UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **CRIMINAL NO.:** 16-10094 _LTS_ |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| ROSS MCLELLAN, | ) | Conspiracy |
| | ) | (18 U.S.C. § 371) |
| Defendant. | ) | |
| | ) | Securities Fraud |
| | ) | (15 U.S.C. §§ 78j(b) & 78ff(a) and |
| | ) | 17 C.F.R. § 240.10b-5) |
| | ) | |
| | ) | Wire Fraud |
| | ) | (18 U.S.C. § 1343) |
| | ) | |
| | ) | Aiding and Abetting |
| | ) | (18 U.S.C. § 2) |
| | ) | |
| | ) | Criminal Forfeiture Allegation |
| | ) | (18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. |
| | ) | § 2461(c)) |

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

### General Allegations

At times relevant to this Superseding Indictment:

### Certain Relevant Persons and Entities

1.     Defendant ROSS MCLELLAN was an individual who resided in Hingham, Massachusetts.  MCLELLAN was employed as an executive vice president and global head of the Portfolio Solutions Group for State Street Corporation (together with its subsidiaries and affiliates, "State Street"), a financial services company headquartered and with its principal place of business in Boston, Massachusetts that was one of the world's largest asset managers and

custody banks.  MCLELLAN was also the president of State Street's U.S. broker-dealer subsidiary, which was registered with the Securities and Exchange Commission ("SEC").  State Street was a global leader in the transition management business, which was part of its Portfolio Solutions Group.

2.      Edward Pennings was an individual who resided in the United Kingdom and was employed by State Street in its London, England office as a senior managing director and head of the Portfolio Solutions Group for Europe, the Middle East, and Africa ("EMEA").  Pennings reported to MCLELLAN.

3.      Richard Boomgaardt was an individual who resided in the United Kingdom and was employed by State Street in its London, England office as a managing director and head of the Transition Management desk for the EMEA region.  Boomgaardt reported to Pennings.

4.      State Street was a depository institution holding company subject to supervision and regulation by the Federal Reserve.  State Street was a "financial institution" as that term is defined in Title 18, United States Code, Section 20.

5.      A U.S. company, referred to herein as the "U.S. Insurance Company," was a leading provider of life insurance and annuity products, with its principal place of business in New York, New York.  The U.S. Insurance Company was a member of the Federal Home Loan Bank of New York, and was a "financial institution" as that term is defined in Title 18, United States Code, Section 20.

<u>General Background on the Transition Management Business</u>

6.      Large institutional investors – such as pension funds and endowments – often have complex investments consisting of relatively illiquid assets, or positions that due to their sheer size are difficult to unwind without negatively affecting their price.  Transition

management is, generally, the business of helping such institutions efficiently move their investments between and among asset managers or liquidate large investment portfolios, with the goal of minimizing the costs associated with such "transitions." As a general matter, transition managers have three principal tasks: (1) to assume responsibility for the performance of investment portfolios during transitions; (2) to communicate with incoming and outgoing asset managers about the composition of their respective portfolios; and (3) to facilitate transitions by executing the necessary trades, with the goal of reducing risk and cost for their clients.

7.      The performance of a transition is typically measured using a metric called the "implementation shortfall," which is comprised of a number of different types of explicit and implicit costs. When seeking transition management assignments from prospective clients, transition managers typically prepare an estimate of the implementation shortfall. That estimate is one critical factor, among others, in the awarding of transition management business. After completing the assignment, transition managers typically provide their clients with a post-trade analysis that provides the actual results and assesses performance during the transition.

8.      At State Street, the relationship between a transition manager and its client, and their respective responsibilities, are typically documented in a contract referred to as a "transition management agreement" ("TMA"). The TMA may govern multiple transitions over the life of a client relationship. Details of specific transition assignments are often set forth in a shorter document referred to as a "Transition Notice" or "Periodic Notice," which contains details of the transition and generally includes the transition manager's agreed-upon compensation. In State Street's case, this compensation was typically either a per-trade charge on securities transactions associated with the transition, referred to variously as a "commission," "markup," "markdown,"

3

or "spread" (collectively, "commissions"), or a flat fee for the entire transition expressed as a specific number or as a percentage on the value of the portfolio to be transitioned.

General Allegations Regarding the Conspiracy
Charged in Count One and the Scheme to Defraud

9.      In or about and between February 2010 and September 2011, the defendant,, ROSS MCLELLAN, agreed with Pennings, Boomgaardt and others known and unknown to the Grand Jury, to engage in a scheme to defraud, and to obtain money and property of at least six of State Street's transition management clients in the EMEA region, by applying hidden commissions to securities trades conducted on behalf of those clients. As part of the conspiracy, MCLELLAN, together with Pennings, Boomgaardt and others known and unknown to the Grand Jury, agreed to mislead clients and others about what State Street was charging for transition management services, by (1) secretly charging commissions on securities trades conducted as part of certain transitions over and above the agreed upon fees for those transitions; (2) actively concealing the hidden commissions from the affected clients and from others within State Street; and (3) taking additional steps to cover up what they had done.

Objects

10.     A principal purpose and object of the conspiracy was to make money for State Street by secretly overcharging at least six transition management clients – including, but not limited to, an Irish Government Pension Fund, a British Government Pension Fund, and a Middle Eastern Sovereign Wealth Fund – through the use of hidden commissions on securities that State Street purchased and sold on their behalf in the course of transitions.

11.     Another purpose and object of the conspiracy was to conceal the hidden commissions from clients, and from others within State Street, including through the use of false and misleading periodic notices, post-trade reports, and other documents.

4

## Manner and Means

12.     The manner and means by which the defendant, ROSS MCLELLAN, together with Pennings, Boomgaardt and others known and unknown to the Grand Jury, accomplished the objects of the conspiracy, included, among other things, the following:

a.     State Street, at the direction of MCLELLAN and Pennings, agreed to manage transitions for six clients pursuant to agreed-upon fees – in several cases, a flat fee, and in at least one case, for no fee.  In accordance with those agreements, written trading instructions for those transitions distributed to State Street's traders via wire communications in interstate and foreign commerce generally reflected that the clients were not to be charged commissions on trades executed on their behalf.

b.     Notwithstanding those agreements, and the written trading instructions, MCLELLAN, Pennings, and Boomgaardt directed employees of State Street to apply commissions to fixed income trades – and, in at least one case, to equities trades – executed on behalf of those clients.

c.     MCLELLAN, Pennings, and Boomgaardt took steps to hide the commissions from their clients, including by directing that the commissions not be broken out in either the implementation shortfall calculation or any other post-trade reports provided to the clients.  In at least one instance, MCLELLAN and Boomgaardt requested that State Street's traders provide them with the reported daily high and low prices of securities State Street had traded in connection with the transition so that MCLELLAN and Boomgaardt could determine the amount of

the commissions to be applied to each security without attracting the client's attention by exceeding the bounds of reported prices.

d.  When one of the affected clients inquired about whether it had, in fact, been charged commissions in breach of its agreement with State Street, MCLELLAN, Pennings, and Boomgaardt sought to cover up their actions.  Among other things, Pennings initially denied that any commissions had been charged, and later – at MCLELLAN's direction – acknowledged only that some commissions had been "inadvertently" charged on securities traded in the United States, but did not disclose that they had, in fact, been intentionally charged, both in the United States and also in Europe.  MCLELLAN, Pennings, and Boomgaardt also sought to mislead State Street's compliance staff into believing that the commissions had been charged in error and that the amount of the overcharges was limited to the commissions applied on U.S. securities.

### Overt Acts Committed in Furtherance of the Conspiracy
### Charged in Count One and as Part of the Conspirators' Scheme to Defraud

13.     On or about various dates in or about and between February 2010 and September 2011, the defendant, ROSS MCLELLAN, together with Pennings and Boomgaardt, took the following overt acts, among others, in furtherance of the conspiracy:

### The Middle Eastern Sovereign Wealth Fund

14.     In or about February 2010, State Street, at the direction of MCLELLAN and Pennings, offered to conduct a large fixed-income transition for the sovereign wealth fund of a Middle Eastern country (the "Middle Eastern Sovereign Wealth Fund") at no charge.  In an email to a representative of the Middle Eastern Sovereign Wealth Fund – which was one of State Street's largest transition management clients – Pennings wrote: "We will price the bonds and t-

6

bills at 'net' – this means that for this transition there will be no commission charged on the fixed income trades. We anticipate being able to charge the other side of the transactions which will enable us to keep commissions for [the Middle Eastern Sovereign Wealth Fund] at zero." Pennings forwarded this email to MCLELLAN.

15.     In a subsequent email to MCLELLAN, Pennings noted that if the transitioned assets "are bonds then we should make our quarter."

16.     In a telephone call on or about March 2, 2010, Pennings and Boomgaardt discussed the plans to charge hidden commissions on the transition, and Pennings instructed Boomgaardt not to talk about those plans "with anyone . . . because it's not going to help our story. Don't even share it with the rest of the team, to be honest." Boomgaardt responded, in substance, that Pennings would have to interact with someone else on the transition management desk over the course of the transition because he would be away during part of the transition. Pennings replied: "Yeah, OK, but they don't need to know what's in the documentation."

17.     In an email to MCLELLAN on or about June 3, 2010, Pennings advised that he would "need you involved on the FI [fixed income] trading desk in [the] US to ensure they do as we want." That same day, Pennings told Boomgaardt that he had spoken with MCLELLAN, who had indicated that he wanted to "get . . . involved in the [Middle Eastern Sovereign Wealth Fund] deal . . . to see how we can make it nice." Pennings relayed that MCLELLAN said to "take less" on one portion of the portfolio and "take a lot more" on another portion of the portfolio, and that MCLELLAN "said you can still take 1 or 2 on the outgoing side. . . . I mean, no one is going to fucking notice that. . . . it's a rounding error, so no one is going to notice that."

18.     In a telephone call among Boomgaardt, in London, and two Boston-based traders on or about June 15, 2010, Boomgaardt instructed the traders that "before you book out the client side, send the executions across and we will have a look and figure out what levels we want to put on the client side." On the same day, MCLELLAN, who was in London at the time, asked one of the traders for "the range [of prices] across the day. . . " adding, "Basically, I want the high."

19.     MCLELLAN and Boomgaardt then calculated commissions for the traders to apply to the trades that would keep the Middle Eastern Sovereign Wealth Fund's client-side prices within the intraday high and low prices for the securities, thereby helping to hide the commissions from the client.

<u>The Irish Government Pension Fund</u>

20.     In or about December 2010, MCLELLAN and Pennings discussed State Street's bid to manage a transition for a large public pension fund based in Dublin, Ireland (the "Irish Government Pension Fund"). In an email to MCLELLAN on or about December 1, 2010, Pennings wrote: "Gotta win this one! Any ideas how to get more revenue would be appreciated. . . . How about a 1 [basis point] management fee or something of that nature, no commissions and then take a spread? My tax dollars are after all paying for their reckless spending." MCLELLAN replied: "agree with a zero commission bid," but added that State Street's traders would "need to trade net," such that commissions would not be disclosed in trading results provided to the client. Pennings responded: "Great minds think alike. We have to charge fee then otherwise they get suspicious . . . "

8

21. State Street ultimately proposed a flat management fee of 1.25 basis points (0.0125%) of the value of the transitioned assets. The proposal specified that there would be no fixed income or equities commissions.

22. In an email to Boomgaardt, Pennings noted: "Just to clarify – 1.25 bps is management fee. The extra quarter point makes it look like we actually thought about it and did the calculations . . . . "

23. After the Irish Government Pension Fund awarded State Street only part of the transition, State Street negotiated for, and the Irish Government Pension Fund agreed to, a slightly higher flat fee of 1.65 basis points (0.0165%) of the value of the assets, plus certain specified costs for futures and foreign exchange transactions.

24. In a subsequent telephone call, Pennings told Boomgaardt that "we just need to be very, very creative, which we will," and added: "Make sure it . . . doesn't say anything about not taking any spreads, because we're going to have to in the U.S." Pennings instructed Boomgaardt not to inform the transition manager assigned to the deal about the hidden commissions.

25. In an email to MCLELLAN, Pennings reported that the deal with the Irish Government Pension Fund was for "1.65 bps. Need to be very creative." MCLELLAN responded: "We will."

26. On or about March 23, 2011, Boomgaardt reviewed a draft of the post-trade report for the first tranche of the Irish Government Pension Fund transition, and instructed the transition manager to alter the definition of "Commissions" in the report because, according to Boomgaardt, "We are charging a flat fee." On or about March 29, 2011, State Street sent the Irish Government Pension Fund the post-trade report with the term "Commissions" removed from the definitions page.

9

27.     On or about April 5, 2011, prior to the second tranche of the Irish Government Pension Fund transition, Pennings emailed MCLELLAN that the fund "just informed us they did not want to use futures on the trade scheduled for later this week," for which the fund had agreed to pay State Street an additional fee.  Pennings added:  "I think this will increase the 'spread.'"

28.     Because the Irish Government Pension Fund transition involved a significant amount of equities – for which commissions were ordinarily broken out and reported automatically by State Street's trading systems – MCLELLAN, Pennings, and others known and unknown to the Grand Jury devised a plan to conduct the trades in a special trading account ordinarily used to guarantee customers a specific price – the volume weighted average price ("VWAP") – of trades executed over the course of a day.  Using the VWAP account, State Street was able to include a commission of 2 cents per share on each of the U.S. equities trades it executed for the Irish Government Pension Fund, without the commission being broken out on reports sent to the client.

The British Government Pension Fund

29.     In or about February 2011, State Street received a request for proposal ("RFP") from a pension fund based in London, England that managed the retirement assets of certain employees of the British government (the "British Government Pension Fund").  The RFP concerned a fixed-income transition involving more than £3.2 billion in assets.  Pennings forwarded the RFP to MCLELLAN with the note:  "Confidential but check this baby out . . . gotta win that one!"  MCLELLAN replied:  "Thin to win."

30.     In its response to the RFP, State Street proposed a flat fee of 1.75 basis points (0.0175%) of the value of the assets and promised to "provide full disclosure" of "all costs incurred in the transition and any additional revenue sources . . . resulting from the transition."

In a table breaking down costs associated with the transition, State Street indicated that no commissions would be applied.  State Street further pledged "to put our client's interest ahead of our own."

31.     On February 21, 2011, after the British Government Pension Fund cut the size of the transition to approximately £1.3 billion, Pennings confirmed in an email to an executive of the fund that "even though the value is significantly less, we can do this project for a management fee of 1.75 [basis points] of the portfolio value of £1.3 bln or £227,500."  Pennings forwarded this email to MCLELLAN with the note:  "Who's the daddy . . . Happy president's day!"  MCLELLAN responded:  "Nice work."  Pennings then replied:  "I'm thinking 1.5-2 [basis points] . . . "

32.     In a subsequent email to the British Government Pension Fund, Pennings again confirmed that "[t]he fee includes all trading required," adding:  "Pls don't make me go this low every time though!"

33.     On or about March 21, 2011, the instructions sent to traders handling the transition for the British Government Pension Fund provided, in bold-faced lettering, "ZERO COMMS."  That same day, in a telephone call with Boomgaardt, Pennings said he had just had a call with MCLELLAN in which MCLELLAN "said 'how much do you want to take?' and I said, 'whatever, let's see how we go.'"

34.     Thereafter, at the direction of MCLELLAN, Pennings, and Boomgaardt, State Street secretly applied commissions of one basis point (0.01%) to all U.S. trades, and 2 basis points (0.02%) to all European trades it conducted on behalf of the British Government Pension Fund, in addition to the agreed-upon flat fee.  For example, on or about March 22, 2011, MCLELLAN instructed a U.S. fixed income trader to "take a basis point of yield" on trades for

the British Government Pension Fund, notwithstanding that the written trading instructions issued by the transition manager said to charge zero commissions. Later that same day, MCLELLAN instructed the trader to delete any reference to commissions on the file of trading results he sent to the transition manager.

35.     On or about March 23, 2011, MCLELLAN instructed the U.S. fixed income trader to "stay with a basis point of yield" and confirmed that the trader should once again "zero out" the commissions when sending over the trading file to the transition manager.

36.     After the British Government Pension Fund independently learned that commissions had been charged on certain U.S. trades, MCLELLAN, Pennings, and Boomgaardt took steps to prevent the British Government Pension Fund, and State Street's internal compliance staff, from learning the truth, by falsely telling them that the commissions had been charged by mistake and were limited to the U.S. For example, in response to a June 21, 2011 email from an executive of the British Government Pension Fund requesting confirmation that "£242,305 (equal to 1.75 [basis points] on the [assets under management] . . . is the sole revenue for [State Street] and/or any of its affiliates on this event," Pennings responded: "Yes – £242,305 (It should equal 1.75 [basis points] of the total assets)."

37.     When the fund executive informed Pennings that auditors reviewing publicly available data had discovered what appeared to be a one basis point commission on all U.S. trades, Pennings responded: "That doesn't seem right so let me investigate with the US desk and get back to you."

38.     On or about June 22, 2011, MCLELLAN directed Pennings to advise the British Government Pension Fund that State Street had applied "inadvertent commissions" to U.S. trades, but not to disclose that commissions had also been applied to European trades, for which

12

market trading results were not publicly available. At MCLELLAN's direction, State Street refunded the British Government Pension Fund the approximately $1 million in commissions it had secretly charged on U.S. trades – but not the approximately $2 million State Street had, unbeknownst to the fund, charged on European trades.

39.     MCLELLAN and Pennings later advised State Street's compliance staff that State Street had erroneously charged the British Government Pension Fund a commission on U.S. trades – but not that State Street had charged the commission intentionally, or that it had also charged a commission on European trades.

The Scheme to Defraud the U.S. Insurance Company

40.     In addition to engaging in the foregoing scheme to defraud transition management clients in the EMEA region, MCLELLAN, together with others known and unknown to the Grand Jury, engaged in a scheme in or about and between February 2011 and March 2011 to defraud a New York-based U.S. Insurance Company by applying hidden commissions to fixed income trades conducted in connection with transition management services for funds advised by the U.S. Insurance Company.

41.     As part of the scheme, on or about February 24, 2011, MCLELLAN, together with others known and unknown to the Grand Jury, offered the U.S. Insurance Company to manage the transition for a fee of approximately $592,000, calculated as 0.1 basis points of the yield of the securities traded. As part of the proposal, State Street promised that "[c]onsistent with our market leading Fiduciary-Agency business model, our commissions are fully disclosed to our clients around any transition events undertaken. State Street's commission revenues are made up of fully disclosed Equity commissions, Fixed Income commissions and Futures Contract commissions."

13

42.     On or about March 1, 2011, the U.S. Insurance Company accepted State Street's offer.

43.     In a conference call the following day, MCLELLAN instructed two Boston-based traders to "trade the corporates just flat, so just book those out straight net to the client . . . and then the rest of the bulk of the trade is mortgages and treasuries, and right there for the first three days what we'll do is we'll take three-quarters of a basis point of yield, and then obviously we'll see how performance is going from there and see if we need to adjust or what not.  That should make us a fair bit of compensation there."

44.     On or about March 8, 2011, one day after trading on the transition began, MCLELLAN instructed a fixed-income trader to charge 0.5 basis points of yield "on everything, but the corporates do zero."

45.     As a result of MCLELLAN's actions, State Street secretly overcharged the U.S. Insurance Company and the funds it advised by approximately $700,000.

14

## COUNT ONE
### (Conspiracy to Commit Offenses Against the United States)

46.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 45 of this Superseding Indictment and further charges that:

47.     In or about and between February 2010 and September 2011, in the District of Massachusetts and elsewhere, the defendant,

### ROSS MCLELLAN,

together with Pennings, Boomgaardt and others known and unknown to the Grand Jury, conspired to commit offenses against the United States, to wit:

a.     securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, to wit: knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly to use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities; and

b.   wire fraud, in violation of Title 18, United States Code, Section 1343, to wit:

having devised and intending to devise a scheme and artifice to defraud and to

obtain money and property by means of materially false and fraudulent

pretenses, representations and promises, to transmit and cause to be transmitted

by means of wire communications in interstate and foreign commerce, writings,

signs, signals, pictures and sounds for the purpose of executing the scheme to

defraud.

48.   The objectives, manner and means, and overt acts taken in furtherance of the

conspiracy charged herein are set forth in paragraphs 9 through 39.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT TWO</u>
(Securities Fraud)

49.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 45 of this Superseding Indictment and further charges that:

50.     In or about and between December 2010 and September 2011, in the District of Massachusetts and elsewhere, the defendant,

ROSS MCLELLAN,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, to wit: fixed income and equity securities traded on behalf of the Irish Government Pension Fund as part of a transition managed by State Street in multiple tranches in or about and between February 2011 and May 2011.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNT THREE
### (Securities Fraud)

51.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 45 of this Superseding Indictment and further charges that:

52.     In or about and between February 2011 and September 2011, in the District of Massachusetts and elsewhere, the defendant,

### ROSS MCLELLAN,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities, to wit: fixed income securities traded on behalf of the British Government Pension Fund as part of a transition managed by State Street in or about March 2011.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

## COUNTS FOUR AND FIVE
### (Wire Fraud)

53.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 45 of this Superseding Indictment and further charges that:

54.     On or about and the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

### ROSS MCLELLAN,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Wire |
|---|---|---|
| 4 | 4/5/2011 | Email from Pennings to MCLELLAN noting plans to "increase the spread" secretly charged on trades conducted for the Irish Government Pension Fund |
| 5 | 6/22/2011 | Email from MCLELLAN to Pennings directing Pennings to inform the British Government Pension Fund that "inadvertent commissions" had been applied to trades in the United States |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX
### (Wire Fraud Affecting a Financial Institution)

56.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 45 of this Superseding Indictment and further charges that:

57.     On or about February 24, 2011, in the District of Massachusetts and elsewhere, the defendant,

### ROSS MCLELLAN,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme affected a financial institution, to wit, both State Street Corporation and the U.S. Insurance Company, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing the scheme to defraud, to wit:  an email, sent from Boston, Massachusetts to New York, New York, attaching a proposal to the U.S. Insurance Company to manage a fixed-income transition for a fee of approximately $592,000.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## CRIMINAL FORFEITURE ALLEGATION
### (18 .S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c))

58.     Upon conviction of one or more of the offenses charged in Counts One through Six of this Superseding Indictment, the defendant,

### ROSS MCLELLAN,

shall forfeit to the United States, jointly and severally, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

59.     If any of the property described in paragraph 58 above, as a result of any act or omission by the defendant,

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty,

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the property described in paragraph 57 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

21

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
WILLIAM E. JOHNSTON
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION

_____
STEPHEN E. FRANK
ASSISTANT U.S. ATTORNEY
DISTRICT OF MASSACHUSETTS

_____
DEPUTY CLERK
District of Massachusetts
HAROLD G. PUTNAM
2/7/18 @ 11:45 am