# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No. 16-cr-10094-LTS |
| | ) | |
| ROSS MCLELLAN | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## STATE STREET BANK AND TRUST COMPANY'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
## TO QUASH RULE 17(c) SUBPOENAS SERVED BY ROSS MCLELLAN

John J. Butts (BBO No. 643201)
Harry Weiss (BBO No. 521180)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ......................................................................................................... 1

    I.     Transition Management And The Misconduct ...................................... 1

    II.    The U.K. and U.S. Investigations .......................................................... 2

    III.   McLellan's Subpoenas ............................................................................. 4

ARGUMENT ............................................................................................................... 5

    I.     The Subpoenas Should Be Quashed Because They Seek Privileged
        Documents. ................................................................................................ 5

        A.    English Law Governs This Issue And Does Not Provide For
              Subject Matter Waivers .................................................................. 6

        B.    Under U.S. Law, Extrajudicial Disclosures Like These Do Not
              Give Rise To A Subject Matter Waiver. ...................................... 11

        C.    The Expansive Waivers McLellan Seeks Are Not Permitted ................... 15

        D.    McLellan Has No Constitutional Right to State Street's Privileged
              Documents ......................................................................................... 17

    II.    The Subpoenas Should Be Quashed Because McLellan Has Not Satisfied
        The Supreme Court's Requirements For The Issuance Of A Rule 17(c)
        Subpoena. ................................................................................................... 19

        A.    Rule 17(c)'s Stringent Requirements ............................................... 19

        B.    McLellan Has Not Cleared The Relevance Hurdle .................................. 22

        C.    McLellan Has Not Cleared The Admissibility Hurdle ............................ 23

CONCLUSION ............................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Agility Public Warehousing Co. K.S.C. v. Dep't of Defense*,
   110 F. Supp. 3d 215, 226-7 (D.D.C. 2015)................................................................15

*United States v. Al-Amin*,
   2013 WL 3865079 (E.D. Tenn. July 25, 2013) ........................................................21

*Anwar v. Fairfield Greenwich Ltd.*,
   306 F.R.D. 117 (S.D.N.Y. 2013) ..........................................................................7, 9

*United States v. Arditti*,
   955 F.2d 331 (5th Cir. 1992) ..................................................................................22

*AstraZeneca LP v. Breath Ltd.*,
   2011 WL 1421800 (D.N.J. Mar. 31, 2011)................................................................7

*S.E.C. v. Beacon Hill Asset Mgmt. LLC*,
   231 F.R.D. 134 (S.D.N.Y. 2004) ............................................................................14

*United States v. Boyle*,
   2009 WL 484436 (S.D.N.Y. Feb. 24, 2009)............................................................21

*United States v. Cherry,*
   876. F. Supp. 547 (S.D.N.Y. 1995) ........................................................................19

*United States v. Cincotta*,
   689 F.2d 238 (1st Cir. 1982)....................................................................................13

*United States v. Concemi*,
   957 F.2d 942 (1st Cir. 1992)................................................................................21, 22

*United States v. Cuthbertson*,
   651 F.2d 189 (3d Cir. 1981)....................................................................................19

*United States v. Decologero*,
   2006 WL 83471 (D. Mass. Jan. 13, 2006) ..............................................................23

*Evergreen Trading, LLC ex rel. Nussdorf*,
   80 Fed. Cl. 122 (Fed. Cl. 2007) ..............................................................................12

*United States v. Gikas*,
   112 F.R.D 198 (D. Mass 1986)............................................................................20, 22

*United States v. Godfrey*,
   2013 WL 5780439 (D. Mass. Oct. 18, 2013).......................................................................21

*In re Grand Jury Investigation*,
   399 F.3d 527 (2d Cir. 2005).........................................................................................18

*In re Grand Jury, John Doe No. G.J.*
   *2005-2*, 478 F.3d 581 (4th Cir. 2007) ........................................................................5

*In re Grand Jury Proceedings*,
   219 F.3d 175 (2d Cir. 2000).........................................................................................14

*United States v. Hang*,
   75 F.3d 1275 (8th Cir. 1996) .......................................................................................20

*Hawk Mt. LLC v. Mirra*,
   2016 WL 690883 (D. Del. Feb. 19, 2016) ...................................................................15

*Hernandez v. Tanninen*,
   604 F.3d 1095 (9th Cir. 2010) .....................................................................................17

*United States v. Hoeffner*,
   254 F.R.D. 302 (S.D. Tex. 2008)..................................................................................6

*In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.)*,
   348 F.3d 16 (1st Cir. 2003) ................................................................................. *passim*

*United States v. Khan*,
   2009 WL 152582 (E.D.N.Y. Jan. 20, 2009) ................................................................21

*United States v. King*,
   164 F.R.D. 542 (D. Kansas 1996)................................................................................20

*United States v. LaRouche Campaign*,
   841 F.2d 1176 (1st Cir. 1988) .............................................................................. *passim*

*Mergentime Corp. v. Washington Metro. Area Transp. Auth.*,
   761 F. Supp. 1 (D.D.C. 1991) ......................................................................................17

*United States v. Misquitta*,
   2011 WL 1337098 (W.D. Pa. Apr. 7, 2011)..................................................................6

*United States v. Mix*,
   2012 WL 2420016 (E.D. La. June 26, 2012)...............................................................19

*United States v. Nixon*,
   418 U.S. 683 (1974)........................................................................................... *passim*

*United States v. Noriega*,
   764 F. Supp. 1480 (S.D. Fla. 1991) ........................................................22

*FDIC v. Ogden Corp.*,
   202 F.3d 454 (1st Cir. 2000) ...........................................................6, 12

*In re Polymedica Corp. Sec. Litig.*,
   235 F.R.D. 28 (D. Mass. 2006) .............................................................14

*United States v. Potter*,
   463 F.3d 9 (1st Cir. 2006) ....................................................................13

*S.E.C. v. Present*,
   2015 WL 9294164 (D. Mass. Dec. 21, 2015) ........................................18

*Saint-Gobain/Norton Indus. Ceramics Corp. v. General Electric Co.*,
   884 F. Supp. 31 (D. Mass. 1995) .........................................................15

*United States. v. Serrano*,
   406 F.3d 1208 (10th Cir. 2005) ...........................................................17

*United States v. Shindeman*,
   232 F.R.D. 147 (D. Me. 2005) .............................................................20

*United States v. Skeddle*,
   178 F.R.D. 167 (N.D. Ohio 1996) ........................................................20

*United States v. Skeddle*,
   989 F. Supp. 905 (N.D. Ohio 1997) .....................................................16

*United States v. Skilling*,
   2006 WL 1006622 (S.D. Tex. Apr. 13, 2006) .......................................23

*Swidler & Berlin v. United States*,
   524 U.S. 399 (1998) ......................................................................17, 18

*Swift Spindrift, Ltd. v. Alvada Ins., Inc.*,
   2013 WL 3815970 (S.D.N.Y. July 24, 2013) .................................. 15-16

*Taylor v. Illinois*,
   484 U.S. 400 (1988) .............................................................................17

*United States v. Treacy*,
   2009 WL 812033 (S.D.N.Y. Mar. 24, 2009) .........................................14

*United States v. Tucker*,
   249 F.R.D. 58 (S.D.N.Y. 2008) ..................................................... 20-21

*In re Tyco Int'l Multidistrict Litig.*,
    2007 WL 710188 (D.N.H. Mar. 7, 2007) ............................................................14

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) .........................................................................................12

*Vicor Corp. v. Vigilant Ins. Co.*,
    674 F.3d 1 (1st Cir. 2012) ..................................................................................6

*VLT Corp. v. Unitrode Corp.*,
    194 F.R.D. 8 (D. Mass. 2000) ..........................................................................6, 9

*United States v. W.R. Grace*,
    439 F. Supp.2d 1125 (D. Mont. 2006) ...............................................................18

*United States v. Weisberg*,
    2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ......................................................19

*United States v. Wells Fargo Bank, N.A.*,
    132 F. Supp. 3d 558 (S.D.N.Y. 2015) ...............................................................18

*United States v. Wittig*,
    250 F.R.D. 548 (D. Kan. 2008) ........................................................................22

**U.K. Cases**

*B. v. Auckland District Law Society*
    [2003] UKPC 38 ...............................................................................................9

*Berezovsky v. Hine*
    [2011] EWCA Civ 1089 ....................................................................................9

*British Coal Corporation v. Dennis Rye Ltd (No.2)*
    [1988] 1 W.L.R. 1113 ......................................................................................10

*Gotha City v Sotheby's*,
    [1998] 1 WLR 114 ............................................................................................10

*Great Atlantic Insurance Co. v. Home Insurance Co.*
    [1981] 1 WLR 529 ............................................................................................10

*Nea Katerina Maritime Co. Ltd v. Atlantic & Great Lakes Steamship Corp. (No.
    2)*, [1981] Com LR 138 ...................................................................................10

*Property Alliance Group Limited v. The Royal Bank of Scotland plc*
    [2015] EWHC 1557 (Ch) ..................................................................................10

*Ramac Holdings Limited v. Brachers*
    [2002] EWHC (Ch. 1683) ................................................................................11

*Re the RBS Rights Issue Litigation*
    [2016] EWHC 3161 (Ch) ......................................................................................7

**Rules**

Fed. R. Crim. P. 17(c) ............................................................................... *passim*

Fed. R. Evid. 502(a) ...........................................................................................15

**U.K. Statutes**

Financial Services and Markets Act of 2000 .....................................................9

**Other Authorities**

Bankim Thanki, *The Law of Privilege* (2d ed. 2011) .....................................10

Charles Alan Wright, Nancy J. King, Susan R. Klein, and Andrew D. Leipold, 2
    *Federal Practice & Procedure* (4th ed. 2017) .........................................5

## PRELIMINARY STATEMENT

State Street Bank and Trust Company ("State Street"), a non-party to this action, respectfully submits this motion to quash four Rule 17(c) subpoenas that Defendant Ross McLellan served on State Street on May 17, 2017 (attached as Exhibits A-D).  The subpoenas should be quashed for two reasons.  First, they seek the production of a voluminous number of privileged documents based on the unsupported assertion that State Street waived privilege through the production of certain reports and witness interview memoranda in the United Kingdom.  Under English law, which controls these issues, the lion's share of the documents at issue were not privileged.  And even if those documents contained some privileged information, English law does not provide for subject matter waiver.  The rare exceptions under English law do not apply here.  McLellan's arguments would also fail under U.S. law as the First Circuit has held that extrajudicial disclosures of privileged information do not waive privileges over other documents.

McLellan's subpoenas should also be quashed for the independent reason that they are precisely the type of "discovery" requests the Supreme Court has held are not permitted under Federal Rule of Criminal Procedure 17(c).  *See United States v. Nixon*, 418 U.S. 683, 698 (1974).  To guard against such misuses of Rule 17(c), the Supreme Court has required the proponent of a subpoena to make a factual showing that the documents he seeks are relevant, admissible, and specifically identified.  *Id.* at 700.  McLellan has failed to satisfy that test.

## BACKGROUND

### I.      Transition Management And The Misconduct

State Street's transition management business provides a service to institutional investors, *e.g.*, pension funds, that need to make significant changes to their portfolios when moving assets from one manager to another or when changing strategy.  Those portfolios are often worth

billions of dollars and may include more than one thousand positions in fixed income and equity securities. It is not easy to change the composition of an institutional portfolio because selling or buying large blocks of securities too quickly can cause adverse price changes that will reduce the portfolio's value. State Street's transition management business employs strategies to execute transitions efficiently and prudently with the aim of avoiding, to the extent possible, transition-related losses in value. In so doing, State Street acts in an "agency" capacity, which means that when acting as a transition manager, State Street trades for its client and not for itself.

State Street's transition management business is part of its Portfolio Solutions Group, of which Defendant Ross McLellan was formerly the global head. Defendant Edward Pennings formerly oversaw the Portfolio Solutions Group for the Europe, Middle East, and Africa ("EMEA") region, which operated from State Street's offices in London. In 2010 and 2011, Pennings, with McLellan's knowledge and cooperation, misled six EMEA transition management clients by telling them they would be charged a certain amount on the transition and then adding in undisclosed commissions that were not permitted under the client contracts and were inconsistent with Pennings's representations to the affected clients.

When one of the affected clients, the ▮▮▮▮▮▮ identified and questioned markups on some of its fixed income trades, Pennings and McLellan lied to the client and said that the commissions were applied "*inadvertent[ly].*" (SS1_01169455) When the client pressed further, Pennings and McLellan misled to State Street's compliance staff by telling them that the "commission was charged . . . *in error.*" (SS1_00618962) Pennings and McLellan knew all along that the commissions were intentionally charged—they made the decision to charge them.

## II.    The U.K. and U.S. Investigations

McLellan and Penning's misconduct began to come to the surface at the very end of August 2011. Very soon thereafter, State Street initiated an investigation in the U.K. In

September 2011, it retained lawyers from Freshfields Bruckhaus Deriger LLP ("Freshfields") in London.  Soon thereafter, State Street dismissed McLellan and Pennings and engaged an accounting firm to quantify the overcharges and repay the effected clients.  State Street also self-reported the overcharging to the U.K.'s Financial Conduct Authority (the "FCA"), which is the principal regulator for financial markets in the U.K.

The FCA initiated an investigation of State Street's U.K. business.  As part of that investigation, the FCA directed State Street to retain, pursuant to Section 166 of the U.K.'s Financial Services and Markets Act of 2000, a "skilled person" to conduct an independent investigation and report its findings to the FCA.  Deloitte LLP was retained as the skilled person.  Deloitte thereafter conducted an extensive investigation that included a number of employee interviews.  In August 2012, it submitted a comprehensive report to the FCA, which was nearly 1,000 pages long.

Over the course of the FCA's investigation, State Street's U.K. affiliates provided the FCA with a significant number of documents.  Some of those documents included (i) short reports Freshfields prepared for the FCA that explained the facts of the transitions with overcharges, and (ii) memoranda summarizing Freshfields's interviews of State Street employees.  Deloitte separately conducted interviews of State Street's employees, and provided summaries of those interviews to the FCA, and later to State Street.

On January 30, 2014, the FCA brought an action against State Street and, with State Street's consent, imposed a $37.5 million administrative penalty on two entities in the U.K., State Street Bank Europe Limited ("SSBEL") and State Street Global Markets International Limited ("SSGMIL").

The U.S. investigations began in 2013.  The SEC sent its initial subpoena to State Street Corporation, the U.S. parent that is headquartered in Boston, in May 2013.  The U.S. Attorneys' Office ("USAO") sent State Street Corporation a subpoena in November 2013.  On January 18, 2017, State Street Corporation entered into a deferred prosecution agreement with the USAO and Department of Justice that included, among other things, a $32.3 million penalty and the appointment of an independent monitor.

Over the course of these investigations, State Street has produced over 1.3 million pages of documents and thirteen thousand audio files.  The government has provided those materials to Pennings and McLellan, including the Deloitte and Freshfields materials that were provided to the FCA.

### III.    McLellan's Subpoenas

On Wednesday May 17, 2017, McLellan served State Street with four subpoenas pursuant to Fed. R. Crim. P. 17(c).  Each sought documents (for the most part audio recordings and emails) that State Street had listed on a privilege log in other matters, either the USAO/DOJ and SEC investigations of State Street or the SEC's related civil action against McLellan.

McLellan's motions for leave to issue those subpoenas were filed under seal without notice to State Street.[1]  The first was filed on February 24, 2017, and sought a subpoena for 94 recordings of privileged phone calls that, with some exceptions, included Rick Boomgaardt, who McLellan characterizes as a key government witness.  (McLellan's brief in support of that motion is hereafter cited as "McLellan Feb. 24 Br.")  McLellan's motion separated those calls

---

[1]    On May 16, the Court modified the seal to give State Street access to McLellan's motions.  *See* Dkt. 145.

into three categories, and argued that State Street had waived privileges over those calls by its production of the Deloitte and Freshfields reports and interview memoranda. [2]

McLellan subsequently filed motions to issue three more subpoenas, which seek an additional 700 documents and emails that State Street previously logged as privileged. McLellan's motions split those documents into numerous categories.[3]  His argument as to why he was entitled to issue those subpoenas was less than two pages long, and incorporated his February 24 brief by reference.

On April 19, Magistrate Judge Bowler allowed each motion, but "subject to the ability of State Street Bank and Trust Company to raise arguments in a Rule 17(c) motion."  The Magistrate Judge also "express[ed] no opinion on the existence or non-existence" of a privilege applicable to the requested documents or "as to whether the subpoenaed material satisfies the relevancy, admissibility, and specificity hurdles" that the Supreme Court established in *Nixon*, 418 U.S. at 700.  (Attached as Exhibit E)

## ARGUMENT

### I.    The Subpoenas Should Be Quashed Because They Seek Privileged Documents.

A Rule 17(c) subpoena "should be quashed or modified if it calls for privileged matter." Charles Alan Wright, Nancy J. King, Susan R. Klein, and Andrew D. Leipold, 2 *Federal Practice & Procedure*, § 276 (4th ed. 2017) (citation omitted); *see In re Grand Jury, John Doe*

---

[2]    The categories were:  (1) Project Flag, which McLellan uses to refer to State Street's "internal investigation of EMEA's transition management practices, which . . . lasted to December 2011 (McLellan Feb. 24 Br. at 4); (2) a call relating to ▇▇ Transition No. 121; and (3) ▇▇ Transition No. 115, ▇▇▇▇, and ▇▇▇▇▇.

[3]    The categories in the motion McLellan filed on March 7 were:  (1) emails and documents related to Project Flag; (2) emails and documents related to ▇▇▇▇; (3) emails and documents related to ▇▇; (4) emails and documents related to the Herbert Smith law firm; (5) emails and documents related to Pennings's termination; and (6) emails and documents relating to ▇▇▇, and another transition referenced but not named in the indictment.  On April 24, he filed two more motions.  The first parses the documents into ten categories:  (1) transition management review; (2) client fees, remuneration and revenue accrual; (3) client communications; (4) media and press communications; (5) consultant communications/Pricewaterhouse Coopers ("PwC") engagement; (6) communications with Inalytics; (7) transition management and business controls; (8) regulatory investigation; (9) Boomgaardt and employee discipline/termination; and (10) non-disclosure agreements.  The second motion seeks two audio recordings of calls between McLellan and Boomgaardt.

*No. G.J. 2005-2*, 478 F.3d 581, 585 (4th Cir. 2007) ("a subpoena may be unreasonable or oppressive under Rule 17(c)" where it calls for documents subject to "a constitutional, statutory, or common-law privilege").[4]  McLellan does not dispute that the documents he requests are privileged, and he bears the burden of demonstrating a waiver.  *See FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000) (the party seeking to establish an exception to a privilege has "the devoir of persuasion"); *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 17 (1st Cir. 2012) (same). As explained below, McLellan has not carried (and cannot carry) that burden.

> ### A.    English Law Governs This Issue And Does Not Provide For Subject Matter Waivers.

According to McLellan, State Street waived privilege as to a variety of topics by producing other documents to the government.  The only documents McLellan reasonably identifies as giving rise to a waiver are the Deloitte and Freshfields reports and interview memoranda.  *See* Feb. 24 Br. at 9.  That argument suffers from a number of misunderstandings, including McLellan's incorrect invocation of U.S. law.

To begin with, McLellan incorrectly asserts that all of those documents are privileged. As noted, Deloitte was retained to conduct an independent investigation and issue a report to the FCA.  (Engagement Letter, SS1_00000377) (attached as Exhibit F).  Deloitte's report and interviews memoranda were not privileged.

Similarly, although Freshfields was State Street's counsel, the Freshfields documents at issue were not privileged.  Like other legal issues, privilege law is subject to a choice of law analysis.  Foreign privilege law applies to documents in which a foreign sovereign has "the most direct and compelling interest" in the circumstances in which the communication was made.

---

[4]     *See also United States v. Misquitta*, 2011 WL 1337098, at *2 (W.D. Pa. Apr. 7, 2011) ("privileged material would not ordinarily be subject to subpoena" in analyzing Rule 17(c)); *United States v. Hoeffner*, 254 F.R.D. 302, 308 (S.D. Tex. 2008) (quashing subpoena as "unreasonable and oppressive" because compliance "would waive the attorney-client privilege").

*VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8, 16 (D. Mass. 2000); *AstraZeneca LP v. Breath Ltd.*, 2011 WL 1421800, at *4-5 (D.N.J. Mar. 31, 2011) (applying the *VLT* test).  Under that standard, English law controls the Freshfields reports, which were created for, and provided to, the FCA long before any U.S. investigation began.  *See Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 117, 119 (S.D.N.Y. 2013) ("American law typically applies to communications concerning legal proceedings in the United States or advice regarding American law, while communications relating to foreign legal proceedings or foreign law are generally governed by foreign privilege law.") (internal quotations omitted).

English law also controls Freshfields's interview memoranda, which were provided to the FCA long before the U.S. investigations.  The U.K. had a more direct and compelling interest in those memoranda than the U.S. because, among other reasons, Freshfields was retained by SSBEL, a U.K. company, in September 2011 to conduct an investigation of State Street's transition management business in the U.K., the investigation, among other things, enabled State Street to report the overcharging to the FCA, and the FCA rapidly commenced an investigation. The U.S. investigations did not begin until mid- to late- 2013.[5]

Under English law, the Freshfields interview memoranda and reports prepared for the FCA were not privileged.  The interview memoranda record factual information, and are not privileged under English law.  *See Re the RBS Rights Issue Litigation* [2016] EWHC 3161 (Ch), at ¶ 91-93 (attached as Exhibit G) (interview memoranda were not privileged where they "comprise information gathering from employees or former employees preparatory to and for the purpose of enabling [a company], through its directors or other person authorized to do so on its behalf, to seek and receive legal advice").  In essence, English law views the individuals who

---

[5]    As mentioned previously, the SEC issued a subpoena in May 2013, and the DOJ did so in November 2013.

were interviewed as "providers of information as employees and not clients" as would be necessary to bring the communications within a privilege.  *Id*. at ¶ 93.  The reports provided to the FCA were also factual summaries that were open, non-privileged documents under English law.

The only other documents McLellan has identified as giving rise to a possible waiver are Deloitte's summaries of interviews with two State Street lawyers, David Phelan and Bryan Woodard.  *See* McLellan Feb. 24 Br., Exhibits 2 & 3.  Those summaries discuss a range of topics, such as the general structure of State Street's legal team in the U.K., general processes for contract review and execution, and also Phelan's and Woodard's initial review of whether others were aware of the overcharging and some employment actions.  *Id.*

Even if some of that information was privileged (which State Street does not concede), it would not provide a basis for a subject matter waiver.  Once again, this is an issue that is governed by English law because they were created for use in connection with a U.K. investigation.  Also, to the extent State Street produced of those documents, it did so in the U.K. In cooperation with a request from the SEC, the FCA sent a notice of requirement (which is a compulsory order) to SSBEL and SSGMIL (two U.K. companies) on April 17, 2014.  State Street produced the Freshfields materials and the Deloitte interview summaries to the FCA, which subsequently made those documents available to the SEC and/or the DOJ pursuant to mutual assistance agreements.[6]  State Street did not provide a copy of the Deloitte Report.  We believe the FCA had previously provided a copy of what it received from Deloitte to the U.S. regulators.

---

[6]     One of Freshfields's reports (SS1_01328796), which was not privileged, had previously been produced directly to the SEC in response to a subpoena in an unrelated matter.

Because these documents were produced to the FCA by State Street entities in the U.K. pursuant to the FCA's compulsory order, the U.K. had "the most direct and compelling interest" and English law should therefore govern any collateral effects of the production.  *See VLT Corp.,* 194 F.R.D at 16 (controlling law is that of the country with "the most direct and compelling interest" in the communication); *Anwar*, 306 F.R.D. at 119 ("[C]ommunications relating to foreign legal proceedings or foreign law are generally governed by foreign privilege law.").[7]

Even if some of the documents at issue revealed bits of privileged information, McLellan's arguments for a subject matter waiver fail.  First, the FCA, as the party to whom the documents were produced, did not have the ability to use the production to demand other documents protected by a privilege.  Section 413 of the U.K.'s Financial Services and Markets Act prohibits the FCA from demanding a "protected item," which is statutorily defined to include materials that broadly equate with materials that are privileged under English law.  (A copy of this section is attached as Exhibit H.)  If a person discloses a "protected item" to the FCA, there is nothing in the statute that enables the FCA to demand any other "protected item."

Also, under English law, the provision of privileged documents confidentially to regulators for limited purposes does not create a general waiver of privilege even as to the specific documents provided.  *See Berezovsky v. Hine* [2011] EWCA Civ 1089 ¶ 28 ("[I]t does not follow that privilege is waived generally because a privileged document has been disclosed for a limited purpose only . . .") (quoting *B. v. Auckland District Law Society* [2003] UKPC 38) (attached as Exhibit I.  English law recognizes only a "limited waiver" of privilege as to particular documents provided to a third party on a confidential basis, which would only waive privilege (i) in the specific documents, (ii) to be used by the party to whom the documents were

---

[7]      State Street initially reviewed the documents McLellan requests under U.S. privilege law.  It has reviewed the documents it withheld under the *VLT* test and will be making a supplemental production to the government, which we understand will be made available to McLellan.

provided, and (iii) only in connection with the specific purpose for which the documents were provided.  *See Gotha City v Sotheby's,* [1998] 1 WLR 114, at 119 ("If A shows a privileged document to his six best friends, he will not be able to assert privilege if one of those friends sues him because the document is not confidential as between him and the friend.  But the fact six other people have seen it does not prevent him claiming privilege as against the rest of the world.") (attached as Exhibit J).[8]  Since production to the FCA did not cause a waiver to other parties, including McLellan, *a fortiori* that production could not be a basis for McLellan to assert a subject matter waiver over other documents.

Finally, while English law does recognize a concept of "collateral waiver," in which the waiver of privilege as to one document can (in certain circumstances) cause a waiver as to another document, that doctrine is applied in a restrictive way that is not applicable here.  Under English law, when "'a party is deploying in court material which would otherwise be privileged, the opposite party and the court must have an opportunity of satisfying themselves that what the party has chosen to release from privilege'" is not presented in an incomplete way.  Bankim Thanki, *The Law of Privilege* (2d ed. 2011) at 284 ¶ 5.124 (quoting *Nea Katerina Maritime Co. Ltd v. Atlantic & Great Lakes Steamship Corp. (No. 2)*, [1981] Com LR 138, 139, approved in *Great Atlantic Insurance Co. v. Home Insurance Co.*, [1981] 1 WLR 529, 538) (attached as Exhibits M - O, respectively).  As the treatise explains, those two events "will not always" occur at the same time.  Thanki*, supra* at 285 ¶ 5.127.  More specifically:

---

[8]        Limited waivers also apply in the case of documents produced to regulators.  *See, e.g., British Coal Corporation v. Dennis Rye Ltd (No.2)* [1988] 1 W.L.R. 1113, at 1121-22 (holding that documents made available for the limited purpose of assisting a criminal investigation could not be construed as a waiver of privilege in subsequent civil proceedings) (attached as Exhibit K); *Property Alliance Group Limited v. The Royal Bank of Scotland plc* [2015] EWHC 1557 (Ch) at 113 (holding that a bank was entitled to maintain its claim to privilege over documents which were provided to regulators on a limited basis despite the existence of "carve-outs" which allowed the regulators to share the material with other third parties or make it public) (attached as Exhibit L).

> Once privilege is waived in a document by, say, disclosure and inspection during the proceedings then . . . that is the end of the matter in so far as that document in those proceedings is concerned.  The same may not be true of collateral material, and the weight of authority suggests that some reliance upon the document must first occur *in the proceedings* before any waiver in collateral material is triggered.

*Id.* (emphasis added).

Although courts are not in perfect harmony as to the degree and nature of reliance necessary to trigger a collateral waiver, the case law refers to the triggering event as the when a privileged document is "deployed in court."  *Id.* at 285-86 (citing cases to illustrate a debate between courts that require the privileged document to be introduced into evidence and others that have held that a collateral waiver can occur at an earlier point of a judicial proceeding).  The treatise concludes that "it is clear that there can be no question of collateral waiver outside the case of partial waiver made during the course of legal proceedings."  *Id.* at 287 (citing *Ramac Holdings Limited v. Brachers* [2002] EWHC (Ch. 1683 ¶ 56) ("No case has been drawn to my attention which has applied the principle outside partial waiver made during the course of legal proceedings") (attached as Exhibit P)).  The documents at issue have not been used in a legal proceeding, let alone in a legal proceeding between State Street and McLellan.  There is therefore no basis for a collateral waiver under English law.

> **B.  Under U.S. Law, Extrajudicial Disclosures Like These Do Not Give Rise To A Subject Matter Waiver.**

McLellan's subject matter waiver arguments would still fail if U.S. law applied because, as he concedes, the disclosures he claims caused a waiver were "extrajudicial disclosures," meaning disclosures outside of litigation.  McLellan Feb. 24 Br. at 12 n.4.  The First Circuit has held that except for "rare" circumstances (which are not applicable here), "the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential

11

communications on the same subject matter."  *In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 24, 25 n.6 (1st Cir. 2003).

The First Circuit's analysis began from "the unarguable proposition that the attorney-client privilege is highly valued," and that courts must therefore be "cautious about finding implied waivers."  *Id.* at 23; *see Evergreen Trading, LLC ex rel. Nussdorf*, 80 Fed. Cl. 122, 129 (Fed. Cl. 2007) ("this [subject matter waiver] rule must not be too liberally invoked lest it swallow the privilege"). [9]  Although the issue was one to be "evaluated in light of principles of logic and fairness," 348 F.3d at 23, the "common denominator" in cases finding an implied waiver was that "the party asserting the privilege placed protected information in issue for personal benefit through some affirmative act" in litigation and a partial disclosure "would have been unfair to the opposing party."  *Id.* at 24.  The "paradigmatic example" is when a party raises an advice of counsel defense.  When legal advice is put "squarely in issue . . . communications embodying the subject matter of the advice typically lose protection."  *Id.*  That rule is to prevent a party from using a privilege as a sword and a shield; "disclos[ing] fragments helpful to its cause, [while] entomb[ing] other (unhelpful) fragments."  *Id.*

After noting that "[v]irtually every reported instance of an implied waiver extending to an entire subject matter" involved "a disclosure made in the course of a judicial proceeding," the First Circuit held that the concerns that give rise to implied waivers are not applicable in cases involving extrajudicial disclosure of privileged information.  *Id.*  Although the court stopped short of holding that an extrajudicial disclosure could "never" lead to an implied waiver, it was clear that any circumstances in which that could happen "will be *rare*, and the scope of any

---

[9]        "The attorney-client privilege . . . serves important ends.  Its root purpose is 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'"  *Ogden*, 202 F.3d at 461 (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)).

ensuing waiver will be *narrow*." *Id.* at 25 n.6 (emphasis added). The Court further noted that "[w]here a party has not thrust a partial disclosure into ongoing litigation, fairness concerns neither require *nor permit* massive breaching of the attorney-client privilege." *Id.* at 25 (emphasis added).

Although State Street has not used any of the documents in litigation, McLellan argues—based on cases from other circuits—for a series of broad subject matter waivers by asserting that State Street selectively disclosed the documents at issue for the "strategic purpose of seeking to exculpate itself at the expense of incriminating McLellan and others." Feb. 24 Br. at 9. That argument makes no sense from either a "logic" or "fairness" perspective.

As a matter of logic, State Street could not exculpate itself by incriminating McLellan. McLellan was an Executive Vice President whose fraud operated to create State Street's liability. It is black-letter law that a corporation "may be convicted for the criminal acts of its agents, under a theory of respondent superior . . . [when the agent's acts are]. . . of the kind which he is authorized to perform [and are] . . . motivated—at least in part—by an intent to benefit the corporation." *United States v. Cincotta*, 689 F.2d 238, 241-42 (1st Cir. 1982); *see United States v. Potter*, 463 F.3d 9, 25 (1st Cir. 2006) (same). Furthermore, the documents at issue are not exculpatory for State Street. For example, Deloitte's summary bluntly reported that ████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ Deloitte Report at 24 ("Overall Summary") (attached as Exhibit Q). Freshfields's reports to the FCA provided a factual overview of the relevant transitions that detailed how the client was misled and overcharged. *See, e.g.,* SS1_01328796.

13

From a "fairness" perspective, State Street has not used the document at issue as a "sword" in any context, let alone as a "sword" against McLellan in litigation. The productions at issue here were in investigations that did not even present State Street an opportunity to be exculpated. In an analogous setting, the Second Circuit held that the disclosure of legal advice during grand jury testimony did not trigger a waiver because "[t]he grand jury is seldom portrayed as a 'sword' for the defendant or the testifying witness." *In re Grand Jury Proceedings*, 219 F.3d 175, 189 (2d Cir. 2000). The court explained that the grand jury "is an accusatory body under the (almost) complete control of the prosecutor," and "unlike exculpatory testimony at trial that could result in a permanent acquittal or have other res judicata effect, a no true bill from the grand jury might grant [a company] only temporary relief." *Id.* Furthermore, even if State Street had used documents in an effort to "convince regulators and prosecutors to refrain from instituting proceedings against it," that is not the type of use that causes a subject matter waiver. *In re Tyco Int'l Multidistrict Litig.*, 2007 WL 710188, at *1 (D.N.H. Mar. 7, 2007) (applying *In re Keeper of Records* and holding that a company's disclosure of privileged reports in filings with the SEC did not result in a waiver "that extends beyond what [was] actually disclosed").[10]

Nor has McLellan shown prejudice from State Street's disclosure of the documents at issue. *See, e.g.*, *In re Polymedica Corp. Sec. Litig.*, 235 F.R.D. 28, 33 (D. Mass. 2006) (holding that there was no unfairness from past disclosure of privileged report, and explaining that "there [was] no sword" where there "was no evidence that the Defendants sought to make use of the

---

[10]     *See also U.S. v. Treacy*, 2009 WL 812033, at *2 (S.D.N.Y. Mar. 24, 2009) (extrajudicial disclosure to government of interview memoranda for some witness interviews did not trigger a waiver of interview memoranda for other witnesses, and explaining that the use a privilege as both "a sword and shield" was "not implicated where . . . the holder of the privilege is not a party to the action and seeks no advantage against its adversary"); *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 143 (S.D.N.Y. 2004) (holding that the disclosure of certain analyses to the SEC did not "operate[] as [a] total waiver of the attorney-client privilege with respect to all documents, regardless of whether they are directly related to the communications with the SEC").

report in a judicial proceeding" and plaintiffs had "not shown that their case ha[d] been prejudiced in any way by the disclosure of the report").  McLellan has the Deloitte and Freshfields reports, as well as the memoranda of the Deloitte and Freshfields witness interviews that are in State Street's possession, custody, or control.[11]  Thus, this is not a case in which McLellan can credibly argue that State Street has "disclos[ed] fragments [of privileged information] helpful to its cause, [and] entomb[ed] other (unhelpful) fragments."  *In re Keeper of Records,* 348 F.3d at 24.[12]

### C.    The Expansive Waivers McLellan Seeks Are Not Permitted

Even if State Street's extrajudicial disclosures could give rise to an implied waiver, the scope of any such waiver would have to be far narrower than the general topics which McLellan seeks.  In addition to cautioning courts that the circumstances in which an extrajudicial disclosure might cause an implied waiver will be "rare," the First Circuit made clear that "the scope of any ensuing waiver will be *narrow*."  *In re Keeper of Records,* 348 F.3d at 25 n.6; *see Saint-Gobain/Norton Indus. Ceramics Corp. v. General Electric Co.*, 884 F. Supp. 31, 34 (D. Mass. 1995) ("Courts have construed the scope of the subject matter to which the waiver applies to be narrow.").[13]  McLellan fundamentally ignores that direction.

---

[11]    State Street recently identified a few additional memoranda of Deloitte interviews in response to a government request, and will be producing them to the government.  We understand that the government will provide these documents to McLellan.

[12]    McLellan's argument for a subject matter waiver under the discretionary standard of Fed. R. Evid. 502(a) is of no moment.  Subject matter waivers under that rule are "reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, *in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary."*  Fed. R. Evid. 502(a) advisory comm. n. 2 Subdivision (a), (emphasis added).  State Street is not a party to this proceeding and McLellan is not State Street's "adversary."  Also, as noted above, there was nothing "selective" or "misleading" about State Street's disclosure of the reports at issue.  McLellan has the reports as well as the underlying documents and memoranda of witness interviews.

[13]    *See also Agility Public Warehousing Co. K.S.C. v. Dep't of Defense*, 110 F. Supp. 3d 215, 226-7 (D.D.C. 2015) (holding that to the extent privileged emails were disclosed, only a "quite narrow" waiver would be imposed, and noting the purpose of the attorney-client privilege "would be undermined if the Court brought to light a broad spectrum of communications simply because the Agency revealed a few conversations on a few narrow subjects"); *Hawk Mt. LLC v. Mirra*, 2016 WL 690883, at *2 (D. Del. Feb. 19, 2016) ("The scope of a subject matter waiver is generally narrow, even when the disclosure of attorney-client privileged information is intentional."); *Swift*

15

Although State Street does not believe there can be any implied waiver here, the scope of any possible waiver would have to be far more circumscribed than the more than a dozen different subject matters in McLellan's motions.  *See supra* at nn.2-3.  At best, McLellan could argue that, if U.S. law applied, some of the information that Phelan and Woodard shared with Deloitte may be privileged, *e.g.,* regarding their review of whether three other employees (David Puth, Stephen Smit, and Simone Paul) had any awareness of the overcharging, the terminations of McLellan, Pennings, and Boomgaardt, and Woodard's early involvement when the ███ ███ issues first came to light.  *See* McLellan Feb. 24 Br., Exs. 2-3.  If sharing this very limited information with Deloitte effected an implied waiver—and we believe it did not—the waiver would be narrowly tailored to these topics.

But McLellan seeks a waiver as to a number of broad, general categories including, among others:  (i) the entirety of State Street's internal investigation, which McLellan refers to as "Project Flag" (McLellan Feb 24 Br. at 4); (ii) regulatory investigations; (iii) client fees, remuneration, and revenue accrual; (iv) reviews of transition management agreements; (v) client communications; (vi) media and press communications; (vii) consultant communication/PWC engagement; (viii) communications with Inalytics; (ix) emails related to the Herbert Smith law firm; (x) transition management and business controls; (xi) non-disclosure agreements; and (xii) the ███.[14]

---

*Spindrift, Ltd. v. Alvada Ins., Inc.*, 2013 WL 3815970, at *5 (S.D.N.Y. July 24, 2013) ("the scope of any subject matter waiver ordinarily is quite narrow") (internal quotations omitted); *U.S. v. Skeddle*, 989 F. Supp. 905, 908 n.2 (N.D. Ohio 1997) ("Realizing that fairness is at the heart of the waiver issue, courts have generally held that the 'same subject matter' is to be viewed narrowly.").

[14]    State Street did waive privileges with regard to the assessment of whether the transition management group would be allowed to trade with an affiliate counterparty (the fixed income rates desk) on ███ Transition No. 121. McLellan's February 24 motion makes arguments with respect to a call related to that.  *See* McLellan Feb. 24 Br. at 14-15.  That call touches two distinct issues.  A transcript of it has been produced, which reveals the portion of the call relating to the ███ but redacts the portion of the call that is related a different client.  SS2_00000264.  State Street also reviewed the withheld documents that McLellan claims fall within the waiver.  Most were either unrelated or were produced after State Street submitted its log.  State Street did, however, identify six documents

McLellan's attempt to expand the scope of any potential waiver to these broad, general topics is flatly inconsistent with the First Circuit's direction in *In re Keeper of Records* that the scope of any implied waivers will be "*narrow*."  348 F.3d at 25 n.6 (emphasis added).  That is consistent with how courts around the country have approached this issue.  *See, e.g., Hernandez v. Tanninen*, 604 F.3d 1095, 1100-01 (9th Cir. 2010) (holding that disclosure of client's communications with attorney only resulted in waiver of privilege as to that witness, and that the "district court clearly erred in finding a blanket waiver of the attorney-client and work product privileges as to the entire case"); *Mergentime Corp. v. Washington Metro. Area Transp. Auth.*, 761 F. Supp. 1, 2 (D.D.C. 1991) (narrowly construing waiver to allow plaintiffs to discover whether defendant's general counsel made the statements reflected in privileged documents, but denying plaintiff access to all privileged documents on the subject matter of those statements).

### D.     McLellan Has No Constitutional Right to State Street's Privileged Documents

McLellan makes a last-ditch argument—which he relegates to a footnote—that the court's waiver assessment should somehow take into consideration a balancing test that assesses whether "the attorney-client privilege must give way to a criminal defendant's Sixth Amendment right to present a defense."  Feb. 24 Br. at 16 n.5.  That argument is contrary to the clear weight of authority.  To begin with, the Supreme Court has made clear that a criminal defendant "does not have an unfettered right to offer testimony that is . . . privileged."  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988); *see also United States. v. Serrano*, 406 F.3d 1208, 1215 (10th Cir. 2005) ("The right to present a defense . . .  does not displace traditional testimonial privileges").

---

that fell within the waiver and were not included in prior productions.  State Street will produce those documents to the government, and we understand they will be made available to McLellan.

The Supreme Court has also rejected efforts to subject the attorney-client privilege to a balancing test that would weigh the benefits of maintaining the privilege against the benefits of disclosure.  Specifically, in *Swidler & Berlin v. United States*, the Court held that the attorney-client privilege survived a client's death, and in so doing, rejected an argument that the privilege should yield if maintaining it would result in "extreme injustice" or the information sought was "of substantial importance."  524 U.S. 399, 406-09 (1998).

The few cases McLellan cites in support of his argument are inconsistent with *Swidler & Berlin* and the weight of other authority.  In fact, the case McLellan refers to in footnote 5 as the "leading case" in favor of his position, *United States v. W.R. Grace*, 439 F. Supp.2d 1125 (D. Mont. 2006), has been roundly criticized.  One court recently held that "it is hard to square the *Grace* Court's holding with the Supreme Court's emphatic 'reject[ion]' of the 'use of a balancing test in defining the contours of the [attorney-client] privilege,' let alone its observation that 'there is no case authority for the proposition that the privilege applies differently in criminal and civil cases.'"  *United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558, 565 (S.D.N.Y. 2015) (quoting *Swidler & Berlin*, 524 U.S. at 408-09).  Another court in this district has likewise criticized *W.R. Grace* for failing to "discuss *Swidler & Berlin's* rejection of a balancing analysis." *S.E.C. v. Present*, 2015 WL 9294164, at *2 n.5 (D. Mass. Dec. 21, 2015) (also cited in McLellan's Feb. 24 Br. at 16-17 n. 5).  *See also In re Grand Jury Investigation*, 399 F.3d 527, 535 (2d Cir. 2005) (explicitly declining to fashion a balancing test for the attorney-client privilege, or to otherwise establish a rule under which an assertion of privilege would yield to a need for evidence).

Moreover, *W.R. Grace* and the very few cases that have reached a similar result are inapplicable to the circumstances here.  Those cases predominantly concern whether individuals

may use documents already in their possession to support an advice of counsel defense over the

objection of a company that holds a privilege over those documents.  *See W.R. Grace*, 439 F.

Supp. 2d at 1136 (defendants "intend to rely upon an advice of counsel defense that they say can

only be established through the presentation of documents and testimony over which Defendant

Grace claims an attorney-client privilege"); *United States v. Mix*, 2012 WL 2420016, at *1-3

(E.D. La. June 26, 2012) (seeking protective order allowing defendant to use privileged materials

at a trial that "unambiguous[ly]" and "conclusively demonstrate[]" that he "did not commit the

crimes charge[d]") (also cited by McLellan in Feb. 24 Br at 16 n.5).[15]  McLellan is not seeking

to use documents already in his possession, and is not arguing that the documents he seeks will

support an advice of counsel defense.[16]  Furthermore, none of the cases he cites concern using a

balancing test as an additional consideration in an analysis of a subject matter waiver.

## II.   The Subpoenas Should Be Quashed Because McLellan Has Not Satisfied The Supreme Court's Requirements For The Issuance Of A Rule 17(c) Subpoena.

### A.   Rule 17(c)'s Stringent Requirements

Federal Rule of Criminal Procedure 17(c) does not "provide a means of discovery for

criminal cases." *Nixon*, 418 U.S. at 698.  The rule was intended only to "expedite the trial by

providing a time and place before trial for the inspection of subpoenaed items." *Id.*  Courts

"must [therefore] be careful that Rule 17(c) is not turned into a broad discovery device, thereby

undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. 16."

---

[15]     The other case McLellan cites, *United States v. Weisberg*, 2011 WL 1327689, at *4 (E.D.N.Y. Apr. 5, 2011), was in the context of a motion to quash a Rule 17(c) subpoena for privileged documents, but is still inapposite.  In that case, the court said only that a right to assert a defense "may" in some exceptional circumstances outweigh a third party's privilege, but it did not expand on the subject because the defendant had failed to satisfy the general relevance, specificity, and admissibility requirements under the *Nixon* test (*see infra*).  As a result, the court quashed the subpoena's requests for documents listed on the company's privilege log.

[16]     Nor could he.  When McLellan was confronted about these issues in September 2011 as part of State Street's investigation, he said he trusted Pennings to vet the markups with legal.  (SS1_01277433 ¶ 7 (McLellan felt that legal and compliance sign-off on the practice was required, but that was a matter for Pennings and his team to address); *id.* ¶ 25 (McLellan's expectation was that Pennings would involve legal and compliance on the other client transitions as appropriate).)

*United States v. Cuthbertson*, 651 F.2d 189, 197 (3d Cir. 1981); *see United States v. Cherry,* 876. F. Supp. 547 (S.D.N.Y. 1995) (same).

To ensure that Rule 17(c) is not used as a discovery device, the Supreme Court has held that the proponent of a subpoena show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Nixon*, 418 U.S. at 699-700.  The Court reduced those requirements to necessitate that the proponent of a subpoena to "clear three hurdles: (1) relevancy; (2) admissibility; and (3) specificity."  *Id.* at 700; *see United States v. LaRouche Campaign*, 841 F.2d 1176, 1179 (1st Cir. 1988) (same).

Those hurdles can only be cleared by identifying the specific documents that are being requested and making a factual demonstration that they are both relevant and admissible.  *See United States v. Shindeman*, 232 F.R.D. 147, 150 (D. Me. 2005) ("The burden is on the party seeking the subpoena to "'show the evidentiary nature of the requested materials with appropriate specificity'") (quoting *United States v. Skeddle*, 178 F.R.D. 167, 168 (N.D. Ohio 1996)).  Conclusory or speculative statements that reveal a "mere hope that something of value might turn up" will not suffice.  *United States v. Gikas*, 112 F.R.D 198, 201 (D. Mass 1986); *see United States v. Hang*, 75 F.3d 1275, 1283 (8th Cir. 1996) ("a Rule 17(c) subpoena cannot properly be issued upon a 'mere hope'"); *United States v. King*, 164 F.R.D. 542, 545 (D. Kansas 1996) ("[t]hat the requested material is 'potentially' relevant and admissible is not enough, for both tests must be satisfied at the time the evidence is sought").

Presumably recognizing that he cannot meet *Nixon's* requirements, McLellan argues that a lower standard should apply because State Street is not a party to the case.  He does so by citing a few cases from other circuits, such as *United States v. Tucker*, which issued a Rule 17(c) subpoena on a showing that information sought was material to the defense and that the request was not unduly oppressive.  249 F.R.D. 58, 66 (S.D.N.Y. 2008).  That case, and the few others that have done the same, have been soundly criticized as having "limited support and [representing] a distinct minority view."  *United States v. Al-Amin*, 2013 WL 3865079, at *7 (E.D. Tenn. July 25, 2013); *see also United States v. Boyle*, 2009 WL 484436, at *2 (S.D.N.Y. Feb. 24, 2009) (noting that "strict [*Nixon*] standard is applicable both to subpoenas of government agencies and employees as well as those of non-party, non-governmental entities and individuals); *United States v. Khan*, 2009 WL 152582, at *2 (E.D.N.Y. Jan. 20, 2009) ("[T]his court declines to break from long-standing precedent in this circuit, which holds that all subpoenas must comply with the *Nixon* standard.").

Courts in this circuit have uniformly applied *Nixon* to Rule 17(c) subpoena requests, including those directed to third parties.  *See, e.g., United States v. Concemi*, 957 F.2d 942, 949 (1st Cir. 1992) (discussing *Nixon* in the context of a subpoena to a bank that was not a party to the case); *LaRouche*, 841 F.2d at 1179 (applying *Nixon* to a third party subpoena to the NBC news organization); *United States v. Godfrey*, 2013 WL 5780439, at *1 (D. Mass. Oct. 18, 2013) (applying *Nixon* to a third party subpoena directed to financial institutions).  There is no reason for this Court to be the first to apply the minority view.  Among other reasons, reading out the admissibility prong would be inconsistent with the long-standing view that the subpoenaed materials must be "evidentiary and relevant."  *Nixon*, 418 U.S. at 699.  It would also turn Rule 17 into the "means of discovery for criminal cases" that the Supreme Court expressly held it was not intended to be.  *Id.* at 698-99.  Further still, applying a lower standard for subpoenas to third

parties would lead to the perverse result in which non-parties are subject to broader subpoenas (and more burden and expense) than parties.

### B.    McLellan Has Not Cleared The Relevance Hurdle

McLellan's entire showing as to relevance is the conclusory assertion that the materials he seeks are "plainly relevant" based upon his speculative assumption that the materials concern "EMEA transition management activities, policies, and practices and/or to the specific transitions" at issue and are "likely" to provide information as to "who did what[,] when[,] on what authority."  McLellan Feb. 24 Br. at 21.

But conclusions are insufficient.  To carry his burden, McLellan must "*show*" that the materials he seeks are, among other things, relevant.  *Concemi*, 957 F.2d at 949 (emphasis added); *see Gikas,* 112 F.R.D. at 201 ("a 'mere hope' that something of value might turn up" cannot satisfy the proponent's burden).  That requires McLellan to "set forth what the subpoena's materials contain" in sufficient detail that the court does not have to "speculate as to the specific nature of their contents."  *United States v. Arditti*, 955 F.2d 331, 346 (5th Cir. 1992) (holding that it is not enough for the proponent to merely "demonstrate[] why he wants to look into" certain documents).

McLellan has not done so.  His motions merely list hundreds of documents from State Street's privilege logs, and then speculate—with hardly any explanation—that they are "likely" to provide information as to "who did what[,] when[,] on what authority."  Feb. 24 Br. at 21. Rule 17(c)'s "specificity and relevance requirements demand more than the title of a document and a conjecture concerning its contents."  *United States v. Wittig*, 250 F.R.D. 548, 552 (D. Kan. 2008).  "If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused."  *United States v. Noriega,* 764 F. Supp. 1480,

1493 (S.D. Fla. 1991); *see, e.g., United States v. Skilling*, 2006 WL 1006622, at *3 (S.D. Tex. Apr. 13, 2006) (granting motion to quash because defendants failed to explain why the evidence requested was relevant to the case, even though defendants had adequately specified the documents sought).

McLellan's failure to satisfy this standard is particularly glaring when one considers his second, third, and fourth motions. In particular, the argument in the brief he filed on February 24, 2017 was so generalized, and so non-specific, that McLellan was able to incorporate it by reference in his second, third, and fourth motions. He also did so with hardly any additional argument, notwithstanding the fact that he was seeking to subpoena nearly 700 additional documents which he categorized into more than a dozen new categories. If a one-time conclusory assertion that the sought-after documents relate to the case is all that is required by Rule 17(c), *Nixon* and its progeny would be a toothless tiger because anyone could make the same assertion in any case.

### C.     McLellan Has Not Cleared The Admissibility Hurdle

McLellan makes the same half-hearted effort with respect to his burden to show that the documents he seeks are admissible. He does not cite any rule of evidence, and argues only that the documents may in the future become impeachment evidence. That is not enough.

The only potential witness McLellan identifies by name is Rick Boomgaardt, which is revealing in that 87% of the documents McLellan seeks are communications in which Boomgaardt is *not* involved. The subpoenas must be quashed as to those documents given the First Circuit's recognition that "'[g]enerally, the need for evidence to impeach witnesses is insufficient'" to justify a Rule 17(c) subpoena because "the admissibility prong of Rule 17(c) cannot be fully assessed until the corresponding witness testifies at trial." *LaRouche*, 841 F.2d at 1180 (quoting *Nixon*, 418 U.S. at 701); *see United States v. Decologero,* 2006 WL 83471, at *2

23

(D. Mass. Jan. 13, 2006) (the admissibility requirement "is not satisfied by the prospective use of the material only for impeachment").  McLellan cannot overcome that general rule where his motions do not even mention the participants in the communication.

He is also unable to do so with respect to the relatively small number of communications involving Boomgaardt.  McLellan unpersuasively attempts to circumvent the general rule by trying to shoehorn the Boomgaardt communications into a narrow exception where the proponent of the subpoena demonstrates that specifically identified statements of a "'putative key witness, whose general testimony is already known, [and] is scheduled to testify," and are likely to be inconsistent with the witness's testimony.  *LaRouche*, 841 F.2d at 1180 (discussed in McLellan's Feb. 24 Br. at 21).[17]

*LaRouche* concerned a third party subpoena to NBC for out-takes of a journalist's interview of a key witness who had previously testified in a related trial.  *Id.* at 1177-78.  The part of that interview that aired on television "paralleled" the witness's testimony in the earlier case, and based on the statements that aired, the trial court found that it was likely that statements in the out-takes would be inconsistent with the witness's trial testimony.  *Id.*  On that basis, the trial court found that the defendant had made a threshold showing that the interview would contain admissible impeachment evidence and ordered NBC to produce the videotape for an *in camera* review "for possible release to defendants later on."  *Id.* at 1178.  The First Circuit noted that as a general matter, the need to obtain impeachment evidence does not satisfy the admissibility prong of Rule 17(c), but held that "under the circumstances of the case, where a

---

[17]     McLellan cannot credibly argue that this exception applies to the "[o]ther State Street employees" he references but does not identify. Feb. 24 Br. at 22.  Among other things, he has made no showing that those unnamed individuals are likely to testify, does not claim that they are "key witnesses," and gives no indication of what their testimony might be, let alone how any of the communications at issue may be used as impeachment evidence.

putative key witness, whose general testimony is already known, is scheduled to testify," the trial court had not abused its discretion.  *Id.* at 1180.

*LaRouche* does not justify the voluminous production McLellan seeks here.  Most notably, the case does not stand for the proposition that any statements by a purported key witness can be obtained as possible impeachment evidence.  The First Circuit's decision was based on the specific "circumstances" of the case, which included the defendant's showing that based on excerpts of the interview that aired and the witness's prior testimony, the rest of the interview likely contained inconsistent statements with the witness's anticipated testimony.  Unlike the circumstances there, Boomgaardt has not testified before, and McLellan is seeking approximately 130 Boomgaardt's communications without making any showing that they are likely to be inconsistent with Boomgaardt's future testimony.  In fact, McLellan's brief only mentions fewer than twenty Boomgaardt communications.  *See* Feb. 24 Br. at 8-9 & 17-18.[18]

## CONCLUSION

For the foregoing reasons, State Street respectfully requests that the Court quash the subpoenas McLellan served on State Street on May 17, 2017.

Respectfully submitted,

STATE STREET BANK AND TRUST
COMPANY

By its attorneys:

*/s/ John J. Butts*
John J. Butts (BBO No. 643201)
Harry Weiss (BBO No. 521180)

---

[18]     Furthermore, McLellan's requested production entirely bypasses the relief in *LaRouche*, which was that the trial court ordered NBS to produce the videotape for *in camera* review and "possible release to [the] defendants later on."  *Id.* at 1178.  The First Circuit recognized that the court's order was in keeping with the *Nixon* court's "observ[ation]" that *in camera* inspection" would provide a means for "'protection against any release' of inadmissible evidence."  *Id.* at 1182 (quoting *Nixon*, 418 U.S. at 714-15).

WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000
john.butts@wilmerhale.com

Dated: June 12, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2017, a copy of the foregoing was served via email to the registered participants of the ECF system in the above-captioned matter.  In addition, an advance copy was provided by email to counsel for Ross McLellan on June 9, 2017.

*/s/ John J. Butts*
John J. Butts