**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

UNITED STATES OF AMERICA )

vs. )   Case No. 16-cr-10094-LTS

ROSS MCLELLAN )   **FILED UNDER SEAL**

Defendant. )

_____ )

**STATE STREET BANK AND TRUST COMPANY'S REPLY**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**
**TO QUASH RULE 17(c) SUBPOENAS SERVED BY ROSS MCLELLAN**

John J. Butts (BBO No. 643201)
Harry Weiss (BBO No. 521180)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ..............................................................................................................................2

I.     The Subpoenas Should Be Quashed Because They Seek Privileged Documents ..............2

     A.     English Law Governs This Issue And Does Not Provide For Subject
            Matter Waivers................................................................................................4

     B.     Under U.S. Law, Extrajudicial Disclosures Like These Do Not Give Rise
            To A Subject Matter Waiver .............................................................................7

     C.     The Expansive Waivers McLellan Seeks Are Not Permitted ................................9

II.    The Subpoenas Should Be Quashed Because McLellan Has Not Satisfied The
     Requirements For Issuance of Rule 17(c) Subpoenas .......................................................10

     A.     Rule 17(c)'s Stringent Requirements ..................................................................10

     B.     McLellan Has Not Cleared the Relevance Hurdle................................................12

     C.     McLellan Has Not Cleared The Evidentiary Hurdle ............................................15

CONCLUSION..........................................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Agility Public Warehousing Co. K.S.C. v. Dep't of Defense*, 110 F. Supp. 3d 215
(D.D.C. 2015) ................................................................................................9

*United States v. Al-Amin*, 2013 WL 3865079 (E.D. Tenn. July 25, 2013)..................................11

*Anwar v. Fairfield Greenwich Ltd*, 306 F.R.D. 117 (S.D.N.Y. 2013)..............................................6

*United States v. Arditti*, 955 F.3d 331 (5th Cir. 1992)......................................................15

*Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92 (S.D.N.Y. 2002).....................................5

*Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1 (D.D.C. 1999) ...............................................2

*United States v. Chevron Corp.*, 1996 WL 444597 (N.D. Cal. May 30, 1996)..............................4

*United States v. Concemi*, 957 F.2d 942 (1st Cir. 1992) ....................................12, 15, 17

*Cue v. General Motors LLC*, 2015 WL 4750844 (D. Mass. Aug. 10, 2015) ..................................3

*United States v. Cusick*, 2011 WL 5036008 (D. Mass. Oct. 20, 2011) ..................................16, 17

*United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980)...........................................................11

*United States v. Decologero*, 2006 WL 83471 (D. Mass. Jan. 13, 2006)....................................17

*United States v. Ferguson*, 2007 WL 2815068 (D. Conn. Sept. 26, 2007) ..................................11

*Garcia v. E. J. Amusements of New Hampshire, Inc.*, 89 F. Supp. 3d 211 (D.
Mass. 2015).....................................................................................................2

*United States v. Gikas*, 112 F.R.D. 198 (D. Mass. 1986) .......................................12, 17

*United States v. Godfrey*, 2013 WL 5780439 (D. Mass. Oct.18, 2013) ......................................10

*Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514 (S.D.N.Y. 1992) ..................................5

*Goss Intern. Americas, Inc. v. MAN Roland, Inc.*, 2006 WL 1575546 (D.N.H.
June 2, 2006)...................................................................................................3

*In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.)*, 274 F.3d
563 (1st Cir. 2001) ..........................................................................................2

*In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65 (1st Cir. 2011) .............................................2, 3

*Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D 58 (S.D.N.Y. 2010) ..............................................6

*Hawk Mt. LLC v. Mirra*, 2016 WL 690883 (D. Del. Feb. 19, 2016)..............................................9

*In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16 (1st Cir. 2003) ............................................................................... *passim*

*United States v. Khan*, 2009 WL 152582 (E.D.N.Y. Jan. 20, 2009) ...........................................11

*United States. v. LaRouche Campaign*, 841 F.2d 1176 (1st Cir. 1988)............................10, 16, 17

*United States v. Libby*, 432 F. Supp. 2d 26 (D.D.C. 2006)............................................................13

*United States v. Manghis*, 2010 WL 349583 (D. Mass. Jan. 22, 2010)..................................13, 15

*In re New England Compounding Pharmacy Inc. Prod. Liab. Litig*, 2013 WL 6058483 (D. Mass. Nov. 13, 2013)....................................................................2

*United States v. Nixon*, 418 U.S. 683 (1974) ..................................................................... *passim*

*United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991) ...................................................13

*United States v. O'Neill*, 2010 WL 330215 (D. Me. Jan. 21, 2010)............................................17

*Saint-Gobain/Norton Indus. Ceramics Corp. v. General Electric Co.*, 884 F. Supp. 31 (D. Mass. 1995) ...................................................................................9

*United States v. Shinderman*, 232 F.R.D. 147 (D. Me. 2005) ...............................................12, 15

*United States v. Shinderman*, 432 F. Supp. 157 (D. Me. 2006).....................................................16

*United States v. Skeddle*, 989 F. Supp. 905 (N.D. Ohio 1997) .....................................................9s

*Swift Spindrift, Ltd. v. Alvada Ins., Inc.*, 2013 WL 3815970 (S.D.N.Y. July 24, 2013) ..........................................................................................................................9

*United States v. Treacy*, 2009 WL 812033 (S.D.N.Y. Mar. 24, 2009).......................................8, 9

*In re Tyco Intern. Ltd. Multidistrict Litig.*, 2007 WL 710188 (D.N.H. Mar. 7, 2007) ......................................................................................................................8, 9

*United States v. Western Titanium*¸ 2010 WL 4569890 (S.D. Cal. Nov. 4, 2010) .......................13

*United States v. Wittig*, 250 F.R.D. 548 (D. Kan. 2008).........................................................11, 15

*VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8 (D. Mass. 2000) ...................................................4, 5

*Wultz v. Bank of China Ltd.,* 979 F. Supp.2d 479 (S.D.N.Y. 2013) .............................................5

## U.K. CASES

*RBS RIGHTS ISSUE LITIGATION* [2016] EWHC 3161 (CH) …………………………………4

## STATUTES, RULES, AND REGULATIONS

Fed. R. Crim. P. 17(c) ................................................................................ *passim*

U.K. Financial Markets and Services Act § 166 ..........................................................9

## OTHER AUTHORITIES

24 Fed. Prac. & Proc. § 5507 (1st ed.) ........................................................................4

Restatement (Second) Conflicts of Laws § 139(1) (1971) ............................................5

## PRELIMINARY STATEMENT

McLellan's opposition confirms that the subpoenas he issued to State Street should be quashed.  Setting his rhetoric aside, McLellan makes a number of key admissions, either explicitly or through silence, that demonstrate his subpoenas are improper.  For example, he appears to recognize that the documents he claims caused a subject matter waiver were *not privileged* under English law, but nevertheless advances the convenient argument that U.S. law should control their status.  Bu as he concedes the documents were created in the U.K. for use by the U.K's Financial Conduct Authority (the "FCA") and were provided to the FCA *before any U.S. investigation began*.  Under those circumstances, the U.K. had the most direct and compelling interest in the documents, and English law controls.  That should be the end of the inquiry—the production of non-privileged documents cannot trigger a subject matter waiver.

The subpoenas should also be quashed for the independent reason that McLellan has not met the requirements for a Rule 17(c) subpoena as set forth in *United States v. Nixon*, 418 U.S. 683 (1974).  His attempt to get over the "relevance" hurdle amounts to a two-sentence, conclusory argument that the documents he seeks are "plainly relevant," while the case law requires a factual showing with reasonable specificity.  He attempts to clear the "admissibility" hurdle by arguing in conclusory terms that the documents he seeks will be admissible as impeachment evidence, while the general rule in this circuit is that Rule 17(c) subpoenas cannot be used to obtain impeachment evidence.  Although McLellan tries to shoehorn his subpoenas into a narrow exception for a putative key witness, he identifies only one such witness, who is not even a party to the substantial majority of the requested communications.  Moreover, even as to that witness, McLellan does not explain what the witness is likely to testify to or how the communications to which that witness is a party are likely to yield impeachment evidence.

1

McLellan's hope that casting a broad enough net may turn up something of use does not satisfy Rule 17(c)'s requirements.

## ARGUMENT

### I.     The Subpoenas Should Be Quashed Because They Seek Privileged Documents

McLellan's arguments about burden reveal the unfairness and gamesmanship of his subpoenas.  He issued subpoenas for nearly 800 documents from State Street's privilege logs, and with a handful of exceptions addressed in footnote 4, admits that he is "*not in a position to dispute that the documents [he subpoenaed] are privileged*."  Opp. at 3.  McLellan nevertheless asserts that State Street should have turned its motion to quash into a voluminous, "document by document" examination of the privileges associated with each of the hundreds of documents at issue before addressing his waiver arguments.  Opp. at 4.  But State Street has made the requisite document by document showing.  As the courts have recognized, the "universally accepted means" of asserting privileges in federal courts is the submission of a privilege log.  *See In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.)*, 274 F.3d 563, 575-76 (1st Cir. 2001) (quoting *Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, 1 (D.D.C. 1999); *Garcia v. E. J. Amusements of New Hampshire, Inc.*, 89 F. Supp. 3d 211, 215 (D. Mass. 2015) (same).[1]

Not only has State Street submitted privilege logs—McLellan does not take any issue with the sufficiency of the information State Street provided—but State Street has also gone further.  As we committed in our opening brief, State Street has re-evaluated the documents McLellan requested with the goal of either confirming their privileged status under the law of the country with the most direct and compelling interest in the communication or making the

---

[1]     In the case McLellan cites as requiring a "document by document" showing, the party claiming privilege did *not* submit a log at all and improperly relied on "only a blanket assertion of privilege."  *In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d 65, 71 (1st Cir. 2011).  In *In re New England Compounding Pharmacy Inc. Prod. Liab. Litig.*, 2013 WL 6058483, at *12 (D. Mass. Nov. 13, 2013), the proponent of the privilege also failed to submit a privilege log.

document available.  *See* State Street Opening Br. at 9 n.7; *see infra* at 4-7 (explaining the choice of law analysis).  Through that process, State Street has withdrawn its privilege assertions, or narrowed them through redactions, as to approximately 200 of the documents at issue, which have been produced to the government.[2]  Those documents have been produced to the government and updated privilege logs are attached as Exhibit A.[3]

McLellan also makes too much of the burden as to his implied waiver arguments.  State Street readily acknowledges that it bears a burden of *persuasion.  In re Grand Jury Subpoena (Mr. S.)*, 662 F.3d at 71 (the party invoking the privilege must "carry the *devoir of persuasion*" that a privilege applies and has not been waived); *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003) (same).  But when privileges are challenged under an implied waiver theory, the common-sense analysis must begin with the proponent of the waiver argument identifying the documents that he contends were disclosed and revealed privileged information.  *See, e.g., In re Keeper of Records.*, 348 F.3d at 23 ("[W]e turn first to the government's contention that XYZ impliedly waived the attorney-client privilege" when a lawyer discussed legal advice on a specifically identified call with a third-party); *Cue v. General Motors LLC*, 2015 WL 4750844, at * 6-7 (D. Mass. Aug. 10, 2015) (recognizing that defendant had the burden or persuasion, but analyzing the purported waiver based on plaintiff's explanation of how the defendant purportedly disclosed privileged information); *Goss Intern. Americas, Inc. v. MAN Roland, Inc.*, 2006 WL 1575546, at *1 (D.N.H. June 2, 2006) (denying

---

[2]        We understand that the government will make these documents available to McLellan.  State Street did not produce these documents directly given its position that McLellan's subpoenas should be quashed for the independent reason that they do not comply with the *Nixon* requirements for a Rule 17(c) subpoena.  *See infra* at 10. The document State Street provided included the non-privileged portions of the documents McLellan in footnote 4 as involving a third party.  In most cases, the third party was listed on an early email in a longer string and was inadvertently redacted.

[3]        In addition to identifying the withdrawn privilege assertions, State Street's log identifies instances in which an initially logged document was produced, *e.g.,* in connection with State Street's express waiver over two topics (*see infra* n.8), or where a duplicate was produced, *e.g.,* a non-privileged attachment to a privileged communication produced as a standalone document.

defendant's motion to compel under subject matter waiver theory because the motion was "far too vague regarding the specific privileged communications" that were alleged to have been disclosed and caused the waiver); 24 Fed. Prac. & Proc. § 5507 (1st ed.) ("[T]here is general agreement" that the party claiming waiver has "the burden of proving the preliminary facts").[4]

Despite his hyperbole about State Street's purported "massive" disclosures of privileged information, McLellan does not identify anything beyond what he specified in his motion for leave to serve the subpoenas—the Deloitte and Freshfields reports and interview memoranda. *See* Opp. at 8; McLellan Feb. 24 Br. at 9. As shown below, none of those documents give rise to any implied waiver, let alone waivers of the more than a dozen purported subject matters into which McLellan has grouped the documents at issue. *See* McLellan Feb. 24 Br. at 5 & nn.2-3.

A.   **English Law Governs This Issue And Does Not Provide For Subject Matter Waivers**

McLellan appears to recognize—through his silence—that his waiver arguments fail if English law controls. His opposition does not respond in any way to State Street's showings that (i) the Freshfields and Deloitte documents at issue *are not privileged* under English law; and (ii) even if they were, English law does not recognize implied waivers in circumstances like this. *See* State Street Opening Br. at 6-11.[5] If English law controls, his subpoenas must be quashed.

---

[4]    If the opponent of the privilege did not have to first identify the supposedly privileged information that was disclosed, it would make for an impossible process. For example, in a case like this in which a party has produced more than a million pages of documents, it would make no sense from either an efficiency or fairness perspective to require the party asserting the privilege to catalogue its production and show that the produced documents did not contain privileged information. *See United States v. Chevron Corp.*, 1996 WL 444597, at *3 (N.D. Cal. May 30, 1996) (noting that putting "no burden whatsoever" on the party seeking waiver "would obviously be unsustainable" because the proponent of the privilege would face the "classic" dilemma of having to prove a negative: "the only way [to] prove 'non-waiver' is by disproving the entire universe of possible bases for waiver"). That is particularly so where the opponent of the privilege has equal access to the documents that have been produced. Although we do not believe State Street has any obligations like this, if the Court believes that more is required, we respectfully submit that given the potential burden, the Court should first determine what portions of McLellan's subpoenas, if any, satisfy Rule 17(c)'s requirements and the issues surrounding choice of law.

[5]    Under English law, memoranda recording factual information obtained in employee interviews are not privileged whether they "comprise information gathering . . . preparatory to and for the purpose of enabling [a company], through its directors or other person authorized to do so on its behalf, to seek and receive legal advice." *RBS Rights Issue Litigation* [2016] EWHC 3161 (Ch), at ¶¶91-93 (attached to State Street Opening Br. as Ex. G). And Freshfields reports to the FCA were factual summaries that were open, non-privileged documents under

Although McLellan asserts that U.S. law controls, there does not appear to be any meaningful dispute between the parties that the choice of law standard articulated in *VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8 (D. Mass. 2000), governs whether U.S. or English law applies. *See* Opp. at 7 (block quoting *VLT*). *VLT* teaches that foreign law controls when a communication has nothing to do with the U.S., and when the communication has only an incidental connection to the U.S. 194 F.R.D. at 15. But, if a communication has "more than an incidental" connection to the U.S., "the court will undertake a more traditional analysis and defer to the law of privilege of the nation having the *most direct and compelling interest in the communication*." *Id.* at 16 (emphasis added); *see Astra Aktiebolag v. Andrx Pharm., Inc.*, 208 F.R.D. 92, 98 (S.D.N.Y. 2002) (where "communications took place in a foreign country or involved foreign attorneys or proceedings, this court defers to the law of the country that has the 'predominant' or 'the most direct and compelling interest'); Restatement (Second) Conflicts of Laws § 139(1) (1971) ("Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the law of the local forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.").[6]

---

English law. A copy of Freshfields report on the ▮▮▮▮▮▮ transition is attached as Exhibit B. A copy of the cover letter forwarding the other reports to the FCA is attached as Exhibit C. We have not located a copy of the letter with the enclosures, but include the reports we believe were enclosed within Exhibit C.

[6] Although McLellan suggests otherwise, the analysis is no different under the other cases he cites that refer to the standard as the "touching base" test. For example, as Chief Judge Saris explained in *VLT*, the case that McLellan cites as having developed the "touching base" test, *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514 (S.D.N.Y. 1992), quoted some rigid language from a case decided more than forty years ago, but it engaged "in a traditional balancing test" that "focuses on those countries which have 'the dominant interest in' the issue." *VLT Corp.*, 194 F.R.D at 16 (quoting *Golden Trade*, 143 F.R.D. at 520-21). In other words, *Golden Trade*, like *VLT Corp,* "utlize[d] a choice of law analysis that looks to the sovereign with the 'most direct and compelling interest.'" *VLT Corp.*, 194 F.R.D. at 16. Indeed, McLellan himself acknowledges that "[t]he 'touching base' standard looks to 'the law of the country that has the predominant or the most direct and compelling interest in whether [the] communications should remain confidential.'" Opp. at 8 n.7 (citing *Wultz v. Bank of China Ltd.*, 979 F. Supp.2d 479, 486 (S.D.N.Y. 2013)). McLellan takes *Wultz* out of context when he then argues that the fact that the Freshfields materials were not privileged under English law means the U.K. has no interest in their confidentiality. The analysis turns on which country has the greatest interest in determining *"whether"* a document should be protected. The U.K. has an obvious interest in when a document is, and is not, privileged. That is especially so when it comes to documents created in the context of a U.K. investigation.

McLellan all but concedes that at the time the documents at issue were prepared, the U.K. had the "most direct and compelling interest" in the Deloitte and Freshfields documents by acknowledging that the reports "were prepared and the interviews were conducted [(1)] *for submission to the FCA*[; and (2)] *prior to the commencement of the investigation in this country*." Opp. at 8 (emphasis added).[7]  In other words, the documents were prepared solely in connection with a U.K. proceeding.  Under such circumstances, there should be no question that the U.K. had a more "direct and compelling interest" than the U.S.  *See Anwar v. Fairfield Greenwich Ltd*, 306 F.R.D. 117, 119 (S.D.N.Y. 2013) ("[C]ommunications relating to 'foreign legal proceedings or foreign law' are generally governed by foreign privilege law"); *Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D 58, 65 (S.D.N.Y. 2010) (same and citing cases).

Contrary to McLellan's assertions, the fact that English law controls the Deloitte and Freshfields documents is not in conflict with State Street's prior positions.  The emails he cites in support of his claim were from a different period—July and August 2013 (Opp. Ex. A)—which is *after* the SEC issued its subpoena and *after* Deloitte and Freshfields materials were created and submitted to the FCA.  Furthermore, State Street's U.K. counsel was speaking about information still to be provided and he took no position, saying only that State Street had to "consider" the interplay of U.S. law and possible waiver issues.  Opp. Ex. A at 1 (also noting that the U.S. law implications were not "clear").  Choice of law is not one-size-fits all.  The analysis requires a document-specific inquiry into which country had the "most direct and compelling interest *in the communication*."  *VLT*, 194 F.R.D. at 16 (emphasis added).  Although the answer may be different as to other documents, the U.K. unquestionably had the most direct and compelling

---

[7]     In fact, the documents were also submitted to the FCA before the commencement of any U.S. investigation. The SEC issued the first U.S. subpoena on May 30, 2013.  Deloitte completed its investigation and issued its report to the FCA on August 15, 2012.  Freshfields conducted its interviews between September and November 2011, and submitted the memoranda to the FCA on May 2, 2013 (SS1_01277526).

interest over documents like the Freshfields and Deloitte documents at issue that were created for and used in a U.K. investigation before the start of any U.S. investigation.

McLellan cannot tip the relative interests by arguing that there was a *possibility* of U.S. involvement before the SEC issued its subpoena on May 30, 2013.  As State Street has explained to the DOJ, prior to the commencement of the U.S. investigations, State Street perceived the overcharges as a U.K. problem given that they were limited to the EMEA region, which was run in London, and no U.S. clients were affected.  Opp. Ex. B at 3 (labeled page 6).  State Street's disclosure to the Federal Reserve (its prudential banking supervisor) in September 2011, and its subsequent response to the SEC's oral request for information following news coverage of the overcharges, does not elevate the U.S.'s interest above the U.K.'s interests.  If anything, it confirms that the U.K. had a more direct and compelling interest.  The Deloitte and Freshfields documents were not prepared at the request of, or for use by, the U.S. government.

The subsequent provision to the U.S. government of the documents State Street had previously provided to the FCA also does not change the outcome.  That is especially so given that McLellan has not disputed State Street's showing that the Freshfields and Deloitte documents were *not privileged* under English law either when they were created or when the FCA passed them to the U.S. government.  The disclosure of a non-privileged document cannot cause a waiver of privilege associated with a different document.

**B.  Under U.S. Law, Extrajudicial Disclosures Like These Do Not Give Rise To A Subject Matter Waiver**

Even if U.S. law applied, there would be no subject matter waiver.  Contrary to McLellan's arguments, the First Circuit's holding in *In re Keeper of Records* is not limited to disclosures made in the context of business negotiations or in situations where there is no anticipation of litigation.  The decision applies far more broadly, as the court held: "Where a

party has not thrust a partial disclosure into ongoing litigation, fairness concerns neither require nor permit massive breaching of the attorney-client privilege."  348 F.3d 16, 25.  Although the court did not say that an extrajudicial disclosure can "never" cause an implied waiver, it made clear that the circumstances in which that might happen would be "rare."  *Id.* at 25 n.6.

McLellan attempts to shoehorn this case into such a rare circumstance by mischaracterizing State Street as his "adversary" and as one that used privileged information against him as a "sword."  Neither are true.  State Street's cooperation with the government was not intended to, and did not, cast itself as blameless while inculpating McLellan.

McLellan incorrectly equates State Street's cooperation with waiver.  Apart from two narrow issues that are not germane to this motion,[8] State Street's cooperation did not include the disclosure of privileged information, let alone the use of such information as a sword against McLellan.  As reflected in its letter to the DOJ, ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████  Opp. Ex. B at 8-9 (labeled pages 30-31).  That information was not privileged, but in any event, using privileged information "to convince regulators and prosecutors to refrain from instituting proceedings against" the company is not the type of benefit that could trigger a subject matter waiver under *In re Keeper of Records.  In re Tyco Intern. Ltd. Multidistrict Litig.*, 2007 WL 710188, at *1 (D.N.H. Mar. 7, 2007) (applying *In re Keeper of Records* and rejecting subject matter waiver argument based on company's disclosure

---

[8]      State Street waived privileges with regard the two instances in which McLellan or Pennings incorrectly asserted that they received approval from Legal or Compliance to charge undisclosed markups, one of which relates to an issue on ███ Transition No. 121 and the other to a meeting with lawyers from the Herbert Smith law firm. State Street has produced the few additional related documents related to those topics that inadvertently remained on its privilege log.

in SEC filings of counsel's analysis of potential legal claims against former directors engaged in wrongdoing); *see United States v. Treacy*, 2009 WL 812033, at *2 (S.D.N.Y. Mar. 24, 2009) (disclosure of counsel's interview memoranda to SEC was not a "sword and shield" where "holder of privilege is not a party to the action and seeks no advantage against its adversary").[9]

### C.    The Expansive Waivers McLellan Seeks Are Not Permitted

McLellan does not dispute that the First Circuit has made clear that even in the "rare" case of an implied waiver from an extrajudicial disclosure, "the scope of any ensuing waiver will be *narrow*." *In re Keeper of Records*, 348 F.3d at 25 n.6.; *see Saint-Gobain/Norton Indus. Ceramics Corp. v. General Electric Co.*, 884 F. Supp. 31, 34 (D. Mass. 1995) (same, but outside the context of extrajudicial disclosures).[10]   That principle is clearly at odds with the broad waivers McLellan seeks.  Although he appears to accept that it would be inappropriate to extend a waiver to "the entire case," McLellan argues in the next breath that the waiver should extend to "transition management practices and the particular transitions at issue."  Opp. at 18.

That view appears to be based on the scope of Deloitte's report, which summarized its broad investigation for the FCA pursuant to § 166 of the U.K. Financial Markets and Services Act.  *See* Opening Br. Ex. F.  Given the nature of that engagement, Deloitte's report was not privileged under any country's law.  McLellan does not meaningfully argue otherwise, but

---

[9]      McLellan misses the point when he attempts to distinguish *Tyco* as involving disclosure through SEC filings rather than in response to the subpoena.  Opp. at 15 n. 14.  Regardless of forum, that case involved the disclosure of privileged information about wrongdoing by former directors, as McLellan argues State Street supposedly did here.  His attempt to distinguish *Treacy* as involving the disclosures of a smaller amount of privileged information than State Street supposedly disclosed is beside the point as to whether there was a waiver.

[10]      *See also Agility Public Warehousing Co. K.S.C. v. Dep't of Defense*, 110 F. Supp. 3d 215, 226-7 (D.D.C. 2015) (holding that to the extent privileged emails were disclosed, only a "quite narrow" waiver would be imposed, and noting the purpose of the attorney-client privilege "would be undermined if the Court brought to light a broad spectrum of communications simply because the Agency revealed a few conversations on a few narrow subjects"); *Hawk Mt. LLC v. Mirra*, 2016 WL 690883, at *2 (D. Del. Feb. 19, 2016) ("The scope of a subject matter waiver is generally narrow, even when the disclosure of attorney-client privileged information is intentional."); *Swift Spindrift, Ltd. v. Alvada Ins., Inc.*, 2013 WL 3815970, at *5 (S.D.N.Y. July 24, 2013) ("the scope of any subject matter waiver ordinarily is quite narrow") (internal quotations omitted); *United States v. Skeddle*, 989 F. Supp. 905, 908 n.2 (N.D. Ohio 1997) ("Realizing that fairness is at the heart of the waiver issue, courts have generally held that the 'same subject matter' is to be viewed narrowly.").

asserts that State Street provided Deloitte privileged information through Deloitte's interviews of

two State Street attorneys.  Opp. at 11; McLellan Feb. 24 Br. Exs. 2 & 3 (memorandum of

Phelan and Woodard interviews).  Although we do not believe that the limited, high-level

information reflected in those interview memoranda provides a basis for an implied waiver, they

would not support the broad waivers McLellan seeks.  Those memoranda in large part reflect

non-privileged process-oriented information.  To the extent they go deeper, it is related to three

employees' lack of awareness of the undisclosed markups, the disciplinary decisions of

McLellan, Pennings, and Boomgaardt, and one of the lawyer's involvement when the ███████

issue first came to light.  Although we do not believe that this limited information could cause an

implied waiver, the scope of any such waiver would have to "be *narrow*" and tailored to those

discrete topics.  *In re Keeper of Records*, 348 F.3d at 25 n.6 (emphasis added).[11]

## II.   The Subpoenas Should Be Quashed Because McLellan Has Not Satisfied The *Nixon* Requirements For Issuance of Rule 17(c) Subpoenas

### A.   Rule 17(c)'s Stringent Requirements

Although McLellan attempts to muddy it, the standard he must satisfy under Rule 17(c) is

clear.  The First Circuit, and every district court in this circuit that has addressed the issue, has

applied the Supreme Court's test in *United States v. Nixon*, 418 U.S. 683 (1974), to subpoenas

directed to parties and non- parties alike.  *See, e.g., United States. v. LaRouche Campaign*, 841

F.2d 1176, 1179 (1st Cir. 1988) (applying *Nixon* to subpoena issued to a third-party subpoena);

*United States v. Godfrey*, 2013 WL 5780439, at *1 (D. Mass. Oct.18, 2013) (same).  Under that

---

[11]   McLellan does not dispute that the information in those memoranda do not extend to:  (i) the entirety of State Street's internal investigation, which McLellan refers to as "Project Flag" (McLellan Feb 24 Br. at 4); (ii) regulatory investigations; (iii) client fees, remuneration, and revenue accrual; (iv) reviews of transition management agreements; (v) client communications; (vi) media and press communications; (vii) consultant communication/PWC engagement; (viii) communications with Inalytics; (ix) emails related to the Herbert Smith law firm; (x) transition management and business controls; (xi) non-disclosure agreements; and (xii) the ██████. *See* Opening Br. at 16.

test, McLellan must show that his requests clear three hurdles: "(1) relevancy; (2) admissibility; and (3) specificity." *Nixon*, 418 U.S. at 700; *LaRouche Campaign*, 841 F.2d at 1179.

McLellan concedes that *Nixon* has been uniformly applied in this circuit to subpoenas directed at third parties, but argues that if he has not satisfied the *Nixon* test (which he has not), the Court should consider an "alternative" approach that is more permissive of subpoenas to third parties and requires only that requested documents are material and relevant. Opp. at 20. Courts have recognized, however, that applying a different test for third parties has "limited support and [represents] a distinct minority view." *United States v. Al-Amin*, 2013 WL 3865079, at *7 (E.D. Tenn. July 25, 2013); *United States v. Khan*, 2009 WL 152582, at *2 (E.D.N.Y. Jan. 20, 2009) ("[T]his court declines to break from long-standing precedent in this circuit, which holds that all subpoenas must comply with the *Nixon* standard.").

McLellan accepts that the few cases on which he "relies . . . represent a minority view," Opp. at 20, but encourages this Court to depart from the First Circuit's authority and become the first court in this circuit to apply his "alternative" approach. But McLellan offers no compelling reason why the Court should do so, arguing only that his approach would still be good enough to prevent Rule 17(c) from becoming a "*general* discovery device." Opp. at 20 (emphasis added). But Rule 17(c) was "not intended to provide a means of discovery for criminal cases" at all. *Nixon*, 418 U.S. at 698. It was intended only to expedite trial by providing for a pre-trial inspection. *Id.* And McLellan's alternative test, which does not include the "admissibility" and "specificity" hurdles, would remove "Rule 17's limitations on criminal discovery" and thwart its purpose. *United States v. Ferguson*, 2007 WL 2815068, *3 (D. Conn. Sept. 26, 2007); *United States v. Wittig*, 250 F.R.D. 548, 552 n.11 (D. Kan. 2008) (citing *Ferguson* with agreement); *see also United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980) ("Courts must be careful

11

that Rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16").

Nor can McLellan make a convincing argument that a lesser standard is necessary to allow criminal defendants to have "a full and fair opportunity to prepare for trial." The *Nixon* standard has been widely employed since 1974, and it has not stood in the way of fairness.

### B.     McLellan Has Not Cleared *Nixon's* Relevance Hurdle

To obtain a Rule 17(c) subpoena, "[t]he moving party must show, among other things, that the material he seeks is evidentiary and relevant." *United States v. Concemi*, 957 F.2d 942, 949 (1st Cir. 1992); *Nixon,* 418 U.S. at 699 (same). That showing cannot be made with "conclusory statements that [the requested documents] are relevant." *United States v. Gikas*, 112 F.R.D. 198, 201 (D. Mass. 1986); *see also United States v. Shinderman*, 232 F.R.D. 147, 152 (D. Me. 2005) (same).

But conclusory statements of relevance are all that McLellan has offered. His initial motion devotes all of *two sentences* to showing that the 94 separate telephone calls at issue in his first subpoena are relevant. Those sentences amount to McLellan's assertion that the calls are "plainly relevant" because they somehow "pertain to State Street's EMEA transition management activities, policies, practices, and/or to the specific transitions " at issue, occurred at some point during the eighteen-month period in which the alleged conspiracy took place or at some point during the investigation, and, he surmised, are likely to contain information "regarding who did what when and on what authority." McLellan Feb. 24 Br. at 21. The conclusory, non-specific nature of that explanation is evidenced by the fact that McLellan was later able to file three more motions which requested another 700 documents that McLellan assigned into a *dozen* new categories, but without virtually *any* additional argument, let alone showing, of relevance. He merely incorporated his first motion by reference.

It takes much more to satisfy *Nixon*.  To overcome a motion to quash, the proponent of a subpoena "must prove" that the materials he seeks are "relevant and admissible."  *United States v. Manghis*, 2010 WL 349583, *2 (D. Mass. Jan. 22, 2010).  "If the moving party cannot reasonably specify the information contained in or believed to be contained in the documents sought . . . this is a sure sign that the subpoena is being misused."  *United States v. Noriega*, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991); *see also United States v. Western Titanium*¸ 2010 WL 4569890, * 2 (S.D. Cal. Nov. 4, 2010) ("While exquisite specificity may not be required . . . , the wholesale production of documents which may ultimately turn out to contain little or no material evidence is certainly not condoned.").  McLellan makes no meaningful effort to defend the specificity of his initial effort.  He attaches redacted transcripts for two telephone calls, but argues that the missing detail for the other 700 documents and 94 recorded telephone calls "is sufficiently provided in State Street's own privilege logs."  Opp. at 21.

McLellan cites no case in which the descriptions in a privilege log were enough to clear *Nixon's* relevance hurdle, and in any event, State Street's log descriptions cannot be mistaken as a proxy for "relevance."  In his initial motion, McLellan defined that term as meaning that a document has a "'tendency to make the existence of *a fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence.'"  McLellan Feb. 24 Br. at 19 (quoting *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006) (emphasis added)).

The fact that State Street logged a document as privileged has no relation to that standard. State Street produced documents in response to broad requests by the FCA or the government that were not limited in subject matter scope, such as requests for the entire mailboxes of four individuals over an almost two-year period and requests for any recorded telephone call

13

involving a number of people over similarly broad periods of time.  Privileged documents captured by those requests were logged regardless of subject matter or relevance to the issues under investigation.  McLellan's dragnet approach to "selecting" the documents to subpoena has not added anything in terms of relevance.  Many of the documents he seeks were described on State Street's logs as discussing advice regarding a "transition management agreement," "client negotiations," "contract negotiations," "transitions," "requests for proposals," "client communications," "periodic notices," or "transaction reporting."  *See, e.g.,* Opening Br. Ex. A, log entries 14, 28, 35, 37; Ex. B, log entries 1194, 3922, 3934, 5061; Ex. C, log entries 8, 16, 20, 21.  Thus, numerous descriptions of the documents McLellan has selected give no indication that the document relates to one of the six overcharged clients at issue.  And, even where a description does reflect a relevant client, McLellan offers nothing to show that the documents relate to "a fact" about one of those clients' transitions "that is of consequence to the determination of the action."

It is also insufficient for McLellan to assert that he has cleared the relevance hurdle in connection with documents that have some relation to State Street's internal investigation or to Deloitte's Section 166 investigation, two different things that McLellan lumps together, along with many others, as "Project Flag."  Those investigations extended far beyond the transitions at issue in the indictment.  For example, a focus of each investigation was to ensure that there were no other overcharged clients, whether in the U.K. or in other regions of the world.  Deloitte's major work streams also included assessing and enhancing State Street's systems, operational controls, governance arrangements, culture, and the functioning of State Street's compliance, risk management, and internal audit functions.  None of those issues relate to whether McLellan defrauded the six clients at issue in the indictment.

14

The reality is that despite his assertions, McLellan has no idea how any of the documents may have a "tendency to make the existence of *a fact that is of consequence* to the determination of the action more probable or less probable." McLellan Feb. 24 Br. at 19. He has made broad requests on the "mere hope that something of value might turn up," and is consequently unable provide any detail beyond the high-level information in State Street's privilege logs. That is not enough. As courts have held, *Nixon's* "specificity and relevance elements require more than the title of a document and conjecture as to its contents." *United States v. Arditti,* 955 F.3d 331, 345 (5th Cir. 1992); *Wittig*, 250 F.R.D. at 552 (same).

### C.    McLellan Has Not Cleared *Nixon's* Evidentiary Hurdle

McLellan has also failed to "show" that the documents he seeks are admissible. *Concemi*, 957 F.2d at 949; *see Manghis*, 2010 WL 349583 at *2 (proponent "must prove" that the materials he seeks are "admissible"); *Shinderman*, 232 F.R.D. at 150 ("The burden is on the party seeking the subpoena to 'show the evidentiary nature of the requested materials with appropriate specificity.'"). His argument begins with the *ipse dixit* assertion that his motions "identified reasons" why the materials were admissible on grounds "other than impeachment." Opp. at 22. Not so. McLellan's motions do not explain the purported non-impeachment grounds for admissibility with respect to any particular document.

McLellan's blanket argument that the documents he seeks might turn up impeachment evidence is also unavailing. To begin with, the only witness he identifies is Rick Boomgaardt, who is not even on the substantial majority of the documents McLellan seeks. McLellan does not argue otherwise, but still clings to impeachment as a basis to satisfy *Nixon*. Although he has not received the government's witness list, McLellan speculates that some unnamed traders, compliance personnel, senior management, and/or lawyers may be called to testify. Opp. at 23. But even if someone from one or more of those groups is called, it remains to be seen who that

would be.  Thus, McLellan cannot deny the great likelihood that his subpoenas seek numerous communications between witnesses who may never testify.  He likewise cannot assert that all of the documents he requested are likely to yield impeachment evidence.

McLellan's argument also collapses under the weight of his prior arguments.  In his initial motion, McLellan argued:  "While impeachment evidence may ordinarily not satisfy the *Nixon* standard, this Court has the discretion to order pretrial production 'where a putative key witness, whose general testimony is already known, is scheduled to testify.'"  McLellan Feb. 24 Br. at 21 (quoting *LaRouche Campaign*, 841 F.2d at 1180).  Unidentified witnesses obviously cannot be considered "putative key witnesses."[12]

And even though Boomgaardt may be a key witness, McLellan's non-specific, blanket arguments that the documents may provide impeachment evidence do not clear the admissibility hurdle with respect to the more than one hundred varied communications he seeks that involve Boomgaardt.  Although *LaRouche Campaign* did not foreclose the use of Rule 17(c) subpoenas for impeachment purposes, it also did not open the door to dragnet subpoenas that seek hundreds of documents in the hope that some of them may turn up some impeachment evidence.  To the contrary, as McLellan recognized, the general rule is that "'the need for evidence to impeach witnesses is insufficient.'"  841 F.2d at 1180 (quoting *Nixon*, 418 U.S. at 700).

Furthermore, the First Circuit's decision in *LaRouche Campaign* was based on a far more specific showing that the requested materials (out-takes of a single interview of a key witness) were likely to yield impeachment evidence.  After reviewing the parts of the interview that aired and the witness's prior testimony in a related case, the court concluded that the district court did not err in ordering production because there was a sufficient "likelihood that the outtakes would

---

[12]     The cases McLellan cites are also limited to key witnesses.  *See, e.g., United States v. Cusick*, 2011 WL 5036008, at *1 (D. Mass. Oct. 20, 2011) (subpoena sought complaints filed by "the alleged victim" in the case); *United States v. Shinderman*, 432 F. Supp. 157, 159 (D. Me. 2006) (subpoena sought documents relating to a complaint filed by "one of [the defendant'] chief accusers" who was "expected to testify at trial").

reveal inconsistent statements and bias." 841 F.2d at 1180. McLellan has made no such showing here. He provides no information about Boomgaardt's expected testimony, and no explanation of how any particular document is likely to reveal an inconsistent statement or bias.

Unable to make that showing, McLellan argues that this is an issue within the court's discretion. But that does not mean that anything related to an expected key witness can be subpoenaed in the hope it will turn up some impeachment evidence. Just as the "[m]ere speculation as to the content of documents is hardly a showing of relevance," *Concemi*, 957 F.2d at 949, it is hardly a showing of admissibility. *See Gikas*, 112 F.R.D. at 201 ("[A] defendant must show more than a 'mere hope' that something of value might turn up in the documents.").

Nor can McLellan argue that courts apply their discretion under *LaRouche Campaign* loosely. As reflected in two cases from this district, that is not the case.[13] In one, the court declined to issue a subpoena that sought documents for "prospective use" as impeachment material. *United States v. Decologero*, 2006 WL 83471, *2 (D. Mass. Jan. 13, 2006). In the other, which McLellan cites as support for his argument, this Court conducted the same type of analysis that the First Circuit conducted in *LaRouche Campaign*. *United States v. Cusick*, 2011 WL 5036008 (D. Mass. Oct. 20, 2011) (Sorokin, J.). The defendant in that case was a fisherman charged with assaulting and sexually harassing a NOAA monitor. The Court denied a motion to quash a Rule 17(c) subpoena for other complaints the victim filed because (i) the defendant had made a showing that the monitor testified to the grand jury that the only complaint she ever filed against a fisherman was the complaint in that case; and (ii) the defense counsel proffered that she

---

[13] The bulk of the cases McLellan cites are inapposite because they are from outside the First Circuit and are not bound by *LaRouche Campaign*. The others do not support McLellan's implicit assertion that anything related to a key witness can be subpoenaed as potential impeachment evidence. For example, in *United States v. Cusick*, 2011 WL 5036008 (D. Mass. Oct. 20, 2011), the court conducted the exacting analysis discussed above. Another, *United States v. O'Neill*, 2010 WL 330215, *2 (D. Me. Jan. 21, 2010), did not reach the question of whether the defendant had satisfied *Nixon's* admissibility prong because the defendant had "failed to satisfy the relevance prong."

had filed others.  *Id.* at *1 (holding that the subpoena sought "specific documents concerning an impeachment matter").  McLellan has offered nothing comparable.[14]

## CONCLUSION

For the foregoing reasons, as well as those set forth in State Street's opening brief, State Street respectfully requests that the Court all State Street's motion to quash.

Respectfully submitted,

STATE STREET BANK AND TRUST COMPANY

By its attorneys:

*/s/ John J. Butts*
John J. Butts (BBO No. 643201)
Harry Weiss (BBO No. 521180)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000
Dated: August 1, 2017                 john.butts@wilmerhale.com

---

[14]     McLellan's underestimates his failures to comply with *Nixon* when he argues the documents will inevitably be subject to a trial subpoena if the Court finds a waiver.  Putting aside that there has been no waiver, his subpoenas would fail for the same reasons if he submits the same requests later.  It is disingenuous for McLellan to ask the Court to overlook those failures based on his conjecture that a request closer to trial would inevitable delay the trial. There is no reason to expect delay if McLellan appropriately narrows the subpoenas to the documents, if any, about which he can satisfy *Nixon* requirements.

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2017, a copy of the foregoing was served via email to the registered participants of the ECF system in the above-captioned matter.

*/s/ John J. Butts*

John J. Butts