UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 16-10094-LTS |
| ) | Leave to File Granted |
| ROSS MCLELLAN, ) | February 26, 2018 |
| Defendant ) | |

**DEFENDANT ROSS MCLELLAN'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO HIS MOTION TO SEVER COUNT 6**

For the reasons set forth herein and in defendant McLellan's opening motion, Mr. McLellan's Motion to Sever Count 6, Dkt. 292, should be granted.

As described in Mr. McLellan's opening motion, nearly all of the factors relevant to the Rule 8 analysis support his argument that Count 6 and the EMEA charges are not properly joined. *See* Dkt. 292 at 5-7. Indeed, the Government concedes that Mr. McLellan's alleged EMEA co-conspirators "were not involved" in the alleged fraud against the U.S. Insurance Company and makes no representations that alleged U.S. Insurance Company co-conspirators were involved in Counts 1-5. Dkt. 298 at 7. Beyond the "vague thematic connection" of purportedly hidden commissions, which is insufficient to support joinder for the reasons set forth in Mr. McLellan's opening motion, Dkt. 292 at 7-8, the Government falls back on Mr. McLellan himself as providing "the common link between the six EMEA clients and the U.S. client." Dkt. 298 at 4. But the mere accusation of the defendant's involvement in two disparate instances of criminal conduct cannot support joinder, even where there is a temporal relationship between the charges. *See United States*

*v. Hawkins*, 776 F.3d 200, 209 (4th Cir. 2009).  Indeed, under a contrary rule, joinder of counts against a single defendant would be appropriate in each and every case.

Among other distinctions, Mr. McLellan's opening motion emphasized that "State Street's interactions with the U.S. Insurance Company were governed by a meaningfully distinct legal and regulatory regime from that applicable to its relationships with EMEA clients." Dkt. 292 at 6.  The Government does not dispute this point, but instead attempts to undermine its relevance.  First, the Government posits that the regulatory differences are only pertinent to Mr. McLellan's "potential defenses."  Dkt. 298 at 5.  But, in order to convict Mr. McLellan, the government will have to prove, among other things, "a material misrepresentation or omission."  *In re Atl. Power Corp. Sec. Litig.*, 98 F. Supp. 3d 119, 128 (D. Mass. 2015).  As Mr. McLellan has already explained, "[w]hether or not a particular representation was false or misleading must necessarily be judged against the backdrop of applicable disclosure requirements and regulatory guidance." Dkt. 292 at 6.  Again, the Government does nothing to controvert this statement, instead conclusorily responding that this is not "an omissions case," but instead a case "about *affirmative* misrepresentations." Dkt. 298 at 6.[1]  In any event, in a recent decision by this Court, Judge Talwani relied on differing disclosure requirements to sever fraud charges based on alleged affirmative misrepresentations.  *See United States v. Withrow*, No. 15-CR-10261, 2017 WL 5707529, at *2 (D. Mass. Nov. 27, 2017) ("There is no allegation that the specific disclosure rules which Defendant is alleged to have violated during the [first] scheme were relevant to the [other]

---

[1] In light of the position articulated by the Government on this point, Mr. McLellan will shortly file a motion to strike any language referencing alleged omissions from the superseding indictment and to preclude the Government from relying on an omission theory at trial.

scheme.").[2] The Government does not discuss or even acknowledge this precedent.[3]

In order for discrete counts to be tried together under Rule 8(a), "[a] rational basis in fact, sufficient to warrant joinder, must be discernible *from the face of the indictment*." *United States v. Boylan*, 898 F.2d 230, 245 (1st Cir. 1990) (emphasis added). The Government's opposition instead relies in large part on new and unverified assertions to justify joinder of Count 6 with the pre-existing EMEA counts. The opposition includes, among others factual representations which are unaccompanied by any exhibit that would provide context for what are in essence entirely new allegations: (1) Mr. McLellan took unspecified "specific steps . . . . to prevent the overcharges [alleged in Count 6] from being detected during State Street's internal investigation," Dkt. 298 at 3; and (2) Mr. McLellan made certain "incriminating admissions to his co-conspirators in Europe regarding the transition in the U.S," *id.* at 6. The Government also represents that "few, if any,

---

[2] Here, the differences between U.S. legal and regulatory norms and those governing transitions for EMEA clients are reinforced by the fact that State Street employed separate legal and compliance personnel, issued separate compliance communications in those two regions, and of course was subject to the practices of distinct governmental regulatory agencies. These distinctions are unaffected by the Government's suggestion that, on one occasion, State Street's EMEA personnel interacted with U.S. compliance staff.

[3] The Government suggests other distinctions between Count 6 and the EMEA charges in its own opposition. It states, for example, that State Street "entered into the transition with the U.S. Insurance Company *without* any transition management agreement in place and *without* consulting with the bank's legal department." Dkt. 298 at 7. Each of the three EMEA transitions specifically referenced in the indictment was, by contrast, conducted pursuant to a transition management agreement. Counsel for Mr. McLellan also understand, based on their initial review of the new discovery, that the U.S. Insurance Company was a client of State Street Global Advisors, which was referred to the Portfolio Solutions Group by the bank's advisory arm. For these reasons, among others, Mr. McLellan anticipates needing an additional expert witness to opine on the parties' relative obligations to formalize their understanding in a written agreement and what, if any, rights each party may have in the absence of such an agreement. Further, it is Mr. McLellan's understanding that State Street's relationship with the U.S. Insurance Company was not governed by the specialized disclosure rules set out in the Employee Retirement Income Security Act, a separate matter that will likely require additional factual or expert testimony.

additional witnesses will be required to prove the new count," *id.* at 5, but it does not and has not committed itself to not calling new and additional co-conspirators as witnesses (although it has informed the undersigned that at this time there is no intention to rely on the testimony from any new cooperating co-conspirator). Given the First Circuit precedent's reliance on the face of the indictment, *see, e.g.*, *Boylan*, 898 F.2d at 245, at the very minimum if the Government believes that joinder is warranted based on facts not set out in the indictment itself, the defendant would request a more particularized evidentiary proffer, *see, e.g.*, *Hawkins*, 776 F.3d at 208 n.4; *United States v. George*, No. 03-CR-10091, 2004 WL 746282, at *2 (D. Mass. Apr. 6, 2004).

To the extent the Court is inclined to rely on the Government's unverified factual assertions, Mr. McLellan requests that it first require an evidentiary proffer sufficient to confirm the accuracy of those claims. To do otherwise and proceed to a joint trial based on such general statements of "fact" would risk a mistrial request in the event that the Government's characterizations are not borne out by the trial evidence due to the predictable spillover prejudice that would result from the joinder of counts.[4]

Even if, despite the fundamental differences between Count 6 and the EMEA charges, the

---

[4] Indeed, these new factual assertions by the Government are not to the undersigned's knowledge contained in the discovery. Further, there would be no reason for Mr. McLellan to discuss, much less make "incriminating admissions" about, the U.S. Insurance Company transition with his alleged EMEA co-conspirators, presumably Pennings and/or Boomgaardt, who both worked exclusively on EMEA transitions, had nothing to do with any U.S. domestic transition, and who apparently made no mention of these admissions in their initial proffers/disclosures to the Government. *See* Dkt. 298 at 3 ("The government first learned of the potentially fraudulent transition . . . via a self-disclosure by State Street on October 25, 2017."). Additionally, Mr. McLellan has been provided with no evidence of steps he is alleged to have taken to interfere with any internal investigation about the matters alleged in Count 6 or even that there was any ongoing internal investigation relating to the domestic insurer's transition prior to the time McLellan left State Street in early October of 2011.

Court finds that joinder is proper under Rule 8, it should nonetheless exercise its discretion to sever the charges under Rule 14. The Government's argument to the contrary is heavily predicated on its position that "*all* of the evidence pertaining to" the EMEA counts "would be admissible in a separate trial on Count Six, and vice-versa." Dkt. 298 at 1 (emphasis added). This assertion is somewhat remarkable in light of the Government's concession that the two sets of charges involve absolutely no overlap in the alleged co-conspirators (other than Mr. McLellan himself) or the alleged victims. The Government, while paying lip service to Federal Rule of Evidence 404(b), maintains that evidence relating to Count 6 would be admissible at a separate trial on the pre-existing counts as "intrinsic" to the EMEA conspiracy, or as part of the same "common scheme or plan." Dkt. 298 at 8-9. The Government is wrong on both points.

Evidence qualifies as "intrinsic," and thus is not subject to the strictures of Rule 404(b), only where it "directly proves the charged offense." *United States v. Green*, 617 F.3d 233, 248 (3d Cir. 2010) (citation omitted). This category includes "the necessary description of the events leading up to the charged crime." *United States v. Robles-Alvarez*, 874 F.3d 46, 50–51 (1st Cir. 2017) (citation omitted). The precedents cited by the Government all fit comfortably within this framework. *See, e.g.*, *United States v. Roszkowski*, 700 F.3d 50, 56 (1st Cir. 2012) ("[T]he fact that [the defendant] discharged his weapon is intrinsic to its felonious possession."). Here, by contrast, the alleged fraud on the U.S. Insurance Company is in no way "necessary" to the description of the pre-existing charges. The conspiracy alleged in the original indictment was expressly limited to "transition management clients in the EMEA region," and therefore, by its terms, did not include any transition conducted on behalf of the U.S. Insurance Company. Dkt. 1 at ¶ 7. Indeed, the EMEA transitions were conducted by a distinct legal entity – State Street Bank

Europe Limited. That entity was supported by different compliance and legal departments, had different employees, and operated under a different regulatory regime. This separateness is reinforced by the fact that, in its superseding indictment introducing Count 6, the Government made only one change to its EMEA allegations to correct a "typographical error." Dkt. 298 at 2 n.1. Thus, the Government can describe, and in fact has described, the alleged EMEA conspiracy without a single reference to the U.S. Insurance Company. In arguing that Count 6 is nonetheless intrinsic to the EMEA counts, the Government suggests that the charges "involve[] many of the same [unidentified] witnesses." Dkt. 298 at 9. It also cites certain unspecified "ongoing conversations (including with traders)" that purportedly connect the allegations. *Id.* As described above, absent an evidentiary proffer, neither Mr. McLellan nor the Court can be expected to simply accept the Government's representations at face value. Other than U.S. traders who executed trades that were part of both the EMEA transitions and the domestic transition, the discovery reviewed to date reflects no common participants or conversations.

For two offenses to constitute part of a "common scheme or plan" for purposes of admissibility under Rule 404(b), one must "lead[] in a progression" to the other. *United States v. Lynn*, 856 F.2d 430, 435 (1st Cir. 1988). This can rarely, if ever, be the case where, as here, "[t]he participants in both events were entirely different." *Id.* The roles played by alleged co-conspirators are particularly important in the present case, where, at least with respect to the EMEA conspiracy, Mr. McLellan is not alleged to have had any direct interaction whatsoever with the relevant clients. Rather, Mr. McLellan is said to have acted through others, namely Pennings and Boomgaardt, who allegedly made false representations at his "direction." *See, e.g.*, Dkt. 282 at ¶ 14. It is difficult to conceive of two discrete fraud charges as connected by a single scheme absent

any overlap among the individuals alleged to have actually made the fraudulent representations.[5]

Crucially, the Government may not establish a "common scheme" sufficient to avoid exclusion under Rule 404(b) by merely alleging "repeated performance of the same class of crimes." *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979). Under such a loose definition, any relevance that the uncharged misconduct might hold would be based on precisely the type of propensity reasoning proscribed by that rule (*i.e.*, Mr. McLellan defrauded one client, which makes it more likely that he defrauded other clients as part of a "common scheme"). Instead, the Government was required to articulate a "common non-propensity thread connecting" Count 6 to the EMEA charges. *Lynn*, 856 F.2d at 435. This it has failed to do. The Government insists that "[t]he jury need make no inference that McLellan had a criminal propensity to conclude that he developed a plan to defraud transition clients where possible during 2010 and 2011." Dkt. 298 at 10. But it never connects the purported existence of that common plan to the pre-existing EMEA charges in a chain of logical inferences not including criminal propensity. There is, for example, no suggestion that any aspect of the supposed plan was "so unusual and distinctive as to be like a signature," thereby tending to prove that the perpetrator of one offense must also have committed the other. *Phillips*, 599 F.2d at 136 (citation omitted). Nor does evidence relating to Count 6 tend to prove any idiosyncratic motive relevant to the EMEA conspiracy. *Cf. United States v. DeCicco*, 370 F.3d 206, 213 (1st Cir. 2004). Of course, Mr. McLellan's purported desire to "generate extra

---

[5] While the indictment is not a model of clarity on this point, the Government's opposition could be read to imply that the allegedly fraudulent statements to the U.S. Insurance Company were made by Mr. McLellan himself. *See* Dkt. 298 at 3. This is yet another example of an unsubstantiated assertion by the Government. Additionally, even assuming (without conceding) the accuracy of this characterization, the suggestion that Mr. McLellan may have had some direct interaction with the U.S. Insurance Company actually serves to further distinguish Count 6 from the EMEA charges.

revenue for State Street" is not sufficiently particular to provide the requisite connection. Dkt. 298 at 10. Otherwise almost all financial crimes committed by the same actor could be described as parts of a broader common scheme. This close analysis exposes the Government's "common scheme" contention for what it is: a veiled argument based on criminal propensity. *See Withrow*, 2017 WL 5707529, at *2 (stating that the government's description of offenses as part of a common scheme "blur[red] the line between propensity evidence and modus operandi").[6]

With respect to Federal Rule of Evidence 403, the Government suggests that evidence of Mr. McLellan's involvement "in seven, rather than six, fraudulent transitions" will not "inflame a jury or cause jurors to render a verdict on an improper basis." Dkt. 298 at 10. The Government does not, however, address whether evidence that Mr. McLellan defrauded "at least six" EMEA clients might prejudice the jury against him in a trial focused on the sole fraud allegedly committed against the U.S. Insurance Company. Mr. McLellan submits that the Government's piling on of "at least six" additional allegations would give rise to a substantial likelihood of prejudice. *See* Maguire, *Proposed New Federal Rules of Criminal Procedure,* 23 Ore. L. Rev. 56, 58-59 (1943) ("We all know that, if you can pile up a number of charges against a man, it is quite often the case that the jury will convict, where, if they were listening to the evidence on one charge only, they

---

[6] The Government also suggests in passing that evidence relating to Count 6 would be admissible at a trial on the EMEA charges to prove Mr. McLellan's "knowledge, intent, and absence of mistake." Dkt. 298 at 9. This argument, however, suffers from a flaw similar to that identified above: the Government neglects to explain how the evidence would tend to establish Mr. McLellan's knowledge other than through a propensity inference (*i.e.*, because Mr. McLellan knowingly defrauded one client, he is more likely to have knowledge of the other alleged frauds). Moreover, the differences between the applicable legal and regulatory regimes identified above negate any connection that might otherwise be drawn. *Cf. United States v. Klein*, 515 F.2d 751, 756 n.14 (3d Cir. 1975) (explaining that "prior crimes, like mail fraud and conspiracy . . . can arise in so many different factual contexts, that no rule can be stated as to what knowledge a prior conviction will give").

would find it wholly insufficient as to the degree of proof required.").

Finally, the Government's decision to add a new substantive count against Mr. McLellan less than four months before trial will significantly prejudice his defense absent relief from the Court. The Government has produced more than 58,000 pages of discovery in connection with the new charge. Counsel for Mr. McLellan has been told of the potential for additional discovery. Counsel will be seeking additional discovery, whether through Rule 16 or Rule 17, including emails during the relevant time periods of at least two new alleged co-conspirators who relate solely to Count 6. This quantum of new discovery, in itself, undermines any claim that the alleged fraud on the U.S. Insurance Company is "intrinsic" to the EMEA conspiracy. The Government suggests that the resulting burden on Mr. McLellan is somehow lessened, to the point of being "minimal,"[7] Dkt. 298 at 1, by the voluminous discovery produced prior to the superseding indictment. In fact, the opposite is true. As noted in his opening motion, "Mr. McLellan has significant work left to do to prepare his defense to the pre-existing charges." Dkt. 292 at 11. Among other things, Mr. McLellan has only recently received a significant number of new documents in response to his Rule 17(c) subpoenas, and he continues to seek important documents from non-U.S. entities relevant to the EMEA charges. Now, as a direct result of the superseding

---

[7] In connection with its argument on this point, the Government inaccurately characterizes the relative resources available to the parties. Regardless of whether Mr. McLellan has retained more lawyers than the Government has currently assigned to this case, there is no way for him to replicate or match the vast resources that the U.S. Department of Justice brings to bear against him. This imbalance is only heightened by the Government's ability to seek assistance from federal agencies such as the Securities and Exchange Commission ("SEC"), as well as from State Street and its counsel. The Government is also believed to be relying upon a third-party electronic discovery consultant to assist it in managing the massive amount of documents, and presumably the more than 13,000 audio files, related to this case.

indictment, Mr. McLellan must take time away from these efforts to review tens of thousands of pages of new discovery, possibly seek and review additional discovery from relevant third parties, identify possible new fact witnesses (*e.g.*, employees of the U.S. Insurance Company who interacted with State Street), identify and retain at least one new expert witness, file any necessary pre-trial motions, and develop new defense theories. And he must do all of this in the brief window, now just over three months, prior to the scheduled June 4 trial date, all the while tending to the countless other matters requiring attention in the final period leading up to a complex federal trial. Such trial preparations will include, among other things, review of any Jencks Act material of the post 2011-12 interviews of the EMEA co-conspirators by the Government and/or SEC, witness lists, potential exhibit lists, and expert disclosures provided by the Government, none of which have been received to date. The Government suggests its willingness to relieve the substantial burden on Mr. McLellan somewhat by sharing with him a binder of "hot" documents relating to Count 6. While Mr. McLellan appreciates the Government's offer and awaits receipt of the binder, he has the right to have his own legal counsel review the Government's productions and decide what documents are important, not only to the Government's case against him but also to his potential defenses.[8]

For the foregoing reasons, and the reasons set forth in his opening motion, Mr. McLellan's Motion to Sever Count 6 should be granted.

---

[8] As noted in Mr. McLellan's opening motion, if the Court declines to sever Count 6, Mr. McLellan has no choice but to request a continuance so that he can adequately prepare for trial on the new substantive count, as well as the pre-existing charges. The Government has expressed its willingness to agree to a "modest continuance." Dkt. 298 at 13. If the Court decides to pursue this route, despite Mr. McLellan's strong preference to defend himself against the EMEA charges on June 4 as scheduled, Mr. McLellan requests that the new trial date be set for at least one week after August 4 to accommodate Mr. Weinberg's family wedding that is scheduled on that date.

Respectfully submitted,

Ross McLellan
By his Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: February 26, 2018

## CERTIFICATE OF SERVICE

    I, Martin G. Weinberg, hereby certify that on this date, February 26, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

                                                **/s/ Martin G. Weinberg**
                                                Martin G. Weinberg