UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 16-10094-LTS |
| | ) | |
| ROSS MCLELLAN, | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANT ROSS MCLELLAN'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE
RELATING TO ALLEGED CONCEALMENT AND INCORPORATED
MEMORANDUM OF LAW**

Now comes the defendant Ross McLellan and respectfully requests that this Honorable Court

exclude all evidence relating to alleged acts and statements of himself or any alleged coconspirator

occurring after May 24, 2011. Alternatively, should the Court conclude that the evidence is

admissible, defendant requests that this Court instruct the jury that it cannot find that acts or

statements relating to alleged concealment of the alleged fraud (both securities fraud and wire fraud)

from transition management clients, including the British Government Pension Fund, and from the

State Street compliance staff were part of the charged conspiracy to commit securities fraud and wire

fraud unless it finds that McLellan entered into an original conspiratorial agreement in 2010 that

included an express original agreement to conceal the alleged fraud from both the transition

management clients and from State Street compliance personnel after the main conspiratorial

objectives alleged had been accomplished.

As reason therefor, defendant states:

1. The superseding indictment generally alleges that, as part of the conspiracy, McLellan,

"together with Pennings, Boomgaardt and others known and unknown to the Grand Jury, *agreed* to mislead clients and others and others about what State Street was charging for transition management services, by (1) secretly charging commissions on securities trades conducted as part of certain transitions over and above the agreed upon fees for those transitions; (2) actively concealing the hidden commissions from the affected clients and *from others within State Street*; and taking additional steps to cover up what they had done." Indictment, ¶9 (emphasis added). The indictment further alleges that an object of the conspiracy "was to conceal the hidden commissions from clients, and *from others within State Street*, including through the use of false and misleading periodic notices, post-trade reports, and other documents." Indictment, ¶11 (emphasis added)..

2. Among the "Manner and Means" of the conspiracy was, the indictment alleges:

When one of the affected clients inquired about whether it had, in fact, been charged commissions in breach of its agreement with State Street, McLellan, Pennings, and Boomgaardt sought to cover up their actions. Among other things, Pennings initially denied that any commissions had been charged, and later—at McLellan's direction—acknowledged only that some commissions had been "inadvertently" charged on securities traded in the United States, but did not disclose that they had, in fact, been intentionally charged, both in the United States and also in Europe. McLellan, Pennings and Boomgaardt also sought to mislead State Street's compliance staff into believing that the commissions had been charged in error and that the amount of the overcharges was limited to the commissions applied on U.S. securities.

Indictment, ¶12(d).

3. The indictment further alleges the following overt acts of concealment:

¶36.   After the British Government Pension Fund independently learned that commissions had been charged on certain U.S. trades, McLellan, Pennings, and Boomgaardt took steps to prevent the British Government Pension Fund, and State Street's internal compliance staff, from learning the truth, by falsely telling them that the commissions had been charged by mistake and were limited to the U.S. For example, in a response to a June 21, 2011 email from an executive of the British Government Pension Fund requesting confirmation that "£242,305 . . . is the sole revenue for [State Street] and/or any of its

affiliates on this event," Pennings responded: "Yes—£242, 305 (It should equal 1.75 [basis points] of the total assets)."

¶37.  When the fund executive informed Pennings that auditors reviewing publicly available data had discovered what appeared to be a one basis point commission on all U.S. trades, Pennings responded: "That doesn't seem right so let me investigate with the US desk and get back to you.

¶38.  On or about June 22, 2011, McLellan directed Pennings to advise the British Government Pension Fund that State Street had applied "inadvertent commissions" to U.S. trades, but not to disclose that commissions had also been applied to European trades, for which market trading results were not publicly available. At McLellan's direction, State Street refunded the British Government Pension Fund the approximately $1 million in commissions it had secretly charged on U.S. trades—but not the approximately $2 million State Street had, unbeknownst to the fund, charged on European trades.

¶39.  McLellan and Pennings later advised State Street's compliance staff that State Street had erroneously charged the British Government Pension Fund a commission on U.S. trades—but not that State Street had charged the commissions intentionally, or that it had also charged a commission on European trades.

4.  The last act necessary to complete the last of the transitions that are the subject of the conspiracy charged in Count One appears to have been the final post-trade report sent to the Irish Government Pension Fund on May 24, 2011, at the completion of all trading necessary to complete the transition.

5.  The alleged acts and statements relating to concealment from the British Government Pension Fund and from State Street compliance staff occurred after the main objectives of the alleged fraud conspiracy had been achieved (assuming *arguendo* that such a conspiracy existed). They were not part of the main conspiracy but were, instead, at most, the subject of a separate, later-formed concealment agreement. As such, these acts and statements are not admissible as over acts in furtherance of the conspiracy, nor are the post- May 24, 2011, statements of alleged coconspirators admissible as coconspirator statements made in furtherance of the conspiracy.

As further reason therefor, defendant refers the Court to the Memorandum of Law incorporated herein.

## MEMORANDUM OF LAW

The analysis of this issue must begin with *Grunewald v. United States*, 353 U.S. 391 (1957), which in turn drew on the Court's prior decisions in *Krulewitch v. United States*, 336 U.S. 440 (1949), and *Lutwak v. United States*, 344 U.S. 604 (1953). In *Grunewald*, the Court held that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." 353 U.S. at 401-02. The Court further explained:

> Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators. For every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators.

353 U.S. at 402. The Court stressed that "*a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.*" *Id.* at 405 (emphasis added). In such latter cases, the Court continued, "the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." *Id.* at 405-06.

4

Thus, the central question where concealment allegations are concerned is when the conspiracy ended. "A conspiracy endures as long as the co-conspirators endeavor to attain the 'central criminal purposes' of the conspiracy." *United States v. Upton*, 559 F.3d 3, 10 (1st Cir. 2009). Concerning the distinction made by the *Grunewald* Court, the First Circuit in *Upton* noted that where the central objectives of the conspiracy have been attained, "the government must present some proof of *an express original agreement to engage in the acts of concealment*." *Id.* at 14 (emphasis added).[1] *See United States v. Twitty*, 72 F.3d 228 (1st Cir. 1995)("Mere efforts to conceal a crime do not automatically extend the life of the crime itself, but acts of concealment can extend the life of a conspiracy if the proof shows an express original agreement among the conspirators to continue to act in concert in order to cover up their crime" (internal quotation marks omitted)).

While the indictment alleges that the concealment efforts were part of the main conspiracy, those allegations are not controlling at trial. What matters is what the trial evidence shows regarding the scope of the original conspiratorial agreement.

> The government says that the conspiracy continued through 2005 because the indictment alleged that one object of the conspiracy was to conceal the conspiracy itself and the acts committed in furtherance thereof. The government's idea is that the language of the indictment is controlling. . . . If this is supposed to mean that one need look only at the indictment to determine the duration of the conspiracy, the government is quite mistaken.

*United States v. Turner*, 548 F.3d 1094 (D.C. Cir. 2008). *See, e.g., United States v. Hong Vo*, 978 F.Supp.2d 49, 54 (D.D.C. 2013)("[T]he language in the indictment—charging that the conspiracy

---

[1] In *Upton*, the Court held that the acts of concealment were in furtherance of the main objects of the conspiracy, where the conspiracy charged was a concealment money laundering conspiracy which necessarily had concealment as an object. Here, however, the indictment charges a §371 conspiracy, which does not necessarily entail concealment. *See United States v. Alberico*, 559 F.3d 24, 28 (1st Cir. 2009)(distinguishing between conspiracy charges under §371 and conspiracy to commit money laundering for purposes of applying *Grunewald*).

lasted until December 2012—does not conclusively establish the duration of the conspiracy.");

*United States v. Kang*, 715 F.Supp.2d 657, 673 (D.S.C. 2010)("[T]his court is not aware of any rule

of law whereby the indictment controls the scope of the conspiracy when the evidence at trial does

not support the same. In other words, the indictment establishes a ceiling not a floor.").

Here, the central objectives of the charged conspiracy—the obtaining of additional revenues

for State Street through undisclosed mark-ups and commissions—was fully accomplished on May

24, 2011, when State Street sent the Irish Government Pension Fund the last post-trade report at the

end of all of the trading necessary to complete the last transition which is the subject of the

conspiracy charged. The conspiracy as charged was, at that point, at an end.

The statements to the British Government Pension Fund alleged in the indictment were made

in June 2011, after the main conspiratorial objectives alleged had been accomplished, and the alleged

statements to State Street compliance staff were made even later. These further acts or statements

by McLellan and/or any of the alleged coconspirators allegedly seeking to conceal the charging of

the undisclosed mark-ups/commissions were not, therefore, part of the conspiracy charged.  The

government cannot, in this case, prove that the later acts and statements relating to concealment were

part of an express original agreement to continue to conceal the alleged fraud conspiracy after its

objectives had been accomplished.  The alleged later acts and statements were, at most, part of a

separate concealment conspiracy and cannot, therefore provide the basis for conviction of the

conspiracy charged in Count One. Nor should evidence of them be admitted at trial.[2]

_____

[2] Statements made by alleged coconspirators after the end of the conspiracy are, by definition,
not admissible under Fed. R. Evid. 801(d)(2)(E) as statements made in furtherance of the conspiracy.
If the government, in its response to this motion, asserts alternative grounds for admissibility of these
later acts or statements, other than as overt acts in furtherance of the conspiracy charged or as
coconspirator statements in furtherance of the conspiracy charged, McLellan will respond at that

The conspiracy charged in Count One is one predicated exclusively on affirmative misstatements made to certain transition management clients, three of which are specified in the indictment. *See, e.g.,* Government's Response in Opposition to Defendant's Motion to Sever Count 6 (Doc. 298) at 4, 5, 6. Indeed, the government has explicitly taken the position that this is not a concealment/omissions case. *See id.* at 6 ("Despite McLellan's best efforts to turn this into an omissions case, this is a case about *affirmative* misrepresentations that McLellan personally made or directed" (emphasis in original)).The only alleged targets of the alleged misstatements are the transition management clients, and the government's reliance on an affirmative misrepresentation theory of securities and wire fraud is inconsistent with post-accomplishment concealment's having been part of an express original conspiratorial agreement. This is particularly pertinent with respect to the alleged misstatements to/concealment from State Street compliance staff, who were not in any way an object of the conspiracy charged. As *Grunewald* stresses, conspiracies, by their very nature, demand secrecy and concealment after the main conspiratorial objectives have been accomplished; they cannot be expanded indefinitely by proof of later acts of concealment. This case is no different (assuming *arguendo* that the government can prove the existence of a conspiracy to defraud transition management clients of which McLellan was a member).

That the alleged concealment acts and statements are alleged to have occurred after a client asked questions or after State Street compliance staff began to investigate does not mean that those acts and statements were encompassed within the original conspiratorial agreement. As *Grunewald* makes clear, an original agreement to conceal cannot simply "be implied from circumstantial

_____

time. Suffice it to say at this juncture that it the Court concludes that there exists an alternative basis for their admission, the evidence before the jury should be narrowly limited to the purpose for which it was admitted.

evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." 353 U.S. at 401-02.  For example, in *Twitty*, where the defendants were charged with a §371 conspiracy, the First Circuit held that the conspiracy had ended before the acts of concealment and that the defendants were engaged only in covering up their crime: "While there were arguably explicit agreements to conceal between Twitty and Martin, they occurred late in the day when the conspirators knew that agents were on their trail and active trafficking in guns had come to an abrupt halt." 72 F.3d at 233. In *Kang*, the court concluded that interviews given by the defendants after the fraudulent accounting conspiracy had ended were not in furtherance of the main fraud conspiracy:

> Concealment in and of itself cannot serve to extend the life of the conspiracy alleged by the government into the limitations period. Irrespective of any acts of concealment alleged or proven at trial that occurred during the alleged conspiracy to commit mail, wire, and securities fraud, other than silence, there was no conspiratorial activity beyond September 2000. In other words, "concealment was ... [not] essential to the continuing vitality of the conspiracy," because no conspiracy existed to continue. *United States v. Justus*, 162 F.3d 1157, *6 (4th Cir.1998) (Table). The interviews with Mr. Glick were not acts of concealment necessary to complete the original conspiracy alleged in the indictment. While the conspiracy alleged may have involved concealment, concealment during an ongoing conspiracy does not convert the Glick interviews in 2003 into acts of concealment necessary for the completion of the crime.

*Kang*, 715 F. Supp. 2d at 677-78.

In *United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996), the court found a conspiracy count time-barred, rejecting the government's argument that later concealment statements could be found to be part of the main conspiracy on a "lulling" theory.

> Pointing to another of the original objects of the conspiracy—the fraud on Chromalloy's customers (¶ 55)—the Government attempts to bring Mr. Vitti's overt acts of deceiving Air India within the scope of the original conspiracy by referring to them as examples of "lulling" activity designed to help continue the fraud, rather than to obstruct its detection. But this does not fairly comport with the particularized allegations of the Indictment. The

communications to Air India specified as the only overt acts in the Indictment that fall within the statute of limitations are not alleged to have been undertaken in furtherance of lulling Air India into continuing its purchases of faulty engine parts, *but rather as attempts to prevent Air India, after it had already uncovered evidence of the fraud, from detecting the full scope and nature of the scheme, and thereby demanding fuller restitution.*

*Id.* at 506 (emphasis added).

In *United States v. Marcus Schloss & Co.*, 710 F. Supp. 944 (S.D.N.Y. 1989), the court

rejected the government's argument that a an effort to obstruct an SEC investigation into the insider

trading that was the central aspect of the conspiracy was part of the insider trading conspiracy:

The government's answer . . . is that the indictment alleges throughout, explicitly or implicitly, the insider trading conspirators' objective of secrecy; and that the objective of obstructing the SEC investigation should be regarded as part of a single, seamless conspiratorial web.

If that were a fair characterization, then *Grunewald* and comparable cases would not apply. But I cannot accept at face value the government's analysis of the case at bar. Of course, during the lifetime of the insider trading conspiracy, the conspirators attempted to preserve secrecy. . . . But I perceive a quantum difference between this sort of concealment, inherent in all insider trading conspiracies so long as they remain undetected and in operation, and a conspiracy to obstruct justice once the conspiracy is detected and comes to an end. . . .

Thus the insider trading conspiracy came to an end on March 26-27. It cannot be said that the conspiracy came to an end because it had fully achieved or attained its purposes; one can reasonably infer that, absent detection, the conspirators would have continued their insider trading indefinitely. Thus the case is distinguishable from *Grunewald* in respect of the manner in which the conspiracy came to an end; but end it did, as the result of its detection[.]

*Id.* at 949-50. Thus, the court concluded, the evidence would not be admissible against the

defendants, who were not part of the subsequent obstruction, unless the government could prove "an

express original agreement on the part of the conspirators to commit and suborn perjury before the

SEC if the conspiracy was detected." *Id.* at 950.

## CONCLUSION

The alleged acts and statements relating to concealment from the British Government Pension Fund and from State Street compliance staff occurred after the main objectives of the alleged fraud conspiracy had been achieved (again, assuming *arguendo* that such a conspiracy existed). They were not part of the main conspiracy but were, instead, at most, the subject of a separate, later-formed concealment agreement. As such, these acts and statements are not admissible as overt acts in furtherance of the conspiracy, nor are the post-May 24, 2011, statements of alleged coconspirators admissible as coconspirator statements made in furtherance of the conspiracy. The Court should exclude all evidence relating to these alleged concealment acts and statements.

McLellan believes that the government will be unable to present evidence of an express original agreement to conceal the alleged fraudulent scheme after its termination, and the government should not be permitted to offer evidence regarding these later acts and statements without first satisfying that Court that it can demonstrate that they were part of the original conspiratorial agreement. However, if the evidence is received as in furtherance of the conspiracy and not later stricken, then McLellan would request that the Court instruct the jury that it cannot find that acts or statements relating to alleged concealment of the alleged fraud from transition management clients, including the British Government Pension Fund, and from the State Street compliance staff were part of the charged conspiracy to commit securities fraud and wire fraud, and cannot convict McLellan on the basis of his participation in them, unless it finds that McLellan entered into an original conspiratorial agreement in 2010 that included an express original agreement to conceal the alleged fraud from both the transition management clients and from State Street compliance personnel after the main conspiratorial objectives had been accomplished. McLellan will

include a request for such an instruction in his Requests for Instructions, now due to be filed by May 21, 2018.

Respectfully submitted,
By his attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (telephone)
(617) 338-9538 (fax)
owlmgw@att.net

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this 24th day of April, 2018, I caused the within Motion to be served on all registered participants through its filing with this Court's CM/ECF system.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

11