UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

ROSS MCLELLAN,
Defendant

No. 16-10094-LTS

**DEFENDANT ROSS MCLELLAN'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO TRANSITION CONDUCTED FOR THE DUTCH PENSION FUND AND INCORPORATED MEMORANDUM OF LAW**

Now comes the defendant Ross McLellan and respectfully requests that this Honorable Court exclude all evidence relating to the transition conducted for the Dutch Pension Fund.[1]

As reason therefor, defendant states:

1. Count One of the Superseding Indictment charges a conspiracy to commit securities fraud and wire fraud. The Superseding Indictment alleges that "[a] principal object and purpose of the conspiracy was to make money for State Street by secretly overcharging at least six transition management clients . . . through the use of hidden commissions on securities that State Street purchased and sold on their behalf in the course of transitions." Indictment, ¶10. One of those six transition management clients, although not named in the indictment, was the Dutch Pension Fund.

2. Defendant anticipates, based on discovery produced to date and the government's recently-produced witness list, that the government will seek to offer evidence at trial regarding the Dutch Pension Fund transition.

[1] In keeping with the usual practice in this case, this Motion/Memorandum will refer to the transition management client at issue pseudonymously.

3. Neither the securities laws of the United States nor the wire fraud statute, 18 U.S.C. §1343 apply extraterritorially.

4. The securities transactions conducted by State Street as part of the Dutch Pension Fund transition were wholly extraterritorial, consisting entirely of fixed-income trades conducted in euros on foreign security exchanges, with irrevocable liability to complete the trades attaching outside the United States. SS1-00196028-52. They thus fall outside the reach of the securities laws of the United States and cannot, therefore, be validly prosecuted in this country as part of a conspiracy to commit securities fraud in violation of United States securities laws.

5. The Dutch Pension Fund transition was contracted for and conducted by EMEA personnel located in the United Kingdom, and the decision to charge undisclosed markups on the transition trades was made by the EMEA team in the U.K., including Edward Pennings, whom the indictment alleges "resided in the United Kingdom and was employed by State Street in its London, England office as a senior managing director and head of the Portfolio Solutions Group for Europe, the Middle East, and Africa ("EMEA")." Indictment, ¶2. Also instrumental in the transition was Rick Boomgaardt, who "resided in the United Kingdom and was employed by State Street in its London, England office as a managing director and head of the Transition Management desk for the EMEA region" and who "reported to Pennings." Indictment, ¶3. The domestic contacts with the Dutch Pension Fund transition were, at best, minimal and do not suffice to bring this alleged fraud within the reach of the wire fraud statute.

As further reason therefor, defendant refers the Court to the Memorandum of Law incorporated herein.

**LOCAL RULE 7.1(a)(2) STATEMENT**

The government opposes the granting of the within motion.

**MEMORANDUM OF LAW**

## I. THE EXTRATERRITORIALITY INQUIRY AFTER *MORRISON.*

In its 2010 decision in *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010), the Supreme Court dramatically altered the way in which federal courts should assess the extraterritorial application of federal statutes. *Morrison* proceeded from the "longstanding principle of American law" that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 255, *quoting EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991)("*Aramco*"). This principle "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Id.* Accordingly, "'unless there is the intention of Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'" *Id., quoting Aramco*, 499 U.S. at 248. That being the case, *Morrison* prescribed a hard-and-fast rule, applicable to all cases under the statute at issue: "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.*

As the Second Circuit has explained:

> The presumption against extraterritoriality is a method of interpreting a statute, which has the same meaning in every case. The presumption against extraterritoriality is not a rule to be applied to the specific facts of each case. . . . A statute either applies extraterritorially or it does not, and once it is determined that a statute does not apply extraterritorially, the only question we must answer in the individual case is whether the relevant conduct occurred in the territory of a foreign sovereign.

*United States v. Vilar*, 729 F.3d 62, 74 (2d Cir. 2013).[2]

The *Morrison* Court provided useful guidance regarding what does *not* constitute a "clear indication" of congressional intent, stressing that a statute does not apply extraterritorially simply because it refers to "foreign commerce." *See* 561 U.S. at 262-63 ("we have repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to foreign commerce do not apply abroad," *quoting Aramco*, 499 U.S. at 251). The *Morrison* Court also cautioned that "*possible* interpretations of statutory language do not override the presumption against extraterritoriality." *Id.* at 264 (emphasis added). Later, in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), the Court added another caution regarding statutory language which is not indicative of extraterritorial application, noting that "it is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality." *Id.* at 1665.

The *Morrison* Court also acknowledged that whether or not the presumption comes into play is often "not self-evidently dispositive," but instead "requires further analysis," *Morrison*, 561 U.S. at 266, to determine whether the proposed application of the statute is in fact extraterritorial rather than domestic. An application is not domestic, however, simply because the offense has *some* contact with United States territory. "[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic

---

[2] The *Vilar* Court held that *Morrison* applies to criminal securities fraud prosecutions. *Id.* at 67. Other courts considering the extraterritorial reach of criminal statutes have either reached the same conclusion or simply assumed that the *Morrison* paradigm applied equally in the criminal context. *But see United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014)("it has never been established in this Circuit that *Morrison* limits the scope of criminal liability for violations of the Securities Exchange Act to the same extent it limits the scope of civil liability"). The First Circuit has not considered the issue.

activity is involved in the case." *Id.* at 266 (emphasis in original). The determinant of whether the statute is being applied domestically or extraterritorially is the "focus of congressional concern." *Id.*

The Supreme Court resoundingly ratified the *Morrison* standard in *RJR Nabisco, Inc. v. European Community*, ___ U.S.___, 136 S.Ct. 2090 (2016):

> It is a basic premise of our legal system that, in general, United States law governs domestically but does not rule the world. This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application. The question is not whether we think Congress would have wanted a statute to apply to foreign conduct if it had thought of the situation before the court, but whether Congress has affirmatively and unmistakably instructed that the statute will do so. When a statute gives no clear indication of an extraterritorial application, it has none.

*Id.* at 2100 (internal quotation marks and citations omitted).

## II. THE SECURITIES TRANSACTIONS CONDUCTED DURING THE DUTCH PENSION FUND TRANSITION FALL OUTSIDE THE SCOPE OF 15 U.S.C. §78j(b) AND 17 C.F.R. §240.10b-5 AND CANNOT, THEREFORE, BE PART OF A CONSPIRACY TO VIOLATE THE SECURITIES LAWS OF THE UNITED STATES.[3]

### A. Under the Supreme Court's *Morrison* Decision, 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5 Do Not Apply Extraterritorially.

The *Morrison* Court concluded that the focus of §10(b) is "not upon the place where the

---

[3] In denying McLellan's Motion to Dismiss Counts Two and Three and So Much of Count One as Charges Conspiracy to Commit Securities Fraud, to Exclude Evidence of Extraterritorial Transitions and Transactions, and Motion for Related Discovery (Doc. 148), the Court stated that "this Ruling does not preclude McLellan from renewing his motion to dismiss or narrow the charges based on *Morrison*, should the facts adduced by the government at trial demonstrate that some of the conduct at issue was beyond the reach of United States criminal laws." Order on Motions to Dismiss (Doc. 302) at 4 n.6. The Court also noted that, because the indictment does not mention the Dutch Pension Fund transition, "there are no allegations to strike or narrow at this time." *Id.* at 5.This Motion will demonstrate that the Dutch Pension Fund transition falls outside the reach of the securities laws of the United States and that the conspiracy charged in Count One should be narrowed accordingly.

deception originated, but upon purchases and sales of securities in the United States." 561 U.S. at 266. "Section 10(b) does not punish deceptive conduct, but only deceptive conduct in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." *Id.* (internal quotation marks omitted). "It is those transactions that the statute seeks to regulate . . . ; it is parties or prospective parties to those transactions that the statute seeks to protect." *Id.* at 267 (internal quotation marks and citation omitted). Therefore, the Court held, "[s]ection 10(b) reaches the use of a manipulative or deceptive device *only* in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 270 (emphasis added).

The securities transactions undertaken to complete the Dutch Pension Fund transition were not purchases or sales of securities listed on an American stock exchange, as the trades were conducted exclusively in euros on foreign exchanges, so the question then becomes whether the transactions can nonetheless be considered domestic transactions falling within *Morrison*'s second prong. In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), the Second Circuit established an analytical framework for determining whether securities transactions are domestic transactions falling within *Morrison*'s second prong, holding that "transactions involving securities that are not traded on a national exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Id.* at 67.[4] In making this determination, relevant

[4] This standard has been followed by a number of other courts outside the Second Circuit. In *United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015), the Third Circuit essentially adopted the Second Circuit's *Absolute Activist* formulation, agreeing that "'[c]ommitment' is a simple and direct way of designating the point at which . . . the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.'" *Id.* at 136, *quoting Absolute Activist,* 677 F.3d at 68. Thus, "territoriality under *Morrison* turns on 'where, physically, the purchaser or seller committed him or herself' to pay for or deliver a security."

considerations include, but are not limited to, "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70.

To identify when irrevocable liability is incurred, the court must determine the "time when the parties to the transaction are committed to one another." *Butler v. United States*, 992 F.Supp.2d 165, 176 (E.D.N.Y. 2014), *quoting Absolute Activist*, 677 F.3d at 68. This inquiry is fact specific. *Id. Compare, e.g., Vilar*, 729 F.3d at 76-78 (transactions were domestic where agreements to purchase securities were entered into in Puerto Rico and New York and purchasers thereby incurred irrevocable liability to purchase the securities in the United States); *United States v. Mandell*, 752 F.3d 544, 549 (2d Cir. 2014)(transaction was domestic where investors were required to submit purchase applications and payments to the company in the United States, and the company had the discretion to accept or reject those applications on receipt); *United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2014)(*Morrison* satisfied where securities were sold over the OTCBB and Pink Sheets, fund which made the purchase was "run out of New York City," and defendant's office was located in Florida), *with, e.g., Loginovskaya v. Batratchenko*, 764 F.3d 266, 274-75 (2d Cir. 2014)(transactions were foreign where "meeting of the minds" took place in Russia); *see also S.E.C. v. Amerindo Inv. Advisors, Inc.*, 2014 WL 405339 at *5 (S.D.N.Y. Feb. 3, 2014)(court notes the need to reconsider, after *Morrison*, "whether undisputed facts show that [each victim] was inside the United States when he or she agreed to purchase the securities at issue").

Under the *Absolute Activist* standard adopted by the Second Circuit, which looks to the location where irrevocable liability to buy or sell securities was incurred, or the "commitment" standard of the Third Circuit, which looks to the same indicia, the Dutch Pension Fund transactions

---

*Id., quoting Vilar,* 729 F.3d at 77 n.11. The First Circuit has not yet considered the issue.

fall entirely outside the scope of 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5, as irrevocable liability to buy and sell the securities involved in the transition was incurred entirely in the Netherlands (where the Dutch Pension Fund is headquartered) and/or the U.K. There is no evidence that any of the securities sold or bought during the June 2010 transition were sold or bought on United States securities markets, and there is no evidence that could support a finding that irrevocable liability (or commitment) to purchase the securities was incurred in the United States or that title to any of the securities passed in the United States. The securities transactions conducted as part of the Dutch Pension Fund transition were, accordingly, extraterritorial. Even if the undisclosed mark-ups would support a securities fraud prosecution were these transactions domestic securities transactions, the charging of undisclosed mark-ups on the Dutch Pension Fund transition transactions does not constitute a securities fraud offense subject to the laws of the United States and cannot validly be prosecuted as part of a conspiracy to violate the securities laws of the United States.[5]

---

[5] In his Motion to Dismiss Counts Two and Three and So Much of Count One as Charges Conspiracy to Commit Securities Fraud, to Exclude Evidence of Extraterritorial Transitions and Transactions, and Motion for Related Discovery (Doc. 148) at 12-17, McLellan contended that Section 929P(b) of the Dodd-Frank Act does not supersede *Morrison* in criminal cases. This Court found it unnecessary to address the issue in ruling on that motion, Order on Motions to Dismiss (Doc. 302) at 4 n.5, and it need not address it now. Section 929P(b) was effective on July 22, 2010, and the Dutch Pension Fund transition at issue was completed on July 5, 2010. USDOJ-SS- 00555-56. Even if §929P(b) did overrule *Morrison*, it cannot be applied retroactively without violating the Ex Post Facto Clause.

"It is an elementary principle of our form of government, one ingrained in the history of our Nation, that ex post facto criminal laws are not to be tolerated. Thus the Constitution prohibits the retrospective application of criminal laws to the prejudice of a defendant." *United States v. Vazquez-Rivera*, 135 F.3d 172, 177 (1st Cir. 1998). Retroactive application of a criminal statute violates the Ex Post Facto Clause if the application of the law "disadvantage[s] the offender affected by it . . . by altering the definition of criminal conduct or increasing the punishment for the crime." *Id.* Here, if §929P(b) were to be interpreted to supercede *Morrison*, it would alter the definition of criminal conduct by extending the prohibitions of 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5 to securities transactions that would not have constituted a crime under *Morrison*. This was the conclusion reached by the one decision to consider whether §929P(b) applied retroactively in a SEC

## III. THE DUTCH PENSION FUND TRANSITION CANNOT VALIDLY BE CONSIDERED AS PART OF A CONSPIRACY TO COMMIT WIRE FRAUD BECAUSE OF THE MINIMAL CONTACTS WITH THE UNITED STATES.

As the Supreme Court recently stated, *Morrison* and *Kiobel*

> reflect a two-step framework for analyzing extraterritoriality issues. At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." *If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.*

*RJR Nabisco*, 136 S.Ct. at 2101, *quoted in United States v. Valenzuela*, 849 F.3d 477, 485 n.3 (1st Cir. 2017)(emphasis added). Applying this two-step framework, the Second Circuit held in *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *reversed and remanded on other grounds, RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090 (2016),[6] that the wire fraud statute does not apply extraterritorially:

> The argument in favor of extraterritoriality depends on their references to foreign commerce. The wire fraud statute applies to the transmission of communications by "wire, radio, or television ... in interstate or foreign commerce" in the execution of a scheme to defraud. *Id.* § 1343. . . . In *Morrison,* the Supreme Court observed that a "general reference to foreign commerce . . . does not defeat the presumption against extraterritoriality." . . . This admonition appears to bar reading [the wire fraud statute] literally to cover wholly foreign

---

enforcement action. *See SEC v. Battoo*, 158 F.Supp.3d 676, 692 (N.D.Ill. 2016)("Because Section 929P(b) expands the scope of liability for Sunderlage's past conduct, the general presumption against retroactivity kicks in"); *see also SEC v. Tourre*, 2013 WL 2407172 at *1 n.4 ("Because the Dodd-Frank Act effectively reversed *Morrison* in the context of SEC enforcement actions, the primary holdings of this opinion affect only pre-Dodd-Frank conduct").

[6] The Supreme Court did not consider whether the wire fraud statute applied extraterritorially in *RJR Nabisco* but instead focused its opinion on the extraterritoriality of the RICO statute.

> . . . communication. We conclude that the references to foreign commerce in [the wire fraud] statute[], deriving from the Commerce Clause's specification of Congress's authority to regulate, do not indicate a congressional intent that the statute[] apply extraterritorially.

*Id.* at 140-41. The Court did not further define the line between domestic and extraterritorial applications of the wire fraud statute because the conduct alleged in that case stated a domestic cause of action but did provide the following general guidance: "If domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States." *Id.* at 142.[7]

In a later summary order, the Second Circuit found the domestic contacts of the alleged scheme to defraud insufficient to render the wire fraud statute applicable to the conduct at issue, noting that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Petroleos Mexicanos v. SK Engineering & Const. Co.*, 572 Fed. App'x 60, 61 (2d Cir. 2014), *quoting Norex Petroleum Ltd. v. Access Indus., Inc.,* 631 F.3d 29, 32–33 (2d Cir.2010). *See Morrison*, 561 U.S. at 266. The domestic contacts alleged were, in the *Petroleos* Court's view, insufficient to sustain jurisdiction, even though financing was obtained in this country, invoices were sent to a bank in this country for payment, and the domestic bank issued payment. *Id.* at 61.

*United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014), is not to the contrary.[8] *Lyons* addressed

---

[7] The Court expressly did not decide "whether domestic conduct satisfying fewer than all of the statute's essential elements could constitute a violation of such a statute." *Id.* at 142 n.14.

[8] McLellan recognizes that, in ruling on his motions to dismiss, the Court felt itself guided by" *Lyons.* Order on Motions to Dismiss (Doc. 302) at 4. The Court noted that, as in the statute at issue in *Lyons*, "[t]he wire fraud statute explicitly references transmissions in interstate or foreign commerce," *id.*, but *Lyons* appears to be inconsistent with *Morrison*'s teaching that a statute's inclusion of a reference to foreign commerce does not by itself mean that Congress intended that the statute apply extraterritorially. In addition, *Lyons* was decided before the Supreme Court "clarified

the extraterritoriality of 18 U.S.C. §1084, not §1343. Section 1084 prohibits the "knowing[] use[] [of] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers." In a cursory analysis, the Court concluded that §1084 applies extraterritorially because it explicitly references transmissions between the United States and a foreign country. *Id.* at 718. Because "[t]he communications giving rise to these convictions had at least one participant inside the United States, the Court stated, the communications "fall within the statute's scope." *Id.*

*Lyons* relied predominantly on *Pasquantino v. United States*, 544 U.S. 349 (2005), a case decided well before *Morrison* and *RJR Nabisco.* In *Pasquantino*, the defendants, over a four-year period, used the telephones while in the United States to order liquor from discount liquor stores in Maryland and then paid others to smuggle the liquor into Canada, thereby depriving Canada of substantial tax revenues. This was not, the Supreme Court said, an extraterritorial application of the wire fraud statute because the offense "was complete the moment [defendants] executed the scheme inside the United States." *Id.* at 371. It was, therefore, the Court concluded, domestic conduct that was being punished. *Lyons* cannot support the proposition that §1343 applies extraterritorially

---

its test for deciding whether a statute applies extraterritorially" in *RJR Nabisco*. *Valenzuela*, 849 F.3d at 485. Moreover, in *Lyons*, although the offshore betting operation was located in Antigua, the defendants conducted extensive activities in Florida and Massachusetts, recruiting American customers and paying them their winnings and collecting their losses. *See id.* at 711-12. Section 1084 differs from §1343 in that its focus is on the use of the wires to transmit gambling information. If the *Morrison/RJR Nabisco* focus standard were applied in *Lyons*, the result would likely have been the same. Here, however, as addressed further *infra*, the focus of the wire fraud statute is on the scheme to defraud.

whenever United States wires are used in the execution of the fraud.[9] As the Second Circuit explained in *RJR Nabisco*:

> In *Pasquantino* . . . , the Supreme Court suggested, in dictum, that, because the wire fraud statute punishes frauds executed in interstate or foreign commerce it is surely not a statute in which Congress had only domestic concerns in mind. . . . . Because that statement is dictum, and because *Morrison* explicitly rejects the reasoning on which it relies, we do not read *Pasquantino* to require us to construe the "foreign commerce" language of the wire fraud statute as rebutting the presumption against extraterritoriality.

764 F.3d at 141 n.11 (internal quotation marks and citations omitted).

Thus, the analysis must turn to the second part of the *Morrison/Kiobel/RJR Nabisco* standard—the focus of the wire fraud statute—to determine whether the Dutch Pension Fund transition represents a domestic, or instead extraterritorial, application of the statute. *See RJR Nabisco*, 136 S.Ct. at 2101 (courts should "look[] to the statute's focus," and "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; *but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory*" (emphasis added)).

The essential elements of wire fraud are: "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme." *United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013). The scheme to defraud must cause, or have been intended to cause, a deprivation of money or property. *See United States v. Christopher*,

---

[9] In *Pasquantino*, virtually all of the offense conduct took place in the United States. That being the case, the result in *Pasquantino* would likely have been the same under the *Morrison/RJR Nabisco* standard.

142 F.3d 46, 54 (1st Cir. 1998). Thus, §1343 "forbids a particular class of frauds (*i.e.*, frauds that are designed to take money or property and that involve the U.S. [wires]." *Elsevier, Inc. v. Grossman*, 199 F.Supp.3d 768, 783 (S.D.N.Y. 2016). Such frauds are, therefore "properly considered the 'focus' of" §1343. *Id. See, e.g., United States v. Bradley*, 644 F.3d 1213, 1249 n.77 (11th Cir. 2011)("The mail and wire fraud statutes . . . focus their attention on the use of a misrepresentation to obtain money that is not owed"); *United States v. Brien*, 617 F.2d 299, 307 (1st Cir. 1980)("the mail and wire fraud statutes focus on the scheme, not on the implementation of it"). Thus, the focus of the statute is the prohibited fraudulent conduct, not the use of domestic wires. The use of domestic wires may confer *jurisdiction*, but, as *Morrison* teaches, jurisdiction is a separate matter from whether the conduct alleged falls within the substantive scope of the statute at issue. *See United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 102-03 (D.D.C. 2017).[10]

The Dutch Pension Fund fraud alleged by the government—assuming *arguendo* only that

[10] Some courts have found that use of domestic wires, even minimally, will suffice to constitute the offense a domestic one, *see, e.g., United States v. Allen*, 160 F.Supp.3d 698, 707 (S.D.N.Y. Feb. 16, 2016); *United States v. Hayes*, 99 F.Supp.3d 409 (S.D.N.Y. 2015), *aff'd on other grounds*, 118 F.Supp.3d 620 (S.D.N.Y 2015). The better view, however, is found in *United States v. Hawit*, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2016), in which the court rejected the government's contention that even a single use of domestic wires sufficed to make the offense subject to prosecution under §1343, concluding that that "extreme position" was foreclosed by the Second Circuit's *Petroleos Mexicanos* decision, which held that "'three minimal contacts' with the United States—including the use of U.S. wires to transfer of illicit funds—were insufficient to establish a domestic application of the wire fraud statute." *Id.* at *5. "The natural implication of *Petroleos Mexicanos*," the court continued, "is that, in determining whether the wire fraud statute is being applied 'domestically' or 'extraterritorially' in a given case, a court must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires." *Id. See United States v. Prevezon Holdings LTD.*, 122 F.Supp.3d 57, 71-72 (S.D.N.Y. 2015)(court, in part relying on *Petroleos Mexicanos*, refused to apply §1343 to a foreign fraud that involved single use of U.S. wires).

there was fraud—was centered in London, where Pennings, Boomgaardt, and the rest of the eMEA team were located. The Dutch Pension Fund agreement with State Street was negotiated between Pennings and others in the U.K. and the Dutch Pension Fund in the Netherlands. The decision to charge the mark-ups was made by Pennings and the EMEA team in the U.K., all trading took place abroad by traders located in the U.K. and was managed by State Street personnel in the U.K., the undisclosed markups were taken in the U.K., the pre- and post-trade estimates and reports were prepared in the U.K. and sent to the Dutch Pension Fund using wholly foreign wires. The use of wires to conduct the negotiations, the trading, the submission of pre- and post-trade reports, and all other communications between State Street and the Dutch Pension Fund was exclusively foreign. If there was fraud here, it did not touch upon the United States or even the use of United States wires.

Discovery provided to date reveals that the Dutch Pension Fund transition's only contacts with the United States appear to have been emails from Pennings to McLellan keeping McLellan apprised of his efforts to secure the Dutch Pension Fund transition for State Street, USDOJ-SS-00551, a later email telling McLellan that because Dutch Pension Fund had decided to use its own broker rather than State Street, State Street would have to "charge a bit more." USDOJ-SS-00541, USDOJ-SS-00554, an email from Pennings to Chris Carlin in Boston giving him an estimate of expected revenues for the transition, USDOJ-SS-00543, Pennings telling McLellan what the revenue from the transition would be, USDOJ-SS-00543, copying McLellan on internal U.K. emails discussing how to address the Dutch Pension Fund's questions regarding how the transition would be handled, USDOJ-SS-00551-52, an email from McLellan to Pennings asking about the progress of the transition, to which Pennings responded that McLellan would just "have to trust the maestro." USDOJ-SS-00553, an email from State Street Boston to Boomgaardt asking whether Dutch Pension

Fund had started trading, to which Boomgaardt responded that it had, USDOJ-SS-00557, and a note in which Pennings told McLellan the day's estimated revenues from the transition. USDOJ-SS-00557. While these communications related to the Dutch Pension Fund transition generally, they were unrelated to Pennings' decision to overcharge Dutch Pension Fund. They were not part of the alleged fraud, they were not necessary to carry it out, nor did they assist the commission of the alleged fraud in any way.[11] If there was fraud here, it was a foreign one, outside the scope of the wire fraud statute, and not a domestic one.

**CONCLUSION**

The securities transactions conducted to perform the Dutch Pension Fund transition were wholly foreign transactions that, even if there were fraud involved, fall outside the reach of the United States securities laws. Similarly, any fraud committed in conjunction with the charging of undisclosed mark-ups on Dutch Pension Fund transition trades was a foreign, not a domestic fraud, falling outside the scope of the wire fraud statute. The government should not, therefore, be permitted to offer evidence relating to the Dutch Pension Fund transition, as it cannot have been part of a conspiracy to violate the securities laws of the United States or the wire fraud statute. At minimum, the Court should require the government, before it presents any evidence relating to the

[11] The use of wire communication facilities of the United States does not alone suffice to bring an alleged fraud within the purview of the wire fraud statute. Instead, the wires must have been used *in furtherance of the fraudulent scheme*. *See, e.g., Appolon*, 715 F.3d at 367. The wire fraud statute itself requires that the communication have been made "for the purpose of executing" the fraudulent scheme. 18 U.S.C. §1343. *See United States v. Tavares*, 844 F.3d 46, 58 (1st Cir. 2016)(mail fraud). The ultimate question is "whether the use of the wires was sufficiently closely related to [the] scheme" to bring the defendant's conduct within the statute. *United States v. Pietri Giraldi*, 864 F.2d 222, 224 (1st Cir. 1988). The answer to that question in this case must be no. Nothing in the wire communications that were sent to or from the United States had any capacity to further the execution of the scheme; they were no more than routine updates on the status of the transition, having no relationship to whether undisclosed mark-ups would be or were taken.

Dutch Pension Fund transition, to satisfy the Court that it can prove either that the transaction involved domestic securities transactions or that the alleged fraud was a domestic one, falling within the purview of the wire fraud statute.

Respectfully submitted,
By his attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (telephone)
(617) 338-9538 (fax)
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

**CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this 26th day of April, 2018, I caused the within Motion to be served on all registered participants through its filing with this Court's CM/ECF system.

**/s/ Martin G. Weinberg**
Martin G. Weinberg