UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 16-cr-10094-LTS |
| | ) | |
| ROSS MCLELLAN, | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

### Ross McLellan's Renewed Motion to Sever Count 6

In its February 28, 2018, order denying severance of Count 6 in this matter, the Court

relied upon, *inter alia*, the government's "proffer[] that at least several of the same witnesses will

testify about facts material to proving all six counts in the Superseding Indictment," and

observed that, "for present purposes, it appears likely that much, though perhaps not all, of the

evidence admissible at a trial of Counts 1 through 5 also would be admissible at a trial of Count

6, and vice versa, under Federal Rules of Evidence 404(b) and 403," Order at 3, *citing United

States v. DeCicco*, 370 F.3d 206, 210-11 (1st Cir. 2004) (explaining "evidence may be

admissible . . . even if it may be construed as propensity evidence, if it is used to show any of the

other elements set out in" Rule 404(b), including a "common plan or scheme").  "Under these

circumstances," the Court held, "the charges plainly are properly joined under Rule 8, and

McLellan has not persuaded the Court it would be justified in exercising its discretion to grant

severance under Rule 14."  Order at 3.

With an additional two plus months to examine the discovery related to Count 6 (which

has substantially expanded in the months following the Court's Order), there is no meaningful

overlap in the evidence or witnesses as to the two independent schemes charged by the

1

government.  Moreover, given the absence of any true connection between the two charged

schemes, the rules of evidence would not permit introduction of the Counts 1-5 evidence in a

separate trial of Count 6.  As such, because the "present purposes" and "circumstances" relied

upon by the Court in denying Mr. McLellan's motion to sever have evolved and changed, Mr.

McLellan respectfully moves the Court anew to sever Count 6.

## Local Rule 7.1(a)(2) Certification

Undersigned counsel conferred with counsel for the Government, and the

Government, by and through Assistant U.S. Attorney Stephen E. Frank, opposes the instant

motion.

## Argument

I.  *A joint trial creates an unfair playing field for Mr. McLellan—particularly where it involves two independent schemes, two entirely different sets of characters and facts, and requires two separate and distinct defenses.*

Whether or not Count 6 is properly joined under Rule 8,[1] the defense respectfully submits

the Court should exercise its broad discretion and sever the count pursuant to Rule 14.[2]  As

detailed below, a separate trial for Count 6 would be streamlined, relatively short, and entail

little, if any, actual overlap of witnesses or evidence, and a fair application of Rules 404(b) and

403 would surely preclude evidence of the Count 1-5 transitions at a separate trial for Count 6.

First, Counts 1-5 all involve foreign-domiciled entities, in contrast to the U.S. Insurance

Company at issue in Count 6.  The entities at issue in Counts 1-5 are each subject to foreign laws and

---

[1] While Mr. McLellan continues to press that joinder is not appropriate pursuant to Rule 8, he relies upon and incorporates his prior pleadings on that issue, rather than rehashing the arguments made therein.  *See, e.g.*, Dkt Entries 292, 301.

[2] As to Rule 14, "the question of whether joinder of offenses unduly prejudices a defendant is addressed to the district court's sound discretion."  *United States v. Richardson*, 515 F.3d 74, 80-81 (1st Cir. 2008), *citing United States v. Casas*, 425 F.3d 23, 36 (1st Cir. 2005), *cert. denied*, 547 U.S. 1061 (2006); *United States v. Alosa*, 14 F.3d 693, 694-95 (1st Cir. 1994); *United States v. Fenton*, 367 F.3d 14, 22 (1st Cir. 2004).

they each operate pursuant to the peculiar business practices of their local jurisdiction.  While these jurisdictional peculiarities will be the subject of significant evidence and testimony during trial of Counts 1-5, such evidence would be non-existent in a separate trial of Count 6.  <u>Second</u>, the fraudulent scheme charged in Counts 1-5 revolves around State Street's "EMEA" transition management team.[3]  The misrepresentations charged in Counts 1-5 derive exclusively from EMEA's employees—principally, Edward Pennings and/or Rick Boomgaardt.  Mr. McLellan is not alleged to have personally made a single affirmative misrepresentation to a single victim charged in Counts 1-5.  In a severed trial, there would be absolutely no need for a Count 6 jury to be burdened or exposed to the mechanics, operations or representations of the EMEA transition management team.[4]

Third, Count 6 involves a different statute.  While the government characterized this argument as "frivolous" in its original opposition, noting that Count 6 "merely requires the government to prove one additional element—that the defendant's fraudulent scheme 'affected' a financial institution," *see* Govt. Opp. at 4-5, the additional element will require the government to establish additional facts to support the newly charged offense—testimony and evidence that is entirely unrelated to Counts 1-5.

Fourth, the U.S. Insurance company transition is not included within the Count 1 conspiracy.  Paragraph 48 of the Superseding Indictment (part of the Count 1 charging paragraphs) provides that the "objectives, manner and means, and overt acts taken in furtherance of the conspiracy charged herein are set forth in paragraphs 9 through 39," *see* Superseding Indictment at p. 16, and it therefore explicitly excludes the U.S. Insurance Company scheme set forth in paragraphs 40 through 45, *see* Superseding Indictment at pp. 13-14.

---

[3] "EMEA" stands for Europe, Middle East and Africa.
[4] Mr. McLellan addresses the government's 404(b), 403 and "intrinsic evidence" arguments *infra*, *see* pp. 8-9.

Fifth, all but one of the transitions at issue in Counts 1-5 are governed by a written

Transition Management Agreement ("TMA") executed by State Street's foreign subsidiary, State

Street Bank Europe, Limited ("SSBEL").  Count 6, on the other hand, concerns a transition

performed for a U.S.-based customer, there was no TMA executed by the parties and therefore no

TMA to govern the transition, and the U.S.-based customer was an existing customer of State Street

Global Advisors ("SSGA"), with absolutely no connection to SSBEL or State Street's EMEA

transition management team.  The absence of a governing TMA renders the Count 6 transition

fundamentally different than the transitions at issue in Counts 1-5—any representation to any client

at issue in Counts 1-5 must be examined in light of the governing TMA.  In a separate trial of Count

6, none of the evidence regarding the foreign TMA's would be relevant or material to the jury's

determination of the transition at issue in Count 6.[5]

For all of these reasons, there is no meaningful overlap in the evidentiary presentations of

the two charged schemes.  Count 6 does not concern or implicate the EMEA transition

management team, which constitutes the epicenter of the schemes charged in Counts 1-5.  The

principal actors as to Counts 1-5—Edward Pennings and Rick Boomgaardt—played no role in

the Count 6 transition and have no first-hand testimony to offer as to Count 6.[6]  The government

---

[5] The one foreign transition not subject to a formal TMA had no U.S. securities traded, it was executed pursuant to a side-letter agreement with terms that are substantially similar to State Street's foreign TMA template, and it is also the subject of a defense motion *in limine*.  *See* Dkt. 343.

[6] The government argued in its original opposition pleading that it "anticipates many of the *same* witnesses will testify to *all* the counts, and that few, if any, additional witnesses will be required to prove the new count" (emphasis in original), and argued that "even witnesses" not involved in Count 6 would be called in separate trials "because the government has learned that McLellan made incriminating admissions to his co-conspirators in Europe regarding the transition in the U.S."  Based on the discovery turned over to date, there are no European co-conspirator "witnesses" who claim Mr. McLellan made admissions, only a single witness—Edward Pennings.  In a May 2018 discovery production, the defense learned that during a proffer session that *post-dated* the superseding indictment, Mr. Pennings alleged that Mr. McLellan made a

correctly observed in its original opposition pleading that the only alleged link between the

counts is Mr. McLellan.  Govt. Opp. at 4 (asserting that Mr. McLellan "is the common link

between the six EMEA clients and the U.S. client").[7]  Moreover, while the government argued

that Count 6 involves the "same affirmative misrepresentations," *see* Govt. Opp. at 1, that simply

is not a fair characterization of the relevant charged schemes.  Here, as to Count 6, the alleged

misrepresentations are by different employees than those at issue in Counts 1-5, with the only

similarity being the allegation that Mr. McLellan somehow separately aided and abetted them.

Moreover, as noted, Count 6 does not have a governing TMA.  The absence of a TMA is a

critical distinction because the written TMA's constitute the framework of representations made

to five of the six EMEA clients, including those alleged in substantive securities or wire fraud

counts.  In short, these are essentially two distinct and independent schemes, each of which

involves an entirely different cast of characters and an entirely different set of facts.[8]

---

single, non-detailed incriminating admission to him regarding the transaction alleged in Count 6.
Putting aside the obvious credibility issues that attach to this recent memory of Mr. Pennings (in
a plethora of prior interviews and proffer sessions spanning over six years Mr. Pennings never
raised or discussed any issue related to the U.S. Insurance Company), this singular, isolated
comment is the extent of any proposed testimony from any EMEA-based witness as to the Count
6 transition.

[7] But, as noted in Mr. McLellan's original reply memorandum, "the mere accusation of the
defendant's involvement in two disparate instances of criminal conduct cannot support joinder,
even where there is a temporal relationship between the charges."  McLellan Reply at 1-2, *citing
United States v. Hawkins*, 776 F.3d 200, 209 (4th Cir. 2009).  As argued in his reply, "under a
contrary rule, joinder of counts against a single defendant would be appropriate in each and
every case."  McLellan Reply at 1-2.

[8] In its original opposition, the government repeatedly argued that McLellan "and his co-
conspirators" intentionally hid actual commissions charged to the client at issue in Count 6, but
that assertion obscures the fact that none of the charged co-conspirators are the same—meaning,
the principal co-conspirators charged as to the original indictment (Pennings and Boomgaardt)
had nothing to do with the domestic transaction charged in Count 6.  Instead, the government
contends there is a different set of conspirators at issue with regard to Count 6 (*see, e.g.*, Govt.
Opp. at 7) (conceding different alleged participants), and in fact the government recently filed a
criminal complaint against one of them.  *See United States v. Walker*, No. 18-MJ-07160 (D.
Mass.), Dkt. 1-2.

Indeed, while the government argued there would be "many" of the "same" witnesses should

the counts be severed, an examination of the discovery provided to date does not support that

assertion, at least not with regard to the critical or principal witnesses as to each separate scheme.  An

examination of the government's proposed witness list reveals the same.  After excluding the State

Street Keeper of Records witness and the two witnesses from the U.S. Insurance Company at issue in

Count 6, the government's proposed witness list contains 15 additional names**:** five of whom are

employees of the foreign entities (not witnesses at a separate trial of Count 6), one of whom is the

employee of the firm hired to review the foreign transitions (not a witness at a separate trial of Count

6), and one of whom is the EMEA employee (Rick Boomgaardt) whom has not alleged any

incriminating admissions by Mr. McLellan as to Count 6 and therefore will not foreseeably be a

witness at a separate trial of Count 6.  That leaves eight (8) remaining witnesses, each of whom is

either a government employee (three law enforcement officers)[9], a government cooperating witness

(Mr. Pennings, who recently and suddenly recalls an admission by Mr. McLellan) whose testimony

as to Count 6 would be limited to a single alleged admission by Mr. McLellan, or Boston-based

employees of State Street (four witnesses), which has cooperated extensively with the government in

the investigation and prosecution of this case; the potential for overlap (other than Pennings) is

limited to two State Street U.S. traders, neither of whom will offer testimony that will be lengthy or

subject to extensive cross-examination.[10]  The fact of the matter is that a separate trial regarding

Count 6 would be streamlined, relatively short, and minimally burdened (if at all) by repetitive

testimony or evidence (*e.g.*, there may be 1-2 Boston-based State Street employees (traders) offering

---

[9] The government has advised it will call two of the three at most at the scheduled trial.

[10] Of the four Boston-based State Street employees known to Mr. McLellan, a review of
discovery produced to date shows that one witness has no relevant testimony regarding the U.S.-
based transaction, another has no testimony to offer regarding Counts 1-5, and the remaining two
witnesses are U.S. based traders whose testimony will be short and largely uncontested. Mr.
McLellan has not yet received Jencks material for one of the four witnesses and so he therefore
is not yet in a definitive position to comment on that witness' proposed testimony.

non-contested information regarding the trading of securities).

Lastly, the government has argued that Count 6 was "intrinsic" to Counts 1-5, and that evidence as to Counts 1-5 would be admissible in a separate Count 6 trial pursuant to Rules 404(b) and 403. *See United States v. Jordan*, 112 F.3d 14, 16 (1st Cir. 1997) (setting forth "[t]hree types of prejudice may result from trying a defendant for several offenses during the same trial," including where "proof that defendant is guilty of one offense may be used to convict him of a second offense, even though such proof would be inadmissible in a second trial for the second offense …"); *cf.* Govt Opp. at 7 (arguing that severance pursuant to Rule 14 "is unwarranted because evidence relating to Count 6 would be admissible in a trial on Counts 1 through 5, and vice-versa"). For the following reasons, these arguments should be rejected as a basis for joinder.

First, nothing about Counts 1-5 is "part of a necessary description of events" leading up to the Count 6 transition. *See* Govt. Opp. at 9; *United States v. Robles-Alvarez*, 874 F.3d 46, 50–51 (1st Cir. 2017) (citation omitted) ("the necessary description of the events leading up to the charged crime"). The conspiracy alleged in the original indictment was expressly limited to "transition management clients in the EMEA region," and therefore, by its terms, did not include any transition conducted on behalf of the U.S. Insurance Company. Dkt. 1 at ¶7. Indeed, the EMEA transitions were conducted by a distinct legal entity – SSBEL. That entity was supported by different compliance and legal departments, had different employees, and operated under a different regulatory regime. This separateness is reinforced by the fact that, in its superseding indictment introducing Count 6, the government made only one change to its EMEA allegations to correct a "typographical error." Dkt. 298 at 2 n.1. As noted already, an entirely different cast of characters is at issue in Count 6 and evidence of Count 6 is not "part and parcel of ongoing conversations" with regard to Counts 1-5. *See* Govt. Opp. at 9. The government did not identify any such conversations or emails in its opposition pleading. The defense has listened to innumerable recorded conversations

and reviewed seemingly endless email chains and there does not appear to be any overlap of conversations between the transition at issue in Count 6 and the transitions at issue in Counts 1-5.

As to Rule 404(b), while the government invoked the Rule's buzzwords of "knowledge, intent, and absence of mistake, and . . . common plan or scheme" in its opposition, it never pierced the terms with substantive analysis.  The government argued that all of the transitions together showed that Mr. McLellan concocted a scheme to generate additional revenue by concealing commissions on trading.  Govt. Opp. at 10.  But, this is effectively a propensity argument—*i.e.*, if Mr. McLellan engaged in such conduct with regard to five or six EMEA clients then he would be more likely to have done so with the U.S. based client.  The fact of the matter is that whether or not Mr. McLellan conspired with Boston-based employees to unlawfully conceal commissions charged in connection with the U.S. based client's trading bears no "special relevance" to whether or not he conspired with Edward Pennings and Rick Boomgaardt to unlawfully conceal commissions on EMEA transitions, all of which were governed by TMA agreements that are wholly irrelevant to the U.S. based transition and subject to a different legal and regulatory framework.  Stated differently, assuming *arguendo* that Mr. McLellan did in fact improperly conceal commissions on the U.S. based transition, that fact does not tend to show a motive, opportunity, a common design, scheme, plan, or intent to conceal commissions on EMEA based transitions executed in the context of lengthy TMAs.  It would only show a propensity to commit such a crime.

Importantly, the government has not suggested, in any respect, that any aspect of the supposed schemes were "so unusual and distinctive as to be like a signature," thereby tending to prove that the perpetrator of one offense must also have committed the other.  McLellan Reply at 7, *citing United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979) (citation omitted).  As argued in his reply pleading, "for two offenses to constitute part of a 'common scheme or plan' for

8

purposes of admissibility under Rule 404(b), one must 'lead in a progression' to the other."

McLellan Reply at 6, *citing United States v. Lynn*, 856 F.2d 430, 435 (1st Cir. 1988).  This can

rarely, if ever, be the case where, as here, "[t]he participants in both events were entirely different."

*Id*.; *see also* McLellan Reply at 6-7 (arguing that the government may not establish a "common

scheme" sufficient to avoid exclusion under Rule 404(b) by merely alleging "repeated performance

of the same class of crimes") (*citing Phillips*, 599 F.2d at 136).  Nor, as Mr. McLellan argued in his

reply pleading, does evidence relating to Count 6 tend to prove any idiosyncratic motive relevant to

the EMEA conspiracy.  *Cf. United States v. DeCicco*, 370 F.3d 206, 213 (1st Cir. 2004).

Finally, whether or not admissible pursuant to Rule 404(b), it seems axiomatic that the

wide universe of evidence regarding the EMEA transitions would be excluded in a separate trial

of Count 6 pursuant to Rule 403.  The government viewed the Rule 403 issue principally through

the lens of admitting Count 6 at a trial of the original indictment.  Govt. Opp. at 10 ("Evidence

that McLellan was involved in seven, rather than six, fraudulent transitions of an almost identical

nature is simply not the type of evidence that will inflame a jury or cause jurors to render a

verdict on an improper basis.").  Viewed from the perspective of a severed trial as to Count 6

only, however, Rule 403 would surely preclude evidence of the EMEA transitions from

admission.  A jury considering only Count 6 would be overwhelmed by evidence as to Counts 1-

5.  Surely, the government's piling on of "at least six" additional allegations to a severed Count 6

trial would give rise to a substantial likelihood of unfair prejudice, the risk of confusing or

misleading the jurors, undue delay, wasting time, and/or needlessly presenting cumulative or

irrelevant evidence.  *See* Maguire, *Proposed New Federal Rules of Criminal Procedure,* 23 Ore.

L. Rev. 56, 58-59 (1943) ("We all know that, if you can pile up a number of charges against a

man, it is quite often the case that the jury will convict, where, if they were listening to the

evidence on one charge only, they would find it wholly insufficient as to the degree of proof required.").

II.      *An unfair burden of mastering 70,000 plus pages of new discovery*.

In its original opposition pleading, the government argued that "the fact that the government has produced an additional 58,000 pages of discovery related to Count Six (in a searchable electronic database) also does not support severance," asserting it was "less than 5 percent" of the 1.35 million pages previously provided during discovery. Govt. Opp. at 12-13 (government arguing that supplementing 1.35 million plus pages of discovery "by less than 5 percent, four months before trial, does not materially change the burden faced by McLellan or his counsel"). That argument was misplaced, as an initial matter, and it has been proven incorrect by the experience of the past few months. First, it has been a monumental challenge to review, digest, master and incorporate the new materials into a defense narrative the defense had spent 23 months building prior to the return of the superseding indictment. Digesting and incorporating 58,000 pages in four months—not even contending with the myriad other matters at issue in the final months of trial preparation—is immensely challenging in a vacuum, but incorporating them into an existing defense, built over 23 months of preparation, only adds to the burdens. Second, the number is no longer 58,000. Since the Court issued its order denying severance, the defense has received an additional 15,000 plus pages from the government, State Street, and the U.S. Insurance Company regarding Count 6, and is expecting additional productions from the U.S. Insurance Company. Third, and finally, the government's attempt to minimize the quantum of new materials by reducing it to a percentage of the government's entire discovery production should be outright rejected. Following this logic to the extreme, if the government produced one billion documents during discovery, it would not be unfair (in the government's eyes) to produce fifty million pages of discovery four months prior to trial.

Clearly, it is not the percentage that matters, but the raw number.  If anything, the voluminous nature of the discovery provided before the superseding indictment only increases the burden on Mr. McLellan, particularly considering that Mr. McLellan must also re-examine the original 1.35 million pages of discovery with an eye towards the new Count 6.

It would be unprecedented in this day and age, in this district, for a defendant to be forced to trial, less than four months from indictment, in a case involving more than 70,000 pages of materials.  In other words, if Count 6 was a stand-alone proceeding, Mr. McLellan would never be forced to trial in less than four months.  Forcing him to do so here compromises his constitutional right to a fundamentally fair proceeding, particularly where, as here, he is forced to construct and present two separate and distinct defenses.

III.    *Conclusion*

Wherefore, for all of the foregoing reasons, Mr. McLellan respectfully requests an order severing Count 6 from the remainder of the charged offenses in this matter.

> Respectfully Submitted,
> Ross McLellan
> By His Attorney,
>
> **/s/ Martin G. Weinberg**
> Martin G. Weinberg
> Mass. Bar No. 519480
> 20 Park Plaza, Suite 1000
> Boston, MA 02116
> (617) 227-3700
> owlmgw@att.net

Dated: May 18, 2018

11

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, May 18, 2018, a copy of the foregoing document has been served, via electronic mail, upon Assistant U.S. Attorney Stephen E. Frank and U.S. Department of Justice Trial Attorney William Johnston.

**/s/ Martin G. Weinberg**
Martin G. Weinberg