UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 16-10094-LTS |
| ) | |
| ROSS MCLELLAN, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF CONCEALMENT**

The government respectfully submits this response in opposition to the defendant's motion *in limine* to exclude evidence of concealment. Starting from the false premise that the charged conspiracy achieved its "main objective" once the Irish Government Pension Fund was defrauded, McLellan seeks to keep from the jury "all evidence relating to alleged acts and statements of himself or any alleged coconspirator" occurring after that date or, in the alternative, to have the jury instructed that such acts cannot be considered as part of the conspiracy to commit securities and wire fraud. McLellan's motion should be denied because (1) determining the scope of the charged conspiracy is a matter reserved for the jury; (2) the conspiracy did not, in fact, achieve its main objective once the Irish Government Pension Fund was defrauded; (3) the conspiracy as charged did, in fact, include an express agreement to conceal the fraud from clients and from others within State Street, and such concealment was plainly in furtherance of the conspiracy's central objectives, and enabled it to continue; and (4) even if, for the sake of argument, the concealment were part of a separate conspiracy, the evidence would still be admissible.

**Background**

The superseding indictment charges a conspiracy, spanning February 2010 through September 2011, "to obtain money and property of at least six of State Street's transition management clients in the EMEA region, by applying hidden commissions to securities trades conducted on behalf of those clients." Dkt. 282, ¶ 9. The indictment alleges that the defendant agreed with his co-conspirators "to mislead clients and others about what State Street was charging for transition management services, by (1) secretly charging commissions on securities trades conducted as part of certain transitions over and above the agreed upon fees for those transitions; (2) actively concealing the hidden commissions from the affected clients and from others within State Street; and (3) taking additional steps to cover up what they had done." Id. The indictment cites two principal purposes of the alleged conspiracy: first, "to make money for State Street by secretly overcharging at least six transition management clients," and second, "to conceal the hidden commissions from clients, and from others within State Street." Id. ¶¶ 10-11.

As the government has repeatedly made clear, the alleged conspiracy was open-ended in nature: "to defraud clients by secretly overcharging them *where the opportunity presented itself*. Six clients were actually defrauded as a result of that agreement." Dkt. 262 at 3 (emphasis added). Indeed, in correspondence concerning the defendant's request for a bill of particulars, the defendant himself acknowledged the open-ended nature of the conspiracy, noting: "My question is whether the proof of *the broader more open-ended agreement* will involve proof that Mr. McLellan, Pennings, or Boomgaardt agreed to defraud a specific named client or agreed to overcharge a specific named client other than the six clients named/disclosed even if this additional client or clients were not actually defrauded, or whether the evidentiary basis for your

more open-ended conspiratorial allegation does not involve proof of any specific additional client or transition." Id.

The evidence at trial is expected to show that the last client *actually defrauded* as part of the alleged conspiracy—before the persistent client inquiries that caused it ultimately to unravel—was the Irish Government Pension Fund, whose transition was completed in May 2011. But the indictment does not suggest, nor will the evidence at trial prove, that the conspiracy itself ended with that fraud, or that its main objectives were achieved. Indeed, the evidence is expected to show precisely the opposite: that the conspirators' success in defrauding their clients emboldened them, and that they were looking for *more* clients to defraud, when their scheme was uncovered.

## Argument

Starting from the faulty premise that the charged conspiracy ended with the fraud against the Irish Government Pension Fund, McLellan seeks to exclude evidence of everything he and his co-conspirators did thereafter to cover up their crimes. McLellan's desperate attempt to keep the jury from learning about (or, at least considering) evidence of his actions in the summer of 2011 is understandable: that evidence is devastating proof of his guilt. But his effort must fail for at least three reasons. First, determining the scope of the alleged conspiracy is a matter properly reserved for the jury. Second, the conspiracy as charged did *not* achieve its main objective with the fraud against the Irish Government Pension Fund. Third, the charged conspiracy included an express agreement to conceal the fraud from clients and from others within State Street, and such concealment efforts were, in any event, in furtherance of the conspiracy's main objectives. And fourth, even if, for the sake of argument, the concealment were part of a separate conspiracy, the evidence would still be admissible.

I.     Applicable Law

"A conspiracy endures as long as the co-conspirators endeavor to attain the 'central criminal purposes' of the conspiracy." United States v. Upton, 559 F.3d 3, 10 (1st Cir. 2009) (quoting Grunewald v. United States, 353 U.S. 391, 401 (1957)). "Determining the contours of the conspiracy ordinarily is a factual matter entrusted largely to the jury." Id. at 11.

In Grunewald, a statute of limitations case, the Supreme Court addressed the question whether acts of concealment that extended into the limitations period rescued an otherwise time-barred conspiracy prosecution. In addressing the question, the Court noted that "the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." 353 U.S. at 397. It concluded "that after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment." Id. at 401-402. In reaching that conclusion, however, "the Court drew a distinction between 'acts of concealment done in furtherance of the main objectives of the conspiracy,' and 'acts of concealment done after these central objectives have been attained for the purposes of covering up after the crime.'" Upton, 559 F.3d at 14 (quoting Grunewald, 353 U.S. at 405). "Where the latter is involved, the government must present some proof of an express original agreement to engage in the acts of concealment. However, nothing in the case law imposes a requirement that conspirators expressly agree to engage in acts of concealment where those acts are done in furtherance of the main objectives of the conspiracy." Id.

Tellingly, the defendant fails to note that in Grunewald itself, the Supreme Court remanded the case to the trial court for a determination whether the charged acts of concealment were in furtherance of the conspiracy as charged, or whether they were instead the types of inevitable acts of concealment that follow the completion of any conspiratorial agreement. Grunewald, 353 U.S. at 410-411.

II.   The Defendant's Effort to Limit the Scope
      Of the Charged Conspiracy Should Be Rejected

The defendant's desperate effort to keep the jury from considering devastating evidence of his guilt should be rejected because (1) the scope of a conspiracy is a matter reserved for the jury; (2) the conspiracy as alleged had not achieved its main objectives prior to the charged acts of concealment;  (3) that concealment was, in turn, expressly alleged in the superseding indictment to be an objective of the charged conspiracy and was, in any event, committed in furtherance of the conspiracy's main objectives; and (4) even if, for the sake of argument, the concealment were part of a separate conspiracy, the evidence would still be admissible.

First, it is black letter law that the scope of a conspiracy is a matter reserved for the jury—as even cases cited by the defendant make clear. See, e.g., United States v. Hong Vo, 978 F. Supp. 2d 49, 54 (D.D.C. 2013) ("the scope of the conspiracy is a factual matter entrusted largely to the jury"); see also United States v. Stewart, 744 F.3d 17, 22 (1st Cir. 2014) ("leaving for the jury the questions of the actual scope of the conspiratorial agreement, whether the acts alleged actually occurred, and, if so, whether they furthered the conspiracy's objectives"); United States v. Berroa, 856 F.3d 141, 155 (1st Cir.) ("Determining the contours of the conspiracy ordinarily is a factual matter entrusted largely to the jury.") (quoting Upton, 559 F.3d at 10) (internal quotation marks omitted); United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (same); see also United States v. Moussaoui, 382 F.3d 453, 473 (4th Cir. 2004) ("the scope of an

5

alleged conspiracy is a jury question"). "To decide the issue at this stage of the proceedings would be to arrogate a jury function." Hong Vo, 978 F. Supp. 2d at 54. Accordingly, McLellan's effort to narrow the conspiracy's scope prior to trial—and thereby to keep from the jury some of the must damning evidence of his guilt—should be rejected.

Second, McLellan starts from the false premise that the "central objectives of the charged conspiracy—the obtaining of additional revenues for State Street through undisclosed mark-ups and commissions—was fully accomplished on May 24, 2011, when State Street sent the Irish Government Pension Fund the last post-trade report," and that "[t]he conspiracy as charged was, at that point, at an end," Def. Br. at 6. McLellan's proposition is almost comical: that having successfully defrauded the Irish fund, the conspirators simply decided to call it quits and terminate their conspiracy, and that all the acts of concealment that followed were "at most, part of a separate concealment conspiracy." Id. That, of course, is not what the government has alleged, nor what the evidence will prove.

Instead, the superseding indictment expressly alleges that the conspirators sought "to make money for State Street by secretly overcharging *at least six* transition management clients—including, but not limited to, an Irish Government Pension Fund, a British Government Pension Fund, and a Middle Eastern Sovereign Wealth Fund—through the use of hidden commissions on securities that State Street purchased and sold on their behalf in the course of transitions." Dkt. 282, ¶ 10. The indictment thus alleges a continuing, open-ended scheme to overcharge clients as opportunities arose—a fact that, as noted, the defendant himself has previously acknowledged. See Dkt. 262 at 3. Cf. Forman v. United States, 361 U.S. 416, 424 (1960), overruled on other grounds, Burks v. United States, 437 U.S. 1 (1978) ("The indictment

was based on one continuing conspiracy to evade Seijas' tax.").[1] While six clients were actually defrauded as part of that scheme (with the Irish Government Pension Fund the last of those), the scheme did not end with that fraud—which was "but an 'installment' of what the conspirators aimed to accomplish," Grunewald, 353 U.S. at 408—but rather continued until the defendant's concealment efforts failed and he was fired. The government has never alleged that the conspirators decided they had had enough after the fraud against the Irish Government Pension Fund was complete. The defendant's contrary contention defies both the evidence and common sense, and should be rejected.[2]

Third, the indictment specifically alleges that one of the principal objectives of the charged conspiracy was to conceal the fraud from clients of State Street and from others within the bank. Dkt. 282, ¶ 11. Two of the four "manner and means" paragraphs of the indictment describe these concealment efforts, noting, *inter alia*, that McLellan and his co-conspirators "took steps to hide the commissions from their clients, including by directing that the commissions not be broken out in either the implementation shortfall calculation or any other

---

[1] For this reason, the cases on which the defendant relies are inapt. In Twitty, for example, the court noted that the defendants' efforts to conceal "occurred late in the day when the conspirators knew that agents were on their trail and active trafficking in guns had come to an abrupt halt." United States v. Twitty, 72 F.3d 228, 233 (1st Cir. 1995). But it suggested that "[t]his might be a closer case if the conspirators had continued their gun trafficking and agreed to new measures of concealment as part of an expanded conspiracy." Id.

[2] Indeed, even if the acts of concealment the defendant seeks to exclude could be consistent with *post hoc* efforts to cover up a completed crime, those acts are at a minimum equally consistent with the government's theory that the crime was continuing, and therefore may not be excluded. See, e.g., United States v. Turner, 548 F.3d 1094, 1101 (D.C. Cir. 2008) ("although the Court disagreed that acts concealing a conspiracy to obtain rulings that temporarily barred prosecution for tax evasion furthered the conspiracy beyond the date the defendants obtained the rulings, it emphasized that the very same acts could continue the conspiracy if its objective were to evade tax liability permanently rather than simply to obtain temporary no-prosecution rulings").

post-trade reports provided to the clients," and by requesting "that State Street's traders provide them with the reported daily high and low prices of securities State Street had traded in connection with the transition so that [they] could determine the amount of the commissions to be applied to each security without attracting the client's attention by exceeding the bounds of reported prices," and by lying to one of the affected clients about whether commissions had been charged, then claiming that they had been "inadvertently" charged, and then seeking "to mislead State Street's compliance staff into believing that the commissions had been charged in error and that the amount of the overcharges was limited to the commissions applied on U.S. securities." Id. ¶¶ 12(c)-(d). Similarly, the indictment alleges numerous overt acts involving concealment throughout the period of the charged conspiracy, and the evidence at trial is likewise expected to show that such concealment was expressly discussed among the conspirators from the outset of their crime. These allegations do not simply extend the life of the charged conspiracy beyond its conclusion, and into a limitations period. Instead, they set forth its essential character. Cf. Forman v. United States, 361 U.S. 416, 424, overruled on other grounds, Burks v. United States, 437 U.S. 1 (1978) ("The concealment of the 'holdout' income must continue if the evasion is to succeed. It must continue until action thereon is barred and the evasion permanently effected.").[3] For example, the indictment alleges that on March 2, 2010, near the *beginning* of the charged conspiracy, Pennings told Boomgaardt to not to discuss the charging of hidden commissions with other members of the Transition Management group, instructing him, "Don't

---

[3] As the court noted in Hong Vo, a case on which the defendant relies: "Because the government in Turner alleged only acts of concealment in support of its theory of the conspiracy's duration, it was required to prove that there was an express original agreement to conceal. In contrast, here the government supports its theory of the conspiracy's duration with acts taken to further the central objective of the conspiracy—accumulation of wealth." United States v. Hong Vo, 978 F. Supp. 2d 49, 56 (D.D.C. 2013).

even share it with the rest of the team, to be honest." Dkt. 282, ¶ 16.  Elsewhere, the indictment alleges that "Pennings instructed Boomgaardt not to inform the transition manager assigned to the deal about the hidden commissions" being charged to the Irish Government Pension Fund, id. ¶ 24, and that McLellan personally a trader "to delete any reference to commissions on the file of trading results he sent to the transition manager" responsible for the British Government Pension Fund transaction, id. ¶ 34.  The evidence will show that such concealment was critical not simply to enabling the defendant and his co-conspirators to avoid the detection of a completed fraud, but rather to enabling them to continue their scheme by defrauding the same clients, and other clients, again and again (as they did with the Middle Eastern Sovereign Wealth Fund, which was defrauded twice in 2010).  In this regard, McLellan's request that the Court instruct the jury "that it cannot find that acts or statements relating to alleged concealment . . . were part of the charged conspiracy to commit securities fraud and wire fraud unless it finds that McLellan entered into an original conspiratorial agreement in 2010 that included an express original agreement to conceal," Def. Br. at 1, is simply a request to instruct the jury not to consider evidence of the very overt acts with which he is charged.

Moreover, even if the indictment did not expressly charge that concealment was a central objective of the charged conspiracy, the evidence at trial will show that the acts of concealment in which the defendant and his co-conspirators engaged in the summer of 2011 were in furtherance of the conspiracy's main objectives.[4]  Had the defendant succeeded in covering up

---

[4] The defendant cites to a supposed representation by the government that "this is not a concealment/omissions case." Def. Br. at 7.  The omissions theory the government has disclaimed is silence in light a duty to disclose: "[T]his is *not* an omissions case, in which State Street promised customers an implementation shortfall, while remaining silent as to how much it would charge for its services." Dkt. 170.  Omitting a material fact designed to make an uttered statement misleading is an affirmative misrepresentation within the heartland of the

the fraud on the British Government Pension Fund—by, for example, lying to the client and to State Street's internal compliance staff—then State Street would have been free to keep $2 million in European overcharges the conspirators stole from that client, as well as the additional millions of dollars they stole from other clients, *and* to continue the defendant's fraud scheme on other, unsuspecting clients. Accordingly, this is *not* a case, like Marcus Schloss, where the scheme's detection marked its end. In that case, the court noted that the insider trading ring, once detected, was over, and that the defendants' subsequent lies to the Securities and Exchange Commission could not have been in furtherance of continued insider trading. That is not true here, where the lies the defendant and his co-conspirators told the British Government Pension Fund, and their own compliance colleagues, were designed to *prevent* their scheme from coming to light, thereby enabling it to succeed and continue. Cf. United States v. Justus, 162 F.3d 1157 (4th Cir. 1998) (noting that concealment was "essential to the continuing vitality of the conspiracy").

Fourth, even assuming, for the sake of argument, the concealment were part of a separate conspiracy, the evidence would still be admissible and its exclusion unwarranted. The cases the defendant cites are patently inapposite. Some cases concern the admissibility of co-conspirator statements. See, e.g., Krulewitch v. United States, 336 U.S. 440 (1949); Lutwak v. United States, 344 U.S. 604 (1953). The question before courts in those cases was whether the government could rely on the co-conspirator exception to the hearsay rule to admit a statement

---

government's theory. See United States v. Weimert, 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he concept of misrepresentation is [] broad, reaching not only false statements of fact but also misleading half-truths and knowingly false promises."); United States v. Kone, 303 F. App'x 38, 40 (2d Cir. 2008) (noting that an affirmative misrepresentation theory encompasses "half truths" and the omission of "facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading").

10

for its truth.  If a conspiracy concluded before the cover-up began, the result would be that a co-conspirator's statement made after the conspiracy ended would not be admissible for its truth against the defendant under that particular rule.  But that is it.  Those statements would still be admissible so long as the government qualified them under a different exception to the hearsay rule or proposed to use the statements for a purpose other than for their truth.

In other cases, the question was whether a particular overt act was actually in furtherance on the conspiracy for purposes of determining whether a conspiracy charge fell within the statute of limitations period.  See, e.g., Grunewald, 353 U.S. 391; Upton, 559 F.3d at 12.  The possible remedy for a finding that there was a separate conspiracy, and thus no overt act within the limitations period, would be dismissal of the particular count, not exclusion of the supposedly separate concealment evidence.  Here, there are no statute of limitations concerns as the original indictment was returned on March 31, 2016, and the government does not need to rely on the cover-up conduct to ensure that an overt act falls within the limitations period.  Indeed, the original and superseding indictment allege overt acts unrelated to the cover-up that post-date March 31, 2011.  See Dkt 282, ¶ 27.  In none of the cases on which the defendant relies did the courts contemplate excluding evidence merely because a conspiracy had concluded.  Whether or not the defendant's cover-up was part of the charged conspiracy, it is still relevant and admissible to prove the defendant's knowledge, intent and consciousness of guilt.

**Conclusion**

For the foregoing reasons, the government respectfully requests that the defendant's motion be denied.

Respectfully submitted,

| | |
|---|---|
| SANDRA MOSER<br>Acting Chief, Fraud Section<br>Criminal Division | ANDREW E. LELLING<br>UNITED STATES ATTORNEY |
| By:  */s/ William E. Johnston*<br>WILLIAM E. JOHNSTON<br>Trial Attorney | By: */s/ Stephen E. Frank*<br>STEPHEN E. FRANK<br>Assistant U.S. Attorney |

**CERTIFICATE OF SERVICE**

I certify that on May 18, 2018, this document was filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

/s/ *Stephen E. Frank*
STEPHEN E. FRANK