UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA   )
                                    )
            v.                      )          Criminal No. 16-10094-LTS
                                    )
ROSS MCLELLAN,                )
                                    )
            Defendant.          )
_____)

## GOVERNMENT'S TRIAL BRIEF

On March 31, 2016, a Grand Jury returned an Indictment charging the defendant, Ross

McLellan, a former executive vice president of State Street, with two counts of securities fraud,

two counts of wire fraud, and one count of conspiracy to commit the same, in connection with a

scheme to defraud at least six institutional investors who were clients of State Street's transition

management business.  Dkt. 1.  On February 7, 2018, the Grand Jury returned a Superseding

Indictment adding one count, involving an additional institutional investor client, to the original

five counts.  Dkt. 282.  The trial of this matter is scheduled to begin on June 4, 2018 and is

expected to last three to four weeks.

## Background

As set forth in the Superseding Indictment, transition management is, generally, the

business of helping large institutional investors efficiently move their investments between and

among asset managers or liquidate large investment portfolios, with the goal of reducing risk and

costs.  Transition managers assume responsibility for the performance of investment portfolios

during the period of the transition, communicate with incoming and outgoing asset managers

about the composition of their respective portfolios, and execute the trades necessary to

1

effectuate the transition.  State Street's transition management business is located within its

Portfolio Solutions Group, of which McLellan, who was based in Boston, was the global head.

The Superseding Indictment alleges a conspiracy and scheme to defraud State Street

clients in or about and between February 2010 and September 2011, wherein McLellan, together

with Edward Pennings—McLellan's direct report, based in London, who headed the Portfolio

Solutions Group for Europe, the Middle East and Africa—and Rick Boomgaardt, who reported

to Pennings and headed the transition management group for the EMEA region, as well as others

within the bank, conspired to make money for State Street by secretly overcharging certain

transition management clients through the use of hidden commissions on securities traded in the

course of transitions.

Specifically, the Superseding Indictment alleges that State Street, at the direction of the

defendants, agreed to manage transitions for six clients pursuant to agreed-upon fees—in several

cases, for a flat fee (meaning that the clients would pay State Street a management fee but would

receive market prices on all the securities trades conducted in connection with the transitions,

without any additional per-trade charge), and in the case of one client, for no fee (meaning that

the client would simply receive the market prices, with no additional per-trade charge).  Then,

notwithstanding those agreements, and representations made to the affected clients in the course

of attempting to win their business—including that State Street would "put our client's interest

ahead of our own"—the defendant and his co-conspirators directed other State Street employees

to apply secret commissions to securities trades conducted in connection with the transitions,

thereby diminishing the net value the clients obtained from those trades and enriching State

Street beyond its bargained-for compensation.  For example, when trading began for the

transition conducted for a British Government Pension Fund, McLellan instructed a Boston-

based fixed income trader to add commissions to U.S. fixed income trades notwithstanding written trading instructions to the contrary.  In summary, the Superseding Indictment alleges that McLellan and his co-conspirators sought to defraud the affected clients by misleading them as to what State Street would charge for each transition and at what price it would buy and sell securities on their behalf.

The Superseding Indictment also alleges that McLellan took affirmative steps to hide the commissions from the affected clients, and from others within the bank, including by asking U.S. traders working in Boston for the intraday highs and lows to make sure that the undisclosed commissions, when added to the actual prices at which the trades were executed, did not exceed the range of reported market prices for the day.  It alleges that McLellan also directed a U.S. trader to delete the commissions from the file of trading results he sent to a fellow State Street employee, in order to mislead the employee—and ultimately, the client—about the prices at which State Street had bought and sold securities on the client's behalf.  In order to hide the commissions taken on U.S. equities trades for one of the affected clients, the Irish Government Pension Fund, McLellan, his co-conspirators, and others at the bank devised a scheme to use a special trading account that would allow them to show the client only a single price—one that included the hidden commissions—thereby evading the bank's automated reporting mechanism for U.S. equities trades, which discloses the market price at which securities are traded and separately breaks out commissions.  And finally, when the British Government Pension Fund independently learned that commissions had been applied to certain U.S. securities trades in contravention of its agreement with State Street, McLellan directed that the client be told that "inadvertent commissions" had been applied to the U.S. trades—which he knew was a lie, because he was the one who had instructed the U.S. trader to add the commissions to the trades.

McLellan further directed that the client *not* be told that commissions had also been applied to European trades—for which market trading results were not publicly available to contradict the false market prices State Street had reported.  In a last-ditch effort to avoid exposure of the fraudulent scheme, McLellan told the same lie to State Street's compliance staff—that the bank had erroneously charged the British Government Pension Fund commissions on only its U.S. securities trades.

The Superseding Indictment alleges that in March 2011, contemporaneous with the fraud against the EMEA clients, McLellan engaged in the same fraud against a U.S. Insurance Company based in New York.  The Superseding Indictment alleges that McLellan orchestrated a scheme pursuant to which State Street won the U.S. Insurance Company's business by agreeing to a specified, disclosed fee for the transition, and then instructed traders to charge the insurance company a higher fee through the application of hidden commissions on fixed income trades.

For these crimes, the defendant is charged with conspiring with Pennings, Boomgaardt and others, to commit securities fraud and wire fraud and fraud, in violation of 18 U.S.C. § 371 (Count One).  McLellan is also charged with two substantive counts of securities fraud, and aiding and abetting the same, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, in connection with fraud against an Irish Government Pension Fund (Count Two) and the British Government Pension Fund (Count Three).   McLellan is likewise charged with two substantive counts of wire fraud, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1343 and 2, again in connection with the fraud against the Irish Government Pension Fund (Count Four) and the British Government Pension Fund (Count Five). Finally, McLellan is charged with one count of wire fraud affecting a financial institution, and

aiding and abetting the same, in violation of 18 U.S.C. §§ 1343 and 2, in connection with the fraud against the U.S. Insurance Company.

**Evidence**

The following is a summary of certain key forms of evidence the government currently anticipates offering in its case-in-chief, along with related issues.

### A.  Cooperating Witnesses

Pennings and Boomgaardt have both pled guilty, pursuant to plea agreements, to conspiring to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371, and have entered into cooperation agreements with the government.  The government anticipates calling both cooperating witnesses to testify at trial.

The witnesses are expected to testify about their roles in and understanding of the conspiracy, and statements McLellan made to them in furtherance of the conspiracy.  Through these witnesses, the government expects to introduce emails exchanged between and among McLellan and other members of the conspiracy, and telephone calls (recorded pursuant to State Street's policy) in which they discussed the conspiracy with McLellan and with one another, and the witnesses are expected to offer their understanding of those communications.

### B.  Other State Street Employees

The government may call certain other State Street employees to testify about the directives they were given by the defendant in furtherance of the scheme.  For example, the government may call two Boston-based traders, Stephen Finocchi and Thomas Clemmenson, who worked on the fixed income trading desk that was part of McLellan's Portfolio Solutions Group, to testify about the directives McLellan gave them to apply commissions to trades conducted for various clients in contravention of the written trading instructions they received.

5

Finocchi, who is expected to be granted immunity from prosecution, is also expected to testify about McLellan's direction to him to delete the commission information from trading results he sent to a transition management analyst in London, who was responsible for relaying the results to the bank's client.  The government may call Joseph Dionisio, an equities trader, who is expected to testify about the defendant's directives to him concerning the trading of certain exchange-traded funds on behalf of the Irish Government Pension Fund, and the application of hidden markups to those trades.  The government may also call Kristen Morris, a transition management analyst in Boston, to testify about McLellan's directives to her concerning commissions to apply to trades conducted for the U.S.-based insurance company, in contravention of the written trading instructions she issued to traders.

### C.  Victims

The government expects to call several State Street clients that were victimized by the defendant's fraud, who are expected to testify about the representations that the defendant and his co-conspirators made to them about what they would be charged for transition services, and their understanding of those representations.  The witnesses, including individuals who are expected to come to the United States voluntarily from England, Ireland and the Netherlands, will also testify about the significance of fees and commissions in their evaluation of transition management proposals.  A consultant to three of the victims will likely testify about his investigation into the hidden commissions during the summer of 2011, and in particular the difficulty he had obtaining information from the defendant, and his co-conspirators, about hidden commissions State Street applied to European bond trades.

### D.  Law Enforcement Witnesses

The government expects to call either a special agent of the Federal Bureau of Investigation ("FBI") or an Inspector with the United States Postal Inspection Service to testify about certain admissions the defendant made in an interview in early 2012 about State Street's transition management business practices—and, in particular, its disclosure practices with respect to fees and commissions.  Among other things, in that interview, McLellan advised the agents that State Street fully disclosed its own commission and fee structure to its clients, and that he believed it was permissible to take a spread, as long as it was disclosed and the client was not a fiduciary.

The government may also call an FBI special agent to introduce certain other emails of the defendant and his co-conspirators.  This is a standard method of admitting the contents of prior conversations that were transcribed or recorded but for which no percipient witness is being called.  See, e.g., United States v. Font-Ramirez, 944 F.2d 42, 49 (1st Cir. 1991) (trial court has discretion to allow readers to read transcripts into the record) (citing United States v. Rengifo, 789 F.2d 975, 983 (1st Cir. 1986)).

### E.  Emails, Recorded Calls, Invoices and Other Records

Primarily through the cooperating witnesses and current and other State Street employees, as well as through the testimony of several victims and a law enforcement agent, the government expects to introduce numerous emails and recorded telephone calls in which McLellan and his co-conspirators discussed, *inter alia*, their scheme to apply hidden commissions to client trades.  The government will also seek to introduce various documents the conspirators submitted their victims to win their business (e.g., responses to requests for proposal and pre-trade reports), to document their agreements (e.g., emails, transition management

agreements, and periodic notices reflecting the financial terms of the transactions), and to summarize the bank's performance (e.g., post-trade reports), as well as the invoices State Street submitted to its clients for the transition management services it rendered.

Virtually all of the government's exhibits were produced by State Street, and the government understands that the defendant does not dispute their authenticity. Accordingly, in order to streamline the presentation of the evidence, and with the permission of the Court, the government intends to offer its exhibits into evidence in bulk at the outset of the trial. The government identified one exhibit on its preliminary exhibit list that was produced by the Middle Eastern Sovereign Wealth Fund. The defendant indicated that he objected to that exhibit on the basis of, *inter alia*, authenticity. Accordingly, the government has withdrawn the exhibit.

### F.  Other Records and Potential Witnesses

In the absence of stipulations, the government will need to call additional witnesses, including the following:

- A State Street records custodian to testify about dates of the phone calls the government expects to introduce into evidence and the time stamps of the emails the government expects to introduce (since the headers on those emails reflect times in various time zones, including Greenwich Mean Time).

- Witnesses who will testify that State Street Corp. was a bank holding company registered with the Federal Reserve in 2010 and 2011, and that any liabilities or losses suffered by State Street Global Markets would have been absorbed by State Street Corporation, and that the U.S. Life Insurance Company was a member of the Federal Home Loan Bank in 2011, and that any liabilities or losses suffered by the funds it

advised would have been absorbed by the company, and that those entities are therefore "financial institutions" within the meaning of 18 U.S.C. § 20.

• Witnesses who will testify that the bonds traded by State Street in the United States on behalf of EMEA transition management clients in 2010 and 2011 also cleared and settled in the United States.

In addition, government will also seek, in the absence of a stipulation, to introduce the deferred prosecution agreement entered into by State Street Corp., to prove that State Street actually did suffer a loss as a result of the defendant's scheme, and therefore was "affected" by that conduct for purposes of 18 U.S.C. § 3293(2) and 18 U.S.C. § 1343, an element of Count Six.  See, e.g., United States v. Heinz, 790 F.3d 365, 367 (2d Cir. 2015) (noting that government's evidence that financial institution was "affected" by defendant's conduct "comprised non-prosecution agreements and settlement agreements (the 'Bank Agreements') that UBS and two other coconspirator banks entered into with the Department of Justice, other federal regulatory agencies, and various state attorneys general; testimony from representatives of these banks that the Bank Agreements resulted from the conduct charged in the superseding indictment; and documents reflecting that some of the Bank Agreements discuss the particular transactions referenced in the indictment.").

### G. Potential Rebuttal Expert

With the Court's permission, the government may call John Minahan, Ph.D, CFA, as a rebuttal expert.  The scope of Dr. Minahan's testimony will depend on the nature of the testimony the defendant elicits from experts during his case-in-chief concerning accepted understandings and practices in the investment management and transition management industry.

Dr. Minahan is an expert in the management of large institutional investment programs, with a career in the field of investment management that spans 20 years and includes experience as both a pension fund consultant and a scholar.  As a result of his work, he has extensive experience in the field of transition management.

From 1992 through 2010, Dr. Minahan served, with the exception of a two-year period, as a consultant with, variously, the Meketa Investment Group, and with New England Pension Consultants, where he worked with union, corporate, and public pension funds and endowments, and served, *inter alia*, as director of research, heading a department responsible for investment manager research.  From 1997 through 1999, Dr. Minahan served as National Director of Investment Services for MetLife.  Dr. Minahan has also held several academic appointments, including most recently as Senior Lecturer in Finance at the M.I.T. Sloan School of Management (from 2005 through 2010) and previously, as an assistant professor of finance at the University of Massachusetts at Boston, and as a visiting assistant professor of finance at Babson College. Dr. Minahan obtained his Ph.D. from M.I.T.'s Sloan School in 1988, where he concentrated in managerial economics and finance, and his bachelor of science degree from Boston College in 1981, where he concentrated in economics.

## Legal Issues

The parties have separately briefed several evidentiary issues concerning the admissibility of various documents, records and testimony.  Those motions are pending before the Court and the government will not separately rehearse them here.

A.  Co-Conspirator Statements

As noted above and briefed separately, the government intends to seek the admission of the statements made by the defendant's co-conspirators during and in furtherance of the

conspiracy, pursuant to F.R.E. 801(d)(2)(E).  According, the government respectfully requests

that the Court make findings pursuant to <u>United States v. Petroziello</u>, 548 F. 2d 20 (1st Cir.

1977), at the close of all the evidence, having accepted the co-conspirator statements during the

course of the government's case, as counseled by <u>United States v. Ciampaglia</u>, 628 F.2d 632, 638

(1st Cir.), <u>cert</u>. <u>denied</u>, 449 U.S. 956 (1980).

B.  <u>Lay Opinion Testimony</u>

As noted above, the government intends to introduce certain recorded calls and emails of

the alleged co-conspirators, including the defendant, during the testimony of the co-conspirators

who participated in those conversations, and to ask the witnesses to testify about their

understanding of the conversations and certain terms used.  Such lay opinion testimony is

permitted pursuant to F.R.E. 701, provided that it is (1) rationally based on the perception of the

witness; (2) helpful to a clear understanding of the witness's testimony or the determination of a

fact in issue; and (3) not based on scientific, technical, or other specialized knowledge.  <u>See</u>

F.R.E. 701.

A witness may "testify about his subjective interpretation of a conversation in which he is

participating as long as 'his opinion is rationally based on his perception and is helpful either to

an understanding of his testimony or to the determination of a fact in issue." <u>United States v.</u>

<u>Lizardo</u>, 445 F.3d 73, 83 (1st Cir. 2006) (citation and internal quotation marks omitted).

C.  <u>Aiding and Abetting and Vicarious Liability</u>

With respect to the substantive wire fraud and securities fraud offenses charged in Counts

Two through Six, the government anticipates that the evidence will establish the defendant's

guilt directly and under an aiding and abetting theory.  That is:

(1) The defendant participated directly in the fraud scheme; and

(2) The defendant aided and abetted his co-conspirators in their execution of the fraud.

The substantive offenses charged in Counts Two through Five were each part of the fraud conspiracy in which the defendant participated directly.  Moreover, as set forth above, McLellan personally directed subordinates to apply hidden commissions in contravention of written trading instructions, and to hide those commissions in communications with others.  There is, accordingly, evidence that in addition to directly executing and attempting to execute the charged scheme, the defendant willfully aided and abetted its execution by associating himself with it and seeking through his own actions to make it succeed.

Similarly, the government expects that the evidence will establish the defendant's guilt of Counts Two through Five vicariously.  Specifically, the defendant was a member of the charged conspiracy at the time when his co-conspirators engaged in the scheme to defraud State Street's clients.  The twin frauds were each committed in furtherance of the charged conspiracy and were within the reasonably foreseeable scope of the unlawful project on which the defendant embarked.  See United States v. Vazquez-Castro, 640 F.3d 19, 24 (1st Cir. 2011) ("'As with aiding and abetting theory, vicarious co-conspirator liability under Pinkerton is not in the nature of a separate offense.'") (quoting United States v. Sancez, 917 F.2d 607, 612 (1st Cir. 1990)).  Indeed, the schemes to commit securities fraud and wire fraud with respect to EMEA clients were specific objects of the conspiracy charged in Count One.[1]

---

[1] Although the evidence at trial will show that the defendant conspired with others to commit the substantive fraud against the U.S. Insurance Company charged in Count Six, the government does not seek a Pinkerton charge with respect to Count Six.  While the First Circuit appears not to have addressed the issue, and most other Circuits to have addressed the issue have concluded that Pinkerton liability is appropriate even where a conspiracy is uncharged, the Ninth Circuit has taken a different approach.  Compare, e.g., United States v. Zackery, 494 F.3d 644, 648 (8th Cir. 2007) ("As Pinkerton liability is an issue of whether the evidence was sufficient to convict

## Other Matters

A.  <u>Electronic Presentation of Evidence</u>

The government intends to present its evidence in electronic format using Trial Director. The government anticipates that Erin Leahy, a paralegal with the U.S. Attorney's Office, and Martina Kneifel, a paralegal with the Criminal Division, Fraud Section, will operate Trial Director and will also be available to assist defense counsel with the presentation of government exhibits.

B.  <u>Use of PowerPoint Presentation</u>

With the Court's permission, the government intends to use a PowerPoint presentation during its closing argument, which will allow for a more efficient presentation of the documentary and audio evidence.

C.  <u>Case Agent</u>

With the Court's permission, the FBI Special Agent Robert "Benson" Erwin, the case agent involved in the investigation, will sit at counsel table with the attorneys prosecuting the case.

D.  <u>Jury Binders</u>

The government may prepare binders of call transcripts that, with the Court's permission, it will provide to the jury.

---

the defendant of a substantive offense, whether the indictment charged a separate conspiracy offense is simply irrelevant.  Indeed, its absence reduces the risk of double punishment."), <u>with United States v. Nakai</u>, 413 F.3d 1019, 1023 (9th Cir. 2005) (noting that "use of <u>Pinkerton</u> where conspiracy is not charged in the indictment has been the custom of other circuits," and citing cases in the Third and Seventh Circuits, but concluding that "[i]t is error to use a <u>Pinkerton</u> instruction in a case in which the indictment does not allege a conspiracy").

Respectfully submitted,

SANDRA MOSER                          ANDREW E. LELLING
Acting Chief, Fraud Section           United States Attorney
Criminal Division

By:  */s/ William E. Johnston*          By: */s/ Stephen E. Frank*
WILLIAM E. JOHNSTON                   STEPHEN E. FRANK
Trial Attorney                        Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

I certify that on May 21, 2018, this document was filed through the ECF system, which

will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

/s/ *Stephen E. Frank*
STEPHEN E. FRANK