UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) |   |
| v. | ) ) | Criminal No. 16-10094-LTS |
| ROSS MCLELLAN, | ) ) |   |
| Defendant. | ) ) |   |

**GOVERNMENT'S MOTION *IN LIMINE* TO LIMIT
DEFENDANT'S PROPOSED EXPERT TESTIMONY[1]**

The government respectfully submits this motion *in limine* to limit the testimony of experts that defendant Ross McLellan may rely on in his case-in-chief.  According to disclosures made by the defendant, each of the defendant's experts intends to provide portions of testimony that are irrelevant or unreliable, or improperly touch upon issues left to the Judge or jury.  The defendant intends to have his experts (1) improperly interpret the contracts at issue, (2) make prohibited legal arguments that place the burden of guarding against fraud on the victims of fraud; and (3) offer irrelevant opinions about (a) potential misconduct at banks other than State Street in 2010 and 2011, and (b) the applicable regulatory regime after the conduct at issue had concluded.

**Background**

The defendant Ross McLellan has been charged with securities and wire fraud in connection with a scheme to secretly overcharge transition management clients of State Street Corp.  Transition management is the business of buying and selling large quantities of securities

---

[1] Pursuant to Local Rule 7.1(a)(2), the government has conferred with counsel for the defendant, who has indicated that he opposes this motion.

on behalf of institutional investors who are changing asset managers or otherwise restructuring their portfolios. The seven clients alleged to have been defrauded by the defendant are all institutional investors: five based in Europe, one based in the Middle East, and one based in the United States. State Street's transition management business was part of a much larger financial institution whose primary lines of business were custody banking and asset management. The bank's typical practice was to sign a transition management agreement (TMA) with its clients, which was an evergreen legal agreement governing the relationship between the client and the bank. The particular terms governing an individual transition were typically spelled out later in a document called a periodic (or transition) notice. Many of State Street's competitors in transition management were full-service investment banks, which meant they had proprietary trading desks that could earn revenue from acting as market-makers for trades that their transition desks referred to them. State Street, by contrast, did not make markets in fixed income or equities during most of the relevant period. Its transition management unit marketed its "unconflicted agency" services as a virtue of its business model which, in contrast to many of its competitors, resulted in transparent, commission-based pricing and no conflicts of interest.

On April 20, 2018, the defendant provided notice pursuant to Federal of Criminal Procedure 16(b)(1)(C)(i) of experts he may call in his case-in-chief. The relevant excerpts from those disclosures, for purposes of this motion, are set forth below:

Marc Menchel

- "Securities Industry Terminology and Practices: Based upon his education, training and experience, Mr. Menchel may offer his expert opinion on the meaning of certain terms relevant to securities trading generally, and transition management in particular, as well as related industry practices, including:

    o "Many investment banks considered themselves as 'market makers,' in fixed income securities but increasingly these banks were decreasing their inventories substantially and this was the case in 2010 and 2011. Instead of trading from pre-

existing inventories, they would buy and sell the relevant securities after learning the trades their client wanted to make. This practice reduced the risk that is otherwise inherent in trading as principal from large inventories."

- "Disclosure of Broker-Dealer Remuneration: . . . .

    o "Mr. Menchel may also review the rationale for this regulatory regime and explain that an attempt to change the rules to require dealers to disclose mark-ups failed because bond-market participants – on both the "sell" side and the "buy" side – did not support full disclosure. The aborted attempt to require full disclosure was proposed by the SEC in Securities and Exchange Act Release No. 33743. Congress subsequently introduced a bill to require similar disclosures, S. 2114, 113th Cong. (2014), but the bill did not pass. As General Counsel of FINRA, Mr. Menchel was involved in discussions about changing the regulatory regime to provide for greater disclosure. He met with industry groups who expressed their opinion that market participants do not want the disclosure of mark-ups. These industry participants explained that buyers and sellers determine the fairness of the quoted price based on bonds based on the bonds' characteristics knowing that any mark-up or mark-down is embedded in that quoted price. Based on these discussions and his experience interacting with market participants during his time at FINRA generally, Mr. Menchel may opine that institutional bond market participants such as investment funds and pension funds do not regard disclosure of a dealer's costs or profits as important or desirable; rather, institutional bond buyers focus on total price and yield, which necessarily take into account any embedded profit in the price quoted by a dealer. These market participants often invest heavily in research and analytics and are equipped to evaluate the fairness of a price and negotiate accordingly."

Martin Bednall

- "U.K. Transition Management Practices: Based on his education, training, and experience Mr. Bednall may offer his expert opinion on the following customs and practices in the U.K. transition management industry.

    o "Alternative Transition Management Providers: Many investment banks offering transition management services trade as principal, with the bank acting as a counterparty and investing its own capital. Investment banks may therefore engage in the practice of 'pre-hedging' by buying the necessary securities before the benchmark is taken. If, for example, a client retains the bank for a transition that involves the buying of bonds, the bank may buy those bonds in advance of the planned transition, thus increasing the price. The bank will then sell the bonds to the client at the higher price. Pre-hedging can cost the client significantly more than the mark-ups by State Street in the transitions relevant to this case. It was a generally held belief in the transition management industry that pre-hedging often costs more than 10 bps. Sophisticated clients that regularly use these transition

management providers seem to accept that the banks are making money beyond the explicit fee."

- "Contractual Language: Mr. Bednall may testify as to how certain provisions of State Street's transition management agreements . . . for the relevant transitions would be understood in the industry:

  o "He may testify that those agreements would be understood to give the transition manager full discretion on implementation of the transition, including selection of broker-dealers and would permit use of an affiliated broker-dealer and so long as it provides 'best execution.'  The concept of best execution does not preclude mark-ups or fees.  Indeed, if it did, transition managers' affiliates could never trade as riskless principal.

  o "He may testify that those agreements would be understood as expressly allowing the manager's affiliate to benefit from a mark-up in addition to any management fee.  He may further testify that a periodic notice which is silent on the issue would not alter that expectation.

  o "He may testify that those agreements would not be understood to impose any obligation to disclose remuneration to affiliated broker-dealers.

  o "He may testify that those agreements would be understood to supersede all prior agreements or statements, including oral statements.

  o "He may testify that, as a matter of industry custom, references to 'commissions' in agreements and accompanying schedules are generally understood to related to equity trading."

Simon Bradley

- "Implicit Costs: . . . Mr. Bradley may further testify that the transition management agreements between State Street and clients relevant to this case . . . made clear that there would be implicit costs in addition to any explicit management fee."

Michael Travaglini

- "RFP Process:  Based upon his education, training, and experience, Mr. Travaglini may testify that, in the U.S. investment management industry, RFP responses are generally considered non-binding.  Because RFP responses are non-binding, where a particular representation or term is important to the client, it is the client's responsibility to ensure that representation or term is incorporated into a binding contract.  In the transition management context, if the parameters of a transition change significantly after the RFP response, it is not reasonable to expect the proposed terms to endure."

- "Broker-Dealer Compensation:  Based upon his education, training, and experience, Mr. Travaglini may testify that sophisticated institutional investors in the U.S. understand that broker-dealers charge for execution costs and often earn a profit embedded in the bid/ask spread.  Absent an explicit agreement to the contrary, it would be unreasonable for an institutional investor to expect a transition manager to conduct a transition solely for a fixed fee that did not exclude execution costs. . . ."

**Argument**

I.     Applicable Law

Expert testimony is allowed to the extent it is relevant, reliable, and limited to areas not otherwise reserved for the judge or jury.  Federal Rule of Evidence 702 requires that (a) the expert's specialized knowledge help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony be based on sufficient facts or data; (c) the testimony be the product of reliable principles and methods; and (d) the expert reliably apply the principles and methods to the facts of the case.  The trial judge is the "gatekeeper in apply Rule 702's admissibility criteria."  Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 113 (1st Cir. 2010).  Experts may not testify that a "defendant did or did not have the mental state or condition that constitute an element of the crime charged."  Fed. R. Evid. 704(b).  Moreover, even if admissible under Rule 702, expert testimony may still be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595 (1993).

In addition to the general rules regarding admissibility, there are a variety of subject areas reserved for the Judge and jury.  "Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  United State v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994); see also United States v. Zipkin, 729 F.2d 384, 387 (6th Cir. 1984) ("It is the function of the trial judge to determine the law of the case.  It is impermissible to delegate that function to

5

a jury through the submission of [expert] testimony on controlling legal principles."). "Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value." United States v. Casas, 356 F.3d 104, 120 (1st Cir. 2004) (quoting United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994)).

    II.    The defendant's experts should not be permitted to interpret the contracts at issue.

The defendant has proposed to use expert testimony to advance the argument that his conduct was permitted under the relevant contracts, and that the victim-client should not have relied on any oral representations or other written proposals. See supra (Mr. Bednall may "testify that those [transition management] agreements would be understood as expressly allowing the manager's affiliate to benefit from a mark-up in addition to any management fee."). The defendant proposes to do that by using Mr. Bednall to interpret the contracts and opine as to the parties' understanding of the contractual provisions.

As an initial matter, contractual interpretation has little relevance in most criminal fraud cases.[2] Reliance is not element of criminal fraud, and contractual disclaimers or contrary representations in contracts do not alter or negate the materiality of a defendant's misrepresentations. See, e.g., United States v. Weaver, 860 F.3d 90, 95 (2d Cir. 2017) (holding that "contractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes"); United States v. Ghilarducci, 480 F.3d 542, 546-47 (7th Cir. 2007) (rejecting argument that contractual disclaimers "stating that no oral promises had been made" made oral representations immaterial).

---

[2] Indeed, the government usually must rely on conduct and representations outside of a contract to bring fraud charges in the first place. See, e.g., United States v. Steffen, 687 F.3d 1104, 1116 (8th Cir. 2012) (noting that "duty to disclose must be independent of any duty imposed by the contract" and dismissing indictment where "alleged omission are indistinguishable from breaches of [defendant's] contractual duties under the security agreement").

6

To the extent the content of contracts are relevant—either to the materiality of the alleged misrepresentations or to the defendant's state of mind—courts have consistently *rejected* efforts by experts to interpret contracts. That is because, to the extent it is relevant and necessary, "contract interpretation is a question of fact to be resolved by the jury." Foisy v. Royal Maccabees Life Ins. Co., 356 F.3d 141, 148 (1st Cir. 2004); see also S.E.C. v. Goldsworthy, Civ. No. 06-10012-JGD, 2008 WL 2943398 (D. Mass. Jan. 3, 2008) ("[I]t is not appropriate to have experts opine 'as to the legal obligations of the parties under the contract.'") (citation omitted); Marx & Co., Inc., v. Diners' Club, Inc., 550 F.2d 505, 510 (2d Cir. 1977) ("The question of interpretation of the contract if for the jury and question of legal effect is for the judge. In neither case do [courts] permit expert testimony."); Loeb v. Hammond, 407 F.2d 779, 781 (7th Cir. 1969) (excluding expert from interpreting contract).

When courts have allowed expert opinion regarding contracts, it is merely to elucidate a specific word or term requiring specialized or technical knowledge. See, e.g., North American Specialty Ins. Co. v. Myers, 111 F.3d 1273 (6th Cir. 1997) ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible."). Moreover, the legal effect or common understanding of including such a term of art in a contract would still be off limits. The proposed testimony of Mr. Bednall and Mr. Bradley brazenly crosses this line. The defendant seeks to offer their testimony to advance the legal conclusion that the charging of undisclosed commissions was allowed under the relevant contracts. Proper testimony might, for example, be limited to the meaning of the terms "best execution" or "cross-trades," which appear in some of the contracts and are unique to the securities industry. Yet whether those terms impose any obligations on the either party to the contract—and what those obligations are—is a matter reserved for the Judge and jury.

7

Accordingly, Mr. Bednall should not be permitted to interpret the contracts, nor should Mr. Bradley be permitted to opine on whether the contracts make clear that implicit costs will be charged.

> III. The defendant's experts should not be allowed to give legal opinions about the <u>responsibilities in the contracting process or the securities industry.</u>

The defendant's proposed expert testimony also includes other impermissible legal conclusions, such as whether a transition proposal creates a binding legal obligation, and whose responsibility it is to negotiate certain contractual provisions. <u>See</u> <u>supra</u> ("[I]n the U.S. investment management industry, RFP responses are generally considered non-binding. Because RFP responses are non-binding, where a particular representation or term is important to the client, it is the client's responsibility to ensure that representation or term is incorporated into a binding contract."). Such opinions stray from what is industry practice to offering a legal conclusion as to what representations are legally binding and who has the legal responsibility to memorialize certain provisions in a contract. <u>See</u> <u>Highland Capital Mgmt. v. Schneider</u>, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (noting that "courts allowed testimony from experts within the securities industry merely to discuss the ordinary practices and usages of that industry, and specifically barred testimony that stated a legal conclusion").

The defendant may properly seek, on cross-examination, to question the victims who testify about whether they viewed RFP responses as binding. But he is not permitted to use an expert as a mouthpiece to advance what is plainly a legal conclusion, and thereby to usurp the Court's role in instructing the jury on the relevant legal principles, and the jury's role in applying those principles to the facts in evidence.

> IV. Expert testimony about irrelevant time periods or tangential parts of the securities industry are irrelevant and likely to confuse the jury.

Other areas of the defendant's proposed expert testimony are inadmissible under Federal Rules of Evidence 401 and 403 and should be rejected.

First, the defendant seeks to offer expert testimony regarding misconduct at banks other than State Street. Specifically, through Mr. Menchel and Mr. Bednall, the defendant wants to inject into trial the unrelated practice of "front-running" (or "pre-hedging") at banks that traded on a principal basis. "Front-running" is when a broker exploits confidential information about an impending client transaction to purchase or sell the securities ahead of the client's trade, knowing that when the client's transaction goes to market it will affect the market price and the broker will be able to profit from the price movement. This practice, which is prohibited by FINRA, has no relevance to the case at hand. The Superseding Indictment mentions nothing about front running. The transition trading desk at State Street was not capable of front running stocks and bonds because it did not trade those securities, during most of the relevant period, on a principal basis—indeed, the defendant and his co-conspirators highlighted this absence of proprietary trading as a virtue of State Street's business model. And the conduct of other banks has no bearing on whether the defendant and his co-conspirators committed a crime. In short, whether or not other banks engaged in front-running is not likely to make a fact "of consequence" "more or less probable than it would be without the evidence." Fed. R. Evid. 401.

The only conceivable purpose for offering evidence of front-running—to argue that, contrary to common sense, transition clients did not expect or require disclosure of fees because they believed that principal trading operations were front-running their trades and earning undisclosed revenue to their disadvantage, or that this illegal practice on the part of other banks gave the defendant a good faith belief that his unrelated crime was allowed—does not survive

9

Rule 403's requirement that its probative value not be substantially outweighed by the danger of jury confusion.  The jury will already have to grapple with a number of complex financial concepts to understand transition management and how orders are placed and booked in agency trading operations.  Injecting into the trial speculation about unrelated misconduct at banks with *different trading operations* than State Street is at best a misguided attempt to impugn other financial institutions and at worst deliberate effort to distract the jury from the allegations at hand.  This case is about transitions at State Street and the representations that the defendant and his co-conspirators made to clients to induce them.  Relevant evidence includes why transition clients chose State Street and what happened after the deals between State Street and clients were struck, not unsubstantiated speculation about what was going on elsewhere (for which the defendant's proposed experts also have no proper foundation).

Second, the defendant has indicated that he seeks to offer expert testimony regarding unsuccessful attempts to change the regulatory regime by revising S.E.C. Rule 10b-10 to require broker-dealers to disclose their mark-ups, and a 2014 congressional attempt to enact a similar change in the law.  Legislative and regulatory history has no bearing on whether the defendant intentionally devised a scheme to mislead clients about how much State Street was charging, nor is it necessary for the jury to understand security industry practices.  To the extent such history has some relevance to defendant's state of mind, expert testimony cannot be used as a substitute for the defendant's own testimony (subject to cross-examination) to imply that the defendant himself had such knowledge.  Cf. F.R.E. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.").  Moreover, the suggestion that an attempt to change the broker-dealer rules in *2014*—three years after the charged conduct, and

10

long after the defendant was terminated by State Street—has any relevance to this case, is absurd. Allowing such evidence at trial would only muddle the issues and invite jury confusion.

## Conclusion

For the foregoing reasons, the government respectfully requests that the defendant be precluded from eliciting expert testimony on the areas set forth above.

Respectfully submitted,

| | |
|---|---|
| SANDRA MOSER<br>Acting Chief, Fraud Section<br>Criminal Division | ANDREW E. LELLING<br>United States Attorney |
| By: */s/ William E. Johnston*<br>WILLIAM E. JOHNSTON<br>Trial Attorney | By: */s/ Stephen E. Frank*<br>STEPHEN E. FRANK<br>Assistant U.S. Attorney |

## CERTIFICATE OF SERVICE

I certify that on May 21, 2018, this document was filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

/s/ *William E. Johnston*
WILLIAM E. JOHNSTON