UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                    )
                                    )
UNITED STATES OF AMERICA            )
                                    )
       v.                           )     No. 16-10094-LTS
                                    )
ROSS MCLELLAN,                      )
       Defendant                    )
                                    )
_____)

**DEFENDANT ROSS MCLELLAN'S OBJECTIONS TO
GOVERNMENT'S PROPOSED JURY INSTRUCTIONS**

Without waiving any objections that he may assert in the future, defendant Ross McLellan asserts the following specific objections to the Proposed Jury Instructions of the United States (Doc. 367)("Gvt. Proposed Instructions"). He also continues to request that the Court give the instructions requested in his Requests for Instructions to the Jury (Doc. 362)("McLellan Requests for Instructions").

**I.    THE COURT SHOULD NOT GIVE A WILFUL BLINDNESS INSTRUCTION.**

The government routinely requests that the jury be instructed regarding wilful blindness, regardless of whether the facts of the case actually warrant the instruction. *See* Gvt. Proposed Instructions at 6. Here, they will not, and the Court should not give a wilful blindness instruction. A wilful blindness instruction is appropriate only if, *inter alia*, "(1) a defendant claims lack of knowledge, [and] (2) the facts suggest a conscious course of deliberate ignorance." *United States v. Azubike*, 564 F.3d 59, 66 (1st Cir. 2009). In determining whether a wilful blindness instruction was properly given, courts should "consider whether the record reveals 'flags' of suspicion that, uninvestigated, suggest wilful blindness." *Id. See, e.g., United States v. Ford*, 821 F.3d 63, 74 (1st

Cir. 2016)("Evidence sufficient to meet requirement (2) can include evidence that the defendant was confronted with 'red flags' but nevertheless said, 'I don't want to know what they mean'"); *United States v. Appolon*, 695 F.3d 44, 67 (1st Cir. 2012)("what is needed are sufficient warning signs that call out for investigation or evidence of deliberate avoidance of knowledge"); *see also United States v. Bray*, 853 F.3d 18, 30 (1st Cir. 2017)("A willful blindness instruction is meant to inform jurors that they may impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps" (internal quotation marks omitted)).

The government's theory in this case has never been that McLellan was wilfully blind to anything. Quite the contrary: it contends that McLellan directed a knowing and intentional plot to overcharge State Street transition management clients for their transition trades. Under such circumstances, a wilful blindness instruction should not be given. "[W]hen the evidence presented at trial provides the jury with only a binary choice between actual knowledge and innocence, a willful blindness instruction is inappropriate." *Azubike*, 564 F.3d at 67.

## II. THE GOVERNMENT'S PROPOSED INSTRUCTION REGARDING THE "IN CONNECTION WITH" ELEMENT OF SECURITIES FRAUD IS MISLEADINGLY INCOMPLETE.

Telling the jury only that the it can find that the alleged fraudulent scheme was "in connection with the purchase or sale of a security" if it "in some way 'touched upon' a securities transaction," Gvt. Proposed Instructions at 12, does not fully elucidate for the jury what this element of the securities fraud offenses requires it to find. There will be a serious dispute in this case as to whether any affirmative misrepresentations that were made (assuming *arguendo* that there were any) or the alleged scheme to defraud itself were "in connection with" the purchase or sale of securities, and the jury needs additional guidance regarding how to make this critical determination. As the

cases cited at pages 7-8 of McLellan Requests for Instructions demonstrate, to find that a misrepresentation or scheme "touched upon" the purchase or sale of securities means that it must have affected *the decision to buy or sell a particular security*. It does not suffice to prove a violation of the securities laws charged that the misrepresentation or scheme affected some other types of decisions by the transition management clients. The jury should, accordingly be instructed as set forth in McLellan Requests for Instructions at 7.

### III.   THE COURT SHOULD LIMIT ITS SECURITIES FRAUD INSTRUCTIONS TO AFFIRMATIVE MISREPRESENTATIONS.

The government, after having repeatedly insisted that this is not an omissions case but instead a case about affirmative misrepresentations, *see, e.g.*, Government's Response in Opposition to Defendant's Motion to Sever Count 6 (Doc. 298)("Severance Opposition") at 6  ("Despite McLellan's best efforts to turn this into an omissions case, this is a case about *affirmative* misrepresentations that McLellan personally made or directed" (emphasis in original)), now, in its proposed instructions, seeks to resurrect an omissions theory.  Gvt. Proposed Instructions at 13, 14. The Court should decline to permit the government, virtually on the eve of trial, to expand its theory of prosecution in this manner.  Instead, the Court should limit the jury's consideration to affirmative misrepresentations that McLellan personally made or directed, as set out in McLellan Requests for Instructions at 2.

This is not just a matter of fundamental fairness, given McLellan's reliance on the government's representations in preparing to defend against an affirmative misrepresentation case and not against an omissions theory, but should also be a matter of judicial estoppel. Judicial estoppel "prevents a litigant from pressing a claim that is inconsistent with a position taken by that

litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." *United States v. Szpyt*, 785 F.3d 31, 41 (1st Cir. 2015) (citation omitted). Factors relevant in considering a claim of judicial estoppel include: "whether (1) a party's later position . . . [is] clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept that party's earlier position; and (3) . . . the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Dyer v. City of Boston*, 2018 WL 1513568, at *8 (D. Mass. Mar. 27, 2018), *quoting United States v. Pakala*, 568 F.3d 47, 59 (1st Cir. 2009). In response to McLellan's argument in support of severance of Count 6 that the governing regulatory regimes in the EMEA region differ from that applicable to the U.S. Insurance Company transition, the government forcefully responded that any such differences were illusory "because neither regulatory regime permits affirmative misrepresentations, such as those with which McLellan is charged." Severance Opposition at 11. In that same Opposition, the government expressly took the position, quoted in the preceding paragraph, that "this is a case about *affirmative* misrepresentations that McLellan personally made or directed," even going so far as to add its own emphasis to the word "affirmative."

These representations satisfy the elements of judicial estoppel. First, the government's statement that "this is a case about affirmative misrepresentations" would clearly be inconsistent with any subsequent reliance upon purportedly fraudulent omissions. Second, the government successfully opposed severance based in part on these representations. Third, it is entirely unfair for the government to oppose severance based on the assertion that this is not an omissions case only to later reverse course and argue omissions to the jury. *Cf. Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5, 7 (1st Cir. 1991)(accepting the plaintiff's "position that it does not

presently claim defendant had a duty to supply omitted matter in order to prevent possible misleading" in civil securities fraud case).[1]

## IV. THE COURT SHOULD INSTRUCT THE JURY TO CONSIDER THE SOPHISTICATION OF THE TRANSITION MANAGEMENT CLIENTS.

McLellan objects to instructing the jury that once it finds that there was a material misrepresentation, "it does not matter whether the intended victims were gullible buyers or sophisticated investors, because the law protects the gullible and unsophisticated as well as the experienced investor." Gvt. Proposed Instructions at 14. On the contrary, as the Second Circuit recognized in *United States v. Litvak*, 808 F.3d 160. 183-85 (2d Cir. 2015), the sophistication of the investor matters a great deal when considering the materiality of a statement. What might alter the total mix of information for a gullible or inexperienced investor may not for an experienced, sophisticated investor, who will have a very different basis for evaluating what is being said. Rather than give this portion of the government's proposed instructions, the Court should instruct as requested by McLellan at page 9 of his Requests for Instructions. *See also* McLellan Requests for Instructions at 5.

## V. FOREIGN SECURITIES TRANSACTIONS CONDUCTED BY STATE STREET EMPLOYEES LOCATED IN THE UNITED STATES ARE NOT DOMESTIC SECURITIES TRANSACTIONS.

The government requests that the jury be instructed that "[s]ecurities transactions conducted by a U.S.-based agent on behalf of a foreign buyer or seller can still occur in the United States even

---

[1] Although the First Circuit left open the question whether judicial estoppel may be applied against the government in a criminal case in *United States v. Levasseur*, 846 F.2d 786, 795 (1st Cir. 1988), it more recently, in *Szpyt*, considered whether the doctrine should be applied against the government without expressing any reservations about its potential applicability in criminal cases in general (although concluding that the doctrine should not be applied in the circumstances before the Court in that particular case).

if title initially originates from the abroad, or is ultimately transferred abroad at the end of the transaction. Accordingly, if you find that State Street employees based in the United States executed securities transactions as agents on behalf of foreign clients, then you may find that the purchase or sale of such securities occurred in the United States for purposes of this element." Gvt. Proposed Instructions at 18-19. As set forth in McLellan Requests for Instructions at 14-16, a securities transaction is a domestic securities transaction in only three circumstances: (1) if it is conducted over an American stock exchange, (2) if irrevocable liability to purchase or sell the security is incurred in the United States, or (3) if title passes in the United States. Unless one of these three circumstances is present, the location of State Street employees in the United States does not suffice to make the securities transaction a domestic one. The requested instruction can only serve to confuse the jury.

The cases on which the government relies do not support the giving of the instruction. In *United States v. Georgiou*, 777 F.3d 125, 135-137 (3d Cir. 2015), "some of the relevant transactions required the involvement of a purchaser or seller working with a market maker and committing to a transaction in the United States, incurring irrevocable liability in the United States, or passing title in the United States." In *United States v. Vilar*, 729 F.3d 62, 76-78 (2d Cir. 2013), a number of the victims of the fraud irrevocably committed to the transactions while physically located in the United States. In *Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310 (11th Cir. 2011), the Court concluded that the plaintiff's complaint survived a motion to dismiss because it alleged that "[t]he transaction for the acquisition of the Templeton stock closed in Miami, Florida on June 10, 2008, by means of the parties submitting the stock transfer documents by express courier into this District." In *Butler v. United States*, 992 F.Supp.2d 165 (E.D.N.Y. 2014),

the defendant, located in New York, solicited foreign clients to invest in auction rate securities in the United States. Once the clients agreed to invest,

> Butler bought and sold securities from the Credit Suisse office in New York. The ARS trading was conducted between Butler, the liaison desk at Credit Suisse's New York office, and other United States Banks (i.e. Merrill Lynch). He made these purchases and sales on behalf of his clients, pursuant to instructions made to him in New York over the phone or through email. Once an instruction from the client was received, Butler, as American based agent of the client, acted, creating irrevocable liability in the United States.

*Id.* at 178. This scenario bears no resemblance to the activities of the State Street employees in this case.

Finally, in *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 560 (S.D.N.Y. 2014), the court concluded that the allegations of plaintiff's complaint were sufficient to withstand a motion to dismiss where the complaint alleged that the plaintiff had purchased the notes by placing an order with a broker in the Miami, Florida, office of UBS, which then transmitted the order to its broker-dealer in New York, New York, where funds from plaintiff's UBS account were transferred internally to UBS's back office, where the order was filled and the transaction was completed. Again, a very different scenario. And in both *Butler* and *Atlantica Holdings*, the client contracted directly with the American broker for the purchase of the security, thus rendering the broker the agent of the client for purpose of conducting the transaction, whereas here the contracts were all with State Street Bank Europe London (SSBEL), not with any domestic entity, resulting in transitions managed by the State Street transition management team working out of State Street's U.K. office.

**VI.   SIMPLE "RISK OF LOSS" DOES NOT SATISFY THE "AFFECTING A FINANCIAL INSTITUTION" ELEMENT OF COUNT 6.**

The government requests that the jury be instructed that "[f]or a scheme to have 'affected'

7

a financial institution it must have exposed the financial institution to a new or increased risk of loss." Gvt. Proposed Instructions at 25. This unduly expansive proposition would permit the jury to convict if there were *any* chance of loss, no matter how remote or speculative. Instead, there must have been a "realistic prospect of loss." *United States v. Agne*, 214 F.3d 47, 53 (1st Cir. 2000). *See* McLellan Requests for Instructions at 25.

### VII. TO PROVE THAT THE ALLEGED FRAUD AFFECTED A FINANCIAL INSTITUTION, IT DOES NOT SUFFICE THAT A SUBSIDIARY ALONE WAS AFFECTED.

The government requests that the jury be instructed that "[a] financial institution is affected if a wholly-owned subsidiary of the financial institution is exposed to actual loss or increased risk of loss. And an employee of a financial institution or its wholly owned subsidiary can 'affect' that financial institution or its wholly-owned subsidiary to a new or increased risk of loss." Gvt. Proposed Instructions at 25. That a subsidiary is "affected" does not, however, without more, satisfy this element. Instead, "at minimum there needs to be some impact on the financial institution to support a [wire fraud] conviction." *United States v. Agne*, 214 F.3d 47, 51-52 (1st Cir.2000), and "the government must present evidence that the fraud 'affected' the parent financial institutions." *United States v. Mavashev*, 2009 WL 4746301, at *4 (E.D.N.Y. Dec. 7, 2009). In *United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998), on which the government relies, the Court upheld the sufficiency of the evidence on this element because the government presented testimony that the subsidiary "borrowed the money for its transaction with Bouyea from its parent, Centerbank, and that when [the subsidiary] suffered a $150,000 loss as a result of Bouyea's fraudulent scheme, Centerbank was affected by this loss." *Id.* at 195. *See, e.g., United States v. Fabian*, 798 F. Supp. 2d 647, 687 (D. Md. 2011)("The defrauding of a wholly-owned subsidiary of an insured depository institution, *if it affects the parent*

8

*corporation*, may suffice to sustain a conviction for mail fraud affecting a financial institution" (emphasis added)); *see also United States v. Pelullo*, 964 F.2d 193, 215 (3d Cir. 1992)(approving charge that told jury that "if you find that the defendant engaged in a fraudulent scheme to defraud [subsidiary], you may find the defendant guilty . . . *if you also find that the scheme had an effect on [the parent]*" (emphasis added)). The jury should not, therefore, be instructed that "affecting" a wholly-owned subsidiary suffices to prove the "affecting a financial institution" element.[2]

## VII. THE COURT SHOULD NOT GIVE A *PINKERTON* INSTRUCTION.

The government has requested that the Court give a *Pinkerton* instruction. Gvt. Proposed Instructions at 26. McLellan asks that such an instruction not be given. "[A] *Pinkerton* charge should not be given as a matter of course." *United States v. Vazquez-Castro*, 640 F.3d 19, 25 (1st Cir. 2011), *quoting United States v. Sanchez*, 917 F.2d 607, 612 n.4 (1st Cir. 1990). The giving of a *Pinkerton* instruction is particularly problematic in this case—and potentially confusing for the jury—because the instructions, as the government concedes, would have to Exclude Count 6 from its ambit. The instruction also should not be given because the danger is too great that the jury will draw an inference that is the opposite of the one allowed under *Pinkerton* and find McLellan guilty of being a member of a conspiracy based on evidence that others may have committed the substantive offenses.[3]

---

[2] To the extent that this proposed instruction would permit the jury to find that State Street was a "victim" of the offense charged in Count 6, whether the circumstances of this case would permit such a finding should await the presentation of the evidence.

[3] "[T]he First Circuit has acknowledged the view in other circuits that the *Pinkerton* charge should not be given in 'marginal case[s]' because of the risk that the jury will draw the inverse of the *Pinkerton* inference, *i.e.*, the jury will hold the defendant vicariously liable for a conspiracy merely because the government shows that others have committed numerous substantive offenses." First Circuit Pattern Jury Instruction 4.18.371(2), Comment (5), although it appears to have

The decision whether or not to give a *Pinkerton* instruction lies within this Court's substantial discretion. Here, the reasons for not giving it far outweigh its rationale. The instruction should not be given.[4]

Respectfully submitted,
By his attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (telephone)
(617) 338-9538 (fax)
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

### CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this 28th day of May, 2018, I caused the within Response to be served on all registered participants through its filing with this Court's CM/ECF system.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

---

expressed some skepticism with this argument. *See United States v. Wester*, 90 F.3d 592, 597 (1st Cir. 1996).

[4] At minimum, the Court should await the completion of the evidence before making a final decision whether a *Pinkerton* instruction should be given.