UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                                )
                                )
UNITED STATES OF AMERICA        )
                                )
v.                              )     No. 16-cr-10094-LTS
                                )
ROSS MCLELLAN,                  )
    Defendant                   )
                                )
_____  )

**DEFENDANT ROSS MCLELLAN'S RESPONSE TO THE GOVERNMENT'S MOTION *IN LIMINE* TO LIMIT DEFENDANT'S PROPOSED EXPERT TESTIMONY**

Now comes the Defendant, Ross McLellan, by and through undersigned counsel, and hereby respectfully responds to the Government's Motion *in Limine* to Limit Defendant's Proposed Expert Testimony, Dkt. 366. The Government's objections relate solely to four areas of testimony that may be proffered by Mr. Mclellan's expert witnesses at trial: (1) expert opinion concerning specific provisions of the operative agreements in this case; (2) expert testimony from Mr. Travaglini that RFP responses in the transition management industry are considered non-binding and that important terms are generally incorporated by transition managers and clients into the operative transition documents; (3) testimony concerning the practices of alternative transition management providers; and (4) testimony concerning a failed 2014 congressional bill, which would have required disclosure of mark-ups/mark-downs on fixed income riskless-principal and principal transactions. Importantly, the Government does not contest Mr. McLellan's experts' qualifications, whether they possess specialized knowledge that would help the trier of facts understand the evidence or determine a fact in issue, or whether other proffered opinions should be excluded. As detailed below, the objected-to testimony is

1

relevant, not conclusive on the ultimate issues in this case, is helpful to the jury, and is properly admissible as testimony regarding the customs and practices in the transition management industry.  *See Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 200-02 (1st Cir. 2007) (referring to testimony from "expert in fixed income securities with forty-five years of experience in the financial services industry" as "strong evidence" regarding appropriateness of plaintiff's bond trading); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) ("Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."); *United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015).

      First, the Government attempts to exclude any opinions, except for the definition of certain terms, related to the transition management agreements between the alleged victims and State Street Bank Europe, Ltd.  *See* Dkt. 366 at 6-8.  As an initial matter, the Government argues that the testimony is irrelevant, *see* Dkt. 366 at 6-7.  It goes without saying, that the contracts here – the principal documents governing the rights and obligations of the parties, including State Street's right to act as riskless principal – are certainly relevant to the case and expert testimony explaining the complicated terms therein is relevant under Fed. R. Evid. 401.  The Government acknowledges, as it must, that State Street's "typical practice was to sign a transition management agreement (TMA) with its clients, which was an evergreen legal agreement governing the relationship between the client and the bank."  *See* Dkt. 366 at 2.  The use of an evergreen TMA is a standard routine and practice within the transition management industry and the meaning of terms within the TMA, as understood by sophisticated market

2

participants partaking in the transition of billions of dollars of securities, are undeniably relevant to the instant matter. *See Bielunas v. F/V Misty Dawn, Inc*., 621 F.3d 72, 76 (1st Cir. 2010) (to be relevant, "the evidence need not definitively resolve a key issue in the case—it need only move the inquiry forward to some degree.").

The Government further argues that Mr. McLellan's experts should not be allowed to interpret the contracts at issue in this case because it is a matter that is reserved for the Judge and jury. *see* Dkt. 366 at 7-8. While Fed. R. Evid. 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," here, Mr. McLellan's experts do not seek to testify on the ultimate issue, *i.e.* whether Mr. McLellan did or did not violate any laws. *See Berckeley Invest. Group, Ltd. v. Colkitt,* 455 F.3d 195, 218–19 (3rd Cir.2006) (expert could testify as to the customs and business practices in the securities industry, but not to whether the defendants violated the law). The proffered testimony is intended solely to help the jury understand the terms of complicated agreements that were entered into by sophisticated market participants. *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."). Accordingly, courts have allowed experts to comment on complex contractual provisions as long as they do not opine on the ultimate issue, here the defendant's guilt or innocence. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983) (permitting "plaintiffs' expert witness, a lawyer, to testify concerning the interpretation given some of the prospectus boilerplate language in the securities industry"); *see also Hewitt v. Liberty Mut. Group, Inc.,* 268 F.R.D. 681, 2010 WL 2505912 * 5 (M.D. Fla. May 27, 2010) (in homeowners' action against insurer of their homeowners' insurance policy, alleging that insurer breached insurance contract,

insurance adjuster was allowed to testify as an expert as to his opinion whether there was coverage for the damage to homeowners' residence under the insurance contract provisions in dispute).  Furthermore, the testimony is relevant and necessary to establish how an ***objective*** market participant standing in the alleged victims' shoes would understand these various terms. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (materiality must be viewed from perspective of the ***reasonable investor***); *see also SLSJ, LLC v. Kleban*, No. 14-CV-390 (CSH), 2017 WL 4329732, at *21 (D. Conn. Sept. 29, 2017) (allowing testimony about "the customary expectations and understandings that passive investors have when they are members of LLCs"); *S.E.C. v. Cuban*, No. 08-CV-2050-D, 2013 WL 791405, at *12 (N.D. Tex. Mar. 5, 2013) (relying on expert testimony that "a reasonable investor would expect that [an offering] with such incentives to investors would have the result of diluting shareholder value").

Accordingly, the proffered opinions concerning specific TMA provisions are relevant, not conclusive on the ultimate issues in the case, and are likely to help the jury understand the complex industry specific provisions within the TMAs.  *See Hewitt*, 268 F.R.D. at 686 ("The Court finds that he is sufficiently qualified based on his experience and training to opine whether there was coverage under the insurance contract provisions in dispute. The opinions he is offering here appear to be of the type he renders in the ordinary course of his profession, which is statutorily recognized as an area of expertise. Further, while his opinions may not be conclusive on the ultimate issues in the case, it does appear, as a prima facie matter, that his testimony is likely to be of assistance to the finder of fact.").

Second, the Government objects to the proposed expert testimony of Mr. Travaglini, a former pension fund executive who regularly used transition managers to restructure the fund's asset holdings, and who is expected to testify that Request for Proposal (RFP) responses are

4

considered non-binding and that important terms are generally incorporated by transition managers and clients into the operative transition documents.  *See* Dkt. 366 at 8.  The Government argues that this amounts to an impressible legal conclusion and proposes that the defense seek this information from the alleged victim-witnesses on cross-examination.  *See id.*  This testimony, however, relates directly to the ordinary practices of professionals engaged in the transition management industry.  *See Marx & Co.*, 550 F.2d at 509 ("Testimony concerning the ordinary practices of those engaged in the securities business is admissible . . . ").  Mr. Travaglini is expected to testify that it was ordinary transition management industry practice for clients to issue RFPs to transition managers and, that following a response to an RFP, clients would incorporate terms they believed were relevant and essential into the operative transition documents.  This testimony is properly admissible as testimony regarding the customs and practices in the transition management industry.  It is not an area of common knowledge and would be helpful to the jury.

Furthermore, the Government's proposed alternative – "to questions the victims who testify about whether they viewed RFP responses as binding" – is nonsensical.  Dkt. 366 at 8.  The standard of a "reasonable investor" is an objective one.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976).  Evidence of a victim-witness's subjective belief is not relevant and a potentially mistaken belief by that victim-witness is unduly prejudicial.  *See United States v. Litvak*, 889 F.3d 56, 72 (2d Cir. 2018) (vacating conviction where "district court erred in admitting testimony on [victim-witnesses]'s erroneous belief that [defendant] acted as [] agent.").  Accordingly, this testimony should be admitted through Mr. Travaglini.

Third, the Government objects to the proposed testimony of Mr. Menchel and Mr. Bednall concerning practices at alternative transition management providers under Fed. R. Evid.

5

401 and 403. Mr. Menchel is expected to testify that investment banks offering transition management services would act as market-makers, *i.e.* that they would purport to purchase and sell securities held in their proprietary accounts, in order to generate additional trading profit. He would further testify, based on his industry knowledge and experience, that investment banks substantially decreased their securities inventories following the 2008-2009 financial crises and that these banks, instead of trading pre-existing inventory, would buy and sell the relevant securities in anticipation of a planned transition. Mr. Bednall is similarly expected to testify that investment banks trading as principal would purchase and sell securities for their own account prior to a transition to earn additional trading revenue. This expert testimony is relevant, admissible, and concerns the ordinary practices of banks engaged in the transition management business during the relevant time period. Evidence of alternative transition manager practice is necessary to show that investment banks, like State Street, earned undisclosed trading revenue while carrying little risk. Furthermore, the proffered testimony is relevant to the industry wide understanding that the only way for transition managers to offer low or zero transition fees is to earn additional trading revenue. *See United States v. Litvak*, 808 F.3d 160, 181 (2d Cir. 2015) (vacating conviction based on exclusion of expert testimony "about the process investment managers use to evaluate a security, and the irrelevance of the broker-dealer's acquisition price to that process, [which] was directly probative of whether [defendant]'s misstatements would have been material to a reasonable investor"). Thus, the testimony is relevant to the issue of materiality and the ordinary practices of banks engaged in the transition management business during the relevant time period. The evidence is also not likely to cause any jury confusion. A jury should have no issue delineating between the two transition management models, to the

extent the differences are relevant which the defense disputes and, if necessary, this Honorable Court can instruct the jury to consider the evidence solely for its intended purposes.

Fourth, the Government objects to Mr. Menchel's testimony concerning a failed legislative attempt in 2014 to change securities regulations to require broker-dealer disclosure of mark-ups/mark-downs on fixed income riskless-principal and principal transaction, *see* Dkt. 366 at 10. The Government argues that the notion that an "attempt to change the broker-dealer rules in *2014*–three years after the charged conduct, and long after the defendant was terminated by State Street–has any relevance to this case, is absurd." *See id.* at 10-11. Courts, however, have long held that expert testimony concerning the general background and requirements under federal securities laws is properly within the scope of expert testimony. *See United States v. Offill*, 666 F.3d 168, 176 (4th Cir. 2011) (affirming admission of expert "testimony on the general operation of securities law, even though the areas of testimony were directly relevant to the conduct with which [the defendant] was charged, allowing the jury to determine the law's applicability to [the defendant]"); *United States v. Laurienti*, 611 F.3d 530, 548 (9th Cir. 2010) ("The scope and meaning of the rules of the National Association of Securities Dealers . . . is a proper subject of expert testimony."); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (permitting expert to provide "general background on federal securities regulation and the filing requirements of Schedule 13D"). Mr. McLellan's experts are expected to testify that securities regulations during the relevant time period did not require disclosure of broker-dealer mark-ups/mark-downs on fixed-income riskless-principal and principal transaction, *i.e.* most of the securities transactions at issue in this case. The fact that a legislative effort that was introduced in 2014 failed to change that requirement further underscores the fact that there was no regulatory requirement to disclose the mark-ups/mark-downs in 2010 and 2011. Furthermore,

there is nothing ambiguous or confusing about the fact that the legislature attempted to change the law to require disclosure of mark-ups/mark-downs in 2014, when there was no such requirement in 2010 or 2011. Accordingly, the proffered testimony is relevant and admissible under Fed. R. Evid. 401 and 403.

Based on all of the foregoing, Mr. McLellan respectfully requests this Honorable Court to deny the Government's Motion *in Limine* to Limit Defendant's Proposed Expert Testimony, Dkt. 366, in its entirety.

Respectfully Submitted,
Ross McLellan
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: May 28, 2018

8

## **CERTIFICATE OF SERVICE**

      I, Martin G. Weinberg, hereby certify that on this date, May 28, 2018, a copy of the foregoing document has been served, via ECF, upon Assistant U.S. Attorney Stephen E. Frank and U.S. Department of Justice Trial Attorney William Johnston.

                                            **/s/ Martin G. Weinberg**
                                            Martin G. Weinberg