UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
            v.                  )        Criminal No. 16-10094-LTS
                                )
ROSS MCLELLAN,                  )
                                )
            Defendant.          )
_____)

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT'S MOTIONS *IN LIMINE***

The United States respectfully submits this omnibus response to defendants' motions *in limine*, Dkt. 360, 361, 365, 373.

1. McLellan's voluntary admissions to federal agents in January 2012 are admissible.

The defendant's motion *in limine* to exclude relevant and voluntary admissions he made in January 2012 concerning State Street's charging practices is without merit. See Dkt. 361. As part of a prior investigation into Bank of New York ConvergEx ("ConvergEx"), a competitor of State Street's in the transition management business, an FBI agent and a U.S. Postal Inspector visited the defendant's home and asked him about State Street's charging practices for transition management clients, and about his knowledge of ConvergEx's practices. At the time—a mere three months after McLellan had been dismissed from State Street—there was no criminal investigation into State Street's transition management business.

Among other things, McLellan told the agents that State Street fully disclosed its own commission and fee structure to its clients, and did not take spreads. McLellan also said that believed it was permissible to take spreads, as long as they were disclosed and the client was not a fiduciary. McLellan also told the agents that he had suspected that ConvergEx had charged undisclosed spreads, and that he at one point was faxed an internal spreadsheet detailing the

amount of those spreads by client.  McLellan said he did not know who sent the spreadsheet, but believed it was an unhappy former ConvergEx employee who wanted to let the industry know about the company's practices.

McLellan's admissions about State Street's charging practices under his leadership— specifically, that State Street fully disclosed its own commission and fee structure to its clients, and did not take spreads, and that he believed it was permissible to take spreads *as long as they were disclosed*—are directly relevant to his knowledge, state of mind, and intent.  The evidence at trial will show that State Street, at the defendant's direction, *did*, in fact, apply undisclosed spreads to trades conducted on behalf of transition management clients, in contravention of its business practices and the representations it made to those clients.  The defendant's statement that State Street fully disclosed its commission and fee structure demonstrates his knowledge of the bank's ordinary practices.  His admission that spreads are permissible only where they are disclosed is compelling evidence that he knew what he was doing was wrong.  His false denial that State Street applied undisclosed spreads is quintessential evidence of consciousness of guilt. See, e.g., United States v. Gonsalves, 668 F.2d 73, 75 (1st Cir. 1982) ("The desire to 'cover something up,' . . . implies a consciousness of guilt of the particular crime charged.") (citation omitted); cf. Simpson v. Spencer, 372 F. Supp. 2d 140, 148 (D. Mass. 2005) (post-conduct statement "shed light" on state of mind when "the state of mind with which [the defendant] acted was a material issue at trial").  As such, the defendant's statements about State Street's charging practices, what he understood to be permissible, and his denial that State Street charged hidden spreads, are all plainly relevant evidence of his state of mind, admissible under Federal Rule of Evidence of 401.

McLellan's statements concerning his understanding of ConvergEx's practices is equally relevant. His statement that he suspected that ConvergEx charged undisclosed spreads, and that he believed an unhappy former ConvergEx employee faxed him the spreadsheet detailing such spreads in order to alert let the industry about the company's practices, demonstrates that the defendant understood those practices to be wrong. This statement will be corroborated by other evidence at trial—including the spreadsheet itself, which McLellan provided to his co-conspirator Pennings to use in warning prospective clients of ConvergEx's practices. Pennings thereafter characterized the spreadsheet to a client as evidence of "abuse" by ConvergEx, and forwarded that email to the defendant. The government intends to introduce these emails at trial as evidence of the defendant's knowledge, intent and motive, and the context in which he developed his fraud scheme. Indeed, contrary to McLellan's contention, his admissions concerning ConvergEx's practices are not an unrelated distraction, but rather an integral backdrop to the scheme he developed and executed with Pennings, Boomgaardt, and others. That scheme was conceived amid intense competition in the transition management business, and at a time when McLellan and his co-conspirators suspected that some of their competitors, including ConvergEx, were engaged in deceptive practices. Ultimately, the defendant and his co-conspirators chose to engage in those same practices.

The probative value of the defendant's admissions is not substantially outweighed by the danger of *unfair* prejudice under Federal Rule of Evidence of 403. The key term is "'unfair' because by design, all evidence is meant to be prejudicial." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (internal quotation marks omitted and alterations incorporated). Unfair prejudice occurs when the evidence "invites the jury to render a verdict on an improper emotional basis." United States v. Morales-Aldahondo, 524 F.3d 115, 120 (1st Cir. 2008)

(citation omitted).  Evidence that the defendant was aware of alleged misconduct by others and falsely denied his own may be prejudicial, insofar as it is probative of his knowledge and criminal intent, but it is not unfairly so.   The jury will only be asked to convict based on the evidence of what McLellan himself actually did and said.

Such evidence runs no risk of jury confusion.  The government is not seeking to introduce evidence of ConvergEx's conduct beyond what McLellan and his co-conspirators knew about and discussed.  The defendant's awareness of what State Street's competitors were doing is plainly relevant to his own conduct and his motive and state of mind.  McLellan's attempt to blunt the relevance of these admissions by distinguishing ConvergEx's practices (charging a hidden commission, applied by an offshore affiliate, on top of an explicit commission) from State Street's (charging a hidden commission, applied by an affiliate, on top of a disclosed fee) has little bearing on the Rule 403 analysis, and also ignores the fact that the defendant and his co-conspirators engaged in effectively identical conduct (quoting one commission rate and then secretly applying a higher one, as they did with the Middle Eastern Sovereign Wealth Fund, the Dutch Pension Fund, and the U.S. Life Insurance Company).  The relevant similarity between ConvergEx and State State is that both were in the transition management business and both deceived their clients about the prices they charged for trades by applying hidden commissions.  The defendant and his co-conspirators believed ConvergEx's conduct was wrong, and specifically discussed that fact, before deciding to emulate it.  Then, mere months after his own scheme was exposed, the defendant acknowledged to agents that what ConvergEx was doing was wrong while denying that he had engaged in similar conduct.  Such evidence plainly clears the low Rule 403 hurdle.

Moreover, excluding the defendant's admissions would not eliminate the ConvergEx issue from the trial, because that company's conduct, and its low-ball bids against State Street, formed the relevant context for the defendant's scheme.  Indeed, Pennings and Boomgaardt are likely to testify about their awareness and understanding of ConvergEx's conduct, because it goes to their state of mind, and knowledge of the wrongfulness of their conduct, at the time of the charged conspiracy, and because Pennings specifically discussed that conduct with McLellan at the time they developed the charged scheme.  In sum, there is no basis in law or the facts of this case to exclude McLellan's voluntary, essentially contemporaneous admissions concerning his knowledge, intent and consciousness of guilt, and the context of the conduct with which he is charged.

2.  The defendant's motion *in limine* to admit evidence of 17 C.F.R. § 240.10.b-10 and S. 2114 should be denied.

The defendant has filed a motion *in limine* to admit two pieces of evidence: (1) 17 C.F.R. § 240.10b-10, and (2) S. 2114.  The first, regulations regarding disclosures by broker-dealers, should not be admitted unless the defendant can make some minimal showing that he was aware of the regulation during the relevant time period.  The second, a failed Senate bill from 2014—*three years* after the conduct in this case ended—cannot possibly have any relevance to the defendant's state of mind and therefore should be not admitted into evidence.

As an initial matter, neither the statute nor the failed legislation is relevant to this case. The two exhibits are both part of the defendant's attempt to conflate his charged misconduct— affirmatively misleading clients into believing they would be charged one rate for trades and then charging them another—with simply failing to disclose the commissions earned.  As the government has noted previously, this is not an omissions case in which the defendant was under a duty to disclose, but an *affirmative misrepresentation* case in which, by misleading and

deceptive statements, half-truths, and outright lies, the defendant and his co-conspirators intentionally led clients to believe one thing while intending to do another so they could take their client's money.[1]  See, e.g., United States v. Lloyd, 807 F.3d 1128, 1153 (9th Cir. 2015) ("A broker cannot affirmatively tell a misleading half-truth about a material fact to a potential investor because the duty to disclose in these circumstances arises from the telling of a half-truth, independent of any responsibilities arising from a truth relationship.") (alterations incorporated) (citation omitted).[2]

To the extent there is some marginal relevance to the proposed exhibits, it is only the SEC regulation, and only then if the defendant introduces some evidence he knew about or relied on it.  McLellan is welcome to argue that he, in good faith, misinterpreted the regulation not requiring disclosure to mean he had a license to lie—which the jury will be free to accept or reject.  But he should not be able to enter the regulation into evidence on the *sole* basis that by its very existence he knew about and relied on it.  "Willfulness is personal.  It relates to the defendant's state of mind.  It does not exist in the abstract.  Unless there is a connection between the external facts and the defendant's state of mind, the evidence of the external facts is not

---

[1] Courts have repeatedly held that "omit[ting] to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading" is an affirmative misrepresentation theory.  United States v. Kone, 303 F. App'x 38, 40 (2d Cir. 2008); see also United State v. Sumeru, 449 F. App'x 617, 622 (9th Cir. 2011) (half-truths, where materials facts were concealed or omitted alongside other statements, are affirmative misrepresentations); United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000) (affirmative misrepresentations include failures to disclose alongside other statements).  Contrary to the defendant's repeated contentions otherwise, the government has never disclaimed this theory.

[2] As the government stated in its motion *in limine* to exclude parts of the defendant's proposed expert testimony, Dkt. 366, the defendant is not charged with failing to make a disclosure he was under a regulatory duty to make.  The defendant's effort to place irrelevant regulations and failed statutes into evidence would confuse and mislead the jury, and usurp the Court's role in instructing the jury on the relevant law.  Cf. Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.") (further citation and internal quotation marks omitted).

relevant." United States v. Curtis, 782 F.2d 593, 599 (6th Cir. 1986) (excluding evidence that tax law was unsettled and complex when the defendant acknowledged he could not establish that he was confused by it).  Courts routinely require defendants to make some showing that they relied on a regulation or statute before admitting it into evidence.  See United States v. Giambalvo, 810 F.3d 1086, 105 (8th Cir. 2016) ("[S]tatutes or case law upon which the defendant claims to have actually relied are admissible to disprove that element if the defendant lays a proper foundation which demonstrates such reliance.  By contrast, materials upon which the defendant does not claim to have relied . . . can be excluded as irrelevant and unnecessarily confusing because only the defendant's subjective belief is at issue.") (quotation marks and citations omitted) (emphasis in original); United States v. Herzog, 632 F.2d 469, 473 (5th Cir. 1980) (where defense was based primarily on issue of intent, affirming district court's exclusion of testimony of law professor on complexity of the law because others' "comprehension of the tax laws could not have any bearing on [defendant's] intent").

A contrary rule would allow defendants to admit into evidence *any* information in the public domain without connecting it to their own states of mind.  When the government seeks to admit information that is in the public domain for proof of a defendant's state of mind, it usually must satisfy the requirements of Rule 104(b): that a jury could find by a preponderance of the evidence that the defendant came into contact with the material—just like any other conditional fact.  See, e.g., United States v. Sans, 731 F.2d 1521, 1533 (11th Cir. 1984) (in money laundering case, newspaper articles about an individual's criminal activity admissible to prove state of mind of defendants who handled individual's money when shown that defendants had "come in contact" with those articles).  Indeed, the cases the defendant cites are instances where the government introduced regulations into evidence in its cases-in-chief.  See, e.g., United

States v. Harvard, 103 F.3d 412, 422-23 (5th Cir. 1997) (affirming admission of civil banking regulations, offered by the government, as evidence of the defendant's motive and intent, when defendant was chairman of a bank)).  While many cases the defendant cites are silent on the question whether the government satisfied the Rule 104(b) standard, the facts make clear the government had offered some evidence that the defendant was aware of the relevant regulation. See, e.g., United States v. Mzese, 2014 WL 2804001, at *2 (D. Md. June 19, 2014) (where defendant was employed as licensed real estate agent, real estate regulations and employer policies were properly admitted into evidence).

This question was more explicitly addressed in United States v. Parks, 68 F.3d 860 (5th Cir. 1995), a case that the court relied on in Harvard.  In Parks, to support its bid to admit certain regulations into evidence, the government offered testimony from two witnesses familiar with the regulations who served on the same bank board as that of the charged defendants, from which the jury could reasonably draw the inference that the defendants were familiar with the same regulations.  Id. at 867.[3]  Unless the defendant is able to meet the Rule 104(b) threshold— by, for example, offering evidence that a securities license he obtained or on-the-job training he received required knowledge of this regulation—the government opposes its admission.

The failed legislation, however, should not be admitted under any circumstance.  The fact that Congress tried and failed to pass legislation *in 2014* concerning mandatory disclosure by riskless principal broker-dealers has no relevance to this case and bearing on the defendant's

---

[3] Even the case the defendant points to most fervently, United State v. Flotron, 3:17-CR-00220-JAM, Dkt. 198 (Apr. 15, 2018)—where the court, without citing to any authority, ruled that CFTC regulatory guidance was admissible—still did not allow legislative history on the ground that "there is no reason to suppose that [the] defendant would have been aware of legislative history or public comments submitted to the [CFTC]."  *Id.* at 4-5.

state of mind in *2010 and 2011*—because obviously he could not have drawn any inference one way or the other from legislation that had not yet been conceived, much less enacted.

    3.  <u>The DPA is admissible to prove an essential element of Count Six.</u>

       The defendant's motion *in limine* to exclude State Street's Deferred Prosecution Agreement ("DPA"), Dkt. 373, should be denied.  Count Six of the Superseding Indictment charges wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343.  An essential element of this charge—which extends the statute of limitations from five years to 10 years—is that the government prove that the defendant's conduct "affected" a financial institution.  To prove this element, the government must introduce evidence showing, beyond a reasonable doubt, that State Street Corporation was exposed to a new or increased risk of loss as a result of the defendant's conduct.[4]  <u>See</u> <u>United States v. Stargell</u>, 738 F.3d 1018, 1022 (9th Cir. 2013) ("[I]ncreased risk of loss . . . is sufficient to 'affect' a financial institution."); <u>United States v. Mullins</u>, 613 F.3d 1273, 1278-79 (10th Cir. 2010) (holding that a new or increased risk of loss was sufficient for fraud to affect a financial institution); <u>United States v. Serpico</u>, 320 F.3d 691, 694 (7th Cir. 2003) (fraud affects a financial institution if it is exposed to a risk of loss even if it never suffers an actual loss).  An employee can affect his financial institution employer even if the employer itself has criminal liability for the same conduct.  <u>See</u> <u>United States v. Heinz</u>, 790 F.3d 365, 367 (2d Cir. 2015) (defendants affected their financial institution employers and co-conspirators by exposing those employers to financial loss as a result of their fraudulent conduct); <u>cf.</u> <u>Serpico</u>, 320 F.3d at 695 (rejecting argument that because "the banks in both

---

[4] The government is also pursuing an alternate theory, as alleged in the superseding indictment, that the defendant's conduct affected the U.S. Insurance Company, which was also a financial institution by virtue of its membership in the Federal Home Loan Bank of New York.  However, the government expects the defense to contest whether the relevant entity was, in fact, affected.

schemes were willing participants who would not have participated unless it was in their interests" they could not been affected).[5]

The financial penalty State Street was required to pay and the monitorship to which it was required to submit as a result of the defendant's scheme is conclusive evidence that State Street was exposed to a new or increased risk of loss by the defendant's conduct.  See Heinz, 790 F.3d at 367 (evidence of risk of loss included DPAs signed by the financial institutions that were the employers of the defendants); United States v. Rubin/Chambers, Dunhill Ins. Services, 831 F. Supp. 2d 779, 785 (S.D.N.Y. 2011) ("[T]he terms of the Non-Prosecution Agreements are sufficiently direct evidence establishing that the fraud offenses charged in the Superseding Indictment 'affect[ed]' UBS and JPMorgan because the Non-Prosecution Agreements demonstrate that those banks participated in the fraud charged and suffered actual monetary losses as a result of their participation.").  Accordingly, the DPA is essential to prove to the jury that the defendant's conduct charged in Count Six is the type of conduct that affects and has affected State Street.

The defendant contends that the DPA has no relation to the U.S. Insurance Company fraud and is unduly prejudicial.  He is mistaken.  The applicable standard is a new or increased risk of loss *at the moment* the conduct occurs, *not* when it was discovered.  See, e.g.,  Mullins, 613 F.3d at 1280 (rejecting argument that because fraudulent loans had already been paid off "before fraud was discovered" a financial institution was not affected); United States v. Bank of New York Mellon, 941 F. Supp. 2d 438, 458 (S.D.N.Y. 2013) ("Courts regularly have concluded

---

[5] If the employee works for a wholly-owned subsidiary of a financial institution, the result is the same.  See United States v. Pelullo, 964 F.2d 193, 215-17 (3rd Cir. 1992) (financial institution need not be the object of the fraud, but may still be affected through loss suffered by wholly-owned subsidiary); United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998) (financial institution affected by loss to its wholly-owned subsidiary).

that a fraud affects an institution by embroiling it in costly litigation, whether because the fraud causes actual losses to the institution through settlements and attorney's fees or because it exposes the institution to realistic *potential legal liability*") (emphasis added); United States v. Countrywide Fin. Corp., 996 F. Supp. 2d 247, 249-50 (S.D.N.Y. 2014) ("[E]ven the threat of criminal liability . . . is bound to affect any federal insured entity in material fashion.").

There is also no undue prejudice.  Courts routinely allow plea agreements—which frequently contain statement of facts referring to the defendants against whom co-operators are testifying—for purposes other than proving a defendant's guilt.  See United States v. Gentles, 619 F.3d 75, 86 (1st Cir. 2010) ("[A] prosecutor may admit a witness's plea agreement into evidence, discuss the details of the plea during closing arguments, and comment upon a witness's incentive to testify truthfully") (quoting United States v. Bey, 188 F.3d 1, 7 (1st Cir. 1999)).  So long as the evidence of a co-operator's guilty plea is accompanied by "appropriate limiting instructions" it may be admitted "even though it similarly invites an inference of the defendant's guilt."  United States v. Foley, 783 F.3d 7, 17 (1st Cir. 2015).  Similarly here, the jury can be instructed to consider State Street's DPA solely with respect to whether State Street faced an increased risk of loss from the defendant's conduct vis-à-vis the U.S. Insurance Company, and *not* as evidence of the defendant's guilt.  See United States v. Ghavami, No. 10-CR-1217(KMW), 2012 WL 2878126, at *10 (S.D.N.Y. July 13, 2012) (admitting non-prosecution agreements, settlement agreements, and related testimony for "limited purpose of establishing the applicability" of § 3293(2), i.e., whether a financial institution was affected thereby triggering the 10-year statute of limitations).

The defendant may not like the choice he faces: either stipulate to an element of the offense or permit the jury to hear evidence that the defendant's former employer entered into a

DPA with the government and paid a significant fine as a result of the defendant's conduct—even if tempered by a limiting instruction.  But that is no different from similar, case-law sanctioned situations where potentially prejudicial information is necessary to prove an element of a crime.   In felon-in-possession cases, for example, the defendant must stipulate to his prior felony or else details of his prior felony are admitted to the jury.  Cf. Old Chief v. United States, 519 U.S. 172 (1997) (if defense stipulates to fact of prior conviction, details of prior conviction need not go to the jury).  Rule 403 is no bar to this type of evidence.  As the Court stated in Old Chief, "what counts as the rule 403 'probative value'" is assessed in light of other evidentiary alternatives.  Id. at 184.  The cases the defendant cites are all situations where a corporate plea agreement was to be used for some non-essential purpose, or no purpose at all.  See United States v. Wirtz, No. CR 04-18, 2004 WL 2271745, at *2 (D. Minn. Sept. 25, 2004) (corporate plea agreement not being used for *any* proposed purpose, and government did not even oppose defendant's motion to exclude); United States v. Andreas, 23 F. Supp. 835, 849 (N.D. Ill. 1998) (deferring ruling on admissibility of corporate plea agreement for general purpose of "soften[ing] sting of cross-examination" while allowing use of individual plea agreements for same purpose); United States v. Brown, 913 F. Supp. 1324, 1330 (D. Minn. 1996) (corporate plea agreement never introduced at trial, but jury improperly exposed to it as extrinsic evidence).

Here, there are no less prejudicial alternatives that allow the government to meet its burden of proof.  The government must prove to the jury that the defendant's conduct resulted in a risk of loss to State Street.  Legal costs and settlements with the government and the victim investment funds are how State Street was affected.   No amount of prejudice can outweigh the government's right to meet this element of the offense.  See United States v. Higdon, 638 F.3d 233 (3rd Cir. 2011) (noting in a felon in possession case, where the defendant did not want the

jury to know the *fact* that he was a convicted felon, "any prejudice results from the requirements of the statute itself, and is best addressed by an appropriately forceful limiting instruction").

The Confrontation Clause poses no obstacle to the introduction of the DPA because it applies only to "testimonial" statements, i.e., those whose "primary purpose" is to "establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006). Under this standard, the Court has held that forensic lab reports and statements to police are testimonial, but not 911 calls or children's statements to teachers.[6] A corporate plea agreement when offered purely as evidence that an agreement was reached between the government and a company requiring the company to pay a fine, is not a statement "to establish or prove past events" for later criminal prosecution. The factual basis of State Street' DPA would not be offered for the purpose of proving anything about the defendant's conduct; the DPA *itself* and the legal obligations contained therein are the proof, not any statements of fact.

Moreover, to the extent the Court finds that the Confrontation Clause is implicated by the DPA, the issue is moot because the government intends to introduce the DPA into evidence through a corporate representative of State Street, who will be subject to cross-examination on the issue whether State Street was affected. Indeed, even if the DPA itself were not admitted into evidence, the corporate representative would still testify that State Street entered into a DPA as a result of the defendant's conduct, agreed to pay a fine, and submitted to a corporate monitor—all at considerable expense to State Street.

---

[6] See Bullcoming v. New Mexico, 564 U.S. 647 (2011) (reports from state crime lab testimonial); Crawford v. Washington, 541 U.S. 36 (2004) (statements during police interrogation testimonial); Davis, 547 U.S. at 822 (911 calls not testimonial); Ohio v. Clark, 135 S. Ct. 2173 (2015) (child's statement to teacher not testimonial).

Finally, Federal Rule of Evidence 408 is no barrier to admission of the DPA or testimony concerning it.  That Rule applies when statements made during the course of settlement negotiations are used to prove the validity of the dispute claim.  <u>First</u>, the government is not proposing to use any *statement* made in the course of negotiations, just the resulting *agreement* itself, which is not covered by the Rule.  <u>Second</u>, to the extent the agreement itself could be viewed as a statement under Rule 408—which the government contests—the Rule only applies when such statements are being used to prove the validity of the disputed claim in the agreement. There is no bar on using them for other purposes, <u>see</u> Fed. R. 408(b), such as here, where the DPA would be used only to prove that State Street suffered actual financial loss because of the conduct in the Superseding Indictment, not that the government's claim against State Street was in fact meritorious.

4. <u>The victims of the defendant's conduct should be allowed to testify just like any victim in in financial fraud case.</u>

The defendant has filed an extraordinary motion *in limine* (Dkt. 360): in an effort to keep the jury from hearing relevant testimony on the issue of materiality, the defendant seeks to prevent the victims of his alleged crimes from testifying that the misrepresentations made to them were important.  The defendant's argument ignores relevant case law on wire fraud, cherry-picks a few quotes from a handful of securities fraud cases, and then reaches the specious conclusion that no subjective opinions are allowed in either securities fraud or wire fraud cases. Such a result is without precedent and flies in the face of decades of court decisions allowing victims to offer such opinions.

McLellan has been charged with wire fraud, securities fraud, and conspiracy to commit the same.  The victim witnesses in this case are representatives of the investment funds and pension funds that were quoted one fee for transition trades and charged another.  They will

testify that the fee quotes they received from the defendant and his co-conspirators were important to their decision to choose State Street and to undertake securities transactions with State Street as their transition manager, and that the total amount of overcharges applied to each of those trades was also significant to them.   Their proposed testimony is within the heartland of what the case law on securities fraud and wire fraud allows.

      a.   <u>Victim testimony on the importance of misstatements is permissible to prove the materiality element of the wire fraud and conspiracy charges, Counts One, Four, and Five.</u>

The First Circuit has clear, long-standing pattern jury instructions for the wire fraud statute, 18 U.S.C. § 1343, providing that one of the elements the government has to prove is that a misrepresented or concealed fact was "material," defined as having "a natural tendency to influence or be capable of influencing the decision of the decisionmaker to whom it was addressed."  <u>First Circuit Criminal Pattern Jury Instructions</u>  4.18.1343; <u>see also</u> <u>United States v. Prieto</u>, 812 F.3d 6, 13 (1st Cir. 2016) (endorsing same standard).  Materiality, in this context, encompasses a wide range of potential susceptibility.  <u>See</u> <u>United States v. Brien</u>, 617 F.2d 299, 311 (1st Cir. 1980) ("We discern no intention on the part of Congress to differentiate between schemes that will ensnare the ordinary prudent investor and those that attract only those with lesser mental acuity.").

It is standard in wire fraud cases for victims to testify that the alleged misstatements were significant and that knowing the truth would have affected their behavior, and this case should be no different.  <u>See, e.g.</u>, <u>United States v. Ranney</u>, 719 F.2d 1183, 1187-88 (1st Cir. 1983) (affirming district court's decision to allow government to "pose a series of hypothetical questions to each investor" about "whether he would have made the investment had he known that [the] representations were false"); <u>United States v. Appolon</u>, 715 F.3d 362, 368 (1st Cir.

2013) (bank officer testimony that misstatements in loan application could affect decision to approve loan established materiality of misstatement); United States v. Hill, 643 F.3d 807, 842 (11th Cir. 2011) (affirming district court's allowing "witnesses who had personally dealt with the fraudulent loan transactions at issue to respond to the government's questions about what would have happened if the facts had been different").  Indeed, in the context of many fraud schemes, it is hard to imagine who else can credibly testify about the materiality of a misstatement or omission other than the person, or a representative of the entity, to whom the misstatement or omission was directed.

Even where misrepresentations are directed to a third party, the intended victim of a fraud scheme can testify to importance of omitted or misrepresented information.  For example, in the prosecution of traders at Rabobank for manipulating the LIBOR benchmark to benefit themselves in interest rate swaps with certain counterparties, Judge Rakoff allowed those counterparties to testify that "If there was a potential for Rabobank to manipulate the interest rate, then we probably wouldn't have entered into it because if the interest rate could have been manipulated higher or lower, we wouldn't have wanted to be involved in it."  United States v. Allen, 160 F. Supp. 3d 698, 703 (S.D.N.Y. 2016), reversed on other grounds, 864 F.3d 63 (2d Cir. 2017).

When, as is the case here, the significance of a misstatement hinges on the amount of monetary loss, victim testimony on that misstatement is also admissible on the grounds that it helps prove intent.  "Proving specific intent in . . . fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent.  Proof that someone was victimized by the fraud is thus treated as some evidence of the schemer's intent."  United States v. Copple, 24 F.3d 535,

545 (3rd Cir. 1994) (citation and internal quotation marks omitted); United States v. Foley, 783

F.3d 7, 19 (1st Cir. 2015) ("[W]hile an ultimate purpose of either causing some financial loss to

another or bringing about some financial gain to oneself is not the essence of fraudulent intent,

the knowledge that one's actions are, in fact, bringing about such losses may demonstrate one's

intent to commit fraud"); United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d

Cir. 1970) ("[T]he purpose of the scheme must be to injure, which doubtless may be inferred

when the scheme has such effect as a necessary result of carrying it out.  Of course proof that

someone was actually victimized by the fraud is good evidence of the schemer's intent.")

(citation and internal quotation marks omitted).  Given the added relevance of loss, there can be

no serious dispute that the representatives of the investment funds allegedly defrauded by the

defendant's scheme should be permitted to testify about the significance of the misstatements

and the amount their funds lost.  For these reasons alone, the defendant's motion should be

denied.

      b.  Victim testimony on the importance of misrepresentations is independently
           admissible to prove the securities fraud counts, Counts One, Two, and Three.

Just as with wire fraud, a required element of securities fraud is that the alleged

misrepresentation or concealment be material.  In the securities fraud context, "a

misrepresentation is material if there is a substantial likelihood that it would affect the behavior

of a reasonable investor."  United States v. Weed, 873 F.3d 68, 73 (1st Cir. 2017).  Put another

way, "there must be a substantial likelihood that the disclosure of the omitted fact would have

been viewed by the reasonable investor as having significantly altered the 'total mix' of

information made available."  TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

As the defendant acknowledges, the standard is an objective one, with the trier of fact tasked

with applying this standard to the facts of the case.  See Amgen Inc. v. Conn. Ret. Plans & Tr.

Funds, 568 U.S. 455, 467 (2013).  In criminal securities fraud trials, courts routinely permit the testimony of actual investors to prove what a "reasonable investor" would have viewed as important.  See, e.g., United States v. Hatfield, 2:06-CR-00550-JS-ETB, 2010 WL 11515680, at *2 (E.D.N.Y. Jan. 25, 2010) ("The Court finds that testimony from several actual DHB investors on what influenced their investment decisions is probative of what a 'reasonable investor' would have considered.");  United States v. Forbes, 2:06-CR-406-FSH, 2006 WL 2850412, at *2 (D. Conn. Oct. 3, 2006) ("[A]s proof of the materiality of the alleged fraudulent practices, [investor] may properly testify that, had he known [company's] historic, publicly disclosed earnings had not been accurately reported . . . he would have regarded that information as important factors in his decision to purchase the stock."); United States v. Reyes, 660 F.3d 454, 469 (9th Cir. 2011) (ruling that government had shown that a reasonable investor would care about misstatements based on fact that "two actual Brocade investors testified that they cared about accurately stated earnings"); United States v. Nicholas, 2:08-CR-00139-CJC, Dkt. 612 (C.D. Cal. Sept. 30, 2009) (denying defense motions in limine that sought to exclude, among other things, testimony from actual investors as to what they "wanted to know" and "cared about" when investing).

Very few courts ever prohibit this type of testimony.  The handful of authorities the defendant cites are fraud-on-the-market cases where a single investor's view of the materiality of a misstatement may be less relevant to the jury's determination because the price of a given security is determined by the market and by investors' collective assessment of the publicly available information.  See, e.g., In re ICN/Viratek Sec. Litigation, No. 87-cv-4296, 1996 WL 34448146, at *4 n.2 (S.D.N.Y. July 15, 1996) ("[M]ateriality is a determination of whether the market would have cared about a particular statement so that the market price of the st[o]ck of the relevant corporation would then have changed—in a way that would then have affected all

actual investors except those who relied entirely on sources other than public information.");

United Sates v. Berger, 473 F.3d 1080, 1097 (9th Cir. 2007) (misstatements in public filings with the SEC.  But as the prior cases demonstrate, this is a minority position.

Moreover, the court need not pick sides in this debate, because this is not a fraud-on-the-market case.  At trial, the evidence will show that State Street's clients heavily negotiated the commissions and fees they were charged.  The investors will testify that these fees mattered to them, that knowing what the defendant and his co-conspirators actually intended to charge them (often multiples higher than what was quoted) would have been important to their decision, and that the hidden fees they ended up paying were significant to their funds.  Courts almost always allow investors to testify about the significant of specific misrepresentations directed to them. For example, in United States v. Litvak (Litvak I), 808 F.3d 160 (2d Cir. 2015), the charged conduct concerned alleged misstatements made by a defendant (a bond trader) to his counterparties regarding the prices the defendant had paid for mortgage-backed securities.  In holding that the defendant's misstatements were not immaterial as a matter of law, the court noted that "several of [defendant's] counterparties' representatives testified at trial that they considered the misrepresentations meaningful in the course of those transactions and that they or their employers were harmed by [defendant's] misleading course of conduct." *Id.* at 177.  The second time the case came to the Second Circuit, United States v. Litvak (Litvak II), 889 F.3d 56 (2018), following an earlier reversal on unrelated grounds and a retrial resulting in conviction, the court *again* endorsed the district court's decision to allow "counterparty traders [to] testify to their own point of view" so long "as the testimony about the significance of a defendant's misstatements and each trader's own point of view is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." *Id.* at 65 (internal quotation

marks omitted).  Therefore, following <u>Litvak I</u> & <u>II</u>, the funds' representatives here should be permitted to testify as to the significance of the misrepresentations, so long as their opinions appear within the bounds of reasonable investors.  And the fact that multiple investors will testify in similar fashion—that fees mattered to them, that knowing what the defendant and his co-conspirators intended to charge would have been important to their decisions, and that the hidden fees they paid were significant—is itself evidence that those views are reasonable.

Even a case the defendant cites bears out this point.  <u>See</u> <u>United States v. Rigas</u>, No. 02-CR-1236(LBS), 2004 WL 360444, at *2 (Feb. 26, 2004) (noting that the "testimony of a single investor sheds little light" on the question of materiality).  In <u>Rigas</u>, the court allowed the testimony of an investor who had read the defendant's company's 10-K filings, participated in an earnings call with the defendant, and, as a result of his participation in the call, held onto the company's stock.  At the same time, the court tentatively excluded the testimony of a second "investor who had no nexus with the alleged defrauders other than reading public statements, purchasing the stock and sustaining a loss."  *Id.*

Because the defendant and co-conspirators acting at his direction made misrepresentations directly to the pension and investment fund representatives they defrauded, those investors should be permitted to testify as to the significance of those misrepresentations.

c.  <u>Rule 403 poses no barrier to the admission of victim testimony.</u>

The defendant contends that whatever probative value the investors' testimony has, it is substantially outweighed by the danger of unfair prejudice.  That is simply not true.  Unfair prejudice results when there is testimony that is inflammatory or distracting from the issues at hand.  Materiality and intent, however, are elements of the offense.  Victim testimony is directly relevant to both of those elements, and courts routinely allow it over Rule 403 objections.  <u>See,</u>

e.g., United States v. Holloway, 826 F.3d 1237, 1246 (10th Cir. 2016) ("One means of establishing intent to defraud is by proof of economic harm to victims of the fraud."); United States v. Kruse, 601 F. App'x 827 (11th Cir. 2015) (evidence that victims lost life savings was relevant to "materiality of appellant's misrepresentations concerning the safety of the investment for retirement funds").  Where courts have drawn the line on victim testimony is where the victims testify about possibly collateral effects of their victimization.  See, e.g., Copple, 24 F.3d at 545 (noting little probative value of victim testimony that health had suffered from financial loss or that funds had to be diverted from children's college educations).  No such testimony is contemplated here.  Accordingly, Rule 403 should not bar the victim-witnesses' testimony.

**Conclusion**

For the foregoing reasons, the defendant's motions should be denied.

Respectfully submitted,

| | |
|---|---|
| SANDRA MOSER | ANDREW E. LELLING |
| Acting Chief, Fraud Section | United States Attorney |
| Criminal Division | |

| | |
|---|---|
| By:  _/s/ William E. Johnston_ | By: _/s/ Stephen E. Frank_ |
| WILLIAM E. JOHNSTON | STEPHEN E. FRANK |
| Trial Attorney | Assistant U.S. Attorney |

**CERTIFICATE OF SERVICE**

I certify that on May 28, 2018, this document was filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

/s/ _William E. Johnston_
WILLIAM E. JOHNSTON