UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                      :

   Plaintiff,                          :      Criminal Action No.
                 1:16-cr-10094-LTS
  v.                                    :

ROSS MCLELLAN,                                 :

   Defendant.                          :

- - - - - - - - - - - - - - - - - - x


  BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 2


Tuesday, June 5, 2018
8:33 a.m.







John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Debra M. Joyce, RMR, CRR, FCRR
Official Court Reporter
raeufp@gmail.com

```
1                      A P P E A R A N C E S

2     On behalf of the Plaintiff:

3          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:   STEPHEN E. FRANK
4          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
5          Boston, Massachusetts  02210
           (617) 748-3244
6          stephen.frank@usdoj.gov

7
           UNITED STATES DEPARTMENT OF JUSTICE
8          BY:   WILLIAM JOHNSTON
           1400 New York Avenue, Northwest
9          Washington, D.C.  20005
           (202) 514-0687
10         william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
           BY:   MARTIN G. WEINBERG
14         20 Park Plaza
           Suite 1000
15         Boston, Massachusetts  02116
           (617) 227-3700
16         owlmcb@att.net

17
           LAW OFFICES OF ROBERT M. GOLDSTEIN
18         BY:   ROBERT M. GOLDSTEIN
           20 Park Plaza
19         Suite 1000
           Boston, Massachusetts  02116
20         (617) 742-9015
           rmg@goldstein-lawfirm.com
21

22         LAW OFFICES OF MAKSIM NEMTSEV
           BY:   MAKSIM NEMTSEV
23         20 Park Plaza
           Suite 1000
24         Boston, Massachusetts  02116
           (347) 251-4800
25         mentsev@gmail.com
```

## TABLE OF CONTENTS

### TRIAL WITNESSES

On behalf of the Plaintiff:                                    Page

RICHARD BOOMGAARDT

        By Mr. Johnston                                        89

### EXHIBITS

                                                          Admitted

Numbers 10, 24, 30, 32, 43, 80, 191, 193, 195,            140

196, and 197

Number 15                                                 122

### MISCELLANEOUS

                                                             Page

Opening Statement by the Plaintiff                           25

Opening Statement by the Defendant                           55

**P R O C E E D I N G S**

1

2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4    for the District of Massachusetts is now in session, the

5    Honorable Leo T. Sorokin presiding.

6          Today is June 5th, the case of United States vs.

7    Ross McLellan, criminal action 16-10094 will now appear

8    before this court.

9          Counsel, please identify themselves.

10         THE COURT:  I see all counsel and Mr. McLellan.

11         Okay.  Everyone is ready?  Any issues to talk

12   about?

13         MR. JOHNSTON:  Yeah, we just -- we're going to be

14   moving a bunch of discs into exhibit -- into evidence and we

15   can -- we're going to let the defense know exactly which

16   ones.  So hopefully they can all come in at once.  If not, we

17   can do them one by one.  These are all going to be ones that

18   we covered on the direct examination of Mr. Boomgaardt.

19         THE COURT:  Okay.  Have you already gone over which

20   ones?

21         MR. FRANK:  No, we're about to do that.

22         THE COURT:  Okay.  Fine.  So my view is, if there's

23   no objection to them coming into evidence, I have no problem,

24   like at the beginning of Mr. Boomgaardt -- how do you say his

25   name?

1          MR. JOHNSTON:  Boomgaardt.

2          THE COURT:  Booomgaardt.  Mr. Boomgaardt, just

3     saying we're moving these in.  I'll explain to the jurors

4     that these are ones coming in without objection.  That's

5     what's happening and so -- to save time, we'll just do it en

6     masse and then you'll be referring to them at different

7     points in the examination.

8          That doesn't preclude individual exhibits along the

9     way at any point coming -- you know, coming up, and offering

10     them in the ordinary way, and --

11          MR. WEINBERG:  Judge, it would certainly be

12     helpful, it's Tuesday morning, and the Government still has

13     not advised us, after Mr. Boomgaardt, who the next witnesses

14     are, so we can officially and economically prepare the rest

15     of the week.  I would ask Your Honor to ask the Government to

16     advise us who comes after Boomgaardt.

17          MR. FRANK:  Your Honor, our -- we're happy to work

18     cooperatively with the defense and not have -- and be

19     transparent, but I think that that should then go both ways.

20     We're happy to tell them the day before witness --

21     Mr. Boomgaardt is going to be testifying today.  He's going

22     to be testifying all day tomorrow, so we're not going to get

23     to the next witness until Thursday, but we don't think that

24     they need eons of advance notice, but we're prepared to do

25     that if the defense would reciprocate, but we're in a

1    situation where --

2            THE COURT:  You mean so they're calling their

3    witnesses, tell you in a day in advance?

4            MR. FRANK:  Well, actually, what I'm referring to

5    here is the fact that we're three weeks away from their case,

6    we don't have a realistic witness list.  I know Your Honor

7    says that their list is adequate and that's fine, but if we

8    are going to be transparent about who we're actually calling

9    and the sequence and all that stuff, they're not calling 26

10   witnesses in 3 days and they know that right now.

11           And so if they're going to ask us to be

12   transparent, we're fully prepared to do that, but then we

13   would ask for the courtesy of some transparency on the other

14   side, as well.  And tell us which of those witnesses they're

15   reasonably likely to call.  And then they can give us a

16   heads-up, you know, as we get closer, as to which ones and in

17   which sequence.  But 26 witnesses in 3 days is an actual

18   impossibility.

19           MR. WEINBERG:  First of all, it's 5 days, and

20   second of all, there will be decisions made responsive to the

21   evidence.  I will provide Mr. Frank the same 48-hour notice

22   that we're asking for from him.

23           MR. FRANK:  Except that I provided a list of actual

24   witnesses that I intend to call, with *Jencks* for all the

25   witnesses and that has not been reciprocated by the defense.

1    There's a number of witnesses for whom there's no *Jencks*.

2    There's a number of reciprocal *Jencks*.  And there's -- even

3    in five days, he's identified more witnesses than our entire

4    three-week direct case, and it's just not realistic and so

5    all I'm asking is for reciprocity.

6              MR. WEINBERG:  Judge, I'd be happy to give them

7    *Jencks*, if they would be happy to tell WilmerHale to tell

8    State Street to have its employees be interviewed.  As

9    opposed to the categorical rejections of our attempts to

10   interview anybody.

11             MR. FRANK:  The witnesses for whom we're requesting

12   *Jencks* are not even, in several cases, currently employed by

13   State Street.  They know exactly what they're going to say

14   and they're just not telling us.

15             MR. WEINBERG:  Seven of the eight witnesses that

16   are -- other than experts in reputation, witnesses and

17   foreign lawyers are State Street or former State Street

18   employees, many of whom we've been unable to interview.  Mr.

19   Frank has the four depositions from the SEC case.  They were

20   given the information on four of the eight that he's

21   questioning about, but we're weeks before the defense.  We're

22   not going --

23             You know, if we hadn't given an extensive defense

24   witness list and instead we're putting new witnesses on the

25   list, we'd have the reverse complaint that Mr. Frank is being

1    ambushed.  Now, we give him a realistic list of the potential

2    defense witnesses and reciprocally we're denied even the

3    knowledge of who the witness after Mr. Boomgaardt is.

4            THE COURT:  So there are a couple of practical

5    issues that you people are going to have to work out.  The

6    first is the timing disclosure.  Okay.  My view of it is

7    this.

8            One, as a general matter, I think -- I believe in

9    the principle of relevance.  Right?  It's the foundation of

10   the rules of evidence and it's a good guide to figuring out

11   what other things you should do.

12           The principle of non-relevance that sometimes

13   applies outside the courtroom arena, where you can have a

14   particular issue and you can tie it to some totally,

15   completely unrelated issue doesn't -- it's not impermissible

16   and you all are free to do that in whatever your negotiations

17   are, but as a practical matter, it makes sense to take these

18   issues one by one, it seems to me.  You're going to work them

19   out yourselves.  You can give him 48 hours' notice if you

20   wish.  I'm not ordering you to give him 48 hours' notice.

21           What I'm telling both of you, as a general matter,

22   is what I said -- I meant everything I said to the jury

23   yesterday, including that I intend to explain to them the

24   process as it goes on.  I take that seriously.  I try to

25   explain to them.  I'll explain to them why there's not

1    leading questions on direct, as a general matter, with the

2    exceptions, and why there's leading questions on cross, and

3    things like that.  Some of them are mostly fairly innocuous,

4    and the like.

5           The problem you run if you don't give notice is

6    that if you don't give notice and he needs more time to

7    prepare, I'll give him more time to prepare.  And depending

8    on what I think about it, I may just say, like, you know, we

9    need to take a break to give people time to prepare.  And if

10   I thought it was reasonable, that's all I'll say.  But if I

11   feel like notice should have been given, I'm not afraid to

12   say to the jurors that the Government could have given notice

13   and didn't and that's why they need time and that's why we're

14   taking a break.

15          Now, on the first instance, I'm not threatening you

16   with that, I don't mean it that way.  I'm not doing that

17   automatically.  But my advice to all of you is be practical.

18   This is a long case.  These are very important issues to the

19   Government.  It's very important issues to Mr. McLellan.

20   There's really no good reason why either of you shouldn't be

21   given 48 hours' notice.

22          As to his witness list, as unhappy as you are about

23   not having *Jencks*, I haven't seen a whiff that there's *Jencks*

24   that he has that he hasn't given you.  He doesn't have it.

25          MR. FRANK:  Well, there's no way for me to prove

1    that, Judge --

2              THE COURT:  I understand that.  You're in the

3    position -- he often -- not he particularly, but defense

4    counsel will complain to me that the Government hasn't given

5    us *Jencks* on this or that person, and they'll say that's all

6    the *Jencks* that we have.  And I accept that, because I

7    accept -- in other words, unless you have a basis to show me

8    he's being dishonest, which there isn't, and you're not

9    alleging --

10             MR. FRANK:  I have the highest respect for counsel

11   and I would never suggest that and I don't believe that.  But

12   he does have -- he could give me a proffer of what he expects

13   the witnesses to say, why he's calling them.

14             THE COURT:  Right.

15             MR. FRANK:  These are witnesses that in some cases

16   appear entirely irrelevant to this case.  And if I have a

17   relevance objection, I can't even make it until they start

18   talking, by which point the cat is out of the bag.

19             THE COURT:  Right, but they're not talking today.

20   Seven of the witnesses are character witnesses.  You know, as

21   well as I do, that he has a big decision to make about

22   character evidence.

23             MR. FRANK:  And I'm not objecting to the character

24   witnesses, Your Honor.

25             THE COURT:  Right, but so you take them out.  And

1    then there's the experts, which you have their reports, and

2    then there's the three lawyers, you have their depositions.

3    And you know the three lawyers aren't talking to him, so he

4    knows what he knows through the deposition and he knows from

5    what he knows from the documents, which are available to you.

6    And he knows what he knows from his client, which is not

7    available to you.

8            MR. FRANK:  We're talking about several witnesses,

9    Judge, who are on his list, who are not State Street

10   employees, or in some cases who are and who don't appear to

11   have any relevance to this case.

12           THE COURT:  But that's not 26 anymore.  Now, we're

13   down to how many?

14           MR. FRANK:  Well, the 26 -- the issue with the 26,

15   Judge, is that, for example, he's got four experts.  Is he

16   really going to be putting on four experts, is he only

17   planning to put on one, two, three of those experts.  I mean,

18   there has to be some reciprocity here.

19           For example, just to give the Court another

20   example.  We disclosed our exhibit list a month ago.  We

21   disclosed two dozen audio exhibits that we intend to

22   introduce six weeks ago.  Counsel has refused to tell us

23   which of the exhibits they object to, unless we tell them

24   witness by witness which of those exhibits we're putting in

25   and what sequence.  And that's just not reciprocity, Judge.

1          That's asking us, at the same time that they're

2     arguing to the court that they should be able to surprise us

3     with audio exhibits that they fully intend to use on cross

4     examination.  And the Court is going to give a neutral

5     explanation to the jury if we need additional time.  And yet

6     I'm being told that we're going to get a nonneutral

7     explanation if he needs additional time for exhibits that

8     I've actually identified.

9          THE COURT:  No, what I told you yesterday --

10    actually, that's not quite right.  What I told you yesterday

11    was in the first instance, I was going to give a neutral

12    explanation.  If I feel like you're asking for unreasonable

13    amounts of time that you don't need, or I feel like he's

14    being unreasonable and not identifying the thing, then I will

15    consider a nonneutral explanation.  And that might not be the

16    first time around, that might be later in the case.  So if --

17    and that applies to anything.  And my goal in this is not to

18    give nonneutral explanations to the jury.  My goal in the

19    first instance is to let you each try your case.  But if I

20    feel like people are wasting time, then that's a different

21    thing.

22          With respect to the exhibits, you don't have to --

23    he's not telling you -- he's saying to you, essentially, a

24    time principle.  Like if you want to know which ones we're

25    going to object to, this is what it is, he's saying I want to

1    know which witnesses you're going to use him.  You don't have

2    to tell him with that.  I'm not ordering you to -- you can

3    put in your exhibits like, okay, these are the ones we're

4    going to use today.  And you can put them in en masse, or if

5    you want to hold back and put in one by one, you can do them

6    one by one, and that's fine.  I'm not going to --

7              I mean, I encourage all of you to be practical,

8    because it strikes me that this case, I could be wrong, but

9    this case is more about -- there's not so much -- this is

10   more of a state of mind and an interpretation and

11   characterization case.  This isn't really a dispute about

12   whether the light was red or green.

13             MR. FRANK:  Agreed.

14             THE COURT:  And so in that sense, you know, you

15   should stay focused on what the issues are.  But, you know,

16   we'll take it one step at a time.  I think you probably want

17   to take a couple minutes to talk to each other about that and

18   I want to raise one other issue with you, but yes.

19             MR. WEINBERG:  We have one other issue, Your Honor,

20   which addresses a motion to -- we served a subpoena on State

21   Street for e-mails between the dates of November 2 --

22             THE COURT:  Is this the pending motion to compel or

23   something else?

24             MR. WEINBERG:  This is yet another --

25             THE COURT:  All right.

```
 1              MR. WEINBERG:  We served a trial subpoena for
 2   e-mails between November 2 and 4, 2010, which is squarely
 3   within the subject matter waiver.  State Street used these
 4   e-mails, waived the privilege, and proactively relied upon
 5   them to make the arguments they made that resolved their
 6   matters.
 7              THE COURT:  And what's the issue about the
 8   subpoena?
 9              MR. WEINBERG:  We now have an assertion of
10   privilege as to e-mails, some of which have never been
11   disclosed to us.  And I presume, therefore, not disclosed to
12   the Government, that come within this period that are
13   relevant, that talk about requests by Mr. McLellan for legal
14   advice from Ms. McCay, who is the US Attorney at State
15   Street.  You know, we are concerned that we understood --
16              THE COURT:  The attorney in the United States, not
17   the --
18              MR. WEINBERG:  State Street's legal advisor.
19              THE COURT:  Not that the US Attorney's Office put
20   an AUSA and --
21              MR. FRANK:  I believe thatis part of Mr. Weinberg's
22   theory, but that's --
23              THE COURT:  And that's not the --
24              MR. WEINBERG:  So one, we operated and I expect the
25   Government operated under the belief that all of the e-mails
```

1    that were relevant to KIA 121 that had been within the

2    subject matter waiver had been disclosed to the FCA, through

3    the FCA, to Mr. Frank, and from Mr. Frank to me.

4            THE COURT:  Short version, you want me to order

5    something?

6            MR. WEINBERG:  I want you to order State Street on

7    the very short notice to justify the assertion of privilege

8    as to the e-mails that come between November 2 and 4, and in

9    particular a set of e-mails that we've never seen.

10           THE COURT:  What is -- I could either order them to

11   file like an explanation, or should I have a status

12   conference this afternoon, like just with counsel, the three

13   of you, and sort of see what the issue is and talk about

14   timing or what have you.

15           MR. WEINBERG:  I would ask Your Honor to order them

16   by the end of the day to justify their assertion of

17   privilege, given the subject matter waiver, and given Your

18   Honor's order to Document 273, which, at footnote 9,

19   essentially, finds a waiver and puts the burden on State

20   Street to identify any documents that they --

21           THE COURT:  Have they given you a log?

22           MR. WEINBERG:  They've given us a log.

23           THE COURT:  I think I should -- I'm not sure how

24   much -- if I issue an order at 9:00 a.m. and say they have to

25   respond by 5:00, what I'm really going to get.  Why not have

1    a hearing this afternoon?

2            MR. WEINBERG:  Two reasons.  One is the practical,

3    which is that I'm going to be preparing to cross-examine

4    Mr. Boomgaardt, and second, these are not e-mails that are

5    relevant to Mr. Boomgaardt.  So if Your Honor --

6            THE COURT:  So you just want me to say explain the

7    basis for having privilege in light of prior -- prior waivers

8    by State Street?

9            MR. WEINBERG:  Yes.  And on whatever time schedule,

10   you know, short time schedule Your Honor thinks is

11   appropriate.  I'm glad to argue this tomorrow afternoon or

12   Thursday afternoon.

13           THE COURT:  Okay.

14           MR. WEINBERG:  Thursday afternoon being preferable,

15   given the Boomgaardt.

16           THE COURT:  Also, one juror, Juror Number 49, why

17   don't you --

18           Maria, show this to counsel.

19           (Discussion off the record.)

20           THE COURT:  Does counsel think I should talk to

21   this juror?  I think I should.

22           MR. WEINBERG:  Yes, Your Honor.

23           THE COURT:  Do you think I should do that -- just

24   at sidebar is fine?

25           MR. FRANK:  I think that's fine, Your Honor.

 1          THE COURT:  All right.

 2          Maria, would you get that juror?

 3          MR. WEINBERG:  Judge, while we're waiting for the

 4   juror, there's one other preliminary matter.  We ordered the

 5   transcript of Mr. Pennings' Rule 11.  We received the

 6   unsealed portion of the transcript.  Now, I would ask the

 7   Court, given the status of the case --

 8          THE COURT:  Any reason he shouldn't be able to get?

 9          MR. FRANK:  Absolutely not.

10          THE COURT:  So I order the seal is in place, but

11   defense counsel may obtain the entire sealed and unsealed

12   portions.

13          MR. WEINBERG:  Thank you very much.

14          (Discussion off the record.)

15          THE COURT:  Bring the juror over to sidebar.

16          (The following discussion held at the bench.)

17          THE JUROR:  Good morning.

18          THE COURT:  How are you doing?

19          THE JUROR:  Sorry to bring this bad news to you.

20          THE COURT:  That's okay.  So just for the record,

21   you're Juror No. 49?

22          THE JUROR:  Yeah.

23          THE COURT:  Okay.  So you told Ms. Simeone there

24   was an issue about getting compensated from your job or

25   something.  Just tell me what the problem is.

1          THE JUROR:  Well, I just recently was employed by

2     this employer and I had been there eight months, so I was

3     under the assumption that I would be able to be paid and I

4     talked to them before giving them the notice and it seemed

5     like it was fine.  But I called them yesterday, because I was

6     picked and selected.  And he goes, well, I was trying to

7     contract HR, because until you get the year mark, I wouldn't

8     get compensated for the whole time.

9          THE COURT:  So what's the status, what did you

10    learn?  You'll get paid for how much, if at all?

11         THE JUROR:  Just what I would get paid here.

12         THE COURT:  Oh, so you wouldn't get paid from your

13    jobs.  And just remind me, I apologize that I don't recall.

14    What do you do?

15         THE JUROR:  I'm a diesel mechanic.

16         THE COURT:  Oh, you're a diesel mechanic.  That's

17    right.  And you've been there eight months?

18         THE JUROR:  Yeah.

19         THE COURT:  Okay.  And so bottom line is, if you

20    serve on the jury for this case, then you will get paid what

21    we pay you, the $50 a day, but you'll get nothing from your

22    job?

23         THE JUROR:  Yeah.

24         THE COURT:  And how much do you make from work?

25         THE JUROR:  I take home about $800 a week and I've

1    been paying school loans and car insurance and --

2              THE COURT:  All right.  Do you have any questions

3    about that?

4              MR. GOLDSTEIN:  No.

5              THE COURT:  Do you have any questions about that?

6              MR. FRANK:  No.

7              THE COURT:  Why don't you just take a seat in the

8    jury box.

9              THE JUROR:  The chairs right over there?

10              THE COURT:  Yeah, and we'll talk to counsel for a

11    minute.

12              MR. WEINBERG:  I wonder whether the Court could

13    make a request of the employer to --

14              THE COURT:  Waive the rule.

15              MR. WEINBERG:  They are internal rules to pay him.

16              MR. FRANK:  That's what I was thinking.  I believe

17    he's an alternate.

18              THE COURT:  He's an alternate?

19              MR. JOHNSTON:  Yeah.

20              THE COURT:  Okay.  Sir, why don't you come back for

21    a second?

22              So this is what I think I'm going to do, if it

23    doesn't cause a problem for you.  I'm going to have you stay

24    today.

25              THE JUROR:  Okay.

1          THE COURT:  We're going to call your employer, if

2     that's okay.  If you provide Ms. Simeone the information,

3     we're going to ask your employer to pay you.

4          THE JUROR:  Okay.

5          THE COURT:  And if they agree, then you'd be all

6     set, right?

7          THE JUROR:  Yeah.

8          THE COURT:  Okay.  And if they don't, then I'll

9     talk to you again and see if we can work this out for you.

10          THE JUROR:  Okay.  That sounds fair.

11          THE COURT:  Okay.

12          THE JUROR:  Awesome.

13          THE COURT:  So Maria, come on over for one second.

14     Two things.  Ask this juror to give you the name of his

15     employer and the contact information, and then I'm going to

16     want you to call them.  I'll explain to you exactly what I

17     want you to say, but the gist is to call them to ask them

18     to -- they have a rule that you don't get paid for jury

19     service until you've been there a year.  He's been there

20     eight months and I want them to make an exception for him.

21          THE DEPUTY CLERK:  Okay.  You want me to ask them

22     that?

23          THE COURT:  That's what we're going to do, but you

24     and I will talk about that.  So get that information from him

25     and then you can take him back to the jury room.

1           THE DEPUTY CLERK:  Okay.

2           THE COURT:  And I'll get back to -- and give your

3   contact information to Maria, too, so that if we don't have

4   an answer by 1 o'clock, we can reach out to you in the

5   afternoon and let you know.

6           THE JUROR:  All right.  Thank you.

7           THE COURT:  Okay.  Once we know what the answer on

8   that is, then we'll see where we are.

9           MR. WEINBERG:  Okay.

10          MR. FRANK:  Thank you, Your Honor.

11          MR. WEINBERG:  Thank you, Judge.

12          (Bench conference concluded.)

13          MR. FRANK:  Your Honor, one additional issue.  It's

14   my understanding that the defense has chalks that it's going

15   to be using during the opening.  We haven't been given an

16   opportunity to see those.  We've provided ours.  Counsel has

17   indicated he'll provide them to me to look at after I open,

18   so we'd ask for a recess, so that I can take a look at those

19   chalks.

20          MR. WEINBERG:  We agree.

21          THE COURT:  Fine.

22          (Discussion off the record.)

23          MR. JOHNSTON:  Your Honor, this is for something

24   when we're actually doing the direct examination, but because

25   the -- a number of audio recordings will be played during the

1    direct examination, we've prepared binders of transcripts.

2    Do you want them distributed to the Court and the jurors when

3    the audio is played, or do you want it like under their

4    seats?

5            THE COURT:  So you have -- just give me an -- are

6    we talking one or --

7            MR. JOHNSTON:  No, so there are -- for the entire

8    examination, there's approximately 10 or 12 calls.  Today

9    we'll maybe get through five of them.  And so they're all

10   in -- we've -- we have about --

11           THE COURT:  You have a tabbed notebook, basically.

12           MR. JOHNSTON:  Yeah, they're tabbed notebooks, by

13   exhibit number.

14           THE COURT:  I think the simplest thing to do is

15   when you reach the first phone call, then we'll distribute

16   them to the jurors, and they'll have them.  And they have all

17   ten calls in them and I'll explain to them that these are

18   calls.  They're transcripts and you'll refer to them like

19   this is call one or call eight, or however they're tabbed, so

20   they'll know where to turn.  And then they'll have all of

21   them for all of the calls.

22           MR. JOHNSTON:  Okay.  All right.

23           THE COURT:  That sounds good.  And we'll just do it

24   when we get to the first one.

25           MR. JOHNSTON:  And one other matter that I wanted

1    to raise with the Court.  We believe we need until Friday to

2    respond to all of -- file our objections to the jury

3    instructions.

4              THE COURT:  No problem.  I was thinking Friday and

5    I admired your eagerness.

6              MR. JOHNSTON:  I was a little overoptimistic.

7              THE COURT:  That's fine.

8              MR. JOHNSTON:  Given all of the objections that

9    need to be raised.

10             (Discussion off the record.)

11             THE COURT:  Okay.  So when Ms. Simeone was back

12   there before, we did not have all the jurors.

13             Mr. Frank, the transcripts with respect to the

14   audio tapes, are you offering them into evidence, or are you

15   using them just as chalks?

16             MR. FRANK:  We're just using them as an aid, Your

17   Honor.  We don't believe they should come into evidence.

18   Counsel has indicated to me that he does not have an

19   objection to any of the audio, so we would ask for the

20   Court's permission to move that in in bulk.  Just that --

21   the --

22             THE COURT:  Yes.  I think you should do that in

23   front of the jury, though, either before you call Boomgaardt,

24   or right when he takes -- whenever a convenient time for you,

25   if you wish to do it.

1          THE DEPUTY CLERK:  We're just missing two.

2          THE COURT:  You have 14.

3          MR. WEINBERG:   Judge, do you mind if we take about

4     a two-minute break?

5          THE COURT:  A quick men's room break?

6          MR. WEINBERG:  Yeah.

7          THE COURT:  Yeah.  Go quickly.

8          (Pause.)

9          (The jury enters the courtroom.)

10         THE COURT:  Good morning, ladies and gentlemen.

11    Did everybody follow my instruction, no independent research,

12    don't discuss the case among yourselves, or with anyone else?

13         Okay.  So I know it's -- this is downtown Boston.

14    It's not always an easy place to get to, especially if you're

15    coming from afar and especially on the first and second day.

16    So it happens, but do your best to, once you figured out how

17    to get here in a convenient and timely way to do that and try

18    to arrange your schedule so you can get here in time, because

19    we can't begin unless we have all of you and all the lawyers

20    and all the court staff.  So that just helps us keep moving

21    promptly and efficiently.

22         As I told you yesterday, we're going to begin this

23    morning with opening statements.  Opening statements are not

24    evidence.  They are an outline of what the lawyer expects the

25    evidence to be.  They're a helpful guide for you at the

1    beginning of the case, to understand what's coming.  And so

2    we begin with the Government's opening statement.

3              MR. FRANK:  Thank you, Your Honor.

4                    **OPENING STATEMENTS BY THE PLAINTIFF**

5              MR. FRANK:  In 2010 and 2011, the defendant, Ross

6    McLellan, was a senior executive at State Street Corporation,

7    one of the biggest banks in the world, based right here in

8    Boston.  He led a group that provided services to pension

9    funds and other large institutional investors, investors with

10   billions of dollars under management.  Often, for the benefit

11   of individuals, like retired postal workers, or supermarket

12   employees.

13             In 2009, that group had one of the best years in

14   its history.  But in 2010, more banks were getting into the

15   business.  And in one key region, several of State Street's

16   competitors were undercutting it on price, offering to do the

17   same work for cheaper, prices State Street couldn't match.

18             How did the defendant respond?  At his direction,

19   State Street began secretly overcharging its clients, adding

20   hidden commissions to billions of dollars' worth of trading

21   in stocks and bonds, commissions that added up to millions of

22   dollars the clients didn't know they were being charged.

23   They promised clients low fees and they promised to act in

24   the client's best interest, to put the client's interest

25   ahead of the bank's own interests.

1            But that is not what they did.  Instead, they

2     secretly tacked on hidden fees, fees that the clients

3     couldn't see.  They promised one price and they secretly

4     charged another.  And they did it at the direction of this

5     man, the defendant, Ross McLellan.  They lied to separate

6     clients from their money.  That's a crime.  It's called

7     fraud, and it's what brings us here today.

8            Good morning, again, ladies and gentlemen.  I'd

9     like to reintroduce myself.  My name is Stephen Frank, I'm an

10    assistant United States Attorney here in the district of

11    Massachusetts.  Together with my colleague, William Johnston,

12    and Heather Leahy, a paralegal with the US Attorney's Office,

13    we represent the United States.  It's our job to present to

14    you the evidence that proves beyond a reasonable doubt that

15    the defendant did exactly what he's charged with doing,

16    cheating State Street's clients and violating the federal

17    securities fraud, wire fraud, and conspiracy laws in the

18    process.

19            Now, as you'll learn, the defendant ran a worldwide

20    group at State Street.  It was called Portfolio Solutions.

21    It had several different functions, but the biggest was

22    called "Transition Management."  You are going to learn a lot

23    about Transition Management over the next few weeks.  But

24    basically, it's about helping large institutional investors,

25    like pension funds, move their money from one place to

1   another place, or to restructure their investments, and doing
2   it as cheaply and as efficiently as possible.
3           For example, if you're a large pension fund and
4   you're responsible for managing the retirement savings of
5   thousands of individual employees, you might have money,
6   billions of dollars, with all sorts of different money
7   managers.  And they invest it for you, in a wide variety of
8   different stocks and bonds.  You might decide that you're not
9   happy with the performance of one of your managers, or you
10  just want to make a change in your portfolio, your
11  investments for some other reason, like to reallocate those
12  assets.  And that requires you to move your money to a
13  different manager, or a different set of investments.
14          To do that, you need to sell the stocks and bonds
15  that you have over here and buy the stocks and bonds that the
16  new manager wants to invest in.  You might think about it as
17  a little bit like switching banks, only it's a lot more
18  complicated than that.  And when you have billions of dollars
19  invested in all sorts of different stocks and bonds, it can
20  get very, very complicated.
21          Transitioning those investments, getting out of
22  these stocks and bonds, and into these stocks and bonds, and
23  doing it quickly, efficiently, and at the lowest cost.
24  That's the business of transition management.  And the unit
25  that the defendant ran at State Street was a major provider

1    of that service all around the world.

2            In 2009, the defendant's group had one of its best

3    years ever.  You might remember that that was just after the

4    financial crisis, when the markets had been very, very

5    volatile, bouncing up and down.  But as the stock and the

6    bond markets gradually settled down, lots of pension funds

7    and other big investors who had been waiting to move their

8    money around decided that now was the time.  For the

9    defendant's group, that meant a lot of business, a lot of

10   opportunity and it translated into great results that year.

11           But as the new year began in 2010, that trend

12   started to reverse.  There was less money moving around and

13   more competitors started to get into the business.  That

14   meant that it was going to be tough for the defendant's unit

15   to repeat the performance that it had in 2009.  And you'll

16   learn that his goal wasn't just to repeat that performance,

17   it was to do better.

18           And there was another issue.  Not only was there

19   more competition, but prices were dropping.  Now, that was

20   especially true in Europe, the Middle East, and Africa.  At

21   State Street, they call it EMEA for short.

22           State Street's operations for that region were

23   based in London.  The head of Portfolio Solutions for the

24   EMEA region was a man named Edward Pennings.  He reported

25   directly to Ross McLellan, who was the global director of

1      that group.  The head of transition management for EMEA was a

2      man named Richard or Rick Boomgaardt.  He reported to

3      Mr. Pennings.

4            Now, you will learn that the standard way that

5      banks like State Street charge for transition management is

6      by the trade.  It's a per trade charge.  It's usually called

7      a commission.  Sometimes, depending on whether you're talking

8      about stocks or bonds, it can be referred to by different

9      words, a markup, or sometimes a markdown, or a spread.

10     Because instead of adding a separate commission of a few

11     pennies per share, you actually mark up the price of the bond

12     by that amount.  But each of those terms refers to a charge

13     per trade.  And you will learn that at State Street, those

14     terms were often used interchangeably.  In fact, most of the

15     time they just used the word "commission."

16           Usually, those per trade charges are measured in

17     pennies.  Sometimes they're measured in something called

18     basis points.  Now, that's just industry jargon, but really

19     what it is, it just refers to a tiny percentage -- a tiny

20     percentage of 1/100th of a percentage point.  So if you were

21     to trade a bond and the bond is worth $100, one basis point

22     is just one penny.  Now, that might not sound like a lot of

23     money, but when you're buying and selling billions of

24     dollars' worth of stocks and bonds, individual pennies can

25     add up very fast.  And you will learn that in this case, they

1    added up to millions of dollars.

2           In 2010, State Street's competitors in Europe were

3    offering lower and lower commissions to win transition

4    management signups.  A few banks even offered to charge zero,

5    no commission.  Some did that just to win a share of the

6    business, to get clients in the door, hoping to get market

7    share or to make money from those clients in other ways.  For

8    example, instead of charging commissions for trying to find

9    someone else to buy the client's shares, some banks -- which

10   was what State Street did -- some banks might just buy the

11   shares themselves, hoping that later on, they could sell

12   those same shares for a higher price, or not.

13          And some competitors had a reputation in the market

14   for playing dirty, for promising low prices, and then tacking

15   on additional hidden commissions that the clients couldn't

16   see.  But State Street promised a different approach.  In

17   London, the defendant's team, Mr. Pennings and

18   Mr. Boomgaardt, told clients that they weren't like those

19   other competitors.  In fact, they put those promises in

20   writing.

21          They competed on price, as well, but they also

22   promised to act in their client's best interest, to act as

23   their agent, and to represent them in getting the best price

24   for their stocks and their bonds.  They used this word:

25   "Fiduciary."  That's a legal term, but State Street actually

1    explains to clients what it meant.  Putting client's interest

2    first, ahead of the bank's own interest.

3            Pay us an agreed-upon fee, they said, and we'll go

4    out and get you the best deal that we can find for your

5    stocks and bonds, and pass it right along to you.  That's

6    what they promised.  But as you'll learn, that's not what

7    they did.

8            Instead, once they succeeded in luring clients in

9    with a low price and a promise to put the client's interest

10   first, they did exactly the opposite.  They tacked on secret

11   commissions that the clients couldn't see, money that they

12   didn't know had been picked right out of their pockets.

13   That's not putting clients first.  That's fraud.

14           Who was behind this scheme?  The defendant, Ross

15   McLellan.  He was the boss.  He gave the directions.  He

16   ordered the lies.  In fact, you will learn that when the

17   defendant saw how well the scheme was working with Pennings

18   and Boomgaardt in Europe, he decided to try it out right here

19   at home, on a major insurance client based in New York.  He

20   overcharged that company alone by close to $1 million.  And

21   when the jig was up, it was the defendant who ordered the

22   coverup.

23           Over the course of the next few weeks, you will

24   learn about transition management assignments involving six

25   different clients in Europe and the Middle East.  There's

1    KIA, it's the Kuwait Investment Authority.  It's a Government

2    fund in the country of Kuwait.  There's a pension fund in the

3    Netherlands that has a very complicated name, which I'm not

4    going to try and say to you, we're going to call it Dutch

5    Doctors.  There were two pension funds in England.  One was

6    the Royal Mail.  That is the equivalent of the postal

7    service.  It manages the retirement savings of postal

8    workers.  And there was another one, Sainsbury's.  That

9    managed the retirement savings of thousands of employees of a

10   large supermarket chain in England called Sainsbury's.

11          And there was two funds in Ireland.  One was this

12   one, Eircom.  That's a phone company in Ireland.  They

13   managed a retirement savings of people that worked in the

14   phone company.  And then there was one that has a very

15   complicated name in Gaelic, which I'm not going to try and

16   say, but it's called National Treasury Management Agency in

17   English, or NTMA.  You'll also hear about an assignment for

18   that US insurance company that I mentioned, it's called AXA

19   Equitable Life Insurance Company.

20          You will learn that some of those clients were

21   fairly sophisticated investors and some were not, but all of

22   them trusted State Street.  They all believed the

23   representations that the defendant's people made to them.

24   And in each case, the defendant and his co-conspirators took

25   advantage of that trust and broke that trust.

1          So let me tell you a little bit about how this
2    scheme worked.  For each of those clients, State Street
3    promised a low fee for transition management services.  Now,
4    in the case of KIA, which was one of the bank's largest
5    clients across the bank, they told clients that they would
6    charge zero comission for transition assignments.  In the
7    case of Dutch Doctors and AXA, they offered a low commission
8    rate.  In the case of NTMA and Sainsbury's and Royal Mail and
9    Eircom, they promised a flat fee.

10          That is, instead of a per trade commission, they
11   said they would charge a fixed price, no matter how much
12   trading, no matter how much buying and selling of stocks and
13   bonds was involved.  For example, here's an e-mail in which
14   Pennings tells the defendant about an opportunity to bid on a
15   transition for Royal Mail.  He forwards the e-mail from Royal
16   Mail asking for them to bid and he says confidential, but
17   check this baby out, gotta win this one.

18          And here's the defendant's response.  Thin to win.

19          Defendant is a golfer.  That's a golf expression
20   apparently.  And it means bid low so that we can win the
21   deal.

22          But they didn't just promise a low price.  They
23   also offered to be their client's agent.  To help their
24   client get the best price for those stocks and bonds.  And
25   they promised to be their fiduciary, to put their clients'

1    interests first.

2          Over the course of this trial, we are going to show

3    you the promises that they made.  Here's an example of what

4    State Street promised to do for Royal Mail.  In our fiduciary

5    role, we always act as agents to the client.  Contractually,

6    we have to put our client's interest ahead of our own.  We

7    assure clients.  We act in their best interest by aligning

8    our interest with theirs.

9          And here's that thin price that they promised, a

10   flat management fee of 1.75 basis points, that's

11   0.0175 percent, on the value of the legacy assets.  Those are

12   the assets that are being moved from point A to point B.

13         Here's what they promised to do for NTMA.  State

14   Street will act as a fiduciary of the portfolio for the

15   entire transition period.  In our fiduciary role, we always

16   act as agent to the client.  And here's what they promised to

17   charge.  We propose to charge zero commission on all trading

18   activity.  We propose to charge a management fee of

19   1.25 basis points.  That is, 0.0125 percent on the assets

20   entering transition.

21         You'll learn that in the case of NTMA, they

22   ultimately agreed with the client on a slightly higher rate,

23   1.65 basis points, when the size of the deal got smaller.

24   They only were awarded part of that deal.

25         Here's an example of what they promised to do for

1    AXA.  Our unique fiduciary role throughout the entire

2    transition period provides clients with the comfort that all

3    conflicts of interest are avoided and allows us to focus our

4    efforts on managing each transition as a partner in the best

5    interests of our client.

6         And here's how they promised to charge.  Consistent

7    with our market leading fiduciary-agency business model, our

8    commissions are fully disclosed to our clients around any

9    transition events undertaken.  State Street's commission

10   revenues are made up of fully disclosed equity commissions --

11   that's stocked commissions -- fixed income commissions --

12   that's bond commissions -- and future contract commissions.

13        But you will learn that State Street didn't

14   actually charge the low rates that it promised and its

15   commissions were not fully disclosed.  Instead, once the bank

16   won those assignments, they added secret commissions to each

17   and every one of those deals.  And they did it with the

18   defendant's approval and often on his direct orders.

19        For example, remember that promise to Royal Mail

20   that we talked about a moment ago, to charge a flat fee of

21   1.75 basis points instead of commissions?  Here's the e-mail

22   where Pennings tells Royal Mail, that even though Royal Mail

23   has cut the deal size, there's going to be less things

24   involved, State Street will still do it for that price.  I

25   confirm that even though the value is significantly less, we

can do this project for a management fee of 1.75 basis points
of the portfolio value of 1.3 billion pounds or
227,500 pounds.

Remember what the defendant told him, thin to win.

But as soon as they did win the deal, with that
promise, Pennings forwarded the e-mail to the defendant and
he said who's the daddy?  Happy President's Day.

And then look at what he says next.  I'm thinking
1.5 to BPY.  You will learn that "BPY' stands for basis
points of yield.  That's an extra hidden commission, on top
of this flat fee that he's just promised the client.  And you
will learn that that is exactly what they did.

At the defendant's instruction, they charged Royal
Mail an extra basis point of yield on trades in the United
States, and an extra two basis points of yield on trades in
Europe and they hid those extra commissions from the client.
Those tiny, little charges on each and every trade translates
into $3 million of hidden commissions that were charged to
Royal Mail, for a trade that Royal Mail thought was costing
it 227,500 pounds.  That's a little less than $400,000.
That's not putting client interest first.  That's fraud.

And remember that promise to do the transition for
NTMA for a flat fee?  Here's the defendant's e-mail to Royal
Mail telling you that they won that deal for 1.75 basis
points.  And then look what he says next.  Need to be very

1    creative.  And how did the defendant respond?  We will.

2            Over the next few days and weeks, you will learn

3    exactly what these men meant by being creative, charging

4    hidden commissions on top of what they promised to charge,

5    being creative by adding secret commissions is not acting in

6    a client's best interest; it's fraud.

7            Remember KIA, the client that they promised to

8    charge zero commissions?  There were actually two transitions

9    that State Street promised to do for KIA at that rate.

10   Here's -- Pennings has just sent an e-mail to McLellan,

11   telling him that one of those deals is about to happen next

12   week.  And McLellan responds, awesome.  Five million?  That's

13   $5 million.  Pennings replies, aiming for that.  And then he

14   says, gonna have to be creative and need you involved on the

15   FI trading desk.  That's the fixed income bond trading desk,

16   in the US, to ensure that they do as we want.

17           And you will learn that the defendant and the

18   co-conspirators were creative, as to how they tacked on those

19   commissions so the clients wouldn't see them.

20           In the course of this trial, you're going to learn

21   a lot about how stocks and bonds trade, perhaps more than you

22   ever wanted to know, and about how their prices are recorded,

23   and about a lot of other complicated concepts.  The witnesses

24   will explain everything that you need to know along the way.

25           But here's a key point.  In the stock market, you

can usually look up the price at which stocks trade every
day.  You can look it up in the newspaper, you can look it up
online.  And usually when a broker buys a stock for you, he
needs to break out the price that he paid and what he's
charging you as a commission.  But for bonds, it's different.
Bonds don't trade on a central exchange.  They trade in a lot
of different places.  It's called over the counter.  It's all
over the place.

And when a broker buys a bond for you, the custom
is that he only gives you a single price.  It's called the
net price.  That price includes the broker's commission.
That's why it's sometimes called a markup or a spread,
because they actually mark up the price of the bond by that
amount, or when they're selling, they mark down the price of
the bond by that amount, but it's included in the price.  And
that makes it easier to hide when you're adding extra
commissions, because the client has to take it on faith that
this net price includes the rate that you've agreed upon.

And State Street's clients did take it on faith.
They trusted the bank.  And the defendant knew that.  And he
took advantage of that trust.

Most of the deals that we're going to talk about
were bond deals, because it was easier for the defendant and
his co-conspirators to include hidden commissions in the net
price of those bonds.  And that's why it was very hard and in

1       some cases impossible for the victims in this case to learn

2       that they had been overcharged.  But you will learn that the

3       defendant and his co-conspirators also figured out a way to

4       pull off their scheme for stocks and that's what they did

5       with the NTMA, the Irish government fund, and that's another

6       way that they got creative.

7            Take a look at this e-mail from Pennings to the

8       defendant about that deal.  They received a request for a bid

9       and Pennings writes, how about a 1 basis point management

10      fee, or something of that nature, and no commissions and then

11      take a spread?  That's just another word for commission.

12           And then he suggests -- and this is how the

13      defendant responds.  Agree with a zero commission bid.  Ian

14      will need to trade net.  Ian is the head of trading in

15      Europe.

16           Trade net.  That means trade the stocks in a way

17      that the commission is not broken out, so that it's wrapped

18      up and included in the price, so that the client can't see.

19           And what does Pennings say?  Great minds think

20      alike.  We have to charge a fee, then otherwise they get

21      suspicious.

22           You're going to hear about other examples of what

23      the defendant did.  You'll hear that in June of 2010, he was

24      visiting London during the first of those trades for KIA.

25      While he was there, he directed his bond traders in Boston to

1   send him their trading results, as well as the high prices to

2   which those same bonds traded during the course of the day.

3   And then this senior executive actually sat down on the

4   trading desk and he personally figured out how many pennies

5   he could add to each and every one of those bond trades to

6   get the prices right up around that high market price.

7          That way, if the client ever looked, if it was ever

8   able to find those prices and looked, there was less of a

9   chance that the client would notice that there was a hidden

10  commission included, because it would look like State Street

11  did all the trades right around the prices that the bonds

12  actually traded on that day, even though in reality, State

13  Street had paid much less for those bonds.

14         On the Royal Mail transition, the defendant

15  personally directed a junior bond trader to disregard the

16  written trading instructions that he received, which told him

17  to charge zero commission, because Royal Mail had agreed to a

18  flat fee.  Instead, the defendant told that trader to apply

19  commission of 1 basis point of yield to every single trade.

20  And then he instructed that same trader to hide those

21  commissions, when he was sending over the trading results to

22  a colleague in London, who was responsible for reporting

23  them.

24         On the AXA transition, the defendant also

25  personally instructed traders to disregard the written

trading instructions they received and to charge a higher
rate on most of those trades.  As a result, State Street
charged AXA $1.3 million, close to three times the commission
that it had promised.

Ladies and gentlemen, you will hear the defendant
give those instructions in his own words.  That's because at
State Street, just like at many other banks, certain phone
lines are recorded.  And the defendant's line and
Mr. Pennings' line were not recorded.  But Boomgaardt's line
and the trader's lines were recorded.  That's a bank policy,
designed to make sure that if there's ever a disagreement
about a trade, there's a record of what was said.

As a result, you will hear the defendant actually
instruct that bond trader to apply commissions to each and
every one of those Royal Mail trades and then to zero them
out when he sends the file over to his colleague.  You will
hear him instruct the traders on AXA to charge a different
price than State Street promised and you will hear him
instruct those traders in Boston to send over the high prices
of the day to him in London, before booking out the trades to
KIA.  In fact, when you listen to that call, I'd ask you to
pay close attention.  You will actually be able to hear the
defendant giggle when he asks for the high price.

How else are we going to prove this case to you?
Through a variety of different kinds of evidence.

1           You will hear from Ed Pennings and Rick Boomgaardt,

2    the defendant's two co-conspirators in Europe.  They will

3    take you behind the curtain in this conspiracy and tell you

4    about how it came about and how it worked.  They will walk

5    you through those phone calls and give you realtime insight

6    into what they were thinking when they carried out this

7    scheme with the defendant.  And as the three of them tried

8    desperately to cover it up.

9           You will learn that Boomgaardt and Pennings have

10   pled guilty to committing the crime of conspiracy and that

11   they will testify before you in the hopes of obtaining

12   leniency when they're sentenced.  You will have the

13   opportunity to evaluate their testimony for yourselves and

14   you should evaluate it very closely.  The Judge will instruct

15   you to give it extra scrutiny.  And you will evaluate whether

16   and how it's backed up by the other evidence that you will

17   see and that you will hear.

18           You'll also hear from some of the other people who

19   worked for the defendant at State Street, including the

20   traders who executed his instructions and applied those

21   hidden commissions to those client traders.  You'll see the

22   e-mails and other documents the defendant and his

23   co-conspirators sent and received.  What they said to win

24   those deals, the false promises that they made to clients,

25   the misrepresentations and half truths that they told, and

1       also what they said to each other at the same time.

2               And you will hear from several of the victims of

3       the defendant's fraud, the people to whom those false

4       promises were made.  They will testify about the trust that

5       they placed in State Street to live up to those promises and

6       about how State Street took advantage of and breached that

7       trust.

8               Here's what else the evidence is going to show.  In

9       June of 2011, executives at one of those defrauded clients,

10      Royal Mail, discovered that the price of each and every one

11      of the bonds State Street had traded for them in the United

12      States was off by exactly 1 basis point of yield.  Now, that

13      didn't seem right to them, because State Street had agreed to

14      charge Royal Mail a flat fee and no commissions.  Now, we'll

15      explain to you later how they were able to figure it out for

16      the bonds that traded in the United States, but why it was

17      impossible for them to know what they had been charged in

18      Europe.

19              An executive at Royal Mail, a man named Ian

20      McKnight, sent an e-mail to Ed Pennings, asking him about it.

21              Pennings responded, that doesn't seem right.  Let

22      me investigate.

23              You will learn that the Royal Mail inquiry set off

24      a three-month scramble by the defendant, Pennings, and

25      Boomgaardt to cover up what they had done.  First, the

1   defendant came up with a plan to claim that the commissions

2   were a fat-finger error. You know what that is, when you go

3   to your computer, and your finger actually hits the wrong

4   button, bumps the wrong key. At the defendant's direction,

5   Pennings sent this e-mail to McKnight.

6          Further, to our discussion yesterday, we have

7   confirmed inadvertent commissions applied on your fixed

8   income trading of $954,406. Inadvertent commissions applied.

9   That means that the commissions were applied by mistake.

10          Who came up with that language? The defendant did.

11   He instructed Pennings to use that exact language, even

12   though you will hear the call in which it was the defendant

13   himself who personally ordered the trader to apply those

14   commissions and then to hide them when he sent over the

15   trading results to his colleague. And even as the defendant

16   ordered that that close to a million dollars in overcharges

17   on US trades be refunded to Royal Mail, he tried to keep

18   Royal Mail from finding out that he had also charged

19   $2 million worth of hidden commissions in Europe. He even

20   lied to State Street's compliance department. That's the

21   bank's internal watchdog, to keep them from finding out. But

22   eventually, that lie, too, unravelled.

23          You will learn that at the end of August 2011,

24   Boomgaardt ignored the defendant's order to send a letter to

25   Royal Mail and its consultant from the head of compliance at

1    State Street, claiming that $1 million was the correct refund
2    and that it had been discharged as a mistake.  Instead,
3    Boomgaardt reported to higher-ups that the commissions had
4    been charged deliberately and that they had been charged in
5    Europe, as well.
6            You will hear the defendant's realtime reaction
7    when that happened, in a recorded phone call on August 26,
8    2011, between the defendant, Boomgaardt, and Pennings.  On
9    that call, you will hear the defendant tell his
10   co-conspirators that they're going to have to come clean,
11   that they're going to have to rip the band-aid off, that they
12   don't have a leg to stand on; that he fears the situation
13   with Royal Mail is just the tip of the iceberg.
14           And then you will hear the three men talk about a
15   plan to try to convince State Street that everything they did
16   with Royal Mail was legitimate, that the contract with Royal
17   Mail actually allowed them to charge those hidden
18   commissions.  You're going to hear the defendant actually
19   reading that contract over the phone, as he tries to come up
20   with a cover story for what they've done.
21           But ladies and gentlemen, the evidence will show
22   that there is no contract in the world that allows you to lie
23   to people to separate them from their money.  There is no
24   contract in the world that permits you to tell someone that
25   you're charging them one price, while secretly intending to

1    charge them another.  And the contracts between State Street

2    and its clients are no different.

3            You're going to hear about those contracts over the

4    course of this trial.  None of them gave the defendant and

5    his co-conspirators the right to deliberately mislead their

6    clients about what the bank was charging and there's no law

7    that allows you to do that, either.  That's fraud.

8            For his actions, the defendant is charged with

9    three crimes.  Count 1 charges him with conspiracy to commit

10   securities fraud and wire fraud.  Now, you'll hear from Judge

11   Sorokin that conspiracy is a legal word for an agreement or

12   an understanding between two or more people to do something

13   that the law forbids.  The understanding in this case was

14   between the defendant, Ed Pennings, and Rick Boomgaardt.

15           Counts 2 and 3 charge the defendant with securities

16   fraud.  That's a form of fraud that involves stocks and

17   bonds, like the ones that State Street's clients hired it to

18   buy and sell on their behalf.

19           Counts 4 through 6 charge the defendant with wire

20   fraud.  That's just fraud that involves a wire, like a phone

21   call, or an e-mail.

22           In the end, the evidence will show that the

23   defendant conspired with Boomgaardt and Pennings, promised

24   clients one price, and secretly charged them another.  That

25   they applied hidden commissions to billions of dollars' worth

1    of trades, earning State Street millions of dollars in the

2    process; that they knew that what they were doing was wrong

3    and that when they got caught red-handed, they lied to cover

4    it up.

5          After you've heard all the testimony, listened to

6    the recordings, and sees all the other evidence, Mr. Johnston

7    and I will have the opportunity to speak with you again.  And

8    when we do, we will ask you to deliver the only verdict

9    consistent with that evidence, that the defendant is guilty

10   as charged.

11         Thank you.

12         THE COURT:  Thank you, Mr. Frank.

13         Ladies and gentlemen of the jury, I remind you that

14   opening statements are not evidence, just an outline of what

15   counsel believes the evidence to be.

16         In a moment, we're going to begin the opening

17   statement of Mr. Weinberg, but to allow counsel to get

18   organized and the like to switch from one to the other and

19   their presentations and so forth, we're going to take a brief

20   break.

21         So all rise for the jury.

22         (The jury exits the courtroom.)

23         THE COURT:  All right.  You can be seated.

24         How long do you think you need?

25         MR. FRANK:  Probably just a second.

```
 1                    THE COURT:  Okay.

 2                    Do you want the monitor there, Mr. Weinberg?

 3                    MR. WEINBERG:  Yes, Your Honor.

 4                    MR. JOHNSTON:  You do want this here?

 5                    THE COURT:  He does.

 6                    MR. WEINBERG:  We'll need about five minutes to get

 7       organized, Your Honor, to show Mr. Frank the exhibits.

 8                    THE COURT:  Okay.  We'll stand in recess for five

 9       minutes.

10                    (Court in recess at 9:55 a.m.

11                    and reconvened at 9:58 a.m.)

12                    THE COURT:  We're back in session.  I understand

13       from Mr. Frank there are two that he has an issue with.

14                    MR. FRANK:  That's correct, Your Honor.

15                    THE COURT:  If you -- can you tell me what it is,

16       or show me what they are?

17                    MR. FRANK:  Sure.  Well, the defense can show you

18       what they are.  One of them is an e-mail that we've actually

19       discussed previously in court.  It's an e-mail from the

20       defendant to two individuals at State Street, his boss, David

21       Puth and Karen Keenan, in which he advises them of

22       anticipated revenues for upcoming deals.  So as to the

23       defendant -- well, the whole e-mail is hearsay and it

24       includes the response from one of those executives, "you made

25       my day."  And if I recall correctly, Your Honor said you
```

1    weren't sure how you could see why that response would be

2    relevant.  So it's both hearsay and relevance is the

3    objection.

4                    THE COURT:  What's the other one?

5                    MR. FRANK:  The other one is an audio clip that the

6    defense wishes to play of a conversation not involving the

7    defendant, but between the two co-conspirators, Boomgaardt

8    and Pennings, and it's an audio clip in which Mr. Pennings

9    says something to Mr. Boomgaardt about making sure the NTMA

10   contract doesn't say anything about spreads.  It's not going

11   to be inconsistent with any prior testimony.  It's hearsay as

12   to the defendant.  It cannot relate to the state of mind of

13   the defendant, because he's not even on the call.  And so we

14   object to that coming in, as well.

15                   MR. WEINBERG:  It's a tape recording the Government

16   has marked to play with Mr. Boomgaardt.  It's an excerpt from

17   a tape currently scheduled to be heard either today or

18   tomorrow through Boomgaardt's direct.

19                   THE COURT:  It's just a portion of the tape that

20   the Government is not playing.

21                   MR. WEINBERG:  No, they are playing it.  They just

22   don't want me to use.

23                   THE COURT:  You're playing that tape?

24                   MR. FRANK:  I'm actually not --

25                   THE COURT:  You're offering that into evidence?

```
 1              MR. FRANK:  I'm not sure, Your Honor.  I'll have to
 2    check.
 3              MR. WEINBERG:  It's in your transcript book.
 4              MR. FRANK:  If you're telling me that that's in our
 5    transcript book, then I will withdraw the objection on that
 6    one.
 7              On the other one, I continue to object on hearsay
 8    and relevance grounds.
 9              THE COURT:  Do either of you have a copy of it,
10    just so I can look at it?
11              MR. WEINBERG:  Yes, Your Honor.
12              May I present it to Ms. Simeone?
13              THE COURT:  Yes.
14              (The Court reviews the document and confers with
15              the law clerk.)
16              THE COURT:  So let me make sure we're talking about
17    the same thing.  This is the one where he outlines some large
18    Q4 wins and large prospects, it's that change?
19              MR. FRANK:  Yes, Your Honor.  And she responds "you
20    made my day."
21              THE COURT:  Is that the part you don't like?  It's
22    not the rest of it at all?
23              MR. FRANK:  All of it I object to, though "you made
24    my day" is irrelevant and it's hearsay.
25              THE COURT:  How doesn't that help you?
```

1    MR. FRANK:  Your Honor, it's an evidentiary

2    objection.  It's not whether it helps or hurts me.  It

3    shouldn't come in.

4          THE COURT:  I know.  I'm just trying to understand.

5          MR. FRANK:  Well, he's trying to make an argument

6    that we think is an irrelevant argument, which is that he

7    advised higher ups that these deals were revenue-generating

8    deals.  He can make the argument, but he can't put in this

9    document, which is his own self-serving hearsay.  It's not a

10   business record.  We're not objecting to the business records

11   that he wants to put in that --

12         THE COURT:  Why doesn't he show -- not as to "you

13   made my day," but the rest of it, just to his state of mind

14   as to what kind of profit they were going to make.  That's a

15   motive in the case.

16         MR. FRANK:  That's not state of mind evidence, Your

17   Honor.  That's statement of belief and that's explicitly

18   excluded under 803(3).  He's not saying I'm happy, he's not

19   saying I'm sad, he's not saying I'm exciting.  He's saying I

20   believe that we will earn $5 million on this trade.  First of

21   all, so it's not under 803(3).  It shouldn't come in for its

22   truth, and it's just self-serving hearsay as to him and their

23   response is equally hearsay.

24         MR. WEINBERG:  Judge, the Government has charged

25   Mr. McLellan with concealing business practices, implicitly

1    the expected revenue from State Street.

2            MR. FRANK:  That's not true, Your Honor.

3            MR. WEINBERG:  It's in the indictment, Steve.

4            MR. FRANK:  It's not true that we've charged the

5    defendant with concealing the revenue.  It's concealing how

6    he generated the revenue.

7            MR. WEINBERG:  That's a distinction too thin to

8    support an exclusion of a document that's offered not only

9    under 803(3), but it's offered to reflect Mr. McLellan's

10   state of mind at the time it was written, right before the

11   KIA transition, rather than concealing the expected revenues

12   from a zero commission transition.

13           He's telling Mr. Puth, his immediate supervisor,

14   and Ms. Keenan, who worked with Mr. Puth, that this

15   transition, this zero fee transition, is going to generate

16   $5 million dollars and --

17           MR. FRANK:  Well, that's not, first of all, what

18   he's saying in that e-mail, Your Honor.  He's saying nothing

19   about zero fee transition.  But also, we are not objecting to

20   other evidence that comes in within the rules of evidence

21   that are proper business records about the fees that were

22   generated.  What we are objecting to is this hearsay,

23   self-serving hearsay statement by the defendant.

24           MR. WEINBERG:  Judge, (a), this is a business

25   record.  This is normal, ordinary ways that State Street

1    communicates up the hierarchy regarding their pipeline, their

2    forecasted revenues.  Secondly, it is state of mind, but

3    third, it's not even offered right now for the truth, it's

4    offered to demonstrate Mr. McLellan's good faith --

5           THE COURT:  Why do you need "you made my day."

6    Never mind why you need it.

7           MR. WEINBERG:  It tells them right back that what

8    you're doing is supported by Mr. Puth and myself, since

9    Mr. Keenan works with Mr. Puth.

10          THE COURT:  But what's supported, that he's getting

11    money?

12          MR. WEINBERG:  It's endorsement of the transition

13    revenues, which are part of the transition, which has zero

14    front fees.  It shows, to State Street --

15          THE COURT:  Is there going to be evidence that she

16    knew that there was zero fees?

17          MR. WEINBERG:  Not direct evidence, Your Honor, but

18    she's a professional banker, as is Mr. Puth.  They know

19    what's going on under their regime.

20          MR. FRANK:  There is zero evidence that she knew

21    anything about it.

22          MR. WEINBERG:  The Government disputes she knows

23    it, but I'm entitled, Your Honor, to show Mr. McLellan's

24    transparency with the hierarchy of the bank.

25          MR. FRANK:  He's not entitled to argue facts that

1    are not in evidence, Your Honor, and that will not be a fact

2    in evidence.  There will be nothing even remotely suggesting

3    that she knew anything.

4         MR. WEINBERG:  This will be offered as part of a

5    group of evidence to show transparency of a routine basis.

6         THE COURT:  So this is what I'm going to do.  I'm

7    not ruling on whether the document is admissible in evidence

8    or not.  This is just your opening statement.  Certainly, it

9    seems reasonable to put in -- I'm not -- I'm overruling the

10   objection of the Government as you using it in the opening,

11   which is your statement of what you anticipate the evidence

12   to be as to his e-mail to her.

13        I will tell you, as to the "you made my day," that

14   seems potentially more problematic.  I'm not ruling that it's

15   in or out now.  I'm not ruling in or out any of it.  All of

16   you are just making statements about what you think the

17   evidence will be.  That one -- that part seems potentially

18   more problematic, because its significance depends upon a

19   basis for its relevance and admissibility seems to depend

20   upon a basis to infer that she knew.

21        So I'm not sustaining the objection even to that as

22   to using in the opening, but I'm just highlighting for you

23   that one.  I'm not admitting the other part, I'm not ruling

24   on your evidentiary objection.  So I'll hear you.  But that

25   other part seems more problematic to me in forecasting what

1    the issues are.

2              MR. WEINBERG:  I'll cover the subject without using

3    the demonstrative, Your Honor.

4              THE COURT:  All right.

5              MR. FRANK:  Thank you, Your Honor.

6              THE COURT:  You're welcome.

7              Ready to go?

8              MR. WEINBERG:  Ready to go.

9              THE COURT:  All right.  Go get the jury.

10             (The jury enters the courtroom.)

11             THE COURT:  Mr. Weinberg, are you ready to go?

12             MR. WEINBERG:  Thank you.

13             THE COURT:  Go ahead.

14                   **OPENING STATEMENT BY THE DEFENDANT**

15             MR. WEINBERG:  Good morning, ladies and gentlemen.

16   I'm Martin Weinberg, along with Rob Goldstein, Max Nemtsev.

17   We have the honor of representing Ross McLellan.

18             There are few horrors greater in a democracy than

19   for an innocent man to be accused of crimes he did not

20   commit.  The evidence will compel him -- over the next

21   several weeks, show you that Ross McLellan is not only

22   presumed innocent.  He's factually and legally innocent,

23   wrongfully charged for crimes that, if committed by anyone,

24   were committed by the Government's two star witnesses, Edward

25   Pennings and Richard Boomgaardt.

1          Each of whom, one a Dutch citizen, one a Canadian

2     citizen, both living in London, or the London areas, tried

3     desperately to escape the risks of imprisonment an ocean away

4     from their families and chose to enter cooperation agreements

5     with the Government, where they traded and bargained away

6     their testimony and we contend the truth, in an effort to

7     please the prosecutors and earn each of them what they

8     expected to be a ticket for freedom out of this US

9     prosecution.

10          The core allegation in this case is false

11     statements.  That the Government didn't tell you that Mr.

12     McLellan, of the seven clients who were allegedly defrauded,

13     of the seven of them, Mr. McLellan made no false statements

14     to any of them.  Didn't even speak with six of the seven.

15     And the seventh, the US domestic insurance company, AXA, he

16     was on a conference call that had nothing to do with pricing

17     or charging or markups or spreads.

18          Mr. McLellan, to underscore the point, never spoke

19     to, never met, never e-mailed, never texted, was not on a

20     conference call with any of Mr. Pennings' six European

21     clients; not Royal Mail, not KIA, not NTMA, not any of the

22     others.  Didn't even have an e-mail with Mr. McKnight of the

23     Royal Mail, or with the NTMA people or with Mr. Das who

24     represented the KIA.  Mr. Pennings monopolized the

25     communications between his clients and to State Street.

1          This is a prosecution of a man who trusted the

2    wrong person in Edward Pennings, who relied on Mr. Pennings,

3    who was the head of the UK office, with lots of people under

4    his, Pennings' supervision.  Who relied on Mr. Pennings to

5    know the law in the UK, to talk to the UK lawyers.  State

6    Street is a global bank.  They had lawyers in each of its

7    divisions.  He relied on Mr. Pennings to negotiate contracts

8    that conformed to British and European law.  He relied on

9    Mr. Pennings to engage in negotiations that conformed to the

10   contracts and conformed to the British and European laws.

11          Mr. McLellan relied in good faith on Mr. Pennings,

12   and Mr. Pennings betrayed him, Mr. McLellan.

13          Mr. McLellan is being accused of being criminally

14   responsible for what, at its essence, is Pennings' excesses,

15   Mr. Pennings' lies, Mr. Pennings' deceptions of his,

16   Mr. Pennings' clients.

17          Mr. McLellan did have a supervisory role over

18   Mr. Pennings.  Mr. McLellan was in Boston, Mr. Pennings in

19   Europe.  Mr. McLellan had a thousand transitions a year under

20   his watch, ranging from transitions in Boston to transitions

21   in Tokyo, South Africa to London, and businesses this big,

22   global businesses, State Street business.  Mr. McLellan had

23   to delegate responsibilities and in this case he delegated

24   them to the wrong person in Mr. Pennings.

25          Mr. Frank mentioned the seventh transition, AXA,

the domestic insurer, the only one that was not under
Pennings' watch.  It was not only not a crime in regards to
AXA, it wasn't even a breach in contract.  There was no
contract between AXA and State Street.  There was just a
business arrangement, the give and take between a billionaire
client and a billionaire bank.  The evidence will show that
concealment and secrecy is the hallmark of a conspiracy.

Mr. McLellan's relationship to this transition, the
only United States transition that is at stake in this
prosecution, was open, was proper, was consistent with
business norms.  The evidence will show from the Government's
own witnesses, that the commissions charged to AXA were not
only reasonable, but they were under industry norms.  And the
evidence will show, as a result, AXA was happy with the
performance of this transition and rehired State Street just
months later to do a separate transition.

The Government doesn't always get it right.  Every
one who were prosecuted are not guilty.  243 years ago, our
founding fathers rebelled against the British monarchy, the
British crown.  They distrusted authority being centralized
with a king and a sovereign.  And they enacted, as a result
of this distrust, a set of rights which formed the
cornerstones, the foundation of the criminal justice system.
The founding fathers architected a set of rights that include
presumption of innocence, the cornerstone right.  The right

1    that every defendant charged by federal prosecutors enjoys in

2    an American courtroom.

3            They put this burden of proof squarely on the

4    Government, on the accuser, on the representatives of the

5    prosecution, and they created a high burden of proof, proof

6    beyond a reasonable doubt.  A standard of proof that's

7    different than we use in our daily life.  But most

8    pivotably -- most pivotably, they entrusted the decision,

9    ultimately, over guilt or innocence, over whether you believe

10   or don't believe a witness, credibility judgments, the

11   founding fathers entrusted it not to a judge, who's as wise

12   as Judge Sorokin, not to a government, but to a jury of 12.

13           Mr. Goldstein and I, Mr. Nemtsev, over the course

14   of the next three weeks, will demonstrate to you through

15   evidence, not just through this exchange in opening

16   statements, which the Court properly instructed were not

17   evidence.  We will present to you and prove to you that the

18   prosecution is built on a flawed foundation.  It's built on

19   the quicksand of testimony of Mr. Pennings and

20   Mr. Boomgaardt.

21           Testimony that derived from deals, exchanges of

22   testimony with the Government, exchanges of testimony to the

23   Government, with the hope and expectation that at the end of

24   this trial, Mr. Frank, the Assistant US Attorney, will

25   support Mr. Pennings' and Mr. Boomgaardt's need and request

1    to exchange their testimony for a benefit, for a

2    recommendation of sentencing leniency for Pennings and

3    Boomgaardt, who are the two State Street former executives

4    who will loan, one to one, with the six clients that Mr.

5    Frank told you, in the Government's position, who are

6    allegedly victimized by the charges.

7          We'll show you that before these cynical,

8    self-serving deals that were cut by Pennings and Boomgaardt,

9    the investigation of Royal Mail, for instance, was focused on

10   contracts, and whether the contracts supported both the fee

11   and the trading revenues.  The investigation was focused on

12   business dealings between, as I said, giant billionaire

13   clients, like the KIA, which had hundreds of billions of

14   dollars in royal sowed money in the coffers of State Street,

15   in the State Street bank.  That focused on competition in

16   Europe between State Street, and the Goldman Sachses and JP

17   Morgans and Citibanks, the more famous, global banks.

18         But after the deals were cut with Pennings and

19   Boomgaardt, deals cut because Pennings and Boomgaardt had an

20   understandable fear of being locked away in a prison an ocean

21   away from their families.  Boomgaardt and Pennings both

22   understood, both believed that in order to get the benefits

23   of their dealings, they needed to blame Ross McLellan for

24   their conduct, their communications, their e-mails, their

25   trading charges.

1          For years, you will learn, that Mr. Pennings and

2     Mr. Boomgaardt asserted their own innocence.  They made

3     written statements, each of them, proclaiming their

4     innocence, proclaiming that the contracts supported the

5     charges, supported the business charges between State Street

6     and its clients.

7          Mr. Pennings, for six years, told everyone State

8     Street -- in its internal investigation, State Street's

9     outside lawyers from Freshfields, disciplinary hearing

10    officers, an employment tribunal, where Mr. Pennings

11    challenged his being discharged.  The City of London Police,

12    the investigating arm of Great Britain, the FCA, which is

13    Britain's SEC.  It regulates the securities industry.

14         Mr. Pennings told all of these people for six years

15    that the contracts supported the charges, that State Street

16    lawyers endorsed the contracts and endorsed the charges.  And

17    that he was innocent, a scapegoat, a victim of State Street's

18    witch hunt against him.  Those will be Pennings' words before

19    he exchanged his testimony with the United States

20    prosecutors.

21         Same with Mr. Boomgaardt, who will be the

22    Government 's first witness.  For two and a half years, he,

23    too, proclaimed his innocence, until each of them bowed to

24    the fear, the pressure, the debilitating anxiety of being

25    targeted by a US criminal investigation oceans away from

1    their home; being targeted for their communications.  And I

2    mean Pennings' and Boomgaardt's communications, because Mr.

3    McLellan never spoke to these clients; to clients from the

4    Netherlands, clients from Kuwait, clients from Great Britain,

5    clients from Ireland.

6            The evidence will be that Pennings and Boomgaardt

7    each lacked the will to withstand this assault against their

8    futures and they surrendered to the power of the prosecutor

9    to get the benefit of the bargains, they changed their

10   stories, Pennings changed his story 180 degrees,

11   Mr. Boomgaardt less, because he was already trying to shift

12   responsibility up to his hierarchy, when he was talking to

13   his disciplinary officer, a disciplinary hearing officer.

14           They changed their stories and knew that they had

15   to come to court here and blame Mr. McLellan, in order to get

16   the benefits.  Mr. McLellan, who unlike them, will not plead

17   guilty to crimes he did not commit and is instead entrusting

18   his future to you.

19           Let's look together at the agreements that

20   Mr. Pennings and Mr. Boomgaardt executed and we'll try to --

21   can we get them on the computer, as well?

22           MR. NEMTSEV:  Yes.

23           MR. WEINBERG:  Thank you, Your Honor.

24           This is Pennings' cooperation agreement and it's a

25   full eight- or nine-page agreement.  You'll receive it in

evidence.  And it essentially defines Pennings' cooperation, what he expects, what the standards are in receiving what he expects.  So the key language begins, Should the defendant, who is Mr. Pennings, provide substantial assistance in the investigation or a prosecution of another person.

And I submit that's in the prosecution of Mr. McLellan.  The US Attorney and the fraud section agree that before sentencing, the US Attorney and fraud section will file a motion under sentencing law 5K.1, to recommend that the Court impose a sentence below the guidelines, below the advisory sentencing guidelines.

The key is the next paragraph.  The determination whether Mr. Pennings has provided substantial assistance rests solely in the discretion of the US Attorney and fraud section and is not subject to appeal or review.

In other words, whether or not Mr. Pennings gets the benefit of this bargain, gets this 5K motion, gets a recommendation below the sentencing guidelines, increases his chances to avoid being incarcerated in the United States, depends solely on the determination made by the Government, by the prosecutor, who is not even subject to appeal or review.

Unreviewable sole discretion rests in the prosecutors, whether on one hand they help Mr. Pennings, and on the other hand, Mr. Pennings receives a Government

recommendation of 60 months in prison.  There's no parole in
our system.  He'd do 85 percent, about four years in prison
would be the Government's recommendation, away from his
family who would be thousands of miles away.  And that's what
coerces witness's testimony and makes them want to please the
prosecutor, and change what they told for six years,
180 degrees for Mr. Pennings.

The US Attorney and fraud section, really Mr.
Frank, Mr. Johnston, will make this determination when the
defendant has provided substantial assistance, based upon the
truthfulness and value of defendant's assistance in the
prosecution of Mr. McLellan.  And value.  The standard is not
just whether or not they deem Pennings' testimony to be
truthful, it's whether or not they determine, in their sole,
unreviewable discretion, that he has given value to one of
two parties in this criminal trial with the Government.

It's a powerful incentive for a salesman like
Pennings, who, for six years has asserted his innocence, for
six years has said the contracts supported everything he did.
For six years has been saying that the bank and its lawyers
approved what he did, to do a 180-degree reversal and be
blaming Mr. McLellan and claiming that what he did, did not
conform to the contracts, did not conform to British law.

On the one hand, the five-year recommendation from
his Government, the prosecutors.  On the other hand, a

recommendation of sentencing leniency.  The evidence will show that truth is the first casualty of this type of cynical agreement that rests on value to the prosecution, not just on truthfulness.

You will learn that Mr. Pennings -- Mr. Boomgaardt has sat with the Government, hour after hour, day after day, proffering, disclosing what they have to say.  And yet the decision of whether to file this motion, to recommend sentence of leniency, or the decision to withhold it and not file it, has still not been made.  The motions have not been filed.

The Government, despite spending day after day with Pennings and Boomgaardt, is withholding their decision, in their unreviewable sole discretion, whether to help Pennings or not, until after he testifies in this case.  That's a heavy hammer over the head of a man that wants to avoid five years or four years in an American prison.

You will meet Mr. Pennings, he will testify.  You will hear from Mr. Boomgaardt shortly, perhaps in a few hours.  We will together navigate and explore their past statements and their current statements.  It is your function to either believe or not believe them, to be detectives of deception, to judge their untrustworthiness or trustworthiness, when they point a finger of accusation at Ross McLellan in this courtroom.

1          You will hear that Mr. McLellan grew up in Rhode

2     Island, went to college at Stonehill in Easton, got a job,

3     went to night school.  Boston College, business

4     administration, and then at State Street.  Through relentless

5     and dedicated hard work, he earned every benefit.  His

6     promotions were not through entitlement or privilege, they

7     were through hard work.  He rose through the State Street

8     banks to become its youngest executive vice president and he

9     rose through the ranks of a bank, knowing that he had to

10    follow its rules and practices, not to fire or ignore them,

11    if he wanted to continue this path to success.

12          The evidence will show that Mr. McLellan was a man

13    with absolutely no motive to authorize illegal conduct,

14    fraudulent conduct, any conduct that breached the

15    expectations of the bank.  He fully believed that each of the

16    transitions that are the subject of this federal criminal

17    prosecution were consistent with contract and that each of

18    the charges were authorized by those contracts.

19          State Street, as I said, had lawyers not only in

20    Boston, but in England.  Mr. McLellan fully believed that

21    those lawyers in England had discussed the business

22    arrangements, discussed the new business model, discussed the

23    decisions in 2010 to compete with the Goldman-Sachses of the

24    world.  Those were decisions not made in the asylum, or at

25    least Mr. McLellan did not believe them to be.

1          The evidence will be that Mr. Pennings told Mr.

2     McLellan, also told Mr. Boomgaardt, the Government's first

3     witness, that he, Pennings, had the approval of the State

4     Street lawyers in London to establish this new business model

5     of low explicit fees.  For the KIA, there were zero fees.

6     And instead, the bank would make its profits and revenues

7     through trade.  That was the business model of Goldman Sachs,

8     the business model of the competitive banks with State

9     Street.

10         And yes, they did conform or bring their business

11    model closer in alignment to that of the other major global

12    banks.  They did it because the clients wanted it, these low

13    fees.  The clients preferred that the banks make their money

14    through trading revenues.  There's nothing illegal about

15    conforming or bringing your business model into competition

16    with the people that are also bidding for these transitions

17    and there's nothing illegal about conforming your pricing

18    strategies with the pricing that clients want.

19         Mr. McLellan had no motive to risk his career to

20    support Pennings' business model, his negotiations, his

21    communications with these clients.  Mr. Pennings also told

22    people --

23         This is May 2011.  This is the business record of

24    State Street.  Mr. Pennings had just become the director of

25    State Street Global Markets International.  That's the

broker-dealer arm of State Street in Europe.  He'd been made
a director not by Mr. McLellan, but by Steve Smit, who was
the head of the London office of State Street Global Market.
He attended this executive meeting of State Street Global
Markets, along with Mr. Smit, along with a variety of other
people, including Simone Paul, who was the lawyer that
Mr. Pennings told Mr. Boomgaardt, okayed and knew of the new
business model and okayed and endorsed Mr. Pennings' using it
in his negotiations with the European clients.

Mr. Bailey was like the CEO in Europe, Mr. Skully
was the head compliance person.  Here's what Mr. Pennings
said at that meeting to all these people.  Pennings queried
the report whether he captured all the revenue in the
transition management business, which included the revenue
generated by the transitions that the Government is trying to
criminalize in this case.  He noted, meaning Pennings, that
it only captures the fees.  The small transition fees, the
227,000 charged to Royal Mail, which is a lot of money to you
and I, but not to a billionaire client to trade 2.4 billion
worth of assets.

And then Pennings said that the report did not
capture the spreads.  That's bond language for markups,
markdowns.  It's fine language for the revenues that State
Street made on the trading that the Government is trying to
criminalize in this case.

1          So in May of 2011, Mr. Pennings is putting on

2     record with everybody in Europe, including Mr. Smit, the

3     lawyers, the compliance people, the COO, that spreads are

4     being taken on European transitions, not just fees, but

5     spreads, markups, markdowns, trading revenues that are going

6     to State Street Global Markets, but do not appear on several

7     of the reports.

8          Mr. Pennings also told people in the London office

9     that he had had a conversation with four separate lawyers for

10    State Street, two of them outside lawyers for the law firm

11    named Herbert Smith, two of them State Street's in-house

12    lawyers.  And that he had told them, on this conference call,

13    that their new contracts had to conform to the new business

14    practice of State Street, which was to charge fees, to charge

15    spreads, to have both of them, and not necessarily to be

16    required to disclose them when the contracts between the

17    clients and the bank approved them.

18         But the Government has no evidence as to why Mr.

19    McLellan would deliberately risk his career, his future, his

20    license as a securities person.  There's no evidence here.

21    The Government may argue, well, he was -- he wanted to make

22    more revenues, but any compensation he would receive, only a

23    tiny fraction of it was based on these European transitions.

24    Mr. McLellan managed over a thousand transitions a year and

25    he managed many other parts of the State Street business.

1          The Government may argue, well, transition -- the
2    transition team wasn't doing well.  But on December 22, 2010,
3    Mr. McLellan sent an e-mail to about 50 or 75 people and he
4    said, we're having a great year, revenues and transition
5    management are up 8 percent.
6          He had no motive, his job was not at risk, his
7    compensation was not at risk, he was on a positive trajectory
8    with the bank.  People don't commit crimes without motives
9    and -- fraudulent crimes without a monetary motive.  And
10   there simply is no evidence that Mr. McLellan's job was in
11   peril, salary in peril, compensation in peril, at the times
12   with these principal transitions.
13         December 22, 2010, that's days before the NTMA
14   transition was entered.  It's two months before the Royal
15   Mail bank -- Royal Mail transition was entered.  He simply
16   had no motive to knowingly, deliberately, or willfully enter
17   a conspiracy to commit fraud with Mr. Pennings.  And that's
18   the standard in a criminal case.
19         This is not a civil case, where it is negligence,
20   where jurors were asked whether somebody should have known.
21   This is a criminal case, where the Government has the burden
22   beyond a reasonable doubt to prove to you that Mr. McLellan
23   acted knowingly, intentionally, and willfully.  They need to
24   prove that he didn't act in good faith and there's simply no
25   evidence beyond a reasonable doubt why he would jeopardize

his life to support Pennings' business negotiations, absent a belief that Mr. Pennings, who was entrusted to run the British group --

We have an organization chart to prove just how many people were in it.  There was simply no evidence beyond a reasonable doubt that Mr. McLellan simply trusted the wrong person.

The evidence will show that Mr. Pennings, who lived and worked in London, who was relied on to know British regulations, British law, to know the business models of State Street's competitors, to negotiate State Street's transition agreements with these European clients.  It was Mr. Pennings who was relied on to know how to price the deals, how to conform his conduct to the State Street expectations, the rules, the laws.  It was, in fact, Mr. Pennings who did negotiate the deals.

Mr. McLellan was his supervisor, and Mr. McLellan had a thousand transitions to supervise.  He simply could not do them all.

The evidence will prove and you will be able to conclude from that evidence that he trusted too much.  Maybe he didn't manage Pennings closely enough.  The failures of management and failures of supervision are not willful, deliberate, knowing, intentional fraud.  And that's the gap between what we believe the evidence will show and what the

1    Government has told you they contend to try to prove.

2           There will be evidence in this case about the

3    contracts.  Contracts defined the business relationships, not

4    marketing materials, but contracts entered into between a

5    billionaire client like Royal Mail, that had its own

6    sophisticated representatives negotiating its interest in

7    doing a transition, and State Street bank.

8           Let me show you the contract between Royal Mail and

9    State Street.  The contract came in 2005, and that brought it

10   up and cemented it in this March transition.  It was signed

11   by Mr. Pennings and Mr. Smit, the head of the British office,

12   on March 2, with the representatives of the Royal Mail.  The

13   key terms, and they're written in British legal language, so

14   they're not easy, are these:

15          Conflicts of interest disclosure duties.  The

16   manager.  That's the State Street Bank of Europe.  The

17   transition manager -- may benefit from the commission, fee,

18   markup or markdown, payable by the customer -- that's Royal

19   Mail -- to the broker-dealer.  That's State Street's

20   broker-dealer.  The broker-dealer that generated a markup on

21   the bond trades, the $2.4 billion bond trades.  So the

22   contract says, point-blank, State Street can benefit from the

23   markups of the broker-dealer.

24          An associate in the State Street Global Market

25   acted as broker-dealer, meaning they're trading the bonds,

1    buying and selling, in respect to the portfolio transactions,

2    that's the buying and selling of the bonds, may benefit from

3    a commission, fee, markup or markdown payable to the

4    customer.

5              So the contract legitimizes Royal Mail's paying a

6    markup or markdown.  A markup is simply if I sell a bond for

7    100, the client will get 99.95 cents of 100, $0.05 or $0.04

8    or less will go to the bank, or the broker, or whoever did --

9    executed the trades.

10             Here is the key language in this contract.  No duty

11   to account for profits.  Neither the manager, which is the

12   transition manager, nor the associate, which is the

13   broker-dealer, shall be liable to account for and/or pay the

14   customer any profit, commission, or re-numeration received by

15   moving of the bond trades referred to in clause 6-1, which --

16   of the bond trades the are the subject of the transition.

17             So this is one of many contracts and will work

18   together to navigate through the labyrinth of European

19   transition grievance.  It won't be easy.  This is not a case

20   like a bank robbery and the issue is who's the man with the

21   gun.  This is going to require us all to, together, explore

22   and navigate through some of the business arrangements, the

23   business deals, the business contracts between the bank and

24   its billionaire clients.

25             But this contract says to Mr. McLellan that the

1     State Bank Europe negotiated an agreement with Royal Mail to

2     charge markups to make money from markups from bonds, and

3     that they have no obligation to tell the client the exact

4     amount of the markups.

5             You know, banks are not, as we all know,

6     not-for-profits.  They're big businesses and when we go to a

7     bank, deposit -- make a deposit, go to a bank if we're a

8     small business and you deposit the week's profits, the bank

9     receives it, gives us a deposit slip.  They give you, if

10    you're lucky, one percent or half a percent.  It doesn't keep

11    the money at the branch.  It loans the money out, mortgage

12    loans, car loans, at interest rates that far exceed the

13    interest rate being paid for the deposit.

14            The bank has a right to do that under its rules and

15    it's got a right not to tell him how much money they're

16    making for your weekly deposit.  What limits the bank --

17    what -- banks have limits in this world of big business that

18    we live with.  We don't have to love it, but it's real.

19    Banks are there to make money for its shareholders, the

20    public, global banks.

21            What limits them is contracts.  Parties like Royal

22    Mail, sophisticated parties like KIA, they have leverage.

23    They don't have to do business with State Street.  They can

24    do business with Goldman Sachs or JP Morgan.  So they

25    essentially entered into contracts.  These clients can

1    negotiate contracts.  They can say I don't like provision

2    6.2.  I want you to disclose your trading revenues.  In this

3    case, they didn't.  They can walk away from State Street and

4    say I don't like this contract, I want to know what profits

5    you made.  I want that written into a contract.  They didn't.

6            And together we'll explore sort of the contracts

7    that make up the foundation of this case.

8            Let me briefly turn to two of the transitions that

9    the Government mentioned in its opening, KIA, Kuwait

10   Investment Authority.  The evidence will be indisputable that

11   the representative of KIA told State Street either bid zero

12   commission, zero fees, make your money through markups or

13   trading, or you will not be selected to do this transition.

14           There were conversations.  Mr. Pennings had these

15   conversations, Mr. McLellan never met with them.  Pennings

16   went to the Mideast several times a year.  Mr. McLellan never

17   did.  Had to rely on what Mr. Pennings was telling

18   Mr. McLellan KIA was telling him.  And what KIA was telling

19   him, unless you change your business model, you're not going

20   to succeed in getting this transition.  So what did State

21   Street do?  They charged zero commission, zero fees.  They

22   would make their money through trading, they would make their

23   money through markups.

24           And anyone in the investment world, the banking

25   world knows, State Street was not going to move $2 billion of

1    KIA assets from one group to another for free, for no

2    commissions, no fees.  It was understood that State Street

3    was going to charge a markup.  That's a charge in this case.

4    It's part of their alleged conspiracy is they charge markups

5    and didn't specifically disclose them, when KIA could only

6    understand, and there was specific communications indicating

7    they did understand, that State Street was not going to help

8    them move billions and trade billions for free.  There were

9    going to be markups.

10           Mr. Frank said that Mr. McLellan was asking for the

11   day's high and lows so he can conceal the markups from KIA,

12   keep the markups so it was within what KIA can look at the

13   financial pages -- could see are within the highs and lows of

14   the day.

15           You will hear evidence that, in fact, certain of

16   the bonds traded for KIA, that what the KIA price was was

17   higher than the market high.

18           In other words, State Street was telling Mr. Das,

19   look at the Bloomberg reports, the financial reports, you'll

20   see these bonds traded between 90 and 100, but you're

21   being -- you're getting 100 and one.  You're paying 100 and

22   one to buy the bond, really 100.18, not 100 and one.  These

23   markups were 1/100th of a percent.  So when you hear four

24   markups, that's 4/100th of one percent.

25           If Royal Mail was charged one percent of their

1    $2.4 billion, they would have been charged $24 million.

2    Instead, they paid 4/10th of one percent -- 4/100th of one

3    percent, or about $400 of a trillion million dollars' worth

4    of bonds.  $4 to trade $10,000 worth of bonds.

5           And we'll, again, explore the arithmetic of this

6    labyrinthine world of finance.  It won't be simple arithmetic

7    to see what somebody did or did not do with regard to bonds.

8           Now, the Government argues well, Mr. Das and KIA

9    were defrauded.  KIA 115, that's the number of transitions of

10   merger 15.  They're getting charged for the bond trades,

11   sometimes higher than the market high.  That transition was

12   shared amongst three banks.  KIA was so happy with the

13   results of that transition, that they were aiming to do a

14   transition in November of 2010, twice as big a transition.

15   They gave it all to State Street.

16          Performance is not just based on how high a

17   commission is, whether it's two or three basis points.  You

18   will see evidence in this case focused on the seven clients

19   of State Street that the Government alleges were victims.

20   Five of them hired State Street to do later transitions,

21   after the transitions that the Government is trying to

22   criminalize.

23          A sixth one had consultants.  The consultants sent

24   State Street other transitions after the transition that is

25   the subject of this prosecution.  AXA, the domestic insurance

1   company, months after the transition that the Government

2   claims is part of this case, they hired State Street to do

3   another transition.

4        These are professionals.  These clients of State

5   Street, they're billionaire clients, they have consultants,

6   they have lawyers, they have analysts, they have advisors.

7   They repeatedly hired State Street, demonstrating that the

8   performance of these transitions, the expertise of State

9   Street, was successful.  The clients got what they expected.

10  There was a prediction to the clients made from what they

11  call pre-trades.  Mr. Boomgaardt will tell you about it in a

12  bit, the predictions.  What's the overall cost of taking a

13  billion dollars of US Treasuries and turn them into a billion

14  dollars of European bonds, and the fees are a minor part.

15       It's the overall costs that these clients are

16  interested in.  And these clients over and over again got

17  what they paid for.  Their expectations were met and the

18  proof is they rehired State Street.

19       KIA 121, Mr. McLellan, the day after his twins were

20  born, goes to the State Street office for an important

21  meeting with certain of the heads of the State Street bank.

22  E-mails are exchanged.  And you will see that Mr. McLellan

23  put on record, through e-mails -- it was a short meeting and

24  then he went back to his family, but he put on record in the

25  e-mails that there is going to be a markup by the

broker-dealer in this case.  It's another zero commission KIA

deal.

And this one, Pennings even told KIA, we'll cover

all your custody costs and charge you nothing.  Of course,

KIA knew there was going to be trading revenues, that was no

secret.  You'll hear compelling evidence that KIA knew and

agreed that State Street can mark up the bond trades and you

will receive compelling, documented evidence, at the time of

these discussions, that Mr. McLellan was sending him the

contract and periodic notice to the global heads of

compliance of legal, and making sure that the US authorities

in Boston, State Street, understood Mr. Pennings' business

model.

Royal Mail, Mr. Frank showed you an e-mail written

by Mr. Pennings on February 21 at 9:20 from his home, to the

Royal Mail representative, Ian McNight.  McKnight says to

him, there's 227,000.  Does that cover it all, does that

include all trading revenues?  Something the other clients

didn't ask.  Mr. Pennings says yes, but don't make me do it

again.

This e-mail, unlike many other e-mails where Ross

gets an FYI, after Mr. Pennings' cuts his deals, this e-mail

was concealed by Mr. Pennings.  There is no evidence that

Mr. Pennings ever forwarded that e-mail that promised Royal

Mail that the 227,000 would be their only charge.  When

1    6 months later, Mr. McLellan found out that Mr. Pennings,

2    from his home, made an off-the-contract secret promise to get

3    a deal, Mr. McLellan -- Mr. Pennings, the salesman, telling

4    Mr. McKnight, the representative of Royal Mail, don't worry,

5    this will be it.

6              Mr. McLellan didn't know of and no one knew of that

7    e-mail for 6 months.  It hit Mr. McLellan like a missile in

8    the night, that Mr. Pennings had betrayed him.  That's

9    Mr. Pennings, the salesman.  That e-mail, it's an important

10   e-mail.  It's a promise by Mr. Pennings to a client.  That

11   e-mail was kept by Mr. Pennings, secret.  It was concealed by

12   Mr. Pennings.  It was not disclosed by Mr. Pennings in

13   conversations.

14             Royal Mail complains.  They found out that there

15   was a markup.  Mr. McLellan steps in, sends them back a

16   million dollars, rebates them part of their markup.  This is

17   business.  You will hear evidence that State Street regularly

18   made political concessions to clients.  They made it, because

19   they wanted the client's good weather.  They wanted the

20   client's business.  And as much as a million dollars is a

21   huge, huge amount to you and I, to a global bank that makes

22   hundreds of billions of dollars, it's the price of doing

23   business, and the price of keeping the client happy.

24             AXA.  Again, the Government is taking what you will

25   find to be ordinary business between two giant businesses and

1    trying to make it something more.  The prosecutors are

2    lawyers, not bankers, not businessmen.

3            If we can just play a minute of the audio.  This is

4    Mr. McLellan openly talking to the US treasurers.

5            (Audio plays.)

6            THE WITNESS:  You'll hear the whole tape.  This is

7    the way that bankers talk to traders and supervise trades.

8    What's important is, that if Mr. McLellan for one second

9    thought that there was any wrongdoing, anything wrong,

10   anything that State Street didn't approve, anything that

11   would violate the regulations of any regulator, he didn't

12   have to have a tape-recorded call with five people, an open

13   call, where he's telling them about the complexity of the

14   deal.  Where you'll hear, when you hear the whole tape, that

15   he set certain small markups, very small markups.  Markups

16   that you will conclude are beneath the industry norms.

17           Could have asked all the traders, go to my office,

18   where there's no tape recording.  He didn't.  He called into

19   a tape-recorded line.  Been at State Street for 15 years.  He

20   knows the traders lines are taped.

21           Likewise, with other of the transitions where he's

22   talking to a trader and telling them to add a markup, he

23   could have easily walked down to the trader and told him

24   that.  He could have asked the trader to walk up to his

25   office.  They're all in the same building.

1          This is the acts of someone who acts in good faith,

2     who thinks that his instructions are consistent with

3     contracts, who believes that he is asking, as you heard on

4     the tape, charge a fair markup between AXA, the insurance

5     company.  It was working with another branch of State Street

6     as its advisors, State Street Global Advisors and State

7     Street Global Markets.

8          NTMA, very quickly.

9          THE COURT:  Mr. Weinberg.

10          MR. WEINBERG:  Nine straight proposals that State

11     Street had made and nine straight times they lost.  Pennings

12     asks them, why are we losing.  They tell Mr. Pennings, your

13     fees are too high.  What does Mr. Pennings do?  He lowers the

14     fees and correspondingly increases the trading revenues.  But

15     first, they see whether or not the contract permits the

16     charging of trading revenues.  This is a small slice of a

17     conversation between Pennings and --

18          (Audio plays.)

19          MR. WEINBERG:  Mr. Pennings is saying, make sure

20     the contract doesn't prohibit the taking of spreads, because

21     we're going to have to in the US.  Again, this is realtime,

22     this is December of 2010, this is the time of the NTMA

23     transition.  This is not the time -- this is really 7 years

24     before Pennings cuts his deal with the Government and changes

25     his testimony.

1           This is the time when bankers were looking at

2    contracts and seeing whether or not the spreads were allowed,

3    whether or not the decision not to disclose the exact amount

4    of compensation made by the bank was disclosed.  You'll hear

5    evidence that's industry norms.  Banks don't ordinarily tell

6    clients exactly how much trading revenues they made.

7           Ross McLellan was never part of a coverup, he was

8    never part of any lies to compliance.  The evidence will be

9    that Ross McLellan, with a thousand transitions and a

10   thousand other obligations, didn't have Royal Mail as the

11   center of his life.  But on August 26th, he did.  And you'll

12   hear tapes of his trying to catch up.

13          He asked on that date, Mr. Boomgaardt, send me the

14   contracts, send me the requests for proposal.  I need to take

15   control of something that was off my radar until this day.

16   And you will hear evidence that Ross asks Pennings, is this

17   allowed by -- you're confirming, is this okay and legal and

18   Pennings says yes.  A fee and a spread are okay legally.

19          He asks Pennings, how many times did you charge

20   your fee in a spread?  Four times.  This is a manager putting

21   something squarely at the heart of the radar and the evidence

22   will be that Ross McLellan, when he took over, went to the

23   head of legal, went to the head of compliance, said there

24   were intentional charges.  I understand they would be

25   consistent with contract.  Let's discuss what to do.  This is

1   not the act of somebody that had anything to hide, who was

2   engaged in some concealment conspiracy.

3            The evidence will compellingly show that Mr.

4   McLellan did not knowingly violate the securities law, that

5   he did not knowingly violate the wire fraud law.  That it's

6   not a criminal mistake to trust the wrong person.  The

7   evidence will show that he is not responsible for these

8   European transitions, and to the extent that clients were

9   promised anything by Mr. Pennings that went outside the

10  contracts, which ordinarily govern the relationships between

11  the bank and its clients, that Mr. Pennings alone made

12  promises, a master salesman.  A man who may just believe the

13  end of a sale justifies saying things that Mr. McLellan did

14  not know he said, did not authorize him to say.

15           Mr. McLellan never authorized him to go one inch

16  outside the contracts, to do anything that Mr. McLellan did

17  not fully believe was known to, agreed to, endorsed by the

18  lawyers at State Street.

19           Mr. McLellan has pled not guilty.  We believe the

20  evidence will demonstrate that he is not guilty.  And I will

21  have the honor at the end to ask you, not out of sympathy,

22  but because of the evidence, to return a verdict of not

23  guilty.

24           Thank you very much.

25           THE COURT:  Thank you, Mr. Weinberg.

1            I remind you, ladies and gentlemen of the jury, the

2    opening statements are not evidence, but an outline of what

3    the lawyers expect the evidence to show.  I told you before

4    we are going to take a morning break around 11 o'clock, so

5    we'll take the morning break now, and then we'll resume with

6    the first witness.

7            All rise for the jury.

8            (The jury exits the courtroom.)

9            THE COURT:  Okay.  Stand in recess, come back at 20

10   after, and then once we all assemble, we'll get the jury.

11           MR. WEINBERG:  Thank you.

12           (Court in recess at 11:06 a.m.

13           and reconvened at 11:21 a.m.)

14           THE CLERK:  The McLellan matter is back in session.

15           THE COURT:  Please be seated.

16           (Discussion off the record.)

17           THE COURT:  Counsel, can I see you at sidebar for

18   one minute?

19           (At sidebar on the record.)

20           THE COURT:  So Ms. Simeone talked to number 49's

21   boss; she talked to HR.  HR did not agree to change the

22   policy.  They said he's 50 percent of their -- this category

23   workforce, and at the moment they're out a day diesel

24   mechanic.  So the question is either do I -- I could -- I

25   could to some degree demand more, I could have a hearing,

1    but -- or -- so I invite your suggestions first as to how to

2    proceed.

3              MR. JOHNSTON:  And you have you had experience

4    prevailing on employers before?

5              THE COURT:  I have to be honest, with trying to

6    prevail employers, my greatest experience was a lengthy death

7    penalty trial that I tried two years ago.  And in my

8    experience in that was large employers, certain large

9    employers, like National Grid.  That's why I asked that

10   question.  National Grid, big employers like that will often

11   pay for jury service.  Smaller companies were typically three

12   days because there's a state law in Massachusetts that they

13   have to pay three days but wouldn't pay more than that.  In

14   that case, I just -- everyone agreed, but you couldn't have

15   someone serve three months.

16             MR. FRANK:  Do we know what size employer this is?

17             THE COURT:  I don't -- Maria?

18             MR. FRANK:  They obviously have an HR department.

19             MR. WEINBERG:  Judge, to the extent your Honor

20   exercises discretion to strike him, we have no objection.

21             THE COURT:  What's the name of the company?

22             THE CLERK:  The name of the company is Miller Truck

23   Leasing, and I spoke with Brian Elliott, who referred me to

24   Terry Paulis --

25             THE COURT:  So my experience is there are companies

1    like Mass. General, big employers that do have this policy.

2    I'm not aware of any legal requirement that requires them to

3    pay -- my understanding is they can't punish a person, take

4    away a job.  The issue is the person's paycheck.

5              So that's my limited experience with that.  And --

6    and a sense of fairness in terms of thinking about like is it

7    fair -- I guess the concern I have about having a hearing,

8    making them come in for a hearing, is it seems heavy-handed,

9    and it seems that it's not really fair because they're under

10   no legal obligation to do it.

11             MR. FRANK:  So I agree with that, your Honor, but I

12   also, without knowing how big a company it is and whether

13   it's just an HR person saying this is our policy and we're

14   not going to change it, I'm not sure it wouldn't be worth a

15   phone call.  I suffer from the post-traumatic sense of having

16   lost -- went through the alternates, including losing one on

17   the first day, and then and losing him.

18             As Mr. Weinberg can tell you, I'm not against

19   leaning heavily on people.

20             MR. GOLDSTEIN:  I can attest to that.

21             (Discussion off the record.)

22             THE COURT:  Can the people in the gallery, if you

23   want to have conversations, if you can go outside, because it

24   makes it difficult for the court reporter.

25             (At sidebar on the record.)

```
 1                THE COURT:  So you'd like us to find out how big
 2      the employer is?
 3                MR. FRANK:  I just think it would be worth that
 4      inquiry and make a call from you with a light touch as
 5      opposed -- I'm not suggesting a hearing.
 6                THE COURT:  So why don't you -- I'll call after
 7      1:00; I'll just call the person and see.
 8                And I think at 1:00, I'll update the juror and ask
 9      him to come at least tomorrow.  I'm not sure -- depending on
10      whether I'll connect with the person whoever it was by
11      tomorrow, because that would be his third day.
12                MR. FRANK:  Thank you, your Honor.
13                MR. WEINBERG:  Thank you, Judge.
14                (Discussion off the record.)
15                THE COURT:  Counsel, Ms. Simeone was saying HR is
16      in New Jersey.
17                THE CLERK:  And their owner is located in Illinois.
18                THE COURT:  So maybe it's a reasonably big company.
19                (End of discussion at sidebar.)
20                (Jury entered the courtroom.)
21                THE COURT:  Please be seated.
22                All right.  Counsel, call your first witness.
23                MR. JOHNSTON:  The government calls Rick Boomgaardt
24      to the stand.
25                THE COURT:  The witnesses are sequestered?
```

1          MR. JOHNSTON:  Yes.

2          THE COURT:  So, ladies and gentlemen of the jury,

3    the witnesses will come in from the hallway.  It takes a

4    moment.  And the reason for that is the witnesses don't sit

5    in the courtroom to listen to the testimony of other

6    witnesses.  They just give their own testimony.

7          So, Mr. Boomgaardt, you can go right there to the

8    witness box and remain standing, and Ms. Simeone will

9    administer the oath to you.

10         (The witness was duly sworn.)

11         THE COURT:  Go ahead.

12         You can be seated.

13         THE WITNESS:  Thank you.

14                        **RICHARD BOOMGARDT**

15         having been duly sworn, testified as follows:

16         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

17   BY MR. JOHNSTON:

18   **Q.**  Mr. Boomgaardt, how old are you?

19   **A.**  I'm 45.

20   **Q.**  Where do you live?

21   **A.**  I live just outside London in the UK.

22   **Q.**  Where did you grow up?

23   **A.**  I grew up in Canada.

24   **Q.**  Did you used to work at State Street Bank?

25   **A.**  Yes, I did.

1   **Q.**   From what time period?

2   **A.**   From 2008 to 2012.

3   **Q.**   Where did you work for them?

4   **A.**   In the London office.

5   **Q.**   What was your job there?

6   **A.**   I was the head of the transition management desk for

7   Europe, Middle East, and Africa.

8   **Q.**   What did you do in your job as transition manager?

9   **A.**   I managed a team of project managers, portfolio managers

10  that ran transition projects.

11  **Q.**   Who did you report to in 2010, 2011?

12  **A.**   I reported to Edward Pennings.

13  **Q.**   What was his title?

14  **A.**   He was a senior managing director and head of Portfolio

15  Solutions for Europe, Middle East, and Africa.

16  **Q.**   Who did he report to?

17  **A.**   He reported to Ross McLellan.

18  **Q.**   What was Mr. McLellan's title?

19  **A.**   He was the global head of Portfolio Solutions.

20  **Q.**   Did you commit a crime while working at State Street

21  Bank?

22  **A.**   Yes, I did.

23  **Q.**   What did you do?

24  **A.**   We took hidden commissions from clients, so money that

25  clients weren't expecting to have taken from them.

1    Q.  Do you see anyone in this room that committed that crime

2    with you?

3              MR. WEINBERG:  I object.

4              THE COURT:  What's the objection?

5              MR. WEINBERG:  To a legal conclusion of what is or

6    what is not a crime, your Honor.  We certainly have no

7    objection to his identification of Mr. McLellan.

8              THE COURT:  I'm going to overrule the objection but

9    explain it to the jury.

10             So, ladies and gentlemen, the conclusion as to

11   whether Mr. McLellan committed a crime, that's for you to

12   determine.  That's what this entire case is about.  The

13   government bears the burden of proof about that.

14             So with that context and with that qualification,

15   you can have that question.

16   BY MR. JOHNSTON:

17   Q.  Mr. Boomgaardt, do you see anyone in this room with whom

18   you committed that crime?

19   A.  Yes.

20   Q.  Who is that?

21   A.  Ross McLellan.

22   Q.  Did you plead guilty to a crime in connection with his

23   conduct?

24   A.  I did.

25   Q.  When did you plead guilty?

1    **A.**   Roughly a year ago.

2    **Q.**   What crime did you plead guilty to?

3    **A.**   Conspiracy to defraud.

4    **Q.**   When was your conduct first uncovered by the bank's

5    clients?

6    **A.**   In mid-2011.

7    **Q.**   What happened to your job after the conduct was

8    uncovered?

9    **A.**   Well, eventually I lost my job.

10   **Q.**   Have you worked in finance since?

11   **A.**   No, I haven't.

12   **Q.**   What have you been doing for work?

13   **A.**   I haven't had much paying work.  Most of the stuff I've

14   been doing has been voluntary.

15   **Q.**   I'm going to now ask you some questions about your

16   career.

17            Where did you attend school?

18   **A.**   My first degree was at Queen's University in Canada.

19   **Q.**   What did you study?

20   **A.**   Mathematics.

21   **Q.**   Did you have any additional education?

22   **A.**   Yes, I did a master's degree at Reading University in the

23   UK.

24   **Q.**   What did you study there?

25   **A.**   International securities investment and banking, so

1  finance essentially.

2  **Q.**  Was your first job after graduate school?

3  **A.**  I worked at Goldman Sachs.

4  **Q.**  What did do you at Goldman Sachs?

5  **A.**  I was part of their graduate recruitment class, but I

6  worked in a group called pension services for most time I was

7  there.

8  **Q.**  What did you do in your role at pension services?

9  **A.**  We were a coverage group for pension funds, so we would

10  really talk to them about what their investment needs were

11  and how that might fit in with the products that Goldman

12  Sachs offered.

13  **Q.**  Where did you work for Goldman Sachs?

14  **A.**  In London.

15  **Q.**  When did you leave Goldman Sachs?

16  **A.**  I left Goldman Sachs in 2000.

17  **Q.**  Where did you go after that?

18  **A.**  I went to work for Credit Suisse after that, also in

19  London.

20  **Q.**  What is Credit Suisse?

21  **A.**  It's the investment banking arm of Credit Suisse, so a

22  big Swiss bank.

23  **Q.**  That was also in London?

24  **A.**  That was also in London.

25  **Q.**  What did you do for Credit Suisse?

1    **A.**   I started up their transition management business at

2    Credit Suisse.

3    **Q.**   How long did you work there?

4    **A.**   I was at Credit Suisse for about eight years.

5    **Q.**   And then where did you go after Credit Suisse?

6    **A.**   After Credit Suisse, I went to work for State Street.

7    **Q.**   I want to ask you a few questions about financial

8    concepts.  You stated you worked as a transition manager.

9    Can you explain what one does?

10   **A.**   Surely.  Transition management is really a specialist

11   portfolio restructuring and project management business.

12   **Q.**   And who are your clients in this business?

13   **A.**   Typically pension funds, insurance companies, government

14   wealth funds, but I would say pension funds probably made up

15   the majority of our clients.

16   **Q.**   Can you tell us what a pension fund is?

17   **A.**   Sure.  A pension fund is a fund that is set up by a

18   corporation, government for its employees to pay them their

19   pension upon retirement.  So it's a fund that's set up to

20   fund the future pensions of their employees.

21   **Q.**   What do pension funds invest in?

22   **A.**   Lots of things.  Stocks and bonds predominantly.

23   **Q.**   Who typically manages the investments of a pension fund?

24   **A.**   Pension funds normally hire asset managers to look after

25   those pension funds.  So the likes of Fidelity, Putnam, and

1    State Street Global Advisors.  There's lots of asset managers

2    that provide services to pension funds in that way.

3    Q.  So if pension funds have asset managers, when would they

4    need a transition manager?

5    A.  Most often we got involved when they decided to change

6    those asset managers, so if they were looking to hire a

7    different portfolio manager, a different asset manager from

8    the one they have now.  And really, it's the transition

9    manager's job to take the portfolio from what it looks like

10   to what that new asset manager would like it to be.  And

11   quite simply, that involves selling the things that the new

12   asset manager doesn't want to hold and buying the things that

13   they do want to hold that weren't currently in the portfolio.

14   Q.  What are the things that you buy and sell?

15   A.  Predominantly stocks and bonds.

16   Q.  How are transition managers compensated?

17   A.  Generally speaking, we were compensated on a commission

18   basis, so on a per-transaction commission for what we were

19   trading.

20   Q.  So each purchase or sale of the stock and bond, you'd

21   earn a commission?

22   A.  That was the typical charging structure we used, yeah.

23   Q.  How was the performance of a transition manager

24   evaluated, whether they've done a good or bad job?

25   A.  It is evaluated across, I guess, a couple of different

1   ways.  One is kind of how operationally smooth everything
2   went.  But from a numbers perspective, it's a concept called
3   "implementation shortfall," which really captures all of the
4   costs of moving that portfolio from one place to another.
5   **Q.**  You used this term "implementation shortfall."  Is that
6   the -- when you say the total costs of a transition?
7   **A.**  Yes.  It captures all the costs of the transition.
8   That's what it's designed to do.
9   **Q.**  What is sort of a common way of understanding what that
10  concept means?
11  **A.**  Well, the concept really is a -- it assumes that in a
12  perfect world you could just snap your fingers and you would
13  be out of the portfolio that you didn't want to be in anymore
14  and into the portfolio that you'd like to be in.  And we then
15  track what happens with the actual portfolio relative to that
16  benchmark of having been able to snap your fingers.
17          Obviously in the real world you can't just snap
18  your fingers.  You have to actually do some trading to get
19  from one place to another, and that can take some time.  So
20  that really captures all of the costs that the fund has
21  incurred by making those changes.
22  **Q.**  So the gap where the fund ends up and this theoretical
23  benchmark is the implementation shortfall?
24  **A.**  That's right.  That's the simplest way to think about it.
25  **Q.**  What are the largest components of this implementation

1   shortfall?

2   **A.**   You can divide it up in a few ways.  There's a direct

3   cost component, if you like, the things that are easy to

4   quantify.  And in that, you have things like exchange, taxes

5   and fees, and also the commissions that we would charge.

6   **Q.**   So you call those direct costs?

7   **A.**   Yeah, direct, explicit.  They're easy to quantify.

8   **Q.**   And what are the indirect costs of a transition?

9   **A.**   So the indirect costs, again, there are a few.  One is if

10  you look at a stock market quotation, for instance, you'll

11  see two prices for a stock: one, a price where you can buy;

12  and one, a price where you can sell.

13         And the difference between those two things is

14  called the "bid-ask spread."  So in theory, the fair price of

15  that asset is right in the middle.  But because you're buying

16  or selling it, you're dealing it at one price or the other.

17  So there's a little bit of slippage in there.

18         The second one is --

19  **Q.**   If I may pause you for a second.

20         When you use the word "slippage," what do you mean?

21  **A.**   A cost.

22  **Q.**   So there's a cost to just trading in the market?

23  **A.**   Absolutely, yeah.

24  **Q.**   And what's the second category you were going into?

25  **A.**   The second one is simply by being in the market and

1    trading, you are either -- you are affecting the supply and

2    demand of the things that you're buying.

3            If you're in the market buying something, you're

4    putting demand into the market; if you're selling something,

5    you are putting supply into the market.  And the simple laws

6    of supply and demand mean that that tends to move the price.

7            In the business, we call that "market impacting."

8    So you're impacting the market you're trading in simply by

9    putting your own trades in because you are affecting that

10   supply and demand balance.

11   **Q.**  And why, in particular, is that an issue with pension

12   funds who are transitioning?

13   **A.**  Well, it's -- I guess it's an issue for all of the funds,

14   anybody that's doing it.  It's a real cost, and it is because

15   of the size of the transitions that we're doing.  We can be

16   talking about putting a lot of supply or demand when we're

17   talking of trades that are hundreds of millions and billions

18   of dollars in size.  Those really can have an impact on the

19   market if they're not managed correctly.

20   **Q.**  So what you're saying is if you're selling a billion

21   dollars of a certain stock, obviously the price would fall

22   for that stock?

23   **A.**  Yes, all other things being equal.  You're putting quite

24   a lot of supply into the market there, yeah.

25   **Q.**  Which parts of this implementation shortfall are merely

1    estimates before the transition actually occurs?

2    **A.**   Sure.  I guess the last part, I should finish off the

3    implementation shortfall piece.

4              The last bit is when you're trading, it takes some

5    time to finish trading a portfolio of that size.  You can't

6    do all of the trades at exactly the same time.  You know,

7    markets aren't open at the same time, the Far Eastern markets

8    aren't open at the same time as the U.S. market is, for

9    instance.

10             But while all the trading is going on, there is

11   other news that's coming into the market.  Companies are

12   releasing earnings, there are terrorist events, there are

13   earthquakes that are going on, and all of those things also

14   affect the prices in the market.

15             Now, you can't do much about that, but it still is

16   a cost to the fund and a risk to the fund of not being in the

17   portfolio that you'd like to be in.  And really, that part we

18   call the "opportunity cost."  And that can be -- that could

19   go in the favor of the fund or it could be a cost, but

20   it's -- it is another potential area of cost for the fund.

21   **Q.**   So which of these categories are merely estimates before

22   buying and selling begins?

23   **A.**   The bid-ask spread is an estimate, although we can get a

24   pretty good estimate on that because we've got quite good

25   data for where those trade.

1          The market impact is also an estimate.  That's a

2     quantitative model that we use to come up with what the

3     market impact costs, what we estimate the market impact cost

4     based on things like how much of an average day's trading are

5     we needing to trade for this.

6          And then the opportunity cost is also an estimate.

7     And we assume that the markets aren't going to go for or

8     against the client, but we then give them a range and say

9     kind of two-thirds of the time you would expect your

10    opportunity costs to be between sort of this side on the good

11    and this side on the bad.

12    **Q.**  So fair to say there's a lot of uncertainty in the

13    transition business?

14    **A.**  Yeah, yeah.

15    **Q.**  Which part of the implementation shortfall can be known

16    to a fairly good degree in advance?

17    **A.**  The commissions, the direct bid.  The commissions and

18    taxes and fees can be known fairly directly.

19    **Q.**  And why can they be known?

20    **A.**  Because we've got a very good idea of how much we're

21    going to need to trade.  And we know what the commission

22    rates are, we know what the taxes and fees rates are in the

23    various different markets, so we can come up with a pretty

24    accurate estimate of what that's going to be.

25    **Q.**  Are they agreed upon in advance?

1    **A.**   Yeah.   The taxes and fees, there's nothing we can do;

2    that's not negotiated, but that's set by the exchanges and

3    countries themselves.   Yes, generally the commissions are set

4    and agreed and set out in the legal agreement that's in place

5    between the transition manager and the client.

6    **Q.**   So taxes, fees, and commissions are really the only parts

7    of this cost that can be known in advance prior to beginning

8    selling?

9    **A.**   Yeah, the rest are estimates.

10   **Q.**   I want to direct your attention to the beginning of 2010.

11   Could you give us a sense of what the competitive environment

12   was like for the London transition business that you were a

13   part of?

14   **A.**   Yeah, sure.   I mean, it's -- I guess -- in order to

15   answer that, I need to probably step back a little bit and

16   talk a bit about coming out of the credit crunch and how 2009

17   was.

18          We had seen a few things in the transition

19   management market at the back of the credit crunch.   Part of

20   that was we saw some of the investment banks pull away a

21   little bit from the transition management business --

22   **Q.**   Who were the investment banks that you're referring to?

23   **A.**   We had seen -- well, for instance, where I used to work

24   at Credit Suisse had shrunk the size of their transition

25   management offering.   So that was a good example of banks

1    sort of retrenching a little bit.

2         We also saw through 2008 and maybe a little bit of

3    early 2009 that clients weren't really so keen to do a big

4    restructuring because the markets they felt were a bit

5    dislocated, that they weren't trading the way they normally

6    do, and they were afraid that making a big shift in those

7    markets was probably going to be more expensive than if they

8    waited for a while.

9         So we had at that period a series of kind of

10   pent-up demand, if you like, people who wanted to do

11   transitions but hadn't done them yet.  And a little bit less

12   competition than we used to have, which meant that State

13   Street in 2009 in Europe was in a good place to have a very

14   good year, which we did.  We had, I think, our best revenue

15   year that we had had in 2009.

16        So going into 2010, we saw some of those

17   competitors coming back into the market, being a little bit

18   more aggressive on their commission quotes.  And also, of

19   course, that pent-up demand of transitions wasn't there

20   anymore.  It was getting back to sort of more normal market

21   conditions for us in our business.

22   **Q.**  And what effect, if any, did this have on your

23   competition?

24   **A.**  Well, there was more competition around.  So it was -- it

25   certainly felt like we were starting to lose business that we

1    had won in 2009 because other competitors were being more

2    aggressive, particularly with their commission quotes.

3    **Q.**   Who were your main competitors in this time period, early

4    2010?

5    **A.**   Transition management is a bit of a funny business in

6    that way.  We compete with some of the custody banks, like

7    Northern Trust and Bank of New York.

8           We also compete with some of the asset managers in

9    the UK.  That was kind of Legal & General and BlackRock.  And

10   also some of the investment banks, so Citibank, Nomura,

11   Goldman Sachs, Morgan Stanley.

12   **Q.**   Was there any difference between State Street's business

13   model at this time and the investment bank's business model?

14   **A.**   State Street structurally is a bit different than the

15   investment banks.  So yes.

16          Our transition management business was set up in

17   kind of the broker-dealer part of State Street, but different

18   than an investment bank's broker-dealer in that we didn't

19   really have any principal business.  We weren't a

20   market-making business where we were actively quoting prices

21   in equities and bonds.  We had what we call an agency model,

22   where we're acting on the client's behalf to go out and

23   trade.

24   **Q.**   How does an agent compare to a principal in this type of

25   market?

1          MR. WEINBERG:  If your Honor please, we object,

2     702.  It's not been marked under 702.  I think this is beyond

3     701.

4          MR. JOHNSTON:  He's testifying from his personal

5     experience in decades in the industry.

6          THE COURT:  So you cite 702?

7          MR. JOHNSTON:  He's testifying based on his

8     understanding of what these terms mean in the industry that

9     he worked in for over 15 years.

10          (Discussion off the record.)

11          THE COURT:  So he can explain what it meant to him

12     and how he used those terms.

13          What we're discussing, ladies and gentlemen, is

14     whether he's an expert and can offer expert testimony.  Here,

15     he can explain to you what "agent" meant to him and his work

16     at State Street during the relevant time and how he used the

17     term and how he understood it.

18          Go ahead.

19     BY MR. JOHNSTON:

20     **Q.**  Can you explain to us what you understood the term

21     "agent" to mean compared to the term "principal"?

22     **A.**  Sure.  I guess -- the way I like to think of it, I guess,

23     is a principal is sort of like somebody who owns a used car

24     lot.  If you're looking to buy a car, you can go directly to

25     a used car lot and they will sell you a car or buy your car

1    from you.

2              Alternatively, you can employ an agent whose job it

3    is to go to all of the various used car lots and find the

4    best price for you for either the car you want to buy or the

5    car that you are selling.

6              An agent will charge you a fee, like the commission

7    that we would charge in transition management for going

8    around and doing that work for you in finding the best price

9    for whatever it was that you wanted to buy or sell.  That's

10   probably the -- I guess the easiest analogy in my view.

11   **Q.**  And in your understanding, how did the way an agent make

12   money differ from the way a principal make money?

13   **A.**  An agent would charge you a commission for providing that

14   service for you.  They would agree to the price with the used

15   car lot to buy or sell your car, and you would pay that price

16   plus the commission that the agent was going to charge you.

17             On a used car lot, you would negotiate with that

18   used car lot and for a purchase price.  What you wouldn't

19   know is how much money the principal made because he may

20   have -- if you were buying a car, he may have bought that car

21   three years ago.  He may have bought it for $50 and sold it

22   to you for $100.  All you know is you've agreed to buy that

23   car for $100.

24   **Q.**  So when were you acting as an agent at State Street, what

25   was your understanding as to the role you had for your

1    client?

2    **A.**   Our role was to go and find the best execution for the

3    client, given the nature of the trades that we had to do.  We

4    were acting in the client's best interest to go and find them

5    the best -- the best price so that we could deliver the

6    lowest cost for them.

7    **Q.**   And when you're a principal, whose interest are you

8    looking out for?

9    **A.**   There's a conflict there.  Because if you're on the used

10   car lot, you've got an incentive to try to sell that car for

11   as much as you can to make your profit as big as possible.

12          So where you're acting as principal in that

13   scenario, it's difficult, there's certainly a conflict to

14   manage there between giving the client the best price and

15   maximizing your own profits on your lot.

16   **Q.**   Did you see both types of models in the transition

17   business at this time?

18   **A.**   Yeah.  Yeah, we did.

19   **Q.**   And to your understanding, why would a client want a

20   principal model?

21          MR. WEINBERG:  I object.

22          THE COURT:  What's the objection?

23          MR. WEINBERG:  An expert may be able to tell us why

24   a client would want something, but he's not the client.  He's

25   on the other side of these business transactions.

1          MR. JOHNSTON:  He understands the industry and has

2     to know the competition and how to distinguish his business

3     from the competitor's business and how he interacts with

4     clients.  So he can testify to what his understanding of why

5     his model was different and perhaps more advantageous than

6     the principal model.

7          MR. WEINBERG:  I would contend he can testify to

8     certain clients and certain transitions, ones that are

9     relevant, but not just some global understanding of clients

10    in general.  That's the province of an expert, your Honor.

11         THE COURT:  He can testify to how it affected him

12    with specific clients and how it affected him in specific

13    things he did, but not globally about the industry.

14    BY MR. JOHNSTON:

15    **Q.**  When you spoke to clients about State Street's model, how

16    would you distinguish what you did between what a

17    principal-based model would do?

18         MR. WEINBERG:  It's irrelevant unless it's dealing

19    with the clients that are subject matter of this case rather

20    than clients in different years in different transitions

21    under different circumstances.

22         MR. JOHNSTON:  Your Honor, if I may?

23         THE COURT:  Yes.

24         MR. JOHNSTON:  Part of what needs to be -- the

25    foundation needs to be laid is that the witness understood

1    the industry at the time.  And so he's working on dozens of

2    transitions every year, so to have him be able to testify as

3    to what certain terms meant for a particular client, he needs

4    to be able to --

5              THE COURT:  Limited to the particular client.  He

6    can talk about his work generally, but not -- unless he's

7    disclosed as an expert, not generally as an expert about the

8    industry.

9              MR. JOHNSTON:  Understood, your Honor.

10   BY MR. JOHNSTON:

11   **Q.**  When you would distinguish State Street's model to

12   clients in the 2010 time period, how would you do that

13   compared to the principal model?

14   **A.**  First and foremost, we would say that our model was an

15   agency model.  And that eliminated that conflict of interest

16   between effectively dealing with our own used car lot.  So we

17   would make a big point of saying that we don't have that

18   conflict so we don't have to manage it.

19              The easiest way to manage that conflict is to not

20   have it, by using the agency route.  There were still clients

21   who liked to -- preferred to go down the principal route, but

22   our pitch was we think the right model is to be the client's

23   fiduciary and act as an agent.

24   **Q.**  And what was your understanding of why some clients

25   didn't prefer State Street's model?

**A.**   Generally the biggest reason that I saw, certainly for
clients choosing the principal route, was immediacy.

It does take some time, again, going back to the
used car lot analogy, to go to all those used car lots to
find the car you want.  If you go to just one, it might not
be exactly the car you want but it's close enough, you're
done.

If you thought the price of cars was going to
change a lot in the very near future, what you wanted to do
was just get the car now, then some of them would go down
that principal route in order to try and get things done more
quickly.

**Q.**   And what was your understanding of who bore the risk in
an agency model?

**A.**   Well, in an --

MR. WEINBERG:  I object, again, Judge.  This is
squarely within 702.

THE COURT:  Sustained just as to the form.

BY MR. JOHNSTON:

**Q.**   Would you -- did you ever have discussions with clients
about who would bear risk and how that risk could be
minimized by using one model over the other?

**A.**   Yes, we did.

**Q.**   And what would you tell them?

**A.**   That in an agency model, the risk of the market moving

1    around, so that opportunity cost element of the shortfall

2    that I spoke about earlier, that is born by the client.  That

3    risk is theirs.

4         In a principal execution, that is born by the

5    principal.  So, again, if you go to a used car lot and they

6    agree to buy your car from you, they then have the risk of

7    being able to sell that car for more money.  It might be that

8    they sell it for less money and they have a loss.  That's the

9    risk transference that happens in a principal.

10        For agency, that risk lies with the client; and in

11   the principal model, that would lie with the principal.

12        MR. WEINBERG:  Judge, I don't want to interfere.

13   May I have an objection, a motion to strike, and may I make

14   it at the recess, the 702 objections?

15        THE COURT:  Yes.

16        MR. WEINBERG:  The witness has not been identified

17   under that rule, and this is beyond --

18        THE COURT:  You can have that.

19        MR. WEINBERG:  Thank you, sir.

20   BY MR. JOHNSTON:

21   Q.  I'd like to ask you a few more questions.

22        When you were at Credit Suisse, how many years did

23   you work there in the transition management business?

24   A.  For eight years.

25   Q.  And how often did you interact with clients during those

1    years?

2    **A.**   We were doing on average, I guess, 20 or so a year at

3    Credit Suisse.  Actual transitions, but interacting with

4    clients kind of all the time, part of the marketing of the

5    business.

6    **Q.**   What was Credit Suisse's model?

7    **A.**   It was an investment bank.  We used an agency model, but

8    Credit Suisse did have its own used car lot as well, I guess.

9    It was one of the ones that we could trade with our own

10   broker or we could trade in a purely agency way.

11   **Q.**   Is that a hybrid between what you did at State Street and

12   what you refer to as your principal competitors?

13   **A.**   Yes, I guess in some way.  Credit Suisse did have the

14   ability to do principal trading in equities and bonds in a

15   way that State Street didn't.

16   **Q.**   So what did that mean for what you did as a transition

17   manager there?

18   **A.**   Well, from a project manager --

19              MR. WEINBERG:  I object, your Honor.

20              Excuse me, Mr. Boomgaardt.

21              THE COURT:  What's the objection?

22              MR. WEINBERG:  Relevance.

23              THE COURT:  Overruled.

24              MR. JOHNSTON:  The question --

25              MR. WEINBERG:  Again, the same objection.  He's not

1    been noticed as an expert, his background has not been --

2          THE COURT:  He's just describing, at least as to

3    this question, as to what he actually did.

4          MR. WEINBERG:  For Credit Suisse, years before.

5          THE COURT:  Yes, that's the relevance I overruled.

6          MR. WEINBERG:  Okay.

7          THE COURT:  Go ahead.

8          You can answer the question.

9    BY MR. JOHNSTON:

10   **Q.**  The question, Mr. Boomgaardt, was, when you were at

11   Credit Suisse, how did the presence of, as you say, a used

12   car lot at Credit Suisse affect what you did as a transition

13   manager at Credit Suisse?

14   **A.**  From the project management element of it, it didn't make

15   too much difference.  But it did -- we actively looked to

16   find ways to manage that conflict, and to the point where we

17   actually outsourced our bond dealing rather than doing it all

18   with Credit Suisse's bond desk.  We actually used the asset

19   management desk so that we could access more counterparts in

20   the market, different used car lots rather than just the one

21   internally.

22   **Q.**  While you were at Credit Suisse, what was the conflict

23   that you faced as a transition manager?

24   **A.**  It's the conflict between how much do we trade with our

25   own business internally, so our own used car lot, and how

1    much do we go outside.  And we would treat that used car lot

2    as just one of the counterparties that we would look at.  If

3    we had the best price and that happened to be internally at

4    Credit Suisse, then fine.  But there is -- it is a conflict

5    to manage.

6    **Q.**  Did you approach what you did for your clients any

7    differently when were you at Credit Suisse than when you were

8    at State Street a few years later?

9    **A.**  Not markedly, no.  It was essentially a similar product.

10   And what we were trying do at the end of the day was deliver

11   that -- manage the risks and deliver as small an

12   implementation shortfall as we could.

13   **Q.**  When you were at State Street, did you face the same

14   conflict that you did when you were at Credit Suisse?

15   **A.**  No.  State Street didn't have a principal bond trading

16   business or to do principal trading in stocks either.

17   **Q.**  Was that something that you highlighted to clients?

18   **A.**  Yes, absolutely.

19   **Q.**  How in general did State Street in this time period

20   communicate these differences to clients?

21   **A.**  Well, it was partially the job of the sales team to go

22   out and talk to prospective clients about it.  But also we

23   would often get asked to prepare proposals and things for

24   specific transactions, and in that, we would make sure that

25   they realized that -- how the way we did it was, we viewed,

1    different than others and what our selling points were.

2    **Q.**   When you arrived at State Street in 2008, was there

3    already language for you about how to convey State Street's

4    model to clients?

5    **A.**   Yeah.  State Street was already the biggest transition

6    manager in the world before I started working there, so the

7    selling points and how the business was set up was done years

8    before I ever started working there.

9    **Q.**   Did the way State Street's transition business presented

10   itself to clients change at all from when you started in 2008

11   to 2010?

12   **A.**   Not to my knowledge, no.

13   **Q.**   How would you describe how you generally represented

14   yourself to clients in this time period?

15   **A.**   As an agent and a fiduciary, so working on their behalf.

16   **Q.**   Could you say what it means to be a fiduciary, in your

17   understanding?

18   **A.**   Sure.  A fiduciary in the way that we were using it in

19   those proposals was somebody who was acting in the client's

20   best interest and putting the client's interest ahead of our

21   own.

22   **Q.**   Do you know whether the way you portrayed the London

23   transition business differed from the way the American or the

24   Asian transition business at State Street presented itself?

25   **A.**   We were pretty common across the globe, but I wasn't

1  party to writing proposals for the U.S. teams or the -- or

2  our Asian counterparts.

3  **Q.**  Did anyone in Asia or America say things to you to make

4  you think they were doing things differently over there?

5          MR. WEINBERG:  Object.

6          THE COURT:  Overruled.

7  **A.**  No, no.

8  **Q.**  And who is the global head of all these transition

9  management businesses at State Street?

10 **A.**  Ross McLellan was.

11 **Q.**  Now, you stated that -- you testified that one of the

12 things you did at State Street was highlight the advantages

13 of a conflict-free model to the clients; is that right?

14 **A.**  Yes.

15 **Q.**  Did highlighting these advantages ensure you got all the

16 business you wanted?

17 **A.**  No, no, no.  It was a competitive environment,

18 unfortunately.  No, we didn't win everything.

19 **Q.**  And in your experience at this time, what did a lot of

20 clients focus on?

21 **A.**  A lot of clients were focused on those direct costs,

22 particularly the commission charges that transition managers

23 proposed to do these.

24 **Q.**  Did they care about the implicit costs that you talked

25 about, the opportunity costs, the market costs?

1    **A.**   Of course they cared about them.  And they needed to

2    understand what the strategy was for managing those, the

3    risks of those costs, but they're not things that you can

4    negotiate.

5           What they negotiated on was commissions.  That was

6    the -- that was a big differentiator for winning and losing

7    business.

8    **Q.**   Did they negotiate on any other terms other than

9    commission, to your knowledge?

10   **A.**   Not usually, no.  It was normal to have a debate and a

11   negotiation around commission.

12   **Q.**   You testified earlier that State Street's normal way --

13   or maybe you just said transition manager's normal way of

14   compensation was commission; is that correct?

15   **A.**   Yeah.

16   **Q.**   Was this any different at State Street from, say, Credit

17   Suisse where you worked?

18   **A.**   No.  At Credit Suisse as well we normally got paid by

19   per-transaction commissions.

20   **Q.**   Was that the same for bonds as well as stocks?

21   **A.**   It was at Credit Suisse, particularly once we moved to

22   the sort of asset management way of dealing, although a lot

23   of times when we were dealing -- there was also flat fees

24   involved where people -- clients for lots of different

25   reasons instead of having a per-transaction charge would want

1    to be invoiced afterwards for -- and have that cost separate

2    rather than having it as a per-transaction charge.

3    **Q.**   Would the flat fees be in addition to the commission

4    charges?

5    **A.**   No, no.  Usually instead of.  That was the way -- we

6    generally didn't mind whether it was coming as a commission

7    or as a flat fee, but our method for figuring out what that

8    flat fee would be was starting with how much we thought the

9    commission would be if we were charging in the normal way.

10   **Q.**   Whether charged as a flat fee or a commission, was this

11   something that you made up as you went or agreed upon in

12   advance?

13   **A.**   It was agreed with the client in advance.  As I said, it

14   was part of the negotiation.

15   **Q.**   Are there other terms that are used for commissions in

16   the bond market when you were working there?

17   **A.**   Yeah.  You would hear -- you would hear "spreads" and you

18   would hear "mark ups" and "markdowns."  Both of those in

19   bonds were really synonymous with "commissions."  They just

20   describe the mechanic of how we took that commission, I

21   guess, in a bond, where if we executed it, we would add or

22   subtract or mark up or markdown our spread, if you like, and

23   then book that net price out to the client.  It's just -- it

24   describes the mechanism for charging the commission.

25   **Q.**   When you booked bond trades, did the markup or markdown

1  or spread, was that broken out separately?

2  **A.**  Not generally, no.

3  **Q.**  What about for equities?  Was that the case for equities?

4  **A.**  Equities, generally commissions would be shown

5  separately, both in the reporting that we did and the

6  reporting that went to the client via their custodian.

7  **Q.**  Before 2010 at State Street, had you ever charged flat

8  fees?

9  **A.**  Yes, probably.  It was becoming more prevalent in 2010

10  certainly.

11  **Q.**  How common was it compared to commissions?

12  **A.**  Oh, vast majority are commissions.  So if we were doing

13  100 trades a year, maybe five or ten of them might have been

14  flat fees.  That sort of -- most of them would be on

15  commission.

16  **Q.**  I now want to direct your attention to the revenue

17  expectations at State Street in the early 2010 time.

18         Were you aware of the revenue targets at State

19  Street then?

20  **A.**  I was for our business, yup.

21  **Q.**  How did they compare year to year?

22  **A.**  Well, as I said, we had a very good year in 2009, so our

23  revenue -- the revenue expectations that were set for us were

24  for growth on that 2009 revenue.  So --

25  **Q.**  How much growth was expected?

1   **A.**   I can't remember exactly the numbers, but it was in the

2   order of 10 or 20 percent, I think.  But it's -- it was

3   certainly a significant increase on what had already been the

4   best year we had had.

5   **Q.**   Did you think that that target was reasonable?

6   **A.**   I thought it was going to be difficult.  I thought,

7   again, for the reasons I said, 2009 had been a bit of a

8   perfect storm for us.  We had done really, really well.  It

9   was going to be difficult to sustain that, given the market

10   pressures that I described earlier.  It was going to be

11   difficult.

12   **Q.**   Do you know who set the revenue goals at State Street at

13   this time?

14   **A.**   I don't know if there was a single person that set the

15   goals.  I guess my understanding of the way that it worked is

16   it came from the top at a corporate level, divided into the

17   various different business units, and filtered down through

18   the management to the individual regions inside those units.

19          So in our case, I heard that budget from Ed

20   Pennings who in turn got it from Ross McLellan.  How it got

21   broken up above that, I don't know.

22   **Q.**   What role did the transition management desk in London,

23   what role did its revenue play in the portfolio group's

24   revenue?

25   **A.**   The European business was important, but it was small in

1    comparison to what was being done in Boston.  And Portfolio

2    Solutions as well overall was a fairly small business unit

3    inside what State Street was doing as a whole.

4    **Q.**  To your knowledge, what were State Street's largest

5    business units?

6    **A.**  Well, asset management and custody were both bigger than

7    even inside global markets.  In global markets, you had

8    securities, finance, foreign exchange, and Portfolio

9    Solutions.

10          Both those other two businesses were bigger than

11   Portfolio Solutions was, by quite some way, I believe.

12   **Q.**  Do you have any idea of how much larger the two

13   businesses were than Portfolio Solutions?

14   **A.**  I can't recall.

15   **Q.**  Did your business have anything to do with custody or

16   asset management?

17   **A.**  We talked to a lot of the same clients.  So, yes, we did

18   interact with them a lot, but it wasn't a -- those weren't

19   locked in.  They were, I guess, sources of leads for our kind

20   of business.

21   **Q.**  Do you know whether at this time in 2010 meeting revenue

22   targets affected compensation for you and your team?

23   **A.**  That was the understanding of everybody, that if you met

24   your revenue targets or exceeded your revenue targets,

25   certainly that was -- that was to be considered a very good

1    thing for your year-end compensation.  And if you -- if you

2    didn't meet those goals, then that's, all things being equal,

3    a negative.

4    **Q.**  What about promotion?

5    **A.**  Same thing for promotion.  If you want to -- it's always

6    good to be in a business unit that's perceived to be doing

7    well, and part of that is exceeding your revenue targets.

8    **Q.**  In the transition management business at State Street,

9    what percentage of your overall compensation would be in the

10   form of an end-of-the-year bonus?

11   **A.**  It really depends on what your seniority is in the bank,

12   I guess.  You know, for me certainly it was -- it was about

13   50-50, in that kind of range.  So 50 percent salary and

14   50 percent year-end bonus.

15   **Q.**  And did that go up or down as you were promoted?

16   **A.**  Your bonus became the bigger part of your salary the more

17   senior you became.

18   **Q.**  And consequently more affected by revenue targets?

19   **A.**  Yes, yeah.

20   **Q.**  I'd like to show you an e-mail that's been marked as

21   Government Exhibit 15 that's not been admitted into evidence.

22            MR. JOHNSTON:  If we could just show it on the

23   witness' monitor.  If we can zoom in on the top, please.

24   **Q.**  You recognize this e-mail --

25   **A.**  I can't see it yet.

 1              THE COURT:  Is that on your monitor?

 2              THE WITNESS:  It's not.

 3              THE COURT:  Now?

 4              THE WITNESS:  No.

 5              Now it is, yes.

 6              THE COURT:  Okay.

 7              You can't see it, not yet.  It's not in evidence.

 8    BY MR. JOHNSTON:

 9    **Q.**  Do you recognize this document, Mr. Boomgaardt?

10    **A.**  Yes, I do.

11    **Q.**  And what is it?

12    **A.**  It's an e-mail from Ross McLellan to the global Portfolio

13    Solutions Group.

14    **Q.**  And what's it dated?

15    **A.**  It's dated March 22, 2010.

16    **Q.**  And what's the subject line?

17    **A.**  Year-to-date update.

18              MR. JOHNSTON:  Your Honor, at this time, the

19    government moves Exhibit 15 into evidence.

20              MR. WEINBERG:  No objection.

21              THE COURT:  Admitted.

22              (Exhibit No. 15 admitted into evidence.)

23              THE COURT:  Now you should be able to see it.

24              MR. JOHNSTON:  Can you please highlight the "From"

25    field and the third name on the "To" field?

1    BY MR. JOHNSTON:

2    **Q.**   Did you receive this e-mail, Mr. Boomgaardt?

3    **A.**   Yes, I did.  I'm one of the recipients.

4            MR. JOHNSTON:  Can we zoom in to the text on the

5    first line, first paragraph of this e-mail?

6    **Q.**   I want to direct your attention to where it says, "It has

7    been a challenging start of the year for Portfolio Solutions,

8    although there are strong signs that the year is turning and

9    that it is extremely important that we do so.  While we will

10   not meet our first-quarter financial goals, we have committed

11   to meeting our budgeted goals for the rest of the year.  We

12   certainly do not want to forecast down further as this will

13   not bode well for us such in areas as compensation and

14   promotions later in the year."

15           Mr. Boomgaardt, what did you understand

16   Mr. McLellan to be saying in this e-mail?

17   **A.**   That it hadn't been a great start to the year for us.  We

18   hadn't met our quarterly budgets and, you know, we need to do

19   better for the rest of the year or it will negatively impact

20   compensation and the prospects for promotion.

21   **Q.**   And this is March of 2010; is that correct?

22   **A.**   Correct.

23   **Q.**   And who are the -- did you notice when we looked at the

24   recipient field, who were all the individuals who received

25   this e-mail?

1    **A.**   It was people from the global Portfolio Solutions team.

2    **Q.**   So transition managers from all around the world?

3    **A.**   Yes.

4          MR. JOHNSTON:   You can take this down.

5    **Q.**   In light of the revenue challenges in early 2010, were

6    there discussions in the London office about how to face

7    these challenges?

8    **A.**   Yeah, we had regular European management meetings,

9    generally on a Friday, to discuss all bits of the business,

10   what we were doing well, what needed to go better, and any

11   ideas we had from increasing revenues.

12   **Q.**   Who were part of those discussions?

13   **A.**   Generally they were in Ed Pennings' office, so Ed would

14   chair them.   That European management committee would be

15   myself, Paul McGee, and Ian Holden.

16   **Q.**   Who is Ian Holden?

17   **A.**   Ian Holden was our head of trading for our Portfolio

18   Solutions Group in London.

19   **Q.**   Where did he sit physically compared to you?

20   **A.**   He sat right behind me, so our desks were almost back to

21   back.

22   **Q.**   What about Paul McGee?   Who was he?

23   **A.**   Paul McGee ran our interim asset management system.   So

24   sometimes clients would know which asset manager they didn't

25   like anymore but they didn't know who they wanted to hire

yet.  And we had a sort of side business that would allow clients to give us those assets, and we would manage them for a little while until they knew which asset manager they eventually wanted to hire.

So obviously very -- and we would manage them on a -- generally match the index or manage them on a passive basis.  But that meant a transition from where they were to this passive portfolio and then another one from the passive portfolio to wherever they'd like to be.  So very much interwoven with our transition management business.

**Q.**  So the main management team in London was you, Ed Pennings, Ian Holden, and Paul McGee?

**A.**  Yes.

**Q.**  And these were the meetings that happened every Friday?

**A.**  Yeah, pretty much every Friday.  It was --

**Q.**  Did anybody who was not based in London ever participate in these meetings?

**A.**  Ross would if he was around, but that was, at most, a few times a year.

**Q.**  What about over the phone?

**A.**  Generally not.  Occasionally I guess, but generally not. It was usually our management team in London.

**Q.**  How would you generally receive your instructions from Boston?  How were they communicated to you?

**A.**  Generally they would come via Ed Pennings.

1    **Q.**  And what would he tell you?

2    **A.**  He would tell what had been relayed to him from Ross

3    McLellan.

4            My interactions directly with Ross were periodic.

5    I didn't speak to him on a daily basis.  It was -- you know,

6    the instructions were relayed down the chain of command from

7    Ross to Ed to his management team.

8    **Q.**  What was discussed in these management meetings in London

9    in early 2010?

10   **A.**  What our pipeline of deals looked like, where the

11   business was going to come from, market trends, ways that we

12   could evolve our business, you know, better reporting, and

13   also ways that we can increase our revenue and how do we meet

14   that competition that we're feeling in the market for --

15   particularly for lower commissions.

16   **Q.**  Was there anything about State Street's model at the time

17   that made it difficult for you to increase your revenue?

18   **A.**  Yeah.  Generally speaking, the amount of trading that

19   comes from transitions was in some ways worth more to an

20   investment bank broker-dealer type of business.  They have

21   lots and lots of other clients; they're not just transition

22   management business to rely on.

23           And transitions gave them a great excuse to go and

24   talk to lots of those other clients, to say, actually:

25   Listen, we've got a lot of trading going out on the desk

1    today.  So if you're thinking of doing any trading, we're

2    going to be a great call for you guys to come and do that

3    trading.

4              So they could generate ancillary commission

5    revenue, extra commission revenue, by dealing with some of

6    their other clients.

7              State Street Portfolio Solutions business was

8    really -- the trading was really dominated by transition

9    management, so we didn't have that source of extra money,

10   really.

11   **Q.**  And you said that -- you testified earlier that the

12   absence of these other businesses was one of the things you

13   highlighted to clients.

14   **A.**  Yeah, yup.

15   **Q.**  But is it your testimony that that -- the absence of

16   these other businesses also made it difficult for you to

17   compete?

18   **A.**  Yeah, it affected the economics of those trades.

19   So there were people who could -- given the exact same

20   transition that we had because they had set themselves up

21   differently, could make money in different ways than we

22   could.  So they could do it and quote the client a lower

23   upfront commission than we could.

24   **Q.**  Could you summarize in your own words what was State

25   Street's model in early 2010?

1     **A.**   It was the same as it had always been.  We were an agent.

2     We were acting in a fiduciary capacity, so nothing had

3     changed in the way that we were marketing ourselves.

4     **Q.**   Did there come an opportunity in early 2010 to abandon

5     this approach?

6     **A.**   Yes.

7     **Q.**   And when did that happen?

8     **A.**   It was, I guess, with regards to a transition that we had

9     been asked to quote for where the client had specifically

10    asked to see no commissions.  So that we would have to -- in

11    order to win the transition, we would have to do it for zero

12    commission.

13    **Q.**   Who was this client?

14    **A.**   It was the KIA, the Kuwait Investment Authority.

15    **Q.**   What is the KIA?

16    **A.**   It's a big fund set up by the Kuwaiti government.  It's a

17    sovereign wealth fund, a government wealth fund in Kuwait.

18    **Q.**   How big are we talking in terms of assets managed?

19    **A.**   I'm not sure anybody knows exactly how big it is, but

20    it's big, one of the biggest in the world.

21    **Q.**   Billions of dollars?

22    **A.**   At least, yeah.

23    **Q.**   How significant of a client was KIA to State Street?

24    **A.**   They were a significant client across lots of businesses.

25    We had done from a transition management perspective plenty

1    of transitions for them before.  But they also touched State

2    Street across asset management, custody, lots of other

3    businesses.  They were a big client of State Street's in

4    general.

5    **Q.**  Who was the relationship person at KIA for State Street's

6    transition team?

7    **A.**  So it was a man called Das, who was our main contact

8    there.

9    **Q.**  Who was Das?

10   **A.**  He was the person at KIA whose job it was to select and

11   make recommendations about which transition manager they

12   should use when they had transitions to do.  He may have

13   other jobs as well, but that was the one that he

14   interacted -- where he interacted with us.

15   **Q.**  Was he from Kuwait?

16   **A.**  No, no.  He wasn't Kuwaiti.

17   **Q.**  Where was he from?

18   **A.**  He's Indian, I believe.

19   **Q.**  Do you know whether he had authority to award you

20   business at State Street?

21   **A.**  My understanding was that he gave recommendations to his

22   superiors.  So he wasn't the one making the decisions, but he

23   was the one recommending.

24   **Q.**  Who was the person at State Street who interacted most

25   frequently with Das?

1    **A.**   Ed Pennings.  So Ed had sales and client relationship

2    responsibility for KIA for our Portfolio Solutions business.

3    **Q.**   How knowledgeable was Das about transition management?

4    **A.**   He wasn't our most sophisticated client, I guess is

5    probably the best way to put it.

6    **Q.**   And why do you say that?

7    **A.**   He seemed very fixated on commissions rather than the

8    overall cost of his transitions.  And explaining to him that

9    if anybody's charging you a zero commission, they're going to

10   be making -- they're going to have to make some money off

11   this somehow; otherwise it's going to -- it's a loss leader

12   business.

13          But also his understanding of things like

14   opportunity cost and agency trading and where that risk lies,

15   all of those were difficult conversations that we had to have

16   with him.  And I'm not convinced that he was, I guess, as

17   well grounded in those financial concepts as some of our

18   other clients were.

19   **Q.**   So you're talking about the difference between implicit

20   costs and direct costs?

21   **A.**   It's kind of all that stuff, I guess, yeah.

22   **Q.**   Had other clients asked you questions about what's the

23   difference between the two?

24   **A.**   Some of them would, yeah.  We dealt with some very

25   sophisticated clients.  You know, Das was -- seemed to be a

1    bit more -- a bit more mechanical in looking for a single --

2    a single measure to try and make his decisions.  And he

3    seemed to think that whoever offered the lowest commission

4    would be the one who ultimately gave him the best outcome.

5    **Q.**   Was there a particular transition where he didn't seem to

6    understand the results you had provided?

7    **A.**   Yes.  I mean, right before I lost my job at State Street,

8    yes, we had done a transition for them and I needed to fly to

9    Kuwait to explain to him the outcomes.

10   **Q.**   What did you have to explain to him?

11   **A.**   That the opportunity cost, the risk of the market moving

12   around was something that he bore because we were -- we were

13   an agency-only model.  And it became a relationship issue

14   inside State Street that he didn't understand it or didn't

15   like the fact that the markets had moved slightly against

16   them so it was a cost to the fund.

17   **Q.**   Had State Street had any control over what the markets

18   had done?

19   **A.**   No, no.

20   **Q.**   Is that a type of question that other clients would ask

21   you, whether you --

22   **A.**   Conversation -- I've never had to go and explain it to a

23   client once -- I hadn't had a client that had as much

24   difficulty understanding that concept, I guess, as what Das

25   had.

1   **Q.**  How many times had you already done transitions for KIA

2   and Das when you were having this conversation?

3   **A.**  Multiple, probably double digits.

4   **Q.**  What was the first opportunity that KIA presented to you

5   to abandon your prior approach?

6   **A.**  It was this bond transition, I guess, that I was

7   describing.  He -- we were one of the preferred providers for

8   KIA, so he would have a list of transition managers that he

9   would ask to quote.  He would give an outline of what was

10  involved in the upcoming transaction and ask for a quote

11  back.  And on this particular one, he told Ed that it had to

12  be done for zero commission or we wouldn't win it.

13  **Q.**  How did you learn of the possible deal with KIA?

14  **A.**  Well, via Ed.  Those leads, if you like, came in via Ed.

15  **Q.**  And how large a transaction are we talking about?

16  **A.**  It was large, several billion dollars' worth of bond

17  trading.

18  **Q.**  What -- how did the revenue prospects of a large

19  multibillion dollar transition compare to some of the -- an

20  ordinary one you would do?

21  **A.**  In the normal course of business, if you were charging a

22  per-transaction commission, the more you have to trade, the

23  more money you make.  So in our business in transition

24  management, big trades were the ones you wanted to win.  They

25  were the elephant deals that we liked to go after.  They were

1   the ones that really generated the revenue.

2   **Q.**   So if an elephant deal was, say, ten times larger than a

3   normal deal, would it require ten times as much work?

4   **A.**   No, not necessarily.  There were elephant deals that

5   actually required less work than some of the smaller ones.

6   The amount of work wasn't necessarily related to how much

7   money was made or how much commission was charged.

8   **Q.**   So how could these elephant deals play into meeting the

9   revenue target for the London desk?

10   **A.**   Sure, the revenue -- the elephant deals, the big ones, if

11   you look at any year and look at what the drivers were of

12   revenue, there's always a few deals that are -- that are big.

13   The bigger deals make more money, so they're important.

14   **Q.**   You testified just a moment ago that State Street

15   couldn't do a transition for zero commissions.

16   **A.**   Well, we could.  We would lose money doing it for zero

17   commissions.  We have costs we need to cover.  We could do it

18   for zero but it would mean losing money.

19   **Q.**   Did you know whether banks were doing it for zero

20   commissions?

21   **A.**   We had heard of them doing it for zero.

22   **Q.**   Had you heard they would be taking a loss?

23   **A.**   We suspected that people who were either newly coming

24   into the market or re-establishing themselves would be --

25   some might be happy do it as a loss leader to get the KIA's

1    business.

2    **Q.**   Why would they be willing to do this?  What was your

3    understanding?

4    **A.**   It credentializes them as a transition manager.  They

5    can -- one of the things that people like to talk about is

6    how many transitions you do and what volume of assets you

7    transition.  That's one way to get a volume of assets that

8    you're doing up, which is -- again, becomes part of the

9    marketing for your next transition.  You know, we're great

10   because we do lots and lots of trading.  That's a great way

11   to do lots and lots of trading.  It adds a value from a

12   marketing perspective for those guys, particularly newer

13   entrants.

14   **Q.**   So a short-term loss but a long-term gain?

15   **A.**   Yes.

16   **Q.**   Did you have an understanding of why KIA expected to pay

17   zero?

18   **A.**   I don't know.  I'm not sure.

19   **Q.**   Did you know at the time whether other banks were

20   pitching low fees to KIA's business in particular?

21   **A.**   Our understanding was there were other banks already

22   pitching zero to KIA, yeah.

23   **Q.**   Did State Street end up pitching for this deal?

24   **A.**   Yes, we did.

25   **Q.**   What did you pitch?

1    **A.**   Zero commission.

2    **Q.**   Were you going to do it for free?

3    **A.**   Nope.

4    **Q.**   Then how were you going to make your money?

5    **A.**   We were going to take a commission anyway but not show it

6    to the client.

7    **Q.**   How would you take it without showing them?

8    **A.**   Well, in bond trades, you don't normally show the

9    commission, in any event.  So the instruction that goes to

10   the client's custodian -- so a fund like the KIA will have

11   a -- will employee a custodian who is the safe-keeper of

12   their assets, that effectively holds the assets on behalf of

13   the -- on behalf of the KIA.

14          And when we trade for them in a transition, we need

15   to instruct them as to what we've traded.  And that

16   instruction really becomes the kind of records of the fund

17   for the KIA.  And those instructions that would go out would,

18   only for bond trades, have the net price, not a commission.

19   So all they would see was the price that already had our

20   commission baked into it.

21   **Q.**   So with only seeing one price, it would be impossible to

22   know what the commission was?

23   **A.**   Yeah, yeah.

24   **Q.**   Had you ever before this deal charged commissions on

25   clients that you hadn't told them about?

1    **A.**  Certainly I hadn't.

2            MR. WEINBERG:  I object, your Honor.  There's no

3    evidence that he hadn't -- no evidence that Mr. Das did not

4    know and was not told about.

5            THE COURT:  I'm not sure the objection -- as to

6    whether he's done it.

7            MR. JOHNSTON:  The question to the witness was, had

8    he ever personally charged commissions without having

9    disclosed them to the clients before.

10           THE COURT:  You can answer that.

11           THE WITNESS:  I hadn't, no.

12   BY MR. JOHNSTON:

13   **Q.**  Did it concern you that you were going to do it here?

14           MR. WEINBERG:  Object.  There's no predicate for

15   the question that he was going to do it here.  There's no

16   predicate that Mr. Das didn't know.

17           MR. JOHNSTON:  That's not the --

18           THE COURT:  That's overruled.

19   BY MR. JOHNSTON:

20   **Q.**  Did it concern you that you were going to charge

21   commissions without disclosing them to the client?

22   **A.**  Yes.  Yes, it did.

23   **Q.**  And why did it concern you?

24   **A.**  Well, because I had been in the business for quite a long

25   time by that point, and I had never been in a situation where

1    we had to figure out our own commission, if you like.  And

2    it's -- it's -- yeah, it didn't feel like the right thing to

3    do, and it was very different from anything that I had seen

4    before.

5    **Q.**   Where did this decision come from at State Street?

6    **A.**   Well, my understanding is it came from Ed and Ross.

7    **Q.**   And who told you that?

8    **A.**   Ed did.

9    **Q.**   Did you know whether Das was told anything about how

10   State Street would make its money?

11   **A.**   Yes.  I did walk into a conversation that Ed was having

12   with Das in his office where Ed did tell him if we charge

13   zero for this, we're going to have to take a spread.

14   **Q.**   Did he say we're going to take a spread out of the money

15   you would otherwise make?

16   **A.**   Not in the bit that I heard, no.  It was we will take a

17   spread on this.  That was as far as that conversation went,

18   or at least the bit that I heard.

19   **Q.**   So you didn't hear one way or the other whether he said

20   it was going to come out of KIA's pocket or some other

21   client's pocket?

22   **A.**   Not in that conversation, no.

23   **Q.**   I'm going to play you a phone call shortly, but before I

24   do, I'd like to ask you a few questions.

25               Were any phone lines recorded at State Street?

1    **A.**   Yes.

2    **Q.**   Whose phone lines were recorded?

3    **A.**   Well, in our group, all of my analysts that worked for me

4    had their phone lines recorded, and the trading desk I

5    believe had their phone lines recorded as well.

6    **Q.**   Was your line recorded?

7    **A.**   Yes.

8    **Q.**   What about Ed Pennings' line?

9    **A.**   Ed's office phone I don't believe was recorded, no.

10   **Q.**   What about Ross McLellan's phone?

11   **A.**   I don't know.  Not sure.

12   **Q.**   Do you know why yours -- your phone and the analysts and

13   the traders phones were recorded?

14   **A.**   We would sometimes take orders from clients, and if there

15   was a dispute with a client about what they wanted to trade

16   or whether it was a buy or a sell or any of those things, it

17   was good practice to have them recorded.

18   **Q.**   Were you aware at the time that your phones were being

19   recorded?

20   **A.**   Yeah, yeah I was.  We specifically asked for them to be

21   recorded because we did have -- we did have an instance where

22   we needed to go back to a tape and didn't have it, so we

23   didn't have the recording, so as part of an office move it

24   had been overlooked.  But, anyway, it was one of the things I

25   checked on a monthly basis to make sure we were being

1    recorded.

2              MR. JOHNSTON:  Your Honor, at this time permission

3    to approach the witness.

4              THE COURT:  Yes.

5    BY MR. JOHNSTON:

6    **Q.**  Mr. Boomgaardt, do you recognize the disks I've handed

7    you?

8    **A.**  Yes.

9    **Q.**  Could you take a moment and look through the stickers on

10   each disk?

11             MR. JOHNSTON:  For the record, I have handed the

12   witness disks that are separately marked as Government

13   Exhibits 10, 24, 30, 32, 43, 80, 191, 193, 195, 196, 197.

14   **Q.**  Do you recognize these disks, Mr. Boomgaardt?

15   **A.**  Yes, I do.

16   **Q.**  What are they?

17   **A.**  They are disks that hold voice recordings, and those

18   stickers have my initials and the date that I listened to

19   those.

20   **Q.**  Have you reviewed the contents on each one of those

21   disks?

22   **A.**  Yes.

23   **Q.**  And are each -- are there recordings on each one of those

24   disks?

25   **A.**  Yes.

1   **Q.**  Are you a participant on the recordings on each one of

2   those disks?

3   **A.**  Yes, I am.

4   **Q.**  And were those recordings made at the time that you were

5   employed at State Street in the 2010-2011 time period?

6   **A.**  Yes, they were.

7   **Q.**  Do they fairly and accurately capture the conversations

8   that you had at the time?

9   **A.**  Yes, they do.

10          MR. JOHNSTON:  Your Honor, at this time the

11   government moves to admit Exhibits 10, 24, 30, 32, 43, 80,

12   191, 193, 195, 196, and 197.

13          MR. WEINBERG:  No objection.

14          THE COURT:  Admitted.

15          (Exhibits No. 10, 24, 30, 32, 43, 80, 191, 193,

16          195, 196, and 197 admitted into evidence.)

17          MR. JOHNSTON:  Your Honor, at this time permission

18   to distribute to the jurors transcripts of these calls and

19   ask the Court to give an instruction.

20          THE COURT:  Let me give an instruction to the jury.

21          The evidence is the disks, the actual recordings of

22   which you'll hear.  What you're receiving now are notebooks

23   which have transcripts of those conversations.  The

24   transcripts are simply to aid you in listening to the

25   evidence, which is the phone calls, the recordings.  If you

1   find there's a difference between the recordings and the

2   transcripts, it's the recordings rather than the transcripts

3   that govern.  And you'll see a number of tabs in your

4   notebooks, and that's because there's a number of recordings

5   that I anticipate the government will play.

6   BY MR. JOHNSTON:

7   **Q.**  Mr. Boomgaardt, you also have a binder in front of you.

8        If I could direct your attention to tab 10, have

9   you reviewed the transcript that's behind Government

10  Exhibit -- behind tab 10?

11  **A.**  Yes.

12  **Q.**  And have you reviewed it to see whether it is an accurate

13  capturing of the phone call that's on Government Exhibit 10?

14  **A.**  Yes.

15  **Q.**  And is it?

16  **A.**  Yes, I believe it is.

17  **Q.**  And how do you know that this is the same transcript that

18  you reviewed?

19  **A.**  It's got my initials and date on the top of the first

20  page.

21        MR. JOHNSTON:  Your Honor, could we please play

22  Government Exhibit 10?

23        (Played recording.)

24  **Q.**  Mr. Boomgaardt, do you recognize any of the voices on

25  that call?

1    **A.**   Yes.

2    **Q.**   Who are they?

3    **A.**   It's myself and Ed Pennings.

4    **Q.**   And what are the two of you talking about?

5    **A.**   Specifically they're talking about the -- a transition

6    coming up for KIA.

7    **Q.**   And directing your attention to where Mr. Pennings says,

8    "The KIA better be a bond target," what's your understanding

9    of what he means there?

10   **A.**   He wants it to be a bond transition so that it's -- our

11   understanding was it was a bond transition, so that's --

12   that's what he's hoping for.

13   **Q.**   What specifically about it being a bond target as opposed

14   to what?

15   **A.**   We knew that the assets it was coming from were bonds,

16   and --

17   **Q.**   What do you call the -- is that the legacy?

18   **A.**   Yeah, the legacy is the existing portfolio; the target is

19   where they're going to.  So we knew the legacy portfolio was

20   treasuries, but I guess at this point we didn't know for

21   definite that it was going to bonds or equities or anything

22   else.

23   **Q.**   And what was your understanding of why Mr. Pennings

24   wanted a bond target as opposed to a stock target?

25   **A.**   Bond transitions in general tended to be better

1    opportunities for us to make money.  We could charge a

2    relatively higher commission on bond trades than we could on

3    equity trades.

4    **Q.**   What about how bond prices were reported?

5    **A.**   That, too.  Bonds -- you know, bond prices only go back

6    as a net price so they don't -- clients don't have a

7    visibility on that commission either.

8    **Q.**   So what would that enable you to do?

9    **A.**   Well, it would enable us to take a commission on this

10   anyway, even if we hadn't agreed one.

11           MR. JOHNSTON:  If we could continue, please.

12           (Played recording.)

13   **Q.**   Mr. Boomgaardt, who are you and Mr. Pennings talking

14   about?

15   **A.**   Talking about Das, so our contact at the KIA.

16   **Q.**   And why does -- why does the term "duration" come up?

17   **A.**   It's -- for bond portfolios, the economics for us as a

18   transition manager to doing bond transitions were better for

19   portfolios that were longer dated.  The conventions in the

20   bond market was to charge a commission based on yield rather

21   than price, and this is --

22   **Q.**   Could I pause you for a second and maybe just help the

23   jurors understand?

24           What does it mean to have a long-dated bond?

25   **A.**   A bond that doesn't expire for a number of years.  It

1    doesn't mature for a number of years.  Bonds are -- they're

2    an obligation to pay money, a coupon every month or year for

3    a certain period of time.  And then you pay back all of the

4    money that you've borrowed, and that could be -- it could be

5    anything from 30 days to 50 years from now.  And the duration

6    of a portfolio -- in simplest terms, everything else being

7    equal, the longer until that final payment's made, the longer

8    the duration of the bond is.

9    **Q.**  And why is there then a mention of it's tough to

10   calculate duration on your little adding machine?  What do

11   you mean by that?

12   **A.**  Das is famous for having an old-fashioned adding machine

13   with the little bit of paper on his desk in the KIA.  That's

14   a, I guess, poorly worded inside joke about possibly his

15   sophistication and not understanding.

16            Duration is not a particularly easy thing to

17   calculate.  For those of you who know calculus, it's the

18   first derivative of the price equation for a bond.  And if

19   your eyes glaze over when I say that, it's because it's not

20   that easy.  It's not easy to calculate, but it's reasonably

21   easy to understand if you're a bond -- if you're doing things

22   in the bond market.

23   **Q.**  How many of your clients, in your experience, understood

24   what duration was?

25   **A.**  Well, bond managers, certainly anyone that's managing

1    bonds knew what that was.  I wouldn't necessarily expect

2    somebody in Das' position who's choosing asset managers and

3    transition managers to necessarily understand what duration

4    is.  But if you've got an interest in the markets and in bond

5    portfolios in particular, you should understand that.  It's

6    pretty fundamental.

7    **Q.**  What, if anything, did duration have to do with the

8    amount of money you could earn?

9    **A.**  So bond market convention was to charge a commission

10   based on the yield of a bond.  So the simplest way to think

11   of that is a specific price for a bond means that it's going

12   to yield a certain amount to maturity.

13        The duration is the relationship between any

14   changes in yield to what it means for the price of the bond.

15   So it's a measure of the sensitivity of the price of the bond

16   to small changes in the interest rate or yield of the bond.

17        And so if you're charging a commission on yield,

18   you need to multiply that commission you're charging times

19   the duration to get what effect that has on the price.  So

20   it's a little bit complicated, but what it means is a

21   longer-duration portfolio for the same quoted commission will

22   mean more money for -- more money for State Street.  So the

23   longer the duration, the more money that State Street could

24   make in commission on those trades.

25   **Q.**  So, for example, a 1 basis point of yield, that could --

1    how would that compare between, say, a bunch of 2-year bonds

2    and a bunch of 20-year bonds?

3    **A.**   Sure, so if 1 basis point of yield on a bond that only

4    had a 1-year duration would only be 1 basis point of price

5    commission; whereas if it was a bond that had a 15-year

6    duration, that 1 basis point of yield would mean 15 basis

7    points of commission that would get taken.

8    **Q.**   So 15 times as much commission potentially?

9    **A.**   Fifteen times as much commission.

10   **Q.**   So when Mr. Pennings says, "I was just going to say -- go

11   to the department and give me the one with the biggest

12   duration," what do you understand him to mean?

13   **A.**   We wanted -- we're equating duration to commission

14   revenue or revenue to State Street.  So the longer the

15   duration, the bigger the -- the more money we can make as --

16   for our business.

17            MR. JOHNSTON:  Continue, please.

18            (Played recording.)

19   **Q.**   Mr. Boomgaardt, what do you understand Mr. Pennings to

20   mean when he says, "I mean, we are going to make our quarter

21   with this, even with 2 billion"?

22   **A.**   That this will be a transition that we're going to make

23   lots of money for, and that will get us on course for meeting

24   our quarterly revenue targets, despite the fact that they've

25   actually split the transition so it's half as big as we

1    thought it was going to be.

2    **Q.**   Where is the other half of the transition going?

3    **A.**   According to Mr. Pennings, it went to Nomura, who was one

4    of our competitors.

5    **Q.**   So what's the -- at least what's being discussed here,

6    what's the size of the -- total size of bonds that are being

7    given to State Street?

8    **A.**   It's a $2 billion portfolio, roughly.

9    **Q.**   How many -- in London in any given year, how many

10   multibillion-dollar transitions would you do?

11   **A.**   Less than ten, probably less than five, probably --

12   between five and ten I guess on a good year, but certainly

13   not more than ten.

14   **Q.**   So this is one of those elephant deals?

15   **A.**   This is an elephant deal.

16   **Q.**   And why do you say -- sorry.  What's your understanding

17   of what Mr. Pennings means what he says, "I can't do equity

18   for zero, can I"?

19   **A.**   That if we do agree to do an equity trade for zero, so,

20   i.e., trading stocks, we're going to lose money on that.

21   It's below what our cost is to provide that service.

22   **Q.**   How can you do -- why can't you do equities for zero when

23   you're doing bonds, at least nominally, for zero?

24   **A.**   Well, bonds we have this mechanism to take a commission,

25   to take a spread anyway.

1        That doesn't exist in the equities business in the

2   same way.  That would get captured on whatever we're sending

3   out to the client's custodian and in the reporting, so they

4   would see it as an additional commission.

5        (Played recording.)

6   **Q.**  Mr. Boomgaardt, why do you -- why do you say, "How else

7   can we structure our commissions so it doesn't look like a

8   commission?"

9   **A.**  Well, if for whatever reason he doesn't want to see a

10  headline commission number, is there another way that we can

11  still tell the client and they understand that we're still

12  going to be making money from it, but is there another way

13  that we can still make that an economic trade for us somehow.

14  **Q.**  And when Mr. Pennings says, "Can we price at net?" what

15  do you understand him to mean?

16  **A.**  The price at net is kind of what we're talking about.

17  Can we do the same thing with bonds?  Can we just give them a

18  single price that they see that doesn't show a commission.

19  **Q.**  And what do you understand Mr. Pennings to say when he

20  goes, "I'm not going to get called out for saying, you know,

21  you already say -- you always say this and yet you are doing

22  it yourself"?

23  **A.**  It was part of what we used to say to clients.  And

24  Mr. Pennings in his pitch that if all you care about is

25  commission, somebody is going to be taking a spread, a hidden

1    commission from you in another place.  So you should stop
2    caring so much about commissions or doing it for zero
3    commission because you're paying for it anyway.  And he feels
4    that there's a risk of him being hypocritical here, and that
5    we are doing exactly that.  So he's saying he's going to put
6    it in the legal agreement so it's clear to the client.
7    Q.  And is that what he means by "periodic notice"?
8    A.  Yes, yes.  So in transitions, normally we would have a
9    master agreement, what we call a TMA, the transition master
10   agreement.  So that that allowed us clients who were regular
11   transition management clients, we wouldn't have to negotiate
12   a new legal agreement every time.  That would set the broad
13   legal structure for how we would deal with each other.  And
14   then each individual transition would have a periodic notice,
15   generally a page or two, that would set out the specifics of
16   that transaction.  That's the periodic notice.  That would
17   get signed separately for each transition that we do for
18   them.
19   Q.  You testified that it was part of Mr. Pennings' pitch to
20   clients that competitors could potentially be charging hidden
21   commissions; is that correct?
22   A.  Yup.
23   Q.  Do you have any knowledge whether clients were receptive
24   to that when they -- when you tried to disparage competitors?
25   A.  Generally my experience was they're not, that disparaging

1    competitors in negative marketing is not generally

2    particularly well received by clients.

3    **Q.**   So was it effective to discredit the competitors?

4    **A.**   I mean, I guess we were still getting business, so it

5    wasn't totally ineffective.  But it's certainly not my

6    preferred way of -- I prefer to talk about the benefits of

7    our model rather than the problems with other people's.

8    **Q.**   So when you say it's just -- "If it's just a different

9    way they want us to capture our revenue, I'm not sure that is

10   the end of the world, if we find a way around -- as long as

11   we -- you know, if we tell him that is how we are going to be

12   taking it, we are probably covered."

13             What are you saying right there, Mr. Boomgaardt?

14   **A.**   Thinking out loud, really.  But if we have an agreement

15   with the client about how and what we're going to take, is

16   there a way to structure it so it doesn't come up as a

17   commission.  But as long as the client is aware of how and

18   what we're taking, there may be a way to do that.  But I

19   don't know.  It's thinking out loud there.

20   **Q.**   So if the client knows you're charging a hidden

21   commission, then it could be okay?

22   **A.**   Well, it's certainly not okay if they don't know you're

23   taking a hidden commission.

24   **Q.**   Would it still be hidden if they know?

25   **A.**   No.  But I guess it's a fact -- it's both the mechanism

1    and the size, I guess, is the bit that may well be hidden or

2    not.  It's the ability to take it but also what you're taking

3    and how you're taking it.

4    **Q.**  Do you know whether the size of commission that you ended

5    up taking or were planning on taking for the KIA was

6    disclosed in the periodic notice?

7    **A.**  It wasn't disclosed in the periodic notice, as far as I

8    know.

9    **Q.**  Do you have an understanding one way or the other whether

10   Das knew the amount of commission that you were going to

11   take?

12   **A.**  I don't believe he did know the amount of commission that

13   we were going to take, no.  I don't think we knew exactly the

14   amount of commission we were going to take when they signed

15   the periodic notice, so I don't know how he would.

16                 (Played recording.)

17   **Q.**  Mr. Boomgaardt, you just testified that you may not have

18   a problem doing this if everything is disclosed to the

19   client, correct?

20   **A.**  Yes, correct.

21   **Q.**  What do you understand Mr. Pennings to be saying here

22   when he says, "Don't talk about it with anyone that we are

23   doing it this way because that is not going to help our

24   story"?

25   **A.**  I think he's recognizing that we're deviating from the

1    way that we normally conduct ourselves, and we'd rather that

2    the client and the market didn't know that.  That's -- it's

3    not the State Street way of doing things.

4    Q.  How did you want to continue presenting yourself to the

5    market?

6    A.  Well, in same way that we were before, in our

7    unconflicted manner.  And this would -- I think, as Ed

8    identified earlier in the call, it puts us in a position of

9    being a bit hypocritical.

10   Q.  So when Mr. Pennings says, "Don't even share it with the

11   rest of the team, to be honest," what do you understand him

12   to mean there?

13   A.  Let's keep this to a close-knit group so it -- so that

14   that information will reduce the risk of that information

15   getting out further to other people in the bank but also the

16   market more broadly.

17   Q.  So who's the team that he's referring to here?

18   A.  My team.

19   Q.  And who would that include?

20   A.  The transition managers that work for me.

21   Q.  He mentioned Paul.  Who's Paul?

22   A.  Paul McGee.

23   Q.  So one of the four individuals you testified participated

24   in these management meetings?

25   A.  That's right, yeah.

1  **Q.**  And when you say, "Well, I'm going to be away right at

2  the end of the deal," so what are you referring to there?

3  **A.**  I'm going to be away, so it won't be me managing this

4  transition.  I won't be the point person.

5           Every transition had a project manager, a

6  transition manager assigned to it, and that would be -- part

7  of my job was to assign my transition managers to the various

8  different deals.  So all I'm saying here is it's going to be

9  somebody in my team.  This isn't going to be me doing it

10 because I'm not going to be here to see the whole thing

11 through.

12 **Q.**  So someone is going to have to be clued in here?

13 **A.**  Yes.

14 **Q.**  What does Mr. Pennings say after that?

15 **A.**  He says they don't need to know what's in the

16 documentation.  So they don't need no know what's been agreed

17 with the client.  They'll approach it in the same way they

18 will every other transition, which is fairly consistent with

19 how my transition managers did their job.  Their job was to

20 manage the risks and project manage the whole thing.  It

21 wasn't to agree commission rates with the clients.  That all

22 set with the sales team that Ed ran.

23 **Q.**  Was this typical for you, keeping secrets from your own

24 team?

25 **A.**  No, no, it wasn't.  I'm -- generally, no.  We went

1    through -- everything was generally very open.  We had a

2    weekly meeting with all of my analysts where we talked

3    through all of the deals.  It's easier that way to get

4    everybody's -- the best of everybody's ideas for all of the

5    transitions.

6    **Q.**  Were you uncomfortable with keeping it a secret?

7    **A.**  Yeah, yeah.  Again, it's different and I didn't -- in my

8    career in transition management, I hadn't been in a situation

9    where I had to keep things quiet from my team.

10   **Q.**  Did you end up getting the KIA deal?

11   **A.**  Yes, we did.

12   **Q.**  With the zero commission pitch?

13   **A.**  Yup.

14   **Q.**  Did the actual trading happen right then in March 2010 or

15   did it happen later?

16   **A.**  No, it was delayed for a little bit.

17   **Q.**  Were you involved in the actual execution of the trades?

18   **A.**  Yes.  I mean, the trading actually gets done by the

19   traders, but in terms of -- I was very hands-on with that

20   transition, yes.

21   **Q.**  Where were you when this happened?

22   **A.**  In London.

23   **Q.**  What month are we talking about?

24   **A.**  When did KIA happen?  It was, I guess, towards mid-end

25   2010.

1    **Q.**  Did anyone else -- was anyone else helping you in London

2    with managing this transition?

3    **A.**  Yeah, I had people in my team helping me.  But from a big

4    perspective, yeah, Ed, and Ross McLellan was actually in town

5    when the transactions happened as well, when the actual

6    trading day happened.

7    **Q.**  Do you know whether that was happenstance or deliberate?

8    **A.**  I think it was happenstance.  I don't remember it

9    necessarily being deliberate.  But, I mean, Ross did visit

10   the offices on a global basis on a periodic basis, so he

11   wasn't -- he wasn't often in London, but it wasn't that

12   unusual either.

13   **Q.**  How did --

14            THE COURT:  Let me stop you here, Mr. Johnston.

15            Ladies and gentlemen of the jury, it's 1:00, so

16   we'll break for the day.  I remind you keep an open mind, you

17   haven't heard all the evidence.  Don't discuss the case among

18   yourselves, don't discuss it with anyone else, don't do any

19   independent research.  I'll see you tomorrow morning.  We'll

20   begin trial at 9:00 a.m. tomorrow morning, so please be here

21   a few minutes early so we can begin at 9:00.  Thank you for

22   your attention.

23            All rise for the jury.

24            (Jury left the courtroom.)

25            THE COURT:  Please be seated.

1                  That objection you want to put on the record, can

2      you do that tomorrow morning at 8:30?

3                  MR. WEINBERG:  Of course, your Honor.

4                  THE COURT:  Anything else before we adjourn?

5                  MR. FRANK:  Not from the government.

6                  THE COURT:  Okay.  I'll see you tomorrow morning at

7      8:30.  Thank you very much.  We're adjoined.

8                  See you tomorrow, Mr. Boomgaardt.

9                  (Court adjourned at 1:01 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      --------------------------

2                          CERTIFICATION

3

4        We certify that the foregoing is a correct transcript of

5    the record of proceedings in the above-entitled matter to the

6    best of our skill and ability.

7

8

9

10   /s/Debra M. Joyce              June 5, 2018
     Debra M. Joyce, RMR, CRR, FCRR   Date
11   Official Court Reporter

12

13

14   /s/Rachel M. Lopez             June 5, 2018
     Rachel M. Lopez, CRR              Date
15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```