UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

      Plaintiff,                            :    Criminal Action No.
                             1:16-cr-10094-LTS
   v.                                       :

ROSS MCLELLAN,                               :

      Defendant.                           :

- - - - - - - - - - - - - - - - - - x


BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 3


Wednesday, June 6, 2018
8:32 a.m.


John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Kelly A. Mortellite, RMR, CRR
Official Court Reporter
raeufp@gmail.com

1                      **A P P E A R A N C E S**

2     On behalf of the Plaintiff:

3          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:  STEPHEN E. FRANK
4          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
5          Boston, Massachusetts  02210
           (617) 748-3244
6          stephen.frank@usdoj.gov

7
           UNITED STATES DEPARTMENT OF JUSTICE
8          BY:  WILLIAM JOHNSTON
           1400 New York Avenue, Northwest
9          Washington, D.C.  20005
           (202) 514-0687
10         william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
           BY:  MARTIN G. WEINBERG
14         20 Park Plaza
           Suite 1000
15         Boston, Massachusetts  02116
           (617) 227-3700
16         owlmcb@att.net

17
           LAW OFFICES OF ROBERT M. GOLDSTEIN
18         BY:  ROBERT M. GOLDSTEIN
           20 Park Plaza
19         Suite 1000
           Boston, Massachusetts  02116
20         (617) 742-9015
           rmg@goldstein-lawfirm.com
21

22         LAW OFFICES OF MAKSIM NEMTSEV
           BY:  MAKSIM NEMTSEV
23         20 Park Plaza
           Suite 1000
24         Boston, Massachusetts  02116
           (347) 251-4800
25         mentsev@gmail.com

1                        **TABLE OF CONTENTS**

2

3                         **TRIAL WITNESSES**

4    On behalf of the Government:                    Page

5    RICHARD BOOMGARDT

6          By Mr. Johnston                            19

7

8

9                            **EXHIBITS**

10                                               Admitted

11   Number 35 and 35-1                              38

12   Number 59                                       59

13   Number 68                                       67

14   Number 70 and 70.1                              73

15   Number 77                                       91

16   Number 79 and 79-1                             112

17   Number 84 and 84.2                             139

18   Number 85                                      143

19   Number 91 and 91-1                             169

20   Number 109 and 109.1                           148

21   Number 124 and 124.1                           153

22   Number 138 and 138-1                           122

23   Number 150                                     159

24   Number 155                                     160

25   Number 170                                     133

**P R O C E E D I N G S**

1
2       (In open court.)

3       THE DEPUTY CLERK:  The United States District Court

4 for the District of Massachusetts is now in session, the

5 Honorable Leo T. Sorokin presiding.

6       Today is June 6th, the case of United States vs.

7 Ross McLellan, criminal action 16-10094 will now appear

8 before this court.

9       THE COURT:  I see all counsel here, and Mr.

10 McLellan.

11       So first with respect to the juror we had a

12 discussion about.  I spoke, at the very end of the day

13 yesterday, with an HR person from the company.  The bottom

14 line is this:  They have 130 employees nationwide, three in

15 Massachusetts.  He's the only person who does what he does in

16 Massachusetts and the person who does it on the night shift

17 can't do it on the day shift, because that person has a day

18 job, and they don't have anyone to cover for him.  The HR

19 person had already spoken to the owner, who is in --

20 somewhere else, not where the HR person is.  So I'm willing

21 to make an exception to their policy and pay him for this

22 period of time.  So I think that's it.

23       I'm not -- I don't think I'm going to go further.

24 I don't think I'm calling the owner and I don't think that I

25 have any legal -- I don't think they're under any legal

1    obligation to pay.  And I think that it could work out poorly

2    for the juror in the long run and I don't think that would be

3    fair.

4            So I'm going to -- unless one of you has an

5    objection or a suggestion, I'm going to bring him in now, or

6    as soon as he arrives, excuse him, explain, just tell him

7    everything and excuse him and send him on his way.

8            Anybody have any issues with that?

9            MR. FRANK:  No, Your Honor.

10           MR. WEINBERG:  No, Your Honor.

11           THE COURT:  All right.  Maria, if he's here, bring

12   him, and if not, as soon as he is, bring him in.

13           I don't think I have anything else, unless you do.

14           MR. WEINBERG:  Two what I hope to be minor issues.

15   One is that Mr. Johnston, through Mr. Boomgaardt, or Mr.

16   Frank through Mr. Pennings, introduces their plea agreements.

17   I would ask the Court to give an instruction that that is

18   being offered for the limited purpose of providing the jury

19   with context as to why their testimony and is not evidence

20   substantive --

21           THE COURT:  Not evidence -- substantive evidence of

22   Mr. McLellan's guilt.

23           MR. WEINBERG:  Thank you.

24           THE COURT:  All right.  That's fine.

25           MR. WEINBERG:  Second is, one of the witnesses

1    we've identified as a prospective witness is named Sean

2    Murphy.

3                THE COURT:  Hold on one second.  I just want to --

4                THE DEPUTY CLERK:  Do you want me to grab him now?

5                THE COURT:  Yeah.  As soon as he's here.

6                I'm sorry, what?

7                MR. WEINBERG:  One of the potential defense

8    witness, he would be in the nature of summary witness,

9    summarizing exhibits that would otherwise be offered into

10   evidence.  Sean Murphy, he's a young lawyer that has worked

11   as part of our defense team.  He was inadvertently in court

12   yesterday during Mr. Boomgaardt's direct.  He was not here

13   when the Court issued a sequestration order.  He didn't

14   understand that it applied to him.  I want to put that on

15   record and I want to ask the Court's leave to except him from

16   the sequestration order.

17               THE COURT:  Any objection?

18               MR. FRANK:  We have no objection to that, Your

19   Honor.  And actually, I think the same is true of our

20   rebuttal expert.  So we would ask that the same reply to our

21   rebuttal expert.

22               I would renew my request with respect to Mr.

23   Murphy --

24               THE COURT:  Hold on.  Just with respect -- do you

25   have any objection to that exception for the rebuttal expert?

1          MR. WEINBERG:  No.

2          THE COURT:  All right.  Fine.  So both of them are

3     excepted.

4          With respect to sequestrations, since I have no

5     idea who the witnesses are, what they look like, I leave it

6     to all of you --

7          MR. FRANK:  They're not coming in.

8          THE COURT:  And if there's an issue, to bring it to

9     me.

10          MR. WEINBERG:  Thanks.

11          MR. FRANK:  What I understood Mr. Weinberg to say

12     now is that Mr. Murphy will be offering summaries of exhibits

13     that might otherwise come into evidence.  What I understood

14     him to say yesterday was that he was going to be offering

15     summaries of the Government's exhibits.  Once again, we

16     haven't seen any drafts.  I'll just note for the Court, there

17     are thousands, if not tens of thousands of pages of trading

18     records, of foreign exchange records that Mr. Weinberg has

19     identified, with literally millions of lines -- millions of

20     lines of trades.  It is probably, at this late date,

21     impossible for us --

22          THE COURT:  Hold on one minute for that.  I want to

23     take care of the juror and send him on his way.

24          MR. FRANK:  Yes, Your Honor.

25          THE COURT:  So bring him in.

```
 1              (The jury enters the courtroom.)

 2              THE COURT:  So I just want to explain to you, sir,

 3    where things are and I want to thank you for your cooperation

 4    with us.  I spoke -- Ms. Simeone spoke yesterday with an HR

 5    person from your company.

 6              THE JUROR:  Okay.

 7              THE COURT:  And the HR explained the policy pretty

 8    much as you understood it.  If you're there a year, they'll

 9    pay for everything, but if you're not there a year, then they

10    pay for -- I think she thinks they pay for nothing.

11              THE JUROR:  Yeah.

12              THE COURT:  I spoke to them late yesterday.  I'm

13    sorry it was too late for me to let you know, so you didn't

14    have to come in today --

15              THE JUROR:  That's fine.

16              THE COURT:  -- but in any event and she reiterated

17    to that and I spoke to her, because I wanted to see whether

18    they could make an accommodation, given the public interest

19    and your willingness to serve, if you could afford to serve.

20              THE JUROR:  Yeah.

21              THE COURT:  And in any event, she said, no, they

22    can't make an accommodation.  So I'm going to release you

23    from jury service, because I don't think it's fair to ask you

24    to spend a month working for us at the pay we pay you.  You

25    just wouldn't be able to afford it.  I understand that.  So
```

1    I'm going to release you.  I'm going to just tell you that

2    under Massachusetts state law -- and I said something along

3    these lines to the HR person, Massachusetts state law

4    requires employers in Massachusetts to pay people for

5    three days of Massachusetts jury service.

6              THE JUROR:  Yeah.

7              THE COURT:  So you could talk to them about that.

8    You'll be paid by us for the three days, but it's not at the

9    same rate that you make when you work.

10             THE JUROR:  Yeah.

11             THE COURT:  And Ms. Simeone will give you a card,

12   you can go downstairs and they'll explain to you how you get

13   what we pay you.  And you can talk to them about them paying

14   you and it's possible that if -- that our jury office

15   downstairs, Mr. McAlear, might be able to help you with that.

16             Maria, would you e-mail him about that?

17             THE DEPUTY CLERK:  Sure.

18             THE COURT:  In the first instance, you just talk to

19   them and maybe they'll accommodate you and pay you for -- the

20   difference is what they would pay you for.  They wouldn't pay

21   you for --

22             THE JUROR:  Yeah.  That's what I was told, yeah.

23             THE COURT:  Right.  Okay.  So in any event, I

24   really thank you for your willingness to serve.  But you're

25   excused from service on this jury, you're all done.  Just go

1     downstairs to the jury office on the second floor and they

2     will tell you whatever you need to know about getting

3     reimbursed for these three days.

4             THE JUROR:  Okay.  All right.  Thank you very much.

5             THE COURT:  You're welcome.

6             THE JUROR:  Can I get my stuff?

7             THE COURT:  Yes.

8             THE JUROR:  Thank you very much.

9             THE COURT:  You're welcome.

10            (The juror exits the courtroom.)

11            THE COURT:  Do either of you want me to explain

12     anything to the rest of the jurors as to why this juror has

13     disappeared?

14            MR. FRANK:  Probably wouldn't hurt, Your Honor.

15            THE COURT:  What would you like me to say?  I think

16     just I've excused him for a personal matter.

17            MR. FRANK:  Yes, Your Honor.

18            THE COURT:  Okay.  I interrupted you, Mr. Frank,

19     and I'm sorry.

20            MR. FRANK:  The only issue, Your Honor, is I

21     understand Mr. Weinberg, today, to be suggesting that the

22     witness would not be summarizing Government exhibits, but

23     will be summarizing defense exhibits.  Again, I have no idea

24     what those are.  But to the extent he proposes to summarize

25     voluminous trading records, even assuming their relevance,

1    which I don't concede, it's already too late for us to start

2    digesting all of that, much less whenever he proposes to

3    disclose it.

4              MR. WEINBERG:  I never suggested that there was any

5    statement by me that Mr. Frank understood correctly or

6    otherwise that his proposed testimony is limited to

7    Government exhibits.  There's no need to summarize Government

8    exhibits.  That's for the Government.  We have an enormous

9    amount of State Street business records.  I haven't yet

10   determined which of those records would be relevant to

11   respond to the Government's case.  We are reserving the right

12   to introduce State Street records and then have a summary

13   witness simply say I have reviewed them and these are the

14   records and this is what they say.

15             THE COURT:  Okay.  Two things.  One, if you're not

16   already doing it, I think you both should be giving 48-hour

17   notice of the witnesses you're going to call.

18             MR. FRANK:  We've done that, Your Honor.

19             THE COURT:  All right.  Fine.

20             MR. FRANK:  In fact, we've -- given the likely

21   duration of the testimony of cross-examination, it's likely

22   at least 72-hours notice that we've given.

23             THE COURT:  Fine.  It makes sense.

24             Second, I'm not, at this moment, ordering you,

25   Mr. Weinberg, to make any disclosures about who you're

1      calling, but I remind you that what the scope -- the fairness

2      considerations, timing considerations, they're entitled to be

3      prepared, to respond.  You understand that, I know.  And so,

4      you know, what -- the scope of what the person testifies to

5      and the amount of controversy to it, assuming it has

6      relevance, which we'll deal with, if there's an objection to

7      relevance, will guide what amount of time you get to respond

8      to it and what to do about it, but you have certain

9      obligations and I know you're aware of them.  You keep them

10     in mind.

11              MR. WEINBERG:  I understand, Judge.  And Mr. Frank

12     will have lead time, because a summary witness can't testify

13     to documents that are not offered as evidence.  We will be

14     marking -- to the extent that his testimony is going to be

15     focused on any additional categories of documents, we'll be

16     marking them, providing them, naming them as defense

17     exhibits, giving them as reciprocal discovery, as we have for

18     the last period of time.

19              THE COURT:  All right.  Anything else for you?

20              MR. FRANK:  There's one minor housekeeping matter,

21     Your Honor.  The jurors, I noticed, took the transcript

22     binders back with them yesterday.  I think probably we should

23     be keeping those on a day-to-day basis, so they don't get

24     marked up.

25              THE COURT:  Right, because you're going to have to

1    add to them.

2          MR. FRANK:  That's right and also I can't promise

3    that each juror will be getting the same binder.  We're not

4    tracking which juror is getting which binder.  And also, they

5    probably shouldn't be looking at them back there, either.

6          THE COURT:  Right.  Hold on.

7    Maria?

8          (Discussion off the record.)

9          THE COURT:  I guess it's a good point, and now I'm

10   just thinking about what if they already marked them up, what

11   if someone wrote a note in them.

12         MR. FRANK:  We can check them, Your Honor.  The

13   Court could also inquire and just admonish the jury not to do

14   that.

15         THE COURT:  Right.  All right.  I think if they've

16   marked them up already --

17         THE DEPUTY CLERK:  I wanted to ask you, one of the

18   jurors actually asked me yesterday if they could mark on

19   them.  Mark the binders.  And I said don't do anything, I

20   said I'll ask.  So I was going to ask you that today.  And

21   also there's one juror that says one of the binders has two

22   tab 10s, with the same transcript, though.  That's just so

23   you know.

24         THE COURT:  So I will tell them that there's no

25   significance to having two tab 10s with the same thing.  I'll

1    tell them -- I think we should -- you have -- basically, is

2    your plan that along the way, as other transcripts come in,

3    you would add them to that.

4              And so the choice is either to collect them at the

5    end of the day, add them, and recirculate them, or hand out

6    three hole-punched ones and have them put them in, if we were

7    to collect them.  Any reason we can't let them mark them up

8    if they want, as long as -- then they have to put their juror

9    numbers on them.  We could collect them.  They could leave

10   them in the courtroom, so they're not deliberating over them.

11   Do you know what I mean?

12             MR. FRANK:  I don't have an objection to that, Your

13   Honor.

14             THE COURT:  Oh, but they're not going into the jury

15   room.

16             MR. FRANK:  They shouldn't go into the jury room,

17   because they're not evidence.

18             THE COURT:  Okay.

19             MR. WEINBERG:  I agree with that, Your Honor.

20             THE COURT:  All right.  So then they shouldn't mark

21   them up, right.  And they should leave them in the courtroom,

22   they -- not take them.  We'll do it that way.  Good point.

23             THE DEPUTY CLERK:  Just have them leave them on the

24   seats, I'll collect them.

25             THE COURT:  So we'll have them leave them in their

1    seats and we'll collect them and you can add to them, or what

2    have you, at the end of the day.  Okay.

3              Anything else?

4              MR. FRANK:  Not from the Government, Judge.

5              MR. WEINBERG:  Not from the defense, Your Honor.

6              THE COURT:  So we'll stand in recess.  We'll resume

7    a couple minutes before 9:00 and we'll have Maria check to

8    see if we have all the jurors.  When we resume, have

9    Mr. Boomgaardt take the witness stand, so he can already be

10   in the seat.  Okay.  Thank you.

11             THE DEPUTY CLERK:  This matter is in recess.

12             (Court in recess at 8:46 a.m.

13             and reconvened at 8:59 a.m.)

14             THE COURT:  Please be seated.  Maria.  You can go

15   get the jury.  By the way, day to day, if you think of a

16   particular exhibit or two or something like that you think I

17   should look at for the first next day because there may be

18   issues about it and it would be helpful if I've read it, you

19   can feel free in the morning or at the end of the day tell me

20   about that at some point and I'll look at it because

21   otherwise, I won't necessarily have read all four binders

22   between today and tomorrow.

23             MR. WEINBERG:  Judge, just so you understand, we

24   have received the government exhibits some time ago.  But I

25   just received this morning a list of exhibits that we should

1    target or focus on that they're going to be offering through

2    Mr. Boomgaardt, so we may need an extra second or two to just

3    go to the right tab in the notebook --

4           THE COURT:  Okay.

5           MR. WEINBERG:  -- consistent with the Post-It that

6    we received this morning and make sure it's not an exhibit

7    that we have any evidentiary objections to.

8           THE COURT:  Okay.  That's fine.

9           (Jury enters the courtroom.)

10           THE COURT:  Please be seated.  Good morning, ladies

11    and gentlemen.  I trust everybody followed my instructions

12    not to discuss the case among yourselves or with anyone else

13    or do any independent research.

14           Good.  First of all, thank you very much for

15    working out your commute so you're here so we can begin right

16    on time.  A couple of things I wanted to explain to you.

17    First, you might have noticed that one of your number is not

18    here anymore.  So I just wanted to explain that to you so you

19    understand.  He had a personal matter, it's unrelated to this

20    case, and he brought that to my attention.  And based on

21    that, I thought it was the proper thing to do to excuse him

22    from service on the jury, so that's why.  It has nothing to

23    do with the case.  It's just something that arose in his

24    personal life.

25           So second, with respect to the notebooks, let me

1    give you a little bit more -- not your personal notebooks

2    that you're taking notes in but the notebooks that have some

3    transcripts in them.  Those, as I explained to you yesterday,

4    are not evidence.  They're what we call a chalk or

5    demonstrative.

6          So sometimes in the course of the trial, you might

7    see like a lawyer make on -- in the old days, a chalkboard

8    and just write.  Like in their closing argument they might,

9    say, write a couple of different points along the way on the

10   chalkboard to highlight things in his closing argument.  You

11   wouldn't get to take the chalkboard in, just the way you

12   can't take any of his closing argument.  So the evidence are

13   the disks, and you'll have them in the jury room because

14   they're in evidence and you'll be able to play them in the

15   jury room and listen to them.  But the transcripts are not

16   evidence.  The transcripts are just a chalk or a

17   demonstrative, just like someone wrote on the chalkboard to

18   guide you along the way.

19         So for that reason I'm asking you, I'm telling you

20   don't make notes on the transcripts because you're not going

21   to have those notebooks in the jury room with you because

22   they're not evidence.  In the jury room, you'll have all of

23   the things that came into evidence.  But things that aren't

24   in evidence, like these notebooks, you won't have.

25         So first, don't write in them for that reason.  If

1    you want to take a note about something, you can write a note
2    in your notebook.  Second, I'm going to ask you to leave them
3    on your seats when you take breaks and leave them on your
4    seats when you're done at the end of the day.  And here is
5    why.  You'll notice that there are a lot of tabs with nothing
6    between the tabs, okay?  That's because the lawyers
7    anticipate that there are going to be other transcripts.  So
8    you'll leave them at the end of the day in your seats, and
9    maybe the next day or maybe a couple of days later there
10   might be another transcript slid in, tab 22 might be blank,
11   or there will be another transcript slid in there, and we
12   would do that at night.  So that's why we want you to leave
13   them.
14          Also, we don't want you to write notes in them
15   because to the extent you're writing notes about it, you
16   should write them in your own notebook and neither I nor the
17   lawyers should be reading them.  That's another reason we
18   don't want them in the notebook of transcripts.
19          Lastly, to the extent that there's a duplicate,
20   like if you have a tab, two tab 10s, for example, I think one
21   of you might have two copies of the same transcript, that's
22   just somebody put it in twice.  It has no significance.
23   Don't worry about it.  It's just what happens when we put
24   together 15 or 16 notebooks with all of these exhibits.  Not
25   a big deal, okay?  Obviously, if you see something in it that

1    were different, bring it to our attention, but I don't expect

2    that to happen.

3            All right.  Mr. Boomgaardt, I remind you you remain

4    under oath from yesterday.  Go ahead, Mr. Johnston and resume

5    your examination.

6                        **RICHARD BOOMGARDT**

7      having been previously duly sworn, testified as follows:

8            **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

9    BY MR. JOHNSTON:

10   **Q.**  Good morning, Mr. Boomgaardt.

11   **A.**  Good morning.

12   **Q.**  Yesterday when we finished you testified that you had

13   been a part of the pitch to KIA to get their bond deal for

14   zero commission; is that correct?

15   **A.**  Yes, that's right.

16   **Q.**  And you testified that you were uncomfortable about

17   abandoning the transparent approach that State Street had

18   taken up to now; is that correct?

19   **A.**  Also correct, yes.

20   **Q.**  Then I asked you, did -- did the transition happen right

21   away in March 2010 after the deal was landed?

22   **A.**  No.  There was some delay before it went ahead.

23   **Q.**  Do you recall approximately how many months it was before

24   it actually began?

25   **A.**  Two or three months.  I mean, it was a fairly significant

1    delay.

2    **Q.**   I want to play you a call from June 3, 2010, Exhibit 24,

3    which has been admitted into evidence.

4              THE COURT:  Is this in the notebook?

5              MR. JOHNSTON:  Yes, it is.

6              THE COURT:  Which tab?

7              MR. JOHNSTON:  24, Your Honor.

8              (Voice recording played.)

9    **Q.**   Mr. Boomgaardt, you don't have a binder in front of you

10   right now?

11   **A.**   I don't, no.

12             MR. JOHNSTON:  Your Honor, permission to approach

13   the witness?

14             THE COURT:  Yes.

15             Do you have an extra binder?

16             MR. FRANK:  Yes.

17   **Q.**   Mr. Boomgaardt, we are in tab 24.

18   **A.**   Okay.

19   **Q.**   Who are you speaking with on this call?

20   **A.**   Edward Pennings.

21   **Q.**   When Mr. Pennings says, "I just spoke to Ross," who do

22   you understand him to refer to?

23   **A.**   Ross McLellan.

24   **Q.**   When Mr. Pennings says, "He suggests to get him involved

25   as well in the KIA deal," then Mr. Pennings says, "You know,

1   make it nice," what do you understand Mr. Pennings to be

2   saying to you?

3   **A.**   That Ross is going to have an input in this deal.  And

4   make it nice means to see how much revenue we can get, how

5   much money we can make from this deal.

6   **Q.**   Is that typical to involve -- was that typical at the

7   time to involve the global head of Portfolio Solutions to

8   maximize the amount of revenue in a given deal?

9   **A.**   No, no, it wasn't usual.

10          (Voice recording played.)

11  **Q.**   Mr. Boomgaardt, what do you understand Mr. Pennings to

12  mean when he says, "He said you can still take one or two on

13  the outgoing side"?

14  **A.**   He's referring to a conversation with Ross.  I guess,

15  that's my assumption from what he said there, take one or two

16  basis points on the sell side of that transition.  The

17  outgoing side being the side we're selling.

18  **Q.**   In general in a transition are there two opportunities to

19  take commissions?

20  **A.**   Well, you can take a commission on any of the trading,

21  either selling, outgoing, or the incoming managers would be

22  the buy side, so either side, yes.

23  **Q.**   So when you're doing a transition, you're selling one set

24  of assets, correct?

25  **A.**   Correct, yeah.

1   **Q.**   Then buying another set of assets?

2   **A.**   Yeah, usually, if it's a two-sided transition, which is

3   most of the time, yes, yeah.

4   **Q.**   So on the outgoing side is the sell portion?

5   **A.**   That's correct.

6   **Q.**   And then what do you call the other side?

7   **A.**   The incoming side, the target side, the buy side, all of

8   those things would be the same.

9   **Q.**   So when he says, "You can still take one or two on the

10  outgoing side," does that refer to the sell side?

11  **A.**   That's right.  Yeah, he's referring to the sell side.

12  **Q.**   Then "one or two," what does that mean?

13  **A.**   One or two basis points is the way that I take that.

14  **Q.**   When Mr. Pennings says, "No one is going to notice that,"

15  what do you understand him to mean?

16  **A.**   That it's small enough that the client isn't going to

17  notice that we've taken that.  They're not going to come and

18  ask us why the prices are -- our support.  It's something

19  that's going to get lost in the rounding, as he says.

20  **Q.**   And why would you be hiding this from the client?

21  **A.**   To avoid the uncomfortable questions about how big of a

22  commission was taken on these trades.

23  **Q.**   And in your understanding who is the one who suggested to

24  take one or two on the outgoing side?

25  **A.**   Well, Ed is implying that that is Ross that said that.

1          (Voice recording played.)

2   **Q.**  Did the trades for KIA begin shortly after this call?

3   **A.**  Yes, yes, I think they did.  Certainly later that month

4   anyway, yeah.

5   **Q.**  Is there a document that spells out typically how much is

6   going to be charged in a given transition?

7   **A.**  Well, there is -- usually there's a periodic notice that

8   goes with a transition that sets out the specifics of any

9   commission agreed with the client, yes.

10  **Q.**  And does that document then inform trading instructions?

11  **A.**  Well, the trading instructions or the instructions to the

12  traders come from the transition management desk normally.

13  So usually the analyst that's running the transition or the

14  lead analyst sends out the trading instructions to the

15  traders via email normally.

16  **Q.**  And typically are you as a transition manager deciding

17  which bonds and stocks to buy or sell, or is that list given

18  to you by the client?

19  **A.**  The client normally gives us the list of what they hold

20  and the list of what they'd like to hold.  From those two

21  lists we work out what trading is necessary.  But we're not

22  really -- we're not making investment decisions so much as

23  figuring out -- if they already hold something that they'd

24  still like to hold, we don't trade that, obviously, but it's

25  working out what net trade needs to get done to get them

1    where they'd like to go.

2    **Q.**   So getting from the stage where you know what the client

3    wants but then the traders need to know what to do, how are

4    those instructions given?

5    **A.**   Once our team, our project management transition

6    management team has worked out what trade needs to happen,

7    those are loaded up into our trading system, and specific

8    instructions are then given to the traders about how to trade

9    it.

10             You know, there can be quite difficult transitions

11   where there are different things happening in different

12   regions, for instance, we're trading European stocks and

13   bonds and U.S. stocks and bonds and Asian stocks and bonds.

14   We need to make sure that we're trading those in the right

15   quantity so we're not leaving the portfolio sitting in cash

16   for too long or any of those kinds of things.

17             So there will always be a set of instructions that

18   come from our transition manager to the trading team

19   instructing them how much to trade.

20   **Q.**   Do you work with State Street's traders around the world

21   on a given transition?

22   **A.**   Yes.   If there are assets that need to be traded in

23   various different regions, then yeah.

24   **Q.**   Typically who trades European stocks and bonds for a

25   transition client?

1  **A.**   Typically that would be our desk in London.

2  **Q.**   What about U.S. stocks and bonds?

3  **A.**   That would be done by the team in Boston normally.

4  **Q.**   Even if a client is based in Europe?

5  **A.**   That's correct, yeah.  The executions would still be done

6  by our Boston trading team.

7  **Q.**   And so how would the Boston trading team know which

8  stocks and bonds to buy or sell for a European client that

9  you've engaged with in London?

10  **A.**   We had the same trading system, so they could see -- if

11  we loaded up a trade that had assets for them to trade, they

12  would see that, certainly on the equity side.  It was a

13  little bit more manual on the bond side.  We would send them

14  a file for them to upload themselves, but those instructions

15  about what to trade would be effectively coming from my desk

16  of transition managers.

17  **Q.**   A file over email?

18  **A.**   Yeah.

19  **Q.**   On those emails, would there be any -- would it specify

20  how much commissions would be charged on the bonds?

21  **A.**   Normally it would, yeah.  Normally it would tell them

22  what commissions to apply on each of the trades.

23  **Q.**   And then typically who actually applies the commission to

24  the trade?

25  **A.**   Mechanically, it's the traders.  They're the ones that

1    book the trades, so that commission needs to get applied in

2    their trading systems.

3    Q.  And do they do it after they've already bought and sold

4    something in the market or before?

5    A.  I guess it depends a little bit.  They do it after

6    they've traded.  But for equities, the commission schedule is

7    uploaded into their system.  So it's -- and that's done

8    before the trade.  So it kind of books more or less

9    automatically when they're ready to go.

10             Bonds, again, were a little more manual, but again,

11   they would generally upload the commission so that they knew

12   what they were getting on those trades before they started.

13   Q.  So what you're saying is that commissions were applied

14   automatically for stocks?

15   A.  Yes.

16   Q.  But they were applied more manually for bonds?

17   A.  That's generally true.  Bonds were generally a more

18   manual -- more manual trading in general, including the

19   booking side.

20   Q.  And it was the traders who would apply the commissions to

21   the bond trades?

22   A.  That's right.  They're the only ones that could.  My team

23   didn't have access to the trading system to be able to do

24   that.

25   Q.  Now I'm going to play you another call, this one from

1    June 15, 2010.

2            THE COURT:  Which tab?

3            MR. JOHNSTON:  This is tab 3.

4            (Voice recording played.)

5    **Q.**  Mr. Boomgaardt, who are you speaking with on this call?

6    **A.**  I'm speaking with two of our bond traders in Boston,

7    Steve Finocchi and Greg Spyropoulos.

8    **Q.**  So they work on the Boston trading desk?

9    **A.**  That's right.

10   **Q.**  Where are you at the time this call is being made?

11   **A.**  In London.

12   **Q.**  Why were you calling Mr. Spyropoulos and Mr. Finocchi?

13   **A.**  To give them trading instructions to make sure they

14   understand how we need them to trade KIA, and AHV, as well is

15   another trade we had at the same time.

16   **Q.**  I thought you said you typically send out instructions

17   via email?

18   **A.**  We do, and if they are complicated, we would follow them

19   up with a phone call.  It's not unusual to speak with them,

20   particularly if it's something that's the size of this,

21   following up with a phone call was not an uncommon thing.

22   **Q.**  What's so unusual about the size of this deal?

23   **A.**  It's big.  It's a $2 billion sell of bonds and a $2

24   billion buy of bonds.  That's a very, very big transition.

25   **Q.**  What types of bonds are being sold here?

**A.**   The sell side are T bills, so very short-dated U.S.
government bonds with a very short maturity, usually
somewhere between kind of 30 and 90 days.

**Q.**   Where are T bills typically traded?

**A.**   They're U.S. securities, so they're generally traded in
the U.S.

**Q.**   So you need the folks in Boston to do this for you?

**A.**   Yeah, yes.

**Q.**   Could your traders in London do this?

**A.**   I don't think so.  I don't remember a time when they did.

**Q.**   You mentioned about halfway down the first page, "I tried
to grab Ross.  He is just interviewing a guy."  Who are you
referring to there?

**A.**   Ross McLellan.

**Q.**   Was he there with you in London?

**A.**   He was there in London at the time, yeah.

**Q.**   Why are you mentioning Ross to Mr. Spyropoulos and
Mr. Finocchi?

**A.**   Because Ross wanted to be involved in the conversation,
wanted to be involved in the trade.  Also, you know, those
guys are used to seeing Ross on a daily basis, so, you know,
knowing that these instructions effectively are coming from
Ross, I guess, to make them comfortable with what I'm telling
them.

**Q.**   You say that that they see Ross on a daily basis.  Is

1    that because --

2    **A.**   They're based in Boston.  They're in the same geographic

3    location.

4    **Q.**   Have you been to State Street -- or had you been to State

5    Street's Boston office at this point?

6    **A.**   Yeah.

7    **Q.**   Where did Mr. Finocchi and Spyropoulos sit compared to

8    where Mr. McLellan sat?

9    **A.**   Oh, it's an open -- it's a big open trading floor in

10   Boston, and Ross's office was kind of around the edge of

11   that, I guess.

12           MR. JOHNSTON:  All right.  Could we continue.

13           (Voice recording played.)

14   **Q.**   Mr. Boomgaardt, directing your attention to page 2 of the

15   transcript to line 6 and 7, when you say to the traders,

16   "Before you book out the client side, send the executions

17   across, and we will have a look and figure out what levels we

18   want to put on the client side," what are you referring to

19   there?

20   **A.**   That'S saying once you've done your executions in the

21   market, send those over, and we'll tell you what commissions

22   to apply so that -- we'll tell you the prices that we want

23   you to book out to the client.  The difference between what

24   we book out to the client and where you've executed in the

25   market is effectively our commission, the money that State

1  Street makes off of those trades.

2  **Q.**  Now, you testified that before this you would also know

3  in advance the commission that you would apply; is that

4  correct?

5  **A.**  Yes, yeah.

6  **Q.**  Is it your testimony that here you're not even sure what

7  commission you're going to apply?

8  **A.**  That's correct, yeah.

9  **Q.**  And so why do you want to see the prices that traders

10  have been able to execute first?

11  **A.**  So that we can see if -- well, I guess for a couple of

12  reasons.  One, to see how well they've executed relative to

13  where trading was that day so that we can apply a commission

14  and to make sure that that commission is as big as it can be

15  while still being -- looking reasonable so that the least

16  likely that the client or anybody else is going to notice

17  that there was a commission taken on those, so consistent

18  with what the trading range of the day is for those

19  securities.

20  **Q.**  So are you saying that a particular bond will trade

21  within a price range?

22  **A.**  Yeah.  It's over a day of bonds, just like stocks, the

23  prices will move around a little bit for lots of different

24  reasons.  And what we're saying there is send us over what

25  you've executed and we'll have a look to see where it traded

1   to make sure that our commission that we're going to put on

2   it is both, you know, as big as it can be but also not so big

3   that it's going to be taking us wildly outside of that range

4   so a client who had access to that information about trading

5   ranges for that the day would go, "Well, hang on a second.

6   My executions look a long way away from what the market was

7   trading that day."

8   **Q.**  You also say on line 8 and 9, "We're basically doing them

9   at zero, and they told us to take a markup or markdown to

10  sort of remunerate ourselves."  What do you mean by that?

11  **A.**  Well, it was a zero commission -- it's a zero commission

12  deal.  So I guess going back to where we were with KIA, they

13  instructed us and we pitched and agreed to do it for zero

14  commission.

15          As I said, Ed did tell Das that we were going to be

16  taking a spread on these.  And my understanding of the

17  conversation that he had with Das was that Das okay with

18  that, so take a spread, just don't show it as a commission.

19  **Q.**  You just didn't know what other representations Ed may

20  have made?

21  **A.**  Exactly.  I mean, he made me aware that he had that

22  conversation.  As I said, I did hear a part of that

23  conversation when I walked into his office.

24  **Q.**  At this point had you ever decided in the middle of a

25  trade how much to apply?

1    **A.**   No, no.

2    **Q.**   And then further down you say, "We can charge a couple of

3    basis points on price for the T bills.  That is probably

4    about all that is legitimate on that, I think."  What are you

5    referring to there?

6    **A.**   T bills are generally liquid and very easy to trade.  So

7    what I'm saying is, if we charge a couple of basis points,

8    you know, that's -- yeah, kind of inside market convention I

9    guess but on the more generous side for State Street.  So

10   it's a fairly large commission but it's not outrageous.

11   **Q.**   Is that referring to the buy -- sorry -- to the sell

12   side?

13   **A.**   That's the sell side, yeah.

14   **Q.**   So what types of bonds are being purchased?

15   **A.**   Much longer dated government securities.  So again,

16   government bonds that don't mature for a number of years.

17   **Q.**   Just so we understand you correctly, on the sell side,

18   you're telling the traders a couple of basis points?

19   **A.**   Yes.

20   **Q.**   But on the buy side you're telling them, "Don't actually

21   apply a commission yet.  Send us over the street prices and

22   we'll make up the that number later"?

23   **A.**   That's correct.

24   **Q.**   And why do you use the term on line 17, "That is probably

25   all that is legitimate"?

1    **A.**  Meaning these things are liquid, so it needs to be a

2    relatively small commission, again, to not be too, too

3    egregious.  I do think that's about as big as that commission

4    could be without it seeming very, very big.

5              I mean, this is I guess part of the reason I felt

6    uncomfortable with all of this is making up your own

7    commission rate is not easy.  You've got an inherent conflict

8    between making as much money for the bank as you can and

9    still treating the customer somehow fairly.

10   **Q.**  Had you ever just made up your own commission number

11   before that?

12   **A.**  No.

13              (Voice recording played.)

14   **Q.**  Mr. Boomgaardt, at the end of this or at the point where

15   we've stopped, what's your understanding of what the traders

16   have agreed to do for you?

17   **A.**  That they're going to sell the U.S. Treasury bills

18   essentially with 2 cents commission baked into the client

19   side execution, so a 2 cent commission on each of those for

20   State Street, and they're going to execute the buys in the

21   market, and they're going to send me a file of those buys so

22   I can then let them know what prices they should book out on

23   the client side.

24   **Q.**  And now I want to play you a call from slightly later

25   that day.  This is Government Exhibit 32, if you want to turn

1    to the tab behind 32.

2              (Voice recording played.)

3    **Q.**   Mr. Boomgaardt, are you on this phone call?

4    **A.**   I am, yeah.  I'm listening.  So on the trading desk,

5    multiple people can pick up the same line.  So that is Ross

6    and me from around my desk on our trading desk talking to

7    Steve Finocchi in Boston.

8    **Q.**   So at the time this call is taking place, where is

9    Mr. McLellan?

10   **A.**   Sitting next to me.

11   **Q.**   And you haven't spoken on this call yet, have you?

12   **A.**   No.

13   **Q.**   What's your understanding of what Mr. McLellan is asking

14   from Mr. Finocchi?

15   **A.**   He is asking him for the data around what the range of

16   the trading was for the executions that we've done on the buy

17   side for KIA.  So for everything we bought, he's asked for

18   the trading range, but specifically, what's the highest price

19   it's traded at today.

20   **Q.**   Why do you need this information from Mr. Finocchi?

21   **A.**   Well, as I said, for two things, to make sure that when

22   we add a commission we're not taking it wildly outside of

23   what those highs of the day were but also that we're not

24   leaving money on the table, I guess, that if there's a -- if

25   our guys have done a spectacularly good execution near the

1   low of the day, maybe there's scope to take a bigger

2   commission.  So it's both of those things, I guess, trying to

3   make as much as money for State Street but at the same time

4   not taking it outside of that range of the day so that

5   clients will start asking a lot of difficult questions, I

6   guess.

7   **Q.**  In your typical transition if your traders do an

8   excellent job, great prices in the market place, who gets the

9   benefit of that performance?

10  **A.**  The client does.

11  **Q.**  If you are marking up the trade to the high of the day,

12  who is getting, in that situation, the benefit of the

13  performance?

14  **A.**  State Street is.

15  **Q.**  Mr. McLellan mentions Bloomberg.  What is Bloomberg?

16  **A.**  Bloomberg, it's a multifaceted tool that's used a lot on

17  trading floors.  It has -- in this specific instance it has

18  data for almost every stock and bond you can think of.  It

19  has price data, but it also has details about what it is, and

20  it also has a news feed.  And in fact, our bond trading

21  system was actually integrated into Bloomberg.

22  **Q.**  What's your understanding of why you need Tradeweb if you

23  have Bloomberg in London?

24  **A.**  Tradeweb is a treasury kind of trading system in the

25  U.S., So it may have better data than what Bloomberg has in

1    it.  We will have looked at both of them.  Certainly we

2    looked at Bloomberg data, but Tradeweb data wasn't something

3    that we had access to in London.

4    **Q.**   Why do you need information from both sources?

5    **A.**   Again, so we can see the best data that's available for

6    those ranges of the day.

7    **Q.**   When Mr. McLellan says, "Basically, I want the high," do

8    you have an understanding of what he meant there?

9    **A.**   Well, what were the high prices?  How do we -- how can we

10   make sure -- we're going to be marking the prices up.  So we

11   want to make sure we're not marking them up past those highs

12   of the day or to such a degree that it's going to be obvious,

13   but at the same time, marking them up high enough that we're

14   maximizing the revenue that State Street can get.

15   **Q.**   And what about his laughter; was there a joke going on

16   between you and Mr. McLellan at the time?

17   **A.**   No.

18   **Q.**   Do you have an understanding of what was funny?

19   **A.**   Well, I mean, we're marking these trades up, so we don't

20   really care what the low of the day was.  We're looking at

21   the high of the day.  It's the only -- we talk about range,

22   but it's really only one side that we care about.

23                    (Voice recording played.)

24   **Q.**   Mr. Boomgaardt, what is your understanding as to what

25   Mr. Finocchi has agreed to do for you and Mr. McLellan at the

1    end of this call?

2    **A.**  To give that Tradeweb data to us, showing the highest

3    traded price on Tradeweb.  So according to Tradeweb, what was

4    the highest price of the day for all of those securities that

5    we had purchased on behalf of KIA that day.

6    **Q.**  Did you receive that data from Mr. Finocchi?

7    **A.**  Yes.

8    **Q.**  Did you -- what did you do after receiving that data?

9    **A.**  Ross and I looked at the Tradeweb prices, we looked at

10    the Bloomberg prices and decided on what commission we should

11    put on those trades for State Street and what prices we

12    should instruct Steve and Greg to book out to the client.

13    **Q.**  So it's still the traders at the end of the day who had

14    to actually enter in the record into the trading system?

15    **A.**  Yes, correct.

16    **Q.**  So you and Ross were deciding the commission, but they

17    still had to manually enter it?

18    **A.**  That's right.

19          MR. JOHNSTON:  If we could take a look, we're going

20    to be looking at an exhibit that's not yet in evidence, if it

21    can just be shown on the witness screen and counsel.

22          Exhibit 35, please.  Zoom in at the top, Erin.

23    **Q.**  Do you recognize this email, Mr. Boomgaardt?

24    **A.**  Yes, I do.

25    **Q.**  Who sent it?

1    **A.**   I did.

2    **Q.**   Who did you send it to?

3    **A.**   It's to Steve Finocchi, Greg Spyropoulos, and I guess a

4    couple of other traders, Ross McLellan and Adnan, who was the

5    analyst that I had working on it, as well as Todd Clemmenson,

6    who is another Boston-based trader, and Tom Bryant as well

7    who is the head of the trading desk or was the head of the

8    trading desk in Boston.

9    **Q.**   Was this sent on the same day as of this phone call we

10   just listened to, on June 15, 2010?

11   **A.**   Yes, it was.

12          MR. JOHNSTON:  Your Honor, at this time the

13   government moves to admit Exhibit 35 and 35-1, which is the

14   attachment to the email.

15          MR. WEINBERG:  No objection.

16          THE COURT:  Admitted.

17          MR. JOHNSTON:  Permission to publish to the jury?

18          THE COURT:  Yes.

19          (Exhibit Nos. 35 and 35-1 admitted into evidence.)

20          MR. JOHNSTON:  You can zoom in on the top again

21   there.

22   **Q.**   Mr. Boomgaardt, I want to direct your attention to the

23   attachment here.  What is it that's attached to this email?

24   **A.**   That attachment is showing the client side prices that

25   we're instructing the traders to book out.

1    **Q.**  And what do you write to Mr. Finocchi?

2    **A.**  "Steve, thanks for the help today.  Here are the client

3    side prices.  Let me know if you have any questions."

4    **Q.**  What was your understanding of what Mr. Finocchi is

5    supposed to do with the information in this attachment?

6    **A.**  Book out the prices that we show him on that Excel sheet.

7    **Q.**  Is Mr. McLellan one of the recipients on this email as

8    well?

9    **A.**  Yes, he is.

10    **Q.**  Let's take a look at the attachment, 35.1.

11         MR. JOHNSTON:  If you can zoom in, please, Erin, at

12    the top.

13    **Q.**  Could you help us understand what we're looking at here,

14    Mr. Boomgaardt?

15    **A.**  Sure.  That is a file showing the bonds that we traded

16    that day.  The CUSIP and the ISIN are unique identifiers for

17    each of those securities.  The description T stands for

18    Treasury.  So those are the U.S. Treasurys, and then you've

19    got two Canadian ones at the bottom there.  The date in the

20    description is the maturity date.

21    **Q.**  So the column that says "Price," what does that refer to?

22    **A.**  That's the price that the guys have traded at in the

23    market.  So the actual execution price that our guys have

24    already done in the market, so what we call the market side

25    or the street side of the trades.

1   **Q.** And what's the column on the right?

2   **A.** That is the client side, so the one in bold there is

3   reflecting the prices that we are asking the traders to book

4   out to the client. So the difference between that client

5   side bold price and just the price column is indicative of

6   the commission that State Street will be keeping.

7   **Q.** And then the top, directing your attention just to the

8   top row, which -- the row that says "Security" at the very

9   top, what's the particular bond that's listed there?

10   **A.** That is a U.S. Treasury bond that pays a 2.125 percent

11   coupon that expires at the end of May 2015.

12   **Q.** How large is it?

13   **A.** Well, we have traded 50 million of that.

14   **Q.** And what's the approximate commission that was applied to

15   this particular bond?

16   **A.** Well, on price it's about .2, so that price of around 100

17   means that the actual value of that will be about 50 million.

18   So those prices are done as a percentage, if you'd like.

19   **Q.** So on a $50 million bond with a 20-cent markup, what's

20   the commission and revenue to State Street from just the

21   single bond trade?

22   **A.** That's about $100,000.

23   **Q.** Is that typical compensation for a bond trade for one of

24   your transition clients?

25   **A.** No. That's very high.

**Q.**   How much higher?

**A.**   Typical, for something of that ilk, would be more in two

or three basis points maybe rather than 20.

**Q.**   So you're talking between seven to ten times higher?

**A.**   That's about right.

**Q.**   And typically, when your traders are executing in the

market, are they trying to get the best price for the client?

**A.**   Yes.

**Q.**   And why is that?

**A.**   Well, because that's an agency way of trading.  We're out

in the market trying to find them the best price.  That's our

duty.

**Q.**   So when you say you're an agent, that means you're trying

to find the best price, get the best price?

**A.**   That's right, yeah.

**Q.**   And if you do better than you expect, who generally gets

that benefit?

**A.**   The client generally gets that benefit.

**Q.**   Who got the benefit here?

**A.**   State Street got the benefit here.

**Q.**   Now, do you know whether you ended up booking out the

client side prices to the exact levels of the Tradeweb data

or whether you used Bloomberg?

**A.**   I don't recall exactly.  We looked at both, but I don't

remember seeing the data on what the Bloomberg prices were.

1    **Q.**  So you're not sure at the end of the day which one you

2    ended up relying on?

3    **A.**  I don't recall.

4    **Q.**  Based on what you recall of working with Mr. McLellan

5    that day, which one do you -- do you have an understanding of

6    which one you would have chosen?

7    **A.**  We would have looked at both and chosen the one that was

8    most advantageous to us.

9    **Q.**  So that made you the most money?

10   **A.**  Yeah.  That could have been Bloomberg, or it could have

11   been Tradeweb; I don't recall.

12   **Q.**  Was pricing the bonds like this to KIA, was that

13   consistent with how you had presented yourself to your

14   clients?

15   **A.**  No, no, it wasn't.

16   **Q.**  Did you feel comfortable doing this, sitting next to

17   Mr. McLellan, marking up the trades?

18   **A.**  No, no.  It made me feel uncomfortable because it's not

19   something I had ever done before.  I had been in the industry

20   for more than ten years at that point, and I had never had to

21   do that before.

22   **Q.**  Why did you do it?

23   **A.**  Well, I was being -- I was being asked to do it by a

24   couple of very senior individuals.

25   **Q.**  How much more senior to you was Mr. McLellan at the time?

1    **A.**   Well, I guess he was two rungs senior to me, I guess.

2    Yeah.  So I was -- at that point I believe I was a managing

3    director.  If not, he would have been three rungs higher than

4    me.  I got promoted whilst I was there from vice president to

5    managing director and then above that was senior managing

6    director, which is what Ed Pennings was, and then above that

7    was executive vice president, which is what Ross's title was.

8    **Q.**   So executive vice president is above senior managing

9    director?

10   **A.**   It is, yeah.

11   **Q.**   And that's above managing director?

12   **A.**   Yeah.

13   **Q.**   That's what you were at the time?

14   **A.**   I believe I was a managing director.  I can't remember if

15   this one was before or after my promotion.  If it was before,

16   then I would have been a vice president, which would have

17   been another rung below managing director.  When I started at

18   State Street I came in as a VP.

19   **Q.**   Now, we just looked at some of the commissions on this

20   one set of bond trades.  Were there additional trades that

21   were done as part of this transition?

22   **A.**   Well, there was the sell side, I guess, that were done

23   there as well.  I don't know if there were others done or

24   not.

25   **Q.**   Do you know approximately how much in commissions State

1    Street made from the KIA transition in June?

2    **A.**   I don't know the -- I don't know the exact number.   I

3    know it was in the millions, but I don't know exactly what

4    that number was.

5    **Q.**   Was that higher or lower than your normal commissions?

6    **A.**   That's a high commission transition, yeah.   That is an

7    elephant deal in every sense.

8    **Q.**   Did this plan to charge higher commissions than you had

9    actually disclosed to the clients continue after KIA?

10    **A.**   It did, yeah.

11    **Q.**   Do you recall a client by the name of Dutch Doctors?

12    **A.**   I do, yeah.

13    **Q.**   Who are they?

14    **A.**   They are a pension fund in Holland that's set up for

15    doctors.   So it's a pension fund to look after and providing

16    income in retirement for doctors in the Netherlands.

17    **Q.**   Did you perform a transition for them in the summer of

18    2010?

19    **A.**   Yes.

20    **Q.**   What kind of assets were they looking to buy and sell?

21    **A.**   Bonds.

22    **Q.**   Do you know whether they negotiated with you on the basis

23    of price?

24    **A.**   I believe they did.   I mean, it was Ed's client.   I

25    wasn't so much involved in the negotiation on Dutch Doctors.

1    **Q.**   Do you know whether you only charged what had been agreed
2    upon with the client?
3    **A.**   No.  We charged more than what was agreed upon with the
4    client.
5    **Q.**   What did you end up doing?
6    **A.**   We -- the agreement was a one basis point charge, and we
7    charged 1.5 basis points, so effectively 50 percent more
8    commission than what had been agreed.
9    **Q.**   I want to play you a call from June of 2010 that's been
10   admitted into evidence, Government Exhibit 43.  If you could
11   turn to that tab.
12                (Voice recording played.)
13   **Q.**   Mr. Boomgaardt, who are you speaking with on this call?
14   **A.**   Ed Pennings.
15   **Q.**   And who are all the names that are being mentioned at the
16   beginning of the call?
17   **A.**   They're all people who are involved with the client Dutch
18   Doctors in one way or another.
19   **Q.**   And why are you talking about sending them something?
20   **A.**   Before any transition, we send them a pre-trade analysis,
21   so a quantitative analysis that shows where the risks of the
22   portfolio are.  It also informs what our trading strategy is
23   in terms of how we'll trade the bonds.  It also gives them an
24   estimate, our estimate of what the total cost of that
25   transition is going to be.  We also put together a project

1    plan that sets out who the parties are that we're engaged

2    with and a timeline of what needs to happen.

3    **Q.**  And in this particular call why are you discussing

4    sending a new pre-trade out?

5    **A.**  They changed the transition.  I believe they made -- they

6    put more assets into the transition, so it ended up being a

7    little bit bigger than what we had initially -- the analysis

8    that we had done for them initially.

9    **Q.**  So you had to update that?

10   **A.**  Yeah, yeah.  A bigger trade generally means you're going

11   to incur a little bit more, certainly market impact and

12   trading costs.

13   **Q.**  And I know it's implied in the name "pre-trade," but is

14   this sent before trading starts?

15   **A.**  It is, yeah.

16   **Q.**  You testified that it includes an estimate of total

17   costs; is that correct?

18   **A.**  Yes.

19   **Q.**  So the indirect costs that you previously testified

20   about?

21   **A.**  Everything.  It's an implementation shortfall.  It's the

22   overall cost, yeah.

23   **Q.**  So that would have estimates of opportunity cost?

24   **A.**  Yeah.

25   **Q.**  Bid-ask, spread?

1    **A.**   Yeah.

2    **Q.**   Then does it also include the direct costs?

3    **A.**   It does.  There are fewer direct costs in terms of taxes

4    and fees and things in the bond market.  There aren't very

5    many, so those aren't broken out separately.  But any

6    commission that we've put in would be included in that cost

7    calculation but inside the bid-ask spread.

8    **Q.**   So the costs, the commission that State Street would be

9    earning would be included in the implementation shortfall

10   that's being provided?

11   **A.**   Yes, yeah.

12            (Voice recording played.)

13   **Q.**   Mr. Boomgaardt, directing your attention to line 10 on

14   page 2, why do you refer to the numbers 51 versus 47.7?

15   **A.**   Those are the cost estimates.  So they've increased the

16   size of it.  What I'm saying there is the estimated cost is

17   now 51 basis points.  The first one we sent to them was 47.7.

18   **Q.**   And that's sort of the total --

19   **A.**   Total cost estimate, yeah.

20   **Q.**   -- direct, indirect, all rolled into one?

21   **A.**   Yeah.

22   **Q.**   What do you understand Mr. Pennings to be asking of you

23   when he says, "Well, if they ask you, say you built in 1 BP,"

24   right?

25   **A.**   He is saying if they ask, tell them that I built one

1    basis point of commission into that pre-trade.

2    **Q.**   Okay.  Then you say, "Okay.  I actually had to scale it

3    down slightly in our columns to get it down."  What do you

4    mean by that?

5    **A.**   That in order to make the difference between that 51 and

6    47.7 not look quite so big, I actually did -- it's implying

7    that I had actually built in a bigger commission, a basis

8    point and a half or something, in the first one, but I had to

9    scale it down to one basis point, about, anyway, in that

10   pre-trade.

11   **Q.**   Okay.  So what you sent over to the client or what you're

12   about to send over to the client includes something at one

13   basis point?

14   **A.**   That's -- I would have to look at the analysis, but

15   that's what I'm saying there.

16   **Q.**   Then Mr. Pennings says, "But make no mistake, we will

17   take one and a half."  What do you understand him to mean?

18   **A.**   That we're going to be charging a basis and a half of

19   commission, despite whatever is in the pre-trade analysis.

20   **Q.**   So before trading starts and despite telling the client

21   one basis point, you're going to take one and a half?

22   **A.**   That's correct.

23   **Q.**   And then when he says, "All right.  They don't need to

24   know that," what do you understand him to be saying?

25   **A.**   Don't tell that to the client.

1   **Q.**   So if they come asking --

2   **A.**   Yeah, don't tell them.

3   **Q.**   Did this transition just include bonds?

4   **A.**   I think it did.  I think it was just a bond transition.

5   **Q.**   And what made it possible to do this, to charge one and a

6   half rather than one where the client would have to ask you

7   to even know?

8   **A.**   Again, commissions weren't and our fixed income reporting

9   weren't as a matter of course broken out separately.  We had

10   to do that manually.  It was a bit of a system thing.  But

11   also in terms of what gets reported to the client and their

12   custodian, the actual transactions that go across only show

13   the client side.  So they only show the net price.  It

14   doesn't show a commission column.  It doesn't say how much

15   money has been taken between where we executed in the market

16   versus what's booked out to the client.  The client only sees

17   their execution; that's it.

18   **Q.**   So they're hidden because of the way the reporting

19   convention --

20   **A.**   Correct, they can't see them.

21   **Q.**   You said that, you testified with KIA that there is some

22   data points available to clients based on sort of just market

23   trading data; is that correct?

24   **A.**   Yes, yeah, there is.

25   **Q.**   So that's sort of the outer limit of the secret

1    commissions you could take?

2    **A.**   It is, yeah.  Most -- but again, it would be generally

3    not possible for most bonds for a client to pick out which

4    was their execution out of anything they see off of

5    Bloomberg, certainly.

6    **Q.**   But if their execution was higher than the highest of the

7    day, would that be noticeable?

8    **A.**   It would be, and certainly something they would be likely

9    to ask a question about.

10   **Q.**   Do you know whether State Street ended up charging one

11   and a half basis points on this transition?

12   **A.**   Yes.  We did charge one and a half basis points on it.

13   **Q.**   Do you know how much in commission that equalled out to?

14   **A.**   I don't know the exact numbers for Dutch Doctors either,

15   but again, it was a million-ish, something like that, I

16   think.

17   **Q.**   In extra revenue or total revenue?

18   **A.**   Sorry.  In extra revenue, yeah.  I think the total

19   revenue was 2 to 3 million, something in that range,

20   certainly in the millions anyway.

21   **Q.**   So an extra 50 percent was from that added commission?

22   **A.**   That's right, yeah.

23   **Q.**   Did you send a post-trade to the client?

24   **A.**   Yes, we did.

25   **Q.**   Did that have the commission number separately broken

1    out?

2    **A.**   No, it didn't.

3    **Q.**   Why didn't it have the commission numbers broken out?

4    **A.**   It wasn't our normal way to report fixed income.  It was,

5    again, in order to get those numbers -- in equities, it was

6    easy because it came straight out of our trading system, and

7    the commission after was easy.  Fixed income was a lot more

8    manual, so it was our standard report that just didn't break

9    out commission.  It had to be done in a manual way.  And it

10   wasn't for this one.

11   **Q.**   How would the client know if State Street hadn't lived up

12   to their end of the bargain?

13   **A.**   In terms of how much commission we took?  They wouldn't

14   know from any of the reporting that we sent them.

15   **Q.**   What if they asked you?

16   **A.**   If they asked us, we could show them the street side

17   executions or we could quantify exactly what those were,

18   yeah.

19   **Q.**   And what did Ed Pennings instruct you to do if Dutch

20   Doctors did in fact ask?

21   **A.**   Well, he told me not to tell them.

22   **Q.**   Did they come asking about that at this time period in

23   the summer of 2010?

24   **A.**   They certainly didn't come asking me about it.  I don't

25   know what conversations anybody else had with them.  I wasn't

1    their main contact.  But I certainly didn't take any queries

2    from them on that I don't believe.

3    **Q.**  So you didn't have to lie to them --

4    **A.**  Correct.

5    **Q.**  -- at this point?  Did you have an understanding whether

6    anyone above Ed approved taking this extra commission from

7    Dutch Doctors?

8    **A.**  Yeah.

9                MR. WEINBERG:  I object, unless there's an

10   evidentiary basis for his understanding, Your Honor.

11               THE COURT:  Sustained.

12   **Q.**  Did you have regular discussions with Ed Pennings about

13   charging secret commissions?

14   **A.**  "Regular" as in for all of the deals where we did it,

15   certainly, yeah.

16   **Q.**  Including for Dutch Doctors?

17   **A.**  Yes, I believe so.

18   **Q.**  Did you have any discussions where Mr. Pennings conveyed

19   to you whether Mr. McLellan knew about charging undisclosed

20   commissions on Dutch Doctors?

21   **A.**  He certainly led me to believe that Ross did know about

22   this and all of the other ones.  But I don't -- I don't

23   recall having a conversation directly with Ross on this

24   particular transition.

25               MR. WEINBERG:  I object to, "led him to believe,"

1    Your Honor, as being an improper evidentiary basis.

2             THE COURT:  You can clarify it before I rule on it.

3    Q.  How often would you speak with Ed Pennings around deals

4    like this where you were not being transparent with your

5    client?

6             MR. WEINBERG:  I object to the editorialization of

7    what he's doing or not doing.

8             MR. JOHNSTON:  I am restating the witness's

9    testimony.  He already testified that charging secret

10   transitions was not being transparent with the client, so it

11   was just to direct the witness's attention to --

12            THE COURT:  Restate the question.

13            MR. JOHNSTON:  Sure.

14   Q.  How often did you speak with Ed Pennings about the

15   transitions where you would not be transparent with the

16   clients?

17            THE COURT:  You can answer that.

18   A.  Frequently.  I mean, I spoke to Ed frequently anyway

19   about everything, but certainly on a very regular basis

20   around these transitions.

21   Q.  And in each of them, particularly with Dutch Doctors, do

22   you recall conversations where Ed made statements about Ross

23   approving of the extra?

24            THE COURT:  Well, what did he say?

25   Q.  What did he say, if you can recall about --

1  **A.**  I mean, I don't recall the exact conversations that I had

2  with Ed.  I do remember my own perceptions from those

3  conversations with Ed that Ross did know about these.

4  　　　　MR. WEINBERG:  I object, Your Honor.  There's again

5  no foundation for his perceptions and no memory of any

6  specific conversation with Mr. Pennings regarding

7  Mr. McLellan and Dutch Doctors.

8  　　　　MR. JOHNSTON:  Your Honor, these witnesses are

9  testifying about things from seven years ago.  Most people

10  can't remember a specific conversation seven years ago unless

11  we have a recording in front of them.

12  　　　　MR. WEINBERG:  I object to the speech about memory.

13  　　　　THE COURT:  Sustained as to the speech.

14  　　　　Ladies and gentlemen, what people remember is for

15  you to decide.  Whether they remember things from today,

16  seven years ago is for you to decide.  The question is what

17  is the basis for him to say -- you can ask him what led him

18  to believe this, but there has to be some foundation for it

19  as opposed to just in the ether he thought it was okay.

20  **Q.**  What if anything about your conversations with Ed led you

21  to believe that Ross approved of this?

22  **A.**  Again, I can't recall the exact specific conversation

23  that I had with Mr. Pennings but --

24  　　　　MR. WEINBERG:  Therefore I object, Your Honor.

25  　　　　THE COURT:  Let him finish the answer.

1    **A.**   But I remember clearly for this transition and all of

2    them having the perception given to me from Ed, because I

3    don't recall talking to Ross about this specific one, but

4    that Ross knew.

5              MR. WEINBERG:   I object and move to strike.

6              MR. JOHNSTON:   Can I ask a few more clarifying

7    questions?

8              THE COURT:   Yes.

9              MR. WEINBERG:   I'd ask the prosecutor not to lead

10   the witness in this area.

11             THE COURT:   Yes.   Who, what, when, where, why and

12   how.

13   **Q.**   Of all the transitions that you worked on, how many of

14   them involved the types of commissions that we've talked

15   about?

16             THE COURT:   During what time period?

17   **Q.**   2010, 2011?

18   **A.**   There were half a dozen or so.

19   **Q.**   And what did that --

20             THE COURT:   Half a dozen had these types of

21   commissions?

22             THE WITNESS:   That's correct, yeah.

23   **Q.**   And in that time period, 2010 and 2011, how many

24   transitions in total did you work on?

25   **A.**   Just in Europe we were doing about 100 a year.

1    **Q.**  Were you comfortable with the transitions that you --

2    with the transitions that involved these types of

3    commissions?

4    **A.**  No.

5    **Q.**  Did that discomfort lead to any -- do you have any

6    recollections, do those memories stand out a little greater

7    to you than just the normal work that you did?

8            MR. WEINBERG:  I object.

9            THE COURT:  Sustained as to the form.

10   **Q.**  Do you remember conversations about the transitions that

11   involved these types of commissions?

12   **A.**  I remember them more than the standard ones, yes, because

13   these were unusual.  They were -- they took us into a

14   different way of charging clients, yeah.  Yeah, I do remember

15   them well.  They were big transitions as well, so those do

16   tend to stick out more as well.

17   **Q.**  And what's the only reason why you went along?

18   **A.**  Because I was given assurances and asked to do it by

19   senior people that I trusted.

20   **Q.**  So then when you did this, when you agreed to lie to the

21   client in that call with Dutch Doctors, who did you believe

22   understood or approved of this?

23           MR. WEINBERG:  I object.  There's either

24   conversations which are a proper predicate that this witness

25   remembers or no memory --

1          THE COURT:  Sustained as to the conclusion.

2     Q.  Did you have conversations with Ed Pennings about Ross's

3     involvement in each and every one of these deals?

4          MR. WEINBERG:  I object, unless it's focussed on

5     one or another rather than all.

6          THE COURT:  Overruled.  You can ask him first if he

7     had general conversations about these deals, yes.

8     Q.  Did you have conversations with Ed Pennings about the

9     deals involving secret commissions?

10    A.  Yes, yes, I did.

11    Q.  With each and every one of them?

12    A.  Yeah.  Again, I can't remember the specific

13    conversations, but each and every one of them I certainly had

14    conversations with Ed and Ed told me that this was approved

15    certainly by Ross.

16    Q.  Did the plan to charge hidden commissions continue?

17    A.  Yes, it did.

18    Q.  Was there any type of deal that was appropriate or that

19    was deemed appropriate to charge hidden spreads on?

20    A.  Large fixed-income-related transitions.

21    Q.  And why were large fixed-income transitions the ones to

22    do?

23    A.  Fixed income because the reporting could be more opaque.

24    The client couldn't see those commissions in our reporting,

25    so that was fairly easy to keep them from -- pardon me --

1   from the client seeing.  And large, because they were the

2   ones that could generate the most revenue.

3   **Q.**  But why not do it on every bond transition that you did,

4   whether large or small?

5   **A.**  It was a deviation from the way we sold ourselves in the

6   market.  The more we did, the more likely that that deviation

7   from our normal plan or normal way of doing business would --

8   the risk of that getting out was greater.  So, you know,

9   focus it on the ones where the impact is the greatest and try

10  and keep it quiet.

11  **Q.**  In this time period of 2010, did you speak about it

12  openly in the London transition team?

13  **A.**  No.

14  **Q.**  With whom did you discuss it in London?

15  **A.**  Only the management team really in London.

16  **Q.**  Did there come another opportunity in 2010 to charge

17  hidden commissions on a KIA transition?

18  **A.**  Yes.

19  **Q.**  And when did that opportunity arise?

20  **A.**  It was later in 2010.  I forget exactly the month.

21  **Q.**  And what type of transition was it?

22  **A.**  It was another bond transition.

23  **Q.**  Who told you about this opportunity?

24  **A.**  Ed.  Ed was the salesperson that covered KIA, so those

25  queries always came in via him.

1    **Q.**  Do you know if a commission rate was promised to the

2    client?

3    **A.**  A commission of zero was promised to the client.

4    **Q.**  Is that what you ended up charging?

5    **A.**  No.

6              MR. JOHNSTON:  All right.  I want to show an

7    exhibit just to the witness, please.

8              THE COURT:  All right.

9              MR. JOHNSTON:  Government Exhibit 59.  If we can

10   zoom in on the text, please.

11   **Q.**  Do you recognize this document, Mr. Boomgaardt?

12   **A.**  Yes, I do.

13   **Q.**  What is it?

14   **A.**  It is an email from Adnan Choudhary, who is one of the

15   analysts that worked for me on my team, to various fixed

16   income bond traders, copied to Ross, Ed and myself.

17   **Q.**  What's the date on this email?

18   **A.**  It is 3rd of November 2010.

19             MR. JOHNSTON:  Your Honor, at this time the

20   government moves to admit Government Exhibit 59.

21             MR. WEINBERG:  No objection.

22             THE COURT:  Admitted.

23             (Exhibit No. 59 admitted into evidence.)

24             MR. JOHNSTON:  Permission to the publish to the

25   jury?

1          THE COURT:  Yes.

2          MR. JOHNSTON:  If we could zoom in again on the

3     text, please.

4     **Q.**  Mr. Boomgaardt, who is Adnan Choudhary?

5     **A.**  He was one of my transition analysts, so he worked for me

6     on my team.

7     **Q.**  And what role did he play in a transition?

8     **A.**  He was the main project manager, so he was the one who

9     ran the operational side, the nuts and bolts of the

10    transition, not the trading side, but all of the planning,

11    analysis, that kind of thing.

12    **Q.**  Then the subject line, "Project X RNSET3 Trading

13    Instructions."  What is that referring to?

14    **A.**  Project X was just our internal name for this KIA

15    transition.  RNSET3 is the account name, our own internal

16    account name for the KIA.

17    **Q.**  And what's included on this attachment -- what is

18    including as an attachment to this email?

19    **A.**  The trade file, the actual buys and sells that need to be

20    done.

21    **Q.**  What types of assets would be listed in the trade file?

22    **A.**  Stocks and bonds.  For this one I think it was

23    particularly just bonds.

24    **Q.**  And who is this email being sent to on the To line

25    specifically?

1    **A.**   Those are all bond traders, both London-based and

2    Boston-based.

3    **Q.**   Who are the London-based traders?

4    **A.**   George McLean, Daniel Hines, and Ian Barnes are

5    London-based.

6    **Q.**   Who are the U.S. traders?

7    **A.**   Thomas Clemmenson and Steve Finocchi on that.

8    **Q.**   So the last two would be based in Boston?

9    **A.**   That's right.

10   **Q.**   Why do you need both traders in London and traders in

11   Boston to trade bonds for you?

12   **A.**   The U.S. team will trade the North American bonds, and

13   the European team will trade everything else.

14   **Q.**   Directing your attention to the fourth line of text where

15   it says, "Comms, 2 BPs of value on the sell side and 18 BPs

16   of value on the buy side," what is that referring to?

17   **A.**   That's telling the traders what commissions to book out

18   on those trades.

19   **Q.**   So again, are we talking about commissions being applied

20   to both selling the clients' old assets and also when they're

21   buying their new assets?

22   **A.**   Yes, yeah, and two different commission rates to be

23   charged on the sell side and a different one on the buy side

24   as well.  So two BPs on the sale side, 18 BPs on the buy

25   side.

1  **Q.**  Do you know why the buy side commission is nine times

2  higher than the sell side commission?

3  **A.**  Similar to the last KIA transition, they were going from

4  very short-dated, short-duration assets to much longer,

5  longer-dated.

6  **Q.**  Which meant what?

7  **A.**  Which meant that the trading range tended to be -- tended

8  to be wider, the bid-ask spread tended to be bigger, and the

9  availability of pricing data was more opaque.  So the ability

10  to take larger commissions existed on the buy side more so

11  than the sell side.

12  **Q.**  Are these similar rates or similar levels of commission

13  to what you took in the prior KIA transition?

14  **A.**  They look pretty similar.  I would need to see the

15  details of the bonds but certainly similar in terms of value

16  from what we've seen in the last execution file.

17  **Q.**  When it says "Comms," is that an abbreviation from

18  something?

19  **A.**  Commissions.

20  **Q.**  And you used the term commissions even though these are

21  bonds?

22  **A.**  Yes, yeah.

23  **Q.**  What are synonymous terms for commissions on bonds?

24  **A.**  Markup, markdown, spreads.  But again, those were the

25  mechanisms for taking the commissions.  They all really refer

1    to the same thing.

2    **Q.**   Then directing your attention to the fourth line from the

3    bottom where it says, "All, please show the high and low of

4    the day before booking the trades.  Please forward to Rick,

5    Ed and me."  What's your understanding of why Adnan is giving

6    this instruction to the traders?

7    **A.**   Same as the previous KIA transition, so that we can look

8    at the executions that are done in the market relative to

9    where the highs and lows are depending on whether we're

10   buying and selling and make sure that our commissions are

11   both as big as they could be but also that it's not taking

12   the executions wildly outside of the range of the day, so

13   less likely to be noticed.

14   **Q.**   So if the traders do a good job, who is going to get the

15   benefit of that outperformance?

16   **A.**   Well, State Street will.  Although on this one I think

17   we're being -- we're actually trying to put the same

18   commission on all of the trades at least, so it's less of a

19   performance bonus for State Street, I suppose.

20   **Q.**   But then if it's already established before trading

21   starts what you're going to charge, why do you need to see

22   the highs and lows of the day?

23   **A.**   Well, exactly for what I just explained, so that we can

24   make sure that we're -- that the commissions for State Street

25   are going to be high and that they're unlikely to be noticed

1    by the client because we're keeping them close to the trading

2    range of the day.

3    **Q.**   So what happens if you looked at the client price plus

4    the 18 BP commission and it was a bit higher than the high of

5    the day?

6    **A.**   We might scale that down so that what gets booked to the

7    client is inside that range.  But I don't recall whether that

8    was done for these ones or not.

9    **Q.**   Is Mr. McLellan copied on this email?

10   **A.**   Yes, he is.

11   **Q.**   Did this trade end up going through?

12   **A.**   Yes, it did.

13   **Q.**   Do you know how much commission State Street earned on

14   this?

15   **A.**   Again, I can't remember exactly, but again, it was a very

16   good -- a very good transition that was in the millions of

17   dollars of commission.

18   **Q.**   Another elephant deal?

19   **A.**   Another elephant deal.

20   **Q.**   Did you provide a post-trade to the client?

21   **A.**   Yes.

22   **Q.**   Did you tell them how much you had earned in revenue?

23   **A.**   No.

24   **Q.**   Why not?

25   **A.**   Well, they didn't want to see.  Again, it was a zero

1    commission deal.  It wasn't our normal course to show it

2    anyway, but we certainly didn't show it; and as far as I

3    know, they didn't specifically ask for it.  They certainly

4    didn't specifically ask me for it, anyway.

5    **Q.**  Did you feel comfortable with this deal?

6    **A.**  No, I didn't feel comfortable with it, any more

7    comfortable with it than I did the last KIA deal.

8    **Q.**  Did you have any conversations with Ed Pennings about

9    whether anyone above him approved of this?

10   **A.**  Yes, yeah, I definitely had conversations with Ed around

11   this one and knew of Ross's approval of it via Ed.  Again, I

12   don't recall having a specific conversation with Ross, but

13   certainly I do remember having a specific conversation with

14   Ed around this one.

15           MR. JOHNSTON:  You can take that down.

16   **Q.**  Were there additional opportunities to charge hidden

17   commissions in this time period?

18   **A.**  Yes.

19   **Q.**  Are you aware of a client called the NTMA?

20   **A.**  Yes.

21   **Q.**  What are they?

22   **A.**  The NTMA are the National Treasury Management Agency, so

23   a government organization in Ireland.  The fund that they

24   were looking after was a fund that was set up to fund future

25   pension liabilities for the Irish people, so no specific

1   employees but rather the populations as a whole.

2   **Q.**   Had you done transitions for the NTMA before?

3   **A.**   Yes, we were on a panel of preferred providers for them

4   for transition exercises, yes.

5   **Q.**   How did you hear of the opportunity to land the NTMA deal

6   in late 2010?

7   **A.**   Through Ed Pennings and Cassie Waller, who were the ones

8   who were the relationship managers for the NTMA.

9   **Q.**   Do you know why NTMA was looking for a transition manager

10  at this time?

11  **A.**   Yes, specifically for that deal was the -- on the back of

12  the credit crunch, the Irish banks were in need of a cash

13  injection, and the Irish government was selling down a large

14  portion of the assets in this fund in order to provide that

15  money to the Irish banks to stabilize them.  So this was a

16  liquidation, a sell only.

17  **Q.**   So no buying going on?

18  **A.**   No.

19  **Q.**   Did you play any role in drafting a proposal to NTMA?

20  **A.**   Yes.  Certainly the pre-trade analysis and trading

21  strategy portions of it, certainly.

22  **Q.**   What types of assets were they looking to sell in this?

23  **A.**   A combination of global equities and bonds.

24  **Q.**   And how large of a deal are we talking?

25  **A.**   Very sizable, billions and billions of dollars.

1  Q.  What type of revenue opportunity did that present to

2  State Street?

3  A.  Again, that is a huge amount of trading.  It's a very big

4  transition.  So on the face of it, it represented a very good

5  revenue opportunity for State Street.

6  Q.  Do you know whether there was any competition to land

7  NTMA?

8  A.  Yes, we weren't the only -- we weren't the only

9  transition manager on their panel of providers.  So we knew

10  there was competition, yeah.

11      MR. JOHNSTON:  I'd like to show an email only to

12  the jury, please -- sorry.  Only to the witness, not the

13  jury.  You'll get it soon.  Government Exhibit 68, please.

14  Q.  Do you recognize this email, Mr. Boomgaardt?

15  A.  Yes.

16  Q.  What is it?

17  A.  It's an email from Ed Pennings to myself.

18  Q.  What's the date?

19  A.  8th of December, 2010.

20      MR. JOHNSTON:  Your Honor, the government moves to

21  admit Exhibit 68 into evidence.

22      MR. WEINBERG:  No objection.

23      THE COURT:  Admitted.

24      (Exhibit No. 68 admitted into evidence.)

25      MR. JOHNSTON:  Permission to publish?

1           THE COURT:  Yes.

2    **Q.**  All right.  Mr. Boomgaardt, I want to direct your

3    attention to the bottom email in the chain.

4    **A.**  Mm-hmm.

5    **Q.**  Mr. Pennings writes, "We should put a high level summary

6    of track record in as well.  We need to tell them that we do

7    at least eight-ish transitions per year, over 10 billion

8    globally and another 10 between 5 and 10 billion."  What is

9    he referring to there?

10   **A.**  He's referring to the proposal that we need to -- or are

11   putting together at that stage for the NTMA.  And in that,

12   one of the things they've asked for I believe is, you know,

13   what's our experience in dealing with large transitions.  So

14   he's asked us to put in a high level summary of what our

15   track record is but doesn't seem too concerned about what our

16   actual track record is but rather telling me what it should

17   say.

18   **Q.**  So he's giving you advice on what to tell NTMA in the

19   proposal?

20   **A.**  Yes.

21   **Q.**  What about the part where he says, "Fees, 1.25 BPs, no

22   commissions"; what do you understand that to mean?

23   **A.**  That we're not going to be charging a per-trade

24   commission on this but rather agree on a flat fee on the

25   value of the assets that are coming into the transition.  So

1  how much is there to sell, and we'll charge you a flat fee of

2  1.25 basis points on the value of that those assets, a basis

3  point being a 100th of a percent.

4  **Q.**  In the first three deals we talked about, the two KIA

5  ones and Dutch Doctors, was there anything like a flat fee

6  there?

7  **A.**  Well, no, there was no fee.

8  **Q.**  So where did the idea come up to suggest a flat fee to

9  NTMA?

10  **A.**  I don't recall if that was our idea or their idea.  There

11  was a movement around this time in the industry in general

12  for clients to have a flat fee rather than necessarily having

13  a -- have the fee captured as a trading commission.  Some of

14  them started to like the idea of a flat fee instead.

15  **Q.**  Why would they want a flat fee rather than a commission?

16  **A.**  There could be lots of reasons.  If they didn't want

17  the -- if they didn't want the cost to be coming out of the

18  fund but rather wanted it done at corporate level or

19  something like that, this was a way to just differentiate the

20  fee from the actual work that needed to get done.  So there

21  are lots of reasons why they might want to do that.

22          For us, what a flat fee allowed us to do was to

23  show flexibility in how we could take our commissions --

24  sorry -- our remuneration, how we got paid for the client.

25  So it wasn't uncommon.  It still wasn't the -- it definitely

1  wasn't the majority, but it wasn't that uncommon either.

2  **Q.**  Did State Street care whether you entered revenue as a

3  flat fee or a commission?

4  MR. WEINBERG:  I object to State Street, as a

5  company of thousands of people, and ask him to focus.

6  MR. JOHNSTON:  I can clarify.

7  THE COURT:  Thank you.

8  **Q.**  Did the London transition team care whether it was

9  compensated as a flat fee or as a commission?

10  MR. WEINBERG:  We're now down to hundreds, but

11  again, I object, Your Honor.

12  MR. FRANK:  Your Honor, I also object to the

13  speaking objections.

14  MR. JOHNSTON:  He has testified that he was the

15  head of the transition management.

16  THE COURT:  Just ask him if he cared --

17  MR. JOHNSTON:  He and his managers cared.

18  **Q.**  Did you and Ed Pennings care whether you earned money as

19  a flat fee or a commission?

20  **A.**  No, no.  Whether we took the commission on a traded basis

21  or charged it as an invoice at the end, we didn't mind too

22  much.  It didn't really matter.  The theory being the quantum

23  would be similar.

24  **Q.**  Typically how would you go and calculate the flat fee

25  that you would propose if you were going to go in that

1    direction?

2    **A.**   Typically we would look at the trading and see how much

3    commission we would charge if we were going to charge a

4    trading commission and use that number as the basis for the

5    flat commission that we would charge them if we were going to

6    charge them a flat fee.

7            So if our analysis showed us that we were going to

8    get something like $200,000 of trading commission, we would

9    say, "Okay, you can either do it as a commission base or you

10   can pay us $200,000 to be invoiced at the end."

11   **Q.**   So then directing your attention to the follow-up email

12   that Mr. Pennings sends to you, "Just to clarify, 1.25 BP is

13   management fee.  The extra quarter point makes it looks like

14   we actually thought about it and did the calculations."  What

15   did you understand him to mean there?

16   **A.**   That he thinks we're being clever but that 1.25 basis

17   points is our fee for managing the transition and that we've

18   done that calculation that I just explained, which is looking

19   at commissions and how much we'd need to charge.

20   **Q.**   Do you know whether 1.25 basis points management fee was

21   a high number or a low number for this type of deal?

22   **A.**   It's low.  That's very aggressive, yeah.

23   **Q.**   Was it intentionally low?

24   **A.**   Yeah, yeah, and it needed to be.  I mean, as I said, we

25   were in competition, so it was going to need to be a low

1   number in order to win the transition.

2   **Q.**   So you needed -- would you say aggressively low?

3   **A.**   Yeah.   That was our understanding, and that's certainly

4   an aggressively low number.   1.25 basis points would barely

5   cover the cost of doing that transition for us.

6   **Q.**   Were you going to not make any money off of it?

7   **A.**   At 1.25 basis points we would -- yeah, that would be a

8   break-even kind of price for us, I believe.

9   **Q.**   Did you intend to make no further money?

10   **A.**   No.

11   **Q.**   What did you intend to do?

12   **A.**   Apply the same -- the same plan that we had with KIA,

13   which is to charge a commission anyway.

14   **Q.**   In this case, what did you want the client to believe

15   when you suggested a management fee?

16   **A.**   That we wouldn't be charging a commission, that it was

17   instead of charging a trading commission.

18           MR. JOHNSTON:   I now want to show just the witness

19   Government Exhibit 70.

20           THE COURT:   All right.

21   **Q.**   Do you recognize this document, Mr. Boomgaardt?

22   **A.**   Yes, I do.

23   **Q.**   What is it?

24   **A.**   It is an email from me to the client, NTMA, copied to Ed

25   Pennings.

1    Q.   What's the date?

2    A.   It's the 9th of December 2010.

3    Q.   Is there an attachment to this email?

4    A.   Yes, there is.

5    Q.   What's that attachment?

6    A.   It is a copy of our proposal for that NTMA transition.

7            MR. JOHNSTON:  Your Honor, the government moves to

8    admit Exhibit 70s and 70-1 into evidence.

9            MR. WEINBERG:  No objection.

10           THE COURT:  Admitted.

11           (Exhibit Nos. 70 and 70.1 admitted into evidence.)

12           MR. JOHNSTON:  Permission to publish to the jury?

13           THE COURT:  Yes.

14   Q.   Who is Killian Buckley?

15   A.   He's the client at NTMA, our main client contact there.

16   Q.   Who are cc'd on this email?

17   A.   Ed Pennings and Cassie Waller.

18   Q.   And what's the attachment that you've put to this email?

19   A.   Yeah, it's the proposal that we sent back to NTMA.  I

20   guess it's not the first one we sent, but rather he had some

21   clarification points on the first one, so this is an updated

22   and corrected version.

23   Q.   So you've made some edits and are sending an updated

24   version of this proposal to the client?

25   A.   That's right.

1          MR. JOHNSTON:  Could we take a look at Exhibit

2     70-1, the attachment.

3     **Q.**  Do you recognize this document?

4     **A.**  Yes, I do.

5     **Q.**  What is it?

6     **A.**  It's a copy of our proposal for that NTMA transition.

7     **Q.**  Did you play any role in preparing it?

8     **A.**  Yes, certainly in overseeing the analysis and trading

9     strategy elements.

10    **Q.**  And what about the content in there, the narrative

11    content?

12    **A.**  Some of it definitely, yeah.  And I certainly read it

13    before it went out.

14          MR. JOHNSTON:  Let's take a look at page 6, please.

15    If we can zoom in to the second paragraph below the "Equity"

16    heading.

17    **Q.**  Again, what is an equity?

18    **A.**  An equity is a share, so rather like a stock rather than

19    a bond, yeah.

20    **Q.**  And is this transition going to involve lots of buying

21    and selling of stocks -- or I guess just selling?

22    **A.**  Just selling of stocks, yeah.

23    **Q.**  I want to direct your attention to where it says, "In our

24    fiduciary role, we always act as agent to the client.  By not

25    taking principal positions, we avoid the conflicts that will

1    be created through executing transitions and also running a

2    proprietary trading book.  We do not provide services such as

3    investment banking in order that we can concentrate on our

4    investor client base and avoid the conflicts of interest.  We

5    believe the best way to manage potential conflicts of

6    interest is by not having them in the first place."

7            What are you communicating to the client here?

8    **A.**   We're saying that we act in a fiduciary role, so putting

9    the client's interest ahead of own; and we're acting as an

10   agent, so we are going out and executing in the market on

11   their behalf.

12   **Q.**   And when you are saying you're going to execute in the

13   market on their behalf, who is supposed to get the market

14   price?

15   **A.**   The client is supposed to get the market price, plus or

16   minus any agreed commission that we have with them.

17   **Q.**   So for every security they want to buy or sell, they get

18   the market price plus whatever agreed-upon commission?

19   **A.**   Yes.

20   **Q.**   And that's the promise you make to the clients?

21   **A.**   That's right, yeah.

22            MR. JOHNSTON:  Let's take a look at page 8, please.

23   Can we zoom under the fixed income portion?

24            MR. WEINBERG:  Excuse me, Mr. Johnston.  I move to

25   strike the last answer, Your Honor.  There's no predicate for

1    the fact that he made that promise to clients.  It's just a

2    generalized statement.

3            MR. JOHNSTON:  Your Honor, if I may respond.

4            THE COURT:  Overruled.  Ladies and gentlemen of the

5    jury, you can take that as a statement from State Street,

6    this witness had some part in preparing some portion of this

7    document, whether or not he prepared that portion as a

8    proposal to NTMA.

9            MR. WEINBERG:  May I reserve the motion to strike

10   at the recess, Your Honor, so we're not burdening the

11   dialogue.

12           THE COURT:  Yes.  Go ahead.

13   Q.  Directing your attention to this content that's

14   underneath "Fixed Income."  Can you tell us what fixed income

15   is?

16   A.  It's another word for bond, yeah.

17   Q.  So when you, in the second large bullet point where it

18   says, "Employ an agency trading strategy to ensure best

19   execution," what are you telling clients you will do for them

20   when you trade bonds?

21   A.  That we are going out to the market on their behalf and

22   finding them the best execution, so getting them the best

23   execution that we can, and that we're going to be giving them

24   the execution that we get in the market, again plus or minus

25   any agreed commission.

1    Q.   So market price plus your commission?

2    A.   Yeah.

3          MR. JOHNSTON:  Let's take a look at page 9, please.

4    Let's zoom in on the top -- sorry.  Just yeah, the top

5    paragraph.

6    Q.   Directing your attention to where it says, "As crossing

7    will be the most important tool for minimizing costs in the

8    transition, we propose to charge zero commission on all

9    trading activity.  We propose to charge a management fee of

10   1.25 basis points, 0.0125 percent, on the assets entering

11   transition.  This fee will cover our cost incurred for the

12   transition and will align our interest with the NTMA in

13   finding the best natural liquidity through our unrivaled

14   crossing network."  Can you explain what crossing is?

15   A.   Sure.  Crossing is just simply trading between State

16   Street's own internal clients.  So if we have, in this case,

17   the NTMA looking to do a lot of selling, we may have another

18   transition client who is looking to do lots of buying.  And

19   we call that crossing.  And we try and match up those trades

20   so that our client that's buying and our client that's

21   selling will get the midpoint, and State Street's general way

22   of doing business is to not charge any commission on those

23   crossing trades.

24   Q.   So the more crossing, the better for the client?

25   A.   In theory, it can be.  Crossing isn't always the best

1    thing for the client, but in this case, because there's so

2    much volume through, crossing could be a really important

3    tool.

4    **Q.**  And so what do you mean that when you say, changing a

5    management fee will align our interest with the NTMA," what's

6    the connection?

7    **A.**  Sure.  Because generally are we didn't charge commissions

8    on crossing, there would be an incentive to possibly not

9    cross as much as we could do because we wanted to do market

10   trading, which we would get a commission for.

11          What we're saying there is if we've agreed to this

12   flat fee, then we're really agnostic to whether we're doing

13   market trading or crossing; we don't mind.

14   **Q.**  Whereas if you are getting a commission, maybe it's a

15   conflict between giving them a cross trade or doing a market

16   trade?

17   **A.**  Yeah, there's certainly a conflict that needs to be

18   managed.

19          MR. WEINBERG:  Objection to the leading, Your

20   Honor.

21          THE COURT:  Sustained as to leading.  Don't lead.

22   Leading, ladies and gentlemen, is when -- a non-leading

23   question is who, what, when, where, why; what happened next;

24   who said this; what made you believe that the things in the

25   response to the last question.  And that causes the witness

1     to be testifying and answering.  Generally on direct, you ask

2     non-leading questions, other than there are exceptions,

3     preliminary matters and certain kinds of things, because

4     non-leading questions you hear from the witness, which is

5     generally the purpose of direct examination.

6           Cross-examination, which we haven't come to but you

7     will come to, you'll find, you'll see that there's mostly

8     leading questions.  This cross-examination ordinarily is

9     mostly to test the witness's memory, accuracy, truthfulness

10    or various other aspects of the testimony.  So on

11    cross-examination, leading questions are generally permitted.

12          So there are various exceptions to these rules that

13    apply in different cases.  But it's not always easy to ask

14    non-leading questions on a direct examination, but

15    non-leading questions are more helpful because you hear the

16    words directly from the witness who was there as opposed to

17    the lawyers who weren't there.  Go ahead.

18    **Q.**  Let's take a look further down the page to the table, the

19    first table.  What information have you included here?

20    **A.**  That is our total cost estimate for the transition.  As

21    they've outlined it to us, that's our estimate of the cost.

22    **Q.**  So then directing your attention to where it says "Equity

23    Commissions" --

24    **A.**  Mm-hmm.

25    **Q.**  What are you telling the client you will charge them?

1   **A.**   Nothing, no equity commissions.

2   **Q.**   And what about fixed income commissions, how much are you

3   telling them you'll charge them?

4   **A.**   Also zero.

5   **Q.**   What did you want the client to understand when you wrote

6   that it was zero commissions for fixed income and equities?

7   **A.**   That we weren't going to be charging a commission for

8   trading those stock and bond executions.

9   **Q.**   Let's take a look at the other table at the bottom.  Why

10   do you include it as a second table?

11   **A.**   They provided a couple of scenarios or ways that we might

12   execute this.  Either they provided them or we came up with

13   two different ideas as to how we might do this.  I can't

14   remember which it was.  But this was including a -- to put a

15   hedge on, so to try and eliminate the market risk for them up

16   front really quickly.  But just a different strategy for

17   executing the transition.

18   **Q.**   And in either scenario, what are you going to charge in

19   commissions?

20   **A.**   Zero commissions on equities were included, and fixed

21   income commissions were also zero, so we weren't proposing to

22   charge a commission in either scenario.

23   **Q.**   I want to draw your attention to some of the other cost

24   categories that you have here.  There's an equity bid-ask

25   spread.  What is that supposed to encompass?

**A.** That's a market cost. As I said, if you look at a quoted price in the stock market, you will see a price where you can buy and a price where you can sell. Because this is a sell-only transition, you're only on one side of that market. The fair price for that asset is the midpoint between where you can buy it and where you can sell it, and that is quantifying the difference between that midpoint and the price where you can actually sell it. So it's a cost to the fund of selling.

**Q.** Is that an estimate or a promise?

**A.** It's an estimate.

**Q.** What about market impact?

**A.** Again, that's the -- that's the effect that this selling will have on the prices in the market. And again, that's an estimate only.

**Q.** And what about taxes and fees?

**A.** That is a very well known -- we know what the taxes and fees are going to be to a pretty high degree of certainty. That doesn't change.

**Q.** Who are these taxes and fees paid to?

**A.** Oh, to the government and agencies around the world that charge them. Like an SEC fee in the U.S. for trading, they are exchange and government imposed charges.

**Q.** These aren't broker fees?

**A.** No.

1  **Q.**  And what about futures?

2  **A.**  Futures, again, we have a hedging strategy.  So futures

3  are derivative instruments.

4  **Q.**  I think you may need to explain what hedging means.

5  **A.**  Sure.  Hedging is a way for us to help them eliminate

6  that opportunity cost risk that I talked about earlier, the

7  market risk, the risk of the market moving around.

8         So in this particular transition because it's a

9  sell-only transition, the risk to this client is that the

10  markets go down quite a lot as we're trading this.  In this

11  scenario that we're talking about here, we would sell that

12  market exposure, so get them into a position using

13  derivatives, using futures that would -- the position that we

14  would establish in the futures would go up if the market went

15  down, so effectively hedging that position.

16  **Q.**  Mr. Boomgaardt, who provides futures in the deal?

17  **A.**  Well, we would be executing them, and we had a clearing

18  arrangement as well, which meant the operational side of

19  being able to hold the futures, we would provide them with

20  that service as well, so there were some charges that State

21  Street would make money on, so a commission-based charge for

22  those futures as well as the clearing capability, so the

23  ability to hold those futures.

24  **Q.**  So these futures are a separate cost of doing the

25  transition?

1    **A.**   They are a separate cost specific for that strategy.

2    **Q.**   Is that the subject of a separate price or negotiation

3    with the client?

4    **A.**   It is.  It's included in the agreement that we have with

5    the client, so in the legal agreements that govern the

6    transition, that would be mentioned separately.

7    **Q.**   And then what about the FX spread, what is that?

8    **A.**   The same kind of thing.  There is, in this particular

9    scenario, they wanted to have all of their proceeds in Euros,

10   because that is the currency of Ireland, that's the currency

11   they wanted to have it all in.  Not all the assets that they

12   were selling were denominated in Euros, so they needed to do

13   foreign exchange to get the dollar-based assets into Euros,

14   the U.K. pounds into Euros, whatever other non-Euro

15   currencies they were.  So that involved some trading as well.

16   You have to sell dollars to buy Euros.

17          Again, if you look at any exchange, a price for an

18   exchange rate at any bank, you will see a price where you can

19   buy and a price where you can sell.  And again, the midpoint

20   is the kind of fair price for doing that exchange, but you're

21   only on one side or the other.  So that FX spread is a

22   measure of that spread cost.

23   **Q.**   Who provided the foreign exchange services for this

24   transition?

25   **A.**   State Street's foreign exchange trading desk was the

1   counterpart that we used.

2   **Q.**   Do you have any control over the State Street foreign

3   exchange desk?

4   **A.**   No, no.  They were a separate part of the business.

5   **Q.**   Did clients ever negotiate the price of the foreign

6   exchange with you?

7   **A.**   Not that I'd ever seen, no.

8   **Q.**   Did you have the ability to price foreign exchange

9   yourself?

10  **A.**   No.

11  **Q.**   Of all of these things, what did you have the ability to

12  negotiate with clients on, all of these categories?

13  **A.**   Commissions.

14  **Q.**   And was that what you negotiated with them on?

15  **A.**   That was -- we did negotiate with almost every client

16  around the commissions we charge but none of the rest.

17  **Q.**   Finally, the fixed income bid-ask spread, is that the

18  same as the equity bid-ask spread, just for bonds?

19  **A.**   That's right.  It's analogous to the equity bid-ask

20  spread but for bond trading.

21          THE COURT:  You're leading, Mr. Johnston.

22  **Q.**   So when you laid out these tables like this, did you

23  intend to tell the client that State Street transition would

24  be earning money buried in any of these other categories?

25  **A.**   No.  Those are all -- they're market costs, costs of

1    trading in the market.

2    **Q.**   And what did you want the client to understand would be

3    the money that the transition desk would be earning?

4    **A.**   The 1.25 basis points that we proposed and no equity

5    commissions or fixed income commissions.

6               MR. JOHNSTON:   You can take this down.

7    **Q.**   Did you come up with this fee structure on your own, Mr.

8    Boomgaardt?

9    **A.**   No.

10   **Q.**   Who if anyone did you discuss this with?

11   **A.**   Yeah, I discussed it in great detail with Ed Pennings and

12   in less detail with Ross McLellan.

13   **Q.**   Did you have conversations with Ross McLellan about the

14   NTMA proposal?

15   **A.**   Yes.

16   **Q.**   On the phone or --

17   **A.**   Yes, on the phone, yeah.

18   **Q.**   And what do you recall about those conversations?

19   **A.**   Well, NTMA was a -- I guess a different transition, in

20   that we took an undisclosed commission on equity trading as

21   well as bond trading, so there were some conversations around

22   what mechanism there would be in stock trading to allow us to

23   take commissions on that.  And it was around that guise, I

24   guess, that I remember the conversations with Ross.

25   **Q.**   You previously testified that this was -- you didn't know

1  how you could take any commissions on equities?

2  **A.**  (Nods.)

3  **Q.**  So can you describe what these conversations were that

4  you had about how you could do the same with equities on the

5  NTMA deal?

6  **A.**  Yeah.  I mean, from my perspective coming into those

7  conversations I didn't really understand the mechanics that

8  well of how equities were going to work, but it was using

9  a -- the only principal account that our equity traders had,

10  which was occasionally for clients, and I had never seen it

11  used for a transition client, but some clients liked to trade

12  with a real focus on the volume-weighted average price over a

13  day.

14        So that is a good -- the volume-weighted average

15  price gives you a good indication of what the average

16  execution looked like in a certain stock over the day.  Some

17  clients would want to have that price guaranteed.  And State

18  Street's stock trading desk did have the ability to guarantee

19  that people would get that volume-weighted average price in

20  which point the traders would trade during the day and they

21  would be obliged to give the client the execution at that

22  volume-weighted average price.  If the executions on the day

23  were better or worse than the average price, that profit or

24  loss stayed with State Street.

25  **Q.**  So you're saying that this separate account was something

1   that just existed at State Street?

2   **A.**   It did.  It wasn't something that certainly any of the

3   clients that I had been involved with had ever used before.

4   It wasn't really one that we used for transition management

5   clients.

6   **Q.**   How did this account enable you to charge hidden

7   commissions on equities?

8   **A.**   Because it was a principal account, again, it didn't

9   capture a commission line so in the same way that the

10   instructions for bonds go out to the client's custodian with

11   a net price, so did the executions coming out of that

12   volume-weighted average price or VWOP account would also

13   include only the price of the execution rather than where the

14   actual executions were done in the market, it wouldn't

15   include that.

16   **Q.**   So what you're saying is if you used the VWOP account --

17               MR. WEINBERG:  I object to the summary, Your Honor.

18   It's going to be a leading question.

19               THE COURT:  Well, I'm overruling the objection

20   because I haven't heard the question yet, but I remind you

21   not to lead.

22               You can loop --

23               MR. JOHNSTON:  That was my intention, Your Honor.

24   **Q.**   You testified, Mr. Boomgaardt, that when you traded

25   stocks, you traded bonds, one price would be reported; is

1  that correct?

2  **A.**  Yes, that's right, just the client's execution.

3          MR. WEINBERG:  Leading question, Your Honor.

4          MR. JOHNSTON:  He's testified to this like ten

5  times.  We're trying to loop it.

6          MR. WEINBERG:  That's why we don't need an 11th.

7          THE COURT:  If you say something ten times, it

8  becomes cumulative.  I'll overrule that objection.  Once

9  you've asked it, they've heard it, we can move on.

10 **Q.**  Could you explain how the VWOP account enabled you to

11 only show the client one price instead of a price and a

12 commission separately?

13 **A.**  Because it was a principal account.  So the risk of --

14 State Street was taking on risk.  So the agreement with the

15 client was that they would get the volume-weighted average

16 price, and that was the price that got booked out to them.

17 It didn't -- there's no obligation under that, under acting

18 as that principal.  And again, this is my understanding.  I

19 wasn't involved in all the mechanics of how that worked

20 because trading wasn't part of my business.

21         MR. WEINBERG:  With all due respect, Your Honor, if

22 he wasn't involved, this shouldn't be a subject for

23 testimony.

24         THE COURT:  He can testify to his understanding of

25 this.

1    **Q.**   Did NTMA request use of the VWOP account?

2    **A.**   No, not to my knowledge.

3    **Q.**   And have you ever used the VWOP account for any

4    transition client?

5    **A.**   Not for any of the clients or any of the transitions that

6    I had been involved with in Europe, no.

7    **Q.**   What is the sole purpose to use the VWOP account for the

8    NTMA deal?

9    **A.**   For the NTMA deal, ti was solely to allow us to take a

10   commission on those trades that wasn't disclosed to the

11   client.

12   **Q.**   Who did you have those discussions with about the VWOP

13   account?

14   **A.**   Ed Pennings, Ross, and Ian Holden, who was our head of

15   trading in London I remember having conversations with.

16          MR. JOHNSTON:  Can we actually pull up 70.1 again.

17   Go to page 36.  Go to the third paragraph, please.

18   **Q.**   Let's take a look where it says, "State Street will act

19   as a fiduciary for the portfolio for the entire transition

20   period.  NTMA executions are not conflicted by proprietary

21   trading.  In our fiduciary role, we always act as agent to

22   the client.  By not taking principal positions, we avoid the

23   conflicts that will be created through executing transitions

24   and also running a proprietary trading book.  We do not

25   provide services such as investment banking in order that we

1  can concentrate on our investor client base and avoid the

2  risk of conflicts of interest."

3        THE COURT:  What's the question?

4  **Q.**  Mr. Boomgaardt, directing your attention to where it says

5  "principal positions," what are you telling the client that

6  State Street does not do?

7  **A.**  That we're acting as agent and we don't take -- we don't

8  take principal positions, so we don't take positions on our

9  own book, that we're acting -- we're trading on the client's

10  behalf.

11  **Q.**  Is the VWOP account a principal position; would you use

12  that?

13  **A.**  Yes, it is.

14        MR. JOHNSTON:  I would like to show the witness

15  just Government Exhibit 77.

16        THE COURT:  Just the witness?

17        MR. JOHNSTON:  Yes, just the witness, 77.

18  **Q.**  I direct your attention to the Send and To and Date line.

19  Who is this email from?

20  **A.**  It is from Ed Pennings to me.

21  **Q.**  Who is it to?

22  **A.**  To me.

23  **Q.**  I'm sorry.  All right.  And then the date?

24  **A.**  December 23, 2010.

25        MR. JOHNSTON:  Your Honor, the government moves to

1    admit Exhibit 77.

2           MR. WEINBERG:  May I have a moment, Your Honor?

3           THE COURT:  Yes.

4           MR. WEINBERG:  Excuse me, Mr. Johnston.  There are

5    a lot of books.

6           I have no objection.

7           THE COURT:  Admitted.  You can publish it.

8           (Exhibit No. 77 admitted into evidence.)

9    **Q.**  We're looking at a bit of an email change, so if we could

10    start with page 2 to the email beginning at 17:43.  What have

11    you written here to Mr. Pennings?

12    **A.**  That I had spoken, had a conversation with Killian --

13    that being Killian Buckley at NTMA -- and that we had agreed

14    to a rate of 1.65.

15    **Q.**  Is that a different rate than you had proposed in the

16    original proposal?

17    **A.**  Yes, it is.

18    **Q.**  And why is that?

19    **A.**  They divided the transition between a couple of different

20    transition managers, so they divided the assets so that we

21    were getting some of the assets that were a bit higher cost

22    to trade, things like emerging market equities and small cap

23    U.S. trades.  So we had gone back and said we will need to

24    increase our flat fee because the things you've given us are

25    higher cost to trade.

1   **Q.**  Killian Buckley, Killian, you're saying, is the NTMA guy?

2   **A.**  Yes, that's right.  He's our main contact at the NTMA.

3   **Q.**  What was the value of the portfolio that they did decide

4   to give to you?

5   **A.**  I believe it was 4 billion or so of trading.

6   **Q.**  And so how would the flat fee that you would earn be

7   calculated off the 4 billion?

8   **A.**  Well, it would be -- it would be 1.65 basis points

9   multiplied by the value of those assets.

10   **Q.**  Is this the price that you suggested, or did you suggest

11   a higher price?

12   **A.**  We went back with a higher price.  I think we went back

13   with 2, I think, 2 basis point proposal.

14   **Q.**  What happened --

15   **A.**  He thought that 2 was too high, and we negotiated and

16   settled on 1.65.

17         MR. JOHNSTON:  Could we scroll up to the next

18   email.  Going in sort of chronological order.

19   **Q.**  What's the response from Ed?

20   **A.**  He said no reconsidering of the entire mandate, meaning

21   they are going to divide it.  We couldn't talk them into

22   giving us the whole thing.

23         MR. JOHNSTON:  Let's go back to the first page and

24   start at the bottom.

25   **Q.**  I guess this is -- then what did you respond to Ed?

1    **A.**   I said it didn't sound like that was something that they

2    were considering, but, you know, anything is possible I guess

3    but certainly not anything I was hopeful about.

4              MR. JOHNSTON:  Go further up, please.

5    **Q.**   Then what did he ask?

6    **A.**   He had asked whether they had instructed the other

7    transition manager that they had won a part of the transition

8    yet.

9    **Q.**   And the next, please.  What's your response?

10   **A.**   I said he didn't say.  The only thing he was concerned

11   about was our quote of 2 basis points, "was taking a piss,"

12   which is a I guess a British-ism for being outrageously high

13   or that it was too high anyway, was his feedback.

14   **Q.**   What was too high?

15   **A.**   Our two basis point commission, our two basis point flat

16   fee proposal to him he didn't like.

17   **Q.**   So then what was the final price agreed upon?

18   **A.**   1.65, so somewhere between the 1.25 we had originally

19   offered and the two that we were trying to get.

20   **Q.**   I don't know if I can draw your memory to the table we

21   were looking at, but what's the overall cost of the

22   transition?

23   **A.**   It was on the order of 25 to 30 basis points, something

24   like that.

25   **Q.**   So that would be the cost that would be potentially faced

1    by the fund overall?

2    **A.**   That's right.

3    **Q.**   So with that cost, how much are they negotiating, having

4    negotiated you down?

5    **A.**   Well, they negotiated us down by 0.35 basis points.

6    **Q.**   0.35, even though they're facing 30, potentially?

7    **A.**   Correct.

8           MR. JOHNSTON:   Could we go further up.   What was

9    your understanding of why clients negotiated like this?

10   **A.**   Because it was really the only element of the cost that

11   they had a direct control over.   The rest of it was, they

12   were market costs and they were estimates.   This one they did

13   have a direct control over.   And 0.35 basis points probably

14   sounds small, but when you multiply it by $4 billion, it's

15   not small anymore.

16   **Q.**   What is Mr. Pennings' response?

17          MR. JOHNSTON:   If you could highlight that, please,

18   Erin.

19   **Q.**   "You're a rock star.   Just curious if they bought our

20   strategy story."   What is he saying?

21   **A.**   Did they like our strategy around how we were proposing

22   to do this transition, the hedging strategy that we had

23   talked about and all of those things.

24   **Q.**   What about when he says, "I bet Nomura gives them a

25   kickback"?

1    **A.**   That is Ed being disparaging of our commission.

2    **Q.**   Is Nomura one of your competitors?

3    **A.**   Yes, yeah, and they were one of the people that was on

4    NTMA's panel as well, so I think they were the one that we

5    believed had won the other half of this transition.

6            MR. JOHNSTON:  Can you go further up.

7    **Q.**   Then what's your response?

8    **A.**   That they didn't disagree with any of the points that we

9    had raised around our strategy.  The only bit that he wanted

10   to negotiate around was the fee.

11   **Q.**   Your fee or someone else's fee?

12   **A.**   Our fee.

13           MR. JOHNSTON:  Further up, please.

14   **Q.**   Then what's Ed's response?

15   **A.**   Tell them we'll do the whole thing.  Tell them not to

16   split it and we'll do it for one basis point instead of 1.25.

17   **Q.**   Would that make you more or less money doing the whole

18   thing for one or half of it for 1.65?

19   **A.**   Well, it would make us a little bit more money, I guess,

20   yeah.

21           MR. JOHNSTON:  Take this down.

22   **Q.**   Was there -- so you were the one who agreed on final

23   price with NTMA?

24   **A.**   I was the one that had that negotiation with Killian,

25   yeah.

1   **Q.**  Did you and Killian negotiate about any other things with

2   the NTMA deal?

3   **A.**  No, that was it, you can see from that email chain.

4   **Q.**  Was this agreement reduced to writing?

5   **A.**  Yes, yeah, it made it into there.  We had a master

6   agreement already in place with NTMA, but it made it into

7   their periodic notice, yes.

8          MR. JOHNSTON:  Your Honor, we have a call that we

9   want to play.  I don't know if --

10          THE COURT:  How long is the call?

11          MR. JOHNSTON:  Approximately four or five minutes.

12          THE COURT:  Go ahead.  We'll do that.

13          MR. JOHNSTON:  Okay.  Let's play Government Exhibit

14   80, please.

15          THE COURT:  80.

16          MR. JOHNSTON:  80, yes.

17          (Voice recording played.)

18   **Q.**  Mr. Boomgaardt, who are you speaking with on this call?

19   **A.**  Ed Pennings.

20   **Q.**  And what are you referring to when you say, "Can I sign

21   that thing for NTMA"?

22   **A.**  That's the periodic notice.  I had a draft of the

23   periodic notice that had come from them, and I'm asking him,

24   I wasn't an authorized signatory, if Ed was in the office.  I

25   would only be if he designated me as such before he left.

1    **Q.**   And why isn't he in the office?  What day is this?

2    **A.**   It's Christmas Eve.

3    **Q.**   2010?

4    **A.**   2010.

5    **Q.**   What do you mean when you say, "They are not doing the

6    whole thing, no, so it is the 4.8 billion at 1.65"?

7    **A.**   That they, as I indicated previously, they were dividing

8    it in half roughly between us and another transition manager.

9    **Q.**   So what is the reference of 1.65?

10   **A.**   The 1.65 is the 1.65 basis point fee that we had agreed.

11   **Q.**   The flat fee?

12   **A.**   The flat fee.

13   **Q.**   Directing your attention to where Mr. Pennings says, "We

14   just need to be very, very creative, which we will."  What do

15   you understand him to mean there?

16   **A.**   We have to be creative about how we're going to make

17   money out of this.  We're not going to make much money at

18   1.65, so we need to be creative about how we were going to go

19   that.

20   **Q.**   And how were you going to do that?

21   **A.**   By using the same plan we had in the previous ones, by

22   charging a commission on bonds and eventually finding a way

23   to do it on equities as well.

24   **Q.**   In this scenario did you believe the client was aware of

25   what you were going to do?

**A.**   No, no.  We had led them to believe quite clearly that we
weren't going to charge any commissions on bond and equity
trading.

                    (Voice recording played.)

**Q.**   Mr. Boomgaardt, what is Mr. Pennings referring to when he
says, "Just check it and make sure it is reflective and
doesn't say anything about not taking any spreads because we
are going to have to in the U.S."?

**A.**   That we are going to take -- we're going to take
commissions on this anyway, and so make sure it doesn't say
that we're not allowed to.

**Q.**   But I thought you had already quoted zero commissions?

**A.**   We did.

**Q.**   So then why were you looking into the agreement for
additional language?

**A.**   Well, just to see whether that agreement covered the
possibility of us in any way taking spreads, commissions in
any other way on these trades rather than explicit
commissions.

**Q.**   Was there any discussion with the client about there
being spreads?

**A.**   No, no, there wasn't.

**Q.**   And what was your understanding of why there was no
discussion about spreads when you talked to Killian Buckley?

**A.**   Because we were pretty clear to them that we weren't

1    going to be charging commissions on these.

2    **Q.**   Is there any difference between spreads and commissions

3    in this context?

4    **A.**   No.  They're synonymous.  I mean, spreads are just

5    undisclosed commissions, but by the very nature of

6    undisclosed commissions, if you disclose them, they're not

7    undisclosed anymore.  So no, the client was certainly of the

8    opinion that we were not charging commission.

9             MR. WEINBERG:  I object, Your Honor.  He can

10   testify to his conversations with the client but not

11   Mr. Pennings that were done in his absence.

12            THE COURT:  I don't think he was testifying to

13   Mr. Pennings --

14            MR. WEINBERG:  He was testifying about the client,

15   what the client understood --

16            THE COURT:  Right.  Sustained as to that.

17            To the extent he testified to what the opinion of

18   the client was, that he can't testify to because he doesn't

19   know what the client's opinion is.  That's in their head.  He

20   can testify to what his understanding is of what they said.

21            Go ahead.

22   **Q.**   Mr. Boomgaardt, in any transition notice that you had

23   been a part of, have you seen language that said, "We will

24   not take any spreads"?

25   **A.**   Not that language, no, but my -- doing legal agreements

1    and getting involved in negotiation of legal agreements was

2    not generally part of my job.  As I said, in these ones, I

3    only signed them because Ed wasn't around.  But no, I had

4    never seen language to that effect.

5    **Q.**  And did you think that because there wasn't any language

6    in there about not taking spreads that you were allowed to do

7    that?

8              MR. WEINBERG:  I object.

9              THE COURT:  Sustained as to the form.

10   **Q.**  Did you have an understanding about whether the absence

11   of such a phrase allowed you to do this?

12             MR. WEINBERG:  I object.

13             THE COURT:  Sustained as to the form.

14   **Q.**  Did you feel comfortable going forward with this without

15   that language being there?

16             MR. WEINBERG:  I object.

17             THE COURT:  Sustained as to the form.

18   **Q.**  Did you believe the agreement allowed you to take hidden

19   spreads?

20             MR. WEINBERG:  I object.

21             THE COURT:  Sustained as to the form.  You're

22   asking him leading questions.  That's at least part of his

23   objection, as I understand it.

24   **Q.**  What did you believe about the agreement and what it did

25   or did not allow you to do?

1    **A.**   The agreement didn't -- certainly from the periodic

2    notice, didn't say much about the ability or otherwise to

3    take those spreads.  It didn't make me feel comfortable about

4    it, but I don't think it said one way or the other whether

5    you could take spreads or undisclosed commissions.

6    **Q.**   What had you led the client to believe at this point?

7                MR. WEINBERG:  Objection.

8                THE COURT:  Overruled.

9    **A.**   The proposal was pretty clear that we weren't -- our

10   proposal was to charge no commissions in equity or fixed

11   income trading and charge a flat fee.

12               MR. JOHNSTON:  Continue, please.

13               (Voice recording played.)

14               THE COURT:  Are you going to go through the whole

15   call?

16               MR. JOHNSTON:  We can continue after the break, but

17   yes.

18               THE COURT:  Why don't we pause here.  We can pick

19   up in that spot after the break.  All rise for the jury.  You

20   can take your notebooks but not the transcript books.

21               (Jury exits the courtroom.)

22               THE COURT:  Please be seated.

23               You had an issue you wanted to raise, Mr. Weinberg?

24               MR. WEINBERG:  Just, it goes back to Exhibit 70,

25   Your Honor.  I made a motion to strike.

1          THE COURT:  What were you moving to strike?

2          MR. WEINBERG:  The generic answers by Mr.

3     Boomgaardt as to what State Street or what others that he

4     understood about a particular agreement or a particular

5     circumstance -- perhaps Mr. Boomgaardt can be allowed to go

6     to the hall during this.

7          THE COURT:  Yes.  If you want to step out and go to

8     the men's room or something.  We won't need you to answer any

9     questions about this.

10         THE WITNESS:  Thank you, Your Honor.

11         MR. JOHNSTON:  Your Honor, if I may respond, I

12    believe the objection was that he didn't -- the witness

13    testified that State Street promised this.  And I mean, we

14    can clarify that he is testifying that as an agent of State

15    Street he sent this proposal containing these representations

16    and he was then the one who signed the agreement.  So I mean,

17    I don't think there's any confusion in the record that he is

18    speaking for anyone other than the entity that ends up

19    contracting for this transition.

20         THE COURT:  I'm not quite sure I understand exactly

21    what your objection is.

22         MR. WEINBERG:  To be precise, Your Honor, go back

23    to the specific question and answer, which I don't have.

24         THE COURT:  The reason I overruled at the time is

25    what I understand the testimony to be is that as to this

1    exhibit, or the attachment to the email really is what we're

2    talking about, he was one of the authors of the attachment,

3    that he was part of the group of people who sent it, that

4    they sent it not on behalf of themselves personally but on

5    behalf of State Street, and then when he was saying what they

6    represented, it was his understanding of what they

7    represented, and he wasn't intending to speak for others

8    except to the extent that what they did was on behalf of

9    State Street.

10           MR. WEINBERG:  What I'm trying to do is narrow the

11   testimony to what I consider to be appropriate under the

12   rules, which is his specific understanding of a statement he

13   made rather than the understanding of State Street or even

14   more --

15           THE COURT:  Yes.

16           MR. WEINBERG:  -- the understanding of the person

17   receiving the statement.

18           THE COURT:  Right.  But I don't think he testified

19   to the understanding of State Street.  What my memory is --

20   but you can, either both of you or either one or both can

21   clarify if it you wish.  I think what he testified to, what I

22   understood was him testifying to sort of what he understood

23   they were representing, which was on behalf of State Street

24   but not speaking for everyone else.  It's a fine line.  But I

25   think to the extent there's an issue, you can clarify it on

1    cross or you can clarify it if you wish if you think there's

2    something that needs to be clarified.  All right?

3              MR. WEINBERG:  Thank you, Your Honor.

4              THE COURT:  You're welcome.  Anything else?

5              MR. FRANK:  Your Honor, just, the objections have

6    been paragraph-long objections in some cases.  I understand

7    there needs to be some explanation of what the objection is

8    so the court can rule on it, but I think there's been a fair

9    amount of argument in some of the objections, and so I would

10   just ask that Mr. Weinberg, if he's going to make an

11   argument, it should be at sidebar.

12             There have been objections about, containing

13   statements about how many employees were in particular groups

14   and how many employees are in the organization as a whole

15   and, you know, what Mr. Boomgaardt would have understood

16   about the what the clients understood, and I just think those

17   go beyond what needs to be said in open court.

18             MR. WEINBERG:  The truth is I think I've been

19   disciplined in not objecting --

20             THE COURT:  It's overruled.  I think that while the

21   general rule is don't make lengthy speaking objections, I

22   don't feel like as a general matter that Mr. Weinberg has

23   been violating that.  I think there were a couple of times he

24   referred to things that were sometimes sort of practical

25   clarifying facts to explain what he was doing.  I take your

1    point and we'll see as we go forward.  All right.  I'll see

2    you at -- come back at 25 after.

3                (Court in recess at 11:11 a.m.

4                and reconvened at 11:26 a.m.)

5                THE DEPUTY CLERK:  The McLellan matter is back in

6    session.

7                THE COURT:  Please be seated.  Are we ready to go?

8                MR. JOHNSTON:  Yes, Your Honor.

9                THE COURT:  All right.  Go get the jury.

10               Do you think you'll finish today?

11               MR. JOHNSTON:  No.

12               THE COURT:  How close?

13               MR. JOHNSTON:  Probably have another hour tomorrow.

14               THE COURT:  Do you know?

15               MR. WEINBERG:  I would expect we'd be finished with

16   Mr. Boomgaardt by the end of tomorrow, Your Honor.

17               THE COURT:  Okay.

18               MR. FRANK:  So should we not have another witness

19   here tomorrow?

20               MR. WEINBERG:  (Indicating.)

21               THE COURT:  Do you think you'll be done at 1:00 or

22   before 1:00?

23               MR. WEINBERG:  Before 1:00, but it's hard to

24   predict.  It depends on the -- it depends on factors that I

25   can't predict with enough certainty to tell Mr. Frank not to

1   have another witness.

2          THE COURT:  All right.

3          MR. FRANK:  I would say, Judge, given the pace, it

4   substantially increases the likelihood that we'll want to

5   stay late next week.

6          THE DEPUTY CLERK:  All rise for the jury.

7          (The jury enters the courtroom.)

8          THE COURT:  Go ahead.

9          MR. JOHNSTON:  Continuing playing the recording,

10  Erin.

11         (Audio plays.)

12         MR. JOHNSTON:  Just for the record, we're on

13  Exhibit 80.  Exhibit 80, page 3.

14         (Audio plays.)

15  BY MR. JOHNSTON:

16  Q.  Mr. Boomgaardt, directing your attention to the bottom of

17  page 2 and into page 3, what are you reading aloud to

18  yourself?

19  A.  The -- the periodic notice that the NTMA had sent

20  through.

21  Q.  Is that a document that you had drafted?

22  A.  No.  No.  It had a standard form, but I guess the

23  particular wording that's in there was drafted by the NTMA.

24  Q.  And why are you reviewing the periodic notice on the

25  phone with Mr. Pennings?

1   **A.**  Well, specifically because he asked to make sure it

2   doesn't say anything about not taking spreads.

3   **Q.**  Did you find a phrase that says, "we are not taking

4   spreads"?

5   **A.**  No.

6   **Q.**  Had you seen such a phrase in any periodic notice before

7   then?

8   **A.**  No.

9   **Q.**  And how many transitions had you worked on in your career

10  at this point?

11  **A.**  Hundreds.

12  **Q.**  And why -- what's your understanding of why Mr. Pennings

13  is asking about FX?

14  **A.**  There were -- there were discussions around this time

15  about getting recognition for revenue that State Street

16  transition management was bringing in to the FX desk.  So

17  transitions often --

18  **Q.**  Sorry, can I interrupt you for a second, Mr. Boomgaardt?

19  What do you mean get revenue recognition?

20  **A.**  So transitions for State Street, when we would do them,

21  often had foreign exchange as part of them, so we needed to

22  trade currencies, as well as stocks and bonds.  That was

23  generally done with State Street's own foreign exchange

24  trading business.  So that was a separate business that had

25  its own revenue line.  And there were some discussions going

1    on inside State Street about the FX business, recognizing

2    somehow, either by transferring money or at least

3    acknowledging the value of the fact that we're doing that

4    much trading with them.

5    **Q.**   So how many of your transition clients had foreign

6    exchange needs?

7    **A.**   In Europe, almost all of them.  It would be a rarity that

8    we would have to do no foreign exchange on a transition for

9    our European clients.  Almost always we would have to do some

10   FX trading.

11   **Q.**   Did you know the value of that foreign exchange trades,

12   the value of those foreign exchange trades to that, to the

13   separate business at State Street?

14   **A.**   No, I didn't have any visibility or knowledge of how much

15   money they made or lost from our trading.

16   **Q.**   Why was that?

17   **A.**   It was a separate business unit to mine, so it didn't --

18   there was no -- we didn't get any revenue directly from the

19   foreign exchange trading business.  And the conversations

20   about any of that were done higher up than me, certainly not

21   by me, anyway.

22   **Q.**   You said you meant -- you testified, revenue that was

23   either gained or lost.  Why do you say that?

24   **A.**   So the foreign exchange trading business is, to use the

25   used car lot analogy, it is State Street's used car lot.  So

1    when we would send an order in to get done, they would have

2    to fill that order.  So if we were selling $100,000,000 to

3    buy euros, they would need to fill that order.  And they

4    would either make money or lose money in doing that.

5            They were taking -- if we were selling dollars,

6    they were taking ownership of those dollars.  And they then

7    had to sell them in the market, or sell them to another

8    client, and they may do that at a better price, or they may

9    do that at a worst price.  But they would -- that risk was

10   sitting with them.  They would need to execute our trades and

11   give us that execution.

12   **Q.**  You previously testified that State Street, in your

13   words, didn't have its own used car lot.  What were you

14   referring to then?

15   **A.**  Stocks and bonds.

16   **Q.**  So it did have its own used car lot that traded stocks

17   and bonds?

18   **A.**  It didn't, no.  FX Foreign Exchange was the only

19   principal business that we interacted with at State Street.

20   **Q.**  So then when Mr. Pennings is referring to possibly

21   earning money from FX, is that a new development or an old

22   development?

23   **A.**  That's a new development, that's him alluding to the fact

24   that there were conversations going on at a higher level

25   about how that gets recognized.

1    **Q.**  So what could potentially happen at the, say, end of the

2    year, based on, say, the volume of foreign exchange business

3    or trades that you had sent over to the FX desk?

4                    MR. WEINBERG:  Objection.  Speculative.

5                    THE COURT:  Overruled.

6                    THE WITNESS:  I believe those discussions were

7    around the possibility of transferring internal revenue

8    credits or something, so that that was recognized as revenue

9    that was associated to Portfolio Solutions and transition

10   management, rather than just FX trading.

11   **Q.**  Did you have any control over what the FX desk made or

12   charged?

13   **A.**  Certainly I didn't, nor my desk, no.

14   **Q.**  Any of the people that worked right around you?

15   **A.**  No.

16                    (Audio plays.)

17   BY MR. JOHNSTON:

18   **Q.**  Mr. Boomgaardt, directing your attention to the last

19   phrase that we heard from Mr. Pennings, where he says, "we

20   will take a spread out of the small caps and the US

21   equities," what do you understand him to mean there?

22   **A.**  That we're going to be taking a -- an undisclosed

23   commission on small cap, which is -- small caps are just

24   small companies, but they're -- just think of them as a

25   specific kind of stock, and US equities, so US stocks.

1    **Q.**  Did you have an understanding at the time whether the

2    client had agreed to these spreads?

3    **A.**  My understanding was the client hadn't agreed to those

4    spreads.

5            (Audio plays.)

6    BY MR. JOHNSTON:

7    **Q.**  Mr. Boomgaardt, directing your attention to where

8    Mr. Pennings says "any sort of spread-taking, that is between

9    you, me, and Ian Holden, and let's not go there with Samina,

10   or anything."

11           What do you understand him to mean?

12   **A.**  That we're not talking about taking those -- those

13   undisclosed commissions or spreads outside of him, myself,

14   and Ian Holden in London, and not talking to Samina, who's

15   going to be the lead transition manager, or the main project

16   manager on this.

17   **Q.**  Who's Ian Holden?

18   **A.**  Ian Holden is the head of trading in Europe.

19   **Q.**  Why can't you let Samina know?

20   **A.**  I guess the fewer people that know about it, the less

21   likely it is to get out, keeping it -- keeping it tight.  You

22   know, transition managers do move companies, they leave, they

23   go other places.  There's a genuine concern that this is a

24   deviation from State Street's -- what we pitch to clients,

25   what our selling points are.  And we would rather it didn't

1    get out in the market that this is the way we were conducting

2    business.

3    **Q.**   Did you end up telling Samina?

4    **A.**   No, I don't believe I did.

5    **Q.**   Did you sign that periodic notice?

6    **A.**   Yes, I did.

7    **Q.**   Could we take a look at document, just for the witness,

8    Government Exhibit 79.

9            Do you recognize this document?

10   **A.**   Yes, I do.

11   **Q.**   What is it?

12   **A.**   It is an e-mail from myself to Ed Pennings.

13           MR. JOHNSTON:  Your Honor, at this time, the

14   Government moves to admit 79 and 79-1.

15           MR. WEINBERG:  I have no objection.

16           THE COURT:  Admitted.

17           (Exhibit Nos. 79 and 79-1 admitted into evidence.)

18           MR. JOHNSTON:  Permission to publish?

19           THE COURT:  Yes.

20   BY MR. JOHNSTON:

21   **Q.**   What's the date on this e-mail?

22   **A.**   The 24th of December, so Christmas Eve of 2010.

23   **Q.**   The same day as that phone call that we just listened to?

24   **A.**   Yes.

25   **Q.**   And what are you asking Ed Pennings here?

1    **A.**   Whether I can sign this transition notice in his absence.

2    **Q.**   Let's take a look at the transition notice, 79-1.   And

3    specifically, can we look, starting on page 2, go down to the

4    very bottom, where it says "Payment Schedule."   And directing

5    your attention to where it says "a fee of 1.65 basis points

6    of the value assets as of the date."

7            Continue to the next page.

8            "That the transition manager gains control over the

9    legacy assets."

10           What is your understanding of the fee that's

11   contained in this -- that's spelled out in this agreement?

12   **A.**   That we will charge 1.65 basis points on the value of the

13   assets as valued on the day that we take over control of the

14   assets.   So whenever they come into the transition management

15   account.

16   **Q.**   They -- what did you want the client to understand with

17   that phrase?

18   **A.**   That we would be charging a flat free and that there

19   wouldn't -- commissions on equity and bond trading would be

20   zero.

21   **Q.**   And is that true, you were not going to charge

22   commissions?

23   **A.**   No, we were planning to charge commissions, anyway.

24           MR. JOHNSTON:   Could we zoom out, please.

25   BY MR. JOHNSTON:

1  **Q.**  And just direct you to the signatures at the bottom.  Do

2  you recall whether you ended up signing the agreement?

3  **A.**  I believe I did, yes.

4  **Q.**  Did you participate at all in the execution of this deal?

5  **A.**  Yeah.  Yup.

6  **Q.**  Did that happen right after the periodic notice was

7  signed in December, or did it happen later?

8  **A.**  There was some delay on it, in getting all the assets

9  ready for sale at NTMA's end, I believe.

10  **Q.**  Who -- what types of assets had to be sold and where were

11  they sold?

12  **A.**  It was a global portfolio, so there was trading to be

13  done in Boston, and trading to be done in London.

14  **Q.**  So what types of assets were being sold in Boston?

15  **A.**  Certainly there were equities being sold in Boston.  I

16  believe there was fixed income as part of the NTMA

17  transition, as well, to bonds and stocks.

18  **Q.**  Did you participate in instructing traders on how to work

19  out trades?

20  **A.**  Yes, I was very involved in the NTMA transition, from

21  trading strategy, right down to talking to traders, yeah.

22  **Q.**  So what was your specific role?

23  **A.**  I was overseeing the transition from -- overseeing the

24  work that Samina was doing and making sure that all the

25  project management elements of the transition were going

1    according to plan.  So there's a lot more to just -- to doing

2    a transition than just trading.

3    **Q.**  What types of -- do you know whether commissions were

4    taken on European trades?

5    **A.**  I believe they were.

6    **Q.**  And who -- do you know who applied those commissions?

7    **A.**  Well, again, the commissions would need to be applied by

8    the traders.

9    **Q.**  Do you know what type of account, if any, they used to

10   execute those trades?

11   **A.**  I believe it was the VWAP account in Europe, as well.

12   But the mechanisms for equities, again, was not my forte on

13   this one.  I was busy trying to make sure that the other

14   things were going well.  That was being taken care of by

15   others.

16   **Q.**  Did you have any discussions with the defendant, Ross

17   McLellan, about using the VWAP account?

18   **A.**  Yes.

19   **Q.**  When were those discussions?

20   **A.**  Prior to trading.  I mean, it was made clear.  We had

21   lots of discussions around this transition as to how we were

22   going to make money and that the VWAP account would be used.

23   I wasn't party to most of the conversations about what that

24   meant on a day-to-day operational level.  It wasn't -- it

25   wasn't something I needed to know.

1    **Q.**  What was your understanding of who was directing the VWAP

2    account trading?

3    **A.**  Well, that was coming from -- from Ross and from Ed.

4    Those were -- it wasn't the traders, or our team kind of

5    making that up.  That was a grade much higher up.

6    **Q.**  Did the client ask for a VWAP account to be used?

7    **A.**  No, I don't believe they did.

8    **Q.**  Did -- you said that some other clients -- you previously

9    testified that these accounts exist to be able to give a

10   volume-weighted average price to a specific client?

11   **A.**  That's right, that's right.

12   **Q.**  But that you had never done this before for a transition

13   client?

14   **A.**  Correct.  It was there, ready for -- for other known

15   transition management clients, generally speaking, certainly

16   in Europe, anyway.

17   **Q.**  Do you know whether the NTMA was actually given the

18   average price for the day?

19   **A.**  I don't believe they were, no.

20   **Q.**  And why weren't they given the average price for the day?

21          MR. WEINBERG:  Objection.  Unless he knows with

22   personal knowledge.

23          THE COURT:  Well, overruled.  That's true for every

24   question.  You can only testify to what you know.

25          THE WITNESS:  Generally, in transition management,

1   we are trading to minimize the implementation shortfall, or

2   the overall cost of the trade.  That doesn't necessarily mean

3   that we're trying to guarantee volume-weighted average price.

4   The volume-weighted average price doesn't necessarily mean

5   the lowest cost to the client.  So it wasn't something that

6   we particularly looked at and it certainly wasn't a specific

7   focus of this transition.

8   BY MR. JOHNSTON:

9   Q.  What was your understanding of why the VWAP account was

10  used?

11  A.  My understanding is -- it was used to allow State Street

12  to -- because it was a principal account, it effectively

13  created our own used car lot.  We owned those assets for a

14  short period of time, which meant that we could book out just

15  the net price to the clients, so they wouldn't see any

16  commissions that were charged on those, in the same way that

17  they didn't in bond trades when we did them.  It allowed us

18  to use an analogous model to what we had in bond trading, to

19  take an undisclosed commission that wouldn't be reported to

20  the client.

21  Q.  And what had you promised the client in terms of

22  comission?

23          MR. WEINBERG:  Objection.  This has been asked and

24  answered.

25          THE COURT:  Sustained.

1    BY MR. JOHNSTON:

2    **Q.**   When trades are executed, are there anything -- is there

3    some type of trading confirmation that's generated by the

4    bank systems?

5    **A.**   Yes.

6    **Q.**   Who generates them?

7    **A.**   It gets generated out of our -- our back office system,

8    so our trade settlement and reporting system that is

9    connected into the trading systems.

10   **Q.**   And when -- when the transition desk is requesting that

11   trades be made on behalf of a transition client, do you know

12   where those trading confirmations go when they're generated?

13   **A.**   So we, as transition managers, will report the trades

14   that we're doing on behalf of a client directly to the

15   client's custodian, so we do that electronically by a Swift

16   protocol, which is just an agreed format of electronic

17   transfer, so it doesn't need to be touched by people.  There

18   are -- and we certainly have the ability to generate manual

19   trade confirmations, as well.

20          But for the vast majority of clients -- and I'm

21   trying to think of anywhere we didn't -- we switched those

22   off and didn't send them to the clients, because they didn't

23   want to get hundreds and thousands of faxes going directly.

24   What they wanted us to do was to report those trades to their

25   custodian, the safe-keeper of their assets, to make sure that

1    the books and records of the custodian accurately reflected
2    what they held and what they had bought and what they had
3    sold.
4    **Q.**  Who did the client rely on to get accurate reports of
5    trading results?
6    **A.**  From State Street and also from the books and records at
7    their custodian.  They expected those to be accurate, as
8    well.
9    **Q.**  Do you know whether using a VWAP account would send a
10   confirmation showing a commission that this had been taken on
11   that account?
12   **A.**  My understanding is that it wouldn't.  But again, I
13   wasn't -- we didn't use the VWAP account very much.  So I
14   don't think it would.  I think it would be a net price that
15   came off.
16              MR. WEINBERG:  Objection.  Move to strike, Your
17   Honor.  He doesn't have any basis to testify about the --
18              THE COURT:  Overruled.
19   BY MR. JOHNSTON:
20   **Q.**  Do you know who coordinated the US trades for the NTMA?
21   **A.**  Well, in terms of who instructed what to trade, that was
22   done by our desk.  But there was certainly an oversight from
23   Ross in Boston at the trading desk, at the time we were
24   trading.
25   **Q.**  How do you know that Ross was exercising oversight over

1    the trading?

2    **A.**   It was discussed and we talked about it.

3    **Q.**   Who discussed this?

4    **A.**   Ed, myself, Ross, Ian Holden.  It was -- we got to that

5    level of discussion about how we were going to -- how we were

6    going to manage this transition.

7    **Q.**   Did you discuss using the VWAP account on those phone

8    calls?

9    **A.**   Yes.  I mean, we knew it was going to be the VWAP

10   account.  Again, it was -- that was clear to me, but not the

11   exact -- the exact mechanics of how it was going to work, but

12   it was clear that that was the account that was going to be

13   used, yes.

14   **Q.**   Are you aware of a type of asset called an ETF?

15   **A.**   Yes.

16   **Q.**   What is an ETF?

17   **A.**   An ETF is an exchange-traded fund.  That's what ETF

18   stands for.  It's -- it allows -- it's similar to a mutual

19   fund, except you can trade it as you would any other stock.

20   So it's listed on, say, the New York Stock Exchange, so you

21   can buy and sell it as an individual security.

22   **Q.**   So it's a tradeable security?

23   **A.**   It's like a tradeable mutual fund.

24   **Q.**   What are sort of the underlying parts of an ETF?

25   **A.**   Well, an ETF will -- it's a fund, as an example, there's

1    an S&P 500 ETF.  It allows you to buy all of the components

2    of the S&P 500 in one go, so it allows you to buy a portion

3    of the portfolio that holds all of the S&P 500, so all of the

4    underlying stocks in one place.

5    **Q.**  So you're saying by buying one security, you can own part

6    of many different securities?

7    **A.**  That's right, yeah.

8    **Q.**  Do you know whether the NTMA had a holding in an ETF as

9    part of this transition?

10   **A.**  Yes, they did.

11   **Q.**  What -- was it a small holding, a large holding?

12   **A.**  No, they had a large holding in a US-listed

13   exchange-traded fund.

14   **Q.**  Do you know the name of that fund?

15   **A.**  I think it was a SPDR, so an S&P 500, or it may have been

16   a Russell.  It was an US equity ETF.

17   **Q.**  Do you know whether, as part of the NTMA transition,

18   there was any type of special trading done around the ETF?

19   **A.**  There may have been.  You can -- with ETFs, you can

20   either trade them as an individual security -- you also have

21   the ability to break them up and trade them, take receipt of

22   all of the underlying securities that are in those.

23            So again, if you were using the S&P 500, you would

24   get 500 stocks, instead of your one holding, and you could

25   trade those individually.  So if the position is big enough,

1    it can make sense to trade that way.

2            MR. JOHNSTON:  Now I want to show a document just

3    to the witness.

4            THE COURT:  Go ahead.

5            MR. JOHNSTON:  All right.  Government Exhibit 138,

6    please.

7    BY MR. JOHNSTON:

8    **Q.**  Do you recognize this document?

9    **A.**  Yes, I do.

10   **Q.**  What is it?

11   **A.**  It is an e-mail from Samina Vernon, so the transition

12   analyst that worked in my team to Killian Buckley and others

13   at NTMA, as well as myself and Ed Pennings and others at

14   State Street.

15   **Q.**  And what is attached to this e-mail?

16   **A.**  It's a post-trade report for NTMA.

17           MR. JOHNSTON:  Your Honor, at this time, the

18   Government moves to admit 138 and 138-1.

19           MR. GOLDSTEIN:  No objection.

20           THE COURT:  Admitted.  You can publish it.

21           (Exhibit Nos. 138 and 138-1 admitted into

22           evidence.)

23   BY MR. JOHNSTON:

24   **Q.**  Who's Killian Buckley, Mark McCrone, and Mikael

25   Langstrom?

1    **A.**   They are all people that work at MTNA.

2    **Q.**   And when are the post-trade reports generated?

3    **A.**   After we're finished, the trading aspect of the

4    transition.

5    **Q.**   Did this transition happen all in one go, or were there

6    multiple parts?

7    **A.**   It had multiple tranches, so we did part of it and then

8    there was another part and then another part.  I believe it

9    was three tranches in the end, if I remember rightly.

10   **Q.**   And do you know what this one corresponds to?

11   **A.**   Off the top of my head, I don't know.  I would need to

12   look at it and see.

13   **Q.**   Did the -- do you recall why this revised post trade is

14   being sent to NTMA?  Directing your attention to the first

15   line.

16   **A.**   One of the questions they had from ours is that we hadn't

17   included the flat fee specifically in the trading shortfall.

18   We had looked at just the trading cost and hadn't included

19   the flat fee in there.

20   **Q.**   So -- and why would they want the fee into the shortfall?

21   **A.**   Well, it's a cost to them, so they wanted that included

22   in there.  The flat fee, the reason it didn't get in there is

23   our reports ran out of -- information that we got out of the

24   trading system.  So it's something -- the flat fee needed to

25   get added back in manual and it didn't on the one that she

1    sent out earlier.

2    **Q.**  Did you prepare any role in preparing this post trade?

3    **A.**  Not in preparing it, but certainly in overseeing it.

4    Yes.  I looked at it before it went out.

5    **Q.**  Let's take a look at the post trade 138-1.  Do you

6    recognize this document?

7    **A.**  Yeah, that's our post-transition report for NTMA.

8    **Q.**  Okay.  Let's take a look at page 2, please.  And if we

9    can zoom in on the box at the bottom.

10              What information have you provided to the client

11   here?

12   **A.**  We have given them what our valuation is on the assets

13   that came into transition for that -- for this particular

14   tranche so that was about 1.4 billion euros of value.  And

15   then what State Street's fee was based on 1.65 basis points

16   of those assets.  The overdraft costs are -- that's

17   sometimes, if we're trading and stocks don't settle when

18   they're supposed to, clients can be charged an overdraft fee,

19   because they're -- they're effectively left with a negative

20   balance in some currency, so we were just paying them back

21   that 8,000 euros to get to a net fee there.

22   **Q.**  So what's the amount that you're reporting to the client

23   that you've earned on this trade?

24   **A.**  Two hundred and -- well, 228,000 and change was our fee,

25   less the overdraft cost of -- I guess a balance to be paid of

1    228,000.

2    **Q.**  Was this in euros?

3    **A.**  Yes.

4    **Q.**  What did you want the client to understand that number to

5    encompass?

6              MR. WEINBERG:  I object, Your Honor.

7              THE COURT:  Overruled.

8              You can answer.

9              THE WITNESS:  That it was our -- our fee for -- for

10   doing all of the trading and project management exercise.

11   That it was in lieu of any commissions that were being

12   charged, but that was our -- that that was our fee.

13   BY MR. JOHNSTON:

14   **Q.**  Is that a true statement?

15   **A.**  No.  No, it's not.

16   **Q.**  Do you know how much you had actually made?

17   **A.**  I don't on this particular tranche, but overall, on NTMA

18   again, we made in the millions.

19   **Q.**  Let's take a look at page 7, please.  And will you go to

20   the box on the right-hand, bottom right.

21              So what information have you set out in this table?

22   **A.**  It's -- it's a breakdown of the total cost for this

23   transition.

24   **Q.**  And where is -- if any, where is State Street's fee

25   spelled out?

1    **A.**   State Street's fee, the flat fee we charge, is the top

2    line of that table.

3    **Q.**   And what value have you put there?

4    **A.**   220,000.

5    **Q.**   And then the commission costs, at 15,000, what is that

6    supposed to represent?

7    **A.**   There are some markets where State Street doesn't have

8    direct access.  So in some of the emerging markets, like

9    places like Chile and Peru, and places like that, we would

10   have to get a local broker in those areas to do the

11   transactions for us and have to pay them a commission.

12   That's really what's getting captured in that commission

13   costs column, I believe.

14   **Q.**   Are you representing that those are commissions that

15   State Street charged for 10,000?

16   **A.**   No, but they are commissions that the client had to pay.

17   **Q.**   Okay.  And so how do they end up getting past the client?

18   **A.**   Well, they get charged by that broker in the execution

19   that comes back.  But they are -- those commission costs

20   would be shown as a separate commission line, so that's why

21   we needed to have that column there, or that row there.

22   **Q.**   And what do you call these types of commission costs?

23   **A.**   Their third-party commissions.

24   **Q.**   So third-party commissions, as opposed to State Street's

25   commissions?

1    **A.**   Correct.

2    **Q.**   And then the -- let's go down to where it says

3    "opportunity costs."  Why is that number in a bracket?

4    **A.**   Because it's a negative.  So a negative means it was a

5    benefit to the client.  So they -- in this particular

6    transition, the market went up as they were selling, which is

7    obviously a good thing for them.  So they ended up having a

8    very substantial negative -- negative cost.  So a very

9    substantial benefit from the market movements.

10   **Q.**   And typically, when you do agency trading, who benefits

11   from either upswings in the markets or downturns in the

12   markets?

13   **A.**   The client does.

14   **Q.**   Are all the commission revenues that State Street earned

15   in this tranche, are they spelled out anywhere here?

16   **A.**   They're not spelled out, no.

17   **Q.**   Are they sort of numerically captured anywhere?

18   **A.**   They are captured in there.  So yes, they would be

19   captured in that total cost number, so that includes all of

20   State Street's commissions in there.

21   **Q.**   But in which of these categories, say, as opportunity

22   cost or market impact cost, is that -- is the hidden

23   commission folded into?

24   **A.**   It would really come out of the opportunity cost in that

25   one.  So it would have been.  Had we not taken commissions,

1    that would have been an even bigger negative number, so an

2    even bigger advantage to the client.

3    **Q.**   So had you not taken the hidden commissions, how would

4    the client's performance have differed?

5    **A.**   They would have had an even lower cost to their

6    transition.  So yeah, they would have been even better off.

7    What's already quite a good result from the client, from a

8    shortfall perspective, would have been even better.

9    **Q.**   Let's take a look at -- I'm sorry, the last question.

10              In laying out the cost like this, did you want the

11   client to know that you had taken these hidden commissions?

12   **A.**   No.  No.

13   **Q.**   Let's take a look at page 68, please.

14              And before we zoom in on anything in particular,

15   what, in general, are we looking at with these rows?

16   **A.**   In general, that is the list of the executions that we've

17   done for the client over the course of the transition.  So

18   it's a list of what we've -- I was going to say bought and

19   sold, but in this case, they were all sells.

20              MR. JOHNSTON:  So if you can zoom in, Erin, on the

21   categories at the very top towards the right, just like --

22   yeah, like one column at the time.  That's fine.  Maybe

23   that's enough for the jurors to see.

24   BY MR. JOHNSTON:

25   **Q.**   Can you explain what the columns -- or, sorry, the rows

1   that you have here?

2   **A.**   Well, so the column, the shares is how many shares we

3   traded, so what was -- how many were sold.  The explicit

4   costs would be any commissions charged or taxes and fees and

5   implicit costs are all of the other trading costs, so spread

6   costs, market impact, and opportunity costs.  The sum of

7   explicit and implicit will get you to the total cost.

8   **Q.**   So the total implementation shortfall?

9   **A.**   That's right, yeah.

10  **Q.**   What types of fees and costs are typically included in

11  the explicit costs?

12  **A.**   The explicit costs is commissions and kind of exchange

13  taxes and fees and those types.

14  **Q.**   So if we take a look at one of these actual trades.

15          We can zoom in, Erin, on the one that says the

16  iShares, Russell 2000, not the full column, first, because

17  other the jury will --

18          Do you see that?

19  **A.**   Yup.

20  **Q.**   So what type of security is that?

21  **A.**   That's an ETF, as you were talking about before.  That is

22  an exchange-traded fund that holds a portfolio of the Russell

23  2000, so a very broad-based US equity index.

24  **Q.**   All right.  And if we could move further along, Erin, to

25  see the other numbers associated with that row.  What's

1  the -- what do these numbers show?

2  **A.**   The first one on the left is the number of shares, so

3  it's about 4.4 million shares of that, so a pretty big

4  position.

5  **Q.**   What would that be worth in dollar terms?

6  **A.**   I don't know.  I would need to see the -- I guess I would

7  need to see the price, which -- which isn't shown on that

8  execution.  This is really a cost breakdown, rather than

9  showing the price.  It shows what we traded and what the

10  shortfall was that was attributable to each of those things

11  that we traded.

12  **Q.**   But how is, generally, a position of 4 million shares in

13  a ETF compare?

14  **A.**   It's a big position.  That would be -- 4 million shares?

15  It's going to be in the hundreds of millions in value terms.

16  **Q.**   And so then directing to where the -- where there is just

17  a dash, which is, I guess, underneath the -- in the direct

18  costs.  Why is that empty?

19  **A.**   It means there were no exchange taxes and fees and no --

20  no commissions taken.

21  **Q.**   Were no commissions taken?

22  **A.**   No, there was commissions taken on that trade, yeah.

23  **Q.**   And so where would those numbers be folded into?

24  **A.**   Into the -- into the implicit costs, so into the

25  2.6 million benefit that you see beside it there.

1  **Q.**  So but for the commissions, what would have been the

2  result for the client?

3  **A.**  He would have been an even bigger benefit than

4  2.6 million.

5  **Q.**  And typically, when you're trading as an agent, you'll

6  get the benefit of a good market performance?

7           MR. WEINBERG:  I object.  This is asked and

8  answered.

9           THE COURT:  Sustained.

10          MR. JOHNSTON:  You can take this down, Erin.

11  BY MR. JOHNSTON:

12  **Q.**  Mr. Boomgaardt, were there additional, as you say,

13  tranches of this transition?

14  **A.**  Yes, they were.

15  **Q.**  Do you know whether additional hidden commissions were

16  taken for those tranches?

17  **A.**  Yes, there were.

18  **Q.**  Do you -- did you play any role in managing those

19  projects?

20  **A.**  Yeah.  I had a pretty hands-on role for all of the

21  tranches across that NTMA transition.

22  **Q.**  Do you know what types of hidden commissions were taken

23  in the other tranches?

24  **A.**  Well, it was a -- it was, again, a global trade.  I can't

25  remember the specifics of what assets came in for each of

1    those transitions, but the same hidden commissions across

2    equities and bonds that we -- stocks and bonds that we had

3    done previously.

4    **Q.**   What about the accounts that you had used?

5    **A.**   I mean, we would -- the accounts would be the same as

6    they were for that tranche, be it the VWAP account for

7    equities, or the normal bond trading accounts.

8    **Q.**   And just to be clear, in the normal bond trading

9    accounts, you don't need to do anything special?

10   **A.**   No, no, that was -- bond trading could be done as normal

11   and there wouldn't be any commissions.

12   **Q.**   But for stocks, you needed to use the VWAP accounts, so

13   it won't be seen?

14   **A.**   Yes, that's right.

15   **Q.**   In that prior document that we saw, where all the

16   individual securities were listed out, had you not used a

17   VWAP account, what would have shown in those explicit cost

18   column?

19   **A.**   Well, if we had taken a commission, it would have shown

20   in that column.

21   **Q.**   Let's take a look at Government Exhibit 170, but only to

22   the witness, please.

23          Do you recognize this document, Mr. Boomgaardt?

24   **A.**   Yes, I do.

25   **Q.**   What is it?

1    **A.**   It is an e-mail from Killian Buckley at NTMA to Cassie

2    Waller and myself, and several others both at NTMA and State

3    Street.

4    **Q.**   And what's the date?

5    **A.**   The 24th of June, 2011.

6    **Q.**   And is there an attachment to this e-mail?

7    **A.**   Yes.

8    **Q.**   What is it?

9    **A.**   It's the NTMA combined post trade.

10   **Q.**   And what does that mean?

11   **A.**   I believe it's the post trade that reflects all of the

12   tranches and the full completion of the NTMA transition.

13   **Q.**   So sort of a summary report?

14   **A.**   Yeah.

15           MR. JOHNSTON:  At this time, Your Honor, the

16   Government moves to admit Exhibit 170.

17           MR. WEINBERG:  No objection.

18           THE COURT:  Admitted.  You can publish it.

19           (Exhibit Nos. 170 admitted into evidence.)

20           MR. JOHNSTON:  Zoom in on the top, please, Erin.

21           THE COURT:  This does not include another exhibit,

22   which is the attachment?

23           MR. JOHNSTON:  We're not admitting the attachment.

24   The Government is not seeking to go back into that now.

25           If we could take a look at just the send field.

1  BY MR. JOHNSTON:

2  **Q.**  So who's this e-mail from?

3  **A.**  It's from Killian Buckley at NTMA.

4  **Q.**  And why is he sending it to yourself and Cassie Waller?

5  **A.**  Cassie was the main relationship manager for NTMA and I

6  was involved in the transition.

7         MR. JOHNSTON:  Can you just take a look at the

8  bottom of the e-mail.  If we could actually just do the

9  numbers, 1 through 6.  Yeah, that's great.  Yeah.  The

10  introductory and then the 1 to 6, please.

11  BY MR. JOHNSTON:

12  **Q.**  What is it that Mr. Buckley is asking you and Cassie

13  Waller?

14  **A.**  He has looked at the post-trade report and had a -- I

15  guess a number of points that he just wanted some

16  clarification on.

17  **Q.**  And what do all those -- in general, do those points

18  relate to?  Like what are they?  Are they all-around cost?

19  **A.**  They're all cost related.  Yes.  I'm just reading through

20  the last of them.  But yes, they all reference cost in one

21  way or another.

22  **Q.**  And how did you -- what type of result did you deliver

23  for NTMA in this transition?

24  **A.**  From an implementation shortfall perspective?

25  **Q.**  Yes.

1    **A.**   It was a good result for them.  As I said, they had some

2    favorable market conditions that certainly helped that.

3    **Q.**   Are market transitions typically something that State

4    Street's transition team controls?

5    **A.**   No, no.  There were risks and transitions that we try and

6    manage.  But we can't control all of the risks and that was a

7    risk that, happily for them, went in their favor in this

8    transition.

9    **Q.**   So it's your testimony that you delivered a good result?

10   **A.**   From an operational perspective, I think they were --

11   they were pleased.  And it came in at a good implementation

12   shortfall number for them.  So, yeah, I think generally it

13   was a successful -- successful transition.

14   **Q.**   Is it typical that a client asks you for -- despite

15   having a great result, all these questions about costs?

16   **A.**   It's not uncommon for clients to come back and try and

17   understand the cost of the transition, particularly for

18   somebody like the NTMA.  I mean, this is a Government

19   organization who has to report to the Parliament in Ireland,

20   so they want to understand that these are not unusual --

21   unusual questions.

22   **Q.**   And in looking to number 4, have they asked you about the

23   Russell 2000 iShare?

24   **A.**   Yes, they asked about it specifically there.

25   **Q.**   And why is it -- what is your understanding about why

1    they're asking about the Russell iShare 2000?

2    **A.**   Because it's a big position and it accounted for quite a

3    large proportion of the shortfall that they had.

4    **Q.**   So they want additional information?

5    **A.**   Yes.  They're asking for a bit more information around

6    when and how we traded that one.

7    **Q.**   At this point, had you told the client that you had taken

8    hidden commissions?

9    **A.**   No.

10   **Q.**   When this e-mail was sent to you, did you intend to tell

11   them, in responding to these questions, that you had taken

12   hidden commissions?

13   **A.**   No.

14   **Q.**   And why didn't you want to tell them?

15   **A.**   Well, they're hidden commissions and that was part of the

16   plan.  As we discussed, it wasn't to be disclosed to the

17   client.  It was done so that they didn't see it.

18             MR. JOHNSTON:  You can take it down, Erin.

19   BY MR. JOHNSTON:

20   **Q.**   Do you know how much revenue, overall, State Street made

21   in the entire NTMA transition?

22   **A.**   Again, I don't know the specifics, but it's in the

23   millions of dollars.

24   **Q.**   Another elephant deal?

25   **A.**   Oh, yeah.  Absolutely.  Big one.

1   **Q.**  Were there additional opportunities to charge hidden

2   commissions in the -- in 2011?

3   **A.**  Yes.

4   **Q.**  Are you familiar with a client called Sainsbury's?

5   **A.**  Yes.

6   **Q.**  Who are they?

7   **A.**  Sainsbury's was a pension fund for the company called

8   Sainbury's and Sainsbury's is one of the largest supermarkets

9   in the UK.  So this is a pension fund for the employees of

10  Sainsbury's.

11  **Q.**  Have you ever worked with Sainsbury's before?

12  **A.**  Yes, they were an existing client of State Street.

13  **Q.**  How did you come to pitch for their business?

14  **A.**  This one came through -- a consultant approached us on

15  behalf of Sainsbury's.

16  **Q.**  What role do consultants play in the transition business?

17  **A.**  So pension funds often have consultants or advisors to

18  advise them on lots of different things.  But for transition

19  management, they specifically would help pension funds to

20  choose a transition manager.  So they were important to us in

21  transition management, because we wanted them to consider us

22  for the business that they were advising pension funds to do.

23  **Q.**  When they would come to you initially, would you know who

24  the end client would be?

25  **A.**  Not always.  Not always.  A lot of times, they would come

1    with a project name or some other way of not disclosing who

2    the client was.

3    **Q.**  So when they were working for a client, would you

4    negotiate directly with the client or directly with the

5    consultant?

6    **A.**  Both.  Some and some.

7         MR. JOHNSTON:  I'd like to show the witness,

8    solely, Government Exhibit 84.

9         THE COURT:  Yes.

10   BY MR. JOHNSTON:

11   **Q.**  If you take a look, Mr. Boomgaardt.  Do you recognize

12   this e-mail, Mr. Boomgaardt?

13   **A.**  Yes, I do.

14   **Q.**  What is it?

15   **A.**  It's an e-mail from myself to two people at the

16   consultants, Aon Hewitt, in fact, three people, one CCed, as

17   well.

18   **Q.**  What's the date on this e-mail?

19   **A.**  The date is the 10th of January, 2011.

20   **Q.**  Who is Aon Hewitt?

21   **A.**  They're one of the big consultants who advise pension

22   funds on, among other things, which transition manager to

23   use.

24   **Q.**  And in this particular instance, who is Aon Hewitt

25   working on behalf of?

1  **A.**   In this particular one, it's Sainsbury's, but I'm not

2  sure that we knew that at the time.

3            MR. JOHNSTON:  Your Honor, at this time, the

4  Government moves to admit Exhibit 84 and 84.2 into evidence.

5            MR. WEINBERG:  No objection.

6            THE COURT:  Admitted.

7            (Exhibit Nos. 84 and 84.2 admitted into evidence.)

8            THE COURT:  You may publish it.

9            MR. JOHNSTON:  Let's zoom in at the top, please.

10  BY MR. JOHNSTON:

11  **Q.**   Let's take a look at this e-mail, Mr. Boomgaardt.  Did

12  you write this?

13  **A.**   Yes, I did.

14  **Q.**   And who are you -- who are you directing this to?

15  **A.**   To Courtney Wilder and Robert McElvanney, but

16  specifically Courtney.  They're both people who worked at Aon

17  Hewitt.

18  **Q.**   What's the attachment to this document or to this e-mail?

19  **A.**   There are two attachments, I guess.  One is a proposal

20  and the second is a specific trading strategy, so more

21  specifically into how we would actually trade this particular

22  transaction.

23  **Q.**   Is there any -- any mention of the costs in here?

24  **A.**   In the proposal --

25  **Q.**   Yes.

1    **A.**   -- there certainly would be, yes.  That's one of the

2    purposes of the proposal, is to get a -- a fee basis and a

3    proposal for how much we would charge.

4    **Q.**   Did a consultant -- did consultants typically care more

5    or less about fees than your -- when you dealt directly with

6    the clients?

7    **A.**   They both cared a lot about fees and it's tough to say

8    one more than the other.  Fees were an important topic of

9    conversation, negotiation with both consultants and clients.

10   **Q.**   Let's take a look at 84.2, please.  Do you recognize this

11   document, Mr. Boomgaardt?

12   **A.**   Yes, I do.

13   **Q.**   What is it?

14   **A.**   It is our -- it is the strategy document that was

15   attached to that e-mail that we just saw.

16   **Q.**   Let's take a look at page 4, please.  Did you -- who did

17   you want to see this document?  Who was this intended for?

18   **A.**   It's intended for the -- for the consultant, Aon Hewitt.

19   **Q.**   And for what purpose?

20   **A.**   To convince them that we should be the ones doing this

21   transition for whoever their client is.

22   **Q.**   Let's take a look where the first bullet point

23   says "employ an agency trading strategy to ensure best

24   execution."

25           What does it mean to employ -- what's your

1    understanding of what you are trying to communicate to the

2    client?

3    **A.**   That we're going to be trading on the client's behalf in

4    the market.  And in an agency execution, we will be giving

5    them the same execution we execute in the market, plus or

6    minus any agreed commission.

7          MR. JOHNSTON:  Let's take a look at page 5, please.

8    Zoom in just on the table.

9    BY MR. JOHNSTON:

10   **Q.**   What information is contained in this table?

11   **A.**   That's our -- that's our cost estimate for this

12   transition.

13   **Q.**   Is this a bond transaction or a stock transition or a

14   mixed, both?

15   **A.**   It's a bond transition.  I think there were some

16   derivatives or things involved, but broadly speaking a bond

17   transition.

18   **Q.**   And what are the commissions that you have proposed to

19   charge the ultimate client for this -- this transition?

20   **A.**   A half a basis point of yields, which, given the

21   information that they provided us, we estimated to be about

22   865,000 pounds.

23   **Q.**   So you used commissions when referring to bonds?

24   **A.**   Yes.

25   **Q.**   Why didn't you use the term markup, markdown, or spread?

1    **A.**   Commissions was a term that is equally, as well, used.

2    Markup or markdown or spread are really just the mechanism

3    that we take for those commissions.  You know, they're

4    synonymous, really.

5            MR. JOHNSTON:  Let's take a look at page 14,

6    please.  We can zoom in on the text.

7    BY MR. JOHNSTON:

8    **Q.**   I'm going to direct your attention to the sentence that

9    says, "When trading fixed income securities, State Street

10   acts as agents of the client and utilize a multidealer

11   competitive bid process."

12           What's your understanding of what that phrase is

13   trying to communicate?

14   **A.**   That we're trading on the client's behalf and we're going

15   out to multiple brokers.  We're going to all the used car

16   lots, or many of the used car lots, anyway, to go and find

17   them the best deal.

18   **Q.**   And when you see multidealer competitive bid process,

19   what do you mean by it's a competitive bid process?

20   **A.**   We will ask several brokers at the same time to quote us

21   a price for a security and the one that comes back with the

22   best price is the one that we execute with.

23   **Q.**   What, if anything, is this communicating or trying to

24   communicate to clients about what your compensation will be?

25   **A.**   Well, it's -- it's indicating that we act as agent, so

1    implicit in that is we will give them the execution that

2    we're getting as a result of this competitive bid process,

3    plus or minus our agreed commission.

4              MR. JOHNSTON:  You can take this down, Erin.

5    BY MR. JOHNSTON:

6    **Q.**  After this proposal, was there any negotiation with Aon

7    Hewitt, or the ultimate client, about fees?

8    **A.**  Yes.

9              MR. JOHNSTON:  Let's take a look at Government

10   Exhibit 85, but only for the witness, please.

11   BY MR. JOHNSTON:

12   **Q.**  Do you recognize this document?

13   **A.**  Yes, I do.

14   **Q.**  What is it?

15   **A.**  It is an e-mail from myself to three people at Aon

16   Hewitt.

17             MR. JOHNSTON:  Your Honor, at this time, the

18   Government moves to admit Exhibit 85 into evidence.

19             MR. WEINBERG:  No objection.

20             THE COURT:  Admitted.  You can publish it.

21             (Exhibit Nos. 85 admitted into evidence.)

22   BY MR. JOHNSTON:

23   **Q.**  Let's take a look at the recipients of this e-mail.  Who

24   are the individual recipients?

25   **A.**  Those are three consultants that worked at Aon Hewitt,

1    that were advising this particular client.

2    **Q.**   Let's take a look at the third paragraph, where you

3    say, "We believe this transition will be as much a project

4    management exercise, as it will be a trading exercise and

5    will require the dedication and significant resources.  As

6    such, we propose to manage the transition for a flat fee of

7    350,000 pounds."

8            What are you representing to the client here?

9    **A.**   That there may not be as much trading involved in this

10   transition as we had originally thought there were.  There

11   was some discussions going on about how this transition might

12   work and the most effective way to do this.  And because

13   there were some derivatives involved in things that possibly

14   it would mean there wouldn't need to be quite so much

15   trading.

16   **Q.**   How were you proposing you earn your commission?

17   **A.**   Via flat fee, rather than a trading commission.

18   **Q.**   So this was in addition to a trading commission?

19   **A.**   No.

20   **Q.**   What do you want the client to understand when you

21   suggested that there would be a flat fee?

22   **A.**   That we wouldn't be charging any commission in addition

23   to that.

24   **Q.**   Now, 350,000 pounds is a lower number than that, if you

25   can recall in that table, when it was listed on a commission

1    of half basis points of yield, it was approximately

2    860,000 pounds?

3    **A.**   Yes, that's right.

4    **Q.**   What explains the difference?

5    **A.**   Well, the transition, I think, as it became known, as we

6    got closer to it on this piece, was going to be an awful lot

7    less trading than what we had -- than what we had

8    anticipated.  So that accounts partially for it and that

9    the -- it wasn't going to be a transition, even if we charged

10   a commission that was going to generate the commission like

11   what we had thought it would in the initial pretrade.  But

12   secondly is why we wanted to make that flat fee at such a

13   level that we would win the transition.

14   **Q.**   Was this a competitive bid?

15   **A.**   We assumed it was.  I don't know whether it was or not,

16   but we always assume that the consultants are putting us in

17   competition, yes.

18   **Q.**   When you suggested a flat fee of 350,000 pounds, is that

19   all you intended to charge?

20   **A.**   No, I believe we intended at that point to still take the

21   undisclosed spreads.

22   **Q.**   And what was it about this deal that made it a good

23   candidate for that plan?

24   **A.**   It was big and bond related.

25   **Q.**   How big are we talking?

1    **A.**   I can't remember the exact size of the portfolios in this

2    one, but again, it was at least several hundred million,

3    possibly over a billion of trading.

4    **Q.**   Who, if anyone, did you discuss proposing a management

5    fee in lieu of commissions?

6    **A.**   Well, I spoke to Ed Pennings a lot about this one.  Yeah.

7    **Q.**   Did you have an understanding whether anyone other than

8    Ed approved of this?

9                MR. WEINBERG:  I object.

10               THE COURT:  Well, just as to whether he had an

11   understanding?

12               MR. WEINBERG:  It's not a predicate for his

13   understanding.  If the Government can create a foundation, I

14   have no objection.

15               THE COURT:  Overruled.  But then you need a

16   foundation if he's going to say what his understanding is.

17   BY MR. JOHNSTON:

18   **Q.**   During the time when you're pitching these deals, how

19   often are you communicating with Ed Pennings about what to

20   present to the client?

21   **A.**   Ed and I sat very close.  I spoke to Ed almost every day,

22   and certainly around these transitions, certainly every day.

23   **Q.**   Did -- were there -- did Ed ever relay to you any

24   comments or conversations he had with Ross McLellan?

25               MR. WEINBERG:  About?

1    BY MR. JOHNSTON:

2    **Q.**   During this time period.

3            THE COURT:  Are you objecting or not?  Yes, as to

4    the form?

5            MR. WEINBERG:  Yes, Your Honor.

6            THE COURT:  Sustained as to the form.

7    BY MR. JOHNSTON:

8    **Q.**   What, if any, conversation did you have with Ed around

9    this proposal?

10   **A.**   About how it was a candidate for using this plan and that

11   he had discussed it farther up the chain with -- with Ross.

12   You know, as much as I spoke to Ed, you know, my

13   understanding and my experience of -- Ed spoke to Ross on a

14   very frequent basis.  And on the basis of that, he was -- he

15   assured me that this had Ross's knowledge and understanding

16   and blessing.

17   **Q.**   Would you have done this without understanding that Ross

18   approved?

19   **A.**   That's -- that's difficult for me to suppose.  I

20   certainly put a lot of store in Ross.  I trusted him and

21   liked him.  And yeah, I put a lot of store in the fact that I

22   thought Ross was -- had blessed this and the others.

23   **Q.**   Was this proposal accepted?

24   **A.**   Broadly speaking, I think it was, yeah.

25   **Q.**   Let's take a look at --

1          MR. JOHNSTON:  Just for the witness, Exhibit 109.

2     Just the field at the top.

3     BY MR. JOHNSTON:

4     **Q.**  Do you recognize this e-mail, Mr. Boomgaardt?

5     **A.**  Yes, I do.

6     **Q.**  Who is it from?

7     **A.**  It is from Raymond Pestana, who was one of the transition

8     managers that worked for me, to Dean Johnson, who was our

9     main contact at the Sainsbury's pension fund.  Copied to

10    myself and Chris Martin, who was the relationship manager in

11    our team from State Street.

12    **Q.**  What date are we talking about here?

13    **A.**  The date is the 28th of February, 2011.

14    **Q.**  So this is approximately a month after those prior

15    e-mails.  At this point, had you learned who the ultimate

16    client was?

17    **A.**  Yes.  Yeah.  Absolutely.  We knew Dean Johnson was at

18    Sainsbury's, so yes.

19          MR. JOHNSTON:  Your Honor, move to admit Government

20    Exhibit 109 and 109.1.

21          MR. WEINBERG:  I have no objection.

22          THE COURT:  Admitted.  You can publish it.

23          (Exhibit Nos. 109 and 109.1. admitted into

24          evidence.)

25          MR. JOHNSTON:  Zoom in at the top, please.

BY MR. JOHNSTON:

**Q.** What is Mr. Pestana sending to Dean Johnson?

**A.** He's sending him the signed version of the periodic notice for this transition.

**Q.** And what happens after a periodic notice is signed?

**A.** We start the planning, organizing, and trading of a transition.

**Q.** Did you review the periodic notice before it was signed?

**A.** I didn't, no.  But that wasn't -- usually periodic notices were reviewed by sales.  They were the ones that had responsibility for them.

**Q.** Were you aware of its contents?

**A.** Broadly speaking, yes.

**Q.** Was that -- as a transition manager, how did you -- how were you supposed to know what were the details of the agreement between the client?

**A.** Well, it was sales' responsibility to tell those to us. I mean, it was -- but I was involved in the negotiations and understood what the fee was going to be and the structure of this particular transition very well, yeah.

**Q.** All right.  Let's take a look at the transition notice, 109.1, please and we can go to page 2.  If we can zoom in on the signatures first.

Who is signed on behalf of State Street?

**A.** Ed Pennings.

1   **Q.**   And do you know who is signed on behalf of Sainsbury's?

2   **A.**   It's Dean Johnson.

3   **Q.**   Let's go further up, where it says the "transaction fee."

4          When it says "State Street will charge an agreed

5   management fee of 350,000 pounds for this exercise," what was

6   your understanding of what you and Ed wanted the client to

7   understand?

8   **A.**   That we would charge a flat management fee of 350,000

9   and -- instead of a per-trade commission charge.

10  **Q.**   Is that all the compensation you intended to make out of

11  this deal?

12  **A.**   No.

13  **Q.**   Did you want the client to know that you were going to

14  make additional compensation out of this deal?

15  **A.**   No.

16  **Q.**   What did you want the -- what did you want them to think

17  the 350,000 represented?

18  **A.**   That it was a management fee that was instead of charging

19  commission on the trading.

20  **Q.**   So instead of a per-trade charge?

21  **A.**   Instead of, yeah.

22          MR. JOHNSTON:  You can take this down.

23  BY MR. JOHNSTON:

24  **Q.**   Was the per-trade charge applied to this transition?

25  **A.**   Yes, it was.

1    **Q.**   Were you involved in the execution of the trades?

2    **A.**   Yes, I was involved in this one.

3    **Q.**   What types of securities were traded?

4    **A.**   Well, this was a -- this was a bond transition, so they

5    were bonds, yes.

6    **Q.**   Do you know whether this was done -- do you know where

7    they were traded?

8    **A.**   I believe it was a global portfolio, but I would need

9    to -- I would need to have my memory refreshed, I guess, on

10   exactly what the markets were.

11   **Q.**   Do you -- how -- in general, how would you communicate to

12   the various desks as to who should trade what?

13   **A.**   Well, we would -- we would send out an e-mail with our

14   trading instructions to the various traders that needed to be

15   involved, depending on which assets it was to be traded.

16   **Q.**   Do you know what size of commissions were taken on these

17   bond trades?

18   **A.**   I don't recall exactly the commissions, but they were --

19   it was another very good remunerative -- we made lots of

20   money, in the millions again, but I don't remember exactly

21   what the commission charges were off the top of my head.

22   **Q.**   Was this consistent with acting in the best interest of

23   your client?

24   **A.**   No.  No, it's not.

25   **Q.**   Was there still another opportunity to charge hidden

1  commissions in this time period?

2  **A.**  Yes.

3  **Q.**  Are you familiar with a client by the name of Eircom?

4  **A.**  Yes.

5  **Q.**  Who are they?

6  **A.**  They are a pension fund for the employees of Eircom,

7  which is, I guess, a telecommunications company in Ireland.

8  **Q.**  Did State Street execute a transition for them in the

9  2011 time period?

10  **A.**  Yes.  Yes, we did.

11  **Q.**  How did State Street land the deal?

12  **A.**  Similarly, it came in via a consultant again, a different

13  consultant this time, but in a way very much analogous to the

14  last one that we talked about.

15  **Q.**  Do you know which consultant was used in this point?

16  **A.**  It was Mercer, I believe, on this occasion.

17  **Q.**  Did they play a role any different than the one that Aon

18  Hewitt had played for Sainsbury's?

19  **A.**  No, very similar.  They were advising the fund on which

20  transition manager to pick, was our understanding of their

21  involvement in this transition.

22  **Q.**  Had you interacted with Mercer before?

23  **A.**  Yes.  Yes.  No, we knew them well.  They were one of the

24  bigger -- one of the bigger consultants, so we knew all the

25  consultants, certainly the bigger ones quite well.

1   Q.   Did the way that you presented State Street's business

2   model differ when you spoke to consultants, as opposed to

3   when you presented to clients directly?

4   A.   No.  No.  We took the same approach with both.

5   Q.   Which included representations about what?

6   A.   Oh, about our agency trading business and elimination of

7   conflicts of interest, and our fiduciary role and all of

8   those things.  That was part of the standard State Street

9   transition management pitch.

10          MR. JOHNSTON:  I want to now show a document just

11   to the witness, Exhibit 124.

12          THE COURT:  Go ahead.

13   BY MR. JOHNSTON:

14   Q.   Do you recognize this document?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   It's an e-mail from Cassie Waller to several people at

18   Mercer and myself.

19   Q.   And what's the date?

20   A.   9th of March, 2011.

21          MR. JOHNSTON:  Your Honor, at this time, the

22   Government moves to admit Exhibit 124 and 124.1.

23          MR. WEINBERG:  No objection.

24          THE COURT:  Admitted.  You can publish it.

25          (Exhibit Nos. 124 and 124.1 admitted into

1        evidence.)

2   BY MR. JOHNSTON:

3   **Q.**   Who's Cassie Waller?  Could you remind us?

4   **A.**   Yes, she's a relationship manager.  So she worked for Ed,

5   but was the one with responsibility for Ireland, so hence,

6   this was an Irish client.  So she also had responsibility for

7   covering the consultants, so two reasons why she would be

8   involved in this one.

9   **Q.**   Where did she work?

10  **A.**   She worked in London.

11  **Q.**   Who are Andrew Williams, Ben Gunnee, and Helen Baldock?

12  **A.**   They are three people who worked at Mercer.

13  **Q.**   What's attached to this e-mail?

14  **A.**   It is our proposal for this Project Austen, they called

15  it.  So we didn't know who the end client was.  But they had

16  obviously sent us a list of questions and asked for a

17  proposal, which is what we've came back with here.

18  **Q.**   So you're saying you don't know who the end client was?

19  **A.**   I don't think we knew at this point, no.

20  **Q.**   Did you review the proposal before it was sent by

21  Ms. Waller?

22  **A.**   Yes.

23  **Q.**   Let's take a look at the proposal, which is 124.1.  Are

24  we looking at the proposal here, Mr. Boomgaardt?

25  **A.**   Yes, that's the proposal for Project Austen.

1   **Q.**  Let's direct your attention to page 4 and let's take a

2   look at the bullet point.

3          MR. JOHNSTON:  Just zoom in on the bullet point.

4   You know what?  It's slightly blown out.  Can you -- just

5   encompassing the last bullet point and the -- below.  All

6   right.

7   BY MR. JOHNSTON:

8   **Q.**  Were you -- directing your attention to the bottom, where

9   it says, "We take full fiduciary responsibility and you have

10  the assurance that each and every decision taken during the

11  transition is motivated only by what is in your best

12  interest."

13         What are you trying to communicate to the client

14  here?

15  **A.**  Well, hopefully it's fairly clear, that we're -- that we

16  are acting in the client's best interest at all times during

17  the transition.

18  **Q.**  Did you mean this?

19  **A.**  I don't know if at that point we were planning on taking

20  undisclosed spreads on this particular transition or not.  I

21  can't recall.

22  **Q.**  I mean, in general, working at State Street.

23  **A.**  In general, that is the methodology we employed for

24  almost all of our transitions, 90 plus percent, with the

25  exception of the ones that we're talking about -- talking

1    about here.

2    **Q.**  Let's take a look at the bottom of page 4, if we can, to

3    the "Proposed Fee" section.

4          When you say, "We propose a flat management fee for

5    this exercise of 4 basis points on the value of assets coming

6    into transition, which equates to 400,000 euros, this flat

7    management fee will be invoiced to the client separately

8    following the transition exercise.  Alternatively, if it is

9    the client's preference, this flat management fee can be

10    taken as a capped commission."

11          What are you representing to the client here?

12    **A.**  That -- we're proposing a management fee and that we

13    don't mind if it's taken as a -- as something where we

14    invoice them at the end as a flat fee, or we can take it also

15    in the form of a commission where, once we hit that cap of

16    400,000 euros, we'll stop charging commissions.

17    **Q.**  Do you know what size of transition we're talking about?

18    **A.**  It was several billion, I think, of trading, or a

19    billionish, anyway.  I can't remember exactly, but in that

20    order of magnitude.

21    **Q.**  Is that a high or low fee for a transition of that size?

22    **A.**  Well, actually, we can figure this out.  It's about a

23    billion euros, I guess, because we're looking at 4 basis

24    points for the value of the assets, for 400,000, so that

25    equates to a billion euros.  That's not really high or low

1   for that, actually.  That's -- 4 basis points would be a

2   pretty average commission for something of that size, I

3   guess.  If anything, a little bit high actually, but it's not

4   too bad.

5           The thing about a flat fee in a transition that is

6   a billion of assets, you've got a billion to sell and a

7   billion to buy.  So it's two billion to trade, in which case

8   you're looking at 2 basis points, which probably takes it

9   down to being quite a low commission, if you're looking on a

10  per-trade basis.

11  **Q.**  Who, if anyone, did you discuss this fee proposal before

12  you had --

13  **A.**  With Ed Pennings.

14  **Q.**  Did you have any understanding of whether this proposal

15  had approval by anyone above Ed?

16          MR. WEINBERG:  Objection.

17          THE COURT:  Overruled as to that yes-or-no

18  question.

19          THE WITNESS:  Yes.

20  BY MR. JOHNSTON:

21  **Q.**  How did you have that understanding?

22  **A.**  From talking to Ed and the -- what he led me to -- what

23  he led me to believe about who knew about it and who was

24  approving of these things.  I did.

25  **Q.**  What did he lead you to believe?

1    **A.**   Well, he led me to believe that Ross knew about this and

2    approved of this as another candidate for our plan.

3    **Q.**   And what was that plan?

4    **A.**   Which was to charge undisclosed commissions.

5    **Q.**   What did you want the client to believe when you

6    presented this in a proposal?

7    **A.**   That we won't be taking any other commissions, only the

8    400,000 in compensation.

9              MR. JOHNSTON:  You can take this down, Erin.

10   BY MR. JOHNSTON:

11   **Q.**   After this proposal, was there any additional negotiation

12   on price?

13   **A.**   Yes.

14             MR. JOHNSTON:  Just to show the witness, Government

15   Exhibit 150.

16             THE COURT:  Go ahead.

17   BY MR. JOHNSTON:

18   **Q.**   Do you recognize this document?

19   **A.**   Yes, I do.

20   **Q.**   What is it?

21   **A.**   It's an e-mail from Cassie Waller to Andrew Williams at

22   Mercer and myself and a few others at State Street.

23             MR. JOHNSTON:  Your Honor, the Government moves to

24   admit Government Exhibit 150 into evidence.

25             MR. WEINBERG:  No objection.

1      THE COURT:  Admitted.  You may publish it.

2      (Exhibit No. 150 admitted into evidence.)

3  BY MR. JOHNSTON:

4  **Q.**  Let's take a look at the middle e-mail, please, in this

5  chain.  Who's Andrew Williams?

6  **A.**  He's a consultant at Mercer that was working on this

7  transition for Eircom.

8  **Q.**  What has he -- what is he sending to you?

9  **A.**  He is sending me a -- a proposal for a fee arrangement

10  that has sort of a sliding scale.  So if the assets are

11  smaller than they think, they will be paying a smaller fee,

12  or if they're bigger, they will be paying all the way up to

13  that 400,000 fee that we had proposed.

14  **Q.**  Do you recall what the ultimate fee that was agreed upon?

15  **A.**  I think it was more or less that structure that we agreed

16  upon.

17  **Q.**  Do you recall the exact number of assets that were -- the

18  size of assets that came in?

19  **A.**  I don't recall exactly, no.

20  **Q.**  So you just recall that this was the sliding scale that

21  was agreed upon?

22  **A.**  That's right.

23  **Q.**  Any other parts of this transition negotiated by Andrew

24  Williams on behalf of Eircom?

25  **A.**  Not that I can remember.  I mean, we did go into a lot of

 1    detail on trading strategy, but that wasn't a negotiation.

 2    It was an explanation.

 3              MR. JOHNSTON:  You can take this down.

 4    BY MR. JOHNSTON:

 5    **Q.**  I want to now show you an e-mail.

 6              MR. JOHNSTON:  Just for the witness, 155.

 7    BY MR. JOHNSTON:

 8    **Q.**  Do you recognize this e-mail?

 9    **A.**  Yes.

10    **Q.**  And what is it?

11    **A.**  It is an e-mail from myself to Ross McLellan.

12    **Q.**  Is it part of a longer chain?

13    **A.**  Yes, I believe so.

14    **Q.**  Is the date May 9, 2011?

15    **A.**  It is, yeah.

16              MR. JOHNSTON:  Your Honor, the Government moves to

17    admit Government Exhibit 155 into evidence.

18              MR. WEINBERG:  No objection.

19              THE COURT:  Admitted.  You may publish it.

20              (Exhibit No. 155 admitted into evidence.)

21    BY MR. JOHNSTON:

22    **Q.**  Let's start with the second-to-the-bottom e-mail, please.

23              Mr. Boomgaardt, directing your attention to what

24    you say, "Eircom is kicking off in anger tomorrow."

25              What are you talking about?

1    **A.**   That means -- it just means that we're starting to trade

2    Eircom tomorrow.   So clearly the transition had already

3    started from a planning and strategy point of view, but we're

4    going to start trading it tomorrow.

5    **Q.**   Where does the term "kicking off in anger" come from?

6    **A.**   It's just a -- a turn of phrase, possibly a Britishism.

7    I don't know -- I get lost between what's Canadian and what's

8    British, now that I've lived in England for 20 years.   So --

9    but all that's meant to portray is that we're going to be

10   starting to trade it the next day.

11   **Q.**   Why are you sending this e-mail to Mr. McLellan?

12   **A.**   I think we need to look at the rest of the chain, but I

13   think we're talking about revenue estimates for what deals we

14   have coming up.

15          MR. JOHNSTON:   Let's take a look further down,

16   Erin.

17          MS. LEAHY:   I apologize.

18          MR. JOHNSTON:   That's all right.   Maybe on page 2.

19   We can zoom in on the bottom e-mail.

20   BY MR. JOHNSTON:

21   **Q.**   What's Mr. McLellan asking you?

22   **A.**   He is looking at our deal calendar.   So we kept a list of

23   what we had for upcoming transitions and the calendar that he

24   was looking at said -- it didn't have anything in for any

25   transitions coming in the next couple weeks from our desk,

1   just asking me if that was correct.

2   **Q.**  Was this standard or atypical?

3   **A.**  I didn't get a lot of e-mails directly from Ross about

4   these things, no.  But occasionally he would ask me questions

5   like this, but it wasn't a regular occurrence.

6   **Q.**  Who, typically, did he reach out to, if he had questions

7   about --

8   **A.**  Ed.  Ed was his main contact.  They spoke an awful lot

9   more frequently than I did with him.

10          MR. JOHNSTON:  Let's go to the next e-mail, please.

11  BY MR. JOHNSTON:

12  **Q.**  What is your response?

13  **A.**  I say, "No, no, that's not right.  I'll get our business

14  analyst to update it, so that it's reflective."

15  **Q.**  What's TIM?

16  **A.**  TIM is our Transition Information Management system, so

17  it was where we kept track of what transitions were upcoming,

18  what we had going on, and what we had done.

19          MR. JOHNSTON:  Let's take a look at the next page,

20  please, Erin.

21  BY MR. JOHNSTON:

22  **Q.**  So what is he responding to you with?

23  **A.**  "Yeah, didn't think you weren't busy.  I thought you had

24  some transitions on the go over there."

25          MR. JOHNSTON:  Take that down, please.

1    BY MR. JOHNSTON:

2    **Q.**  And then we don't need to go and look at the kick it back

3    in anger.  So let's just jump back up to the next one.

4             What is -- what does Ross say to you after that

5    e-mail where you say Eircom is kicking off in anger?

6    **A.**  He's saying that that deal got a little smaller, didn't

7    it?  But revenues are still looking about 1 million.

8    **Q.**  Is 1 million the fee that you had quoted in Sainsbury's?

9    **A.**  No.

10   **Q.**  Now, that was in pounds --

11   **A.**  This is Eircom, not Sainsbury's.

12   **Q.**  Eircom.  Not pounds.  Euros.  Do you know what -- what

13   the conversion rate at the time -- the exchange rate was

14   between dollars and euros?

15   **A.**  I don't off the top of my head, but they're not that far

16   apart.  So it would be a little bit more in dollars, but not

17   dramatically so.

18   **Q.**  Did you believe that -- what was your understanding about

19   how much you were going to be earning on Eircom?

20   **A.**  Well, I knew we were going to be -- at that point, that

21   we were going to be employing our plan and taking undisclosed

22   commissions on it.  So making revenues of 1 million seemed

23   reasonable and probably -- probably a little bit small,

24   actually.

25   **Q.**  What was your understanding of why Mr. McLellan is giving

1   you the estimate of 1 million?

2   **A.**   Well, because he knew about the transition and about how

3   we were going to be taking our -- how we were going to be

4   taking our revenues on that.

5   **Q.**   Did this come as a surprise to you?

6   **A.**   No.

7   **Q.**   All right.  Now let's go to the last e-mail.  What are

8   you -- what's your response?

9   **A.**   Just yes.  "Yup."

10          MR. JOHNSTON:  You can take this down.

11   BY MR. JOHNSTON:

12   **Q.**   Do you know where this 1 million revenue target came

13   from?

14   **A.**   I don't know where it came from particularly, no.  But it

15   was -- we knew we were going to take -- that we were going to

16   be taking undisclosed -- undisclosed spreads on it, so it was

17   just an estimate, that was all.  Nothing more than a

18   placeholder in that system, I believe.

19   **Q.**   Had you decided on the 1 million?

20   **A.**   No, it certainly wasn't -- it certainly wasn't me.  That

21   was a number that I got from Ed.

22   **Q.**   Was a million a large or small amount for a transition of

23   this size?

24   **A.**   Any time we make more than a million, it's a -- it's a

25   big deal, yeah.  A million is good.

1    **Q.**   Did you participate in the execution of this transition?

2    **A.**   Yes.

3    **Q.**   And what role did you play?

4    **A.**   Again, I was pretty hands on with this transition.  It

5    was a very unusual -- it was a very unusual transition and so

6    it needed a bit of expertise on the trading side of it.  But

7    yes, I was involved.

8    **Q.**   And why do you say it was so unusual?

9    **A.**   It was -- the client was buying a very concentrated

10   number, so a small number of very long-dated European

11   Government bonds.  And they had a very specific yield target,

12   so they wanted to -- which really translates into a very

13   specific price that they needed to beat, in order to -- in

14   order to execute the bonds.  If we couldn't match their

15   price, we weren't to execute.  And they did it in a couple of

16   different -- a couple of different tranches, which is an

17   unusual method -- an unusual portfolio to be buying and an

18   unusual trading methodology as well.

19   **Q.**   Did any of that come as a surprise to you before you

20   started the transition?

21   **A.**   No.

22   **Q.**   In the topic of discussion with the client?

23   **A.**   Yeah, specifically, we had lots of discussions about what

24   the best strategy was to be able to hit that for him.

25   **Q.**   Were you aware of this strategy before you quoted the

1    price?

2    **A.**   Not specifically.  It evolved from there, for sure.

3    **Q.**   How about before you agreed upon the price?

4    **A.**   Yes.  Yeah, we knew it then.

5    **Q.**   What types of assets, at the end of the day, were traded

6    as part of this transition?

7    **A.**   Mainly European Government bonds, certainly on the buy

8    side of this, anyway.

9    **Q.**   Where would the trade for that happen?

10   **A.**   In London.

11   **Q.**   Do you know how much you ended up making on this

12   transition?

13   **A.**   Again, I don't know the exact numbers, but more than a

14   million dollars.

15   **Q.**   Was there -- any of that revenue consistent with acting

16   as your client's agent?

17   **A.**   No.

18   **Q.**   How about as their fiduciary?

19   **A.**   No.

20   **Q.**   Now, you testified earlier that you didn't do this on

21   every type of transition, correct?

22   **A.**   Yes, that's right.

23   **Q.**   Were there any -- and you would discuss this with whom in

24   London?

25   **A.**   Ed Pennings and the management team.

1    **Q.**  What -- at this point, what's keeping you from doing --

2    deploying this plan a little more widely?

3    **A.**  The desire for -- for it not to get out in the market, to

4    keep it -- to keep it quiet.  As I said, it was a departure

5    from the way that we sell ourselves to State Street.  And we

6    didn't want to have -- we wanted the ability to still sell

7    ourselves that way.  So the fewer people that knew about

8    that, the less chance that it had getting into the market.

9    **Q.**  So all the other people, the other clients that you

10   didn't charge hidden commissions, did you want them to know?

11               MR. WEINBERG:  Objection.  Leading.

12               THE COURT:  Sustained as to the form.

13   BY MR. JOHNSTON:

14   **Q.**  What, if anything, did you want the other clients that

15   you engaged with to know about this practice?

16   **A.**  Well, we didn't want them to know about it at all.  We

17   wanted them to still believe the State Street pitch of we act

18   as your agent, your fiduciary, and all of those things that

19   we put in our proposals and marketing pitches.

20   **Q.**  And in what circumstances would you not do that?

21   **A.**  The circumstances where we would take an undisclosed

22   commission?  Is that what you're asking?

23   **Q.**  In what circumstances were you not acting as your

24   client's --

25               MR. WEINBERG:  Your Honor, it's been asked and

 1    answered.

 2              THE COURT:  Sustained.

 3    BY MR. JOHNSTON:

 4    Q.  Were there other opportunities that came up to deploy

 5    this plan?

 6    A.  Yes.

 7    Q.  Are you familiar with a client called Royal Mail?

 8    A.  Yes.

 9    Q.  Who are they?

10    A.  They are a pension fund for the workers at Royal Mail.

11    Royal Mail is kind of the UK equivalent of the US Postal

12    Service, so the postal service in the UK.

13    Q.  How did you come to pitch for their business?

14    A.  Royal Mail, I believe, came through a consultant, as

15    well.  Although, I could be wrong.  It is certainly that came

16    to us and was -- we were asked to pitch for.

17    Q.  By whom?

18    A.  I believe it came from a consultant, but I could be

19    wrong.  It may have come directly by the -- directly in from

20    the client, as well.  But we -- my team would hear about it

21    certainly through the sales team, Ed's team.

22    Q.  Had you worked with Royal Mail before?

23    A.  I'm not sure we had.  I don't know if I had particularly.

24    Q.  I want to show you an e-mail.

25              MR. JOHNSTON:  Just for the witness, Government

1    Exhibit 91.

2              Zoom in on the top, please.

3    BY MR. JOHNSTON:

4    **Q.**  Who is this e-mail from?

5    **A.**  It's from Ed Pennings to Ian McKnight and Heath Mottram

6    at Royal Mail.

7    **Q.**  Did you receive this e-mail?

8    **A.**  Yes, I'm copied on it.

9    **Q.**  What's the date?

10   **A.**  February 9, 2011.

11             MR. JOHNSTON:  Your Honor, at this time the

12   Government moves to admit Exhibit 91 and 91-1.

13             MR. WEINBERG:  No objection.

14             THE COURT:  Admitted and you may publish it.

15             (Exhibit Nos. 91 and 91-1 admitted into evidence.)

16   BY MR. JOHNSTON:

17   **Q.**  What have you attached to this e-mail -- or sorry -- has

18   Mr. Pennings attached to this e-mail?

19   **A.**  Attached to the e-mail is our pretrade analysis, both

20   equities and bonds for -- as well as a proposal to -- they

21   had obviously had a specific series of questions and asked us

22   to provide an analysis, as well.  So this is our response to

23   that.

24   **Q.**  Is this before you had landed the deal?

25   **A.**  Yes.

1   **Q.**   What's the significance of the term "Project Arnold"?

2   **A.**   It's a code name, so that the name of Royal Mail isn't

3   attached to it in our communications, so that we're also

4   talking internally about a project name rather than a

5   specific client.

6   **Q.**   Let's take a look at the proposal, but before we do, did

7   you play any role in preparing the proposal?

8   **A.**   Yes.  Yeah.

9   **Q.**   Did you review it before it was sent out?

10  **A.**   Yeah.  And certainly the analysis was done by my team.

11  **Q.**   Let's take a look at 91.1.  Do you recognize this

12  document?

13  **A.**   Yup.  That's -- that's the proposal that we prepared for

14  that project.

15  **Q.**   Let's take a look at page 5, please.  All right.  Let's

16  look at the second paragraph under the 1.2.

17          Directing your attention to where it says "State

18  Street's transition management model is unique in the

19  industry.  The model is a hybrid between a buy-side

20  investment manager and an un-conflicted agency-only

21  broker-dealer."

22          What are trying to indicate to the buyer here?

23  **A.**   That we have a unique way of providing transition

24  management services, that we can have all the advantages of

25  asset managers and also can act as an un-conflicted agency,

1  only, so we don't have the conflicts that some of the

2  investment banks do.

3  **Q.**  With --

4  **A.**  With trading with your own principal books.  They're

5  just -- we set ourselves up to be conflict free.

6          MR. JOHNSTON:  You can zoom out, please.  And could

7  we go to the paragraph that starts with "fixed income,"

8  further down?

9  BY MR. JOHNSTON:

10  **Q.**  Directing your attention to where it says "State Street

11  employs a purely agency approach to fixed income trading."

12          What are you trying to communicate to the client

13  there?

14  **A.**  That we're trading bonds purely on their behalf and that

15  they will get the executions that we do in the market, plus

16  or minus any commissions that we're going to be charged.

17  That's the agency approach.

18          MR. JOHNSTON:  We can take this down, please.

19          Let's go to page 6.  Let's go to the second

20  paragraph, after where it says "equity."

21  BY MR. JOHNSTON:

22  **Q.**  I'm going to direct your attention to the phrase "our

23  in-house agency securities trading desk."

24          What are you trying to communicate to the client

25  with that phrase?

1    **A.**   That our execution desk, our trading desk is an agency

2    trading desk.   It trades --

3    **Q.**   And you say -- sorry for interrupting you.

4          What about the term "in-house"?

5    **A.**   That is part of our team.   That they're an integral part

6    of what we're doing in transition management.

7    **Q.**   And who are those people?   Have any of those names come

8    up so far in your testimony?

9    **A.**   Yeah.   I mean, so Ian Holden was the head of our in-house

10   securities trading desk in London.

11   **Q.**   What about in Boston?

12   **A.**   In Boston, yeah.   All the fixed income traders that we've

13   talked about were all sitting as part of that agency

14   securities trading desk.

15         THE COURT:   I'm going to stop you here.

16         Ladies and gentlemen, we're going to break for the

17   day.   Thank you for your attention.   Don't discuss the case

18   among yourselves, don't discuss it with anyone else, don't do

19   any independent research.   Please leave your transcript

20   notebooks there.

21         All rise for the jury.

22         (The jury exits the courtroom.)

23         THE COURT:   So we'll resume tomorrow morning,

24   unless something's changed.   It sounds like it should be

25   reasonable for the Government to have a witness, because you

1    might get done before 1:00.

2             MR. WEINBERG:  I might.  I don't want to guarantee

3    the Court.

4             THE COURT:  I understand, but I don't want to send

5    them home early.

6             In terms of the scheduling issue that you

7    mentioned, Mr. Frank, does it make the most sense for you to

8    think about that, talk to Mr. Weinberg, and then discuss that

9    tomorrow, either in the morning or at break?

10            MR. FRANK:  We can do that, Your Honor.

11            THE COURT:  I mean, you're thinking more about next

12   week than this week?

13            MR. FRANK:  Definitely next week, Your Honor.  We

14   have some witnesses coming in from Europe next week and our

15   next witness is Mr. Pennings, and I expect that --

16            THE COURT:  After this one?

17            MR. FRANK:  Correct.  So I expect that between the

18   cross-examination -- actually, the witness should probably

19   not be here for this.

20            THE COURT:  Sure, we'll excuse you, Mr. Boomgaardt.

21   You're probably happy to walk out of here.

22            THE WITNESS:  Thank you, Your Honor.

23            (The witness exits the courtroom.)

24            MR. FRANK:  Sorry, Judge.

25            THE COURT:  That's quite all right.  I don't think

1    we revealed any great secrets to him that Mr. Pennings is

2    testifying in this case.

3            MR. FRANK:  I don't think it's a great secret.

4    Between the -- finishing the direct, which is --

5            MR. JOHNSTON:  At least an hour.

6            THE COURT:  All right.  Must be close?  How many

7    more deals are there?

8            MR. JOHNSTON:  Well, there's only one more deal,

9    but there's a bunch of phone calls.  I would say at least

10   six, that some of which are a little longer that -- you know,

11   we're going to try to move fast with them, but this obviously

12   takes longer than you expect.

13           MR. FRANK:  Well, perhaps not than you expected,

14   but we expected.

15           THE COURT:  It definitely takes longer than I

16   expected.  I thought we would be done by next week.

17           MR. FRANK:  These are our longest witnesses by far.

18           THE COURT:  Right.

19           MR. FRANK:  So I'm -- Mr. Pennings' testimony is

20   long and I expect that the cross-examination will be long, as

21   well, and because these witnesses are coming in and we're not

22   sitting next Thursday, we'd like to get them out.

23           THE COURT:  So I guess the thing to talk about

24   is -- talk to each other about when -- what days would make

25   sense -- I guess there's two things I'm thinking about, the

1    overall schedule of hitting the date that we told the jury

2    they'd get the case.  I know it's early, so you don't

3    necessarily know who you're calling in defense, but you

4    must -- I'm sure every day you're getting a clearer idea of

5    what -- where the Government is going, to the extent that you

6    didn't have a clear idea before the opening.

7            So we should think about that, because when I

8    ask -- tell them that they're staying in the afternoon, I'd

9    like to give them some sense like are we suddenly going

10   afternoons every afternoon in order to make June 27th?  Are

11   we thinking it's a few?  In other words, this is like the --

12   like what I --

13           The person I don't want to be is the gate agent

14   that says your plane is delayed, no idea why, no idea when it

15   will go, no idea when I'll talk to you again.  I'd like to

16   give them clear answers, clear explanations as to sort of

17   what if it's every day, if it's a couple times.  Whatever

18   they need, so they understand.

19           MR. FRANK:  The Government believes in

20   transparency, as well, Your Honor.  I would say --

21           THE COURT:  In fairness to the gate agent, it may

22   not be his or her fault.

23           MR. FRANK:  Well, I'll talk to Mr. Weinberg.  I'm

24   pretty confident it would be Tuesday.  It may be Wednesday

25   and there's a question of whether we would need more than

1    that, like Monday.

2              THE COURT:  So basically what you want to do is

3    have Pennings done by Wednesday when we're done?

4              MR. FRANK:  I would like to have Pennings done -- I

5    would like the other witnesses to be out --

6              THE COURT:  You have other witnesses from Europe,

7    too?

8              MR. FRANK:  Correct.

9              THE COURT:  So you'd like to have all of those

10   European witnesses --

11             MR. FRANK:  Wrapped up by Wednesday.

12             THE COURT:  Why don't you talk to each other about

13   that and what afternoons we would have to do.  And then

14   whether you think that would implicate doing afternoons after

15   that or not, so that I can sort of --

16             MR. FRANK:  My only view, Your Honor, is if we can

17   get done with those witnesses by Wednesday, we shouldn't need

18   other afternoons.  That's my hope.

19             THE COURT:  You think that's right?

20             MR. WEINBERG:  Yes, I think if the Government is --

21   you know, I don't know when -- you know, if we finish with

22   Mr. Boomgaardt tomorrow or Friday morning, I think what Mr.

23   Frank is saying is that Mr. Pennings would take the remainder

24   of Friday into Monday.  And what I would suggest, you know,

25   subject to talking to Mr. Frank, is that if there's going to

1     be any late days they not be Monday; they instead be the days

2     that these shorter witnesses are on and off.

3                 THE COURT:  So talk to each other.

4                 MR. FRANK:  I hear that.

5                 THE COURT:  So talk to each other about that and

6     then tell me what you want to do in the morning and then we

7     can give them -- that's giving them reasonable notice in

8     advance, which is fine.

9                 Okay.  Those direct questions, you see how much

10    better you get from the witness, when you ask him what, and

11    then he told you, very clearly, what I think you were looking

12    for.  It's not always easy, I understand, but it is usually

13    more effective.  And I think they like it better, the jurors,

14    both because the questions are shorter and the -- and the

15    answers come from the witness.  So okay.

16                Have a great afternoon, we're adjourned.  See you

17    tomorrow morning at 8:30.

18                THE DEPUTY CLERK:  This matter is adjourned.

19                (Court in recess at 1:07 p.m.)

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

We, Rachel M. Lopez and Kelly A. Mortellite, Certified Realtime Reporters, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 6th day of June, 2018.

/s/ RACHEL M. LOPEZ

/s/ KELLY A. MORTELLITE

_____
Rachel M. Lopez, CRR
Kelly A. Mortellite, RMR, CRR
Official Court Reporter