UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

     Plaintiff,                          :      Criminal Action No.
                                      1:16-cr-10094-LTS

    v.                                  :

ROSS MCLELLAN,                               :

     Defendant.                          :

- - - - - - - - - - - - - - - - - - x


BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 4


Thursday, June 7, 2018
8:37 a.m.


John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Kelly A. Mortellite, RMR, CRR
Official Court Reporter
raeufp@gmail.com

1                    **A P P E A R A N C E S**

2    On behalf of the Plaintiff:

3         UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
          BY:   STEPHEN E. FRANK
4         John Joseph Moakley Courthouse
          One Courthouse Way, Suite 9200
5         Boston, Massachusetts  02210
          (617) 748-3244
6         stephen.frank@usdoj.gov

7
          UNITED STATES DEPARTMENT OF JUSTICE
8         BY:   WILLIAM JOHNSTON
          1400 New York Avenue, Northwest
9         Washington, D.C.  20005
          (202) 514-0687
10        william.johnston4@usdoj.gov

11

12   On behalf of the Defendant:

13        MARTIN G. WEINBERG, P.C.
          BY:   MARTIN G. WEINBERG
14        20 Park Plaza
          Suite 1000
15        Boston, Massachusetts  02116
          (617) 227-3700
16        owlmcb@att.net

17
          LAW OFFICES OF ROBERT M. GOLDSTEIN
18        BY:   ROBERT M. GOLDSTEIN
          20 Park Plaza
19        Suite 1000
          Boston, Massachusetts  02116
20        (617) 742-9015
          rmg@goldstein-lawfirm.com
21

22        LAW OFFICES OF MAKSIM NEMTSEV
          BY:   MAKSIM NEMTSEV
23        20 Park Plaza
          Suite 1000
24        Boston, Massachusetts  02116
          (347) 251-4800
25        mentsev@gmail.com

1                      **TABLE OF CONTENTS**

2

3                      **TRIAL WITNESSES**

4

5   On behalf of the Government:                          <u>Page</u>

6   RICHARD BOOMGARDT

7           By Mr. Johnston                                 12

8           By Mr. Weinberg                                110

9

10

11                          **EXHIBITS**

12

13                                                      <u>Admitted</u>

14   Number 148 and 148.1                                  17

15   Number 173                                            28

16   Number 180                                            40

17   Number 188 and 188.1                                  43

18   Number 201                                           108

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2        (In open court.)

3        THE COURT:  I see all counsel and Mr. McLellan.

4        A couple of things.  After the break this morning,

5   after the 11:00 break, I'll talk to the jurors about the

6   schedule for next week.  And I guess the question -- the

7   schedule will be Monday 9:00 to 1:00, Tuesday 9:00 to 1:00

8   plus the afternoon, Wednesday 9:00 to 1:00 plus the

9   afternoon, no court Thursday, Friday 9:00 to 1:00.

10        The two questions I have are:  one, how much time

11   in the afternoon do you want; and two, what, if anything, do

12   you want me to say about other afternoons that we might be

13   sitting prior to the day they get the case?

14        MR. FRANK:  So it's a little tough to say, Your

15   Honor.  Much of it depends on how -- when Mr. Pennings gets

16   off the stand.  The witnesses for whom we're asking the

17   afternoon testimony are not going to have terribly long

18   direct examinations, and my understanding is there's not

19   going to be terribly long cross-examinations.  So I would

20   think probably 2:00 to 4:00 would be sufficient, but I don't

21   want to promise that because I just --

22        THE COURT:  Sufficient in terms of that day or

23   sufficient in terms of other afternoons?

24        MR. FRANK:  Sufficient in terms of Tuesday and

25   Wednesday.

1          THE COURT:  Okay.

2          MR. FRANK:  You know, if Mr. Pennings gets off the

3     stand Monday or Tuesday morning, you know, there are what?

4     Three witnesses who we'd like to get out by Wednesday.

5          THE COURT:  I see.  So basically what this is about

6     is you have three witnesses after Mr. Pennings who are from

7     overseas.  You want them all done by Wednesday when we leave

8     the courtroom.

9          MR. FRANK:  That's right.

10          THE COURT:  So if Pennings were really fast, you

11     might have all three done.  You might not even want to sit on

12     Wednesday afternoon, on the one hand; on the other hand, if

13     they're going really slowly you'd like to sit past 4:00.

14          MR. FRANK:  That's right.  But I think the need to

15     stay past 4:00, I mean, unless Pennings goes very long, it

16     seems unlikely we would need to go past 4:00.

17          THE COURT:  So if I said 4:00 -- and I don't really

18     want to go past 4:00.  I'd rather say 4:30 and then have

19     4:00.

20          MR. FRANK:  Then I would say 5:00 and then, if it's

21     4:00, they'll be happy.

22          THE COURT:  All right.  And then in terms of other

23     afternoons, do either of you anticipate prior to them

24     getting -- the day they get the case, you don't anticipate

25     we'd need other afternoons?

1              MR. FRANK:  At this point I don't anticipate that.

2              THE COURT:  We could still get the jury the case on

3      that Thursday.

4              MR. WEINBERG:  And my only reservation is that we

5      have several experts who will be coming over from Great

6      Britain.  And again, dependent on the length of the

7      government's --

8              THE COURT:  I think I'm not going to say anything

9      about other afternoons other than that we're on track.  And

10     this is as much as an accommodation scheduling people from

11     overseas so they don't have to spend an inordinate amount of

12     time in the U.S. as it is scheduling in terms of where we are

13     until the end date.

14             MR. FRANK:  That seems fair, Your Honor.  The only

15     addendum I would make to that is, depending on what the

16     defense case looks like, there may be a rebuttal witness or

17     two.

18             THE COURT:  Okay.  I'm not going to address that.

19     All right.  Do you think we'll need to go past 4:00 for the

20     afternoons next week to accomplish those three?  Do you have

21     a sense?

22             MR. WEINBERG:  I think we probably won't need two

23     afternoons, but that's just guesswork based on my

24     understanding that these three witnesses won't be longer

25     than --

```
 1              THE COURT:  I think I'll tell them 9:00 to 1:00,

 2     2:00 to 4:30, but we might not need all of that time.  We

 3     might.  We're reserving it.  We'll see.  That takes care of

 4     the schedule.

 5              With respect to the limiting instructions we talked

 6     about about Mr. Boomgaardt, when do you want me to give that?

 7              MR. WEINBERG:  When and if the government offers

 8     his plea agreement as an exhibit.

 9              THE COURT:  So do it when they offer it.  And if

10     they don't, if you offer it, when you offer it.

11              MR. WEINBERG:  Yes.

12              MR. FRANK:  It's our plan to offer it.  It will be

13     at the end of his testimony.

14              THE COURT:  That's what I thought.  All right.

15     Okay.  I don't have anything else.  Do either of you?

16              MR. FRANK:  No.

17              THE COURT:  Okay.  All right.  I must say that I

18     liked your estimate, Mr. Frank, better about the duration of

19     the examination than Mr. Johnston's estimate, although I will

20     give Mr. Johnston that his estimate was more accurate.  But I

21     do think we should move it along.

22              I see what you're doing and that's fine, and I'm

23     not -- I understand why you're going through all the things

24     you're going through, and as much as -- but I think we could

25     move it along.
```

1          I think they've got the point.  I think that I

2   understand why you need to go through each alleged victim.

3   I'm not saying you can't.  I'm not saying you shouldn't.

4   You're going to make your own decision.  It's your case.  But

5   I do think that the -- there's an iterative repetition by its

6   nature with each of the victims.  They've seen what it is,

7   they understand.  You could do those with more dispatch.

8          I understand that at the end you'll have some other

9   things that aren't that same cyclical, iterative process.

10         MR. FRANK:  Your Honor, just to allay the court's

11  concerns, we're on the last one, and then we're going into

12  something totally different, which is what we allege to be

13  the cover-up, so it's completely different.

14         THE COURT:  Okay.  How long do you think you'll be

15  with him?

16         MR. JOHNSTON:  Depending on objections, hour to

17  hour and a half.

18         THE COURT:  Okay.  So my biggest suggestion with

19  most of the objections I think have been with respect to the

20  form.  And I do -- I just say -- and I'll tell you all

21  something that is completely plagiarized from Judge Saylor,

22  which is his view, which I think is correct, that one should

23  write out all the questions for direct and cross-examination,

24  every question in advance, as well as all the permutations

25  depending upon what the witness answers.

1              It's an incredibly onerous and burdensome exercise,

2      I recognize, but it is a useful one.  But I do think the sort

3      of who, what, when, where, why, some of that, when you switch

4      to that, boom, you get what you want and you move on.

5              I understand it's hard and sometimes it's hard to

6      direct the witness to sort of the area that you want to focus

7      on, but that sometimes helps.

8              So all right.  Then I'll see you in a couple of

9      minutes, two minutes before 9:00 or so, and we'll check on

10     the jury then.  And at that point you can have

11     Mr. Boomgaardt --

12             Oh, one other question.  I know you're going have

13     to Mr. Boomgaardt take the witness stand.  Do all of you

14     understand the sequestration order to mean that while someone

15     is on the witness stand you shouldn't be talking to them?

16             MR. FRANK:  Your Honor, we understand it to mean

17     that once they're on cross we shouldn't be talking to them.

18     That's how we've always understood it.  That said, we haven't

19     had extensive conversations with the witness since he's been

20     on direct.

21             MR. WEINBERG:  I certainly agree with Mr. Frank

22     that, at minimum, once cross-examination starts and even if

23     it extends over that to the next day, there should be no

24     contact between prosecutor and the witness or indirectly with

25     the witness's lawyer to the witness.

```
 1            I prefer that the court in its discretion or

 2   Mr. Frank in his discretion does not, you know, meet with

 3   witnesses midway through direct to comment or to further

 4   rehearse the rest of their direct testimony.  But I would ask

 5   the court for the exercise --

 6            THE COURT:  I think it's wiser not to meet with

 7   people in the course of their direct, once they've started

 8   testifying.  I'm not -- so I just think that it's better not

 9   to, and that would be the better course I think once they

10   take the witness stand.

11            MR. FRANK:  Thank you, Your Honor.

12            THE COURT:  Most of these people, I would imagine

13   they wouldn't have an opportunity anyway.  Other than

14   Pennings, among the future witnesses, I imagine most of them

15   are going to be up and down on the same day if not even

16   before the break.  Okay.

17            MR. FRANK:  Just to be clear, Your Honor, we don't

18   rehearse.

19            THE COURT:  Oh.  That was Mr. Weinberg's --

20            MR. FRANK:  I know.

21            MR. WEINBERG:  We may disagree about the use of

22   that word.  But however, Your Honor --

23            THE COURT:  You might not even agree on the meaning

24   as applied to this given -- as applied to a given set of

25   facts.
```

1          MR. WEINBERG:  While going over Mr. Boomgaardt's

2     Rule 11 transcript, which was a plea before a different

3     judge, there again, there was a section that was redacted or

4     sealed from the transcript.

5          THE COURT:  You need an order from me or from Judge

6     Casper?

7          MR. WEINBERG:  I would ask the court to issue an

8     order.  I don't think Mr. Frank would object.

9          MR. FRANK:  No objection.

10         THE COURT:  Fine.  I order that that be disclosed.

11         MR. FRANK:  Although it -- as a technical matter,

12    does that need to be done by Judge Casper?

13         THE COURT:  Here is what -- I order that in this

14    case you're entitled to review it, and I note that I make

15    that order without objection from the government.

16          I think that it will require something from Judge

17    Casper.  And to the extent that that is required, I think go

18    to the court reporter and ask for it.  I'll email Judge

19    Casper now, but I think you should -- it may be that the

20    court reporter will need something from Judge Casper because

21    it's her case.  I can't imagine that there would be an issue,

22    but just ministerially I think Mr. Frank is correct that it

23    probably needs an order from her.  And I will email her now.

24    Okay.

25         MR. FRANK:  Thank you, Your Honor.

1          MR. WEINBERG:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          COURTROOM CLERK:  This matter is in recess.

4          (Recess taken 8:47 a.m.)

5          THE COURT:  Ms. Simeone, will you go get the jury.

6          I e-mailed Judge Casper.

7          MR. WEINBERG:  Thank you so much.

8          COURTROOM CLERK:  All rise for the jury.

9          (Jury enters the courtroom.)

10          THE COURT:  Good morning, ladies and gentlemen.  No

11    one discussed the case with anyone?  No one did any

12    independent research?  All right.  Good.  So we'll resume.

13          I remind you you remain under oath, Mr. Boomgaardt.

14          Go ahead, Mr. Johnston.

15                    **RICHARD BOOMGARDT**

16      having been previously duly sworn, testified as follows:

17        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.**

18    BY MR. JOHNSTON:

19    **Q.**  Mr. Boomgaardt, when we finished yesterday, were we

20    discussing the Royal Mail transition?

21    **A.**  Yes, we were.

22    **Q.**  And were we reviewing the proposal that you had sent to

23    Royal Mail?

24    **A.**  Yes, we were.

25    **Q.**  If we could take a look at that proposal again, 91.1,

1    please.  It's already been admitted into evidence.  If we

2    could, take a look at page 19.

3              If we could, take a look at Paragraph 1.10.

4    Directing your attention to this paragraph, Mr. Boomgaardt,

5    what have you proposed to charge Royal Mail for this

6    transition?

7    **A.**   A flat management fee of 1.75 basis points of the value

8    of the legacy assets.

9    **Q.**   Is this a flat fee, you say?

10   **A.**   Yes.

11   **Q.**   Was this in addition or in lieu of trading commissions?

12   **A.**   It was to replace trading commissions.  So in lieu of.

13   **Q.**   All right.  If we could take a look at page 21?

14             MR. JOHNSTON:  Please zoom in on the table, please.

15   **Q.**   Directing your attention to the top, what does the flat

16   management fee work out to in terms of the amount you would

17   earn?

18   **A.**   It's 560,000 pounds.

19   **Q.**   That's calculated based off of how large of the

20   portfolio?

21   **A.**   That's right.  3.2 billion, as we say there.

22   **Q.**   What did you want the client to understand when you

23   included this number?

24   **A.**   That we were going to charge a flat management fee to be

25   invoiced at the end and that it would replace any commission

1    charges, per-trade commission charges.

2    **Q.**   Directing your attention to the other numbers, was there

3    any -- did you want the client to understand that there were

4    additional sources of trading revenue for State Street within

5    here?

6              THE COURT:  How about what else did you want the

7    client to understand from this chart?

8    **Q.**   What else did you want the client to understand from this

9    chart?

10   **A.**   That there were other costs involved in the transition,

11   but these were market costs rather than money that was going

12   to go to State Street.

13             MR. JOHNSTON:  You can take this down, Erin.

14   **Q.**   Mr. Boomgaardt, at this point when you're pitching for

15   Royal Mail's business, what was your approach for landing

16   these elephant deals?

17   **A.**   Well, it was to convince the client that we were the

18   right place to do that; that we had the right trading

19   strategy to do it; but also that we were going to go in with

20   a very, very competitive commission/flat fee, but our fee

21   quote was going to be very aggressive.

22   **Q.**   And then what, if anything, would you do if you won the

23   deal based on a competitive commission quote?

24   **A.**   Well, for these ones, by this stage it was, you know,

25   part of the plan was to take a commission anyway.  So to take

1    a commission that we didn't disclose to the clients.

2    **Q.**  Did you participate in executing the Royal Mail

3    transition?

4    **A.**  Yes, I was involved in the Royal Mail transition, yeah.

5    **Q.**  What was your role in executing the transition?

6    **A.**  Again, I mean, I was overseeing the analysts that were

7    looking at that and making sure that everything was going

8    well and also to look over the undisclosed commissions that

9    we were charging.

10   **Q.**  What types of assets were being bought and sold in this

11   transition?

12   **A.**  They were bonds.

13   **Q.**  Where were the bonds being sold?

14   **A.**  Both in the U.S. and in Europe.

15   **Q.**  How much hidden commissions were taken in each place?

16   **A.**  It was 1 basis point of yield in the U.S., I believe, and

17   2 basis points of yield on the European executions.

18   **Q.**  Do you know who coordinated the application of the

19   commissions in America?

20   **A.**  Ross did, Ross McLellan.

21   **Q.**  How do you know that?

22   **A.**  Because it was -- we discussed it as to how the -- what

23   the mechanics of how that was going to work.  It needed some

24   oversight.  So doing the part in Europe was an easy thing for

25   Ed and I to do, and Ross said he would look after making sure

1    that the traders were properly instructed in the U.S. as

2    well.

3    Q.   How did you communicate with Ross in this time period?

4    A.   Well, via phone calls.

5    Q.   Who coordinated the application of the hidden commissions

6    in Europe?

7    A.   That was between myself and Ed Pennings.

8            MR. JOHNSTON:  Let's take a look, if we could just

9    show a document to the witness, please.

10           THE COURT:  Go ahead.

11           MR. JOHNSTON:  Exhibit 148.  Zoom in on the top,

12   please.

13   Q.   Do you recognize this document, Mr. Boomgaardt?

14   A.   Yes.

15   Q.   What is it?

16   A.   It's an email from me to Ian McKnight, who is the client

17   at Royal Mail.

18   Q.   Concerning what?

19   A.   Our post-transition analysis, so the post-trade report

20   that we send to the clients.

21   Q.   What's included as an attachment?

22   A.   The Royal Mail post-trade analysis.

23           MR. JOHNSTON:  Your Honor, at this time the

24   government moves to admit Exhibit 148 and 148.1.

25           MR. WEINBERG:  No objection.

1         THE COURT:  Admitted.  You may publish it to the

2   jury.

3         (Exhibit Nos. 148 and 148.1 admitted into

4         evidence.)

5   **Q.**  Mr. Boomgaardt, directing your attention to the second --

6   to the first paragraph, where you say, "We are pleased to

7   report that the shortfall of 45 BPs is very much in line with

8   the mean pre-trade cost estimate."

9         What are you referring to there?

10  **A.**  Well, before the transition we give them a cost estimate

11  which shows our sort of central point guess.  And as I said,

12  about opportunity cost and markets moving around, we provide

13  them an estimated range of outcomes as well.  So what I'm

14  saying there is that 45 basis points is very much in line

15  with what our central estimate was.

16  **Q.**  And by "estimate," do you mean the implementation

17  shortfall estimate?

18  **A.**  That's right, yes, of the pre-trade analysis that we give

19  them of our estimate of the implementation shortfall costs.

20  **Q.**  Are we talking total costs here?

21  **A.**  Yes.

22  **Q.**  Let's take a look at the second paragraph where you say,

23  "We'll be shortly sending through an invoice, as agreed,

24  reflecting the transition fee of 1.75 basis points on the

25  value of assets coming into the transition."

1          What do you mean by that sentence?

2     **A.**   Well, that we're -- as agreed, we will be sending you

3     through an invoice for the management fee that we had agreed

4     prior to the transition.

5     **Q.**   Was an invoice sent?

6     **A.**   Yes, I believe it was.

7     **Q.**   What did you want the client to understand when that

8     invoice was sent?

9     **A.**   That there was their fee.  That was the remuneration, the

10    money that State Street was making out of this, and it was in

11    lieu of any trading commissions.

12         MR. JOHNSTON:  We can take a look at the

13    attachment, please, 148.1.

14    **Q.**   Do you recognize this document?

15    **A.**   Yes, I do.

16         MR. JOHNSTON:  Let's take a look at page 2.  We can

17    zoom in at the bottom table.

18    **Q.**   Directing your attention to where it says State Street's

19    fee, 1.75 basis points and then 242,305 pounds, do you know

20    approximately what the -- at this time what the value of that

21    number would be in dollars?

22         THE COURT:  At this time or the --

23         MR. JOHNSTON:  The time of this document.

24    **A.**   It would be something in the region of 350,000 or

25    400,000.  Somewhere around there, I think.

1    **Q.**  Was that all the money that State Street's transition

2    team had made in this transition?

3    **A.**  No.

4    **Q.**  How much had you made?

5    **A.**  Again, I can't remember the exact number but in the

6    millions, certainly over a million, yeah.

7              MR. JOHNSTON:  You can take this down.

8    **Q.**  Is there anywhere in this document, Mr. Boomgaardt, where

9    that extra revenue, the 3 million you talked about, is

10   disclosed?

11             MR. WEINBERG:  I object, Your Honor.  He didn't

12   talk about 3 million.  He just said millions.

13             THE COURT:  Sustained as to that.

14   **Q.**  Is there anywhere in this document where those extra

15   millions that you spoke about are disclosed?

16   **A.**  Not explicitly, no.  It's included in the total cost

17   number, but it's not broken out specifically.

18   **Q.**  So how would a client know if you hadn't lived up to your

19   end of the bargain?

20   **A.**  Well, they wouldn't know that we had taken undisclosed

21   commissions from this, no.  All they would see was the total

22   cost.

23   **Q.**  Who, if anyone, did they have to trust?

24   **A.**  Well, they needed to trust us.  There was no other way

25   for them to get that information.  They could ask the

1    questions.  But absent asking the questions, there's no way

2    from this report or anything that they had seen from us or

3    that their custodian had seen from us that they would be able

4    to glean that information.

5    **Q.**  What, if anything, had you said to make your clients

6    trust you?

7    **A.**  Well, we had told them we weren't going to be charging

8    commissions on these and that the management fee was in lieu

9    of those commissions.

10          And, you know, we had worked hard and I certainly

11   personally worked hard to get a reputation for telling the

12   truth and being trustworthy.  So yeah, they took what we said

13   at face value, as I guess they were entitled to do.  They had

14   no reason to believe that we weren't doing what we told them.

15          MR. WEINBERG:  I object to that and move to strike

16   it.

17          THE COURT:  Sustained just as to the part about

18   what they had reason to know or what was in their head.  He

19   can testify to what he was intending to convey to them and

20   what he was trying to do but not what they actually were

21   thinking.

22          Go ahead.

23   **Q.**  Mr. Boomgaardt, did there come a time when Royal Mail

24   started asking questions about how much you had earned?

25   **A.**  Yes, they did.

1    **Q.**   When did that happen?

2    **A.**   It was roughly May 2011.

3    **Q.**   Approximately how long after this post-trade report that

4    you had sent out?

5    **A.**   Oh, a short number of weeks I believe.

6    **Q.**   Who did you hear from -- how did you hear that Royal Mail

7    was questioning the trades that you had done for them?

8    **A.**   Ed Pennings told me.

9    **Q.**   How did he explain that to you?

10   **A.**   He called me into his office and said that Royal Mail was

11   asking questions about the transition and whether the amount

12   that we put in there was our -- was our full -- the full

13   amount of money that State Street had made from this

14   transition.

15   **Q.**   Was there any mention of the types of bonds that they

16   were looking at?

17   **A.**   Eventually there was, yeah.  I don't believe that was the

18   very first contact, but they had specific questions around

19   U.S. bonds, yeah.

20   **Q.**   What did you and Ed do after learning that there were

21   these questions from Royal Mail?

22   **A.**   The questions that Royal Mail asked about U.S. bonds

23   indicated that they had seen U.S. bond executions that

24   indicated to them that there was something that needed

25   explaining.

1    And just to -- I guess to go back a half a step, in

2    the U.S. bond markets, there are or at there were, at least,

3    certain bonds that need to be reported.  So the trades need

4    to be reported to a -- in a system called TRACE that shows

5    you the actual executions that happened across these bonds.

6    And Royal Mail was questioning why there were some

7    executions in some of the bonds that they believed that we

8    traded in on their behalf where there were two trades done in

9    the same size but at different prices.  That, to them, needed

10   a little bit further explanation for us -- from us, I should

11   say.

12   **Q.**   After speaking with Ed Pennings about these questions

13   from Royal Mail, who, if anyone, did you speak with?

14   **A.**   Well, Ross McLellan was looped in.  Ian Holden was also

15   in those conversations with myself and Ed Pennings.

16   **Q.**   Did that happen on that day or later?

17   **A.**   I believe it was the same day.  It may have been -- there

18   may have been two communications, one certainly from Royal

19   Mail asking whether that was the only remuneration, then

20   secondly about specifics around the U.S. bond transition.

21   **Q.**   Where did you have these phone calls?

22   **A.**   In Ed's office.

23   **Q.**   Who was there?

24   **A.**   So Ed, myself, Ian Holden, and Ross McLellan on the other

25   line.

1    **Q.**   What did you talk about in those phone calls?

2    **A.**   We talked about, you know, what we do and how we handle

3    the situation.  This was -- you know, this plan of charging

4    these undisclosed commissions was really predicated on

5    clients not finding out about it.

6            Here was a client that all of a sudden was asking

7    us questions that indicated, you know -- you know, these were

8    the type of questions that we had designed our plan not to

9    have to answer.  So, you know, for us, it was a -- pardon the

10   vernacular -- it was a bit of an "Oh, shit" moment.

11   **Q.**   Did you decide to tell the truth at that point?

12   **A.**   No.

13   **Q.**   What was decided?

14   **A.**   It was decided -- and I guess we had a conversation

15   firstly with Ed, myself, and Ian in London -- that if they

16   could see what was happening in the U.S., we may need to pay

17   back those commissions to them, but that if we were going to

18   go down that road of paying back these undisclosed

19   commissions to the client, we shouldn't stop at the U.S.  We

20   should give them back all of those.  If we're not --

21   **Q.**   So you said "all of those."

22   **A.**   All of those including the European commissions.  And

23   that was -- that was the road that we as the European team, I

24   guess, were comfortable going down.

25            A further call with Ross, I guess, changed our

1    minds and was directed by him to -- you know, how we were

2    going to handle this situation was we were going to pay back

3    those -- pay back the U.S. commissions on the U.S. bonds but

4    keep the European ones and to simply call the U.S. executions

5    a fat-finger trading error rather than a deliberate

6    undisclosed commission.

7    **Q.**  Can you tell us what a fat-finger trading error is?

8    **A.**  Well, "fat finger" means a trader that has accidentally

9    pressed the wrong button and somehow applied these

10   commissions or spreads in error.

11   **Q.**  Was this just a fat-finger error?

12   **A.**  No.  It was a deliberate plan to take these commissions.

13   **Q.**  Whose words were those?

14   **A.**  Those were -- pardon me.  Those are Ross's words.

15   **Q.**  Who communicated this back to the client?

16   **A.**  Ed Pennings communicated that to back to the client,

17   yeah.  He was the main client contact person from our side.

18   **Q.**  In this call with Ross McLellan, Ian Holden, and Ed

19   Pennings, what, if anything, was said about relying on the

20   contract and telling the client that you had justifiably

21   earned this money?

22            MR. WEINBERG:  Objection, leading.

23            THE COURT:  Sustained.

24   **Q.**  What, if anything, was said about the contract in that

25   call?

1   **A.**   That we were justified by the contract in taking those

2   spreads.  You know, that from my perspective --

3            MR. WEINBERG:  Objection to his perspective.  It's

4   beyond the scope of the question.  The question was what was

5   said about the contract.

6            THE COURT:  Okay.  You've answered the question.

7            You can ask the next question.

8   **Q.**   What was your perspective on the contract and this

9   conduct?

10           MR. WEINBERG:  Objection.

11           THE COURT:  What his understanding was, I think you

12   can ask.

13   **Q.**   What was your understanding of the contract and the

14   refund?

15   **A.**   My understanding of the contract was -- you know, at the

16   point of having looked at it again, was that there was some

17   wording but with a caveat around it.  I wasn't convinced that

18   that allowed us to do -- to take those commissions.

19           But what I was certain it didn't allow us to do was

20   to tell the client we weren't going to do it and do it

21   anyway.  You know, it was obvious to me that the contract

22   didn't allow us to lie to our client.  So kind of whatever it

23   said, that was the bit I guess that was most troubling on a

24   personal level.

25   **Q.**   Did anyone say, "Let's go to the client with the contract

1  "?

2  **A.**   It was discussed as an option but clearly put to one

3  side.  You know, this is a -- you know, in any client

4  relationship issue, you don't -- the first point of contact

5  is not to rush to the contract and start a legal battle with

6  them.  So it was decided to -- well, to further lie to them

7  in a -- I guess in a -- probably the only natural extension

8  of the plan that we had employed was to continue to lie.  And

9  that was the agreement we went with.  That was the plan we

10  employed, digging the hole deeper, if you like.

11  **Q.**   You testified earlier that you wanted to return the

12  European trades, correct?

13  **A.**   The commissions made on the European trades, certainly.

14  **Q.**   Pardon me.  The commissions.  Do you know why you didn't

15  decide to also return that money?

16  **A.**   Well, Ross decided not to return that money.  And, you

17  know, the European trades didn't have the same level of

18  disclosure.  There is no TRACE reporting system in Europe the

19  way there is in the U.S.  So again, we hadn't sent them

20  anything that would allow them to be able to see that there

21  was commissions taken, and there was no bond reporting system

22  equivalent to TRACE where somebody could find similar

23  information for European trades.

24  **Q.**   Did you think they would find out about the European

25  commissions?

1    **A.**   If you think to the end game of where it's going to go,

2    that was, it seemed an inevitability that, yes, at some point

3    they are going to find out about that.  We ended up taking a

4    plan that was predicated on them believing the next lie we

5    were going to tell them and then going away.  That seemed

6    unlikely to succeed to me.

7                MR. WEINBERG:  I object.  Move to strike.

8                THE COURT:  Overruled.

9                MR. JOHNSTON:  I'd like to show an email to the

10   witness.

11               THE COURT:  Okay.

12               MR. JOHNSTON:  Government Exhibit 173.

13   **Q.**   Take a look at the top.  Do you recognize this email,

14   Mr. Boomgaardt?

15   **A.**   Yes, I do.

16   **Q.**   Who is it between?

17   **A.**   It is from me to Ian McKnight, copied to Ed Pennings and

18   Heath Mottran, who's another person at Royal Mail.

19   **Q.**   What's the date?

20   **A.**   5th of July, 2011.

21   **Q.**   What's this in regard to?

22   **A.**   It says it's in regard to an updated post-trade analysis

23   that we sent to the client.

24               MR. JOHNSTON:  Your Honor, at this point the

25   government moves to admit Exhibit 173.

1          MR. WEINBERG:  No objection.

2          THE COURT:  Admitted.  You may publish it.

3          (Exhibit No. 173 admitted into evidence.)

4   **Q.**  Let's take this chain chronologically, if we could.

5          MR. JOHNSTON:  Go to page 2, please, and zoom in on

6   the first email.

7   **Q.**  Mr. Boomgaardt, I want to direct your attention to the

8   second sentence where you say, "We are pleased to report" --

9   sorry, second paragraph.

10         "We are pleased to report that the shortfall has

11  reduced to 40 BPs versus a pre-trade estimated mean cost of

12  45 BPs."

13         What are you referring to there?

14  **A.**  That's a reflection of the refund that we had given to

15  the client for the U.S. commissions that -- the commissions

16  charged on the U.S. trades.  That refund had the effect of

17  taking off 5 basis points of their implementation shortfall.

18  So instead of it being 45, we refunded it, and their total

19  cost was now sitting at 40 basis points.

20  **Q.**  So they got a better outcome?

21  **A.**  Yes, yeah.

22  **Q.**  What was the dollar value of the refund of the American

23  commissions?

24  **A.**  It was about a million dollars.

25  **Q.**  Let's take a look at the next paragraph where you say,

1    "On the topic of independent performance measurement, we have
2    reached out to Plexus, who confirmed that they only offer
3    performance measurement for equities."
4              Then there's some other sentences here.  What were
5    you referring to here?
6    **A.**   So as part of our message to go back to Royal Mail on
7    this, Ross instructed that we should tell them that we will
8    find a -- we will get the implementation shortfall
9    independently verified, the calculation of how we've done
10   that.  We'll offer that to the client, to have somebody come
11   in and make sure that we've calculated that implementation
12   shortfall correctly.
13             What that paragraph is saying is there are, I
14   guess, lots of companies that do implementation
15   shortfall-type analysis, but not very many of them do them
16   for bond portfolios.  So when we spoke to some of the biggest
17   providers, you know, they were equities only, so they weren't
18   able to offer that service for bond portfolios.
19   **Q.**   What was your understanding of why this analysis was
20   being suggested to the client?
21   **A.**   So that they could have some comfort that we had
22   calculated that number correctly, the implementation
23   shortfall number correctly.  It was, I guess, a little bit of
24   a smoke screen.  Because again, we had no -- we had no plans
25   to divulge to any performance measurer that we had taken

1   commissions in Europe as well.

2   **Q.**   Were there any concerns about a performance measurer

3   finding the European trades?

4   **A.**   Well, the performance measurers take data from us, so

5   again we would be in control of the data that we were

6   supplying to them, so --

7   **Q.**   What would be the only way that a performance measurer

8   could find the European commissions?

9   **A.**   They would have to have access to the trades, where we

10  traded them in the market, rather than what we had booked out

11  to the clients, so effectively looking at State Street's

12  books and records rather than the client executions.

13  **Q.**   Did those records exist anywhere other than State Street?

14  **A.**   No, not as far as I know.

15  **Q.**   Let's take a look at page 1 of this email chain.

16          MR. JOHNSTON:  We can go down to the bottom email,

17  please.

18  **Q.**   Who sent this response?

19  **A.**   That's from Ian McKnight at Royal Mail.

20  **Q.**   Let's take a look at the second paragraph where

21  Mr. McKnight says, "I've consulted on this and understand

22  that Inalytics are the market leader in independent reviews.

23  And my preference is that you mandate them to perform the

24  audit, irrespective of the higher cost."

25          Do you know who Inalytics is?

1   **A.**   Yes, I do.

2   **Q.**   Who is it?

3   **A.**   Inalytics is a company that specializes in calculating

4   and examining and auditing transition management assignments.

5   So calculating implementation shortfall but also going

6   further than that and digging into the quality of execution

7   and the sources of remuneration and that sort of thing.

8   **Q.**   Do you know any of the people or at this time did you

9   know any of the people at Inalytics?

10  **A.**   Yes.  Yes, I knew them well.

11  **Q.**   Who did you know?

12  **A.**   I knew Rick Demasio, who is the guy that started that

13  business.  I knew him for -- I knew him from kind of the late

14  '90s, I guess.  And Graham Dixon, who really headed up the

15  transition management bit of that.  He and I had known each

16  other for a long time but also worked directly together at

17  Credit Suisse.

18  **Q.**   You said you worked with Graham Dixon at Credit Suisse?

19  **A.**   Yes.

20  **Q.**   How long did you work for him there or work with him

21  there?

22  **A.**   Four years.  Three or four years, something like that I

23  think.

24  **Q.**   What sort of work did you do with him at Credit Suisse?

25  **A.**   We did transition management together.  We worked on the

1    transition manager team.

2    **Q.**  What was your personal relationship with Mr. Dixon at

3    this time?

4    **A.**  Well, we were co-workers.  At this time at Inalytics?

5    **Q.**  Yeah.

6    **A.**  Yeah, I was still in contact with him.  He was an

7    industry contact.  I mean, we weren't close friends, but

8    certainly we were, you know, friendly and professional.

9    **Q.**  What was your professional opinion of him?

10   **A.**  I hold Graham in very, very high regard, a man of the

11   highest integrity and --

12               MR. WEINBERG:  I object, Your Honor.  It's

13   irrelevant.

14               THE COURT:  What's the relevance?

15               MR. JOHNSTON:  Relevance is how they interact.

16   There's a --

17               THE COURT:  How do we get into -- why is his

18   character relevant?

19               MR. JOHNSTON:  Because Mr. Boomgaardt is tasked

20   with being the communicator with Mr. Dixon.

21               THE COURT:  That's his relationship, but why is his

22   evaluation --

23               MR. JOHNSTON:  I guess it can be apparent further

24   in the examination why it matters.

25               THE COURT:  All right.  Sustained for now.

1  **Q.**  Who first suggested that Inalytics be used?

2  **A.**  I believe -- well, it was somebody that we obviously

3  thought of as well, but it was certainly the preferred route

4  that Royal Mail wanted to go down.

5          Inalytics is also a U.K.-based company.  The other

6  ones that we were talking about were more U.S.-based so it's

7  not overly surprising that Royal Mail wanted to go with

8  Inalytics.

9          From our perspective, the service they were

10  offering to provide was quite a lot more expensive, which was

11  why we were a little reluctant to go -- to say that we would

12  pay for that.

13  **Q.**  What, if any, other concerns did you have about Inalytics

14  being on this job?

15  **A.**  I knew the job that Inalytics did.  We had been involved

16  with them in other transitions, and it's more in depth than

17  just calculating the implementation shortfall.  They are

18  renowned for asking difficult questions.  So if we were going

19  to get them involved, there would be some difficult questions

20  asked to answer.

21  **Q.**  What questions did you think they might ask?

22  **A.**  Well, sources of remuneration.  The fact that there was

23  these commissions charged in the U.S. would certainly give

24  them reason to look very closely at our European executions

25  as well.

1    **Q.**  Did you share these concerns with anyone about what

2    Inalytics may or may not find?

3    **A.**  Yes.  Well, over time, certainly, yes.  We knew that

4    Inalytics was going to do a thorough job on this.  I mean,

5    he's talked about them performing an audit, so that's beyond

6    the scope of what we had envisaged offering the client.

7    **Q.**  Who, if anyone, did you share those concerns with?

8    **A.**  Oh, Ed and Ross.

9    **Q.**  What were -- did Ross or Ed have any response to your

10   concerns?

11   **A.**  Nothing other than trying to stick to the same story that

12   we're not going to show them -- our plan is not to show them

13   our street-side execution, so the market side of the

14   executions in Europe.  I don't know whether they shared my

15   concerns that Inalytics would get there in the end or not,

16   but I think that certainly turned out that way.

17   **Q.**  What was the information that couldn't be shared with

18   Inalytics?

19   **A.**  We didn't want to share with Inalytics the executions

20   that we had actually done in the market so that they could

21   compare what we booked out to the client versus the

22   executions we actually did, so seeing what that undisclosed

23   commission was.

24   **Q.**  What had you promised to the client for those particular

25   trades?

1          MR. WEINBERG:  Objection.  Asked and answered.

2          THE COURT:  Sustained.

3  **Q.**  Let's look further down this email where Mr. McKnight

4  says, "We are now very concerned that the initial mistake

5  than the 1 mil overcharge and the fact that Loomis have

6  complained to us about notification procedure this week, too.

7  So I think it's best that any review is done properly and

8  crucially independently."

9          What's your understanding of what Mr. McKnight was

10  sharing with you?

11  **A.**  He's sharing that he has concerns around this.  And you

12  know, it's not too surprising if all of a sudden we've said

13  we owe you a million bucks that he wants to look into things

14  in a little more detail.  And he's asking to look into them

15  in quite a lot more detail.

16  **Q.**  Let's take a look then at the bottom where he says,

17  halfway through the last sentence, "I don't feel that the

18  level of post-transition detail we've had so far is

19  satisfactory to be comfortable that everything is now as it

20  should have been.  And given the sums involved, it is crucial

21  that transparency is there for us."

22          What's your understanding of what is lacking in the

23  post-transition detail?

24  **A.**  Well, they want to see all of the detail that's there.

25  They want to know for certain that there hasn't been any

1    other remuneration, any other money that State Street has

2    taken out of this.  And their view is they'd like to have

3    Inalytics do that, and they expect us to answer the questions

4    that Inalytics are going to put to us.

5            MR. JOHNSTON:  You can take this down.

6    **Q.**  Was Inalytics eventually hired?

7    **A.**  Yes, they were.

8    **Q.**  At whose expense?

9    **A.**  State Street's expense.

10   **Q.**  Were any requests for information made of you?

11   **A.**  Yes.  Yeah, there were several requests, but there was

12   one main email that had 14 or 17 points of different detail

13   that they requested.

14   **Q.**  Did you provide all of that information?

15   **A.**  Not all at once, no.  And certainly some of it took an

16   awful long time for us to provide.

17   **Q.**  Did you consult with anyone prior to choosing which

18   information to hand over and which information to withhold?

19   **A.**  Yeah.  When that request came in, we went through it in a

20   lot of detail with Ed and Ross as to how and what we were

21   going to provide.  It was instructed that I would be the one

22   that would handle the communications with Inalytics because I

23   knew Graham so well, I knew Rick well.  So that was my role.

24           But in terms of what was going to be going back,

25   some of the information we were more than happily and easily

1    readily available for us to send over to them, and my

2    instruction was to start getting that noncontentious,

3    non-cover-up information over to them.

4    **Q.**   What information -- what, if any, information were you

5    told not to turn over?

6    **A.**   There were, I guess, a couple of pieces.  One was the

7    European executions that we had done in the market.  So the

8    market-side executions that I had spoken about just a few

9    minutes ago.

10          Secondly, there was a request for sign-off from

11   compliance that the amount of money that had been paid back

12   was fully representative of the amount that was due back to

13   them; and that in the view of compliance this wasn't a

14   regulatory breach in any way; and that was the sum total of

15   remuneration that State Street had gotten.

16   **Q.**   Breaking that down a bit, who told you not to provide the

17   street-side executions?

18   **A.**   Ed and Ross.

19   **Q.**   What about the compliance letter?

20   **A.**   The compliance letter was the one bit that wasn't in my

21   remit.  Ross said that he and Ed would take care of that one.

22   **Q.**   Could you tell us who compliance is at State Street?

23   **A.**   Yeah.  I mean, compliance, sits kind of with the legal

24   department but sits on the -- generally on the trading

25   floors.  And their job is to make sure that we remain

1    compliant with the trading rules, regulations, all of those

2    things.  So, you know, they're there for answering questions,

3    also to make sure that we're doing things in the proper way.

4    **Q.**   What was your understanding of why Graham Dixon wanted a

5    compliance letter?

6    **A.**   He wanted to ensure that the internal compliance at State

7    Street had taken a look at this issue.  He hadn't seen any

8    proof up to that point that compliance had been involved, and

9    he wanted to make sure that they had been.

10   **Q.**   Was it typical for compliance to be involved in things

11   like this?

12   **A.**   I mean, we had never had a thing like this before, I

13   guess, so it's difficult for me to say what's typical.  But

14   given that there was, you know, these client issues and

15   client questions, then, yes, it would be regular for

16   compliance to be involved.

17   **Q.**   In your mind, did this request for a compliance letter

18   pose any problems?

19   **A.**   Yeah.  It posed some big problems because what he was

20   asking us to attest in the way that we had told them that

21   this was a U.S.-only problem, you know, that simply wasn't

22   true.  So compliance was either not going to be able to write

23   that letter or it could only write that letter on misguided

24   information.

25   **Q.**   Did someone from compliance get involved to write a

1    letter?

2    **A.**   Yeah, there were several people from compliance involved.

3    I mean, eventually the letter was to come from Mark Hansen,

4    who was the head of compliance on a global basis for our

5    business.

6    **Q.**   Where was Mark Hansen based at the time?

7    **A.**   He was based in Boston.

8           MR. JOHNSTON:   Can we take -- could I actually show

9    a exhibit to the witness, Exhibit 180?

10          THE COURT:   Yes.

11   **Q.**   Let's take a look at the top part.   Do you recognize this

12   email, Mr. Boomgaardt?

13   **A.**   Yes.

14   **Q.**   What's the dates?

15   **A.**   22nd of August, 2011.

16   **Q.**   Who is this email from?

17   **A.**   It's from Ross McLellan.

18   **Q.**   Who is it to?

19   **A.**   To Ed Pennings and myself.

20   **Q.**   And who is copied on this email?

21   **A.**   Mark Hansen.

22          MR. JOHNSTON:   Your Honor, at this time the

23   government moves to admit Exhibit 180.

24          MR. WEINBERG:   No objection.

25          THE COURT:   Admitted.   You can publish it.

1            (Exhibit No. 180 admitted into evidence.)

2  **Q.**  Let's look at this, Mr. Boomgaardt.  Directing your

3  attention to where it says "Can you send all the U.S.

4  street-side trades for Royal Mail and what was booked to

5  client," what's he asking you to -- what's your understanding

6  of what he's asking you to do here?

7  **A.**  He's asking me to send both the executions that we did in

8  the market and what we booked to the client.  So to Mark

9  Hansen for the U.S. trades.

10  **Q.**  Continuing, "I spoke to Mark so he is aware this is

11  coming.  We need to prove to the client that we have rebated

12  them the correct amount of funds."

13            At this point, had you rebated them the correct

14  amount of funds?

15  **A.**  For the U.S. trades we had rebated them the correct

16  amount of funds, but we had made no mention of the spreads in

17  Europe.

18  **Q.**  Had you told Mark Hansen that you had taken remunerations

19  in Europe?

20  **A.**  No.  I hadn't had any conversation with Mark Hansen at

21  that point.

22  **Q.**  Do you know whether Ed or Ross had told Mark Hansen about

23  the European commissions?

24  **A.**  I don't know.  I had seen no evidence that they had, but

25  I don't know.

1          MR. JOHNSTON:  You can take this down.

2     **Q.**  What was your understanding of why the U.S. trade

3     executions needed to be sent to Mark Hansen?

4     **A.**  Because Ross was working with Mark Hansen on trying to

5     get this compliance letter.  That was my assumption as to why

6     he wanted to see those things.

7     **Q.**  Were you asked to send the European executions to Mark

8     Hansen?

9     **A.**  No.  Only the U.S. ones.

10    **Q.**  Did you have an understanding at the time why you weren't

11    being asked to send the European executions?

12    **A.**  That, my understanding at the time was that we weren't

13    sending the European executions because we hadn't told

14    anybody about the European commissions that we had taken,

15    including internally.

16    **Q.**  Including the chief of compliance?

17    **A.**  Yeah.

18    **Q.**  Let's take a look at -- before we do, was this letter

19    eventually written?

20    **A.**  It was eventually written, yes, and signed.

21    **Q.**  Who signed it?

22    **A.**  Mark Hansen signed it.

23    **Q.**  Do you know who wrote the content in the letter?

24    **A.**  The first draft I believe was words put together by Ed

25    Pennings.  It did make its rounds around various compliance

1    people and was edited before the final version came out, I

2    believe.

3    **Q.**   Do you know who edited it?

4    **A.**   Compliance certainly did.  I don't know who else.  It

5    changed slightly in form.  Again, it was kind of the one bit

6    of all the things that Inalytics requested that I was least

7    involved in preparing.

8    **Q.**   Who was ultimately tasked with sending it to Inalytics?

9    **A.**   I was tasked with sending it to Inalytics, as I was the

10   one that was responsible for the communications with them.

11   **Q.**   Who asked you to send it to Inalytics?

12   **A.**   Ross did.

13            MR. JOHNSTON:  Let's take a look at, just to the

14   witness, Exhibit 188.

15   **Q.**   Do you recognize this email Mr. Boomgaardt?

16   **A.**   Yes, I do.

17   **Q.**   What is it?

18   **A.**   It's an email from Ross to myself.

19   **Q.**   What's the subject line?

20   **A.**   Inalytics letter.

21   **Q.**   Is there an attachment to this email?

22   **A.**   There is an attachment, yeah.

23   **Q.**   Do you know what that attachment is?

24   **A.**   I believe it's the copy of the signed letter from Mark

25   Hansen.

1    Q.   Do you know why Mr. McLellan is forwarding you this

2    email?

3    A.   To send it on to Graham Dixon at Inalytics.

4         MR. JOHNSTON:   Your Honor, at this time the

5    government moves to admit Exhibits 188 and 188.1.

6         MR. WEINBERG:   No objection.

7         THE COURT:   Admitted.

8         (Exhibit No. 188 and 188.1 admitted into evidence.)

9         MR. JOHNSTON:   Let me zoom in on the bottom two

10   emails first.

11   Q.   Looking at the bottom email from Mark Hansen to these

12   various individuals, what is it that he's asking you and

13   others to do here in the bottom email?

14   A.   To review the letter and ensure that all the information

15   he has is correct.

16        MR. JOHNSTON:   Can we go to the top, please?

17   Q.   Was there any other -- did you have any conversations

18   with Ross that day about this letter?

19   A.   Yeah.   There was a phone call between Ross and I where he

20   told me to send that off to Graham.

21        MR. JOHNSTON:   Let's take a look at the letter,

22   188.1.   We can first zoom in at the top, the subject or the

23   addressee line and then down to the bottom to the signature

24   line.   And then let's take a look at the actual content.

25   Q.   Mr. Boomgaardt, what, if anything, is true in this

1   letter?

2                MR. WEINBERG:  I object to the question, Your

3   Honor.

4                THE COURT:  Well, as to his understanding.

5                MR. WEINBERG:  That's a different question.

6                THE COURT:  It is.

7   **Q.**  In your understanding, what, if anything, is true in this

8   letter?

9   **A.**  Graham's name, address, and telephone number.  You know,

10  the rest of it is incorrect and actually lying in some

11  places.

12  **Q.**  All right.  Let's take a look.  So when the first

13  paragraph says, "With regards to your recent request on

14  behalf of Royal Mail Pensions Trustees Limited and

15  correlating performance analysis of State Street Global

16  Markets Portfolio Solutions execution, please consider this

17  letter a confirmation regarding the accuracy of the

18  previously provided compensation amount of $1,010,003.67."

19                Is that the accurate amount of compensation?

20  **A.**  It's the accurate amount of compensation that we had paid

21  them back, and it is accurate for the U.S.-only portion of

22  the transition but makes no mention of the fact that the

23  same -- that undisclosed commissions were taken on other

24  trades as well.

25  **Q.**  Let's go further down.  "Portfolio Solutions has

1   conducted a thorough review of the fixed-income transactions,

2   whether TRACE eligible or otherwise, executed on behalf of

3   RMPTL.  In accordance with this analysis as well as my

4   independent review of the information therein, I can hereby

5   confirm the accuracy of the compensation amount referenced

6   above."

7           What's your understanding of the phrase "whether

8   TRACE eligible or otherwise"?

9   **A.**   Well, TRACE was the trade reporting system in the U.S.

10  that I had mentioned earlier for some of the bonds, but

11  "TRACE eligible or otherwise" would mean all of the bonds in

12  the transition.

13          There's no mention of North American bonds or

14  U.S.-traded bonds or anything else.  It says "TRACE eligible

15  or otherwise," and "otherwise" would include everything that

16  we traded that's not TRACE eligible, including everything in

17  Europe.

18  **Q.**   So then what's your understanding of why this phrase was

19  included in the letter?

20  **A.**   To be -- to make the client think that they had done the

21  analysis on the European or non-U.S. trades as well.

22  **Q.**   Had Mr. Hansen done any independent review of the

23  information therein?

24          MR. WEINBERG:  I object.

25          THE COURT:  Sustained as to foundation.

1    **Q.**   What was your understanding of whether Mr. Hansen had

2    done any independent review?

3                    MR. WEINBERG:   Object, unless there's a foundation.

4                    THE COURT:   Sustained.

5    **Q.**   Who, if anyone, had been asked to provide the information

6    necessary to do an independent review to Mr. Hansen?

7    **A.**   I hadn't been asked to provide any information for any of

8    the trades outside the ones that had been done in the U.S.

9    It certainly wasn't obvious to me that there had been any

10   independent review of anything other than the U.S. trades.

11   **Q.**   What, if any, information did you give to Mr. Hansen?

12   **A.**   I didn't give any information to Mr. Hansen other than

13   the U.S. executions that I had been asked to provide by Ross.

14   **Q.**   Do you have any knowledge whether Mr. Hansen

15   independently obtained the European street-side executions?

16   **A.**   Not to my knowledge.

17   **Q.**   And then directing your attention to the last sentence or

18   the last sentence of this paragraph, "In addition, please

19   note that State Street Global Markets considers this issue to

20   be an unfortunate error and not a breach of any applicable

21   regulations."

22                    Had these commissions been an unfortunate error?

23   **A.**   No.   No, they had been a -- it was a deliberate plan to

24   take an undisclosed commission.   It was not an error in any

25   sense of the way -- any sense of the word, except possibly

1    moral judgment.

2    **Q.**  Did you send out this letter?

3    **A.**  No, I didn't.

4    **Q.**  Why not?

5    **A.**  I couldn't -- I couldn't send out that letter because I

6    thought it contained inaccurate information.  I was being

7    asked to lie, to lie to clients, lie to somebody I respected.

8    And in the name of our head of compliance, it was asking me

9    to directly lie, and it wasn't something I was prepared to

10   do.

11   **Q.**  Why is that lie any different from any of the other lies

12   you told?

13            MR. WEINBERG:  I object.

14            THE COURT:  What's the objection?

15            MR. WEINBERG:  It asks for a subjective conclusion

16   about why, it's irrelevant, Your Honor.

17            THE COURT:  The question is then why is this lie

18   different from the other lie?

19            MR. WEINBERG:  Yes, it's more philosophic than

20   legal.

21            THE COURT:  Rephrase the question, about why did

22   you do this.  What did you do, and why did you do it?

23            MR. JOHNSTON:  Yeah.

24   **Q.**  Mr. Boomgaardt, you've testified so far that you have

25   lied to clients in executing these transitions.

1    **A.**   That's correct.

2    **Q.**   You testified that this letter to you also felt like a

3    lie, correct?

4    **A.**   Correct.

5    **Q.**   Did this lie feel any different than the ones you had

6    previously done?

7    **A.**   It did.   It was a -- the other lies were no less

8    egregious than this one, but this is a direct, boldface, I am

9    lying to your face, I'm lying to your face in the name of our

10   head of compliance who signed this letter.   So it wasn't just

11   me lying.   It's me lying on behalf of our head of compliance

12   as well.

13           It's different or it was different in my head to

14   selling something to a client and then doing something

15   different.   Equally lies, but this is -- to me, this was a

16   step too far and something I couldn't do.

17   **Q.**   So what happened that evening after you had received this

18   letter from Ross McLellan?

19   **A.**   I didn't send it.   I had a conversation -- so Ed Pennings

20   was away at the time.   He wasn't somebody I could have a

21   conversation with because he wasn't there.   I was feeling

22   pressured and worried.

23           MR. WEINBERG:   Objection.   That's not the question,

24   Your Honor.   The question is what did he do.

25           THE COURT:   Sustained.   Just tell him what he

1    did -- what you did.

2    **Q.**   Did you have a conversation with anyone?

3    **A.**   I went to have a conversation with our head of

4    operations, who Ed and I had talked to before, about whether

5    we needed or whether market convention was to show

6    street-side prices to clients.  And, you know, Ian had come

7    back and said no, it wasn't.

8            I went to talk to him again to say, "If a client at

9    the end of all of this stuff actually reports it to a

10   regulator and the regulator asks us for these executions, am

11   I right in saying that we would have to provide them?"

12           His answer to that was yes.  And that was the end

13   of my conversation with him, but --

14   **Q.**   Why were you going to the head of operations to ask about

15   the street executions?

16   **A.**   Because I had concerns about where the endgame of all of

17   this lying was going to get us, that if we continued to lie

18   and the client continues to not believe us or doesn't believe

19   us, do they have recourse to come and get this information

20   anyway.

21           You know, it was obvious to me that the only course

22   of action that we have is to come and tell the truth to all

23   of this stuff.  I know it's a little bit late to start

24   telling the truth at this point, but continuing to lie is --

25   was unsustainable.

1  **Q.**   What happened that evening after the conversation?

2  **A.**   Well, I went home.  Ian then had a conversation with

3  Marshall Bailey, I believe, who was our -- the chief

4  operating officer in Europe, unbeknownst to me.  But they

5  bumped into each other and I think Ian expressed some concern

6  that I had seemed a bit agitated in that conversation.

7  **Q.**   What happened the next morning?

8  **A.**   Next morning I had an email from Marshall Bailey, asking

9  me if I had a second to pop by his office.

10  **Q.**   Can you explain who Marshall Bailey was in the London

11  office?

12  **A.**   Yeah, he was the chief operating officer, I guess, for

13  the global markets business in Europe.  He was a fellow

14  Canadian and somebody who had been fairly new to the

15  business.  He had only been in State Street for a few months.

16  **Q.**   Why did he call you into the office?

17  **A.**   I didn't know why he called me into the office.  I sat

18  down.  He said, you know, what's up?

19          And I used that as an excuse to tell him what was

20  up and what was going on and what my concerns were and to,

21  you know, ask for help with what was happening with Royal

22  Mail.

23  **Q.**   What do you recall that you told Marshall Bailey at that

24  time?

25  **A.**   I told him about the commissions that we had taken on

1    Royal Mail; the compliance letter that I believed to be --
2    believed to be incorrect; and, you know, why I was feeling
3    pressured and stressed; and, you know, asking for some
4    guidance on where we go with this.
5    **Q.**   Did you mention both the European and American
6    commissions?
7    **A.**   Yes.
8    **Q.**   Why were you feeling so much pressure and stress?
9    **A.**   Because we're lying to clients and I'm being asked
10   actively to lie to clients.  And the -- you know, we had lied
11   to clients, and the strategy of continuing and adding to the
12   lie is not sitting well with me.  It's causing me real, real
13   problems.
14   **Q.**   What did Marshall Bailey instruct you to do at the end of
15   this conversation?
16   **A.**   He instructed me essentially not to do anything, let him
17   deal with it, but don't send anything more out until I had
18   heard more from him.
19   **Q.**   On that day, August 26, 2011, did you have a number of
20   calls with Ross McLellan and Edward Pennings?
21   **A.**   Yes.
22   **Q.**   I'd like to play you one of those calls, which has
23   already been admitted into evidence as Exhibit 193.
24            THE COURT:  Which number?
25            MR. JOHNSTON:  193, Your Honor.

1          THE COURT:  Thank you.

2          (Voice recording played.)

3  **Q.**  Mr. Boomgaardt, who are you speaking with on this call?

4  **A.**  Ross McLellan.

5  **Q.**  Who is the reference, do you understand who "Marsh" is?

6  **A.**  That's a reference to Marshall Bailey.

7  **Q.**  Then directing your attention to line 10 where

8  Mr. McLellan says, "Yeah, well, I just talked to Ed and I

9  think what we are going to do is I'm going to reserve for the

10  two million bucks today in August."

11          What's your understanding of what Mr. McLellan

12  means there?

13  **A.**  The two million bucks is roughly the commissions taken on

14  the European trades.

15  **Q.**  And why do they have to be reserved today?

16  **A.**  So that they could be paid back to the client.

17  **Q.**  So up until then, the two million bucks hadn't been

18  reserved?

19  **A.**  Not as far as I know, no.

20          (Voice recording played.)

21  **Q.**  Mr. Boomgaardt, what do you understand Mr. McLellan to

22  mean when he says, "We'll just figure out a way to come clean

23  and save face with Graham," line 14 and 15?

24  **A.**  That we have to find a way to manage what is a difficult

25  conversation.  We're going to have to tell them that we have

1    taken this money in Europe as well and at the same time try

2    and salvage our reputation.  So we need to find a way to do

3    that without making this look like we did exactly what we

4    did.

5              (Voice recording played.)

6    **Q.**  Mr. Boomgaardt, turning your attention to the top of

7    page 22, what do you understand Mr. McLellan to mean when he

8    says, "We are not going to give them a dime back in the

9    future, so if it's disclosed and he didn't negotiate it,"

10   what's he referring to?

11   **A.**  I think it should be "futures" with an "s" on the end.

12             So there were some questions that Inalytics had

13   around the hedging program that we had put on this.  So the

14   use of financial futures, so a derivative instrument in this

15   transition as well.

16             There was a separate agreement to use futures, and

17   we charged both for execution and for the clearance or the

18   safe-keeping of these futures contracts as well.  There was

19   questions around that as well but a very separate issue from

20   the undisclosed commissions that we're talking about on the

21   bond trades.

22   **Q.**  So when you're -- or when he's referring to a future and

23   if it's disclosed, what is that in reference to?  Why is

24   there a concern about that at this point?

25   **A.**  Because the futures commissions are disclosed to the

1    client, how much we're going to charge for the service of

2    using those futures, telling them that we're going to be

3    charging commissions on those.  It's disclosed, whereas the

4    bond trade commissions are not disclosed.  So hence why we

5    are reserving for them and preparing to pay them back.

6    **Q.**  So the futures were in the contract is what you're

7    saying?

8    **A.**  Yes.

9    **Q.**  But the commissions weren't?

10   **A.**  Correct.

11            (Voice recording played.)

12   **Q.**  Mr. Boomgaardt, what's your understanding of what

13   Mr. McLellan is saying at line 10 when he goes, "I'm going to

14   talk to Hansen this morning and say here is the situation.  I

15   talked to Ed.  Ed said we are perfectly clean by the

16   contract."

17   **A.**  Well, a couple of things, one, that he's going to talk to

18   Mark Hansen in compliance and tell him, I guess, where we

19   really are and that there was European spreads taken on these

20   as well.

21            I'm not sure what he's implying there.  But talked

22   to Ed, yeah, Ed said the contract allowed us to take the

23   spreads.  I mean, it's perfectly clear.  It didn't allow us

24   to tell the clients we weren't going to take commissions and

25   take them anyway or to lie about it.  So it's a bit of a moot

1    point, that one.

2    **Q.**  What did you think at the time?

3    **A.**  That this was the justification that we had used.

4    Hearing that we'd only looked at the contract at 4:00 in the

5    morning after the client had complained was news to me, given

6    this had been purported to have been okay by legal and

7    compliance when we were doing it in the first place.  So it's

8    not --

9    **Q.**  Who had told you that?  Who had told you that this had

10    been reviewed by --

11    **A.**  Ed and Ross had both told me that it had been reviewed

12    and okayed by legal and compliance and senior management.

13    This conversation isn't consistent with that having happened.

14    **Q.**  Do you know what, if anything, Ed or Ross told those

15    other people?

16    **A.**  I don't.

17    **Q.**  Were you present for any such conversations?

18    **A.**  No, I wasn't.

19            (Voice recording played.)

20    **Q.**  Mr. Boomgaardt, what's your understanding of what

21    Mr. McLellan is asking for when he says, "Send over the RFP"?

22    **A.**  He wants to see what was promised to the client in that

23    proposal we put forward.

24    **Q.**  So that the proposal that we were looking at just earlier

25    this morning?

1    **A.**  Yeah, yeah, that's right.

2    **Q.**  And what do you understand him to say or to mean when he

3    says, "I just want to make sure we didn't make any

4    representations that we don't take spreads"?

5    **A.**  That there wasn't anything overtly stated in there that

6    we don't take spreads, you know, there's no question that --

7            MR. WEINBERG:  I object to anything beyond the

8    answer to that question.

9            THE COURT:  Sustained.

10   **Q.**  Had you made other representations in the RFP and in

11   negotiations with the client?

12   **A.**  Yes.

13   **Q.**  And what were those representations?

14           MR. WEINBERG:  Object.  It's been asked and

15   answered and gone over, Your Honor.

16           THE COURT:  It has been asked and answered.  But in

17   this instance briefly you can go into it.  Overruled.

18   **A.**  Well, we had told them that the flat fee we were planning

19   to charge was in lieu of commission and there wouldn't be any

20   commissions charged on their bond trades.

21   **Q.**  Are commissions the same as spreads?

22   **A.**  Yes.  Yeah, they're synonymous.

23   **Q.**  Did you have additional calls with Mr. McLellan that day?

24   **A.**  Yes.

25   **Q.**  I'd like to play you the next one, which is Exhibit 196.

1          (Voice recording played.)

2    **Q.**  Mr. Boomgaardt, who are you speaking with on this call?

3    **A.**  That is Ross McLellan and Ed Pennings.

4    **Q.**  What do you understand Mr. Pennings to say on line 9

5    with, "So the letter from Hansen has not gone out yet"?

6    **A.**  He wants to make sure that we haven't sent that, that

7    it's -- that we haven't gone ahead with that part of lying to

8    the client.

9          MR. WEINBERG:  I object, Your Honor.  It's one

10   thing to ask what is said --

11         THE COURT:  Sustained as to the lying part.

12   Disregard that, ladies and gentlemen.  Next question.

13   **Q.**  Whose decision had it been to not send the letter out?

14   **A.**  Mine.

15   **Q.**  What was the last instruction that you had been given?

16   **A.**  To send it out.

17         MR. JOHNSTON:  Let's continue this.

18         (Voice recording played.)

19   **Q.**  Mr. Boomgaardt, what do you understand Mr. McLellan to

20   mean when he says, "It's pretty crystal clear to me after

21   reading the RFP that we don't have a leg to stand on here

22   once we all see what went on here"?

23   **A.**  Well, that we made the -- we told them in the RFP that we

24   weren't going to charge commissions and we did anyway.  So

25   we've -- you know, we've lied to them and done it anyway.

1    **Q.**  Had the representations in the Royal Mail RFP differed

2    from representations generally made in your business as a

3    State Street transition manager?

4    **A.**  No.  No.  They were very consistent with everything else,

5    the way we present ourselves in the market.

6              MR. JOHNSTON:  So let's continue, please.

7              (Voice recording played.)

8    **Q.**  Mr. Boomgaardt, directing your attention to page 2 where

9    Mr. McLellan says, "I do think we should message to Graham

10   sooner rather than later, particularly today, that we may

11   have the same booking issue in the U.K. as we do in the

12   States.  We haven't confirmed that yet and compliance and

13   audit is looking into it."

14              What do you understand Mr. McLellan to be

15   suggesting?

16   **A.**  That we told Graham further lies about what it is that's

17   happened here.  It's not a -- it wasn't a booking issue in

18   the U.K.  It wasn't a booking issue in the U.S.  It has been

19   confirmed.  We know we took an undisclosed commission here.

20   So it's -- you know, the proposition is to kind of tell them

21   there might be something going on but still in a way that's

22   not being truthful about it.

23   **Q.**  Who was going to have to message that to Graham?

24   **A.**  Well, it's -- I guess in an unwritten way, I guess me.

25   But it's not clear who is going to be making that

1    conversation or having that conversation with Graham.

2    **Q.**   And then further down where -- line 21 to 23 where

3    Mr. McLellan says, "From my point of view, I think we should

4    discuss who is messaging what to where.  Because I mean, at

5    the end of the day here, you know, it's crystal clear, we've

6    got to give the money back," what do you understand

7    Mr. McLellan to be saying?

8    **A.**   That we -- what we told the client and what we did are

9    two very different things, so we have to pay them that money

10   back.  We weren't entitled to take it in the first place.

11   **Q.**   And what do you understand the term "messaging" to mean?

12   **A.**   Well, as I said, this is an uncomfortable conversation.

13   So how do we salvage our reputation on that.  You know, one

14   solution is to continue lying about it.  That's one way to

15   message it.  Another way would to be completely truthful

16   about it.  But I don't know.  It's not clear what that

17   message is.

18                    (Voice recording played.)

19   **Q.**   Mr. Boomgaardt, directing your attention to the comment

20   from Mr. Pennings beginning on line 13 where he says, "I

21   mean, basically we need to just message it internally that,

22   look, this is nothing else than like what we do in FX,"

23   what's your understanding of what Mr. Pennings is saying

24   there?

25   **A.**   He's trying to analogize, so compare the taking of these

1    undisclosed commissions with the way that State Street

2    conducts its foreign exchange business.  Both are potential

3    other sources of remuneration for the bank, but they're very,

4    very different in the way that they collect their money.

5    FX --

6              MR. WEINBERG:  I object to anything beyond what he

7    understands Mr. Pennings said rather than an opinion on FX.

8              THE COURT:  Sustained.

9    **Q.**  Did you agree with Mr. Pennings' statement at the time?

10   **A.**  No.  But I had certainly heard it before as a

11   justification for why we did this.

12   **Q.**  And what was your understanding of what the justification

13   was?

14   **A.**  That it's -- that somehow this is analogous to what we do

15   in FX, that they're both in some ways principal, although

16   one's risk with principal and one is with risk, so the FX

17   desk does take risky positions.  They can make or lose money.

18   The way we're taking our undisclosed commissions, there is no

19   way we're losing any money on that.  It's a riskless way to

20   make money.

21   **Q.**  In your negotiations with any of the clients that we've

22   spoken about during your testimony, were there any

23   negotiations about FX?

24   **A.**  No.

25   **Q.**  Did you have any control over what the FX prices were?

1    **A.**   No.

2    **Q.**   Did you ever -- did you make any representations, one way

3    or the other, about how FX would be done?

4    **A.**   Well, no.  If we were asked, we would tell them that FX

5    was done with our State Street trading desk and that we

6    targeted the 4:00 close for those prices.  That was the

7    extent of those conversations normally.

8    **Q.**   Did you know how much money the State Street FX desk made

9    from any of the trades you sent their way?

10   **A.**   No.

11   **Q.**   So then when Mr. Pennings says "We just need to message

12   it internally," what do you understand the significance of

13   "internally" to be?

14   **A.**   That legal and compliance are going to be looking into

15   this now.  We need to get them comfortable that what we're

16   doing is no different than what they're already comfortable

17   with in our FX business.

18          It's again a way to try and justify what we've

19   done, in some way to make it okay.  I mean, even if it's the

20   same as FX, the fact that we've told them we weren't going to

21   do it and did it anyway is the big point.

22          MR. WEINBERG:  I object, Your Honor.  I'd like an

23   instruction to the witness --

24          THE COURT:  Mr. Boomgaardt, you just answer the

25   question.  If counsel wants to ask you more, he'll ask you

1   more.  Just listen to the question.  Just go as far as the

2   question, and then you stop and wait for the next question.

3                 THE WITNESS:  Sorry, Your Honor.

4                 THE COURT:  Go ahead.

5   **Q.**  Let's take a look at the lines below for Mr. McLellan

6   where he says, "Well, I've already put it this way.  Let me

7   handle that.  I have already talked to David about it.  I

8   left a call message for Marsh Bailey.  I've sent an email to

9   John Norris."

10                Who are those people?  Do you have an understanding

11   of who they are?

12   **A.**  My understanding is that David is David Puth, so the head

13   of the global markets business globally.  Marshall Bailey is,

14   as we've talked about.  John Norris is a member of the legal

15   department in London and the one who I guess we worked most

16   closely with on legal agreements and things for transition

17   management.

18   **Q.**  Are these all executives at State Street?

19   **A.**  Yes.

20   **Q.**  How senior?

21   **A.**  Well, David Puth is as senior as it gets in global

22   markets.  Marshall Bailey, again, had sort of pan-European

23   responsibility for the business as a whole from an operations

24   CEO role, and John Norris was a fairly senior lawyer in

25   London.

1    **Q.**   What, if anything, had Mr. McLellan led you to believe

2    about these executives' knowledge of this conduct?

3              MR. WEINBERG:  I object to this "led you to

4    believe."  If he wants to ask what Mr. McLellan said to

5    Mr. Boomgaardt, I have no objection.

6              THE COURT:  Sustained.

7    **Q.**   What, if any, conversations did you have prior to this

8    phone call with Mr. McLellan about these executives and the

9    practice that you were doing?

10   **A.**   Both Ed and Ross had told me that this had been approved

11   by European management, so I guess that would include Marsh

12   Bailey as well as global management, which would include

13   David Puth.  Ross told me that had been raised with David

14   before, and Ed certainly told me it was raised with legal and

15   compliance, which would include John Norris.  So my

16   expectation was that these people would have already known

17   about this rather than this being the first they heard of it.

18             MR. WEINBERG:  I object to the conclusion "this is

19   the first they heard of it."  There's nothing in the tape to

20   indicate that.  It's simply Mr. Boomgaardt --

21             THE COURT:  Sustained as to that.

22   **Q.**   What was your understanding of what Mr. McLellan was

23   informing David Puth, Marshall Bailey, and John Norris about?

24             MR. WEINBERG:  I object if it's speculation, Your

25   Honor.  The words speak for themselves, and the understanding

1    is -- it's just conclusions.

2              MR. JOHNSTON:  Your Honor, if I may?

3              THE COURT:  You can have that question.  Overruled.

4              You can give us your understanding of those

5    sentences that Mr. McLellan -- that are recorded in the

6    transcript on the tape.

7    Q.   Mr. Boomgaardt, what was your understanding of what

8    Mr. McLellan was saying he was informing David Puth?

9              THE COURT:  No.  What was your understanding of

10   what Mr. McLellan said.

11             MR. JOHNSTON:  Sure.

12   A.   That he had a conversation with David Puth.  I don't know

13   the full extent of that, but to tell him that we've got a

14   client issue.

15             MR. WEINBERG:  I object if he doesn't know what the

16   conversation was about.  Otherwise, it's just speculation.

17             THE COURT:  Sustained.

18             MR. JOHNSTON:  Let's continue.

19             (Voice recording played.)

20   Q.   Mr. Boomgaardt, what's your understanding of what

21   Mr. Pennings is saying here when he says, "I think what we

22   need to say is, look, to be honest, we have no reason to

23   believe in Europe that it was anything else"?

24   A.   It's another attempt to come up with a lie to try and

25   save face.  It's not accurate; it's not true.

1  **Q.**  What's your understanding of who this letter would be

2  directed to?

3  **A.**  Well, I think he's referring to the compliance letter

4  that is to go out to the client.  A new compliance letter to

5  replace the one that I hadn't sent.

6           MR. JOHNSTON:  Continue.

7           (Voice recording played.)

8  **Q.**  Mr. Boomgaardt, what's your understanding of what

9  Mr. Pennings is saying when he says, "The only thing that we

10 are guilty of, as far as I'm concerned, legally, is that --

11 not legally -- is that we are not transparent.  That is what

12 they can accuse us of"?

13 **A.**  He's saying that there is a clause in the contract that

14 says we're okay to take these commissions.  We didn't tell

15 them about it, so we're not really being transparent about

16 how much money we made here, but we haven't really done

17 anything wrong.

18 **Q.**  Why do you say "I'm not so sure about that"?

19 **A.**  Because we told the client we weren't going to do it, and

20 we did it anyway.  It's not a -- it's not just a contract

21 issue, in my view.

22           (Voice recording played.)

23 **Q.**  Mr. Boomgaardt, what's your understanding of

24 Mr. McLellan's statement, "It is silent with respect to any

25 of this.  It doesn't say you can't do it, it doesn't say you

1  can do it"?

2  **A.**  Well, that the contract doesn't specifically say that we

3  can or can't take undisclosed commissions.  That doesn't make

4  me feel any better.

5  **Q.**  And why is it -- what's your response?  On the next page,

6  on the top of page 5.

7  **A.**  My response, I've obviously gone back and dug up the

8  contract prior to this call.  And my reading of the contract

9  is different, that that section that Ed is pointing to about

10  affiliates being able to take a markup is -- has a proviso

11  before it that says only if the execution isn't any worse

12  than if that conflict hadn't existed, i.e. that you're

13  trading with your affiliate.

14  **Q.**  Had the conflict -- had the execution been better or

15  worse?

16          MR. WEINBERG:  I object, Your Honor.

17          THE COURT:  What's the objection?

18          MR. WEINBERG:  No basis.

19          THE COURT:  Sustained just as to foundation.

20  **Q.**  What execution?  What deal are you speaking about in this

21  call?

22  **A.**  Royal Mail.

23  **Q.**  Did you participate in that deal?

24  **A.**  Yes.

25  **Q.**  Did you prepare the post-trade analysis?

1  **A.**  Yes.

2  **Q.**  Did you have a view at this time of whether the execution

3  was good or bad?

4  **A.**  It wasn't as good as it could be because we put a -- we

5  had put an undisclosed commission on it.  It would have been

6  a lot better if we had given them the prices that we had

7  executed in the market as we agreed to do.

8           (Voice recording played.)

9  **Q.**  Mr. Boomgaardt, what do you understand Mr. Pennings to

10  mean when he refers to Pestana?

11  **A.**  Pestana was Raymond Pestana, who was one of my transition

12  analysts that had worked for me who had left and gone to a

13  different transition management provider.

14  **Q.**  And why is he coming up in the context of this

15  conversation?

16  **A.**  It was Ed's suspicion that Raymond had somehow tipped off

17  the client and told him to look at these TRACE records as

18  proof that State Street was doing something they shouldn't

19  have been.

20  **Q.**  What did you mean when you responded, "Different issue

21  because, you know, we have got a tip-of-the-iceberg issue

22  here as well"?

23  **A.**  Well, it's irrelevant whether it's Pestana or anybody

24  else, that the client is a aware of this stuff, and this

25  isn't the only deal we've done this on, right?  There's a few

1    others that we've got the exact same issues with.

2    **Q.**   Then when you say, "Does it then still get raised at a

3    different level," what are you referring to?

4    **A.**   I mean, if we go back and Inalytics and the client don't

5    like our answers, they still have a recourse to go to the

6    FSA, which is the securities industry regulator in the U.K.,

7    so the U.K. equivalent kind of of the SEC I guess.

8    **Q.**   What if any concern do you have --

9    **A.**   Well, the FSA at that point can, you know, fine banks,

10   fine individuals, bar individuals.  But they can request to

11   see whatever information they want to, and we would be

12   obliged to show it to them.  So we are going to have to be,

13   if we follow this to its logical conclusion, 100 percent

14   transparent in everything we're doing at some point.

15                  (Voice recording played.)

16   **Q.**   Mr. Boomgaardt, I just want to direct your attention to

17   what Mr. McLellan says in lines 15 through 18.  What's your

18   understanding of what he's saying there?

19   **A.**   Again, he's pointing to the same clause that Ed had

20   pointed out to the contract, that somehow it's okay by the

21   contract to take a commission markup, markdown, or an

22   affiliate of the transition manager can take that markup or

23   markdown.  Again, I guess we've gone through that, but it

24   doesn't allow us to tell them we're not going to and do it

25   anyway.

1    **Q.**  What's your response?

2    **A.**  Again, to point out that there's a proviso before all of

3    that conflict of interest section in the contract that says

4    all of it has to be so that the client isn't materially worse

5    off than they would be if that conflict hadn't existed.

6    **Q.**  So even apart from the oral statements?

7    **A.**  Yeah.  I mean, it's -- you know, the -- like I said, the

8    contract is only one part of it.

9           (Voice recording played.)

10   **Q.**  Mr. Boomgaardt, what do you understand Mr. McLellan to be

11   saying when he says, "Where that does help us is internally.

12   Look, we put that in there because we know we take spreads on

13   fixed income and our customary spread is in the form of basis

14   points of yield"?

15   **A.**  I don't know exactly how to read that.  It seems as

16   though it's --

17          MR. WEINBERG:  I object, Your Honor.

18          THE COURT:  That's fine.  If you don't know how to

19   read it, you don't know how to read it.  Next question.

20   **Q.**  Mr. Boomgaardt, at the time you worked at State Street

21   from 2010 to 2011, was it customary in the transition

22   business, in your transition business at State Street, to

23   take --

24          MR. WEINBERG:  Judge, I hate objecting, but this is

25   so leading.

1          THE COURT:  Sustained as to the form.

2    **Q.**  How did you charge clients at this time?

3    **A.**  Normally for transitions we would charge them on a basis

4    point of yield basis, an agreed basis point of yield basis

5    for bond transactions.

6          THE COURT:  Do you see the difference between a

7    non-leading question, how did he charge?  Ask the question,

8    the witness answers, you hear the testimony from the witness.

9    The witness is the one with personal knowledge.  The

10   witnesses were there.  None of the lawyers were there, right?

11   They have a lawyer representing them.  The leading questions

12   aren't presented in the same way.  That's why on direct

13   examination, except on preliminary matters, certain kids

14   of -- to move it along, we have the direct questions because

15   it provides the witness's testimony.

16          Go ahead.  Next.

17   **Q.**  Was there a customary spread at this time?

18   **A.**  It wasn't customary.  It was customary for us to charge

19   it in the form of a basis point of yield, but there was no

20   set commission or a customary commission.  It was on a

21   deal-by-deal basis.

22   **Q.**  Agreed upon or --

23   **A.**  Aside from the deals that we've talked about here,

24   previously agreed by the client.

25   **Q.**  And what do you understand Mr. Pennings to be saying when

1   he says, "How do we explain the 2 basis point versus the

2   1 basis point"?

3   **A.**   We charged 2 basis points of yield in Europe and only

4   1 basis point of yield on the U.S. executions.   So again,

5   it's something else we're going to need to come up with a

6   story to explain somehow that doesn't fit into any of the

7   stories that we've come up with yet.

8              (Voice recording played.)

9   **Q.**   Mr. Boomgaardt, what do you understand Mr. McLellan to be

10  saying when he says, "To avoid" -- on page 7, top of

11  page 7 -- "To avoid the tip-of-the-iceberg issue, and

12  Hansen's already mentioned it to me, how many other clients

13  do you have this issue with"?

14  **A.**   That Ross has had that conversation with Mark Hansen

15  where he said, you know, are there other clients?   How many

16  do you have this problem with?   That's the tip-of-the-iceberg

17  issue that he's referring to.   This is only one client; there

18  are others.

19  **Q.**   Do you have an understanding of which clients he's

20  referring to?

21  **A.**   The ones we've already discussed today and yesterday.

22  **Q.**   Then directing your attention to where Mr. McLellan says

23  "Do we know if that is legal in the U.K.,"   what was your

24  understanding of --

25  **A.**   My understanding was that we had already asked that

1   question and had a positive response from legal, that it was

2   legal in the U.K.  I didn't know that there was any question

3   of whether it was legal in the U.K. or not.  That was told to

4   me by both Ross and Ed.  The fact that that question now

5   comes out was troubling.

6          MR. WEINBERG:  I object.  Move to strike anything

7   beyond the previous answer.

8          THE COURT:  Beyond which previous answer?

9          MR. WEINBERG:  Beyond the answer that ends with a

10  sentence and before the witness engages in speculation.

11         MR. JOHNSTON:  Your Honor, he was testifying it's

12  his understanding.

13         THE COURT:  It was his understanding of what it

14  was.

15         MR. WEINBERG:  The understanding of a single

16  sentence, he said he understood legal had approved it.

17  Beyond that, Your Honor, it's not responsive to the question

18  nor to the dialogue here in the tape.

19         THE COURT:  Overruled.  Go ahead.  You have to

20  stick just to the question.

21  Q.   At this point, what was your understanding as to what

22  legal had approved up until these calls?

23  A.   That they had approved -- that this had been brought up

24  with them and that the contract allowed us to -- to do this.

25  This plan had been brought up with and approved by legal.

1    **Q.**  Did you believe that --

2              MR. WEINBERG:  Objection.

3              THE COURT:  Believe what when?

4              MR. JOHNSTON:  At this time when he was in this

5    conversation, did he believe that legal had actually approved

6    what they had done.

7              MR. WEINBERG:  I object.

8              THE COURT:  What's the objection?

9              MR. WEINBERG:  Speculative, relevance.

10             MR. JOHNSTON:  Your Honor, his understanding is

11   vital.

12             THE COURT:  His state of mind is relevant.

13             MR. WEINBERG:  As to this at this point,

14   respectfully, no.

15             MR. JOHNSTON:  Your Honor, one of the central

16   issues in this case is going to be whether he believed any of

17   this.

18             THE COURT:  You can ask him whether he believed

19   that legal had approved it.

20   **Q.**  Did you believe legal had approved what you had done?

21   **A.**  No.  I couldn't see a way that legal could approve of us

22   lying to clients.

23   **Q.**  So what, then, was the limited thing that you did think

24   legal had approved?

25   **A.**  The wording in the contract possibly.

1                    (Voice recording played.)

2    **Q.**  Mr. Boomgaardt, after this call, did you have additional

3    calls that day with Mr. McLellan?

4    **A.**  Yes.

5    **Q.**  I'd like to play you Exhibit 191.

6                    (Voice recording played.)

7    **Q.**  Mr. Boomgaardt, why do you say -- what do you understand

8    Mr. McLellan to be asking when he says, "You want to call me

9    up from an office"?

10   **A.**  Because I was -- I worked in an open-plan trading floor.

11   People were sitting literally almost shoulder to shoulder

12   with me, so it was just to have a private conversation in

13   another room.

14   **Q.**  Do you know whether the recordings -- or the phone lines

15   in the other rooms are recorded?

16   **A.**  I don't think they are.  I don't believe they are.

17   **Q.**  Directing your attention to where Mr. McLellan says, "So

18   what do you think our game plan should be for here?  And then

19   what I'm really concerned with, Rick, is protecting, you

20   know, your integrity with Graham and your integrity with

21   Royal Mail."  What was your understanding?

22   **A.**  Still trying to figure out how we message this thing.  We

23   haven't come up with an answer on that yet.  And he's saying

24   that part of that plan has to be for a way to -- for me to

25   maintain my integrity and market reputation with both

1    Inalytics and Royal Mail.

2    **Q.**  What had the defendant asked you to send to Mr. Dixon the

3    day before?

4    **A.**  A compliance letter signed by -- a letter signed by the

5    head of compliance that he and I both knew contained lies.

6          MR. WEINBERG:  I object.  Testify to what he

7    believed, not to what Mr. McLellan believed.

8          THE COURT:  Sustained as to what Mr. McLellan

9    believed.

10   **Q.**  Did you have additional calls after this with --

11   **A.**  Yes, yes.

12         MR. JOHNSTON:  Exhibit 195, please.

13         (Voice recording played.)

14   **Q.**  What's your understanding, Mr. Boomgaardt, of what the

15   defendant is asking you when he uses the term "cover"?

16   **A.**  He's looking at a report that we send to clients that

17   shows them the price they executed at.  The cover is -- as we

18   say, we use a multi-dealer approach, so we ask for quotes

19   from lots of different dealers.  The cover is the next

20   closest price to the best price that we dealt at.  So if we

21   deal at the best price, the cover is the next one that is

22   closest to that but not dealt at.

23   **Q.**  Why do you keep those records?

24   **A.**  So that we can show clients that we've dealt for them at

25   the best price that we could find in the market.

1          MR. JOHNSTON:  Please continue, please.

2          (Voice recording played.)

3     Q.  Mr. Boomgaardt, what's your understanding of why

4     Mr. McLellan is asking you on line 16, "When you have given a

5     dealt price, that includes our markup, I guess, right"?

6     A.  The only price the client is seeing is the price that

7     they had dealt at, so the client-side price.  We're not

8     showing them any executions from what we actually did in the

9     market.

10    Q.  What do you understand him to mean when he says, "If I

11    read all the communications right, I think you've done it the

12    exact right way"?

13    A.  Well, in none of the communications have we shown them

14    market-side prices.  We've only shown them client-side

15    prices.

16    Q.  And who are you referring to?  Like who are the clients?

17    A.  That's for Royal Mail and Inalytics, so both of them

18    together.

19    Q.  And when you say, "I mean, it's implicit in there, I

20    guess, that that's the street side as well," what do you mean

21    by that?

22    A.  Well, I mean that the client will expect that we didn't

23    take a commission so they're -- they wouldn't expect there to

24    be any difference between client-side and street-side prices,

25    so their understanding would be those two things are the

1    same.

2    **Q.**  Can you just explain maybe for the members of the jury

3    why there are two separate prices and why you believe they

4    would be the same?

5    **A.**  Yeah, quite simply there's an execution that we do in the

6    market and then there's an execution that we do with the

7    client, and the difference between the two prices of those

8    things is the commission that State Street keeps.  What we've

9    shown the client up to this point is only the executions that

10   we've done with them, not the underlying executions that

11   we've done in the market.

12   **Q.**  So then why do you say it's implicit they're the same?

13   **A.**  Because we had an understanding with the client that we

14   wouldn't be charging any commissions.  So if there's no

15   commissions, the execution we do in the market is exactly the

16   same as the execution that we give to the client.

17              (Voice recording played.)

18   **Q.**  Mr. Boomgaardt, what do you understand Mr. McLellan to be

19   referring to, or who do you understand him to be referring to

20   when he says "Mark"?  Who is the person he's referring to

21   when he says, "Mark, look, we've never hidden it"?

22              THE COURT:  Wait a minute.  I don't understand the

23   question.  Is the question who is Mark, in his understanding?

24              MR. JOHNSTON:  Yes, in his understanding, who is

25   the Mark that Mr. McLellan is referring to.

**A.**   Mark Hansen.

**Q.**   Can you remind us who he is?

**A.**   He's head of compliance.

THE COURT:  Sustained.  We know who Mr. Hansen is.
Next question.  We've been talking about Mr. Hansen for the
last hour.  I think the jury follows who Mr. Hansen is.

**Q.**   What do you understand Mr. McLellan to be telling you
from lines 9 to 14?

**A.**   Well, he's recounting a conversation that he's had with
Mark Hansen where he's told him that, you know, we've never
hidden the fact that we intentionally charged a markup.  I
mean, if that's accurate, then he's lied to Mr. Hansen again.

MR. WEINBERG:  I object, Your Honor.  Move to
strike and ask Mr. Boomgaardt to be instructed --

THE COURT:  Strike the part about it means that
he's lied to Mr. Hansen again.

You can testify to what the question is, to what
your understanding is.  Mr. Boomgaardt can testify to what he
told Mr. McLellan.  He can testify to what he gave
Mr. McLellan.  He can testify to what Mr. McLellan said.  But
as to what's inside Mr. McLellan's head is not something that
this witness can testify to.  Go ahead.

**Q.**   At the time did you agree with the statement that, "We
have never hidden the fact that we intentionally charged a
markup here"?

1   **A.**   No.  No, I didn't agree with that because we had

2   intentionally --

3           MR. WEINBERG:  I object.  The question is yes or

4   no.  Once again, there's another --

5           THE COURT:  Sustained.  Just answer the question

6   yes or no.  It was a yes-or-no question.

7   **Q.**   Did you agree with that statement that, "We have never

8   hidden the fact that we intentionally charged a markup"?

9   **A.**   No.  No, I didn't agree.

10  **Q.**   Why didn't you agree with that?

11  **A.**   Because we told the client that it was a fat-finger

12  error, as an example.  That's hiding the fact that we did it

13  intentionally.

14          (Voice recording played.)

15  **Q.**   Mr. Boomgaardt, directing your attention to page 3,

16  lines 4, 5, and 6, when he says, "Look, I'm trying to keep

17  this to Ed and me.  I said Ed and I discussed the agreement

18  and we basically said we have basically what we need to do to

19  charge a markup."

20          What's your understanding of what he's saying

21  there?

22  **A.**   Firstly that he's trying to in some way shield me from

23  internal scrutiny on this and that he's -- still in the

24  context of talking to Mr. Hansen, that they've discussed the

25  contract and agreed that they had the legal basis to go ahead

1    and do that.  To charge the markup, I mean.

2    **Q.**  Prior to this conversation, had you had any other

3    conversations with the defendant about the agreement and who

4    had decided what it allowed?

5    **A.**  Yes.

6    **Q.**  What, if anything, had he represented to you prior to

7    this call?

8           MR. WEINBERG:  Can we get some context, when, where

9    this conversation allegedly occurred?

10          THE COURT:  Yes.

11   **Q.**  When had you had these prior conversations with the

12   defendant about what the agreement did or did not allow?

13   **A.**  We had that conversation across the course of the deals

14   that we've covered so far in my testimony here, that there

15   was a previous agreement and an okay that had come from

16   legal, rather than just from Ed and Ross's own reading, but

17   this had been done with the input of legal that it was okay

18   to take these and the contracts allowed the taking of these

19   types of commissions.

20   **Q.**  And what's your understanding of what he's telling you

21   now?

22   **A.**  That it was a decision that was made by him and Ed.

23          (Voice recording played.)

24   **Q.**  Mr. Boomgaardt, directing your attention to the top of

25   page 4 where Mr. McLellan says, "You know, our desk operates

1    under this with most clients and, you know, we are going to

2    come aboveboard here even though we are not contracted to."

3            What's your understanding what he's telling you

4    there?

5    **A.**   That this may be the message that we -- as part of the

6    message, another suggestion for what the message might be

7    that we go to clients, that this is the way that we do

8    business for lots of clients.  In this case, we don't have to

9    contractually, legally, but we're going to pay the money back

10   to you, Mr. Client.

11   **Q.**   Had you operated this way with most clients?

12   **A.**   Not most clients, no.  Only the ones that we've discussed

13   previously in my testimony here.

14   **Q.**   Had you come back to Royal Mail with that answer, that

15   we're going to give you the money back but not contractually

16   to?

17            THE COURT:  As of this call?

18            MR. JOHNSTON:  As of this call.

19   **A.**   No.  No, we hadn't.

20            MR. JOHNSTON:  Let's continue.

21            (Voice recording played.)

22   **Q.**   Mr. Boomgaardt, directing your attention to where

23   Mr. McLellan says at the bottom of page 4, "On the futures,

24   we really don't have anything to hide, do we," what do you

25   understand him to be referring to?

1  **A.**   The compensation, the question around the compensation

2  that we made on futures and our futures hedging strategy from

3  Inalytics.  There was an agreement on futures commissions in

4  place with the client.  We had told him them that, so there

5  was nothing to hide.  It was explicit.

6  **Q.**   And then when you say, "I mean there's nothing.  There's

7  no secrets around it," what do you mean there?

8  **A.**   It's explicit and agreed with the clients in contrast to

9  the undisclosed commissions which were not disclosed to the

10  clients and there is secrets around.

11             (Voice recording played.)

12  **Q.**   In the days that followed August 26, did you have

13  additional discussions with Mr. McLellan?

14  **A.**   Yes.

15  **Q.**   I'd like to play you a call from August 30, 2011.

16             THE COURT:  What number?

17             MR. JOHNSTON:  This is Exhibit 197.

18             (Voice recording played.)

19             THE COURT:  One thing that will speed it up, if you

20  want to ask him what his understanding of something is once

21  you've played it.  I don't think you need to repeat it.  I

22  think you can say what's your understanding of what was said

23  at lines 10 to 12.

24             MR. JOHNSTON:  Okay.

25             (Voice recording played.)

1    **Q.**  Mr. Boomgaardt, directing your attention to lines 21 and

2    22, what do you understand Mr. McLellan to be saying to you

3    there?

4    **A.**  Again, that between him and Ed they're trying to protect

5    me in some way from the internal ramifications of all of

6    this.

7                  (Voice recording played.)

8    **Q.**  Directing your attention to line 5 and 6, what's your

9    understanding about this, what he's saying to you?

10   **A.**  That again, going back to the client to say that there

11   are market-making businesses that can make revenue here.  And

12   that is true from -- our foreign exchange business is a

13   market-making business, but there's no market-making business

14   on our transition desk in bonds.  That's -- it wasn't a

15   market-making business that was taking the undisclosed

16   commissions on this.

17   **Q.**  Then on lines 2 and 3, what do you understand

18   Mr. McLellan to be stating?

19   **A.**  Just that we hadn't said we wouldn't take a spread in our

20   RFP.

21   **Q.**  Who is the "he"?

22   **A.**  The "he" he's referring to is John Norris in legal.

23   **Q.**  And what's your understanding of what John Norris wants,

24   based on --

25   **A.**  To find that we haven't made assertions or to see if we

1  have made assertions in that proposal about whether we would

2  or wouldn't be taking commissions on these trades.

3  **Q.**  Had you made assertions?

4  **A.**  Yes.

5           (Voice recording played.)

6  **Q.**  What information do you have left to give Mr. Dixon?

7  **A.**  Well, the compliance letter and a request from them that

8  they can verify whether or not there were charges taken on

9  non-U.S. bond trades.

10 **Q.**  And at this point, why aren't you giving the European

11 execution data to Mr. Dixon?

12 **A.**  Because I have been instructed not to.

13 **Q.**  By who?

14 **A.**  By Ross.

15          (Voice recording played.)

16 **Q.**  Mr. Boomgaardt, the compliance letter that you refused to

17 send out, what statement was in there?

18 **A.**  Well, there were lots of statements, I guess.  There was

19 a statement that it had been an error.

20          MR. WEINBERG:  Judge, this has been asked,

21 answered, reviewed, testified to.

22          THE COURT:  Sustained.  We've been over it.

23 **Q.**  What concern are you expressing when you say, you know,

24 if they're asking whether the same thing happened in Europe

25 and we point-blank say no?

1    **A.**   That we would be lying to the client at that point and

2    continuing the lie that we've already told them.  We can't --

3    our explanation to the client can't involve us denying the

4    fact that we got these commissions.

5              MR. WEINBERG:  I object to the last part of the

6    answer.

7              THE COURT:  Sustained as to that because that's not

8    his understanding.  That's saying what he thinks they could

9    or couldn't do.  I'll strike that part.  Next question.

10   **Q.**   What had you told the client up to this point?

11             MR. WEINBERG:  I object, unless this is something

12   new, Your Honor.  We've gone over this.

13             MR. JOHNSTON:  Withdrawn.

14             (Voice recording played.)

15   **Q.**   Mr. Boomgaardt, I want to direct your attention to the

16   bottom of line 4 and into lines 1 and 2 on 5.  What are you

17   saying there?

18   **A.**   That we're trying to get the information that Graham

19   needs particularly around, as we talked about, the time stamp

20   futures and FX.

21   **Q.**   I mean the part on 24, on page 4, where you say, "It may

22   be the same on the bond trades in Europe, we don't know," and

23   then continuing on the top of page 5, "It could be anything.

24   We don't know."

25   **A.**   I'm speculating on what Graham might write in his report

```
 1    if we don't give him the actual executions of what we did and
 2    the commissions that we took in Europe, that he might write
 3    in his report that we don't know how much they made in Europe
 4    because they wouldn't tell us.
 5              (Voice recording played.)
 6              THE COURT:  Any more questions on the call?
 7              MR. JOHNSTON:  No, Your Honor.
 8              THE COURT:  Then we'll take a break at this time.
 9    Take the morning break.  All rise for the jury.
10              (Jury exits the courtroom.)
11              THE COURT:  How much lounger of the witness?
12              MR. JOHNSTON:  Ten to 15 more minutes.  We're done
13    with calls.
14              THE COURT:  I'm sorry?
15              MR. JOHNSTON:  We're done with calls.
16              THE COURT:  All right.  Take a break, come back in
17    15 minutes, see you then.
18              (Court in recess at 11:09 a.m.
19              and reconvened at 11:22 a.m..)
20              THE COURT:  Two quick things before we get the
21    jury.  One, we're going to get you another pitcher of water,
22    Mr. Boomgaardt.  Do you want me to get you a cup right now?
23    It might take us a couple of minutes.
24              THE WITNESS:  I've got some in this cup right now,
25    so I'm fine for now.  Thank you, Your Honor.
```

```
 1            THE COURT:  Second, we only have ten minutes, so
 2    I'm going to tell the jury just ten more minutes on this
 3    witness, because we're now on eight hours or thereabouts.  I
 4    think four on Tuesday, minus the -- what's today?  Thursday?
 5    Four?  I'm not going to tell them this.  I'm just counting on
 6    our --
 7            MR. FRANK:  We're not on eight hours with this
 8    witness.  On Tuesday, we did an hour and a half.
 9            THE COURT:  An hour and a half on Tuesday.  Four,
10    minus the break on Wednesday.
11            MR. FRANK:  So that was a total of five --
12            THE COURT:  Four plus an hour and a half, minus a
13    15 minute break.
14            MR. FRANK:  Well, whatever, we're very close,
15    Judge.  There's no more calls.
16            THE COURT:  So I'll just tell them we're very
17    close.
18            MR. FRANK:  That's fine.  They're going to observe
19    that themselves when he wraps up.
20            THE COURT:  They will, but they won't observe that
21    when they walk in.  They won't observe that until he wraps
22    up.
23            MR. FRANK:  Judge, could we have a very brief
24    sidebar?
25            THE COURT:  Yes.
```

1              (The following discussion held at the bench.)

2         MR. FRANK:  We totally understand Your Honor's

3    frustration with the pace.  We share the frustration.  We are

4    going to wrap up very quickly.  This is the longest witness

5    for the direct case.

6         THE COURT:  I won't say to them how long it's going

7    to be, if that's what you're asking me to do.  My point is,

8    simply, I get it that he's a long witness, okay?  I don't

9    have any problem that he's a long witness.  I'm not going to

10   say to them and I won't say to them that you told me three to

11   five, or six to seven.  I'm not going over anything like

12   that.

13        My point is only that like this is not because

14   Mr. Weinberg is objecting that it's taking this long, that

15   most of the objections have been fair.  There have been other

16   questions that are leading that he hasn't objected to, but I

17   haven't said anything about it, because I'm trying not to --

18   I get it, it's hard.  I'm not trying to step on you, Mr.

19   Johnston.  I know that being a trial lawyer is a very

20   difficult thing and it's very easy to sit where I sit and

21   think you should do it this way, you should do it that way, I

22   get that.  I'm old, but I'm not that old.  But some of this

23   is like --

24        Well, you understand.  So anyway.  I won't say

25   that, but I'm expecting that we're going to wrap up soon with

1    this witness.

2              MR. FRANK:  We are.

3              THE COURT:  All right.  Okay.  I'm going to tell

4    them, in terms of scheduling that -- what we talked about

5    this morning, in terms of next week.  Is it fair to represent

6    to them that we're on track, in terms of what we told them in

7    jury selection, in terms of when we finish the case?

8              MR. FRANK:  I believe we are.

9              THE COURT:  Okay.  Fine.

10             (Bench conference concluded.)

11             THE COURT:  Maria, go get the jury.

12             Oh, Mr. Weinberg, Judge Casper said that was fine

13   with her.

14             MR. WEINBERG:  Great.  Thank you very much.

15             THE COURT:  You have the transcript already?

16             MR. WEINBERG:  We have the transcript.  There's

17   just the section that's marked sealed and we'll be getting

18   it.

19             THE COURT:  You'll have that in time.

20             MR. WEINBERG:  Thank you.

21             THE COURT:  You don't need to do anything else to

22   get it.  I just don't want to have a delay based on the

23   mechanics of obtaining that portion of it.

24             MR. WEINBERG:  Thank you, Judge.

25             (The jury enters the courtroom.)

1          THE COURT:  So ladies and gentlemen, I want to

2     update you a little bit on the schedule before we resume the

3     questioning.  Two things.  First, we're on track to finish.

4     That means deliver to you the case, in the time that I told

5     you at the outset.  That you'll have it no later than -- I

6     continue to anticipate you'll have it no later than that

7     Thursday that I told you about, the 28th.

8          MR. FRANK:  The 28th.

9          THE COURT:  The 28th of June.  I confirmed -- I

10    went over that with the lawyers during the break.

11         The second thing is, I mentioned to you at the

12    beginning, that there might be some afternoons where we're

13    going to sit.  So I want to go over the schedule, because

14    there are two afternoons that we're going to have court.

15    Tomorrow will be 9:00 to 1:00, just the same as we've been

16    doing this week.  Monday will be 9:00 to 1:00, just the same

17    as this week.  Tuesday and Wednesday we'll sit in the

18    afternoons, 9:00 to 1:00, and we'll have an hour break for

19    lunch.

20         And you'll have two choices for lunch, you can

21    bring your own lunch and stay in the jury room and eat there,

22    what have you.  You can go out, leave through the back, go

23    out of the jury room, and you can eat lunch in the cafeteria

24    in the courthouse.  You might have seen it when you're here.

25    You can eat lunch there.  You can take your lunch, you can

1    get lunch there and bring it back to the jury room.  Or you

2    can go outside to any place in the neighborhood, get lunch,

3    come back.  You'll have an hour.

4            We'll resume at 2:00.  We'll go no later than 4:30.

5    We're going to do that on Tuesday of next week.  Same

6    schedule next Wednesday.  I'll tell you why.  The reason for

7    this is the next week we have a number of witnesses from

8    overseas and we're trying to get them all done and not have

9    them have to stay in the United States longer than necessary,

10   and accommodating travel schedules and other commitments.

11           Next Thursday, there's no court.  No trial on

12   Thursday, because of a court event that I have, that I have

13   to attend.  And then Friday next week, we'll have court

14   again, just 9:00 to 1:00.  Okay.  All right.

15           You may resume, Counsel, go ahead.

16   BY MR. JOHNSTON:

17   **Q.**   The last call we listened to was on August 30, 2011.

18   What happened at State Street in the four to five weeks after

19   that call?

20   **A.**   The investigations continued internally.  State Street

21   appointed an outside legal firm to come in and do some

22   investigative work, as well as an accounting firm that came

23   in to do some investigative work around this, as well.  And

24   in that intervening period, Ed Pennings was suspended from

25   work, and I guess a little while later, Ross, as well.

1    **Q.**  Were you dismissed right away?

2    **A.**  No.

3    **Q.**  Were clients eventually told that they had been

4    overcharged?

5    **A.**  Yes.

6    **Q.**  When did that occur?

7    **A.**  Well, later -- later that year.  So towards the -- the

8    kind of fourth quarter of 2011.

9    **Q.**  Who went to speak to the clients?

10   **A.**  Marshall Bailey, Steve Smit.  I also sat in on some of

11   those client meetings.

12   **Q.**  At the meetings you attended, who did the speaking?

13          MR. WEINBERG:  Judge, I object to this area, it's

14   beyond the scope of the allegations on the indictment.

15          MR. JOHNSTON:  This goes to witness credibility,

16   which will become apparent on cross-examination.

17          MR. WEINBERG:  Well, let's wait for

18   cross-examination.

19          MR. JOHNSTON:  Well, part of what the Government is

20   entitled to --

21          MR. WEINBERG:  May we approach bench?

22          THE COURT:  Let's do this at sidebar.

23          (The following discussion held at the bench.)

24          MR. JOHNSTON:  Part of what the cross-examination

25   is going to try to elicit is that he never thought anything

1     he did was wrong, so his presence at meetings where he didn't

2     speak up and say things to the clients.

3            THE COURT:  So I understand the context.  These are

4     meeting that people from State Street go, where they say, in

5     some form, we're paying you back, we overcharged you, and

6     they may have provided some explanation as to how.

7            MR. JOHNSTON:  They've tried to -- the only thing

8     I'm trying to elicit here is that at these meetings, he did

9     speak up and volunteer that he had participated in this and

10    that is relevant, because on cross, they're going to try to

11    suggest that --

12           THE COURT:  Are you going to try to suggest that?

13           MR. JOHNSTON:  -- he was wrong.  All these

14    statements that he made after this to internal investigators

15    to clients are all consistent with him believing that he had

16    done nothing wrong.

17           THE COURT:  Are you going to suggest that he did

18    nothing wrong?

19           MR. WEINBERG:  I'm certainly going to use the

20    statements that he made over a lengthy period of time to

21    demonstrate what he was saying, Your Honor, whether he says

22    he was lying or telling the truth, we'll see on cross.  They

23    have redirect.

24           MR. FRANK:  Well, Your Honor, basically, no --

25           MR. JOHNSTON:  If it looks like we're hiding the

1     fact that he had different stories at a different time, then

2     obviously it's damaging to our case, so we're entitled to

3     elicit, on direct, instances where his silence or speaking

4     could be suggested to say that.

5            THE COURT:  So you would anticipate that there's --

6     post these meetings -- statements that he made in which he

7     basically asserted, or could read to be asserted, that he

8     thought at the time that what he was doing was okay.

9            MR. JOHNSTON:  Yes.

10           THE COURT:  And you're saying that before he made

11    some of these statements he went to these meetings and at

12    these meetings he said what?

13           MR. JOHNSTON:  He said nothing.  He didn't

14    volunteer anything.  He just sat there quietly at those

15    meetings.

16           THE COURT:  That's what you think happened at those

17    meetings.

18           MR. JOHNSTON:  Other people spoke.

19           THE COURT:  No, but that he said nothing.

20           MR. JOHNSTON:  He didn't say anything.

21           MR. WEINBERG:  I mean, this is being offered as the

22    inevitable consequence of having the other people making

23    statements consistent with the Government's view of

24    prosecution.  It's hearsay.

25           MR. JOHNSTON:  We're not going to elicit what the

1      other people said.  We're just going to ask did you speak up

2      to volunteer your participation.

3              THE COURT:  I'm going --

4              MR. JOHNSTON:  I'm going to ask was there a

5      meeting -- yes, who did the speaking in those meetings.  In

6      those meetings, did you volunteer --

7              THE COURT:  Why isn't it hearsay what those people

8      told them?

9              MR. JOHNSTON:  It's not about -- we're not

10     eliciting what was told.

11             THE COURT:  You just did.

12             MR. FRANK:  That's already happened.

13             MR. WEINBERG:  The leading question is the

14     assertion -- there's nothing in the record about what State

15     Street people said to the clients.  That is what I understood

16     we were not going to go into --

17             THE COURT:  You can say there were meetings.

18             MR. JOHNSTON:  But the fact that was said -- he can

19     testify that things were said.  We're not offering for the

20     truth of the matter.

21             THE COURT:  You can say things were said, but

22     that's not saying what was said.

23             MR. JOHNSTON:  Right, but certain things were said

24     and the fact of the statements are his state of mind.

25             MR. FRANK:  He has just testified, without

1    objection, that clients were told they were overcharged.

2           THE COURT:  Yeah, and he said he told them that and

3    that he knew that.

4           MR. FRANK:  He didn't say that he told them that.

5           MR. JOHNSTON:  He said they were told.

6           THE COURT:  Well, I think in some instances he told

7    them.

8           MR. FRANK:  He said he was present.

9           MR. JOHNSTON:  He said he was present at these

10   meetings where they were told.  I'm just going to elicit that

11   he didn't do the talking and they're not being offered for

12   the truth of the fact that they were overcharged.  Obviously,

13   we don't need that.  We don't need State Street's statement

14   to prove that they were overcharged.  This is all about his

15   state of mind and what we believe we're entitled to, a few

16   targeted questions that will pertain to his state of mind.

17          THE COURT:  So basically what you want to elicit

18   that he went to a meeting with client and with other people

19   from State Street, other people from State Street said --

20   what did these other people from State Street say?

21          MR. JOHNSTON:  Said here's your money back, we

22   overcharged you, and then he said nothing.  He didn't

23   volunteer that he had been a part of this, that this had been

24   intentional.

25          THE COURT:  So he was silent at all these meetings

1    is what you want and that then arguably takes -- rebuts the

2    assertion that --

3             MR. JOHNSTON:  That he was silent, because he

4    didn't think that he had done anything wrong.

5             MR. WEINBERG:  I understood that this trial was not

6    going to include, from my discussions with Mr. Frank, State

7    Street's conduct after the conspiracy to pay back clients, to

8    meet with clients, to have analysis of clients.  This is a

9    backdoor way -- where he, Mr. Johnston, snuck one question

10   and answer in.  This is highly inappropriate.  It's hearsay,

11   the jury is going to receive it that State Street agreed with

12   Mr. Boomgaardt's current trial testimony that there was

13   something wrong with it.  The conclusion, the inference of

14   paying them back, is something was wrong.  The bank concluded

15   something was wrong.

16            MR. FRANK:  Your Honor, if I may respectfully say,

17   we're not going to get into the main payback.  Mr. Weinberg

18   is right, we don't believe any of the September stuff was

19   relevant, other than to show that Mr. Boomgaardt did not,

20   himself, come clean in September.

21            MR. JOHNSTON:  Or October or November.  For a few

22   years after that.

23            MR. FRANK:  We're not going to get into who's

24   getting paid back.

25            MR. WEINBERG:  They can ask a single leading

1    question of Mr. Boomgaardt --

2              MR. FRANK:  No, we can't ask a single leading

3    question.

4              MR. WEINBERG:  I'll allow one, but to get in what

5    State Street said it did in his presence is --

6              MR. FRANK:  We are not going to get into what State

7    Street said.

8              MR. WEINBERG:  Well, he just did with a leading

9    question.

10             MR. FRANK:  Were the clients eventually told they

11   were overcharged, obviously Mr. Boomgaardt and Mr. McLellan

12   and Mr. Pennings were all ultimately fired, so we don't need

13   to go into any --

14             THE COURT:  What is the relevance of them being

15   fired?

16             MR. JOHNSTON:  We -- we need to tell the stories

17   why there are different stories at different points of time.

18   We need the relevant facts of who's going on, with their

19   employment, are they contesting their firing, why are they

20   having these different statements.  What's the context of it

21   and this is all going to be relevant.

22             THE COURT:  Okay.  But then I'm going to tell them

23   that State Street's view of the world is irrelevant to their

24   determination.

25             MR. FRANK:  We have no objection to that.

1          MR. JOHNSTON:  We have no objection to that.

2    That's fine.

3          THE COURT:  So you're not going to ask them about

4    the paying back.  What are you going to ask them?

5          MR. FRANK:  He's going to ask them whether there

6    are meetings with clients in the fall of 2011, was he present

7    at those meetings, did he say anything about his own conduct

8    at those meetings.  That's it.

9          THE COURT:  That's fine.  You can lead on that.

10         MR. JOHNSTON:  We just have to give the context of

11   the context of the meetings, that the clients were being told

12   that they were overcharged --

13         THE COURT:  No, you don't need that.  He just said

14   I don't need that.  Remember what he already told you.  The

15   most important lesson that comes out of this case for you to

16   take back to the Department of Justice.  This is really

17   important.  That is the local provinces rule and that the

18   local -- the district of Massachusetts, which is actually the

19   oldest district in the entire federal system, older than the

20   Southern District.  Formed before the Southern District.

21         MR. FRANK:  Southern District of Florida.

22         THE COURT:  Formed before those people who think

23   they're the mother, that they rule.  He just told you that

24   you're not asking that, so you're not asking that.  That's

25   his ruling.  You can appeal that to his boss.

1          MR. WEINBERG:  Just so we're clear.

2          THE COURT:  His two leading questions.  One, were

3     they meetings with clients, where you were present, yes, and

4     did you speak up and say anything about what had happened.

5          MR. FRANK:  But that limited scope of questioning

6     is conditioned on Mr. Weinberg not getting into State

7     Street's view in September of 2011.

8          MR. JOHNSTON:  Which of course he is going to do.

9          MR. WEINBERG:  Don't tell me what I'm going to do.

10    Mr. Frank and I have discussed this.

11         THE COURT:  If he does, then you come back.

12         MR. WEINBERG:  The question that you just asked --

13    you would ask him leading questions and getting him to talk

14    about what State Street is after.  Mr. Frank and I had an

15    agreement.  We discussed this.  We agreed that we were not

16    going in the Government putting in State Street's -

17         THE COURT:  And you're not either?

18         MR. WEINBERG:  I don't intend to.  And you know,

19    quite frankly, the last question or two, it breached that

20    agreement and walked into an area that we had agreed not to.

21         MR. FRANK:  I understand it wasn't relevant.

22    Mr. Weinberg didn't commit.

23         MR. WEINBERG:  I committed not going into.

24         THE COURT:  We're going to leave it where it is for

25    now.  Okay.

1          (Bench conference concluded.)

2          THE COURT:  Let me explain one thing, ladies and

3    gentlemen.  I apologize for taking up your time talking about

4    this legal issue.

5          So the fact that Mr. Boomgaardt says that

6    Mr. Pennings and Mr. McLellan were suspended by State Street,

7    those things are relevant to various people's state of mind,

8    but whatever State Street's view of this, whether it was

9    right or wrong, legal or illegal, that's not a fact that's

10   for you to -- that's relevant to your determination.

11         You decide -- you listen to sort of what happened,

12   you decide what happened, you decide what people did, what

13   they didn't do, what they said, what they didn't say.  You

14   decide what their state of mind was, based on the evidence

15   you hear and the testimony about the various people.  And

16   then you decide, based on my instructions at the end, what

17   was -- whether the Government's proved its case or not.

18         What State Street's view of it is -- that's just,

19   in a sense, an opinion about something, and they're not being

20   asked the question you were asked, and their opinion is not

21   relevant.

22         Okay.  Go ahead.

23   BY MR. JOHNSTON:

24   Q.  Mr. Boomgaardt, in the fourth quarter of 2011, were you

25   present at meetings with clients that have been discussed in

1    your testimony?

2    **A.**  Yes.

3    **Q.**  At any of those meetings, did you volunteer that you had

4    participated in any plan to intentionally overcharge them?

5    **A.**  No.

6    **Q.**  How long did you remain at State Street?

7    **A.**  I was suspended on the 13th of January, in 2012.

8    **Q.**  Before you were suspended, did you participate in any

9    interviews with internal investigators?

10   **A.**  Yes.

11   **Q.**  What were those interviews about?

12   **A.**  They were about the -- the facts around the specific

13   transitions that we've talked about, the -- the expressly --

14   the mechanics and the facts around the overcharging of these

15   clients.

16   **Q.**  Were you completely truthful in those interviews?

17   **A.**  I wasn't completely truthful as to my own -- my own

18   culpability in those, but I was factual in everything else

19   around the mechanics of what was done, when, how, and all of

20   those things.

21   **Q.**  What do you mean you weren't completely truthful about

22   your culpability?

23   **A.**  Well, I had a -- I was trying to protect my job, so I'm

24   playing down my own -- my own role in those -- in those

25   transitions that we spoke about.

1    **Q.**  You testified that you were fired.

2    **A.**  Yes.

3          THE COURT:  Actually, he didn't testify to that.

4    He testified that he was suspended.

5          MR. JOHNSTON:  Sorry.

6    BY MR. JOHNSTON:

7    **Q.**  You were suspended.  Did you -- were you eventually

8    terminated?

9    **A.**  Yes.  I was suspended and eventually terminated for

10   misconduct, yes.

11   **Q.**  Did you contest your termination?

12   **A.**  Yes, I did.

13   **Q.**  And what was the basis for contesting your termination?

14   **A.**  That I hadn't been treated fairly by the bank.

15   **Q.**  Why did you think you hadn't been treated fairly?

16   **A.**  I guess for a couple of reasons.  I didn't think that

17   they had treated me fairly in -- in my dismissal process, but

18   also that my involvement in -- in the transitions was not

19   sufficient to warrant gross misconduct, which is what they

20   had initially charged me with.

21   **Q.**  Did you think you had done anything wrong at the time you

22   had done it?

23   **A.**  I thought that we had lied and misled the clients and I

24   was embarrassed and ashamed of all of that, but, you know,

25   the fact that they then kept me around to sort of help clean

1    up the mess, I guess, was the bit that I had the biggest

2    problem with.  If -- they had the evidence, if they were

3    going to dismiss me, that they could have done it at the same

4    time as Mr. McLellan and Mr. Pennings, but they kept me

5    around for some number of months for their own reasons.

6    **Q.**  Were you interviewed by other authorities even after you

7    were dismissed?

8    **A.**  Yes.

9    **Q.**  By whom?

10   **A.**  I continued to be interviewed by an accounting firm that

11   was working on behalf of the FCA, which is what the FSA

12   rebranded itself to be, so the regulator in the UK, as well

13   as the City of London Police.

14   **Q.**  Were you completely truthful in those interviews?

15   **A.**  Again, towards the fact of how it worked and things, yes,

16   but still playing down my own involvement in all of this.

17   **Q.**  Why were you planning down your own involvement?

18   **A.**  Self-preservation, trying to -- you know, I had allowed

19   myself or wanted to believe that there was a way out of this.

20   But you know, it's -- you know, the -- it was -- it was a

21   process I guess I needed to go through to be honest with

22   myself through all of this.

23   **Q.**  Did there come a time when you decided to tell the truth?

24   **A.**  Yes.

25   **Q.**  When was that?

1    **A.**   I reached out to the Department of Justice in the US and

2    came over here at my own expense and my own -- my own

3    volition to come and explain things to the Department of

4    Justice here.

5    **Q.**   Had you been contacted before you reached out yourself?

6    **A.**   No, I hadn't.  I hadn't been subpoenaed or charged or --

7    no, I didn't even know if I was a person of interest to the

8    DOJ at that point, no.

9    **Q.**   How did you even know there was an investigation?

10   **A.**   I had seen a footnote in a State Street report, State

11   Street filing of some kind, I can't remember exactly what it

12   was, that had mentioned that there was -- US authorities were

13   looking into the transition management business.  So on the

14   back of that, I reached out.

15   **Q.**   Did you have an understanding at the time when you did

16   all this conduct whether what you were doing was right or

17   wrong?

18   **A.**   Yes, I did have an understanding.

19   **Q.**   What was that?

20           MR. WEINBERG:  Judge, I object.

21           THE COURT:  Overruled.  This is now back at the

22   time of these transitions.

23           MR. WEINBERG:  If it's back at the time of the

24   transitions, fine.  If it's --

25           THE COURT:  Yes, that's what --

1     That's what the question is, right?

2  BY MR. JOHNSTON:

3  **Q.**  Yes, back at the time of the transitions, did you know

4  what you were -- did you have an understanding about whether

5  what you were doing was right or wrong?

6  **A.**  Yes, my -- I wasn't comfortable with any of it.  It sat

7  badly with me and I knew it was the wrong thing to be doing.

8  **Q.**  Why did you do it?

9  **A.**  Because I allowed myself to get comfortable and believe

10  the stories that I was told by people that I trusted, senior

11  managers, and people that I believed in, and who, quite

12  frankly, had a lot of control over whether my career was

13  successful at State Street or not.

14  **Q.**  Did you eventually plead guilty to a crime?

15  **A.**  I did, yes.

16  **Q.**  When was that?

17  **A.**  I pled guilty -- well, I guess in front of the Court

18  about a year ago.

19  **Q.**  What was the crime to which you pleaded guilty?

20  **A.**  Conspiracy to defraud.

21  **Q.**  Have you signed a cooperation agreement with the

22  Government?

23  **A.**  Yes, I have.

24     MR. JOHNSTON:  I would like to show an exhibit just

25  to the witness.

```
 1              MR. WEINBERG:  We would ask the Court for the
 2    instruction.
 3              THE COURT:  Do you want it now or after he does it?
 4              MR. WEINBERG:  Whenever Your Honor prefers.
 5              THE COURT:  Why don't you do it first and then
 6    I'll -- go ahead.
 7    BY MR. JOHNSTON:
 8    Q.  I'll show you Government Exhibit 201.
 9              MR. JOHNSTON:  You can zoom in on the top, please,
10    of this, Erin.
11    BY MR. JOHNSTON:
12    Q.  Do you recognize this document?
13    A.  Yes, I do.
14    Q.  What is it?
15    A.  It's a copy of the plea agreement that I have with the
16    United States.
17              MR. JOHNSTON:  Your Honor, at this time, the
18    Government moves to admit Exhibit 201.
19              THE COURT:  Any objection?
20              MR. WEINBERG:  No objection.
21              THE COURT:  Subject to the instruction?
22              MR. WEINBERG:  Yes.
23              THE COURT:  All right.  So ladies and gentlemen,
24    I'll publish it, it's admitted.  And I'll publish it to the
25    jury.
```

1          (Exhibit No. 201 admitted into evidence.)

2          THE COURT:  Let me explain both this document,

3    which is the witness's plea agreement with the United States

4    Department of Justice, and how you should understand -- I

5    imagine you're going to hear a little bit more about this

6    either from Government counsel or defense counsel.

7          That is, you'll hear evidence that Mr. Boomgaardt

8    has pleaded guilty to charges arising from the events that

9    are subject to this trial.  You must not consider his guilty

10   plea as any evidence of Mr. McLellan's guilt.  Let me just

11   repeat that.  It is not evidence of Mr. McLellan's guilt.

12         Mr. Boomgaardt's decision to plead guilty was a

13   personal decision about his own guilt.  You should disregard

14   his guilty plea completely when considering Mr. McLellan's

15   guilt or innocence.  Instead, you may consider

16   Mr. Boomgaardt's guilty plea only for the purposes of

17   determining how much, if at all, to rely upon his testimony.

18   You should give Mr. Boomgaardt's testimony the weight you

19   believe it deserves, keeping in mind that it must be

20   considered with caution and great care.

21         Go ahead.

22         MR. JOHNSTON:  Zoom in on the first paragraph.

23   BY MR. JOHNSTON:

24   Q.  Who is this agreement between?

25   A.  It is between myself and the United States Attorneys.

1          MR. JOHNSTON:  Could we take a look at page 11,

2     please.  Zoom in on the signature, please.

3     BY MR. JOHNSTON:

4     **Q.**  Do you see your signature here?

5     **A.**  Yes, I do.

6     **Q.**  Why is the -- could you explain why the date is different

7     than the date that you pled guilty?

8     **A.**  This was, I guess, done under -- it was done under seal a

9     good year prior to me pleading in front of the judge.

10          MR. JOHNSTON:  You can take this down, Erin.

11    BY MR. JOHNSTON:

12    **Q.**  Do you hope to receive any benefit from cooperating with

13    the Government?

14    **A.**  Yes.

15    **Q.**  And what do you hope to receive?

16    **A.**  A reduced sentence when it comes to sentencing.

17    **Q.**  What is your understanding of what is required of you?

18    **A.**  To tell the truth.

19    **Q.**  What is your understanding of what could happen to you if

20    you don't tell the truth?

21    **A.**  Well, both I won't get the benefit of any reduced

22    sentence, but I could be open for perjury charges, as well.

23    **Q.**  Who decides what, if any sentence, you get?

24    **A.**  The judge.

25          MR. JOHNSTON:  Thank you.  No further questions.

1          THE COURT:  Cross-examination?

2          MR. WEINBERG:  Thank you, Your Honor.

3          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

4   BY MR. WEINBERG:

5   **Q.**  Who decides whether you get charged with perjury,

6   Mr. Boomgaardt?  The United States Attorneys, correct?

7   **A.**  I guess you'll know that better than me.  But it's --

8   **Q.**  Who are the prosecutors in this courtroom?

9   **A.**  The prosecutors are the DOJ, yes.

10  **Q.**  Who brings charges?

11  **A.**  They would be the ones responsible for bringing charges

12  is my understanding.

13  **Q.**  Perjury is a charge, right?

14  **A.**  Yes, it is.

15  **Q.**  So, therefore, the decision or whether or not to indict

16  you for perjury in this trial would be made by Mr. Frank and

17  Mr. Johnston, correct?

18          MR. FRANK:  Objection.  Misstates.

19          THE COURT:  Overruled.  It's a question about what

20  his state of mind is.

21          You can answer.

22          THE WITNESS:  I don't know the answer to that.  It

23  may well be the case under US law that you can make that

24  complaint to make the perjury charge, yourself, sir.  I don't

25  know.

BY MR. WEINBERG:

**Q.**  Do you really believe, as you sit here now, testifying under oath, that defense counsel can decide whether government witnesses get indicted for perjury?  Is that really your testimony, Mr. Boomgaardt, or is it just a wise guy answer?

**A.**  I can assure you ---

MR. JOHNSTON:  Objection.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  I'm not trying to provide you any wise guy answer, sir.  I'm trying to give you answers that are accurate.  And my knowledge of the US legal system is limited, sir.

BY MR. WEINBERG:

**Q.**  In Great Britain, do defense counsel get to indict Government witnesses for perjury?

**A.**  I don't know.  I'm not a criminal lawyer.

**Q.**  How many times have you met with Mr. Frank or Mr. Johnston?  How many different days?

**A.**  Several.  I don't know the answer off the top of my head.  But several.

**Q.**  Four full days in 2014, when you first started proffering?

**A.**  That's probably about right.  Something -- that sounds roughly correct, I guess.

1   **Q.**   Many more hours and many more days over the past month?

2   **A.**   There have been more meetings over the past month,

3   certainly, yes.

4   **Q.**   You've met with them whenever they've asked you to meet

5   with them; is that correct?

6   **A.**   Pretty much, yes.

7   **Q.**   You are hoping, are you not, that they file a motion that

8   could help you, correct?

9   **A.**   Yes, the 5K motion to be filed would come from them.

10  That's correct.

11  **Q.**   And you're hoping that as a result of the 5K motion that

12  comes from them, you might gain sentencing leniency; is that

13  correct?

14  **A.**   Yes, that's correct.

15  **Q.**   And you believe the 5K motion will help you get

16  sentencing leniency, correct?

17  **A.**   I'm hopeful.  I don't know what it's going to be and I

18  haven't seen it and there have been no promises made in that

19  regard, sir.

20  **Q.**   And you've been cooperating for four years and there's

21  still no promise whether or not your cooperation merits the

22  Government's filing of a 5K motion, correct?

23  **A.**   That's correct, sir.

24  **Q.**   You understand that the decision whether or not to file

25  one has been deliberately delayed and reserved by Mr. Frank

1      and Mr. Johnston until after you testify; is that right?

2                   MR. FRANK:  I object, Your Honor.

3                   THE COURT:  What's the objection?

4                   MR. FRANK:  It misstates, it attributes

5      deliberation to the United States Government.  It attributes

6      deliberation to me personally, which Mr. Weinberg knows to be

7      untrue.

8                   MR. WEINBERG:  We don't know that to be untrue,

9      Your Honor.

10                  THE COURT:  Okay.  So ladies and gentlemen, let me

11     explain.  Mr. Frank and Mr. Johnston are the lawyers

12     representing the United States Government.  The United States

13     Government, like an entity, only acts through its lawyers.

14     It can't act, except through people.  Whether these decisions

15     are --

16                  Whether the decisions relating to Mr. Boomgaardt

17     are made solely by Mr. Johnston and Mr. Frank, or whether

18     they involve other people in the course of the Government,

19     and other lawyers or people involved, is a separate question.

20     So I think that we're not going to have a trial about who

21     makes the decision.  That's really not the question.  So

22     Mr. Weinberg, you can have these questions, but the focus of

23     it is not -- is on sort of the Government's decision and the

24     Government acts through a whole set of actors.

25                  Go ahead.

BY MR. WEINBERG:

Q.  You sat with the Government for four full days?

THE COURT:  But one lawyer per witness.

MR. FRANK:  Yes, Your Honor.

THE COURT:  So what that means, ladies and gentlemen, that there's one lawyer per each witness.  That means one lawyer -- so we saw on the direct examination is Mr. Johnston asks the questions, Mr. Weinberg made the objections.  That means Mr. Weinberg will be the one doing the cross-examination and it means Mr. Johnston does the objections.

When we get to redirect, there will be one more round, narrower, but there will be one more round. Mr. Johnston will ask the questions and Mr. Weinberg will make any objections, and if there's recross, that's the last part of the two rounds, then Mr. Weinberg will ask the questions.  But the other lawyers on the team can't sub in on the same witness, either for objections or for witnesses.

They switch on different witnesses, because they're sharing the load.  But we try to do that, that's as much for focus and convenience to keep track of things.  So sometimes it happens that we allow that to happen, but I'm really reminding counsel that we should do one.

(Discussion off the record.)

THE COURT:  Go ahead.

1          MR. WEINBERG:  Thank you, Your Honor.

2     BY MR. WEINBERG:

3     Q.   Mr. Boomgaardt, I want to go back to 2014.  You came to

4     the United States and you sat with the Government prosecutors

5     for two full days in May of 2014, correct?

6     A.   That sounds right, yes.  The date sounds correct.

7     Q.   At your own expense?

8     A.   At my own expense.

9     Q.   Wanting them to receive your testimony, correct?  Your

10    cooperation?

11    A.   Yeah.  To answer questions that they might have, but yes,

12    to have a conversation with them.

13    Q.   And that told you whether or not you were going to be

14    prosecuted or not at that time, correct?

15    A.   Correct.

16    Q.   You came here pursuant to what was called the proffer

17    agreement.  Do you recall that?

18    A.   Yes.

19    Q.   And the proffer agreement was between you, the fraud

20    section of the Department of Justice, and the US Attorney's

21    Office, who specifically said to you that the prosecutors

22    would reserve the right whether or not to bring charges or

23    not against you, correct?

24    A.   I was aware of that, yup.

25    Q.   Your desire at that time was to convince them not to

1    bring charges against you, correct?

2    **A.**   That would have been the most desirable outcome,

3    certainly.

4    **Q.**   You came back to see them in November of 2014, did you

5    not?

6    **A.**   Yes, I believe that's right.

7    **Q.**   Sat with them again for two full days, correct?

8    **A.**   Yes, I believe that's correct.

9    **Q.**   Answered all their questions, correct?

10   **A.**   Yes.  Yeah.  They were asking questions and I was

11   answering them, yes.

12   **Q.**   And again, your hope at that time was that your proffer

13   to them and your cooperation with them and your answering

14   every question they asked, day after day, would result in

15   your not being prosecuted, correct?

16   **A.**   That was an aspiration.  It was also to, you know, for my

17   own personal reasons to come and get this clear and get

18   this -- you know, it had been hanging around through lots of

19   different investigations.  This was another one.  I

20   cooperated with all of them.  This was another one to

21   cooperate with.

22   **Q.**   Let's talk about some of other investigations.  There was

23   an investigation by State Street about your conduct, was

24   there not?

25   **A.**   Yes.

1  **Q.**  And you were interviewed by State Street's external

2  counsel, Freshfields, in London, were you not?

3  **A.**  I was.

4  **Q.**  At least four times, correct?

5  **A.**  I don't know if it was that many, but I'll take your word

6  for it.  It was awhile ago.

7  **Q.**  You were interviewed by Deloitte, were you not?

8  **A.**  Yes.

9  **Q.**  They were hired by State Street to help in this internal

10  investigation, correct?

11  **A.**  Yes, that's right.

12  **Q.**  You were interviewed, were you not, by the City of London

13  Police?

14  **A.**  I was.

15  **Q.**  You gave statements to State Street's disciplinary

16  hearing officer, did you not?

17  **A.**  Yes, I did.

18  **Q.**  A 21-page written statement?

19  **A.**  Sounds about right.

20  **Q.**  An appeal from the denial of your request that you not be

21  suspended?

22  **A.**  Yes.  I guess you're referring to the outcome of the

23  first disciplinary hearing that I had.

24  **Q.**  You testified twice, once in the disciplinary hearing,

25  and once at the appeal, correct?

1    **A.**   That's true.  Correct.

2    **Q.**   Let's go to some of the things that you said to them

3    during these other investigations that preceded 2014.

4              Did you sit down and write a 20- or 21-page written

5    statement in February of 2012, just months after the last

6    phone call that the Government played to you during their

7    lengthy direct examination?

8    **A.**   I did put a written document together for my -- yes, for

9    my disciplinary hearing.  I did, yes.

10   **Q.**   And your intention was that that written document be

11   received as the truth, correct?

12   **A.**   Yes.

13   **Q.**   You wanted to convince the people that you were telling

14   the truth when you wrote that 21-page written statement,

15   correct?

16   **A.**   Yeah.  I wanted to get my case across as to why I thought

17   I should retain my job at State Street and why I should not

18   be dismissed.

19   **Q.**   And they forced you to write one thing or another, didn't

20   they?

21   **A.**   Nobody was holding a gun to my head.  No, sir.

22   **Q.**   Though you had some time limits, you had enough time to

23   write 21 pages, correct?

24   **A.**   Yes, evidently.

25   **Q.**   You're an intelligent guy, you know what you were

1  writing, correct?

2  **A.**  Yes.

3  **Q.**  Do you recall saying in the very first paragraph of that

4  21-page statement, "Honesty and integrity are core principles

5  for me"?

6  **A.**  Yes, sir, I remember writing that.

7  **Q.**  Do you remember saying that "Over the past three and a

8  quarter years at State Street, I believe I have shown my

9  commitment to the best interest of State Street and its

10  clients and how important honesty and integrity are to me"?

11  **A.**  Yeah, that's a -- that's a statement from there.  Yes.

12  **Q.**  Do you recall saying in this written statement, "At all

13  times, I behaved honestly and with integrity and without any

14  intent to mislead clients"?

15  **A.**  That is written in there.  As I said I am --

16  **Q.**  Do you recall saying, "At all times I acted honestly and

17  with integrity.  I did not deliberately mislead clients"?

18         Do you recall writing that?

19  **A.**  That's also in there.  Yes, sir.

20  **Q.**  And you wanted to be believed, correct?

21  **A.**  Yes.

22  **Q.**  Do you recall saying "I have dealt honestly and

23  professionally with clients in all communications."

24         Do you recall that?

25  **A.**  I do.

1    Q.  And do you recall writing that although you didn't agree
2    with the business decisions "at no time did I believe I was
3    participating in an act to deceive clients"?
4    A.  Yes, that's written in there.
5    Q.  "Or that what we were doing was in accordance with the
6    relevant contracts."
7    A.  Also, that was what I was told by the people that I
8    trusted to -- who said they looked at all those things.  So
9    again, you know, the contract is only one part of this.
10   Q.  Well, let's be a little specific here.  You met with Ed
11   Pennings, or spoke to Ed Pennings on a regular basis,
12   correct?
13   A.  Which period are we talking about, sir?
14   Q.  2010/2011.
15   A.  At work, yes.
16   Q.  At work.
17   A.  He was my direct line boss.  Yes.  I spoke with him on a
18   daily basis.
19   Q.  You worked in the same building, correct?
20   A.  Correct.  Yes.
21   Q.  Mr. McLellan didn't work there, although occasionally he
22   visited.  Correct?
23   A.  That is correct, sir.
24   Q.  Your calls were tape-recorded, correct?
25   A.  The calls that were coming from my -- the phone on my

1    desk were recorded after a certain point.  There were some

2    that were not recorded, as I think I explained.  They were --

3    I made sure they were recorded so that we had tapes of those

4    conversations for my analysts.

5    **Q.**  Yes or no, have you ever heard a tape recording of Mr.

6    McLellan discussing the contract with any of the six

7    transition clients prior to your discussions on August 26th

8    that the Government just pled?

9    **A.**  Could you repeat the question?

10   **Q.**  Yes.  Have you heard any tape played for you by the

11   Government, your lawyers, anyone, prior to August 26th, the

12   day that you and Mr. McLellan were talking after the fact --

13   **A.**  Uh-huh.

14   **Q.**  -- where Mr. McLellan is talking to you about a contract?

15   **A.**  I don't -- I don't believe so.

16   **Q.**  Do you recall any tape that you heard, prior to

17   August 26th, where Mr. McLellan is talking to you about what

18   lawyers have said to him?

19   **A.**  No, I don't believe so.  But my --

20   **Q.**  Do you recall any tape where Mr. McLellan is talking to

21   you about any conversations he had with David Puth, who was

22   to him what Mr. Pennings was to you?

23   **A.**  I don't know.

24   **Q.**  Yes or no?

25   **A.**  No.

1    **Q.**  But you did have lots and lots and lots of conversations

2    with Ed Pennings about contracts, correct?

3    **A.**  It wasn't the biggest subject of conversation, but we did

4    talk about it.  We talked about everything, but lots and lots

5    and lots is probably overstating it.  Legal agreements were

6    not part of my role at State Street, but they were part of

7    Ed's.

8    **Q.**  But your contracts were not part of, as you said, your

9    remit or your role, correct?

10   **A.**  That's right.

11   **Q.**  It was Mr. Pennings's department, correct?

12   **A.**  Yeah, it was for him and his sale team, for each of those

13   transitions, to make sure that the legal agreements were in

14   place and liaise with the legal team.

15   **Q.**  And Mr. Pennings told you that contracts were in place

16   that authorized the charging of undisclosed spreads to

17   clients, even clients who were charged fees.  That came from

18   Mr. Pennings to you, correct?

19   **A.**  Yes.  He told me that it had been approved and that those

20   contracts allowed the taking of those undisclosed

21   commissions.

22   **Q.**  Mr. Pennings told you, during these conversations, that

23   he had had conversations with the lawyers in the London

24   office of State Street, correct?  Meaning Simone Paul?

25   **A.**  Yes, she was one of the lawyers in the State Street

1    office.  That's one of them, yup.

2    **Q.**  And he, Mr. Pennings, assured you that the UK lawyers

3    knew about the charging of undisclosed spreads on top of fees

4    and that they had approved that new business model, correct?

5    **A.**  He did give me the assurance that they had looked at the

6    plan and that it was -- that they had approved it, yes.

7    **Q.**  You weren't there when you talked to the lawyers.  You

8    were relying on him, right?

9    **A.**  That's right.  I wasn't a party to those conversations

10   directly.

11   **Q.**  When he told you about the contracts, you didn't always

12   read the contracts, you relied on him, correct?

13   **A.**  That's right.  More often than not, I didn't read the

14   contracts before transitions.  That's right.

15   **Q.**  Did he tell you he went to the executive management at

16   State Street Global Markets International and told them that

17   the new business model at State Street, in early 2011, was to

18   charge undisclosed spreads, as well as fees?

19   **A.**  He had -- he had told me that he had taken and brought up

20   that subject with the European global markets.  So not the

21   global team, but the European management and that he had

22   brought that up at a management committee meeting, yes.

23   **Q.**  So in other words, he told you he had disclosed the

24   business model of charging fees and an undisclosed spread to

25   the European management committee?

1    **A.**   Yes.  And on phone conversations in Ross' -- in Ed's

2    office with Ross, he told me the same thing about Puth and

3    others at the global level.

4    **Q.**   I'm focusing you right now on Mr. Pennings.

5    **A.**   I understand, but I think it's --

6              THE COURT:  Mr. Boomgaardt, the way it works,

7    sometimes frustrating for witnesses, is there's no

8    soliloquies.  You don't get to take the witness stand and

9    tell what you think is relevant.  The lawyers decide what's

10   relevant subject to the Court's rulings, so he asked the

11   questions, just like Mr. Johnston asked the questions.  If

12   you just answer the questions.  If there's something else

13   that you think is important, presumably on redirect, the

14   Government counsel will ask you.  If they don't ask you about

15   it, it means they didn't want to ask you about it.  And so

16   you just answer the questions.

17             Go ahead.

18   BY MR. WEINBERG:

19   **Q.**   There's a man named Steve Smit who ran the London office;

20   is that correct?

21   **A.**   That's correct.  Yeah, he ran Global Markets for State

22   Street in London.  Yeah.

23   **Q.**   Mr. Pennings told you that he had discussed the new

24   business model of charging undisclosed spreads in addition to

25   low fees with Mr. Smit, and Mr. Smit was knowledgeable and

1    accepted that; is that correct?

2    **A.**   That's what Mr. Pennings told me, yes.

3    **Q.**   And you weren't at the conversations between Mr. Smit and

4    Mr. Pennings, sir.  You were relying on Mr. Pennings?

5    **A.**   That's right.  I didn't sit in on European management

6    committee meetings.  That was sort of a level up from me.  So

7    yes, I was relying on Mr. Pennings.

8    **Q.**   And Mr. Pennings had conversations with Mr. McLellan that

9    you didn't participate in?

10   **A.**   Oh, certainly, yes.  Absolutely.

11   **Q.**   And, therefore, the corollary of that is, you don't know

12   whether Mr. Pennings told Mr. McLellan the same thing that

13   Mr. Smit had approved, do you?

14   **A.**   I don't know exactly what was told to Mr. Smit and I

15   don't know all of the conversations that Mr. Pennings had

16   with Mr. McLellan, either.

17   **Q.**   So let me ask my question.  You don't know whether or not

18   Mr. Pennings told Mr. McLellan that the head of the London

19   office of State Street Global Markets knew of and approved

20   the business pricing of undisclosed spreads and fees,

21   correct?

22   **A.**   I don't know that, no.

23   **Q.**   And you don't know whether or not Mr. Pennings told Mr.

24   McLellan on these calls you were not part of that he had gone

25   to the UK legal department, they knew of, and also approved

1    Mr. Pennings's business model of charging certain clients an

2    undisclosed markup on top of a fee, correct?

3    **A.**   Yeah.  By definition, if I wasn't on a call, I can't

4    attest to any knowledge of that call.

5    **Q.**   And Mr. Pennings never told you that he concealed from

6    Mr. McLellan that he, Pennings, went to the executive

7    management of the Europe management group and told them about

8    the new business model of charging undisclosed spreads and

9    fees and that they had proof, correct?

10   **A.**   That's correct.

11   **Q.**   Mr. Pennings ever tell you that they had a conference

12   call when they were remodeling a transition management

13   agreement, that he had told four lawyers; two from State

14   Street's internal, two from an outside firm named Herbert

15   Smith.  He had told all four of them that the way that he was

16   charging certain clients was to add an undisclosed spread to

17   a fee?

18   **A.**   He didn't make the assertion in that much detail, but,

19   yes, he did say around that time, we had to reword the

20   contract because of new European laws.  That those

21   conversations were happening with those lawyers, as you say,

22   and that the topic of this charging model did come up, yes.

23   That's what he told me.

24   **Q.**   So Pennings told you that he had made a disclosure to UK

25   legal and they said okay, correct?

**A.**   Yes.

**Q.**   That he made a disclosure to the management committee of the broker-dealer and they said it was okay, correct?

**A.**   Yes.

**Q.**   That he made a disclosure to outside counsel for State Street in London and the law firm of Herbert Smith.  They said okay.

**A.**   Yes, he made all of those statements to me, yes.

**Q.**   And he said to you that UK compliance was okay with the new business model, correct?

**A.**   He said he had spoken to them and yes, that it had been okayed by them, as well.

**Q.**   And that was part of what gave you some comfort that you, Rick Boomgaardt, could participate with Mr. Pennings in the charging of undisclosed spreads to clients, correct?

**A.**   It was part of what gave me some comfort, yes.

**Q.**   At that point, Mr. Pennings had been promoted to the head of all portfolio solutions in London, correct?

**A.**   Yes, that's right.  Ross promoted him, yeah.

**Q.**   He was the -- Steve Smit promoted him; isn't that correct?

**A.**   No, I don't think it is, sir.

**Q.**   It's your testimony that Mr. McLellan promoted Mr. Pennings?

**A.**   Mr. McLellan was Mr. Pennings' direct line manager.  He

1    was the one responsible for promotion.  I had a conversation

2    with Mr. Pennings after Ed got promoted and saying that Ed

3    was being promoted by him and part of the reason for that was

4    I hadn't been at State Street long enough to be in the

5    running for that -- for that position myself.

6    Q.  Let's go back to your conversations with Mr. Pennings.

7    How frequently did he tell you that UK legal had been advised

8    of and had okayed the business model of charging nondisclosed

9    spreads on top of fees?

10   A.  I don't know how frequently.  I mean, he made that

11   assurance and he made it at multiple times as we went through

12   the transitions that we testified over about -- over the last

13   couple of days.

14   Q.  How often did Mr. Pennings tell you that the contracts

15   for the clients in question authorized, approved, did not

16   prohibit the charging of undisclosed spreads on top of fees?

17           MR. JOHNSTON:  Objection.  Compound question.

18           THE COURT:  Overruled.

19           THE WITNESS:  Sorry, could you repeat it, please?

20           MR. WEINBERG:  Sure.

21   BY MR. WEINBERG:

22   Q.  How often did Mr. Pennings tell you about the contracts

23   entered into between State Street and the transition clients

24   that had been the subject of your direct examination

25   authorized, approved, or did not prohibit the charging of

1  undisclosed spreads on top of fees?

2          MR. JOHNSTON:  Objection.  Compound question.

3          THE COURT:  Overruled.

4          THE WITNESS:  Again, I don't know how many times,

5  but certainly that assurance -- I had that assurance from him

6  for each of those -- each of those transitions.

7  BY MR. WEINBERG:

8  **Q.**  You and he reviewed the Royal Mail contract together in

9  his office, did you not?

10  **A.**  Not until afterwards, not before Ed.

11  **Q.**  It's your testimony that he never read out to you

12  section 6-1 and 6-2 in a discussion that it was okay to

13  charge Royal Mail?

14  **A.**  And he read out bits of our -- the standard contract, as

15  well.  So it was certainly bits that he read out, but that's

16  not a contract review.  That was him, I guess, telling me

17  what the -- what the specifics were, but yeah.

18  **Q.**  It's not a contract review, but he was telling you the

19  specifics of the contract?

20  **A.**  I didn't read the contract myself, from beginning to end.

21  **Q.**  He was reading it.

22  **A.**  He had read it.  I guess he at least read that bit that

23  he read out to me.  Yes, sir.

24  **Q.**  He was reading from a contract, read you legal language,

25  and said that that legal language in the contract authorized

1    the charging of Royal Mail with an undisclosed spread,

2    correct?  That was his interpretation?

3    **A.**  Yes, I think that's correct.

4    **Q.**  And likewise, for NTMA, you recall, on a tape recording

5    that the Government played for you several days ago, Ed

6    Pennings saying to you, you read the NTMA contract to make

7    sure it doesn't prohibit an undisclosed spread, because we

8    are going to take one, correct?

9    **A.**  Yes, that was on the -- that was on the tape.  That was

10   for the periodic notice, I guess, rather than the main

11   agreement, yes.

12   **Q.**  It didn't prohibit?

13   **A.**  There was nothing that specifically prohibited it, no.

14   **Q.**  And likewise, you had conversations with Mr. Pennings

15   about some of the other contracts, be it Sainsbury's or

16   Eircom, and Mr. Pennings, whose remit it was to review

17   contracts, advised you that in his understanding, as your

18   immediate supervisor and the head of transition management of

19   PSG in London, those contracts proved -- did not prohibit the

20   taking of undisclosed spreads on top of fees, correct?

21              MR. JOHNSTON:  Compound question.

22              THE COURT:  It's a long question.  It's a very long

23   question.  Why don't you break it apart?

24              MR. WEINBERG:  I'll break it out, Your Honor.

25   BY MR. WEINBERG:

1    **Q.**  Mr. Pennings advised you that, in his judgment, correct,

2    the contracts relating to Sainsbury's and Eircom also did not

3    prohibit the taking of undisclosed spreads, correct?

4    **A.**  That was my understanding at the time that I got from Ed,

5    yes, but I didn't check any of those contracts, myself,

6    sadly.

7    **Q.**  I didn't ask you.  Mr. Pennings is telling you, he, whose

8    responsibility it was to enter agreements had checked the

9    contracts, they authorized the taking of nondisclosed spreads

10   on top of fees, correct?

11   **A.**  Or certainly didn't prohibit them, anyway, but yes,

12   allowed by the contract would probably have been his

13   terminology, yes.

14   **Q.**  So let's go back to your written statement of

15   February 2012, at a time that, in your words to Mr. Johnston,

16   you were in a self-preservation mode, trying to keep your

17   job, correct?

18   **A.**  Okay.  Yeah.

19   **Q.**  There were lies in that written statement; were they not?

20   **A.**  There was -- I wasn't truthful about what my role in all

21   of this was.

22   **Q.**  Well, let's go back to them.  "At all times I conducted

23   myself with honesty and integrity."  That's what you said?

24   **A.**  Uh-huh.

25   **Q.**  Is that a deception, a lie, or the truth?

**A.**  It is -- it's not correct.  I knew these were -- I knew these were wrong.  We had told the client we weren't going to take commissions and we did.

**Q.**  So it's either truthful or not truthful?

**A.**  That's not truthful.  It wasn't at all times.  I strive to be -- I strive to be honest and show integrity and I let myself down and certainly those clients.

**Q.**  But you let State Street down, because at the very time that you were trying to be truthful and considered your own integrity, you were assuring them that "I never acted to deliberately mislead a client."  Those were your words on February 1, 2012, correct?

**A.**  Yes.

**Q.**  It was your words that "at all times I acted honestly and with integrity," correct?

**A.**  Yeah.

**Q.**  And that "how important honesty and integrity are to me," correct?

**A.**  Yes.  They are important to me.

**Q.**  "Honesty and integrity are core principles to me," you wrote, correct?

**A.**  And they are.

**Q.**  So at the moment you're writing that honesty is a core principle, you're lying and deceiving for the purpose of keeping your job, correct?

1   **A.**  I am trying to save my job, sir.  Yes.  That's right.

2   Honesty and integrity are important principles for me.

3   **Q.**  Were they important on February 1, 2012, when you were

4   assuring State Street that you never deceived the client?

5   **A.**  Yes, they were.  But that's -- you know, I'm -- I'm not

6   proud of playing down my role in this.  I'm really not, which

7   is one of the reasons that I've taken responsibility for the

8   role I've had in it.

9   **Q.**  This has nothing to do with your role, does it, Mr.

10  Boomgaardt?  It has everything to do with whether or not, in

11  your mind, on February 1, 2012, you deceived clients.  You

12  said you didn't.  Today you said you did.  Which is it?

13  **A.**  We have -- we deceived clients all the way through this.

14  **Q.**  So today, you're saying that you did deceive clients.

15  Could we, therefore, agree that your words to State Street,

16  when you were assuring them of how important honesty and

17  integrity were to you, that your words, "I never deceived the

18  client," were a lie?

19  **A.**  They're not true.

20  **Q.**  A lie made to keep your job, correct?

21  **A.**  With the view to keeping my job, yes, sir.  That's right.

22  **Q.**  Today, your freedom is on the line, is it not,

23  Mr. Boomgaardt?

24  **A.**  Yes.  Yeah, it is.

25  **Q.**  You want the Government to help you go home to London to

1   your family and two young children, rather than to go to the

2   inside of the United States prison, an ocean away from your

3   family, correct?

4   **A.**   That's correct, but I reached out to them, sir.  They

5   didn't come and find me.

6   **Q.**   You reached out to them with a desire not to be

7   prosecuted, correct?

8   **A.**   Yeah.

9   **Q.**   You wanted finality?

10  **A.**   Yeah, and I do want finality in this.  I came over here

11  and -- you know, with no knowledge of them having me as a

12  person of interest, or -- my interest is to set the record

13  straight.  I'm here taking responsibility for my actions for

14  this, sir.  I've pled guilty to a crime on the back of this.

15  **Q.**   Mr. Boomgaardt, let's go back to 2014, before you came

16  over here voluntarily, because you read something in a State

17  Street filing.  Isn't it a fact that four months before you

18  came over here, you were interviewed by the City of London

19  Police?

20  **A.**   Yes, that's correct.

21  **Q.**   Isn't it a fact that when you talked to clients, these

22  were European or mideastern clients, correct?

23  **A.**   Yeah, that's true.

24  **Q.**   You were concerned that you were being criminally

25  investigated in the City of London Police, right?

1   **A.**   Well, I was more than concerned.  I was being criminally

2   investigated by the City of London Police, sir.  Yes.

3   **Q.**   For the very same things that Mr. Frank and Mr. Johnston

4   prosecuted you for, correct?

5   **A.**   Certainly the same behaviors around the same transitions.

6   Yes, sir.

7   **Q.**   And you told the City of London Police that you acted in

8   good faith, did you not?

9   **A.**   Which -- are we talking about a specific document or --

10  **Q.**   We're talking about a written statement you made to the

11  City of London police four months before you did a 180-degree

12  turn and talked to the Government and said you were guilty.

13  You recall that, don't you?

14  **A.**   I recall writing a -- a very short document in response

15  to very specific disclosure that was given to me by the City

16  of London Police, yes.

17  **Q.**   Which asserted that you were not guilty of fraud,

18  correct?

19  **A.**   It was in response to the very specific disclosure that

20  they gave me.  It wasn't in response to -- it wasn't a

21  blanket statement of there's nothing, I haven't done

22  anything.  It was in response to a very specific set of

23  disclosures that they had given me.  It was also only about

24  two pages long.  I've been testifying for what, eight hours?

25  **Q.**   So in other words, when you were asked to make a short

1  written statement, it's okay to lie, but when you testify for

2  eight hours, you can tell the truth?

3  **A.**  It was in response to a very specific question that they

4  were asking, a very specific disclosure.  Again, I'm not

5  proud of having played down my own involvement in this, sir,

6  I'm really not.

7         MR. WEINBERG:  May I have a moment, Your Honor?

8         THE COURT:  You may.

9  BY MR. WEINBERG:

10 **Q.**  Do you recall writing to the City of London in the short

11 statement that you, today, say is the truth, "I acted

12 honestly, because I believe the assurances I was given by

13 people I trusted."

14 **A.**  I did believe, to a certain degree, yeah, they had the

15 assurances.  But I am here to put my hand up and have done

16 already than I am more culpable than what I've said in that

17 statement and I think we covered that.  It's -- I did allow

18 myself to get comfortable because of the assurances that I

19 was given by both Edward Pennings and Ross McLellan and that

20 is where those stories -- that belief comes from.  I wanted

21 nothing more than to really believe that and hope that it was

22 true, but I knew it wasn't.

23 **Q.**  Do you recall saying "I did not have any part to play in

24 the formulation of the idea to charge State Street clients

25 with a spread"?

1    **A.**   This was not my plan, sir.

2    **Q.**   Do you recall being on tape-recorded calls with

3    Mr. Pennings, on March of 2010, March 2, 2010, saying, "We

4    need to figure out some way to structure commissions for

5    KIA," which was demanding of you and Mr. Pennings that there

6    be no -- there be zero commissions, zero fees?

7    **A.**   Are you referring to the conversation -- the call that

8    was played in this courtroom?

9    **Q.**   Yes, Mr. Boomgaardt.

10   **A.**   That was referring to a potential Japanese equity

11   transition.  It wasn't related to that transition, but we did

12   have that conversation.  I think you'll also hear that it was

13   if the client is okay with it and the client agrees with it.

14   That was not my plan.  It really wasn't.  That came from --

15   this was a plan that was dictated to me and certainly I was

16   necessary in making it work.

17   **Q.**   Mr. Boomgaardt, let's talk for a second about these six

18   clients.  The European clients; KIA, Royal Mail, NTMA,

19   Sainsbury's, Eircom, and Dutch Doctors.  You had

20   conversations with how many of the representatives of those

21   clients?

22   **A.**   Probably all of them, in one way or another.

23   **Q.**   Mr. Pennings had conversations with how many of those

24   clients?

25   **A.**   Again, all of them, in one way or another.

1   **Q.**  Mr. McLellan had conversations, one to one, with how many

2   of those clients?

3   **A.**  I don't know.  None that I'm aware of, but I'm not sure.

4   **Q.**  You're not aware that he ever met Das, or any of the

5   other representatives of the KIA, correct?

6   **A.**  I'm not.  I wasn't with him if he met them.  No, sir.

7   **Q.**  Mr. Pennings regularly went to the Mideast and had many

8   conversations with Das, who was the representative of the

9   KIA, right?

10  **A.**  That's right.  The Middle East was part of Ed's coverage

11  area, yes, so he was there frequently.

12  **Q.**  Dutch Doctors, Mr. Harden, did you have conversations

13  with him?

14  **A.**  Yes, certainly e-mail conversations, but probably on the

15  phone, as well.

16  **Q.**  Did Mr. Pennings, to your knowledge, had conversations

17  with Mr. Harden of the Dutch Doctors, correct?

18  **A.**  Yes.

19  **Q.**  You and Mr. Pennings discussed the Dutch Doctor

20  transition, correct?

21  **A.**  Yes.

22  **Q.**  Mr. McLellan, to your knowledge, never met Mr. Harden,

23  correct?

24  **A.**  Correct.  I don't know that he did or didn't.

25  **Q.**  Never saw an e-mail from Mr. McLellan to Mr. Harden,

1  correct?

2  **A.**  Not that I can recall, no.

3  **Q.**  Never saw an e-mail from Mr. McLellan to Das or anyone at

4  the KIA, correct?

5  **A.**  Again, not that I've seen.  No, sir.

6  **Q.**  Royal Mail, Ian McKnight, negotiated an agreement with Ed

7  Pennings, correct?

8  **A.**  Yes.  Ian McKnight was the main client contact at Royal

9  Mail, yeah.

10  **Q.**  You had certain contacts with Mr. McKnight, did you not?

11  **A.**  I did.

12  **Q.**  You have no knowledge that Mr. McLellan ever met

13  Mr. McKnight, did you?

14  **A.**  I have no knowledge that he has or hasn't, no.

15  **Q.**  No knowledge that Mr. McLellan ever e-mailed

16  Mr. McKnight, correct?

17  **A.**  Correct.

18  **Q.**  No texts between Mr. McLellan or Mr. McKnight or Das or

19  the representative of Dutch Doctors, to the best of your

20  knowledge?

21  **A.**  Not that I've ever seen.

22  **Q.**  You've never been on an investor call with Mr. McLellan

23  and either Das, KIA, McKnight, Royal Mail, Harden, or Dutch

24  Doctors, correct?

25  **A.**  Yes.  That's correct, to the best of my knowledge, yes.

1    **Q.**  You have no knowledge, despite your years of thinking

2    about this case, of Mr. McLellan ever having any face-to-face

3    or any one-to-one contact with any of those three clients?

4    **A.**  I don't recall Ross meeting face-to-face with any of

5    those clients you mentioned, no.

6    **Q.**  How about the fourth client, NTMA?  You read a lot of

7    conversations, a lot of e-mails with Killian Buckley,

8    correct?

9    **A.**  That's right.

10   **Q.**  Mr. Pennings certainly had lots of conversations with

11   Killian Buckley?

12   **A.**  He did have conversations with Killian Buckley, as well.

13   Yes.

14   **Q.**  You have no knowledge that Mr. McLellan ever met Mr.

15   Buckley, or any other representative of the NTMA, do you?

16   **A.**  Not to my knowledge.  I don't have any knowledge whether

17   he did or didn't.

18   **Q.**  No e-mails to your knowledge between Mr. McLellan and any

19   of these four clients, the NTMA being the fourth?

20   **A.**  None that I was copied on in any way, I don't think, no.

21   **Q.**  No texts that you've ever seen?

22   **A.**  No.

23   **Q.**  No participation in any of the conference calls between

24   NTMA and State Street?

25   **A.**  Not that I can recall, no.

1    **Q.**   Okay.  Let's talk about the fifth client, Sainsbury's.
2    They had a consultant, did they not?
3    **A.**   Yes, they did.
4    **Q.**   Who was the consultant?
5    **A.**   It was Aon Hewitt for that one, I believe.
6    **Q.**   Dean Johnson was the representative of the Sainsbury's
7    fund?
8    **A.**   That's right.  He was our main contact at the Sainsbury's
9    fund, itself.
10   **Q.**   You have contact with Mr. Johnson?
11   **A.**   I've met Mr. Johnson and spoken to him, yes.
12   **Q.**   You had contacts with the consultant, correct?
13   **A.**   Yes.
14   **Q.**   Mr. Pennings met with Mr. Johnson?
15   **A.**   I believe so.
16   **Q.**   Communicated with him by e-mail?
17   **A.**   Again, I believe so, yeah.
18   **Q.**   Communicated with the consultants for Sainsbury's,
19   correct?
20   **A.**   Yes, I believe he did.  I certainly did.
21   **Q.**   You're not aware of Mr. McLellan ever meeting
22   Mr. Johnson, are you?
23   **A.**   I'm not aware of him meeting Mr. Johnson, no.
24   **Q.**   You're not aware of Mr. McLellan discussing any
25   Sainsbury's transition with any of the consultants of

1   Sainsbury's, are you?

2   **A.**   No, I'm not aware of that.

3   **Q.**   No e-mails that you've seen?

4   **A.**   Not that I can remember, sir.  It was a long time ago.

5   **Q.**   No texts you've seen?

6   **A.**   No.  I didn't -- the text question, I've never seen any

7   of Ross' texts, unless he sent them to me, sir.

8   **Q.**   No participation on the conference call?

9   **A.**   Not that I can recall.

10  **Q.**   And the sixth client at issue, Eircom, were they

11  represented by consultants?

12  **A.**   They were, yes.

13  **Q.**   You had conversations with them?

14  **A.**   The consultants and the client, both, yes.

15  **Q.**   Mr. Pennings had conversations with them, either by

16  e-mail, or in person, or on the phone?

17  **A.**   Yup.

18  **Q.**   And to your knowledge, Mr. McLellan had no conversations

19  with any consultant for or any representative of Eircom,

20  correct?

21  **A.**   No.  I mean, he would have had conversations with Mercer,

22  but not specifically that I know that had anything to do with

23  the Eircom transition specifically.

24  **Q.**   No e-mails that you've seen between Mr. McLellan and

25  Eircom, correct?

1    **A.**  Not that I can recall.

2    **Q.**  No participation in investor call with Eircom, as you

3    recall, correct?

4    **A.**  Again, not that I recall.

5    **Q.**  That's all six, right?  KIA, Royal Mail, NTMA, Eircom,

6    Sainsbury's, and Dutch Doctors?

7    **A.**  Those are the ones that I've been testifying about, yes.

8    **Q.**  So let's go back to your state of mind on 2012, where

9    you're defending your job, rather than your liberty.  Do you

10   recall saying "I have breached no standard of conduct" in

11   your writing to State Street?

12   **A.**  Yes.

13   **Q.**  Do you recall writing to State Street, "I behaved in good

14   faith at all times in my communications with the client"?

15   **A.**  Yes, I remember writing that.

16   **Q.**  Those are your words you chose to write to communicate to

17   State Street, to deceive State Street, to keep your job,

18   correct?

19   **A.**  I think I've already answered that.  Though, yes.

20   **Q.**  At this time, when you were fighting for your job, City

21   of London Police were not involved, were they, to your

22   knowledge?

23   **A.**  Not at that point, I don't believe.

24   **Q.**  More important, going back to 2010 and 2011, during these

25   six transitions or seven transitions for six clients that you

1    participated in, you did not believe when you were helping

2    Mr. Pennings, charging undisclosed spread that Mr. Pennings

3    said was okay by contract, that you were committing a fraud,

4    did you?

5    **A.**   I didn't think about it in those terms.  I certainly knew

6    what we were doing was not right.  However you want to define

7    that.

8    **Q.**   And you've repeatedly said that you were not comfortable

9    with the new business model of State Street, correct?

10   **A.**   Yeah.  That plan took us a long way away from what we

11   were telling our clients we were going to do.

12   **Q.**   But you never -- you did not believe at the time you did

13   it, that what you were doing was in violation of a contract,

14   correct?

15   **A.**   I didn't think about it in those terms.  It wasn't a

16   specific thought.  What I thought was in violation of what

17   was the right thing to do for the client and our fiduciary

18   duty to the client.

19   **Q.**   You didn't believe that you were committing a criminal

20   act, did you?

21   **A.**   Again, I didn't think about in that way, but you know,

22   I'm thinking about it now in that way, but no, I didn't at

23   the time.  It wasn't that I didn't think it was -- I knew it

24   was wrong and I knew it was the wrong thing to do, and that

25   wrongness is a criminal act.  So it wasn't -- it wasn't my

1   manner of thinking, but it was a -- yes, this is the wrong

2   thing to do.  We're in breach of what we've told the clients

3   we're going to do.  This is ethically the wrong thing to do.

4   As it turns out, it's also criminally the wrong thing to do,

5   but that wasn't the first thing that popped into my mind.

6           MR. WEINBERG:  I move to strike, Your Honor.  The

7   question was what he thought in 2010 to 2011.

8           THE COURT:  Overruled.

9   BY MR. WEINBERG:

10  **Q.**  Did you believe in 2010, when you and Mr. Pennings added

11  the markup for KIA, that it was on your mind at that time

12  that you were intentionally, deliberately committing a

13  criminal act?  Yes or no?

14  **A.**  It was in my mind that this is the wrong thing to do.  I

15  remember driving home from work after sitting and putting

16  those spreads on the trades with Ross beside me, going what

17  we've done is not right here.

18  **Q.**  Did you resign?

19  **A.**  No.

20  **Q.**  Did you take this issue to Mr. Smit?

21  **A.**  No, I didn't.

22  **Q.**  Did you tell Mr. McLellan, in March of 2010, when you

23  decided to charge a markup to KIA, we are committing a crime,

24  we're committing a fraud?

25  **A.**  No.

1    **Q.**  Did you take it up to Mr. Puth, Mr. McLellan's superior

2    at the State Street Global Markets and tell him Mr. Pennings

3    just asked me to commit a crime and I don't like it?

4    **A.**  No, I didn't and I wish I had done it at the time.

5    **Q.**  Did you go to UK legal and tell them that you were being

6    asked to commit what, today, in 2018 you say you now think

7    was something wrong and a crime?

8    **A.**  No.

9    **Q.**  Did you go to UK compliance and register your complaint?

10   **A.**  No, I didn't take any action on it until the 26th of

11   August that we went through.  I wish I had done.  I was being

12   asked to do it by people that I respected and trusted and,

13   you know, I wish I had been stronger and stood up sooner to

14   that.

15   **Q.**  Bottom line, you didn't resign and you didn't complain

16   and you participated with Mr. Pennings in charging the

17   spread -- and let's focus on KIA for a minute, correct?

18   **A.**  I went along with it.  That doesn't mean that I thought

19   it was the right thing to do.

20   **Q.**  Okay.  KIA is -- we can take one of these transitions and

21   we'll go to the others probably tomorrow.  KIA was a huge

22   sovereign wealth fund, were they not?

23   **A.**  That's right.  Yup.

24   **Q.**  Hundreds of billions of dollars of assets, correct?

25   **A.**  I don't know.  I don't know exactly the size, but it's

1    safe to assume that.  Yes, sir.

2    **Q.**  It's one of the world's biggest?

3    **A.**  It's one of the world's biggest.  Yeah.

4    **Q.**  One of the bank's biggest clients?

5    **A.**  That's correct.

6    **Q.**  And they were unmistakably, unconditionally telling

7    Mr. Pennings that the only way that State Street is going to

8    get our next transition from $2 billion in bonds is to

9    propose zero commissions, zero fees, correct?

10   **A.**  That was my understanding, from what Ed told me of his

11   conversations with the KIA.  That's right.

12   **Q.**  Mr. Pennings also told you that other banks were offering

13   to do the KIA transition for nothing; zero fees, zero

14   commissions?

15   **A.**  That was also the understanding that he gave me, yup.

16   **Q.**  And nothing might be the wrong word, because it's not

17   your understanding that the competitors of State Street were

18   looking to do a $2 million transition for free; is that

19   correct?

20   **A.**  Not for free, no.  They might have been willing to do it

21   for zero commission.

22   **Q.**  But they would have made their money from trading,

23   correct?

24   **A.**  I assume so.

25   **Q.**  You worked at Goldman Sachs, did you not?

1    **A.**  I did work at Goldman Sachs.

2    **Q.**  They had a different business model than State Street,

3    didn't they?

4    **A.**  Yes.

5    **Q.**  But they made a lot of money, didn't they?

6    **A.**  Yes, they had different ways of making money out of

7    transition management business than what State Street did.

8    **Q.**  They would propose low fees, correct?

9    **A.**  Are we talking about Goldman Sachs?

10   **Q.**  Yes.

11   **A.**  I worked at Goldman Sachs nearly 20 years ago.

12   **Q.**  You knew, as a professional in the transition management

13   field in London, that the competitors like Goldman Sachs in

14   Europe were charging very low explicit fees in 2010, correct?

15   **A.**  We saw some very aggressive explicit fees in 2010.  Yes,

16   sir.  That's correct.  I wouldn't -- not necessarily Goldman,

17   but certainly Nomura was our understanding.

18   **Q.**  Citibank?

19   **A.**  Yeah.  I mean, these were all competitors.

20   **Q.**  And your competitors were going to your clients, or your

21   potential clients, like NTMA and KIA, and trying to meet what

22   the client wanted, which is low or no explicit fees, correct?

23            MR. JOHNSTON:  Objection, Your Honor.  Statement as

24   to what the clients were trying to do -- the competitors,

25   sorry.

1            THE COURT:  It's as to what his understanding is,

2    overruled.

3            THE WITNESS:  I don't know whether clients wanted

4    the low commissions or not.  KIA, in that particular deal, I

5    believe did tell Ed they wanted to do it for zero

6    commissions.  So yeah.

7    BY MR. WEINBERG:

8    **Q.**  State Street is not a not for profit, correct?

9    **A.**  No, it's not.

10   **Q.**  They're a bank that looks to make money, correct?

11   **A.**  Yeah.

12   **Q.**  Its' shareholders and they're a public company and one of

13   their objectives, as you understand it, is to make a profit,

14   correct?

15   **A.**  That's correct.

16   **Q.**  State Street was not going to do a $2 billion transition,

17   which meant selling $2 billion of one asset, and buying $2

18   billion of another for free, correct?

19   **A.**  Probably.  We would lose money if we did that.

20   **Q.**  Yes.

21   **A.**  There may be reasons for doing it and we certainly saw

22   competitors trying to buy market share by doing transitions

23   for less than cost, but I had never seen that at State

24   Street.

25   **Q.**  State Street was already credentialed by KIA.  They were

1    on their account, correct?

2    **A.**   That's right.

3    **Q.**   You had prior transitions with KIA?

4    **A.**   We had done KIA transitions before, yes.

5    **Q.**   Now, KIA could afford consultants, could they not?

6    **A.**   I assume so.  I don't know what their policy on

7    consultants was.

8    **Q.**   Do you have any doubt that they had the financial assets

9    to afford to have consultants?

10   **A.**   I don't doubt it, but -- I don't know.

11   **Q.**   They could afford analysts, correct?

12          THE COURT REPORTER:  I'm sorry, they could afford

13   what?

14          MR. WEINBERG:  Analysts.  Bond analysts, bond

15   professionals.

16   **A.**   They could, they had investment professionals working

17   there.  So evidently, yes.

18   **Q.**   Sure.  And you had no reason to believe that when Das

19   told Pennings that we need to see zero commissions, or you're

20   not getting transition 115, that Das believed that State

21   Street was going to do this for free, correct?

22          MR. JOHNSTON:  Objection.  Asking for what he

23   believes the client believed.

24          MR. WEINBERG:  With him talking about his

25   understanding?

1          THE COURT:  What his understanding of what Das

2     believed, not what Das actually believed.  So it's his state

3     of mind, what were you thinking.

4          THE WITNESS:  Sorry, could you repeat the question

5     for me?  Sorry.

6     BY MR. WEINBERG:

7     Q.  Yes.  You did not believe that Das, the KIA, believed

8     that State Street, a giant transition manager, credentialed

9     on the annals, had done prior deals, was going to do

10    $4 billion of trading of bonds for free, correct?

11    A.  I guess so.  I had -- as I think I alluded to earlier, I

12    had concerns about his sophistication, but no.  I don't think

13    he expected us to do it for free, but as he was -- well, as

14    Ed told him, that we would somehow make money in another way

15    off this, but that it wasn't going to come from his pocket.

16    Q.  You walked in on a phone conversation where Mr. Pennings

17    was telling Das, we're going to make money from the spread,

18    correct?

19    A.  Yes.

20    Q.  You repeatedly were told by Mr. Pennings during this time

21    period that Das is okay with us making money from a spread,

22    correct?

23    A.  That's what Ed told me, yes.

24    Q.  Told you that Das was happy for State Street to make

25    money, as long as they met the implementation shortfall,

1    correct?

2    **A.**   He didn't mention anything about the implementation

3    shortfall and I don't think any client would be happy to have

4    an undisclosed commission taken out of them.  But all I can

5    say is that I walked in on that conversation and Ed did tell

6    him that we would take a spread on this.  He also

7    subsequently told him that that spread would somehow be taken

8    from the other side and not come out of his pocket, which is

9    incorrect.

10   **Q.**   Which is ridiculous, correct?  You don't take a million

11   dollar spread from $4 billion of trades from the other side,

12   do you, as a routine of practice?

13   **A.**   We had never had a mechanism where -- taking money or

14   compensation from the other side of a trade before.

15   **Q.**   And these analysts and consultants that were accessible

16   to KIA would know that that was not the routine and practice

17   in the bond market in Europe, in 2010, correct?

18          MR. JOHNSTON:  Objection.  He's --

19          THE COURT:  Sustained as to what they would know.

20   BY MR. WEINBERG:

21   **Q.**   Do you recall having a telephone conversation that you

22   heard several days ago with Greg Spyropoulos?

23   **A.**   Spyropoulos.

24   **Q.**   Spyropoulos.

25   **A.**   Yes, I do.

1    **Q.**   He was a US trader?

2    **A.**   Yes, he was a trader based in Boston.   A bond trader

3    based in Boston.

4    **Q.**   Do you recall what you said about KIA during that call?

5    **A.**   Yeah.   Exactly what we said, that they had agreed that we

6    could take a spread on these bonds.

7    **Q.**   We could take a spread on these bonds.   At the time that

8    you were talking to Mr. Spyropoulos about marking up the

9    bonds, correct?

10   **A.**   That's right.

11   **Q.**   You didn't tell Mr. Spyropoulos, KIA said it was okay for

12   us to take a spread, but only if it came from the other side,

13   did you?

14   **A.**   I didn't qualify the remark.   No, sir.

15   **Q.**   In fact, you were telling him that in the context of

16   telling him we want to see the highs and lows of the day,

17   correct?

18   **A.**   That's right.

19   **Q.**   And he sent you the highs and lows, or you were sent the

20   highs and lows of the day, as you sat in London, correct?

21   **A.**   Yes, he did send that file across, yes.

22   **Q.**   And you've looked at Government Exhibit -- at Exhibit 35,

23   which is the client's side prices, correct?

24   **A.**   That's right, yup.

25   **Q.**   And you've also had occasion to look, have you not, at

1    the highs and lows that were sent to you by the United States

2    at your request on June 15th, correct?

3    **A.**   The Tradeweb data, the file that came across from Greg,

4    is what you're referring to?

5    **Q.**   Yes.

6    **A.**   I did see that.

7    **Q.**   Isn't it a fact that what you saw, to your surprise,

8    Mr. Boomgaardt, is that the client side prices charged to the

9    KIA were higher than the highs of the day, correct?

10   **A.**   That was only looking at the Tradeweb data.  We were also

11   looking at Bloomberg data in -- which is a more accessible

12   source.

13   **Q.**   So whatever the data is, it came as a surprise to you

14   two days ago, when you looked and compared Exhibit 35 and

15   Exhibit 33, what the client saw was 35 and what the trade

16   data is is 33, and so the client was being charged prices

17   higher than the high/low range, correct?

18   **A.**   They were a little bit higher than those Tradeweb prices,

19   yes.

20   **Q.**   Surprised you, didn't it?

21   **A.**   It was our methodology for figuring out those prices was

22   to make them not higher than the high, so what it means is

23   that the Bloomberg data that we can't see showed different

24   high prices than the trade web data what Greg sent across.

25   **Q.**   Or what it meant that Das was expecting markups, and Mr.

1    McLellan, who was with you, did not care whether or not

2    Mr. Das was getting client side prices that he could check

3    against the data and see it exceeded the high?

4            MR. JOHNSTON:  Objection.  Compound question, calls

5    for speculation.

6            THE COURT:  Sustained as to compound question.

7    BY MR. WEINBERG:

8    **Q.**  When was the first time you compared Exhibit 35 and the

9    client side prices and the market data?

10   **A.**  Well, the first --

11   **Q.**  Two days ago?

12   **A.**  Well, the first time we did it was about eight years ago,

13   sir, when it first came across, right?

14   **Q.**  Second time was two days ago, right?

15   **A.**  I believe so.  Yeah.

16   **Q.**  Up until that time, it was your understanding that you

17   had received the high and low range and it set the price for

18   the client to see, within the high, correct?

19   **A.**  Yeah.  And that, I guess, that -- I was surprised that

20   the Tradeweb data would have been different than the

21   Bloomberg data, but we don't have --

22   **Q.**  Have you seen the Bloomberg data?

23   **A.**  I was going to say we don't have access to the Bloomberg

24   data.  I haven't seen it.

25   **Q.**  So you don't know what the Bloomberg data said as you sit

1    here now eight years later?

2    **A.**   No, I don't.  No, but I know we looked at it.

3    **Q.**   But if you're just saying the Bloomberg data is different

4    than the data that you saw in Exhibit 33?

5    **A.**   It could be.  I don't know that it's different, but it

6    might be.  Tradeweb and Bloomberg didn't necessarily agree.

7    **Q.**   It might not be.

8    **A.**   It might not be, but it might be.

9    **Q.**   But the data that you received from the United States was

10   what the Government showed you, Exhibit 33, correct?

11   **A.**   That's right.

12   **Q.**   And when you looked in the US Attorney's Office, after my

13   opening, and tried to determine whether or not the prices

14   sent to Das and the KIA were within the high/low range, you

15   told the Government they're higher than the high?

16   **A.**   Yeah, they are slightly higher than the high, the

17   trade -- the Tradeweb high.

18   **Q.**   And therefore, some client, who's looking at them and

19   checking them against the very same high/lows you got, could

20   see that they're being charged more than the high, correct?

21   **A.**   If they had access to Tradeweb, but they're more likely

22   to check that against Bloomberg.

23   **Q.**   Which could have been the same thing.  You don't know,

24   because you don't remember, correct?

25   **A.**   That's right.  It could have been the same, could have

1    been different.

2    **Q.**   You were told Das expected State Street to make money,

3    correct?

4    **A.**   Yeah.   That was -- that's what Ed said.

5    **Q.**   That's what Ed said.   And here you have Mr. McLellan who

6    was sitting with you in London and setting the prices, the

7    client side prices, sending -- setting prices higher than the

8    high/low range, which would have sent a message, if anybody

9    compared them, that we're paying a markup, correct?

10   **A.**   Again, I would need to see the other analysis that we did

11   against the Bloomberg prices to agree with you there.

12   It's -- it certainly looks as though those prices are higher

13   than the Tradeweb highs that we sent through.

14   **Q.**   The Tradeweb highs are what you got from Boston at your

15   request.   Send us the high lows, you got the Tradeweb

16   highs --

17   **A.**   It was at Ross' request that this --

18           MR. JOHNSTON:  Objection.  Compound.

19           THE COURT:  I don't think that was compound.  You

20   can answer.

21           MR. WEINBERG:  Then it's a yes.

22           THE WITNESS:  The request for the Tradeweb prices

23   came from Ross and they did come, you're right.  And those

24   prices that we then booked out to the clients are higher than

25   what's sent across.  As I'm saying, there is a missing piece

1   of that analysis.

2   **Q.**   A missing piece that might be consistent with that amount

3   analysis or might not, you don't know?

4   **A.**   No.  But my experience was Tradeweb and Bloomberg were

5   more often different than the same, but they could have been.

6   But it's a -- all I'm saying is there's a missing piece of

7   analysis and you're drawing a conclusion with impartial, with

8   incomplete analysis, is all I'm saying.

9          THE COURT:  I strike, because that's not

10  responsive.  Ladies and gentlemen, witnesses don't get to

11  comment on what kind of conclusions lawyers are or aren't

12  suggesting by their question.

13         You're drawing conclusions.  Lawyers just ask

14  questions, witnesses just answer questions.

15         Go ahead with the next question.

16  BY MR. WEINBERG:

17  **Q.**   Let's go back.  This was a conversation you had with

18  Mr. Johnston and Mr. Frank on Tuesday evening after court,

19  correct?

20  **A.**   I can't remember if that was the first time I saw that or

21  not, but it was in the last few days, anyway.

22  **Q.**   Last few days.  You have been -- you testified on direct

23  Tuesday, did you not?  That was the start of your direct?

24  **A.**   Yes, it was.

25  **Q.**   After you testified, did you go to the US Attorney's

1    Office?

2    **A.**   Did I go in -- I can't remember if it was Tuesday that I

3    did.  I certainly had a quick conversation, but I'm not sure

4    if we landed up in the attorney's office on Tuesday.

5    **Q.**   Did you talk to the US Attorneys after you testified on

6    Tuesday?

7    **A.**   Briefly.

8    **Q.**   Did you talk to them after you testified Wednesday?

9    **A.**   Yes.

10   **Q.**   Did you tell them that you weren't tough enough

11   Wednesday, that you needed to come to court today and be more

12   aggressive?  Is that what they said, Mr. Boomgaardt?

13   **A.**   No, they asked questions and I answered them.

14   **Q.**   So they asked questions of you during your direct

15   testimony between day two, Wednesday, and Thursday, correct?

16   **A.**   Yes, I met with them yesterday afternoon, sorry.

17   **Q.**   How many hours?

18   **A.**   Half an hour.

19   **Q.**   How about over the weekend?  Did you meet with them

20   Saturday or Sunday?

21   **A.**   I met with them for a short period of time on both days,

22   yeah.

23   **Q.**   Were you surprised by the questions that you were asked

24   on Tuesday?

25   **A.**   Not necessarily surprised by them.  I mean, these --

1   **Q.**  You went over the questions and the -- on the direct

2   exam, correct?

3   **A.**  They asked me questions and I answered.  Whether -- if

4   there's a lot of exhibits to go through and yeah -- and they

5   asked questions and I answered them.  That was what happened

6   in those conversations.

7   **Q.**  You sat with them for many hours going over tapes, going

8   over exhibits, answering every question that they asked,

9   correct?

10  **A.**  Yeah.  That's right.

11  **Q.**  And that wasn't the first time this year that you sat

12  with them in preparing for your testimony as a prosecution

13  witness, was it?

14  **A.**  Again, I did meet with them before and, yeah.  They asked

15  me questions and I answered them.  That's how all the

16  meetings with them have gone.

17  **Q.**  How many parts of how many days this year did you meet

18  with the Government?

19  **A.**  I don't know the answer to that off the top of my head.

20  **Q.**  Four, five, six?

21  **A.**  Something of that -- yeah, probably something like that,

22  four, five, something in that -- something in that range.

23  **Q.**  Total of maybe 15, 20 hours at least?

24  **A.**  That's probably about right.

25  **Q.**  Some of the days longer, some of the days shorter,

1    correct?

2    **A.**   Yeah.

3    **Q.**   After four pretty full days back in 2014, correct?

4    **A.**   Yes.

5    **Q.**   Those are more like six -- seven-hour days, correct?

6    **A.**   I can't recall.  But they were fairly long.  They were --

7    my recollection is they were pretty full days, yes.

8    **Q.**   30 hours there, 15 hours here, you probably spent about

9    35, 50 hours with Mr. Frank and Mr. Johnston, or Mr.

10   Johnston's predecessor, Ms. O'Shea, correct?

11   **A.**   That sounds about right.

12   **Q.**   And you sit with them when they ask you to, in part,

13   because you have agreed to be a witness for them, correct?

14   **A.**   Yeah.  Yeah.  Partly, but certainly not the early ones.

15   I mean, again, I was -- I was over here on my own bill,

16   meeting -- attending those meetings.

17   **Q.**   But you had a purpose, even though you were here on your

18   own bill and that was to persuade Mr. Frank and Ms. O'Shea to

19   give you a pass, not to charge you criminally, and let you

20   continue with your life without being a defendant in the

21   United States federal courtroom, correct?

22   **A.**   I didn't even know at that point that I was -- I hadn't

23   been charged with anything.  I didn't even know that I was a

24   person of interest in their investigation.

25   **Q.**   Mr. Boomgaardt, you sat with the City of London.  They're

1  conducting a criminal investigation into some of the same

2  subjects as you've testified to today, correct?

3  **A.**  Yeah.

4  **Q.**  You flew over to see the United States Attorney and the

5  Department of Justice in May of 2014.  Accept my dates.

6  **A.**  Yes.  Okay.

7  **Q.**  You signed a proffer agreement?

8         MR. JOHNSTON:  Objection.  Accept my dates?

9         MR. WEINBERG:  Do you dispute that that's the

10  accurate day?

11         MR. JOHNSTON:  No, but that's not -- you can say,

12  will you accept for the purposes of this question.  I mean,

13  we don't just represent -- state facts.

14         THE COURT:  Are the facts going to be different

15  than those were the dates?

16         MR. JOHNSTON:  I don't --

17         THE COURT:  Do you want to put in evidence on

18  those?

19         MR. JOHNSTON:  No, we don't.  We have the -- we

20  have them here, but --

21         THE COURT:  Do you want him to --

22         MR. JOHNSTON:  We think it's improper to just --

23         THE COURT:  Fine.  Mr. Weinberg.  Show him the

24  document that says the date and ask him what the date is.

25         MR. WEINBERG:  May I approach the witness?

1          THE COURT:  You may approach the witness.

2          MR. WEINBERG:  Thank you, sir.

3    BY MR. WEINBERG:

4    Q.  Mr. Boomgaardt, I show you your first two -- and I

5    represent to you to be the Government's notes of your first

6    two proffers and ask you to look at the dates that are in the

7    lower level --

8          THE COURT:  Do you want to see the documents before

9    he shows them to the witness?

10         MR. FRANK:  That's fine.

11         MR. JOHNSTON:  We have copies.

12         THE WITNESS:  Yes, sir, the 1st and 2nd of May,

13   2014.

14   BY MR. WEINBERG:

15   Q.  You came back in November of 2014, did you not?

16   A.  I believe that's right, yeah.

17   Q.  Four days, correct?

18   A.  Again, it sounds about right.  I can't remember exactly,

19   but for a number of days, anyway.  Yeah.

20   Q.  You don't dispute that you were here for four days

21   talking to the Government on your own dime, correct?

22   A.  Correct.

23   Q.  Did you have lawyers with you?

24   A.  Yes.

25   Q.  You signed proffer agreements, did you not?

1    **A.**   Yes.

2    **Q.**   Saying to you, at their very essence, that we are not

3    promising you that you are not going to be prosecuted as a

4    result of your four days of efforts, correct?

5    **A.**   Yeah.   There were no promises made.

6    **Q.**   You knew there was a federal criminal investigation, did

7    you not?

8    **A.**   At this point, I knew there was an investigation going

9    on.   Yes, clearly.

10   **Q.**   Clear that Ms. O'Shea came up from Washington from the

11   Department of Justice to join Mr. Frank, who was the very

12   head of the economics crimes division of the US Attorney's

13   Office and they talked to you for four days, correct?

14              MR. JOHNSTON:   Objection.

15              THE COURT:   To what?

16              MR. JOHNSTON:   He was misstating the position of

17   Mr. Frank back in 2014.

18              MR. WEINBERG:   I'm sorry.

19   BY MR. WEINBERG:

20   **Q.**   He was the assistant head of the economic crimes division

21   and now is the head.   You remember that, don't you?

22   **A.**   Yes, I'm not sure I was aware of that at the time, but

23   there were conversations with Mr. Frank and Ms. O'Shea, yes.

24   **Q.**   You still didn't think that there was a federal criminal

25   investigation that you might be part of?

1   **A.**   I knew they were interested in the investigation, yes,

2   and it was increasingly obvious that, yes, they were

3   interested in what I had to say and me, as an individual,

4   yes.

5   **Q.**   Do you remember on the second day, May 2, walking in

6   there and saying, I was a member of a criminal conspiracy?

7   **A.**   No.  That wasn't the -- that's not how it went.  But --

8   **Q.**   Let me see if I can refresh your memory.  Let me go --

9   we'll get there tomorrow morning at 9 o'clock.

10             45, 50 hours with the Government, ballpark,

11  correct?

12  **A.**   That sounds about right.

13  **Q.**   Did your attorneys tell you they received a letter from

14  me asking for 90 minutes of your time at a time and place of

15  your convenience?

16  **A.**   Yes.

17  **Q.**   You know I have no 5K motion to file for you; is that

18  correct, Mr. Boomgaardt?

19  **A.**   Yes, I'm aware of that.

20  **Q.**   We have no agreement, correct?

21  **A.**   We have no agreement.

22  **Q.**   No cooperation agreement between you and me?

23  **A.**   No.

24  **Q.**   Your answer was no, correct?  You declined to be

25  interviewed?

1    **A.**   I declined to be interviewed.  Yes, that's correct.

2    **Q.**   Let's go back to 2012, when you were trying to preserve

3    your job.  Do you recall saying the allegations against you

4    were unfounded and that you were staggered when you were

5    suspended?  Are those your words?

6    **A.**   I was staggered when I was suspended.

7    **Q.**   "I'm being punished and sacrificed because of an agenda

8    that State Street has."

9            Do you recall those words?

10   **A.**   Yup.

11   **Q.**   "In my defense document," meaning the 21 page February 1,

12   2012, document, "I was trying to be completely fair and

13   honest."

14           Do you remember repeating that?

15   **A.**   Yeah.

16   **Q.**   And that was a document where you said you never deceived

17   a crime?

18   **A.**   Yes.

19   **Q.**   That was the document that you said how important honesty

20   and integrity were to you, correct?

21   **A.**   I think I've already said yes to that, but yeah.

22   **Q.**   You said "I'm the victim here."  Is that what you said?

23   **A.**   Possibly.  I don't remember writing that exact word, but

24   if you're reading it from there, then I'll take your word for

25   it.

1    **Q.**  Thank you.  "At all times I conducted myself

2    professionally and with honesty and integrity.  I never acted

3    to deliberately mislead a client.  I've never breached a

4    standard of conduct.  I've acted honestly and in good faith

5    and there were no grounds for a finding of misconduct

6    warranting dismissal.  That's what you wrote, correct?

7    **A.**  Yup.

8    **Q.**  Do you recall attending an appeal on your objections to

9    State Street's dismissal, this being May of 2012?

10    **A.**  Yes, I do.

11    **Q.**  This is just a year after the events in question,

12    correct?

13    **A.**  Yup.

14            THE COURT:  Last question, Mr. Weinberg.

15            MR. WEINBERG:  Okay.

16            THE COURT:  Go head.

17    BY MR. WEINBERG:

18    **Q.**  Do you recall that you were asked about whether you

19    believed that the undisclosed markups were, quote, "business

20    decisions"?

21    **A.**  I don't recall that directly, but --

22    **Q.**  Do you recall telling the hearing officer -- this is

23    during the appeal -- "there were business decisions allowed

24    in contract, even though you disagreed with the business

25    decisions"?

1      **A.**   Yes, I remember saying those, yes.

2             THE COURT:  I'm going to stop you here,

3      Mr. Weinberg.

4             MR. WEINBERG:  Thank you, Your Honor.

5             THE COURT:  Ladies and gentlemen of the jury, don't

6      discuss the case among yourselves, don't discuss it with

7      anyone else, don't do any independent research.  Thank you

8      for your attention.  I'll see you bright and early tomorrow

9      morning to resume at 9:00 a.m., thank you.

10            (The jury exits the courtroom.)

11            THE COURT:  All right.  I'll see counsel at 8:30.

12     Just a reminder, under a sequestration order, there's no

13     discussion between counsel and the witness during

14     cross-examination.

15            MR. FRANK:  May we have a two minute sidebar, Your

16     Honor?

17            THE COURT:  Do we have to do it now?  Can we do it

18     in the morning?

19            MR. FRANK:  It would be fresher if we did it now.

20            THE COURT:  All right, I'll do it now.

21            Mr. Boomgaardt, you can step out, yes.

22            (The following discussion held at the bench.)

23            MR. FRANK:  Judge, I want to put on the record why

24     we objected to Mr. Weinberg's statement.  It's not because

25     his facts are not accurate.  They are accurate.  Mr. Weinberg

1    knows I have the highest distinction of him.  I would never

2    suggest --

3                THE COURT:  What's the issue?

4                MR. FRANK:  The issue is --

5                THE COURT:  You mean about the dates?

6                MR. FRANK:  The issue is that a lawyer cannot make

7    a representation in front of the jury, except by facts that

8    are accurate.  That is, vouching for the facts that is coming

9    out of the lawyer's mouth, and that is an absolute no-no.

10   And Mr. Weinberg's facts may be perfectly accurate.  I'm sure

11   they are.  But he can't testify in this case.  And much of

12   his speechifying is, in fact, testifying, which is then

13   compounded by "accept my facts."

14               THE COURT:  So a couple things.  One, don't make

15   representations that they're true.  But two, there's a

16   practical issue.  It's totally different -- like at some

17   point in time, there's day questions --

18               MR. FRANK:  Stipulate.

19               THE COURT:  And so you can say -- he can say, I

20   represent to you that this is the date.

21               And if you want to object, then say --

22               MR. JOHNSTON:  That's different.

23               THE COURT:  -- we have no objection to him

24   representing the date.  And if there's going to be a dispute

25   -- I don't know whether there's a dispute about the fact --

1    then stand up, but --

2             MR. FRANK:  We were not clear in what the basis of

3    the objection was, partly because I nudged him and he stood

4    up and that's how it happened.

5             MR. WEINBERG:  I'll use better language tomorrow.

6             MR. GOLDSTEIN:  Well, if I can defend my good

7    friend, Mr. Weinberg.  Mr. Frank shouldn't be standing up in

8    front of the jury and telling the jury that something

9    Mr. Weinberg had said was untrue.  So if we're going to have

10   common rules, let's have common rules.

11            MR. FRANK:  Let me just be clear.  Some of the

12   things Mr. Weinberg said, not intentionally, were untrue.

13            THE COURT:  This is between all of you.  All of you

14   can have that discussion later, off the record.

15            MR. WEINBERG:  That's okay.

16            THE COURT:  Fine.  Don't -- I agree with you.  You

17   shouldn't be vouching whether -- my reaction is like if we're

18   not disputing the dates, why do we need to go through five

19   minutes to clarify what the date is.

20            I get it.  He shouldn't say --

21            MR. FRANK:  That wasn't the purpose.

22            MR. WEINBERG:  That was the only purpose.

23            MR. FRANK:  That was not the purpose of his

24   objection.

25            THE COURT:  No, I understand that.

1          MR. FRANK:  But the other point that we would make,

2     Your Honor, is again, with all respect, this is not about me.

3     There should be no attempt by the defense to personalize this

4     to two prosecutors, one of whom has been on the case for

5     three months.

6          MR. JOHNSTON:  Well, six.

7          THE COURT:  So it was untrue.

8          MR. FRANK:  My status --

9          THE COURT:  Washington just said so.  It's the

10     oracle.

11          MR. FRANK:  -- as deputy chief of the economic

12     crimes unit is irrelevant.

13          MR. WEINBERG:  It's not irrelevant.

14          MR. FRANK:  It is irrelevant.

15          THE COURT:  I don't view your status as irrelevant.

16          I do think you need to be careful about how

17     personal you make it.  Explain to them it's really the

18     Government for the people, it's department decisions.  I may

19     say more about that, depending on how it goes.

20          I do think it's relevant.  There's a wholly

21     different thing to meet with -- to meet with the Attorney

22     General of the United States, than to meet with a so-called

23     lowly assistant.  The status of the person who you're meeting

24     with is in some way reflective of the significance.

25          MR. FRANK:  I appreciate you putting me in that

1    context, Your Honor.

2         MR. WEINBERG:  Steve hasn't had many

3    recommendations rejected in the office.  But I would object

4    respectfully, because I do think decisions about 5Ks --

5         THE COURT:  I do think you're entitled to ask

6    something about it.  I think that -- because it is, in some

7    way -- to some degree, it's your recommendations that do

8    matter.  You're the people who most know about it.  But it's

9    not your personal decision, it's a decision of the

10   Government.

11        MR. FRANK:  But what Mr. Weinberg said, which was

12   not quite right, was that I make the decision.  As he knows

13   there's a multilayer process.  And let me assure you that

14   particularly when the esteemed fraud section is involved,

15   there are many, many, many lawyers --

16        MR. JOHNSTON:  That is added value there.

17   Bureaucracy.

18        THE COURT:  Right.

19        MR. WEINBERG:  My view of the world and Mr. Frank

20   makes the decisions.

21        THE COURT:  Fine.  I'll see you guys tomorrow.

22        (Court in recess at 1:06 p.m.)

23

24

25

1                   CERTIFICATE OF OFFICIAL REPORTER

2

3

4            We, Rachel M. Lopez and Kelly A. Mortellite,

5     Certified Realtime Reporters, in and for the United States

6     District Court for the District of Massachusetts, do hereby

7     certify that pursuant to Section 753, Title 28, United States

8     Code, the foregoing pages are a true and correct transcript

9     of the stenographically reported proceedings held in the

10    above-entitled matter and that the transcript page format is

11    in conformance with the regulations of the Judicial

12    Conference of the United States.

13

14                        Dated this 7th day of June, 2018.

15

16

17

18                        /s/ RACHEL M. LOPEZ

19                        /s/ KELLY A. MORTELLITE

20

21

22

23    _____
                          Rachel M. Lopez, CRR
24                        Kelly A. Mortellite, RMR, CRR
                          Official Court Reporter
25