<pre>
 1                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 2

 3    - - - - - - - - - - - - - - - - - - - x

 4    UNITED STATES OF AMERICA,              :

 5         Plaintiff,                        :    Criminal Action No.
                                                  1:16-cr-10094-LTS
 6         v.                                :

 7    ROSS MCLELLAN,                         :

 8         Defendant.                        :

 9    - - - - - - - - - - - - - - - - - - - x

10


11       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                              JURY TRIAL
13                             Day 5

14


15                      Friday, June 8, 2018
                             8:35 a.m.
16


17


18


19


20    John J. Moakley United States Courthouse
      Courtroom No. 13
21    One Courthouse Way
      Boston, Massachusetts
22


23    Rachel M. Lopez, CRR
      Debra M. Joyce, RMR, CRR, FCRR
24    Official Court Reporter
      raeufp@gmail.com
25
</pre>

```
 1                    A P P E A R A N C E S

 2    On behalf of the Plaintiff:

 3        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
          BY:  STEPHEN E. FRANK
 4        John Joseph Moakley Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts  02210
          (617) 748-3244
 6        stephen.frank@usdoj.gov

 7
          UNITED STATES DEPARTMENT OF JUSTICE
 8        BY:  WILLIAM JOHNSTON
          1400 New York Avenue, Northwest
 9        Washington, D.C.  20005
          (202) 514-0687
10        william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13        MARTIN G. WEINBERG, P.C.
          BY:  MARTIN G. WEINBERG
14        20 Park Plaza
          Suite 1000
15        Boston, Massachusetts  02116
          (617) 227-3700
16        owlmcb@att.net

17
          LAW OFFICES OF ROBERT M. GOLDSTEIN
18        BY:  ROBERT M. GOLDSTEIN
          20 Park Plaza
19        Suite 1000
          Boston, Massachusetts  02116
20        (617) 742-9015
          rmg@goldstein-lawfirm.com
21

22        LAW OFFICES OF MAKSIM NEMTSEV
          BY:  MAKSIM NEMTSEV
23        20 Park Plaza
          Suite 1000
24        Boston, Massachusetts  02116
          (347) 251-4800
25        mentsev@gmail.com
```

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                    <u>Page</u>

RICHARD BOOMGARDT

      By Mr. Weinberg                                     15

      By Mr. Johnston                                     70

      By Mr. Weinberg                                     76

EDWARD PENNINGS

      By Mr. Frank                                        82

**EXHIBITS**

                                                       <u>Admitted</u>

Number 2                                                    44

Number 5                                                    97

Number 5-1                                                  97

Number 6                                                   100

Number 7                                                   107

Number 8                                                   114

Number 9                                                   121

Number 11                                                  123

Number 12                                                  126

**EXHIBITS, Cont.**

|  |  | <u>Admitted</u> |
|---|---|---|
| Number 13 | | 129 |
| Number 14 | | 135 |
| Number 16 | | 140 |
| Number 19 | | 151 |
| Number 20 | | 152 |
| Number 22 | | 154 |
| Number 27 | | 165 |
| Number 33 | | 24 |
| Number 33-1 | | 26 |
| Number 34 | | 167 |
| Number 38 | | 170 |
| Number 41 | | 172 |
| Number 42 | | 174 |
| Number 46 | | 157 |
| Number 48 | | 178 |
| Number 49 | | 183 |
| Number 50 | | 184 |
| Number 52 | | 188 |
| Number 521 | | 33 |

**P R O C E E D I N G S**

1
2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4  for the District of Massachusetts is now in session, the

5  Honorable Leo T. Sorokin presiding.

6          Today is June 8th, the case of United States vs.

7  Ross McLellan, criminal action 16-10094 will now appear

8  before this court.

9          THE COURT:  I see all counsel and Mr. McLellan.

10          Any issues to talk about?

11          MR. WEINBERG:  Just one.  I don't know if it's an

12  issue.  It may be a nonissue, but I intend to offer, through

13  cross-examination, several exhibits from the Government

14  exhibit list that Mr. Johnston did not offer.

15          THE COURT:  Okay.

16          MR. WEINBERG:  I don't believe there would be an

17  objection to it, but I just felt you should vet it this

18  morning.

19          MR. FRANK:  Maybe we could take a look at which

20  exhibits and then we can decide whether we're going to

21  object.

22          THE COURT:  Sure.

23          MR. WEINBERG:  Sure.

24          THE COURT:  All right.  And then show him and --

25          MR. WEINBERG:  2 and 33 are the ones that come to

```
 1    mind.  The Royal Mail contract, number 2, and 33 is the
 2    high/lows that were sent to London by the US traders.
 3              MR. FRANK:  No objection.
 4              THE COURT:  To those two.  Okay.  All right.  That
 5    solves that.  So you'll be with him on cross, do you have any
 6    idea how long?
 7              MR. WEINBERG:  I guess 30 to 40 minutes, Your
 8    Honor.
 9              THE COURT:  Okay.  And so then who would be next?
10    Pennings?
11              MR. FRANK:  Pennings.
12              THE COURT:  Pennings.  Okay.  And you'll -- he'll
13    take the rest of the day?
14              MR. FRANK:  Yes, Your Honor.  I will move as
15    quickly as I can.
16              THE COURT:  I'm sure you will.
17              MR. WEINBERG:  Judge, the only other potential
18    issue.  We're in receipt of Your Honor's order regarding the
19    State Street privilege log, of course respect the decision,
20    but we would reserve our right to seek an in-camera review of
21    just three of the e-mails that were on the privilege log.
22    We're talking to Mr. Butts at State Street to see if he would
23    identify what general legal issue Mr. McLellan was addressing
24    during the number 3 period.
25              THE COURT:  Sure.  I don't -- that's fine.  Talk to
```

1    them, and if you reach an agreement or if you don't, you want

2    to file a motion seeking that, that's fine.  Not a problem.

3              MR. FRANK:  We haven't been presented with any

4    tapes for cross, so I'm assuming there are no tapes that are

5    being used on cross.

6              MR. WEINBERG:  None intended as of 8:35 a.m.

7              THE COURT:  How about 8:37?

8              MR. WEINBERG:  Things change on the sight.  It's an

9    existential experience.

10             THE COURT:  Okay.  All right.

11             And Pennings -- will Pennings likely be all day

12   Monday between the rest of direct and cross?

13             MR. FRANK:  I expect.  His direct is -- just to

14   give the Court an idea, it was four and a half hours-ish.

15   I'm trying to make it shorter than that, but it's going to be

16   in that ballpark.

17             THE COURT:  I imagine it's sort of similar in scope

18   of -- somewhat.

19             MR. FRANK:  It is similar in scope.  We're not

20   using as many recordings, but there's a lot of documents.

21             THE COURT:  Right.  Okay.  Fine.  All right.  Then

22   I'll see you at like two minutes to 9:00 and hopefully we'll

23   have all the jurors then.

24             MR. FRANK:  Thank you.

25             THE DEPUTY CLERK:  This matter is in recess.

1                    (Court in recess at 8:38 a.m.

2                    and reconvened at 8:52 a.m.)

3          THE COURT:  You waive Mr. McLellan's presence for

4    this, Mr. Weinberg?

5          MR. WEINBERG:  Yes, Your Honor.  There's one

6    additional issue.

7          Late yesterday -- again, trying to work with State

8    Street and avoid litigation, we received an unredacted copy

9    of an audio between Mr. Boomgaardt and Mr. Pennings that had

10   previously been redacted.  It was part of our subpoena on the

11   privilege log and they agreed it was relevant and waived --

12   provided it to us.

13         Within the redaction is the following --

14         THE COURT:  Do you have a copy that I could look

15   at?

16         MR. WEINBERG:  We do, Your Honor.

17         THE COURT:  So this is one of the -- a

18   tape-recorded conversation recorded by State Street, just the

19   way these other things were recorded?

20         MR. FRANK:  Yes, Your Honor.

21         THE COURT:  And is this -- is it August 31st?

22         MR. FRANK:  Yes.

23         MR. WEINBERG:  Yes, Your Honor.

24         THE COURT:  2011.  So this is right around the

25   events that we've been talking about.

1          MR. FRANK:  Yes.

2          THE COURT:  Okay.

3          MR. WEINBERG:  And on page 7 -- perhaps we can mark

4    it for identification -- page 8, I'm sorry.

5          THE COURT:  Should we call it letter A for

6    identification, because you're using numbers for exhibits,

7    right?  A for identification.

8          MR. WEINBERG:  On page 8 and this is the part that

9    was redacted and now unredacted, towards the bottom.

10   Mr. Pennings says to Mr. Boomgaardt, where they discuss

11   whether they have to repay the money and discussing what I

12   would contend to be whether the contract supports the

13   retaining of the money.  Pennings says, "We are in our rights

14   to do it.  Even compliance says we are and legal says we

15   are."

16         Mr. Boomgaardt says, "It's a communication issue."

17   They go on.

18         THE COURT:  Hold on.  Let me just read this

19   section.

20         Okay.  So I take it you want it and Mr. Frank

21   objects, so why do you want it and then I'll ask Mr. Frank

22   why he objects.

23         MR. WEINBERG:  Right.  I think there are.

24         THE COURT:  What portion do you want?  You just

25   want the -- Pennings saying we are in our rights to do it,

1  even --

2          MR. WEINBERG:  If I go there, it's the context that

3  the decision was being made, that Mr. Boomgaardt was aware

4  of, that he and Mr. Pennings were talking about, whether to

5  give back European, whether or not that would intensify the

6  Royal Mail response, and whether that would get them in

7  trouble.  And here's Mr. Pennings saying to Mr. Boomgaardt,

8  compliance says we're okay, legal says we're okay, and it's

9  part of the dialogue.

10          Now, I would -- if I offered it, it would be

11  offered, and this is the -- the issue that Your Honor found

12  engaging in the pretrial litigation.  It doesn't go to --

13          THE COURT:  There are many engaging issues in this

14  case.

15          MR. WEINBERG:  It doesn't go to Mr. McLellan's

16  state of mind, because he's not a participant in this

17  conversation, even though Mr. Pennings may say that Mr.

18  McLellan was the source of that information, because Ross is

19  in Boston and Pennings is in London.

20          THE COURT:  Right.

21          MR. WEINBERG:  But it goes to Mr. Pennings's state

22  of mind, which we will contend was consistently to say the

23  contracts support what we were doing, and during this

24  concealment phase, legal and the compliance were, at minimum,

25  debating whether the contracts supported our position.

1          THE COURT:  So why wouldn't it come in on Pennings,

2    rather than Mr. Boomgaardt?

3          MR. WEINBERG:  It could come in under Pennings.

4          THE COURT:  What's its relevance to Boomgaardt?

5          MR. WEINBERG:  Only that Mr. Boomgaardt is involved

6    in these discussions about what to give to Royal Mail, what

7    to give to --

8          THE COURT:  But does it impeach anything about --

9          MR. WEINBERG:  No.

10         THE COURT:  So it doesn't impeach anything

11   about him and it doesn't say anything about -- it's not --

12   you're offering, if I understand you correctly -- the reason

13   you would be offering it is to impeach Mr. Pennings' state of

14   mind.  I assume Mr. Pennings is on the witness stand, going

15   to assert now, that then, at the relevant time, prior to and

16   including this date, he thought it was a crime or a fraud.

17   I'm assuming that.

18         MR. WEINBERG:  I would expect, given

19   Mr. Boomgaardt's current position, that it would not be

20   unexpected to hear Mr. Pennings say the same thing.

21         THE COURT:  Right, and so that you would want to

22   use it as to Pennings to impeach that.

23         MR. WEINBERG:  It's not as much to impeach, as to

24   provide the circumstantial evidence as to what they were

25   receiving, what they knew.  The bigger picture, Judge, is

1    we're charged with a crime.  When State Street spent a month,

2    knowing everything, looking at this, not giving Royal Mail

3    its $2 million European rebate, deciding whether the contract

4    supported that, it's a very close call, and that's

5    inconsistent with the clarity of criminal fraud that the

6    Department of Justice and the US Attorney's Office are --

7              THE COURT:  Well, is that -- the significance of

8    that is that, at that time, that this is a reflection,

9    either, (a), of Pennings' state of mind that it wasn't

10   criminal, or was it a reflection that State Street -- State

11   Street's judgment about this isn't really --

12             MR. WEINBERG:  To be candid, it's in the middle.

13   Mr. McLellan is saying, look, if the -- if the people that --

14   you know, we contend Mr. McLellan escalated this on

15   August 26th.  It was not on his --

16             THE COURT:  Mr. Boomgaardt.

17             MR. WEINBERG:  Mr. McLellan.  That it was not

18   really on his radar.  He's got a million other things to do,

19   August 26th, realizes it's a problem, calls for the contract,

20   calls for the RFP, gives it to Hansen, gives it to legal, and

21   says look, I think the contract supports it.  What do you

22   want me to do.  If you want to give the money back, I'll take

23   it on.  I'll go see the client, I'll give it back.  If you

24   feel the contract supports it, as I do, then we don't have to

25   and we'll tell Royal Mail that the contract supports it.

1    That's the subtext.

2              This is supportive of that -- that state of mind by

3    Mr. McLellan, which is this is really Pennings saying that

4    McLellan said that legal said and compliance said this is

5    okay.  And I do understand that it goes more directly to

6    Mr. Pennings than it goes to Mr. Boomgaardt, but it is a

7    conversation between the two of them one day after a

8    conversation that the Government pled yesterday.

9              MR. FRANK:  Your Honor, may I respond to some of

10   those arguments?

11             THE COURT:  Yes.

12             MR. FRANK:  First of all --

13             THE COURT:  I guess the short answer is.  It seems

14   to me not really a Boomgaardt issue, that if it comes in, it

15   comes in for Pennings.

16             MR. WEINBERG:  I don't disagree that it's far more

17   relevant to Pennings.

18             THE COURT:  So then I'll say, without prejudicing

19   your right to address this issue before I do anything about

20   it, it's not coming up in the cross of Mr. Boomgaardt.

21   You're not going to get to cross for Pennings.

22             MR. FRANK:  That's fine.  If that's -- he was

23   suggesting that it was going to come up today.

24             MR. WEINBERG:  I was tempted but I've been

25   discouraged, Your Honor.

```
 1              MR. FRANK:  We think it doesn't come in for a
 2    number of reasons and should it come in --
 3              THE COURT:  I want to get the jury.  And I'll give
 4    you your chance.
 5              But go ahead, Maria.  See if they're all here and
 6    then bring them in.
 7              And if you could get Mr. Boomgaardt.
 8              THE DEPUTY CLERK:  They are here.
 9              THE COURT:  Go get them.
10              Mr. Frank, we can discuss this Monday at 8:30,
11    because you won't be done with your direct.
12              MR. FRANK:  That's correct.
13              THE COURT:  And to the extent it matters to your
14    direct, you'll have a chance to address it then.
15              MR. FRANK:  Well -- okay.
16              THE COURT:  Or if you want to, maybe at the break,
17    but I can't do it at 1:00.
18              MR. FRANK:  That's fine.  Thank you.
19              (The jury enters the courtroom.)
20              THE COURT:  Ladies and gentlemen, good morning.
21              Nobody discussed the case or did any independent
22    research?  Great.
23              All right.  We resume.  Mr. Boomgaardt remains on
24    the stand for cross-examination.
25              I remind you, you remain under oath.
```

1          Mr. Weinberg, go ahead.

2          MR. WEINBERG:  Thank you very much, Your Honor.

3     Good morning.

4                     **RICHARD BOOMGARDT**

5      having been previously duly sworn, testified as follows:

6          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT, Cont.**

7     BY MR. WEINBERG:

8     **Q.**  Mr. Boomgaardt, I want to focus you back to 2010 and

9     2011.  You were working in the London offices of State

10    Street, correct?

11    **A.**  Yes, that's right.

12    **Q.**  In the London office was a transition management team,

13    was there not, that you were in charge of?

14    **A.**  That's correct, yup.

15    **Q.**  There was a transition management sales team that

16    Mr. Pennings was in charge of?

17    **A.**  Also correct.

18    **Q.**  There was a legal team that was in London and responsible

19    for reviewing any new contracts or any amendments to old

20    contracts?

21    **A.**  Yes, that's right.

22    **Q.**  There was a compliance team that also had its UK and

23    European Mideast responsibilities, correct?

24    **A.**  Yes, that's correct.

25    **Q.**  There was a trading team that would trade European

1   assets, securities, bonds, stocks?

2   **A.**   Yes, that's right.

3   **Q.**   And in Boston, separately and distinctly, there was a US

4   compliance department, was there not?

5   **A.**   Yes.   Yup.

6   **Q.**   US legal department, correct?

7   **A.**   Uh-huh.

8   **Q.**   US traders?

9   **A.**   Yes.

10   **Q.**   US transition management team that essentially did what

11   you did for the United States transitions?

12   **A.**   Yes.

13   **Q.**   And there were roughly seven, eight, nine times as many

14   US transitions a year as there were in Europe and the Middle

15   East; is that right?

16   **A.**   Yes, that's about right.

17   **Q.**   And there was also the US sales team, correct?

18   **A.**   That's also correct, yes.

19   **Q.**   Which was to do what Mr. Pennings did, which was to go

20   out and try get new clients and maintain new clients?

21   **A.**   That's correct.   Yup.

22   **Q.**   Similarly, there was a State Street team in Asia, was

23   there not?

24   **A.**   Yes.

25   **Q.**   Headquartered in Tokyo?

1    **A.**   Well, mainly Sydney at that point.

2    **Q.**   Sydney.  And there was somebody in charge of the Sydney

3    office; is that correct?

4    **A.**   Uh-huh.

5    **Q.**   As Mr. Pennings was in charge of the PSG in London,

6    correct?

7    **A.**   Yeah.

8    **Q.**   And people in Asia were going out and trying to get new

9    clients, maintain old clients, do transitions, and do trades

10   as you were in Europe, and as others were in America,

11   correct?

12   **A.**   Yes, that's broadly right.  Yup.

13   **Q.**   And when State Street was doing these transitions in

14   Europe, they were pursuant to contracts that were signed in

15   Europe or in Great Britain, correct?

16   **A.**   Yes.

17   **Q.**   Regulated by the security regulator in London, it was

18   called the FCA at the time?

19   **A.**   FSA at that point, but it changed names.  Same thing.  It

20   re-branded to the FCA.

21   **Q.**   But there was a separate regulator from the SEC in

22   America?

23   **A.**   Yes, that's right.

24   **Q.**   And a separate law made into Great Britain law that

25   governed the contracts signed in London, that was separate

1  from the contracts that were signed in Boston?

2  **A.**  Yes, that's right.  Our contracts were under English law

3  normally, yeah.

4  **Q.**  And certain people in the London office were authorized

5  by the FSA/FCA to sign those contracts, correct?

6  **A.**  Yes.  I don't know if that was regulated by the FCA

7  specifically, but yes, there were authorized signatories.

8  And whether that was internal or external, I'm not sure of

9  the authorization process.

10  **Q.**  State Street may have had their own internal guidelines,

11  but they required people that were working for the State

12  Street Bank in Europe to sign European contracts, correct?

13  **A.**  I believe that's correct, yeah.

14  **Q.**  And Mr. McLellan was not working for the State Street

15  bank in Europe, correct?

16  **A.**  No, I don't believe he was.  I think he was employed in

17  Boston.

18  **Q.**  And he didn't sign the contracts that were the subject of

19  this case; is that correct?

20  **A.**  Yes, I don't believe he signed any of those contracts,

21  no.

22  **Q.**  Mr. Pennings and Mr. Smit signed those contracts or

23  others who were approved and were working for the bank in

24  Europe?

25  **A.**  Yes, or had been previously.  Some of them were fairly

1    old contracts, but yeah.

2    **Q.**   And I think you said yesterday that there was about 1,000

3    transitions a year; is that correct?

4    **A.**   On a global basis, that's about right, I think.

5    **Q.**   Some out of Sydney and Asia, some out of London and

6    Europe, some in the Mideast that were essentially supervised

7    out of London, but most of them in the United States,

8    correct?

9    **A.**   Yes.

10   **Q.**   And each different division had their own head of PSG; is

11   that correct?

12   **A.**   Well, meaning that we had three regions, yes.

13   **Q.**   Three regions --

14          THE COURT:  What's PSG?

15          MR. WEINBERG:  PSG, the Portfolio Solutions Group.

16   **Q.**   Is that correct?

17   **A.**   That's right, broadly speaking.  Yeah, that's how the

18   management chain went.  Yes.

19   **Q.**   Which had a number of different divisions, transition

20   manager being one of them.

21   **A.**   Yeah.

22   **Q.**   Mr. Pennings was the head of PSG, as you were the head of

23   Transition Management in London during the 2010/2011

24   period, -- correct?

25   **A.**   That's correct, yup.

1   **Q.**  Asia had their own hierarchy, correct?

2   **A.**  They did, yeah.  I mean, it was a smaller office, but

3   yeah.  Similar hierarchy.

4   **Q.**  And America had a bigger office and they, too, had their

5   hierarchy, right?

6   **A.**  That's right.

7   **Q.**  Mr. Pennings was on top of these three different -- Mr.

8   McLellan was on top of these three different divisions in

9   terms of having global supervision, correct?

10  **A.**  Yes, that's correct.

11  **Q.**  Of the thousand transitions a year.

12  **A.**  That was how many we were doing, yes.

13  **Q.**  And am I correct that it was not your routine and

14  practice, regular practice, when you were drafting RFPs or

15  responses to these potential transition bids by potential

16  clients to send them to Mr. McLellan to review and address,

17  correct?

18  **A.**  Yes.  No, that's true.  That was not our normal course of

19  business, no.

20  **Q.**  Not your normal course of business when you wanted to

21  tell a client in the pretrade estimate what you thought the

22  overall costs were.  That was something that you were

23  involved in, as the head of transition management, correct?

24  **A.**  That's right.  The cost estimates and trading strategy

25  and things, yes.  That was done by my desk.

1  **Q.**  It had not been your routine and practice to send those

2  pretrade estimates to Mr. McLellan to review, edit, draft,

3  correct?

4  **A.**  Correct.  We might ask the traders in the US for some

5  input if there were some North American bonds and things that

6  were in those portfolios or equities, but not routinely to

7  Mr. McLellan, no.

8  **Q.**  Contracts were either negotiated, if they were new

9  clients, or amended and upgraded if they were old clients,

10  correct?

11  **A.**  Yeah.  Broadly speaking, yeah.

12  **Q.**  Not your routine and practice to send a new contract to

13  Mr. McLellan for his review, unless there was something

14  unusual about a legal issue, correct?

15  **A.**  I guess so, but again, legal and contracts were done by

16  Ed's team rather than mine.  So I didn't have a normal

17  routine, it was really done by them.  But generally speaking,

18  I think your point is correct, it didn't go to Ross.

19  **Q.**  In other words, he wasn't getting a thousand contracts a

20  year to go review, draft, edit, et cetera?

21  **A.**  I wouldn't have thought so, no.

22  **Q.**  And likewise, he wasn't getting a thousand post trades a

23  year to review and edit, at least as far as you know?

24        MR. JOHNSTON:  Objection.  The witness has already

25  said he doesn't know what Mr. McLellan would or would not

1  have received.

2          THE COURT:  Not as -- overruled.

3          THE WITNESS:  Certainly for the European bid of

4  that, which was 100 or so, so the vast majorities you said

5  were European -- were US clients, so in the several hundreds.

6  So I don't know what he would have got from them, but

7  certainly from us, your point is correct.

8  BY MR. WEINBERG:

9  Q.  And you have no reason to believe that things were

10 different in different locations, do you?

11 A.  No.  No, I don't.

12 Q.  You knew Mr. McLellan came up through the ranks at State

13 Street, if I could use that word, from a US perspective,

14 correct?

15 A.  That's my understanding, yes.

16 Q.  And before he was global head, he was US head, correct?

17 A.  I believe that's correct, as well.

18 Q.  And you don't have any knowledge that he, in your years

19 in Goldman or Credit Swiss or State Street, Mr. McLellan was

20 never employed by a European bank, correct?

21 A.  Not to my knowledge.

22 Q.  Never stationed, to your knowledge, in London, correct?

23 A.  Again, not to my knowledge.

24 Q.  And to your knowledge, he was never trained in British

25 law, FCA regulations, or the unique practices of London?

1          MR. JOHNSTON:  Objection.  Foundation.  The witness

2     started at State Street --

3          THE COURT:  Overruled.

4          MR. JOHNSTON:  -- in 2008.

5          THE COURT:  I understand.  Overruled.

6          THE WITNESS:  I have no idea.

7     BY MR. WEINBERG:

8     Q.  You have no knowledge that during the years you were at

9     State Street, Mr. McLellan was ever formally trained by State

10    Street in British law and British regulations?

11    A.  I have no knowledge either way on that question, I'm

12    afraid.

13    Q.  Okay.  I want to, if I can, Mr. Boomgaardt, go back

14    briefly to the KIA, 115.  And that is an occasion where you

15    told us that Mr. McLellan was with you by happenstance in

16    London on June 15th, correct?

17    A.  He was in London.  That's correct.

18    Q.  And you testified he was there, to your knowledge, by

19    happenstance.  That's your words, correct?

20    A.  I don't know if I said "happenstance."  I don't know the

21    reason why he was in there, but I believe he was already

22    coming over, yes.

23    Q.  Do you remember that there was a phone call and Mr.

24    McLellan was out interviewing people.  Do you remember that?

25    A.  I do.

1   **Q.**  And you and Mr. McLellan asked the US traders for the

2   street prices, correct?  In other words, the prices that

3   certain bonds were purchased by State Street for the KIA,

4   correct?

5   **A.**  Yes, that's right.

6   **Q.**  And you also asked the US traders, did you not, to send

7   you the high/lows of the day?

8   **A.**  Yes, that's correct.

9          MR. WEINBERG:  Could we have Government Exhibit 33,

10  or Exhibit 33.

11  BY MR. WEINBERG:

12  **Q.**  And I ask you whether or not --

13         MR. JOHNSTON:  The exhibit is not in evidence yet.

14         MR. WEINBERG:  I would move for its admission.

15         MR. JOHNSTON:  No, we don't object.

16         THE COURT:  All right.  It can be published for the

17  jury.

18         So number 33 is in evidence.

19         (Exhibit No. 33 admitted into evidence.)

20  BY MR. WEINBERG:

21  **Q.**  Is this document, this e-mail, is it blurry for you?

22  **A.**  It is a little bit.  That's better, yeah.

23  **Q.**  Does that refresh your memory that on June 15th, you were

24  being sent, at your request, the intraday high and lows for

25  the different bonds that were being purchased for the KIA?

1    **A.**   Yes.

2    **Q.**   And on this e-mail, it was being sent by a man named

3    Stephen Finocchi, did you know who he was?

4    **A.**   Yes.  He was a trader in Boston.

5    **Q.**   Did you know who Mr. Spyropoulos was?

6    **A.**   He's also a trader in Boston.

7    **Q.**   Mr. Choudhary?

8    **A.**   Choudhary?  Yes.  He worked for me.

9    **Q.**   He worked for you.  That is you, Ross.  Mr. Clemmenson?

10   **A.**   Also a trader in Boston.

11   **Q.**   And Mr. Bryant?

12   **A.**   A trader in Boston.  Also, our global head of trading.

13   **Q.**   These were people who were on this e-mail, sending to

14   London certain trade information, correct?

15   **A.**   Yeah.

16   **Q.**   And certainly no concealment from those US and Great

17   Britain traders, that there was discussions about what client

18   price to put on the bonds, correct?

19   **A.**   Well, I mean, from that e-mail, I guess it's sending back

20   the highs and lows, but those people are copied on the

21   e-mail, yeah.

22           MR. WEINBERG:  Let's go to Exhibit 33-1.  This has

23   not yet been admitted, but I would move for its admission.

24           MR. JOHNSTON:  No objection.

25           THE COURT:  Admitted, 33-1.  You may publish.

1          (Exhibit No. 33-1 admitted into evidence.)

2    **Q.**  This is the attachment to the June 15th e-mail, is it

3    not?

4    **A.**  It looks like it.  Yup.

5    **Q.**  And the attachment is the response to the request from

6    London, made to the US traders, to look at their data, and to

7    inform you in London and Mr. McLellan in London what the

8    intraday high-end price is -- high and low price is for

9    certain specific bonds?

10   **A.**  Yes, I believe that's the Tradeweb data that we had asked

11   for, yes.

12   **Q.**  And those are the specific bonds, you see 50 million, 60

13   million, 80 million.  Those were the bonds that were

14   purchased by State Street at the instruction of KIA for the

15   KIA new portfolio, the buy portfolio, the portfolio that KIA

16   wanted to transfer its billions into; is that correct?

17   **A.**  That's correct.

18   **Q.**  And there was going to be a markup on those bonds, was

19   there not?

20   **A.**  Yes, sir.

21   **Q.**  And the markup occurred after your receipt of the high

22   and lows, correct?

23   **A.**  Yes.  The idea was for us to come back to tell them what

24   that markup should be.

25   **Q.**  I am going to hand to you, if I may, with the Court's

1       permission, a copy of this, so that Mr. Boomgaardt can have

2       it when he looks at the next exhibit.

3                    THE COURT:  Just show it to counsel.

4                    MR. WEINBERG:  Could we see Exhibit 35, which has

5       been admitted into evidence.

6                    THE COURT:  35 is in evidence?

7                    MR. WEINBERG:  Yes, Your Honor.

8                    And in particular, 35-1, if I can.  Thank you.

9       BY MR. WEINBERG:

10      **Q.**  Mr. Boomgaardt, you reviewed this yesterday, and it

11      includes the client side prices, does it not?

12      **A.**  Yes, it does.  Those are the ones in bold, yeah.

13      **Q.**  And they're the prices that the KIA was charged for these

14      14 bonds that were purchased for the them on the 15th day in

15      June in America, correct?

16      **A.**  That's right.  Those are the -- the prices that we booked

17      out to the client.

18      **Q.**  These prices, the client side prices, at least ten of

19      them are higher than the high of the day that was sent to you

20      and shown to you in Exhibit 33-1 that is in front of you.

21      And you can compare them now, if you'd like, starting with

22      the first one.  What's the high of the day on Exhibit 33-1?

23      **A.**  It is -- sorry, which one is that?

24      **Q.**  It's the one I handed you.

25      **A.**  The one you handed me.  Fine.  It is 100.578125.

1    **Q.**  So the high is 100.57 and KIA is being --

2           THE COURT:  Which line item are we looking at?

3           MR. WEINBERG:  The first line item on 35, Your

4    Honor, 35-1 compared to the first line item of 33.  I don't

5    have the computer skills to put them next to each other.

6    I've handed Mr. Boomgaardt the hard copy.

7    BY MR. WEINBERG:

8    **Q.**  Can we agree that the client price, the price that is

9    being charged to KIA is higher than the intraday high that

10   was sent to you by the US desk?

11   **A.**  Yes.

12   **Q.**  Go to the next bond, client side, 100.66.  What's the

13   high of the day?

14   **A.**  100.66 -- well, 666.  5625.

15   **Q.**  High of the day is lower than the client's end?

16   **A.**  It is, yes.

17   **Q.**  And if we go through and I think you've probably done the

18   exercise, most of the bonds priced by Mr. McLellan in London

19   on June 15th, that was sent to the KIA, were at a price a

20   little higher than the high of the market day?

21   **A.**  Well, higher than the Tradeweb price, yes.  I think we

22   went through this yesterday about Bloomberg and Tradeweb, but

23   yes, they're higher than the Tradeweb prices that we got from

24   the traders in Boston.

25   **Q.**  And you've been asked by the Government to go back to

1    Bloomberg?

2    **A.**   No.

3    **Q.**   You don't know that the prices in Bloomberg are any

4    different?

5    **A.**   I don't.  I don't know that they're not any different,

6    either.

7    **Q.**   But these were the highs requested by you and Mr.

8    McLellan, from the US traders, sent to you in London.  Mr.

9    McLellan had them in front of him and he deliberately put

10   higher prices on the client side, correct?

11   **A.**   They're higher than the Tradeweb prices, yes.  We also

12   had -- the reason we requested the Tradeweb data was because

13   we didn't have access to it.  We only had access to

14   Bloomberg.  So again, it's the same point from yesterday, but

15   I take the point.  They're higher than the Tradeweb prices we

16   got from Boston, yes.  I agree with you.

17   **Q.**   So therefore, the KIA, with their billions of dollars and

18   access to analysts and access to bond professionals, if they

19   were to look at the Tradeweb data, they would see that the

20   prices they were being charged were higher than the high of

21   the day, correct?

22   **A.**   If they had access to Tradeweb, that's exactly what they

23   would see, yes.

24   **Q.**   And you don't know if the Bloomberg prices were not the

25   same or even lower than the Tradeweb data, you just don't

1    know?

2    **A.**   Correct.

3    **Q.**   Okay.  And if a client was to see, then, that a price

4    that they were being charged was higher than the high of the

5    day, that would be consistent with the client knowing a

6    markup had been added to their price, correct?

7              MR. JOHNSTON:  Objection.  Calling for speculation

8    of what the client would know.

9              THE COURT:  Overruled.

10             THE WITNESS:  They would know that it was a higher

11   price.  They would -- they may be entitled to ask that

12   question.  They certainly wouldn't necessarily know that it

13   was -- a markup had been applied.  Again, I don't know what

14   the -- the actual prices that go into Tradeweb, whether

15   they're actual reported prices or not, but it would be a

16   question for them to ask.

17   BY MR. WEINBERG:

18   **Q.**   It would invite questions from the KIA --

19   **A.**   It certainly could.

20   **Q.**   -- if they cared about the price they were charged,

21   correct?

22   **A.**   It could.

23   **Q.**   They didn't ask any questions, did they?

24   **A.**   Not to me and not to my knowledge.

25   **Q.**   They never asked you -- not ever.  We're dealing with

1    June 15.  They didn't come back and say to you at any time,

2    or to your knowledge, ask Mr. Pennings at any time, how much

3    money did State Street make in transition 115, did they?

4    **A.**  Not that I'm aware of.  Certainly not to me.

5    **Q.**  Mr. Das, no other person in KIA, in June, July, August,

6    September, October of 2010, ever asked you or to your

7    knowledge, Mr. Pennings, tell me what the markup was, tell me

8    what the spread was, tell me how much money State Street made

9    from trading our billions of dollars, did they?

10   **A.**  Certainly not to me and I'm not aware of any

11   conversations, no.

12   **Q.**  But you do remember that Mr. Das did send you a table

13   that he asked you to fill out; is that correct?

14   **A.**  He had a particular way that he liked to have his post

15   trades reported, yeah.

16   **Q.**  And it had the amount of assets that was sold, the amount

17   of assets left to sell, and the overall cost, correct?

18   **A.**  I believe that's correct.  I mean, I haven't seen that in

19   an awful long time.

20   **Q.**  Let me see if I can refresh your recollection.

21            MR. WEINBERG:  Just the witness.

22            THE COURT:  Just the witness?

23            MR. WEINBERG:  Well, and --

24            THE COURT:  And the Court.

25   BY MR. WEINBERG:

1    **Q.**  Does this refresh your recollection that on June 21, or

2    six days after the trade, Das, or the person that you knew as

3    Das, sent Mr. Pennings a table?

4    **A.**  Yes, and I'm not copied on that e-mail, but that is

5    consistent with the kind of reporting that Das had asked for

6    previously.  So that seems -- that seems plausible to me,

7    yeah.

8         MR. WEINBERG:  I would move for its admission, Your

9    Honor.

10        MR. JOHNSTON:  Objection.  The witness says he

11   wasn't copied on it.  How can he --

12        MR. WEINBERG:  Well, show him the next one, Your

13   Honor.

14        THE COURT:  Why don't you show him the next one?

15        MR. WEINBERG:  That was the response to this.

16   BY MR. WEINBERG:

17   **Q.**  And that was an e-mail from Mr. Das to Mr. Pennings and

18   let me show you another e-mail that is a response from you to

19   Das with a copy to Pennings on the same day, June 21.  Does

20   that refresh your recollection as to a table that you filled

21   in to send to the KIA six days after the trade?

22   **A.**  Yes.  Yes, it does.

23        MR. WEINBERG:  I move for that admission.

24        MR. JOHNSTON:  No objection, Your Honor.

25        THE COURT:  This one -- does this have a number?

1         MR. WEINBERG:  521.

2         THE COURT:  521 is in evidence.  And you might want

3  to publish it.  Put it on the screen.

4         (Exhibit No. 521 admitted into evidence.)

5         THE COURT:  521 in evidence.

6  BY MR. WEINBERG:

7  **Q.**  And this is a table sent by you to Mr. Das in response to

8  his request for information that he wanted to know about KIA

9  115, correct?

10  **A.**  Yes, that was his specific request, yes.

11  **Q.**  He wanted to know how much was traded on a certain day;

12  is that correct?  Column 1?

13  **A.**  Yes.

14  **Q.**  And it's roughly $4 billion between June 15 and June 16,

15  correct?

16  **A.**  That's about right.  Yes.

17  **Q.**  Which is consistent with the $2 billion you were selling

18  and the $2 billion you were buying.

19  **A.**  That's right and it looks like there was sort of $30

20  million of a -- a residual still to trade.

21  **Q.**  Balance to trade he was interested in and there was

22  still, as you say, 30 billion --  $30 million of the $4

23  billion to trade, correct?

24  **A.**  That's correct.

25  **Q.**  And he was also interested in something called the

1  implementation shortfall, was he not?

2  **A.**  Yes.  Yup.  That's the last column there.  So that's the

3  overall cost as I explained, I think.

4  **Q.**  Exactly.  That's the cost of going from the $2 billion in

5  one set of assets to the 2 in another, correct?

6  **A.**  That's right.  It's the all in cost, the overall cost.

7  **Q.**  Includes market impact?

8  **A.**  Yes, it does.

9  **Q.**  Includes opportunity costs?

10  **A.**  Yup.

11  **Q.**  Includes bid-ask spread?

12  **A.**  Yes, it does.

13  **Q.**  Includes taxes?

14  **A.**  Yes.  There won't be any in bonds, but yes, it would, in

15  theory.  Yes.  It includes everything.  You're right.

16  **Q.**  And it includes the piece that State Street has taken out

17  for its use of its expertise and its trading of the

18  $2 billion twice, correct?

19          MR. JOHNSTON:  Objection.

20          THE COURT:  What's the objection?

21          MR. JOHNSTON:  He's stating that -- he's

22  characterizing what they're doing as expertise, when the

23  witness is testifying that they were trading.

24          THE COURT:  Overruled.

25          THE WITNESS:  It includes all the costs, including

1    the undisclosed commissions that State Street took.  Those

2    are in there, everything is in there.

3    BY MR. WEINBERG:

4    Q.  Well, you say undisclosed, it was disclosed to Das and

5    not protested by Das that there was going to be a markup of

6    the spread by State Street.  They weren't doing this for

7    free, correct?

8    A.  He -- yes, I think we went through that.  They were

9    unquantified.  Is that a better way to put it?

10   Q.  Unquantified, which made you uncomfortable, but you did

11   it, correct?

12   A.  Yeah.  We did.

13   Q.  And there is expertise involved in transition management,

14   is there not?

15   A.  Well, I like to think so, yeah.

16   Q.  I mean, you spend your day, amongst other things, using

17   your brain, using your experience, using your education and

18   training to try to get a client's assets from one set of

19   assets, which was short-term US treasuries, to another set of

20   assets, correct?

21   A.  For this transition, that's true, yeah.

22   Q.  With the least overall cost, correct?

23   A.  That was the goal of what we were trying to do, yeah.  I

24   mean, cost is one part of it.  Operationally, we need to make

25   sure that that works as well, but yes.  That's one of the

1    goals.

2    **Q.**   And on the other side, there are skills and expertise on

3    the trading map, are they not?

4    **A.**   Yes.

5    **Q.**   And since KIA wanted to give you no transition management

6    fee, no explicit fee, no explicit commissions, the monies

7    that State Street made were from the trading revenues on this

8    KIA 115, correct?

9    **A.**   They were from the commissions we put on it, yeah.

10   **Q.**   And the implementation shortfall included those spreads

11   and markups, along with all the other costs, correct?

12   **A.**   Yes, they do.

13   **Q.**   And the implementation shortfall, whether it was

14   June 15th at 7 basis points, June 16th in 2011, was below

15   what your pretrade told KIA to expect as the overall cost of

16   this transition?

17   **A.**   Yes, I believe it was below the estimate for them, yeah.

18   **Q.**   And KIA was happy with the results of this transition?

19   **A.**   I guess -- I have no evidence to say they weren't.  They

20   would have been happier, I think, if we hadn't taken quite so

21   much of a commission on it.

22   **Q.**   But you said that they didn't know about the commission.

23   **A.**   That's true.  If they had known and it was smaller, they

24   would have been even happier, because that number would have

25   been smaller.

1   **Q.**   Sure.  And they would have been thrilled if there was no
2   commission, correct?
3   **A.**   I guess so.
4   **Q.**   Every client would be happy if State Street did all of
5   their trading, $4 billion of trading, for free.  That would
6   be helpful to a client, right?
7   **A.**   I suppose it would.
8   **Q.**   A bank is not a not for profit and doesn't ordinarily
9   trade $4 billion of assets without charging the client
10  somewhere for something, correct?
11  **A.**   Yes.
12  **Q.**   Okay.  KIA was -- you don't know whether they were happy
13  or not, because Mr. Das was communicating with Mr. Pennings,
14  but the one thing you do know is KIA 115, they divided it
15  between State Street, Nomura, and if you know, Goldman.
16  **A.**   I do know it was split.  I can't remember the exact
17  details, but we weren't the only ones that were doing it,
18  yes.
19  **Q.**   In other words, another bank got some of the billions,
20  and State Street got some of the billions.  They shared KIA
21  115.
22  **A.**   Yes, that's right.  I think there were multiple managers
23  involved and split some of them for us to do and some for
24  others, yes.
25  **Q.**   And in November, there was another transition, number

1   121, correct?

2   **A.**   Yes.

3   **Q.**   This was 115.  121 was a $4-billion transition, correct?

4   **A.**   Again, I can't remember the exact details.

5   **Q.**   Pretty big?

6   **A.**   I can -- it was pretty big, as well.  Yes.

7   **Q.**   They awarded 100 percent of that transition to State

8   Street, correct?

9   **A.**   I believe that's correct.

10  **Q.**   Let me ask you a few questions about another area.

11          Oh, by the way, Nomura, that was one of your

12  competitors?

13  **A.**   It was, yeah.

14  **Q.**   Do you recall saying on a tape-recorded call that was

15  played either yesterday or the day before, "Nomura is going

16  to make a killing on this transition"?

17  **A.**   Yes, I forget which -- that was for NTMA, I believe.

18  **Q.**   NTMA, December 24?

19  **A.**   Yup.

20  **Q.**   You remember that.  Normura, like State Street, was not a

21  not for profit, correct?

22  **A.**   Yes.

23  **Q.**   They were your competitor, correct?

24  **A.**   Yes.

25  **Q.**   They made lots of money on transitions to which they

1   shared on State Street or got on their own, correct?

2   **A.**  I don't know.  I never saw their profitability.  We

3   assume so.

4   **Q.**  You had an ex-Nomura employee working for you, did you

5   not?

6   **A.**  For a while we did, yeah.

7   **Q.**  And he would tell you how much money they made on their

8   transitions?

9   **A.**  He wouldn't, no.  But again, we assumed it was a

10  profitable business and that they were doing -- they were

11  making money, or else they wouldn't be in the business.

12  **Q.**  Making a killing is what you expected them to make on the

13  NTMA portion that they got, correct?

14  **A.**  That's what I said, that is a turn of phrase, but yes.

15  That's what I said.

16  **Q.**  And they were one of your principal competitors, were

17  they not?

18  **A.**  Certainly they were a major competitor, yeah.

19  **Q.**  They won a lot of these NTMA transitions before you got a

20  piece of transition 14, correct?

21  **A.**  Yes, they were a panel member for the NTMA, as well.  So,

22  yes, our understanding was that they were winning a

23  significant number of the NTMA transitions, yeah.

24  **Q.**  Do you remember Mr. Pennings telling you that NTMA told

25  him the reason that State Street was losing to Nomura was

1    that State Street's explicit fees were too high?

2    **A.**   Yeah, that was a -- that was something that we were aware

3    of and discussing, but yes, I do remember that conversation.

4    **Q.**   And like the KIA, which was demanding charge zero or

5    lose, NTMA was saying bring down your commissions to one, one

6    and a quarter, one and a half if you want us to give you part

7    of our transitions, correct?

8    **A.**   Yeah, I don't think they told us exactly what level to

9    bring them down to, but the feedback from them was that our

10   explicit commission was higher than others on their panel of

11   quoting.  Absolutely.

12   **Q.**   They weren't as blunt as Das, but they sent you the same

13   message.  If you want a piece of our client transitions, you

14   have to change your business pricing, bring it down to

15   compete with Nomura's, if you will, correct?

16   **A.**   That was the message we took from the information they

17   gave us, yes.

18   **Q.**   And during the December period, you were charging -- you

19   were offering to them 1.25 basis points, believing that you

20   were in line to get the whole transition, correct?

21   **A.**   That was the quote that we gave them for the entire

22   transition, that's right.  In that proposal that we looked

23   at, yes.

24   **Q.**   And that was very aggressive, was it not?

25   **A.**   For us it was.

1  **Q.**  Meaning very low, very aggressive?

2  **A.**  Yup.

3  **Q.**  And that barely kept the lights on, is one of your

4  phrases, meaning it barely covered State Street's costs,

5  correct?

6  **A.**  That's right.  And my understanding of our costs on

7  trades like that was kind of a basis point to a basis point

8  and a half, depending on what we were trading, so it's about

9  cost for us, I think.  Yeah.

10  **Q.**  So if one to one and a half is your cost, the normal when

11  you would charge basis points to many of your client --

12  potential transition clients was to be charging them one,

13  two, or three basis points of yield, correct?

14  **A.**  For fixed income bond transitions, yeah, somewhere

15  between half a basis point and three would be very high, but

16  in that change, depending on what we were trading is probably

17  about right.

18  **Q.**  And when you charged yield, just so we understand it, you

19  say you charged one basis point yield.  If it was a

20  three-year bond, meaning that it matured in three years, that

21  would be the equivalent of charging three basis points of

22  value, correct?

23  **A.**  Not quite.  If the duration, rather than the maturity

24  date, and those things are a little bit different.  So a

25  three-year bond -- if it had -- they're not quite the same.

1  The duration is normally a little bit shorter than what the

2  maturity is, depending on how big the coupon on the bond is,

3  but if you take a three-year duration bond in your example,

4  then you're absolutely correct.

5  **Q.**  So if it was a five-year duration bond and one basis

6  point yield would end up being the same as five basis points?

7  **A.**  That's how the math works, yes.

8  **Q.**  And 7, 8, 10, would have the same mathematics, correct?

9  **A.**  That's right.

10  **Q.**  And it was common for State Street in 2010 and 2011 to be

11  charging clients for corporate bond transitions, a basis

12  point of yield that ended up getting State Street 5, 6, 7,

13  8 points of value?

14  **A.**  Basis points, not points.

15  **Q.**  Basis points.  And a basis point, so we understand the

16  arithmetic, is 1/100th of a percent?

17  **A.**  That's right.  So 1/10,000th of the overall value.  Yeah.

18  **Q.**  So if State Street was trading $10,000 of Royal Mail's

19  bonds, one basis point of value would get it $1?

20  **A.**  That's correct.

21  **Q.**  One basis point of yield would get it 3, 4, $5?

22  **A.**  Yes, depending on the duration, but yes.

23  **Q.**  But we're dealing at a fraction of what we're dealing at,

24  1/100th or 2/100th of one; is that correct?

25  **A.**  That's correct.

1    **Q.**  So if you're doing $100, these clients weren't paying a

2    dollar, they were paying $0.01 or $0.02, correct?

3    **A.**  Yes, that's right.

4    **Q.**  Okay.  Let me direct your attention, if I may, to

5    Exhibit 2, that I would first show to the witness, and then

6    move for its admission.

7              And you're familiar, are you not, with the Royal

8    Mail contract?

9    **A.**  I am now, yeah.

10   **Q.**  And you recall that the Royal Mail contract was something

11   being reviewed carefully by Mr. Pennings in the period before

12   the Royal Mail transition, correct?

13   **A.**  Yes, he was reviewing it, yup.

14   **Q.**  And you remember being at his office one day when he was

15   reviewing it, correct?

16   **A.**  Yeah.

17   **Q.**  And you recall Mr. McLellan being on the phone at least

18   one time when you and Mr. Pennings were reviewing the Royal

19   Mail contract, correct?

20   **A.**  Yes, that's right.

21   **Q.**  And amongst the --

22              MR. WEINBERG:  I would move for its admission, Your

23   Honor.  I don't think there's an objection.

24              MR. JOHNSTON:  No objection.

25              THE COURT:  All right.  Exhibit 2 is in evidence

1    and may be published.

2           (Exhibit No. 2 admitted into evidence.)

3    BY MR. WEINBERG:

4    **Q.**  There was a section in the Royal Mail contract that you

5    either reviewed physically in Mr. Pennings' office, or

6    Mr. Pennings was quoting to you while you were trying to

7    determine, or he was trying to determine whether or not an

8    undisclosed markup could be added to the fee, correct?

9           MR. JOHNSTON:  Objection.  Vague as to time.

10           THE COURT:  Just when?

11    BY MR. WEINBERG:

12    **Q.**  For the Royal Mail transition, which occurred in March of

13    2011.

14    **A.**  We did review, at some point, this -- and it's this --

15    this contract and particularly this -- this Clause 6 and its

16    subclauses.

17    **Q.**  And Mr. Pennings -- either you reviewed it physically

18    together in his office, or Mr. Pennings was quoted -- quoting

19    it to you; is that correct?

20    **A.**  That's right.

21    **Q.**  Mr. Pennings was taking the position that these clauses,

22    that the manager may benefit from a markup payable by the

23    customer to the broker-dealer.  You see that clause, do you

24    not?

25    **A.**  I do.  Yes.

1   **Q.**  And the next clause being that an associate is acting as

2   broker-dealer and that they may benefit from the markup, were

3   being cited to you by Pennings to support his position as

4   communicated to you that this contract permitted a markup on

5   broker-dealer trades, correct?

6   **A.**  Yes.

7   **Q.**  And you, at some point, talked to him about it.  And you

8   didn't necessarily share that view, but you understood that

9   that was Mr. Pennings' view, correct?

10  **A.**  I did.  And I didn't, probably mistakenly, read the

11  entire contract.  I think if you look at the proviso portion

12  of that, you'll come to a different -- well, I would have

13  come to a different conclusion about that.

14  **Q.**  And you did.

15  **A.**  Afterwards, I did.

16  **Q.**  You thought that it would be better for the client if

17  State Street didn't charge any trading revenues, that then

18  the client would get a better price, correct?

19  **A.**  Yeah.  And certainly what this doesn't allow us to do is

20  to tell them we're not going to do it and do it anyway.

21  There's no provision for lying to the client in here.

22  **Q.**  Let's talk about that, Mr. Boomgaardt.  That's been a

23  repeated theme of your testimony, has it not?

24  **A.**  It has.  It's the bit that I felt uncomfortable and wrong

25  about, yes.

**Q.** Uncomfortable and those were the words you used many
times on direct.  That when this was occurring -- I'm not
focusing you on 2014 when you met with the Government, or
2016, when you signed the plea agreement, or 2017 when you
pled guilty.  I want to bring you back to 2010 and 2011.  You
had discomfort with some of the business practices in State
Street.

**A.** I had some discomfort with the business practices at
State Street.  This, I knew was wrong.  Two different things.
I didn't like the way that we dealth FX, I didn't like the
way that we disclosed our futures commissions.  Those things
I was uncomfortable with.  This is wrong.

**Q.** So let's then take you, if we can, to your statements.
You were interviewed, were you not, on September of 2011?

**A.** By who?

**Q.** By Freshfields?

**A.** Yes.

**Q.** They're the bank's outside lawyer, correct?

**A.** Yeah.  They were the ones doing the kind of internal
investigation for State Street around this, yeah.

**Q.** They were looking at the Royal Mail transition, because
Mr. McKnight was the person complaining, correct?

**A.** They were looking -- it was broader than that, but Royal
Mail was certainly one thing they were looking at.  That's
right.

1    **Q.**  Do you recall saying to Freshfields, during your very

2    first interview, in September of 2011, that you recall

3    discussions about the Royal Mail contract, correct?

4    **A.**  Yeah.  Yeah, we got through that, yeah.

5    **Q.**  Do you recall saying that the fee itself, that was the

6    only revenues, the 1.75 transition management fee, it would

7    not be a very economic transition for State Street?

8    **A.**  That's right.  That's not a particularly high fee.

9    That's right.

10   **Q.**  So State Street would come close to breaking even, might

11   make a few dollars, but it was not an economic transition,

12   not going to be a profitable transition, if the only monies

13   that went to State Street for Royal Mail was that small

14   transition management fee, right?

15   **A.**  It would be slightly profitable, but not particularly so.

16   **Q.**  Do you remember saying to Freshfields -- you do recall

17   being interviewed, correct?

18   **A.**  I remember meeting with Freshfields, yes.

19   **Q.**  And there was several lawyers hired by State Street from

20   the London solicitors that came from the Freshfield law firm

21   to interview you?

22   **A.**  There was a couple of them, yeah.

23   **Q.**  Do you recall saying that you believed there was scope in

24   the contract with Royal Mail for the bank to charge

25   commission?

1    **A.**   That was the discussion, as it was explained to me by Ed.

2    Yeah.  That's the way it went.

3    **Q.**   You told Freshfields that that was something that you

4    understood, correct?

5    **A.**   Yeah.

6    **Q.**   You told Freshfields -- again, I'm trying to get you back

7    in time, seven years?

8    **A.**   Yeah, I remember the discussions.  I also remember

9    telling Freshfields that I didn't think it was the right way

10   to go, that I had my -- I -- that I was very uncomfortable

11   with it.

12   **Q.**   "He, Mr. Boomgaardt, viewed the combination of commission

13   and a flat fee as a departure from the bank's normal way of

14   doing business, but thought that if there was a legal way to

15   make money, then the banks should do it."

16            Do you recall telling them that?

17            MR. JOHNSTON:  Objection.  Improper impeachment.

18   He's reading notes of a third party.

19            THE COURT:  He's asking if he said that, right?

20            MR. JOHNSTON:  Okay.

21            THE WITNESS:  I don't remember using those words

22   exactly.  It sounds like a summary, or their summary of our

23   conversation.

24   BY MR. WEINBERG:

25   **Q.**   Consistent with what you told them, even if it's not

1   verbatim?

2   **A.**  Sorry, if you read it again -- hold on.

3         THE COURT:  Why don't you give it to him to look at

4   first.

5         MR. WEINBERG:  Sure, Your Honor.

6         THE WITNESS:  Thank you.

7         MR. WEINBERG:  It's paragraphs 19 through 21.

8         THE WITNESS:  19 through 21.

9         (Witness reviews document.)

10  BY MR. WEINBERG:

11  **Q.**  Mr. Boomgaardt, I'm going to focus you on paragraphs 19

12  through 21.  If the Government wants to ask you about other

13  paragraphs, they will when it's their turn.

14  **A.**  Sure.  I'm just trying to get the context of the whole

15  thing.

16  **Q.**  Sure.  One of the subjects that you were asked about was

17  the contract, correct?  The decision to charge commissions?

18  **A.**  Yes.  It's around the decisions to charge those

19  commissions.  Those paragraphs, yes.

20  **Q.**  Now, having read paragraph 19 of a memo that was written

21  by lawyers for Freshfields, the bank's outside law firm at

22  London, does it refresh your memory that you said that you

23  believed that, within the contract, the scope in the contract

24  with Royal Mail was to charge a commission?

25  **A.**  That's what was explained to me by my superiors, yes.  So

1    that's consistent with that.

2    **Q.**   And you didn't tell Freshfields at that time that the

3    charging of the commission was outside the contract,

4    according to Mr. Pennings and Mr. McLellan, did you?

5    **A.**   I didn't, no.

6    **Q.**   And did you tell Freshfields that you -- this is halfway

7    down paragraph 19, you viewed the combination of the

8    commission and a flat fee -- meaning the undisclosed

9    commission and the 1.75 small flat fee -- as a departure from

10   the bank's normal way of doing business, but thought that if

11   there was a legal way to make money for the bank, the bank

12   should do it?

13   **A.**   Yeah, that's -- that was broadly the way I -- the way I

14   thought it.

15   **Q.**   Sure.

16   **A.**   But it was -- I'm not a lawyer, but clearly the --

17   clearly it was -- you know, and you can see from the rest of

18   the paragraph --

19              THE COURT:  His question is just whether you said

20   that.

21              THE WITNESS:  Pardon me?

22              THE COURT:  Just whether you said that to them.

23              THE WITNESS:  That would be consistent with what I

24   said, I think, yes.

25   BY MR. WEINBERG:

1    **Q.**  And is it consistent with what you said that you told
2    Freshfields you believed Mr. Pennings had looked at the Royal
3    Mail contract, at a meeting, along with the periodic notice
4    and amendment to the agreement, and that you believed the
5    contract says the earning of the commission by a
6    broker-dealer is not prohibited by the contract?
7    **A.**  That's the way it was explained to me by Ed in that
8    meeting, yeah.
9    **Q.**  And do you recall now, having read this, that when you
10   were talking to Freshfields, you said you believed that the
11   Royal Mail contract did not prohibit the earning of a
12   commission by the State Street broker-dealer?
13   **A.**  That's what I believed at the time.  I hadn't looked at
14   that contract in detail.
15   **Q.**  We're only asking you for how you felt back before you
16   were a Government witness, when you were being interviewed by
17   Freshfields in September of 2011.  I'm only focused on your
18   state of mind back near the time of these events.  I know a
19   lot has happened, okay.  So try to focus on this meeting with
20   Freshfields.
21                THE COURT:  Just the questions, Mr. Weinberg.
22                MR. WEINBERG:  Thank you, Your Honor.
23   BY MR. WEINBERG:
24   **Q.**  Do you recall at the bottom of paragraph 12 telling
25   Freshfields that although you were not comfortable with the

1    decision, you viewed it as a commercial decision?  Three

2    lines up, paragraph 20.

3              THE COURT:  Are you asking him --

4              He's not asking you to confirm what's in the

5    document.

6              Just ask him what you think he said.

7    BY MR. WEINBERG:

8    Q.  Is it consistent with your memory of what you said to

9    Freshfields on that day in September of 2011, that you viewed

10   the decision to take a markup on Royal Mail as a commercial

11   decision?

12             THE COURT:  Hold on.  Yes.

13             MR. JOHNSTON:  Yeah, he's reading directly from the

14   notes as opposed to directing the witness' attention to a

15   paragraph and asking him whether he recalls --

16             THE COURT:  He's just asking the witness whether he

17   said the things he stated.

18             MR. JOHNSTON:  He's reading off the note.

19             MR. FRANK:  He's asking him whether it's consistent

20   with a document.

21             THE COURT:  He's not -- two things.  One at a time.

22             MR. FRANK:  Yes, Your Honor.

23             THE COURT:  Second, he can read from whatever he

24   wants.  The question isn't is the document accurate.  The

25   trial is not about the accuracy of any particular document

1     that a lawyer might be looking at.  The question is, what did

2     he say at that time.  That's what Mr. Weinberg's -- that's

3     what I understand the question to be.

4                MR. WEINBERG:  Yes.  Totally.

5                THE COURT:  Did you say this at that meeting?

6                Why don't you state the question again, because I'm

7     sure none of us have followed it at this point.

8     BY MR. WEINBERG:

9     Q.   Back seven years ago, when you were sitting with

10    Freshfields, do you recall telling them that you, at that

11    time, viewed the decision whether to take the undisclosed

12    markup, the trading markup, as a commercial decision?

13    A.   I can't remember using exactly those words, but possibly,

14    I guess.  I mean, it was a -- it was a commercial decision in

15    some ways, but it was also a -- it was also a lot broader

16    than that.

17    Q.   Do you recall saying that nothing in your opinion was

18    being done that was illegal under the contract?

19    A.   I don't remember using those words exactly.  As I said

20    previously about my views on what the contract allowed us to

21    do, it was told to me by my superiors that it was okay with

22    the contract.  It's --

23    Q.   And you didn't -- in going back to September, you did not

24    tell Freshfields that the views of your superiors to rely on

25    a contract between a client, Royal Mail, and the bank, State

1   Street, was illegal?  That's not words you used?

2   **A.**  I -- I don't recall exactly, no.  I mean, it's -- I think

3   I do see in this, as well, that it talks about me --

4           THE COURT:  It's not what -- he's saying you can

5   look at that -- if you don't remember something, you can look

6   at that and then say, hmm, having looked at that, it

7   refreshes my recollection, or no, it doesn't, but then you

8   testify to what you remember, not to what the document says.

9   If you can follow that.

10  BY MR. WEINBERG:

11  **Q.**  You didn't tell Freshfields you thought it was illegal to

12  charge Royal Mail a markup, yes or no?

13  **A.**  I don't believe.  I don't recall.  I really don't know.

14  It's an awfully long time ago.

15  **Q.**  Of course.  Let me show you the next interview with

16  Freshfields.  And I'm going to point your --

17          THE COURT:  Why don't you just ask him the

18  questions and if he doesn't recall, then show it to him.

19          MR. WEINBERG:  Maybe I can refresh him.

20  BY MR. WEINBERG:

21  **Q.**  Do you recall a second interview with Freshfields?

22  **A.**  Yes.

23  **Q.**  And do you recall telling Freshfields about the same

24  subject, that you didn't view the charging of a markup as a

25  legal issue, as you were pointed to a clause in the

1    transition contract, which seemed clear?

2    **A.**   I guess that's broadly right.  I mean, it's consistent

3    with my understanding that -- and what I was told by my

4    superiors, that it was allowed by the contract.  What was

5    also said in that interview was that the client expected not

6    to see any commissions and they did.

7    **Q.**   You looked at the contract with your superiors,

8    Mr. Pennings, Mr. McLellan, you were pointed to a clause in

9    the contract that appeared to expressly permit the

10   broker-dealer to charge a markup and then not disclose the

11   markup.  And Mr. Pennings relied on that contract to approve

12   the charging of an undisclosed markup, did he not?

13   **A.**   That was the story that he told me.

14   **Q.**   That's what happened, is it not?

15   **A.**   That is what happened.  It doesn't --

16   **Q.**   That's all I'm asking, Mr. Boomgaardt.  Let's go on to

17   the next interview with you, which was the written statement

18   that we reviewed in part yesterday.

19          Do you recall when you were writing -- now, we

20   don't have Freshfields ready, the memo of what you said.  We

21   have you sitting down and writing a 21-page statement,

22   correct?

23   **A.**   This is for my employment hearing; is that correct?

24   **Q.**   Yes.  Yes.  Do you recall writing that you were given

25   assurances that "the contracts by State Street covered our

1  method of charging in FX, foreign exchange, in futures"?

2  **A.**  Yeah.

3  **Q.**  And that "both of those areas were discussed specifically

4  with legal when our transition management agreement was

5  updated in 2010."

6  **A.**  Yup.

7  **Q.**  "I had no reason to believe the taking of markups was any

8  different."  Do you recall writing that?

9  **A.**  In terms of the discussions that was had with legal, that

10  was exactly what I was told.  That our method of taking was

11  going to be covered by the agreement.  What the agreement

12  didn't allow us to do was to lie to them when they asked

13  about it.  That's not written in there.

14  **Q.**  Mr. Boomgaardt, did you not write, "In subsequent

15  meetings, Ed Pennings assured me that not only had he spoken

16  to legal on the subject of taking markups on bonds, but also

17  brought the matter up in weekly management meeting with other

18  business heads in Europe, including Steve Smit, the head of

19  the MBA"?

20  **A.**  Yeah, I think you asked me that yesterday, but yes.

21  **Q.**  And were you not told in your discussions with

22  Mr. Pennings that he viewed the bond markups as no different

23  than the FX markups?

24  **A.**  That was his view, yeah.

25  **Q.**  And that the FX markups, foreign exchange markups, even

1  you didn't know how much the bank was making on the trading

2  of foreign exchange, yes or no?

3  **A.**  That's true, but that's a principal risk-taking business.

4          THE COURT:  You answered the question.  You didn't

5  know.

6          THE WITNESS:  Can I clarify that?  I'm not sure

7  that FX took markups.

8          THE COURT:  No, you can tell him you knew or you

9  didn't know.  The question is did you know how much they were

10 making from FX.  Did you know that?

11         THE WITNESS:  Well, his question was about FX

12 taking markups and if I knew how much they took.  I don't

13 know that FX took any markups.  It was a principal

14 risk-taking business.

15 BY MR. WEINBERG:

16 **Q.**  Put it out of the way.  Let's take the word "markup" out.

17 Your foreign exchange desk was getting currency trades from

18 transition management, correct?

19 **A.**  Yes, they were.

20 **Q.**  In other words, legal in London said it was perfectly

21 okay for transition management to give to their affiliate,

22 the foreign exchange desk, any trading of US dollars for euro

23 dollars, or US dollars for Great Britain pounds?

24 **A.**  That's right, our currency trading was almost exclusively

25 done through State Street's desk.

1  **Q.**  The FX desk in London for State Street was not a not for

2  profit, correct?

3  **A.**  It wasn't meant to be.  No.

4  **Q.**  They made money?

5  **A.**  I believe that's true.  I didn't have any visibility on

6  it, but yes.  I believe they made money.

7  **Q.**  And they made money based upon exchanging currency for

8  transition management clients, correct?

9  **A.**  Amongst others.  Transition management was a small bit of

10  what they did.

11  **Q.**  And the transition management clients did not know how

12  much money the State Street FX affiliate was making on their

13  currency trades, did the client?

14  **A.**  No, that's true.

15  **Q.**  And legal okayed that, did legal not?

16  **A.**  Yes.  Yeah.  That was in our legal agreement that we

17  would trade with them.

18  **Q.**  The clients did not know how much money was being made as

19  to these clients, say KIA, on the markups on their bonds,

20  correct?

21  **A.**  That -- the KIA didn't know what the markup on their

22  bonds was.  Yes, that's correct.

23  **Q.**  The KIA didn't know what the markups was or the profits

24  were on the FX desk for their currency trading, did they?

25  **A.**  They didn't know what revenue, if any, FX made on their

1  foreign exchange deals.  That's correct.

2  **Q.**  And the lawyers in London okayed each of these business

3  practices, correct?

4  **A.**  Certainly FX, and I was told that they had okayed our --

5  this business plan.  I've seen no evidence that they had, but

6  at that point, I was certainly told that.

7  **Q.**  Let me focus you on a remaining subject.  Yesterday we

8  reviewed in some detail your 21-page statement, correct?

9  **A.**  Yup.

10 **Q.**  And we talked about how you wrote on page 1 of that

11 statement about how important honesty and integrity were to

12 you, they were core principles to you, correct?

13 **A.**  We did cover that, yes.

14 **Q.**  And we covered, did we not, that you felt at the time

15 that your job was at stake, correct?

16 **A.**  That's right.

17 **Q.**  And that you lied to maintain your job or increase your

18 chances of maintaining your job, even though the very

19 statements that you were saying how important honesty and

20 integrity were, correct?

21 **A.**  Yes, I was minimizing my own involvement in all of this,

22 yes.

23 **Q.**  You were lying, were you not?

24 **A.**  I'm not lying about honesty and integrity being important

25 principles to me, no.

1  **Q.**  But you were lying about certain statements you made in

2  the same document you said honesty and integrity were

3  important?

4  **A.**  Yes, I should have been more clear on the statements.

5  **Q.**  You weren't clear by design?

6  **A.**  Only about my own -- I was relying -- and that's what's

7  in those statements.  I was sticking to the story that I had

8  been told by my superiors about this.  I regret writing those

9  things and they're not accurate.

10  **Q.**  Mr. Boomgaardt --

11  **A.**  But the stories don't --

12  **Q.**  When it came time for a conflict between your integrity

13  and your belief that lying would help you save your job, you

14  chose lying instead of telling the truth.  Isn't that the

15  bottom line?

16  **A.**  I disagree with you, but the bottom line is, I was

17  explaining what it was that allowed me to get comfortable

18  enough to do this.  It bothered me, but clearly I took enough

19  comfort from what was being told to me, the reasons -- and

20  we've gone through them all about the assurances around the

21  legal agreement, the analogies to other business models.

22  That -- despite me knowing those things weren't right,

23  despite that, I still went ahead and did it anyway, until a

24  point where I was asked to directly write a boldfaced lie to

25  a client.

1  **Q.**  Mr. Boomgaardt, didn't you say over and over, in this

2  21-page statement, I, Rick Boomgaardt, did not deceive a

3  client.  I dealt with every client fairly, honestly,

4  candidly, and in good faith?  Those are your words.

5  **A.**  That's what's written in there.

6  **Q.**  That's a lie?

7  **A.**  It's not right, you're right.

8  **Q.**  It's a lie.

9  **A.**  We lied to clients.

10  **Q.**  So you lied when your job was at issue.  You preferred to

11  lie.  You, yourself, lying to a State Street disciplinary

12  officer, in order to try to increase your chances of saving

13  your job?  That's what you did.

14  **A.**  I had my job at stake and that's --

15  **Q.**  And you chose to lie.

16  **A.**  You're focusing on a little bit of what's in there --

17  there's a -- the facts around what I've said in there and why

18  I got comfortable are all still relevant.  I admit that I

19  have been in that -- minimizing my own role in that and I am

20  sorry and ashamed for having done that, but that doesn't

21  change the facts of the case, which are all documented and

22  well --

23  **Q.**  Mr. Boomgaardt, I'm interested in focusing you not on the

24  facts of the case, where you're testifying as a Government

25  witness.  I'm interested in it bringing you back to the facts

1    that you said to State Street, in your 21-page written

2    statement --

3    **A.**   Yes.  And we've been through this, I think.  I've

4    explained the reasons why I've written what I've written in

5    there and I've said that those are -- that is not my view.  I

6    felt uncomfortable and those --

7    **Q.**   You lied.

8    **A.**   Those things are wrong in there.

9    **Q.**   Why is it so hard?  You lied to save your job, correct?

10   **A.**   Yeah, and we lied to clients.

11   **Q.**   And you lied to State Street on February 1, in writing,

12   to save your job, yes or no?

13   **A.**   I was trying to save my job and minimize my position,

14   that's correct.

15   **Q.**   2016, you signed the cooperation agreement, did you not?

16   **A.**   That's right.

17   **Q.**   You signed it with Mr. Frank and another member of the

18   Department of Justice, Ms. O'Shea, correct?

19   **A.**   Yes, they were the ones that were involved at that point,

20   yeah.

21   **Q.**   You and your lawyers negotiated a plea agreement,

22   correct?

23   **A.**   A plea agreement was put to me.  There was not an awful

24   lot of negotiation going on with it, but I had -- a plea

25   agreement was put in -- was put in front of me and we agreed

1   to a plea agreement.  I've signed a plea agreement.

2   **Q.**   The Government offered to allow you to plead to a single

3   count with a 60-month maximum, correct?

4   **A.**   I've pled guilty to a single count.  That's right.

5   **Q.**   You understand that they gave up their right to charge

6   you with additional counts that had higher statutory

7   maximums, do you not?

8   **A.**   I assume -- yes.  I understand that there's one charge on

9   that, yes.

10  **Q.**   And the charge has a 60-month maximum, correct?

11  **A.**   Yes, I believe that's correct.

12  **Q.**   And did you discuss your guidelines, the sentence

13  guidelines?

14  **A.**   They're also, I think, in the -- set out in that -- in

15  that document, so I certainly understand them, yeah.

16  **Q.**   And they're even higher than 60 months, correct?

17  **A.**   They are, correct, yeah.

18  **Q.**   But by pleading, or being afforded the opportunity to

19  plead to a single count, your higher guidelines were

20  compressed down to the maximum five years that that count

21  counted, correct?

22  **A.**   I'm not sure how all the math worked.  It was certainly

23  lots of points around this that would have got me up to the

24  maximum, anyway, yes.

25  **Q.**   The Government has promised, have they not, in exchange

1  for your plea of guilty, to assist you if you make an

2  application to serve any jail sentence you get, in a

3  different country, whether it's Canada where you were born,

4  or London where you live, correct?

5  **A.**  I haven't had any such promise, no.

6  **Q.**  You've not been promised that the Government will assist

7  you in a prisoner exchange treaty application if you make it?

8  **A.**  I haven't signed any such agreement, I don't believe.

9            MR. WEINBERG:  I think it's 201, if I recall the --

10           THE COURT:  Is 201 in evidence?

11           MR. WEINBERG:  Yes, Your Honor.

12  BY MR. WEINBERG:

13  **Q.**  You've seen your plea agreement, have you not?

14  **A.**  I have.  It's been a little while since I looked at it in

15  detail, but yeah.

16  **Q.**  Let's review it.  This is the last section, or the last

17  subject I will be asking you about.  Let's go to page 4.

18  Very bottom of 4, maybe we can inflate it a little, if you

19  can.

20           Contained within your contract with the Government,

21  the plea agreement, is a provision that if you are eligible,

22  and if you apply, the US Attorney and the fraud section,

23  which means the Department of Justice in Washington, agree

24  not to oppose your transfer application.

25           Do you see that?

1    **A.**  I see that, yeah.

2    **Q.**  Can we continue to the top of 5.

3           And that they're essentially saying to you that

4    they can't guarantee you that just because they don't oppose

5    it, that you're going to get it.

6    **A.**  Yeah, so that's different than a promise to support my

7    application.

8    **Q.**  Not to oppose it if you make it.

9    **A.**  Yeah.  I think that's slightly different than your

10   question, but yes.  I see that.

11   **Q.**  Your family is in London, or the London area?

12   **A.**  Yeah, near London.

13   **Q.**  You have a wife and two children?

14   **A.**  A wife and two children.

15   **Q.**  Very much want to get back to London as a free man, do

16   you not?

17   **A.**  Yeah, I'd love to.  Of course.

18   **Q.**  You decided not only to plead guilty, but to cooperate,

19   correct?

20   **A.**  Yes.

21   **Q.**  You want a 5K1.1 motion, do you not?

22   **A.**  Yes.  I mean, that's not ultimately my decision, but yes.

23   **Q.**  Yes, it's a decision of the US Attorney and the fraud

24   section of the Department of Justice, correct?

25   **A.**  Yes.

1    **Q.**  And you understand that Mr. Frank, sitting here as the

2    prosecutor in this case, and Mr. Johnston, who are here in

3    court and led you through your direct testimony, will make a

4    recommendation after your testimony ends, correct?

5    **A.**  Yes, that's my understanding.

6    **Q.**  You don't see any other -- you don't see any attorney

7    general of the United States sitting here watching your

8    testimony, do you?

9    **A.**  I'm not sure I would recognize him if he was here, or

10   she.

11   **Q.**  These are the two prosecutors you've dealt with and you

12   want their recommendations to get a motion that will ask for

13   sentencing leniency for you, correct?

14   **A.**  Yes.

15   **Q.**  And you understand that if they don't make a motion,

16   they're required, as part of your agreement, to recommend the

17   low end of your guideline, which is 60 months, correct?

18   **A.**  Yes.

19   **Q.**  And you understand that in America, we've got a tough

20   prison system, and you're going to do 85 percent of the

21   60 months if that's the sentence that is imposed?

22   **A.**  I'm not an expert on the American prison system, but I'll

23   take your word for that.

24   **Q.**  If the Government makes the motion, you understand

25   they're going to be making the motion, asking your sentencing

1    judge to impose a sentence of less than 60 months.

2    **A.**   Yes, I think that's the point of the 5K, to deviate from

3    the sentencing guidelines.

4    **Q.**   They can -- if they make the motion, they can ask for

5    three years, two years, one year, six months, three months,

6    or nothing.

7    **A.**   I understand.

8    **Q.**   That's their prerogative, as you understand it, correct?

9    **A.**   Yes.

10   **Q.**   And do you understand --

11              MR. WEINBERG:  And could we have Exhibit 201, the

12   bottom of 6, and the top of 7.

13              Let me walk you through the language in your

14   agreement, starting with the last two sentences on page 6.

15              Can we go to page 6, the last two sentences,

16   please.  Should you provide substantial assistance in the

17   investigation or prosecution of person -- let's go to 7, the

18   top.  Next, please.

19              Can you read that?

20   **A.**   I can see it, yup.

21   **Q.**   "The Government is observing itself, if you provide,

22   quote, 'substantial assistance,' to make this motion that you

23   believe will help your odds of going back to your family and

24   kids in London without serving months or years in a United

25   States jail thousands of miles away," correct?

1  **A.**   Yes.  I guess, that's what that means.

2  **Q.**   That's why you're here?

3  **A.**   Yeah.  Well, it's not why I'm here, sir, with all due

4  respect.

5  **Q.**   Have you been -- has it been explained to you that they

6  have sole discretion -- without review, you can't appeal

7  it -- sole discretion to either file this motion that will

8  help you go home, or not file the motion that will increase

9  your chances of landing in a United States prison?

10  **A.**   Yes.  Yeah, I understand that.

11  **Q.**   You've given up your right to appeal, to challenge.  It's

12  totally up to the US Attorney and largely up to the two

13  individuals sitting at the prosecution's counsel table.

14  **A.**   I understand that's what it says in the plea agreement.

15  **Q.**   And do you understand the criteria that this agreement

16  says will be used?  They will make this determination based

17  on truthfulness, their evaluation of truthfulness, and the

18  value of your assistance.

19         Do you understand that?  Did you read that?

20  **A.**   I do.  Regardless of the outcome or result of any

21  proceedings or trial.  Yes.

22  **Q.**   The value of your testimony and their prosecution of Mr.

23  McLellan will be one of the elements that they use to

24  determine whether the Government, in its sole discretion,

25  with no appeal, files a motion that can help you go home.

1    Correct?

2    **A.**   Regardless of the outcome of the trial.  Yes, I

3    understand that.

4    **Q.**   But value is value to them in their prosecution, correct?

5    That's the language of your contract, correct?

6    **A.**   The language is also regardless of the outcome.  So I

7    have no vested interest in the outcome of this trial.

8    **Q.**   But you do have vested interest in providing value to one

9    side of this case, the United States Attorney, because they

10   alone -- not me, only them -- can help you go home, correct,

11   Mr. Boomgaardt?

12   **A.**   They're the ones who would file any 5K motion.  You're

13   correct.

14              MR. WEINBERG:  Thank you, sir.  I have no other

15   questions, Judge.

16              THE COURT:  All right.  Any redirect?

17              MR. JOHNSTON:  Yes.  Briefly, Your Honor.

18              THE COURT:  Okay.

19              So ladies and gentlemen, we have two rounds.

20   That's the direct examination, the cross-examination, we

21   completed those two parts.  Those are typically the longest

22   parts and then we have redirect.  That's what Mr. Johnston

23   will do now, and then Mr. Weinberg has an option, if he

24   wishes, to do recross, and then we're done with the witness.

25              Go ahead.

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. JOHNSTON:

**Q.**   You were asked questions on cross-examination about the bond prices you asked from Mr. Finocchi, correct?

**A.**   Yes, it's specifically for the KIA 115.

**Q.**   Yes.  KIA 115.

**A.**   Yes.

**Q.**   Why did you ask for those prices?

**A.**   So we could see where the highs of the days were.  We were going to be marking these bonds up and we wanted to make sure that they were within the highs of the day.

**Q.**   How did you use those prices?

**A.**   We used them as a reference price.  We also looked at Bloomberg prices to see what were the data sources and what the prices -- what the prices off those data sources told us.

**Q.**   Had you ever previously compared execution prices to the intraday highs before booking out a trade like that?

**A.**   I hadn't, no.

**Q.**   Who had suggested that that was how you should do it?

**A.**   That was Ross.

**Q.**   You testified yesterday that that evening, you left the office driving home, and you felt bad.  Why?

**A.**   Because it didn't feel like we were doing the right thing for the client.  There was an inherent -- there's a massive conflict created by that.  What's the right undisclosed

1    spread to take?  If we could take whatever and whatever

2    spread we want, why wouldn't we take the whole thing?  What's

3    the limit we put on that?  Is it reasonability?  You know,

4    what's the upper limit on how much you take in a commission,

5    when you can take whatever you want?

6    **Q.**   What was the limit in this instance?

7    **A.**   The highs of the days, so they wouldn't be noticed by the

8    client.  That was the limit that we imposed.

9    **Q.**   What had KIA been told they would be charged, in terms of

10   commission?

11   **A.**   Well, in terms of commission, zero.

12   **Q.**   You were asked some questions about foreign exchange.  Is

13   what you did the same or different from how foreign exchange

14   operated at State Street?

15   **A.**   It's different.

16   **Q.**   How so?

17   **A.**   Foreign exchange is a principal market making business.

18   If we ask them to -- if we're going to sell them dollars to

19   buy euros, they're going to physically take ownership of

20   those dollars.  They then either hang on to those dollars and

21   hope they can sell them for something else, either at a

22   profit or at a better price, or they'll start doing it in the

23   market to minimize their losses.

24            What they don't know when they take those on is

25   exactly how much money they're going to make or lose.  Some

1    of it they may have been able to offload at the same time,
2    but some of our trades are at a size where they would have
3    had to take those positions on.  And again, they wouldn't
4    know.  There's a risk of them losing money on those trades.
5              On the bond commissions that we were putting on, we
6    were only doing executions in the market that we knew we were
7    going to then pass on to the client.  So there's no risk
8    there.  There's no -- while there is a short period of time
9    where State Street owns those bonds, there's no risk.
10   Because we've already agreed what the price is, we're going
11   to put a markup on it and we're going to book it out.  It
12   doesn't matter if the market moves around.  We don't have to
13   unwind that position.  It is simply a riskless way to make
14   money.
15   Q.   Did you ever negotiate FX prices with clients?
16   A.   No.
17   Q.   How about commissions?  Did you negotiate those?
18   A.   Yes.
19   Q.   Did you ever hide anything about FX from the clients?
20   A.   No.  I think it's -- we didn't -- it wasn't the first
21   thing that we talked about that we were dealing everything
22   with our State Street foreign exchange business, but it
23   certainly wasn't something we hid, either.  Clients certainly
24   knew that.
25   Q.   What did you hide?

1    **A.**   The commissions that we took on the transitions that

2    we've gone through over the last few days.

3    **Q.**   You were asked some questions about Nomura.  Did -- how

4    did Nomura's business model differ from State Street's

5    business model?

6    **A.**   Well, they were a broker-dealer, so they had ways of

7    making money that were different from ours.  They were a

8    principal bond trading business.  They also had principal

9    equity trading business, where they traded equities for the

10   firm's own money.  And as I said, they also had lots and lots

11   of other clients, so that transition management trading

12   allowed them to generate more trading commissions from some

13   of those clients, in a way that State Street couldn't.

14   **Q.**   What, if anything, did that mean for the types of

15   commissions they could show clients?

16   **A.**   The business for them could still be economic and

17   profitable at a lower upfront commission than it could be for

18   State Street.

19   **Q.**   You were asked some questions about the assurances that

20   Mr. Pennings had given you.  You -- did you rely on anyone

21   else's assurances to go along with this plan?

22   **A.**   Yes, I relied on Ross McLellan's assurances.

23   **Q.**   And what assurances did he give you?

24   **A.**   Similar.  That this had been -- that it was okayed by the

25   contract.  That it had been pushed up the chain to management

1    at global level and that this was -- this was the right

2    business model and it was okay by the bank.  I viewed Ross

3    very much as the business.  He was the guy that ran this

4    thing.

5    **Q.**  What, if anything, did Mr. McLellan tell you about what

6    Mr. Puth had told him?

7    **A.**  That he had raised it with -- with Puth and that he was

8    in favor of anything that was going to generate more money

9    for the bank.  If it was -- it was the right way to go.  It

10   had support at that level.

11   **Q.**  Were these discussions before or after Royal Mail came

12   calling?

13   **A.**  My understanding was those conversations had happened

14   before Royal Mail.

15   **Q.**  You were asked some questions about -- or additional

16   questions about Mr. Pennings' assurances to you.  What was

17   your understanding whether legal had actually approved of

18   your telling clients one thing and charging another?

19   **A.**  Well, that we hadn't had a specific discussion about.

20   The -- I see no evidence that legal was comfortable or happy,

21   or had at that point seen any evidence that legal was happy

22   with us telling clients we weren't going to take a commission

23   and then taking one anyway.

24   **Q.**  At any point -- or did you have an understanding whether

25   legal had approved of your lying to clients?

1   **A.**   I don't think they ever approved of us lying to clients.

2   I'd certainly never seen any evidence of it.

3   **Q.**   You were asked some questions about UK law.  Did you have

4   an understanding, one way or the other, whether UK law

5   allowed you to lie to clients about how much you were going

6   to charge them?

7   **A.**   No, I didn't believe UK law was -- allowed us to lie to

8   your clients, no.

9   **Q.**   You were -- you were asked some questions about your

10  interviews with Freshfields in 2011 and 2012.  Were you

11  completely truthful in those interviews?

12  **A.**   Not about my role in this, no.

13  **Q.**   Why weren't you?

14  **A.**   It was made very clear that these were interviews that

15  were being done on State Street's behalf and I was concerned

16  about the possible fallout from this.  I viewed it as a

17  serious thing and I was minimizing my role in that.  And

18  replaying what my -- what my bosses had told me.

19  **Q.**   Did, at any point, you believe that the contract allowed

20  you to lie?

21  **A.**   No.

22  **Q.**   Did you believe at the time that what you were doing was

23  right or wrong?

24  **A.**   Oh, I knew it was wrong at the time.

25  **Q.**   You -- did you plead guilty to a crime?

**A.**   Yes.

**Q.**   Why did you plead guilty?

          MR. WEINBERG:  I object, Your Honor.  It's
inconsistent with the Court's instruction.

          MR. JOHNSTON:  I asked him if he pled guilty and
then why he pled guilty.

          THE COURT:  No, I understand.  I'm just thinking
about why -- you can have -- overrule the objection.

          But ladies and gentlemen, so you understand, as I
said before, this is with respect to his state of mind.  It's
not evidence that Mr. McLellan committed a crime.  It's just
relevant for you evaluating his testimony about what he
testified about.

          With that, you can answer the question.

BY MR. JOHNSTON:

**Q.**   Mr. Boomgaardt, why did you plead guilty?

**A.**   Because I believe I'm guilty of a crime.

**Q.**   Who decides your sentence?

**A.**   The Judge.

          MR. JOHNSTON:  Thank you.  No further questions.

          THE COURT:  Any recross?

          MR. WEINBERG:  Very short.

          **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. WEINBERG:

**Q.**   Do you understand, Mr. Boomgaardt, that you could plead

1    guilty and not cooperate with one of the two parties to this

2    case?

3    **A.**   Yeah.

4    **Q.**   You chose to both plead guilty and enter a cooperation

5    agreement, hoping that as a result of your plea and as a

6    result of your helping the Government, they will help you,

7    correct?

8    **A.**   Yeah.  I am hoping for a 5K motion from them, yes.

9    **Q.**   Now, you mentioned that lying to clients is something

10   that you don't approve of, correct?

11   **A.**   That's right.

12   **Q.**   Mr. McLellan never spoke to any one of these six clients,

13   did he?

14   **A.**   He didn't speak directly to the clients.

15   **Q.**   That's what I'm asking, Mr. Boomgaardt.  He didn't speak

16   to the clients, in writing, over the phone, or in

17   face-to-face meetings?

18   **A.**   Not to my knowledge.

19   **Q.**   And therefore, Mr. McLellan didn't lie to clients

20   personally, correct?

21            MR. JOHNSTON:  Objection.

22            THE COURT:  As far as he knows.

23            THE WITNESS:  He certainly instructed people to lie

24   to clients, so whether he did it in person or not, I don't

25   know.

BY MR. WEINBERG:

**Q.** Mr. Boomgaardt, you have given statement after statement, Freshfields, Deloitte, the City of London, not until you wanted to get the Government's help to send you back to London instead of to the inside of the prison, have you said that Mr. McLellan directed anybody to lie?

**A.** He sent me a compliance letter.

**Q.** That's a yes-or-no question?

**A.** Then the answer is no. I'm trying to elaborate, but if you want a yes or no --

**Q.** Okay. Did you tell Freshfields that Mr. McLellan told you to lie to Royal Mail in February or March of 2011, when you were cutting the deal with them to do a transition?

**A.** Sorry, I don't understand the question.

**Q.** Did you tell Freshfields, when they were conducting their internal investigation, that -- let's start with KIA. During the KIA transition in June of 2010, did Mr. McLellan tell anyone to lie?

MR. JOHNSTON: Objection. This is beyond the scope of the Government's redirect.

THE COURT: Not in light of what he said. He's entitled to it.

MR. JOHNSTON: He opened the door.

THE COURT: No, I don't think he did. And the door got open, but -- so you can go ahead.

1          THE WITNESS:  Sorry, can you just repeat the

2    question?

3    BY MR. WEINBERG:

4    **Q.**  Let's take the compliance letter that you've testified to

5    at great length, put it over here.  (Indicating).

6          Did you tell anyone, before you became a Government

7    witness, that Mr. McLellan directed a lie to a transition

8    client about a transition?

9    **A.**  Accepting that big elephant in the room that you put over

10   here.

11   **Q.**  No, it's not a big elephant, it's a compliance letter.

12         THE COURT:  Putting aside both your

13   characterizations, his question doesn't invite you to comment

14   on things that's outside the scope.

15         And you're not commenting outside the scope,

16   either.

17         The question is simply, putting that letter aside,

18   okay --

19         What is the question?

20   BY MR. WEINBERG:

21   **Q.**  Yes, the letter aside, you had seven transitions for six

22   European Mideast clients, correct?

23   **A.**  Yes.

24   **Q.**  You were asked about them in September of 2011 by

25   Freshfields and then again by Deloitte.  Isn't it a fact

1  that, yes or no, you never told those investigators what you

2  told today, that Mr. McLellan directed you to lie to any of

3  those six clients during any of those seven transitions

4  regarding the markups?  Yes or no?

5  **A.**  I don't recall in all of those things.

6  **Q.**  Okay.  You don't recall?

7  **A.**  He --

8  **Q.**  I'm just asking you whether you recall --

9  **A.**  You're asking me to recall a meeting from seven years

10 ago.  I can give you a fuller answer of all the times that

11 he's asked myself and Ed Pennings to lie, if you like.

12 **Q.**  I'm asking you about what you told the investigators --

13 **A.**  Again, I don't remember the Freshfields interviews well

14 enough to say, sir.

15 **Q.**  Or the Deloitte interviews?

16 **A.**  The -- again, that was a similar time frame.  Without

17 being -- having my memory refreshed, I can't remember exactly

18 what I said.

19 **Q.**  So to cap off this conversation, because we're on

20 recross, you don't recall, as you sit here now, telling the

21 investigators -- again, setting the compliance issue aside,

22 the letter aside, that Mr. McLellan directed you to lie

23 during the transitions to KIA, Sainsbury's, Eircom, Royal

24 Mail, NTMA, and I may be missing one, Dutch Doctors.

25 **A.**  I don't remember --

1   **Q.**   Thank you.

2   **A.**   -- the details of those conversations well enough.

3   **Q.**   And the last subject is Mr. Puth.  Do you recall him

4   coming to London right after the KIA 121 transition?

5   **A.**   I don't, no.

6   **Q.**   Did you meet Mr. Puth?

7   **A.**   I met Mr. Puth briefly, I believe.  But not with -- not

8   with regards to anything transition-specifically.

9   **Q.**   Did Mr. Pennings ever tell you that Mr. Puth

10  congratulated he and his team for their work on KIA?

11  **A.**   I think I do remember him saying that, yeah.

12  **Q.**   I do have one more subject.  FX.  You testified how FX's

13  business model was different than the fixed income, correct?

14  **A.**   Yes.

15  **Q.**   But from the client perspective, regardless of these

16  differences in business models, the client was not told how

17  much money State Street made on its foreign exchange trades,

18  correct?

19  **A.**   I believe that's correct.

20  **Q.**   And the client also was not told how much money State

21  Street made on the fixed income trades, where there was a

22  decision by State Street to take a spread that wasn't

23  disclosed pursuant to those contracts, correct?

24  **A.**   The client wasn't told we weren't going to make any money

25  on FX, whereas they were on the bond trades.

1          MR. WEINBERG:  No other questions, Mr. Boomgaardt.

2          THE COURT:  All right.  Mr. Boomgaardt, thank you

3     very much, your testimony is concluded.  You may step down.

4     You're excused.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Next witness.

7          MR. FRANK:  Thank you, Your Honor, the Government

8     calls Edward Pennings.

9          THE COURT:  So ladies and gentlemen, the two rounds

10    that you just watched, that's the most that happens on any

11    witness.  It's pretty typical for you to see two rounds.  The

12    second round is optional for the calling lawyer and optional

13    for the opposing lawyer.  As you see, typically, the scope is

14    narrow and much shorter.  It's just follow-up and

15    clarification questions.  So you can anticipate that that

16    will happen with most of the witnesses.  Maybe all the

17    witnesses, maybe not all the witnesses.  That's up to the

18    lawyers, but that's fine, either way.

19          (The witness was duly sworn.)

20          THE COURT:  Please be seated.

21          Go ahead, Mr. Frank.

22                         **EDWARD PENNINGS**

23         having been duly sworn, testified as follows:

24         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

25    BY MR. FRANK:

1    **Q.**   State your name.

2    **A.**   Edward Pennings.

3    **Q.**   Can you spell it for the record, please.

4    **A.**   E-d-w-a-r-d, P-e-n-n-i-n-g-s.

5    **Q.**   How old are you?

6    **A.**   47.

7    **Q.**   Where do you live?

8    **A.**   In England.

9    **Q.**   Are you currently employed?

10   **A.**   I work part-time from home.  First and foremost, I'm the

11   primary caregiver of my young children, one and four.  I set

12   up a business with my brother, in Holland, and spent part

13   time on that.

14   **Q.**   What kind of business is that?

15   **A.**   It's a online flower bulb seeds business.

16   **Q.**   Can you speak into the microphone, please?

17   **A.**   Sure.

18            THE COURT:  Big room.  So just keep your voice up a

19   little louder than you think is normal, everyone will be able

20   to hear you.

21            THE WITNESS:  And I also work with my wife, who set

22   up a new venture last year, providing outsourced marketing

23   and prospecting services for small and startup firms.

24   **Q.**   Did you previously work at State Street?

25   **A.**   Yes.

**Q.**   When?

**A.**   From 2001 to 2011.

**Q.**   What happened in 2011?

**A.**   I was fired.

**Q.**   What did you do at State Street?

**A.**   I was the Portfolio Solutions head in the European region.

**Q.**   Who appointed you to that position?

**A.**   Ross McLellan.

**Q.**   Have you ever been convicted of a crime?

**A.**   Yes.

**Q.**   What crime?

**A.**   Conspiracy to commit wire and securities fraud.

**Q.**   When?

**A.**   In June 2017, so last year.

**Q.**   What did you do --

         MR. WEINBERG:  Excuse me, Mr. Frank.  Can Your Honor give the instruction again regarding the limits of the use?

         THE COURT:  Yes.  So I remind you, ladies and gentlemen, with respect to Mr. Pennings' testimony, like with Mr. Boomgaardt, that you've heard evidence that he pleaded guilty to charges arising from when he participated with events that are the subject of the trial and you must not consider his guilty plea as any evidence of Mr. McLellan's

1    guilt.  Mr. Pennings' decision to plead guilty was a personal

2    decision about his own guilt.  You should disregard his

3    guilty plea completely when considering Mr. McLellan's guilt

4    or innocence.

5            Instead, you may consider Mr. Pennings' guilty plea

6    only for the purpose of determining how much, if at all, to

7    rely upon his testimony.  You should give Mr. Pennings'

8    testimony the weight you believe it deserves, keeping in mind

9    that it must be considered with caution and great care.

10           Proceed.

11           MR. WEINBERG:  Thank you, Your Honor.

12   BY MR. FRANK:

13   **Q.**  What did you do, sir, that led to your conviction for

14   that crime?

15   **A.**   In my final year, or thereabouts, at State Street, we, or

16   I, told clients we charged one thing, where, in fact, we

17   charged more without them knowing about it.

18   **Q.**  Did you do that with anyone else?

19   **A.**  Yes.

20   **Q.**  Did you see anyone you did that with in this courtroom

21   today?

22   **A.**  Yes.

23   **Q.**  Who?

24   **A.**  Mr. McLellan.

25   **Q.**  Mr. Pennings, how far did you go in school?

1    **A.**  I have a master's degree.

2    **Q.**  In what?

3    **A.**  Business, international business.

4    **Q.**  Where did you get that?

5    **A.**  At the American Graduate School of International

6    Management in Arizona.

7    **Q.**  What did you do after getting your master's degree?

8    **A.**  I started working in Holland as an options and futures

9    trader on the trading floor.

10   **Q.**  And how long did you do that for?

11   **A.**  I was in Holland probably between one and two years.  It

12   was the early '90s.

13   **Q.**  And then?

14   **A.**  And then that company sent me to London to do a similar

15   job.

16   **Q.**  And how long did you work at that company in London?

17   **A.**  Up until '97, I believe.

18   **Q.**  And then what happened?

19   **A.**  Then I joined another firm called PaineWebber, which is a

20   US brokerage firm, to become a futures broker.

21   **Q.**  And how long did you work at PaineWebber?

22   **A.**  Only a year.

23   **Q.**  And then what happened?

24   **A.**  I moved to ING Barings, in a similar role, but with

25   slightly more responsibilities.

1    **Q.**  And how long did you work at ING Barings?

2    **A.**  Only a year, because the Russian or Asian crisis at the

3    time.  That made me redundant.

4    **Q.**  And then what happened?

5    **A.**  Then I found a job at a company called Lynch, Jones, and

6    Ryan, which merged with, or were taken over by Instinet to

7    sell commission recapture services in Europe.

8    **Q.**  And how long did you work there?

9    **A.**  Up until 2001.

10   **Q.**  And just to take a step back, where are you originally

11   from, sir?

12   **A.**  Holland.

13   **Q.**  Where are you a citizen of?

14   **A.**  The Netherlands.

15   **Q.**  Is English your native language?

16   **A.**  No.

17   **Q.**  What is?

18   **A.**  Dutch.

19   **Q.**  Did there come a time when you began working at State

20   Street?

21   **A.**  Yes.

22   **Q.**  When was that?

23   **A.**  2001.

24   **Q.**  And tell us about the ark of your career at State Street.

25   **A.**  I was hired by State Street to set up a commission

1    recapture business in Europe for them and sell transition

2    management services.

3    **Q.** And at some point -- what was your rank when you were

4    hired?

5    **A.** Vice president.

6    **Q.** At some point, were you promoted?

7    **A.** Yes.

8    **Q.** What was your rank when you were terminated?

9    **A.** Senior managing director.

10   **Q.** And at what point did you become -- did Mr. McLellan

11   appoint you as head of the Portfolio Solutions Group in

12   Europe, the Middle East, and Africa?

13   **A.** Early 2009.

14   **Q.** I want to direct your attention to that period and

15   particularly to early 2010.  Who -- were you still at that

16   point the head of the Portfolio Solutions Group for Europe,

17   the Middle East, and Africa?

18   **A.** Yes.

19   **Q.** Who were you reporting to?

20   **A.** Ross McLellan.

21   **Q.** How many employees did you have reporting to you?

22   **A.** The team consisted of between 20 and 25 people, I

23   believe, of which seven or eight, probably, reported to me

24   directly.

25   **Q.** And was one of those individuals Mr. Boomgaardt?

1   **A.**   Yes.

2   **Q.**   Was one of those individuals somebody by the name of Ian

3   Holden?

4   **A.**   Yes.

5   **Q.**   And who was that?

6   **A.**   That's the head of the trade execution desk in London for

7   Transition Management.

8   **Q.**   Was one of those individuals somebody by the name of Paul

9   McGee?

10   **A.**   Yes.

11   **Q.**   Who was that?

12   **A.**   He was the senior transition manager, ultimate head of

13   the desk, and also the head of the futures overlay business.

14   **Q.**   And were there also various sales people who reported to

15   you?

16   **A.**   Yes.

17   **Q.**   How were you compensated during that time?

18   **A.**   A fixed salary and a discretionary bonus.

19   **Q.**   What was the bonus based on?

20   **A.**   How well State Street did as a company, how well the

21   division of State Street Global Markets did, how well the

22   Portfolio Solutions Group did globally and also specifically

23   for the EMEA, Europe, Middle East and Africa region, and how

24   well I personally did.

25   **Q.**   When you say how well, what is the measure of how well

1   each of those components did?

2   **A.**   It was my understanding revenue and how I motivated my

3   team.

4   **Q.**   What was your compensation in 2009?

5   **A.**   I believe my salary was around 142 or thereabouts,

6   pounds, thousand pounds.  And just under $1 million of bonus.

7   **Q.**   What was your salary and bonus in 2010?

8   **A.**   I believe my salary was around 170, or thereabouts.  170,

9   75, thousand pounds, and $900,000 or thereabouts.

10  **Q.**   Bonus?

11  **A.**   Yes.

12  **Q.**   So each of those years, you made over a million dollars?

13  **A.**   Yes.

14  **Q.**   What was the nature of your relationship with the

15  defendant?

16  **A.**   Well, he was my boss.  We had a very good relationship.

17  I liked him and I respected him and everyone liked him.

18  **Q.**   How often did you speak with him?

19  **A.**   I would say daily, on average.

20  **Q.**   What kinds of things did you discuss?

21  **A.**   Predominantly business and chitchat and -- yeah, mainly

22  business.

23  **Q.**   What were you able to observe about the defendant's role

24  within State Street?

25  **A.**   He was well respected, knowledgeable, and was also

1    promoted during my time there, in that role.  And he was

2    probably one of the youngest EVPs.

3    **Q.**  Executive vice presidents?

4    **A.**  Yes.

5    **Q.**  Do you have an understanding of how long or what his

6    experience was in the transition management business?

7    **A.**  He joined before me, I believe, as a transition manager

8    in Boston, so yeah.  He had a couple more years of experience

9    in the transition business.  He was a transition manager, so

10   I was a salesperson.

11   **Q.**  How did you regard his knowledge of the transition

12   management business?

13   **A.**  Extremely well.

14   **Q.**  Do you have an understanding of whether he was familiar

15   with the marketing materials that State Street distributed to

16   clients for transition management?

17   **A.**  Yes.

18   **Q.**  What's your understanding?

19   **A.**  That he knew the pitch and he knew the marketing

20   materials.  Yes.

21   **Q.**  How do you know that?

22   **A.**  Some of the corporate materials were done by the

23   marketing department and needed approval.  We had an approved

24   marketing slide, deck of PowerPoint slides and, you know, we

25   talked about it.  It was the same message globally.

1    **Q.**   And what was that message?

2    **A.**   That we acted as an agent, a fiduciary agent to the

3    client.

4    **Q.**   How many employees were there at State Street, to your

5    knowledge, during the this time period of 2010/2011?

6    **A.**   I would say between 30 and 35,000.

7    **Q.**   30 and 35,000?

8    **A.**   Globally, or thereabouts.

9    **Q.**   How many were at the defendant's level, or above?

10   **A.**   I would say between 50 and 100.

11   **Q.**   Tell us what the competitive landscape was like in the

12   transition management business, in the EMEA region in

13   early 2010.

14   **A.**   Extremely challenging.

15   **Q.**   Why was that?

16   **A.**   There was an immense pressure on fees, commissions, and

17   there were a lot of competitors that were undercutting us.

18   **Q.**   Undercutting you how?

19   **A.**   Charging virtually no fees or zero fees and making money

20   elsewhere.

21   **Q.**   How did State Street get paid for transitions?

22   **A.**   Commissions.

23   **Q.**   What kind of commissions?

24   **A.**   Transaction-based fees, commissions on individual trades.

25   **Q.**   Would you negotiate those transitions with clients or

1    not?

2    **A.**   Yes.

3    **Q.**   Would you agree upon them or not?

4    **A.**   Yes.

5    **Q.**   In a transaction, in a commission-based business, am I

6    correct in understanding that the more trading, the higher

7    the fee?

8    **A.**   Yes, if the fee is the same and the level is the same,

9    yes.

10   **Q.**   The rate?

11   **A.**   Yes.

12   **Q.**   And the larger the transition, the more -- the higher the

13   fee?

14   **A.**   Yes.

15   **Q.**   How many transitions did you do in the EMEA region per

16   year on average?

17   **A.**   On average, probably around 100, or maybe a bit less or a

18   bit more on average, I would say, in that ballpark.

19   **Q.**   What was your revenues, annually?

20   **A.**   2009 was a bumpy year.  We had probably transition

21   revenues of between 40 and $50 million.  And that was sort of

22   a doubling, almost, or thereabouts of the previous year.

23   **Q.**   So 2009 was a very good year?

24   **A.**   Yes.

25   **Q.**   How many of those transitions were, say, a billion

1  dollars or more in size?

2  **A.**  I would say between five and ten.

3  **Q.**  What impact did those large deals have on your revenues?

4  **A.**  Well, they make or break your year.  You really were

5  dependent on the large deals.

6  **Q.**  You testified a moment ago that you were being undercut

7  on price in early 2010.

8  **A.**  Yes.

9  **Q.**  Did there come a time when you came to believe that

10  certain of your competitors were undercutting you in

11  dishonest ways?

12  **A.**  Yes.

13  **Q.**  Tell us about that.

14  **A.**  It came to our attention, we suspected it already, but it

15  came to our attention that a competitor of ours, Bank of New

16  York, ConvergEx, which is also active in the transition

17  management business, that they were telling clients the

18  commission was very low and, in fact, they were charging

19  additional charges and it came in the form of a spread that

20  was sent to us.

21  **Q.**  What came to you in the form of a spreadsheet?

22  **A.**  Evidence of that practice.

23  **Q.**  And what was the practice?

24       MR. WEINBERG:  Your Honor, please.  I don't want to

25  interrupt, could we reserve the objection to this ConvergEx

1    area?

2             THE COURT:  Yes.

3             MR. WEINBERG:  Thank you, sir.

4             THE COURT:  Go ahead.

5             MR. FRANK:  And Your Honor, just to be sure, I'm

6    asking for the witness' understanding of what a competitor

7    was doing.

8             THE COURT:  Yes.

9             THE WITNESS:  Could you repeat the question?

10   BY MR. FRANK:

11   **Q.**  What was your understanding of what ConvergEx was doing

12   that you believed to be dishonest?

13   **A.**  I think they were fleecing their clients.

14   **Q.**  How so?

15   **A.**  Well, they charged a low fee to win the deal, to rope in

16   the client, and then make money somewhere in the back end,

17   without the client knowing about it.

18   **Q.**  You mentioned the spreadsheet?

19   **A.**  Yes.

20   **Q.**  What was the spreadsheet that you were referring to?

21   **A.**  It showed a list of clients and some of them I

22   recognized, because we pitched for those clients, and they

23   were clients of ours as well.  And it showed commissions and

24   it showed markups in securities trades, so equities or bonds.

25   I couldn't exactly pinpoint that and also in the FX business.

1    And then it was a total sort of revenue per client.

2    **Q.** Where did you get this spreadsheet?

3    **A.** It was sent to me by e-mail by Ross.

4    **Q.** You got it from the defendant?

5    **A.** Yes.

6    **Q.** Do you have an understanding of how he came into

7    possession of this spreadsheet?

8    **A.** All I know is that it came from Asia, and I have

9    absolutely no idea where from.

10   **Q.** What did he tell you about where he got it?

11   **A.** From Asia.

12   **Q.** Did he tell you who sent it to him from Asia?

13   **A.** No.

14          MR. FRANK:  Could we show the witness Government

15   Exhibit 5, please.

16          THE WITNESS:  It's very small.  Sorry.

17          MR. FRANK:  We're going to blow it up.

18          THE WITNESS:  Okay.

19          MR. FRANK:  And could you actually, Erin, please,

20   blow up a little more, like the top half.

21   BY MR. FRANK:

22   **Q.** Do you recognize this document?

23   **A.** Yes.

24   **Q.** What is it?

25   **A.** It is a document -- an e-mail from me to Ross on January

1    the 7th, 2010.

2              MR. FRANK:  Thank you, the Government moves to --

3    the Government moves to enter Exhibit 5, Your Honor.

4              MR. WEINBERG:  Again, it's the same -- the 403

5    objection that was made pretrial.

6              THE COURT:  Overruled.  Admitted.

7              (Exhibit No. 5 admitted into evidence.)

8              THE COURT:  It's number 5, right, Mr. Frank?

9              MR. FRANK:  Yes, Your Honor.  Thank you.  And

10   there's an attachment, we would move to admit that, as well.

11             MR. WEINBERG:  And Judge, just so I'm not

12   interfering --

13             THE COURT:  Yes, same objection.  I'll preserve it

14   on this.

15             58-1 is in evidence, as well.

16             MR. FRANK:  Thank you.

17             (Exhibit No. 5-1 admitted into evidence.)

18             MR. FRANK:  And just to make sure that I'm not

19   seeing things, are there blue arrows on everybody else's

20   screen, or is it just mine?

21             THE COURT:  There is.

22             MR. FRANK:  Okay.  I'm not touching them again.

23             Could we blow up the bottom e-mail there, please.

24   BY MR. FRANK:

25   Q.  Mr. Pennings, what is this e-mail?

1   **A.**   This is an e-mail that I sent to a client and again, a

2   prospect at this time, to Neville Fields, on the 7th of

3   January, 2010.

4   **Q.**   Who is Neville Field?

5   **A.**   Neville Field was the manager of the Government's

6   Institutions Pension Fund in Namibia, which is in Southwest

7   Africa.

8   **Q.**   So he was a prospective client?

9   **A.**   Yes, I think they were a client before and we were

10   pitching again.

11   **Q.**   And just to orient us at this time, this was the first

12   week of January in 2010?

13   **A.**   Yes.

14   **Q.**   What's going on in this e-mail?

15   **A.**   I'm explaining --

16   **Q.**   Well, actually, before you answer that question, can you

17   tell us what the subject is of that e-mail?

18   **A.**   "Artificially low commissions due to undisclosed spread.

19   Confidential."

20   **Q.**   And what's the subject matter?

21   **A.**   It deals with the information that we received regarding

22   BONY, so Bank of New York's trading practices.

23   **Q.**   Were what you telling Mr. Field?

24   **A.**   I sent it to him, after I cleared that with my boss, and

25   I said I'll discuss the details and explain to you what we --

1    how we interpreted what this means.

2    **Q.**   Could we look at the top half of the document.

3              Who did you forward this exchange with Mr. Field

4    to?

5    **A.**   To Mr. McLellan.

6              MR. FRANK:  And if we could just, Erin, highlight

7    the name of the attachment.

8    BY MR. FRANK:

9    **Q.**   Could you read that, Mr. Pennings?

10   **A.**   "BONY ConvergEx client abuse list."  And I suppose that's

11   the date.

12   **Q.**   Why is it called the client abuse list?

13   **A.**   Well, because we thought they were abusing the clients.

14   **Q.**   And why did you forward this to the defendant?

15   **A.**   Because this was a very large trade.  Ross was always

16   interested in large deals.  And this was the first time that

17   we actually, to the best of my recollection, the -- that we

18   sent this document to a client of ours that we were pitching

19   for.  And I wanted to see if we could save a very large

20   pitch, where I was told that my competitor was significantly

21   cheaper in the commissions.

22   **Q.**   How did the Namibian pension fund react to your attempt

23   to discredit ConvergEx?

24              MR. WEINBERG:  Objection, Your Honor.  It's

25   hearsay.

```
 1              THE COURT:  What's the relevance?  Just on a state
 2     of mind?
 3              MR. FRANK:  Yes, Your Honor.
 4              THE COURT:  Okay.  Overruled for that purpose.
 5              THE WITNESS:  He reacted -- I believe he
 6     said, "I'll look into it."
 7     BY MR. FRANK:
 8     Q.  Did you win the deal?
 9     A.  No.
10              MR. FRANK:  Can we look at Government Exhibit 6 for
11     the witness only, please.
12     BY MR. FRANK:
13     Q.  Do you recognize this document?
14     A.  Yes.
15     Q.  What is it?
16     A.  It is a document that I sent to Ross on the following
17     day, on January the 8th.
18              MR. FRANK:  The Government moves to admit
19     Exhibit 6.
20              THE COURT:  Same objection?
21              MR. WEINBERG:  (Nods head.)
22              THE COURT:  Overruled.  Admitted.
23              (Exhibit No. 6 admitted into evidence.)
24     BY MR. FRANK:
25     Q.  I'd like to direct your attention to the e-mail at the
```

1    bottom of the page.  So this is the following day?

2    **A.**  Yes.

3    **Q.**  It's another exchange with Mr. Field?

4    **A.**  Yes.

5    **Q.**  You write, in the first paragraph, "further to our

6    discussion this morning, I can state unequivocally that State

7    Street Transition Management only collect revenues through

8    fully disclosed, explicit agency commissions.  Any internal

9    crosses, matched flow with other transition management

10   clients, will not attract any commissions at all.  On

11   average, we cross around 25 percent of internal equities

12   internally at zero commissions.  We do not take any

13   undisclosed spreads.  Furthermore, we are always acting in a

14   fiduciary capacity."

15            When you told this prospective client that,

16   unequivocally, State Street Transition Management only

17   collect revenues through fully disclosed, explicit agency

18   commissions, what did you intend for the client to

19   understand?

20   **A.**  That if we say we charge you X commissions, then that was

21   the revenue that State Street would take and this directly

22   compares with what I tried to explain to the client, where

23   they looked at the BONY pitch, it showed a very low

24   commission, but in fact, they would be paying much more,

25   which is what we believed.

**Q.**  When you told the client that internal crosses would not

attract any commissions at all, what were you referring to?

**A.**  Well, you know, we had a higher commission, I knew that

and I wanted to remind them that if you take into account our

internal crossing, where we match the flow with other

clients, our commission rate is actually slightly liar --

lower than -- by 25 percent.

**Q.**  And that's because you wouldn't charge for those?

**A.**  Correct.

**Q.**  When you told the client "we do not take any undisclosed

spreads," what did you intend for the client to understand?

**A.**  That what we told them the commissions was, that was what

he's going to pay us, and nothing more.

**Q.**  When you told the client that you always act in a

fiduciary capacity, what did you intend for him to

understand?

**A.**  That we were not going to be the other side of their

trades.  We weren't going to act as a principal counterparty,

and we would act in their best interest and have our interest

aligned with them.

**Q.**  In the next paragraph you say, "The transition management

team, including our affiliates, does not have a proprietary

trading book and therefore cannot act as a principal

counterparty to either your equity or fixed income trades.

We treat each transition as an interim asset management

1    assignment and this means our interests are always aligned

2    with those of our clients.  Our agency-only trading desk sits

3    within the transition management group and they do not have

4    their own P&L.  They purely are there to execute transition

5    management order flow, just like any execution desk within a

6    buy-side asset management firm."

7            When you told Mr. Field that your "agency-only

8    trading desk sits within your transition management group,"

9    what did you intend to understand?

10   **A.**   That, again, the commissions that we will tell the client

11   that we were going to charge were the only fees and that our

12   trading desk was only there to execute the trades as an order

13   of execution desk and not benefit from the flow in other

14   ways.  They cannot be the principal counterparty.

15   **Q.**   When you told him that "they do not have their own P&L,"

16   is that profit and loss?

17   **A.**   Yes.

18   **Q.**   What did you intend for him to understand?

19   **A.**   That the trading desk wouldn't make any money without

20   them knowing about it.

21   **Q.**   You go on to say, "due to its over-the-counter nature,

22   only the State Street's FX business" -- what is FX?

23   **A.**   Foreign exchange currency trading.

24   **Q.**   "... is a principal business and this is completely

25   separate from the transition management business.  We have a

1   multi-dealer platform through the electronic FX KLUP connect

2   system for FX executions and are happy to use any FX

3   counterparty of your choosing."

4           What did you intend for Mr. Field to understand

5   about State Street's principaled FX business?

6   **A.**   That it didn't -- it wasn't part of our group and that it

7   was a principal business.

8   **Q.**   And what does that mean?

9   **A.**   That they may make money by betting the bank's money, if

10  you will.  They're the other sides.

11  **Q.**   And is that the same or different as what you did with

12  stocks and bonds?

13  **A.**   It was different.

14  **Q.**   Could we take a look at the next page, please.

15          MR. FRANK:  And if we can enlarge the bottom -- the

16  second-to-last paragraph.

17  BY MR. FRANK:

18  **Q.**   You said, "We are very serious about our fiduciary

19  responsibilities and would be very keen to work alongside

20  your consultant, Riscura, to serve the best interests of

21  GIBF.  Our industry is under constant scrutiny as a result of

22  bad practice by a few, and therefore, it is our constant aim

23  to raise the ethical standards to the highest levels by being

24  100 percent open and transparent to our clients and aligning

25  our interests with theirs."

1          Did you say that to Mr. Field?

2     **A.**   I wrote it in an e-mail to him.

3     **Q.**   Why?

4     **A.**   Because that's what we believed and that's what we did.

5     **Q.**   What were you referring to when you referred to "bad

6     practice by a few"?

7     **A.**   In this particular case, Bank of New York.

8     **Q.**   And what was Bank of New York doing that you thought was

9     bad practice?

10    **A.**   They were misleading the clients.

11    **Q.**   Could we go to the first page, please.

12          How does this description of your business versus

13    your competitors' business compare with what you told other

14    clients?

15    **A.**   The pitch was similar.

16    **Q.**   Same pitch?

17    **A.**   Yeah.

18    **Q.**   Could we look at the top e-mail, please.

19          You forwarded this e-mail to the defendant?

20    **A.**   Yes.

21    **Q.**   Why?

22    **A.**   Because we were both looking at it, a number of us were

23    looking at it, because it was, you know -- it was a big

24    opportunity, it was a big trade.  And also, it was kind of

25    maybe somewhat uncomfortable that we would send information

1    from a competitor to educate the client on what's going on in

2    the market.

3    Q.  Did you discuss ConvergEx's client abuse through the

4    charging of hidden commissions with the defendant?

5             MR. WEINBERG:  I object, Your Honor, to the leading

6    questions.  There's been many of them.  I've tried not to

7    object.

8             MR. FRANK:  There haven't been leading questions.

9             THE COURT:  Without speaking.  Either way, it's

10   overruled to this question.

11            THE WITNESS:  Could you repeat?

12   BY MR. FRANK:

13   Q.  Did you discuss ConvergEx's client abuse through the

14   charging of hidden commissions, which you testified a moment

15   ago, with the defendant?

16   A.  Yes.

17   Q.  What did he tell you about that?

18   A.  You know, I think he was just -- that the -- you know,

19   he's saying the same thing as I did, it's not right.

20            MR. FRANK:  We can take this document down.

21   BY MR. FRANK:

22   Q.  During this period of time in early 2010, what was going

23   on with your revenues in the transition management business

24   in Europe and the Middle East?

25   A.  We were lagging, our budget.

1    **Q.**  Did you have revenue targets?

2    **A.**  Yes.

3    **Q.**  Who set them?

4    **A.**  I got mine from Ross, but I don't know where they came

5    from.

6              THE COURT REPORTER:  I'm sorry.  Say that again?

7              THE WITNESS:  I got my revenue targets from Ross

8    McLellan and where he gets them from, I suspect from his

9    boss.

10             MR. FRANK:  You're trailing off a little bit at the

11   end, Mr. Pennings, please keep your voice up.

12             THE WITNESS:  There you go.

13             MR. FRANK:  Could we show the witness Exhibit 7,

14   please.

15   BY MR. FRANK:

16   **Q.**  Do you recognize this document?

17   **A.**  Yes.

18   **Q.**  I'll blow it up for you.

19             What is it?

20   **A.**  It is an e-mail from Ross to myself on February 12th.

21             MR. FRANK:  Move to admit Exhibit 7.

22             MR. WEINBERG:  No objection.

23             THE COURT:  Admitted.

24             (Exhibit No. 7 admitted into evidence.)

25   BY MR. FRANK:

1    **Q.** Could we look at the bottom e-mail, please.  Subject line

2    is "Forecast Q1."

3           You say, "Ross, you asked me about the EMEA Q1

4    forecast.  I would say, at the moment, around 5 to $6 million

5    is the KLUP -- it clearly all depends on what else comes in

6    in the next few weeks."

7           What are you communicating to the defendant here?

8    **A.** He asked me about what we believe Q1, the first quarter,

9    was going to look at, versus budget, and I gave him a dollar

10   amount of 5 to $6 million, which was about halfway where we

11   probably needed to be.

12   **Q.** I'm sorry, it was what?

13   **A.** Which was about halfway where we needed to be.

14   **Q.** Could we look at Mr. McLellan's response, please.  What

15   did he tell you?

16   **A.** "To use your own words, not enough."

17   **Q.** Did you discuss with the defendant the difficulties you

18   were having competitively?

19   **A.** Yes.  It was widely discussed.

20   **Q.** It was widely discussed?

21   **A.** Yeah.

22   **Q.** Who else did you discuss it with?

23   **A.** My management team, sales people.

24   **Q.** Who was your management team?

25   **A.** Rick Boomgaardt, Paul McGee, Ian Holden, Stuart

1  Lannister, in London.

2  **Q.**  Are you familiar with an entity called KIA, the Kuwait

3  Investment Authority?

4  **A.**  Yes.

5  **Q.**  What is KIA?

6  **A.**  It's the Kuwait Investment Authority.

7  **Q.**  What is it?

8  **A.**  It's the Government sovereign wealth fund, it's referred

9  to.  It's a very large investment management fund.

10  **Q.**  Was KIA a client?

11  **A.**  Yes.

12  **Q.**  Of your business or of the bank?

13  **A.**  Both.

14  **Q.**  How big a client?

15  **A.**  Very big.

16  **Q.**  Tell us how big.

17  **A.**  I think in Europe, it was probably top five bank-wise;

18  and for my business, I would say up there in the top three,

19  if not sometimes the biggest.

20  **Q.**  Did there come a time around this period when you had an

21  opportunity to pitch on a transition to the Kuwait Investment

22  Authority?

23  **A.**  Yes.

24  **Q.**  What kind of opportunity?

25  **A.**  It was a large fixed income deal for a billion dollars.

1  **Q.**  When you say "fixed income," was there bonds?

2  **A.**  Yes.

3  **Q.**  How did that opportunity compare with the size of other

4  deals?

5  **A.**  Very favorably, very big.

6  **Q.**  Did you have an understanding of what you needed to do to

7  win that deal?

8  **A.**  Yes.

9  **Q.**  What was that?

10  **A.**  Pitch zero commissions.

11  **Q.**  Who told you that?

12  **A.**  That came from the client.

13  **Q.**  Who at the client?

14  **A.**  A gentleman by the name of Das.

15  **Q.**  And who was that?

16  **A.**  That's an employee of the Kuwait Investment Authority and

17  a department that we were facing off with for transition

18  management.

19  **Q.**  What did you decide to do?

20  **A.**  We discussed it internally and we decided to pitch zero.

21  **Q.**  Who did you discuss it with?

22  **A.**  With my team in London, the management team, and Ross

23  McLellan.

24  **Q.**  Was it your intention to actually charge zero

25  commissions?

1  **A.**  No.

2  **Q.**  What was your intention?

3  **A.**  We were going to build in our compensation in -- or

4  commission into the price.

5  **Q.**  Who did you discuss that plan with?

6  **A.**  With my management team and Ross McLellan and also a

7  gentleman by the name of Rod Ringrow.

8  **Q.**  Who's Rod Ringrow?

9  **A.**  He was the senior or the head of State Street client

10  management in the Middle East.

11  **Q.**  What was the defendant's reaction to that plan?

12  **A.**  Yes, we have to.

13        MR. FRANK:  Your Honor, I'm happy to keep going on

14  to the next document.

15        THE COURT:  Another topic?  All right.  We'll break

16  here for the morning break.

17        Thank you, Mr. Frank.

18        All rise for the jury.

19        (The jury exits the courtroom.)

20        THE COURT:  All right.  In recess until 11:15.

21        MR. FRANK:  Thank you, Your Honor.

22        (Court in recess at 11:00 a.m.

23        and reconvened at 11:16 a.m.)

24        THE COURT:  Please be seated.  Can I see you for

25  one moment at sidebar?

```
 1                 (At sidebar on the record.)
 2            THE COURT:  This is nothing.  In an overabundance
 3       of caution, when Ms. Simeone was taking the jury out, one of
 4       the jurors said to her, you know, there's another juror that
 5       has asthma and holds it in while he's in court.  And there is
 6       another juror who does have an inhaler.  And one of the
 7       proceedings we were talking, Ms. Simeone noticed that when
 8       she takes the jury out.  So I authorized her to tell him he
 9       can bring his inhaler in the courtroom.  It seems totally
10       fine.  Since it's a communication with the jury, I just
11       wanted to tell you so if you had any issues or whatever, you
12       know about it.
13            MR. WEINBERG:  Judge, while we're here, again, I
14       make this request, that Mr. Frank be required to have the
15       witness read these lengthy e-mails rather than have them read
16       by Mr. Frank.
17            I understand they're an exhibit; I understand why
18       Mr. Frank would prefer to read them himself.  Somehow, I'm
19       sure unconsciously, there's emphasis on certain words that
20       are not emphasized in the e-mails.
21            MR. FRANK:  It's not unconscious; it's deliberate.
22       It's my right to read the evidence into the record, your
23       Honor.
24            THE COURT:  I think he can ask -- I don't see --
25       whether there are limits to that in situations, I don't think
```

1    what he's doing is impermissible in any way.  And I also with

2    respect to the leading, I don't think he's -- technically

3    there are certain questions that are leading, but I think

4    they're properly leading.  In other words, he's just

5    directing the witness to something, and they don't seem to be

6    really suggesting, asking the witness what did you mean by

7    this, what happened or what have you.  So he's not -- not

8    leading in that way.  So that's why I overruled the

9    objection, that they seem more preliminary matters to be

10   leading on rather than substantive matters, so that's why I

11   overruled.

12             MR. WEINBERG:  Understood.  Thought I'd ask, even

13   if I knew it was a long shot.

14             THE COURT:  It never hurts to ask.

15             MR. FRANK:  If you could just characterize which of

16   your motions are long shots and don't expect to win, that

17   would be helpful.

18             MR. WEINBERG:  We try; in our next case.

19             (End of discussion at sidebar.)

20             THE COURT:  Counsel, at 1:00 when I release them,

21   I'm going to remind them again about the schedule:  Monday

22   9:00 to 1:00, Tuesday and Wednesday 9:00 to 1:00 and 2:00 to

23   4:30, nothing on Thursday, Friday 9:00 to 1:00, and that we

24   remain on track to finish on time.

25             MR. WEINBERG:  Can your Honor reemphasize the

1    no-internet instruction at the break?

2              THE COURT:  Yes.  If I don't say that at the end of

3    every day, feel free to remind me, but I intend to say it

4    every day.

5              (Pause.)

6              THE CLERK:  All rise for the jury.

7              (Jury entered the courtroom.)

8              THE COURT:  Please be seated.

9              Go ahead, Mr. Frank.

10             MR. FRANK:  Thank you, your Honor.

11             If we could show Exhibit 8 just to the witness.

12   BY MR. FRANK:

13   **Q.**  Mr. Pennings, when we left off, we were discussing your

14   plan to bid on this Kuwait Investment Authority proposal.

15             Do you recognize this document?

16   **A.**  Yes.

17   **Q.**  What is it?

18   **A.**  It is a document from me to Ross regarding -- or on

19   February 24th.  Sorry.

20   **Q.**  February 24th of what year?

21   **A.**  2010.

22             MR. FRANK:  Move to admit Exhibit 8.

23             MR. WEINBERG:  No objection.

24             THE COURT:  Admitted.

25             (Exhibit No. 8 admitted into evidence.)

1          MR. FRANK:  If we could turn to page 2 and enlarge

2     the bottom.

3     Q.  If you could look at the bottom e-mail, that's an e-mail

4     from Mr. Das to you on the 23rd of February 2010.

5          Do you see that?

6     A.  Yes.

7     Q.  If we could look at the text, he says, "Dear Sir, KIA is

8     intending to go for a transition amounting to USD 4 billion

9     to 4 target managers.  Kindly provide your most competitive

10    quote in terms of commission in basis points."

11         Do you see that?

12    A.  Yes.

13    Q.  What do you understand Mr. Das to be asking you?

14    A.  He just asked us to quote for the deal with the lowest

15    commission.

16    Q.  How does this type of a request for a bid compare to how

17    other clients requested bids?

18    A.  It's very different.

19    Q.  How?

20    A.  He doesn't say anything.  We don't even know what the

21    trade is, whether it's fixed income or equities, and he just

22    wants to have a commission rate.

23    Q.  When you bid on deals for other clients, what types of

24    information did they provide?

25    A.  They would give an indication as to what the portfolio

1    looks like, possibly what -- who the managers are, not

2    necessarily, but certainly make a distinction between

3    equities and fixed income.

4    **Q.**   And when you would give a proposal, would you typically

5    provide the commission or would you provide other information

6    as well?

7    **A.**   Normally we would provide what we call "pre-trade

8    analysis," so an implementation shortfall estimate, if we

9    have the details or enough details to prepare that.

10   **Q.**   You responded to Mr. Das, "Thanks for your note.  We are

11   very keen to do this.  But before I give you the quote, could

12   you tell me what the target manager's mandates will be?  Is

13   it also T bills or is it going to be into other bonds or

14   equities?"

15           What were you asking Mr. Das?

16   **A.**   Can you give me some more information?  Because we don't

17   really know how to pitch for this if we have no idea what it

18   is.

19   **Q.**   Mr. Das responds at the bottom, "We do not the wish list

20   yet."

21           What is the wish list?

22   **A.**   That is the target portfolio that we are supposed to

23   purchase for the client.

24   **Q.**   So at this moment in time, did you have an understanding

25   of where the assets were currently invested?

1    **A.**   I believe it was T-bills, very short-dated government

2    bonds.

3    **Q.**   And I do understand this correctly, that you didn't know

4    what they were transitioning into?

5    **A.**   It was my belief it was fixed income, but I had no idea

6    what type.

7    **Q.**   If we could look at your response to Mr. Das.  You write,

8    "Dear Das, although the details of the target side of this

9    transition are still unknown, assuming this is an all Fixed

10   Income transition, I would like to propose the following:

11           "We will price the bonds and T bills at 'net.'

12   This means that for this transition there will be no

13   commissions changed on the fixed income trades.  We

14   anticipate being able to charge the other side of the

15   transactions which will enable us to keep commissions for KIA

16   at zero."

17           What were you telling Mr. Das with this

18   communication?

19   **A.**   That we will charge zero commissions but we would still

20   make money on the deal.

21   **Q.**   How would you make money on the deal if you charge KIA

22   zero commission?

23   **A.**   By charging essentially a markup.

24   **Q.**   Who were you telling him you were going to be charging

25   when you told him you would charge the other side of the

1   transaction?

2   **A.**   That's nonsense.

3   **Q.**   I'm sorry?

4   **A.**   That's nonsense.

5   **Q.**   What do you mean?

6   **A.**   Can't charge the other side.

7   **Q.**   You can't charge the other side?

8   **A.**   No, not -- it's just not practically possible.  Basically

9   what we would do is we get the best price in the market, and

10  we just add a fee and then build that into the price that a

11  client only sees one net price is what it's referred to.  So

12  it's not someone else being charged.

13  **Q.**   Mr. Pennings, when you told Mr. Das you would charge the

14  other side of the transaction, what did you intend for him to

15  believe?

16  **A.**   That he would not have to pay anything because it was

17  zero.

18  **Q.**   Well, who would be paying?

19  **A.**   Well, like I said, that's -- you know, the other side is

20  nonsense.

21  **Q.**   If we could look at the next paragraph, in the middle of

22  the paragraph, you said, "We have a 100 percent dedicated,

23  integrated agency fixed income execution desk in our

24  transition management group.  This is a unique feature that

25  hugely benefits the risk management capability and that no

1    other provider in the market has.  All benefits are passed on

2    to our clients."

3              Do you see that?

4    **A.**  Yes.

5    **Q.**  When you told Mr. Das that you have an integrated agency

6    fixed income execution desk in your transition management

7    group, what were you telling him?

8    **A.**  That execution desk would not be making any money other

9    than the commissions that we would state to the client.

10   **Q.**  When you told Mr. Das "All benefits are passed on to our

11   clients," what were you telling him?

12   **A.**  That there's not going to be any other revenues.

13             MR. FRANK:  Could we look at the top e-mail,

14   please?

15   **Q.**  You forwarded this e-mail on the same day to

16   Mr. McLellan?

17   **A.**  Yes.

18   **Q.**  Why?

19   **A.**  Because he was very interested in this deal, and it was

20   the first deal that we pitched zero commissions for on the

21   basis that we did.

22   **Q.**  You testified earlier about Mr. McLellan's experience in

23   the transition management industry?

24   **A.**  Yes.

25   **Q.**  You testified also about charging the other side of the

1    transaction?

2    **A.**   Just now, yes.

3    **Q.**   When you sent this e-mail to Mr. McLellan, did he tell

4    you that was nonsense?

5    **A.**   Not that I can recall, no.

6    **Q.**   Did he say anything?

7    **A.**   I don't recall.

8    **Q.**   What was the purpose of sending your e-mail to Mr. Das?

9    **A.**   To make him believe that we charged zero commissions.

10   **Q.**   Prior to sending it, did you discuss the substance with

11   anyone?

12   **A.**   I discussed -- this was obviously a new thing for us.  I

13   discussed it with my team and with my boss.

14   **Q.**   What happened after you submitted this bid?

15   **A.**   We won half of it.

16           MR. FRANK:  If we look at Exhibit 9, for the

17   witness only, please.

18   **Q.**   Do you recognize this document?

19   **A.**   Yes.

20   **Q.**   What is it?

21   **A.**   It is an e-mail from me to Ross on March the 2nd in 2010.

22           MR. FRANK:  The government moves to admit Exhibit

23   9.

24           MR. WEINBERG:  No objection.

25           THE COURT:  Admitted.

1          (Exhibit No. 9 admitted into evidence.)

2  BY MR. FRANK:

3  **Q.**  At the bottom of the page there's an e-mail from Mr. Das

4  to you, 2nd of March 2010, copy to Rodney Ringrow.

5          Remind us who that is.

6  **A.**  That is the head of the client relationship management

7  for State Street in the Middle East.

8  **Q.**  Was he aware of your plan?

9  **A.**  Yes.

10  **Q.**  You wrote, "Dear Edward, subsequent to your quote" -- I'm

11  sorry.

12          Mr. Das wrote, "Dear Edward, subsequent to your

13  quote, KIA's senior management is pleased to appoint you as

14  the transition manager for 115 USD 2 billion.  Kindly send us

15  the documentation package asap."

16          Do you see that?

17  **A.**  Yes.

18  **Q.**  And 115, what does that refer to?

19  **A.**  That's the transition.  They just gave it a name, 115.

20  **Q.**  And if we look at the prior e-mail in the chain -- I'm

21  sorry.  The one above it.

22          You forwarded this to Mr. McLellan.  Do you see

23  that?

24  **A.**  Yes.

25  **Q.**  You wrote, "They split the trade between us and Nomura

1  (also at zero commissions).  Apparently there is another one

2  coming."

3          Do you see that?

4  **A.**  Yes.

5  **Q.**  Why did you forward this to Mr. McLellan?

6  **A.**  Because we just won a very large deal.

7  **Q.**  And what were you telling him when you said, "They split

8  the trade between us and Nomura (also at zero commissions)"?

9  **A.**  That Nomura also pitched zero commission.

10  **Q.**  Did you have an understanding of whether Nomura had ways

11  of making money even when it was charging zero commissions?

12  **A.**  It was my belief that they were making money, yes.

13  **Q.**  Did you have an understanding of how?

14  **A.**  Not really.  I didn't work at Nomura.

15  **Q.**  If you look at the e-mail above, Mr. McLellan responds,

16  "Better than a loss.  See assets yet?"

17          Do you see that?

18  **A.**  Yes.

19  **Q.**  And then you respond, "Nope.  But if they are bonds, we

20  should make our quarter."

21          What did you mean by that?

22  **A.**  If they're bonds, we could mark them up.  And given the

23  size of the deal, that would, you know, make us a lot of

24  money and hopefully make the budget for the quarter.

25  **Q.**  And at this point, how were you doing budgetwise?

1    **A.**   We were behind.

2          MR. FRANK:  If we look at Exhibit 11, please, for

3    the witness only.

4    **Q.**   Do you recognize this document?

5    **A.**   Yes.

6          MR. FRANK:  Erin, can we blow up the entire text?

7          Thank you.

8    **Q.**   What is it?

9    **A.**   It's -- I'm sending Das at the KIA the periodic notice,

10   copying Rick Boomgaardt.

11   **Q.**   And what's the periodic notice?

12   **A.**   The periodic notice is a document that refers to the

13   transition management framework agreement, essentially talks

14   about the fees, sets out the terms, and briefly describes

15   what a transition is.

16          MR. FRANK:  The government moves to admit

17   Exhibit 115 -- I'm sorry.  Withdrawn.

18          Government moves to admit Exhibit 11 and its

19   attachment.

20          MR. WEINBERG:  No objection.

21          THE COURT:  Admitted.

22          (Exhibit No. 11 admitted into evidence.)

23          MR. FRANK:  And if we could look, Erin, at the

24   attachment.

25   BY MR. FRANK:

1    **Q.**  What is this document?

2    **A.**  That is the periodic notice.

3    **Q.**  And who -- there are some --

4         THE COURT:  I couldn't hear you.  What did you say

5    it was?

6         THE WITNESS:  That's the periodic notice.

7    BY MR. FRANK:

8    **Q.**  In the last paragraph, "Transaction 115, a fixed income

9    transition from legacy managers XXX and then to target

10   managers XXX."

11        Do you see that?

12   **A.**  Yes.

13   **Q.**  Who was supposed to fill that in?

14   **A.**  The KIA.

15        MR. FRANK:  And if we could look at the second

16   page.

17        Erin, if you could highlight the commission fee,

18   the last row in the table.

19   **Q.**  Mr. Pennings, what does that say?

20   **A.**  Zero.

21   **Q.**  Why is that?

22   **A.**  Because we were going to charge zero commissions.

23   **Q.**  Now, I'd like to look at footnote 2.

24        You wrote, "All bonds will be priced" -- first of

25   all, did you draft this document or did someone else?

1   **A.**   I believe I did.

2   **Q.**   You wrote, "All bonds will be priced net as per market

3   convention with all markups included in the spread and no

4   additional explicit commission fee charged."

5            Do you see that?

6   **A.**   Yes.

7   **Q.**   What is the market convention for bonds?

8   **A.**   That is the market convection from bonds to price at net.

9   **Q.**   What does it mean to price something net?

10  **A.**   That the remuneration, the fee is built into the price.

11  **Q.**   Why did you put this footnote on this periodic notice?

12  **A.**   Because I didn't want to get called out afterwards if

13  someone asked.

14  **Q.**   What do you mean by that?

15  **A.**   I used it as a cover.  Because we pitched it as zero, and

16  clearly it wasn't possible to charge zero on something.

17  We've been telling for six years that we couldn't do stuff

18  for zero.  So if they then queried it, I could fall back on

19  it.

20  **Q.**   If who queried it?

21  **A.**   The client.

22  **Q.**   You said you've been telling them for six years you

23  couldn't charge zero?

24  **A.**   Well, that's what our general pitch was, you know, we

25  charge a transparent fee.

1   **Q.**  If you could look at footnote 4, please, you say, "In

2   carrying out its duties and responsibilities, the manager

3   will at all times act in good faith, with due diligence, and

4   in a manner that a prudent manager would believe at the time

5   to be in the best interests of the customer."

6          Do you see that?

7   **A.**  Yes.

8   **Q.**  How did that compare with what you generally told

9   clients?

10  **A.**  That -- well, that was a standard sentence that was in

11  most, if not all, KIA transition management notices.

12         MR. FRANK:  If we could show the witness Exhibit

13  12, please.

14  **Q.**  Do you recognize this document?

15  **A.**  Yes.

16  **Q.**  What is it?

17  **A.**  It's a conversation between Ross and myself on March 6th.

18         MR. FRANK:  The government moves to admit Exhibit

19  12.

20         MR. WEINBERG:  No objection.

21         THE COURT:  Admitted.

22         (Exhibit No. 12 admitted into evidence.)

23         MR. FRANK:  Erin, could we put up Exhibit 12 next

24  to Exhibit 11, please?  So Exhibit 11, the e-mail with the

25  periodic notice is on the right.  Could we blow up just the

1    header?

2    BY MR. FRANK:

3    **Q.**  Can you tell us the date of the periodic notice that you

4    sent to Mr. Das?

5    **A.**  March 3, 2010.

6         MR. FRANK:  Can we look at the header for Exhibit

7    12, please?

8    **Q.**  What's the date?

9    **A.**  March 6, 2010.

10        MR. FRANK:  And now if we could just focus on

11   Exhibit 12, if we look at the second page, the bottom e-mail.

12   **Q.**  You see you've written to Mr. McLellan -- actually, this

13   one is March 5th.  Do you see that?

14   **A.**  Yes.

15   **Q.**  "KIA one manager is a billion govvies, duration of about

16   three years, the other mix of govvies and corp., I think with

17   about the same duration, maybe a bit longer like four.

18   Legacy is t bills."

19        What are you saying?

20   **A.**  I'm describing or relaying what I found out that the

21   transition actually looks like, so the target and the legacy

22   portfolios.

23   **Q.**  What did you do with that information?

24   **A.**  It allows you to get an idea of what type of risk and

25   what type of remedy you can get out of it.

1    **Q.**  Why does it -- what does it have to do with revenue?

2    **A.**  In bonds, we charged a basis point over number of basis

3    points of yield, and there is a mathematical relationship

4    between the duration and the rate.

5           So the longer the duration, the higher the

6    revenues, essentially.

7    **Q.**  What about -- is there any relevance to your ability to

8    charge undisclosed commissions?

9    **A.**  It is easier to build in fees or hide fees, if you will,

10    in longer duration bonds.

11    **Q.**  Why?

12    **A.**  Spreads -- bid and ask offer spreads are somewhat wider,

13    and it's just easier to do.

14    **Q.**  You write, "6 million perhaps?  What do you think.  Is 8

15    million too much?"

16           What are you referring to?

17    **A.**  Possible revenues.

18           MR. FRANK:  If we can look at Mr. McLellan's

19    response on the prior page, please.  Actually, if you can

20    just blow up the bottom half of the -- this part right here.

21    **Q.**  You see that Mr. McLellan responds, "How about 7?"

22    **A.**  Yes.

23    **Q.**  And then you respond, "8 probably better then.  We can

24    definitely value it as we please, right, so we always look

25    good and cheap."

```
 1                  Do you see that?
 2   A.   Yes.
 3   Q.   What are the numbers that you are referring to there?
 4   A.   The revenue numbers.
 5   Q.   Again, what have you quoted?
 6   A.   Zero.
 7   Q.   Can you look at Mr. McLellan's response?
 8             How does he respond?
 9   A.   "8 it is."
10             MR. FRANK:  Can we show the witness Exhibit 13,
11   please?
12   Q.   Do you recognize this document?
13   A.   Yes.
14   Q.   What is it?
15   A.   It's a document that I forward to Ross on March the 18th.
16   Q.   So about ten days later?
17   A.   Roughly, yes.
18             MR. FRANK:  Move to admit 13.
19             MR. WEINBERG:  No objection.
20             THE COURT:  Admitted.
21             (Exhibit No. 13 admitted into evidence.)
22   BY MR. FRANK:
23   Q.   If you look at the bottom e-mail, this is an e-mail from
24   Mr. Das to you on 17 March 2010.  "Dear Edward, good morning.
25   Kindly confirm that SSBT" --
```

1         What is that?

2    **A.**   State Street Bank and Trust.

3    **Q.**   -- "is in compliance with the T-charter in terms of

4    quoting zero commission."

5         What is the T-charter?

6    **A.**   It's an industry -- voluntary industry code that was put

7    together by the transition management providers in our

8    industry to promote transparency and make it easier for

9    clients to compare one with another.

10   **Q.**   What did you understand Mr. Das to be asking you when he

11   asked whether you were in compliance with the T-charter in

12   terms of quoting zero commission?

13   **A.**   Are you disclosing all the revenues to the KIA.

14   **Q.**   Do you see that there are two individuals copied on his

15   e-mail to you?

16   **A.**   Yes.

17   **Q.**   Who are they?

18   **A.**   Othman Al-Issa and Adel Hamadah.  Adel was Das' direct

19   boss, and Othman was Adel's boss.

20   **Q.**   Have you met those individuals?

21   **A.**   Yes.

22   **Q.**   Did you have an understanding of what their role was, if

23   any, in the selection of a transition manager?

24   **A.**   Yes.

25   **Q.**   What was your understanding?

1    **A.**  They would choose the transition manager.

2    **Q.**  How well did you know them?

3    **A.**  Fairly well.  I met them several times.

4    **Q.**  Based on your interactions with them, did you have an

5    understanding of their financial sophistication?

6              MR. WEINBERG:  Objection, your Honor.

7              THE COURT:  Overruled.

8              As to your understanding.

9    **A.**  Relating to transition management, I don't think they

10   were very sophisticated.

11   **Q.**  Why?

12   **A.**  Just by, you know, their behavior, the way they talked,

13   the way they avoided the subjects, they -- it was just my

14   impression that they didn't know what they were talking

15   about.

16   **Q.**  If we look at your response to Mr. Das' question about

17   whether you were in compliance with the T-charter in quoting

18   zero commission, you write -- "Hi, Das" --

19              MR. FRANK:  If we can highlight the first three

20   paragraphs.

21   **Q.**  "The T-Charter requires us to disclose all sources of

22   revenue and our periodic notice is doing just that.  We will

23   also do this in our post-trade report.  Therefore I confirm

24   we are in compliance with the T-Charter."

25              What were you intending for Mr. Das to understand?

1   **A.**   That we were in compliance with the T-charter.

2   **Q.**   Was that true?

3   **A.**   No.

4   **Q.**   What was your intent with this paragraph?

5   **A.**   Kind of just talk around the subject.  I wasn't overly

6   familiar with the various rules of the T-Charter, and I just

7   picked up the document and it says you need to disclose all

8   sources.

9           So I was trying to be cute with the language,

10   saying that we were disclosing all sources.  But, in fact,

11   what he was looking for is, you know, are you disclosing all

12   the revenue.

13   **Q.**   In the next paragraph you say, "As discussed, for this

14   particular fixed income transition we have adjusted our

15   normal pricing structure and will arrange to get a share of

16   the spread from the 'other side' (the successful winning

17   counterparty for each individual security as chosen by us as

18   your agent in a competitive bid process) in order for KIA to

19   forego explicit commissions."

20           What were you attempting to communicate to Mr. Das

21   there?

22   **A.**   The same line, that we get it from the other side.  That

23   just was impossible.

24   **Q.**   If you could keep your voice into the microphone.

25   **A.**   Sorry.

1    **Q.**   I'm not sure everyone is catching what you're saying.

2    **A.**   It was again the same nonsense.

3    **Q.**   You write, "In fixed income markets, remuneration tends

4    to be wrapped up in the spread with prices quoted 'net' due

5    to the principal 'over the counter' nature of the market.

6    This approach is not possible for the equity transactions as

7    there has to be an explicit commission charge there."

8              Were those statements true or untrue?

9    **A.**   That's true.

10   **Q.**   If we go down to the next paragraph --

11   **A.**   For us, it was true.

12   **Q.**   If we go down to the next paragraph, you write, "As

13   discussed many times with KIA, and indeed with all of our

14   clients, we always prefer to charge explicit commissions

15   (also with fixed income transactions) as this in our opinion

16   is much more transparent.  However, in this instance the

17   guidance we have been given is to eliminate the explicit

18   commission element as this is unfortunately what the

19   non-transparent principal broker business models (our

20   competition on the panel) are forcing upon us."

21             When you refer to your "non-transparent principal

22   broker business models," what were you referring to?

23   **A.**   The competition that was winning the deals at zero.

24   **Q.**   What was your understanding of whether they had the

25   ability to earn money in other ways?

1    **A.**   They were either acting as a principal counterparty

2    making money that way or taking spreads.  But, again, I

3    wasn't working on these -- with these companies, so I can't

4    really give more information on that.

5    **Q.**   If you look at the top, you forwarded this e-mail to the

6    defendant?

7    **A.**   Yes.

8    **Q.**   Why?

9    **A.**   Because it was kind of an awkward question, and I just

10   wanted to keep Ross in the loop.

11   **Q.**   Why was it an awkward question?

12   **A.**   Because it appeared to me that that question wouldn't

13   come from the KIA directly.  I believe it was -- it was

14   coming from a competitor that was still quoting

15   transparently, lost the deal on that basis, and basically

16   told the KIA why don't you ask these guys if they're

17   complaint with the T-charter.

18           MR. FRANK:  Could we look at Exhibit 14, please,

19   just for the witness?

20   **Q.**   Do you recognize this document?

21   **A.**   Yes.

22   **Q.**   What is it?

23   **A.**   It's an e-mail I sent to Das on the 18th of March of that

24   same year.

25           MR. FRANK:  The government moves to admit 14.

```
1              MR. WEINBERG:  No objection.

2              THE COURT:  Admitted.

3              (Exhibit No. 14 admitted into evidence.)

4    BY MR. FRANK:

5    Q.  Would you look at the bottom e-mail, please?

6              You write -- well, Mr. Das sends you an e-mail

7    saying, "Kindly quote commission as per table below."

8              Do you see that?

9    A.  Yes.

10   Q.  Who filled in that table?

11   A.  I believe I did.

12   Q.  The first box says, "Transition manager commissions and

13   fees."  Do you see that?

14   A.  Yes.

15   Q.  You filled in "zero commission"?

16   A.  Yes.  That was the pitch we made.

17   Q.  The last box says, "Bid-Offer Spreads & Market Impact."

18             You filled in, "TBC and included in pre-trade

19   estimate when portfolio details are known."

20             And then you wrote, "(State Street shares small

21   portion of bid-offer spread with most competitive

22   counterparty.)"

23             What does "TBC" mean?

24   A.  To be confirmed.

25   Q.  What did you mean by the parenthetical?
```

1    **A.**   That, again, it's a repetition of the same, you know, lie

2    that we were taking some money from the other side, which

3    wasn't the case.

4    **Q.**   If we look at your fuller e-mail at the top of the page,

5    I want to highlight the second paragraph.

6              You said, "We do not yet know who the executing

7    brokers will be for each security, as we are putting a number

8    of brokers in competition in order to achieve the best price

9    for KIA.  So it depends on which one provides the best price.

10   I can tell you, however, that I estimate State Street

11   receiving on average only a few basis points out of the

12   bid-ask spread (out of which we have to cover all of our

13   costs as well as the operational risk).  The fact that we act

14   as your fiduciary agent and put a number of brokers in

15   competition for each security has over the past two years

16   resulted in client savings of between 10 basis points and in

17   a number of cases of more than 3 percent depending on the

18   portfolio."

19             What did you intend to convey to Mr. Das there?

20   **A.**   That we would only take a few basis points but we can't

21   tell you exactly, you know, more about it yet because we

22   don't know who the counterparties are going to be.

23   **Q.**   When you said "we act as your fiduciary agent," what did

24   you intend to convey?

25   **A.**   Standard language that we act in their best interest.

1   **Q.**   And then if we could look at the third sentence of the

2   next paragraph, "The difference between our client-driven

3   fiduciary agency process (we do not have a proprietary

4   trading book) and that of our broker competitors anticipated

5   to be doing the other part of this transition (who do have

6   their own proprietary trading book) is that our interests are

7   aligned with those of the KIA and theirs certainly are not."

8           Who is the "they" that are you talking about there?

9   **A.**   Any competitor that acted as a principal, a

10  counterparty --

11  **Q.**   Who is the broker competitor who is anticipated to be

12  doing the other part of this transition?

13  **A.**   It was Nomura and Goldman.

14  **Q.**   What were you telling Mr. Das about those competitors?

15  **A.**   That they would be making money elsewhere.

16  **Q.**   What were you telling him about their business model?

17  **A.**   That it's not transparent.

18  **Q.**   What did you mean when you said that they have a

19  proprietary trading book?

20  **A.**   That they would be the other side of the trade and in

21  that way would be able to make money without the client

22  knowing it.

23  **Q.**   And when you said that you had a fiduciary agency process

24  that was client driven and didn't have a proprietary trading

25  book, what were you saying about your business?

**A.**   That that model, in my view, was better and more
advantageous to the client.

**Q.**   And what were you saying about that model?

**A.**   That it is more transparent or it is transparent.  We get
the best price in the market as an agent.  And where the
principal counterparty is involved, that they have no
obligation to get the best price.  So what we were doing was
acting in the best interest of the client.

Of course all of that stopped when we put a spread
on top of it without telling him.

**Q.**   Mr. Pennings, you had an office at State Street's London
office?

**A.**   Yes.

**Q.**   Was your telephone line recorded?

**A.**   No.

**Q.**   Do you know if the defendant's telephone line was
recorded?

**A.**   He told me that it wasn't.

**Q.**   He told you it was not?

**A.**   No.

**Q.**   When did he tell you that?

**A.**   When this -- when we were found out, essentially.  He
said it was probably good thing.

**Q.**   He said it was probably a good thing?

**A.**   Yes.

1   **Q.**  Did you have an understanding of what he meant by that?

2   **A.**  It was obvious to me.

3   **Q.**  Why is that?

4   **A.**  Because we probably have said things that, you know, was

5   not correct and, you know, talked about this plan.

6   **Q.**  Did there come a time in the spring of 2010 when you

7   traveled to South Africa?

8   **A.**  Yes.

9   **Q.**  Why?

10  **A.**  Business.

11              (Discussion off the record.)

12              MR. FRANK:  May I approach, your Honor?

13              THE COURT:  You may.

14  BY MR. FRANK:

15  **Q.**  I'm handing you, Mr. Pennings, four disks bearing the

16  numbers 16, 128, 184, and 132.  Would you take a look at

17  those, please, and tell me if you recognize them.

18  **A.**  Yes, I recognize these.

19  **Q.**  What are they?

20  **A.**  They're disks with conversations that I listened to and

21  signed --

22  **Q.**  Did those disks --

23  **A.**  -- as to the -- made some corrections to the transcripts.

24  **Q.**  Do those disks fairly and accurately capture those

25  conversations?

1    **A.**   To the best of my knowledge, what I could hear.

2           MR. FRANK:  The government moves to admit 16, 128,

3    132, and 184.

4           THE COURT:  Any objection, Mr. Weinberg?

5           MR. WEINBERG:  Yes, your Honor.  If they could be

6    offered one at a time.  There is an objection to one of them,

7    but it's not the tapes that are coming up in the immediate

8    chronology.

9           THE COURT:  So what's the first one you want?

10          MR. FRANK:  16.

11          THE COURT:  Any objection to 16?

12          MR. WEINBERG:  None, your Honor.

13          THE COURT:  16 is in evidence.

14          (Exhibit No. 16 admitted into evidence.)

15   BY MR. FRANK:

16   **Q.**   And have you had an opportunity to review a transcript of

17   this exhibit?

18   **A.**   Yes.

19   **Q.**   If you could look at the binder in front of you, there's

20   a tab for 16.

21          Is that the transcript you reviewed?

22   **A.**   Yes.

23   **Q.**   Does it clearly and accurately reflect the conversation?

24   **A.**   I've listened to it and I've corrected it to the best of

25   my knowledge, yes.

1    **Q.**   Okay.   The jury is going to have the entire recording in

2    evidence, but I'm only going to direct to you a portion of

3    it.

4              If we could turn to page 6 of the transcript --

5              MR. WEINBERG:   Judge, may we approach the bench for

6    one second for an evidentiary objection?

7              (At sidebar on the record.)

8              MR. WEINBERG:   Very quickly, I thought 16 was KIA.

9    Apparently it's a conversation about ConvergEx.   We got a

10   transcript this morning; is that right?

11             MR. FRANK:   No, you got a transcript weeks ago.

12             MR. WEINBERG:   We got it this morning to put in the

13   book.   Is that the ConvergEx conversation?

14             MR. FRANK:   Yes.

15             MR. WEINBERG:   We have an objection to it.

16             THE COURT:   This is the same -- which ConvergEx

17   thing?

18             MR. FRANK:   This is a conversation between

19   Mr. Boomgaardt and Mr. Pennings about a conversation that

20   Mr. Pennings had with a representative of ConvergEx that he

21   met in South Africa in which Mr. Pennings confronted the

22   representative about their client abuse, about the charging

23   of hidden commissions, about the reliance on a contract with

24   affiliate language substantially similar to the affiliate

25   language in State Street's own contract with clients, and

1     told Mr. Johnston that what ConvergEx was doing --

2              THE COURT:  Told Mr. Johnston --

3              MR. JOHNSTON:  No relation.

4              THE COURT:  Okay.

5              MR. FRANK:  In one of the peculiar twists of this

6     case -- told them what they were doing was wrong and was

7     going to get them in trouble with the regulators about it

8     goes to the state of mind at the start of conspiracy what

9     they were doing at that time and went on to do was in their

10    own minds directly comparable to what ConvergEx was doing.

11             MR. WEINBERG:  It's not the conspirators, it's

12    Mr. Pennings and Mr. Boomgaardt.  And the government has made

13    arguments during the pretrial litigation that Mr. Pennings'

14    state of mind is not relevant and does not warrant the

15    admission of e-mails.

16             Here we have Mr. Pennings repeating a conversation

17    he had with an outside party to Mr. Boomgaardt but not to

18    Mr. McLellan.  Clearly it's prejudicial, clearly we would

19    request its exclusion.

20             MR. FRANK:  Your Honor, we've just offered evidence

21    that he discussed this very --

22             THE COURT:  Is this ConvergEx --

23             MR. FRANK:  And BONY, Bank of New York, are the

24               same thing.

25             THE COURT:  Okay.  I'm going to overrule the

1    objection.  I'm prepared to explain to the jury that you want

2    this is in as a state of mind, the trial is not about

3    ConvergEx --

4              MR. FRANK:  Absolutely, we have no objection.

5              THE COURT:  -- what ConvergEx did, it's relevant as

6    to the state of mind of the people talking.

7              MR. WEINBERG:  Of the two people talking.

8              THE COURT:  Do you want me to do that?

9              MR. WEINBERG:  Thank you, your Honor, yes.

10             THE COURT:  Mr. Frank, when you're about to get to

11    it, then I'll explain.

12             MR. FRANK:  We're about to get to it.

13             THE COURT:  Okay.

14             MR. FRANK:  Your Honor, can we --

15             THE COURT:  Is there any objection to the other

16    exhibits?

17             MR. WEINBERG:  I have to go through -- I don't say

18    I agree with Steve, they were given to us *en masse* before,

19    three of them we're still filtering through.  I was focused

20    on Mr. Boomgaardt.  We'll know in a few minutes.  Do you want

21    to just tell us which ones they are?

22             MR. FRANK:  You have them.

23             THE COURT:  When you get to them --

24             MR. WEINBERG:  I have no objection to the KIA ones

25    or the Dutch Doctor ones.

1           (End of discussion at sidebar.)

2           THE COURT:  What you're about to hear about is a

3   little bit more about this ConvergEx that you've heard some

4   reference to already.  And the relevance of this -- this

5   trial is not about what -- Bank of New York and ConvergEx are

6   the same.

7           MR. FRANK:  ConvergEx.

8           THE COURT:  ConvergEx.

9           Is not about whether Bank of New York or ConvergEx,

10  what they were doing, so that's not your focus, and this

11  evidence isn't offered for that purpose.

12          It's offered and its relevance is with respect to

13  the state of mind of the people who heard about it or talked

14  about it here.  It will be with respect, I think, to

15  Mr. Pennings and whoever else is on this phone call you hear.

16          So that's what it's about, and that's the purpose

17  for which you are to consider, not whether they were doing

18  right or wrong but what these people understood about it.

19          Go ahead.

20          MR. FRANK:  If we could look at page 6 of the

21  transcript, beginning at line 23.

22  BY MR. FRANK:

23  **Q.**  And you have that there, Mr. Pennings?

24  **A.**  Yes.

25          MR. FRANK:  Are the jurors there?

1           Thank you.

2           Erin, if we could start at 6:40 into the call.

3           (Played recording.)

4           THE COURT:  Can we pause for a second?

5           MR. FRANK:  I'm sorry.  We started at page 6, line

6    23.  It's a little hard to hear.  Is there a volume --

7           ERIN:  I just checked.  It's all the way up.

8           THE COURT:  Maria, can you check?

9           THE CLERK:  I'll check.

10          MR. FRANK:  6:40, page 6, line 23.

11          THE COURT:  It's at the bottom.  Thank you, go

12   ahead.

13          (Played recording.)

14          MR. FRANK:  If we could just stop right there.

15   BY MR. FRANK:

16   Q.  Mr. Pennings, at page 6, line 23, you refer to somebody

17   by the name of Alex Johnston.

18   A.  Yes.

19   Q.  Who is Alex Johnston?

20   A.  He was in charge of BONY's ConvergEx Africa business in

21   transition management.

22   Q.  And when Mr. Boomgaardt -- was that Mr. Boomgaardt whose

23   voice we heard?

24   A.  Yes.

25   Q.  He asked him how was Alex Johnston, what is he referring

1   to?

2   **A.**   Well, I guess he was saying how -- you know, how is your

3   conversation with him or how did he react or --

4   **Q.**   And you responded, "He turned bright red"?

5   **A.**   Yes.

6   **Q.**   What were you referring to?

7   **A.**   I confronted him with, you know, the fact that we had

8   information that allegedly referred to their marking up of

9   trades without client knowing about it.

10  **Q.**   And at the top of page 7, line 2, you say, "Yeah, he had

11  heard it over the last couple of months from various sources

12  that there were questions about their dealings.  He said

13  there is one client that had the consultants, you know, comb

14  through all the numbers and time stamps and whatever because

15  GIPF is letting their consultant do it."

16          Remind us what is GIPF?

17  **A.**   That's the Namibian government fund that we just talked

18  about.

19  **Q.**   That's the fund that you warned about ConvergEx?

20  **A.**   Yes.

21  **Q.**   And when Mr. Boomgaardt -- when Mr. Johnston told you

22  that one client had their consultants comb through all the

23  numbers, what were you referring to?

24  **A.**   That we offered to go over there after BONY won the deal

25  to go over their reporting.  And they said, "Well, we're not

1    going to do that.  We're going to let our consultant do it."

2           So the consultants reviewed the trading of BONY's

3    service.

4    **Q.**  What was your understanding of what they were looking

5    for?

6    **A.**  Spreads, hidden spreads.

7    **Q.**  And you said to Mr. Boomgaardt, "But their consultant is

8    never going to find it because they don't understand how it

9    works."

10          What's the "it" that you're referring to?

11   **A.**  The taking of undisclosed revenues.

12   **Q.**  Is it that hard to understand?

13   **A.**  It's not so easy to find if you don't have the right data

14   or you don't know where to look.

15          MR. FRANK:  If we could pick up at line 11, please.

16          (Played recording.)

17          MR. FRANK:  If we could stop it right there.

18   **Q.**  You said, "Look, mate, there's ample evidence that you

19   guys are not playing by the rules, and I'm just telling you

20   you have to stop doing what you're doing because it's hurting

21   the industry.  And if you don't, you will end up with a

22   regulator."

23          What were you telling Mr. Johnston?

24   **A.**  That, you know, we found out, and what he's doing is

25   wrong.  You need to stop doing it because you get into

1    trouble, and we were getting into trouble because we were

2    losing all these deals at this time.

3    **Q.**   And you said he would end up with a regulator.  What were

4    you referring to?

5    **A.**   I was just trying to scare him that, in my view, they

6    probably breached regulations.

7            MR. FRANK:  Could you pick up at line 17?

8            (Played recording.)

9            MR. FRANK:  Stop right there.

10   **Q.**   At the top of page 8, line 2, you say, "It is wrong."

11           What's the "it" that you're referring to?

12   **A.**   Taking more than you say from clients.

13   **Q.**   And if we look at page 7, line 18, you say, "He said we

14   have fiduciary and non-fiduciary and is very clear in the

15   contract that we are taking spreads.  And I said, well,

16   actually now that you mentioned it, it's not because it's

17   incredibly ambiguous.  Because you are saying you are

18   completely agent, it is all the revenue you take, and then

19   your clients don't understand that if it says somewhere an

20   affiliate may or may not take a spread."

21           Do you see that?

22   **A.**   Yes.

23   **Q.**   Whose contract were you referring to when you described

24   them as agent and said an affiliate may or may not take a

25   spread?

1    **A.**   BONY.

2    **Q.**   And what were you saying was ambiguous and that clients

3    didn't understand?

4    **A.**   That he said they had a fiduciary, non-fiduciary

5    document, which I've seen their documents for a similar

6    client in Africa, and it was pretty clear to me that it was a

7    fiduciary document saying we are agent and the only revenue

8    we are taking is the commissions.

9    **Q.**   And he said there was also language about an affiliate

10   taking a spread?

11   **A.**   Yes, that's what he said.

12   **Q.**   At the time, did State Street's contracts with clients

13   also include language about affiliates taking spreads?

14   **A.**   Yes.

15   **Q.**   Did you discuss those contracts with the defendant?

16   **A.**   Yes.

17   **Q.**   What was the nature of those conversations?

18   **A.**   We were looking at this time how we would respond to the

19   state of the industry and the need for pitching low.  And our

20   solution was to basically take a hidden markup.  And we were

21   looking to whether the contract could provide us cover or

22   excuse in case that was found out.

23   **Q.**   And what was your conclusion?

24   **A.**   Well, on its own, the contract would probably be vague

25   and ambiguous enough, but that sort of voided -- the fact

1    that we were telling the client that we were not doing it

2    voided that.

3    **Q.**  At the time that you were having this conversation with

4    Alex Johnston, what were you intending to do with respect to

5    KIA?

6    **A.**  We were going to take a markup.

7    **Q.**  And what were you telling the client?

8    **A.**  That we were charging zero commissions.

9    **Q.**  Now, we looked at your communications with Mr. Das in

10   March.  Do you recall that?

11   **A.**  Yes.

12   **Q.**  When did transition 115 actually happen?

13   **A.**  I believe in June of 2010.

14   **Q.**  In that period, in that interim period, what was

15   happening with the revenue of your business?

16   **A.**  Well, we were still behind.

17              MR. FRANK:  Could we show the witness Exhibit 19,

18   please?

19   **Q.**  Do you recognize this document?

20   **A.**  Yes.

21   **Q.**  What is it?

22   **A.**  It's an e-mail from Ross to myself and Peter Weiner on

23   the 13th of May 2010.

24              MR. FRANK:  The government moves 19.

25              MR. WEINBERG:  No objection.

```
 1              THE COURT:  Admitted.
 2              (Exhibit No. 19 admitted into evidence.)
 3   BY MR. FRANK:
 4   Q.  If you look at the "To" line, it's to yourself and Peter
 5   Weiner, as you just indicated.
 6              Who is Peter Weiner?
 7   A.  He was my equivalent or certainly the head of sales at
 8   the time in the Boston office for the U.S.
 9   Q.  He was your counterpart?
10   A.  Yes.
11   Q.  Who did he report to?
12   A.  Ross, Ross McLellan.
13   Q.  Mr. McLellan forwards you an e-mail with the subject line
14   "FW:  GM end of day revenue estimate 13 May 2010."
15              Do you see that?
16   A.  Yes.
17   Q.  He writes, "I will get you guys on this e-mail soon, but
18   our revenue lately has sucked."
19              What did you understand the defendant to be telling
20   you on the 13th of May 2010?
21   A.  That we were behind.
22   Q.  When did the transition for KIA happen?
23   A.  In June.
24              MR. FRANK:  Could we look, for the witness only, at
25   Exhibit 20, please?
```

1    **Q.**  Do you recognize this document?

2    **A.**  Yes.

3    **Q.**  What is it?

4    **A.**  It's an e-mail from me to Ross on June the 2nd.

5    **Q.**  About two weeks after that e-mail about your revenues

6    sucking?

7    **A.**  Yes.

8                MR. FRANK:  The government moves to admit 20.

9                MR. WEINBERG:  No objection.

10               THE COURT:  Admitted.

11               (Exhibit No. 20 admitted into evidence.)

12   BY MR. FRANK:

13   **Q.**  If we look at the bottom of the page, it's an e-mail from

14   you to Mr. McLellan.  You write, "June estimated revenue."

15               Do you see that?

16   **A.**  Yes.

17   **Q.**  What are we looking at here?

18   **A.**  A couple of deals that we had in the pipeline that were

19   about to come to fruition in June.

20   **Q.**  What's the total revenue you were expecting?

21   **A.**  $7.25 million.

22   **Q.**  And where was the lion's share of that coming from?

23   **A.**  From the KIA.

24   **Q.**  How much?

25   **A.**  In this state, $4 million.

1   **Q.**  Okay.  And if we look at the top two e-mails, the

2   defendant responds, "How likely are KIA and UBS?  Your math

3   sucks, by the way."

4        What did you understand him to mean when he said

5   that your math sucks, besides the obvious?

6   **A.**  The obvious.  It didn't add up.

7   **Q.**  Your numbers didn't add up properly?

8   **A.**  Not in that little table, no.  I was missing a million.

9   **Q.**  And you responded, "Very likely.  Just spoke to KIA and

10  he said next week or the week thereafter.  Absolutely UBS is

11  happening.  Just looked at it and indeed the math sucks on

12  the face of it, as I really expect to take 5 million from

13  KIA."

14       What did you mean you told the defendant that you

15  expected to take 5 million from KIA?

16  **A.**  Well, we didn't give him -- well, we told him it's zero,

17  but we obviously intended to take a hidden fee.  And given

18  that they didn't know where that was, we had flexibility

19  there.

20  **Q.**  Earlier we looked at an e-mail chain where the defendant

21  discussed 6, 7, or 8 million.  Do you recall that?

22  **A.**  Yes.

23  **Q.**  What changed?

24  **A.**  We learned more about the deal.  And the duration on the

25  target portfolio was less than we had hoped, so I thought it

1    was realistic to lower the expectation of revenues.

2         MR. FRANK:  Could we look, for the witness only, at

3    Exhibit 22, please?

4    Q.  And you write to -- well, do you recognize this document?

5    A.  Yes.

6    Q.  What is it?

7    A.  It is an e-mail from me to Ross on June 3rd.

8         MR. FRANK:  The government moves to admit 22.

9         MR. WEINBERG:  No objection.

10        THE COURT:  Admitted.

11        (Exhibit No. 22 admitted into evidence.)

12        MR. FRANK:  Actually, if you could expand it to the

13   top three e-mails.

14   BY MR. FRANK:

15   Q.  Can you read that at the bottom there, Mr. Pennings?

16        THE COURT:  Can you blow it up?

17        MR. FRANK:  Let's go to the bottom.

18   BY MR. FRANK:

19   Q.  You wrote to Mr. Pennings, "KIA happening next week"?

20   A.  Yes.

21   Q.  How did he respond?

22   A.  "Awesome.  5 million?"

23   Q.  What did you understand he was referring to?

24   A.  Do we get 5 million in revenue?  Can we expect $5 million

25   of revenue?

1    **Q.**  Then you responded, "Aiming for that, although duration

2    is only around three years on the target and pretty much

3    nothing on the legacy.  Gonna have to be creative and need

4    you involved on the FI trading desk in the U.S. to ensure

5    they do as we want."

6              Do you see that?

7    **A.**  Yes.

8    **Q.**  When you said "Gonna have to be creative," what were you

9    referring to?

10   **A.**  That just refers to taking a hidden markup.

11   **Q.**  And when you said "need you involved on the FI trading

12   desk in U.S. to ensure they do as we want," first of all,

13   what's the FI trading desk?

14   **A.**  The fixed income execution desk.

15   **Q.**  That's bonds?

16   **A.**  Yes.

17   **Q.**  What were you telling the defendant when you said you

18   needed him involved to ensure they do as you want?

19   **A.**  As far as I was aware, he was the only person aware of,

20   you know, what we were doing here with the KIA, in the Boston

21   office.

22   **Q.**  So why did you need him to be involved?

23   **A.**  Because if there's zero commissions -- I wasn't really

24   sure how the trade instructions were communicated, if they

25   would stay zeroed.  And clearly we needed someone there so

1    say, Well, actually it's not zero, we need to mark them up.

2    **Q.**   In the next paragraph you said, "Believe it or not, but

3    we are now going to share one target manager with Nomura as

4    TM and trading on the same day.  They are clueless."

5              What were you telling the defendant there?

6    **A.**   That the KIA not only split the deal between us and two

7    other managers -- in this case here, Nomura -- but they also

8    gave us the instruction to buy exactly the same portfolio for

9    the same manager at the same time, which is not very smart.

10   **Q.**   Who was clueless?

11   **A.**   The KIA.

12   **Q.**   Did you have an understanding of whether the defendant

13   shared that view of the KIA?

14   **A.**   I think there was enough talk about the KIA's ability to

15   understand these type of things that I think yes.

16   **Q.**   Now, who interacted directly with the KIA?  You or the

17   defendant?

18   **A.**   I did.

19   **Q.**   Did you talk about the KIA with the defendant?

20   **A.**   Yes.

21   **Q.**   Did you express views like this?

22   **A.**   Yes, they're clueless.

23   **Q.**   Did this transaction happen?

24   **A.**   Yes.

25   **Q.**   How much did you earn?

1    **A.**  I believe $2.6 million or thereabouts.

2    **Q.**  What did you disclose to the KIA about what you earned?

3    **A.**  Zero, nothing.

4         MR. FRANK:  Could we look, for the witness only, at

5    Exhibit 46, please?

6    **Q.**  Do you recognize this document, once we blow it up?

7    **A.**  Yes.

8    **Q.**  What is it?

9    **A.**  It is an e-mail from Rick Boomgaardt to myself on

10   June 30th.

11        MR. FRANK:  The government moves to --

12   **Q.**  What are you forwarding here?

13   **A.**  Well, he's sending something to me.

14   **Q.**  I'm sorry.  You're right.  What is he sending to you?

15   **A.**  He sends me the post-trade implementation shortfall

16   report for KIA transition 115, and he's asking me if I want

17   to read it before it goes out.

18        MR. FRANK:  The government moves to admit 46 and

19   its attachment.

20        MR. WEINBERG:  No objection.

21        THE COURT:  Admitted.

22        (Exhibit No. 46 admitted into evidence.)

23   BY MR. FRANK:

24   **Q.**  What is the post-trade?

25   **A.**  It is a report that describes what happened during the

1    transition, and it's -- provides an accounting of all the

2    costs that occurred and gives an implementation shortfall

3    number.

4              MR. FRANK:  Could we look at the attachment?

5    **Q.**  Is this the draft of the post-trade that you were sent?

6    **A.**  Yes.

7              MR. FRANK:  Could we look at page 3, please?

8              Erin, if you could just highlight that first line.

9    Thank you.

10   **Q.**  And you say there -- well, the report says, "The

11   restructuring had a final implementation shortfall of 10bps,

12   or $2,047,550 against a Pre Trade mean cost estimate of

13   17bps."

14             Do you see that?

15   **A.**  Yes.

16   **Q.**  What does "bps" refer to?

17   **A.**  Basis points.

18   **Q.**  So when this report provides to KIA that the final

19   shortfall was 10 basis points and the pre-trade mean estimate

20   was 17 basis points, what were you telling the client?

21   **A.**  That the -- they got a much better deal than they

22   expected, given the implementation shortfall estimate was

23   17 basis points and it ended up being 10.

24   **Q.**  You did well.

25   **A.**  Very well.

**Q.**  And when you said that the shortfall is $2,047,000, do you see that?

**A.**  Yes.

**Q.**  What would the shortfall have been if you hadn't added those hidden commissions?

**A.**  It would actually be a gain.

**Q.**  A gain?

**A.**  A gain, yes.

**Q.**  So they would have made money?

**A.**  They would have made money, which is very rare, yes.

**Q.**  In the next paragraph you said, "Our agency trading model proved effective."

What were you saying there?

**A.**  That we traded it very well, you know.  And we just say "agency trading model" because it is an agency trading model.

**Q.**  What is an agency trading model?

**A.**  That we act on behalf of the client.

**Q.**  What does an "agency trading model" mean with respect to the disclosure of commissions, if anything?

**A.**  Normally with agency trading, you would specify a commission.

MR. FRANK:  Can we look at the chart on the same page?

**Q.**  What does this chart show, Mr. Pennings?

**A.**  This chart shows the actual implementation shortfall,

1  which is the left bar.  So that's what we achieved.  Given

2  that we had -- our approach is a multi-panel dealer

3  execution.

4          So what we would do on behalf of the client is pick

5  the best price in the market, and we compared it to the

6  next-best price, so not the winning price but the one that

7  was just -- the second best.  And we also compared it to the

8  worst price of all the brokers that we asked.  And that

9  shows, you know, how much we saved the client.

10  **Q.**  It shows that your model is effective?

11  **A.**  Yes.

12  **Q.**  You're not taking the worst or the second-best price but

13  the best price?

14  **A.**  Yes.

15  **Q.**  Can you tell us what would have happened to that bar on

16  the left, the actual shortfall, if you hadn't taken those

17  hidden commissions from KIA?

18  **A.**  Well, as before, we would just be above the line.

19  **Q.**  It would go in the opposite direction?

20  **A.**  Yes, to the tune of just over half a million dollars.

21          MR. FRANK:  Could we look at page 12, please?

22  **Q.**  What are we looking at here?

23  **A.**  These are the individual bonds that were sold, with the

24  prices.

25  **Q.**  What kinds of bonds?

1  **A.**  Well, it says here treasury bills.

2  **Q.**  Where do treasury bills trade?

3  **A.**  In the U.S.

4  **Q.**  And if I could direct your attention to the column in

5  almost in the middle.  It says "Price" --

6  **A.**  Yes.

7       MR. FRANK:  Erin, could you highlight that column,

8  please?

9  **Q.**  What does that column indicate?

10  **A.**  That's the price the client got.

11  **Q.**  And where is your commission?

12  **A.**  It's in that price.  It's a net price.

13  **Q.**  Where is it disclosed on this chart?

14  **A.**  It doesn't.

15  **Q.**  How does the client know what you charged them?

16  **A.**  Well, they don't.

17       MR. FRANK:  You could take that down.

18  **Q.**  Based on your interactions with Mr. Das, what, if

19  anything, do you believe him to have understood about your

20  intention to make money on this deal?

21       MR. WEINBERG:  Objection.

22       THE COURT:  Overruled as to what his

23  understanding -- this is his understanding.

24       MR. FRANK:  Yes, your Honor.

25  **A.**  I believe he knew that we were making money off this

1    deal.

2    **Q.**   You believe he did know?

3    **A.**   That he were making money, yes.

4    **Q.**   Do you have an understanding of whether he knew how you

5    were making money?

6    **A.**   No.  No, I just know that he knew we make money.

7    **Q.**   Did there come a time when you told others at State

8    Street that Mr. Das knew State Street would make money on its

9    business, KIA's business?

10   **A.**   Yes.

11   **Q.**   What did you tell them?

12   **A.**   I believe that Das understands that we were making money,

13   we take a spread, that he understood it.

14   **Q.**   Did you tell Mr. Das how much money you made?

15   **A.**   No.

16   **Q.**   Did you also e-mail Mr. Das about where you were going to

17   make that money?

18   **A.**   Well, I told him the other side, which is nonsense.

19   **Q.**   You testified earlier about Mr. Das' superiors at KIA?

20   **A.**   Yes.

21   **Q.**   Adel and Othman?

22   **A.**   Mm-hmm.

23   **Q.**   Do you have an understanding of whether they understood

24   you were making money?

25   **A.**   I have no idea.  I don't know.

1    **Q.**  At about the same time that you were working on KIA 115,

2    did there come a time when you were made aware of an

3    opportunity involving a pension fund in the Netherlands?

4    **A.**  Yes.

5    **Q.**  Can you tell us -- you said you're Dutch?

6    **A.**  I am.

7    **Q.**  Why don't you tell us what the name of that fund is in

8    Netherlands?

9    **A.**  There's two funds, (speaking Dutch).

10            MR. FRANK:  I'm sure the court reporter appreciates

11   that.

12            (Laughter)

13            MR. FRANK:  We'll just call them Dutch Doctors.

14            THE COURT:  I think for the record you should

15   translate what you just said, since the official language is

16   English.

17            MR. FRANK:  I think you're right, your Honor.

18            THE COURT:  So I think you need to translate what

19   you just said to Dutch.

20            THE WITNESS:  Let's call them Dutch Doctors and

21   Medical Specialists.

22   BY MR. FRANK:

23   **Q.**  What are the official names of the funds that you just

24   said in Dutch?

25   **A.**  Well, that's a tricky one.  We tend to just speak Dutch

1    in Holland.  It was referred to as Dutch Doctors.

2    **Q.**  Okay.  We'll go with that.

3            How big an opportunity was the Dutch Doctors

4    transition?

5    **A.**  Very big opportunity.

6    **Q.**  And tell us about the deal.  What was the nature of it?

7    **A.**  This was a deal that came in through our asset management

8    affiliate, SSGA, State Street Global Advisors.  And it was

9    interesting because we were struggling with cross-selling in

10   the State Street.  This was a massive opportunity, and we

11   were actually very pleased that they came to us.

12   **Q.**  So State Street Global Advisors, what is that?

13   **A.**  That's the investment management arm that -- of State

14   Street.  It's one of the divisions.  SSGM is the trading arm.

15   **Q.**  So what does State Street Global Advisors do?

16   **A.**  They manage money for our clients, including the two

17   doctors funds in Holland.  They ran index funds, and in this

18   case fixed-income indexed portfolios.

19   **Q.**  Did they have anything to do -- did State Street Global

20   Advisors have anything to do with the transition management

21   business?

22   **A.**  We sometimes got business referred from them.  We were

23   trying to cross-sell business.

24   **Q.**  It would be better for State Street?

25   **A.**  It would be better for State Street, yes.

1          MR. FRANK:  Can we look, for the witness only, at

2    Exhibit 27, please?

3    **Q.**  Do you recognize this document?

4    **A.**  Yes.

5    **Q.**  What is it?

6    **A.**  It's an e-mail from Ross to myself on June 13th.

7          MR. FRANK:  The government moves to admit 27.

8          MR. WEINBERG:  No objection.

9          THE COURT:  Admitted.

10          (Exhibit No. 27 admitted into evidence.)

11   BY MR. FRANK:

12   **Q.**  If we could look at the top two e-mails.  At the bottom,

13   you send an e-mail to Mr. McLellan on June 10th of 2010.  And

14   you say, "FYI, we are trying to get this trade."

15          And he responds, "Let's discuss this tomorrow."

16          Do you see that?

17   **A.**  Yes.

18   **Q.**  Again, this is the Dutch Doctors trade?

19   **A.**  Yes.

20   **Q.**  Why were you telling the defendant about it?

21   **A.**  Because it was a very large deal, and it came through

22   SSGA, and we wanted to make sure that we were actually

23   getting the deal that SSGA wouldn't at the last moment just

24   do it themselves.

25   **Q.**  How would that work?

1    **A.**  I don't know.  We were just very pleased that we got some

2    referral here.  I thought it was handy to have Ross'

3    involvement because he could then push in the U.S. through

4    the seniors at SSGA to make sure that they would help us win

5    this deal.

6    **Q.**  And where was the money moving?

7    **A.**  In Europe.  It was a European bond portfolio, government

8    bond portfolio.  And given the state of the markets at the

9    time, financial crisis and the troubles in Greece, they

10   wanted to move to -- the entire portfolio became an

11   80 percent German bond portfolio and 20 percent Dutch

12   government portfolio.

13   **Q.**  Who was going to manage it after the transition?

14   **A.**  SSGA again, so it stayed with them.

15   **Q.**  But moving to different investments?

16   **A.**  Yes.

17   **Q.**  Mr. McLellan said, Let's discuss this tomorrow, on

18   June 13th.

19            Do you recall whether you, in fact, did discuss it

20   with the defendant?

21   **A.**  I believe we did.

22            MR. FRANK:  Can we look, for the witness only, at

23   Exhibit 34, please?

24   **Q.**  Do you recognize this document?

25   **A.**  Yes.

1   **Q.**  What is it?

2   **A.**  It's a document I forwarded regarding the Dutch Doctors

3   to Ross on June the 15th.

4            MR. FRANK:  The government moves to admit 34.

5            MR. WEINBERG:  No objection.

6            THE COURT:  Admitted.

7            (Exhibit No. 34 admitted into evidence.)

8   BY MR. FRANK:

9   **Q.**  You were forwarding an e-mail from yourself to Roul

10  Haerden and Rick Boomgaardt?

11  **A.**  Yes.

12  **Q.**  Who is Roul Haerden?

13  **A.**  The counterpart of the client, the Dutch Doctors that we

14  were interfacing with.

15  **Q.**  What was his job?

16  **A.**  He was an investment or portfolio manager at the pension

17  funds, and his job was to decide or help decide what -- how

18  they were going to move from one portfolio to the other and

19  who's going to do it and how.

20  **Q.**  And you copied someone named Faheem Malik?

21  **A.**  Yes.

22  **Q.**  Who's that?

23  **A.**  He was at the time the relationship manager at SSGA for

24  this particular client.

25  **Q.**  And this is sent on the 15th of June, 2010?

1   **A.**   Yes.

2   **Q.**   That was the day after you spoke with the defendant?

3   **A.**   I believe that was the 13th or -- well, it was just

4   after.

5   **Q.**   You said, "Hi, Roul.  I understand there are still some

6   questions that needed to be addressed by ourselves, so I have

7   taken the liberty to summarize again for you the benefits of

8   our portfolio."

9               MR. FRANK:  And I apologize.  I moved the --

10              THE COURT:  Portfolio.

11              MR. FRANK:  If we could go a little further down to

12   the next sentence.

13   **Q.**   And you wrote in the next sentence, "We strongly believe

14   that the use of our specialist transition management desk

15   will not result in extra cost, but instead it will result in

16   significant savings for the doctors fund."

17              What were you telling Mr. Haerden there?

18   **A.**   I remember him being extremely frustratingly cheap about

19   it, that he wanted something for nothing.  He wanted first

20   SSGA to do it for nothing, and they refused.  Then they came

21   to us.  And he was focusing on the fees.

22              So I wanted to convey to them that just look at the

23   fees.  We're actually going to -- we anticipate saving money

24   for you rather than just, you know, the transition costing

25   money.

1          MR. FRANK:  If you could look at page 2 of this

2     document, Erin.

3     Q.  If you look at Mr. Haerden's e-mail to Mr. Pennings and

4     Mr. Boomgaardt, he writes in that first paragraph, "We also

5     are having some internal discussions" --

6          Do you see that in the middle of paragraph?

7          "We also are have having some internal discussions

8     whether we should use a transition manager and if these

9     activities will not cost us additional money (in terms of

10    direct or indirect fees)."

11         Is that what you're referring to?

12    A.  Yes.

13    Q.  And if we could go back to the first page, at the top of

14    the page, who did you forward this exchange to?

15    A.  To Ross McLellan.

16    Q.  Why did you do that?

17    A.  Because, you know, I wanted to keep him in the loop.

18    Again, it was a very large deal which always attracted

19    attention, and because of the involvement of SSGA and

20    hopefully his help with talking to counterparts of SSGA

21    senior management in Boston.

22         MR. FRANK:  Can we show the witness only Exhibit

23    38, please?

24    Q.  Do you recognize this document?

25    A.  Yes.

1    **Q.**   What is it?

2    **A.**   It is an e-mail from me to Roul Haerden, copied to a

3    number of people, on June 17th.

4    **Q.**   Who are the other people?

5    **A.**   Richard Boomgaardt, Faheem Malik.  Again, he's the

6    relationship manager from SSGA.  Lex Ravensbergen and Michel

7    Salden, they were two employees from the Dutch Doctors funds.

8              MR. FRANK:  Government moves to admit 38.

9              MR. WEINBERG:  No objection.

10             THE COURT:  Admitted.

11             (Exhibit No. 38 admitted into evidence.)

12   BY MR. FRANK:

13   **Q.**   Mr. Harden is writing to you -- do you see that? -- on

14   17th June 2010?

15   **A.**   Yes.

16   **Q.**   And I'm going to go to the second bullet point, "Do the

17   estimated trading costs" -- do you see that?

18   **A.**   Yes.

19   **Q.**   "Do the estimated trading costs include the fees that you

20   will charge and how much will these fees (in bp or in cash

21   amount) approximately be?"

22             What did you understand Mr. Haerden to be asking

23   you there?

24   **A.**   How much we would take out of the trades in terms of

25   revenues.

1    **Q.**  He says "(in bp or in cash amount)."  What did you

2    understand him to mean by that?

3    **A.**  In basis points or just a dollar or Euro amount.

4    **Q.**  Are basis points an approximate thing?

5    **A.**  Well, no.

6    **Q.**  Range or approximate rate?

7    **A.**  A base point rate is not approximate, but it could move

8    depending on the volume of trading.

9    **Q.**  What could move?  The cash amount?

10    **A.**  Yes.

11    **Q.**  And how did you respond -- if we could look at the top

12    e-mail -- the second bullet point, you say, "In the analysis,

13    we have built in 1 basis point that the execution desk takes

14    out of the spread, so yes, the total implementation shortfall

15    estimate does include all fees."

16            What were you telling Mr. Haerden?

17    **A.**  That we were going to charge him 1 basis point of yield

18    in this case.

19    **Q.**  Now, the date of this is June 17th of 2010?

20    **A.**  Yes.

21            MR. FRANK:  Could we look, for the witness only, at

22    Exhibit 41, please?

23    **Q.**  Do you recognize this document?

24    **A.**  Yes.

25    **Q.**  What is it?

1    **A.**   It's an e-mail from me to Ross on June 17th.

2            MR. FRANK:  The government moves to admit 41.

3            MR. WEINBERG:  No objection.

4            THE COURT:  Admitted.

5            (Exhibit No. 41 admitted into evidence.)

6            MR. FRANK:  If we could start on page 2, the bottom

7    two e-mails.

8    BY MR. FRANK:

9    **Q.**   You see the e-mail from Mr. McLellan to you?

10   **A.**   Yes.

11   **Q.**   He asks, "Any word on doctors?"

12   **A.**   Yeah.

13   **Q.**   What did you understand him to be asking about?

14   **A.**   Did we hear back from them?  Have we won the deal yet or

15   not?

16   **Q.**   And you responded, "You are just going to have to trust

17   maestro.  28 June is the latest.  I think we got it but had a

18   lot of questions on comms this morning."

19           Do you see that?

20   **A.**   Yes.

21   **Q.**   Who is the maestro?

22   **A.**   I was patting myself on the back.  That would be me.

23   **Q.**   And you said, "I think we got it but had a lot of

24   questions on comms this morning."

25           What are comms?

1   **A.**   Commissions or revenue fees.

2   **Q.**   What were you telling the defendant there?

3   **A.**   That I think we won it and we would start trading on the

4   28th of June.

5          MR. FRANK:  Let's take a look at the defendant's

6   response at the top of the page.

7   **Q.**   What did he say to you?

8   **A.**   "Just win, baby."

9   **Q.**   What did you understand him to be telling you?

10  **A.**   Just win.

11         MR. FRANK:  If we could take a look, for the

12  witness only, at Exhibit 42, please.

13  **Q.**   Do you recognize this document?

14  **A.**   Yes.

15  **Q.**   What is it?

16  **A.**   It's an e-mail on the 18th of June from me to Ross.

17  **Q.**   What had happened between the 17th of June and the 18th

18  of June?

19  **A.**   We were told by the client at that point that after we

20  won it -- or I believe we won it by that time -- that we were

21  not going to be able to clear the futures.  Because they have

22  in their contract with their custodian, which was JPMorgan, a

23  clause that JPMorgan was the only counterparty that could do

24  that.

25  **Q.**   What does it mean when somebody else clears the futures?

1    **A.**   We had to do a lot of futures trades on this transition,

2    and the way we normally -- the only way that we can collect

3    revenues for futures is through clearing them.  We couldn't

4    charge any commissions on them.  That was just the technical

5    operational issue.  We could only collect revenues through

6    clearing.

7    **Q.**   And you typically -- is that typically wrapped up in your

8    general commission rate or is that separate?

9    **A.**   No, we normally do that separately.

10   **Q.**   You negotiate that with the client or --

11   **A.**   Yes, or -- yes.

12             MR. FRANK:  The government moves to admit Exhibit

13   42.

14             MR. WEINBERG:  No objection.

15             THE COURT:  Admitted.

16             (Exhibit No. 42 admitted into evidence.)

17   BY MR. FRANK:

18   **Q.**   And if you look at this bottom two e-mails,

19   Mr. Boomgaardt says, "You spoke to Roul.  JP is their futures

20   clearer.  No room for changing it.  I have a call in to Paul

21   Vermeulen as well for a second opinion.  I told Roul he can

22   ignore all of the RBS docs if they won't be settling up a

23   clearing agreement.  Will keep you posted."

24   **A.**   In this particular case -- I stand corrected.

25             We weren't, State Street, clearing the futures.  We

1  were intending to clear the futures because that involved

2  some more documentation.  At the same time, we also had RBS,

3  which is the Royal Bank of Scotland, as a partner in futures,

4  and they would do it for us and we would receive a kickback,

5  essentially.  So it's the same, but it was just outsourced,

6  if you will.  So that's what "RBS" refers to.

7          I'm not sure if I answered your question, actually.

8  I just went on a bit.

9  Q.  You had an arrangement with RBS that they would handle it

10 for you?

11 A.  Yes.  That's an easier way of saying it.

12 Q.  You forwarded this to Mr. McLellan, and you said -- I'm

13 sorry.  If we could go back to where you were.

14          You said, "No futures.  The other fund is most

15 likely a go as well so overall not bad."

16          What were you telling Mr. McLellan there?

17 A.  That we couldn't collect future revenue on this deal --

18 well, that's the first impression -- and that we're -- I

19 believe first we only talked about one of the doctors funds.

20 And it turned out that both of them were going to do exactly

21 the same and they were about the same size, so the deal even

22 became bigger.

23 Q.  What did the loss of the futures business mean for State

24 Street?

25 A.  A significant loss of revenue.

1    **Q.**  Did you discuss that with Mr. Haerden?

2    **A.**  Yes.

3    **Q.**  What did you tell him?

4    **A.**  We were -- you know, sort of myself and Rick Boomgaardt

5    were on a conference call with Roul Haerden, saying, Look,

6    what are we going to do?  Obviously we're arguing that we

7    should be clearing the futures, and that was not going to be

8    the case.

9            And I told him, you know, that's the only way for

10   us to get revenue.

11           He said, "That's your problem."

12   **Q.**  I'm sorry.  What did he say?

13   **A.**  "That's your problem."

14           MR. FRANK:  If we could look at the top e-mail on

15   this chain, the top two.

16   **Q.**  Mr. McLellan responds to you, "Sounds like a done deal.

17   Great work."

18           Then you respond, "Just have to charge a bit more

19   given that we don't get futures revenue."

20           Do you see that?

21   **A.**  Yes.

22   **Q.**  Then you said, "It looks like the Luxembourg EM equity

23   deal is in the bag too for July.  I love myself."

24   **A.**  I was patting myself on the back.

25   **Q.**  And that was a different deal, the Luxembourg EM equity

1    deal?

2    **A.**  Yes, totally unrelated, and we didn't win that one, I

3    believe.

4    **Q.**  When you said, "Just have to charge a bit more, given

5    that we don't get futures revenue," did you have permission

6    from Dutch Doctors to increase your rate?

7    **A.**  They didn't give us permission, no.

8    **Q.**  What did do you?

9    **A.**  We did it anyway.  We discussed it.  We decided that we

10   would just raise the fixed income commissions from one to one

11   and a half to cover ourselves for that piece, for the

12   futures.

13   **Q.**  Who did you discuss it with?

14   **A.**  Rick Boomgaardt and Ross and maybe one or two others,

15   probably Paul McGee.

16   **Q.**  And you increased it from 1 basis point to 1.5?

17   **A.**  Correct.

18   **Q.**  What's the implication of that adjustment?

19   **A.**  That we were taking more revenue out of the fixed income

20   trades.

21   **Q.**  How much more?

22   **A.**  A half a basis point, an increase of 50 percent.

23   **Q.**  Fifty percent more?

24   **A.**  Yes.

25   **Q.**  How much did you ultimately earn on the Dutch Doctors

1    transition?

2    **A.**   Several million dollars.

3    **Q.**   Did you ever tell Mr. Haerden that you had helped

4    yourself to an extra 50 percent?

5    **A.**   No.   They never asked.

6    **Q.**   Did there come a time when you had --

7          MR. FRANK:   We can take this down, Erin.   Thank

8    you.

9    **Q.**   Did there come a time when you had the opportunity to bid

10   on another large bond transition for KIA?

11   **A.**   Yes.

12   **Q.**   When was that?

13   **A.**   In October, I believe, of 2010.

14          MR. FRANK:   Can we show the witness Exhibit 48,

15   please?

16   **Q.**   Do you recognize this document?

17   **A.**   Yes.

18   **Q.**   What is it?

19   **A.**   It's an e-mail from me to Ross on the 21st of October.

20          MR. FRANK:   The government moves to admit 48.

21          MR. WEINBERG:   No objection.

22          THE COURT:   Admitted.

23          (Exhibit No. 48 admitted into evidence.)

24          MR. FRANK:   Erin, if we could go to the last page,

25   and blow up that e-mail there.

1    BY MR. FRANK:

2    **Q.**  You see this is an e-mail from Mr. Das to a whole bunch

3    of people?

4    **A.**  Yes.

5    **Q.**  Who are they?

6    **A.**  My competitors, mainly.

7    **Q.**  Your competitors?

8    **A.**  Yes.

9    **Q.**  So we see BlackRock?

10   **A.**  BlackRock, BONY Mellon -- that's another part of BONY --

11   that they had two transition management outfits.

12   **Q.**  So that's not ConvergEx?

13   **A.**  No.

14          Citi, Citigroup, Goldman Sachs, JPMorgan, Nomura

15   again, and Russell, Frank Russell and myself at State Street.

16   **Q.**  And he writes, "Dear All, KIA is intending to go for a

17   fixed income transition for USD 4 billion from two of its

18   portfolios to three target managers.  The custodian for the

19   source and the target is same.  Kindly let us know the

20   following.  Please quote.  Please let us know the most

21   favorable period to perform transition timeline."

22          Do you see that?

23   **A.**  Yes.

24   **Q.**  When he said "Please quote," what did you understand him

25   to mean?

1    **A.**   Give your lowest commission rate.

2            MR. FRANK:  If we could look at the prior page for

3    your response at the very bottom.

4    **Q.**   You wrote in the copy to Mr. Boomgaardt, "Hey, Das.

5    Thank you for including State Street in your search for

6    transition manager for this project.  We are able to quote

7    zero commissions for this transition.  And in addition, when

8    awarded the whole trade, we will absorb all transaction fees

9    normally charged by the custodian.  This means we will pay

10   all custody transaction fees associated with this transition

11   for KIA."

12           What were you telling Mr. Das?

13   **A.**   We would pitch zero.  But given our experience last time

14   when we pitched zero, we still didn't win the whole deal.  We

15   were in the unique position to -- because we were the

16   custodian for the fund, and every transition with lots of

17   trading generates costs for the custodian, and that's billed

18   to the client.  We offered to waive those costs or, you know,

19   absorb those costs.  So we were paying them to do the

20   transition.

21   **Q.**   Did you send him an implementation shortfall estimate at

22   this point?

23   **A.**   No, because we have no idea what the portfolio looked

24   like.

25           MR. FRANK:  If we could look at the first page, at

1    the very bottom.

2    **Q.**  He says, "Dear Ed, we are pleased to advise that you have

3    won this transition 121.  Kindly send the documentation

4    package asap to proceed further."

5              Do you see that?

6    **A.**  Yes.

7              MR. FRANK:  If we could look at the e-mail right

8    above that.

9    **Q.**  Who did you forward this to?

10   **A.**  To Ross.

11   **Q.**  Why?

12   **A.**  Well, we just won a massive deal.  It's $8 billion of

13   trading, so, you know, that's something you want your boss to

14   know.

15   **Q.**  Why was it $8 billion if it's a $4 billion deal?

16   **A.**  Because we're selling $4 billion and then we need to buy

17   $4 billion, so it totals to 8.

18   **Q.**  Did you discuss this bid with anyone prior to submitting

19   it to KIA?

20   **A.**  Yes.

21   **Q.**  Who?

22   **A.**  To my management team, Rick, Paul McGee, Ian Holden,

23   probably some salespeople or the relevant transition manager

24   that was working on it, Ross, and again Ringrow was involved

25   or copied on it.

1   **Q.**  So the defendant was among the people?

2   **A.**  Yes.

3   **Q.**  When you submitted this bid proposing zero commissions,

4   was it actually your intention to charge zero commissions?

5   **A.**  We were going to charge a hidden fee.

6            MR. FRANK:  If we could take a look at the top of

7   this e-mail exchange, the top two e-mails.

8   **Q.**  How did the defendant respond when you told him that you

9   had won the deal?

10  **A.**  You want me to say that?  "You're the fucking man."

11  **Q.**  How did you respond?

12  **A.**  "You f+ckin right."

13           MR. FRANK:  If we could look at Exhibit 49 -- just

14  before we do that -- I'm sorry, Erin.  My bad.  Go back.

15  **Q.**  What was the date of that top e-mail?

16  **A.**  October 21st.

17  **Q.**  2010?

18  **A.**  Yes.

19           MR. FRANK:  Could we show the witness Exhibit 49,

20  please?

21  **Q.**  Do you recognize this exchange?

22  **A.**  Yes.

23  **Q.**  What is it?

24  **A.**  It is an e-mail exchange between Paul McGee and myself on

25  the 21st of October 2010.

1          MR. FRANK:  And the government moves to admit 49.

2          MR. WEINBERG:  No objection.

3          THE COURT:  Admitted.

4          (Exhibit No. 49 admitted into evidence.)

5          MR. FRANK:  And if we could look at the third

6   e-mail.  Sorry, the fourth e-mail.

7   BY MR. FRANK:

8   **Q.**  You say to Mr. McGee, "Went well here.  Won KIA."

9          Do you see that, with four exclamation points?

10  **A.**  Yes.  It was a very big deal.

11  **Q.**  Mr. McGee responds in the prior e-mail, "Great.  How much

12  will it bring in?"

13         Do you see that?

14  **A.**  Yes.

15         MR. FRANK:  If we could look at the top two e-mails

16  from this chain.

17  **Q.**  You wrote, "Back up the truck.  6 or 7 or 8.  Whatever

18  you want."

19         Do you see that?

20  **A.**  Yes.

21  **Q.**  What did you mean when you said "Back up the truck"?

22  **A.**  This expression came from the U.S.  It means we're going

23  to make a lot of money so bring a big truck.

24  **Q.**  And how did Mr. McGee respond?

25  **A.**  "Love it.  When you get to those sorts of numbers, it

1    seems silly not to round it up to 10 million."

2          MR. FRANK:  Could we show the witness Exhibit 50,

3    please?

4    **Q.**  Do you recognize this document?

5    **A.**  Yes.

6    **Q.**  What is it?

7    **A.**  I'm sending Das the periodic notice on 22nd of October

8    and copying Rick.

9    **Q.**  And again, the periodic notice is what?

10   **A.**  It's the document that refers to the transition

11   management agreement, stating the terms, the fees, and a

12   short description of the trade.

13   **Q.**  It contains the fees?

14   **A.**  Yes.

15          MR. FRANK:  The government moves to admit Exhibit

16   50 with its attachment.

17          MR. WEINBERG:  No objection.

18          THE COURT:  Admitted.

19          (Exhibit No. 50 admitted into evidence.)

20   BY MR. FRANK:

21   **Q.**  You write, "Dear Das, please find the attached periodic

22   notice for transition 121 for KIA's signature," and then you

23   ask him to fill in some details.

24          Do you see that?

25   **A.**  Yes.

1          MR. FRANK:  Could we look at the attachment?

2          And if we could just look at the bottom sentence

3    there.

4    **Q.**  "The manager will be acting as riskless principal with

5    trades executed on a multi-dealer competitive basis."

6          Do you see that?

7    **A.**  Yes.

8    **Q.**  What does that mean?

9    **A.**  For us, riskless principal was similar to being an agent,

10   sometimes referred to as a quasi agent.  It's essentially an

11   operational difference, but I wanted to put the word

12   "principal" in there so that if they asked questions about

13   it, we could point to that.

14   **Q.**  Why could you point to that?

15   **A.**  Because then we could say told you so.  We were charging

16   you or we didn't have to tell you.

17   **Q.**  Were you, in fact, trading as a principal?

18   **A.**  No.  Riskless principal for all intents and purposes is

19   the same as agent, except that for settlement purposes you

20   sit in between the market and the client.  So we face off

21   with the market and the client faces off with us, so the

22   market doesn't know who is trading.

23   **Q.**  And is that a good thing or a bad thing for the client?

24   **A.**  I think it's a good thing.

25   **Q.**  Why?

1    **A.**   Because then, if you're a very large institution, the

2    market would not know that that institution is doing a big

3    trade.

4    **Q.**   And why would that matter?

5    **A.**   Because principal houses having that information would

6    like to have that information so they can benefit from it.

7    **Q.**   So what is the convention in the bond market with respect

8    to how you trade?

9    **A.**   In our case, riskless principal and that we would -- not

10   just us, but that's just the convention, is to price trades

11   net.  So, again, the commissions and fees are built into the

12   price and the client only sees one price.

13   **Q.**   What did you tell clients about what it meant to trade as

14   riskless principal?

15   **A.**   Didn't really tell an awful lot because it's the same as

16   agent, from our perspective.

17   **Q.**   What did it mean when were you acting as riskless

18   principal for how you negotiated or disclosed fees?

19   **A.**   In normal cases we would just, you know, do the same as

20   we would do in equities.  We say we charge you X number of

21   basis points.  It just wouldn't be split out.

22   **Q.**   If we look at page 2 of the transition notice.

23            And if we look at the third row up from the bottom,

24   execution type, you again wrote "riskless principal"?

25   **A.**   Yes.

1   **Q.**   And then if we could look at footnote 4, you wrote,

2   "Execution will be on the basis of a competitive multi-dealer

3   basis.   Trades will not attract any commission and will be

4   priced net.   The manager may benefit from a bid-ask spread."

5         Do you see that?

6   **A.**   Yes.

7   **Q.**   What was your intention in putting that in there?

8   **A.**   Again, that is what we were doing.   And I thought that,

9   you know, if anyone asked a question afterwards, we disclosed

10  actually what we were going to do.   But I didn't expect them

11  to really read that or understand that.

12  **Q.**   They're a giant company?

13  **A.**   They are.

14  **Q.**   You didn't expect them to read it?

15  **A.**   No.

16  **Q.**   Why?

17  **A.**   I just didn't.   I didn't think they were sophisticated

18  enough.

19         MR. FRANK:   Could we look at footnote 2, please?

20  **Q.**   "In carrying out its duties and responsibilities, the

21  manager will at all times act in good faith, with due

22  diligence, and in a manner that a prudent manager would

23  believe at the time to be in the best interests of the

24  customer."

25         Do you see that?

1   **A.**   Yes.

2   **Q.**   Why did you put that in there?

3   **A.**   That's just a standard sentence.  I think that's been

4   there for six years.

5   **Q.**   At the time that you put that in there, did you intend to

6   act in the best interest of the customer?

7   **A.**   Like I said, this was a standard line.  But, you know,

8   clearly we were taking a hidden fee, so that's not in the

9   best interest.

10          MR. FRANK:  You can take this down.

11  **Q.**   Did there come a time when you received a periodic notice

12  back from the KIA?

13  **A.**   Yes.

14  **Q.**   Was it the same as the one we just looked at?

15  **A.**   No.

16          MR. FRANK:  Could we take a look at Exhibit 52,

17  please, for the witness only?

18  **Q.**   Do you recognize this document?

19  **A.**   Yes.

20  **Q.**   What is it?

21  **A.**   It's an e-mail from me to Ross on the 26th of October.

22          MR. FRANK:  The government moves to admit 52.

23          MR. WEINBERG:  No objection.

24          THE COURT:  Admitted.

25          (Exhibit No. 52 admitted into evidence.)

1          MR. FRANK:  I actually want to look at the bottom

2     e-mail, the bottom two e-mails.

3     BY MR. FRANK:

4     **Q.**   What is Mr. Das sending to you and to Muhammad Patel?

5     **A.**   The periodic notice.

6     **Q.**   Who is Mr. Patel?

7     **A.**   That is someone who works in the custody division of

8     State Street and was a relationship manager or service

9     manager for KIA client.

10          MR. FRANK:  If we could look at the attachment,

11     Erin.

12          I'm sorry, your Honor, I don't think I admitted the

13     attachment.  The government offers the attachment as well.

14          MR. WEINBERG:  No objection.

15          THE COURT:  Admitted.

16     BY MR. FRANK:

17     **Q.**   Does this first page of the periodic notice, which has

18     now been signed and stamped, look the same as essentially the

19     one that you sent?

20     **A.**   I haven't seen the one -- did we just look at that?  But

21     yes, this looks familiar.

22     **Q.**   We could put them side by side, if it would be helpful.

23     **A.**   Yeah, they look the same.

24          MR. FRANK:  I now want to look at the second page.

25     Actually, maybe it would be helpful, if we could put up the

1   second page of Exhibit 52-1 with the second page of

2   Exhibit 50-1.

3               (Discussion off the record.)

4               THE COURT:  For the jury, can you identify the two

5   documents?

6               MR. FRANK:  I'm about to do that, your Honor.

7   BY MR. FRANK:

8   **Q.**  So on the left, the print is a little bit small.  We're

9   looking at the periodic notice that you sent to the KIA; and

10  on the right, we're looking at the periodic notice you got

11  back from the KIA.  Do you see that?

12  **A.**  Yes.

13  **Q.**  Do they look the same to you?

14  **A.**  No.

15  **Q.**  It says in both of them, "Execution type," Riskless

16  Principal" -- actually, I'm sorry.  I'm getting a little bit

17  confused.

18              If you look on the right, it says "Execution type,"

19  "Riskless Principal."  Do you see that?

20  **A.**  Yes.

21  **Q.**  And that's consistent with what you said on page 1?

22  **A.**  Yes.

23  **Q.**  And then below that, the bottom three boxes say:

24  "In-Kind crossing," "Zero charges," "External crossing,"

25  "Zero," "Extra compensation," "Custody charges to be met by

1    the Transition manager."

2              Do you see that?

3    **A.**  Yes.

4    **Q.**  What does that mean?

5    **A.**  The last bit, first of all is correct, so that's fine.

6              The in-kind crossing and external crossing is a

7    reference to an equity transition.

8    **Q.**  To stocks?

9    **A.**  Yes.

10   **Q.**  Was this a stock portfolio or a bond portfolio?

11   **A.**  A bond portfolio.

12   **Q.**  Do you cross bonds in the same way that you cross stocks?

13   **A.**  Crossing in bonds is very rare, if it happened at all.

14   **Q.**  And you discussed crossing with the client in this

15   transition?

16   **A.**  No.

17             MR. FRANK:  Erin, if we could just take down the

18   exhibit on the left.  Never mind, why don't we just look at

19   the next page of the exhibit on the right.  And if you could,

20   blow up the footnotes there.

21   **Q.**  If we look at these footnotes, Mr. Pennings --

22   **A.**  Yes?

23   **Q.**  -- do they have anything to do with bonds?

24   **A.**  Very little.  No.

25   **Q.**  If you look at footnote 5, it refers to equity trades?

1   **A.**   Yes.

2   **Q.**   If you look at footnote 6, it refers to VWAP.

3   **A.**   That's equity.

4   **Q.**   What is VWAP?

5   **A.**   Volume-weighted average price.

6   **Q.**   Does that have anything to do with bonds?

7   **A.**   Not really.

8   **Q.**   Do these footnotes look like the footnotes you sent over

9   to the KIA?

10  **A.**   No.  It looks like something that they copied and pasted

11  from the previous document.

12  **Q.**   Thank you.

13          MR. FRANK:  If we could look at the cover e-mail

14  again, Erin, 52.

15          THE COURT:  Before you go there, I'm going to stop

16  you if you're starting a new e-mail.

17          MR. FRANK:  I'm just finishing this e-mail, your

18  Honor.  I appreciate that.

19  BY MR. FRANK:

20  **Q.**   You forwarded this periodic notice to Mr. McLellan.  Do

21  you see that?

22  **A.**   Yes.

23  **Q.**   And you wrote, "Unbelievable - they took out all

24  reference to FI and inserted language on equity crossing for

25  zero.  In summary, we are acting as principal and no

1    reference to any commissions on fixed income," and there are

2    four exclamation marks.

3              What were you telling the defendant?

4    **A.**   I just explained how -- I'm sorry -- stupid it was.  And

5    also that there's now really no reference to any fees

6    whatsoever other than, you know, the first page or -- well,

7    it's repeated, that we were acting as principal or riskless

8    principal and we want them to believe that it was principal.

9    **Q.**   What did you do after receiving the periodic notice back

10   from the KIA?

11   **A.**   I asked him to go back and have my version signed.

12   **Q.**   And what happened?

13   **A.**   They didn't.  They just said go with the flow.

14   **Q.**   Who said that to you?

15   **A.**   Das.

16   **Q.**   Told you to go with the flow?

17   **A.**   Yeah.  He said that several times.

18             MR. FRANK:  Thank you, your Honor.  Now would be a

19   good time.

20             THE COURT:  So, ladies and gentlemen, we'll adjourn

21   now.  Before I let you go, I want to remind you Monday 9:00

22   to 1:00, same as today; Tuesday 9:00 to 1:00 and 2:00 to

23   4:30; same on Wednesday; no court at all on Thursday; Friday

24   back to the 9:00 to 1:00.  Don't discuss the case among

25   yourselves, don't discuss it among anyone else, don't do any

1    independent research, including don't do any Google or

2    internet researches.

3              Thank you very much, have a nice weekend.  I'll see

4    you Monday morning.

5              All rise for the jury.

6              (Jury left the courtroom.)

7              THE COURT:  All right.  See you Monday morning at

8    8:30.  We're adjourned.  Have a nice weekend.

9              (Court adjourned at 1:01 p.m.)

1                         -------------------------

2                              CERTIFICATION

3         We certify that the foregoing is a correct transcript

4 of the record of proceedings in the above-entitled matter to

5 the best of our skill and ability.

6

7

8

9 /s/Debra M. Joyce           June 8, 2018
   Debra M. Joyce, RMR, CRR, FCRR  Date

10 Official Court Reporter

11

12

13 /s/Rachel M. Lopez         June 8, 2018
   Rachel M. Lopez, CRR      Date

14 Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25