UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, :

Plaintiff, : Criminal Action No. 1:16-cr-10094-LTS

v. :

ROSS MCLELLAN, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - x

BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

JURY TRIAL
Day 6

Monday, June 11, 2018
8:35 a.m.

John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Kelly A. Mortellite, RMR, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
BY: STEPHEN E. FRANK
John Joseph Moakley Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3244
stephen.frank@usdoj.gov

UNITED STATES DEPARTMENT OF JUSTICE
BY: WILLIAM JOHNSTON
1400 New York Avenue, Northwest
Washington, D.C. 20005
(202) 514-0687
william.johnston4@usdoj.gov

On behalf of the Defendant:

MARTIN G. WEINBERG, P.C.
BY: MARTIN G. WEINBERG
20 Park Plaza
Suite 1000
Boston, Massachusetts 02116
(617) 227-3700
owlmcb@att.net

LAW OFFICES OF ROBERT M. GOLDSTEIN
BY: ROBERT M. GOLDSTEIN
20 Park Plaza
Suite 1000
Boston, Massachusetts 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

LAW OFFICES OF MAKSIM NEMTSEV
BY: MAKSIM NEMTSEV
20 Park Plaza
Suite 1000
Boston, Massachusetts 02116
(347) 251-4800
mentsev@gmail.com

**TABLE OF CONTENTS**

**TRIAL WITNESSES**


| On behalf of the Government: | Page |
|---|---|
| EDWARD PENNINGS | |
| By Mr. Frank | 27 |
| By Mr. Weinberg | 178 |


**EXHIBITS**


| | Admitted |
|---|---|
| Number 54 | 37 |
| Number 56 | 32 |
| Number 57 | 38 |
| Number 59 | 42 |
| Number 63 | 43 |
| Number 65 | 45 |
| Number 66 | 53 |
| Number 67 | 59 |
| Number 69 | 65 |
| Number 71 | 67 |
| Number 72 | 69 |
| Number 76 | 72 |

**EXHIBITS, Cont.**


| | Admitted |
|---|---|
| Number 78 | 74 |
| Number 81 | 75 |
| Number 83 | 78 |
| Number 86 | 80 |
| Number 88 | 87 |
| Number 89 | 88 |
| Number 90 | 89 |
| Number 91 | 91 |
| Number 92 | 95 |
| Number 93 | 99 |
| Number 128, 132, and 184 | 103 |
| Number 142 | 85 |
| Number 152 | 110 |
| Number 160 | 124 |
| Number 161 | 131 |
| Number 162 | 132 |
| Number 163 | 132 |
| Number 164 | 142 |
| Number 165 | 135 |
| Number 166 | 137 |
| Number 167 | 138 |
| Number 168 | 141 |

**EXHIBITS, Cont.**

| | Admitted |
|---|---|
| Number 169 | 140 |
| Number 178 | 145 |
| Number 179 | 146 |
| Number 182 | 149 |
| Number 185 | 150 |
| Number 185-1 | 153 |
| Number 187 | 155 |
| Number 194 | 158 |
| Number 203 and 204 | 175 |

**P R O C E E D I N G S**

(In open court.)

THE DEPUTY CLERK: The United States District Court for the District of Massachusetts is now in session, the Honorable Leo T. Sorokin presiding.

Today is June 11th, the case of United States vs. McLellan, criminal action 16-10094 will now appear before this court.

THE COURT: I see all counsel and Mr. McLellan. Mr. Johnston, thank you for your filing. I got that. I'm going through it.

Anything that you want to talk about?

MR. FRANK: Just a couple of housekeeping matters, Your Honor. First of all, we have an immunity application for one witness for the Court.

THE COURT: Okay.

MR. FRANK: Who I expect to testify later this week, which I can hand up.

MR. WEINBERG: Who?

THE DEPUTY CLERK: Thank you.

(The Court reviews the document.)

THE COURT: I don't think there's really any basis for you to object, if you wanted to, is there, Mr. Weinberg?

MR. WEINBERG: I wish I could, but Congress has exempted defense counsel from either seeking immunity, or

objecting to it, except on the grounds that I don't have the basis for.

THE COURT: That's what I thought.

Okay. I've signed the order, as it all looks in order.

MR. FRANK: Thank you, Your Honor.

I haven't had this situation before with a witness, but my intention is to elicit it on direct examination, that he's been immunized, unless there's some reason not to.

THE COURT: I don't see any reason not to. I think it would be appropriate.

MR. FRANK: Thank you. The other issue --

THE COURT: I suppose, just one thing with respect to that, if -- is he -- he won't be testifying today, right?

MR. FRANK: No.

THE COURT: If you want me to give a limiting instruction, it would be a little bit different than a limiting instruction for a cooperator, because he's not hoping for leniency. He doesn't have -- he's not been charged with anything, right? So it would be slightly different -- if you want me to -- maybe you could think about, either of you or both of you, depending on whether you agree or disagree, just like a couple of sentences to explain to the jury. I'll probably look to the two of you to submit me something first, before I just go off on a frolic and

explain it myself.

So if you want to have a voice, I welcome that. You can give me something -- when would he like to testify?

MR. FRANK: Probably Wednesday.

THE COURT: Fine. So maybe tomorrow by the end of the day, or Wednesday morning. It's not -- nothing going to be too long. So maybe Wednesday morning, give me something, or the end of the day tomorrow, and you can give me one thing that you agree upon, or you can give me two separate things. It doesn't make a difference to me.

MR. FRANK: I'll inquire at the office. I'm not sure it's necessary, but I'll ask.

THE COURT: Right.

MR. FRANK: The other issue, Your Honor, was the issue that we tabled last week about the telephone call.

THE COURT: Yeah. Do I have a copy -- I know we marked it for identification -- not in this book, right?

MR. FRANK: No. I can hand up a copy.

THE COURT: Fine. Thank you. And you didn't want the whole thing, you wanted one portion, right, Mr. Weinberg?

MR. WEINBERG: Yes, Your Honor.

THE COURT: What page was it on?

MR. WEINBERG: Page 8 is -- I don't recall.

MR. FRANK: I'm not sure that our versions are exactly the same. There's -- there were some issues with the

transcript.

THE COURT: Okay. Do you know?

MR. WEINBERG: There's, in essence, a sentence there where Mr. Pennings is telling Mr. Boomgaardt in their one-to-one conversation that legal and compliance have --

MR. FRANK: It's page 9 -- on the version I just gave Your Honor, it's page 9 in the middle of the page.

THE COURT: Oh, the sentence, "We are in our rights to do it, even compliance says we are and legal says we are."

MR. FRANK: Right. And the issue there, Your Honor, is just by way of context. Mr. Pennings was actually on mandatory vacation during this period. It's required in the securities industry that people take a certain number of consecutive weeks off.

THE COURT: Consecutive?

MR. FRANK: Yes, in order that -- if they're perpetrating some sort of fraud, it doesn't happen while they're away and maybe comes to light. There's regulations surrounding that, so he was on his mandatory two weeks away. He was calling in to the office. I think in this -- he was either in France, or he was on his way back.

The source of this information, "even compliance says we are and legal says we are," is the defendant. So it's the defendant's self-serving hearsay and it's actually double and triple hearsay, because it's the defendant

purporting to report to Mr. Pennings what other people purportedly said to the defendant.

It's highly misleading, because even if those conversations happened -- and there's no evidence here that they did, even if those conversations happened, this is on August 31, 2011. Nobody in compliance and nobody in legal actually knew the full scope or even remotely close to the full scope of what had happened.

So the defense is using this to suggest that compliance and legal were actually okay with what happened. And this is the very issue that we've been dealing with, where Mr. Weinberg disavowed putting in what happened in September, as the investigation was underway. State Street didn't have the complete facts. They were learning new facts every day. And it -- it suggests that compliance and legal were okay with this, or were thinking about being okay with this. And that's completely contrary to what ultimately happened.

MR. WEINBERG: One, the legal and compliance did not authorize the return of the European monies for over a month. They were weighing whether or not the contract did or did not authorize the markup that was charged to the European bonds and Royal Mail.

Two, the other evidence in this case reflects that Mr. McLellan went to Mr. Hansen, went to legal, and wrote a

letter to legal saying I believe the contract authorizes this on September 5, to David Phelan, who was Brian Woodard's boss, who was the two heads of Global Legal. And on an August 26 call, Mr. McLellan is quoted as saying, "I brought this to Hansen. I told Hansen about the contract. I told him that there was a deliberate markup."

So you know, the Government can argue maybe Mr. McLellan's disclosures were a day late. I could argue that this is a bank manager, escalating to the heads of compliance at legal, the issue of whether or not the markups were or were not squarely within the heartland of a contract that was entered between Mr. Pennings and the State Street bank in Europe and Royal Mail.

Here's Mr. Pennings, the Government --

THE COURT: Are you arguing it's admissible for the truth?

MR. WEINBERG: I'm arguing it's admissible to Mr. Pennings' state of mind. And to the extent that the Government wants to say that Mr. McLellan is the source, to Mr. McLellan's state of mind. The Government yesterday -- not yesterday, Friday, strongly argued Pennings' state of mind is relevant when they were offering certain tapes, including the tapes with Pennings repeating his conversation about ConvergEx. And this is simply more evidence, its within the ambit of the conspiracy, which the Government

charged through the end of September. It's part of the context. Maybe Mr. Frank can make counter-arguments. Maybe it goes to the weight. But this goes to what Mr. Pennings believed on August 31st, which is right in the middle of what the Government has claimed to be a, quote, coverup.

MR. FRANK: Your Honor, if the issue were Mr. Pennings' state of mind, then we would -- we would agree that his statement, "we are in our rights to do it" should come in. There's no reason, but for an attempt to confuse the jury and mislead the jury about compliance and legal's point of view, to add the sentence, "even compliance says we are and legal says we are." That's second and third degree hearsay. It's false, it's misleading.

And the issue is not what Mr. Weinberg keeps trying to make it, which is are undisclosed commissions arguably permitted under the contact. The issue is are affirmative false statements that you're not taking undisclosed permission -- commissions permitted under any contract or any law. And the fact that as these days went by it became more clear to compliance and legal what had actually happened in this case, is critical to understanding why they came to the conclusion that what happened here was a fraud and why they fired Mr. McLellan and they fired Mr. Pennings within days of this conversation.

MR. WEINBERG: There's so much packaged into that.

Let me try to take it one at a time.

THE COURT: So this is what I'm going to do. I'm going to allow both sentences in, but I'm going to explain to the jury that the -- the two sentences -- you want two sentences that you want, right?

MR. WEINBERG: Yes.

THE COURT: I'm going to allow both sentences. I'm going to explain to the jury when it comes in simply that this is not evidence that compliance did -- that compliance or legal said it's okay. This is Pennings' saying that. It goes to his state of mind and what he said and that that's what it's in for. It's not -- it's not proof that legal took this position. It's not proof that -- it's just proof that that's what he said and you can consider it to his state of mind.

MR. FRANK: Your Honor, we believe that that squarely opens the door to entering the fact that State Street admitted that it perpetrated a fraud here. And we think, then, that should come in, that they admitted, in a deferred prosecution agreement, that these employees and the bank perpetrated the fraud.

THE COURT: Why?

MR. FRANK: Because it's highly misleading to suggest that compliance and legal ever thought this was okay. They didn't know what had happened and when they knew what

had happened, they fired these people. And not only did they fire these people, but the bank admitted that it perpetrated a fraud. And that is critical to the jury understanding this sentence.

Otherwise, there is this suggestion that for a time the bank was okay with it. And the bank was never okay with it once it knew what had happened. And so we think this is extraordinarily misleading. It's purportedly coming in for a witness' state of mind as they're scrambling to persuade people with their sort of second coverup story, that this is permitted under the contract. And ultimately, when the facts were known to compliance and legal, within weeks of this, there was a -- an absolute decision made that this was not permitted by any contract, that --

THE COURT: So two problems with your argument, Mr. Frank, I think.

MR. FRANK: Only two?

THE COURT: Only two that I can think of at the moment. The first is that -- it's not saying -- and I don't think the jury will be confused, that this is evidence that, in fact, legal said it. The reason I'm going to explain to the jury when it comes in, that this isn't evidence of what legal said, is I think the jury will understand that this isn't about what legal said.

But if -- I do think you should think about and be

careful about opening the door. I don't think this sentence opens the door that Mr. Frank describes, but I also think that it's a lot further to go, even if the -- I'm not -- I haven't -- I'm not saying what I would do if the door was opened, or -- I haven't thought that through, because I have the impression Mr. Weinberg doesn't want to open that door, so he would prefer not to go that far. But the deferred prosecution agreement is more -- even if this were substantive evidence that legal said it's okay, the answer, the rebuttal evidence is that legal said it wasn't okay, not necessarily that legal said it wasn't okay and pled guilty, essentially, to a crime.

MR. FRANK: It's more than that they said it wasn't okay under the contract, Judge. It's that they acknowledged that what happened here was an out-and-out fraud. And the suggestion that they were ever okay with it is highly misleading. The other --

And I can't really -- without putting in all sorts of legal witnesses to talk about their day-by-day analysis of this -- I mean, which would be a complete frolic and detour --

THE COURT: Well, how far down the road of legal -- I mean, I guess the question really is what --

MR. FRANK: And it's not the only time that it appears, Judge, in this call, which if he puts it in, we

would submit the entire call should come in, because he's lying throughout this phone call and coming up with other cover stories in this phone call. For example, at page 5, line 20, he says contractually, we are fine, I have been told. That's, again, coming from the defendant. So --

MR. WEINBERG: What Mr. Frank is not saying is that Mr. Pennings, on August 26, five days earlier, is saying to Mr. McLellan, we're fine under the contract. Mr. McLellan later is discussing the contract and the three-way call with Boomgaardt and Pennings. Pennings has taken the position the contract supports us.

I do have to answer --

MR. FRANK: That's in evidence. He can use that.

MR. WEINBERG: Let me finish, Steve.

There's two points that Mr. Frank has made. You know, one that Mr. McLellan was fired. He negotiated a termination. This was not like Mr. Pennings or Mr. Boomgaardt, who were fired.

Second of all, the Government says it's an affirmative lie case and that's been their essential position. That's not our position. Our position is that the Government is criminalizing nondisclosed spreads. The affirmative lie was a Pennings statement to McKnight that Mr. McLellan never knew about. Mr. McLellan didn't lie to anybody. And whether or not a jury concludes there were

affirmative lies and they were agreed to, is an issue that's hotly contested, not a given in terms of --

THE COURT: Here's my question with respect to the sentence. The more that it's put before the jury that there were consultations with legal, that people had the state of mind, that people were either asserting that legal said it was okay, or that there's evidence that they thought legal said it was okay, or they had some discussion with legal that made them think that -- the more thing of evidence of that nature comes in, the more it opens the door to evidence as to what -- at the time, those statements were made, what, if anything, legal knew, and that whether legal -- what, if anything, legal did differently, once it knew more.

MR. FRANK: And the other issue --

MR. WEINBERG: I am seeking this, Judge, to the extent I do, only to respond to what the Government's argument, or Mr. Pennings' testimony is going to be, that there was a debate. It was limited to Royal Mail. That was the complaining client, on the August 26th of 31st period. One side of the debate was the contract supported the markup. We don't have to give them back any money. We didn't have to give them back the first million. That's the position Mr. McLellan took in this limited internal debate, that's largely on the recordings of August 26th.

The other side of the debate is give them back the

two million -- there was this side of Mr. Pennings -- because that might end the issue. It was the political thing to do, like it was the first million.

I'm not looking to let this evolve into the internal investigation that looked at KIA and looked at other transitions. I'm only focused on August 26th to August 31st, or to September 5 and 6. The period where the Government is offering evidence that they're going to spin and say because Mr. McLellan wasn't authorizing the return of the $2 million of the European bonds that somehow he was involved in a coverup. What happened there was this was totally off his radar. It goes on his radar on August 26. The e-mails and calls for contracts has a number of conversations, looks at the contract, and studies it for the first time, sees that the contract supports the markup and that was the limit of what was being discussed by him, by legal, by compliance.

Yes, it broadened shortly thereafter. Yes, at the end of the day, State Street, for its own self-interest, which is a lot different than the guilt or innocence of Mr. McLellan, made a deal with the FCA, later made a deal with the US Attorney. We don't want to get involved in all that. If they put it in, we're going to have to go and be debating why do banks cut deals rather than litigate, because they're at the mercy of the United States Department of Justice.

MR. FRANK: They fired Mr. McLellan before they

struck any deal with the FCA. And yes, they did fire him. They ultimately negotiated severance once he contested his firing, but they fired him.

Number two, Your Honor, what he's trying to argue is ratification. This after the fact legal consultation, this attempt to cover up and persuade legal that there's an out under the contract, when legal doesn't know what's happened, that kind of after the fact consultation has nothing to do with his state of mind when he's committing the crime, when he's actually defrauding the coverup. It is part of the coverup. He's trying to persuade legal that what they're doing is okay under the contract.

And by narrowly focusing on August 26th to September 5th, what the defense is cleverly doing is focusing on a period of time when legal is getting piecemeal facts, doesn't know what has happened and is -- oh, are you telling me that there is some clause under the contract? Well, let's look at the contract, let's see what happened, and then let's go back and find out what you actually told the client. And very quickly thereafter, they came to the determination that this was a fraud.

MR. WEINBERG: Because they found Pennings' secret e-mail. They found that Mr. Pennings had made an off-the-record promise to Royal Mail. Until that, legal and compliance were focused, like Mr. McLellan was focused, on

the contract. And I'm entitled to reflect their --

THE COURT: But even if they're only looking at Royal Mail, how different is Royal Mail from all the others?

MR. WEINBERG: It's, right then, Judge, the alleged coverup was limited to Royal Mail. The letters from Hansen was Royal Mail. What legal was looking at on August 26th was Royal Mail. What they said to him that the contract looks like it supports it, is Royal Mail.

David Puth says, in another conversation, through Ross, the contract supports it, why are we giving the money back? He's got e-mails which I know the Government would object to me using, where people are saying -- this is getting like Nick Bond, this is getting blown up too much. Or Woodard.

Right then, it's focused on a contract issue, an undisclosed markup issue. And then it wasn't until they go and dearchive -- I think that's the right word. They do the archaeological dig into Pennings' e-mail and find the February 21 e-mail that was not copied to Pennings and Ross, not copied to Boomgaardt. That's when they conclude, yes, there was an affirmative lie.

MR. FRANK: That's false, Your Honor.

MR. WEINBERG: So if the Government wants to go into this period and start claiming that Mr. McLellan's adoption of the contract. He sent it to Bailey, he sends it

when he gets it, that he believed the contract supported the markup, he's -- point-blank tells David Phelan, the head of legal, I wouldn't send them -- give the money back, but if you want to, it's your choice --

THE COURT: Let me just see what Mr. Frank has to say.

MR. FRANK: So that's untrue, because eventually they also went into the defendant's e-mails and they found much of the evidence that we're talking about here.

MR. WEINBERG: What evidence?

MR. FRANK: But Your Honor is absolutely right. They were looking in those days at the Royal Mail, because that's what they knew about. That's where the, you know, the issue had hit the fact and that's what they were looking at.

THE COURT: The evidence is the copies of the e-mails to KIA.

MR. FRANK: All the other evidence, the NTMA e-mails, all the evidence that we've been putting in in this case eventually emerged and you know, the fact that he had manipulated the NTMA transactions so that they were trading stocks in a principal account, a dormant principal account that had never -- was not to be used for that purpose, that the client hadn't asked to be used. All of that evidence of his deliberate involvement in every step of this process eventually became apparent, but that took some time to

happen.

But what was going on between August 26th and September 5th was that the defendant was trying to avoid what he referenced on that phone call, which was the tip-of-the-iceberg issue. He was concerned that they were going to start looking at all of these transactions and figure out what had gone on here. So it is highly misleading for the defense to cherry-pick those few days, when he is actively trying to mislead legal and compliance and when they're trying -- they're trying to figure out what's going on and suggest, as in through this phone call, that they are okay with it. They were not okay with it.

MR. WEINBERG: He's not --

MR. FRANK: And we believe if that evidence comes in, that they were okay with it during those few days, then the evidence should come in that when they learned what had happened, they admitted that their executives had perpetrated a fraud. Not just that it wasn't okay under the contract, but that it was an out-and-out fraud. And that is a magnitude -- that is an order of magnitude different from concluding that it wasn't okay under the contract.

MR. WEINBERG: Well, the Government needs to call its witness. If this is -- if my defending Mr. McLellan's state of mind, which the Government is putting into evidence through the August 26 phone calls, my only way to defend Mr.

McLellan's position of not returning the money is exactly what he was saying then and e-mailing.

He was telling compliance and legal I believe the markup was allowed by the contract, which he had first studied right on tape. You see a tape where he's starting saying we need to reserve the money, you know, the contract doesn't support it. And then Pennings says read it. He's reading it and he says it does support it.

I don't --

THE COURT: I think the first --

MR. FRANK: So just to be clear, now what we're hearing is that this is coming in for the defendant's state of mind, so his own self-serving, second-round hearsay through Mr. Pennings, after the fact, looking for legal ratification, is now his state of mind during the perpetrating -- during the perpetrating of this fraud.

MR. WEINBERG: There's no inconsistency. It's a state of mind issue for Mr. McLellan, which neutralizes the Government's argument --

THE COURT: Well, how does this sentence, on this page of the transcript, go to Mr. McLellan's state of mind?

MR. WEINBERG: Because the Government is going to argue that McLellan is the source of the information.

THE COURT: But on the -- I guess the way I looked at it --

MR. FRANK: It's legal's state of mind.

THE COURT: On the piece of evidence alone, without -- I haven't heard that other evidence, but I -- just on that piece of evidence alone goes to Mr. Pennings' state of mind.

MR. WEINBERG: It does.

THE COURT: And that's why I'm going to let it in. It seems to me that what it does do, it certainly opens the door to you showing with Mr. Pennings what he did or didn't know at the time or what he had or hadn't told legal at the time, to -- whatever that statement was. I don't know if that statement was sort of just throwing it in there.

MR. FRANK: I can't do that, Judge, because Mr. Pennings was not in the office. This was all Mr. McLellan seeking to persuade legal, in private conversations, that this was okay and not giving them the full facts. And so by --

THE COURT: He doesn't know what -- all he knows -- if you asked him about it, all he would say is that Mr. McLellan told me this. I don't know what McLellan told legal.

MR. FRANK: That's correct. And the statement, "we're okay under the contract," I admit is -- gets at Mr. Pennings', albeit, after the fact, state of mind. The statement "legal and compliance are okay with it,"

doesn't get at Mr. Pennings' state of mind while he's committing this crime, because he didn't check with legal and compliance while he was committing this crime. This is after the fact. This is Mr. Weinberg trying to argue through a back door that legal and compliance ratified what they did and that's just misleading. And we can't get into all that without calling a dozen additional witnesses.

THE COURT: Do you have any other issues that you wanted to raise with me this morning?

MR. WEINBERG: No, Your Honor.

THE COURT: Do you?

MR. FRANK: No, Your Honor.

THE COURT: Okay. Let me think about it for a minute.

(The Court and law clerk confer.)

THE COURT: Okay. Maria, you can go get the jury. I stand by what I said before, that the two sentences come in. I don't think it opens the door to the DPA agreement. I do think it allows the Government to elicit what was or wasn't said. You know what the basis of his assertion was. In terms of Mr. McLellan, was it Mr. McLellan, and if you wish to put in evidence as to what Mr. McLellan had or hadn't told the lawyers from other sources, then you can do that. And we'll take it one step at a time in terms of the evidence.

Is Mr. Pennings here? You should get him and put him on the witness stand.

MR. WEINBERG: In other words, if I understand the ruling correctly, that if I use the --

THE COURT: If you use those two sentences, that doesn't open the door to the DPA.

MR. WEINBERG: Or open the door to hearsay from Pennings as to other matters, but it opens the door, or potentially opens the door for the Government to call Woodard, the lawyer --

MR. FRANK: No, Your Honor. The other hearsay issue is not my understanding of the ruling and if --

THE COURT: I haven't touched that other issue. I don't know.

(The jury enters the courtroom.)

THE COURT: Good morning, ladies and gentlemen, I hope you had a nice weekend. No one did any independent research, talked to anybody else about the case. Good.

So we resume, Mr. Pennings remains on the witness stand. I remind you, Mr. Pennings, you remain under oath from Friday.

Mr. Frank, are you ready to proceed?

MR. FRANK: I am, Your Honor. Thank you.

**EDWARD PENNINGS**

having been previously duly sworn, testified as follows:

**DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.**

BY MR. FRANK:

**Q.** Good morning. Mr. Pennings, when we left off, we were talking about the periodic notice that you received back from the Kuwait Investment Authority in or about October 2011, regarding the KIA 121 transition. Do you recall that?

**A.** Yes.

**Q.** And if we could look at Exhibit 52, which we were looking at --

MR. FRANK: And Erin, if you can just enlarge that. Yes, please, all the way.

BY MR. FRANK:

**Q.** You had received the periodic notice back and it was different from the periodic notice that you had sent to the KIA.

Do you recall that testimony?

**A.** Yes.

**Q.** And you said to Mr. McLellan, in this e-mail, forwarding the periodic notice from KIA, "unbelievable. They took out all reference to FI."

What is FI?

**A.** Fixed interest bonds.

**Q.** Bonds.

"And inserted language on equity crossing."

What is equity crossing?

**A.** Where, in stock transactions, you can match one client with another, without having to go through the market.

**Q.** So what are you telling Mr. McLellan here about what KIA has done with this periodic notice?

**A.** They messed it up.

**Q.** How so?

**A.** They took the fixed income language out, which was needed in there, because it was a fixed income transition. And they seemed to have just copied and paste an old equity document and just put it in and sign it again.

**Q.** And then you wrote, "in summary, we are acting as principal and no reference to any commissions on fixed income."

Do you see that?

**A.** Yes.

**Q.** And what were you telling Mr. McLellan there?

**A.** That, you know, that we essentially put in, were acting as principal -- or actually, I said riskless principal. But the sophistication of the KIA wasn't very good, to put it mildly. So they may very well have thought we acted as a principal. And there was no reference to commissions, because that was taken out, for fixed income, that is.

**Q.** Okay.

MR. FRANK: Erin, thank you. We can take this down.

BY MR. FRANK:

**Q.** Mr. Pennings, at some point, did a complication arise with the KIA 121 transition?

**A.** Yes.

**Q.** What happened?

**A.** Late the evening before, certainly late London time, I was -- I received an e-mail from some individuals in the US who wanted to amend the details of the trade to include State Street's rates business, which is the principal trading business in fixed income for State Street.

**Q.** So let's just take a step back to understand. Previously, you had testified that State Street acted as an agent with respect to both bonds and stocks.

**A.** Yes.

**Q.** And it shopped around?

**A.** Yes.

**Q.** At some point, did there come a time when State Street set up a proprietary trading operation for bonds?

**A.** Yes.

**Q.** When was that?

**A.** Somewhere around early 2010, I think. We were just in the -- at a time where it became live, certainly, in the US.

**Q.** So they were betting the bank's own money?

**A.** It's fair to say, yes.

**Q.** And that was called the rates desk?

**A.** Yes.
**Q.** And what were they asking you to do the night before you started the transition for KIA in November of 2011?
**A.** Well, me, they were asking us to go to legal and compliance to see if it was possible to have the rates business as part of the multidealer panel and pitch for, or quote for the deal.
**Q.** So they would be on the other side of the trade?
**A.** Correct.
**Q.** You would be trading against them?
**A.** The rates business would be trading against the client, yes.
**Q.** Could we look at -- and what was your concern about that?
**A.** A number of concerns. First of all, I didn't like them.
**Q.** What do you mean by that?
**A.** They took a lot of resources away from us and they were highly paid individuals, for what I believe wasn't necessarily a very good job.

Second, I thought it was wrong. We'd be making money twice. And third, I was worried that if we showed a documentation to legal, they would see that the transition management agreement was actually a one-off equity deal agreement and not even a master agreement. And the periodic notice would say zero commissions, which, you know, everyone knew we were going to make a lot of money out of it, so that

wouldn't add up and we got caught.

**Q.** So you were concerned that they would see that the periodic notice would say zero commissions?

**A.** Yes.

**Q.** And why was that a concern?

**A.** Because we never did zero commissions.

**Q.** And you said "we would both be making money out of this"?

**A.** If they would do their job right, then they would be able to make a lot of money out of it, yes. If they were successful, yes.

**Q.** Would it have been possible for them to also lose money?

**A.** Yes.

**Q.** And would that profit or loss have accrued to the transition desk, or to some other part of State Street?

**A.** Other part of State Street.

**Q.** Could we take a look at Exhibit 56, please, just for the witness.

Mr. Pennings, do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an e-mail chain between Ross and myself on November 2nd.

**Q.** And that's the night before the KIA deal?

**A.** Yes.

MR. FRANK: Government moves to admit 56.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 56 admitted into evidence.)

BY MR. FRANK:

**Q.** Looking at page 2 of this e-mail chain, the very first e-mail, at the bottom of the page.

What is this e-mail? Who is Melissa McKay?

**A.** I believe that Melissa McKay is legal in Boston for SSGM.

**Q.** And she's written an e-mail, if you look at the top, to Simone Paul and Krystyna Beck. Who are those people?

**A.** Those are legal in London.

**Q.** And Bryan Woodard, who's he?

**A.** The global head of legal for SSGM.

**Q.** Chris Carlin?

**A.** Ross' COO based in Boston.

**Q.** He worked for Ross?

**A.** Yes.

**Q.** Tom Bryant?

**A.** He was the head of trading in Boston.

**Q.** For whom?

**A.** For Ross, for the transition management business.

**Q.** So he traded on behalf of the transition desk, on behalf of your clients?

**A.** Yes.

**Q.** Who is Evan Bernsten?

**A.** The head of the rates business globally.

**Q.** So he traded against Mr. Bryant?

**A.** If he was successful, yes.

**Q.** And then there's you and then who are these other individuals? Stephen Bliss, Vincent Manzi, and the rest of the names on this list?

**A.** Anthony Scully is European compliance, head of European SSGM compliance. And the others are Boston based, either compliance or legal. I don't know.

**Q.** If you look at the text of the e-mail, she writes, "Hi Simone and Krystyna. Brian Woodard and I just got off the phone with Evan Bernsten and Tom Bryant. Evan and Tom would very much like to find a way that the State Street rates desk could be a potential dealer for fixed income trades, in connection with a large fixed income based transition, coming up for KIA this week."

Do you see that?

**A.** Yes.

**Q.** And then further down, two sentences later, she writes, "Brian has asked if you can please take a look at the KIA transition documentation first thing tomorrow your time, to see whether anything in the document would prohibit State Street from acting as one of the fixed income dealers on the other side of riskless principal fixed income trades, whether all sources of State Street revenue must be disclosed," et

cetera.

What was your understanding of what she was asking Ms. Paul and Ms. Beck to look at there?

**A.** The documentation, the transition management agreement, and the periodic notice to see if it specifically prohibits, and if so, if they need to have the client sign any other documentation.

**Q.** And just to be clear, what did you understand her to mean when she referred to acting as one of the fixed income dealers on the other side of fixed income trades?

**A.** That the transition trading desk would include the rates desk to pitch for flow, to quote for flow.

**Q.** So they would get a quote from them, along with everybody else they were getting quotes from?

**A.** That would be the idea.

**Q.** And a few sentences later, she writes, "If this is not expressly prohibited or required to be disclosed in the KIA documentation, our view is that to avoid a conflict issue, we should provide disclosure in the transition notice, or in a separate document that State Street may act as a potential dealer."

Do you see that?

**A.** Yes.

**Q.** What did you understand Ms. McKay to be saying when she said "we should provide disclosure"?

**A.** Like I said, we needed to communicate to the client and get their signoff in a separate document.

**Q.** If we back out of this e-mail and look at the next e-mail up in the chain. You forwarded this communication to the defendant. Why?

**A.** I noticed he wasn't on it. And, you know, we talked about the KIA was a big deal. I was worried, you know, where this was going, also because it was almost midnight for me and the client was three or four -- well, four hours probably ahead of London, in Kuwait, and they don't like to sign stuff. So I was worried that this was going to complicate, if not worse, the deal.

**Q.** What do you mean "if not worse"?

**A.** That it may not happen.

**Q.** You were worried that they would pull the deal?

**A.** Possibly, yes.

**Q.** If we could look at the first page of this e-mail chain and the bottom two e-mails.

Mr. McLellan writes to you, "I need this agreement."

Do you see that?

**A.** Yes.

**Q.** What agreements are they referring to?

**A.** The transition management agreement and the periodic notice.

**Q.** And then you respond, "BTW, there is no way we can disclose our spread."

Do you see that?

**A.** Yes.

**Q.** What were you telling the defendant when you said there is no way we can disclose our spread?

**A.** We said zero commissions to the client and we were not going to disclose the spread, because the deal was pitched at zero.

**Q.** What were you afraid of here?

**A.** That the client would start asking questions that, you know, maybe our competition would find out and our business model, our regular business model would be compromised.

**Q.** Who were you concerned about disclosing your spread to?

**A.** The client.

**Q.** Can we take a look at the top e-mail.

How did the defendant respond when you told him there was no way we can disclose our spread?

**A.** "Agreed."

**Q.** Can we take a look at, for the witness only, Exhibit 54, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** An e-mail exchange between myself and Ross on November

the 2nd, again, at -- you know, late at night.

**Q.** That's the same night?

**A.** Yes.

**Q.** Before the trade?

**A.** Yes.

**Q.** E-mails were going back and forth?

**A.** Yes.

MR. FRANK: The Government moves to admit 54.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 54 admitted into evidence.)

BY MR. FRANK:

**Q.** Mr. McLellan writes to you, "Did legal look at the original agreement?"

Do you see that?

**A.** Yes.

**Q.** And you respond, "absolutely not. Nor did they look at the periodic notice. This can of worms stays closed."

What was the can of worms you were referring to that you wanted to stay closed?

**A.** There's two cans. One of them being the master agreement not being a master agreement signed in 2004, for only an equity deal in North America, so arguably inappropriate for this deal. And, you know, more importantly, it said zero commissions.

**Q.** And what was your concern about the fact that the periodic notice said zero conditions?

**A.** That someone put two and two together, knowing that we were going to make several million dollars out of this deal, because that was well signalled and they say you can't do that.

**Q.** Somewhere where would put two and two together?

**A.** Either in legal or compliance.

**Q.** If we look at Exhibit 57 for the witness only, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's, again, a continuation of the e-mail trail between Ross and myself.

MR. FRANK: The Government moves to admit 57.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 57 admitted into evidence.)

BY MR. FRANK:

**Q.** And if you look at the bottom of the page, the first page, Mr. McLellan says to you, "send to Krystyna or Simone, or whoever you like better. I would be surprised if they accept."

What did you understand the defendant to be telling you to send to Krystyna or Simone?

**A.** The transition management agreement and periodic notice.

**Q.** And when he said "whoever you like better," what did you understand him to mean by that?

**A.** The way I saw it is whoever you think is more likely to let it slip, or not see it.

**Q.** And then it says, "I would be surprised if they accept."

Do you see that?

**A.** Yes.

**Q.** And then if we can look at your response, you responded, "accept what? Us letting rates quote?"

And then let's look at the defendant's response. He says "letting us do the trade."

What was your understanding of what the defendant was telling you when he said that he would be surprised if legal allowed you to do the trade?

**A.** Well, for the same reasons that I just mentioned, you know. It was a zero commission bid and we were going to make money out of it.

**Q.** Now, I just want to make sure that we're chronologically -- this is in November of 2010?

**A.** Yes.

**Q.** Hadn't you already done a trade for KIA with zero commissions and made a lot of money by this point?

**A.** Yes.

**Q.** What about Dutch Doctors?

**A.** Yes.

**Q.** And yet, your understanding is that the defendant was saying he would be surprised if legal let you do the trade, once they looked at the documentation?

**A.** Yes.

**Q.** Did you send the documentation to legal?

**A.** I think I sent it to Ross and he forwarded it to Brian Woodard and then it sort of -- came or made its way back to London again.

**Q.** And then what happened?

**A.** We did the trade.

**Q.** They let you do the trade?

**A.** They did.

**Q.** They didn't spot it?

**A.** They let us do the trade, so I don't know what they seen or what they looked at.

**Q.** Do you have an understanding of what they were looking at the agreement for?

**A.** Well, I mean, the discussion was about seeing whether the rates desk could get a piece of the action. The rates desk could participate.

**Q.** Who, if anyone, did you speak with after legal signed off on going ahead with KIA 121?

**A.** First Simone Paul came to my office in the morning before the trade, because I remember being -- well, we were on hold,

essentially. The trade was ready to go and I spoke to my team in the morning. And when she came down and said, yeah, you're good to go, following the e-mail she sent, we said, all right, okay, we're good to go. And, you know, I spoke to Ross, as well. Obviously, there was a very big deal.

**Q.** Did you tell anyone else that legal had signed off?

**A.** Well, the people that needed to do the trade. So Rick Boomgaardt, Paul McGee, Ian Holden, some of the transition managers were passed on by them. You know, it's -- we were waiting to do the trade.

**Q.** And what did you tell them?

**A.** We're good to go, legal has approved it. And you know, it's okay.

MR. FRANK: Could we show the witness only Exhibit 59, please.

BY MR. FRANK:

**Q.** Do you recognize this document, Mr. Pennings?

**A.** Yes.

**Q.** What is it?

**A.** It's an e-mail from Adnan Choudhary, which was one of the transition managers working on the deal in London on Wednesday, November the 3rd with trade instructions.

MR. FRANK: The Government moves to admit 59.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 59 admitted into evidence.)

BY MR. FRANK:

**Q.** These are the trading instructions that went out the next day?

**A.** Yes.

MR. FRANK: And if we could look, Erin, the third line down, it says, "Comms: Two basis points of value of the sellside, and 18 basis points of the value on the buyside."

What are the traders being instructed?

**A.** That's the fee or commission that we would take out of the deal.

**Q.** What did you tell KIA the commission that you would take out of the deal was?

MR. WEINBERG: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Zero.

BY MR. FRANK:

**Q.** I'm sorry?

**A.** Zero.

**Q.** Why doesn't it say "markups" or "markdowns"?

**A.** I don't know. We use it interchangeably. Some call it commission, some call it a markup, some call it a spread. It's the same thing -- technically it's not the same, but from a client's perspective, it's a revenue that we take from the client.

**Q.** Per trade?

**A.** Yes.

**Q.** Could we show the witness only Exhibit 63, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an e-mail exchange between myself and Ross on November 5th.

**Q.** So this is two days after trading has started?

**A.** Yes.

MR. FRANK: Government moves to admit 63.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 63 admitted into evidence.)

BY MR. FRANK:

**Q.** If we could look at the bottom e-mail. You e-mail Mr. McLellan and you say, "How much did we make on the balance?"

Do you see that?

**A.** Yes.

**Q.** What were you asking the defendant?

**A.** I thought that we were done with the trade. That it was finished on the 4th, I think, and I asked him how much did you take in the US in terms of markups or spreads or commissions.

**Q.** Why did you ask the defendant that question?

**A.** He was the only one I'm speaking to in the US.

**Q.** You didn't say what deal you were talking about?

**A.** Not in this highlighted bit, no.

**Q.** Well, that's the -- that's the entirety of your e-mail, is it not?

**A.** Okay. Yeah. Then, no, I didn't, because it was pretty obvious.

**Q.** Can we look at the defendant's response. What did he tell you?

**A.** "$1 million yesterday. We have another 100 million left to trade."

**Q.** And how did you respond?

**A.** I need more.

**Q.** You said I need more?

**A.** Yes. Like the more revenue, the better.

MR. FRANK: Can we show the witness only Exhibit 55, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** Again, it's an e-mail between myself and Ross on November the 5th.

MR. FRANK: Government moves to admit 65.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 65 admitted into evidence.)

BY MR. FRANK:

**Q.** If we look at the bottom e-mail, Mr. Choudhary writes to Mr. Das, copied to you, Mr. Boomgaardt, and Mr. McLellan. He writes, "Hi Das, please find attached the latest daily update report for the KIA transition 121."

And then if we go a little bit further down, it says "implementation shortfall, 19 basis points, or $7.7 million. Pre-transition estimate, 26 basis points for $10.3 million."

Do you see that?

**A.** Yes.

**Q.** What was Mr. Choudhary telling your client?

**A.** Just giving an update that we're almost done, 98 percent was traded, and a cost in terms of implementation shortfall was a lot better than we expected.

**Q.** So you were doing well for the client?

**A.** Extremely well.

**Q.** Can we look at the e-mail above? You forwarded that to the defendant and you wrote, "take some more on the tail." What does it mean to take some more on the tail?

**A.** Just reference the earlier e-mail and we're well below expectations. So if you have $100 million left to trade, which is the tail, then you take some more on it.

**Q.** Take some more what?

**A.** Take some more revenues, because we're still under estimate.

**Q.** Take some more money for whom?

**A.** For State Street.

**Q.** Now, is that acting in the customer's best interest?

**A.** No.

**Q.** When you are acting as an agent, who is entitled to the benefit about performance, if you end up doing really well?

MR. WEINBERG: Objection.

THE COURT: Overruled?

THE WITNESS: The client is.

BY MR. FRANK:

**Q.** And is that any different when you're acting as a riskless principal?

**A.** Not from my perspective, no.

**Q.** Who was getting the benefit of State Street's out performance, when you take some more on the tail?

**A.** We took some of that benefit.

MR. FRANK: We could take this down.

BY MR. FRANK:

**Q.** Mr. Pennings, did there come a time when you decided to use this plan of charging hidden commissions more broadly?

**A.** Yes.

**Q.** Tell us what the plan was.

**A.** It was discussed over a period of time already, but this

clearly worked. And we decided that where there were big deals that we were asked to pitch for, where we believed that we were competing with competitors that were less transparent, or certainly be able to undercut us, that we would look to, you know, again, take a hidden spread, if you will, and charge a management fee in lieu of the commissions.

**Q.** What kind of a management fee in lieu of commissions?

**A.** Super low management fee to win the deal.

**Q.** Charge a low fee and then charge a higher hidden cost?

**A.** Yeah, charge as low a fee that we believed was competitive with the -- or anticipated other quotes in the market and still, you know, make the client believe that that was it for us.

**Q.** Have you heard the term "bait and switch"?

**A.** Yes.

**Q.** Is that what you're describing?

MR. WEINBERG: I object.

THE COURT: Sustained.

BY MR. FRANK:

**Q.** You were going to charge a low up-front cost and then add hidden costs?

**A.** Yes.

**Q.** You testified you were going to do this on big deals. What kinds of big deals?

**A.** Initially fixed income, big fixed income deals.

**Q.** Why fixed income?
**A.** Because it didn't require us to do anything else, other than not mentioning the spread or commission, whatever, in the periodic notice.
**Q.** Why do you say that?
**A.** Because that's how it was.
**Q.** Why is fixed income different than stocks?
**A.** In stocks, we always applied commissions as an agent or -- and those are separated, so you have a price, to get the best price in the market, and then you add your commission to it, which is visible.
In bonds, there's a similar process, but it's built into the price, so the price is delivered to the client at what we call net.
**Q.** And what does it mean to be delivered to the client net?
**A.** It's built into the price of the bond, so the client doesn't see the commissions or markups or spreads split out.
**Q.** You testified that you were only going to do this on big deals?
**A.** Yes.
**Q.** Why?
**A.** Small deals, we didn't really feel we had the same competitive pressures. Some of the banks didn't seem to be interested in those. There were -- they also wouldn't really move the dial in terms of the revenue and if we were to do

this on every deal, it's obviously increasing the chances of getting caught. And also, you know, you might as well just change your business model, which we weren't prepared to do.

**Q.** Who was involved in the decision to apply this scheme to big fixed income deals?

MR. WEINBERG: May we approach the bench, Your Honor?

THE COURT: Yes.

(The following discussion held at the bench.)

MR. WEINBERG: Within two minutes, Mr. Frank, in his legal questions, has talked about bait and switch, scheme, hidden commissions, coming from the prosecutor, rather than the witness. I understand he's entitled to ask the witness his understanding, but consistently feeding the words "hidden commissions" and now talking about scheme and bait and switch, we're evolving into Mr. Frank testifying, rather than Mr. Pennings, and I object.

MR. FRANK: That's a little bit rich for Mr. Weinberg for me to be talking about me testifying when his questions are a paragraph long and when he advises the jury that what he says should be accepted as true, which I have not done.

MR. WEINBERG: When you're on cross-examination, Mr. Frank --

MR. FRANK: May I finish?

MR. WEINBERG: Yes.

MR. FRANK: Thank you.

I use the word "hidden," I don't think there's any dispute that these were hidden. Mr. Weinberg is using the word "undisclosed." I haven't objected to his using the word "undisclosed," but the commissions were hidden, there's been no factual dispute about that.

Number two, the question to the witness was, who was involved, and so --

THE COURT: So I think the question who was involved is not leading and, I think that -- I'll think about the leading. This question is not leading, but just pay attention to that and we'll go from there.

MR. WEINBERG: The objection was not to who is involved, it was to who was involved in the scheme. That was the question. That was the one I asked to approach the bench on.

MR. FRANK: He just testified that there was a scheme to apply the commission. He just testified to it.

THE COURT: He said there was a plan.

MR. FRANK: I can rephrase it.

THE COURT: Okay.

(Bench conference concluded.)

THE COURT: Go ahead.

MR. FRANK: Thank you, Your Honor.

BY MR. FRANK:

**Q.** Mr. Pennings, who was involved in the plan to apply hidden spreads to big deals?

**A.** Myself, my management team in London, some salespeople, and Ross McLellan.

**Q.** Did you tell anyone, at any time on your team, that senior management had approved of the plan?

**A.** Everyone knew that Ross approved of the plan. He was senior management.

**Q.** What, if anything, did the defendant, Mr. McLellan, tell you about whether senior management had approved of the plan?

**A.** In relation to the KIA, I believe there was a discussion between -- that he relayed a discussion that he had with Puth, Woodard and Hansen, but I wasn't there, so I don't know what was being discussed.

**Q.** He told you that he had had a discussion with David Puth?

**A.** Around the time of the KIA, yes.

**Q.** And Brian Woodard?

**A.** Yes.

**Q.** And Mark Hansen?

**A.** Yes.

**Q.** Now, Mark Hansen, again, was the head of compliance for Mr. McLellan's unit?

**A.** No, he was the head of the global, the head of SSGM compliance.

**Q.** For the unit that Mr. McLellan ran?
**A.** Well, he was part of it, yes.
**Q.** And Mr. Woodard?
**A.** Global head of legal.
**Q.** And Mr. Puth?
**A.** He was the global head of SSGM.
**Q.** Mr. McLellan's boss?
**A.** Yes.
**Q.** And the defendant told you he had cleared it with them?
**A.** I don't know the details of the conversation. All I remember is that he had a conversation regarding -- you know, around the KIA time, I believe about the KIA, about this issue, yes.
**Q.** But you don't know what happened at this conversation, because you weren't there?
**A.** No.
**Q.** What was the next deal where you have the opportunity to apply hidden spreads?
**A.** The Irish Government funds, the NTMA, asked us to pitch for an extremely large transition.

MR. FRANK: Could we show the witness Exhibit 66, please.

BY MR. FRANK:
**Q.** Do you recognize this document?
**A.** Yes.

**Q.** What is it?

**A.** It's the request for a tender from the NTMA and it's an e-mail between myself and Ross, on December the 1st.

MR. FRANK: Government moves to admit 66.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 66 admitted into evidence.)

BY MR. FRANK:

**Q.** So this is just after -- December 1st, just after the KIA transition?

**A.** Yeah, about a month after, or a couple of weeks after.

MR. FRANK: Could we look at the bottom e-mail, please.

BY MR. FRANK:

**Q.** The e-mail is from somebody named Killian Buckley to you, with a copy to somebody named Eugene O'Callaghan and others. Do you see that?

**A.** Yes.

**Q.** Who is Killian Buckley?

**A.** A representative of the NTMA.

**Q.** And who is Eugene O'Callaghan?

**A.** I believe that was his boss.

**Q.** And you write, "Dear Ed, further to the framework agreement dated 9th, October, 2007, please find attached a request for tender, schedule E of the framework agreement,

for transition number 14."

What is a request for tender?

**A.** Provide a quote and a proposal.

**Q.** And what was he referring to when he was referring to transition number 14?

**A.** Transition number 14 was a 10-billion-euros transition, predominantly in equities.

**Q.** How big a deal was a 10-billion-euro transition?

**A.** That's about as big as they come.

**Q.** And did you have an understanding of what the purpose of this transition was?

**A.** Yes. To liquidate or to raise assets. Ireland, in the financial.

MR. WEINBERG: I object, Your Honor.

MR. FRANK: It's his understanding, Your Honor.

THE COURT: Yeah, overruled.

THE WITNESS: In the financial crisis, Ireland, I believe helped out some of the banks in the country and that's what they used the money for, or were going to use the money for.

**Q.** So they were selling these assets to bail out the banks?

**A.** Yes. That was my understanding. Sorry.

**Q.** And if we look at the -- your response -- well, if we can just look at the top e-mail. You forwarded the request for tender to the defendant, on the same day that you received

it. Why did you do that?

**A.** It was a massive deal. And we had a number of meetings about how we were going to pitch for those type of deals and this was one of them. The only difference was that it was predominantly equities.

**Q.** Equities are what?

**A.** Stocks.

**Q.** Now, earlier you testified that you were focused on bond deals for this plan.

**A.** Yes.

**Q.** Did there come a time when you learned that it was a -- that it was possible to apply hidden markups to stocks, as well as bonds?

**A.** Yes.

**Q.** What did you learn?

**A.** I learned that it was possible to do it in equities, as well, from our head of trading in London, Ian Holden. He said, well, actually, we're not trading as a pure agent in equities, which was new to me, but we also acted as riskless principal in equities.

**Q.** What did that mean from a practical standpoint?

**A.** From a practical standpoint -- there was no real difference; from a client's perspective, other than State Street was acting as the counterparty for settlement purposes and sitting in between the market and the client. So doing

back-to-back trades.

**Q.** Was State Street taking any risk?

**A.** Not market risk, but the same risk as always in transition management, which is operational risk.

**Q.** And what did that -- what did Mr. -- who was telling you this?

**A.** Ian Holden.

**Q.** What did Mr. Holden tell you that permitted you to do with respect to the disclosure of commissions?

**A.** Sorry, can you repeat that?

**Q.** What, if anything, did Mr. Holden tell you you could do with respect to commissions on stock deals?

**A.** In this case, he said if we have -- if we can use a principal account, then we can trade stocks net, as well.

**Q.** Meaning hide the commissions?

**A.** Yes.

**Q.** Earlier you testified that you always traded stocks as agent.

**A.** Yes.

**Q.** Did State Street, to your knowledge, have principal accounts?

**A.** There are some principal accounts. There's an error account and there was, in Europe -- and I think there's some principal accounts in the US, but I wasn't familiar with it at the time. But in Europe, we also had an account for VWAP

trading, which is volume-weighted average price, which I believe one or two clients had requested us to do in the prior year.

**Q.** Had NTMA requested that you use that account?

**A.** No.

**Q.** What had you told NTMA about how you would be trading?

**A.** We would be trading as agent, as per normal.

**Q.** Okay. So you forward this request for tender to the defendant and you write, "gotta win this one, any ideas how to get more revenue would be appreciated. Nomura competitor, along with Citi."

Do you see that?

**A.** Yes.

**Q.** What did you mean when you said, "Any ideas how to get more revenue would be appreciated"?

**A.** Well, we -- or I, at least, just learned about the fact that we could take a spread in equities and this was the deal that we identified as one that we needed to win. And we couldn't win in -- well, in our view, on the basis of transparent commissions.

**Q.** You said, "How about a one basis point management fee or something of that nature, no commissions, and then take a spread? My tax dollars are, after all, paying for their reckless spending."

Whose reckless spending were you talking about?

**A.** It's a poor joke about NTMA always appointing Nomura.

**Q.** And you said, "How about a one basis point management fee, or something of that nature, no commissions, and then take a spread?"

What were you asking the defendant?

**A.** Just to pitch on the basis of a very low management fee, which would hopefully be sufficiently competitive and that, in lieu of commissions.

**Q.** Now, on the KIA deal, you had done it for no management fee, no commissions?

**A.** Correct.

**Q.** That's what you told the client?

**A.** Yes.

**Q.** Why, on the NTMA deal, were you proposing to -- a one basis point management fee?

**A.** Because the NTMA was considered to be more advanced and not as ignorant. So they wouldn't believe that having spent years telling them you can't do stuff for zero, that we would actually be able to do stuff with zero.

**Q.** Could we take a look, for the witness only, at Exhibit 67, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's a communication between myself and Ross on December

the 1st, 2010.

MR. FRANK: The Government moves to admit 67.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 67 admitted into evidence.)

BY MR. FRANK:

**Q.** Mr. Pennings, this is a continuation of that same chain. The third e-mail down, you say, "Gotta win this one." And I would now focus on that second e-mail in the middle there.

You see that the defendant has responded to your suggestion?

**A.** Yes.

**Q.** He writes "futures commissions associated with hedging against adverse market movements. Agree with zero commission bid, Ian will need to trade net. FX. Sales trading the entire basket."

Do you see that?

**A.** Yes.

**Q.** Now, future commissions. Are those the same kind of commissions that you trade on stocks and bonds?

**A.** No.

**Q.** Typically, are those separately agreed upon?

**A.** Typically, yes.

**Q.** And then he says "agree with a zero commission bid, Ian will need to trade net."

Who, again, is Ian?

**A.** Ian Holden, the trading -- head of trading in Europe.

**Q.** What did you understand the defendant to be telling you when he said Ian will need to trade net?

**A.** Well, to build the spread or commission in the price and trade net.

**Q.** Normally, when you were conducting transitions, did you trade stocks on a net basis?

**A.** No.

**Q.** And then he says, "FX. And sales trading the entire basket."

What are those references to?

**A.** We would make money on FX, State Street would. And we could also make money on equity trades, finding the other side of the trade. So crossing them with other potential clients and charging them a commission.

**Q.** Charging who a commission?

**A.** The other clients.

**Q.** So in that case, you actually would be making money on the other side?

**A.** Correct.

**Q.** By charging a commission?

**A.** Yes.

**Q.** Was that possible in bonds?

**A.** Not really in bonds, no.

**Q.** And FX, you said we would be making money. Who would be making money from FX?

**A.** State Street. The FX desk.

**Q.** Your desk?

**A.** No.

**Q.** Did there come a time when you tried to get the FX desk to share revenue with you?

**A.** Yes.

**Q.** Tell us about that.

**A.** It was an ongoing conversation that we felt we needed that revenue to be more competitive. And especially in this case, we felt that we wanted to have FX revenue directly credited to our team and I asked for that, as well.

**Q.** Did there come a time when they agreed to share some revenue with you?

**A.** Not in relation to this deal, but for 2010, there was a lump sum recognition to our team for the flow that we brought in.

**Q.** Do you know whether the FX desk made or lost money on a particular deal that you traded with them?

**A.** I know they made money. I'm not sure if they ever lost money.

**Q.** And why don't you know the answer to that?

**A.** Because no one told me.

**Q.** Did you have anything to do with the FX desk?

**A.** We were a very large client, but I had no -- I wasn't sitting on the desk, I didn't know what they were doing, no.

**Q.** You were a client of the FX desk?

**A.** Yes.

**Q.** Now, when the defendant said do you -- Ian will need to trade net, you understood what that meant?

**A.** Yes.

**Q.** Can we look at your response. You said "great minds think alike. We have to charge fees, otherwise they get suspicious."

Do you see that?

**A.** Yes.

**Q.** When you told the defendant, we have to charge a fee, or otherwise they will get suspicious, who were you concerned would get suspicious?

**A.** The client.

**Q.** What were you concerned the client would get suspicious of?

**A.** If we said zero, they were going to say well, how are you going to make money?

**Q.** So when you said we have to charge a fee, otherwise they get suspicious, what were you concerned they would be suspicious of?

**A.** That we would take more money than we told them.

**Q.** If you take a look at Exhibit 70-1, please, just for the

witness. And I believe this one is in evidence; is that right? Yes. Okay. So we can show this to the jury.

Mr. Pennings, I'm going to be very quick with this document, because the jury has already seen it. It's the -- do you recognize this to be the -- your response to NTMA's request for a proposal?

**A.** Yes.

**Q.** And if we just take a quick look at page 6. If we look at the third paragraph, under "equity."

MR. FRANK: No, above that, Erin.

BY MR. FRANK:

**Q.** In the first sentence, under equity, you say "in our fiduciary role, we always act as agent to the client."

Do you see that?

**A.** Yes.

**Q.** Where were you telling the client there?

**A.** Standard language that we act as fiduciary in your best interest?

**Q.** In the client's best interest?

**A.** Yes.

**Q.** And what about when you said we act as agent?

**A.** That's also just standard.

**Q.** And what are you telling the client there?

**A.** That we didn't really change our business model.

**Q.** And what does it mean, to act as agent to the client?

**A.** You try to get the best price in the market and put a commission on it transparently.

**Q.** Could we look at page 9, please.

If you look at the top, under "fee proposal," it says, "As crossing will be the most important tool for minimizing costs in this transition, we propose to charge zero commission on all trading activity. We propose to charge a management fee of 1.25 basis points on the assets entering the transition. This fee will cover our cost incurred through the transition and it will align out interest with the NTMA and find the best liquidity through our unrivalled crossing network."

What were you telling the client there?

**A.** It's an explanation as to why we would charge a basis point management fee in lieu of commissions.

**Q.** What are you telling them?

**A.** We had the ability to -- at State Street, to cross a lot of flow with other clients. And traditionally, we did not charge a commission for that. And so the more you cross, the less commission we would get and that could be perceived as a conflict of interest.

**Q.** So that would be a reason to charge a management fee, instead of a per trade charge?

**A.** Yeah, it could be.

**Q.** And if we just look at the table below. What did you

tell the client you would charge per trade on equities, if we look at the first line there?

**A.** Zero.

**Q.** And if we look at the last line above total cost, what did you tell the client you would charge per trade on bonds?

**A.** Zero.

**Q.** When you sent this document to the client, was it your intention to charge zero commissions on equities?

**A.** No.

**Q.** Was it your intention to charge zero commissions on bonds?

**A.** No.

**Q.** Could we look at Exhibit 69 for the witness only, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** E-mail exchange between myself and Ross on December the 9th.

MR. FRANK: Government moves to admit 69.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 69 admitted into evidence.)

BY MR. FRANK:

**Q.** Could we look at the second e-mail. The defendant says to you, "I read the NTMA submission and thought the text was

good. I did not check the numbers, as Rick said they would change."

Do you see that?

**A.** Yes.

**Q.** When the defendant said, "I read the NTMA submission," what submission did you understand him to be referring to?

**A.** The transition number 14. I believe he was in London at the time and I was in the Middle East.

**Q.** That's the proposal that we just looked at?

**A.** Yes.

**Q.** The one that said that you would be acting as fiduciary and as agent?

**A.** That's the one, yeah.

**Q.** The one that said you would charge zero per trade?

**A.** That's still the one, yeah.

**Q.** And he thought the text was good?

THE COURT: That's leading.

**Q.** Is that what he's telling you? Is that you're understanding?

MR. FRANK: Sorry, Your Honor.

**A.** That's what he said.

**Q.** Could we take a look, for the witness only, at Exhibit 71. Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It is an e-mail from me to Killian Buckley at the NTMA, copying Cassie Waller and a number of other people, on December the 15th.

MR. FRANK: Government moves to admit 71.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 71 admitted into evidence.)

BY MR. FRANK:

**Q.** If we could look at the second page and the second paragraph. He writes, "Dear Cassie and Ed."

Who is Cassie?

**A.** That's the salesperson and relationship manager, in my team, for Ireland.

**Q.** Who does she work for?

**A.** For me.

**Q.** You said we have a -- he said, "We have a number of clarification queries in relation to your tender submission for transition number 14, which I have outlined below."

And then I would to look at the second paragraph there, "taking into account the management fee of 1.25 basis points and the futures market impact of 1.8 million, we have calculated an implementation shortfall estimate of 29 basis points with a one standard deviation range of 10.6 basis points."

And then he says, "Can you please confirm that this

calculation is correct and outline why the management fee of 1.25 basis points has not been included in your implementation shortfall calculation."

Do you see that?

**A.** Yes.

**Q.** What did you understand Mr. Buckley to be asking you when he asked you why the management fee of 1.25 basis points has not been included in the calculation?

**A.** Well, exactly that. I actually agreed with Killian that it should be in there, but Rick Boomgaardt was of a different opinion, I believe, if my memory serves me well and he thought it should be separate, but we moved to put it back in. It was always a transparent project management fee, but it's just a matter of putting it in or not.

**Q.** And if we look at your response on the prior page, paragraph 1 of your response, you say, "your calculation of 29 basis points for implementation shortfall is correct, as is the SD change."

What is the SD range?

**A.** Standard deviation.

**Q.** "All transactions are proposed to be done at zero commission, but a management fee of 1.25 basis points is proposed to be charged. This should be included in the implementation shortfall to the total cost number. The management fee not included was an oversight, as we normally

charge on a commission basis and these would flow automatically to the IS."

What's the IS?

**A.** Implementation shortfall estimate.

**Q.** When you told Mr. Buckley that the management fee not be included was an oversight, because you normally charge on a commission basis, what were you telling him?

**A.** That the fee should be in there, because it's in lieu of commissions.

**Q.** What was your hope he would believe, based on that representation that you were charging per trade?

**A.** That that was it.

**Q.** Could we look, for the witness only, at Exhibit 72, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** An e-mail between myself and Ross, on December the 15th.

MR. FRANK: Government moves to admit 72.

MR. GOLDSTEIN: No objection.

MR. WEINBERG: No objection, Your Honor.

THE COURT: Admitted.

(Exhibit No. 72 admitted into evidence.)

BY MR. FRANK:

**Q.** The bottom of the first page, there's an e-mail to you

and Ross McLellan from Peter Weiner. Who is Peter Weiner?

**A.** It's the head of sales or head of portfolio solutions in the US, so my counterpart.

**Q.** Your counterpart? If you could just speak into the microphone. I'm having trouble.

**A.** Sorry. Yeah.

**Q.** He's your counterpart in the US?

**A.** Yes.

**Q.** And he says, "the Irish Treasury is doing one bill transition on REIT out of SSGA, the time frame the first week of January. We are talking to Citi. We still have time."

And you respond in the e-mail above, "We didn't get that one. We are currently pitching for a 14 billion dollar liquidation."

What are you and Mr. Weiner talking about?

**A.** Peter Weiner spotted somewhere that the NTMA was asking for a $1 billion pitch, as well. But we already knew that we didn't get that one. And I was mentioning to him the one that we were pitching for, the number 14, which was, at the time, $14 billion.

**Q.** And if we look at the e-mails above, the defendant forwards that to you and says, "Hear anything back from them?"

Who's the them that you understand him to be referring to?

**A.** The NTMA.
**Q.** And you write, "We had to clarify three points, which I responded to this a.m."
Is that the e-mail that we just looked at?
**A.** Yes.
**Q.** And then you write, "they thought we were cheap, I guess."
What were you telling the defendant when you said they thought we were cheap?
**A.** Well, they kept following up with questions and if we would've pitched on a regular basis, we may not have gotten those questions, because we would be too expensive.
**Q.** What was your understanding of why the defendant was asking you whether you had heard anything back from NTMA?
**A.** Well, it was a $14 billion transition. It was a big revenue event.
**Q.** If we could show the witness only Exhibit 76, please.
Do you recognize this document?
**A.** Yes.
**Q.** What is it?
**A.** It's an e-mail between -- from me to Killian and then copying a number of other people, including Ross.
MR. FRANK: The Government moves to admit 76.
MR. WEINBERG: No objection.
THE COURT: Admitted.

(Exhibit No. 76 admitted into evidence.)

BY MR. FRANK:

**Q.** If you look at the very bottom of the page, there's an e-mail to you, copying Eugene O'Callghan and Killian Buckley at NTMA. And in the second paragraph, he writes, "The issues that you have raised around the higher costs involved in this particular group of accounts are valid. Can you, therefore, provide an indication of costs that you would propose to charge for this portion of the transition?"

What is Mr. Buckley talking about there?

**A.** We were competitive here, but not competitive enough because they only awarded us half the trade. They just basically cut it in half between us and Nomura. And we said, well, this was the most difficult part to trade, most expensive part to trade, so we were suggesting a higher project management fee.

**Q.** So what had you quoted at this point that they had awarded?

**A.** 1.25 basis points.

**Q.** And so you said the part that you gave us is more complicated, more difficult to trade, we want more for that?

**A.** Yes.

**Q.** And what is Mr. Buckley asking you here?

**A.** He -- you know, he had sympathy for that and he said, "Can you give us an idea of what you're looking for?"

**Q.** And if we can just look at your response. And if we could just look at the second to last paragraph. "In terms of fees, to reflect the fact that this is the most expensive half of the trade and that some of the more attractive pieces, i.e., large cap, Europe, and Asia, have been left out. We propose, with your agreement, to raise our fees to two basis points. From a trade vantage point of view, we still remain of the opinion that us managing the entire deal is the most beneficial for NTMA and should you wish to reconsidering, then we are willing to offer to you the entire trade for a fee of one basis point."

What were you telling Mr. Buckley there?

**A.** That we wanted to have two basis points for the piece that they'd awarded us and if they would reconsider, we would just lower it to one basis point.

**Q.** If you look at the header, you blind copied Mr. McLellan. Do you see that?

**A.** Yeah.

**Q.** Why did you copy Mr. McLellan on this exchange with NMTA where you were proposing to raise your fee to two basis points?

**A.** Because we discussed it and we wanted to keep him in the loop. This was probably the biggest deal of the year and it was of interest.

**Q.** Can we look, for the witness only, at Exhibit 78, please.

Before I actually talk to you about this document, what happened after you proposed raising your fee to two basis points?

**A.** They didn't agree to that.

**Q.** Who didn't agree?

**A.** The NTMA.

**Q.** What happened?

**A.** I believe, again, I was traveling and Rick Boomgaardt talked to them about the fee and the changes, if any. And they agreed upon 1.65 basis points.

**Q.** So you proposed going from going to 1.25 to 2 and they came back with 1.65?

**A.** I believe so. I wasn't part of that discussion.

**Q.** And what is this document that we're looking at, sir?

**A.** That's an e-mail chain between myself and Ross on the 23rd of December.

MR. FRANK: Government moves to admit 78.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 78 admitted into evidence.)

BY MR. FRANK:

**Q.** If you look at the bottom e-mail, you write to Mr. McLellan, on the 23rd of December, 2010, "NTMA is 1.65 basis points, need to be very creative."

What were you telling Mr. McLellan when you said

NTMA is 1.65 basis points?

**A.** That's the project management fee that we agreed upon.

**Q.** What did you mean when you said need to be very creative?

**A.** That we definitely need to take a spread, because 1.65 is not enough.

**Q.** And had you previously discussed that with him?

**A.** Yes.

**Q.** And if you look at his response, what does he say?

**A.** "We will."

**Q.** We will what?

**A.** "Be very creative."

**Q.** And then you responded?

**A.** "Be very creative."

**Q.** Can we show the witness Exhibit 81, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an e-mail exchange between Ross and myself on the 25th.

MR. FRANK: The Government moves to admit 81.

MR. WEINBERG: No objection.

THE COURT: Any objection, Mr. Weinberg?

MR. WEINBERG: Oh. No, Your Honor.

THE COURT: Admitted.

(Exhibit No. 81 admitted into evidence.)

BY MR. FRANK:

**Q.** If we could look at the bottom e-mail on the chain. You write to Mr. McLellan on December 25th, that's Christmas Day?

**A.** It is, yes.

**Q.** Subject line "I have seen the light.

A, Merry Christmas to you and your family. B, here's what I think we should do with our new best friends in Ireland."

Who are your new best friends in Ireland?

**A.** NTMA.

**Q.** "1.65 basis points for the privilege of working with us and to compensate us for putting up with their bizarre handling of this. 10-12 basis points out of fixed income. Three basis point spread out of US equity and global small cap. Trade all global emerging markets net through brokers, organize with FX to collect five basis points for trading back to euro. Perhaps the FX bit needs a bit of discussion up front involving you and Snyder."

Who is Snyder?

**A.** That is the global head of FX.

**Q.** "But we have to show the revenue in our numbers."

Why were you e-mailing Mr. McLellan about the NTMA deal on Christmas Day?

**A.** I guess I was bored and you know, we had this massive deal and it was quite exciting.

**Q.** "You wrote 1.65 basis points for the privilege of working with us."

And then you wrote, 10 to 12 basis points out of fixed income, three basis point spread out of US equities and global small caps.

What were you referring to there?

**A.** The 1.65 basis point was the agreed-upon project management fee and the small portion of fixed income, we would just apply our typical level of commission, which would, in this case, be 10 to 12 basis points, and take three basis points out of the equities.

**Q.** What would that mean for what you were charging NTMA?

**A.** Well, it would be more than what we told them it would be.

**Q.** How much more, on a deal this size?

**A.** Several million.

**Q.** Had you discussed these fees with them?

**A.** Well, no. We just told them it was 1.65.

**Q.** What was your understanding of what would have happened if you had gone back to NTMA with this proposal?

**A.** They would probably have given it all to Nomura.

**Q.** How did the defendant respond? "FX won't be a problem. Merry Christmas, Saint Eddie."

Do you see that?

**A.** Yes.

**Q.** What did you understand him to mean when he said FX won't be a problem?

**A.** That we would get recognition for FX.

**Q.** And why did you -- what was your understanding of why he was calling you Saint Eddie?

**A.** It was Christmas. I had just seen the light.

**Q.** Can we show the witness Exhibit Number 83, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an e-mail exchange between Ross and myself again, now December 30th.

MR. FRANK: The Government moves to admit 83.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 83 admitted into evidence.)

BY MR. FRANK:

**Q.** If you look at the bottom e-mail, it's from you to the defendant on December 30, 2010.

"FYI, NTMA TMA and periodic notice for upcoming trade."

Do you see that?

**A.** Yes.

**Q.** What's the TMA?

**A.** The transition management agreement.

**Q.** What's the periodic notice?

**A.** That's the schedule, whatever number it was, or schedule, letter. It's the transition notice.

**Q.** What kind of information is contained in the periodic notice?

**A.** The transaction details and fee based -- fee basis.

**Q.** Did it refer to the 10 to 12 basis points you plan to take out of fixed income and the other basis points you plan to take out of equities?

**A.** No.

**Q.** Why did you send the defendant the transition management agreement and the periodic notice for NTMA?

**A.** We talked about it before. I think Ross asked again to check whether there's anything specifically prohibiting us from taking a spread.

**Q.** Anything specifically saying don't take a spread?

**A.** Yeah.

**Q.** And if we look at the defendant's response -- actually, the top two e-mails. What did the defendant tell you, based upon his review of these documents.

**A.** "No issues."

**Q.** And how did you respond?

**A.** "Told you so. It's their agreement, not ours."

**Q.** Why were you asking the defendant about this agreement?

**A.** Well, we just wanted to make sure that it didn't say

anything specifically to prohibit us from taking a spread.

Sorry?

**Q.** Did it?

**A.** No, it didn't, but the idea was to fall back on the contract, in case you got found out.

**Q.** Did you consult with any lawyers?

**A.** No.

**Q.** Why not?

**A.** Because they would say you can't do this, because it's one thing not being in a contract, but it's another thing to basically lead them to believe that the fee was everything we would take.

**Q.** Can we show the witness only Exhibit 86, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** An e-mail between myself and Ross on January 20, 2011.

MR. FRANK: The Government moves in Exhibit 86.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 86 admitted into evidence.)

BY MR. FRANK:

**Q.** If you look at the bottom half of the page, Mr. Buckley sends an e-mail to you and others.

"I have attached a signed instruction letter in

relation to the upcoming liquidation of equities."

Do you see that?

**A.** Yes.

**Q.** What's an instruction letter?

**A.** The go-ahead for a part of the transition that was approved at the time.

**Q.** You forwarded that to the defendant and you wrote "FYI, NTMA first tranche."

What's a tranche?

**A.** Different parts. It was split up, I believe, in three separate deals.

**Q.** So you're doing it in stages?

**A.** Yes.

**Q.** And why did you send the defendant a notification that you were starting the first stage?

**A.** Because he was interested in it and we wanted to make sure that Ross was in the loop and also because he would instruct the trading in the US.

**Q.** If we could look at the top part of the page. He responds to you, "Let's discuss plan in the a.m."

Do you see that?

**A.** Yes.

**Q.** Did you discuss the plan in the a.m.?

**A.** I believe we did. I don't recall the details anymore.

**Q.** What was the plan you discussed, to the extent you

remember?

**A.** What I do remember is that there were a significant portion of ETFs involved in the US.

**Q.** What are ETFs?

**A.** Exchange traded funds.

**Q.** What are those?

**A.** It's essentially one stock traded on the exchange, that represent a bucket of underlying stocks. In this case, the Russell 2000 small cap US equities.

**Q.** So one stock that tracks trading in 2000 stocks?

**A.** Yes.

**Q.** Okay. Why were you discussing ETFs?

**A.** Because as I understood it from Ross, the taking of a spread in an ETF was not possible by just selling the ETF. I don't know why. And he said there's a way around it, you can just redeem the ETF, i.e., break it open, and trade the 2,000 underlying stocks and then you can put a markup on them.

**Q.** So if you -- you called it redeem the ETF?

**A.** Yes.

**Q.** Trade the underlying stocks?

**A.** Yes.

**Q.** What would that allow you to do?

**A.** Well, first of all, it's better, because it's less market impact. And second, it allowed us to put a markup on it, as I understood it, which was not possible on the ETF. But I

may have misunderstood it, but certainly, that was my understanding.

**Q.** Who told you about this plan?

**A.** Ross.

**Q.** Could we look at Exhibit 126 for the witness only.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** An e-mail between myself and Ross on March 15th.

**Q.** You testified earlier that the NTMA transition happened in stages?

**A.** Yes.

**Q.** Does this refer to that?

**A.** Yes.

**Q.** At a later stage?

**A.** Yes.

MR. FRANK: The Government moves to admit 126.

MR. WEINBERG: No objection.

THE COURT: Admitted.

BY MR. FRANK:

**Q.** At the bottom of the page, Samina Vernon sends an e-mail to Europe SSDM portfolio operations and global transitions. Do you see that?

**A.** Yes.

**Q.** Who are those people?

**A.** The transition managers and the traders. I was not part of that group.

**Q.** And it said -- what is this document?

**A.** It's the trading instructions.

**Q.** And it says, "Comms: Zero."

Do you see that?

**A.** Yes.

**Q.** What does that mean?

**A.** Commissions: Zero.

**Q.** And if we look at the two e-mails above it, the defendant forwarded these trading instructions to you, do you see that?

**A.** Yes.

**Q.** What did he ask you?

**A.** "You're giving shit away."

**Q.** And how did you respond?

**A.** "I belive the subject line says fixed income and then I said it's NTMA. Have I ever let you down on fixed income?"

**Q.** What did you mean when you said, "I believe the subject line says fixe income NTMA. Have I ever let you down on fixed income?"

**A.** Well, it was my understanding that he may not have realized that this was the NTMA, because it doesn't say in the subject line. So that's what I'm reminding him of. And fixed income was always a profitable trade. But, you know, in this case, as well, given the size, although the fixed

income portion wasn't that big.

**Q.** What were you going to do on the fixed income portion? You were going to charge zero commissions?

**A.** Yes.

**Q.** You were going to charge zero commissions?

**A.** Yes.

**Q.** Were you going to charge anything else?

**A.** Yes.

**Q.** What were you going to charge?

**A.** A spread, or a hidden commission.

**Q.** Could we look at Exhibit 142 for the witness only, please.

What is this document?

**A.** An e-mail between me and Ross, on April 5th.

**Q.** And what's the subject?

**A.** NTMA.

MR. FRANK: Government moves to admit 142.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 142 admitted into evidence.)

BY MR. FRANK:

**Q.** You write, "NTMA just informed us they did not want to use futures on the trade scheduled for later this week. I think this will increase the 'spread'."

Do you see that?

**A.** Yes.

**Q.** What did you -- what were you telling the defendant when you said, "I think this will increase the 'spread'"?

**A.** To compensate for not getting futures, to raise the spread on the equities.

**Q.** Why was spread in quotation marks?

**A.** It's -- it's the hidden revenue, so, yeah.

**Q.** Did you, in fact, charge hidden revenue on this deal?

**A.** Yes.

**Q.** How much did you make on the NTMA deal?

**A.** I don't know the exact amount, but it was several million dollars.

**Q.** What had you told the client you were going to charge?

**A.** 1.65 basis points, plus futures revenue on the previous tranche. I'm not sure if the futures revenue actually occurred, because I remember going back and forth a couple of times, but I don't know if that was known at this stage, but we didn't tell them we were going to make several million.

MR. FRANK: We can take this down.

BY MR. FRANK:

**Q.** Did there come a time when you had an opportunity to bid on a transition for an entity called the Royal Mail Pension Fund?

**A.** Yes.

**Q.** What was the nature of that deal?

**A.** It was, again, a very large transition, both equities and fixed income initially. And you know, we were very keen to, obviously, pitch for that and win it.

**Q.** Can we show the witness only Exhibit 88, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** I'm forwarding an e-mail to Ross on February 3, 2011.

MR. FRANK: The Government moves to admit 88.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 88 admitted into evidence.)

BY MR. FRANK:

**Q.** It's an e-mail from Ian McKnight to you. Who is Ian McKnight?

**A.** That's the Royal Mail contact.

**Q.** And he copied somebody named Heath Mottram. Who is that?

**A.** I believe that was his boss at the time. I knew him.

**Q.** He says, "Ed, I work with Heath at Royal Mail. Please find attached a request for proposal in respect to a transition project, Project Arnold, we are soon to undertake."

Do you see that?

**A.** Yes.

**Q.** You forwarded that to the defendant on the same day and

you wrote, "Confidential, but check this baby out. Gotta win that one."

Why did you forward this e-mail to the defendant?

**A.** Because it was a massive deal, if it came to fruition.

**Q.** Could we look and show the witness only Exhibit 89, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** A response from Ross to myself on February 3rd.

**Q.** His response to that same e-mail?

**A.** I believe so.

MR. FRANK: Erin, could you enlarge it?

THE WITNESS: Yes.

MR. FRANK: The Government moves to admit 89.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 89 admitted into evidence.)

BY MR. FRANK:

**Q.** How did the defendant respond when you said you gotta win the Royal Mail deal?

**A.** "Thin to win."

**Q.** What did you understand thin to win to mean?

**A.** Bid very low.

**Q.** Can we show the witness only Exhibit 90, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** An e-mail exchange between Heath Mottram and myself on February the 4th.

MR. FRANK: The Government moves to admit Exhibit 90.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 90 admitted into evidence.)

BY MR. FRANK:

**Q.** Mr. Mottram -- you say to Mr. Mottram, "Hi, Heath. We are working on your proposal at the moment and I just want to check with you what your preference is in terms of charging structure. Would you favor a fixed-fee-based compensation or a commission-based compensation. Clearly, we will do everything to be as competitive as possible, but I just wanted to check with you, beforehand, as different organizations prefer different structures."

Why did you ask Mr. Mottram whether he favored a fixed-fee-based compensation or a commission-based compensation?

**A.** This was one of these large deals, again, that we needed to pitch very competitively, and, you know, we discussed it internally, and felt we had to do the same as we did for

NTMA. And that was only possible if we could pitch for it with a project management fee. So I was, you know, suggesting that to Heath Mottram to see if there was any opposition against a project management fee.

**Q.** Who did you discuss it with internally?

**A.** With the management team in London, Ross, and perhaps one or two salespeople that helped with the RFP.

**Q.** Now, typically, if you were to propose a fixed fee, how would you calculate it in the ordinary course?

**A.** We would just -- if there was no hidden fees, you mean?

**Q.** Yes.

**A.** We would just look at, okay, what are we going to most likely earn if we just charged a regular commission. And then we do a pretrade analysis, and cap it and translate it into a project management fee.

**Q.** So it's the same either way, basically?

**A.** Yes.

**Q.** Is that what you did in this case?

**A.** No.

**Q.** What did you do in this case?

**A.** We made it much, much lower.

**Q.** Why?

**A.** Because we wanted to win the deal, and we felt that we had to be more competitive than charging or transparent commissions.

**Q.** And Mr. Mottram responded to you. We don't have a preference. Feel free to give us a choice.

Do you see that?

**A.** Yes.

MR. FRANK: Could we look at Exhibit 91, please.

THE DEPUTY CLERK: Is this in evidence?

MR. FRANK: This is in evidence.

THE DEPUTY CLERK: It's not, no.

MR. FRANK: Okay. If we could show the witness only Exhibit 91 and its attachment.

BY MR. FRANK:

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It is the e-mail between me and Ian McKnight, copying a number of others, on February of 09 -- February 9, 2011. Sorry.

**Q.** And what is the attachments?

**A.** It is the proposal.

MR. FRANK: The Government moves to admit 91 with its attachments.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 91 admitted into evidence.)

BY MR. FRANK:

**Q.** You write, "Dear Ian and Heath, further to your request below, I herewith send you State Street's proposal in respect of the planned transition project, 'Project Arnold.'"

Do you see that?

**A.** Yes.

**Q.** "And therefore, have put together a very competitive flat-fee-based bid, which is fully detailed in the RFP document."

Do you see that?

**A.** Yes.

**Q.** And if we could look at the attachment, is this the proposal that you sent to Royal Mail?

**A.** Yes.

**Q.** If we look at page 12, please.

You say in the first full paragraph, "in our fiduciary role, we always act as agent to the client."

Do you see that?

**A.** Yes.

**Q.** And then you say, "by not taking principal positions or having a principal trading book, we avoid conflicts that will be created through executing transitions and also running a proprietary trading book. Contractually, we have to put our client's interest ahead of our own." Do you see that?

**A.** Yes.

**Q.** What did you intend for Royal Mail to believe when you

told them that in your fiduciary role you always act as agent for the client?

**A.** That we are not the other side of their trades. And we're not acting as a principal, we're acting in their best interest.

**Q.** And when you say, "contractually we have to put our client's interest ahead of our own," what did you intend them to believe?

**A.** That we're acting in their best, and we are aligned to them. That's just standard language.

**Q.** And you say the same thing in the second paragraph, in the last sentence of the second paragraph, "we assure our clients that we act in our interest by aligning our interest with theirs."

Do you see that?

**A.** Yes.

**Q.** And then in the next paragraph you say, "the transition team has its own dedicated electronic agency execution desk in each of State Street's regional management centers."

Do you see that?

**A.** Yes.

**Q.** And then in the next sentence, at the end, you say, "Therefore, all trading is done in the client's account, in the most transparent manner. State Street will be the client's counterpart for settlement, depending on the asset

traded."

What are you explaining to the client there?

**A.** That we act as their agent.

**Q.** What does it mean that you'll be their counterpart for settlement purposes?

**A.** The riskless principal language again. That's quasi-agent, if you will.

**Q.** And when you say you have dedicated electronic agency execution desks, what did you mean by that?

**A.** That the execution desks for the transition management trades are part of the Portfolio Solutions Group, and do not have the ability to make any other money other than what we tell them we're going to make.

**Q.** Can you look at page 21, please. If you can enlarge that the cost summary.

You say, "The table below shows the total mean cost for the equity and fixed income transition. Transition fee, 1.758 points of GDP 3.2 billion, 560,000."

Do you see that?

**A.** Yes.

**Q.** What are you telling the client there?

**A.** That that's the fee we're going to charge them.

**Q.** If we could look at page 37, please.

"The cost breakdown, the expected costs for the corporate bond liquidation are below."

Do you see that?

**A.** Yes.

**Q.** What does it say under "commissions"?

**A.** Nothing.

**Q.** What did you intend the client to believe by that?

**A.** That there weren't any.

**Q.** Did you come a time when --

MR. FRANK: Thanks Erin.

BY MR. FRANK:

**Q.** Did there come a time when Royal Mail changed the terms of this deal?

**A.** Yes.

**Q.** What happened?

**A.** They took away the equity portion and I think they even lowered the fixed income bit, as well.

**Q.** Can we show the witness only Exhibit 92.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an e-mail exchange between me and Ross on February 21, 2011.

MR. FRANK: The Government moves to admit 92.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 92 admitted into evidence.)

BY MR. FRANK:

**Q.** If you can look at the second page -- I'm sorry. The third page. This is an e-mail from Ian McKnight to you and in the second paragraph -- in the first paragraph, it gives you the details of the transition. Do you see that?

**A.** Yes.

**Q.** And it says, "Can you please let me have confirmation of the fee you propose?"

Do you see that?

**A.** Yes.

**Q.** And if you turn to the first -- second page, second e-mail, you say, "Hi, Ian. Further to our discussion, I can confirm that even though the value is significantly less, we can do this project for a management fee of 1.75 basis points of the portfolio value of 1.3 billion pounds, or 227,500 pounds."

Do you see that?

**A.** Yes.

**Q.** What were you telling Mr. McKnight there?

**A.** That we would keep the project management fee at 1.75 basis points, as originally quoted. It's just a lower number.

**Q.** What did you intend for him to believe about that number?

**A.** That that was the total compensation.

**Q.** Was that your intention at that time, for that to be the

total compensation?

**A.** No.

**Q.** Can we look at the first page, please.

Can we look at the bottom e-mail, you forwarded this exchange to Mr. McLellan and you wrote "Who's the Daddy? Happy President's Day."

Do you see that?

**A.** Yes.

**Q.** What were you telling Mr. McLellan when you said, "Who's the daddy?"

**A.** That we won this deal. Pretty good.

**Q.** And how did the defendant respond?

**A.** "Nice work."

**Q.** And if we can then look at your response, you said, "I'm thinking 1.5 to 2 BPY."

Do you see that?

**A.** Yes.

**Q.** What are BPY?

**A.** Basis points of yield.

**Q.** What were you telling the defendant when you said I'm thinking 15 to 2 BPY?

**A.** You know, we obviously had discussed that we couldn't do it for 1.75 basis points and we're going to take a spread and that was the level I was thinking of, two basis points of yield in this case would be our regular type of commissions.

**Q.** When you're not charging a management fee?

**A.** Yes.

**Q.** And when you said we had discussed it, who had you discussed that with?

**A.** With those involved in the plan. So my management team, some of the sales people that were part of the RFP, and Ross.

**Q.** Had Royal Mail agreed to pay an extra per trade charge of 1.5 to 2 basis points of yield?

**A.** No.

**Q.** What was your understanding of what would have happened if you had proposed that on top of your project management fee?

**A.** He said that if we keep the project management fee as is, i.e., 1.75 basis points of the value of the trade, of the portfolio, then it's ours. And if that wasn't the case, then he would have to review it again.

**Q.** Could we show the witness only Exhibit 93, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** An e-mail exchange between myself and Ian McKnight and Heath Mottram that same evening.

MR. FRANK: The Government moves to admit 93.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 93 admitted into evidence.)

BY MR. FRANK:

**Q.** And if you look at this e-mail exchange, this is a -- further up from the e-mail where you said to Mr. McKnight, further to our discussion, "I confirm that even though the value is significantly less, we can do this project for a management fee of 1.75."

Do you see that?

**A.** Yes.

**Q.** And responded, "Ed, for the avoidance of doubt, can you confirm that this is your full and final transition fee, including all the buying and selling required by my trades listed below to construct the new 1.3 billion pound portfolio?"

Do you see that?

**A.** Yes.

**Q.** And you respond, "The fee includes all trading required. Please don't make me go this low every time, though."

Do you see that?

**A.** Yes.

**Q.** What were you confirming for Mr. McKnight?

**A.** That the project management fee was all that he was going to pay.

**Q.** Did you forward this e-mail to the defendant?

**A.** I believe I did not.

**Q.** Did you copy the defendant on this e-mail?
**A.** I don't think so.
**Q.** Why not?
**A.** It was a -- just -- it's long time ago. But I believe this was the last e-mail in the trail and it just confirmed what we already discussed, so there wasn't an awful lot of news in there.
**Q.** I'm sorry, there --
**A.** There wasn't anything new in there, from my perspective, because it was just a confirmation of what we were going to do.
**Q.** Was the defendant, to your knowledge, aware that you were bidding an all-in flat fee?
THE COURT: That's leading.
MR. WEINBERG: Thank you.
BY MR. FRANK:
**Q.** Did you have an understanding of whether the defendant is aware of what the fee was included?
MR. WEINBERG: Object.
THE COURT: That's just a yes or no question.
THE WITNESS: Sorry?
THE COURT: That's just a yes or no question.
THE WITNESS: Could you repeat the question?
BY MR. FRANK:
**Q.** Did you have an understanding of whether the defendant

was aware of what the flat fee included?
**A.** Yes.
**Q.** What was your understanding?
**A.** That it was a flat fee plus a hidden spread.
MR. FRANK: Could we look at Exhibit -- well, that one.
May I approach the witness?
THE COURT: Yes.
BY MR. FRANK:
**Q.** Mr. Pennings, I'm showing you a disc labeled Exhibit 128. Do you recognize that disc?
**A.** Yes.
**Q.** What is it?
**A.** It is a disc labeled "128" with my signature on it.
**Q.** Have you reviewed that disc?
**A.** Yes.
**Q.** What's on it?
**A.** A conversation that I've reviewed.
MR. FRANK: Government moves to admit 128.
MR. WEINBERG: No objection.
THE COURT: Admitted.
BY MR. FRANK:
**Q.** And if you could turn, Mr. Pennings, to your -- the binder there, under Exhibit 128. Have you had an opportunity to review this transcript?

**A.** Yes.

**Q.** And you believe it to be a fair and accurate representation of what's on that disc?

**A.** Yes.

**Q.** And this is a conversation between you and Mr. Boomgaardt on March 21, 2011?

**A.** Yes.

**Q.** If we could turn to --

THE COURT: Hold on one second, Mr. Frank.

(The Court and the clerk confer.)

THE COURT: I think you might have already admitted 128. Is that possible, or do we have two? I'm just trying to see whether we have two discs. Ms. Simeone thinks I might have admitted 128 on Friday.

MR. FRANK: I don't believe we admitted it -- unless we admitted it in -- well, actually, what happened, to my memory, Your Honor, is that I approached the witness with four discs.

THE COURT: Oh. And we did one, yes.

MR. FRANK: We did one. I'm not sure if we ended up doing the other ones or not --

THE COURT: We only admitted one, when we approached with four. I remember. That's correct.

MR. FRANK: The others are 132, 184 -- so the others were 132 and 184. I don't know if the defense has an

objection to those.

MR. WEINBERG: Not to 132 and not to 184.

MR. FRANK: So then the Government would offer those, as well.

THE COURT: So 132 and 184 are admitted, 128 is admitted now, and 16 was admitted on Friday?

MR. FRANK: Yes, Your Honor. Thank you.

THE COURT: Got it. All right. Go ahead.

(Exhibit Nos. 128, 132, and 184 admitted into evidence.)

BY MR. FRANK:

**Q.** Could you turn to page 4 of your transcript, at approximately line 17.

MR. FRANK: Is everyone there? And if we could play the recording beginning at three minutes and 55 seconds.

(Audio plays.)

BY MR. FRANK:

**Q.** Mr. Pennings, at page 5, line 4, you told Mr. Boomgaardt, "I just got a call from Ross and he said how much do you want to take and I said, well, you know, whatever. Let's -- you know, to be honest with you, let's see how it goes, right, but not more than two."

What were you referring to there?

**A.** The hidden spreads.

**Q.** And when you said, "let's see how it goes, but not more

than two," what were you suggesting?

**A.** Not more than two basis points of yields.

**Q.** What did you mean let's see how it goes?

**A.** See how we're doing in terms of the expectations and if it goes well, certainly not more than two, because that would be, you know -- that wouldn't be right in my view.

**Q.** Was it right to do what you were doing in your view?

MR. WEINBERG: Object.

THE WITNESS: No, but that would be less right.

THE COURT: Overruled.

BY MR. FRANK:

**Q.** When you said let's see how it's going, were you referring to a specific measure of performance?

**A.** Yes.

**Q.** What measure was that?

**A.** The implementation shortfall.

**Q.** Why was it important to stay within the implementation shortfall?

**A.** That tends to be the most important benchmark to look at. And if you -- if we were to be unlucky, or and things just didn't go as well as expected, then we could have gone over that and it may have raised questions and, you know, further scrutiny. So if we're under it, we tend to not get any scrutiny.

**Q.** Any?

**A.** Scrutiny.

MR FRANK: If we look -- well, could we go to Exhibit 132, tab 132 in your binders. This is a call on March 23, 2011. And if we could go to page 2, line 3. Sorry. 48 seconds into the call.

(Audio plays.)

BY MR. FRANK:

**Q.** Mr. Pennings at line 6, you said, "Uh, He took a bit yesterday, probably going to take a bit and a half."

Who are you referring to?

**A.** Ross in the US.

**Q.** And then Mr. Boomgaardt said, "We have two here," and you said, "I think we need to do that again."

Where were you taking two basis points?

**A.** In Europe.

**Q.** And then you said at line 10, "I mean, you know, if we stay under 53, or whatever it is, we're good.

What were you referring to there?

**A.** I believe that was the original implementation shortfall estimate.

**Q.** And what did you mean when you said if we stay under that, we're good?

**A.** Then, you know, there wouldn't be any questions.

**Q.** I'm sorry?

**A.** There wouldn't be any questions.

**Q.** And then at line 15, you said, "Well, if it didn't price, even better, because just make it add up, right?"

What are you referring to there?

**A.** Sometimes as I understand it in bonds, the pricing wasn't very clear or not available and it's just a function of the market. And then there was some leeway that they could adjust it slightly, or make it work a little bit in your favor.

**Q.** Take more money?

**A.** No, not unless they just price the bonds differently.

**Q.** I see.

MR. FRANK: Could we resume at the top of page 3.

(Audio plays.)

BY MR. FRANK:

**Q.** Mr. Pennings, at page 3, line 4, you said, "Are you guys in next week, you and Paul and Ian?"

Who were you referring to?

**A.** My management team in London.

**Q.** Who was Paul?

**A.** Paul McGee.

**Q.** Who was Ian?

**A.** Ian Holden.

**Q.** And you said, "I want to set some time with Ross together, as well."

And then you said lower down at line 8, "The whole

Puth management team is coming over."

Tell us what was going on here.

**A.** Well, I don't exactly know what --- or remember exactly what the Puth management team was coming over for, but I know that Ross was part of that and he was over, so he had some meetings with other senior managers and also spent time with our team.

**Q.** And then at line 19 you said, "I just want, you know, all of us to sit together and say, okay, you know, what do we see and how do we respond and you know, what is our message and what are we going to do? Because I think we need to all be on the same page. And you know, I think everyone should, you know, think as to how we can best deal with what we are facing."

Do you see that?

**A.** Yes.

**Q.** What were you referring to?

**A.** Set up another meeting between my team in London, with Ross there, as well, and discuss how we're going to go forward with the transparency issues in the market and the competitive environment. Because we've now done a couple of trades on the hidden fee basis. And you know, we were just discussing how we were going to deal with it going forward.

**Q.** Why did you think it was important that you all be on the same page?

**A.** Because we didn't feel comfortable with it and we, you know, needed to make sure that everyone was as comfortable as possible with it. So -- and if not then maybe we should stop doing it.

**Q.** Did the meeting occur?

**A.** I believe it did, yes.

**Q.** Was the defendant present?

**A.** Yes.

**Q.** What did you agree to do?

**A.** I think there was no difference as to what we were doing before. There was no real conclusion, other than to say, you know, we'll continue doing this on a case-by-case basis.

**Q.** Could we look at Exhibit 148 for the witness only, please.

Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It is the e-mail from Rick Boomgaardt to Ian McKnight, copying a number of people, on April the 14th of 2011.

MR. FRANK: And this is actually in evidence and if we can just show it to the jury.

BY MR. FRANK:

**Q.** Mr. Boomgaardt writes, "Hi, Ian, as discussed, please find the post transition analysis report attached. We are pleased to report that the shortfall of 45 basis points is

very much in line with the mean pretrade cost estimate."

What was Mr. Boomgaardt telling the client there?

**A.** That the transition went really well.

**Q.** And if we can look at the attachment, do you recognize the post trade report to the client?

**A.** Yes.

MR. FRANK: If we look at page 2, Erin, the bottom of the page.

BY MR. FRANK:

**Q.** Do you see where it says, "State Street's fee based on 1.75 basis points, 242,305 pounds"?

**A.** Yes.

**Q.** Was that a true statement or an untrue statement?

**A.** Well, it was the fee, but it wasn't everything that we took.

**Q.** How much more did you take?

**A.** A couple of million, I think. I don't know the exact amount.

MR. FRANK: Can you take that down?

BY MR. FRANK:

**Q.** Did there come a time when you bid on a transition for en entity called Eircom?

**A.** Yes.

**Q.** What is Eircom?

**A.** The Irish Telecom Company Pension Fund.

**Q.** Did they approach you directly or through consultants?
**A.** Through consultants. Mercer, I believe.
**Q.** Can we look, for the witness only, at Exhibit 152, please.
Was there a negotiation with Mercer that you recall?
**A.** Yes.
**Q.** And what was the substance of what happened?
**A.** It was a very long, drawn-out conversation. They were constantly going back and forth about the fee and also some clauses in the contract that were proving to set some bottlenecks. I wasn't really that involved with the negotiation.
**Q.** Did there come a time when you reached an agreement with them?
**A.** Yes.
**Q.** Do you recognize this document?
**A.** Yes.
**Q.** What is it?
**A.** It's an e-mail from me to Cassie Waller, Rick Boomgaardt, and Paul McGee on April 21st.
MR. FRANK: The Government will submit 152.
MR. WEINBERG: No objection.
THE COURT: Admitted.
(Exhibit No. 152 admitted into evidence.)

MR. FRANK: Will you just blow up both e-mails. Thank you.

BY MR. FRANK:

**Q.** It's an e-mail from BenGunnee@Mercer.com to you and others. Who was Ben Gunnee?

**A.** He was the head of the Mercer Investment Consultant team that we were dealing with.

**Q.** He says, "Ed, client will sign contract as discussed with final agreed amendment. Fee agreed at 350. Thanks and have a good weekend."

Do you see that?

**A.** Yes.

**Q.** And you forwarded that to Cassie Waller. She's, again, on your sales team?

**A.** Yes.

**Q.** Rick Boomgaardt and Paul McGee and you wrote, "FYI, fee no problem."

Why did you say fee no problem?

**A.** If I recall directly, this was a very long, drawn-out conversation that frustrated both us and Mercer. And Ben Gunnee at one point contacted me directly to iron out one contract clause and also the fee. And the fee didn't really make much of a difference, anyway, because we were going to charge a hidden spread, so that's why I'm saying fee, no problem.

**Q.** Did you discuss this with the defendant?
**A.** Yes.
**Q.** Did you end up charging a hidden spread?
**A.** Yes.
**Q.** Do you recall how much?
**A.** Not the exact amount. I think the total revenue was about $1 million, or something like that.
**Q.** What had you told the client you were going to charge?
**A.** 350 euros.
**Q.** Do you recall bidding?

MR. FRANK: We can take this down. Thank you, Erin.

BY MR. FRANK:

**Q.** Do you recall bidding on a transition for a client called Sainsbury's?
**A.** Yes.
**Q.** What is Sainsbury's?
**A.** A UK supermarket and its pension fund.
**Q.** What kind of deal was that?
**A.** It was a large, fixed income deal again.
**Q.** Did you -- do you recall what you bid for that deal?
**A.** Yes.
**Q.** What did you bid?
**A.** We ended up, again, with a project management fee.
**Q.** Flat fee?

**A.** A flat fee, yes.

**Q.** Did you intend to charge only a flat fee?

**A.** No.

**Q.** What did you intend to do?

**A.** We intended to charge our regular level of commissions, but not disclosed.

**Q.** And is that what you, in fact, did?

**A.** Yes.

**Q.** Do you recall how much you earned?

**A.** Not -- I mean, over a million dollars. I don't know exactly how much.

**Q.** Mr. Pennings, I want to switch gears for just a moment. Did there come a time when the defendant spoke to you about applying hidden commissions to any deals outside of Europe?

**A.** He did once, yes.

**Q.** Tell us about that.

**A.** I don't know too much about it, but he mentioned that he did a deal in the US for an insurance company.

**Q.** Did he tell you which company?

**A.** It was a -- an affiliate of AXA Insurance.

**Q.** AXA?

**A.** Yes.

**Q.** And what, if anything, did he tell you about AXA?

**A.** There was, I believe, very large fixed income trade, $6 billion, that needed to be transitioned.

**Q.** And what did he tell you about that deal?

**A.** That they did a similar approach as to what we were doing in Europe for these five or six clients.

**Q.** What did you understand that to mean?

**A.** That they took hidden markups.

**Q.** When was this conversation?

**A.** I don't recall exactly. Second quarter, mid 2011. I don't know the exact timing.

**Q.** Were you involved in the AXA deal?

**A.** No.

**Q.** Do you know anyone who was involved?

**A.** No. Well, I -- if you tell me who was involved, then I may know them, but I don't know off the top of my head.

**Q.** You don't know that they were involved?

**A.** Sorry?

**Q.** Do I understand you to mean that you don't know who was involved, in other words, you don't know who participated?

**A.** No, I don't.

**Q.** Do you know the details of that deal?

**A.** It was a very large, fixed income, I believe $6 billion.

**Q.** Do you know anything more about it?

**A.** No.

**Q.** Did there come a time in the spring of 2011 when you had a meeting with several lawyers regarding State Street's standard form of transition management agreement?

**A.** Yes.
**Q.** When was that?
**A.** In April of 2011.
**Q.** Was that a phone meeting or an in-person meeting?
**A.** In person and with some people on the conference call.
**Q.** Who was -- who attended that meeting?
**A.** Myself and some people from London legal, including Simone Paul. And on the call were Chris Carlin from the US and two lawyers from an external law firm, Herbert Smith, who were contracted to help out in the transition management business, as their legal department in State Street couldn't deal with the flow.
**Q.** What do you mean the legal department couldn't deal with them?
**A.** They didn't have enough resources.
**Q.** Was this meeting before or after the deals that we've just talked about?
**A.** Largely after.
**Q.** Well, let's walk through it. Was it before or after the KIA deals?
**A.** After.
**Q.** What about Dutch Doctors?
**A.** After.
**Q.** What about Royal Mail?
**A.** After.

**Q.** What about Sainsbury's?
**A.** After.
**Q.** What about NTMA?
**A.** I think NTMA was in the final stages.
**Q.** What about Eircom?
**A.** They were after -- sorry. The Eircom trade occurred afterwards.
**Q.** What was the purpose of the meeting?
**A.** To update the transition management agreement to make it easier for clients to sign up and negotiate with us. It was considered to be a very -- you know, it was bias toward State Street documents and rather negative. It said, you know, we can't do this, we can't do that. And we wanted to make it slightly more we can do this and can do that, to make it easier.
**Q.** Did you call that meeting?
**A.** No.
**Q.** Who did?
**A.** I believe it was Simone Paul.
**Q.** As part of that meeting, did there come a time when you discussed the fee provisions in the standard form of transition management agreement?
**A.** We discussed every clause, and the fee provisions were part of that, yes.
**Q.** Did you have any concerns about the fee provisions?

**A.** When I was there, you know, we certainly wanted to make sure that the -- the -- some of the provisions that we wanted to rely on, in case it was, you know, needed, stayed in the contract. And there was also one particular clause that we wanted to get out.

**Q.** Who's the "we" that you're referring to?

**A.** You know, myself, and the team in --

**Q.** The royal we?

**A.** I'm sorry?

**Q.** The royal we? Sorry. Go on.

**A.** I missed that. Sorry.

So there was a sentence in the fixed income paragraph that was inconsistent with the rest of the document and specifically mentioned that we had to disclose the markups in the periodic notice and I asked them to remove that, which they did. It also stated that --

**Q.** Well, let me just stop you right there.

**A.** Okay.

**Q.** Why did you ask them to remove that?

**A.** Well, that was a specific -- not prohibition, but a specific reference to you have to disclose it. And clearly, for the trades that we were doing, and we may have to do that again, that would be not very helpful.

**Q.** And the language that you asked them to remove said what?

**A.** Whatever spread is being taken in lieu of commission

needs to be disclosed in the periodic notice.

**Q.** Okay. What else?

**A.** There was also a clause that said we never charged management fee, which just didn't make any sense. So we had that removed.

**Q.** Why did that not make sense?

**A.** Because we did charge management fees from time to time, albeit not very often.

**Q.** Anything else?

**A.** Well, there were, you know, some of the clauses in the conflict of interest section, and you know, definition of broker-dealer that we relied upon. It was quite vague and ambiguous language, and that, I wanted to make sure that it stayed in as it was.

**Q.** That it stayed in?

**A.** Yes.

**Q.** Anything else?

**A.** I did mention that the market was less and less transparent and that we may need those clauses, or may need to rely on some of those clauses in the future. And, in fact, we had done so for a handful of trades already.

**Q.** Did anyone say anything?

**A.** No.

**Q.** Did you tell anyone at that meeting that you had taken hidden commissions while telling clients that you were

charging them zero commissions?

**A.** No.

**Q.** Why not?

**A.** Because they would say you can't do that.

**Q.** Did you tell anyone else at State Street about this meeting?

**A.** I told Rick Boomgaardt. I believe I told Ross, but I can't, you know, say any specific, you know, or remember any details.

**Q.** Do you remember what you told them?

**A.** That, you know, we updated the DMA and the clauses are still in there and then that's -- I don't -- like I said, I don't know the details anymore.

**Q.** Did there come a time, around May of 2011, when you attended a meeting of the directors of an entity called State Street Global Markets International?

**A.** Yes.

**Q.** What is that entity?

**A.** It is the legal entity that houses the transition management trading desk and collects the trading revenues for the transition management business and it also housed some other businesses, unrelated.

**Q.** And what was the purpose of that meeting?

**A.** It was a quarterly board meeting.

**Q.** Why were you there?

**A.** I was invited as a guest, because I believe one or two board members were either about to resign or had already resigned and they were in need of more people.
**Q.** Did there come a time at that meeting when you discussed revenues in the transition management business?
**A.** Yes.
**Q.** Why?
**A.** Because every business that generated revenue had to give an update and, you know, know what was going on, essentially.
**Q.** What did you say?
**A.** I told them that we were missing five and a half million dollars worth of spread revenue.
**Q.** Did you say which revenues?
**A.** Spread revenue.
**Q.** Did you say anything about -- further about those revenues?
**A.** No.
**Q.** Which revenues were you referring to?
**A.** The revenue from -- I believe it was the Royal Mail, Sainsbury's, and some from NTMA.
**Q.** The hidden commissions?
**A.** Yes.
**Q.** Did you tell anyone at that meeting that that's the revenue you were referring to?
**A.** I may have mentioned the clients, but I didn't say

anything more than that.

**Q.** Was the issue solved?

**A.** Eventually, yes.

**Q.** And around this same time, was there a meeting of the senior management committee of State Street Global Markets in Europe?

**A.** Yes.

**Q.** Did the issue of revenues come up at that meeting?

**A.** Yes.

**Q.** What, if anything, did you say?

**A.** Similar. The head of finance, Patrick Waller, and the head of operations, Ian Scott, said they would look at it and sort it out and make sure it would be resolved.

**Q.** So there was a revenue recognition issue?

**A.** Yes.

**Q.** And did you tell them how the revenue had been generated?

**A.** Well, I didn't say that we had lied to a client, but I may have referred to spread revenue, but I don't know the exact details.

**Q.** I'm sorry. You did not say that you had lied to a client?

**A.** No.

**Q.** Why not?

**A.** Yeah. That would be obvious, wouldn't it?

MR. FRANK: Your Honor, I'm about to start a new

topic.

THE COURT: Fine. Do you want to take a break now?

MR. FRANK: Yes.

THE COURT: Ladies and gentlemen, take the morning break. All rise for the jury.

(The jury exits the courtroom.)

THE COURT: You can step down, if you want, Mr. Pennings.

You can be seated.

Two quick things, Mr. Weinberg, Mr. Frank.

One, do you have any idea how long?

MR. FRANK: Maybe an hour, maybe less.

THE COURT: Okay. So you'll probably finish today?

MR. FRANK: Oh, I'll definitely finish.

THE COURT: I wanted to tell you, I received an e-mail from Mr. Butts -- or Ms. Simeone received an e-mail from Mr. Butts this morning, just reporting that he had reached out to the three lawyers that we had the status conference about that -- share what I had said, that each of the three carefully considered the Court's request, took time to think about it, and each has declined to participate.

You can look at the e-mail if you want. Unless one of you thinks I need to, I don't think I need to docket the e-mail. It was just to Ms. Simeone, but if you want me to, I will.

MR. WEINBERG: Not necessarily, Your Honor, but if you just put the response on the record.

THE COURT: That's why I put it on the record now. I think that's sufficient. And you can both look at the e-mail if you wish.

MR. WEINBERG: We're over 400 docket entries, I don't think we need --

THE COURT: Another one.

MR. FRANK: Actually --

THE COURT: Do you think we should put it on the record?

MR. FRANK: I think it would be safer to put it on the docket.

THE COURT: Then Maria, you should docket the e-mail that he sent you.

THE DEPUTY CLERK: Do you want it on the --

THE COURT: No, I think the docket --

MR. FRANK: Maybe we should redact the precise e-mail address.

THE COURT: Mr. Butts' or Ms. Simeone's?

MR. FRANK: Well, you know what, it's Mr. Butts'. He's on the docket. Withdrawn.

THE COURT: He's on the docket and Ms. -- so not the e-mail you forward, just the one to you.

Okay. See you at 11:15.

THE DEPUTY CLERK: All rise, this matter is in recess.

(Court in recess at 10:59 a.m. and reconvened at 11:17 a.m.)

THE COURT: Please be seated. Maria, go get the jury.

(Jury enters the courtroom.)

THE COURT: Go ahead, Mr. Frank.

MR. FRANK: Thank you, Your Honor.

BY MR. FRANK:

**Q.** Mr. Pennings, did there come a time in or about June of 2011 when you received an inquiry from Royal Mail concerning its transitions?

**A.** Yes.

MR. FRANK: Can you show the witness Exhibit 160, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's the inquiry on Tuesday, June 21.

MR. FRANK: Government moves to admit 160.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 160 admitted into evidence.)

**Q.** You can look at the second page, the only email on that

page. Ian McKnight at Royal Mail emails you with a copy to Heath Mottram, "Ed, as part of our post-transition audit work, please could you please confirm that as per the post-transition report, 242,305 pounds, equal to 1.75 basis points on the AUM as of 21 March 2011, together with any commissions on futures execution and/or clearing is the sole revenue for SSGM and/or its affiliates on this event." Do you see that?

**A.** Yes.

**Q.** What's AUM?

**A.** Assets under management.

**Q.** Okay. And what did you understand Mr. McKnight to be asking you here?

**A.** Is that fee really the only fee that you charge.

**Q.** The 242,305?

**A.** Yes.

MR. FRANK: If we could look at the prior page, the bottom email.

**Q.** You responded, "Hi, Ian. Yes, 242,305 pounds should equal 1.75 basis points of the total assets. As per my email of 4 March, we also agree to combined futures execution clearing commission equivalent of 1 basis point of traded value. This should add up to approximately 421,800 pounds. Not all contracts were in pounds so subject to some FX movements. Total revenue comes to 664,105." Do you see

that?

**A.** Yes.

**Q.** When you told Mr. McKnight that the management fee of 1.75 basis points and the futures fees were the only fees charged, was that true or untrue?

**A.** That was untrue.

**Q.** If you look at Mr. McKnight's response, "Ed, the reason I ask is because an independent body has conducted a review of the post-book which has raised some concerns as TRACE reporting suggests a 1 basis point in yield markup/markdown on all U.S. dollar denominated trades. Could you please explain this markup." What is TRACE reporting?

**A.** It is a U.S. based transaction type of reporting. I'm not familiar with the workings of it now.

**Q.** But it's only in the U.S.?

**A.** Yes.

**Q.** And do you know what it shows?

**A.** It shows the prices of every bond that is being traded, I believe.

**Q.** Of the ones that are reported in TRACE?

**A.** Yes.

**Q.** And what did you understand Mr. McKnight to be asking you in this email?

**A.** He's asking us as to how we can explain a bare markup that was charged on the U.S. trades.

**Q.** Would you look at your response. You said, "Hi Ian. That doesn't seem right so let me investigate with the U.S. desk and get back to you. I should hopefully be able to get back to you tomorrow."

When you told Mr. McKnight that that doesn't seem right, was that true or untrue?

**A.** Well, it was -- it was right, so it's untrue.

**Q.** Okay. And what was your reaction when you got Mr. McKnight's email?

**A.** Shocked, buying time here, going to Ross and see how we're going to resolve this.

**Q.** Did you discuss this response with anyone before sending it?

**A.** I discussed all -- the response below with Rick and possibly Paul McGee and Ian Holden, but that's it.

**Q.** What did you do after seeing this email?

**A.** I had a number of discussions with Ross, and I forwarded this, I believe.

**Q.** What were those discussions about?

**A.** How are we going to get out of this.

**Q.** What was the nature of those discussions?

**A.** Can we find an excuse to explain how we got to that one basis point, and what are we going to do with it.

**Q.** What did you decide?

**A.** We decided to explain it away as an error, a

futures-related error given that the futures also attracted one basis point, so we believed that we could explain it that way and just pay the money back and move on.

**Q.** Whose idea was it to say that it was the same fee that you had charged on the futures?

**A.** We were just bouncing ideas, myself and Ross, on the phone. I think we had a couple of ideas, and none of them very good. I believe I mentioned that I spotted there was a one basis point on the futures, so maybe we can do that, and he said that's exactly what we're going to do.

**Q.** Was there any discussion at that time about telling them we're going to keep the money?

**A.** We had a number of options, just, you know, not pay anything back, pay everything back or just pay the bit back that they spotted, the last one we took, which was quite possibly the worst one. But there were discussions of, you know, to the tune of can we explain away or use ambiguous language in the contract to not pay anything back. But it was best decided to pay back what they spotted, explain it away as an error and then move on.

**Q.** Did you tell them about the money you charged in Europe?

**A.** No.

**Q.** Why not?

**A.** Because it was decided that we were not going to do that. We thought they were not going to find that out. And that

was -- you know, we discussed it but Ross said we're not paying it back.

**Q.** Why did you think they wouldn't be able to find out what you charged in Europe?

**A.** Because there was no TRACE.

**Q.** There's no TRACE system in Europe?

**A.** Not that I'm aware of, no.

**Q.** What happened next?

**A.** We rebated the money immediately, and I thought, you know, that was it. But then Ross suggested also that we put in place an arrangement with a transaction cost analysis firm to have the trade looked over again with the idea of just looking at it from an implementation shortfall perspective, which we knew was very good.

**Q.** What do you mean by that, looking at it just from an implementation shortfall perspective?

**A.** It's not uncommon in the U.S., I believe, to have an independent party review transitions, and they just tend to look at the implementation shortfall, and we knew again that the implementation shortfall number was correct and also very good. So it was hoped that if we could just demonstrate through a third party that the implementation shortfall was correct, then the issue would go away.

MR. FRANK: If you can show the witness only Exhibit 161, please.

**Q.** Do you recognize this document?
**A.** Yes.
**Q.** What is it?
**A.** It's an email from me to Ross on June 21.
**Q.** So that's the same day?
**A.** Yes, in the evening.
**Q.** And he writes to you, "954406." Did you have an understanding of what that number referred to?
**A.** Yes.
**Q.** What was it?
**A.** Ross said we're going to pay it back immediately, let me see how much it was. He looked at the systems in the U.S., and that's the number he came up with in terms of dollars.
**Q.** That was the U.S. hidden commissions?
**A.** Yes, it turned out missing 50,000 or so, but that was just because he missed a day.
**Q.** And then you responded, "Spoke to him. He wants us to credit account which I said we would do." Who is the "him" that you're referring to?
**A.** Ian McKnight.
**Q.** And then you said, "He asked us to check that this was the entire amount. I told him it appeared to be a U.S. issue." Is that what you told Mr. McKnight?
**A.** Something along those lines, yes. I certainly didn't talk about the fact that we took markups in Europe.

**Q.** When you told Mr. McKnight that it was a U.S. issue, was that true or untrue?

**A.** It was untrue. The decision was made to only pay back the U.S. part, so I had no choice.

**Q.** And who made that decision?

**A.** Well, the ultimate decision was made by Ross.

MR. FRANK: Can we show the witness only Exhibit 162, please. That was shown to the jury? I'm sorry. I apologize. We offer 161, please.

MR. WEINBERG: I have no objection.

THE COURT: Admitted.

(Exhibit No. 161 admitted into evidence.)

MR. FRANK: I'm letting the jury catch up.

THE COURT: That's fine.

MR. FRANK: Has everyone read the email? I apologize for that. If we can show the witness only Exhibit 162.

**Q.** Do you recognize this document, Mr. Pennings?

**A.** Yes.

**Q.** What is it?

**A.** It's an email from Ross to Chris Carlin, copying me, on June 21, again, the same evening.

MR. FRANK: Government offers 162.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 162 admitted into evidence.)

**Q.** Remind us again who Mr. Carlin is?

**A.** COO, chief operating officer for Ross.

**Q.** Who does he report to?

**A.** Ross.

**Q.** Mr. McLellan writes, "Chris, we have overcharged a client 954,406 for a Europe TM. We need to debit this against this month's revenue and get a wire to the client. Please work with Ed tomorrow on this." Do you see that?

**A.** Yes.

**Q.** What did you understand Mr. McLellan to be telling Mr. Carlin when he said that you had overcharged a client?

**A.** That we took money that we weren't supposed to take and it needed to go back.

MR. FRANK: Can we show the witness only Exhibit 163, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It is an email from me to Ross on June 21, again later on in the evening.

MR. FRANK: The government offers 163.

MR. WEINBERG: No objection, Your Honor.

THE COURT: Admitted.

(Exhibit No. 163 admitted into evidence.)

**Q.** You write to Mr. McLellan, "I will first double check with Rick that Europe is okay and then propose the following, 'Further to our conversation yesterday, we confirm that our trading desk in the U.S. has erroneously applied commissions at 1 basis point of yield to trades that should have gone through at zero commissions. We have investigated the issue and confirm that the total amount overcharged to be 954,406. We will arrange for this amount to be credited to the Royal Mail Pensions Trustees account immediately. We apologize for this oversight but hope to rectify the situation through this action.'" Then you wrote, "Do you also agree to add the following, 'The post-trade implementation shortfall will also be adjusted slightly downwards to take this rebate into account.' Please let me know if you are okay with the above wording."

What was this email referencing?

**A.** We had a number of conversations that evening, and we -- basically Ross asked me to come up with some language that we could accompany the payment with as sort of a face-saving out for the client.

**Q.** You wrote, "I will first double check with Rick that Europe is okay." What were you referring to there?

**A.** Whether there is any way that the European commissions could be spotted.

**Q.** And when you wrote, "We confirm that our trading desk in

the U.S. has erroneously applied commissions at 1 basis point of yield to trades that should have gone through at zero commissions," was that true or untrue?

**A.** It's untrue.

**Q.** When you wrote in the last sentence, "We apologize for this oversight," was that -- was it true or untrue that this was an oversight?

**A.** That was untrue.

**Q.** When you wrote -- when you asked Mr. McLellan, "Do you agree to add the following, 'The post-trade implementation shortfall will also be adjusted slightly downwards,'" what were you referring to?

**A.** If we're going to give the client a rebate, then the implementation shortfall would consequently be better.

**Q.** Would be better?

**A.** Yes.

**Q.** Why is that?

**A.** Well, because there's less cost involved.

MR. FRANK: Could we show the witness only Exhibit 165, please.

**Q.** While we're calling that up, Mr. Pennings, why were you asking Mr. McLellan for permission to send this email?

**A.** It's a pretty big deal. I didn't have -- I certainly didn't feel like I had the authority to rebate almost a million dollars, and it was uncomfortable. And I think it's

only normal then that you ask your boss. I mean, it was a lie.

MR. FRANK: Can we look at 165 for the witness only.

**Q.** And can you tell us whether you recognize that document?

**A.** Yes.

**Q.** What is it?

**A.** It's an email exchange again between myself and Ross on the following day, June 22.

MR. FRANK: Government offers 165.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 165 admitted into evidence.)

**Q.** On Wednesday he writes to you, "Tell RM." Who is RM?

**A.** Royal Mail.

**Q.** "Tell Royal Mail that we are rebating the 950 immediately. We will also hire Inalytics to perform an independent analysis on the transition to ensure RM was treated fairly. Let's get this done today." And you responded, "Okay." Who is Inalytics?

**A.** A performance measurement company in Europe.

**Q.** What was your reaction to his proposal to hire Inalytics?

**A.** I said okay there. I didn't like it.

**Q.** Why didn't you like it?

**A.** I didn't like Inalytics, and they certainly didn't like

State Street, and I thought they were going to dig way too deep. And then we're basically stonewalling them or going to stonewall them on the European part, which didn't look good.

**Q.** You were concerned they would dig too deep?

**A.** Yes.

**Q.** Did you discuss those concerns with anyone?

**A.** Yes.

**Q.** Who did you discuss it with?

**A.** With my team in Europe and with Ross.

**Q.** What did the defendant say?

**A.** I think, you know, we will need them or something along the lines of.

MR. FRANK: Can we look at Exhibit 166 for the witness only.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an email from Ross to myself again on the 22nd, just following the other one.

**Q.** And Mr. McLellan responds to you -- writes to you, "Suggested language. We need to be truthful here. We have confirmed overcharges on your fixed income trading of 954k, which does include certain bonds that are not TRACE-eligible and not reported in any manner. We are in the process of revising the post-trade analysis as this will better your

performance, and we also believe it is appropriate for us to hire an independent analysis firm, Inalytics, to review all the transactions affected in the transition, including fixed income and FX." Do you see that?

**A.** Yes.

MR. FRANK: I'm sorry. It wasn't admitted again? I offer 166.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 166 admitted into evidence.)

MR. FRANK: Thank you, Your Honor.

**Q.** When the defendant wrote, "We have confirmed overcharges on your fixed income trading of 954k, which does include certain bonds that are not TRACE-eligible and not reported in any manner," what did you understand him to be suggesting you tell Royal Mail?

**A.** That, you know, we only overcharged on the U.S. bonds.

**Q.** Are bonds in Europe TRACE-eligible, to your understanding?

**A.** Again, to my understanding, no.

**Q.** Did you believe this email to be truthful?

**A.** No.

MR. FRANK: Can we show the witness only Exhibit 167, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** An email from Ross to myself on the 22nd again.

MR. FRANK: Government offers 167.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 167 admitted into evidence.)

**Q.** I'd like to start on the second page at the bottom of the chain. Mr. McLellan writes to you, "What are we doing?" Do you see that?

**A.** Yes.

**Q.** And you wrote, "Do you want to call it overcharges or markups?" What's the "it" that you were referring to?

**A.** The hidden fees.

MR. FRANK: And if we just take a quick look back at 166, can you blow that up, please.

**Q.** "We have confirmed overcharges." Do you see that?

**A.** Yes.

**Q.** So you were asking him about that?

**A.** Yes, I had a conversation as well, so I may have asked other things as well, but I don't recall exactly.

MR. FRANK: Okay. Can we go back to 167.

**Q.** You asked the defendant, "Do you want to call it overcharges or markups?" And if you look at the bottom of the first page, what did the defendant tell you to call it?

**A.** "Inadvertent commissions applied."

**Q.** Inadvertent commissions applied?

**A.** Yes.

**Q.** Do you know what "inadvertent" means?

**A.** At the time I thought it just meant wrong.

**Q.** Do you now know what it means?

**A.** Intentionally wrong.

**Q.** You think inadvertent means --

**A.** Mistakenly. Sorry, sorry. I apologize.

**Q.** Unintentionally wrong, unintentionally applied?

**A.** There you go.

**Q.** Was that a true or untrue statement?

**A.** That's untrue.

**Q.** And if we could go to the email above, you said, "You happy for Inalytics to get involved?" Why did you ask the defendant that question?

**A.** Because we didn't, I myself and Rick and Paul McGee and Ian Holden didn't want Inalytics involved because we were worried that they were going to dig too far.

**Q.** And how did the defendant respond?

**A.** "We will need them."

MR. FRANK: Can we show the witness only Exhibit 169, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?
**A.** It's again an email exchange between myself and Ross on the 22nd, later on that day.
MR. FRANK: Government offers 169.
MR. WEINBERG: No objection.
THE COURT: Admitted.
(Exhibit No. 169 admitted into evidence.)
**Q.** If you look at the bottom email, you addressed it to the defendant. Do you see that?
**A.** Yes.
**Q.** And it's the email to Mr. McKnight, "Hi Ian. Further to our discussion, we have confirmed inadvertent commissions applied," et cetera. Then you wrote toward the end, "We also believe it is appropriate for us to hire an independent analysis firm, Inalytics, to review all the transactions affected." Do you see that?
**A.** Yes.
**Q.** Why did you send this email drafted to Mr. McKnight to Mr. McLellan?
**A.** Because I wanted to have his final approval, this was essentially his language, and to make it absolutely certain that we wanted to send that out.
MR. FRANK: Can we show the witness only Exhibit 168, please.
**Q.** Do you recognize this document?

**A.** Yes.
**Q.** What is it?
**A.** That's the email that I was instructed to send to the Royal Mail.
MR. FRANK: Government offers 168.
MR. WEINBERG: No objection.
THE COURT: Admitted.
(Exhibit No. 168 admitted into evidence.)
**Q.** So this is the same email which you're now sending to Ian McKnight and Heath Mottram at Royal Mail?
**A.** Yes.
MR. FRANK: Erin, could you highlight the blind copy line.
**Q.** Why did you blind copy the defendant?
**A.** We were all involved in this, and, you know, I wanted my boss to be aware that this had actually gone out.
MR. FRANK: Can you show the witness only Exhibit 164, please.
**Q.** Do you recognize this document?
**A.** Yes.
**Q.** What is it?
**A.** An email from Ross to myself on the 23rd, the following day.
MR. FRANK: Government offers 164.
MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 164 admitted into evidence.)

**Q.** Look at the bottom email on the first page, Mr. McLellan says to you on the 23rd of June, "Have you spoken with him?" Do you have an understanding of who the "him" is that the defendant is referring to?

**A.** Ian McKnight.

**Q.** And you respond, "Yes. He thought the idea of Inalytics was good. Rick Di Mascio and Graham are out this week, so Monday is the first day Rick Boomgaardt can speak to them. He has put an email in to them." Who are Rick Di Mascio and Graham?

**A.** Those are the I think owner and senior manager of Inalytics.

**Q.** And why would Rick Boomgaardt be the one speaking to them?

**A.** Rick Boomgaardt knew them very well and he was friends with Graham and maybe even Rick Di Mascio, I'm not sure, but certainly with Graham Dixon because he used to work with him.

**Q.** When you wrote, "He thought the idea of Inalytics was good," who is the "he" you're referring to?

**A.** Ian McKnight.

**Q.** If we could look at the defendant's response, he wrote, "Great. Let's put this to bed." What is your understanding what he wanted to put to bed?

**A.** Well, the issue, pay the money back and then hopefully, you know, we're good. If they see that the implementation shortfall is even better than it was, then, you know, that should do the trick.

**Q.** Is that what happened?

**A.** No, not entirely, no.

**Q.** What happened?

**A.** Inalytics, as feared, came back with a whole slate of questions, and, you know, we needed to answer those. And one of them was, "Did you take any money elsewhere?"

**Q.** So Inalytics didn't accept the representation that one million was the correct refund?

**A.** No.

**Q.** Did there come a time in August when Inalytics made a new demand?

**A.** Yes.

**Q.** What was that?

**A.** They wanted to -- in the absence of us showing the trade details in Europe, they wanted to have a sign-off from compliance or audit.

**Q.** They had asked for the trade details from Europe?

**A.** I believe so, yes.

**Q.** And what would that information have showed?

**A.** It would show what we refer to as the Street-side and the client-side trade list, but no broker would give you the

Street side, so we had hoped that they would just accept that, that we were not going to give that.

**Q.** Because it's not ordinary practice to give that out?

**A.** No.

**Q.** And did they accept that?

**A.** No.

**Q.** And what would that information have shown them?

**A.** The markup.

**Q.** So what did they ask for in August?

**A.** A letter from compliance stating that this was all that we've taken, the bit that we rebated.

**Q.** What happened?

**A.** Ross asked me to draft something in case compliance asked that we could have in our back pocket to help them out writing a letter.

**Q.** A letter from whom?

**A.** From compliance.

**Q.** Ross asked you to draft a letter from compliance?

**A.** Yes, or some wording.

**Q.** I'm sorry?

**A.** Or some wording.

MR. FRANK: Can we show the witness 178, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It is an email from me to Ross on the 22nd of August.

MR. FRANK: Government offers 178 and its attachment.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 178 admitted into evidence.)

**Q.** Monday, 22nd of August, you write to the defendant, "As discussed, see attached for suggested wording for the compliance letter. Let me know if this works." Do you see that?

**A.** Yes.

**Q.** And if we look at the attachment, did you draft this letter, this draft?

**A.** I believe so. It's like the second or third iteration of it.

**Q.** "Dear Mr. Dixon, I refer to the performance analysis you are currently conducting on behalf of our mutual client, Royal Mail Pension Fund Trustees Limited. As requested by our transition management team, we have reviewed all bond trading activity as well as the commission rebate relating to the global credit transition executed for this client in March and April of 2011. Following the review, I can confirm that the compensation amount of 1,010,003.67 for all TRACE and non-TRACE eligible bonds is consistent with our internal analysis. I trust this information is helpful for your

analysis. Kind regards, Mark Hansen." Do you see that?

**A.** Yes.

**Q.** Was this letter true or untrue?

**A.** It was untrue.

MR. FRANK: Could we show the witness Exhibit 179, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an email from me to Ross and Rick Boomgaardt on the 22nd.

MR. FRANK: Government offers 179.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 179 admitted into evidence.)

**Q.** And if we could just -- if you look at your email to the defendant, you write -- can you blow it up -- "How about this? Not sure about the phrasing of the regulations line, so let me know what you think." Do you see that?

**A.** Yes.

**Q.** And if we look at the letter pasted below, it says, in the second paragraph, "As requested by our transition management team, we have reviewed all bond trading activity." Do you see that?

**A.** Yes.

**Q.** Was that true or untrue?
**A.** That's not true.
**Q.** And in the next sentence, it says, "Following the review, I can confirm that the compensation amount of one million, et cetera, for all TRACE and non-TRACE eligible bonds is consistent with our internal analysis."
Was that the correct compensation amount for all TRACE and non-TRACE eligible bonds?
**A.** No, because it excludes the European bonds.
**Q.** Then you added a sentence, "We view this as an internal error that has now been corrected and do not treat this as a breach of any regulations." Why did you add that sentence?
**A.** Because we were asked to put that in by Inalytics.
**Q.** What did they want you to put in?
**A.** I think something along these lines. They communicated to Rick, so I wasn't party to that.
**Q.** Was it true that this was an internal error?
**A.** No.
**Q.** Why were you drafting another version of this letter?
**A.** Like I said, I was asked to do a couple of iterations. The first bit wasn't very elaborate. It was just merely a -- I think roughly a copy-and-paste exercise of what we sent to the client. And then he asked for some more and then some more, and then we were asked by Inalytics to add the sentence about the regulations.

**Q.** Who asked you to draft these different versions of this letter?

**A.** Ross.

MR. FRANK: Can we show the witness only Exhibit 180, please. It's apparently already in evidence, so we can show it to the jury.

**Q.** You wrote -- I'm sorry. Mr. McLellan wrote to you and to Mr. Boomgaardt, copied to Mr. Hansen, "Rick, can you send all the U.S. Street-side trades for Royal Mail and what was booked to the client? I spoke to Mark, so he is aware this is coming. We need to prove to the client that we have rebated them the correct amount of funds. Mark, call me with questions once you receive the data." Do you see that?

**A.** Yes.

**Q.** Had you rebated the clients the correct amount of funds?

**A.** In terms of the U.S. we did, but not with regard to Europe because we didn't rebate that.

**Q.** Would there be any way for Mr. Hansen to know that from the information the defendant was asking Mr. Boomgaardt to send him?

**A.** Not if he only gets the U.S. Street side and he doesn't ask about anything else.

MR. FRANK: Could you show the witness only Exhibit 182, please.

**Q.** Do you recognize this?

**A.** Yes.
**Q.** What is it?
**A.** It's an email from Mark Leaden to myself on the 23rd of August.
**Q.** Who is Mark Leaden?
**A.** U.K.-based compliance officer.
**Q.** Who did he report to?
**A.** To Anthony Scully.
**Q.** And who did he report to?
**A.** Mark Hansen.
**Q.** The person whose name is on the letter?
**A.** Yes.

MR. FRANK: Government offers 182.

MR. WEINBERG: No objection.

THE COURT: It's admitted.

(Exhibit No. 182 admitted into evidence.)

**Q.** If we could just look at the bottom email, there's an email with no text from Mr. McLellan to Mr. Hansen. Do you have an understanding of what he's sending Mr. Hansen? Maybe the email above would give you light to determine that.

Mr. Hansen forwards it to Mr. Scully and Mr. Leaden and says, "Did you guys write this and verify what the facts are? Let me know if I can sign?"
**A.** That appears to be a version of the letter.
**Q.** And Mr. Leaden forwards it to you and says, "Okay. Now

prove this to me." What did you understand Mr. Leaden to be asking you to prove to him?

**A.** To confirm that it's correct, or show what details underlie the letter.

MR. FRANK: Can we show -- is 185 in evidence? No. Could we show the witness only 185, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It's an email from Mark Hansen to a number of people, including myself.

MR. FRANK: Government offers 185.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(Exhibit No. 185 admitted into evidence.)

**Q.** And if we -- let me just ask you, Mr. Pennings, before we go through this. Mr. Leaden asks you to prove that was correct?

**A.** Yes.

**Q.** Did you have a conversation with Mr. Leaden?

**A.** I have had a very briefly conversation with Mr. Leaden.

**Q.** Did you tell him that you intentionally overcharged clients?

THE COURT: That's leading.

MR. FRANK: Withdrawn.

**Q.** What did you tell Mr. Leaden?

**A.** He came to my office and he said, "What happened?" I said, you know, "We had an issue with the client. We've rebated them. We took a spread that we shouldn't have taken." He, you know, said, "So what else?" I said, you know, "I told the client it was an error," because I led him to believe it was an error, and, you know --

**Q.** Who led you to believe it was an error?

**A.** Mark Leaden. And that was it. And then he said -- you know, he thought that whatever is in the document was correct. I never told him about the European part.

MR. FRANK: If we could look at 185.

THE COURT: Is that in evidence?

MR. FRANK: I offer it, if not.

MR. WEINBERG: I have no objection.

THE COURT: 185 is admitted, if it isn't in evidence already.

(Exhibit No. 185 admitted into evidence.)

**Q.** Could we look at the second page, bottom email. It's an email from Mr. Leaden to Mr. Hansen and Mr. Scully, copied to you, Mr. McLellan, Chris Carlin and Rick Boomgaardt. "Mark, spoke to Pennings. Here is the deal. One, attached are the transaction details, the commissions match. Roughly 950,000 has already been paid to the client. The remainder will be paid in due course. This was due to trade dates and the

correspondence analysis but is moot with regards to this letter. Two, the client should have been charged a flat fee on the portfolio but a commission was charged on the corresponding trades in error. Hence, rebate of the revenue earned. The June 2005 TM agreement contractually allows for a markup with affiliates, clause 6.25, but there is of course an argument whether the flat fee side letter would supersede the initial TM agreement, both attached. That said it was an input error and not any type of regulatory breach. Three, Graham Dixon at Inalytics has requested a non-regulatory breach comment be added to the letter. Hence the following was drafted, revised letter attached. 'We view this as an error that has been corrected and do not consider this a regulatory breach.'" Then he writes, "From my understanding, I would consider the above accurate and as an FYI these were Boston transactions."

Was this accurate, Mr. Pennings?

**A.** No.

**Q.** And there's a reference to what the contract may or may not allow. Do you see that in paragraph 2?

**A.** Yes.

**Q.** Do you have an understanding of whether Mr. Leaden was an attorney?

**A.** He was not an attorney as far as I'm aware.

**Q.** If you could look at the email above, Mr. Hansen

responds, "Rick, I know we want this asap, but can we talk first thing Wednesday morning when I get in to understand exactly what the customer is looking for me to say. For example, does the TRACE language need to be in there?" Do you see that?

**A.** Yes.

**Q.** I want to move up to the top email in the first page. Mr. Hansen now to Mr. Boomgaardt, Mr. Clemmenson, you and others. Who is Mr. Clemmenson?

**A.** I believe he is a U.S. trader on the transition trading desk.

**Q.** And Mr. Hansen writes, "Please review this letter and ensure that I have all the correct information. This is based upon the information provided and verified, but please let me know if there is anything incorrect at all from any of your standpoints." Do you see that?

**A.** Yes.

**Q.** And who is the first name that he copied on this email?

**A.** Ross McLellan.

MR. FRANK: If we could look at 185-1, which, if it's not in evidence, I offer it.

THE COURT: Any objection, Mr. Weinberg?

MR. WEINBERG: No, Your Honor.

THE COURT: 185-1 in evidence.

(Exhibit No. 185-1 admitted into evidence.)

**Q.** Do you see another copy of this letter?

**A.** Yes.

**Q.** "Dear Mr. Dixon. With regard to your recent request on behalf of Royal Mail Pensions Trustees Limited and correlating performance analysis of State Street Global Markets Portfolio Solutions March/April 2011 execution of RMPTL's global credit transition, please consider this letter a confirmation regarding the accuracy of the previously provided amount of $1,010,003.67. Portfolio Solutions has conducted a thorough review of the fixed income transactions, whether TRACE-eligible or otherwise, executed on behalf of RMPTL. In accordance with this analysis as well as my independent review of the information therein, I can hereby confirm the accuracy of the compensation amount referenced above. In addition, please note that State Street Global Markets considers this issue to be an unfortunate error and not a breach of any applicable regulations. If you have any further questions or concerns, please feel free to contact me at (617) 664-1562." Do you see that?

**A.** Yeah.

**Q.** Was this letter true or untrue?

**A.** Still untrue.

**Q.** Was this an unfortunate error?

**A.** It was unfortunate but it was no error.

MR. FRANK: Can we show the witness only Exhibit

187, please.
**Q.** Do you recognize this document?
**A.** Yes.
**Q.** What is it?
**A.** It's an email from me to Ross following a trail on the 24th.
**Q.** On the same trail?
**A.** Yes, I think so.
MR. FRANK: Government offers 187.
MR. WEINBERG: No objection.
THE COURT: Admitted.
(Exhibit No. 187 admitted into evidence.)
MR. FRANK: Erin, if you could blow up the first three emails. Thank you.
**Q.** Do you see that on the bottom is Mr. Hansen's email, "Please review this letter and ensure that I have the correct information"?
**A.** Yes.
**Q.** How did the defendant respond?
**A.** "Looks good to me."
**Q.** "Looks good to me." And then you responded to the defendant only, "Perhaps without the phone number"?
**A.** Yes.
**Q.** Why did you suggest "perhaps without the phone number"?
**A.** I actually -- I believe I did not see the final version

of the letter because I was out of the office and in an area with no phone reception, so I couldn't download it. But I did have a conversation with Ross asking what was in it. He said something along the lines of it hasn't really changed a lot, it just looks a bit better, and it's got Hanson's phone number on it.

**Q.** So why did you suggest "perhaps without the phone number"?

**A.** Well, it's like you're inviting someone to call your head of compliance who just signed something that was not true.

**Q.** When you discussed the letter with the defendant, did you discuss on the phone the presence of the phone number?

**A.** Yes.

**Q.** Do you recall what he told you?

**A.** Yes.

**Q.** What did he tell you?

**A.** He said, "Maybe I'll just rewire the phone lines to my office."

**Q.** Did you understand that to be a joke or serious?

**A.** It was a joke.

MR. FRANK: Could we -- I'm going to go to Exhibit 184, which is audio that's now in evidence.

**Q.** If I could direct you to page 3 of the transcript, line 2.

**A.** Sorry. 184?

**Q.** 184, page 3, line 2. Actually, it might be line 4.

MR. FRANK: If we could start, Erin, at 1:52 seconds into the recording.

(Voice recording played.)

MR. FRANK: We'll stop it right there.

**Q.** At the top of page 3 at line 4, you say, "Did Hanson already sign the thing?" What are you referring to?

**A.** The letter.

**Q.** He says, "No, not yet, but I got the latest version of it from Mark Leaden. It sounds a little more compliancy now." What did you understand him to mean there?

**A.** That they changed the letter to make it sound better.

**Q.** And at line 19, you say, "Well, as long as it makes it sound like they -- as long as it sort of makes it sound like they looked at every trade." Do you see that?

**A.** Yes.

**Q.** What did you mean by that?

**A.** Well, the whole point was to make the European question go away.

**Q.** How?

**A.** By having it signed off and making it ambiguous enough to have the reader believe that everything was included, including the European trades.

**Q.** What happened next, Mr. Pennings?

**A.** The letter didn't get sent out, and, you know, the stuff

came out.

MR. FRANK: Can we show the witness only on Exhibit 194, please.

**Q.** Do you recognize this document?

**A.** Yes.

**Q.** What is it?

**A.** It is an email from Mark Hansen to a number of people, including myself.

MR. FRANK: Government offers 194.

MR. WEINBERG: No objection.

THE COURT: Admitted.

(GExhibit No. 194 admitted into evidence.)

**Q.** If we could look at the very first email, Mr. Hansen writes to you and others, "Based upon the recent discussion, my letter may not be correct, so please do not send until we discuss further." Do you see that?

**A.** Yes.

**Q.** Do you know what happened in the interim?

**A.** I wasn't in the office, but I'm aware of what, roughly what happened.

**Q.** What's your understanding?

MR. WEINBERG: I object.

THE COURT: Based on at that time or something he learned?

**Q.** What was your understanding at the time of what happened?

**A.** That Rick had another discussion with Ian Scott. We spoke to Ian Scott prior, probably two months earlier or a month earlier, I can't remember exactly, asking again about whether I believe it was possible to spot the European trades.

And again, I wasn't party to those discussions, but I believe Ian Scott then said or felt uncomfortable, thought something was not right here and escalated it to London management.

MR. FRANK: We're going to look at Exhibit 196. This is a call that we've all listened to before. It's in the transcript binders. And I'd like to take you through it, Mr. Pennings.

THE WITNESS: Which one?

MR. FRANK: 196. I'm sorry -- yeah, 196.

**Q.** Do you have that in front of you?

**A.** Yes.

MR. FRANK: Pick it up at the top, please.

(Voice recording played.)

**Q.** You say, "So the letter from Hanson has not gone out yet." Mr. Boomgaardt says, "It hasn't." Then at line 12 Mr. McLellan says, "Ah, that was a good move." And you respond on line 13, "That was a very good move."

Why did you think it was a very good move not to send that letter?

**A.** Because it was untrue, and we had the compliance officer sign it, so that would have gotten us in more trouble.

MR. FRANK: Can we pick up it up at line 14, please.

(Voice recording played.)

MR. FRANK: We'll stop right there.

**Q.** At the top of page 2, line 1, Mr. McLellan says, "It's pretty crystal clear to me after reading the RFP that we don't have a leg to stand on here once we all see what went on here?"

What is your understanding of what Mr. McLellan is saying there?

**A.** That what we did was wrong.

**Q.** When Mr. McLellan said, "Once we all see what went on here," what was your reaction to that?

**A.** I think we all knew what went on there for quite a long time because that was the whole strategy and the point of doing this.

**Q.** At line 8 he says, "I do think we should message to Graham sooner rather than later particularly today that we may have the same booking issue in the U.K. as we do in the States. We haven't confirmed that yet, and compliance and audit is looking into it."

Was that message that Mr. McLellan was proposing true or untrue?

**A.** Untrue.

MR. FRANK: Can we pick it up, please.

(Voice recording played.)

MR. FRANK: Okay. Just pause it right there for a moment.

**Q.** If we look at page 2, line 21, the defendant says, "I think we should discuss who is messaging what to where because, I mean, at the end of the day, here, you know, it's crystal clear we have got to give the money back."

What did you understand the defendant to mean when he said, "It is crystal clear we have got to give the money back"?

**A.** That we need to give the European money back. We already had that -- discussed that earlier in Europe, at which point it was overruled, and now we're all on the same page.

**Q.** Who had overruled it previously?

**A.** Ross.

**Q.** If we look at page 3, line 13, you say, "Well, we need to be a little bit -- I mean, basically we need to just message it internally that, look, this is nothing else than like what we do in FX."

Was that a true statement or an untrue statement?

**A.** It was untrue.

**Q.** Why?

**A.** It was another, you know, excuse of fallback or whatever

you want to call it that we would compare it to. It's similar but it's not exactly the same.

**Q.** Why is it not the same?

**A.** Because FX is a principal market and didn't -- wasn't part of our business.

**Q.** And did you make any representations to clients about FX when you were negotiating transitions --

**A.** I would say that's the main difference, if you will. We never really talked about it.

MR. FRANK: If we could look at the -- actually if we could pick it up from where we left off.

(Voice recording played.)

MR. FRANK: I want to stop to briefly there.

**Q.** At line 17, the defendant says, "Let me handle that. I've already talked to David about it." Do you have an understanding of who David is?

**A.** David Puth.

**Q.** What had the defendant previously told you about David Puth?

**A.** That the KIA situation was discussed, and, again, I wasn't there, so that was prior to the Royal Mail.

**Q.** Then he says, "I left a call message for Marsh Bailey." Who is that?

**A.** That's London management.

**Q.** Then he says, "I've sent an email to John Norris." Who

is that?

**A.** London legal.

**Q.** And then he says at line 22, "And I brought Hansen into the loop." Who is that a reference to?

**A.** Mark Hansen.

**Q.** What had you been telling Mr. Hansen and his team all week?

**A.** That it was an error.

MR. FRANK: Can we keep going, please.

(Voice recording played.)

MR. FRANK: Can you stop it right there, please.

**Q.** At page 4, line 7, just after Mr. McLellan says, "I'm not sure there's a good answer for any of those," you say, "I think what we need to do is say, Look, to be honest, we had no reason to believe in Europe that it was anything else, you know, but we did a thorough investigation and this has come up, you know. Here is the total compliance letter for the global trade. Here you go. Here is the money." Do you see that?

**A.** Mm-hmm.

**Q.** Was it true or untrue that you had done a thorough investigation, this had come up, and you had no reason to believe in Europe that it was anything else?

**A.** No, it wasn't true. We were trying to save face and come up with ideas of how to do so.

**Q.** Then you say at line 13, "He will say it's not a regulatory issue because legally in the document we can do this." Who is the "he" you're referring to?

**A.** Compliance, whether it's Hansen or Leaden.

**Q.** Did you believe at the time, sir, that legally in the document you could do what you did?

**A.** I think the contract was vague and ambiguous enough on its own to take a spread. The problem we had is that we made representations otherwise.

**Q.** Did you believe legally under the document you could do that?

**A.** No. The document doesn't allow you to lie.

**Q.** Mr. McLellan responds, "Yeah. I mean, I read the agreement today. It doesn't say anything about -- I mean, put it this way, it's silent with respect to any of this. It doesn't say you can't do it. It doesn't say you can do it." Then you refer to the conflict of interest section. You say, "Even Leaden spotted that last week, saying your affiliates can take a markup." Do you see that?

**A.** Yes.

**Q.** Do you recall, sir, at the beginning of your testimony we listened to you describing a conversation you had with Alex Johnston of ConvergEx?

**A.** Yes.

**Q.** Do you recall what you told Mr. Johnston about affiliate

language in his contract?

MR. WEINBERG: I object. It's apples and oranges, Your Honor.

MR. FRANK: I object to the argument, Your Honor.

THE COURT: We'll just have objections to the questions. What are you referring tow here?

MR. WEINBERG: Can we go to the bench, Your Honor?

THE COURT: Sure.

**SIDEBAR:**

THE COURT: I'm just not sure I understand what conversation you're referring to in the question.

MR. FRANK: At the very beginning of his direct, we played a conversation between Mr. Pennings and Mr. Boomgaardt, in which he referred to his conversation with Alex Johnston of ConvergEx where he chastised him for language that he said the clients don't understand --

THE COURT: Yes. So what's the question here?

MR. FRANK: The question is whether he recalls what he told Mr. Johnston about language concerning affiliates taking a markup.

MR. WEINBERG: Objection. One, it's asked and answered. Two, the contracts are different, but I understand Mr. Frank is trying to weld them together by going back to this point while they're talking about the Royal Mail contract to the ConvergEx contract.

MR. FRANK: The issue is the defendant in his co-conspirator's state of mind, Your Honor. It's not the specifics of the contract. He told Mr. Johnston that language concerning --

THE COURT: Mr. Pennings.

MR. FRANK: Correct -- that language concerning affiliates taking a spread which Mr. Johnston was relying on to charge hidden commissions was vague and would get them into trouble, the line item would get them into trouble with regulators.

MR. WEINBERG: Which goes back to the original part of the objection, which is that the government has gotten all that in through the testimony --

MR. FRANK: It's state of mind evidence.

THE COURT: You can ask briefly. Not too much because you went into it before.

MR. FRANK: I'm not going to ask very much, Your Honor. Thank you.

(End of sidebar.)

**Q.** Mr. Pennings, at the page 4 you say, "Even Leaden spotted that last week or earlier this week saying your affiliates can take a markup." Do you see that?

**A.** Yes.

**Q.** Do you recall the conversation that you described to Mr. Boomgaardt that we talked about earlier in your testimony

where you spoke with Alex Johnston of ConvergEx about his contract?

**A.** Yes.

**Q.** Do you recall what you told Mr. Johnston about language in the ConvergEx contract about affiliates taking a markup?

**A.** Yes.

**Q.** What did you tell him?

**A.** That the client wouldn't understand it or don't see it.

**Q.** What did you tell Mr. Johnston about what he was doing?

**A.** He was taking undisclosed revenues.

**Q.** What did you tell him you thought about that?

**A.** That was wrong --

MR. WEINBERG: Objection.

THE COURT: Overruled.

**Q.** I'm sorry?

**A.** That that was wrong.

**Q.** Thank you. On page 5, line 5, after Mr. Boomgaardt says, "I'm not sure that it's covering us," do you see that?

**A.** Yes.

**Q.** You respond, "I still think it's Pestana." What are you referring to?

**A.** Pestana was a former transition manager working for Boomgaardt who wasn't very popular. He left, and we believed that he informed either the Royal Mail or through him it ended up at Royal Mail, what we were doing.

MR. FRANK: Thank you. Can we resume.

(Voice recording played.)

MR. FRANK: We'll stop it right there.

**Q.** At page 5, line 10, Mr. Boomgaardt says, "Does this put an end to it or does it not? Does it then still get raised at a different level?" And Mr. McLellan then asks, "Meaning they go to the FSA anyway." Did you have an understanding of what was being referred to there?

**A.** The FSA was at the time the U.K. regulator.

**Q.** And what did you understand Mr. Boomgaardt to be asking?

**A.** Whether, if we resolved this issue, whether Inalytics would query more or, you know, refer it to the FSA if they felt like we weren't honest.

**Q.** At line 14, Mr. McLellan says, "I'm reading the clause right now. And I mean, it actually does say the manager may benefit from the commission fee, markup/markdown payable by customer and associates acting as the broker-dealer with respect to portfolio transactions may benefit from the commission fee markup/markdown by the customer." Do you see that?

**A.** Yes.

**Q.** What was your reaction when you heard Mr. McLellan reading that section of the contract?

**A.** Well, that was one of the clauses that we were always going to fall back on, so I don't think that was anything

new. We all knew those clauses existed well before.

**Q.** Had you previously discussed them?

**A.** Yes.

**Q.** And then at page 6, Mr. McLellan says at line 3, "We're not going to litigate this thing, are we? Where that does help us is internally. Look, we put that in there because we know we take spreads on fixed income, and our customers' spread is in the basis points of yield." Do you see that?

**A.** Yes.

**Q.** What did you understand Mr. McLellan to say when he said, "Where that does help us is internally"?

**A.** In my view, the contract was there, you know, in this particular case, when it all went wrong. So I think that's what he refers to.

**Q.** I'm sorry. So what did you understand it to mean when he said, "Where it does help us is internally"?

**A.** As an explanation of using the ambiguous language.

**Q.** Then you said at line 7, "How do we explain the 2 basis points versus the 1 basis point." And he responded, "I don't know. You got to come clean, you come clean for everything." Do you see that?

**A.** Yes.

**Q.** What did you understand Mr. McLellan to mean what he said, "You got to come clean, you come clean for everything"?

**A.** That we just -- well, coming clean is to come clean, tell

the truth. Obviously, that's not what happened at that point.

MR. FRANK: Can resume where we left off.

(Voice recording played.)

MR. FRANK: We're going to stop right there.

**Q.** At page 6, when you were discussing whether it was an iceberg issue at line 16, do you see that? And then at the top of page 7, "To avoid the tip of the iceberg issue"?

**A.** Yes.

**Q.** What is the "tip of the iceberg issue" that you understand to be referenced there?

**A.** That we did it for a number of other deals, the same thing.

**Q.** And what was your concern?

**A.** My concern -- I mean, I didn't -- at the time I didn't really think about the other deals. I wasn't wholly on the other side of the road somewhere, and I focused on Royal Mail. But from what I understood here is that Rick and Ross wanted to mention it to Graham Dixon that there were others.

**Q.** Then you say, "Well, there's four, right?" And Mr. Boomgaardt says, "There's four. I couldn't remember the number." And Mr. McLellan responds, "And these would be clients you charged a fee and a spread." Do you see that?

**A.** Yes.

**Q.** What was your reaction when Mr. McLellan asked that

question?

**A.** Well, everyone who was involved in the plan knew that we charged a fee and a spread, so maybe he was just referring to the actual number 4, but certainly it was known that fees had been charged in addition to spreads.

**Q.** Then he says at line 10, "Do we know if that is legal in the U.K.?" And you say, "Yeah, the fee is fine. You can't double dip." What were you referring to there?

**A.** The fee, charging a fee and a commission on its own, you know, that there's nothing inherently wrong with that if it's disclosed.

**Q.** So what makes it wrong?

**A.** The fact that we made the client believe that the fee was all that we were going to charge.

**Q.** Was this the first time you discussed charging a fee and a spread with the defendant?

**A.** No.

MR. FRANK: Okay. We're going to stop there with that call.

**Q.** Mr. Pennings, what happened after August 26?

**A.** There was an investigation by an external law firm, Freshfields, contracted by State Street.

**Q.** Did there come a time when you were interviewed as part of that internal investigation?

**A.** Yes.

**Q.** Did you tell the truth?
**A.** I wasn't truthful.
**Q.** You were not truthful?
**A.** No.
**Q.** What did you tell them?
**A.** I told them that, you know, exactly what, you know, the idea of the fallback was going to be, that the contract allowed it, that it was the same as FX, that the industry was the same. So those were, you know, untruths.
**Q.** Why did you tell them those things?
**A.** Because I tried to save my job.
**Q.** What happened next?
**A.** I was suspended.
**Q.** And then what happened?
**A.** I was interviewed again.
**Q.** What, if anything, did you tell them?
**A.** Same story. It was difficult because I wasn't very well-prepared, I hadn't seen the documents in a long time, and they were just put in front of me. But the story was the story.
**Q.** And was the story true or untrue?
**A.** The story was untrue.
**Q.** What happened next?
**A.** I was fired.
**Q.** After you were fired, did there come a time when you

challenged your termination?

**A.** I did.

**Q.** Tell us about that.

**A.** I sued the bank for wrongful dismissal.

**Q.** And was there a proceeding, a legal proceeding?

**A.** It was in the U.K. tribunal.

**Q.** And did you testify at that tribunal?

**A.** I did.

**Q.** Did you testify truthfully?

**A.** No. I told them the same story.

**Q.** Were you under oath?

**A.** Yes.

**Q.** Why did you lie?

**A.** To save my job and try and get the money back that was withheld from me, which was a significant amount.

**Q.** Did you get your job back?

**A.** No.

**Q.** Did you get any money?

**A.** No.

**Q.** What happened to you in March of 2016?

**A.** I found out that the U.S. government indicted me for this case.

**Q.** Where were you when you were indicted?

**A.** In England.

**Q.** What was your reaction to that?

**A.** Difficult to describe. It was the most shocking thing that has ever happened to me.
**Q.** After your indictment did there come a time when you surrendered to U.S. authorities?
**A.** Yes.
**Q.** Did there come a time when you pled guilty to a crime?
**A.** Yes.
**Q.** When was that?
**A.** In June of 2017.
**Q.** What crime did you plead guilty to?
**A.** I pled guilty to conspiracy to commit securities and wire fraud.
**Q.** In connection with your plea, did you enter into a plea agreement with the government?
**A.** I did, yes.
**Q.** Did you also enter into a cooperation agreement with the government?
**A.** Yes. At a later point, yes.
MR. FRANK: I'd like to show the witness only Exhibits 203 and 204, please.
**Q.** Mr. Pennings, do you recognize these documents?
**A.** Yes.
**Q.** What is the document on the left?
**A.** It's the plea agreement.
MR. FRANK: Why don't we take a closer look at the

heading.

**A.** Sorry. It says the cooperation agreement. I couldn't read that.

MR. FRANK: Erin, if we could blow up the document on the right.

**Q.** What's that document?

**A.** That's the plea agreement.

MR. FRANK: Government offers 203 and 204.

THE COURT: Any objection, Mr. Weinberg?

MR. WEINBERG: No objection, subject to the request for instruction.

THE COURT: All right. Admitted.

(Exhibit No. 203 and 204 admitted into evidence.)

THE COURT: I remind you, ladies and gentlemen, as I explained to you yesterday with respect to Mr. Boomgaardt, that this is evidence about Mr. Pennings pleading guilty to charges arising from the events that are the subject of this trial. You must not consider his guilty plea as any evidence of Mr. McLellan's guilt. Mr. Pennings' decision to plead guilty was a personal decision about his own guilt. You should disregard his guilty plea completely when considering Mr. McLellan's guilt or innocence. Instead, you may consider Mr. Pennings' guilty plea only for the purpose of determining how much if at all to rely upon his testimony. You should give Mr. Pennings' testimony the weight you believe it

deserves, keeping in mind that it must be considered with caution and great care.

BY MR. FRANK:

**Q.** If you could look at page 6 of the document on the left. Do you recognize those signatures?

**A.** Yes.

**Q.** Whose signature it is on top?

**A.** That's mine.

**Q.** Whose is below?

**A.** That's my attorney.

**Q.** If you look at page 9 on the document on the right, do you recognize those signatures?

**A.** Yes.

**Q.** Whose are they?

**A.** Mine and my attorney.

**Q.** Mr. Pennings, have you been sentenced?

**A.** No.

**Q.** What is your understanding of the maximum sentence you face?

**A.** I believe it's a maximum of five years for conspiracy.

**Q.** What is the minimum?

**A.** Zero.

**Q.** Are you currently on bail?

**A.** Yes.

**Q.** Have you spent any time in jail since pleading guilty?

**A.** No.

**Q.** What is your understanding of what you have agreed to do pursuant to your cooperation agreement?

**A.** I have to meet with the government whenever they ask me, and I have to tell the truth.

**Q.** What is your understanding of what will happen if you follow all the terms of your cooperation agreement?

**A.** The government will request for leniency.

**Q.** What is your understanding of what happens if you do not tell the truth?

**A.** I'll be in much more trouble and I could be convicted of perjury.

**Q.** Is the judge required to give you a lower sentence if the government asks for leniency?

**A.** No.

**Q.** Are you hoping for a lower sentence as a result of your cooperation?

**A.** I hope and pray every day --

THE COURT: What is he hoping for?

**Q.** What are you hoping for?

**A.** For leniency.

**Q.** What is your understanding of who will decide your sentence?

**A.** The judge.

MR. FRANK: No further questions.

THE COURT: Cross-examination?

MR. WEINBERG: Thank you, Your Honor.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. WEINBERG:

**Q.** Good afternoon, Mr. Pennings.

**A.** Good afternoon.

**Q.** You told the jury at the very start of direct testimony that you were the primary caretaker for your young children; is that correct?

**A.** That is -- that's correct, yes.

**Q.** At the time you first learned that you were a defendant charged by the U.S. government with securities fraud, you had one child; is that correct?

**A.** That's correct.

**Q.** You were living in London with your wife and child and had hopes for a second child, correct?

**A.** Living outside of London, yes.

**Q.** You came to this courthouse the first time in the company of your lawyers and pled not guilty; is that correct?

**A.** That's correct.

**Q.** And that plea of not guilty was accompanied by your approval of your lawyer making a statement on your behalf; is that correct?

**A.** Yes.

**Q.** In other words, you approved that -- you approved your

lawyer saying to the media that Ed Pennings is innocent, he had no criminal intent?

**A.** I took his advice, yes.

**Q.** That statement in 2017 was consistent with statements that you had been making since 2011; is that correct?

**A.** I believe it was 2016.

**Q.** 2016, the first day you were here?

**A.** Yes.

**Q.** Your lawyer made a statement asserting your innocence, correct?

**A.** Yes.

**Q.** And that assertion of your innocence is consistent with what you told State Street back in 2011 when the internal investigations began?

**A.** In lines -- yes, there was not much explanation, I believe, but yes.

**Q.** And that assertion of innocence was consistent with what you wrote in a statement to the employment tribunal; is that correct?

**A.** Yes, it's the same explanation.

**Q.** A lengthy statement of almost 100 pages, correct?

**A.** It was a very lengthy statement, yes. My lawyer wrote that and I approved it.

**Q.** You adopted it and permitted it to be submitted to the employment tribunal and considered by the tribunal, which is

a judge-type forum in the U.K.; is that correct?

**A.** Yes.

**Q.** Thereafter there was a hearing at the employment tribunal, correct?

**A.** Yes.

**Q.** As you told Mr. Frank, you testified on your own behalf under oath in that tribunal, correct?

**A.** Yes.

**Q.** And without getting involved in the details, you essentially told the tribunal you were innocent, you committed no fraud, the contracts supported the undisclosed markups to the clients, correct?

**A.** That was the story that I stuck to, yes.

**Q.** And you then were investigated by the City of London Police, were you not?

**A.** Yes.

**Q.** And you made statements to the City of London Police, did you not?

**A.** Similar statements, yes.

**Q.** One was handwritten, another typed, but the thrust of those statements was to tell the City of London Police that you committed no fraud, that you were innocent, the contracts that were entered between the client and State Street supported the way in which the clients were charged, correct?

**A.** My lawyer wrote those statements, yes, and I approved

them, and list the same excuse essentially, yes.

**Q.** The FCA or FSA, whichever letters come first, it's the same agency, it's similar to the United States Securities and Exchange Commission, correct?

**A.** I suppose you can say that.

**Q.** Excuse me?

**A.** I said I suppose you can say that.

**Q.** It's the regulator of the securities industry in Great Britain where you worked?

**A.** Correct.

**Q.** And you also made statements or answered questions through your counsel to that agency, did you not?

**A.** I can't remember exactly. I've been there once, and they didn't request any statements from me, but I believe my counsel made some written representations, but I can't remember them now.

**Q.** And if they were representations made to you by your counsel at Slater and Gordon to the FCA, they would have been statements consistent with your position and adopted and authorized by you, correct?

**A.** Those were the same type of statements, yes.

**Q.** I want to take you back to 2016 when you just told the jury that you were shocked to learn that you were charged with a criminal offense in the United States, correct?

**A.** That's right.

**Q.** You were scared as a result of being charged with a felony criminal offense in the United States, were you not?
**A.** Yes.
**Q.** And you were scared that as a result of that prosecution, there was the risk that if you were convicted, you would be imprisoned in the United States, which was, to you, a foreign country, correct?
**A.** There was a chance of that, yes.
**Q.** And you understood that there was a chance that you would be -- that if you were convicted, you would be sentenced to many years in a United States prison, correct?
**A.** I don't know if it was many years, but years, yes.
**Q.** Years?
**A.** Yes.
**Q.** An ocean or thousands and thousands of miles away from your wife and your children. Because you had a second child during this period of time, correct?
**A.** Yes. He's a year and a half, yes.
**Q.** That's a fate that you very, very much want to avoid, is it not?
**A.** Of course.
**Q.** And you made a decision after you started to fight this case that it was in your self-interest to reach a plea agreement with the United States, correct?
**A.** Really starting to look into the case, seeing what

evidence they had against me, it was pretty clear to me that what they accused me of, I did.

**Q.** Because you had made all these statements to all the clients yourself?

**A.** Myself and my team, but on the instructions of -- not always but sometimes on your client, yes.

**Q.** Not always but sometimes. So let's talk about what was going through your mind when you made this, what was a difficult decision for you, which was to plead guilty to a felony, correct?

**A.** Correct.

**Q.** And you calculated the benefits of working with the prosecutors against the benefits of going to trial, and you chose to work with the prosecutors in an effort to minimize the risks of going to jail, correct?

**A.** I discussed with my attorneys what the best approach was, and it became very clear that it didn't make sense to keep defending the indefensible.

**Q.** And the indefensible meaning?

**A.** That I conspired, I did it. So I just thought this has taken long enough, it's ruined seven years of my life and my family, and I needed to move on and put it behind me as soon as possible. And in a way that, you know, I had to take responsibility for that.

**Q.** You could have pled guilty and not cooperated, but you

chose, did you not, to enter a second agreement, a cooperation agreement, to try to see whether or not Mr. Frank and Mr. Johnston would file a motion on your behalf; is that correct?

**A.** I pled guilty first, yes.

**Q.** You pled guilty first, then reached a second agreement, and that's called a cooperation agreement, which you hope will result in the government's filing what they call a 5K1 motion, correct?

**A.** That's certainly what I'm hoping for, yes.

**Q.** And you're hoping that as a result of their filing a 5K1 motion that that will help you in front of the sentencing judge in accomplishing your ultimate goal, which is to go back to your family, back to your children, and not go to jail in the United States. No guarantees but hopes, correct?

**A.** Yes.

**Q.** And you understand that, as the two prosecutors sit here now, they have not promised you that 5K1 motion. They've withheld that promise; is that correct?

**A.** That's correct.

**Q.** If they don't file it, you understand that they're going to be recommending you go to jail in the United States, correct?

**A.** I don't know what they're going to be recommending, but it certainly is not going to be very good.

**Q.** If they do file the motion, they have the discretion to recommend anything under the maximum down to probation, correct?

**A.** I believe so, but I'm not -- I don't know the details to that extent.

**Q.** You understand the decision whether or not they file that motion is completely 100 percent in the discretion of the U.S. Attorney's Office that Mr. Frank represents and the Department of Justice in Washington that Mr. Johnston represents?

**A.** It is my belief that if I tell the truth that the judge needs to see that I'm telling the truth as well. But you're correct in that it's up to the DOJ or the prosecutor.

**Q.** You're a smart guy. You've read the plea agreement, and you see that they have reserved the sole discretion to on one hand file that motion and on another hand withhold it, correct?

**A.** It's -- it's very much in their hands, yes.

**Q.** Yes. There's no appeal. They could either file it or not file it, correct?

**A.** That's what I understand, yes.

**Q.** So what I'd like to do in the few remaining moments, we'll go back to some of your prior statements, is to talk to you about a meeting that you participated in in April of 2011 with the lawyers from Herbert Smith, the lawyers from State

Street, yourself, correct? You do recall that meeting?
**A.** Yes.
**Q.** That meeting came within two or three weeks of the end of the Royal Mail transition in the spring of 2011, did it not?
**A.** It was in mid-April, so that's probably about right, yeah.
**Q.** And the Royal Mail transition occurred in late March?
**A.** Yes.
**Q.** Okay. And at the meeting were several lawyers who were in-house lawyers in the London office of State Street, correct?
**A.** Yes.
**Q.** One was Simone Paul; is that right?
**A.** Yes.
**Q.** And Simone Paul was a lawyer that you knew well, correct?
**A.** Well, I knew her. I don't want to say I knew her that well, but yes, I knew her.
**Q.** She worked in the same building as you?
**A.** Yes.
**Q.** She reviewed new transition management agreements when you were able to have new clients come to State Street, correct?
**A.** She and others, yes.
**Q.** The office was headed by Krystyna Beck, but Ms. Paul did more work with you on --

**A.** The office was -- they hired John Norris as the head, but before that they merged the securities lending, which was Krystyna Beck, with global markets, which was Simone. And I think Krystyna Beck came out on top.

**Q.** So Simone Paul and John Norris, the newly hired head of the U.K. legal team for State Street Global Markets, participated in this meeting; is that correct?

**A.** Yes.

**Q.** And participating as well were two other lawyers from Herbert Smith, that was an outside law firm hired by State Street to help with the review of contracts, correct?

**A.** Yes.

**Q.** Four lawyers in all?

**A.** There were actually more lawyers.

**Q.** More lawyers than four. The purpose was to go over the transition management agreement that State Street was using to perform its or to enter into agreements with clients in --

**A.** Yes.

**Q.** Is that correct?

**A.** Yes.

**Q.** In other words, each year or so they take the contract, the template if I can use that legal word, they review it, they amend it to conform to the business of State Street, correct?

**A.** I don't think they would review it every year, but it was

reviewed at that time.

**Q.** Let's go to that time. The purpose was to review it, and you went over with them, with the more than four lawyers, some were on the phone, some were in person, the different clauses in that contract, correct?

**A.** That's correct.

**Q.** And the purpose was to create a new contract that would be used going forward; is that correct?

**A.** An updated contract.

**Q.** Updated. There would be amendments of the older contract where amendments were required to conform to business practices, correct?

**A.** To make it easier, because we constantly ran into troubles with negotiating.

**Q.** Okay. You recall that there was a clause in the prior contract that said that all of the pricing had to be disclosed on the periodic notice, correct?

**A.** I believe it was in the fixed income paragraph, yes.

**Q.** And you told the lawyers that that's not consistent with all of the transitions that you have done on fixed income, and they deleted that requirement, correct?

**A.** I'm not sure if I said it like that. I said it wasn't consistent with the language in the equity paragraph, which didn't have that language. And it was always going to be, the fees were part of the periodic notice, not the framework

or template, if you will.

**Q.** When you wrote about the Herbert Smith meeting to the employment tribunal as part of the 98-or-so-page package that you presented to them in an effort to save your job or to win back your job, you described this as an important meeting. Do you recall?

**A.** I don't recall that, but that could be.

**Q.** And you said that the meeting was instigated or organized by Simone Paul of legal to discuss how we could amend the TMA, correct?

**A.** Yes.

**Q.** And you said that the meeting was led by Ms. Paul and went through the TMA document clause by clause to see where clauses could be simplified or removed, correct?

**A.** Yes.

**Q.** And you said to the employment tribunal in your written statement, "I very clearly and specifically discussed State Street's trading with undisclosed markups through affiliates and the no duty to disclose profits clauses relied on." Do you recall that?

**A.** I recall that's in there, but it wasn't all true.

**Q.** So was it true that you clearly and specifically discussed State Street's trading with undisclosed markups?

**A.** I don't believe I said "undisclosed."

**Q.** Was it true that you talked about the no duty to disclose

paragraphs?

**A.** Yes, that's true.

**Q.** Is it true that you told the lawyers that there were transitions where both a fee and a spread were charged?

**A.** It -- maybe. I believe I may have said that.

**Q.** Is it true that you highlighted to Simone Paul a number of definitions, such as the definition of broker/dealer?

**A.** Yes.

**Q.** Broker-dealer included State Street Global Markets International, which was the affiliate broker-dealer of State Street Bank of Europe and London, correct?

**A.** Yes, it included --

**Q.** It's kind of like your local broker-dealer --

**A.** Yes.

**Q.** -- that Mr. Holden worked for?

**A.** Yes.

**Q.** And is it true that you highlighted to these more than four lawyers in-house, U.K., external from Herbert Smith, clauses 6.14 and 6.15, which were the clauses within the Conflict of Interest section that allowed an affiliate broker-dealer to charge markups and make money from clients?

**A.** Those clauses, correct, yes, I have highlighted those.

**Q.** And you highlighted the next clause, 6.2, which was a clause in the overall contracts that said that the affiliate, State Street Global Markets broker-dealer, had no obligation

to disclose to the client the markups, spreads, revenues, generated by trading?

**A.** I don't know the exact wording of the clause, but I know there's a no duty to disclose clause which was part of every clause that we looked at, yes.

**Q.** In other words, those clauses, the affiliate broker-dealer can mark up and make money and had no duty to disclose, were part of almost all of the transition management agreements entered in this 2010/2011 period between the transition management and the clients in Europe, correct?

**A.** If it was a State Street-based template, then yes.

**Q.** In other words, when the contract was -- when the parties were using the State Street contract, those clauses were included, correct?

**A.** Yes.

**Q.** And they were specifically included in the Royal Mail contract, correct?

**A.** They were in there, yes.

**Q.** And they were specifically included in this, what I call template, which was the contract that was the starting point for State Street's negotiations to enter contracts with new clients, correct?

**A.** Yes.

**Q.** It was in there in 2010, and it stayed in there in 2011,

correct?

**A.** To my knowledge, yes.

**Q.** And they were amongst the clauses that you focused Ms. Paul, the U.K. lawyer, and the other lawyers on during this what you deem to be an important meeting regarding Herbert Smith and the changes or the revisions when required in the template, correct?

**A.** Like I said, we went through all of the clauses and the fee clauses were part of those.

**Q.** Do you recall saying that you identified these clauses as crucial for the competitiveness of the businesses as State Street would have to rely upon them again in the future?

**A.** I'm not sure. That's probably an exaggeration. I may have said that, but again, to defend myself, but I certainly referred to them in relation to the market being less transparent.

**Q.** And by "less transparent," you discussed with all of these lawyers that the market was competitive?

**A.** Yes.

**Q.** That you were in charge of trying to get new clients and keep old clients and win transitions for your team at State Street, correct?

**A.** We were all responsible for that, yes.

**Q.** But you were the --

**A.** I was the head of the team in Europe, yes.

**Q.** You were the head of the team, and you were the chief sales guy, correct?

**A.** I was the salesperson, yes, yeah.

**Q.** You were the one that went down to the Mideast on a regular occasion and met with the representatives of the KIA and you went to Abu Dhabi?

**A.** I did.

**Q.** And you met a lot of the sovereign wealth representatives from the Mideast, correct?

**A.** Yes.

**Q.** Your job was to get their business, correct?

**A.** Correct.

**Q.** And you also met with representatives of lots of the major European, whether they were pension funds or sovereign wealth funds, to try to get their business?

**A.** That was a big part of my business overall, yes.

**Q.** And you wanted to make sure that within the contracts that were approved by this team of outside and inside lawyers were clauses of the contracts that would be consistent with the way that you were going to mark up and use spreads to compete with the other banks?

**A.** That's not entirely accurate. I was concerned that -- or it was important that it didn't specifically say that you could not, in these handful of clients where we essentially mislead the clients, we did have that language in there in

most of them. But, you know, it obviously assumes that you're silent then on any other representations.

**Q.** You didn't want any express -- if I can use the legal terms that I think were being used, you didn't want anything within the contract that expressly prohibited markups by the broker-dealer including the affiliates of State Street, correct?

**A.** That's correct, because that was the fallback.

**Q.** And you didn't want anything in the contracts that imposed on the affiliate some duty to disclose the markups?

**A.** That's correct.

**Q.** And you were successful in keeping 6.2 in the contract, which was the specific clause that authorized the broker-dealer affiliate not to disclose to the client the amount of monies generated by markups on transitions, correct?

**A.** It was never challenged.

**Q.** You also talked that day, did you not, about FX, foreign exchange?

**A.** I believe I did.

**Q.** And you explained to the lawyers that the competitive business model that you were using in Europe to compete with the Nomuras and Citibanks and Goldmans of the world was consistent in your opinion as given to the lawyers at that time?

**A.** Could I just stop you. Could you just repeat that? They're very long sentences.
**Q.** Let's break it out. That's more than fair.
During this time period, one of the burdens of competing was the nature of the commissions that were being charged by your competitors, correct?
**A.** Commissions or no commissions, correct.
**Q.** They were charging almost nothing, correct, out front?
**A.** That was our experience.
**Q.** And you knew that because you had gone to some of the transition clients, like NTMA, and had complained about why you were losing all of the transitions in 2010, correct?
**A.** I didn't know it for certain. I suspected it, yes.
**Q.** And you and Mr. Boomgaardt at one point said to NTMA, which when Nomura got half of the transition, that they're going to, quote, make a killing. Do you remember that?
**A.** I believe it was Mr. Boomgaardt, I don't know, but it sounds familiar.
**Q.** I mean, State Street was employing a former Nomura banker at this time, was it not?
**A.** Correct.
**Q.** Mr. Kevin O'Neil?
**A.** Yes.
**Q.** And he let you know, did he not, that Nomura's business model was to charge almost no commissions, as low as

possible, and make a fortune through trading, correct?

MR. FRANK: Objection, Your Honor. I'm not sure what he means by "trading."

THE COURT: Do you know what he means by "trading"?

THE WITNESS: Maybe he can explain.

**Q.** Nomura, in contrast to State Street, had its own bonds, correct?

**A.** Had its own --

**Q.** Had its own inventory of bonds.

**A.** I never worked for Nomura, but that's probably fair to say because they were an investment bank.

**Q.** And it was your understanding, right or wrong, your understanding, your mindset when you were in competition with these banks in 2010 that these investment banks like Nomura could make a great deal of money by taking a bond from its inventory, putting it in the client's inventory and having a good spread between the price it bought it at and the price that it was charging the client?

**A.** It was my understanding that they could make money in other ways.

**Q.** That State Street couldn't?

**A.** Yes.

**Q.** You also understood that State Street for the longest times had made a lot of money on foreign exchange trading for transition management clients in Europe, correct?

**A.** They made money for transition clients, yes -- from transition client flow.

**Q.** And the clients were not told the amount of money that the FX desk of State Street, the affiliate of State Street, was making on their foreign exchange, was it?

**A.** No.

**Q.** You didn't even know, correct?

**A.** No. That's correct. Sorry. No, I didn't know.

**Q.** And you compared it -- not now, today in 2018, but back in 2011, you compared the fact that State Street legal approved FX, an affiliate of State Street, making non-disclosed revenues, you relied on that and used that as basis to say, "And so can we on fixed income"?

MR. FRANK: Could we have a timeframe, and could we have a context?

THE COURT: I think you said 2010 and 2011.

MR. FRANK: 2011 is a year, Your Honor. At one point we were talking about a specific meeting.

THE COURT: Are you talking about the meeting, or are you talking about the time period --

**Q.** Well, first, let me -- you told the employment tribunal -- you relied on your employment tribunal statements in comparing State Street's legal approval and history of making money on FX, correct?

**A.** Yes, I compared it to that, yes.

**Q.** And not disclosing the amounts to clients?
**A.** That was never disclosed.
**Q.** And you compared it to what you contended to be the State Street legal's approval of non-disclosed markups to transition clients for bonds?
**A.** Except they were never approved.
**Q.** But you said they were approved in your statements to the employment tribunal, correct?
**A.** Approved by whom? By legal?
**Q.** Approved by legal, compliance and senior management.
**A.** Well, the only senior management that approved it was Ross.
**Q.** Isn't it a fact that you said that it was widely known to, disclosed to, and approved by senior management in addition to Ross? I'm dealing with 2011, your statements --
**A.** I know. And I also said I wasn't truthful in my statements, but some of the language that was in the KIA email trail that we saw -- was it this morning or Friday -- was also used as an extension of the excuse, if you will, and knowledge of compliance and legal.
**Q.** So you raised your hand, took an oath, tried to be believed, swore to tell the truth and lied to the judge who was presiding over the employment tribunal in the London courts in 2012?
**A.** I spun the story and did not tell the truth. That's

correct, and I'm not proud of it.

**Q.** That's consistent with the fact that before the tribunal your lawyers wrote a 98-page statement that you reviewed, approved and submitted intending for the judge to believe it, correct?

**A.** They spun the story, yes, and I approved it.

THE COURT: I'll stop you here, Mr. Weinberg.

Ladies and gentlemen of the jury, two things before I let you go. One, I remind you about the schedule. Tomorrow 9:00 to 1:00. We'll break for lunch, 1:00 to 2:00. Court 2:00 to 4:30. Same schedule on Wednesday. No court Thursday. Friday back to 9:00 to 1:00. Don't discuss the case among yourselves or with anyone else. Don't do independent research including on the Internet. Thank you for your attention.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT: Unless there's anything, I'll see you tomorrow morning.

MR. FRANK: Nothing for the government.

THE COURT: Okay. You're excused. See you tomorrow morning. You don't have to be back until just a couple of --

THE WITNESS: Sorry?

THE COURT: You just have to be back a couple

minutes before 9:00.

I'll see you all at 8:30.

(Court in recess at 1:01 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

We, Rachel M. Lopez and Kelly A. Mortellite, Certified Realtime Reporters, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 6th day of June, 2018.

/s/ RACHEL M. LOPEZ

/s/ KELLY A. MORTELLITE

________________________________________

Rachel M. Lopez, CRR
Kelly A. Mortellite, RMR, CRR
Official Court Reporter