UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

      Plaintiff,                            :     Criminal Action No.
                                     1:16-cr-10094-LTS

    v.                                       :

ROSS MCLELLAN,                               :

      Defendant.                            :

- - - - - - - - - - - - - - - - - - x


      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


JURY TRIAL
Day 7


Tuesday, June 12, 2018
8:37 a.m.




John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

1                           **A P P E A R A N C E S**

2     On behalf of the Plaintiff:

3          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:  STEPHEN E. FRANK
4          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
5          Boston, Massachusetts  02210
           (617) 748-3244
6          stephen.frank@usdoj.gov

7
           UNITED STATES DEPARTMENT OF JUSTICE
8          BY:  WILLIAM JOHNSTON
           1400 New York Avenue, Northwest
9          Washington, D.C.  20005
           (202) 514-0687
10         william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
           BY:  MARTIN G. WEINBERG
14         20 Park Plaza
           Suite 1000
15         Boston, Massachusetts  02116
           (617) 227-3700
16         owlmcb@att.net

17
           LAW OFFICES OF ROBERT M. GOLDSTEIN
18         BY:  ROBERT M. GOLDSTEIN
           20 Park Plaza
19         Suite 1000
           Boston, Massachusetts  02116
20         (617) 742-9015
           rmg@goldstein-lawfirm.com
21

22         LAW OFFICES OF MAKSIM NEMTSEV
           BY:  MAKSIM NEMTSEV
23         20 Park Plaza
           Suite 1000
24         Boston, Massachusetts  02116
           (347) 251-4800
25         mentsev@gmail.com

1

<u>**TABLE OF CONTENTS**</u>

2

3

**TRIAL WITNESSES**

4

5    On behalf of the Plaintiff:                        <u>Page</u>

6    EDWARD PENNINGS

7            By Mr. Weinberg                         22

8            By Mr. Frank                           118

9            By Mr. Weinberg                        148

10   DEAN JOHNSON

11           By Mr. Johnston                        157

12           By Mr. Goldstein                       178

13           By Mr. Johnston                        230

14   ROUL HAERDEN

15           By Mr. Johnston                        240

16           By Mr. Goldstein                       260

17           By Mr. Johnston                        272

18

19

20

21

22

23

24

25

1                              **EXHIBITS**

2                                                              Admitted

3       Number 740                                                89

4       Number 3                                                168

5       Number 21-1                                             138

6       Number 23-1                                             140

7       Number 25-1                                             141

8       Number 40                                               252

9       Number 53                                                81

10      Number 58                                                91

11      Number 137                                              174

12      Number 478                                              224

13      Number 756                                               90

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4    for the District of Massachusetts is now in session, the

5    Honorable Leo T. Sorokin presiding.

6          Today is June 12th, the case of US vs. Ross

7    McLellan, criminal action 16-10094 will now appear before

8    this court.

9          THE COURT:  I see all counsel and Mr. McLellan.

10   Good morning.

11         MR. WEINBERG:  Good morning, Your Honor.

12         MR. JOHNSTON:  Good morning.

13         THE COURT:  So any issues to discuss?

14         MR. JOHNSTON:  There's one issue about a possible

15   redaction on a phone call that we expect to be admitted into

16   evidence tomorrow.  The defense has requested that a crude

17   joke be redacted that's in -- that comes in sort of the

18   middle of a call between the defendant and a trader.  We

19   think part of it --

20         THE COURT:  Do you have the transcript?  Can I just

21   look at it?

22         MR. JOHNSTON:  Yeah.  I'm handing up the transcript

23   to 107.  Page 3.

24         THE COURT:  Page 3?

25         MR. JOHNSTON:  It's in the middle.  It will jump

1    out at you.

2              THE COURT:  Oh.  So who -- Dionisio is testifying,

3    right?

4              MR. JOHNSTON:  Yeah.  Dionisio.

5              THE COURT:  Dionisio.  I'm sorry.  And remind me

6    who he is?

7              MR. JOHNSTON:  He was an equity trader in Boston

8    who worked on the desk.

9              THE COURT:  So -- and the gist is this some sort of

10   conversation, in your view, about like trading and --

11             MR. JOHNSTON:  No, it's actually a particular --

12   it's a particular transaction.  It's part of the NTMA

13   transition, where one of the things they did was broke up an

14   ETF and traded the parts of it.

15             THE COURT:  Oh, redeemed it essentially?

16             MR. JOHNSTON:  Redeemed it.  Exactly.  And so

17   Mr. Dionisio is the one doing the redeeming and he's having a

18   conversation with the defendant about the progress of those

19   efforts, and sort of in the middle of this conversation,

20   there's this joke.  And then it continues into talking about

21   the conduct.  So it is in the middle of the discussion of the

22   activity itself and we -- the Government had agreed to redact

23   half of it.

24             THE COURT:  Which half were you willing to redact

25   and which half is the other half that they --

1          MR. Johnston:  The second -- the last two words.

2          MR. GOLDSTEIN:  They want to keep in the expletive

3     and cut out the other two words afterward.

4          THE COURT:  So you're willing to take out "sex

5     toy"?

6          MR. JOHNSTON:  Yes.

7          THE COURT:  And you want to take out "fucking sex

8     toy."

9          MR. GOLDSTEIN:  There's absolutely no need for the

10    F-word.  I would actually request that the entire McLellan

11    response and the laughter be edited out of the tape.  It has

12    no relevance to the conversation.  My understanding is the

13    Government suggests that it goes to the nature or comfort of

14    the relationship between Mr. McLellan and Mr. Dionisio.

15          This particular comment bears little to no

16    relevance regarding nature or comfort of the relationship.

17    They can get that otherwise.  And certainly, the use of the

18    expletive word does not, in any sense of the meaning, further

19    any context for a relationship and so there's no need for it.

20    It's an effort to paint Mr. McLellan as crude before the jury

21    and I'd ask the Court to direct the Government to redact the

22    McLellan line and the laughter and the jury will miss nothing

23    in terms of the context.

24          THE COURT:  Let me read the whole transcript.

25          MR. JOHNSTON:  Okay.  And it might be worthwhile

1    for you to actually hear it, as well.  Because I think it has

2    more relevance when you hear it in the context of the

3    actual --

4                THE COURT:  Fine.  Let me read it first and then

5    I'm happy -- it comes up tomorrow, so I can always listen to

6    it at some point today.

7                MR. JOHNSTON:  Because sometime this afternoon, we

8    do have to --

9                THE COURT:  We have to do whatever you're going to

10   do to it?

11               MR. JOHNSTON:  Exactly.

12               THE COURT:  I agree.  I'll read it and -- I can

13   always listen to it at lunch.

14               MR. JOHNSTON:  And just one small point to respond

15   to Mr. Goldstein.  The jury has already heard several F-words

16   from the defendant in a couple of other phone calls.  So it's

17   not like they are -- they believe that, you know, he speaks

18   like a nun or something.  So I think it's -- it's a little

19   bit much to say that somehow they need to -- he needs to be

20   protected from the perception that he's a crude speaker.  So

21   I think that that argument doesn't really have much weight

22   here.

23               MR. GOLDSTEIN:  And very quickly, Your Honor.  The

24   fact that the jurors already received evidence of this, makes

25   this particular comment cumulative and reduces any relevance

1    of the expletive in this context.

2              MR. FRANK:  Except they haven't heard it when --

3              MR. JOHNSTON:  They have yet to hear a phone call

4    with Mr. Dionisio.  They've heard phone calls with

5    Mr. Boomgaardt, phone calls with Mr. Pennings.

6              THE COURT:  I don't think he's arguing that the

7    phone call is cumulative.  I think he's arguing that the

8    word, given -- in that sense, the word is cumulative.  So in

9    any event, I understand the argument from both of you.  Let

10   me read it and then I might ask you to listen to it at some

11   point.  And I'll do that in time, so that whatever redaction,

12   whether it's just what you propose, or more, you can get done

13   today, ready for tomorrow.

14             MR. FRANK:  Just a couple of housekeeping matters,

15   Your Honor, on timing.  We may not need the time this

16   afternoon or tomorrow afternoon.  It just sort of depends on

17   the pace this morning.  Mr. Weinberg advised me last night

18   that he expects only about another hour and 40 minutes to two

19   hours of cross-examination.  That would take us to the break.

20   Depending on the length of redirect, the two victim witnesses

21   who are lined up for today, their direct examinations are

22   short.  I expect their cross-examinations will be short, as

23   well.  So it's not impossible that we would finish by 1:00.

24             THE COURT:  So after Pennings comes who?

25             MR. FRANK:  Dean Johnson from Sainsbury's.

1          THE COURT:  Essentially a victim witness?

2          MR. FRANK:  Correct.  And Roul Haerden from Dutch

3     Doctors.  And then we have another victim witness lined up

4     for tomorrow.  And then we have some other witnesses lined up

5     for tomorrow, as well.  So it's not -- these are --

6          THE COURT:  So let me ask you this, in terms of

7     timing.  First of all, my general view is jurors are always

8     happy to be let go early.  They're always very unhappy to be

9     told they're staying later than you told them.  So if we

10    finish earlier, fine.  So having told them that they might

11    sit these two afternoons, if we get through the three

12    witnesses you just -- Pennings and the other two today and do

13    whomever tomorrow and are done today and tomorrow at

14    1 o'clock, then where does that put us in terms of your case?

15         MR. FRANK:  We're very well on pace, Your Honor.

16    In fact, that was the second issue I wanted to raise.  We

17    have one victim witness who is unable to fly in.  This is one

18    of the Irish victims.  He's unable to fly in until Monday.

19    His son is participating in a Special Olympics this weekend

20    and he just can't leave until Monday morning.  So he's unable

21    to testify until Tuesday.  There is some possibility we would

22    not fill the day on Monday.

23         THE COURT:  So right now, if he were to -- if he

24    didn't have this issue and he could just come at your

25    convenience, if he were like all other witnesses who just

1    came at your beck and call, and did whatever you wanted them

2    to do.

3              MR. GOLDSTEIN:  Not just witnesses, Your Honor --

4              THE COURT:  What did you say?

5              MR. GOLDSTEIN:  Nothing.

6              THE COURT:  You would probably rest at the end of

7    the day Monday?

8              MR. FRANK:  It's not impossible.  It just depends

9    on the pace.

10             THE COURT:  So Monday or Tuesday you would rest?

11             MR. FRANK:  That's my expectation.

12             THE COURT:  And so what if he -- what you're saying

13   is maybe you end up resting on Tuesday, anyway.  But maybe

14   you would be all done at Monday at 11:00 or 12:00 and you

15   have this one other witness and he just isn't available until

16   Tuesday?

17             MR. FRANK:  Yeah, it could be -- it depends on the

18   pace.  We could rest even -- we could be done on Monday even

19   earlier than that.  You know, there's one -- so --

20             THE COURT:  Who comes -- so tomorrow is more --

21   another victim witness that you said?

22             MR. FRANK:  Yes.

23             THE COURT:  And then who comes after?

24             MR. FRANK:  And then Mr. Dionisio, Mr. Finocchi.

25   Both traders.

```
 1              THE COURT:  Yes.
 2              MR. FRANK:  Possibly Ms. Morris, who is another
 3   transition analyst in the United States.
 4              THE COURT:  She would be about -- at the US
 5   Count 6?
 6              MR. FRANK:  Correct.  It's possible she would go on
 7   Friday.
 8              THE COURT:  All right.
 9              MR. FRANK:  We expect a couple of agents, one agent
10   to testify about those comments, the statements of the
11   defense -- of the defendant.
12              THE COURT:  Yes.
13              MR. FRANK:  That's going to be very brief.
14              THE COURT:  Right.
15              MR. FRANK:  One agent who is just here to admit
16   some documents.
17              THE COURT:  Also very brief.
18              MR. FRANK:  Also very, very brief.
19              What else on Friday?
20              MR. JOHNSTON:  A representative of State Street,
21   compliance.
22              MR. FRANK:  That's not on Friday.  He's on Monday,
23   not testifying on Friday.
24              Oh, Mr. Clemmenson, who is another trader.
25              THE COURT:  All right.
```

```
1              MR. FRANK:  Mr. Kelly, who is another -- who is
2      another victim witness.
3              THE COURT:  All right.
4              MR. FRANK:  So that should take us --
5              THE COURT:  So you're going to finish some time
6      during Friday and Tuesday depending on how the pace --
7              MR. FRANK:  Well, we're not going to finish on
8      Friday.
9              THE COURT:  I mean, subject to --
10             MR. FRANK:  We're on pace for Tuesday.
11             THE COURT:  You're on pace for Tuesday.  All right.
12             MR. JOHNSTON:  Monday?
13             MR. FRANK:  Monday is just a question mark of
14     whether we fill the time.
15             THE COURT:  Okay.  And then how long do you think
16     you have?  Still same estimate or different estimate?  In
17     terms of your case.
18             MR. WEINBERG:  Same estimate.  We'll be able to
19     give the Court a better estimate on Monday morning.  But
20     certainly, you know, we're well on schedule.
21             THE COURT:  So there's no worry that we will not
22     give the case to the jury that Thursday.  The Thursday, two
23     weeks from this Thursday.
24             MR. FRANK:  No worry.
25             MR. WEINBERG:  No worry at all.
```

1          THE COURT:  And there's a reasonable -- it sounds

2    to me like there's a reasonable possibility that they're

3    actually going to get it earlier.

4          MR. FRANK:  Yes, there is a possibility of a

5    rebuttal case, but it would be brief.

6          THE COURT:  Right.  Your rebuttal case is likely to

7    be the -- an expert, or an expert and another witness or two?

8          MR. FRANK:  Correct.

9          THE COURT:  Depending on what their case is.

10          MR. FRANK:  Correct.  We still don't know who their

11    witnesses are.

12          THE COURT:  Okay.

13          MR. FRANK:  We're now more than a week into trial

14    and we still haven't been able to narrow it from 26.

15          THE COURT:  I suspect we might all three be in the

16    same shoes.

17          Okay.  Well, the reason I ask these questions just

18    like I'm thinking -- having reserved the time with the

19    jurors, thinking about whether we need to use it, but what

20    you're really saying is we reserved -- if I gather it right,

21    we reserve the time, in any event, say, the cross with

22    Pennings goes longer, we have these -- today and tomorrow we

23    have several witnesses from overseas and we need to -- in

24    fairness to them, we need to get their testimony done and

25    over so they can fly out.

1           And after that, the Friday -- Friday, 9:00 to 1:00,

2    Monday 9:00 to 1:00, and Tuesday, 9:00 to 1:00, is more than

3    ample for you to finish your case.

4               MR. FRANK:  That's my expectation.

5               THE COURT:  I mean -- right.

6               MR. FRANK:  But in any event, we're easily on

7    track.

8               THE COURT:  Right.  On pace.

9           And then after that, even if you don't -- if he

10   rests Tuesday at 1 o'clock, that Wednesday, Thursday, Friday,

11   Monday, Tuesday, is more than enough time for you and that

12   still leaves --

13              MR. WEINBERG:  More than enough, Your Honor.

14              THE COURT:  Okay.

15              MR. FRANK:  Well, he might be able to start on

16   Tuesday, actually.

17              THE COURT:  Right.  I'm just saying, if you went

18   longer, worst-case scenario.

19           Okay.  So I won't address it with the jurors.

20   We'll see where we are at 11:00.  I'll give them an update at

21   11:00 and if we release them early, we release them early and

22   then -- there's no -- I guess if we didn't sit today, I'd

23   rather not -- I'd rather not sit -- like if we didn't sit

24   this afternoon, would we definitely not need to sit tomorrow

25   afternoon?

1          MR. FRANK:  Yes, Your Honor.  That's right.

2          THE COURT:  Okay.  Fine, because I don't want to

3     make them, having told them both days, let them go today, and

4     then say oops, tomorrow.

5          MR. FRANK:  As long as we get these two witnesses

6     done today, we can do Mr. McKnight first thing tomorrow and

7     he'll be able to make his flight.

8          THE COURT:  I see.  Okay.  Fine.  All right.  Does

9     that make sense to you, too, Mr. Weinberg, in terms of the

10    amount of cross for those witnesses?

11         MR. WEINBERG:  It does, Your Honor.

12         THE COURT:  Okay.

13         MR. FRANK:  I am serious, Your Honor.  It's now

14    Tuesday of the second week of trial.  They haven't narrowed

15    their witness list, at all.

16         THE COURT:  I think we should talk about that at

17    1 o'clock.

18         MR. FRANK:  Okay.

19         MR. WEINBERG:  Judge, I'm being told by Mr.

20    Goldstein that the cross-exam of one of the two witnesses

21    that Mr. Frank intends to called today after the Pennings

22    cross, you know, might be longer than I had expected.  It

23    might be up to 45 minutes, so we may need this afternoon to

24    give us the assurance of both the witnesses being finished.

25    So I would not -- I would defer telling the jury.

```
 1              THE COURT:  I think what we should do at 11:00, is
 2      discuss who's coming and how long the cross is.  Maybe we
 3      finish Pennings at 11:00.  Maybe -- we'll have a better idea
 4      of where we are at that point.
 5              MR. FRANK:  That sounds reasonable.
 6              THE COURT:  I'm certainly not going to tell them
 7      now that we're not sitting this afternoon.
 8              MR. FRANK:  Okay.
 9              THE COURT:  All right.  Okay.  I think that's
10      everything from me.
11              Anything else for you?  Okay.  All right.  We'll
12      break.
13              Do you have the tape right here?
14              MR. JOHNSTON:  Yes.
15              THE COURT:  Why don't you just play it right now.
16              MR. JOHNSTON:  Do you just want it --
17              THE COURT:  Play the whole thing.  It's not very
18      long, right?
19              MR. JOHNSTON:  No, it's not.
20              THE COURT:  3 minutes and 17 seconds.
21              MR. GOLDSTEIN:  Your Honor --
22              THE COURT:  Do you not want to play it in open
23      court?
24              MR. GOLDSTEIN:  Well, I was going to ask if we can
25      do it at sidebar.  I mean, the nature of the comments have
```

```
1    already been heard, so I think it's fine.
2              MR. FRANK:  Everyone knows what he said, Judge.
3              THE COURT:  It's -- none of the witnesses are here.
4              MR. JOHNSTON:  We're just trying to protect the
5    jury here.
6              THE COURT:  And there's no witnesses in the
7    courtroom?
8              MR. FRANK:  No.
9              THE COURT:  Okay.  Fine.
10             MR. FRANK:  Why isn't it coming out of your
11   speakers?
12             THE DEPUTY CLERK:  I don't know.  Are you plugged
13   in?
14             MS. LEAHY:  With the dock, we've never had this
15   trouble.  Interesting.
16             THE DEPUTY CLERK:  Do you want me to call systems?
17             THE COURT:  I'll tell you what, for the moment, why
18   don't you bring it over for sidebar, because you just play it
19   on the laptop.
20             Got it.
21             (Audio plays.)
22             THE COURT:  So the point of those -- that line and
23   the laughter is what?
24             MR. JOHNSTON:  Shows the comfort that the defendant
25   has with the trader who he's instructing to take a
```

1    significant markup on millions of shares for the NTMA.

2         THE COURT:  I think you should take it out.  I

3    think it's pretty clear.  You have a lot of comfort from the

4    context.  They're back and forth, including all right, pal,

5    fine with me, the way they're talking back and forth.  They

6    seem quite comfortable.  I don't think you need that and I

7    think it just adds, under 403, the balancing of the -- the

8    probative value is limited, especially in the face of the

9    other -- the nature of the conversation and the other things,

10   it doesn't have any particular substantive value other than

11   the comfort.  You have other evidence in the conversation of

12   comfort and there's unfair prejudice.  So on balance, I

13   strike the -- the --

14        MR. JOHNSTON:  Your Honor, can we -- can it be --

15   sounds like a bleep and then we get laughter, because I do

16   think that that is an important part.

17        MR. FRANK:  Well, I just want to make one other

18   point, Your Honor, if I may.  They've heard all of these

19   witnesses using that kind of foul language, the F-word.  I'm

20   not talking about the words that come after it.  It's

21   actually misleading to the jury to suggest that this

22   defendant speaks differently than everyone else they've heard

23   from, including other words they've heard him say, and that

24   he's somehow got a pristine vocabulary.

25        THE COURT:  I don't think it -- I'm not scrubbing

1    transcripts so that the defendant sounds like a choir boy,

2    but the particular phrase here is different than just using

3    the F-word and it's of a different caliber than just

4    language.  And it's of something different, that has no

5    relevance to the case.  And to say just delete the last

6    two words, it only invites people to speculate as to what he

7    said, because nobody would -- it doesn't make sense why the

8    laughter comes without it.

9            And the reason you want, which I understand and is

10   a reasonable reason to want to put it in, it seems pretty

11   clear, when I listen to the tone that, to me, they seem

12   comfortable with each other, especially at the end.  And so

13   I'm not -- I think -- I can't recall at the moment whether

14   they've heard other tapes or Mr. McLellan has used language

15   like that.  But if they haven't, it's not because I don't

16   think I've struck it all and I'm not striking it for that

17   reason.  If you just use that word, it doesn't -- I wouldn't

18   see any particular reason to strike it.  It's just that

19   context.

20           MR. JOHNSTON:  So just to be clear, what is the

21   Court ordering to be struck?

22           THE COURT:  Line 9 and 10.

23           MR. JOHNSTON:  So no laughter can appear on the

24   tape?

25           THE COURT:  Why can't they have the laughter

1    without line 9.

2              MR. JOHNSTON:  That's fine.  We can keep the

3    laughter in and they just won't hear "sounds like" --

4              MR. GOLDSTEIN:  If that's the balance the Court

5    wants to strike is fine.  I think the laughter is irrelevant

6    without the comment, but if you want to keep it in there,

7    then --

8              THE COURT:  Yeah, strike line 9.  I don't have a

9    problem with the laughter.  There's nothing unfair about the

10   laughter, and to the extent it shows they're comfortable with

11   each other, because they're laughing, that's fine.

12             Okay.  So just line 9.

13             All right.  Maria, did the knock mean they're all

14   here?

15             THE DEPUTY CLERK:   (Nods head.)

16             THE COURT:  All right.  Go get them.

17             Oh, go get the witness first.

18             MR. WEINBERG:  And does Your Honor mind if I walk

19   around --

20             THE COURT:  No.  Go right ahead.

21             Is it true, Mr. Frank, that the only witnesses not

22   at your beck and call are beck and Paul?

23             MR. FRANK:  No, Your Honor, as I've actually made

24   clear, there was a witness in London, Samina Vernon --

25             THE COURT:  It's just a joke.

1          MR. FRANK:  But it's actually --

2          THE COURT:  No, it's just a pun.

3          MR. FRANK:  Oh, beck and Paul.

4          THE COURT:  Yes.

5          MR. FRANK:  I got that.  Thank you.  That is funny.

6          (The jury enters the courtroom.)

7          THE COURT:  Good morning, ladies and gentlemen.

8    Nobody discussed the case with anyone, among yourselves, or

9    otherwise?  No one did any independent research?

10         Good.  All right.  We resume.  Mr. Pennings, I

11   remind you you remain under oath.

12         Go ahead, Mr. Weinberg, you may continue with your

13   cross-examination.

14         MR. WEINBERG:  Thank you very much, Your Honor.

15                        **EDWARD PENNINGS**

16     having been previously duly sworn, testified as follows:

17       **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT, Cont.**

18   BY MR. WEINBERG:

19   **Q.**  Mr. Pennings, I want to direct your attention, first, to

20   your first statement made on April 11, 2013, to the City of

21   London Police.  Do you recall a handwritten statement made to

22   the City of London Police?

23   **A.**  I recall my lawyer writing something there, yes.

24   **Q.**  And do you recall signing that statement, Mr. Pennings?

25   **A.**  Yes.

1    **Q.**  Do you recall saying to the City of London Police, "I

2    categorically deny any offense of fraud by abuse of position

3    or conspiracy to defraud"?

4    **A.**  I may have -- if it's not in front of me, I don't know

5    the exact words, but something along those lines.

6    **Q.**  I'm going to put it on a screen just for you, so I can

7    ask you whether or not the words that you read refresh your

8    recollection as to what you said to the City of London

9    Police.

10             Paragraph 1?

11   **A.**  That I recognize, yes.

12             THE COURT:  Just read it to yourself and then he'll

13   ask you another question.

14   BY MR. WEINBERG:

15   **Q.**  And do you now recall saying to the City of London

16   Police, in a prepared statement in 2013, "I categorically

17   deny any offense of fraud by abuse of position or conspiracy

18   to defraud"?

19   **A.**  I did sign that, yes.

20   **Q.**  Do you also agree that you said to the City of London

21   Police in 2013, quote, "The manner in which trades were

22   executed on behalf of Royal Mail Pension trustees, I believed

23   at all times was within the terms of the contract between

24   State Street and Royal Mail"?

25   **A.**  That's part of the same notes, so, yes.

1    **Q.**  Are those words that you used in the same prepared

2    statement to the City of London Police?

3    **A.**  It's the words that my lawyer wrote and I signed off on,

4    yes.

5    **Q.**  You adopted those words by signing them, is that correct,

6    Mr. Pennings?

7    **A.**  That's fair to say.

8    **Q.**  You knew this was being presented to the City of London

9    Police?

10   **A.**  That's correct.

11   **Q.**  And you knew the City of London Police was conducting an

12   investigation?

13   **A.**  I was just brought into the police, so, yes.

14   **Q.**  Third, "The manner in which such trades were executed was

15   authorized by State Street management."

16          Do you recall adopting those words that were

17   written by your lawyers?

18   **A.**  Yes.

19   **Q.**  And do you also recall, "The manner in which such trades

20   were executed, I believe, was consistent with normal industry

21   practice."

22          Are those words that were written by your lawyer

23   that you adopted by signing this statement?

24   **A.**  Yes.

25   **Q.**  Did you make a second statement to the City of London

1    Police?

2    **A.**   My lawyer made -- we did put in a written submission,

3    yes.

4    **Q.**   And that was about seven months, eight months later on

5    January of 2014?

6    **A.**   I don't know the exact date.

7    **Q.**   Okay.  Well, let me show you page 1 of that and ask you

8    to see -- the first paragraph dates back to the handwritten

9    statement of April 11, 2013?

10   **A.**   This screen is really blurry.  I don't know.

11           THE COURT:  We'll see if we can fix that.

12           THE WITNESS:  It's -- oh, better.

13   BY MR. WEINBERG:

14   **Q.**   I'm going to be directing your attention to paragraphs 5

15   through 8.  So perhaps we can make them easier to see.

16           Can you see them now?

17   **A.**   Yes.

18   **Q.**   Did you --

19           THE COURT:  Do you want him just to read them over

20   first, or do you want to ask him?

21           MR. WEINBERG:  I can go one paragraph at a time --

22           MR. FRANK:  I object to the reading, Your Honor.

23   He can ask the witness whether he remembers saying something,

24   but he's not permitted to read from a document.

25   BY MR. WEINBERG:

1    **Q.**  Do you remember saying the following --

2         THE COURT:  Well, I don't know -- I think it just

3    depends on the question.  So I'll take it question by

4    question.

5         MR. WEINBERG:  I'll frame it to combine both.

6    BY MR. WEINBERG:

7    **Q.**  Do you recall, Mr. Pennings, on January 31, 2014,

8    submitting a typewritten statement that was prepared by your

9    lawyers on your behalf to the City of London Police?

10   **A.**  They submitted a statement, yes.

11   **Q.**  And that indicated, did it not, that the City of London

12   Police had not ended their investigation between April 2013,

13   and the date of this statement, January 2014, correct?

14   **A.**  It was still ongoing, yes.

15   **Q.**  And in that statement, you and your lawyers were making

16   representations to the City of London Police that you wanted

17   them to rely on and believe; is that correct?

18   **A.**  I wanted them to drop the investigation, yes.

19   **Q.**  And you wanted them to drop the investigation, in part,

20   relying on your submissions, your statements to them,

21   correct?

22   **A.**  I'll take that -- well, I didn't think of it like that,

23   but that's fair to say.

24   **Q.**  The fact, is it not, that one of the reasons that you

25   submitted this statement was to persuade the City of London

1  Police that you were innocent, correct?

2  **A.**  It was my defense.  Yes, I kept using the same story,

3  yes.

4  **Q.**  And your lawyers prepared these things for you, correct?

5  **A.**  They did, yes.

6  **Q.**  And they relied on what you told them to prepare these

7  statements --

8           MR. FRANK:  Objection to what his lawyers relied

9  on, Your Honor.

10           THE COURT:  Overruled.

11  BY MR. WEINBERG:

12  **Q.**  Do you understand that your lawyers were relying on what

13  you told them?

14  **A.**  My lawyers had -- the facts that we had at the time,

15  which wasn't everything.  And a lot of it was from memory, as

16  well.  So, yeah, the story was spun the way we had been

17  saying it for a number of years at the time.

18  **Q.**  Did your lawyers know that you were spinning a false

19  story?

20           MR. FRANK:  Objection to privilege, Your Honor.

21           THE COURT:  Sustained as to that.

22  BY MR. WEINBERG:

23  **Q.**  Did you understand that your lawyers understood that you

24  were spinning a story, rather than telling a truth?

25           MR. FRANK:  Objection.  Privilege, Your Honor.

1              MR. WEINBERG:  It's a disclosure --

2              THE COURT:  Overruled.  That's definitely --

3              THE WITNESS:  It was my belief that the lawyer

4      understood what happened and they were acting in my best

5      interest.  This was designed to, you know, again, defend

6      myself.

7      BY MR. WEINBERG:

8      Q.  Is it your understanding that your lawyers presented

9      false statements to the City of London Police on your

10     defense?

11     A.  It was a false statement, so they may not have -- I don't

12     know what their thinking was.  I don't know how lawyers

13     think, to be honest.

14     Q.  You spoke to them and they were relying, at least in

15     part, on what you told them, correct, Mr. Pennings?

16     A.  I would assume they would rely on what I said, yes.

17     Q.  Is there anything in these statements that is

18     inconsistent with what you told them?

19             MR. FRANK:  Your Honor, I'm not sure where he's

20     going with this, but I object to the attempt to use the

21     attorney's advocacy in some misleading way and we can discuss

22     it at sidebar, if Mr. Weinberg --

23             MR. WEINBERG:  I would like to, because I think

24     this falls into an exception of the privilege.

25             THE COURT:  All right.

1          (The following discussion held at the bench.)

2          MR. WEINBERG:  It's a crime of fraud.  He just said

3    that his lawyers presented the fraudulent statement to the

4    City of London Police.  And whether his lawyers knew it or

5    not, the crime fraud exception is when a lawyer is being used

6    by a client to facilitate a fraud.

7          MR. FRANK:  Whether the lawyers committed a crime

8    here is not an issue.  The defendant has admitted that he

9    lied.  He has admitted that he told the lawyers a story and

10   that the lawyers advocated on his behalf and the lawyers may

11   or may not have been complicit in it, but the lawyers are not

12   on trial.

13         THE COURT:  No, the lawyers is not on trial.  But

14   if he told the lawyers --

15         MR. FRANK:  What he told the lawyers is privileged,

16   Your Honor.

17         THE COURT:  Well, but not if he used them to

18   perpetrate a crime.  Then the crime fraud exception would

19   apply, right?

20         MR. FRANK:  But we shouldn't be delving into it.

21         MR. JOHNSTON:  He objected to even going into this

22   line of questioning to begin with.

23         MR. WEINBERG:  Do two prosecutors need to argue one

24   legal issue?

25         MR. FRANK:  You have two defense lawyers here.

```
1                    MR. WEINBERG:  And Mr. Goldstein has restrained him
2       very carefully.
3                    MR. FRANK:  Mr. Goldstein has been speaking loudly
4       and audibly that the jury can hear him throughout your
5       cross-examination.
6                    MR. WEINBERG:  I thought he's been thinking
7       positively about --
8                    THE COURT:  All right.  So a couple things.  First,
9       all of you, relax a little bit.  One, okay -- one lawyer in
10      front of the jury standing up for objections, at sidebar,
11      it's different, as a general matter, I don't mind.  I don't
12      think Mr. Johnston is out of order by making a comment.  I
13      haven't heard Mr. Goldstein making comments audibly.  If he
14      has -- if anybody's making comments audibly, they're
15      appropriate -- that I'm not responding to, that if you think
16      it's improper, you need to bring it to my attention.
17                   MR. FRANK:  It just happened.
18                   THE COURT:  All right, because I haven't heard it.
19      I didn't hear it then.  And it would be consistent with my
20      general understanding.  So as a general matter, I get it,
21      that things get a little heated, but my suggestion, as a
22      general matter is you focus on each issue at hand, rather
23      than tying to prior issues that people have done, or what
24      have you.  Someone made a prior speaking objection or not.
25                   So as to the issue at hand --
```

1          MR. FRANK:  If I can just articulate, Your Honor.

2     First of all, the witness has an attorney in the room.  It's

3     not the attorney from that time.  So if the witness needs to

4     be counselled about his privilege, I would ask that he be

5     given an opportunity to do that.

6          Number two, I objected to the very initial

7     questions about what you said to your lawyer.  There is no

8     reason to go into that and there's no --

9          THE COURT:  What is the purpose, aside from the

10    crime of fraud exception?

11         MR. WEINBERG:  The purpose, Judge, is that the

12    witness is depicting the statements as false.  I don't

13    necessarily agree with that, but that's what he said.

14         THE COURT:  Right.

15         MR. WEINBERG:  He then says his lawyers prepared

16    those, even though he ends up signing them.  So he's trying

17    to slide away from those being his statements.

18         MR. FRANK:  No, he's not.

19         MR. WEINBERG:  Steve, let me finish.

20         THE COURT:  Let him finish.

21         MR. WEINBERG:  But the principal thing is, that if

22    he lied to his lawyers and then adopted those lies, that's a

23    different level of falsity.  It's whether it's 608(b), or

24    whether it's part of the inconsistency.  He is essentially

25    saying that my lawyer's prepared statements on my behalf,

1     based -- that I want him to admit, based on his -- what he

2     now says are lies to his lawyers, which is a different --

3     it's another lie.  It's lies to the tribunal, it's lies to

4     the police.

5          THE COURT:  Here's the line, I think.  You can --

6     you can impeach him on a fact, or you can elicit the fact

7     that this statement is here, although written out in the

8     sense of written out by the lawyers, are based on

9     communications with him.  I think that's fair.  I don't think

10    that goes into any unfair privilege.  It's, in for

11    substance -- I mean, obvious there's no way that the lawyer

12    could have written the statement without talking to him.  So

13    I think you can get that.

14          I think that, like, getting into those particular

15    communications with the lawyer is different.  And the only

16    reason why crime fraud exception issue here, it seems to me,

17    that I think you can cross him on the statements -- you can

18    tie him to the statements that the statements were prepared

19    by the lawyers based on their communications without getting

20    into -- without going over all the particulars of their

21    communications.

22          MR. WEINBERG:  Just intending to get him to say

23    that he lied to his lawyers?

24          MR. FRANK:  No, that's not the issue, Your Honor.

25          MR. WEINBERG:  He did.

1              MR. FRANK:  We don't know it.  The lawyers are not

2     here and whether he lied to his lawyers is irrelevant.  The

3     statement is a lie.  He's admitting that.  He signed the

4     statement and adopted that.  He's admitted that.  He's

5     admitted he's had communications with the lawyer, but the

6     substance of the communications with his lawyer are

7     privileged and that should not be delved into.

8              THE COURT:  But he lied to his lawyer in order to

9     perpetrate -- is the statement under oath?

10             MR. WEINBERG:  No, it's signed by him, not under

11    oath.

12             THE COURT:  Or obstruction -- we can go to the laws

13    of Great Britain, but if he lied to the lawyers or got his

14    lawyers to file something with the City of London, why

15    wouldn't the fraud exception apply?

16             MR. FRANK:  Because first of all, it's under

17    British law.  Second of all, I don't know what the parameters

18    are.  I don't know what the parameters of the attorney-client

19    relationship in Britain.  So all of those issues that should

20    have been briefed in advance -- what he's got is the witness

21    saying over and over and over and over again, I like --

22             THE COURT:  Why don't you do it this way:  You can

23    get he lied in his statement, you told the lawyers that --

24    they prepared this statement, based upon what you told them.

25    Okay.  And you told them these things.

1          MR. FRANK:  That's the same thing, Your Honor.

2    That's getting into the substance of this communications with

3    his lawyers.

4          MR. WEINBERG:  It amazes me that, given the

5    arguments that I've heard from the United States Attorney's

6    Office, and the crime fraud exception, that Mr. Frank doesn't

7    think this is a paradigm.

8          THE COURT:  But the question is what is the

9    interpretation of the law, whether it be British privilege

10   and British law, none of which at the moment any of us know.

11         MR. WEINBERG:  I can't represent that I know the

12   scope of the exceptions in the British --

13         MR. FRANK:  I'll represent that I know them, but

14   that may not be true.

15         MR. GOLDSTEIN:  That's the second thing he said,

16   because I want to respond to another thing.  I categorically

17   did not make any statements in front of the jury, number one.

18   Number two, the only reason we're having this debate is

19   because the witness opened the door in his conversations by

20   answering Mr. Weinberg's question, rather than saying, yes,

21   these are my prior statements.  He's continuing to try to

22   blame his lawyer for the prior statements.

23         MR. FRANK:  No, he's not.  He's unquestionably

24   adopted those statements repeatedly.  He simply testified

25   factually that the handwriting on the document was his

1    lawyer's handwriting.  They wrote the same --

2              MR. GOLDSTEIN:  That's Mr. Frank's version.

3              MR. FRANK:  That's what he said and he also said

4    that these statements were typed by his lawyer, that's also

5    unquestionably true.  The actually -- but -- you have said --

6    and he responded to your question that you adopted

7    statements, yes, which frankly, I should have objected to,

8    because the adoption is a legal term of art that he's not

9    familiar with.  He's sitting up there uncounseled.

10             THE COURT:  He's not uncounseled.  He's got a

11   lawyer in the courtroom.

12             MR. FRANK:  But he doesn't -- Your Honor.

13             THE COURT:  That lawyer wasn't born yesterday.  I

14   mean, I don't know who he is, but he's a lawyer at some big

15   firm.

16             MR. FRANK:  He's a former EDNY prosecutor, Judge.

17   His integrity is unimpeachable.

18             THE COURT:  There you go.  So he's not a potted

19   plant.  He wouldn't be afraid to stand up.  He knows how to

20   ask to be heard.

21             MR. WEINBERG:  Former Department of Justice public

22   integrity prosecutor.

23             THE COURT:  The jury doesn't think the word

24   "adopted" is a legal term.  They understand -- the way I

25   understood the question, the way I think they understood it,

1    is did you sign these, did you make these your own.

2           MR. FRANK:  Your Honor, here's what we don't object

3    to.  Did you speak with your lawyers, did your lawyers

4    prepare the statement?  Did you sign the statement?  Did you

5    adopt the statement?  Did you represent it to the City of

6    London Police to be true?  All of those things are

7    completely -- you know.

8           THE COURT:  This is cooperation agreement, did you

9    waive the privilege?

10          MR. FRANK:  No.

11          MR. GOLDSTEIN:  Why did you lie to your lawyers?

12          MR. FRANK:  No, he cannot ask him that, because you

13   can't respect what British law is with respect to that.  For

14   example, I know that in Dutch law you can --

15          MR. GOLDSTEIN:  Steven, it's an act of dishonesty,

16   it's completely admissible in 608(b), specific to his

17   conduct.  Lying to a lawyer is an act of dishonesty.

18          MR. FRANK:  Lying to a lawyer may be privileged and

19   you can't represent otherwise.  For example, lying to a

20   prosecutor is not a crime --

21          MR. GOLDSTEIN:  Federal rules of evidence control

22   here.

23          THE COURT:  Stop, stop.  You know what, both of

24   you, I'm the person deciding.  It doesn't help talking over

25   the judge.

1          MR. FRANK:  The other point, Your Honor, is it's

2    cumulative.  He's admitted the same statements to be lies

3    over and over and over again.  Whether the lawyer is the

4    recipient of it or not --

5          MR. WEINBERG:  It's an amazing objection, given the

6    length and duplication of your direct exams.

7          THE COURT:  What do you want to ask him?

8          MR. WEINBERG:  I want to ask him whether or not the

9    statements -- the statements made to his lawyers -- let me

10   rephrase that.  What I want to do is get him say that

11   statements that he signed were untrue.  They were authored by

12   his lawyers -- they were authored based, at least in

13   substantial part, on what he said to his lawyers and when

14   he -- reviewing the statements and in any way change them --

15         THE COURT:  You can ask him if he reviewed the

16   statements, you can ask him if the statement was a lie, you

17   can ask him if it was prepared after he met with his lawyers.

18   You can ask him if he told the lawyers after he reviewed it,

19   that this was a lie.

20         MR. FRANK:  Well, that I will object to.  If it's

21   based on communications with his lawyers, that's one thing.

22   He then signed it, that's another thing, but again, what he

23   told his lawyers about the statement, unless counsel is

24   prepared to represent that somehow there's a crime fraud

25   exception under British law.

1          MR. WEINBERG:  He's in a United States courtroom,

2     subject to rules of evidence by 608(b).

3          THE COURT:  You can ask him if he signed the thing,

4     because the point is that he signed it and you can ask him if

5     before --

6          MR. FRANK:  We wouldn't object to him being asked,

7     did you protest the statement.

8          THE COURT:  Yes, you can ask him things like that,

9     because otherwise, it's unfair.  So you can certainly ask him

10    that.  That gives you what you want.

11         MR. WEINBERG:  Good enough.  Not everything,

12    though.

13         (Bench conference concluded.)

14         THE COURT:  So just so you understand, ladies and

15    gentlemen of the jury, there are -- the issue that I've been

16    discussing with the lawyers and what relates here is -- our

17    question -- you've probably heard something called the

18    attorney-client privilege.  And so we're just talking about

19    what the lines are, what the nature of that privilege is,

20    with respect to various questions that have been or will be

21    asked, in terms of what would be admissible, because you're

22    entitled -- what's privileged -- what's --

23         Privileged communications are communications you

24    don't have to reveal.  And so certain kinds of conversations

25    between you and your lawyer are privileged.  Not every

1    conversation between you and a lawyer is privileged.  And so

2    we're talking about -- we were talking about that.  That's

3    what it is.  I think we've resolved it, both with the

4    Pennings question, and that so maybe we've resolved it as to

5    the going-forward questions as well, so we don't have to take

6    another sidebar.

7            Go ahead.

8            MR. WEINBERG:  Thank you, Your Honor.

9    BY MR. WEINBERG:

10   **Q.**  To bring us back to where we were, Mr. Pennings, this

11   prepared statement was signed by you, was it not?

12   **A.**  I believe so, yes.

13   **Q.**  And it was presented by you?

14   **A.**  I'm not certain.  Is it signed by me?  Yes, it is.

15   **Q.**  And you understood at the time that it was to be

16   presented to the City of London Police, in an effort to

17   convince them to drop their investigation of you?

18   **A.**  Yes, as a defense document, yes.

19   **Q.**  And let's go to paragraph 6 of page 1 of the statement.

20           Do you recall signing a statement prepared by your

21   lawyers, which said to the City of London Police,

22   quote, "Without limitation, I deny that any State Street

23   client, which is the subject of this investigation, was

24   overcharged" ?

25   **A.**  That's part of the statement.

1    **Q.**   You read the statement before signing it?

2    **A.**   Yes.

3    **Q.**   Didn't tell your lawyers to change paragraph 6, did you?

4    **A.**   No, I did not.

5    **Q.**   Understood paragraph 6, written by your lawyers, was

6    written in part based on what you had disclosed to them?

7    **A.**   Fair to say.

8    **Q.**   Paragraph 7, does it refresh your recollection that

9    included in this statement written by your lawyers, signed by

10   you, and presented to the City of London Police in 2014 are

11   the following, "I have always accepted that undisclosed

12   revenues were earned by State Street affiliates in relation

13   to transactions undertaken on behalf of certain clients"?

14   Are those your words?

15   **A.**   That's part of the statement, as well, yes.

16   **Q.**   "However, at all times I acted in the belief and

17   understanding that the contracts with such clients and

18   relevant regulations permitted State Street to take

19   undisclosed revenues."

20           Was that the words of a statement written by your

21   lawyer and presented on your behalf to the City of London

22   Police?

23   **A.**   That's part of the statement.  And I think, you know, the

24   spin here, the lie is, essentially --

25   **Q.**   Mr. Pennings, answer my --

1          MR. FRANK:  I would ask that the witness be

2     permitted to finish his answer.

3          THE COURT:  The question is simply, is that the

4     statement that was submitted.

5          MR. FRANK:  Well, the witness started to answer

6     further.  Mr. Weinberg did not object, but then when he saw

7     where the witness was going, he objected.

8          THE COURT:  So we're not going to have speaking

9     objections.  The question is just yes/no -- as I understand

10    the question.

11         THE WITNESS:  It's part of the statement.

12    BY MR. WEINBERG:

13    Q.  And is part of the statement in the conclusion of that

14    paragraph, Mr. Pennings, "Further, the position was known

15    about and authorized by those in senior positions, plural,

16    within State Street."

17         Yes or no?

18    A.  That's also part of the statement.

19    Q.  Was it also part of the statement, in paragraph 8, "I

20    have submitted detailed information to the employment

21    tribunal, also to the FCA, in relation to the matters which

22    underlie this investigation.  And if necessary, it would be

23    my intention to rely on those submissions."

24    A.  Again, it's the same statement, but I'll happily explain

25    the context of it.

1    **Q.**  I want you to --

2          MR. WEINBERG:  Can we turn to the next page,

3    please.

4    BY MR. WEINBERG:

5    **Q.**  I want you to look at paragraph 15 and tell me whether

6    it -- these words were part of the statement that you signed

7    and submitted to the City of London Police.

8          "While State Street affiliates earned revenues from

9    certain clients, which were not disclosed, my belief is that

10   if one analyzes the transactions, they will all demonstrate

11   that clear value and savings were provided to the clients and

12   that the total implementation shortfall, which is the

13   standard industry benchmark for measuring transition costs,

14   came in at or below client expectations."

15         Was that part of your submission to the City of

16   London Police?

17   **A.**  It's part of the submission and it's true.

18   **Q.**  Paragraph 16, was it part of this submission, quote, "The

19   practice of charging a portfolio management fee with

20   undisclosed revenues then being generated by trading

21   affiliates was, I believe, common industry practice.  It was

22   adopted by State Street in response to similar practices by

23   our competitors, in order that we could compete with them."

24         Was that part of the statement submitted on your

25   behalf to the City of London Police?

**A.**   Yes.

**Q.**   Was it also part of the statement, "My recollection is the practice of earning undisclosed revenues was widely discussed in the industry"?

**A.**   Yes.

**Q.**   "And without limitation, I understood that similar practices were used by other banks, including Citigroup, Nomura, Bank of New York, Goldman Sachs, Credit Suisse, and Morgan Stanley."

**A.**   I believed that they also used undisclosed revenues, yes.

**Q.**   "My belief in that regard came from talking to people within the financial services sector, some of whom had worked at these institutions who were later hired by State Street. It was also my belief that investment consultants, including those who were retained in relation to transactions relevant to this investigation also knew undisclosed revenues to be part of the industry."

**A.**   That's part of the statement, yes.

**Q.**   Turning to the next page, paragraph 19.  Do you recall representing to the City of London Police, in 2014 in this statement, quote, "Without limitation, I understood that the following were aware of the charging structure employed in relation to some, if not all, of the deals now under investigation."

          And you then listed a series of people, correct?

1    **A.**   It's part of the statement, correct.

2    **Q.**   Ross was one, correct?

3    **A.**   Yes.

4    **Q.**   Paul McGee was second?

5    **A.**   Yes.

6    **Q.**   Ian Holden, your head of trading, was third?

7    **A.**   Yes.

8    **Q.**   Rick Boomgaardt was fourth?

9    **A.**   Yes.

10   **Q.**   Steve Smit, who was the head of the SS -- the State

11   Street Global Markets in London was fifth?

12   **A.**   Yes, I don't know the extent of his knowledge, but I

13   mentioned him, yes.

14   **Q.**   Well, you said, it listed him, quote, "Without

15   limitation, I understood that the following were aware of the

16   charging structure employed in relation to some, if not all,

17   of the deals now under investigation."

18            He is one of the persons you identified as knowing

19   about a charging structure that included nondisclosed

20   revenues, correct?

21   **A.**   It's part of the statement.

22   **Q.**   Were you lying about Mr. Smit?

23   **A.**   I don't know.  I don't know what he knows.  He may have

24   been on an e-mail, so I don't know.  I just took that as he

25   knows and I'm not sure if that's correct or not.

1    **Q.**  Well, when your written statement was submitted to the

2    City of London Police, you didn't have any indecision.  You

3    said he knew.

4    **A.**  I know, but I've also said that I wasn't truthful.

5    **Q.**  So you were not truthful about accusing Mr. Smit, to the

6    City of London Police, as being one of the people that knew

7    of this charging structure of nondisclosed revenues?

8    **A.**  What I'm saying is that I am not 100 percent sure if he

9    knew, or if he did not know.

10    **Q.**  But you said here --

11    **A.**  I said it.  I know that.  I wasn't overly truthful in the

12    statement.  Okay.  But I am now saying that I am not

13    100 percent certain if he knew or not.  He may have been on

14    an e-mail, he may have read it, he may not have read it.  I

15    don't know, but he could have known.

16    **Q.**  You didn't hesitate to identify him as a person that knew

17    it and --

18    **A.**  No, because it helped me at the time.  I thought it

19    helped me at the time and I was defending myself.

20    **Q.**  So you were prepared, when it helped you, to identify

21    people to the City of London Police, correct?

22    **A.**  I don't know.  I think I've answered the question.  I

23    haven't been truthful in the statement.

24    **Q.**  Stuart Glenister, did he know?

25    **A.**  I believe he may.  He was in some of the meetings.

1   **Q.**  Certainly knew?

2   **A.**  It was a long time ago.  I think he probably did.  He

3   wasn't necessarily involved in it, but he was in some of the

4   meetings.

5   **Q.**  But you named him as someone who knew to the City of

6   London Police?

7   **A.**  I did, yes.

8   **Q.**  Chris Carlin, did you name him as somebody that knew

9   about undisclosed revenues to the City of London Police?

10  **A.**  He was part of the statement, yes.

11  **Q.**  Are you certain he knew at the time you wrote the

12  statement?

13  **A.**  Certain.  I think he was involved in rebating, so I'm

14  assuming that, you know --

15  **Q.**  Thomas Bryant?

16  **A.**  He was the trader and he was --

17  **Q.**  Did he know of undisclosed revenue?

18  **A.**  I think you're going to have to ask Thomas Bryant.  It

19  was my thinking, if you're on the KIA e-mail trail, that

20  you're aware, but I can't say that for 100 percent certain.

21  **Q.**  Did you have any -- when you named Mr. Bryant, in a

22  statement to the City of London Police, you told the City of

23  London Police Mr. Bryant knew of undisclosed revenues,

24  correct?

25  **A.**  From my conversation with -- well, not my conversation.

1  From the way we were trading in the US, on these particular

2  deals, I have inferred that he would have known.

3  **Q.**  Rod Ringrow, you named him?

4  **A.**  He did know about the KIA, yes.

5  **Q.**  Evan Bernsten.  Did he know of undisclosed revenues that

6  were being made by the State Street Global Markets?

7  **A.**  He was trying to railroad the KIA deal, so I'm assuming

8  he knew.

9  **Q.**  David Puth, did he know?

10  **A.**  Ross told me that he had a conversation with him.

11  **Q.**  So you named a series of 10 or 11 people here who you say

12  knew that there was undisclosed revenues, correct?

13  **A.**  Yes.  But --

14  **Q.**  Some you're sure of, some you are unsure of, correct?

15  **A.**  Undisclosed revenue is different from lying to clients.

16  **Q.**  Your statement is, "I understood the following were aware

17  of the charging structure employed in relation to some, if

18  not all, of these deals," correct?  That's your language.

19  **A.**  That's correct.  Yes.

20  **Q.**  Let's go to paragraph 20.  Did you tell the City of

21  London Police the following:

22          "Further, and without limitation, I believe that

23  the following people from compliance and legal in both Boston

24  and London were also aware of the position, not least the KIA

25  deal and its structure."

1          And that you then list a series of lawyers and

2    compliance people to the City of London Police?

3    **A.**   That's part of the statement, yes.

4    **Q.**   Justine McCormack.  Did you ever have conversation with

5    Attorney McCormack?

6    **A.**   I can make this a shorter answer.  These people were on

7    the e-mail trail for the KIA, so that's why we put that in

8    there.  But I don't know what they read, what they haven't

9    read, you know.  So they may or may not know, but I can't say

10   that for certain.

11   **Q.**   But this representation was that they were aware; is that

12   correct?

13   **A.**   Okay.  I also said already that I wasn't 100 percent

14   truthful there.

15        MR. FRANK:  Objection, Your Honor.  He read part of

16   the statement, but not all of it.

17        THE COURT:  He read all of it before.  Overruled.

18   BY MR. WEINBERG:

19   **Q.**   Paragraph 22.  Do you recall writing to the City of

20   London Police, "My recollection is that the position was also

21   discussed at a TMA update meeting organized by legal and

22   attended by State Street's external counsel, Herbert Smith,

23   in April 2011"?

24   **A.**   I'm just reading it.

25   **Q.**   Sure.

1    **A.**   Okay.  It's part of my statement, but again, I said the

2    statement wasn't truthful and I believe I -- yesterday, I

3    referred to or further explained my meeting in April of 2011

4    and what happened there.

5    **Q.**   And there were five or six lawyers at that meeting,

6    correct?

7    **A.**   That's about right, yeah.

8    **Q.**   And not one of them told you, Mr. Pennings, that we

9    needed to eliminate from our template the provision that says

10   that State Street is under no obligation, no duty to disclose

11   revenues made by our broker-dealer affiliate, correct?

12   **A.**   Um --

13   **Q.**   Yes or no?

14   **A.**   It is correct, but I also did not know that we were lying

15   to clients.

16   **Q.**   I understand, Mr. Pennings.  So let me focus you on this

17   question.

18   **A.**   Correct.

19   **Q.**   Did any of those lawyers challenge you, in any respect,

20   on April 2011, regarding what you told them was your need to

21   keep in the contract the no duty to disclose provision?

22   **A.**   They did not object, no.

23   **Q.**   Okay.  And the no duty to disclose provision of a

24   contract is irrelevant when the bank discloses its revenues,

25   correct?

 1              MR. FRANK:  Objection to what's relevant under

 2     contract, Your Honor.  If he wants to ask him his

 3     understanding.

 4              THE COURT:  I guess relevant to what?

 5              MR. WEINBERG:  It's not relevant to a --

 6     BY MR. WEINBERG:

 7     Q.  Am I correct --

 8              MR. WEINBERG:  I'll ask it through the next

 9     question, Judge, rather than --

10     BY MR. WEINBERG:

11     Q.  There's a no duty to disclose provision that's in both

12     the Royal Mail contract and the template, correct?

13     A.  There is one, yes.

14     Q.  And that authorizes the bank not to be required to

15     disclose revenues made by an affiliate, correct?

16     A.  Well, I'm not a lawyer or anywhere legally qualified, but

17     it's my belief that, just as a standalone contract, that you

18     don't need to disclose any of the clauses in there, I

19     suppose, as long as there's no other statement made to the

20     contrary.

21     Q.  Of course, if the revenues were all disclosed, the bank

22     wouldn't need a no duty to disclose clause in its contracts,

23     correct?

24     A.  Again, I'm not a lawyer, but it makes sense.

25     Q.  Okay.  Let me go to the employment tribunal.  Like the

1    City of London Police, you work with lawyers to present to

2    the employment tribunal a lengthy written statement on your

3    behalf, correct?

4    **A.**   Correct.

5    **Q.**   And like the statements to the City of London Police,

6    although they typed it and they wrote it, you read it and

7    adopted and approved it, and knew it was going to be

8    presented to a tribunal, correct?

9    **A.**   I did, yes.

10   **Q.**   And you knew that that tribunal was like a judge, like a

11   court.  It was going to decide on issues that were important

12   to you?

13   **A.**   It was an employment tribunal, yes.

14   **Q.**   And your goal in presenting this 98-page, written

15   statement was to persuade the tribunal of the truth of those

16   statements, correct?

17   **A.**   It was to persuade them to side with me to get my job

18   back and the money that was taken.

19   **Q.**   And your testimony was, if I recall it correctly at the

20   end of direct, that you were untruthful in significant parts

21   of that 98-page statement, correct?

22   **A.**   I made untruthful statements, yes.

23   **Q.**   And you made them purposefully for the -- with the

24   intention of persuading the employment tribunal to take your

25   side, rather than State Street's?

1    **A.**  Yes, I lied.

2    **Q.**  And you not only lied in writing, you also went to the

3    employment tribunal, raised your right hand, took an oath to

4    tell the truth, lied?

5    **A.**  It's the same thing.  The submission was also -- I don't

6    know how you called it, but I lied.  I'm not proud of it.

7    It's -- it's something that I did and I have to live with.

8    **Q.**  It's something you did to try to increase the chances of

9    you preserving your job, correct?

10   **A.**  Yes.

11   **Q.**  It's something you did because it was your, Ed Pennings',

12   self-interest to do it, correct?

13   **A.**  Yes.

14   **Q.**  And when you signed this statement, you told the

15   employment tribunal that you were being treated like a

16   scapegoat.  Do you recall that?

17   **A.**  I recall that, yes.

18   **Q.**  And there was a witch hunt to get you.

19   **A.**  Well, I felt like I was singled out and treated

20   differently from others who did the same, yes.

21   **Q.**  And you said repeatedly in that 98 pages that you broke

22   no contract and, therefore, you broke no regulation, and that

23   your job should be preserved, correct?

24   **A.**  I don't know if I said that repeatedly, but again, I

25   wasn't truthful and I misled clients.

1   **Q.**  Let's look at some of the things that you wrote with the

2   intention of having your writings believed.  Okay?

3   **A.**  I'm sorry, what believed?

4        THE COURT:  That's not really a question,

5   Mr. Weinberg.

6        THE WITNESS:  I didn't hear what you were saying.

7        THE COURT:  There's no question pending,

8   Mr. Pennings.  You don't have to -- he's turning to something

9   else and then he'll ask you a question.

10       MR. WEINBERG:  Go to paragraph 316, if you can

11  navigate through that.  Got it?

12  BY MR. WEINBERG:

13  **Q.**  Well, let me ask you this, Mr. Pennings, and I can bring

14  you the hard copy.  It's lots of pages.

15       Did you tell the employment tribunal that, quote,

16  "Steve Smit was aware of the deliberate taking of undisclosed

17  spreads"?

18  **A.**  That was an earlier statement from the police, so I don't

19  know if it is, yes.  It's -- I'm assuming this is part of the

20  same statement.

21  **Q.**  It is.  This, I would represent to you, is part of the

22  statement submitted on your behalf to the employment

23  tribunal?

24  **A.**  Okay.

25  **Q.**  And in it, you say, "Steve Smit was aware of the

1    deliberate taking of undisclosed spreads, was aware that this

2    model had been used previously in relation to KIA and was

3    aware that the true position was hidden from the client when

4    they raised inquiries."

5         Do you recall writing that?

6    **A.**  I don't recall writing it, but it's there, so it's part

7    of it, yes.

8    **Q.**  And you wanted it to be believed, did you not?

9    **A.**  Yes.

10   **Q.**  Because it was helpful to you if the head of London

11   office of State Street Global Markets like you was aware of

12   the practice by State Street to charge hidden or nondisclosed

13   revenues, correct?

14   **A.**  Yes.  But this is purely, I believe, relating to the KIA.

15   **Q.**  And today you say you're not sure what Mr. Submit knew

16   and didn't --

17   **A.**  It is my belief that he had information that he could

18   draw conclusions from, but I'm not sure what he -- what kind

19   of conclusions he draw -- drew, or if any.

20   **Q.**  But it's fair to say that back in 2012, when you were

21   writing lengthy statements or signing lengthy statements,

22   that were written for you, you simply stated to them, with no

23   limits or conditions, that he was aware of the deliberate

24   taking of undisclosed spreads?

25        MR. FRANK:  Asked and answered.

1          THE COURT:  Overruled.

2          THE WITNESS:  I believe I already said that I was

3   not truthful.  Steve Smit fired me, took several million

4   dollars away from me, and I was angry with him.  And I was

5   probably a little liberal with the truth here.  No, I was

6   liberal with the truth.

7   **Q.**  So part of the reason that you were comfortable accusing

8   Mr. Smit is that you were angry with him?

9   **A.**  I didn't say I was comfortable.

10  **Q.**  Part of the reason you accused Mr. Smit of something

11  you're currently unsure of was that you were angry with him?

12  **A.**  I was angry with him, but I was trying to save my job and

13  have the tribunal overrule that dismissal.

14  **Q.**  Did you ask Mr. McLellan to come to London, testify on

15  your behalf at the employment tribunal, and were angry at him

16  for not complying with your wishes?

17  **A.**  I wasn't angry at Mr. McLellan.  I don't recall him

18  coming over, but I may have.  I may have, but I wasn't angry

19  with Mr. McLellan.

20  **Q.**  Let's switch to another subject, Mark Leaden.  Do you

21  recall Mark Leaden?

22  **A.**  Yes.

23  **Q.**  Do you recall that he was a compliance officer for State

24  Street in the August 2011 period?

25  **A.**  Yes.

1  **Q.**  Do you recall a conversation with him on August 23rd of

2  that year?

3  **A.**  Not in great detail, but I know I had a conversation with

4  him, yes.

5  **Q.**  Do you recall telling him that the reason that Royal Mail

6  was charged a markup was an error?

7  **A.**  Yes, he was, you know, under the understanding that it

8  was an error.

9  **Q.**  You told him it was an error, but you later told the

10  employment tribunal that you told Mr. Leaden that it was

11  intentional and part of our contract, correct?

12  **A.**  Again, I wasn't truthful.  The story was spun to defend

13  myself.  It's for a fact that Mark Leaden was under the

14  impression that it was an error, yes.

15  **Q.**  And you gave him that impression in your conversation

16  with him and then you lied about it later, correct?

17  **A.**  I lied, yes.

18  **Q.**  And you said he was wrong when you deliberately asked

19  about your conversation with Mr. Leaden at your disciplinary

20  hearing.  You said I'm right, I told him it was an error.

21  He's wrong.

22  **A.**  I don't think --

23  **Q.**  Let me turn that around.  You told the disciplinary

24  hearing officer that Mr. Leaden, when he said you said it was

25  an error, was wrong.  You claimed that you told them the

1   truth that it was an intentional markup, correct?

2   **A.**   I don't know the exact details of any conversation to

3   whoever you're referring to.

4   **Q.**   You lied about Mr. Leaden, correct?

5   **A.**   I spun that.  I lied about the conversation, yes, to make

6   it work for us.

7   **Q.**   And did it concern you that it would put his job in

8   jeopardy as a compliance officer, if your lies were believed,

9   and his recollection was not believed?

10   **A.**   I'm not proud of what I did.

11   **Q.**   But in order to advance your self-interest, you were

12   prepared to lie about Mr. Leaden, a compliance officer, even

13   if it risked his position at State Street?

14   **A.**   I never thought of it that way.  He was very jovial about

15   the whole thing.  So I never thought of putting his job at

16   risk.

17   **Q.**   Did you think of putting Mr. Smit's position at risk, if

18   your lies about him were believed?

19   **A.**   No.

20   **Q.**   Did you think about whether State Street would fire a

21   compliance officer if they believed your statement that you

22   told them that the markup was intentional and then he did

23   nothing about it?

24   **A.**   I think I just answered it.  I didn't think of it.

25   **Q.**   I want to go to a few other parts of your employment

1    tribunal statement.

2              Do you recall, Mr. Smit saying to the employment

3    tribunal that -- excuse me, Mr. Pennings, that "I did not

4    believe that State Street had acted in breach of any

5    regulations.  Given that we did not breach any contractual

6    obligations, we never even considered having potentially

7    breached any regulations."

8              Do you recall saying that?

9    **A.**  I don't recall, but it's there.  You know, this was our

10   contract defense and the reality is I didn't think much more

11   about regulations at the time.  I knew it was wrong.

12   **Q.**  You certainly weren't thinking about the criminal law at

13   the time of your employment tribunal, were you?

14   **A.**  Absolutely not.

15   **Q.**  You were absolutely, at all times, in 2010, 2011, 2012,

16   not believing that you were jeopardizing your freedom by

17   doing anything that would be prohibited by the criminal law;

18   is that right?

19   **A.**  I never thought of that, never crossed my mind.

20   **Q.**  Never discussed with Ross, never discussed with Rick

21   Boomgaardt, correct?

22   **A.**  No, I didn't know.  That is correct.  Yes.

23   **Q.**  What was discussed is contracts and whether or not

24   markups could be taken on buys.  That was one of the subjects

25   that you were discussing, correct?

1    **A.**   I never, in my wildest dream, dreamed that I could be

2    indicted by US court.

3    **Q.**   Or indicted by any Court; is that correct?

4    **A.**   Or by any court.

5    **Q.**   Let me go to -- this is paragraph 6.  We can blow that

6    up.

7            Do you recall saying the following and I'll read it

8    along with you.

9            "In addition, how could State Street assess the

10   extent to which Royal Mail had a legitimate grievance,

11   without assessing whether the client had signed up to a

12   contract, where they were, in fact, not entitled to full

13   transparency?"

14           Those are the words of your statement, correct?

15   **A.**   Uh-huh.

16   **Q.**   "After all, the client has a degree of choice as to the

17   structure and price of a deal that they choose.  On one view,

18   the contract agreed with the client meant that State Street

19   were entitled to say to the client the management fees were X

20   and that disclosure of any remuneration made by affiliates

21   was not covered or required by the contract with Royal Mail."

22           Correct?

23   **A.**   That's what it says.

24   **Q.**   And then you said "I do feel that would have been

25   attractive approach and did not do so, but that was a

1    response that was arguably permissible under the deal and

2    contract that they agreed to with State Street."

3    **A.**   Uh-huh.

4    **Q.**   And this is a paragraph of a statement to the employment

5    tribunal, addressing whether State Street could take the

6    position the contract allowed the markups or alternatively,

7    the position that we should be diplomatic, we should give

8    back the markups to Royal Mail, and try to preserve a

9    positive relationship with them?

10   **A.**   I'm not entirely sure if this interpretation of the

11   contract is correct.  You may have seen that the reason for

12   my dismissal at State Street was for my response to the Royal

13   Mail until -- following the query.  And I think I am

14   referring here to how I would have -- how I could have

15   responded in that situation and I'm also saying that it's

16   arguably permissible under the deal.

17   **Q.**   State street on a couple of occasions, putting Royal Mail

18   aside, when there's issues with clients, have just rebated

19   money to clients, correct?

20   **A.**   They were quite quick to rebate clients to put the issue

21   to bed.

22   **Q.**   And in fact, you would tell people it's better to rebate

23   the money, or give the money back quickly, rather than have

24   an extended conversation, because then we could have a good

25   relationship with the client and we can go back and make

1    other -- other deals with them, where we make the money back,

2    correct?

3    **A.**   I remember discussing that with Ross, yes.

4    **Q.**   Sainsbury's was one of them.  There was an issue with

5    Sainsbury's?  You told them pay Sainsbury's back what you say

6    they owe, we'll have future deals with Sainsbury's.

7    **A.**   Not that I recall.

8    **Q.**   Other clients you do recall, correct?

9    **A.**   Not off the top of my head, but could be.  I just don't

10   know.

11   **Q.**   But you do recall the bank was quick to try to give money

12   back and try to resolve client issues under the banner that

13   the client is always right?

14             MR. FRANK:  Objection at sidebar, Your Honor.

15             THE COURT:  All right.

16             (The following discussion held at the bench.)

17             MR. FRANK:  Mr. Weinberg has extracted from me a

18   representation that I would not get into reimbursements to

19   clients.  We've discussed at length at previous sidebars and

20   at previous conferences that we would not get into the bank's

21   reaction in September and he's now trying to elicit those

22   very rebates to the clients and trying to go into matters

23   that he previously represented that he'd not go into.

24             MR. WEINBERG:  Nothing could be farther from the

25   truth.  I was addressing his knowledge.  He was out of the

1    bank before the bank rebated any monies to the clients at

2    issue here.

3            THE COURT:  So what are you asking him?

4            MR. WEINBERG:  I was asking about his understanding

5    at the time of the August -- June, really, June 2011, when

6    they gave back the million dollars, that that's not

7    inconsistent with what he understood to be the bank's

8    practices beforehand.

9            MR. FRANK:  That was not the question.  The

10   question was about giving money back to Sainsbury's and the

11   other defrauded clients.

12           MR. WEINBERG:  No, the Sainsbury's return of money

13   was at the conversation with him in 2010, or early 2011.  I

14   could show Mr. Frank the e-mail I was referring to.  It has

15   nothing to do with giving the money back after.  He wouldn't

16   know of it firsthand, because he wasn't there any longer.

17           MR. FRANK:  Well, if he has nothing to do with it

18   then I'm not sure why it's relevant.  Sainsbury's did not

19   know at the time that it had been defrauded.

20           MR. WEINBERG:  This is not the same situation,

21   Steve.  This is another issue, which I can present it to the

22   Court at a recess, if we can dig it out of the archives.

23   There was another 2010 issue with Sainsbury's, and Pennings

24   said give them the money back, or resolved the problem.

25           THE COURT:  Then you need to clarify that, because

1    if you're saying --

2              MR. WEINBERG:  No.

3              THE COURT:  From the question, it just seemed like

4    the only Sainsbury's deal we've heard about is the

5    Sainsbury's deal that Mr. Frank has presented.

6              MR. WEINBERG:  Okay.

7              THE COURT:  So that question you asked about

8    Sainsbury's, it seemed like it was about --

9              MR. WEINBERG:  It didn't even occur to me that

10   Steve was going there.

11             THE COURT:  So in terms of what you want to ask him

12   about, is money given back to -- that sort of the money given

13   back and other times prior to that that money was given back,

14   when there were unrelated disputes between him and the

15   client, and sort of keep the client happy policy.

16             Is that what you want to do?

17             MR. WEINBERG:  I'll focus the timeline.

18             THE COURT:  Do you object to that?

19             MR. FRANK:  I don't object to that, but I think

20   there's a risk of confusion.  So I think the generic question

21   of --

22             MR. WEINBERG:  I'm happy to leave it alone, is --

23   you don't want me to focus on it being a different

24   Sainsbury's deal.  Either way.

25             MR. FRANK:  I think the Sainsbury's shouldn't be

1    relevant to this.

2                MR. WEINBERG:  I'm glad to go to other clients.

3                THE COURT:  Okay.

4                MR. FRANK:  I think the question should be were

5    there times when you gave money back to clients.

6                THE COURT:  Yeah, why do we need the specifics?

7                MR. WEINBERG:  We don't.

8                THE COURT:  Okay.

9                (Bench conference concluded.)

10               THE COURT:  Go ahead, Mr. Weinberg.

11               MR. WEINBERG:  Thank you, Your Honor.

12               THE COURT:  Wait one moment until Ms. Lopez is

13   ready.

14               Go ahead.

15   BY MR. WEINBERG:

16   Q.  So I'm directing your attention to the time period before

17   June 21 and 22, when the rebate was made to Royal Mail?

18   A.  2010 and 2011.

19   Q.  Thank you, 2011.  Taking your experience from that date,

20   backward, to what you knew at the time.  You were aware that

21   there were other circumstances where clients, right or wrong,

22   you know, made a complaint, had issues, and State Street's

23   practice was to try to resolve them peacefully,

24   diplomatically, and keep the good will of the client,

25   correct?

1    **A.**   It's fair to say that State Street paid back money very

2    quickly and liberally.  But, you know, if it's a legitimate

3    case, then it's not so difficult to do.  In this case, we're

4    covering it up.

5    **Q.**   The question was State Street's practice?

6    **A.**   You're right, yes.

7    **Q.**   Thank you, Mr. Pennings.

8            Can we turn to paragraph 44.

9            If you would look at 44 through 47, Mr. Pennings.

10   I'll try to cut through all the words --

11   **A.**   I've read the 40 -- well, whatever is up here.

12   **Q.**   We'll get you the other paragraphs in a second.  They're

13   on the next page.

14   **A.**   (Witness reviews document.)

15   **Q.**   Mr. Pennings, focusing on paragraph 47.

16   **A.**   Oh, I haven't gotten there yet.  I'm at 46.

17   **Q.**   Okay.  We'll wait.

18   **A.**   (Witness reviews document.)

19           Yes.

20   **Q.**   Am I correct that you represented to the employment

21   tribunal that in the bond market, it is common practice for

22   brokers to price the bonds net, rather than charging an

23   explicit commission?

24   **A.**   Yes, built into the price.

25   **Q.**   Pricing a security net essentially means that the markup

1    or commission is built into the price, correct?

2    **A.**   That's correct.

3    **Q.**   Did you also tell them that more and more transition

4    managers now ask executing brokers to provide net prices?

5    **A.**   That's correct.

6    **Q.**   And that included executing brokers who were outside

7    brokers, or hired by a transition manager from some other

8    company, or inside brokers or broker-dealer affiliates of the

9    transition manager, correct?

10   **A.**   I think what I'm referring to here is when we use

11   external brokers, where we don't have direct market access,

12   or where State Street didn't have direct market access.

13   **Q.**   Let's look at the second sentence of paragraph 46.

14          "More and more transition managers now ask

15   executing brokers, irrespective of them being affiliated to

16   the transition manager or not, to provide net prices."

17   **A.**   That's what I just referred to, yes.

18   **Q.**   You were referring to transition managers asking brokers

19   to provide net prices to them as a growing regular course

20   of --

21   **A.**   That was our belief that was going on in Europe, yes.

22   **Q.**   And paragraph 45, second sentence -- or the first

23   sentence is, "The transition manager has choices whether to

24   use external brokers or affiliate brokers."

25          Correct?

1    **A.**  Yes.

2    **Q.**  And in each case you write "The client pays the cost of

3    the broker."

4         Correct?

5    **A.**  Yes, the client pays for trading, yes.

6    **Q.**  Brokers don't work for free?

7    **A.**  That's correct.

8    **Q.**  Not whether they're State Street's affiliate broker or

9    whether it's some external broker hired by a transition

10   manager, correct?

11   **A.**  Brokers make money, yes.

12   **Q.**  I want to go to a different subject, if I may, and that's

13   the KIA -- two KIA transitions, correct?

14   **A.**  Subject to these proceedings, yes.

15   **Q.**  There was actually a prior KIA transition, was there not?

16   **A.**  There were many KIA transitions.

17   **Q.**  And do you recall, back in 2008, before Mr. McLellan

18   managed you, saying to Das, "If it is a government bond

19   portfolio, forego the commission, as it will already be

20   implicit in the spread"?

21   **A.**  I don't recall.  But if I've said that, then that's not

22   inconsistent with what I've said before.

23   **Q.**  In other words, having a spread, charging a client a

24   spread, it's not unique to the six transitions that Mr. Frank

25   featured during his direct exam, is it?  Yes or no?

**A.**  I believe I said in the direct examination that there is
no difference in fixed income, apart from whether you
disclose it, the level of spread or commission, whatever you
want to call it, in the periodic notice.

**Q.**  So let me quickly go through some facts with KIA and make
sure that we got them.

You knew, before you bid on KIA 115, that a bid
above zero would result in State Street's not winning that
particular transition, correct?

**A.**  That was my belief, yes.

**Q.**  You had been told that by Mr. Ringrow and maybe by
Mr. Das directly that the lowest bid wins and you should be
very low, correct?

**A.**  Yes.

**Q.**  And you understand very low to be zero?

**A.**  In this case, it was mentioned that we needed to be zero,
yes.

**Q.**  Your job was to win the transition and essentially,
although -- essentially, you made the bid that Mr. Das told
you directly or indirectly was what you needed to do to win
the transition.

**A.**  It was widely believed -- well, widely believed -- it was
believed by myself and some others that we needed to charge
zero, yes.

**Q.**  You sent him, days after winning the bid, that first

1   periodic notice.

2   **A.**   Which bid?

3   **Q.**   KIA 115.

4   **A.**   Okay.

5   **Q.**   Can we have Exhibit 11?  It's really 11-1, Max, sorry.

6            THE COURT:  This is already in evidence.

7            MR. WEINBERG:  It is, Your Honor.  The next page.

8   BY MR. WEINBERG:

9   **Q.**   All right.  And if you can zoom down to the notes.  It

10  says "commission fees zero."  And this is what you're sending

11  back to the KIA -- note two --

12           MR. WEINBERG:  And this could be for the jury, as

13  well, Your Honor.

14           THE COURT:  It is.

15           MR. WEINBERG:  Thank you.

16           THE COURT:  It should be on your screen.  Is it on

17  your screen?

18           THE JUROR:  Affirmative responses.

19  BY MR. WEINBERG:

20  **Q.**   "All bonds will be priced net as per market convention."

21           Do you see that?

22  **A.**   Yes.

23  **Q.**   That's your language?

24  **A.**   I think so.

25  **Q.**   It's classic bond language?

1    **A.**   It's normal practice, yes.

2    **Q.**   And again, you're essentially telling Das that when State

3    Street reports the client prices, he's going to have a net

4    price to his bond purchases, correct?

5    **A.**   That is fair to say, yes.

6    **Q.**   Which is going to include the market price and include

7    the markup that goes to the broker-dealer?

8    **A.**   It's one price, so they don't see this breakout.

9    **Q.**   But that one price will consist of what the purchase

10   price was from some counterparty and whatever the markup was,

11   the spread?

12   **A.**   That's correct.

13   **Q.**   And if Das hired analytics or Hewitt or Towers Watson or

14   any of the European consultants to come in and look at KIA

15   115 afterwards, they would understand this language?

16           MR. FRANK:   Objection to what they would

17   understand.

18           THE COURT:   Sustained as to the form.

19   BY MR. WEINBERG:

20   **Q.**   Well, you understood that an outside consultant would

21   understand the spread coms, the markup, the net pricing

22   includes some money for the State Street affiliate

23   broker-dealer?

24   **A.**   If I were to pay a consultant to consult me on that, I

25   would expect that consultant to know what it means.

1    **Q.** All right. And it wouldn't mean what you term to be --

2    they could use ridiculous or some other -- nonsense, which is

3    the idea that State Street would make $2 million --

4    $2.6 million from the other side of these market deals?

5            MR. FRANK: Objection. That's not what he was

6    referring to. It misstates the testimony.

7            MR. WEINBERG: It's not misstating the testimony.

8            THE COURT: We're not going to have an argument

9    about what the testimony was.

10            Ladies and gentlemen, your memory of the testimony,

11   your collective memory, is what controls.

12            So what's the question?

13   BY MR. WEINBERG:

14   **Q.** The question is that any market professional, anybody

15   that you would hire to do an audit of a transition, would

16   understand that it is nonsense, your words, to believe that

17   State Street was making its spread from the other party, the

18   other side, correct?

19            MR. FRANK: Objection to what market professionals

20   would understand.

21            MR. WEINBERG: It's what Mr. Pennings would

22   understand the market professionals --

23            THE COURT: As rephrased, overruled.

24            THE WITNESS: I gave that explanation in an e-mail

25   to explain away how we would do zero and I did not, or we did

1    not want the market to know that we were bidding zero,

2    because it went against our marketing pitch and our whole

3    business model.  I thought it was nonsense.  I don't know

4    what other people think.  I just don't know.

5    BY MR. WEINBERG:

6    Q.   But in this case, in fact, the spread came from where it

7    usually comes from, the markup?

8    A.   Like I said, in my direct testimony, I believe it would

9    practically be impossible to do what -- because we don't know

10    who's the counterparty.

11    Q.   And to finish this note that is being communicated, you

12    know, by you to Das, "All bonds will be priced net as per

13    market convention with all markups included in the spread and

14    no additional explicit commission fee charged."

15         And that was put there to represent what State

16    Street -- what your intention was in terms of the making of

17    monies for State Street, correct?

18    A.   In part.  It's also, you know --

19    Q.   To protect yourself?

20    A.   Just to protect ourselves.  They wanted to see zero, here

21    you go, we got zero.  If they ever come and ask us

22    afterwards, we can just use that as a cover.

23    Q.   And the bank could not charge zero and make any money on

24    this transition without a markup.  It was biased, correct?

25    A.   They couldn't charge zero and make money, no.

1    **Q.**   Banks are in the business to make money, correct?

2    **A.**   That's my belief.

3    **Q.**   And KIA was one of the wealthiest sovereign wealth funds

4    in the world, correct?

5    **A.**   I don't see the relevance of that, but you're correct.

6    **Q.**   And Das understood State Street was going to make money,

7    didn't he?

8              MR. FRANK:  Objection to what Das understood.

9    BY MR. WEINBERG:

10   **Q.**   You understand that Das understood that he was -- that

11   you were going to make money?

12   **A.**   It was my belief that Das knew that we were making money.

13   **Q.**   After the transition, Das never demanded of you, in June,

14   July, August, September, October of 2010, Mr. Pennings, how

15   much money did State Street make from that $2 billion

16   transition?

17   **A.**   No.

18   **Q.**   And neither did anyone else at KIA during that window

19   between that transition 115 and the next one, correct?

20   **A.**   No.  That is correct, sorry.  They didn't ask.

21   **Q.**   They awarded you all of transition 121, correct?

22   **A.**   Yes.

23   **Q.**   So let's focus, if we may, on KIA 121.  Here the proposal

24   to win the KIA transition was zero commissions and we, State

25   Street, will cover some of your charges, your expenses,

1    correct?

2    **A.**  Yes.

3    **Q.**  So that if there was no additional source of revenue,

4    State Street would lose money doing a $4 billion transition

5    for this massive wealth fund from Kuwait, correct?

6    **A.**  Correct.

7    **Q.**  You understood, did you not, that any industry expert,

8    any consultant, anybody looking at KIA 121, and looking at

9    the offer of zero -- and we'll cover the costs -- would know

10   that State Street was going to charge a markup on the bonds

11   to make some money, correct?

12   **A.**  I don't -- I don't know common to other people, but --

13   **Q.**  It's only obvious.

14   **A.**  It's obvious, yes.

15   **Q.**  And, in fact, that was the plan, correct?

16   **A.**  That we were going to make money, yes.

17   **Q.**  And when you won the transition proposal in late October

18   or mid October, you forwarded that success, the -- Das'

19   saying "you win," to Mr. Smit, the head of the UK office, did

20   you not?

21   **A.**  Whether it was May or Ringrow, I can't remember, but

22   that's what I referred to earlier, as well, yes.

23   **Q.**  And do you recall Mr. Smit saying the words, "fantastic

24   win"?

25   **A.**  I believe something along those lines.  He was very

1  happy.

2  **Q.**  Happy to see that you succeeded in persuading KIA to give

3  you a $4 billion bond transition for no fees and cover their

4  costs, correct?

5          MR. FRANK:  Objection as to why Mr. Smit was happy.

6          THE COURT:  Sustained as to why -- you asked --

7  BY MR. WEINBERG:

8  **Q.**  And did you understand that Mr. Smit was happy and that

9  others were happy, because they expected that monies would be

10  made from this transition?

11  **A.**  It was my belief that he was extremely happy and that he

12  knew that we were going to make a lot of money out of this

13  very large trade.

14  **Q.**  Mr. Puth, back in Boston, head of State Street Global

15  Markets and the man who was -- supervised or was above Mr.

16  McLellan in the hierarchy, you also learned that he was

17  interested in KIA 121, did you not?

18  **A.**  I believe, from Ross, that he was and he was normally

19  interested when there was something very large going on, yes.

20  **Q.**  Because they were what's called pipelines; is that

21  correct?

22  **A.**  Well --

23  **Q.**  Revenue forecasts went up the line?

24  **A.**  That's called a pipeline, yes.  So what's expected to

25  come in over the next whenever.

1   **Q.**   Right.   In other words, Mr. Puth, Mr. Smit would ask you

2   and your team to send them what are the deals that are coming

3   up in the next month or quarter and how much money do you

4   expect to make from them, correct?

5   **A.**   I wouldn't send it directly to him, but that would go

6   through Ross, and I'm assuming that he would pass it on, yes.

7   **Q.**   And after the deals were concluded, there would also be

8   ways for the others in the bank that weren't in London to

9   know how much money was generated by the transition addition,

10   correct?

11   **A.**   Before or afterwards?

12   **Q.**   Afterwards.

13   **A.**   I think everyone who received revenue numbers was aware

14   that we made a lot of monies, yes.

15   **Q.**   In other words, dollar for dollar, every dollar that was

16   made by your group in London on the transitions that are the

17   subject of this case went to the State Street bank, correct?

18   **A.**   Yes, it didn't go into my pocket, no.

19   **Q.**   It went right to the bank, correct?

20   **A.**   Well, yes.

21   **Q.**   And there was profit and loss statements and daily

22   revenue reports and people who wanted to know would know how

23   much money was made on different transitions, correct?

24              MR. FRANK:   Objection to what others would know.

25              THE COURT:   Sustained as to that.

1    BY MR. WEINBERG:

2    **Q.**   You understood that others would know how much money was

3    generated by the transitions at issue here?

4    **A.**   In this particular case, this was such a large

5    transition, it was my belief that, you know, people would

6    have known it came from KIA, yes.

7    **Q.**   And therefore, if people were aware that the -- that the

8    deal with KIA was zero commissions and yet millions of

9    dollars were coming from this deal, they would know that they

10   came from the trading of bonds, correct?

11            MR. FRANK:  Objection to what they would know.

12            THE COURT:  Sustained.

13   BY MR. WEINBERG:

14   **Q.**   You understood that they, as professional bankers, would

15   understand that the difference between zero and millions came

16   from the spread, the markups on the buying and selling of

17   bonds for KIA, correct?

18   **A.**   If people would have looked at the document and saw that

19   it said zero.

20   **Q.**   Yup.

21   **A.**   And then the same day or two days or a day later, 4

22   million or whatever it was comes in, I would expect them to

23   know that it came from the same client and you know,

24   either -- I don't know what they -- it's very difficult for

25   me to say what other people think, but it seems to me pretty

1    obvious.

2    **Q.**   Understood.  Let's focus on this November 2, 3, 4 period

3    in 2010, KIA 121.

4              You understood that Mr. McLellan was back in

5    Boston; is that correct?

6    **A.**   I knew he was in Boston, yes.

7    **Q.**   You recall his wife gave birth to twins a day or two

8    before the -- this transition?

9    **A.**   Around the time.  I know he had twins and I was very

10   happy for him, yes.

11   **Q.**   Do you recall that Mr. McLellan was asking you, during

12   this time period, to send him the KIA contract and the KIA

13   periodic notice?

14   **A.**   Yes.

15   **Q.**   Do you recall seeing evidence that Mr. McLellan then sent

16   the periodic notice to a man named Brian Woodard?

17   **A.**   He did, yes.

18   **Q.**   To David Puth?

19   **A.**   I don't know.

20   **Q.**   To Krystyna Beck, the UK lawyer?

21   **A.**   I think either Brian Woodard or myself sent it either to

22   Krystyna or Simone Paul.  I'm not sure, but if there's a

23   documentation, then sure.

24   **Q.**   You're aware that there were meetings on November 2,

25   which were late in the day for you, the day before trading in

1    the United States, with a United States lawyer named Melissa

2    McCay, correct?

3    **A.**   I was aware there were meetings with lawyers and

4    compliance, yes.

5    **Q.**   Were you aware that Brian Woodard, who was Ms. McCay's

6    global head of legal, was involved in these decisions and

7    meetings, correct?

8    **A.**   That was my understanding, yes.

9    **Q.**   And you're aware that the next day in London, that at

10   least Ms. Beck and Simone Paul, the UK lawyers, were involved

11   in reviewing the contract, reviewing the periodic notice, and

12   deciding whether the trade could proceed, correct?

13   **A.**   I knew they were involved.  I don't know what they looked

14   at, but that's something that you would have to ask the

15   lawyers.  They were involved.

16   **Q.**   Let's look at a few e-mails and maybe that will refresh

17   your memory.

18   **A.**   I know they received the e-mails.

19   **Q.**   They received the documents?

20   **A.**   They received the documents, but all I'm trying to

21   explain is I don't know exactly what they looked at.

22   **Q.**   Fair enough.  They received from -- whether directly from

23   Mr. McLellan or from Mr. McLellan to Mr. Woodard --

24   **A.**   They received the documents.

25   **Q.**   And the documents meant both the contract and the

1    periodic notice that governed this KIA 121, correct?

2    **A.**   Correct.

3    **Q.**   And they gave their blessing to KIA 121's proceeding

4    sometime in November 3, correct?

5    **A.**   Yes.

6    **Q.**   So I want to turn your attention, in particular, to a

7    couple of these e-mails.  One was admitted yesterday.  It's

8    Government Exhibit 53.  Perhaps we can access that.  And I

9    want to see if we can expand the Bryant e-mail to you, Chris

10   Carlin, and Ross McLellan?

11            MR. WEINBERG:  Can we get that any bigger, Max?

12   Perfect, thanks.

13   BY MR. WEINBERG:

14   **Q.**   Mr. Bryant was the head of US trading and he was saying

15   to Ross, you, and Chris Carlin, "heads up, Evan just left my

16   office.  He got Puth hot and bothered on this trade, and they

17   have Woodard saying he thinks it's fine that we trade

18   internally, because it is a non-ERISA client."

19            Do you see that sentence?

20   **A.**   Yes.

21   **Q.**   And just so we can identify people, Evan was Mr.

22   Bernsten, who was the head of rates, correct?

23   **A.**   Yes.

24   **Q.**   Puth is David Puth, the head of State Street Global

25   Markets?

1    **A.**   Yes.

2    **Q.**   And Woodard is Brian Woodard, the global head of legal,

3    correct?

4    **A.**   Yes.

5              MR. FRANK:  I'm not sure this is in evidence.

6              THE WITNESS:  Or Brian --

7              THE COURT:  Hold on one second.

8              MR. FRANK:  I'm not sure this is in evidence.  We

9    don't have an objection to it being in evidence, but just as

10   a technical matter --

11             THE COURT:  All right.  If it's not in evidence

12   then  --

13             MR. WEINBERG:  I thought it was, I'm sorry.

14             THE COURT:  Then I'll admit it since there's no

15   objection to it.

16             THE DEPUTY CLERK:  What number is it?

17             THE COURT:  53.  Why don't you check to see.  If it

18   wasn't already admitted, we'll admit it now.

19             MR. WEINBERG:  I move for its admission.

20             (Exhibit No. 53 admitted into evidence.)

21             THE DEPUTY CLERK:  It has not been admitted.

22             THE COURT:  It has not been?

23             THE DEPUTY CLERK:  Has not been.

24             THE COURT:  All right.  It has not been admitted.

25             MR. WEINBERG:  I apologize.  It's now admitted?

1          THE COURT:  Admitted.

2          (Exhibit No. 53 admitted into evidence.)

3    BY MR. WEINBERG:

4    **Q.**  Mr. Bryant is saying that Mr. Woodard is saying, he being

5    the lawyer, the global head of legal, he thinks it's fine

6    that we trade internally, because it is a non-ERISA client.

7          Did you understand that ERISA was a law in the

8    United States?

9    **A.**  I'm not a hundred percent familiar with it, but I was

10   broadly aware of what ERISA -- I believe it had some extra

11   responsibilities that come with it.

12   **Q.**  And there's no ERISA in Europe, correct?

13   **A.**  No.

14   **Q.**  So what you understood, without knowing its details,

15   added a level of disclosure obligations to the bank in the

16   United States?

17   **A.**  That was my belief, yes.

18   **Q.**  I want to -- next sentence is:  "Evan," meaning Bernsten,

19   "had legal all set up on a call, so we called Brian," meaning

20   Woodard, "Melissa," who is the US lawyer, Melissa McCay, "and

21   Justin," who is another lawyer, Justin McCormack, "from my

22   office;" is that correct?

23   **A.**  I don't know Justin or Melissa, but I understood they

24   were legal, yes.

25   **Q.**  "Woodard and Melissa," the two lawyers, "had no problem

1    stating they were fine with the transition manager using

2    Evan's group as the counterparty, but it was TM, transition

3    management, you, Ross, Chris, and Ed, that were against it.

4    I'm sure that's how they put it to Puth, as well."

5              You recall there was some discussions on November 2

6    about whether or not the bond business that Evan Bernsten

7    headed, that David Puth had set up, could be in competition

8    with other outside banks to buy the KIA bonds, correct?

9    A.   Yes, there was a discussion about that, yes.

10   Q.   And that was, in part, why all these lawyers were focused

11   on this transition back in the United States, correct?

12   A.   That's my understanding, yes.

13   Q.   Melissa is going to have the head of legal in the UK look

14   at the contract and unless there is expressed prohibition in

15   the language in using an affiliate, they feel it's okay if

16   the transition manager notifies KIA in advance in the notice

17   to the client that we may use an affiliate as a counterparty

18   when we start trading.

19             I changed a few words to make it easier to

20   understand, but that's the thrust of it, correct?

21   A.   Correct.

22   Q.   "Ed, you are going to have to work with legal in the UK

23   tomorrow on the wording of the contract."

24             Correct?

25   A.   Correct.

1    **Q.**   "Or work on why KIA will boot us if we change how we sold

2    the trade to them when we want it.  I am not sure if

3    compliance is 100 percent okay with this, so Chris and I will

4    discuss that with them in the US morning."

5          Correct?

6    **A.**   That's what it says, yes.

7    **Q.**   And that's because the trading was supposed to the next

8    day in the UK, which is four or five hours ahead?

9    **A.**   Four or five hours ahead.  And then Kuwait is --

10   **Q.**   And this is all occurring late in your day November 2 in

11   Boston, involving some pretty high level people?

12   **A.**   Correct.

13   **Q.**   Head of legal, Puth, compliance, a lot of people looking

14   at this deal?

15   **A.**   I agree.

16   **Q.**   And essentially, you're being tasked by these people to

17   work with UK legal to make sure that the contracts permit the

18   trading, correct?

19   **A.**   Being tasked, I don't think Tom Bryant would give me

20   orders in the UK, but you can argue from this that that's

21   what he's asking, yes.

22   **Q.**   He's saying that if you want to go ahead and trade that

23   the lawyers in the US are delegating to the lawyers in Great

24   Britain the decision whether the trading will be okay.

25   **A.**   I'm not sure if you can take -- draw that conclusion, but

1    it's -- it's fair to say, I suppose.

2    **Q.**  Melissa did say earlier -- Melissa being Melissa McCay,

3    the lawyer in the US?

4    **A.**  That's my understanding from it.

5    **Q.**  "She didn't see it as an issue that we both make money on

6    this trade (FIRB)."

7            Does that relate to rates, the Evan Bernsten group?

8    **A.**  Yes.

9    **Q.**  And "TM" relating to Portfolio Solutions, your gorup?

10   **A.**  Correct.

11   **Q.**  "So if we are forced to do it, we should both be able to

12   charge, us as the BD."

13           Does that mean broker-dealer?

14   **A.**  That's my understanding.

15   **Q.**  "And them as an MM, market marker, on behalf of STT,

16   State Street."

17   **A.**  Yes.

18   **Q.**  So Mr. Bryant is saying to Ross that the US lawyer,

19   Melissa McCay said during this phone call with Mr. Woodard

20   and others that it's okay for State Street Transition

21   Management to make money, correct?

22   **A.**  Yes.

23   **Q.**  Through it's broker-dealer, correct?

24   **A.**  That's what I read from it, yes.

25   **Q.**  They were reading the contracts in the periodic notices

1  and it said zero commissions?

2           MR. FRANK:  Objection as to what they were reading.

3           THE COURT:  Sustained as to that.

4  BY MR. WEINBERG:

5  **Q.**  They had available to them, Mr. Woodard received from Mr.

6  McLellan, the periodic notice?

7           MR. FRANK:  Objection to what they had available to

8  them, Your Honor.  All that's been testified to was something

9  was transmitted.

10          THE COURT:  Overruled.

11 BY MR. WEINBERG:

12 **Q.**  Was the periodic notice transmitted by you to Mr.

13 McLellan and do you understand it was then transmitted to

14 Mr. Woodard?

15 **A.**  I remember that I sent the transition management

16 agreement and the periodic notice to Mr. McLellan that

17 evening.  I don't know what time.

18          MR. WEINBERG:  Could we have 740, please, Max.

19          THE COURT:  Is that in evidence?

20          MR. WEINBERG:  No.

21          And can you blow up the bottom e-mails.

22 BY MR. WEINBERG:

23 **Q.**  Does this series of e-mails from about 7:22, on

24 November 2 refresh your recollection that Mr. McLellan sent

25 to Mr. Brian Woodard, the global head of legal, the periodic

1   notice?

2   **A.**   Yes.  I knew he sent it.  I don't know the exact timing,

3   because I always get confused with the US and then London

4   times.

5   **Q.**   And do you see that Mr. Woodard then sent it to --

6           MR. FRANK:  Objection to reading -- objection to

7   reading from the document.

8   BY MR. WEINBERG:

9   **Q.**   Does this refresh your recollection as to what you knew

10  on November 2, 2010, that Mr. Woodard, thereafter, with an

11  e-mail CCed to you, sent the notice on to Krystyna, it's the

12  UK lawyer, Krystyna Beck, saying, "Can you take a look at

13  this in the morning and discuss with Ed?  I'll send some

14  thoughts later tonight."

15  **A.**   Yes.

16  **Q.**   Okay.  Can we go to the top one.  And then, again, the

17  next at 12:06 a.m., Ross is, again, sending the periodic

18  notice, this time signed.  The first one wasn't, correct?

19  **A.**   He sent a periodic notice.  I don't know what -- I don't

20  see the attachment, so --

21  **Q.**   It says attachment "periodic notice signed," correct?

22  Here is the --

23  **A.**   That's what it says, yes.

24  **Q.**   You have no reason to doubt that Mr. McLellan was sending

25  the period notice signed to Mr. Woodard via this e-mail,

1    correct?

2    **A.**   No, because I believe I sent it to Ross, so --

3    **Q.**   You sent it to Ross and Ross sent it to the lawyers?

4    **A.**   That's my understanding, yes.

5    **Q.**   Thank you.  So going back to Exhibit 53 admitted.

6    Whether Ms. McCay did or did not have the periodic notice at

7    the time of this, Mr. Bryant was saying to you, in essence,

8    don't worry if rates get approved or not, because even if

9    they do and even if they can buy the bonds and even if they

10   can make money, we, the transition management team, will also

11   be able to make money on this transition, correct?

12   **A.**   He relayed the message from Melissa.  I don't think Tommy

13   Bryant is a lawyer, but Melissa is.

14   **Q.**   More importantly, he is telling you what the United

15   States lawyer, Melissa McCay, who's working with Bryant

16   Woodard is saying, you could charge a markup and make money

17   on bonds as a broker-dealer?

18   **A.**   He's saying we can both make money, so yes.

19            MR. WEINBERG:  Can we have 766, please?

20            THE COURT:  Is that in evidence?

21            MR. WEINBERG:  No, Your Honor.

22            I'm reminded, Your Honor.  I apologize.  I didn't

23   move for the admission of 740, which is the e-mails with the

24   periodic notice that we just discussed.  I would move for its

25   admission.

```
1              MR. FRANK:  No objection.

2              THE COURT:  Admitted.

3              (Exhibit No. 740 admitted into evidence.)

4     BY MR. WEINBERG:

5     Q.  Would you look at the -- the e-mail that's on your

6     screen.  And does this refresh your recollection about your

7     saying to Chris Carlin, in the morning of November 3, the day

8     after you got Mr. Bryant's e-mail about what Ms. McCay said,

9     that "we can take a spread"?

10    A.  Yes, that's what I said here.  Yes.  I don't recall the

11    e-mail, but it refreshes my memory.

12    Q.  In other words, rates could compete in the marketplace

13    and if they get a best execution, they can buy a bond or sell

14    a bond, but we, the broker-dealer, will take a spread on KIA

15    121?

16    A.  Yes, that is what I said.  That is, the following day,

17    right?

18    Q.  Yes.

19    A.  Yes.

20              MR. WEINBERG:  760, please -- I would actually move

21    for the admission of that document, as well, Your Honor.

22              MR. FRANK:  No objection, Your Honor.

23              THE COURT:  Admitted.

24              MR. JOHNSTON:  What's the number?

25              MR. WEINBERG:  756.
```

```
 1                    THE COURT:  That was 756?

 2                    MR. WEINBERG:  Yes, Your Honor.

 3                    (Exhibit No. 756 admitted into evidence.)

 4       BY MR. WEINBERG:

 5       Q.   November 3 --

 6                    THE COURT:  What Exhibit is this?

 7                    MR. WEINBERG:  This is -- it's not admitted yet,

 8       but we'll be moving for its admission.

 9                    THE DEPUTY CLERK:  What's the number?

10                    MR. WEINBERG:  760, Your Honor.

11       BY MR. WEINBERG:

12       Q.   Do you recall when you went to the office on November 3,

13       there was a review by UK legal of whether or not this

14       transition could proceed?

15       A.   They were looking at it, yes.

16       Q.   And do you recall that Simone Paul and Krystyna Beck were

17       both part of the UK legal team that was -- at Brian Woodard's

18       request, was looking at this transition and seeing whether or

19       not to approve it?

20       A.   Yes.

21       Q.   And that Krystyna Beck had said to you --

22                    MR. WEINBERG:  This is Exhibit 58.  Is that

23       admitted?

24                    THE DEPUTY CLERK:  58 is not.

25       BY MR. WEINBERG:
```

1   **Q.**  I would show you first Exhibit 58 and then we'll go to

2   Simone Paul.

3             MR. WEINBERG:  And I would move for the admission

4   of this Exhibit, Your Honor.

5             MR. FRANK:  No objection.

6             THE COURT:  58 is admitted.

7             (Exhibit No. 58 admitted into evidence.)

8   BY MR. WEINBERG:

9   **Q.**  And you recall that you were essentially telling all

10  these lawyers in the middle of that page --

11            If we can have that a little -- that there was

12  discussions and that you're okay to have rates quote prices,

13  but only if there's best execution, correct?

14  **A.**  Yes.

15  **Q.**  And you were quoting a part of the KIA contract to the

16  lawyers to support that conclusion, correct?

17  **A.**  Yes.

18            MR. WEINBERG:  And could we go up to the Krystyna

19  Beck e-mail?

20  BY MR. WEINBERG:

21  **Q.**  Ms. Beck is sending an e-mail to you, Brian Woodard,

22  Ross, Chris Carlin, Simone Paul, Tom Bryant, and Anthony

23  Skully, correct?

24  **A.**  Yes.

25  **Q.**  And she is saying, "From a legal perspective, per se,

1    there is no issue in dealing with the rates desk as a

2    counterparty.  It must be consistent with conflict of

3    interests policy."

4            Correct?  Meaning best execution.

5    **A.**  That's what it says, yes.

6    **Q.**  Okay.  Now let's go to Simone Paul, who's another lawyer

7    in the UK office.

8            THE COURT:  This is a different exhibit, right?

9            MR. FRANK:  Your Honor, I believe counsel may have

10   misread from that document.  I didn't catch it, but I believe

11   the words "conflicts of interest" are not in the document.

12           THE COURT:  I think the last --

13           THE WITNESS:  Just best execution, it said, right?

14           THE COURT:  I think the last line of the e-mail.

15           MR. FRANK:  Okay.

16   BY MR. WEINBERG:

17   **Q.**  So now I want to switch to Simone Paul.

18           THE COURT:  Is this a different e-mail?

19           MR. WEINBERG:  This is 760, Your Honor.

20           THE COURT:  And I'm sorry, you admit 760 or not?

21           MR. WEINBERG:  Not yet, but I will move for its

22   admission.

23           THE DEPUTY CLERK:  He just did.

24           THE COURT:  All right.

25   BY MR. WEINBERG:

1   **Q.**  And do you recall Ms. Paul was reading some of the

2   contracts, had some issues --

3              THE COURT:  Hold on, Mr. Weinberg.

4              THE DEPUTY CLERK:  No, not yet.

5              THE COURT:  760 is not yet admitted.  He is going

6   to offer it.

7              Go ahead.

8   BY MR. WEINBERG:

9   **Q.**  Do you recall that Ms. Paul was reviewing the contracts

10  on the morning of the 3rd?

11  **A.**  Yes, she was.

12  **Q.**  And you and her had an e-mail exchange where you were

13  telling her that the periodic notice referred to fixed

14  income, correct?

15  **A.**  Yes, because I believe she put in the subject

16  line "derivatives trading," which was not relevant.

17  **Q.**  You corrected her, she approved -- reviewed it again,

18  approved the transition, and the transition occurred,

19  correct?

20  **A.**  She approved the fact that we could go ahead and do the

21  transition.

22  **Q.**  The transition generated several millions of dollars of

23  revenues as a result of the taking of spreads, correct?

24  **A.**  Correct.

25  **Q.**  And they were taken by the affiliate of State Street,

1    pursuant to the agreement, correct?

2    **A.**   To affiliates, yes.

3    **Q.**   And you, thereafter, met David Puth, did you not?

4    **A.**   I remember speaking to him.  I don't know exactly when.

5    **Q.**   Do you remember -- do you remember his congratulating

6    you?

7    **A.**   I believe he was quite pleased with the trade, yes.

8    **Q.**   Do you remember sending an e-mail to Ross McLellan on

9    November 5th telling Ross that you had your meeting with

10   Puth?

11   **A.**   Yes.

12   **Q.**   And do you recall saying he, Puth, loves Eddie, meaning

13   you?

14   **A.**   Yeah, he congratulated me.

15   **Q.**   Mr. Puth, in no way, objected to the KIA 121 transition?

16   **A.**   No, he didn't.

17   **Q.**   Congratulated you on making a lot of money for State

18   Street?

19   **A.**   Yes.

20   **Q.**   Talked to you about FX and how the transitions were

21   generating FX revenues that were important to the bank?

22   **A.**   I believe he mentioned that, yes.

23   **Q.**   Revenues that were not disclosed to the client, correct?

24   **A.**   FX revenues not disclosed, no.

25   **Q.**   And the overall result of the meeting is that Mr. Puth

1    was very happy with your leadership on KIA 121, correct?

2    **A.**   He was happy.  I don't know with what parts of my

3    involvement.  He was happy, but I didn't ask him.  I was

4    quite happy that he was happy.

5    **Q.**   Happy enough to tell Ross, he, Puth, loves Eddie,

6    correct?

7    **A.**   Correct.

8    **Q.**   Now, I want to go back to the employment tribunal.

9            MR. WEINBERG:  If we can go back to paragraph 96.

10   And can you blow up paragraph 96, Max?  Thank you.

11   BY MR. WEINBERG:

12   **Q.**   Do you recall your attorneys on your behalf, in a serious

13   tribunal dealing with your employment, saying, "David Puth,

14   Mark Hansen, Brian Woodard, Ross McLellan, and Simone Paul

15   all knew that a zero commission was being quoted and yet the

16   day after this large transition, State Street showed several

17   million US dollars had been received in revenue via the

18   client."

19   **A.**   That's in the statement, yes.

20   **Q.**   "The whole team, including myself, were all congratulated

21   on this deal by senior management, including Steve Smit and

22   David Puth."

23   **A.**   I recall that, yes.

24   **Q.**   "If State Street really would not allow or did not

25   approve to take a markup through our trading affiliates, then

1    certainly David Puth, Brian Woodard, or Mark Hansen would

2    have spotted this dramatic increase in revenues immediately

3    as all of them had sight of State Street's daily revenue

4    numbers."

5           That's your writing?

6    **A.**   They had sight of the revenue numbers, yes.

7    **Q.**   Mark Hansen is global head of compliance, correct?

8    **A.**   He is, for SSGM.

9    **Q.**   "If there had really been a problem with the model of the

10   transaction, it would have been corrected in 2010."

11          That's what you wrote to the employment tribunal?

12   **A.**   That's what I wrote, yes.

13   **Q.**   I want to be clear here.  The very most senior

14   management, senior legal, and senior compliance were all well

15   aware of the deal, how it worked, and none of them raised any

16   queries.

17   **A.**   I made assumptions that they would have spotted the zero.

18   I can't say that for certain.  But I made, for this purpose,

19   that assumption, yes.

20   **Q.**   You used that assumption and made an unconditional

21   statement to the employment tribunal.

22          "David Puth, Mark Hansen, Brian Woodard, Ross

23   McLellan, and Simone Paul all knew that a zero commission was

24   being quoted and yet a day after this large transition, State

25   Street showed several million US dollars had been received."

1   **A.**   They were either on the e-mail trail, or as I understood

2   it, been talked to by Ross.  So I just assumed they knew

3   which, you know, is probably a step too far, but that's what

4   I wrote.

5   **Q.**   Well, Simone Paul was the one that you were in direct

6   one-to-one communication with, not Ross, correct?

7   **A.**   Yes, Simone Paul came to my office in the morning of the

8   3rd, I believe, and said you can go ahead with the trade.  It

9   says fixed income, so you're okay.

10   **Q.**   Did she know it was zero commission?

11   **A.**   I don't know.

12         MR. FRANK:  Objection to what she knew.

13   BY MR. WEINBERG:

14   **Q.**   Did you understand that she knew it was zero commission?

15   **A.**   I simply dont know.  I wanted her to understand it, but I

16   just don't know.

17   **Q.**   But you wrote to the employment tribunal, or allowed your

18   lawyers to write a statement you signed, "Simone Paul, the UK

19   lawyer, knew that zero commission was being quoted."

20         Was that true or false?

21   **A.**   I did say that and it was an assumption.  She may have

22   and she may not.  I don't know.

23   **Q.**   And again, you weren't considering her interest as a

24   lawyer, or her position as a State Street lawyer when you

25   unconditionally wrote to the employment tribunal Simone Paul

1    knew, correct?

2              MR. FRANK:  Asked and answered numerous times.

3              THE COURT:  Overruled.

4              THE WITNESS:  I wasn't thinking of her position.

5    No, I didn't realize that that would have any impact at that

6    point.  Actually, Simone Paul had already left the bank,

7    because she left in 2011, I believe.

8    BY MR. WEINBERG:

9    **Q.**  You weren't thinking about what effect this had on her

10   profession, were you?

11   **A.**  I wasn't, no.

12   **Q.**  Okay.  That's all.

13             Now, Mr. Frank has focused you on six or seven

14   transitions during his direct examination, correct?

15   **A.**  He did, yes.

16   **Q.**  Were these the only transitions where nondisclosed

17   revenues were charged to clients?

18   **A.**  I think there was another client where we had undisclosed

19   revenues, but that client, in my view, was not misled.

20   **Q.**  Do you remember a client named Henkel, H-e-n-k-e-l, from

21   2009?

22   **A.**  No, I don't.

23   **Q.**  Let me see if I can refresh your recollection.  This is

24   January 2009.  It was before Ross McLellan was head of global

25   PSG; is that correct?

1    **A.**  Yes.  That's correct.

2            MR. WEINBERG:  Could we have 792.  Could you show

3    Mr. Pennings the top e-mail.

4            And this is not in evidence, Your Honor.

5            THE COURT:  I understand.

6            MR. WEINBERG:  Henkel --

7            THE COURT:  You're just refreshing his

8    recollection?

9            MR. WEINBERG:  Yes, Your Honor.

10           THE COURT:  Why don't you just have him read it.

11           Did you read it?

12           THE WITNESS:  Yeah, I read the e-mail.  I don't --

13   I don't recall it, but it's clearly from me.

14           MR. FRANK:  He can't see the entire document,

15   they've excerpted one line.

16           MR. WEINBERG:  I'm glad for you to see the whole

17   document.  Can you show the entire document?

18   BY MR. WEINBERG:

19   **Q.**  Who was Andreas Franz?

20   **A.**  Andreas Franz was someone who worked in Germany for State

21   Street Custody.

22   **Q.**  What is he asking you to do in January of 2009?

23   **A.**  If I can just read that.

24   **Q.**  Sure.

25   **A.**  (Witness reviews document.)  Okay.  He's asking us to put

1      a pre-trade together for a 200 million euro portfolio.

2      **Q.**  And what do you tell Mr. Boomgaardt?

3      **A.**  "I would use eight basis point commissions and $0.02 per

4      share in the US."

5              Which is odd, because the subject line says "global

6      credit," which would refer to a fixed income trade, and I'm

7      quoting -- or I'm suggesting to him equity commissions.

8              MR. WEINBERG:  Okay.  794.  Can you show, first,

9      Mr. Pennings, the bottom e-mail?  Thanks, Max.

10     BY MR. WEINBERG:

11     **Q.**  Do you see certain questions being asked by a

12     representative of Henkel?

13             MR. FRANK:  Objection, form.

14     BY MR. WEINBERG:

15     **Q.**  Of Mr. Franz?

16             MR. FRANK:  Objection to form.

17             THE COURT:  Overruled.

18             It's just yes or no.

19             THE WITNESS:  If I can --

20             MR. FRANK:  Your Honor, he's being asked what the

21     document says, rather than what he remembers.

22             MR. WEINBERG:  Thank you, Mr. Frank.

23             THE COURT:  Once you've read it.  If you want to

24     read the others, you can.

25             THE WITNESS:  (Witness reviews the document.)

1    Okay.

2    BY MR. WEINBERG:

3    **Q.**  One of the questions being asked by the client, through

4    Mr. Franz, was what is the fee that State Street is charging,

5    correct?

6    **A.**  Yes.  So it looks like we've put a -- or a pre-trade

7    analysis together, which came to 56 basis points, or

8    something.

9            MR. WEINBERG:  Can we go up to the top, top two

10   e-mails, thanks.

11   BY MR. WEINBERG:

12   **Q.**  So Mr. Franz is asking you and Mr. Boomgaardt, "Can you

13   please urgently advise me on the questions that you had just

14   read," correct?

15   **A.**  Uh-huh.

16   **Q.**  And you were saying the fee is two basis points, correct?

17   **A.**  That's what it says, yeah.

18   **Q.**  Even though on the e-mail before, six days earlier, you

19   said you would use eight basis points commission?

20           MR. FRANK:  Again, object to form, Your Honor.

21           THE COURT:  Overruled.

22           THE WITNESS:  Okay.  It's two basis points, yes.

23   BY MR. WEINBERG:

24   **Q.**  Do you recall just a second ago, on a January 9 e-mail,

25   you were saying to Mr. Boomgaardt, "I would use eight basis

1    points commissions and two CPS in the US"?

2    **A.**  Yes, I would like to see what this particular transition

3    is about.  In Germany we had what we would refer to sometimes

4    as broker deals, that just merely move the securities from

5    one account to another.  So I'm not sure if this is a proper

6    transition or not.  I just don't know.

7    **Q.**  So broker-dealers, would it be a routine practice to

8    charge undisclosed markups on broker-dealers?

9    **A.**  I don't think undisclosed was routine, no.

10   **Q.**  Do you charge AHV, a Swiss client, undisclosed markups?

11   **A.**  Yes, we did.  That's the one that I just referred to.

12           MR. WEINBERG:  Can we have 796 at the top.

13           THE WITNESS:  In relation to Henkel, I don't think

14   this was undisclosed.  I might be mistaken here.

15           MR. WEINBERG:  Moving on.  We're going to look at

16   796.  Top paragraph, top e-mail.

17   BY MR. WEINBERG:

18   **Q.**  Please read this and I'll ask whether it refreshes your

19   recollection as to whether or not you wanted the client to

20   know the revenues that were generated by this transition.

21           MR. FRANK:  I ask that the witness be allowed to

22   read the entire document.

23           THE COURT:  Yes, you can read the whole chain, if

24   you want.

25           THE WITNESS:  I don't know what this is.

 1             THE COURT:  Is the Exhibit just one page?

 2             MR. WEINBERG:  No, it's three pages, Your Honor.

 3             THE COURT:  Do you want to just give him a paper

 4     copy?  Would that be quicker?

 5             MR. FRANK:  Could we have a copy, as well, Your

 6     Honor?

 7             THE COURT:  Yes.

 8             THE WITNESS:  (Witness reviews document.)

 9             Okay.  I've read it.

10     BY MR. WEINBERG:

11     Q.  Were you advising the State Street team not to disclose

12     the amount of revenues to the client?

13     A.  I've not -- this does not refresh my recollection.  It

14     could be.  I would just be speculating.  So "make sure that

15     they treat this revenue confidential, as it is not to go back

16     to the client," I have no idea what it refers to.

17     Q.  Let's take the words and see if we can figure it out.

18     A.  Well, I can see the words.  I was just hoping that there

19     was more information, so that I could explain it.

20     Q.  Not to go back to the client means that you don't want

21     the revenues to go back.  You want them held confidential,

22     doesn't it?

23     A.  This revenue is confidential.  That's what it says.

24     Q.  Not to go back to the client?

25     A.  That's what I read out.  I just don't know what it is.

1    **Q.**   There was 790,000 euros made -- or was it 930,000?

2             MR. FRANK:  Your Honor, may we approach?

3             THE COURT:  Sure.

4             How much longer do you have, Mr. Weinberg?

5             MR. WEINBERG:  Judge, if we took a break, I could

6    crystallize the remaining 15 minutes or so.

7             THE COURT:  Why don't we take the morning break now

8    and then I can talk to them and we don't have to sit here and

9    listen to this.

10            All rise for the jury.

11            (The jury exits the courtroom.)

12            THE COURT:  Mr. Pennings, you can step out.

13            You need to do it at sidebar?

14            MR. FRANK:  Not if the witness and jury aren't

15   here, Your Honor.

16            THE COURT:  Okay.  You can all be seated.

17            Can I take a look at the exhibit?  That might be

18   helpful.

19            MR. WEINBERG:  Sure.  I was directing him to the

20   bottom of page 3 of the chain.

21            THE COURT:  It starts on page 3 and works its way

22   backwards?

23            MR. WEINBERG:  Yes, I think so.

24            And this was my last question on this subject, Your

25   Honor.

```
1              THE COURT:  Okay.

2              What's P-A-T-T?

3              MR. WEINBERG:  (Indicating.)

4              THE COURT:  Okay.  So the question you want to ask

5         is what?

6              MR. WEINBERG:  Is whether or not, at the time, he

7         was essentially telling Mr. Gority (phonetic spelling) not to

8         disclose to the client what the revenues were, the revenues

9         were over 900,000 euros.

10              MR. FRANK:  Your Honor, there's a couple of

11         objections.  One is that the witness has already testified

12         that there's not information in this one document to refresh

13         his recollection as to what's going on here.  And in fact, on

14         the face of this document, he himself is asking what those

15         back revenues are.  He has no idea what they are.

16              The second objection is this e-mail is plainly

17         before the transition had occurred.  No revenue had actually

18         been earned at this point and so the question is misleading.

19         They're talking about expected revenues.  He's asking what

20         revenues they are even talking about.  So it's highly

21         misleading to suggest that he's hiding revenues from the

22         client when the deal had not been done.

23              THE COURT:  Well, I don't find that it's highly

24         misleading, because it could be --

25              MR. FRANK:  Well, he's asking what revenues were
```

1      earned and, in fact, this is not what that document is

2      talking about.

3              MR. WEINBERG:  It's just as probative if he says

4      that he understood this to be what revenues should be

5      disclosed on a pre-trade estimate.  It's all before Mr.

6      McLellan and that's the point, Your Honor.

7              MR. FRANK:  The point is that that was not the

8      question that was asked.  And more importantly, the witness

9      has testified that this single document does not refresh his

10     recollection and on the --

11             THE COURT:  The problem more is that -- that the

12     witness has said I don't really know what I meant when I

13     wrote this.  Right?

14             MR. WEINBERG:  Yes.  Which --

15             THE COURT:  And you've asked him the question and

16     he said, essentially, I wrote this and I don't know what I

17     meant when I said treat the revenues confidential as to not

18     go back.

19             MR. WEINBERG:  And I'm testing the veracity of that

20     claim to not know what it meant to treat the revenue

21     confidential as to not going back to the client.

22             MR. FRANK:  He's tested it, Your Honor.  The

23     witness has said he doesn't remember it.  There's many

24     reasons.

25             MR. WEINBERG:  I think it helps the testing process

1    for there to be 900,000 euros at issue --

2              THE COURT:  The 900,000 euros comes on page 3?

3              MR. WEINBERG:  It comes from page 3, the MBO deal

4    is given the revenue at 963.

5              MR. FRANK:  That's like five e-mails back.

6              MR. WEINBERG:  It's the same day.  It's about an

7    hour and a half back.

8              MR. FRANK:  On the first page, there are different

9    revenue numbers being talked about and the witness is

10   questioning, on the document, what those revenues are.  He

11   doesn't know.

12             THE COURT:  He doesn't know what one of them is.

13             MR. FRANK:  Correct.  And the other one is not

14   900,000.

15             MR. WEINBERG:  It's 963,417.

16             MR. FRANK:  Not on the first page, Your Honor.

17             MR. WEINBERG:  The third page has higher numbers.

18             THE COURT:  Higher and lower.

19             MR. FRANK:  The higher number, he doesn't know what

20   it is, and the lower number is not what was being asked about

21   and the revenues haven't been earned and he doesn't remember

22   the document or the transaction and it's a year before the

23   charged conspiracy.

24             MR. WEINBERG:  Precisely.  It's relevance.

25             THE COURT:  Fine.  I think that, I guess, Mr. Frank

 1    has made a number of different objections.  I don't think

 2    that it's misleading because the revenue hasn't been earned,

 3    because you're -- what you're asking about is whether you

 4    want to disclose it, be it in advance, when you make an

 5    estimate.  We don't want to tell the client we're going to

 6    make this, or we don't want to tell the client we didn't make

 7    that.  You're indifferent to that.  It appears from this

 8    chain that they haven't done the transition.  But the point

 9    is the same.

10            So he said he doesn't recall it, the transition or

11    this.  What question would you want to ask him now?

12            MR. WEINBERG:  Does it refresh your recollection

13    when you review an e-mail that shows 963,417 euros as the

14    projected revenue, that you didn't want that revenue to go

15    back to client, you wanted to be hidden from the client, to

16    use Mr. Frank's words.

17            MR. FRANK:  That's not what this e-mail says and

18    the witness has testified that it doesn't refresh his

19    recollection.

20            MR. WEINBERG:  This e-mail means -- doesn't mean

21    that it's not said.

22            MR. FRANK:  Mr. Weinberg, himself, has testified he

23    doesn't know what the revenues referred to when Your Honor

24    asked him about back revenues, which is what's on the first

25    page of this e-mail chain.

1          MR. WEINBERG:  Not every word of this e-mail is

2     relevant and I'm not offering the e-mail as an exhibit.  I'm

3     offering it to refresh his memory that he has practiced.

4     This isn't the first time in his life that he didn't disclose

5     revenues to clients as the Government has tried to put in

6     this case.

7          MR. FRANK:  That's not what we're talking about

8     this case.  Nondisclosed revenues are not the subject of this

9     case, lies are the subject of this case.  Second of all, the

10    document at page 3 says, "the BATT feedback into the MBO deal

11    is giving the revenue at 963" and in the very first e-mail,

12    the last e-mail on the chain, the defendant says what are

13    these BATT revenues anyway?"

14         So to ask him about revenues that, on the face of

15    the document, he's indicating he doesn't know what they are,

16    and to suggest that he's hiding those revenues whose identity

17    he is unaware of from the client is highly misleading.

18         MR. WEINBERG:  This is what redirect is for.  "Make

19    sure they treat this revenue confidential, as it is not to go

20    back to this client" is distinct from the next sentence.

21    "What are these BATT revenues anyway."

22         MR. FRANK:  These are not -- the BATT revenues,

23    which is what Mr. Weinberg is talking about with the 963 are

24    not the revenues that the witness is talking about keeping

25    confidential.  And the witness has testified he doesn't know

1    the circumstances of the confidentiality.  He has testified

2    that there were deals where there were undisclosed revenues.

3    He's cited the AHV deal as an example.  Again, undisclosed

4    revenues are not lies.

5            MR. WEINBERG:  Undisclosed revenues are what this

6    case is very much about, Your Honor.  The Government wants to

7    use lies.  We believe, at most, the Government proof has

8    established an undisclosed revenues which were consistent --

9            THE COURT:  I don't think you can just read to him,

10   though, things that -- in order to refresh his recollection,

11   right?  You can show it to him, but I don't think you can

12   just read something and say -- you can say does -- looking at

13   this, looking at that, does that refresh your recollection.

14   Can you just read to him and say, does it refresh your

15   recollection, X, Y, Z?

16           MR. WEINBERG:  I think I can, Your Honor.

17           MR. FRANK:  I do not think you can and that is what

18   I've been objecting to.  That is completely prohibited.

19   That's admitting a document into evidence that's not in

20   evidence.  The point of putting a document in front of a

21   witness, when he doesn't remember them, is to refresh his

22   recollection.

23           THE COURT:  I think you can test his memory.  I

24   don't think you're foreclosed from inquiring further, merely

25   because he says he doesn't recall.  However, I don't -- and

1    it seems to me, in reading this, there's two different -- my

2    just quick readthrough, there's two different revenue streams

3    that are being talked about.  There's this so-called BATT

4    money, 963,000 and change pounds, which appears like --

5    reappears on the first page as the 1.3 million US dollars and

6    then there's some other revenue that's referred to.

7            MR. WEINBERG:  It matters not to me which revenues

8    are at issue, what matters to me is he's telling Mr. Gority

9    (phonetic spelling), don't tell the client about the

10   revenues.

11           MR. FRANK:  And that's been asked and answered.

12           MR. WEINBERG:  Not to my satisfaction, Mr. Frank.

13   It's cross exam and you get redirect.

14           MR. FRANK:  And that doesn't address the issue --

15           THE COURT:  You can ask him more about it.  I don't

16   think you're limited.  The asked and answered objection is

17   overruled, but I don't think you can read him these things

18   and say well, haven't you read it?  You know, you can say did

19   you read it carefully, did you read all three e-mails, did

20   you read all three pages.  But I don't think you can say to

21   him, okay, well, it says here, this, does that refresh your

22   recollection.  If he read it and it didn't refresh his

23   recollection, it didn't.

24           MR. WEINBERG:  Shortly after the break, Your Honor,

25   and I do intend to wind down the cross, there may well be a

1   tape.

2          THE COURT:  A tape.

3          MR. WEINBERG:  It's about a two-minute tape.  I'm

4   glad to play it, because it is short, to the witness with Mr.

5   Frank listening.  It does relate to, again, Mr. Pennings' not

6   disclosing or not wanting disclosed to clients, you know,

7   different revenues in a pre-trade this time.

8          THE COURT:  Oh, you're thinking that you might need

9   to refresh his -- are you offering the tape, or is it

10  something you just might want him to listen to to refresh his

11  recollection.

12         MR. WEINBERG:  It's something I would offer it, but

13  I would also want to refer to it as refreshing his

14  recollection, and see what he says about it.

15         THE COURT:  Do you know which tape this is?

16         MR. FRANK:  I have no idea, Your Honor, and I don't

17  know that it's --

18         THE COURT:  I don't know what -- so I don't know

19  what you're asking me, Mr. Weinberg.  Are you asking me to

20  play it --

21         MR. WEINBERG:  I'm just previewing it, since we had

22  a lot of pretrial litigation about this, that this is that

23  moment when tapes may become relevant.  So while we're on a

24  break, we can discuss this.

25         THE COURT:  So why don't you -- a couple things.

1    One, why don't you tell Mr. Frank what it is.  At this point,

2    he's not talking to Mr. Pennings, anyway.  There doesn't seem

3    to be any downside to you.  And you can see.  Then you'll

4    decide what your view is and then we can talk about it before

5    I bring the jury back, as to what, if any, issues it

6    presents.  And whether there's no objections, or whether

7    there are objections and what they are.

8          And if we need to play it to Mr. Pennings outside

9    the presence of the jury, better to do it before we bring

10   them back in, rather than send them out and back.  So we'll

11   give you time for that.

12         Second, about how much longer do you think you are,

13   including that if you got all you wanted out of it?

14         MR. WEINBERG:  I would say 20 minutes, is -- what I

15   would ask the Court is to allow us 15 minutes.  So I want to

16   talk to Mr. McLellan and the defense team.  This is an

17   important witness.

18         THE COURT:  I'll give you a little longer break, is

19   what you're saying, than usual.

20         MR. WEINBERG:  Thank you.

21         THE COURT:  That's fine.  So okay.  And then in

22   terms of redirect, obviously, you don't know for sure,

23   because you haven't heard all the cross yet, and one thing

24   you don't know what he's going to ask about, but ballpark at

25   the moment.

1          MR. FRANK:  Not very long, Your Honor, less than a

2     half an hour, but it would be helpful to me in keeping it

3     short, if I could have five minutes after the cross to

4     collect my thoughts and get organized, if we could take a

5     five-minute break.

6          THE COURT:  So -- all right.  We'll come back to

7     that.

8          So tell him what the tape is and why don't you do

9     that and then I'll see you in a couple minutes.  Not to be

10    done with the break, but just to see where we are on that, to

11    figure out how long we need.  So short redirect and then

12    probably no recross, or short recross.  So we certainly

13    finish this witness before the end -- before 1 o'clock.

14         Will we want to --

15         MR. FRANK:  We're going to probably -- assuming

16    that we're not -- well, I already understand that one witness

17    is going to be crossed for 45 minutes, so we're definitely

18    going to go into the afternoon.

19         THE COURT:  We're going into the afternoon.  Okay.

20    Fine.  Okay.  So nothing further to tell the jurors about the

21    schedule today, sort of on track for what I told them before.

22    Maybe we finish a little before 4:30, maybe not.  Okay.

23         MR. WEINBERG:  I'm going to show Mr. Frank three

24    different alternative audios that we want to play.

25         MR. FRANK:  Three different calls now?

```
 1              MR. WEINBERG:  Yes.
 2              THE COURT:  Why don't you do this.  I'll be in the
 3     back.  If there are any issues with respect to the audio that
 4     you want to raise with me, either in the form of objections
 5     or you want Mr. Pennings to hear them before, just tell
 6     Ms. Simeone and she'll get me, I'll be right here.
 7              MR. WEINBERG:  Thank you.
 8              THE COURT:  Otherwise, I'll -- so if I don't hear
 9     from you, I'll come back at 11:25 -- is 11:25 enough time?
10              MR. WEINBERG:  That will be great.
11              THE COURT:  Okay.  And if I hear from you before,
12     I'll come back before then, but if you have objections about
13     those, get me before, as soon as you know,.
14              MR. FRANK:  Thank you, Your Honor.
15              THE DEPUTY CLERK:  This matter is in recess.
16              (Court in recess at 11:08 a.m.
17              and reconvened at 11:20 a.m.)
18              THE COURT:  Please be seated.  So you have one
19     issue?
20              MR. FRANK:  Well, I've just been advised that none
21     of the tapes are coming in.  So I have no objections, Your
22     Honor.
23              THE COURT:  Okay.
24              MR. FRANK:  So withdrawn.  I really could use five
25     minutes to --
```

1          MR. WEINBERG:  He should use it now.  I'm going to

2    be about five or six more with the --

3          THE COURT:  I'm sorry.  Wait.  Just to be clear.

4    Do you need more time to talk to your client, Mr. Weinberg?

5          MR. WEINBERG:  What I'm saying is as a result of

6    the recess, I've shortened the --

7          THE COURT:  So you now have five, six minutes of

8    cross left?

9          MR. WEINBERG:  Just a conclusion.

10          THE COURT:  And a couple of tape issues that might

11    have been are gone?  Okay.

12          MR. FRANK:  If I could use those five minutes, I'll

13    be fine.

14          THE COURT:  So why don't we take five more minutes

15    now and then we'll go seamlessly --

16          MR. FRANK:  I'll deal with the last five minutes on

17    the fly.

18          THE COURT:  There you go, I have full faith and

19    confidence that you can do that.

20          MR. FRANK:  Like a real lawyer.

21          THE COURT:  Ah.

22          MR. WEINBERG:  Well, I predict my conclusion.

23          THE COURT:  Well, actually real lawyers do prepare.

24    It's clear you have prepared, so you are a real lawyer.  But

25    to the extent what you're saying is real lawyers are -- I

1    think what it means you mean is that because you're so

2    prepared, you're able to respond to the last five minutes,

3    with -- based upon all the preparation that you're done,

4    rather than merely making it up as you go along, which isn't

5    really a real lawyer.  But that I don't have any doubt that

6    you're capable of doing, based on all the work that's been

7    evident here.  All right.  So we'll take five minutes or so

8    and then I'll come back out and get the jury.

9              MR. FRANK:  Thank you.  And I'd like a copy of the

10   transcript for my mother.

11             THE DEPUTY CLERK:  This matter is in recess.

12             THE COURT:  I thought you were going to tell me you

13   wanted it for Mr. Lelling.

14             MR. WEINBERG:  Actually, his first job in private

15   practice.  He'll have it in a billboard on his office.

16             (Court in recess at 11:22 a.m.

17             and reconvened at 11:29 a.m.)

18             THE COURT:  Are you all set?  Other than getting

19   Mr. Pennings?

20             MR. WEINBERG:  Yes, I've told Mr. Frank, Your

21   Honor, that my cross-exam is concluded.

22             THE COURT:  Oh, you don't have five minutes?

23             MR. WEINBERG:  I wanted to stick within the

24   schedule that I asked you for yesterday, two hours.

25             THE COURT:  All right.  If I go out again and come

1    back, will that -- will the Government --

2              MR. WEINBERG:  Every time you go out, it gets

3    shorter.

4              THE COURT:  Yeah.  Okay.  So we're done.  Let's get

5    Mr. Pennings.  So all you're going to do is say you don't

6    have any more questions?

7              MR. WEINBERG:  Yes.

8              THE COURT:  Fine.  Okay.

9              Maria, you can go get the jury.

10             You can be seated.  Thank you.

11             (The jury enters the courtroom.)

12             THE COURT:  All right, Mr. Weinberg, when we broke,

13   you were doing your cross-examination.  Do you have any other

14   questions?

15             MR. WEINBERG:  No other questions, Your Honor.

16             THE COURT:  All right.  Mr. Frank, do you have any

17   redirect?

18             MR. FRANK:  Briefly, Your Honor, thank you.

19             THE COURT:  All right.

20             **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

21   BY MR. FRANK:

22   **Q.**  Mr. Pennings, you were asked some questions about your

23   competitors, Citibank, Nomura, Bank of New York, Goldman

24   Sachs, Credit Suisse, and Morgan Stanley, and whether they

25   also had the capability of earning undisclosed revenues?

1    **A.**   Yes.

2    **Q.**   Do you recall those questions?

3    **A.**   Yes.

4    **Q.**   Those investment banks -- those are all investment banks,

5    correct?

6    **A.**   I believe --

7    **Q.**   Citibank, Nomura, Bank of New York, Goldman Sachs, Credit

8    Suisse, and Morgan Stanley?

9    **A.**   Yes.

10   **Q.**   And State Street is not an investment bank, is it?

11   **A.**   No.

12   **Q.**   And so those banks had legitimate ways to make money from

13   trading for their own accounts that were unavailable to State

14   Street; is that correct?

15            MR. WEINBERG:  Objection.

16            THE COURT:  Sustained as to the form.

17   BY MR. FRANK:

18   **Q.**   Those banks had other ways of making money that were not

19   available State Street?

20            MR. WEINBERG:  Objection to leading.

21            THE COURT:  The initial leading questions are fine,

22   but this is more substantive.

23            MR. FRANK:  This is redirect.

24            THE COURT:  Right, but it's still direct.  I don't

25   have with you leading sort of as to preliminary matters, but

1    now you're getting to the substance of his testimony, and I

2    think it should be not leading.

3    BY MR. FRANK:

4    **Q.**  To what extent did you understand whether those banks had

5    other ways of making money that were not available to you?

6    **A.**  I knew that investment banks could make money in other

7    ways.

8    **Q.**  And that wouldn't involve lying to clients?

9    **A.**  There are legitimate ways to make revenues without

10   disclosing them and not lying.

11   **Q.**  Thank you.  You were asked some questions about Steve

12   Smit and what he may or may not have known.  Do you recall

13   those questions?

14   **A.**  Yes.

15   **Q.**  If Steve Smit were aware of the fact that you were hiding

16   commissions from clients and lying to them about it, what

17   would that make Steve Smit?

18          MR. WEINBERG:  Objection.

19          THE COURT:  Sustained as to that.  That's

20   speculative and asks for a conclusion.

21   BY MR. FRANK:

22   **Q.**  Did you tell Steve Smit you were lying to clients?

23   **A.**  No, not in those words, no.

24   **Q.**  You were asked some questions about what you told Mark

25   Leaden.  Do you recall that?

1    **A.**   Yes.

2    **Q.**   And you initially -- I believe you testified you

3    initially told him that this was an error, what had happened

4    to Royal Mail?

5    **A.**   Yes.  Yes.

6    **Q.**   And then Mr. Weinberg asked you -- contrasted that with

7    what you told the tribunal, which was that the charges were

8    intentional, correct?

9    **A.**   I'm not sure if I understand.

10   **Q.**   You told Mr. Leaden it was an error?

11   **A.**   Yes.

12   **Q.**   You told the tribunal it was on purpose and it was okay?

13   **A.**   That -- I'm not sure if I said that in the tribunal, but

14   I wasn't truthful there.

15   **Q.**   Did you suggest to the tribunal that the Royal Mail

16   charges were intentional and were okay?

17   **A.**   No, I never said they were intentional.

18   **Q.**   You had charged undisclosed commissions to Royal Mail.

19   **A.**   Yes.

20   **Q.**   You didn't tell the tribunal it was an accident.

21   **A.**   Umm --

22   **Q.**   Your position in the tribunal was that it was not an

23   error, correct?

24                   MR. WEINBERG:  It's leading.  I object.

25                   THE COURT:  Sustained as to the form.

1          Mr. Pennings, wait.  That's all right.

2          I sustained the objection, so you don't have to

3     answer the question.

4     BY MR. FRANK:

5     **Q.**  Was it your testimony in the tribunal that Royal Mail had

6     been inadvertently charged?

7     **A.**  Yes.

8     **Q.**  In the tribunal, you told them that they had been

9     inadvertently charged?

10    **A.**  It was an error.

11    **Q.**  You told the tribunal it was an error?

12    **A.**  I'm not sure if I'm understanding what you're --

13    **Q.**  I'm not sure you are, either.

14         THE COURT:  No commenting on the --

15    **A.**  I think I misunderstand what you were asking --

16         THE COURT:  Nonleading questions, I think, will

17    help.

18    BY MR. FRANK:

19    **Q.**  What was your position with respect to Royal Mail in the

20    tribunal.

21    **A.**  That we didn't do anything wrong.

22    **Q.**  And what was your position with respect to Royal Mail --

23    okay.  That you didn't do anything wrong?

24    **A.**  Yes.

25    **Q.**  You're aware, are you not, that the defendant told Mark

```
 1   Hansen --
 2           MR. WEINBERG:  I object.  This is going to be
 3   leading again, Your Honor.
 4           MR. FRANK:  It's going to be leading?
 5           MR. WEINBERG:  Yes, it is leading.
 6           MR. FRANK:  I'm establishing the background.
 7           MR. WEINBERG:  It's not background, it is a leading
 8   question.
 9   BY MR. FRANK:
10   Q.  Are you aware of what Mr. McLellan told Mr. Hansen at the
11   beginning of the week of August 22nd?
12   A.  I wasn't party to --
13           THE COURT:  That's just yes or no, if you're aware
14   of that.
15           THE WITNESS:  No.
16   BY MR. FRANK:
17   Q.  Have you seen an e-mail where Mr. McLellan -- Mr.
18   McLellan asked you to draft a compliance letter?
19   A.  Yes.
20           MR. WEINBERG:  Beyond the scope, Your Honor.
21           MR. FRANK:  No, it's not.
22           MR. WEINBERG:  Yes, it is.
23           THE COURT:  I'll overrule it for now.
24   BY MR. FRANK:
25   Q.  You were asked to draft a compliance letter?
```

1    **A.**  Yes.

2    **Q.**  You were aware of who was to sign that letter?

3    **A.**  Yes.

4    **Q.**  Was the letter true or untrue?

5    **A.**  Untrue.

6              MR. WEINBERG:  Objection, Your Honor.

7              THE COURT:  Overruled.

8    BY MR. FRANK:

9    **Q.**  What did the letter say about the charges on Royal Mail?

10   **A.**  That they were an error.

11   **Q.**  And you're aware that Mr. McLellan later took the

12   position with respect to compliance that the charges were not

13   an error?

14             MR. WEINBERG:  Judge, I object.  That's a leading

15   question.

16             THE COURT:  Sustained as to that, both as to

17   leading and as to time frame.

18   BY MR. FRANK:

19   **Q.**  Are you aware of what Mr. McLellan told compliance at the

20   end of the week of August 26th?

21             MR. WEINBERG:  Objection, beyond the scope.

22             MR. FRANK:  It's not beyond the scope, Your Honor.

23   I'm happy to explain.

24             THE COURT:  I think I want to see both of you at

25   sidebar.

1          (The following discussion held at the bench.)

2          MR. WEINBERG:  My first objection is Mr. Frank may

3    have gotten into the rhythm of cross in the last two hours,

4    but his redirect is --

5          THE COURT:  He's fixing that.

6          MR. FRANK:  I am fixing that, but it's my

7    understanding that on redirect, there's generally a little

8    more latitude.

9          THE COURT:  I agree.  I'm giving you that.

10         MR. FRANK:  Thank you, Your Honor.  The issue is

11   that Mr. Weinberg attempted to establish on cross-examination

12   that Mr. Pennings was not credible, because he had first told

13   Mark Leaden of compliance that it was an error and later

14   testified that it was intentional and it was permitted.

15   That's exactly what I'm establishing the defendant did.

16         MR. WEINBERG:  I offered that for impeachment to

17   show that he's willing to recuse another person.  I did not

18   go into the substance.

19         MR. FRANK:  That's not what it was about.

20         MR. WEINBERG:  Can I finish, Steve?

21         MR. FRANK:  It was about that portion -- there was

22   a different portion of the cross-examination about accusing

23   another person.  That portion was simply about the fact that

24   he told Leaden it was an error and he later told the tribunal

25   it was intentional.

1          MR. WEINBERG:  Yes, and that was to establish, too,

2     that he was prepared to make an accusation against Leaden.  I

3     did not go into the August 26th tapes, the August 26th

4     letters.

5          THE COURT:  I agree --

6          MR. FRANK:  I'm entitled to establish that the

7     defendant took the exact same stance that he -- it was an

8     error and then --

9          MR. WEINBERG:  No, you're not.

10          MR. FRANK:  -- when that didn't work, he said it

11     was intentional and permitted under the contract.

12          MR. WEINBERG:  That is so far beyond.

13          THE COURT:  It's beyond the scope.  Because it's

14     one thing -- his cross-examination was just about him being a

15     liar on this.  You said this and then you lied and threw

16     somebody under the bus.  But the --

17          MR. FRANK:  But the defendant is lying in the same

18     way, Judge.

19          THE COURT:  He may be, but you have that evidence

20     about his change of position.  But as to the redirect, he

21     didn't go into that.  Not everything that's relevant in the

22     case can you go in on redirect.

23          MR. FRANK:  Okay.

24          THE COURT:  So I think that if the only relevance

25     of all this going to the compliance is to say that, look,

1    they make the point that McLellan did the same thing.  He

2    didn't go into what McLellan did or anybody did.

3              MR. FRANK:  He's been going into what McLellan did

4    the entire time.

5              THE COURT:  No, it's about -- no, he didn't,

6    actually.  Mostly he went into what this guy said and did as

7    being a liar.  So I think this, going into that,

8    comparatively, is beyond.  Like just going into everything,

9    what McLellan did or didn't do, but I don't see that as --

10             MR. FRANK:  Well, how about this, Judge.  Can I

11   establish that after August 26th, they all took the position

12   that it was permitted and intentional?

13             MR. WEINBERG:  I did not go near August 26th.  I

14   didn't even play August -- the August 31st tape, Judge.

15             MR. GOLDSTEIN:  On purpose.

16             THE COURT:  Okay.

17             MR. WEINBERG:  I kept this very close to

18   impeachment.  That was a deliberate decision, so the door

19   wouldn't be open to another redirect that looked like direct.

20             MR. FRANK:  The issue is he conferred with the

21   defendant and then they all changed their stories.

22             MR. WEINBERG:  I didn't go near that.

23             MR. FRANK:  You established that he changed his

24   story.  I'm entitled to say that he did it after consultation

25   with your client.

 1              THE COURT:  Well, I think he can ask him if he

 2      talked to your client, in between the two times that he

 3      changed his story.  That's fair.

 4              MR. WEINBERG:  He didn't change his story.  He had

 5      a consistent story.

 6              THE COURT:  No, he told -- he told Leaden it was a

 7      mistake and then he said it was intentional.

 8              MR. WEINBERG:  He admitted that he lied to

 9      Mr. Leaden.  He never changed his story.  His story was

10      always that this was an error.  That's what he told five

11      different tribunals.

12              THE COURT:  Right, but then he told the tribunal

13      that it was intentional.

14              MR. FRANK:  No.

15              THE COURT:  He told the tribunal that he told

16      Leaden that it was intentional.

17              MR WEINBERG:  That was on --

18              THE COURT:  Right.  And so he can elicit that it

19      was after -- that he talked to your client in between.

20              MR. WEINBERG:  Between the first.

21              THE COURT:  Between the first Leaden conversation

22      and the tribunal.

23              MR. WEINBERG:  He told Freshfields that it was

24      intentional.

25              MR. FRANK:  Yes, that was after conferring with

1    your client.  That was in September.

2              MR. WEINBERG:  Do you have a basis to ask him that?

3              MR. FRANK:  We heard him on August 26th conferring

4    with your client.  And your client advised him that he has

5    now told Hansen.  He's brought Hansen into the loop.

6    Thereafter, they started relying on the contractual argument

7    that was discussed on the 26th call.

8              MR. GOLDSTEIN:  Your Honor, as I understand the

9    ruling, the question is whether or not before he testified at

10   the tribunal, he had a conversation with Mr. McLellan.

11             MR. FRANK:  That's not what I'm establishing.  What

12   I'm establishing is throughout the week of August 22nd, he

13   told Mr. Leaden that it was an error.  They then conferred at

14   the end of that week.  Thereafter, they all, including

15   this -- this witness adopted this story that it was

16   intentional, that it was permitted by the contract, what they

17   discussed on that August 26th claim.  That's when the story

18   changed.

19             THE COURT:  You can put in that his story

20   changed -- that his story changed on August 26th and that his

21   story changed after talking to Mr. McLellan.

22             MR. FRANK:  That's all I want to do.

23             THE COURT:  That's different.

24             I overrule.

25             THE COURT:  Are you objecting to that?

         1            MR. WEINBERG:  First, I object to story.

         2            THE COURT:  Well, yes.

         3            MR. WEINBERG:  If he's going to go back and get

         4    into August 26th to August 31st, it's just going to open more

         5    doors on cross that I didn't open on my cross-examination.

         6            THE COURT:  No, the only thing I understand him to

         7    be going into is that he began saying that it was

         8    intentional, his view of it.  Could have a different view,

         9    but his view is that the witness didn't begin saying it was

        10    intentional until after a particular --

        11            MR. WEINBERG:  So the way it should be elicited, if

        12    at all, is when did you first say it was intentional and why,

        13    rather than Mr. Frank leading him into a conversation that

        14    attributes it to Mr. McLellan.  He's got a very friendly

        15    witness who's very smart.  He doesn't need leading questions.

        16            MR. FRANK:  I don't need to ask it in that vague

        17    and ambiguous way.

        18            MR. WEINBERG:  Yes, you do.

        19            MR. FRANK:  No, I can direct him to the time

        20    period.

        21            THE COURT:  You can direct him to the time period,

        22    but not, didn't you change your story after this phone call.

        23    That's --

        24            MR. FRANK:  Can I establish that the call came in

        25    between and then the story changed?

 1                MR. GOLDSTEIN:  I thought, Your Honor -- I'm a
 2      little confused.
 3                THE COURT:  You want to ask him, did you have a
 4      conversation with Mr. McLellan on such and such a date.
 5                MR. FRANK:  That's correct.
 6                THE COURT:  And then you say --
 7                MR. FRANK:  Thereafter -- -
 8                THE COURT:  What was your story before, what was
 9      your story after?
10                MR. FRANK:  Correct.
11                THE COURT:  That's allowed.
12                (Bench conference concluded.)
13                THE COURT:  So ladies and gentlemen, let me just
14      explain one thing to you that we've been discussing, which is
15      you heard the lawyers refer to scope.
16                So what happens, as I explained to you before
17      the -- it gets narrower as we go into the second round.  So
18      one issue that comes up, as a general matter, on redirect,
19      what Mr. Frank is doing now, you're not entitled to ask
20      questions that are beyond the scope, beyond the topics that
21      were discussed during the cross-examination.
22                The simplest example is that if Mr. Weinberg says I
23      have no questions for a witness on cross-examination, then
24      the scope is zero, and so the other -- then if the other
25      lawyer says Judge, I want to do redirect, the answer is no.

1    There's nothing to redirect on, because there was no

2    cross-examination.  If the lawyer asked one question, to keep

3    it very simple, that was related to one thing.  On redirect,

4    you're limited to that -- to that one area.  It's not

5    reopening everything.  So we've been discussing what are the

6    parameters and what's the scope.  And so what happens on

7    recross is it's generally limited to the scope of what the

8    redirect is.

9            Go ahead, Mr. Frank.

10   BY MR. FRANK:

11   **Q.**  Mr. Pennings, you were asked some questions about what

12   you told Mark Leaden of compliance, during the week of

13   August 22, 2011.  Do you recall those questions?

14   **A.**  By Mark Leaden, yes.

15   **Q.**  What did you tell Mark Leaden during the week of

16   August 22nd about whether the charges on Royal Mail were

17   intentional, or in error?

18   **A.**  They were in error.

19   **Q.**  At the end of the week of August 22nd, while you were on

20   vacation, you had conversations with the defendant.  Do you

21   recall that?

22   **A.**  Yes.

23   **Q.**  And in particular, you had a conversation that we

24   listened to with the defendant and Richard Boomgaardt on

25   August 26th, do you recall that?

**A.**  Yes.

**Q.**  Your employment tribunal, your interviews with Freshfields, all of the various statements that Mr. Weinberg went through with you, occurred after August 26th, correct?

**A.**  Yes.

**Q.**  In those interviews, what, if anything, did you say about whether you were entitled by the contract to charge undisclosed commissions on Royal Mail?

**A.**  As of -- in some of those interviews, I told them that the contract allowed it.

**Q.**  Thank you.  You were asked some questions about your meetings with -- your meeting with State Street lawyers in April of 2011.  Do you recall those questions?

**A.**  Yes.

**Q.**  You were asked whether any lawyer challenged you on a provision of the standard transition management agreement, permitting -- providing for no duty to disclose profits.

Do you recall those questions?

**A.**  Yes.

**Q.**  With respect to each of the clients that we have talked about today, did you make representations to them about what you would be charging?

**A.**  No.

**Q.**  With respect to the clients that are the subject of this case, did you make representations to them about what fees

1    State Street would be charging?

2            MR. WEINBERG:  I object.  It's just been asked and

3    answered, Your Honor.

4            THE COURT:  Overruled.

5            THE WITNESS:  We didn't.

6    BY MR. FRANK:

7    **Q.**  Did you tell Royal Mail what you were going to charge?

8    **A.**  We told them we were going to charge a management fee in

9    lieu of the commissions.

10   **Q.**  That's right.  And what did you --

11           THE COURT:  No, not the, "That's Right."

12           MR. FRANK:  I'm sorry, Your Honor.

13   BY MR. FRANK:

14   **Q.**  And did you make similar representations to Sainsbury's,

15   NTMA, Eircom?

16   **A.**  Yes, the clients were told that we were charging only a

17   small project management fee in lieu of the commissions.

18   **Q.**  Thank you.

19           THE COURT:  You don't need to thank the witness,

20   Mr. Frank.

21           MR. FRANK:  I'm thanking him for the answer, not

22   the substance, Your Honor, but I will refrain from thanking

23   him.

24   BY MR. FRANK:

25   **Q.**  And during that April 2011 meeting with lawyers, did you

1    tell them that you had charged clients a commission after

2    telling the clients you would not charge a commission?

3    **A.**  No, I did not tell them that.

4    **Q.**  You were asked questions about statements you made to the

5    employment tribunal about acting in good faith, not breaching

6    the contract, others within State Street knowing what you

7    were doing.

8            Do you recall those questions?

9    **A.**  Yes.

10   **Q.**  What, if anything, do you recall about whether the judge

11   believed you?

12           MR. WEINBERG:  I object.

13           THE COURT:  Sustained.

14   BY MR. FRANK:

15   **Q.**  What, if anything, do you recall about a judgment that

16   was made about your credibility in those proceedings?

17           MR. WEINBERG:  I object.

18           THE COURT:  Sustained.

19   BY MR. FRANK:

20   **Q.**  Did you win or lose?

21           MR. WEINBERG:  I object.

22           THE COURT:  Overruled.

23           THE WITNESS:  I got an unfair dismissal outcome,

24   but I got no money and the comment was:  You could have been

25   fired, anyway.

BY MR. FRANK:

**Q.**   You made similar statements in the disciplinary proceedings that you were asked about within State Street?

**A.**   Yes.

**Q.**   Did you get your job back?

**A.**   No.

**Q.**   Were your benefits taken away?

**A.**   Yes.

**Q.**   You were asked some questions about State Street paying money back to clients, when there were disputes on occasion. Do you recall those questions?

**A.**   Yes.

**Q.**   In those instances, did you lie to clients about what you were paying back?

**A.**   No.

**Q.**   You were asked a series of questions about the first KIA transition, KIA 115.  Do you recall those questions?

**A.**   Yes.

**Q.**   What, if anything -- and you were asked about conversations with Mr. Das about the spread?

**A.**   Yes.

**Q.**   Do you recall an e-mail -- do you recall what you said to Mr. Das about from whom the spread would be earned in KIA 115?

**A.**   Yes.

1   **Q.**   What did you tell him?

2   **A.**   The other side.

3   **Q.**   What, if anything, did you recall telling the defendant

4   about KIA's sophistication?

5   **A.**   They weren't very sophisticated.

6   **Q.**   Do you recall using the word "clueless"?

7   **A.**   Yes.

8   **Q.**   With respect to the 115 transition, you sent them a

9   periodic notice.  Mr. Weinberg showed it to you, do you

10  remember that?

11  **A.**   Yes.

12          MR. FRANK:  Could we look at Exhibit 11-1, please.

13          THE COURT:  That's in evidence, right?

14          MR. FRANK:  Yes, Your Honor.

15          Could we look at the second page.  Could we blow

16  that up, please, and enlarge.

17  BY MR. FRANK:

18  **Q.**   And this periodic notice says "commission fees zero."  Do

19  you see that?

20  **A.**   Yes.

21  **Q.**   And Mr. Weinberg pointed you to footnote two?

22  **A.**   Yes.

23  **Q.**   "All bonds will be priced net as per market convention."

24          Do you see that?

25  **A.**   Yes.

1    **Q.**   Is that what you got back from KIA?

2    **A.**   I think it was changed.

3              MR. FRANK:  Could we show, for the witness only,

4    Exhibit 21-1, please.  If you could blow up the whole page.

5    BY MR. FRANK:

6    **Q.**   Do you recognize that, Mr. Pennings?

7    **A.**   Yes.

8    **Q.**   What is it?

9    **A.**   It's a periodic notice that we got back from the KIA,

10   which was wrong.

11             MR. FRANK:  Government offers 21-1.

12             MR. WEINBERG:  No objection.

13             THE COURT:  Admitted.

14             (Exhibit No. 21-1 admitted into evidence.)

15             MR. FRANK:  Could we enlarge the -- there we go.

16   Thank you.  And if you could highlight the middle provision

17   there, transaction 116.

18   BY MR. FRANK:

19   **Q.**   Can you tell us what that refers to, Mr. Pennings, that

20   highlighted portion?

21   **A.**   A Japanese equity transition.

22   **Q.**   Number 116?

23   **A.**   Number 116, yes.

24   **Q.**   What transition were you dealing with with Mr. Das here?

25   **A.**   115.

1    **Q.**  Was it a Japanese equity transition?

2    **A.**  No.

3    **Q.**  But this is what they sent back?

4    **A.**  That's what they sent back initially, yes.

5    **Q.**  And if we look at the next page, does that look like what

6    you sent them?

7    **A.**  No.

8    **Q.**  It refers to crossing.  Do you see that?

9    **A.**  Yes.

10   **Q.**  Is that relevant to a bond transition?

11   **A.**  No.

12   **Q.**  Did you take another stab at it and send them another

13   periodic notice?

14           THE COURT:  What did you do next?

15   BY MR. FRANK:

16   **Q.**  What did you do next?

17           MR. FRANK:  I'll get it eventually.

18           THE WITNESS:  I contacted them and sent them the

19   correct version again.

20           MR. FRANK:  Could we look at, for the witness only,

21   23-1, please?

22   BY MR. FRANK:

23   **Q.**  Do you recognize this document?

24   **A.**  Yes.

25   **Q.**  What is it?

1    **A.**  It says 115, the periodic notice.

2    **Q.**  Is this what you sent back to them the second time?

3    **A.**  I believe so, yes.

4            MR. FRANK:  The Government offer 23-1.

5            MR. WEINBERG:  No objection.

6            THE COURT:  Admitted.

7            (Exhibit No. 23-1 admitted into evidence.)

8    BY MR. FRANK:

9    **Q.**  And you've corrected that.  It now says transition 115,

10   fixed income.  Do you see that?

11   **A.**  Yes.

12   **Q.**  Could we look at page 2.  There's no reference to a

13   commission on this document, is there?

14   **A.**  No.

15   **Q.**  What had you told Mr. Das about a commission?

16   **A.**  Zero.

17   **Q.**  And in the footnotes, can you show us the footnote that

18   refers to bonds being priced net with all markups included in

19   the spread?

20   **A.**  If it was there, but it's not.

21   **Q.**  It's not there?

22   **A.**  No.

23   **Q.**  Can we look -- is this what you got back from KIA, after

24   you sent it to them?

25   **A.**  I think we only got the first page back.

1          MR. FRANK:  Could we show the witness only

2     Exhibit 25-1, please.

3     BY MR. FRANK:

4     **Q.**  Do you recognize this document?

5     **A.**  Yes.

6     **Q.**  What is it?

7     **A.**  It's the signed period notice.

8     **Q.**  Do you recall whether or not it was a one-page or a

9     two-page document when you got it back?

10    **A.**  I believe this was it, one page.

11         MR. FRANK:  Government offers 25-1.

12         THE COURT:  Any objection?

13         MR. WEINBERG:  No objection.

14         THE COURT:  Admitted.

15         (Exhibit No. 25-1 admitted into evidence)

16    BY MR. FRANK:

17    **Q.**  That's what you got back, right?

18    **A.**  Yes.

19    **Q.**  It didn't have the table, it didn't have the page two?

20    **A.**  No.

21    **Q.**  Thank you.  You were asked some questions about the

22    second KIA transition and the review that legal performed

23    with respect to whether you could trade opposite the rates

24    desk, do you recall that?

25    **A.**  Yes.

1  **Q.**  You were asked some questions about Exhibit 53.  Could we

2  look at Exhibit 53, please?

3         THE COURT:  That's now in evidence, right?

4         MR. FRANK:  Yes, it is, Your Honor.

5  BY MR. FRANK:

6  **Q.**  Mr. Weinberg showed you the bottom e-mail.  Do you recall

7  that?

8  **A.**  Yes.

9  **Q.**  He didn't show you the top e-mail, did he?

10  **A.**  I spotted it, but he didn't.

11  **Q.**  He didn't ask you any questions about it?

12  **A.**  Didn't ask any questions, no.

13  **Q.**  What did you say to the defendant, Tom Bryant, and Chris

14  Carlin about KIA 121?

15  **A.**  "I don't want to look at the contract with legal, at

16  all."

17  **Q.**  Why didn't you want to look at the contract with legal?

18  **A.**  We didn't want to risk the trade.  If it was going to be

19  scrutinized, we worried that they were going to spot the fact

20  that we said zero and it wasn't zero and they were also going

21  to spot that it was an equity one-off transition management

22  agreement and this was a fixed income deal and I didn't like

23  the rates desk.

24  **Q.**  Could we look at Exhibit 54, please.  That same night,

25  when Mr. McLellan asked you whether legal looked at the

1   agreement, what did you respond?

2   **A.**   "Absolutely not, nor did they look at the periodic

3   notice.  This can of worms stays closed."

4   **Q.**   Could we look at Exhibit 57, please.  And if we look at

5   the bottom e-mail, Mr. McLellan said, "Send to Krystyna or

6   Simone, whoever you like better.  I would be surprised if

7   they accept."

8           Do you recall that?

9   **A.**   Yes.

10  **Q.**   And then you asked -- do you recall asking "accept what?"

11  **A.**   Yeah, "us letting rates quote?"

12  **Q.**   And then he responded, "Letting us to the trade, right"?

13  **A.**   Yes.

14  **Q.**   And again, this was after KIA 115 had already happened

15  and you hadn't consulted legal?

16  **A.**   Yes.

17  **Q.**   And after Dutch Doctors?

18  **A.**   Yes.

19  **Q.**   And ultimately, it was your testimony and you told

20  Mr. Weinberg on cross-examination that you did get legal's

21  authorization, correct?

22  **A.**   That --

23  **Q.**   They let you do the trade?

24  **A.**   Yeah, they let us do the trade, yes.

25  **Q.**   And that was after getting the periodic notice, correct?

1    **A.**   Yes.

2    **Q.**   Could we look at Exhibit 52, please.  52-1.  Do you

3    recognize this to be the periodic notice that was sent to

4    legal to review?

5    **A.**   Yes.

6    **Q.**   And if we could blow up the bottom paragraph there,

7    transition 121.  That refers to a fixed income transaction.

8    Do you see that?

9    **A.**   Yes.

10   **Q.**   And I'd like to look with you at page 2, please.  Can you

11   see that, Mr. Pennings?

12   **A.**   Yes.

13   **Q.**   Could we blow up the bottom three parts there of the

14   table.  Yes.

15          You see the reference to crossing, "in-kind

16   crossing," and "external crossing"?

17   **A.**   Yes.

18   **Q.**   Is crossing a fixed income concept or an equities

19   concept?

20   **A.**   Equities.

21   **Q.**   Would crossing have any applicability to this trade?

22   **A.**   No.

23   **Q.**   Could we go back out and look at the rest of the chart?

24          Do you see any other reference to commissions on

25   this chart?

1   **A.**   No.

2   **Q.**   It's silent; is that correct?

3   **A.**   Yes.

4   **Q.**   And that's what legal was looking at, a silent document,

5   correct?

6   **A.**   I don't know if they were looking at it.  I don't know

7   what they looked at.  It just said zero charges in the

8   crossing bit.

9   **Q.**   In crossing, correct?

10   **A.**   In crossing.

11   **Q.**   And it says, "Extra compensation, custody charges to be

12   met by the transition manager."

13           Do you see that?

14   **A.**   Yes.

15   **Q.**   But there's no reference to commissions, is there?

16   **A.**   No.

17           MR. FRANK:  You can take that down.

18   BY MR. FRANK:

19   **Q.**   You were asked some questions at the beginning of your

20   cross-examination yesterday about your decision to cooperate.

21   Do you recall those questions?

22   **A.**   Yes.

23   **Q.**   You were asked whether you calculated the benefit of

24   working with the prosecution versus the benefits of going to

25   trial.  Do you recall Mr. Weinberg asking you that?

1   **A.**   Yes.

2   **Q.**   When did you decide to plead guilty, Mr. Pennings?

3   **A.**   In -- in 2017, I pled guilty in June.

4   **Q.**   Could we look at Exhibit 203, please.

5          Do you recognize this as your plea agreement?

6   **A.**   Yes.

7   **Q.**   Can we blow up the date?  What was the date this plea

8   agreement was transmitted to you, sir?

9   **A.**   May 31, 2017.

10  **Q.**   Could we look at page 9, please.  What is the date that

11  you signed it?

12  **A.**   The 2nd of June, 2017.

13  **Q.**   At the time that you signed this agreement to plead

14  guilty to the crime with which you were charged, had the

15  Government offered you a cooperation agreement?

16  **A.**   I did not have a cooperation agreement, no.

17  **Q.**   At the time you signed this agreement to plead guilty,

18  had you even met with the Government?

19  **A.**   Other than in court, when I did my earlier plea, no.

20  **Q.**   Did you have any sort of promise of a cooperation

21  agreement?

22  **A.**   No, I wasn't promised anything.

23  **Q.**   Sitting here today, do you recall the date that you first

24  met with the Government to be interviewed?

25  **A.**   When I came here to plead guilty, I believe.

1    **Q.**  That was the first time?

2    **A.**  Yes.  It was in -- again, in June.

3                MR. FRANK:  May I approach the witness, Your Honor?

4                THE COURT:  You may.

5    BY MR. FRANK:

6    **Q.**  Take a look at that document, Mr. Pennings.  Does that

7    refresh your recollection that the first time you met with

8    the Government --

9                THE COURT:  Let him see if it refreshes his

10   recollection, and then ask the question.

11               Is the question when?

12               MR. FRANK:  Yes.

13   BY MR. FRANK:

14   **Q.**  Does that refresh your recollection as to when was the

15   first time you met with the Government?

16   **A.**  Yes.

17   **Q.**  When was the first time you met with the Government?

18   **A.**  June 26th.

19   **Q.**  And when did you enter into a cooperation agreement with

20   the Government?

21   **A.**  After that.

22   **Q.**  And that was weeks after you had agreed to plead guilty

23   to the crime with which you were charged.  Is that true?

24   **A.**  Yes.

25               MR. FRANK:  No further questions.

| | |
|---|---|
| 1 | THE COURT:  Any recross? |
| 2 | MR. WEINBERG:  Yes.  Very short, Your Honor. |
| 3 | **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT** |
| 4 | BY MR. WEINBERG: |
| 5 | **Q.**  Mr. Frank showed you a number of periodic notices back |
| 6 | and forth from KIA, correct? |
| 7 | **A.**  Yes. |
| 8 | **Q.**  The fact is, as you testified at the very end of |
| 9 | yesterday, Mr. Das told you to go with the flow; is that |
| 10 | correct? |
| 11 | **A.**  He did say something like that, yes. |
| 12 | **Q.**  And the flow meant the spread, correct? |
| 13 | MR. FRANK:  Objection to what Mr. Das meant. |
| 14 | MR. WEINBERG:  To you. |
| 15 | THE COURT:  To what it meant to you.  Overruled as |
| 16 | to that. |
| 17 | THE WITNESS:  I believe he said it on two |
| 18 | occasions.  It was also in relation to the -- I mean, what -- |
| 19 | this was in relation to the periodic notice that didn't make |
| 20 | any sense whatsoever. |
| 21 | BY MR. WEINBERG: |
| 22 | **Q.**  And as you've told us many times, Mr. Das knew that you |
| 23 | understood that KIA knew that State Street was going to make |
| 24 | money on this transition; it wasn't really doing it for free. |
| 25 | **A.**  I believe Das understood that. |

1   **Q.**   KIA 121, Mr. Frank showed you an e-mail where you did not

2   want the contract reviewed, correct?

3   **A.**   Correct.

4   **Q.**   But the fact is that you also understood that

5   Mr. McLellan called for the contract, correct?

6   **A.**   He had some further conversations, and it was clear that

7   we had to give the contracts, yes.

8   **Q.**   And so Mr. McLellan asked you for the contract and the

9   periodic notice, and he made the decision to send them on to

10  the head of Global legal, Brian Woodard, and then to the UK

11  legal team, correct?

12  **A.**   I don't exactly know what happened in the background, but

13  I was asked by Ross to send the contract because I enlisted

14  his help in getting this sorted.

15  **Q.**   And you see in the e-mails where US legal was saying that

16  UK legal would review the contract, review the documents, and

17  make a decision whether to authorize KIA 121, correct?

18  **A.**   I've seen the e-mails, yes.

19  **Q.**   So regardless of whether you wanted or didn't want legal

20  to review the contract, they certainly did review it, to your

21  understanding, on November 3, before they authorized the

22  transition?

23  **A.**   They received the contracts, yes.

24  **Q.**   You weren't in their office?

25  **A.**   I weren't in their office.  I'm assuming they looked at

1    it.

2    **Q.**   If they did their job, you assume they reviewed the

3    contract and okayed the transition?

4    **A.**   They okayed the transition.

5    **Q.**   Mr. Frank led you through a chronology of a plea, a

6    meeting with the Government, and a cooperation agreement,

7    correct?

8    **A.**   Yes.

9    **Q.**   Your going to see the Government in June was not a

10   surprise to you.  You had made the decision even before you

11   pled that you would attempt to get Mr. Frank and Mr. Johnston

12   to back you up and give you a cooperation agreement that

13   might help you go home to England.  Isn't that a fact?

14          MR. FRANK:  Objection to getting them to "back you

15   up," Your Honor.

16          THE COURT:  Overruled.

17          THE WITNESS:  Can you quickly restate the

18   question -- or not restate, repeat the question?  Sorry.

19   BY MR. WEINBERG:

20   **Q.**   It was your hope and expectation, even before you pled

21   guilty, that by cooperating with the prosecutors and by

22   testifying against Mr. McLellan, that that would help you get

23   home to England?

24   **A.**   First of all, I'm not testifying against Mr. McLellan.

25   It was my hope that I would get a cooperation agreement that

1    would help me in -- get leniency.

2    **Q.**  Thank you.  We have spent a lot of time, direct, cross

3    exam, talking about truth, correct?

4    **A.**  Yes.

5    **Q.**  I want to ask you whether you recall an e-mail with Dalia

6    Debs, where she asked you whether or not --

7              MR. FRANK:  Beyond the scope, Your Honor.

8              THE COURT:  I don't know what it is.  I can't rule

9    on that at the moment.

10             MR. WEINBERG:  I probably need to approach the

11   bench in order to tell Your Honor what it is.

12             THE COURT:  Fine.  I'll look at it.

13             (The following discussion held at the bench.)

14             MR. WEINBERG:  This is the question, and this is

15   the answer Dalia Debs --

16             THE COURT:  (The Court reviews the document.)

17             So what do you want to ask?

18             MR. FRANK:  May I see?

19             THE COURT:  Yes.

20             MR. WEINBERG:  "Do you lie about lying?"

21             MR. FRANK:  How is that relevant to the scope of

22   my --

23             MR. WEINBERG:  Because your scope went into things

24   that you said that he had different stories and --

25             MR. FRANK:  I didn't ask him about lying.

```
 1              MR. WEINBERG:  Well, I don't have to use the word.

 2              THE COURT:  Truthfulness, I think you can ask him

 3     that.

 4              MR. FRANK:  Where's the -- okay.  That's her

 5     statement to him?

 6              MR. WEINBERG:  Yes, lie about lying if needed.

 7              MR. FRANK:  May 28, 2010, Your Honor.  They're

 8     clearly playing around.  This is highly prejudicial, Your

 9     Honor.

10              THE COURT:  He's not introducing the exhibit.  He's

11     just asking the question.  He's not --

12              MR. FRANK:  The response, then, is, "What do you

13     lie about?  That State Street is fabulous to your clients?"

14     They're talking "LOL."  This is clearly in jest, and I have

15     not had an opportunity to redirect again and that is

16     extraordinarily misleading.

17              MR. WEINBERG:  He can say it's in jest, but it's

18     his words.

19              MR. FRANK:  This is quintessential 403.  It is not

20     relevant, it is not actually talking about lying.

21              MR. WEINBERG:  Of course he is.

22              MR. FRANK:  This is a complete sandbag, Your Honor.

23     He's been holding this for recross -- for recross and it

24     is -- it is, frankly, outrageous.  This has no relevance to

25     any questions I asked.  It's obviously a joke, and there is
```

1  going to be no opportunity to fix it.

2           MR. WEINBERG:  The whole redirect was aimed at

3  contradicting his prior statements.

4           MR. GOLDSTEIN:  And Mr. McLellan --

5           THE COURT:  So this is what -- you can ask him:  Do

6  you lie about lying?  You can show him -- you can't admit

7  this.

8           MR. WEINBERG:  Yeah.

9           THE COURT:  And you can't admit it indirectly by

10  just reading it.  But you can ask him, do you lie about

11  lying?  And if he says no --

12           MR. FRANK:  Your Honor.

13           MR. WEINBERG:  I'll ask him, does it refresh.

14           MR. FRANK:  It's unfair to the jury that the

15  document says that.  It's incredibly prejudicial, and there

16  would be no opportunity to fix it.  If there was a redirect,

17  then it would be different.  But for him to ask that question

18  and leave the jury with that impression, and the impression

19  in which he said it and there's an LOL, it's completely

20  obviously a joke, and the witness is extraordinarily

21  prejudicial.

22           MR. WEINBERG:  It's probative to the fact that he

23  lies about lying.

24           MR. FRANK:  It's probative of a joke.

25           MR. JOHNSTON:  It's a sandbag.

1          THE COURT:  Can I see it again?

2          MR. JOHNSTON:  It's a sandbag for sure.

3          THE COURT:  (The Court reviews the document.)

4          I guess I would have thought that this would have

5     been probative on cross, not just recross.

6          MR. JOHNSTON:  It really wasn't probative right on

7     cross.

8          MR. WEINBERG:  I made the judgment not to use it

9     then.  And Mr. Frank went back to his credibility, rather

10    than resting off of cross.

11         MR. FRANK:  Now, come on, that's ridiculous.

12         MR. WEINBERG:  It's a responsive or regressive.

13         MR. FRANK:  This is not probative of anything.

14    It's a joke.

15         MR. WEINBERG:  You know lots of people who joke

16    about lying about lying?

17         THE COURT:  I think you can -- you can't admit the

18    e-mail, you can't read the e-mail.  You can ask him:  Do you

19    lie about lying?

20         MR. FRANK:  Your Honor, I would ask that

21    Mr. Weinberg be directed not to show the e-mail, not to

22    suggest there's an e-mail, not to suggest there's a document.

23         MR. WEINBERG:  Well, I may want to refresh his

24    recollection that he said it, if he denies it.

25         THE COURT:  If he says he doesn't and you want to

1    refresh his recollection, you can show it to him to refresh

2    his recollection.  But then you have to give him a chance to

3    explain it, which would be -- he might explain it as like --

4    you have to give him a chance to say, "What did you mean by

5    that, and what was this about?"  So that's -- if you refresh

6    his recollection, he's entitled to an opportunity -- the

7    witness to explain.

8           MR. WEINBERG:  What I'll say is:  Do you lie about

9    lying?  Have you ever said to anyone you lie about lying?

10          MR. FRANK:  That's misleading.

11          MR. WEINBERG:  It's not misleading.

12          MR. FRANK:  It is misleading, because it suggests

13   that he said it in a serious comment.

14          MR. WEINBERG:  Mr. Frank wants me not to use the

15   document.  That's the middle ground.

16          THE COURT:  You can do that.

17          MR. FRANK:  Your Honor, it is extremely misleading.

18   I would then ask that I be given an opportunity to ask a

19   couple of questions on re-redirect.  This is leaving the jury

20   with an absolutely misleading impression.  To say, "Did you

21   ever tell anyone did you lie about lying," suggests that it

22   was said in seriousness, that it was said in connection with

23   this case.  It has no relevance to anything here.  It's

24   extremely prejudicial.

25          THE COURT:  You have to date it.

1            MR. WEINBERG:  I can date it.  Did you tell a

2      friend that you lie about lying?

3            MR. FRANK:  Your Honor, it was a joke.

4            THE COURT:  That's not obvious that it's a joke.

5            MR. FRANK:  If she says LOL.

6            THE COURT:  Yeah, but not about that.  That's her,

7      not him.

8            MR. GOLDSTEIN:  The witness is capable of

9      explaining things for the witness themselves.  It's not

10     everything that the lawyer has to explain.

11            THE COURT:  All right.

12            (Bench conference concluded.)

13     BY MR. WEINBERG:

14     Q.  All right.  Mr. Pennings, back in May of 2010, did you

15     tell a friend that you lied about lying?

16     A.  I have no idea.

17     Q.  You could have, maybe you did, maybe you didn't?

18     A.  Did I tell a friend that I lie about lying?

19     Q.  Yes.

20     A.  I don't know.  I don't recall that.

21            MR. WEINBERG:  I have no other questions.

22            THE COURT:  All right.  Thank you very much,

23     Mr. Pennings.  You're excused.

24            Next witness.

25            MR. JOHNSTON:  Your Honor, the Government calls

1    Dean Johnson to the stand.

2              THE COURT:  Mr. Johnston, does he need those

3    document things?

4              MR. JOHNSTON:  No, he doesn't.  I can retrieve

5    those.

6              (The witness was duly sworn.)

7              THE COURT:  Go ahead.

8                         **DEAN JOHNSON**

9         having been duly sworn, testified as follows:

10         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

11   BY MR. JOHNSTON:

12   **Q.**  Could you please state your name, sir.

13   **A.**  My name is Dean Johnson.

14   **Q.**  How old are you?

15   **A.**  I am 60 years old.

16   **Q.**  Where do you live?

17   **A.**  I live in London, England.

18   **Q.**  Where do you work?

19   **A.**  I work for Sainsbury's in London.

20   **Q.**  What is Sainsbury's?

21   **A.**  Sainsbury's is one of the largest retailers in the United

22   Kingdom, specializing in groceries.

23   **Q.**  How large is Sainsbury's?

24   **A.**  How large is Sainsbury's?  The capitalization of the

25   company is probably about $9 billion.

1    **Q.**   How many stores are there?

2    **A.**   Approaching 1,000.

3    **Q.**   How many employees work at Sainsbury's?

4    **A.**   Approaching 200,000.

5    **Q.**   What do you do at Sainsbury's?

6    **A.**   I'm the investments officer for the pension fund.

7    **Q.**   How large is this pension fund?

8    **A.**   Right now it is 11 billion sterling, which is about 15

9    billion US dollars.

10   **Q.**   For whose benefit is this pension fund?

11   **A.**   It's for the benefit of the employees and former

12   employees, employees of Sainsbury's.

13   **Q.**   How many beneficiaries would that be?

14   **A.**   About 80,000.

15   **Q.**   What's the average size of a pension with Sainsbury's, in

16   a fund that you manage?

17   **A.**   Probably a -- about 7,000 pounds.

18   **Q.**   A year?

19   **A.**   Per year, yeah.

20   **Q.**   How long have you managed the Sainsbury's pension fund?

21   **A.**   This is my tenth year.

22   **Q.**   How long have you been in the asset management field,

23   generally?

24   **A.**   Over 30 years now.

25   **Q.**   What is your educational background?

**A.**   I've a bachelor's degree from the University of
Birmingham in England.

**Q.**   Do you have any professional qualifications?

**A.**   Yeah.  I'm a fellow of the Pensions Management Institute
in the UK.

**Q.**   How do you view your role as a pension fund manager?

**A.**   My role is to execute the investment strategy, make sure
that it's on track.  I manage all the relationships that the
pension fund has with banks, investment managers, advisors.
I'm in charge of all of those things.

**Q.**   What, if any, responsibility do you feel towards the
funds that you manage?

**A.**   I have what's known as a fiduciary responsibility
that's -- UK pension funds are set up under a trust, so I
effectively work with the trustees of the pension fund for
the benefit of the beneficiaries.  What we say is we have to
treat all the assets as if they were our own.

**Q.**   But they're not your own?

**A.**   They're not our own, but as a trustee, that's what you
have to do.

**Q.**   Whose assets are they?

**A.**   The assets belong to the beneficiaries of the pension
fund.

**Q.**   How, if any, does this obligation affect your role in
deciding and controlling costs?

```
 1              MR. GOLDSTEIN:  Excuse me.  I object, Your Honor.

 2     I'd like to be heard at sidebar, please.

 3              THE COURT:  All right.

 4              (The following discussion held at the bench.)

 5              THE COURT:  What's the objection?

 6              MR. GOLDSTEIN:  Mr. Johnston is trying to elicit

 7     from the witness an understanding of his role as a fiduciary,

 8     I think as a way in closing to argue that the language in

 9     some of these contracts was still the similar duty upon State

10     Street.

11              MR. FRANK:  No.

12              MR. GOLDSTEIN:  So it's irrelevant in term of what

13     he viewed his rule --

14              MR. FRANK:  No.  --

15              MR. GOLDSTEIN:  Can I finish?

16              MR. JOHNSTON:  Sure.

17              MR. GOLDSTEIN:  Thank you.  So it's irrelevant in

18     terms of what his view is, as to his beneficiaries.  It has

19     no bearing in term of the issues that are important in this

20     case.

21              MR. JOHNSTON:  If I may respond, Your Honor.

22              THE COURT:  Yes.

23              MR. JOHNSTON:  The defendant's understanding of his

24     duty to the funds is relevant to the question of materiality,

25     how he made the decisions, how he assessed the --
```

1            THE COURT:  Wait, the defendant's understanding.

2            MR. JOHNSTON:  I'm sorry, the witness's

3    understanding of his duty to the funds he managed is relevant

4    to how he approached costs and how he evaluated the

5    representations that State Street made to him, so we need

6    to --

7            THE COURT:  What his state of mind is about, what

8    his role is, that's fair.  But it's about what his state of

9    mind, so what did he do.

10            MR. JOHNSTON:  That's exactly right.

11            (Bench conference concluded.)

12            THE COURT:  Go ahead.

13    BY MR. JOHNSTON:

14    **Q.**  My last question to you, Mr. Johnson, is how, if any,

15    does your role as a fiduciary affect your approach to costs?

16    **A.**  Costs is one of the things that I have a major influence

17    over and try to control, so it's in the best interests of the

18    beneficiaries that costs are kept as low as possible.

19    **Q.**  What, if any, outside providers do you need to hire as a

20    manager of the pension fund?

21    **A.**  We need investment consultants, we need investment

22    managers.  We need actuaries, we need a whole array of

23    advisors.  We have a very small internal team, so we always

24    look outside to get the best possible advice.

25    **Q.**  Have you ever had an occasion to hire a transition

1    manager?

2    **A.**   Yes.

3    **Q.**   Why would you hire a transition manager?

4    **A.**   We hire a transition manager when we are making changes

5    within the pension fund and moving assets within portfolios

6    and also changing investment strategy.

7    **Q.**   Why wouldn't you have one of your normal asset managers

8    do this?

9    **A.**   Well, sometimes they could be conflicts of interests.

10   And it's a very special skill, especially if more than two

11   portfolios are involved.

12   **Q.**   What role, if any, do you view the transition manager as

13   playing towards the funds that are being transitioned?

14   **A.**   The transition manager effectively arranges moving assets

15   from one fund manager, one investment manager, to other

16   investment managers, and also maintaining market exposure

17   during that period of time, which is a key role.

18   **Q.**   Why is it important to maintain market exposure?

19   **A.**   Because we have to ensure that the strategy is being

20   followed, that we wouldn't want to be out of the -- that we

21   wouldn't want to be out of certain markets and, you know,

22   experience any loss.

23   **Q.**   What important -- what factors are important to you in

24   making the decision about which transition manager to hire?

25   **A.**   I suppose, chiefly, skill and expertise and cost.

1   **Q.**   Directing your attention to the 2011 time period, did

2   there come a time when Sainsbury's retained State Street as a

3   transition manager?

4   **A.**   Yes, there was.

5   **Q.**   What was going on at the time in the fund that required a

6   transition manager?

7   **A.**   We were making some changes to the investment strategy

8   and wanted to move assets from three of our investment

9   managers to one of our investment managers.  And we also

10  wanted to change some of the indexes that we were -- we were

11  investing against.

12  **Q.**   What types of assets are we talking about?

13  **A.**   We're talking about bonds, mainly corporate bonds, issued

14  by US and UK companies.

15  **Q.**   And that was the old portfolio you say?

16  **A.**   That was the old portfolios, yeah.  And we were moving

17  those assets, transitioning those assets to a portfolio

18  manager who was investing in UK government stock and UK

19  derivatives.

20  **Q.**   Why did you want to make this change?

21  **A.**   We wanted to increase our liability hedging portfolio.

22  We have a large portfolio which hedges the liability of

23  the -- the liabilities of pension fund to protect it against

24  movements in inflation and interest rates, reducing the, you

25  know, long-term risk of the pension fund.

1  **Q.**  That sounds a bit complicated.  But is the short answer

2  you want to reduce your risk?

3  **A.**  We wanted to reduce the risk, yeah.

4  **Q.**  What was the process that led you to select State Street?

5  **A.**  We hired an independent advisor to do this, to search for

6  the best transition manager.  And they had that -- they had

7  that single mandate.

8  **Q.**  Who did you hire to help you select a transition manager?

9  **A.**  We hired Aon Hewitt.

10  **Q.**  Who is Aon Hewitt?

11  **A.**  Aon Hewitt are a well-known investment advisory company

12  and also an employee benefit consultants.

13  **Q.**  Do you know what process they followed to find you a

14  transition manager?

15  **A.**  Well, they have fairly deep resources, and they -- they

16  interviewed various transition managers and obviously knew

17  the best ones.

18  **Q.**  Do you know which transition managers they considered?

19  **A.**  The short list was State Street and JP Morgan.

20  **Q.**  Did there come a time when Aon Hewitt made a

21  recommendation to you?

22  **A.**  Yeah.  They provided a -- quite a detailed report, showed

23  why they had gone to the people that they -- that they

24  selected, and suggested that we hire State Street.

25  **Q.**  What were their reasons for recommending that you hire

1 State Street?

2 **A.** Well, one was cost.  The other was that they felt their

3 skill and expertise of the people at State Street was

4 superior to that of JP Morgan.

5 **Q.** Did you personally look at the State Street proposal?

6 **A.** No, I didn't.

7 **Q.** What materials did you review before making this

8 selection?

9 **A.** I reviewed the report from Aon Hewitt.

10 **Q.** So what was your understanding of who reviewed the

11 original proposal from State Street?

12 **A.** My understanding was that Aon Hewitt reviewed it for us.

13 Yeah.

14 **Q.** Had you ever used State Street before this 2011

15 transition?

16 **A.** Yes, we had.  Yeah.

17 **Q.** When had you used them before?

18 **A.** Well, we used them twice, I believe, for a big equity

19 transition in 2009.

20 **Q.** Who, in particular at State Street, had you worked with

21 on a transition?

22 **A.** The -- the employee at State Street who I -- was my

23 opposite member was Rick Boomgaardt.  I also worked with the

24 relationship management team, as well.

25 **Q.** Who were those folks?

1    **A.**   A guy called Chris Martin.  I can't remember the other

2    guy.  I also worked with a guy called Rick Pestana, who

3    worked with -- with Rick Boomgaardt.

4    **Q.**   You testified that State Street had a competitive cost in

5    their proposal; is that correct?

6    **A.**   That's correct, yeah.

7    **Q.**   How, if at all, did the implementation shortfall estimate

8    factor into your decision?

9    **A.**   Significantly.  But the implementation shortfall provided

10   by both banks was very similar.

11   **Q.**   Are there any -- in your understanding, which parts of

12   the implementation shortfall are hard to know in advance?

13   **A.**   Well, it's difficult to know the how markets will react

14   during the period of the transition.  So the implementation

15   shortfall is a rough estimate.

16   **Q.**   Are there any parts of the implementation shortfall that

17   you can know in advance?

18   **A.**   Well, if a fixed fee has been charged, yes, you know that

19   that is a known cost.

20   **Q.**   Was a fixed fee proposed in this transition?

21   **A.**   It was.

22   **Q.**   Was that attractive to you?

23   **A.**   It was attractive.

24   **Q.**   Why so?

25   **A.**   Why so?  Well, it provided us with a known cost.

1    **Q.**  And why is that something that is beneficial to you prior

2    to transitioning assets?

3    **A.**  Well, it meant that we knew what the costs were, to a

4    certain extent, and we also weren't going to be charged a

5    spread on the dealing.

6    **Q.**  Prior to going with State Street, had you ever met Ross

7    McLellan?

8    **A.**  No.

9    **Q.**  Had you ever seen the defendant before today?

10   **A.**  No.

11   **Q.**  When you selected State Street, did you have an

12   understanding of who bore the market risk of the transition?

13   **A.**  Well, I suppose we would -- we were bearing it, to a

14   certain extent.

15   **Q.**  And why would Sainsbury's pension fund be bearing the

16   market risk of the transition?

17   **A.**  They're our assets.

18   **Q.**  And what, then, role would the transition manager be

19   playing with respect to those assets?

20   **A.**  They were just trading them as riskless principals.

21   **Q.**  What was your understanding, if any, of who would benefit

22   from a better-than-expected performance in the transition?

23   **A.**  Yeah, we would, the pension fund.

24   **Q.**  I'd like to show you a document that --

25            MR. JOHNSTON:  For the witness only, Government

1    Exhibit 3.

2              MR. GOLDSTEIN:  There's no objection, if the

3    Government just wants to move it in.

4              MR. JOHNSTON:  We move to admit Government Exhibit

5    Number 3.

6              THE COURT:  3 is admitted.

7              (Exhibit No. 3 admitted into evidence.)

8    BY MR. JOHNSTON:

9    **Q.**  Do you recognize this document, Mr. Johnson?

10   **A.**  Yeah.  It's the transition management agreement between

11   State Street and the Sainsbury's transition fund.

12   **Q.**  Let's take a look at page 18, please.  Take a look at the

13   signatures.

14              Do you recognize any of the signatures on this

15   page?

16   **A.**  The top one is my signature, and the one below, it was

17   one of my former colleagues.

18   **Q.**  And why is the date "July 9, 2009"?

19   **A.**  Because that was the original contract that we had with

20   State Street.

21   **Q.**  Before the first time you hired them?

22   **A.**  That's correct, yeah.

23   **Q.**  What was your understanding of what this contract -- the

24   role this contract would play in future transitions?

25   **A.**  The contract is a base document.

1  **Q.**  And would there be anything -- what, if anything, would

2  come after this?

3  **A.**  Yes.  There's a, what we call a transition -- a

4  transition notice, which is appended to the contract, which

5  details the work to be done and the costs and fees, you know,

6  that would be charged.

7  **Q.**  Is there a new one for every transition, or is there only

8  one?

9  **A.**  There's a new one for every transition, yeah.

10  **Q.**  Let's take a look at page 7, please.  Direct your

11  attention to the top paragraph.

12       If we could -- I want to read to you, "The client

13  authorizes and directs that such broker-dealer associates of

14  State Street may accept compensation in lieu of commission in

15  the form of a spread between the sale or purchase price of

16  the fixed income security sold or bought by the fund, subject

17  to a transition notice, and the purchase or sale price of the

18  fixed income security, paid or received as applicable by the

19  third-party market counterparties on the other side of the

20  transaction."

21       What, if anything, do you understand this phrase to

22  mean?

23  **A.**  Well, exactly what it says, compensation in lieu of a

24  commission.  So a fee could be charged instead of that.

25  **Q.**  Okay.  And let's take a look further up, where it says,

1    "The client also hereby authorizes and directs State Street,"

2    and then, "to place all fixed income securities orders

3    through broker-dealer associates of State Street, in a manner

4    whereby such associates would act as the riskless principal

5    agency counterparty between a fund subject to a transition

6    notice and the third-market" -- "third-party market

7    counterparties on the other side of the transaction."

8            What's your understanding of the term "riskless

9    principal agency counterparty"?

10   **A.**   That means there's no spread.  There's no difference

11   between the buy cost and the sell cost.

12   **Q.**   And what's your understanding of what the term "agency"

13   here means?

14   **A.**   Agency means that they're working for us and in our best

15   interests.

16   **Q.**   Who would be working for you in your best interest?

17   **A.**   State Street would be, yeah.

18   **Q.**   And then finally, at the bottom, where it says, "The

19   amount of compensation in the form of a spread, permitted to

20   be received by such broker-dealer associates and any such

21   riskless principal transaction involving a fixed income

22   security, shall be specifically identified in the transition

23   notice."

24           What's your understanding of what that phrase

25   means?

1    **A.**   That means that if any -- all the compensation, any

2    compensation is actually detailed in the transition notice.

3              MR. JOHNSTON:  You can take this down, Erin.

4    BY MR. JOHNSTON:

5    **Q.**   Did you have an understanding, in 2011, whether State

6    Street would be acting as an agent or principal for your

7    transition?

8    **A.**   They would be acting as an agent.

9    **Q.**   And what was that understanding based on?

10   **A.**   Well, the transition notice that we signed.

11   **Q.**   Had you seen any representations, one way or the other,

12   in the proposals or reports that Aon Hewitt had sent to you?

13   **A.**   Yes.  Yeah.

14   **Q.**   And what was your understanding from reading --

15   **A.**   The understanding is they'd be doing this work for us for

16   a fixed cost, and there wouldn't be any commissions payable.

17   **Q.**   Let's take a look at a document that's already been

18   admitted into evidence, Exhibit 109-1.  Let's just zoom in at

19   the top, please.

20             Do you recognize this document, Mr. Johnson?

21   **A.**   Yes, I do.

22   **Q.**   What is it?

23   **A.**   That is the transition notice, which relates to the

24   transition in question, which is appended to the contract.

25   **Q.**   Let's take a look at page 2, please.  And can we first

1    zoom in on the signatures.

2              Do you recognize any of the names here?

3    **A.**   Yes.  The first one is mine.  And the second one is

4    Edward Pennings, who is part of the transition team at State

5    Street in London.

6    **Q.**   All right.  If we can zoom further up on the transition

7    fee component.

8              Mr. Johnson, what was your understanding as to what

9    this provision in the transition notice meant?

10   **A.**   That meant we'd be paying State Street a fixed fee of

11   350,000 pounds sterling for this job.

12   **Q.**   Was that number going to be in lieu of commission or in

13   addition to commission?

14   **A.**   In lieu of.

15   **Q.**   What -- what was your -- what, if anything, made you

16   believe that 350,000 was the sole amount you'd be paying for

17   this transition?

18   **A.**   Well, the -- as it states it in the contract, yeah, that

19   is what was represented to us by Aon Hewitt, when they went

20   out to search for a transition manager.

21   **Q.**   And your understanding at the time was that Aon Hewitt

22   had reviewed State Street's proposal?

23   **A.**   They had.  I mean, at the time -- it's a very competitive

24   business, so both JP Morgan and State Street were prepared to

25   do this work for a fixed fee.

1   **Q.**  At any point, did you authorize someone at State Street

2   to charge you commissions or fees in addition to this

3   350,000 pounds?

4   **A.**  We did not.

5   **Q.**  Did the transition occur?

6   **A.**  Yes.

7   **Q.**  Were you initially satisfied with the result?

8   **A.**  We were very satisfied with the result initially, yes.

9   **Q.**  And why was that?

10  **A.**  It came -- the cost of it came in below the estimated

11  amount, you know, the shortfall amount, as we call it.

12  **Q.**  And if you recall, what, if anything, had happened in the

13  market that went in your favor?

14  **A.**  I don't recall.  But I just know -- we seemed to hit a

15  sweet spot.

16  **Q.**  I want to show you a document, for the witness only,

17  Exhibit 137.

18          MR. JOHNSTON:  If we can zoom in at the top,

19  please, Erin.

20  BY MR. JOHNSTON:

21  **Q.**  Do you recognize this document, Mr. Johnson?

22  **A.**  Yes, I do.  It's the invoice that State Street sent us

23  for this job.

24          MR. JOHNSTON:  We move to admit Exhibit 137.

25          MR. GOLDSTEIN:  No objection.

1          THE COURT:  Admitted.

2          (Exhibit No. 137 admitted into evidence.)

3          MR. JOHNSTON:  Publish to the jury, please.  If we

4    can zoom again at the top, please.

5    BY MR. JOHNSTON:

6    **Q.**  Who is this bill addressed to?

7    **A.**  It's addressed to me at Sainsbury's.

8    **Q.**  And what's the amount of the bill?

9    **A.**  350,000 pounds sterling.

10   **Q.**  Was this invoice paid?

11   **A.**  Yes.

12   **Q.**  What was your -- when you paid this invoice, what was

13   your understanding as to what this fee covered?

14   **A.**  I thought that covered all the work that State Street had

15   undertaken for us in respect to this transition of assets.

16   **Q.**  At some point did you come to learn that Sainsbury's had

17   been charged additional?

18   **A.**  We did, yes.

19   **Q.**  And approximately how much in additional fees had you

20   been charged on the bond transition?

21   **A.**  Well, we were charged additional commissions of

22   $1.1 million.

23   **Q.**  Had you authorized anyone to make those charges?

24   **A.**  We had not.

25   **Q.**  What was your reaction when you found that out?

1    **A.**   Shocked and stunned.

2    **Q.**   To what extent would knowing that you would have been

3    charged 1.1 million have affected your decision to hire State

4    Street?

5    **A.**   We wouldn't have hired them.  We would have used JP

6    Morgan.

7    **Q.**   How, if at all, did this extra cost affect the

8    implementation shortfall?

9    **A.**   Significantly.  It was a big chunk of it.

10   **Q.**   How has this experience -- or did this experience affect

11   your business relationship with State Street?

12   **A.**   It -- it ended it.  It was a very large business

13   relationship that we had with State Street.  They ran a

14   very -- they run a 1.5 billion sterling -- sterling equity

15   portfolio, which we closed.  We were about to appoint them as

16   our custodian bank.  We had signed off on that.  That ended

17   and we vowed never to work with them again.

18   **Q.**   Are you referring to business units other than State

19   Street Transition Management?

20   **A.**   Yeah, all State Street.  We won't touch them.

21   **Q.**   Even business units that had nothing to do with the

22   transition team.

23   **A.**   In London, State Street were all in one building, so we

24   just considered them to be the same entity.

25   **Q.**   What, if any, revenues did that mean you no longer paid

1  State Street?

2  **A.**  Well, we ceased to pay them the management fee for the UK

3  equity portfolio.  They also ran some currency hedging for

4  us.  Yeah, that was pretty much it at the time.

5  **Q.**  What were those -- what's the approximate fees you were

6  paying for those custodian business?

7  **A.**  Oh, probably about one and a half million sterling,

8  probably about a million sterling a year from the equity

9  portfolio, which was all of the pension funds' equities.

10  **Q.**  Prior to this experience with State Street, what was --

11  how was the business relationship with them?

12  **A.**  It was very good.  We had a long standing relationship

13  with them.  We had a previous portfolio, which we had

14  actually moved to another manager, just because we thought

15  the other manager was better.  But we were -- as I say, we

16  were just about to appoint them as the custodian bank.  They

17  would have been the custodian of all the pension funds

18  assets.

19  **Q.**  Did you trust them before this 2011 transition?

20  **A.**  Yeah, we did, yeah.

21  **Q.**  And what happened after the transition?

22  **A.**  Well, it's -- there was a complete loss of trust and I

23  was instructed to end all ties with them.

24  **Q.**  Who gave you that instruction?

25  **A.**  The trustees of the pension fund.

1    **Q.**  Has anything like this happened in your 30 years?

2              THE COURT:  Sustained.

3              MR. GOLDSTEIN:  Objection.

4              THE COURT:  Sustained.

5    BY MR. JOHNSTON:

6    **Q.**  Had you ever been deliberately overcharged before?

7              MR. GOLDSTEIN:  Objection.

8    **Q.**  -- to your knowledge?

9              MR. GOLDSTEIN:  Objection.

10             THE COURT:  Sustained.  I'm not sure that's

11   relevant.

12             Because this case, ladies and gentlemen, is about

13   these charges in this case and the conduct here.

14             MR. JOHNSTON:  Your Honor, it is relevant to his

15   state of mind and how he viewed the charges and whether they

16   were important to him.

17             THE COURT:  And whether they were what?

18             MR. JOHNSTON:  Important and significant to his

19   fund.

20             THE COURT:  Well, didn't he already testify about

21   that?

22             MR. JOHNSTON:  Right, but the Government is

23   entitled to elicit some additional context for why they were

24   important and whether --

25             THE COURT:  You can ask him why these charges are

```
 1    important to him, but -- that's relevant to the case.
 2    BY MR. JOHNSTON:
 3    Q.   The 1.1 million in overcharges that you testified to, who
 4    ultimately ended up paying that fee?
 5    A.   State Street.  State Street reimbursed us.
 6              MR. GOLDSTEIN:  Objection.
 7    BY MR. JOHNSTON:
 8    Q.   I'm sorry.  That wasn't a -- sorry.  Withdrawn.
 9              MR. WEINBERG:  May I reserve a motion, Your Honor?
10              THE COURT:  You can reserve a motion, sure.
11    BY MR. JOHNSTON:
12    Q.   Any overcharges to the pension fund, out of whose pocket
13    does that ultimately come?
14    A.   It comes out of the pension fund.
15              MR. JOHNSTON:  Thank you, no further questions.
16              CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT
17    BY MR. GOLDSTEIN:
18    Q.   Mr. Johnson, you testified you never met this man before,
19    correct?
20    A.   That's correct, yeah.
21    Q.   Taking you back to 2010, 2011, you didn't have a single
22    e-mail with Mr. McLellan, correct?
23    A.   That's correct.
24    Q.   Not a single telephone call with him, correct?
25    A.   I believe so.
```

1    **Q.**  Mr. McLellan never made any representations or promises

2    or assurances to you, correct?

3    **A.**  Correct.

4    **Q.**  Back in 2010 or 2011, this man, simply to you, didn't

5    exist in your world, correct?

6    **A.**  I was aware of his name.

7    **Q.**  But you didn't know him and he didn't make any

8    representations to you, correct?

9    **A.**  No, that's correct.

10            MR. GOLDSTEIN:  And Max, can we have Exhibit 3,

11   please?

12   BY MR. GOLDSTEIN:

13   **Q.**  Mr. Johnson --

14   **A.**  Johnson.

15   **Q.**  Johnson.  Mr. Johnston asked you some questions about the

16   transition management agreement that was executed between

17   Sainsbury's and State Street, correct?

18   **A.**  Yeah.

19   **Q.**  And this is the contract that governed your relationship

20   with State Street, in terms of the transition management

21   business, correct?

22   **A.**  Correct.

23   **Q.**  And this is what you would call a bilateral agreement,

24   meaning there are two parties to this particular agreement,

25   correct?

1    **A.**   Yeah.

2          MR. GOLDSTEIN:  And Max, if we could have the

3    second page, please.  The top blown up, please.  Thank you.

4          Actually, a little bit higher than that, Max.  The

5    whole top.  The header up top, Max.  Thank you.

6    BY MR. GOLDSTEIN:

7    **Q.**   On the top right corner, it says "transition management

8    agreement, 12 March 2009 version," correct?

9    **A.**   Yeah.

10   **Q.**   All right.  And that was not something generated by

11   Sainsbury's, right?  Meaning this is an agreement that was

12   generated by State Street.  It's a template; is that correct?

13   **A.**   I believe so, yeah.

14   **Q.**   Okay.  And if you go down, the date of this particular

15   agreement is July of 2009, correct?

16   **A.**   Yup.

17   **Q.**   All right.  And so this is a year or so more than the

18   transition Mr. Johnston just asked you about, correct?

19   **A.**   Yes.

20   **Q.**   All right.  And if we look at the parties, the

21   organizations that are a party to this contract, the first

22   one is Sainsbury's, correct?

23   **A.**   No, it's State Street.

24   **Q.**   Well, it's not with State Street.  It's actually not

25   State Street, right?  It's State Street Bank Europe Limited,

1    correct?

2    **A.**  Yes.

3    **Q.**  And that's who you entered a contract into, was that

4    particular entity, State Street Bank Europe Limited, correct?

5    **A.**  Yes.

6    **Q.**  And if you look below, it says it's an entity

7    incorporated under the laws of England, right?

8    **A.**  Yeah.

9    **Q.**  And it says that "for the balance of this agreement,

10   references to the word State Street" --

11           MR. GOLDSTEIN:  Max, if you could highlight that,

12   please.

13   BY MR. GOLDSTEIN:

14   **Q.**  "Would refer back to what I will refer to as SSBEL or

15   BEL, State Street Bank Europe Limited."

16           Do you see that?

17   **A.**  Yeah.

18   **Q.**  And the other party to this contract is Sainsbury's,

19   right?

20   **A.**  Yeah.

21   **Q.**  And you, when you negotiated this agreement, you signed

22   this agreement, correct?

23   **A.**  Yes.

24   **Q.**  And you represented the interests of Sainsbury's, right?

25   **A.**  Yes.

1    **Q.**  Testified it's a massive pension fund, right?

2    **A.**  It's big.

3    **Q.**  Not just big.  I mean, there's upwards of $7-plus billion

4    as part of this fund, right?

5    **A.**  Yeah, more.

6    **Q.**  More now, right?

7    **A.**  Yeah.

8    **Q.**  Okay.  And when you were entering into this agreement

9    with State Street Bank Europe Limited, your role in

10   negotiating this contract was to protect the interests of

11   Sainsbury's, right?

12   **A.**  Yes.

13   **Q.**  You were the chief investment officer, correct?

14   **A.**  Yes.

15   **Q.**  And you had been in the industry for 20 or 30 plus years,

16   correct?

17   **A.**  Yup.

18   **Q.**  And I think your official title was investment

19   controller, right?

20   **A.**  It was then, yeah.

21   **Q.**  Something that came to a chief investment officer, right?

22   **A.**  Yes.

23   **Q.**  You had a job to oversee the investments and the

24   execution of the pension funds, right?

25   **A.**  Yes.

1  **Q.**  Your job, as you testify, was to protect the

2  beneficiaries of that fund, right?

3  **A.**  Yeah.

4  **Q.**  And your job was to select the right asset manager who

5  was going to manage the assets, right?

6  **A.**  Yes.

7  **Q.**  And in this particular context, it was your

8  responsibility to select the right transition manager, right?

9  **A.**  Yes.

10  **Q.**  Wasn't Mr. McLellan's role and responsibility to

11  negotiate this contract on behalf of Sainsbury's, was it?

12          MR. JOHNSTON:  Objection.  The witness has said

13  that he doesn't know the defendant.  So I don't know how he

14  can possibly testify as to --

15          THE COURT:  Overruled.  I think he can know who

16  negotiates on behalf of Sainsbury's, based on his testimony.

17  BY MR. GOLDSTEIN:

18  **Q.**  Was it Mr. McLellan's role to negotiate this contract, to

19  the extent he was involved, looking out for the people of

20  Sainsbury's, right?  That was your responsibility, right?

21  **A.**  I don't understand what you're trying to say.

22  **Q.**  Meaning you represented the interest of Sainsbury's in

23  the formation of this foundational agreement between

24  Sainsbury's --

25  **A.**  Yeah.

1    **Q.**   -- and State Street Bank Europe Limited, right?

2    **A.**   Yeah.

3    **Q.**   Okay.  And I presume you're paid very well to perform

4    your role at Sainsbury's?

5    **A.**   Reasonably.

6    **Q.**   And what does reasonably mean, back in 2009?

7    **A.**   You want to know what my salary was?

8    **Q.**   I do.

9    **A.**   I suppose with bonuses it was probably about

10   100,000 pounds per year.

11   **Q.**   Okay.  And Sainsbury's has, back at that time -- you have

12   your own legal department?

13   **A.**   We do, but we use specialist outside lawyers for any

14   pension fund investment business.  So we don't use our

15   in-house team.

16   **Q.**   And what about in terms of negotiating contracts?  Do you

17   have in-house lawyers to help you when you negotiate

18   transition management agreements?

19   **A.**   No, we use outside lawyers.

20   **Q.**   So you have the assets and the wherewithal and the

21   resources to hire outside lawyers to negotiate these

22   foundational agreements, whether they're with State Street

23   Bank Europe Limited, or some other transition management

24   principal?

25   **A.**   We use outside lawyers to negotiate all agreements for

1    us.

2    **Q.**  Okay.  And you would also have available to you and, in

3    fact, utilized here, a consultant to help you in terms of

4    selecting the right transition manager, right?

5    **A.**  Correct.

6    **Q.**  Now, on the other side of this coin, you have State

7    Street Bank Europe Limited, right?

8    **A.**  Yes.

9    **Q.**  And they -- that's the entity, as opposed to State Street

10   Global Markets, or State Street Global Markets International,

11   who's the signatory to this foundational agreement with

12   Sainsbury's, correct?

13   **A.**  Sorry, can you say that again?

14   **Q.**  The party who signed this agreement with you is with

15   State Street Bank Europe Limited, not another entity, such as

16   State Street Global Markets?

17   **A.**  Yes, that's right.

18   **Q.**  Or State Street Global Markets International, right?

19   **A.**  Yeah.

20        MR. GOLDSTEIN:  Okay.  And if you go down to the

21   whereas line, Max.

22   BY MR. GOLDSTEIN:

23   **Q.**  The client, which is Sainsbury's, from time to time, will

24   appoint State Street as transition manager.  Do you see that?

25   **A.**  Yeah, from time to time.

1    **Q.**  Right.  You're not appointing -- and again, a reference

2    to State Street is not State Street, writ large, it's the

3    State Street defined in the contract, which is BEL, Bank

4    Europe Limited, right?

5    **A.**  Yeah.

6    **Q.**  And they're appointed as a transition manager, not

7    appointed as a broker-dealer, right?

8    **A.**  Right.

9    **Q.**  And then if you go down, the next section is

10   interpretations and definitions.  Do you see that?

11   **A.**  Yeah.  If you blow it up, I will.

12   **Q.**  Sure.  And the first paragraph, interpretations and

13   definitions, sets out various key terms that will appear

14   later on in this contract, right?

15   **A.**  Right.

16   **Q.**  And the very first one talks about capitalized terms and

17   refers to FSA rules on two occasions, right?

18   **A.**  Yes.

19   **Q.**  And the FSA was the regulatory agency that governs the

20   securities industry in the United Kingdom, right?

21   **A.**  Was then.

22   **Q.**  It's now the FCA, right?

23   **A.**  Correct.

24   **Q.**  And you don't see any reference to the Securities

25   Exchange Commission in this first paragraph, right?

1    **A.**   Can't see it, no.

2    **Q.**   Right, because Sainsbury's is a UK-domiciled entity,

3    right?

4    **A.**   Yes.

5    **Q.**   BEL, State Street Bank Europe Limited, is also a

6    UK-domiciled entity, right?

7    **A.**   Yes.

8    **Q.**   And so predictably, naturally references here are to the

9    FSA, which is now the FCA, right?

10   **A.**   Correct.

11   **Q.**   All right.  And then if you go down, the next section is

12   definitions.  Do you see that?

13   **A.**   Yes.

14   **Q.**   All right.  And if we go to the next page, the second

15   paragraph and third paragraph defines, for each of these

16   parties, the term "associate and broker-dealer," right?

17   **A.**   Yes.

18   **Q.**   And so it reads, "Associate means the ultimate holding

19   company of State Street."

20           Do you see that?

21   **A.**   Yes.

22   **Q.**   And what that means is that associate -- you're talking

23   about an associate of State Street Bank Europe Limited,

24   right?

25   **A.**   Yes.

1    **Q.**  And it's defining for you and anyone else who's relying

2    on this contract, what constitutes or consists of an

3    associate, right?

4    **A.**  Yeah.

5    **Q.**  And it refers to the ultimate holding company of State

6    Street, any direct or indirect wholly owned subsidiary of

7    that holding company, correct?

8    **A.**  Yeah.

9    **Q.**  And then it goes on to state such entities include, but

10   are not limited to State Street Global Markets International

11   Limited.  Do you see that?

12   **A.**  Yeah.

13   **Q.**  State Street Global Markets LLC, right?

14   **A.**  Yes.

15   **Q.**  And State Street Bank and Trust Company, right?

16   **A.**  Yeah.

17   **Q.**  And so right here, at basically the outset of the

18   contract, it's giving clear notice that there are other

19   "entities, affiliates or associates of the company to which

20   you have entered into a transition management agreement,"

21   correct?

22   **A.**  Yes.

23   **Q.**  The next paragraph, broker-dealer, means "a broker and/or

24   dealer and/or market-maker, as the case may be, which is in

25   the business of effecting or entering into securities,

1    futures and/or foreign exchange commissions, benefitting from

2    a commission, fee, markup or markdown, as the case may be."

3           Do you see that?

4    **A.**   I see that, yeah.

5    **Q.**   And so you've been in this industry for 30-plus years

6    now, right?

7    **A.**   Uh-huh.

8    **Q.**   You know what a broker-dealer is, right?

9    **A.**   Yes.

10   **Q.**   And so a broker-dealer is an entity that performs

11   execution of trades, right?

12   **A.**   Yeah.

13   **Q.**   And so when you entered into a contract with State Street

14   Bank Europe Limited, you knew, it's clearly provided here,

15   that State Street Bank Europe Limited was not the

16   broker-dealer, or is not a broker-dealer, right?

17   **A.**   I can't say I'm clear or not -- I'm not sure.

18   **Q.**   Well, do you see anywhere in here that it refers to State

19   Street Bank Europe Limited as being a broker-dealer?

20   **A.**   That State Street Bank is a broker-dealer?

21   **Q.**   We'll get to this in a subsequent section.  The point is,

22   you're on clear notice, as part of this contract, that a

23   broker-dealer benefits from a commissioned fee markup or

24   markdown, as the case may be, correct?

25           MR. JOHNSTON:  Objection.

 1          THE COURT:  What's the objection?

 2          MR. JOHNSTON:  He's telling the witness that he's

 3   on notice.  He can testify to what his understanding is.

 4          THE COURT:  Overruled.

 5          You can answer the question.

 6   BY MR. GOLDSTEIN:

 7   Q.  The contract reads "broker-dealer," okay.  "In the

 8   business of effecting or entering into securities benefitting

 9   from a commission fee markup or markdown, as the case may

10   be."

11          It's the definition provided in the foundational

12   agreement between you and State Street Bank Europe Limited as

13   to what the parties mean when the words "broker-dealer"

14   appears in the subsequent provisions of the transition

15   management agreement, correct?

16          MR. JOHNSTON:  Objection.  Form.  He didn't ask

17   what the witnesses' understanding was, or what the terms

18   meant.  He just asked a -- he's just testifying about what

19   the terms mean.

20          THE COURT:  Well, he asked him, isn't that what it

21   means?

22          MR. JOHNSTON:  He didn't.

23   BY MR. GOLDSTEIN:

24   Q.  Correct, Mr. Johnston?

25          THE COURT:  Why don't you answer the question?

1           Why don't you repeat the question.

2    BY MR. GOLDSTEIN:

3    **Q.**   The contract defines broker-dealer as --

4    **A.**   Yeah, the contract defines broker-dealer for sure, yeah.

5    **Q.**   And it defines it as "someone in the business of

6    effecting or entering into securities, benefitting from a

7    commission fee markup or markdown, as the case may be."

8           Correct?

9    **A.**   Yeah, that's what it says.

10           THE COURT:  All right.  We'll break here.

11           So ladies and gentlemen, I'll remind you.  We'll

12    break now for lunch from 1:00 to 2:00, but we're going to

13    resume at 2:00.  So just a couple little instructions.  First

14    of all, don't discuss the case among yourselves or with

15    anyone else.  And if you have a moment, don't do any

16    independent research and more practically, with respect to

17    lunch, you're free -- if you brought lunch to eat in the jury

18    room, you're free to go downstairs, wear your jury tags.  You

19    can go to the cafeteria in the courthouse.  That's probably

20    -- free culinary advice, probably the least expensive place

21    in this neighborhood to eat.  And you're welcome to eat

22    there, but I don't get any fee if you do or you don't.  So

23    you can make your own decisions.

24           But you can go there -- the advantage of going

25    there, is it will give you -- be quicker in terms of getting

1    back and the like.  You won't have to get in and out of the

2    building.  But there are many places in the neighborhood if

3    you wish to just walk around or go somewhere else.  You can

4    bring your lunch back there, you can eat somewhere else.  We

5    just ask you to be back in time to resume at 2:00 and we'll

6    resume at 2 o'clock.

7              Thank you very much for your attention, all rise

8    for the jury.

9              Oh, wait.  Obviously, you may run into people from

10   the case in the cafeteria or walking around at lunch and

11   don't talk to them and they won't talk to you and take no

12   offense at that.  Thanks.

13             (The jury exits the courtroom.)

14             THE COURT:  All right.  We'll resume at 2 o'clock.

15   See you then.  Thank you.

16             (Court in recess at 1:02 p.m.

17             and reconvened at 1:59 p.m.)

18             THE DEPUTY CLERK:  The McLellan matter is back in

19   session.

20             THE COURT:  Please be seated.

21             Everybody ready?  Mr. Goldstein, your audience

22   seems to have disappeared.

23             MR. GOLDSTEIN:  Right.

24             THE COURT:  The audience seems to have disappeared.

25             MR. GOLDSTEIN:  I know where I stand.

1          THE COURT:  You do.  All right.

2          Go get the jury.  If they need a minute, then

3     that's fine, but if they're ready, we'll take them now.

4          THE DEPUTY CLERK:  Okay.

5          THE COURT:  Is the next witness, direct, same

6     duration as this witness about?

7          MR. JOHNSTON:  Yeah, approximately the same.

8          THE COURT:  What happened?

9          MR. WEINBERG:  After the First Circuit upholds the

10    dismissal, getting back the passport --

11         THE COURT:  Yes.

12         MR. WEINBERG:  Those experiences don't happen every

13    day.

14         THE COURT:  I saw that decision.  That was a speedy

15    trial issue, right?

16         MR. WEINBERG:  Yeah.  Yeah.

17         (The jury enters the courtroom.)

18         THE COURT:  Go ahead.

19    BY MR. GOLDSTEIN:

20    Q.  Mr. Johnson, we left off, we were talking about the

21    definition of broker-dealer.  Do you recall that line of

22    questioning?

23    A.  Yes.

24    Q.  If you go to the contact, where it defines broker-dealer,

25    it talks about -- it says, "in the business of effecting of

1    entering into securities, benefitting from a commissioned

2    fee, markup or markdown, as the case may be."

3              Do you see that language?

4    **A.**   Yes.

5    **Q.**   All right.  And when they refer to a markup or markdown,

6    that generally is a reference to pricing on bond executions,

7    correct?

8    **A.**   Correct.

9    **Q.**   And so what that means is that if a broker-dealer buys a

10   bond, let's say $100, it may mark up that bond when it passes

11   it on to $100.01, and that is referred to as a markup,

12   correct?

13             MR. JOHNSTON:  Objection.  Could he ask the witness

14   what his understanding is of these terms?

15             THE COURT:  You can add to that.  That's your

16   understanding?

17   BY MR. GOLDSTEIN:

18   **Q.**   And let me just preface my question, is that your

19   understanding?

20   **A.**   Yeah.

21   **Q.**   Okay.  And the difference between the --

22             THE COURT:  I guess, just so we're clear.  So all

23   these questions, with respect to this, are his understanding.

24   It's not -- it's not a legal interpretation of the contract.

25   It's his understanding of his reading of the contract or his

1    understanding, generally.  That's what --

2              MR. GOLDSTEIN:  Thank you.

3    BY MR. GOLDSTEIN:

4    **Q.**  And you've worked in this industry for 30 years, right?

5    **A.**  Yes.

6    **Q.**  And so the difference between the execution price of 100

7    and the markup to 100.01, for instance, is referred to in the

8    industry as the spread, correct?

9    **A.**  The difference between the buy and the sale price.

10   **Q.**  Right, is referred to as the spread, right?

11   **A.**  Yes.

12   **Q.**  Okay.  Now, underneath -- after broker-dealer, there are

13   other terms that are defined in this contract, correct?

14   **A.**  Yes.

15   **Q.**  And you see there are references to the FSA, FSA rules,

16   FSMA, and MIFID, right?

17   **A.**  Yeah.

18   **Q.**  And again, those are references to UK regulatory agencies

19   or statutes and regulations, right?

20   **A.**  At that time, yes.

21   **Q.**  Right.  And you don't see any reference to Securities and

22   Exchange Commission, or United States regulations, right?

23   **A.**  It's a UK contract.

24   **Q.**  Right.  And if we move on to the next page, at the top,

25   there's a section entitled "Appointment of State Street."

1          MR. GOLDSTEIN:  Which I'll ask Max to blow up the

2     entire paragraph, Max.  Just that top paragraph is fine for

3     now, Max.

4     BY MR. GOLDSTEIN:

5     **Q.**  It reads, if you can follow along, "The client may, from

6     time to time, appoint State Street as a transition manager

7     for the liquidation or restructuring of certain portfolios."

8          Right?

9     **A.**  Yes.

10    **Q.**  Once again, just making it clear that State Street and

11    State Street in this context means State Street Bank Europe

12    Limited, right?

13    **A.**  Yes.

14    **Q.**  That they're being appointed as a transition manager,

15    right?

16    **A.**  Yes.

17    **Q.**  And if we --

18          MR. GOLDSTEIN:  If we go down to paragraph 2.3.,

19    Max.

20    BY MR. GOLDSTEIN:

21    **Q.**  It talks about Sainsbury's being categorized as a

22    professional client.  Do you see that?

23    **A.**  I do.

24    **Q.**  And it reads, "State Street has categorized the client as

25    a professional client.  This replaces any previous

1    categorization."

2            Right?

3    **A.**  Yes.

4    **Q.**  And then it moves on to say that "Professional clients

5    are considered to possess the experience, knowledge, and

6    expertise to make their own investment decisions and assess

7    the risks inherent in their decisions."

8            Right?

9    **A.**  Yes.

10   **Q.**  This just means that Sainsbury's is in the profession of

11   securities industry, correct?  Is that your understanding of

12   what professional client means?

13   **A.**  Yes.

14   **Q.**  Okay.  And if we move on to the next page, terms of

15   assignment.

16           MR. GOLDSTEIN:  If you can just blow up that

17   first -- the bottom two paragraph, under "terms of

18   assignment."

19   BY MR. GOLDSTEIN:

20   **Q.**  Again, it talks about State Street, which, in this

21   context, is SSBEL, right?

22   **A.**  Yes.

23   **Q.**  "In its capacity as transition manager" -- I'm reading

24   that correctly, right?

25   **A.**  Yeah.

1   **Q.**   "Under this agreement, shall provide the client with

2   services for liquidating or restructuring a fund in a

3   cost-efficient and flexible manner."

4          Right?

5   **A.**   Yes.

6   **Q.**   It doesn't say "as cheaply as possible," right?   It

7   certainly doesn't say for free, right?

8   **A.**   It does say "cost-efficient."

9   **Q.**   And flexible, right?

10  **A.**   Yeah.

11  **Q.**   And then the next paragraph, towards the bottom of the

12  page, as part of another paragraph, it reads that "State

13  Street shall be expected to act only in the capacity of a

14  transition manager under the agreement."

15         Do you see that?   It's the second to last line,

16  beginning with State Street?

17  **A.**   Yeah, I saw that.

18  **Q.**   "And in such capacity to exercise discretion only on

19  price and timing with respect to the trading."

20         Right?

21  **A.**   Yes.

22  **Q.**   And so again, it's just reinforcing the concept that

23  State Bank Europe Limited has been appointed in the capacity

24  as a transition manager, right?

25  **A.**   Yes.

1   **Q.**  All right.  Now, if we go down to the next page, at the

2   bottom, it gets -- there's a provision that's entitled

3   "Securities Market Trading."

4           Do you see that?

5   **A.**  Yes.

6   **Q.**  All right.  It reads -- and this paragraph in particular

7   concerns equity transactions, as opposed to fixed income

8   transactions, correct?

9   **A.**  Yes.

10  **Q.**  All right.  And it reads, "The client hereby authorizes

11  and directs State Street to place all equity securities

12  orders on behalf of the fund, that are not executed in a

13  cross trade, as described above, through its broker-dealer

14  associates."

15          Do you see that?

16  **A.**  Yes.

17  **Q.**  And so earlier, when I asked you questions about whether

18  or not State Street Bank Europe Limited was the broker-dealer

19  in the context of this transition management agreement, this

20  particular paragraph makes it clear, does it not, that

21  Sainsbury's is authorizing and directing SSBEL to execute its

22  orders through its broker-dealer associates, do you see that?

23  **A.**  Yeah, but this is in respect to equities and we were

24  trading bonds.

25  **Q.**  Correct.

1          MR. JOHNSTON:  Objecting, he's not asking what his

2    understanding is.  He's testifying as to what is clear --

3    what parts are clear in the contract.

4          THE COURT:  All of these questions are as to what

5    his understanding is and it's just he's asking him on cross

6    whether -- he's asking is it clear that your understanding

7    was this.

8          MR. JOHNSTON:  We just think the record should be

9    clear that he should actually have to say those words, is it

10   your understanding that this phrase means this.

11         MR. GOLDSTEIN:  How about this, Your Honor.  I will

12   stipulate, to the extent I'm asking him questions about

13   the --

14         THE COURT:  All the questions as I've already

15   explained to the jury, with respect to this contract, are not

16   a legal interpretation of this contract -- as far as -- are

17   you aware -- I don't think anybody has testified to a legal

18   interpretation of any --

19         MR. FRANK:  We could be explicit, Your Honor, at

20   sidebar.  I just want to be very clear about what the concern

21   is.  It's a form concern and I'm not sure that it's clear.

22         THE COURT:  It's certainly not clear, because I'm

23   not perceiving -- there's no -- I don't think we need a

24   sidebar.

25         There's no -- this witness is not interpreting the

1    contract.  He's testifying when he's being asked about the

2    contract, either is this what the contract says, or just

3    these are the words in the contract, or is this what --

4    implicit in the questions, is this your understanding of the

5    contract.  Because he's not being asked -- I don't understand

6    Mr. Goldstein is seeking to ask and it would be objectionable

7    if he did, what is a legal interpretation of the contract.

8    That's not for this witness to give.  The law is for --

9    that's not --

10           So you can ask him what your understanding is.  He

11   can ask you these questions.

12           And he's asking you, sir, for your understanding of

13   what these provisions mean and you can tell him whatever the

14   proper answer, based on what your understanding is.

15           MR. GOLDSTEIN:  Thank you, Your Honor.

16           THE COURT:  Go ahead.

17   BY MR. GOLDSTEIN:

18   **Q.**  Mr. Johnson, the contract clearly states, black letters

19   on white paper, it reads, "The client hereby authorizes and

20   directs State Street to place all equity securities orders

21   through its broker-dealers associates."

22           Did I read the contract accurately?  I cut out a

23   few words in between.

24   **A.**  You did, but we weren't trading equities.

25   **Q.**  Completely understood.  It's in the contract, though,

1    right?

2    **A.**   Sure, it's in the contract.  It's there in black and

3    white as you've just said, yeah.

4    **Q.**   Right and what it does is it combines two terms that were

5    separately defined earlier on.  Meaning it combines

6    "broker-dealer" with "associates," right?

7    **A.**   Yeah.

8    **Q.**   Right?

9    **A.**   Yeah.

10   **Q.**   And so what it says is that these equity orders will be

11   executed through SSBEL's broker-dealer associates, right?

12   **A.**   Equity orders, yeah.

13   **Q.**   And then it goes on to provide, or to state, again, black

14   letters on white paper?

15            THE COURT:  So we're clear, what your answers are,

16   either if he asks you is this what it just says, either it

17   says that or it doesn't say that, or he's asking you, is that

18   what you understand it to mean?

19            THE WITNESS:  Right.

20   BY MR. GOLDSTEIN:

21   **Q.**   And it provides a few examples of who those broker-dealer

22   associates are, right?

23   **A.**   Yes.

24   **Q.**   And it specifically refers to State Street Global Markets

25   LLC, right?

1    **A.**   It does.

2    **Q.**   And State Street Global Markets International Limited,

3    right?

4    **A.**   Yes.

5    **Q.**   And so was it your understanding, based on this

6    paragraph, that those two entities were broker-dealer

7    associates of State Street Bank Europe Limited?

8    **A.**   It's my understanding, yeah.

9    **Q.**   Okay.

10           MR. GOLDSTEIN:   If we can go to the next page,

11   please, top paragraph, Max.

12   BY MR. GOLDSTEIN:

13   **Q.**   Paragraph 7.2 is a paragraph Mr. Johnston reviewed with

14   you during direct examination.  Do you remember that?

15   **A.**   Yes.

16   **Q.**   All right.  Let's start at the top.  Okay?  It

17   reads, "The client hereby authorizes and directs State

18   Street" -- I'm going to exclude the subject to language,

19   unless I think it's relevant, "to place all fixed income

20   securities orders through broker-dealer associates of State

21   Street."

22           Right?

23   **A.**   Uh-huh.

24   **Q.**   All right.  And so again, the client is Sainsbury's,

25   right?

1    **A.**   We're the client.

2    **Q.**   Authorizes and directs State Street to place all fixed

3    income security orders through its broker-dealer associates,

4    right?

5    **A.**   Yes.

6    **Q.**   And we know from the preceding paragraph that at least

7    two broker-dealer associates are State Street Global Markets

8    LLC and State Street Global Markets International Limited,

9    right?

10   **A.**   Yes.

11   **Q.**   All right.  It then goes on to state, "In a manner,

12   whereby such associates would act as the riskless principal

13   agency counterpart."

14          Do you see that?

15   **A.**   Yes.

16   **Q.**   All right.  And so the contract clearly provides that the

17   associates would be acting as the riskless principal agency

18   counterparty, right?

19   **A.**   Yes.

20   **Q.**   Between the fund.  That's Sainsbury's fund, correct?

21   **A.**   Yes.

22   **Q.**   And third-party market counterparties on the other side,

23   right?

24   **A.**   Yes.

25   **Q.**   All right.  The next sentence reads, "the client

1    authorizes and directs that such broker-dealer associates of

2    State Street may accept compensation in lieu of commission in

3    the form of a spread.

4              Do you see that?

5    **A.**  Yes.

6    **Q.**  All right.  Now, when Mr. Johnston asked you a question

7    about what that meant, I believe you testified that you

8    interpreted "spread" to mean "fixed fee."  Was I -- is that

9    what you meant to testify to?

10   **A.**  No.

11   **Q.**  Okay.  And so your understanding of this paragraph is

12   that the broker-dealer associates, meaning State Street

13   Global Markets, LLC, or State Street Global Market

14   International Limited may accept compensation in lieu of

15   commission, in the form of a spread.  Right?

16   **A.**  Yes.

17   **Q.**  And as you testified a little bit earlier, "spread" means

18   the difference, a markup or a markdown, correct?

19   **A.**  Yes.

20   **Q.**  And all of which relates to fixed income, securities

21   transactions, right?

22   **A.**  Yeah.

23   **Q.**  Okay.  And so what this means, if you understand -- what

24   you understand this to mean is that riskless principal agency

25   does not preclude a spread.

1   **A.**  I'm not sure about that.

2   **Q.**  Well, doesn't it clearly state riskless principal agency

3   is how they would be acting, the associates?

4   **A.**  Riskless principal means that there is no risk on --

5   outside the trade, so it's done at a mid market price.

6   **Q.**  All right.  But I'm asking what this paragraph says.  And

7   what this paragraph says is that the associate --

8           THE COURT:  His understanding of this paragraph.

9           MR. GOLDSTEIN:  Well, what the paragraph says and

10  then I'll ask him --

11          THE COURT:  Okay.

12  BY MR. GOLDSTEIN:

13  **Q.**  What the paragraph says is that, "The associates will act

14  as riskless principal agency and" -- "and they may benefit

15  from a spread."

16  **A.**  The associates, yeah.

17  **Q.**  That's what the -- that's what this paragraph provides,

18  right?

19  **A.**  But not State Street Bank Europe.

20  **Q.**  Right.

21  **A.**  Yeah.

22  **Q.**  No, exactly, meaning the associates, right?

23  **A.**  Okay.

24  **Q.**  And so let me back up for a second.  Okay.  The way this

25  works in the marketplace is that you have a contract, meaning

1    Sainsbury's has a contract with State Street Bank Europe,

2    right?

3    **A.**  Uh-huh.

4    **Q.**  All right.  This paragraph and the prior paragraphs talk

5    about broker-dealer associates executing fixed income

6    transactions, right?

7    **A.**  Yeah.

8    **Q.**  All right.  And so what happens is State Street Bank

9    Europe Limited, in their capacity as transition manager for

10   Sainsbury's has to use a broker-dealer to execute trades in

11   the marketplace for Sainsbury's, right?

12   **A.**  Yes.

13   **Q.**  All right.  And so that broker-dealer stands between

14   State Street Bank Europe Limited on one side and the

15   marketplace on the other side, right?

16   **A.**  Yeah.

17   **Q.**  All right.  And so your understanding of this paragraph

18   is simply that that broker-dealer that sits between State

19   Street Bank Europe Limited and the marketplace can benefit

20   from a spread on fixed income transactions.

21   **A.**  The associate broker-dealer can, yeah.  As written on

22   this contract.

23   **Q.**  Right.  And so -- now, this paragraph also provides, at

24   the bottom, in interest of full clarity, it says, "The amount

25   of compensation in the form of a spread, permitted to be

1    received by such broker-dealer associates in any such

2    riskless principal transaction involving a fixed income

3    security shall be specifically identified in the transition

4    notice."

5            Right?

6    **A.**   Yes.

7    **Q.**   So this paragraph provides, in your understanding, that

8    if there is a spread to be taken by the broker-dealer, it's

9    going to be detailed in the transition notice, right?

10   **A.**   Uh-huh.

11   **Q.**   Right.  So before we get to another place, you testified

12   on direct examination, it was your understanding that State

13   Street Bank Europe Limited was acting in an agency capacity.

14           Do you recall that testimony?

15   **A.**   Yes.

16   **Q.**   You met with members of the Federal Bureau of

17   Investigation and were interviewed by Mr. Frank and --

18   actually, Mr. Frank at some point in time, January 6, 2016.

19   Do you recall meeting with members of Mr. Frank's prosecution

20   team?

21   **A.**   I do, yes.

22   **Q.**   All right.  And you were interviewed on that date,

23   correct?

24   **A.**   Yes.

25   **Q.**   And they asked you all sorts of questions, like they

1    asked you today, questions about Sainsbury's transition,

2    right?

3    **A.**  Yes.

4    **Q.**  And do you recall telling them, when you sat with them in

5    January of 2016 -- by the way, it may seem elementary, but

6    your memory of these events were better in January of 2016

7    than they are today in June of 2018, right?

8    **A.**  I have a pretty clear recollection of what was discussed.

9    **Q.**  Okay.  And so during that meeting with FBI personnel and

10   Mr. Frank and his team, do you recall telling them you

11   believe State Street acted as a principal on behalf of

12   Sainsbury's?

13   **A.**  I don't recall that.

14           MR. GOLDSTEIN:  Your Honor, may I approach the

15   witness and see if this refreshes his recollection?

16           THE COURT:  Yes.

17           MR. GOLDSTEIN:  Thank you.

18   BY MR. GOLDSTEIN:

19   **Q.**  Mr. Johnson, you're free to read whatever part of the

20   document you want to, but I specifically will point you to

21   that particular line and that particular paragraph?

22   **A.**  Yeah.  Okay.

23   **Q.**  Just read it to yourself.

24   **A.**  Okay.  Yeah.

25   **Q.**  And having read that, does that refresh your memory as to

1    whether or not you told Mr. Frank and members of the FBI when

2    you were interviewed in January 2016 that you believe State

3    Street had acted as a principal on behalf of Sainsbury's?

4    **A.**  If it says so.  It was a pretty long meeting.

5    **Q.**  Okay.  And whether or not -- whatever you said in that

6    particular day, the contract would just review clearly

7    provides that the associates were acting on a riskless

8    principal agency basis, correct?

9    **A.**  Yeah, but the transition notice is what is -- overrides

10   everything in the contract.

11   **Q.**  We'll get to the transition notice, Mr. Johnson.

12   **A.**  Okay.

13   **Q.**  But the last paragraph we talked about is where it said

14   that State Street was going to detail in the transition

15   notice any spreads earned by the broker-dealer, right?

16   **A.**  It does, yeah.

17   **Q.**  All right.

18          MR. GOLDSTEIN:  Let me direct your attention to

19   paragraph 12, Max, the conflicts of interest and disclosure

20   duties.  Just the top paragraph.

21          So this is another provision of that particular

22   contract, the transition management agreement, you executed

23   in 2009 with State Street, correct?

24   **A.**  Yes.

25   **Q.**  And this particular paragraph deals with potential

1      conflicts of interests on State Street's behalf, right?

2   **A.**   Uh-huh.

3   **Q.**   And State Street, again, it's SSBEL, right?

4   **A.**   Yes.

5   **Q.**   And it reads, "State Street's employees comply with a

6      conflict of interest policy with a view to managing any

7      conflict which may arise between State Street's own interest

8      and those of its associates and the interest of its clients,

9      or between the client's interests and those of other

10     clients."

11              Do you see that?

12  **A.**   I see it.

13  **Q.**   It goes on to read that, "State Street will inform the

14     client of the nature and source of any conflict where it does

15     not consider that the arrangements under the conflicts of

16     interest policy are sufficient to manage a particular

17     conflict."

18              Right?

19  **A.**   Yeah, sorry.  Can you read that again?  I didn't quite

20     see it.

21  **Q.**   Sure.

22              "State Street will inform the client of the nature

23     and/or source of any conflict where it does not consider that

24     the arrangements under the conflicts of interest policy are

25     sufficient to manage a particular conflict."

1          Do you see that?

2   **A.**  Yes.

3   **Q.**  And it goes on to read that, "The client agrees that

4   State Street and its associates may provide services to the

5   client, even though a potential conflict of interest, in

6   relation to a particular investment or strategy may exist."

7          Do you see that?

8   **A.**  Yes.

9   **Q.**  And so it's your understanding, sir, right, that this

10  particular paragraph provides that State Street can still act

11  and its associates may still provide services, even if a

12  potential conflict exists, right?

13  **A.**  Yes.

14          MR. GOLDSTEIN:  And then if you go on, Max, to the

15  following paragraphs, the contract between Sainsbury's and

16  SSBEL, particularizes some, but not all, potential conflicts,

17  right?  You see up top where it says, "Such potential

18  conflicts may include, but shall not be limited to the

19  following"?

20  **A.**  Yeah.  There's a list of them, yeah.

21  **Q.**  So if we just jump to 12.1.4, the last paragraph on that

22  page.  It provides that one such conflict, potential

23  conflict, is where "State Street and/or an associate may

24  benefit from a commissioned fee, markup or markdown, payable

25  by the client to the broker-dealer."

1          Do you see that?

2     **A.**  Yes.

3     **Q.**  And so your understanding of the contract is that even

4     when this potential conflict exists, State Street and its

5     associates may still provide services to Sainsbury's, right?

6     **A.**  Yeah.

7     **Q.**  All right.  Next page, top paragraph.

8          "Another potential conflict that may exist is where

9     an associate is acting as a broker-dealer, in respect of a

10    fund transaction, and may benefit from a commission fee,

11    markup or markdown, payable by the client."

12         Do you see that?

13    **A.**  Yeah.

14    **Q.**  All right.  So this goes back to what we were talking

15    about earlier, in terms of how these executions are placed in

16    the marketplace.  Meaning, State Street Bank Europe Limited

17    places an order through its broker-dealer associate, the

18    broker-dealer associate goes to the marketplace.  There's a

19    markup in terms of the price they pay and the price they pass

20    on.  And this provides that even when that potential conflict

21    exists, State Street and its broker-dealer associates may

22    still provide services to Sainsbury's."

23         Correct?

24         MR. JOHNSTON:  Objection.

25         THE COURT:  Kind of a long question.

1          MR. JOHNSTON:  Compound.

2          THE COURT:  Yes, Mr. Goldstein, maybe we can break

3    it apart.

4    BY MR. GOLDSTEIN:

5    **Q.**  Going back to what we talked about before, the

6    marketplace.  State Street Bank Europe Limited is not a

7    broker-dealer, right?

8    **A.**  It's not a broker-dealer.

9    **Q.**  Right.  It has affiliates or associates that are

10   broker-dealers, right?

11   **A.**  Yes.

12   **Q.**  Those associates or affiliates go to the marketplace to

13   execute orders on behalf of State Street Bank Europe Limited,

14   right?

15   **A.**  Yeah.

16   **Q.**  They can benefit, meaning the associate broker-dealer can

17   benefit, from a spread between the purchase price and the

18   price that's passed on ultimately to State Street Bank Europe

19   Limited, and/or Sainsbury's, right?

20   **A.**  Uh-huh.

21   **Q.**  And all this is saying to Sainsbury's, your understanding

22   as the person who signed this contract, is that even when

23   that potential conflict exists, State Street and its

24   associates can still provide the services to Sainsbury's,

25   right?

1    **A.**   Yup.

2    **Q.**   All right.  Now, the next paragraph, 12.2, provides

3    that "Neither State Street nor any associate shall be liable

4    to account for and/or pay to the client any profit,

5    commission, or remuneration made or received from or by

6    reason of the fund transactions referred to in clause 12.1."

7          Do you see that?

8    **A.**   Uh-huh.

9    **Q.**   All right.  And so your understanding, sir, of this

10   particular subsection of the contract is that neither State

11   Street nor any associate shall be liable to account for any

12   money that may have been made by the broker-dealer in

13   executing the fixed income securities?

14   **A.**   Yeah, but they did.

15   **Q.**   They did.

16   **A.**   They did repay us the commissions.

17   **Q.**   I can't hear you.  I'm sorry.

18   **A.**   They did repay us the commissions.  The markup.

19   **Q.**   Right, but this particular paragraph says they're not --

20   **A.**   That particular paragraph says that, yeah.

21   **Q.**   It says they're not responsible to account for any of

22   that money, right?

23   **A.**   That's what it says.

24   **Q.**   So in all fairness to Sainsbury's and SSBEL, this

25   particular provision, 12.2, conflicts or is in conflict with

1    the earlier paragraph, where it said that State Street would

2    detail markups or spreads that were incurred, correct?

3    **A.**   Yeah.

4            MR. JOHNSTON:  If he can testify to his

5    understanding as to whether it conflicts.

6            THE COURT:  Correct.  Sustained just as to

7    conflict.  You can ask him his understanding.

8    BY MR. GOLDSTEIN:

9    **Q.**   Is it your understanding that this particular paragraph,

10   12.2, is in conflict or is inconsistent with the prior

11   paragraph where it said State Street would detail in the

12   transition notice markups or spreads earned by its

13   broker-dealer associates?

14   **A.**   It would be appear to be.

15           MR. GOLDSTEIN:  Max, if we could go to

16   paragraph 13, fees and costs.

17   BY MR. GOLDSTEIN:

18   **Q.**   Paragraph 13, fees and costs, "State Street will not

19   charge a management fee for its services hereunder."

20           Do you see that?

21   **A.**   Yes.

22   **Q.**   "Client will be liable to pay commission on fund

23   transactions in accordance with the relevant transition

24   notice."

25           Right?

1   **A.**   Uh-huh.

2   **Q.**   This, too, is in direct conflict of your understanding,

3   sir.  This is in direct conflict with the transition notice

4   that was ultimately executed between Sainsbury's and State

5   Street for the transition that we're talking about, right?

6   **A.**   Yeah.  My understanding is the transition notice

7   overrides everything in the contract, which is what I've said

8   before.

9   **Q.**   Okay.  But according to the actual language in the TMA,

10  State Street is not going to charge a management fee, right?

11  **A.**   That's right.

12          MR. GOLDSTEIN:  All right.  Max, miscellaneous, the

13  next page, please.

14  BY MR. GOLDSTEIN:

15  **Q.**   A couple of quick paragraphs, Mr. Johnson.  Nothing too

16  controversial.  "The agreement is governed by and construed

17  in accordance with the laws of England and Wales."

18          Correct?

19  **A.**   Uh-huh.

20  **Q.**   "The agreement may only be modified or amended in

21  writing, signed by both parties or their authorized

22  representatives."

23          Right?

24  **A.**   Yeah.

25  **Q.**   "The agreement constitutes the entire and complete

1  agreement between the parties hereto, concerning the subject

2  matter hereof."

3  Right?

4  **A.**  Yes.

5  **Q.**  "Supercedes all prior agreements."

6  Right?

7  **A.**  Yeah.

8  **Q.**  And it's signed by you, right?

9  **A.**  Yes.

10  **Q.**  All right.  And then attached to this particular TMA is a

11  form transition notice.  Do you see that?

12  **A.**  Yeah.

13  **Q.**  Okay.  If we can go to page 3 of this particular -- it

14  sets out all of the manager's obligations, right?

15  **A.**  Yup.

16  **Q.**  All right.  And without going through them word for word,

17  there's a -- you know, 10 plus paragraphs in terms of what

18  the manager's obligations are, correct?

19  **A.**  Yeah.

20  **Q.**  All right.  Now, at some point, flash-forward to 2011,

21  you were -- you wanted to do a transition from one asset

22  class to another asset class, right?

23  **A.**  Yes.

24  **Q.**  And you appointed or hired Hewitt to manage the selection

25  of a transition manager, right?

**A.**   Yes.

MR. GOLDSTEIN:  And if we could go to Exhibit 84-1.
I believe it's in evidence.

Is that consistent with your records, Mr. Johnston?

THE WITNESS:  It's there.

MR. GOLDSTEIN:  No, no, I was asking the
Government.

BY MR. GOLDSTEIN:

**Q.**   So this is the final proposal filed by State Street to
Hewitt; is that correct?

**A.**   Yes.

**Q.**   And -- now, this was January of 2011, right?

**A.**   Yeah.

**Q.**   You already had a transition management agreement in
place with State Street Bank Europe, right?

**A.**   Yeah.

**Q.**   But instead of simply going to State Street and asking
them directly, meaning you, Sainsbury's, you went through a
third-party consultant, right?

**A.**   Yes.

**Q.**   And so when State Street was bidding or submitting a
response to the tender for this particular transition, at
this point in time, you, Sainsbury's, would not have
disclosed to State Street that you were the ultimate client,
right?

**A.**   That's correct.

**Q.**   And so they wouldn't have been told that there was already an existing TMA in place, transition management agreement, right?

**A.**   That's right.

**Q.**   And they wouldn't know that there were already negotiated a whole set of terms with the client, meaning Sainsbury's, right?

**A.**   Right.

**Q.**   All right.  And if we turn to the next page, there begin a whole series of questions that were asked by Hewitt on your behalf, correct?

**A.**   Yes, I'm not familiar with this document.

**Q.**   Okay.  So you have not reviewed this document?

**A.**   I don't recall reviewing it.  Certainly not in the last seven years.

**Q.**   Okay.  And so Government didn't review it with you prior to you testifying?

**A.**   No.

**Q.**   How about State Street's response to the request for tender?  Have you reviewed that?

**A.**   State Street's response?

**Q.**   Yes.

**A.**   Is that a different document?

**Q.**   Yes, there's a different document.  A more fulsome

1    document.  Have you seen that?

2    **A.**   No, I haven't seen that.

3    **Q.**   Okay.  All right.  Let's push forward, then.

4    **A.**   The only thing I looked at was the advice that we got

5    from Hewitt.

6             MR. GOLDSTEIN:  Okay.  If I can have Exhibit 109 --

7             THE COURT:  Is that in evidence?

8             MR. GOLDSTEIN:  Well, not 109 -- periodic notice --

9    109.1.

10            THE COURT:  109.1 is in evidence.

11   BY MR. GOLDSTEIN:

12   **Q.**   This is the transition notice that Mr. Johnston went

13   through with you on your direct exam, correct?

14   **A.**   Yes.

15   **Q.**   And so again, at the top, it's directed to State Street

16   Bank Europe Limited, right?

17   **A.**   Yes.

18   **Q.**   And that's, as we've learned, an entity distinct and

19   separate from their broker-dealer associates, correct?

20   **A.**   Yes.

21   **Q.**   It's dated February 28, 2011, right?

22   **A.**   Yeah.

23   **Q.**   And where it says "Transition Agreement."

24            MR. GOLDSTEIN:  If we could just blow up that

25   paragraph, Max.

1          It says, "The undersigned appoints State Street to

2     manage the liquidation or restructuring of the fund on the

3     terms and subject to the conditions of the transition

4     management agreement, dated 9th of July, 2009."

5          Do you see that?

6  **A.**  Yes.

7  **Q.**  And so this particular transition notice incorporates the

8     terms and conditions that were set out in that contract that

9     we just reviewed, correct?

10 **A.**  Yes.

11 **Q.**  All right.  And so on the next page, where it talks about

12    a transaction fee and it talks about a management fee,

13    there's nothing here that repudiates or excludes the

14    broker-dealer associates from benefitting from markups,

15    markdowns, or spreads, is there?

16 **A.**  No, but it was represented to us that that would be the

17    only fee.

18 **Q.**  But you never even dealt with State Street.  You were

19    dealing with Hewitt, correct?  Is that correct?

20 **A.**  Yeah, but Hewitt are our agents and they negotiated a

21    flat fee of 350,000 pounds.

22 **Q.**  So my question is, in terms of the -- someone looking at

23    just the transition notice, there's nothing in here

24    explicitly precluding State Street Bank Europe Limited's

25    broker-dealer affiliates from being compensated in lieu of

1   commission in the form of a spread?

2   **A.**   I think in the contract it says any markups or markdowns

3   have to be put onto the transition notice and they're not.

4   **Q.**   Right.  And the transition management agreement also says

5   that State Street should not be responsible for accounting

6   for any remuneration earned by the State Street associate

7   broker-dealer.  We just went through that, right?  Meaning my

8   point is, there's a lot of contradictory terms here, isn't

9   there?

10  **A.**   Yeah, but my point, what I'm trying to get across is that

11  the transition notice overrides all the terms of the contract

12  and that's our understanding.  And you know, through the --

13  you know, the relationship, and the trust that we had with

14  State Street at that time.

15  **Q.**   Fair enough.  So that was your understanding.  My

16  question in response to you is where does it say that in the

17  transition notice?

18  **A.**   The transition notice says there is a -- effectively a

19  flat fee of 350,000 pounds for that job.

20  **Q.**   And what does it say about broker-dealer associates?

21  **A.**   It doesn't say anything.

22  **Q.**   Right.  And it also incorporates the terms of the TMA

23  that you executed with State Street Bank Europe Limited,

24  right?

25  **A.**   Sorry --

1    **Q.**  The first page of the transition notice explicitly

2    incorporates the terms of the TMA that you executed with

3    State Street Bank Europe Limited, right?

4    **A.**  Yeah.

5         MR. GOLDSTEIN:  Your Honor, I move to admit Exhibit

6    478, the posttrade.  The Government has not objection.

7         THE COURT:  Is that correct?

8         MR. JOHNSTON:  That's correct, Your Honor.

9         THE COURT:  478 is admitted.

10        (Exhibit No. 478 admitted into evidence.)

11   BY MR. GOLDSTEIN:

12   **Q.**  Mr. Johnson, you were asked a series of questions by Mr.

13   Johnston about the implementation shortfall as a result of

14   the transition performed by SSBEL.  Do you recall those

15   questions?

16   **A.**  Yes.

17   **Q.**  And after a transition is complete, you receive what's

18   called a post transition report; is that correct?

19   **A.**  Correct.

20   **Q.**  And that's something that you would look at with some

21   particular care after a transition?

22   **A.**  Yeah, it's a detail telling how much the transitions

23   cost.

24   **Q.**  Right.  So if I can direct your attention to --

25        MR. GOLDSTEIN:  It should be the fifth page, Max,

1    where it says "implementation shortfall."

2    BY MR. GOLDSTEIN:

3    **Q.**   Implementation shortfall was SSBEL's explanation to you

4    in terms of the actual cost incurred by Sainsbury's, correct?

5    **A.**   Yes.

6    **Q.**   All right.  And it says, "Market trading commenced on the

7    third of March and we completed approximately 53 percent on

8    the first day."

9            Correct?

10   **A.**   Yes.

11   **Q.**   It says, "We are pleased to report the final

12   implementation shortfall for the restructure was 19.1 BPS, or

13   approximately 2.9 million pounds."

14           Is that correct?

15   **A.**   Yeah.

16   **Q.**   "Excluding the SSTM fee."

17           Right?

18   **A.**   Yes.

19           MR. GOLDSTEIN:  All right.  And then, Max, if we

20   can jump forward to the actual detail.  So page 2 of the 33

21   and if you could blow up the table on the bottom right-hand

22   corner.

23   BY MR. GOLDSTEIN:

24   **Q.**   Okay.  This is a table representing the implementation

25   shortfall analysis, correct?

1    **A.**   Yeah.

2    **Q.**   All right.  And so what you see here is there's a row

3    that's entitled "bid offer spread," right?

4    **A.**   Yes.

5    **Q.**   And that goes back to the transition management agreement

6    that we reviewed before, meaning the bid offer spread is what

7    we were talking about, in terms of the difference between the

8    markup or markdown that a broker-dealer associate can charge

9    to perform executions of fixed income securities?

10           MR. JOHNSTON:  Objection.  The prior document said

11   nothing about bid offer spread.

12           THE COURT:  Well, you can break it apart into

13   two pieces.

14           MR. GOLDSTEIN:  Sure.

15   BY MR. GOLDSTEIN:

16   **Q.**   When you testified earlier about markups and markdowns,

17   you testified that that's commonly known as a spread, right?

18   **A.**   Yeah.

19   **Q.**   It's also commonly known as the bid offer spread, right?

20   **A.**   Yup.

21   **Q.**   Okay.  And so in this line where it says, "bid offer

22   spread," that's a reference to remuneration earned by

23   broker-dealers in executing your transaction, your fixed

24   income security transactions, right?

25   **A.**   Uh-huh.

1  **Q.**  All right.  And it provides that the cost for doing that

2  was $5,191,458, right?

3  **A.**  Uh-huh.

4  **Q.**  And it sets out the cost in terms of basis points and

5  it's 33.3, correct?

6  **A.**  Yeah.

7  **Q.**  And so it also has opportunity costs, it has other costs

8  in there, right?

9  **A.**  Yeah.

10  **Q.**  And when you testified that you must have hit a sweet

11  spot, the opportunity cost, you gained money in terms of this

12  transition, right?

13  **A.**  Yes.

14  **Q.**  And so that's why it's bracketed in parenthesis, right?

15  **A.**  Yes.

16  **Q.**  So it says that the total cost was $2,990,322, right?

17  **A.**  Uh-huh.

18  **Q.**  Or 19.21 basis points, right?

19  **A.**  Yes.

20  **Q.**  And so in terms of the disclosure to Sainsbury's, every

21  penny is accounted for in your posttrade report, right?

22  **A.**  I'm not sure about that.

23  **Q.**  What's missing from --

24  **A.**  Well, I can't tell the -- the interpretation was that it

25  was pretty light on detail.

1    **Q.**   Okay.  But you have the bid offer spread there, right?

2    **A.**   Yeah.  We had to have it forensically audited afterwards.

3    **Q.**   Right.  And in terms of your forensic audit, you don't

4    have any information, do you, that even a penny was hidden in

5    terms of the actual final cost to Sainsbury's.  Meaning,

6    there may be disagreement about whether or not State Street

7    disclosed what it had earned, but there's no disagreement in

8    terms of that every penny was disclosed in the implementation

9    shortfall, right?

10   **A.**   I don't know.

11   **Q.**   As you sit here, has anyone ever told you that one penny

12   was not accounted for in this transition?

13   **A.**   No.  But there were -- we were repaid some of the money

14   by State Street.

15            MR. GOLDSTEIN:  Okay.  And if we can go to page 7,

16   Max, please.  7 of 33.  Big, bottom table, please.

17   BY MR. GOLDSTEIN:

18   **Q.**   This table is entitled "Reconciliation to Pre-Transition

19   Analysis."  Do you see that?

20   **A.**   Yes.

21   **Q.**   And so what it shows is what the pre-trade estimates were

22   and what the actual cost was, correct?

23   **A.**   Yes.

24   **Q.**   So in terms of the bid-offer spread, SSBEL estimated that

25   it would cost Sainsbury's 38.1 basis points to execute this

1    transition, right?

2    **A.**   Yes.

3    **Q.**   But in the end, it actually cost less in terms of the bid

4    offer spread, right?  33.3?

5    **A.**   Yeah.

6    **Q.**   So it was on the plus side of 4.8 basis points?

7    **A.**   Yeah.

8    **Q.**   And then it talked about total cost, and it said the

9    estimated total cost was 38.4, correct?

10   **A.**   Yes.

11   **Q.**   And that the actual cost was 19.2, right?

12   **A.**   Yes.

13   **Q.**   Meaning, in short, what happened here was that the actual

14   transition was far more favorable than was estimated out

15   front by State Street Bank Europe Limited, correct?

16   **A.**   Yeah.  But transition managers do tend to overestimate,

17   in my experience.

18   **Q.**   Right.  But you relied on the estimate, right?

19   **A.**   We relied on the estimate.  Obviously, we relied on the

20   estimate.

21   **Q.**   And you selected State Street, based on a representation

22   that it would cost approximately 38.4 basis points to

23   implement your transition strategy, right?

24   **A.**   Uh-huh.

25   **Q.**   And in the end, they came in at 19.2 basis points, right?

1    **A.**   Yes.

2    **Q.**   So they outperformed what they said the estimate would be

3    at the outset, right?

4    **A.**   Yeah.  But as I said, I think a lot of it is due to

5    market movements.  But it was a better result than we

6    expected.

7    **Q.**   Better result than you expected.  And in fact,

8    Sainsbury's made money on the transition, right?

9    **A.**   It was still a cost.

10             MR. GOLDSTEIN:  No further questions.

11             THE COURT:  Any redirect?

12             MR. JOHNSTON:  Yes, Your Honor.  Briefly.

13         **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

14    BY MR. JOHNSTON:

15    **Q.**   Mr. Johnson, on cross-examination, you were asked some

16    questions about the bid-offer spread, correct?

17    **A.**   Yeah.

18    **Q.**   What role did you see State Street's transition desk as

19    playing for you in the market?

20    **A.**   We saw them as arranging the trades that were necessary

21    to complete the transition of assets.

22    **Q.**   Did you have an understanding whether they would be

23    acting as your agent?

24    **A.**   Yes, they were acting as our agent.

25    **Q.**   And when an agent is acting on your behalf in the market,

1  who is on the other side of your agents transactions?

2  **A.**   Another party, a counterparty.

3  **Q.**   Do you have an understanding of whether those

4  counterparties could be broker-dealers?

5  **A.**   Yes.

6  **Q.**   And was it your testimony that broker-dealers charged bid

7  offers -- charged spreads?

8  **A.**   Yes, they do.

9  **Q.**   So when you -- when you receive a post trade report that

10  gives you a bid-offer spread, did you have any way to know

11  whether that was the spread of the other broker-dealers on

12  the other side of the transaction, or your agent who was

13  charging you a spread?

14  **A.**   No, it was the people on the other side of the

15  transaction.

16  **Q.**   That was your understanding of what that term meant?

17  **A.**   Yeah.

18  **Q.**   Did you have an understanding whether your agent's

19  compensation was built into the bid-offer spread in?

20  **A.**   Yeah, the agent wasn't -- that compensation wasn't built

21  into the bid-offer spread, no.

22  **Q.**   At least that's what you thought?

23  **A.**   That's what I thought, yeah.

24  **Q.**   You were asked some questions about opportunity costs,

25  correct?

1    **A.**  Yes.

2    **Q.**  And you were asked questions about the market having

3    moved in your favor, correct?

4    **A.**  Yes.

5    **Q.**  When you hire someone -- in your understanding, when you

6    hire a transition manager to act as your agent, who benefits

7    from favorable movements in the market?

8    **A.**  We do.  Yes.

9    **Q.**  You were asked some questions about the specific legal

10   entity that entered into an agreement with Sainsbury's,

11   correct?

12   **A.**  Yes.

13   **Q.**  I'd like to show you Government Exhibit 137, which is

14   already in evidence.  As you can see, it's the invoice that

15   we previously looked at.  So if we can take a look at the

16   upper right-hand cornerv -- sorry, of the upper, upper

17   right-hand corner.

18          What's the entity that sent you this invoice?  If

19   you could read it out loud.

20   **A.**  "State Street Global Markets."

21   **Q.**  "International Limited"?

22   **A.**  International, yeah.

23   **Q.**  So not State Street Bank of Europe Limited?

24   **A.**  No.

25   **Q.**  At that time, were you paying attention to which

1    particular entity was invoicing you?

2    **A.**  No.  Especially like I said earlier, we just considered

3    State Street to be one entity.  They were always in the same

4    building.

5    **Q.**  And you were asked some questions about the transition

6    management agreement.  Just so we're clear, how many years

7    before the transition was the transition management agreement

8    signed?

9    **A.**  Less than two.

10   **Q.**  Let's take a look at page 7.

11        MS. LEAHY:  Of?

12        MR. JOHNSTON:  I'm sorry.  Yes.  Of Exhibit 3,

13   please.  Zoom in on the top paragraph.

14   BY MR. JOHNSTON:

15   **Q.**  So you were asked some questions, if I'm correct, about

16   various entities existing within State Street, correct?

17   **A.**  Yes.

18   **Q.**  And particularly about compensation that associate

19   broker-dealers may earn, correct?

20   **A.**  Yeah.

21   **Q.**  So directing your attention to the bottom where it says,

22   "The amount of compensation, in the form of a spread,

23   permitted to be received by such broker-dealer associates, in

24   any such riskless principal transaction involving a fixed

25   income security, shall be specifically identified in the

1    transition notice."

2    **A.**   Yes.

3    **Q.**   Was there a spread identified in the transition notice?

4    **A.**   There was not.

5    **Q.**   What was the only fee that was identified in the

6    transition notice?

7    **A.**   350,000 pounds.

8    **Q.**   Who had led you to believe that 350,000 pounds was the

9    only amount that you'd be charged?

10            MR. GOLDSTEIN:  I object, Your Honor.

11            THE COURT:  Overruled.

12            THE WITNESS:  Aon Hewitt.

13   BY MR. JOHNSTON:

14   **Q.**   And I actually want to show you an e-mail that's been

15   admitted into evidence, the -- I believe it's 109.  If we can

16   zoom in at the top.

17            Do you recognize this e-mail, or at least any of

18   the names on this e-mail, Mr. Johnson?

19   **A.**   Yeah, I recognize the -- I recognize all the names.

20   **Q.**   And in looking at this e-mail, what has -- what's being

21   sent to you?

22   **A.**   It's a periodic notice.

23   **Q.**   And if we can take a look at the periodic notice, 109-1,

24   and go to page 2.  Zoom on the signature block.

25            Who signed the periodic notice on behalf of State

1    Street?

2    **A.**   Edward Pennings.

3           MR. JOHNSTON:  Thank you, Your Honor.  No further

4    questions.

5           THE COURT:  Any recross?

6           MR. GOLDSTEIN:  No recross.

7           THE COURT:  All right.  Thank you very much,

8    Mr. Johnson.  You're excused.

9           Next witness?

10          MR. JOHNSTON:  The Government calls Roul Haerden to

11   the stand.

12          MR. WEINBERG:  Judge, may we approach the bench

13   while the next witness is coming?

14          THE COURT:  Sure.

15          MR. WEINBERG:  You have a juror raising their hand.

16          THE JUROR:  Can I go to the bathroom?

17          THE COURT:  Sure.  You all can take a break.  Come

18   back in five minutes.

19          All rise for the jury.

20           (The jury exits the courtroom.)

21           (The following discussion held at the bench.)

22          MR. WEINBERG:  What I want to try to do is guard

23   against the future witnesses from the State Street clients

24   blurting out that State Street repaid them.

25          MR. FRANK:  We've instructed Mr. Haerden's attorney

1    in the break that he should not do that.  But I will point

2    out that, in this particular case, Mr. Johnston interrupted

3    him before he completed his sentence, and it was then

4    elicited at least three times by Mr. Goldstein on

5    cross-examination.

6                MR. GOLDSTEIN:  What was?

7                MR. FRANK:  The fact that they were reimbursed by

8    State Street.  So I can't guard against what happens on

9    cross-examination.

10               MR. GOLDSTEIN:  They were reimbursed.

11               THE COURT:  I think, in fairness, he testified to

12   it in cross-examination.  He didn't specifically -- Mr.

13   Goldstein didn't ask for it.

14               MR. FRANK:  I agree, Your Honor.

15               THE COURT:  But the rest of it implies that he

16   wanted it.

17               THE DEPUTY CLERK:  The witness is still in the

18   courtroom.

19               MR. FRANK:  The next witness is here, and I don't

20   know when he came in.

21               THE DEPUTY CLERK:  And he wants to know if he can

22   stay in the future to watch.

23               THE COURT:  Oh.  Mr. Johnson wants to know if he

24   can stay in the courtroom?

25               Do you guys have a view?

```
 1              MR. FRANK:  We don't have an objection.

 2              MR. GOLDSTEIN:  I don't care.

 3              THE COURT:  Mr. Johnson is done, he can stay if he

 4       wishes.

 5              MR. FRANK:  Mr. Haerden I don't believe was here

 6       during the prior testimony.

 7              THE COURT:  No, he was not.

 8              MR. WEINBERG:  You'll tell all of these witnesses

 9       in advance?

10              MR. JOHNSTON:  There's no question that we will; as

11       I tried to walk the line on the direct with, "At some point

12       did you learn," not the basis for how he learned he was

13       overcharged.

14              THE COURT:  I didn't think you elicited.

15              MR. JOHNSTON:  Right.

16              MR. WEINBERG:  So I think if they were

17       instructed --

18              THE COURT:  How -- this witness is short direct?

19              MR. FRANK:  Short.

20              MR. GOLDSTEIN:  Shouldn't be that long.

21              THE COURT:  Same as the last one?

22              MR. FRANK:  If anything, shorter.

23              THE COURT:  So we'll be done with this witness

24       today?

25              MR. FRANK:  Uh-huh.
```

```
 1              THE COURT:  Do you have anyone else for today?
 2              MR. FRANK:  No.  But we would like to be done with
 3     this witness today.
 4              THE COURT:  Yeah.  We're going to go until 4:30.
 5              And then in terms of the scheduling for tomorrow,
 6     assuming we're done -- we'll be done with this witness today.
 7     And then tomorrow, you have another -- at 9 o'clock
 8     another --
 9              MR. FRANK:  Mr. McKnight.
10              THE COURT:  He's with?
11              MR. FRANK:  Royal Mail.
12              THE COURT:  Royal Mail.  Same direct, around, or a
13     little bit longer?
14              MR. JOHNSTON:  A little longer.
15              MR. FRANK:  Maybe slightly longer.
16              MR. JOHNSTON:  A half hour.
17              MR. FRANK:  We'll keep it short.
18              THE COURT:  Similar cross or shorter?
19              MR. WEINBERG:  No longer and probably shorter.  If
20     I'm doing it.  We haven't --
21              THE COURT:  You haven't thought that out.  Okay.
22              And then after that, who else?
23              MR. FRANK:  We have short witnesses.  We have --
24     well, their testimony will be short.  We have -- well, their
25     testimony will be short.  We have Mr. Dionisio, Mr. Finocchi,
```

1    I'm not sure in which sequence.  But they're both traders.

2              THE COURT:  Like do you want to go -- like today,

3    should I tell them at the end of the day we'll be going

4    tomorrow afternoon?

5              MR. FRANK:  No, I think we can end at 1:00

6    tomorrow.  It's totally fine.  Our concern was getting the

7    foreign witnesses out.

8              THE COURT:  No, no, I don't have a problem with it,

9    but I'd like to tell them.  I would like to tell them, if

10   they're not coming in tomorrow, today, if I can.  So the

11   bottom line is even, if we just go to 1:00, we're fine and on

12   track.  Okay.  Fine.

13             (Bench conference concluded.)

14             MR. JOHNSTON:  Your Honor, may the witness approach

15   the witness stand?

16             THE COURT:  Yes.

17             Mr. Haerden, why don't you sit down.  We're waiting

18   for everyone to go to the men's room and the women's room.

19             (Court in recess at 2:54 p.m.

20             and reconvened at 2:57 p.m.)

21             THE COURT:  Okay.  You can go get the jury.

22             We have everybody, right?  Yeah.

23             (The jury enters the courtroom.)

24             THE COURT:  So the Government called the next

25   witness.

1           What's his name, Mr. Johnston?

2           MR. JOHNSTON:  I'll let him pronounce it, so I

3     don't --

4           THE COURT:  Why don't you state your name for the

5     record, sir, so somebody can state it correctly.

6           THE WITNESS:  Yes.  My name is Roul Haerden.

7     R-o-u-l, H-a-e-r-d-e-n.

8           MR. JOHNSTON:  Mr. Haerden --

9           THE COURT:  Hold on.  Maria needs to administer the

10    oath.

11          (The witness was duly sworn.)

12          THE COURT:  Please be seated.

13          Go ahead, Mr. Johnston.

14                         **ROUL HAERDEN**

15          having been duly sworn, testified as follows:

16          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

17    BY MR. JOHNSTON:

18    **Q.**  Mr. Haerden, how old are you?

19    **A.**  I'm 41 years old.

20    **Q.**  Where do you live?

21    **A.**  I live in Almere, in the Netherlands.

22    **Q.**  What do you do for work?

23    **A.**  I currently work at an asset management company in

24    Amsterdam, called Kempen Capital Management.

25    **Q.**  How long have you worked in asset management?

1  **A.**  18 years now.

2  **Q.**  What sort of education do you have?

3  **A.**  I have two degrees in finance.

4  **Q.**  Is one of those a graduate degree?

5  **A.**  Yeah.  Master's degree and a postgraduate agree --

6  degree.

7  **Q.**  Did you used to work at a pension fund called the doctors

8  pension fund?

9  **A.**  Yes, I did.

10  **Q.**  When did you work there?

11  **A.**  I worked there in the period from 2007 to 2013.

12  **Q.**  What was your role there?

13  **A.**  I was a portfolio manager at the pension fund, which

14  means that I partially take care of the money that the

15  pension funds invest in several asset clauses.

16  **Q.**  Where is this fund located?

17  **A.**  The fund is located in Utrect in the Netherlands.

18  **Q.**  Do you mind, for purposes of these questions, if we call

19  it the Dutch Doctors Fund?

20  **A.**  That's okay.

21  **Q.**  What types of assets did the Dutch Doctors Fund invest

22  in?

23  **A.**  They invested in a variety of assets, with mainly bonds,

24  equities, real estates, and private equity.

25  **Q.**  Who are the beneficiaries of the Dutch Doctors Fund?

1    **A.**   The beneficiaries of the fund are the Dutch general

2    practitioners and the medical specialists.  So around 12,000

3    people.

4    **Q.**   What, if any, responsibility did you have to the

5    beneficiaries of this fund?

6    **A.**   To make sure that we make good investments for them, so

7    that, in the end, they can have a decent pension plan and

8    also a chance of good indexation.

9    **Q.**   What, if any, impact did this responsibility have on how

10   you engaged outside providers for the fund?

11   **A.**   It was quite important for us, when we selected external

12   managers, that we looked at the best available managers.

13   Yeah.  Available in the world, and we took great detail in

14   selecting those managers.

15   **Q.**   What factors would you look at when selecting a manager?

16   **A.**   For example, the quality of the investment team, the

17   broader organization, the investment process itself, the

18   performance of the fund to be invested in, and also costs

19   that were related to the asset manager.

20   **Q.**   In general, who bears the cost when the Dutch Doctors

21   Pension Fund loses money?

22   **A.**   Those are the ultimate beneficiary holders, so i.e., the

23   pensioners, or the general practitioners and the medical

24   specialists.

25   **Q.**   Did the Dutch Doctors Fund ever have occasion to hire a

1    transition manager?

2    **A.**   Yes, they did.

3    **Q.**   And directing your attention to 2010, did you hire a

4    transition manager in that period?

5    **A.**   Yes, we did.

6    **Q.**   What was going on in the fund that required the services

7    of a transition manager?

8    **A.**   At that stage, we had government bonds portfolio, that

9    invested in broad government bonds throughout all of Europe.

10   Given the fact that the euro crisis was quite alive in that

11   period, the pension fund board decided to scale down risk and

12   to move to the more safe account, which, like, for example,

13   Germany and the Netherlands.  For that specific pot we hired

14   a transition manager to transform the portfolio to the

15   desired portfolio.

16   **Q.**   If you don't mind, do you think you can have the

17   microphone moved a little bit closer to you just so --

18   **A.**   Yeah.

19   **Q.**   How many -- what's the size of assets that needed to be

20   purchased and sold?

21   **A.**   My recollection, that was around 1.6 billion euros.

22   **Q.**   Who was managing your old portfolio?

23   **A.**   That was being managed by State Street Global Advisors.

24   **Q.**   Is that the same unit as State Street's transition

25   management?

**A.** No. It's a different unit. So State Street Global
Advisors is the asset manager that we selected to manage this
fund. And State Street, the transition manager was part of
State Street bank, so it's a separate legal entity.

**Q.** Who was going to manage the portfolio after the
transition occurred?

**A.** State Street Global Advisors, the asset manager. So it
was only for a short moment of time that the transition
manager stepped in to change the portfolio, then they gave it
back to the asset manager, and they could continue to take
care of the portfolio.

**Q.** So is what you're saying that the transition manager
serves as an interim or caretaker?

**A.** Yes, that's correct.

**Q.** Why did you need the services of a transition manager, as
opposed to just having your asset manager do this?

**A.** For the pension fund, it was very important to have
transparency on the expected costs that were involved in such
a large transition. State Street, the asset manager was not
able to provide very much detail what the expected cost would
be, and the transition manager was in a better position to
provide that insight, what the cost would be so that we could
make a well-informed decision to we move on or not.

**Q.** To what extent, if any, were the transition managers fees
a factor in deciding to use such a transition manager?

1  **A.**  They were an important part, because fees are a fixed

2  component in the total cost that you can have when you move a

3  portfolio.  The other part of the costs are the potential

4  market impact, which it's not known in advance.  So fees were

5  the only factor that you knew in advance with certainty.

6  **Q.**  You're saying the transition manager's fees were the only

7  thing that could be known in advance?

8  **A.**  Yes.

9  **Q.**  And what couldn't be known in advance?

10  **A.**  The total potential market impact that could occur when

11  we move this portfolio in the market.

12  **Q.**  Who suggested that you use State Street as a transition

13  manager?

14  **A.**  The suggestion was made by State Street Global Advisors,

15  the assets manager that did not have sufficient insight to

16  provide information themselves.

17  **Q.**  Did you consider other transition managers, other than

18  State Street?

19  **A.**  Not to my recollection.

20  **Q.**  Why not?

21  **A.**  Because we received sufficient transparency in advance of

22  the trade, and also the costs, what were being charged to us

23  seemed fair at that moment.

24  **Q.**  Who did you interact with at State Street transition

25  management, with respect to the deal you hired them for?

1  **A.**   There were two people, that was Edward Pennings and Rick
2  Boomgaardt.
3  **Q.**   Did you ever interact with Ross McLellan?
4  **A.**   No.
5  **Q.**   Until today, have you seen Ross McLellan?
6  **A.**   No, I have never seen him.
7  **Q.**   I'd like to show you an e-mail that's been admitted into
8  evidence, Government Exhibit 34.  If we could take a look at
9  page 2, please.
10          Mr. Haerden, do you recognize this e-mail?
11  **A.**   Yes, that's from me.
12  **Q.**   And I want to direct your attention to where you say, on
13  the first paragraph, "We also are having some internal
14  discussions whether we should use a transition manager, and
15  if these activities will not cost us additional money in
16  terms of direct or indirect fees."
17          What are you asking Mr. Pennings and Mr. Boomgaardt
18  in this e-mail?
19  **A.**   I first read the specific part before I give you an
20  answer, because it has been awhile.
21  **Q.**   Sure.
22  **A.**   (Witness reads the document.)
23          The question that I asked is what the expected
24  costs would be if we would hire a transition manager, because
25  you bear some costs because of -- you enter the market by

1    trading those securities.  But we also expected that we had

2    to pay the transition manager a fee for the services, of

3    course.

4    Q.  So in this question, whose fees are you asking about?

5    A.  I am asking for the fees that are being charged by the

6    transition manager.

7    Q.  Did you get a response to this question right away?

8    A.  No.  Only later on.

9            MR. JOHNSTON:  All right.  Let's take a look at

10   Government Exhibit 38, which has been admitted into evidence.

11   If we could zoom in on the top e-mail, please, Erin.

12   BY MR. JOHNSTON:

13   Q.  As you can see, this is -- was sent from Mr. Pennings to

14   yourself, Mr. Haerden, with CCed to several individuals.

15           Do you recognize the name Lex Ravensbergen?

16   A.  Yes, that was my superior at that time.

17   Q.  And what about Michel Salden?

18   A.  That was a colleague of me.

19   Q.  And what about Faheem Malik?

20   A.  Faheem Malik was a salesperson that worked at State

21   Street Global Advisors.

22   Q.  Now, directing your attention to, actually, the second

23   e-mail --

24           MR. JOHNSTON:  So let's go further down, Erin, to

25   the one right below this.

1    BY MR. JOHNSTON:

2    **Q.**  So the prior e-mail, as you can see, Mr. Haerden, you

3    write, "Do the estimated trading costs include the fees that

4    you will charge, and how much will these fees in basis point

5    or in cash amount approximately be?"

6              Do you see that?

7    **A.**  Yes.

8    **Q.**  What were you trying to ask -- or what were you asking

9    Mr. Pennings when you wrote this e-mail?

10   **A.**  Yeah.  My specific question was that whether the trading

11   ^ costs cost that were being charged, if that also included

12   the fees that were being charged by the transition manager,

13   as well.  And I made two specific questions about basis

14   points, because that's a normal term that we use in the fixed

15   income world, and also in cash amount, to get an approximate

16   feeling what the expected cash cost would be.

17   **Q.**  Why do you use the term "approximately"?

18   **A.**  If you trade such a large portfolio, so a portfolio of

19   1.6 billion euros, you do not know in advance what the exact

20   cash amount will be.  You can know what the expected fee

21   would be, for example, in terms of basis points, because

22   that's a fixed number.  But you have to multiply that by a

23   sort of metric called duration, and then also multiply that

24   by the portfolio size to get the expected euro amount.  So

25   that's why I use "approximately," because it's such a large

1    number that I did not expect it to be precise on the exact

2    euro.

3    **Q.**  So you're using "approximately" to refer to the cash

4    amount?

5    **A.**  Exactly.

6    **Q.**  Are you using "approximately" to refer to basis point?

7    **A.**  No.  Because basis point is a very specific number in

8    this case.

9    **Q.**  And when you -- when you're referring to the trading

10   costs, are you referring to third-party trading costs or the

11   transition manager's trading costs?

12   **A.**   In total, the transition manager trading cost.  But the

13   transition manager trading costs are also partly related with

14   the third-party manager trading --

15           Excuse me, what do you want by third-party trading

16   cost?

17           MR. JOHNSTON:  Sure.

18           THE COURT:  Did he say, what does he mean by --

19           MR. JOHNSTON:  Yeah, he's asking my question.

20           THE COURT:  I know.  But what I'm wondering, what

21   you really want to know is:  What did he mean by trading

22   cost?

23           MR. JOHNSTON:  Yeah.  So I'll ask some questions to

24   get into that.

25   BY MR. JOHNSTON:

1    **Q.**  When you're hiring a transition manager, did you have an

2    understanding whether they were acting as a principal or an

3    agent for you?

4    **A.**  As an agent in this case.

5    **Q.**  And when you hire a transition manager as an agent, what

6    did you expect the agent to be doing for you in the

7    marketplace?

8    **A.**  The agent has the task to perform a so-called "best

9    execution" basis.  They need to find the cheapest bonds

10   available that can be bought and sold in the market so that

11   the expected trading cost will be as low as possible.  That's

12   the job of the agent.  So it's called best execution, and you

13   pay a fee for that service.

14   **Q.**  So whose fee are you asking about in the highlighted

15   portion?

16   **A.**  I'm asking about a fee that will be charged by the

17   transition manager.

18   **Q.**  Which would be on top of anything else?

19   **A.**  On top of the market costs.

20   **Q.**  Understood.  Let's go --

21          Oh, at this point, Mr. Haerden, had the Dutch

22   Doctors Fund made a final decision to hire State Street as a

23   transition manager?

24   **A.**  No.  Because we still did not have the full picture

25   complete, before we could move on and go back internally to

1   make a final decision.

2   **Q.**   Let's take a look at Mr. Pennings' response.  And now to

3   highlight the second bullet point.

4           "In the analysis, we have built in one basis point

5   that the execution desk takes out of the spread.  So yes, the

6   total implementation shortfall estimate does include all

7   fees."

8           What was your understanding of what Mr. Pennings

9   was telling you in this e-mail?

10  **A.**   Mr. Pennings told me that he was going to charge

11  one basis point as a commission for the activities that State

12  Street would perform.

13  **Q.**   What was your understanding of who would get the benefit

14  if State Street did better than expected?

15  **A.**   As is the case in an agency trade, the benefit, but also

16  the shortfall, is always for the pension fund itself.  So we

17  still run the full risk.

18  **Q.**   Conversely, if the market went down, who would suffer?

19  **A.**   The pension fund.

20          MR. JOHNSTON:  You can take this down.

21          I'd like to show you, the witness only, a document

22  marked Government Exhibit 40.

23          If we can zoom in sort of at the top third, Erin.

24          MR. GOLDSTEIN:  There's no objection, Your Honor,

25  if the Government just wants to move it in.

1          MR. JOHNSTON:  We can move into evidence,

2    Government Exhibit 40.

3          THE COURT:  Admitted.

4          (Exhibit No. 40 admitted into evidence.)

5          MR. JOHNSTON:  If we can zoom in on the top third

6    for Mr. Haerden's benefit.

7    BY MR. JOHNSTON:

8    **Q.**  Do you recognize this document, Mr. Haerden?

9    **A.**  Yes.

10   **Q.**  What is it?

11   **A.**  It's a so-called investment management agreement.  What

12   it means is it's an agreement between us and the transition

13   manager.

14   **Q.**  And what -- directing your attention to the parties here,

15   one says -- and I'm not going to read it in Dutch, but who --

16   what entity is that?

17   **A.**  That is the Dutch Doctors that you refer to.

18   **Q.**  That's been called in this agreement the customer?

19   **A.**  Exactly.

20   **Q.**  And why is the counterparty State Street Global Advisors?

21   **A.**  The counterparty is State Street Global Advisor, because

22   they are the asset management firm that still manages the

23   total portfolio on behalf of us.

24   **Q.**  And what was your understanding of what the purpose of

25   this letter was?

1    **A.**  My understanding of the purpose of this letter was that

2    State Street, the asset manager would give the portfolio to

3    the transition manager for a certain time period; the

4    transition manager would do its job and give the new

5    portfolio back to State Street, the asset manager, and they

6    could move on with managing the portfolio as it was.

7            MR. JOHNSTON:  Let's take a look at page 2, please.

8    If we could -- sorry, page 3, first.  If you could zoom in at

9    the signatures.

10   BY MR. JOHNSTON:

11   **Q.**  Do you recognize any of the names here, Mr. Haerden?

12   **A.**  Yes, I do.

13   **Q.**  Which ones?

14   **A.**  Let's start with the bottom left, Jan Willem Baan.  That

15   was the CIO of the Doctors Pension Fund.  The person to the

16   right, Mr. Van der Linden, was the actuary.  And the person a

17   little bit higher was Edward Pennings, the person that worked

18   for the transition management company.

19   **Q.**  Did you review this agreement before it was signed?

20   **A.**  Yes, I did.

21   **Q.**  Let's take a look at page 2, please.  We can zoom in at

22   paragraph 5 at the bottom, Roman numeral V.

23          Directing your attention to where it says, "The

24   transition manager is expressly authorized by the

25   customer" -- if we could highlight that -- and then, "to

1    execute portfolio transactions through its affiliated

2    broker-dealers" -- and then further down -- "who may benefit

3    from a markup or markdown on such portfolio transactions."

4            What was your understanding of what that term or

5    that sentence meant in the contract?

6    **A.**   Yup.   If State Street -- the transition manager was going

7    to buy or sell bonds, they could apply so-called markup or

8    commission on those -- on those bonds when they performed the

9    execution of this transition.

10   **Q.**   Did you have an understanding as to the amount that --

11   the amount of the spread or a markup that State Street's

12   affiliate was authorized to apply to your trades?

13   **A.**   Yes, I did.   And that was being confirmed in the earlier

14   e-mail that you sent.   So the one basis point.

15   **Q.**   And then further down, where it says, "Bonds will be

16   executed on a competitive, multidealer basis, demonstrating

17   best execution, and priced net as per market convention,"

18   what's your understanding of what it means for bonds to be

19   executed on a competitive, multidealer basis, demonstrating

20   best execution?

21   **A.**   It means that a transition manager, in this case that

22   works as an agency, has the role to select the best

23   broker-dealers available that show the best prices for

24   certain bonds to trade.   And by "net," I mean that it takes

25   into account all costs that are being charged.

1    **Q.**  So what does that mean with respect to whether a

2    commission charge is separately broken out?

3    **A.**  To my knowledge, this net means that the commissions are

4    included in the price.

5    **Q.**  Now, is there anywhere in this agreement that that

6    one basis point number is actually spelled out?

7    **A.**  No, it is not.

8    **Q.**  And why isn't it?  Why not?

9    **A.**  Because we earlier received a confirmation by e-mail from

10   Edward Pennings that we agreed on the one basis point fee

11   that was being charged, and it was, for me, sufficient enough

12   to move on because we had an agreement on paper, and that

13   was, for me, okay.

14   **Q.**  Let's take a final look at page 1.  If we can go and zoom

15   on the actual date of this agreement.

16           Is that date the same as that e-mail that you

17   previously testified about?

18   **A.**  Yes, that's correct.

19   **Q.**  Was this letter signed before or after receiving that

20   e-mail from Mr. Pennings?

21   **A.**  After receiving the e-mail.  Because we were waiting to

22   get a final confirmation of what the costs would be; because

23   otherwise, we did not have the picture complete before we

24   could proceed and also go to our board to ask for permission.

25           MR. JOHNSTON:  You can take this down.

BY MR. JOHNSTON:

**Q.**   Did there come a time, prior to the trading actually
starting, where Mr. Pennings contacted you regarding the cost
of clearing futures?

**A.**   I'm not sure.  But I recall that we were not allowed to
trade futures, and hence, we had to -- so hence, Edward
Pennings had to buy and sell only bonds in the portfolio.  So
he was not allowed to use futures on this trade.

**Q.**   Who did the Dutch Doctors Pension Fund use to clear their
futures?

**A.**   The funds used JP Morgan as a standard account party to
use futures, and we were obliged to use JP Morgan, also, in
this case.  So that's the reason why we could not use State
Street or give State Street the mandate to trade futures.

**Q.**   Do you recall whether you told Mr. Pennings that?

**A.**   I think that was later than the 17th of June, because we
had that information and we only received that information
later on.

**Q.**   So after the agreement had already been signed?

**A.**   Yes.

**Q.**   What, if anything, do you recall telling Mr. Pennings
about that?

**A.**   I told him that we were not allowed to use State Street
as an agent to trade futures, and that we had to stick by our
owner-custodian, JP Morgan, and that he had to move on with

1    trading the portfolio, so only in bonds and not in futures

2    then.

3    **Q.**  So what was the only -- what was the amount that -- or

4    the rate that you thought you were paying for State Street's

5    services?

6    **A.**  As I was being shown in the e-mail, my understanding was

7    that it was one basis point, because that is what we agreed

8    upon.

9    **Q.**  At any point after signing that agreement, did you agree

10    to a different fee?

11    **A.**  No.

12    **Q.**  Did the transition actually go forward?

13    **A.**  Yes, it did.

14    **Q.**  How did State Street perform?

15    **A.**  They performed well, compared to their estimated trading

16    cost.

17    **Q.**  Were you satisfied?

18    **A.**  Yes.

19    **Q.**  What was your understanding of what you had been charged

20    by State Street in the course of this?

21    **A.**  One basis point, because that is what we agreed upon in

22    the e-mail.

23    **Q.**  At some point, did you learn that the Dutch Doctors Fund

24    had been charged a different amount?

25    **A.**  Yes, we did.  I think it was late 2011 or early 2012.

1   **Q.**   By how much were you -- how different was the charge that

2   you were actually charged?

3   **A.**   We learned that it was a charged that was 50 percent

4   higher, one-and-a-half basis points.

5   **Q.**   What did that work out to in dollar or euro terms?

6   **A.**   I think it was around 1.5 million euros that was being

7   charged additionally.

8   **Q.**   How significant, if any, is 1.5 million to the Dutch

9   Doctors Pension Fund?

10  **A.**   It's very significant, because you can pay a lot of

11  pensions from that money.

12  **Q.**   Had you known that you would be paying this fee, would

13  that have affected your decision about hiring -- whether to

14  hire State Street as a transition manager?

15  **A.**   Yes.  Because I thought the one basis point was a fair

16  number, given my earlier market experiences that I had with a

17  previous job.  And I -- due to my understanding, one basis

18  point, in that range, was a fair number to trade government

19  bonds with.

20  **Q.**   What is this prior experience that you're speaking of?

21  **A.**   I used to work at another pension fund called APG, the

22  second largest pension fund in the world.  They manage around

23  500 billion euros, and I also managed there a so-called swap

24  portfolio.  And I was involved with our trading desk to trade

25  swaps as well.  So that's where I learned what estimated

1    trading costs or markups were that was being charged by trade

2    by counterparties.

3    **Q.**   So you testified that, at the time you made a decision

4    that, one sounded fair and reasonable?

5    **A.**   Yes.

6    **Q.**   What about 1.5?

7    **A.**   I think that was far higher, given the fact that -- to

8    give you maybe an example government bonds, the bid-offer

9    spreads are very tight, maybe three or four basis point.  So

10   if you add one basis point or one-half basis point, compared

11   to that bid offer of three or four basis points, I think that

12   is quite substantial.

13   **Q.**   How did the extra charge affect the implementation

14   shortfall that the fund received?

15   **A.**   In the end, we got a worse deal, because we were being

16   overcharged.

17   **Q.**   What, if any effect, did this experience have on your

18   business relationship with State Street?

19            MR. GOLDSTEIN:  Objection, Your Honor.

20            THE COURT:  Overruled.

21            You can answer the question.

22   BY MR. JOHNSTON:

23   **Q.**   The question, Mr. Haerden, is, what, if any effect, did

24   this experience have on your business relationship with State

25   Street?

1    **A.**   A negative effect, because we put State Street on a

2    so-called blacklist for a while, and we decided not to do

3    trades with them anymore.

4    **Q.**   How long did they remain on the blacklist?

5    **A.**   I think for maybe one or two years.

6    **Q.**   At the end of the day, if the Dutch Doctors Pension Fund

7    loses money, out of whose pocket does it come?

8    **A.**   Eventually out of the pocket of the general practitioners

9    and the medical specialists, because they pay the premiums

10   for their pension fund.

11              MR. JOHNSTON:   Thank you.   No further questions.

12              THE COURT:   Cross-examination.

13              MR. GOLDSTEIN:   Thank you.

14              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

15   BY MR. GOLDSTEIN:

16   **Q.**   Mr. Haerden, you testified you've never met or seen Ross

17   McLellan; is that correct?

18   **A.**   Yes, that's correct.

19   **Q.**   Back at the time of the transition, you had absolutely no

20   communications with Mr. McLellan, correct?

21   **A.**   That's correct.

22   **Q.**   Your point of contact was with other individuals at State

23   Street Bank Europe Limited, correct?

24   **A.**   Yes.

25   **Q.**   Edward Pennings and other individuals?

1    **A.**  Yes, that's correct, Edward Pennings and Rick Boomgaardt.

2            MR. GOLDSTEIN:  Max, if I could have Government

3    Exhibit -- or Exhibit 34, the second page.

4    BY MR. GOLDSTEIN:

5    **Q.**  This is an e-mail that Mr. Johnston went through with

6    you, in terms of an e-mail from you, to Mr. Pennings and Rick

7    Boomgaardt, correct?

8    **A.**  Yes.

9    **Q.**  And directing your attention, you asked -- Mr. Johnston

10   asked you about, "We're also having some internal discussions

11   about whether we should use a transition manager, and if

12   these activities will not cost us additional money in terms

13   of direct or indirect fees," correct?

14   **A.**  Yes.

15   **Q.**  Now, if I can direct your attention to the responsive

16   e-mail from Mr. Pennings on the next page, that Mr. Johnston

17   did not go through with you, this is the second paragraph --

18           MR. GOLDSTEIN:  If you would just blow that up,

19   Max.

20   MR. GOLDSTEIN:

21   **Q.**  The last sentence in that second paragraph, Mr. Pennings

22   tells you, "The specialist transition management desk within

23   State Street Bank Europe Limited executes trades through

24   State Street Global Markets International Limited," correct?

25   **A.**  Yes.

1    **Q.**  "Which for its remuneration compares a portion of the

2    spread with the most competitive bid-offer available," right?

3    **A.**  Can I read it again?

4    **Q.**  Sure.  You can read it to yourself.

5    **A.**  Yes.  (The witness reads the document.)

6              Yes, that's correct.

7    **Q.**  So what Mr. Pennings is telling you, in clear language,

8    is that State Street Bank Europe Limited -- which is the

9    entity that you ultimately contracted with, right?

10   **A.**  Yes.

11   **Q.**  And we'll get to the agreement that you had, but it was a

12   three-party agreement between Dutch Doctors, State Street

13   Global Advisors, and State Street Bank Europe Limited, right?

14   **A.**  Yes.

15   **Q.**  So what he's telling you here, which is June 15th --

16   right?

17   **A.**  Yes.

18   **Q.**  He's telling you that, "SSBEL executes its trades through

19   an affiliate broker-dealer," right?

20   **A.**  Yup.

21   **Q.**  And he's providing you clear notice that that

22   broker-dealer, State Street Global Markets International,

23   will earn money in executing those trades, right?

24   **A.**  That's correct.

25   **Q.**  And in the form of a spread, right?

1    **A.**   Yes.

2    **Q.**   And that's customary, meaning when a bank, such as State

3    Street Bank Europe Limited, goes to the marketplace, it needs

4    a broker-dealer to execute trades for it, right?

5    **A.**   Yes.

6    **Q.**   And that broker-dealer will, in turn, charge a markup,

7    markdown, or some fee for the service it provides in the

8    process, right?

9    **A.**   Correct.

10   **Q.**   And so he's telling you on June 15th, in no uncertainly

11   terms, that SSBEL's broker-dealer affiliate will ultimately

12   earn some remuneration for executing those terms, right?

13   **A.**   Correct.

14   **Q.**   And you testified that your understanding was that State

15   Street Bank Europe Limited was operating in an agency

16   capacity, right?

17   **A.**   Yes.

18   **Q.**   Given that understanding, as well as the e-mail that we

19   just looked at and the contract that we'll look at in a few

20   minutes, it was your understanding that, notwithstanding your

21   understanding that State Street Bank Europe was acting in an

22   agency capacity, the broker-dealer would still earn

23   remuneration for the services that it provided, right?

24   **A.**   Yes.

25   **Q.**   Meaning there's nothing inconsistent with a bank

1    representing itself as acting in an agency capacity, and an

2    affiliate broker-dealer charging a markup, markdown, or

3    spread to perform its services in connection with a

4    transition, right?

5    **A.**   That's correct.

6            MR. GOLDSTEIN:   Could we have Exhibit 38, please,

7    Max.

8    BY MR. GOLDSTEIN:

9    **Q.**   Mr. Haerden, this is an e-mail that Mr. Johnston went

10   through with you, and you testified regarding your statement

11   in the middle of the page, "Do the estimated trading costs

12   include the fees that you will charge, and how much will

13   these fees, (in basis points or cash amount) approximately

14   be?"

15           Do you see that?

16   **A.**   Yes.

17   **Q.**   And you testified that it was your understanding or your,

18   when you wrote this in your e-mail, that your use of the word

19   "approximately" referred to the cash amount, not the basis

20   points, right?

21   **A.**   Yes.

22   **Q.**   And my question in return is, you certainly never

23   explained that that was your -- you never had a conversation

24   with Mr. McLellan about what you were asking here, right?

25   **A.**   No.

**Q.**  And you're also -- did you talk to Mr. Pennings and
explain to him what your understanding was, or did he simply
respond to your e-mail?

**A.**  He responded to my e-mail, because we did not have any
detailed information on the charges yet at that stage.

**Q.**  Right.  And you used the word "do the estimated trading
costs," right?

**A.**  Yes.

**Q.**  And you used the word "approximately," right?

**A.**  Correct.

**Q.**  And he responded, up top, "In the analysis, we have built
in one basis point that the execution desk takes out of the
spread," right?

**A.**  Yes.

**Q.**  So again, clearly disclosed that the execution desk is
going to earn a spread, right?

**A.**  Yes.

**Q.**  And he said that, "So yes, the total implementation
shortfall estimate does include all fees," right?

**A.**  Yes.

**Q.**  And he specifically also uses the word "estimate," right?
"Shortfall estimate"?

**A.**  No.  Yeah, he used the word "shortfall estimate," but to
my understanding, what this means, a shortfall estimate is
the total expected cost that you can bear of changing a

1    portfolio.  It did not relate, to my knowledge and

2    understanding, to the one basis point fee.  I did not see

3    that as an estimate.  I did see that as a specific hard

4    number, and the estimates relates to the potential market

5    volatility that you can incur when you trade those bonds.

6    **Q.**  No doubt about it, that was your understanding, right?

7    **A.**  Yeah.

8    **Q.**  My question is, you never had this dialogue with

9    Mr. Pennings, in connection with this e-mail, right?

10   **A.**  No.

11   **Q.**  And his responsive e-mail to you uses implementation

12   shortfall estimate, right?

13   **A.**  Yes.

14   **Q.**  And so if we turn to Exhibit had 40, which is the

15   ultimate contract that was executed by Dutch Doctors, and we

16   go to the specific paragraph 4 -- paragraph 5, I'm sorry.

17            MR. GOLDSTEIN:  Well, 4 and 5, Max.

18   BY MR. GOLDSTEIN:

19   **Q.**  We can agree that there's nothing in the final contract

20   between Dutch Doctors and State Street Bank Europe Limited,

21   incorporating your understanding that the broker-dealer was

22   only going to take one basis point, right?

23   **A.**  This contact did not refer to the one basis point, if you

24   mean that.

25   **Q.**  Right.  And obviously, regrettable from your side, if you

1    could do it over, you would incorporate the one basis points

2    into the account?  Would that be fair?

3              MR. JOHNSTON:  Objection.

4              THE COURT:  Sustained.

5    BY MR. GOLDSTEIN:

6    **Q.**  Do you think you should have included the one basis point

7    in the contract?

8    **A.**  No, because I had the information already on paper by

9    e-mail.  And that was sufficient for me, because I had a

10   paper trail that I could prove that it was one basis point

11   that was going to be charged.

12   **Q.**  And that was an e-mail that dealt with words such as

13   "estimate" and "approximate," right?

14             MR. JOHNSTON:  Objection.

15             THE COURT:  Overruled.

16   BY MR. GOLDSTEIN:

17   **Q.**  Correct?

18   **A.**  That's correct.

19   **Q.**  And the contract is the actual document that governs your

20   relationship with State Street Bank Europe.  That's your

21   understanding, correct?

22   **A.**  That is correct.

23   **Q.**  And again, what it says, in paragraph 5, is that, "The

24   transition manager is expressly authorized by the customer to

25   execute portfolio transactions through its affiliated

1    broker-dealer."  Do you see that?

2    **A.**  Yes.

3    **Q.**  So again, notwithstanding your understanding that State

4    Street Bank Europe Limited was acting in an agency capacity,

5    the actual contract specifically provides that State Street

6    Bank Europe Limited's affiliate, it's broker-dealer, could

7    also charge a markup or markdown for its services, right?

8    **A.**  That's true.

9    **Q.**  And it says that, "Bonds will be executed on a

10   competitive, multidealer basis, demonstrating best execution

11   and priced net as per market convention," right?

12   **A.**  Yes.

13   **Q.**  And that's fair, that is market convention, right, that

14   bonds such as these will be priced net?

15   **A.**  Yes.

16   **Q.**  And Mr. Pennings is the signatory to that particular

17   e-mail, correct -- I mean, that particular contract?

18   **A.**  Yes.

19   **Q.**  Now, you testified that an individual by the name of Lex

20   Ravensbrgen who, I guess, was your superior at Dutch Doctors

21   at the time, right?

22   **A.**  Yes.

23   **Q.**  And you were keeping him abreast of your conversations

24   and your e-mails with Mr. Pennings and others at State

25   Street, right?

1   **A.**   Yes.

2   **Q.**   And do you recall that -- you would forward e-mails that

3   you would receive from Mr. Pennings, right?

4   **A.**   Correct.

5   **Q.**   And do you recall that he told you that he "has nothing

6   against transition manager, if he does his job well.  It can

7   certainly be beneficial, but in the end, he's just a broker

8   who has to earn his money, as well"?

9   **A.**   I don't recollect that.

10          MR. GOLDSTEIN:  Your Honor, may I approach?

11          THE COURT:  You may.

12  BY MR. GOLDSTEIN:

13  **Q.**   Mr. Haerden, I'm handing to you what is an original

14  e-mail in your native language, as well as a translation.

15  **A.**   Uh-huh.

16  **Q.**   And what I would ask you to do is read to yourself --

17  what I'm interested in asking you is whether or not reading

18  this particular paragraph, that refreshes your memory in

19  terms of what Mr. Ravensbergen had said to you.

20          And you can read it in whichever language you

21  prefer.

22  **A.**   Yeah.  So from my understanding, this e-mail is being

23  translated.

24          THE COURT:  I'm sorry.  Have you had a chance to

25  read that as long as you want?  You had a chance to look at

1   that, right?

2           THE WITNESS:  Yes.

3           MR. JOHNSTON:  I just want to be clear to the

4   witness, that he has access to the Dutch version, which is

5   the original.

6           THE COURT:  Yes, I think he knows that.

7           You can read it in Dutch, if you prefer.

8           THE WITNESS:  No, but just my understanding, this

9   e-mail is being translated to English for you?

10          THE COURT:  But you can read it in Dutch, if you

11  prefer.

12          MR. JOHNSTON:  Well, he needs to be pointed to

13  where in the document is the Dutch version.

14          THE WITNESS:  Oh, no, it's here, behind, yeah.

15          THE COURT:  If you wish to read it in Dutch, you

16  can do that, that's fine.

17          THE WITNESS:  Okay.  I will do that in Dutch, yeah.

18          (Witness reads the document.)

19          THE WITNESS:  Yes, I read the e-mail.

20  BY MR. GOLDSTEIN:

21  Q.  And having read that, does that refresh your memory that

22  your superior, Mr. Ravensberger, told you he "has nothing

23  against a transition manager.  If he does his job well, it

24  can certainly be beneficial, but in the end, he is just a

25  broker that has to earn his money, as well"?

1          Does that refresh your recollection?

2     **A.**  Yes, that's correct.

3     **Q.**  And Mr. Haerden, before I conclude, there was no

4     ambiguity, from your perspective, that State Street Bank

5     Europe Limited's broker-dealer affiliate, would be charging a

6     markup or markdown in executing trades for Dutch Doctors,

7     right?

8     **A.**  That's correct.

9     **Q.**  The ambiguity or disagreement you have is what they could

10    fairly charge you in terms of those execution services,

11    right?  Meaning the e-mail that Mr. Pennings sent you led you

12    to understand it was going to be one basis point.

13    **A.**  That's correct.

14    **Q.**  But there was no ambiguity on your part that there would

15    be a spread, a markup/markdown charge, in connection with

16    these execution services?

17    **A.**  To my understanding, the markup would be one basis point,

18    so that was clear to us when we received that e-mail; and

19    that also answered the questions that we had, that they were

20    going to charge a markup.

21    **Q.**  And your understanding of that one basis point is based

22    on an e-mail, not the contract, right?

23    **A.**  That's correct.

24          MR. GOLDSTEIN:  No further questions.

25          THE COURT:  I inquire, Mr. Johnston?

```
 1              MR. JOHNSTON:  One question.
 2         REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
 3    BY MR. JOHNSTON:
 4    Q.  Mr. Haerden, is one basis point approximately 1.5 basis
 5    points?
 6    A.  No, not to my memory.
 7    Q.  Is 4-and-a-half million euros approximately 3 million
 8    euros?
 9    A.  No.
10              MR. JOHNSTON:  Thank. You.
11              THE COURT:  Any redirect -- or recross, rather?
12              MR. GOLDSTEIN:  No recross.
13              THE COURT:  All right.  Thank you very much, sir.
14    You're excused.
15              We stand, with the schedule, where we were when we
16    talked earlier?
17              MR. FRANK:  Yes, we are.
18              THE COURT:  So ladies and gentlemen, let me explain
19    where we are.  We're ahead of schedule for today.  So we're
20    done for the day.  And the positive news -- I hope it's
21    positive news for you -- is that tomorrow we will only need
22    to go 9:00 to 1:00.  We reserved this -- as you saw, we had
23    several witnesses from Europe, and there's another witness
24    from Europe tomorrow, and for various reasons we need to get
25    them all done today and tomorrow.  But the other witness we
```

 1   have, the Government has coming from Europe, we'll be done

 2   with tomorrow before 1 o'clock, so it won't be any need to go

 3   into the afternoon to get people back home to where they're

 4   coming from.

 5           So we're done for roday.  Tomorrow will be 9:00 to

 6   1:00; Thursday, no court; Friday, 9:00 to 1:00.  We remain on

 7   track, the lawyers assure me, to finish the case on the

 8   schedule that we originally told you about.  So that's good.

 9           So don't discuss the case among yourselves, don't

10   discuss it with anyone else, don't do any independent

11   research, including, among other things, on the Internet.

12           And have a nice afternoon.  I'll see you tomorrow

13   morning.  We resume at 9:00 a.m.  Thank you for your

14   attention.

15           All rise for the jury.

16           (The jury exits the courtroom.)

17           THE COURT:  Okay.  I'm happy to see you at 8:30,

18   but if you don't anticipate any discussion, then we can meet

19   a little later.  I defer to the two of you as to whether

20   it's --

21           MR. WEINBERG:  I don't see any issues.

22           MR. FRANK:  9 o'clock is fine with us, Judge.

23           THE COURT:  All right.  Maybe ten of nine.

24           MR. FRANK:  Ten of 9:00?

25           THE COURT:  Just in case.  Little by little.

1              All right.  Have a good afternoon.  Thank you very

2    much, we're adjourned.

3              THE DEPUTY CLERK:  This matter is adjourned.

4              (Court in recess at 3:49 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 12th day of June, 2018.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter