1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3    - - - - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA,              :

5          Plaintiff,                       :    Criminal Action No.
                                                 1:16-cr-10094-LTS
6       v.                                  :

7    ROSS MCLELLAN,                         :

8          Defendant.                       :

9    - - - - - - - - - - - - - - - - - x

10

11       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                          JURY TRIAL
13                         Day 8

14

15               Wednesday, June 13, 2018
                        8:52 a.m.
16

17

18

19

20   John J. Moakley United States Courthouse
     Courtroom No. 13
21   One Courthouse Way
     Boston, Massachusetts
22

23   Rachel M. Lopez, RPR, CRR
     Kathleen Mullen Silva, RPR, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

```
 1                    A P P E A R A N C E S

 2   On behalf of the Plaintiff:

 3        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
          BY:  STEPHEN E. FRANK
 4        John Joseph Moakley Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts  02210
          (617) 748-3244
 6        stephen.frank@usdoj.gov

 7
          UNITED STATES DEPARTMENT OF JUSTICE
 8        BY:  WILLIAM JOHNSTON
          1400 New York Avenue, Northwest
 9        Washington, D.C.  20005
          (202) 514-0687
10        william.johnston4@usdoj.gov

11

12   On behalf of the Defendant:

13        MARTIN G. WEINBERG, P.C.
          BY:  MARTIN G. WEINBERG
14        20 Park Plaza
          Suite 1000
15        Boston, Massachusetts  02116
          (617) 227-3700
16        owlmcb@att.net

17
          LAW OFFICES OF ROBERT M. GOLDSTEIN
18        BY:  ROBERT M. GOLDSTEIN
          20 Park Plaza
19        Suite 1000
          Boston, Massachusetts  02116
20        (617) 742-9015
          rmg@goldstein-lawfirm.com
21

22        LAW OFFICES OF MAKSIM NEMTSEV
          BY:  MAKSIM NEMTSEV
23        20 Park Plaza
          Suite 1000
24        Boston, Massachusetts  02116
          (347) 251-4800
25        mentsev@gmail.com
```

1 **<u>TABLE OF CONTENTS</u>**

2

3 **TRIAL WITNESSES**

4

5 On behalf of the Plaintiff:                                    <u>Page</u>

6 IAN MCKNIGHT

7           By Mr. Frank                             18

8           By Mr. Weinberg                          60

9           By Mr. Frank                             79

10          By Mr. Weinberg                          86

11 JOSEPH DIONISIO

12          By Mr. Johnston                          91

13          By Mr. Goldstein                        112

14          By Mr. Johnston                         120

15          By Mr. Goldstein                        122

16 STEPHEN FINOCCHI

17          By Mr. Frank                            125

18          By Mr. Goldstein                        156

19          By Mr. Frank                            170

20          By Mr. Goldstein                        174

21

22

23

24

25

1                              **EXHIBITS**

2

3                                                          <u>Admitted</u>

4    Number 62, 64, 129, 131, and 133                          136

5    Number 96                                                   45

6    Number 107                                                  97

7    Number 127                                                 144

8    Number 130                                                 147

9    Number 135                                                 150

10   Number 149                                                  48

11   Number 172                                                  56

12   Number 305                                                 124

13   Number 399                                                 121

14   Number 1101                                                 74

15   Number 1108                                                 80

16

17

18

19

20

21

22

23

24

25

|  |  |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (In open court.) |
| 3 | THE DEPUTY CLERK:  The United States District Court |
| 4 | for the District of Massachusetts is now in session, the |
| 5 | Honorable Leo T. Sorokin presiding. |
| 6 | Today is June 13th, the case of United States vs. |
| 7 | Ross McLellan, criminal action 16-10094 will now appear |
| 8 | before this court. |
| 9 | THE COURT:  I see counsel and Mr. McLellan. |
| 10 | Anything to talk about?  Or are we ready to go? |
| 11 | MR. WEINBERG:  I have two things to talk about in |
| 12 | terms of Mr. McKnight, who is the first witness, Your Honor. |
| 13 | THE COURT:  Remind me who Mr. McKnight is. |
| 14 | MR. WEINBERG:  Mr. McKnight is the Royal Mail -- |
| 15 | THE COURT:  Oh, right. |
| 16 | MR. WEINBERG:  I expect him to testify or to be |
| 17 | asked questions similar to that -- |
| 18 | THE COURT:  To the other two. |
| 19 | MR. WEINBERG:  I object to the extent, the |
| 20 | extensiveness of the impact on Royal Mail testimony, if |
| 21 | that's the intent, to elicit that they did things with State |
| 22 | Street that they -- all of the reaction to learning -- |
| 23 | THE COURT:  You mean like -- we no longer worked |
| 24 | with State Street. |
| 25 | MR. WEINBERG:  Blackballing State Street. |

1          THE COURT:  What's the relevance of that evidence?

2          MR. FRANK:  I'm not intending to elicit it from

3    Mr. McKnight.  It is relevant to the effecting of a financial

4    institution from this type of conduct.

5          THE COURT:  For Count 6.

6          MR. FRANK:  Well, but Your Honor, all of this

7    happened at the same time.  It's all the same conduct and our

8    argument is going to be that that type of conduct affects a

9    financial --

10         THE COURT:  No, I understand, but I mean, it's for

11   Count 6?

12         MR. FRANK:  Yes.

13         THE COURT:  But he's not asking about --

14         MR. FRANK:  It also does get at the materiality.

15   It gets at the other elements that we need to --

16         THE COURT:  I thought that was the theory and

17   that's why I let it in.  But in any event, he's not offering

18   it in this witness, so that's easy.

19         MR. WEINBERG:  And the other request, Your Honor,

20   is that in his 302, I don't know whether Mr. Frank is

21   expecting it.  You know, he used words like "crime" and

22   "fraud."

23         MR. FRANK:  I'm not expecting that, I'm not

24   expecting to elicit that on direct.  If it comes out at

25   cross, I can't stop that from happening.

1          MR. WEINBERG:  I'm a fairly disciplined

2     cross-examiner.

3          MR. FRANK:  I'm getting that sense.

4          MR. WEINBERG:  It's not going to come out

5     responsive to my questions, but I do ask the Government to

6     instruct him not to use those words on direct.

7          MR. FRANK:  Your Honor, I'm reluctant to be

8     asked -- well, I'm reluctant to do that.  I don't think

9     the --

10          THE COURT:  It's hard to be reluctant to be asked

11     since you're not asking.

12          MR. FRANK:  That's right.  I would encourage the

13     Court not to ask me to do that, for the following reason.  I

14     don't intend to elicit it on direct, but this victim feels he

15     has been the victim of a fraud.  He has said that repeatedly

16     and that is highly relevant.

17          He will testify, I am sure, if asked, that he

18     doesn't know the elements of criminal fraud, he doesn't know

19     the elements of our statute, but he feels he's been defrauded

20     and I feel he has the right to testify to that if he's asked

21     a question that implicates that.

22          MR. WEINBERG:  And I don't.  I think, under --

23     whether it's 403 or 701, his opinion, putting a criminal

24     label on his -- on the conduct that he alleges is not

25     admissible evidence for the jury.  That's for Your Honor's

1    instructions, the jury to find.

2            THE COURT:  You agree he could say he felt

3    deceived?

4            MR. WEINBERG:  Yes.

5            THE COURT:  But not --

6            MR. FRANK:  If it comes out, Your Honor.  We would

7    certainly not object to a limiting instruction.

8            THE COURT:  So this is what my suggestion is.  I'm

9    not going to order you to do anything.  You do whatever you

10   think you should do, or not do in your own good judgment.  It

11   sounds like that, from the way you've drafted your direct

12   examination, I'm sure this isn't like just subpoenaed, show

13   up, and asked him questions.  That you don't anticipate it

14   coming out, in which case it seems that it might -- it

15   probably won't, but I understand there's no guarantees in

16   this.  You decide what you want.

17           If he says it's a crime or fraud, I'm going to

18   explain to the jury that that's not what this is, he doesn't

19   have an opinion about that.  They should disregard that.

20   That's not like -- you know, and we'll deal with it that way.

21           MR. WEINBERG:  Judge, I have a visceral feeling,

22   and it's coming out.  Unless either you or Mr. Frank

23   instructs the witness that it is inappropriate for him to put

24   labels like crime and fraud on his feelings and I ask the

25   Court or Mr. Frank to instruct him.

1          MR. FRANK:  I have no -- I can't speak to

2    Mr. Weinberg's visceral feelings.  I don't have a visceral

3    feeling it's going to come out.  It hasn't come out in his

4    preparations and I'm not intending to elicit it.  And if

5    Mr. Weinberg stumbled into it, then I can't stop that.  I

6    have instructed him not to bring up the fact that after the

7    million dollars that the defendant ordered him to get back,

8    I've asked him not to get into the $2 million and whatever

9    happened later on with State Street, the refunds.  But I

10   don't feel I should be asked to have him re-characterize his

11   feeling, if that comes out in cross examination.

12         THE COURT:  I don't think he's asking you with

13   respect to cross.  I think he's anticipating that his cross

14   is going to be focused, directed with specific questions that

15   aren't likely, unless the witness is -- to cause him to say

16   those things.

17         I think what he's asking you, to be clear, is

18   simply to tell him that on direct examination, he not offer

19   that up and -- in response, so it sounds like questions that

20   don't specifically target that.  You can choose to do that or

21   not, but I'm just telling you, that I'm -- if he says it, I'm

22   going to be very clear to the jury as to what's what and

23   what's not.  And so it might be simpler if he doesn't -- it

24   would be simpler if he doesn't, but how to manage that in the

25   first instance, I'm going to leave to you.

1          Anything else, Mr. Weinberg?

2          MR. WEINBERG:  Although, respectfully, I think if

3     the witness's here, it would not be inappropriate for the

4     Judge, for Your Honor, to instruct him what's not admissible

5     evidence is his lay opinion about fraud a crime.

6          THE COURT:  If he says it, I'm prepared to say

7     something about it.

8          MR. FRANK:  What would Your Honor like me to tell

9     him.  I'm happy to tell him whatever Your Honor wants me to

10    tell him.

11         THE COURT:  I think it's wiser, but I'm not

12    ordering you.

13         MR. FRANK:  To tell him what?

14         THE COURT:  I think it's wiser to tell him that he

15    shouldn't volunteer his opinion that it's a crime or a fraud,

16    the two things that Mr. Weinberg has raised, because you're

17    not intending to elicit that.  You're not seeking to put that

18    in.  It raises other issues, so I think it's wiser to do it.

19    On the other hand, I'm not ordering you to do it.  And if he

20    does it and if he says it, then I see it from the two things

21    you're both telling me, I think it sounds like it might not

22    happen.  It sounds like if it does happen, it's more likely

23    to happen on direct, where there's more open-ended questions

24    than on cross.  But I recognize that it's conceivable that it

25    could happen at any time, or not at all.

1          So you -- that's -- I'm not telling you to tell him

2    to re-characterize his feelings.  He feels how he feels.

3    This is a question of what you're looking to elicit and what

4    comes out.  I'm not going to sit there and, you know, tell

5    the jury -- I'm going to just explain that issue to him.

6          MR. FRANK:  I will instruct him not to -- to not

7    say those things on direct examination.

8          MR. WEINBERG:  Or not to say them unless they

9    respond to a question on cross.  I mean, I don't --

10         THE COURT:  Okay.  Anything else from either of

11   you?

12         MR. FRANK:  Yes, Your Honor.

13         MR. WEINBERG:  Last thing, Judge, we're preparing

14   some responses to the Government's opposition to our request

15   for instructions that will be filed by tomorrow morning, sir.

16         THE COURT:  Fine.  That's fine.

17         MR. FRANK:  Your Honor, we're approximately a week

18   away from any defense case, if not less.  The Government was

19   instructed a week before our opening to disclose who our

20   first witness was going to be to the defense and I would ask

21   that the defense be instructed to tell us who its first

22   witness is going to be.

23         MR. WEINBERG:  We'll do more than that, but

24   tomorrow, Your Honor.  We're meeting and trying to narrow

25   down our witness list, trying to reschedule some witnesses,

```
 1    who we had anticipated would be coming significantly later
 2    than they're now going to be required to come.  I will advise
 3    Mr. Frank by 1 o'clock tomorrow.
 4                THE COURT:  Fine.
 5                MR. FRANK:  The other issue, Your Honor, is with
 6    respect to whether we need to call an additional witness,
 7    we've asked the defense to stipulate that the phone
 8    recordings occurred on the dates that State Street has
 9    indicated to us that they occurred on.  We've gone back and
10    forth on the exact time of the calls, we're no longer asking
11    for a stipulation as to the time.
12                THE COURT:  Because time gets into London time.
13                MR. FRANK:  And GMT, and various complicating
14    factors.  But -- and we've been assured by the defense that
15    the time stamps on the e-mails are not going to be an issue.
16    So we don't need to call a witness about that, but as to the
17    time -- because --
18                THE COURT:  What do you have to say, Mr. Weinberg?
19                MR. WEINBERG:  Three things.  We certainly don't
20    have any objection to the dates that have been represented to
21    us to be the dates of the phone calls.  We're not going to
22    argue that's not August 26, that's August 24, but I don't
23    think a stipulation is necessary.  The jury has these tapes.
24    They've seen the transcripts.  The transcripts have dates.
25    We're not going to contend the dates are inaccurate.
```

1          MR. FRANK:  The transcripts are not in evidence and

2     are not going back to the jury.  So that's why we are

3     requesting a stipulation.

4          THE COURT:  So the alternative to a stipulation is

5     to call a keeper of the records, basically?

6          MR. FRANK:  I think so.  Unless -- you know, I

7     mean, I just don't want to have any sort of an appellate

8     issue.

9          THE COURT:  I understand.

10         MR. FRANK:  Or any sort of an issue being made

11    about -- on Rule 29 or anything like that.

12         MR. WEINBERG:  There is not going to be a legal

13    issue or a factual issue.  The dates that are on the face of

14    the transcripts, they can be marked for identification.  We

15    do not contest the accuracy of those dates.

16         MR. FRANK:  If the jury comes back.

17         THE COURT:  How will the jury know, when they

18    listen to a recording, as to what date it is?

19         MR. FRANK:  That's my concern, Your Honor.

20         MR. WEINBERG:  I'm prepared to work with Mr. Frank

21    at giving them a date that corresponds to the exhibit number.

22    In other words, if they do a column, Exhibit 1 through 10,

23    date, there will not be an objection from the defense and

24    that could go in as an exhibit for identification and the

25    jury could have it in the jury room.  I have no problems with

1      that.

2                 THE COURT:  You mean not for identification, but in

3      evidence -- but it was something that would go to the jury.

4                 MR. WEINBERG:  Like a summary.  I just don't want

5      to be stipulating to facts that we --

6                 THE COURT:  Why don't you do that?

7                 MR. FRANK:  We'll prepare an exhibit.

8                 THE COURT:  That lists like the number --

9                 MR. FRANK:  Of the recording.

10                THE COURT:  -- of the recording.  Like it's the

11     disc one, disc two, whatever -- however they're numbered and

12     a date.  And you offer it, he won't object to it, it'll be in

13     evidence and the jury will have it.

14                MR. FRANK:  That's fine, Your Honor.  Thank you.

15                MR. WEINBERG:  Lastly, we don't stipulate to the

16     times.

17                THE COURT:  Yeah, I understand.

18                MR. WEINBERG:  And I cannot guarantee that these

19     e-mail times will not become relevant.  In fact, I intend to

20     ask Mr. McKnight about times that are accurate on one set of

21     e-mails and mixed up on another.  But I don't think Mr. Frank

22     and I have any disagreement that there was a -- the follow-up

23     e-mail that was Government Exhibit 93, was sent at 9:30, and

24     the response about 9:36.

25                MR. FRANK:  I don't have that committed to memory.

1      What I do know is that the time stamps are very confusing.

2      The e-mails were pulled from various servers at State Street

3      by a vendor.  They have GMT time on some of them, they have

4      local time on some of them.  Some of them account for British

5      summer time, some of them don't.  It's a very complex issue

6      and if that's going to be an issue, we're going to need to

7      call a witness from Kroll to testify about time stamps.  I

8      don't think the timing of particular e-mails should be an

9      issue in this case.  If it's the sequence, I'm sure we can

10     work it out, but if it's the, you know --

11             THE COURT:  This is how I understand things.  What

12     I understand Mr. Weinberg to be saying, is that, (a), he does

13     not object to a summary list of the exhibit numbers with the

14     dates, if the list is the list of recordings that have come

15     into evidence, with the corresponding date drawn from the

16     transcript.  And that he won't object to that, that will be

17     helpful to the jury.  It will give you what you want.

18             What I understand him to be saying, as to times,

19     he's not agreeing to such an exhibit.

20             MR. FRANK:  Nor are we asking for --

21             THE COURT:  Or a stipulation and that he's saying

22     in candor, that as to certain times, he may be raising issues

23     with respect to them.

24             What that means for all of you, in terms of the

25     evidence, I don't know, but that's what I understand --

```
 1              MR. WEINBERG:  I'm actually predicting that if
 2    there are e-mail chains that have different times that don't
 3    correspond to the sequence of e-mails that Mr. Frank and I
 4    can work that out.
 5              THE COURT:  Fine.
 6              MR. WEINBERG:  And we can probably do, as to any of
 7    those e-mails that become relevant, another summary of the
 8    times.  But I don't know that this is going to require a
 9    Kroll expert or a Kroll witness.  If it does, it does.
10              THE COURT:  So maybe you should just talk a little
11    bit among yourselves about that, to see where you are and
12    whether you need a witness or not, or what you might need to
13    work out.
14              Okay.  Maria, do you know if we have all the
15    jurors?
16              THE DEPUTY CLERK:  We do.
17              THE COURT:  All right.
18              MR. FRANK:  All right.  If I could be given a
19    moment to speak to Mr. McKnight.
20              MR. WEINBERG:  Judge, I'm going to take this one
21    minute to run to the men's room.  I'll be right back.
22              THE COURT:  Go ahead.
23              (Court in recess at 9:06 a.m.
24              and reconvened at 9:07 a.m.)
25              MR. FRANK:  Judge, could I call the witness?
```

```
 1              THE COURT:  No, because he hasn't been on the
 2    witness stand yet.  We'll call him once the jury's here.
 3              MS. LEAHY:  Judge, can I give you the new
 4    transcripts for the calls?
 5              THE COURT:  Sure.  Thank you.
 6              Okay.  Maria, you can go get the jury.
 7              Just on redirect, since this came up yesterday,
 8    I'll explain to you my view, which is that redirect is like
 9    direct, except the ratio of preliminary questions to regular
10    questions differs, because in redirect what you typically
11    would say, you recall Mr. Weinberg asking about the interview
12    with the City of London Police.  Yes, that's leading and
13    that's totally fine.  And in particular, he asked you a
14    series of questions about bloppity bloppity blop.  That's
15    totally fine, leading, setting it all up, framing it.  All
16    that I don't have any problem with.
17              And then you ask like why did you say that, or what
18    happened, or whatever, and that one -- that -- when the
19    witness is going to explain it, to me, should be nonleading,
20    rather than you giving the explanation.
21              And so, yes, most of the questions are leading,
22    because the ratio is probably like three to one, because it's
23    a couple preliminary questions to one.  So that's my --
24              MR. FRANK:  I understand that's Your Honor's view
25    and I will adhere to it.  I just -- by way of background,
```

1    I've --

2            THE COURT:  We'll catch it at another time.

3                (The jury enters the courtroom.)

4            THE COURT:  Please be seated.  Good morning, ladies

5    and gentlemen.  Nobody did any independent research, nobody

6    discussed the case with anyone else?  Good.

7            Mr. Frank, call your next witness.

8            MR. FRANK:  Thank you, Your Honor.  The Government

9    calls Ian McKnight.

10           THE COURT:  Mr. McKnight, if you come forward to

11   the witness box right there and remain standing for

12   Ms. Simeone to administer the oath.

13               (The witness was duly sworn.)

14           THE COURT:  Please be seated, keep your voice up

15   nice and loud, because it's a big room and we want the jurors

16   to hear you.  You can also use the microphone.  That will

17   help a little bit.

18           Go ahead, Mr. Frank.

19           MR. FRANK:  Thank you, Your Honor.

20                        **IAN MCKNIGHT**

21       having been duly sworn, testified as follows:

22       **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

23   BY MR. FRANK:

24   **Q.**  Good morning, sir.

25   **A.**  Good morning.

1    **Q.**  Just for the record, could you tell us your name and

2    spell it for the court reporter, please?

3    **A.**  Ian McKnight, I-a-n, M-c-K-n-i-g-h-t.

4    **Q.**  Thank you.  And if you could just pull that microphone a

5    little bit closer.  I think that might -- thank you.

6               Where do you live?

7    **A.**  I live in Oxted Surrey, in the UK.

8    **Q.**  Is that near London?

9    **A.**  About 30 miles south.

10   **Q.**  And where do you work?

11   **A.**  I work for the Royal Mail's pension plan.

12   **Q.**  What is Royal Mail?

13   **A.**  The Royal Mail is the universal postal service provider

14   for the UK.

15   **Q.**  And how many employees does it have?

16   **A.**  Several hundred thousand.

17   **Q.**  And the pension plan, directing your attention to the

18   period 2011, approximately, about how much money was in the

19   pension plan at that time?

20   **A.**  At that point, it would be between -- it escalated

21   quickly over a period of years, so it would be between 20 and

22   30 billion pounds.

23   **Q.**  What was the average wage, if you know, of a British

24   postal worker at that time?

25   **A.**  It would be at the order of, I'm guessing, about

1    20,000 pounds.

2    **Q.**   What was the average pension at that time?

3    **A.**   The pension, it depends on the years of service as to

4    what pension they would get, but I guess 7 to 12,000 pounds.

5    **Q.**   Per year?

6    **A.**   Per annum.

7    **Q.**   And for whose benefit was the money in the Royal Mail

8    pension fund?

9    **A.**   So the money is held in trust for the benefit of paying

10   pensions for the workforce.

11   **Q.**   What do you do at the Royal Mail Pension Fund?

12   **A.**   Currently I'm the chief investment officer, so I'm

13   responsible for overseeing the assets that we have in the

14   trust.

15   **Q.**   And again, if you could just keep your voice up a little

16   bit.

17   **A.**   Sure.

18   **Q.**   What was your role in 2011?

19   **A.**   2011, I was called an investment strategy manager, so I

20   allocated assets, but was effectively number two to the head

21   of the investments.

22   **Q.**   And who was that?

23   **A.**   A chap called Heath Mottram.

24   **Q.**   How long have you worked at Royal Mail?

25   **A.**   I joined in 2009, so coming up to nine years, eight and a

21

half years.

**Q.**   And what did you do before you worked for Royal Mail?

**A.**   Before then, I was an investment consultant, variously,
for ten years for Willis Towers Watson, a local firm called
Laycock Peacock, Morgan Stanley, and then KPMG.

**Q.**   And prior to being an investment consultant, were you in
school?

**A.**   I went to the University of Warwick and have a degree in
mathematics.

**Q.**   Does the Royal Mail manage its own money, or is the money
outsourced to professional managers?

**A.**   It's all outsourced to third-party specialist, asset
management companies.

**Q.**   Did there come a time in or about early 2011 when the
Royal Mail decided to move money from one set of managers to
another?

**A.**   That's correct, yes.

**Q.**   Tell us about that.

**A.**   Okay.  So we were reshuffling some of our asset
allocation.  We were specifically diversifying our investment
grade credit managers and so we were moving assets from a
manager called Wellington, based here in Boston, actually,
and also putting it to a new manager, called Loomis Sayles,
also in Boston, funnily enough, everyone is big on credit
down here.  And all the takings in cash that we raised from

1    the sale of equities or shares and putting all of that

2    together into a new mandate, with a new asset manager of the

3    order of 1.3 billion pounds.

4    **Q.**   So moving from Wellington to Loomis Sayles and moving

5    some other money around, as well?

6    **A.**   Correct.

7    **Q.**   And how much money was involved?

8    **A.**   As I say, it was 1.3 billion pounds.

9    **Q.**   And was that mostly in stocks or mostly in bonds?

10   **A.**   It would have been a mixture of cash and bonds.

11   **Q.**   What kind of bonds?

12   **A.**   Investment grade credit or corporate debt.  So as a

13   lender, you will lend to a company.  That's corporate debt.

14   **Q.**   And were those American bonds or other kinds of bonds?

15   **A.**   It was a mix, across the globe, I would guess about a

16   half to two-thirds would have been US credit, so it's US

17   companies and the remainder would have been Europe and

18   beyond.

19   **Q.**   When you do transitions, do you typically use code names?

20   **A.**   Yes, we do.  Yes.

21   **Q.**   Why is that?

22   **A.**   It's to keep a bit of an anonymity.  We use code names

23   for most of the big projects that we undertake.

24   **Q.**   What was the code name for this project?

25   **A.**   This one was "Project Arnold."

1    **Q.**  Arnold?  Why?

2    **A.**  It was slightly for our own satirical amusement, because

3    we were sacking Wellington effectually so -- and

4    AllianceBernstein at the time, so you were terminated.

5    **Q.**  Did there come a time when you decided to hire someone to

6    assist you with this transition?

7    **A.**  Yeah, when you're doing a big transfer like that, you can

8    choose to just instruct the managers directly yourself, but

9    because of the scale involved and the potential for market

10   impact of such volumes going through, it's best to have a

11   specialist with the right flows to manage that for you and

12   try and keep the cost down.

13   **Q.**  How did you decide -- how did you go about deciding who

14   to hire?

15   **A.**  So we took a short list of the top transitions managers,

16   we were already aware of.  It was the third biggest plan in

17   the UK at the time, so we knew the market and then we picked

18   a short list of, I think, four, transitions managers, and

19   requested a proposal from them to conduct this business for

20   us.

21   **Q.**  Do you recall who those four were?

22   **A.**  So there was, I think, J P Morgan was one, and State

23   Street, Russell Investments, and Deutsche Bank.

24   **Q.**  And you worked with each of those banks previously?

25   **A.**  In different capacities.  I had worked with each of those

1    providers, but not specifically in the field of transition.

2    I did mostly with JP Morgan previously.  I think Royal Mail

3    itself had used a mixture of all of them and to varying

4    degrees.

5    **Q.**   At State Street, who were your contacts?

6    **A.**   It was a chap called Ed Pennings, who was known to my

7    then-boss Heath, from the work that he had done previously.

8    And subsequently, I met a chap called Rick Boomgaardt, who

9    was allocated as an assistant on income on the account with

10   that.

11   **Q.**   Did you have any contacts or interactions with Ross

12   McLellan?

13   **A.**   No.

14   **Q.**   Have you ever met him?

15   **A.**   Never.

16   **Q.**   Spoken with him?

17   **A.**   Nope.

18   **Q.**   E-mailed with him?

19   **A.**   Not that I'm aware of.

20   **Q.**   Texted with him?

21   **A.**   Not that I'm aware of the.

22   **Q.**   Do you know what he looks like?

23   **A.**   I couldn't pick him out, no.

24   **Q.**   Did all of those four banks submit proposals?

25   **A.**   They did, yes.

1         MR. FRANK:  Could we show the witness Exhibit 91

2  for the witness only, please -- oh, actually, I think this

3  might be in evidence.

4         THE DEPUTY CLERK:  71 is in evidence.

5         MR. FRANK:  Thank you.  So we can show it to

6  everyone.

7  BY MR. FRANK:

8  **Q.**  Do you recognize this e-mail, Mr. McKnight?

9  **A.**  I'll just have a read of it, sorry.

10         Yes.

11  **Q.**  And just to orient you by way of context, if we can look

12  at the lower e-mail, first.  Do you recognize this e-mail?

13  **A.**  Yes.

14  **Q.**  And do you see that you've sent it to Edward Pennings,

15  with a copy to Heath Mottram.  And if you look at the second

16  sentence, you say, "Please find attached a request for

17  proposal in respect to the transition project, Project

18  Arnold, we are soon to undertake."

19         Do you see that?

20  **A.**  Yes, I do.

21  **Q.**  And then looking at the response, Mr. Pennings writes

22  back, "Dear Ian and Heath, further to your request below, I

23  am pleased to herewith send you State Street's proposal in

24  respect to the planned transition project, Project Arnold."

25  **A.**  Uh-huh.

1    **Q.**  And then I want to direct your attention to the third

2    paragraph.  He says, "I would, again, like to stress our keen

3    desire to work with Royal Mail Pensions Trustees Limited

4    again and, therefore, have put together a very competitive

5    flat fee based bid, which is fully detailed in the RFP

6    document."

7              Do you see that?

8    **A.**  Yes.

9    **Q.**  To your knowledge, had Royal Mail worked with State

10   Street previously on transitions?

11   **A.**  Yes, I believe they had.

12   **Q.**  Was that prior to you getting there or --

13   **A.**  Yes, it was before my time.

14   **Q.**  Okay.  Had you had prior experience with flat fee bids?

15   **A.**  Yes.

16   **Q.**  And what was that experience?

17   **A.**  It's generally a cleaner way to price a transition trade.

18   **Q.**  Cleaner how?

19   **A.**  In that you know what you're paying before it's done.

20   **Q.**  If we could take a look at the attachment.

21              Do you recognize this, sir?

22   **A.**  Yes.

23   **Q.**  Is it the proposal that you received?

24   **A.**  That's correct.

25              MR. FRANK:  And if we could look, please, Erin, at

1    page 5.

2    BY MR. FRANK:

3    **Q.**  I want to direct your attention to the second paragraph?

4            MR. FRANK:  That's the one, Erin.  Yes, thank you.

5    BY MR. FRANK:

6    **Q.**  Right in the middle of the paragraph, there's a sentence

7    that reads, "With our agency execution experience, we are

8    further able to truly understand how the many trading

9    algorithms work best from a pure transition trading point of

10   view, to protect our clients on a fiduciary basis and

11   minimize the overarching implementation shortfall benchmark."

12           Do you see that, sir?

13   **A.**  I do, yes.

14   **Q.**  What did you understand that to mean?

15   **A.**  Well, that's a summary of what you're looking for in a

16   transition manager.  So at the top there it says "agency

17   execution experience," which is acting as an agent on your

18   behalf, facing the market on your behalf.

19   **Q.**  And what do you understand it to mean to act as an agent

20   and face the market on your behalf?

21   **A.**  Okay.  So the agent will go and approach the

22   broker-dealers and ask them for bids for buying or selling

23   your securities on your behalf, and they act in that capacity

24   for you, as it says there, "on a fiduciary basis," which

25   means in your best interests.

1          Again, at the end it says, "minimize the

2    overarching implementation shortfall."  I'm not sure if

3    you've had that defined before, but it's a measure of --

4    seemingly how did you move everything instantaneously, how

5    did you do versus that, because you can't trade it all in

6    that second and you're trading around it to try to get the

7    best price and at different points of liquidity.

8          And so minimizing that is a good thing, you want to

9    keep that as low as possible.  So saying here we're acting as

10   agents not just somebody actually trading it with ourselves

11   and also it's saying you're acting on a fiduciary basis and

12   also it's saying we're trying to keep the cost down.  So in

13   one big sentence, that's kind of what you're looking for.

14   **Q.**  You mentioned something about trading with yourselves.

15   If we look at the next sentence, it says "State Street does

16   have a proprietary principal trading desk and thus avoids the

17   conflicts of interest associated with the investment bank

18   portfolio trading desk business model."

19          What did you understand that to mean?

20   **A.**  Well, there's also a suspicion, I think, when you're

21   dealing with a big bank, that one arm of the bank will

22   benefit when another arm that you're dealing with is acting

23   on your behalf.  Certainly Goldman Sachs, for instance, in

24   London have a very kind of bad market presence because of

25   things that have allegedly gone on years ago.  And so this is

1    saying that State Street isn't doing something in their own

2    interest, so avoiding those conflicts of interests.  So it's

3    arm's length.  And as the agency bid there suggests, he's

4    acting as agent for you, not as somebody on the make, if you

5    like.

6    **Q.**  Did you review this document prior to making your

7    selection of a transition manager?

8    **A.**  Yes.  I remember a very lengthy afternoon pouring

9    through.  This is only one page of quite a long document and

10   there were four of them.

11   **Q.**  Did you believe it?

12   **A.**  There's no reason not to.  It's presented as a statement

13   of fact.

14   **Q.**  Could we look a little further down the page, where it

15   says "fixed income."  Do you see that?

16          MR. FRANK:  Blow that up.

17   BY MR. FRANK:

18   **Q.**  And I want to direct your attention to the first

19   sentence.  "State Street employs a purely agency approach to

20   fixed income trading."

21          Is that consistent with what you just explained in

22   your understanding?

23   **A.**  Yes, it's restating what was said above, adding the word

24   "purely" in.

25   **Q.**  And what did you understand the word "purely" to mean?

1    **A.**   It's just a fluffy word that's used in such documents.

2                 MR. FRANK:   Could we direct the witness to page 7,

3    please.   Could we blow up that chart.   Thank you.

4    BY MR. FRANK:

5    **Q.**   Do you see this chart, Mr. McKnight?

6    **A.**   I do.   It's a little grainy.

7    **Q.**   Can you tell from this chart who's in charge of State

8    Street's business in transition management?

9    **A.**   Yeah, the big box at the top says "Ross McLellan, Senior

10   Managing Director, Global Head of Portfolio Solutions Group."

11   **Q.**   And I believe you testified that you were dealing with

12   Mr. Pennings and Mr. Boomgaardt?

13   **A.**   Yes.   Mr. Pennings is set out in the box below.

14   **Q.**   A little hard to read, but it's in the box below?

15   **A.**   Yeah.   Yup.

16                MR. FRANK:   Could we look at page 12, please.   And

17   I just want to enlarge the paragraph below the bullet points

18   there.   Thank you.

19   BY MR. FRANK:

20   **Q.**   In the first sentence it says, "In our fiduciary role we

21   always act as agent to the client."

22                Do you see that?

23   **A.**   Uh-huh.

24   **Q.**   And then the last sentence, "Contractually, we have to

25   put our client's interests ahead of our own"?

1    **A.**   Yes.

2    **Q.**   Did you read that at the time?

3    **A.**   Yes.  I read it all.

4    **Q.**   What did you understand it to mean?

5    **A.**   The first bit is restating the points made earlier, that

6    this entity is acting in a fiduciary role on your behalf and

7    it's adding the word "always."  We always act as agents to

8    the client, so they're acting on our behalf in our best

9    interests.  That's what the first sentence is saying.  The

10   last bit is suggesting that, contractually, we have to put

11   our client's interests ahead of our own.  It's

12   straightforward.

13   **Q.**   Straightforward how?

14   **A.**   In the -- when you're appointing them, this entity isn't

15   putting their own interests ahead of yours.

16   **Q.**   Let's look at two paragraphs below that.  It says "The

17   transition team has its own dedicated electronic agency

18   execution desk in each of State Street's regional transition

19   management centers.  All our trading staff is dedicated to

20   transition-related trading and does not possess a proprietary

21   or principal trading book.  Therefore, all trading is done in

22   the client's account, in the most transparent manner.  State

23   Street will be the client's counterpart for settlement,

24   depending on the asset trader."

25            Do you see that?

1    **A.**  Yes.

2    **Q.**  Did you have an understanding of what that meant?

3    **A.**  So it's saying that -- and it's as I described earlier,

4    it's an agency execution desk, so dedication electronic by

5    the buyer.  It just means they do it on a computer.  Right?

6    So it's an agency that's acting as a -- going to the third

7    parties with whom you would trade and getting you best

8    execution, so the best value that they can get in the market

9    as a fiduciary person for you.

10            And then what else is it saying?

11            All dedicated to transition relationship.

12            Okay.  So it's saying that they're not shovelling

13   trade just through their own book, they're doing the whole

14   market.  So again, it's clean and you're getting best

15   execution.  And the most transparent -- well, that's

16   self-explanatory.  The last sentence, they will be settlement

17   depending on the -- I suspect that's referring for the fact

18   that perhaps State Street could be used as one of the

19   brokers, along with everybody else.

20   **Q.**  When it says --

21   **A.**  -- it's vague.

22   **Q.**  -- "The transition team has its own dedicated execution

23   desk," did you have an understanding of what that meant?

24   **A.**  So this team, it's -- they have specific dealers who

25   specialize in doing this for you, so dedicated to the

1    transition team is how I would interpret that.

2    **Q.**  Can we look at page 19, please, and if I could direct

3    your attention to the bullet points --

4            MR. FRANK:  Actually, the bullet points right above

5    that, Erin.  Thank you.

6    BY MR. FRANK:

7    **Q.**  And if you look at the bullet point -- oh, my screen

8    is -- there we go.

9            MR. FRANK:  Could you highlight that, Erin?

10   BY MR. FRANK:

11   **Q.**  Again, it says, "Truly un-conflicted fiduciary agency

12   business model."

13           Do you see that?

14   **A.**  Yes.

15   **Q.**  And again, is that simply more of what you were

16   testifying about earlier?

17   **A.**  It's just a different permutation of the word.

18   **Q.**  And if we look at the paragraph below that,

19   paragraph 1.10, you see that in your request for proposal,

20   you asked, "What fee structure do you propose for this

21   project?"

22   **A.**  Yes.

23   **Q.**  And the response was, "We propose to charge a flat

24   management fee of 1.75 basis points, 0.0175 percent, on the

25   value of the legacy assets.  This fee will cover our cost

1    incurred for the transition and will align our interest with

2    the Royal Mail in finding the best natural liquidity through

3    our unrivalled crossing network."

4          What did you understand that to mean?

5    **A.**   So a flat fee is a fixed amount and the way it's defined

6    here is it's a percentage of the value of the assets that

7    we're selling.  So -- and that's what it means by legacy

8    assets.  I think there was a -- you're testing me.  Of the

9    1.3 billion, there was different slugs.  It might have been

10   300, 400, and something else.  And in aggregate, that's 1.3.

11   So say, for example, it was 1.3 billion pounds, you multiply

12   that by the 1.75 basis points and it comes up with a planned

13   amount and that would be the fixed fee that you're paying for

14   the services of an agency transitions manager.

15   **Q.**   And what did you understand that those services would

16   include?

17   **A.**   It would include coordinating with each of the outgoing

18   managers, or simply taking the cash from us and selling down

19   or moving across the appropriate assets.  So if you imagine

20   you're moving from Wellington to Loomis Sayles and they're

21   doing the same kind of assets, some of those will be the

22   same.  They might want actually to own some of the ones you

23   already own, so that simply gets moved across.

24          Others they might prefer Shell to British Petroleum

25   and they'll sell one and buy the other.  And then those are

1    traded in the market on your behalf.  So that's what those

2    services are.  And you restrict your portfolio from one set

3    of assets to another set of assets.

4            MR. FRANK:  Could we show the witness page 37,

5    please.  Could we blow up the cost breakdown.  Thank you.

6    BY MR. FRANK:

7    **Q.**  Do you see this chart, Mr. McKnight?

8    **A.**  Yes.

9    **Q.**  What does it indicate under "commissions" for the bond

10   liquidation?

11   **A.**  That there are no commissions charged.

12   **Q.**  What did you understand that to mean?

13   **A.**  There were no charges being added.

14   **Q.**  For what?

15   **A.**  For executing these trades on your behalf.  Because as it

16   said above, we're agreeing to a fixed fee, not a

17   commission-based fee.

18           MR. FRANK:  You can take this down.  Thank you,

19   Erin.

20   BY MR. FRANK:

21   **Q.**  Mr. McKnight, how did this proposal compare to the

22   proposals that you received from the other banks?

23   **A.**  In aggregate or -- can you be more specific?

24   **Q.**  How did it compare in your mind?

25   **A.**  Well, it ultimately won.  I did a -- I created some sort

of scoring metrics across various factors.  All the things
that we described that you might want to look at in a good
transitions manager.  It's a scale, access to liquidity, and
cost, and quality of the team, so on and so on.  And it won.
But, you know, a fine margin, I think, with another provider,
but ultimately this was the cheapest by some margin, as I
recall.

**Q.**  And that cost, that fee that you mentioned, was that
relevant to your decision?

**A.**  As I suggested, yes, that was probably the thing that
touched in their favor, along with the scale and quality of
the business.

**Q.**  What about the fact that State Street represented itself
to be your agent and fiduciary?  Did those factor into your
decision at all?

**A.**  That was a given.  That's what you want somebody to do,
if you were, as I mentioned, the example earlier -- and I
don't want to tarnish Goldman Sach's fine reputation, but if
you went there and you found out they were just pumping it
straight through their own broker dash, you wouldn't be too
happy.  So what you want is somebody acting impartially and
in your best interests as an agent on your behalf.  So you
pay him for a service.

**Q.**  You mentioned earlier the metric of the implementation
shortfall?

1    **A.**   Yes.

2    **Q.**   Did that factor into your decision?

3    **A.**   Yes, and they were all presented as here's our estimate.

4    The thing with implementation shortfall, is you never really

5    know what it's going to be until you go into the market for

6    those -- for those trades and get them.  So it's a difficult

7    art to do, but based on the experience of a manager doing it

8    every day, they have a rough idea of what sort of things they

9    might, how much they might have to trade and what the impact

10   of that might be and the liquidity.  And they can estimate

11   for you what that is.  So as I said earlier, the lower, the

12   better in that.

13   **Q.**   Is there any part of the implementation shortfall

14   estimate that you consider to be more reliable?

15   **A.**   Any part of it?

16   **Q.**   Yes.

17   **A.**   It's usually just presented as a percentage.

18   **Q.**   Okay.  And you understand -- if we could go back and look

19   at page 37 of Exhibit 91 -- is that 91?  Yes.  91.

20              You see there's a total cost there?

21   **A.**   Yes.

22   **Q.**   And there are other components?

23   **A.**   Uh-huh.

24   **Q.**   Is there any part of that that you consider to be more

25   reliable than the market estimates?

1    **A.**   Oh, I see.  I see what you're asking.

2          So the bid offer spread, which is the largest

3    number there, when you buy or sell a bond, and you put it to

4    the market, somebody has to bid for how much they're going to

5    give you.  That's typically the lower number.  And if you --

6    sorry, the higher number.  And if they're going to buy it off

7    you, they want to pay you less, typically, so that would be

8    the lower number and the bid ask spread is the difference

9    between the two.

10   **Q.**   So you understand that to be a market estimate?

11   **A.**   Yes.

12   **Q.**   What about the commissions?

13   **A.**   Well, that's quite clearly saying zero.  The bid ask

14   spread estimate is the market impact of you physically

15   trading things.  And in that regard, if you're able to just

16   have somebody come in the other way and do it at the mid

17   price, which is the -- in between the bid and ask, then

18   that's good, because you don't incur that spread.

19          MR. FRANK:  Thank you.  We can take that down.

20   BY MR. FRANK:

21   **Q.**   What did you do after you received these proposals?

22   **A.**   After, I made a recommendation to Mr. Mottram, who was my

23   boss at the time, that actually, on the going matrix, as

24   presented, that they should get the business.  He agreed and

25   we then went back to people pitching for this business to

1    thrash out what the exact fee would be, before appointing

2    them.

3                MR. FRANK:  Can we look at Exhibit 93, please, for

4    the witness, only.

5                Sorry, that's in, as well.  So we can show that to

6    the jury.  And if we can start on page 2.  Blow up that

7    bottom e-mail.

8    BY MR. FRANK:

9    Q.  You see that you said to Mr. Pennings, "Thank you for

10   your first submission, which I'm pleased to report has now

11   made the cut to our final consideration."

12   A.  Yes.

13   Q.  And then you said, "As our process has evolve we are in a

14   position to give you an overview of the revised transfer

15   specifics.  600 million pounds cash, 300 million of global IG

16   corps, 400 million pounds of sterling credit sold, assume

17   seven years' duration."

18               Do you see that?

19   A.  Yes.

20   Q.  And then you asked for confirmation of the fee you

21   proposed?

22   A.  Yes.

23   Q.  And Mr. Pennings responded, "Hi Ian, thanks for your

24   e-mail.  I guess the trade has changed somewhat from the

25   initial indication."

1             Do you see that?

2   **A.**   Yes.

3   **Q.**   How had the trade changed?

4   **A.**   So on your initial slide that you just put up, it had

5   600, 300, 400, with sterling, global, and cash.  I suspect --

6   I suspect we added in the sterling, or maybe there was more

7   cash or less cash.  I forget.

8   **Q.**   Do you recall if you had previously intended to

9   transition more assets than 1.3 billion?

10  **A.**   That may very well be the case.

11  **Q.**   Can we turn to the prior page of this document.  And if

12  we look at the third e-mail down.  Mr. Pennings writes to you

13  on Monday, February 21, 2011.  "Hi, Ian, further to our

14  discussion, I confirm that even though the value is

15  significantly less, we can do this proposal for a management

16  fee of 1.75 basis points of the portfolio value of

17  1.3 billion pounds or 227,500 pounds."

18             What was your understanding of what that meant?

19  **A.**   Well, that's pretty clear, as I described earlier, on a

20  flat fee basis, you define it as a proportion of the amount

21  of legacy assets.  Where that amount is 1.3 billion pounds,

22  that translates at that fee rate proposed to the number

23  shown, to 227,500 clearly.  The value of that 1.3 will go up

24  and down slightly before the transitions.  But you know that,

25  whatever value it is, you'll be paying 1.75 basis points of

1    that as a fixed panned amount.  And that's what you're going

2    to be paying.

3    **Q.**  Did you have an understanding, based upon this e-mail,

4    and the prior documents that you'd reviewed, of what that

5    number included?

6    **A.**  Yes, it was the full transition management project, and

7    acting as agent on your behalf, to implement it for you.

8    **Q.**  Could we look at the next e-mail up, please.  You

9    responded, "Ed, for the avoidance of doubt, can you confirm

10   this is your full and final transition fee, including all the

11   buying and selling required by my trades listed below, to

12   construct the new 1.3 billion pound portfolio?"

13           Do you see that?

14   **A.**  Yes.

15   **Q.**  What were you asking Mr. Pennings to confirm there for

16   the avoidance of doubt?

17   **A.**  Well, that it -- that it is the full and final fee.  So

18   full, in that it includes absolutely everything and it's

19   required that there are no additional costs.  Because again,

20   it was the lowest on the tenders.  I had a chat with Heath,

21   we were delighted it was such a low bided come in and I

22   wanted to check that was the case.

23   **Q.**  Now, you testified a moment ago that you understood the

24   prior e-mail and the prior communication --

25           MR. WEINBERG:  I object.

```
 1              THE COURT:  I just want to hear -- I don't know
 2    what the question is, so wait.
 3              MR. FRANK:  It's going to be a why question.
 4              MR. WEINBERG:  It's about to be leading.
 5              THE COURT:  I'll hear the question and then you can
 6    object.
 7              Go ahead.
 8    BY MR. FRANK:
 9    Q.  You testified a moment ago that you understood the prior
10    communication to be a flat fee, encompassing the execution?
11    A.  Yes, I did.
12    Q.  Why did you ask this question for the avoidance of doubt?
13    A.  It's my job to make sure I know what I'm paying for
14    something before we do it and I don't want any
15    misunderstanding.  I want it in black and white, exactly what
16    I'm agreeing to.  But, yeah, it's clear from both e-mails
17    that that includes absolutely everything.  I think the reply,
18    which we haven't highlighted here says, "Yes, that includes
19    absolutely everything."
20    Q.  Did you have any doubt, based on the first e-mail?
21              MR. WEINBERG:  I object.
22              MR. FRANK:  I can rephrase the question, Your
23    Honor.
24              THE COURT:  Fine.  Do that.
25              THE WITNESS:  I think I've already answered that.
```

1    No.
2              THE COURT:  Well, there's nothing for you to say,
3    because he's asking you a different question.
4              THE WITNESS:  Sorry, Judge.
5    BY MR. FRANK:
6    Q.  Were you -- based on the prior e-mail, how confident were
7    you that your understanding was correct?
8              MR. WEINBERG:  Objection.
9              THE COURT:  Overruled.
10             THE WITNESS:  Could you show me the e-mail again,
11   sorry.  Which one are you referring to now?
12             MR. FRANK:  We'll look at the e-mail below.
13             THE WITNESS:  And the question is what?
14   BY MR. FRANK:
15   Q.  How confident were you that your understanding was
16   correct that this included everything?
17   A.  Like it couldn't be clearer.  We can do this project for
18   a management fee of X.
19   Q.  Can we look at the top e-mail?
20             Mr. Pennings responds, "The fee includes all
21   trading required.  Please don't make me go this low every
22   time, though."
23             Do you see that?
24   A.  Yes.
25   Q.  What did you understand that to mean?

1    **A.**   Well, there had been a pattern throughout the

2    conversations I had had with Ed, in which you probably

3    already gleaned from some of the things we saw earlier, that

4    they were very keen for this business.  He was especially

5    keen.  And we had, in 2012 coming up, one of the biggest

6    pensions deals in history.  We gave the Government 30 billion

7    pounds and somebody was going to be managing that.  And I

8    understood that that was quite something you'd want to be

9    getting involved with now, so that you're a preferred

10   provider for the big deal later.  And therefore, the please

11   don't make me go every time, I would -- guess refer to

12   that -- you would have to ask him.

13   **Q.**   That was an upcoming deal of 30 billion pounds?

14   **A.**   Yeah.

15   **Q.**   What did you understand Mr. Pennings to mean when he said

16   the fee includes all trading required?

17   **A.**   So absolutely everything we will do for you, so when

18   we're going to the market, whatever we do for you, anything

19   that's done, this fee includes all of that.

20   **Q.**   How did that compare with your prior understanding?

21   **A.**   It's completely consistent.

22   **Q.**   What happened next?

23   **A.**   What happened next?  We appointed State Street to conduct

24   the business.

25               MR. FRANK:  Could we show the witness Exhibit 96,

1    please.

2              THE COURT:  96 in evidence, Maria?

3              MR. FRANK:  It's not, your Honor.

4              THE COURT:  Okay.

5    BY MR. FRANK:

6    **Q.**  Mr. McKnight, do you recognize this document?  Can you

7    see it?

8    **A.**  Yes, I do, yes.

9    **Q.**  What is it?

10   **A.**  So this is an annex or side letter to the main transition

11   management team.  So State Street, because they'd worked for

12   us before, we already had a standing agreement with them to

13   conduct transition business.  Now each time you put in place

14   a new deal with them, you put a commercial terms annex in

15   there and this was the commercial terms annex for this deal.

16   **Q.**  What do you mean the commercial terms annex?

17   **A.**  That's setting out the specifics -- so it's saying here

18   what --

19             MR. FRANK:  Well, let me actually first offer the

20   document.  The Government offers 96.

21             THE COURT:  Any objection, Mr. Weinberg?

22             MR. WEINBERG:  No, I don't.

23             THE COURT:  Admitted.

24             (Government Exhibit No. 96 admitted into evidence.)

25   BY MR. FRANK:

1   **Q.**   What did you understand -- what do you mean by commercial

2   terms annex?

3   **A.**   This is setting out the fees we will be paying and the

4   deal that will be conducted for those fees and it's in

5   paragraphs 3 and 4, as is.

6   **Q.**   Okay.  So let's look at paragraphs 3 and 4.

7   **A.**   Starting "legacy portfolio."

8   **Q.**   And is this document sometimes referred to as -- if you

9   look at the top.  Maybe it's a little hard to see right now.

10  You see it says "periodic notice"?

11  **A.**   Yes.

12  **Q.**   Is that what you mean by a side letter?

13  **A.**   That's correct.  Yes.  It's an annex to amend a master

14  agreement.

15  **Q.**   It says, "Legacy portfolios of 600 million pounds cash,

16  BlackRock Sterling Liquidity Fund, 300 million pounds of

17  global investment grade corporates, Wellington, and 400

18  million pounds of sterling credit, Standard life."

19  **A.**   Uh-huh.  Yeah.

20  **Q.**   "Will be reshaped to a new global investment grade

21  corporates portfolio managed by Loomis Sayles."

22           That's what you were hiring them to do?

23  **A.**   That's right.  I said that's putting it into legalese, I

24  think the e-mail you saw just now, and that's the deal that

25  we wanted effecting on our behalf.

1    **Q.**  And then it says, "A flat management fee of 1.75 basis

2    points will be charged on the value of the portfolio."

3           What was your understanding of what that meant?

4    **A.**  That you would take the value of the portfolio as sold,

5    apply 1.75 percent basis points to it and that would be the

6    fixed fee you are paying for this transition to take place.

7    **Q.**  Did the transition happen?

8    **A.**  It did, yes.

9    **Q.**  Did there come a time when you received a report on its

10   performance?

11   **A.**  Yes.

12          MR. FRANK:  Could we show the witness 148, please.

13   That's in evidence.

14   BY MR. FRANK:

15   **Q.**  You see, you received an e-mail from Mr. Boomgaardt, on

16   April 14th?

17   **A.**  Yeah.

18   **Q.**  "Hi, Ian, as discussed, please find the post transition

19   analysis report attached.  We are pleased to report that the

20   shortfall of 45 basis points is very much in line with the

21   mean pre-trade cost estimate."

22          What did you understand that to mean?

23   **A.**  In a nutshell, that's saying we've done it and it went

24   well.

25   **Q.**  What does it mean that the shortfall was very much in

1    line with the mean pre-trade estimate?

2    **A.**   Well, the pre-trade estimate, which was low, had been met

3    by the actual implementation, so it hadn't gone above what

4    you thought it might cost before you did it, in terms of the

5    spread.

6    **Q.**   Were you satisfied with this performance?

7    **A.**   Yes.  It was a successful transition.

8    **Q.**   The second sentence -- the third sentence says, "We will

9    be shortly sending through an invoice, as agreed, reflecting

10   the transition fee of 1.75 basis points on the value of the

11   assets coming into the transition."

12   **A.**   Uh-huh.

13   **Q.**   What did you understand that to mean?

14   **A.**   The bill is on its way.

15   **Q.**   Did there come a time when you received that bill?

16   **A.**   Yes.

17           MR. FRANK:  Could we show the witness 149, please.

18           THE COURT:  Is that in evidence?

19           MR. FRANK:  No.

20           MR. WEINBERG:  No objection.

21           THE COURT:  It's in evidence now.  Admitted.

22           MR. FRANK:  Thank you, Your Honor.

23           (Government Exhibit No. 149 admitted into

24           evidence.)

25   BY MR. FRANK:

1   **Q.**   Do you recognize this document?

2   **A.**   It's a bill to me for 242,000 pounds.

3            THE COURT:  Keep your voice up.

4            THE WITNESS:  Sorry.  Yes, It's a bill sent to me

5   for 242,000 pounds and a bit.

6   BY MR. FRANK:

7   **Q.**   What did you understand this to cover?

8   **A.**   The transition management services, as stated.

9   **Q.**   Did Royal Mail Pension Trustees Limited pay this bill?

10  **A.**   Yes, that will have gone to my head of finance, who would

11  have released the cash.

12           MR. FRANK:  Take this down.  Thank you.

13  BY MR. FRANK:

14  **Q.**   Mr. McKnight, did there come a time when you learned that

15  you had been charged something different from what you had

16  previously understood?

17  **A.**   Yes.

18  **Q.**   What happened?

19  **A.**   It's a convoluted story, so it may take me a few minutes.

20  Is that okay?

21  **Q.**   Go ahead.

22  **A.**   So Heath was having a lunch with Russell Investments.

23  **Q.**   Russell Investments was a firm that had competed with

24  State Street for this transition?

25  **A.**   Yes.  On, frankly, an unrelated matter.

```
 1              MR. WEINBERG:  Excuse me, Mr. McKnight.  I think
 2    this is going to be hearsay, Your Honor.
 3              MR. FRANK:  It explains what he did next, Your
 4    Honor.
 5              THE COURT:  Overruled.  So I'll hear it and let me
 6    explain it, depending on whether it is hearsay or not.
 7              But go ahead.
 8              THE WITNESS:  Okay.  So I saw that he was having
 9    lunch with him.  It turns out he was going to join them, so
10    he was seeing them in a different capacity.  And he happened
11    to be meeting his transition management team.  And he invited
12    me to join him at lunch and they were touting for business,
13    saying I'm really sorry we missed out on this.  Because, of
14    course, they were still mindful that this big deal was going
15    on in future.
16              MR. WEINBERG:  Objection.  The lunch is hearsay,
17    Your Honor, the conversations are hearsay.
18              THE COURT:  So far, I overrule that.  Their
19    unhappiness is not offered for the truth, but just for their
20    state of mind at the time, and the context.
21              So go ahead.
22              THE WITNESS:  Okay.  So what Heath often had a
23    tendency to do was to throw a bone to people that you meet,
24    sort of keep them open for future business, and so on.  And
25    he said, oh, well, why don't you have them check the one
```

```
 1   we've just done and see how -- if they could have done any
 2   better in terms of the implementation, or could they have
 3   done a better job.
 4   BY MR. FRANK:
 5   Q.  Could Russell have done a better job?
 6   A.  That was the question he asked me to ask them, yes.
 7        MR. WEINBERG:  Excuse me, can I have a running
 8   objection to the conversation?
 9        THE COURT:  Yes.  You can have a running objection
10   to hearsay and it's overruled.
11        Go ahead.
12   BY MR. FRANK:
13   Q.  After Mr. Mottram asked you to ask Russell --
14   A.  Yes.
15   Q.  -- to evaluate how State Street had performed, is that
16   what you did?
17   A.  Yes, it's a throw-away comment from him and not something
18   that I've usually done.  Remember, we had this big deal
19   coming up, I was very busy.  But I had broke my leg and so I
20   was working from home at that period and had a few extra
21   hours a day.  I don't have to commute.  And I got to the
22   bottom, blessfully, of my lengthy to-do list that day and saw
23   this thing, this little scribble that I made.  And said well,
24   I'll give them a ring.  And I just spoke to them, sent them
25   through the post trade report, I think it was, to see if they
```

1     could do any better.

2     **Q.**   What happened?

3     **A.**   Then about a week later, I got a phone call from the

4     person there saying I think we should have a meeting, we

5     found something you need to see.  And they came in to our

6     office.

7             MR. WEINBERG:  Your Honor, please, I -- the next

8     conversation, I have an objection to, the content of what he

9     was told by somebody from Russell.

10            MR. FRANK:  It explains exactly what he did next,

11    Your Honor.

12            THE COURT:  So what I anticipate is coming next,

13    what has come, some of this is what we call hearsay, it's

14    statements made by other people who aren't testifying before

15    you, reporting what their statements are.  And so it's

16    admissible for you, not for the truth of what they said.

17    That is, these people at Russell looked at it and you're not

18    to consider it for like, in fact -- their assessment,

19    whatever it was, that we might hear about in a moment is

20    correct or not, but just for the effect that it had on this

21    witness and what it caused him to do, or what it caused Royal

22    Mail to do.  So the fact that they heard it, not the truth of

23    it.

24            Go ahead.

25            MR. FRANK:  Thank you, Your Honor.

1          Continue, Mr. McKnight.

2          THE WITNESS:  So they came in and presented me with

3     a simple A4 sheet of paper that analyzed a series of trades

4     that had taken place covering US credits and it transpires

5     and it was news at the time, that there's a publically

6     available system called TRACE that allows you to look at

7     trades going through the markets and see the spread that's on

8     there and what they found --

9     BY MR. FRANK:

10    Q.   Let me just stop you right there.  This system, TRACE,

11    that you refer to.  What is your understanding of which

12    trades it shows?

13    A.   The trades pertaining to US corporate credit --

14    Q.   US corporate bonds?

15    A.   -- that was traded on our behalf.  Yes, that's correct.

16    Q.   What is your understanding of whether the TRACE system

17    shows bonds that trade outside of the US?

18    A.   I don't believe it does at all.  I think it's just a US

19    system, or it was at the time.

20    Q.   Okay.  And do you have an understanding of whether it

21    includes bonds other than corporate bonds at that time?

22    A.   I'm afraid I don't know.

23    Q.   Okay.  And if you could just keep your voice into the

24    microphone, sir?

25    A.   Sure.

1    **Q.**   What happened next?

2    **A.**   So this document highlighted that there had been an

3    additional spread of 0.01 or one basis point.  0.01 percent

4    applied to every US trade that had been examined.

5    **Q.**   What did you do when you found out?

6    **A.**   I went to State Street and asked them what had happened.

7    And Ed, I believe it was, said jeez, this is an accident.

8    Somebody has had a fat finger and our -- our trading guys

9    have applied a fee to the spread, which of course they

10   didn't, you know -- we're on a fixed fee, so I'm sorry, it

11   looked like -- because they're used to doing it like this,

12   they've just applied that anyways.  It was a matter of

13   course, it was described to me as a terrible and expensive

14   accident.

15   **Q.**   And what happened next?

16   **A.**   Well, I asked if the other two -- the non-US trades had

17   been effected similarly and I was told clearly no and I

18   wasn't satisfied that was the case.  So a firm I had met

19   coincidentally, a week or two earlier, called Analytics, are

20   specialists at this.  And actually, I had been advised

21   elsewhere to use them as a check on this.

22           And I went to Ed and said we would like them to

23   come in and do a full check of this process and I want you to

24   pay, you know, because you made this -- this apparent

25   mistake.  So that's what I did.

1    **Q.**  Did there come a time around that time, in connection

2    with Mr. Pennings' communications with you, when State Street

3    offered you a refund of approximately $1 million?

4    **A.**  I believe so, yes.

5    **Q.**  And did you accept that money back?

6    **A.**  I would have done.

7    **Q.**  What was your understanding of what that money

8    represented?

9    **A.**  The additional spread cost that had been applied

10   erroneously to our transition and made repair to us for that,

11   because it shouldn't have been on there.

12            MR. FRANK:  Could we show the witness only

13   Exhibit 172, please.

14   BY MR. FRANK:

15   **Q.**  Do you recognize this document, Mr. McKnight?

16   **A.**  Yes.

17   **Q.**  What is it?

18   **A.**  So this was a reissue of the post trade analysis, clearly

19   an additional spread has been applied.  Reducing that spread

20   reduces your cost, your implementation shortfall goes down.

21   And as it says in paragraph 2 --

22            MR. FRANK:  Just a moment, please.

23            The Government offers 172 and its attachment.

24            MR. WEINBERG:  I have no objection.

25            THE COURT:  Admitted.

1              (Government Exhibit No. 172 admitted into

2              evidence.)

3    BY MR. FRANK:

4    **Q.**  I'm sorry, sir.  What were you pointing to?

5    **A.**  Just in paragraph 2 saying that the shortfall was reduced

6    to 40 basis points.  I think it was 45 before.  So it was

7    even better deal without the additional costs having

8    erroneously been applied.

9    **Q.**  Better for who?

10   **A.**  Better for our members.

11   **Q.**  What happened next?

12   **A.**  So Analytics were appointed to go into State Street and

13   seek further information on the other trades, the non-US

14   trades that had taken place.  And there was a very protracted

15   process I recall.  It was seven years ago, but it went on

16   awhile, and the chap there --

17   **Q.**  What was your understanding of why it took so long?

18   **A.**  I believe there had been resistance to releasing data

19   that we required and I think I had to step in and chase them

20   for it.

21              MR. WEINBERG:  I object.  This is based on hearsay,

22   Your Honor.

23              THE COURT:  To the extent you know.

24              THE WITNESS:  It was -- it was the market level

25   data that would enable us to do a similar check on the

1    European trades as we had been able to do publically through

2    TRACE on the US trades.

3                THE COURT:  Go ahead.

4                MR. FRANK:  Thank you, Your Honor.

5    BY MR. FRANK:

6    **Q.**  Did there come a time when you learned that there had

7    been a shakeup at State Street?

8    **A.**  Yes.

9    **Q.**  At some point thereafter, did you ultimately get the

10   information you were looking for about the European bond

11   trades?

12               MR. WEINBERG:  I object and ask to approach the

13   bench, Your Honor.

14               THE COURT:  All right.  I'll see you at sidebar.

15               (The following discussion held at the bench.)

16               MR. WEINBERG:  I think we've gone one question

17   beyond my understanding of the limits of where we agreed, the

18   rectification of the issues with their different clients.

19               MR. FRANK:  I didn't intend to do that, Your Honor,

20   and I don't intend to do that.  What I'm intending to elicit

21   is did you --- were you at some point able to confirm what

22   the overcharges were.  So at some point he got the data and

23   they were able to confirm what the overcharges were.

24               THE COURT:  Why don't you just ask him that?  Say

25   once you got the data --

1          MR. FRANK:  I'm happy to do that.

2          MR. WEINBERG:  Well, if that's where it ends, I

3     have no objection.

4          MR. FRANK:  No, well, then can I continue with the

5     question?

6          THE COURT:  No, the --

7          MR. WEINBERG:  The question you were going to ask,

8     not the question you did ask.

9          (Bench conference concluded.)

10         THE COURT:  Go ahead and rephrase the question, Mr.

11    Frank.

12         MR. FRANK:  Thank you, Your Honor.

13    BY MR. FRANK:

14    **Q.**  At some point, did you learn how much you had been

15    overcharged outside the United States?

16    **A.**  Yes.  I was informed through the Analytics process, that

17    the estimate was, instead of $1 million, that the total was,

18    in fact, $3 million.

19    **Q.**  In addition to the overcharges on the bonds, were you

20    upset about how much State Street charged for futures?

21    **A.**  They were both futures and FX involved in the transition.

22    So you use futures to maintain market exposure as you're

23    going through the transition.  And of course, you do the same

24    with your FX, so your market exposure is as you wanted it

25    throughout the period.  And they were pretty high fees that

1    we were paying for those, as well.

2    Q.  Were you upset about that?

3    A.  When I discovered the order of magnitude of them, yes.

4    Q.  Did there come a time when you asked for all that money

5    back, as well?

6    A.  Yes.  On principle, frankly.  We were pretty peeved of

7    having been relieved of $3 million and so I didn't want them

8    getting anything.  I said you're giving all of it back.  I

9    want it all back.  Anything you've taken out of this, we want

10    it back, and our trustees were supportive of that.

11    Q.  In your mind, was the bond issue the same as the issue

12    with those other --

13                MR. WEINBERG:  Objection.

14                THE COURT:  Overruled.

15    BY MR. FRANK:

16    Q.  With those other futures and FX?

17    A.  No, it was separate.

18    Q.  Why did you ask for that money back?

19    A.  On principle.

20    Q.  You referenced learning that you had been overcharged

21    $3 million?

22    A.  Uh-huh.

23    Q.  What did you think you were going to be charged for this

24    transaction?

25    A.  200 -- well, 1.75 basis points of 1.3 billion pounds, or

1    220 or something thousand pounds.  So that's clearly --

2    that's a lot more when you add $3 million on.

3    **Q.**  Was that difference important to you?

4    **A.**  Very, yes.  It's material.  It's a huge sum.  What is it?

5    It's $10 for every postman within our company and I was

6    pretty peeved.

7    **Q.**  $10 for every postman in your company?

8    **A.**  Yeah.  So I was very cross.

9    **Q.**  Why --

10   **A.**  And so was my board.

11   **Q.**  Why?

12           MR. WEINBERG:  Objection, Your Honor.  The

13   relevance has been established.

14           THE COURT:  Sustained.

15   BY MR. FRANK:

16   **Q.**  Would it have been important to you to know that

17   information about what State Street was planning to charge

18   prior to making the decision to award the transition?

19   **A.**  Well, they wouldn't have been appointed if that was the

20   fee.

21           MR. FRANK:  Thank you.  No further questions.

22           THE COURT:  Cross-examination, Mr. Weinberg?

23           MR. WEINBERG:  Thank you, Your Honor.

24           **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

25   BY MR. WEINBERG:

1   **Q.**   Good morning, Mr. McKnight.

2   **A.**   Good morning, sir.

3   **Q.**   Ross McLellan, who sits right in front of you, at the

4   right-hand side of defense table, is a man you've never met,

5   never seen, correct?

6   **A.**   Correct.

7   **Q.**   Never spoken to, e-mailed, texted, been on a conference

8   call to your knowledge, et cetera, correct?

9   **A.**   Not to the best of my knowledge.

10  **Q.**   You saw his name on the top of an organization chart and

11  in the RFP response by Royal Mail?

12  **A.**   Yeah.

13  **Q.**   And you also saw, if you remember, different boxes that

14  went out from his name to Asia and to the United States,

15  illustrating that he was in charge, globally, of these

16  transitions, correct?

17  **A.**   Correct.

18  **Q.**   One of the arrows down and then spread out into a bunch

19  of boxes led to Mr. Pennings and Mr. Pennings' team in

20  London, correct?

21  **A.**   Correct.

22  **Q.**   Mr. Pennings was the man that your bank had dealt with

23  before and that you looked to on this transition as your

24  principal counterparty, if I could use that word for these

25  discussions, correct?

1    **A.**   He was our main contract at State Street, correct.

2    **Q.**   Sure.  And he was the man you would e-mail when you

3    wanted information or wanted assurances, correct?

4    **A.**   Correct.

5          MR. WEINBERG:  I want to direct your attention to

6    Exhibit 91 in evidence, on page 37, if I can.  Can you blow

7    that up for just a second?

8    BY MR. WEINBERG:

9    **Q.**   And if you see that, this is the original RFP that was

10   responding to Royal Mail's request to four different

11   providers for their responses to how they would estimate how

12   they would propose to do a transition, correct?

13   **A.**   Correct.

14   **Q.**   And you see that the proposed cost, the implementation

15   shortfall cost at this time was in the 20s, correct?

16   **A.**   Correct.

17   **Q.**   This was a much bigger deal, was it not?

18   **A.**   What are you asking me?  Sorry.

19   **Q.**   The deal that was originally proposed was much larger

20   than the deal that ultimately was transitioned from

21   Wellington to Loomis Sayles at this time?

22   **A.**   Oh, I see.  I would forget the number, the original

23   discussions that we were concerning.

24   **Q.**   If you remember, if you reviewed the RFP, that at one

25   point the predicted commission for 1.75 would be over

1    500,000 pounds?

2            MR. FRANK:  Objection to the use of the word

3    "commission," Your Honor.

4            THE COURT:  Why don't you clarify what you mean?

5            MR. WEINBERG:  Sure.

6    BY MR. WEINBERG:

7    **Q.**  The charges that State Street was originally proposing,

8    based on the magnitude of what assets were going to be moved

9    from Wellington to Loomis was originally over 500,000 pounds;

10   is that correct?

11   **A.**  I think that what you're simply observing is that if

12   you're applying a 1.75 basis points to a larger number, you

13   get a larger number.

14   **Q.**  Absolutely.

15   **A.**  Correct.  Yes.

16   **Q.**  So does that lead you to recall -- and I know we're going

17   backwards in time from 2018 to 2011, that the original

18   thought was that Royal Mail was going to transition an amount

19   of assets that were over double what ended up being

20   transitioned?

21   **A.**  And we didn't.

22   **Q.**  You didn't.  You changed your mind?

23   **A.**  Yeah.

24   **Q.**  And narrowed the scope of this transition, correct?

25   **A.**  Uh-huh.  Correct.

1    **Q.**   There was no follow-up RFP, was there?

2    **A.**   Not to the best of my knowledge.

3    **Q.**   Right.  But you were -- as a professional that wanted to

4    be sure what your client that you were responsible for was

5    going to be paying, had a series of e-mails with

6    Mr. Pennings, wherein you wanted to get the assurance from

7    him that this change of the size of the deal would not change

8    the manner in which Royal Mail was being charged, correct?

9    **A.**   I wanted to fully understand the fees we were paying,

10   that's correct.

11   **Q.**   In other words, you understood when the -- when a deal

12   twice as big would result in twice the fees to State Street

13   and you were having the deal, you wanted to make sure that

14   State Street was still going to apply the 1.75 basis points

15   to whatever was left of the transition, correct?

16   **A.**   That's correct.

17   **Q.**   And so that led to a series of e-mails that -- do you

18   recall they were at night on February 21, with Mr. Pennings?

19   **A.**   That would make sense, given I had broken my leg, and was

20   working 13 hours a day.

21   **Q.**   It was a long day.

22             MR. WEINBERG:  Could we have Government Exhibit 93

23   to start?  And if we could blow up the bottom.

24             So you first gave Mr. Pennings your phone number

25   and then Mr. Pennings followed it up with an e-mail to you

1    that was sent sometime on the evening of February 21; is that

2    correct?

3    **A.**   Judging by the date stamp on this, yes.

4    **Q.**   And what he was saying is that following the phone call,

5    he was confirming that, "even though the value was

6    significantly less, we can do this project for a management

7    fee of 1.75 basis points of the portfolio value or

8    227,500 pounds."

9            Correct?

10   **A.**   That's what it says.

11   **Q.**   He didn't say anything there -- he didn't explicitly give

12   you an assurance until his next e-mail that that management

13   fee would cover the transition management and any revenues,

14   any fees, any costs, any charges that would be generated by

15   the trading of these $1.3 billion of assets, right?

16   **A.**   I'm afraid I disagree.  It says we can do this project --

17   this project for a management fee of X.

18   **Q.**   Let's go to the next --

19   **A.**   It's pretty clear.

20   **Q.**   Let's go to the follow-up e-mail.  And again, this is

21   9:20 -- what is 21:17?  Is that 9:17?

22   **A.**   Well, is that printed off my e-mail or somebody else's?

23   I don't know what time zone we're in there.

24   **Q.**   Let me, if I can, switch to an e-mail that has both of

25   these times in the same -- in the same style.

```
1              MR. WEINBERG:  Just the witness for now.

2              MR. FRANK:  Marty?

3              Can I approach counsel, Your Honor?

4              THE COURT:  Yeah.

5              (Counsel confers.)

6   BY MR. WEINBERG:

7   Q.   Does this e-mail refresh your recollection that these --

8              THE COURT:  Is this one in evidence?

9              MR. WEINBERG:  No, Your Honor.  I'm asking him

10  about an e-mail that I've given him that matches, in

11  substance, 93, that's already before the jury.

12             THE COURT:  All right.  Go ahead.

13  BY MR. WEINBERG:

14  Q.   And I'm just focusing you on the time.

15  A.   Okay.

16  Q.   Does that refresh your memory that there was a follow-up

17  e-mail by you at -- in the evening of February 21st?

18  A.   There evidently was.

19  Q.   And then there was a follow-up e-mail from Mr. Pennings,

20  back to you, on the evening of February 21, seven years ago.

21  A.   Yes.  Evidently so, yes.

22  Q.   And does this refresh your recollection that Mr. Pennings

23  sent you his response to your e-mail about six minutes after

24  you sent him your --

25             MR. FRANK:  I object to this, Your Honor, and we
```

1  can approach at sidebar.  I'm not sure the relevance, but to

2  the extent counsel thinks it is relevant, I would object.

3          THE COURT:  I think he can ask him if he sent it

4  six minutes later.  That's just asking him if he remembers.

5          MR. FRANK:  If that's all, then that's -- if it

6  refreshes his recollection.

7          THE WITNESS:  It appears to be a statement of fact.

8  BY MR. WEINBERG:

9  Q.  So I want to go over, back to 93, which has two different

10  forms of time that it's in evidence and focus you on the

11  follow-up question that you had of Mr. Pennings.

12          "For the avoidance of doubt, can you confirm this

13  is your full and final transition fee, including all the

14  buying and selling required by my trades listed below to

15  construct the new $1.3 billion portfolio?"

16          That was what you asked Mr. Pennings, correct?

17  A.  Correct.

18  Q.  And as you told Mr. Frank on direct, you wanted

19  Mr. Pennings, black and white, because the deal had changed,

20  and you didn't want any doubt, any uncertainty.  You wanted

21  Mr. Pennings to give you an e-mail assurance that that

22  transition management fee, the 227, covered all of the

23  transition, including the trading cost, correct?

24  A.  I wanted it in black and white, yeah.

25  Q.  And this gave you the assurance in black and white, that

1      Mr. Pennings, who was your contact at State Street, was

2      saying to you the fee includes all the trading required,

3      correct?

4      **A.**   Well, I was asking for the avoidance of doubt.  By

5      definition, for the avoidance of doubt.  And he's clearly

6      saying, it includes everything.  So I'm now comfortable.  I

7      was already comfortable.  I want to make sure, absolutely

8      certain in black and white, that we have here, written down,

9      telling me what you're going to cost, because it was a low

10     bid.  Right?  So I want to make sure that I'm very clear, for

11     the avoidance of doubt.

12     **Q.**   Yeah, I'm not being critical.

13     **A.**   Yeah, okay.  I don't know what the point is.

14     **Q.**   But this is the last e-mail, avoidance of doubt, and Mr.

15     Pennings' e-mail back to you, that you had with Mr. Pennings

16     on February 21, regarding the fee, correct?

17     **A.**   So what are you asking me?

18     **Q.**   This is the last e-mail that you recall with

19     Mr. Pennings.  This resolved any doubt and gave you the black

20     or white assurance from Pennings' e-mail that you relied on

21     to go forward?

22     **A.**   Whether it was the last e-mail.  I exchanged e-mails with

23     him over a period of weeks or months.  I'd have to see all

24     the e-mails to remind myself if it was the last e-mail.

25     **Q.**   Fair enough.  You do not know which e-mails, if any,

1    Mr. Pennings shared with Mr. McLellan, do you?

2    **A.**   I have no idea what Ed did with his e-mail.

3    **Q.**   And you don't know that Mr. Pennings failed to provide

4    Mr. McLellan, Mr. Boomgaardt, or anyone else at the bank with

5    a copy of this e-mail that resolved your doubt and informed

6    you that the fee included all the trading, do you?

7           MR. FRANK:  Objection to what Mr. Pennings did or

8    did not do.

9           THE COURT:  Well, it's --

10          MR. FRANK:  It's really to form.

11          THE COURT:  Overruled.

12          THE WITNESS:  I don't know.

13   BY MR. WEINBERG:

14   **Q.**   Okay.  Implementation shortfall is a principal benchmark

15   that persons like yourself, in charge of pension fund monies,

16   look to in a transition, correct?

17   **A.**   It's one of the factors that we look at, yes.

18   **Q.**   And I think you said this transition came in at or under

19   the predicted shortfall?

20   **A.**   You saw earlier.  Yes, it did.

21   **Q.**   And the implementation shortfall essentially is what is

22   the cost to go from my assets at Wellington, taking them to

23   Loomis, that includes the market impact, the uncertainty, and

24   the fees, correct?

25   **A.**   It includes the full cost of doing it, as it should.

1    **Q.**  And you were happy with this transition in terms of the

2    performance, until you learned that there was additional

3    charges, correct?

4    **A.**  Yes.

5             MR. WEINBERG:  May I have a moment, Your Honor?

6             THE COURT:  Yes.

7             MR. WEINBERG:  Can we have Exhibit 2, please.

8    BY MR. WEINBERG:

9    **Q.**  You mentioned that there was a transition management

10   agreement that was in place between Royal Mail and State

11   Street that dated to -- from before your time there, correct?

12   **A.**  Correct.

13   **Q.**  And were you familiar with the provisions of that

14   agreement?

15   **A.**  No.  So our process is to go -- every document that we

16   sign legally goes through our lawyer and this had already

17   been through the lawyer.  So I reviewed the contractual

18   terms, the second bit that we saw earlier, the -- sorry, the

19   commercial terms bit, the contractuals, which are catch-alls

20   for a whole myriad of transitions.  And it is pretty much a

21   standardized document, had already been reviewed, and this

22   was that thing.

23            MR. WEINBERG:  And if we can point to 6.1 and 6.2.

24   Thank you, Max.

25   BY MR. WEINBERG:

```
 1    Q.  Do you recall at some point reading provision 6 and in
 2    particular, 6.1, 4, and 5?
 3    A.  Yes.
 4    Q.  And 6.2, which I believe is on the next page.  This is
 5    styled "no duty to account for profits," correct?
 6    A.  That's what it's titled.
 7    Q.  And it says that neither the transition manager nor the
 8    associate shall be liable to account to the customer, meaning
 9    the client or you, for remuneration made by portfolio
10    transactions in connection with a transition.
11    A.  That's what it says --
12    Q.  Now, you did amend this contract on March 3 of 2011, did
13    you not?  And maybe you don't recall the date, but there were
14    certain amendments that were negotiated between you and State
15    Street in connection with this upcoming transition, were
16    there not?
17    A.  This is the schedule that we saw earlier that you're
18    referring to.
19    Q.  Do you recall --
20            MR. WEINBERG:  Max, if you can pull up for
21    refreshing recollection first.  And this, I think, is 11.01
22    and if you go to the fifth page.
23    BY MR. WEINBERG:
24    Q.  Do you recall that in early March of 2011, there was an
25    amendment to the transition management agreement that we just
```

1    reviewed that had article 6.1 and 6.2, that made certain

2    changes in the contract, in the underlying older contract,

3    including in the definition section?

4    **A.**   And this would have been following the legal review of

5    the annex?

6    **Q.**   Sure.

7    **A.**   Because the lawyer doesn't just read it.  They read the

8    whole thing to make sure you're good to go.

9    **Q.**   Sure.  Yeah, I'm, again, not being critical.  But there

10   was a review by Royal Mail before the later March transition

11   of the underlying contract and there was certain amendments

12   to the underlying contract that were negotiated between your

13   lawyers and somebody at State Street, correct?

14   **A.**   That's what you're telling me.

15   **Q.**   Let's look at the next page.  And the new agreement,

16   perhaps to refresh your memory, changed some definitions in

17   broker-dealer and included the word -- that that definition

18   included "associates," meaning associated broker-dealers with

19   State Street, correct?

20   **A.**   So this is such that when you're acting as an agent,

21   you're able to use State Street's broker-dealer, as one of

22   the counterparties you can use in the market.  That's the

23   purpose of inserting.

24   **Q.**   And there was an amendment to the definition in 2011 and

25   this March amendment, correct?

1   **A.**   Okay.

2   **Q.**   Next page, please.

3           MR. WEINBERG:   Thanks, Max.

4   BY MR. WEINBERG:

5   **Q.**   And there was also an addition of a provision in the

6   March 2011 amendment, amendments for future transactions that

7   you could see.

8   **A.**   To enable the overlays to be put on during the process --

9   to enable the futures overlay to be used to minimize our out

10  of market exposure during any subsequent transition.

11  **Q.**   There was no amendment to article 6 of the underlying

12  Royal Mail transition agreement that provided that State

13  Street and its affiliate broker-dealers had no obligation to

14  account for profits, were there?  I could show it --

15  **A.**   Show me again.  Sorry.

16          MR. WEINBERG:   May I approach, Your Honor?

17          THE COURT:   Yes.

18          MR. WEINBERG:   It might be easier to have Mr.

19  McKnight thumb through this.

20          THE COURT:   Just show it to counsel.

21          MR. FRANK:   We have no objection, Marty.  So if you

22  want to just move in the document.

23          THE COURT:   No objection to it coming into

24  evidence?

25          MR. FRANK:   To the amendment agreement.

```
1                    THE COURT:  Amendment agreement.  All right.
2               Are you offering it?
3               MR. WEINBERG:  Yes.  I'm offering it.
4               MR. FRANK:  It's a five-page document.
5               THE DEPUTY CLERK:  1101?
6               THE COURT:  1101 is the number?
7               MR. WEINBERG:  Correct.
8               THE COURT:  All right.  1101 is in evidence.
9               (Exhibit No. 1101 admitted into evidence.)
10              THE WITNESS:  Sorry.  This doesn't include the bits
11    that we were just talking about.  6.1 and 6.2.
12    BY MR. WEINBERG:
13    Q.  In other words, Royal Mail and whoever was focused on the
14    contact and enacting an amendment or negotiating an amendment
15    did not seek to amend the provisions of the underlying
16    agreement that allowed State Street to charge markups through
17    it's broker-dealer and not account for them, correct?
18    A.  This is a subtlety of it.  And in your agreement, 6.1, it
19    quite clearly states that you're not able to shovel stuff
20    through the broker-dealer.  You want to be able to use State
21    Street's broker-dealer, okay.  What you don't want is it all
22    going through there, off-market, without it being best
23    execution.  And in 6.1, it clearly states we're not able to
24    do this, unless it's in your best interest.  So by putting it
25    through there, it's not in your best interest.  And
```

1    therefore, the provision did not tell you what their

2    broker-dealer --

3              In the same way that I didn't see what, for

4    example, if we went to Goldman or Deutsche Bank, their P&L

5    was on each spread bit that they did.  And so I don't think

6    the 6.2 applies in this case, because we've clearly

7    superseded it with a commercial terms annex, stating the

8    fixed fee you will take that includes everything you're going

9    to do for us.

10   Q.   I understand that.  That's your understanding?

11   A.   That is my understanding of it, yes.

12   Q.   So let me ask you about your understanding of how State

13   Street did perform.  From your understanding, they acted as

14   your agent, went to the marketplace, and bought bonds from

15   counterparties, correct?

16   A.   Sorry?  What are you asking me?  Are you asking me how

17   they performed, or are you asking what they did?

18   Q.   I'm asking do you understand that they didn't trade you

19   bonds from their own inventory, like a Goldman Sachs would.

20   They went to the market and bought bonds from a series of

21   counterparties.

22   A.   But then they applied a spread to those.

23   Q.   But they were acting -- when they went to the

24   marketplace, they were looking for bonds and you have no

25   reason to believe the bonds they bought were not the best

1    bonds at the lowest price?

2    **A.**   Oh, I see.  Commercially, it would have been fine apart

3    from the $3 million spread.

4    **Q.**   I understand, but you didn't count on a spread, but you

5    did expect them not to be selling you their own bonds, like

6    some of the banks, such as Goldman Sachs, but to instead go

7    as your agent to the marketplace --

8    **A.**   One of which might be their own broker-dealer, under the

9    terms of the contract, which is fine.

10   **Q.**   Do you have any reason to believe it was their own

11   broker-dealer?

12   **A.**   No.

13   **Q.**   So they went to the marketplace, as far as you know.  You

14   were happy with the transition until you found out about the

15   spreads and you understood that they acted in the

16   marketplace, looking to buy bonds or sell bonds on your

17   behalf?

18   **A.**   The transition, as presented, was a successful one.

19   However, it would have been more successful --

20   **Q.**   Of course.

21   **A.**   -- and the restated post trade analysis showed it should

22   have been more successful, without the additional layer of

23   fee that, frankly, wasn't agreed.

24   **Q.**   But my question, Mr. McKnight, is not focused on your

25   disappointment at their charging a spread of one basis point

1    or two basis points on the bonds?

2    **A.**  Uh-huh.

3    **Q.**  What I'm trying to focus you on is how State Street still

4    performed and that they went to the marketplace, they looked

5    at different outside external broker-dealers, they bought

6    bonds, they were placed in the Loomis account.  They sold

7    bonds from the Wellington account and they gave you the bonds

8    in the end, correct?

9           MR. FRANK:  Objection to form.  Compound and he

10    also wasn't asking for his understanding, but my principal

11    objection is to the compound form.

12           MR. WEINBERG:  I can break it up.

13           THE COURT:  Why don't you break it up, just because

14    it would be simpler.

15           MR. FRANK:  And as long as he's asking for his

16    understanding.

17           THE WITNESS:  I would suggest --

18           THE COURT:  Understanding or what you know.

19           THE WITNESS:  I would suggest you speak to the

20    specialist I sent in to analyze it.

21           THE COURT:  Hold on, Mr. McKnight.  He's going to

22    break it apart.  It will be simpler into a series of

23    questions.  You don't have to answer right now.

24           THE WITNESS:  Okay.

25           THE COURT:  Go ahead.

BY MR. WEINBERG:

**Q.**   Your understanding is that State Street did not just simply go to its own inventory of bonds and sell you their bonds and have you place them in Loomis, correct?

**A.**   The minutia of whom they traded with and who they didn't, I direct you to speak to the specialist I sent in to analyze every trade they did.  I can't memorize the thousands of trades they did or they didn't do it with.  I'm sorry.

**Q.**   Do you understand what they were saying to you, in part, is that they would go out to the marketplace and look for the best buys on the bonds you're going to sell, look for the best buys on the bonds you were going to buy?

**A.**   That's what should have happened, yes.  Purely agency basis, acting in your fiduciary duty.

**Q.**   And other than your disappointment about them adding a basis point or two, that's what they did, correct?

            MR. FRANK:  Objection.

            THE WITNESS:  A basis point or two is $3 million.

BY MR. WEINBERG:

**Q.**   To your knowledge, they went to the marketplace and they acted -- bought bonds from a number of different parties, sold bonds to a number of different parties, in contrast to the Goldman Sachs of the world?

**A.**   To my knowledge, they charged me ten times what they should've done.

1  **Q.**  Okay.  Mr. McKnight, I can tell you don't want to answer

2  that question.  I --

3           MR. FRANK:  Objection.  Objection, Your Honor.

4  Move to strike.

5           THE COURT:  You can disregard that, ladies and

6  gentlemen.

7           Anything else, Mr. Weinberg.

8           MR. WEINBERG:  I have no other questions.  I

9  apologize for the last question.

10          MR. FRANK:  Super briefly, Your Honor.

11          **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

12  BY MR. FRANK:

13  **Q.**  Mr. McKnight, Mr. Weinberg asked you a series of

14  questions about how many minutes elapsed between the time of

15  your e-mail to Mr. Pennings and his response to you?

16  **A.**  Uh-huh.

17  **Q.**  And he put a document in front of you?

18  **A.**  Yes.

19          MR. FRANK:  The Government moves to admit that

20  document.

21          MR. WEINBERG:  I have no objection.

22          THE COURT:  All right.  What's the number, or does

23  it not have a number yet?

24          MR. FRANK:  It does not have a number.

25          MR. WEINBERG:  We had it as 1108.

1          THE COURT:  1108 admitted.

2          (Exhibit No. 1108 admitted into evidence.)

3          MR. FRANK:  Could we have the ELMO, please.  And

4     now we are going to put on full display my lack of technical

5     ability.

6          He showed you -- can everyone see you that?

7          THE JUROR:  Yes.

8     BY MR. FRANK:

9     Q.  He showed you these top two e-mails.  Do you see the

10    e-mail at the -- the second e-mail.  Can everyone see my mark

11    there?

12         THE JUROR:  Yes.

13    BY MR. FRANK:

14    Q.  It has a time stamp of 21:17 on February 21st.  Do you

15    see that?  Mr. McKnight, do you see that?

16    A.  Yes.

17    Q.  And then the response from Mr. Pennings appears to have a

18    time stamp six minutes later at 21:23?

19    A.  Sure.

20    Q.  I'm going to show you the rest of the document.  The very

21    first e-mail, there's a time stamp of 21:30.  Do you see

22    that?

23    A.  Yes.

24    Q.  From Mr. Pennings to you?

25    A.  Uh-huh.  Okay.  Yes.

1    **Q.**  And then your response is at 20:36, correct?

2    **A.**  Yes.

3    **Q.**  I know you're not an expert in the space time continuum,

4    but is it possible to respond to an e-mail before it's sent?

5    **A.**  Clearly not.

6    **Q.**  And then the next e-mail is at 22:02 according to this

7    document?

8    **A.**  Isn't this a point I just made on the time zones?  I

9    really don't know which time zone each one is referring to.

10    **Q.**  That's exactly right.  So on --

11              THE COURT:  Sir --

12              MR. FRANK:  I -- withdrawn.  I apologize, Your

13    Honor.

14              THE COURT:  That's exactly -- that's exactly what

15    Mr. Weinberg did.

16              MR. FRANK:  Withdrawn and I move to strike my own

17    remark.

18              THE COURT:  Yes, it's allowed and struck.

19    BY MR. FRANK:

20    **Q.**  22:02 from Mr. Pennings?

21    **A.**  Yes, I see that.

22    **Q.**  And then the response is earlier at 21:17?

23    **A.**  Again, yes.

24    **Q.**  So you don't know, do you, sir -- withdrawn.

25    BY MR. FRANK:

1    **Q.**   What, if anything, do you know about whether the time

2    stamps on this document are accurate?

3    **A.**   If you worked for Royal Mail and had our IT department,

4    frankly, nothing whatsoever.

5    **Q.**   Do you know where Mr. Pennings was when he sent these

6    e-mails?

7    **A.**   I really don't know, sir.

8    **Q.**   Do you know what time zone he was in?

9    **A.**   I'm afraid not.

10   **Q.**   Looking at this document, can you tell whether his e-mail

11   was sent to you six minutes later, or an hour and six minutes

12   later?

13   **A.**   I'm afraid not, in the context just presented.

14   **Q.**   Could we look at Exhibit 2, please.

15           MR. FRANK:  I'm sorry, we need to switch back to

16   the --

17           THE DEPUTY CLERK:  Yes.

18   BY MR. FRANK:

19   **Q.**   You were asked some questions about the provisions of the

20   master transition management agreement.

21   **A.**   Uh-huh.  Yes.

22   **Q.**   And could you go to provision 6.

23           MS. LEAHY:  Page?

24           MR. FRANK:  Just advance through the pages.  There

25   we go.  Enlarge the first part.

BY MR. FRANK:

**Q.**   Do you recall being asked about provision 6?

**A.**   Yes, it's the matter we just discussed.

**Q.**   And I believe you answered something about this provision permitting State Street to be one of the counterparties?

**A.**   You want them to be.

**Q.**   What do you mean by counterparty?

**A.**   So when you're trading the bond, so State Street are acting for us, going to the market.  They might go to Goldman Sachs or Deutsche Bank or to Citi, or to whomever.  And one of those big players on the broker-dealer side would be State Street, which would be another part of the bank and they're a big player.  You kind of want their bid, it might be the best one.  So you want a provision that allows them to do that, insofar as it it's not shuffling money through to make more money.  Insofar as saying it's not less favorable to us, i.e., either they're acting as your agent, not in your interest, not in their interest.  That's quite clear.

**Q.**   So the counterparty -- do I understand you correctly to be referring to somebody trading out of their own inventory as their principal?

**A.**   Yes.

**Q.**   Do you know whether or not State Street had the capacity to trade bonds as a principal at this time?

**A.**   I'm afraid not.  I don't know if they did or didn't.  I

1    would expect they did, but not on the fiduciary -- not on the

2    agency basis we're returning them.  They certainly would not

3    have done, because that was explicit in what we'd agreed.

4    **Q.**   And the transition desk that you hired to conduct the

5    transition, did you have an understanding of whether or not

6    they were acting as your agent or as a principal

7    counterparty?

8    **A.**   Well, it said earlier purely agency basis.  It shouldn't

9    have had any principal involvement whatsoever.

10   **Q.**   And do you recall earlier that you read, in the response

11   to the request for proposal, something about the transition

12   desk having a dedicated integrated agency execution desk?

13   **A.**   Yes and that's the thing you want to see, because it's

14   arm's length to the broker-dealers and if that happens to be

15   a State Street arm, then that should be arm's length, and a

16   Chinese wall put between them and you just treat them like

17   everybody else on the street.

18   **Q.**   So on whose behalf did you understand the transition

19   management desk's dedicated integrated execution desk to be

20   trading?

21   **A.**   Dedicated integrated -- sorry, say that again.

22   **Q.**   Let me rephrase the question.

23          On whose behalf did you understand the dedicated

24   integrated execution desk to be trading?

25   **A.**   The agency trading desk should have been acting on our

1    behalf and our best interest.  Absolutely.  That's the whole

2    idea as part of the deal.

3    Q.   The first sentence of this provision, 6.1, reads,

4    "Provided that the manager will ensure that such portfolio

5    transactions are affected on terms which are not materially

6    less favorable to the customer, than if the potential or

7    actual conflict had not existed, the manager is authorized."

8              Do you see that?

9    A.   I certainly do.

10   Q.   What is your understanding of whether or not the

11   application of $3 million in commissions that you didn't know

12   about was materially less favorable to you, or not?

13   A.   I would argue strongly it quite clearly breaches the

14   sentiment of 6.1, but I'm not a lawyer.

15   Q.   What representations were made to you about how much you

16   were going to be charged?

17   A.   As discussed earlier, it was a fixed fee of 227,000,

18   whatever it is, pounds.

19   Q.   How much were you charged?

20   A.   240, which is understandable, given the difference in

21   value.  So it was 1.75 basis points, that was the fee that we

22   agreed.  That was the fee that was applied.

23   Q.   And what else were you charged?

24   A.   A further $3 million or more dollars in additional

25   spread, which we didn't agree to.

1          MR. FRANK:  No further questions.

2          MR. WEINBERG:  Just one or two questions, Your

3    Honor.

4          THE COURT:  Go ahead.

5          MR. WEINBERG:  May I ask them from here?

6          THE COURT:  You can.

7          **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

8    BY MR. WEINBERG:

9    **Q.**  You have no reason to doubt the sequence of these

10   e-mails, do you?

11   **A.**  I'm really confused by the sequencing of e-mails now,

12   because they're bits of paper with lots of dates on them.

13   **Q.**  It was seven years ago, right?

14         THE COURT:  Just so the record is clear,

15   Mr. Weinberg, what are you showing him?

16         MR. WEINBERG:  I'm having him look at the

17   Exhibit 93, which is the February 21 e-mails.

18         THE COURT:  Sequence.  Okay.

19         THE WITNESS:  Okay.  Let me see.

20         THE COURT:  So the question is simply, do you have

21   any reason to doubt the order in which they occur without --

22         THE WITNESS:  Let me just -- could I read them?

23         THE COURT:  Yes.  Go ahead and take a look at them.

24   Take your time.

25         THE WITNESS:  No, that looks like right.

1    BY MR. WEINBERG:

2    **Q.**   The sequence looks right, the time is understandably

3    uncertain seven years later.  It could have been six minutes,

4    it could have been longer?

5    **A.**   Okay.  Sure.  Your guess is as good as mine on the timing

6    given what we just disclosed.

7               MR. WEINBERG:  No further questions.

8               THE COURT:  Okay.  Thank you very much, Mr.

9    McKnight.  You're excused.  Thank you for your testimony.

10              THE WITNESS:  Thank you very much.

11              THE COURT:  Next witness.

12              MR. JOHNSTON:  Could we have two minutes, Your

13   Honor, before we bring him in?

14              THE COURT:  Do you want to talk to me or do you

15   want --

16              MR. JOHNSTON:  No, I guess when do you think we'd

17   be taking our morning break?  Right at 11:00?

18              THE COURT:  About 11:00.

19              MR. JOHNSTON:  Okay.  The direct testimony is going

20   to last approximately 30 minutes, 35 minutes.

21              THE COURT:  Bring him in and we'll go a little bit

22   longer, or we'll take a break.

23              MR. WEINBERG:  Judge, while he's coming in, could

24   we just address very quickly a legal issue at the sidebar?

25              THE COURT:  Sure.  In the meantime, who's the

```
 1    witness?
 2              MR. JOHNSTON:  Joe Dionisio.
 3              THE COURT:  All right.  Joe Dionisio.
 4              MR. WEINBERG:  Judge, no need.  It's for the next
 5    witness.
 6              THE COURT:  Oh, fine.  All right.  Go ahead.  Call
 7    Mr. Dionisio.
 8              MR. GOLDSTEIN:  Your Honor, may we approach
 9    sidebar, quickly, please?  I'm sorry.
10              THE COURT:  All right.
11              (The following discussion held at the bench.)
12              MR. GOLDSTEIN:  Your Honor, this is the witness,
13    this is the recording that you had ruled on in terms of the
14    redaction from the audio, in terms of the --
15              THE COURT:  Oh, yes.
16              MR. GOLDSTEIN:  And so this morning, I was handed a
17    copy of the proposed transcript, which is just an aid.  And I
18    don't think that the jury needs to know that there was a
19    redaction.  It takes things -- it makes it look like there
20    was a comment.  It invites speculation by them.  So I'd ask
21    that --
22              THE COURT:  Let him finish.
23              MR. GOLDSTEIN:  I would ask that the Government not
24    provide the transcript on this particular call, or later they
25    get a revised transcript, but I don't think that they need to
```

1    know that something was redacted.  I would think that it

2    invites speculation.

3            MR. FRANK:  Well, first of all, this is an effort

4    to disrupt the flow of our case.  We specifically addressed

5    these issues yesterday.  Second of all, Your Honor

6    specifically ruled that the laughter comes in and so I'm not

7    sure whether counsel then means to suggest there should be a

8    pause and bizarre laughter.

9            THE COURT:  I think what counsel means to suggest,

10   whether -- just so we're all clear.  The question isn't what

11   I addressed.  I addressed the question it doesn't come in,

12   you guys haven't put in the tape.  Whether you-all addressed

13   what the transcript was going to look like or not wasn't

14   something anyone talked to me about.  Whether you all talked

15   about it with yourselves or not, I have no clue.  What we

16   didn't address, and no one addressed, not the Government and

17   not defense counsel, I've not been informed of that, is

18   whether the transcript should look like this.  So it's not

19   been before me before whether the transcript should look like

20   this, which is what it does, or whether it should look like

21   line 8 should be the last line of text, line 9 should be the

22   laughter, and then line 10.  And that we didn't talk about.

23   That I don't think is the question.

24           I don't impugn that this is necessarily an effort

25   to sandbag and bring it up at the last minute.

```
 1              MR. FRANK:  Well, it could have been brought up
 2    this morning, Your Honor.
 3              MR. JOHNSTON:  Yeah.
 4              THE COURT:  The question simply is what's your view
 5    of it.  I'm not interested at the moment --
 6              MR. JOHNSTON:  Could we resolve it with a limiting
 7    instruction?  I mean, like, we invite the jury it's for
 8    reasons that you should not to consider why it's taken out,
 9    we ask you just to ignore it and don't read anything one way
10    or the other into why this line is missing.  We would be
11    totally fine with that.
12              MR. GOLDSTEIN:  That's fine, Your Honor.
13              THE COURT:  Fine.
14              (Bench conference concluded.)
15              THE COURT:  Go ahead.
16              MR. JOHNSTON:  Mr. Dionisio, could you please state
17    your name and spell it for the court reporter.
18              THE WITNESS:  Sure.  It's Joseph Dionisio --
19              MR. GOLDSTEIN:  Your Honor, I'm not sure that the
20    witness has been sworn in.  Perhaps --
21              THE COURT:  Oh.  Thank you, Mr. Goldstein.
22              (The witness was duly sworn.)
23              THE COURT:  They got me distracted with that legal
24    issue.
25                          JOSEPH DIONISIO
```

1                    having been duly sworn, testified as follows:

2              **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

3    BY MR. JOHNSTON:

4    **Q.**  Could you please state your name and spell it for the

5    court reporter, please.

6    **A.**  Sure.  It's Joseph Dionisio.  J-o-s-e-p-h,

7    D-i-o-n-i-s-i-o.

8    **Q.**  Mr. Dionisio, where do you live?

9    **A.**  Cohasset, Massachusetts.

10   **Q.**  How old are you?

11   **A.**  47.

12   **Q.**  Where do you work?

13   **A.**  State Street Bank.

14   **Q.**  How long have you worked there?

15   **A.**  It will be 14 years in July.

16   **Q.**  What is your job at State Street?

17   **A.**  I am a transition trader.

18   **Q.**  Directing your attention to the 2010/2011 time period,

19   who did you report to?

20   **A.**  I reported to Tommy Bryant, who reported to Ross

21   McLellan.

22   **Q.**  Did you work in the Boston office of State Street?

23   **A.**  Yes.

24   **Q.**  When did you first join State Street?

25   **A.**  2004.

1  **Q.**  What was your rank at the time, or your title at --

2  in 2010/2011?

3  **A.**  It's always been the same, vice president, trader.

4  **Q.**  And what was the defendant's title while you worked

5  there, or while in this period, 2010 or 2011?

6  **A.**  I'm not sure.  Well, he was promoted at some point.  I

7  don't remember when.

8  **Q.**  How many levels senior to you was he?

9  **A.**  He was my boss's boss.

10  **Q.**  What sort of education do you have?

11  **A.**  I have two master's degrees.

12  **Q.**  In what?

13  **A.**  One in actuarial science and one in banking and finance.

14  **Q.**  Where did you go to school?

15  **A.**  Boston University.

16  **Q.**  Have you traded equities your whole time at State Street?

17  **A.**  I've had the same job, yes.

18  **Q.**  Directing your attention to the 2010/2011 time period,

19  you testified that you always traded stocks at State Street?

20  **A.**  Yes.

21  **Q.**  And who would you trade stocks on behalf of?

22  **A.**  The bulk of the business was for transition clients.

23  **Q.**  When trading for transition clients, did you trade as a

24  principal, or an agent?

25  **A.**  Most of the time as an agent.

1    **Q.**   What did it mean to trade stocks as someone's agent?

2    **A.**   As agent, you're actually trading in the client's

3    account, and the price you get is the price that the client

4    gets, with just a commission added on.

5    **Q.**   Is that how your desk makes money?

6    **A.**   Yes.

7    **Q.**   How would you know, generally, how much commissions to

8    charge?

9    **A.**   There's a desk called the transition desk, where the

10   analysts work that give us the transitions and they send an

11   e-mail with the -- the directions on how to trade, or how

12   they want to proceed.  And one of the -- one of the features

13   is the commission.  Ultimately, the transition desk

14   electronically tags the order with a commission before we get

15   it.

16   **Q.**   Did you have an understanding whether clients had agreed

17   to commissions before they were applied?

18   **A.**   Yes.

19   **Q.**   And what was that understanding?

20   **A.**   That the client and the sales folks negotiate the

21   commission and it is then relayed to us.

22   **Q.**   Did you ever have any direct client contact?

23   **A.**   No.

24   **Q.**   Did you ever negotiate fees?

25   **A.**   No.

1    Q.  Would you ever decide how much to charge in commissions

2    after the trading had charged?

3    A.  No.

4    Q.  Had started, sorry.

5    A.  Yeah, no.

6    Q.  I would now direct your attention to the early 2011 time

7    period.  Did you conduct trades on behalf of a transition

8    client by the name of the NTMA?

9    A.  Yes.

10   Q.  In February of 2011, did you perform a trading exercise

11   called a redeem?

12   A.  Yes.

13   Q.  Could you explain to the jurors what a redeem is?

14   A.  Sure.  The client had a large order of an ETF, and an ETF

15   is a security that is made up of many other securities, in

16   this case maybe 1800.  And it tracked the Russell 2000 index.

17   And what we did was by doing a redeem, we -- instead of

18   selling the ETF in the open market, we sold the underlying

19   constituents of the ETF, and then redeemed the ETF at the

20   fund family and that's really how it works.

21   Q.  Okay.  And we'll break that down a little bit.

22            What is the -- what does ETF stand for?

23   A.  Exchange traded fund.

24   Q.  Where are ETFs traded?

25   A.  On listed exchanges.  Continuously throughout the day,

1   like the New York Stock Exchange or --

2   **Q.**   And what about the -- you say the underlying stocks for

3   the ETF.  Where are those traded?

4   **A.**   Those also trade on the exchange, as well.

5   **Q.**   The New York Stock Exchange?

6   **A.**   It could be New York.  Yeah.

7   **Q.**   You said that -- correct me if I'm wrong, but the process

8   is you trade in the ETF for the underlying shares; is that

9   correct?

10  **A.**   Yes.  Instead of selling the ETF on the exchange, we sell

11  the underlying securities on the exchange and then redeem the

12  ETF.

13  **Q.**   So trade it in.

14  **A.**   We trade it in, yes.

15  **Q.**   What's the reason to break up an ETF like this?

16  **A.**   Usually when the order is extremely large.  The ETF order

17  is extremely large.  To minimize market impact, it's often

18  best to trade the underlying securities, which are easily

19  traded, much more liquid, and then by selling the underlying

20  securities that are very liquid, you minimize market impact

21  to essentially get the client a better price on the ETF that

22  they're actually trying to sell.

23  **Q.**   Let's break that down a little bit.  So what do you mean

24  by there could be market impact if you just sold the ETF?

25  **A.**   Sure.  So I believe in this case, we had over 4 million

1    shares of the IWM for sale and market impact essentially

2    means too much supply for the market to handle.  And the ETF,

3    itself, may be illiquid, which is really another word for

4    saying there's too much supply.  And the underlying

5    securities that make up that index are very liquid.  And by

6    selling the underlying securities, we can minimize market

7    impact, versus if we had sold the ETF itself and that

8    essentially gets the client a better price.

9    **Q.**  Did you have to do this type of transaction in a

10   particular account at the bank?  Or did you typically do it

11   in a particular type of account?

12   **A.**  For the redeems, I think we'd use the principal account

13   almost always, yes.

14            MR. JOHNSTON:  Permission to approach the witness,

15   Your Honor?

16            THE COURT:  Yes.

17   BY MR. JOHNSTON:

18   **Q.**  Mr. Dionisio, I've handed you a disc marked Government

19   Exhibit 107.

20            Do you recognize this disc?

21   **A.**  Yes.

22   **Q.**  What is it?

23   **A.**  That is a recording of a phone conversation I had with

24   Ross.

25   **Q.**  Did this occur on February 25, 2011?

1    **A.**  Yes.

2    **Q.**  And how do you know the --

3         MR. GOLDSTEIN:  There's no objection, Your Honor.

4         MR. JOHNSTON:  Your Honor, the Government moves to

5    admit 107 into evidence.

6         THE COURT:  Admitted.

7         (Government Exhibit No. 107 admitted into

8         evidence.)

9    **Q.**  And Mr. Dionisio, I want to direct your attention to

10   the -- you have a binder in front of you.  If you could open

11   it up to the tab behind 107.

12        MR. JOHNSTON:  And if we can play it, please, Erin.

13        (Audio plays.)

14   BY MR. JOHNSTON:

15   **Q.**  Mr. Dionisio, who are you speaking with on this phone

16   call?

17   **A.**  I'm speaking to Ross.

18   **Q.**  And what's your understanding of why he's calling you, or

19   you calling him?

20   **A.**  He was checking in on the ETF trade I was doing.

21   **Q.**  And what's the name of the ETF that you were trading?

22   **A.**  The symbol is IWM, which is the Russell 2000 -- it tracks

23   the Russell 2000 index.

24   **Q.**  And on page 1, if I can direct your attention to lines 19

25   and 20, you say, "Oh, yes, so he is reading an e-mail from

1    Paul McGee."

2              What's your understanding of what that -- what

3    you're referring to there?

4    **A.**   Yeah.  So the transition analysts send us, essentially,

5    the directions of the transition as an e-mail and we were

6    just reviewing that.

7    **Q.**   Did you have an understanding whether that -- or do you

8    recall whether that e-mail included the amount of commission

9    that should be applied to this trade?

10   **A.**   I don't know.

11             (Audio plays.)

12   BY MR. JOHNSTON:

13   **Q.**   Mr. Dionisio, direct your attention to where you say on

14   line 11 and 12, "So this is the e-mail I sent you, by noon

15   today, 20 million, 100,000, 20 million shares traded."

16             What are you referring to there?

17   **A.**   So again, we're not selling the ETF.  We're selling the

18   underlying on behalf of the client.  So what I was reading --

19   what I was reporting to Ross on this was that in the open

20   market, on the exchange, IWM had traded 20 million shares

21   when I typed out the e-mail.

22   **Q.**   So in the morning, 20 million shares of this ETF had been

23   traded?

24   **A.**   Yes.

25   **Q.**   And what's the relevance of that number to what you're

1    trying to do?

2    **A.**   Yup.  So I -- I think it's best by example.  I say, "If

3    we were 20 percent of the volume, we would be done."

4              So meaning if I was selling that ETF on the

5    exchange and we maintained to be 20 percent of the total

6    volume that was trading, we would be complete with the order

7    at this point.

8    **Q.**   And how many shares of this ETF were you trying to trade?

9    **A.**   I believe it was a little over 4 million.

10   **Q.**   So 4 million would be 20 percent of 20 million?

11   **A.**   Yes.  Right?  Yes.

12   **Q.**   Okay.  And then directing your attention to where you

13   say, "If we were 20 percent of the volume, we would be done.

14   And that averages 81.17 and my average is 81.28 -- 29-ish."

15             What are you referring to there?

16   **A.**   So my average, 81.28, that's a derived price.  So what

17   I'm doing here is I'm selling the underlying securities of

18   the ETF and we do some math to back into what my IWM price,

19   or the client's IWM price would have been and that is -- that

20   was roughly where I was at, at that point in the morning.

21   **Q.**   So were you -- correct me if I'm wrong, but you're

22   selling 1,800 different stocks?

23   **A.**   Yes.  The client essentially wants to sell the one ETF.

24   I'm selling the 1800-plus underlyings that make up that ETF,

25   and my derived price is 81.28.

1    **Q.**  So the price that you've been able to get from selling

2    all the underlying stocks is 81.28?

3    **A.**  Yes.

4              THE COURT REPORTER:  Can I get a clarification?

5    How is that?  "81.28"?

6              MR. JOHNSTON:  Yes.

7              I should let the witness answer that.

8              THE COURT:  It's fine.

9    BY MR. JOHNSTON:

10   **Q.**  Okay.  And then the second number, or the first one as

11   the case is, what is 81.17?

12   **A.**  Sure, so that's $81.17, that's where the ETF's

13   volume-weighted average price is.  So as the security is

14   trading on the exchange, a lot of times traders will use an

15   average price, in the exchange of -- as a benchmark, so if

16   you would take a -- instead of an arithmetic average, you

17   take a volume-weighted average, the average price that's

18   traded in the exchange, when I sent the e-mail was $81.17.

19   **Q.**  Okay.  So just so we understand this correctly, the ETF

20   has traded at $81.17, up until that late morning.

21   **A.**  Yeah, the average of the roughly 20,100,000 shares is

22   81.17.

23   **Q.**  And the stocks that you've been able to sell individually

24   have worked out to around 81.28?

25   **A.**  That's correct.

1    **Q.**   So have you done better or worse than the market?

2    **A.**   Better than the average, yes.

3    **Q.**   All right.  And then directing your attention to where

4    Mr. McLellan says, "All right, so that is what they are

5    getting, 81.15, 81.14."

6            What are you understanding him to be saying there?

7    **A.**   That was the price that the client was going to receive.

8    **Q.**   Receive for what?

9    **A.**   Selling the IWM.

10   **Q.**   And then what's the difference between 81.14 and 81.29?

11   What does that represent?

12   **A.**   That's what we received, the bank, as a commission.

13   **Q.**   So then when he says, Mr. McLellan says, "We'll take

14   about, you know 15, 16 cents on it."

15           What do you understand him to be referring to?

16   **A.**   That is the -- I should really restate.  It's a markdown,

17   this is a markdown of 15 or 16 cents.  It's really not a

18   commission, it's a markdown and that would be how much we

19   make on the trade.  We, the bank.

20   **Q.**   Okay.  So at $0.15 a share, times 4 million shares, how

21   much profit to the bank is that?

22   **A.**   It's $600,000.

23           (Audio plays.)

24           THE COURT:  Pause it here for a moment.

25           MR. JOHNSTON:  Yeah.

1              THE COURT:  So let me just explain one thing,

2    ladies and gentlemen of the jury.  You can see on your

3    transcripts a black line, where something has been redacted.

4    So I want to explain to you why that is there.  There -- in

5    the course of this case, you're receiving a lot of evidence.

6    The entire scope and purposes of the rules of evidence is to

7    provide you relevant evidence, evidence relevant to the

8    things you need to decide.  There's obviously a lot of

9    evidence in the case and one thing we do is try to limit the

10   amount you receive simply because there's no reason for you

11   to receive more than you need.  You're receiving enough.

12             And so here, there's been something that's been

13   redacted, because in the course of the conversation, there

14   was something that has nothing to do with this case.  It has

15   nothing to do with the charges.  It doesn't have anything to

16   do with anything and it's extraneous and that's why it's

17   excluded.

18             So you should draw no inference from the fact that

19   something has been excluded.  You shouldn't speculate about

20   what it was.  It doesn't have anything to do with the case

21   and you should draw an inference, either way, as to any party

22   about it.  And it -- I just wanted to explain it to you, so

23   understand why that occurred and what that is.

24             Go ahead.

25             (Audio plays.)

1    BY MR. JOHNSTON:

2    **Q.**  All right.  Mr. Dionisio, I want to direct your attention

3    to page 3, line 11, where you say, "So, all right, that will

4    be fine, I will put up around -- somewhere around there."

5              And then Mr. McLellan says, "Yes, 81.15."

6              What do you understand him to be telling you there?

7    **A.**  He was instructing me on what the client should get for

8    the price for selling the item.

9    **Q.**  And then you say, "All right.  And then I will do a

10   fraction and make it look like a VWAP."

11             What's your understanding of what that means?

12   **A.**  So we were going to give the client the VWAP price,

13   instead of the price that we sold at.

14   **Q.**  Had you previously booked out client trades on a VWAP

15   basis before this instance?

16   **A.**  No.

17   **Q.**  And what was your understanding of why the client was

18   getting the VWAP, rather than the price you had executed at?

19   **A.**  Well, we -- well, we have to make money.  It was a

20   markdown.

21   **Q.**  Was it your -- did you have an understanding whether

22   whatever markdown that you had -- you were applying was

23   something the client had agreed upon?

24   **A.**  Sure.

25   **Q.**  And then when you say, "Anything we pick is going to be

1    great."

2              What do you mean by that?

3    **A.**   I believe that morning, the market -- or at least IWM was

4    up.  So not only were we beating the open price, I beat the

5    VWAP by at least somewhere between 11 and 15 cents, which is

6    pretty significant.  So whether the benchmark was the open,

7    which I think he mentioned, or the VWAP, we were looking good

8    that day.

9    **Q.**   And then what do you understand him to mean when he says,

10   "Yes, but it makes us the most money, but I want 15 cents"?

11   What do you understand that to mean?

12   **A.**   Well, the $.15 would be our markdown.  I don't want to

13   say it's commission, because truly, in a principal trade,

14   it's a markdown.  And that would be our profit, the bank's

15   profit for doing the trade, similar to a commission.  They're

16   identical.

17   **Q.**   Did you have an understanding at the time whether

18   principal trades or agency trades would be previously

19   approved by a client?

20   **A.**   Yeah, the commissions usually negotiated before the trade

21   begins.

22   **Q.**   And what about whether it's going to be done through --

23   on a principal basis or on an agency basis?  Did you have an

24   understanding whether that was approved by clients?

25   **A.**   Yeah, it would be, because we're instructed by the TM

1    desk, who speaks to the client.

2    **Q.**   How typical was it to first --

3              What are you being instructed to do at the end of

4    this call?

5    **A.**   I'm going to mark the trade down $0.15, and price the

6    client at $81.15.

7    **Q.**   Had you -- prior to this, had you ever chosen the

8    markdown or commission after trading had already started?

9    **A.**   No.

10   **Q.**   Prior to this, had the defendant, an executive at the

11   bank, given you instructions on how much of a commission or

12   markdown to charge on a particular trade?

13   **A.**   No.

14   **Q.**   You previously testified a few minutes ago that,

15   generally, the purpose of breaking up an ETF is to get a

16   price -- a better price for the client, correct?

17   **A.**   Yes.

18   **Q.**   And you also testified that the purpose of agency trading

19   is to get the best result for the client, correct?

20   **A.**   Regardless of principal or agent, you want the best price

21   for your client.

22   **Q.**   And in this instance, did you do better or worse --

23   better or worse than the market?

24   **A.**   We did better.

25   **Q.**   Who got the benefit of that out-performance?

1    **A.**  We did.

2              MR. JOHNSTON:  No further questions.

3              THE COURT:  All right.  I think we'll take a break

4    now before the cross-examination.

5              All rise for the jury.

6              (The jury exits the courtroom.)

7              THE COURT:  In 15 minutes?

8              MR. GOLDSTEIN:  Thank you, Your Honor.

9              MR. FRANK:  Your Honor, just a housekeeping matter.

10   So --

11             MR. GOLDSTEIN:  He shouldn't be here for this.

12             THE COURT:  Mr. Dionisio, we're going to excuse

13   you.  We're going to resume in 15 minutes.  You can hang

14   around in the hallway, you can go to the men's room if you

15   wish, and then come back in.

16             You may all be seated.

17             MR. FRANK:  Counsel estimates approximately 20

18   minutes on cross.  We may or may not have a very brief

19   redirect.  There's another witness waiting.  That's a pretty

20   brief direct.  I don't know what their cross will look

21   like --

22             THE COURT:  Who's the next one waiting?

23             MR. FRANK:  Finocchi.

24             THE COURT:  Okay.  So he's 15 to 30 minutes direct?

25             MR. FRANK:  Yes, Your Honor.  Probably closer to 30

1    than 15, but in that -- on that order of magnitude.  So all

2    I'm saying is we may be done a little before 1:00.  We're

3    still on pace.

4              THE COURT:  Okay.  So if they have -- you're

5    telling me now to just be prepared for the fact that if I

6    were to say who's the next witness after him, you would be

7    telling me that there isn't anybody for today and we might

8    finish early.  Which I won't make you do in front of -- but I

9    get it.  That's what you're telling me.

10             MR. FRANK:  Correct, if Your Honor wanted, there's

11   another local witness I could get her across town, but I

12   think to interrupt her testimony in the middle probably

13   doesn't make a lot of sense, given that there's a day --

14             THE COURT:  Let me just think about this for a

15   second.  So you're going to be about how long, Mr. Goldstein?

16             MR. GOLDSTEIN:  20 minutes or so.  Not long.  Maybe

17   even briefer.

18             THE COURT:  Okay.  How long on the next witness?

19             MR. GOLDSTEIN:  Same thing, Your Honor.

20             THE COURT:  Okay.  All right.  And we're on

21   track -- one of the things that I want to talk to them about

22   was to tell them on Friday, I'll give them an update about

23   next week and sort of where we are, just sort of tell them

24   today that Friday I'll give them an update where we are.  But

25   it's fair to say we remain on track to get it to them no

```
 1    later than two weeks from tomorrow?
 2             MR. FRANK:  We're very much on track, Your Honor.
 3    In fact, Monday, we have -- as I think I mentioned yesterday,
 4    we have a witness coming in from Ireland, who can only travel
 5    on Monday.
 6             THE COURT:  He's going to testify on -- is it a
 7    him?
 8             MR. FRANK:  Yes.
 9             THE COURT:  He'll testify on Tuesday.
10             MR. FRANK:  Correct.  That might leave, depending
11    on what happens, some extra time on Monday.
12             THE COURT:  So at the moment what you anticipate is
13    we finish a little early today, we'll have 9:00 to 1:00 on
14    Friday with your other witnesses.  Monday, we might finish a
15    little early, because we won't have him and all you'd have
16    left, after Monday -- what you anticipate is you'd be done on
17    Monday, except for him?
18             MR. FRANK:  Correct.  And we might have a little or
19    a lot of time on Monday, depending on what happens on Friday.
20             THE COURT:  All right.  So in other words, you
21    might have -- it might be 12:30 and it might be 10:00 a.m. on
22    Monday, depending on --
23             MR. FRANK:  Depending on what happens on Friday.
24             THE COURT:  Right.  Okay.  So one thing, just as a
25    practical matter to think about, which you can all discuss, I
```

1    throw out to you to think about, is depending on where we

2    are, if it's 12:30, I'm fine, because we're on track to

3    finish early, given the scheduling and the like.  On the

4    other hand, if it's 9:00 or 10:00, that sort of -- I'd really

5    rather not bring the jury in for an hour.  So the -- one

6    thing that you could do, which I'm fine with, if you're all

7    fine with, I suggest --

8            But I would want to know you're both fine with it,

9    is the Government could say we're not quite done, we have

10   this one other witness.  You know who he is, I suppose, and

11   then we could proceed with the defense case.  And then on

12   Tuesday -- we'll take them out of order.

13           And then on Tuesday, the first thing we do is take

14   this witness, because he's from oversees.  You present him,

15   then you'd be done, you rest.  You'd make whatever motions

16   you want to make and then we would proceed in whatever way we

17   proceed.  So that would be one practical way to make use of

18   the time.  You can think about whether that makes sense or

19   not.

20           We'll know better where we are after you talk to

21   each other and whatever discussion you have tomorrow among

22   yourselves and Friday.  I just -- I'm hesitant to bring them

23   in for a half an hour and send them home for an hour.  And I

24   know you don't -- I don't have a problem that he's coming in

25   on Tuesday.  That's reasonable, but we should just think

1    about how to deal with that and so I throw that out as one

2    way to deal with it.

3          MR. WEINBERG:  We also will be renewing our motion,

4    since this is the witness from NTMA and NTMA is the entity

5    that has not provided any of the documents in response to our

6    letters rogatory.  And the entity that the Government has

7    elected not to use its MLAT powers, which is the only way to

8    get NTMA to give us the documents.  We'll be moving to

9    exclude his testimony.

10         THE COURT:  Okay.  And yes, you can make that

11   motion and then I'll read it and we'll consider whatever

12   there is to consider and rule at that time.

13         Very effective, Mr. Weinberg, looping into your

14   point that you're filing the motion, the prior relevant, in

15   your view, facts.

16         MR. FRANK:  The other option, Your Honor, just

17   would be to give the jury the day off on Monday and we finish

18   on Tuesday.  We will have probably one or two short witnesses

19   on Monday, but I anticipate that combined with the Tuesday

20   witnesses, we'd be able to easily finish, easily, in one day.

21         THE COURT:  So that's the other option that's

22   available.  I would only want to do that if I knew pretty

23   confidently that we're actually on or ahead of schedule in

24   terms of the promise to the jury, which I think all of these

25   things we'll have a better -- you-all will have a better idea

1    by tomorrow afternoon and we can talk about Friday morning.

2           So the most I'm going to say to them today --

3    you'll have a better idea, because they're going to tell you

4    tomorrow afternoon, the beginning of who their witnesses are,

5    and you'll all have a better idea as you sort of see what the

6    evidence is on Friday, so you think about that scheduling

7    issue.

8           What I'm going to tell them today is simply that on

9    Friday, at the end of the day, I'll update them further on

10   the schedule and that we remain on track.  And then Friday,

11   I'd like to tell them what, you know, like either they're

12   coming in on Monday or not, or give them just a further

13   update.  Maybe they're just on track, but certainly Monday.

14          MR. FRANK:  Yes, Your Honor, I had forgotten that

15   tomorrow we actually are not in court, so perhaps the

16   notification doesn't have to wait until 1 o'clock.

17          THE COURT:  I'll leave that to all of you to work

18   out.

19          MR. WEINBERG:  Notification will come tomorrow.

20          THE COURT:  We'll come back in ten minutes, 25

21   after.  Is that enough time for all of you?

22          THE DEPUTY CLERK:  This matter is in recess.

23          (Court in recess at 11:14 a.m.

24          and reconvened at 11:28 a.m.)

25          THE CLERK:  McLellan matter is back in session.

1          THE COURT:  Please be seated.

2          (Jury enters.)

3          THE COURT:  Go ahead, Mr. Goldstein.

4          MR. GOLDSTEIN:  Thank you, Your Honor.

5          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

6    BY MR. GOLDSTEIN:

7    **Q.**  You testified on direct examination regarding Exhibit

8    107, which was the audio recording that we just listened to a

9    few moments ago, right?

10         And towards the end of that discussion,

11   Mr. McLellan talks to you about whether or not to take around

12   15 or 20 cents, right?  And you testified --

13         THE COURT:  That's a question.  You have to say yes

14   or no.

15         THE WITNESS:  Yes.  I'm sorry.  I nodded.  I'm

16   sorry. I'll say yes.

17         THE COURT:  We may understand the nodding but the

18   court reporter doesn't.

19   **Q.**  The bank State Street's in business to earn money,

20   correct?

21   **A.**  Yes.

22   **Q.**  State Street, as you know, it was not a not-for-profit,

23   right?

24   **A.**  Correct.

25   **Q.**  You worked within the broker-dealer; is that correct?

1    **A.**   That's correct.

2    **Q.**   And as part of the broker-dealer it's your function to

3    execute trades given to you by whichever party is ordering

4    the execution, correct?

5    **A.**   That's right.

6    **Q.**   And here it's the transition management team has placed

7    an order for execution of certain trades, right?

8    **A.**   Yes.

9    **Q.**   And you're simply executing those trades and the

10   broker-dealer is taking remuneration or money as an earnings

11   on the services that they have provided, correct?

12   **A.**   They did.

13   **Q.**   All right.  And you testified that you worked principally

14   or exclusively for the trading of equities, right?

15   **A.**   That's right.

16   **Q.**   As distinguished from fixed income, correct?

17   **A.**   Yes.

18   **Q.**   And your experience, while employed by the broker-dealer

19   at State Street, on the equities side is sometimes you would

20   trade as an agent and sometimes you would trade as riskless

21   principal, correct?

22   **A.**   Very rarely for transitions, yes.

23   **Q.**   Very rarely for which of those two?

24   **A.**   For riskless principal for transitions.  That was, I

25   think, as far as my recollection, one or two times.

1  **Q.**  Okay.  Now, whether or not you were trading in the

2  capacity of an agent or riskless principal, either way, when

3  you traded equities, the commission was disclosed in the

4  confirmations of those trades, correct?

5  **A.**  By law it is.  I believe in this case it wasn't.

6  **Q.**  In terms of the commissions -- the confirmations for

7  NTMA, have you seen those, sir?

8  **A.**  I saw one sample.

9  **Q.**  Which sample did you see?

10  **A.**  I don't know the specific trade, because there were many

11  equity trades.

12  **Q.**  Let me put the ETF aside.  Okay?

13          There were other equity trades for the NTMA client,

14  correct?

15  **A.**  Correct.

16  **Q.**  Are you testifying that the confirmations for those

17  equity trades did not show a commission?

18  **A.**  They did, but I believe they were addressed to the London

19  trading desk, not to the client.

20  **Q.**  And so the confirmations did, in fact, disclose the

21  commissions charged, correct?  Whether or not that was --

22  **A.**  For the agency trade, yes.  In the capacity that I did

23  the IWM trade it wouldn't have been disclosed.

24  **Q.**  Absolutely.  Put the ETF aside.  Okay?  ETF we'll get to.

25          But in terms of just the equity trades, other than

1    the ETF trades, on the confirmations that went either to

2    London or the custodian, those showed the commissions that

3    were actually charged, correct?

4              MR. JOHNSTON:  Objection, beyond the scope of the

5    direct.  We never asked about confirmations.

6              THE COURT:  Overruled.

7    BY MR. GOLDSTEIN:

8    **Q.**  Correct?

9    **A.**  Can you re-ask the question.

10   **Q.**  Yes.  Putting aside the ETF, any equity trades performed

11   for NTMA, the confirmations actually disclosed the

12   commissions charged on the equity trades, correct?

13   **A.**  I haven't seen all the commissions.  I saw one example.

14   **Q.**  Okay.  And the government, did they go through with you

15   before you testified and showed you all of the confirmations

16   that were generated as a result of the NTMA trades?

17   **A.**  I saw one sample.

18   **Q.**  And you didn't see the others?

19   **A.**  No.

20   **Q.**  Now, in terms of the ETF, you testified that you

21   disaggregated or disassembled the ETF because that way you

22   could get a better price, better result for the client,

23   correct?

24   **A.**  Yes.

25   **Q.**  And so that's a very complicated process.  I think we can

1    all agree, right?

2    **A.**  Yes.

3    **Q.**  And you'd agree with me too that when you disaggregate

4    the ETF, there's market risk or price risk to State Street

5    when it disaggregates the ETF, right?

6    **A.**  No.  I would argue that it's more operational risk.  So

7    there's very little market risk because what we're doing is

8    selling the underlying securities and then deriving the price

9    that the client could get based on our average.  There is

10   some degree of operational risk where -- not to get into the

11   minutiae, but we have to guess how much cash is in that fund.

12   It's only published after the market closes.  And usually you

13   can get within a couple hundred bucks, and it's not terribly

14   risky, and then there are some clearing risks, that the --

15   the risk of the trade not settling with a counterparty but,

16   again, it's all de minimis.  This essentially was a riskless

17   principal trade.  So there's really no market risk.

18   **Q.**  All right.  But there is some risk?

19   **A.**  There's operational risk, yes.

20   **Q.**  And there's also costs associated with it, correct?

21   **A.**  Yes.

22   **Q.**  Costs for clearing trades; is that correct?

23   **A.**  Yes.

24   **Q.**  Redemption costs, right?

25   **A.**  Yes.

1    **Q.**  The point is, the bank -- you in your capacity as the

2    broker-dealer need to charge for the service provided because

3    there is some risk and there is costs involved, correct?

4    **A.**  Yes.

5    **Q.**  And there's also expertise involved, your expertise as a

6    trader of those ETF shares, correct?

7    **A.**  There is.

8    **Q.**  And, in fact, at one point in time when at State Street

9    you were proposing a formal business line of disaggregating

10   ETF shares, correct, in terms of the execution of those

11   trades?

12   **A.**  I'm not sure.

13   **Q.**  Do you remember preparing a power slide presentation,

14   sending it to Mr. McLellan, in terms of increasing bank's

15   profitability by disaggregating the ETFs?

16   **A.**  Yeah.  That was for trading the bank's money, though, not

17   the client's money.

18   **Q.**  Now, you testified that you didn't know of another

19   instance where the size of the markup or markdown on the ETF

20   was determined after the trading had begun.  Do you recall

21   that testimony?

22   **A.**  Yes.

23   **Q.**  Do you recall performing a transaction or executions for

24   a client named Colcom?

25   **A.**  No.  I should note that most of our client orders, the

1    account number is coded.  So it wasn't until I saw the
2    evidence that I even knew that this client was NTMA because
3    when we get trades, they're just coded with the account
4    number.
5    **Q.**   Okay.  There are also third-party firms that would
6    perform the service of disaggregating ETFs if State Street's
7    broker-
8    dealer didn't want to do it, correct?
9    **A.**   Yes.
10   **Q.**   Firms such as Susquehanna or James Street, right?
11   **A.**   Yes.
12   **Q.**   And rather than you going through your expertise and
13   specialty of you breaking up this ETF, you could have
14   outsourced it to those firms and they would have paid back a
15   commission to State Street, correct?
16   **A.**   I'm not sure of the cost structure, but we indeed did use
17   other firms to do that.
18   **Q.**   If you had not disaggregated the ETF and instead simply
19   sold the ETF as is, there could be a markup on that sale of
20   the ETF, correct?
21   **A.**   Absolutely.
22   **Q.**   And you testified regarding getting the best price for
23   the client.  Do you recall that testimony on direct
24   examination?
25   **A.**   I did.

1   **Q.**  All right.  Getting the best price for the client does

2   not mean that the bank, the broker-dealer, doesn't get paid

3   for the execution services that it has provided, right?

4   **A.**  It certainly should get paid.

5   **Q.**  The bank should get paid, right?

6   **A.**  Absolutely.

7   **Q.**  The broker-dealer should get paid for its services,

8   right?

9   **A.**  Yes.

10  **Q.**  Its expertise, its specialty, right?

11  **A.**  Yes.

12  **Q.**  Your expertise and specialty as a broker-dealer has

13  nothing to do with architecting the strategy or plan of a

14  transition, right?  I mean, that's something --

15  **A.**  I have only been charged -- I'm only charged to trade the

16  security.  I don't devise the strategy at all.

17  **Q.**  Right.  Devising the strategy and how the transition is

18  going to operate or happen is within the purview of the

19  transition management team, the analysts that interface with

20  the ultimate client, correct?

21  **A.**  That is true.

22  **Q.**  And eventually, after they go through what's their

23  specialty, their function, their role, they end up sending

24  instructions to you in terms of the execution services that

25  are being provided, right?

1   **A.**   Yes.

2   **Q.**   And those two functions are distinct from each other;

3   you're an expert -- not an expert, but your specialty is in

4   the execution service side, right?

5   **A.**   That's right.

6           MR. GOLDSTEIN:  Nothing further, Your Honor.

7           THE COURT:  Not required.

8           MR. JOHNSTON:  Could we show, just for the witness,

9   401.

10          THE CLERK:  It's on there.

11          THE COURT:  So this is --

12          THE WITNESS:  Boy, that's real blurry on my end.

13          THE COURT:  They'll work that out.  Is this 401 or

14  a different one?

15          MR. JOHNSTON:  This is 399.

16          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

17  BY MR. JOHNSTON:

18  **Q.**   Mr. Dionisio, on cross-examination you were asked some

19  questions about trade confirmations for equities, correct?

20  **A.**   Yes.

21  **Q.**   And do you see this trade confirmation where it says "for

22  the account of"?

23          MR. GOLDSTEIN:  Your Honor, I object.  I don't

24  believe this is in evidence.

25          MR. JOHNSTON:  It's not.

1           THE COURT:  I don't think it is in evidence.

2           MR. JOHNSTON:  We can move to admit it into

3    evidence, move to admit 399.

4           MR. GOLDSTEIN:  I need to see a copy of this, Your

5    Honor.

6           MR. JOHNSTON:  This is yours.  You marked it 399.

7           THE COURT:  Any objection?

8           MR. GOLDSTEIN:  No objection, Your Honor.

9           THE COURT:  All right.  399 is admitted.

10           (Exhibit No. 399 admitted into evidence.)

11    **Q.**   What sort of document are we looking at, Mr. Dionisio?

12    **A.**   It's a trade confirm.

13    **Q.**   Directing your attention to where it says "For Account

14    of," who is this directed to?

15    **A.**   That's one of our accounts in London.

16    **Q.**   And where it says "C/O," care of, who is that?

17    **A.**   Yeah, that's the London transition desk.

18    **Q.**   So on this confirmation, anywhere is it being directed to

19    the end transition client?

20    **A.**   No.

21    **Q.**   Okay.  And so where you see in the bottom corner it says

22    commission -- bottom right-hand corner --

23    **A.**   Yeah.

24    **Q.**   Take a look at page 2.  I'm sorry, page 3.  If we could

25    zoom in again to the same information.  On this transaction

1    as well, what's the -- where is it being directed to,

2    Mr. Dionisio?

3    **A.**   That's the same destination, the transition desk in

4    London.

5    **Q.**   Okay.

6            MR. JOHNSTON:  And if we can zoom out, please, to

7    the text in the kind of upper right -- yes, there, please.

8    **Q.**   So looking at this, can you tell whether this in fact

9    gets sent to the end transition client?

10   **A.**   No, that was sent to us.

11   **Q.**   And on cross-examination you testified that the bank

12   makes money when it charges commissions, correct?

13   **A.**   Yes.

14   **Q.**   What's the typical cents per share you charge on equity

15   trades?

16   **A.**   Yeah.  I believe at the time it was two to three cents.

17   It's lower now.

18   **Q.**   And what was the commission you ended up applying on the

19   ETF trade that you testified about?

20   **A.**   15 cents.

21           MR. JOHNSTON:  Thank you.  No further questions.

22           THE COURT:  Recross.

23           **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

24   BY MR. GOLDSTEIN:

25   **Q.**   ETF is different than a standalone equity trade, right,

1    in terms of what it requires from you, sir?

2    **A.**   They are different, but riskless principal is the same no

3    matter what security you're trading.

4    **Q.**   And the amount of work is different in terms of

5    disaggregating the ETF as opposed to selling a standalone

6    share?

7    **A.**   Yeah.  There's more work.  It's mostly computerized.

8    **Q.**   Okay.  When Mr. McLellan asked you to take 15 or 20

9    cents, you agreed with him and you guys hung up the phone,

10   right?

11   **A.**   I did.

12   **Q.**   There wasn't any shock or awe in your response to him,

13   was there?

14   **A.**   Not in my response, but --

15   **Q.**   Thank you.

16   **A.**   -- of the --

17   **Q.**   Thank you.

18           MR. GOLDSTEIN:  May I please have Exhibit 305 on

19   the monitor, please, for the witness.

20           Your Honor, I'd ask to move into evidence Exhibit

21   305.

22           THE COURT:  Any objection?

23           MR. JOHNSTON:  If it's just the trade confirms and

24   not the underlying email.

25           THE COURT:  Is there an objection to what they're

1    offering or not?

2              MR. GOLDSTEIN:  It's not the email.

3              MR. JOHNSTON:  No objection.

4              THE COURT:  Fine.  Admitted.  What number is it?

5              MR. GOLDSTEIN:  305.

6              THE COURT:  305 in evidence.

7              (Exhibit No. 305 admitted into evidence.)

8              MR. GOLDSTEIN:  Max, can we blow up the top block

9    there?

10   Q.   Mr. Dionisio, what's the information contained in that

11   top block?

12   A.   I have never seen this before.  I don't know what it is.

13   Q.   Okay.  "DL AGT," do you know what that stands for?

14   A.   No.

15   Q.   And how about ID agent, "ID AGT," no?

16   A.   No.  I've never had any operations background.

17   Q.   Okay.

18   A.   I know these are banks, obviously, but I've never seen

19   this ever.

20   Q.   Well, had you seen the exhibit that the government just

21   went through with you on redirect?

22   A.   A trade confirmation?

23   Q.   That trade confirmation, yeah.

24   A.   I had seen that, yeah.

25   Q.   Can we go down to the bottom where it talks about the

1    markup, markdown.  Do you see the language markup/DWN; do you

2    know what that means?

3    **A.**   Sure.  Mark up or down two cents per share.  So if you

4    were buying, and we the bank bought it for $10, we would sell

5    it to the client for $10.02.  That would be a markup.

6              MR. GOLDSTEIN:  No further questions, Your Honor.

7              THE COURT:  All right.  Thank you very much, sir.

8    You're excused.

9              Next witness.

10             MR. FRANK:  The government calls Stephen Finocchi.

11             (The witness was duly sworn.)

12             THE COURT:  Please be seated.  Go ahead, Mr. Frank.

13             MR. FRANK:  Thank you, Your Honor.

14                         **STEPHEN FINOCCHI**

15           having been duly sworn, testified as follows:

16         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

17   BY MR. FRANK:

18   **Q.**   Good morning Mr. Finocchi.

19   **A.**   Good morning.

20   **Q.**   Could you state and spell your name for the record,

21   please?

22   **A.**   My name is Stephen Finocchi.  S-t-e-p-h-e-n.  Last name

23   is F-i-n-o-c-c-h-i.

24   **Q.**   Where do you live?

25   **A.**   Foxborough, Massachusetts.

1   **Q.**   And where do you work?

2   **A.**   I currently work at Loomis Sayles.

3   **Q.**   What do you do at Loomis Sayles?

4   **A.**   I am a high yield bond trader.

5   **Q.**   What is Loomis Sayles?

6   **A.**   Loomis Sayles is an asset management firm.

7   **Q.**   How long have you worked as a bond trader at Loomis

8   Sayles?

9   **A.**   A total of seven years.

10  **Q.**   Where did you work previously?

11  **A.**   Prior to that was State Street.

12  **Q.**   How long were you at State Street?

13  **A.**   I was at State Street from December of 2009 to April of

14  2011.

15  **Q.**   What did you do at State Street?

16  **A.**   I was a bond trader.

17  **Q.**   Prior to State Street where did you work?

18  **A.**   I worked at Credit Suisse.

19  **Q.**   What did you do there?

20  **A.**   I was also a high yield bond trader.

21  **Q.**   How long did you work at Credit Suisse?

22  **A.**   For a total of five years.

23  **Q.**   What about before that?

24  **A.**   Prior to joining Credit Suisse I came out of graduate

25  school.

1    **Q.**   So tell us about your educational background.

2    **A.**   I received a master's of financial mathematics from the

3    University of Chicago, and prior to joining graduate school I

4    was at the College of the Holy Cross with a degree in

5    mathematics.

6    **Q.**   When you worked at State Street, who did you report to?

7    **A.**   Thomas Bryant.

8    **Q.**   And what was his job?

9    **A.**   He was the head of trading.

10   **Q.**   Who did he report to?

11   **A.**   He reported to Ross McLellan.

12   **Q.**   What was the nature of your relationship with the

13   defendant?

14   **A.**   Very friendly and amicable.

15   **Q.**   How senior to you was he?

16   **A.**   He was very senior.

17   **Q.**   Are you a golfer?

18   **A.**   Yes.

19   **Q.**   What kind of golfer are you?

20   **A.**   I'm a pretty good golfer.

21   **Q.**   Have you heard the term scratch golfer?

22   **A.**   Yes.

23   **Q.**   What does that mean?

24   **A.**   Scratch golfer is someone who typically shoots a round

25   par.

1    **Q.**  That's very, very good?

2    **A.**  Very good.

3    **Q.**  Are you a scratch golfer?

4    **A.**  Close to it.

5    **Q.**  Did you play golf together with the defendant?

6    **A.**  Yes.

7    **Q.**  On one occasion or more than one occasion?

8    **A.**  One occasion.

9    **Q.**  When was that?

10   **A.**  It was approximately the fall of 2010 at his course for a

11   member guest.

12   **Q.**  Where was it?

13   **A.**  At Marshfield Country Club.

14   **Q.**  There's where he belonged?

15   **A.**  Yes.

16   **Q.**  And he invited you?

17   **A.**  Yes.

18   **Q.**  To your knowledge, did the defendant play golf with other

19   people who sat on the trading desk with you?

20              MR. GOLDSTEIN:  Your Honor, I object.  I don't know

21   what the relevance of this is.

22              MR. FRANK:  The relevance is the nature of the

23   relationship, Your Honor.

24              THE COURT:  All right.  A little bit.  Overruled.

25   BY MR. FRANK:

1  **Q.**  To your knowledge, did he play golf with other people on

2  the trading desk?

3  **A.**  Not to my knowledge.

4  **Q.**  Are you familiar with the expression thin to win?

5  **A.**  Yes.

6  **Q.**  What is that -- is that a golfing expression?

7  **A.**  That's a golfing term.

8  **Q.**  What does that mean?

9  **A.**  It's typically when you hit a golf ball low on the face

10  of a ball and the ball stays very thin.  It stays below the

11  wind, and it typically turns out to be a good shot.

12  **Q.**  So you hit it low and it's a good shot?

13  **A.**  Yeah.  It's not affected by the wind.

14  **Q.**  Did you work on transitions when you worked on the

15  transition -- I'm sorry -- on the trading desk at State

16  Street?

17  **A.**  Yes, I did.

18  **Q.**  How much of your work was devoted to transitions?

19  **A.**  The majority of it was.

20  **Q.**  Describe the typical way in which you would be assigned

21  to a transition, if you wouldn't mind.

22  **A.**  We would receive an email from a transition management

23  analyst.  Within that email there would be instructions.  It

24  would have a trade file of the securities we'd be either

25  buying or selling.  And also there would be a stated

1    commission to be charged to the client.

2    **Q.**   And how was that commission typically quoted?

3    **A.**   It was typically quoted in basis points.

4    **Q.**   What would you do when you would receive that email with

5    those instructions?

6    **A.**   We would take the file, we would upload that into a

7    system, and then we would begin trading.

8    **Q.**   What was the system that you uploaded it into?

9    **A.**   It was called FICOMS.

10   **Q.**   F-I-C-O-M-S?

11   **A.**   Correct.

12   **Q.**   Do you know what that stands for?

13   **A.**   I don't have the exact wording, but I know it starts with

14   fixed income.

15   **Q.**   And what kind of system is that?

16   **A.**   It was a proprietary system that State Street built.

17   **Q.**   How did you use that system?

18   **A.**   When we would -- when we would execute the bond within

19   the -- within a broker-dealer, we would then input the price

20   into the system and then the system would generate a client

21   side ticket, client side price.

22   **Q.**   And what was the difference between the price that you

23   would get on the market and the client side price?

24   **A.**   The difference was the commission.

25   **Q.**   The commission that you'd enter into the system?

1    **A.**   Yes.

2    **Q.**   From the email that you received from the transition

3    analyst?

4    **A.**   Yes.

5    **Q.**   I want to direct your attention to June of 2010.  Do you

6    recall -- I'm sorry.  There's a binder in front of you.  You

7    can just put that off to the side for just a moment.

8            Do you recall working on a transition on or about

9    June of 2010 involving a client called KIA?

10   **A.**   Yes.

11   **Q.**   Did there come a time when you were asked to send over

12   the intraday high prices --

13   **A.**   Yes.

14   **Q.**   -- from the market before booking out that trade?

15   **A.**   Yes.

16   **Q.**   Where did you send those prices?

17   **A.**   I sent those via email to Ross McLellan and Rick

18   Boomgaardt.

19   **Q.**   Where were they?

20   **A.**   Where were they?  At the time I'm not sure of exact

21   location, but maybe London.

22   **Q.**   And where did you get those intraday high prices?

23   **A.**   We got those off of Tradeweb.

24   **Q.**   What is Tradeweb?

25   **A.**   Tradeweb is a fixed income trading platform that gives

1  data and prices.

2  **Q.**  Did you do math -- did you send those intraday highs from

3  Tradeweb over?

4  **A.**  Yes.

5  **Q.**  How long have you been a bond trader?

6  **A.**  I've been in the industry for fifteen years and a trader

7  for twelve.

8  **Q.**  Prior to -- and at this point how long had you worked at

9  State Street --

10  **A.**  At that point --

11  **Q.**  -- in 2010?

12  **A.**  It would be less than a year, approximately seven months.

13  **Q.**  Prior to that, how often had you gotten a request like

14  that one from the defendant to send over the intraday highs

15  before booking out a trade?

16  **A.**  Never.

17  **Q.**  How often had anyone asked you at State Street for the

18  intraday highs before booking out a trade?

19  **A.**  Never.

20  **Q.**  Prior to this incident, how often did you receive

21  direction from the defendant on what to charge on a trade?

22  **A.**  The first time.

23  **Q.**  How often did you receive direction during a trade

24  concerning what to charge?

25  **A.**  I'm sorry.  Can you repeat that.

1   **Q.**  How often did you receive a direction after starting to

2   trade concerning what to charge for those trades?

3   **A.**  It was rare.

4   **Q.**  Did there come a time in late 2010 when you handled

5   another transition for that same client, KIA?

6   **A.**  Yes.

7   **Q.**  Could we show the witness Exhibit 59, please.

8          THE COURT:  59 is not yet in evidence.

9          MR. FRANK:  It is in evidence, Your Honor.  I

10  apologize.  But 59-1 -- I'm just showing him 59.

11         It's not coming up on my monitor.

12         THE CLERK:  Oh, okay.  I didn't switch.  Sorry.

13         THE COURT:  It's on yours now?

14  **Q.**  Can you see that --

15  **A.**  Yes, I do.

16  **Q.**  -- document?

17  **A.**  Yes.

18  **Q.**  Do you recognize it?

19  **A.**  Yes.  It's an email.

20  **Q.**  And who's it from?

21  **A.**  Adnan Choudhary.

22  **Q.**  Do you know who that is?

23  **A.**  That was a transition management analyst.

24  **Q.**  Where was he?

25  **A.**  He was located in London.

1    **Q.**  And what's the date?

2    **A.**  Wednesday -- I'm sorry.  November 3, 2010.

3    **Q.**  And what kind of email is this?

4    **A.**  This is a typical trading instructions email that

5    included a trade file and also commissions to be charged.

6            MR. FRANK:  Erin, could you highlight that line

7    that Mr. Finocchi just referred to about commissions.

8    **Q.**  What is that telling you to do?

9    **A.**  That is asking me -- telling me to charge two basis

10   points of value on the sells and 18 basis points on the buys

11   of the securities in that file.

12   **Q.**  And when you typically execute bond trades, are you

13   familiar with the term markup or markdown?

14   **A.**  Yes.

15   **Q.**  What do those terms mean?

16   **A.**  It's interchangeably used with charging commissions.

17   **Q.**  The same thing?

18   **A.**  Yes.

19   **Q.**  Directing your attention to where it says 18 basis points

20   of value -- and we can take a look at the bonds if it would

21   be helpful to you that were listed in the attachment to this

22   email, but how does 18 basis points compare with what you

23   typically charge?

24   **A.**  It was very high.

25   **Q.**  And if we look at the bottom, just before any questions,

1    it says, "All, please show the high and the low of the day

2    before booking the trades."  Do you see that?

3    **A.**  Yes.

4    **Q.**  Was that common or uncommon?

5    **A.**  Very uncommon.

6            MR. FRANK:  I'd like to approach the witness with

7    some disks.  If I could have one moment, Your Honor.

8            THE COURT:  Yes.

9    BY MR. FRANK:

10   **Q.**  Mr. Finocchi, I'm approaching you with five disks.  I'd

11   like you to take a look at those, please.  Do you recognize

12   those?

13   **A.**  Yes, I do.

14   **Q.**  What are they?

15   **A.**  These are disks with exhibits and with my initials, along

16   with a date of when I saw these disks.

17   **Q.**  And what's on those disks?

18   **A.**  There's a -- in terms of -- the information inside these?

19   **Q.**  Yes.  What's on the disks?  Have you listened to them?

20   **A.**  Yes, I have.

21   **Q.**  What are they?

22   **A.**  Phone calls, conversations.

23   **Q.**  That you had at State Street?

24   **A.**  Yes.

25           MR. FRANK:  The government moves to admit 62, 64,

1   129, 131 and 133.

2           MR. GOLDSTEIN:  No objection, Your Honor.

3           THE COURT:  Admitted.

4           (Exhibit Nos. 62, 64, 129, 131, and 133 admitted

5           into evidence.)

6   **Q.**  In the binder in front of you you'll see transcripts.  If

7   you could turn to 62.  Have you had an opportunity to review

8   these transcripts --

9   **A.**  I have.

10  **Q.**  -- of calls prior to today?

11  **A.**  Yes, I have.

12  **Q.**  Do the transcripts fairly and accurately capture the

13  conversations?

14  **A.**  Yes, they do.

15  **Q.**  So if you could look at the transcript of Exhibit 62, and

16  if you look at the cover page, you'll see that the date is

17  November 4, 2010, do you see that?  Is that in yours?

18  **A.**  I don't see --

19  **Q.**  I'll represent to you it's November 4.

20  **A.**  The front of the -- the front --

21  **Q.**  Do you have a cover page?

22  **A.**  Yes, the cover page says it.

23  **Q.**  It says November 4?

24  **A.**  Yes, it does.

25  **Q.**  And that's the day after you received those emailed

1   instructions?

2   **A.**  That's correct.

3   **Q.**  Okay.  Could we listen to Exhibit 62, please.

4          (Audio played.)

5          MR. FRANK:  We'll stop it there.

6   **Q.**  Mr. Finocchi, at page 1 of the transcript, line 18 you

7   said to -- this is a conversation with the defendant?

8   **A.**  That's correct, yes.

9   **Q.**  You said to him, "In terms of today's levels, I don't

10  know what you want me to do."  What were you referring to

11  there?

12  **A.**  Booking out the client side of the trade, the client

13  prices.

14  **Q.**  What are the levels you mean?

15  **A.**  Excuse me?

16  **Q.**  What do you mean by "levels"?

17  **A.**  The client side prices.

18  **Q.**  And how would those differ from the street side prices?

19  **A.**  They would be reflected with a commission.

20  **Q.**  And he responds "Just start working through them, start

21  working through them and, you know, obviously you work them,

22  you know, everything else is for us."  What did you

23  understand the defendant to mean when he said "everything

24  else is for us"?

25  **A.**  That the difference between the client price and the

1    price on the street is for State Street.

2    **Q.**   And he says "Beyond that" -- and previously you'd been

3    directed to send over the intraday highs before booking out

4    the trade?

5    **A.**   Yes.

6    **Q.**   And then he says, "Beyond that, before I get in the

7    office if you need to put anything on the tape, just use that

8    18 basis points of price."  What was your understanding when

9    he said if you need to put anything else on -- anything on

10   the tape?

11   **A.**   If I needed to book out corporate bonds, which have to be

12   reported to Trace within 15 minutes, I would put that on the

13   tape.

14   **Q.**   And so when you say "corporate bonds have to be booked

15   out to Trace," what are you referring to?

16   **A.**   Within corporate bonds, they have a -- sort of a

17   reporting site that would show the prices of where corporate

18   bonds are being traded at that time.

19   **Q.**   And so he said for those, if you need to report those,

20   just use 18 basis points?

21   **A.**   Yes.

22   **Q.**   What did you understand that to mean?

23   **A.**   If I need to book out the client side charge, 18 basis

24   points of price on top of the trade that was done.

25   **Q.**   Do you know, sir, whether at that time other types of

1    bonds needed to be reported to Trace?

2    **A.**    No.

3    **Q.**    You don't know or the answer is no?

4    **A.**    Well, no, corporate bonds only had to be reported.

5    **Q.**    What about Treasurys?

6    **A.**    They did not have to.

7    **Q.**    What about mortgage-backed securities?

8    **A.**    They did not, no.

9    **Q.**    If we could turn to Exhibit 64, please, in your binder.

10   You'll see that this is a call from November 5, 2010, the

11   following day.

12   **A.**    Yes.

13   **Q.**    And if we could start at page 2 of the transcript, line

14   11.  That's at one minute and 27 seconds.

15            (Audio plays.)

16            MR. FRANK:  Stop it right there, please.

17   **Q.**    When the defendant says, "Are you still taking two on the

18   T bills and 18 on what you buy," what do you understand him

19   to be asking?

20   **A.**    He is telling me to take two basis points of price on the

21   T bills and then 18 basis of value or price on whatever I'm

22   buying.

23   **Q.**    You respond at line 13, "Absolutely.  Is that cool with

24   you?"  Why were you asking the defendant that question?

25   **A.**    I was just confirming if that was the instructions to do.

1          MR. FRANK:  If you'd pick up line 16.

2          (Audio played.)

3   **Q.**  We're going to stop it right there, Mr. Finocchi.

4          If you could turn to page 2, at line 16 you say,

5   "What I've been doing too is, for example, like they wanted a

6   huge block of this HSBC paper."

7   **A.**  Mm-hmm.

8   **Q.**  Who's the "they" you're referring to?

9   **A.**  The client.

10  **Q.**  And what is HSBC paper?

11  **A.**  HSBC paper is a corporate bond that's issued by the Bank

12  of HSBC.

13  **Q.**  So it's a kind of a bond?

14  **A.**  It is.  It's a corporate bond.

15  **Q.**  Then you say at 19, "They wanted like 22 million.  So I

16  talked to them, I said, 'Do you want me to' -- see, one

17  manager wanted 4 point something million and the other one

18  wanted the rest, like, you know, another, you know, 18 or

19  whatever."  What are you saying there?

20  **A.**  I'm saying that the total order to buy was 22 million.

21  The buys were going to be split to multiple managers.  One

22  manager wanted 4 million and the rest of the other managers

23  wanted 18.  That equals the 22.

24  **Q.**  So these funds managers for KIA wanted you to buy -- one

25  of them wanted 4 million of those bonds and the other wanted

1    18 million?

2    **A.**   That's correct.

3    **Q.**   A total of 22?

4    **A.**   22, yes.

5    **Q.**   And then at the top of page 3 you say, "So I asked him if

6    I can start partially filling, and he said yes."  Who's the

7    "he" that you're referring to there?

8    **A.**   I believe that's the transition management analyst.

9    **Q.**   Adnan Choudhary or somebody sitting on the desk?

10   **A.**   Yes, correct.

11   **Q.**   Then you say, "So what I did is I've been buying paper

12   but some places I'm getting it like a bip or two cheaper but

13   I'm selling to the client at the same price on the high

14   side."  And Mr. McLellan responds, "Perfect."  And then you

15   say, "And I keeping like the bip.  Do you know what I mean?"

16   What are you telling the defendant there?

17   **A.**   That when I began buying the security, I found it at one

18   certain price.  As the market went on, I was able to buy the

19   same security at a slightly better price.  And then when I

20   booked it -- when I sold it to the client I used the original

21   first price instead of doing a weighted average.

22   **Q.**   You gave it to the client at the higher price?

23   **A.**   Yes.

24   **Q.**   And then you say, "I'm keeping like the bip."  Do you see

25   that?

1   **A.**  Yes, I do.

2   **Q.**  What were you telling the defendant, who were you keeping

3   that bip for?

4   **A.**  State Street.

5   **Q.**  And then the defendant responded -- so who was getting

6   the benefit of the performance in this case?

7   **A.**  State Street.

8   **Q.**  And then the defendant responded "that is for Uncle

9   Stephen."  Do you see that?

10  **A.**  Yes.

11  **Q.**  Do you have an understanding of who Uncle Stephen is?

12  **A.**  Me.

13  **Q.**  What's your first name?

14  **A.**  Stephen.

15  **Q.**  Did you understand the defendant to actually mean that

16  was for you personally?

17  **A.**  No.

18  **Q.**  What did you understand him to mean?

19  **A.**  It meant for our group within State Street.

20  **Q.**  For State Street?

21  **A.**  For State Street, yes.

22  **Q.**  Is what you were doing here consistent with your

23  understanding of what's in the client's best interests?

24  **A.**  It's not consistent.

25  **Q.**  Is it consistent with acting as a client's agent?

1    **A.**  We weren't acting as client's agent.

2    **Q.**  Is what you did here consistent with acting as a client's

3    agent?

4    **A.**  No, it's not.

5    **Q.**  Why were you bragging about it to the defendant?

6           MR. GOLDSTEIN:  Well, I object, Your Honor.

7           MR. FRANK:  I'll rephrase.

8           THE COURT:  Sustained, yes.

9    BY MR. FRANK:

10   **Q.**  Why were you telling the defendant about it?

11   **A.**  I was boasting.

12   **Q.**  Why were you boasting to the defendant?

13   **A.**  To make myself look good.

14   **Q.**  Why did you think that would make you look good?

15   **A.**  So he would like me.

16   **Q.**  Why did you think he would like you?

17   **A.**  Because this would be good for the group.  We were

18   increasing profit for our group within State Street.

19   **Q.**  Did there come a time, Mr. Finocchi, when you were

20   involved in a transition for Royal Mail?

21   **A.**  Yes.

22          MR. FRANK:  Can we show the witness only Exhibit

23   127, please.

24   **Q.**  Do you recognize this document?

25   **A.**  Yes, I do.

1    **Q.**  What is it?

2    **A.**  It is an email from Samina Vernon with trading

3    instructions, which has a file of the list of securities to

4    be traded.

5    **Q.**  These are consistent with the trading instructions you

6    typically receive?

7    **A.**  Yes.

8            MR. FRANK:  The government offers 127.

9            THE COURT:  Any objection?

10           MR. GOLDSTEIN:  No objection, Your Honor.

11           THE COURT:  Admitted.

12           (Exhibit No. 127 admitted into evidence.)

13   **Q.**  And the date on this is March 21, 2011, do you see that?

14   **A.**  Yes, I do.

15   **Q.**  What do these instructions tell you to do with respect to

16   a commission on this trade?

17   **A.**  It states to charge zero commissions.

18   **Q.**  If you could turn in your binder to transcript 129.  If

19   you look at the front page.  You see it's on March 22, 2011,

20   the next day.

21   **A.**  Yes, I do.

22           MR. FRANK:  Can we play this call, please.

23           (Audio plays.)

24   **Q.**  Mr. Finocchi, at line 10, the defendant says to you, "On

25   the Royal Mail one from Samina yesterday you can actually

1    take a basis point of yield on those."  Do you see that?

2    **A.**  Yes.

3    **Q.**  Then you respond at line 14, "I was actually just on a

4    chat with her."  Who's the "her" that you were referring to?

5    **A.**  Samina Vernon.

6    **Q.**  When you say you were on a chat with her, what do you

7    mean by that?

8    **A.**  She had reached out to me on our internal chat system.

9    **Q.**  And you said, "And she says she was telling me don't

10   charge any commissions.  So I was just going to -- I'm going

11   to take your word and just go with it."  Do you see that?

12   **A.**  I do, yes.

13   **Q.**  What did you understand the defendant to be telling you

14   there?

15   **A.**  He's instructing me to charge commissions even though

16   Samina said not to.

17   **Q.**  Had you ever before this received instructions to apply a

18   commission where you had previously received written

19   instructions telling you not to apply commission?

20   **A.**  No.

21         MR. FRANK:  Could we look at transcript 131,

22   please.

23   **Q.**  If you see, Mr. Finocchi, this is also on March 22.

24   **A.**  Yes.

25   **Q.**  Later that same day?

1    **A.**  Yes.

2              MR. FRANK:  Could we play 131, please.

3              (Audio plays.)

4    **Q.**  At line 13, the defendant says to you, "What does Samina

5    need for reporting back?  Just send her back the net prices

6    that the client is getting.  Right?"  You respond, "Do you

7    want me to take off commissions?"  And he responds, "Yeah,

8    don't send her that line."  Do you see that?

9    **A.**  Yes.

10   **Q.**  What did you understand the defendant to be telling you

11   there?

12   **A.**  When we send back a report to Samina, to delete the

13   column that had the commission line in there, the commission

14   numbers.

15   **Q.**  To delete the column or to delete the numbers?

16   **A.**  It tells us to delete the column.

17   **Q.**  And --

18   **A.**  I'm sorry.  Zero them out.

19   **Q.**  To zero them out?

20   **A.**  Do you want me to take off commissions?

21   **Q.**  What does that mean to you?

22   **A.**  It actually means to take off -- to delete the line.

23   **Q.**  And did you have an understanding of why he was telling

24   you to do that?

25   **A.**  Well, he did not want Samina to see the commissions.

1    **Q.**   Is that typical?

2    **A.**   No.

3    **Q.**   Who did you understand that those commissions would be

4    reported to?

5    **A.**   The commissions would be sent to the transition manager

6    and then they would send it off to the client.

7    **Q.**   What did you understand him to be telling you to do?

8    **A.**   He is trying to tell me to hide the commissions from

9    Samina.

10           MR. FRANK:  Could we look at Exhibit 130, please.

11   This is for the witness only.  I'm sorry.

12   **Q.**   Mr. Finocchi, do you recognize this document?

13   **A.**   Yes.

14   **Q.**   What is it?

15   **A.**   This is an email from myself to Samina that states the

16   executions that were done that day for the Royal Mail

17   transition.

18   **Q.**   So this is also on March 22?

19   **A.**   Yes.

20           MR. FRANK:  The government moves to admit 130 with

21   its attachment.

22           MR. GOLDSTEIN:  No objection.

23           THE COURT:  Admitted.

24           (Exhibit No. 130 admitted into evidence.)

25   **Q.**   So if we could look at the email.  You say to Ms. Vernon,

1    "Samina, please find attached today's U.S. executions for

2    Royal Mail."  Do you see that?

3    **A.**  Yes.

4            MR. FRANK:  And Erin, could we go to the

5    attachment.  Could we blow that up, just part of it.  That's

6    fine.

7    **Q.**  What are we looking at here, Mr. Finocchi?

8    **A.**  This is an execution report of the securities that were

9    trading -- traded in the market.  It has a list of the name

10   and the price that was done.

11   **Q.**  Okay.

12   **A.**  Along with the commission column.

13   **Q.**  Okay.  And if we look at the far left column, what kind

14   of bonds are these?

15   **A.**  These are corporate bonds.

16   **Q.**  What kind of companies?  Are these U.S. bonds or foreign

17   bonds?

18   **A.**  These are all U.S. dollar bonds.

19   **Q.**  Do they trade in the United States or elsewhere?

20   **A.**  They trade in the United States.

21   **Q.**  In the price column what are we looking at, is that the

22   street side price or the client side price?

23   **A.**  That's the client side price.

24   **Q.**  Does that include any markup or markdown?

25   **A.**  Yes, it does.

1   **Q.**  And then on the far right, the commission column?

2   **A.**  Yes.

3   **Q.**  What does that reflect?

4   **A.**  It shows zero commissions were charged.

5   **Q.**  Did you actually charge zero commissions?

6   **A.**  No.

7   **Q.**  Was this column true or untrue?

8   **A.**  Untrue.

9   **Q.**  What was actually included in the price?

10  **A.**  The commission.

11  **Q.**  How would Samina know that?

12  **A.**  She would not.

13  **Q.**  Could we go to Exhibit 133 in your binder, please.  Do

14  you see from the cover this was a call on March 23, 2011?

15  **A.**  Yes.

16  **Q.**  Okay.

17          MR. FRANK:  Could you play the call.

18          (Audio plays.)

19  **Q.**  Mr. Finocchi, at the top of page 2, Mr. McLellan says to

20  you at line 2, "Stay with the basis point of yield then."

21  You respond, "Yes, definitely, and I am zeroing out those

22  commissions when I send over the file."  What did you mean

23  when you said you were zeroing out those commissions when you

24  sent over the file?

25  **A.**  I am deleting the commission numbers in that column and

1    making them zero.

2    **Q.**   What are you putting in that column?

3    **A.**   Zeros.

4    **Q.**   Even though there was actually a commission being

5    charged?

6    **A.**   Yes.

7    **Q.**   And how does the defendant responds?

8    **A.**   "You got it, pal."

9              MR. FRANK:  Could we take a look for the witness

10   only, at Exhibit 135, please.

11   **Q.**   Do you recognize this document?

12   **A.**   Yes.

13   **Q.**   What is it?

14   **A.**   This is an email to Samina Vernon with the list of

15   securities that were executed for the Royal Mail transition.

16             MR. FRANK:  I would offer Exhibit 135 and its

17   attachment.

18             MR. GOLDSTEIN:  No objection.

19             THE COURT:  Admitted.

20             (Exhibit No. 135 admitted into evidence.)

21   **Q.**   If you see, it's sent on March 25, 2011.

22   **A.**   Yes.

23   **Q.**   And you said, "Samina, please find attached today's U.S.

24   executions for Royal Mail."

25   **A.**   Yes.

```
 1              MR. FRANK:  And can we look at the attachment,
 2   please.
 3   Q.  We're looking at the same kind of chart here?
 4   A.  Yes.
 5   Q.  And these are also U.S. securities?
 6   A.  Yes.
 7   Q.  And the price column in the middle --
 8              MR. FRANK:  Erin, could you please highlight that.
 9   Q.  What does that reflect?
10   A.  These are the client prices.
11   Q.  And on the far right, the commission column?
12   A.  That's the commission column that has all zeros.
13   Q.  Did you actually apply zero commissions?
14   A.  No.
15   Q.  What did you do?
16   A.  We charged commissions.
17   Q.  On whose instructions?
18   A.  Ross McLellan.
19   Q.  And why did you put zeros in the commission column?
20   A.  Because I was instructed by Ross.
21   Q.  I'm sorry, by whom?
22   A.  I was instructed by Ross.
23   Q.  Was what you wrote in the commission column true or
24   untrue?
25   A.  Untrue.
```

1          MR. FRANK:  Thank you.  You can take that down.

2    **Q.**  Mr. Finocchi, you are testifying today pursuant to a

3    court-ordered grant of immunity?

4    **A.**  Yes.

5    **Q.**  What is your understanding of what that means?

6          MR. GOLDSTEIN:  Your Honor, may we approach

7    sidebar, please?

8          THE COURT:  Sure.

9          (Sidebar conference.)

10         MR. GOLDSTEIN:  Your Honor, I've no intention of

11   impeaching this witness's credibility.  I'm not going to go

12   into his immunity agreement or even approach that territory.

13   I don't think the fact that he has an immunity agreement from

14   the government is relevant in his testimony and should be

15   excluded under 403.

16         MR. FRANK:  First of all, I stressed this issue the

17   other day before I did it.

18         Second of all, whether or not counsel chooses to

19   impeach him or not, it is relevant to his credibility because

20   under that agreement he can be prosecuted only if he perjures

21   himself and doesn't tell the truth.  So my intention is to

22   ask two narrow questions simply to establish that he's under

23   an obligation to tell the truth.

24         MR. GOLDSTEIN:  All witnesses are under an

25   obligation to tell the truth.  The immunity agreement doesn't

1    impact that one way or the another.  The prejudice that flows

2    from it is that it's another witness who the government uses

3    subtextually to say that there was a crime committed, and I

4    don't anticipate getting into credibility issues, and if

5    Mr. Frank thinks for a moment that I do on my

6    cross-examination, he can get into it on his redirect

7    examination.

8            MR. FRANK:  There's going to be no further

9    discussion to suggest that a crime has been committed.  I'm

10   going to ask simply what his understanding is of what the

11   agreement provides.  It provides him with protections as long

12   as he tells the truth.

13           MR. WEINBERG:  It's inherent in seeking immunity,

14   Your Honor, that a man believes not that he's going to commit

15   perjury but there's some underlying crime.

16           THE COURT:  You are not offering the document?

17           MR. FRANK:  I'm not offering the document.

18           THE COURT:  Go ahead.

19           MR. WEINBERG:  It sends a message that this man

20   felt he needed, or his lawyer felt he needed immunity not

21   from perjury, which you can't immunize, but from the

22   underlying crime that he now has immunity to not incriminate

23   himself.  It's unnecessary unless we would look to impeach

24   him.  And I understand the government can do their redirect,

25   put in plea agreements, the obligation to tell the truth.

1    All this does other than say he has the obligation to tell

2    the truth, and it's no different from an immunized or

3    non-immunized witness, is to tell the jury that he believed

4    his conduct was criminal and  needs immunity to protect

5    himself.

6              THE COURT:  I think the government can put it in.

7    The objection is overruled.  I'm happy to explain to the jury

8    something similar to the immunity instruction.  And just if

9    you have a cooperating witness just because of immunity --

10   I'm happy to say something, if you wish.

11             MR. WEINBERG:  Respectfully, I don't think there's

12   anything even as wise a judge as you could say --

13             THE COURT:  I'm not sure about that.

14             MR. WEINBERG:  -- that would detoxify the prejudice

15   that comes from the jury having to explain that he needed

16   immunity to testify.

17             THE COURT:  Well, he got immunity and he is

18   testifying.  And it is -- it seems credibility, truthful,

19   challenge to some degree is always relevant for the jury.

20   They could choose -- you don't have to challenge a witness

21   and they could choose to disregard a witness.  It seems to

22   give a fuller picture to the jury.  I'll overrule the

23   objection.  I'll say nothing to the jury unless one of you

24   want us to.

25             MR. WEINBERG:  Judge, respectfully, if we don't

1    impeach his credibility then his credibility is not an issue.

2    Therefore, to bolster his credibility without impeachment is

3    impermissible.  In other words, you can't go and put him on

4    the witness stand without his credibility.  The credibility

5    response comes from impeachment.

6              MR. FRANK:  I'm willing to limit my further

7    questioning on this topic beyond the one unobjected-to

8    question that's already been asked and answered to the

9    question about what is your understanding of what happens if

10   you don't tell the truth today.  That's it.  That doesn't get

11   into anything further.

12             THE COURT:  Okay.

13             MR. WEINBERG:  Well, I would object to that, Judge.

14   I object to it to any witness.

15             MR. GOLDSTEIN:  Right.

16             MR. WEINBERG:  This witness is no different than

17   any others.  He took an oath.

18             THE COURT:  It's sort of implied by everybody when

19   you take an oath -- I guess now I'm confused.  The state of

20   the record is you've asked the question.  And then they

21   objected and we went to sidebar.  He hasn't answered yet.

22             MR. FRANK:  He did answer the question.  I believe

23   there was no formal objection.  After he answered the

24   question, I believe counsel said, "May we approach sidebar."

25   That's my memory of what happened.

1          MR. GOLDSTEIN:  I think that's accurate.  I move to

2     strike the response and question then.

3          MR. FRANK:  That, Your Honor, I object to because

4     that then raises the question --

5          THE COURT:  The question is what's the relevance?

6     Putting aside the striking and all that, I mean, we're here

7     now.  What do you want me to do?

8          MR. FRANK:  I'm happy to sit down.

9          THE COURT:  He's happy to sit down.

10          MR. GOLDSTEIN:  Okay.

11          THE COURT:  Okay?

12          MR. GOLDSTEIN:  Yes.  Fine.

13          (End of sidebar conference.)

14          MR. FRANK:  Thank you, Mr. Finocchi.  No further

15     questions.

16          THE COURT:  Sometimes we have discussion and we're

17     able to short-circuit things.  It doesn't always happen that

18     way when six lawyers and a judge get together and actually

19     can make it shorter, but sometimes.

20          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

21     BY MR. GOLDSTEIN:

22     **Q.**  Good afternoon, Mr. Finocchi.

23     **A.**  Good afternoon.

24     **Q.**  I understand from your direct examination testimony that

25     for many years now you've been a bond trader; is that

1   correct?

2   **A.**   That's correct.

3   **Q.**   And when you were at State Street, you were a bond trader

4   within State Street's broker-dealer, correct?

5   **A.**   Yes.

6   **Q.**   You were employed by the broker-dealer, correct?

7   **A.**   Yes.

8   **Q.**   And the way that worked -- I think you testified that a

9   lot of your flow or a lot of the orders that you received

10  came from the transition management desk; is that correct?

11  **A.**   That's correct.

12  **Q.**   But the broker-dealer was a different part of the bank

13  than, for instance, State Street Europe Limited, correct?

14          MR. FRANK:  Foundation.

15          THE COURT:  Overruled.  You may answer.

16  BY MR. GOLDSTEIN:

17  **Q.**   Is that correct?

18  **A.**   I'm sorry.  Can you rephrase that question.

19  **Q.**   Broker-dealers have a different function, a different

20  service than the transition desk at State Street Europe

21  Limited, correct?

22  **A.**   I don't know.

23  **Q.**   Well, you know what you do, right?

24  **A.**   I do.

25  **Q.**   And you were in the broker-dealer unit, right?

1    **A.**  Yeah, I was.

2    **Q.**  You executed trade orders, correct?

3    **A.**  I did.

4    **Q.**  And what that means is that to execute securities on an

5    exchange, it requires the services of a broker-dealer,

6    correct?

7    **A.**  Yes.

8    **Q.**  And the broker-dealer goes to the marketplace and would

9    seek competitive offers or bids in terms of the securities

10   that you were looking to trade on behalf of State Street

11   Global Markets LLC, correct?

12   **A.**  Correct.

13   **Q.**  And so when you went to that particular marketplace, you

14   would solicit the best counterparty that you could find for a

15   particular security that you were looking to execute,

16   correct?

17   **A.**  Correct.

18   **Q.**  And as part of that process, broker-dealers are

19   remunerated or earn money for the service that they provide,

20   correct?

21   **A.**  Yes.

22   **Q.**  And in the context of transition management, you did put

23   out solicitations to multi parties for a competitive-based

24   auction in terms of what you were looking to buy and sell,

25   right?

1    **A.**  Yes.

2    **Q.**  And you would, as a matter of practice, in working for

3    Mr. McLellan implement that practice of soliciting and

4    seeking and finding the best counterparty for a particular

5    transaction at issue, right?

6    **A.**  Yes.

7    **Q.**  And that's a different function than the analysts that

8    sit within the transition management team, correct?

9    **A.**  Yes.

10   **Q.**  Meaning you had no role, no function in implementing or

11   architecting the strategy put in place for a transition

12   management client, correct?

13   **A.**  Yes.

14   **Q.**  What happens is the transition management analyst or

15   salesperson, while the salesperson would solicit business

16   from an end client, correct?

17   **A.**  Correct.

18   **Q.**  And they'd go through their process of selling and then

19   architecting a strategy, but that was completely foreign to

20   what you did within State Street Global Markets, LLC, right?

21   **A.**  That's right.

22   **Q.**  You had no role, no function, nothing to do with what the

23   transition management team did on that side of State Street's

24   business, correct?

25   **A.**  We worked together on transitions, but we had different

1    roles.

2    **Q.**  And in working together on transitions meant that they

3    would send to you via email or otherwise the particular

4    executions they wanted you to perform for them, right?

5    **A.**  Yes.

6    **Q.**  And you would act in accordance with those instructions,

7    correct?

8    **A.**  Correct.

9    **Q.**  And when a broker-dealer goes to the marketplace and

10   executes transactions for securities, there are costs

11   involved, right?

12   **A.**  Can you ask that question -- rephrase that.

13   **Q.**  There are costs incurred by a broker-dealer when they

14   execute securities, correct?

15   **A.**  Sure.

16   **Q.**  Such as, I think you spoke about Bloomberg or Tradeweb,

17   right?

18   **A.**  Yes.

19   **Q.**  There are also clearing costs that are incurred, right?

20   **A.**  Yes.

21   **Q.**  So when you execute a transaction, it's not free to the

22   broker-dealer, right?

23   **A.**  It's not.

24   **Q.**  Right.  So you can't go to the marketplace and execute

25   four or five or 50 million orders for free, right?

1    **A.**  I mean, you could.

2    **Q.**  Right.  It wouldn't be a profitable business, would it?

3    **A.**  No, it would not.

4    **Q.**  And the broker-dealer was in the business of making money

5    for State Street, right?

6    **A.**  Yes.

7    **Q.**  And so when you were asked questions by Mr. Frank about

8    boasting to Mr. McLellan about a spread you were taking,

9    that's because the broker-dealer was in the business of

10   making money?

11   **A.**  That's our business.

12   **Q.**  Right.  And there's nothing surprising to you about that

13   fact, right?

14   **A.**  No.

15        MR. GOLDSTEIN:  Okay.  If I could have Exhibit 59,

16   please.

17   **Q.**  This is an email Mr. Frank went through with you.

18        MR. GOLDSTEIN:  If I could have the top part --

19   actually, the whole -- the body of the email with the top

20   part, please.

21   **Q.**  This was the email from Mr. Choudhary to a number of

22   individuals where at the bottom it says, "Please show the

23   high and low of the day before booking the trades."  Do you

24   see that?

25   **A.**  I do, yes.

1    **Q.**  And it asks -- "Forward to Rick, Ed or Mr. Choudhary"; is

2    that correct?

3    **A.**  Yes, that's correct.

4    **Q.**  And there are numerous people on this particular email,

5    right?

6    **A.**  Yes.

7    **Q.**  Mr. McLean, what did he do?

8    **A.**  He was a fixed-income trader in London.

9    **Q.**  And Mr. Hines?

10   **A.**  He also was a fixed-income trader in London.

11   **Q.**  Mr. Barnes?

12   **A.**  He was also a fixed-income trader in London.

13   **Q.**  Fixed income is bonds, right?

14   **A.**  Yes, sir.

15   **Q.**  Clemmenson?

16   **A.**  He was a bond trader in Boston.

17   **Q.**  And yourself and then Mr. Holden?

18   **A.**  I don't recall Mr. Holden.  I believe he worked also as a

19   transition management analyst.

20   **Q.**  Mr. Pennings?

21   **A.**  Yes, worked in the London office.

22   **Q.**  Mr. Boomgaardt?

23   **A.**  Also worked in the London office.

24   **Q.**  And Mr. McLellan, right?

25   **A.**  Yes.

1    **Q.**  So it wasn't a secret, was it, that they wanted to know

2    the highs and the lows of the day before booking the trades,

3    meaning there's multiple people on this particular email,

4    right?

5    **A.**  Yes.

6    **Q.**  The other piece of it that you were asked questions about

7    was the 18 basis points of value on the buy side, right?

8    **A.**  Yes.

9    **Q.**  Do you recall that those particular buy side securities

10   were of long-term duration?

11   **A.**  I don't recall.

12   **Q.**  If it was a long-term duration and you were using basis

13   points of yield, would that result in a higher basis points

14   number in terms of the overall value of the asset?

15   **A.**  I'm sorry.  Can you rephrase the question.

16   **Q.**  Do you know what basis points of yield is?

17   **A.**  Yes.

18   **Q.**  Can you explain it to the jury?

19   **A.**  A basis point is one one-hundredth of a percentage point.

20   **Q.**  But when you use basis points of yield as opposed to

21   basis points of value, do you know the difference?

22   **A.**  Value would be actual price and basis points of yield

23   would be on the actual yield, which equates to a price.

24   **Q.**  Right.  Which is duration impacts.  The longer the

25   duration of the bonds, the more basis points would be applied

1    in terms of the overall value, correct?

2    **A.**   Sure.

3    **Q.**   Okay.  Now, Mr. Frank also showed you a series of

4    transcripts.  If we could begin with Exhibit 62, please.  Do

5    you have that in front of you, sir?

6    **A.**   Yes, I do.

7    **Q.**   The date of the call on Exhibit 62 is November 4,

8    correct?

9    **A.**   Correct.

10   **Q.**   And the date of the call on Exhibit 64 is November 5,

11   correct?

12   **A.**   Correct.

13   **Q.**   Mr. Frank asked you about certain statements that were

14   made during these phone calls, correct?

15   **A.**   Yes.

16   **Q.**   And you were a participant in these phone calls, correct?

17   **A.**   Correct.

18   **Q.**   Now, what you were not a participant in, I don't think,

19   were any emails or telephone conversations that occurred on

20   November 2 and November 3 between UK lawyers and U.S. lawyers

21   regarding the KIA transition, were you?

22   **A.**   I was not.

23   **Q.**   So as of November 4 and November 5, when Mr. Frank was

24   asking you these questions, you had no idea what was

25   discussed between UK counsel and U.S. counsel regarding this

1    particular transition, correct?

2    **A.**   That's correct.

3    **Q.**   No idea what analysis was performed by United Kingdom

4    lawyers regarding this particular transition?

5    **A.**   Correct.

6    **Q.**   No idea regarding analysis by United States lawyers

7    whether or not this KIA transition could go forward, correct?

8    **A.**   Correct.

9    **Q.**   Don't know whether UK compliance examined this from their

10   perspective and allowed this particular transition to go

11   forward as architected?

12   **A.**   Correct.

13   **Q.**   And same question for the U.S. compliance, right?

14   **A.**   Correct.

15   **Q.**   No idea in terms of any conversations Mr. Pennings may

16   have had with an individual that goes by the name of Mr. Das,

17   right?

18   **A.**   I have no --

19   **Q.**   You weren't included in on those conversations?

20   **A.**   I was not included, right.

21   **Q.**   Whatever your role is in terms of the executions, that's

22   your role as to KIA, right?

23   **A.**   Yes.

24   **Q.**   Mr. Frank also showed you or went through with you

25   Exhibits 129 and 130-1.  Those were the conversations

1   referencing a person named Samina.  Do you recall those?

2   **A.**  Yes.

3   **Q.**  Do you know whether or not -- strike that.

4           The dates of these calls were -- both of them were

5   March 22, correct?

6   **A.**  Correct.

7   **Q.**  And did you know whether or not at that time that State

8   Street Bank Europe Limited suspected that Ms. Samina Vernon

9   was leaving State Street for Russell, a competitor?

10          MR. FRANK:  Objection.

11          MR. GOLDSTEIN:  It's whether or not he knows.

12          THE COURT:  Overruled.

13  BY MR. FRANK:

14  **A.**  I did not know.

15  **Q.**  Mr. Frank showed you Exhibit 130, and in particular

16  130-1.

17          MR. GOLDSTEIN:  Do you have that up, Max?

18  Actually, why don't you start with 59-1, Max, sorry.

19          Give me one second, Your Honor.

20          (Discussion among counsel.)

21          MR. GOLDSTEIN:  Why don't we start with 130-1.

22          THE COURT:  Switching computers?

23          MR. GOLDSTEIN:  Yes.  If you could enlarge the

24  bottom part where it says U.S. Treasurys.  Do you see where

25  it says --

1          MS. LEAHY:  This here?

2          MR. GOLDSTEIN:  Yeah, the whole --

3    Q.   Do you see -- this was a spreadsheet Mr. Frank showed you

4    of bonds that were traded, correct?

5    A.   Correct.

6    Q.   And the Treasurys there, that's an example of a bond that

7    is not Trace-eligible, correct?

8    A.   That's correct.

9    Q.   And so if the intention was to hide commissions or

10   markups from a client, there'd be no independent way to

11   verify what markup was added to the Treasurys because it's

12   not Trace- eligible, right?

13   A.   I'm sorry.  Can you rephrase that question.

14   Q.   Yes.  Treasurys are not Trace-eligible, right?

15   A.   That's right.

16   Q.   You testified that it's well known in your industry that

17   corporate, U.S. corporate bonds are subject to Trace

18   requirements, right?

19   A.   That's correct.

20   Q.   Trace requirements means that within 15 minutes of the

21   trade you're required to post the details of the trades onto

22   a system that's available to the investment community, right?

23   A.   That's right.

24   Q.   Treasury bonds are not Trace-eligible, right?

25   A.   That's correct.

1    **Q.**   Therefore, they're not put into that available
2    information database, right?
3    **A.**   That's right.
4    **Q.**   And so if the intention was to purely and completely hide
5    markups to these bond executions, if they'd been added to the
6    Treasurys, it would not be on the Trace system, correct?
7    **A.**   It would be hard to show.  U.S. Treasurys don't have
8    reporting prices.
9    **Q.**   Right.  That's exactly the point, correct?
10   **A.**   That's correct.
11   **Q.**   All of these other executions of that day --
12           MR. GOLDSTEIN:  If we can just blow up the top 20
13   lines.  That would be fine.  Thank you.
14   **Q.**   Those are all Trace-eligible, right?
15   **A.**   It looks like they are.
16   **Q.**   Okay.  Meaning that those would be available in the Trace
17   system, correct?
18   **A.**   Yes.
19   **Q.**   And so to truly hide commissions, you wouldn't put it in
20   the Trace-eligible system, would you?
21           MR. FRANK:  Objection to what he would or wouldn't
22   do.
23           THE COURT:  Sustained.
24           MR. GOLDSTEIN:  No further questions -- actually, I
25   do have one further question.

BY MR. GOLDSTEIN:

**Q.**  Do you recall at one point there was going to be work done on the FICOM system at State Street?  You were looking to update or make changes to the FICOM system?  Do you recall that?

**A.**  I recall there was work being done on the FICOM systems, yes.

**Q.**  And, again, the FICOM system was the proprietary software system that the broker-dealer, State Street Global Market, used to record the trading details, correct?

**A.**  Yes.

**Q.**  Do you recall that one piece of that particular modification project was to implement a dynamic fee adjustment within FICOMs for non-ERISA transitions?

**A.**  I don't recall that.

        MR. GOLDSTEIN:  May I approach, Your Honor?

        THE COURT:  You may.  Do you need this exhibit up anymore?

        MR. GOLDSTEIN:  No.  Thank you.

        THE COURT:  You can take that down.  Thank you.

BY MR. GOLDSTEIN:

**Q.**  Mr. Finocchi, I'm handing you a document purely for you to review on your own to see whether or not it refreshes your recollection.  Okay?  So you're free to look at whatever you want.  This is an email -- I'll direct your attention

1    specifically to this entry.  But, again, you can look at the

2    entire document if you need to.  Okay?

3  **A.**   Okay.

4              THE COURT:  He just wants you to look at it, read

5    the part he pointed to and any other part that you wish and

6    then you can push it to the side and he'll ask you another

7    question.

8              THE WITNESS:  Okay.

9  **A.**   I see here there's dynamic --

10             THE COURT:  You don't have to read it aloud.  He

11   just wants you to --

12  **Q.**   I just want you to look at it, and then I'm going to ask

13   you a question after you've looked at it.

14  **A.**   (Witness reviewing document.)

15  **Q.**   Having looked at the document, does that refresh your

16   recollection that at one point in time State Street Global

17   Markets was considering adding a dynamic fee adjustment

18   control for non-ERISA transactions?

19  **A.**   No.

20             MR. GOLDSTEIN:  Nothing further, Your Honor.

21             MR. FRANK:  Very briefly, Your Honor.

22             THE COURT:  Yes.

23         **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

24   BY MR. FRANK:

25  **Q.**   Mr. Finocchi, you were asked some questions about making

1   money for the broker-dealer at State Street?

2   **A.**  Yes.

3   **Q.**  Do you recall those questions?

4   **A.**  Yes, I do.

5   **Q.**  Do you know how the transition management desk charges

6   for its services?

7   **A.**  Most of our transitions were charged, we charge per trade

8   or there are times I believe there was an agreed-upon

9   commission.

10   **Q.**  And who applies those commissions that remunerate the

11   transition management desk for its services?

12   **A.**  It would be the trading desk.

13   **Q.**  Thank you.

14       MR. FRANK:  Can we take a look at Exhibit 59,

15   please.

16   **Q.**  Do you recall, Mr. Goldstein showed you this document,

17   and he asked you about all these names?

18   **A.**  Yes.

19       MR. FRANK:  Erin, could you highlight all these

20   names.

21   **Q.**  Do you know who all these people worked for,

22   Mr. Finocchi?

23   **A.**  Yes, all State Street.

24   **Q.**  And who was their boss?

25   **A.**  The --

1   **Q.**   Who was the top person on this email?

2   **A.**   The top person on this email is Ross McLellan.

3   **Q.**   He's the boss of all these other people?

4   **A.**   Absolutely.

5   **Q.**   You were asked --

6           MR. FRANK:  We can take that down.  Thank you.

7   **Q.**   You were asked some questions about what happened on

8   November 2 and November 3 and lawyers having discussions

9   about the KIA transition that you worked on.

10  **A.**   Yes.

11  **Q.**   Do you know one way or the other the lawyers were told

12  that KIA was promised zero commissions?

13  **A.**   No.

14  **Q.**   Would it surprise you to learn that KIA was promised zero

15  commissions given what you charged?

16  **A.**   Zero commissions?

17  **Q.**   Yes.

18  **A.**   It would be surprising.

19  **Q.**   It would be surprising?

20          MR. FRANK:  Could we take a look at Exhibit 130-1.

21  **Q.**   Mr. Goldstein showed you this document, and he asked you

22  some questions about whether these corporate bonds were

23  Trace- eligible.

24  **A.**   Yes.

25  **Q.**   And these were --

1          MR. FRANK:  Can you blow up some of them.

2          MS. LEAHY:  Mm-hmm.

3          MR. FRANK:  Thank you.

4    **Q.**  These were the bonds that you charged a basis point of

5    yield but zeroed out the commissions when you sent over the

6    file to Samina Vernon?

7    **A.**  Yes.

8    **Q.**  How would a client know that it was charged a basis point

9    of yield on these bonds without doing an audit?

10   **A.**  It would not know.

11   **Q.**  It would have to go to Trace and look it up?

12   **A.**  Yes.

13   **Q.**  Bond by bond?

14   **A.**  Yes.

15   **Q.**  Do you know what happened when this particular client,

16   Royal Mail, actually did that?

17   **A.**  I don't.

18   **Q.**  Would it surprise you to know?

19          MR. GOLDSTEIN:  Objection, Your Honor.

20          THE COURT:  Sustained if he doesn't know.

21   BY MR. FRANK:

22   **Q.**  Do you know what this client was told when they asked

23   whether a basis point of yield had been applied to each and

24   every one of those trades?

25          MR. GOLDSTEIN:  Objection.

```
 1              THE COURT:  You can --
 2              MR. GOLDSTEIN:  Beyond the scope.
 3              THE COURT:  Overruled.
 4              If you know.
 5   Q.  Do you know what the client was told when they asked
 6   whether a basis point of yield had been applied to each and
 7   every one of those trades?
 8              THE COURT:  Based on your own personal knowledge.
 9   A.  My personal -- I did not know that --
10              THE COURT:  No.  Based on your own personal
11   knowledge the question is, do you know what they were told?
12              THE WITNESS:  I do not know what they were told.
13   Q.  Did you apply the basis point of yield by mistake?
14   A.  No.
15   Q.  Who told you to apply it?
16   A.  Ross McLellan.
17              MR. FRANK:  No further questions.
18              MR. GOLDSTEIN:  Briefly.
19          **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**
20   BY MR. GOLDSTEIN:
21   Q.  You were asked if you were surprised KIA had been told
22   zero commissions by Mr. Frank, correct?
23   A.  Yes.
24   Q.  You don't know exactly what was told to Mr. Das at KIA or
25   not, right?
```

1    **A.**  I do not know.

2    **Q.**  Not a party to those conversations?

3    **A.**  No, I was not.

4    **Q.**  Were you ever told that Mr. Das told Ed Pennings to go

5    with the flow in terms of the paperwork that was being

6    generated as to KIA?

7    **A.**  No.

8    **Q.**  Were you ever told that Mr. Das had been explicitly told

9    by Mr. Pennings that State Street would earn its revenue

10   through a spread if he wanted papers that said --

11                  MR. FRANK:  Objection.  Misstates materially.

12                  THE COURT:  Overruled.

13   BY MR. GOLDSTEIN:

14   **Q.**  Were you ever told that?

15   **A.**  No.

16   **Q.**  You just simply weren't a party to those conversations,

17   right?

18   **A.**  That's right.

19   **Q.**  And in terms of the questions regarding someone finding

20   the Trace-eligible bonds that were traded, do you recall that

21   question from Mr. Frank?

22   **A.**  Yes.

23   **Q.**  Anyone with access to Bloomberg would have access to that

24   information, right?

25   **A.**  Not just -- no.

1    **Q.**   It's not recorded in Bloomberg?

2    **A.**   It is, but you need to have the ability to get to Trace.

3    **Q.**   Right.  Within Bloomberg, right?

4    **A.**   Yes.

5             MR. GOLDSTEIN:  No further questions.  Thank you.

6             THE COURT:  Thank you very much, Mr. Finocchi.

7    You're excused.

8             Ladies and gentlemen, we're going to finish a

9    couple of minutes early today because rather than calling --

10   dragging some witness from wherever they are in for ten

11   minutes and split them and make them come back on Friday is

12   unreasonable.  So we're going to break now.

13            No court -- just a couple scheduling things.  No

14   court tomorrow.  Day off because I told you there's a

15   courtwide -- this courtwide conference unrelated to -- like a

16   judicial education conference.

17            And Friday we resume, 9:00 to 1:00 on Friday.  I

18   talked to the lawyers at the break.  We remain on track with

19   the schedule I told you at the beginning, which is good.  And

20   Friday at the end of the day I'll have talked to the lawyers

21   during the day on Friday and at 1:00 I'll update you on the

22   schedule going forward in terms of where we stand.

23            So don't discuss the case among yourselves.  Don't

24   discuss it with anyone else.  Keep an open mind.  You haven't

25   heard all the evidence yet.  Don't do any independent

1    research.  Have a nice afternoon and nice day tomorrow.  I'll

2    see you Friday morning to resume at 9:00.  Thank you for your

3    attention.

4              All rise for the jury.

5              (Jury exits.)

6              THE COURT:  Do we have more transcripts to put in

7    this notebook?  I ask the practical question --

8              MR. JOHNSTON:  There is one more call.

9              THE COURT:  -- because my notebook is getting very

10   full.

11             MR. FRANK:  We'd be happy to get Your Honor a

12   fatter notebook.

13             THE COURT:  I was thinking more for the jurors.

14             MR. FRANK:  We might take some of them out.

15             THE COURT:  Just think about that.  You might want

16   to take a few out, because mine every time I turn it -- you

17   don't have to get me another notebook.  I can just take some

18   out.  That's fine.  Maybe we should meet Friday at 8:30 if

19   there are any other issues.  We can talk about scheduling.

20   We don't have to have issues, but...

21             MR. FRANK:  We'll try to think some up.

22             THE COURT:  Anything else before we adjourn?

23             MR. GOLDSTEIN:  No, Your Honor.

24             MR. FRANK:  No.

25             THE COURT:  Okay.  Have a nice day.  See you Friday

1    morning.

2                THE CLERK:  All rise.  This matter is adjourned.

3                (Court in recess at 12:54 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3

 4

 5    UNITED STATES DISTRICT COURT )

 6    DISTRICT OF MASSACHUSETTS    )

 7

 8

 9         I we certify that the foregoing is a correct

10    transcript from the record of proceedings taken June 13, 2018

11    in the above-entitled matter to the best of my skill and

12    ability.

13

14    /s/ Rachel Lopez

15    _____

16    Rachel Lopez, RPR, CRR

17    Official Court Reporter

18

19

20

21    /s/ Kathleen Mullen Silva            6/18/18

22    _____    _____

23    Kathleen Mullen Silva, RPR, CRR      Date

24    Official Court Reporter

25
```