```
1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
2

3    - - - - - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA,              :

5           Plaintiff,                      :   Criminal Action No.
                                                1:16-cr-10094-LTS
6        v.                                 :

7    ROSS MCLELLAN,                         :

8           Defendant.                      :

9    - - - - - - - - - - - - - - - - - - x

10

11       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                            JURY TRIAL
13                            Day 9

14

15                   Friday, June 15, 2018
                          8:33 a.m.
16

17

18

19

20   John J. Moakley United States Courthouse
     Courtroom No. 13
21   One Courthouse Way
     Boston, Massachusetts
22

23   Rachel M. Lopez, RPR, CRR
     Debra M. Joyce, RMR, CRR, FCRR
24   Official Court Reporter
     raeufp@gmail.com
25
```

1                    **A P P E A R A N C E S**

2    On behalf of the Plaintiff:

3        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
         BY:  STEPHEN E. FRANK
4        John Joseph Moakley Courthouse
         One Courthouse Way, Suite 9200
5        Boston, Massachusetts  02210
         (617) 748-3244
6        stephen.frank@usdoj.gov

7
         UNITED STATES DEPARTMENT OF JUSTICE
8        BY:  WILLIAM JOHNSTON
         1400 New York Avenue, Northwest
9        Washington, D.C.  20005
         (202) 514-0687
10       william.johnston4@usdoj.gov

11

12   On behalf of the Defendant:

13       MARTIN G. WEINBERG, P.C.
         BY:  MARTIN G. WEINBERG
14       20 Park Plaza
         Suite 1000
15       Boston, Massachusetts  02116
         (617) 227-3700
16       owlmcb@att.net

17
         LAW OFFICES OF ROBERT M. GOLDSTEIN
18       BY:  ROBERT M. GOLDSTEIN
         20 Park Plaza
19       Suite 1000
         Boston, Massachusetts  02116
20       (617) 742-9015
         rmg@goldstein-lawfirm.com
21

22       LAW OFFICES OF MAKSIM NEMTSEV
         BY:  MAKSIM NEMTSEV
23       20 Park Plaza
         Suite 1000
24       Boston, Massachusetts  02116
         (347) 251-4800
25       mentsev@gmail.com

1    **<u>TABLE OF CONTENTS</u>**

2

3    **TRIAL WITNESSES**

4

5    On behalf of the Plaintiff:                          <u>Page</u>

6    JAMES KELLY

7            By Mr. Johnston                              28

8            By Mr. Weinberg                             81

9    TOM CLEMMENSON

10            By Mr. Johnston                             90

11            By Mr. Goldstein                           110

12            By Mr. Johnston                            133

13            By Mr. Goldstein                           134

14    KRISTEN MORRIS

15            By Mr. Frank                               136

16            By Mr. Weinberg                            178

17            By Mr. Frank                               195

18            By Mr. Weinberg                            199

19

20

21    **EXHIBITS**

22

23                                                <u>Admitted</u>

24    Number 95 and 95.1                                 44

25    Number 101, 101.1, 101.2, 101.3, and 101.4         47

**EXHIBITS**

|  | Admitted |
|---|---|
| Number 102.1, 102.2, 102.3, and 102.4 | 95 |
| Number 102 | 95 |
| Number 114 | 156 |
| Number 115 | 158 |
| Number 116 and 123 | 98 |
| Number 119, 119.1, and 119.2 | 58 |
| Number 121 and 121.1 and 121.2 | 61 |
| Number 122 and 122.1 | 106 |
| Number 125 | 176 |
| Number 140 | 169 |
| Number 141 | 170 |
| Number 143 | 173 |
| Number 153 | 174 |
| Number 206 | 160 |
| Number 207 | 63 |
| Number 208 | 55 |
| Number 212 | 199 |
| Number 496 | 185 |

|  | Marked |
|---|---|
| Number B | 135 |

**P R O C E E D I N G S**

1

2        (In open court.)

3        THE DEPUTY CLERK:  The United States District Court

4   for the District of Massachusetts is now in session, the

5   Honorable Leo T. Sorokin presiding.

6        Today is June 15th, the case of United States vs.

7   Ross McLellan, criminal action 16-10094 will now appear

8   before this court.

9        THE COURT:  I see all counsel and the defendant.

10        So I, this morning, ran into two of the jurors in

11   the cafeteria and one of them asked me if I had a good

12   conference and so I told him -- I didn't say what it was

13   about.  But I did say I had spoken and presented and I can

14   report to you that maybe there's hope for you that I'm wiser

15   and fairer and smarter now than I was on Wednesday.  So maybe

16   you'll have less problems with all my different -- whatever I

17   do or don't do.  At least there's hope.

18        So do we have anything to talk about?

19        MR. GOLDSTEIN:  Well, with that in mind, Your

20   Honor, that you could perhaps be wiser and fairer, I'd like

21   to renew an objection to the Government presenting testimony

22   regarding McLellan's statements to the agents who visited him

23   at his home.  It was the subject of the Court's order on

24   June 1st, 2008, Document 405.  My understanding is that now

25   the Government is not calling him today, they're calling him

1    Monday.  So I don't when the Court and the Government -- I

2    sent them an e-mail this morning that I wanted to renew this

3    objection.  We can handle it this morning, we can handle it

4    Monday, whichever the Court --

5           THE COURT:  If he's not coming until Monday, let's

6    see if there are any issues for today first.

7           MR. Weinberg:  No, real issues --

8           You're not calling Trombly today, right?

9           MR. FRANK:  No.

10          MR. WEINBERG:  Just a preview, there will be some

11    evidentiary objections to one of the Government other

12    witnesses on the -- an FBI agent that's going to put on

13    certain exhibits that are offered by the Government.

14          THE COURT:  Okay.  Before we get to any issues,

15    with respect to today.

16          MR. FRANK:  We don't have any issues for today.

17    We'd prefer to resolve issues --

18          THE COURT:  I'm happy to do that.  I just want to

19    first make sure.  So let me just ask you this about today.

20    So who are we going to hear from today?

21          MR. FRANK:  We're going to hear from James Kelly,

22    who works for AXA.

23          THE COURT:  AXA is the US company?

24          MR. FRANK:  Correct.

25          THE COURT:  Right.  Okay.

1          MR. FRANK:  We are going to hear from Tom
2     Clemmenson, who is a trader on the fixed income desk.
3          THE COURT:  Kelly will be something of a piece with
4     the other -- the witnesses we've heard from from the other
5     pension funds.
6          MR. FRANK:  Without an accent, yes, Your Honor.
7          We'll hear from -- not so much.  Actually we're
8     going to hear from Tom Clemmenson, who was a trader on the
9     fixed income desk at State Street, and we're going to hear
10    from Kristen Morris, who was a transition analyst on the --
11    at State Street in the United States.
12         THE COURT:  Okay.  And then after then.  So that
13    would be today.  Then Monday?
14         MR. FRANK:  So the question is what Your Honor
15    wants to do about Monday.  We have lined up two FBI agents,
16    one of them is Garett Trombly, who's simply going to be a
17    reader of documents that we contend are admissible.
18         THE COURT:  All right.  Those are the ones with the
19    evidentiary issues, not as to the reading, but as to some of
20    the documents?
21         MR. WEINBERG:  Yes.
22         THE COURT:  All right.
23         MR. FRANK:  And that should be very --
24         THE COURT:  If he read everything that you wanted
25    him to read, how long?

```
1              MR. FRANK:  Half an hour.  It's short testimony.
2              THE COURT:  Okay.
3              MR. FRANK:  I haven't timed it, but it's about --
4       it's about 15, 16 e-mails.
5              THE COURT:  Okay.
6              MR. FRANK:  Then there's Special Agent
7       McGillicuddy, who's flying in from Washington for this
8       testimony.  His testimony is five to ten minutes long.  He's
9       the one who's going to be testifying about the interview with
10      the defendant.  His testimony will be limited to statements
11      that the defendant made about his own business.
12             THE COURT:  He's not going to talk about --
13             MR FRANK:  The only thing he would say about
14      ConvergEx is he was there, because he was involved in an
15      investigation that pertained to ConvergEx.  He went to talk
16      to the defendant.  The defendant was not in any way a target
17      or subject of that investigation.
18             THE COURT:  He went to talk to him as a witness?
19             MR. FRANK:  Correct.
20             THE COURT:  Or potential witness?
21             MR. FRANK:  Correct.  And the only other thing he
22      would elicit that pertains is he will elicit -- I will elicit
23      from him that the defendant acknowledged having received that
24      spreadsheet that was admitted previously.
25             THE COURT:  The one that Pennings talked about.
```

1          MR. FRANK:  Correct.  And that we -- and we saw

2     some e-mails about it.  And that -- it would simply

3     corroborate Mr. Pennings that the defendant received this

4     from an anonymous, disgruntled ConvergEx employee.

5          THE COURT:  Pennings received it.

6          MR. FRANK:  The defendant received it.  Pennings

7     testified that the defendant gave it to him, that the

8     defendant didn't know where he had gotten it from, it came

9     from somewhere in Asia, and that the defendant simply told

10     the agent, I got this spreadsheet.  I don't know who it's

11     from.  I thought it was from a ConvergEX disgruntled

12     employee.  That's it.  There's no substance on ConvergEx.

13     The remainder of his statements will be about his business,

14     what he did at State Street, what he understood State

15     Street's practices to be.

16          THE COURT:  When was the interview?

17          MR. FRANK:  It was in January of 2012.

18          MR. WEINBERG:  Yes.

19          MR. FRANK:  So shortly after he left State Street.

20          THE COURT:  I see.  Okay.

21          MR. FRANK:  So that will be his testimony.  And

22     then we'll have a State Street witness, Scott Shaw, who will

23     testify about where bonds that are traded in the United

24     States actually -- where they clear, where title passes.

25          THE COURT:  Okay.

```
 1              MR. FRANK:  And he will also testify about the
 2    extent to which State Street was affected by this.  And you
 3    know, to that extent, I mean, there may be an issue there, to
 4    the extent that he testified that they paid a criminal money
 5    penalty, but his testimony is also fairly brief.
 6              THE COURT:  All right.  And then after -- that's
 7    everybody you have.
 8              MR. FRANK:  That's everybody for Monday.  So that's
 9    fairly brief testimony.  That's not going to even come close
10    to fill the day.  And then we have Eugene O'Callaghan, who's
11    flying in on Monday from Dublin to be prepared to testify on
12    Tuesday.
13              THE COURT:  And he's another victim witness of --
14    similar piece?
15              MR. FRANK:  Correct.
16              THE COURT:  With a related, but different accent?
17              MR. FRANK:  Very different accent.  Yes, Your
18    Honor.
19              THE COURT:  All right.  And then that -- so then if
20    you did those Monday, then you do him Tuesday morning and
21    then you'd rest?
22              MR. FRANK:  Correct.
23              THE COURT:  And if -- all right.  And where do you
24    all stand, in terms of scheduling?
25              MR. WEINBERG:  Well, we have narrowed our witness
```

1    list.  I think we have met all of Mr. Frank's both

2    expectations and concerns about witnesses.  We've given them

3    a sequence of witnesses that -- at least a sequence of expert

4    witnesses.  We will have an expert from Virginia named Mark

5    Menchel as our first witness.  We're -- we have a second

6    expert that will be available on Tuesday.  We think they will

7    fill the day and we're hopeful that Your Honor holds court on

8    Monday, so that we have the time on Tuesday.  It sounds like

9    the Government will -- if there's no Court on Monday, between

10   NTMA and these other three witnesses, there will be a

11   Tuesday --

12             THE COURT:  You would like me to have Court --

13   okay, so my question is, what if the Government went Monday,

14   presented the three -- putting aside evidentiary issues,

15   presented everything they want to present.  And what about if

16   we took out of order -- or would that not work, one of your

17   experts?

18             MR. GOLDSTEIN:  I don't think it's ideal, because

19   it's just discordant for him to be testifying as an expert on

20   Monday and then have the Government come in with one of their

21   victim witnesses Tuesday.

22             THE COURT:  So you would prefer -- what your

23   preference is is that we go a partial day on Monday, Tuesday

24   go full day.

25             MR. WEINBERG:  Yes.

```
 1              THE COURT:  And Tuesday, what, you would have after
 2   that, their last witness and resting, would be one expert or
 3   two?  Two would certainly complete the day in your view?
 4              MR. WEINBERG:  Yes.
 5              THE COURT:  And then -- are there expert reports
 6   for the experts?
 7              MR. WEINBERG:  There's a rather detailed disclosure
 8   that we made pursuant to Rule 16.  There were no reports.
 9              THE COURT:  Can you give me that disclosure by the
10   end of the day, just so I can read it, so I have some idea of
11   what's coming?
12              MR. WEINBERG:  We can provide it to Your Honor.
13              MR. FRANK:  Detail's in the eye of the holder, Your
14   Honor.  It's a few paragraphs about each witness.
15              MR. WEINBERG:  It's far more detailed than the
16   Government's rebuttal experts, you know, who don't have
17   reports, either.
18              MR. FRANK:  Your Honor, the Government has provided
19   12 single-spaced --
20              THE COURT:  At the moment, I'm not -- whatever
21   there is, I want to read it, just because it will be helpful
22   for whatever.  I imagine there might be objections to various
23   experts.
24              So how long do you -- in terms of -- if we do that,
25   so Monday -- if he got everything he wanted with his three
```

```
 1    witnesses, if all of your objections are overruled, that
 2    would be the longest presentation on Monday.  You have a
 3    third -- approximately 30-minute witness and approximately
 4    10-minute witness.  And then who was the -- and then the
 5    State Street witness?
 6              MR. FRANK:  Yes, he's not more than 30 minutes, 20
 7    minutes.
 8              THE COURT:  So you have between 45 minutes and an
 9    hour and a half of direct examination depending on how
10    quickly it all goes.
11              MR. FRANK:  Yes, Your Honor.
12              THE COURT:  How much cross, of all that, if it all
13    came in, would you have?
14              MR. WEINBERG:  I don't want to give the Court a
15    final prediction.  I think there will be cross on the witness
16    that will testify to the conversation with McLellan.  There
17    may be cross that goes into the distinctions between
18    ConvergEx and the transitions in this case.
19              THE COURT:  It would be fair to me to --
20              MR. FRANK:  Your Honor, that would be -- just so I
21    can respond to that.  We've been asked not to elicit anything
22    about ConvergEx's business practice.  We're not going to
23    elicit anything about it other than what the defendant --
24    what's been already elicited.  There's going to be nothing
25    further about it.  So to then cross-examine an agent of the
```

1    FBI about his investigation of ConvergEx, we think would be

2    completely out of bounds, and we think that should be

3    resolved promptly.

4             MR. WEINBERG:  And to sanitize and distort --

5             THE COURT:  Hold on.  At the moment, I just want to

6    stay focussed on schedule.  We'll come back to evidence.

7             So you might have 15 or 20 minutes.  You might have

8    an hour and a half.  It's probably not going to be --

9             MR. WEINBERG:  I think they'd be finished by the

10   11 o'clock break on Monday, Your Honor.

11            THE COURT:  Okay.  That's what I'm trying to figure

12   out.  So -- and then, if we finish by -- if we're done and we

13   broke at 11:00, then Tuesday we go all day.  Your two

14   experts -- assuming this -- the witness that the Government

15   has on Tuesday goes similarly, direct and cross, to the

16   others, you think you'll get on -- you might get on your

17   second expert?  Will your second expert get off the witness

18   stand on Tuesday?

19            MR. WEINBERG:  Predictably yes, if we had -- it

20   really depends on the length of cross.

21            THE COURT:  Maybe, maybe not.

22            MR. WEINBERG:  Maybe, maybe not.  He's a shorter

23   expert than Mr. Menchel.  He covers more territory.

24            THE COURT:  And then how much more would I

25   anticipate, if you do?

```
1              MR. WEINBERG:  I say either a day or two days,
2     depending on the usual decisions that get made regarding the
3     defense.
4              THE COURT:  All right.  So it would -- are you
5     likely to be -- are you going to call any other experts
6     besides this?
7              MR. WEINBERG:  Probably a third expert.
8              THE COURT:  All right.  So there's a reasonable
9     likelihood you're going to call your rebuttal expert?
10             MR. FRANK:  Yes, Your Honor, subject to whatever
11    motions the defense makes.
12             THE COURT:  Right, but -- okay.  And that expert
13    would be an hour on direct and then whatever cross there is.
14    So --
15             MR. FRANK:  So I should just be clear that we have,
16    in an abundance of caution, designated his testimony as
17    possibly involving expert testimony.  He's a fact witness.
18    He's going to offer lay opinion testimony.  We think it's all
19    admissible on those grounds.
20             THE COURT:  I'm just trying to figure out at the
21    moment --
22             MR. WEINBERG:  Wait.
23             THE COURT:  The schedule in terms of everybody gets
24    everything they want --
25             MR. WEINBERG:  We should tell the Court that we
```

1    received -- we had a schedule for the disclosure of experts,

2    where the Government was going to disclose their experts 60

3    or 70 days before.  We disclosed ours.  The Government didn't

4    disclose an expert.  We disclosed ours 40 days before, as we

5    were required by agreement.  The Government, shortly before

6    trial, identified an expert named Mr. Minahan, from MIT.  You

7    know, we didn't complain about the timing of that.  Although

8    we may complain he's not a rebuttal expert.

9            And yesterday, we got notice that the Government

10   wants a second rebuttal expert, who we reserve our right to

11   challenge that, Judge.

12           THE COURT:  All right.  So you don't have to

13   respond to that now, Mr. Frank.  I understand from your

14   expression that you don't agree.

15           And so just in terms of scheduling, so what I hear

16   is if we went Monday until 11:00, Tuesday morning, the

17   defense -- or the Government presents its live witness, you

18   go with your experts, you think you would finish your case,

19   your defense case, sometime possibly Wednesday and certainly

20   Friday.

21           MR. WEINBERG:  Yes.

22           THE COURT:  It would be in that range.

23           MR. WEINBERG:  Yes, Your Honor.

24           THE COURT:  Depending on how much you -- how many

25   people you call.  But it sounds likely -- the likely outcome

1    is Wednesday or Thursday.  Might be Friday.

2              MR. WEINBERG:  Somewhere --

3              THE COURT:  Depends some of it on cross and some of

4    it --

5              MR. WEINBERG:  Somewhere in that area, Judge.

6              THE COURT:  All right.  And your rebuttal case, if

7    you call all of the witnesses, however they're labeled.

8              MR. FRANK:  It would be short.

9              THE COURT:  It would be short -- so it's possible

10   that we'll finish the case potentially Thursday, if they

11   finished Wednesday and possibly Monday, but something in that

12   time frame.

13             MR. FRANK:  Yes, Your Honor.

14             THE COURT:  All right.  Okay.

15             MR. WEINBERG:  We're ahead of schedule, Judge.

16             THE COURT:  Right.  I thought so, but just I wanted

17   to kind of go over it all.  Okay.  Fine.

18             Then this is what I'm going to do.  I'm going to go

19   over the schedule with the jury at the end of the day, before

20   I send them home.  I'm going to tell them -- unless one of

21   you disagrees with this -- I'm going to tell them that Monday

22   that we're going to -- we're on or ahead of schedule, that

23   the Government -- that given the shift in both the

24   combination of form witnesses and shift from the Government

25   presentation of evidence, the defense presentation of

1    evidence and scheduling the witnesses, the --

2            What we're going to do is Monday, they're going to

3    hear from three witnesses and we anticipate -- that we'll

4    certainly be done by 1:00 and there's a very strong

5    likelihood that we'll be done much earlier than 1:00, and --

6    but for scheduling and sequencing and better presentation of

7    evidence, it makes more sense to do it this way.  So they'll

8    get out early on Monday.

9            Tuesday morning, we'll start at 9:00, the

10   Government will have another witness on Tuesday, who's coming

11   from overseas, and then we anticipate that will be the end of

12   the Government's case, and we'll turn to the defense case.

13           The defense will then present evidence that -- and

14   I expect that they're going to get the case no later than the

15   beginning of the following week and leave it at that for now.

16   And then we can talk a little more as we get closer, in terms

17   of the mechanics of that, and the like.

18           MR. WEINBERG:  Two last matters, Judge.  One is, we

19   do want, since the -- Mr. O'Callaghan is going to be planning

20   on flying over from Ireland, I assume, on -- sometime on

21   Monday, to testify Tuesday morning, you know, we do, again,

22   request that the Court exclude him.  We still have not

23   received any response from NTMA.  He's a witness.  Were he

24   not a foreign witness, we would --

25           THE COURT:  Now I'm ready to go over all of those

1    evidentiary issues, starting first on Monday, but that's
2    Tuesday, but I'm not ignoring that.
3              MR. WEINBERG:  Okay.
4              THE COURT:  So Monday, taking that one at a time,
5    first there's -- you have issues -- the defense has issues
6    both with the agent who's reading things, with respect to
7    what he's reading, and with respect to the admissibility of
8    the statements that Mr. McLellan is alleged to have made to
9    the other agent, and no particular issues with the State
10   Street witness, or yes?
11             MR. WEINBERG:  I don't expect any -- I don't know,
12   other than reading a two and a half page 302, I don't know
13   whether Mr. Frank is going elsewhere.  We will object to any
14   testimony by this witness regarding any monetary payment made
15   by State Street, any deferred prosecution.
16             THE COURT:  You mean to the criminal fine or the
17   deferred prosecution?
18             MR. WEINBERG:  Anything that suggests to this jury
19   unnecessarily that the bank conceded guilt, whether -- either
20   deferred prosecution or through the payment of the criminal
21   penalty as -- you know, as implicating 403 issues and
22   implicating the Sixth Amendment issues, given the Crawford
23   case, which prohibits the substantive use of a plea of a
24   co-conspirator against a defendant and I think even limiting
25   instructions would detoxify the prejudice that would be

1    generated by that kind of evidence.

2            THE COURT:  So I guess my question, first, as to

3    this witness, is are you offering the deferred prosecution

4    agreement, the fact that they admitted guilt, or the criminal

5    fine paid?

6            MR. JOHNSTON:  Your Honor, we don't plan to

7    introduce the deferred prosecution agreement.  You ruled on

8    that.  Your Honor ruled on that already.  We didn't plan on

9    putting it into evidence.

10           However, we do believe the deferred -- the fact

11   that there was a deferred prosecution agreement still has to

12   come into evidence through the testimony of Mr. Shaw for two

13   independent reasons.

14           One, we need to establish that the -- and we're

15   entitled to establish that the AXA fraud affected State

16   Street as a financial institution.  One of the ways that it

17   affected State Street was that, because it had a deferred

18   prosecution agreement with the Government, it had an

19   obligation to investigate and to expend resources to uncover

20   what had happened and then to report that conduct to the

21   Government.  So in that instance, it expended resources to --

22   just to be able to uncover what had happened.

23           Secondly, the deferred prosecution agreement, or at

24   least the fact that the company had to pay fines as a result

25   of its employee's conduct, is also relevant to show that --

1    and something that we need to establish, is that misconduct

2    by employees can result in losses to their employer.  And

3    there's -- you know, in our briefing on this, we've cited a

4    number of cases that have allowed such evidence and have

5    relied on that, on exact -- exactly the same type of evidence

6    to be able to establish that an employer -- an employee's

7    conduct can affect his financial institution employer's

8    business for purposes of the 10-year statute of limitations.

9    So we think we have to be able to elicit it on both ends.

10          But we don't need to -- I mean, the issue that we

11   face is the defense, right, doesn't want us to be able to

12   elicit the fact that the fine was paid or the magnitude of

13   the fine.  But the problem is, you know, they don't want to

14   stipulate at all to the fact that any institution -- that any

15   financial institution was affected.  So we still have to meet

16   our burden of proof.  They may not like it.  They may not

17   like the fact that that's now an element of the crime.  So we

18   are perfectly open to a limiting instruction, to say this is

19   what it means for a financial institution to be affected.  It

20   doesn't necessarily imply any guilt about the person --

21          THE COURT:  What, if at all, is there evidence that

22   bears on the question of affecting the financial institution?

23          MR. JOHNSTON:  Well, I mean, it's the fact that

24   they -- you know, we've elicited a little bit through some of

25   the other victims, who said we just cut off all business with

1    State Street.  So that would be -- but of course, their

2    position is, well, that was a different fraud.  That's not --

3    the AXA fraud didn't go and affect State Street that way.

4    You know, the testimony that we heard was the Sainsbury's

5    victim, or the Royal Mail victim.  So the defense's position

6    is well that even -- even that testimony doesn't prove

7    anything about what the AXA conduct did, the effect that the

8    AXA conduct had on State Street.

9            Obviously our position is that, based on the case

10   law, it is an increased or new risk of loss.  So it doesn't

11   have to be actual loss.  So showing that the same type of

12   conduct, occurring at the exact same time --

13           THE COURT:  So the one piece of evidence that you

14   have is that these victims of a Count 1 conspiracy described

15   that the -- learning about the conduct at issue in the case

16   caused them to blacklist State Street or not do business with

17   State Street, either specifically transition management, or

18   more generally with all their businesses.  And that while

19   that wasn't AXA, that's of the piece and the jury could infer

20   that similar conduct could lead to a similar result.  And so

21   one argument -- one set of evidence that you have is that.

22           MR. JOHNSTON:  That's one set.

23           THE COURT:  Okay.  And then the second set of

24   evidence is whatever the -- whatever of that genre the AXA

25   witness said.

1           MR. JOHNSTON:  Yes.  So the AXA witness -- the

2   issue, right, is that -- you know, because the AXA fraud was

3   really just uncovered in the fall, the resolution of that

4   matter has not happened yet.  There's still ongoing

5   negotiations between State Street and AXA as to what

6   resolution will be because of that and so -- and we're not

7   going to elicit, well, what's the course of your negotiation,

8   right?

9           THE COURT:  Sure.

10          MR. JOHNSTON:  So we're sort of stuck between a

11  rock and a hard place.

12          THE COURT:  So they're not going -- he's not going

13  to say we blacklisted them, because they haven't yet decided

14  whether to blacklist them.

15          MR. JOHNSTON:  Right.  And that --

16          THE COURT:  Or that they paid us a certain amount

17  of money, or whatever, or that they paid a fine, a civil

18  fine, State Street, as a result of AXA, because that's still

19  being worked out.

20          MR. JOHNSTON:  Right.  It's still being worked out.

21  You know, the -- the defense sort of wants it where well, we

22  can't elicit that fine -- well, a fine hasn't been paid, so

23  obviously we can't elicit that.  Well -- and the fine would

24  pay for the first, Count 1 through Count 5, so we can't

25  elicit that.  You know, we can't elicit anything to make --

1    to actually meet our burden.

2            THE COURT:  Actually, Mr. Weinberg, you just

3    expressed exactly.  His view is that you should have done it

4    already.  Grievous error has been committed day after day by

5    me allowing you to present all this evidence and if I had

6    just eliminated all the evidence, the trial would have been

7    faster, and it would have been fair.

8            MR. WEINBERG:  And ironically, the very evidence

9    that Your Honor did admit is within the monetary -- is

10   consistent with what the Government now wants, which is a

11   deferred prosecution and a fine paid for the Sainsbury's,

12   paid for the Royal Mails.  They have that evidence, over our

13   objection, to argue that the bank was at risk.  You heard

14   Dean Johnson, without dispute, say that they were blacklisted

15   and you heard these witnesses say that monies were paid.

16   They have that.  We're not going to dispute that.  It's not

17   disputed.

18           But I'd like to just make a record, Judge, that,

19   one, we, dispute the case law that the Government correctly

20   cites and it's not a lot of case law that I can cite, the

21   idea that State Street signs an agreement and ends up, you

22   know, reporting itself.  And you know, was charged here as a

23   co-conspirator, that they're also alleged to be the financial

24   institution that is harmed for purposes of bank fraud

25   jurisdiction, you know, we disagree with and we object to.  I

1   understand the case law is --

2           THE COURT:  Pause here.  I'm going to -- I will

3   hear both of you more with respect to this and the other

4   evidentiary issues that relate to Monday, so we can --

5   because I can see how it would be helpful to all of you if I

6   resolve them today, so I'll do that, but I don't want to

7   delay waiting the jury.

8           Just one last question for Mr. Johnston.  So what

9   you want to add, what you basically have is the victims from

10  Europe who have said -- that interfered with our -- we

11  changed the amount of business we did with State Street.  We

12  eliminated it, we blacklisted them, we stopped working with

13  them, whatever -- however the different ways they put it.

14  That's one set.

15          What you want to admit, through the State Street

16  witness, is, (a), as a result of the Count 1 conspiracy, we

17  entered into a deferred prosecution agreement, not the

18  agreement itself, but the fact that they entered into an

19  agreement.  Two, you want to admit that a deferred

20  prosecution agreement required us, when we learned of the AXA

21  issue, to investigate it and report it.  And that cost us

22  money to investigate it and report it.

23          And three, that -- was three you wanted to admit

24  the fine, or not?

25          MR. JOHNSTON:  No, we don't necessarily need to

1    admit the fine.  What we do want --

2             THE COURT:  It's yes or no, whether you're asking

3    for it or not.

4             MR. JOHNSTON:  We want a --

5             MR. FRANK:  Remember, you --

6             THE COURT:  This is just one more example, in that

7    long-simmering issue that has pervaded American history since

8    like the passage of the constitution, which is who is in

9    charge.  This is the moment, is it Washington, or is it

10   Boston, and I'll let you two work that out.

11            MR. FRANK:  Let me just say I'm very uncomfortable

12   advocating a states' rights position here, but --

13            THE COURT:  Maria, go get the jury.

14            MR. WEINBERG:  Judge, we of course think that any

15   evidence that suggests that State Street believed this to be

16   a fraud, admitted this to be a fraud, you know, is akin to

17   testimony that a co-conspirator pled guilty or conclusions.

18            MR. FRANK:  And that's not what we're asking for,

19   to be clear, Your Honor.  We don't have to call it a deferred

20   prosecution agreement.  We can call it an agreement.  We

21   don't have to call it criminal money penalty, we can call it

22   a fine or a penalty, but the magnitude is relevant.

23            THE COURT:  Right.

24            MR. WEINBERG:  The magnitude is not relevant.  It's

25   the risk of having to pay money that is the element.

```
 1                MR. FRANK:  If I could finish --
 2                THE COURT:  We'll talk more about it at 1:00 or at
 3      11:00.
 4                Mr. Frank, you should have a fuller view of the
 5      state's rights position.  It was justice Brandeis, himself,
 6      who was a major proponent of states' rights.
 7                (The jury enters the courtroom.)
 8                THE COURT:  Good morning, ladies and gentlemen of
 9      the jury.  Nobody did any independent research, discussed the
10      case, or anything of that nature?  Good.  All right.  So I
11      thank you for accommodating me in that I had a
12      judicial education conference, as I explained to one of your
13      number -- one or two I ran into in the cafeteria this
14      morning, that it was a conference both which I was speaking
15      at and being educated at.
16                So hopefully now I'm wiser, smarter, and better.
17      And you will see, you will be the judge.  Like you're the
18      judge of this case, you too, at the end, I'll ask you whether
19      you think, well, afterwards, was I better or not, and I can
20      report it back to the conference organizer as to -- at the
21      court, as to whether it really helped or not.  So you could
22      think about that.  You won't be getting any jury instructions
23      on that, but you're certainly free to comment at the end of
24      the case about that.
25                All right, so we're ready to resume with the next
```

1   witness for the Government.

2           MR. JOHNSTON:  Yes, Your Honor.  The Government

3   calls James Kelly to the stand.

4           THE COURT:  And I will, ladies and gentlemen,

5   before you go home today at 1 o'clock, I will update you on

6   the schedule for where we are in the rest of the case.

7           (The witness was duly sworn.)

8           THE COURT:  Please be seated.

9           Go ahead.

10                          **JAMES KELLY**

11       having been duly sworn, testified as follows:

12       **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

13   BY MR. JOHNSTON:

14   **Q.**  Good morning, Mr. Kelly.

15   **A.**  Good morning.  Can everybody hear me okay?

16           THE COURT:  Yes.

17   **Q.**  Where do you live?

18   **A.**  I live in New Providence, New Jersey.

19   **Q.**  How old are you?

20   **A.**  I'm 49 years old.

21   **Q.**  Where do you work?

22   **A.**  I work at AXA Equitable Life Insurance Company.

23   **Q.**  What kind of company is AXA Equitable?

24   **A.**  AXA Equitable is a life insurance company that is in the

25   business of offering retirement products, investment

1    products, and life insurance.

2    **Q.**  Do you work within a particular business unit at AXA

3    Equitable?

4    **A.**  I work within the Funds Management Group.  FMG, we call

5    it.

6    **Q.**  What does FMG do?

7    **A.**  We are the investment advisor and also the administrator

8    for the mutual funds that support our investment insurance

9    products.

10   **Q.**  What are mutual funds?

11   **A.**  So a mutual fund is an investment company that holds

12   securities; stocks, bonds.  A mutual fund is a legal entity

13   that has no employees, so it needs to contact out with an

14   investment and an administrator to run its operations.

15   **Q.**  So what you're saying is a mutual fund is a separate

16   legal entity?

17   **A.**  It's a separate legal entity, yes.

18   **Q.**  And how is it organized?

19   **A.**  It's a '40 Act company.

20   **Q.**  Is it a trust?

21   **A.**  The mutual funds are in a trust, yes.

22   **Q.**  You say that the trust doesn't actually have any

23   employees?

24   **A.**  It does not.

25   **Q.**  So what role, then, does AXA Equitable play with respect

1    to these funds?

2    **A.**   So AXA Equitable is the investment and the administrator.

3    And myself and members of the funds management group, we are

4    officers on the funds.  I'm the controller.

5    **Q.**   What does it mean to be a controller?

6    **A.**   So some of my day-to-day responsibilities include

7    financial reporting for the mutual funds, accounting-type

8    work operations, tax.  And from time to time, I also work on

9    transitions.

10   **Q.**   How long have you worked at AXA Equitable?

11   **A.**   12 years.

12   **Q.**   How long have you worked in the role of being a fund

13   administrator and advisor?

14   **A.**   About 20 years.

15   **Q.**   Where did you go to school?

16   **A.**   I went to school at Monmouth College.

17   **Q.**   What did you study?

18   **A.**   Finance.

19   **Q.**   You testified that part of your job is to hire transition

20   managers?

21   **A.**   Yes.

22   **Q.**   What sort of service providers do the funds -- or do the

23   managers need to hire on behalf of the funds?

24   **A.**   Custodian service, transition manager, subadvisors.

25   Those were all service providers that the investment advisor

1   needs to contract out with.

2   **Q.**   Who were the ultimate investors in these funds that you

3   helped manage?

4   **A.**   So the ultimate investors are the people that buy certain

5   insurance products in AXA Equitable.  In a legal sense, AXA

6   Equitable owns the funds, but the peoples that buy the

7   certain insurance products, the performance of their

8   insurance products is driven by the underlying mutual funds.

9   So if our mutual funds perform strongly, certain of these

10  insurance products will also perform strongly.

11  **Q.**   What is AXA's responsibility to these mutual funds?

12  **A.**   We have a fiduciary responsibility to the funds.

13  **Q.**   What does it mean to have a fiduciary responsibility, in

14  your understanding?

15  **A.**   My understanding is we need to put the interests of the

16  funds' before our own.

17  **Q.**   Do you have any individual responsibility toward the

18  funds?

19  **A.**   I have a fiduciary responsibility, myself, to the funds.

20  **Q.**   And why do you individually have such a responsibility?

21  **A.**   I am an officer of the funds.

22  **Q.**   What, if any, does this responsibility have on your

23  approach to costs?

24  **A.**   We would look to minimize costs, where possible, because

25  that will increase the performance of our funds.

1   **Q.**  Do these funds ever have occasion to hire a transition

2   manager?

3   **A.**  Yes, they do.  For example, there's times where a

4   portfolio manager needs to be replaced, or maybe a fund is

5   changing an investment strategy.  And that would require a

6   mutual fund to do a large amount of buying or selling, kind

7   of changing the makeup or changing the composition of what

8   the funds hold.

9   **Q.**  Why would you need a transition manager to do that for

10   you?

11   **A.**  Because FMG does not -- the funds management group does

12   not have its own brokerage operations, so we would need to

13   contract out with a transition manager.

14   **Q.**  Directing your attention to early 2011, did a number of

15   AXA funds undergo a transition?

16   **A.**  Yes.

17   **Q.**  Which funds were these?

18   **A.**  EQ/Core Bond, multi-sector portfolio -- Multi-Manager

19   Multi-Sector Portfolio, Multi-Manager Core Bond.

20   **Q.**  And what types of -- so are these three different mutual

21   funds?

22   **A.**  Three different mutual funds, yes.

23   **Q.**  And what types of assents were in these mutual funds?

24   **A.**  Fixed income bonds.

25   **Q.**  Just bonds?

1    **A.**   Primarily bonds.

2    **Q.**   How large were these three funds put together?

3    **A.**   Billions of dollars.

4    **Q.**   What was your -- your personal role with respect to these

5    three funds that were undergoing a transition?

6    **A.**   So I was part of a group within the funds management

7    group that had the responsibility of selecting a -- selecting

8    a transition manager and also supervising the transition

9    manager throughout the whole process.

10   **Q.**   In general, how does the group that you're a part of go

11   about the process of selecting a transition manager?

12   **A.**   So first we -- our goal is to prequalify a number of

13   transition managers through a due diligence questionnaire.

14   And this due diligence questionnaire is about a 30- to

15   40-page document, with a whole host of questions for

16   transition managers, because we want to know all aspects of a

17   transition manager's capabilities and their operations before

18   we would even start dealing with them.   That's the first

19   step.

20   **Q.**   So you send these questionnaires to the -- to various

21   transition managers?

22   **A.**   We do and the transition managers would fill them out and

23   then we would receive them back.   And a number of us within

24   the funds management group would then review the question --

25   review the answers that the transition manager inserted.

1    **Q.**  If you were satisfied with the answers in the

2    questionnaire, what would -- what happens then?

3    **A.**  The next step is to typically set up an onsite due

4    diligence visit with the transition manager and, you know, to

5    further meet face to face, ask more questions, tour their

6    trading floor.

7    **Q.**  And then if you're satisfied with what you see in person,

8    what's the next step?

9    **A.**  The next step is typically we would put them, what we

10   call, on our bench, and have them available to send proposals

11   to.

12   **Q.**  At any given time, how many transitions managers would be

13   on AXA's bench?

14   **A.**  Three to four.

15   **Q.**  I'd like to show you, for the witness only, a document

16   that's been marked as Government Exhibit 4.

17           MR. JOHNSTON:  Bear with me for a second.  My

18   monitor is not working.

19           THE COURT:  You can't see it on the monitor?

20           THE WITNESS:  No.

21           THE COURT:  Maria?

22           It's not on yours, either, Mr. Johnston?

23           MR. JOHNSTON:  No.

24           THE COURT:  It's on mine.

25           THE DEPUTY CLERK:  I'm not sure.

```
1              MR. JOHNSTON:  Well, can the witness see it?
2              THE COURT:  He cannot.
3              Maria, go check.
4              MS. LEAHY:  We can give him a hard copy.
5              THE COURT:  In the meantime, do you have a hard
6     copy you can give him?
7              MS. LEAHY:  Yeah.
8              MR. JOHNSTON:  Could you actually just give him all
9     the binders?
10             MS. LEAHY:  You don't want to use the ELMO?
11             MR. JOHNSTON:  For the witness, we'll need all of
12    them.
13             MR. WEINBERG:  Judge, since there's an evidentiary
14    objection to this object, can we approach the bench while the
15    Government is coordinating?
16             THE COURT:  Sure.
17             (The following discussion held at the bench.)
18             MR. WEINBERG:  If I understand directly, the
19    Government is offering a 40- or 50-page questionnaire and
20    that is dated September of 2009, prepared by persons other
21    than Mr. McLellan and we, therefore, object.
22             THE COURT:  So can I just see it?
23             MR. GOLDSTEIN:  Sure.
24             THE COURT:  Is this basically -- this is the
25    questionnaire that we talked about?
```

1          MR. JOHNSTON:  Yes.  And at the time this was

2     submitted, Mr. McLellan was the business head of the unit.

3     So we're not saying that he personally wrote this, but this

4     shows the representations that his business --

5          THE COURT:  What's the objection?

6          MR. WEINBERG:  It's 18 months earlier.  It's not

7     directly correlated to this transition and there will be no

8     other questionnaire or update to it.  So we think it's not

9     relevant.

10          THE COURT:  Overruled.

11          MR. WEINBERG:  Thank you.

12          (Bench conference concluded.)

13          THE COURT:  We're working on the monitors, but in

14     the meantime, does the witness have a paper copy of that

15     exhibit?

16          MR. JOHNSTON:  Yes.

17     BY MR. JOHNSTON:

18     Q.  Could you look at the one that starts with the range of 1

19     to 90?

20          THE COURT:  So the binders have different ranges.

21     We want you to look at number 4.

22          MS. LEAHY:  104.

23          MR. JOHNSTON:  Yeah 104 and we'll start on page 4.

24          THE COURT:  Number 104 or number 4?

25          THE WITNESS:  Tab 4, I have it.

```
1              THE COURT:  So just so I'm clear, is it Exhibit 4?
2              MR. JOHNSTON:  It's Exhibit 4.
3              THE COURT:  All right.
4    BY MR. JOHNSTON:
5    Q.  Do you recognize this document, Mr. Kelly?
6    A.  Yes.
7    Q.  What is it?
8    A.  This is a due diligence questionnaire that was sent from
9    our compliance department within the funds management group
10   to State Street.
11             MR. JOHNSTON:  Your Honor, at this time, the
12   Government moves to admit Exhibit 4 into evidence.
13             THE COURT:  All right.  It's allowed.
14             MR. JOHNSTON:  Thank you, Your Honor.  Permission
15   to publish to the jury.  Let's see if that works.
16             THE COURT:  We'll see if it works.  Is it on your
17   monitors?
18             MR. JOHNSTON:  It actually just popped up on mine,
19   too.
20   BY MR. JOHNSTON:
21   Q.  Mr. Kelly, is your monitor working?
22   A.  Well, I think my green light is off, I think.
23             Yes.  Well, it's a little bit fuzzy.
24             THE COURT:  Well, you'll have the paper copy.  You
25   can always refer to that, if you prefer, if it's clearer.
```

1          Go ahead, Mr. Johnston.

2    BY MR. JOHNSTON:

3    **Q.**  Mr. Kelly, is this one of the questionnaires that gets

4    sent out to transition managers you're seeking to put on your

5    bench?

6    **A.**  Yes, it is.

7    **Q.**  Let's take a look at page 4, please.

8          THE COURT:  Maybe you could get the date, just

9    to --

10          MR. JOHNSTON:  Sure.

11   BY MR. JOHNSTON:

12   **Q.**  And then back to page 1, if you could look.  What's the

13   date that was -- that this document was submitted?

14   **A.**  September 3, 2009.

15          MR. JOHNSTON:  Can we go to page 4, please.  If we

16   could blow up where it says "Global Fixed Income."

17   BY MR. JOHNSTON:

18   **Q.**  Mr. Kelly, what is your understanding of the phrase

19   "State Street is a lead agency fixed-income trading firm"?

20   **A.**  That State Street would trade on an agency basis, meaning

21   that they would trade on behalf of their client, that they

22   would go out in the market and seek the best price possible.

23   That they would not trade out of their own inventory of

24   securities and that's potentially a conflict because they

25   could generate revenue other than the stated commission rate

1    that we pay them.

2    **Q.**  What's your understanding of the term "best execution,"

3    which appears in the next sentence?

4    **A.**  So best execution, my understanding it's a trading term,

5    and you would go out into the market and try and get the best

6    price possible for a given trade at the lowest possible cost.

7            MR. JOHNSTON:  If we could take a look at page 8,

8    please, and if you can go in on the paragraph that

9    states "fiduciary responsibility."

10   BY MR. JOHNSTON:

11   **Q.**  "State Street is willing to act as a fiduciary for the

12   portfolio for the entire transition period."

13           What is your understanding of what that term means?

14   **A.**  That State Street would put the interest of our funds

15   ahead of their own, throughout the entire transition period,

16   starting with their responses in the due diligence

17   questionnaire, through the pre-trade analysis, through

18   trading, through post-trade reporting, just through the

19   entire process.

20           MR. JOHNSTON:  And if we could go to page 13,

21   please.  Go to the answer on number 13, please, Erin.

22   BY MR. JOHNSTON:

23   **Q.**  So directing you attention to this question, where you've

24   requested a disclosure of relevant revenue.  What's your

25   understanding of the answer, "State Street's sole source of

1    transition revenues is commissions, which are detailed in our

2    pre-trade analysis and agreed upon in each transition

3    notice"?

4    **A.**   That State Street's sole source of revenue for

5    transitioning our portfolios would be from the stated

6    commission rate that was -- that was in the pre-trade

7    analysis.  That would be their only source of revenue.

8              MR. JOHNSTON:  And let's go to page 14, please, and

9    if we can blow up number 15.

10   BY MR. JOHNSTON:

11   **Q.**   And directing your attention to where it says, under sub

12   question (a), "Our only remuneration commissions is paid

13   explicitly in commission fees, which are detailed in our pre-

14   and post-trade reports."

15             What's your understanding of what they're telling

16   you here?

17   **A.**   That State Street's sole revenue source for transition of

18   trading in our portfolios would be from the stated commission

19   rate that was agreed upon in the pre-trade analysis.

20             MR. JOHNSTON:  And now let's take a look at

21   page 45.  If we can zoom in on the 2B1.  Just this whole

22   text.  That would be fine.

23   BY MR. JOHNSTON:

24   **Q.**   Now, directing your attention to the answer at the bottom

25   of the screen, where it says "We do not markup trades."

1    What's your understanding of what State Street is

2    telling you here?

3    **A.**   It's my understanding that the commission rate would be

4    the sole source of revenue and that there wouldn't -- there

5    wasn't going to be another source of revenue.

6    **Q.**   All right.  And let's go to page 12 briefly.  If we can

7    zoom in on the organization chart at the top.  What's your

8    understanding of who was the head of transition management

9    when AXA received this questionnaire?

10   **A.**   Ross McLellan.

11       MR. JOHNSTON:  Can you take this down?

12   BY MR. JOHNSTON:

13   **Q.**   In early 2011, was State Street on AXA's bench?

14   **A.**   Yes.  They successfully made it through our due diligence

15   process and they were on our bench.

16   **Q.**   Had you ever actually done a transition with them at that

17   point?

18   **A.**   Not prior, no.

19   **Q.**   So they had been on your bench for a little while?

20   **A.**   I would estimate a year or two.

21   **Q.**   Do you know why you hadn't chosen State Street up to that

22   point?

23   **A.**   I don't have a specific memory.  I -- my best memory is

24   that they just did not win a -- a bid.  Maybe other

25   transitions managers beat them out.

1    **Q.**  Now, in the 2011 time period, where these three mutual

2    funds that you testified about, were looking to go through a

3    transition, which transition managers did you reach out to to

4    request proposals from?

5    **A.**  We requested proposals from State Street, BlackRock, JP

6    Morgan, and BNY ConvergEx.

7    **Q.**  Did you receive responses from all of those?

8    **A.**  Yes, we did.

9    **Q.**  Let's take a look at -- actually, before we go and look

10   at it, how, in general, do you go about reviewing and

11   analyzing the proposals that you receive from transition

12   managers?

13   **A.**  So it's a collaborative effort within the funds

14   management group.  It's not just one person that's going to

15   make a decision.  We have members from compliance, investment

16   services, fund administration, my department.  The whole

17   group of us will collaborate and look at all the pre-trade

18   analyses and determine which transition manager that we would

19   give a transition to.

20   **Q.**  Are you familiar with a concept called implementation

21   shortfall?

22   **A.**  Yes.

23   **Q.**  What is an implementation shortfall?

24   **A.**  The implementation shortfall is the total cost of buying

25   and selling securities.  It has explicit costs or direct

1    costs like a commission rate, but it also has indirect costs

2    that are not known until a security trades, but they can be

3    estimated.

4    **Q.**   Which parts of the implementation shortfall can be known

5    in advance?

6    **A.**   The commission rate.

7    **Q.**   Which parts are estimates?

8    **A.**   Opportunity costs, market impact, spread costs.

9    **Q.**   What -- how important, if any, is the commission cost in

10   your decision to hire a transition manager?

11   **A.**   It is significant, because it's a known cost, before you

12   start trading.

13              MR. JOHNSTON:  And now I want to show you a

14   document, for the witness only, Exhibit 95.

15              THE COURT:  Can you see it?

16              THE WITNESS:  If you can blow it up.  That's fine.

17   BY MR. JOHNSTON:

18   **Q.**   Mr. Kelly, do you recognize this document?

19   **A.**   Yes.

20   **Q.**   What is it?

21   **A.**   This is an e-mail from myself to State Street, Ross

22   McLellan, and Kevin Walker.  And I am sending them compliance

23   certification to fill out.  Also, I am sending them

24   materials, such as the model portfolio and our current

25   portfolios, so that they can complete a pre-trade analysis.

1    **Q.**  Mr. Kelly, is this e-mail that you're looking at just

2    part of an earlier e-mail in a longer chain?

3              MR. JOHNSTON:  You can zoom out, Erin, and show him

4    the top.

5              THE WITNESS:  Yes.

6    BY MR. JOHNSTON:

7    **Q.**  Your Honor, at this time the Government moves to admit

8    Exhibit 95 and its attachment, 95.1?

9              MR. WEINBERG:  No objection.

10             THE COURT:  Admitted.

11             MR. JOHNSTON:  Publish to the jury, please.

12             THE COURT:  Yes.

13             (Exhibit Nos. 95 and 95.1 admitted into evidence.)

14             MR. JOHNSTON:  Let's zoom back in at the bottom,

15   please.

16   BY MR. JOHNSTON:

17   **Q.**  Mr. Kelly, what documents are you sending to Mr. McLellan

18   and Mr. Walker?

19   **A.**  Compliance certification, the model portfolio, and our

20   current holdings.  They need these -- they need the model

21   portfolio and the current portfolio to complete their cost

22   estimate or pre-trade analysis.

23   **Q.**  What stage in the selection process are you at when

24   you're sending this e-mail to Mr. McLellan and Mr. Walker?

25   **A.**  This would be after we've chosen State Street as a

1    transition manager for this project.

2    **Q.**   After you've -- have you received a proposal from them

3    yet?

4    **A.**   Actually, this is -- I'm sorry; I said after.  Prior

5    to -- this is -- this is part of -- this is part of the --

6    what we would send out to each transition manager, for them

7    to complete a pre-trade analysis.  Then we would receive all

8    of the pre-trade analyses back from all of the transition

9    managers.

10   **Q.**   So at this point, you're just reaching out to State

11   Street to ask for a proposal?

12   **A.**   Correct.

13   **Q.**   And is this the info that they need to give you a

14   proposal?

15   **A.**   It is.

16   **Q.**   And then when you say, "Pre-Trade analysis is due back to

17   us by tomorrow end of day."

18              What are you telling them there?

19   **A.**   I'm telling them -- I'm asking them to complete a cost

20   estimate or a pre-trade analysis and to have it back to us by

21   tomorrow, end of day.

22   **Q.**   And when you say, in the very first line, "as discussed,

23   please see attached files," what's your understanding of

24   whether you had a conversation with Mr. McLellan?

25   **A.**   So my understanding is that I would have -- I would have

1    called Ross and just given him a heads-up that these

2    documents were coming over, so he could look out for it in

3    his e-mail.

4    **Q.**  Let's take a look at the response up top, please.  Did he

5    send you a document back --

6    **A.**  Yes.

7    **Q.**  -- Mr. McLellan?

8              MR. JOHNSTON:  Let's take a look at the attachment,

9    please.  95.1.  Let's zoom in.

10   BY MR. JOHNSTON:

11   **Q.**  What document are we looking at, Mr. Kelly?

12   **A.**  This is a compliance certification that I'd have --

13   **Q.**  What's the purpose?

14   **A.**  Just to have the -- each transition manager certify to us

15   certain things that, for example, that they will report any

16   trade errors.  We just want to be comfortable with the

17   compliance culture of the transition manager.

18   **Q.**  Who signed this one behalf of State Street?

19   **A.**  Ross McLellan.

20             MR. JOHNSTON:  We can take this down, Erin.

21             And I want to show a document for the witness only,

22   Exhibit 101.

23   BY MR. JOHNSTON:

24   **Q.**  Do you recognize this document, Mr. Kelly?

25   **A.**  Yes.

1  **Q.**  What is it?

2  **A.**  This is a document from State Street and it includes the

3  pre-trade analyses.

4  **Q.**  And is this date one day after that prior e-mail we

5  looked at?

6  **A.**  I didn't notice the date on the prior e-mail.

7  **Q.**  What's the date that you see on this e-mail?

8  **A.**  February 24th.

9         MR. JOHNSTON:  Your Honor, at this time the

10  Government moves to admit Exhibit 101, with its attachments,

11  101.1, 101.2, 101.3, and 101.4.

12         MR. WEINBERG:  No objection.

13         THE COURT:  Admitted.

14         (Exhibit Nos. 101, 101.1, 101.2, 101.3, and 101.4

15         admitted into evidence.)

16         MR. JOHNSTON:  If we can publish to the jury,

17  please.

18         THE COURT:  I did.

19  BY MR. JOHNSTON:

20  **Q.**  Who sent you the pre-trade back?

21  **A.**  Kevin Walker.

22  **Q.**  And why are there four different attachments to this

23  e-mail?

24  **A.**  There is -- three attachments are for each fund in the

25  transition and then they also -- State Street also sent a

1    strategy document, transition management strategy document.

2    **Q.** Did you review the pre-trade analysis after receiving it

3    from State Street?

4    **A.** I reviewed it and a number of my colleagues reviewed it.

5    **Q.** Let's take a look at 101.1, please.  What's this

6    particular document that we're looking at?

7    **A.** That is the transition strategy analysis that State

8    Street sent to AXA.

9           MR. JOHNSTON:  Let's take a look at page 5 of this

10   document.  We can zoom in on the graphic at the bottom.

11   BY MR. JOHNSTON:

12   **Q.** Directing your attention to the phrase at the bottom of

13   the right-hand corner of this wheel, where it says "fully

14   dedicated global agency trading desk."

15          What's your understanding of what that phrase

16   means?

17   **A.** That State Street would trade on an agency basis for our

18   trades, meaning they would not trade out of the inventory of

19   their own securities, to potentially generate another source

20   of revenue for themselves.  That they would go out in the

21   market, as our agent, and try and obtain the best price

22   possible for our funds.

23   **Q.** And then where it says "fiduciary relationship."  Do you

24   have an understanding of that phrase that differs from what

25   we saw in the questionnaire?

**A.**  No, it doesn't differ.  State Street is representing that
they would be a fiduciary for our funds and put the interests
of our funds ahead of their own.

**Q.**  Let's take a look at page 9, please.  If we can zoom in
at the top.

Directing your attention to the top of that
paragraph where it says, "State Street's transition
management business model is built around complete
transparency to clients in relation to all elements of
transaction cost and performance.  State Street's goal in
transitioning fixed income assets is to maximize the value of
the transition portfolio by eliminating the hidden costs and
conflicts of interest that exist within the fixed income
market."

What's your understanding of what State Street is
telling you in this part of their proposal?

**A.**  Okay.  So for the first sentence, that State Street is
going to be completely transparent to us, as a client,
through the whole transition management process.  They're
going to be transparent and honest about their answers in the
due diligence questionnaire.  They're going to be honest and
transparent about the pre-trade analysis that they sent us,
the bid, through trading, and through the post-trade
reporting.

**Q.**  Let's take a look at paragraph 2, briefly.

1          Directing your attention to the first two

2     sentences, where it says "State Street does not charge an

3     explicit management or project management fee for transition

4     assignments.  State Street does not take a spread on any

5     transactions, nor do we let any counterparty take a spread on

6     our clients' transactions."

7          What is your understanding of what State Street is

8     telling you here?

9     **A.**   I understand this to mean that State Street's sole source

10    of revenue, that they represented multiple times, would just

11    be form the commission rate that's charged to our trades at

12    the time of execution.

13    **Q.**   Let's take a look at page 6, please.

14         Now, you testified that there were three different

15    bond portfolios that were going to be transitioned?

16    **A.**   Yes.

17    **Q.**   What are we looking at here on this page?

18    **A.**   This is part of a pre-trade analysis that was sent from

19    State Street and it details out the costs of the transition.

20    **Q.**   And is this for all three portfolios or just for one of

21    the portfolios?

22    **A.**   Just for one portfolio, the Multi-Sector Bond Portfolio.

23    **Q.**   All right.  And let's take a look at where

24    the "commission" line is.  What's your understanding of

25    what's being represented to you here?

1  **A.**  That State Street would charge .57 basis points and that

2  the estimated dollar amount of applying that rate to our

3  trades would be $95,000.

4  **Q.**  So of these two numbers, the basis point number and the

5  absolute dollar number, which one, if any, is, in your mind,

6  approximate?

7  **A.**  The approximate is the dollar amount.  The basis point

8  number, that's a fixed rate.

9  **Q.**  Why is the dollar amount approximate, in your

10  understanding?

11  **A.**  Yeah, the dollar amount is approximate, because the

12  trades are going to take place sometime in the future, maybe

13  four or five, six business days down the road and we won't

14  know exactly, because of market volatility, what the prices

15  of those securities that are going to be bought and sold.  So

16  the dollar amount can fluctuate.

17  **Q.**  Can the rate fluctuate in your understanding?

18  **A.**  The rate would not fluctuate from the final pre-trade

19  analysis, through trading.  That's not acceptable.

20  **Q.**  Let's take a look at page 7, please.  What are we looking

21  at on this page?

22  **A.**  Same document, but for a different fund.  This is part of

23  the pre-trade analysis sent by State Street.

24  **Q.**  And let's draw your attention to the commissions line.

25  What's the approximate dollar amount of commissions

1     that State Street says they will earn on -- for trading this

2     particular portfolio?

3     **A.**   Approximately $117,000.

4     **Q.**   And you'll notice the -- on the right is the basis point

5     number, slightly above the prior one?

6     **A.**   Yes.

7     **Q.**   Do you -- is your understanding about which of these two

8     is approximate any different than for the prior fund?

9     **A.**   No different.  The basis point is fixed and the dollar

10    amount can fluctuate for the reason I mentioned.

11    **Q.**   Let's take a look at page 8, please.

12             What are we looking at on this page?

13    **A.**   Same document, but for another fund, part of a pre-trade

14    analysis.

15    **Q.**   And is the -- in your understanding, the commission

16    information presented to you in any different way than in the

17    prior two funds?

18    **A.**   No different.

19    **Q.**   So looking at the approximate dollar amounts of

20    commissions for the three funds, this one is $379,000 and we

21    saw that there were approximately 95, 117,000 of the prior

22    two.  What was your understanding of the total amount of

23    commissions in the approximate range that State Street was

24    proposing to charge you for all three portfolios?

25    **A.**   It was roughly $590,000.

```
 1              MR. JOHNSTON:  You can take those down, Erin.
 2    BY MR. JOHNSTON:
 3    Q.  Who did you end up choosing to select -- or to undertake
 4    your transition?
 5    A.  We chose State Street.
 6    Q.  Why did you choose State Street?
 7    A.  Well, first, because they made it through our due
 8    diligence process, the due diligence questionnaire and
 9    follow-up questions.  Also, they were the low cost provider.
10    They -- with the pre-trade analysis, their total costs were
11    estimated to be lower than the other transition managers.
12    Q.  How did the commission figure that they quoted compare to
13    the commission figures quoted by the other transition
14    managers?
15    A.  The commission rate was lower than other transition
16    managers.
17    Q.  Did you personally make this decision, or was it a
18    collective one?
19    A.  No, it was a collective decision with multiple --
20    multiple of my colleagues in the funds management group.
21    Q.  Did there come a time when a contract was signed between
22    State Street and AXA for this transition?
23    A.  It's our practice to have a contact executed with a
24    transition manager, before they start trading.  We looked for
25    a contract and no contract has been found so far.
```

1   **Q.**  So you're saying that you looked in AXA's records and you

2   can't find a contact between AXA and State Street with

3   respect to this transition?

4   **A.**  We looked and we also contracted out with the technology

5   company to help us search for it, because we believed we had

6   a contract.

7   **Q.**  But you haven't --

8   **A.**  But one has not been found so far.

9   **Q.**  Is it your ordinary practice to have a contract?

10  **A.**  It is our ordinary practice.

11  **Q.**  Did the transition go forward with State Street?

12  **A.**  It did.

13  **Q.**  Did there come a time, prior to the actual trading, where

14  a member of your staff had a question about principal trades?

15  **A.**  Yes.

16       MR. JOHNSTON:  All right.  Let's take a look, for

17  the witness only, at Exhibit 208.

18  BY MR. JOHNSTON:

19  **Q.**  Do you recognize this document, Mr. Kelly?

20  **A.**  Yes.

21  **Q.**  What is it?

22  **A.**  This is an e-mail from Kevin Walker, to one of my

23  colleagues in the funds management group.

24       MR. JOHNSTON:  Your Honor, at this time, the

25  Government moves to admit Exhibit 208.

1          MR. WEINBERG:  No objection.

2          THE COURT:  Admitted.

3          (Exhibit No. 208 admitted into evidence.)

4     BY MR. JOHNSTON:

5     **Q.**  Let's take a look at the bottom e-mail first.  Mr. Kelly,

6     who sent this e-mail to Carla Byer?

7     **A.**  Kevin walker.

8     **Q.**  Do you know who Kevin Walker is?

9     **A.**  Yes, he worked in the transition management group at

10    State Street.

11    **Q.**  Can you tell us who Carla Byer is?

12    **A.**  One of my colleagues at the time in the fund

13    administration group in funds managements, FMG.

14    **Q.**  And who are the three people who are copied on the bottom

15    e-mail?

16    **A.**  Ross McLellan, Kevin Miller, and Peter Weiner.

17    **Q.**  Directing your attention to where Mr. Walker says, "Per

18    our conversation, we do not have a principal book that we

19    trade against, nor are we compensated for flow on a quid pro

20    quo basis."

21         Do you have an understanding why -- why Ms. Byer

22    would be asking about principal trades?

23    **A.**  We wanted to ensure that State Street would not be

24    trading out of their own inventory, because that would be a

25    conflict.  They could possibly generate additional revenue

1    from our trades, other than the specified commission rate on

2    the pre-trade analysis.

3    **Q.**  And then further on, where it says, "The booking

4    convention will be as riskless principal, which is standard

5    in the fixed income market, and will help avoid operational

6    errors."

7           Mr. Kelly, are you familiar with the term riskless

8    principal?

9    **A.**  I am not familiar with it.  It sounds to me like it had

10   something to do with how the trades were actually booked to

11   our funds, but I don't -- I don't have a great knowledge of

12   riskless principal, that term.

13   **Q.**  And then further on, where it says, "All spreads and

14   commissions on trades for a transition assignment are fully

15   disclosed and agreed prior to the mandate."

16          What's your understanding of what Mr. Walker is

17   telling Ms. Byer there?

18   **A.**  That the commission rate that would be on the final

19   pre-trade from State Street would be their sole source of

20   revenue for our transition and that would be fully disclosed.

21   **Q.**  Did this e-mail alter, in any way, your prior

22   understanding of State Street's role, as you understood, from

23   the questionnaire and the pre-trade?

24   **A.**  No, it was -- it was similar.

25   **Q.**  Let's then go further up to Ms. Byer's forward.  Who did

1    she -- Ms. Byer forward this e-mail to?

2    **A.**   To my colleagues in the funds management group.  There

3    are compliance colleagues there and fund administration

4    department folks.

5    **Q.**   Do you have an understanding of why Ms. Byer would

6    forward this e-mail to the rest of you?

7    **A.**   It just goes to it's an important e-mail and it should be

8    shared.

9    **Q.**   Do you recall any specific conversation you had around

10   this e-mail?

11   **A.**   Not specifically, no.

12   **Q.**   Did you receive a final pre-trade, before the trading --

13   or -- started?

14   **A.**   Yes, we did.

15   **Q.**   Let's take a look, for the witness only, at Exhibit 119.

16   And what's the date on this e-mail?

17   **A.**   March 7, 2011.

18   **Q.**   Who is this e-mail from?

19   **A.**   Kristen Morris.

20   **Q.**   Are you one of the recipients on this e-mail?

21   **A.**   Yes.

22           MR. JOHNSTON:  Your Honor, at this time, the

23   Government moves to admit 119, along with its attachments,

24   119.1 and 119.2.

25           MR. WEINBERG:  No objection.

1              THE COURT:  Admitted.

2              (Exhibit Nos. 119, 119.1, and 119.2 admitted into

3         evidence.)

4    BY MR. JOHNSTON:

5    **Q.**  Mr. Kelly, do you know who Kristen Morris is?

6    **A.**  I'm assuming she worked in the transition group at State

7    Street.

8    **Q.**  Who are all these individuals on the Copy line?

9    **A.**  I'm seeing members of Funds Management Group and also

10   members of State Street.

11   **Q.**  What's your understanding of what is being sent to you,

12   as an attachment to this e-mail?

13   **A.**  A revised pre-trade analyses for two of our funds.

14   **Q.**  Why, in general, would you receive a revised pre-trade,

15   if you already had an original pre-trade?

16   **A.**  Well, it's not uncommon for a transition manager to send

17   the final pre-trade.  You know, as the time to trading gets

18   closer, they may want to refine their estimate of the

19   indirect costs, because it's actually closer to trading and

20   they can give a slightly more accurate number for what they

21   estimate for indirect costs.

22   **Q.**  Okay.  And I want to direct your attention to the body of

23   the e-mail, where Ms. Morris says, "The inkinds have gone up

24   in both cases."

25              What's your understanding as to what that sentence

1   means?

2   **A.**   So I take that to mean -- so inkinds are securities that

3   don't need to be traded, that they're suitable for the legacy

4   portfolio and also the new portfolio, so no trading needs to

5   be done.

6   **Q.**   What effect, if any, does an increase in inkinds have on

7   the commissions that would be charged?

8   **A.**   Well, it would lower the dollar amount of commissions,

9   because less trades need to happen.

10  **Q.**   Let's take a look at one of the attachments, 119.1,

11  page 2.

12          Is this a revised pre-trade for one of those three

13  funds?

14  **A.**   It is.

15  **Q.**   Directing your attention to the commission line.  Has the

16  commission line for this particular fund, has the numbers

17  gone up or gone down from the first pre-trade that you

18  received?

19  **A.**   It's gone down, both the basis points and the dollar

20  amount.

21  **Q.**   What's your understanding of why the basis point rate

22  would decrease?

23  **A.**   So it's my best memory that State Street had additional

24  time to analyze the portfolio and they identified additional

25  securities that didn't need to trade and that created

1    efficiencies.  So they could pass along those efficiencies to

2    the funds, via a lower commission rate.

3    **Q.**  Did that surprise you that they would lower the rate

4    before the trading?

5    **A.**  No, because through the whole process, due diligence

6    process, you know, they said numerous times that they would

7    be a fiduciary to our funds, and put the interest of our

8    funds first, so it wouldn't surprise me to see them find

9    efficiencies and pass that along to our funds.

10   **Q.**  Let's take a look at Exhibit 119.2.  Page 2.

11           Are we looking at another -- or a revised pre-trade

12   for a second fund?

13   **A.**  Yes.

14   **Q.**  And directing your attention to the Commission line,

15   has -- have the numbers gone up or down, compared to the

16   first pre-trade?

17   **A.**  Also down.

18           MR. JOHNSTON:  All right.  And let's take a look at

19   a document for the witness only, 121?

20   BY MR. JOHNSTON:

21   **Q.**  Do you recognize this e-mail, Mr. Kelly?

22   **A.**  Yes.  It's a -- State Street is sending us the third

23   finalized pre-trade analysis.

24   **Q.**  So for the third fund?

25   **A.**  For the third fund.

1    **Q.**   What's the date on this e-mail?

2    **A.**   March 7, 2011.

3            MR. JOHNSTON:  Your Honor, at this time, the

4    Government moves to admit Exhibit 121 into evidence and also

5    its attachments 121.1, and 121.2.

6            MR. WEINBERG:  No objection.

7            THE COURT:  Admitted.

8            (Exhibit Nos. 121 and 121.1 and 121.2 admitted into

9            evidence.)

10   BY MR. JOHNSTON:

11   **Q.**   Who has sent you this e-mail, as well?

12   **A.**   Kristen Morris.

13   **Q.**   Let's take a look at the attachment 121.2, page 2.

14           Did you -- is this e-mail -- was this sent on the

15   same day as the other revised pre-trade analyses?

16   **A.**   Yeah.

17   **Q.**   Okay.  Let's take a look at the commission line here.

18   And for this one, has the commission numbers gone up or down?

19   **A.**   Down.

20   **Q.**   So what was the -- you know, adding up the -- the

21   estimated commission numbers for each of the three

22   portfolios, what was the amount that you understood State

23   Street would be charging you for the transition for all three

24   funds?

25   **A.**   Roughly $433,000.

```
 1              MR. JOHNSTON:  You can take this down, Erin.
 2   BY MR. JOHNSTON:
 3   Q.  Did the transition occur?
 4   A.  Yes, it did.  State Street did trade our transition.
 5   Q.  Were you pleased with the results?
 6   A.  The results were in line with the pre-trade analysis, but
 7   at the time, we didn't know that State Street had cheated our
 8   funds of roughly $800,000.
 9              MR. WEINBERG:  Objection.  I move that the answer
10   be struck.
11              THE COURT:  Sustained.  Beyond the scope.
12              You're asking when -- later.
13              MR. JOHNSTON:  Yeah, we'll ask about the --
14              THE COURT:  Just the next questions.
15              So one question at a time, Mr. Kelly.
16              THE WITNESS:  Okay.
17              THE COURT:  So just the question that he asked just
18   with respect to that.
19              Why don't you ask him whatever your next question
20   is?
21              MR. JOHNSTON:  Sure.
22   BY MR. JOHNSTON:
23   Q.  Mr. Kelly, did -- do you prepare any checklist or
24   document after a transition occurs?
25   A.  Yes.
```

1   **Q.**  Is this type of checklist done in the ordinary course of
2   your business?
3   **A.**  It is.
4   **Q.**  Is it made by someone who has personal knowledge of the
5   matter?
6   **A.**  It is.
7             MR. JOHNSTON:  I want to show you Government
8   Exhibit 207, for the witness only.
9   BY MR. JOHNSTON:
10  **Q.**  Do you recognize this document?
11  **A.**  Yes, this is a transition management checklist that is
12  prepared by members of FMG and it's shared internally.
13  **Q.**  Who prepared this particular one?
14  **A.**  That is my handwriting.  I prepared this document.
15            MR. JOHNSTON:  Your Honor, at this time, the
16  Government moves to admit Exhibit 207.
17            MR. WEINBERG:  No objection.
18            THE COURT:  Admitted.
19            (Exhibit No. 207 admitted into evidence.)
20            MR. JOHNSTON:  If we can take a look at page 5,
21  briefly.  If we can zoom in on the signature and the date on
22  the bottom.
23  BY MR. JOHNSTON:
24  **Q.**  Do you recognize the signature, Mr. Kelly?
25  **A.**  That is my signature.

1    **Q.**  And what date did you prepare this checklist?

2    **A.**  April 5, 2011.

3    **Q.**  And what did that day coincide with?

4    **A.**  It coincided with the -- it was the time after trading

5    finished and the transition was completed.

6    **Q.**  Let's take a look at page 1, please.  If we can zoom in

7    at the top.  Which portfolios have you listed there?

8    **A.**  The Multi-Sector Bond, Multi-Sector Core Bond, and

9    EQ/Core Bond.

10   **Q.**  So the three -- same three portfolios that you've been

11   testifying about?

12   **A.**  Correct.

13   **Q.**  And then the transition date, what dates do those

14   represent to you?

15   **A.**  The dates that trading happened, from March 7, 2011, to

16   March 18, 2011.

17   **Q.**  And which firms have you listed here as having submitted

18   bids to you?

19   **A.**  BlackRock, JP Morgan, BNY ConvergEx, and State Street.

20   **Q.**  And why is this a document that's prepared after

21   transition has occurred?

22   **A.**  Well, this is just to make sure that, you know, our

23   normal course of business is followed.  This checklist serves

24   as sort of a reminder for things -- for members of FMG to

25   think about during the transition.

1   **Q.**  Let's take a look at page 2, please.  And if we can zoom

2   in on question 2.  Directing your attention to your -- the

3   yes box and the agreed upon cost, why did you fill it out the

4   way you did?

5   **A.**  I filled it out the way I did, because in the pre-trade

6   analysis that State Street sent over, the commission rate was

7   disclosed, so I checked yes, and that the agreed-upon costs

8   of the commission rate were approximately .45 basis points.

9   **Q.**  Now, and why did you -- why did you say it was

10  approximately .45 basis points?

11  **A.**  Well, because there were three portfolios and, you know,

12  the stated commission rate differed a little bit.  So in

13  hindsight, I should have listed out all three portfolios with

14  a specific commission rate for all three.

15  **Q.**  But do you recall what the range was, just from the prior

16  documents we looked at?

17  **A.**  I believe it was in between .45 and .40.

18  **Q.**  Okay.  So you actually picked the high one?

19  **A.**  Yeah and that's why I put that squiggle line in the

20  beginning, meaning approximate.

21  **Q.**  Let's take a look at the answer to question 6.  Why did

22  you fill out this answer the way you did?

23  **A.**  Because State Street represented that they would be

24  trading our securities on an agency basis, not doing

25  principal trades, meaning that they wouldn't trade out of

1    their own inventory of securities and possibly generate

2    revenue other than the stated commission rate.

3              MR. JOHNSTON:  You can take this down, Erin.

4    BY MR. JOHNSTON:

5    **Q.**  At some point, did you find out you had been charged more

6    than you had been expected?

7    **A.**  Yes.

8    **Q.**  And by how much did you find out you had been

9    overcharged?

10   **A.**  Roughly $800,000.

11   **Q.**  Would that have been something you wanted to know prior

12   to selecting State Street as your transition manager?

13   **A.**  Absolutely.  It could have changed the outcome of the bid

14   process of selecting a transition manager.

15   **Q.**  How so?

16   **A.**  Well, State Street represented that they were going to

17   charge, in comparison, a low commission rate, when, in fact,

18   they did not.  And, you know, it would have brought them

19   closer to other transition managers that we had a

20   relationship already, that we've used in the past, and were

21   comfortable with.  And maybe we would have chosen another

22   transition manager.

23   **Q.**  What was the total amount -- what's your understanding of

24   the total amount that State Street charged you?

25              MR. WEINBERG:  I object, unless there's a basis for

1     the answer.  In other words, unless there's an admissible

2     evidentiary basis.

3              MR. JOHNSTON:  Can we have a -- can we have a

4     sidebar?

5              THE COURT:  Well, one part's in the --

6              MR. WEINBERG:  May we --

7              THE COURT:  Well, actually, you haven't elicited

8     evidence from what they paid, just elicited evidence from the

9     pre-trade.  Why don't you start with that?

10             MR. JOHNSTON:  Well, I asked him how much he

11    believed he had paid.

12             MR. WEINBERG:  Judge, this may be something to

13    raise at the sidebar.  It is an evidentiary rule.

14             THE COURT:  All right.

15             (The following discussion held at the bench.)

16             MR. WEINBERG:  I ask what the expected source is of

17    his detailed information.

18             MR. JOHNSTON:  Yeah.  I mean, here's the thing, so

19    we can go into foundation.

20             MR. WEINBERG:  I'm asking you --

21             MR. JOHNSTON:  No, I get it.  Obviously, there have

22    been discussions between State Street and AXA about the

23    amount of overcharges.  State Street has disclosed to them

24    and said we have made 1.3 million.  We understand that in the

25    original final pre-trade, 431,000.  So his understanding as

1    to where the 1.3 million figure came from is, yes, through --

2              THE COURT:  The 431,000 in commission was paid at

3    the time?  It was paid at the time?

4              MR. JOHNSTON:  We believed they were paid 431,000.

5              THE COURT:  Management fee is in a separate check.

6              MR. JOHNSTON:  Exactly.

7              THE COURT:  So his basis of his understanding

8    was -- that there's more, the discovery of there's more came

9    from State Street.

10             MR. JOHNSTON:  State Street disclosed it to AXA,

11   and said we charged you more than had been agreed upon in the

12   pre-trade and said we, in fact, made, on commissions

13   1.3 million, so if we want to go into foundation, then

14   it's --

15             MR. WEINBERG:  I think once going into foundation,

16   it's hearsay.

17             MR. JOHNSTON:  We can get into their -- their

18   way -- their negotiating a settlement.

19             MR. WEINBERG:  It's still hearsay.

20             MR. JOHNSTON:  No, it's not -- it wouldn't be.  We

21   could get someone from State Street to be like we looked at

22   the books, we know exactly how much they charge.  We've told

23   AXA that.

24             MR. WEINBERG:  And then you would be in breach of

25   the agreement that we've been operating under, which is State

1     Street's --

2              MR. JOHNSTON:  You can't have it both ways.

3              THE COURT:  Of course I can.

4              MR. WEINBERG:  The judge will decide about that.

5              THE COURT:  So your agreements -- are your

6     agreements -- I'm not ruling on your agreements now.  Okay.

7     I don't know what you all have agreed to or not agreed to and

8     you all make your own agreements based in light of what you

9     all know you have to do.

10             The question here is the only way he knows the

11    amount -- to the extent there was more charged, he knows how

12    much was negotiated, he's testified to all that.  What he

13    understood the commission rate to be, he believes there's

14    more, because it was told to him by State Street, right?

15             MR. JOHNSTON:  Yeah, via, counsel to counsel, and

16    then on down to him, yes.

17             MR. FRANK:  Well, actually, there was a

18    Pricewaterhouse study that was used by State Street to

19    determine the precise amount and that's the basis for what

20    State Street told him.  So he can testify that he understands

21    the Pricewaterhouse --

22             MR. WEINBERG:  Which we've never seen.

23             MR. FRANK:  Neither have we.  It's not relevant.

24    The point is --

25             THE COURT:  Has he read it?

1           MR. FRANK:  I don't believe he has.

2           THE COURT:  So Pricewaterhouse did the study.

3           MR. FRANK:  Because there's no way for him to know,

4    because they're at Pricewaterhouse, Your Honor.

5           MR. JOHNSTON:  And when you take about, hey, we've

6    had legal negotiations, they've offered to pay us back up to

7    1.3 million, plus all the interests, we can go into that.

8           MR. WEINBERG:  It's not related to the -- first of

9    all, you have the contracted, now we want to go into the

10   details.

11          MR. JOHNSTON:  No.  It's actually just a kind of

12   looping question to be like, okay, you believe they were

13   charged over 800,000.  What's your understanding as to what

14   you were going to pay.  The 1.3 million, you take 800,000,

15   plus 434,000.

16          THE COURT:  So wait.

17          MR. WEINBERG:  They have the facts in.  We didn't

18   object to the single question about his understanding that

19   they were overcharged 800 -- anything beyond this, Judge,

20   is -- or hearsay.

21          THE COURT:  He did say that, right, that's what you

22   objected to, before, you came back around to that?

23          MR. FRANK:  He said that was overcharged 800,000.

24   That's why I think it's kind of a silly objection.  He's

25   overcharged 800,000.  We're just trying to follow up:  What's

1  the total amount you paid?  1.3 million.

2          THE COURT:  So what do you want asked?

3          MR. JOHNSTON:  I'm just going to ask, what's your

4  understanding of the total amount you paid.

5          MR. WEINBERG:  And I object.

6          THE COURT:  So you don't -- but you don't object to

7  the question regarding the 800,000?

8          MR. WEINBERG:  I didn't object, thinking that there

9  was a basis of a particular person at State Street, but it's

10  now become apparent that Mr. Walker, for instance, didn't

11  give him a number, that it came from a circuitous source.

12          MR. FRANK:  Mr. Walker lied to him about the

13  number.  Do you want to get into that?

14          MR. WEINBERG:  No.

15          MR. FRANK:  So this is really -- this is --

16  surreal.

17          MR. JOHNSTON:  We've been avoiding the discussions

18  between companies for the very reasons that you didn't want

19  us to elicit exactly how --

20          MR. WEINBERG:  And I didn't object to the single

21  question they need to make their argument that AXA believed

22  they were overcharged.  Anything beyond that is hearsay and

23  unnecessary.

24          MR. FRANK:  We've done it on every single witness,

25  Judge.  We've said what was the total amount you were

1    charged, what was the amount you expected to pay.  I don't

2    understand the objection all of a sudden.

3              MR. WEINBERG:  Because the other witnesses had

4    specific --

5              MR. FRANK:  They had all representations from State

6    Street.

7              THE COURT:  You can -- you can have one more

8    question.  You have to -- you already have the question that

9    how much were you overcharged, they said 800,000, and then

10   you want to ask one more question, what was the total amount

11   that you believe you were charged.  Over your objection, you

12   can have that question.

13             MR. GOLDSTEIN:  Your Honor, may I be excused from

14   the courtroom for a few minutes?

15             THE COURT:  Yes.  Do you want me to tell the jury?

16             MR. GOLDSTEIN:  No.

17             (Bench conference concluded.)

18             THE COURT:  Go ahead.

19   BY MR. JOHNSTON:

20   Q.  Mr. Kelly, what is your understanding of the total amount

21   that AXA paid to State Street for this transition?

22   A.  The total amount was for roughly $433,000.

23   Q.  That was the amount that you believed you were going to

24   to be -- you were going to pay?

25   A.  That was the --

1          THE COURT:  This question is now, today, how much

2     do you believe your company paid -- has paid State Street for

3     this transition?

4     **A.**   In commission -- in commission, it's over 1.2 million.

5     **Q.**   What costs, if any, has AXA equitable incurred to date in

6     connection with these overcharges?

7          MR. WEINBERG:  Objection.

8          THE COURT:  Overruled.

9          THE WITNESS:  We've incurred legal costs, lost

10    productivity.  I should be at my desk doing my job for my

11    shareholders and also there's an ongoing risk and cost.

12    We're in the news, our funds, about being cheated.

13         MR. WEINBERG:  I object, Your Honor, move to

14    strike.

15         THE COURT:  Sustained as to that.  Just as to that

16    word.

17         Ladies and gentlemen, that sort of borders into the

18    conclusion which is at issue in the trial, which is for you.

19         Go ahead.

20         THE WITNESS:  Just the headline risk of our funds

21    and our company being in the newspaper.  It might persuade

22    someone to not buy our products.

23    BY MR. JOHNSTON:

24    **Q.**   What's been the amount of legal fees that AXA equitable

25    has expended so far --

```
 1              MR. WEINBERG:  Objection.
 2   Q.  -- in connection with these overcharges?
 3              THE COURT:  Do you pay -- I think you need a
 4   foundation before anything, with respect to that.
 5   BY MR. JOHNSTON:
 6   Q.  Sure.  Have you participated in interviews with legal
 7   counsel and discussion with legal counsel at AXA Equitable?
 8   A.  Yes.
 9   Q.  Do you have an understanding as to who has had to pay
10   legal costs in connection with investigating these
11   overcharges?
12              MR. WEINBERG:  Objection.  Hearsay.
13              THE COURT:  Sustained as to the form of that
14   question.
15   BY MR. JOHNSTON:
16   Q.  Do you have an understanding whether AXA equitable has
17   paid legal costs in connection with investigating the
18   overcharges?
19              MR. WEINBERG:  Yes or no.  I would ask that it be
20   limited to yes or no.
21              THE COURT:  Yes or no.
22              THE WITNESS:  Yes.
23   BY MR. JOHNSTON:
24   Q.  What is the basis of your understanding?
25   A.  That it is over $100,000.
```

1          THE COURT:  No, what is the basis for you knowing

2     that there has been legal costs.  In other words, how do you

3     know that?  Not what it is, but how do you know it?

4          THE WITNESS:  I know it because I've met with

5     counsel, that they are charging, charging us for that.

6     BY MR. JOHNSTON:

7     **Q.**  Do you know that -- has AXA Equitable hired outside

8     counsel?

9     **A.**  Yes.  That's what I meant.  That I've sat with outside

10    counsel.

11    **Q.**  Is that a free service?

12    **A.**  It is not free.

13    **Q.**  What's your understanding of the amount of fees --

14         MR. WEINBERG:  Objection, hearsay.

15    BY MR. JOHNSTON:

16    **Q.**  -- that you paid to -- that AXA has paid to outside

17    counsel?

18         THE COURT:  How do you know?  I think you need to

19    find out what's the basis for his understanding of the

20    amount.

21         MR. FRANK:  Can we just have a moment, Your Honor?

22         THE COURT:  Yes.

23         (Counsel confers.)

24         THE WITNESS:  I have a basis --

25         THE COURT:  He's going to ask you another question.

BY MR. JOHNSTON:

**Q.**   Let me rephrase.  Are you the controller of the three

funds that is the subject of the overcharges?

**A.**   Yes.

**Q.**   Is one of your -- what role, if any, do you have in

assessing and analyzing costs incurred by those funds?

**A.**   Sometimes I oversee and I actually see the actual

invoices and I have seen invoices from outside counsel.

**Q.**   And what types of amounts are we talking about?

            MR. WEINBERG:  Objection.

            THE COURT:  What's the objection now?

            MR. WEINBERG:  Hearsay and irrelevant.

            THE COURT:  Overruled.

            THE WITNESS:  I've seen invoices.  My best estimate

is it's over $100,000.  And those are just the invoices from,

you know, awhile back.  There's current legal costs, also,

that we haven't been billed for, yet.

BY MR. JOHNSTON:

**Q.**   What harm, if any, can result to AXA Equitable, itself,

as a manager to the funds, as a result of losses to the fund?

            MR. WEINBERG:  Objection.

            THE COURT:  You mean -- I don't know what that

question means.  Sustained.

BY MR. JOHNSTON:

**Q.**   Are these funds a separate legal entity?

1   **A.**  Yes.

2   **Q.**  What role does AXA Equitable have with respect to these

3   funds?

4           MR. WEINBERG:  I object.  There's no basis for any

5   opinion.

6           MR. JOHNSTON:  Your Honor, he's testified he was a

7   controller of these funds and an officer of the funds.

8           MR. WEINBERG:  No, he testified that he was a

9   controller of -- investment manager for the funds.

10          THE WITNESS:  No -- can I --

11          THE COURT:  Actually, you can't.  There will be

12  other questions.  The hard part about being the witness,

13  Mr. Kelly, is you only get to answer the questions.

14          The question you want is what harm comes to AXA?

15          MR. JOHNSTON:  Yes, because part of the testimony

16  has been that these funds are actually separate legal

17  entities, so we are asking questions about the connection.

18          THE COURT:  Who paid the invoices?

19          MR. JOHNSTON:  But this is a separate harm.

20          THE COURT:  All right.  You can answer that

21  question.

22  BY MR. JOHNSTON:

23  **Q.**  Who paid the initial legal invoices?

24  **A.**  AXA Equitable paid the initial legal invoices.

25  **Q.**  Now, I want to ask you some questions about harm that

1    would result to AXA Equitable from losses to the fund.  You

2    testified previously that AXA Equitable is a manager of the

3    fund?

4    **A.**  Correct.

5    **Q.**  What losses can AXA Equitable suffer, if the fund itself

6    suffers a loss?

7                    MR. WEINBERG:  Objection.

8                    THE COURT:  What do you mean by -- do you mean loss

9    -- what do you mean?

10                   MR. JOHNSTON:  Financial loss.

11                   THE COURT:  Overruled.

12                   THE WITNESS:  So the -- we have a board of

13   independent trustees that we need to report to.

14   BY MR. JOHNSTON:

15   **Q.**  When you say "we," do you mean the funds have an

16   independent board of trustees?

17   **A.**  Yes.

18                   THE COURT:  And the "we" is AXA?  Who's the "we"?

19                   THE WITNESS:  The funds have a board of trustees,

20   independent board of trustees.

21   BY MR. JOHNSTON:

22   **Q.**  And who hires, or who has the authority to hire or fire

23   the manager?

24   **A.**  The board of trustees has the ability to fire us, if

25   we're not doing a good job.

1    **Q.**  What role can -- if a loss is suffered by the fund, how

2    can that cause a loss in the manager?

3             MR. WEINBERG:  Objection.

4             THE COURT:  Overruled.

5             THE WITNESS:  Can you repeat the question, please.

6    BY MR. JOHNSTON:

7    **Q.**  Yes.  If a loss is suffered by the fund, how can that

8    result as a loss to the manager?

9    **A.**  So if a loss is suffered by the fund, our board of

10   trustees would look to the manager, AXA Equitable, to make

11   the fund whole.

12   **Q.**  What do you mean make them whole?

13   **A.**  Sorry.  Meaning to compensate the fund by that loss, by

14   that dollar loss.

15   **Q.**  Who has to -- so who would be making the payments back to

16   the fund?

17            MR. WEINBERG:  This is speculative.  I object, Your

18   Honor.

19            THE COURT:  It's asked and answered.  Sustained.

20   He just said.

21   BY MR. JOHNSTON:

22   **Q.**  The manager?

23            THE COURT:  He just said, you asked him the

24   question, he answered it.  Next question.

25   BY MR. JOHNSTON:

1    **Q.**   How is AXA Equitable compensated for its work as a

2    manager?

3    **A.**   Through different fees, management fee, administration

4    fee.

5    **Q.**   Do the management fees that AXA Equitable earns have any

6    relationship to the amount of funds under management?

7    **A.**   Yes, it does.  It's an asset-based fee.  So as assets

8    rise, our management fee in dollars would rise.

9    **Q.**   So then if a -- what, if any, effect could a loss of fund

10   have on the management fees that AXA Equitable could earn?

11   **A.**   It would decrease our dollar amount of management fees.

12   **Q.**   And from 2011, when this transition occurred, until 2017,

13   what's your understanding of the amount of fee -- or the

14   amount of funds that were not in the three funds that were

15   being managed by AXA Equitable?

16            MR. WEINBERG:  I object.

17            THE COURT:  Sustained.  It's not a clear question.

18   BY MR. JOHNSTON:

19   **Q.**   As a result of the overcharges, were those funds under

20   management, the 800,000 under management during -- from 2011

21   to 2017?

22   **A.**   They were not.

23   **Q.**   Was AXA Equitable earning fees on that 800,000 during

24   those six years?

25   **A.**   No, but we should have.

1        MR. WEINBERG:  I object.  Move to strike.

2        THE COURT:  Sustained as to the "should have."

3        MR. JOHNSTON:  No further questions, Your Honor.

4        THE COURT: All right.  Cross-examination.

5        MR. WEINBERG:  Thank you, Your Honor.

6        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

7    BY MR. WEINBERG:

8    **Q.**  Good morning.  Very brief, Mr. Kelly.  AXA is a huge,

9    international insurance company, is it not?

10   **A.**  AXA is a large insurance company.

11   **Q.**  It's centered in France, but it's got another huge

12   subsidiary in the United States, called AXA?

13   **A.**  AXA Equitable Life Insurances, based out of New York

14   City.

15   **Q.**  Sure.  It's got billions of dollars of assets, does it

16   not?

17   **A.**  Yes.

18   **Q.**  And part of AXA Equitable New York is the subsidiary you

19   work for, which is called FMC, is that the right letters?

20   **A.**  It's FMG, the funds management group.

21   **Q.**  All right.  And one of the functions of your group is to

22   manage mutual funds, correct?

23   **A.**  Correct.

24   **Q.**  That are -- largely consists of the dollars that have

25   been paid by annuity holders, et cetera, customers of AXA?

1  **A.**   Customers of AXA.

2  **Q.**   Who have an interest in whether or not the mutual funds

3  go up or down, correct?

4  **A.**   Correct.

5  **Q.**   And you do your best to manage them and have them go up

6  and beat the market, correct?

7  **A.**   Yes.

8  **Q.**   You show it.  You have subadvisors, do you not, at times?

9  **A.**   We have a number of subadvisors that we hire.

10  **Q.**   Sure.  And one of them was State Street Global Advisors,

11  correct?

12  **A.**   Correct.

13  **Q.**   And they assist you in making investment decisions and in

14  advising as to these huge mutual funds, correct?

15  **A.**   They assist.  We would set the investment strategy, but,

16  yes, they do assist with day -- with some day-to-day

17  responsibilities.

18  **Q.**   In 2009, you received a question -- did you receive the

19  questionnaire or the response to a questionnaire from State

20  Street, correct?

21  **A.**   From State Street Transition Manager, yes.

22  **Q.**   Yes.  And it was not until February of 2011 that State

23  Street was given a transition by AXA; is that correct?

24  **A.**   In 2011, correct.

25  **Q.**   This was a huge transition, was it not?

1    **A.**   It was large, yes.

2    **Q.**   How many billions?

3    **A.**   Approximately 10 billion.

4    **Q.**   And was there -- there was going to be trading from the

5    legacy from the mutual funds out of certain assets and then

6    the purchase of other assets, correct?

7    **A.**   Correct.  We wanted to change a benchmark in the funds,

8    so yes.  A large amount of trading.

9    **Q.**   Putting aside, if we can, the issue of the amount of

10   commissions.  State Street went to the market, it sold the

11   securities, it bought the securities on behalf of the

12   shareholders of these mutual funds, correct?

13   **A.**   Yes.

14   **Q.**   In other words, it didn't go to some inventory and sell

15   its own bonds, to your knowledge, correct?

16   **A.**   To my knowledge, no, they traded on an agency basis, to

17   my knowledge.

18   **Q.**   Right.  And again, an agency basis is to know you want to

19   sell certain securities, go out in the market on your behalf,

20   look at the potential buyers, pick the best buyer, often by

21   the lowest cost, and sell the asset on your behalf, correct?

22   **A.**   Yeah.  As an agent, we would look to State Street to

23   obtain the best possible price at the lowest cost.

24   **Q.**   And they met the implementation shortfall, performed

25   well, putting aside, again, the issue of the commissions.

1    **A.**  Well, the commissions are part of the implementation

2    shortfall, so I don't understand why it would be set aside.

3    **Q.**  You did select State Street for a second transition, did

4    you not, in August of 2011?

5    **A.**  The reason we selected them is because --

6              THE COURT:  That's a yes or no question.  Did you

7    or did you not select them in 2011?

8              THE WITNESS:  Yes, we did.

9    BY MR. WEINBERG:

10   **Q.**  The routine and practice at your investment advisor to

11   the mutual funds is when you do transitions is to enter

12   transition management agreements, correct?

13   **A.**  It's our practice to have a transition management

14   agreement executed before trading starts.  And we were

15   surprised that one -- that we could not find one for this

16   transition.

17   **Q.**  Well, going back to February of 2011, do you have a

18   specific recollection today -- and I understand we're seven

19   years later -- at having negotiated a specific transition

20   management agreement?

21   **A.**  That would not be my responsibility.  That would be

22   others within the funds management group, in our legal

23   department, but I do not have a specific recollection of --

24   of negotiating a -- an agreement.

25   **Q.**  AXA's got a huge IT section, it looked at its computers,

1    couldn't find a transition management for this $10 billion

2    transition, correct?

3    **A.**   We have looked and we could not find one.

4    **Q.**   And you have not seen one from any other source, have

5    you?  In other words, State Street has not provided you with

6    a transition management agreement, correct?

7    **A.**   They have not.

8    **Q.**   The US Government has not shown you a transition

9    management agreement?

10   **A.**   No.  But the source would either be from AXA or State

11   Street, not the Government.

12   **Q.**   Right.  You don't have one.

13   **A.**   We -- I'm not sure -- you know, it may exist somewhere,

14   in a file.  We don't know that.

15   **Q.**   You've looked --

16   **A.**   But as of today, there's no evidence, but it's our

17   practice to have one.

18   **Q.**   But you can't testify there was one and that this wasn't

19   an aberration to your practice, correct?

20   **A.**   I cannot testify that there is an agreement.

21   **Q.**   And an agreement would --

22   **A.**   Well, I'm sorry, a contract.

23   **Q.**   Contract.

24   **A.**   I mean -- yeah.

25   **Q.**   So without beating up on this issue, I just want to go

1    back to an exhibit that the Government offered you and it's

2    Exhibit 4, which is going back to the questionnaire that

3    State Street responded to in September 3, 2009.

4            MR. WEINBERG:  And Max, is it possible to get

5    page 8?  The Fiduciary Responsibility paragraph.

6    BY MR. WEINBERG:

7    Q.   Am I correct that the response was "State Street is

8    willing to act as a fiduciary for the portfolio for the

9    entire transition period, subject to the terms, conditions,

10   and limitations set forth in our transition services

11   agreement"?

12   A.   I'm just reading that again, because it just popped up.

13   Q.   Sure.

14   A.   We had an agreement with State Street that the commission

15   rate on the pre-trade analysis would be the amount that would

16   be applied to our fund -- to our securities trades.  We could

17   not find a contract, but we had an agreement.

18   Q.   There was a contact, that would consist of the agreement,

19   would it not?

20   A.   I'm not a lawyer.  I don't know the specifics between an

21   agreement and a contract.

22   Q.   You have transition agreements, do you not, that come

23   with contracts?  You've seen them before, have you not?

24   A.   We have -- we contract out with the transition manager.

25   That's our practice.

1    **Q.**  And lawyers negotiate these agreements, and they become

2    part of the file for a transition, correct?

3    **A.**  They negotiate the contract.

4    **Q.**  Right.  And that's what you've been looking for, but

5    can't find?

6    **A.**  We cannot find the contract.

7    **Q.**  We can go to page 13.  These, again, are -- paragraph 13,

8    line 2.

9          "State Street's sole source of transition revenue

10    is commissions which are detailed in our pre-trade analysis

11    and agreed upon in each transition notice, delivered under

12    your transition agreement."

13          Here, in terms of the documents that you've

14    reviewed, you've reviewed pre-trade analysis, but not

15    contracts, not transition notices, and not transition

16    agreements, correct?

17    **A.**  Repeat the question again, please.

18    **Q.**  Right.  You've had available to you and have reviewed

19    pre-trade analyses, correct?

20    **A.**  Yes.

21    **Q.**  But you've not had available to you and you've not seen

22    or reviewed a transition notice or a transition agreement.

23    That's what you've been looking for and can't find?

24    **A.**  We cannot find the contract, correct.

25    **Q.**  Ross McLellan, have you ever met him?

1    **A.**   Not personally.

2    **Q.**   Okay.  You remember, based on an e-mail, a short

3    conversation on February 23rd, thereabouts, before the

4    awarding of the transition to AXA?

5    **A.**   I don't have a specific memory of that, but the e-mail

6    said, "as discussed," so I'm assuming we had a phone

7    conversation.

8    **Q.**   That's a fair stab of having a phone conversation that

9    understandably, you don't remember seven years later,

10   correct?

11   **A.**   I don't have a specific memory of it.

12   **Q.**   And no memory of any other conversation with Mr.

13   McLellan?

14   **A.**   Just I have a vague recollection.

15   **Q.**   Just specific recollections.

16   **A.**   I only have a vague recollection of speaking with Ross.

17   **Q.**   Last subject is the other competing bids.  Have you

18   reviewed them in preparation for your testimony?

19   **A.**   Well, not only I review them, but other members of the

20   Funds Management Group review them and would collaborate on

21   them.

22   **Q.**   Do you recall the JP Morgan proposal?

23   **A.**   I remember receiving a proposal from JP Morgan.

24   **Q.**   And do you recall that their proposed commission rate

25   exceeded $4 million for the same transition that you ended up

1  awarding to State Street?

2  **A.**  I don't have a recollection of this specific amount from

3  JP Morgan.

4  **Q.**  Let me quickly show it to you to refresh your memory.  I

5  think it's 491.  Page 2 first.  Again, it's broken in three

6  parts, because there's three mutual funds that the assets are

7  being traded out of, correct?

8  **A.**  Yes.  Three.  The trading happened out of three mutual

9  funds.

10  THE COURT:  You just want him to review it himself,

11  to see if it refreshes his recollection.

12  MR. WEINBERG:  Yes.  If he can review page 2.

13  Maybe if I can approach the witness?

14  THE WITNESS:  Thanks.

15  THE COURT:  Yes.

16  He wants you to review it yourself, Mr. Kelly, as

17  you are and when you're done reviewing it, you can look up,

18  and he'll ask you another question.

19  THE WITNESS:  Okay.  I'm finished.

20  MR. WEINBERG:

21  **Q.**  JP Morgan's proposal was to charge three basis points,

22  which would have totaled over $4 million, correct?

23  **A.**  That's what their pre-trade analysis says, yes.

24  MR. WEINBERG:  I have no other questions.  Thank

25  you, Your Honor.

```
 1              THE COURT:  All right.  Any redirect?
 2              MR. JOHNSTON:  No, Your Honor.
 3              THE COURT:  All right.  Thank you very much,
 4    Mr. Kelly.  You're excused.
 5              Next witness.
 6              MR. JOHNSTON:  Your Honor, the Government calls Tom
 7    Clemmenson to the stand.
 8                          TOM CLEMMENSON
 9         having been duly sworn, testified as follows:
10          DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
11    BY MR. JOHNSTON:
12    Q.  Good morning, Mr. Clemmenson.
13    A.  Good morning.
14    Q.  You can actually move those binders away.  They just --
15    you can leave them there.
16              Mr. Clemmenson, where do you live?
17    A.  Farmington, Connecticut.
18    Q.  How old are you?
19    A.  56.
20    Q.  Where do you work?
21    A.  I work at Conning & Company, in Hartford.
22    Q.  What is Conning & Company?
23    A.  We're an investment manager.
24    Q.  What is your position there?
25    A.  I'm a bond trader.
```

1    **Q.**   How long have you worked at Conning & Company?

2    **A.**   Coming up on five years.

3    **Q.**   How long have you been in the financial industry, over

4    all?

5    **A.**   Since 1986.

6    **Q.**   What is your educational background?

7    **A.**   BA in economics.

8    **Q.**   Did you used to work at State Street bank?

9    **A.**   Yes.

10   **Q.**   From what years did you work there?

11   **A.**   2007 to the beginning of 2013.

12   **Q.**   What did you do at State Street bank?

13   **A.**   I was a fixed income trader.

14   **Q.**   Did you work within a particular unit at State Street?

15   **A.**   It was part of the transition management group.

16   **Q.**   You said you traded fixed income?

17   **A.**   Yes.

18   **Q.**   So bonds?

19   **A.**   All bonds, yes.

20   **Q.**   Who did you report to in the 2010/2011 time period?

21   **A.**   Tom Bryant.

22   **Q.**   Who is Tom Bryant?

23   **A.**   He was in charge of our group, as well as the equity

24   traders.

25   **Q.**   Do you know who Tom Bryant reported to at this time

1  period?

2  **A.**  Yes, Ross McLellan.

3  **Q.**  When you traded in the transition group, for whose

4  benefit would you trade?

5  **A.**  For the client's.

6  **Q.**  Would you be trading with the client's money or the

7  bank's money?

8  **A.**  Client's.

9  **Q.**  What was your aim when trading on behalf of transition

10  clients?

11  **A.**  To get the best prices we could for the client.

12  **Q.**  How did the transition desk make its money?

13  **A.**  We -- we would charge what you would call a markup, a

14  commission, a fee for our services.

15  **Q.**  Who applied those commissions?

16  **A.**  We did that at the trading desk.

17  **Q.**  Were those commissions just for the traders or was it for

18  a larger group of folks?

19  **A.**  It was my understanding that it was a pool that paid

20  different groups.

21  **Q.**  Including transition analysts?

22  **A.**  Including transition analysts, correct.

23  **Q.**  What are some other terms you use?  Markup, markdown

24  commission?  Are there any other terms that were used?

25  **A.**  We call it fees.  It means the same thing.  You could

1    take a spread out, yes.

2    **Q.**   Did the commissions you charge depend on whether you did

3    a good or bad job?

4    **A.**   No.

5    **Q.**   How would you know what fees to charge at any given

6    transition?

7    **A.**   We were told prior to the beginning of trading what to

8    charge.

9    **Q.**   So then who would get the benefit of a better performance

10   in trading?

11   **A.**   The client.

12   **Q.**   Did you have any direct communications with clients

13   regarding the fees?

14   **A.**   No.

15   **Q.**   Did you ever negotiate with them about commissions?

16   **A.**   No.

17   **Q.**   Who would communicate with clients, to your

18   understanding?

19   **A.**   Either people in the sales group and potentially the

20   transition managers.

21   **Q.**   Did you have an understanding at the time whether

22   commission rates were agreed upon with clients before a

23   transition occurred?

24   **A.**   That was my understanding, that they had been agreed

25   upon.

```
1   Q.  How would you receive the transition?  How would you
2   receive the instructions for what commission to apply to a
3   given trade?
4   A.  Usually via e-mail for most cases.  Sometimes verbally.
5   Very rarely.
6   Q.  Who in particular would send this by e-mail?
7   A.  The transition manager who was assigned to that
8   particular transition.
9   Q.  Directing your attention to February, March 2011, do you
10  recall being involved in a transition for a client named AXA
11  Equitable?
12  A.  Yes.
13          MR. JOHNSTON:  I want to show you a document that's
14  been marked as 102, for the witness only.
15  BY MR. JOHNSTON:
16  Q.  Do you recognize this document?  Is it not on the screen?
17  A.  No.
18          THE COURT:  Should be.
19          MR. JOHNSTON:  Let's see if we move into
20  evidence --
21          THE COURT:  Hold on.  Did you switch to them?
22          THE DEPUTY CLERK:  No.  Sorry.
23          THE WITNESS:  I see it now.
24  BY MR. JOHNSTON:
25  Q.  Do you recognize this document, Mr. Clemmenson?
```

1    **A.**  Yes.

2    **Q.**  What is it?

3    **A.**  It's a request for a conference call to discuss an

4    upcoming transition for AXA.

5           MR. JOHNSTON:  Your Honor, at this time the

6    Government moves to admit 102.

7           MR. GOLDSTEIN:  No objection.

8           THE COURT:  Admitted.

9           (Exhibit No. 102 admitted into evidence.)

10          MR. JOHNSTON:  And we would at the same time move

11   to admit 102.1, 102.2, 102.3, and 102.4.

12          THE COURT:  Admitted.

13          (Exhibit Nos. 102.1, 102.2, 102.3, and 102.4

14          admitted into evidence.)

15   BY MR. JOHNSTON:

16   **Q.**  Who is sending -- are you one of the recipients on this

17   e-mail, Mr. Clemmenson?

18   **A.**  Yes.

19   **Q.**  Who is sending you this e-mail?

20   **A.**  Kevin Walker.

21   **Q.**  Who is Kevin Walker?

22   **A.**  He worked on -- initially, on the transition management

23   desk, and then he had moved to sales.

24   **Q.**  Do you know who he reported to?

25   **A.**  I believe it was Ross McLellan.

1    **Q.**   Let's take a look down below where it says, "We have a

2    call at 3:30 today with the client.  Tom, they wanted our

3    head fixed income trading on that call and that is you.  Can

4    you familiarize yourself with this transition prior to the

5    call by reviewing the pre-trades and the strat dock?"

6              What is your understanding of what is being asked

7    of you?

8    **A.**   We would look at the -- my portion of this would be to

9    look at their bond holdings, give them an idea of how we

10   think it would go, if there were any bonds in there that were

11   going to be difficult to trade.

12   **Q.**   Where would you find that information?

13   **A.**   Just market knowledge.  We could run some pre-trades with

14   some market information.

15   **Q.**   And but for a client's specific portfolio, how would you

16   find out what type of bonds were in there?

17   **A.**   They would send us a list of what their holdings were, or

18   at least a preliminary list.

19   **Q.**   Would any of that be included in a pre-trade information?

20   **A.**   Generally, you would see that.  I don't know if that's

21   one of the attachments here, but generally you would see

22   that, yes, before we would get on the call, so that we knew

23   what it actually held.

24   **Q.**   So what's your understanding of why you're being asked to

25   review these documents?

1    **A.**   Because we were the ones that were going to be

2    transacting.

3    **Q.**   And by "we," do you mean the trading desk?

4    **A.**   Trading desk, yes.

5    **Q.**   Do you recall having a conversation with the client on

6    this -- about this particular transition?

7    **A.**   Yes, I do.

8    **Q.**   And what do you recall?

9    **A.**   That we did take a look at their bonds, to give them an

10   idea of what was in store for trading.

11   **Q.**   And when you would do this, would you -- what information

12   would you pay attention to in the pre-trade?

13   **A.**   My portion would be just to look at the bonds.  I wanted

14   to let them know what kind of liquidity they could expect.

15   **Q.**   What, if any, attention did you pay to the commission

16   line?

17   **A.**   At that point, none.

18   **Q.**   And why isn't that something that you would pay attention

19   to?

20   **A.**   Because usually before we would trade, we would know --

21   we would be told what the commission would be at that point.

22   **Q.**   Let's take a look, if we can --

23          MR. JOHNSTON:  Actually, let's just take this down.

24   BY MR. JOHNSTON:

25   **Q.**   Were you on a conference call prior to the trading of

1    this transition?

2    **A.**  Yes.

3           MR. JOHNSTON:  Permission to approach the witness,

4    Your Honor.

5           THE COURT:  Yes.

6           MR. GOLDSTEIN:  Which number is this?

7           MR. JOHNSTON:  It's 116.

8           MR. GOLDSTEIN:  There's no objection.

9           MR. JOHNSTON:  Okay.

10          At this time, the Government moves to admit 116 and

11   123 into evidence.

12          THE COURT:  No objection, right?

13          MR. GOLDSTEIN:  No objection.

14          THE COURT:  Admitted.

15          (Exhibit Nos. 116 and 123 admitted into evidence.)

16   BY MR. JOHNSTON:

17   **Q.**  Mr. Clemmenson, if we could turn to your tab -- in the

18   binder that I handed you, and go to tab 116.

19   **A.**  Okay.

20          (Audio plays.)

21   BY MR. JOHNSTON:

22   **Q.**  Mr. Clemmenson, who were you having a conversation with

23   on this call?

24   **A.**  Ross McLellan.

25   **Q.**  Who else is on this call?

1    **A.**   Peter Weiner, Kevin Walker, and Greg Spyropoulos.

2    **Q.**   Who are Peter Weiner and Kevin Walker?

3    **A.**   They were in the sales group.

4    **Q.**   Who is Greg Spyropoulos?

5    **A.**   He worked on the trading desk.

6    **Q.**   Directing your attention to page 2, is it typical to

7    receive charging instructions from Ross McLellan?

8    **A.**   It was not the norm, no.

9    **Q.**   Do you have a memory of any other instance of Mr.

10   McLellan telling you how much to charge a client?

11   **A.**   Not that I recall, no.

12   **Q.**   Let's take a look at line 10 -- or, I'm sorry, start at

13   line 11, where he says -- where Mr. McLellan says "Because

14   SSGA is a manager, basically what they are saying is we've

15   got to come up with fair pricing with respect to what we're

16   doing for this."

17          Do you have an understanding of what Mr. McLellan

18   means when he says we have got to come up with fair pricing?

19   **A.**   Not particularly.  I mean, fair pricing I would assume

20   would mean getting the best prices we could get in the

21   marketplace.

22   **Q.**   Do you have any -- do you have an understanding whether

23   that refers to commission, or whether it refers to just you

24   going out in the market and buying?

25   **A.**   In this instance, no, because it's not very clear.

1    **Q.**   You're not sure one way or the other what he means?

2    **A.**   No.

3    **Q.**   Let's go further down, where -- on line 14, Mr. McLellan

4    says "We will trade the corporates just flat, so just book

5    those out, straighten that out to the client, whatever you

6    guys are dealing, and then the rest of the bulk of the trade

7    is mortgages and treasuries."

8         What do you understand Mr. McLellan to mean when he

9    says that?

10   **A.**   Corporate bonds that were held in the portfolio, we would

11   trade with no commission or no fee, and then we would charge

12   on treasuries and mortgage securities.

13   **Q.**   Before testifying today, did you take a look at the --

14   those pre-trade reports that we looked at on Exhibit 102?

15   **A.**   Yes, I would have flipped through those, yes.

16   **Q.**   And what's your understanding of the composition of the

17   portfolio between corporates and mortgages and treasuries?

18   **A.**   The majority was mortgages and treasuries.

19   **Q.**   Let's go further down, where Mr. McLellan says "And right

20   there, for the first few days, what we will do is we will

21   take three quarters of the basis point of yield and then

22   obviously we will see how performance is going from there and

23   see if we need to adjust, whatnot."

24        What's your understanding of what that means?

25   **A.**   Well, I think we'll probably look at what the commissions

1   are earned up until that point and then reevaluate.

2   **Q.**  What's the amount that you understand him to be

3   instructing you to apply?

4   **A.**  Three quarters of a basis point of yield.

5   **Q.**  Now, do you know -- is there a difference between basis

6   points of yield and basis points of value?

7   **A.**  Yes.

8   **Q.**  What's the relationship between the two?

9   **A.**  It depends on the term of the security, how long it is.

10   **Q.**  Typically -- typically, is a basis point of yield a

11   larger -- if you're talking about commissions, is a basis

12   point of yield more than a basis point of value?

13   **A.**  It could be.  It would depend on the duration of the

14   securities.

15   **Q.**  What types of -- what duration is yield higher than

16   value?

17   **A.**  The longer ones are higher, yes.

18   **Q.**  Was it typical for you to adjust your commission rate,

19   based on the performance of your trading?

20   **A.**  I would say that wasn't the norm, but we did do it

21   occasionally.

22   **Q.**  And the few occasions where you did do it, did you adjust

23   it up, or did you adjust it down?

24   **A.**  I think usually it would have been down, I think.

25   **Q.**  Do you have any memory of ever adjusting compensation up

1    in the course of trading?

2    **A.**   Not that I can recall, no.

3    **Q.**   In the instances when you adjust it down, what was your

4    understanding of what the commission agreement had been with

5    clients?

6    **A.**   That whatever it was, that we were getting near that

7    level of compensation, and that we could turn it off.

8    **Q.**   What do you mean by the level of compensation?

9    **A.**   Whatever that was agreed upon with the client to charge

10   overall.

11   **Q.**   Are you referring to a capped commission?

12   **A.**   It could have been a cap, yes.

13   **Q.**   What is a capped commission arrangement?

14   **A.**   Where you would agree to, say, trade to portfolio for,

15   say, $100,000 commission, and when you got there, you would

16   stop.

17   **Q.**   So commission would be on initially?

18   **A.**   Yes.

19   **Q.**   And then when would it stop?

20   **A.**   If we reached that cap, we would turn it off.

21   **Q.**   Do you have an understanding, based on looking at the

22   portfolio here, whether three-quarters of a basis point of

23   yield is -- on just treasuries and mortgages, is more or less

24   than .1 basis points of yield applied to the entire

25   portfolio?

1    **A.**   It, generally, would be higher, yes.

2    **Q.**   And that's based on what?

3    **A.**   Just the overall -- so instead of a tenth of a basis

4    point, you're charging three-quarters of a basis point, so

5    it's a higher value.

6    **Q.**   So even if the corporates are flat, it would still be

7    higher, with three-quarters on the other two.  Is that what

8    you're saying?

9    **A.**   Yeah, that could definitely be the case, yeah.

10          MR. JOHNSTON:  Let's continue, please.

11          (Audio plays.)

12   BY MR. JOHNSTON:

13   **Q.**   Mr. Clemmenson, drawing your attention to page 3 on

14   line 10, why do you ask if this is going to be done as a

15   principal, or an agent?

16   **A.**   It's purely for bookkeeping purposes on our part.

17   **Q.**   And when you mean -- when use the word "principal," do

18   you mean principal-principal, or riskless principal?

19   **A.**   Riskless principal.

20   **Q.**   And why are you -- what's the significance of one versus

21   the other --

22   **A.**   For our job, it would be risk as principal.  We could

23   essentially book one side of the trade and sort of flip the

24   ticket and book the other.  Where as if we did it as agent,

25   we'd have to take each ticket and manually type in the

1    commission on each bond as we went.  So as you can see, 4,000

2    line items times two tickets would be a lot of inputs.

3    **Q.**  How much more time would that take you?

4    **A.**  Oh, a fair amount of time longer.

5    **Q.**  Did the designation as riskless principal or agent affect

6    how you did your trading?

7    **A.**  No.

8    **Q.**  Or how you applied commission?

9    **A.**  No.

10   **Q.**  What was its significance to you?

11   **A.**  The amount of work.

12            MR. JOHNSTON:  If we could jump forward to -- I

13   think we start at 9:20, please.  So skip forward, starting at

14   page 8 of this same call.

15            THE COURT:  Where on page 8?

16            MR. JOHNSTON:  Yeah, page 8, Your Honor.

17            THE COURT:  No, but what line?

18            MR. JOHNSTON:  We will be beginning on line 18 at

19   page 8.

20            (Audio plays.)

21   BY MR. JOHNSTON:

22   **Q.**  Mr. Clemmenson, drawing your attention to the bottom of

23   page 8, who's speaking on line 18?

24   **A.**  Kevin Walker.

25   **Q.**  And when he says, "So I think Ross mentioned, Ross, you

1    mentioned three-quarters of yield, you know, normally Kristen

2    I think has to send that over as part of the process."

3            What do you understand Mr. Walker to be saying?

4    **A.**  He's saying you charge three-quarters basis point of a

5    yield.

6    **Q.**  Why is there a reference to Kristen?

7    **A.**  Because I believe she was the transition analyst that was

8    assigned to this one.

9    **Q.**  What's Kristen's last name?

10   **A.**  Morris.

11   **Q.**  So what's the typical process for receiving the

12   commission number?

13   **A.**  We would generally get it via e-mail.

14   **Q.**  From someone in Ms. Morris' position?

15   **A.**  Yes.

16   **Q.**  And so what is Mr. Walker telling you to do?

17   **A.**  He's telling us to apply the three-quarters of a basis

18   point of yield and just let Kristen know that if she has

19   something different, that we had spoken to Ross.

20   **Q.**  And then on the top of page 9, when you say, "Yeah, okay,

21   and we'll do the corporates flat."

22           So, okay, what do you mean by that?

23   **A.**  Just reenforcing that we're charging no fee on the

24   corporate bonds that were held.

25   **Q.**  And then what are you -- which bonds are you charging the

1    fee on?

2    **A.**   The treasuries and the mortgages.

3    **Q.**   Do you recall conducting these trades, Mr. Clemmenson?

4    **A.**   Yes.

5            MR. JOHNSTON:  I want to show you a document, for

6    the witness only, 122.

7    BY MR. JOHNSTON:

8    **Q.**   Do you recognize this document?

9    **A.**   Yes.

10   **Q.**   What is it?

11   **A.**   It's an e-mail we sent from the trading desk to Kristen.

12   **Q.**   What's the date on the e-mail?

13   **A.**   March 7, 2011.

14           MR. JOHNSTON:  Your Honor, at this time, the

15   Government moves to admit 122 and 122.1.

16           MR. GOLDSTEIN:  No objection.

17           THE COURT:  Admitted.

18           (Exhibit Nos. 122 and 122.1 admitted into

19           evidence.)

20   BY MR. JOHNSTON:

21   **Q.**   Who is Greg Spyropoulos?

22   **A.**   He worked with us on the trading desk.

23   **Q.**   Are you one of the recipients on this e-mail?

24   **A.**   Yes.

25   **Q.**   What is your understanding of why you're included on this

1    e-mail?

2    **A.**   As one part of who was trading in that transition.

3    **Q.**   What's attached to this e-mail?

4    **A.**   The executions of the trades that were done on that day.

5    **Q.**   So March 7, 2011?

6    **A.**   Yes.

7              MR. JOHNSTON:  Let's take a look at the attachment,

8    122.1, starting with page 1.  If we can just start with where

9    the name is and maybe the first to third, Erin.

10   BY MR. JOHNSTON:

11   **Q.**   What are we looking at on this page, Mr. Clemmenson?

12   **A.**   There's the information pertaining to the bonds that we

13   traded on that given day.

14   **Q.**   So which bonds are captured here in this blowout?

15   **A.**   Right here those are all corporate bonds and there's one

16   municipal.

17   **Q.**   And so how much commission has been applied to the

18   corporate bonds?

19   **A.**   Zero.

20   **Q.**   Let's take a look at page 2, please.  We can zoom in at

21   the bottom half.

22              What types of bonds are we looking at on this part

23   of page 2?

24   **A.**   Oh, there's some mix.  There's some corporate bonds, some

25   treasury notes, some mortgages.  Commercial mortgage paper.

1   Q.   Which bonds here have commissions applied to them?

2   A.   The treasury notes and the mortgage bonds.

3   Q.   Is this consistent or inconsistent with the instructions

4   you were given on the March 2nd call?

5   A.   That's consistent.

6         MR. JOHNSTON:  You can take this down, Erin.

7   BY MR. JOHNSTON:

8   Q.   On the following day, March 8, 2011, did you have a phone

9   call with the defendant about this trading?

10  A.   Yes.

11        MR. JOHNSTON:  I'd like to direct your attention to

12  the tab behind 123.

13        (Audio plays.)

14  BY MR. JOHNSTON:

15  Q.   Mr. Clemmenson, drawing your attention to page 2, where

16  Mr. McLellan tells you on line 6, "Keep chugging along, stay

17  with that plan, half a bit of yield on everything, but the

18  corporates do zero."

19        What's your understanding of what he's telling you

20  to do?

21  A.   To continue trading corporates flat and apply a half a

22  basis point of yield on everything else.

23  Q.   If you recall the conversation from March 2nd, you were

24  instructed, in the phone call, three-quarters of a basis

25  point of yield.  Do you have an understanding of why this

1    number was different?

2    **A.**  Well, not knowing what they agreed on with the client,

3    I'm assuming he's adjusting, because he is in a better

4    position to have the information than I am.

5    **Q.**  So from this conversation, do you have an understanding

6    of what commission you would be applying to these trades?

7    **A.**  Yes.  Half a basis point of yield.

8    **Q.**  And then further down, where you say, "Yeah, we haven't

9    put those in yet.  That's the commission we're going to

10   have."

11              What are you referring to?

12   **A.**  I think we figured -- the commission that we would have,

13   based on the trades that we hadn't booked yet.

14   **Q.**  So at this point, has the -- how much of the commission

15   has been booked out?

16   **A.**  I think it looks like, from what -- Steve, that we had

17   70,000 booked out at that point.

18   **Q.**  And do you know from this how much more is about to be

19   booked out?

20   **A.**  Not from this I don't, no.  But it would be high -- it

21   would be more than what we pitch as the 70,000, yeah.

22   **Q.**  Did you have an understanding whether the client had

23   agreed to any change in commission rate?

24              MR. GOLDSTEIN:  I object.  There's no foundation

25   for this question.

1      THE COURT:  Sustained.

2      MR. JOHNSTON:  Your Honor, can I ask did he have an

3  understanding --

4  BY MR. JOHNSTON:

5  **Q.**  Why are you following Mr. McLellan's order here?

6  **A.**  Because he's the boss.  He has more information than I

7  would have.

8  **Q.**  Did you have more or less information than Mr. McLellan

9  as to what any client had agreed to?

10  **A.**  I would have less.

11      MR. JOHNSTON:  No further questions.

12      THE COURT:  All right.  Cross-examination.

13      MR. GOLDSTEIN:  Thank you, Your Honor.

14      **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

15  BY MR. GOLDSTEIN:

16  **Q.**  You just testified -- good morning, Mr. Clemmenson.

17  **A.**  Good morning.

18  **Q.**  You just testified that Mr. McLellan was the boss, right?

19  **A.**  Correct.

20  **Q.**  And you also testified a little bit earlier that

21  Mr. Bryant reported to Mr. McLellan, right?

22  **A.**  Yes.

23  **Q.**  Mr. McLellan had a very wide array of responsibilities in

24  his position, correct?

25  **A.**  Yes.

1    **Q.**  Meaning it's not simply you, Mr. Bryant, and a few other

2    of the traders.  He's responsible for the US trading; is that

3    correct?

4    **A.**  Yes.

5    **Q.**  You knew he was also responsible at the same time for

6    EMEA; is that correct?

7    **A.**  Yes.

8    **Q.**  Also responsible for Asia Geographic Territory, correct?

9    **A.**  Yes.

10    **Q.**  Meaning the organizational chart that was under Ross

11    McLellan was incredibly extensive, wasn't it?

12    **A.**  You could say that, yes.

13    **Q.**  Mr. Johnston asked you at the beginning of his

14    examination about if you knew where -- well, strike that.

15    You were a bond trader, right?

16    **A.**  Correct.

17    **Q.**  Fixed income is another way to say bonds, right?

18    **A.**  Yes.

19    **Q.**  And you worked within the broker-dealer at State Street,

20    correct?

21    **A.**  Yes.

22    **Q.**  State Street Global Markets LLC, correct?

23    **A.**  Yes.

24    **Q.**  All right.  And inside of the broker-dealer, there's your

25    side of the sort of corporation, which is fixed income of

1    bonds, and there's also equity traders, correct?

2    **A.**  Yes.

3    **Q.**  All right.  And so you -- I think you have a degree from

4    Trinity; is that correct?

5    **A.**  Yes.

6    **Q.**  All right.  And you know who Mr. Finocchi is, right?

7    **A.**  Yes.

8    **Q.**  Went to the -- got a master's from the University of

9    Chicago.  Are you aware of that?

10   **A.**  I think I remember that, yes.

11   **Q.**  How about Mr. Dionisio, do you know he had two degrees,

12   two master's degrees from Boston University?

13   **A.**  No, I didn't know that.

14   **Q.**  The point is, talented guy, doing a difficult job,

15   meaning executing orders in the marketplace, correct?

16   **A.**  Yes.

17   **Q.**  All right.  And so let me talk to you about the process a

18   little bit.  Transition management is composed of different

19   roles and responsibilities, right?  You have the analyst on

20   one side and you have traders, like yourself, on the other

21   side, correct?

22   **A.**  Uh-huh.

23   **Q.**  And so when a client comes to, for example, State Street

24   Bank Europe Limited, are they -- are you aware that they

25   negotiate a transition management agreement with that

1    particular corporate entity, meaning State Street Bank Europe

2    Limited?

3              MR. JOHNSTON:  Objection, Your Honor.  The witness

4    doesn't work in Europe.

5              THE COURT:  Sustained.

6    BY MR. GOLDSTEIN:

7    **Q.**  Transition management clients negotiate -- as you

8    testified on direct examination, negotiate commissions in the

9    terms of the transition management with the transition

10   management sales side, correct?

11   **A.**  That's my understanding.

12   **Q.**  And you don't have a role in that process, right?

13   **A.**  No, I do not.

14   **Q.**  And then the analyst architect the strategy that is going

15   to be put in place for that particular client, right?

16   **A.**  Yes.

17   **Q.**  And that in and of itself is a complicated process that

18   takes time and resources for that personnel within that

19   department of State Street, correct?

20   **A.**  I never did that, but I would assume, yeah, there's some

21   work involved in that, yes.

22   **Q.**  And then eventually, once that plan is architected,

23   developed, it's the execution side, meaning to execute that

24   strategy, orders are transmitted to the broker, such as

25   yourself, or the broker-dealer, right?

1    **A.**  Yes.

2    **Q.**  All right.  And broker-dealers are compensated for the

3    services that they provide, right?

4    **A.**  Yes.

5    **Q.**  All right.  And so when you receive an order to execute a

6    security transaction on behalf of a client of a transition

7    management, you then go to the marketplace to fulfill that

8    order, right?

9    **A.**  Yes.

10   **Q.**  All right.  Now, inside of that marketplace, there are

11   what's known as counterparties, correct?

12   **A.**  Yes.

13   **Q.**  All right.  And so when you go to the marketplace and

14   you're looking to execute orders, you are -- best execution

15   is trying to find the right counterparty, right?

16   **A.**  Yes.

17   **Q.**  Putting trades into competition, right?

18   **A.**  Correct.

19   **Q.**  And on the other side of you, meaning these

20   counterparties, are people working against you to try and get

21   the best prices on behalf of their clients, right?

22   **A.**  Well, not necessarily their clients.  They may be trading

23   for their own books.

24   **Q.**  Exactly.  Meaning so when you go to the marketplace,

25   you're in competition with people on the other side, right?

1   **A.**   Yes.  Potentially.

2   **Q.**   Right.  And so part of the job of a good trader is to go

3   and figure out and compete against these other counterparties

4   that are in the marketplace, right?

5   **A.**   In some sense, yes.  I mean, we're not necessarily

6   competing with them, because we're not running a book, so

7   they're trading a proprietary book.  We were not.  We needed

8   them for liquidity.

9   **Q.**   Fair enough.  So you're trying to locate the best

10  counterparty, right?

11  **A.**   Correct.

12  **Q.**   These other counterparties have their own interest at

13  stake, not your interest, right?

14  **A.**   Correct.

15  **Q.**   Not the transition management client's interest, right?

16  **A.**   Right.

17  **Q.**   The point is that it's a difficult, challenging job going

18  to the marketplace and executing orders in your position as a

19  bond trader, right?

20  **A.**   It can be.

21  **Q.**   People on the other side may have algorithms they're

22  using our computer models to figure out what prices they

23  wanted to get their particular transactions at, right?

24  **A.**   It could be.

25  **Q.**   Okay.  And as part of that process, you testified that

1    the broker-dealer earns remuneration, or is paid for the

2    services that they provide, right?

3    **A.**   Yes.

4    **Q.**   Mr. Johnston asked you a question about where that

5    compensation or commission went and you testified you thought

6    it went to a pool that was divided amongst different units,

7    right?

8    **A.**   Right.

9    **Q.**   You didn't work in the finance department at State

10   Street, right?

11   **A.**   No.

12   **Q.**   You weren't on the executive management committees,

13   right?

14   **A.**   No.

15   **Q.**   The point is, you have no idea how that money is actually

16   divided up within the different State Street corporations,

17   right?

18   **A.**   That would be correct.

19   **Q.**   Okay.  You testified that Mr. Walker reported to Ross.

20   Didn't he, in fact, report to Mr. Weiner?

21   **A.**   That I don't recall, if he did or not.

22   **Q.**   Let me direct your attention to Exhibit 116, please.

23   It's the audio -- transcript of the audio that you -- you

24   were asked to review with Mr. Johnston.  The participants on

25   that call were yourself, right?

1    **A.**   Yes.

2    **Q.**   Ross, correct?

3    **A.**   Correct.

4    **Q.**   Gregory Spyropoulos?

5    **A.**   Correct.

6    **Q.**   Kevin Walker?

7    **A.**   Yes.

8    **Q.**   And Peter Weiner or *Weiner*, right?

9    **A.**   Right.

10   **Q.**   Many people on the phone, right?

11   **A.**   Uh-huh.

12   **Q.**   Mr. McLellan is on the phone, speaking openly and

13   transparently with those on this conference call, right?

14   **A.**   Yes.

15   **Q.**   Okay.  And so if I can direct your attention to page 2,

16   where Mr. McLellan said, "We got a good flavor of what you're

17   looking for" -- this starts at line 8, Mr. Clemmenson -- "you

18   know, obviously we want to make a couple of bucks on this

19   trade."

20            Do you see that?

21   **A.**   Yes.

22   **Q.**   Broker-dealer's in the business of making money, right?

23   **A.**   Correct.

24   **Q.**   Given the amount of work that goes into it, he says,

25   right?

1    **A.**   Yes.

2    **Q.**   Not an easy process, right?  As we just reviewed?

3    **A.**   Right.

4    **Q.**   Correct?

5    **A.**   Correct.

6    **Q.**   He said, "You know SSGA is the manager."

7              Do you see that?

8    **A.**   Yes.

9    **Q.**   SSGA is State Street Global Advisors, right?

10   **A.**   Yes.

11   **Q.**   Different unit within State Street, right?

12   **A.**   Yes.

13   **Q.**   Provides asset investment or asset management investment

14   advice to different entities throughout the United States and

15   even internationally, right?

16   **A.**   Yes.

17   **Q.**   And he said, "Because SSGA is the manager, basically what

18   they are saying is we have got to come up with fair pricing,"

19   right?

20   **A.**   Yes.

21   **Q.**   And so what he's saying to you there is that what they

22   are saying refers to State Street Global Advisors, right?

23   **A.**   Right.

24   **Q.**   They're telling Mr. McLellan he has to come up with fair

25   pricing, right?

1    **A.**  Yes.

2    **Q.**  And you say okay, right?

3    **A.**  Yes.

4    **Q.**  And Mr. Johnston asked you a series of questions, also,

5    Mr. Clemmenson, about things, whether you recall.  Like do

6    you recall Mr. McLellan giving verbal instructions like this

7    or do you recall certain instances, and your testimony was

8    that you don't recall it, right?

9    **A.**  Right.

10   **Q.**  Now, this was 2011, right?

11   **A.**  Correct.

12   **Q.**  It's a long time ago?

13   **A.**  Yes.

14   **Q.**  All right.  And you're not testifying it never happened

15   before, your testimony is, as you sit here today, you just

16   don't recall, right?

17   **A.**  That's correct.  I don't recall it happening.

18   **Q.**  Now, Mr. McLellan says, at line 14, "We'll trade the

19   corporates just flat."

20           Do you see that?

21   **A.**  Yes.

22   **Q.**  All right.  And if we could have exhibit --

23           MR. WEINBERG:  Max, if we could have Exhibit 122-1.

24   BY MR. WEINBERG:

25   **Q.**  This was the spreadsheet Mr. Johnston showed you, where

1    the corporates weren't -- there was no commission attached to

2    the corporate trade, right?

3    **A.**   Yeah, I don't see it here, but yes.

4    **Q.**   But you recall that testimony, right?

5    **A.**   Yes.

6    **Q.**   Okay.  And Mr. Johnston showed you a couple of those

7    spreadsheets, pointing out that corporates did not have

8    commissioned charged on it, right?

9    **A.**   Yes.

10   **Q.**   And that goes back to what Mr. McLellan says during this

11   conversation that corporates will be traded flat, right?

12   **A.**   Correct.

13   **Q.**   And if you look at line 21, on page 2, there's a

14   discussion in terms of about 4,000 tickets, right?

15   **A.**   Yes.

16   **Q.**   And you also testified, when reviewing this conversation,

17   that you asked about riskless principal or agency, because it

18   implicated booking issues for you, in terms of executing

19   these security orders, correct?

20   **A.**   Yes.

21   **Q.**   Meaning it was a -- it was a highly intensive manual

22   responsibility to try and book these kinds of trades, right?

23   **A.**   Yes, it was a manual process.

24   **Q.**   Right.  And so corporates -- you know what a TRACE

25   reporting system is, right?

1    **A.**   Yeah.

2    **Q.**   All right.  Corporates are TRACE reportable, but only if

3    there's a markup or a commission attached to it, right?

4    **A.**   No, all trades go to TRACE.

5    **Q.**   Even if there's no markup or commission to it?

6    **A.**   Correct.

7    **Q.**   And you're sure about that?

8    **A.**   Pretty sure about that.  Yeah.

9    **Q.**   Okay.  In any event, if corporates were not -- strike

10   that.

11           If corporates are not TRACE reportable -- well,

12   strike that.

13           TRACE requires that all of the tickets be reported

14   into the TRACE system within 15 minutes, right?

15   **A.**   Correct.

16   **Q.**   Did you load all of these into -- all of these -- there

17   are 2,300 corporates in this particular transaction, right?

18   **A.**   I don't recall the actual total number.

19   **Q.**   Do you recall loading -- and you would have to do it

20   twice, right?  The original ticket and the second ticket,

21   right?

22   **A.**   Yes.

23   **Q.**   So if it was 2,300, that would be 4,600 tickets, right?

24   **A.**   Yes.

25   **Q.**   TRACE requires that it be inputted within 15 minutes of

1    the order, correct?

2    **A.**  Yes.

3    **Q.**  Are you testifying that you loaded those 4,600 orders

4    into TRACE within the 15 minutes?

5    **A.**  No, if you look at that spreadsheet, the amount of

6    corporates that on there are not a lot, and there was three

7    of us that were trading.

8    **Q.**  And the maximum per day that you could do in terms of

9    reporting to Trace was what?  150?

10   **A.**  Probably 150, doing it manually per man.  You probably

11   could do that.

12   **Q.**  On page 4 of the transcript, which Mr. Johnston did not

13   go through with you --

14          THE COURT:  Mr. Johnston, how much longer do you

15   have?

16          MR. GOLDSTEIN:  A little bit.  We can break, Your

17   Honor.

18          THE COURT:  We'll take the morning break, ladies

19   and gentlemen.  All rise for the jury.

20          (The jury exits the courtroom.)

21          THE COURT:  All right.  We'll stand in recess,

22   we'll resume at 25 after.

23          (Court in recess at 11:09 a.m.

24          and reconvened at 11:25 a.m.)

25          THE CLERK:  All rise.  The McLellan matter is back

1    in session.

2              THE COURT:  You can go get the jury.

3              Please be seated.

4              (Jury entered the courtroom.)

5              THE COURT:  Please be seated.

6              Go ahead, please.

7              MR. GOLDSTEIN:  Thank you, Your Honor.

8    BY MR. GOLDSTEIN:

9    **Q.**  Before the break, we addressed the subject of trace

10   reporting requirements, right?

11   **A.**  Yes.

12   **Q.**  In your capacity of your executing corporate bond

13   purchase, okay, you go to the marketplace, let's say Goldman

14   Sachs sells you a bond for a hundred.  Goldman Sachs is then

15   responsible for reporting that sale within the trace

16   reporting system, correct?

17   **A.**  Yes.  They would report their side of the trade, yes.

18   **Q.**  And if State Street did not add any markup or commission

19   to that particular purchase or sale, there would be no trace

20   reporting requirements for State Street, correct?

21   **A.**  No.  Being a broker-dealer, we would have to report that.

22   **Q.**  Even if there's no markup?

23   **A.**  Right.  We report our trade as well as the client side

24   price, too.

25   **Q.**  Is your testimony that you reported all of these

1    corporate bond purchases of sales for AXA within trace

2    reporting requirements?

3    **A.**   Yes.  Over the 10-day period, yes, we would.

4    **Q.**   Instanet is the system that relates to equities only.

5    Are you familiar with that?

6    **A.**   No.

7    **Q.**   Have you ever heard of Instanet?

8    **A.**   I've heard of it, yes.

9    **Q.**   Not part of your process in fixed income?

10   **A.**   No.

11   **Q.**   When you ultimately did execute orders, there are

12   confirmations generated, correct?  Confirms?

13   **A.**   Yes.

14   **Q.**   And those confirms or confirmations are sent to a

15   client's custodian bank or custody bank, correct?

16   **A.**   Yes.  I would say -- I'm not overly familiar with that

17   process.  It was out of the back office.

18   **Q.**   Are you generally familiar with that concept?

19   **A.**   Yes.

20   **Q.**   Have you seen confirms?  Do you see where it notes on the

21   confirmation whether a particular transaction was done on an

22   agency or riskless principal basis?

23   **A.**   I generally wouldn't have seen any confirms, no.

24   **Q.**   But riskless principal was the default trading -- the way

25   the default trade that you executed transactions, correct,

1    riskless principal?

2    **A.**   For the most part, yes.

3    **Q.**   Whether or not it was riskless principal or agency,

4    broker-dealer could be entitled to added markup or markdown,

5    correct?

6    **A.**   If that was agreed on, yes.

7          MR. GOLDSTEIN:  Now I'd like to try my hand at a

8    chalk, Your Honor, if I could, an illustrative chalk.  Could

9    we have the ELMO, please?

10          THE COURT:  Sure.

11    BY MR. GOLDSTEIN:

12    **Q.**   So, Mr. Clemmenson, you did -- as part of your job within

13    State Street, you did execute fixed-income instruments sent

14    to you by State Street Bank Europe, Limited, correct?

15    **A.**   If it was a global transition, we would.

16    **Q.**   Right.  State --

17          MR. JOHNSTON:  Objection.  Beyond the scope.  He

18    never testified about doing any transitions for Europe.

19          THE COURT:  Overruled.

20          Go ahead.

21    BY MR. GOLDSTEIN:

22    **Q.**   You would receive orders from State Street Bank Europe,

23    Limited, correct?

24    **A.**   Yes.

25    **Q.**   And by "you," I mean State Street Global Markets,

1    correct?

2    **A.**   Yes.

3    **Q.**   The broker-dealer?

4    **A.**   Yes.

5    **Q.**   So if this is you, State Street Global Markets, LLC, and

6    this is State Street Bank Europe, Limited, you would receive

7    orders for execution from State Street Bank Europe, Limited,

8    correct?

9    **A.**   Yes.  We could receive something from a TM analyst in

10   London.

11   **Q.**   And you are the broker-dealer, correct?

12   **A.**   Mm-hmm.

13   **Q.**   And this is the bank entity; is that correct?

14           MR. JOHNSTON:  Objection, Your Honor.  Could we

15   have a sidebar, please?

16           THE COURT:  All right.

17           (At sidebar on the record.)

18           THE COURT:  Are you worried that Mr. Goldstein's

19   artistic skills are going to so outshine the lawyers from

20   Washington, this could be done?

21           MR. JOHNSTON:  I do.  I think this could be the

22   nail in the coffin for us.

23           Our problem is obviously they're trying to use this

24   witness to advance another part of the case that had nothing

25   to do with the direct testimony, and we understand that

1    that's -- may be in their interest, but that's really not

2    consistent with the rules here where they should confine

3    their cross-examination to the scope of the direct.  And he

4    already said -- he didn't testify about Europe, and now we're

5    frolicking in this transnational --

6              THE COURT:  What's the scope?

7              MR. GOLDSTEIN:  The frolic, Your Honor, is that he

8    testified at length about his role as a fixed-income trader

9    for State Street.  And so I think the jury needs to

10   understand exactly what that role is.  He testified that he

11   executed orders on behalf of State Street Bank Europe --

12             MR. FRANK:  No, he didn't.

13             MR. JOHNSTON:  You asked about that on cross; we

14   didn't ask about Europe.

15             MR. GOLDSTEIN:  Right, and he answered it.

16             MR. JOHNSTON:  Over our objection.

17             MR. GOLDSTEIN:  Unfortunately, I think the

18   government skipped kindergarten where they're not told it's

19   not polite to interrupt people.  If I could just finish what

20   I'm saying, you guys will have a chance, okay?

21             THE COURT:  He has a point.

22             MR. FRANK:  We're also engaging on *ad hominem*

23   attacks.

24             THE COURT:  Let me make a couple of things clear.

25   One, you've all had *ad hominem* attacks that have not been up

```
1    to the level of professionals that all of you are, that I not

2    only expect but all of you actually display.  You have some

3    real good lawyers here, but there's been allegations of

4    disingenuous behavior.

5              I get it; this is an important case for all of you

6              and you all get stressed.  You've all done it,

7              all four of you, okay.  I don't view any of you

8              less for having done it because I think all of

9              you are good lawyers, and it happens.  It's a

10             stressful trial.  It's a lot at stake for the

11             government, it's a lot at stake for the

12             defendant.  So move on.

13        Those things are rolling off my back, I'm not

14             interested in them, I don't care, it doesn't move

15             me.

16        The main point is what is helpful is to not

17             interrupt the other person because I can hear it

18             and I go one at time.  You've all been to some

19             extent guilty of that as well.

20        So tell me why this area, it's beyond the scope of

21             the direct, to the extent it's -- to the extent

22             it's beyond the scope of the direct, where are we

23             going?

24        MR. GOLDSTEIN:  I just want to explain to the jury

25   the process is that the broker-dealer receivers an order, it
```

1    goes to the marketplace, does best execution.  There's
2    nothing inconsistent with what he testified to in terms of
3    going to the marketplace and adding a commission or a markup,
4    that best execution means going to the marketplace and
5    soliciting and obtaining the best price for the customer,
6    whether it's riskless principal or agency.  The broker-dealer
7    has a custom --
8            THE COURT:  You do not intend to get into
9    individual trades.
10            MR. GOLDSTEIN:  No.
11            THE COURT:  It's more of just an exemplar.
12            MR. GOLDSTEIN:  Yes.
13            MR. FRANK:  Can I say --
14            THE COURT:  Sure.
15            MR. FRANK:  He can do that in the United States.
16   He doesn't have to go to State Street.  There's a
17   considered -- I don't want to make any allegation, but it's
18   remarkable to me that he's talking about State Street Bank
19   Europe, Limited.
20            The defense is a contractual element with respect
21   to the complaints about State Street Bank Europe, Limited's
22   interaction with other State Street Bank entities.
23            This witness is not that witness.  If they want to
24   call him in their direct case, they can recall him for that.
25   In our case, he testified to AXA.  They went into great

1    length to make clear that there was no contract with AXA.

2    There's no issue about State Street Bank Europe, Limited with

3    AXA.  So if they want to make the point he executes trades as

4    riskless principal on behalf of some other entity -- I don't

5    know what relevance it has here because there's no contract

6    with AXA entered into by another entity, but if they want to

7    try to make that argument, fine.

8              But why is he talking about State Street Bank

9    Europe, Limited?  That's an unrelated part of the case that

10   he's trying to bring in through this witness.

11             MR. GOLDSTEIN:  It's completely consistent with his

12   testimony --

13             THE COURT:  It's overruled, go ahead.

14             MR. GOLDSTEIN:  Thank you.

15             (End of discussion at sidebar.)

16   BY MR. GOLDSTEIN:

17   Q.  Mr. Clemmenson, to get back to my questions, State Street

18   Bank Europe is one of the transition management desks that

19   would send orders to the broker-dealer SSGM, LLC, meaning to

20   you, correct?

21   A.  Yes, it was a global transition, yes, if they held U.S.

22   dollar bonds.

23   Q.  Exactly.  And they would do that on behalf of a client of

24   State Street Bank Europe, Limited, right?

25   A.  Yes.

1    **Q.**  Now, you as the broker-dealer, you go to the marketplace

2    to find a counterparty, correct?

3    **A.**  Yes.

4    **Q.**  And so what you do is you put in a competitive process.

5    You put these counterparties in competition with each other

6    on behalf or as to try to secure best execution for your

7    client, correct?

8    **A.**  Yes.

9    **Q.**  And so when you go to the marketplace and you engage all

10   of these different counterparties, there's different

11   considerations that you take into consideration when

12   selecting the right counterparty, correct?

13   **A.**  Generally, no.  We'd send it out to a list of

14   counterparties.

15   **Q.**  Okay.  And looking for what from them?

16   **A.**  Best price.

17   **Q.**  Best price, right.

18          And so there's never an occasion where you would

19   get, say, an offer of a hundred and an offer of 102 and you'd

20   take the worst of the two prices, right?

21   **A.**  No.

22   **Q.**  Meaning you would always go to the marketplace and

23   execute best execution, meaning getting the best price on

24   behalf of your client, right?

25   **A.**  Correct.

1   Q.   Okay.  And after that process is done and you've selected

2   the best price, at some point in time, as you testified, a

3   confirmation is sent to a custody bank for the client,

4   correct?

5   A.   Yes.

6   Q.   And so when Mr. --

7        MR. GOLDSTEIN:  If we could have Exhibit 4, Max,

8   please, page 4.

9        Global fixed income, please.

10  Q.   So where it stays State Street is a lead agency

11  fixed-income trading firm, that's accurate, right?

12  A.   I believe so.  I'm not involved in the marketing, in the

13  wording of the marketing, so --

14  Q.   And it -- your trading desk did try to leverage your size

15  to achieve best execution, right?

16  A.   Yes.

17  Q.   That's what you did in relation to the AXA transaction,

18  correct?

19  A.   Yes.

20  Q.   And that's what you would do as a matter of practice

21  under Mr. McLellan's leadership, correct?

22  A.   Yes.

23  Q.   There's nothing inconsistent about going to the

24  marketplace as a riskless principal or an agent and then

25  after that process is complete, meaning after you've secured

1    the best price for your client, there's nothing inconsistent

2    with you then adding a markup or markdown to compensate you,

3    the broker-dealer, for the services that you've provided,

4    correct?

5    **A.**   Correct.  We would -- whatever the markup we were told to

6    apply, yes, would be applied.

7              MR. GOLDSTEIN:  Nothing further, Your Honor.

8              THE COURT:  Any redirect?

9              MR. JOHNSTON:  Yes, briefly, Your Honor.

10             **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

11   BY MR. JOHNSTON:

12   **Q.**   Mr. Clemmenson, you were asked some questions about trace

13   reporting, correct?

14   **A.**   Yes.

15   **Q.**   Of the three types of bonds that you traded in the AXA

16   transition, which of them at that time reported the trace?

17   **A.**   Only corporate bonds.

18   **Q.**   Did you apply commissions to corporate bonds?

19   **A.**   No.

20   **Q.**   What were the other two types of commissions, two types

21   of bonds you traded?

22   **A.**   Mortgage securities and treasury securities.

23   **Q.**   Did you apply commissions to those bonds?

24   **A.**   Yes.

25   **Q.**   You were asked some questions about trade confirmations.

1  Have you seen any trade confirmations for the AXA trades?

2  **A.**  No.

3  **Q.**  Do you know one way or the other whether they went to a

4  client or a custody bank?

5  **A.**  I have no way of knowing that.

6  **Q.**  Do you know what information, if any, would be on there

7  regarding markups or markdowns?

8  **A.**  No, I wouldn't.

9  **Q.**  You were asked some questions about the phone call on

10 March 2, 2011.  Of all the people on that phone call, who was

11 the boss?

12 **A.**  Ross McLellan.

13 **Q.**  Was Edward Pennings on that call?

14 **A.**  No.

15 **Q.**  Was Richard Boomgaardt on that call?

16 **A.**  No.

17          MR. JOHNSTON:  Thank you.  No further questions.

18          MR. GOLDSTEIN:  Quickly, Your Honor.

19          **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

20 BY MR. GOLDSTEIN:

21 **Q.**  If a markup is added to a bond execution, you have to

22 produce another ticket; is that correct?

23 **A.**  We'd have to produce two tickets regardless of whether

24 there was a markup or not.

25          MR. GOLDSTEIN:  Thank you.

1          Your Honor, if I could, could I have the chalk

2     marked Exhibit B and have Mr. Clemmenson initial it?

3          THE COURT:  Mark it for identification?

4          MR. GOLDSTEIN:  Yes.

5          MR. JOHNSTON:  Your Honor, we object.

6          THE COURT:  You object to marking it for

7     identification?

8          MR. JOHNSTON:  No.  I'm sorry.  I thought he said

9     move to admit.

10          THE COURT:  You withdraw that, don't you?

11          MR. JOHNSTON:  Yes.

12          THE COURT:  You may approach, and you may have that

13     marked for identification.

14          (Exhibit No. B marked for identification.)

15          THE COURT:  For identification, ladies and

16     gentlemen, means it's marked for the record and the Court.

17     Things that are in evidence you bring back with you to the

18     jury room.  Things that are marked for identification are

19     just preserved in the record of the proceedings.

20          MR. GOLDSTEIN:  Thank you, you Honor.  No further

21     questions.

22          THE COURT:  You're excused, sir.  Thank you very

23     much.

24          Next witness.

25          MR. FRANK:  Thank you, Your Honor.  The government

1    calls Kristen Morris.

2              (Pause.)

3              (The witness was duly sworn.)

4              THE CLERK:  Thank you.

5                      **KRISTEN MORRIS**

6         having been duly sworn, testified as follows:

7         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

8    BY MR. FRANK:

9    **Q.**  Still morning.  Good morning, Ms. Morris.

10   **A.**  Good morning.

11   **Q.**  Could you tell us where you live, please.

12   **A.**  In Andover, Massachusetts.

13   **Q.**  And where do you work?

14   **A.**  State Street Bank and Trust.

15   **Q.**  What do you do at State Street?

16   **A.**  I'm a transition analyst on the transition management

17   desk.

18   **Q.**  And how long have you worked at State Street?

19   **A.**  About 22 years.

20   **Q.**  And have you had pretty much the same job during most of

21   that time or have you had different jobs?

22   **A.**  Most of the time, about 19 years, I've been on the

23   transition management desk.

24   **Q.**  As an analyst?

25   **A.**  As an analyst.

1    **Q.**  I want to direct your attention to 2011.  Do you have

2    that in mind?

3    **A.**  Yes.

4    **Q.**  Who did you report to in 2011?

5    **A.**  Kevin Miller.

6    **Q.**  And what was his job?

7    **A.**  He was in charge of the transition management analyst

8    desk.

9    **Q.**  In the United States?

10   **A.**  In the United States, correct.

11   **Q.**  And who did Kevin Miller report to?

12   **A.**  He reported to Peter Weiner.

13   **Q.**  And what was his job?

14   **A.**  He was the head of the North American sales team.

15   **Q.**  And who did Peter Weiner report to?

16   **A.**  He reported to Ross McLellan.

17   **Q.**  And what was his job?

18   **A.**  He was in charge of -- globally of transition management.

19   **Q.**  How many layers above you was Ross McLellan?

20   **A.**  He was three layers above me.

21   **Q.**  And when you started at State Street, did you know Ross

22   McLellan?

23   **A.**  He and I started pretty much at the same time.  I think I

24   started a couple of months maybe before he did.

25   **Q.**  Okay.  And yet, in 2011, you were a transition management

1    analyst and he was three layers above you.

2    **A.**   Yes.

3    **Q.**   And how senior was he at the bank?

4    **A.**   He was just promoted to executive vice president, so he

5    was pretty senior.

6    **Q.**   Tell us what your responsibilities were as a transition

7    analyst.

8    **A.**   As an analyst, we worked on the day-to-day operations of

9    a transition, so we would coordinate between the various

10   parties, we would deal with the clients, the custodians, the

11   incoming managers.  We worked on strategy and delivered trade

12   files to the trading desk.

13   **Q.**   And when you say you delivered trade files to the trading

14   desk, what does that mean?

15   **A.**   So we compared the assets that we were given and we

16   compare that to the target portfolio to determine what we

17   need to buy and what we need to sell.  So then we take those

18   trades and we send them electronically up to the transition

19   trading desk.

20   **Q.**   And do you send anything else to the traders?

21   **A.**   That is followed with an e-mail with the instructions on

22   how to trade the portfolio.

23   **Q.**   And what's included in those instructions?

24   **A.**   It would have the account number, the -- when to start

25   trading, the value of the buy, the value of the sells, and

1   what the commission rates were.

2   **Q.**   And you testified you provide that in an e-mail?

3   **A.**   That's correct.

4   **Q.**   Tell us a little bit about the layout.  Where do you work

5   relative to where the traders work?

6   **A.**   Sure.  So myself and the other analysts, we work on the

7   trading floor.  It's a long desk, almost like a long

8   dining-room table, and we sit either side of this desk.  I'm

9   actually on the end of the desk, and next to me there's an

10   aisle that separates us from the next group of desks, which

11   one over and one up is the transition trading desk.

12   **Q.**   So they're a few feet from you?

13   **A.**   A stone's throw away, correct.

14   **Q.**   Where, in this time period, did Ross McLellan sit?

15   **A.**   He sat up on the sixth floor.  It was overlooking the

16   trading desk, but it was one floor up.

17   **Q.**   So he looked down on the trading desk?

18   **A.**   Correct.

19   **Q.**   When you would issue those e-mail instructions to the

20   traders, where did you get that information from?

21   **A.**   For bigger deals, there's a strategy team that puts

22   together strategy documents that talks about how we're going

23   to trade the portfolio, which assets to trade first to reduce

24   the risk, how long the trade should be.  So for larger deals,

25   we would get that direction from the strategy group.  For

1    smaller deals, we would determine the instructions ourselves.

2    **Q.**  And what about with respect to what to charge?  Where did

3    you get that information from?

4    **A.**  From the transition notice.

5    **Q.**  The periodic notice?

6    **A.**  Correct.

7    **Q.**  How do you charge for transitions in the ordinary course?

8    **A.**  So for equities, it's charged cents per share for U.S.

9    and Canadian equities.  For international equities, it's

10   charged on basis points of notional value.  On fixed income,

11   it's basis points of notional value or basis points of yield.

12   And on features contracts, it's by contract.

13   **Q.**  I want to direct your attention to fixed income for a

14   moment.  You testified there's basis points of value and then

15   there's basis points of yield.

16   **A.**  Correct.

17   **Q.**  What's the difference?

18   **A.**  So basis points of yield takes into account the duration

19   and interest rates of the bond to determine what the

20   commission would be.  Basis points of notional value is just

21   more of a linear equation.  It's just the basis points times

22   the value of the bond to give you the commission rate.

23   **Q.**  And if you charge somebody, call it half a basis point of

24   yield, is that more or less, typically, on a bond than half a

25   basis point of value?

1    **A.**   Typically it's more.

2    **Q.**   Why is that?

3    **A.**   Just -- I don't know.

4    **Q.**   Just mathematical?

5    **A.**   From my experience, when we charge basis points of yield,

6    it's -- the -- it turns out to be -- the same number turns

7    out to be a higher commission dollar amount than the same

8    number of basis points of notional value.

9    **Q.**   And is that because the longer the duration of the bond,

10   the longer you're applying that?

11   **A.**   That's correct.

12   **Q.**   Okay.  And who applies those commissions?

13   **A.**   They're applied on each individual trade by the traders.

14   **Q.**   Who tells the traders what commissions to apply?

15   **A.**   The transition analysts do.

16   **Q.**   So it's somebody in your role?

17   **A.**   Correct.

18   **Q.**   What is your understanding of what that commission

19   covers?

20   **A.**   That commission covers -- that's our only fee that State

21   Street makes on the trade.  It would cover the analyst, the

22   traders, the operation group, the -- all the overhead.

23   **Q.**   So no matter what entity is directing which entity to do

24   what, that's the fee that you charge?

25                 MR. WEINBERG:  Objection, leading.

1           THE COURT:  Sustained as to the form.

2   BY MR. FRANK:

3   **Q.**  You're aware that the trading desk is in a particular

4   entity and your desk may be in a different entity.  Are you

5   aware of that?

6   **A.**  That's correct.

7   **Q.**  But there's one fee that's charged?

8   **A.**  That's correct.

9           MR. WEINBERG:  Objection, Your Honor.

10          THE COURT:  Overruled.

11  BY MR. FRANK:

12  **Q.**  And that fee -- what's your understanding of what that

13  covers, again?

14  **A.**  That fee covers the transition analyst, the trading

15  teams, the operational teams, the account setup team, the

16  legal teams, general overhead.

17  **Q.**  I want to direct your attention to March of 2011.  Do you

18  recall working on a transition for a client called AXA?

19  **A.**  I do.

20  **Q.**  What was the nature of that deal?

21  **A.**  It was a fixed-income trade.  There were three different

22  portfolios, different groups of assets.  It was a large

23  trade.  It was about seven to eight billion dollars in total.

24  **Q.**  How big a deal -- where does that rank in deals that

25  you've worked on?

1    **A.**   It was a very big deal for me.  It was probably one of

2    the top three deals I've worked on dollarwise.

3    **Q.**   In your career?

4    **A.**   In my career, correct.

5    **Q.**   And what about for the desk?  How big a deal was it for

6    the desk?

7    **A.**   I think it was a pretty big deal for the desk as well.

8    **Q.**   What, if anything, did you learn about the commission

9    that was to be applied to that deal?

10   **A.**   I was told it was .1 basis points of yield.

11   **Q.**   .1 basis points of yield?

12   **A.**   Correct.

13          MR. FRANK:  Could we take a look at Exhibit 102.1

14   in evidence, please.

15   **Q.**   Do you recognize this document, Ms. Morris?

16   **A.**   Yes.  This is the strategy document.

17   **Q.**   Is this also called a pretrade?

18   **A.**   Looking at the front page, I think it's the pretrade

19   strategy document, correct.

20          MR. FRANK:  And if we could look at page 9 of the

21   document, the first paragraph.

22   **Q.**   So we've read the first two sentences.  I want to direct

23   your attention to the sentence sort of in the middle of that

24   first paragraph, beginning with, "Many fixed-income trades."

25   Do you see that?

1              "Many fixed-income trades" --

2              Do you see that?

3    **A.**  I do.

4    **Q.**  -- "are conducted on a principal basis where the dealer

5    hides the actual cost (i.e., the dealer's profit) of the

6    trade.  Clients are not aware of the costs, given the lack of

7    transparency in the fixed-income market.  Our process puts

8    the investment community in competition for the bonds to see

9    who will pay the highest price for bonds we are selling and

10   offer bonds at the lowest price for bonds we are purchasing

11   for our clients."

12              Can you tell us what your understanding is of what

13   that means?

14   **A.**  Sure.  So we -- State Street did not take on principal

15   positions, meaning we did not buy bonds from the client and

16   hold them in our own account.  So we worked as an agent.  We

17   would go out and we would solicit the best bids or the best

18   offers for each of the securities we were trading, and then

19   we would execute at those best levels.

20   **Q.**  And what about what the client would pay you for that?

21   **A.**  So the client would pay a commission on that.  And that

22   would be the only revenue that State Street would make on the

23   trade.

24   **Q.**  Okay.  And would that commission be agreed upon in

25   advance or not?

1    **A.**   It would be agreed upon in advance, correct.

2    **Q.**   And would it be disclosed or not?

3    **A.**   It would be disclosed in the transition notice, correct.

4    **Q.**   So it says here that many fixed-income trades are

5    conducted on a principal basis where the dealer hides the

6    cost, the dealer's profit on the trade.  Do you see that?

7    **A.**   I do.

8    **Q.**   Did State Street do that, in your understanding?

9    **A.**   No.

10   **Q.**   Could we look at the next paragraph, please?

11          "State Street does not charge an explicit

12   management or project management fee for transition

13   assignments.  State Street does not take a spread on any

14   transactions nor do we let any counterparty take a spread on

15   our clients' transactions.  We do not engage in commission

16   sharing, revenue sharing, referral payments, and/or other

17   economic benefits that our firm or its affiliates receive as

18   a result of our transition management activities.  Consistent

19   with our market-leading fiduciary-agency business model, our

20   commissions are fully disclosed to our clients around any

21   transition events undertaken.  State Street's commission

22   revenues are made up of fully disclosed equity commissions,

23   fixed-income commissions, and futures contract commissions."

24          What's your understanding of what that means?

25   **A.**   That State Street would disclose any commissions that we

1   made on any of the trades.

2   **Q.**   And you used the word "commissions."  What is your

3   understanding of what this means with respect to markups,

4   markdowns, or spreads?

5   **A.**   So for fixed-income products, if we were trading on a

6   riskless principal basis, the commission would be either a

7   markup, markdown, or spread of the price.  If we were trading

8   as an agent, it would be delineated out in the ticket itself.

9   But it would be the same commission either way.

10  **Q.**   And what is this paragraph saying, in your understanding,

11  about that?

12  **A.**   That we're fully transparent with the commissions that we

13  charge.

14  **Q.**   And again, does that mean the same thing for markups,

15  markdowns, and spreads, in your understanding?

16  **A.**   Correct.  It would be the same thing whether it was as a

17  markup or as a -- delineated as an agent trade.

18  **Q.**   And is this description that we've looked at on this page

19  consistent or inconsistent with the way State Street marketed

20  itself generally to clients?

21  **A.**   It's consistent.

22  **Q.**   Same across the board?

23  **A.**   Correct.

24        MR. FRANK:  Can we look at page 21, please?

25  **Q.**   If we could look at that first paragraph, the last

1    sentence, it says, "The following table details the actions

2    we take in the transition process, in which at all times we

3    act as a fiduciary and never outsource our fiduciary duties."

4            What's your understanding of what that means, that

5    you always act as a fiduciary and never outsource your

6    fiduciary duties?

7    **A.**   Sure.  That we'll always act in the best interest of the

8    client.  We'll put their interests ahead of State Street's

9    interests.

10   **Q.**   I want to take a look at the column on the left, that

11   chart.

12           And if we look right in the middle, you see where

13   it says "finalize transition management agreement"?

14   **A.**   Yes.

15   **Q.**   What does that mean?

16   **A.**   The transition management agreement is the agreement

17   between State Street and the client.  So oftentimes there's

18   negotiations back and forth.  This just means that before

19   trading begins we will finalize and have a contract executed.

20   **Q.**   Okay.

21           Standard practice?

22   **A.**   Correct.

23   **Q.**   If we could take a look at page 26, please.

24           And if we could just take a look at the entry for

25   Friday, February 25th of 2011.

1          First of all, could you just tell us what this

2   calendar is?

3   **A.**   Sure.  One of the things that we do as transition

4   analysts is we'll put together a timeline to share with the

5   parties involved in the transition so that the custodian and

6   the managers and the clients know exactly what should happen

7   on each day.  This is an example --

8   **Q.**   A client would understand from this what's supposed to

9   happen?

10  **A.**   Correct.  It's not necessarily set in stone, but it's

11  generally what should happen on each day.

12  **Q.**   If we look at Friday, February 25th of 2011, do you

13  see -- I think it's the second entry there.  It says "SSGM TM

14  agreement finalized"?

15  **A.**   Yes.

16  **Q.**   What's your understanding of what that means?

17  **A.**   That we would finalize the contract on that day.

18  **Q.**   And that would be the bank's expectation?

19  **A.**   Correct.

20  **Q.**   Could we look at pages 6 through 8, please.  Let's start

21  with 6.

22          You testified there were three portfolios involved

23  here?

24  **A.**   Yes.

25  **Q.**   Okay.  So I'm showing you this part of the estimate for

1   the multimanager, multisector bond fund transition.

2   **A.**   Okay.

3   **Q.**   What are we looking at?

4   **A.**   So this is the first page with some of the cost

5   information on it.   The intimate -- implementation shortfall

6   is listed here for the trade.

7   **Q.**   And this is the pretrade estimate?

8   **A.**   Correct.   It's a pretrade estimate.

9   **Q.**   And if we look at the commission line, tell us what we're

10  looking at there.

11  **A.**   Sure.   So that's the expected commission for the trade.

12  In dollar terms, it's 95,438.   Basis point terms, it's .57.

13  **Q.**   When we are looking at that in .57, is that basis points

14  of yield or basis points of value?

15  **A.**   That's basis points of value.   That's the value -- that's

16  the ratio of the commission dollars over the value of the

17  portfolio.

18  **Q.**   And how do you typically quote commissions to clients, in

19  terms of basis points of yield or basis points of value?

20  **A.**   Commissions are calculated on basis points of yield to

21  come up with an aggregate dollar number, and then that dollar

22  number is relayed to clients in terms of basis points of

23  portfolio value.

24  **Q.**   So internally you calculate it using basis points of

25  yield?

1   **A.**   Correct.

2   **Q.**   And then you quote it to the client this way in terms of

3   basis points of value?

4   **A.**   That's correct.

5   **Q.**   Do you have an understanding of what basis point of yield

6   figure was used to calculate this commission in terms of

7   basis points of value?

8   **A.**   I believe it was .1 basis points of yield.

9   **Q.**   Okay.  So we're looking at, for the first portfolio, the

10   estimated cost was $95,000, approximately?

11   **A.**   Correct.

12          MR. FRANK:  If we look at page 7, please.  We're

13   now looking at the multimanager core bond fund transition.

14   **Q.**   What's the commission number for this one?

15   **A.**   117,640.

16   **Q.**   What was the basis point of the field figure that was

17   used to calculate this commission?

18   **A.**   Again, I believe it was .1 basis points of yield.

19   **Q.**   If we look at the next page, page 8, we're now looking at

20   the EQ core bond fund transition.

21          What's the total commission estimate here?

22   **A.**   379,222.

23   **Q.**   What basis point of yield figure was used to calculate

24   this commission number?

25   **A.**   Again, I believe it was .1 basis points of yield.

1    **Q.**  So it's .1 across the board?

2    **A.**  Yes.

3    **Q.**  So why do the basis points of notion value fluctuate

4    slightly?

5    **A.**  Because the value of each of the individual portfolios is

6    different.

7    **Q.**  Okay.  That's just what the denominator is?

8    **A.**  Correct.

9    **Q.**  Okay.  And you've had an opportunity to review this

10   before, right?

11   **A.**  I have.

12   **Q.**  Have you had an opportunity to add up the numbers that we

13   looked at, 95,000, 117,000, and 379,000 in estimated

14   commissions?

15   **A.**  Yes.

16   **Q.**  And what does that add up to?

17   **A.**  It's approximately 590,000.

18   **Q.**  In your experience, would the rate used to calculate

19   these commissions change after a transition has been awarded?

20   **A.**  It could if the client was renegotiating the commission

21   rate before the contracts were signed.

22   **Q.**  What about in the absence of an agreement with the

23   client?

24   **A.**  I'm sorry.  Can you ask that question again?

25   **Q.**  What about if the client didn't renegotiate?

1    **A.**   Then it would be the same.

2    **Q.**   Would the absolute dollar number change?

3    **A.**   The absolute dollar number would change.

4    **Q.**   Why is that?

5    **A.**   It's dependent on the market value.  Since it's

6    calculated on the principal value of the trade, if the market

7    value goes up, the dollar value goes up; conversely, if it

8    goes down, the dollar value goes down.

9    **Q.**   How does .1 basis points of yield compare to the rate you

10   would traditionally charge for a bond transition?

11   **A.**   It's a very low rate.  Typically at the time we were

12   charging 1 basis point of yield.

13   **Q.**   And did you charge 1 basis points of field typically for

14   any size bond transition?

15   **A.**   To my memory --

16   **Q.**   Or would it vary by size?

17   **A.**   To my memory, most of them were at 1 basis point of

18   yield.  Certainly for bigger transitions we would get more

19   aggressive and have lower commission rates.

20   **Q.**   And again, how big was this transition relative to most

21   transitions?

22   **A.**   It was a very big transition.

23   **Q.**   You testified earlier that you typically would get the

24   information on what commissions you were charging from the

25   transition notice?

1    **A.**   Correct.

2    **Q.**   Is that what happened in this case?

3    **A.**   No.  There wasn't a transition notice in this case.

4    **Q.**   Do you recall learning why there was no transition

5    notice?

6    **A.**   To the best of my memory, I recall being told that -- for

7    this particular trade, SSGA, which is the money management

8    arm of State Street was the investment manager, and they were

9    changing their benchmark -- or the client wanted to change

10   their benchmark to a different benchmark.  So SSGA was going

11   to be the manager after the transition as well.  And since

12   the client had a contract with SSGA as investment manager,

13   that we didn't need to have a subsequent contract as a

14   transition manager.

15   **Q.**   Who told you that?

16   **A.**   I don't remember.  It was either -- it would have either

17   been my boss, Kevin Miller, or the COO, Chris Carlin.

18   **Q.**   And who did Chris Carlin report to?

19   **A.**   He reported to -- I'm not sure actually.

20   **Q.**   Okay.  And Kevin Miller you testified earlier reported

21   to?

22   **A.**   Peter Weiner.

23   **Q.**   Who reported to?

24   **A.**   To Ross McLellan.

25   **Q.**   Okay.

1          And you testified about what was going on in the
2     portfolio.  So it was moving from -- it was staying within
3     State Street Global Advisors?
4     **A.**   Correct.  Except for the time that it was being pulled
5     out for transition when it would reside under State Street
6     Global Markets.
7     **Q.**   So you were reinvesting it in different assets and giving
8     it back to State Street Global Advisors?
9     **A.**   That's correct.
10    **Q.**   In your experience, how often did it happen that a deal
11    did not have a transition notice?
12    **A.**   Not very often.  This is really the only one I can
13    remember.
14    **Q.**   And what about a transition management agreement?
15    **A.**   Same thing.
16    **Q.**   You don't remember any other times?
17    **A.**   I don't remember any other times.
18    **Q.**   Did you have occasion -- have you had occasion at State
19    Street to do other deals where you were transitioning a
20    portfolio within SSGA?  In other words, where it started at
21    SSGA, you transition it, and then it goes back to SSGA.
22    **A.**   Yes.
23    **Q.**   And in those deals, is there typically an investment
24    management agreement with SSGA?
25    **A.**   Yes, there is.

1    **Q.**  And in those deals, typically do you have a transition

2    asset management agreement nonetheless?

3    **A.**  Yes, we do.

4    **Q.**  So even accounting for those deals, you don't recall any

5    other times?

6    **A.**  I don't recall, no.

7    **Q.**  Did there come a time when you learned that the plan

8    about how to charge AXA had changed?

9    **A.**  No.

10            MR. FRANK:  Well, let me show the witness only

11   Exhibit 114, please.

12            (Pause.)

13   **A.**  I'm sorry.  Yes.

14            So before the trading began, I got an e-mail from

15   Ross, saying that he had spoken to the trading desk and that

16   we'll charge on mortgages and treasuries but not other

17   fixed-income products.

18   **Q.**  So I put in front of you a document.  Do you recognize

19   that document?

20   **A.**  Yes.

21   **Q.**  What is it?

22   **A.**  It's the e-mail that I just referenced from Ross McLellan

23   to me.

24            MR. FRANK:  The government offers 114.

25            MR. WEINBERG:  No objection.

1          THE COURT:  Admitted.

2          (Exhibit No. 114 admitted into evidence.)

3    BY MR. FRANK:

4    **Q.**  And so you just testified, but I'll read it for the

5    record.  It says, from Mr. McLellan to you, on Wednesday,

6    March 2, "Spoke to desk on AXA comms."

7          What do you understand that to mean?

8    **A.**  AXA commissions.

9    **Q.**  "They are all set.  Essentially we will chart on mort and

10   treasuries and not others."

11         What do you understand "mort" to refer to?

12   **A.**  To mortgage securities.

13   **Q.**  Is this consistent or inconsistent with how AXA was going

14   to be charged?

15   **A.**  It was inconsistent.  I previously understood it was

16   going to be .1 basis points of yield.

17   **Q.**  Across the portfolio?

18   **A.**  Across the board, correct.

19   **Q.**  Does this e-mail tell you anything about what the rate is

20   going to be?

21   **A.**  It does not.

22   **Q.**  Just on which securities you're going to charge?

23   **A.**  That's correct.

24   **Q.**  Okay.

25         And if we just look up at the top, you forwarded

1   this to Kevin Miller?

2   **A.**   Correct.

3   **Q.**   Why did you do that?

4   **A.**   Just FYI.  He was my boss.  I kept -- I wanted to keep

5   him in the loop of things that were going on.

6   **Q.**   Did you have an understanding of why Mr. McLellan was

7   telling you that you were going to charge on mortgages and

8   treasuries and not others?

9   **A.**   No.

10   **Q.**   Prior to this deal, how often did you receive

11   instructions from Mr. McLellan about what to charge on a deal

12   once it had been awarded?

13   **A.**   Not -- I don't remember much -- many times, if any, other

14   than this one.

15   **Q.**   This is the only one you remember?

16   **A.**   Right.  He would instruct us prior to the deal being run.

17   If we were running a pretrade, he would tell us how much he

18   wanted to charge for the pretrade but --

19   **Q.**   But not after?

20   **A.**   But not after.

21   **Q.**   And whose job was it to instruct traders how much to

22   charge?

23   **A.**   It was a transition analyst.

24   **Q.**   Your job?

25   **A.**   Yes.

1    **Q.**  Prior to this deal, how often do you recall Ross McLellan

2    instructing traders on your deals how much to charge?

3    **A.**  I don't recall any other deals.

4    **Q.**  Never happened?

5    **A.**  Not that I can recall.

6            MR. FRANK:  Could we show the witness Exhibit 115.

7    Is this in evidence?

8    **Q.**  Do you see that in front of you?

9    **A.**  I do.

10   **Q.**  What is it?

11   **A.**  It's the letter of direction that AXA -- I'm sorry.

12           It's an e-mail from me to my colleagues where I'm

13   forwarding a copy of the letter of direction and the

14   service-level documents that SSGA had provided to us that

15   discussed the fact that AXA knew that we were taking over the

16   transition of the portfolio from SSGA.

17           MR. FRANK:  The government offers 115 and its

18   attachment.

19           MR. WEINBERG:  No objection.

20           THE COURT:  Admitted.

21           (Exhibit No. 115 admitted into evidence.)

22   BY MR. FRANK:

23   **Q.**  So you testified that this e-mail attaches a letter of

24   direction.  Is that referred to as an LOD?

25   **A.**  That's correct.

1    **Q.**   What is a letter of direction?

2    **A.**   It's instructions from the client to an investment

3    manager about some purpose for one of their portfolios.

4    **Q.**   Basically telling them State Street Global Markets is

5    going to transition this for us?

6    **A.**   Correct.

7    **Q.**   And is it typical to have these?

8    **A.**   It's typical for clients to send letters of direction to

9    investment managers.

10   **Q.**   And who was the investment manager here?

11   **A.**   SSGA, State Street Global Advisors.

12   **Q.**   Is this letter of direction a substitute for a transition

13   management agreement?

14           MR. WEINBERG:  I object.

15   BY MR. FRANK:

16   **Q.**   In your understanding.

17   **A.**   No.

18           THE COURT:  Hold on.  You still object?

19           MR. WEINBERG:  Yes.  There needs to be a predicate

20   for the understanding, Your Honor.

21           THE COURT:  Overruled.

22           You can answer.

23   **A.**   I'm sorry.  Can you ask the question again?

24   **Q.**   In your understanding, is a letter of direction a

25   substitute for a transition management agreement?

1    **A.**   No.  It's just the letter of direction to the investment

2    manager.

3    **Q.**   Is it a substitute for a periodic notice, in your

4    understanding?

5    **A.**   No.

6    **Q.**   Does it contain any terms of the deal?

7    **A.**   It does not, no.

8              MR. FRANK:  Could we show the witness Exhibit 206,

9    please?

10   **Q.**  Do you recognize this document?  We'll blow it up for

11   you.

12   **A.**   Yes.  This is an example of an e-mail that I would send

13   to the trading desk with the details and instructions for a

14   trade.  This was for the AXA trade, discussed the three

15   portfolios and the fact that I had sent the trades to the

16   desk and what the commission rate was.

17   **Q.**   These are an example of trade instructions?

18   **A.**   Correct.

19              MR. FRANK:  The government offers 206.

20              MR. WEINBERG:  No objection.

21              THE COURT:  Admitted.

22              (Exhibit No. 206 admitted into evidence.)

23   BY MR. FRANK:

24   **Q.**   And this you sent on Friday, March 4, 2011, and you said,

25   "Hi, all.  Attached please find the trades for AXA for

1    Monday."

2              So you were going to start trading the following

3    Monday, March 7th?

4    **A.**   That's correct.

5    **Q.**   And then you say below that, "Commission is .1 basis

6    points of yield."  Do you see that?

7    **A.**   Correct, I do.

8    **Q.**   Why did you put that there?

9    **A.**   Because that was my understanding that was the commission

10   rate to be charged for that trade.

11   **Q.**   Now, earlier we looked at an e-mail you had received from

12   Mr. McLellan, telling you that he had instructed the traders

13   to charge on mortgages and treasuries and not others.  Do you

14   recall that?

15   **A.**   I do.

16   **Q.**   But you didn't put that in this instruction e-mail to the

17   traders.

18   **A.**   No, I did not.

19   **Q.**   Why not?

20   **A.**   My job was just to let them know what the commission rate

21   was for the trade.  If he had other conversations with him,

22   that was his conversation, and I didn't -- I wasn't privy to

23   all that information.

24   **Q.**   Did there come a time when you revised the pretrade

25   estimate for AXA?

1   **A.**   I did.  There --

2   **Q.**   Why?

3   **A.**   Typically when we do a transition, we'll first run a

4   pretrade which just generally gives an idea of the cost and

5   the timing and the liquidity for the clients.  And then right

6   before the trade happens, we'll run a final pretrade version,

7   so that would incorporate any changes made to the portfolio

8   as well as updated market environment conditions.

9              MR. FRANK:  Okay.  Could we look at 119.1 in

10  evidence, please?

11             Actually, before we look at 119.1, I'm sorry, can

12                 we look at the cover e-mail which is also in

13                 evidence?

14  **Q.**   You said, "Hi, all, attached please find the pretrade

15  reports for the EQ core and multisector portfolios."

16             Why did you just send those two?

17  **A.**   So taking a look back through my e-mails, I see that we

18  had received revisions on one of the portfolios from SSGA

19  right before trading was getting ready to commence.  So the

20  two portfolios we were ready to begin trading and we had to

21  continue working on the pretrade and trade details for the

22  third.

23  **Q.**   And you wrote, "The in-kinds have gone up in both cases."

24             What did you mean by that?

25  **A.**   So in-kinds are positions that we start with that we can

1    also use in the eventual target allocation.  So those are

2    positions that don't have to be traded.  We literally earmark

3    them as in-kinds and move them over to the new target

4    allocation.

5    **Q.**  What does that mean for trading commissions?

6    **A.**  So if the in-kinds go up, it generally means that less

7    trading is required, so the commissions would generally go

8    down.

9    **Q.**  Because you're not charging for the in-kinds?

10   **A.**  There's no charge for the in-kind.

11            MR. FRANK:  If we could look at page 2 of the

12   attachment, please.

13   **Q.**  And if we look at the top left corner, this is the final

14   pretrade estimate for the AXA multisector portfolio.  Do you

15   see that?

16   **A.**  I do.

17   **Q.**  And the commissions are 73,747?

18   **A.**  Yes.  Estimated commissions are 73,747 or .45 basis

19   points.

20   **Q.**  Basis points of what?

21   **A.**  Basis points of portfolio value.

22   **Q.**  And what value did you use to calculate that commission?

23   **A.**  I believe it was .1 basis points of yield.

24   **Q.**  So the same that we saw earlier?

25   **A.**  Correct.

1    **Q.**  But there's just less trading?

2    **A.**  Correct.

3         MR. FRANK:  And if we look at the next attachment,

4    and if we also look at page 2.

5    **Q.**  And you see that the estimate here is 268,000?

6    **A.**  Correct.

7    **Q.**  And it's .4 basis points?

8    **A.**  That's correct.

9    **Q.**  And that's of notional value or of yield?

10   **A.**  Of notional value.

11   **Q.**  And what value was used to calculate that?

12   **A.**  .1 basis points of yield.

13   **Q.**  Same value?

14   **A.**  Correct.

15   **Q.**  That didn't change?

16   **A.**  That didn't change.

17        MR. FRANK:  And if we could look at 121.1 in

18   evidence, please.  The next -- actually, 121.2.

19   **Q.**  Do you recall sending the third estimate a little bit

20   later that day?

21   **A.**  I do, yes.

22        MR. FRANK:  Okay.  If we could look at page 2.

23   **Q.**  And what are the commissions here?

24   **A.**  90,318, or .44 basis points of portfolio value.

25   **Q.**  And what value did you use to calculate that?

1   **A.**   .1 basis points of yield.

2   **Q.**   And so if we add up -- again, did you have an opportunity

3   before you came to court today to add up the three values we

4   just looked at?

5   **A.**   I did.

6   **Q.**   Approximately 90,000, approximately 73,000, and

7   approximately 268,000?

8   **A.**   Yes.

9   **Q.**   What did that add up to?

10   **A.**   Approximately 431,000.

11   **Q.**   So commissions from the initial pretrade of 591,000 to

12   the final pretrade of 431,000, if my math is correct, went

13   down by 160,000 approximately?

14   **A.**   Approximately, correct.

15   **Q.**   In the ordinary course -- let me just ask you.

16           You testified that you used .1 basis points of

17   yield in this calculation?

18   **A.**   I did.

19   **Q.**   Would .5 basis points of yield have changed this result?

20   **A.**   Yes.

21   **Q.**   What would have happened?

22   **A.**   I would imagine it would multiply it by five.

23   **Q.**   Gone up by five?

24   **A.**   Correct.

25   **Q.**   And what if you charged .5 basis points of yield on the

1   bulk of the portfolio and zero on a small part of the

2   portfolio?  Would the number still have gone up?

3   **A.**   I'm sorry.  Can you repeat that question?

4   **Q.**   If you charged .5 on most of the portfolio --

5   **A.**   Okay.

6   **Q.**   -- zero on a small portion of the portfolio, what's your

7   understanding of what would have happened to the number?

8   **A.**   I believe it would have gone up.

9   **Q.**   It would have gone up.

10          In the ordinary course, do you trade bonds at State

11  Street as riskless principal or as agent?

12  **A.**   Well, I don't trade the bonds myself --

13  **Q.**   I understand.

14  **A.**   -- but State Street generally trades them -- at that

15  time, we traded as riskless principal.

16  **Q.**   And what is the difference, in your understanding?

17  **A.**   It's really an operational difference.  It's how the

18  trades are booked.  So when you're trading as agent, the

19  commission is delineated out on each individual trade.  When

20  you're trading as riskless principal, the commission is -- is

21  in the net pricing of the bonds.  But it's the same number

22  either way.

23  **Q.**   Okay.  So it's just an operational difference?

24  **A.**   Correct.

25  **Q.**   When do you typically trade bonds as agent?

1    **A.**  At the time, I remember when SSGA was the incoming

2    manager, oftentimes we would trade them as agent.

3    **Q.**  Now, in this deal, SSGA was the incoming manager?

4    **A.**  Correct.

5    **Q.**  Do you have an understanding of whether you traded as

6    agent or as riskless principal?

7    **A.**  We traded as riskless principal.

8    **Q.**  Do you know why?

9    **A.**  I don't know why.  I did see e-mails recently --

10        THE COURT:  If you don't know why, you don't know.

11   BY MR. FRANK:

12   **Q.**  That's fine.  You don't know why?

13   **A.**  I don't know why.

14   **Q.**  But the upshot of that would be that the price would be

15   reported to the client on a net basis?

16   **A.**  I'm sorry.  Can you repeat that?

17   **Q.**  The price would be reported to the client on a net basis

18   if you traded as riskless principal?

19   **A.**  Correct.

20   **Q.**  The commission wouldn't be separately broken out?

21   **A.**  It would not be, as riskless principal.

22        MR. FRANK:  Could we look at Exhibit 122 in

23   evidence, please?

24   **Q.**  What are we looking at here, Ms. Morris?

25   **A.**  So Greg Spyropoulos was one of our fixed-income traders.

1    Here, he is sending me details of the execution for that

2    particular day, along with some trading commentary or market

3    commentary.

4             MR. FRANK:  And if we could look at the attachment

5    in evidence and look at page 2, and if we could just enlarge

6    the lower half of the page.

7    **Q.**  Do you typically look at this document in the ordinary

8    course, Ms. Morris?

9    **A.**  I do see it, but typically we were using this information

10   to load into the macros that we used to run the client

11   reports.

12   **Q.**  And so would you look at the commissions that were

13   applied in the ordinary course?

14   **A.**  I wouldn't look specifically at them, no.

15   **Q.**  Would you be able to know, if you had looked at them,

16   what rate had been used to come up with them?

17   **A.**  Not just by glancing at the spreadsheet, no.

18   **Q.**  Why is that?

19   **A.**  As I said, when you're trading on basis points of yield,

20   it takes into account the bond's duration and interest rate,

21   so it's not a linear equation.

22   **Q.**  Complicated calculation?

23   **A.**  Correct.

24   **Q.**  And again, you testified that on a -- when you're

25   reporting to the client as riskless principal, it would be on

1    a net basis, correct?

2    **A.**   Correct.

3    **Q.**   So would the client see these commissions in its

4    reporting?

5    **A.**   No.

6            MR. FRANK:  Can we look at Exhibit 140, and I think

7    just for the witness only.

8    **Q.**   Do you recognize this document?

9    **A.**   I do.

10   **Q.**   What is it?

11   **A.**   It's an e-mail that I sent to my colleagues.  I sent it

12   to Ross McLellan and Kevin Miller and Kevin Walker, letting

13   them know that the final post-trade wrap-up was just about

14   complete, asking them --

15   **Q.**   I'm going to cut you off right there.  I apologize.

16           MR. FRANK:  The government offers 140.

17           MR. WEINBERG:  No objection.

18           THE COURT:  Admitted.

19           (Exhibit No. 140 admitted into evidence.)

20   BY MR. FRANK:

21   **Q.**   You testified you sent this to Mr. McLellan?

22   **A.**   To Mr. McLellan and Kevin Miller and Kevin Walker.

23   **Q.**   And you said, "Hi.  The AXA post-trade is just about

24   complete.  The post-trade is on the shared drive under the

25   following," and then you sent a link.

1        What are you telling them?

2    **A.**  Where the post-trade is located on the shared drive.

3    **Q.**  Why are you telling them that?

4    **A.**  I was asking them to review it to see if they had any

5    corrections or any additions they wanted to make the

6    post-trades.

7    **Q.**  Why were you sending this to Mr. McLellan?

8    **A.**  Just because it was a big trade and I knew he was

9    involved early on.

10   **Q.**  And why were you sending it to Mr. Walker?

11   **A.**  Because he was the salesperson on the trade.

12        MR. FRANK:  And could we show the witness only

13   Exhibit 141, please?

14   **Q.**  Do you recognize this document?

15   **A.**  So this is -- I do, yes.

16   **Q.**  What is it?

17   **A.**  This is an e-mail from Kevin Walker to me, a response to

18   that e-mail that I had sent out asking for my colleagues to

19   review the documents.

20        MR. FRANK:  The government offers 141.

21        MR. WEINBERG:  No objection.

22        THE COURT:  Admitted.

23        (Exhibit No. 141 admitted into evidence.)

24   BY MR. FRANK:

25   **Q.**  Mr. Walker says to you, "Looks good.  Ross thought it

1    looked good, too."

2              What did you understand him to be telling you

3    there?

4    **A.**   That he had reviewed the post-trade and that he thought

5    it looked good generally, that Ross had looked at it and he

6    thought it looked good, too.

7    **Q.**   By "Ross," who did you understand him to be referring to?

8    **A.**   Ross McLellan.

9    **Q.**   Then I want to direct your attention to the last

10   sentence.  He says, "One question is, I am wondering if the

11   lack of a commission figure is going to invite further

12   questions?  I would say probably most definitely!"

13             What did you understand him to mean by that?

14   **A.**   At the time, there was not -- at the time, our

15   fixed-income report did not have commission dollars listed as

16   a separate line on the post-trade.

17   **Q.**   So what did you understand him to be saying when he said,

18   "I'm wondering if the lack of a commission figure is going to

19   invite further questions?"

20   **A.**   I think that he was saying that since there was not a

21   commission figure on the post-trade that the client was going

22   to wonder what the commissions were.

23   **Q.**   And if I could direct your attention to the response at

24   the top of the page.

25             You said in the second sentence, "I will also make

1    the other changes -- thanks for catching those.  Re

2    commissions:  Do we want to send out as is?"

3            Do you see that?

4    **A.**  I do.

5    **Q.**  Do you recall getting a response to that?

6    **A.**  I don't, no.

7    **Q.**  Do you recall sending out the post-trade?

8    **A.**  I do.

9    **Q.**  Do you recall whether you added any discussion of

10   commissions?

11   **A.**  I don't believe I did, no.

12           MR. FRANK:  Could we show the witness 143?  Is this

13   in evidence?

14           Could we show the witness 143, please?

15   **Q.**  Do you recognize this?

16   **A.**  I do.

17   **Q.**  What is it?

18   **A.**  So this is the e-mail I sent to the client, AXA, with the

19   post-trade reports attached to it.

20   **Q.**  Okay.  And you say, "Attached please find State Street's

21   post-trade reports for the fixed-income transition."

22           Do you see that?

23   **A.**  I do.

24           MR. FRANK:  The government offers 143 and its

25   attachment.

1          MR. WEINBERG:  No objection.

2          THE COURT:  Admitted.

3          (Exhibit No. 143 admitted into evidence.)

4     BY MR. FRANK:

5     Q.   And if we could look at page 3 of the post-trade under

6     "Trading Recap."  I want to direct your attention to the

7     third sentence.  It says, "The transition went quite well

8     with the overall costs coming in at 12.26 basis points, right

9     around our mean expected costs of 11.98 basis points."

10         Do you see that?

11    A.   I do.

12    Q.   What are you telling the client there?

13    A.   So when we do the pretrade analysis, we set forth what we

14    think our mean expected costs are, and then we put a one

15    standard deviation band around that.  Ideally we would like

16    to come in close to the mean.  I'm telling the client here

17    that we came in at just .28 basis points higher than the

18    mean, so it was a good result.

19    Q.   Good result.  Do you recall what your client's reaction

20    was?

21    A.   I don't.

22    Q.   Would there be any way from this report for the client to

23    know what it had actually been charged in commissions?

24    A.   I'm sorry.  Can you repeat that?

25    Q.   In your understanding, would there be any way for the

1    client to know from this post-trade report that you sent what

2    it had actually been charged in commissions?

3    **A.**   No.

4    **Q.**   And if the client had been charged a lower commission

5    rate, what is your understanding of what that would have

6    meant for the implementation shortfall?

7    **A.**   A lower commission rate would have meant that the

8    implementation shortfall would have been even lower.

9    **Q.**   Better result for the client?

10   **A.**   A better result for the client, correct.

11            MR. FRANK:  Can we show the witness only Exhibit

12   153, please?  Actually, the top e-mail.

13   **Q.**   Do you recognize this document?

14   **A.**   I do.

15   **Q.**   What is it?

16   **A.**   It's an e-mail I had sent out to Chris Carlin and Kevin

17   Miller, letting them know I had updated the results.  And

18   TIM -- that's our transition information management system

19   that records all of the costs and the performance of the

20   trades that we do --

21   **Q.**   Let me just stop you right there for a moment.

22            MR. FRANK:  The government offers 153.

23            MR. WEINBERG:  No objection.

24            THE COURT:  Admitted.

25            (Exhibit No. 153 admitted into evidence.)

1   **Q.**   What are you telling Mr. Carlin and Mr. Miller about the

2   AXA revenues?

3   **A.**   That the total revenue was 1,296,216.

4   **Q.**   And how did that compare with what you had told the

5   client in the final pretrade?

6   **A.**   It was much higher.

7   **Q.**   How much higher?

8   **A.**   About 900,000.

9   **Q.**   About three times as high?

10  **A.**   Between two and three times as high.  Correct.

11  **Q.**   It was 430,000?

12  **A.**   Correct.  Sorry.  About three times as high.

13  **Q.**   Was the first time you learned that the commissions that

14  had been charged to AXA exceeded what you had told the client

15  in the final pretrade?

16  **A.**   No.  I remember learning about it earlier in the trade.

17  **Q.**   Tell us about that.

18  **A.**   So at the time, we were -- when we had fixed-income

19  trades, the fixed-income products were a little bit -- they

20  were not as easy to pull into our updates as the equities

21  were.  So I had a colleague of mine helping me pull the

22  information into the reports, and he was much better at

23  identifying issues when positions were kicking out or

24  whatnot.  So anyway, he had at one point said, Hey, the

25  commissions in this trade are much higher than they were on

1    the pretrade.

2    **Q.**  And what happened?

3    **A.**  I believe that I had raised that up to somebody else,

4    whether it would have been my boss, Kevin Miller, or Kevin

5    Walker, just to let them know what was going on.

6           I know that no corrective action was taken, so I

7    believe I was given some type of answer that let me know that

8    what we were doing was fine and to continue with the process.

9    **Q.**  But you don't remember specifically what you were told?

10   **A.**  I don't remember specifically, no.

11          MR. FRANK:  Could we show the witness only

12   Exhibit 125, please?

13   **Q.**  Do you recognize this document?

14   **A.**  I do.

15   **Q.**  What is it?

16   **A.**  It's an e-mail communication letting everyone know that

17   Ross had been -- Ross McLellan had been promoted to executive

18   vice president.

19   **Q.**  What's the date?

20   **A.**  March 10, 2011.

21          MR. FRANK:  The government offers 125.

22          MR. WEINBERG:  No objection, Your Honor.

23          THE COURT:  Admitted.

24          (Exhibit No. 125 admitted into evidence.)

25   BY MR. FRANK:

1    **Q.**  March 10, 2011, that Thursday, was that four days after

2    you started trading on the AXA deal?

3    **A.**  It was.

4    **Q.**  Directing your attention to the first two paragraphs.  It

5    says, "Each year, during the annual senior-level promotion

6    process, candidates for promotion to leadership roles are

7    evaluated against a specific and predetermined set of

8    criteria, including business results, strategic thinking,

9    leadership, collaboration, globalism, character, and

10   managerial influence.  Following this rigorous promotions

11   process, I am pleased to announce that Ross McLellan has been

12   promoted to executive vice president.

13           "During Ross' 14-year tenure at State Street, he

14   has made outstanding contributions to global markets and to

15   our Portfolio Solutions Group, which includes leading the

16   world's largest transition management business.  Following

17   his promotion to head of the global portfolio solutions

18   business in 2009, Ross led transition management to a record

19   year in 2010 with strong year-on-year revenue growth."

20           Do you see that?

21   **A.**  I do.

22   **Q.**  How did $1.3 million compare with what you earned on a

23   typical deal?

24           MR. WEINBERG:  I object.

25           THE COURT:  Overruled -- I'm sorry.  Sustained.

1  There's not really evidence of what's a typical deal.

2           MR. FRANK:  Well, she's testified --

3           THE COURT:  You need a different kind of question,

4  I think, than that.

5  BY MR. FRANK:

6  **Q.**  How did the size of this deal compare with the typical

7  deal?

8  **A.**  It was much larger than the typical deal.

9  **Q.**  And how did the $1.3 million in revenue you earned on

10  this deal compare with what you earned on the typical deal?

11  **A.**  It was one of the larger revenue deals.

12  **Q.**  And who gave directions to the traders on what to charge

13  on this deal?

14  **A.**  I gave directions in the e-mail and Ross had subsequent

15  conversations.

16           MR. FRANK:  Thank you.  No further questions.

17           THE COURT:  Cross-examination, Mr. Weinberg?

18           MR. WEINBERG:  Thank you, Your Honor.

19           **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

20  BY MR. WEINBERG:

21  **Q.**  Good afternoon, Ms. Morris.

22  **A.**  Good afternoon.

23  **Q.**  I want to make sure we finish by 1:00.

24           The last document that Mr. Frank showed you was

25  dated March 10 and announced the promotion of Ross McLellan,

1  correct?

2  **A.**  Correct.

3  **Q.**  Referencing his accomplishments in 2010 and before?

4  **A.**  Correct.

5  **Q.**  There's nothing in that document regarding the decision

6  by State Street to promote him that has any relationship to

7  the AXA transition, is there?

8  **A.**  I'm sorry.  Can you repeat that?

9  **Q.**  There's nothing in that document that in any way shows a

10  cause and effect between AXA, the trading that was going on

11  in March of 2011, and the decision by State Street Bank to

12  promote him based on his performance and his ability and his

13  commitment to the bank for the years preceding 2011; is that

14  correct?

15  **A.**  There was nothing in that document that related -- that

16  said it related to the AXA transition.

17  **Q.**  And you don't know whether the decision to promote him

18  was made many weeks before the AXA transition even began, do

19  you?

20  **A.**  Oh, I have no idea when the decision was made.

21  **Q.**  It was announced on March 10, 2011?

22  **A.**  Correct.

23  **Q.**  Presumably made beforehand, correct?

24  **A.**  Presumably, correct.

25  **Q.**  And you worked with Ross for many years, did you not?

1    **A.**   I did.

2    **Q.**   Respected him?

3    **A.**   I did.

4    **Q.**   Hardworking?

5    **A.**   Yes.

6    **Q.**   Intelligent?

7    **A.**   Yes.

8    **Q.**   Created a respectful relationship between you and he?

9    **A.**   I'm sorry.  Can you repeat that?

10   **Q.**   It was a respectful relationship between you and he?

11   **A.**   Yes.

12   **Q.**   That he was respected by others in the community that you

13   worked, which is the State Street Global Markets?

14   **A.**   Yes, he was.

15   **Q.**   The government has shown you post-trades and made the

16   point that the client couldn't see from the post-trade what

17   the commissions were, correct?

18   **A.**   Correct.

19   **Q.**   Is that unusual?

20   **A.**   At the time, no.

21   **Q.**   At the time, the routine and practice of State Street,

22   whether it was AXA or some other client, was to give them a

23   post-trade that didn't break out what State Street made from

24   its work and performance and executions of trades and the

25   overall cost to the client, correct?

1    **A.**  So at the time, our equity post-trades broke out the

2    commission; but at the time, the fixed-income post-trades did

3    not break out the commission.

4    **Q.**  And that was because, if you know, the rules and

5    regulations for broker-dealers in the United States required

6    the breakout of equity commissions but did not require the

7    breakout of bond commissions unless it was an ERISA client?

8            MR. FRANK:  Objection, foundation.

9            THE COURT:  Why don't you establish the foundation

10   first.  Sustained.

11   BY MR. WEINBERG:

12   **Q.**  Do you know whether or not the decision by State Street

13   as a routine and practice in 2010, 2011 not to break out the

14   commissions for clients on bonds but to break them out on

15   stocks was because that's what the rules required, the FINRA

16   rules or the SEC rules?

17   **A.**  I don't know what the rules were, no.

18   **Q.**  But you could tell us, that is the routine across the

19   board.  2010, the norm was not to break out the commissions

20   from the overall costs for the clients in post-trades,

21   correct?

22   **A.**  For transition management, correct.

23   **Q.**  You worked only in the United States, correct?

24   **A.**  I spent some time in Australia.

25   **Q.**  Okay.  You didn't work in London, correct?

1    **A.**  I did not, no.

2    **Q.**  So you had no personal involvement or experience in the

3    transition management practices in the U.K., correct?

4    **A.**  No.  I've never visited the U.K.

5    **Q.**  So you would not, therefore, know whether or not markups

6    or even transition management fees were charged to U.K. or

7    European clients in contrast to the United States where the

8    norm was commission, correct?

9    **A.**  Correct.  I don't know the difference between what

10   happened in the U.K. versus the U.S.

11   **Q.**  Although it was transition management, U.S. transition

12   management, Asia transition management, Europe, these were

13   really three separate silos that Mr. McLellan managed,

14   correct?

15   **A.**  Correct.

16   **Q.**  In other words, you aren't trained in U.K. law, and you

17   have no reason to believe the U.K. transition managers were

18   trained in U.S. law?

19   **A.**  I wouldn't know, no.

20   **Q.**  Exhibit 119 was an e-mail that you sent out to --

21        MR. WEINBERG:  If we can pull that up.  Thank you.

22   **Q.**  This is March 7, and it's part of your sending the second

23   pretrade estimate out because there have been changes by AXA

24   in terms of what you were buying and selling, correct?

25   **A.**  There were changes by the State Street Global Advisors

1    portfolio managers.  But, yes, there were changes.

2    **Q.**  So this transition had a lot of people involved in it,

3    did it not?

4    **A.**  It did have a lot of people.  Typically transitions do.

5    **Q.**  Right.  But this one also had State Street Global

6    Advisors, correct?

7    **A.**  As both the legacy manager and the incoming manager,

8    correct.

9    **Q.**  The legacy manager and the incoming manager were both

10   State Street Global Advisors, correct?

11   **A.**  Correct.

12   **Q.**  State Street Global Markets was chosen to do the

13   transition for the State Street Global Advisors client,

14   correct?

15   **A.**  Correct.

16   **Q.**  And State Street Global Advisors personnel were involved

17   in taking a look at how the transition was going, correct?

18              MR. FRANK:  Objection to what they were doing.

19

20   BY MR. WEINBERG:

21   **Q.**  To the extent you remember.

22              THE COURT:  Overruled, to the extent you know.

23   **A.**  I'm sorry.  Can you repeat the question?

24   **Q.**  Some of the State Street Global Advisors people had some

25   communications with some of the State Street Global Markets

1    people about the transition?

2              MR. FRANK:  Objection, foundation.

3              MR. WEINBERG:  If you know.

4              THE COURT:  Overruled.

5              You can answer the question.

6    **A.**  I'm sorry.  Can you repeat that question one more time?

7    **Q.**  Sure.  You talked to some of the State Street Global

8    Advisors people during the course of this transition about

9    how it was going, did you not?

10   **A.**  I did.

11   **Q.**  And you were aware that State Street Global Advisors had

12   a lawyer named Lance Dial that was involved in looking at the

13   transition; is that correct?

14   **A.**  I see that his name was on some e-mails that I had seen,

15   but I didn't have any personal involvement so I don't know

16   what he did or didn't do.

17   **Q.**  Were you aware that AXA was not an ERISA client?

18             MR. FRANK:  Objection, foundation.

19             THE COURT:  Overruled.

20   **A.**  I was.

21   **Q.**  And if ERISA clients, if you know, were entitled to

22   greater disclosure than non-ERISA clients?

23             MR. FRANK:  Foundation.

24             THE COURT:  Overruled.  If you know.

25   **A.**  I'm not sure.

1   **Q.**  But you do recall you've seen e-mails in your preparation

2   for today that demonstrate AXA was not an ERISA client?

3               MR. FRANK:  Objection, hearsay.

4               THE COURT:  Just as to the e-mails.

5               You can ask whether she knows whether it was an

6   ERISA client or not, but I think you already asked her that.

7   BY MR. WEINBERG:

8   **Q.**  Let me show you a document and try to make it quicker.

9               MR. WEINBERG:  Could we have 496 just for the

10  witness?

11  **Q.**  Is this an e-mail that you received back on March 1

12  before the trading?

13              MR. FRANK:  Objection to the form.

14              THE COURT:  Overruled.

15  **A.**  This is an e-mail that I received on March 1.

16              MR. WEINBERG:  I would move for its admission, Your

17  Honor.

18              MR. FRANK:  No objection.

19              THE COURT:  Admitted.

20              (Exhibit No. 496 admitted into evidence.)

21  BY MR. WEINBERG:

22  **Q.**  Lance Dial of SSGA legal has raised with Mellissa that we

23  have a 17-e-1 (commissions with an affiliated broker-dealer

24  issue).

25              Do you recall being told that?

**A.**   I recall -- I don't necessarily recall it, but I have seen this e-mail.  It's been a while.

**Q.**   I know.  It's several years ago, and I understand that you wouldn't recall the exact words.

But having read this, does this ring a bell that this is a concept that you were told back seven years ago?

**A.**   It does ring a little bell, yes.

**Q.**   "And that we will have to sign a certification letter representing to AXA that our commissions are reasonable and fair and that the commission charged is at least as favorable as that given to comparable customers."

Is that the content of what Mr. Carlin is telling a series of people, including Ross McLellan, Peter Weiner, Kevin Walker, yourself?

**A.**   Yes.

**Q.**   And then it continues, You do not have to trade these -- I guess there's a call now that may come up.  And then you do not have to trade these as agent, as this is a 40 Act fund and not ERISA.

Do you know what a 40 Act fund is?

**A.**   I have a general sense of what a 40 Act fund is.

**Q.**   And what is your general understanding?

**A.**   It's an insurance company fund or a mutual fund.

**Q.**   So Mellissa is Ms. Mellissa McKay, an attorney for State Street Global Markets, if you know?

1    **A.**   That was my understanding in reading it, but I don't know

2    for sure.

3    **Q.**   If that understanding is correct, then there's at least

4    been conversations with Lance Dial, an attorney for SSGA,

5    Mellissa McKay, an attorney for SSGM, global markets, rather

6    than the adviser.  And they're talking about the standards

7    for charging AXA must meet 17-e-1 and, B, in the words of

8    this e-mail, reasonable and fair and at least as favorable as

9    that given to comparable customers, correct?

10            MR. FRANK:  Objection to what lawyers are talking

11   about that she's not a party to.

12            THE COURT:  You can ask for her understanding.

13   BY MR. WEINBERG:

14   **Q.**   Is that your understanding?

15   **A.**   I'm sorry.  Can you repeat the that question?

16   **Q.**   Yes.  There were two lawyers involved -- is it your

17   understanding, based on this e-mail, that there were lawyers,

18   first the adviser from State Street, lawyer for the

19   broker-dealer for State Street, and that they're

20   discussing -- and this e-mail is from Mr. Carlin -- about

21   17(e)(1) and its requirement that the fees charged by State

22   Street Global Markets to AXA be, quote, reasonable and fair

23   and at least as favorable as that given to comparable

24   customers.

25   **A.**   That would be my understanding in reading this, yes.

1   Q.   And that State Street is going to have to certify that as
2   a fact that the fees were fair and reasonable, correct?
3   A.   That's what this seems to say, yes.
4   Q.   And these were very low fees, correct?
5   A.   These were very --
6   Q.   Very comparably low fees.  Whether it's 1/10 of a basis
7   point of yield or 2/10 of a basis point of yield, this is
8   well below what other customers were ordinarily charged for
9   fixed-income transactions in 2010?
10  A.   .10 basis points of yield was much lower than other
11  clients were charged back then.
12  Q.   And this was a challenging transition, was it not?
13  A.   Yes, it was.
14  Q.   Lots of moving pieces and pressure on State Street Global
15  Markets to do it in accordance with the strict and expedited
16  time schedule, correct?
17  A.   That's correct.
18  Q.   And it was unique to you in that there was no contract.
19  A.   That's correct.
20  Q.   In all your years of being a transition management
21  analyst, you've never done a transition, small or huge like
22  this one, without a transition management contract?
23  A.   Not that I can remember, correct.
24  Q.   Or a periodic notice or a transition notice, correct?
25  A.   Correct.

1  **Q.**  Ordinarily, if we go to this calendar that Mr. Frank

2  showed you, it was anticipated that there was going to be a

3  transition management agreement, correct?

4  **A.**  Correct.

5  **Q.**  You don't have personal knowledge why there wasn't,

6  correct?

7  **A.**  I don't have personal knowledge why there wasn't.

8  **Q.**  But you know from reading the March 1 e-mail there are

9  lawyers involved from State Street's end and both the

10  advisors and the broker-dealer, and somehow this becomes a

11  transition without a transition management agreement the

12  first time in your career.

13  **A.**  Right.  I just -- I recall being told that we didn't have

14  to have one in this instance because SSGA was involved.

15  **Q.**  And you were not told whether the absence of a transition

16  management agreement was requested by AXA or requested by

17  their advisor, State Street Global Advisors, correct?

18  **A.**  I don't know how.

19  **Q.**  Don't know who -- but you do know that the client, AXA,

20  authorized the transition to go forward, correct?

21  **A.**  That was my understanding, yes.

22  **Q.**  You saw that LDO, whatever that means, that was

23  authorization to -- for State Street Global Advisors to let

24  the broker-dealer, State Street, go forward and do this huge

25  transition, correct?

1    **A.**   The letter of direction, LOD, actually, that AXA sent to

2    SSGA said that they were directing SSGA to let State Street

3    Global Markets do the transition.

4    **Q.**   Ordinarily the sequence is it that there's a request to

5    different providers to tell the client, you know, on what

6    terms and how they're going to conduct a transition, correct?

7    **A.**   I'm sorry.  Can you say that again?

8    **Q.**   Ordinarily there's a sequence where AXA or a client would

9    say:  I want to get a transition manager.  They put it out to

10   a number of transition manager options, they get back some

11   response, and in this case, there was a pretrade estimate,

12   correct?

13   **A.**   Correct.

14   **Q.**   And a strategy proposal?

15   **A.**   Correct.

16   **Q.**   Except for this event, ordinarily what would come after

17   would be negotiations that would result in a transition

18   management agreement with a transition agreement, correct?

19   **A.**   That's correct.

20   **Q.**   And that would set forth the results of the negotiations

21   between State Street Global Markets and the client, correct?

22   **A.**   Correct.

23   **Q.**   And there were times when the agreement is at variance

24   with the pretrade; in other words, things changed as a result

25   of negotiations?

1    **A.**   At time, correct.

2    **Q.**   I want to quickly show you -- by the way, AXA was still

3    moving the parts.  Even after March 7, correct, there was

4    still changes of assets that were going to be traded and not

5    traded, if you recall?

6    **A.**   I recall that we had conversations with the portfolio

7    managers, but I believe by March 7th it was -- it was pretty

8    much locked in.

9    **Q.**   Let me show you Exhibit 512 for identification.  And this

10   is in no means meant to be critical.  It's seven years ago.

11   So I've got the e-mails and I just want you to look at one on

12   March 9 and see if it refreshes your memory.

13            THE COURT:  You just want her to read it to

14   herself?

15            MR. WEINBERG:  Yes.

16   **A.**   I see this, yes.

17   **Q.**   Does that refresh your memory that they were still moving

18   parts to this deal even after the second pretrade on March

19   7th?

20   **A.**   They were.  So sometimes with fixed-income trades in

21   particular, if there's bonds that we can't find in the

22   market, we'll reach back out to the portfolio managers and

23   they'll give us substitutes.

24   **Q.**   Do you recall during this transition informing at least

25   Mr. Carlin that you knew that this was not an agency trade,

1    this was going to be riskless principal?

2    **A.**   I did see e-mails where he asked me to confirm that we

3    were trading as riskless principal, yes.

4    **Q.**   Now, transition managers have a lot of responsibilities.

5    It's hard work, correct?

6    **A.**   Correct.

7    **Q.**   You do a lot of analysis; is that correct?

8    **A.**   We do a lot of coordination, a lot of project management.

9    **Q.**   And a lot of responsibility to meet schedules and to set

10   out the timing of trades, correct?

11   **A.**   Correct.

12   **Q.**   And then the broker-dealer does different things.  They

13   go and execute the trades consistent with your instructions,

14   correct?

15   **A.**   To be honest, I'm not exactly sure how the lines work

16   between the transition manager and the broker-dealer.

17   **Q.**   This was a many, many, many billion-dollar transition,

18   was it not?

19   **A.**   It was.

20   **Q.**   Three mutual funds, each with a significant amount of

21   assets, correct?

22   **A.**   Correct.

23   **Q.**   And I'm going to show you very briefly --

24            MR. WEINBERG:  If Your Honor please, can I approach

25   the bench, because I think we can do this quicker.

1            THE COURT:  Yes.

2            Show Mr. Frank.

3            MR. WEINBERG:  Yes.

4            (Discussion off the record.)

5    BY MR. WEINBERG:

6    **Q.**  If I can just show you what looks like one of the

7    pretrades --

8    **A.**  Okay.

9    **Q.**  -- and bring you back seven years and ask whether or not

10   there was in one of the mutuals 6.7 -- more than 6.7 billion?

11   **A.**  Yes, there was.

12   **Q.**  And then in the second one another 2 billion?

13   **A.**  That's correct.

14   **Q.**  So we're up to 8.7.  And then --

15   **A.**  Sixteen.

16   **Q.**  So we're over 10 billion in assets, correct?

17   **A.**  Correct.

18   **Q.**  Amongst the three mutuals.  And some of those assets, if

19   I am correct, were traded -- the mutual funds sold certain

20   securities and then bought other securities, correct?

21   **A.**  Well, we as transition managers, as a transition manager

22   hired to transition the portfolio, did that.

23   **Q.**  Right.  So even though there was 10 billion of assets in

24   play, there could have been more trading than just 10

25   billion.  Correct?

1    **A.**   Correct.

2              MR. WEINBERG:  Can I just look at my notes, Your

3    Honor, for a second?

4              THE COURT:  Yes.

5              (Pause.)

6    BY MR. WEINBERG:

7    **Q.**   You received an e-mail from Ross on March 2 telling you

8    that he had talked to the traders; is that correct?

9    **A.**   The one we saw earlier, yes.

10   **Q.**   And Ross had his own conference room near the trading

11   floor, did he not?

12   **A.**   Not to my knowledge.  There were conference rooms, but I

13   don't think that Ross had his own one.  He had an office.

14   **Q.**   An office and then there were conference rooms nearby?

15   **A.**   I don't recall that, no.

16   **Q.**   The traders had their phones tape-recorded, correct?

17   **A.**   Yes.

18   **Q.**   And that was to protect the bank against any issues that

19   arose with clients regarding what they ordered and at what

20   rates, things like that, right?

21   **A.**   I know that they had their phones recorded, yes.

22   **Q.**   But not every phone at State Street has a tape-recorder

23   on it, correct?

24   **A.**   Correct.

25   **Q.**   Yours didn't and lots of other people didn't who weren't

1    traders?

2    **A.**   To my knowledge, no.

3    **Q.**   Had Mr. McLellan wanted to have a phone call with the

4    traders on March 2 without a tape-recording, he could easily

5    have asked them to go to the conference room or any of the

6    offices that didn't have tape-recording, correct?

7            MR. FRANK:  Objection to what he could have done.

8            THE COURT:  Overruled.

9    **A.**   He could have asked them to go to a different room.  He

10   could have, yes.

11   **Q.**   And it was not a secret.  In other words, everybody knew

12   that if you're going to call in to a trader, those calls are

13   going to be recorded, correct?

14   **A.**   Correct.

15           (Pause.)

16           MR. WEINBERG:  That's it.

17           THE COURT:  Any redirect?

18           MR. FRANK:  Very briefly, Your Honor.

19           **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

20   BY MR. FRANK:

21   **Q.**   You don't know where Ross McLellan was on March 2nd, do

22   you?

23   **A.**   No.

24   **Q.**   And the traders sit on the trading desk, correct?

25   **A.**   They do.

1    **Q.**  And it would be extremely unusual if all the traders got

2    up from the trading desk and went to a conference room to

3    have a meeting about what to charge on a deal, would it not?

4    **A.**  It would be, yes.

5    **Q.**  Fair to say that would raise some eyebrows?

6    **A.**  I suppose, yeah.

7    **Q.**  How many calls happen on a trading desk in a given day?

8    **A.**  I have no idea, but I would imagine quite a few.

9    **Q.**  Probably hundreds?

10   **A.**  I would imagine so, yes.

11   **Q.**  And over the course of 2010 --

12          THE COURT:  Well, don't imagine, so strike that.

13   She said she didn't know how many calls.

14          THE WITNESS:  Okay.

15   BY MR. FRANK:

16   **Q.**  They're calling up brokers all the time as part of their

17   job, correct?

18   **A.**  They are.  There's also electronic communication as well.

19   **Q.**  So over the course of a year, there would be thousands

20   and thousands of phone calls recorded?

21   **A.**  I would think so.

22   **Q.**  Fair to say finding one phone call in that haystack would

23   be a job, wouldn't it?

24          THE COURT:  Sustained.  That's leading.

25   BY MR. FRANK:

1   **Q.**  You were asked about whether .1 basis points is lower

2   than other typical commissions?

3   **A.**  Yes.

4   **Q.**  And you recall you testified to that effect on direct

5   examination?

6   **A.**  Yes.

7   **Q.**  How did $1.3 million compare to what you typically earned

8   on a transition?

9   **A.**  It was a high commission rate or it was a high commission

10  dollar trade for us.

11  **Q.**  Mr. Weinberg showed you a document --

12          MR. FRANK:  Marty, was that 491?

13          MR. WEINBERG:  496.

14          MR. FRANK:  496.  Could we take a look at that

15  document, please, Max?

16          Thank you, Max.  Can we blow that up?

17          THE COURT:  That's in evidence, right?

18          MR. FRANK:  This is in evidence, yes.

19          MR. WEINBERG:  Yes, Your Honor.

20          THE COURT:  All right.

21  BY MR. FRANK:

22  **Q.**  Do you recall he showed you this document regarding Lance

23  Dial of SSGA legal asking for a certification --

24          MR. FRANK:  Max, if you wouldn't mind highlighting

25  from "certification" in the second line.

1   **Q.**  -- certification letter representing to AXA that our
2   commissions are reasonable and fair?
3   **A.**  Yes.
4   **Q.**  And that the commission charge is at least as favorable
5   as that given to comparable customers?
6   **A.**  Yes.
7   **Q.**  Do you see that?
8   **A.**  I do.
9   **Q.**  Do you know if those letters typically actually disclose
10  what the commission is?
11  **A.**  I actually haven't seen one of those letters.
12  **Q.**  So you don't know whether it tells the client what the
13  rate was that was charged?
14  **A.**  I don't know.
15  **Q.**  Or whether it just says that the commission is fair and
16  reasonable?
17  **A.**  I don't know.  I've never seen the letter itself.
18  **Q.**  Now, Mr. Weinberg didn't show you any responses to this
19  e-mail.  Have you ever seen the defendant's response to this
20  e-mail?
21  **A.**  No.
22          MR. FRANK:  May I approach, Your Honor?
23          THE COURT:  You may.
24          MR. FRANK:  Your Honor, could I have the ELMO?
25          THE COURT:  Yes.

1           MR. FRANK:  I believe the next Exhibit Number is

2    212 for us.  The government would offer this document as

3    Exhibit 212.

4           MR. WEINBERG:  No objection.

5           THE COURT:  Admitted.

6           (Exhibit No. 212 admitted into evidence.)

7    BY MR. FRANK:

8    Q.  You see this is the e-mail that Mr. Weinberg showed you.

9    Lance Dial of SSGA legal has raised with Mellissa that we

10   have a 17(e)(1), commissions with an affiliated broker-dealer

11   issue, in that we will have to sign a certification letter

12   representing to AXA that our commissions are reasonable and

13   fair and that the commission charged is at least as favorable

14   given to comparable customers?

15   A.  Yes, I see that.

16   Q.  Ms. Morris, can you read for the record how the defendant

17   responded to that e-mail?

18   A.  He said, "Tell Lance that we'll worry about what's fair."

19   Q.  Do you know if that certificate letter was ever sent?

20   A.  I don't know.

21          MR. FRANK:  No further questions.

22          MR. WEINBERG:  Just two questions, Your Honor.

23          **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

24   BY MR. WEINBERG:

25   Q.  One --

1           MR. WEINBERG:  May I ask them from here?

2           THE COURT:  You may.

3    BY MR. WEINBERG:

4    Q.  Mr. Frank asked you about whether 1.3 million is out of

5    the ordinary, large commission?

6    A.  Correct.

7    Q.  Is it a large commission for a $10 billion-plus

8    transition?

9    A.  It would be in line with a $10 billion trade.

10   Q.  It's not -- certainly not high for a $10 billion

11   transition, right?

12   A.  It's not high for a $10 billion transition.

13   Q.  Low for a $10 billion transition?

14   A.  I don't know.

15   Q.  And lastly, the e-mail that Mr. Frank just showed you

16   where Ross says "Tell Lance," that's Lance Dial, the lawyer

17   for SSGA, as far as you know?

18   A.  I would assume so, from the chain of the e-mail.

19   Q.  And you see it's 3:39 p.m. in Boston?

20   A.  Okay.

21          MR. FRANK:  Objection to the time, Your Honor.

22          THE COURT:  It's in evidence.

23          MR. FRANK:  It doesn't say that the time stamp is

24   from Boston.

25          THE COURT:  Overruled.

1    BY MR. WEINBERG:

2    **Q.**  Is Mr. Carlin in Boston?

3    **A.**  Mr. Carlin is in Boston.

4    **Q.**  And do you know whether Ross was in Asia at the time with

5    a very different time zone than 3:39 p.m. Eastern time?  Do

6    you recall from seven years ago that Ross was traveling

7    during this week and was e-mailing from Asia?

8    **A.**  I don't remember.  I feel like he was, but I don't

9    remember.

10            MR. FRANK:  Your Honor --

11   BY MR. WEINBERG:

12   **Q.**  And after you received an e-mail from Ross on March 2, do

13   you remember any further involvement of Ross in this

14   transition?

15   **A.**  I don't remember it.  I did see another e-mail talking

16   about that we were trading corporates one day.

17            MR. WEINBERG:  Thanks very much.

18            Thank you, Your Honor.

19            THE COURT:  You're excused.  Thank you very much.

20            Are we -- counsel, same schedule we talked about

21   this morning, right?

22            MR. FRANK:  Yes, Your Honor.

23            MR. WEINBERG:  Yes, Your Honor.

24            THE COURT:  So, ladies and gentlemen of the jury,

25   let me explain to you where we are.

1    So we're coming -- the government is almost at the

2    end of its case, the presentation of its evidence.  So Monday

3    we'll resume -- you'll have the weekend obviously, and Monday

4    we'll resume with trial.  I anticipate Monday is going to be

5    a short day, and let me explain to you why we're doing it

6    this way.

7         The government is going to have some evidence on

8    Monday, you'll hear that, and it probably -- it will

9    certainly be done by 1:00.  And I just want to tell you that

10   you may well be done well before 1:00.  But to keep -- and

11   the reason is the witness that the government is going to

12   present on Tuesday is coming from overseas and can't be here

13   on Monday.  And so that's why there's that little gap.

14        In terms of keeping the case moving and efficient

15   presentation of the evidence in an orderly way that will make

16   it most comprehensible and the best presentation for you,

17   we're going to -- you'll have some evidence on Monday.  I

18   don't think we'll go until 1:00.  It's possible, but I don't

19   think so.

20        And then Tuesday -- and then I anticipate that

21   Tuesday morning the government, after that witness, will be

22   done with its presentation of evidence.

23        And then we'll turn to the defense, and I

24   anticipate that the defense is going to be presenting

25   evidence, and Tuesday we'll go 9:00 to 1:00.  And we'll start

1    proceeding with the defense evidence and their presentation

2    of witnesses.

3            In terms of the overall schedule of the case, I

4    anticipate you will receive the case for your deliberations

5    no later than the beginning -- than early in the following

6    week.  So we'll have next week.  The latest you'll receive

7    the case I anticipate is early the following week, which is

8    sooner than we had talked about when you were selected as

9    jurors.  We had talked about essentially two weeks from

10   yesterday.  So what I'm telling you is same week but earlier

11   in that week right now you'll get the case.  So no later than

12   that.

13           So we're ahead of schedule, which is good, and

14   we'll keep moving.

15           So don't discuss the case among yourselves, don't

16   discuss it with anyone else, don't do any independent

17   research, keep an open mind.  You haven't heard all the

18   evidence, you haven't heard the closing arguments of the

19   lawyers or my instructions on the law.

20           Have a nice weekend.  We'll resume on Monday at

21   9:00 a.m.

22           All rise for the jury.

23           (Jury left the courtroom.)

24           MR. WEINBERG:  Judge, may Ross be excused?

25           THE COURT:  Yes.

```
 1              THE DEFENDANT:  Thank you.

 2              THE COURT:  You can be seated.

 3              I think, depending on how long this is, I might

 4    just want you to tell me what the evidentiary issues are.  I

 5    don't know about you, but it's good to have a break around

 6    1:00.

 7              So just working backwards, the evidentiary issues

 8    are, one, the objection to the witness on Tuesday.  I

 9    understand what that is.  If you want to be heard more about

10    it, I'm happy to hear you more, but let's come back to that.

11              There's the challenge to the -- objection to the

12    agent testifying to the statements of Mr. McLellan in January

13    2012, right?

14              MR. GOLDSTEIN:  Yes.

15              THE COURT:  What's the gist of that, the basis for

16    that objection?

17              MR. GOLDSTEIN:  It's a 403 objection, Your Honor.

18    They went to Mr. McLellan's house to ask him about ConvergEx.

19    When you actually study the agent's report, the questions

20    relate to a time period other than what's at issue in this

21    case.  Meaning State Street used ConvergEx in the late --

22              THE COURT:  I don't think the government intends to

23    ask about ConvergEx.

24              MR. GOLDSTEIN:  Which makes it all the more

25    misleading.  Meaning the context for the question and answer
```

1     is compare and contrasting --

2               THE COURT:  Tell you what, do I have the 302?

3               MR. FRANK:  I do, Your Honor.

4               THE COURT:  That may be helpful and then I'll --

5               MR. FRANK:  It's highlighted.

6               THE COURT:  If defense doesn't object, I'm happy to

7     take it.

8               MR. GOLDSTEIN:  There's no objection.

9               THE COURT:  The gist of your objection is that it's

10    about a different time period.  Let me read the 302 and then

11    we'll see.

12              MR. GOLDSTEIN:  Sure.

13              THE COURT:  So that's the agent issue.

14              MR. FRANK:  There's a secondary issue which is the

15    cross-examination of the agent and the scope of the

16    cross-examination.

17              THE COURT:  If they go into the ConvergEx, then you

18    might want to get more into -- things that you wouldn't have

19    gotten into.

20              MR. FRANK:  Well, no, I don't intend to get into

21    ConvergEx.  I don't think they should be allowed to get into

22    ConvergEx, because the issue is the defendant's state of

23    mind, not what's going on in the mind of the agent.

24              THE COURT:  So if the government gets what it wants

25    on direct, I overrule that objection, what do you want to

1    elicit on ConvergEx and why would it --

2            MR. GOLDSTEIN:  What the government wants to do is

3    elicit statements by Mr. McLellan regarding State Street's

4    disclosure practices.

5            THE COURT:  I think you know what I should do -- I

6    should read this first.  I'm wasting your time without

7    reading it.

8            So that's the agent.  What's the other -- the two

9    issues with the agent, I get that.  There's an issue with

10   respect to the other agent witness who is going to read

11   certain documents.

12           MR. WEINBERG:  It really goes back in some respects

13   to our pretrial give-and-take on evidentiary issues.  The

14   government is going to try to offer through the agent certain

15   exhibits that we will have evidentiary objections to.  And

16   maybe the best way is for us to give Your Honor --

17           THE COURT:  Give me the exhibits, the ones you're

18   going to object to, and then I'll look at them.

19           And there's no objection to the agent reading them.

20   It's only an objection to whether he can read all of them or

21   just some of them.

22           MR. WEINBERG:  I say as long as the agent reads it

23   in a neutral voice, then that's fine.  Once they're admitted,

24   there's an issue.

25           So can I get that to Your Honor tomorrow morning?

```
 1              THE COURT:  How many are there?  What are we
 2     talking about?
 3              MR. FRANK:  Well, we're still identifying them, but
 4     right now there's about 15 or 16 total e-mails.  There may be
 5     one or two more.
 6              THE COURT:  These are internal, like, State Street
 7     e-mails or something?
 8              MR. FRANK:  These are e-mails generally to the
 9     defendant or from the defendant.  There are a couple of
10     e-mails -- there are a couple of AXA-related e-mails we
11     contend are co-conspirator statements that are not to or from
12     the defendant; there's only a couple of those.
13              THE COURT:  So fine to get them to me -- either
14     way, you're not objecting to everything.  Is this an agent
15     who's here or coming up from DC?
16              MR. FRANK:  He will be here.
17              THE COURT:  So you can get them to me, you talk to
18     each other, find out what's what, get them to me, I'll look
19     at them, and then I'll either hear you Monday morning --
20     probably want to hear what the issue is once I've read them.
21     That's fine.  If you want to get them to me any time tomorrow
22     is fine.
23              MR. WEINBERG:  That would be great.
24              THE COURT:  It doesn't matter when tomorrow.  I'm
25     going to look at them on Sunday.
```

1              MR. WEINBERG:  So perhaps the best way, because I

2      don't have them electronic, is to send Mr. Frank a list of --

3      he can send me a list of what he's offering.  He sent me a

4      partial list last night.  I'll identify what the defense is

5      objecting to, and in shorthand, whether there's no

6      conspirator statement or relevance.  And perhaps if the

7      government can --

8              We can PDF a copy to you.  Showing my technological

9      lack of skills.

10             But I'll make the objections and Mr. Nemtsev will

11     get you the documents.

12             THE COURT:  Okay.  Are there other --

13             MR. WEINBERG:  Can we do that through an e-mail

14     tomorrow sometime?

15             THE COURT:  Yes.  Yes, e-mail -- do you have my law

16     clerk's e-mail?

17             MR. WEINBERG:  I don't, but --

18             THE COURT:  He can give it to you at the end of the

19     hearing.  And copy of the government on it.

20             MR. WEINBERG:  Of course.

21             THE COURT:  Is that all of the universe of

22     evidentiary issues?

23             MR. FRANK:  There's an issue -- are you going to

24     brief the issue on the rebuttal?  So we have a witness who's

25     flying in from overseas this weekend.  He was originally

1    going to be --

2              THE COURT:  This is the one Tuesday?

3              MR. FRANK:  No.

4              THE COURT:  Different witness.

5              MR. FRANK:  Different witness.  This is Graham

6    Dixon of Inalytics.  You'll recall --

7              THE COURT:  Yes, I do.

8              MR. FRANK:  So Inalytics --

9              THE COURT:  He's testifying on Monday.

10             MR. FRANK:  He's not testifying on Monday.  He was

11   originally going to be a witness in our case in chief.  We've

12   decided not to call him in our case in chief.  I'd like to

13   reserve the right to call him as a rebuttal witness.

14             I sent Mr. Weinberg a letter yesterday, suggesting

15   I think his testimony is fact testimony and/or lay opinion

16   testimony.  But in light of the defense's objection at the

17   start of this trial to Mr. Boomgaardt's testimony, in an

18   abundance of caution, I've identified him --

19             THE COURT:  Remind me of that objection.

20             MR. FRANK:  It was an objection that his testimony

21   had strayed into expert --

22             THE COURT:  Oh, yes.

23             MR. FRANK:  I identified Mr. Dixon -- I suggested

24   that to the extent some of his testimony may be deemed

25   similarly to be expert testimony, we were identifying him as

1    a rebuttal expert, and I set forth an additional disclosure.

2              So I understand Mr. Weinberg is objecting to that.

3              MR. WEINBERG:  We're going to brief it, Your Honor,

4    so --

5              THE COURT:  At the moment -- you're only going to

6    call him as a rebuttal person?

7              MR. FRANK:  Correct.  But the issue is he's flying

8    in this weekend.

9              THE COURT:  Yes.

10             MR. FRANK:  And the other issue is, to the extent

11   the Court determines that he is or is not an expert and to

12   the extent it nonetheless permits his testimony, I would ask

13   that he be permitted to be in the courtroom for the testimony

14   of the defense experts.  Not the fact witnesses.  To the

15   extent that his testimony is also fact testimony, I'm not

16   asking for that.  But to the extent it is responsive to the

17   expert testimony and that he's deemed an expert, I would ask

18   that he be permitted --

19             THE COURT:  If I determined -- if I said he's not

20   an expert, then you don't want him in the courtroom.

21             MR. FRANK:  I don't want him in the courtroom.  I

22   still think his testimony -- I don't think I can have him in

23   the courtroom if he's not an expert.

24             THE COURT:  Right.  You're not suggesting to me --

25   you're not arguing for an exception to the sequestration rule

1    for him if he's deemed not an expert.  But if he is deemed an

2    expert, then you think the rules shouldn't apply to him and

3    you would want him here just for the expert witnesses so he

4    could respond that.

5            MR. FRANK:  That's correct, Your Honor.

6            THE COURT:  And you want to brief the question.

7            MR. WEINBERG:  Yes, Your Honor.

8            THE COURT:  Fine.

9            Oh, I see.  Is the issue with him flying in, that

10   he wouldn't fly in -- if I deemed -- if I right now I just

11   said -- in a perfect world, if I read the brief and heard

12   your response and had a ruling and it all happened

13   instantaneously and there were no implementation shortfall,

14   then --

15           MR. FRANK:  I'm sensing there would be a shortfall.

16           THE COURT:  Then you might not have him -- if I

17   said he's not an expert, just fact, you might not have him

18   fly in this weekend, or it wouldn't matter?

19           MR. FRANK:  No, actually there's a decision tree.

20   Because I think, actually, even if he's a fact witness, his

21   testimony comes in as either fact or lay opinion testimony.

22   I only identified him as an expert in an abundance of

23   caution.

24           THE COURT:  What does that all have to do with him

25   flying in this weekend?  I'm trying to figure out why that

1    matters.

2            MR. FRANK:  I guess the one decision would be if

3    the Court were to determine that his testimony were so

4    constricted as a fact witness that we couldn't get into any

5    of the issues that I've identified, then we might make a

6    decision.  But I realize now in talking it through that he

7    probably needs to just fly in and we'll brief the issue.

8            MR. WEINBERG:  Or send him daily copy and wait and

9    see if there's anything to rebut.

10           THE COURT:  Well, I'm -- far be it for me to tell

11   the executive branch how to spend its money.  So you fly him

12   in or not, that's up to you.  It's not like you're hanging on

13   something from me about flying him in.  So fine.

14           So I think what I want to do is I'll read the 302.

15   You'd like me to rule on this before Monday because that

16   affects whether this agent comes up.

17           MR. FRANK:  That's correct, Your Honor.

18           THE COURT:  All right.  How about we reconvene

19   at 2:00.  I think we'd all be happier.  I'd be happier.

20           MR. FRANK:  That's the royal we.

21           MR. WEINBERG:  Judge, is there any way I can burden

22   the Court to make it quarter of 2:00?  I've got a pretty

23   long-standing 2:30 commitment.

24           THE COURT:  Fine, 1:45.  The only thing we'll talk

25   about at 1:45 is this witness.

1          MR. WEINBERG:  And can Mr. McLellan be excused from

2     this?

3          THE COURT:  He's excused.

4          THE CLERK:  This matter is adjourned.

5          (Court in recess at 1:12 p.m.

6          and reconvened at 1:48 p.m.)

7          THE DEPUTY CLERK:  All rise, the McLellan matter is

8     back in session.

9          THE COURT:  Please be seated.

10         So I read the 302.  I have to say, it seems like it

11    more goes to weight than admissibility.  I understand that

12    some of the questions concern the 1990s, but based on 302, it

13    seems fairly open ended and later there's a discussion about

14    not taking a spread that goes up -- it sounds like it's

15    talking about a contemporaneous period of time.

16         MR. GOLDSTEIN:  Well, I don't see the

17    contemporaneous section, Your Honor.

18         THE COURT:  Well, at the -- two ways.  One is on

19    the last page, there's a summary of a discussion and -- about

20    a meeting a couple months ago and then Mr. McLellan says,

21    "State Street does not take spread."

22         And it is an earlier time period that -- he's

23    certainly being asked about a period in late 1990s, 2000s,

24    but some of it is more recent.  I guess what I would say is,

25    look, this is how it strikes me, it's -- that time period is

1    a -- makes the evidence less powerful, but not so far out

2    that I would say I wouldn't admit it.

3          MR. GOLDSTEIN:  So here's my issue in a nutshell.

4    It's not just the time period.  That's one feature of this,

5    but there are questions about a matter, State Street's

6    relationship with ConvergEx, the use of ConvergEx, back

7    before State Street even had a London desk, before they had

8    an Asia desk.  We're talking about early 2000s.

9          So that's the context of Mr. McLellan talking to

10   them, contrasting State Street from ConvergEx during that

11   time period.  And so the problem is that the Government wants

12   to elicit these statements from Mr. McLellan, as if he's

13   talking about the transitions at issue, or as if he's talking

14   about the practices in place when these transitions at issue

15   happened.  And so I think there is a very substantial

16   misleading -- potential misleading of the jurors, confusions

17   of the issues.  I don't think it just goes to weight.  I

18   think the problem is that the jury is going to get the

19   impression that Mr. McLellan is making these statements and

20   they have any relevance whatsoever to what the practices were

21   for these particular transition clients.  And I think if we

22   learned anything over the last couple of weeks, other than

23   the fact of Mr. Frank not being able to sit down, was

24   that each of these transitions are *sui generis* in a sense

25   meaning that you --

1          THE COURT:  It is the new cancer, you know.

2          MR. GOLDSTEIN:  They all have individual

3   negotiations, they all have different contracts or

4   potentially have different contracts.  And so for an agent to

5   take the stand and say I spoke to Mr. McLellan, he said

6   here's the practice with State Street, it's incredibly

7   misleading, when it bears no relationship to the transitions

8   at issue.  The Government doesn't need these statements and

9   so whatever probative value they have, I would argue they're

10  substantially outweighed by a confusion of the issues,

11  misleading of the jury.  And to the extent the Government

12  needs any piece of this, which I contend would be that Mr.

13  McLellan forwarded this spreadsheet, they can call the agent

14  for that particular purpose.

15          Mr. McLellan did forward the ConvergEx, he said he

16  forwarded the ConvergEx spreadsheet.  That's what they're

17  tying, in terms of relevance to this case, but all of these

18  other statements concern an entirely different subject

19  matter, a different time period, and bear no relationship to

20  the actual transitions at issue, but the jury is going to

21  come away with the sense that Mr. McLellan was saying, State

22  Street never does this.  State Street does that.

23          THE COURT:  You're going to have to do

24  cross-examination that he hadn't been asked about -- you

25  didn't ask him about these about these transitions, you

1    didn't talk about this, you didn't talk about that.  You were

2    talking about this, he told you about a time period when they

3    didn't have a desk to do the trading, which was 1990s, and

4    all of that?

5          MR. GOLDSTEIN:  That certainly helps.  But given

6    that -- given all of that predicate, I don't know why the

7    relevance isn't outweighed by the potential confusion of the

8    jury or misleading the jury.  And that is my argument in a

9    nutshell.

10         MR. FRANK:  Just with respect to the timing point,

11   Your Honor.  Your Honor pointed to that second to last

12   paragraph.  And the paragraph begins, "Mr. McLellan met with

13   Velee a couple of months ago."

14         And then it says, "McLellan believes Velee was

15   pumping him for information about spread.  McLellan advised

16   State Street does not," present tense, "take spread."  It's

17   present tense and it's in January of 2012.  So it's exactly

18   contemporaneous with the issues in this case and he ran the

19   transition business.  So obviously they're talking about

20   spreads in the business that he ran and counsel can make his

21   arguments on cross-examination, within limits.

22         MR. GOLDSTEIN:  But it's not obvious what he was

23   talking about and the entire conversation had to do with

24   ConvergEx and so --

25         MR. FRANK:  No, it didn't.

1          MR. GOLDSTEIN:  That's the exact point, meaning

2     they want to elicit this statement as if he's talking about

3     these transitions.  And has no -- I don't think the

4     Government is even contending that this statement had

5     anything to do with these transitions and so --

6          THE COURT:  He wasn't asked about these transitions

7     in the interview.

8          MR. FRANK:  Absolutely not, Your Honor.  We didn't

9     know about them at the time, but the point is he was talking

10    about his practices in his business.  It goes to his state of

11    mind.  It's going to be five minutes of testimony about his

12    state of mind.  That's it.

13         THE COURT:  The 403 objection raised, Mr.

14    Goldstein, I understand, but it's overruled for, generally,

15    the reasons that I articulated.

16         There was a -- I'm not clear what it is that you

17    might be doing in cross that Mr. Frank might be objecting to,

18    but I had the sense there was something -- some issues along

19    those lines.

20         MR. GOLDSTEIN:  Well, I think I need to explain the

21    context for those statements.  That they went there that

22    night, they had questions regarding a different subject

23    matter.  ConvergEx had nothing to do with State Street's

24    transition management business.  When he asked these

25    questions, it was in that context.  Mr. McLellan -- the same

1    things Your Honor just said.

2              He wasn't talking about the specific transitions,

3    he was talking generalities, but I have to get into the

4    context.  Otherwise, I think it's incredibly misleading.

5              MR. FRANK:  That's not an issue for us, Your Honor.

6    In fact, we're going to establish all of that on direct.  The

7    issue is, what I heard counsel to suggest earlier, and maybe

8    I misunderstood, was that they wanted to get into the

9    ConvergEx business model, what the agent was investigating

10   with respect to ConvergEx and what was happening at ConvergEx

11   and that's irrelevant.  We've never argued --

12             THE COURT:  Pause.

13             MR. GOLDSTEIN:  Maybe.  Meaning I may need to

14   establish that the context of the conversation was a practice

15   that is simply foreign to what the practice was at State

16   Street.  My understanding of the ConvergEx model was that

17   despite trade being US based and despite ConvergEx having an

18   US-based broker-dealer, they were sending the orders to

19   another broker-dealer they had in Bermuda, so that they could

20   do a markup in Bermuda, through that broker-dealer, which was

21   their own affiliate, send it back to the US, where they'd

22   interpose a second markup.

23             And so it's -- in our position and our contentions,

24   it's entirely different than what the State Street, what

25   their operations were.  And it's that context that I think

1    would give the jury some understanding of what the statements

2    are that Mr. McLellan was making.

3            MR. FRANK:  So the issue is the defendant's state

4    of mind, not what ConvergEx was doing and we're only asking

5    questions about what the defendant said about his own

6    business and he said we don't take spreads and he said we

7    fully disclose our fees and what we charge.  That's all.

8            THE COURT:  But they told him they were asking

9    about ConvergEx.

10           MR. FRANK:  They came to him and said they were

11   investigating ConvergEx.  That's it.  Then they asked him

12   questions.  They didn't volunteer information to him.

13           THE COURT:  Sure.

14           MR. FRANK:  So the issue about what he may have

15   thought about what ConvergEx was doing, unless he said in

16   here -- and I don't see it in here -- that he knew ConvergEx

17   was using offshore entities to apply spreads and routing

18   things back to New York, there's no issue of what -- the

19   Government was investigating what ConvergEx was doing and

20   they talked to him about what he was doing.

21           MR. GOLDSTEIN:  I just think it's incredibly unfair

22   to let the Government introduce statements from Ross, without

23   us also being able to also explain at the same time what the

24   differences were between ConvergEx and State Street

25   practices, given that's the entire context for this

1    conversation.  Mr. McLellan is being interviewed about

2    ConvergEx, therefore, you can assume that he understood what

3    the practices were, which is what he's talking to the agents

4    about.

5            MR. FRANK:  In fact, what he says here is he was

6    never -- McLellan said he was never informed that -- by

7    ConvergEx, that a spread was being taken.  He suspected it.

8    There's nothing in here suggesting that he knew that trades

9    were being routed through Bermuda, that it -- the mechanism

10   for any of that.  The only statement he made was that he

11   suspected they were making money above and beyond what they

12   told State Street they were making.

13           MR. GOLDSTEIN:  And this is just a summary of the

14   conversation.  And so I'm allowed to test the witness in

15   terms of what they spoke about and whether or not that was a

16   subject matter of the discussion and he can answer the

17   questions yes or no.

18           THE COURT:  So I'm not ruling anything out.  It is

19   just a summary.  It's not tape-recorded, as far as I can tell

20   from this.  But the issue is -- I think the relevant issue is

21   what did Mr. McLellan say, what was his state of mind.  So

22   the -- I don't necessarily agree with Mr. Frank, that you

23   can't ask some of the more specific things that he's

24   objecting to, but depending on -- but I don't necessarily

25   agree.  I think it depends.

1          In other words, that if -- if the agent, for

2     example, went in and said, "I'm investigating ConvergEx, tell

3     me everything you know about ConvergEx," and just started

4     writing things down, what else do you -- and just asked

5     nonleading questions.  What else do you know about ConvergEx,

6     what else do you know?  Do you know anything else that they

7     did?  Do you know anything else about that?  And said nothing

8     else and then what he reports is just all of that.

9          The fact that -- and none of that, and he says that

10    and he tells us whatever McLellan said that the Government

11    wants to elicit.  Then -- and none of that is about this

12    double commission you described.  I don't know how

13    relevant -- like getting deeply into the ConvergEx model and

14    that scenario, might not be that relevant.  On the other

15    hand, depending on what he asked or how, and so we'd have to

16    see.  I don't think --

17         I think the context matters.  I mean, he didn't

18    make these statements in a vacuum.  And on the other hand, I

19    do think that -- I do think the focus is -- the relevance of

20    this is what did he say and what did he know and what was his

21    state of mind and to shed light on the things he said.

22         MR. FRANK:  So if I understand Your Honor

23    correctly, because it's relevant to our decision to call the

24    witness, what the agents said to McLellan and what McLellan

25    said to the agents can be delved into; what the agents,

1    themselves, knew about ConvergEx that they didn't share with
2    McLellan cannot be delved into?
3            THE COURT:  Well, I didn't say that, but I
4    understand your point.  I think it depends.  I don't know
5    what the agents knew or know and this case isn't about
6    ConvergEx.  On the other hand, there is evidence about
7    ConvergEx in this case, that you elicited.  And I can't
8    remember if they objected and I overruled or they didn't, but
9    it's in evidence.
10           MR. FRANK:  But what we elicited was what the
11   conspirators understood about.
12           MR. JOHNSTON:  I've only ever been a Government
13   attorney, Your Honor.
14           MR. FRANK:  Your Honor, but their own jury
15   instructions ask for more than what he, counsel, is
16   suggesting is what we have to prove.
17           THE COURT:  Here's the thing.  I want to think
18   about this.  I'll just tell you the two considerations that
19   I'm thinking about.  One is that I am -- you know, it gives
20   me pause that admitting some of this, which is inferential
21   evidence, has the effect of telecommunicating -- or
22   communicating directly to the jury what Mr. Weinberg is
23   saying about, that the bank paid a lot of money, and the
24   implications that come with that, in terms of guilt, and on
25   those points.

1          On the other hand, I am concerned -- on the other

2     hand, this is the other thing I'm weighing, sort of the point

3     that Mr. Johnston makes that these are big -- both companies

4     are big companies.  There's two that potentially are

5     financially affected, or two that are in play for that.

6     They're both big companies and that the biggest single

7     expense you have in the -- in the universe here is the money

8     you paid -- that they paid to the Government -- or different

9     parts of the Government.  And I'm concerned about the issue

10    you raise and unfairly hamstringing your ability to argue

11    the -- you know, the facts that support that element.  I hear

12    that, too.  And I'm just thinking about that, because I think

13    they're both important considerations, so I want weigh sort

14    of where that goes.

15          MR. FRANK:  So in light of that, I mean, does it

16    make sense to defer our witnesses until Tuesday?  I don't

17    know how we're supposed to prepare the witness to testify if

18    we can't tell them what's within bounds and what's not within

19    bounds.

20          MR. WEINBERG:  The only remaining issue for direct

21    examine, because if you put on the FBI agent, you put him on

22    at your own peril.  And Your Honor will make rulings and we

23    know the ground rules regarding approaching the bench.

24          In terms of the State Street witness, we'll come at

25    8:30, we have only one thing to resolve, which is the

1    formular of what he is allowed to say about potential harm to

2    State Street, but we would -- we have an out-of-state witness

3    coming in Tuesday --

4         THE COURT:  We're going to go forward on Monday.

5    Here's the thing.  As I understand with respect to the FBI

6    agent, the issue is basically -- you have two issues.

7         One, you have a universe of things you would think

8    about, which is fine with respect to calling the witness.

9    And the other more particular is, to the extent the defense

10   decides to ask at 8:30 whether they -- decides to ask to go

11   into this other area and whether I rule after hearing from

12   you, yeah.

13        If I rule no, it doesn't change anything you're

14   going to do.  If I rule yes, it might, and so maybe we'll

15   meet a little -- maybe we'll meet at 8:15 and then we have

16   time to talk, and there's a little more time before 9:00 with

17   respect to that.

18        With respect to the State Street witness, the

19   reality is that it's a complicated issue.  It implicates some

20   of the things I'm going to think about it and I'll either

21   issue something over the weekend, or we'll talk about it

22   Monday morning at 8:15.

23        All right, we're adjourned.

24        Wait.  Will you give this back to Mr. Frank.

25        (Court in recess at 2:23 p.m.)

```
1                    --------------------------

2                         CERTIFICATION

3

4        We certify that the foregoing is a correct transcript of

5    the record of proceedings in the above-entitled matter to the

6    best of our skill and ability.

7

8

9

10   /s/Debra M. Joyce              June 15, 2018
     Debra M. Joyce, RMR, CRR, FCRR    Date
11   Official Court Reporter

12

13

14   /s/Rachel M. Lopez             June 15, 2018
     Rachel M. Lopez, CRR              Date
15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```