UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
)
)
UNITED STATES OF AMERICA          )
)
v.                                )          No. 16-10094-LTS
)
ROSS MCLELLAN,                    )
Defendant                         )
)
_____ )

**DEFENDANT ROSS MCLELLAN'S MOTION FOR JUDGMENT OF ACQUITTAL
AND INCORPORATED MEMORANDUM OF LAW**

Now comes the defendant Ross McLellan and respectfully moves, pursuant to Fed. R.

Crim. P. 29, that this Honorable Court order the entry of a judgment of acquittal on all counts

with which he is charged.

The government's prosecution of McLellan stretches the charging statutes beyond what

they can bear. The trial evidence introduced by the government was insufficient to meet its

burden of proof on each and every one of the counts alleged. The government advances a novel

theory of securities fraud in which any alleged false statement by State Street related solely to the

selection of a transition manager, and was entirely divorced from any decision to buy or sell

securities. The purported scheme underlying the wire fraud counts was squarely based out of

London and extended to three other countries, notably excluding the United States. Moreover,

two of the three wire fraud charges set forth in the Superseding Indictment are expressly

predicated on McLellan's mere receipt of unsolicited emails and are utterly unsupported by any

evidence that McLellan made or caused the relevant transmissions. Finally, much of the alleged

conduct occurred after each and every one of the relevant transitions had been conducted and completed and, therefore, cannot have been in furtherance of any alleged initial scheme.

## LOCAL RULE 7.1(a)(2) STATEMENT

The government opposes the granting of the within motion.

## MEMORANDUM OF LAW

**A.**  **COUNTS TWO AND THREE AND SO MUCH OF COUNT ONE AS CHARGES CONSPIRACY TO COMMIT SECURITIES FRAUD.**

By the time the transition management clients at issue began seeking a transition manager, they had *already* made the decision to buy and sell securities and had sometimes *already* decided just what securities they were going to sell and which replacement securities they were going to buy. Because the purportedly false statements to which witnesses testified were all made either in the context of seeking to obtain transition management contracts or well after the securities transactions at issue had taken place, they were neither material misstatements nor were they made "in connection with" the purchase or sale of securities. McLellan should, therefore, be acquitted on Counts Two and Three and so much of Count One as charges conspiracy to commit securities fraud.

15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5 contain a critical limiting principle: the fraud must have been "in connection with the purchase or sale of any security." In *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014), the Supreme Court considered the question whether the phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" in 15 U.S.C. §78bb(f)(1)(A) was broader than misrepresentations that are material to the purchase or sale of a covered security. *Id.* at 1066. Answering that question with a resounding no, the Court held that "[a] fraudulent

misrepresentation . . . is not made 'in connection with' . . .  a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Id.* The same is true under 15 U.S.C. §78j(b) and the parallel language of Rule 10b-5: A misrepresentation is material only "when there is a substantial likelihood that a reasonable investor would find [the misrepresentation] important in making an investment decision." *United States v. Vilar*, 729 F.3d 62, 92 (2d Cir. 2013), *quoting United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012).

Misstatements that "do[] not affect the decision to make the investment in which the loss complained of occurred [are] not actionable under Rule 10b-5." *Trustees of Hotel Employees & Rest. Employees Int'l Union Pension Fund v. Amivest Corp.*, 733 F.Supp. 1180, 1186 (N.D.Ill. 1990), *quoting Latigo Ventures v. Laventhal & Horwath*, 876 F.2d 1322, 1325 (7th Cir.  1989). *See, e.g., SEC v. Pirate Investor LLC,* 580 F.3d 233, 240 (4th Cir. 2009) ("[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security"); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("Material information is information that would be important to a reasonable investor in making his or her investment decision"); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir.  1997) ("A statement . . . is only material if a reasonable investor would consider it important in determining whether to buy or sell stock").

In addition, to constitute securities fraud under Rule 10b-5(b), the false statements must be made "in connection with the purchase or sale of any security," *i.e.*, they must "coincide" with a securities transaction, and the deception must be in connection with the purchase or sale of a security, "*not deception of an identifiable purchaser or seller*." *Merrill Lynch, Pierce, Fenner &*

*Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (emphasis added). Misstatements made "in connection with" the purchase or sale of a security must be "of a sort that would cause reasonable investors to rely thereon, and, in connection therewith . . . cause them to purchase or sell a corporation's securities." *SEC v. Norstra Energy Inc*., 202 F.Supp.3d 391, 397 (S.D.N.Y. 2016), *quoting SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968).

While the Supreme Court had said that the statute should be construed "flexibly to effectuate its remedial purposes," *SEC v. Zanford*, 535 U.S. 813, 819 (2002), it has at the same time cautioned that "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of §10b." *Id.* at 820. *See Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 938 (2d Cir. 1984) (federal securities laws are not intended "to provide a broad federal remedy for all fraud").[1]

The false statements to which witnesses have testified that were made in the course of seeking to obtain the clients' transition management business were not made "in connection with" the purchase or sale of securities. The investment decisions had already been made by the clients, and they were already committed to selling particular securities and purchasing

---

[1] Nor does the statute encompass actions that are more properly treated as breaches of contract. *See, e.g., Hunt v. Robinson*, 852 F.2d 786, 787-88 (4th Cir. 1988) (goal of the statute "is not furthered by bringing within the ambit of § 10(b) claims amounting to breach of contract or common law fraud which have long been the staples of state law");  *Korff v. Bank Julius Baer & Co.*,1990 WL 67771, at *3 (S.D.N.Y. May 14, 1990) (dismissing complaint where "[a]lthough plaintiffs' allegations may provide the basis for a claim of breach of fiduciary duty or breach of contract, they fall far short of providing the basis for a federal claim under §10(b) or Rule 10b-5"); *Bischoff v. G.K. Scott & Co.*, 687 F. Supp. 746, 749 (E.D.N.Y. 1986) ("It is well settled that allegations of a mere breach of contract or breach of fiduciary duty, without more, do not state a claim under Section 10(b) or Rule 10b–5," *citing Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 445 (2d Cir.1971)); *see also Gigliotti v. Mathys*, 129 F.Supp.2d 817, 823-24 (D.V.I. 2001) ("key factor in weeding out cases involving mere breaches of contract is whether the alleged misrepresentations were intended to induce a sale or purchase of a security at the time of sale or purchase").

replacement securities for their portfolios. The only question before them was what transition manager to use for their transitions.

In *SEC v. Goble*, 682 F.3d 934, 943-44 (11th Cir. 2012), the Court rejected the SEC's theory that under Rule 10b-5 the misrepresentation at issue was material because it would have impacted an investor's choice of broker-dealers. The test for materiality in the securities fraud context, the Court stated, is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Id.* at 943. The operative "course of action," the Court continued, is "an *investment* decision—*not an individual's choice of broker-dealers*." *Id.* (emphasis added). The Court held that "a misrepresentation that would only influence an individual's choice of broker-dealers cannot form the basis for §10b securities fraud liability." *Id.* at 944.[2]

More recently, in *Brink v. Raymond James & Assocs., Inc.*, 2018 WL 2752572 (11th Cir. June 8, 2018), the issue before the Court was "whether the conduct alleged in Brink's complaint—that RJA built a profit into the Processing Fee while representing to its Passport Account customers that the Processing Fee covered only the actual costs of transaction execution and clearing—constitutes a 'misrepresentation or omission of a material fact in connection with the purchase or sale' of those securities." *Id.* at *4. The Court noted that "[m]ateriality has special meaning in the context of federal securities fraud," *i.e.*, "materiality in federal securities

---

[2] Similarly, the First Circuit recently stated that "a fact is material where there is 'a substantial likelihood that' its disclosure 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 750 (1st Cir. 2016), *quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). That "total mix of information" must pertain to an *investment* decision. Here, the misstatements pertained solely to the clients' choice of transition manager, *not* to any investment decision.

law requires a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.*, *quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Relying on its prior decision in *Goble*, the Court concluded that "the choice of a type of investment account, much like the choice of a broker-dealer, is not intrinsic to the investment decision itself. Although RJA's alleged misrepresentation regarding the Processing Fee might have influenced a reasonable investor's decision to pick the Passport Account over another type of account, that does not make the alleged representation 'material.'" *Id.* at *5.[3]

Misstatements made after the securities transaction is conducted also are neither material to nor "in connection with" the purchase or sale of securities. Any such misstatements cannot support a securities fraud prosecution under Rule 10b-5(b) because the misstatements must have occurred "*prior to or contemporaneous with* the sale of securities." *Bosio v. Norbay Sec., Inc.*,

---

[3] *See, e.g., Taylor v. Westor Capital Group*, 943 F.Supp.2d 397, 403 (S.D.N.Y. 2013) (complaint failed to state claim under Rule 10b-5 where the alleged fraud "pertains not to the sale of the securities or the value of the securities themselves, but to the terms of the relationship between the broker and the customer"); *Trustees of Hotel Employees & Rest. Employees Int'l Union Pension Fund v. Amivest Corp.*, 733 F.Supp. 1180, 1185-86 (N.D.Ill. 1990) (complaint dismissed where fraud alleged related only to Trustees' relationship with defendant and "was not related to a decision whether or not to invest in a particular security;" trustees alleged "only that they should have received the commissions that were retained by Amivest" but failed to allege "any facts that would indicate that they would not have purchased the mutual funds absent the alleged fraud"); *Bischoff*, 687 F.Supp. at 749 ("In general, misrepresentations made by brokers inducing the opening of an account are not actionable under the federal securities laws. Because such broker misrepresentations are connected to the broker's efforts to attract the investor's business, and are not tied to a particular trade, they do not meet the Rule 10b-5 requirement that an actionable misrepresentation be in connection with the purchase or sale of securities"); *Williamsport Firemen Pension Boards I & II v. E. F. Hutton & Co.*, 567 F.Supp. 140, 144 (M.D. Pa. 1983) (dismissing count of complaint because allegations of misrepresentations with respect to commissions to be earned by defendants "have no causal connection to the purchase by the Pension Boards of any particular securities. The alleged fraud involves only the general relationship between the Defendants and the Pension Boards").

599 F.Supp. 1563, 1566 (E.D.N.Y. 1985) (emphasis added by court). *See, e.g., Arst  v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir.1996) (deceptive conduct that occurred after investor's decision to sell shares was not "in connection with" sale of security); *Taylor v. Westor Capital Group*, 943 F.Supp.2d 397, 402-03 (S.D.N.Y. 2013) (complaint dismissed where fraudulent conduct alleged postdated decision to purchase securities, and plaintiff did not allege that defendant's conduct affected his purchasing decisions);  *MathStar, Inc. v. Tiberius Capital II, LLC*, 712 F.Supp.2d 870, 881 (D.Minn. 2010) ("As a matter of law, 'conduct actionable under Rule 10b-5 must occur before investors purchase the securities,'" *quoting Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1487 (9th Cir. 1991)); *Seattle First Nat. Bank v. Carlstedt*, 678 F.Supp. 1543, 1547 (W.D.Okla. 1987) ("Activities that occur after a plaintiff's purchase of a security cannot form the basis for liability under Rule 10b-5"); *Troyer v. Karcagi*, 476 F. Supp. 1142, 1153 (S.D.N.Y. 1979) ("because the misrepresentation was allegedly made after the purchases and sales listed on the computer printout, the alleged misrepresentation could not be in connection with these purchases and sales").

Because the false statements to which the witnesses testified fall into either the former or the latter category—for example, statements in RFPs pitching State Street as a transition manager or, in the case of Royal Mail, a hidden email by Pennings to the client regarding State Street's fees made to obtain the clients' transition management business that affected only the clients' choice of transition manager or statements made after the securities transactions were completed, they were neither material to a decision to purchase or sell a security or "in connection with" the purchase and sale of a security.[4] McLellan should, therefore, be acquitted

---

[4] The government also introduced evidence of McLellan instructing traders regarding the charging of commissions during the course of the relevant transitions. These instructions,

of these charges.

The government's proof on the securities fraud counts has also been insufficient on another independent point. The Supreme Court has squarely held that the relevant statutory provision does not apply extraterritorially. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010). Thus, in order to fall within the scope of the statute, an alleged false statement must occur in connection with "the purchase or sale of a security listed on an American stock exchange" or "the purchase or sale of any other security in the United States." *Id.* at 273. The government has introduced no evidence that the underlying securities involved in the transitions relevant to this case were listed on an American stock exchange. The operative question thus becomes whether "irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).  Here, again, the government's proof was insufficient. The sole witness called by the government on this issue, Scott Shaw, did not even work at State Street in 2010 and 2011.  He, therefore, could not definitively testify whether trades conducted by State Street on behalf of the relevant clients during the relevant time period cleared or settled in the United States.  Shaw's speculation that they may or probably would have done so does not constitute proof beyond a reasonable doubt.

## B.    COUNTS FOUR AND FIVE AND SO MUCH OF COUNT ONE AS CHARGES CONSPIRACY TO COMMIT WIRE FRAUD.

Because 18 U.S.C. §1343 does not apply extraterritorially, McLellan cannot be convicted of the wire fraud offenses charged in Counts Four and Five, as well as so much of Count One as charges conspiracy to commit wire fraud, unless the government proves beyond a reasonable

---

however, in and of themselves, do not constitute false statements. Their relevance to this case lies solely in relation to prior representations, *e.g.*, in RFPs, which the government contends were rendered false by McLellan's actions.

doubt that this was a case of domestic fraud. It has not done so, and McLellan should, accordingly, be acquitted on these charges.

As the Supreme Court recently stated, *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010), and *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013),

> reflect a two-step framework for analyzing extraterritoriality issues. At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." *If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.*

*RJR Nabisco, Inc. v. European Community*, ___ U.S.___, 136 S.Ct. 2090, 2101 (2016), *quoted in United States v. Valenzuela*, 849 F.3d 477, 485 n.3 (1st Cir. 2017) (emphasis added). Applying this two-step framework, the Second Circuit held in *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *reversed and remanded on other grounds, RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090 (2016),[5] that the wire fraud statute does not apply extraterritorially:

> The argument in favor of extraterritoriality depends on their references to foreign commerce. The wire fraud statute applies to the transmission of communications by "wire, radio, or television ... in interstate or foreign commerce" in the execution of a scheme to defraud. *Id.* § 1343. . . . In *Morrison,* the Supreme Court observed that a "general reference to foreign commerce . . . does not defeat the presumption against extraterritoriality." . . . This admonition appears to bar

---

[5] The Supreme Court did not consider whether the wire fraud statute applied extraterritorially in *RJR Nabisco* but instead focused its opinion on the extraterritoriality of the RICO statute.

> reading [the wire fraud statute] literally to cover wholly foreign . . . communication. We conclude that the references to foreign commerce in [the wire fraud] statute[], deriving from the Commerce Clause's specification of Congress's authority to regulate, do not indicate a congressional intent that the statute[] apply extraterritorially.

*Id.* at 140-41. The Court did not further define the line between domestic and extraterritorial applications of the wire fraud statute because the conduct alleged in that case stated a domestic cause of action but did provide the following general guidance: "If domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States." *Id.* at 142.[6]

In a later summary order, the Second Circuit found the domestic contacts of the alleged scheme to defraud insufficient to render the wire fraud statute applicable to the conduct at issue, noting that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application." *Petroleos Mexicanos v. SK Engineering & Const. Co.*, 572 Fed. App'x 60, 61 (2d Cir. 2014), *quoting Norex Petroleum Ltd. v. Access Indus., Inc.,* 631 F.3d 29, 32–33 (2d Cir.2010). *See Morrison*, 561 U.S. at 266. The domestic contacts alleged were, in the *Petroleos* Court's view, insufficient to sustain jurisdiction, even though financing was obtained in this country, invoices were sent to a bank in this country for payment, and the domestic bank issued payment. *Id.* at 61.

*United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014), is not to the contrary.[7] *Lyons*

---

[6] The Court expressly did not decide "whether domestic conduct satisfying fewer than all of the statute's essential elements could constitute a violation of such a statute." *Id.* at 142 n.14.

[7] McLellan recognizes that, in ruling on his motions to dismiss, the Court felt itself

addressed the extraterritoriality of 18 U.S.C. §1084, not §1343. Section 1084 prohibits the "knowing[] use[] [of] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers." In a cursory analysis, the Court concluded that §1084 applies extraterritorially because it explicitly references transmissions between the United States and a foreign country. *Id.* at 718. Because "[t]he communications giving rise to these convictions had at least one participant inside the United States, the Court stated, the communications "fall within the statute's scope." *Id.*

*Lyons* relied predominantly on *Pasquantino v. United States*, 544 U.S. 349 (2005), a case decided well before *Morrison* and *RJR Nabisco.* In *Pasquantino*, the defendants, over a four-year period, used the telephones while in the United States to order liquor from discount liquor stores in Maryland and then paid others to smuggle the liquor into Canada, thereby depriving Canada of

---

"guided by" *Lyons.* Order on Motions to Dismiss (Doc. 302) at 4. The Court noted that, as in the statute at issue in *Lyons*, "[t]he wire fraud statute explicitly references transmissions in interstate or foreign commerce," *id.*, but *Lyons* appears to be inconsistent with *Morrison*'s teaching that a statute's inclusion of a reference to foreign commerce does not by itself mean that Congress intended that the statute apply extraterritorially. In addition, *Lyons* was decided before the Supreme Court "clarified its test for deciding whether a statute applies extraterritorially" in *RJR Nabisco*. *Valenzuela*, 849 F.3d at 485. Moreover, in *Lyons*, although the offshore betting operation was located in Antigua, the defendants conducted extensive activities in Florida and Massachusetts, recruiting American customers and paying them their winnings and collecting their losses. *See id.* at 711-12. Section 1084, the statute at issue in *Lyons*, differs from §1343 in that its focus is on the use of the wires to transmit gambling information. If the *Morrison/RJR Nabisco* focus standard were applied in *Lyons*, the result would likely have been the same. Here, however, as addressed further *infra*, the focus of the wire fraud statute is on the scheme to defraud.

substantial tax revenues. This was not, the Supreme Court said, an extraterritorial application of the wire fraud statute because the offense "was complete the moment [defendants] executed the scheme inside the United States." *Id.* at 371.  It was, therefore, the Court concluded, domestic conduct that was being punished. *Lyons* cannot support the proposition that §1343 applies extraterritorially whenever United States wires are used in the execution of the fraud.[8] As the Second Circuit explained in *RJR Nabisco*:

> In *Pasquantino* . . . , the Supreme Court suggested, in dictum, that, because the wire fraud statute punishes frauds executed in interstate or foreign commerce it is surely not a statute in which Congress had only domestic concerns in mind. . . . Because that statement is dictum, and because *Morrison* explicitly rejects the reasoning on which it relies, we do not read *Pasquantino* to require us to construe the "foreign commerce" language of the wire fraud statute as rebutting the presumption against extraterritoriality.

764 F.3d at 141 n.11 (internal quotation marks and citations omitted).

Thus, the analysis must turn to the second part of the *Morrison/Kiobel/RJR Nabisco* standard—the focus of the wire fraud statute—to determine whether the evidence shows that this particular application of the wire fraud statute represents a domestic, or instead extraterritorial, application of the statute. *See RJR Nabisco*, 136 S.Ct. at 2101 (courts should "look[] to the statute's focus," and  "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; *but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory*" (emphasis added)).

---

[8] In *Pasquantino*, virtually all of the offense conduct took place in the United States. That being the case, the result in *Pasquantino* would likely have been the same under the *Morrison/RJR Nabisco* standard.

The essential elements of wire fraud are: "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme." *United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013). The scheme to defraud must cause, or have been intended to cause, a deprivation of money or property. *See United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998). Thus, §1343 "forbids a particular class of frauds (*i.e.*, frauds that are designed to take money or property and that involve the U.S. [wires]." *Elsevier, Inc. v. Grossman*, 199 F.Supp.3d 768, 783 (S.D.N.Y. 2016). Such frauds are, therefore "properly considered the 'focus' of" §1343. *Id. See, e.g., United States v. Bradley*, 644 F.3d 1213, 1249 n.77 (11th Cir. 2011) ("The mail and wire fraud statutes . . . focus their attention on the use of a misrepresentation to obtain money that is not owed"); *United States v. Brien*, 617 F.2d 299, 307 (1st Cir. 1980) ("the mail and wire fraud statutes focus on the scheme, not on the implementation of it"). Thus, the focus of the statute is the prohibited fraudulent conduct, not the use of domestic wires. The use of domestic wires may confer *jurisdiction*, but, as *Morrison* teaches, jurisdiction is a separate matter from whether the conduct alleged falls within the substantive scope of the statute at issue. *See United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 102-03 (D.D.C. 2017).[9]

---

[9] Some courts have found that use of domestic wires, even minimally, will suffice to constitute the offense a domestic one, *see, e.g., United States v. Allen*, 160 F.Supp.3d 698, 707 (S.D.N.Y. Feb. 16, 2016); *United States v. Hayes*, 99 F.Supp.3d 409 (S.D.N.Y. 2015), *aff'd on other grounds*, 118 F.Supp.3d 620 (S.D.N.Y 2015). The better view, however, is found in *United States v. Hawit*, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2016), in which the court rejected the government's contention that even a single use of domestic wires sufficed to make the offense subject to prosecution under §1343, concluding that that "extreme position" was foreclosed by the Second Circuit's *Petroleos Mexicanos* decision, which held that "'three minimal contacts'

The evidence shows that if there was a scheme to defraud here, it was centered in London, the locus where the alleged misrepresentations were made to clients by Pennings and Boomgaardt, and the clients that were allegedly defrauded were all foreign entities. The clients and/or their consultants solicited State Street's transition management through contacts with State Street Bank Europe, headquartered in London, and the clients' communications with State Street relative to the transitions at issue were all conducted over exclusively foreign wires. State Street's responses to the requests for proposals and the pre-trade implementation shortfall estimates were prepared in the UK and sent to clients from the UK. The alleged affirmative false statements made to clients regarding which witnesses have testified were all made by persons located in the UK using exclusively foreign wires. The contracts and periodic notices were negotiated between persons located in the UK and persons and entities located abroad, and signed on behalf of State Street in the UK. The contracting party was State Street Bank Europe, and the transitions were managed through the Portfolio Solutions Group for Europe, the Middle East, and Africa, which was located in London. The broker-dealer for the transactions was State Street Global Markets International, headquartered in London (although it did delegate some trades to State Street Global Markets in the United States). The allegedly false statements relied

---

with the United States—including the use of U.S. wires to transfer of illicit funds—were insufficient to establish a domestic application of the wire fraud statute." *Id.* at *5. "The natural implication of *Petroleos Mexicanos*," the court continued, "is that, in determining whether the wire fraud statute is being applied 'domestically' or 'extraterritorially' in a given case, a court must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires." *Id. See United States v. Prevezon Holdings LTD.*, 122 F.Supp.3d 57, 71-72 (S.D.N.Y. 2015) (court, in part relying on *Petroleos Mexicanos*, refused to apply §1343 to a foreign fraud that involved single use of U.S. wires).

upon by the government are contained in RFPs drafted and sent from London to foreign clients or emails that were sent by Pennings from London to foreign clients. The only communications with the clients were by employees located in the UK, and all the paperwork, such as pre-trade documents and post-trade reports, was generated by State Street Bank Europe in the UK and sent from London to the foreign clients. If there was fraud here, it was a foreign one, outside the scope of the wire fraud statute, and not a domestic one and McLellan should, accordingly, be acquitted on Counts Four and Five and so much of Count One as charges conspiracy to commit wire fraud.

## C.      COUNT FOUR.

Count Four charges that, for the purpose of executing the alleged scheme to defraud, McLellan "did transmit and cause to be transmitted" a particular April 5, 2011 email. Dkt. 282 at ¶ 54. The email was, however, not transmitted by McLellan at all.  To the contrary, it is a message from Pennings to McLellan stating in its entirety that "Ntma just informed us they did not want to use futures on the trade scheduled for later this week. I think this will increase the 'spread.'" Not only did McLellan not send this email, but there is no evidence whatsoever that he caused it to be sent. Indeed, to the contrary, Pennings' email appears to be entirely unsolicited. And there is no indication that McLellan responded to, or even read, the email. McLellan cannot be convicted on this count based on an email that he neither sent nor caused to be sent.  "The federal [wire] fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the [wires] is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *United States v. Tavares*, 844 F.3d 46, 58 (1st Cir. 2016), *quoting Schmuck v. United States*, 489 U.S. 705, 710 (1989). The use of the wires charged must

have been "incident to an essential part of the scheme," *United States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2008). "[T]he scheme's completion or the prevention of its detection must have depended in some way on the [use of the wire.]" *United States v. Pacheco-Ortiz*, 889 F.2d 301, 305 (1st Cir.1989). The purely informative email sent by Pennings, without any apparent prompting from McLellan, does not satisfy these requirements. *See Chattanooga-Hamilton Cty. Hosp. Auth. v. Hosp. Auth. of Walker*, No. 14-CV-0040, 2015 WL 11622950, at *10 (N.D. Ga. May 11, 2015) ("[T]he Court cannot conclude that an entity that simply received unsolicited e-mails engaged in wire fraud").

## D.    COUNT FIVE.

Count Five charges that, for the purpose of executing the alleged scheme to defraud, McLellan sent Pennings an email on June 22, 2011, telling Pennings to inform Royal Mail that commissions had been inadvertently applied to trades conducted in the United States. The transition conducted on behalf of Royal Mail had been completed more than two months prior when State Street sent a post-trade report to the client. The government's wire fraud charge appears to be founded in the theory that the June 22 email nonetheless advanced the purported scheme to defraud by concealing the full amount of State Street's revenues from the client. As McLellan has argued elsewhere, the "alleged acts and statements relating to concealment from" Royal Mail "occurred after the main objectives of the alleged fraud conspiracy had been achieved." Dkt. 340 at 3; *see also infra* at 17-19. Such an "after-the-fact" transmission cannot support a wire fraud conviction. *See United States v. Lazarenko*, 564 F.3d 1026, 1036 (9th Cir. 2009) ("To support a wire fraud charge, the wire must be incident to the execution of the scheme and not part of an after-the-fact transaction that, although foreseeable, was not in furtherance of

16

the defendant's fraudulent scheme" (citation omitted)). Rather, the use of the wires must be "part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 715 (1989). In the present case, there is no evidence that, at the time they hatched the alleged scheme, McLellan and his purported co-conspirators envisioned telling inquiring clients that the charges were inadvertent or accidental. Rather, to the contrary, Pennings, one of the government's own principal witnesses, testified unequivocally that the group intended to use contract language appearing to permit mark-ups as "cover" if issues ever arose. Accordingly, the after-the-fact June 22 email cannot serve as the basis of the wire fraud charge.

**E.     COUNT ONE.**

This is, as the government has repeatedly reiterated, a case about affirmative representations. As the government has emphatically stated, "lies are the subject of this case." Tr. 5/12/18 at 107. The government has presented no evidence that McLellan made any false statements independent of the concealment efforts with respect to Royal Mail. Because the government has failed to prove that McLellan entered into an original conspiratorial agreement that included an agreement to engage in concealment from State Street's compliance department or withholding information from Royal Mail after the completion of the transition, he should be acquitted on Count One.

In *Grunewald v. United States*, 353 U.S. 391 (1957), the Court held that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and

punishment." 353 U.S. at 401-02. The Court further explained:

> Acts of covering up, even though done in the context of a mutually understood
> need for secrecy, cannot themselves constitute proof that concealment of the
> crime after its commission was part of the initial agreement among the
> conspirators. For every conspiracy is by its very nature secret; a case can hardly
> be supposed where men concert together for crime and advertise their purpose to
> the world. And again, every conspiracy will inevitably be followed by actions
> taken to cover the conspirators' traces. Sanctioning the Government's theory
> would for all practical purposes wipe out the statute of limitations in conspiracy
> cases, as well as extend indefinitely the time within which hearsay declarations
> will bind co-conspirators.

353 U.S. at 402. The Court stressed that "*a vital distinction must be made between acts of

concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of

concealment done after these central objectives have been attained, for the purpose only of

covering up after the crime*." *Id.* at 405 (emphasis added). In such latter cases, the Court

continued, "the acts of covering up can by themselves indicate nothing more than that the

conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain

attempted to conceal the murder of Abel from the Lord." *Id.* at 405-06. *See United States v.*

*Twitty*, 72 F.3d 228 (1st Cir. 1995) ("Mere efforts to conceal a crime do not automatically extend

the life of the crime itself, but acts of concealment can extend the life of a conspiracy if the proof

shows an express original agreement among the conspirators to continue to act in concert in

order to cover up their crime" (internal quotation marks omitted)).

The statements to Royal Mail were made in June 2011, after the main conspiratorial

objectives alleged had been accomplished, and the alleged statements to State Street compliance

staff were made even later. These further acts or statements by McLellan and/or any of the

alleged coconspirators allegedly seeking to conceal the full amount of State Street's revenues

were not, therefore, part of the conspiracy charged.  The government has not proven that the later

acts and statements relating to concealment were part of an express original agreement to

continue to conceal the alleged fraud conspiracy after its objectives had been accomplished.

McLellan should, therefore, be acquitted on this count.

**F.      COUNT SIX.**

This count, introduced in a Superseding Indictment issued February 7, charges a wire

fraud against AXA Equitable Life Insurance Company ("AXA"). In connection with that

purported scheme, McLellan is alleged to have caused a wire transmission on February 24, 2011.

The trial evidence reflects only one relevant communication involving McLellan on that date: an

email from Kevin Walker at State Street to AXA attaching three pre-trade reports and a strategy

document. McLellan was copied on the email, which included five other recipients. There is no

evidence whatsoever that McLellan drafted, edited, or even read any of the attached documents,

which total seventy-four pages in length. The government's wire fraud charge appears to be

predicated upon commission quotes comprising a single line of a single page in each of the three

pre-trades. Again, there is no evidence that McLellan provided, knew of, or even noticed these

commission quotes.

The stark absence of proof on this charge requires McLellan's acquittal. Because the

government has done nothing to "directly link[]" McLellan to the purportedly false statements in

the pre-trades, the government was at least "required to establish that [he] was so involved with

the information being placed" into the documents "that one could say [he] 'caused' the

information to be given to [AXA]; without such evidence, no rational jury could . . . convict[]"

him. *United States v. Ragan*, 24 F.3d 657, 659 (5th Cir. 1994) (reversing verdict finding

defendant guilty of mail and wire fraud). This it has utterly failed to do. And, having expressly tied this wire fraud count to the February 24 pre-trades, the government cannot now fall back on other communications involving McLellan. *See United States v. Takhalov*, 838 F.3d 1168, 1170 (11th Cir. 2016) (noting that "[t]he government could have indicted [the defendant] for [a different] email. But it didn't"). Absent any connection between McLellan and the allegedly false commission quote, any evidence of his subsequent instructions to traders about commission levels cannot, of course, support a conviction. This possible *actus reus* is completely divorced from any conceivable *mens rea*, especially considering evidence of McLellan's awareness of an ongoing legal review concluding that the charges to AXA need only be reasonable.[10]

## G.    CONCLUSION

For the foregoing reasons, McLellan respectfully requests that this Honorable Court order the entry of a judgment of acquittal on all counts.

Respectfully submitted,

Ross McLellan
By his Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

---

[10] Of course, Pennings' vague testimony that McLellan made some statement (on an unspecified date that could have been months after the February 24 wire) comparing the AXA transition to transitions conducted on behalf of the relevant EMEA clients is no substitute for evidence that McLellan actually made or caused to be made the specific wire transmission charged in this count.

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: June 19, 2018

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, June 19, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg