

U.S. Department of Justice

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

June 14, 2018

By Email

Martin G. Weinberg, Esq.
Robert M. Goldstein, Esq.
20 Park Plaza
Suite 1000
Boston, MA 02116

    Re:    United States v. Ross McLellan
            Criminal No. 16-10094-LTS

Dear Messrs. Weinberg and Goldstein:

      As you know, we previously identified Graham Dixon of Inalytics as a witness in this case. While we no longer intend to call Mr. Dixon as part of the government's case-in-chief, we reserve the right to call him as a rebuttal witness. While we believe Mr. Dixon's background, experience and understandings based thereon are all admissible in his capacity as a fact witness and pursuant to Fed. R. Evid. 701 in connection with his review of the Royal Mail, KIA and Sainsbury transitions in this case, we provide the information herein in an abundance of caution to the extent any of his testimony is deemed "expert" pursuant to Fed. R. Evid. 702. The substance of this expected testimony has largely been disclosed to you previously, notably in the FBI-302 reports dated November 23, 2015 and March 1, 2016 and the reports Mr. Dixon prepared concerning the KIA, Royal Mail and Sainsbury transitions. We summarize key points below.

      Mr. Dixon's biography is also enclosed. As you know, he is one of the world's leading authorities on the field of transition management, with decades of experience in the industry. As set forth in the November 23 FBI-302, Mr. Dixon ran the first freestanding transition management team in Europe at Mercury Investments, and also served as head of transition management at Credit Suisse in London. He holds an undergraduate degree in computer science and economics, and an MBA from the City University in London.

      If called as a witness, Mr. Dixon is expected to testify as follows:

- The sophistication of market participants varies.  As set forth in the 302, pension fund managers in the United Kingdom are often financial "lay people," not investment and finance professionals.  They rely on professional investment advisors for investment and finance decisions, and place trust in their selected banks and financial advisors.

- Commissions, mark-ups, mark-downs and spreads all refer to per-trade charges, and these terms may be used interchangeably.  Investment managers and other institutional industry participants understand that a specified commission on trades, whether in equities or fixed-income securities, covers all per-trade charges, however they are denominated, and would not expect to be charged a mark-up, mark-down or spread in addition to a commission by the same entity.  Likewise, where fixed fees are charged in lieu of commissions, clients reasonably understand that to mean that there will be no per-trade charge.

- As set forth in the November 23 FBI-302, the primary difference between principals and agents in transitions is that principals assume the market risk of transitioning the client's positions while agents merely execute trades on the client's behalf, with the market risk retained by the client.  In the United Kingdom, classical agency trading has been replaced by the "riskless principal" model, where the client retains the risk but maintains market anonymity.  There is no bottom line difference between the approaches, other than that in the riskless principal model, the client has no right to inspect the street-side trading records.  Riskless principals and agents are required to act in the best interests of their clients.

- In the U.K., the vast majority of transition work is performed on a commission basis, although fixed income transitions may be done on a fixed-price basis.  Where the transition manager is acting as agent or riskless principal, all fees are disclosed to the client.

- Transition management clients typically focus on negotiating the best possible commission rates (or fixed fees), and do not typically negotiate foreign exchange spreads, since foreign exchange is considered an ancillary service.  Transition management clients and other industry participants understand that foreign exchange is a principal business and that foreign exchange desks may earn undisclosed spreads (or take undisclosed losses).  Foreign exchange is a highly liquid market, particularly in major currencies, and spreads are narrow.

- Transition management clients are typically focused on controlling commission costs and fees, which are one component of the implementation shortfall that clients can negotiate and control.  Pension fund clients do not prefer transition managers' fees to be implicit rather than explicit. As set forth in the November 23 FBI-302, Mr. Dixon may testify that the periodic notices between State Street and clients that he has reviewed in this case (e.g., Royal Mail and Sainsbury) made clear that the fixed fees were the sole charges the clients would pay for trading the securities involved in those transitions.  Low fees do not suggest that a transition

manager is taking undisclosed markups.  Rather, transition managers may have many reasons for charging low fees to win business.

- There is no evidence that undisclosed pre-hedging in transitions has occurred since Deutsche Morgan Grenfell was investigated for that practice in or about 2002 and sanctioned by the FSA in 2004.  Compliance desks specifically monitor against undisclosed pre-hedging.

- Regardless of the outcome of a transition, clients are interested in the individual components of the implementation shortfall.  When a transition manager acts as an agent or riskless principal, its goal should be to deliver the best possible implementation shortfall.  Clients expect that any outperformance over pre-trade estimates belongs to them.

- Pre-trade estimates of implementation shortfall include market-related, or implicit costs that are based on estimates (e.g., bid-ask spread, market impact, opportunity cost), and explicit, "hard" costs that are fixed (e.g., commission rates or flat fees).  While the absolute dollar amount of a commission may fluctuate based on market conditions or changes in the legacy or target portfolios, the commission rate should not change absent an agreement between the transition manager and the client.

- In Mr. Dixon's experience, negotiated fees supersede boilerplate language that appears in transition management agreements.

Please let us know if you have any questions or concerns.

Very truly yours,

| | |
|---|---|
| SANDRA MOSER<br>Acting Chief, Fraud Section<br>Criminal Division | ANDREW E. LELLING<br>United States Attorney |
| By:  /s/ William E. Johnston<br>WILLIAM E. JOHNSTON<br>Trial Attorney | By: /s/ Stephen E. Frank<br>STEPHEN E. FRANK<br>Assistant U.S. Attorney |