UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                              )<br>)<br>ROSS MCLELLAN,                              )<br>            Defendant                          )  | No. 16-CR-10094-LTS |

**DEFENDANT ROSS MCLELLAN'S MOTION TO RECONSIDER ORDER
EXCLUDING DEFENSE EXHIBITS 300, 365, 540 AND 556**

Now comes the Defendant, Ross McLellan, by and through undersigned counsel, and hereby respectfully moves this Honorable Court to reconsider its Order excluding defense exhibits 300, 365, 540, and 556. As grounds and reasons therefor,[1] Mr. McLellan states that all four of these documents constitute verbal acts powerfully demonstrating Mr. McLellan's, as well as his alleged co-conspirators', good faith belief in the legality of their actions. As further grounds and reasons for his request, Mr. McLellan relies on the Memorandum of Law incorporated herein.

**MEMORANDUM OF LAW**

The government has gone to great lengths to characterize Mr. McLellan's professed reliance on contract language as a mere "cover story," or a post hoc justification for a prior fraud.

---

[1] Mr. McLellan notes that he did not have the opportunity to respond to the government's objections to exhibits 300 and 365 because the government did not lodge its objections until after this morning's hearing. Both documents had been included in the updated list of exhibits provided to the government the prior evening, as well as in the list of possible exhibits filed with the Court prior to the start of trial.

1

Trial Tr. (June 5, 2018) at 45; *see also, e.g.*, Trial Tr. (June 8, 2018) at 149 (Pennings testifying, "we were looking to whether the contract could provide us cover or excuse in case that was found out"). Defense exhibit 365 puts the lie to the government's characterization. Contracts were not a "cover story" for Mr. McLellan. Rather, they were at the heart of how he did business.

The government alleges a conspiracy spanning from February 2010 through September 2011. *See* Dkt. 282 at ¶ 9. This purported scheme is said to have been "open-ended in nature" and involved the charging of hidden commissions wherever "the opportunity presented itself." Dkt. 354 at 2 (citation omitted). If this allegation were true, one would think that, in June 2010, four months after the illicit plot was hatched, Mr. McLellan would not be expressly instructing traders to disclose fixed income commissions. But that is precisely what he did. Once the issue of possible non-disclosure was escalated to his attention, Mr. McLellan responded, "it is contract related so it needs to be tightly coordinated. [M]ake sure [the trader] gives them the comms for this deal as it is explicitly stated in the agreement as [I] pulled it today." It would be difficult to imagine more powerful evidence of Mr. McLellan's good faith reliance on contract language. If, as the government has contended not only to the Court but also to the jury, Mr. McLellan was using contracts as mere "cover" for charging undisclosed commissions, why would he cite contract language in directing that commissions be disclosed?

Moreover, Mr. McLellan's instruction to disclose is a verbal act beyond the scope of the hearsay rule. *See* Dkt. 386 at 3 ("[O]ut of court statements in the nature of 'instructions' or 'directions' are 'not statements of fact at all' and therefore not hearsay." (citing *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999); *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir.

2017); *United States v. Gibson*, 675 F.2d 825, 834 (6th Cir. 1982)). While the latter part of Mr. McLellan's statement arguably contains an assertion that the contract required disclosure, Mr. McLellan is not offering the document to establish this fact. Indeed, the actual content of the contract is beside the point. What matters is Mr. McLellan's directing disclosure based on contract language. The probative value of the evidence would be the same even assuming Mr. McLellan's interpretation of the contract was completely wrong. The substantial probative force of this document is not substantially outweighed by the danger of unfair prejudice or any of the other countervailing considerations set out in Rule 403. While the email is, no doubt, prejudicial to the government's case, this is only because it directly discredits the government's leading response to Mr. McLellan's good-faith defense.

      Defense exhibit 300 is admissible for similar reasons.[2] Pennings, Mr. McLellan's alleged co-conspirator, testified regarding his participation in an April 2011 conference call with attorneys to discuss amendments to the template transition management agreement ("TMA") utilized by State Street. Pennings admitted to openly asking on the call that the lawyers delete a portion of the template "specifically mention[ing] that we had to disclose the markups." Trial Tr. (June 11, 2018) at 117. Exhibit 300 not only corroborates Pennings' testimony on this point, but also conclusively demonstrates that the attorneys acted on his suggestion and deleted the language in question. Section 7.2 of the redlined document indicates that the following language was stricken from a provision relating to fixed income trading: "The amount of . . . commission

---

[2] The exhibit, in its current form, includes a cover email between State Street lawyers, an attached template transition management agreement, and a redline reflecting recent changes made. While Mr. McLellan included the cover email in his exhibit list for context, he would have no objection to introducing only the two attachments into evidence at trial.

3

or compensation permitted to be received by . . . Associates in any such transaction shall be specifically identified in the Transition Notice." The fact that State Street legal personnel, at Pennings' direction, removed this express disclosure requirement from the template document used as the basis for all State Street's TMAs strongly supports Pennings' good faith belief in the legality of his actions. As Mr. McLellan has argued elsewhere, Pennings' "state of mind is independently relevant to the conspiracy charge against Mr. McLellan." Dkt. 386 at 13 (citing *United States v. Moran*, 493 F.3d 1002, 1013 (9th Cir. 2007); *United States v. Harris*, 733 F.2d, 1005 (2d Cir. 1984)). Indeed, the Court has consistently admitted evidence in this case based on its relevance to Mr. Pennings' state of mind, sometimes at the government's request.

Nor does the template TMA fall within the general rule against hearsay. The document is not communicating a fact – it is a fact. Mr. McLellan does not seek to offer the document for the truth of any assertion made therein, but rather merely to show that the document was edited to remove the relevant sentence. This probative value does not, in any way, depend on the veracity of any out-of-court assertion. Alternatively, the template document is admissible as a record maintained in the regular course of business. Fed. R. Evid. 803(6). Indeed, in this respect, the template TMA is no different than the countless other contracts, pre-trades, RFPs, and other regularly generated business documents that are already in evidence. Exhibit 300 is also admissible under the so-called "residual exception" to the rule against hearsay in light of the corroboration provided by Pennings' testimony.

During its case-in-chief, the government emphasized Mr. McLellan's allegedly instructing a trader to delete commission information from a file that would be sent to State Street employee Samina Vernon in connection with the Royal Mail transition. In direct response

to this evidence,[3] Mr. McLellan seeks to introduce an email sent less than two weeks after the relevant conversation took place reflecting well over $3 million in revenues from the Royal Mail transition. This email was sent to a group of five people, including Samina Vernon, the very individual from whom the government contends the commissions were concealed, and Rick Boomgaardt, one of Mr. McLellan's alleged co-conspirators. The mere fact of this communication is, in itself, evidence that revenues generated by the allegedly "hidden commissions" were openly reported within State Street, and this fact is, in turn, supportive of Mr. McLellan's good-faith defense. This probative value is only enhanced by the government's specific emphasis on purported concealment from Ms. Vernon. The document's relevance does not depend at all on the truth of any assertion contained therein. Other evidence in the record establishes that the revenue figures provided are at least roughly accurate, but this document is not offered to prove the actual revenue figures, but instead for the fact that revenue figures that exceeded 227,000 GBP were in fact disclosed to Ms. Vernon.

Finally, Mr. McLellan asks the Court to reconsider its ruling on the admissibility of document 556. As an initial matter, the government does not appear to dispute the relevance of this document. And for good reason. A State Street employee who worked under Mr. McLellan texted him in June 2011 that the client, AXA, was "looking for a commission $ figure" for the transition conducted that spring. Mr. McLellan responded simply, "1 bps." Mr. McLellan expects to establish through other evidence already in the record that the commissions actually

---

[3] Unlike exhibits 300 and 365, Mr. McLellan did not disclose this document to the government prior to trial. This is because Mr. McLellan did not "intend" to use the email, within the meaning of Rule 16, until the government presented its case-in-chief, including its particular focus on the alleged concealment from Samina Vernon.

5

applied by State Street were approximately equal to one basis point of asset value, or "1 bps," but this text is not offered to prove that the AXA commission was actually one basis point. Instead, the text is offered to demonstrate Mr. McLellan's state of mind—to wit, that when asked to disclose the AXA commission, he provided a response of 1 basis point (a value that far exceeds the .1 bpy cited within the AXA pre-trade). It is a verbal act that reflects his state of mind. The mere fact that Mr. McLellan, upon being informed of the client's inquiry, did not respond .1 bpy (the figure contained in the pre-trade), but instead offered a significantly higher dollar figure is powerful evidence of his good faith.[4] Stated simply, the probative value of the document is not related to the truth of any assertions therein as Mr. McLellan does not seek to use the message to establish the amount that State Street actually charged AXA. Instead, Mr. McLellan will utilize other evidence in the record (which he is properly entitled to do) to establish that the response was ultimately accurate.

In ordering that this document be excluded, the court also cited the fact that it was not disclosed pre-trial, as well as potential issues as to authenticity. First, Mr. McLellan was only obligated to disclose pre-trial documents he intended to use in his case-in-chief. For the reasons that counsel explained at sidebar, the decision to use this particular exhibit was not made until the day of its disclosure, and it was promptly disclosed at that time. Moreover, to the extent the Court has concerns regarding the timeliness of the disclosure, Mr. McLellan submits that they can be adequately addressed through measures less severe than outright exclusion. Mr. McLellan is also prepared to call as a witness an experienced professional who will authenticate

---

[4] Mr. McLellan's response stands in sharp contrast to that of Pennings, his alleged co-conspirator, who, when faced with a similar after-the-fact client inquiry, decided to lie (without consulting or otherwise involving Mr. McLellan in any way).

the text as Mr. McLellan's. The government, of course, will be free to cross-examine that witness, and, after considering the testimony, the Court will be able to decide whether a sufficient foundation has been laid for admission.

For the foregoing reasons, Mr. McLellan respectfully requests that this Honorable Court reconsider its prior Order and allow Mr. McLellan to introduce into evidence exhibits 300, 365, 540, and 556.

Respectfully submitted,

Ross McLellan
By his Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: June 20, 2018

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, June 20, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg