1          UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
2

3   - - - - - - - - - - - - - - - - - - x

4   UNITED STATES OF AMERICA,              :

5          Plaintiff,                      :    Criminal Action No.
                                                1:16-cr-10094-LTS
6        v.                                :

7   ROSS MCLELLAN,                         :

8          Defendant.                      :

9   - - - - - - - - - - - - - - - - - - x

10

11      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                        JURY TRIAL
13                       Day 10

14

15

                   Monday, June 18, 2018
16                      8:25 a.m.

17

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom No. 13
22   One Courthouse Way
     Boston, Massachusetts

23

     Rachel M. Lopez, RPR, CRR
24   Official Court Reporter
     raeufp@gmail.com

25

1                        **A P P E A R A N C E S**

2     On behalf of the Plaintiff:

3          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:  STEPHEN E. FRANK
4          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
5          Boston, Massachusetts  02210
           (617) 748-3244
6          stephen.frank@usdoj.gov

7
           UNITED STATES DEPARTMENT OF JUSTICE
8          BY:  WILLIAM JOHNSTON
           1400 New York Avenue, Northwest
9          Washington, D.C.  20005
           (202) 514-0687
10         william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
           BY:  MARTIN G. WEINBERG
14         20 Park Plaza
           Suite 1000
15         Boston, Massachusetts  02116
           (617) 227-3700
16         owlmcb@att.net

17
           LAW OFFICES OF ROBERT M. GOLDSTEIN
18         BY:  ROBERT M. GOLDSTEIN
           20 Park Plaza
19         Suite 1000
           Boston, Massachusetts  02116
20         (617) 742-9015
           rmg@goldstein-lawfirm.com
21

22         LAW OFFICES OF MAKSIM NEMTSEV
           BY:  MAKSIM NEMTSEV
23         20 Park Plaza
           Suite 1000
24         Boston, Massachusetts  02116
           (347) 251-4800
25         mentsev@gmail.com

**TABLE OF CONTENTS**


**TRIAL WITNESSES**


On behalf of the Plaintiff:                                    Page

SPECIAL AGENT GARETT TROMBLY

     By Mr. Frank                                         34

     By Mr. Weinberg                                      56

SCOTT K. SHAW

     By Mr. Johnston                                      62

     By Mr. Goldstein                                     72

     By Mr. Johnston                                      78

SPECIAL AGENT MICHAEL MCGILLICUDDY

     By Mr. Frank                                         81

     By Mr. Goldstein                                     87

     By Mr. Frank                                        106

     By Mr. Goldstein                                    111



**EXHIBITS**

                                                           Admitted

Number 98, 99, 111, 112, 159, 176, 181, 189,                 36

190, 209, and 211

Number 99.1 and 99.2                                         43

Number 213

<strong>P R O C E E D I N G S</strong>

1
2       (In open court.)
3       THE DEPUTY CLERK:  The United States District Court
4  for the District of Massachusetts is now in session, the
5  Honorable Leo T. Sorokin presiding.
6       Today is June 18th, the case of United States vs.
7  McLellan, criminal action 16-10094 will now appear before
8  this court.
9       THE COURT:  Good morning.  I apologize for being
10  late.  I actually have been here for a long time and I got
11  detained on another matter, so I apologize for that.  I hate
12  to make you come in so early and then make you wait.
13       So do we have anything to -- I see -- just for the
14  record, all counsel and McLellan.
15       Are there any issues to resolve?
16       MR. FRANK:  I think we just needed a little bit of
17  clarification, which Mr. Johnston can address, on the issue
18  for Mr. Shaw's testimony, on Your Honor's ruling from last
19  night.
20       THE COURT:  Who's -- just so I know.
21       MR. FRANK:  He's the witness who will be testifying
22  about --
23       THE COURT:  Is this State Street?
24       MR. FRANK:  Correct.
25       THE COURT:  Okay.  Sure.

```
1              MR. FRANK:  And then we have an issue with
2    respect -- two other issues that are not for today, but that
3    we wanted to raise.
4              THE COURT:  Okay.
5              Go ahead, Mr. Johnston.
6              MR. JOHNSTON:  So my understanding, from the
7    Court's order, is that we aren't allowed to discuss any type
8    of civil liability that State Street may face as a result of
9    the AXA overcharges?  Does that include if State Street would
10   have to -- could be sued by AXA for having overcharged them
11   and --
12             THE COURT:  So here's what I was thinking, maybe
13   just to clarify a little more and -- was this:  I was --
14   there may be more categories than this, but here's what I was
15   envisioning.  It might be the categories of money.  I imagine
16   State Street has or will spend money on lawyers to
17   investigate accountants or other types of people to do
18   investigations, responses.  That they might be paying AXA
19   money for the same purposes.  They might be reimbursing AXA
20   for its own legal fees, even if AXA paid some money on its
21   own.
22             They might be refunding or rebating, or however you
23   want to characterize it, they might be giving back the eight
24   or 900,000, whatever it was.  They might also face potential
25   legal liability for a lawsuit from AXA or from the SEC, or
```

1    from the US Attorney's Office, or the Department of Justice.

2    So it -- what I was thinking is that you could ask -- you

3    could elicit from them what they have spent, in any of those

4    categories, and what they anticipate spending, but the

5    labeling -- the concern I have is the labeling.

6              So in other words, suppose they had spent a million

7    dollars on lawyers and accountants in whatever category.  You

8    could elicit that and you could elicit that it was from

9    lawyers.  And suppose they're -- this is my -- I have no idea

10   of this, I'm just imagining.  That suppose they're

11   negotiating with the SEC or with the criminal prosecutors or

12   with -- for a settlement and they're somewhere between zero

13   and 20 million in the negotiations.  Right?  They could -- I

14   think it's permissible to say that they have further expenses

15   to incur and they anticipate those expenses could reach as

16   much as 20 million, but without specifying what it is, that's

17   what I was thinking; that they don't get to say that it's --

18   these are related to it, without further elaboration.

19             Because the concern that I have is the same

20   Government liability implies sort of a determination of

21   guilt.

22             MR. JOHNSTON:  So if the term "government

23   liability" wasn't used, but let's say the question is --

24             THE COURT:  What do you want to elicit?

25             MR. JOHNSTON:  So something like asking, are there

1    any -- is there any outstanding liability with respect to

2    AXA, or any ongoing negotiation with respect to AXA.

3             THE COURT:  So to me, the real relevant thing is

4    what have they paid and what might they pay.  And not what is

5    it for, other than, obviously, the -- implicit in any

6    question is that it relates to the AXA thing, as opposed to

7    paying money to build a new building.  So why does it matter

8    what kind of payment it is?

9             MR. JOHNSTON:  It doesn't really matter, Your

10   Honor, just for the jury to be able to understand why this

11   money is being paid.  It just -- because out of the kindness

12   of their hearts, or is it because they feel like they're

13   obligated to do it, which is what goes to more than -- this

14   isn't a discretionary payment, but it's a loss that they

15   are --

16            MR. FRANK:  It's a liability.

17            MR. JOHNSTON:  Because it's a liability that when

18   they -- when an employee of theirs overcharges a client, that

19   gives the client certain recourse.

20            THE COURT:  Sure.

21            MR. JOHNSTON:  That then can cost them money.  So

22   it's not just, yeah, we feel bad, here you go.  It's here's a

23   payment, because we're going to need -- we don't want to drag

24   this out in an expensive lawsuit, where we could have jury

25   damages.

1          THE COURT:  Well, how much are you going to -- if

2     he asks the question, how much has the AXA matter cost you

3     money?  Yes.  How much?  $2 million.  What, if any, further

4     expenses -- how much of any further amounts do you reasonably

5     anticipate that you might incur?  1 to 5 million.

6          How much are you going to challenge the amount or

7     the connection?

8          MR. WEINBERG:  What I respectfully challenge is the

9     subject matter, Your Honor.  First of all, to go back a step,

10    we have made motions to sever this count.  We see almost no

11    overlap now that the evidence about AXA is virtually

12    complete.  I consider this to be extremely prejudicial.  I

13    see it to be extremely unnecessary.  I see the ineluctable

14    message to the jury that State Street bank, in quotes,

15    believes, (a), there was an overcharge, (b), we're going to

16    compensate it, (c), it's worth millions, all of which is

17    essentially telling this jury, from some man named Shaw, who

18    had no firsthand involvement, that was not a participant in

19    2011, that the global bank, in quotes, aligns itself with the

20    Government's view that this was a fraud that's worth millions

21    of dollars.

22         The element that this is directly related to is

23    such a narrow element.  It says, "Does the bank have

24    potential risk?"  We're not going to contest the bank has

25    potential risk, when there's an employee issues that result

1    in disagreements between clients and banks.  Potential risk.

2    It doesn't have to be quantified, it doesn't have to be

3    monetized, it doesn't have to be particularized.  All they've

4    got to do is ask this man, you've been around, you're a

5    controller, when there are issues and when clients complain

6    about charges, what is the bank's potential risk?  Our

7    potential risk is we have to -- we pay money back to maintain

8    good relationships.  We pay money to investigate.  We pay

9    money to do accountants.  That's the end of the element.

10           I can represent to this Court that I do intend, in

11   final argument, to dispute that the bank has potential risks.

12   But I believe Your Honor has given them a license to backdoor

13   this AXA case, which is otherwise a very, very weak

14   allegation, to backdoor it through Shaw's testimony, into

15   something far more than it is.  And I understand they're

16   paying money, it's not necessarily because of Mr. McLellan's

17   conduct, but that's the message that the jury is going to

18   get.  He's here, Shaw's there, and they're go to basically

19   say we've investigated this, we've spend hundreds of

20   thousands or dollars for accountants and lawyers.  We've

21   concluded that there's an overcharge.  That, by itself, is

22   prejudicial.

23           That, by itself, says State Street thinks the

24   pre-trade is a commitment, where our view is, in the absence

25   of a contract, it is what is fair and reasonable from the

1    SSGA lawyers, but they're going to weigh in on the

2    Government's version of the facts.  They're going to

3    reinforce it and then they're going to put a dollar figure on

4    it and make it seem like there's some massive monetary fraud

5    here, when all they need to do is say banks have potential

6    risks when clients have a complaint about charges, we

7    investigate, we pay money to investigators, we pay money to

8    lawyers, we look hard at it.  And maybe we pay money to

9    clients.  I will not be contest that, I will not be

10   contending that that does not satisfy that element of proof.

11          MR. JOHNSTON:  The amounts here, Your Honor, are

12   not prejudicial, in light of the overall evidence.

13          THE COURT:  How much are the amounts?

14          MR. JOHNSTON:  So 300,000 in legal fees.  And the

15   only real -- I mean, they -- amount that could exceed just

16   the overcharge, would be basically interest on the 800,000

17   over --

18          THE COURT:  So all you're planning to elicit is

19   what Mr. Weinberg described, plus -- and in this case, what

20   did you spend?  About 300,000 in legal fees and plus the

21   amount of the -- we paid back and then plus --

22          MR. JOHNSTON:  Well, as of last week, they hadn't

23   paid back the money yet.  These are ongoing negotiations.

24   But our understanding is one of the negotiation figures is

25   around like whether AXA will get its legal fees and also

1  whether AXA -- or the amount of interest on the 800,000 from

2  2011 to present.  So that's --

3          THE COURT:  Given his concession, then what's wrong

4  with what he says?  I'm going to hold him to that

5  representation.

6          MR. JOHNSTON:  Right.  Okay -- we can -- I think

7  that we do need to be able to elicit that -- when an employee

8  commits this type of conduct, it's not just, oh, this is like

9  an inconvenience that we have.  It's like a big deal.  And

10  maybe we don't need to get into like the specifics about this

11  particular deal, like we expect to pay $15 million and we

12  don't actually --

13          THE COURT:  Well, I can understand why it's --

14          MR. FRANK:  If I can just briefly address Your

15  Honor's question.

16          THE COURT:  Yeah.

17          MR. FRANK:  We have to prove that State Street was

18  affected.  It's affected by the increased likelihood of loss.

19  Counsel has had the opportunity, we've been begging counsel

20  to stipulate, so we don't have to call this witness, that

21  there's an increased likelihood of loss.  The -- what we've

22  gotten back is, what Your Honor heard today, which is we

23  won't contest it, but not contesting it doesn't relieve us of

24  our burden.  We still have to prove it affirmatively.

25          If he stipulates, we're relieved of the burden.  If

1     he doesn't stipulate, we have to prove it.  And proving it in

2     the abstract we may have expenses is not really proving it.

3     We're entitled to show they've actually incurred expenses and

4     they actually expect to incur expenses and the magnitude is

5     approximately in the low 1 to $2 million range.  And given

6     the numbers we've been talking about in this case, to suggest

7     that there's some undue prejudice from the low million dollar

8     range, you know, I just don't think withstands back and

9     forth.

10         MR. WEINBERG:  Well, here's the prejudice.  The

11     prejudice is that if the witness says that we are going to

12     pay or intending to pay or negotiating to pay the overcharge,

13     plus interest, essentially he's weighing in on the fact that

14     there was an overcharge, which the defendant doesn't concede

15     has been proven at all and it doesn't concede it's been

16     proven to be attributable to McLellan.  The element here is

17     satisfied by the generic risk of having to pay.  They're

18     already established that they've paid through lawyer fees and

19     investigation fees, or accounting fees.  They can say that we

20     have not resolved the matter with AXA, that clearly State

21     Street has the potential to be paying a client to respond to

22     a client's complaint.

23         MR. JOHNSTON:  The defense's jury instruction on

24     this element, I believe, includes the term "substantial

25     likelihood," whereas the Government's term was a new or

1   increased risk of loss.  I can't recall if they actually, if

2   your suggestion instruction had "actual loss," but I do

3   believe the term is "substantial likelihood" and --

4           THE COURT:  Whatever their instruction is, which I

5   don't recall at the moment, I don't think the -- that I'm

6   going to tell the jury that there has to have been an actual

7   loss.  It seems to me that it doesn't have -- that the bank

8   does not have to have suffered an actual loss in order to

9   satisfy this.

10          MR. FRANK:  But the fact is it has suffered an

11  actual loss.  And you know, again, we're happy to stipulate

12  to this point.  But if we're not going to be allowed to -- if

13  we're going to be in agreement to stipulate to it, then we

14  think we should be entitled to show that they have actually

15  spent some money on this.

16          MR. WEINBERG:  I don't mind the spending the money

17  to investigate, what I mind is the judgments of the

18  investigation that we are going to pay, likely to pay.  What

19  they can say is that the client has made -- that we were

20  addressing a client request --

21          THE COURT:  They might pay.

22          MR. WEINBERG:  And we may pay and it may be the

23  amount the client is requesting, plus interest.

24          MR. FRANK:  That's essentially what we're

25  eliciting.  What we're eliciting is that we're in

1    negotiations with the client, the negotiations are nearing a

2    conclusion, and we expect to pay them back 800,000, plus some

3    amount above that.

4         MR. WEINBERG:  That's the statement that sends the

5    message that we believe there was an overcharge of 800,000,

6    and we're going to pay it.

7         MR. FRANK:  Your Honor, all evidence is --

8         MR. WEINBERG:  Which is more than the element

9    requires and I'm -- I am representing to the Court, I'm not

10   going to contest the sufficiency in argument.

11        MR. FRANK:  Actually, it's not what the element

12   requires.  Mr. Weinberg is making the argument that they're

13   doing this as a business decision, not because they face any

14   increased liability.  So we need to prove that they're paying

15   the money back because of the increased liability.

16        MR. WEINBERG:  I don't -- I do not believe that the

17   element requires proof they're going to repay it.  What it

18   requires is proof that they were at risk as a result of an

19   allegation of overcharging them.  What the witness should not

20   be able to do is to suggest that State Street believes

21   there's an overcharge, believes that Mr. McLellan is involved

22   and expects imminently to be repaying the exact amount of the

23   overcharge, plus interest.  Because that's akin to State

24   Street weighing in, in favor of the Department of Justice

25   position, on an element that nowhere near requires that level

1    of particularity.

2              In fact, I think it's satisfied by a general

3    statement by this man saying, in other matters, any time

4    there's a client complaint, we investigate.  That causes --

5    that costs money.  In this case, we have investigated.  It's

6    cost $300,000.  What other potential monetary issues could

7    State Street have?  Well, sometimes if we intended to settle,

8    we would have a monetary interest in settlement.  Period.

9              MR. FRANK:  Mr. Weinberg is trying to make this a

10   business decision and it's not.  They're paying AXA back

11   because of an increased liability and all the witness is

12   going to testify is not, you know, in detail on the

13   negotiations, but there have been negotiations and that

14   they're intending to pay them back.

15             MR. GOLDSTEIN:  And it's the intention that goes

16   beyond what the statute requires and sends the impermissible

17   message that State Street has concluded that there was an

18   overcharge and there was wrongdoing.

19             MR. FRANK:  State Street has concluded that it

20   faces an increased liability and rather than test that

21   liability in Court, they're paying the client back, because

22   they know they're going to lose.

23             MR. WEINBERG:  Because they know they're going to

24   lose is the same as saying we have concluded we were wrong.

25             MR. FRANK:  Well, he's not going to say we know

```
 1    we're going to lose.  He's going to say we have a liability,
 2    we're paying them back.
 3              MR. WEINBERG:  That's more prejudicial.  That's
 4    someone who has no personal knowledge having listened to
 5    State Street lawyers concluding this liability, which is
 6    consistent with the Government's case and inconsistent with
 7    the defendant's.
 8              MR. JOHNSTON:  And a stipulation would remove any
 9    prejudice from your client.
10              MR. WEINBERG:  What's the stipulation you're
11    seeking?
12              MR. FRANK:  That State Street was affected by
13    purposes of the statute.
14              MR. JOHNSTON:  Or AXA was affected and that was it.
15    It's one or the other we don't need --
16              MR. WEINBERG:  You certainly can't say AXA was
17    affected, because I don't concede there was an overcharge.
18    What I concede is that banks have potential liability and
19    real expenses when clients make complaints, and AXA has made
20    a complaint.
21              MR. FRANK:  And stipulate that State Street was
22    affected.
23              MR. WEINBERG:  I stipulate State Street has paid
24    legal expenses to investigate.
25              MR. FRANK:  Stipulate to the element, or we get to
```

1    prove it.

2            MR. WEINBERG:  Judge, I don't think they can prove

3    it the way they want to prove it.  I think it's terribly

4    prejudicial and completely unnecessary.

5            THE COURT:  Okay.  I understand the dispute to

6    be -- that there to be no objection to eliciting that State

7    Street has spent money on lawyers and accountant-type people,

8    in investigating the AXA matter, and the dispute I understand

9    is whether and -- and they can say anything about what they

10   might pay, with respect to sort of settlement of claims from

11   AXA.  And to the extent they can say how much it is, the

12   reason that they're paying for it.  And that's a fair

13   characterization of where you both are?

14           MR. WEINBERG:  Yes.

15           MR. JOHNSTON:  Yes.

16           THE COURT:  Okay.  All right.  I just want to look

17   at the instruction.

18           David.

19           (The Court and the law clerk confer.)

20           THE COURT:  You guys certainly do raise complicated

21   fine evidentiary lines.  So okay.  I'm going to permit the

22   Government to elicit the amount of -- that they reasonably

23   anticipate further paying the AXA element to AXA, whatever

24   that is.  That seems to me within -- that seems to me a

25   balance, in all the considerations that I can think about.

1    That seems reasonable.  But I do share -- I am concerned

2    about having sort of the thumb of State Street having done a

3    big like -- "we had to pay it" is concerning and -- because

4    it raises the question of their own independent -- it's sort

5    of like their opinion that this was wrong, which is

6    different.  That isn't necessarily necessary for loss.  I

7    mean, it's not necessary for loss, I don't think.

8              So I think that the closer you hue to the line

9    of -- on the other hand, I think it's unfair to not allow

10   them -- to allow the Government -- it's unfair not, in the

11   balance of all the evidentiary considerations here, to not

12   allow the Government to put in the amount of the -- that they

13   might pay in settlement and that there might be something

14   there, given what the potential different inferences are, in

15   relationship between the different issues.

16             So but the more -- I think you should stay away

17   from we have to pay it.  Like this is what we reasonably

18   anticipate paying AXA, something in this range.  Or we

19   reasonably anticipate paying AXA money and it could be as

20   much as X, 1.2, or whatever it is.  And it's in process.  We

21   think we're going to pay them something, but we haven't yet.

22             MR. FRANK:  So we understand that, Your Honor, and

23   that's perfectly acceptable to us.  I would just ask that if

24   the defense, then, goes on cross-examination into, well, this

25   is a business decision and you might be paying this back

1    simply as a business decision, we think then they will have

2    opened the door to the fact that State Street views this as a

3    liability.

4              THE COURT:  Are you likely to do that?

5              MR. WEINBERG:  No, I'm not likely to do it.

6    However, I do think it puts us in an impossible situation of

7    the Government putting in we've investigated this, we've paid

8    300 grand to investigate and now we are anticipating paying

9    back the exact amount of overcharge plus interest.

10             THE COURT:  I'm open to telling the jury, as a

11   limiting instruction, subject to what you'll tell me, that to

12   the extent they've -- that something along the lines of that

13   this is -- something addressing the notion that whatever

14   State Street's view of it is not, like, relevant evidence as

15   to whether there was, in fact, an overcharge or a crime or a

16   fraud or anything like that -- to separate that out, I don't

17   know if you want that or not.  I understand there's this fine

18   line between the different issues.  So I'm not going to do

19   that unless you want it, but I'm open to it if you want it.

20             MR. WEINBERG:  I think what I'm open to is

21   discussing with the Government whether or not -- preserving

22   my objection, because I don't want to stipulate and haven't

23   stipulated, but I do think this is terribly prejudicial, the

24   combination of we've investigated through lawyers and money

25   and now we're about to or anticipate paying the exact amount

1    the Government alleges as an overcharge, plus interest, is --

2    there's no other inference a reasonable jury would draw,

3    except State Street has investigated on its own and concluded

4    the Government's right and the defendant is wrong and there

5    was an overcharge.  And we're going to go pay over a million

6    dollars to try to make it right.

7         It's akin to a plea of guilty, which *Crawford* says

8    is not supposed to be admitted against the defendant.  This

9    is akin to a plea of guilty.  Yes, it doesn't have the

10   criminal intent and it doesn't have the criminal label, but

11   to a jury, it's the thumb of State Street, again, is on the

12   side of the Government.  It's sending a message that we

13   believe the Government is right, AXA was wronged.  AXA was

14   right, there was an overcharge.  We've investigated it, it

15   cost us 300 grand, now we're going to go pay them the 800

16   plus.

17        So I object to it, but I do want to try to reduce

18   the prejudice by seeing whether or not there's a stipulation

19   that the State Street witness would testify more generically,

20   that State Street, when there's a complaint by a client such

21   as AXA, pays money to lawyers and accountants to investigate

22   and potentially pays money to a client that believes they

23   were overcharged.  That to me satisfies their element.  I

24   combine it with my commitment not to dispute it on final

25   argument.  I think that reduces the prejudice.  I wish I

1    didn't have to stipulate, but I think I need to in light of

2    the Court's evidentiary rulings.

3              THE COURT:  Okay.

4              MR. WEINBERG:  So could we have five minutes to see

5    if we can work something out?

6              THE COURT:  Absolutely.

7              MR. FRANK:  I can tell you right now, that

8    stipulation as outlined doesn't satisfy our view of our

9    burden, especially in light of the arguments Counsel has

10   already made to the jury.

11             THE COURT:  He wants to talk to you.

12             MR. FRANK:  I'm happy to do that, but just so the

13   Court is aware, counsel has already made arguments to the

14   jury that -- about business decisions and paying people back

15   as a business decision and he's making that argument with

16   respect to his own client's decision to reimburse Royal Mail

17   a million dollars.  And that was a business decision and this

18   simply reinforces the defense argument --

19             THE COURT:  Pause.  The two of you, I'm perfectly

20   content to give you a few minutes to talk to each other.

21             You had two other matters, do they relate to today?

22             MR. FRANK:  They relate to tomorrow's testimony.

23             THE COURT:  All right.  So we can talk about them

24   after.  We still anticipate, even if you do everything you

25   think you're going to do, that we finish before 1 o'clock

1     today?

2               MR. FRANK:  Very much before 1 o'clock.

3               THE COURT:  Okay.

4               MR. GOLDSTEIN:  Your Honor, I should at least raise

5     the fact that I do believe I have a good faith on the

6     ConvergEx issue.  I do believe I have a good faith to inquire

7     of the witness in terms of the model that ConvergEx have been

8     employing and that that was a subject matter of discussion

9     during the interview.

10              MR. FRANK:  I can represent to the Court, the

11    witness will testify that did not come up in the interview.

12              THE COURT:  He can ask him.  The witness can say it

13    didn't.

14              Okay.  Five minutes or so?  I'll just wait here.

15              (Counsel confers.)

16              MR. GOLDSTEIN:  Mr. Weinberg is reminding me in

17    terms of -- not to limit my -- I have the ability to inquire

18    into ConvergEx not simply because of the discussion that

19    happened during the interview, but because the Government is

20    relying on the ConvergEx model as a -- in a broader fashion,

21    in terms of the evidence it has admitted through the

22    spreadsheet.  And so having introduced the subject matter of

23    ConvergEx into this trial -- and this is actually a point of

24    contention, Your Honor.

25              I mean, the Government wants it both ways.  The

1    Government wants the jury to conclude there was something

2    wrong with ConvergEx, therefore, there was something wrong

3    with State Street's model.  The fact of the matter is,

4    they're not apples to apples.  ConvergEx was different.  So

5    any observations by State Street personnel about the

6    ConvergEx model is not therefore a commentary on what State

7    Street was doing.  ConvergEx was much different than State

8    Street.  So the Government is giving the jury a misleading

9    picture, in terms of --

10              THE COURT:  So what do you want to do with the

11   witness that might implicate that?

12              MR. GOLDSTEIN:  Well, I think I should be able to

13   elicit from the witness what ConvergEx was.  That ConvergEx

14   is not the State Street model.  ConvergEx was US-based trades

15   that --

16              THE COURT:  So that would be discussion that would

17   be separate -- that would be evidence separate from what they

18   discussed?

19              MR. GOLDSTEIN:  Yes.

20              THE COURT:  Okay.

21              MR. GOLDSTEIN:  Well, if he denies discussing it, I

22   have certain questions I'll ask him about the discussion.  If

23   he denies it, I then think I should be able to elicit from

24   the witness what happened in ConvergEx and distinguish what

25   happened in ConvergEx from the allegations in this case.

 1            THE COURT:  That would -- so I guess, there's a

 2      couple of questions about that.  One is, relevance.  You

 3      object from a relevance perspective?

 4            MR. FRANK:  Absolutely.

 5            THE COURT:  Okay.  Why?

 6            MR. FRANK:  Because the relevance issue is the

 7      witness's state of mind.  We have carefully limited our

 8      questioning on the ConvergEx issue to the -- to the

 9      conspirator's state of mind and that's all we're eliciting.

10      In fact, what we're elicited today from the agent has nothing

11      to do with ConvergEx at all.

12            THE COURT:  No, I understand that's a scope or

13      what-have-you questions --

14            MR. FRANK:  Right.  But all we've elicited is their

15      state of mind about what they thought was going on at

16      ConvergEx.  That's all that ConvergEx is relevant for, that

17      they believed it was applying hidden spreads, the mechanism

18      is not relevant.  They didn't know the mechanism.  The

19      witness will testify that they didn't discuss any mechanism.

20            MR. GOLDSTEIN:  Well, there is no testimony

21      regarding Mr. McLellan's state of mind regarding ConvergEx.

22            THE COURT:  No, but the evidence with respect to

23      ConvergEx is whatever is in those e-mails and spreadsheet and

24      discussion between him and Pennings that came in, which is

25      relevant to his -- in other words, whatever that says about

1     whatever he thought about it.

2          MR. GOLDSTEIN:  The fact that they're discussing

3     ConvergEx, Your Honor, means that they have an idea, in terms

4     of what's happening from ConvergEx.  So evidence of what was

5     really happening with ConvergEx is a link and a chain to show

6     the defendant knew what was going on with ConvergEx.

7          THE COURT:  But you don't know what else -- there's

8     no basis right now to know that he knew anything.  He may

9     have known a lot about ConvergEx, but there's nothing in the

10    record to show that he would know anything about ConvergEx

11    other than what's in that e-mail and whatever was discussed

12    today.

13         MR. FRANK:  And, in fact, he affirmatively denied

14    in the interview that he knew anything about how ConvergEx

15    was applying spreads.

16         MR. GOLDSTEIN:  That's not my understanding of the

17    interview.  I'm entitled to ask --

18         MR. FRANK:  He's entitled to ask him whether --

19    what he said and what was discussed.  The issue is he's not

20    entitled to delve beyond the scope of what was discussed in

21    the interview.

22         MR. GOLDSTEIN:  And that's Mr. Frank's opinion, but

23    when they want to inject the subject of ConvergEx and they

24    want to --

25         THE COURT:  I'll tell you what, when you -- since

```
1    some of this is foundation, if you want to go beyond what
2    he's -- the discussion, into just generally ConvergEx, okay,
3    come to -- we'll have a sidebar and then we'll talk about it
4    and then I'll have a better understanding of where we are,
5    because I'll have heard the witness and --
6                MR. GOLDSTEIN:  Very well.
7                THE COURT:  All right.  You want a couple of
8    minutes to talk to each other?
9                MR. WEINBERG:  Yes, Your Honor.
10               THE COURT:  How long do you want?
11               MR. WEINBERG:  I think we'll know within three or
12   four minutes whether there's the basis for a stipulation.
13               THE COURT:  Do you want me to leave the courtroom?
14               MR. WEINBERG:  No.  I can march over to the
15   Government table and see what they --
16               MR. FRANK:  We'll meet him halfway in the
17   militarized zone.
18               MR. WEINBERG:  -- negotiate.
19               (Court in recess at 9:01 a.m.
20               and reconvened at 9:06 a.m.)
21               MR. WEINBERG:  Here's where we're at.  So I
22   understand courts don't get involved in stipulations, but
23   respectfully, the Court's evidentiary decisions have led to
24   the discussions and we're very close.
25               THE COURT:  Yes.
```

1              MR. WEINBERG:  I am prepared to stipulate, in the

2      language of the statute, that a State Street witness would

3      testify that, as a result of the alleged conduct in Count 6,

4      State Street, a financial institution, has been affected.

5      That, in essence -- and I also will not dispute -- somehow

6      I'm not going to argue or stipulate to that it's a lie and I

7      don't believe it.

8              It's stipulating that there would be testimony

9      that's undisputed.  It's the way I believe stipulations

10     should come in, because Mr. McLellan could stipulate and know

11     that a witness would say it.  But he doesn't stipulate and

12     know that State Street, in fact, was affected.  And that's

13     the way I think stipulations should be drafted from a

14     perspective of being consistent with the defendant's

15     agreement.

16             The Government wants a stipulation that the

17     defendant agrees that State Street, a financial

18     institution --

19             THE COURT:  Was affected.  They want to -- so you

20     want a stipulation, this is what the evidence is.  In a

21     summary form, the evidence is that they were affected.

22             MR. WEINBERG:  Right.

23             THE COURT:  And they want a stipulation that says

24     the element is satisfied.

25             MR. WEINBERG:  I'm not disputing that the element

1    is satisfied by that stipulation.  There will be no

2    counterevidence.  I'm not going to cross-examine Mr. Shaw to

3    try to backdoor or dilute the stipulation, so they get what

4    they want as a practical matter.  They have satisfied this

5    element.  There will be no dispute on final argument.  And

6    the only reason I'm inviting the Court to weigh in is that

7    this is a way to balance the prejudice --

8              THE COURT:  Can you tell me, again, what you want

9    to stipulate to, the words of it?

10             MR. WEINBERG:  Yeah, essentially, the same words

11   they have, but I want to put the qualifier that a witness

12   from State Street would testify that State Street is a

13   financial institution and was affected by the alleged

14   conduct.

15             THE COURT:  Do you want to put in the word

16   "undisputed"?  In other words, that you have -- well, first

17   of all, you can all agree to whatever you want, I'm just

18   throwing out there that are you willing to say that there's

19   no dispute?  Or you don't want to go that far?

20             MR. WEINBERG:  I don't want to be in a position of

21   any way reinforcing the allegations in Count 6, which I

22   contend to be both weak and improperly joined to Counts 1 to

23   5, to reinforce it with the defendant admitting that State

24   Street has been prejudiced by conduct that we contest didn't

25   occur.

1          So this is a way for the Government to satisfy the

2     element.  I am not going to dispute it in front of a jury.

3     I'm not disputing it on final argument.  I'm not

4     cross-examining anybody to try to, in any way, reduce the

5     effect of the stipulation.  It is simply one of two forms of

6     stipulation.  It's the form I think is more consistent with

7     the fact that we're asking the defendant to stipulate to an

8     element.  We're stipulating, essentially, that the Government

9     evidence would satisfy that evidence, that stipulation, and

10    to avoid the prejudice, or most of the prejudice, we're

11    stipulating that a State Street witness would testify to

12    whatever the language they would otherwise want in a factual

13    stipulation.

14          THE COURT:  You're saying that the defendant

15    stipulates that a witness from State Street would testify

16    that as a result of the conduct alleged in Count 6, State

17    Street was exposed to -- State Street, a financial

18    institution, was exposed to loss and a -- and/or realistic

19    prospect of loss.

20          MR. WEINBERG:  No, I think we would stipulate to

21    the language the Government wants, which is the statutory

22    language that State Street has been affected by the alleged

23    conduct in Count 6.

24          THE COURT:  Affected.  You would testify that a

25    witness from State Street would testify that it was affected

1    by the conduct alleged.

2              MR. WEINBERG:  Which satisfies both parts of their

3    statutes of limits element that State Street was a financial

4    institution and was affected.  That's all they need.  The

5    rest of it is just sheer prejudice.

6              MR. FRANK:  Your Honor, either -- we believe we

7    either are entitled to put in the evidence for the jury to

8    conclude it was affected or that the element should be

9    removed.  But this walking of a fine line doesn't actually

10   remove the element.

11             THE COURT:  I guess the question is, as a general

12   proposition, Mr. Frank, you are correct.  In other words, you

13   are ordinarily entitled to the evidence and as a general

14   matter, that -- you know, this isn't an *Old Chief* situation.

15   And the one question is -- to think about is balancing the

16   consideration that -- of avoiding the sort of conclusory --

17   fairly giving you what you need, but avoiding the imprimatur

18   of a conclusion of State Street as to the merits of Count 6,

19   which I know you're not trying to backdoor.

20             MR. FRANK:  We want to remove State Street from the

21   equation.  He wants to put State Street's conclusion into the

22   equation, actually, through his stipulation.  State Street

23   concluded that it was affected.  We want to remove that.

24   Just take the element out.  The parties stipulate that, for

25   purposes of the statute, it was affected.  It's neutral and

1    it removes that element.  But what he wants to do now,

2    actually, is to say State Street has concluded it was

3    affected, which doesn't remove the element and actually

4    doesn't remove the prejudice he's complaining about.

5           THE COURT:  You don't have to submit the element.

6           MR. FRANK:  It just reduces the weight of our

7    evidence is what it does.

8           MR. WEINBERG:  And there's another way to do this,

9    which is that we could stipulate to the element, but not have

10   the stipulation go to the jury.  Instead the Court can

11   instruct the jury, there's no dispute as to one of the

12   elements in Count 6, that being that State Street was a

13   financial institution that was affected by the alleged

14   conduct.

15          MR. FRANK:  Your Honor, if the Court instructs the

16   jury that there is no dispute, and therefore, they have to

17   find that to be proved, that element, that State Street was a

18   financial institution and was affected, no dispute there.

19          MR. WEINBERG:  I think that's the way to do it,

20   Judge.

21          THE COURT:  Fine.  You both agree?

22          MR. WEINBERG:  But do it as part of the Court's

23   instructions.

24          THE COURT:  The instructions, just when I get there

25   to instruct them, as to element 5, or I don't know what

```
1    element number it is, but whatever element number is this,
2    and I instruct you to find that that's -- based on the
3    agreement of the parties, that's true and you should find
4    that and then you -- and then you, the jury, figure out the
5    rest.  Then that satisfies --
6              MR. FRANK:  Then they just have to figure out the
7    wire fraud element.
8              THE COURT:  All the other elements of the --
9    whatever they are at the moment.  I'm not sure, but yeah, so
10   all the other elements of the count.
11             MR. FRANK:  Yeah.  While we're at it, you can just
12   instruct them on those, as well.
13             MR. WEINBERG:  And then add that Mr. McLellan is
14   responsible for the entire acts of --
15             MR. FRANK:  Stipulated.
16             THE COURT:  Fine.  All right.  So that solves that.
17   Okay.  Are you ready to go?
18             MR. FRANK:  Could we have a moment to tell the
19   witness, actually?
20             THE COURT:  Yes.
21             MR. FRANK:  Thank you, Your Honor.
22             (Court in recess at 9:16 a.m.
23             and reconvened at 9:17 a.m..)
24             MR. FRANK:  We're ready to go, Your Honor.
25             THE COURT:  Okay.
```

1          Maria, go get the jury.  Thank you.

2          Who's first this morning?

3          MR. FRANK:  Garret Trombly, he's reading in the

4    unobjected-to exhibits.

5          MR. WEINBERG:  And is he reading into -- the

6    objected-to exhibits that the Court has ruled on?

7          MR. FRANK:  Yes.

8          MR. WEINBERG:  Judge, will you take another look at

9    the 159, which is the City of Philadelphia e-mail, that Mr.

10   McLellan --

11         THE COURT:  I recall that one.  What's the issue?

12         MR. WEINBERG:  It's just a -- if I can use the term

13   "apples and oranges."  It's a US client, it has ERISA-type

14   protections.  It has nothing to do with the European trades.

15   It just creates --

16         THE COURT:  Why do you really need it?

17         MR. FRANK:  First of all, there's an AXA count in

18   the indictment.

19         THE COURT:  There's a what?

20         MR. FRANK:  There are American trades at issue in

21   the indictment.  It goes to his state of mind.  He's familiar

22   with State Street's business model.  He distinguishes what

23   they do in FX from what they do in fixed income.  It's very,

24   very clear that -- and he's on notice, that State Street

25   fully discloses all --

```
1              (The jury enters the courtroom.)
2              THE COURT:  Good morning, ladies and gentlemen.  I
3    hope you had a nice weekend.  Nobody did any independent
4    research, nobody discussed the case, anything like that, you
5    followed the instructions.  Good.  All right.
6              So I apologize for beginning a little bit late.
7    I've been talking to the lawyers, who actually got here
8    early, to try to iron out a few issues, see if we couldn't
9    keep this moving on or ahead of schedule.  And I think we've
10   narrowed things a little.  It took us a few minutes longer
11   than I thought, so that's why the delay in starting.
12             So call your first witness.
13             MR. FRANK:  Thank you, Your Honor, the Government
14   calls Special Agent Garett Trombly.
15                 SPECIAL AGENT GARETT TROMBLY
16          having been duly sworn, testified as follows:
17          DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF
18   BY MR. FRANK:
19   Q.  Good morning, Special Agent.
20   A.  Good morning.
21   Q.  Could you tell us your name, please, and spell it?
22   A.  My name is Garett Trombly, G-a-r-e-t-t, T-r-o-m-b-l-y.
23   Q.  Thank you.  Where do you work?
24   A.  I work for the FBI.
25   Q.  What do you do for the FBI?
```

1     **A.**   I investigate foreign corruption and money laundering.

2     **Q.**   And you're a special agent?

3     **A.**   I am.

4     **Q.**   So the squad that you're assigned to is foreign

5     corruption and money laundering?

6     **A.**   Correct.

7     **Q.**   Have you had any involvement in the investigation of the

8     defendant in this case?

9     **A.**   I have.  I have participated in some interviews and

10    reviewed some documents.

11    **Q.**   Are you the case agent for the case?

12    **A.**   I am not.

13    **Q.**   And what is the case agent?  What does that mean?

14    **A.**   The case agent is the primary individual responsible for

15    the investigation and coordination with the US Attorneys

16    Office.

17    **Q.**   Fair to say you've had more limited involvement?

18    **A.**   Very much so.

19    **Q.**   Okay.  I just want to go through some documents with you

20    and have you read them for the record; is that all right?

21    **A.**   Certainly.

22    **Q.**   If we could look at Exhibit -- well?

23         MR. FRANK:  Well, first of all, Your Honor, the

24    Government would offer Exhibits 98, 99, 111, 112, 159, 176,

25    181, 189, 190, 209, and 211.

1               THE COURT:  Give me one moment.

2               Can you read the list back again?  You read it

3      slowly and I appreciate it, Mr. Frank, but just again so I

4      can --

5               MR. FRANK:  98, 99, 111, 112, 159, 176, 181, 189,

6      190, 209, and 211.

7               THE COURT:  All right.

8               MR. WEINBERG:  We would just preserve the

9      objections that we had previously discussed.

10              THE COURT:  Yes.  Subject to that, those are

11      admitted.

12              MR. FRANK:  Thank you.

13              (Exhibit Nos. 98, 99, 111, 112, 159, 176, 181, 189,

14              190, 209, and 211 admitted into evidence.)

15              MR. FRANK:  Could we look at Exhibit 189, please.

16      And Erin, if you could just highlight the bottom e-mail.

17              MR. WEINBERG:  Your Honor, please, has the Court

18      many made a final ruling on this?

19              THE COURT:  Yes.

20              MR. WEINBERG:  Okay.  Thanks.

21      BY MR. FRANK:

22      Q.   Special Agent, can you tell us the date of this e-mail?

23      A.   It's dated June 14, 2011.

24      Q.   And who is it from?

25      A.   It's from Daniel Falkowski.

1    Q.  And if you could just -- if we could just turn to the

2    signature block.

3            MR. FRANK:  Which is on the next page there.

4    BY MR. FRANK:

5    Q.  Can you tell us who Daniel Falkowski is?

6    A.  He's an investment associate working for the City of

7    Philadelphia Board of Pensions and Retirement.

8    Q.  And if we just turn back to the subject, the header of

9    the e-mail.  Who is the e-mail addressed to?

10   A.  Eric Carangelo, Ross McLellan, and Elijah Rawlyk.

11   Q.  And what's the subject?

12   A.  "Follow-up."

13   Q.  Okay.  Could you read the body of the e-mail for the

14   record, please?

15   A.  Certainly.

16           "Eric, Ross, and Elijah, it was nice meeting you

17   all earlier.  I found the paragraph contained within the RFP

18   that mentioned proprietary trading.  Please see below.  This

19   was the revised paragraph from your legal counsel.

20           "39.  Does your firm or an affiliate have a company

21   or proprietary account in which you may be the other side of

22   a given transaction?  If so, what safeguards can you describe

23   that ensure you are placing the goals of the client ahead of

24   your firm's capability to book revenue in this manner?

25           "State Street, as a firm, has only limited

1    proprietary trading activity.  The proprietary trading

2    activity of our US business is currently limited to State

3    Street Bank and Trust Company's activities as a dealer of

4    fixed income, currency, and interest rate derivatives.  State

5    Street does not have a proprietary equity trading desk.

6            "The types of trades that we may execute on behalf

7    of transition management clients as part of a transition

8    management are equity trades, future trades, fixed income

9    trades, and foreign currency trades.  Equity and futures

10   trades are executed on an agency basis.  With respect to

11   fixed income trades, we act as riskless principal, except

12   under certain circumstances, where we trade fixed income as

13   agent.  Riskless principal trading means that we locate a

14   dealer to buy or sell the fixed income security and we

15   simultaneously execute corresponding buy-and-sell

16   transactions with the dealer and the client, with the only

17   difference in price being the spread on such trades, agreed

18   with the client in advance.

19           "State Street's proprietary fixed income dealing

20   desk is not one of the dealers with which we would executed

21   fixed income trades for the City of Philadelphia.  Instead,

22   we would obtain quotes for only third party dealers.  All

23   spreads and commissions on equity, futures, and fixed income

24   trades for a transition assignment are fully disclosed and

25   agreed prior to the mandate.

1           "In addition, to the extent directed by a client,

2    State Street foreign currency trading desk could act as the

3    counterparty or dealer with respect to foreign exchange

4    trades, or we could agree to execute such trades on an agency

5    basis with a third party dealer.  To the extent that State

6    Street acts as a counterparty or dealer on foreign exchange

7    trades, it could make a profit in the form of a spread,

8    charged by it on such transactions."

9    **Q.**   Thank you and if you could -- if we could now take a look

10   at the response to this e-mail.  Special Agent, can you tell

11   us who the response was from?

12   **A.**   It's from Ross McLellan.

13   **Q.**   And the date?

14   **A.**   Tuesday, June 14, 2011.

15   **Q.**   Could you read the response?

16   **A.**   "Dan, thanks for sending this over, certainly something

17   we need to clarify in future responses.  Obviously, our FX

18   desk profits from trading, as do all bank's FX.  However, as

19   we are a fiduciary in our transition business, we exclude

20   State Street as a counterparty.  Similarly, as a bank, we use

21   interest rate swaps and derivatives to hedge our balance

22   sheet.  Again, nothing relating to the TM business.  Thanks

23   again for your time today and look forward to hearing from

24   you in the future."

25   **Q.**   Thank you.  Can you look at Exhibit 99, please.  And

         1    could you read -- could you tell us who this e-mail is from

         2    and who it's to?

         3    **A.**   The e-mail is from Edward Pennings, it's sent to Ross

         4    McLellan.

         5    **Q.**   What's the date?

         6    **A.**   February 24, .2011.

         7    **Q.**   What are the attachments?

         8    **A.**   "Final signed TMA.pdf.zip, and periodic notice.pdf.zip."

         9    **Q.**   And what does the e-mail say?

        10    **A.**   "FYI, NTMA agreement again for your review."

        11           MR. FRANK:  And could we just take a look at the

        12    first attachment and the next page.  Could you enlarge the

        13    text.

        14    BY MR. FRANK:

        15    **Q.**   What's the date of this letter?

        16    **A.**   October 10, 2007.

        17    **Q.**   And what does the first sentence say?

        18    **A.**   "With reference to the above, I now enclose the

        19    transition management services framework agreement, dated as

        20    of 9th October, 2007."

        21    **Q.**   If we could look at the next page.  Could you tell us

        22    what it says at the top?

        23    **A.**   "TRANSITION MANAGEMENT SERVICES FRAME WORK AGREEMENT,

        24    dated the 9th day of October, 2007."

        25    **Q.**   And if we can look at the next attachment, please.  Can

1    you tell us what this document is?  It says at the top.

2    **A.**  It's a contract order for services.

3    **Q.**  And does the header of the page -- what does it say on

4    the header of the page?

5    **A.**  "National Treasury Management Agency."

6    **Q.**  Thank you.  Can we look at Exhibit 98, please.

7             MR. FRANK:  And Erin, if you can move to the second

8    page, please, and the bottom e-mail.

9    BY MR. FRANK:

10   **Q.**  Can you tell us who this is from and who this is to?

11   **A.**  It's from Chris Carlin.  It's to Paul McGee.

12   **Q.**  And the date?

13   **A.**  February 24th, 2011.

14   **Q.**  Can you read the e-mail, please?

15   **A.**  "Paul, for NTMA, are we invoicing them or charging a

16   com?"

17   **Q.**  And if we go to the e-mail up from that, the response?

18   Can you tell us how Mr. McGee responded?

19   **A.**  "Invoicing after the trade."

20   **Q.**  Can we go to the next e-mail up, please.  Does this

21   appear to be an e-mail back from Mr. Carlin back to

22   Mr. McGee?

23   **A.**  It does.

24   **Q.**  What does it say?

25   **A.**  "Why are the fixed income trades being booked with coms,

1    then?"

2    **Q.**   And can you tell us, if we look at the next e-mail, who's

3    that from?

4    **A.**   It's from Mr. McGee.

5    **Q.**   To?

6    **A.**   Chris Carlin.

7    **Q.**   What does he say?

8    **A.**   "It's on a need to know basis.  Speak with Ross.  He

9    knows the strategy here."

10   **Q.**   If we could look at the next e-mail up.  Who's it from?

11   **A.**   Chris Carlin.

12   **Q.**   And who is it to?

13   **A.**   Ross McLellan.

14   **Q.**   What is the date?

15   **A.**   February 25, 2011.

16   **Q.**   Can you read the e-mail, please.

17   **A.**   "Care to share?  I want to make sure I tell finance the

18   right amount to accrue.  Looks like we are recognizing

19   revenues on the fixed income and futures.  McGee referred me

20   to you."

21   **Q.**   And can you tell us, if we look at the top e-mail, does

22   this appear to be a response from the defendant?

23   **A.**   Yes.

24   **Q.**   What does he say?

25   **A.**   "1.75 BPS on value traded.  Will also have revenue

1    potentially from ETF redemption.  We'll call you in a few."

2    Q.  Thank you.  Can we look at Exhibit 211, please.  And if

3    we could look at the bottom --

4              MS. LEAHY:  I have it as a pdf on here.  Can I pull

5    it up?

6              MR. FRANK:  Sure.  Your Honor, I have been advised

7    that I neglected to admit the attachments to Exhibit 99,

8    which are 99.1, and 99.2, which we just read.  I would offer

9    those for the record, as well as the attachment to

10   Exhibit 181.

11             THE COURT:  Any objection to those, Mr. Weinberg?

12             MR. WEINBERG:  Only the objections that your Honor

13   has reserved.

14             THE COURT:  Over -- they're admitted.

15             MR. FRANK:  Thank you.

16             (Exhibit Nos. 99.1 and 99.2 admitted into

17             evidence.)

18             MR. FRANK:  Okay.  Erin, if you can move down to

19   the bottom of the page -- no, not that page.  There we go.

20   And if you could just please enlarge that.

21   BY MR. FRANK:

22   Q.  Mr. McLellan -- Mr. McLellan.  Special Agent Trombly,

23   could you tell us who this e-mail is from and who it is to?

24   A.  It's to Peter Weiner to Ross McLellan and Kevin Walker.

25   Q.  What is the date?

1    **A.**   February 18, 2011.

2    **Q.**   Can you read the first sentence, please?

3    **A.**   "The investment team at AXA asked us to call the

4    Treasurer, but they do not want him to know that we were told

5    of the trade.  SSGA wants a transition manager involvement."

6    **Q.**   And the next sentence?

7    **A.**   "Treasury has a longstanding relationship with JPM."

8    **Q.**   Okay.  And if we can move up to the top e-mail.  Who's

9    that from?

10   **A.**   It's from Ross McLellan.

11   **Q.**   Who's that to?

12   **A.**   Kevin Walker.

13   **Q.**   The date?

14   **A.**   February 19, 2011.

15   **Q.**   And what's the text?

16   **A.**   "Let's chase this Tuesday morning."

17   **Q.**   Thank you.  And if we can look at Exhibit 209, please.

18   And if we could look at the bottom e-mail.

19          Who's that from?

20   **A.**   Carla Byer.

21   **Q.**   And if you can just read her title from the signature

22   block?

23   **A.**   Vice President, AXA Equitable.

24   **Q.**   And if you can just read the first two sentences of the

25   e-mail, please.

1    **A.**  "Kevin, I left you a voicemail, as well.  We have decided

2    to go with SSGM Transition Management for the transition of

3    the three portfolios."

4    **Q.**  Thank you.  If we could look at the next e-mail up,

5    please.

6            Who is this from?

7    **A.**  Kevin Walker.

8    **Q.**  Who is it to?

9    **A.**  Ross McLellan and Peter Weiner.

10   **Q.**  What's the date?

11   **A.**  March 1, 2011.

12   **Q.**  What's the subject line?

13   **A.**  It's a forward, "AXA Equitable transition."

14   **Q.**  And can you read the text, please?

15   **A.**  "Winner, winner."

16   **Q.**  And if you can just look at the response, who is the

17   response from?

18   **A.**  Peter Weiner.

19   **Q.**  Who is it to?

20   **A.**  Kevin Walker and Ross McLellan.

21   **Q.**  And what does he say?

22   **A.**  "Fantastic."

23   **Q.**  Thank you.  If we can look at Exhibit 111, please.  And

24   if we could look at the second page, bottom e-mail.

25            Who's that from?

1    **A.**   Kevin Walker.

2    **Q.**   Who is that to?

3    **A.**   Steven Finocchi, Peter Weiner, and Ross McLellan.

4    **Q.**   What is the date?

5    **A.**   March the 1st, 2011.

6    **Q.**   Can you read the text, please?

7    **A.**   "Are you guys available at 2:30 Eastern tomorrow to touch

8    base on AXA starting Thursday?"

9    **Q.**   And if we can look at the response.  Who is the response

10   from?

11   **A.**   Ross McLellan.

12   **Q.**   What does he say?

13   **A.**   "Yes, please send invite."

14           MR. FRANK:  If we can look at the next e-mail up

15   please, on the prior page, yes.

16   BY MR. FRANK:

17   **Q.**   Who is that from?

18   **A.**   Steve Finocchi.

19   **Q.**   Who is that to?

20   **A.**   Kevin Walker.

21   **Q.**   Who is it copied to?

22   **A.**   Tom Clemmenson.

23   **Q.**   And can you read the text, please?

24   **A.**   "Hi, Kevin.  Unfortunately I am out today because I am

25   attending a funeral."

1    **Q.**  And if we look at the continuation on the next page.

2    **A.**  "Tom, could you please help out Kevin?  Thanks, Steve."

3            MR. FRANK:  And if we could go back to the first

4    page, Erin, and read the response.

5    BY MR. FRANK:

6    **Q.**  You see this is from Kevin Walker to Ross McLellan and

7    Peter Weiner.

8    **A.**  Correct.

9    **Q.**  What does he say?

10   **A.**  "Steve F. out today.  Is this a conversation we want to

11   have with Tom?"

12   **Q.**  And if you want to look at the response.  Who's the

13   response from?

14   **A.**  Ross McLellan.

15   **Q.**  What does he say?

16   **A.**  "Sure.  Let me discuss coms."

17   **Q.**  Thank you.  If we look at Exhibit 112, please.  And if we

18   could look at the bottom of the page.  Who is it from?

19   **A.**  Chris Carlin.

20   **Q.**  And who is in the recipient line?

21   **A.**  Kevin Walker, Peter Weiner, copied to Thomas McNichol,

22   and Kevin Miller.

23   **Q.**  What is the text?

24   **A.**  "I hear AXA is coming in quickly.  Where do we stand with

25   their contract?  Let me know if legal needs to work on

1  anything quickly."

2  **Q.**  Can we look at the next e-mail up, please.  Who is it

3  from?

4  **A.**  Kevin Walker.

5  **Q.**  Who is it to?

6  **A.**  Peter Weiner and Ross McLellan.

7  **Q.**  Chris Carlin is not on this e-mail?

8  **A.**  Correct.

9  **Q.**  Neither is Thomas McNichol or Kevin Miller?

10 **A.**  Correct.

11 **Q.**  Could you read text, please?

12 **A.**  "What to do."

13 **Q.**  And the subject line?

14 **A.**  "AXA contract."

15 **Q.**  Thank you.  And could we look at the response, please.

16 Who is it from?

17 **A.**  Ross McLellan.

18 **Q.**  Who is it to?

19 **A.**  Kevin Walker and Peter Weiner.

20 **Q.**  The text?

21 **A.**  "Have they sent us the LOD?"

22 **Q.**  And if we look at the response.  And who's this from?

23 **A.**  Kevin Walker.

24 **Q.**  Who is it to?

25 **A.**  Ross McLellan and Peter Weiner.

1    **Q.**  Can you read the first sentence, please?

2    **A.**  "Not yet, I left a voicemail for Carla this morning,

3    asking her to send it to you and I."

4    **Q.**  Thank you.  And can we look at 176, please.

5           MR. FRANK:  And Erin, if you can move ahead to the

6    third page -- actually, you're going to have to move up just

7    for one moment, just to the very bottom there.

8    BY MR. FRANK:

9    **Q.**  Can you see who this e-mail is from?

10   **A.**  Ross McLellan.

11   **Q.**  And the date?

12   **A.**  August 2, 2011.

13   **Q.**  And if we look at the next page, who is it to?

14   **A.**  Chris Carlin.

15   **Q.**  And what is the text?

16   **A.**  "Why is Peter calling me about AXA?"

17   **Q.**  And it says "sent from my iPhone."

18           Do you see that?

19   **A.**  Yes.

20   **Q.**  Can we look at the response, please.  Could you read the

21   response, please.

22   **A.**  "The auditors picked them for review and there is no

23   contract.  He just left me a message that we should spin it

24   as a brokerage trade from the IM."

25   **Q.**  Can we look at the response, please.

1       MR. FRANK:  And Erin, if you can just go to the

2   prior page so we can see who the response is from.

3   BY MR. FRANK:

4   **Q.**  Who's it from?

5   **A.**  It's from Ross McLellan.

6   **Q.**  To Chris Carlin?

7   **A.**  Correct.

8   **Q.**  And if we can look at the text, again, please.  What does

9   he say?

10  **A.**  "That's what AXA wanted.  Why is he calling me?"

11  **Q.**  And if we can look at the final e-mail from Chris Carlin.

12  Do you see that it's from Chris Carlin to Ross McLellan?

13  **A.**  I do.

14  **Q.**  Can you read the text please?

15  **A.**  "Okay.  I will spin it that way.  Hope we get dinged.  I

16  told Peter to let you enjoy your vacation, he was calling

17  you, because I sent you both an e-mail on it."

18  **Q.**  Okay.  Can we look at Exhibit 181, please.  Can you tell

19  us who this is from and who it's to?

20  **A.**  It's from Ross McLellan to Mark Hansen.

21  **Q.**  The date?

22  **A.**  August 23, 2011.

23  **Q.**  And you see that's a Tuesday?

24  **A.**  Yes.

25  **Q.**  And what's the attachment?

1    **A.**   Royal Mail.doc.zip.

2    **Q.**   Is there any text in the body of the e-mail?

3    **A.**   There's not.

4    **Q.**   Can we look at the attachment, please.  Can you tell us

5    who this letter is addressed to?

6    **A.**   It's addressed to Mr. Graham Dixon, Analytics limited.

7    **Q.**   And who is it from?

8    **A.**   Mark Hansen.

9    **Q.**   And he's senior vice president and head of compliance at

10   State Street Global Market?  Is that what that says?

11   **A.**   Yes.

12   **Q.**   Could you read the text of the letter, please?

13   **A.**   "Dear Mr. Dixon, I refer to the analysis you are

14   currently conducting on behalf of our mutual client, the

15   Royal Mail Pension Trustees Limited.

16           "As requested by our transition management team, we

17   have reviewed the bond trading activity as well as the

18   commission rebate relating to the global credit transition

19   executed for this client in March/April 2011.

20           "Following the review, I can confirm that the

21   compensation amount of $1,010,003.67 for all TRACE and

22   nonTRACE eligible bonds is consistent with our internal

23   analysis.

24           "I trust this information is helpful for your

25   analysis."

1    **Q.**  Thank you.  Could we look at Exhibit 189, please.  This

2    is a multipage chain.  If we could start on the fourth page,

3    please, at the bottom.

4              Who is this from?

5    **A.**  Marshall Bailey.

6    **Q.**  Who is it to?

7    **A.**  Ross McLellan.

8    **Q.**  Can you tell us the date?

9    **A.**  August 25, 2011.

10   **Q.**  That's a Thursday?

11   **A.**  Correct.

12   **Q.**  Can you tell us the subject line?

13   **A.**  "Ross, I need to speak with you urgently, please.  Please

14   call my mobile below."

15   **Q.**  And is there any text below?

16   **A.**  No.

17   **Q.**  Can we look at the response?  This is from McLellan?

18   **A.**  Yes.

19   **Q.**  What does it say?

20   **A.**  "No mobile below."

21   **Q.**  Can we look at the response?  What is that word?

22   **A.**  "Sorry."

23   **Q.**  And does there appear to be a phone number beneath it?

24   **A.**  Yes.

25   **Q.**  If we can look at the response?  Is that from Mr.

1   McLellan to Mr. Bailey?

2   **A.**   It is.

3   **Q.**   What does he say?

4   **A.**   "Let's chat in the a.m., could barely hear you.  I'm

5   aware and believe it is in control."

6   **Q.**   Thank you.  Could we look at the response?  Who is this

7   from?

8   **A.**   Marshall Bailey.

9   **Q.**   Who is it to?

10   **A.**   Ross McLellan.

11   **Q.**   And the date?

12   **A.**   August 25, 2011.

13   **Q.**   Could you read the text?

14   **A.**   "I have just found a place to pull over on the highway,

15   apols for the bad line.  Glad you are aware of it and glad

16   you feel it is under control.  My concern is that we are

17   operating in a manner consistent with the FSA and other

18   requirements.  It sounds serious, but I have very few facts

19   at this point."

20   **Q.**   Could we look at the response from McLellan?

21   **A.**   Yes.

22   **Q.**   Date?

23   **A.**   August 25, 2011.

24   **Q.**   What does he say?

25   **A.**   "We are fine with respect to contract and FSA.  Client

1    perception and consultant perception is issue."

2    **Q.** Could we look at the response? This is back from

3    Mr. Bailey?

4    **A.** Yes.

5    **Q.** Can you tell us the date of this e-mail?

6    **A.** August 26, 2011.

7    **Q.** That's Friday?

8    **A.** Correct.

9    **Q.** Can you read the response, please?

10   **A.** "Ross, how much do we know about the FSA rules here? Can

11   you let me know what advice you have sought on our

12   obligations to our client and what risks we might be running?

13   Can you point me to the people that have advised you on the

14   FSA and UK/Europe regulation, and what steps have been taken

15   to ensure your comfort that we are fine with respect to

16   contract and FSA is, in fact, the case.

17             "I am not convinced that we have done enough work

18   on this and ask that we urgently find out our obligations and

19   risks. If you can help by linking me into the discussions

20   that you've had internally, I will follow-up. Who in legal

21   and compliance has been consulted?"

22   **Q.** Can you look at the response, please? How does McLellan

23   respond?

24   **A.** "Will call you this morning."

25   **Q.** Thank you. Can you look at Exhibit 190, please. Who is

1   this from?

2   **A.**   Ross McLellan.

3   **Q.**   Who is it to?

4   **A.**   David Puth.

5   **Q.**   If you read the -- and the date, please?

6   **A.**   Friday, August 26, 2011.

7   **Q.**   Can you read the text of the e-mail?

8   **A.**   "David, wanted to bring you up to speed on a client issue

9   we have in the UK.  We performed a US bond and European bond

10   transaction for this client in March.  We took a basis point

11   of yield on these transactions, which is our customary charge

12   for bond transactions.  The issue is that this was not

13   disclosed to the client and they also paid us a management

14   fee for the transaction.

15       "Compliance is looking into whether you can charge

16   a management fee and a spread.  The initial read is that this

17   is fine if disclosed properly.  The reason this has come to

18   light is the client is asking us to certify all remuneration

19   to State Street and affiliates as part of the transaction.

20   Should we not get 100 percent comfortable with how we process

21   this, we will rebate the spreads back to the client.  Mark

22   Hansen is looking into this and Marsh and Steve are aware, as

23   well.  Nothing for you to do at this point, rather, I am

24   simply making you aware."

25       MR. FRANK:  Thank you, no further questions.

```
 1              THE COURT:  Any cross-examination, Mr. Weinberg?

 2              MR. WEINBERG:  Yes, Your Honor, just about five

 3      minutes, if I can.

 4              THE COURT:  Yes.

 5                CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

 6      BY MR. WEINBERG:

 7      Q.   Good morning.

 8      A.   Good morning.

 9      Q.   I'm going to show you one page of one of the exhibits

10      that Mr. Frank introduced in evidence and had you read.

11              MR. WEINBERG:  Can I have 99.1, please.  Could we

12      blow it up?

13      BY MR. WEINBERG:

14      Q.   And I appreciate you're not the case agent and you -- if

15      I understand your direct testimony, did a limited amount of

16      work on this case; is that correct?

17      A.   That is correct.

18      Q.   You understand, however, do you not, that the NTMA

19      transition that is the subject of several of the exhibits

20      that Mr. Frank had you introduce in evidence was a transition

21      of a client from Ireland, correct?

22              MR. FRANK:  Objection.  Beyond the scope.

23              THE COURT:  Well, no.  This exhibit came in.

24      Overruled.

25              MR. FRANK:  The witness simply introduced the
```

1    exhibit, Your Honor.  That's my objection.

2            THE COURT:  You're asking him what he knows or to

3    read this?

4            MR. WEINBERG:  I'm going to focus him on one of the

5    exhibits and have him read certain things into evidence.

6            THE COURT:  Overruled.

7            MR. WEINBERG:  Just like Mr. Frank did.

8            MR. FRANK:  If that's the case.  We have no

9    objection, Your Honor.

10            THE COURT:  You can answer the question, if you

11   know.

12   BY MR. WEINBERG:

13   **Q.**  Is this one of the pages of one of the exhibits that the

14   Government prosecutor had you introduce to this jury?

15   **A.**  Yes, it is.

16   **Q.**  And is this list in the top portion of the exhibit the

17   name of the client?

18   **A.**  It does.

19   **Q.**  The National Treasury Management Services, NTMA?

20   **A.**  Correct.

21   **Q.**  And does it state where they're domiciled in Ireland,

22   correct?

23   **A.**  It is indicated.

24   **Q.**  And does it reflect that this is a kind of general,

25   introductory sheet, that says that the clients of State

1    Street could be in any one of these countries?

2              MR. FRANK:  Objection.  Foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  There are many boxes showing many

5    different countries on the sheet.

6    BY MR. WEINBERG:

7    Q.  And this is as -- this sheet is a State Street business

8    record to your understanding?

9              MR. FRANK:  Objection.

10             THE WITNESS:  That is my understanding.

11   BY MR. WEINBERG:

12   Q.  Thanks.  Could we go down to the next -- listed here is a

13   number of different State Street entities, correct?

14   A.  Correct.

15   Q.  In other words, it demonstrates that the contract in this

16   case was State Street Bank Europe, rather than any of the

17   other State Street entities, correct?

18   A.  That's what's indicated, yes.

19   Q.  Could we go down to the bottom, please.  And again here,

20   there's a subject for governing law, listing a number of

21   countries and a number of states that could be the legal site

22   of a contract, correct?

23   A.  That is what the form shows.

24   Q.  And here at the contract is the governing law for this

25   particular transaction is Ireland, correct?

1    **A.**  Yes, that's what's indicated.

2    **Q.**  Not Great Britain and certainly not any of the states of

3    the United States are checked off here, correct?

4    **A.**  Only Ireland is checked.

5    **Q.**  Now, if we can switch to Exhibit 159.  And if we can go

6    to the second page and highlight the name of the individual

7    that's corresponding with Mr. McLellan in this exhibit.

8    BY MR. WEINBERG:

9    **Q.**  Do you see that the e-mail originates with a Dan

10   Falkowski who is an investment associate at the City of

11   Philadelphia Board of Pensions and Retirement?

12   **A.**  Yes.

13   **Q.**  And he's asking about a document he received from State

14   Street and Mr. McLellan is providing an answer, correct?

15   **A.**  Yes.

16   **Q.**  And Philadelphia is a City in Pennsylvania in the United

17   States, and we can assume, can we not, that the governing

18   law, if there's a transition involving the City of

19   Philadelphia Pension Fund would be a US law and perhaps a

20   Philadelphia law, correct?

21   **A.**  That would be my guess.

22   **Q.**  And this is -- he's writing on behalf of a US city

23   pension fund, correct?

24   **A.**  Yes.

25   **Q.**  Asking questions of Mr. McLellan about a US -- a

1    potential US transition for a US pension fund that's a city

2    pension fund, correct?

3    **A.**   Correct.

4    **Q.**   And are you aware of the fact that certain US pension

5    funds have special protections under US law, a law called

6    ERISA?

7             MR. FRANK:  Objection.  Beyond the scope.

8             THE COURT:  Sustained.

9    BY MR. WEINBERG:

10   **Q.**   Are you aware, if you are, that the laws in Philadelphia

11   and the United States are different than the laws in Ireland

12   and Great Britain?

13            MR. FRANK:  Objection.  Beyond the scope.

14            THE COURT:  Overruled.

15            THE WITNESS:  I'm aware of differences in the law,

16   generally.

17   BY MR. WEINBERG:

18   **Q.**   Okay.  Not specifically, but generally?

19   **A.**   No, not in any particular specific.

20   **Q.**   But you do know, from the exhibit beforehand, that that

21   sheet shows the subject governing law and then has a series

22   of countries and a series of states that would, when checked

23   off, be the separate, distinct governing law that controlled

24   a contract between a party and State Street as to a specific

25   transition, correct?

1          MR. FRANK:  Objection as to what it shows, Your

2     Honor.

3          THE COURT:  Sustained as to the form of the

4     question.

5     BY MR. WEINBERG:

6     **Q.**  99-1, shown to you before, has a list of states and

7     countries that have the title "governing law," correct?

8     **A.**  Yes.

9     **Q.**  And the governing law of the United States is distinct

10    from the governing law that had NTMA and State Street Bank

11    Europe as their contracting parties, correct?

12    **A.**  The form suggests that.

13         MR. WEINBERG:  Thank you.

14         THE COURT:  Any redirect?

15         MR. FRANK:  No questions, Your Honor.

16         THE COURT:  Thank you very much, sir, you're

17    excused.

18         Next witness.

19         MR. JOHNSTON:  Your Honor, the Government calls

20    Scott Shaw to the stand.

21         MR. FRANK:  Your Honor, we would also offer into

22    evidence, while we're waiting for the witness, Exhibit 213,

23    which is simply a list of the exhibit numbers for the audio

24    that we've previously introduced.  It's been entered into

25    evidence, as well as the dates of those calls, which I

1   understand are not objected to.

2          MR. WEINBERG:  No objection.

3          THE COURT:  So Exhibit 213 is itself -- it's a

4   summary in a sense, by listing the audio recordings and the

5   date of the audio recordings?

6          MR. FRANK:  That's correct, Your Honor.

7          THE COURT:  All right.  That's admitted.

8          (Exhibit No. 213 admitted into evidence.)

9          THE COURT:  You'll have that with you in the jury

10   room and that will be helpful to you, I think, ladies and

11   gentlemen.

12                    **SCOTT K. SHAW**

13       having been duly sworn, testified as follows:

14        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

15   BY MR. JOHNSTON:

16   **Q.**  Good morning, Mr. Shaw.

17   **A.**  Good morning.

18   **Q.**  Where do you live?

19   **A.**  I live in Boston, Massachusetts.

20          THE COURT:  Just for the record, have him state his

21   name.

22          MR. JOHNSTON:  Sure.

23          THE WITNESS:  Scott Kevin Shaw.

24          THE COURT:  Go head.

25   BY MR. JOHNSTON:

1   **Q.**   Where do you live, Mr. Shaw?

2   **A.**   Boston, Massachusetts.

3   **Q.**   How old are you?

4   **A.**   57.

5   **Q.**   Where do you work?

6   **A.**   I work at State Street Bank and Trust.

7   **Q.**   What is your job there?

8   **A.**   I'm the chief compliance officer for our global markets,

9   global exchange, and global treasury operations.

10  **Q.**   So that includes the entity called State Street Global

11  Markets?

12  **A.**   Yes.  The broker-dealer compliance officer reports to me

13  and to the president of the broker-dealer.

14  **Q.**   How long have you worked at State Street?

15  **A.**   About two-and-a-half years now.

16  **Q.**   Where did you work before that?

17  **A.**   I've been in the industry 36 years, mostly in the

18  compliance field.  I was at Bank of New York Mellon for ten

19  years prior to State Street, covering treasury broker-dealer

20  services, their global markets.  At the time, they had 21

21  broker-dealers when I joined them, I was in projects to

22  consolidate some of those operations.  Prior to that, I was

23  the chief compliance officer at Bear Stearns and a number of

24  other companies over my career.

25  **Q.**   Do you have any professional qualifications related to

1    your job?

2    **A.**   Quite a few.  Aside from sitting on many industry

3    associations, including one of the authors of the white paper

4    on the role of compliance back in 2005, I do have a number of

5    broker-dealer licenses, based on my role as a chief

6    compliance officer in the industry for many years.  I have

7    the Series 7, Series 24, 63, 14, 15.

8    **Q.**   What are some of the duties that you have as a chief

9    compliance officer of State Street Global Markets?

10   **A.**   State Street structures compliance around something

11   called a compliance oversight program --

12             MR. WEINBERG:  Excuse me, Mr. Shaw.

13             I object, unless it's related to the limited

14   subjected matter that I understand this witness is being

15   offered for.

16             MR. JOHNSTON:  Your Honor, we need to lay some of

17   the foundation of his background and duties so he has a

18   foundation for eliciting what he's going to be testifying

19   about.

20             THE COURT:  Is it going to be relating to what he's

21   testifying about?

22             MR. JOHNSTON:  Yes.  He's going to be testifying

23   about how he knows certain things about how bonds are traded.

24             THE COURT:  Very briefly, with respect to the -- I

25   don't think you're called to testify about the compliance

1    program that State Street does or doesn't have.  But just

2    very briefly.

3              THE WITNESS:  So in a nutshell, and including the

4    compliance director at the specific broker-dealer, who I

5    mentioned before that reports to me, and the president of

6    that broker-dealer, has a duty to stay abreast of

7    regulations, make sure there's a training program, that there

8    are communications to management and others with regard to

9    the changing of regulations; overseeing a surveillance

10   program to monitor the activities within the broker-dealer,

11   to ensure that there are tools and there's a review that

12   managers and supervisors who are licensed to oversee the

13   activities within broker-dealer.

14   **Q.**   Mr. Shaw, in your experience, or 30 years of experience

15   as a compliance officer, have you gained knowledge about the

16   operations side of a broker-dealer?

17   **A.**   Yes.

18   **Q.**   Does that include knowledge about how over-the-counter

19   securities are settled and cleared?

20   **A.**   Yes.

21   **Q.**   What is the basis of your knowledge?

22   **A.**   Well, aside from just being a head of compliance for many

23   years, at Bank of New York, we owned a company called

24   Pershing.  Pershing was the largest securities clearing firm

25   in the world, with over 1,000 broker-dealers.  We were also

1    one of the largest government securities clearing firms in

2    the world, to the tune of about $8 trillion a day in

3    government securities clearance.

4    **Q.**   Can you tell us what clearing and settlement is, as it

5    pertains to US bonds?

6    **A.**   Sure.  It's actually -- most people don't realize it's

7    quite complicated and heavily regulated --

8              THE COURT:  Not what people realize, just answer

9    what is --

10             THE WITNESS:  Okay.  In a transaction, a client,

11   someone wants to buy a bond, someone wants to sell a bond,

12   goes through a broker-dealer, they meet on a price in the

13   back-office side of the operation.  Most of the major firms

14   are members of something called the National Securities

15   Clearing Corp., NSCC.  The parent entity is the Depository

16   Trust Clearing Corporation.  The securities markets break

17   down to DTC, the NSCC, which I just mentioned, and FICC.

18   FICC handles mostly government securities.  DTC is the

19   central of securities processing entity.  NSCC is a CCP.

20             So what happens is everything is -- I believe

21   people spoke about TRACE, from what I understand.  But the

22   broker-dealers have an obligation to report activity to a

23   public marketplace, so that there is access for regulators to

24   monitor the transaction itself.  On the back-end side is

25   where all of these other activities take place.

1          So what you'll see is that the company will flow

2     its information up into NSCC, which we are a member of, as

3     almost every major --

4     BY MR. JOHNSTON:

5     **Q.**   When you say "we are a member," you're talking about

6     State Street Global Markets?

7     **A.**   That's right.

8     **Q.**   Do you have an understanding of whether State Street

9     Global Markets was a member of the NSCC in 2010/2011?

10    **A.**   I believe they were.

11    **Q.**   And why is it important for broker-dealers to be members

12    of the NSCC?

13    **A.**   Post the market collapse in 2007, the initiation of the

14    regulations known as Dodd-Frank, there's a push towards

15    central clearing.  Almost every major firm, over a thousand

16    firms or members --

17          MR. WEINBERG:  Excuse me, Mr. Shaw.  The only thing

18    relevant is 2010 and 2011.  I think Dodd-Frank came after.  I

19    object.

20          MR. JOHNSTON:  Dodd-Frank was 2009, but that's

21    fine.

22          THE COURT:  Neither of you are testifying as to

23    when Dodd-Frank was or wasn't passed, what it is, or

24    either -- if it has relevance to this case, it will come from

25    the witnesses.  So the jury should disregard the references

1    by both counsel to Dodd-Frank.

2          I think the witness should just stay focused on

3    your questions about what is clearing and settlement, without

4    regard to sort of larger industry --

5          THE WITNESS:  How the market operates?

6          THE COURT:  Yeah.

7    MR. JOHNSTON:

8    **Q.**  If we could just maybe break it down for the jury.  What

9    happens when a bond clears and settles?

10   **A.**  Sure.  I was trying to get there.

11         Clearance is the process whereby the records are

12   maintained.  The eventual transfer of records to multiple

13   entities to maintain accuracy, slightly similar to eBay, if

14   anyone's ever used eBay, flow of information, it is all done

15   electronically today.  Settlement, which used to be T plus

16   five, then to T-3, and as of last October is now trade date

17   plus two, is when the actual money moves from the buyer,

18   through to the seller, and the securities go from the seller

19   to the buyer.

20   **Q.**  Does that happen at the same time, the money exchange,

21   and then the bond exchange?

22   **A.**  That's right.

23   **Q.**  And where does that exchange happen for US corporate

24   bonds?

25   **A.**  It goes --

1    THE COURT:  2010 to 2011.  Not 2018, not 2009.

2    THE WITNESS:  The push towards electronic --

3    THE COURT:  Just when did it happen in 2010 to

4    2011, is what he's asking you.

5    MR. WEINBERG:  NSCC was probably electronic in 2010

6    and 2011.

7    BY MR. JOHNSTON:

8    **Q.**  And where was the NSCC located in 2010/2011?

9    **A.**  DTCC, which is the parent over these entities, is based

10   in New York.  DTC is regulated by the New York State banking

11   authorities, the SEC and the fed.

12   **Q.**  That's okay.  We don't need to go into where they are

13   regulated.

14   **A.**  Okay.

15   **Q.**  So when you say that a bond clears and settles at the

16   NECC, in the 2010/2011 time period, who maintains the record

17   of this -- or who coordinates this transfer of the money and

18   the ownership record?

19   **A.**  So to try and keep it simple, the exchanges and the

20   brokers are members of NSCC.  They have -- so if you were to

21   kind of draw a chart, you have DTC, which is a central

22   clearing -- which is a central security repository, where the

23   records are maintained.  You have the NSCC, which matches and

24   handles the flow of information, such that there is accuracy.

25   It's all done electronically.  And then you have the brokers

1    who communicate with their clients.  And then the clients

2    direct their custodians to move the money.

3    **Q.**   So who are members of the DTC?

4    **A.**   All -- there are over 1,000 broker-dealers and exchanges.

5    Most of the exchanges.  So these are central clearing parties

6    under --

7    **Q.**   So when -- in 2010/2011, when a bond, a US corporate bond

8    was either bought or sold by State Street Global Markets,

9    where would -- how would State Street Global Markets ensure

10   that the -- it was transferred to the other party?

11   **A.**   It was sent to the back office settlement process.

12   **Q.**   And who coordinates the settlement process?

13   **A.**   Well --

14   **Q.**   Which entity?

15   **A.**   Operations at the broker-dealer would flow the

16   information up electronically.

17   **Q.**   To which entity?

18   **A.**   To the NSCC.

19   **Q.**   I want to show you a document that's already been

20   admitted into evidence, Exhibit 148.1, page 15 --

21          Or actually, before we go there, I'm showing you a

22   post-trade report.

23          Is your monitor visible?

24   **A.**   I guess.  For Royal Mail it says?

25   **Q.**   Yes.  This is a post-trade report, fixed income.  If we

1    can look at page is 15.  And if we can zoom in on several of
2    the trades in the middle.
3    **A.**   This is a terrible screen, by the way.
4              THE WITNESS:  Thank you.  He blew it up, because
5    otherwise you can't see it.
6              THE DEPUTY CLERK:  Okay.
7    BY MR. JOHNSTON:
8    **Q.**   Mr. Shaw, I'm showing you trade information.  And you can
9    see there's dates in the right-hand columns for March 22,
10   2011, March 25, 2011.
11   **A.**   Yes.
12   **Q.**   Looking at these bond trades, can you determine whether
13   these were settled and cleared in the United States?
14   **A.**   These are US bonds.  I know, based upon the left side,
15   these are ISIN numbers, which is an international agreement
16   among countries.  The United States mostly uses something
17   called a CUSIP, but globally they use an ISIN.  The first two
18   letters of an ISIN is the country of origin of the bond or
19   the securities.  So US makes it pretty clear that these are
20   US securities.
21   **Q.**   And at the time, in 2011, where did bonds like these US
22   corporate bonds clear and settle?
23   **A.**   Through the NSCC.
24   **Q.**   And where is the NSCC located?
25   **A.**   New York.

1    **Q.**   One final question.  Where do US -- US stocks trade?

2    **A.**   Mostly in the United States, but there are markets that

3    exist in the over-the-counter, where you probably could do a

4    transaction somewhere else.

5    **Q.**   So where are US stocks --

6    **A.**   Mostly in the United States.

7    **Q.**   What exchanges?

8    **A.**   The New York Stock Exchange, back then.  There were other

9    regional exchanges, and most large broker-dealers make

10   markets in these securities.

11   **Q.**   And in 2010/2011, where were, to your knowledge, all US

12   corporate bonds cleared and settled that were bought and

13   sold?

14   **A.**   Virtually almost all over the United States.

15            MR. JOHNSTON:  Thank you.  No further questions.

16            THE COURT:  Cross-examination, Mr. Goldstein?

17            MR. GOLDSTEIN:  Thank you, Your Honor.

18            May we have the ELMO, please.

19            **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

20   BY MR. GOLDSTEIN:

21   **Q.**   Good morning, Mr. Shaw.

22   **A.**   Good morning.

23   **Q.**   You testified -- well, strike that.

24            You were testifying regarding the time period

25   of 2010/2011, correct, regarding some aspects of your

1    testimony?

2    **A.**  Yes.

3    **Q.**  And I'm correct in concluding that you were not with

4    State Street at that relevant time, right?

5    **A.**  No, I was not.

6    **Q.**  You have no personal knowledge regarding how their

7    backroom operations actually worked in 2009, 2010, or 2011,

8    correct?

9    **A.**  Well, I had some questions and asked a few people within

10   the organization in preparing for --

11   **Q.**  Excuse me.  I'm asking about your personal knowledge.

12   **A.**  My personal knowledge is only based on what people told

13   me.

14   **Q.**  Right.  So you have no firsthand personal knowledge,

15   right?

16   **A.**  I was not there.

17   **Q.**  So you can't testify, from your own personal knowledge,

18   in terms of how State Street's back-office operations worked

19   in 2009, 2010, or 2011, correct?

20   **A.**  Not firsthand personal knowledge, only relying on

21   material that's been presented to me.

22         MR. GOLDSTEIN:  Your Honor, I move to strike the --

23         THE COURT:  The latter part is struck.

24         MR. GOLDSTEIN:  And I would ask if you would just

25   instruct the witness to answer the question.

```
1              THE COURT:  Yes.  Just the question.

2    BY MR. GOLDSTEIN:

3    Q.  So for the third time --

4              MR. FRANK:  Objection.

5              THE COURT:  Overruled.

6    BY MR. GOLDSTEIN:

7    Q.  No firsthand knowledge regarding how State Street's

8    back-office operations worked in 2009, 2010, or 2011,

9    correct?

10   A.  Correct.

11   Q.  Thank you.  And you testified regarding that now that

12   you're at State Street, the head of the broker-dealer

13   apparently reports to you; is that correct?

14   A.  The chief compliance officer reports to me, and as I

15   stated before, to the president of the broker-dealer.

16   Q.  My point is that State Street has an independent

17   broker-dealer, correct?

18   A.  It does.

19   Q.  And it's a corporate entity called SSGM, LLC, right?

20   A.  Correct.

21   Q.  Shorthand for State Street Global Markets, LLC, correct?

22   A.  Correct.

23   Q.  Different corporate entity than State Street Bank and

24   Trust, correct?

25   A.  Correct.
```

1    **Q.**   Now, when -- State Street has other corporate entities

2    besides State Street Global Trust, right?   State Street Bank

3    and Trust, correct?

4    **A.**   Yes.

5    **Q.**   And one of those is State Street Bank Europe Limited,

6    correct?

7    **A.**   I believe so.

8    **Q.**   And when -- State Street Global Markets does execute

9    trades on behalf of State Street Bank Europe Limited,

10   correct?

11   **A.**   I assume so, yes.

12           MR. GOLDSTEIN:   Right.   Your Honor, I'd like to

13   show the witness what's been marked as Exhibit B.

14           THE COURT:   This is for identification?

15           MR. GOLDSTEIN:   Yes.

16           THE WITNESS:   Can you shrink this?

17           MR. GOLDSTEIN:   Sure.

18           THE WITNESS:   Keep going.   It looks like there's

19   things off to the right that I can't see.

20           MR. GOLDSTEIN:   That's just someone's initials,

21   Mr. Shaw.

22           THE WITNESS:   Okay.   Yes.

23   BY MR. GOLDSTEIN:

24   **Q.**   Now, State Street Bank Europe Limited, you're aware they

25   can contract with clients in Europe for transition management

1    services, correct?

2              MR. JOHNSTON:  Objection, Your Honor.  Beyond the

3    scope.

4              THE COURT:  Sustained.

5    BY MR. GOLDSTEIN:

6    **Q.**   State Street Global Markets executes trades on behalf of

7    State Street Bank Europe Limited, correct?

8    **A.**   According to what I'm seeing here, it looks that way.

9    **Q.**   Well, no.  I'm asking you.  You just testified a few

10   moments ago that you understand that State Street Global

11   Markets is a broker-dealer for the bank, right?

12   **A.**   Yes.

13   **Q.**   And it performs execution services for other corporate

14   subsidiaries of the bank, like State Street Bank Europe

15   Limited, correct?

16   **A.**   Yes.

17   **Q.**   And when a broker-dealer executes a trade, meaning when

18   SSGM, LLC, executes a trade, they go to the marketplace --

19   **A.**   That's right.

20   **Q.**   -- to find a counterparty for that particular trade,

21   right?

22   **A.**   Correct.

23   **Q.**   And after locating a specific counterparty, that's sort

24   of the process that you were testifying about in terms of

25   clearing and settlement, right?

1    **A.**   No.  That's execution.  Clearing and settlement takes

2    place after the execution.

3    **Q.**   Right.  Meaning after the trade is executed, there needs

4    to be settlement and clearance, right?

5    **A.**   Yes.

6    **Q.**   And that's when title to whatever was bought and sold is

7    transferred from one party to the next, right?

8    **A.**   It's a little more complicated with regard to title under

9    the way the market is structured.  We can have a very lengthy

10   conversation about that.

11   **Q.**   That's way above my pay grade, Mr. Shaw.

12   **A.**   So we can just say transfer of ownership or beneficial

13   ownership.

14   **Q.**   So in a fixed income execution, the broker-dealer goes to

15   the marketplace, and eventually the fixed income instrument,

16   if they're buying it, would go from a counterparty to the

17   broker-dealer, meaning SSGM, LLC, correct?

18   **A.**   There would be a trade report, yes.

19   **Q.**   Right.  And does title and ownership of that fixed income

20   go from the counterparty to SSGM, LLC?

21   **A.**   Change of beneficial ownership, not title.

22   **Q.**   Okay.  And so change of beneficial ownership goes to the

23   broker-dealer, correct?

24   **A.**   It goes to the end customer who bought the bonds.

25   **Q.**   Eventually, right?

**A.**   Yes.  The broker-dealer never owns the bonds, unless they're buying for themselves.

**Q.**   And if State Street Global Markets is executing a particular order for State Street Bank Europe Limited, as you see here in this exhibit, SSGM's client is SSBEL; is that correct?  Meaning when SSBEL orders execution, the broker-dealer's client is the SSBEL.

**A.**   What does "E-L" stand for?

**Q.**   State Street Bank Europe Limited.

**A.**   Yes, then.

**Q.**   So that's correct, right?

**A.**   If that's how the order is given, yes.

MR. GOLDSTEIN:  Thank you.

Nothing further, Your Honor.

THE COURT:  Redirect?

MR. JOHNSTON:  Briefly.

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

BY MR. JOHNSTON:

**Q.**   Mr. Shaw, do you have personal knowledge of where all US corporate bonds were settled and cleared in 2010 and 2011?

**A.**   I'm pretty confident that it's through NSCC and DTC. They've been around a long time.

**Q.**   And why are you confident that that's where all US bonds were settled and cleared in 2010 and 2011?

**A.**   The settlement process is either bilateral or centrally

1    cleared.  Bilateral is where it would be done away from DTC,

2    NSCC, these central clearing counterparties.  The efficiency

3    of the market has evolved over many, many years where, from a

4    risk standpoint and efficiency in the marketplace, tools that

5    are provided to the industry from these entities over time.

6    Virtually all bonds and securities flow through central

7    clearing.

8    **Q.**  And prior to testifying today, did you review business

9    records of State Street?

10   **A.**  Yes.

11   **Q.**  Did you look at the trade records for the transitions of

12   Royal Mail, NTMA, KIA, Sainsbury's?

13   **A.**  Yes.

14   **Q.**  Did you review those?

15           MR. GOLDSTEIN:  I object, Your Honor, in terms

16   of -- I don't know what records we're referencing, whether

17   they've been admitted or not.

18           THE COURT:  Sustained.  It's beyond the scope.

19           MR. JOHNSTON:  He challenged the basis of his

20   knowledge of where these records were, where these trades --

21           THE COURT:  Not as to specific transactions.

22   BY MR. JOHNSTON:

23   **Q.**  Did you review trade confirmations prior to coming into

24   court today?

25   **A.**  I reviewed a sample, yes.

1    **Q.**  We can go and review Exhibit 399, which has been already

2    admitted into evidence.

3             MR. GOLDSTEIN:  Beyond the scope, Your Honor.

4             THE COURT:  Sustained.

5    BY MR. JOHNSTON:

6    **Q.**  Where did -- in Exhibit 399, which you reviewed, where

7    did those bonds settle and clear?

8             MR. GOLDSTEIN:  Objection, Your Honor.

9             THE COURT:  Sustained.

10   BY MR. JOHNSTON:

11   **Q.**  Where do US bonds settle and clear in 2010/2011?

12            MR. GOLDSTEIN:  Objection.

13            THE COURT:  Overruled.

14            THE WITNESS:  Mostly through the NSCC and DTC.

15            MR. JOHNSTON:  Thank you.

16            THE COURT:  Any recross?

17            MR. GOLDSTEIN:  No.

18            THE COURT:  You're excused, sir.  Thank you very

19   much.

20            Next witness.

21            MR. FRANK:  Thank you, Your Honor, the Government

22   calls Michael McGillicuddy.

23            THE COURT:  Can I see counsel for one second at

24   sidebar?

25            (The following discussion held at the bench.)

1          THE COURT:  I just want to clarify, with this
2    witness, I'm unclear as to what -- this is the FBI agent,
3    right?  Did you want me to say something about him not being
4    there related to this case, or is that just going to come out
5    in the direct?
6          MR. FRANK:  It's going to come out in the first
7    questions for direct.
8          THE COURT:  So you're not asking me for an
9    instruction?
10          MR. WEINBERG:  No, not at this point, but if it's
11    the all unclear, I'll ask again.
12          THE COURT:  Right and I just -- the reason to have
13    you at sidebar is what you want me to say or not to say.
14    That's fine.
15          (Bench conference concluded.)
16          THE COURT:  Please be seated.
17          Go ahead, Mr. Frank.
18          MR. FRANK:  Thank you, Your Honor.
19              **SPECIAL AGENT MICHAEL MCGILLICUDDY**
20          having been duly sworn, testified as follows:
21          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**
22    BY MR. FRANK:
23    **Q.**  Could you tell us your name and spell it for the record,
24    please?
25    **A.**  Yes.  It's Michael McGillicuddy, M-i-c-h-a-e-l, last name

1    spelled M-c, capital G, i-l-l-i-c-u-d-d-y.

2    **Q.**   Where do you work?

3    **A.**   I work for the FBI's Washington field office.

4    **Q.**   And how long have you worked at the FBI?

5    **A.**   About 12 and a half years.

6    **Q.**   And during most of that time, what squad have you been

7    assigned to?

8    **A.**   Most of the time, I've been on a securities fraud squad

9    in our criminal division.

10   **Q.**   Have you had any involvement in the investigation of the

11   defendant in this case?

12   **A.**   I have not, no.

13   **Q.**   Or of State Street's transition management business?

14   **A.**   No.

15   **Q.**   Did there come a time when you were involved in an

16   investigation of an entity called ConvergEx?

17   **A.**   Yes, that was one of my investigations.

18   **Q.**   What is ConvergEx?

19   **A.**   It's a large broker-dealer based in New York.

20   **Q.**   As part of your investigation, did there come a time when

21   you interviewed the defendant in this case, Ross McLellan?

22   **A.**   Yes, I interviewed Mr. McLellan in January of 2012.

23   **Q.**   Why did you interview Mr. McLellan?

24   **A.**   We had obtained some information that State Street was a

25   significant client of ConvergEx's and Mr. McLellan's name was

1    given to us as the point of contact for order flow coming

2    from State Street.  So we wanted to talk to him as a witness,

3    both as a client, and maybe even a potential victim.

4    **Q.**   Where did you interview him?

5    **A.**   At his residence.

6    **Q.**   And why did you go to his house?

7    **A.**   At the time, our information was that he no longer worked

8    at State Street and given that we did not know where he was

9    employed, the obvious choice was to catch up with him at his

10   home.

11   **Q.**   Was your visit announced or unannounced?

12   **A.**   It was unannounced.

13   **Q.**   Why is that?

14   **A.**   It's what we call a knock-and-talk interview.  We were

15   just looking to catch up with a possible victim at the most

16   convenient place for them.

17   **Q.**   What was Mr. McLellan's demeanor when you spoke with him?

18   **A.**   Cooperative.

19   **Q.**   He invited you into his home?

20   **A.**   He did.

21   **Q.**   As part of the interview, did there come a time when you

22   spoke to him about a spreadsheet relating to ConvergEx?

23   **A.**   Yes.

24   **Q.**   Tell us about that.

25   **A.**   He said that he had received an anonymous fax --

1   anonymous being my words -- a fax that looked to be an

2   internal ConvergEx document, which was a spreadsheet that

3   outlined the amount of spread that ConvergEx had taken on its

4   clients trades over some period of time.

5   **Q.**   What, if anything, did he tell you about who he thought

6   sent the spreadsheet to him?

7   **A.**   He didn't know.  He -- he believed it to be from a

8   disgruntled former ConvergEx employee that was looking to out

9   the practice of ConvergEx taking a spread on client trades.

10  **Q.**   Did Mr. McLellan say anything to you about State Street's

11  own business practices during that interview?

12  **A.**   Yes.

13  **Q.**   When you spoke to him, were you speaking about the

14  transition business specifically, or more generally?

15  **A.**   More generally.

16  **Q.**   Why is that?

17  **A.**   Just order flow that came into ConvergEx.

18  **Q.**   Okay.  What, if anything, did he tell you in that

19  conversation about how State Street chooses third-party

20  brokers?

21         MR. GOLDSTEIN:  Well, Your Honor, I object given --

22  could we be heard at sidebar, please, rather than --

23         THE COURT:  All right.

24         (The following discussion held at the bench.)

25         MR. GOLDSTEIN:  I'm not exactly sure where Mr.

1    Frank is going.  You're just asking whether the questions

2    related to transition management in general, specifically or

3    some in general?

4            THE COURT:  I thought he said that his question

5    talked generally about State Street, but not specifically

6    about business management.

7            MR. FRANK:  And what I can elicit, if counsel is

8    concerned about it, is that Mr. McLellan described in his

9    biography, said that he had transition business.  The

10   questions were not -- he didn't phrase each question with

11   respect to in transition management, he just asked a

12   general -- general understanding, what he was talking about

13   in his business.

14           MR. GOLDSTEIN:  Well, the problem, Your Honor, was

15   that will -- given the statements given, it's not even in the

16   specific context of transition management business.

17   Mr. McLellan is making broad-based statements about State

18   Street's business practices, which is not even confined to

19   this trial.  It's more misleading.

20           MR. FRANK:  That's incorrect, Your Honor.  The

21   witness will testify that --

22           THE COURT:  It's overruled.  I think that goes at

23   the moment to the weight.

24           (Bench conference concluded.)

25   BY MR. FRANK:

1   Q.   What, if anything, did he tell you about how State Street

2   chooses third-party brokers?

3   A.   He said they routed order flow to several brokers and

4   that it shows their brokers based on their ability to provide

5   best execution, best price, and lowest commission rate.

6   Q.   What, if anything, did he tell you about State Street's

7   practices with respect to taking commissions and fees?

8   A.   That they fully disclosed their commission structure and

9   their fee structure to their clients.

10  Q.   What, if anything, did he tell you about State Street's

11  practices with respect to taking undisclosed spreads?

12  A.   That they did not take spreads on the types of trades

13  that they routed to ConvergEx.

14  Q.   And what types of trades were those?

15  A.   I'm not sure we asked him that.  We were just talking

16  about order flow to ConvergEx generally, but I understood

17  that to be equities, because that was the subject matter of

18  our case.

19  Q.   What, if anything, did he tell you about when he believed

20  it was permissible to take spreads?

21  A.   He said he thought it was permissible, as long as the

22  spread was fully disclosed, and the client was not a

23  fiduciary.

24          MR. FRANK:  Thank you, no further questions.

25          THE COURT:  Cross-examination, Mr. Goldstein?

1          MR. GOLDSTEIN:  Thank you, Your Honor.

2          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

3     BY MR. GOLDSTEIN:

4     **Q.**  Good morning, Agent McGillicuddy?

5     **A.**  Good morning.

6     **Q.**  You testified Mr. McLellan told you that -- well, strike

7     that.  You spoke to Mr. McLellan about State Street's

8     practices back in the late 1990s and early 2000s, correct?

9     **A.**  We spoke to him about State Street's practices over the

10    course of time leading up to the interview.

11    **Q.**  He told you that State Street used ConvergEx in the 1990s

12    and early 2000s, correct?

13    **A.**  He told us that that's when -- in his head, that's when

14    they sent them significant order flow.

15    **Q.**  He told you that it stopped before 2008, correct?

16    **A.**  He didn't say it stopped.  He said significant.  He said

17    the business level had dropped off.

18    **Q.**  Okay.  But you asked him about State Street's outsourcing

19    of when -- when it selected broker-dealers external to State

20    Street, right?

21    **A.**  Yes.

22    **Q.**  All right.  And as you just testified, he told you that

23    there were multiple factors that State Street considered when

24    it was picking an outside broker-dealer, correct?

25    **A.**  Correct.

1   **Q.**  He also told you that back in that time period, State

2   Street didn't have broker-dealers in Europe or Asia, correct?

3   **A.**  I don't think he said that.  He did say he used ConvergEx

4   for those regions.

5   **Q.**  Okay.  And he told you that when he selected a broker, or

6   when State Street was selecting an outside broker, they

7   looked to, in your words, best execution, best price, and

8   lowest commissions, correct?

9   **A.**  Yes.

10  **Q.**  That would mean, that, in Mr. McLellan's mind, when he

11  was speaking to you, best execution was not synonymous with

12  best prices, was it?

13          MR. FRANK:  Objection to what was going on in Mr.

14  McLellan's mind.

15          THE COURT:  Sustained as to Mr. McLellan's mind.

16  You can rephrase.

17  BY MR. GOLDSTEIN:

18  **Q.**  When you asked him how he selected, he didn't simply say

19  best execution, right?

20  **A.**  Right.  He said best execution, best price, and lowest

21  commission rate.

22  **Q.**  Right.  So, therefore, best execution is not limited to

23  best price, according to the statement he gave you, correct?

24          MR. FRANK:  Objection.  Unless he's asking for the

25  witness's understanding.

1                   THE COURT:  Overruled.

2     BY MR. GOLDSTEIN:

3     **Q.**   Correct?

4     **A.**   I don't know how he defined the three and whether the

5     second two were mutually exclusive and a subset of the first.

6     He just listed the three.

7     **Q.**   Right.  Listed all three, right?  Didn't simply list best

8     execution, right?

9     **A.**   Correct.

10    **Q.**   The interview took place in Mr. McLellan's home,

11    approximately 7 o'clock, correct?

12    **A.**   That's right.

13    **Q.**   Knock-and -- what did you call it?  A knock-and what?

14    **A.**   Knock-and-talk interview.

15    **Q.**   Knock-and-talk interview.  No advanced warning, right?

16    **A.**   That's right.

17    **Q.**   Mr. McLellan was inside his home with his wife, having a

18    glass of wine, in fact, correct?

19    **A.**   I don't know remember if he was having a glass of wine.

20    His wife was at the residence, yes.

21    **Q.**   Let you in, was cooperative, willing to speak to you,

22    right?

23    **A.**   Yes.

24    **Q.**   All right.  And you testified that your conversation with

25    him was limited to equities, correct?

1    **A.**   I think we were talking about order flow that State

2    Street sent to ConvergEx.  So I'm not sure we asked him to

3    define what that was, but --

4    **Q.**   But you knew it to be equities, right?

5    **A.**   I understood it to be equities, because that was the

6    focus of our case, but I don't know if we asked him about

7    that.

8    **Q.**   And the conversation related to US-based clients of State

9    Street, correct?

10   **A.**   We did not limit it to that, no.

11   **Q.**   No.  And did you ask Mr. McLellan any questions regarding

12   a transition for the NTMA, an Irish Government agency?

13   **A.**   We did not.

14   **Q.**   All right.  So when you testified that Mr. McLellan made

15   statements about State Street's practices, you testified he

16   said fully disclosed commission and fee structure, right?

17   **A.**   Correct.

18   **Q.**   That was just some general question to him, or was that

19   specifically focused on State Street's transition management

20   business?

21   **A.**   The way I remember it -- remember we were focused on the

22   ConvergEx investigation.  So we would have asked him how he

23   understood ConvergEx was being compensated.  But I think his

24   answer was by commission and then we would have asked him,

25   you know, were they taking a spread?  And I think that he

1    said that no one ever told him that they were taking spread

2    at that point in time.  We were talking the earlier years.

3    And I think the statement he made was a general statement

4    that he offered.

5    Q.  Right.  So it's not like you asked Mr. McLellan -- well,

6    strike that.

7            Are you aware of the transition management

8    business -- during the course of your investigation, you've

9    come to be familiar with the transition management business?

10   A.  Yes, that was a piece of the ConvergEx investigation, as

11   well.

12   Q.  And you know that every transition for a particular

13   client can be different, right?

14   A.  Sure.

15   Q.  Right?  I mean, some transitions are US-based ERISA

16   clients, some transitions are for European clients?

17           MR. FRANK:  Objection, beyond the scope.

18           THE COURT:  Sustained.

19   BY MR. GOLDSTEIN:

20   Q.  You didn't ask Mr. McLellan any questions regarding the

21   NTMA transition, did you?

22           MR. FRANK:  Asked and answered.

23           THE COURT:  Overruled.

24           THE WITNESS:  Did not.

25   BY MR. GOLDSTEIN:

1    **Q.**   No.  Did not ask him any questions about negotiations

2    with NTMA, right?

3    **A.**   Did not.

4    **Q.**   So his statement to you about disclosure had nothing to

5    do with the NTMA transition, right?

6                    MR. FRANK:   Objection what it had to do with.

7                    THE COURT:   Overruled.

8    BY MR. GOLDSTEIN:

9    **Q.**   Right?

10   **A.**   I don't know what was in his head when he answered that

11   question.

12   **Q.**   You certainly didn't ask him about it, right?

13   **A.**   I did not ask him about those transitions.

14   **Q.**   He didn't say let me talk to you about the NTMA

15   transition, did he?

16   **A.**   No.

17   **Q.**   Same question for the Royal Mail.  Did you ask him any

18   questions about the Royal Mail's transition?

19   **A.**   Royal Mail?

20   **Q.**   Yes.

21   **A.**   No.

22   **Q.**   Did you ask him any questions about the Royal Mail

23   contract?

24   **A.**   No.

25   **Q.**   Did you ask him any questions about what fees,

1    commissions, markups, or spreads were permissible pursuant to

2    the Royal Mail contract?

3    **A.**   No, we just talked generally about when spread was

4    permissible.

5    **Q.**   Right, so when you asked him a question about spreads and

6    he gave you an answer, it wasn't tied to the Royal Mail

7    transition, was it?

8    **A.**   I don't know what was in his head, but we didn't ask him

9    about that transition.

10   **Q.**   Right.  Same thing with Dutch Doctors, was that a subject

11   matter of your conversation?

12   **A.**   It was not.

13   **Q.**   What about Sainsbury's?  Did that come up in your

14   conversation?

15   **A.**   No.

16   **Q.**   Eircom?

17   **A.**   Eircom?

18   **Q.**   Yes.

19   **A.**   No.

20   **Q.**   AXA?

21   **A.**   No.

22   **Q.**   None of the questions that you asked him, none of the

23   subject matters that you raised with him had anything to do

24   with those entities or transitions, right?

25   **A.**   Unless his general answer was comprised of, you know,

1    overflow from those entities, I'm not sure.

2    **Q.**  Right.  Did he say those things?

3    **A.**  No.

4    **Q.**  Did he talk to you about those companies?

5    **A.**  Did not.

6    **Q.**  Did you raise the names of those companies?

7    **A.**  No.

8    **Q.**  Were you talking about those companies?

9    **A.**  No.

10   **Q.**  Now, you know that in the United States, there are ERISA

11   guidelines or rules that govern transitions in the United

12   States, right?

13           MR. FRANK:  Beyond the scope.

14           THE COURT:  Sustained.

15   BY MR. GOLDSTEIN:

16   **Q.**  You spoke to Mr. McLellan about ConvergEx, right?

17   **A.**  Yes.

18   **Q.**  You know that ConvergEx had -- you said it was a

19   broker-dealer based in New York, right?

20   **A.**  Correct.

21   **Q.**  You also know it had a broker-dealer based outside of the

22   United States, right?

23           MR. FRANK:  Objection to what the agent knows.

24   That's not relevant.

25           THE COURT:  What is the --

1          MR. GOLDSTEIN:  Perhaps we should be heard at

2     sidebar, Your Honor.

3          THE COURT:  All right.

4          (The following discussion held at the bench.)

5          MR. GOLDSTEIN:  Your Honor, Mr. Frank again looked

6     back to the spreadsheet.  We also have -- the spreadsheet is

7     this ConvergEx spreadsheet that elicited testimony on direct

8     examination for a guidance spreadsheet.  There's also a

9     conversation in evidence regarding Mr. McLellan --

10    Mr. Pennings and Mr. McLellan and Mr. Pennings talks about

11    double-dipping as a reference to ConvergEx, with

12    double-dipping, is they were interposing a second

13    broker-dealer into their execution process.

14          What ConvergEx was doing is they were taking the

15    order in the United States, they were first sending it to a

16    broker-dealer in Bermuda.  That broker-dealer would add

17    spreads and give it back to the US broker-dealer.  And the

18    second ConvergEx broker-dealer would then take a second

19    spread as the reference to double-dipping.  It's incredibly

20    unfair and highly misleading for the Government to elicit

21    statements about what Mr. McLellan said, tying it to this

22    ConvergEx, and not letting us get into the -- what they were

23    really talking about, which is the ConvergEx model.

24          And so whether they talk about it, if the agent is

25    going to deny it or not, he knows what the ConvergEx model

1    was, and if they're trying to contribute the state of mind to

2    Mr. McLellan, the jury should hear what the ConvergEx model

3    was.

4              MR. FRANK:  He specifically asked the defendant --

5    and counsel is welcome to ask about whether he knew they were

6    taking spreads -- whether he knew whether it was permitted by

7    contract, and what he knew about it.  None of this came out.

8    The only relevance to this was the defendant's state of mind.

9    There was no discussion of double-dipping.  There was no

10   discussion of --

11             THE COURT:  This is plainly beyond the scope.  I

12   think what he's saying is, that where this is relevant beyond

13   the scope --

14             MR. FRANK:  I'm sorry, Your Honor.  It's not just

15   beyond the scope; it's beyond what they discussed.  And so

16   the relevance of what they discussed, whether it's going to

17   the scope of my question or not, is only what was in the

18   defendant's head and none of this was in the defendant's

19   head.  What he's trying to do is elicit what's in the agent's

20   head.  The agent --

21             THE COURT:  If I understand it, I think he's saying

22   it's in the defendant's head, because there was a discussion

23   between him and Pennings about double-dipping.

24             MR. FRANK:  There wasn't, though.  We have no

25   testimony about a discussion between him and Pennings about

1    double-dipping.  The only reason the spreadsheet -- the only

2    reference to the spreadsheet with respect to the defendant --

3         THE COURT:  I thought he said that Pennings had a

4    discussion.

5         MR. GOLDSTEIN:  No, it's in a recording that the

6    Government introduced.

7         MR. FRANK:  Not with respect to ConvergEx, at all.

8    The August 26th conversation, there was no discussion of

9    ConvergEx.  In the August 26th discussion, which was a year

10   and several months after the ConvergEx discussion, which was

11   in early 2010, there was a separate conversation and that

12   discussion about whether it's permissible to take a fee and a

13   spread at the same time.  Do you know if that's legal in the

14   UK.

15        And Pennings responded in that conversation, I

16   believe a fee and a spread are legal.  It's double-dipping

17   that I think is illegal in the UK.  That has nothing to do

18   with what was in the defendant's head in February or January

19   of 2010 about ConvergEx's business model.  The only thing we

20   spoke about with respect to ConvergEx was the spreadsheet

21   that he testified to, was that the spreadsheet was --

22        THE COURT:  Here's the question that I have about

23   going beyond.  It's mostly the scope, but it's at the scope

24   of the direct of the witness testimony.  You can get into

25   ConvergEx generally, but the question is, what is the

1   foundation that connects whatever business model information

2   or not, that you would have to the defendant?  Because right

3   now, we have evidence, a little bit.  So the question is what

4   gives rise to his understanding of the improper, so to speak,

5   or the double-dipping, which he might not know about.

6            MR. WEINBERG:  Can I take a shot at this, Judge?

7            THE COURT:  Yes.

8            MR. WEINBERG:  They emphasized it today and

9   reinforced McLellan's receipt of the spreadsheet, which was

10  sent to Pennings, where Pennings essentially says this is

11  unethical and confronts -- the reason it's unethical is not

12  that it matches State Street's later business model, the

13  reason that they thought it was worth sending a spreadsheet

14  and confronting a client is that ConvergEx was doing

15  something that was off the charts for banks.  They were

16  charging these --

17           MR. GOLDSTEIN:  Double-dipping.

18           THE COURT:  What's the charge, though, the

19  spreadsheet?  What does the spreadsheet show?

20           MR. WEINBERG:  It shows the ConvergEx double

21  markups.  Testimony shows the markup.

22           MR. FRANK:  No, it doesn't show.

23           MR. WEINBERG:  It shows the --

24           MR. FRANK:  We can look at the spreadsheet, Your

25  Honor.  The spreadsheet shows -- there's a column for

1    commissions and there's a column for spreads, there's a

2    column for FX, and there's a column for everything else.  It

3    doesn't show double-dipping.  There's no discussion of

4    double-dipping.

5              MR. JOHNSTON:  It wasn't the person who asked

6    questions about the spreadsheet?  In fact, Ed Pennings,

7    the --

8              MR. WEINBERG:  No, because he's not a reliable

9    person to give a truthful answer.

10             MR. JOHNSTON:  I know you may not like it.

11             MR. WEINBERG:  So on -- the spreadsheet has

12   columns.  One is the disclosed commissions; the other is the

13   undisclosed second spread, bigger.

14             THE COURT:  There's two columns with respect to the

15   spreads.  There's one --

16             MR. WEINBERG:  It doesn't say double-dipping.

17             THE COURT:  I understand that, but is there two

18   columns reflecting commissions or spreads?

19             MR. FRANK:  There's a column reflecting commission

20   and there's a column reflecting -- I actually don't know that

21   it's called spreads, Your Honor.  I'd have to look at the

22   spreadsheet.  I think it's called trading revenue or

23   something like that.  Trading --

24             MR. WEINBERG:  This agent would know that their

25   books and records were --

```
 1              THE COURT:  All right.  I'm going to overrule the
 2   objection, but it's beyond the scope.  So ordinarily I would
 3   say -- I wouldn't make you recall the witness, because it's
 4   just a waste of time, but I will make you ask some direct
 5   questions.  He's an agent, so I understand it's -- but I
 6   think that it should be more in the nature of direct
 7   examination, because it's clearly beyond the scope of what
 8   they have presented.  And what you're looking for now is
 9   just -- is not really related, per se, to the interview.
10   This is what they discussed or --
11              MR. FRANK:  So what is Your Honor allowing,
12   exactly?
13              THE COURT:  I'm allowing him to essentially elicit
14   from him knowledge about things that he asked about
15   ConvergEx.  It's up to you if you want to go there.  I don't
16   know what the risk is to that.
17              MR. GOLDSTEIN:  Okay.
18              THE COURT:  But it's beyond the scope of the
19   direct, but given that he was a major customer and given that
20   the two columns -- what I understand you all to think with
21   the ConvergEx work, I see that there's enough of a connection
22   to allow this -- that there's enough of a connection for an
23   evidentiary purpose to allow evidence about this, because
24   there's a reasonable inference that McLellan would know that,
25   given these things.  That said, I'm not going to completely
```

1    let you go to direct exam, because he's an agent, but it's

2    more in the nature of a direct exam.

3            MR. FRANK:  Your Honor, I would ask that you limit

4    the scope and not go down a wild goose chase for the

5    ConvergEx road.  If he can tie it with a few questions, but

6    if we're going to go into an explanation of ConvergEx --

7    because I'll note at this point in the investigation, January

8    of 2012, they had only been investigating ConvergEx for a few

9    months.

10           MR. GOLDSTEIN:  The state of the investigations,

11   Your Honor, so they can take the commissions on two separate

12   levels, broker-dealer level.

13           THE COURT:  Okay.

14           (Bench conference concluded.)

15           THE COURT:  So ladies and gentlemen of the jury,

16   what you've seen so far in the case is direct examination has

17   been direct, nonleading questions, cross-examination is

18   leading questions, and you've heard, occasionally, objections

19   about the scope -- and as a general matter, the

20   cross-examination stays within topics related to direct

21   examination, or related to sort of things that go to -- help

22   you evaluate the credibility of the witness.

23           Sometimes we've been discussing -- and what you're

24   going to hear in a moment -- is some questions beyond -- some

25   of which may go beyond the scope of the direct.  So there --

1    the reason we're doing it this way and having it now, first

2    of all, is so that we don't have to have the witness come

3    back another time.  He's here.  It's more efficient to do it

4    now.  But when it goes beyond the scope of the direct, then

5    ordinarily the questioning lawyer asks direct questions.

6    Because now you're presenting information from the witness,

7    you're not cross-examining them and you go into some separate

8    topic.  So you ordinarily hear just direct questions.

9          It may be a little bit -- in this case, the witness

10   is a Government -- FBI agent, a Government employee, so

11   there's a little more latitude for Mr. Goldstein in terms of

12   the form of his questions, but nonetheless, it's beyond the

13   scope, so it would be more in the nature of a direct

14   examination, when he asks these questions.  And we've just

15   been having -- that's what the discussion was about.

16         So go ahead, Mr. Goldstein.

17   BY MR. GOLDSTEIN:

18   **Q.**  Agent McGillicuddy, you testified that ConvergEx had a

19   broker-dealer located in New York, correct?

20   **A.**  Yes.

21   **Q.**  They had a second broker-dealer located in another

22   location, correct?

23   **A.**  They had subsidiaries around the globe, yes.

24   **Q.**  And was there a broker-dealer based in Bermuda?

25   **A.**  There was.

1    **Q.**   And ConvergEx was routing orders, execution orders?

2            MR. FRANK:  Objection.

3    **Q.**   Were --

4    BY MR. GOLDSTEIN:

5    **Q.**   Were they routing orders to more than one of their

6    broker-dealers?

7    **A.**   Yes.

8    **Q.**   Okay.  And explain that to the jury, please.

9    **A.**   So our investigation revolved around ConvergEx's program

10   trading business and that order flow generally came in from a

11   sales trading desk and ConvergEx Global Markets had two

12   desks, one in New York and one in London, but their executing

13   desks were elsewhere, one being in Bermuda, and one being in

14   Hong Kong.

15   **Q.**   And so were they taking multiple -- were they taking

16   spreads at two different locations for transactions, sort of

17   double-dipping, so to speak?

18   **A.**   I don't know what you mean by double-dipping, but the

19   spread was taken at the executing desk, is my understanding.

20   **Q.**   And was there a second spread or commission taken at a

21   subsequent broker-dealer desk?

22   **A.**   Not to my knowledge.

23   **Q.**   And so explain it to the jury, please.

24   **A.**   Explain what?

25   **Q.**   The process how the trades routed from one desk to

1    another.

2    **A.**   Okay.  There would be -- I'm going to say CGM, ConvergEx

3    Global Markets.  There would be a sales trader --

4    **Q.**   Where are they located?

5    **A.**   Could be in New York, could be in London, depending on

6    the client.

7    **Q.**   All right.

8    **A.**   So an order would come in.  The sales trader would take

9    the order, would route the order to various desks, because if

10   it was a block trade, they could route it to an executing

11   desk in New York.  If it was a program trade, they could

12   route it to either Bermuda or Hong Kong to be executed,

13   depending on the region.

14   **Q.**   Okay.  And was there a commission taken in Bermuda or

15   Hong Kong in that instance?

16   **A.**   I believe the commission in that instance would have been

17   taken by the New York or the London broker-dealer.

18   **Q.**   Okay.  And was it necessary to send these trades to

19   Bermuda or Tokyo to execute the trade?

20              MR. FRANK:  Objection.

21              THE COURT:  Overruled.

22              THE WITNESS:  Was it necessary?

23   BY MR. GOLDSTEIN:

24   **Q.**   Yeah.  To execute the trade, did they have to send it to

25   the offshore broker?

1    **A.**  No, not in all cases.

2    **Q.**  Okay.  Getting back to your interview with Mr. McLellan.

3    He told you that, after 2002, the relationship with ConvergEx

4    dropped off, correct?

5    **A.**  He did.

6    **Q.**  He told you that State Street moved its business to

7    electronic trading platforms, such as Instanet, right?

8    **A.**  Yes.

9    **Q.**  Instanet is an equity platform, correct?

10   **A.**  I don't know.

11          MR. GOLDSTEIN:  May I have one moment, Your Honor?

12          THE COURT:  You may.

13   BY MR. GOLDSTEIN:

14   **Q.**  You also talked to -- Mr. McLellan told you about

15   conversations that he had with an individual regarding

16   planned sponsor business, right?

17          MR. FRANK:  Objection.  Beyond the scope.

18          MR. GOLDSTEIN:  It's the subject of the interview,

19   Your Honor.

20          THE COURT:  Overruled.

21   BY MR. GOLDSTEIN:

22   **Q.**  You spoke to Mr. McLellan about the planned sponsor

23   business, right?

24   **A.**  He did.

25   **Q.**  And that's US-based ERISA business, correct?

1    **A.**  Don't know.

2    **Q.**  Do you know anything about ERISA?

3            MR. FRANK:  Objection to what the agent knows about

4    ERISA, Your Honor.

5            THE COURT:  Overruled.

6            THE WITNESS:  ERISA came up in a limited basis on

7    the ConvergEx case, generally when talking about a fiduciary

8    relationship.

9    BY MR. GOLDSTEIN:

10   **Q.**  In the United States?

11   **A.**  I don't know.  I don't know if it was exclusive to that.

12           MR. GOLDSTEIN:  Nothing further, Your Honor.

13           **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

14   BY MR. FRANK:

15   **Q.**  So Special Agent McGillicuddy, in ConvergEx, they were

16   promising one price and charging another?

17           MR. GOLDSTEIN:  Objection, Your Honor.

18           THE WITNESS:  Explain what you mean by that.

19           THE COURT:  Overruled.

20   BY MR. FRANK:

21   **Q.**  ConvergEx was promising its customers one price and

22   secretly charging another?

23   **A.**  They were taking markups without customer's knowledge.

24   **Q.**  They were taking disclosed commissions?

25   **A.**  Yes.

1    **Q.**   And hidden markups?

2    **A.**   Yes.

3    **Q.**   And that was the subject of your investigation?

4    **A.**   It was.

5    **Q.**   And that's what you went to talk to the defendant about?

6    **A.**   Yes.

7    **Q.**   And he told you that when he routed trades through

8    ConvergEx, they paid a commission?

9              THE COURT:   Sustained as to the leading.

10   BY MR. FRANK:

11   **Q.**   What, if anything, did he tell you State Street paid when

12   they routed -- knowingly paid when they routed trades to

13   ConvergEx?

14   **A.**   The commission.

15   **Q.**   And what, if anything, did he tell you he knew about

16   whether State Street was paying more than that?

17   **A.**   He -- he told us during the period of time that State

18   Street was using ConvergEx for a lot of order flow, he was

19   aware that they were charging a commission.  And over the

20   course of time, there were about three events which led him

21   to believe that ConvergEx may have been taking a spread.

22   **Q.**   What, if anything, did he tell you he knew at the time

23   that he was paying the commission about whether they were

24   also taking a spread?

25   **A.**   That no one ever told him that ConvergEx was taking a

1    spread.

2    **Q.**   What, if anything, did he tell you he did when he

3    suspected they were taking a spread?

4    **A.**   So after he had gathered these three different data

5    points that they may have been taking a spread, when it

6    became clear that ConvergEx -- that State Street may again be

7    sending significant order flow to ConvergEx, he took measures

8    to make sure that a spread could not be taken.

9    **Q.**   You were asked some questions about what -- when the

10   defendant told you he believed it was permissible to take a

11   spread?

12   **A.**   Yes.

13   **Q.**   Do you recall those questions?

14   **A.**   Yes.

15   **Q.**   And you were asked whether he had told you whether you

16   were talking about specific State Street clients at the time.

17   Do you recall that?

18   **A.**   Yes.

19   **Q.**   And I believe your testimony was you were not talking

20   about specific clients?

21   **A.**   We were not.

22   **Q.**   What, if anything, did he tell you about when he believed

23   it was permissible to take a spread?

24               MR. GOLDSTEIN:  Objection.

25               THE COURT:  What's the objection?

1          MR. GOLDSTEIN:  Beyond the scope and asked and

2     answered.

3          MR. FRANK:  It's not beyond the scope.  It's

4     directly responsive.

5          THE COURT:  Overruled.

6          THE WITNESS:  He said that he thought it was

7     permissible to take the spread, if the spread was fully

8     disclosed, and the client was not a fiduciary.

9     BY MR. FRANK:

10    **Q.**  And you were asked some questions about the time

11    period -- well, about his statement to you that State Street

12    fully disclosed its own commission and fee structure.  Do you

13    recall that?

14    **A.**  Yes.

15    **Q.**  Did he narrow that to a specific time period?

16    **A.**  Hard to say.  We were talking about an early time period,

17    but the questions were more general, as well.  So I'm not

18    sure.

19    **Q.**  And you were asked some questions about his statement to

20    you that State Street does not take spread?  Do you recall

21    that?

22    **A.**  Yes.

23    **Q.**  And that statement was in reference to a conversation he

24    had had just a few months before; is that correct?

25    **A.**  Say that again?

1   **Q.**  Well, do you recall that he told you about a conversation

2   that he had had a few months before your interview?

3   **A.**  Yes.

4   **Q.**  And what, if anything, did he tell you about State Street

5   taking a spread in the context of that conversation?

6          MR. GOLDSTEIN:  I object, Your Honor.

7          THE COURT:  Sustained.

8   BY MR. FRANK:

9   **Q.**  The conversation he described was a few months before?

10  **A.**  Yes.

11  **Q.**  Was it within that -- what, if anything -- what context

12  was it within that he told you about State Street not taking

13  a spread?

14  **A.**  He was, at the time, having a breakfast meeting with

15  ConvergEx's CEO, exploring, I guess, an employment

16  opportunity, and he felt that the CEO was pumping him for

17  information about State Street's practices and whether they

18  were taking a spread, and he told the CEO that State Street

19  did not take a spread.

20  **Q.**  And that was a few months before he met with you?

21  **A.**  Yes.

22  **Q.**  You were also asked some questions about his statement

23  concerning best execution, best price, and lowest commission?

24  **A.**  Yes.

25  **Q.**  What, if anything, did he tell you about lowest

1   commission being a factor in State Street's selection of a

2   broker?

3   **A.**  He said that they selected their brokers based on their

4   ability to provide best execution, best price, and lowest

5   commission rate.

6            MR. FRANK:  Thank you.  No further questions.

7            THE COURT:  Recross, Mr. Goldstein?

8            MR. GOLDSTEIN:  Thank you, Your Honor.  May I just

9   stand over here, Your Honor?

10           THE COURT:  You may.

11           **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

12   BY MR. GOLDSTEIN:

13   **Q.**  Agent McGillicuddy, you testified that -- just in

14   response to Mr Frank's questions told you that Mr. McLellan

15   told you that they did not take spreads on the trades.  That

16   was your testimony.  That's what he said to you, right?

17   **A.**  I testified twice on that topic.  One was that he told me

18   that State Street did not take a spread on the types of

19   trades that are routed to ConvergEx.

20   **Q.**  Let me stop you right there.  That's exactly my point,

21   meaning when --

22           MR. FRANK:  Objection to what counsel's point is,

23   Your Honor.

24           THE COURT:  Sustained.

25           Just go ahead, Mr. Goldstein.

1    BY MR. GOLDSTEIN:

2    **Q.**   Thank you, Your Honor.  When he made that statement, he

3    limited that particular statement to the types of trades they

4    would have routed to ConvergEx, right?

5    **A.**   That's right.

6    **Q.**   And those were equity -- US-based equity trades, right?

7    **A.**   I don't think we asked him that question.  My

8    investigation was on equity trades; so I would have

9    understood that to be talking about equity trades.

10   **Q.**   Okay.  And when you testified regarding ConvergEx model

11   in terms of a markup and a spread, what ConvergEx was doing

12   was taking a markup and then also taking an agency

13   commission, correct?

14            MR. FRANK:  Beyond the scope.

15            THE COURT:  Overruled.

16            THE WITNESS:  That's my understanding, yes.

17   BY MR. GOLDSTEIN:

18   **Q.**   And when Mr. McLellan told you that State Street's

19   practice was to disclose taking a spread, what he told you

20   was it was disclosing that a spread was going to be taken, as

21   contrasted with fully disclosing what that spread would be,

22   correct?

23            MR. FRANK:  Objection.

24            THE COURT:  Overruled.

25            THE WITNESS:  I don't understand the question.  Can

1    you repeat it, please?

2    BY MR. GOLDSTEIN:

3    **Q.**   Yeah.  Do you understand that there's a difference

4    between disclosing to a client that a spread will be taken or

5    fully disclosing the scope of what the spread was that had

6    been taken?  There's a difference there, right?

7    **A.**   Are you talking about qualitative versus quantitative

8    disclosure?

9    **Q.**   Yes.

10   **A.**   Okay.

11   **Q.**   What Mr. McLellan told you was that State Street had a

12   practice of disclosing that they were taking a spread as

13   contrasted with a statement that he told you they fully

14   disclosed what the spread was.  Do you recall that in your

15   report?

16   **A.**   I don't.

17           MR. GOLDSTEIN:  Nothing further, Your Honor.

18           THE COURT:  Thank you very much, sir, you're

19   excused.

20           Are we now, just one left?

21           MR. FRANK:  No, we're done for today, Your Honor.

22           THE COURT:  Right, but I mean for tomorrow.

23           MR. FRANK:  That's correct, Your Honor.

24           THE COURT:  All right.  And then that's it?

25           MR. FRANK:  We're going to evaluate tonight, Your

1    Honor, but that's the current finding.

2              THE COURT:  Okay.

3              So ladies and gentlemen, and --

4              Generally, as a general matter, where we stand,

5    same with respect to the schedule in terms of --

6              MR. FRANK:  Absolutely, Your Honor.

7              THE COURT:  All right.  So remember I told you we'd

8    be done early.  We're done today.  Tomorrow the Government

9    has another witness it's going to call and that witness is

10   coming from Europe.  And for various scheduling reasons

11   couldn't be here today and that's why we're not going to

12   1 o'clock for that witness and that's where we're finishing

13   in a moment.

14             So tomorrow morning we'll resume at 9:00 and the

15   Government will call that witness from Europe and then

16   they're -- they anticipate that the Government will finish

17   its case tomorrow.  It may finish with that witness.  And

18   what Mr. Frank is referring to is he is just going to look

19   over -- and Mr. Johnston -- and see if there's anything else

20   that they think they need.

21             So in any event, then we'll move -- whenever the

22   Government finishes, we'll move to the defense case, but we

23   remain on the schedule I told you on Friday, which is I

24   anticipate you'll receive the case no later than early next

25   week.  What I mean is receive the case for your deliberations

1    when we're done with the presentation of evidence.

2            So keep an open mind.  You haven't heard all the

3    evidence.  You haven't heard closing arguments or my

4    instructions on the law.  Don't do any independent research.

5    Don't discuss the case among yourselves or with anyone else.

6            Feel free, if you wish -- I imagine the snack is

7    there, feel free to stay, if you wish, or in any event, court

8    is in recess for the day.  We won't have any more trial

9    proceedings today and we'll resume tomorrow morning at 9:00

10   am.  Thank you for your attention.  All rise for the jury.

11           (The jury exits the courtroom.)

12           THE COURT:  So you mentioned before, there were a

13   couple other issues.

14           MR. FRANK:  Yes, Your Honor.  One is with respect

15   to the expert witnesses that the defense -- well, they're

16   both related to the expert witnesses the defense intends to

17   call.

18           THE COURT:  What's -- that's the motion to compel,

19   basically, right?

20           MR. FRANK:  Yes, Your Honor.

21           THE COURT:  What's the defense view?

22           MR. WEINBERG:  There's no legal basis for us to

23   disclose to the Government evidence that they claim would be

24   relevant to the witness's interest.  They want invoices, they

25   want, you know, engagement letters between lawyers and

1   experts.

2           You know, the reason that the Government is

3   required to do that is due process, which are rights that

4   flow to citizens, not the prosecutor.  There's no rule,

5   there's no case law, there's no statute, and there's no

6   practice in my knowledge where defense lawyers have to

7   volunteer to the Government evidence that helps the

8   Government's cross-examination.

9           This is a credible expert.  Mr. Frank will ask him

10  how much he's paid and he'll give him the answer tomorrow.

11  That's what cross-examination is for.  You don't need to --

12  it's not a civil case.  You don't get to depose the experts.

13          MR. FRANK:  Your Honor, there is a practice of

14  disclosing this type of limited information, in fact, in the

15  *Sampson* case, it's my understanding that the defense

16  willingly disclosed it without any issue in that case.

17          I have no basis to know -- I have no reason to

18  think he'll lie, but I have no basis to know whether he's

19  going to be fully forthcoming about the terms of his

20  agreement, how he's being paid, what he's being paid for,

21  what other limitations there may or may not be in the

22  agreement.  And so I have a -- I have a right to ask that.

23          I could subpoena it.  I haven't done that.  I could

24  serve him with a subpoena tomorrow morning to do that.  I've

25  held off from doing that, but I'm simply asking for this

1    material, which I think gets directly to his credibility and

2    to his bias and I need to have a basis to know whether he's

3    giving me complete answers.

4            MR. WEINBERG:  He's a credible person.  He's a

5    former head of FINRA.  He's going to give Mr. Frank candid

6    and honest answers to the specific questions that Mr. Frank

7    asks.

8            THE COURT:  So I'll tell you -- interesting -- I

9    read the motion last night.  And it's an interesting issue.

10   You are correct that in the *Sampson* case, no one ever asked

11   me about it, I don't think, in the *Sampson* case.  There were

12   a lot of experts in that case and my memory is that -- I

13   never actually saw -- I assume, actually, there was that kind

14   of disclosure and I don't doubt, if you confirmed it, that

15   that happened, Mr. Frank.  Certainly, there was a lot of

16   fulsome cross-examination at various point of all the experts

17   about that.  And I had the impression, as I think about it,

18   that that had been disclosed.  I get why you want it and I

19   understand the practicality.

20           I just want to think a little bit about it and I

21   read it last night, but didn't really get a chance to ponder

22   it much, because -- and I noticed how the rule is written,

23   the local rule and so -- but I will address it in a short

24   order, shortly, one way or another.  I just want to think a

25   little bit about it.

1        I just wanted to hear, before I did anything
2    further.  I wanted to see what the defendant's position was.
3    Now I understand their position and so I'll resolve that
4    before.
5            MR. FRANK:  So Judge, so Your Honor's going to rule
6    whether, in your discretion, they should give it to us?
7    Because the other issue is I do think I would be entitled to
8    subpoena it from the witness.  I don't think it's a protected
9    document in any way.  And so we prefer just to go --
10           THE COURT:  Yes, I understand you prefer to have me
11   say just give it to them and get it, than do a subpoena.
12           MR. FRANK:  Right.  And -- so the only thing I
13   would ask is, depending on -- since we don't know the outcome
14   of Your Honor's decision, that the witness be directed to
15   bring those documents -- all their expert witnesses be
16   directed to bring those documents with them in case we choose
17   to go the subpoena route.
18           THE COURT:  I'll address that, too, in the order.
19           MR. WEINBERG:  He's en route from the Washington
20   area to Boston, Your Honor.  I don't know what he has or not,
21   but I doubt that it's the regular course of practice for an
22   expert to be lugging his financial records in case the
23   Government subpoenas them.
24           THE COURT:  I'll think about all that.  I'll get
25   the scope of it.

1              What's the other issue?

2              MR. FRANK:  The other issue is I understand that --

3      so, as I mentioned last week, Graham Dixon is a fact witness

4      in this case.  We've elected not to call him in our case in

5      chief, but reserve the right to call him as a rebuttal

6      witness.  We've provided very extensive disclosures about

7      him, including 12 pages of single-paced 302s, his reports of

8      several transitions that he analyzed.

9              He has also complied with the letter rogatory

10     request of counsel, produced voluminous materials to the City

11     of London Police which counsel has.  So because we are now

12     calling him as a rebuttal witness, because -- potentially,

13     because counsel objected to some of the questions we asked at

14     the beginning of this case of Richard Boomgaardt concerning

15     custom and practice in the UK, in the transition management

16     business --

17             THE COURT:  My memory, such as it is, is that I, by

18     and large, overruled those, saying he was a fact witness and

19     allowed you to elicit those things.

20             MR. FRANK:  That's right.  Understood.  And we

21     believe that, on the same basis, Mr. Dixon should be able to

22     testify as a fact witness and offer lay opinion testimony.

23     But in an abundance of caution, we said, because of the

24     objection and because he's being called as a rebuttal

25     witness, we said, to the extent he is designated an expert,

1    here is -- here are his sort of views.  Most of which were

2    set forth in the 302s that were previously produced.

3           We provide that to counsel last week.  So I

4    understand counsel's objecting to it on that basis.  He

5    hasn't yet filed an objection, so we haven't had an

6    opportunity --

7           THE COURT:  You mean that it's a lay expert

8    disclosure?

9           MR. FRANK:  Correct.  I guess.  I'm not sure -- I

10   think that's the basis.  And so what we would ask is that he

11   be permitted, however that comes out, whether he's limited

12   purely to being a fact witness, whether the Court regards him

13   as an expert, that he be permitted to sit in on the expert

14   testimony, but not any fact testimony in the defense case.

15          MR. WEINBERG:  I have no objection to his sitting

16   in while Mr. Menchel testifies.  In the event, which I hope

17   would be unlikely, that Your Honor would permit him to

18   testify as a rebuttal expert, but I do think the issue of

19   what he's permitted to testify to and where it falls ought to

20   be reserved until you hear the defense case and see what

21   there is to rebut.

22          THE COURT:  That sort of solves your --

23          MR. FRANK:  That does solve the problem.

24          Do I understand you to be saying it's just

25   Mr. Menchel tomorrow?  Or it --

```
 1              MR. WEINBERG:  He can sit through any experts he
 2      wants.
 3              MR. FRANK:  I'm asking for scheduling purposes.
 4              MR. WEINBERG:  Yes.
 5              MR. FRANK:  Just Mr. Menchel?
 6              MR. WEINBERG:  No, we have two experts ready to
 7      testify tomorrow, in the event that the Government rests at
 8      10 o'clock and we think that they'll reasonably fill the rest
 9      of the day.
10              MR. FRANK:  And that's --
11              MR. WEINBERG:  Travaglini and Menchel.
12              MR. FRANK:  Okay.  I'm just reconfirming, because
13      he just kept referring to Menchel.
14              THE COURT:  So is there anything that I should look
15      at about what -- is there anything that you've given to the
16      Government -- what, if anything, have you given to the
17      Government that describes what they're going to testify to?
18              MR. WEINBERG:  They have a detailed disclosure
19      letter that I believe the Court has, but I'm glad to --
20              THE COURT:  Can you just either provide it to me
21      again, or tell me where it is in the docket.  Either one is
22      fine.
23              MR. WEINBERG:  I don't know that it's in the
24      docket.  It's in my briefcase and I'll hand it to you.
25              THE COURT:  Just to read it and it would be helpful
```

1    for me to read it.

2             MR. FRANK:  Your Honor, we also have asked for and

3    not received what materials the witnesses relied on in

4    forming their expert opinion and that has not been provided

5    to us.  So we asked that they be directed to provide that to

6    us, as well.

7             And we'd also ask, since we're now 48 hours from

8    Wednesday, that we be told who the witnesses are for

9    Wednesday.

10            THE COURT:  I can keep this, Mr. Weinberg?

11            MR. WEINBERG:  Yes, Your Honor.  I'm sure there are

12   many of them back at the office.

13            THE COURT:  Who will come after the experts -- I'm

14   sorry, the two experts you're calling are Menchel,

15   M-e-n-c-h-e-l?

16            MR. WEINBERG:  Yup.

17            THE COURT:  And who is the one after that?

18            MR. WEINBERG:  Travaglini.

19            THE COURT:  Travaglini.  And then if they both

20   finished tomorrow, who will come Wednesday?

21            MR. WEINBERG:  The truth is, I'm not certain.

22   We're going to be making decisions tonight regarding

23   potential Wednesday testimony.  It could be Mr. Bradley,

24   who's a third expert, it could be Mr. Bednall.  I don't know

25   and I don't want to make representations.  We're going to

1    obviously consider and talk to Mr. McLellan about his rights

2    and we'll report to the Court tomorrow.

3           MR. FRANK:  I object, Your Honor.  We were directed

4    to provide our witnesses 48 hours in advance.  We provided

5    our first witness a week in advance and then we provided --

6    and then our second witness many days in advance.  This is --

7    this is not right that we are now 48 hours from testimony,

8    potentially of the defendant, potentially of experts, I don't

9    know who else, and they haven't decided yet and -- how are we

10   supposed to prepare for that?

11          MR. WEINBERG:  And we may not decide until the

12   testimony is complete tomorrow when we have a chance to talk

13   to our client.  He has a constitutional right to make a

14   decision, every defendant does.  They make an informed

15   decision, they evaluate the state of the evidence with their

16   lawyers.  I know of no rule that Mr. Frank -- Mr. Frank wants

17   to create a rule that --

18          THE COURT:  Mr. McLellan -- his testimony stands in

19   a different position than other witnesses.  And --

20          MR. WEINBERG:  If he doesn't testify, then we -- we

21   are -- after we see the testimony of the two experts, we will

22   make a decision on Mr. Bradley and Mr. Bednall.

23          MR. FRANK:  Your Honor, the law of this case is

24   that 48 hours' notice was to be provided and we're now 48

25   hours away and they're refusing to provide notice and they're

1    telling us that they're not going to provide notice until the
2    night before the testimony.  Then we would ask for a delay in
3    the trial, so we can prepare.  This is completely outrageous.
4             MR. WEINBERG:  Would Mr. Frank feel better if I
5    said Mr. Bednall and Mr. Bradley would be the follow-up
6    witnesses and then I elect not to call them.  I told him who
7    the witnesses are, what the fork in the road is.  We'll be
8    making those decisions after testimony tomorrow.
9             THE COURT:  So what you're telling me is that after
10   the two experts tomorrow, you either might call the one or
11   both -- the next witnesses would be those two experts, if you
12   choose to call them?
13            MR. WEINBERG:  Yes.
14            THE COURT:  And if you didn't call them, if you
15   chose not to call them, then you wouldn't call them, and that
16   then the further question remains whether -- what Mr.
17   McLellan will do.
18            MR. WEINBERG:  Yes, Your Honor.
19            THE COURT:  And will there be other witnesses after
20   that?
21            MR. WEINBERG:  If Mr. McLellan testifies, there
22   would be supportive witnesses.  We've given Mr. Frank the
23   list of potential reparation and character witnesses.  We
24   haven't made a decision.  I don't generally call character
25   witnesses unless I call the defendant, but I identify the

1    character witnesses in case the defendant --

2            THE COURT:  Would it be fair to say, just in terms

3    of the order, after these two experts, it's the next two

4    experts, if they're called, Mr. McLellan, if he's called, and

5    if Mr. McLellan is called, then certainly those other

6    witnesses that you identified, and if not --

7            MR. WEINBERG:  Certainly, our current plans are,

8    assuming Mr. McLellan does not testify, it would be the two

9    experts, if anyone at all, after tomorrow's testimony.  If

10   Mr. McLellan does testify, we'll be making selections amongst

11   the character witnesses.

12           THE COURT:  Who might follow after?

13           MR. WEINBERG:  Yes.  And we haven't -- we have not

14   made -- and I say that to the Court in candor -- the

15   decision.  And won't make that decision until after we see

16   how the testimony goes tomorrow, whether we feel it is in the

17   defendant's interest to call additional experts or not and

18   then we'll discuss with Mr. McLellan the need for a final

19   decision.

20           MR. FRANK:  So in other words, 48 hours before the

21   testimony, I'm either supposed to be preparing for the

22   testimony of two experts, one of whom I was previously

23   advised would not be called and -- or I'm supposed to prepare

24   for the possible testimony of the defendant, all of that

25   tonight, but I don't know what I'm preparing for?

```
1              MR. WEINBERG:  I prepared for Mr. Pennings and
2     Boomgaardt for weeks.  I'm sure Mr. Frank --
3              MR. FRANK:  Well --
4              MR. WEINBERG:  Let me finish, Steve.  He's got a
5     very detailed list of what the four experts would testify to.
6     He got them in the timely way as opposed to the late
7     disclosures and rebuttal experts, or so-called rebuttal
8     experts.  He's had this since 40 days prior to June 4th.
9     He's prepared, Judge.
10             And I have every right -- I don't carry a burden in
11    this case, as Your Honor will instruct, I reserve my right to
12    not call a single witness.  I reserve my right to call
13    experts three and four, depending on how experts one and two
14    do.  That's the best I can do for Mr. Frank.
15             MR. FRANK:  Your Honor, if counsel was so prepared,
16    then there was no reason I needed to tell him a week in
17    advance who my first witness was going to be and then who my
18    second witness is going to be.  There's additional
19    preparation that happens within the last 48 hours.  I would
20    move to preclude those two witnesses if counsel cannot
21    represent today that he's calling them.
22             THE COURT:  That's denied.
23             MR. FRANK:  This is -- Your honor, I mean -- the --
24             THE COURT:  The motion to exclude the defendant's
25    experts that they have disclosed, because he hasn't
```

1    unequivocally said he's calling them in 48 hours is denied.

2    And that motion is not particularly well grounded, Mr. Frank,

3    and you know that.

4              MR. FRANK:  I'm not contesting Your Honor's ruling.

5              THE COURT:  So the question as to preparation is a

6    different issue.  Pick and choose the issues.

7              At the moment, the way I see things is this:  What

8    I understand Mr. Weinberg to be saying and where things are,

9    is that the -- in the sequence of witnesses he's going to

10   call, the next people up after the two witnesses would be

11   these further two experts and if -- so he may not call those

12   two experts.

13             If he doesn't call -- the way I see the scenario as

14   playing out, okay, is he might call those two experts.  He

15   might not.  And then there will be a decision about Mr.

16   McLellan testifying.  He might or might not.  If he doesn't

17   call the two experts and he doesn't call Mr. McLellan, he's

18   likely -- what I hear him saying is he's likely done with his

19   evidence after those two experts.

20             MR. WEINBERG:  That is correct.

21             THE COURT:  If, in fact, he does that, you won't

22   have been ill prepared.  If he calls some of those -- the

23   people to focus on next, what I understand, are the two

24   people.  If it turns out tomorrow he says that he's not

25   calling those two people and he's calling Mr. McLellan.  And

1    on Wednesday we can talk about, then, whether you need extra

2    time to prepare, given that it happened a lot quicker, but

3    now is not the time for that.

4              MR. FRANK:  I understand, Your Honor.

5              THE COURT:  And I'm certainly not excluding the

6    witnesses.

7              MR. FRANK:  As long as Your Honor will entertain a

8    motion to --

9              THE COURT:  I will entertain any motion any one of

10   you file.  There's never been a case when I haven't

11   considered it.  I will consider any request that you make.  I

12   will consider it on the merits of the request and under the

13   circumstances, as I have tried to do throughout this case, is

14   to give everyone a full and fair opportunity to --

15             I'm not looking to prevent you from preparing.  I'm

16   not looking to prevent Mr. Weinberg from preparing, although

17   I know he feels that I rushed him to trial and so we'll just

18   cross that bridge when we get there.  I will say --

19             MR. WEINBERG:  I will make one other statement that

20   might resolve this, which is that if Mr. McLellan elects to

21   testify, he would precede the two experts.  So if Mr. Frank

22   is looking for who would come after the two experts, and all

23   of them are going to testify, the two experts and Mr.

24   McLellan -- Mr. McLellan is going to go --

25             THE COURT:  So actually -- I see.

1          MR. WEINBERG:  So it's Mr. McLellan and the

2     Government ought to get ready, although all defendants get to

3     exercise constitutional decisions and it won't be decided

4     fully until tomorrow.

5          MR. FRANK:  That actually makes it more

6     complicated, Your Honor, because a moment ago my

7     understanding was the two experts and I was going to prepare

8     tonight for those two experts and now I'm being told I need

9     to prepare for the defendant, but if the defendant elects not

10    to testify, then all of a sudden, I could be faced with those

11    two experts.

12         MR. WEINBERG:  No, the two experts, Mr. Menchel and

13    Mr. Travaglini are testifying tomorrow.  Mr. Frank has known

14    that for a week.

15         THE COURT:  No, I understand that.

16         If Mr. McLellan doesn't testify, it's -- in other

17    words, the next witness is Mr. McLellan after those two

18    experts, unless you decide not to -- unless Mr. McLellan

19    decides not to -- decides to exercise his personal,

20    independent right that's his and decides not to testify.  And

21    then, in which case, you might or might not call those other

22    two experts.

23         MR. WEINBERG:  Precisely.  We'll know about the

24    experts after our first two experts testify and we'll advise

25    Mr. Frank accordingly.  This is not unusual, Judge.  What's

1    unusual is Mr. Frank's insistence on --

2              THE COURT:  At the moment we are where we are.  I

3    have one thing I just want to tell you, not related to what

4    we've been -- not exactly related to what we've been

5    discussing, but I'd like to tell you at sidebar.

6              (The sidebar conference was sealed at 11:10 a.m.)

7              (The following discussion held at the bench.)

8              THE COURT:  So unrelated to this discussion, I've

9    been thinking about generally a particular issue in criminal

10   cases related to testimony of defendants, partially arising

11   out of issues in 2255.

12             I'm thinking and the reason that I wanted to bring

13   it up now, so you can contemplate it before.  This only

14   applies -- well, I guess it might apply either way whether he

15   testifies or doesn't testify.  It certainly applies if he

16   does, to have a -- out of the hearing of the jury, a very

17   brief colloquy, like where I probably just would ask two

18   questions, like do you understand that your decision to

19   testify is your personal decision to exercise, have you had a

20   full and fair opportunity to talk to your lawyer about it,

21   and are you making that -- after having a full and fair

22   opportunity, are you making a decision not to testify.

23             MR. WEINBERG:  I have no problems with Your Honor

24   doing that, but I would ask that it be done in chambers and

25   not in the -- not accessible to the media, which would only

1    focus if -- let's assume he doesn't testify.  The last thing

2    we want is to have an article, Mr. McLellan doesn't --

3            THE COURT:  Could we do it like at sidebar, or do

4    you want me to do it -- do you want me to do it in the lobby

5    in the back?

6            MR. WEINBERG:  The lobby in the back, since there

7    is press here, and if the *Globe* raised its lead with

8    Salemme's deciding not to testify as a public matter, and --

9    I see 360 is covering it.  I don't know whether they were

10   going to get any coverage as it relates to --

11           THE COURT:  Okay.  You don't care if I have that

12   conversation?

13           MR. FRANK:  I do not.

14           THE COURT:  All right.  So I guess we could have a

15   period of time to do it in the back and do it in the back and

16   just think about it.  Okay.  Fine.  Okay.

17           MR. WEINBERG:  And I will discuss that with Mr.

18   McLellan, in the event -- did you want to do that regardless?

19           THE COURT:  It hadn't occurred to me either way.

20           MR. WEINBERG:  I do understand, assuming he elects

21   not to, that certainly defendants on habeases have used that

22   as a basis to challenge.

23           THE COURT:  And honestly, the reason it comes out

24   is what happens sometimes is honest defense.  When it's down

25   the road, they don't remember the specific conversation.

1    They remember like their practice, but they don't necessarily

2    have a specific recollection of the conversation and then I'm

3    faced with a question of whether I have to have an

4    evidentiary hearing two years down the road.  And the

5    question factually, in the face of one affirmative assertion,

6    versus a general practice, and then I've asked the question

7    on colloquy.  And it seems fair, because in fact if there

8    were a misunderstanding by the defendant, it is his personal

9    right, I'd rather have him know and be able to exercise.

10              MR. WEINBERG:  I don't have a trouble with Your

11   Honor's questions, and we and Mr. McLellan will go to

12   chambers and answer any questions regarding his decision.

13              THE COURT:  Okay.

14              MR. FRANK:  Okay.

15              (The Court and the court reporter confer.)

16              THE COURT:  Counsel, can I see you for a moment.

17              Do you want me to seal the sidebar until after the

18   verdict?

19              MR. WEINBERG:  That will be great.

20              THE COURT:  I think I'm going to seal this sidebar,

21   until -- to be unsealed after the verdict is rendered, simply

22   based on the following facts.  That it concerns the

23   defendant's and the procedures regarding the defendant's

24   possible testimony or not testimony, the exercise of this,

25   how he chooses to exercise his constitutional rights and

1      given that there has been some publicity about this case and

2      publicity in another case apparently concerning the

3      defendant's decision to testify or not.

4                   In an effort just to avoid any potential issues

5      with all the -- with the jury, it appears to me that the jury

6      has been fully compliant with all my instructions.  I think

7      the balance of public interest, necessarily, to a fair trial

8      is just to seal the sidebar, until -- once the verdict comes

9      back, I don't think at that point it will be unsealed,

10     without further -- the day after the verdict, it will be

11     unsealed, without further order of the Court, absent a motion

12     from somebody.

13                   THE COURT:  You're welcome, we're adjourned.

14                   (Bench conference concluded.)

15                   THE COURT:  See you at 8:30 tomorrow morning.

16                   We stand in recess.

17                   THE DEPUTY CLERK:  This matter is in recess.

18                   (Court in recess at 11:14 a.m.)

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 18th day of June, 2018.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter