```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3        - - - - - - - - - - - - - - - - - - x

4        UNITED STATES OF AMERICA,              :

5              Plaintiff,                       :    Criminal Action No.
                                                     1:16-cr-10094-LTS
6           v.                                  :

7        ROSS MCLELLAN,                         :

8              Defendant.                       :

9        - - - - - - - - - - - - - - - - - - x

10

11          BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                                  JURY TRIAL
13                                 Day 11

14

15                        Tuesday, June 19, 2018
                                8:34 a.m.
16

17

18

19

20       John J. Moakley United States Courthouse
         Courtroom No. 13
21       One Courthouse Way
         Boston, Massachusetts
22

23       Rachel M. Lopez, CRR
         Kelly A. Mortellite, RMR, CRR
24       Official Court Reporter
         raeufp@gmail.com
25
```

1                  **A P P E A R A N C E S**

2     On behalf of the Plaintiff:

3          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:  STEPHEN E. FRANK
4          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
5          Boston, Massachusetts  02210
           (617) 748-3244
6          stephen.frank@usdoj.gov

7

           UNITED STATES DEPARTMENT OF JUSTICE
8          BY:  WILLIAM JOHNSTON
           1400 New York Avenue, Northwest
9          Washington, D.C.  20005
           (202) 514-0687
10         william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
           BY:  MARTIN G. WEINBERG
14         20 Park Plaza
           Suite 1000
15         Boston, Massachusetts  02116
           (617) 227-3700
16         owlmcb@att.net

17

           LAW OFFICES OF ROBERT M. GOLDSTEIN
18         BY:  ROBERT M. GOLDSTEIN
           20 Park Plaza
19         Suite 1000
           Boston, Massachusetts  02116
20         (617) 742-9015
           rmg@goldstein-lawfirm.com
21

22         LAW OFFICES OF MAKSIM NEMTSEV
           BY:  MAKSIM NEMTSEV
23         20 Park Plaza
           Suite 1000
24         Boston, Massachusetts  02116
           (347) 251-4800
25         mentsev@gmail.com

1                     **TABLE OF CONTENTS**

2

3                      **TRIAL WITNESSES**

4  On behalf of the Plaintiff:                          <u>Page</u>

5  EUGENE O'CALLAGHAN

6         By Mr. Frank                                  26

7         By Mr. Goldstein                              53

8         By Mr. Frank                                 104

9         By Mr. Goldstein                             114

10

11 On behalf of the Defendant:                          <u>Page</u>

12 MARC MENCHEL

13        By Mr. Goldstein                             132

14        By Mr. Frank                                 164

15

16                        **EXHIBITS**

17                                                   <u>Admitted</u>

18 Number 11-1, 46-1, 50-1, 68, 91-1, 91-2, 91-3,      121

19 115-1, 115-2, 130-1, 123, 135-1, 143-1, 172-1,

20 and 178-1

21 Number 66-1                                          54

22 Number 174                                           45

23 Number 560 and 561                                   69

24 Number 562 and 563                                   82

25 Number 564                                           95

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (In open court.) |
| 3 | THE DEPUTY CLERK:  The United States District Court |
| 4 | for the District of Massachusetts is now in session, the |
| 5 | Honorable Leo T. Sorokin presiding. |
| 6 | Today is June 19th, the case of United States vs. |
| 7 | McLellan, criminal action 16-10094 will now appear before |
| 8 | this court. |
| 9 | THE COURT:  I see all counsel and Mr. McLellan. |
| 10 | All right.  Any issues to discuss? |
| 11 | MR. FRANK:  We have a couple of issues, Your Honor. |
| 12 | One is, in doing some additional work last night on the |
| 13 | stipulation issue, we came across US vs. Pratt, 568 F. 3d 11, |
| 14 | which is a First Circuit case.  And that case provides that |
| 15 | in the First Circuit's view, there is a settled rule that the |
| 16 | content of a stipulation must be published to the jury prior |
| 17 | to the close of evidence.  There is language -- there is one |
| 18 | sentence in the decision which says -- suggests that the |
| 19 | parties can agree otherwise.  And it specifically says |
| 20 | ordinarily -- |
| 21 | THE COURT:  What's the issue?  You haven't finished |
| 22 | the stipulation? |
| 23 | MR. FRANK:  I'm sorry? |
| 24 | THE COURT:  What's the issue?  You haven't finished |
| 25 | the stipulation?  Is that -- |

1          MR. FRANK:  My concern is, Your Honor, that our

2     discussion yesterday was about presenting the stipulation to

3     the jury as part of the Court's instructions.

4          THE COURT:  Oh, I see.

5          MR. FRANK:  And so this decision has language

6     suggesting that the parties could agree otherwise.  It says

7     ordinarily, unless there is a contrary agreement between the

8     parties, district courts should ensure that a stipulation or

9     the content thereof is presented to the jurors prior to the

10     close evidence.  So it does suggest that there could be a

11     contrary agreement between the parties.

12          But then there's contrary language in the opinion,

13     including the sentence I just read a moment ago and a

14     footnote which says, "Our holding is simply a reminder to the

15     trial Courts of some well established propositions, namely

16     that stipulations are evidence, jury instructions are not,

17     and a stipulation should be presented to the jury in whatever

18     manner the parties and Courts agree prior to the close of

19     evidence."

20          So our concern is that we not have an issue --

21          THE COURT:  Before that case, or putting aside that

22     case, exactly where were you on this issue?  Like what had

23     been resolved among yourselves before the potential wrinkle

24     posed by that case?

25          MR. FRANK:  Well, I reviewed the transcript from

1    yesterday and the transcript says -- I said, "If the Court

2    instructs the jury that there is no dispute, and therefore,

3    they have to find that to be proved, that element that State

4    Street was a financial institution and was affected, no

5    dispute there."

6            Mr. Weinberg said, "I think that's the way to do

7    it."

8            And then he said, "but do it as part of the Court's

9    instructions."

10           THE COURT:  So have you two had any further

11   discussions since we had that conversation in Court?

12           MR. WEINBERG:  No, Mr. Frank was kind enough to

13   send me references to the case.  I sent him back references

14   to the part of the case that supports, like most other

15   things, that the parties can agree, that Mr. McLellan can

16   waive, and that this can be done consistent with our

17   understanding of yesterday as part of the instructions.

18           THE COURT:  So what you're proposing is I simply

19   say words to the effect, in the instructions, there's --

20   let's just say, for sake of discussions, six elements to that

21   offense.  Element number 6 is that the financial institution

22   to which State Street suffered a loss, the Government has to

23   prove beyond a reasonable doubt that they suffered a loss or

24   risk of loss that affected the financial institution, in this

25   case State Street.  The parties agree and I direct you to

1   find that this element is satisfied.  Or something like that.

2         MR. WEINBERG:  The way I'd like it presented and I

3   think it's fair to present, is that if the other elements are

4   proven beyond a reasonable doubt, this element is agreed to

5   by stipulation.

6         MR. FRANK:  Okay.  Well, that's a slightly

7   different presentation of what I understood us to have agreed

8   to yesterday.

9         MR. WEINBERG:  Well, it's implicit, that you've got

10  to find every element beyond a reasonable doubt and this --

11        THE COURT:  Well, they certainly couldn't find Mr.

12  McLellan guilty unless they also found the others.  But why

13  not -- what I thought we discussed is simply what I just

14  recited, that -- you know, that this is what the element is,

15  I'd say it in a sentence, or a phrase and then that the --

16  something like -- and these aren't exact words, but the

17  parties agree that this is -- this element, the Government

18  has met its burden on this element, and you're instructed to

19  find that element.  And --

20        MR. WEINBERG:  I mean, my point is that

21  essentially -- and the reason why I asked for it to be in the

22  context of the general instruction.

23        THE COURT:  I'm happy to remind them that that --

24        MR. WEINBERG:  I'm not agreeing that State Street

25  was affected.  I'm agreeing that if there was a proven AXA

1   fraud that involved Mr. McLellan, then they were affected for

2   purposes of the statute.  In other words, that's not a

3   disputed element.

4           MR. FRANK:  So then I think we don't have an

5   agreement, Your Honor.

6           THE COURT:  How would that have an effect?  What

7   would be the significance of that?  Is that preserving your

8   rights for other cases or this case?

9           MR. WEINBERG:  No, in this case.  It's in the

10  context of a -- you know, it's in the context of -- State

11  Street is not affected by AXA, unless there's an overcharge,

12  unless there's a criminal overcharge.  Then it's affected.

13  I'm not disputing, in other words, that banks get affected by

14  actions of employees and that State Street would be affected

15  by the AXA transaction, if there was a fraud, if there was --

16  if the Government proved beyond a reasonable doubt what

17  they've charged.  I would never -- the predicate is they have

18  to prove the other elements.  Now, Your Honor --

19          THE COURT:  Given.  No one is arguing that they

20  don't have to prove the other elements in order to convict

21  Mr. McLellan.

22          MR. WEINBERG:  So Your Honor would -- I assume,

23  would be saying to the jury, these are the elements of

24  Count 6, assuming that Your Honor denies a Rule 29, which I

25  hope will not occur and I want to address that at the

1    conclusion.

2         THE COURT:  Sure.  All of this predicate -- without

3    prejudice to your Rule 29 motion.

4         MR. WEINBERG:  But assuming that it goes to the

5    jury, Your Honor is going to have a set of elements, five of

6    the elements are in dispute.  The Government needs to prove

7    them beyond a reasonable doubt, the sixth one is not in

8    dispute.  The parties stipulate that State Street, with

9    their -- this offense, State Street would be affected and

10   State Street is a financial institution.  I mean, they're not

11   affected in a vacuum, they're affected by the conduct that

12   the Government has charged.

13        MR. FRANK:  Your Honor, we don't have an agreement

14   if that's -- that's not what I understood yesterday.  What

15   the transcript says, what Mr. Weinberg said yesterday

16   was, "The Court can instruct the jury" --

17        THE COURT:  I'm not holding either of you to the

18   transcript.  I'm just trying to figure out if you have an

19   agreement.  In other words, if you tell me today you don't

20   want to have an agreement, I'm not pulling out the transcript

21   and saying you said.  And likewise, I'm not saying --

22        The question just is a practical one.  Do you have

23   an agreement as to resolution of this or not?  Because what I

24   understand Mr. Weinberg to be saying now is simply what -- is

25   the instruction is likely to read something like this.  This

1     might come as a great surprise to all of you.

2             The Government bears the burden of proof beyond a

3     reasonable doubt on Count 6 to prove the following elements:

4     One, and I'll say what element number one is.  Two, and I'll

5     say what element number two is, three, four, however many it

6     divides out.  I don't remember at the moment.  The last one

7     being the -- the loss affected element.

8             And then I'm only doing this if you both agree, but

9     if you both agree, I'm -- subject to thinking about *Pratt* --

10    well, we'll come back to *Pratt*.  I haven't thought about

11    *Pratt* before I walked out.  But I would be saying that, you

12    know, as to -- then as to number 6 --

13            And then there'd be further explanation below that

14    explaining those things in the elements that require

15    explanation and either in element 6 or further below, and

16    explaining element 6, I would say something like the parties

17    agree that element 6 is satisfied and the Government has met

18    its burden of proof on that.  And that doesn't -- and maybe

19    for clarity, if it were necessary, if you want me to say it

20    is -- just that this has no effect.  That you have to make an

21    independent determination on the other five elements.  That's

22    obvious and something like that.

23            If that's agreeable to both of you, or with some

24    tweak agreeable to both of you, then the question is, does

25    *Pratt* pose an obstacle to that.

1          MR. WEINBERG:  That is agreeable in that context,

2     Your Honor.  I just -- you know, the reason why it was

3     important to me that it be in the context of the instructions

4     is I don't want to have the Government stand in front of this

5     jury, without the other elements, and say Mr. Weinberg and

6     Mr. McLellan agree that State Street was affected by the AXA

7     fraud.  That's why I wouldn't stipulate to the evidence,

8     which I consider very prejudicial.  I don't want to go back

9     to the -- debate the Court's evidentiary decision.

10         THE COURT:  Two questions for you, Mr. -- one is a

11    stipulation along the lines that I just described agreeable

12    to you.  And two, if it is, then we should talk about what's

13    the implications of *Pratt*.

14         MR. FRANK:  A stipulation is, in concept, agreeable

15    to us, but it depends on the precise language of the

16    stipulation.

17         THE COURT:  So what I suggest is this:  It sounds

18    like, in principle, you both agree to something along the

19    lines of what I've outlined, subject to exactly what it --

20    how it's written.  What I would propose -- what I'm -- why

21    isn't it -- you both agree on what the language of the

22    element is, as quoted from the statute.  Why not just say

23    element, whatever number it becomes, element number, call it

24    six, is quoting the statute -- I don't have the language in

25    front of me, but whatever that statutory language is, that

1     about which there is no dispute, I think, between you about

2     what the statute says.

3              And that the Government and Mr. McLellan agree

4     that -- that this element, the Government has met its burden

5     of proof, or this element is satisfied, or the Government has

6     met its burden of proof on this element, and that you are

7     instructed to find this element satisfied.  And that -- but

8     you must, nonetheless, consider -- you know, you make an

9     independent determination on all the other elements and

10    there's no agreement as to any other elements.  And that --

11    or -- something like that.  I mean --

12             MR. FRANK:  That's acceptable to us in concept.

13    What I was objecting to was Mr. Weinberg's suggestion that to

14    find that there was a condition, that they had to find a

15    fraud before they found that element, and that's not what I

16    understand or --

17             THE COURT:  Right.  No, I understand.  If I say

18    that or --

19             MR. WEINBERG:  That's fine.

20             THE COURT:  That's acceptable to both of you?

21             MR. WEINBERG:  That's acceptable and Mr. McLellan

22    is here listening to the debate.  There's not going to be a

23    dispute if the stipulation in this case is incorporated into

24    the instructions as discussed.

25             THE COURT:  You've discussed this with him and he's

1    agreeable?

2              MR. WEINBERG:  Yes.

3              THE COURT:  All right.  So then the question is the

4    *Pratt* issue.

5              MR. FRANK:  So Your Honor, I think with respect to

6    the *Pratt* issue, we would suggest a way around that would be

7    a colloquy with the defendant, where he explicitly

8    understands the issues, and waives any right --

9              THE COURT:  Understands his right to the jury trial

10   on that issue and waives that, essentially.

11             MR. FRANK:  And -- yes, and understands that we are

12   deviating from the standard practice of presenting the

13   evidence to the jury during the course of the case and

14   presenting this to them as a fait accompli during the jury

15   instructions.

16             MR. WEINBERG:  To be clear, so the record is

17   crystal clear, I am advising Mr. McLellan, as a matter of

18   strategy, that it is in his interest to have the stipulation

19   incorporated into the instructions that will also list the

20   other disputed elements at the same time.  And, therefore, we

21   request an exception to *Pratt* and that the stipulation be

22   read to the jury as part of the instructions.

23             THE COURT:  All right.  How about I ask -- you

24   object, or tell me to pause -- like two questions to ask Mr.

25   McLellan.

1          MR. WEINBERG:  Sure.

2          THE COURT:  So Mr. McLellan, you've heard this

3  discussion we've just been having about this issue about the

4  loss affecting a financial institution element of Count 6?

5          MR. MCLELLAN:  Yes, Your Honor.

6          THE COURT:  All right.  Have you had a full and

7  fair opportunity to discuss it with your lawyers?

8          MR. MCLELLAN:  Yes, Your Honor.

9          THE COURT:  All right.  Are you satisfied with the

10 advice and representation, as to this issue, they've given

11 you?

12         MR. MCLELLAN:  Yes, Your Honor.

13         THE COURT:  All right.  And do you agree, or do you

14 join in the decision to not present this element to the jury,

15 but tell the -- instruct the jury that it's satisfied as a

16 matter of law, by virtue of an agreement?

17         MR. MCLELLAN:  Yes, Your Honor.

18         THE COURT:  All right.  Any other questions?

19         MR. FRANK:  I think, just to be clear, that that

20 instruction will come during jury instructions and after the

21 close of evidence.

22         THE COURT:  Right.  And that this will -- as part

23 of my jury instructions, which come after the close of all

24 the evidence and after the final arguments, closing arguments

25 by all the lawyers in the case.

```
 1              MR. MCLELLAN:  Understood.
 2              THE COURT:  All right.  And that's all fine with
 3     you?
 4              MR. MCLELLAN:  Yes, sir.
 5              MR. WEINBERG:  And may I respectfully, because I'm
 6     always hesitant not to make the objections at the appropriate
 7     time, renew my statement that this stipulation is a result of
 8     my -- of the Court's overruling my objection to the
 9     Government's proffer that it wanted Mr. Shaw to testify to
10     the --
11              THE COURT:  Your evidentiary objection to what the
12     testimony was that I allowed in is preserved.
13              MR. WEINBERG:  Thank you, sir.
14              THE COURT:  All right.  Fine.
15              Thank you, Mr. McLellan.
16              All right.  So my suggestion, just in terms of
17     the -- maybe, Rachel, you can give me -- e-mail me the little
18     portion that I read to them that they both agreed to about
19     the instruction.
20              And then I'll incorporate that in the jury
21     instructions, the draft that I give you, so you can both look
22     at that.
23              All right.  Any other issues for today?
24              MR. JOHNSTON:  Your Honor, there's a matter of
25     making sure the record reflects which exhibits have been
```

1       admitted.  There's -- after going through the transcript,

2       there may be like two exhibits that show up in the record as

3       a different number than they actually are --

4                   THE COURT:  Okay.

5                   MR. JOHNSTON:  So we're going to take a moment and

6       go compare.

7                   THE COURT:  My suggestion, just as a general

8       matter, in -- to the extent there's a worry about this, the

9       presumptive record of what's in and out is Ms. Simeone's

10      list.  If there's a dispute or ambiguity -- if one of you

11      raises a dispute or ambiguity, if you think something is in

12      that's not on her list, you think something is out that she

13      has in, then the final word is to go look at the transcript.

14      So if you have some -- so I would suggest looking at the --

15      if you haven't already done it, looking at her list, too.

16      But that's fine.  If there's two that you think came in under

17      one number and they are a different number, we can clarify

18      that and that's fine.

19                  All right.  Anything else?

20                  MR. FRANK:  Not for the Government, Your Honor.

21                  MR. WEINBERG:  Just at the conclusion of the

22      Government's witness, when the Government rests, we'd like a

23      short break to at least preserve certain issues.

24                  THE COURT:  Fine.  We'll take a five-minute break.

25                  MR. WEINBERG:  Thank you.

1          THE COURT:  Okay.  All right.  I don't have --

2          MR. WEINBERG:  There's one other issue, again, for

3    the abundance of caution.  We again renew our motion to

4    exclude Mr. O'Callaghan.  He's the representative of NTMA.

5    NTMA has refused to provide any documents, despite the

6    letters rogatory they were issued by the US District Court in

7    Massachusetts.

8          They have, instead, advised that they would only

9    produce it, pursuant, essentially, to a request by one

10   central prosecutor to the Irish central prosecutor, which the

11   Government has declined to do.  We have, therefore, been

12   denied our right to access records that are in the exclusive

13   control of the Government, meaning they could have, but chose

14   not to seek them by the MLAT.

15         We are denied the ammunition, if you will, the

16   materials that we would ordinarily be provided for the

17   purposes of cross-examining Mr. O'Callagrahn.  I believe he

18   should not be provided the forum in this court to be a

19   witness, when he has refused to produce documents that, were

20   he a United States witness, would have been required to be

21   produced, pursuant to Rule 17(c).

22         I believe that the Government could have rectified

23   that circumstance.  They chose not to.  I understand the

24   Court made a legal ruling saying the Court did not believe it

25   should or could exercise its authority to order the

1    Government to use its treaty powers.  But one of the

2    sanctions available to the Court is to exclude the witness

3    who represents the party that has consistently refused to

4    produce even one page of its business records, pursuant to

5    the letters rogatory.

6            We have gotten certain information from State

7    Street, that the Government has provided, having received it

8    from State Street, via the FCA.  But we have a right, I

9    believe, under the Sixth Amendment, to have a witness that's

10   going to come to court and testify in a criminal trial

11   against a citizen, produce evidence, and they shouldn't be

12   allowed to come here and testify in a context where we're

13   denied the materials that we would ordinarily have and that

14   we find necessary for the purpose of indicating our Sixth

15   Amendment right to cross-examine and our Sixth Amendment

16   right to produce evidence.

17           MR. FRANK:  Your Honor, just to make sure that the

18   record is abundantly clear on this point.  First of all,

19   there are no materials related to NTMA that are in the

20   possession, custody or control of the United States, that

21   have not been turned over to the defense.  None.

22           Everything has been turned over to the defense

23   that's in our possession, custody, or control.  Materials

24   that we may or may not be able to obtain by MLAT are not

25   materials that are in our possession, custody and control.

1 And we've been advised by the Office of International Affairs

2 that an MLAT does not allow us to obtain -- to seek materials

3 from a foreign Government on behalf of the defense as a

4 matter of treaty.

5    Second, it is not true that the defense has not

6 received any materials from the files of NTMA, beyond those

7 provided by State Street.  In fact, NTMA filed a report with

8 the City of London Police, pursuant to that agency's

9 investigation.  It turned over extensive documents to the

10 City of London Police, pursuant to that agency's

11 investigation, including internal memoranda, handwritten

12 notes of this witness about meetings he had with State Street

13 representatives and other documents.  Those materials were

14 turned over to the defense as part of the Government's

15 discovery production in this case.  So there are internal

16 records that are available to the defense, of NTMA, that have

17 been produced beyond those made available by State Street.

18    Third, the defense actually had been in discussions

19 with the NTMA regarding a deposition of this witness

20 approximately a year ago and the witness had agreed to sit

21 for a deposition with the defense.  Then there arose

22 additional issues when the defense sought additional

23 documents, pursuant to letters rogatory from the NTMA and at

24 that point the agreement broke down.  But there was an

25 agreement, prior to the defense pursuing the letters rogatory

1    process, for this witness to sit for a deposition in the

2    parallel civil proceedings, and he was prepared to do so at

3    that time.

4         MR. WEINBERG:  So to answer that, going backwards,

5    yes.  We moved to depose him.  Yes, for a preliminary period,

6    Mr. O'Callghan had agreed through counsel to the deposition.

7    When we thereafter moved for documents that would have

8    enhanced the trial in the criminal process, Mr. O'Callaghan

9    refused to produce documents and refused to do a deposition,

10   unless we withdrew, essentially, our request for a

11   deposition.  Maybe he would have gone back and allowed the

12   deposition then, but he certainly said to us through counsel

13   that if you want documents, I'm not being deposed.  I don't

14   think that's a basis to interfere with my objection.

15        Second, Mr. Goldstein advises that there are

16   some --

17        (Counsel confers.)

18        MR. WEINBERG:  Mr. Goldstein advises that there is

19   a limited set of documents received from the City of London

20   Police.  This has been his witness, so it wasn't on the

21   forefront of my brain.  But it is -- they were all dated, I'm

22   advised, after the investigation, rather than being the

23   contemporaneous records of NTMA.

24        (C), they're a small subset of what would be the

25   ordinary business records of NTMA.  We have repeatedly asked,

1    and I believe Mr. Frank, in fairness to him, has asked NTMA

2    to produce it.

3              But (d), this Court's decisions and its decisions

4    about constitutional rights are not dependent on what

5    somebody in Washington tells Mr. Frank is the position of the

6    Department of Justice.  This would --

7              Last, is that if their position -- if the way it's

8    presented to the Department of Justice is the defense wants

9    us to go get documents, that's not really a completely fair

10   description of what is required.  The Court issued letters

11   rogatory.  What we asked -- the Government to do is to

12   provide documents that would expand the reliability of the

13   truth-telling function as to the NTMA allegations.  It's not

14   that I wanted just impeachment documents.  I wanted the

15   documents to define the transition that the Government is

16   trying to criminalize.

17             MR. FRANK:  Just one last --

18             THE COURT:  I think -- just a couple of

19   observations.  One, the request, at this time, to exclude the

20   Government's witness is denied.  I overrule the objection.

21             That said, I think I've noted this before, but

22   whenever there's a -- that one of the founding principles of

23   our criminal justice system is the defendant's power -- a

24   defendant's right to invoke the Court's power to subpoena

25   witnesses and documents to come to court.  That's a

1    foundational principle that was enshrined in the Bill of

2    Rights at the founding of our country.  It's one of the

3    essential tools that helps assure the fairness of trials and

4    the truth-finding function.  And it is --

5                It does raise -- I think I've said this before.

6    There is a concern raised whenever you have a witness who is

7    not subject, or potential witness, to that power or a set of

8    documents or what have you.  Here we have -- certainly this

9    witness appears not subject to that power, at least with

10   respect to defense.  But any -- but at the moment, I am -- I

11   decline to exclude the witness and we'll assess further, if

12   further motions are made, if and when it's relevant.

13               MR. WEINBERG:  Well, I would make a motion for the

14   Court to give the jury an adverse inference instruction, at

15   this time, when this witness testifies.

16               THE COURT:  So that I'm not allowing or denying.

17   I'm just -- that's a request for jury instruction.  I will

18   consider that.  I'll give you both a chance to address it and

19   talk about it.  And I will -- I don't know what my view of

20   that is.  I haven't thought about that.  But I don't think

21   now, we have to hash that out now.  That's not affected by --

22   that's a jury instruction question, rather than a witness

23   question.

24               MR. WEINBERG:  I'm actually hoping for it twice.

25   Once when the witness testifies and once during jury

1    instructions, but we have an instruction that we'll provide

2    to the Court during the break.

3              THE COURT:  All right.

4              MR. FRANK:  Just to be clear, Your Honor, there

5    were -- and for the record, there were documents that the

6    defense obtained for each of the other -- or for many of the

7    other victim witnesses and they used exactly one of those

8    documents in the cross-examination of one witness.  So the

9    notion that there is some trove of documents that would be

10   helpful to the defense, for this particular witness, when

11   there were none for any of the other witnesses --

12             THE COURT:  Pause one second.

13             Maria, is the jury here?

14             THE DEPUTY CLERK:  I have to go check.

15             THE COURT:  Okay.  We'll see if we have everyone.

16             MR. WEINBERG:  The truth is that we reviewed the

17   documents, that we used them to formulate questions and

18   decide what not to ask.  And for instance, we would be

19   getting from the NTMA the other proposals we used with AXA,

20   the JP Morgan proposal, of 4.2 million, which was triple what

21   AXA got charged and six times what -- or nine times what the

22   Government claims they should have been charged.

23             We expect that NTMA, too, got proposals.  We know

24   they split the transition with Nomura and we very much wanted

25   to see those proposals to be able to use them in the

1    cross-examination of Mr. O'Callaghan.

2              MR. FRANK:  Those documents would have been equally

3    available to the defense from other sources, such as Nomura.

4              MR. WEINBERG:  Yes.  And we used the letters

5    rogatory to try to get them from Nomura and Goldman Sachs.

6    Goldman Sachs never produced them and Nomura is producing

7    documents in a serial way starting about two or three days

8    ago.  So --

9              MR. FRANK:  Goldman Sachs is not relevant to this

10   witness and counsel has just represented that he obtained

11   documents from Nomura and that Nomura voluntarily agreed to

12   produce those documents.

13             MR. WEINBERG:  As to the KIA transition.  We have

14   not certainly accessed the documents we want that

15   Mr. O'Callaghan could have produced.  In the middle of this

16   trial, we're getting dumps of documents from Nomura and --

17             MR. FRANK:  Perhaps counsel could make clear when

18   he asked Nomura for those documents.

19             MR. WEINBERG:  When I asked Nomura for the

20   documents is the same day that the letters -- within weeks of

21   the letters rogatory, when we hired British counsel, Nomura

22   was one of the nine letters rogatory issued to Great

23   Britain --

24             MR. FRANK:  And how long after the --

25             MR. WEINBERG:  And we've been pushing for months

```
 1    and months and months and months --
 2               THE COURT:  You know what?  If you guys want to
 3    have a conversation, you're free to have a conversation
 4    whenever you want and you can ask, Mr. Frank, whatever
 5    questions of Mr. Weinberg you wish to ask.
 6               MR. WEINBERG:  Sorry, Your Honor.
 7               THE COURT:  And since he's not under subpoena, he
 8    can choose to answer them or not, as he wishes.
 9               MR. GOLDSTEIN:  Could we have a few minutes, Your
10    Honor, or no?
11               THE COURT:  What did you say?
12               MR. GOLDSTEIN:  Could we have a few minutes?
13               THE COURT:  To go to the men's room?
14               MR. GOLDSTEIN:  Yeah.
15               THE COURT:  You have time to go.
16               (The jury enters the courtroom.)
17               THE COURT:  Good morning, ladies and gentlemen.
18    Nobody did any independent research, discussed the case with
19    anybody?  Good.  All right, so we resume with the
20    Government's case this morning.
21               Next witness, Mr. Frank.
22               MR. FRANK:  Thank you, Your Honor.  The Government
23    calls Eugene O'Callaghan.
24               (The witness was duly sworn.)
25               THE COURT:  Go ahead, Mr. Frank.
```

1          MR. FRANK:  Thank you, Your Honor.

2                    **EUGENE O'CALLAGHAN**

3          having been duly sworn, testified as follows:

4          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

5    BY MR. FRANK:

6    **Q.**  Good morning, Mr. O'Callaghan.

7    **A.**  Good morning.

8    **Q.**  Could you state and spell your name for us, please?

9    **A.**  My name is Eugene O'Callaghan, E-u-g-e-n-e,

10   O-C-a-l-l-a-g-h-a-n.

11   **Q.**  And where do you live, sir?

12   **A.**  I live in Dublin, in Ireland.

13   **Q.**  And where do you work?

14   **A.**  I work in the National Treasury Management Agency in

15   Dublin.

16   **Q.**  What is the National Treasury Management Agency?

17   **A.**  It is an agency of Government which manages assets and

18   liabilities on behalf of the Government.

19   **Q.**  It's often referred to as the NTMA?

20   **A.**  That's correct.

21   **Q.**  What do you do at the NTMA?

22   **A.**  I am the director of the Ireland Strategic Investment

23   Fund.  That's the head of the fund and the Ireland Strategic

24   Investment Fund is the Ireland Sovereign Wealth Fund.

25   **Q.**  And in the period of 2010 to 2011, was that fund known by

1    a different name?

2    **A.**   Yes.  It was previously the National Pensions Reserve

3    Fund and then the Ireland Strategic Investment Fund is the

4    successor fund to the National Pensions Reserve Fund.

5    **Q.**   And what purpose did the National Pensions Reserve Fund

6    serve?

7    **A.**   The purpose of the National Pensions Reserve Fund to

8    build up a pool of assets, which would be used as a means of

9    part payment of pensions, both public sector worker pensions,

10   and social welfare, social security-type pensions, between

11   the years 2025 and 2055.  So it was a long-term investment

12   fund.

13   **Q.**   And how large, approximately, was the fund in 2010 or

14   2011?

15   **A.**   So it got to a maximum of about 23 billion euros or 24

16   billion euros.  I think that was in about 2009.  And then was

17   used -- a large portion of the fund was used to recapitalize,

18   to pay out the Irish banks in the financial crisis.  So I

19   think in 2010 or 2011, it may have been about 16 billion

20   euros.

21   **Q.**   How long have you worked at the NTMA?

22   **A.**   Since 2005.  So that's over 13 years.

23   **Q.**   And what did you do previously?

24   **A.**   Previously I worked and I was an executive director and

25   chief operating officer of Irish Life Investment Managers,

1    which is Ireland's largest investment management business.

2    **Q.**   And what did you do before that?

3    **A.**   Before that I worked in corporate finance for a year with

4    KPMG and before that I worked in New Zealand in an investment

5    bank and I started my career as a chartered accountant at

6    KPMG in Dublin.

7    **Q.**   And briefly, what's your educational background?

8    **A.**   I have a commerce degree from the University College

9    Dublin.

10   **Q.**   Does NTMA manage its own money, or does it outsource to

11   professional money managers?

12   **A.**   Almost entirely outsourced.  So the NPRF at the time had

13   a manager of managers' model, where all of the asset

14   management was outsourced, small amounts of cash might have

15   been managed internally.

16   **Q.**   Did there come a time in about late 2010 or early 2011,

17   when the NTMA decided to sell a large portfolio of stocks and

18   bonds?

19   **A.**   Yes.  That came about in late 2010, when the Irish

20   economy, following the financial crisis, and what -- got into

21   severe difficulty and Ireland as a country entered into a

22   program of financial support, which was what was known as the

23   Troika, which was the International Monetary Fund, the IMF,

24   the European Union, and the European Central Bank.  And that

25   was -- that program of financial support was 85 billion euros

1    and 17 billion euros, approximately, of that 85 was to be

2    provided by Ireland.  And of that 17, 10 billion was to come

3    from the assets of the National Pension Reserve Fund.

4    **Q.**   So what was that money going to be for?

5    **A.**   That was used -- that was money that was used -- the 85

6    billion, you mean?

7    **Q.**   The 10 billion.

8    **A.**   Oh, the 10 billion was invested in equities, mainly

9    equities around the world and those equities were going to be

10   realized, sold, so that the money could be used by the Irish

11   Government to bail out the two Irish banks, which had got

12   into severe difficulty, the two main banks.

13   **Q.**   So you were selling off pension funds to bail out the

14   banks?

15   **A.**   Correct.

16   **Q.**   And it was approximately 10 billion euros?

17   **A.**   10 billion euros of our assets were sold off, yes.

18   **Q.**   And that was approximately half of the -- a little less

19   than half of what was at the fund at that time?

20   **A.**   It was a little more than half, at the time, because some

21   money of the fund from the 23 billion had been used in 2009

22   to inject some capital into the banks prior to that.

23   **Q.**   And you testified that they were primarily stocks and

24   some bonds from around the world?

25   **A.**   That's correct.

1   **Q.**   What, if any, US securities were involved?

2   **A.**   So there were very significant elements of -- elements of

3   the portfolio, were US securities.  From memory, it was over

4   30 percent of the assets were US equities.

5   **Q.**   Equities traded on US exchanges?

6   **A.**   Correct.

7   **Q.**   Did there come a time when you decided to hire someone to

8   assist you with that transition?

9   **A.**   Yes, so we had a transition manager panel in place since

10  the year 2007, so transition managers assisted us in large

11  portfolio movements.  You know, in executing large portfolio

12  movements.  This would have been a very, very substantial

13  transaction.  So we had a panel in place, which comprised

14  three banks.  State Street, Nomura, and Citibank, and we

15  issued a tender to each of those, a tender request for each

16  of those to tender for the execution of the sale of the 10

17  billion.

18  **Q.**   And a tender is what?

19  **A.**   It's a -- it's a pitch, if you like, where we ask

20  questions, which help us to assess which is likely -- which

21  of the members of the panel is likely to do the best job for

22  us.  And so we ask questions which are responded to in fairly

23  detailed written form.  And ultimately we assess those

24  answers against predefined criteria in order to select, you

25  know, how we go -- our course of action.

1    Q.   You mentioned three banks; Citibank, Nomura, and State

2    Street?

3    A.   They were the three.

4    Q.   And you worked with each of those banks before?

5    A.   Yes, we had.  So this was transition number 14 on -- for

6    the panel that had been put in place since 2007 and we had

7    worked with all of them, you know, during -- from numbers 1

8    to 13, all of the -- of those three banks had executed some

9    transitions for us.

10   Q.   Who were your contacts at State Street?

11   A.   My main contact was Ed Pennings, who was the head of the

12   transition management activity in London, and Cassie Waller

13   was the client relationship manager.  We worked out with her

14   quite a lot, too.

15   Q.   Did you know the defendant, Ross McLellan?

16   A.   I knew of Ross McLellan and he was the head of the

17   transition group, but I don't recall meeting him and there

18   would have been no interaction on the transactions.

19   Q.   How did you decide which of the banks to hire?

20   A.   We went through an evaluation process.  This evaluation

21   process was -- had to be consistent with EU, European Union

22   procurement rules and procedures.  So we comprised -- I

23   should say established or assembled an evaluation group of

24   five of the senior executives in the National Pensions

25   Reserve Fund team; me, the other two most seniors, and two

others.  And we were joined by a compliance person to make
sure that we -- that the process complied with the
procurement rules.

        And then we assessed each of the responses against
a number of criteria and essentially scored them.  And
ultimately from that scoring process, we selected -- we
decided to split the award between State Street and Nomura.

**Q.**   What were the factors that you assessed them on?

**A.**   So the factors would have been -- and they were set out
and each of the tendering banks was aware of these factors.
So number one would have been the team and the experience
that was being brought to bear on this particular transition,
because sometimes people were available or not, so there was
a team and experience being brought to bear.

        The second one was around the investment strategy
that was proposed, because this was a complex, very large
transaction.

        And the third one was around implementation
shortfall, which is the -- sort of the industry standard
mechanism for calculation the all-in cost of the transition,
so each of the tenders provided us with an estimate of what
the implementation shortfall would be.  The forth aspect was
fees and charges that would have been earned by the
transition manager and there was also a -- an element
attaching if there had been any material recent changes

1    within the organization that we needed to take account of.

2          So we scored each of the responses against those

3    criteria.

4    Q.  If we could take a look at Exhibit 70-1 -- or 70.1, in

5    evidence, please.

6          And Mr. O'Callaghan, do you recognize this proposal

7    that was submitted by State Street to the NTMA in connection

8    with NTMA transition number 14?

9    A.  Yes.

10   Q.  Could we look at page 6, please.

11         MR. FRANK:  And Erin, if you can just blow up the

12   top two paragraphs under "Equity."

13   BY MR. FRANK:

14   Q.  And again, this was primarily an equity or stock

15   transition?

16   A.  Yes, absolutely.

17   Q.  If you look at the first two sentences of that paragraph,

18   it says, "State Street is entirely focused on serving the

19   needs of our clients.  We assure clients we act in their best

20   interest by aligning our interest with theirs."

21         Do you see that?

22   A.  Yes.

23   Q.  What was your understanding of what that meant?

24   A.  That absolutely, that State Street would always act in

25   our best interest, and that our interests would be what drove

1  all of the activity, and that their interest would be the

2  same as our interests, and that there would never be any

3  differences.

4  **Q.**  If you could look at the next sentence, it says, "In our

5  fiduciary role, we always act as agent to the client."

6  What did you understand State Street to be telling

7  you when they referred to their fiduciary role?

8  MR. GOLDSTEIN:  I just object, Your Honor, for the

9  record.  Asking him his understanding of these documents.

10  The documents stand for themselves.

11  THE COURT:  Overruled.

12  THE WITNESS:  And fiduciary, I am -- to me, means

13  acting in a position of trust and acting in a position of

14  good faith, on behalf of the beneficiary of the service.  And

15  acting as agent is acting in a manner carrying out the

16  activity as if -- as if, in our place.  So as if it was us

17  executing the transactions in the marketplace.  So

18  essentially, trust and good faith, and acting as if they were

19  us.  And, therefore, acting totally in our interest.

20  MR. GOLDSTEIN:  I would just ask for an instruction

21  that it's his understanding, Your Honor.  It's not -- it's

22  not an interpretation.

23  THE COURT:  That's the witness understanding.

24  MR. GOLDSTEIN:  Thank you.

25  THE COURT:  As to what the document meant to him

1     when he reviewed it.

2             Go ahead.

3     BY MR. FRANK:

4     **Q.**  To be clear, Your Honor -- I mean, to be clear,

5     Mr. O'Callaghan, these are not your words, correct?

6     **A.**  They are not my words.  No.

7     **Q.**  They are State Street's?

8     **A.**  They are.  Absolutely.

9     **Q.**  Let's look at page 8, please.  Do you see where it

10    says "fixed income" in the middle of the page there?  You see

11    that the heading is "fixed income"?

12    **A.**  Yes.

13    **Q.**  And if we go to the second circle, it says "employ an

14    agency trading strategy to ensure best execution."

15            What did you understand that to mean?

16    **A.**  So it's the same principles of an agency acting on our

17    behalf and best execution is a market concept to ensure that

18    the best price is obtained.  And in the case of sales and the

19    highest price possible is obtained, you know, at each time

20    transactions are executed.

21    **Q.**  And who did you understand would get the benefit of that

22    best price?

23    **A.**  So we and the National Pensions Reserve Fund would get

24    the benefit of that.

25    **Q.**  Could we look at page 9, please.  Do you see at the top

1    of the page, there's a "fee proposal"?

2    **A.**   Yes.

3    **Q.**   It says, "As crossing will be the most important tool for

4    minimizing costs in this transition, we propose to charge

5    zero commission on all trading activity.  We propose to

6    charge a management fee of 1.25 basis points, 0.0125 percent

7    on the assets entering the transition.  This fee will cover

8    our cost incurred for the transition and will align our

9    interest with the NTMA in finding the best natural liquidity

10   through our unrivalled crossing network."

11            What did you understand that to mean?

12   **A.**   So I understood that there would be no commissions

13   charged on any of the trades where previous transitions that

14   had been carried out.  There would have been a commission

15   charged.  And in place of the commission, in order for State

16   Street to earn revenue, that there would be a management fee

17   of 1.25 basis points charged on all the assets that they were

18   going to sell for us.  And that that would be the only cost

19   that we would incur and the only revenue that State Street

20   would earn from the transaction.

21   **Q.**   If we could look at the table below, do you see that they

22   presented you with a cost summary, in tabular form, for two

23   scenarios?

24   **A.**   Yup.

25   **Q.**   Do you recall that one scenario was selling all the

1    assets at one point in time and one scenario was -- that they

2    offered you was a phased approach?

3    **A.**   Yes, I do, yeah.

4    **Q.**   So if we look at this one, if you look at the sentence,

5    it says, "Scenario one, full liquidation at a single point in

6    time."

7             Do you see that?

8    **A.**   Yes.

9    **Q.**   And what does it say under "equity commissions"?

10   **A.**   Zero is the equity commission.

11   **Q.**   And at the bottom, what does it say under "fixed income

12   commissions"?

13   **A.**   Zero.

14   **Q.**   And if we can look at scenario two, do you see that this

15   reflects three tranches of the equity transition?  Do you

16   understand that to mean three different phases of sales?

17   **A.**   Yeah, three phases of the -- broken down into the three

18   phrases.

19   **Q.**   And what does it represent under equity commissions?

20   **A.**   Zero.

21   **Q.**   And what does it represent under -- well, it doesn't --

22   yeah, at the bottom, fixed income commissions?

23   **A.**   Zero.

24   **Q.**   What was your -- well, let me ask you this,

25   Mr. O'Callaghan.  Had you ever, previously, paid for

1    transitions on a flat fee basis?

2    **A.**   No, I don't think so.

3    **Q.**   Did any of the other contenders for this transition bid

4    on a flat fee basis?

5    **A.**   No, not that -- I don't think so.   No.

6    **Q.**   They bid on a commission basis?

7    **A.**   Yeah.

8    **Q.**   What was your understanding of what a flat fee included?

9    **A.**   So a flat fee was the all-in cost and was effectively in

10   place of the commissions, which, you know, under different

11   charging structure might be charged.

12   **Q.**   Was there any significant -- what, if any, significance

13   was there to you that State Street told you it would act as

14   your agent and your fiduciary?

15   **A.**   That was -- that was vital.   And -- for State Street.

16   And agency was -- you know, the agency model was very much a

17   part of State Street's proposition to us from 2007.   And

18   fiduciary responsibility is a critical -- fiduciary duty is a

19   critical element of any activity that we might outsource and

20   that was absolutely vital.

21   **Q.**   Have you heard the term VWAP, V-W-A-P?

22   **A.**   I have, yes.

23   **Q.**   Did you ask -- well, first of all, what is your

24   understanding of what that term means?

25   **A.**   Volume-weighted average price.   And it's a measure of the

1  average price that a security might trade at over the course

2  of a period, usually a day, and it's a means often used of

3  assessing trading efficiency or trading skill.

4  **Q.**  Did you ask State Street to trade for you in this

5  transition on a VWAP basis?

6  **A.**  No, we didn't.  We used implementation shortfall, which

7  is an alternative method of assessing trading outcomes.  That

8  was our basis for evaluation.

9  **Q.**  What did you do after you received this proposal from

10  State Street?

11  **A.**  We had proposals from Nomura and Citibank, also, and --

12  and we -- as I said, previously we assembled an evaluation

13  group, including five people, including the three most senior

14  people in the team.  And then we assessed each of the

15  proposals against each other and against our criteria.

16  **Q.**  If we could look at Exhibit 71 in evidence, please.

17          Mr. O'Callaghan, do you see, this is an e-mail

18  dated December 15, 2010, from Edward Pennings to Killian

19  Buckley and Cassie Waller, with a copy to you?

20  **A.**  Yeah.

21  **Q.**  Who is Killian Buckley?

22  **A.**  Killian Buckley was a senior analyst working in my team.

23  He reported to me.

24  **Q.**  And if we look at paragraph number one, it says "Your

25  calculation of 29 basis points for implementation shortfall

1    is correct, as is the SD range.  All transactions are

2    proposed to be done at zero commission, but a management fee

3    of 1.25 basis points is proposed to be charged.  This should

4    be included in the implementation shortfall to the total cost

5    number.  The management fee not included was an oversight, as

6    we normally charge on a commission basis and these would flow

7    automatically into the IS.  We apologize for not including

8    this in the first tables in the report on page 9."

9         What's happening in that paragraph?

10   **A.**  So this e-mail was at a time after the submission had

11   been received before we finalized our decision.  And the

12   calculation -- the estimation of implementation shortfall

13   should include all costs of executing the trade and there's

14   an acknowledgment in here that the management fee of

15   1.25 basis points, because it seems it was a bit different

16   from the normal commission procedure, was not included in the

17   implementation shortfall, and an acknowledgement that it

18   should have been and an apology for that, so the

19   implementation shortfall would have been adjusted

20   accordingly.

21   **Q.**  Can we look at Exhibit 76 in evidence, please.

22        You testified that there came a time when you

23   awarded half of the transition to State Street and half to

24   Nomura?

25   **A.**  Yes.

1   **Q.**  If we can look at this e-mail from Mr. Pennings to

2   Mr. Buckley, dated December 23, 2010.  And you see that you

3   were copied on the e-mail?

4   **A.**  Yes.

5   **Q.**  And if we look at the second to last paragraph,

6   beginning "in terms of the fees" --

7            MR. FRANK:  Do you mind blowing that up, Erin?

8            MS. LEAHY:  Oh, sure.

9   BY MR. FRANK:

10  **Q.**  It says, "In terms of the fees, to reflect the fact that

11  this is the most expensive half of the trade and that some of

12  the more attractive pieces, i.e., Large Cap Europe and Asia,

13  have been left out, we propose, with your agreement, to raise

14  our fee to two basis points.  From a trade strategy point of

15  view, we still remain of the opinion that us managing the

16  entire deal is the most beneficial for NTMA.  And should you

17  wish to reconsider, then we are willing to offer to do the

18  entire trade for a fee of one basis point."

19            Do you see that?

20  **A.**  Yes.

21  **Q.**  How did you react to this proposal for State Street to

22  increase its fee to two basis points?

23  **A.**  So this was based on the split that we had decided when

24  we split the transition between Nomura and State Street.  And

25  State Street's -- were making the case that their 1.25 basis

1    points had been priced on the basis of the entire basket.

2    And in our split, they were making the case that the easier,

3    if you like, parts of the trade -- particularly Large Cap

4    Europe, had been assigned to Nomura and that it was -- that

5    they had some of the more -- State Street had some of the

6    difficult parts of the trade and some of the more costly

7    parts.

8              And therefore, they were seeking to renegotiate the

9    1.25 basis points, up to two basis points.  And then we had

10   some discussion on that and ultimately, we settled -- we

11   agreed, there was a merit in the argument and we settled on

12   an amount of 1.65 basis points in the end.

13   Q.  Why did you not agree to pay the two basis points that

14   they asked for?

15   A.  Well, I think it was a pricing negotiation, if you like,

16   and we felt while there was broad merit and we didn't accept

17   that the quantum of the increase was justified, but we were

18   happy to settle at 1.65.

19   Q.  Did there come a time after this when you entered into a

20   formal agreement?

21   A.  Yes, we did.  We signed a contract order with State

22   Street.

23   Q.  Is that also sometimes known as a periodic notice?

24   A.  I think it could be.  We used the phrase --

25   Q.  You used the phrase "contract order"?

1   **A.**   Yes, we used the phrase "contract order," yeah.

2   **Q.**   Could we look at 99.2, please.

3         And is this that document?

4   **A.**   Yes.

5   **Q.**   Okay.  And could we look under "special conditions."

6         You see under, "performance deliverables," it

7   refers to the liquidation of approximately 4.8 billion euros

8   in total from both equity and fixed income accounts?

9   **A.**   Yes.

10  **Q.**   And then if we look at the next page, the very bottom, do

11  you see there's a payment schedule?

12  **A.**   Yes.

13  **Q.**   It says, "A fee of 1.65 basis points of the value of the

14  assets as of the date," and it continues on the next

15  page, "that the transition manager gains control over the

16  legacy assets."

17         Do you see that?

18  **A.**   Yes.

19  **Q.**   And what is your understanding of that fee?

20  **A.**   So that was the fee that State Street was going to earn

21  and we were going to pay for the execution of the transition,

22  1.65 basis points on the entire value of the assets.

23  **Q.**   Why is there no mention of commissions or spreads in this

24  document?

25  **A.**   Because there were to be zero commissions and that was

1  the understanding, that was what we had agreed, so we only

2  recorded over here what we were going to pay, and there was

3  to be no commissions.

4  **Q.** I neglected to ask you, with respect to the last

5  document, Mr. O'Callaghan.  If we could take a quick look

6  back at Exhibit 76.

7  In the header of that document, do you see there's

8  a blind copy to the defendant?

9  **A.** Yes.

10 **Q.** Did you have an understanding that he was involved in

11 this transition?

12 **A.** I wasn't aware that he was involved.  I knew he was the

13 global head of transition management and this was a big

14 transaction, but I wasn't aware that Mr. McLellan was

15 involved.

16 **Q.** Can we look at Exhibit 99.1 in evidence, please.

17 MR. FRANK:  And if you could advance to the third

18 page.

19 BY MR. FRANK:

20 **Q.** You recognize this to be the master transitions services

21 agreement that you entered into with State Street?

22 **A.** Yes.

23 **Q.** And if we could look at the date.  What is the date of

24 this document?

25 **A.** The 9th of October 2007.

1    **Q.**   Have you reviewed this document?

2    **A.**   Yes.

3    **Q.**   Is there anything in this document that you believe

4    allows for the charging of additional commissions or spreads,

5    beyond those disclosed in the contract order?

6    **A.**   No, nothing.

7            MR. FRANK:  Could we take a look at Exhibit 174,

8    please.  And actually, for the witness only.

9    BY MR. FRANK:

10   **Q.**   Do you recognize this document?

11   **A.**   Yes.

12   **Q.**   There are three pages.  Could we look at the next page?

13   And the next page?  Do you recognize these documents?

14   **A.**   Yes.

15   **Q.**   What are they?

16   **A.**   They are the invoices from State Street, to us, for

17   the -- for the management fee that had been agreed, one for

18   each tranche, of the three tranches of the transition.

19           MR. FRANK:  The Government offers 174.

20           MR. GOLDSTEIN:  No objection, Your Honor.

21           THE COURT:  Admitted.

22           (Exhibit No. 174 admitted into evidence.)

23   BY MR. FRANK:

24   **Q.**   Could we look at the first page.  There's some markings

25   on this page in handwriting and a stamp.  What do those

1   reflect, Mr. O'Callaghan?

2   **A.**   They are internal authorization procedures, so there are

3   signatures by Killian Buckley in relation to -- under goods

4   received, that the service was received and that the amount

5   was correct and the payment approved, was by Eileen

6   Fitzpatrick, who was my number two at the time.

7   **Q.**   You see the first tranche, you were billed approximately

8   230,000 euros?

9   **A.**   Yes.

10  **Q.**   Could we look at the second page, please.  For the

11  second, you were billed approximately 35,000 euros?

12  **A.**   Yes.

13  **Q.**   Could we look at the third, please.  And for the third,

14  you were billed 432,000 euros?

15  **A.**   Yes.

16  **Q.**   Have you had an opportunity to add those numbers up?

17  **A.**   Close to 700,000.

18  **Q.**   And what was your understanding of what that 700,000

19  euros represented?

20  **A.**   So that was the total revenue that State Street would

21  have earned from the -- from the transition.  That was the

22  management fee, where previously they might have earned

23  commissions.  This was the fee that we paid.

24          MR. FRANK:  Take that down.

25  BY MR. FRANK:

1    **Q.**  State Street performed the transition for you?

2    **A.**  They did.

3    **Q.**  How did they do?

4    **A.**  They did well.  There were -- the first tranche went well

5    and the implementation shortfall outcome was better than the

6    pre-trade estimate.  And in discussion afterwards, there were

7    certain market factors which had assisted that, but that was

8    a very satisfactory outcome.  The second tranche was very

9    small, not very material.  The third tranche was a little bit

10   worse than the pre-trade estimate of implementation

11   shortfall, but there were mitigating factors to do with the

12   availability of securities for trading.  We had issues with

13   our global custodians, so that was the reason we agreed with

14   Citibank -- or State Street.  That was the reason for the

15   slightly adverse performance, and overall, it was a very

16   satisfactory result.

17   **Q.**  Did there come a time when you learned that you had been

18   charged something different from the 700,000 euros you had

19   paid?

20   **A.**  Yes.  That emerged in October 2011, when there were media

21   reports that Mr. McLellan and Mr. Pennings --

22          MR. GOLDSTEIN:  I object, Your Honor.

23          MR. FRANK:  I don't think he was going to --

24          THE COURT:  I think it's beyond the scope of the

25   question.  The question was, did he learn at a time --

```
 1                 MR. FRANK:  You're right, Your Honor.  What
 2    happened?
 3    BY MR. FRANK:
 4    Q.   How did you learn that you had been overcharged?
 5                 MR. GOLDSTEIN:  Well, I object, Your Honor.  I
 6    mean, if he just wants to ask him if he learned, then the
 7    answer is yes.  That's fine.
 8                 THE COURT:  He already asked that, and he said yes.
 9                 MR. FRANK:  And I wanted to ask him how he learned.
10                 MR. GOLDSTEIN:  Well, I think it's --
11                 Objection withdrawn, Your Honor.
12                 THE COURT:  I guess it depends.  So I overrule it
13    for now.
14    BY MR. FRANK:
15    Q.   How did you learn that you had been overcharged?
16    A.   So there were media reports, and --
17                 THE COURT:  What's the relevance to the newspaper
18    reports?
19                 MR. FRANK:  He's not going to discuss the newspaper
20    reports, Your Honor.
21                 THE COURT:  He just said --
22                 MR. FRANK:  I can move on, that's fine.
23    BY MR. FRANK:
24    Q.   Did there come a time when you learned how much you were
25    overcharged?
```

1    **A.**   Yes, we were advised by State Street in around November.

2               MR. GOLDSTEIN:  I --

3    BY MR. FRANK:

4    **Q.**   Let me just stop you right there.  I just want to learn

5    what -- the amount you were overcharged was.

6               MR. GOLDSTEIN:  Move to strike the reference to

7    State Street.

8               MR. FRANK:  No objection to that, Your Honor.

9               THE COURT:  Strike.  Disregard that portion.  Go

10   ahead.

11   BY MR. FRANK:

12   **Q.**   Mr. O'Callaghan, did you learn what the amount was?

13   **A.**   Yes.

14   **Q.**   What was the amount?

15   **A.**   2.6 million euros.

16   **Q.**   And what was that for?

17   **A.**   And that was in respect of commissions which were

18   incorrectly or improperly deducted from the sales proceeds

19   that were achieved in the marketplace, when our securities

20   were being sold.

21   **Q.**   And did there come a time when you learned that there was

22   an additional amount you had been overcharged?

23   **A.**   Yes.

24   **Q.**   What was that amount?

25   **A.**   That was just under 800,000 US dollars.

1   **Q.**   And what was that for?

2   **A.**   That was in relation to the liquidation or realization of

3   an exchange traded fund on the Russell 2000 index.

4   **Q.**   So the total amount of the overcharge was?

5   **A.**   It was about 3.2 million euros.

6   **Q.**   That was on top of the approximately 700,000 euros that

7   you had paid?

8   **A.**   Yes.

9   **Q.**   What was your reaction to learning that you had been

10  overcharged?

11          MR. GOLDSTEIN:   I object, Your Honor.

12          THE COURT:   Overruled.

13          THE WITNESS:   I was shocked, I think -- I was

14  definitely shocked.   I was incredulous, really, that, you

15  know, there could have been improper amounts charged against

16  our account by an entity or an organization as reputable as

17  State Street.   I knew it was serious, you know, 3.2 million

18  euros.   And it had happened on my watch and I knew -- you

19  know, I was very bothered by it.   I was shocked, bothered.   I

20  couldn't believe it, basically.

21  **Q.**   Did there come a time when you were called to testify

22  before a body known as the Oireachtas?

23          MR. GOLDSTEIN:   I object, Your Honor.

24          THE COURT:   What is the relevance of this?

25          MR. FRANK:   Materiality, Your Honor.

1          THE COURT:  What is this?

2          MR. FRANK:  I'm happy to describe it at sidebar.

3          (The following discussion held at the bench.)

4          THE COURT:  What is this body?

5          MR. FRANK:  It's the joint Houses of Congress in

6   Ireland.  He was called to testify and called to account.  He

7   was grilled for several hours about why this had happened on

8   his watch.  It was highly relevant to materiality, it was a

9   national scandal, and he nearly lost his job over it.  The

10  defense is contesting the materiality on these charges.

11         MR. GOLDSTEIN:  Your Honor, this posthoc event that

12  didn't go into his decision to select State Street, bears no

13  relevance to materiality.  It's incredibly prejudicial.  It's

14  going to raise the specter of this man going before the Irish

15  Congress and answering questions.  It's irrelevant and the

16  relevance is substantially outweighed by the prejudice.

17            And my understanding is it was somebody else who

18  was grilled.  Mr. O'Callaghan was there, but he was not the

19  principal person who was questioned or grilled before the

20  parliament.

21         MR. FRANK:  Mr. O'Callaghan was grilled and that's

22  his understanding of what happened.  And he testified and it

23  was a big deal for him and it gets directly at the

24  materiality of these massive overcharges.

25         THE COURT:  Sustained.  I don't think that's

1    directly material.

2              (Bench conference concluded.)

3    BY MR. FRANK:

4    **Q.**   Would it have been important to you to know how much

5    State Street intended to charge you prior to make making your

6    decision to award them this transition?

7    **A.**   Yes.

8    **Q.**   Why?

9    **A.**   This was -- this was part of our evaluation criteria.

10   The fees were a significant part.  It was also important from

11   the perspective of transparency and the principle of

12   transparency, which State Street had always been

13   articulating.  And -- but overall, it was part of our

14   assessment process of the proposition that was put in front

15   of us.

16   **Q.**   Would it have changed the outcome?

17   **A.**   If we had known about it, it would most certainly have

18   changed the outcome, because the score that would have been

19   awarded for fees in our assessment criteria for Citibank

20   would have been -- for State Street would have been

21   materially less.

22              MR. FRANK:  No further questions.

23              THE COURT:  Cross-examination.

24              MR. GOLDSTEIN:  Thank you, Your Honor.

25              **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MR. GOLDSTEIN:

**Q.**  Good morning, Mr. O'Callaghan.  As you testified during your direct examination, you don't know Mr. McLellan, right?

**A.**  No.

**Q.**  Never made any representations to you in the course of transition 14, which is the subject matter of Mr. Frank's direct examination?

**A.**  No.

**Q.**  Never asked him any questions about the transition, right?

**A.**  Never asked me questions?

**Q.**  You never asked him any questions?

**A.**  No, not that I can recall, no.

**Q.**  Mr. Buckley, as far as you know, didn't ask him any questions, right?

   MR. FRANK:  Objection as to what Mr. Buckley did.

   THE COURT:  Overruled.  As far you know.

   THE WITNESS:  As far as I know, he didn't.

BY MR. GOLDSTEIN:

**Q.**  Mr. McLellan didn't -- as far as you know, well, he didn't make any representations to you regarding the transition, correct?

**A.**  That's correct.

**Q.**  And as far as you know, didn't make any representations to Mr. Buckley, right?

1    **A.**  As far as I know.

2           MR. GOLDSTEIN:  Max, can we have Exhibit 66-1,

3    please.

4    BY MR. GOLDSTEIN:

5    **Q.**  This is the request for tender that I believe Mr. Frank

6    asked you some questions about, correct?

7    **A.**  I'm not sure -- I'm not sure if he asked about this

8    document.

9    **Q.**  Okay.  He did ask you about the request for tender.

10          MR. FRANK:  This document is not in evidence, Your

11   Honor.

12          MR. GOLDSTEIN:  Your Honor, I'd move to admit in

13   66-1.

14          MR. FRANK:  No objection.

15          THE COURT:  Admitted.

16          (Exhibit No. 66-1 admitted into evidence.)

17   BY MR. GOLDSTEIN:

18   **Q.**  This is the request for tender that you sent out to

19   Citigroup, Nomura, and State Street Bank Europe Limited,

20   right?

21   **A.**  Yes.

22   **Q.**  It's dated December 1, 2010?

23   **A.**  Yes.

24   **Q.**  And if I could -- and this sets out essentially what you

25   were looking for from the panel that had been in existence

1    since, I think, 2007, correct?

2    **A.**   Yes.

3    **Q.**   All right.  And if we go to page 3, paragraph 1, where it

4    talks about the services, it references the transition

5    manager, right?  Required to liquidate up to $10 billion.

6              You see that under the services?

7    **A.**   Yes.  At 10 billion euros.

8    **Q.**   I'm sorry, 10 billion euros.  Just jump to page 9 of 10,

9    there's a subject matter that you'll see in a moment, which

10   is called "award criteria."  And this is the set of criteria

11   that you reference during your direct examination in terms of

12   how you would select amongst the different members of your

13   panel, correct?

14   **A.**   Yes.

15   **Q.**   And so the first criteria is relevant experience and

16   capability for transitions of this nature, correct?

17   **A.**   Yes.

18   **Q.**   And the weighting to that is 30 percent, right?

19   **A.**   Including the transition team as part of that 30 percent

20   as well.  Yes.

21   **Q.**   And the next is the trading strategy, that's assigned a

22   weight of 30 percent, correct?

23   **A.**   Yes.

24   **Q.**   Fees is broken down into three subparts, correct?

25   **A.**   Yes.

1          MR. GOLDSTEIN:  Pull that up a little bit, I don't

2     know if the jury -- you guys see that.  Is that right?  Okay.

3     BY MR. GOLDSTEIN:

4     **Q.**  Consistency with fee bases quoted in RFP process is one,

5     right?

6     **A.**  Yes.

7     **Q.**  Commissions payable to tender and to third parties is a

8     second bullet point, correct?

9     **A.**  Yes.

10    **Q.**  And then any other fees or charges, right?

11    **A.**  Yes.

12    **Q.**  And that's assigned a 10 percent weighting, right?

13    **A.**  Yes.

14    **Q.**  And then 20 percent for estimated implementation

15    shortfall and market impact and basis for estimation,

16    correct?

17    **A.**  Yes.

18    **Q.**  And then another ten percent for material changes since

19    Framework Agreement, right?

20    **A.**  Yes.

21    **Q.**  So 10 percent is the fees, 90 percent is attributable to

22    other factors, right?

23    **A.**  Not quite, because the fees would be part of the -- one

24    element of the implementation shortfall, as well.

25    **Q.**  Well, we can get there, but here, the category fees

1    including has a 10 percent weighting, right?

2    **A.**  Yes.

3         MR. GOLDSTEIN:  Could we have the Exhibit 82.2,

4    Your Honor.  Max.

5         THE COURT:  Is that in evidence?

6         THE DEPUTY CLERK:  No.

7         MR. GOLDSTEIN:  I would move to admit 82-2, Your

8    Honor.

9         MR. FRANK:  I need to see what that is.

10        MR. GOLDSTEIN:  It's the contract with the cover

11   page.  It's the TMA with the cover page on it.

12        MR. FRANK:  I object, Your Honor.  This witness has

13   never seen that document.

14        MR. GOLDSTEIN:  This document is in evidence in

15   another Exhibit.

16        MR. FRANK:  Then he can show him that other

17   exhibit, Your Honor.

18        MR. JOHNSTON:  99.1.

19        MR. GOLDSTEIN:  No, the cover page.

20        THE COURT:  May I see what the document is?

21        MR. GOLDSTEIN:  Sure.

22        MR. NEMTSEV:  99.1 has it.

23        MR. GOLDSTEIN:  Okay.  99.1 has it?  Okay.  99.1,

24   please.

25   BY MR. GOLDSTEIN:

1    **Q.**   You see that, Mr. O'Callghan?

2    **A.**   It's quite difficult to read on the screen here.

3    **Q.**   It is.  You see your name there, the name of your entity,

4    National Treasury Management Services?

5    **A.**   Well, that's not the exact name of our entity, I

6    assume -- sorry, is this a State Street document?

7    **Q.**   It is, sir.

8    **A.**   Yeah, so the name is slightly incorrect.  It should be

9    National Treasury Management Agency.

10   **Q.**   And in terms of the counterparty domicile, the NTMA is

11   located in Ireland.  Do you see Ireland checked off there?

12   **A.**   Yes.

13   **Q.**   And on the counterparty type, is pension fund accurate?

14   **A.**   That has always been a question of legal discussion,

15   because actually the NTMA was a sovereign reserve fund, not a

16   pension fund, so it depends on how legalistic you want to be.

17   It wasn't actually a pension fund.

18        MR. GOLDSTEIN:  Okay.  And Max, quickly, if we

19   could have 99-2.

20   BY MR. GOLDSTEIN:

21   **Q.**   This is the contract for order services Mr. Frank went

22   through with you, right?

23   **A.**   Yes.

24   **Q.**   Okay.  And you see that the entity that you contracted

25   with is State Street Bank Europe Limited.  Do you see that,

1    sir?

2    **A.**   Yes.

3    **Q.**   And if we go to the signature page, there's also --

4    there's a line for a signatory for State Street Bank Europe

5    Limited to sign this contract and order for services,

6    correct?

7    **A.**   Yup.

8    **Q.**   Okay.

9             MR. GOLDSTEIN:   And while we're here, if we can go

10   back to the first page, please, Max.

11            The contract for order services explicitly states,

12   at paragraph 1, "The National Treasury Management Agency

13   hereby accepts the tender submitted by you on 8

14   December 2010, to perform services as set out in the request

15   for tender on the following basis."

16   BY MR. GOLDSTEIN:

17   **Q.**   Do you see that?

18   **A.**   Yes.

19   **Q.**   And then it provides, "Unless and except to the extent

20   that this contract order expressly states otherwise, the

21   terms and conditions of the Framework Agreement entered into

22   between the NTMA and State Street on 9th of October 2007, per

23   in the Framework Agreement, shall be read as a whole and

24   deemed to form and be read and constructed as part of this

25   contract order for services, together the contract."

1           Do you see that?

2   **A.**  Yes.

3   **Q.**  "The terms and conditions of this contract order for

4   services shall prevail in the event of a conflict with or

5   ambiguity in the terms and conditions of the Framework

6   Agreement."

7           Correct?

8   **A.**  Yes.

9           MR. GOLDSTEIN:  Now, if we can go back to cover

10  page on 82- -- 99-1, Max, please.

11  BY MR. GOLDSTEIN:

12  **Q.**  You see there's a section "contracting entity."  Do you

13  see that?

14  **A.**  Yes.

15  **Q.**  And you see that there's a check mark for State Street

16  Bank Europe Limited, right?

17  **A.**  Yes.

18  **Q.**  Consistent with the contract for order services, right?

19  **A.**  Seems to be, yeah.

20  **Q.**  Okay.  We'll go to "initiating site."  The box London is

21  checked off.

22  **A.**  I'm assuming -- I haven't seen this document.  This is

23  all State Street documentation, but State Street Bank Europe

24  was based in London.  Yes.

25  **Q.**  That was my question.  It's consistent with your

1    understanding of where State Street Bank Europe Limited is

2    located, right?

3    **A.**   Yes.

4    **Q.**   And then there's the securities trading agreement types.

5    There's a bunch of different boxes and transition management

6    is -- has the check mark, correct?  Do you see that?

7    **A.**   Yes, I do.  I do.

8    **Q.**   All right.  And then sub category, there's a check mark

9    next to transition management master agreement.  Do you see

10   that, sir?

11   **A.**   Yes.

12   **Q.**   And then finally, governing law, there's a bunch of

13   different jurisdictions, and Ireland has a check mark next to

14   it, right?

15   **A.**   Yes.

16   **Q.**   And your understanding was that this transition would be

17   governed by Ireland law.  Is that consistent with your

18   understanding?

19   **A.**   That was part of a Framework Agreement in 2007, yes.

20           MR. GOLDSTEIN:  Okay.  And if we could go to the

21   actual Framework Agreement, Max.

22   MR. GOLDSTEIN:

23   **Q.**   At the top, it's addressed to Mr. Edward Pennings, State

24   Street Bank Europe Limited, correct?

25   **A.**   Sorry, I can't see what that document is and that page

1    is, but I can see below that as to whether it's a Framework

2    Agreement, like you said.

3         MR. GOLDSTEIN:  Okay.  If we go to the second page,

4    Max, just show him that.

5         THE WITNESS:  Yeah, I recognize that.

6         MR. GOLDSTEIN:  Okay.  Go back to the first page,

7    please.  And just blow up the body of the letter, please.

8    Including the date, Max, sorry.

9    BY MR. GOLDSTEIN:

10   **Q.**  It's a letter dated October 10, 2007.  Do you see that,

11   sir?

12   **A.**  Yes.

13   **Q.**  References Framework Agreement, right?

14   **A.**  Yes.

15   **Q.**  It's written by a person by the name of Aideen O'Riley,

16   do you see that?

17   **A.**  Yes.

18   **Q.**  Employed by your agency, sir, at the time?

19   **A.**  Yes.

20   **Q.**  As a senior legal advisor?

21   **A.**  Yes.

22   **Q.**  Did you have other in-house lawyers -- or is that Mr. or

23   Ms. O'Riley?

24   **A.**  Ms. O'Riley.

25   **Q.**  Ms. O'Riley.  Is she the only lawyer, or did you have

1    other lawyers?

2    **A.**   We have a lot more now.  We would have had a small

3    number.  She was the senior lawyer at the time who dealt with

4    all of these issues.

5    **Q.**   Okay.  And would you ever outsource -- if you had legal

6    needs, would you hire outside counsel to assist you?

7    **A.**   NTMA does that on regular occasions, but not always.

8    **Q.**   Okay.  Go back to, it says "Dear Ed, with reference to

9    the above, I now enclose the Transition Management Services

10   Framework Agreement, dated the 9th of October 2007.  I would

11   be grateful if you would arrange to have the agreement signed

12   on behalf of State Street Bank Europe and return one part for

13   my attention."

14        Do you see that, sir?

15   **A.**   Yes.

16   **Q.**   All right.  So again it's going to be signed on behalf of

17   the entity known as State Street Bank Europe, right?

18   **A.**   Yes.

19   **Q.**   And if we quickly go through some of the provisions --

20        MR. GOLDSTEIN:  On the next page, Max.

21   BY MR. GOLDSTEIN:

22   **Q.**   A "whereas" clause.  "NTMA may require a transition

23   manager to perform transition management services."  Correct?

24   **A.**   Yes, from time to time.  Yes.

25   **Q.**   And a transition manager is defined above to be a

1    specific entity and that is --

2              MR. GOLDSTEIN:  Right above, Max.

3    BY MR. GOLDSTEIN:

4    **Q.**  State Street Bank Europe Limited is identified as the

5    transition manager, right?

6    **A.**  Yes.

7    **Q.**  And down at the bottom, there's a definition

8    for "affiliate."  Right?

9    **A.**  Yes.

10   **Q.**  And you read this agreement before it was signed, right?

11   **A.**  Yes.

12   **Q.**  All right.  So you understood that State Street Bank

13   Europe Limited, therefore, had affiliates, right?

14   **A.**  Yes.

15   **Q.**  And if we just jump to paragraph 6.4.  This is a

16   paragraph setting out that the NTMA was a sophisticated

17   investor, correct?

18   **A.**  Yes.  Institute with assets more -- if that's what

19   sophisticated means, yes.

20   **Q.**  Or institutional investor?

21   **A.**  Institutional investor, definitely.

22   **Q.**  Okay.  Paragraph 9.1.

23              "Transition manager is regulated by the financial

24   services authority."

25              Is that correct?

1   **A.**  Yes, it was their representation.  I'm sure it was

2   correct.

3            MR. GOLDSTEIN:  And paragraph 12.12 and 12.1,

4   please, Max.

5   BY MR. GOLDSTEIN:

6   **Q.**  This is "assignment, subcontracting, and delegation,"

7   right?

8   **A.**  Yup.

9   **Q.**  And by the way, did you review this contract with Mr.

10  Frank before you testified?

11  **A.**  Not with Mr. Frank.  I've reread it since then.  And in

12  preparing for the case, it was material that I needed to

13  refresh myself on.

14  **Q.**  But not with Mr. Frank in your preparation to testify?

15  **A.**  So --

16  **Q.**  Yes or no.  Did you go through this with Mr. Frank?

17  **A.**  It depends on what you mean -- sorry.  It depends on what

18  you mean by going through it.  We didn't go through it clause

19  by clause, but there was -- we did discuss that the Framework

20  Agreement would be an important document for me to be

21  refreshed on.

22  **Q.**  And if we look at 12.1, it reads that the "Transition

23  manager will not transfer or assign, directly or indirectly,

24  any part of this Framework Agreement, or any contract order

25  without the prior written consent of the NTMA.  The

1    transition manager will not subcontract any element of the

2    services without the prior written consent of the NTMA, which

3    consent may be withheld at the NTMA's absolute discretion."

4            Right?

5    **A.**   Yeah.

6    **Q.**   It gives you some authority in terms of whether or not

7    you provide consent under those circumstances, right?

8    **A.**   That's correct.

9    **Q.**   It says that "Nothing in this clause will prohibit or

10   restrict the transition manager's ability to use or appoint

11   execution agents and brokers in undertaking the services."

12           Right?  Did I read that correctly?

13   **A.**   Yes.

14           MR. GOLDSTEIN:  If we could have Exhibit 70,

15   please, Max.

16   BY MR. GOLDSTEIN:

17   **Q.**   This is 70-1.  It is the proposal response that State

18   Street submitted to NTMA, in which Mr. Frank went through

19   with you.  Do you recall this line of questioning on direct

20   examination?

21   **A.**   Yes.

22   **Q.**   If we could turn to page 9, please.  Mr. Frank went

23   through with you that, under "equity commissions," there's a

24   zero under 1.2 cost summary.  Is that accurate, meaning in

25   terms of what you reviewed on direct examination?

1    **A.**   Yes.

2    **Q.**   Underneath "equity commissions," there's an equity

3    bid-ask spread figure, correct?

4    **A.**   Yes.

5    **Q.**   And it's a little bit more than $3.4 million?

6    **A.**   Yes.

7    **Q.**   And then scenario two, which was --

8               THE COURT:  Is that dollars or euros?

9               MR. GOLDSTEIN:  Euros.  I'm --

10   BY MR. GOLDSTEIN:

11   **Q.**   Well, what is it?

12   **A.**   Euros, beg your pardon.  Yes, euros.  That's correct.

13   **Q.**   And then onto scenario two, it -- again equity

14   commissions is zero, but it also has an equity bid-ask spread

15   figure, which is almost, but not exactly the same as scenario

16   one, correct?

17   **A.**   Yes.

18   **Q.**   Now, it's not simply the proposal that you receive, but

19   you also received pre-trade submissions by State Street,

20   correct?  That set out what the implementation shortfall

21   expectations or estimates would be?

22   **A.**   Yes.

23   **Q.**   And you testified on direct examination -- putting aside

24   your testimony about your belief that you were overcharged,

25   when you got the final post trades for the liquidation of the

1   NTMA assets, you said you were extremely satisfied with the

2   results, right?

3   **A.**   I think I said very satisfied, but yes.

4   **Q.**   My apologies, very satisfied?

5   **A.**   Yeah.  Yeah.

6   **Q.**   Now, you understand that -- well, it's accurate, right?

7   I mean, before you go through with the transition, State

8   Street provides what's called a pretransition implementation

9   shortfall analysis, right?

10  **A.**   Yes.

11  **Q.**   And in that, State Street provides an estimate, a

12  prediction, a hope of what it would cost to conduct the

13  transition at issue, right?

14  **A.**   Yeah.  An all-in cost.

15  **Q.**   Right.

16  **A.**   Yeah.

17  **Q.**   And it's broken out both in terms of equity transactions

18  and fixed income transactions, correct?

19  **A.**   Are you referring to a specific document?  But in

20  general, yes, I agree, yeah.

21              MR. GOLDSTEIN:  So Max, the tranche one, pre-trade.

22              THE COURT:  Is that already in evidence?

23              MR. GOLDSTEIN:  It's not an exhibit?

24              MR. NEMTSEV:  No.

25              MR. GOLDSTEIN:  Okay.

1              Your Honor, may I have -- I need these marked --
2       they're marked up, so I'll have to replace them.  But I'd
3       like to mark for identification at this point, unless there's
4       no objection.  I'd like to move into evidence the equity
5       pretransition implementation shortfall analysis, prepared by
6       NTMA, number 14, dated February 24, 2011.
7              MR. FRANK:  No objection, Your Honor.
8              THE COURT:  All right.
9              MR. GOLDSTEIN:  And the fixed income pre-trade
10      analysis, also dated February 24, 2011.
11             THE COURT:  Do we know what the next unused number
12      is?
13             THE DEPUTY CLERK:  Do you know what the -- I think
14      it's 513.
15             THE COURT:  513.
16             MR. NEMTSEV:  560.
17             THE COURT:  560.
18             MR. GOLDSTEIN:  So I'll do it -- so the equity
19      pre-transition implementation shortfall analysis will be
20      Exhibit 560, and the fixed income, pre-trade analysis, dated
21      February 24, 2011, will be 561.
22             THE COURT:  Yes.
23             (Exhibit Nos. 560 and 561 admitted into evidence.)
24             THE COURT:  So ladies and gentlemen, the reason for
25      the high numbers is lots of documents, in the course of the

1    case, get marked.  The lawyers don't necessarily offer

2    everything and -- or sometimes there's duplicate copies and

3    you don't need three copies of the same document.  One copy

4    suffices if there is nothing different between the documents.

5            So you should infer nothing from the fact that the

6    numbers might not be sequential and that's why sometimes

7    we're looking for just the next number, to be sure we don't

8    overlap with another number that might be used by someone

9    else.

10           Go ahead.

11           MR. GOLDSTEIN:  So I'll need the Elmo.

12   BY MR. GOLDSTEIN:

13   Q.  You recognize this document, Mr. O'Callaghan, as the

14   equity pre-transition implementation shortfall analysis?

15   A.  Yeah, that's the title, yes.

16   Q.  Okay.  And this is a document that was provided to the

17   NTMA by State Street, before the first tranche.  Is that fair

18   to say?

19   A.  Yeah, I'm pretty certain the 24th of February was just

20   before the first tranche.

21   Q.  Okay.  And you testified there were three different

22   stages or tranches for this --

23   A.  Yes.

24   Q.  -- liquidation exercise, correct?

25   A.  Yeah.

1    **Q.** All right. And so equity refers to shares, correct?

2    **A.** Yes.

3    **Q.** Stock. And then if we go to the second page of this

4    document -- this is going to be tough.

5         MR. GOLDSTEIN: Your Honor, may I just approach the

6    witness? I think it might be easier.

7         THE COURT: Yes.

8         MR. GOLDSTEIN: All right.

9    BY MR. GOLDSTEIN:

10   **Q.** So Mr. O'Callaghan, on the second page of this document

11   is where State Street provides what it -- the estimated cost

12   of implementing this tranche one, for the equity piece of

13   tranche one, correct?

14   **A.** Yeah. That's what it looks like, yes.

15   **Q.** Okay. And in terms of the market value of what was

16   being -- the equities that were being transitioned, it's

17   1,228,000,000 and change, correct?

18   **A.** Yes.

19   **Q.** And then in terms of commissions, there's no commission

20   listed, correct?

21   **A.** Zero commission, yeah.

22   **Q.** The bid-ask spread is $1,028,731, right?

23        THE COURT: Euros. Euros or dollars?

24        MR. GOLDSTEIN: I'm showing my isolationist

25   tendencies.

1    BY MR. GOLDSTEIN:

2    **Q.**   Euros?

3    **A.**   Euros.

4    **Q.**   Okay.

5    **A.**   Sorry -- this has actually got dollars headed on the

6    heading there.

7    **Q.**   And so the bid-ask rev was a little more than a million

8    dollars.  1,028,000, right?

9    **A.**   Right.

10   **Q.**   And the market impact is listed at 6,998,658, correct?

11   **A.**   Almost, yeah.

12   **Q.**   There's an entry for FX spread?

13   **A.**   Yes.

14   **Q.**   And there's a taxes and fees line, correct?

15   **A.**   Yes.

16   **Q.**   And so the estimate for the total costs for the equity

17   part of tranche one, comes out to what?  Can you --

18   **A.**   8.8 million, approximately.

19   **Q.**   Okay.  And then you'd also received what's been marked as

20   Exhibit 561, same kind of document, what State Street

21   estimates to transition the fixed income piece of tranche

22   one, correct?

23   **A.**   Yes.

24   **Q.**   And within that estimate, there's a beginning portfolio

25   value of 137,760,188 euros, correct?

1    **A.**  Yes.

2    **Q.**  And underneath that, in terms of cost, there's a bid-ask

3    spread of 244,966, correct?

4    **A.**  Yes.

5    **Q.**  And the total estimated cost would be 244,966, correct?

6    **A.**  Yeah.

7    **Q.**  Or about 17.8 basis points, right?

8    **A.**  Yes.  Yes.

9    **Q.**  Now, you also receive -- after tranche one is complete,

10   you receive what's called a post-transition implementation

11   shortfall analysis, right?

12   **A.**  Yes.

13   **Q.**  And that's where State Street provides you with the

14   actual results of the transition, right?

15   **A.**  Yes.

16            MR. GOLDSTEIN:  Is Exhibit 138-01 in evidence?

17            THE DEPUTY CLERK:  138-01 I have as 66.

18            MR. GOLDSTEIN:  It's in?  Okay.

19            Your Honor, I am just going to leave the

20   pre-transitions --

21            THE COURT:  Leave the -- oh, there.  Fine.  138-01

22   is in, Maria?

23            THE DEPUTY CLERK:  I have it as 66.

24            MS. LEAHY:  Yeah.

25            THE DEPUTY CLERK:  You do?

```
 1              MR. GOLDSTEIN:  In evidence?

 2              THE COURT:  Yes.

 3              MR. GOLDSTEIN:  Max, if we could just show them the

 4    front page.

 5              THE COURT:  Maria, you have to switch back.

 6    BY MR. GOLDSTEIN:

 7    Q.   This is the post-transition implementation shortfall

 8    analysis you received?

 9    A.   Yup.

10    Q.   Dated 3/29 of '11, correct?

11    A.   Yup.

12    Q.   And if we go to the equity analysis.

13              MR. GOLDSTEIN:  Page 6 of 81, please, Max, and if

14    you could blow up the starting value of the global equity,

15    the total.

16    BY MR. GOLDSTEIN:

17    Q.   Mr. O'Callaghan, do you see that the total starting value

18    of the actual transition was 1,229,210,041, right?

19    A.   Yes.

20    Q.   And if you could go back -- this is --

21              MR. GOLDSTEIN:  If we go back one page, this is

22    with the equity analysis, Max.  Can we go back one page from

23    this?  Okay.

24    BY MR. GOLDSTEIN:

25    Q.   How does that -- how does that starting figure compare to
```

1     the pre-trade, sir?

2     **A.**   It's very -- it's 122 -- it's very similar.  It's not

3     quite the same, but very similar.

4     **Q.**   A little bit more, in terms of the actual --

5     **A.**   Yeah, tiny amount.

6     **Q.**   And by "tiny," how much is that?

7     **A.**   On asset value, it's 1.229, and as compared to 1.228

8     there may have been, you know, market moves or some other

9     factors which might have accounted for a timing difference in

10    evaluations.

11    **Q.**   So tiny would be about a million dollars?

12    **A.**   I would say tiny might be too strong.  It's a very small

13    amount in the context of 1.229, and asset values of

14    1.229 billion.

15    **Q.**   Okay.

16           MR. GOLDSTEIN:  And if we could go to page 7,

17    please.  The table on the right-hand side, Max.

18    BY MR. GOLDSTEIN:

19    **Q.**   So this is the actual costs incurred during the

20    transition, correct?

21    **A.**   I assume so.  I'm --

22           MR. GOLDSTEIN:  Max, if you show him the top left

23    implementation shortfall box, so he can just orient himself.

24    BY MR. GOLDSTEIN:

25    **Q.**   Do you see that, sir?

1  **A.**  Yes.

2  **Q.**  Well, these are what the actual cost of the transition as

3  compared -- well, no.  They're the actual cost, correct?

4  **A.**  Yes.

5  **Q.**  All right.  So we'll go back to the bottom right box?

6  **A.**  Yes.

7  **Q.**  State Street Global Management, there's a fee there of

8  $220,410, correct?

9  **A.**  That's what set out, yes.

10  **Q.**  There's a small commission cost of about 15,000?

11  **A.**  Yes.

12  **Q.**  And then there's a bid-ask spread cost of 1 million -- or

13  a little more than a million dollars, correct -- or a million

14  euros.  Do you see that, sir?

15  **A.**  I do, yeah.  Sorry.

16  **Q.**  And how does that compare to the estimated cost in the

17  pre-trade for the equities, the bid-ask?

18  **A.**  The bid-ask is lower than the pre-trade.

19  **Q.**  Meaning the actual bid-ask that was incurred was lower

20  than the estimated bid-ask contained in the pre-trade, right?

21  **A.**  Yes, there will always be differences, but yes.

22  **Q.**  Right.  And then there's a market impact cost of

23  6,497,000 or so, right?

24  **A.**  Yes.

25  **Q.**  And is that more or less than what was estimated before

1    the transition?

2    **A.**   That's less than was -- so I should make the point that

3    the -- the estimate beforehand is a central case estimate.

4    There's a variability attaching to it, which was a very

5    important part of the pre-trade estimate, as well, but it's

6    less than.

7    **Q.**   There's no doubt about that, but in terms of the actual

8    numbers --

9    **A.**   It's less than the central case.

10   **Q.**   It's less than what was estimated, right?

11   **A.**   Yes.

12   **Q.**   And you see in the post trade, there's an entry for

13   taxes, there's an entry for FX cost, and then there's an

14   opportunity cost.  Do you see that?

15   **A.**   Yes.

16   **Q.**   It's bracketed and it's 8,896,000 or so.  Do you see

17   that?

18   **A.**   Yes.

19   **Q.**   That bracket means that that was money actually -- it was

20   not a cost, it was a gain to the portfolio, correct?

21   **A.**   Yeah, relative to the implementation shortfall benchmark,

22   which is the methodology for calculating implementation

23   shortfall, yes.

24   **Q.**   All right.  And so you get to the bottom, total cost, the

25   total cost of the actual implementation, including everything

1    above it, is 468,196, right?

2    **A.**  Yes.

3    **Q.**  And how does that compare to the estimated costs in the

4    pre-trade?

5    **A.**  It's substantially less.

6    **Q.**  The estimated cost was --

7    **A.**  8.8 million.

8    **Q.**  8.8 million, right?

9    **A.**  Yes.

10           MR. GOLDSTEIN:  And if we go to page 11, please,

11   Max.

12   BY MR. GOLDSTEIN:

13   **Q.**  Mr. Frank asked you questions about the iShare Russell

14   2000 piece of this transition.  Do you see that, sir?

15           MR. GOLDSTEIN:  Bottom box, Max, top line.

16   BY MR. GOLDSTEIN:

17   **Q.**  Do you see that, sir?

18   **A.**  Yes.

19   **Q.**  Again, we have a bracketed number, right?

20   **A.**  Yes.

21   **Q.**  So the liquidation or execution of those shares ended up

22   gaining in excess of 2.6 million, correct?

23   **A.**  Yes.  On this tranche, yes.  Yup.

24   **Q.**  Okay.

25   **A.**  Sorry, that's relative -- it's a gain relative to the

1    benchmark, which would have been the price at the start of

2    the -- the market price at the start of the transition

3    period.

4    **Q.**  Yes.  Thank you.

5            MR. GOLDSTEIN:  And Max, if we can go to the fixed

6    income analysis piece of this, page 14 of 81, please.

7    BY MR. GOLDSTEIN:

8    **Q.**  On your screen, sir, this is -- on the top left, this is

9    the implementation shortfall analysis for the fixed income

10   piece, correct?

11   **A.**  Yes.

12   **Q.**  And starting value of the fixed income is listed at

13   137,709,544, correct?

14   **A.**  Yes.

15   **Q.**  And how does that compare to the estimated cost in the

16   pre-trade, sir?

17   **A.**  It's very similar, again, probably minor market moves or

18   timing variances.

19   **Q.**  A little bit less, right?

20   **A.**  Yes, very slightly less.

21           MR. GOLDSTEIN:  And then the bottom right column,

22   table, Max, the implementation shortfall analysis.

23   BY MR. GOLDSTEIN:

24   **Q.**  We have a bid offer spread where the actual cost was

25   200,482, correct?

1    **A.**   Yes.

2    **Q.**   And if we go back to the pre-trade, the actual cost was

3    less than what was estimated in the pre-trade, right?

4    **A.**   Yes, the pre-trade was 244.

5    **Q.**   And so the total cost, in terms of going back to the

6    table on the screen, 242,202.  Do you see that?

7    **A.**   Yes.

8    **Q.**   That's actually a couple thousand dollars less than what

9    was estimated in the pre-trade, right?

10   **A.**   Yes.

11   **Q.**   Okay.  And you testified that in terms of tranche two, I

12   think you testified it was a minor transition, right?

13   **A.**   It was much smaller than one or three.

14   **Q.**   And do you recall that, once again, the actual costs

15   incurred for tranche two were slightly less than what had

16   been estimated by State Street?

17   **A.**   I can agree that based on that -- that page, yes.

18   **Q.**   Well, no.  I'm now referring to tranche two, sir.  This

19   is tranche one, I think.

20   **A.**   So tranche two is the fixed income, the 244 and the 242.

21   Is that correct?  Sorry.

22          MR. GOLDSTEIN:  That's okay.

23          Your Honor, can I just show him a document to

24   refresh his memory?

25          THE COURT:  Yes.

1    BY MR. GOLDSTEIN:

2    **Q.**  Mr. O'Callaghan, take your time, I'm just showing you a

3    document to refresh your recollection as to tranche two.

4    **A.**  Yup.

5    **Q.**  Okay.  So having shown you this document,

6    Mr. O'Callaghan, does it refresh your memory that as for

7    tranche two, the implementation shortfall was .16 percent

8    against the pre-trade estimate of .179, slightly less in

9    terms of the actual cost?

10   **A.**  Yes, that sounds about right to me.

11          MR. GOLDSTEIN:  Thank you.

12   BY MR. GOLDSTEIN:

13   **Q.**  And then there was a third and final tranche, right?

14   **A.**  Yes.

15          MR. GOLDSTEIN:  Are these pre-trades in evidence?

16   No.

17          Steve, do you have an objection to the --

18          MR. FRANK:  No.

19          MR. GOLDSTEIN:  Your Honor, I move in, as the next

20   two exhibits, the equity pre-transition implementation

21   shortfall analysis.

22          THE COURT:  Admitted at 562.

23          No objection, right, Mr. Frank?

24          MR. FRANK:  No objection, Your Honor.

25          THE COURT:  And the next one is what?

1          MR. GOLDSTEIN:  The next one is fixed income

2    pre-trade analysis, both of which are dated April 6th.

3          THE COURT:  Admitted as 563.

4          (Exhibit Nos. 562 and 563 admitted into evidence.)

5          MR. GOLDSTEIN:  May I just hand these to the

6    witness?

7          THE COURT:  You may.

8          MR. GOLDSTEIN:  Thank you.

9    BY MR. GOLDSTEIN:

10   **Q.**  Mr. O'Callaghan, I'm showing you what's been admitted

11   into evidence.  Those are the pre-trade estimates submitted

12   by State Street in response to the third tranche of this

13   transition exercise, correct?

14   **A.**  Yes.

15   **Q.**  And if you turn to the --

16         MR. GOLDSTEIN:  May I approach, Your Honor?

17         THE COURT:  You may.

18   BY MR. GOLDSTEIN:

19   **Q.**  Again, Mr. O'Callaghan, it shows the -- the pre-trade

20   shows the estimated market value of the equity piece of this

21   transition, right?

22   **A.**  Yes.

23   **Q.**  And can you just read the number to the jury?

24   **A.**  2,986,442 million.  That's 2.986 billion euros, 442.

25   **Q.**  Okay.  And if you turn to the next page.  I'm sorry, not

1   the next page.  It also has listed, again, those different

2   costs that are estimated in terms of the transition, right?

3   **A.**   Yes.

4   **Q.**   There's zero cost associated with the line that's

5   entitled commissions, right?

6   **A.**   Yes.

7   **Q.**   Then there's an entry for bid-ask spread, correct?

8   **A.**   Yes.

9   **Q.**   And what figure is listed as an estimate for the bid-ask

10  spread for the equity piece of this transition?

11  **A.**   1,263,422.

12  **Q.**   And there's a market impact line, as well?

13  **A.**   Yeah.

14  **Q.**   And can you read that number in terms of the State Street

15  estimate?

16  **A.**   4,691,235.

17  **Q.**   And there's no entry for opportunity cost, correct?

18  **A.**   Not at the pre-trade.  At the pre-trade point.  That only

19  emerges afterwards.

20  **Q.**   And the total estimated cost for the equity piece of this

21  transition, can you read that number for the jury, please?

22  **A.**   6,676,266.

23  **Q.**   Okay.  If I can direct your attention to the fixed income

24  analysis.  Again, this is State Street's estimate to

25  transition the fixed income piece of tranche three, correct?

1      **A.**   Yes.

2      **Q.**   And the estimated portfolio value of the fixed income

3      instruments, can you read that figure to the jury?

4      **A.**   67,805,117.  805,117.

5      **Q.**   And in terms of estimated cost, there's an entry for

6      bid-ask spread, correct?

7      **A.**   That's correct.

8      **Q.**   And if you can just read that number, please?

9      **A.**   144,680.

10     **Q.**   Again, no opportunity cost, correct?

11     **A.**   No, there wouldn't be one at the pre-trade stage.

12     **Q.**   And the total estimated costs, can you read that figure?

13     **A.**   It's the same number, 144,680.

14     **Q.**   Okay.

15              MR. GOLDSTEIN:  So is that Exhibit 170-01?

16              MR. FRANK:  I don't think that's the consolidated

17     one.

18              MR. GOLDSTEIN:  What's that?

19              MR. FRANK:  I'm not sure that's the consolidated

20     one.

21              MR. GOLDSTEIN:  Okay.  All right.

22              Could we have Exhibit 170-1, please, Max.

23              THE DEPUTY CLERK:  Is that in evidence?

24              MR. GOLDSTEIN:  According to Mr. Johnston, it is.

25     BY MR. GOLDSTEIN:

1    **Q.**  This is the post-transition implementation shortfall

2    analysis.  This is post-transition, right?

3    **A.**  Yes.

4    **Q.**  And this is where State Street provides to the NTMA what

5    the actual costs of implementation were, right?

6    **A.**  Yes.

7           MR. GOLDSTEIN:  And if we turn to page 3 at the

8    bottom, Max.

9    BY MR. GOLDSTEIN:

10   **Q.**  You testified on direct examination that the actual costs

11   incurred in tranche three were higher than the estimated

12   cost, correct?

13   **A.**  Yes.

14   **Q.**  You testified that there was some issue in terms of

15   certain shares being available -- not being available at the

16   opportune time, right?

17   **A.**  Yes.

18   **Q.**  And that's reflected in this --

19          MR. GOLDSTEIN:  Bottom paragraph, Max, please.

20   BY MR. GOLDSTEIN:

21   **Q.**  Where it says, "Due to the number and value of stocks

22   that were unavailable at the start of trading and then in

23   many cases do not become available for several days later,

24   the transition cannot easily be measured using the IS

25   benchmark."

1        Right?  You see that, sir?

2    **A.**   That's what's written down, yes.

3    **Q.**   And that's what you had testified to on direct

4    examination, right?

5    **A.**   I don't know that I testified can easily be measured.  I

6    think it can be measured, but the reason for a difference

7    might be because of those factors, or the main reason for an

8    adverse -- or a slightly adverse outcome might be due to

9    those factors.

10   **Q.**   And that reason was understood by you at this time?

11   **A.**   Yes.  And it was a rare making on our side and not on

12   State Street's side.

13   **Q.**   Okay.

14        MR. GOLDSTEIN:  And if we turn to page 6, please,

15   Max.  Actually, you can just go to page 7, please.

16   BY MR. GOLDSTEIN:

17   **Q.**   This is the implementation shortfall analysis for the

18   equity piece of the transition.  Do you see that?

19   **A.**   Yup.

20   **Q.**   And in terms of the actual starting value, could you --

21   it's 2,972,000,000 and change, right?

22   **A.**   Yeah.

23   **Q.**   And how does that compare to the pre-trade estimate?

24   **A.**   2,986,000,000 and change, as you say.

25   **Q.**   So slightly lower, right?

1    **A.**   Yes.

2    **Q.**   14 million?

3    **A.**   Yes.

4    **Q.**   And then on the right-hand side, there's a table which

5    provided the costs, right?

6    **A.**   Yes.

7    **Q.**   And again, there's a 224 next to the commission line,

8    right?

9    **A.**   Yes.

10   **Q.**   And then the bid-ask spread, the actual cost incurred was

11   1,363,203, correct?

12   **A.**   Yes.

13   **Q.**   And how does that compare to the pre-trade estimate?

14   Slightly more?

15   **A.**   Pre-trade was 1263, so it's about 100,000 more.

16   **Q.**   Okay.  And there's a line for market impact cost,

17   $4,522,075, right?

18   **A.**   Right.

19   **Q.**   And that's slightly below what the pre-trade estimate of

20   4691, right?

21   **A.**   4691.  Yeah.

22   **Q.**   And then there's an opportunity cost listed of -- in

23   excess of 13 million.  Do you see that, sir?

24   **A.**   Yes.

25   **Q.**   And that was not in the pre-trade estimate, right?

1    **A.**   Yeah.   That's an outcome that would never be estimated in

2    advance, yes.

3    **Q.**   And so that was the driving -- a driving force of the

4    total costs, right?

5    **A.**   Yes.

6    **Q.**   And that goes back to what we had just talked about on

7    the page 2 or so, that certain shares were not available and

8    that impacted the opportunity costs?

9    **A.**   Yes, that's correct.

10   **Q.**   And so the total cost was 14,356,347.  Do you see that?

11   **A.**   Yes.

12   **Q.**   And that's a -- 7 million plus more than what's in the

13   pre-trade, right?

14   **A.**   Yes.

15   **Q.**   And we're almost there, but if we go through the fixed

16   income piece, as well?

17              MR. GOLDSTEIN:   Max, it's page 14.

18   BY MR. GOLDSTEIN:

19   **Q.**   There's a market value of 67,950,422, right?

20   **A.**   Yes.

21   **Q.**   Slightly less than what was in the pre-trade?

22   **A.**   Slightly more, actually.   It's 67805 beforehand.

23   **Q.**   You're right.

24              MR. GOLDSTEIN:   And then there's a bid-ask spread

25   on the bottom right, Max, bottom table on the right-hand

1    side.

2    BY MR. GOLDSTEIN:

3    **Q.**   There's a bid offer spread of 125,708, right?

4    **A.**   Yes.

5    **Q.**   How does that compare to the bid offer spread in the --

6    that was estimated in the pre-trade?

7    **A.**   Well, the pre-trade was 134,000, so it's 9,000 less.

8    **Q.**   Again, no opportunity cost in the pre-trade, but there's

9    an opportunity cost here of 131,173.  That's an actually --

10   that's a gain?

11   **A.**   Yes.

12   **Q.**   Okay.  And then the total cost, there's actually a gain

13   on the fixed income side, right?

14   **A.**   Yes.

15   **Q.**   And so the pre-trade estimate estimated a cost of

16   approximately $134,680 and it ends up that there was a gain

17   on the fixed income side.

18   **A.**   Of 5,000.

19   **Q.**   Okay.  Mr. O'Callaghan, have you taken the time, in the

20   course of examining the results of the transition management

21   services provided by State Street Bank Europe Limited to

22   compare what the estimated total costs were, versus the

23   actual total cost, meaning adding up all of these different

24   numbers that we just went through?

25   **A.**   Do you mean at the time?

1   **Q.**   At the time, or since then.

2   **A.**   Well, at the time, we -- we evaluated the report that

3   you've just outlined, against the pre-trade, and we had the

4   discussions on the factors that might have caused

5   differences, and that led us to the conclusion at the time

6   that we were satisfied with the implementation shortfall

7   outcome, very satisfied with it.  And you know, I haven't

8   spent too much time since then looking at it.  That's my view

9   then and it remains my view, that the trading outcome was

10  very satisfactory.

11  **Q.**   And would it surprise you -- so we talked about tranche

12  two and we didn't quantify it, but the estimate was higher

13  than what the actual costs incurred for tranche two were,

14  right?  Remember the 16 versus 17.9 -- point 16?

15  **A.**   Yeah.

16  **Q.**   Would it surprise you that just considering tranche one

17  and tranche two, that the estimated costs were 15,921,000,

18  and the actual costs were 900,000, less 15,000, 61,000,

19  meaning that the actual costs to transition in excess of

20  $10 billion, State Street actually beat their pre-trade

21  estimates?  Would that surprise you?

22  **A.**   No, it wouldn't surprise me, because the essence of a

23  pre-trade estimate and the variability, the standard

24  deviation that goes around that, is there's an equal

25  probability that the outcome would be more or less than the

1    central case estimate.  So I would not be surprised that the

2    outcome would be better or more favorable than the pre-trade

3    estimate.

4    Q.   And you're not surprised, because -- I mean, it was a

5    laborious exercise.  We just went through the numbers and

6    they did beat their pre-trade estimates, right?

7    A.   Yeah.  We didn't add the whole lot together, but the --

8    for example, they didn't because of the opportunity costs,

9    because of stocks not being available and so on.  But

10   ultimately, when we assessed all the factors, we were very

11   satisfied with the outcome, yes.

12   Q.   Incredibly complicated task to transition in excess of

13   $10 billion, right?  Or 10 billion euros?

14   A.   Yes.  Though State Street just did 4.8 of that, but in

15   total, 10 billion is a big number.

16   Q.   4.8 billion, incredibly complicated task, right?  A lot

17   of moving pieces, opportunity costs, market impact, trading

18   stocks and bonds over the entire globe, right?

19   A.   Yes, it's complicated.

20   Q.   It's complicated.  That's what State Street Bank Europe

21   contracted with you to do, right?

22   A.   They did.

23   Q.   And in the end, they ended up beating, in terms of actual

24   dollar for dollar, euro for euro, they beat what they had

25   estimated would be the total cost for transitioning those

1    funds, right?

2    **A.**   The -- the outcome was better, but there are market

3    factors -- market conditions will drive those outcomes very

4    significantly.  And so the outcome was more favorable.

5    But -- and we were very satisfied.  But it's market

6    conditions, typically, that are significant drivers of the

7    implementation shortfall outcomes.

8    **Q.**   Okay.  Now you testified that State Street was one of

9    several transition managers on a panel, correct?

10    **A.**   One of three.

11    **Q.**   One of three.  And NTMA, transition 14 was not the only

12    transition State Street had submitted bids for, correct?

13    **A.**   Well, they submitted bids for all of them, as far as I

14    can remember.

15    **Q.**   Right.  1 through 14, right?

16    **A.**   Yes.

17    **Q.**   And do you recall that in March of 2010, NTMA issued a

18    request for proposals as to transition number 9?

19    **A.**   We did that -- sorry.  I don't know that it was in the

20    date that you have mentioned, so -- but I do know that we did

21    issue proposals for transition number 9, but I'm not sure of

22    the date.

23            MR. GOLDSTEIN:  Your Honor, may I approach just to

24    make this quick?

25            THE COURT:  Yes.

1          MR. GOLDSTEIN:  Thank you.

2          THE COURT:  Show Mr. Frank.

3          MR. GOLDSTEIN:  I'm going to show him a bunch of

4    e-mails just to refresh his memory as to the dates.

5          MR. FRANK:  This is concerning number 10.

6          MR. GOLDSTEIN:  Yeah, it's going to go 9 through

7    14.  You can look at those -- do you have any objection to me

8    showing him those?

9          MR. FRANK:  Not if you're just showing them to him.

10   BY MR. GOLDSTEIN:

11   Q.  Mr. O'Callaghan, I'm showing you an e-mail and I just

12   show it to you to refresh your recollection as to whether or

13   not it refreshes your recollection that it was March 16,

14   2010, when your request for tender went out as to transition

15   number 9?

16         THE WITNESS:  Yeah.

17         THE COURT:  Just read it to yourself and then --

18         THE WITNESS:  Sorry.

19         THE COURT:  Look at it yourself and then the

20   question is whether it refreshes your recollection.

21         THE WITNESS:  Yup, that's -- yeah, I can recognize

22   that e-mail, yeah.

23   BY MR. GOLDSTEIN:

24   Q.  Okay.  And do you recall that, in or about April of 2010,

25   you notified State Street they had not been selected for

1    transition number 9?

2    **A.**   No, I don't recall.  Yeah.

3    **Q.**   Look at the document.  See if that refreshes your memory.

4    **A.**   Yes, that was an e-mail from me advising them that they

5    weren't successful, yes.

6    **Q.**   And do you recall that, in or about May 28, 2010, a

7    request for proposal went out as to transition number 10?

8    **A.**   Well, subject to checking the date, but yeah.

9           MR. GOLDSTEIN:  Perhaps the Government might just

10   stipulate as to the dates, Your Honor, so that I need not.

11          MR. FRANK:  I'm sorry, what are you asking?

12          MR. GOLDSTEIN:  If the Government will stipulate as

13   to the dates of these transitions, the tenders.

14          MR. FRANK:  We have no objection to you

15   representing what the dates are.

16          THE COURT:  Fine.

17          THE WITNESS:  Okay.  Yeah.

18   BY MR. GOLDSTEIN:

19   **Q.**   So at transition 10, the request for tender went out in

20   May 28, 2010.  Okay?

21   **A.**   Okay.

22   **Q.**   Do you recall that State Street was not selected for

23   transition number 10?

24   **A.**   Yeah.  That's -- that's correct.

25   **Q.**   And request for tender for transition number 11 went out

1   July 7, 2010.  And once again, State Street was not selected

2   for transition number 11, correct?

3   **A.**  Yes.

4   **Q.**  And July 15, 2010, a request for tender for transition

5   number 12 went out, and once again, State Street was not

6   selected, correct?

7   **A.**  Yes.

8   **Q.**  And do you recall that after transition number 12, after

9   State Street, Mr. Pennings was -- his submission was not

10  accepted in terms of transition number 12, Mr. Pennings asked

11  for a meeting with yourself and Mr. Buckley?

12  **A.**  Well, again, I remember meeting Mr. Pennings, but I don't

13  remember the date.  But if you say that's the date, that's

14  probably correct.

15          MR. GOLDSTEIN:  Your Honor, I'm going to move into

16  evidence an e-mail to Mr. O'Callaghan dated August 4, 2010.

17  I don't know if there's an objection or not.

18          MR. FRANK:  No objection.

19          THE COURT:  Admitted.  So this will be 564.

20          (Exhibit No. 564 admitted into evidence.)

21          MR. GOLDSTEIN:  May I have the Elmo, please.

22          I'm just going to give him a copy, in case he can't

23  read that, Your Honor.

24          THE COURT:  Fine.

25  BY MR. GOLDSTEIN:

1    **Q.**   So if you take a look at that e-mail, Mr. O'Callaghan,

2    this is an e-mail from Mr. Pennings after State Street was

3    not selected for transition number 12, correct?

4    **A.**   Yes, that's correct.

5    **Q.**   Okay.  And if I direct your attention to the bottom of

6    that first page, there's an e-mail that begins, "Dear

7    Killian," correct?

8    **A.**   Yes.

9    **Q.**   That's from Mr. Pennings, right?

10   **A.**   Yes.

11   **Q.**   Mr. Boomgaardt, Rick Boomgaardt is copied on that, or

12   it's sent to him, actually, right?

13   **A.**   Yes.

14   **Q.**   Dated August 4, 2010, right?

15   **A.**   Yes.

16   **Q.**   And you're one of several people who are copied on that

17   particular e-mail, right?

18   **A.**   Yes.

19   **Q.**   Subject is transition number 12, right?

20   **A.**   Yes.

21   **Q.**   Mr. Pennings writes, "Dear Killian, thank you for your

22   note."

23           And he's referring to the note on the preceding

24   page alerting Mr. Pennings that State Street had not been

25   selected for transition number 12, right?

1    **A.**   Yes.

2    **Q.**   He writes, "Clearly, we are, again, very disappointed

3    with the outcome of the selection process for transitions 11

4    and 12," right?

5    **A.**   Yes.

6    **Q.**   He writes, "We obviously seem to be missing a trick when

7    communicating with NTMA, given that our market share on this

8    limited panel is far below our overall market share in EMEA,

9    as well as globally."

10          Right?

11   **A.**   Yes.

12   **Q.**   He continues to write "A lot of work" -- "a lot of

13   work" -- the jury can't see it, anyway, "A lot of work goes

14   into preparing these proposals, so we want to make every

15   effort to ensure we deliver what you are expecting from us."

16          Right?

17   **A.**   Yes.

18   **Q.**   "I, therefore, would like to suggest a meeting with your

19   team to have a frank and open discussion, feedback, session,

20   to see what we can do, if anything, to improve our success

21   rate with NTMA."

22          Right?

23   **A.**   Yes.

24   **Q.**   "So would a meeting at your office at 11:00 a.m. on

25   either" several dates that he proposes, and asks you if any

1    of those dates would work, right?

2    **A.**  Yes.

3    **Q.**  He writes, "I would also like to take the opportunity to

4    introduce Kevin O'Neill, ex-Nomura, and Ray Pestana, ex-Citi,

5    who both joined our team in the past 12 months."

6         Right?

7    **A.**  Yes.

8    **Q.**  And that's customary, isn't it, that people in the

9    banking sector will move from one particular transition

10   manager to another?  Is that familiar with your

11   understanding?

12   **A.**  That's pretty common.

13   **Q.**  Okay.  And so I presume you had a meeting with

14   Mr. Pennings.  Do you recall?

15   **A.**  I can't recall specifically.  I can recall in general

16   that Mr. Pennings and -- was very keen to get feedback and

17   you know, not just in a meeting, but we've had -- you know,

18   there would have been phone conversations or whatever.  And

19   he was very keen to get feedback to -- and understand why

20   State Street was not successful in a number of those tenders.

21   **Q.**  And that was --

22   **A.**  And he had less success than he would have anticipated.

23   **Q.**  And he's asking you what trick they're missing, right?

24   **A.**  That was his phrase.  I wouldn't use that phrase.

25   It's -- you know, it's our evaluation criteria, with

1    predefined framework, and we evaluate everybody objectively

2    against that.  So I wouldn't use the word "trick."  That's --

3    I definitely wouldn't use that word.

4    **Q.**  It's Mr. Pennings' word, right?

5    **A.**  It's Mr. Pennings' word.  Yes.

6    **Q.**  To Mr. Buckley, correct?

7    **A.**  Correct.

8    **Q.**  And that was August 4, 2010, right?

9    **A.**  Yes.

10   **Q.**  Then October 18, 2010, transition number 13, the tender

11   for transition number 13 came out.  Do you recall that?

12   **A.**  Well, again, I'm -- subject to the date being correct,

13   yes.

14   **Q.**  But there was a transition 13, correct?

15   **A.**  There was, yes.

16   **Q.**  And once again, State Street submitted a tender, correct?

17   **A.**  Yeah.  I assume so.

18   **Q.**  And once again, State Street was not selected, correct?

19   **A.**  Yes.

20   **Q.**  And so do you recall that again, November 17, 2010,

21   Mr. Pennings was again asking to have a meeting with

22   Mr. Buckley?

23   **A.**  Well, I expect that could have happened.  I don't recall

24   it specifically.  But I have no reason to doubt that that

25   would have happened.

1           MR. FRANK:  Your Honor, can we have a sidebar?

2           THE COURT:  Sure.

3           (The following discussion held at the bench.)

4           MR. FRANK:  He's now been on cross for more than

5    twice as long as he was on direct.  We're well beyond the

6    scope of the direct.  I haven't objected to any of these

7    questions, but I'm wondering where this is headed.

8           MR. GOLDSTEIN:  I'm going through the process of

9    selection, it's not beyond the scope.  They're talking about

10   State Street having bring on the panel, State Street having

11   been selected to some transitions earlier.

12          That was a direct question asked by Mr. Frank.  I'm

13   showing that State Street was not selected in a whole series

14   of transitions, leading up to transition number 14.

15          MR. JOHNSTON:  You can ask it in like five

16   questions, but I understand, there's a reason, a tactical

17   reason, to delay this.

18          THE COURT:  I'm glad you understand, Mr. Johnston.

19   That's helpful.

20          So how much longer do you think you have?

21          MR. GOLDSTEIN:  I'm going to ask to introduce this

22   e-mail that shows that there was a meeting or a conversation,

23   right before transition 14.  And I think that's my last set

24   of questions before me asking Mr. Weinberg --

25          MR. FRANK:  Then we have no objection.

```
1              THE COURT:  To that document?
2              MR. FRANK:  I have no objection to that document.
3              THE COURT:  Okay.  Great.
4              MR. FRANK:  Actually, you know what?  I'm sorry.  I
5     do object to this document.  This document didn't go to the
6     witness.
7              THE COURT:  Let me see.
8              What's the basis to -- the witness didn't get it.
9              MR. GOLDSTEIN:  It's not for the truth -- I'll use
10    it to refresh his memory as to whether or not he had a
11    meeting around this time.
12             THE COURT:  Fine.
13             (Bench conference concluded.)
14    BY MR. GOLDSTEIN:
15    Q.  Mr. O'Callaghan, let me just quickly show you a document,
16    see if this refreshes your recollection as to whether or not
17    you had a telephone call with Mr. Pennings after State Street
18    was not selected for transition 13, on or about
19    November 17, 2010.
20    A.  Yeah, I'm sure I did have that call, yeah.
21    Q.  The point being, Mr. O'Callaghan, while you testified
22    State Street had received some of the transitions or one or
23    more of the transitions during your direct examination, the
24    fact of the matter is, there was a whole sequence of
25    transitions leading up to transition 14, where State Street
```

1    was not selected, correct?

2    A.   That's correct.

3    Q.   And Mr. Pennings was reaching out to Mr. Buckley and

4    yourself, trying to figure out what State Street could do to

5    start winning its fair share of transitions, correct?

6    A.   Reaching out was -- would be typical of tenderers under

7    procurement processes.  Generally, unsuccessful tenderers who

8    were looking to get feedback as to, you know, how they could

9    be more successful at the next time, but he was doing -- he

10   was doing that quite a lot.

11   Q.   Right.  I'm not suggesting that there was anything

12   improper or unusual.  It's just a fact that he was reaching

13   out, asking what he was missing in terms of the selection

14   process?

15   A.   Yes, he was looking for feedback and -- yeah, exactly.

16   And we were willing -- we were happy to provide feedback.

17   Q.   And are you aware that the defense has been trying to

18   obtain materials from the NTMA leading up to and before your

19   testimony?  Has anyone made you aware of that fact?

20   A.   I have only a very general awareness of the issues.  I

21   haven't been involved in that discussion whatsoever.

22   Q.   And what's your general awareness?

23   A.   My general awareness is that there were -- there were

24   discussions around the provision of documentation and the

25   NTMA's chief legal officer on external counsel handled that

1   entirely.  I wasn't involved in it.  And the outcome, as I

2   understand it, was that the documentation we provided was --

3   which is available to the defense, was what we provided to

4   the City of London Police, with all of the various appendices

5   attaching to that.

6   Q.  And none of the materials that you provided to the City

7   of London Police were dated on or before, let's say,

8   August of 2011?

9          MR. FRANK:  Objection, misstates.  And it's facts

10  not in evidence.

11         THE COURT:  If he knows.  Overruled.

12         THE WITNESS:  Well, there would have been like a

13  transition management agreement in 2007, for example, which

14  was part of what was provided.  So there was some earlier

15  documentation and so -- I may have been more specific --

16  BY MR. GOLDSTEIN:

17  Q.  Fair enough.  But the point is that you're aware the

18  defendant was trying to obtain additional documents from the

19  NTMA and there was a decision made by your legal counsel to

20  not provide those materials to Mr. McLellan in advance or

21  even now, while you're testifying, right?

22  A.  Yeah, I'm just not sure.  I personally don't know what

23  materials were being sought, for example.  I have no idea on

24  it.

25  Q.  But you're sure they weren't provided in response to

1    those requests, right?

2    **A.**   My understanding is that they weren't provided.  Yes.

3              MR. GOLDSTEIN:  Nothing further.

4              THE COURT:  Any redirect?

5              MR. FRANK:  Yes, Your Honor.  Briefly.

6              **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

7    BY MR. FRANK:

8    **Q.**   Would you look at Exhibit 66-01, please, page 9.

9              MR. FRANK:  If you could blow up that chart.

10   BY MR. FRANK:

11   **Q.**   Mr. O'Callaghan, you were asked some questions on

12   cross-examination about your criteria for your award

13   selection process?

14   **A.**   Yes.

15   **Q.**   And you were asked some questions about the 10 percent

16   weighting you give to fees that's part of that -- part of

17   those criteria?

18   **A.**   Yes.

19   **Q.**   And then counsel asked -- and then you indicated that the

20   fees were double counted, because they're also included in

21   the implementation shortfall, correct?

22   **A.**   Yes.

23   **Q.**   Counsel indicated he would come back to that?

24   **A.**   Sorry?

25   **Q.**   Counsel indicated he would come back to that?

1    **A.**  Yes.

2    **Q.**  He didn't, did he?

3    **A.**  No, I don't think so.  No.

4    **Q.**  But, in fact, part of that criteria -- one of the factors

5    in implementation shortfall is fees, correct?

6    **A.**  Yes.

7    **Q.**  So what is -- if you include fees in both of those

8    categories, how much do they play into your overall analysis?

9             MR. GOLDSTEIN:  I object to the characterization,

10   Your Honor.

11            MR. FRANK:  The question is how much do they play

12   into your overall analysis.

13            THE COURT:  How much does what play in?

14            MR. FRANK:  Fees.

15            THE COURT:  He can ask him how much fees play into

16   the overall analysis.  Overruled.

17            THE WITNESS:  So the fees are -- the 10 percent for

18   fees, they play directly into that.  Fees would typically be

19   a relatively small part of the 20 percent, so they would be

20   the entirety of the 10 percent, and a small portion of the

21   20 percent.

22   BY MR. FRANK:

23   **Q.**  And in this instance, would knowing what State Street

24   actually charged, had it affected the outcome had you known

25   it when awarding the transition?

1    **A.**   Almost certainly it would and -- because Nomura and State

2    Street had very similar scores and Nomura had ten on fees,

3    and State Street had 9.7, and Citibank was some distance

4    behind.  And we decided to split the award, because the two

5    scores were very similar.  So if State Street's very high fee

6    had been included, then their score out of ten would have

7    dropped down to about two, so they would have fallen out of

8    the running, so we would almost certainly have awarded the

9    full transition to Nomura, if we had known in advance.

10             MR. FRANK:  Can we look at Exhibit 70.1, please.

11    This is the pre-trade -- I'm sorry, the proposal that counsel

12    showed you.

13             THE WITNESS:  Yes.

14             MR. FRANK:  If we look at page 9, please.  And if

15    we blow up that chart.

16             MS. LEAHY:  Top one?

17             MR. FRANK:  Yes, please.

18    BY MR. FRANK:

19    **Q.**   You were asked some questions about the equity bid-ask

20    spread component?

21    **A.**   Yup.

22    **Q.**   Did you understand that to be a market cost?

23             MR. GOLDSTEIN:  Well, I object to the leading

24    nature of the examination.

25             THE COURT:  Let me hear the question, first.

1    BY MR. FRANK:

2    **Q.**  Did you understand that to be a market cost, or a

3    remuneration to State Street?

4              THE WITNESS:  Okay to answer?

5              THE COURT:  You can answer.  Sorry, yes.

6              THE WITNESS:  That's a market cost, in my

7    understanding.

8              MR. FRANK:  Thank you.  If we could look at

9    Exhibit 138, please.  And if you could go to page 6 of the

10   attachment, I'm sorry, 138 attachment.  I'm sorry, the next

11   page and if we could blow up the chart on the right.

12   BY MR. FRANK:

13   **Q.**  You were asked some questions about those commission

14   costs?

15   **A.**  Yes.

16   **Q.**  Did you understand those to be commission costs incurring

17   to State Street, or to third-party brokers?

18   **A.**  To third-party brokers.

19   **Q.**  And d you recall -- what, if anything, do you recall

20   about a communication with State Street about whether it was

21   absorbing the cost of third-party brokerage charges into its

22   management fee?

23   **A.**  Well, my understanding was that we wouldn't -- we

24   wouldn't be paying any trading costs.  That's my recall, or

25   commission costs, I should say.

1    **Q.**  And you were asked some questions about -- well,

2    actually, if we could look at Exhibit 170.1, please.  And if

3    we could look at page 7.  And again --

4            MR. FRANK:  Erin, if you could just blow up that

5    bottom right.

6    BY MR. FRANK:

7    **Q.**  You were asked some questions about various lines here,

8    bid-ask spread, market impact, and opportunity costs?

9            Do you recall --

10   **A.**  Yes, what tranche is this?  Sorry.

11   **Q.**  I believe this is the final post trade?

12   **A.**  Yeah, okay.

13   **Q.**  Do you recall those questions?

14   **A.**  Yes.

15   **Q.**  Do you know where in this analysis State Street hid the

16   commissions that they charged you?

17           MR. GOLDSTEIN:  I object.

18           THE COURT:  Sustained as to the form.

19   BY MR. FRANK:

20   **Q.**  Do you know where those commissions are included in this

21   analysis?

22   **A.**  No, I don't.

23   **Q.**  Could be any one of those lines?

24   **A.**  I -- I don't know.  I don't know what happened within

25   State Street.

1    **Q.**  And you were asked some questions about that opportunity
2    cost.  Do you see that?
3    **A.**  Yes.
4    **Q.**  Do you have an understanding of whether that number would
5    have been different, if State Street had not helped itself to
6    3.2 million euros in --
7                MR. GOLDSTEIN:  Objection.
8                THE COURT:  Sustained as to the form.
9    BY MR. FRANK:
10   **Q.**  Do you have an understanding of whether any of these
11   numbers could have been different if you hadn't been charged
12   that 3.2 million euros?
13   **A.**  Yeah, the bottom number, the 14.3 million number would
14   have been different, the total number, but I don't know which
15   element of the breakdown would have been affected.
16   **Q.**  Would have been by 3.2 million euros of that 14 million?
17   **A.**  Well, that was tranche number three, but in principal,
18   the 3.2 million would have come out of the total costs in
19   whatever tranches they were, they were improperly deducted.
20   **Q.**  And counsel asked you some questions about State Street's
21   overall performance and the fact that they beat the pre-trade
22   estimate?
23   **A.**  Yes.
24   **Q.**  What's your understanding of how they would have
25   performed --

1    **A.**   Sorry, they --

2    **Q.**   Sorry?

3    **A.**   They didn't -- we were very satisfied, what the

4    opportunity cost here was significant, but that was due to

5    our -- our issue.  So they didn't beat the pre-trade estimate

6    on tranche three by a significant amount, but that was --

7    that was down to us.

8    **Q.**   Well, they told you that it was due to those issues,

9    correct?

10                MR. GOLDSTEIN:  Well, I object.

11                THE COURT:  Sustained.

12   BY MR. FRANK:

13   **Q.**   Overall, they beat the pre-trade estimate.  Was that your

14   understanding?

15   **A.**   We were very satisfied with the outcome.  I would just

16   need to add up the numbers.  I'm not sure if the aggregate,

17   if they beat them or not.  But if any deficiency, we were

18   very happy, very satisfied that State Street did a great job

19   and it was down to -- the deficiency was down to problems on

20   our side, or any underperformance against the pre-trade was

21   due to issues on our side.

22   **Q.**   And what is your understanding of what the performance

23   would have been like if you hadn't been charged that

24   3.2 million euros?

25   **A.**   It would have been 3.2 euros better than we would have --

1    and we would have all been in 3.2 million more.

2    **Q.**  And when a transition manager acting as your agent

3    outperforms its pre-trade estimate, what is your

4    understanding of who is entitled to the benefit of that

5    outperformance?

6    **A.**  We're absolutely entitled to it.  They're operating on an

7    agency basis and we take all the risk and obtain all the

8    return.

9    **Q.**  And what's your understanding of who bears the cost of

10   underperformance?

11   **A.**  We certainly bear the cost of underperformance.

12   **Q.**  And in fact, to the extent that they underperformed on

13   one of those tranches, did State Street offer to compensate

14   you for that?

15              MR. GOLDSTEIN:  I object.

16              THE COURT:  Sustained as to the form.

17   BY MR. FRANK:

18   **Q.**  What, if anything, did State Street offer to do when they

19   underperformed?

20   **A.**  In relation to trading, on the performance, nothing.

21   That was the outcome that they had to bear the only offer

22   they made was in relation to -- or the only recompense was in

23   relation --

24              THE COURT:  That answers the question.

25              THE WITNESS:  -- to the improper --

```
 1              MR. FRANK:  That's fine.
 2              THE WITNESS:  Okay.  Sorry.
 3    BY MR. FRANK:
 4    Q.  Could we take a look at Exhibit 99-1, please.  And if we
 5    could look at the third page.
 6              You were asked some questions about your master
 7    transition services agreement?
 8    A.  Yes.
 9    Q.  And you were asked some questions about whether it's
10    governed under Irish law?
11    A.  Yes.
12    Q.  Where did the US --
13              MR. GOLDSTEIN:  That's incorrect, I think.  The
14    cover sheet references Ireland law.  Not this.
15              MR. FRANK:  No, the agreement references it, as
16    well.  I can refresh the -- can we go to the last page?  No,
17    not that last page.  If you can just move earlier, please.
18    Before the schedules.
19    BY MR. FRANK:
20    Q.  There, governing law.  That provision says that the
21    agreement is governed under Irish law, correct?
22    A.  Yes.
23    Q.  Where did the US stocks that you sold trade?  In what
24    country did they trade?
25              MR. GOLDSTEIN:  Foundation, Your Honor.  I object.
```

1      THE COURT:  Sustained as to the form.

2  BY MR. FRANK:

3  Q.  Do you know where the US stocks that you sold traded?

4  A.  They would have traded on US exchanges.

5  Q.  And do you know what law applies in the United States?

6  A.  The United States law.

7  Q.  Could we look at --

8      MR. FRANK:  I'm not sure of the page number, Erin,

9  but if you go earlier to provision.

10 BY MR. FRANK:

11 Q.  You were asked about provisions 9.1 and 12.1, do you

12 recall that?

13 A.  9.1 was about --

14 Q.  The financial services authority?

15 A.  Yes.

16 Q.  And then you were asked about 12.1.  Do you recall that?

17 A.  Yeah.  Excuse me, yes.

18 Q.  I'd like to show you provision 6.2.

19      "In respect of services for which the transition

20 manager has been appointed pursuant to the tender procedure,

21 the transition manager agrees that it shall, at all times,

22 act in good faith."

23      Do you see that?

24 A.  Yes.

25 Q.  What is your understanding of whether that happened here?

```
1              MR. GOLDSTEIN:  I object, Your Honor.
2              THE COURT:  Overruled.
3    BY MR. FRANK:
4    Q.  What is your understanding of whether State Street acted
5    in good faith with respect to --
6              THE COURT:  Based on your personal knowledge.
7    BY MR. FRANK:
8    Q.  -- with respect to the services it provided to you?
9              THE WITNESS:  So, sorry.
10             THE COURT:  Based on your personal knowledge.
11             THE WITNESS:  Yeah, based on my personal knowledge,
12   there were improper commissions deducted, and that's
13   definitely not in good faith.
14             MR. FRANK:  Thank you, no further questions.
15             MR. GOLDSTEIN:  Can you leave that up, please?
16   Sorry.
17        RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT
18   BY MR. GOLDSTEIN:
19   Q.  Who is the transition manager identified in the contract?
20   It's State Street Bank Europe Limited, right?
21   A.  Yes.
22   Q.  And Mr. Frank asked you a question regarding
23   Exhibit 70.1, which was the tender, the proposal that had a
24   bid offer line item.  Do you recall that line of questioning,
25   about bid-ask spread?
```

1    **A.**  Yeah.

2    **Q.**  And they also showed you the bid-ask spread in

3    Document 170, right.  And when he asked you the question as

4    to Exhibit 70, he asked you what -- strike that.

5           The bid offer spread, you identified it as being a

6    market cost, right?

7    **A.**  Yeah.

8    **Q.**  It's a market cost associated with broker-dealer

9    services, right?

10   **A.**  Correct.

11   **Q.**  And so the entries for 3 million or 5 million for bid-ask

12   spread, if State Street had used an external broker-dealer,

13   rather than an affiliate broker-dealer.  For example, if

14   State Street Bank Europe Limited gave the execution services

15   to Goldman Sachs, Goldman Sachs bid offer, the prices they

16   charged for execution services would be within that bid offer

17   spread line item, correct?

18          MR. FRANK:  Objection.  Foundation to what Goldman

19   Sachs would have done.

20          THE COURT:  If you know.  Overruled.  You can

21   answer, if you know.

22          THE WITNESS:  Sorry, can you repeat the question?

23   Sorry.

24   BY MR. GOLDSTEIN:

25   **Q.**  Sure.  Bid offer spread line item reflects execution

1    services, costs imposed for execution services by

2    broker-dealers, right?

3    **A.**   Yes.  It's the difference between the price that one

4    might be able to buy at and sell at.

5    **Q.**   Right.  So when a broker-dealer goes to the marketplace

6    to execute transactions there's markups and markdowns

7    involved with those services, right?

8    **A.**   Uh-huh.

9    **Q.**   And that's what's reflected in the line item bid offer

10   spread, bid-ask spread in the pre-trades and in the post

11   trades, right?

12   **A.**   Yes.

13   **Q.**   And so if State Street Bank Europe Limited had selected

14   Goldman Sachs, or Citibank, or some other broker-dealer,

15   other than State Street Bank Europe Limited's affiliate,

16   there would still be bid-ask spread costs within the

17   pre-trade and the post trade, right?

18            MR. FRANK:  Objection to the hypothetical, Your

19   Honor.

20            THE COURT:  Overruled.

21   BY MR. GOLDSTEIN:

22   **Q.**   Correct?

23   **A.**   There would be bid-ask spreads incurred, right.

24   **Q.**   Right.  It's just a cost of execution performed by

25   broker-dealers, which is a necessary component of conducting

```
 1    a transition, correct?
 2    A.   In the marketplace, yeah.
 3              MR. GOLDSTEIN:  In the marketplace.  Thank you.
 4    Nothing further.
 5              THE COURT:  You're excused, sir.  Thank you very
 6    much for your testimony.
 7              MR. FRANK:  The Government rests, Your Honor.
 8              THE COURT:  All right.
 9              MR. JOHNSTON:  Well, wait.  No.
10              MR. FRANK:  I'm sorry.  One second.
11              MR. JOHNSTON:  We need the break to work out --
12    make sure that we're on the same page in terms of exhibits
13    before we rest.
14              THE COURT:  All right.
15              You agree with that?
16              MR. FRANK:  I do agree with that, Your Honor.  My
17    dramatic moment has been stolen from me.
18              THE COURT:  Yes.
19              So ladies and gentlemen, what we're going to do --
20    so let me just explain what that means.  The Government is
21    done with its witnesses.  What they want to do is simply
22    review the exhibits to make sure that all the ones that
23    they -- as you know, there's been a lot of exhibits and just
24    compare the list to make sure all the ones they think they've
25    offered that have been admitted and, in fact, have been, and
```

1    to make sure we're all on the same page with that.

2            So we'll do that, but -- with Mr. Frank's

3    statement, withdrawn, but essentially stated, is that there

4    aren't any more witnesses from the Government.  They've

5    concluded their presentation of the evidence.  So we're going

6    to take the break now.  We'll sort out if there are any

7    issues about exhibits, we'll come back.

8            If there are other exhibits to be introduced, that

9    will happen not when you're out in the back, but that will

10   happen in front of you.  They're just going to take a few

11   minutes to go over their list, then the Government will rest,

12   and then we'll turn to see what, if any, evidence the defense

13   wants to present.

14           All right.  All rise for the jury.

15           (The jury exits the courtroom.)

16           THE COURT:  Do you want a couple minutes just to go

17   over the list among yourselves?

18           MR. JOHNSTON:  Yeah, we'll need to do it with

19   Maria, as well.

20           THE COURT:  Fine.  Why don't you do that and then

21   I'm happy to -- and then I'll come back and I'll hear, if it

22   works for both of you.  What makes the most sense to me, is

23   even though the Government has -- once we solve what these

24   are, you can make your -- whatever motions you want to make,

25   whatever arguments you want to make.

1          And then when the jury comes back in, if there are

2     more to admit or not.  But if there are more to admit, we'll

3     deal with that.  Then you can rest in front of the jury and

4     then you can -- I will acknowledge that all of the arguments

5     that you made during the break are applied then and whatever

6     rulings I made then and we won't have to redo it, if that's

7     agreeable to both of you.

8          MR. WEINBERG:  Thank you, Your Honor.

9          THE COURT:  All right.  Fine.  So how long do you

10    want to -- before I come back?

11         MR. JOHNSTON:  Ten minutes?

12         THE COURT:  Fine.  I'll be back in ten minutes.

13         (Court in recess at 11:00 a.m.

14         and reconvened at 11:35 a.m.)

15         THE COURT:  Please be seated.  Where are we?

16         He stole your dramatic moment and then he just

17    departed.

18         MR. FRANK:  The two people with the relevant

19    knowledge have just left.  None of us were involved in these

20    discussions, Your Honor.

21         MR. WEINBERG:  We had the good grace to be able to

22    go to the men's room before the discussion.

23         THE COURT:  Does one of you want to go out in the

24    hallway and see where they are?

25         MR. FRANK:  Your Honor, just a minor point.  I

1     don't know what the court's practice is with respect to

2     expert witnesses, but we would request that the word "expert"

3     not be used.  We have no objection to establishing his

4     qualifications and establishing that he's offering opinion

5     testimony pursuant to Rule 702, but we do have an objection

6     to him being designated with the word "expert" in front of

7     the jury.

8               THE COURT:  What do you want?

9               MR. WEINBERG:  I never heard of that objection

10    before.  I have no objection to not using the word "expert"

11    before he is asked for expert testimony, but I do intend on

12    final argument to tell the jury they had an authentic expert

13    tell them X, Y, and Z.

14              THE COURT:  What is the basis for the objection?

15              MR. FRANK:  403, Your Honor.

16              THE COURT:  Overruled.

17              Do we need -- I know him only by the name "Max."

18    Who do we need on your side?

19              MR. WEINBERG:  I'm sure he's just in the men's room

20    and Mr. Goldstein will have him back in 30 seconds.

21              THE COURT:  Okay.  So where are we in terms of the

22    exhibits?

23              MR. JOHNSTON:  We're all squared away.  When the

24    jury is back in, we're just going to read for the court

25    reporter a number of exhibits just to make sure that we had

1       it in our records that they were admitted, but they --

2                   THE COURT:  Ms. Simeone didn't have them.  So you

3       have some number that you both agree are in evidence;

4       Ms. Simeone's list doesn't list them as in evidence.

5       Nobody's gone back, obviously, which is fine, to the

6       transcript to see, but you all agree they're in, So you're

7       just, when they come in, are going to say Exhibit 1 to

8       whatever --

9                   MR. JOHNSTON:  I'm going to read off a list of

10      exhibits.

11                  THE COURT:  Fine.  Okay.  You agree with that?

12                  MR. WEINBERG:  Yes, Your Honor.

13                  THE COURT:  Okay.

14                  MR. JOHNSTON:  I guess we can or cannot do that in

15      front of a jury, I guess.  Doesn't matter.

16                  MR. FRANK:  I have no objection to doing it right

17      now.

18                  THE COURT:  Fine.  Let's just do it right now and

19      I'll tell them we did it.

20                  MR. JOHNSTON:  Sure.  Just for the record, the

21      parties agree that these exhibits have been admitted into

22      evidence:  11-1, 46-1, 50-1, 68, 91-1, 91-2, 91-3, 115-1,

23      115-2, 130-1, 123, 135-1, 143-1, 172-1, 178-1.  That's it.

24                      (Exhibit Nos. 11-1, 46-1, 50-1, 68, 91-1, 91-2,

25                      91-3, 115-1, 115-2, 130-1, 123, 135-1, 143-1,

1               172-1, and 178-1 admitted into evidence.)

2               THE COURT:  Do you agree with that?

3               MR. GOLDSTEIN:  Yes, Your Honor.

4               THE COURT:  All right.  Those are in evidence.  So

5  that -- when the jury comes out, I'm going to tell them that

6  there were just a number of exhibits.  And to speed things

7  up, we just read them in here, but they're in evidence and

8  they'll have them within the jury room.

9               So when they come back, you're going to rest,

10  Mr. Frank; is that right?

11              MR. FRANK:  Yes, Your Honor.

12              THE COURT:  So why don't you make whatever motions

13  you want to make when Mr. Frank rests now, and I will treat

14  them as if made after Mr. Frank says he rests, and whatever I

15  rule will apply then.

16              MR. WEINBERG:  Thank you, Your Honor.  I've given

17  to Mr. Frank about two minutes ago copies of the motions,

18  hard copy.  We'll file them electronically.  There are three

19  motions.  I don't know that all of them need to be addressed

20  right now.  The most important one of course is the motion

21  for judgment of acquittal.

22              THE COURT:  I have three documents.  I just want to

23  make sure.  One is supplemental request for instruction to

24  the jury.  I don't need to resolve that right now.

25              MR. FRANK:  You don't.

1           THE COURT:  The second is motion to preclude expert

2    testimony from Graham Dixon.  I don't have to approve of that

3    at the moment.  And then I have one motion for judgment of

4    acquittal and incorporated memo of law.  That's the issue.

5           MR. WEINBERG:  Yes, Your Honor.  I'm content if

6    Your Honor would prefer argument on all but one of the counts

7    after the jury leaves today.

8           THE COURT:  All right.

9           MR. WEINBERG:  But I do ask the court because, to

10   drop back, we vigorously contested the joinder of the AXA

11   account to the preexisting European counts.  The Government

12   made representations that succeeded in persuading Your Honor

13   to join the counts, largely based on a contention of

14   overlapping evidence.

15          I don't believe the evidence has demonstrated such

16   an overlap.  I believe we've been prejudiced by the joinder.

17   But I also most strongly believe that the count, which is a

18   wire fraud count dating to February 24, has been utterly

19   unproven.

20          The evidence as to February 24 -- first of all, I

21   think that the AXA alleged fraud has been proven as a

22   generality.  But even drilling down to what the government

23   did or did not allege and prove, they alleged a certain wire.

24   They exempted AXA from the conspiracy.  That wire was a

25   pre-trade sent from Ms. Morris at State Street to a number of

1    people on February 24, including AXA.  It did contain within
2    the documents a statement that the commission would be, you
3    know, based on .1 basis point yield.  The commission turned
4    out later in March, several weeks later, to be something
5    other than that.

6         Mr. McLellan was one of a number of people that
7    passively received that.  There isn't any evidence from
8    Ms. Morris, who was the only one of two witnesses, and
9    Mr. Clemmenson, who was the other witness, that Mr. McLellan
10   had any participatory role in the setting of the commission,
11   in the including of the commission in this pre-trade.  There
12   was no absolutely no evidence he read this pre-trade.
13   There's no evidence he was a decisionmaker before the
14   pre-trade, that he directed or caused the pre-trade to be
15   written in this manner.

16        There were two different people between Ms. Morris
17   and Mr. McLellan, that being Mr. Walker and Mr. Weiner.
18   Anybody could have discussed with Ms. Morris.  She didn't
19   testify that Mr. McLellan participated in setting the
20   condition.  Didn't testify that Mr. McLellan participated in
21   drafting, reviewing, editing, authoring this pre-trade.  And
22   there's no evidence in the record he read it.

23        This is the wire fraud that's charged individually
24   against Mr. McLellan.  There's no Pinkerton option here.
25   Either he did it or he caused it, and the evidence is

1    completely lacking as to any.

2            The evidence is completely consistent that at least

3    a week later Mr. McLellan was on an email with a lawyer for

4    State Street Global Advisors, Mr. Deal and others, and they

5    were talking about needing to certify a certain price and

6    that the price needed to be fair and reasonable.

7            The tape recording that the government played on

8    March 2 was an open discussion with Mr. McLellan, setting

9    different terms for trading.  He asked during the tape:

10   Anybody have any questions, comments?  And they talked about

11   scheduling.  Nobody said to Mr. McLellan:  Don't you

12   remember, Ross, you okayed a pre-trade at a different basis

13   point?

14           THE COURT:  So this argument is essentially there's

15   no evidence that he set up the deal at .1 prior to the

16   February 24th email.  Therefore there's no basis to infer he

17   caused it.

18           MR. WEINBERG:  Yes, Your Honor.

19           THE COURT:  What do you say about that, Mr. Frank?

20           MR. WEINBERG:  There's plenty of evidence of that,

21   Your Honor.  First of all, he told Ed Pennings he'd charge

22   hidden commissions on the AXA deal.  That's in evidence.

23           Second of all, we introduced in evidence an email

24   when the deal was first -- the opportunity was first

25   presented to State Street where the defendant said to Kevin

1    Walker:  Let's chase this.

2              There was evidence of numerous emails that he was

3    on regarding AXA, including the one that's alleged to be in

4    furtherance of the fraud as the specific wire, which is the

5    pre-trade on which he was copied.  He personally directed the

6    traders what to do.

7              THE COURT:  You're talking about prior?  I think

8    his theory is, if I understand it correctly, that whether or

9    not -- putting aside the question whether later a fraud

10   occurred, he's saying that for your Count 6, you need to show

11   that Mr. McLellan caused the February 24 email to be sent

12   based on the allegations in the indictment, that being the

13   transmission.

14             And he's saying he didn't send the email.  That

15   seems clear.  Or he could have caused it.  And he's saying

16   there's an absence of evidence that on or before February 24

17   he did things that caused that email to be sent.

18             MR. WEINBERG:  Or if I could just have the

19   corollary that he in February 24 had any knowledge that later

20   AXA would be charged a different price, that there was any

21   intent to deceive when they set this commission.

22             THE COURT:  I see.  Even if he caused it, there

23   wasn't yet any fraud.

24             MR. WEINBERG:  They could have decided a week

25   later, with all these lawyers saying we have to certify a

1    price, to set a price.  And he could have told Pennings two

2    months later things that had no basis before February 24.

3                THE COURT:  As to the first point, just the --

4    what's the evidence that on or before the 24th his

5    involvement including the price?

6                MR. FRANK:  On or before that date, he said, Let's

7    chase this, to Kevin Walker, who's the frontline salesperson.

8    There's been evidence that he doesn't interact with customers

9    directly, although he did in this particular case, but that

10   they have salespeople do that interaction.

11               There's also evidence he specifically interacted

12   before February 24.  We have AXA.  There was an email

13   introduced into evidence that referenced a phone call between

14   Jim Kelly and the defendant directly.

15               There's also been evidence that -- it's in evidence

16   that he signed the compliance certification on February 23

17   that was sent to AXA.  He personally signed it.

18               There's been extensive evidence that he directed

19   every aspect of this trade.

20               THE COURT:  All right.

21               MR. WEINBERG:  Judge, if I can just rejoin -- I

22   know you want to get to the jury -- as to why seeking a deal

23   does not mean that on February 24 beforehand he had any

24   criminal intent or any participation in setting a rate.

25   Telling Walker to go chase the deal does not mean that on

1    February 24 that he gave them a price that he didn't intend

2    to be the price, if in fact he had any knowledge of it.

3              THE COURT:  Right.  But what I'm deciding here is

4    not whether that single email is proof beyond a reasonable

5    doubt of criminal intent, but whether, given what Mr. Frank

6    has described, whether Mr. McLellan's -- facts that a jury

7    could conclude, from which a jury could conclude his

8    involvement in the deal, whether the jury could also infer

9    that as of February 24 he had a fraudulent intent, and that

10   determination they could make on a variety of evidence.

11             And so I think on the totality of the evidence

12   before me, which I think the standard -- correct me if I'm

13   wrong -- is I'd have to find that no reasonable jury could

14   conclude that Mr. McLellan committed this offense, in order

15   to allow a Rule 29.

16             MR. WEINBERG:  Based on non-speculative evidence,

17   Your Honor would have to believe that there was a fair basis

18   in the evidence that there was a scheme to defraud AXA that

19   preexisted the sending of a wire.  A wire sent before the

20   scheme commenced cannot further the scheme.

21             There's no evidence -- the only evidence is Ross

22   says to Walker, Good deal.  Go chase it.  That's one.

23             Two, he certifies something to AXA that has nothing

24   to do with pricing or pretrades.  It's a nondisclosure of

25   some sort.

1          I can go back to February 23.  There's no evidence

2     from Kelly they spoke about the terms or conditions.  Kelly

3     didn't have any recollection of any specific conversation

4     with Mr. McLellan.

5          There's nothing in this record to reflect that the

6     existence, planning, decision to charge AXA something other

7     than what was in the February 24 pretrade had been made, and

8     there's no evidence other than his receiving a 40-page

9     document that he knew it, focused on it, directed it, caused

10    it, read it.

11         But even taking that aside, if that could be argued

12    to be a closer call -- it's not a close call, respectfully --

13    is that there was a scheme to defraud AXA that was in

14    existence on February 24.  And therefore the wire is not in

15    furtherance of a scheme to defraud.

16         And Your Honor should, you know, respectfully,

17    grant a judgment of acquittal.

18         THE COURT:  You're always respectful, Mr. Weinberg.

19         MR. WEINBERG:  Huh?

20         THE COURT:  You're always respectful.

21         MR. WEINBERG:  Thank you.

22         But I'm anxious not to have to defend the AXA

23    charge, which I believe shouldn't have been joined with the

24    other charges.  And that's why I'm pushing Your Honor not to

25    defer but to consider it, whether it's now at this break or

1    at 1:00.

2              THE COURT:  I understand why you want me to rule.

3    I'm at the moment not persuaded that I should allow a Rule 29

4    motion on Count 6.  If you want to argue it more after the

5    break, after 1:00, I'm fine to do that.

6              Before I just go get the jury, so you're going to

7    rest.  I'll tell them about the other exhibits, and then

8    you're going to call Mr. --

9              MR. WEINBERG:  Marc Menchel will be the first

10   witness.

11             THE COURT:  How many was it, Mr. Johnston?  Ten?

12             MR. JOHNSTON:  Ten what?

13             THE COURT:  Ten exhibits you read in.

14             MR. JOHNSTON:  Do you want an approximate number?

15             MR. GOLDSTEIN:  15.

16             THE COURT:  15.  Okay.

17             (Jury entered the courtroom.)

18             THE COURT:  So, ladies and gentlemen, let me update

19   you where we are.  During the break, we did a couple of

20   things.  One was the lawyers went over all the exhibits that

21   have been offered and discussed and identified approximately

22   15 that they agree are or should be in evidence.  And they

23   just read the list in while you were out on the break.  It

24   just seemed faster and simpler rather than have you sit here

25   and listen to them read a list of numbers.  It's by

1  agreement.  You'll have those.  There's no difference in

2  those and any others.  You'll have all the exhibits that are

3  in evidence when you go back to retire to deliberate.

4          We also made the arrangements to shift from the

5  government presenting evidence to the defense.  So it took a

6  few moments.

7          MR. FRANK:  Thank you, Your Honor.  The government

8  rests.

9          THE COURT:  All right.  So that means that's the

10 formal and dramatic, now, conclusion to the government's

11 case.

12         MR. GOLDSTEIN:  Defense calls Marc Menchel.

13         THE COURT:  So you've been used to the government

14 asking non-leading questions and the defense asking leading

15 questions because that's how it goes, generally, when a

16 lawyer calls a witness.

17         Now the roles are reversed because now the defense

18 is presenting evidence, so they will be asking non-leading

19 questions, except on preliminary matters, and the government

20 will be cross-examining the witnesses, so as a general matter

21 they're entitled to ask leading questions.

22         MR. WEINBERG:  Judge, may we reserve the issues

23 that were raised in the motion?

24         THE COURT:  Yes.  Thank you.  They are reserved.

25         MR. WEINBERG:  Thank you.

```
 1                  (The witness was duly sworn.)

 2                  THE COURT:  Please be seated.

 3                  Go ahead, Mr. Goldstein.

 4                  MR. GOLDSTEIN:  Thank you, Your Honor.

 5                           MARC MENCHEL

 6             having been duly sworn, testified as follows:

 7         DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT

 8    BY MR. GOLDSTEIN:

 9    Q.  Please state your name and spell your last name for the

10    record.

11    A.  Sure.  My name is Marc Menchel, M-e-n-c-h-e-l.

12    Q.  Mr. Menchel, just pull the microphone a little bit closer

13    so everyone can hear you.  There's water to your right.

14                  Where do you currently work, sir?

15    A.  I'm self-employed.  I'm my own consultancy, Menchel

16    Consultancy.

17    Q.  What do you do at Menchel Consulting?

18    A.  I consult on broker-dealer matters and financial matters

19    generally.

20    Q.  And before that, what did you do?

21    A.  I was a general counsel of FINRA.

22    Q.  And what is FINRA?

23    A.  FINRA, which was formerly known as the National

24    Association of Security Dealers, is a national securities

25    association.
```

1              So it's a little arcane to explain, but the way

2    regulation works in this country is every broker-dealer that

3    does business off the exchange -- there are broker-dealers

4    who only deal on an exchange.  But any broker-dealer who does

5    business off an exchange, so any broker-dealer that has

6    customers, for example, has to join a national security

7    association.  There could be --

8    **Q.**  Mr. Menchel, what does FINRA stand for?

9    **A.**  That's a good question.

10   **Q.**  It has been some time.

11   **A.**  It has been some time.  I don't remember really what the

12   acronym is.

13   **Q.**  All right.  It's an organization doing -- what was your

14   position there?

15   **A.**  General counsel.

16   **Q.**  Okay.  And what did you -- what was your day-to-day at

17   FINRA?  First, how long did you work there, sir?

18   **A.**  Ten years.

19   **Q.**  And what years were they?

20   **A.**  I worked there from 2002 to 2012.

21   **Q.**  Okay.  And as general counsel, what was your

22   responsibility and role there?

23   **A.**  So I was in charge of the regulatory process, and it was

24   three main things.  We wrote every rule filing that went to

25   the SEC.  And so FINRA makes rules that have to be blessed by

1    the SEC.  There is a disciplinary process at FINRA.  And

2    after a hearing, when that goes to appeal, my group was

3    counsel to the NAC, the National Adjudicatory Counsel.  And

4    also we were counsel to the operating units of the

5    organization.

6            So there was enforcement, there was market

7    regulation, and there was market -- sorry -- and then there

8    was also our markets practice.

9    **Q.**  Okay.  And how many people were working with you at FINRA

10   during your ten years there?

11   **A.**  Between 40 and 50.

12   **Q.**  And how many lawyers were there?

13   **A.**  About half of that was lawyers.

14   **Q.**  And what was your role in relation to that staff of

15   lawyers?

16   **A.**  So I was the general counsel, and they all reported to

17   me.

18   **Q.**  Okay.  And where were you located when you were working

19   with FINRA?

20   **A.**  I was in Washington, D.C.

21   **Q.**  All right.  And explain FINRA's role in terms of the

22   regulation or overseeing of a broker-dealer.

23   **A.**  Okay.  So FINRA, which I now remember is Financial

24   Industry Regulatory Association.

25            As I was beginning to explain before, every

1    broker-dealer that does business off-exchange, so every

2    broker-dealer that does business with a customer, has to join

3    a national securities association.  Doesn't have to join an

4    exchange.  Has to join a national securities association.

5    FINRA happens to be the only national securities association.

6    **Q.**   Okay.  So what does that mean in terms of FINRA's

7    interaction with the broker-dealers?

8    **A.**   That means every broker-dealer basically in the country

9    has to be a member and they're overseen by FINRA.  They have

10   to follow FINRA rules and they are subject to FINRA's

11   disciplinary practice.

12   **Q.**   And what is a broker-dealer?

13   **A.**   A broker-dealer is an entity, could be a person, that

14   transacts business in securities.

15   **Q.**   And where do those transactions occur?

16   **A.**   Well, to have -- they have to occur -- to be a

17   broker-dealer and be subject to broker-dealer regulation, you

18   have to make use of interstate commerce.  So it can't solely

19   be in the state.  Those transactions occur -- you're talking

20   about the actual securities transactions they do for

21   customers --

22   **Q.**   Right.

23   **A.**   -- they occur on exchanges.

24   **Q.**   Give me an example of an exchange.

25   **A.**   The New York Stock Exchange would be an exchange.

**Q.**  You mentioned there are FINRA rules that the
broker-dealers have to follow, right?

**A.**  Correct.

**Q.**  And what are some examples of rules during your ten years
that the broker-dealers needed to abide by?

**A.**  Sure.  So there are conduct rules, for example.  And
conduct rules would be rules like the suitability rule, which
means a broker-dealer can only recommend securities that they
think are in accord with your objectives or rules pertaining
to the amount of markup.

             MR. FRANK:  Objection, Your Honor.

             THE COURT:  What's the objection?

             MR. FRANK:  Inconsistent with the court's prior
ruling.  I can explain it at sidebar.

             THE COURT:  All right.  I'll hear you at sidebar
briefly.

             MR. GOLDSTEIN:  Your Honor, to save time, why don't
I just move on, unless Mr. Frank wants to push something.

             THE COURT:  If you're moving on, it's moot.  Next
question.

**Q.**  Before FINRA, what did you do for work, sir?

**A.**  I was general counsel at a Boston-based firm, Tucker
Anthony, that no longer exists.

**Q.**  And as general counsel at Tucker Anthony, what did that
consist of in terms of your responsibilities and your role?

1    **A.**  I had both corporate responsibility, like any corporation

2    would have, making sure we're okay with our Delaware filings,

3    following SEC rules or FINRA rules; and the compliance

4    department, which would try to make sure we were in

5    compliance with the requirements, as well, reported to me.

6    **Q.**  How long were you at Tucker Anthony?

7    **A.**  Six years.

8    **Q.**  And did your work there relate to broker-dealers?

9    **A.**  Tucker Anthony was a broker-dealer and an investment

10   adviser.

11   **Q.**  So what involvement did you have in their broker-dealer

12   business?

13   **A.**  Well, my involvement was, pretty much everything that

14   they did was run by legal for my purview to make sure that we

15   were following the requirements of the industry.

16   **Q.**  And were you the only lawyer there, or were there other

17   people that worked under you?

18   **A.**  No.  We had a small legal department.  We had probably

19   eight lawyers and probably a compliance department of about

20   ten.

21   **Q.**  And did those lawyers in the compliance department, did

22   they report to you?

23   **A.**  Yes.

24   **Q.**  And prior to Tucker Anthony, what did you do for work,

25   sir?

1    **A.**   I worked for Prudential Based Securities, later known as

2    Prudential Securities.

3    **Q.**   And what were your responsibilities there?

4    **A.**   I first joined them as a general lawyer in the legal

5    department and then was asked to go to London to become the

6    compliance officer in London, and eventually I became

7    international counsel.

8    **Q.**   Okay.  And in terms of the U.S.-based operations, did you

9    have any role or responsibility regarding any broker-dealer

10   work?

11   **A.**   Yes.  Because the London branch was both a British

12   broker-dealer and a branch of the U.S. broker-dealer.

13   **Q.**   And prior to Prudential, what did you do for work, sir?

14   **A.**   I worked at a firm called Tucker Anthony.  Thomson

15   McKinnon.  Excuse me.

16   **Q.**   What did you do at Thomson McKinnon?

17   **A.**   I first joined Thomson as a compliance -- just compliance

18   analyst.  I eventually became the deputy compliance director.

19   I left there --

20   **Q.**   Where were they located?

21   **A.**   They were located -- trying to remember -- on Water

22   Street in New York City.

23   **Q.**   And were they a broker-dealer or did you have any

24   responsibilities with relation to a broker-dealer while you

25   worked there?

1   **A.**   They were a broker-dealer, an investment advisor, and a

2   futures -- they were a commodity dealer.

3   **Q.**   And what responsibilities did you have both as a

4   compliance analyst and a deputy compliance director, as it

5   relates to the broker-dealer activities?

6   **A.**   I was the one who answered customer complaints.  I was

7   the one that advised, with other people as well, the

8   operating broker-dealer units of Thomson McKinnon.

9   **Q.**   Okay.  And how many years have you professionally been

10  involved in the broker-dealer industry?

11  **A.**   It's going on 38 years.

12  **Q.**   And are you a member of any professional associations

13  with regard to that work in the broker-dealer industry?

14  **A.**   So when I was in the industry, I was a member of the SIA,

15  broker-dealer association.  I was on the executive committee.

16  **Q.**   And how about your schooling, sir?

17  **A.**   I went to Davidson College and I went to Syracuse law

18  school.

19  **Q.**   So in your almost 40 years working in the U.S.-based

20  broker-dealer business, did you become familiar or intersect

21  at all with the area of transition management?

22  **A.**   Well, I certainly -- more so when I became a regulator

23  because I'm not sure --

24  **Q.**   When you say you became a regulator, which --

25  **A.**   When I joined FINRA.  And when I say "mostly," that

1    iteration of dealing with institutions, because that's just

2    another way of dealing with institutions or another service

3    to institutions by broker-dealers or banks and

4    broker-dealers.

5           That's something you pick up obviously your whole

6    way through.  Because I'm always -- you deal with trading

7    desks.  When you're a compliance officer, the way to help a

8    trading desk is to go to a trading desk, understand what they

9    do, understand what clients want.

10          But then as a regulator, you're not just dealing

11   with the broker-dealer side.  You're dealing with the

12   customer side, and that's where you really begin to

13   understand even better what we call the buy side, which is

14   the other side, the institutional side facing broker-dealers.

15   **Q.**  And that was during your ten years while you were working

16   with FINRA, sir?

17   **A.**  Well, I had some experience with that, understanding that

18   from the broker-dealer perspective.  Talked to traders, you

19   understand what they're telling you customers want.  But

20   you're not talking directly to customers.

21          Once you become a regulator, you begin to talk

22   directly to customers.

23   **Q.**  What do you mean by a "regulator"?  What exactly do you

24   mean by that in terms of your work at FINRA?

25   **A.**  So FINRA is a regulator.  It has regulatory obligations

1    under the law, and it is -- it makes rules.  It can't just

2    make it on its own; it has to have those rules presented to

3    and approved by the SEC.

4    **Q.**  I'm sorry.  Go ahead.

5    **A.**  And then it goes out and enforces those rules through

6    examination and investigations.

7    **Q.**  And over the course of your 30-plus years in the

8    industry, did you come to understand how broker-dealers

9    execute trades?

10   **A.**  Oh, yes.

11   **Q.**  And can a broker-dealer execute trades as a principal?

12   **A.**  Yes.

13   **Q.**  And what does that mean for a broker-dealer to be acting

14   as a principal?

15   **A.**  It just means that the broker-dealer in executing that

16   trade took -- either had those securities in the inventory

17   and sold it to its customer, or in executing the customer

18   order, it went out to another party, bought them, momentarily

19   put them in its inventory, and then sold it to the customer.

20   **Q.**  And is that something that is also sometimes referred to

21   as a proprietary model?

22   **A.**  I think we're mixing up terms here.  So a proprietary

23   model and principal really don't intersect.  We can talk

24   about models in a second.  But I'm simply referring to how a

25   trade gets executed.  Okay?

1          You can execute a trade as a principal or you can

2     execute a trade as an agent.  Certainly in the equity world

3     there's no distinction.  There are distinctions in the

4     fixed-income world.

5     **Q.**   How does a broker-dealer typically earn compensation when

6     acting as a principal?

7     **A.**   It charges a markup or a markdown.  So if you're buying,

8     it charges a markup.  If you're selling, the opposite of a

9     markup is a markdown.  And in the agency world, we would call

10    it a commission.  They're really the same thing.

11    **Q.**   And based on your experience in the U.S. broker-dealer

12    industry and knowledge of the practice and knowledge in the

13    U.S. broker-dealer industry, are you familiar with the term

14    riskless principal?

15    **A.**   Yes.

16    **Q.**   What does that mean?

17    **A.**   That simply means that when you went out and bought those

18    securities from another party, you already had an order in

19    hand for those securities so you weren't at any risk.  At the

20    time you went out to the other party and bought those

21    securities, you already knew you had an offsetting order.

22    **Q.**   And how does a broker-dealer acting as a riskless

23    principal typically earn compensation?

24    **A.**   The same way as a principal.  There's no distinction in

25    the principal model.  You earned it as a markup or a

1    markdown.

2    **Q.**   And did institutional -- strike that.

3             What do you understand an institutional investor to

4    be?

5    **A.**   So an institutional investor, we -- actually, there's a

6    definition in the FINRA rules.  But in common parlance, an

7    institutional investor is an investor of sophistication and

8    size that is dealing with a broker-dealer.

9    **Q.**   And in your experience, would a multi-billion-dollar

10   pension fund or a sovereign wealth fund or insurance company

11   be categorized as a institutional or sophisticated or

12   professional investor?

13   **A.**   So we don't have the term "professional investor" in this

14   country.  That's a European term.  But yes, they would be

15   sophisticated and institutional.

16   **Q.**   Do institutional investment professionals understand --

17   in your experience, 30-plus years in the U.S. broker-dealer

18   industry, do institutional investment professionals

19   understand that broker-dealers trading as riskless principal

20   earned remuneration through either markups or markdowns?

21            MR. FRANK:  Foundation, Your Honor.

22            THE COURT:  Overruled.

23            Let me just explain.  So, ladies and gentlemen,

24   he's testifying generally about his understanding in the

25   securities industry.  That's what this is.

1          That's what you're offering him for, right?

2          MR. GOLDSTEIN:  Yes, Your Honor.

3          THE COURT:  Go ahead.  You can answer.

4     **Q.**  Do you recall the question?

5     **A.**  Yes.

6     **Q.**  So do institutional investment professionals understand

7     that broker-dealers trading as riskless principal earn

8     remuneration through either markups or markdowns?

9     **A.**  Yes.

10    **Q.**  And has that been known in the broker-dealer and

11    investment institutional investment community?

12    **A.**  The institutional investment community expects to deal

13    only on a principal basis.

14    **Q.**  Say that again?

15    **A.**  The institutional community expects to deal pretty much,

16    at least on fixed income, only on a principal basis.

17    **Q.**  When you say "principal," are you including within that

18    riskless principal?

19    **A.**  Yes.

20    **Q.**  Are they the same to you?

21    **A.**  In this case, they would be the same.  I mean, there is a

22    distinction between principal and riskless principal, okay,

23    and it has ramifications when it comes to issues like markup,

24    how much in compensation you can earn.  But it has no

25    distinction as to how those trades are done with the

1    institutional side of the business.

2    **Q.**   And in both situations, institutional investors would

3    reasonably expect a broker-dealer to earn remuneration in

4    both principal and riskless principal through both markups

5    and markdowns?

6    **A.**   Yes.

7    **Q.**   And based on your experience in the U.S. broker-dealer

8    industry and your knowledge of the practice and norms in a

9    U.S. broker-dealer industry, can a broker-dealer execute

10   trades in an agency capacity?

11   **A.**   Yes.

12   **Q.**   What does that mean for a broker-dealer to execute trades

13   in an agency capacity?

14   **A.**   So that means when it went out and bought those

15   securities, instead of taking it into a proprietary account,

16   it took it into its general ledger, its books and records,

17   but not taking ownership of it.  It took it into a customer

18   account and then moved the ownership directly to the

19   customer.

20   **Q.**   And in your experience, do broker-dealers ever trade

21   fixed-income securities in an agency as opposed to principal

22   or riskless principal capacity?

23   **A.**   They can and they do but not with the institutional side.

24   They do with the retail side from time to time.

25   **Q.**   So let me preface my questions, I'm asking you only about

1    the institutional side, okay?

2    **A.**   Okay.

3    **Q.**   So can you give an answer with that in mind, sir?

4    **A.**   Yeah.  I've never seen it done on any basis other than

5    principal.

6    **Q.**   Okay.  Based on your experience in the U.S. broker-dealer

7    industry and your knowledge of practice and norms in the U.S.

8    broker-dealer industry, are broker-dealers typically

9    compensated for the services they provide?

10   **A.**   Yes.

11   **Q.**   Are there costs, fixed or variable costs, associated with

12   the services provided by broker-dealers?

13   **A.**   Yes.

14   **Q.**   Can you explain some of those fixed and variable costs?

15   **A.**   Sure.  You have to pay the people who are executing those

16   transactions.

17   **Q.**   So these are employees?

18   **A.**   Those are employees.

19        You have to have systems in place to -- I'm going

20   to use the word "clear" those transactions, meaning when you

21   take ownership, right, you have to process those trades in

22   such a way so they end up in the right account.  And in some

23   cases, you are providing -- not in the institutional world --

24        THE COURT:  He's only asking about --

25   **A.**   Okay.  So there would be no custody services.

1    **Q.**   And are you familiar with the term "best execution"?

2    **A.**   Yes.

3    **Q.**   What does that mean, sir?

4    **A.**   That means in the course of an execution, a broker-dealer

5    always has best execution obligations to its customer, but --

6    and it really means one of three things:  best price, and/or

7    speed of execution, and/or certainty of execution.

8    **Q.**   And what do you mean by "speed of execution"?

9    **A.**   So it might be more important to a client to get a trade

10   executed quickly than to get the absolute best price.

11   **Q.**   And how about "certainty of execution"?  What do you mean

12   by that?

13   **A.**   Again, a client may wish to make sure a trade is executed

14   rather than making sure that the trade is done at the very

15   best price.

16   **Q.**   Are there circumstances in which institutional investors

17   might prioritize speed and/or certainty over getting the

18   lowest price?

19   **A.**   Yes.

20   **Q.**   And does the duty of best execution preclude or prohibit

21   broker-dealers from earning remuneration either through a

22   markup or markdown for the services that the broker-dealer

23   provides?

24   **A.**   No.

25   **Q.**   Why is that?

1     **A.**   Because best execution is -- does not relate at all to

2     markup rules.  What governs remuneration --

3               MR. FRANK:  Objection, Your Honor.

4               THE COURT:  Sustained as to beyond the scope of the

5     question.

6     **Q.**   What governs remuneration for broker-dealers?

7               MR. FRANK:  Objection, Your Honor.

8               THE COURT:  What's the objection?

9               MR. FRANK:  Same objection as before, to the

10    extent -- and I'm not sure where we're going with it.  But to

11    the extent that we're getting into the issue that Your Honor

12    addressed pretrial.

13              THE COURT:  Let me just see counsel at sidebar for

14    a moment.  Maybe I can speed this up.

15    **SIDEBAR:**

16              MR. GOLDSTEIN:  I don't understand the objection,

17    Your Honor.

18              MR. FRANK:  To the extent we're going to get into

19    Rule 10(b)10 which governs the permissible amount of

20    undisclosed markups and riskless principal trades, my

21    understanding was that the court ruled previously that we

22    could only get into that to the extent counsel has proved,

23    provided some basis that the defendant was aware of that

24    specific rule.  There's been no evidence to my knowledge

25    whatsoever on that point.

1          MR. WEINBERG:  I don't agree with Mr. Frank's

2     recollection of the limits of the evidence.  You have here a

3     FINRA general counsel who is familiar with the rule, the rule

4     governs broker-dealers trading fixed income in the United

5     States, and it says in contrast to equities where disclosure

6     is required, that disclosure is not required for fixed income

7     for professional and institutional investors.  It's a crucial

8     part of his explanation as to why institutional investors

9     expect broker-dealers to charge --

10          THE COURT:  So essentially what you want, what you

11     anticipate he's going to say is that the FINRA rules don't

12     require disclosure of the amount of compensation for

13     broker-dealers.

14          MR. GOLDSTEIN:  Eventually, yes.

15          MR. FRANK:  So we specifically addressed this issue

16     pretrial.  And unless my memory is completely mistaken, which

17     I don't think it is, the issue was that the defense had to

18     present some proof that the defendant was aware of this rule.

19     They're now -- if they're now arguing that it's relevant to

20     what institutional investors expect, that's a different

21     argument that was made pretrial and it seems to me a

22     back-door way of getting at exactly the thing the court

23     previously ruled on.

24          MR. WEINBERG:  The defendant is on a committee for

25     State Street Global Markets, which was the broker/dealer.

1    This is the guidepost.  This is what broker-dealers are

2    allowed by FINRA to do or not do.  They're not required to

3    make disclosure on buys.  They are on equity.  It's known by

4    everybody in the financial markets.

5              MR. FRANK:  There's been no evidence of what he

6    knows in his capacity working --

7              THE COURT:  No specific evidence that he knows, but

8    given the general evidence that I've heard, I'm prepared to

9    allow some of this.  Overruled for now.

10   (End of sidebar.)

11   BY MR. GOLDSTEIN:

12   Q.  So, Mr. Menchel, are there any specific SEC rules

13   governing disclosure of broker-dealer compensation?

14   A.  No.

15             THE COURT:  SEC or FINRA?

16   Q.  FINRA or SEC, sir, are there any rules governing

17   disclosure of broker-dealer compensation?

18   A.  I'm sorry.  Disclosure, yes.

19   Q.  And which rule is that?

20   A.  10(b)10.

21   Q.  And what, if anything, does Rule 10(b)10 require

22   broker-dealers trading fixed-income securities as a riskless

23   principal or principal, what does it require of them in terms

24   of disclosing broker-dealer compensation?

25   A.  It says that broker-dealers can disclose the transaction

1    as a matter of price, the full price, or the yield.

2    **Q.**   Do they have a duty to disclose the costs or amount of

3    any remuneration earned through a markup or a markdown?

4    **A.**   No.

5    **Q.**   Based on your experience in the U.S. broker-dealer

6    industry and your knowledge of the practice and norms in the

7    U.S. broker-dealer industry, is it customary for a

8    broker-dealer to take a markup or markdown when acting as a

9    principal or riskless principal?

10   **A.**   It is customary.

11   **Q.**   And is there a limit to the amount of a markup or

12   markdown a broker can take in these circumstances?

13   **A.**   Yes.

14   **Q.**   What is that limit?

15   **A.**   Well, there is no fixed limit per se.

16   **Q.**   Is there something called a 5 percent rule?

17   **A.**   There is.

18   **Q.**   And what is that?

19   **A.**   That's a FINRA rule.  It's not really called a 5 percent

20   rule.  It's called the markup rule.  And there is a specific

21   section dealing with fixed income, and it really begins with

22   the idea that FINRA has a 5 percent guideline.  But then it

23   goes into various factors that should inform that guideline.

24   **Q.**   And contrasted with 5 percent, what is a percent -- what

25   is a basis point in terms of a percentage?

1    **A.**   Well, a basis point is 1/100 of a percentage.

2    **Q.**   So what you're testifying to is that a broker-dealer, the

3    upper limits of a markup or markdown is 5 percent compared to

4    a basis point, which is 1/100 of 1 percent?

5    **A.**   So there's no limit.  It's a guideline.  The rule says

6    there's no limit, and the SEC has repeated that there's no

7    limit.

8              But there has to be a benchmark.  When I was at

9    FINRA, in fact most equity markups coalesce around 2.8

10   percent.  Fixed income tends to be lower, and enforcement

11   cases tended to happen only after 4 percent.

12             And because of that, we -- the SEC thought that was

13   too high a markup even under the 5 percent guideline to begin

14   the enforcement activities.  And because of that, we

15   promulgated, an addition to the markup rule that related

16   specifically to debt.

17   **Q.**   Okay.  And is it common in your experience for a

18   broker-dealer to take a markup of a quarter of a point or

19   25 basis points?

20   **A.**   Yes.

21   **Q.**   And is it -- in your experience, is a markup of 2 basis

22   points of yield excessive?

23             MR. FRANK:  Your Honor, could we have a particular

24   security that he's talking about?

25             THE COURT:  Yes.

1   **Q.**  Fixed income.

2         MR. FRANK:  No, Your Honor.  I mean, could we have

3   a -- markups -- is he talking about any fixed-income

4   security, or is he talking about a particular fixed-income

5   security?

6         MR. GOLDSTEIN:  As a matter of practice, Your

7   Honor.

8         THE COURT:  As to just all types of bonds or

9   categories of bonds like corporate bonds --

10   **Q.**  Let's start with corporate bonds.

11   **A.**  So with corporate bonds, you can take a higher yield than

12   you would on a treasury bond.  And on a low-rated bond you

13   could take a higher markup than you would on a corporate

14   bond.

15         THE COURT:  You were asking what's customary in the

16   industry?

17         MR. GOLDSTEIN:  Yes.

18         THE COURT:  Why don't you phrase the questions that

19   way.

20   **Q.**  Basically, let me move on to a different subject matter,

21   Mr. Menchel.

22         Based on your experience in the U.S. broker-dealer

23   industry and your knowledge of the practice and norms, what

24   is the reason for a distinction between institutional and

25   non-institutional customers?

1    MR. FRANK:  Objection, relevance.

2    THE COURT:  Overruled.

3  **A.**  It goes to the duties that are owed.  And so there are

4  oftentimes less duties under the entire scheme owed to

5  institutional clients than are owed to retail clients.

6  **Q.**  And do broker-dealers acting as riskless principal and

7  trading fixed-income securities disclose markups, in your

8  practice and experience?

9  **A.**  I'm sorry.  Say that again.

10 **Q.**  Do broker-dealers acting as riskless principal in trading

11 fixed-income securities disclose the markups that they have

12 charged?

13 **A.**  No.

14 **Q.**  Why not?

15 **A.**  Because 10(b)10 does not require it.  And since

16 broker-dealers gear their confirmation process to the federal

17 requirements, they would not disclose it.

18 **Q.**  Did you have any understanding as to whether industry

19 participants would support a rule requiring disclosure of

20 markups on --

21    MR. FRANK:  Objection.

22    THE COURT:  Sustained.

23 **Q.**  Based on your experience, Mr. Menchel, what does an

24 agency approach to trading mean?

25 **A.**  Well, it depends upon the context.  In the context in

1    which the materials I read, it means that you're not trading

2    against your customer.

3    Q.   What do you mean by that, when you say "trading against

4    your customer"?

5    A.   So when you're an institution and you bring certain

6    trades to your customer, to a broker-dealer, that can tell

7    the broker-dealer or allow them to make educated guesses

8    about what your strategies may be in the market.  And they

9    can take advantage of that information and trade against it.

10          When a broker-dealer tells the institutions we have

11   an agency platform, that really means all I care about is

12   getting your order done.  I'm not going to try to trade

13   against your strategy.

14   Q.   What are some examples of how they might trade against

15   the client strategy in that circumstance?

16   A.   So for example, you have a very large mutual fund that

17   comes in and says to a broker-dealer, I need to sell a very

18   large position -- I'll just make this up -- in Microsoft.

19          A broker-dealer that had a proprietary trading arm

20   could possibly take advantage of that.  The legality of that

21   is questionable, but they could take advantage of that,

22   right, and use that information to their benefit and make

23   money in the market.

24          When you say to an institution, I have an agency

25   platform, what you're saying is that's not what I do.  I'm

1    here to execute your trades.  I'm not interested in your

2    strategy.  I'm not taking advantage of that.

3    **Q.**  And is an agency approach to trading, is that a promise

4    to execute trades free of charge for a broker-dealer?

5    **A.**  No.

6    **Q.**  Does an agency approach to trading preclude a

7    broker-dealer from earning remuneration either through

8    markups or markdowns?

9    **A.**  No.

10   **Q.**  Why do broker-dealers acting as principal or riskless

11   principal charge markups or markdowns?

12   **A.**  That's the business they're in.  I mean, the service that

13   they're offering is execution, and they have to pay for the

14   costs of getting that done.

15   **Q.**  And are the execution services provided by a

16   broker-dealer distinct from transition management services?

17            MR. FRANK:  Objection.

18            THE COURT:  Overruled.

19   **A.**  Yes.  Transition management services, you're paying a fee

20   for a transition manager, and then there has to be an

21   execution of the trades.

22   **Q.**  What does a transition manager do, meaning that is

23   distinct from broker-dealer?  What's their role?

24            MR. FRANK:  Objection, foundation.

25            THE COURT:  Sustained just as to foundation.

1    **Q.**   What's the broker-dealer's role in terms of a transition

2    management strategy?

3               MR. FRANK:  Objection, foundation.

4               THE COURT:  If you know, you can answer.  It's

5    overruled.

6    **A.**   Okay.  So if the broker-dealer is the transition manager,

7    which it could be the case, it is doing two things.

8               It is saying, I'm going to help you meet your goals

9    in the transition, okay, which is there's a cost to make the

10   transition, right?  When you move from one set of assets to

11   another, there are costs involved in that.  Not just trading

12   costs, right?

13              There are costs such as the implementation.  I'm

14   selling one portfolio, I'm moving to another.  I may be

15   moving from one currency to another.  There are opportunity

16   costs.  There are risks.  There's timing, okay?

17              And what the transition manager does is say, Here

18   is what I think we can do, here is what the total costs to

19   you are in doing that.  Meaning, what's going -- what is it

20   going to cost you to move from one --

21              MR. FRANK:  I object to any testimony about what

22   transition managers do.  There's no foundation for that.

23              THE COURT:  Sustained as to that.

24   **Q.**   In your experience, sir, are --

25              MR. FRANK:  And I move to strike it, actually.

```
 1              THE COURT:  Yes.
 2   BY MR. FRANK:
 3   Q.  Are the two distinct services offered, one by a
 4   transition manager and one by the broker-dealer, are they
 5   typically compensated separately?
 6              MR. FRANK:  Your Honor, I object on foundation
 7   grounds.  This witness is not an expert on transition
 8   managers.
 9              THE COURT:  Let's just --
10              MR. FRANK:  Sorry.
11   Q.  Mr. Menchel, you have 30-plus years in the securities
12   industry in the United States, correct?
13   A.  Correct.
14   Q.  You worked for FINRA for ten years as general counsel,
15   correct?
16   A.  Correct.
17   Q.  Another 20-plus years as general counsel or as a lawyer
18   working with, inside and for broker-dealers, correct?
19   A.  Correct.
20   Q.  During that period of time, I believe you testified that
21   you have experienced working with or dealing with transition
22   management services, correct?
23              MR. FRANK:  Your Honor, I object as beyond the
24   scope of the disclosed testimony, of the disclosed
25   qualifications.
```

1          THE COURT:  I think that might be beyond the scope

2      of the report, Mr. Goldstein.

3          MR. GOLDSTEIN:  I can move on, Your Honor.

4          THE COURT:  Okay.

5      **Q.**  Mr. Menchel, based on your experience in the U.S.

6      broker-dealer industry and your knowledge of the practice and

7      norms in the U.S. broker-dealer industry, are you aware of

8      any prohibition on a banking entity charging a transition

9      management fee and an affiliated broker-dealer earning

10     remuneration through either a markup or a markdown?

11         MR. FRANK:  Objection as to transition management,

12     Your Honor.

13         THE COURT:  Overruled as to that question.

14     **A.**  I'm not aware of such a ban.

15     **Q.**  I'm sorry.  I didn't hear you.

16     **A.**  I'm not aware of any ban.

17     **Q.**  And does that apply to both equity and fixed-income

18     executions?

19     **A.**  Yes.

20     **Q.**  And would institutional professionals reasonably expect a

21     flat management fee paid to a transition manager to be the

22     sole compensation for the manager and affiliated

23     broker-dealers?

24         MR. FRANK:  Objection.

25         THE COURT:  Sustained.

1    **Q.**  Are there any reasons why a transition management client

2    might prefer to use an affiliated broker-dealer?

3            MR. FRANK:  Objection.

4            MR. GOLDSTEIN:  Your Honor, I point you to

5    Paragraph 3A on page 5 of the disclosure.

6            THE COURT:  Thank you.

7            MR. FRANK:  It's an issue of foundation, Your

8    Honor.

9            THE COURT:  Overruled as to the foundation.

10            You can answer.

11    **A.**  Yes, there is a reason.

12    **Q.**  Why is that, sir?

13    **A.**  Well, because in doing the executions, if you use an

14    affiliate, you have more control as to how those executions

15    take place.

16    **Q.**  Are you familiar with the term "implementation

17    shortfall"?

18    **A.**  Yes.

19    **Q.**  And can you please describe it?

20            MR. FRANK:  Objection.

21            THE COURT:  Isn't that beyond the scope of the

22    report, Mr. Goldstein?

23            MR. GOLDSTEIN:  I'll move on, Your Honor.

24            May I have one moment, Your Honor?

25            THE COURT:  You may.

1          MR. GOLDSTEIN:  Thank you.

2          Your Honor, in terms of the implementation

3    shortfall, if I can refer you to Paragraph 4 on page 5.

4          THE COURT:  Okay.

5          MR. FRANK:  My objection is on foundation, Your

6    Honor.

7          THE COURT:  Ask the question again and then I'll

8    hear the objection.  Or ask the question you want to ask and

9    then I'll see.

10         MR. GOLDSTEIN:  Just one moment, Your Honor.

11   BY MR. GOLDSTEIN:

12   **Q.**  Are you familiar with the term "implementation

13   shortfall"?

14   **A.**  I am.

15   **Q.**  And please describe it.

16         MR. FRANK:  Objection, Your Honor.

17         THE COURT:  Foundation?

18         MR. FRANK:  Yes, Your Honor.

19         THE COURT:  Overruled as to that.

20         You can answer the question.

21   **A.**  Sure.  You have a benchmark of expectations of what

22   you're going to achieve in a transition, what your costs are

23   going to be -- outside trading costs, maybe even including

24   trading costs, right -- and you have a target that you're

25   going for.

1          The implementation shortfall would be did I achieve

2    that target or did I not achieve that target?  If I don't

3    achieve that target, I have an implementation shortfall.  If

4    I do better than that -- if I hit that target, I've hit my

5    target.  Or I could maybe even do better than my target.  But

6    it's really jargon.

7    **Q.**  And in your experience, what importance, if any, do

8    institutional market professionals attach to the

9    implementation shortfall?

10          MR. FRANK:  Objection, Your Honor.

11          THE COURT:  Customarily, what was customary at that

12   time?

13          MR. GOLDSTEIN:  Yes.

14          MR. FRANK:  Your Honor, it's a transition

15   management term, as it's been discussed.  And unless there's

16   a representation that it's outside the context of transition

17   management, we object on foundation grounds.

18          THE COURT:  Overruled.

19   **A.**  I'm sorry.  I got lost in the colloquy.

20   **Q.**  What importance, if any, do institutional market

21   professionals attach to the implementation shortfall?

22          THE COURT:  What's the customary practice?

23   **Q.**  Customary practice.

24   **A.**  Well, it's what you're shooting for.  It's a hope, right?

25          So if I could explain it by example, sometimes it

1     is what you hope to achieve in moving from one set of assets

2     to another.  A set of outcomes.  Foreign exchange costs.

3     Opportunity costs.  Okay?  Market professionals understand

4     it's an estimate, okay, and then they will judge you by how

5     good you do versus that estimate.

6     Q.   In your experience and customary practice, is the overall

7     implementation shortfall more or less important to

8     institutional market professionals than a broker-dealer's

9     remuneration for the broker-dealer services?

10                MR. FRANK:  Objection, foundation.

11                THE COURT:  Overruled.

12    A.   What's important is the implementation shortfall.

13    Because they don't care.  An institution -- and this is true

14    of any execution.  No -- no institution really cares what a

15    broker-dealer makes as long as the price they get or the

16    expectation they get for the order is met.

17    Q.   And when securities are traded, is it necessary for a

18    broker-dealer to participate in the execution of those

19    transactions?

20    A.   It's essential.

21    Q.   And when assets are transitioned, whether it's an

22    affiliated broker-dealer or an external broker-dealer, will

23    there be costs imposed or remuneration imposed for those

24    broker-dealer services?

25    A.   Yes.

1                MR. GOLDSTEIN:  May I have one moment, Your Honor?

2                THE COURT:  You may.

3    Q.  Mr. Menchel, in connection with your extensive experience

4    in the broker-dealer industry --

5                MR. FRANK:  Objection to the commentary, Your

6    Honor.

7                THE COURT:  Overruled.

8    Q.  -- did you become aware of an investigation into the

9    business practices of a company named ConvergEx?

10                MR. FRANK:  Objection as beyond the scope, Your

11   Honor.

12                THE COURT:  Sustained.

13                MR. GOLDSTEIN:  Nothing further, Your Honor.

14           **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

15   BY MR. FRANK:

16   Q.  Good afternoon, Mr. Menchel.  How are you?

17   A.  Good.  How are you?

18   Q.  Thank you.  I'm well.

19                You worked at FINRA before you were a consultant?

20   A.  Yes.

21   Q.  And you haven't worked as a transition manager, have you?

22   A.  No.

23   Q.  And you've never supervised a transition manager?

24   A.  No.

25   Q.  And you've never negotiated a transition management

1    agreement?

2    **A.**   No.

3    **Q.**   And you've never worked as a pension fund manager?

4    **A.**   No.

5    **Q.**   And you've never traded bonds on a trading desk?

6    **A.**   Not on a trading desk, no.

7    **Q.**   And you've never been a direct supervisor of anyone who

8    traded bonds on a trading desk?

9    **A.**   Not a direct supervisor.

10   **Q.**   And you've never calculated an implementation shortfall

11   in a transition, have you, sir?

12   **A.**   No.

13   **Q.**   You testified, Mr. Menchel, that broker-dealers acting as

14   riskless principals charge markups on bonds.  Was that your

15   testimony?

16   **A.**   Correct.

17   **Q.**   And a markup is an amount that's added to the principal

18   price; is that correct?  Or a markdown is deducted from the

19   price, correct?

20   **A.**   Correct.

21   **Q.**   And your testimony is that the term "commission" does not

22   apply in a principal or riskless principal setting, correct?

23   **A.**   It's just not the term used.

24   **Q.**   It never applies, correct?

25   **A.**   No, that's not correct.  It's not the term used.  Because

1    they really are the same thing.

2    **Q.**   They're the same thing; is that right?

3    **A.**   Yes, yes.

4    **Q.**   And isn't it true, sir, that your testimony is that that

5    term never applies?

6    **A.**   No.  I'm not sure what you're referring to.

7    **Q.**   Does the term "commission" ever apply in a principal

8    setting?

9    **A.**   The term "commission" and the word "markup" are the same

10   thing.

11   **Q.**   Does the term "commission" ever apply in a principal

12   setting?

13   **A.**   Well, from a regulatory point of view --

14   **Q.**   Can you answer my question yes or no, sir?

15   **A.**   I can't answer it yes or no because it's not susceptible

16   to a yes-or-no answer.

17   **Q.**   Do you recall testifying in the matter of United States

18   v. Jesse Litvak?

19   **A.**   Yes.

20   **Q.**   Did you testify on March 4 of 2014?

21   **A.**   Yes.

22   **Q.**   In the District of Connecticut?

23   **A.**   Yes.

24   **Q.**   You were under oath?

25   **A.**   Yes.

1    **Q.**  Do you recall testifying:

2          Question:  "Does the term 'commission' ever apply

3    in a principal setting?"

4          MR. GOLDSTEIN:  Your Honor, this is not

5    inconsistent with anything that Mr. Menchel just said to him.

6          THE COURT:  Overruled.

7    **Q.**  Question:  "Does the term 'commission' ever apply in a

8    principal setting?"

9          Answer:  "Never."

10          Was that your testimony under oath in the matter of

11    United States v. Litvak?

12   **A.**  Yes.

13   **Q.**  Was it true at the time you said it?

14   **A.**  Yes.

15   **Q.**  Is it true today?

16   **A.**  Okay, yes.

17   **Q.**  Okay, yes?

18   **A.**  Okay, yes.  Context means everything.

19   **Q.**  Is the statement true, sir?

20   **A.**  The statement is true because the --

21   **Q.**  Thank you.

22   **A.**  -- term "commission" --

23   **Q.**  Thank you.

24   **A.**  -- is principal.

25   **Q.**  Thank you.

1            And they're the same thing, commission and markups,

2     just different words for the same economic principle,

3     correct?

4     **A.**  Correct.

5            MR. FRANK:  Could we look at Exhibit 59, please.

6     **Q.**  Have you seen this document, Mr. Menchel?

7     **A.**  I may have.  I just don't recall.

8     **Q.**  Well, how many documents have you reviewed in preparation

9     for your testimony today?

10    **A.**  Mostly -- probably 20, 25.

11    **Q.**  20 or 25 documents is the entire universe of documents

12    you reviewed in preparation for testifying in this trial

13    today?

14    **A.**  Yeah, because I wasn't a fact witness.  I was only asked

15    about market practice.

16    **Q.**  It's a yes-or-no question, sir.  20 or 25 documents is

17    the extent of the documents you reviewed in preparing for

18    this case?

19    **A.**  That's what I think is correct.

20    **Q.**  And who selected those documents?  Did you select those

21    documents, or did counsel select those documents for you?

22    **A.**  Counsel.

23    **Q.**  And was this one of those documents?

24    **A.**  I just don't recall.

25    **Q.**  These are trading instructions.  Is that what they appear

1    to you to be?

2            I'll represent to you that these are trading

3    instructions.

4    **A.**   Okay.

5    **Q.**   And do you see that there's a reference to commissions,

6    2 basis points of value on the sell side and 18 basis points

7    of value on the buy side?  Do you see that?

8    **A.**   Yes, yes.

9    **Q.**   And these are trading instructions for bonds.  Do you see

10   that?

11   **A.**   Yes.

12   **Q.**   So would you agree that in these trading instructions at

13   State Street Bank they use the word "commissions" with

14   reference to bonds?

15           MR. GOLDSTEIN:  Your Honor, I object.  The witness

16   has no context for the questions that are being asked of him

17   as to these specific documents.

18           THE COURT:  Sustained.

19   **Q.**   Does it appear that the word "commissions" is on this

20   document, sir?

21   **A.**   Yes.

22   **Q.**   And it appears to refer to bonds?

23   **A.**   Yes.

24           MR. GOLDSTEIN:  I object.

25           THE COURT:  Sustained.

1          MR. FRANK:  Your Honor, I'm not sure I understand.

2          THE COURT:  I just think -- he hasn't read this

3    document, so I don't know what -- how he can give an

4    interpretation of it.  He can say what's on it.

5          MR. FRANK:  He has testified that bonds are always

6    traded --

7    **Q.**  Have you testified that bonds are always traded as

8    principal or riskless principal?  Correct?

9    **A.**  Well, unless they're done on an equity basis, on an

10   agency basis.

11   **Q.**  Wasn't it your testimony that you've never seen that,

12   sir?  You've only ever seen bonds traded on a principal or

13   riskless principal basis?

14   **A.**  In the institutional setting.

15   **Q.**  Well, would you agree that -- this case is about

16   institutional investors, correct?

17   **A.**  Right.

18   **Q.**  And so we're looking at a set of trading instructions

19   relevant to this case, correct?

20         MR. GOLDSTEIN:  He doesn't know, Your Honor, what

21   he's looking at.

22         MR. FRANK:  I'm representing it to him.

23   **Q.**  If these are trading instructions relevant to this case,

24   would you agree that they are for institutional investors?

25         MR. GOLDSTEIN:  Your Honor, there's an order here.

1    I object.

2              MR. FRANK:  Your Honor, I'm allowed to impeach with

3    documents that are in evidence.

4              THE COURT:  I think the issue is asking him his

5    specific understanding of a document he's never seen or read

6    as opposed to -- there's nothing wrong with the line of

7    questioning you're asking.

8              MR. FRANK:  I understand.  I understand.

9    Q.  Your testimony was that with respect to institutional

10   investors, bonds are always traded on a principal or riskless

11   principal basis.  Yes or no?

12   A.  Yes.

13   Q.  And your testimony was that the term "commission" is

14   improper when referring to trades on a principal or riskless

15   principal basis.  Yes or no?

16   A.  I didn't say "improper."

17   Q.  You said it was never used.  Yes or no?

18   A.  Yes.

19   Q.  These trading instructions refer to bonds traded for an

20   institutional investor, correct?

21              MR. GOLDSTEIN:  Objection.

22              THE COURT:  Sustained.  He doesn't know.

23   Q.  These trading instructions refer to bonds on their face.

24              THE COURT:  Sustained.

25              MR. GOLDSTEIN:  Thank you.

1              MR. FRANK:  Let's look at Exhibit 206.

2    **Q.**  Have you seen this document before?

3    **A.**  I just don't recall.

4    **Q.**  Out of 20 or 25 documents that you've reviewed, you don't

5    recall any of these documents?

6    **A.**  These weren't -- these weren't material to me.

7    **Q.**  How do you know if they were material to you if you don't

8    know if you've seen them?

9    **A.**  Because it wasn't what I was really retained to do as an

10   expert.

11   **Q.**  You're testifying about the term "commission," "markup,"

12   "markdown" in a principal or riskless principal or agency

13   setting, are you not?

14   **A.**  I am.

15   **Q.**  These documents are documents in this case, correct?

16   **A.**  Yes.

17   **Q.**  Did you select the documents you looked at or did counsel

18   decide what would be material to your testimony?

19              MR. GOLDSTEIN:  Asked and answered.

20              THE COURT:  Sustained.

21   **Q.**  Did counsel decide what was material to your testimony?

22              MR. GOLDSTEIN:  Again, objection, Your Honor.

23              THE COURT:  That's overruled as to that.

24              You can answer that.

25              THE WITNESS:  I can answer?  Okay.

1      THE COURT:  You can answer.  Sorry.

2  **A.**  Not entirely, because counsel asked me certain questions

3  about practices in the industry.

4  **Q.**  Did counsel select the documents that you looked at?

5      MR. GOLDSTEIN:  Asked and answered.

6  **A.**  Yes.

7      THE COURT:  Overruled.

8  **Q.**  Counsel decided which documents were material for you to

9  look at with respect to your testimony, yes?

10  **A.**  Yes.  But those are not the only documents I looked at.

11  **Q.**  And you don't -- I thought you just said 20 or 25

12  documents.

13  **A.**  I did.  But that's not the only documents that I looked

14  at.  I also looked at 10(b)10.

15  **Q.**  I'm not asking you about 10(b)10.  We'll get to that,

16  sir.

17      This document that you're looking at right now,

18  have you looked at it before?

19  **A.**  I just don't recall.

20  **Q.**  Does it appear to you to be another set of trading

21  instructions?

22  **A.**  Yes.

23  **Q.**  Does it appear to use the word "commission"?

24  **A.**  It used that word.

25      MR. FRANK:  Could we look at Exhibit 122, please.

1    **Q.**  Is this one of the documents --

2              MR. FRANK:  Can you blow it up, please?

3    **Q.**  Have you looked at this document?

4    **A.**  I don't recall.

5    **Q.**  Another document you don't recall.

6    **A.**  I really don't recall any documents other than the

7    documents that have to do with the proposals.

8    **Q.**  So the only documents you can recall looking at are

9    documents relating to the proposals made to State Street

10   clients?

11   **A.**  Yes.

12   **Q.**  So you don't recall this document?

13   **A.**  Not particularly.

14   **Q.**  And this document says "Regarding AXA trading" at the

15   top, correct?

16   **A.**  Yes.

17   **Q.**  And it says "Execution and commentary for today's

18   trading," correct?

19   **A.**  Yes.

20             MR. FRANK:  Could we look at the attachment,

21   please.

22             Could we look at the top part of that page?

23   **Q.**  Would you agree with me, sir, that these appear to be

24   bond trades?

25   **A.**  Yes.

1    **Q.**  Would you agree with me, sir, that on the far right
2    there's a commission column?
3    **A.**  Yes.
4    **Q.**  Would you agree with me that it appears that at least at
5    State Street the term "commission" is used with respect to
6    charges on bonds?
7              MR. GOLDSTEIN:  I object, Your Honor.
8              THE COURT:  I think you can ask him whether in
9    these documents it was used.
10             MR. FRANK:  Fair enough.  Thank you, Your Honor.
11   **Q.**  Would you agree with me that in these State Street
12   documents the term "commission" is used with respect to
13   charges on bonds?
14             MR. GOLDSTEIN:  I object, Your Honor.  He's got no
15   context for this document.
16             MR. FRANK:  That's not my fault, Your Honor.
17             THE COURT:  All right.
18             So, ladies and gentlemen of the jury, you should
19   disregard that comment as to the characterization.  The
20   lawyers make decisions.  It's not a question of fault here
21   about what the witness does or doesn't know.  He's not a fact
22   witness.  He's not offered as a fact witness.  And so
23   that's -- what he knows is for you to draw inferences about,
24   and I'll instruct you about witnesses like this in terms of
25   you'll evaluate the weight and the like of their testimony,

1    just like you will other witnesses.

2             And so you can ask him what the documents say, to

3    the extent he knows.

4    Q.  Does it appear to you that on this State Street document

5    the word "commission" was used to refer to charges that were

6    applied to bond trades?

7             MR. GOLDSTEIN:  I object to the latter part of the

8    question.  He can testify to what's shown in the document but

9    not in terms of the context of the document.

10            MR. FRANK:  I'm not asking about the context, Your

11   Honor.  There was a document labeled "Execution and Trading."

12   I'm showing him the attachment.

13            THE COURT:  I think if you break it apart, you can

14   get what you want.

15   Q.  Do these appear to be bond executions?

16   A.  I think so.

17   Q.  And does it appear that the word "commission" is used to

18   apply to charges applied to these bond executions?

19   A.  Well, when you say "the charges," I don't see -- I see

20   zeros and I see the word "commission."

21   Q.  Let's look lower down the page, that same column.  Page

22   2, actually.

23            Now do you see charges in that column?

24   A.  Yes.

25   Q.  Does it appear to you now that there are commission

1    charges applied to these bond trades?

2    **A.**  It would appear so.

3    **Q.**  And if you look at the bonds to which the commission

4    charges have been applied, they appear to be U.S. Treasury

5    bonds; is that correct?

6            Could you just focus on --

7    **A.**  Some are.

8    **Q.**  And some are mortgage-backed securities, correct?

9    **A.**  Right.

10   **Q.**  Also a form of bonds?

11   **A.**  Correct.

12   **Q.**  And the commission charges have not been applied to

13   corporate bonds; is that correct?

14           THE COURT:  On this selection.

15           In other words, the question is, is there a zero in

16   that column in what's blown up with respect to things that

17   appear to be corporate bonds?

18   **A.**  Yeah, I mean, obviously.  For example, United --

19   **Q.**  It's a yes-or-no question.

20           THE COURT:  Just answer yes or no as to that.

21           THE WITNESS:  On the ones that are blown up?

22           THE COURT:  Yes.

23   **Q.**  Those are U.S. treasuries.

24   **A.**  Yes.

25   **Q.**  I'm asking you the ones that are highlighted.  Above it,

1    do you see it says "United Parcel Service"?

2    **A.**   Yes.

3    **Q.**   That's a company, correct?

4    **A.**   Correct.

5    **Q.**   It appears no commission was charged on those corporate

6    bonds, correct?

7    **A.**   I don't know if they're corporate bonds.

8    **Q.**   You don't know if bonds issued by the United Parcel

9    Service are corporate bonds?

10   **A.**   I don't know if it's the bond or the equity.

11   **Q.**   Didn't you just testify these appear to be bond trades?

12   **A.**   It did -- I don't know if everything on here is a bond or

13   this is a mix of bonds and equities.  I don't know that.

14   **Q.**   You don't know about the AXA transition?

15   **A.**   I don't know what this document is showing.

16   **Q.**   Did you review documents in connection with the AXA

17   transition?

18   **A.**   Not the transition itself.

19   **Q.**   Are you aware that State Street transitioned billions of

20   dollars worth of bonds for AXA and there were no equities

21   involved?

22   **A.**   I didn't know whether there were no equities involved or

23   not.

24   **Q.**   You were aware that they transacted billions of dollars

25   worth of bonds for AXA?

1    **A.**   I know there were a lot of bonds.

2    **Q.**   And you reviewed documents in connection with AXA in

3    preparation for your testimony today?

4    **A.**   I recall reviewing -- actually, I recall reviewing -- I

5    don't know -- it might have been AXA, the proposal.

6    **Q.**   So you can't testify from looking at these documents

7    whether these are bonds or stocks.  Is that your testimony?

8    **A.**   I don't know.

9    **Q.**   Well, can you look at the CUSIP number?  Wouldn't that

10   tell you?

11          MR. FRANK:  Can we move further left?

12   **A.**   Yeah, the CUSIP number would tell you.

13          MR. FRANK:  Let's move further left.

14   **Q.**   Now can you tell whether they're bonds?

15   **A.**   They appear to be bond CUSIPs.

16   **Q.**   And would you agree that on the corporate bonds there is

17   no commission that's been applied in the commission column?

18   **A.**   Yes.

19          MR. FRANK:  Can we look at Exhibit 127, please.

20   Can you blow it up a little more than that, please.

21   **Q.**   Okay.  More trading instructions.  Have you reviewed

22   these, Mr. Menchel?

23   **A.**   I don't recall.

24   **Q.**   You don't know?

25   **A.**   I don't recall.

1    **Q.**   Do you recall reviewing any trading instructions?

2    **A.**   Oh, yeah.

3    **Q.**   But you don't recall the three that we've now looked at?

4    **A.**   No.

5    **Q.**   And these appear to be trading instructions for bonds,

6    correct?  Do you see first --

7    **A.**   Yes.

8    **Q.**   -- fixed-income sales, fixed-income buys?

9    **A.**   Yes.

10   **Q.**   And again we see the word "commissions," correct?

11   **A.**   Yes.

12          MR. FRANK:  Could we look at Exhibit 168, please.

13   **Q.**   Have you looked at this document before?

14   **A.**   Hold on a second.

15          (Witness reviews document.)

16          I think I have seen this one before.

17   **Q.**   And so when you testified earlier that the term

18   "commission" is never used for principal or riskless

19   principal trades in fixed-income securities, that was after

20   you had looked at this document?

21   **A.**   Yes.

22   **Q.**   And can we agree, sir, that on this document the term

23   "commissions" is used specifically with respect to

24   fixed-income trading?

25   **A.**   It's used in slang in this, yes.

1    **Q.**  I'm sorry, sir?

2    **A.**  It's used in slang or industry jargon here, yes, but not

3  in confirmations ever.

4    **Q.**  I wasn't asking about confirmations, was I?

5    **A.**  That's what my testimony was about.

6    **Q.**  I don't recall you using the word "confirmation" in your

7  testimony.  Did I miss it?

8    **A.**  I don't know.

9    **Q.**  Can we agree that in this email, which as you'll note was

10  blind-copied to the defendant, Ross McLellan, the term

11  "commissions" was used in connection with fixed-income

12  trading?

13    **A.**  Yes.

14    **Q.**  And this email was sent to a client, Ian McKnight?

15          MR. GOLDSTEIN:  Objection, Your Honor.

16          THE COURT:  Sustained.

17    **Q.**  You don't know who Ian McKnight is?

18    **A.**  I don't know.

19    **Q.**  Do you know who came up with the term "inadvertent

20  commissions" with respect to these fixed-income trades?

21          MR. GOLDSTEIN:  Objection, Your Honor.

22          THE COURT:  Sustained.

23    **A.**  I don't know.

24          THE COURT:  You don't have to answer the question.

25  It's sustained.

1    **Q.**   Have you spoken with the defendant in preparation for

2    your testimony today?

3    **A.**   No.

4    **Q.**   You've never spoken with the defendant?

5    **A.**   No.

6    **Q.**   You've never interviewed the defendant as part of

7    preparing your testimony?

8              MR. GOLDSTEIN:  Asked and answered twice.

9              THE COURT:  Sustained.

10   **Q.**   So you have no basis for knowing what he knows, do you,

11   sir?

12             MR. WEINBERG:  May we reserve an objection at the

13   sidebar later, Your Honor?

14             THE COURT:  Yes.

15             Sustained as to that question, in any event.  Next

16   question.

17   **Q.**   You testified about Rule 10(b)10?

18   **A.**   Yes.

19   **Q.**   Did you ever speak with the defendant about Rule 10(b)10?

20             MR. GOLDSTEIN:  Asked and answered, Your Honor.

21             MR. WEINBERG:  May we approach the bench, Your

22   Honor?

23             THE COURT:  Sustained as to this question.  Why do

24   we need to approach the bench?

25             MR. WEINBERG:  May I reserve a different objection

1    then at the break?

2              THE COURT:  Yes.

3              MR. WEINBERG:  I didn't realize the time.  Sorry.

4              MR. FRANK:  Your Honor, I'm about to start a new

5    topic.

6              THE COURT:  All right.  Ladies and gentlemen, so

7    we'll break for the day.  Keep an open mind.  You haven't

8    heard all the evidence or the closing arguments or

9    instructions.  Don't discuss the case among yourselves, don't

10   discuss it with anyone else, don't do any independent

11   research.  I'll see you tomorrow morning.  Thank you for your

12   attention.  We will resume at 9:00 a.m. tomorrow.

13              All rise for the jury.

14              (Jury exits the courtroom.)

15              THE COURT:  Mr. Menchel, you're excused, and you

16   should step out.

17              You can be seated.  Sorry.

18              You said you wanted to address something.

19              MR. WEINBERG:  Yes.  I think Mr. Frank's questions

20   are an impermissible and an almost outrageous comment on the

21   defendant's Fifth Amendment rights.

22              Mr. Menchel was called as a general expert on

23   broker-dealers.  He was not charged with the task of being a

24   summary witness, of being a conduit for Mr. McLellan's

25   testimony, or being a conduit for Mr. McLellan's state of

1    mind.

2         He wasn't called to testify about AXA or Royal Mail

3    or any other transition.  He was called as a general expert,

4    hugely qualified regarding the ordinary and industry

5    practices of broker-dealers.

6         For Mr. Frank to be asking him do you know what's

7    in Mr. McLellan's mind, did you speak to Mr. McLellan, it's

8    just a back-door comment that burdens and is -- impermissibly

9    burdens Mr. McLellan's Fifth Amendment right.

10         MR. FRANK:  That's not remotely what I was

11    attempting to do, Your Honor.  And I have no objection to an

12    instruction to the jury that he has no obligation to testify

13    or anything that the court thinks is curative on that front.

14         What I was attempting to establish is that this

15    witness has no basis for knowing that anything he's testified

16    to about Rule 10(b)10 is something that's known to the

17    defendant, and there's no evidence in the record as to that

18    point.

19         He's testifying about Rule 10(b)10, which is a

20    back-door way of suggesting that the defendant thought he was

21    entitled to charge these markups and not disclose them.  And

22    there's nothing in the record and he has no basis for

23    testifying that that was known to this defendant.

24         MR. WEINBERG:  A broker-dealer's knowledge of

25    10(b)10 is like a criminal lawyer's knowledge that Title 18

1    is the United States Code.

2              THE COURT:  Couple of things.

3              I think I am going to say something to the jury.  I

4    think the repeated questions, despite being sustained, about

5    what discussions happened between Mr. McLellan and the

6    witness, who said nothing in any way, shape, or form related

7    to -- that could have been -- that was predicated on a

8    conversation with Mr. McLellan warrants some sort of curative

9    instruction.  I'll think of exactly how to put it and review

10   it with you in the morning before I --

11             MR. WEINBERG:  I would like Your Honor to consider

12   including in that instruction that these questions were

13   impermissible, they were far beyond the scope, and that they

14   were an unfair burden on Mr. McLellan's constitutional right

15   to rely on counsel.

16             MR. FRANK:  We object to that, Your Honor.

17             THE COURT:  I'll consider it.  I will think about

18   it, and whatever I'm thinking about I'll review with you in

19   the morning.

20             MR. WEINBERG:  Thank you, sir.

21             THE COURT:  So that resolves that aspect of that

22   issue.  Is there anything else to talk about?

23             MR. GOLDSTEIN:  In terms of scheduling, I don't

24   know how much longer Mr. Frank expects to have for this

25   witness.

```
 1              MR. FRANK:  30 minutes.

 2              THE COURT:  Okay.

 3              MR. FRANK:  Roughly.  I'm guesstimating.

 4              THE COURT:  Right.

 5              MR. WEINBERG:  Okay.

 6              THE COURT:  Then --

 7              MR. GOLDSTEIN:  Mr. Travaglini will be next.

 8              THE COURT:  How long will he be on direct?

 9              MR. GOLDSTEIN:  Shorter than Mr. Menchel.

10              THE COURT:  And cross would be similar to this

11      witness or shorter?

12              MR. FRANK:  Or shorter.  And I have -- I don't know

13      whether there are any other witnesses after that.

14              THE COURT:  That's what I was going to ask.

15              MR. WEINBERG:  Either Mr. McLellan's testimony --

16      we'll resolve that today or tomorrow morning.

17              Sean Murphy is a witness who, like Federal Special

18      Agent Trombly, would be called to read in defense exhibits

19      that we will be moving for admission sometime tomorrow.  He

20      has also done a summary that we have provided the government

21      or should have provided the government --

22              MR. FRANK:  There has been none provided, Your

23      Honor.

24              MR. WEINBERG:  It will be provided within five

25      minutes of the break.
```

1           -- that deal with his analysis of records that were
2    marked as defense exhibits.
3           Those are the likely witnesses for tomorrow.
4           MR. FRANK:  Your Honor, this is exactly the issue I
5    raised two weeks ago about these summary exhibits.  It's now
6    1:00 the day before testimony is supposed to be elicited.
7    There are apparently summary charts of I don't know what that
8    have been prepared.  There is no conceivable way that if
9    those are summaries of voluminous evidence we can be ready
10   to --
11          MR. WEINBERG:  It's not that voluminous, Judge.
12   It's -- what happens in State Street is there's daily --
13          THE COURT:  This is what I suggest, since in my
14   general experience it's best to talk about things when
15   everyone knows what they're talking about rather than before,
16   all right?
17          I don't know whether this is a summary of 150
18   million pages of documents or a summary of four pages.  And
19   therefore the scope of what -- I don't know whether it's
20   something when you read it you actually would object to or
21   whether you won't.  I understand the concern you have and --
22   but I'm not resolving it in a vacuum.  So --
23          MR. WEINBERG:  We'll discuss it.
24          THE COURT:  -- I think what you should do is you
25   should -- with respect to Mr. Murphy, it strikes me there's

1   two areas.

2          One is there are documents you're proposing to

3   admit.  To the extent you haven't identified the specific

4   ones you want, identify them.  If there's no dispute, either

5   they're already in -- if there is no dispute as to their

6   admission, that seems straightforward enough.

7          If there's a dispute as to admission, then what I

8   suggest that all of you do is sometime you either ECF file or

9   otherwise transmit to me those documents that are at least in

10  dispute so I can read them before we convene in the morning

11  so that I can hear you about whatever disputes there are as

12  to the exhibits.

13         And as to the summary, I think you need to turn it

14  over to him, like, immediately.  And then you look at it and

15  then you see what it is, and if there's an issue, then

16  provide a copy of it to me as well as to that so I can look

17  at it and then I'll address it.

18         MR. WEINBERG:  Thank you, Your Honor.

19         THE COURT:  I just don't know.  It could be so many

20  different things -- I don't know anything about it -- that it

21  just depends.  So I think it's best if you look at it first

22  and then I'll hear whatever objections people have, if any.

23         MR. WEINBERG:  It's something a paralegal can run

24  through the documents in about an hour and see that the chart

25  is correct.  But I will provide all the information to

1    Mr. Frank as soon as we break.

2         MR. FRANK:  So are we no longer calling the British

3    experts?

4         MR. WEINBERG:  Not tomorrow, no.

5         THE COURT:  So tomorrow is the rest of this expert,

6    Mr. Travaglini, Mr. Murphy.

7         Mr. Murphy's testimony, at most, is reading

8    essentially exhibits that are offered and admitted into

9    evidence and identifying a summary chart that's admitted into

10   evidence and describing whatever, how he formed it?

11        MR. WEINBERG:  Yes, with the potential for

12   Mr. McLellan's testimony.  That will be tomorrow.  And we'll

13   be making final decisions on whether we're calling in our

14   case in chief experts three and four as soon as we break.

15        THE COURT:  All right.  I'll see you all tomorrow

16   at 8:30.  Thank you.

17        COURTROOM CLERK:  All rise.  This matter is

18   adjourned.

19             (Court in recess at 1:07 p.m.)

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

We, Rachel M. Lopez and Kelly A. Mortellite, Certified Realtime Reporters, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 19th day of June, 2018.

/s/ RACHEL M. LOPEZ

/s/ KELLY A. MORTELLITE

_____
Rachel M. Lopez, CRR
Kelly A. Mortellite, RMR, CRR
Official Court Reporter