1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3    - - - - - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA,                :

5            Plaintiff,                       :    Criminal Action No.
                                                   1:16-cr-10094-LTS
6        v.                                   :

7    ROSS MCLELLAN,                           :

8            Defendant.                       :

9    - - - - - - - - - - - - - - - - - - x

10

11        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                            JURY TRIAL
13                            Day 12

14

15
                     Wednesday, June 20, 2018
16                         8:48 a.m.

17

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

1                    **A P P E A R A N C E S**

2    On behalf of the Plaintiff:

3         UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
          BY:   STEPHEN E. FRANK
4         John Joseph Moakley Courthouse
          One Courthouse Way, Suite 9200
5         Boston, Massachusetts  02210
          (617) 748-3244
6         stephen.frank@usdoj.gov

7
          UNITED STATES DEPARTMENT OF JUSTICE
8         BY:   WILLIAM JOHNSTON
          1400 New York Avenue, Northwest
9         Washington, D.C.  20005
          (202) 514-0687
10        william.johnston4@usdoj.gov

11

12   On behalf of the Defendant:

13        MARTIN G. WEINBERG, P.C.
          BY:   MARTIN G. WEINBERG
14        20 Park Plaza
          Suite 1000
15        Boston, Massachusetts  02116
          (617) 227-3700
16        owlmcb@att.net

17
          LAW OFFICES OF ROBERT M. GOLDSTEIN
18        BY:   ROBERT M. GOLDSTEIN
          20 Park Plaza
19        Suite 1000
          Boston, Massachusetts  02116
20        (617) 742-9015
          rmg@goldstein-lawfirm.com
21

22        LAW OFFICES OF MAKSIM NEMTSEV
          BY:   MAKSIM NEMTSEV
23        20 Park Plaza
          Suite 1000
24        Boston, Massachusetts  02116
          (347) 251-4800
25        mentsev@gmail.com

```
1                      P R O C E E D I N G S
2              (In open court.)
3              THE DEPUTY CLERK:  The United States District Court
4    for the District of Massachusetts is now in session, the
5    Honorable Leo T. Sorokin presiding.
6              Today is June 20th, the case of United States vs.
7    Ross McLellan, criminal action 16-10094 will now appear
8    before this court.
9              THE COURT:  I see all counsel, please be seated,
10   and Mr. McLellan.  I'm just reading those exhibits.  I'm
11   sorry I'm late.  So a couple things before we get to that.
12   First, I received the e-mail from the jury clerk this morning
13   that one of the jurors yesterday, after leaving court, fell,
14   and is seeing a doctor today and can't come in, so he won't
15   be here.  So the two options, I could excuse the juror and we
16   could proceed, or we could wait another day.  My inclination
17   is to excuse the juror and proceed, because by my
18   calculation, we finish the evidence in this case, hope
19   springs eternal, sometime between today and Monday and so we
20   have four alternates.  But I've -- you can see the -- this
21   e-mail, which would identify which juror it is, but I'm not
22   going to read it aloud, because it has his name.
23             So Maria, you can show this to them, just so they
24   know what I know.
25             THE DEPUTY CLERK:  Sure.
```

1          THE COURT:  Ms. Simeone reminds me we don't have

2     four alternates, we have three.

3          THE DEPUTY CLERK:  I think he's the one in the

4     middle.

5          (Counsel confers.)

6          MR. WEINBERG:  If Your Honor please.  What would

7     the Court's practice be if there was to be a substitution of

8     an alternate?  Would the alternates be chosen at random, or

9     is there a specific alternate that comes?

10         THE COURT:  There would be a specific.  It would be

11    the -- I can't remember now, where -- because there's only

12    three, which seat is empty.  I don't have that in my mind,

13    but it would be the lowest seat number alternate, I would

14    ordinarily go in that order would be my practice, so it would

15    be whoever is in seat seven and then if that -- we use that

16    alternate, it would be seat 8, and then 13 and 14.

17         MR. WEINBERG:  Okay.  Thank you, Your Honor.

18         (Counsel confers.)

19         MR. GOLDSTEIN:  Can we have a few moments, Your

20    Honor?

21         THE COURT:  Yes.

22         MR. FRANK:  Your Honor, could I have a second to

23    run to the restroom while they're --

24         THE COURT:  Of course.  Yes.

25         (Court in recess at 8:53 a.m.

1          and reconvened at 8:55 a.m.)

2          THE COURT:  All right.  Have you all had sufficient

3     time to talk about the juror issue?

4          MR. WEINBERG:  We have, Your Honor.

5          THE COURT:  What's your perspective views?

6          MR. WEINBERG:  Our view is that we should maintain

7     the jury of 12 that we have and spend this day arguing the

8     many legal issues that have emerged in the case.  I still

9     think we'll finish the evidence this week.  I think it's not

10    likely that we'll need that extra day for the testimony that

11    was conditional and I'm confident that with two full days,

12    Thursday and Friday, we'll complete the evidence.

13         MR. FRANK:  The Government is content to substitute

14    the alternate juror, Your Honor.

15         THE COURT:  So would it be fair to say, Mr. Frank,

16    you're fine to substitute the alternate juror.  You don't

17    object to some desire to keep moving, obviously, but there's

18    no -- I'm not saying I agree with that.  I'm just thinking

19    about -- I'm trying to figure out --

20         MR. FRANK:  If you're asking the Government's

21    position, the Government's position is we object to delaying

22    the proceedings for that purpose.

23         THE COURT:  All right.  Well, let me do this -- in

24    the meantime, why don't you both -- I just have one copy, I

25    apologize.  This is the curative instruction I'm going to

```
 1   give.  Ms. Simeone, you can just show it to them.  I need it
 2   back, because it's my only copy.  I'll give you two minutes
 3   to look at it.  We'll stand in recess for two minutes.
 4              THE DEPUTY CLERK:  This matter is in recess.  All
 5   rise.
 6              (Court in recess at 8:57 a.m.
 7              and reconvened at 9:10 a.m.)
 8              THE DEPUTY CLERK:  The McLellan matter is back in
 9   session.
10              THE COURT:  Can I have the jury instructions back?
11              Please be seated.
12              So first to the -- I have a couple of questions for
13   you about the juror question before I resolve that.
14              MR. WEINBERG:  Yes, Your Honor.
15              THE COURT:  So I think I'd like to talk to you at
16   sidebar.
17              (The following discussion held at the bench.)
18              THE COURT:  So before I decide, I want to know the
19   universe of what's left.
20              MR. WEINBERG:  Okay.
21              THE COURT:  I know that what's left is the
22   cross-examination of this expert.
23              MR. WEINBERG:  Yes.
24              THE COURT:  Half an hour, at most, about.  Maybe
25   there's redirect.
```

```
1                    MR. GOLDSTEIN:  Short, if any.

2                    THE COURT:  But I would think not much of anything.

3                    MR. GOLDSTEIN:  Five minutes.

4                    THE COURT:  And then there's your next expert.

5          He's pretty similar to this expert.  So he's an hour.

6                    MR. WEINBERG:  Shorter, I would think, than this

7          expert.

8                    THE COURT:  Right.  And then there's these

9          exhibits, even if I overruled every Government objection and

10         they all came in, basically, it's just reading them in.  I

11         don't know if it's 15 minutes or an hour, but it's not that

12         long.

13                   MR. WEINBERG:  Yes.

14                   THE COURT:  There's not a lot.  So then if

15         that's -- so I guess the question is, what else is there?

16                   MR. WEINBERG:  The only other evidence would be if

17         the Government continues an authenticity challenge to a text

18         that came from Mr. McLellan's phone.  We would want to call

19         the -- well, the guy that imaged it, whether that's outside

20         the jury's presence, whether or not, as the Court's

21         rulings --

22                   THE COURT:  So the most -- other evidence that

23         might come in, something in the nature of authentication

24         evidence or keeper of the records with respect to that.

25                   MR. WEINBERG:  Just ten minutes to --
```

```
 1              THE COURT:  No other character witnesses.  You
 2     don't anticipate --
 3              MR. WEINBERG:  No, I do not anticipate the
 4     defendant testifying and the corollary is we're not
 5     calling --
 6              THE COURT:  The character witnesses --
 7              MR. WEINBERG:  -- character witnesses.  And I've
 8     given you a full list of defense witnesses.
 9              THE COURT:  So if we proceed today, we finish your
10     evidenced today, and if we proceed tomorrow, we finish your
11     evidence tomorrow.
12              MR. WEINBERG:  Definitely.  For sure.
13              THE COURT:  So then rebuttal, you have what?
14              MR. FRANK:  Well, if that exhibit comes in, which
15     we strongly believe it should not, we believe we're going to
16     need a delay in the proceedings to potentially obtain a
17     Mr. Walker to testify.  The other person on the end of the
18     purported texts.
19              THE COURT:  All right.  So.
20              MR. FRANK:  If not --
21              THE COURT:  Let's talk about the universe in terms
22     of --
23              MR. FRANK:  And then there would be Mr. Dixon,
24     potentially.
25              THE COURT:  So the potential universe, for your
```

1    rebuttal evidence, if they got everything -- I resolved these

2    objections and they got everything, which is the greatest

3    universe, you would have possibly Mr. Dixon, you'd have to

4    decide whether you're going to call him or not, and then deal

5    with the objection.  You would have possibly a compulsion

6    order and putting aside the timing question of getting him,

7    his testimony would be relatively short.

8              MR. FRANK:  Okay, I think his testimony could be

9    easily an hour.

10             THE COURT:  About that one text?

11             MR. JOHNSTON:  No, it would be about --

12             MR. FRANK:  It would be about his involvement in

13   the AXA scheme, Your Honor.

14             MR. WEINBERG:  We're not opening --

15             MR. FRANK:  Oh, yes.  We believe it's opening the

16   door to his involvement in the fraud.

17             MR. WEINBERG:  Well, we don't.

18             MR. FRANK:  If that text is being presented -- I

19   don't know if Your Honor wants to hear about the text right

20   now.

21             THE COURT:  Just the -- so basically your view.  I

22   know the --

23             MR. FRANK:  My view is his testimony would be

24   fairly extensive.

25             THE COURT:  Because it would open the door to more,

1    in which case, if you got everything --

2              MR. FRANK:  His knowing and intentional involvement

3    in a fraud.

4              THE COURT:  And so it would be like an hour

5    testimony.

6              MR. FRANK:  And then we would probably want to

7    call -- if we did that, we would probably want to call one or

8    two -- recall one or two corroborating witnesses, Jim Kelly

9    from AXA, and Kristen Morris from State Street.  Their

10   testimony would be short, but it would corroborate what

11   Mr. Walker would testify about his actions.

12             THE COURT:  So your rebuttal, is a -- putting aside

13   the text, your rebuttal is, at most, Dixon.  Or it's

14   somewhere between --

15             MR. FRANK:  Putting aside the text, at most Dixon.

16             THE COURT:  And Dixon is about how long if you were

17   to do him?

18             MR. FRANK:  30 to 40 minutes.

19             THE COURT:  Okay.  And so -- and if their -- so

20   bottom line is, if we didn't have court today, it's possibly

21   we finish the trial tomorrow, even with all the -- even if

22   they get everything and you get everything, putting aside the

23   timing question about Walker.  The timing of getting Walker

24   and it's possible that it spills into Friday.

25             MR. FRANK:  Well, I think the --

```
 1              THE COURT:  Probably it spills into Friday.
 2              MR. FRANK:  It's highly unlikely I would be able to
 3     get Mr. Walker by tomorrow.
 4              THE COURT:  I meant putting aside the question of
 5     getting him, assuming he were here.
 6              MR. FRANK:  If I get what I want on his direct
 7     examination, the cross-examination, I think, is probably
 8     going to be equal in duration.
 9              THE COURT:  So basically --
10              MR. FRANK:  I think it could be a couple of days.
11              THE COURT:  So it could be Thursday and Friday, I
12     can't see how it goes past Friday, two days.
13              MR. WEINBERG:  I just find the proposition that a
14     single text from Mr. McLellan, after the fact, telling him
15     what the amount of revenues are will allow us to retry AXA.
16              THE COURT:  Scope, we'll talk about later, so
17     that's -- the most is what you've described.  So the most
18     is -- so like fairly, if everybody got everything.  I'm not
19     saying everybody is getting everything.  I think you both
20     should assume that you're unlikely to get everything you
21     want.  But putting that aside, this being not that different
22     from the rest of life, that would mean that we could finish
23     the evidence in two days, I think, would be more than
24     realistic, Thursday, and Friday, and then we -- would that be
25     unrealistic?
```

1          MR. FRANK:  I think two days may be realistic, Your

2    Honor, but I don't think Friday is realistic, if that text

3    comes in, giving the other issues.

4          THE COURT:  The timing -- so two days would be

5    realistic.  The practical problem would be getting Walker.

6          MR. FRANK:  Correct, and getting a compulsion

7    order.

8          THE COURT:  So what would you need to do that?

9          MR. FRANK:  I need US Attorney approval, which I

10   can get pretty quickly.  I need an --

11         THE COURT:  And when you say a compulsion order,

12   you mean an immunity order?

13         MR. FRANK:  Correct.  I need fraud section

14   approval.  I need OEO approval and --

15         MR. JOHNSTON:  And then it goes to the back.

16         MR. FRANK:  And there would need to be

17   communication with Mr. Walker and his lawyers, but all of

18   that.

19         THE COURT:  So Walker is not -- he's testifying not

20   voluntary just through the subpoena.

21         MR. FRANK:  Not without immunity.  He's been

22   charged on a complaint with the AXA fraud.  He has proffered

23   about the AXA fraud.  And just to make clear, he has

24   testified -- he has proffered, that -- as counsel knows, that

25   when AXA called, the call that's referenced in the text --

1    first of all, he's proffered that he was knowingly and

2    intentionally involved in a fraud with respect to AXA.

3              THE COURT:  All right.

4              MR. FRANK:  He has specifically proffered that when

5    he received the call referred to in the text from AXA, he

6    responded to them by lying.  That is corroborated by Kristen

7    Morris.

8              THE COURT:  All right.

9              MR. FRANK:  And by --

10             THE COURT:  So the timing issue for you and that

11   would take you --

12             MR. WEINBERG:  I don't know how that rebuts

13   a truthful --

14             THE COURT:  Different question, but that would take

15   you anywhere more than a day, getting the Washington people?

16             MR. FRANK:  Yes.

17             THE COURT:  Even with Mr. Johnston on the team?

18             MR. FRANK:  It could.

19             THE COURT:  Right.  Okay.  All right.  Okay.

20             I'm still inclined to -- on balance, this is what

21   I'm going.  I'm going to bring the jurors in.  My assessment

22   of the e-mail, which is all I know about the jurors' problems

23   are that that seems like in the nature of the things that

24   likely a person would be able to serve tomorrow, because he's

25   just going to the chiropractor.  He's not going to the

1    emergency room, he's not going to a surgeon, what have you.

2    I'm not waiting more than one day and I wouldn't be waiting

3    if I didn't think we could reasonably conclude it.  And so

4    what I'm going to do then is not now excuse that juror.  I'm

5    just going to bring the jury in, explain to them that what

6    we're --

7             MR. FRANK:  I'm sorry, Your Honor, there's one

8    other issue.

9             THE COURT:  Sure.

10            MR. FRANK:  Mr. Dixon has to leave by the end of

11   the week.  He's been here all week.  So we may need to, in

12   order to get him home, if he's going to testify in

13   rebuttal...

14            THE COURT:  He could testify Friday.

15            MR. FRANK:  If he could testify Friday, I think

16   that would be no problem.

17            THE COURT:  Yeah, that's not a problem.

18            MR. WEINBERG:  I don't see any way, Judge, our case

19   lasts more than two or three hours, maximum.

20            THE COURT:  Right.  I don't, either.

21            Okay.  So fine, then I'm going to bring them in.

22   I'm going to tell them that one person is injured.  What I

23   know now, I think it's the nature of an injury that is for

24   one day and he'll be back tomorrow.  If he's not able to be

25   back tomorrow and we're going to proceed without him.  That

1       it's been two and a half weeks and so it seems best to wait.

2               And so we'll do that, so I thank them for their

3       patience and we'll take care of things so we can keep moving

4       expeditiously and we'll remain on track to get them the case

5       no later than what I told them, which was early next week.

6               And then I'm not going to give the curative

7       instruction now, because if he's on the jury, he won't have

8       heard it until -- whatever curative instruction I give,

9       whatever views you have, I can hear you later.  We can give

10      that -- whatever the nature of his injury is, if he can't

11      come tomorrow, then we'll proceed tomorrow without him.

12      We'll excuse him and I'll move in the alternate in the form

13      that I say.

14              MR. WEINBERG:  Thank you, Your Honor.  And we'll

15      have an opportunity afterwards to discuss the legal issues.

16              THE COURT:  Yeah, I'll talk to you -- I have

17      nothing else between now and 1 o'clock but you.

18              (Bench conference concluded.)

19              THE COURT:  All right.  Maria, go get the jury.

20              (The jury enters the courtroom.)

21              THE COURT:  Good morning, ladies and gentlemen.  I

22      trust nobody discussed the case with anyone else, did any

23      independent research, followed my instructions.  Correct.

24      Good.

25              So let me explain why we're late and what's been

1     going on.  As you probably already have figured out, one of

2     you is not here today.  And so I learned this morning that

3     the juror who is missing had a minor accident yesterday.  I

4     think, from what I understand, I haven't spoken to the juror,

5     it sounds like he's fine, but he has to go to the doctor

6     today.  And so we've been discussing the schedule and what to

7     do about that.  And that's why we're running a little late.

8     I didn't -- we didn't learn about all of this until just a

9     few minutes before 9 o'clock.

10          So here's what we're going to do today and it's a

11    little bit inconvenient for all of you and I apologize, but

12    let me explain why we're doing this.  And we're going to

13    adjourn now for the day, because one of your number is not

14    here.  And based on what I understand, I think he'll be here

15    tomorrow.  And so I don't think -- if it was the --

16          First of all, fortunately, it's not the kind of

17    accident, from its description, that's serious or anything

18    like that.  And if it were, we would -- we would be worried

19    about the individual.  But in the case, we would -- we would

20    have to proceed -- we wouldn't delay the case for weeks or

21    anything like that.  But for one day, it seems reasonable.

22          So what we're going to do is adjourn for today.

23    You go on your way, free day, not here, and we'll resume

24    tomorrow morning at 9:00 a.m. for sure.  You can count on

25    that, without any doubt whatsoever.

1        But in the meantime, I've also been talking to the

2    lawyers as obviously, you know, we're nearing the end of the

3    case as scheduled, so let me update you on that.  I told you

4    originally that you'll get the case no later than next

5    Thursday.  And then at the end of last week I updated you and

6    said no later than early next week.  And so for sure, you're

7    going to receive this case, no later, even without sitting

8    today, for sure, you're going to receive this case no later

9    than early next week.  And it's quite possible that you will

10   receive it much earlier than that.  All right?

11        So that was the other thing that I wanted to talk

12   to the lawyers about, because I want to make sure that we're

13   on or ahead of schedule and we are.  So you needn't worry

14   about that.  So tomorrow's schedule, we will have court, and

15   it will be 9:00 to 1:00.  Because we're nearing the end, let

16   me just tell you generally how the schedule is going to work

17   for the rest of the case, so you understand.

18        When we're receiving evidence day-to-day, 9:00 to

19   1:00, when that's done.  When we're done with the evidence,

20   then we turn to closing arguments, and my final instructions

21   to you on the law, which will be detailed and explained to

22   you, all of the law that you will need to know to apply in

23   this case.  So the day that that happens is the day that I'll

24   ask you to stay past 1 o'clock.

25        And that's when the closing arguments, final

1    instructions, and then you'll go to the jury room, we'll give

2    you the exhibits, and you'll commence your deliberations.

3    That's when I'll ask you to stay past one and day-to-day

4    thereafter, all day, for your deliberations.  I will give you

5    advanced notice of that.

6            In other words, you won't find out tomorrow at

7    12 o'clock, oh, we're having closing arguments now and you're

8    staying the whole day.  It's not going to work that way.  You

9    will have at least one-day advanced notice and hopefully

10   two days advanced notice of the day on which you'll have to

11   stay -- the day that I'll be asking you to stay after

12   1 o'clock.  So tomorrow you won't be.  Tomorrow will be 9:00

13   to 1:00.  All right?  And I'll probably start updating you

14   day-to-day as to where we are, so you have an idea.  So

15   we're -- even losing this day, we're ahead of schedule, and

16   you're going to get this case soon, no later than early next

17   week and quite possibly earlier than that.  All right.

18           So I apologize for this inconvenience, but I've

19   thought about it and I think on balance, we've spent a lot of

20   time in the case, you've all spent a lot of time, and the

21   most sense, in terms of doing this fairly and efficiently,

22   but considering all the considerations, is to adjourn for the

23   day.  It's a beautiful day out.  And we'll resume tomorrow

24   morning at 9:00 a.m.  Rest assured, in terms of the schedule,

25   we're on or ahead of schedule.  All right?

1          So don't discuss the case among yourselves, don't

2     discuss with anyone else, don't do any independent research.

3     And I appreciate you coming in today and your devotion every

4     day and so I thank you very much.  I will see you tomorrow

5     morning when we resume, for sure, at 9:00 a.m.

6          All rise for the jury.

7          (The jury exits the courtroom.)

8          THE COURT:  So as we go through it, any issues on

9     the curative instruction?

10         MR. WEINBERG:  We would request that Your Honor

11    make clear, first, that the questions at issue came from the

12    prosecutor.  And two, we would ask the Court to consider

13    putting before the word "questions," that the questions were

14    improper.  In other words --

15         THE COURT:  So let me just -- I might reference,

16    especially given the two-day lag, that Mr. Frank asked the

17    questions.  I'm not going to say improper, it's implied by

18    sustained.  I don't think -- and I say it for the record, so

19    the record is clear, to the extent this issue arises later.

20    I don't think that there was anything intentional about what

21    Mr. Frank did.  I believe that it was inadvertent.  I don't

22    think he was in any way intending to comment on the

23    defendant's right to remain silent or right to testify.

24         I make that finding both based on my assessment of

25    Mr. Frank's conduct throughout the course of the case, but

 1   also his demeanor and his expression when the issue was

 2   raised.  I think that it was -- his response was sincere and

 3   I don't think that there was anything intentional about it.

 4   So I think that the -- it's fair to say, at the end of --

 5   it's not going to be yesterday, but at the end of the day

 6   Tuesday, a number of questions --

 7            MR. FRANK:  Your Honor, if we could at least make

 8   it the Government, as opposed to --

 9            THE COURT:  Yes.

10            MR. FRANK:  Just as a -- I very much appreciate

11   Your Honor's comments.  As a factual matter, there were two

12   questions prior to the objected-to questions, that were

13   neither objected to and obviously not sustained.  Those were:

14            "Have you spoken with the defendant in preparation

15   for your testimony today?

16            "Answer:  No.

17            "Question:  You've never spoken with the defendant?

18            "Answer:  No."

19            THE COURT:  I'm just going to strike it all,

20   because I just don't think it really is relevant.  They're

21   not arguing -- I don't see that it's particularly material.

22   I think the only way I'm going to change the curative

23   instruction is, say, at the end of the day Tuesday, I heard a

24   number of questions by the Government during

25   cross-examination asking Mr. Menchel, and then the rest will

1    be the same and I think that's it.

2            I'm not getting into being improper.  I'm not

3    getting any intent thing, because I don't think there was

4    anything intentional about it at all.  I don't have any

5    ambiguity in my mind about that whatsoever.  And so I'll

6    leave it at that.

7            MR. FRANK:  Thank you, Your Honor.

8            THE COURT:  All right.  That's the curative

9    instruction.

10           Maria?

11           (The Court and the deputy clerk confer.)

12           THE COURT:  Just so you know, I've instructed

13   Ms. Simeone to have the jury office reach out to the juror,

14   both to explain to the juror we expect to see him tomorrow

15   morning at 9:00 a.m., or in time to resume at 9:00 am.  And

16   if there's any reason, either in the course of the day, or

17   after the doctor's appointment, that causes him to believe he

18   won't be able to be here tomorrow, he's to let us know as

19   soon as possible, so we know.  Because one way or another,

20   with or without him, we'll proceed tomorrow.  And if I hear

21   anything about that, either way, or in any form, I'll let you

22   know.

23           All right.  That brings us to --

24           MR. WEINBERG:  Would Your Honor consider, so we're

25   not inviting the juror to think that it's discretionary

1    whether or not he comes tomorrow, to say something like,

2    we're continuing tomorrow and we expect to see you --

3            THE COURT:  Yes, I told Ms. Simeone, you should

4    tell him that we're -- we didn't sit today, because he's not

5    here.  We're continuing tomorrow.  And if there's any medical

6    problem, he should let us know.

7            MR. WEINBERG:  To please let us know.

8            THE COURT:  Yes.  That's essentially -- all right.

9            With respect to the exhibits, they fall into two

10   categories, I think, the -- so Exhibit Number 553 is in one

11   category.  And all the others, in a general matter, fall into

12   the other category.  So let me just -- I have a suggestion

13   about 553.  And my understanding, essentially, is that the

14   Government got it yesterday, that the Government paralegals

15   were working very hard yesterday going through it.  I don't

16   know whether that -- you're done with that process or not.

17           But given that we're not sitting today, my thought

18   on 553, rather than addressing it now, since what it appears

19   to me to be is a summary of records from State Street about

20   revenue in some fashion and that there could be issues in the

21   nature of just potentially mistakes that the parties might

22   resolve and agree upon.  There could be issues about

23   clarification, that some discussion -- and there could be

24   issues that the parties disagree on, that are

25   characterization that might not go to -- that might go to

1  both fair admissibility and fair cross-examination, or there

2  could be some other issues.

3          But probably the most useful thing to do was -- as

4  to that one, is put it aside, and hear from you later today.

5  I'm happy to see you again later today to resolve any issues

6  about it.  Then you've had more time to look at it and go

7  through it, and to the extent that you identify an error,

8  like if you think it is an error and you tell them and they

9  will either -- I assume they'll either say you're right and

10  fix it, which might resolve it.  Or they'll say, no, this is

11  why it's not an error and it might cause you to say oh, it

12  isn't or no, you're wrong, or whatever.  And then I'll decide

13  it.  So my thought would be to give you some time and then

14  see you at a hearing this afternoon about that one.

15          MR. FRANK:  That's fine, Your Honor.  We do have a

16  relevance objection to it, as well.

17          THE COURT:  Am I correct that this is a summary of

18  revenues of the transition management unit, day-to-day,

19  during that period of time?

20          MR. WEINBERG:  No, Your Honor.  It's close.  It's

21  a -- it's a daily -- it comes from daily revenue reports that

22  we received in evidence from the Government that originated

23  at State Street that are routine business records.  They

24  generate daily revenue reports on a daily basis.  I don't

25  know that we got 365, or one for each business day, but every

1    one we got, we had Mr. Murphy review.

2            What it is is the daily revenue report, only the

3    line that deals with the FX desk.  The FX desk, you know,

4    received the transition management referrals, traded FX as an

5    affiliate of State Street.  The Government argued --

6            THE COURT:  Does the number represent the amount of

7    FX trading, or the amount of profit or loss?

8            MR. WEINBERG:  The amount of profits.  The point of

9    the demonstration -- and I quite frankly think it could also

10   come in by testimony -- how many days' revenues did you look

11   at?  400.  How many days did FX show a loss?  Four.  The

12   point is that it's not an ordinary money market maker that

13   wins or loses 60 percent of the time.  FX almost always wins

14   and it ties back to the notion that, at the time of the

15   transitions, when there was a decision whether or not

16   nondisclosed fixed income revenue was lawful, consistent with

17   contract, consistent with State Street practices, there was

18   testimony that we did it on FX, the lawyers agreed that FX

19   was appropriate in Europe, and that was one of the bases for

20   the -- Mr. Pennings' decision that it was lawful in Europe.

21           THE COURT:  Just in terms of relevance.

22           MR. FRANK:  So it's a different business unit.

23   It's not limited to FX revenue derived from transition

24   management.  It combines various different forms of FX

25   revenue, from various different types of FX trading.  And the

1    fact that the --

2            THE COURT:  So this is the -- in your view, this

3    line item, putting aside how -- you know, whether it is

4    summarized correctly or not, but in your view, this line item

5    is a summary of what the FX desk did, which would encompass

6    FX trading for transition management, to the extent they had

7    any that day and FX trading for -- other FX trading totally

8    unrelated.

9            MR. FRANK:  That is my understanding, Your Honor,

10   unless counsel wishes to correct that understanding.  That's

11   my understanding.  It's also my understanding that there are

12   various different forms of FX trading involved here, not one

13   form of FX trading.  And furthermore, that the relevance is

14   further undermined by the fact that the FX, as a whole, made

15   money from trading for various different clients or for its

16   own account on different days, is not relevant.

17            If there were any relevance at all, which I

18   dispute, it would be whether they made or lost money for

19   particular clients on a consistent basis, or on particular

20   trades for a consistent basis.

21            Obviously, the unit as a whole is --

22            THE COURT:  The question is is the line item FX

23   revenue arising out of transition management, or all FX

24   revenue from whatever form?

25            MR. WEINBERG:  FX revenues, because the --

1          THE COURT:  From whatever form.

2          MR. WEINBERG:  -- there's no way they break out the

3     profits from the transition management clients.

4          THE COURT:  I got it.  Let me think about that.

5          MR. WEINBERG:  There's no way we've been able to

6     discern that they break out the profits from transition

7     management clients.  The relevance, Judge, is that the

8     Government tries to, you know, extinguish the relationship

9     between nondisclosed FX, nondisclosed fixed income by arguing

10    that as to FX, we're a market maker, we're at risk.  And that

11    the only purpose of this and the only place it would be

12    argued is that FX, you know, is a market maker in name, but

13    in fact, on 300 out of 304 days, it made a profit.  So that's

14    the --

15         THE COURT:  Let me think about it in terms of

16    relevance, in terms of the other issues that relate to it, I

17    have the hearing --

18         What time is the hearing today, Maria?  2:30?

19         THE DEPUTY CLERK:  2:30.

20         THE COURT:  2:30?  I have a 2:30 hearing on a

21    summary judgment matter, so I'm happy to hear you on other --

22    the other issues relating to this exhibit after that.

23         MR. FRANK:  And I would say, Your Honor, that, if

24    it comes in through a summary witness, then it opens the door

25    to rebuttal testimony about the FX business.

```
 1              THE COURT:  I guess my view would probably be it
 2    might open the door to how the -- what kind of -- how the FX
 3    business makes money and what that number represents and the
 4    different sources it comes from and the like, but not
 5    everything about FX.
 6              MR. FRANK:  Stipulated.
 7              THE COURT:  It strikes me that would be pretty
 8    narrow.
 9              MR. FRANK:  We agree with that.
10              THE COURT:  Okay.  All right.  That brings us to
11    the other exhibits.  So I think I understand, by and large,
12    why you're offering them and why you're objecting.  There's
13    some I have a question about.  So what my inclination would
14    be is to just run through my thought, either tell you what I
15    think, and stop on the ones that I have questions at, and
16    then if you want to be heard further on it, then I will.
17              So 530 was objected to on relevance and hearsay.
18    I'm inclined to overrule those objections and allow it in.
19    532, I had a question about why is this relevant and why
20    isn't it hearsay?
21              MR. WEINBERG:  Its relevance to is that there was
22    an concession made by State Street to FedEx, which was having
23    a business dispute with State Street.  They conceded it, and
24    as a result, they very shortly thereafter got the custody
25    business of FX.
```

1          THE COURT:  How is the jury going to know

2    anything -- so your point is that they make an accommodation

3    to a customer, separate and apart -- the customer is always

4    right theory?

5          MR. WEINBERG:  Yes.

6          THE COURT:  And as a result of that accommodation,

7    then they got a big chunk of business from that customer.

8          MR. WEINBERG:  And Mr. McLellan knew it.

9          THE COURT:  But how is any of that displayed in

10   this e-mail?  Assuming that, for the moment's sake of

11   discussion, that that -- evidence about all of that were

12   relevant for this point, this doesn't really -- why isn't

13   this --

14         MR. WEINBERG:  It's not as tight as some of the

15   other connections.  I think there's a single e-mail about a

16   business dispute and a second e-mail about State Street

17   gaining custody that is not --

18         THE COURT:  I think it's just one e-mail.

19         MR. WEINBERG:  I don't know that the second one is

20   being objected to.

21         THE COURT:  Oh, I see.  I haven't read that one.

22         MR. WEINBERG:  And I think that's a single

23   sentence, if I recall it correctly, that says State Street

24   won the FX custody business, or words to that effect.

25         MR. FRANK:  I'm not sure what e-mail you're

```
 1    referring to there that I didn't object to.
 2              THE COURT:  In any event, this one -- the
 3    objection, 532, is sustained.
 4              533, same question about relevance and hearsay.
 5              MR. WEINBERG:  There's a series of e-mails that we
 6    seek to put in that demonstrate two things.  One is that Mr.
 7    McLellan was aware that Mr. Pennings was communicating with
 8    legal in UK.  He was frustrated, but instead of ignoring
 9    legal in UK, he, Pennings, and Mr. McLellan, elevated the
10    issues to Mr. Woodard, who's the global legal head of State
11    Street Global Markets.  It demonstrates --
12              It's relevant to Mr. McLellan's state of mind that
13    legal is not being ignored.  That when Pennings had issues
14    with legal, he raised them either with Mr. McLellan, who
15    raised them with Mr. Woodard, or Mr. Pennings raised them
16    with Mr. Woodard.  At the conclusion of this chain of events,
17    Herbert Smith, the outside counsel, is hired to assist.
18    Mr. Pennings meets with Herbert Smith, as well as the
19    in-house lawyers during the meeting where they review the
20    template contract.  Mr. Pennings makes disclosures to them.
21              THE COURT:  But who's going to say -- so you're
22    saying this goes to his -- defendant's state of mind.
23              MR. WEINBERG:  Yes.
24              THE COURT:  And Mr. Pennings' state of mind that
25    they're both willing to elevate -- elevate issues that might
```

1    touch on legal to Mr. Woodard.

2          MR. WEINBERG:  It's mostly -- it ties to an e-mail,

3    January 20, 2011, which is partially redacted, where

4    Mr. Woodard is saying to Mr. Pennings, he's setting down the

5    rules.  Which is that whenever there is any change with the

6    contract, you need to go through UK legal.  That's

7    January 2011, prior to the Royal Mail contract, prior to the

8    Eircom event.  And relevant to Mr. McLellan, who is

9    monitoring this dialogue, who is participating in it, and

10   who, therefore, has a state of mind that Mr. Pennings, rather

11   than circumventing or ignoring UK legal, is being told all

12   these contracts need to get reviewed by UK legal.  And that

13   is very relevant to his good faith, his state of mind --

14         THE COURT:  That's not this e-mail.

15         MR. WEINBERG:  It's the January 2011 one which --

16         THE COURT:  I don't have -- that one is not in

17   front of me.  533 is an e-mail from Pennings to Woodard,

18   McLellan, and Carlin --

19         MR. WEINBERG:  Yup.

20         THE COURT:  -- about a conference call and --

21         MR. WEINBERG:  Yes, this -- this one is

22   Mr. Pennings going directly to Mr. Woodard, explaining -- you

23   know, complaining about the lawyers.  Mr. McLellan

24   essentially saying don't do an idiotic thing at a meeting, go

25   through me, and it ends up going to Mr. Woodard, with Mr.

1    McLellan elevating the issue to Mr. Woodard, and it's part in

2    several e-mails that in some total are strongly supportive of

3    Mr. McLellan's good faith.

4            MR. FRANK:  Which e-mail are you referring to in

5    January of '11?

6            MR. WEINBERG:  I'll have to give you a number.

7    January 2011.

8            MR. FRANK:  Is that in evidence?

9            MR. WEINBERG:  It's either not objected to or it's

10   in this book.

11           MR. FRANK:  I don't see it in this book.

12           MR. NEMTSEV:  It's supposed to be 351.

13           MR. WEINBERG:  Which one?

14   MR. NEMSTSEV:  351.

15           MR. FRANK:  Is that in evidence?

16           MR. WEINBERG:  It's on our list and I think there

17   is maybe no objection.

18           THE COURT:  So you're saying -- 533 goes to Mr.

19   McLellan's state of mind, because it shows that he knows that

20   Pennings was talking to the lawyers, and --

21           MR. WEINBERG:  Yes.  May I hand to the Court an

22   exhibit that we identified?

23           THE COURT:  Yes.

24           MR. WEINBERG:  In our -- yesterday and the

25   Government didn't have an objection to it.

 1              MR. FRANK:  Which one is that?

 2              MR. WEINBERG:  351.

 3              MR. FRANK:  351 is not in -- I don't believe this

 4    was identified yesterday and I don't believe we didn't have

 5    an objection to it.

 6              THE COURT:  The one you just gave me is numbered

 7    351, not yet in evidence, and --

 8              MR. FRANK:  This e-mail was not identified

 9    yesterday.

10              THE COURT:  All right.

11              MR. NEMTSEV:  It's not one of the new ones.  It was

12    previously produced to you, but it was identified as --

13              MR. FRANK:  Your Honor, if it was identified, I

14    don't have that in front of me.  I didn't recognize it, so

15    I'm looking at it for the first time.

16              I thought you sent me all of the exhibits that you

17    wanted to introduce as images.

18              MR. NEMTSEV:  All the production, that had all of

19    them.

20              MR. FRANK:  That had all of the exhibits in it?

21              MR. NEMTSEV:  Yes, including the --

22              MR. FRANK:  In pdf form?

23              MR. NEMTSEV:  In pdf form.

24              MR. FRANK:  This was not in that.

25              We would object to the additional exhibit, as well,

1  Your Honor.

2  THE COURT:  All right.  So explain to me,

3  Mr. Weinberg, why, the two -- I assume this objection is the

4  same as to 351, Mr. Frank?

5  MR. FRANK:  It is, Your Honor.  And additionally, I

6  would note that Mr. McLellan -- I mean, Mr. Pennings

7  testified.  There was an opportunity for him to address these

8  e-mails had they been put in front of him.  Instead, we're

9  now without him as a witness and these are being put in

10  without his ability to comment on them.

11  MR. WEINBERG:  Well, that's not the test of --

12  THE COURT:  Right.  I guess the next question is,

13  though, why is it relevant and why isn't this hearsay.

14  MR. WEINBERG:  I think it's highly relevant.  I

15  think of the two exhibits, the last one that I gave to Your

16  Honor, 351, I think the number is the January 20 e-mail --

17  THE COURT:  I guess less in terms of relevance.  I

18  think I understand relevance, why, as to these, why is it not

19  hearsay?

20  MR. WEINBERG:  Because it goes to Mr. McLellan's

21  state of mind.  It goes directly to Mr. McLellan's belief, in

22  good faith, his subjective state of mind, this is the basis

23  for it, that legal has given a direction to Mr. Pennings and

24  there's no subsequent evidence, to Mr. McLellan's knowledge,

25  that Pennings is routinely ignoring it.

1          MR. FRANK:  Your Honor --

2          MR. WEINBERG:  And that the inference from it, is

3    that if Mr. Pennings has received this direction from the

4    very global head of legal, that he is reviewing contracts

5    with Simone Paul, Ms. Beck, or Ms. Donares (phonetic

6    spelling), the UK State Street legal officers.

7    Trustworthiness is corroborated by the fact that he went to a

8    meeting on April 11th, I think, it is -- April 7th or

9    April 11, 2011, with over four lawyers, and reviewed the

10   template contract, paragraph by paragraph.  This is a very

11   important e-mail to us in terms of Mr. McLellan's state of

12   mind.

13         MR. FRANK:  Your Honor, just briefly, statements of

14   belief are explicitly not state of mind under the rule.

15   State of mind is I'm surprised, I'm shocked, I'm

16   disappointed, not statements of belief about facts.

17            Number two, it is relevant that these exhibits were

18   identified to us for the first time yesterday, after

19   Mr. Pennings testified and is now out of the country.  Had

20   they been identified as -- had counsel sought to introduce

21   them in a timely manner, we wouldn't be having -- we wouldn't

22   be unable to respond as we are now.

23         MR. WEINBERG:  Two things, Your Honor.  One is,

24   this is not being offered for the truth of the matter stated,

25   it's not being offered under 803-3.  It is being offered

1    exclusively for the limited purpose of showing something that

2    Mr. McLellan knew.  It's relevant.

3              Second is that I have no obligation to use every

4    document that I have pro -- that the Government has provided

5    me in cross-examining Mr. Pennings.

6              MR. FRANK:  No, you're not, but you are under an

7    obligation that we're both under to identify exhibits you

8    intend to use in your case in chief prior to trial.

9              MR. WEINBERG:  And we identified many documents

10   that we intended to use.

11             MR. FRANK:  Not this one.

12             MR. NEMTSEV:  The e-mail was identified.

13             MR. FRANK:  And objected to.  It's not --

14             THE COURT:  Right, but that doesn't mean that --

15             MR. FRANK:  As to that e-mail, that's true, Your

16   Honor.  As to the other e-mail --

17             THE COURT:  The fact that they identify it, your

18   objection doesn't preclude the identification --

19             MR. FRANK:  But the other e-mail was not identified

20   until last night.

21             THE COURT:  Right.  Just to be clear.

22             MR. WEINBERG:  Mr. Goldstein reminds me that this

23   procedure was seeking to use, with Mr. Murphy, and through

24   the introduction of exhibits that go to state of mind.  The

25   Government did much of the same when they had an FBI agent

1    receive --

2            THE COURT:  I'm going to allow 533 and 351, not for

3    the truth of the matter asserted, and when they come in --

4    I'm happy to explain that to the jury, but just to show

5    things that were known to Mr. McLellan at the time, or were

6    told to him.

7            534 strikes me as the Government's objection is

8    sustained and it's out.

9            535, in as to -- not for the truth, but just as to

10   Mr. Pennings' state of mind.

11           MR. WEINBERG:  Judge, could I stop you at 534 and

12   just make a short statement?

13           THE COURT:  Yes.

14           MR. WEINBERG:  That the relevance of 534 is, again,

15   Mr. McLellan's state of mind, telling Mr. Puth, his immediate

16   superior, in the aftermath of the KIA -- right before the KIA

17   transaction, the KIA 121, Puth is going to London.

18           Mr. McLellan is saying, "I'm sure Ed will give you

19   the details."

20           I mean, that's -- his state of mind is there's

21   nothing to hide.  I'm confident, Mr. Puth, when you go to

22   London and see Mr. Pennings, he'll tell you everything.

23           THE COURT:  I don't think that really reveals his

24   state of mind and so I don't really see that.  So that one I

25   sustain the Government's objection, 534.

1            535 I said was in for Mr. Pennings' state of mind.

2            537, in same way.

3            MR. FRANK:  Your Honor, 535, may I be heard on

4    that?

5            THE COURT:  Yes.

6            MR. FRANK:  I don't -- Mr. Pennings' state of mind

7    is not the issue right now.  It's Mr. McLellan's state of

8    mind.  This is -- it's pure hearsay.  It's clearly being

9    offered for the truth of the fact that she had been

10   approached.  It predates --

11           THE COURT:  She?  Who's she?

12           MR. FRANK:  SV.  Are we talking about --

13           THE COURT:  Yeah.  535.  I just don't know who SV

14   is.

15           MR. FRANK:  Samina Vernon.

16           THE COURT:  The part that striked me as admissible

17   is the second sentence.  That it goes to a motive by him and

18   that motive may -- I could imagine how that motive could be

19   helpful to either side, but --

20           MR. FRANK:  I believe what it's being offered for,

21   Your Honor, is the state of mind that they couldn't confide

22   in her because she was at risk of leaving State Street.

23   That's the issue for which it's being offered.

24           MR. WEINBERG:  Mr. Frank and I finally agree on the

25   matter.  That is the purpose --

1          THE COURT:  The purpose is the first sentence.

2          MR. WEINBERG:  The purpose is the first sentence.

3    It's important that Mr. Pennings believes Ms. Vernon is

4    leaving, because it provides his state of mind as to why he

5    would, thereafter, participate in trading where they're

6    removing the -- where they're not allowing her to see that

7    there is an adding of markups.  What's happening here, in

8    terms of context is -- and we heard it from Mr. O'Callaghan,

9    is that bankers are leaving banks and going to the

10   competitors and bringing with them confidential information

11   about how a bank charges and how --

12         THE COURT:  Who's Russell?

13         MR. WEINBERG:  Ms. Vernon --

14         THE COURT:  No, Russell.

15         MR. GOLDSTEIN:  Russell.

16         MR. WEINBERG:  Oh, that's one of their -- that's

17   their chief competitor.  So they believe Ms. Vernon is

18   jumping ship, going to Russell.  Therefore, their state of

19   mind is let's not share confidential business information.

20         THE COURT:  Is the thing not shared with her after

21   October 21, 2000?

22         MR. WEINBERG:  Yes, and the evidence the Government

23   will point to and argue strongly is that Mr. McLellan called

24   traders and they had a zero instruction that they received

25   from Samina Vernon, and Mr. McLellan said, you know, just

1    trade at one basis point.

2          MR. FRANK:  To the extent there's anything on the

3    face of this e-mail that refers to Mr. Pennings' state of

4    mind it's that he cannot afford to lose any more transition

5    managers.  It's not that he's concerned she's going to take

6    confidential business information.  There's nothing in the

7    record -- it's -- Mr. O'Callaghan certainly didn't testify

8    about confidential business information.  He simply

9    acknowledged in response to a cross-examination question that

10    people from other firms have been introduced to him.  So --

11          THE COURT:  No, but it shows his state of mind that

12    she might leave.

13          MR. WEINBERG:  Exactly.

14          MR. FRANK:  And --

15          THE COURT:  And that he might not -- he doesn't

16    want that, but -- which doesn't seem that important to either

17    of you.

18          MR. WEINBERG:  I'm glad to redact the second

19    sentence.  It's the first sentence that's critical to us.

20          MR. FRANK:  Your Honor, redacting the second

21    sentence makes it even more misleading.  But the point is, to

22    the extent he's concerned at all, it's about a loss of

23    manpower.  It's not about a taking of business secrets.

24    There's nothing on this e-mail that suggests that.  Nor did

25    he testify to that effect.  And this is an example of an

1    e-mail that I would have asked him about, had it been

2    identified in a timely way as a defense exhibit.  It was not.

3              MR. WEINBERG:  Mr. Frank has equal access to the

4    evidence, knows the importance of Samina, could have done a

5    word search, come up with this, and had Mr. Pennings address

6    it in his case.  I don't have an obligation to trust

7    Mr. Pennings' answers as a precondition to having admissible

8    defense exhibit.

9              THE COURT:  No, you didn't have to ask him.  The

10   question is whether you should have told him about it before,

11   so he could have asked if he wanted to.

12             All right.  I'm going to think about this.

13             MR. FRANK:  Your Honor, the only thing I would say

14   is the Court imposed a deadline for exhibits that were to be

15   introduced in the case in chief and this whole binder is

16   filled -- that I have in front of me is filled with exhibits

17   that they seek to introduce in the next 24 hours that were

18   for the first time marked after the defendant's case in chief

19   had started.

20             MR. WEINBERG:  That's just not true.  Many of these

21   documents were provided to the Government prior to trial.

22             MR. FRANK:  Everything from 530 up.

23             MR. WEINBERG:  Some we got afterwards, some we

24   intended to use for impeachment, not our case in chief.

25   Things change.  But this is a subjective state of mind, it's

1    a piece of information.  The Government can argue it has

2    nothing to do with confidentiality.  But clearly, rumor has

3    it, she's been approached by their leading competitor.

4    Pennings' knowledge of that provides an explanation.  Not

5    because it's true.

6              THE COURT:  All right.  I want to think about it.

7              MR. WEINBERG:  In other words, Russell might not

8    have approached her, but Pennings believes it is highly

9    relevant to whether or not they want to disclose their

10   pricing to her.

11             MR. FRANK:  Well, Pennings' state of mind is not on

12   trial, but --

13             MR. WEINBERG:  Yes, it is.

14             MR. FRANK:  But more importantly, all of the

15   exhibits marked 530 and above were not disclosed in a timely

16   way.  They were disclosed yesterday.

17             THE COURT:  Okay.  I'll think about that.

18             538, what's the -- what's the purpose of this?

19             MR. WEINBERG:  This is relevant, Your Honor, to --

20             MR. FRANK:  I'm sorry, did Your Honor rule on 536?

21             THE COURT:  No, I said I'd think about it.

22             MR. FRANK:  536?  I'm sorry, 537.

23             THE COURT:  534, I said was out.  535, I'm -- and

24   530 -- I'm sorry, you're right.  I skipped 537 --

25             MR. FRANK:  535, Your Honor, is considering.

1          THE COURT:  I'm thinking about.  I'm sorry, you're

2     right, I missed 537.

3          So 537, what's the --

4          MR. GOLDSTEIN:  537 is, first of all, relevant for

5     the same reason 538 is, which is that these are e-mails

6     involving Mr. Pennings' compensation.  Mr. Pennings is

7     seeking -- Mr. McLellan -- to step back and give Your Honor a

8     little context.  Mr. McLellan gets a sum of money from

9     Mr. Puth.  He decides how to disseminate it amongst a certain

10    group of people.  This being --

11         THE COURT:  People under him, basically.  Yeah.

12         MR. WEINBERG:  Yeah.  In terms of salary, it's not

13    his decision, it's done by --

14         THE COURT:  It's the bonus money.

15         MR. WEINBERG:  The lower the bonus -- the more

16    Mr. Pennings is pushing him to give him a high bonus and the

17    evidence that Mr. McLellan has told Mr. Smit, I'm not giving

18    him what he wants.  In fact, he's giving him one-third less

19    than he wants, because he's giving him the amount in US

20    dollars, not Great Britain pounds.  It's inconsistent with --

21    it's consistent with his good faith, that there's no

22    conspiracy, I'm not awarding extra money to this

23    coconspirator.  That instead, he's going to be treated in a

24    routine fashion.

25         So this is highly relevant to Mr. McLellan's --

1          THE COURT:  You're offering it for the truth, or

2    for what purpose is it?

3          MR. WEINBERG:  Well, issuing --

4          THE COURT:  How it's a response to --

5          MR. FRANK:  It's explicitly --

6          THE COURT:  Well, I want to hear from Mr. Weinberg,

7    first.  You'll have a chance, Mr. Frank.

8          So what's the response to the hearsay objection?

9          MR. WEINBERG:  Here it is, take 537, Your Honor.

10   Mr. Pennings is saying --

11         THE COURT:  I read it.  I got it.  I'm just

12   wondering, but why isn't it hearsay.

13         MR. WEINBERG:  Okay, because Mr. McLellan, it's not

14   the truth moved to Dublin.  It's the fact that Mr. McLellan

15   is essentially saying no, even though --

16         THE COURT:  So all of this, what's the relevance

17   of, essentially, Mr. McLellan believing Mr. McLellan -- Mr.

18   McLellan being told or state of mind being that Pennings

19   wants more than he's giving him?

20         MR. WEINBERG:  It's relevant to -- it's relevant to

21   his state of mind and whether he's in good faith or in bad

22   faith.  In other words, if I'm a conspirator and I've got

23   this guy and Mr. Pennings wants more money, instead of giving

24   him the ordinary business award, he's going to give him more

25   money.  The fact that he doesn't, that his state of mind here

1    is I'm getting information from Pennings that a higher

2    compensation is very important to Mr. Pennings and his state

3    of mind is so what?  Go move to Dublin if you're complaining

4    about the British taxes or the currency ratio.   Is

5    essentially saying to Pennings -- and this is not the truth,

6    move to Dublin, it's his state of mind.  I don't care, go

7    move, quit.  It doesn't matter to me.  That's classic

8    state-of-mind, circumstantial evidence that his state of mind

9    is inconsistent with the willful conspiratorial allegations

10   of this case.

11            THE COURT:  Yes, Mr. Frank.

12            MR. FRANK:  First of all, at risk of sounding like

13   a broken record, the reason that the Court --

14            THE COURT:  That's Mr. Johnston's line, I thought,

15   from his filings.

16            MR. FRANK:  We've been hanging around together too

17   long.  The reason that there's a deadline for pretrial

18   marking of exhibits is so that there's no trial by surprise.

19   We are now into the defense case and we are seeing the

20   designation of multiple exhibits for the first time and that

21   is fundamentally unfair.

22            Number two, move to Dublin is clearly a joke.  It's

23   not -- it's not -- it says nothing about the defendant's

24   state of mind.  It says nothing about what he did after this.

25   It says nothing about anything.  It's completely irrelevant.

1    So, you know -- but fundamentally, all of these exhibits that

2    we're looking at, we should have -- the defense should be

3    under an equal obligation and was under an equal obligation

4    to mark them pretrial.  And this is just fundamentally unfair

5    to sandbag us like this.

6              MR. GOLDSTEIN:  Could I respond to that briefly,

7    the allegation of sandbagging?  There's a hypocrisy here,

8    given the fact we had a schedule to provide experts in our

9    case in chief 70 days before trial.  Mr. Dixon is an expert

10   in their case in chief.  He's not really a rebuttal witness,

11   but if he were, we have a schedule to provide rebuttal

12   witnesses 25 days before trial.

13             Mr. Dixon's -- we have told the Government about

14   this lay opinion.  Mr. Dixon's opinions as set forth in Mr.

15   Frank's letter is the quintessential case in chief expert

16   opinions known to them and not rebutting our expert.  And yet

17   we got notice that they want to call him as an expert and,

18   therefore, try to circumvent legitimate evidentiary

19   objections to lay opinions 10 days into trial.  And after

20   Pennings leaves, after Boomgaardt leaves, and Mr. Frank is

21   talking about sandbagging and violating and rules of

22   procedure and schedules and agreements.

23             THE COURT:  So let me just say a couple things.

24   One, I understand the Government to be objecting to all of

25   these above number -- 530 and above, on the grounds that they

1      weren't disclosed until yesterday and that that objection

2      applies to all of them, right?

3              MR. FRANK:  That's correct, Your Honor.

4              THE COURT:  Right.  So I will consider that as to

5      all of them.  And I understand what that -- what follows from

6      that, in terms of whether you might ask people about that or

7      not, or whether you call -- recall people or whatever.  And I

8      understand the other issues about this one and let me think

9      about this one.  540 -- and your objection to all of them is

10     preserved on that issue.  I'm going to think about that

11     objection as to all of them.  You don't have to repeat it as

12     to each one.  I get it.

13             MR. FRANK:  I understand, Your Honor.  And are we

14     skipping 538, or have you ruled on that?

15             THE COURT:  538 essentially is a group with 537.

16     It seems to me they're the same kind of issue and they're the

17     same thing.  So I'm thinking about that.  I'm likely to think

18     about all of them after I'm hearing all of you.

19             So 540.

20             MR. WEINBERG:  The relevance is we're not offering

21     this for the truth of the matter stated, i.e., what the

22     revenues generated by these transitions are.  We're offering

23     it to show that Ms. Vernon received notice on April 1, 2011,

24     about eight days after the tape-recorded call with

25     Mr. Finocchi's received notice about Royal Mail's generating

1    markups, even though their transition management fee was 227.

2    So it's for the fact of the matter, not for the truth of the

3    matter.

4         MR. FRANK:  It's plainly for the truth of the

5    matter, if she's -- if -- I mean, it's -- I don't understand

6    what the fact of the matter is, versus the truth of the

7    matter.  They're plainly arguing that she would receive

8    notice that these are the actual revenues.

9         MR. GOLDSTEIN:  Your Honor, can I address one piece

10   of Mr. Frank's global objections on hearsay?  Hearsay is only

11   for the truth of the matter asserted.  We're not introducing

12   the exhibit to prove these are the actual numbers.  We're

13   introducing it for the fact that she received this

14   information, which ties back to earlier evidence.  It's

15   classic nonhearsay and it applies, basically, to almost all

16   of Mr. Frank's hearsay objections.

17        THE COURT:  Okay.  Thank you, Mr. Goldstein.  Okay.

18        541, what about this one?

19        MR. WEINBERG:  It's really -- I think Mr. Goldstein

20   described it more lucidly than I.  It's not being offered for

21   anything that did or did not happen with FX.  It's being

22   offered for Mr. McLellan's knowledge that errors occur in

23   trading and that is relevant because of the Government

24   argument that it's perfectly appropriate to have transitions

25   where the broker-dealer gets no money.

1          THE COURT:  Why is this about an error?

2          MR. WEINBERG:  They're talking about a $900,000

3     loss and the TM desk is going to assume the loss.

4          THE COURT:  The loss that the FX desk incurred?

5          MR. WEINBERG:  Yes.  And it just -- it just shows

6     that there are risks -- the Government wants to claim

7     riskless principal.

8          THE COURT:  It shows that he understands that

9     there's risk to particular --

10         MR. WEINBERG:  And you've got a charge.  If there's

11    risks, that's one of many categories of information that

12    require the clients be charged.

13         THE COURT:  Anything you want to say about that

14    one, Mr. Frank?

15         MR. FRANK:  We withdraw our objection, Your Honor.

16         THE COURT:  All right.  541 is in.

17         542.

18         MR. WEINBERG:  Again, relevant to this state of

19    mind -- it's first whether or not there is a lunch or not a

20    lunch.  It's the state of mind that the people receiving this

21    e-mail and the people sending it believed that Royal Mail is

22    happy and that there's going to be future business with them.

23    They're going to a business lunch with them.

24         THE COURT:  It seems kind of peripheral, doesn't

25    it?

1          MR. WEINBERG:  Seems what?

2          THE COURT:  Peripheral.

3          MR. WEINBERG:  I'd say it's not the most compelling

4     inference, but it's an inference that the Government could

5     argue as weak.  But the reality is as of this date --

6          THE COURT:  But he got up and said he was happy at

7     the time.

8          MR. WEINBERG:  It's corroborative that that --

9          THE COURT:  I don't think the Government is going

10    to argue, though, that he's --

11         I mean, you're not going to stand up and say and

12    the day after the transition, he was unhappy, are you?

13         MR. FRANK:  No, Your Honor.

14         THE COURT:  So this one is out.

15         MR. WEINBERG:  We'll withdraw that.

16         THE COURT:  542 is out.  544.

17         MR. FRANK:  543?  Oh, this one is actually -- this

18    is in as a Government exhibit, 543.  I'm sorry, Your Honor.

19    I have it in my book, still, but you're right, 544.

20         THE COURT:  544.  What about this one,

21    Mr. Weinberg?

22         MR. WEINBERG:  This is an important one that goes

23    to Mr. McLellan's state of mind.  What happens on August 22nd

24    is that there is -- Mr. Dixon, Analytics, on behalf of Royal

25    Mail are seeking a letter from State Street that attests to

1    certain facts.  The Government is making the claim that these

2    letters are false, because they hid the existence of --

3              THE COURT:  I get it.

4              MR. WEINBERG:  -- markups on Europe.

5              THE COURT:  It goes to what he was told and knew

6    or --

7              MR. WEINBERG:  He believed it was -- he believed

8    his sole purpose of the letter, based on these

9    communications, was to verify US -- the US rebate.

10             THE COURT:  All right.

11             MR. FRANK:  He's explicitly offering it for its

12   truth.  It wasn't marked, so we didn't have an opportunity to

13   ask witnesses about it.  But he's explicitly offering it for

14   its truth and to any other purposes, it's pure self-serving

15   hearsay.  It's exactly, exactly what the rules forbid a

16   defendant from doing, is offering his own statements as

17   self-serving hearsay.

18             MR. WEINBERG:  The principal importance of this is

19   what Mr. Pennings and Mr. Boomgaardt are saying.

20   Mr. Pennings is saying just what we gave back, I thought,

21   Rick.  Ross is asking a question, aren't we asking Hansen to

22   approve total comp.  His answer goes to state of mind from

23   Pennings, just what we gave back I thought.  Rick says that's

24   my understanding --

25             THE COURT:  I'll think about that one.

1          MR. FRANK:  Your Honor, the statements of

2     coconspirators are also hearsay as to the defendant.

3          MR. WEINBERG:  This goes right to one of their

4     allegations about falsity, Your Honor.  It goes right to Mr.

5     McLellan's state of mind.

6          THE COURT:  I understand the arguments of both of

7     you.  Thank you.

8          MR. WEINBERG:  Thank you, Judge.

9          THE COURT:  548.  What's the relevance and why

10    isn't this --

11         MR. WEINBERG:  The relevance is that this is

12    relevant to Mr. McLellan's being told, not the truth, not

13    whether Mr. Pennings, in fact, had a conversation with

14    Mr. McKnight, but the fact that Mr. McLellan is being told by

15    Mr. Pennings, I told McKnight we made money elsewhere.  It

16    goes right to the state of mind and right to -- relevant to

17    his actions in this period that the Government is attempting

18    to criminalize as a concealment.

19         THE COURT:  But didn't Pennings repeatedly

20    testify that he -- I thought he testified repeatedly that

21    McKnight was one of the people that knew about these

22    different charges that are at issue in this case?

23         MR. FRANK:  What I believe Mr. Pennings testified,

24    Your Honor, is that after the million dollars in hidden

25    commissions was disclosed to Mr. McKnight as inadvertent

1    commissions.

2              THE COURT:  McKnight is the trading disc head?

3              MR. FRANK:  McKnight is Royal Mail.

4              THE COURT:  Oh, not the -- I'm confusing the two

5    Ians.  I'm sorry.  So this is the -- the reference to Ian

6    here, Ian McKnight is the Royal Mail person, not the internal

7    person at the trading desk.

8              MR. FRANK:  Right.  And what I believe he testified

9    to and I believe it's also in a phone call, is that after

10   that, McKnight said is there anything more and he said, well,

11   you know that we trade as principals, like in FX, you know,

12   we made money in FX.

13             THE COURT:  Hold on.  Let me just read it now that

14   I understand it.  I made a mistake in thinking about who it

15   was about.

16             Okay.  I'm sorry.  Now I understand.

17             Let me start again, Mr. Weinberg.  Why is it

18   relevant?

19             MR. WEINBERG:  It's relevant because whatever

20   Pennings did or did not testify, I don't think --

21             THE COURT:  Forget of what I referred to testimony.

22   I was thinking this was referring to a different person.

23             MR. WEINBERG:  It goes right to Mr. McLellan's

24   state of mind that Mr. Pennings is telling him, on an

25   important date, which is right in the middle of his

1    escalating these matters, having lawyers and compliance come

2    in and try to decide whether the contract supports the

3    withholding of the additional rebate.  Pennings is telling

4    him, I told McKnight, not just what -- you know, what the --

5    his e-mails to McKnight said, the e-mails on June 22.  I told

6    him we made additional money.  It's not relevant for the

7    truth of the matter stated, which is I'm not going to argue,

8    in fact, McKnight knew that Pennings -- that State Street

9    made additional money.  I'm going to argue that Mr. McLellan

10   is being told by the guy he trusts on August 31 that the guy

11   was candid with McKnight and told him that there were

12   additional revenues.  It's again, not being offered for the

13   truth, being offered for Mr. McLellan's state of mind.

14            MR. FRANK:  Well, on August 31st -- we haven't

15   offered testimony about August 31st, but August 31st is after

16   the hidden commissions -- the full scope of the hidden

17   commissions had been disclosed internally.

18            MR. WEINBERG:  The --

19            THE COURT:  I'm going to reserve on that.  I'm

20   going to think about that.

21            549.  What's the relevance of this?

22            MR. WEINBERG:  The relevance is to show, you know,

23   what Mr. McLellan is doing in his life that the Government

24   has -- and it's not unique to Mr. Frank or this case, when

25   people get prosecuted, the -- what else they're doing the

1    other 23 hours and 48 minutes of the day get eclipsed and

2    it's only the 12 minutes that deal with Mr. McLellan and

3    Boomgaardt and Pennings and Royal Mail.  The relevance is to

4    demonstrate that Mr. McLellan, at all times during this

5    crucial period, was tasked by State Street to decide on a

6    major purchase of another company.

7              MR. FRANK:  Well, then that's plainly being offered

8    for the truth of the matter, Your Honor, and it's also being

9    offered, we would submit --

10             THE COURT:  That's what I said.

11             Isn't that just hearsay?

12             MR. WEINBERG:  There's a portion of this that's

13   hearsay, if it was offered for the truth of the matter

14   stated.  What's offered is State Street bank's people telling

15   him that he did a good job.

16             THE COURT:  Well, this one is out.

17             550.  What about that?

18             MR. WEINBERG:  Again, this is relevant to Mr.

19   McLellan's state of mind, in that he told Pennings to be

20   factual and honest.  It's not being offered for the truth of

21   the fact.  It's being offered that McLellan is encouraging

22   people --

23             THE COURT:  Isn't it really offered for the truth

24   that that's what he did do, rather than his state of mind

25   that he wants him to be that way?

1          MR. WEINBERG:  No, it's being offered not that, in
2     fact, he told him that.  It's being offered that McLellan
3     believes that that, as a state of mind, of encouraging people
4     to cooperate with the fresh field investigation.
5          MR. FRANK:  That is self-serving hearsay, if I ever
6     heard it.
7          MR. WEINBERG:  I don't know what that means.
8          MR. FRANK:  It means a defendant cannot offer his
9     own statements --
10         MR. WEINBERG:  For the truth.  For the truth of the
11    matter.
12         MR. FRANK:  Without testifying and being
13    cross-examined on them.
14         MR. WEINBERG:  You can offer anything that's
15    nonhearsay, whether the author is the defendant or
16    Mr. Pennings.
17         THE COURT:  I'll think about that.
18         MR. GOLDSTEIN:  Your Honor, the First Circuit
19    United States --
20         THE COURT:  I understand your point.  I get it.
21         MR. GOLDSTEIN:  Thank you.
22         THE COURT:  All right.  So I'll think about that
23    one.  That brings us to 556.  So working -- I guess there's a
24    couple of issues.
25         First of all, why isn't it -- why isn't it hearsay?

1          MR. FRANK:  If I could just -- on the last one,

2     Your Honor, if it's -- it's his own statements being offered

3     for his own state of mind, which is contingent on the truth

4     of the statements.

5          THE COURT:  So let me just explain one thing.  The

6     fact that it's his statement, in my view, doesn't make it

7     inadmissible without his testimony, that's just wrong, in my

8     view.  If you have a case that says that a nonhearsay

9     statement of the defendant can't be admitted, because it's

10    the defendant's, unless he takes the witness stand, show it

11    to me, and I'll reconsider.

12         My question as to statements that are being offered

13    that are McLellan's is is there a nonhearsay purpose.  If

14    it's being offered for the truth of the matter asserted, it's

15    not admissible unless it's a business record or in some

16    exception.  So I guess the question is, is it a nonhearsay.

17         So I -- I have my -- I'm not sure -- as to that

18    one, I'm thinking about it, because I'm not totally persuaded

19    at the moment that it is a nonhearsay.  That's why I'm

20    thinking about it.

21         MR. FRANK:  What I was trying to say, Your Honor,

22    perhaps not articulately, is it has no bearing on his state

23    of mind if he doesn't -- if it's not true.  He's asserting

24    himself the truth of this statement and the only way that it

25    has a bearing on his state of mind is if that statement is

1    actually true.  He's asserting, "I told Ed to be factual and

2    honest about the entire situation."

3             So if that's an untrue statement, then it doesn't

4    bear on his state of mind.  Then he's just lying.  The only

5    way it bears on his state of mind is if it's true.

6             THE COURT:  I'll think about that.

7             MR. FRANK:  Apparently that was not as clear as --

8    well --

9             THE COURT:  So 556.  First, why isn't it just

10   hearsay?

11            MR. WEINBERG:  Because it's, again, being offered

12   for the nonhearsay purpose.  It's not being offered that, in

13   fact, one basis point was what AXA was charged.  It's being

14   offered because Mr. McLellan is telling Mr. Walker, who's

15   asking a question about, apparently, an inquiry from AXA.

16   Mr. McLellan is in good faith telling him to tell the truth.

17            They are now asking what our commission was.  Mr.

18   McLellan is saying one basis point, which turns out to be

19   more than AXA was charged.  AXA ends up being charged

20   1.296 million.  And the Government argues, whoa, there's a

21   variance with what the pre-trade is.  That's a crime.  The

22   issue is, did Mr. McLellan willfully participate in a

23   scheme to lie to AXA --

24            THE COURT:  The relevance of this is someone tells

25   him there's an inquiry from AXA for a commissioned dollar

1    figure, and he says, essentially, tell them one basis point.

2    And it's not offered, you're saying, for the truth that, in

3    fact, it's one basis point; it's being offered for his state

4    of mind that --

5              MR. WEINBERG:  State of mind, saying to them we're

6    not going to -- if this text was in the Government's

7    possession and it said tell him 400 grand, tell them, you

8    know .1 BPY, which is what is in the pretrades.  This would

9    be a home run for the Government.

10             They would argue finally we have evidence that Mr.

11   McLellan is lying to AXA.  Because at this point in the case,

12   they don't have that evidence.  He's not lied to AXA.  They

13   don't have evidence that he asked anyone else to lie to AXA.

14   This is the one moment where Mr. McLellan is being asked by

15   the salesman at AXA, you know, what should I tell them?  And

16   Mr. McLellan is telling them one basis point, which is --

17   demonstration that his state of mind, it's good faith, it's

18   nonconcealment.  He's got nothing to hide.

19             He's, in fact, telling this guy, in a text, without

20   all these records available to him, he's telling him to tell

21   them it's more than the books and records show.  Because when

22   you do the computations, one basis point turns out to be over

23   what the real number was; completely consistent with good

24   faith, completely inconsistent with the Government's theory

25   of conspiracy, wrongdoing, that Mr. McLellan was engaged in a

1    scheme to defraud AXA.

2              THE COURT:  And how are you going to authenticate

3    it?

4              MR. WEINBERG:  We have -- you know, if Mr. Frank is

5    going to continue to contest authenticity, this comes from

6    Mr. McLellan's phone.  It was imaged.  We'll have the person

7    that went to his house, got the phone, imaged the text, gave

8    him the phone back.  He's a forensic guy.  He can testify to

9    the Court, which I think is the first -- the threshold of

10   authenticity, is whether the Court believes we've met the

11   requirements of 901.  I think that clearly meets the

12   requirements of 901.

13             Secondly, it's self-authenticating.  The Government

14   on a million occasions looks to the content of the words.

15   Here Walker, who is the sales manager at AXA, and Mr.

16   McLellan is being depicted by everybody as the boss.  He

17   starts out by saying the words, "Boss man, AXA was looking

18   for a commissioned figure, are you around to chat tomorrow?"

19             So I think it's self-authenticating, without the

20   need to call a forensic examiner.

21             THE COURT:  Okay.  I'll hear from you, Mr. Frank.

22             MR. FRANK:  First of all, it's obviously not

23   self-authenticating.  If you just look at the document, Your

24   Honor, you'll see that that line, "Boss man, AXA was looking

25   for a commissioned dollar figure," the bubble actually goes

1    over the date.  It's the only bubble that goes over the date,

2    which seems rather odd, if that's an accurate representation

3    of what's on the phone.

4              Second of all, not only was this not an exhibit

5    that was marked until yesterday, this was not a document that

6    was produced until yesterday.  It was not produced in Rule 16

7    discovery and should be excluded on that basis alone.

8              Third, it raises all of the issues that I addressed

9    with the Court at sidebar.  Fourth, it's plainly being

10   offered for its truth.  Counsel just stood up here and said

11   that, in fact, AXA was charged one basis point, and this

12   proves that the defendant was telling his subordinate to tell

13   the truth to AXA that, in fact, it was one basis point.  So

14   that relies on the truth of the assertion that it was

15   one basis point.

16             In fact, it wasn't one basis point that they were

17   charged, it was more than one basis point that they were

18   charged.  But that's not what counsel is arguing.  So you

19   know, there's myriad authenticity issues here.

20             By the way, the authenticity witness that counsel

21   just spoke about, is somebody who's not on the defendant's

22   witness list, never been identified to the Government before.

23   There's issues with what else is on this phone, what else is

24   not on this phone, where this phone has been all this time.

25   There's -- there's countless issues that this is going to

1    open up.

2              MR. WEINBERG:  So if I could answer them one by

3    one.

4              THE COURT:  Uh-huh.

5              MR. WEINBERG:  Number one, in terms of the

6    discovery rule, Your Honor, it was not until yesterday that

7    we intended to use this in the case in chief.  We knew of it

8    beforehand.  We had a reasonable expectation the Government

9    would flip Mr. Walker; they didn't.  It was being reserved

10   for impeachment of a potential Government witness.  Yesterday

11   we decided to use it.  We gave it to the Government.  That's

12   the requirements of the rule.

13             Number two is tell the truth is not offered for the

14   truth of the matter stated.  It's offered for somebody's

15   state of mind.  Tell the truth.  One basis point is not

16   offered for the truth of the matter stated, that that, in

17   fact, is the basis point that AXA was charged.  It's a

18   disclosure of Mr. McLellan's state of mind.  Tell them --

19   don't be -- don't tell them the wrong number.  Tell them, you

20   know -- tell them one basis point.

21             That's got to be a state of mind disclosure that

22   Mr. McLellan is in good faith, rather than trying to prove

23   the fact of the matter that AXA was charged one basis point.

24             Three is, the Government doesn't get to rummage

25   around a defendant's phone, because the defendant wants to

1    offer a single text.

2              Fourth is, that the Government doesn't get to retry

3    AXA with a new witness.  This is a very limited door opener,

4    which is whether or not, if the man was to testify, I didn't

5    get this text, we had a phone call.  You know, that's

6    rebuttal.  Rebuttal is not starting from A to Z and asking

7    the man questions that the Government had the right to ask

8    him if they immunized him, or if they made their decisions

9    before trial.  Just like Mr. Dixon in a way, this was -- this

10   is a case-in-chief witness they elected not to call and my

11   using a single text to prove a very limited purpose, which is

12   Mr. McLellan's good faith state of mind, on a specific date,

13   when asked a question he responds, does not open the door to

14   retrying AXA.

15             And fifth, obviously, when you look at these dates,

16   UN relates to June, and it comes after May, and before June.

17             THE COURT:  All right.  Let me think about this

18   one.

19             MR. FRANK:  Your Honor, I'm not going to address

20   his -- unless the Court wants me to, what this opens the door

21   to, but I do want to say briefly, in response to the point

22   that they were reserving this for cross-examination.  I gave

23   them my witness list on May 4th, a month before trial.  So

24   I'm incredulous.

25             THE COURT:  Is Walker on it?

1          MR. FRANK:  No.

2          MR. WEINBERG:  May I approach the bench, Your

3     Honor?  I don't know that I want to make a public statement

4     about why this was -- became a defense exhibit yesterday, but

5     I do want to --

6          THE COURT:  Sure.  Do you want to have a sidebar?

7          MR. WEINBERG:  Yes.

8          (The following discussion held at the bench.)

9          MR. WEINBERG:  While it is true that Mr. Walker was

10    not on the Government's list and it's also true that the

11    Government identified him as an unindicted coconspirator, not

12    formally, because AXA wasn't in the conspiracy count, but I

13    think in our conversations, Walker was out there.  The

14    Government charges him, arrests him in his home, on a stand

15    alone criminal complaint.

16          It was always our view that the Government was

17    attempting to elicit his testimony against Mr. McLellan.  The

18    fact that today they said they'd immunize and indict a

19    defendant who's the subject of a criminal complaint confirms

20    that their priority with Walker is not prosecuting Walker.

21    It's getting Walker to testify against Mr. McLellan.

22          When Mr. Frank and I talked about are these guys

23    witnesses, and Mr. Frank candidly and correctly said they are

24    not currently going to be cooperating witnesses in the AXA

25    case, but never extinguished what I fully believe to be his

1     desire to convince them and then arrest him, in hope that he,

2     in his own self-interest, would become a witness.

3     Mr. Walker's lawyers have carefully monitored this case.

4     He's got a lawyer from New York who's been up here.  And

5     they've been doing their job trying to calibrate whether or

6     not it's in Mr. Walker's interest to fight the case or

7     cooperate with the Government.

8              But until the Government rested, I was not

9     100 percent convinced they wouldn't cut a deal, immunize

10    Walker, drop the complaint.  The indictment which was

11    supposed to be brought in 30 days was delayed.  I understand

12    that.  They're delaying it so they keep their options open.

13    They did elect, obviously, not to give in to Mr. Frank's

14    requirement that they plead, but it doesn't mean that

15    Mr. Walker was not a --

16             THE COURT:  Okay.  I understand.

17             MR. FRANK:  Can I just briefly, Your Honor.  If I

18    wanted to immunize Mr. Walker, I could have immunized Walker

19    and called him in as a cooperating witness a long time ago.

20             THE COURT:  Sure.

21             MR. FRANK:  I charged him because I do have the

22    present intent to indict him and to proceed against him.  I

23    wasn't going to indict him when I was preparing for this

24    trial.  And I also wanted to, frankly, see how this trial

25    turned out before I indicted a lower level person involved in

1      the same scheme.

2              THE COURT:  Sure.  Right.

3              MR. WEINBERG:  I'm not alleging that Mr. Frank

4      arrested and charged him without probable cause, but there

5      was always the option for Walker to negotiate even an

6      immunity grant, or to negotiate a please.

7              MR. FRANK:  If I had wanted him to immunize him and

8      call him as a witness, I would have done so.

9              THE COURT:  I got it.  Thanks.

10             (Bench conference concluded.)

11             THE COURT:  What's -- so I'm going to reserve on

12     566.

13             708, what's that?

14             MR. FRANK:  Your Honor, those are the Bloomberg --

15     if I could just address that.

16             THE COURT:  Sure.

17             MR. FRANK:  That is Bloomberg data.  As you'll

18     recall, there was the issue of the Bloomberg versus the

19     Tradeweb data.

20             THE COURT:  The Tradeweb data is what was sent.

21             MR. FRANK:  What Mr. Finocchi sent.  The Bloomberg

22     data is what they had in London.  So we went to WilmerHale

23     and we asked, can you find this Bloomberg data, because we

24     didn't have it.  And this was sent over in an Excel

25     spreadsheet to me from WilmerHale.  I don't know who -- and

1    then I immediately turned around and produced it to the

2    defense.

3            I don't know who went into Bloomberg to get it.  I

4    don't know how it was -- how they came up with it.  I don't

5    know that it's accurate.  I just know that it came from

6    WilmerHale.  And so I turned it over in an abundance of

7    caution, but if they want actual Bloomberg data, they can go

8    get actual Bloomberg data.  That would be a business record

9    of Bloomberg.  It's not a business record of State Street.

10   It's just stuff that somebody, I don't know who, apparently

11   went and got from a Bloomberg terminal.

12           MR. WEINBERG:  We understood it to be turned over

13   as an accurate depiction of what appears in the Bloomberg

14   database for the particular day in question, which I recall

15   to be June 15, 2010.  It's completely consistent with what

16   we've been able to access through -- electronically.  The

17   number -- it's clearly relevant, they corroborate the

18   numbers -- they're a little different than the numbers in the

19   other database, but they're numbers showing that the highs of

20   the day are lower than the client side prices that were being

21   charged by Mr. McLellan to KIA, which it --

22           THE COURT:  So what you're saying is that you could

23   go to Bloomberg, right now, putting aside having this report

24   that Mr. Frank has described, this particular document, and

25   you could punch in -- these numbers are essentially bond

1    numbers?

2            MR. FRANK:  And to be clear, I have no -- if they

3    want to get it from Bloomberg and have it authenticated, I

4    have no objection to the data coming in.  But I genuinely

5    don't know if this is accurate data or who came up with it.

6            MR. WEINBERG:  We can all together get on a

7    computer and --

8            THE COURT:  I guess that's my point is if like

9    these are just -- if these individual numbers that -- what

10   I'm assuming are bond numbers, correspond to the numbers of

11   the bonds -- some of the -- if each of these corresponds to a

12   bond that was at issue then and all of you can just look up

13   in Bloomberg what the numbers for that day are, then I would

14   think you could, in one way or another, whether it's this

15   particular document or -- I can't imagine why we would need

16   it, if you all wanted a witness from Bloomberg, but like if

17   nobody's disputing it, why couldn't there be some document

18   that shows what the numbers are from Bloomberg and it is what

19   it --

20           MR. WEINBERG:  Your Honor, has the residual

21   trustworthiness except to the hearsay rule --

22           THE COURT:  So I guess my question is, are you

23   disputing that if you go to the Bloomberg terminal.

24           MR. FRANK:  I don't have access to a Bloomberg

25   terminal, Your Honor.  Those are $30,000 piece of equipment.

1    I just don't have that.  So I don't know who did this.  I

2    don't know that they did it accurately.  I don't know that

3    these are actually from June 15th, you know.

4            THE COURT:  So my only issue, it sounds like, for

5    this is there some way for somebody to access a Bloomberg

6    terminal, the way you all can see that the numbers are or are

7    not accurate.  And if they're not accurate, that's one thing.

8    And if they are accurate, I would think you could.

9            MR. WEINBERG:  May I have a second, Your Honor?

10           THE COURT:  Yeah.

11           (Counsel confers.)

12           MR. FRANK:  Bloomberg could be subpoenaed.

13           THE COURT:  Right.  That's -- I could subpoena --

14   somebody could subpoena Bloomberg.

15           MR. FRANK:  And they could've subpoenaed Bloomberg

16   ten days ago when I gave them --

17           MR. WEINBERG:  We could also go to WilmerHale,

18   which is around the corner, and have a representative of the

19   Government look at their -- as they access the Bloomberg

20   terminal.  They didn't create numbers to help Mr. McLellan.

21   That's not -- State Street has not been active in helping Mr.

22   McLellan.  I fully believe that the Wilmer numbers are

23   accurate.  They come directly from a terminal.  They have a

24   terminal.

25           THE COURT:  State Street.

1          MR. WEINBERG:  State Street has a terminal.  All

2     Mr. Frank has to do is ask State Street are these numbers

3     accurate.  They'll have an answer in about 11 minutes and

4     we'll know the numbers are accurate.

5          MR. FRANK:  That doesn't make them accurate, Your

6     Honor.  That still requires some person to go to a Bloomberg

7     terminal, type in these CUSIP numbers accurately, make sure

8     they got the date accurate, and accurately reflected on a

9     spreadsheet.  There's a number of issues.

10         There is a way to get the accurate data.  And I

11    turned this document -- this spreadsheet over to the defense

12    well more than a week ago.  They could have subpoenaed

13    Bloomberg.

14         THE COURT:  Well, here's my view.  There's the

15    simple way and the hard way.  I prefer the simple way.  The

16    question here that is at issue is these bond numbers.  The

17    relevance of Bloomberg data is in the record and I don't

18    understand anyone to be disputing that this is relevant.  The

19    data on Bloomberg on June 15th is relevant for these -- what

20    looks like approximately 10, 15 bonds, something like that.

21         So I think that you guys should talk to each other

22    and figure out how to -- if it's wrong, totally different.

23    It's a fair point if it's wrong.  But rather than spending

24    five lawyers, a paralegal, a defendant, and judge, and all

25    court staff arguing about what it is, I think either State

1     Street could look it up.  I would think they could look it up

2     for you.  Somebody could call WilmerHale.  If WilmerHale has

3     a Bloomberg terminal.  They produced it.  They can at least

4     explain how they produced it.

5              We can have a subpoena to Bloomberg, if somebody

6     wants a subpoena issued from the Court to Bloomberg, for

7     somebody to come in.  But this isn't a contention of the

8     defense, that this was the Bloomberg data they were looking

9     at that day, in the sense of whether or not it's accurate.

10    The contention is this is just Bloomberg data and anybody who

11    at any time who goes into Bloomberg would get this.  So I

12    would think you all could figure out how to --

13             MR. FRANK:  Well, it is the contention of the

14    defense that this is the data they looked at that day.

15             THE COURT:  No, no.  What I mean -- they're not

16    saying this was the piece of -- are you saying this is the

17    piece of paper they looked at?

18             MR. WEINBERG:  No, it's a spreadsheet that this

19    comes from.  Mr. --

20             THE COURT:  Are you content if somebody from

21    Bloomberg came here and said I punched into my terminal

22    today, June 15th, these numbers, and this is what I got?

23             MR. WEINBERG:  That's what anybody that has access

24    to a Bloomberg terminal to put in the certain bond number and

25    a certain --

1          THE COURT:  So it's not the particular thing

2    without regard to whether it's accurate, it's just whatever

3    Bloomberg's database shows?

4          MR. WEINBERG:  It's all electronic.  I have no way

5    to get a computer from eight years ago and recreate what

6    somebody would have seen that day.

7          THE COURT:  You don't really know -- what you're

8    saying, Mr. Frank, is you don't know whether WilmerHale

9    produced the spreadsheet in response to the request, whether

10   in the sense of literally created it, or where they got it

11   from.

12         MR. FRANK:  My belief is -- first of all, I have no

13   reason to believe that WilmerHale has a Bloomberg terminal.

14   My belief is that WilmerHale called over and asked somebody

15   at State Street to go punch these things into a Bloomberg

16   terminal and create a spreadsheet in response to my question.

17   I don't believe this spreadsheet previously existed.  So I

18   don't know who did that and whether they did it accurately.

19   I turned it over.

20         I assumed if counsel wanted it, he would subpoena

21   Bloomberg.  We don't need a Bloomberg person to come in here.

22   They can provide a certificate of authenticity.

23         MR. WEINBERG:  I didn't know until last night that

24   this was contested.  We got --

25         THE COURT:  Here's all I'm interested in.  All of

1    you, I think, should solve the problem, okay?  And solving

2    the problem, somebody could call WilmerHale and find out,

3    somebody could call State Street.  You could either in the

4    end of that, agree to that, if it's accurate.  And if it's

5    not accurate, somebody could ask for a subpoena and we'll

6    subpoena Bloomberg to produce the data.

7            I'm not interested, in this issue, in an argument

8    about who should have done what when.  It seems to me we're

9    having a criminal trial here and the question -- the only

10   issue between all of you -- you all agree that the data is

11   relevant.  You all agree that it's nonhearsay.  The only

12   question is this.  Actually what the Bloomberg terminals

13   show.  I think you can solve that.  If you can't, you let me

14   know.

15           106.3.  What's the -- what is this and why is it

16   relevant and not hearsay?

17           MR. WEINBERG:  This is a start of documents that

18   are offered not for the truth of the details, but to

19   establish that these clients, like KIA and Dutch Doctors,

20   went back and offered State Street future transitions after

21   the transitions that the Government has identified as, you

22   know, being within the scope of their alleged scheme to

23   defraud.

24           THE COURT:  I'm sorry, say that again.

25           MR. WEINBERG:  We think it's important -- I know

1     that we've established through certain witnesses they were

2     happy with the performance of State Street.  We think it's

3     important that these different clients of State Street went

4     back to them, went back to the European transition management

5     desk, sent proposals to Mr. Pennings or Mr. Boomgaardt, after

6     the transactions that are the subject of this case.

7                THE COURT:  So this shows that they're

8     essentially -- after the transaction at issue in this case,

9     they went back and said do another -- possibly do another

10    deal for us.

11               MR. WEINBERG:  Yes, that's the only limited

12    relevance and we have a series of them, but some are objected

13    to and --

14               THE COURT:  163 -- this e-mail -- we're looking at

15    the same thing?  This e-mail exchange with Faheem Malick.

16               MR. FRANK:  I don't -- it doesn't appear to be what

17    the e-mail shows.

18               THE COURT:  I don't understand that to be what it's

19    about.  That's why I'm confused.

20               MR. WEINBERG:  May I have a moment, Your Honor?

21               THE COURT:  Absolutely.

22               MR. WEINBERG:  I thought that was part of that

23    series.

24               THE COURT:  Just so we're talking about that same

25    thing.  It begins with an e-mail on June 28, 2011.

1              MR. WEINBERG:  Mr. Harden testified to a transition

2       in 2010.  This is offered not for the truth, but for the

3       limited purpose of showing that Dutch Doctors remained a

4       client of State Street about a year after the transition that

5       is the subject of this case.  They're asking for a

6       post-transition report, it's not dating back to 2010.

7              THE COURT:  A post-transition report about that

8       transition or about another transition?

9              MR. WEINBERG:  About another one.

10             THE COURT:  So this is not about the transition at

11      issue in the case.  This just shows that -- I see, by asking

12      for a post-transition report, that shows that they had done

13      another transition for the Dutch Doctors after the one at

14      issue in this case.

15             MR. WEINBERG:  Yes, Your Honor.

16             THE COURT:  I see.  Okay.  Now I understand what it

17      is.

18             MR. FRANK:  First of all, a year later, it's

19      irrelevant.  But second of all, then is plainly being offered

20      for its truth, that there was a transition, and that the

21      e-mail says that statements in this e-mail are correct and

22      true.

23             THE COURT:  It seems rather indirect to show that.

24             MR. WEINBERG:  I understand.

25             THE COURT:  I'll think about it.

```
 1              And then the last one I have is 1129.  It looks
 2    like a contract with AXA?
 3              MR. WEINBERG:  Yes, Your Honor.  This demonstrates
 4    the same --
 5              THE COURT:  They did another deal later.
 6              MR. WEINBERG:  They did another deal and had a
 7    contract for that other deal, in contrast to the
 8    February/March transaction.
 9              MR. FRANK:  We'll withdraw our objection.
10              THE COURT:  All right.  1129 is in.
11              Okay.  So I have some to think about.  I'll think
12    about those.  I'll issue a short order promptly.
13              MR. WEINBERG:  Judge, could I burden the Court for
14    just one minute with a short status report that relates to my
15    motion to exclude NTMA, or my motion for an adverse inference
16    in two parts?
17              THE COURT:  Yes.
18              MR. WEINBERG:  One is, we are getting materials in
19    sequence from Nomura, through the UK letter rogatory that is
20    being processed, and we've gotten some materials from the UK
21    and we haven't gotten others.  We have a subset of the Nomura
22    materials, none from Goldman Sachs.  And the subset we have
23    goes to Nomura's involvement with the KIA transition.  We
24    have not gotten -- and I've confirmed with Mr. Nemstev, who
25    is actively monitoring the receipt of the answer to the
```

1    letter rogatory.  We've got nothing from Nomura from the

2    NTMA.

3         Two, we did receive a subset of documents that

4    Mr. Goldstein has advised me of that he used to prepare for

5    the NTMA cross-exam from the City of London Police.  It does

6    not include the proposals to NTMA from other parties.  It

7    does not include anything about the appraisal of the

8    proposals.  It does not include contemporaneous e-mails.  It

9    consists largely of post October 2011 interviews with other

10   people.  It consists of notes made by NTMA, contemporaneous

11   with events after October 2011, or well after the transition.

12        There may be one or two other items, but the core

13   of the letters rogatory, served on NTMA -- we tried to serve

14   them through the Irish Government and they declined to

15   produce anything, either voluntarily to the Government, or

16   pursuant to the letters rogatory.  We are still not in the

17   possession of.  The City of London subset, again, largely,

18   was of the City of London interviews with these NTMA people

19   in the aftermath of NTMA learning about the Pennings Royal

20   Mail events and all of the give and take between State Street

21   and NTMA, and NTMA notes regarding the aftermath which were

22   produced in the City of London.

23        Is that accurate?

24        MR. GOLDSTEIN:  Yes.

25        MR. WEINBERG:  Thank you.

1            THE COURT:  All right.  Fine.  So to summarize

2     where things stand, there's -- I've ruled on some of these,

3     I'll rule on the rest.  I'll issue them in an electronic

4     order and you'll get that so you'll know.  I'll do that

5     promptly.

6            With respect to the summary chart issues, it

7     strikes me there's two issues.  One, I don't need to hear

8     from you again.  I understand now what it is and I understand

9     both what the Government's argument is as to why it

10    essentially -- it's not relevant, if you will.  That has

11    nothing to do with its accuracy or inaccuracy, but if I were

12    to allow it in, there is an issue about sort of the

13    verification process you're going through.

14           If there's issues about that and you wish to be

15    heard about that, tell -- either one of you, tell Ms. Simeone

16    and I'll see you after my 2:30 hearing.  I'm available and if

17    I need to see you, I will.

18           So that, I think, takes care of all that is in

19    here.  We'll resume tomorrow with Mr. Menchel.  Is that how

20    you say his name?

21           MR. WEINBERG:  Yes.

22           THE COURT:  And then the -- then next is the other

23    expert?

24           MR. WEINBERG:  Mr. Travaglini, yes.

25           THE COURT:  Who's shorter, the summary witness, and

1    then we turn to the -- fine.

2             Could I see you just for one last thing at sidebar?

3             (The following proceedings were

4             sealed at 10:47 a.m.)

5             (The following discussion held at the bench.)

6             MR. WEINBERG:  Your Honor can teach an evidence

7    course in law school.

8             THE COURT:  Based on this case, it would give me

9    enough fodder.  I don't know if I'm smart enough.

10            Is there any reason I shouldn't just do the

11   colloquy with Mr. McLellan now?

12            MR. WEINBERG:  No problem, Your Honor.

13            THE COURT:  Should he just come up here at sidebar?

14            MR. WEINBERG:  Sure.  You can do it at sidebar.

15            THE COURT:  Fine.  Why don't you get him.

16            Thanks, Mr. McLellan.  So first, just to be clear,

17   this sidebar is sealed, until Monday, after the jury's

18   verdict, after which it's unsealed, without further order of

19   the Court.  I'm sealing the sidebar for the same reason that

20   I sealed the other one, which it seems to me, since there is

21   some media coverage of the case, I think on balance, that the

22   defendant's right to a trial -- I don't want to impair that

23   and the public's right to know.  The short delay and the

24   public's right to know when I conducted colloquy and when you

25   made the decision whether to testify or not, it seems to me

1    outweigh the interest and the warring and any potential issue

2    about these decisions which aren't relevant for the jury's

3    consideration, so that short delay.  So the sidebar is

4    sealed.  It automatically is unsealed one business day after

5    the jury's verdict, without further order of the Court,

6    unless somebody files a motion at the time that there would

7    be some reason to seal it.

8             So just a couple of questions, Mr. McLellan.

9             First, you have a constitutional right to take the

10   witness stand to testify on your own defense, just as you

11   also have a constitutional right to remain silent.  The

12   decision about whether to testify.  That is, whether to take

13   the stand and testify in your own defense, is your decision,

14   personal decision.  Your decision to be made.  If you -- if

15   you choose not to testify, I will instruct the jurors that

16   they cannot hold that decision against you, that they can't

17   even discuss your decision not to testify, the fact that you

18   didn't testify.

19            Do you understand each of these rights?

20            MR. MCLELLAN:  Yes, I do.

21            THE COURT:  All right.  Do you understand that the

22   decision to testify or not is your decision?

23            MR. MCLELLAN:  Yes, I do.

24            THE COURT:  That is independent.  You can make that

25   separate from your lawyers.

1            MR. MCLELLAN:  Yes.

2            THE COURT:  And have you had a full and fair

3    opportunity to discuss this with your lawyers?

4            MR. MCLELLAN:  Yes, I have, Your Honor.

5            THE COURT:  All right.  Will you testify in this

6    case?

7            MR. MCLELLAN:  No, Your Honor.

8            THE COURT:  All right.  Okay.  I don't think

9    there's anything else that I need to ask.

10           MR. FRANK:  I do not.

11           MR. WEINBERG:  Thank you, Your Honor.

12           MR. MCLELLAN:  Thank you.

13            (The following proceedings were

14            unsealed at 10:50 a.m.)

15            (Bench conference concluded.)

16           THE COURT:  Okay.  I don't think --

17           MR. WEINBERG:  The only other loose ends are the

18   filings that we made yesterday and the Government responded

19   to last night.  One -- they didn't respond to the judgment of

20   acquittal motion, but whether the Court wants further

21   argument, I'm prepared to address count by count, but we have

22   briefed it in 21 pages --

23           THE COURT:  I've read all of your filings.  My view

24   on the jury instructions is I don't need to hear any of you

25   about the jury instructions at the moment.  My intention, in

1     this case, is to do what my practice is, which is after the

2     evidence, but before, I will issue draft instructions in

3     verdict form on ECF, so that you have them.

4           You'll have an opportunity to review them.  We'll

5     have a charge conference.  I'll hear what I am anticipating,

6     given on the plethora of filings, that all of you will have a

7     lot to tell me.  And I'll hear all of what you have to say.

8     I'll either resolve what you have to say at the charge

9     conference as to some things.  If there are minor things that

10    we can work out.  If there are larger things, I may take them

11    under advisement.

12          I will revise the instructions.  I will then issue

13    the instructions again on ECF so you have them, so you will

14    know them before the closing argument.  And it's my practice

15    to provide -- it's always been my practice to give one copy

16    of the instructions to the jurors to take back to the jury

17    room with them.  I recently have -- in a recent case, civil

18    case, I actually gave 12 copies, or whatever, however many it

19    was.  One for every juror so they could follow along as I was

20    reading to them and take them back.

21          I'm not as facile as, say, Judge Zobel, who seems

22    capable of just issuing the instructions from her mind.  I

23    need to write them out and so what I write out will be my

24    intention to read to them.  So I probably would give them all

25    a copy and then they'd all have copies, just so they can read

1    along.  I think it might help with the comprehension, because

2    this is a lot of material.

3              So that, in the general course, would be how I

4    would do it and the particular timing, you know, of -- so you

5    have both the reasonable time to review them before the

6    charge conference, a reasonable amount of time for me to look

7    them over.  And then advise it and give it to you so that you

8    know what it is, to the extent there are issues I reserved on

9    at the charge conference, before you did your closing

10   argument.  That's the general course.

11             MR. WEINBERG:  And the last remaining issue, the

12   Rule 29 is before Your Honor pending, would be the Dixon

13   issue.

14             THE COURT:  So rule 29, just I'm going to reserve

15   on.  I'm not requiring the Government to file a response to

16   it.  And so --

17             MR. WEINBERG:  Certain parts of the Dixon issue are

18   generic to Dixon's eligibility to be a rebuttal expert and

19   then some of them are specific to responding to what

20   evidences he will be responding to.  I -- the Court may want

21   to reserve --

22             THE COURT:  Right.  I think I want to -- now I have

23   a better sense of where we're going than I did last night

24   when I read those papers.  So let me think about that and if

25   I want to have argument --

1          As a general matter, my view is rebuttal is

2     rebuttal, not retrial.  So I'll -- I don't know that I -- I

3     think I understand what -- from the discussions that we've

4     had, what you would want to do.  And in the papers, what you

5     want to do with them.  And I understand what the issues are

6     and I don't know that I need further hearing and I'll just

7     rule at the appropriate time, whatever there is to rule.

8          MR. FRANK:  I think just as a technical matter, I

9     neglected to append our notice, which I had marked as an

10    exhibit.  I think it actually -- our notice was appended to

11    your motion.

12         MR. WEINBERG:  Yeah, it was.

13         THE COURT:  The notice -- the expert disclosure

14    notice made --

15         MR. FRANK:  The additional expert disclosure.

16         THE COURT:  Yes, it was in his -- I have it.  I

17    don't think you need to file it again.

18         MR. FRANK:  And I don't know if the Court -- I

19    don't recall if the 302s were also filed with your --

20         THE COURT:  No.

21         MR. FRANK:  So I'm happy to disclose those to the

22    Court.

23         THE COURT:  You might as well file them, so I have

24    them, just in case I need to --

25         MR. WEINBERG:  Here's the threshold issue and I

1 won't burden the Court with any --

2    THE COURT:  I understand there to be a couple of

3 issues.  One, is he an expert.  If he is an expert, was it

4 timely disclosed under whatever relevant, if any, rules, or

5 agreements apply.  And so that's one issue.  The second is

6 you object to say that much, if not all, of what he has to

7 say is not proper rebuttal.

8    MR. WEINBERG:  And third is that we've been very

9 disciplined in terms of, (a), our selection of experts,

10 limiting them to the US experts.  Mr. Dixon is not an expert

11 in US broker-dealer practices.  There's nothing that Mr.

12 Menchel is testifying to that properly could be rebutted from

13 a UK expert and we're doing the same with Mr. Travaglini.  We

14 made a decision not to call the UK experts, in order not to

15 open this up into battle of experts with one expert saying

16 one thing and another a diametrically opposite thing.

17    I think we've been disciplined with Mr. Menchel.

18 We focused only on broker-dealers and only on US, rather than

19 on UK transition management, and UK clients.  And therefore,

20 I think there's no basis for Mr. Dixon to testify.

21    MR. FRANK:  If I can just very briefly respond.

22    THE COURT:  Yes.

23    MR. FRANK:  First of all, it would be our intention

24 to call him only as a rebuttal witness.  We understand that

25 we're not retrying the case here, but only to rebut

contentions made by Mr. Menchel and the other expert.  We
believe, in the first instance, he should be able to do so,
based on -- as a fact witness, with -- you know, through lay
opinion testimony, based on his personal work in this field
of transition management, as well as his work with these
specific clients and his understanding of his own -- his own
understanding of what these documents and terms meant, as
well as those of his clients.

            To the extent it's deemed expert testimony, we
believe he is abundantly qualified to testify about those
portions of the testimony that implicate the field of
transition management and there was testimony yesterday,
notwithstanding our objection, that Mr. Menchel really is not
qualified to testify about the field of transition
management.  There was testimony elicited from him about
transition management agreements and about the field of
transition management.  And so we believe there is a
possibility that we would want to elicit rebuttal testimony
directly targeted to those issues, not about Rule 10(b)10 or
anything beyond his scope of expertise and personal
knowledge.

            THE COURT:  Okay.

            MR. FRANK:  There is one other issue, Your Honor,
which is -- I don't know whether the defense is still seeking
to admit the SEC depositions and so -- and I know the Court

1  has not ruled on that issue yet.  But that hasn't been raised

2  and so I just want to have the record clear on that.

3          THE COURT:  I assumed they weren't, because I

4  hadn't heard.

5          MR. WEINBERG:  If we could have some time, we do

6  not think we will be offering the SEC depositions, Your

7  Honor, but we'd like further opportunity.

8          THE COURT:  All right.  If you --

9          MR. WEINBERG:  We'll advise both the Court and the

10  Government whether we are seeking it to offer any -- either

11  of them, or either a part of either of them.  We'll do that

12  early this afternoon.

13          THE COURT:  Fine.

14          MR. FRANK:  So just so the record is clear.  To the

15  extent the defense still wishes to offer those depositions,

16  we would request that the defense turn over to us the actual

17  videotapes, which we've never seen of the depositions, so

18  that we can review them, and make a decision about whether we

19  wish to withdraw our objection.

20          THE COURT:  Sure.  Fine.

21          I need to see you at sidebar about one other

22  matter.

23          (The following discussion held at the bench.)

24          MR. WEINBERG:  I would ask the Court to reserve

25  until we find out how he's doing after his 1 o'clock

1    chiropractor appointment.

2          MR. FRANK:  I think it's abundantly clear that he

3    doesn't --

4          THE COURT:  Hold on.

5          MR. FRANK:  I thought his, appointment was at

6    scheduled, and apparently he has a follow-up scheduled.

7          THE COURT:  Right.  I don't think there's a further

8    appointment today.

9          MR. WEINBERG:  Okay.  I read it quickly.

10          THE COURT:  You can read it again.  I think there

11    originally was an appointment and he went earlier.

12          Here's my proposed resolution.  My proposed

13    resolution is that I'm going to instruct, unless somebody

14    tells me one reason not to, I would tell the jury office to

15    tell this person that he doesn't have to come in.  We would

16    proceed tomorrow as we told the jurors, we will replace the

17    person in the way I described.  I think given what the person

18    has said, that that's the --

19          MR. WEINBERG:  I would offer the alternative, which

20    is to ask the jury contact to communicate with this juror

21    later this afternoon and see whether or not his medical

22    condition permits him to come in tomorrow.  You know, with

23    back injuries or chiropractic injuries, you could feel better

24    a lot quicker than you might think.

25          THE COURT:  So what you're asking me to do is have

1    the jury office ask -- call the person this afternoon and say

2    how are you feeling?

3              MR. WEINBERG:  How are you doing?  Can you come in?

4    Are you physically able to come in and continue jury service?

5    If he still says no and I'll send you a doctor's letter, then

6    I'm not asking the Court to continue the trial further, but I

7    do think we should make our best efforts to keep the jury

8    intact.  And, therefore, I would ask for that one further

9    initiative to check on his condition at 4 o'clock or 3

10   o'clock.  We have all the other jurors coming in tomorrow.

11             THE COURT:  I'll think about that.  I'm not going

12   to do anything other than that.  And obviously if I learn

13   anything from the jury office, I'll let you know as soon as

14   I know.

15             MR. WEINBERG:  I would also add that given that

16   it's becoming more and more likely that we're going to have a

17   substitute for an alternate for a juror, I understand the

18   Court's belief or position that it becomes the juror who

19   randomly was seated in seat 13, rather than seat 14 or 15.

20             THE COURT:  Just so we're clear, so I'm thinking,

21   the way I think about it is seat 7 -- in other words, the 7th

22   seat in the first row.  Yes.

23             MR. WEINBERG:  That happened to be the juror who

24   was chosen last, rather than first or second as an alternate.

25             THE COURT:  Okay.  I don't remember.

1          MR. WEINBERG:  And I don't know whether or not -- I

2     could think of two other alternative ways to select an

3     alternate, one being who was chosen first and second being at

4     random.  I don't know whether there's any rule that requires

5     the Court to select the juror --

6          THE COURT:  Let me just be totally transparent with

7     all of you.  I can't -- as I stand here now, I'm not sure

8     I've ever had to replace somebody.  I may have, I feel like I

9     have, but I don't have a specific recollection of when I did

10    it.  And I think if I did it, my thought would have been to

11    go to the seat numbers, not the order numbers, but the seat

12    numbers I can keep track of, and the order number I have a

13    memory of.  I don't think there's any rule that requires me

14    to do it that way.

15         The only other way it seems to me that I would

16    think about doing it is I guess I could potentially -- I'm

17    not saying I would do it, but there's by random, there's sort

18    of the first picked, I supposed, as opposed to first seat.

19    You obviously all had thoughts about each individual juror in

20    a way that I don't.  And so, you know, I'll think -- what

21    you're essentially pressing me to do is think about the

22    practice that I have about how to fill it in and I'll think

23    about that.

24         I try to -- I prefer these kinds of things to do

25    the same way every time, just because it seems fairer.  If

1    I've done it, I've done it once, I think.  I don't remember.

2    But certainly not a whole lot.  So I will, you know, think

3    about that and tell all of you -- I don't know that I'll do

4    it differently than I said, but I'll certainly consider it.

5              MR. WEINBERG:  Why should anything be easy in this

6    case?

7              THE COURT:  Correct.  You certainly are all making

8    me earn my salary.  Okay.  Fine.

9              MR. FRANK:  So for the record, we support the plan

10   that was originally out, which was to go to juror number 7,

11   we all agreed all of these -- the juror seated in seat number

12   7.  We all approved these procedures, we all knew what the

13   procedures were, we all exercised our peremptory challenges

14   on that basis, and we all approved of all of these jurors.

15             MR. WEINBERG:  I don't know that there was any

16   discussion before the selection of the alternates as to who

17   would replace a juror first.  I understand we each exercised

18   a peremptory.

19             THE COURT:  I got it.  One question, do you need to

20   show this -- do you want to show this to Mr. McLellan before

21   we recess?

22             MR. WEINBERG:  No, I think we can explain it and

23   he's a very responsive and trusting client.

24             THE COURT:  Fine.

25                  (Bench conference concluded)

1              THE COURT:  The other expert you had referenced,

2     Mr. -- you had made reference, I thought, to another expert

3     in --

4              MR. FRANK:  It's not our intention to call him.

5              THE COURT:  All right.  That person is not --

6     okay.  Fine.  Then we're adjourned.  Thank you very much.

7              THE DEPUTY CLERK:  All rise, this matter is

8     adjourned.

9              (Court in recess at 11:09 a.m.)

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4              I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                        Dated this 20th day of June, 2018.

14

15

16

17                        /s/ RACHEL M. LOPEZ

18

19

20                        _____

                          Rachel M. Lopez, CRR
21                        Official Court Reporter

22

23

24

25