1                 UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS

2

3  - - - - - - - - - - - - - - - - - - x

4  UNITED STATES OF AMERICA,       :

5       Plaintiff,           :   Criminal Action No.
                             1:16-cr-10094-LTS

6     v.                  :

7  ROSS MCLELLAN,             :

8       Defendant.          :

9  - - - - - - - - - - - - - - - - - - x

10

11     BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

13                   JURY TRIAL
                     Day 13

14

15

16            Thursday, June 21, 2018
                8:35 a.m.

17

18

19

20

21  John J. Moakley United States Courthouse
    Courtroom No. 13
22  One Courthouse Way
    Boston, Massachusetts

23

24  Rachel M. Lopez, CRR
    Official Court Reporter
25  *raeufp@gmail.com*

1                    **A P P E A R A N C E S**

2    On behalf of the Plaintiff:

3        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
         BY:  STEPHEN E. FRANK
4        John Joseph Moakley Courthouse
         One Courthouse Way, Suite 9200
5        Boston, Massachusetts  02210
         (617) 748-3244
6        stephen.frank@usdoj.gov

7
         UNITED STATES DEPARTMENT OF JUSTICE
8        BY:  WILLIAM JOHNSTON
         1400 New York Avenue, Northwest
9        Washington, D.C.  20005
         (202) 514-0687
10       william.johnston4@usdoj.gov

11

12   On behalf of the Defendant:

13       MARTIN G. WEINBERG, P.C.
         BY:  MARTIN G. WEINBERG
14       20 Park Plaza
         Suite 1000
15       Boston, Massachusetts  02116
         (617) 227-3700
16       owlmcb@att.net

17
         LAW OFFICES OF ROBERT M. GOLDSTEIN
18       BY:  ROBERT M. GOLDSTEIN
         20 Park Plaza
19       Suite 1000
         Boston, Massachusetts  02116
20       (617) 742-9015
         rmg@goldstein-lawfirm.com
21

22       LAW OFFICES OF MAKSIM NEMTSEV
         BY:  MAKSIM NEMTSEV
23       20 Park Plaza
         Suite 1000
24       Boston, Massachusetts  02116
         (347) 251-4800
25       mentsev@gmail.com

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Defendant:                                       Page

MARC MENCHEL

      By Mr. Frank                                        21

      By Mr. Goldstein                                    42

      By Mr. Frank                                        46

MICHAEL TRAVAGLINI

      By Mr. Goldstein                                    47

      By Mr. Frank                                        65

      By Mr. Goldstein                                    72

      By Mr. Frank                                        74

SEAN MURPHY

      By Mr. Weinberg                                     78

      By Mr. Frank                                        89

      By Mr. Weinberg                                     94

      By Mr. Frank                                        95

1 **EXHIBITS**

2                                                                    Admitted

3    Number 300 (as modified), 307, 311, 317, 351,              78

4    352, 473, 505, 506, 507, 508, 509, 510, 523,

5    1129, 530, 533, 535, 536, 541, 543, 544, 545,

6    547, 548, 551, 552, 555, 540, and 708

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4    for the District of Massachusetts is now in session, the

5    Honorable Leo T. Sorokin presiding.

6          Today is June 21st, the case of United States vs.

7    Ross McLellan, criminal action 16-10094, will now appear

8    before this court.

9          THE COURT:  I see all counsel and Mr. McLellan.

10          Maria, will you get that individual juror?

11          THE DEPUTY CLERK:  Oh, yes.

12          THE COURT:  Mr. Weinberg, I thought I got in early

13    to the office.  I thought I was going to have a nice, relaxed

14    morning.  I could look over some papers, I could look at some

15    matters in other cases, and what do I find?  This blizzard of

16    memos and motions addressing all sorts of issues.

17          MR. FRANK:  The Government would like recognition

18    for not troubling Your Honor.

19          THE COURT:  You get recognition for that, this

20    time.

21          It is certainly the definition of zealous.

22          MR. WEINBERG:  I think I should say thank you, but

23    I'm not sure.

24          (Juror enters the courtroom.)

25          THE COURT:  Hi.  How are you doing?

1              THE JUROR:  Good morning.

2              THE COURT:  So it looks like you're feeling better,

3      are you?

4              THE JUROR:  Yeah, I'm feeling a lot better.

5              THE COURT:  Great.  So -- because I'm glad you're

6      fine.  The real question is, do you feel like you can sit and

7      serve?

8              THE JUROR:  Yeah, I mean, if I could stand up for

9      some period of time, I am like really like stiff, like if I

10     stand up.

11             THE COURT:  Totally.  So at any point -- and you're

12     sitting in the back row anyway, right?  Yeah.  Any time you

13     want to stand up.  You can stand up the whole time, if you

14     want, you can stand up and down.  You can stand for five

15     minutes, sit for five minutes, whatever you want to do is

16     totally fine.  And if you need a break at some point, just

17     raise your hand and we can take a break for a few minutes, if

18     you think -- you know, you just want to walk in the jury room

19     or something, to just stretch your back.  That's totally

20     fine.

21             THE JUROR:  Awesome.  I feel awful about having

22     everyone go home yesterday.

23             THE COURT:  Don't worry about it.  You shouldn't

24     feel bad about it and -- it's a long case and it seemed

25     like -- it wasn't on you.  That was on me.  And I thought it

1    was the right thing to do and I'm convinced it was the right

2    thing to do.  So don't worry about it and I'm glad you're

3    fine.  I'm glad you're feeling better and great.  So then

4    we'll see you in a few minutes.

5                THE JUROR:  Awesome.

6                THE COURT:  Good.  Thank you.

7                Just for the record, because this is all being

8    transcribed, do you remember your juror number?

9                THE JUROR:  47.

10                THE COURT:  47.  Perfect.  Thank you.

11                THE JUROR:  And I have the documents of the x-rays

12    and all the medical work.  I don't know if you need --

13                THE COURT:  I don't need anything -- for the reason

14    that you weren't here yesterday.

15                THE JUROR:  Okay.

16                THE COURT:  I accept what you have to say.  I don't

17    need to see any documentation.

18                THE JUROR:  Thank you.

19                (The jury exits the courtroom.)

20                THE COURT:  I see no issue with him continuing to

21    serve.  Do either of you?

22                MR. FRANK:  No, Your Honor.

23                MR. WEINBERG:  No, Your Honor.

24                THE COURT:  All right.  Fine.  So that takes care

25    of that.

1        All right.  So with respect to the -- I think the

2   only thing that Mr. Weinberg filed that requires ruling now,

3   is -- he filed a motion to reconsider my order -- my

4   electronic order yesterday, which excluded various exhibits,

5   not all the exhibits, but excluded various exhibits, and he

6   moved to reconsider as to four exhibits.  I've read -- I'm

7   assuming -- I'm inferring that nothing in the Government's

8   position has changed?

9        MR. FRANK:  No, Your Honor.

10       THE COURT:  Okay.  So I treat the motion as

11   opposed.  I've reviewed it, I've thought about what I had --

12   looked back at the orders, the reasons, and thought about it

13   and here's my ruling.  I just want to make sure I get the

14   exhibit numbers correct.  Okay.

15       As to 565, which is the text message, and 365, the

16   motion is denied.  As to 300, I'm prepared to -- I'm

17   partially allowing the motion.  On further reflection and

18   thinking about the issues, I would allow it as to page 8 of

19   the template, which is the one that has the section that you

20   refer to, 7 point whatever, page 1 of the template that shows

21   the cover page, just to provide context and -- and it just

22   seems like that's sufficient, based on the motion to

23   reconsider.

24       MR. FRANK:  Your Honor, could we be heard on that?

25       THE COURT:  Yes.  Briefly.

1          MR. FRANK:  So I will be brief.  This document was

2     sent by Sarah Louis to Simone Paul and John Norris, copied to

3     Michael Holton.  It went to -- it did not go to the

4     defendant.  There's no reason to believe it was ever seen by

5     the defendant.  It did not go to Ed Pennings.

6          THE COURT:  What about that issue?  What about

7     that?

8          MR. WEINBERG:  This is not being offered to -- for

9     his state of mind.  It's being offered as so many documents

10    have been offered.  He didn't read RFPs that have come into

11    the case.  Pre-trade reports.  This is --

12          THE COURT:  Well, what is it being offered for?

13          MR. WEINBERG:  It's being offered as either a

14    business record or a trustworthy record to demonstrate the UK

15    legal -- to corroborate.  This is being offered for the

16    truth.  It's not being offered for anybody's state of mind,

17    but it's really being offered as a document, as an act.  As

18    much as a post trade, a pre-trade, a contract.  This is a

19    business record of State Street that demonstrates and

20    corroborates Mr. Pennings' testimony at pages I think 114 to

21    118, June 11th, regarding his recollection of a meeting with

22    the Herbert Smith lawyers and the State Street lawyers, where

23    they --

24          THE COURT:  What about that?

25          MR. FRANK:  It's not a business record, Your Honor.

1   There's no evidence whatsoever that it's a business record.

2   It's an e-mail sending an attachment from an outside law firm

3   to somebody at State Street.  There's no evidence that it was

4   maintained in the ordinary course of business, that it needed

5   to be maintained, that it was -- he's utterly failed to meet

6   the business records exception to the hearsay rule and there

7   was no impeachment of Mr. Pennings on the fact that this

8   meeting occurred.  In fact, counsel agrees that the meeting

9   occurred and that what Mr. Pennings said was true.  So

10  there's no -- I just don't understand any theory how this

11  sort of extraneous e-mail with an attachment could come in

12  for its truth.

13          MR. WEINBERG:  The e-mail is not important to me.

14  The attach --

15          THE COURT:  I'm not allowing the e-mail.  Right.

16  It's just page 1 and page 8 of the document.

17          MR. WEINBERG:  Okay.

18          THE COURT:  And then 540, I've reconsidered, and

19  would allow.  Not for the truth, but for the reasons you

20  articulate.

21          MR. WEINBERG:  Thank you, Your Honor.

22          MR. FRANK:  Your Honor, again, with respect to 540,

23  it was not sent to any -- by any witness in this case, to --

24  or defendant, it didn't go to any -- I guess it was copied to

25  Rick Boomgaardt, but we're not talking about the state of

1     mind of Samina Vernon.  I don't see how that is relevant to

2     this case.

3              THE COURT:  I'm allowing it for the reasons that

4     they described in their motion for reconsideration.  All

5     right.  I think with respect to Dixon scope or rebuttal,

6     those kinds of questions -- I'm not going to rule on any of

7     that now.  I'm going to wait until they're done, rest, we'll

8     send the jury out, we'll take a break, and then we'll talk

9     about where we are and that.

10              I will tell you that as I understand it now, the --

11     what you have left, what you have left is the cross of Mr.

12     Menchel, whatever, if there is redirect and recross, if --

13     then we have Travaglini you're calling?

14              MR. WEINBERG:  Yes, Your Honor.

15              THE COURT:  And then we have the witness who's

16     reading in the documents that I allowed and if there are

17     others that were unobjected to that you agreed to.  All of

18     that is not taking that long, right?

19              MR. WEINBERG:  No, we'll be moving for an admission

20     of a series of documents and then have Mr. Murphy read ten or

21     twelve of them --

22              THE COURT:  And the ones you are moving to admit

23     are either ones that were agreed to, or the ones that I've

24     overruled the objection?

25              MR. WEINBERG:  Precisely.

1          THE COURT:  Okay.

2          MR. FRANK:  And Your Honor, did Your Honor

3    contemplate giving a limiting instruction at that time to the

4    jury on the purpose for which these documents are being

5    introduced?

6          THE COURT:  The ones you've agreed on, I'm willing

7    to give a limiting instruction for you.  I don't know what

8    they are, so I don't know whether they're in for the truth or

9    not.  The ones that I've ruled on, I'm happy to tell them

10   that these are in for state of mind or you know, for other

11   purposes, if you want.  And I haven't prepared an

12   instruction.  I've ruled for these reasons, and I'm willing

13   to explain that to the jury as they come in.  That seems

14   fine.

15         MR. FRANK:  So maybe we should spend five minutes

16   with counsel, just figuring out which ones are coming in for

17   their state of mind and which ones are coming in for their

18   truth.

19         THE COURT:  If you want.  You have the larger list,

20   right?  So that might be helpful.  So you can do that.

21         Let me just address one thing about overarching

22   schedule.  This is what I'm thinking about the schedule.  I'm

23   not going to address this with the jurors in the morning, but

24   I'll tell you what I'm thinking about.  It seems to me that

25   there's not that much left.  There's not -- you don't have a

1    lot.  I don't imagine that there's -- I -- you all make your

2    own decisions.  That said, we're near the end of the case.

3    It seems to me that there's not like --

4           I would think we could reasonably finish all of the

5    defense case and the rebuttal, if any, by the end of the day

6    today.  And then if that were the case, it would be my

7    inclination not to close tomorrow, to tell the jurors to come

8    back on Monday morning for closing arguments and charge.  I

9    would -- it would be my inclination to do that for the

10   following reasons:  One, then, it seems to me that you've all

11   filed a blizzard, would be a fair description, of -- helpful,

12   but a blizzard of filings regarding the jury instructions.

13   I've gone through all of that.

14          I could be ready to close tomorrow, even if you

15   finished today at 1 o'clock, but I think that we've spent a

16   lot of time in this case.  It's an important case to both

17   sides.  It would be more carefully presented if I gave you

18   the instructions at some point, tomorrow we had a charge

19   conference, I then finish the instructions.  The response

20   changes to whatever issues you raised and didn't raise and

21   you knew what they are.  And then you had a little time to

22   prepare and then the jury, Monday morning, gets the case.  It

23   seems to be a more orderly presentation.  That would be my

24   inclination and it seems like we could reasonably do that.

25          If we for some reason didn't finished today.  I

1    think we should be able to, but if we didn't, we would take

2    evidence tomorrow, then we would certainly -- I can't imagine

3    how we wouldn't finish the evidence tomorrow.  I think we

4    should -- I really think we should finish the evidence today.

5    And then we'd see, but I think my inclination would still be

6    to close on Monday.  That's my thought.  Do either of you

7    have a different view?

8                MR. FRANK:  Two minor thoughts.  To the extent we

9    present Mr. Dixon as a rebuttal witness, I imagine his

10   testimony will be very brief.  It would be helpful to us to

11   have some opportunity to evaluate and consider the testimony

12   of the defense experts before we do that.  And so our

13   preference would be to present that -- to decide today

14   whether we're going to present that testimony and then to

15   offer it briefly tomorrow morning.

16                But even if we did that, I would see no reason why

17   we couldn't -- if Your Honor was willing to do that, have a

18   charge conference this afternoon, and close tomorrow.  We're

19   certainly fine closing on Monday, but in our view, giving the

20   jury three days off before we close may not be ideal, but we

21   defer to the Court on that.  We're ready to go tomorrow if

22   everyone else is ready.

23                MR. WEINBERG:  Other than our objection to the

24   premature ending today with the jury coming back tomorrow so

25   that Mr. Dixon can answer one or two questions, we leave it

1       up to the Court's discretion when you want final argument.

2               THE COURT:  I'm -- we'll see where we are when the

3       defense breaks, but my inclination is to do it when -- to do

4       it on Monday.  I think it's a better -- I think they'll get a

5       better presentation and it then -- it doesn't break up the --

6       if they deliberate.  If it takes them longer than an

7       afternoon to deliberate, it doesn't break up the

8       deliberations over the weekend, and I don't really want to --

9       is it just -- presents it that way.  So all right.  So I

10      think that's it.

11              MR. FRANK:  So what about with respect to giving us

12      the night on the rebuttal?

13              THE COURT:  I'm not inclined to do that.  I mean,

14      you know what these people -- you know what their case is.

15      Their defense case has been disclosed to you -- what turns

16      out to be their defense case, you've known about since the

17      beginning of the trial, which is these two experts.  And

18      these exhibits, most of them aren't coming in -- well, some

19      are.  I don't remember if most or not.  I don't know how many

20      are in or out, but there aren't that many.  They don't strike

21      me as big issues.  I don't really see -- it's a big thing, so

22      I'm disinclined to wait.  And I'm -- to be honest with you,

23      Mr. Frank, I'm not sure why you'd want to call Mr. Dixon.

24              MR. FRANK:  I'm not sure that I do, Your Honor, to

25      be honest, but that's -- you know.

1      THE COURT:  Right, and so am I going to make you --
2  when they rest, am I going to turn to you and say yes or no,
3  and not give you a moment to think?  No.  I know you wouldn't
4  like that and you've done a good job and I'm not trying to --
5  I want to give you a fair opportunity, but I don't know that
6  you need the whole day and I'm not going to bring the jury in
7  to send them like home.
8      And so this is a significant case to McLellan and a
9  significant case to every criminal defendant.  It's a
10  criminal case.  So I don't want to jam the, like get out the
11  instructions and see and I want to -- and I'd prefer to have
12  heard all the evidence before I, you know, finalize the
13  instructions for sure.  That's always my practice.  And so,
14  you know -- and you know what you can say if you call them.
15  But -- so I think what we should do is finish -- we finish
16  their case.  We'll take a break then.  You think about it a
17  little bit, we'll talk about it, we'll see where we are and
18  then we'll see.
19      MR. GOLDSTEIN:  Your Honor, in the spirit of
20  finishing today, I have a couple of objections to Mr. Frank's
21  cross-examination of Mr. Menchel.
22      THE COURT:  Okay.
23      MR. GOLDSTEIN:  There are basically two objections.
24  One is beyond the scope and the other is personal knowledge,
25  Rule 611 and Rule 602.  When we were here the last time, Mr.

1    Frank was going through particularized documents with Mr.

2    Menchel and asking him to interpret or comment upon those

3    particular documents.  Mr. Menchel was not called, has not

4    been retained as an expert to comment on the transitions at

5    issue or the documents at issue.

6            And so Mr. Frank going through these documents is

7    both, (a), beyond the scope of my direct examination.  I did

8    not ask him any questions regarding these transitions.  I

9    asked him only about the customs of the industry and

10   practice, as he has gained that knowledge over 30-plus years

11   in the US-based broker-dealer business.  And for Mr. Frank to

12   be asking him questions about the particular transactions and

13   particular documents, both is beyond the scope of my

14   examination.

15           And under Rule 602, a witness may testify to a

16   matter only if he has personal knowledge of the matter.  And

17   Mr. Menchel has not been retained and has no personal

18   knowledge regarding the vast trove of materials Mr. Frank is

19   putting before him --

20           THE COURT:  Hold on.  Maybe I can shorten it.

21           Are you intending to ask questions of that genre

22   today in the cross with him?

23           MR. FRANK:  Certainly a lot less, Your Honor.  He

24   did testify that he had reviewed RFPs.  He reviewed 20 to 25

25   documents and I may ask him about some of those, but on a

1   very limited basis.

2          MR. GOLDSTEIN:  But he was not asked on direct

3   examination about RFPs or those documents.  It's a generation

4   of his cross and so it's beyond the scope of my direct

5   examination.

6          MR. FRANK:  It informed his opinions that he's

7   testifying about, Your Honor.  He's here as an expert

8   testifying as to how these terms were used.  And, in fact, he

9   did testify on direct examination that the term "agency," as

10  used in the RFP documents that he had analyzed, that he had

11  reviewed, had a particularized meaning.

12         MR. GOLDSTEIN:  So if he wants to ask that

13  particular question, fine.  But it doesn't open up a whole

14  penumbra of materials that Mr. Frank was putting before him,

15  asking him what the word "commission" meant in the context of

16  one of 208 exhibits admitted by the Government.

17         THE COURT:  I think you should think about the

18  issue, Mr. Frank, because I think it's a good point he makes.

19  There -- obviously, to the extent he testified about the

20  agency issue, that's different.  It -- that he didn't review

21  things might be more effective than what -- that he doesn't

22  know what this means, specifically.

23         MR. FRANK:  I agree.

24         THE COURT:  In other words -- so I hear you and I

25  will think about it and evaluate those objections on a

1    case-by-case, question-by-question basis.

2            MR. GOLDSTEIN:  Thank you, Your Honor.

3            THE COURT:  All right.  I'll give you -- we'll give

4    you a couple minutes.  I'll come back in at like one minute

5    to 9:00 and you can talk about what those exhibits are and I

6    can just explain the limiting instruction.  Essentially it's

7    in not for the truth, but for state of mind or something like

8    that on the -- one by one as they come in when you read the

9    list, to the extent necessary, or when you're having someone

10   read it.

11           MR. FRANK:  Thank you, Your Honor.

12           THE COURT:  We'll stand in recess.

13           THE DEPUTY CLERK:  All rise, we stand in recess.

14           (Court in recess at 8:54 a.m.

15           and reconvened at 8:59 a.m.)

16           THE DEPUTY CLERK:  All rise.

17           THE COURT:  You can be seated.

18           You all ready?

19           MR. FRANK:  We are, Your Honor.  I can advise the

20   Court of --

21           Go get the jury.

22           Where's Mr. Menchel?

23           MR. GOLDSTEIN:  Right outside, Your Honor.

24           THE COURT:  Why don't you go bring him in?

25           (The jury enters the courtroom.)

1          THE COURT:  Good morning, ladies and gentlemen.

2          As you can see, your one member who wasn't here

3     yesterday is back and is feeling better.  So that's good.

4     We'll resume this morning.

5          A couple matters first.  Nobody discussed the case,

6     nobody did any independent research, everybody followed my

7     instructions?  Yes.

8          Okay.  Second, when we broke on Tuesday, at the end

9     of the day on Tuesday, you heard a number of questions from

10    the Government asking Mr. Menchel whether he had interviewed

11    or spoken with Mr. McLellan.  I sustained objections to each

12    of these questions, and although I do not think Mr. Menchel

13    answered any of these questions, if he did, I strike his

14    answers and instruct you to disregard both the questions and

15    any answer he may have given, as they are not evidence.

16         The Government bears the burden of proof beyond a

17    reasonable doubt as to each crime charged in this case.  The

18    burden never shifts to the defendant.  Mr. McLellan is

19    presumed innocent of each and every crime charged in this

20    case.  The United States Constitution guarantees Mr. McLellan

21    the right to remain silent.  He does not have to testify.

22    And if he does not testify, you may not consider that fact at

23    all.  It is utterly irrelevant.

24         We now will -- a couple of more procedural matters.

25    We'll resume with the testimony.  You remember Mr. Menchel

1  was on the stand, so we resume with the cross-examination of

2  Mr. Menchel.  Before you leave today, I will update you as to

3  the schedule for the entire rest of the case and when we will

4  finish and so we're close.  And I'll give you the exact

5  schedule as to what is left and what we'll be doing when and

6  when you'll be here in the afternoon and all of that, so

7  don't worry about that.  You'll know everything before you

8  leave today, from me.

9         All right.  We resume, Mr. Frank, with your

10  cross-examination.

11         MR. FRANK:  Thank you, Your Honor.

12         THE COURT:  Mr. Menchel, I remind you you remain

13  under oath.

14         THE WITNESS:  I understand.

15                    **MARC MENCHEL**

16    having been previously duly sworn, testified as follows:

17        **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.**

18  BY MR. FRANK:

19  **Q.**  Good morning, again, Mr. Menchel.

20  **A.**  Good morning.

21  **Q.**  It's been a couple of days since we were here.  In that

22  time period, you have not met with defense counsel, have you?

23  **A.**  No.

24  **Q.**  And have you reviewed any additional documents since

25  then?

1   **A.**   No.

2   **Q.**   Okay.  Just to sort of orient us, when we spoke a couple

3   of days ago, I believe you testified that commissions are the

4   same as markups?

5   **A.**   Essentially the same.

6   **Q.**   And would you agree that we saw a number of instances

7   where the term "commission" was used with respect to bonds?

8   **A.**   Yes.

9   **Q.**   You testified about -- on direct examination, about the

10  duties of riskless principals.  Do you recall that?

11  **A.**   Yes.

12  **Q.**   I want to ask you a couple questions about agents.  Bonds

13  can trade on an agency basis, can they not?

14  **A.**   They can.

15  **Q.**   And there's no requirement that they trade on a riskless

16  principal basis, correct?

17  **A.**   Correct.

18  **Q.**   And agents don't buy for their own account.  They buy or

19  sell for the accounts of their customers, correct?

20  **A.**   Correct.

21  **Q.**   And agents charge commissions, correct?

22  **A.**   Correct.

23  **Q.**   And agents have to disclose commissions, correct?

24  **A.**   Correct.

25  **Q.**   And the relationship between a broker and its client,

1    whether that's an agency relationship or a principal

2    relationship, is based on the deal that's struck between the

3    broker and its client, correct?

4    **A.**   It's based on the order.

5    **Q.**   It's based on the deal that's struck.  Is that not true?

6             MR. GOLDSTEIN:  Asked and answered, Your Honor.

7             THE COURT:  Overruled.

8             THE WITNESS:  I don't understand that.  It's order

9    by order.

10   BY MR. FRANK:

11   **Q.**   Mr. Menchel, have you not previously testified that the

12   nature of the relationship between the broker and its client,

13   whether that is an agency relationship, or a principal

14   relationship, is based on the deal that is struck between the

15   broker and its client?

16   **A.**   No, it's based on the transaction.

17   **Q.**   When we spoke a couple of days ago, do you remember I

18   asked you about your testimony in the *United States*

19   *vs. Litvak*?

20   **A.**   Yes.

21   **Q.**   And do you remember that you testified in that case

22   before a federal judge and a federal jury and you were under

23   oath?

24   **A.**   Yes.

25   **Q.**   Did you not testify in that case --

1        MR. GOLDSTEIN:  Could I have the page, please?

2        MR. FRANK:  Page 2167, at line 17.

3        "QUESTION:  Trades are executed based on the deal

4    that is struck between the broker-dealer and its customer,

5    right?

6        "ANSWER:  Yes."

7    BY MR. FRANK:

8    Q.  Was that your testimony in the *United States vs. Litvak*?

9    A.  I'll take your representation.

10   Q.  Yes?

11   A.  I'll take your representation.

12   Q.  Would you like to review the testimony?

13   A.  Sure.  Thank you.

14       "That's exactly what I just said to you today, it's

15   based on how trades are executed and how they are confirmed."

16   You left that part out.

17   Q.  "QUESTION:  And your answer was that the relationship,

18   whether it was a principal relationship or an agent

19   relationship is established based on how trades are executed

20   and how they are confirmed, right?"

21   A.  Right.

22   Q.  "ANSWER:  That's correct.

23       "QUESTION:  Trades are executed based on the deal

24   that is struck between the broker-dealer and its client,

25   correct?

1           "ANSWER:  Yes."

2           Was that your testimony?

3           MR. GOLDSTEIN:  Your Honor, he's skipping lines in

4    his testimony.

5           MR. FRANK:  I will read the entire testimony.  In

6    fact, Your Honor, we can put it up on the screen, if that

7    would be helpful.

8           MR. GOLDSTEIN:  He's to read it and show it to the

9    witness.

10          THE COURT:  I'm not quite sure what -- show it to

11   the witness and then ask him what you want to ask him.

12          MR. FRANK:  May I share it with the witness, Your

13   Honor?

14          THE COURT:  Yes.

15   BY MR. FRANK:

16   Q.  Mr. Menchel, you were asked --

17          THE COURT:  Just let him read it first.

18          MR. FRANK:  Actually, I think I have an extra copy.

19          I spoke too soon, I do not have an extra copy.

20          THE WITNESS:  We can do it together.

21   BY MR. FRANK:

22   Q.  All right.  Let's do it together.  You were asked, "The

23   relationship, whether it is a principal relationship or an

24   agent is established based on how trades are executed and how

25   they are confirmed, right?"

1          And you answered, "correct."

2     **A.**   Correct.

3     **Q.**   Okay.  And then you were asked a question about how

4     trades were confirmed, correct?

5     **A.**   Correct.

6     **Q.**   And then we were asked, "Trades are executed based" --

7          MR. GOLDSTEIN:  Your Honor, it's either he reads

8     the question and answer verbatim or he doesn't.

9          MR. FRANK:  I'm not interested in the trades being

10    confirmed, Your Honor.  We can go through the whole thing.

11    Actually, let's go through each one.  And then you were

12    asked, "Trades were confirmed using trade confirmations,

13    right?"

14          And you answered, "Yes."

15    **A.**   Correct.

16    **Q.**   And then you were asked, "Trades are executed based on

17    communications?"

18          And you said, "Rarely."

19          Correct?

20          MR. GOLDSTEIN:  Between the parties.

21          MR. FRANK:  Is counsel conducting the

22    cross-examination or am I?

23          THE COURT:  Mr. -- are you asking questions of me?

24    Or are you making an objection to what he's saying?  There is

25    not a colloquy between the two of you.  The two of you speak

1  to me, not to each other.  And so if you object to his

2  objections, object to his objections.

3          Are you omitting something in what you're reading?

4          MR. FRANK:  I'm happy to read the entire thing,

5  Your Honor, but --

6          THE COURT:  So he's -- the form of what he's doing

7  is objecting to what you're reading.  If you are reading a

8  question, you either -- if you are reading a question and

9  asking whether this is the question asked, you either need to

10  read the whole question or you need to say I am omitting a

11  portion, but you can't skip over it without indicating

12  either, if you're reading from the transcript.

13  BY MR. FRANK:

14  **Q.**  I would like to direct your attention to line 17.

15          "QUESTION:  Trades are executed based on the deal

16  that is struck between the broker-dealer and its customer,

17  right?"

18          And you answered "Yes."

19  **A.**  Correct.

20  **Q.**  Thank you.  And that's true, is it not?

21  **A.**  Yes.  I should say, the entirety of what I said is true.

22  **Q.**  Is it true that trades are executed based on the deal

23  that is struck between the broker and its customer?  That's

24  all I'm asking you.  Is that true?

25  **A.**  But that wasn't the entirety of what I said.

```
1              THE COURT:  He's not asking you about what you
2     said.  Now he's just asking you this question.  Now he's just
3     asking you this question.  He's not asking you what you said.
4              THE WITNESS:  Okay.
5              THE COURT:  And the question is, is it true that
6     trades are executed based on the deal that is struck between
7     the broker and its customer?
8              THE WITNESS:  Yes.
9              MR. FRANK:  Thank you.
10    BY MR. FRANK:
11    Q.  And you testified that you had reviewed proposals
12    submitted by State Street to some of its clients.  Do you
13    recall that testimony?
14    A.  Yes.
15    Q.  Do you recall reviewing a proposal made by State Street
16    to the National Treasury Management Agency, NTMA?
17    A.  Yes.
18    Q.  Okay.  Do you know how many times the word "agent" or
19    "agency" appeared in that document?
20    A.  I did not count up the number of times.
21    Q.  Would you accept my representation that it was 17 times?
22    A.  I have no reason to -- I accept your representation.
23    Q.  And would you also agree that that document stated that
24    State Street would act as a fiduciary for its client?
25    A.  Yes.
```

1   **Q.**  Do you know how many times the word "riskless principal"

2   appeared in that document?

3   **A.**  I don't think I recall that word.

4   **Q.**  It didn't appear, did it?

5   **A.**  I don't recall it.

6   **Q.**  Would you like to review the document?

7          THE COURT:  We're not going to have him read the

8   document.  The document is in evidence, right?

9          MR. FRANK:  It is in evidence, Your Honor.

10  BY MR. FRANK:

11  **Q.**  Did you review the proposal to Royal Mail?

12  **A.**  Yes.

13  **Q.**  Do you know how many times the word "agent" or "agency"

14  appeared in that document?

15         MR. GOLDSTEIN:  Your Honor, I object.

16         THE COURT:  Sustained.

17  BY MR. FRANK:

18  **Q.**  Would you except my representation that those words

19  appeared 27 times in that document?

20         MR. GOLDSTEIN:  Objection.

21         THE COURT:  Sustained.  Questions aren't evidence.

22  BY MR. FRANK:

23  **Q.**  Can we agree that the word "agent" and "agency" appeared

24  throughout that document?

25         MR. GOLDSTEIN:  Objection, Your Honor.

1          THE COURT:  Sustained.

2   BY MR. FRANK:

3   **Q.**  Can we agree that State Street represented it would be

4   acting as an agent in that document?

5          MR. GOLDSTEIN:  Objection, Your Honor.

6          THE COURT:  Can I see counsel for a moment?

7          (The following discussion held at the bench.)

8          THE COURT:  So two things.  One is did he testify

9   at all about NTMA?

10          MR. GOLDSTEIN:  No.

11          THE COURT:  He did not.  The only thing that ties

12   him to his direct is the -- you said he made the comment that

13   you reminded me this morning about agents and agency, right?

14          MR. FRANK:  He made the comment on direct

15   examination that the way the word -- he reviewed those RFPs

16   and that the way the word was used in those RFPs.

17          THE COURT:  Oh, was not trading against.

18          MR. FRANK:  All I'm trying to establish is that

19   he's now testified what the word "agent" connotes, which is

20   that commissions will be disclosed, that the -- whether a

21   relationship is an agency or principal relationship is based

22   on the deal that is struck between the client and its broker.

23   And now all I'm establishing is that throughout these

24   proposals that he reviewed, prior to his testimony, the

25   relationship was described as an agency relationship, and not

1    a principal relationship.  That's all I'm establishing.

2              THE COURT:  That it's --

3              Yes?

4              MR. WEINBERG:  The problem is, Your Honor, whether

5    we have to unravel it on redirect, or whether it -- the Court

6    should sustain objections, is the word "agent" has multiple

7    different uses.  Agent in the marketplace, which is how the

8    word "agent" is used throughout these RFPs, we will act as

9    your agent in contrast to we will sell you our own bonds,

10   does not connote that there needs to be disclosure.

11             THE COURT:  Okay.  Got it.  Two things.

12             You can ask them, were they acting as an agent, you

13   know, there's a view were they acting as an agent in this --

14             MR. FRANK:  Actually, I'm interested in what they

15   told the client they were acting as.

16             THE COURT:  You can ask him, if he read the

17   document, if they told him that.  But the thing that I remind

18   you is that remember what you told me throughout this case

19   what your case is about.  We've spent more time -- by my

20   memory, on cross-examination of this witness, than direct,

21   and I'm not cutting your cross-examination off.  I'm just

22   reminding you about that.

23             MR. FRANK:  I understand that, Your Honor.  I'm not

24   going to be long today, but there's been a lot of objections,

25   some of which I just literally did not understand.  Just now,

1    I didn't understand the basis of those objections.

2              THE COURT:  Because we're not going to have him

3    read the document.  It's in evidence.  You've made the point.

4    It has what it has.  He didn't say it didn't say agent in the

5    document.  There really wasn't anything to impeach about how

6    many times it was in there.  And so --

7              MR. FRANK:  I'm not trying to impeach him on that.

8    But the document says what it says and I need to establish

9    what it says.

10             MR. WEINBERG:  He's read the document, the document

11   is in evidence.  Mr. Frank can argue from the evidence that's

12   existed, but he's not giving the opinions on the document.

13             THE COURT:  Okay.  Keep going.

14             MR. FRANK:  Hang on.  I just want to be clear.

15             So I can ask him whether the document represented

16   to the client that State Street will be acting as an agent?

17             MR. WEINBERG:  I object.

18             THE COURT:  Why?

19             MR. WEINBERG:  He's not giving any opinions on the

20   document on the NTMA relationship, the Royal Mail

21   relationship.  Mr. Frank has elicited that the word "agent"

22   is in the document.

23             THE COURT:  What about his opinion that agency

24   means not trading against the interest of the client.  That's

25   all it means.

```
1              MR. FRANK:  As used in the document.

2              MR. WEINBERG:  That's how it was used in the

3    document.  If he gave him a question that didn't confuse the

4    term "agent" as a fiduciary relationship and the --

5              MR. GOLDSTEIN:  Trading.

6              MR. WEINBERG:  And the basis.

7              THE COURT:  What's the question that you want to

8    ask him?  I'm sorry.

9              MR. FRANK:  Counsel --

10             THE COURT:  Just forget that.  What's the question

11   that you want to ask?

12             MR. FRANK:  Whether State Street will be

13   representing in the document that it will be acting as an

14   agent.  That's it.

15             THE COURT:  I think he can ask that.

16             MR. GOLDSTEIN:  I don't know that that -- which

17   document are you referring to, and which language?

18             THE COURT:  The NTMA.

19             MR. FRANK:  Well, no.  Now, we're on Royal Mail.

20             THE COURT:  Not on NTMA?

21             MR. FRANK:  We're done with NTMA.

22             THE COURT:  Okay.  You can ask that.

23             (Bench conference concluded.)

24   BY MR. FRANK:

25   Q.  Okay.  We were talking about the Royal Mail proposal,
```

1    correct?

2    **A.**   Correct.

3    **Q.**   And you reviewed that proposal, correct?

4    **A.**   Correct.

5    **Q.**   And that proposal represented to the client that State

6    Street would be acting as an agent, correct?

7    **A.**   Yes, but not in the context of what we just read.

8    **Q.**   I -- yes or no?

9              MR. GOLDSTEIN:  Your Honor.

10             THE COURT:  He can say yes or no, or I can't answer

11   yes or no.  If you feel like it needs further explanation,

12   that's for the other side to ask you questions.

13             THE WITNESS:  I understand that, Judge.

14             THE COURT:  Yes, no, or I can't?

15             THE WITNESS:  Yes.

16   BY MR. FRANK:

17   **Q.**   And it didn't say anything about riskless principal, did

18   it?

19   **A.**   No.

20   **Q.**   Did you review the AXA due diligence questionnaire?

21   **A.**   I don't recall that one.

22   **Q.**   Did you review any documents relating to AXA?

23   **A.**   I just don't recall that.

24   **Q.**   Do you know how AXA represented itself -- how State

25   Street represented itself to AXA?

1  **A.**   I couldn't know, because I don't remember reviewing those

2  documents.

3  **Q.**   You testified about Rule 10(b)10?

4  **A.**   Yes.

5  **Q.**   And you testified that pursuant to that rule, a

6  broker-dealer acting as a riskless principal, in a fixed

7  income trade, has no duty to disclose its markup.  Do you

8  recall that testimony?

9  **A.**   Yes.

10  **Q.**   That means that if you're a broker, you can be silent

11  about your markup, correct?

12  **A.**   Correct.

13  **Q.**   Would you agree with me, sir, that the rule doesn't

14  permit you to lie about what you're charging?

15  **A.**   I agree with that.

16  **Q.**   You can't tell a half-truth or deliberately mislead a

17  client, correct --

18          MR. GOLDSTEIN:  I object.

19  BY MR. FRANK:

20  **Q.**   -- under SEC rules?

21          MR. GOLDSTEIN:  I object, Your Honor.

22          THE COURT:  Sustained as to that.

23  BY MR. FRANK:

24  **Q.**   There are other SEC rules that specifically prohibit

25  misleading clients, correct?

1    **A.**   There are other SEC rules against fraud.

2    **Q.**   Well, there are rules that specifically prohibit

3    misleading clients, correct?

4    **A.**   It has to be material.  So I just -- I can't answer that

5    question, then.

6    **Q.**   Well, you're familiar with Rule 10(b)(5); is that

7    correct?

8    **A.**   Yes.

9    **Q.**   And Rule 10(b)(5) applies to broker-dealers, correct?

10            MR. GOLDSTEIN:  Objection, Your Honor.

11            THE COURT:  Sustained.

12            THE WITNESS:  It applies to broker-dealers.

13            THE COURT:  You can't answer.

14   BY MR. FRANK:

15   **Q.**   You are familiar that there are rules that specifically

16   prohibit affirmative or misleading -- materially misleading

17   statements to clients, correct?

18            MR. GOLDSTEIN:  Objection, Your Honor.

19            THE COURT:  Sustained.

20            MR. FRANK:  Your Honor, may I inquire as to the

21   basis?

22            THE COURT:  Beyond the scope.  He's only talked

23   about 10(b)(5).  He's not coming in to testify about all the

24   other rules that might or might not exist.  And --

25   BY MR. FRANK:

**Q.**   Rule 10(b)(10) does not allow you to materially mislead a client, does it?

**A.**   No.

**Q.**   And in fact, you're aware that these rules are promulgated under the Securities Exchange Act, correct?

**A.**   Correct.

**Q.**   And the purpose of that act is to ensure honest securities markets, correct?

           MR. GOLDSTEIN:  Objection, Your Honor.

           THE COURT:  Sustained.

BY MR. FRANK:

**Q.**   The purpose of the securities laws are to protect investors, correct?

           MR. GOLDSTEIN:  Objection, Your Honor.

           THE COURT:  Sustained.

BY MR. FRANK:

**Q.**   When you were at FINRA, acting as general counsel, you took action against brokers who misled their clients, correct?

           MR. GOLDSTEIN:  Objection.

           THE COURT:  Sustained.

BY MR. FRANK:

**Q.**   You testified that institutional investors understand that a broker-dealer will get paid for execution costs, even when the transition manager is collecting a fee.  Do you

1  recall that testimony?

2  **A.**  Yes.

3  **Q.**  Were you here for the testimony of Ian McKnight, Royal

4  Mail?

5  **A.**  No.

6  **Q.**  Were you here for the testimony of Dean Johnson of

7  Sainsbury's?

8  **A.**  I wasn't here for anybody's testimony.

9  **Q.**  You weren't here for Eugene O'Callaghan, either, of NTMA?

10       MR. GOLDSTEIN:  Your Honor, he's just testified he

11  wasn't here for any testimony.

12       THE COURT:  Overruled as to that question.

13  BY MR. FRANK:

14  **Q.**  Were you here for Eugene O'Callaghan of NTMA?

15  **A.**  No.

16  **Q.**  Now, that was on Tuesday morning, correct?

17  **A.**  I wouldn't know.  I wasn't here.

18  **Q.**  Well, you were right outside on Tuesday morning, weren't

19  you?

20       MR. WEINBERG:  I object, Your Honor.

21       THE COURT:  Sustained.

22  BY MR. FRANK:

23  **Q.**  You're getting paid $700 per hour for your time?

24  **A.**  It's either 700 or 750.  I don't remember.

25  **Q.**  It's hard to remember.

1   **A.**  Well, it's not my normal rate.

2   **Q.**  It's about $12 per minute?

3          MR. GOLDSTEIN:  Objection, Your Honor.

4          THE COURT:  Overruled.

5          THE WITNESS:  I haven't done the math.  I do it by

6   the hour.

7   BY MR. FRANK:

8   **Q.**  Well, actually, today you're not billing by the hour,

9   you're billing by the day, correct?

10  **A.**  Correct.

11  **Q.**  You're billing $9,000 for your time today, correct?

12  **A.**  Correct.

13  **Q.**  And you billed $9,000 for your time yesterday, correct?

14  When you weren't even in Court?

15  **A.**  Correct.

16  **Q.**  And you billed $9,000 for the day before, when you

17  testified for approximately one hour, correct?

18  **A.**  Correct.

19  **Q.**  And you billed $9,000 for the day before that, when you

20  flew in from your home in the Washington area, correct?

21  **A.**  Correct.

22  **Q.**  You have billed $36,000 for the last four days, during

23  which you've testified for a grand total of about an hour and

24  a half, correct?

25  **A.**  Well, I haven't billed anything yet, but that's what's

1  owed to me.

2  **Q.**  That's what you're going to get, correct?

3  **A.**  I hope so.

4  **Q.**  And not only did you get that -- are you going to get

5  that $36,000, but you've billed another $7,000 and change for

6  reviewing those 20 to 25 documents that you testified about,

7  correct?

8  **A.**  No.

9  **Q.**  That's incorrect?

10  **A.**  That's incorrect.  There are other things that I billed

11  for.

12  **Q.**  Meeting with counsel, correct?

13  **A.**  Telephone calls, yes.

14  **Q.**  So you billed $7,000 and change for reviewing those 20 to

15  25 documents and a couple of phone calls and meetings with

16  counsel, correct?

17  **A.**  The majority of that is meeting with counsel.

18  **Q.**  So even less -- the minority of that was actually

19  reviewing documents in this case, correct?

20  **A.**  Correct.

21  **Q.**  So altogether, between that time and your time over the

22  last four days, you stand to make well in excess of $42,000,

23  correct, for your testimony?

24  **A.**  Yes.

25  **Q.**  And you are here as advocate for Mr. McLellan, correct?

1   **A.**  No.

2   **Q.**  You're not?

3   **A.**  I'm not an advocate.

4   **Q.**  Well, do you remember that I called you up the night

5   before your testimony?

6   **A.**  Yes.

7   **Q.**  And you said in that conversation you would only talk to

8   me if you had --

9             THE COURT:  Before you ask that question, let me

10  see you at sidebar.

11            (The following discussion held at the bench.)

12            THE COURT:  It's one thing if you just want to

13  establish that he didn't talk to you, I don't know what it

14  was.  But if it's a substantive conversation, I don't know,

15  that --

16            MR. FRANK:  I'll tell you exactly what it is and

17  you can tell me if it's improper.

18            THE COURT:  I'm just wondering if you become a

19  witness.

20            MR. FRANK:  There was an FBI agent in the room,

21  listening, so there's an FBI agent witness, and the only

22  thing I want to elicit is that he said he would only speak to

23  me if he had counsels' blessing.

24            MR. GOLDSTEIN:  I object to the question.  It

25  implies that counsel didn't give a blessing, which he doesn't

1   know if that's true or not.

2           THE COURT:  No, sustained.  You're not touching

3   that.

4           (Bench conference concluded.)

5   BY MR. FRANK:

6   **Q.**  You wouldn't speak with me; is that correct?

7   **A.**  We did speak on the phone.

8   **Q.**  You wouldn't speak with me substantively about this case,

9   correct?

10  **A.**  I don't know what you mean by substantively.

11  **Q.**  Did we talk about the case?

12  **A.**  You asked me about the case.

13  **Q.**  Did you answer?

14  **A.**  No.

15          MR. FRANK:  Thank you.  No further questions.

16          **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

17  BY MR. GOLDSTEIN:

18  **Q.**  Mr. Menchel, you were asked questions about being here

19  for four days, correct?

20  **A.**  Correct.

21  **Q.**  And the rate of your pay for those four days.  You

22  weren't planning to be here for four days, right?

23  **A.**  That's correct.

24  **Q.**  You ended up being here for four days, given the nature

25  of the proceedings that occurred, correct?

1    **A.**   Correct.

2    **Q.**   And do you -- are there occasions where you actually

3    decline engagement offers for particular parties?

4              MR. FRANK:  Objection.  Beyond the scope.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes.

7    BY MR. GOLDSTEIN:

8    **Q.**   And have you done that in the past, sir?

9    **A.**   Yes.

10   **Q.**   And if you weren't here testifying, what would you be

11   doing, sir?

12             MR. FRANK:  Objection, hypothetical.

13             THE COURT:  Overruled.

14             THE WITNESS:  I would be home attending to other

15   matters.

16   BY MR. GOLDSTEIN:

17   **Q.**   And being compensated for your time, sir?

18   **A.**   Yes.

19   **Q.**   Mr. Frank asked you questions about "agent" and

20   "agencies."  Does that word have different meanings in

21   different contexts?

22   **A.**   Yes.

23   **Q.**   And in the -- the RFP materials that you saw and looked

24   at, when it talked about acting in an agency capacity, what

25   did -- in your experience, in the US broker-dealer industry,

1  what does that mean, sir?

2  **A.**   So when I read the materials, it meant we, the transition

3  manager and our affiliates, are not going to trade against

4  you.  So they know that the party that they're servicing will

5  be selling a lot of assets.  That information is very

6  important and the agency concept there is, I'm not going to

7  use any account at my firm to trade against you, to my

8  benefit.

9  **Q.**   So the company is not going to use the strategy, the

10  client strategy against it, by betting its own resources

11  against the client, right?

12  **A.**   Correct.

13  **Q.**   Now, an agent can also be a designation in terms of the

14  relationship between a broker-dealer and a client, correct?

15  **A.**   It can be.

16  **Q.**   And Mr. Frank asked you questions about disclosure being

17  required when a broker-dealer acts as an agent in the

18  marketplace, correct?

19  **A.**   Yes.

20  **Q.**   And where is that designation found?  If -- when a

21  broker-dealer is acting as an agent, a principal, or a

22  riskless principal?  Is that found in something called trade

23  confirmations?

24  **A.**   Correct.

25  **Q.**   And that was the subject of your testimony in the *Litvak*

1    matter, correct?

2    **A.**   Correct.

3    **Q.**   And Mr. Frank asked you questions, when you were last

4    here, about the term "commission."  Do you recall his

5    questioning about whether commissions were the same as

6    markups and markdowns?

7    **A.**   Yes.

8    **Q.**   And in a different context, can commission, spreads, and

9    markup and markdown mean different things?

10   **A.**   Yes.  They can mean different things.

11   **Q.**   And can they be used interchangeably in different

12   contexts?

13   **A.**   Sometimes they can, but they can mean different things.

14   **Q.**   Okay.  And does the name of the remuneration earned by a

15   broker-dealer, meaning whether you call it a markup, markdown

16   or commission, does that impact at all the rules of

17   disclosure that you testified about?

18   **A.**   Yes.

19   **Q.**   And whether you call it a markup or markdown or

20   commission, based on your 38-plus years' experience, is it

21   customary for a broker-dealer to take remuneration when

22   executing both stocks and bonds?

23   **A.**   Yes.

24   **Q.**   And is that true whether they're trading as a principal,

25   riskless principal, or agent?

1    **A.**  Yes, that's true.

2    **Q.**  And whether you call it a markup, markdown, spread, or

3    commission, based on your 38-plus years' experience in the US

4    broker-dealer business, do institutional investors understand

5    that broker-dealers earn remuneration when executing both

6    stocks and bonds?

7              MR. FRANK:  Beyond the scope, Your Honor.

8              THE COURT:  Sustained.

9              MR. GOLDSTEIN:  I have nothing further, Your Honor.

10             THE COURT:  Any recross?

11             MR. FRANK:  Very briefly, Your Honor.

12             **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

13   BY MR. FRANK:

14   **Q.**  Whether it's called a commission or a markup or a

15   markdown, it's -- economically, it's the exact same thing,

16   correct?

17   **A.**  Correct.

18   **Q.**  It's a per-trade charge, correct?

19   **A.**  Correct.

20   **Q.**  You testified about trading confirmations.  Do you recall

21   that?

22   **A.**  Yes.

23   **Q.**  Did you review any in this case?

24   **A.**  I did.

25   **Q.**  Did you see that they didn't go to the client?

1    **A.**  No, they went to the client.

2    **Q.**  They did?

3    **A.**  Well, yeah, the client was State Street.

4    **Q.**  So they didn't go to Royal Mail, or NTMA, or any of those

5    clients, correct?

6    **A.**  I can't tell from the confirmation that they went to

7    those people.

8    **Q.**  You saw --

9    **A.**  They were not directed to those people.

10   **Q.**  They were directed to State Street, correct?

11   **A.**  Correct.

12          MR. FRANK:  Thank you.  No further questions.

13          THE COURT:  All right.  Thank you very much, you're

14   excused.

15          THE WITNESS:  Thank you.

16          MR. GOLDSTEIN:  Your Honor, the defense calls

17   Michael Travaglini.

18          (The witness was duly sworn.)

19          THE COURT:  Go ahead.

20                    **MICHAEL TRAVAGLINI**

21       having been duly sworn, testified as follows:

22       **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

23   BY MR. GOLDSTEIN:

24   **Q.**  Mr. Travaglini, please state your name and spell your

25   last name for the record, sir?

1    **A.**   Sure, my name is Michael Travaglini, T-r-a-v-a-g-l-i-n-i.

2    **Q.**   Did you grow up in this area, Mr. Travaglini?

3    **A.**   I did.   I grew up in east Boston just across the harbor,

4    and I now live in Winchester, Massachusetts, which is just

5    north of Boston.

6    **Q.**   And where did you go to college, sir?

7    **A.**   I'm a graduate of Harvard University, 1985, and I have a

8    BA in Government.

9    **Q.**   And after college, any further schooling?

10   **A.**   I went onto Georgetown University law center, where I

11   earned my JERS doctor degree in the year 1990.

12   **Q.**   And after that, what you did you do for work, sir?

13   **A.**   I took a job with a Boston law firm known as Goodwin

14   Procter and I worked there from 1990 to 1993.

15   **Q.**   And after that?

16   **A.**   Tom Menino had just been elected mayor of Boston in 1993

17   and I had a relationship with him.   And in his new

18   administration, I accepted the position to be the executive

19   officer of the Boston retirement system, which was the office

20   that managed the defined benefit plan for the City of Boston

21   employees and teachers.

22   **Q.**   And what did you do in that capacity?

23   **A.**   In that capacity, as executive officer, I was responsible

24   for 34 employees.   All of whom were dedicated to the benefits

25   side, if you will, meaning enrolling people, paying them,

1    disability applications, and things like that.  And I worked

2    with a three-person board of trustees overseeing, at the

3    time, it was roughly over a billion-seven in retirement

4    assets that needed to be managed.

5    **Q.**   And what roles did you have in terms of the management of

6    those assets?

7    **A.**   Primarily leaning on an outside professional consulting

8    firm, known as Callan Associates, they're a nationally known

9    pension consultant, working with Joe Barsick and the three

10   member trustees responsible for all aspects of --

11          The way those jobs work is the board sets the asset

12   allocation, meaning how much money they want in stocks,

13   bonds, and the different asset classes that are available to

14   investors.  And then I, along with my consultant, needed to

15   go out and hire managers along that overarching asset

16   allocation.

17          Once hired and funded, you need to monitor

18   performance, in an ongoing basis.  Sometimes managers didn't

19   perform the way you wanted, so they needed to be fired, so

20   you needed to replace them with a different manager.  That

21   would involve transition management assignments, the whole

22   range of investment functions that go along with managing a

23   pension fund.

24   **Q.**   And in connection with that $1.7 billion, did you conduct

25   any transitions of those assets at any point in time while

1    there?

2    **A.**   I did.   In the Boston job, I relied primarily on Joe

3    Barsick and Callan to be the point person for those

4    transitions.

5    **Q.**   And how long were you in that position?

6    **A.**   I was in that position for just about three years.   The

7    downside of working for elected officials is they sometimes

8    want you to do something else, even when you're not ready.

9    Mayor Menino asked me to go up to the Boston redevelopment

10   authority.   I wasn't excited about that, but at that point in

11   my career, I didn't have the ability to tell him no.   So I

12   went up to become chief of staff at the BRA, which is

13   Boston's economic development agency.

14   **Q.**   And after that, what did you do, Mr. Travaglini?

15   **A.**   After that, I learned that there was a woman named

16   Shannon O'Brien, who was running for State Treasurer in

17   Massachusetts.   And the Treasurer, among other things here in

18   the Commonwealth, oversees the state retirement fund.   And so

19   I managed her political campaign for Treasurer in 1998.   And

20   when she successfully won that office in the fall, we were

21   sworn in in January, and I became her First Deputy Treasurer

22   in January of 1999, overseeing --

23            I sat as the chair of the nine member board of

24   trustees of the state pension fund for that time, but the

25   State Treasurer in the Commonwealth also handles abandoned

property, issuing all the bonds for the Commonwealth, kind of
a quirky, political thing in Massachusetts, because of when
it's created the State Treasurer also oversees the state
lottery.  So as her top deputy, the individual is responsible
for all of those verticals reported up to me.

**Q.**   And any institutional investment experience in that
position?

**A.**   Well, for four years -- so the PRIM board, the
nine-member board of trustees for the state pension fund --

**Q.**   You mentioned PRIM, what is that?

**A.**   Oh, I apologize.  So the state pension fund in
Massachusetts, by name, is known as the Pension Reserves
Investment Management board.  It was created by statute.
That was the name the legislature gave it.  So --

**Q.**   The acronym?

**A.**   The acronym, yes.  So when I refer to PRIM, so it's a
nine-member board of trustees, which includes the Governor of
the Commonwealth, the Treasurer of the Commonwealth sits as
chair by statute, and then the other members are either
elected or appointed.  I can give you detail -- so the
governor gets one appointment, the Treasurer gets one
appointment; two others are elected by the beneficiaries.
Two representing employees and two representing state
teachers.

**Q.**   So did you serve on that committee?

**A.**   I chaired for four years as First Deputy Treasurer.   I chaired the six meetings a year of that PRIM board, if you will.

**Q.**   And any investment decisions made during that time by the committee?

**A.**   Well, again, trying to orient you, PRIM had a staff that worked day-to-day, full-time, so there was an executive director, a chief investment officer.   There were probably 20 -- between 20 and 25 employees at the time.   So day-to-day, they -- the primary job of the board, if you will, again, was to set the overall asset allocation.

So in 1999, I would probably say there was about 26 billion in assets in the Massachusetts fund.   The board would meet and work with outside experts to develop the asset allocation and diversification.

**Q.**   And that's what you did while you were on the board, you participated in that process?

**A.**   In that process, absolutely, yes.

**Q.**   And you would set out the mandate for the people at PRIM and then they would make a decision in terms of how to --

MR. FRANK:  Objection, leading.

MR. GOLDSTEIN:  I'm just trying to --

THE COURT:  Sustained.

BY MR. GOLDSTEIN:

**Q.**   Okay.  So what would the board do, sir, in terms of its

1    interaction with PRIM?

2    **A.**   Well, the staff -- I would think of the staff as a

3    manager of money managers.  Right?  So once the board voted

4    on and approved that top line allocation, that was a

5    blueprint for staff to go out and hire best in class managers

6    along those asset classes.  Right?  If you wanted to be

7    invested in stocks, I had 11 -- not I, there were 11 people.

8    11 staff members who were -- had expertise in investments.

9    **Q.**   Okay.  And you served -- remind me how long you were on

10   the committee that was setting the blueprint there.

11   **A.**   So another bad thing of working for elected officials,

12   Treasurer O'Brien decided to run for Governor in 2002, when

13   it wouldn't have been my advice to her.  And so she was

14   unsuccessful and lost to Mitt Romney, who became the governor

15   at that time.  And the way politics works in Massachusetts is

16   we were in office on January 14, 2003 and we were out of

17   office on January 15, 2003.  We were succeeded by Tim Cahill

18   in the Treasurer's office, so there was a separate

19   election to replace Treasurer O'Brien, who, by running for

20   Governor --

21              THE COURT:  He's just asking you how long you were

22   in the job.

23              THE WITNESS:  Sorry.  Sorry, Your Honor.

24              MR. GOLDSTEIN:  I tried to lead, Your Honor.

25              THE WITNESS:  Until 2003.

BY MR. GOLDSTEIN:

**Q.**   Okay.  And what did you do next for work?

**A.**   I started looking for --

**Q.**   Well, let me ask you this.  Was there a time you actually went and worked at PRIM?

**A.**   Yes.

**Q.**   When was that?

**A.**   Yes, so after quickly getting a job for Putnam Investments, the new Treasurer who replaced us arbitrarily fired the person who was leading PRIM and tried to handpick a successor.  The board rejected that, made him hire an executive search firm.  So while I was working --

THE COURT:  Just when you went there and he asked you when you went there and --

THE WITNESS:  In February of 2004.

BY MR. GOLDSTEIN:

**Q.**   And in what role were you hired at PRIM?

**A.**   As the executive director.

**Q.**   And what did that mean, sir?

**A.**   So that was the top staff person overseeing the staff of between 20 and 25.  The two direct reports to me were the chief investment officer and the chief operating officer and I took that job in February of -- and I was appointed by and selected by the nine-member board of trustees.

**Q.**   Okay.  And you were there from what years?

**A.**   I was there from 2004 to 2010.

**Q.**   And during those years, how many assets were involved in the fund, sir?

**A.**   I'd say roughly probably 30 billion to -- again, I was there both up to 2008, when it was at its peak and then I was still there in 2010, when it came back, as you know, the assets are valued daily.  So probably between 30 and 45 billion, I would say, during my tenure.

**Q.**   And in that position, were you responsible for mandating the blueprint that was given to you by the executive committee?

**A.**   No.  Again, the nine-member board still did that.  Now I was in the day-to-day position to be the staff person who took that blueprint and implemented and executed along it.

**Q.**   And to implement and execute it, what did you do, sir?

**A.**   It would depend on what asset classes were implicated. Again, my investment staff was oriented by public markets, real estate, private equity.  So it just depended on which type of investment you were -- we were dealing with.  But -- so it was just a matter of delegation.

        Obviously we took the overall blueprint, which dealt with all the assets, and it would then be delegated down along staff specialists, if you will.

**Q.**   And as executive director of PRIM, did you have occasion to transition assets from one portfolio to another?

**A.**   During all of my six years there, I was in -- personally

involved in the bidding RFP process to hire both asset

managers and transition managers.  Depending on the

particular search, I would go on due diligence visits and

site visits along with my staff, you know, a whole -- the

range of facets involved.

**Q.**  Can you estimate how many transitions you oversaw in the

yearly basis that included the services of a transition

manager?

**A.**   I would say during the six years that I was there, we

averaged around four transition management assignments on an

annual basis.

**Q.**   And what were your responsibilities in connection with

these transitions?

**A.**   Well, one, making sure they were done correctly.  Stan

Mavromates was my chief investment officer and so our

responsibilities were to determine which third-party

transition manager we were going to use.

**Q.**   Did you have a panel?

**A.**   The way we did it at PRIM was we prequalified firms, so

we did one large RFP, where we invited -- and an RFP is a

request for proposals.  I don't know if that has come up

here.  It is the way that the investors test the marketplace

and see who was interested on bidding on your business.

**Q.**   And would you evaluate those proposals or responses to

1    the RFPs?

2    **A.**   Yes, we had a team, again, because asset classes differ.

3    There would be representation from each of my investment

4    staff on a transition management RFP.  And so it would be a

5    collective review and assessment and decisionmaking process.

6    **Q.**   What customarily is included within those RFPs from your

7    perspective?

8    **A.**   Well, again, the -- what you are trying to determine in

9    an RFP is --

10            THE COURT:  I'm sorry, are you asking him what was

11   in the RFPs that they did or just customarily --

12   BY MR. GOLDSTEIN:

13   **Q.**   Customary, in the industry as an investment professional

14   in the United States, what is customarily within these RFPs?

15   **A.**   Well, money management is a business of scale and we were

16   very large.  So anyone we were trying to deal with, at first

17   we wanted to make sure that they, the company we were going

18   to contract with, was -- had sufficient scale and depth of

19   experience to do the transactions that we needed done.  So

20   there may be some firms in the transition management business

21   who just because of our size couldn't work for PRIM.

22            So we would have objective criteria in the RFP,

23   trying to determine the scale of the bidders, because we had

24   a set of minimum criteria.  And if you weren't large enough

25   or had enough experience, you wouldn't meet the minimum

1    objective criteria.  Ultimately, we were trying to determine,

2    when we went to do that transaction, who was the best

3    available, if you will.

4    **Q.**  And based on your extensive experience in the US-based

5    transition management business and your knowledge of the

6    practices and norms of that particular industry, do

7    institutional investors understand RFP responses to be

8    binding?

9    **A.**  No.  I would --

10   **Q.**  What do you consider those responses to be?

11   **A.**  I would characterize the RPF.

12            THE COURT:  Does he or --

13            MR. GOLDSTEIN:  People in the industry.  I'm sorry,

14   Your Honor.

15   BY MR. GOLDSTEIN:

16   **Q.**  What do people in the industry consider RFP responses to

17   be?

18   **A.**  The beginning of the sales process.

19   **Q.**  And based on your experience in the US-based transition

20   management business, what steps, if any, do institutional

21   investors take to formalize any terms in the RFP they believe

22   to be important?

23   **A.**  There's -- ultimately, the beginning of the process is

24   the RFP, the end of the process is the transition management

25   agreement, which is a contract between you and the vendor

1    you've selected, which sets forth the terms of that

2    particular assignment.

3    Q.   And in your experience, do institutional investors

4    integrate important terms and --

5              MR. FRANK:  Objection to the leading, Your Honor.

6              THE COURT:  Sustained just as to the form.

7    BY MR. GOLDSTEIN:

8    Q.   What terms do institutional investors ultimately

9    incorporate into the contracts of the transition management

10   agreement?

11   A.   Any and all terms related to again -- transition

12   managements are very discrete assignments, so there's a

13   dollar value, right?  You may be looking to transition a

14   million dollars, there's an asset class.  It would be stocks,

15   bonds, whatever particulars securities you were talking

16   about.  You'd want to know the timeline for implementation

17   and you'd certainly want to know the cost.

18   Q.   Let me ask you this.  In your experience, are there any

19   limits upon which an institutional investor can negotiate

20   into a TMA, in terms of the terms and conditions of the

21   ultimate transition?

22   A.   No.

23   Q.   And based on your experience, are there occasions where

24   the parameters or terms of a transition change, after the RFP

25   responses have been submitted?

1   **A.**   Yes.   I mean, these are financial transactions, done on

2   exchanges which are open every day and are constantly

3   changing.   So you only know the actual results of a

4   transition when you implement the transition.

5   **Q.**   And what, if any, expectations do institutional investors

6   have as to whether or not the terms proposed in an RFP

7   response would endure, when the terms of the transition

8   significantly change from the RFP process to the actual

9   implementation?

10   **A.**   Well, again, I'm not sure I understand your question, but

11   the point is, you plan to do a transition and so there's all

12   kinds of pre-transition analyses gets done, but you only know

13   the true outcome when the transition itself is actually

14   implemented in the active markets.

15   **Q.**   And based on your experience in the US-based transition

16   management business, do institutional investors routinely ask

17   questions about --

18           MR. FRANK:   Objection to the leading, Your Honor.

19           THE COURT:   Sustained, just as to the form.

20   BY MR. GOLDSTEIN:

21   **Q.**   What, if any steps, can an institutional investor do if

22   they're unsatisfied, unhappy, or unclear about any terms that

23   are in a transition management agreement?

24   **A.**   They can explicitly write them down and memorialize them

25   and that is often what needs to happen.   Because the

1  interests of each party on the transaction are different.

2  **Q.**  And are there negotiations that can ensue in terms of the

3  terms -- ultimate terms of a transition management agreement?

4  **A.**  Oh, there are significant negotiations between the RFP

5  and the formalization of the transition management agreement.

6  **Q.**  And what involvement, if any, do broker-dealers have in

7  the transition management process?

8  **A.**  Well, broker-dealers are a necessary party at the -- I

9  would consider at the end of the transition management

10  process.  Your transition manager, is, to use a bad sports

11  analogy, your quarterback, but ultimately, if you're moving

12  securities, you need a registered broker-dealer to effectuate

13  those sales, buys and sells.

14  **Q.**  And is another term used, execution, or to execute those

15  buys and sells?

16  **A.**  Yes.

17  **Q.**  And based on your experience in the US-based transition

18  management business, how are broker-dealers typically

19  compensated for trading in the context of a transition?

20  **A.**  They are compensated by what are called commissions or

21  bid-ask spread.  They are different terms of art, but they

22  make a percentage of the number of shares that they're moving

23  on your behalf.

24  **Q.**  And are you familiar with pre-trade and post trade

25  reports?

1    **A.**   I am, yes.

2    **Q.**   And do they customarily have a line item expense for this

3    bid-ask spread?

4               MR. FRANK:   Objection to the leading, Your Honor.

5               THE COURT:   Sustained as to the form.

6    BY MR. GOLDSTEIN:

7    **Q.**   What kind of expenses are outlined in pre-trades and post

8    trades?

9    **A.**   Again, unless you're explicit, you know, we used to

10   always ask for direct and indirect fees to be explicitly

11   shown in pre-trade -- any pre-trade analysis.  In part,

12   because we always were aware that the best pre-trade analysis

13   still doesn't match up penny for penny to what happens after

14   the transition.

15   **Q.**   And based on your experience in the US transition

16   management business, are broker-dealer execution costs

17   usually included in a fixed or flat TM fee?

18   **A.**   They are not, no.

19   **Q.**   And is it customary for institutional investors to pay

20   both a fixed or flat transition management fee --

21               MR. FRANK:   I object to the leading, Your Honor.

22               THE COURT:   Sustained as to the form.

23   BY MR. GOLDSTEIN:

24   **Q.**   What's the custom in the US-based transition management

25   business, in terms of paying both a flat fixed fee, as well

1   as paying execution costs for broker-dealer services in the

2   context of a transition?

3   **A.**   Well, you know, again, fees are different for all sizes

4   of investors.  Our experience was they're -- in fact, we

5   never paid a fixed fee, in part, because of our size.  But

6   normally, there is a fixed fee and then there is a fee

7   associated with any securities, this commission that we've

8   talked about, that are transacted on your behalf.

9            MR. FRANK:  Objection on foundation grounds, Your

10  Honor.

11           THE COURT:  Overruled.

12  BY MR. GOLDSTEIN:

13  **Q.**  And do institutional investors prefer --

14           MR. FRANK:  Objection to leading.

15           THE COURT:  It's not yet -- he hasn't finished the

16  question, so wait.

17           But I remind you, you should not be leading.

18           MR. GOLDSTEIN:  Yes, Your Honor.

19  BY MR. GOLDSTEIN:

20  **Q.**  Do institutional investors prefer for a transition

21  manager to use affiliated or external broker-dealers in

22  connection with transitions?

23  **A.**  Affiliated.

24  **Q.**  And why is that, sir?

25  **A.**  So you know, we're talking about the cost of a transition

1    management here.  The real goal of a transition management is

2    to minimize the market impact.  And so I don't want to go on

3    a tangent, but there's a cost to moving securities that's an

4    actual bill, if you will, but there's also the ending value

5    of your fund, after the transition is conducted.  So we would

6    spend lots of time with the transition manager, trying to

7    strategically decide when the transition was going to occur,

8    to minimize that market impact.

9    **Q.**  And what impact, if any, does hiring an affiliate

10   broker-dealer -- what advantage would that have given an

11   institutional investor?

12   **A.**  Well, the primary one is if you're using -- so a number

13   of securities can be crossed, is the term, meaning that if

14   you have a transition manager that's got an enormous amount

15   of clients and an enormous amount of holdings.  If you use an

16   affiliated broker-dealer, a number of the securities can be

17   simply substituted for those of another client and there's

18   actually no cost associated with that, fixed or commission.

19   And so that's called crossing.

20          And so we always like using an affiliated

21   broker-dealer, because just take 100 percent.  You know, we

22   might end up paying for 75 percent of each transition

23   management, because 25 ended up being crossed at no cost to

24   us.

25   **Q.**  What advantages, if any, are there in terms of

1    communication between the transition manager and an

2    affiliated broker?

3    **A.**   Well, usually technology platforms are the same.  You

4    know, the parties know each other and do this on a day-to-day

5    basis.  You know, again, these are transactions that need to

6    be conducted efficiently and strategically.  So if there's

7    familiarity with the transition manager and the

8    broker-dealer, there are generally more advantages to that.

9    **Q.**   Okay.  And can a transition manager lean on an affiliated

10   broker-dealer in certain circumstance to try to meet

11   implementation shortfalls?

12             MR. FRANK:  Objection to leading.

13             THE COURT:  Sustained.

14             MR. GOLDSTEIN:  No further questions, Your Honor.

15             THE COURT:  Cross-examination?

16             MR. FRANK:  Thank you, Your Honor.

17             **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

18   BY MR. FRANK:

19   **Q.**   Good morning, Mr. Travaglini.

20   **A.**   Good morning.

21   **Q.**   You testified that RFPs are the beginning of a sales

22   process, correct?

23   **A.**   That's correct.

24   **Q.**   And would you agree with me that it's important for the

25   bank to be truthful in its responses, in its proposals to its

1   clients?

2   **A.**   Yes.

3   **Q.**   Because a client reads that and places trust that the

4   representations are true.

5   **A.**   Yes.

6   **Q.**   And that's what you did when you were at Mass. PRIM,

7   correct?

8   **A.**   Well, we knew they were true when they were in a

9   subsequent written agreement.

10  **Q.**   So you didn't --

11  **A.**   They were representations.  We took them for what they --

12  we assumed they weren't lying to us.

13  **Q.**   Thank you.

14  **A.**   But we also were going to verify.

15  **Q.**   Thank you.  But you assumed they weren't lying?

16  **A.**   Yes.

17  **Q.**   Okay.  And it was important to you that they weren't

18  lying, correct?

19  **A.**   Yes.

20  **Q.**   And you testified that you would negotiate transition

21  management agreements thereafter?

22  **A.**   Yes.

23  **Q.**   The agreements that you negotiated at Mass. PRIM, were

24  those evergreen agreements, or were they unique to every

25  specific transition?

1    **A.**   The ones we negotiated were unique to the transactions we

2    were dealing with at the time.

3    **Q.**   So you're unfamiliar with transition management

4    agreements that are evergreen, negotiated in advance, and

5    then modified subsequently by periodic notices or transition

6    notices?

7    **A.**   Could you repeat your question?

8    **Q.**   Are you unfamiliar with --

9    **A.**   I've never heard of evergreen transition management or

10   encountered them.

11   **Q.**   Thank you.

12   **A.**   Agreements.

13   **Q.**   By the way, when you were at Mass. PRIM, negotiating

14   transition management agreements, did you ever negotiate with

15   State Street?

16   **A.**   Yes.

17   **Q.**   Did you conduct transitions with State Street?

18   **A.**   Yes.

19   **Q.**   So did you know the defendant?

20   **A.**   I did not.

21   **Q.**   Do you know the defendant?

22   **A.**   I do not.

23   **Q.**   Okay.  And it was important to you in that process to

24   negotiate about fees, correct?

25   **A.**   That's correct.

1    **Q.**  Because fees are important?

2    **A.**  Yes.

3    **Q.**  Fees are important generally in the investment management

4    business, correct?

5    **A.**  That is true.

6    **Q.**  It's important to control them, because that is something

7    you can control, correct?

8    **A.**  Yes.  If you don't lose sight of the fact that market

9    impact --

10              THE COURT:  No, you've answered his question.

11              THE WITNESS:  Okay.  Sorry, Your Honor.

12              THE COURT:  It's all right.

13   BY MR. FRANK:

14   **Q.**  And you would actually ask explicitly for the direct and

15   indirect fees to be shown?

16   **A.**  Yes.

17   **Q.**  It was important for you to know what those direct fees

18   that you were paying were, correct?

19   **A.**  Correct.

20   **Q.**  Now, you testified that when you were at Mass. PRIM, you

21   never paid a fixed fee, correct?

22   **A.**  Correct.

23   **Q.**  You just paid by commission.

24   **A.**  On transition --

25   **Q.**  Assignments?

1    **A.**   -- management assignments.

2    **Q.**   Yes.  Thank you.  So for those assignments, you just paid

3    a commission, correct?

4    **A.**   That's correct.

5    **Q.**   And you testified that when there was crossing involved,

6    you didn't pay a commission for the crosses, correct?

7    **A.**   That's correct.

8    **Q.**   And so does it make sense to you that where there might

9    be a lot of crossing, a transition manager would prefer to be

10   paid on a flat fee basis, instead of by commission?

11   **A.**   That's not been my experience, no.  Again, it's the --

12   the reason why.

13   **Q.**   Thank you, sir.

14            THE COURT:  You answered.

15            THE WITNESS:  Okay.

16   BY MR. FRANK:

17   **Q.**   The transition assignments that you were involved in,

18   prior to Mass. PRIM, you didn't personally negotiate those?

19   **A.**   When I worked for the City of Boston, no.

20   **Q.**   So your only personal experience negotiating transition

21   management assignments was while at Mass. PRIM?

22   **A.**   That is correct.

23   **Q.**   And you haven't negotiated transition management

24   agreements subsequent to Mass. PRIM?

25   **A.**   I have not been in a position to.

1 **Q.** So the last time you negotiated a transition management

2 agreement was eight years ago, when you left Mass. PRIM?

3 **A.** That is correct.

4 **Q.** And your exclusive experience in negotiating those

5 agreements was for a six-year period?

6 **A.** That's correct.

7 **Q.** And you never negotiated evergreen ones, correct?

8 **A.** Excuse me?

9 **Q.** Evergreen agreements.

10 **A.** No.

11 **Q.** It was always one-offs?

12 **A.** Yes.

13 **Q.** And you testified that, in your experience, negotiating

14 those agreements, clients have the ability to negotiate

15 specific terms, correct?

16 **A.** Yes.

17 **Q.** And they have the ability to ask questions of the

18 provider, correct?

19 **A.** Correct.

20 **Q.** And it's important that they get truthful answers,

21 correct?

22 **A.** Correct.

23 **Q.** So if a bank were to tell you they're charging a

24 particular fee or a particular commission rate, it would be

25 important to you that that representation be accurate,

1   correct?

2   **A.**  That's why it would be in the fee schedule, at the end of

3   the transition management agreement.

4   **Q.**  Exactly, because it's important that it be accurate,

5   correct?

6   **A.**  Correct.

7   **Q.**  And you testified that the overall performance, which is

8   an important measure of the success of a transition, is the

9   implementation shortfall, correct?

10   **A.**  Yes.  If you mean -- when you use implementation

11   shortfall, if you mean --

12   **Q.**  The overall costs of the transition.

13   **A.**  The value to the fund that you are managing, right?

14   **Q.**  That's the measure --

15   **A.**  Is the fund in a better financial position or as good and

16   efficient financial position as it can be in, given the

17   transaction that you just implemented.

18   **Q.**  But you're familiar with the term "implementation

19   shortfall"?

20   **A.**  I am.

21   **Q.**  And that's a measure of the overall cost of the

22   transition, correct?

23   **A.**  Yes.

24   **Q.**  And one component of that cost are the direct fees that

25   are charged by the transition manager, correct?

1    **A.**   Yes.

2    **Q.**   And that is a fixed component, correct?

3    **A.**   Correct.

4            MR. FRANK:  Thank you.  No further questions.

5            MR. GOLDSTEIN:  Briefly, Your Honor.  May I just

6    inquire from the table?

7            THE COURT:  Yes.

8            **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

9    BY MR. GOLDSTEIN:

10   **Q.**   Mr. Travaglini, what ultimately controls the terms and

11   conditions of a transition management, is it the transition

12   management agreement, the contract, or is it an RFP?

13           MR. FRANK:  Objection, beyond the scope.

14           THE COURT:  Overruled.

15           THE WITNESS:  It's the transition management

16   agreement.

17   BY MR. GOLDSTEIN:

18   **Q.**   And where do institutional investors memorialize

19   important terms from their perspective for a transition?

20   Where do you find those terms memorialized?

21   **A.**   Well, the transition management agreement is a contract,

22   a written contract.  So anything that you want memorialized

23   is -- and it's done with lawyers on both sides, legal counsel

24   on both sides, to get to a -- so that if there is a

25   subsequent dispute, you refer to that document.

1    **Q.**  And that's the customary practice for institutional

2    investors, is to memorialize the important terms and

3    conditions in the ultimate contract, right?

4               MR. FRANK:  Objection to the leading, Your Honor.

5               THE COURT:  Sustained as to the form.

6    BY MR. GOLDSTEIN:

7    **Q.**  And in your experience, if you want to control fees,

8    where would you put provisions to control fees?

9    **A.**  In the fee schedule.

10   **Q.**  In the transition management agreement?

11   **A.**  Yes, if it was -- you know, they're an investment

12   management contracts for asset managements, there are

13   transition management agreements for transition management

14   assignments.

15   **Q.**  And Mr. Frank asked you questions about contracts.  If an

16   agreement says, if a transition management agreement says a

17   broker-dealer can take a markup or markdown --

18               MR. FRANK:  Beyond the scope, Your Honor.

19               THE COURT:  Let me see what the question is first.

20   BY MR. GOLDSTEIN:

21   **Q.**  -- would you expect that to occur in terms of a

22   broker-dealer affiliate?

23               MR. FRANK:  It's both leading and beyond the scope.

24               THE COURT:  Sustained as to the form.

25   BY MR. GOLDSTEIN:

1    **Q.**  In your experience, have broker-dealer affiliates of

2    banks been used during transition management agreements?

3              MR. FRANK:  Beyond the scope, Your Honor.  I didn't

4    ask any questions about affiliates.

5              THE COURT:  Sustained.

6              MR. GOLDSTEIN:  Nothing further, Your Honor.

7              THE COURT:  All right.  Any recross?

8              MR. FRANK:  Yes, Your Honor.

9              **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

10   BY MR. FRANK:

11   **Q.**  Mr. Goldstein just asked you some questions about what

12   you put in transition management agreements, correct?

13             MR. GOLDSTEIN:  That's not -- that's inaccurate,

14   Your Honor, I object.

15   BY MR. FRANK:

16   **Q.**  He asked you questions about it's important to

17   memorialize terms in transition management agreements,

18   correct?

19             MR. GOLDSTEIN:  I have an objection.

20             THE COURT:  Well, the first question, the objection

21   is moot, because he asked a new question.  He withdrew the

22   question and asked a new question.  So are you objecting to

23   the new question?

24             MR. GOLDSTEIN:  I didn't hear it, actually, Your

25   Honor.

1           THE COURT:  Why don't you ask it again.

2           MR. FRANK:  Thank you, Your Honor.

3   BY MR. FRANK:

4   Q.  It's important to memorialize the terms of the agreement

5   in a transition management agreement, correct?

6   A.  Yes.

7   Q.  But you don't have any experience with evergreen

8   transition management agreements that are modified by

9   subsequent periodic notices?

10          MR. GOLDSTEIN:  Beyond the scope, Your Honor.

11          THE COURT:  Overruled.

12          THE WITNESS:  I don't.  As I said, I don't -- I

13  never heard of them in my tenure as a pension specialist.

14  BY MR. FRANK:

15  Q.  But if that were to occur and the fees were set forth in

16  the periodic notice, those would be binding, correct?

17          MR. GOLDSTEIN:  Objection, Your Honor.

18          THE COURT:  Sustained.  Disregard the answer.

19  Sustained.

20  BY MR. FRANK:

21  Q.  If the fees were set forth in a binding document, I mean,

22  that's binding, correct?

23  A.  I'm not speaking to evergreen.  I just told you that I'm

24  not -- I have no experience or familiarity --

25          THE COURT:  He's not asking about evergreen, but we

1    don't need to know his --

2              THE WITNESS:  No, he did ask me, Your Honor, about

3    evergreen.

4              MR. FRANK:  You're right, Your Honor.  I apologize.

5              THE COURT:  Well don't -- hold on.  The witness's

6    answer as to whether binding means binding, which is what the

7    question was.

8    BY MR. FRANK:

9    **Q.**  Contracts can be modified, correct?

10             MR. GOLDSTEIN:  I object, Your Honor.

11             THE COURT:  Sustained.

12   BY MR. FRANK:

13   **Q.**  If the fees are set forth in the contract, you would

14   expect those fees to be adhered to, correct?

15   **A.**  Correct.

16             MR. FRANK:  Thank you.

17             THE COURT:  Thank you very much, Mr. Travaglini,

18   you're excused.

19             Next witness?

20             MR. WEINBERG:  The defendant calls Sean Murphy.

21             MR. NEMTSEV:  Your Honor, before Mr. Murphy

22   testifies, we'd like to admit a number of exhibits that are

23   not --

24             THE COURT:  Why don't -- you want to read the list?

25             Go ahead, Mr. Murphy, take the -- is Mr. Murphy --

1    some of these exhibits is Mr. Murphy going to read them?

2              MR. WEINBERG:  He's going to read a small subset of

3    the exhibits that Mr. Nemtsev is going to put on the

4    record --

5              THE COURT:  So let me just explain, ladies and

6    gentlemen of the jury.

7              Well, swear in Mr. Murphy first.

8              (The witness was duly sworn.)

9              THE COURT:  So you might remember in the

10   Government's case, there was a number of exhibits, a witness

11   read some of those exhibits and they were just admitted and

12   so that's what's going to happen now.

13             There's a series of exhibits.  Counsel will read

14   the list and I'll admit them and they'll be in.  You'll have

15   all of the ones that are admitted in the jury room when

16   you're deliberating.  As to some of those exhibits, this

17   witness will read portions of them, but I don't anticipate

18   he'll be reading all of all of these exhibits.

19             Go ahead.

20             MR. NEMTSEV:  Your Honor, we move for admissions of

21   Exhibits 300, 307, 311, 317, 351, 352, 473, 505, 506, 507,

22   508, 509, 510, 523, 1129, 530, 533, 535, 536, 541, 543, 544,

23   545, 547, 548, 551, 552, 555, 540, and 708.

24             THE DEPUTY CLERK:  540?

25             MR. NEMTSEV:  540.

1      THE COURT:  And then 708 was the last one.

2      MR. FRANK:  300 as modified, correct?

3      MR. NEMTSEV:  300 as modified, the two pages.

4      MR. FRANK:  No objection, Your Honor.

5      THE COURT: All right.  Admitted.

6      (Exhibit Nos. 300 (as modified), 307, 311, 317,

7      351, 352, 473, 505, 506, 507, 508, 509, 510, 523,

8      1129, 530, 533, 535, 536, 541, 543, 544, 545, 547,

9      548, 551, 552, 555, 540, and 708 admitted into

10     evidence.)

11     MR. WEINBERG:  Thank you, Your Honor.

12     THE COURT:  Go ahead.

13                         **SEAN MURPHY**

14     having been duly sworn, testified as follows:

15     **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

16 BY MR. WEINBERG:

17 **Q.**  Good morning, Mr. Murphy.

18 **A.**  Good morning.

19 **Q.**  What is your profession?

20 **A.**  I'm an attorney.

21 **Q.**  And are you part of the defense team for Mr. McLellan in

22 this case?

23 **A.**  I am.

24 **Q.**  Have you reviewed certain documents?

25 **A.**  I have.

1   **Q.**  And I'm going to direct you to just a small subset of

2   what Mr. Nemtsev introduced into the record, okay?

3   **A.**  Okay.

4   **Q.**  First is 536, if we could have that for the jury.  And if

5   I could direct your attention to the middle e-mail that comes

6   from Anandoth Krishnadasan.

7   **A.**  Yes.

8   **Q.**  Can you please read that?

9   **A.**  Sure.

10       It says, "Dear Ed, we are pleased to advise you

11   that you have won this Transition 121, kindly send the

12   documentation package ASAP to proceed further."

13   **Q.**  And then if I could lead you up in the chain of e-mails

14   to the next two e-mails.

15   **A.**  First one is from Rod Ringrow.  It says, "Good news."

16       And then Steven Smit responds, "Fantastic win."

17   **Q.**  And who does he respond to?

18   **A.**  Steven Smit responds to Edward Pennings and Rod Ringrow.

19   **Q.**  311, please.  And I would ask Mr. Nemtsev just to blow up

20   the very top of it.

21       Who is this e-mail written from and to?

22   **A.**  It's written from Mr. McLellan to David Puth.

23   **Q.**  The date November 3, 2010?

24   **A.**  That is correct.

25   **Q.**  And does it have a subject?

1    **A.**   Subject is a forward of "notice."

2    **Q.**   Thank you.  The next e-mail is 317.  And 317, can we blow

3    up the top two.  What is the date of this e-mail?

4    **A.**   November 3, 2010.

5    **Q.**   And directing your attention to the second e-mail down,

6    who is it from and is it to people, including a Mr. Mark

7    Hansen?

8    **A.**   It is from Mr. McLellan, and it does include Mark Hansen.

9    **Q.**   And can you tell us what the e-mail says?

10   **A.**   That e-mail says, "Are you saying only one of us can

11   charge a markup?"

12   **Q.**   And is the date November 2, 2010, or the date before the

13   last e-mail?

14   **A.**   The date of that e-mail is November 2, 2010.

15   **Q.**   Next is 473.

16          MR. WEINBERG:  And the top two e-mails, please,

17   Mr. Nemtsev.

18   BY MR. WEINBERG:

19   **Q.**   Is the bottom e-mail, dated November 3, the same date

20   we've been discussing?

21   **A.**   Yes, it's November 3.

22   **Q.**   And what is the subject?

23   **A.**   It is "TMA KIA fixed income derivatives trading."

24   **Q.**   And can you read the first line?

25   **A.**   It says, "We are trading this PM."

1    **Q.**   Written by Mr. Pennings to Mr. McLellan?

2    **A.**   That is correct.

3    **Q.**   And what does the top e-mail say?

4    **A.**   The response from Mr. McLellan says, "Can you have Simone

5    clarify via e-mail?"

6    **Q.**   Same date, correct?

7    **A.**   Yes, that is correct.

8    **Q.**   Okay.  Next is 352 and I won't have you read all of this.

9    **A.**   Thank you.

10   **Q.**   Can you blow that up?  From Mr. McLellan, again, to Mark

11   Hansen, is that correct?

12   **A.**   That is correct, on August 26, 2011.

13   **Q.**   Okay.  And can you go down to the subject?

14   **A.**   Subject is, "Relevant section from agreement."

15   **Q.**   And what is Mr. McLellan sending to Mr. Hansen?

16   **A.**   He's sending a section from the Royal Mail transition

17   management agreement.

18   **Q.**   Can you go down to the small four and small five?

19   **A.**   Sure.  It says, small four starts "The manager may

20   benefit from the commission, fee, markup or markdown payable

21   by the customer to the broker-dealer, or, five, an associate

22   is acting as a broker-dealer in respect to such portfolio

23   transaction and may benefit from a commission, fee, markup,

24   or markdown payable by the customer."

25   **Q.**   Who was Mr. Hansen?

 1    **A.**  Mr. Hansen is an attorney for State Street, or was an

 2    attorney for State Street in Boston.

 3              MR. FRANK:  I object to this, Your Honor.  There's

 4    no personal knowledge.

 5              THE COURT:  Sustained as to beyond reading the

 6    document.

 7    BY MR. WEINBERG:

 8    **Q.**  547?

 9              MR. FRANK:  I actually move to strike, as well,

10    Your Honor.

11              THE COURT:  Yes.  What he read -- what he read of

12    the document, you can consider.  The purpose of the witness

13    is to read the document.  Beyond that, I strike.

14    BY MR. WEINBERG:

15    **Q.**  547, can you --

16              MR. WEINBERG:  Max, can you blow up the top?

17    BY MR. WEINBERG:

18    **Q.**  Same date, August 26th?

19    **A.**  Yes.  August 26, 2011.

20    **Q.**  And who is the sender on this e-mail?

21    **A.**  Mr. McLellan.

22    **Q.**  Who was it sent to?

23    **A.**  John Norris.

24    **Q.**  Who else?

25    **A.**  CCed Mark Leaden, Mark Hansen, and Mr. Boomgaardt.

1    **Q.**   And what is the attachment?

2    **A.**   The attachment is the signed periodic notice for Royal

3    Mail dated February 24, 2011, and also attached is the Royal

4    Mail TMA from 2005.

5    **Q.**   Next is 548, a Pennings to Ross McLellan e-mail on

6    August 31?

7    **A.**   Yes.  2011.

8    **Q.**   What is the content of Mr. Pennings' e-mail to Mr.

9    McLellan?

10   **A.**   It says, "The more I think about it, the more it could be

11   that Graham's comment about someone whispering in RM's ear

12   could actually refer to me having told Ian McKnight that I

13   could not say that we didn't make money elsewhere.  Ian may

14   have told Graham, he therefore thinks we made money

15   elsewhere.  How are we getting on with the compliance draft

16   letter?"

17   **Q.**   544.  And I'd ask you to go to page 2, the top e-mails.

18   Right there.  Mr. McLellan to Mr. Pennings and Boomgaardt,

19   August 22, 2011?

20   **A.**   That is correct.

21   **Q.**   What does the e-mail say?

22   **A.**   It says, "Aren't we asking Hansen to approve total comp?"

23   **Q.**   What is the answer?

24   **A.**   I believe it's cut off from what I'm seeing, but I

25   believe it's an e-mail from Mr. Pennings that says just what

1    we gave back, I thought, and then Rick.

2    **Q.**  If we go to the first page and then we go to the bottom,

3    which is the -- and that is from Mr. Pennings to Mr.

4    McLellan, August 22, and that was the subject you had read

5    right at the top of page 2?

6    **A.**  That is what I had read, yes.  Also, it was CCed to

7    Mr. Boomgaardt.

8    **Q.**  What is Mr. Boomgaardt's input on August 22 to

9    Mr. Pennings and Mr. McLellan?

10   **A.**  He responds, "That is my understanding by 'compensation

11   amount,' he means the check we wrote to Royal Mail, i.e. to

12   attest that the amount paid back is equal to the coms taken."

13   **Q.**  And what is Mr. McLellan's answer?

14   **A.**  I can't see that on screen yet.

15            Mr. McLellan responds on August 22, 2010, -- I'm

16   sorry, 2011, "Okay, this should be easy."

17   **Q.**  535.

18            MR. WEINBERG:  Just -- can we extend that, Max?

19   Thanks.

20   BY MR. WEINBERG:

21   **Q.**  Written by Mr. Pennings to Mr. McLellan on October 21,

22   2010?

23   **A.**  That is correct.

24   **Q.**  Can you read what Mr. Pennings says to Mr. McLellan?

25   **A.**  "Rumor has it that SV" -- who is Samina Vernon -- "has

1    been approached by --

2              THE COURT:  Just SV.

3              THE WITNESS:  I'm sorry, Your Honor.

4              "Rumor has it SV has been approached by Russell but

5    not confirmed.  I cannot afford to lose any more TMs."

6    BY MR. WEINBERG:

7    **Q.**  Just a few more.  555, just the top e-mail.  Written by?

8    **A.**  Samina Vernon.

9    **Q.**  To a lot of people on February 25, 2010?

10   **A.**  Yes.

11   **Q.**  Including Mr. McLellan, Mr. Pennings, and Mr. Boomgaardt?

12   **A.**  That is correct.

13   **Q.**  What is the subject?

14   **A.**  Pre-trade sample report.

15   **Q.**  What does Ms. Vernon say in this e-mail?

16   **A.**  She said, "I forget to mention that there are two total

17   cost pages (one for UK and US) and two costs pages for fixed

18   income, depending on whether we need to split out coms or

19   not."

20   **Q.**  Next is 351, just the very top e-mail.  Who is that from?

21   **A.**  Brian Woodard.

22   **Q.**  Who is it to?

23   **A.**  Mr. Pennings, Simone Paul, Melissa McKay, and a cc to

24   Mr. McLellan.

25   **Q.**  What does it say?

1   **A.**   Subject, which is regarding "Hanover ADIC guarantee."  It

2   says, "Thanks, Ed.  Policy only refers to our standard

3   contract.  It doesn't allow for replicating another

4   negotiated contract that may have had concessions for one

5   reason or another.  No worries, just please make sure we run

6   it by someone going forward.  We can continue to ramp up and

7   will always have someone around to assist.  Take care and

8   let's get together next week and catch up when I'm out of

9   there."

10  **Q.**   This response to an e-mail right below it by

11  Mr. Pennings?

12  **A.**   That's correct.

13  **Q.**   What does it say?

14  **A.**   It says, "Brian, this had been done around Xmas time when

15  pretty much no legal was available.  Also, I believe our

16  policy document here states that if no changes have been

17  made, legal doesn't have to sign off.  Normally legal reviews

18  our documentation."

19  **Q.**   So that was -- the e-mail you read before that was from

20  Mr. Woodard back to Mr. Pennings, correct?

21  **A.**   That is correct.  That was his response.

22  **Q.**   Next is 551.  And does this relate to a travel document

23  that's appended to it, that's addressed to Mr. McLellan on

24  June 22?

25  **A.**   Yes.

1    **Q.**  And what does it show?

2    **A.**  June 22nd shows a flight scheduled on the 22nd -- I'm

3    sorry, June 22nd, 2011 going from Boston to San Francisco.

4    **Q.**  And the flight is scheduled for whom?

5    **A.**  Mr. McLellan.

6    **Q.**  Next document is 5 -- 552, the next travel document.  And

7    is this another travel record?

8    **A.**  It is.

9    **Q.**  For Mr. McLellan?

10   **A.**  Yes.

11   **Q.**  And can you tell us the dates and what that trip

12   represents, or was scheduled -- the scheduled trip

13   represents?

14   **A.**  The scheduled trip represents a flight starting on

15   February 26, 2011, from Boston with a layover in New York.

16   The ultimate destination would be Hong Kong, China.

17   **Q.**  And the date?

18   **A.**  February 26th, 2011.

19   **Q.**  Does that travel plan have a return?

20   **A.**  It does on -- I believe it's on the following pages.

21   **Q.**  Could we have the next page, bottom.  It starts March 1?

22   **A.**  Yes.  This is -- from my review of this previously, this

23   isn't the ultimate destination, but on March 1, 2011, it

24   departs Hong Kong to Sydney.

25   **Q.**  And where does it go from Sydney?

1    **A.**   I believe three days later on March 4th -- yes.  March 4,

2    2011, it goes from Sydney, ultimate destination, I believe

3    is -- oh, I'm sorry.  From what's in front of me, it goes

4    from Sydney to Los Angeles, California.

5    **Q.**   Last exhibit, 523.  And if we can zoom in on governance

6    and on the second subject under governance.

7    **A.**   Yes.

8    **Q.**   We --

9    **A.**   It says, "SS proposed Edward Pennings to become a

10   director."

11   **Q.**   And can we go up to the top of that document and

12   determine what that is?

13   **A.**   It's minutes from a meeting on May 12, 2011.

14   **Q.**   And is it for State Street Global Markets International?

15   **A.**   International Limited.  Yes, sir.

16   **Q.**   And do some of the participants that are listed here

17   include Stephen Smit with the initials SS?

18   **A.**   Yes.

19   **Q.**   And on the right-hand side, Simone Paul?

20   **A.**   Yes.

21   **Q.**   Edward Pennings, Marshall Bailey?

22   **A.**   Yes.

23   **Q.**   And if we can go to one more line item there,

24   under "finance," number 4, and five lines, or six lines down,

25   if we can yellow that out, or yellow that up.

1          THE COURT:  Again, and what were --

2          THE WITNESS:  EP queried.  It says, "EP queried.

3    If the report captured all of the revenue in the transition

4    management business, he noted that it only captures fees not

5    the spreads and will meet with KOFO to discuss."

6          MR. WEINBERG:  Thank you very much, Mr. Murphy.

7          Thank you, Your Honor.

8          THE COURT:  Any questions?

9          MR. FRANK:  Yes.  Just briefly.

10         Just a little more reading, Mr. Murphy.

11         **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

12   BY MR. FRANK:

13   **Q.**  If we could just take a quick look at 536, please.

14         THE DEPUTY CLERK:  Oh, is it max?  I'm sorry, I

15   changed it.

16         MR. FRANK:  Sorry.

17         Max, if you could just blow up the top, please.

18         THE COURT:  He wants you to blow it up.

19   BY MR. FRANK:

20   **Q.**  Mr. Murphy, do you see Mr. McLellan on this e-mail?

21   **A.**  The top one?  No.

22   **Q.**  Do you see him -- are you familiar with this document?

23   **A.**  I'm familiar with this e-mail chain, yes.

24   **Q.**  Do you see Mr. McLellan, do you know if he's anywhere on

25   this e-mail chain?

1    **A.**  To my recollection, he is not.

2    **Q.**  Thank you.  Could we look at Exhibit 311, please.

3            MR. FRANK:  And Max, if you wouldn't mind blowing

4    up the bottom e-mail.

5    BY MR. FRANK:

6    **Q.**  Could you read the first sentence, please.

7    **A.**  Sure.  It says, "All, we discussed this issue here this

8    morning and the conclusion was that we are okayed to have

9    rates quote prices as one of the potential liquidity

10   providers, but it will have to be on a competitive (blind)

11   basis."

12   **Q.**  Thank you.  And could you read the very last sentence of

13   the e-mail, please?

14   **A.**  It says, "If we are set up operationally to trade with

15   rates and they provide us with the best quote, then we can

16   deal with them.  If not, then we will deal with whoever

17   provides the best prices, per our usual competitive due

18   process."

19   **Q.**  Thank you.  Can we look at 317, please.

20           MR. FRANK:  And Max, if you can go to the -- if you

21   wouldn't mind going to the very last page of the document.

22   And if we can just take a look at the very last e-mail.

23   Could you read the first sentence, please?

24   **A.**  Sure.

25           "We are happy to use Even's team as a counterparty

1  tomorrow as it appears Brian and team are on board."

2  **Q.**  Thank you.  Could we look at Exhibit 473, please.

3           MR. FRANK:  And if you could go to the second page

4  of the document.  And if you could blow up the Krystyna Beck

5  e-mail there.  Thank you, Max.

6  BY MR. FRANK:

7  **Q.**  Could you read the first sentence, please, Mr. Murphy?

8  **A.**  Sure.  "To all, from a legal perspective, per se, there's

9  no issue in dealing with the rates desk as a counterparty,

10  provided it's consistent with TM's best execution policy."

11  **Q.**  Thank you and could you read the last sentence, please.

12  **A.**  "Dealing with the rates desk as counterparty generally

13  going forward must also be consistent with conflicts of

14  interest policy."

15  **Q.**  Thank you.  Could we look at 352, please.

16           MR. FRANK:  And Max, if you could just blow up the

17  header on the first paragraph.  Thank you.

18  BY MR. FRANK:

19  **Q.**  Mr. Murphy, what is the date of this e-mail?

20  **A.**  August 26, 2011.

21  **Q.**  That's Friday?

22  **A.**  According to this, yes.

23  **Q.**  And could you read the first sentence, up to the comma,

24  please?

25  **A.**  "Provided that the managers will ensure that such

1    portfolio transactions are affected on terms which are not

2    materially less favorable to the client then if the potential

3    or" --

4            What's that?

5            THE COURT:  What I'm -- I think it says "customer,"

6    not "client," doesn't it?

7            THE WITNESS:  Oh, I'm sorry.

8            "...to the customer that if the potential or actual

9    conflict had not existed."

10           MR. FRANK:  Thank you.

11   BY MR. FRANK:

12   **Q.**  Could we look at Exhibit 544, please.

13           MR. FRANK:  And Max, if you just blow up the --

14   actually, I'm sorry, if you could just go to the last page.

15   I apologize, page 3.  There you go.  Sorry.  There you go.

16   Could you blow up that e-mail on the bottom of the page,

17   please.

18   BY MR. FRANK:

19   **Q.**  It's a little bit hard to read, Mr. Murphy, can you read

20   that?

21   **A.**  The whole thing?

22   **Q.**  No.  I just -- can you actually see it?

23   **A.**  Yes.

24   **Q.**  Are you able to read it, is what I'm asking.

25   **A.**  Oh, yeah.  I'm asking do you want me to read the whole

1  e-mail?

2  **Q.**  I just want to -- so you see who this e-mail is from and

3  who it's to?

4  **A.**  Yes, it's from Mr. Pennings to Mr. McLellan and

5  Mr. Boomgaardt.

6  **Q.**  And could you read the -- "following the review," from

7  there, through the next sentence, please?

8  **A.**  It says, "Following the review, I can confirm that the

9  compensation amount of one million" -- I'm just going to read

10  it -- $1,010,003.67 for all TRACE and nonTRACE eligible bonds

11  is consistent with our internal analysis.  We view this as an

12  internal error that has now been corrected and do not treat

13  this as a breach of any regulations."

14  **Q.**  Thank you.

15  **A.**  "I trust this information is helpful for your analysis."

16  **Q.**  Thank you very much.  And just as a last one, can we look

17  at 351, please.

18          MR. FRANK:  And can you blow up the top header,

19  please.

20  BY MR. FRANK:

21  **Q.**  Could you just read the subject line, please?

22  **A.**  Sure.  It's "response to Hanover (ADIC) guarantee."

23          MR. FRANK:  Thank you.  No further questions.

24          MR. WEINBERG:  Just two very brief ones.  May I ask

25  them from here, Your Honor?

1          THE COURT:  Yes.

2          **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT**

3   BY MR. WEINBERG:

4   **Q.**  On the second to last e-mail that Mr. Frank had you read,

5   which is 544, page 3 of the very bottom, does that identify

6   who Mark Hansen is?

7   **A.**  Yes, it does.

8   **Q.**  Can you read his title at State Street Global Markets?

9   **A.**  His title is senior vice president, head of compliance.

10  **Q.**  And if we can go back to 317 for just a minute.  Mr.

11  Frank had you read --

12          MR. WEINBERG:  Excuse me for just one minute, Your

13  Honor.  I'm sorry, 311.  I apologize.  Too many numbers here.

14  Do we have 311?  If I can just go to a screen, Your Honor.

15  Can we blow up the second page and then the bottom e-mail.

16  Yes.

17  BY MR. WEINBERG:

18  **Q.**  Mr. Frank had you read part, but not all of this.  Can

19  you read the e-mail from Mr. Pennings to Brian Woodard and

20  Ross McLellan, and others, including Simone Paul and Krystyna

21  Beck, on November 3, please?  Subject "Notice"?

22  **A.**  Yes.  It says, "All, we discussed this issue here this

23  morning and the conclusion was that we are okayed to have a

24  rates quote prices as one of the potential liquidity

25  providers, but it will have to be on a competitive line

1    basis.  Our trading desk has to ensure best execution and has

2    the final say to whom they trade with.

3                The contract states the following:  The manager may

4    deal on a customer's behalf with any of the manager's

5    affiliates, as long as the terms -- term are as favorable to

6    the customer as would be obtained from a nonaffiliate

7    broker-dealer."

8    **Q.**  Okay.  Thank you.

9    **A.**  Sure.

10               MR. WEINBERG:  Thank you, Your Honor.

11               THE COURT:  Anything else?

12               **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

13   BY MR. FRANK:

14   **Q.**  Could you continue?

15               THE COURT:  Go ahead.

16               THE WITNESS:  "Under no circumstance should we give

17   rates preferential treatment.  We are to set up operationally

18   to trade with rates and they provide us with a best quote,

19   then we can deal with them.  But if not, we will deal with

20   whoever provides the best price, as per our usual competitive

21   due process."

22               MR. FRANK:  Thank you.  No further questions.

23               THE COURT:  All right.  You're excused.  Thank you

24   very much, Mr. Murphy.

25               Next witness.

1          MR. WEINBERG:  That concludes the defense, Your

2     Honor.

3          THE COURT:  All right.  Ladies and gentlemen, so

4     you've heard the Government's case, they rested on Tuesday.

5     We've now heard the evidence presented by the defense.  They

6     have now rested.  That's what Mr. Weinberg has just said.  So

7     what we'll do now is take the morning break and probably a

8     little bit longer, because I want to talk to the lawyers

9     about the schedule for the rest of the case and then I'll

10    bring you back in and we'll go over all of that.

11         All right.  All rise for the jury.

12         (The jury exits the courtroom.)

13         THE COURT:  Please be seated, unless you know, for

14    sure, now, why don't we take a little break, give you time

15    to -- you wanted to think about what you wanted to do, right?

16         MR. FRANK:  I can tell you our answer.

17         THE COURT:  All right.

18         MR. FRANK:  We're done.

19         THE COURT:  You're done.  Okay.  That's my -- I --

20    what I thought you should do, but --

21         MR. FRANK:  We appreciate it, Judge.

22         THE COURT:  -- you get to make your own -- what did

23    you say?

24         MR. FRANK:  We appreciate it, thank you.

25         THE COURT:  Just saves me from having to save you.

1              All right.  So let me take a five -- I'm going to

2      take a five-minute break.  You can go to the men's room.  I

3      just want to think about a couple of things and then we'll

4      come back and we'll talk about scheduling.

5              (Court in recess at 10:34 a.m.

6              and reconvened at 10:45 a.m.)

7              THE DEPUTY CLERK:  The McLellan matter is back in

8      session.

9              THE COURT:  Please be seated.

10             Any further comments about scheduling?

11             MR. WEINBERG:  Just two.  First, can I formally

12     renew my motion for judgment acquittal, Your Honor.  I think

13     that's a procedural obligation.

14             THE COURT:  Yes.

15             MR. WEINBERG:  And we would incorporate all of the

16     arguments that were in the initial filed motion.

17             THE COURT:  Fine.  Renewed.

18             MR. WEINBERG:  Two is, I think it's Your Honor's

19     discretion whether we go on Monday.  That's perfectly fine

20     with us.  I'm wondering if late this afternoon, or sometime

21     this afternoon would be an appropriate time for the charge

22     conference.

23             THE COURT:  If we go Monday, I would probably have

24     the charge conference tomorrow morning, because I think

25     that's --

1          MR. WEINBERG:  Totally.  Whatever is good for you.

2          THE COURT:  Do you have a preference between

3     tomorrow and Monday?

4          MR. WEINBERG:  Whatever the Court wants.  I can

5     argue tomorrow, we could argue Monday.  I'm absolutely fine

6     with going through the weekend and arguing Monday.  It's

7     really up to Your Honor.

8          THE COURT:  So there are two things that I've been

9     thinking about and I'll just -- one is, it's been a lengthy

10    case and there's a lot of issues that you've all raised about

11    the jury instructions and I'm anticipating that you will have

12    lots of comments about the jury instructions, which is fine.

13    I mean, you've had -- you've all had useful things to say.

14    So and then -- and then Friday afternoon, in a long case, it

15    worries me a little bit that there's a pressure to go too

16    quickly.  On the other hand, we have more time today than I

17    anticipated.

18          So I take it you're -- you're fine either way?

19          And you're fine either way, too?

20          MR. FRANK:  Yes, Your Honor.

21          THE COURT:  Give me a minute.

22          (The Court and law clerk confer.)

23          MR. WEINBERG:  Judge, if Your Honor please, if it's

24    this even, we prefer Monday.  The defense team wants to have

25    more input into the final argument.

1          THE COURT:  What did you say?

2          MR. WEINBERG:  The defense team wants to have more

3     collective input into my planned argument, so I've been asked

4     to ask for --

5          THE COURT:  Then I'll stick with what I plan.  The

6     big thing that's been goading me is that the instructions are

7     a bit complicated and I want to make sure that I get them

8     right, or as right as I'm capable and so I think we'll do

9     that.

10          I'll bring the jury back in.  That will give them a

11     couple more minutes to -- they have their snack, right?

12          THE DEPUTY CLERK:  They do.

13          THE COURT:  I'll bring them in.  I'm going explain

14     to them the rest of the schedule.  We'll have a -- I figure

15     the charge conference will probably be tomorrow morning.  My

16     plan would be to issue the draft version on ECF of the

17     instructions in verdict form, then you'll have it, you'll

18     review it.  We'll meet tomorrow morning and I'll hear you and

19     then I would make whatever charges need to be made and then I

20     would get you a copy of the revised version, so you have

21     that, you know what it is, both of you.  Then Monday morning

22     at 9:00, we begin Government's -- Government, defense, and

23     then the Government 's rebuttal.

24          MR. WEINBERG:  Just for Your Honor's schedule, on

25     Monday, I think -- I've talked to Mr. Frank.  I think the

1     Government is seeking an hour and 15 minutes, an hour at the

2     front end, 15 minutes on rebuttal and we would ask for the

3     hour and 15 minutes for our defense summation.

4               THE COURT:  All right, Mr. Frank?

5               MR. FRANK:  Yeah, I was giving an approximate

6     number.  If the Court is okay with us being plus or minus a

7     couple of minutes on either end.

8               THE COURT:  All right.

9               MR. FRANK:  One, just, matter that I wanted to put

10    on the record, briefly, Your Honor.  Mr. Weinberg -- because

11    this has been an issue in the case.  Mr. Weinberg advised me

12    yesterday that it was not his intention to seek to admit the

13    depositions of Krystyna Beck and Simone Paul.  I know the

14    Court hasn't ruled on that issue, but in any event, I just

15    wanted to put on the record that the defense elected not to

16    seek their admission and -- before closing its case.

17              THE COURT:  All right.  So --

18              MR. WEINBERG:  Let me respond to that, Your Honor,

19    by saying, yes, that's accurate, and (b), the depositions

20    were taken in the SEC case, subject to pretty strict rules

21    regarding the scope of subject matter that was negotiated

22    over many months.  I would, of course, preferred to have

23    Ms. Paul and Ms. Beck here pursuant to the MLAT, but the

24    Government didn't exercise those powers.

25              THE COURT:  All right.  Fine.  So I think one thing

1    that it would be helpful to do today, or -- probably today.

2    Two things for all of you.  Go over the exhibits and collect

3    the exhibits so that -- just to confirm, so we're all set.

4    Because once the jury goes out to deliberate, I would want

5    all of you, before Ms. Simeone carries or wheels the cart,

6    depending on what it is, of exhibits into the jury room, I

7    want all of you to put on the record that you agree that

8    what's going out is in evidence.

9            So to the extent you can be on the same page, at

10   least as to the numbers or what have you, that would be --

11   make it quicker than, because it would be nice to not make

12   them wait once they go back.

13           The second is there's a number of audio discs.

14   Those can be played in two ways by the jury -- have you

15   thought about that, Mr. Frank?

16           MR. FRANK:  I have not, Your Honor.  We have to

17   confirm that whatever device is used to play the audio discs,

18   there's -- some of the recordings that were made in England

19   have a special codec that needs to be installed on the

20   device.

21           THE COURT:  It needs like a software program to

22   play?

23           MS. LEAHY:  No, we've converted them all.

24           MR. FRANK:  Withdrawn.  They've been converted to

25   MP3.

1          THE COURT:  Okay.  So -- hold on.

2          (The Court and deputy clerk confer.)

3          THE COURT:  We're going to load everything on JERS.

4    Right?  So we're going to give them a paper copy of all the

5    things that came into paper, give them the physical discs and

6    then load everything on JERS.  And so in JERS, they would be

7    able to play the -- they would be able to play the MP3s.  All

8    right.

9          So one issue that I just want to flag you about

10   JERS.  JERS requires an index be created, so that --

11   essentially, when they pull it up on the screen, you can

12   pick, you want disc 12, so it -- or Exhibit 42, or whatever.

13   And there's -- if it's just numbers, it's useless to the

14   jury, it has to have some description, I think.  You should

15   think about that.  But then what I would like to have happen

16   is whatever description is created, since there is one that

17   is created, be agreed upon.  And rather than after the fact,

18   somebody decide they just discovered that there isn't a list

19   with a description and they didn't like the description.

20          Maria, do you create the description?

21          THE DEPUTY CLERK:  They create the disc.

22          THE COURT:  When you load it on to JERS, it's

23   the --

24          THE DEPUTY CLERK:  And I can add a description, as

25   long as I have --

```
 1            THE COURT:  So I think the ideal would be that you
 2    all would have the list -- load it on to JERS.  You can do
 3    that today or tomorrow, get that all set.  It might be even
 4    nice so you could have it done, so like Maria could test it.
 5            THE DEPUTY CLERK:  So we were talking about doing
 6    that tomorrow.
 7            THE COURT:  Perfect.  Do that tomorrow, test it.
 8    But also to the extent there's this index.  This arose in
 9    another case and I'd rather have everyone agree what this
10    says on the index, or I'll resolve -- if you can't agree on
11    what the index is, I'll resolve the disputes.  I don't want
12    to find out about it later.  I want to have it resolved in
13    advance before it goes to the jury.
14            MR. WEINBERG:  This is the true end of paper
15    documents, isn't it?
16            THE COURT:  Yes.  Exactly.  Okay.  So that is --
17            Maria, why don't you go get the jury?
18            At least for you, Mr. Johnston, it means a
19    beautiful weekend in New England, instead of a hot, summer
20    weekend, in a hot sweltering over-humid capital.
21            MR. JOHNSTON:  I actually am going back, Your
22    Honor.  I haven't been home in four weeks.  I need to make
23    sure I still have a residence.
24            THE COURT:  I can understand that.  Hopefully it's
25    air-conditioned.
```

1              (The jury enters the courtroom.)

2              THE COURT:  So ladies and gentlemen, let me explain

3    to you the rest of the schedule in the case.

4              You've heard all the evidence.  There will be no

5    more evidence, we're done with the evidence.  So what's next

6    and what remains in the case is closing arguments and my

7    final instructions to you on the law.

8              Now, that's not going to happen right now and let

9    me tell you why and what's going to happen.

10             It's actually going to happen -- we're going to do

11   this Monday morning.  Start at Monday morning and we'll have

12   closing arguments.  And let me explain to you why we're not

13   doing it this afternoon or tomorrow morning.  Because I can

14   imagine why you would think why aren't we ready to go do the

15   next thing.  I'm usually ready to go.  Right?

16             And so the reason is this:  There are two things

17   that happen next, that you're going to hear.  The closing

18   arguments of the lawyers and my instructions to you on the

19   law.  But my instructions to you on the law, under the law,

20   properly and fairly, I need -- after I'm done with them, I

21   give them to the lawyers, both to the Government's lawyers

22   and the defense lawyers to look at, so that they have a

23   chance to comment on what I've written out as the

24   instructions on the law.

25             And then after they've had a chance to look at it

1    and comment on it, I hear from them.  And then they make

2    comments, objections, suggestions, and then I may change that

3    or revise that.  And so that -- and I can't finish my

4    instructions until the evidence is finished, because

5    depending on what the evidence is, sometimes the instructions

6    are -- you need to -- I need to address certain things or not

7    address certain things, or what have you.

8            So that's why we're not doing it really, tomorrow

9    morning, because I want to do -- we've been here now a couple

10   of weeks, we're ahead of schedule.  So I want to finish the

11   instructions, give it to the lawyers.  I'll meet with the

12   lawyers tomorrow.  We'll go over that process, we'll be done

13   with it.  Then Monday morning, you'll come in, 9:00 a.m.,

14   we'll resume trial.  9:00 a.m., the closing arguments will

15   begin and then as soon as -- and the order, just so you know,

16   I'll explain it to you.

17           The Government will go first, they'll present their

18   closing argument.  Then the defense will present their

19   closing argument.  Then the Government will have a short

20   rebuttal.  The Government gets the short rebuttal, because it

21   has the burden of proof.  So that's the way we always do it.

22           And then after the lawyers are done with their

23   closing arguments, I will give you my instructions on the

24   law.  You will have a copy of my instructions.  I'll deliver

25   them to you orally, but you'll have a copy in writing in the

1    jury room.  Then you'll retire to the jury room and when you

2    retired to the jury room, we'll give you all the exhibits.

3           In addition, you might have noticed a big TV screen

4    with no cable TV service in the jury room.  It has no cable

5    TV service.  However, what we expect to do is that all of

6    the -- we expect to give you the exhibits in two forms.

7    You'll have all of the exhibits that you've seen/heard, in

8    paper, in the jury room, the ones that are in evidence.  In

9    addition, you'll have an electronic copy of all of them, and

10   with a remote control you'll be able to see them on the

11   screen and where that will be particularly helpful is things

12   that aren't readable like discs, but are audio or what have

13   you, you can play them, and that's what that system

14   facilitates.  You'll have both and we'll have all of that

15   working and set up for you.  So -- on Monday morning.

16          So you'll have that and then closing arguments

17   Monday, my instructions, and you'll go out, then you'll begin

18   your deliberations and you'll have everything you need.

19          Starting on Monday, I'll be asking you to stay all

20   day.  It won't take all day for the closing arguments and the

21   instructions, but I'll ask you -- but then you'll turn to

22   your deliberations and I ask you to stay all day, as you go

23   forth with your deliberations.

24          In addition, we will be providing you not only the

25   snack that you've been getting every day around the time that

1    you've been having it, but the Court will be providing you

2    lunch each day.  So lunch will be delivered to the jury room,

3    so you won't have to worry about that while you're

4    deliberating.

5            So in the meantime, I thank you for you attention.

6    I thought about this schedule and I understand in terms of

7    like potential desire to keep going -- yes.

8            THE JUROR:  When you say "all day," do you mean

9    like 4:30 again?

10           THE COURT:  Yes, so essentially what I really mean

11   with all day is this.  That's a good question.  When you are

12   deliberating, you are in charge of your own schedule, but

13   what I would normally anticipate is you would commence

14   deliberations at 9:00 a.m. if it were Tuesday or any day and

15   on Monday, and day-to-day, like on Monday, I would typically

16   expect you to go until about 4:30, but I would defer to you

17   as to what time you want to end.  That will be the collective

18   decision of the jury.  But what I would anticipate is not

19   like 1 o'clock and then -- ordinarily.  But it will be -- you

20   all will be in charge of that.

21           All right.  So we're not done, don't discuss the

22   case among yourselves, don't discuss it with anyone else,

23   don't do any independent research, including with the

24   internet.  Keep an open mind, because you have not heard --

25   although you've heard all the evidence, you have not heard

1    the lawyer's closing instructions to you and you have not

2    heard -- or closing arguments and you have not heard my

3    instructions on the law.  I thank you very much for your

4    attention.  We're near the end.

5                All rise for the jury.

6                (The jury exits the courtroom.)

7                THE COURT:  Okay.  So 9:30 tomorrow morning, and

8    I'll see you for a charge conference?

9                MR. WEINBERG:  Great.

10                MR. FRANK:  Yes, Your Honor, is it Your Honor's

11    practice to excuse the alternates at the beginning of

12    deliberations, or do you keep them around?

13                THE COURT:  We could talk about what you want to do

14    about that.  I know that generally I have not -- I know some

15    judges keep them in a separate room, so they're not going to

16    go into the jury room for deliberations.  12 will go into the

17    jury room for deliberations.

18                I know some judges will keep them in the courthouse

19    in another room.  I've always felt that's a little unfair to

20    the individual jurors to sit there with essentially -- not

21    locked away, but kind of.  So probably what I would do is

22    bring them out, tell them that they're -- send the jury --

23    send them back with the jury before they deliberate, so they

24    can collect their things, then have them brought back in.

25    I'll probably explain to them --

1          I explain to them before they go out, they're the
2     alternates, they can go back to say good-bye and to get their
3     things and then bring them in and say we might need you,
4     don't discuss the case, don't do any independent research,
5     essentially that mantra, and send them home, unless somebody
6     thought I should do something different for some reason in
7     this case.
8               That seems fine in terms of anything.
9               And then if we need them, we'll call them in and
10    substitute them in.  Okay.  All right.  See you at 9:30
11    tomorrow morning.
12              THE DEPUTY CLERK:  All right.  This matter is
13    adjourned.
14              (Court in recess at 11:04 a.m.)
15
16
17
18
19
20
21
22
23
24
25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in
and for the United States District Court for the District of
Massachusetts, do hereby certify that pursuant to Section
753, Title 28, United States Code, the foregoing pages
are a true and correct transcript of the stenographically
reported proceedings held in the above-entitled matter and
that the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.

Dated this 21st day of June, 2018.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter