<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3      - - - - - - - - - - - - - - - - - - x

 4      UNITED STATES OF AMERICA,              :

 5            Plaintiff,                        :    Criminal Action No.
                                                     1:16-cr-10094-LTS
 6          v.                                  :

 7      ROSS MCLELLAN,                          :

 8            Defendant.                        :

 9      - - - - - - - - - - - - - - - - - - x

10


11          BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                               CHARGE CONFERENCE
13


14


15                       Friday, June 22, 2018
                              9:37 a.m.
16


17


18


19


20      John J. Moakley United States Courthouse
        Courtroom No. 13
21      One Courthouse Way
        Boston, Massachusetts
22


23      Rachel M. Lopez, CRR
        Official Court Reporter
24      raeufp@gmail.com

25
</pre>

1                    **A P P E A R A N C E S**

2    On behalf of the Plaintiff:

3         UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
          BY:  STEPHEN E. FRANK
4         John Joseph Moakley Courthouse
          One Courthouse Way, Suite 9200
5         Boston, Massachusetts  02210
          (617) 748-3244
6         stephen.frank@usdoj.gov

7
          UNITED STATES DEPARTMENT OF JUSTICE
8         BY:  WILLIAM JOHNSTON
          1400 New York Avenue, Northwest
9         Washington, D.C.  20005
          (202) 514-0687
10        william.johnston4@usdoj.gov

11

12   On behalf of the Defendant:

13        MARTIN G. WEINBERG, P.C.
          BY:  MARTIN G. WEINBERG
14        20 Park Plaza
          Suite 1000
15        Boston, Massachusetts  02116
          (617) 227-3700
16        owlmcb@att.net

17
          LAW OFFICES OF ROBERT M. GOLDSTEIN
18        BY:  ROBERT M. GOLDSTEIN
          20 Park Plaza
19        Suite 1000
          Boston, Massachusetts  02116
20        (617) 742-9015
          rmg@goldstein-lawfirm.com
21

22        LAW OFFICES OF MAKSIM NEMTSEV
          BY:  MAKSIM NEMTSEV
23        20 Park Plaza
          Suite 1000
24        Boston, Massachusetts  02116
          (347) 251-4800
25        mentsev@gmail.com

**P R O C E E D I N G S**

1
2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4   for the District of Massachusetts is now in session, the

5   Honorable Leo T. Sorokin presiding.

6          Today is June 22nd, the case of United States vs.

7   Ross McLellan, criminal action 16-10094 will now appear

8   before this court.

9          Counsel, please identify themselves for the record.

10          THE COURT:  I see all counsel.

11          And you waived Mr. McLellan's presence?

12          MR. WEINBERG:  Yes.

13          THE COURT:  All right.  Okay.  I have the

14   Government's filing.  I have gone through that.  That's why

15   I'm a little bit late.  I apologize for that.  And so why

16   don't we just go through that first and then I'll hear from

17   whatever -- I'll hear both your views on theirs and then I'll

18   hear whatever you have.

19          MR. WEINBERG:  Thank you, Your Honor.

20          THE COURT:  All right.  So what's your view,

21   Mr. Weinberg, on whether I should have willful blindness?

22          MR. WEINBERG:  I think it's the antithesis of the

23   Government's theory of prosecution, which is this -- Mr.

24   McLellan directed Mr. Pennings and Mr. Boomgaardt, caused

25   Mr. Pennings and Boomgaardt to commit these frauds with

1    clients.  You can't direct somebody while you're willfully

2    blind.  There's an essential contradiction between the

3    Government theory, the facts in the case, their arguments,

4    that -- what I expect to be Mr. Johnston and Mr. Frank's

5    arguments, in a willful blindness charge.

6            Willful blindness is an alternative theory of

7    knowledge that is not to be instructed in cases where the

8    Government's theory is actual knowledge.  And I submit that

9    there is simply no evidence that Mr. McLellan was blinded to

10   red flags and avoided knowing something.  The paradigm is

11   the, you know, the person -- somebody gives them a suitcase

12   at the border and says, I'm going to give you five grand on

13   the other side and they walk the suitcase over without

14   opening it up.  That's where willful blindness comes from.

15   This is the antithesis of that.

16           THE COURT:  Okay.  I'm going to think about the

17   willful blindness.  I -- I'm happy to hear if you have more

18   to say, but you --

19           MR. FRANK:  Only that -- I mean, we've cited it,

20   Judge.  The case law is crystal clear that the willful

21   blindness theory is -- can co-exist with the theory of actual

22   knowledge, where the defense argues that he relied on the

23   wrong guy, when he gets an e-mail saying we have to charge a

24   fee, otherwise they get suspicious.  That's the

25   quintessential red flag and he goes ahead with the

1    transaction and he instructs the traders to apply undisclosed

2    markups.  So the defense is the one that's advancing this

3    theory and there's easily evidence from which a jury can

4    infer that he was blind to those red flags and deliberately

5    avoided looking into them.

6              MR. WEINBERG:  And one suggestion, Your Honor, is

7    wait until the final arguments.  I don't intend to argue that

8    Mr. McLellan was willfully blind.  I intend to argue that he

9    never directed Mr. Pennings to do certain things that the

10   Government claims he did and that Pennings and Boomgaardt are

11   committing -- are lying to the extent that they're blaming

12   McLellan for it.

13             MR. FRANK:  He's already -- Judge, I understand

14   that he's not arguing that he was willfully blind, but he's

15   opened the door to it, he argued it in opening, that he

16   relied on the wrong guy.

17             MR. WEINBERG:  That's not being willfully blind.

18   You need more than reliance.  You need --

19             THE COURT:  I got it.  I'll think about it.  I'm

20   disinclined to wait, because I think it's fair for both of

21   you to know what law I'm going to instruct on before you

22   close.  So I'll -- I think I'll resolve it before, one way or

23   the other, so you know.

24             MR. WEINBERG:  Well, I would respectfully --

25             THE COURT:  I understand if I resolve it the way

```
 1    the Government wants, you object.  You think it's not
 2    applicable and not warranted in this case.
 3            MR. WEINBERG:  It's even more than that.  I believe
 4    the Government thereafter should not be able to argue that
 5    Mr. McLellan knowingly directed Mr. Pennings and
 6    Mr. Boomgaardt.  It's inconsistent with willful blindness.
 7    They have to make a choice.  Either he was knowledgeable and
 8    engaged and directed and led an alleged conspiracy, or he was
 9    willfully blind and not educating themselves as to what
10    Mr. Pennings was doing.  They can't be arguing alternative
11    theories when their real argument has been only one of those
12    two theories.
13            MR. FRANK:  Unfortunately, the First Circuit says
14    we can.
15            MR. WEINBERG:  The First Circuit says that if
16    there's a factual predicate, the Court has discretion to
17    issue a willful blindness instruction, not that it must.
18            THE COURT:  All right.  I got it.
19            The second -- what's your position, Mr. Weinberg,
20    on the modification that the Government proposes on page 28?
21    Which is with respect to essentially just modifying the
22    sentence at the top -- top of page 28, to say -- add the
23    phrase, "on fixed income securities when trading as a
24    principal or riskless principal."
25            MR. WEINBERG:  I would object to the Government's
```

1    modification of that instruction, Your Honor.

2              THE COURT:  Why?

3              MR. WEINBERG:  Because it's unnecessary.  There's

4    been no allegation here that there was any failure to

5    disclose an equity on a -- in other words, the

6    confirmations -- this Government is not putting confirmations

7    where there was a failure to disclose an equity trade.  This

8    is purely a concept that relates to the fixed income trades,

9    but I see no reason for the Court to, you know, complicate

10   the clarity of its instruction by limiting it.

11             MR. FRANK:  Your Honor --

12             THE COURT:  Okay.  You mean, as a general matter,

13   this already only applies to fixed income.

14             MR. WEINBERG:  Yes.

15             THE COURT:  But what about the equity transaction

16   on the Russell 2000?  That was an equity, not a fixed income.

17             MR. FRANK:  Well, and it also does apply to fixed

18   income, Your Honor, where fixed income is traded as agent.

19             MR. WEINBERG:  You know, I think Your Honor is

20   right, there is the ETF and the breakdown of the ETF.  So I

21   mean, I'd prefer it being as it is, but I can't strongly

22   argue that it shouldn't be limited to the fixed income, which

23   is --

24             THE COURT:  All right.  I think I'll modify.

25             MR. FRANK:  I'm sorry, I didn't quite understand.

1              THE COURT:  I think I'll modify it.

2              MR. FRANK:  So Your Honor, are you going to add

3      that exact phrase "on fixed income when trading is principal

4      or riskless principal."?

5              MR. WEINBERG:  That I object to.

6              THE COURT:  What do you want me to say?

7              MR. WEINBERG:  Just there's no general duty on

8      fixed income to -- Your Honor has already said no general

9      legal duty to disclose on fixed income.

10             MR. FRANK:  But that's -- that's an incorrect

11     statement of the law.

12             THE COURT:  What do you say about that,

13     Mr. Weinberg?

14             MR. WEINBERG:  Well, I guess what I say about that.

15             THE COURT:  Here's what I'm trying to address here.

16     The Government's position throughout the case has been this

17     is not an omissions case.  I don't agree with -- you may

18     object to this, but I haven't -- as you can see in the

19     instruction, agreed to limit the instruction to just saying

20     affirmative misrepresentations.  But given the nature of

21     the -- because I do think that this sort of half-truths

22     theory is fairly in.  But the Government has never suggested,

23     up to now, at any point in the case, that Mr. McLellan could

24     be guilty merely for being silent.

25             Like the reason -- to the extent there's something

1    not said that matters, it matters because there were things

2    that were said that conveyed an impression that either were

3    affirmatively untrue or were misstatements.  But this is --

4    you haven't proceeded on a theory that -- that just doing

5    this, in and of itself, without the statements, is illegal.

6            MR. FRANK:  That's exactly right, Your Honor, but

7    there's one important nuance to that, which is that we have

8    proceeded on a theory that they affirmatively told the

9    clients they were acting as agent.  And so to an agents --

10   their own experts testify that agents do have duties of

11   disclosure.  So while we're not proceeding on a failure to

12   disclose case, we are proceeding -- in the presence of a

13   duty, we are proceeding on an affirmative misstatements case.

14   And where they affirmatively told clients we are acting as

15   your agent, if the Court chooses to put in a statement of

16   what the -- what the law is --

17           THE COURT:  But then there's no general legal

18   duty -- the reason -- even on that theory you're describing,

19   the duty to disclose arises because of what they said.

20           MR. FRANK:  Correct.

21           THE COURT:  Not because they had some independent

22   duty to disclose.

23           MR. FRANK:  Exactly right.  But if you're going to

24   put in the law with respect to duties to disclose, agents do

25   have duties to disclose.  So they are -- by calling

1  themselves agents, it would just be misleading to tell the

2  jury that --

3          THE COURT:  No, no.  People who are legally agents

4  might have duties to disclose, but calling oneself an agent

5  doesn't necessarily establish -- somebody in the audience

6  could say I'm a lawyer.  Lawyers have duties, but calling

7  themselves a lawyer doesn't make them a lawyer.

8          MR. FRANK:  You're right.

9          THE COURT:  That's the difference.  So the concern

10  I have here is that given there are, essentially, undisputed

11  charges that weren't expressly disclosed to the client.  Like

12  I don't think Mr. Weinberg -- there's any argument that some

13  of these fees were charged right.  No one is suggesting they

14  were actually listed on a bill to the clients.  That the jury

15  would infer that that's -- there was some requirement to tell

16  them.  Any requirement to tell them arises out of things they

17  said to them that were lies and this was -- right?

18          MR. FRANK:  Stipulated.  Two points.  One is, when

19  they told clients they were agents, that gave rise to an

20  understanding on the part of the clients.  So if the Court is

21  going to instruct the jury on the duties to disclose, we

22  think it needs to be a complete instruction.

23          THE COURT:  All I want -- what I'm trying to say

24  here and all I want to say to the jury here is, at the

25  get-go, they had no duty to disclose.  This is a lies, half

1    lies, fraud, deceit, the different theories case.  Like what

2    they did isn't illegal, without the statements.  Right?  It's

3    the statements that make this illegal, at least on the

4    presentation and theory of the --

5              MR. FRANK:  Correct.  But my only quibble is that

6    where they say they are an agent, I think the jury needs a

7    complete understanding of what the law is with respect to

8    agents and riskless principals.  Because by calling

9    themselves agents, they're giving rise to an understanding.

10   So if we're going to say the law doesn't say X about riskless

11   principals --

12             THE COURT:  I'm not -- but I'm actually thinking

13   that I shouldn't say anything about riskless principals.  I'm

14   not trying to instruct them on all of the laws of agents.  I

15   just want them to understand that at the beginning of this

16   whole process, there was no general duty to disclose.  Given

17   what they said, they could've -- there's no -- you know, that

18   doesn't permit them to lie, necessarily, but -- or probably

19   not at all.

20             But I'm not trying to describe to them -- and

21   saying they're agents then gets into the question of whether

22   they were -- whether they were actually agents or whether

23   they just said they were agents and what they intended.  And

24   that's like no different, in a sense, than what you're

25   describing as saying we're only charging a management fee and

1    we're not charging a commission.

2          MR. WEINBERG:  It's also going to have the Court

3    weigh in on just -- in what context they represented they

4    were agents.  Our argument, Mr. Frank argues that the word

5    "agent" somehow imposes all these additional

6    responsibilities.  We argue the word "agent" is an accurate

7    description in the marketplace.

8          THE COURT:  But you're arguing that those

9    responsibilities are coming in because of what people

10   understood from it.

11         MR. FRANK:  And what they said.

12         THE COURT:  And what they understood is from what

13   the defendant said.

14         MR. FRANK:  Correct.

15         THE COURT:  And not because of some independent

16   legal status.  In other words, you're not invoking there's

17   Rule 42 and it says that as a result of this status.  This is

18   a case that -- in which you're arguing they said things and

19   as a result of what they said, they duped people.  And as a

20   result of what they said, part of what they duped was it

21   invoked different understandings.

22         MR. FRANK:  But that's exactly right.  And so if

23   the Court is going to instruct the jury on what the baseline

24   understandings are in terms of the duties of riskless

25   principals, then it should also --

1          THE COURT:  I don't think I should instruct them on

2     all the baseline understanding of all these things.  What I'm

3     trying to just instruct them is that there's no, at the

4     outset, duty -- the fact that there's a charge that's not

5     revealed to a client, is -- there's no automatic duty to

6     disclose that.

7          MR. FRANK:  But that is only true with respect to

8     fixed income that is traded as riskless principal or

9     principal.  It is not true with respect to riskless principal

10    traded as agent, where there is a duty.  So I think the best

11    course here is for the Court to remain silent on all of that,

12    because that's not core to the securities fraud charge.  But

13    if the Court -- I understand what the Court is trying to do,

14    and so I'm just saying if we're going to wade into that sort

15    of concern --

16         THE COURT:  The concern I have is that the jury

17    will look at this and say they didn't tell them what the

18    commissions are and that's wrong and that's already --

19    they're already two-thirds of the way to being convicted and

20    that would be wrong, if they came to that conclusion on that

21    fact alone.  And so that's the concern that I have.

22         MR. FRANK:  But if the Court is going to wade into

23    this, the statement of the law has to be correct and there is

24    a general legal duty for agents to disclose both equities and

25    fixed income commissions.

```
 1          THE COURT:  But isn't the question as to what --
 2    isn't one of the question -- factual questions of his whether
 3    they were agents.  In other words, the question of agent
 4    could mean different things.
 5          MR. FRANK:  Stipulated, but it is not a correct
 6    statement of the law that there is no general legal duty to
 7    disclose commissions on fixed income trades.  That's only
 8    true where they're traded in a particular capacity.  That's
 9    why I think it's better to remain silent.  But if we're --
10    it's a metaphor for the case.  If the Court is going to speak
11    on this issue, I think it has to be a complete statement
12    of --
13          MR. WEINBERG:  The problem is that the whole agency
14    theory, Your Honor, when you look at the representations that
15    are made in these documents, we will go and act as your agent
16    in the marketplace.  The broker-dealer will act as an agent.
17    It's not the agent as the fiduciary that suddenly dilutes the
18    requirements.  It's the marketplace.  And you've heard
19    uncontradicted evidence that State Street Global Markets, the
20    broker-dealer, acted as an agent in the marketplace.  That
21    doesn't -- they can be an agent and a riskless principal at
22    the same time.
23          MR. FRANK:  That's a defense argument, I get that.
24          MR. WEINBERG:  It's not the defense argument.  It's
25    the uncontradicted evidence in this case.  So by limiting
```

1    this --

2              THE COURT:  I'm going to think about this sentence.

3    I understand what you're both saying.  Let me think about it.

4              MR. WEINBERG:  I would also say, Your Honor, it's

5    in the context, so I want to reserve my objections to going

6    beyond the Government's affirmative misrepresentation theory,

7    which they've said on several occasions this is about lies,

8    this is about affirmative misrepresentations.  They've done

9    it in pleadings, they did it on June 12 in statements to the

10   Court.  This is not an omissions case.

11             Your Honor has weighted it, you know, to our

12   perspective, at least, broadly in favor of broadening the

13   theories of liability beyond what an affirmative

14   misrepresentation, beyond a lie.  This balances it somewhat.

15   It's still troubling and we object to allowing them omissions

16   that mislead, on concealment, on, you know, half-truths.  You

17   know, all of the different options to predicating this case

18   and what the Government said this case was about, affirmative

19   misrepresentations, lies.

20             THE COURT:  So just so you understand why, I

21   don't -- to the extent -- partly, you argued it sort of

22   estoppel theory.

23             MR. WEINBERG:  Yes.

24             THE COURT:  Right.  And I'm not persuaded that the

25   course of this case gives rise to the kind of estoppel -- I'm

1    not persuaded that the course of this case gives rise to the

2    estoppel that you seek to invoke.  And that --

3           I do think that the Government has said this is a

4    lies case and -- but I don't think that they have described

5    it in a way, either in their pleadings or in the evidence,

6    that in some way limits it -- that would limit it such that,

7    say, on page 26, where I'm describing the first element, that

8    I should limit the first element to make an untrue statement

9    of material fact and not include the other parts.  I think

10   that the other parts, the other ways of doing that that are

11   described there, are fair on this evidence, and I do think

12   that part of the reason that I want to have -- put this

13   sentence in was because I want it clear to the jury that this

14   is not a just mere -- not mere, but just an omissions case.

15   And the Government's candid.  It's not arguing that it is.

16   And so I want to think about how to put that in.

17          MR. FRANK:  Just one further thought on that, if I

18   may, Your Honor.  We think in order to be fully complete, the

19   Court should instruct the jury that they may consider the

20   representations that the defendant and his alleged

21   co-conspirators made with respect to the capacity in which

22   they were trading as evidence of their intent.

23          THE COURT:  I'll think about that.  Okay.

24          Next, the -- about interstate fraud, which is

25   page 32.  Essentially, the Government objects to the two

1    sentences at the end of the carryover paragraph on the top of

2    page 32 and I was thinking about deleting the first sentence

3    the Government objects to, the one that begins "facts

4    relevant," but leaving in the second sentence, because that

5    seems like that might be helpful and it seems to resolve the

6    concern that's raised by the Government.

7          Do you have a view on that, Mr. Weinberg?

8          MR. WEINBERG:  You know, my view on that,

9    generally, Your Honor, is that Your Honor could affirmatively

10   instruct the jury, as we have requested in our

11   extraterritoriality instruction on securities fraud.  You

12   know, that's really our request, that Your Honor require the

13   jury, as -- in order to find that this is a United States

14   crime, it made the request -- if I can find it -- request

15   number 10, in the middle paragraph in particular.

16         MR. FRANK:  Can I see that, Marty?

17         THE COURT:  Well, Mr. Frank, if I'm going to tell

18   them, which I think I should, that securities transactions

19   conducted by US-based agent on behalf of a foreign buyer or

20   seller can still occur in the United States, which is

21   correct, even if title originates from abroad or is

22   ultimately transferred abroad at the end of the transaction,

23   I should give them some guidance -- maybe I should, as to how

24   they figure that out.  Why not just say you may consider, but

25   are not limited to considering, where the purchase or sale

1    agreement, and so forth.

2              MR. FRANK:  Well -- may I have a moment, Your

3    Honor?

4              THE COURT:  Yes.

5              (Counsel confers.)

6              MR. FRANK:  There's a couple of issues, Your Honor.

7    One is, one of the factors is where title passes, and where

8    title passes is itself sufficient, as the prior sentence

9    suggests.

10             THE COURT:  Right.

11             MR. FRANK:  For us to meet our burden.  But the

12   other point is, this multifactor test, which as we point out,

13   really relates to sort of peculiar securities that are not

14   the kinds of securities we are talking about in this case,

15   suggests that we have to meet this sort of very high hurdle

16   and establish all of these factors and we don't.  There's

17   been uncontradicted testimony in this case that these US

18   securities, which were traded in the United States by a US

19   broker-dealer cleared and settled in the United States.

20             And what that means is that the securities were

21   transferred from seller to buyer in the United States and the

22   money was transferred from buyer to seller in the United

23   States.  That's all -- that's all we have to show.  And you

24   know, suggesting all these different factors is going to --

25   we think, confuse the jury and sort of raise the burden that

1    we have to meet.

2         MR. WEINBERG:  One is, it may have been

3    uncontradicted, but it wasn't particularly compelling, given

4    the fact that the only witness that addressed this had not

5    worked at State Street and could not testify with any

6    certainty as to the protocols and procedures used by State

7    Street in 2010 or 2011.

8         MR. FRANK:  I will stipulate that he was not the

9    world's most compelling witness, but he was very clear on the

10   practices of clearing and settlement even in 2010 and 2011,

11   and that's independent of what happened in State Street's

12   back office.

13        THE COURT:  All right.  What if I said, maybe to

14   clarify, really, that after the one and two, is sort of an

15   explanation, in a sense, if you don't have one and two,

16   right?  If it is -- it occurs in the US if there's

17   irrevocable liability and it occurs in the US if title

18   passes.  But really, even if you don't have one of those two

19   things, you can still have a securities transaction in the

20   United States.

21        That is, for this case, even if it was a US-based

22   agent in the form of buyer or seller with title originating

23   abroad, or being ultimately abroad, it could, and then you

24   would think about these other things.  That's really what it

25   is.  You think about these things when you don't have the one

1   or two.

2            MR. WEINBERG:  Right.

3            THE COURT:  So maybe if I just clarify that, that

4   would resolve -- and then where entitled to securities would

5   pass would matter, because that would be a thing you would

6   think about.  And that's really -- maybe it's just not clear.

7            MR. WEINBERG:  I'm not sure that I agree with that,

8   Your Honor.  I think you need one or two to establish a

9   security fraud in America, given the context of this case,

10  where contracts were formed outside of America.  I think the

11  Government is seeking an exception to the locus of almost all

12  of the securities activity.

13           THE COURT:  Do you want me to just eliminate

14  everything after?

15           MR. WEINBERG:  No, I think Your Honor should --

16           THE COURT:  Well, but if the seller incurred -- if

17  it's one or two, it's in the US, right?  If it's not one or

18  two, aren't we just done?

19           MR. WEINBERG:  Because I think the facts relevant

20  to the determination, the jury doesn't know what an

21  irrevocable liability in America is, or title, I don't think

22  the Government has clearly -- you establish that by

23  undisputed evidence given the weakness of the evidence that

24  was alone offered on that.  And I think Your Honor could

25  certainly --

1          THE COURT:  So you're saying all these things

2     really mean -- if, in order to determine -- in thinking about

3     irrevocable liability, you may consider all these factors.

4          MR. WEINBERG:  Yes.  And I go back to my request

5     10, which really informs the jury that Mr. McLellan's

6     location in the United States is not dispositive.  And you

7     know, addresses certain of the elements that we think are

8     applicable from the largely Second Circuit law that sets out

9     the relationship, you know, under *Morrison* and securities

10    cases.

11         MR. FRANK:  Your Honor, these are indisputably

12    standard US securities.  They're US Treasuries.  They only

13    trade in the United States.  They're corporate bonds of major

14    United States companies that only trade in the United States.

15         This is suggesting some very high hurdle that

16    applies to like PIPE offerings and various bizarre forms of

17    securities that are just not applicable here.

18         THE COURT:  I think it -- I assume it goes, in some

19    sense, what purchase are we talking about, or what sale are

20    we talking about.

21         MR. FRANK:  By State Street Global Markets, LLC, a

22    US-based broker-dealer.

23         THE COURT:  All right.  Let me think about all

24    that.  I understand both -- I understand that issue better

25    now and it's helpful.

1    As to the -- then the Government had a number of

2 more smaller issues.

3    MR. FRANK:  Of those, there's one that I wish to

4 highlight, Your Honor.  Some of them are quite small.

5    THE COURT:  All right.

6    MR. FRANK:  But the issue about sharp dealing or

7 unethical conduct, we have a very serious concern about.

8    THE COURT:  Okay.

9    MR. FRANK:  Breach of contract alone --

10    THE COURT:  Hold on, let me just find where that --

11    MR. FRANK:  That's at the bottom of page 6 and the

12 top of page 7 of our filing.

13    THE COURT:  Okay.  Thank you.  Go ahead.

14    MR. FRANK:  Breach of contract alone is not fraud,

15 but breach of contract where you never intended to uphold the

16 contract is fraud, and breach of contract certainly can be

17 evidence of fraud.  And sharp dealing and unethical conduct

18 are vague and undefined terms that, by the way, also can be

19 evidence of fraud.  But I'm not sure that anyone really knows

20 what sharp dealing and unethical conduct actually are, but

21 they certainly can be consistent with fraud.  So again, we

22 think that this is a nonstandard instruction that really

23 could have -- could have the --

24    THE COURT:  I won't be insulted, you can say

25 whatever you want.  You won't offend me.

1          MR. FRANK:  -- could have the unintended

2     consequence of --

3          THE COURT:  Other people have said much worse about

4     me.  Some of them are in your office, even.  So it won't

5     bother -- it doesn't bother me.  I don't take it personally.

6          MR. FRANK:  I disavow, whatever they said.

7          THE COURT:  I know Mr. Lelling is here.  I don't

8     know if he disavows everything they said.

9          MR. FRANK:  Could have the unintended consequence

10    of having a defense -- an affirmative defense come out of the

11    Court's mouth and we think that's dangerous and we think a

12    standard instruction is more appropriate.  Contracts are

13    issued in tons of fraud cases and yet this instruction isn't

14    typically given.  But if it is given, we think that it

15    should -- we should take out the ambiguity about sharp

16    dealing and unethical conduct and also make clear to the jury

17    that breach of contract, while alone is not enough, can be

18    evidence of fraud.

19          MR. WEINBERG:  Your Honor has said here that these

20    three terms, without further evidence of fraudulent intent,

21    do not amount to a scheme to defraud.  One of our concerns,

22    Your Honor, is that so much of this case -- and I'll just

23    focus on a specific standalone count, which is Count 5, where

24    the word "inadvertent" -- which is not an e-mail sent to a

25    client to try to get money from a client, it's an e-mail sent

1    to a client, according to the Government's theory, to try to

2    conceal certain facts.  It's charged as a standalone wire

3    fraud.

4         The Government -- Your Honor has talked about

5    reckless disregard here.  Your Honor has given multiple

6    theories of what constitutes a false statement.  We need some

7    balance, so the jury understands that this is not strict

8    liability, that it doesn't -- every business communication,

9    that it's not 100 percent accurate is not a fraudulent

10   statement.

11        And this allows the jury to look at things that may

12   be edgy business conduct and see the -- that they need more

13   than just simply a partially inaccurate statement before they

14   convict somebody of securities or wire fraud.  So we think

15   this concept is extremely important in terms of balancing the

16   other portions of Your Honor's instructions on these two

17   criminal offenses.

18        MR. FRANK:  We think there's tons of balance in

19   here, including multiple good faith instructions.

20        THE COURT:  Okay.

21        MR. FRANK:  I'm pleased, though, that counsel at

22   least acknowledges that the conduct is at least edgy.

23        MR. WEINBERG:  That I do.  Mr. Pennings' and

24   Boomgaardt's conduct, in order to be more specific.

25        THE COURT:  All right.  I have one question

1  about -- Mr. Weinberg, I am -- I think I agree with the

2  Government about page 34, adding in the word "or entity."

3          MR. WEINBERG:  Yes.  Understood.

4          THE COURT:  Okay.  And on page 23 -- sorry.

5          I thought I would change the top -- the first line

6  to read -- it reads this way now, "A conspiracy is an

7  agreement, spoken or unspoken," I would then add "express or

8  tacit, among two or more conspirators."  I think that is --

9  it's similar but -- to what's already there, but adding it, I

10 think, is helpful.  I think the silent is covered by

11 unspoken.  So I'm inclined to add that.

12         MR. WEINBERG:  And I don't prefer it, obviously,

13 but I can't contend that that's in violation of the First

14 Circuit law on conspiracy.

15         THE COURT:  Fine.

16         All right.  What do you have?

17         MR. WEINBERG:  I've got, unfortunately, Judge, a

18 number of points.

19         THE COURT:  By the way, any issues with the verdict

20 slip before I turn to the defense?

21         MR. FRANK:  None, Your Honor, and I assume that

22 you're going to take under advisement, or have you made a

23 decision on the other --

24         THE COURT:  I think the others I'm going to take

25 under advisement.  I'm going to issue something.  You'll get

1    it all today.  I think - - the breach of contract one, I'm

2    puzzling over.  I'm thinking about -- I understand the

3    different issues.  And so I'm not trying to inject an

4    affirmative defense into the case.  I want to think about

5    that and think about how to put it in -- so let me -- I'll

6    puzzle over that and issue something.  And the others, most

7    of the others I'm disinclined to do, the ones on your

8    section 4.

9              MR. WEINBERG:  I'm trying to do this kind of

10   sequentially with Your Honor's instructions.

11             THE COURT:  Sure.

12             MR. WEINBERG:  Page 22, if I can start there.

13             THE COURT:  Yes.

14             MR. WEINBERG:  You have here at least six of State

15   Street's transition management clients.  I think, given the

16   evidence Your Honor can eliminate the "at least," because the

17   testimony was focused on six.

18             THE COURT:  Do you have a view about that?

19             MR. FRANK:  The conspiracy was to defraud

20   elephant -- clients in elephant deals as the opportunities

21   came up.  That's why the "at least" is in there.  We haven't

22   introduced evidence of others that they actually defrauded,

23   but we have introduced evidence that the conspiracy was not

24   limited to those.

25             THE COURT:  I think I'm inclined to leave it.  I'll

1    tell you why.  The reason I've described the -- I'm not going

2    to give the jury the indictment, because it's not evidence.

3    So I thought they -- but they have to find that the agreement

4    that's alleged in the indictment, this is the agreement

5    alleged in the indictment, so that's overruled.

6              MR. WEINBERG:  The last paragraph, page 22, Your

7    Honor, talks about committing offenses on, in, or about

8    certain specific dates.  I don't quarrel with that as being

9    an appropriate explanation of the conspiracy dates, but when

10   it comes to wire fraud, where there are three counts,

11   Counts 4 to 6, allege a specific wire described as being sent

12   on a specific date, I would ask Your Honor to -- in other

13   words, limit this instruction on on or about to Counts 1

14   through 3.

15             THE COURT:  So suppose they determine that the

16   April 6th e-mail -- I think one of the e-mails is April 6th

17   on one of the counts.

18             MR. FRANK:  I don't recall, Your Honor.

19             THE COURT:  But -- whatever.  Let's just say it's

20   April 6th.  Suppose the jury believed that all the elements

21   of that fraud charge were met.  They believed that the e-mail

22   was sent, they believed that it had the sufficient nexus to

23   the fraud, but they believed it was an April 5th e-mail.  You

24   think that's an acquittal?

25             MR. WEINBERG:  No, but I don't think -- if there

1    was evidence that would provide a reasoned basis for them to

2    adopt the hypothesis the Court just communicated.  Here,

3    there's no disputed evidence regarding the date.  There's an

4    e-mail.  Nobody has argued the dates were wrong.  We may have

5    not agreed on time, but these were e-mails --

6              THE COURT:  "May" seems like an understatement.

7              MR. WEINBERG:  Huh?

8              THE COURT:  "May" seems like an understatement in

9    characterizing the respective views of all of you on the

10   timing.

11             MR. WEINBERG:  We have, for instance, the AXA

12   Count 6, February 24th, there's a pre-trade sent.  The date

13   is important.

14             THE COURT:  I'm sorry, say this again?

15             MR. WEINBERG:  On the Count 6, for instance,

16   there's a specific e-mail that attaches a pre-trade to AXA.

17   The Government is alleging that that's a wire fraud.  On

18   Counts 4 and 5, they have specific e-mails.  There's no

19   dispute about the dates.  I don't want the jury to be able to

20   take a wire fraud count that's predicated on a specific

21   transmission and somehow bring other evidence in.

22             The AXA case is classic.  We have a very strong

23   argument, we made it to the Court on a Rule 29 that there's

24   not even any evidence that a scheme to defraud -- even under

25   the Government's theory, of conflicting commissions that one

1    was stated and another one charged.  There's no evidence as

2    to whether or not that was created, thought about, much less

3    that there's any evidence as of February 24th.  So the dates

4    are important and they're not disputed.  What I don't want to

5    do is substitute a generic scheme to defraud into a specific

6    wire count.

7          THE COURT:  But doesn't this instruction just mean

8    on February -- like if they were to view the e-mail -- take

9    AXA, as other than February 24th, they're not -- if they

10   believed that the evidence indicates that, in fact, it was on

11   another date.  That is, that the e-mail was sent on another

12   date, they could -- if they thought the e-mail was sent on

13   February 25th or 23rd, they -- or what have you, they

14   could -- they're not confined by the February 24th

15   allegation.

16         MR. WEINBERG:  I don't disagree with Your Honor

17   philosophically or generically.  I do disagree in the context

18   of this case, where there is such specificity to specific

19   wires, that -- it's not like we have a telephone call that a

20   witness said was made on March 7th.  Sure.

21         THE COURT:  What you're saying is that there will

22   be -- that the jury could do that.  It's just that there is

23   no evidence in this record that would authorize the jury to

24   do that.  And if they did that, came to the conclusion that

25   it was some other date and then made their evaluation about

1    nexus, based on that other date, that would be wrong, because

2    there's no basis to conclude it's any date other than the

3    date listed on the e-mail?

4            MR. WEINBERG:  Yes.  And it starts inviting

5    slippage into other e-mails or into a broader theory of

6    criminal liability than that alleged.

7            THE COURT:  What do you think about that?

8            MR. FRANK:  I don't think it does that.  The Court

9    is very clear, it doesn't matter if the indictment charges

10   that a specific act occurred in or around a certain date.

11   And the evidence indicates that, in fact, it, in other words,

12   that act, was on another date.  That's a very standard

13   proposition of the law.  This is what we charged in the

14   indictment.

15           THE COURT:  I think I'm going to leave it.

16           Next.

17           MR. WEINBERG:  Page 23.  I would ask that the Court

18   limit the object of the agreement to the specific crimes

19   alleged in Counts 2 through 5.  And I say that --

20           THE COURT:  Where are you?

21           MR. WEINBERG:  The middle paragraph, Your Honor.

22           And I think we --

23           THE COURT:  Not just securities fraud or wire

24   fraud, but the specific securities or wire fraud listed in

25   Counts 3 to 5.

1          MR. WEINBERG:  Counts 2 to 5 in particular, because

2     Count 6, AXA is not within the ambit of the Count 1

3     conspiracy.

4          THE COURT:  But you're not arguing that he was in a

5     conspiracy with Boomgaardt or Pennings about 6.  I mean,

6     that's not --

7          MR. FRANK:  We're explicitly arguing the opposite,

8     Your Honor.

9          THE COURT:  Right.  Yeah.  I don't think that's

10    necessary.  Next.

11         MR. WEINBERG:  Page 23, I would ask for special

12    verdicts.  Your Honor could give them an unanimity

13    instruction on whether they agree that it's securities fraud

14    or wire fraud, I would ask that there be a special verdict

15    added to the Count 1 verdict form.

16         THE COURT:  So you want me add -- you want me to

17    break it out -- you want a special finding as to the object?

18         MR. WEINBERG:  Yes.

19         THE COURT:  So phrased how?  So right now it's just

20    we the jury -- being unanimous, have reached the following

21    verdicts, not guilty or guilty on conspiracy.

22         MR. WEINBERG:  I think it's just on the verdict

23    form.  Your Honor has given them the proper unanimity

24    instruction.

25         THE COURT:  Right, but on the verdict form, what

1    specifically --- how would I phrase it?

2              MR. WEINBERG:  Do you unanimously agree?  If you

3    unanimously --

4              THE COURT:  In other words, we the jury --

5              MR. WEINBERG:  -- unanimously agree that the --

6              THE COURT:  Would it be a sub-part question?

7              MR. WEINBERG:  Yes.  Under Count 1.

8              THE COURT:  Essentially, question one -- actually,

9    the one change that I'm going to make to the verdict form,

10   just as I look at it now, is non-substantive.  I'm going to

11   number.  So there will be a one, before Count 1, two, because

12   I refer to them in the instructions as numbered questions.

13   So I'm just going to number them.  So what you're saying is

14   question one is the conspiracy question.  Are you saying that

15   if they find -- if guilty?

16             MR. WEINBERG:  Yes.

17             THE COURT:  Then answer question 1a?

18             MR. WEINBERG:  Yes.

19             THE COURT:  And that would be do you unanimously

20   find that wire fraud --

21             MR. WEINBERG:  The object of the conspiracy.

22             THE COURT:  The object of the conspiracy was wire

23   fraud.  And then under wire fraud, unanimously find wire

24   fraud and securities fraud, and they could -- and then it

25   would be yes or no as to each of those and they could check

1   that?

2           MR. WEINBERG:  Yes.

3           THE COURT:  What do you think about that?

4           MR. FRANK:  I'm just a little concerned that that

5   invites sort of a multiple conspiracy confusion.  The Court

6   is very clear.  You have to agree what he was trying to do

7   here, what the object of the conspiracy was.  But to break it

8   out on the verdict form, I don't think -- I don't think

9   that's standard and I worry that that invites them to sort of

10  think that there is -- there may be two different

11  conspiracies here or that they have to reach some --

12          THE COURT:  It's certainly not -- it's certainly

13  very common in civil cases and rare in criminal cases to have

14  special verdict questions beyond just the -- that's my

15  experience, I agree with you.  And I'm curious, I would have

16  actually thought that you would wouldn't have wanted that.

17          MR. WEINBERG:  No, I think it focuses the jury.  I

18  mean, there's a unanimity requirement here.  And it focuses

19  the jury on which of the two they unanimously agreed on, or

20  both.  And it's important, you know, for obvious reasons.

21          MR. FRANK:  Judge, the only general comment that

22  I'd make in response to that is, you know, this is a

23  complicated case, but it is a standard securities fraud case.

24  And so anything we do that sort of deviates from the standard

25  way that securities fraud cases are treated, seems to me

1    unwarranted and potentially dangerous.

2           MR. WEINBERG:  Here's the reason for it, so there's

3    no secret.  If Mr. McLellan is convicted on Count 1 and

4    there's an appeal and I succeed in persuading the Court of

5    Appeals that it was extraterritoriality as to wire fraud, but

6    the security counts were proven, I think it's important -- I,

7    at least, want to make the request to give the Court of

8    Appeals some clarity as to which of the two objects they

9    agreed on, if the Government opposes it, then I think they're

10   at a disadvantage on an appellate basis.

11          THE COURT:  Right.  I thought it would be something

12   like that.  So you're saying that if -- let's say if you were

13   convicted and if he appeals and you succeed on appeal in

14   establishing an extraterritorial aspect to the wire fraud, so

15   that would -- then the question would be what to do about --

16   you're saying if it was just a general verdict, we wouldn't

17   know whether they --

18          Assuming he was found guilty of everything, we

19   wouldn't know whether -- or even if he wasn't, I suppose,

20   even if he weren't found guilty of securities fraud, either

21   way, we wouldn't know whether the jury thought that he was

22   also guilty of the securities fraud.  And so that would be an

23   independent basis to leave the conspiracy standing and it

24   would be -- or would it be -- I see.  That's why you want it.

25          MR. WEINBERG:  Yes.  I want some clarity.  In other

1    words, if the jury was to say --

2           THE COURT:  In other words, if they said only wire

3    fraud and you prevailed on that.

4           MR. WEINBERG:  Then I get an acquittal.  If I

5    succeed, obviously --

6           THE COURT:  On the other -- right.

7           MR. WEINBERG:  -- on predicate of proving

8    extraterritoriality.

9           THE COURT:  Right.

10          MR. FRANK:  Again, we don't normally peek behind

11   the curtain of what the jury is thinking, but I will also say

12   that, in this case, in the context of what was charged, we

13   would have an indication, because there are separate

14   substantive counts of securities fraud and wire fraud.

15          THE COURT:  Although conceivably, it wouldn't be --

16   I don't think I would -- I'm just thinking out loud, but if

17   the jury came back and said conspiracy, but didn't convict on

18   any of the substantive wire fraud -- the Counts 2 to 5, but

19   convicted on Count 1, I don't think that would be an

20   inconsistent verdict.

21          MR. FRANK:  It would not.  But that's standard in

22   every case where there's a multiple object conspiracy charged

23   and where defense -- the fact that the defendant is making a

24   *Morrison* argument doesn't change that.  There are always

25   arguments about why a --

1           THE COURT:  So let me think about it.  I'll tell

2    you what I'm thinking about.  On the one hand, I think

3    there's a value to trying to -- there's a clarity value, but

4    there's a preference for general questions and I understand

5    you essentially saying the reason you want the clarity -- the

6    reason clarity trumps generality, even though the preference

7    is for generality, is because there is this issue and it

8    would resolve the clarity, it would -- if you prevailed on

9    appeal, everything would be known and that would settle it

10   all out.  And so let me -- I'll think about that.  I'm just

11   not sure.

12          MR. WEINBERG:  Next, on 24, Your Honor instructs

13   that Mr. McLellan, you know, be found not to be part of the

14   agreement at the start, he could still be found guilty if he

15   willfully joined the agreement later.

16          We've asked, in our request, for what I call a

17   *Grunewald* instruction, we raised it pretrial as an evidence

18   matter.  There is no instruction here that would provide the

19   jury with any guidance as to whether, if they found -- and

20   it's certainly conceivable on the basis of this record, they

21   will find that Mr. McLellan was not part of a conspiracy on

22   February and March, or in 2010, to defraud these clients in

23   terms of the selection of transition managers or securities

24   trading, but found that he joined the conspiracy in June and

25   then in August, when he helped Mr. Pennings cover it up, to

1    use the Government's language.

2                THE COURT:  Right.

3                MR. GOLDSTEIN:  But that would not necessarily

4    provide a principled predicate, I would contend, for his

5    having been found guilty of conspiracy's charge.  Because I

6    don't believe there's any evidence that amongst the original

7    agreement is that we would rebate a million dollars to Royal

8    Mail if they complained.  Yet, that is a substantive charge

9    against Mr. McLellan for wire fraud.  And a jury could, on

10   this record -- I'm not saying they would, but could on this

11   record say that's when Mr. McLellan became part of the

12   conspiracy, on June 21 and June 22, when, instead of blowing

13   the whistle on Pennings --

14               THE COURT:  But if the overt act, if the conspiracy

15   preexisted him, and if an overt act had been committed and

16   then he willfully joined --

17               MR. WEINBERG:  If concealment -- if lying to a

18   client about what happened six months earlier --

19               THE COURT:  If lying to a client about lying to a

20   client.

21               MR. WEINBERG:  -- was part of the original

22   agreement, then, yes, the *Grunewald* standard would be met.

23   But if that wasn't part of --

24               THE COURT:  What are you telling me you want me to

25   say here?

1          MR. WEINBERG:  I want you to give an instruction

2    consistent with our request that I believe is request 22, on

3    page 32 of our principal request document.  Just essentially

4    just drafted along the lines of the Grunewald test.

5          MR. FRANK:  Just a factual point.  Even if what

6    Mr. Weinberg says is true, that e-mail, inadvertent

7    commissions applied, served not only to cover up the taking

8    of -- to continue to conceal the other part they were doing,

9    but it was also to keep the $2 million that they had obtained

10   by fraud.  So even if, contrary to fact, Mr. McLellan had not

11   been involved in the original scheme, once he was involved in

12   concealing from the client and keeping the $2 million that

13   had been fraudulently obtained, he's guilty of a conspiracy

14   to commit wire fraud and securities fraud.

15         MR. WEINBERG:  And that's where the disagreement

16   occurs.  I mean, take a bank robbery, if a person did not

17   conspire to rob a bank, but four months later the robber

18   comes to him and says, hey, the police may search my home,

19   they're on to me.  They think I robbed the bank.  Will you

20   help me --

21         THE COURT:  I got it.  I don't think I'm going to

22   change the instruction, but I'll reread -- I'll go back and

23   look at that instruction you have before I conclusively

24   decide.

25         MR. WEINBERG:  And it's not that I'm requesting

1    necessarily that it be on page 24.  I'm requesting that

2    request 22 be considered and adopted.

3              THE COURT:  Right.

4              MR. WEINBERG:  Next is on page 25, this is the

5    start of the omissions -- the references to omissions, down

6    in -- under 10b-5, subsection (b), and it kind of permeates

7    the next five pages, and I just want the Court to understand

8    -- I know the Court does understand our position that we

9    believe the Government structured this case as an affirmative

10   misrepresentation case.  I think this goes to page 26, 27 --

11   all of the different instructions where Your Honor gives the

12   jury alternatives to an affirmative misrepresentation theory,

13   we object to.

14             We understand that it's within the language of

15   10b-5, but it's simply inconsistent with what the Government

16   has put this case on, which is they've said it's an

17   affirmative misrepresentation case and I think the net effect

18   of these instructions is to dilute that burden and to allow

19   the jury to find that Mr. McLellan -- or Mr. McLellan caused

20   Mr. Pennings not to say something that would give the client

21   more information that the client could have then had an

22   understanding that there was not only going to be a

23   transition management fee, but also broker-dealer charges.

24   And that's one of the essential battlegrounds, factually.

25             And I think upon this record -- and I appreciate

1    the Court's single instruction about no duty to disclose, but

2    by repeatedly giving them the options of concealment and

3    omissions and failed to make a statement that would have made

4    the statement they made less misleading, I think Your Honor

5    has essentially prejudicially broadened the basis of criminal

6    liability beyond a theory that Mr. McLellan was prosecuted

7    on.

8              THE COURT:  Okay.  I don't -- you don't agree with

9    that, right?

10             MR. FRANK:  We do not.

11             THE COURT:  That general objection is overruled.  I

12   think that the -- their Government is proceeding on an

13   affirmative misrepresentation theory, but those affirmative

14   misrepresentations could be characterized in a number of

15   different ways, all of which are expressed within the law

16   here.  And I don't think that a reasonable -- I don't think

17   jurors would be confused into thinking that failing to say

18   something, in and of itself, would give rise to liability,

19   absent it -- need to say something because of another

20   misrepresentation or affirmative statement that had been

21   made -- and the intent is clear with respect to the

22   statement.  So as a general matter, it's overruled.

23             What's next?

24             MR. WEINBERG:  Page 26.

25             THE COURT:  Yes.

1          MR. WEINBERG:  The middle, that Mr. McLellan did at

2     least one of the following, either engaged in a scheme to

3     defraud, a fraud or deceit, or made an untrue statement of a

4     material fact.  I believe that the untrue statement of

5     material fact needs to be in connection with a scheme to

6     defraud.  You can't just have an isolated misstatement of

7     material fact.  It needs to be part of an overrided

8     fraudulent scheme to defraud.  So I think by giving them

9     three separate standalone, independent bases that --

10          THE COURT:  Well, if he made an untrue statement of

11     material fact and he made it willfully, knowingly, and with

12     intent to defraud, and that he -- then why wouldn't that be

13     enough, with the third prong, with the jurisdictional prong.

14          MR. WEINBERG:  Because Your Honor says, with

15     respect to the first element, it is not necessary to

16     establish all of the different types --

17          THE COURT:  You have to establish one, two, or

18     three.

19          MR. WEINBERG:  Right.

20          THE COURT:  But isn't that just a correct statement

21     of the law?

22          MR. WEINBERG:  It is a statement -- it's probably a

23     correct statement of the law, regrettably.  But on the basis

24     of this case, you know, you have the real risk of a statement

25     being taken, you know, out of the fraudulent scheme alleged,

1    which is a scheme to lie to clients.  It just allows the jury

2    to adopt a statement that's --

3              THE COURT:  I don't -- I understand the point and

4    the worry, but I'm not persuaded, because it's expressly

5    required that -- that he had to act -- the act then, in that

6    circumstance, would be the untrue statement and he would have

7    had to have acted with the intent to defraud.  So --

8              MR. WEINBERG:  And page 27, Your Honor.

9              THE COURT:  Yes.

10             MR. WEINBERG:  Which is the in-connection

11   instruction.

12             THE COURT:  Yes.

13             MR. WEINBERG:  We believe and we've made certain

14   requests to Your Honor, you know, that the in-connection

15   needs to be in connection with the sale or purchase of a

16   security and not simply a broad in-connection to an

17   investment decision or something that coincided with a

18   securities transaction.  You know, there's several places

19   where the Court, even once you invite a false statement in

20   connection with a selection of a transition manager.

21             And so we would ask the Court to go back and give

22   our request for instruction on this issue, which is number 3,

23   that the statements need to relate directly to an investor's

24   decision to buy or sell a security, in order to be

25   in-connection, as required by the securities law.

```
 1                    THE COURT:  Noted and overruled.

 2                    Next.

 3                    MR. WEINBERG:  Next is --

 4                    THE COURT:  I'm assuming on any of these, if you

 5          want me to say what he's asking for, or something similar,

 6          you're going to stand up and tell me?

 7                    MR. FRANK:  Yes, Your Honor.

 8                    MR. WEINBERG:  27 top.

 9                    THE COURT:  I'm sorry.  What page?

10                    MR. WEINBERG:  27, on the top three lines, Your

11          Honor.

12                    THE COURT:  Yes.

13                    MR. WEINBERG:  I understand it's not an essential

14          element that Mr. McLellan profited or received a benefit, but

15          I'd ask the Court not to say it doesn't matter.  In other

16          words, if the Court can say there it is not an essential

17          element as to whether the alleged unlawful scheme was

18          successful or if Mr. McLellan profited, but one of our

19          arguments factually, is it does matter that he had no

20          benefit, you know, as a motive argument.  And so I would ask

21          the Court to revise that instruction.

22                    MR. FRANK:  We think that's a correct statement of

23          the law, Your Honor, motive is not an element and so it

24          doesn't matter.

25                    MR. WEINBERG:  I'm not asking that it be an
```

1  element.  I'm just asking that it not be excluded as a

2  relevant consideration.

3          THE COURT:  What are you asking for, again?

4          MR. WEINBERG:  It is not an essential element in

5  connection to this case, whether the alleged unlawful scheme

6  was successful or whether Mr. McLellan profited or received

7  any benefits as a result of it.

8          MR. FRANK:  It's not only not an essential element,

9  it's not any kind of an element and motive is irrelevant.

10          MR. WEINBERG:  In fact, Your Honor can flip the

11  sentences and say success is not an element of the crime

12  charged, without the first sentence.  It's an optional way.

13          THE COURT:  In other words, you're saying just

14  delete the first sentence?

15          MR. WEINBERG:  Yes.

16          MR. FRANK:  We wouldn't object to flipping the

17  sentences, but we think that the --

18          THE COURT:  What if I said neither success, profit,

19  nor benefit are elements of the crimes charged?

20          MR. FRANK:  That's fine.

21          MR. WEINBERG:  That's fine.

22          THE COURT:  Okay.  Next.

23          MR. WEINBERG:  Page 27, again, at the -- four and

24  five lines up at the bottom is the omissions theory that

25  we've made clear our --

1          THE COURT:  You've noted your objections,

2     preserved.  It's over.

3          MR. WEINBERG:  Okay.  Then I'm not going to.

4          Next is we object to the reckless indifference

5     alternative.  A statement, claim, or document is fraudulent

6     if it was falsed, or if it was made with reckless

7     indifference.  I think that dilutes the requirement of

8     falsity.

9          THE COURT:  Overruled.

10          MR. WEINBERG:  Page 28, there's a reference about

11     just halfway, five lines down, in the third paragraph or the

12     second paragraph, that begins on that about a fact is

13     material if there's a substantial likelihood or reasonable

14     investor would consider it important in an investment

15     decision.  We would ask that the purchase or sale of a

16     security --

17          THE COURT:  The fact is material -- you mean add to

18     it an investment -- say it again.  What do you want me to

19     add?

20          MR. WEINBERG:  Instead of investment decision,

21     which could be which broker do I choose, or how much do I pay

22     at a premium.

23          THE COURT:  You want to say -- instead of "when

24     making an investment decision," you want to say when

25     making --

1          MR. WEINBERG:  A preponderance or sale of a

2     security.

3          MR. FRANK:  We object to that, Your Honor.

4          THE COURT:  I think I'm going to leave it the way

5     it is.  Overruled.

6          MR. WEINBERG:  We -- the next line, "statement

7     contains a material fact, if there's a likelihood an investor

8     engaging a transition manager would consider it significantly

9     altering the mix of information."  I think this goes beyond

10    what securities fraud criminalizes.  It's more in the nature

11    of a wire fraud that the selection of a broker, an investment

12    manager, a transition manager is simply outside the confines

13    of Title 15, which deals with the purchase and sale of

14    securities.  That's why I would object to that sentence.

15         THE COURT:  What do you think about that?

16         MR. FRANK:  I think there's specific case law

17    addressing this point, which we've previously cited which

18    says exactly what, essentially, is here.

19         THE COURT:  Overruled.

20         MR. WEINBERG:  We've given Your Honor the specific

21    requests, requests 4 and 5, in terms of what we think is the

22    appropriate law.  We've cited to cases that --

23         THE COURT:  I'll look -- it's overruled, but I'll

24    look at 4 and 5, and if I think differently again, then

25    I'll --

1          MR. WEINBERG:  Thank you, Your Honor.

2          Page 28, again, "You may consider the testimony of

3    a victim as evidence."

4          We would ask that that sentence be struck.  That it

5    be instead replaced by the test of materiality as the

6    objective reasonable man test.  And really, it also deals

7    with the sophistication of the investor.  We've given Your

8    Honor request number 6 on the reasonable investor.  But I

9    think this gives too much weight to a victim testimony that

10   easily gets converted into the objective reasonable investor.

11         THE COURT:  Well, I thought -- the reason I added

12   the sentence was I thought -- it's helpful, because one could

13   easily think that the testimony of a victim means that it is

14   material, if a victim says it mattered to me.  It seems to me

15   it's evidence of what a reasonable investor would mean.

16         But I mean, a juror could look at a victim and say

17   I believe you, that it mattered to you, but it -- I don't

18   accept that -- and that's a piece of evidence to consider, as

19   to what matters to a reasonable investor, but I think it

20   doesn't matter to a reasonable investor.  And so your

21   credible, believable, sincere testimony that I credit isn't

22   enough.  So I thought I should -- that's why I thought I

23   should explain it to them, in what way they should view it.

24   And that's why I said hypothetical reasonable investor.

25         MR. WEINBERG:  I think an affirmative instruction,

1   saying that the test is not -- that the view of a specific

2   victim, but instead, from the standard of a reasonable

3   investor.  And in this case, a reasonable, sophisticated

4   investor, sends them the right message in terms of what

5   materiality means.

6           MR. FRANK:  Actually, that, I think, would

7   discredit the testimony of the individual victims in this

8   case and suggest that individual victims should not be

9   considered as reasonable investors.

10          THE COURT:  What if I added to the last sentence,

11  the sentence we've been talking about, something like -- I

12  don't know.  Scratch that.

13          MR. FRANK:  We think this is an uncontroversial

14  proposition, Your Honor.  They may consider it, they may not

15  consider it.  But particularly in this case, where there were

16  multiple --

17          THE COURT:  I don't have any problem with the

18  sentence, I think it's correct.  The only question that was

19  ruminating in my mind is whether I should try to signal to

20  them that it's not dispositive, but I'm trying not to say

21  anything that would say that -- ignore it.  So I think this

22  is accurate and fair and explains to them how to understand

23  the testimony that came that -- and focuses them, this plus

24  the couple of sentences before, focuses them in the idea that

25  it's not a victim-centered subjective test.  It's an

1    objective hypothetical reasonable investor under the

2    circumstances test.

3              MR. FRANK:  Yeah, and I think that's explicit in

4    what's said here.

5              THE COURT:  I note your objection and it's

6    overruled.

7              MR. WEINBERG:  Thank you, Judge.

8              And the next one is page 31.

9              THE COURT:  Yes.

10             MR. WEINBERG:  This is the instrumentalities of

11   the -- and I think that it needs to be more than related to

12   the -- you know, bear some relation to the object of the

13   scheme.  This is the last sentence on the second to last

14   paragraph.  It needs to be in furtherance of the object of

15   the alleged scheme.

16             THE COURT:  The actual wire?

17             MR. WEINBERG:  Yes, that's what we would contend,

18   Your Honor.

19             THE COURT:  So this is the sentence that says -- so

20   we're just all looking at the same thing, "All that is

21   required is that the use of any instrumentality of interstate

22   commerce bears some relation to the object of the scheme or

23   fraudulent conduct."

24             You say it should say "furthers the object of the

25   scheme or fraudulent conduct."

1          MR. WEINBERG:  Let me refer the Court to the case

2     of *US vs. Tavares*, which was the probation officer case that

3     was tried by Judge Young, reversed by the First Circuit.  I

4     argued it and I argued for furtherance.  And my memory is --

5     I was planning on rereading it this morning, but I think Your

6     Honor can refer to that case as setting the proper test

7     for -- that was a mail fraud case, but I think the test is

8     the same in terms of what is the nexus between the scheme and

9     the particular wire e-mail.

10          THE COURT:  All right.  I'll look at that case.

11          MR. FRANK:  Yeah, I don't think that's relevant,

12     Judge, since this is a securities fraud case.  I will note

13     that at the top of the page, the Court already says that the

14     use of a facility of a securities exchange needs to be in

15     furtherance of the scheme to defraud.

16          Without doing some additional research, I'm

17     actually not sure that that's even correct.

18          THE COURT:  For the moment, I'm leaving it all the

19     way it is.  I will read *Tavares*, but your point with respect

20     to *Tavares*, Mr. Frank, is the standard for the connection,

21     the nexus with respect to securities fraud is not established

22     by the nexus for wire fraud.  The general mail or wire fraud

23     statute.

24          MR. FRANK:  Correct.  And I'm actually not even

25     sure -- and I can do some additional research on this,

1    whether the statement at the top of page 31, that the use of

2    a facility of a securities exchange needs to be in

3    furtherance of the scheme is correct.  If Your Honor looks at

4    page 25 -- I'm not saying it's not correct, I just don't

5    know.  But page 25 provides, in the code itself, that it

6    shall be unlawful for any person, by the use of any means or

7    instrumentality of interstate's commerce, and then it

8    provides the rest of the statute.  It doesn't say anything

9    about in furtherance there.

10          THE COURT:  For the moment, I'm leaving -- the top

11    of page -- I'm leaving page 25 exactly as it is, because at

12    some point, finality is important.  You didn't object to it.

13    I'm not changing the -- what page number?  25?

14          MR. WEINBERG:  Got it.  Wire fraud --

15          THE COURT:  I'm sorry, we're on 20 -- 32.

16          MR. WEINBERG:  32, we addressed the

17    extraterritoriality request that we've made.

18          THE COURT:  Right.

19          MR. WEINBERG:  Page 33, the wire fraud element 2,

20    we object to knowing concealment.

21          THE COURT:  I see.  I'm sorry.  Page 33?

22          MR. WEINBERG:  33, the element 2, it's in

23    connection to the -- the requests as to securities fraud.  We

24    also object to the -- any omissions theory, concealment

25    theory.

```
 1              THE COURT:  What's your view?
 2              MR. FRANK:  Your Honor, knowingly concealing
 3     something is plainly an affirmative misstatement, if you're
 4     doing it with the intent to mislead.
 5              THE COURT:  I'm going to leave it the way it is,
 6     overruled.
 7              MR. WEINBERG:  33, the Court has, I presume
 8     deliberately, but I would ask the Court to reconsider the
 9     omission of an extraterritoriality instruction.  We've made
10     one in our requests.  That would be request number 18.  I'd
11     ask the Court to reconsider the necessity for that
12     instruction as to wire fraud.  Your Honor gave it to
13     securities fraud, although not in the exact fashion I
14     requested.
15              THE COURT:  Overruled.  But I'll look -- I'll look
16     back at 18 and think about it.
17              MR. WEINBERG:  Thank you, sir.
18              Page 34, again, the reckless indifference option,
19     three lines up from the bottom, we object to.
20              THE COURT:  Overruled.
21              MR. WEINBERG:  Page 36 is, again, the wire and
22     whether it needs to be in furtherance, rather than related
23     to.
24              THE COURT:  Let me just find the right spot.
25              MR. FRANK:  Where is that, Marty?
```

1          THE COURT:  The second -- first -- the paragraph

2   that begins "wire communications and interstate," are you

3   referring to the sentence, "The wire communication does not,

4   itself, have to be essential to the scheme, but must have

5   been made for the purpose of carrying out the scheme."

6          MR. WEINBERG:  Yes.

7          THE COURT:  That's where *Tavares* would --

8          MR. WEINBERG:  Yes.

9          THE COURT:  I'll look at *Tavares*.

10         MR. WEINBERG:  Okay.

11         THE COURT:  Your Honor has it, in terms of the

12  bottom of page 36, where Your Honor charges on Count 5, this

13  would be the place we would ask the Court to consider the

14  Grunewald instruction.

15         THE COURT:  Remind me of the Grunewald.

16         MR. WEINBERG:  Page 38, which is the AXA charge, we

17  would ask the Court to charge that the jury must find that

18  the scheme to defraud was in existence at the time of the

19  wire that is charged, meaning February 24th.

20         MR. FRANK:  Judge, that's implicit in saying that

21  the wire has to be in furtherance of the scheme.  It's not

22  only implicit, it's explicit.

23         MR. WEINBERG:  I'd say it's implicit, but not yet

24  explicit.  So we'd ask the Court to consider making it

25  explicit.

1          Just two more.

2          THE COURT:  Hold on.  So you would want me to say

3     that --

4          MR. WEINBERG:  There was a scheme to defraud first

5     and then it was in existence at the time of -- on or about

6     February 24, 2011.

7          MR. FRANK:  We object to that, Your Honor.  It

8     says, first, they have to find there was a scheme to defraud,

9     and fourth, they have to find that for the purpose of

10    executing the scheme, or in furtherance thereof, there was a

11    wire.

12         MR. GOLDSTEIN:  Or it caused the specific wire on

13    February 24th, in paragraph 4, would satisfy the need.  We're

14    concerned about a wire that proceeded the scheme to defraud

15    and the jury not having -- not having an explicit -- that if

16    they find the scheme to defraud, they need to find that it

17    was in existence at the time of the wire.

18         MR. FRANK:  Yeah, that's something that he can

19    argue, but we think the instruction --

20         MR. WEINBERG:  It's an element.

21         MR. FRANK:  And it's here.

22         MR. WEINBERG:  Implicit.  We ask for it to be

23    explicit.

24         MR. FRANK:  It is explicit.  There was a scheme to

25    defraud and for the purpose of executing that scheme, this

1   wire was sent.

2            THE COURT:  I understand.  Let me think about that.

3            MR. WEINBERG:  Two more aiding and abetting, I

4   think the Court needs to add an affirmative element to the

5   aiding and betting instruction.

6            THE COURT:  Explain.  What do you want me to say?

7            MR. WEINBERG:  Number one -- let me go to my

8   request.

9            That Mr. McLellan took an affirmative act to help

10  or cause a wire fraud to be committed.

11           MR. FRANK:  The instruction says that, Your Honor,

12  the end of the second.

13           THE COURT:  Took part in the criminal endeavor,

14  seeking to make it succeed?

15           MR. FRANK:  Yes.

16           MR. WEINBERG:  He can passively have participated.

17           THE COURT:  By undertaking some affirmative act?

18           MR. WEINBERG:  Yes.  By taking some affirmative

19  act.

20           MR. FRANK:  It's just not a standard instruction.

21           MR. WEINBERG:  Here, I disagree.  I think that

22  affirmative act has always been a part of the elements of an

23  aiding and abetting instruction.  Otherwise, it becomes a

24  passive sharing of intent.

25           THE COURT:  I'll think about that.  I'll look back

1      and look at that.

2              MR. WEINBERG:  And lastly, we ask the Court to

3      consider an adverse inference instruction regarding the

4      witnesses not called and the documents not produced.  They

5      were exclusively within the control of the Government through

6      MLAT, they chose not to use MLAT.  You know, we had no

7      ability to produce the witnesses, no ability to produce the

8      documents, and I think it's an absolutely paradigm for an

9      adverse inference instruction.

10             MR. FRANK:  Your Honor, an MLAT cannot be used to

11     compel testimony.

12             THE COURT:  I'll tell you what I'm going to do

13     about that.  I haven't included it.  I don't think an adverse

14     instruction -- ordinarily, when one thinks of adverse

15     instructions, one thinks of an adverse instruction arising

16     out of like a spoliation adverse instruction, because the

17     other side spoliated documents or something.  And I don't

18     think that's -- that kind of adverse instruction is

19     applicable here.

20             The -- the inability to subpoena witnesses from

21     overseas is an outgrowth of the nature of the facts giving

22     rise to this indictment and the law and the jurisdictional

23     boundaries, and the like, rather than some other kind of act.

24     Whether I should say anything at all about that -- I haven't

25     so far in the draft, but let me think about that, and if I

1    were to do that, I would do something and I would then want

2    to talk to all of you again, before I was done, because it's

3    an unusual kind of circumstance, and it would be, you know, a

4    different kind of instruction.  And so I would do it, you'd

5    get it, and I would -- if I included something like that, or

6    were thinking about it, I would want to talk to you about it

7    again before -- to give you all a chance to address it and

8    talk about it, I think, would be only fair.  I don't know

9    that I'm going to do that, but I'm -- will puzzle over that.

10            MR. FRANK:  We think, just to be clear, that would

11    be a big mistake, particularly where counsel made an

12    affirmative decision not even to introduce the depositions

13    that he so forcefully argued he should be able to introduce.

14    He withdrew that.

15            So to then say I made a decision not to introduce

16    any of their testimony, because it wasn't everything I wanted

17    and then to get an instruction that he was unable to get

18    their testimony is misleading and extremely prejudicial to

19    the Government.

20            MR. WEINBERG:  I would just answer, we made Rule 15

21    motions, the Government opposed them, only through the

22    assistance of the Government could we have gotten the

23    witnesses and gotten the documents.  We tried very hard.  Mr.

24    Frank chose not to exercise his powers.

25            THE COURT:  Just so you're all clear, the only

thing -- I'm not saying I'm going to do this, but it's -- the
only thing I'm thinking about is that it's -- it is a fact
that there are relevant witnesses to this case who are not
United States citizens and who work and reside outside the
subpoena power of the Court.  There's no dispute about that.

Based upon the rulings that I've made -- I don't
know that I'm right -- I thought it was right and that's why
I did it, but the Court of Appeals potentially will
ultimately decide, but based on the rules that I made,
whatever powers exist under the MLAT treaties are not
available to the defendant.  And that's not -- I don't view
any of this as like a -- to sort of analogize to spoliation,
I don't view any of this as like a spoliation kind of thing,
where the Government didn't do something it should have done.
This is just, you know, an outgrowth of the nature of this
charge.  Not the nature of the charge itself, but the facts
out of which it grows, that there are witnesses oversees and
you could imagine that happening in other cases, too.

Whether I should say anything -- so far I haven't
thought I should say anything about it.  That's why there's
nothing in here, but whether there's anything to be said
about that, and then if I were to say, what would I say and
how would I balance it in light of those depositions or any
other issues that I would have to think about.  And given
that, it would be -- it's not -- it would --

1          I'm not aware of any instruction to which I could

2     look for guidance and nor am I particularly aware of other

3     cases that have arisen in which there's a large number of

4     foreign witnesses, where this kind of issue might have

5     arisen.  I have to -- if I were to add something like this,

6     that's why you would see it in what I issued, but I'd also --

7     you'd see that I would want to talk to you again.  Because I

8     think it would be only fair.

9          If I don't do it, you've made your arguments.

10    They're overruled if I don't do and I don't think there's

11    anything more to discuss.  On the other hand, if I think

12    there is something -- if I think there is something I should

13    say about it, then I think that you're both entitled to

14    address both whether the Government, whether I should say it.

15    I don't think there's any point to hearing about it now.  I

16    understand your position generally.  And also you'd both be

17    entitled to address what I should say.

18          In other words, you could look at what I crafted

19    and you might -- we could preserve our objections, and I

20    shouldn't say more, I shouldn't say anything, but you might

21    say, given whatever I'm doing, you should just put it this

22    way or that way and I would want to hear your input on that.

23    So that's I think where I'd leave that.

24          MR. WEINBERG:  Just so my silence is not

25    misinterpreted, I don't agree with Mr. Frank that the

1      Government is powerless under its treaties to get foreign

2      witnesses to testify.

3              THE COURT:  I'm sorry, say that again?

4              MR. WEINBERG:  I don't believe the Government is

5      powerless under its various treaties to get witnesses to

6      testify.

7              MR. FRANK:  And just one or two sentences, Judge.

8      That opens up a whole can of worms.  First of all, it is

9      contrary to existing instructions.  No court invites a jury

10     to speculate as to what other evidence might be out there.

11             THE COURT:  That's the problem.

12             MR. FRANK:  And we think that would be a problem.

13             THE COURT:  A problem.

14             MR. FRANK:  But more importantly, the implication

15     that we have this power or this evidence exists, invites all

16     sorts of other --

17             THE COURT:  I'm not -- I think you misunderstand.

18     I'm not suggesting that the -- in the ordinary course, we

19     don't advise the jury that the defendant has the power to --

20     has the ability to invoke the Court's subpoena power to call

21     in other witnesses.  It's just sort of presumed that they

22     decide the case based on the evidence and we all operate

23     under the assumption that if there were other relevant

24     evidence that were available, it would be here, because both

25     of you possess the ability to invoke the Court's nationwide

1    subpoena power and that ordinarily encompasses anybody or

2    anything that might be relevant.

3            Here, the -- it's a little bit different.  How to

4    deal with that, whether I should deal with that -- I should

5    say this.  Whether I should deal with that in the

6    instruction, I haven't so far thought I should, I want to

7    think about it.  I don't view it as an -- it's a -- I don't

8    know what I would say about it.  I have to think about it,

9    because I don't know that they could -- what you would infer

10   as to what it means, so I don't know what I would be

11   instructing them about.

12           MR. WEINBERG:  But adverse inference instructions

13   don't require -- are not limited to spoliation or to bad

14   faith.  They're an evaluation of the respective interests and

15   powers of the two parties.

16           THE COURT:  So I don't know what I would say about

17   it and that's why, if I do say something, because it is

18   different and I can't think of a case to look to for guidance

19   about this, I would want -- if I did say something about it,

20   I would give you all an opportunity to be heard again about

21   it, whereas all the rest of these issues, I'm just going to

22   take it under advisement, resolve them, and you can make your

23   objections after I deliver the instructions, but I wouldn't

24   need to hear you again about it.

25           MR. FRANK:  One final point on that, Your Honor.

1    These -- at least two witnesses were available to the defense

2    had the defense sought their testimony in a timely manner.

3    So --

4            THE COURT:  My concern is not with respect to

5    testimony of people who testified.  The issue that's

6    presented here is simply this:  In every other criminal

7    case -- well, in every criminal case, including this one, the

8    defendant can invoke the Court's subpoena power.  In every

9    other -- maybe not every other criminal case ever prosecuted,

10   but in most criminal cases, anybody who anybody would want is

11   within the confines of the United States and subject to the

12   subpoena power, and so they can have the person.

13           Here, there are people who were involved in these

14   things, who certainly might have information that's relevant

15   to the case, whether they would actually be useful witnesses

16   in the matter, and there's a whole lot of other things, but

17   they would be -- aren't subject to the subpoena power.

18   That's different.  And so I don't know that there's anything

19   to say about it, but that is different.

20           MR. FRANK:  Except that two of those people were

21   actually subject to letters rogatory and it did compel their

22   testimony, and the subsequent letters rogatory were only

23   issued in such a way -- were only sought at a time when even

24   had they been issued, it's highly unlikely their testimony

25   would have been compelled in time for trial.

1          MR. WEINBERG:  I don't agree.  We sought their

2     criminal testimony on February 15th, I believe, which is a

3     week after their depositions.  All of the --

4          THE COURT:  But do the -- putting aside timing, do

5     the letters rogatory provide an ability compel their -- to

6     come here to testify in this proceeding.

7          MR. WEINBERG:  No.  It was a process through the UK

8     courts that did not require their physically coming here.

9     What it did is --

10          THE COURT:  It could have led to you being able to

11     take their deposition for this case there.

12          MR. WEINBERG:  Had I moved for a letters -- for a

13     Rule 15 and letters rogatory here, rather than before Judge

14     Woodlock, at a time when I moved for it in front of Judge

15     Woodlock, then I could have taken a letters rogatory

16     deposition there.  I didn't believe I had the basis to argue

17     that I needed their testimony --

18          THE COURT:  So in that sense, people who have

19     information, there's -- the letters rogatory, the way you

20     could do it is getting my permission for a deposition in the

21     criminal case.

22          MR. WEINBERG:  Right.  And we sought that, Your

23     Honor.

24          THE COURT:  Right.  And the letters rogatory and

25     sufficient time to go there and get their testimony compelled

1    there, pursuant to the letters rogatory, and then go there,

2    take their deposition.

3           MR. WEINBERG:  And in two respects.  One is Your

4    Honor allowed a Rule 15 regarding Sarah Lewis, but the

5    Court's wouldn't enforce it without the assistance of the

6    Government.  And two, in terms of Ms. Paul and Ms. Beck,

7    their depositions -- the civil depositions, Mr. Frank opposed

8    their admission.  I didn't ultimately move for them, they

9    were truncated.  They were subject to specific UK procedures

10   that limited them.

11          But most importantly, I moved a week after

12   February 7th, when I took them, for a Rule 15, and we had

13   every possibility, I can't say certainty, because they were

14   represented by Freshfields.  That was the State Street's

15   external counsel in UK.  There were an enormous amount of

16   negotiations that led to the civil depositions.  But a lot of

17   the procedural obstacles, you know, had been resolved in the

18   capacity of the SEC deposition.  It was not impossible that

19   they would have been required by UK law to sit for criminal

20   law depositions, had Mr. Frank not opposed the granting of

21   those two Rule 15s, when they were timely made within a week

22   of the SEC depositions.

23          MR. FRANK:  But that's precisely my point, Your

24   Honor.  This is all hypothetical.  What is clear is that --

25          THE COURT:  I'll think about it.  I got it.

1          All right.  I'll take it under advisement.  I'll

2     issue a revised jury instruction and verdict form on ECF so

3     you'll have it.  We'll start at 9:00 Monday, so maybe let's

4     meet at quarter to 9:00, just to iron out any logistical

5     issues.

6          To the extent you all have issues about whatever

7     demonstratives you choose to use in your closing arguments,

8     you should talk to each other and resolve them if you can.

9     And if you can't, if they're just really quick, we'll meet at

10    a quarter of 9:00, and if for some reason you think that it's

11    going to be a more extended discussion, or what have you,

12    then what you should do is either file something on ECF that

13    requests that we meet earlier and you can assume -- something

14    that tells me or -- you know how to electronically

15    communicate, do it directly, because Ms. Simeone might not

16    be -- is not obligated to check her e-mail over the weekend.

17    So let me know if there's some reason that you needed to meet

18    earlier.  Otherwise, I would think 8:45 would be more than

19    fine.

20         MR. FRANK:  And on the timing, Your Honor.  So we

21    anticipate our closing being an hour, maybe an hour and a

22    couple of minutes and we anticipate rebuttal of about 15

23    minutes, assuming that's all okay with the Court.

24         MR. WEINBERG:  I'm less interested in sticking to

25    one minute or two minutes, just hoping the rebuttal is

1    rebuttal and not a second summation, which is one of the

2    disadvantages of a system where I get to argue in the middle

3    of two prosecutors.

4             MR. FRANK:  It will be rebuttal, Your Honor.

5             THE COURT:  So the overall amount of time I don't

6    have a problem with.  It should just be rebuttal.  15 might

7    be a lot of rebuttal.

8             MR. FRANK:  I'm not sure that I need 15, Your

9    Honor, but I'd like to -- he has an hour and 15 minutes.

10            THE COURT:  Right.  I understand.

11            MR. FRANK:  I generally gave a short --

12            THE COURT:  I think the key to me, the thing that

13   is relevant on the rebuttal and what concerns me when the

14   time gets long, is the longer it is, it seems less like

15   rebuttal and more like another argument and it should be

16   rebuttal.  So but in terms of the amount of time you're

17   talking about, generally that all seems fine.

18            And I want to think about it a little bit and I

19   will talk to you about it Monday morning, just sort of how

20   we'll structure breaks for them.  I don't think it's

21   reasonable to expect them to sit through all of the argument,

22   argument, rebuttal, instructions without taking a break.  And

23   so -- but I'm not going to break in the middle of anybody's

24   argument, obviously.

25            MR. FRANK:  And just so the Court's clear, I'm

1    delivering the rebuttal.  I favor very short rebuttals, but

2    it's a very complex case.  I don't know what all arguments

3    are going to be made.  So I don't want to foreclose myself.

4            THE COURT:  I understand.  I'm not trying to -- I

5    like it well presented to the jury.  It's been well presented

6    so far.  So that's just a general consideration.

7            So you're going to do rebuttal, and Mr. Johnston,

8    you're going to do the close?

9            MR. JOHNSTON:  Yes, Your Honor.

10           THE COURT:  Wow, so you're acceding Mr. Frank.  I

11   thought you were hell bent on establishing local dominance at

12   every turn.

13           MR. FRANK:  It's taking every ounce of my

14   self-control, Your Honor, and a few extra ounces.

15           THE COURT:  Well, Mr. Johnston, you've inspired a

16   lot of self-control in Mr. Frank.

17           MR. FRANK:  Your Honor, I'll take that in the best

18   possible way.

19           THE COURT:  All right.  We're adjourned.  Have a

20   nice weekend.  See you Monday.

21           THE DEPUTY CLERK:  All rise, this matter is

22   adjourned.

23           (Court in recess at 11:06 a.m.)

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                    Dated this 8th day of July, 2018.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20    _____

21    Rachel M. Lopez, CRR
      Official Court Reporter

22

23

24

25