UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                      )
                                      )
UNITED STATES OF AMERICA              )
                                      )
v.                                    )          No. 16-10094-LTS
                                      )
ROSS MCLELLAN,                        )
Defendant                             )
                                      )
_____ )

**DEFENDANT ROSS MCLELLAN'S RENEWED MOTION FOR JUDGMENT OF
ACQUITTAL AND IN THE ALTERNATIVE MOTION FOR NEW TRIAL**

Now comes the defendant Ross McLellan and respectfully moves, pursuant to Fed. R.

Crim. P. 29(c) and 33, that this Honorable Court vacate his convictions and enter a judgment of

acquittal or, alternatively, order a new trial.  As grounds and reasons therefor, Mr. McLellan

renews and supplements his previously filed and pending Motion for Judgment of Acquittal and

further states that a new trial would serve the interests of justice because his convictions are

tainted by (1) multiple instructional errors allowing the jury to convict on an expressly waived

omissions theory and/or based on extraterritorial conduct; (2) spillover prejudice resulting from

the joint trial of Count 6, relating to AXA, and the remaining counts, relating exclusively to the

Europe, Middle East, and Africa ("EMEA") region; and (3) his lack of access to material

evidence resulting from the government's refusal to invoke its rights under applicable Mutual

Legal Assistance Treaties ("MLATs").[1]  As further grounds and reasons therefor, Mr. McLellan

_____

[1] By focusing the instant motion on these three issues, Mr. McLellan does not waive any

1

relies on the Memorandum of Law included below.

## LOCAL RULE 7.1(a)(2) STATEMENT

The government opposes the granting of the within motion.

## MEMORANDUM OF LAW

### A.   JUDGMENT OF ACQUITTAL

Defendant McLellan continues to rely on the arguments presented in his Motion for

Judgment of Acquittal (Dkt. 449) ("JOA Motion"), and incorporates them by reference herein.

In that motion, Mr. McLellan contended that the evidence was insufficient to support his

convictions on Counts 2 and 3 and so much of Count 1 as charges conspiracy to commit

securities fraud because the government failed to prove that the fraud was "in connection with"

the purchase or sale of securities or that the misstatements on which the government relied were

material to the decision to purchase or sell securities.  A misrepresentation is not made "in

connection with" the purchase or sale of a security unless it is material to the investor's decision

to buy or sell a security.  *See* JOA Motion at 2-8.

The record in this case is wholly devoid of evidence that the decisions of ***any*** of the six

clients at issue regarding the particular securities they would buy and sell in accomplishing their

transitions were affected in any way by anything said or done by Mr. McLellan, Pennings,

Boomgaardt, or anyone else whom the government contended were coconspirators.  Instead, the

evidence showed that any misrepresentations affected only the clients' decisions to select State

_____

additional arguments that he may have on appeal.  *See United States v. Cook*, 432 F.2d 1093,
1101 (7th Cir. 1970) ("Under federal procedure, it is not necessary to file a motion for a new trial
in order to have reviewed on appeal questions properly preserved at trial."); *Aaron v. United
States*, 155 F. 833, 838 (8th Cir. 1907) ("A motion for new trial is not essential . . . to entitle a

Street as their transition manager.  *See* Trial Tr. (June 12, 2018) at 175 (Dean Johnson testifies that Sainsbury would not have hired State Street to conduct the transition had it known of the additional charges but would have hired JP Morgan instead); *id.* at 258 (Roul Haerden testifies that knowing of the additional charges would have affected Dutch Doctors' decision to hire State Street); Trial Tr. (June 13, 2018) at 60 (Ian Mcknight testifies that Royal Mail would not have chosen State Street had it known of the total cost); Trial Tr. (June 19, 2018) at 52 (Eugene O'Callaghan testifies that NTMA would not have selected State Street had it known of the additional charges).  As the discussion in Mr. McLellan's JOA Motion demonstrates, statements that are extrinsic to the decision whether to buy or sell a security—such as the decision as to the choice of entity to conduct the selected trades—are neither "in connection with" the purchase or sale of securities or material to the decisions regarding what securities to sell and which to buy as part of the transition.  Because the government's evidence shows no more than this, it fails to satisfy the government's burden to prove beyond a reasonable doubt that any fraud was "in connection with" the purchase or sale of securities or that any misrepresentations (even assuming the government's expansive definition of affirmative misrepresentation) were material to the clients' decisions whether to buy or sell the securities involved in their transitions.  A judgment of acquittal should, therefore, be entered.

The Court's instructions left it open to the jury to convict McLellan of securities fraud if the statement was material to the choice of transition manager.  *See* Dkt. 466 at 28 ("In other words, a statement contains a material fact if there is a substantial likelihood that a reasonable investor engaging a transition manager would likely view the statement as significantly altering

party to a review by the Court of Appeals.").

the total mix of information available.").  As Mr. McLellan contended during the charge

conference and in his objections to the charge as given, this instruction embodies a clear error of

law, as it erroneously expanded the reach of the United States securities laws to encompass

frauds untethered to the decision to purchase or sell securities.  Moreover, this instruction

engendered a second error, as the selection of the transition manager was a purely extraterritorial

occurrence which could not properly provide a basis for conviction of a domestic securities fraud

offense simply because, after the selection of State Street as the transition manager, some of the

securities traded happened to be domestic.  If the jury, consistent with the Court's erroneous

instruction, convicted Mr. McLellan of securities fraud (including conspiracy to commit

securities fraud) based on a finding of fraud in conjunction with the selection of State Street as

transition manager, then any domestic locus of the securities trades was unrelated to the

extraterritorial locus of the fraud.  A judgment of acquittal should be entered on Counts 2 and 3

and so much of Count 1 as charges conspiracy to commit securities fraud or, at minimum, a new

trial on those charges should be ordered, as argued below.

A judgment of acquittal should also be entered on Count 3 because the government failed

to prove that the bond transactions conducted for Royal Mail were domestic securities

transactions.  The securities laws of the United States extend only to domestic securities

transactions. *See* Defendant Ross McLellan's Motion to Dismiss Counts Two and Three and So

Much of Count One as Charges Conspiracy to Commit Securities Fraud, to Exclude Evidence of

Extraterritorial Transitions and Transactions, and Motion for Related Discovery (Dkt. 148)

("Extraterritoriality Motion"); Defendant Ross McLellan's Motion *in Limine* to Exclude

Evidence Relating to Transition Conducted for the Dutch Pension Fund (Dkt. 343).  Mr.

4

McLellan will not here repeat the lengthy discussion of the applicable law contained in those motions but incorporates it by reference.  In a nutshell, a purchase or sale of a security is a domestic securities transaction only if (1) the security is registered on a national securities exchange, as that term is defined in the securities laws, (2) the parties incur irrevocable liability to carry out the transaction within the United States, or (3) title is passed within the United States.  *See* Extraterritoriality Motion at 7-12; *see also* Final Jury Charge (Dkt. 466) at 31.

The Royal Mail transition consisted in part of United States bonds, Trial Tr. (June 13, 2018) at 22, but that alone does not suffice to satisfy the government's burden to prove that the transactions in those bonds were domestic securities transactions.  The government presented no evidence from which it could be found that the bonds were traded on a national securities exchange.  Importantly, the government's own witness, Scott Shaw testified that, while beneficial ownership passes to the broker-dealer (here, SSGM), ***title does not***; the broker-dealer never owns the bonds. Trial Tr. (June 18, 2018) at 77-78.  Thus, there is no evidence that title to the bonds passed in the United States.  Nor did the government produce evidence from which a rational jury could conclude beyond a reasonable doubt that Royal Mail, a British pension fund with no presence in the United States, incurred irrevocable liability to buy/sell the bonds at issue in the United States.  All that Shaw testified to was that the Royal Mail bonds "settled and cleared"—essentially, a reporting process—in the United States.  *Id.* at 71.  Shaw did not work for State Street at the time of these transactions and was thus in no position to testify regarding the underlying specifics as to how and when and where these foreign entities incurred irrevocable liability to purchase/sell the securities at issue, nor did he explain even in general terms what "settle and clear" might mean in terms of the attachment of irrevocable liability.  The

5

jury did not, therefore, have evidence before it based on which it could find beyond a reasonable doubt that the foreign clients incurred irrevocable liability to purchase/sell the securities in the United States.

The Court instructed the jury that "[s]ecurities transactions conducted by a U.S.-based agent on behalf of a foreign buyer or seller can still occur in the United States even if title originates from abroad, or is ultimately transferred abroad at the end of the transition," Dkt. 466 at 31, and this may be true as far as it goes, but the domestic presence of an agent of a foreign buyer or seller does not by itself suffice to make the transactions the agent carries out domestic ones.  Instead, there could be no finding that the securities transactions were domestic ones unless one of two additional facts were proven—transfer of title within the United States or the incurring of irrevocable liability within the United States.  Because the government's evidence proves neither, a judgment of acquittal should be entered on Count 3.

## B.    NEW TRIAL

Rule 33 expressly permits courts to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  The First Circuit has instructed that this rule confers "broad powers in determining whether to grant a new trial."  *United States v. Rodriguez*, 738 F.2d 13, 17 (1st Cir. 1984).  Under this standard, relief "is not limited to cases where the district court concludes that its prior ruling . . . was legally erroneous."  *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994).  Instead, "a trial court may grant a new trial based on reconsideration of its disposition of any discretionary matter."  *United States v. Rapanos*, 115 F.3d 367, 375 n.1 (6th Cir. 1997) (Nelson, J., dissenting).

1.    *Jury Instructions Permitted Conviction on Improper Bases.*

A new trial may be warranted based on a court's refusal to give an instruction requested by the defendant.  Crucially, in granting relief on this ground, the Court need not conclude that its instructions to the jury amounted to "legal error."  *Vicaria*, 12 F.3d at 198.  Rather, it need only determine that, "upon reconsidering the matter," it "should have instructed the jury" as requested.  *Id.*

a.    *Omissions.*

As Mr. McLellan has repeatedly noted, the government entirely disclaimed any reliance on an "omissions" theory of fraud in this case.  *See* Dkt. 362 at 2; Dkt. 387 at 3-5; Dkt. 433 at 2. In opposing Mr. McLellan's request for severance of counts, the government represented to the Court, without qualification, that, "[d]espite McLellan's best efforts to turn this into an omissions case, this is a case about ***affirmative*** misrepresentations that McLellan personally made or directed . . . .  [N]o legal or regulatory regime permits bankers to affirmatively lie.  That is what McLellan is charged with doing."  Dkt. 298 at 6 (emphasis in original).  After receiving and considering the government's brief, the Court denied Mr. McLellan's severance motion.  The government reaffirmed its position several days into trial, asserting (in arguing an evidentiary objection) that "[n]ondisclosed revenues are not the subject of this case, lies are the subject of this case."  Trial Tr. (June 12, 2018) at 109.

But, given the defense being presented by Mr. McLellan, the government soon understood that its disavowal of any reliance on alleged omissions created a problem: Mr. McLellan did not "affirmatively lie" to clients.  In fact, there was no evidence that he had any communications whatsoever with six of the seven clients at issue in this case (the seventh being

incidental communications with AXA) – a point Mr. McLellan was making clear as trial unfolded.  And, even assuming *arguendo* that Mr. McLellan could be said to have "directed" others at State Street to make certain representations to relevant clients, the majority of the representations alleged to have been fraudulent were, without question, literally true.  The government, for example, expressly invited the jury to convict Mr. McLellan based on State Street's indications that it would conduct the transitions for a specified "flat fee."  *See* Trial Tr. (June 25, 2018) at 22-23 ("They promised Sainsbury's a flat fee of 350,000 pounds.  You know what that means, no commissions, no per trade charges. . . .  It was the same for Eircom.  State Street proposed a flat fee of 400,000 euros, which was later negotiated down to 350,000 euros . . . .  They promised Royal Mail a flat fee of 1.75 basis points of the assets.").  The government has never contended that these fee quotes were not accurate on their face.  Rather, it alleged that the quotes were rendered misleading by State Street's failure to disclose its intention to also charge a non-disclosed mark-up through its affiliated broker-dealer.  This is a straightforward omissions theory of fraud.  While the jury convicted Mr. McLellan on Counts 1-5, it appears to have based its verdict on the absence of disclosing the broker-dealer markups rather than on any affirmative lies given the instructions that approved a conviction based on the "deceitful statement of half-truths or the concealment of material facts," Dkt. 466 at 27, and given the absence of any evidence at all that Mr. McLellan made any affirmative false statements in negotiating the transitions at issue[2] or that any such false statements made by Ed Pennings were

---

[2] The government has contended that, even though he had no direct communications with the client, Mr. McLellan caused certain false statements to be made to Royal Mail after all of the transitions at issue in this case had been completed.  There are several problems with the government's reliance on these statements: (1) alleged misstatements "made after the securities

known to and caused by Mr. McLellan, as would be required for an aiding and abetting conviction.[3]

Mr. McLellan made multiple instructional requests on this issue.  In essence, he asked (1) that the Court not refer to "omissions" or any theory of fraud other than affirmative misrepresentations when defining the relevant offenses, *see, e.g.*, Dkt. 362 at 2; and (2) that it expressly prohibit the jury from convicting Mr. McLellan based on a mere "failure to disclose" relevant facts, *see* Dkt. 451 at 1.  The government, in resisting these arguments, sought to move the goal posts by introducing a level of nuance utterly absent from its prior statements on the subject.  For the first time, the government indicated an intent to rely on "alternate forms of affirmative misrepresentation liability, including half-truths, misleading statements, and omissions that make other statements misleading."  Dkt. 445 at 1.  It professed to have "disclaimed" only "a theory of liability based on omissions in the presence of a duty to disclose."

---

transaction is conducted . . . are neither material to nor 'in connection with' the purchase or sale of securities," such that they cannot support conviction for securities fraud, Dkt. 449 at 6; (2) along similar lines, "after-the-fact" transmissions "cannot support a wire fraud conviction," *id.* at 16; and (3) with respect to the conspiracy charge, the government failed to prove that the "original conspiratorial agreement . . . included an agreement to engage in concealment from State Street's compliance department or withholding information from Royal Mail after the completion of the transition," *id.* at 17.

[3] As to the clearest example of an affirmative false statement, Pennings' February 21, 2011 email to Ian Mcknight, the evidence was indisputable that Mr. McLellan did not know of or authorize that false promise.  The government's failure to present even a scintilla of evidence that Mr. McLellan directed, approved, knew of, or even saw after-the-fact this February 21 email would have necessitated a directed verdict in Mr. McLellan's favor on the Royal Mail counts had the Court held the government to its self-professed exclusive reliance on an affirmative misrepresentation theory.  There was no similar affirmative false statement made to NTMA that would support the convictions on Counts 2 and 4, nor any agreement that Pennings would lie to a client as contrasted to not disclosing the intention to include broker-dealer mark-ups as sources of revenue for State Street.

*Id.* Of course, as Mr. McLellan has pointed out elsewhere, "this is not what the government . . .

said" in its prior, unequivocal representations.  Dkt. 451 at 2.

What's more, the government's newfound "half-truth" theory falls squarely within the

broader category of alleged omissions, as defined by the First Circuit.  In *Capri Optics Profit*

*Sharing v. Digital Equipment Corp.*, 950 F.2d 5 (1st Cir. 1991), a class of civil securities fraud

plaintiffs appealed the district court's grant of summary judgment for the defendant.  The lower

court's ruling was based on its conclusion that "it could not support a finding that defendant's

statements were incomplete and inaccurate absent disclosure of [certain] internal corporate

events."  *Id.* at 7 (internal quotation marks omitted).  On appeal, the plaintiffs argued "that this

was not [their] contention at all; rather, the [relevant] statements were false in themselves."  *Id.*

The First Circuit characterized this express appellate waiver as precluding reliance on alleged

"omissions."  *Id.*  Included within this category was any argument that "defendant had a duty to

supply omitted matter in order to prevent possible misleading."  *Id.* at 8.  Other courts have

similarly treated alleged half-truths or incomplete disclosures as omissions.  *See, e.g.*, *Baron v.*

*Smith*, 285 F. Supp. 2d 96, 101 (D. Mass. 2003) ("[T]he plaintiffs do not claim that the

defendants made affirmatively false statements, but rather that the defendants omitted to state

additional information necessary to keep the disclosed information from being misleading.");

*Martin v. Altisource Residential Corp.*, No. 15-CV-0024, 2017 WL 1068208, at *3 (D.V.I. Mar.

16, 2017) (classifying "incomplete or misleading prior disclosure" as a category of an

"omissions" theory (citation omitted)); *SEC v. St. Anselm Expl. Co.*, 936 F. Supp. 2d 1281, 1295

(D. Colo. 2013) (classifying as "fraud-by-omission" argument that "defendants were required

affirmatively to disclose the nature of the company's financing model in order to make

10

statements about the strength and viability of the company's financial situation not misleading").

Against the weight of this authority, the government cites five out-of-circuit cases. Mr. McLellan has already explained why the government's reliance on four of those cases is misplaced. *See* Dkt. 451 at 4-5 n.2. In its most recent pleading on this issue, the government cited one additional case, namely *United States v. Spanier*, No. 16-CR-1545, 2017 WL 1336998 (S.D. Cal. Apr. 7, 2017). While *Spanier* does purport to distinguish "omissions case[s]" from those involving alleged "half-truths," it does so only in the context of countering the defendant's argument that he was under no duty to disclose the information at issue. The court rejected this contention, reasoning that "the duty to disclose arises from the truth already half-spoken." *Id.* at *2. Mr. McLellan has never disputed that, in the abstract, Rue 10b-5 liability may be predicated upon half-truths. If this were not so, any waiver by the government would hardly be worth litigating. *Spanier* exposes the internal inconsistency of the government's own position. The government purports to have waived any reliance on "omissions in the presence of a duty to disclose," but not on half-truths or misleading statements. Dkt. 445 at 1. But a half-truth is just one example of a situation giving rise to a duty to disclose, which, in turn, may lead to liability for an omission. Thus, "if the government's express disavowal of an omissions theory meant anything at all, it certainly conveyed an intent not to rely on purported omissions necessary to render other statements not misleading." Dkt. 451 at 4.

Not only did the government's disavowal of reliance on "omissions" clearly include half-truth and misleading statement theories, but the Court's instructions expressly allowing the jury to convict on those theories resulted in significant prejudice to Mr. McLellan. The government declared that this was not an omissions case in February 2018, only to resurrect such a theory in

its requests for instructions filed three months later and a mere two weeks before trial.  Had the government been forced to proceed on its professed theory that Mr. McLellan affirmatively lied to clients, the defense would have had a strong counter-argument that State Street's representations regarding the flat fees to be charged were, in fact, true.  The prejudice resulting from the Court's contrary ruling is demonstrated by the jury's acquittal of Mr. McLellan on the AXA count, which, in contrast to most of the EMEA charges, involved an alleged affirmative misstatement (the February 24, 2011 pre-trade containing what the government claimed was a promise of a commission other than that in fact applied) rather than a misleading omission.  The Court's instructions effectively precluded an argument that there in fact were no false statements that were either made by or caused by Mr. McLellan given that the Court included within the ambit of its false representation definition omissions "intended to be misleading," Dkt. 466 at 27, which the government would surely have seized upon to attack Mr. McLellan's position were counsel to have argued that, other than the single Pennings February 21, 2011 email, there were no lies, only accurate statements about the transition management fees.[4]  Having spent the three months prior to trial operating under the justified belief, based on the government's own representations to the Court, that he would be able to raise a powerful and convincing argument that State Street's statements about flat fees were true and therefore could not support conviction, Mr. McLellan suffered significant prejudice from the Court's permitting the government to abruptly reverse course.  Even assuming, contrary to Mr. McLellan's previously articulated

---

[4] Mr. McLellan's argument was also restricted by other aspects of the Court's instructions.  For example, the Court determined that it would not inform the jury of the accurate proposition that "breach of contract, sharp dealing, or unethical conduct alone . . . does not amount to a scheme to defraud," without adding the vague and potentially harmful proviso that the jury "may consider"

position, *see* Dkt. 387 at 3-5; Dkt. 451 at 2 n.1, that the government's prior representations do not justify judicial estoppel, Mr. McLellan respectfully submits that the Court should, in fairness, have held the government to its word and allowed the jury to convict based only on affirmative lies. Rule 33 plainly affords the Court the flexibility to grant relief in these circumstances. *See Vicaria*, 12 F.3d at 198.

Indeed, had the Court forced the government to pursue its own self-professed theory of affirmative lies, the evidence would not even have been sufficient to support conviction. The majority of the statements relied upon by the government in urging the jury to convict Mr. McLellan were literally true. For example, the RFP responses and transition notices quoting flat fees were not false in themselves. Indeed, the government has not argued otherwise. Instead, in direct contradiction of its prior representations to the Court, the government largely predicated its case on allegedly misleading non-disclosure of State Street mark-ups. *See* Trial Tr. (June 25, 2018) at 22 ("They promised low fees and to act in their clients' best interest . . . , and they did the opposite, adding secret commissions that the clients couldn't see."); *id.* at 109 ("They were promising a low flat fee – a low fee and then secretly taking commissions that they weren't entitled to."). The precious few affirmative misrepresentations made to clients in the course of negotiating transitions were utterly unconnected to Mr. McLellan.

   *b.*  *Extraterritoriality – Wire Fraud.*

The Court's failure to give Mr. McLellan's requested wire fraud extraterritoriality instructions, and its failure to provide the jury with any instruction at all requiring the jury to find that the wire fraud charges were domestic in nature, provides an alternative basis for a new trial.

___

any such conduct in finding a fraudulent scheme. Dkt. 466 at 34.

Mr. McLellan asked the Court to inform the jury that it could only convict him of wire fraud if the following conditions were met: (1) "the fraudulent scheme involved a substantial amount of conduct in the United States"; (2) "the conduct in the United States was integral to the commission of the fraud"; and (3) "at least some of the conduct involved the use of the U.S. wires."  Dkt. 362 at 26; *see also United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103 (D.D.C. 2017) (applying this standard); *United States v. Gasperini*, No. 16-CR-441, 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017) (same); *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016) (same).  The Court's decision not to provide this instruction was presumably based on *United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014), where the First Circuit suggested that the Wire Act could apply extraterritorially "because it explicitly applies to transmissions between the United States and a foreign country."  *See* Dkt. 302 at 4 (stating that Court was "guided by" *Lyons* in denying Mr. McLellan's motion to dismiss).

Mr. McLellan respectfully submits that the Court should not follow *Lyons*.  As an initial matter, that case involved a different statute than the one at issue here.  More fundamentally, the First Circuit's reliance upon the statute's mere applicability to foreign wire transmissions is contrary to the Supreme Court's clear instruction that a "general reference to foreign commerce . . . does not defeat the presumption against extraterritoriality."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 263 (2010).  The *Lyons* court did not so much as acknowledge *Morrison*, which was not argued (or even cited) in the defendants' filings, *see* Case No. 12-1835, Defs.' Opening and Reply Brs., in its brief analysis of this issue.  Instead, it relied primarily on a precedent pre-dating *Morrison* by five years.  *See Pasquantino v. United States*, 544 U.S. 349, 371-72 (2005).  In *Pasquantino*, the Court affirmed wire fraud convictions in connection with "a

14

scheme to smuggle large quantities of liquor into Canada from the United States." *Id.* at 353. The question presented was "whether a plot to defraud a foreign government of tax revenue violates the federal wire fraud statute." *Id.* After answering this question affirmatively, the Court went on to add that this "***interpretation of the wire fraud statute does not give it extraterritorial effect***." *Id.* at 371 (citation omitted) (emphasis added). After noting that the issue of extraterritoriality had been raised for the first time in a reply brief ***and that the scheme had been executed in the United States***, the Court further cited the statute's "in interstate or foreign commerce" language as evidence that "this is surely not a statute in which Congress had only domestic concerns in mind." *Id.* at 371-72 (citation omitted). As the Second Circuit has recognized, this final aside by the *Pasquantino* Court was pure dicta, completely unnecessary to the result it had already reached in the case. *See European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 n.11 (2d Cir. 2014) ("Because that statement is dictum, and because *Morrison* explicitly rejects the reasoning on which it relies, we do not read *Pasquantino* to require us to construe the 'foreign commerce' language of the wire fraud statute as rebutting the presumption against extraterritoriality."), *rev'd on other grounds*, 136 S. Ct. 2090 (2016). Even overlooking the inconsistency with *Morrison*, *Lyons* was decided without the benefit of the Supreme Court's subsequent "clarifi[cation]" of the "test for deciding whether a statute applies extraterritorially" in *RJR Nabisco*, discussed in more detail below. *United States v. Valenzuela*, 849 F.3d 477, 484 n.3 (1st Cir. 2017). Under that new framework, which looks to the focus of the applicable statute, it is clear that the mere use of U.S. wires is not, in itself, sufficient to render the alleged crime a domestic one. *See also Morrison*, 561 U.S. at 266 ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel

whenever *some* domestic activity is involved in the case" (emphasis in original)).  For these reasons, Mr. McLellan respectfully submits that this Court is not bound by *Lyons* and should not follow it.

Setting *Lyons* aside, the question becomes what the government was required to prove to establish that the alleged conduct was domestic and, therefore, within the scope of the wire fraud statute.  The Supreme Court has recently instructed that this is a context-dependent inquiry that looks to:

> the [particular] statute's 'focus.'  If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).  In the context of the wire fraud statute, the Congressional focus is clear: the statute "focus[es] on the scheme, not on the implementation of it."  *United States v. Brien*, 617 F.2d 299, 307 (1st Cir. 1980); *see also United States v. Bradley*, 644 F.3d 1213, 1248 n.77 (11th Cir. 2011) ("The mail and wire fraud statutes . . . focus their attention on the use of a misrepresentation to obtain money that is not owed."); *Grossman*, 199 F. Supp. 3d at 783 (holding that "frauds that are designed to take money or property, and that involve the U.S. mails[,] . . . are properly considered the 'focus' of § 1341").  Thus, in determining whether the government has proven a domestic wire fraud, the Court should look to the location of "the prohibited fraudulent conduct, not the use of domestic wires" alone.  Dkt. 148 at 23; *see also Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (finding alleged fraud to be extraterritorial notwithstanding "three minimal

contacts with the United States," including use of U.S. wires).

The Court's jury instructions regarding wire fraud contain no reference whatsoever to extraterritoriality or the location of the underlying conduct. Accordingly, they invited the jury to convict Mr. McLellan based on fraudulent activity carried out in Europe. This risk was exacerbated by the Court's materiality instruction focusing on the decision of selecting a transition manager. *See* Dkt. 466 at 35. As Mr. McLellan argued in his motion to dismiss, any fraud in this case "was centered in London." Dkt. 148 at 23. The trial evidence only bolstered this conclusion. *See* Dkt. 449 at 14-15 (noting, among other things, that "the clients' communications with State Street relative to the transitions at issue were all conducted over exclusively foreign wires" and that "[t]he allegedly false statements relied upon by the government are contained in RFPs drafted and sent from London to foreign clients or emails that were sent by Pennings from London to foreign clients"). Moreover, the relevant transition management agreements were entered into under British and Irish law between State Street's European subsidiary and its foreign clients. In short, "[i]f there was fraud here, it was a foreign one, outside the scope of the wire fraud statute." *Id.* at 15.

Even assuming, contrary to Mr. McLellan's argument in his Motion for Judgment of Acquittal, that there was sufficient evidence for a reasonable jury to find that the locus of the alleged fraud was in the United States, the issue was, at the very least, a disputed factual question for the jury to decide. *See Valenzuela*, 849 F.3d at 487 (concluding that "there was sufficient evidence for a jury to find that this was not an entirely 'international' drug distribution scheme which, but for the meetings in the United States, would have had no connection to the country"); *ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 263 (D. Mass. 2016) (denying summary

17

judgment due to "a genuine issue of material fact as to whether this case falls within the predicate act exception to the extraterritorial limitation on copyright law").  The extent to which any fraud orchestrated by Pennings and Boomgaardt from their London offices bore a sufficient connection to the United States to bring them within the scope of the wire fraud statute has been a strongly contested issue throughout this litigation, including at trial.  But without an accompanying instruction, counsel for Mr. McLellan was unable to present it to the jury during summation.[5]  Accordingly, this Court should have instructed the jury that it was required to find such a United States connection in order to convict Mr. McLellan.

c.    *Extraterritoriality – Securities Fraud.*[6]

In *Morrison*, the Supreme Court addressed the specific question of how to determine whether a securities fraud has a sufficient domestic connection to avoid the general rule against extraterritorial application.  Consistent with the principles set out above, the Court looked to the "focus" of Section 10(b) and determined that the provision focused "not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Morrison*, 561 U.S. at 266.  In reaching this result, the Court noted that the statute, on its face, is limited to conduct occurring "in connection with the ***purchase or sale*** of any security." *Id.* (quoting 15 U.S.C. § 78j(b)) (emphasis added).  Relying on this requirement, the Court

---

[5] Counsel for Mr. McLellan did, by contrast, emphasize the predominantly foreign nature of the alleged conduct to the jury during opening argument. *See, e.g.*, Trial Tr. (June 5, 2018) at 57 (explaining that Mr. McLellan "relied on Mr. Pennings to know the law in the UK, to talk to the UK lawyers. . . .  He relied on Mr. Pennings to negotiate contracts that conformed to British and European law. . . .  Mr. McLellan was in Boston, Mr. Pennings in Europe.").

[6] By including an alternative request for a new trial on these counts, Mr. McLellan does not, of course, waive the related Rule 29 arguments outlined above.

announced a specific test for what constitutes a domestic offense under the statute: "Section

10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection

with the purchase or sale of a security listed on an American stock exchange, and the purchase or

sale of any other security in the United States." *Id.* at 273.  In the present case, the Court

instructed the jury that, for transactions involving securities not traded on an exchange, the

government was required to "prove that the purchase or sale of such securities occurred in the

United States."  Dkt. 466 at 31.[7]

The Court's other instructions on securities fraud diluted the "in connection with"

requirement relied upon by the *Morrison* Court so as to render inapplicable the specific test for

determining domestic application set forth in that case.  Contrary to Mr. McLellan's request, the

Court informed the jury that, in order to satisfy this element, the government need only show

"that Mr. McLellan's alleged conduct in some way '***touched upon***' or '***coincided***' with a

securities transaction."  Dkt. 466 at 27 (emphasis added).  The Court further divorced the alleged

securities fraud from any underlying purchase or sale by telling the jury that a fact is material

within the meaning of the securities laws "if there is a substantial likelihood that a reasonable

investor engaging a transition manager would view the statement as significantly altering the

total mix of information available."  *Id.* at 28.  These instructions permitted the jury to convict

---

[7] Contrary to Mr. McLellan's request, *see* Dkt. 362 at 14-15, the Court provided little
explanation as to how the jury should go about determining where a given purchase or sale
occurred.  This is a complicated question beyond the everyday experience of most lay jurors.
And what little explanation the Court did provide could be read to permit the jury to simply
assume that "transactions conducted by a U.S.-based agent on behalf of a foreign buyer or seller"
occurred in the United States. Dkt. 466 at 31.  Absent additional discussion, this language may
well have been understood by the jury to allow a third means of finding a United States
transaction, even if neither irrevocable liability nor the passing of title occurred in the United

Mr. McLellan for alleged misrepresentations relevant to the decision of selecting a transition manager, as opposed to the decision to buy or sell securities.  As Mr. McLellan has explained in his Motion for Judgement of Acquittal, by the time the clients "began seeking a transition manager, they had ***already*** made the decision to buy and sell securities and had sometimes ***already*** decided just what securities they were going to sell and which replacement securities they were going to buy."  Dkt. 449 at 2.  To the extent that the client changed its decisions as to what to buy and sell after selecting a transition manager, it did so independent of any disclosures or advice of State Street.  The Court's instructions rendered the connection between the alleged fraud and any purchase or sale so attenuated as to undermine the logic of the specific test for domestic application outlined by *Morrison*.  *See, e.g.*, *Lay v. United States*, 623 F. App'x 790, 797 (6th Cir. 2015) (holding that *Morrison* test did not apply to Investment Advisors Act because "the focus of [that statute] is clearly on the investment adviser and its actions" (quoting *SEC v. Gruss*, 859 F. Supp. 2d 653, 662 (S.D.N.Y.2012)).  Accordingly, in determining the issue of extraterritoriality, the Court should have instructed the jury to assess the locus of the alleged fraud, as described above in the context of the wire fraud counts.  Because the Court did not give such an instruction, there is a significant risk that the jury convicted Mr. McLellan based on non-U.S. conduct.  Again, the alleged "false statements relied upon by the government are contained in RFPs drafted and sent from London to foreign clients or emails that were sent by Pennings from London to foreign clients" and had no domestic contact at all.  Dkt. 449 at 14-15.

       2.      <u>*Joint Trial of AXA Charge with EMEA Counts Resulted in Spillover Prejudice.*</u>

      Denial of a request for severance, like instructional error, may warrant a new trial.  *See*

---

States.

*United States v. Breinig*, 70 F.3d 850, 852 (6th Cir. 1995).  Such relief is appropriate in the present case because, in denying Mr. McLellan's motion to sever, the Court expressly relied upon certain representations by the government that ultimately proved to be inaccurate. Moreover, while Mr. McLellan was acquitted of the alleged AXA fraud, he was nonetheless prejudiced by the government's express argument that the jury should consider evidence of that fraud in determining his guilt on the EMEA charges.

For the first two years of this case, the charges against Mr. McLellan focused exclusively on transition management clients in the EMEA region.  However, in February 2018, a mere four months before trial, the government issued a Superseding Indictment, adding a count for an alleged fraud against AXA, a United States insurance company.  Mr. McLellan promptly moved to sever the AXA count (Count 6) from the pre-existing EMEA charges.  The motion argued, among other things, that, "at a joint trial, Mr. McLellan would suffer spillover prejudice because evidence regarding the scheme alleged in Count 6 would not be independently admissible at a separate trial on the EMEA charges."  Dkt. 292 at 9.  Mr. McLellan also predicted that there would be "little evidentiary overlap" between the two sets of allegations, noting that the AXA count involved an entirely different group of co-conspirators and a different victim than the purported EMEA scheme.  *Id.*

The representations made by the government in opposing Mr. McLellan's request for severance were not borne out by the trial evidence.  In response to Mr. McLellan's argument regarding spillover prejudice, the government stated that the AXA count would "involve[] many of the same witnesses" as the pre-existing charges.  Dkt. 298 at 9.  The Court denied Mr. McLellan's motion in express reliance upon the government's "proffer[] that at least several of

the same witnesses will testify about facts material to proving all six counts in the Superseding

Indictment." Dkt. 306 at 3. This proffer turned out to be inaccurate. In fact, only one witness

testified about both the AXA and EMEA transitions. That witness, Edward Pennings, was one of

Mr. McLellan's alleged EMEA co-conspirators, and, by his own admission, possessed no first-

hand knowledge of the transition conducted for AXA. Pennings testified that Mr. McLellan told

him State Street "did a similar approach [for AXA] as to what we were doing in Europe for these

five or six clients." Trial Tr. (June 11, 2018) at 114. This cursory statement reflected the sum

total of Pennings' knowledge. Unsurprisingly, the government did not rely upon, or even

reference, this testimony in its argument to the jury nor did counsel for Mr. McLellan deem it

sufficiently prejudicial to address during the defense summation.

But the government did feature the AXA transition in its rebuttal argument. It suggested

that Mr. McLellan's contention that any fraud had been committed by Pennings without his

knowledge should be rejected in light of Mr. McLellan's alleged involvement in the AXA fraud.

*See* Trial Tr. (June 25, 2018) at 111 (referring to email from Mr. McLellan regarding the AXA

transition as "a metaphor for the case"); *id.* at 112 (arguing that Mr. McLellan "must be the

unluckiest man in the world . . . to be mixed up in these frauds in two different continents where

he is the single common denominator. Not Ed Pennings, not Rick Boomgaardt. Ross

McLellan."). Of course, this is precisely the type of criminal propensity argument that is

prohibited by Fed. R. Evid. 404(b). As Mr. McLellan has previously argued in detail, evidence

of the alleged AXA fraud was not admissible for any legitimate purpose with respect to the

EMEA counts. *See* Dkt. 301 at 5-8. Clearly, the AXA evidence was not "intrinsic," in the sense

that it provided "the necessary description of the events leading up to" the purported EMEA

scheme.  *United States v. Robles-Alvarez*, 874 F.3d 46, 50–51 (1st Cir. 2017) (citation omitted).

The government's suggestion to the contrary is belied by the utter lack of significant evidentiary

overlap.  Nor did the evidence support any argument that the AXA transition and the EMEA

charges were part of the same common scheme or plan.[8]  As Mr. McLellan has previously noted,

this standard can rarely be satisfied "where, as here, '[t]he participants in both events were

entirely different.'"  Dkt. 301 at 6 (quoting *United States v. Lynn*, 856 F.2d 430, 435 (1st Cir.

1988)).  And the evidence failed to establish any "'common non-propensity thread connecting'

Count 6 to the EMEA charges."  *Id.* at 7 (quoting *Lynn*, 856 F.2d at 435).  Accordingly, the

government's invitation for the jury to consider Mr. McLellan's alleged fraud on AXA in

rendering a verdict on the EMEA counts was nothing more than a "veiled argument based on

criminal propensity."  *Id.* at 8.

      The First Circuit has expressly recognized the type of spillover prejudice at issue here as

a situation in which severance may be required.  *See United States v. Jordan*, 112 F.3d 14, 16

(1st Cir. 1997) (explaining that there may be prejudice sufficient to require severance where

"proof that defendant is guilty of one offense may be used to convict him of a second offense,

even though such proof would be inadmissible in a separate trial for the second offense" (citation

omitted)).  This is precisely what happened in Mr. McLellan's trial.  For the reasons explained

above, evidence of the alleged AXA fraud would have been inadmissible in a separate trial on

the EMEA counts.  However, because of the joint trial, the government was nonetheless able to

rely on that evidence in arguing that the jury should convict Mr. McLellan for the EMEA

---

[8] The use of a demonstrative showing certain dates where different transactions were conducted
does not, without more, suffice to show interrelatedness as contrasted to being used to argue

conspiracy.  In short, the government was the beneficiary of "an unfair windfall that the rules of evidence and elemental notions of fairness would otherwise not allow."  *Breinig*, 70 F.3d at 853.  The jury's acquittal of Mr. McLellan on the AXA charge does not negate this prejudice.  Despite its conclusion that the government failed to prove that charge beyond a reasonable doubt, the jury may well have considered the AXA evidence in assessing the other charges.  The presence of the AXA count combined with the absence of the requested extraterritoriality instructions had the effect of precluding a defense theory that this was a European/Middle Eastern offense rather than one that featured U.S. victims or U.S. conduct.

      3.        *Inability to Access Material Evidence Violated Mr. McLellan's Right to Present a Complete Defense.*

As Mr. McLellan has repeatedly noted, the Fifth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process Clause "require that criminal defendants be afforded a meaningful opportunity to present a complete defense."  Dkt. 276 at 4 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  This right includes, among other things, "constitutionally guaranteed access to evidence."  *Id.* (quoting *Trombetta*, 467 U.S. at 485).  Consistent with these principles, the First Circuit has made clear that the government may be required to assist the defendant in obtaining relevant evidence, at least where that evidence is available to the government and otherwise inaccessible to the defendant.  *See United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990).  The present case fits comfortably within this framework: (1) the Court has already acknowledged the relevance of the evidence sought from allegedly defrauded transition management clients; (2) Mr. McLellan exhausted all

---

propensity.

reasonable independent means of obtaining that crucial evidence; and (3) the government had the undisputed ability to access the evidence by issuing an MLAT request having failed to persuade NTMA (and Sainsbury) to voluntarily produce the court-ordered documents identified in the Letters Rogatory. *See* Dkt. 276 at 6-8; Dkt. 281 at 4-5; Dkt. 328 at 2-5. The government nonetheless refused to invoke the MLATs. Mr. McLellan's ability to present a complete defense was further hindered by the government's opposition to his attempts to depose former European lawyers for State Street. *See* Dkt. 275 and 296. This Court denied Mr. McLellan's motions to compel the government to exercise its MLAT rights, or alternatively to suppress related evidence offered by the government, citing a perceived lack of authority to compel the government to invoke the treaties. *See* Dkt. 350 at 1.[9] The Court did, however, acknowledge that "the more limited power available to McLellan to compel production of witnesses or documents from outside the United States as compared to within the United States potentially raises fairness or due process considerations in a case such as this one involving foreign victims." *Id.* at 2. It thus expressly permitted Mr. McLellan to renew his Due Process argument "after trial in the event of a conviction." *Id.*

   For the reasons outlined in detail in his prior filings, Mr. McLellan's Fifth and Sixth

---

[9] Mr. McLellan respectfully does not agree with the Court's ruling on this issue. For one thing, "no agreement with a foreign nation can confer power on . . . any . . . branch of Government, which is free from the restraints of the Constitution." *Reid v. Covert*, 354 U.S. 1, 16 (1957). Moreover, even assuming *arguendo* that the Court could not compel the government to exercise its treaty rights, it plainly had the discretion to suppress related evidence offered by the government in order to avoid a one-sided evidentiary presentation. *See* Dkt. 276 at 11-12 (citing *Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 446 (1st Cir. 1997) (explaining that federal courts have the "inherent power to exclude evidence . . . where necessary to prevent the non-offending side from suffering unfair prejudice")).

Amendment rights were violated as a result of his inability to access foreign evidence in this

case.  While Mr. McLellan did receive partial productions in response to some of his Letters

Rogatory requests, the materials obtained fell well-short of providing the "opportunity to present

a **complete** defense" envisioned by the Supreme Court.  *Trombetta*, 467 U.S. at 485 (emphasis

added).  Most glaringly, Mr. McLellan has yet to receive a single document from NTMA, an

entity involved in three of the five counts on which he was convicted.[10]  Moreover, Mr.

McLellan received only partial productions from three other transition management clients that

were the focus of the government's trial evidence, namely KIA, Sainsbury,[11] and Royal Mail.

Making matters worse, the government did not call any representative of KIA as a witness, and

Mr. McLellan was unable to compel the attendance of any such witness due to limitations on the

Court's subpoena power.  Mr. McLellan's lack of access to contemporaneous internal

communications of witnesses from NTMA, Sainsbury, and Royal Mail impaired his ability to

cross-examine those witnesses.  For example, with respect to NTMA, Mr. McLellan did not

receive any of the bids submitted by State Street's competitors for the transition at issue.  Such

documents were expected to demonstrate that competing bidders offered total costs greater than

or equal to those offered by State Street, even including the allegedly undisclosed mark-ups.

This would, in turn, provide fodder for cross-examination to establish that any misrepresentation

---

[10] While NTMA chose not to respond directly to Mr. McLellan's Letters Rogatory requests, Mr. McLellan did receive in discovery a limited set of materials produced by NTMA to the City of London Police.  The majority of these documents post-dated the charged conduct and were thus very different from the contemporaneous records and communications that were the focus of Mr. McLellan's requests.

[11] While Sainsbury itself did not produce any documents in response to Mr. McLellan's Letters Rogatory requests, Mr. McLellan did receive some documents produced by its consultant.

by State Street was not material to NTMA's investment decision.  Indeed, defense counsel

conducted just such a cross-examination of James Kelly, a representative of AXA.  *See* Trial Tr.

(June 15, 2018) at 88-89.  Counsel then emphasized Kelly's testimony in closing argument,

explaining to the jury that the total amount charged by State Street was just "one-third of what"

JP Morgan, an "esteemed global bank," "would have charged the client" for the same transition.

Trial Tr. (June 25, 2018) at 94.  This issue appears to have resonated with the jury, as evidenced

by the fact that Mr. McLellan was acquitted of the alleged AXA fraud.  Mr. McLellan had no

ability to make this type of argument with respect to NTMA as a direct result of his lack of

access to relevant documents.

## C.      CONCLUSION

For the foregoing reasons, Mr. McLellan respectfully requests that this Honorable Court

grant his pending Motion for Judgment of Acquittal, Dkt. 449, or alternatively vacate his

convictions and order a new trial.


Respectfully submitted,

Ross McLellan
By his Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein

27

20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: July 10, 2018

## **CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this date, July 10, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg