UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                :

        Plaintiff,                       :    Criminal Action No.
                                              1:16-cr-10094-LTS
    v.                                   :

ROSS MCLELLAN,                           :

        Defendant.                       :

- - - - - - - - - - - - - - - - - - x


    BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


                        JURY TRIAL
                         Day 14



                  Monday, June 25, 2018
                      8:44 a.m.




John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts


Rachel M. Lopez, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporter
raeufp@gmail.com

 1                    **A P P E A R A N C E S**

 2    On behalf of the Plaintiff:

 3         UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
          BY:  STEPHEN E. FRANK
 4        John Joseph Moakley Courthouse
          One Courthouse Way, Suite 9200
 5        Boston, Massachusetts  02210
          (617) 748-3244
 6        stephen.frank@usdoj.gov

 7
          UNITED STATES DEPARTMENT OF JUSTICE
 8        BY:  WILLIAM JOHNSTON
          1400 New York Avenue, Northwest
 9        Washington, D.C.  20005
          (202) 514-0687
10        william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
          BY:  MARTIN G. WEINBERG
14        20 Park Plaza
          Suite 1000
15        Boston, Massachusetts  02116
          (617) 227-3700
16        owlmcb@att.net

17
          LAW OFFICES OF ROBERT M. GOLDSTEIN
18        BY:  ROBERT M. GOLDSTEIN
          20 Park Plaza
19        Suite 1000
          Boston, Massachusetts  02116
20        (617) 742-9015
          rmg@goldstein-lawfirm.com
21

22        LAW OFFICES OF MAKSIM NEMTSEV
          BY:  MAKSIM NEMTSEV
23        20 Park Plaza
          Suite 1000
24        Boston, Massachusetts  02116
          (347) 251-4800
25        mentsev@gmail.com

**TABLE OF CONTENTS**

**MISCELLANEOUS**

                                                                  <u>Page</u>

Closing Arguments by Mr. Johnston                                 19

Closing Arguments by Mr. Weinberg                                 55

Rebuttal Arguments by Mr. Frank                                   98

Jury Instructions by The Court                                   114

1              **P R O C E E D I N G S**

2           (In open court.)

3           THE DEPUTY CLERK:  The United States District Court

4      for the District of Massachusetts is now in session, the

5      Honorable Leo T. Sorokin presiding.

6           Today is June 25th, the case of United States vs.

7      Ross McLellan, criminal action 16-10094 will now appear

8      before this court.

9           THE COURT:  I see all counsel and Mr. McLellan.

10     Good morning.

11          So Mr. Weinberg, at least, was busy this weekend.

12     So let me go over what I am changing in light of what he

13     filed and what I'm not changing.  I'll just mention what I'm

14     going to change.

15          First, I've revised the verdict form to go back to

16     one general question, the way I originally had it.  It's

17     just going to ask on Count 1 -- this is just with respect to

18     Count 1.  The question will just be conspiracy to commit

19     offenses against the United States, guilty or not guilty.

20     I'm not breaking it out further.  I had broke it out one way,

21     you didn't want that.  That's fine.  I understand why.  But

22     I'm concerned about the -- breaking out the way you suggest

23     the risk of potentially inconsistent verdicts.  And in any

24     event, so I'm leaving it that way.

25          With respect to the instructions, then, I changed,

1    just to conform at the end of the conspiracy section,

2    question 1, it just refers to one question now, instead of

3    two questions.  I -- on -- I've deleted the language, "In the

4    absence of some other representation," about spreads markups.

5    I've spent a lot of time thinking about that over the weekend

6    and reading his submissions, and thought about the arguments

7    you made, Mr. Frank.  And in the end, I think it's correct

8    the way it is and it makes the point that needs to be made,

9    but doesn't go further into it.  And so I'm making that

10   change.

11          A minor typo at the beginning of the wire fraud, it

12   had said, in the second line, "Title 18, United States Code

13   provides wire fraud," and I think it should say "prohibits,"

14   because that's what it does.

15          And then in the second motion for reconsideration,

16   with respect to aiding and abetting, I went back and looked

17   at that, looked at the Supreme Court case law on that.  I

18   think that -- while I don't think -- I think Mr. Weinberg

19   makes a reasonable point that the language I had is not as

20   clear as it ought to be.  So I actually made two changes to

21   that, in light of what I read in the Supreme Court's

22   decision.

23          Under the second element, where it says "intended

24   to help the other person," I've added "commit the securities

25   fraud or wire fraud."

1           And then at the end of the sentence is, after the

2   language "seeking to make it succeed, by taking an

3   affirmative act."

4           The other things changes that he requested I'm not

5   making, so to those extents, the motions for reconsideration

6   allowed and denied.

7           MR. FRANK:  Your Honor, on the one point on the

8   legal duty to disclose commissions, first of all, commissions

9   is a term that their expert testified is -- is used in an

10  agency relationship.  And in an agency relationship, there is

11  a duty to disclose.  So the instruction we submit is

12  incorrect in that respect.

13          Second of all, there's only two ways to trade fixed

14  income, either as an agent or as a principal/riskless

15  principal.  If you're trading as a principal/riskless

16  principal, this is a correct proposition of law.  If you're

17  trading it the other way, it is an incorrect proposition of

18  law.  And so by leaving out "in the absence of some other

19  representation," there is always some other representation,

20  because you can only trade it in one of two ways and this is

21  only correct as to one of those ways.

22          THE COURT:  Well, the general legal duty -- there's

23  no general legal duty.  The duty arises when you take on a

24  specific role, or say something.

25          MR. FRANK:  When you trade fixed income, you either

1   trade it one way or the other way.

2           THE COURT:  Well, you could trade as a principal

3   for yourself.  You could trade as a principal or riskless

4   principal for someone else, or you could trade as an agent

5   for someone else, right?

6           MR. FRANK:  Well --

7           THE COURT:  We've heard evidence about companies

8   trading for their own account.

9           MR. FRANK:  I'm sorry?

10          THE COURT:  We've heard evidence about companies

11  trading for their own account, right?

12          MR. FRANK:  But then there would be no issue of

13  disclosure.  So when -- I mean, stipulated that this only is

14  relevant when trading on behalf of another individual or

15  entity, but when trading on behalf of another individual or

16  entity, there is a general legal duty to disclose when you

17  are acting as an agent.  There is only not a duty to disclose

18  when you are acting in a principal or riskless principal

19  capacity.  So you're always going to be trading on someone's

20  behalf in one of those two capacities.

21          THE COURT:  What if I go to Goldman Sachs and I say

22  I want to buy a billion dollars worth of treasury bills and

23  they say, okay, we'll sell them to you.

24          MR. FRANK:  Then, at least the confirmation will

25  indicate whether they're trading in an principal or agency

1      capacity.  It has to, under the statute.

2              THE COURT:  Right.

3              MR. FRANK:  Under the regulations, disclose that.

4              THE COURT:  And if they say they're the principal,

5      they don't have to disclose to me --

6              MR. FRANK:  Correct.

7              THE COURT:  -- whatever you want to call it,

8      commission, markup or spread.  We certainly have heard some

9      testimony that all those things are the same.

10              MR. FRANK:  Well, his testimony is that the term

11      commission would never --

12              THE COURT:  But I'm not bound by his testimony.

13      I'm just talking about, would you admit that there has

14      been -- you have elicited evidence that it's the same.

15              MR. FRANK:  I have elicited that evidence, but if

16      we are referring to the regulation, which I believe is what

17      the Court is referring to here, Rule 10b-10.  It only

18      refers to spreads or markups and it only refers to them in

19      the context of a principal --

20              THE COURT:  I'm referring not to the specific

21      regulation, but as to the general notion that there isn't

22      some -- the reason that I add the word "general" is there's

23      no -- as I understood the evidence, there's no overarching

24      legal duty that applies in all circumstances.  The duty

25      arises when you say something or trade -- say make a

1    representation about what role you're in, or say something.

2    And that the mere act of having an undisclosed revenue

3    without more is not enough.

4         MR. FRANK:  So the concern is, Your Honor -- I

5    understand that.  But the Court is defaulting to the

6    principal relationship in the absence of a representation and

7    there's no reason to default to the principal relationship in

8    the absence of a representation, any more than there is to

9    default to the agency relationship, in the absence of a

10   representation.

11        If you go to Goldman Sachs, in the absence of a

12   representation, it's simply unclear whether they're acting as

13   an agent or principal, until you get that confirmation, where

14   they are under a duty to disclose what capacity they're

15   acting in.  And if they disclosed that they're acting in a

16   agency capacity, they have a duty to disclose commissions.

17   And if they disclose that they're acting in a principal, they

18   don't --

19        THE COURT:  What's the problem, though?

20        MR. FRANK:  I'm sorry?

21        THE COURT:  What's the problem?  You're going to

22   argue to the jury that they said they were agents, they said

23   they were fiduciaries and they lied to them, right?  And then

24   that's not contrary to any of this.

25        MR. FRANK:  Because in the absence of -- in the

1    absence of the -- in the "absence" language, we believe that

2    the instruction could be confused by the jury to suggest that

3    no matter what they say, there is no legal duty to disclose.

4          THE COURT:  What do you think about that,

5    Mr. Weinberg?

6          MR. WEINBERG:  I think it may be nice as a matter

7    of generic philosophy, but the testimony here, Your Honor,

8    including testimony from Mr. Menchel, is institutional

9    investors only expect in-trade fixed income as riskless

10   principal or principal.  There's no evidence that the

11   Government has introduced, through trade confirmations, for

12   instance, that State Street traded fixed income as an agent.

13   That would result in a different confirmation, so Your

14   Honor's instruction given the --

15         THE COURT:  Well, isn't there evidence that they

16   said they were agents?

17         MR. WEINBERG:  There's evidence they said they were

18   agents in different context, which is going out to the

19   marketplace as an agent for the client.  There's no evidence

20   through documents in this case that fixed income was traded

21   as an agent and, therefore, this instruction is correct,

22   based on the evidence in this case.  And any other

23   instruction just dilutes the purpose of the -- it leads to

24   speculation.

25         The Government can argue that they made these

1    promises, but the reality is the trading was as a principal,

2    as a riskless principal, the generated confirmations, the

3    slips with the number 7, which indicates principal.

4    There's -- Mr. Frank may be, again, right, as a matter of

5    generic philosophy, but on the record of this case, we're

6    dealing with fixed income traded as a principal.  That's what

7    Mr. Menchel said is the everyday norm of institutional

8    investors, the expectations of asset managers and the reality

9    of how bonds are traded.

10              MR. FRANK:  Tom Clemmenson, in fact, testified

11    specifically that fixed income was traded at State Street

12    both as riskless principal and in some instances as agent.

13    And in fact, testified that it was much more complicated when

14    they did it as agent, because there was more manual labor

15    involved in doing so.  Kristen Morris corroborated that

16    testimony, as well.  And Mr. Menchel corroborated that

17    testimony.  Because although he testified that in his

18    experience, it is usually done -- with institutional

19    investors on a riskless principal basis, he said it could be

20    done on an agency basis.  So there was testimony from three

21    witnesses on that front.

22              And again, I appreciate the recognition that I'm

23    right as a matter of philosophy.  I'm right as a matter of

24    regulation and of law.  That when you're trading under reg

25    10b-10 on an agency basis, you do have a duty to disclose.

1    And that's the only quibble that we have with the --

2              MR. WEINBERG:  But, Judge, on the record of this

3    case, the evidence, for instance AXA, where Ms. Morris and

4    Mr. Clemmenson exclusively testified, you have a tape of

5    Mr. --

6              THE COURT:  I'm sorry, Mr. Weinberg.  I just don't

7    see how the jury is going to be confused by this in this

8    case.  In other words, in this case, you're arguing that they

9    made misrepresentations and that they lied to them.  And all

10   of that follows after -- whatever the baseline is and all

11   this is really seeking is what the baseline is before they've

12   done anything.

13             MR. FRANK:  I agree with Your Honor, but my concern

14   is that by leaving out the phrase "in the absence of some

15   other representation," the jury could be confused, because

16   what Your Honor is -- what Your Honor understands and I

17   understand to be the baseline, a jury could understand to

18   mean there is no legal duty to disclose, regardless of what

19   representation -- because it's stated full stop.  There is no

20   legal duty to disclose markups, markdowns, spreads, or

21   commissions on fixed income trades.  Period.

22             MR. WEINBERG:  Judge, this goes right back to

23   Mr. Clemmenson's testimony, which is that agency is going to

24   the marketplace on a client's behalf and trading.  It's not

25   inconsistent with trading as riskless principal.

1          Secondly, the tape of AXA where Mr. Frank mentions

2     Ms. Morris, Mr. Clemmenson, the tape says they're trading as

3     principal, as riskless principal.  There's no evidence of

4     trading in this case as an agent.  The Government can say the

5     clients have misled, but this is an absolute correct

6     statement of law in relation to the facts of this case.  If

7     the Government had proof that they traded this as an agent

8     and didn't disclose it, we haven't.  They had no proof.

9     Every trade, every fixed income trade that's at issue in this

10    case is as riskless principal and, therefore, the instruction

11    is correct.

12          MR. FRANK:  Your Honor, we think the safest course

13    would be to not wade into this area of law.  Mr. Weinberg can

14    make his arguments about Mr. Menchel's testimony and the

15    legal duty to disclose as he sees fit.  But we respectfully

16    submit that if you are going to wade into it, it needs to be

17    hyper-technical.

18          THE COURT:  Okay.  I'm not giving hyper-technical

19    jury instructions, because that's not going to be helpful to

20    the jury, and I don't think that I need to be hyper-technical

21    here.

22          I'm going to think about this for one moment.

23          (The Court and law clerk confer.)

24          THE COURT:  I'll tell you what, the concern I have

25    is not quite the direct point Mr. Frank has made, but the

1    point that he has made that there's the risk that it would

2    mislead the jury in some way.  That I'm concerned about.  I

3    don't -- the hyper-technical explanation, the details of

4    10b-5, or the rule, I don't think that this implicates or

5    inaccurately states it.  But I just want to think about the

6    wording of that.  So I just want to take a two-minute recess

7    to think about that to get it right.  And then I'll tell you

8    what I think and if you don't like it, you'll tell me, and

9    then we'll proceed.

10            MR. WEINBERG:  Thank you.  And while you're taking

11   the recess, could I burden Your Honor to reconsider the

12   page 34, which is to allow the jury to consider sharp dealing

13   or unethical conduct in determining whether this scheme to

14   defraud -- sharp dealing is the contrast to criminal dealing.

15   It's what Mr. Boomgaardt said in his prior statements.  We

16   thought this was sharp dealing.  I think it invites the jury

17   to convict Mr. McLellan based on business conduct that they

18   may find as sharp, it's not transparent, doesn't meet some

19   moral right or wrong standards.  Unethical -- most of

20   what's -- some of what's unethical overlaps with criminal,

21   much of it doesn't and given the --

22            THE COURT:  But all I'm telling them is they may

23   consider it.

24            MR. WEINBERG:  But they may consider it as an

25   invitation to convict based on largely decisions of sharp

1    dealing, which in an everyday real world is what a lot of

2    people think is inherent in business.  I think it invites the

3    jury --

4            THE COURT:  Do you think it creates that

5    invitation?

6            MR. FRANK:  I'm sorry, Your Honor?

7            THE COURT:  Do you think it creates that

8    invitation?

9            MR. FRANK:  I would prefer there be no reference to

10   any of this in the indictment, in the jury instruction, Your

11   Honor.  I think running a stop sign is one thing.  Running a

12   stop sign and killing somebody is another thing, and you can

13   consider the running of the stop sign in considering what

14   happened next.  But I don't think that needs to be mentioned

15   in the jury instruction.

16           Mr. Weinberg has asked the Court to put this in the

17   jury instruction, but doesn't want the second proposition,

18   which is that running a stop sign itself is not the issue,

19   but it may be considered as to the ultimate issue.  And we

20   think -- I think, in fairness, if the first part is going to

21   be in there, the second part should be in there, as well.

22           THE COURT:  That's what I think.  That's what I

23   think.  I'm going to leave it the way it is.

24           MR. WEINBERG:  Well, then, I would say amongst the

25   options, and without waiving my right to request the first

1  part, I think the second part has such risks of toxic

2  spillover, having the jury convict on legal conduct, that I

3  would ask the Court to take both sentences out.  Again,

4  that's not my primary request, but that's the request that I

5  necessarily have to make.

6           THE COURT:  All right.  What page is that on?

7           MR. WEINBERG:  Page 34.

8           THE COURT:  So you would rather me say nothing,

9  than -- hold on.

10          MR. WEINBERG:  I think, again, Your Honor, should

11 say what's in the sentence before the last, but I think the

12 last sentence not only cancels out the sentence before it, I

13 think it leads to the -- to a likelihood of deliberation

14 that's not restricted to what is or is not a crime.

15          THE COURT:  All right.  I'll take both out.

16          You don't object to that, do you, Mr. Frank?

17          MR. FRANK:  I do not, Your Honor, thank you.

18          MR. WEINBERG:  Respectfully, I object to taking out

19 one sentence, but Your Honor has heard my argument.

20          THE COURT:  Okay.  All right.  Okay.  I'll take a

21 two-minute recess just to look at that one sentence.

22          THE DEPUTY CLERK:  All rise, this matter is in

23 recess.

24          (Court in recess at 9:05 a.m.

25          and reconvened at 9:17 a.m.)

```
 1              THE DEPUTY CLERK:  The McLellan matter is back in
 2   session.
 3              THE COURT:  Please be seated.  All right.  So I've
 4   looked that over and thought about it and I'm going to leave
 5   it the way I said this morning.  I've read -- reread the
 6   instruction.  There's various places that make clear that
 7   affirmative misstatements are illegal and that reckless
 8   indifference -- I'm sorry.  That half-truths or concealment
 9   of material facts can constitute fraud.  So I think the risk
10   of confusion is minimal.
11              So I'm going to leave it that -- the only change
12   that I'm going to make as a result of our discussion this
13   morning, is I'm going to take out the two sentences, the
14   breach of contract, and the following "however" sentence.
15              All right.  So we'll bring the jury in.  The
16   Government will close first.  I thought we'd take like a
17   five-minute break, after the Government's closing, let the
18   jury go to the bathroom, or what have you, then come back.
19   Then we'll do the defendant's close, then the rebuttal, and
20   then we'll take the longer break and then I'll give them the
21   charge.
22              And you're going to -- do you want a warning at
23   like five minutes to an hour, 55?
24              MR. JOHNSTON:  I don't believe we'll need a
25   warning.
```

```
 1                    THE COURT:  All right.  Fine.

 2                    Okay.  Maria, go get the jury.

 3                    MR. WEINBERG:  Judge, if I could have a warning at

 4       an hour, although I'm -- for my argument, I'll know I'm 10 or

 5       15 minutes from sitting down.

 6                    THE COURT:  Fine.

 7                    MR. WEINBERG:  I guess not a warning, but a notice.

 8                    THE COURT:  A notice.  Yes.

 9                    (The jury enters the courtroom.)

10                    THE COURT:  Please be seated.

11                    Good morning, ladies and gentlemen.  Did you all

12       have a nice weekend?

13                    Yes.  Good, nobody discussed the case among

14       yourselves or with anyone else, no one did any independent

15       research, read anything about the case?

16                    Good.  Now, as I told you, now we proceed to

17       closing arguments, the final instructions on the law, and

18       then you will commence to deliberate.  Let me tell you the

19       rough schedule for this morning.  You'll hear closing

20       argument from the Government, then we'll take a five-minute

21       break, so you can go back to the jury room.  We'll let

22       defense counsel get organized.  And so you can go to the

23       men's room or the ladies' room if you wish.  But just a very

24       brief break.

25                    We'll come back in and then we'll have the
```

1  defendant's closing argument, followed by the Government's

2  rebuttal.  The Government goes first and last, because they

3  have the burden of proof in this case.  Then we'll take -- it

4  will be a little later than normal, but we'll take the longer

5  morning break and then we'll return to the jury room -- the

6  courtroom from the jury room and then I'll give you my

7  closing -- my final instructions on the law and then you'll

8  retire to the jury room and you can commence your

9  deliberations.  And as I said, we'll have lunch for you

10  today, as well.

11         Okay.  Mr. Johnston, are you ready?

12         MR. JOHNSTON:  Yes, Your Honor.

13         THE COURT:  Go ahead.

14               **CLOSING ARGUMENTS BY THE PLAINTIFF**

15         MR. JOHNSTON:  Inadvertent commissions applied.

16  Those are the defendant's words.  Caught red-handed over

17  charging Royal Mail, the defendant ordered his

18  co-conspirators to lie.  You know those commissions were not

19  inadvertent.  They were no mistake.  They were no fat finger

20  trading error.  They were the same hidden commissions the

21  defendant and Ed Pennings had been secretly planning to

22  charge Royal Mail from the moment they bid on that

23  transition.

24         Remember what the defendant said then?  Thin to

25  win.  They were the same hidden commissions that the

1    defendant himself instructed Stephen Finocchi to apply to US

2    bond trades and they were the same hidden commissions he

3    later told Finocchi to zero out before sending over the file

4    to his colleague, so that others at State Street wouldn't

5    know about them.

6           People lie when they have something to hide, when

7    they know they've done something wrong.  That is why the

8    defendant chose those words.

9           This was not the defendant's first lie, nor was it

10   his last.  It was just one lie, in a web of lies, that the

11   defendant and his co-conspirators spun in a scheme to

12   separate State Street's clients from their money.

13          At the beginning of this case, we told you the

14   evidence would prove, beyond a reasonable doubt, that the

15   defendant conspired with Ed Pennings and Rick Boomgaardt to

16   add hidden commissions to billions of dollars worth of

17   securities trade.  They promised one price and then secretly

18   charged another and that they did it at the direction of the

19   defendant, Ross McLellan.

20          You know that the evidence has shown exactly that.

21   The evidence has given you insight into the mind of this

22   defendant, into what he was thinking when he and his

23   co-conspirators spun that web of lies to take clients' money

24   and into what he was thinking when they lied again to cover

25   it up.

1          Through his words and his actions, you know that

2     this defendant did exactly what he was charged of doing,

3     cheating State Street's clients.  It is the choices that he

4     made and the actions that he and his co-conspirators took

5     that bring us here today.

6          We're now going to take you through the evidence

7     and through each of the counts of the indictment.  For his

8     actions, the defendant is charged with three crimes, wire

9     fraud, securities fraud, and conspiracy to commit those

10    crimes.  Judge Sorokin is going to instruct you as to the

11    elements of those charges, and what we need to prove.

12         The evidence I will summarize for you establishes

13    each of those elements beyond a reasonable doubt.  I'm going

14    to organize the evidence in three buckets.  The first bucket,

15    evidence proving that there was a scheme to defraud, that

16    lies, misleading statements, and half-truths were told.

17         Second, evidence proving that the defendant was

18    involved in that scheme.

19         And third, evidence proving that the defendant knew

20    what he was doing was wrong and that he had the intent to

21    defraud.

22         To the first bucket.  You know from the evidence

23    that there was a scheme to defraud, to lie to State Street's

24    clients, to take their money.  It involves stocks and bonds

25    and lots of financial jargon, but at its heart, it was one of

the oldest and most basic frauds out there, bait and switch,
or in the defendant's words, thin to win.

The defendant and his co-conspirators promised one
thing and delivered another.  They promised low fees and to
act in their clients' best interest, to put their clients'
interest ahead of their own, and they did the opposite,
adding secret commissions that the clients couldn't see.
Sometimes it was a penny or two per trade that they thought
the clients wouldn't notice.  Other times they were more
aggressive, taking the price all the way up to the high of
the day.  Whatever the mechanism, the goal was the same,
secretly pick the pockets of State Street's clients in order
to make money for the bank.

You have seen the promises they made.  They
promised KIA they would charge zero commissions on two
separate bond transitions.  That they would make money on the
deal on the other side so that KIA would be charged nothing.
They promised Dutch Doctors they would charge one basis point
of yield.  They promised Sainsbury's a flat fee of
350,000 pounds.  You know what that means, no commissions, no
per trade charges.

You know from Dean Johnson that that's what he
understood it to mean and you know from Pennings and
Boomgaardt, that that's exactly what they intended.  It was
the same for Eircom.  State Street proposed a flat fee of

1    400,000 euros, which was later negotiated down to 350,000

2    euros, and they offered Eircom a choice, either a flat

3    management fee, or a capped commission.  You know what that

4    means, one or the other, but not both.

5           They promised Royal Mail a flat fee of 1.75 basis

6    points of the assets.  If that wasn't clear enough, they made

7    it explicit later in the same proposal, commissions, nothing.

8           After Royal Mail reduced the size of the deal, Ed

9    Pennings reaffirmed that promise, a flat management fee, who

10   did he forward this e-mail to?  The defendant.  You know they

11   intended Royal Mail to believe there would be no additional

12   charges.  Pennings and Boomgaardt told you that.  And you

13   know from Ian McKnight that that's exactly what he

14   understood.

15          He believed the bank, he trusted them, he had no

16   reason not to.  They made the same promise to NTMA, zero

17   commissions on all trading activity, and a flat fee of

18   1.25 basis points.  It could hardly be more explicit.  Zero

19   commission.  You saw the e-mail where the defendant said he

20   read this very proposal and thought the text looked good.

21          You also know that after they won just half the

22   deal, they asked for more money, two basis points.  But NTMA

23   bargained them down to 1.65.  It was still a flat fee.  Just

24   like Royal Mail, just like Sainsbury's, NTMA thought those

25   words meant what they said, zero commissions.  You heard that

1     from Eugene O'Callaghan, and you also heard from Pennings and

2     Boomgaardt that those were lies and half-truths, because they

3     always intended to charge more.

4            Bait and switch, thin to win.

5            But those low fees weren't the only promises the

6     defendant and his co-conspirators made.  They also promised

7     that State Street would act as an agent and a fiduciary, that

8     it would act in its clients' interests, and put the clients'

9     interests ahead of their own.  They said it over and over and

10    over again.  Remember all those proposals we looked at?

11    Well, here's one of them.

12           It's what they told Royal Mail, "fiduciary agent."

13    They said the same thing to NTMA.  "Fiduciary agent."  Take a

14    look at these proposals in the jury room.  They're

15    Exhibit 70-1 and 91-1.  That was their promise.  That is how

16    they earned their clients' trust.

17           Those promises meant that State Street would go

18    into the market to find the best prices for its clients and

19    that the only difference between that market price and the

20    price the client paid was the agreed-upon commission, where

21    they were charged a flat fee, instead of commission, that

22    number was supposed to be zero.  But you know the defendant

23    and his co-conspirators didn't keep those promises and never

24    intended to.

25           You heard from Boomgaardt and Pennings that those

1    promises were designed to make the clients believe that that

2    was all they would be paying, to lure them in, and then

3    secretly charge them something else, thin to win.

4         When they did charge more, the clients didn't know

5    it, because of the way bond prices are reported to them, a

6    net price, with the commission built in, so the client had to

7    take it on faith that they had actually been charged the

8    right amount.  You know that's true, because you heard them

9    talk about it in realtime.

10        (Audio plays.)

11        MR. Johnston:  That's Exhibit 43.  That's where

12   Pennings tells Boomgaardt to lie to Dutch Doctors about how

13   much they're being charged.  Eventually, they figured out how

14   to do the same thing for stocks, hiding those extra fees

15   behind a net price, so the clients couldn't find out.  You

16   cannot tell a client you are charging one basis point and

17   then secretly charge 1.5.  You cannot tell a client that you

18   are making money from the other side and then secretly charge

19   them out of their own pocket.  And you cannot tell a client

20   you are charging a flat fee and zero commission and then

21   secretly charge the very commission you promised not to take.

22   When you do those things, when you mislead your clients

23   through lies and half-truths in order to take their money,

24   that's fraud.

25        You know that some clients were easier marks for

1  that fraud than others.  KIA was one of those clients.  They

2  didn't understand certain financial concepts like other

3  investment managers.  They were sloppy with paperwork.  As

4  Pennings told the defendant, they were clueless.

5          (Audio plays.)

6          MR. JOHNSTON:  You can hear Pennings and Boomgaardt

7  make fun of Das, the relationship manager at KIA, because he

8  didn't understand the concept of bond duration, like other

9  investment managers did.  Other clients were tougher to put

10  something past.  Ian McKnight wanted to make sure for the

11  avoidance of doubt that their fee included all trading costs.

12  He told you why he asked, not because he was confused, but

13  because he wanted it in black and white, so that State Street

14  couldn't wriggle out of their promise later.

15          At the end of the day, each of these clients

16  trusted State Street to live up to its promises, that it

17  would be their agent, their fiduciary, that it would act in

18  their best interests, and that it would charge the prices

19  that it promised.  The defendant and his co-conspirators

20  violated that trust and they did it on purpose.  That's how

21  you know there was a scheme to defraud.

22          I'm now moving to the second bucket, evidence

23  proving the defendant actively participated in this

24  fraudulent scheme alongside Pennings and Boomgaardt.  As you

25  know now, he directed it.  You have heard from the defense

1    that the defendant never spoke to most of these clients, that

2    he never met them, never talked to them, never sent them an

3    e-mail or texted them.  Well, of course he didn't.  Because

4    in this scheme, everyone had their own role to play and

5    talking to clients wasn't the defendants'.  That was

6    Pennings' job.  He was the front man.  Boomgaardt crunched

7    the numbers and dealt with the European traders.  And the

8    defendant was the boss, he approved it all.  In Pennings'

9    words, he made sure the traders in the US did what we want.

10        The defense also told you that there were a

11   thousand transitions a year and that the defendant was flying

12   around the world and was far too busy to pay attention to all

13   of them.  Well, that's precisely the point.  Because here's

14   what you know.  He did pay attention to these deals, the

15   elephant deals.  They were the ones that drove the bottom

16   line and he was personally involved in these ones every step

17   of the way.  You heard that from Boomgaardt and Pennings, you

18   saw in e-mail after e-mail.  You saw it -- you heard it in

19   recorded call after recorded call.  And Kristen Morris, Tom

20   Clemmenson, and Stephen Finocchi all told you the same thing,

21   how unusual it was for the defendant to personally direct

22   traders what to charge, particularly after trading had

23   already started.  Except for these deals, it never happened.

24        The scheme started with KIA.  Revenues in

25   early 2010 were sagging and the defendant was pushing his

1  team to make more money.  They knew that unless they bid
2  zero, they would lose this deal, because other banks had
3  different ways of making money that weren't available to
4  State Street.  So they cited to bid zero and charge a hidden
5  commission anyways.
6         Pennings and Boomgaardt both told you that the
7  defendant was in on this decision, that he approved it.  And
8  you know that's true, because you have other evidence to back
9  them up, like this e-mail.  It's Exhibit 8, where Pennings
10  tells Das that whatever money State Street will make will
11  come from the other side of the transaction.  An explanation
12  that Pennings told you was utter nonsense.  Pennings
13  forwarded that e-mail to the defendant, and you know why,
14  because he wasn't going to go ahead on this scheme without
15  the boss's okay.  And whatever Das did or did not understand
16  about whether State Street was going to make money, this much
17  is clear.  That statement was a lie.  It was intended to
18  deceive, and the defendant's name is on it in black and
19  white.
20         You also know that the defendant personally told
21  the traders how much commission to charge on each and every
22  one of those bonds.  That money wasn't coming from the other
23  side of the trade, it was coming from KIA.
24         You also know that the defendant personally signed
25  off on the proposal to NTMA.  Here's that e-mail, Exhibit 69,

1   where he told Pennings he had read the submission and thought
2   the text was good.  That's the very same proposal where State
3   Street promised a flat management fee and zero commission,
4   the same proposal where they promised to be NTMA's agent, its
5   fiduciary, to act in its best interests.  When they won that
6   deal, at a flat fee of 1.65 basis points, it was the
7   defendant who agreed they would need to be very creative.
8   And you know what that means:  Charge hidden commissions.
9   Pennings told you that.
10          On Christmas Day, the defendant and Pennings
11  discussed exactly how much those hidden commissions should
12  be.  That's the flat fee at the top.  Right below it are the
13  hidden commissions.  The defendant's response?  "Merry
14  Christmas, Saint Eddie."
15          Take a look at it yourself, it's Exhibit 81.
16          You then heard the defendant, himself, directing
17  Joe Dionisio to charge those same hidden commissions.
18          (Audio plays.)
19          MR. JOHNSTON:  Finish it off.  $0.15 a share on
20  over 4 million shares of the Russell 2000, traded on the New
21  York Stock Exchange.  More than $600,000 for State Street,
22  money that belonged to NTMA, to the people of Ireland.  It
23  was the same with Royal Mail.  Pennings forwarded the
24  defendant the opportunity the moment it arrives and the
25  defendant told them how to respond.  "Thin to win."

1          You know what that means, lure them in with a low

2     fee.

3          When they won the deal, Pennings again forwarded

4     the e-mail to the defendant, laying out the terms, a flat fee

5     of 1.75 basis points, or 227,500 pounds.  Once again, they

6     discussed the hidden commission.

7          "I am thinking 1.5 to 2 basis points yield."

8          It's Exhibit 92.

9          You know that's exactly what they ended up doing.

10    The defendant instructed Finocchi to apply a basis point of

11    yield in the US, and Boomgaardt instructed them to charge

12    two basis points of yield in Europe.  Bait and switch.

13         Mr. Weinberg told you in his opening statement that

14    the defendant's biggest mistake was putting his trust in the

15    wrong person, Ed Pennings.  But you know from the evidence

16    we've just reviewed and all the other evidence in the case,

17    that that's just not true.  This was a criminal partnership

18    from the beginning and the defendant was involved, alongside

19    Pennings and Boomgaardt, every step of the way.

20         Here's how you know to a certainty that this wasn't

21    Pennings' scheme alone, because the defendant orchestrated

22    the same fraudulent scheme right here at home with AXA,

23    another elephant deal involving billions of dollars of bond

24    trades.  It happened right at the same time as the scheme was

25    reaching its peak in Europe and neither Pennings nor

1    Boomgaardt had anything to do with it.

2         From the moment the opportunity came in, AXA was

3    the deal the defendant controlled.  Here he told his

4    salesman, Kevin Walker, "let's chase this Tuesday morning."

5         State Street's proposal to AXA was sent the next

6    week, on Thursday, February 24, 2011, promising a very low

7    fee.  That was three days after that e-mail we just saw,

8    where they promised a flat fee commission to Royal Mail, but

9    then discussed an additional hidden commission.  That was

10   one day before that call we just listened to, involving Joe

11   Dionisio, and that was four days before the periodic notice

12   for Sainsbury's was signed, falsely promising a flat fee of

13   350,000 pounds.  You know exactly what was on the defendant's

14   mind.

15        Just as with the European deals, State Street

16   promised AXA it would be its agent and fiduciary.  That it

17   would act in AXA's best interest.  And they made it clear

18   that all commissions would be fully disclosed.  And just as

19   with the European deals, they promised a low commission rate,

20   this one, a .1 basis points of yield, which equalled about

21   $592,000.  They said it again, all commissions would be fully

22   disclosed and agreed upon prior to the transition assignment.

23        The defendant was copied on this e-mail from Kevin

24   Walker, because this was his deal.  But that promise was a

25   lie.  Shortly after winning the AXA deal at .1 basis points

1    of yield, the defendant told his traders to charge something

2    higher on a conference call, on March 2, 2011.  It's

3    Exhibit 116.

4              (Audio plays.)

5              MR. JOHNSTON:  The defendant was halfway around the

6    world in Australia at that time, but even that didn't keep

7    him from cheating on this elephant deal.  You also heard

8    Walker on the same phone call tell the traders to ignore the

9    trading instructions they would receive from Kristen Morris.

10             (Audio plays.)

11             MR. JOHNSTON:  That's the same thing McLellan told

12   Finocchi three weeks later on the Royal Mail deal, ignore the

13   instructions from Samina Vernon, the transition analyst, and

14   do what I'm telling you instead.

15             On Monday, March 7th, just before trading started,

16   Morris sent AXA an updated pre-trade with lower commission

17   numbers, approximately 423,000, because the in kind transfers

18   had increased, which meant that there would need to be fewer

19   trades.  Jim Kelly told you that he thought State Street was

20   living up to its promise, that it was acting as its

21   fiduciary, and trying to find ways to cut costs, but the

22   opposite was true.

23             In the end, you heard that Kristen Morris -- you

24   heard from Kristen Morris that State Street took $1.3 million

25   from AXA, three times more than the amount disclosed in the

final pre-trade report. It was a bait and switch, plain and simple. And it happened on the defendant's orders, with no Boomgaardt or Penning around.

So now you know that there was a scheme to defraud and that the defendant was involved at every step. So now let's move to the third bucket of evidence, which proves that the defendant intended to mislead his clients and knew what he was doing was wrong.

How do you know that? First, it's just common sense. You can't lie to people to take their money. You learn that before you leave elementary school. You can't tell a client you will charge them one price and then actually charge them another. You can't promise someone you'll act as their agent and in their best interest and then secretly help themselves to their money. That's exactly what they were doing here.

Second, Pennings and Boomgaardt told you, from the witness stand, that they knew what they were doing was wrong, but you don't just have their testimony. You also have what they said to each other at the time. You know that -- you know that because around January of 2010, somebody anonymously faxed the defendant a spreadsheet, showing that a competitor, Bank of New York, ConvergEx, was charging its clients secret commissions higher than the ones that had been agreed upon.

1          Pennings told you about the spreadsheet and you

2     heard that the defendant told Special Agent McGillicuddy

3     about the same spreadsheet when he was interviewed in January

4     2012.

5          The defendant thought it came from an unhappy

6     former ConvergEx employee, who wanted the industry to know

7     what was going on.

8          You saw this e-mail from January of 2010, in which

9     the defendant -- in which Pennings, with the defendant's

10    blessing, tried to use that spreadsheet to disparage BNY

11    ConvergEx with a prospective client.  Look at the subject

12    line.  "Artificially low commissions due to undisclosed

13    spreads."  That's the same scheme, bait and switch.

14         Look at what they called that spreadsheet "BNY

15    ConvergEx client abuse list."  The words speak for

16    themselves.  The defendant and Pennings believed that what

17    ConvergEx was doing was abuse, that it was wrong.  And you

18    know that's true, because you heard Pennings tell Boomgaardt

19    the same thing.

20         This is what he said on April 19, 2010, eight years

21    before testifying in this case.  This is a conversation -- he

22    tells Boomgaardt about a conversation he had with Alex

23    Johnston, a ConvergEx salesman.

24         (Audio plays.)

25         MR. JOHNSTON:  It's wrong.  Those were Ed Pennings'

1    words eight years ago.  It was wrong to tell the client

2    you're their agent and then secretly take their money and it

3    is wrong to rely on vague language in a contract as a cover

4    for those lies.  And he said that before he had ever applied

5    a single hidden commission at State Street, before any

6    Government investigation, before pleading guilty to any

7    crime.

8           You know that the defendant shared those views.

9    When Special Agent McGillicuddy interviewed the defendant as

10   part of the ConvergEx investigation in January of 2012, the

11   defendant said that State Street fully disclosed its own

12   commissions and that it didn't take any spreads.  He said

13   that it was only okay to take a spread if it was disclosed to

14   the client and the client was not a fiduciary.  The defendant

15   said those things to an FBI agent investigating ConvergEx.

16   But you know that the defendant had taken hidden spreads on

17   all of these deals and personally directed traders to apply

18   those secret charges.  So why wasn't he honest with the FBI?

19   Because he knew what he had done was wrong and he wasn't

20   going to admit it to an FBI agent investigating an almost

21   identical scheme.

22          Here's another reason you know the defendant

23   believed that he was doing something wrong.  He and his

24   co-conspirators hid their conduct from clients and even from

25   others within State Street while they were doing it.  If

1    you're doing nothing wrong, you have nothing to hide.

2            Take a look at Exhibit 67.  This is the e-mail

3    between Pennings and the defendant, where they're deciding

4    how to pitch NTMA.  Pennings says, "How about a one basis

5    point management fee or something of that nature, no

6    commission, and then take a spread?"

7            The defendant responds, "Agree with the zero

8    commission bid.  Ian will need to trade net."

9            You know that for bonds they always traded net, but

10   for stocks, they never did.  By this point, though, they

11   figured out a way they could trade stocks net, using a

12   special principal trading account that was never used for

13   transition clients, the VWAP account.  You know that the

14   defendant instruction meant tell the client zero, but have

15   Ian Holden trade those stocks in the principal accounts, so

16   they could add a secret commission and hide it from the

17   client.

18           And look at Pennings' response "Have to charge a

19   management fee, otherwise they get suspicious."

20           Think about that sentence for a minute.  Suspicious

21   of what?  Suspicious that they are living up to their end of

22   the bargain?  Suspicious that they are acting in their

23   clients' best interests, suspicious that they are only

24   charging what the clients expect?  There is no innocent way

25   to complete that independence.

1          Listen to Exhibit 32, the call between the

2    defendant and his Boston traders on June 15, 2010.  You heard

3    from Boomgaardt that the defendant was in London at the time

4    and he personally sat down on the trading desk to figure out

5    how many pennies to add to each trade.  They had the data

6    from Bloomberg, but they wanted Finocchi to send over the

7    data from another source, to see if Tradeweb prices were even

8    higher.

9          (Audio plays.)

10         MR. JOHNSTON:  You can hear the defendant laugh as

11   he asks for the highs, and now you know why.  You heard from

12   Finocchi that, until then, he had never before sent over the

13   highs before booking out a client trade.  It never happened,

14   because they always knew what they were charging before

15   trading started and he had never before been told by the

16   defendant, a senior executive, what to charge on a particular

17   trade.  Boomgaardt told you they did it, because they wanted

18   to charge KIA as much as possible, while reducing the chance

19   that the client would notice.

20         You also heard from Boomgaardt about what he was

21   thinking that day when he drove home.  Here is how he

22   testified on cross-examination.

23         "It was in my mind that this was the wrong thing to

24   do.  I remember driving home from work and sitting and

25   putting those spreads on the trades with Ross beside me,

1   going what we've done is not right here."

2            Listen to Exhibit 129, where the defendant

3   instructed Finocchi to ignore the written trading

4   instructions he had received from Samina Vernon, telling him

5   to apply zero commissions on the Royal Mail transition.

6            (Audio plays.)

7            MR. JOHNSTON:  Now listen to Exhibit 131, where he

8   instructs Finocchi to delete that commission information

9   before sending the trading file over to Vernon.

10            (Audio plays.)

11            MR. JOHNSTON:  "Don't send her that line."  Those

12   are Ross McLellan's words.  If you're doing nothing wrong,

13   you have nothing to hide.

14            Yet another reason you know, to a certainty, that

15   the defendant and his co-conspirators knew what they were

16   doing was wrong, is that when Royal Mail came knocking, the

17   defendant ordered the coverup.  They didn't want Royal Mail

18   or anyone else to find out what they had done.  You heard

19   from Ian McKnight that he learned through TRACE reporting

20   that a basis point of yield had been applied to all US

21   corporate bonds.  That made no sense, because Royal Mail had

22   been promised a flat fee and zero commission.

23            When Pennings asked what they should call the

24   overcharges, the defendant's response was "inadvertent

25   commissions applied."

1          He proposed they give back the million dollars they

2     had earned on the US trades and explained it away as a fat

3     finger trading error.

4          Think about that.  If the defendant and his

5     co-conspirators honestly believed that what they had done was

6     okay, if they were acting in good faith, why lie about it?

7     If they thought the contract allowed it, that legal and

8     compliance had approved of what they had done, why not say

9     so?  The reason is that they knew the contract didn't allow

10    what they had done, because there is no contract in the world

11    that allows you to promise one thing and do another.  There

12    is no contract in the world that allows you to lie.  That's

13    common sense.  And you don't need to be a securities lawyer

14    to know that you can't lie to take people's money.

15    Boomgaardt knew it, Pennings knew it, and the defendant knew

16    it, as well.

17          So they lie, and the decision to lie was the

18    defendant's.  He was the boss.  He had approved the scheme

19    from the beginning and he was not about to come clean.  But

20    lies, as the saying goes, have short legs.  And the

21    defendant's fat fingers story had a fatal flaw, because they

22    just hadn't taken one basis point in the US.  They had taken

23    two in Europe and there was no way to explain that.

24          One fat finger story, they might have gotten away

25    with, but two fat fingers was ridiculous.  Of course, the

1    defendant didn't want to give back that money, anyways.

2    Royal Mail didn't know about it, because those bonds weren't

3    reported on TRACE.  So what did they do?  They crossed their

4    fat fingers and hoped Royal Mail would go away, but you know

5    that's not what happened.

6            Inalytics, the company the defendant had proposed

7    hiring to confirm that State Street had done a good job on

8    the transition was too persistent.  It demanded verification

9    of the European trades.  And when the defendant refused to

10   produce that data, Graham Dixon of Inalytics requested a

11   letter from State Street's compliance department vouching for

12   the accuracy of the million dollar refund.  You know what

13   happened next.

14           The defendant had Pennings write that letter, for

15   the head of compliance, Mark Hansen, to sign.  They went

16   through several drafts.  All of them suggested that the

17   commissions were charged by mistake.  All of them suggested

18   that the million dollar refund was accurate.  And all of them

19   suggested, in one way or another, that compliance had looked

20   at all the trades.  All were lies.

21           Who ordered those lies?  Who signed off on them?

22   Who did Hansen rely on to ensure he had correct information?

23   The defendant.  "Looks good to me."

24           Those are Ross McLellan's words.

25           He lied to his own head of compliance, so they

1    would provide additional cover to his scheme.  You lie and

2    hide like that only when you know you've done something

3    wrong.  The defendant then ordered Boomgaardt to send this

4    letter, with Hansen's signature on it.  But you know that

5    sending that letter was one step too far for Rick Boomgaardt.

6    This was the mother of all lies.  A false and misleading

7    letter from the head of compliance.

8            So Boomgaardt refused the defendant's order, he

9    didn't send that letter.  Instead, for the first time, he

10   went outside his chain of command, to Marshall Bailey, a

11   senior executive at State Street in London, and told them

12   what was going on.  Then, with the scheme unravelling, the

13   three co-conspirators got on the phone.  The date was Friday,

14   August 26, 2011.

15           You've heard that phone call and you have it in

16   evidence.  It's Exhibit 196.  Boomgaardt and Pennings have

17   both testified about it and I encourage you to listen to it

18   back in the jury room.

19           On this call, the three men brainstorm about how to

20   get out of this sticky situation they're in.  As Pennings put

21   it, they needed to defend the indefensible.  And the

22   defendant said pretty much the same thing.

23           (Audio playing.)

24           MR. JOHNSTON:  "We don't have a leg to stand on."

25           Those are Ross McLellan's words, not based on Ed

1    Pennings' e-mails with Ian McKnight, not based on any missile

2    in the night, as Mr. Weinberg put it in opening, based on the

3    RFP.  The proposal State Street had submitted, where they had

4    promised a flat management fee and no commissions, where they

5    promised to be Royal Mail's agent and fiduciary, where they

6    promised to put its interest ahead of their own.  The same

7    promises as the defendant knew they always made, and that

8    they had made to each and every one of the clients they had

9    defrauded.

10           But now they had a new problem.  They told Graham

11   Dixon and Royal Mail for months that the charges were a

12   mistake and had only been applied in the US.  They had told

13   Mark Hansen and the compliance staff the same thing.

14           But now Boomgaardt had told Marshall Bailey that

15   the hidden commissions were intentional and that they had

16   been taken in the US and Europe.  So now they needed two

17   cover stories.  One internal, to explain to State Street's

18   legal and compliance department why they had taken those

19   hidden commissions.  And one external, to explain to Graham

20   Dixon and Royal Mail how they had made another fat finger

21   error.  This one in Europe.

22           Here's what the defendant said.

23           (Audio plays.)

24           MR. JOHNSTON:  Ladies and gentlemen, you don't

25   message the truth, you tell the truth.  Those were just lies.

1    It wasn't a booking issue, there was nothing to confirm.  You

2    know that those commissions had been applied on purpose.

3    Internally, Pennings advocated two possible messages.  First,

4    claimed this was business as usual.

5                (Audio plays.)

6                MR. JOHNSTON:  You know, that there was -- this was

7    nothing like they did in foreign exchange.  They didn't lie

8    to clients about foreign exchange.  They didn't negotiate

9    with clients about foreign exchange, or bargain about

10   exchange rates.  Most importantly, foreign exchange was a

11   different business unit.  It traded the bank's own money as a

12   counterparty to the transition desk.  It was a used car lot

13   that they shopped at on the client's behalf.

14               Second, Pennings proposed relying on their fallback

15   cover story, the one they previously rejected when talking to

16   Royal Mail, that the contract allowed them to do this.

17               At first, both the defendant and Booomgaardt

18   rejected that idea.  Here's what the defendant said.

19               (Audio plays.)

20               MR. JOHNSTON:  But then, a minute later, the

21   defendant decided the contract story was actually a pretty

22   good idea.

23               (Audio plays.)

24               MR. JOHNSTON:  Ladies and gentlemen, when you go

25   back to the jury room, listen to the defendant's words.  It

1       actually does say the manager may benefit from the

2       commission.  Those are not the words of someone who has

3       relied on the contract in good faith.  Those are the words of

4       someone who thinks he's found a cover story.  And you know

5       that because the defendant said as much in almost the same

6       breath.

7                   (Audio plays.)

8                   MR. JOHNSTON:  "Where that does help us is

9       internally."

10                  Those are Ross McLellan's words.  He's found an

11      excuse.  But even the defendant doesn't know how to explain

12      away one basis point versus two basis points.  He's stumped.

13                  "You got to come clean, you come clean for

14      everything."

15                  Ladies and gentlemen, people who act in good faith

16      don't need to come clean.  People who have been telling the

17      truth don't need to come clean.  Only people who lie, people

18      who know they have done something wrong need to come clean.

19      And those are Ross McLellan's words, not anybody else's.

20                  You know what happened next.  The lies continued.

21      For the first time, the defendant went to legal and

22      compliance with the cover story they discussed on that

23      August 26th phone call.  Here's what he told his boss, David

24      Puth that same day:

25                  "We took a basis point of yield on these

1    transactions, which is our customary charge for bond

2    transactions."

3            That's lie number one.  You know that they took two

4    basis points in Europe.

5            "The issue is that this was not disclosed to the

6    client and they also paid us a management fee for the

7    transaction."

8            That's lie number two.  It wasn't not disclosed.

9    They weren't just silent on what they were charging.  They

10   lied to the client.  They told them there would be no

11   commission.  They intended to mislead.

12           Here's his exchange with Marshall Bailey.  Bailey

13   asks, "Can you point me to the people that have advised you

14   on the FSA and UK Europe regulation and what steps have been

15   taken to ensure your comfort that we are fine with respect to

16   the contract in FSA?"

17           Further down he asks, "Who in legal and compliance

18   have been consulted?"

19           The defendant's response?  "We'll call you this

20   morning."

21           You know why he gives this answer, because until

22   then no one in legal and compliance had been consulted.  In

23   fact, the defendant had been lying to compliance all week.

24           Remember how concerned the defendant and Pennings

25   were back in October and November of 2010, with the second

1   KIA deal?  Legal was looking at whether they could use the

2   new rates desk as one of the used car lots that they would

3   shop at for the other side of the bond trades.

4           Here's what Pennings said to the defendant then.

5           "I don't want to look at the contract with legal at

6   all."

7           Pennings told you what the issue was.  They were

8   worried that legal would spot what they were doing and put a

9   stop to it.

10           The defendant then asked, "Did legal look at the

11   original agreement?"

12           Pennings' response?  "Absolutely not.  Nor did they

13   look at the periodic notice.  This can of worms stays

14   closed."

15           They were concerned that they would have to go back

16   to KIA and tell them the truth and they didn't want to do

17   that.

18           "There is no way we can disclose our spread."

19           The defendant's response?  "Agreed."

20           But if legal found out that KIA had been told zero

21   commissions on bonds, there was no way they would approve.

22   Here's what the defendant said.  "I would be surprised if

23   they accept."

24           Pennings:  "Accept what?"

25           The defendant:  "Letting us do the trade."

1          Think about that.  This was after they had already

2     done the first KIA deal, after they had already cheated Dutch

3     Doctors.  Those are not the words of people who believed that

4     legal approved or would ever approve of what they were doing

5     and legal never did.

6          Here's what actually happened.  Legal gave the

7     go-ahead for using the rates desk.  That's why they were

8     looking at the deal in the first place.  They didn't know

9     what Pennings and the defendant had told KIA.  They never saw

10    the e-mails promising zero commissions, so they didn't spot

11    the lie.  The defendant and Pennings dodged a bullet here and

12    they breathed a sigh of relief.

13         The same day that the defendant sent that e-mail to

14    Marshall Bailey on August 26, 2011, he supposedly came clean

15    to compliance.  Here's his report to Boomgaardt about that

16    conversation with Marc Hansen.

17         (Audio plays.)

18         MR. JOHNSTON:  "We have never hidden the fact that

19    we intentionally charged a markup here."

20         Think about that.  This is the same defendant who

21    had been lying to Hansen all week, who had ordered Rick

22    Boomgaardt to send a letter signed by Hansen calling the

23    markups an unfortunate error.

24         And here's what else the defendant said.

25         (Audio plays.)

1      MR. JOHNSTON:  "We have been silent on what our

2    compensation was."

3      You know that's not true.  They were not silent.

4    They explicitly promised Royal Mail that they would charge no

5    commissions and that they would act as its agent and

6    fiduciary, in the very same proposal that the defendant

7    admitted gave them no leg to stand on.  And in that same

8    sentence, in which he told that lie, the defendant said this.

9    "We have never tried to defraud the client."

10      Ladies and gentlemen, it is no accident that the

11    first time the word "fraud" is used in this scheme, it comes

12    out of the defendant's own mouth, because he knew that they

13    hadn't been silent and that misleading clients to take their

14    money is fraud.

15      Here's another way you know, to a certainty, that

16    he believed what he was doing was wrong.  Listen to what the

17    defendant said about their future trades for the Royal Mail

18    deal.  You remember that State Street earns money for futures

19    pursuant to a separate agreement with the client.

20      (Audio plays.)

21      MR. JOHNSTON:  Think about that.  "On the futures,

22    we don't have anything to hide."

23      Because if you've done nothing wrong, you don't

24    have anything to hide.

25      But on the bond trades, they do have something to

hide.  They have $2 million in Europe to hide, because
they've cheated Royal Mail and still haven't come clean.
Those words tell you everything you need to know about the
defendant's state of mind.  So that's the third bucket of
evidence, proving that the defendant knew what he was doing
was wrong and had the intent to defraud.

I now want to address two final points before
discussing the charges.  First, you know that this fraud
mattered.  In legal terms, that it was material.  You heard
from five of those clients, managers of pension funds,
Government funds, people who invest money on behalf of
others, on behalf of retired supermarket cashiers, mail
carriers, and the people of Ireland.

Four of them came here from Europe, an ocean away
to tell you why they believed that they were cheated.  They
thought they were getting a good service at a low price from
a bank they could trust.  They haggled over the commission
numbers.  NTMA bargained them down from two basis points to
1.65.  Instead, NTMA was secretly charged an extra
3.2 million euros.  Royal Mail was secretly charged an extra
$3 million, many times more than what it had agreed to pay.
Dutch Doctors was charged over a million dollars in hidden
charges.  That money mattered.

Ian McKnight told you that it added up to $10 out
of the pocket of every postal worker in England.  Eugene

1    O'Callaghan told you that that money was part of a rescue

2    package for a nation in crisis.  Both of them told you that

3    they would not have hired State Street if they had known what

4    State Street actually intended to charge.

5         Dean Johnson told you the same thing, Roul Haerden

6    said he would never have agreed to the price that Dutch

7    Doctors had been charged.

8         Second, I want to talk to you about motive.  The

9    judge will instruct you as to elements of the crime.  And to

10   the extent what I say differs from what he says, what he says

11   governs.  But I don't expect you'll hear anything about

12   motive.  That's not an element the Government is required to

13   prove.  That said, you know the defendant did have a motive

14   and a powerful one.  Make money for his business unit and

15   ultimately himself.

16        Here's what he said in March 2010, at the start of

17   the scheme.  "It has been a challenging start of the year for

18   Portfolio Solutions, although there are strong signs that the

19   year is turning and it is extremely important that we do so.

20   We certainly do not want to forecast down further, as this

21   will not bode well for us in areas such as compensation and

22   promotions later in the year."

23        Here's what he told Pennings and Boomgaardt --

24   Pennings and Peter Weiner two months later.

25        "Our revenue lately has sucked."

1          You know what happened one month later?  The first

2     KIA deal, then Dutch Doctors, and then came the second KIA

3     deal and all the rest.  Millions of dollars in revenue, all

4     of it -- many of it in hidden commissions that resulted in a

5     strong performance for 2010 and a great start for 2011.

6          And you know what happened exactly one year after

7     you saw that e-mail, where the defendant warned about the

8     consequences of not meeting revenue targets?  He became one

9     of the youngest executive vice presidents at State Street

10    bank, based in part on a record year in 2010, with strong

11    year on year revenue growth.  And you know that the

12    defendant's personal compensation was tied directly to that

13    revenue growth.

14          Now, let's talk about the charges.

15          I told you earlier that the defendant is charged

16    with three different crimes.  Count 1 charges conspiracy to

17    commit securities fraud and wire fraud.  As the judge will

18    instruct you, a conspiracy is nothing more than an agreement

19    between two or more people to do something that the law

20    forbids.  The agreement doesn't have to be explicit or

21    written down, it can be a common understanding, an unspoken

22    agreement.  Here you know that there was an understanding

23    between the defendant, Ed Pennings, and Rick Boomgaardt to

24    cheat State Street's clients, and that there were many overt

25    acts, such as e-mails and phone calls, that were taken in

1    furtherance of this conspiracy.

2            Counts 2 and 3 charge securities fraud in

3    connection with the NTMA and Royal Mail transitions.

4    Securities fraud just means fraud in connection with US

5    stocks or bonds.  Here Royal Mail and NTMA thought they were

6    getting the market price for every stock and bond they bought

7    or sold.  In fact, you know that every one of those purchases

8    and sales contained a hidden commission, and both involved US

9    stocks and bonds that were bought and sold by State Street's

10   traders right here in Boston.

11           Counts 4 and 5 charge wire fraud.  That just means

12   fraud involving the use of interstate or foreign wires, like

13   an e-mail or phone call.  The wire alleged in Count 4 is

14   Exhibit 142.  It's the e-mail between Pennings and McLellan,

15   on April 5, 2011, where Pennings notified McLellan that they

16   would take more of a spread on NTMA.  The wire alleged in

17   Count 5 is Exhibit 167, the June 22, 2011 e-mail, where the

18   defendant tells Pennings to lie to Royal Mail by telling them

19   that inadvertent commissions had been applied.

20           Count 6 charges wire fraud affecting a financial

21   institution.  This is in connection with the scheme to

22   defraud AXA.  The wire charged in Count 6 is Exhibit 101, the

23   February 24, 2011 e-mail by Kevin Walker, sent from Boston to

24   New York, with a copy to the defendant.  It was in this

25   proposal that they said they would do the fee -- do the

1   transition for 592,000.

2           For Count 6, there is an extra element.  The judge

3   will instruct you that the parties have agreed that the fifth

4   element of Count 6, that the conduct affected a financial

5   institution, has been met.  Those are the charges before you.

6           During the course of this trial, you have probably

7   learned more than you've ever wanted to know about stocks,

8   bonds, commissions, markups, agents, and principals.  You

9   have seen hundreds of documents and e-mails, heard hours of

10  testimony, and listened to dozens of recorded calls.  But at

11  the end of the day, the only thing you really need to decide

12  this case is what you walked into court with three weeks ago

13  and that's your common sense.

14          Common sense tells you that misleading clients by

15  promising to charge them one low fee and put their interest

16  ahead of yours and then secretly turning around and charging

17  them something more is fraud.  Common sense tells you that no

18  law and no contract allows you to lie.  And common sense

19  tells you that only someone who knew what he was doing was

20  wrong, lies and covers it up like the defendant did -- you

21  don't need to be a securities lawyer to know any of that.

22          All of the evidence in this case, the tapes,

23  documents, testimony, and the defendant's own words lead to a

24  single, inescapable conclusion, that this defendant is guilty

25  beyond a reasonable doubt as charged.

```
 1              THE COURT:  Thank you, Counsel.  Ladies and
 2     gentlemen of the jury, I remind you that statements of the
 3     lawyer in closing argument are helpful to you, if you find
 4     them helpful, but it's not evidence.
 5              We'll take just a five-minute break and then we'll
 6     resume with closing arguments from the defendant.
 7              All rise for the jury.
 8              (The jury exits the courtroom.)
 9              THE COURT:  Do you want the monitor, Mr. Weinberg?
10              MR. WEINBERG:  Yes, Your Honor.
11              THE COURT:  Okay.
12              (Court in recess at 10:18 a.m.
13              and reconvened at 10:22 a.m.)
14              THE DEPUTY CLERK:  The McLellan matter is back in
15     session.
16              MR. FRANK:  Your Honor, I was just reviewing the
17     defense exhibits.
18              THE COURT:  You can be seated.
19              MR. FRANK:  Could I just have two minutes?
20              THE COURT:  Yes.
21              (Pause.)
22              (The jury enters the courtroom.)
23              THE COURT:  Please be seated.
24              Mr. Weinberg.
25              MR. WEINBERG:  Thank you very much, Your Honor.
```

1          THE COURT:  Go ahead.

2                    **CLOSING ARGUMENTS BY THE DEFENSE**

3          MR. WEINBERG:  Good morning, ladies and gentlemen

4     and thank you for your service as we start the Monday of the

5     fourth week of this trial.

6               Outside of wartime, probably the highest service

7     that a citizen can give this community, this democracy, is to

8     serve on a jury.  This has not been a simple case, this is

9     not like TV justice, where you get simple solutions in 60

10    minutes.  I don't think any of you are of my age and remember

11    a TV show, Perry Mason, where at the 60th minute of every

12    show somebody confessed and the case was taken away from the

13    jury with absolute certainty.  We instead rely on jurors to

14    determine which witnesses to believe, which witnesses not to

15    believe.  The Government gets its chance to argue.  I get my

16    chance to respond.

17              The Government argument told you part of the

18    evidence.  They told you, for instance, that Mr. McLellan, on

19    June 15, 2010, asked to see the highs and lows of the day's

20    trading for KIA.  The Government didn't tell you that Mr.

21    McLellan, thereafter, working from London, where he was there

22    for other purposes, added a markup to the high of the day, a

23    markup that would be detectable, visible, known to the KIA.

24    If he in any way thought that he and State Street were not

25    permitted to take a markup, that KIA believed that there

would be no markup taken, he could have easily marked up the
bond to the high, but not exceeding the high.

The Government tells you he called for the highs
and lows.  They didn't tell you that having received the
highs and lows, he made the markup deliberately -- and
deliberately available to Das, the representative at the KIA.

The Government stressed that Mr. McLellan said to
Mr. Finocchi, you know, charge a basis point and don't tell
Samina Vernon.  The Government failed to advise you of
Exhibit 535, which is an exhibit where the people in State
Street believed that Samina Vernon was leaving, that she was
going to switch jobs, that she was going to go to the
competitor Russell.

The Government focused that Mr. Pennings didn't
want the lawyers at State Street to see the contracts with
KIA.  They didn't tell you that Mr. McLellan sent the
contracts to Bryan Woodard, who was the global chief lawyer
of State Street Global Markets.  The Government stressed
pieces and snippets of audios.  They didn't play the part of
the AXA audio where Mr. McLellan, calling in to five traders
on a tape-recorded line, said we need to be fair and
reasonable in our fees that are being charged to AXA.  The
language that the day before he had received and learned
about in an e-mail on March 1 from Chris Carlin, that quoted
two lawyers saying that in this case, AXA, the fees need to

1   be fair and reasonable and will be certified to the AXA

2   advisor.  This is in an e-mail between Mr. Carlin to Mr.

3   McLellan, but it talks about a conversation that involved two

4   lawyers, Lance Dial, a lawyer at SSGA, which is the advisor

5   to AXA and a lawyer, Melissa, who is Melissa McCay, a lawyer

6   at the broker-dealer.

7           So again, you need to really be detectives here.

8   You're going to have the exhibits in the jury room, you're

9   going to have the audio of this call that Mr. McLellan made

10  on March 2.  It's a very important audio.  I ask you to

11  listen to it.  It takes ten minutes.

12          Mr. McLellan is not engaged in a covert conspiracy

13  with five different people that are on this call.  Mr.

14  McLellan is doing his job.  He is advising them what the

15  markup should be.  There isn't a single word on that call

16  about .1 basis point yield, which was something that was in a

17  pre-trade.  Instead, Mr. McLellan is being open, he's talking

18  to the traders, he's asking them whether they have any

19  comments or questions and he is saying to them, I need the

20  markups to be fair, reasonable.  We're going to certify them

21  to State Street Global Advisors.

22          Let me step back a second.  This is a criminal

23  trial and a criminal justice system that protects citizens by

24  putting the burden squarely on the prosecution table.  It's

25  the highest burden in the legal system and the best legal

1    system in the world.  It means that if there is uncertainty,

2    if you feel maybe McLellan did it, probably did it, possibly

3    he did it, that is not a sufficient and principaled basis

4    under the instructions that will be authoritatively provided

5    to you by his honor, Judge Sorokin, in a short period of

6    time.

7         It's got to proof beyond a reasonable doubt,

8    meaning unimpeachable proof.  Proof from principal witnesses.

9    Proof from witnesses you trust.  Repeatedly, Mr. Johnston

10   said, as he tries to build a bridge between the evidence and

11   Mr. McLellan, he tells you, "How do you know?"

12        Well, because Pennings and Boomgaardt told you

13   that.  You heard it from Pennings and Boomgaardt.

14        Pennings and Boomgaardt are their foundational

15   witnesses.  They are their only bridges between the

16   pre-trades, the responses to proposals, the conversations

17   with the European clients and their representatives and Mr.

18   McLellan.  They are the pillars of the prosecution.  They are

19   corrupted witnesses.  They are witnesses that didn't come to

20   court and raise their hand and testify without the hope,

21   without the expectation of benefits, rewards, the most

22   compelling benefit and reward, which is that they want from

23   the Government a ticket to freedom.  They are expecting in

24   exchange for their testimony to go home.

25        You know that, because Mr. Boomgaardt has a plea

1    agreement, as does Mr. Pennings, that has the Government
2    giving them a benefit, which is that if they are sentenced to
3    any term of imprisonment, the Government will not oppose a
4    transfer of that back to Great Britain, back to where they
5    live, back to where their children are, and Mr. Boomgaardt
6    says I don't even know about that, which is a fair indication
7    that Mr. Boomgaardt is believing that exchange for his
8    testimony, he's going home.  He doesn't have to worry about
9    where he's going to be incarcerated as a result of his plea
10   of guilty.  He expects to go home.  So does Mr. Pennings.
11            So this is this pivotal moment where, in an hour,
12   an hour and a half, the case goes to you.  You've been silent
13   judges of the facts.  The Court will give you the legal
14   instructions and you will then begin to deliberate within the
15   structure that Judge Sorokin gives to you.  But
16   believability, unbelievability, assessing, evaluating
17   witnesses, deciding whether or not, in a matter as gravely
18   important as a criminal prosecution of a citizen that said to
19   you I'm innocent, who's exercised his right to trial, who has
20   entrusted his future to you, whether or not you believe
21   Pennings and Boomgaardt, and I submit they are the
22   indispensable sources of evidence.  If you don't trust them,
23   there is simply a gaping hole between the Government proof
24   and Mr. McLellan.  If you don't trust Pennings and
25   Boomgaardt, then the Government case falls.

1          So let me focus first on them, with this prelude.

2     Mr. McLellan, as you know, as I believe the Government just

3     conceded, spoke to none of the European clients, never spoke,

4     never e-mailed, never texted Mr. McKnight at Royal Mail,

5     Mr. Johnson at Sainsbury's, any of the European witnesses who

6     are clients of Mr. Pennings.  There is no dispute that Mr.

7     McLellan didn't write these RFPs, the requests for proposals.

8     He didn't write the pre-trades.  He didn't communicate by

9     document or by word with any of the clients that make up

10    Counts 1 through 5 -- and we'll discuss AXA separately in a

11    while.

12         Accordingly, he relied on Mr. Pennings.  They were

13    his clients.  Yes, as Mr. Johnston said, Mr. McLellan had a

14    thousand transitions a year on his plate and his

15    responsibilities spanned that the bank, beyond transition

16    management, to all kinds of other types of bank business.  He

17    was on the executive committee of the State Street Global

18    Markets.  He had a lot on his plate.  The Government focuses

19    on six or seven of a thousand transitions as if that

20    constituted the entirety of Mr. McLellan's work life.  He had

21    to rely on people.

22         He didn't know Irish law, British law, was not

23    licensed by the British regulators.  You may remember there

24    was a part of a pre-trade that had a slot on the bottom for

25    all the different countries that State Street traded in,

1     South Africa to Japan, Australia to Great Britain, all over

2     the European union.  Mr. McLellan couldn't master the laws,

3     the practices, the regulations.  He needed to trust the

4     people that State Street selected to man the desks in London,

5     in charge of the Mideast and Europe and Asia.  He trusted Mr.

6     McLellan -- I'm sorry, Mr. McLellan trusted Mr. Pennings.

7            The evidence is clear that Pennings alone went out

8     and talked to the clients, met with the clients, made

9     promises to the clients, negotiated contracts with the

10    clients, talked to lawyers in London about the contracts, got

11    assurances from the lawyers in London that these contracts in

12    the business relationships and the way that the clients were

13    being priced was consistent with what the lawyers in London

14    approved.  And we'll focus in a few minutes on a very pivotal

15    meeting with five lawyers and Mr. Pennings made certain

16    statements that are critical to our understanding of the

17    fabric of these negotiations.

18           But again, the first pathway to a decision, I

19    suggest, for your consideration, is whether or not you trust

20    and believe Ed Pennings and Rick Boomgaardt.  What you do

21    know about them is that both admitted, on cross-examination,

22    that they lied over and over and over and over again on

23    matters of their own self-interest.  They lied to

24    disciplinary officers at State Street.  They lied to the City

25    of London Police when they were conducting an investigation.

1          Mr. Pennings lied in a 98-page, written statement

2     that he tried to pawn off to his lawyers, but ultimately

3     admitted that he read -- he adopted, it came from his words.

4     It was submitted to an employment tribunal, a judge-like

5     proceeding in the Courts of the UK.  He was under oath when

6     he testified consistent with that 98-page statement, and he

7     had no problems lying to the judge and the employment

8     tribunal in London.

9          Mr. Pennings was asked about lying and he said I

10    lied to keep my job.  I'm not proud of it, he said, I made up

11    things, didn't tell the truth.  Mr. Boomgaardt wrote a

12    21-page, written statement, it started by focusing the

13    persons receiving the statement -- which we're going to

14    decide whether or not he did or did not maintain his job --

15    that my core principals, Boomgaardt said, are honesty and

16    integrity.  He wrote that at the very same moment and the

17    very same statement that he has told you was filled with

18    lies.  Lies out of self-preservation, lies to preserve his

19    job.

20          Pennings went farther.  Pennings lied about other

21    people.  Pennings lied about the CEO, the head of the London

22    desk, Mr. Steve Smit.

23          Pennings lied about a compliance officer named Mark

24    Leaden.  Pennings lied about lawyers and compliance people.

25          This is an example that shows Steve Smit, up there

as the head.  Smit promoted Pennings to become a director of
the State Street Global Markets and this is Pennings'
disclosure to the State Street Global Markets executive
committee that the fees that the European clients were being
charged, the revenues that were being charged, were both fees
and spreads and the spreads somehow, the markups were not
being shown in the finances.

But I want to go back to what Mr. Pennings told
you, which is that he lied about lawyers.  He lied about
Mr. Smit, he lied about Compliance Officer Leaden.  He told
you that he didn't think at all about what his lies would
mean to them and their jobs and their careers as compliance
officers and lawyers if Pennings' lies and statements to the
employment tribunal and then to the City of London Police
were believed.  It didn't matter to him.

When I asked him about making false accusations
against other people, his answer was "because it helped me at
the time."

That's a reflection of who Mr. Pennings is.  Didn't
give a second of concern that his lies, if believed, would
have cost Mr. Leaden, the compliance officer, his job.  Would
have cost Mr. Smit, who had a very good job at the bank, his
job.  Would have challenged the lawyers and the different
professionals their futures, their reputations.

When I asked him specifically about Mr. Smit, his

1    words were, he fired me.  He cost me money.  I was angry with

2    him.  I was liberal with the truth.  That's Mr. Pennings

3    responding on cross-examination about how he felt, what was

4    going through his mind at a time when he pointed a finger of

5    false accusation at Mr. Smit during the investigation with

6    the City of London Police.

7            I even asked Mr. Pennings, "Did you ever say to

8    anyone that you even lie about lying?"

9            He said he didn't recall.

10           Each of these two cornerstone witnesses have

11   something even more compelling on the line today than they

12   had back when they were talking to employment tribunals and

13   State Street disciplinary hearing officers, back when they

14   were fighting for their job, their freedom on the line.  They

15   believe that if they provide value in the prosecution of Mr.

16   McLellan, that they will motivate and incentivize Mr. Frank

17   and Mr. Johnston, as representatives of the Government, to

18   file a motion, a 5K motion, seeking sentencing leniency.

19           They executed plea agreements with the Government.

20   Plea agreements would put -- which put all of the power, all

21   of the discretion at their table.  They could choose to file

22   a motion for sentencing leniency and ask a judge for

23   sentences as low as probation, or they could withhold that

24   motion, and the Government recommendation under the

25   guidelines would be five years.

1          Did Mr. Pennings and Mr. Boomgaardt five years or

2     85 percent of five years, in a foreign jail, in the United

3     States, an ocean away from their family and kids, is the

4     ultimate horror.  And if they were willing to lie to preserve

5     a job, what would they be willing to do today, on this

6     witness stand, where the test of whether they've provided

7     substantial assistance, not only rests solely in the

8     discretion of the Government, not subject to appeal or review

9     but the determination will be made, based on the

10    truthfulness, their perception of the truthfulness.  They

11    have no lie detector test, it's what they view as being

12    truthful.

13          And importantly, the value of the defendant's

14    assistance, regardless of outcome in this case.  They chose

15    the agreements.  They chose to predicate their decision

16    whether to file this pivotally important motion, not just on

17    their perceptions of truth, but on their perceptions of

18    value.  We're dealing with two self-interested, smart people

19    in Pennings and Boomgaardt.  They know what the word "value"

20    means.  They know its value to the prosecution in this case.

21          They know something else.  Mr. Boomgaardt told you

22    he's been sitting with the Government for 45 or 50 hours, and

23    the Government has not yet decided whether he has provided

24    substantial assistance.  Mr. Pennings, too, has been

25    regularly available to the Government to be debriefed,

1    neither of them would -- Mr. Boomgaardt told you that he

2    would not, upon receiving a request for me, sit with me for

3    one and a half hours, where he sat with the Government for 45

4    or 50.

5              I got no plea agreement with Mr. Boomgaardt.  I

6    can't reward him or benefit him or help him avoid a prison

7    sentence.

8              But after all their cooperation, the Government

9    still has not chosen whether to file that motion to recommend

10   sentencing leniency or withhold it and recommend a 60-month

11   term of imprisonment.  And you can ask yourself why not and

12   you can ask yourself whether that provides coercive powers

13   over witnesses who, in their life, have demonstrated a

14   willingness and history of committing perjury in other

15   matters for their own self-interest.

16             Whether this deal and the way its written, and the

17   language chosen by the Government, and bottom line is an

18   invitation to perjurers, admitted perjurers, Mr. Pennings,

19   admitted liars, Mr. Boomgaardt, to come into court and give

20   you untrustworthy testimony, perjurious testimony, to make

21   the same kind of false accusation against Ross McLellan, that

22   Pennings made against Steve Smit, Mark Leaden, Simone Paul,

23   other lawyers when he was debriefed and interviewed by the

24   City of London Police and by the employment tribunal.

25             Mr. Frank and Mr. Johnston elicited, but you know,

1     we don't want to be prosecuted for perjury, they say.  But

2     they know that the people who decide whether to prosecute

3     people are the prosecutors.

4            I ask you, please, in the jury room, to think hard

5     about whether these are the kind of witnesses that you want

6     to rely on in making a profoundly important judgment about

7     Mr. McLellan.

8            I want to -- before leaving, the Court will

9     instruct you shortly and he -- as to these witnesses, I think

10    will say the following, that you must consider the testimony

11    of Pennings and Boomgaardt with particular care and caution.

12    They may have had reason to make up stories or exaggerate

13    what others did, because they want to help themselves.  I

14    believe that will be one of the instructions given to you by

15    the Court to help guide your assessment and evaluation of the

16    credibility of the Government's cornerstone witnesses.

17           I want to focus next on February 21, an e-mail,

18    written by Mr. Pennings to Ian McKnight.  It was in the

19    nighttime.  There's really two different e-mails.  And if we

20    could blow up the bottom one.

21           They had a phone call and Mr. Pennings is saying to

22    the representative of Royal Mail, "We can do this project for

23    a management fee of 1.75 basis points of the value of the

24    transition."

25           This is Pennings by e-mail telling Mr. McKnight

1     what the transition management fee will be.

2            But Mr. McKnight, upon receiving this e-mail -- and

3     if the Government theory is correct, that a statement to a

4     client about a transition management fee necessarily means

5     that the bank can't also charge broker-dealer spreads,

6     markups.  It's one of the cutting issues in this case --

7     Government says when a bank says what the transition

8     management fee is, that's the end of it.  They can't charge

9     anything else.

10            The contracts and the evidence presented by the

11     defendant's experts say no.  There's a fee for the transition

12     managers and there's a markup or commissions for the

13     broker-dealers and there's nothing about promising a

14     transition management fee that prohibits the bank, if it's

15     consistent with contract, to also charge a broker-dealer

16     markup.

17            But here is a piece of evidence that can help

18     resolve between these two views of the business world back

19     in 2010 and 20111.  McKnight, representing Royal Mail,

20     responds.  He doesn't just accept that the transition

21     management fee is the only fee that State Street intends to

22     charge Royal Mail.  He says, "for the avoidance of doubt" --

23     key words, "doubt," he has doubt.  "Can you confirm that this

24     is your full and final transition fee" --  and this is

25     important -- "including all the buying and selling required

1    by my trades?"

2            In other words, McKnight is saying in this e-mail,

3    this is real contemporaneous business negotiations.  I have a

4    doubt about whether the transition management fee alone also

5    encompasses, includes the broker-dealer markups.  So McKnight

6    is asking Pennings, on February 21, before Royal Mail finally

7    agrees to do the transition, does that transition management

8    fee also include the buying and selling required by my

9    trades.  Meaning, what the broker-dealer would also charge

10   under normal circumstances for going out in the marketplace,

11   and trading 1.3 billion dollars worth of Royal Mail bonds,

12   selling them, buying new bonds for the new portfolio.  That's

13   what a transition is.  They sell one group of assets, they

14   buy another.  $2.6 billion of trades.

15           McKnight knows, under ordinary circumstances, the

16   broker-dealers are not doing that for free.  You know that,

17   too, because three broker-dealers testified.  Mr. Clemmenson,

18   Mr. Dionisio, Mr. Finocchi.  All of them said broker-dealers

19   get paid.  We don't go to the market and try to select the

20   best price and try to diminish the negative effects of market

21   impact.  We have skills.  One of them went to University of

22   Chicago, got a master's.  Another one had two degrees.  We

23   have skills.  We get paid for the skills; the broker-dealers

24   expect to be paid.  It's different than the transition

25   manager.  Both.

1          Of our experts, Mr. Travaglini told you it is

2     regular for broker-dealers to be paid and asset managers

3     understand that.  Mr. Menchel, whatever we think of his

4     demeanor, whatever we think of the fees he charged, we

5     brought him to you because he was the chief counsel of FINRA,

6     and FINRA regulates all of the broker-dealers.  And he told

7     you broker-dealers expect to get paid and there's nothing

8     about transition management fees that means that

9     broker-dealers don't expect to get paid, and the clients,

10    investment clients, professional clients like Mr. McKnight

11    don't expect to pay a broker-dealer.

12         So here's what Mr. Pennings answers, either about

13    six minutes later or if the times are off, maybe it's longer

14    than that.  "The fee includes all trading required."

15         Now, here's what's important about this.  Pennings,

16    who regularly does an FYI and forwards e-mails to Ross

17    McLellan, he stuck this exchange into his archive and he

18    never ever sent to Ross McLellan anything except the trading

19    management fee.  He never told Ross McLellan he had

20    guaranteed Ian McKnight, at 9:22 p.m., on February 21, that

21    there would be no other fee, except the transition management

22    fee.  That he, Pennings, had made an off the contract,

23    outside the contract, one-to-one promise to a representative

24    of the pension investment fund that there would be no

25    broker-dealer fees in this case.  Not in other cases, in this

1    case.

2           We all know that the Royal Mail contract expressly

3    allows for broker-dealers, affiliate broker-dealers, to

4    charge markups.  We all know that it allows the State Street

5    not to put the markups on record.  There's a specific clause

6    in the contact between Royal Mail and State Street, no duty

7    to disclose.  But here, Pennings is making a promise, taking

8    this outside the contract.  He's saying there will be no

9    trading fees.  He doesn't tell that to Ross McLellan.  He

10   admits under oath he never told McLellan.

11          The Government does not dispute that there was no

12   evidence that Mr. McLellan was told by Mr. Pennings that he

13   had this e-mail exchange.  And you can hear all those tapes

14   from August 26, that Mr. Johnston took little snippets of.

15   Hear them all.  There's not a single word about Pennings

16   having made a promise, one to one, to McKnight on that night

17   before the deal occurred.

18          So why?  It's fair to ask, if they're in a

19   conspiracy together, that's the Government allegation.

20   That's the pivotal allegation in this case that Mr. McLellan

21   is responsible for Mr. Pennings' statements to clients and

22   his, you know, charging certain fees and certain ways and

23   responsible for this.

24          How can you be responsible for what you're not told

25   about, but more important, ask why would Pennings hide this

1    e-mail from Ross McLellan, if they're in a conspiracy?  And I

2    suggest the answer is, they're not in a conspiracy, and he

3    didn't want Mr. McLellan to see this, because if Mr. McLellan

4    saw this, he would not have permitted the Royal Mail markups.

5          Mr. McLellan believes the contract approves the

6    markups.  This e-mail goes around the contract.  Pennings,

7    the representatives making the promise, I don't care about

8    the contract.  I'm not charging you trading revenues.  Why

9    would you hide that if you're in a conspiracy?  You'd be

10   telling your co-conspirator, this is what I promised to

11   McKnight, he's going to believe there will be no markups, now

12   we're free to charge markups.  And yet Pennings denies Ross

13   McLellan the knowledge of what he did in this nighttime

14   e-mail.

15         What else it represents is the real world between

16   banks and clients.  It's got a real world client

17   representative in McKnight.  He's not satisfied to simply be

18   told what the transition management fee is.  Remember, he's

19   read these RFPs, he's read all of the documents that the

20   Government is providing.  And he still has doubt.  And he's

21   saying for avoidance of doubt, please tell me whether or not

22   that transition management fee includes the trading and it

23   does.

24         The evidence is compelling in this case that Mr.

25   McLellan trusted Mr. Pennings.  He trusted Pennings to do

1    negotiations with clients, he trusted Pennings to do

2    negotiations consistent with contracts, to do negotiations

3    consistent with legal advice, not to betray him by hiding

4    crucially important promises that Mr. McLellan didn't know

5    about, not only in February, he didn't know about it in

6    August.  Pennings hid these promises throughout.  And it is a

7    betrayal.  It's what I said to you in the opening, that a

8    business manager doing a thousand transitions has to trust

9    his people and he trusted Pennings and he trusted the wrong

10    man.  And through this e-mail, the wrong man put him in

11    harm's way.

12          Had this e-mail been disclosed, Mr. McLellan

13    wouldn't be in this courtroom.  He would not have allowed

14    that transition to occur with markups that were inconsistent

15    with the e-mail, but fully consistent with the contract,

16    which is all Mr. McLellan had in front of him to determine

17    whether or not the markups were or were not in accord with

18    contract.

19          Good faith.  The Court will instruct you that

20    because this is a criminal case, you must not only look to an

21    act that is done, but look to why it's done, and whether or

22    not a defendant, Mr. McLellan, had good faith.  It's really

23    because of the burden of proof is on the Government on this

24    element, as well.  It's whether the Government has proven to

25    you, beyond a reasonable doubt, he didn't have good faith.

1    Or that they've negated good faith by such compelling

2    witnesses and trustworthy witnesses, that you feel

3    comfortable making the judgment.

4              You know, we have no CAT scans, we have no MRIs, we

5    have no x-rays.  We can't get into people's heads

6    particularly as to what they were thinking and doing eight

7    years ago.  Transactions, transitions, occurring largely in

8    London, with Mid East and European clients.  But we have

9    certain pieces of evidence that I suggest can help you

10   resolve what Mr. McLellan was thinking about in Boston,

11   largely while Mr. Pennings was negotiating these deals.

12             And one of the most irrefutable pieces of evidence

13   is Mr. Pennings' telling you -- and it's one of the few

14   places I'll endorse what he told you about a meeting that he

15   had in April of 2011.  This was a meeting that was attended

16   by over four lawyers, he said.  We can identify four of them,

17   John Norris, who at that point was the chief legal counsel

18   for State Street in its UK offices.  Simone Paul, who had

19   been the lawyer in the State Street UK offices that was

20   charged with reviewing contracts.

21             And you have an e-mail, by the way, it's a short

22   parenthesis, from a man named Bryan Woodard.  Bryan Woodard

23   was the global chief of legal.  He and Mr. Pennings were

24   e-mailing back and forth in January of 2011.  Mr. Woodard is

25   telling Mr. Pennings every contract gets reviewed by legal,

1    meaning UK contracts get reviewed by UK legal.

2              Back to this meeting.  We have Norris and we have

3    Simone Paul from State Street.  We have Pennings from State

4    Street and we have outside counsel, at least two or three of

5    them, one is named Sarah Lewis, and there's several other

6    lawyers from a law firm named Herbert Smith.  A law firm in

7    London, a law firm of solicitors, a law firm that is tasked

8    with helping State Street create a model for their future

9    transition contracts for clients where there's no preexisting

10   contract, like there was for Royal Mail.

11             They're reviewing it, according to Pennings, clause

12   by clause.  They're reviewing the prior contract and trying

13   to decide which clauses to keep, which clauses to delete,

14   which clauses to revise.

15             The first thing they do is they focus on a clause

16   that is in the model contract, that requires disclosure in

17   the periodic notices.  And this is a page of the contract

18   that came after this meeting.  It's in May of 2011, the

19   meeting is in April.

20             I don't know whether we can blow that up, but I can

21   read it.  What's crossed out is the "amount of such

22   commission and compensation permitted to be received by such

23   associates, which is the broker-dealer, in any such

24   transaction, shall be specifically identified in the

25   transition notice."

1            Sorry.  What's important is that that clause is

2    deleted as a result of Mr. Pennings telling the lawyers he

3    wanted the contract to conform to the business practices, the

4    business model, and how he, Pennings, is charging the

5    European clients.  What did the lawyers do?  They cross out

6    the obligation in the contract to provide disclosure of the

7    commissions and the compensation in the transition notice,

8    which is the notice that accompanies a contract between State

9    Street and the clients that are hiring State Street to do the

10   transition management.

11           What else occurs?  Mr. Pennings fights to preserve

12   the clauses that you've seen in the Royal Mail contract, the

13   clauses that allow the broker-dealer to charge a markup and

14   markdown.

15           Royal Mail contract will be before you in the jury

16   room.  It's Exhibit 2, article 6, specific clauses that allow

17   the broker-dealer, the associate, which means that they're a

18   broker-dealer that works for State Street and does some of

19   the transitions for the transition manager; that they're

20   allowed to mark up bond trades, allowed to mark up with

21   markups or markdowns.  That stays in.  Pennings fought to

22   keep it in.

23           What also stays in is the clause of the contract

24   saying there's no duty on the broker-dealer to disclose the

25   markups to the clients.  Pennings fought to keep that in,

1    with all these lawyers.  It was kept in.  They had a clause

2    saying State Street won't charge a transition management fee.

3    That came out.  Pennings said that's not the way that I'm

4    charging some clients.  I'm charging them a fee and I'm

5    charging them broker-dealer spreads.

6            And Pennings testified as to what he told this

7    assembly of lawyers who had the job of creating, of

8    architecting a transition management agreement to govern the

9    transitions between State Street and its European clients,

10   quote, "the market was less and less transparent.  We may

11   need those clauses."

12           Meaning the clauses allowing the markup without a

13   duty to disclose.  "We may need to rely on some of those

14   clauses in the future.  In fact, we had done so for a handful

15   of trades already."

16           Pennings is telling you that he told the lawyers

17   that State Street has done trades where they were markups by

18   the broker-dealer that were not disclosed to the clients and

19   that he needed those clauses to stay in the contract.

20           What happens?  Not one lawyer tells him there's

21   anything wrong with it.  Not one lawyer says -- sounds an

22   alarm and says, "Well, you've got to make a disclosure."  Not

23   one lawyer quarrels with him.  Lawyers from inside State

24   Street UK, lawyer from this outside firm whose job it is to

25   make sure that the contracts align themselves with UK law, UK

1    regulations, not a single voice opposing the continuation of

2    contracts that allow the broker-dealer to mark up bond

3    trades, allow the broker-dealer not to put on record the

4    amount of the markups and allow the combination of management

5    fees and markups.

6              If this was a conspiracy of secrecy -- and I

7    suggest the hallmark of conspiracies are secrecy --

8    Mr. Pennings is disclosing everything he did, and the lawyers

9    are endorsing what he did.  And Mr. McLellan is hearing that

10   the lawyers endorsed what Pennings' new business model is.

11   Your business is not always black and white.  Businesses

12   don't always have duties to spell everything out.

13             Some of you might have bought cars.  You go to car

14   dealers, we don't really know what their bottom line price

15   is.  They tell you a sticker price, you buy it, you feel

16   good.  They have no obligation to say we're getting a $4,000

17   rebate from the car manufacturer, our real price is $20,000,

18   not the 24 that's on the sticker.

19             You go to a store, you really don't know what their

20   cost of goods are.  Businesses don't tell everybody

21   everything.  But when lawyers bless a contract, that is the

22   opposite of a covert, secret conspiracy, the kind of

23   conspiracy that the Government is trying to criminalize.

24   There are such things as business disagreements.  There are

25   such thing as clients like Mr. O'Callaghan, that didn't say

1     to you, I didn't know there was going to be a spread, whether

2     or not the contracts did or did not approve it.  There are

3     business disagreements.

4          These are billion-dollar businesses, a global bank,

5     clients with representatives and consultants and

6     sophistication.  When there are disagreements, they get

7     resolved.

8          You heard about a couple of clients blacklisted

9     State Street, because they didn't like not knowing about the

10    broker-dealer trades.  You've all heard about arbitration,

11    mediation, civil settlements.  That's how businesses deal

12    with monetary issues, without the heavy hammer of

13    representatives from Washington's Department of Justice.

14    Without the heavy hammer of a criminal prosecution.

15         Mr. Pennings told you not in his wildest dreams was

16    what he was doing subjected to criminal charges, whether in

17    Britain or here.  Mr. Boomgaardt, too.  Nobody was thinking

18    this was a criminal issue.  They weren't even thinking it was

19    a regulatory issue.

20         If it was such a clear-cut issue, on August 26th,

21    when Mr. McLellan was taking control and trying to get the

22    contract, get the periodic notice, talk to Mr. Hansen, the

23    head of compliance, talk to Mr. Woodard, the head lawyer.

24    There was not a one-day decision.  State Street didn't say,

25    whoa, you had no right to charge Royal Mail a markup.  There

1    was a business decision being made on these tapes on

2    August 26th.  You don't hear people saying, I'm worried about

3    the Government.

4          What you hear them trying to do is to determine

5    what's the best way to deal with a business problem, a client

6    is seeking money back.  He didn't know about the markups.  Of

7    course he didn't know about them.  He was the client that got

8    that secret e-mail from Pennings on February 21.  These are

9    business issues, not criminal law issues.  And if this was a

10   criminal conspiracy, you would not have Mr. Pennings telling

11   four or five lawyers that owed him no duty, that owed a duty

12   as lawyers to the law, you would not have him making that

13   disclosure, and not having a single lawyer come back and say,

14   Mr. Pennings, you can't do that.  That's not appropriate.

15   That's not what our contracts are meant to say and do to

16   clients.

17         So let me focus on some of the transitions that Mr.

18   Johnston focused you on.

19         KIA, huge, wealthy Mid Eastern sovereign wealth

20   fund.  What do we know?  Well, we know that KIA says to

21   Mr. Pennings, charge zero.  If you don't charge zero, you're

22   not going to get a piece of this transition.  So Mr. Pennings

23   charges zero.

24         What does a client think?  That the bank is going

25   to do a $4 billion transition for free?  Of course this

1    client knew that there was going to be markups on trades.

2    Mr. Pennings said it would be ridiculous for the client to

3    think that the money was coming from somebody else who is

4    buying or selling the bonds to KIA, or selling the bonds

5    they're buying.  It has to come from the spread.  Das knew

6    it, Das approved it.  Das, whatever they want to say about

7    his not being the most sophisticated person, anybody knows

8    banks don't do $4 billion transitions for zero fees, zero

9    commissions.

10          State Street's simply conforming its business

11   proposal to what the client wants.  That can't be a crime.

12   That's business.  If a higher proposal is going to get a

13   rejection, you try to rework your pricing, charge them the

14   way they want and charge the fees that Das, the

15   representative of KIA, okayed.

16          How do we know he okayed it?  Well, Mr. Boomgaardt

17   is on tape, Exhibit 30, telling the traders on June 13th,

18   they told us to take a markup or a markdown to remunerate

19   ourself.  They told us.  The "they" is KIA.

20          How do they know that Ross McLellan knew that they

21   knew?  Again, look at Exhibits 33 and 35.  33 is Ross asking

22   to see the day's high and lows.  35's are the prices the

23   clients in fact, were charged, the prices the client was

24   charged was outside the high/low range, sending an inexorable

25   message to the client that we are taking a markup and we know

1    that you approve of it, because you've asked us not to charge

2    you an explicit transition management fee.

3           On the transition 115, the June transition ends,

4    what happens next?  KIA is happy with 115.  They award all of

5    a bigger transaction in November to State Street.  NTMA,

6    Mr. O'Callaghan said that State Street, like with KIA, had

7    lost a whole bunch of transitions.  What does State Street

8    do?  They bring down their explicit fee to 1.25.  1.25,

9    according to Boomgaardt, is just about enough to keep the

10   lights on.  Banks don't do this with something like a 7 or

11   $8 billion of bond trading and equity trading.  They don't

12   take that on without making a profit.

13          Maybe Mr. O'Callaghan, for some reason, thought

14   they were going to do it for 1.25.  And I accepted there are

15   disagreements and people in good faith can have disagreements

16   and that's what contracts are for.  And what do we know about

17   NTMA?  On December 24, 2010, in a tape-recorded call between

18   Boomgaardt and Pennings, Pennings is saying to Boomgaardt,

19   "just check it" -- which is the contract -- "and make sure it

20   is reflective and doesn't say anything about not taking any

21   spreads, because we are going to have to in the US."

22          And the contracts did not prohibit a spread.  They

23   did not prohibit the bank -- the broker-dealers from charging

24   a markup.  Mr. McLellan asked to see the NTMA contract.  He

25   reviewed it.  He made sure the contract did not prohibit the

1     spread that those Christmastime e-mails said to Mr. McLellan
2     we're going to be taking.
3            ETF?  State Street, what they called disaggregated,
4     that instead of making a one-time sale, Russell 2000, all of
5     it sold in a single sale on the market, they broke it up,
6     took the different stocks, sold them, made a huge profit for
7     NTMA.  $2.6 million of profit to NTMA to go against the
8     ordinary costs of transitions from one set of assets to
9     another.  Yes, State Street made commissions on ETF trades.
10            KIA -- and they made 15 basis points.  Mr. Menchel
11    told you that the FINRA rules are -- they change -- had a
12    seal under 500 basis points and that 25 basis points was well
13    within the norm.  So Mr. McLellan's charging 15 basis points
14    is not out of the norm and there was no one that came into
15    this court and said that they were excessive markups.  The
16    issue is whether they knew of the markups and I suggest that
17    they didn't know of the markups, but the contracts permitted
18    the markups.  That's what a disagreement between companies is
19    all about.  That's not a crime.  Twice, the evidence will be,
20    Mr. McLellan called to review the NTMA contract and the
21    contract had no prohibition on the taking of spreads.
22            KIA 121.  This was different because David Puth
23    wanted State Street, for the first time, to sell its own
24    bonds to KIA, a group called Rates.  So a lot of lawyers came
25    into this, because this was an aberration of the State Street

1    model, which was to offer clients, being their agent, their

2    conflict-free agent in the marketplace.

3            What does that mean?  It means that they -- instead

4    of selling the client their own bonds, they go out to the

5    marketplace and they weigh different, competing brokers.

6    This is the KIA post trade, which says our agency traded

7    model proved effective over the course of the transition.  We

8    were able to find the best counterpart for each trade,

9    meaning the best person to sell bonds KIA wanted, the best

10   person to buy bonds KIA wanted to sell.

11           We executed with 17 different counterparties.

12   That's what broker-dealers do.  And that's what all this

13   language about agency and the fiduciary and the RFPs means.

14   It means I'm not going to go to one counterparty myself.  I'm

15   going to go to the marketplace as your agent and buy bonds at

16   the best price, giving you the best execution.  The best

17   interest of the client doesn't mean that it's going to be

18   done for free.  Broker-dealers don't go to 17 counterparties

19   for free.

20           So what happened here in KIA 121, when State

21   Street, for the first time, wanted to sell KIA its own bonds.

22   In other words, be its principal, not be a conflict-free

23   agency broker.  It brought the lawyers in.  First the US

24   lawyers -- Pennings did say I don't want them to see the

25   contracts -- but the evidence before you, and if you look at

1    the e-mails from November 2 and November 3, Ross McLellan is

2    sending the contract to Bryan Woodard.  He is telling the

3    lawyers here's what you need to decide.

4            Ross is saying I don't think they're going to

5    approve it, not because there's anything wrong with the

6    broker-dealer, us, doing KIA transitions.  I don't think

7    they're going to approve it, because it's different than our

8    business model.  It's got Mr. Puth, my boss, trying to

9    involve another affiliate to buy and sell bonds.  Well, the

10   UK lawyers did approve it.

11           Everybody looked at these contracts, that's their

12   job.  The US lawyers looked at the contracts, the UK lawyers

13   looked at the contracts.  And in Exhibit 53 in front of you,

14   where Mr. Bryant, who's a US trader, is sending this e-mail

15   to Ross McLellan, it's November 2, in reference to the KIA

16   fixed income trade, and it's very important.

17           "Melissa" -- that's Melissa McCay, US lawyer for

18   State Street Global Markets -- "said earlier that she didn't

19   see it as an issue that we both make money on this trade."

20           FIRB is rates, TM is transition management.

21           "So if we are forced to do so" -- they didn't want

22   to trade with these rates.

23           "If we are forced to do so, we both should be able

24   to charge, us as the broker-dealer, and them as the market

25   maker on behalf of State Street."

1          That's a US lawyer who knows that the transition

2     manager's broker-dealer is going to make a markup, make

3     money.  This, again, is KIA.  It's another zero commission

4     deal.  This one Pennings promised them, we're going to do the

5     custody cost as well.

6          In other words, without broker-dealer markups,

7     State Street would be paying KIA to do a $4 billion

8     transaction.  Das, KIA, know there's going to be markups.

9     Ms. McCay, the US lawyer, is reviewing the contracts and

10    saying go ahead, there's nothing wrong with the transition

11    management broker-dealer to be making money.  The only way

12    broker-dealers make money is spreads, is markups.  There's

13    nothing in the KIA contract that prohibits it.  We know that,

14    because Ms. McCay would not be approving the markup if there

15    was something to prohibit it.

16         And we know the next day, the UK lawyers, despite

17    Ross' prediction they won't okay it, did okay it.  And we

18    know that the KIA transition occurred and we know that KIA

19    was happy with the results.  And we know David Puth was happy

20    with the results, Mr. McLellan's boss, because he went to

21    London the next day, congratulated everybody and Pennings

22    sends an e-mail, you know, "Puth loves Eddy."

23         The bank okayed the KIA transition, from the senior

24    management to the US lawyers to the UK lawyers to the people

25    on the ground, the traders.  And his e-mail showing the

1    extent to which the traders knew there was going to be

2    markups.  It's Exhibit 59, an e-mail from an Adnan Choudhary,

3    to about ten different people, telling them what the markup

4    is on one of the two KIA trades.  The only reason that Samina

5    Vernon was walled off was because they believed she was going

6    to Russell, which was the principal competitor of State

7    Street in the market.  And businesses keep their own

8    confidences, they don't disclose them in the marketplace when

9    it's unnecessary.  But the people that needed to know, the

10    traders knew there were markups.  It was no secret and the

11    lawyers approved it.

12              Royal Mail, when you look at the contract,

13    Exhibit 2, it expressly okays the markups.  It expressly

14    okays not disclosing the markups and Mr. McLellan -- here's a

15    piece of the contract.

16              "No duty to account for profits, neither the

17    transition manager or the associate, the broker-dealer should

18    be liable to account for the markups that are payable by the

19    customer to the broker-dealer."

20              This is what Mr. McLellan was guided by by calling

21    in and saying you can have a one basis point markup on the

22    Royal Mail transition.  He again did not know of what I did

23    call in the opening the missile in the night, the betrayal of

24    Pennings.  Pennings having made a secret promise to Ian

25    McKnight.

1            Briefly, because my time is getting short, is the
2      Government has focused in their opening -- in their closing,
3      their opening and closing on inadvertence, on this e-mail
4      that was sent to Royal Mail.  This e-mail was not an e-mail
5      sent to Royal Mail to try to extract money from Royal Mail,
6      to try to get them in a contract.  This was an e-mail sent to
7      a client by State Street, by Pennings, with Ross' knowledge,
8      sending Royal Mail back a million dollars.  It's one of the
9      Government's charges of a crime, is an e-mail sent with a
10     soft message to a client.  It was inadvertent, here's the
11     money you're asking for back.
12            There was other markups, those on August 26th,
13     you'll hear the tapes.  Mr. McLellan, when he took over this
14     project on August 26th, read the contract for the first time
15     in detail, and you hear his opinions change on tape.  We
16     don't have a leg to stand on, maybe the contract supports it.
17     And then he reads article 6, the article you just saw, and
18     says the contract does disclose the markup, does support no
19     duty to disclose.  These tapes are not tapes of a crime.
20     They're tapes of a business trying to make a decision.
21            Remember, Royal Mail said we can be a good client.
22     We have a $30 billion transition coming up.  So what do
23     businesses do when a client complains as Royal Mail did, and
24     says to Pennings, hey, what were your fees; and Pennings lies
25     to them, lied to them without talking to Ross.

1          Only after he says our fees are 1.75, 227,000, plus

2     futures, then he says to Ross, Royal Mail is asking about the

3     markups, we charge the markups.  Ross says give it back to

4     them.  They're asking about the US markups.  So he says it

5     was inadvertent.

6          Businesses have choices.  Ross had a choice, maybe

7     he didn't make, in hindsight -- certainly sitting here, he

8     didn't make the right decision.  But it's not a criminal

9     decision.  Businesses don't always pick a fight with a good

10    client.  They could have chosen to say the contract allowed

11    the markup, we're not giving you a dime back, and then what

12    would have happened?  Two things.

13         They would never have been considered for the

14    $30 billion transition that was coming up.  They would have

15    lost a good relationship to a potentially good client.  And

16    Mr. Pennings would have been at risk of losing his job

17    because he had lied to the client, without Ross' okay the

18    night before.

19         You hear it on some of the tapes, Ross saying to

20    Boomgaardt, I'm going to try to protect your job.  That's

21    what managers do.  They try to be loyal to people.  Again, at

22    the time of this, Ross didn't know that Pennings had made

23    McKnight that February promise.  So they took the diplomatic

24    way out.  And Pennings told you, State Street regularly gives

25    money back when clients complain.  You don't pick a fight.

1          Every business doesn't have to assert a contract

2     and refuse a client.  Some businesses say the client is

3     always right, and they look to the next buy, the next deal,

4     the next transition to make the money back.  That's the State

5     Street model, the client is always right and Pennings says

6     our practice at State Street was to quickly rebate monies

7     when clients complaint.  That's this inadvertent.

8          Instead of saying we intentionally charged you

9     money and you may not be happy and we're not giving it back,

10    they sent an e-mail saying the commissions were inadvertent,

11    here's the million dollars back.  It's not a crime.

12         Businesses don't always say everything to a client

13    about their pricing or their customer service.  Businesses

14    can think the client is wrong, give them the money back.

15    It's a business decision, not a criminal law decision.

16         This compliance letter --

17         THE COURT:  Mr. Weinberg, just wanted to let you

18    know where you are.

19         MR. WEINBERG:  Thank you, Judge.  I'll be winding

20    down.

21         A compliance letter resulted from this series of

22    e-mails.  Mr. McLellan at the bottom e-mail is saying,

23    "Aren't they asking Hansen to approve the total compensation,

24    meaning the US and European bonds?"

25         Pennings says, "No, just what we gave back, I

1  thought."

2          "Rick?"  He asks Boomgaardt.

3          Boomgaardt:  "That is my understanding."  Meaning

4  Pennings'.

5          "By compensation amount, he means the check that we

6  already sent, the $1 million."

7          And Ross says, "That should be easy."

8          And that's the context of the letters that are

9  being discussed between August 22 and August 26, seven years

10  ago.  And when Ross is looking at a letter to compliance that

11  talks about US bonds and TRACE and nonTRACE, this is the

12  context, he believes, that the letter that's going to

13  Mr. Dixon, who is the auditor recommended by Ross to Royal

14  Mail.  You don't do that if you think you did something

15  wrong.

16          The letter to Dixon, by compliance, is thought by

17  Ross McLellan to be a memorialization of the amount of the

18  rebate that has already been given.  The check that's been

19  written.  It's not some master conspiracy where a draft of a

20  compliance letter is somehow inaccurate, as if this is the

21  sum total of everything Ross McLellan is focused on, on

22  August 22, 23, 24.

23          By the 26th, he's focused, and asking Boomgaardt,

24  send me the documents, send me the contract, send me the RFP.

25  He's asking Pennings questions, assure me this is legal in

1    the UK.  Pennings says it's legal, unless we double-dip.

2    Double-dipping is an arcane term.  It means what ConvergEx

3    did, two broker-dealer markups.

4           The Government brings in this witness, witness who

5    went to Ross' house in 2012 to ask about a business dealings

6    by State Street that were largely 14 years earlier, by

7    ConvergEx, another company that was being investigated.  And

8    Ross makes statements about State Street doesn't have the

9    ConvergEx model.  We're open, which they are in the United

10   States.

11          ConvergEx has two broker-dealer charges.  That's

12   double-dipping.  That's what Pennings says you can't do on

13   the August 26th tape.

14          These August 26th tapes of Ross and Boomgaardt and

15   Pennings.  I, like the Government, asks you to listen to

16   them.  They demonstrate a businessman, Ross McLellan, trying

17   to deal with a business problem, which is do we just give

18   Royal Mail back the remaining markup, or do we, at this

19   point, assert a contract?  If it was such a simple decision,

20   there would be no decision.  There'd be a return of the money

21   that day, because lawyers and Mark Hansen have been brought

22   into it and Ross has brought them in and Ross has escalated

23   the issue in the business, and Ross is saying let's make an

24   intelligent decision.

25          And if Ross McLellan thought he had something to

1    hide, he'd be saying to everyone, give them the money back,

2    let's stop the complaints.  These complaints can lead in the

3    wrong direction.  That's what Pennings is saying.  Pennings

4    knows the promise he made.  Ross is saying let's have legal,

5    let's have compliance look at it.

6            AXA.  The charge is February 24th.  There's a

7    transition -- there's a pre-trade that goes to AXA.  It's got

8    one commission.  There's no evidence -- you heard three

9    witnesses talk about AXA, Kristen Morris, State Street,

10   Kelly, AXA, Clemmenson, State Street.  Nobody said that Ross

11   McLellan's decided on the commission, read the pre-trade --

12   this is a criminal allegation.

13           There's a specific wire, the sending of a pre-trade

14   by Kevin Walker to AXA with a cc to Ross.  There's not a

15   piece of evidence that demonstrates to you that Ross McLellan

16   authored that pre-trade, ordered it sent, reviewed it in

17   detail.  It's over 45 pages.

18           What you do have, instead, on AXA is on March 1,

19   Mr. Carlin sends an e-mail to Ross and others, Lance Deal,

20   SSGA, "Legal has raised with Melissa McCay that we have a 17e

21   issue.  We will have to sign a certificate representing to

22   AXA that our commissions are reasonable and fair."

23           Not a word about the two lawyers, McCay and Lance

24   Deal, saying that we have to certify a one-tenth or

25   one-percent commission, which is in the pre-trade, is fair

1    and reasonable.  And if you listen to the audio the next day,

2    Ross uses those words.  We have to make sure our commissions

3    are fair and reasonable.  This is a client of our advisor,

4    our other part of State Street.

5              There's no concealment here.  You have e-mails

6    showing that the revenues were greater than the revenues

7    predicted by this pre-trade, no one asked Ross McLellan, what

8    did you earn?  Ross never lied to anybody.  He didn't lie to

9    AXA.  Kelly couldn't even remember any conversations with

10   Ross, except the one -- there was an e-mail the day before

11   February 24th, they're exchanging nondisclosure agreements.

12             Ross is in Asia, he gets on the phone with the

13   traders.  Listen to the audio.  It has nothing to do with a

14   conspiracy.  Ross is saying to them -- the Government didn't

15   play that part -- make sure the fees are fair and reasonable.

16   They need to get sent over to SSGA and we know the fees were

17   fair and reasonable, because even with the fee that was

18   charged, which led to 1.296.  That's what JP Morgan wanted

19   from AXA, 4.38 million.  The fees were one-third of what this

20   esteemed global bank would have charged the client for.

21             Again, the world of business is gray.  I don't

22   doubt AXA thought they were paying one fee and State Street

23   another.  Those are disputes that get resolved outside a

24   federal criminal courtroom, where they're using speculation

25   and guesswork to try to make Ross McLellan responsible,

1   criminally responsible for a pre-trade that was sent by Kevin

2   Walker to AXA on February 24th, without a witness saying Ross

3   read it, directed it, knew its content, or felt bound by the

4   content.  It's a pre-trade.  The one thing you know about

5   AXA, there was no contract.

6          The AXA witness says it's eight years -- seven

7   years later.  We're still looking for the contract.  We don't

8   believe that we did a transition for $10 billion without a

9   contract.

10         Ms. Morris said, in my whole career at State

11  Street, we never did a deal without contracts before.

12  Contracts are what the parties negotiate.  Contracts have a

13  notice, the notice says what the commissions are.  Parties

14  don't rely on pre- trades.  And parties don't rely on RFPs.

15  The Government didn't say at the back of every RFP is a

16  disclaimer saying this is not a contract.  These are not

17  promises.

18         Quickly, best interests of a client doesn't mean

19  free trading.  "Agency" means exactly what State Street did

20  when they went out in the marketplace and they had 17

21  different counterparties.  Sometimes in business, people

22  disagree.  That's why there are contracts.  Contracts are

23  relevant.

24         Why is Ross reviewing the NTMA contract?  Why are

25  outside lawyers paid to negotiate contracts?  Why did

1    Mr. McKnight amend the Royal Mail contract?  Because
2    contracts define the rights of parties.  And here the
3    contracts supported the markups.  Every lawyer that reviewed
4    the business practice endorsed the business practice, because
5    the contracts did not prohibit both a fee for the transition
6    manager and a markup for the broker-dealer.
7            I'm getting close to the finish.  But liberty is
8    important and I want to make sure I've answered some of Mr.
9    Johnston's arguments.  He said that there was a motive on
10   Ross McLellan's part to make money, to perform.
11           2010, Ross, for his performance, was promoted.  He
12   was promoted before the Royal Mail trades.  He was promoted
13   by his years of service to State Street.  And when you're
14   working for a bank, you don't break its rules.  You know
15   enough not to break its rules.  The wider your
16   responsibilities, the less any one transition means to your
17   performance.  Ross had global responsibilities for a thousand
18   transitions.  He's not affected by whether NTMA or AXA or any
19   one transition made more money than another.
20           AXA made, I think, 7 or $800,000 more than AXA
21   expected.  You don't risk your career, your family, your
22   reputation, your freedom on any single transition.  These
23   banks make billions of dollars.  Your performance is spread
24   over all of the transitions and more, because Ross was head
25   of different departments, spread over all kinds of other

responsibilities.  Yes, maybe Mr. Pennings in Europe, his

performance was more geared as Mr. Boomgaardt's was to these

specific transitions, but the wider your responsibilities,

the wider is the criteria where a bank judges your

performance.

Ross McLellan was not in trouble with the bank.

Ross McLellan was their youngest executive vice president,

promoted by the bank, on a great pathway to success.  There

was nothing in the evidence of this case that demonstrates

that he would willfully, with a specific intent to disobey

the law, that is the test that Judge Sorokin will give you,

bad faith, not good faith, would risk all that for what?  To

have six different transitions make a little more money?  A

lot of money by our standards.  Not a lot of money to a bank

that had hundreds of billions of dollars.

Pennings, what did he get?  Ross is his immediate

supervisor, Pennings' bonus went down in early 2011.  He's

not getting rewarded by Ross McLellan for having done

something in some secret conspiracy.  His bonus went down,

his salary went up.  His bonus went down.  There's nothing

that indicates that Ross McLellan believes that Pennings was

doing anything wrong.

This is the most important moment in a man's life.

Your decision, and I ask you to make the decision not on

sympathy, but on evidence.  On the lack of evidence

1   connecting Ross McLellan to this blizzard of paper that was

2   largely authored and sent and communicated by Mr. Pennings.

3   I go back to where we started, the bridge between the proof

4   and Ross McLellan rests on your acceptance or your rejection

5   of the credibility, the trustworthiness, the fidelity to

6   their oaths of the Government's two cornerstone witnesses.

7         I ask you to weigh their believability and I ask

8   you, in good conscience, based on the evidence, to do one of

9   the greatest things that one citizen can do for another,

10  which is to come back to this courtroom with a verdict that

11  will finally lift the shadow of this staggeringly difficult

12  accusation to a businessman with a reputation and a job and a

13  family, and lift this accusation and tell Mr. McLellan, at

14  last, he is free.

15        Thank you very much.

16        THE COURT:  All right, ladies and gentlemen.  Thank

17  you, Counsel.  I remind you that while the arguments of

18  counsel may be helpful, they're not evidence.

19        Mr. Frank will now give the Government's rebuttal.

20        **REBUTTAL ARGUMENTS BY THE PLAINTIFF**

21        MR. FRANK:  Almost there, ladies and gentlemen.

22  Good morning.  There's a lot that Mr. Weinberg just said.  I

23  have a few minutes to respond and so I'm going to be very

24  brief and target four points.  First, he spoke to you about

25  good faith.  He spoke to you about meetings that happened

1    between Mr. Pennings -- not Mr. McLellan, but between

2    Mr. Pennings and legal and compliance.  In particular, that

3    April 2011 meeting.

4         He didn't mention, by the way, that that meeting

5    happened after most of these transitions had already

6    occurred, after Royal Mail, after the two KIA transitions,

7    after the Dutch Doctors transitions, after most of the NTMA

8    transitions.  That's when that meeting occurred, in April of

9    2011.

10        And he also mentioned legal looking at the KIA 121

11   transition, not for the purpose of approving hidden

12   commissions, which they were never told about, but for the

13   purpose of deciding whether the transition desk could trade

14   opposite the rates desk, could use that used car lot as one

15   of the car lots that they shopped at for those bonds that KIA

16   wanted to buy.  That's the reason that legal was looking at

17   KIA 121.  But those were the two moments when lawyers were

18   involved that Mr. Weinberg wants you to focus on as evidence

19   of his client's good faith.

20        So let's focus on those for just a moment.  If Mr.

21   McLellan believed that legal and compliance had signed off on

22   what they were doing with these hidden commissions, then why

23   was this such a secret within the bank?  Mr. Weinberg just

24   told you that the hallmark of conspiracy is secrecy.  We

25   agree.  It's true.  Why did he keep this such a secret within

the bank?

Why did he personally tell Stephen Finocchi to zero out those commissions when sending over the file to Samina Vernon.  Mr. Weinberg wants you to believe it's because they were concerned that Samina Vernon was going to go to a competitor, Russell?  What was she going to say when she got to Russell?  Was she going to say, guys, you're never going to believe this.  State Street is adhering to its contracts.  Was she going to say, guys, you're never going to believe this, but over at State Street, Ross McLellan is charging clients in a way that legal and compliance says is completely authorized?

Is that what she was going to say?  Or was she going to do at Russell, the same thing that that unhappy ConvergEx employee did, with respect to the spreadsheet he anonymously faxed Mr. McLellan.  And say guess what's going on over at State Street?  They are duping clients, they are cheating clients, they are taking money from clients that the clients don't know anything about, while promising them a low, disclosed commission.  That's why he lied to Samina Vernon and told Stephen Finocchi to lie.

Why was all of this on a need to know basis?  Take a look at Exhibit 98.  That's an e-mail between Chris Carlin, his number two, his chief operating officer, and Paul McGee, the trader over in Europe.  When Chris Carlin wants to know

why is NTMA being charged a flat fee and spreads, that's not
our usual practice.  And Chris Carlin says -- and Paul McGee
says it's on a need to know basis, speak with Ross, he knows
the strategy here.  That's Exhibit 98.

Why, if this was something legal and compliance
approved and that they thought legal and compliance had
approved, do Ed Pennings and Ross McLellan, in November of
2010, talk about not wanting to show the contract to legal,
about opening this can of worms.  Why don't they say, by the
way, there's no way we can disclose our spread and the
defendant says agreed, if they thought legal and compliance
would approve or had approved.

If legal and compliance had approved, why, in June
of 2011, when Royal Mail asked about that basis point of
yield that were charged on its trades in the United States,
does the defendant lie.  Mr. Weinberg has an elegant way of
referring to a lie.  He calls it a soft message.  That's what
he told you it was.

It wasn't a soft message.  Inadvertent commissions
applied is a flat out unadulterated unambiguous lie.  They
weren't inadvertent.  You heard him on the phone telling
Stephen Finocchi to apply those commissions, in defiance of
the written trading instructions he received from Samina
Vernon.  It was a lie.

If all he wanted to do was service the client, give

1    the money back, because that's what they do at State Street,

2    why not just give the money back, and say you know what?

3    Legal and compliance told us we're allowed to charge this

4    money under our contract with you.  And if you look at the

5    contract, we think we have a reasonable case, we can charge

6    this money, but because there's a business disagreement,

7    we're going to give you the money back, because we want to

8    keep doing business with you.  That's what people do when

9    there's a business agreement.  They don't lie.

10           And when they lie and call it a fat finger error,

11   they don't hide the fact that they've also taken another

12   $2 million in Europe that they're still not telling the

13   client about.  He chose to lie.  And you know that he chose

14   to lie, because then when he e-mailed Chris Carlin and said

15   give the money back, his number two, his chief operating

16   officer, he said to Carlin, we overcharged the client.

17   That's Exhibit 162.  You have it in evidence, you can take a

18   look at it.

19           If legal authorized it, then they didn't overcharge

20   anyone.  They made a business decision to give the money

21   back.  If legal and compliance authorized it, why, on

22   August 25th, when Marshall Bailey, the senior executive in

23   Europe, who has now been told by Rick Boomgaardt what exactly

24   went on here, when he e-mailed the defendant and said who in

25   legal and compliance has authorized what you're doing, why

1    didn't the defendant give him a name of who in legal and
2    compliance authorized it?  Why did he say I'll give you a
3    call, instead.
4            That's Exhibit 189.
5            If legal and compliance had authorized this, ladies
6    and gentlemen, why, on that August 26th phone call, between
7    the three co-conspirators, Rick Boomgaardt, Ed Pennings, and
8    the defendant, Ross McLellan.  Why didn't a single one of
9    them mention that legal and compliance had authorized what
10   they were doing.  If they all thought it was okay, why are
11   they so stressed out, why are they reviewing the contract as
12   though for the first time on that phone call.
13           If Simone Paul had said in that April 2011 meeting,
14   Ed, go ahead with what you're doing.  We think it's great.
15   We think it's a terrific new business model, why didn't
16   anyone mention it on that phone call?  Why didn't the
17   defendant say, hey, wait a minute.  I thought in April of
18   2011 you got clearance from John Norris and Simone Paul.
19   We're okay here.  Why, instead, were they lying to their
20   compliance officer all week long.
21           Mr. Weinberg wants you to believe there wasn't a
22   lie in that compliance letter that Ed Pennings drafted at the
23   defendant's direction and repeatedly redrafted over and over
24   again.  You have the different versions of that letter in
25   evidence.  You can take a look at it.  It says that these

1    commissions were applied in error.  That is a flat-out lie.

2    You heard him order the commissions.

3           It says that the million dollars was the full

4    amount overcharged, after looking at all TRACE and nonTRACE

5    eligible bonds.  Those were lies.  They were holding onto

6    $2 million in Europe that they hadn't told Mark Hansen about.

7    The defendant himself said on August 26th at the end of the

8    week, after Rick Boomgaardt has reported to higher-ups what's

9    going on here, that he has finally brought Hansen into the

10   loop.

11          And you heard that phone call, where the defendant

12   is relating his conversation with Hansen to Rick Boomgaardt.

13   And you'll hear him say that Hansen asks, are you guys being

14   straight with us?  Because he knew he had been lied to and

15   the defendant's response, sure, we've never hidden the fact

16   that we purposely charged commissions here.  But you know

17   that's not true.  He's been lying to Hansen about purposely

18   charging commissions all week long.

19          Ladies and gentlemen, those calls on August 26th

20   are devastating evidence of the defendant's guilt.

21   Devastating evidence that he wasn't acting in good faith,

22   devastating evidence that he never believed the contract

23   allowed any of it, and certainly devastating evidence that he

24   and nobody else had ever checked with legal and compliance,

25   and he knew that.

1        A moment on those contracts that Mr. Weinberg was
2   talking about.  He points you to the Royal Mail contract and
3   the communication with -- with -- between Ed Pennings and Ian
4   McKnight.  That e-mail, that missile in the night that you
5   heard about.  You saw Ian McKnight testify.  He told you
6   exactly why he sent the e-mail asking for the avoidance of
7   doubt, not because he was confused.  He knew exactly what
8   State Street had promised.  He just didn't want them to be
9   able to wriggle out of it.
10       And you heard the defendant himself on that
11   August 26th phone call say all he needed to do was look at
12   the request for proposal, the RFP.  Their response to Royal
13   Mail.  And he knew that they didn't have a leg to stand on.
14   Because they hadn't just promised a flat fee.  They'd been
15   absolutely explicit, zero commissions.  And then he had gone
16   on and personally ordered those commissions.  He knew that
17   they had lied to Royal Mail, and it didn't depend on any
18   secret communications between Ed Pennings and Ian McKnight.
19       But he wants you to focus on that contract with
20   Royal Mail.  The provision in the contract that, by the way,
21   he, himself, said on that August 26th phone call, doesn't say
22   you can, doesn't say you can't.  Rick Boomgaardt says it
23   absolutely says you can't.  They're reading it as though for
24   the first time on that phone call, trying to come up with a
25   cover story.  But that's not the only contract at issue here.

1        There's NTMA.  NTMA, Mr. Weinberg himself says --

2   Mr. Pennings told Boomgaardt to check, make sure it doesn't

3   say we can't charge a spread, because we're going to have to

4   here.  Well, of course, it doesn't say what you're not going

5   to charge.  It only says what you are going to charge.  No

6   contract says you cannot lie.  No contract says you cannot

7   steal.  We all know that since grade school.  We cannot do

8   those things, that the law forbids those things.

9        And the contract he didn't mention to you was the

10  Sainsbury's contract.  Why didn't he mention that one to you,

11  because that one explicitly does say you can't charge me

12  anything without disclosing it in the periodic notice, and

13  the periodic notice doesn't disclose commissions, it only

14  discloses a flat fee.  The contracts here, ladies and

15  gentlemen, are not what they were relying on at the time, and

16  the contracts don't allow them to do what they did.  And

17  legal and compliance never said that the contracts allow them

18  to do what they did.

19       The contracts are something they came up with to

20  point to after the fact as a cover story, and the cover story

21  doesn't even work.  Because the contracts don't allow them to

22  do what they did.  You heard it on the phone call, well, how

23  do we justify the two basis points in Europe, versus the

24  one basis point in the United States?  And the defendant's

25  response?  I don't know.  You got to come clean, you come

1    clean with everything.  You come clean with everything.

2         Who talks about coming clean if they think that

3    what they're doing is authorized under a contract?  Who talks

4    about coming clean if they think that legal and compliance

5    has signed off?  Coming clean is the language of liars and

6    criminals.  That's who comes clean.  People who know what

7    they've done is wrong.

8         Mr. Weinberg talks about the cooperating witnesses

9    and he says you can't believe these cooperating witnesses.

10   They have been corrupted for the benefits that they've

11   received.  Let's think about that for a minute.  What

12   benefits have these cooperating witnesses received?

13        The benefit of being permitted to plead guilty to a

14   crime in the United States?  The benefit of being allowed

15   possibly to serve out whatever time they have to serve in

16   prison, in a British jail, as opposed to an American jail?

17   That's a tremendous benefit, ladies and gentlemen.

18        What Mr. Weinberg wants you to believe, as absurd

19   as it sounds, is that these cooperating witness are lying

20   about having committed a crime, that they were operating in

21   good faith at the time, but they have bizarrely, instead,

22   pled guilty to a crime that they didn't commit.  That's what

23   he is asking you to believe, that they have pled guilty to a

24   crime that they didn't commit.

25        I submit to you, ladies and gentlemen, that is

1    flat-out absurd.

2            But at the end of the day, we didn't pick these

3    cooperating witnesses.  Ross McLellan picked these witnesses.

4    They're his guys.  He's the one who called Ed Pennings "Saint

5    Eddy."  He's the one who said you the F-ing man when Ed

6    Pennings brought in that KIA deal with the promise of a zero

7    commission, where they were going to make millions of

8    dollars.

9            Back up the truck, Ed Pennings.  That's the

10   defendant's guy.  He wants you to believe they flew here from

11   England to plead guilty to a crime they didn't commit?  Rick

12   Boomgaardt flew here without knowing that he was the subject

13   of any investigation, because he wanted to get the record

14   straight, he wanted to right what he had done wrong, he

15   wanted to finally get out ahead of things and tell the truth.

16           Ed Pennings, you have his plea agreement in

17   evidence.  I urge you to take a look at it.  It is signed

18   weeks before he ever met with a Government, weeks before he

19   was offered a cooperation agreement.  You have the

20   cooperation agreement in evidence, you can compare the dates.

21   He signed that plea agreement, committed to plead guilty to

22   the crime that he knew he had committed, because he could no

23   longer "defend the indefensible," in his words.  And only

24   much later on did he meet with the Government, tell the

25   truth, and become a cooperating witness for the Government.

1     That's not somebody who became a cooperating

2 witness because of some benefit that he exepcted to receive.

3 That's somebody who owned up to what he had done and was

4 willing to face the consequences.

5     But you also have what they said at the time.

6 Listen to that conversation that you have in evidence between

7 Ed Pennings and Rick Boomgaardt about what was going on at

8 ConvergEx.

9     Mr. Weinberg just showed you a slide where there

10 was two stops on two different commissions with ConvergEx,

11 but only one stop with State Street.  The stop that he left

12 out is the stop where they promised a flat fee instead of

13 commissions.  So it's exactly the same as the ConvergEx lie.

14 A commission and another commission that's hidden.  And in

15 State Street's case, a flat fee instead of a commission and

16 another commission that's hidden.

17     They knew that what ConvergEx was doing was wrong.

18 They were promising a low flat fee -- a low fee and then

19 secretly taking commissions that they weren't entitled to.

20 And they said it in February of 2010, when Rick Boomgaardt

21 and Ed Pennings were on the phone together, they said what

22 ConvergEx is doing, it's wrong.  They're relying on some

23 ambiguous language about affiliates in the contract, when

24 they're telling the clients that they're the agent and

25 they're going to pass on benefits in the market on to the

1    client.  That is exactly what they went on to do in this

2    case.

3            And what did the defendant call it?  He called it

4    client abuse.  That's the name of the attachment, that

5    spreadsheet that Ed Pennings was shopping around when he was

6    disparaging ConvergEx to their competitors.  They knew it at

7    the time.  They knew at the time that what they were doing

8    was wrong and the defendant knew it, as well.

9            Finally, ladies and gentlemen, quickly on AXA.

10   Mr. Weinberg wants you to believe that AXA wasn't a fraud,

11   because there wasn't a contract.  So the argument is, where

12   there is a contract and it has affiliate language, we can

13   take hidden spreads and not tell the client about them, tell

14   them something else.  Where there's an NTMA contract and it

15   doesn't say anything one way or the other about affiliates,

16   in that case, we take hidden spreads and tell the client

17   something else, because it doesn't say we can't.  In

18   Sainsbury's, where there is language that says we can't, we

19   can do it any way.  There's no explanation for that one, but

20   we'll just put that one to the side for a moment.  And then

21   in the case of AXA, because there is no contact, we can lie

22   to them, tell them we're charging one thing and go ahead and

23   charge them something else.

24           Whether there is a contract, whether there isn't a

25   contract, it doesn't matter what the contract says, we,

ourselves, can decide what's the appropriate price, tell the

client one thing, and then charge them whatever we want

behind their backs.  That's the argument the defendant wants

you to believe is legitimate in his mind.

That AXA pre-trade, which the defendant was copied

on, was sent on February 24.  It promised the thin to win

price of $590,000.  And then he went on the phone with those

traders a couple days later and told them to charge something

altogether different.  $1.3 million.

That letter, Exhibit 212, that e-mail exchange

about what's fair and reasonable, that certification that

they supposedly needed to provide the client, but there's no

evidence that they ever did?  Take a look at that e-mail

chain, Exhibit 212, Mr. McLellan's response, which

Mr. Weinberg didn't mention to you was, we'll decide what's

fair and reasonable.  It's a metaphor for the case, ladies

and gentlemen.  He'll decide what's fair and reasonable for

these clients, clients don't get a say in it.  Ross McLellan

gets to decide and not tell anyone, except if he decides to

tell them.

And that is the same week, ladies and gentlemen,

that he's instructing the traders.  He's instructing Joe

Dionisio to charge a hidden spread of $0.15 a share or $0.16

a share on those ETFs for NTMA.  That's the same week that

he's talking with Ed Pennings about the hidden spreads

1    they're going to charge Royal Mail of 1.5 to 2 basis points.

2    It's no accident that it's the same week, ladies and

3    gentlemen, because it's the same scheme.

4                He's flying all over the world, to Australia, and

5    California, and wherever else.  He's got a thousand deals

6    under his watch in any one year.

7                THE COURT:  Mr. Frank.

8                MR. FRANK:  I'm wrapping it up, Your Honor.

9                And yet he's the one who's personally adding

10    pennies per share on KIA, who's directing the traders on

11    Royal Mail and on AXA and NTMA.  And all of these victims

12    have flown here from England, from Ireland, from the

13    Netherlands and from New York City to tell you that they were

14    defrauded.

15                He must be the unluckiest man in the world, ladies

16    and gentlemen.  Unluckiest man in the world to be mixed up in

17    these frauds in two different continents where he is the

18    single common denominator.  Not Ed Pennings, not Rick

19    Boomgaardt.  Ross McLellan.

20                He lied and he directed others to lie, because he

21    knew what he was doing was wrong.  And that's the test.

22    That's the test.  Not that he knew he was breaking a specific

23    law, but that he knew what he was doing was wrong and that's

24    why he lied.

25                And now, ladies and gentlemen, it is up to you, and

1    you alone, to hold him accountable.  To say that lying to

2    customers, to cheat them out of their money is wrong.  It's a

3    crime.  It's fraud.  Common sense tells you that lying to

4    cheat somebody out of their money is fraud.  Common sense

5    tells you that this defendant is guilty beyond a reasonable

6    doubt as charged.

7            Thank you for your attention.

8            THE COURT:  Thank you, counsel.

9            Ladies and gentlemen, I remind you that the

10   arguments of counsel can be helpful, but they are not

11   evidence.  So you're almost done.  What we're going to do is

12   take a 20-minute break now, then I'll give you my final

13   instructions on the law.  I promise you that I will be

14   shorter than the combined lawyers.

15           And so 20-minute break, you'll come back in, I'll

16   give you my instructions and then you'll return to the jury

17   room and you'll be able to commence your deliberations at

18   that point.

19           All rise for the jury.

20           (The jury exits the courtroom.)

21           THE COURT:  All right.  We'll stand in recess, I'm

22   going to make that one change.  I'll print out a fresh copy

23   for all of you and then I'll return it.  Thank you.

24           (Court in recess at 12:03 p.m.

25            and reconvened at 12:25 p.m.)

1        THE CLERK:  All rise.  The McLellan matter is back

2    in session.

3        THE COURT:  So I would have preferred to make 15

4    copies, but the printer is too slow.  So they'll have one

5    copy in the jury room.

6        You can go get the jury.

7        (Pause.)

8        (Jury entered the courtroom.)

9                        **JURY INSTRUCTIONS**

10       THE COURT:  Please be seated.

11       So, members of the jury, you've heard all the

12   evidence in the case.  It is now time for me to give you my

13   final instructions on the law you must apply when considering

14   the evidence in reaching your verdict.  You will notice that

15   I am going to be reading verbatim much of what I say to you

16   now.  I do this because this is no time for creativity or

17   spontaneity on my part.  This case, indeed every criminal

18   case, is governed by very well-established legal principles.

19   This is not my law that I give to you now.  This is the law

20   handed down to us by our supreme court, federal appellate

21   courts, and the United States Congress, and it is very

22   important that I give you the law fully and accurately.  So

23   please bear with me if I appear to be reading at times and

24   not speaking to you in a conversational way.

25       My instructions will be in three parts.  First,

general rules and legal principles that control your duties
as jurors and your consideration of the evidence you have
heard; second, specific definitions and legal principles
related to the elements of the offenses charged in this case;
and third, guidelines for how you are to conduct your
deliberations and return a verdict.  I will give you a copy
of these instructions to take with you into the jury room
when you deliberate, so you should listen carefully but need
not take notes as I read them to you.

Duty of the Jury to Find Facts and Follow Law.

It is your duty to find the facts from all the
evidence admitted in this case.  You and you alone are the
judges of the facts.  My opinion about the evidence in this
case, if I have one, is totally irrelevant.  You should not
interpret anything I have said or done during the trial as
indicating what I think about a witness or a piece of
evidence or what I believe the verdict should be.  It is your
job, not mine, to determine what the facts are in this case.

To those facts you must apply the law as I give it
to you.  The determination of the law is my duty as the
judge.  It is your duty to apply the law exactly as I give it
to you, whether you agree with it or not.  Just as no one may
question the facts as you find them, you may not question the
law as I give it to you.  You must decide the case solely on
the evidence before you and according to the law as I give it

1    to you.  The oath you took at the beginning of the case was a

2    promise to do just that.

3             In following my instructions, you must follow all

4    of them and not single out some and ignore others.  They are

5    all equally important.  You must not read into these

6    instructions any suggestions by me as to what verdict you

7    should return.  That is a matter entirely for you to decide.

8             Presumption of Innocence and Proof Beyond a

9    Reasonable Doubt.

10            Every person accused of a crime is presumed to be

11   innocent unless and until his or her guilt is established

12   beyond a reasonable doubt.  That means that Mr. McLellan is

13   innocent in the eyes of the law unless and until you, the

14   jury, decide by unanimous vote that the government has proved

15   his guilt beyond a reasonable doubt.  This presumption is not

16   a mere formality.  It is a cardinal principle in our justice

17   system and a matter of the most important substance.

18            The presumption of innocence means that the burden

19   of proof is always on the government to prove that

20   Mr. McLellan is guilty of each crime with which he is charged

21   beyond a reasonable doubt.  This is a heavy burden and one

22   which never shifts to Mr. McLellan.  It is always the

23   government's burden to prove each of the elements of the

24   crime charged beyond a reasonable doubt by the evidence and

25   the reasonable inferences to be drawn from the evidence.  The

1      law does not require Mr. McLellan to prove his innocence or

2      to produce any evidence at all.

3             The presumption of innocence alone may be

4      sufficient to raise a reasonable doubt and to require the

5      acquittal of a defendant.  Mr. McLellan has the benefit of

6      that presumption and you are not to convict him of any crime

7      charged unless you are persuaded of his guilt of that charge

8      beyond a reasonable doubt.

9             The term "reasonable doubt" is often used but is

10     not easily defined.  Reasonable doubt exists when, after

11     weighing and considering all of the evidence in the case,

12     using your reason and common sense, you cannot say you have a

13     firm and settled conviction that a charge is true.

14            A reasonable doubt may arise not only from the

15     evidence produced, but also from a lack of evidence.

16     Mr. McLellan has the right to rely upon the failure or

17     inability of the government to establish beyond a reasonable

18     doubt any essential element of any crime charged against him.

19     It is not necessary for you to conclude that Mr. McLellan is

20     factually innocent in order to return a "not guilty" verdict.

21     Such a verdict means only that the prosecution has not met

22     its burden of proving Mr. McLellan guilty beyond a reasonable

23     doubt.

24            You may not convict Mr. McLellan based on

25     speculation or conjecture.  You may, however, draw reasonable

1    inferences from the evidence.  I will explain more about what

2    types of inferences you may and may not draw shortly.  The

3    government has not met its burden and you may not convict

4    Mr. McLellan if you decide that it is equally likely that he

5    is guilty or not guilty.  It is not sufficient for the

6    government to establish a probability, even if it is a strong

7    one, that a fact charged is more likely to be true than not

8    true.  That is not enough to meet the burden of proof beyond

9    a reasonable doubt.  On the other hand, there are very few

10   things in the world that we know with absolute certainty, and

11   in criminal cases the law does not require the government to

12   offer proof that overcomes every possible doubt.  It requires

13   that the evidence exclude any reasonable doubt concerning

14   Mr. McLellan's guilt.

15          Whether the government has sustained its burden of

16   proof does not depend on the number of witnesses it has

17   called or on the number of exhibits it has offered, but,

18   rather, on the nature and quality of the evidence presented.

19          Again, Mr. McLellan is presumed to be innocent and

20   the government bears the burden of proving his guilt beyond a

21   reasonable doubt.  If, after fair and impartial consideration

22   of all the evidence, you are satisfied beyond a reasonable

23   doubt of Mr. McLellan's guilt of a crime charged, you should

24   vote to convict him of that crime.  On the other hand, if,

25   after fair and impartial consideration of all the evidence,

1    you have a reasonable doubt as to Mr. McLellan's guilt of the
2    crime charged, it is your duty to acquit him of that crime.
3         Defendant's Constitutional Right Not to Testify.
4         All criminal defendants, including Mr. McLellan,
5    have a constitutional right not to testify.  Like the
6    presumption of innocence, this is a fundamental principle in
7    our system of criminal justice.  No inference of guilt or of
8    anything else may be drawn from the fact that Mr. McLellan
9    did not testify.  For any of you to draw such an inference or
10   even to discuss in your deliberations Mr. McLellan's decision
11   not to testify would be wrong and would violate your oath as
12   a juror.
13        What Is Evidence; Stipulations; Inferences.
14        The evidence in this case consists of sworn
15   testimony of witnesses, both on direct and cross-examination,
16   the exhibits that have been received into evidence, and the
17   facts to which the lawyers have agreed or stipulated.  You
18   should consider all of the evidence no matter what form it
19   takes and no matter what party introduced it.
20        A stipulation means simply that the government and
21   Mr. McLellan accept the truth of a particular proposition or
22   fact.  Since there is no disagreement, there is no need for
23   evidence apart from the stipulation.  You must accept the
24   stipulation as fact, but you may give it whatever weight you
25   choose.

1          Although you may consider only the evidence

2    presented in the case, you are not limited to the plain

3    statements made by the witnesses or contained in the

4    documents.  In other words, you are not limited solely to

5    what you see and hear as the witnesses testify.  You also are

6    permitted to draw any reasonable inferences you believe are

7    justified in light of common sense and personal experience.

8    An inference is a deduction or conclusion that may be drawn

9    from the facts that have been established.  Any inference

10   that you draw must be reasonable and based on the facts as

11   you find them.  Inferences may not be based on speculation or

12   conjecture.

13          Direct and Circumstantial Evidence.

14          There are two kinds of evidence, direct and

15   circumstantial.  Direct evidence is direct proof of a fact

16   such as testimony of a witness that the witness saw or did

17   something.  Circumstantial evidence is indirect evidence,

18   that is, proof of a fact or facts from which you could draw a

19   reasonable inference that another fact exists, even though it

20   has not been proven directly.

21          You all have experience in your everyday life

22   drawing inferences based on circumstantial evidence.  For

23   instance, imagine it was sunny when you arrived here this

24   morning but just now someone walked into the courtroom

25   wearing a wet raincoat and carrying a dripping umbrella.

1    Without any words being spoken and without looking outside

2    for yourself, you might draw the reasonable inference that it

3    is now raining outside.  In other words, the facts of the wet

4    raincoat and the dripping umbrella would be circumstantial

5    evidence that it is raining.

6            You are entitled to consider both direct and

7    circumstantial evidence.  Neither type of evidence is

8    considered superior or inferior to the other.  The law

9    permits you to give equal weight to both.  It is for you to

10   decide how much weight to give to any piece of evidence.

11           What Is Not Evidence.

12           Certain things are not evidence.  I listed them for

13   you in my preliminary instructions at the start of the trial,

14   and I'll remind you of them now.

15           One, arguments and statements by lawyers are not

16   evidence.  The lawyers are not witnesses.  What they said in

17   their opening statement, closing arguments, and at other

18   times during the trial was intended to help you interpret the

19   evidence, but it is not evidence.  If the facts as you

20   remember them differ from the way the lawyers have stated

21   them, your memory of the facts controls.

22           Two, questions to the witnesses, whether by the

23   lawyers or by me, are not evidence standing alone.  Again,

24   the lawyers are not witnesses and neither am I.  The question

25   and the witness' answer taken together are the evidence.

1          Three, objections by lawyers are not evidence.

2     Lawyers have a duty to their clients to object when they

3     believe a question is improper under the rules of evidence.

4     You should not be influenced by the fact that an objection

5     was made or by my ruling on it.  If I sustained an objection,

6     you must ignore the question or exhibit and should not

7     speculate or guess what the answer might have been or what

8     the exhibit might have contained.

9          Four, anything you may have seen or heard when

10    court was not in session is not evidence.  You are to decide

11    the case solely on the evidence received at trial.

12         Five, notes, if you have kept them, are not

13    evidence.  They are a personal memory aid to be used to

14    refresh your recollection of the evidence during the

15    deliberations.  Do not assume simply because something

16    appears in someone's notes, even your own, that it is

17    necessarily what happened or was said in court.

18         Six, the indictment is not evidence.  I caution

19    you, as I have before, that the fact that Mr. McLellan has

20    had an indictment filed against him is not evidence of his

21    guilt.  The indictment is simply an accusation and the means

22    by which the charge was brought before this court.  It proves

23    nothing.

24         Seventh, anything that I've excluded from evidence

25    or ordered stricken and instructed you to disregard is not

1    evidence, and you must not consider it.

2              Limiting Instructions As to Particular Kinds of

3    Evidence.

4              At times, a particular kind of evidence was

5    received for a limited purpose only.  You may use such

6    evidence only for one specific purpose and not for any other

7    purpose.  I have told when you that occurred and instructed

8    you on the purposes for which the item can and cannot be

9    used.  You must adhere to those instructions when you

10   consider those items during your deliberations.

11             Improper Considerations.

12             You must decide this case solely upon the evidence.

13   You must not be influenced by any personal likes, dislikes,

14   prejudices, or sympathies you may have about Mr. McLellan or

15   any of the witnesses or about the nature of the crimes with

16   which Mr. McLellan is charged.  You may not consider or be

17   influenced by any possible punishment or other consequences

18   that may be imposed on Mr. McLellan as a result of a

19   conviction.  The duty of imposing sentence rests exclusively

20   with me.  The question of possible punishment is of no

21   concern to you and should not influence your deliberations in

22   any way.  As I have explained, your function is to weigh the

23   evidence in the case and determine whether the government has

24   proved Mr. McLellan's guilt beyond a reasonable doubt relying

25   only upon the evidence and according to the law.

1            Credibility.

2            Most evidence received in this case was offered

3   through witness testimony.  As the jury, you are the sole

4   judges of the credibility of the witnesses.  You do not have

5   to accept the testimony of any witness if you find the

6   witness not credible.  In deciding what the facts are, you

7   must determine what testimony you believe and what testimony

8   you do not believe.  To do this, you must look at all the

9   evidence, drawing upon your common sense and personal

10   experience.  You may choose to believe everything a witness

11   said, only a part of it, or none of it.

12            In deciding whether to believe a witness'

13   testimony, you may consider a number of factors such as:  The

14   witness' conduct and demeanor while testifying; the witness'

15   apparent fairness or any bias he or she may have displayed;

16   any interest you discern that the witness may have in the

17   outcome of the case; any prejudice the witness may have

18   shown; the witness' opportunity to see, hear, or know the

19   things about which he or she testified; the reasonableness of

20   the events that the witness related to you in light of the

21   other evidence which you believe; the quality of the witness'

22   memory; and any other facts or circumstances disclosed by the

23   evidence that tend to corroborate or contradict the witness'

24   version of events.

25            Prior Inconsistent Statements.

1          You have heard at various times that certain

2     witnesses who testified in this trial made previous

3     statements about the same subject matter as their trial

4     testimony.  You may consider those earlier statements to help

5     you decide how much of the witness' testimony to believe.  If

6     you find that a witness' prior statement was not consistent

7     with that witness' testimony at this trial, then you should

8     decide whether that affects the believability of that

9     person's testimony.  Sometimes, of course, people make

10    innocent mistakes.  Not every contradiction or inconsistency

11    is necessarily important.  Again, you alone are the judges of

12    the witnesses' credibility.

13         Some prior inconsistent statements may be used for

14    purposes other than impeachment.  If you find that a witness

15    has made inconsistent statements under oath on an earlier

16    occasion, such as in a prior court proceeding, you may

17    consider that earlier statement for its truth or falsity, the

18    same as any other testimony at this trial.

19         Cooperating Witness Testimony.

20         You have heard evidence that Edward Pennings and

21    Richard Boomgaardt pleaded guilty to charges arising from the

22    events that are the subject of this trial.  You must not

23    consider their guilty pleas as evidence of Mr. McLellan's

24    guilt.  The decisions by Mr. Pennings and Mr. Boomgaardt to

25    plead guilty were personal decisions about each person's own

guilt.  You should disregard their guilty pleas completely
when considering Mr. McLellan's guilt or innocence.  You may
consider the guilty plea by Mr. Pennings or Mr. Boomgaardt
only for the purposes of determining how much, if at all, to
credit his testimony.  You should give Mr. Pennings' or
Mr. Boomgaardt's testimony the weight you believe it
deserves, keeping in mind that it must be considered with
particular caution and great care.

You also have heard evidence that Mr. Pennings and
Mr. Boomgaardt testified and provided evidence under
agreements with the government.  You should bear in mind that
a witness who has entered into such an agreement has an
interest in this case different from any ordinary witness.  A
witness who admits to committing a crime and testifies
against others pursuant to a plea agreement with the
government almost always does so in the expectation of more
lenient treatment as a reward for his cooperation.  Although
some people in this position are entirely truthful when
testifying, you must consider the testimony of Mr. Pennings
and Mr. Boomgaardt with particular care and caution.  They
may have had reason to make up stories or exaggerate what
others did because they wanted to help themselves.  You must
determine whether the testimony of such witnesses has been
affected by any interest in the outcome of this case, any
prejudice for or against Mr. McLellan, or by any of the

1    benefits they have received or expect to receive from the

2    government.  If after scrutinizing their testimony you decide

3    to accept it, you may give it whatever weight, if any, you

4    find it deserves.

5            Expert Testimony.

6            You have heard testimony from two expert witnesses

7    in this case, Marc Menchel and Michael Travaglini, about

8    securities trading and the investment industry.  A witness

9    who has special knowledge, experience, or training on a

10   particular topic may testify and state an opinion concerning

11   such matters.

12           Just like any other evidence, you may accept or

13   reject such testimony in whole or in part.  In weighing any

14   expert's testimony, you should consider the factors that

15   generally bear upon the credibility of a witness as well as

16   the expert's qualifications, such as his education,

17   experience and training, the soundness of the reasons given

18   for his opinion, and all other evidence in the case.  You

19   should not accept a witness' testimony merely because he is

20   an expert, nor should you substitute it for your own reason,

21   judgment, and common sense.  Remember that you alone

22   determine the facts in this case.  You alone decide how much

23   of a witness' testimony to believe and how much weight it

24   should be given.

25           Law Enforcement Witnesses.

1              You have heard the testimony of government agents,

2       including special agents for the Federal Bureau of

3       Investigation.  You must evaluate that testimony just like

4       any other testimony or evidence in this case in deciding

5       whether to accept it or reject it.  The fact that a witness

6       may be employed as a government agent does not mean that his

7       testimony is deserving of more or less consideration or

8       greater or less weight than that of any other witness.

9       Again, it is for you to decide whether to accept the

10      testimony of any witness and what weight, if any, to give

11      that testimony.

12              Audio Recordings and Transcripts.

13              During the trial, you heard audio recordings of

14      phone conversations featuring Mr. McLellan or certain

15      witnesses.  These recordings were admitted as exhibits and

16      are part of the evidence in this case for you to consider.

17      To assist you in listening to the recording, I allowed you to

18      have transcripts to read along as the recordings were played.

19      The transcripts were merely to help you understand what was

20      said on the recordings.  These transcripts will not be

21      available to you as evidence during your deliberations.  If

22      you believe at any point that a transcript said something

23      different from what you heard on the corresponding recording,

24      remember that it's the recording that is the evidence, not

25      the transcript.  Any time there's a variation between a

recording and its transcript, you must be guided solely by
what you heard on the recording and not what you saw on the
transcript.

Statements by the Defendant.

You have heard evidence that Mr. McLellan made
certain statements.  For instance, in e-mail conversations
and recorded phone calls and during an interview with in a
special agent with the FBI.  The government claims that in
those statements, Mr. McLellan admitted certain facts.  It is
for you to decide:  One, whether Mr. McLellan made the
statements; and two, if so, how much weight to give those
statements.  In making those decisions, you should consider
all the evidence about the statement, including the
circumstances under which the statements may have been made,
and any facts or circumstances tending to corroborate or
contradict the version of events described in the statements.

Mr. McLellan is charged in an indictment that
contains six separate counts that charge six different
crimes.  Each count will be set forth separately on the
verdict form you'll be asked to return.  You must consider
each count separately and you must return a separate verdict
as to each count.  You may find Mr. McLellan guilty of every
charge, you may find him not guilty of every charge, or you
may find him guilty of some charges and not guilty of others.
Your verdict as to each count must be unanimous and must be

1    determined solely on the evidence or lack of evidence

2    presented against Mr. McLellan on that count.

3            Exhibits and Exhibit Numbers.

4            The exhibits that have been admitted into evidence

5    for your consideration will be given to you when you retire

6    for your deliberations.  The numbers assigned to the exhibits

7    are for convenience and to ensure an orderly procedure.  You

8    should draw no inference from the fact that a particular

9    exhibit was assigned a particular number or that there may be

10   gaps in the number sequence.

11           That concludes the first part of my instructions,

12   ladies and gentlemen.  Maybe before I turn to Part II, if you

13   want to stand up and stretch for a moment, you might enjoy

14   that.  I certainly would like to do that.

15           So Part II of my instructions.  I'm going to

16   instruct you on the nature of the crimes charged in the

17   indictment and the elements of each offense that the

18   government must prove beyond a reasonable doubt.

19           Count One, Conspiracy.

20           Count One of the indictment accuses Mr. McLellan of

21   conspiring with Edward Pennings, Richard Boomgaardt, and

22   others to commit a federal crime.  Specifically, Mr. McLellan

23   is alleged to have conspired to commit the crimes of

24   securities fraud and wire fraud by agreeing to engage in a

25   scheme to defraud at least six of State Street's transition

management clients in Europe and the Middle East by applying hidden commissions to securities trades conducted on behalf of those clients in or about and between February 2010 and September 2011.

For you to find Mr. McLellan guilty of conspiracy, you must be convinced the government has proven each of the following three things beyond a reasonable doubt:

First, that an agreement to commit securities fraud and/or wire fraud existed between at least two people in or about and between February 2010 and September 2011; second, that Mr. McLellan willfully joined in that agreement; and Third, that one of the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy.

You will note that the government charged Mr. McLellan with committing offenses "on/in or about" certain specific dates.  It does not matter if the indictment charges that a specific act occurred in or around a certain date and the evidence indicates that, in fact, it was on another date.  The law only requires a substantial similarity between the date alleged in the indictment and the date established by testimony or exhibits.

A conspiracy is an agreement, spoken or unspoken, express or tacit, among two or more conspirators to accomplish a criminal or unlawful purpose.  The conspiracy

does not have to be a formal agreement or plan in which
everyone involved sat down together and worked out all the
details.  But the government must prove beyond a reasonable
doubt that those who are involved shared a general
understanding about the crime, including the object of the
conspiracy.  Similar conduct among various people or the fact
they may have associated with each other or discussed common
names and interests does not necessarily establish of proof
of the existence of a conspiracy but you may consider such
factors.

        The government does not have to prove that
Mr. McLellan agreed to commit both securities fraud and wire
fraud in order for to you find him guilty of the conspiracy
charge.  The government must, however, prove that
Mr. McLellan agreed to commit at least one of these two
crimes.  You cannot find Mr. McLellan guilty of conspiracy
unless you unanimously agree that the same federal crime was
the object of the conspiracy.  That is, to convict
Mr. McLellan of conspiracy, you all must agree that
Mr. McLellan is guilty of conspiracy to commit securities
fraud and/or you all must agree that Mr. McLellan is guilty
of conspiracy to commit wire fraud.

        To act "willfully" means to act voluntarily and
intelligently and with the specific intent that the
underlying crime be committed; that is to say, with bad

purpose, either to disobey or disregard the law, and not to act by ignorance, accident or mistake.  The government must prove two types of intent beyond a reasonable doubt before Mr. McLellan can be said to have willfully joined the conspiracy charged here: an intent to agree; and an intent, whether reasonable or not, that securities fraud and/or wire fraud be committed.  Mere presence at the scene of the crime is not alone enough, but you may consider it among other factors.  Intent may be inferred from the surrounding circumstances.

Proof that Mr. McLellan willfully joined in the agreement must be based upon evidence of his own words and/or actions.  You need not find that Mr. McLellan agreed specifically to or knew about all of the details of the crime, that he knew every other co-conspirator, that he participated in each act of the agreement, or that he played a major role in it.  However, the government must prove beyond a reasonable doubt that Mr. McLellan knew the essential features and general aims of the venture.  Even if Mr. McLellan was not part of the agreement at the very start, he can be found guilty of conspiracy if the government proves that he willfully joined the agreement later.  On the other hand, a person who has no knowledge of conspiracy but simply happens to act in way that furthers some object or purpose of the conspiracy does not thereby become a conspirator.

1          An overt act is any act knowingly committed by one

2     or more of the conspirators in an effort to accomplish some

3     purpose of the conspiracy.  The overt act itself need not be

4     illegal.  Only one overt act has to be proven.  The

5     government is not required to prove that Mr. McLellan

6     personally committed or knew about the overt act.  It is

7     sufficient if one co-conspirator comitted one overt act at

8     some time during the period of the conspiracy.

9          The government does not have to prove that the

10    conspiracy succeeded or was achieved.  The crime of

11    conspiracy is complete upon the agreement to commit the

12    underlying crime and the commission of one overt act.

13         Question 1 of the verdict form -- and this is the

14    verdict form that you will receive in the jury room, question

15    1 is here.

16         Question 1 of the verdict form asks you to decide

17    whether the government has proved beyond a reasonable doubt

18    that Mr. McLellan conspired to commit securities fraud and/or

19    wire fraud by rendering a verdict of guilty or not guilty.

20         Counts Two and Three:  Securities Fraud.

21         Count Two and Three charge Mr. McLellan with

22    securities fraud.  Congress has passed laws regulating the

23    purchase and sale of securities in the United States.

24    Section 78j subsection (b) of Title 15 of the United States

25    Code states in part:

1           "It shall be unlawful for any person directly or

2     indirectly, by the use of any means or instrumentality of

3     interstate commerce or the mails, or any facility of any

4     national securities exchange...

5           "To use or employ in connection with the purchase

6     or sale of any security registered on a national securities

7     exchange or any security not so registered... any

8     manipulative or deceptive device or contrivance in

9     contravention of such rules and regulations as the

10    [Securities and Exchange Commission] may prescribe as

11    necessary or appropriate in the public interest or for the

12    protection of investors."

13          Section 78ff subsection (a) of Title 15 provides in

14    relevant part that no person may "willfully violat[e] any

15    provision of this chapter... or any rule or regulation

16    thereunder."

17          And Rule 10b-5, a regulation adopted by the

18    Securities and Exchange Commission reads as follows:

19          "It shall be unlawful for any person, directly or

20    indirectly, by the use of any means or instrumentality of

21    interstate commerce, or of any mails or facility or national

22    securities exchange,.

23          "(a) To employ any device, scheme, or artifice to

24    defraud,

25          "(b) To make any untrue statement of a material

fact or to omit to state a material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or,

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

Elements of Securities Fraud.

Count Two alleges that Mr. McLellan violated these laws by committing securities fraud in relation to fixed income and equity securities traded on behalf of NTMA as part of a transition managed by State Street in multiple tranches, in or about between February 2011 and May 2011.

For you to find Mr. McLellan guilty of securities fraud, you must be convinced the government has proven each of the following three things beyond a reasonable doubt:

First, that in connection with the purchase or sale of one or more of the securities traded on behalf of NTMA, Mr. McLellan did at least one of the following:

One, employed a device, scheme or artifice to defraud; two, made an untrue statement of material fact or omitted to state a material fact necessary to make statements not misleading in light of the circumstances; or three, engaged in any act, practice, or course of business that operated or would operate as a fraud or deceit upon NTMA;

1          Second, that Mr. McLellan acted willfully,

2   knowingly, and with the intent to defraud; and,

3          Third, that Mr. McLellan used or caused to be used

4   any means or instruments of interstate commerce, or of the

5   mails, or of any national securities exchange in furtherance

6   of the fraudulent conduct.

7          Requirements of a Fraudulent Act.

8          With respect to the first element, it's not

9   necessary for the government to establish all three types of

10  unlawful conduct.  You may find this element satisfied if you

11  determine that the government has proven any one fraudulent

12  act, but you must be unanimous as to which type of conduct,

13  if any, has or have been proven beyond a reasonable doubt.

14  That is, to convict Mr. McLellan, you must all agree that the

15  same type of conduct described above has been proven.

16         Neither success of the scheme nor profit or benefit

17  from the scheme are elements of the crime charged.

18         In connection with the Purchase Or Sale of a

19  Security.

20         The first element of this offense requires the

21  government to prove beyond a reasonable doubt that the

22  alleged conduct was in connection with the purchase or sale

23  of a security.  This requirement is satisfied if you find

24  that Mr. McLellan's alleged conduct in some way touched upon

25  or coincided with a securities transaction; that is, that the

1    alleged fraud or deceit had some relationship to these

2    individual sales or purchases.

3                    Device, Scheme, or Artifice to Defraud.

4                    One type of unlawful conduct that the government

5    may prove beyond a reasonable doubt is the existence of a

6    device, scheme, or artifice to defraud.  A device, scheme, or

7    artifice to defraud means the forming of some invention,

8    contrivance, plan, or design to trick or to deceive in order

9    to obtain money or something of value.  A "device" is an

10   invention, a contrivance, or the result of some plan or

11   design.  A "scheme" is a design or a plan formed to

12   accomplish some purpose.  An "artifice" is an ingenious

13   contrivance or plan of some kind.

14                   Material Representation.

15                   A second type of unlawful conduct the government

16   may prove is the making of an untrue statement of a material

17   fact or the deliberate omission to state a material fact

18   necessary to make statements not misleading in light of the

19   circumstances.  A statement, claim, or document is

20   fraudulent, one, if it was false when it was made, or if it

21   was made with reckless indifference as to its truth or

22   falsity; and two, if it was made or caused to be made with an

23   intent to deceive.  A deceitful statement of half-truths or

24   the concealment of material facts may also constitute fraud

25   under the statute if such half-truth or concealment was

1    intended to be misleading.  However, there is no general

2    legal duty to disclose fixed income commissions, spreads or

3    markups or markdowns.  You may not convict Mr. McLellan

4    solely based on the taking of undisclosed revenues.

5           In deciding whether Mr. McLellan has made any

6    untrue statement of a material fact or omitted to state a

7    material fact necessary in order to make the statements made

8    not misleading, you may consider both, one, statements or

9    omissions that Mr. McLellan personally made; and two,

10   statements or omissions that Mr. McLellan caused to be made.

11          If you find that the government has established

12   beyond a reasonable doubt that a statement was false or a

13   fact fraudulently omitted, you must next determine whether

14   the fact misstated or omitted was material under the

15   circumstances.  A fact is "material" if there is a

16   substantial likelihood that a reasonable investor would

17   consider the fact important when making an investment

18   decision.  In other words, a statement contains a material

19   fact if there is a substantial likelihood that a reasonable

20   investor engaging a transition manager would view the

21   statement as significantly altering the total mix of

22   information available.  In determining whether a fact is

23   material, you may consider all of the circumstances

24   surrounding the making of the statement.  You may consider

25   the testimony of a victim as evidence in determining what

1   would be material to a hypothetical reasonable investor under

2   the circumstances.

3              Fraud or Deceit.

4              A third type of fraudulent conduct the government

5   may prove is an act, practice, or course of business that

6   operated as a fraud or deceit upon NTMA.

7              Intent.

8              The second element of the crime of securities fraud

9   the government must prove beyond a reasonable doubt is that

10  Mr. McLellan participated in the scheme to defraud knowingly,

11  willfully, and with intent to defraud.

12             An act is done "knowingly" if it is done

13  purposefully and deliberately and not because of a mistake,

14  accident, mere negligence, or some other innocent reason.

15             "Willfully" here means to act with the intent to do

16  something that the law forbids, that is to say, with a bad

17  purpose either to disobey or to disregard the law.  The

18  government need not prove that Mr. McLellan knew that he was

19  breaking any particular law or rule.  The government must

20  prove, however, that he was aware of the general wrongfulness

21  of his acts and that his acts were not due to negligence,

22  inadvertence, or mistake.

23             A person acts with "intent to defraud" if he acts

24  knowingly and with a specific intent to deceive.  In other

25  words, to act with intent to defraud means to know of the

fraudulent nature of the scheme and to act with the intent that the scheme succeed, ordinarily, but not necessarily, for the purpose of causing some loss to another or to bring some gain to oneself.

The question of whether Mr. McLellan acted knowingly, willfully, and with intent to defraud is a question of fact for you to determine, just as you determine any other fact at issue.  This question involves Mr. McLellan's state of mind and the purpose for which he acted at the time the acts in question occurred.  Direct proof of knowledge and fraudulent intent is almost never available.  It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent.  Such direct proof is not required.

Knowledge and intent, though subjective, may be proven by circumstantial evidence based upon a person's outward manifestations, his words, his conduct, his acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.  Circumstantial evidence, if believed, is of no less value than direct evidence.  Regardless of whether evidence is circumstantial or direct, the government must prove the essential elements of the crime charged beyond a reasonable doubt.

1       As I have mentioned, success is not an element of

2   the crime charged.  However, if you find that Mr. McLellan

3   did profit from the alleged scheme, you may consider that in

4   considering Mr. McLellan's state of mind.

5       Good Faith.

6       Because an essential element of securities fraud is

7   intent to defraud, if you find that Mr. McLellan acted in

8   good faith or held an honest belief that his actions were

9   proper and not in furtherance of any unlawful activity, you

10  cannot convict him of that crime.  However misleading or

11  deceptive conduct may have been, Mr. McLellan did not violate

12  the law if he acted in good faith.  False statements or

13  misrepresentations are not fraudulent unless made with

14  fraudulent intent.  Mr. McLellan has no burden to establish a

15  defense of good faith.  The burden is always on the

16  government to prove criminal intent and consequent lack of

17  good faith beyond a reasonable doubt.

18      Use of Any Instrumentalities of Interstate Commerce

19  or Any National Securities Exchange.

20      The third and final element the government must

21  prove beyond a reasonable doubt with respect to Counts Two

22  and Three is that Mr. McLellan knowingly used or caused to be

23  used either, (a), any instrumentalities of interstate

24  commerce; or, (b), a facility of a securities exchange in the

25  United States, in either case, in furtherance of the scheme

1    to defraud.

2         The term "instruments of interstate commerce"

3    include any number of means of conducting commerce or

4    communication among one or more than one state, such as

5    interstate telephone calls and e-mails.  Instrumentalities of

6    interstate commerce include the use purely within one state

7    of a telephone call, e-mail, or any other instrument used to

8    conduct interstate communications.

9         The government need not prove that Mr. McLellan was

10   directly or personally involved in using an instrumentality

11   of interstate commerce or a facility of a securities exchange

12   in the United States.  It's enough if you find that

13   Mr. McLellan, by his actions, directly or indirectly

14   initiated steps, or induced others to initiate steps, that

15   resulted in a causal chain of events resulting in the use of

16   an instrumentality of interstate commerce.

17        With regard to using instrumentalities of

18   interstate commerce like telephones or e-mail, it is not

19   necessary that whatever was communicated was fraudulent or

20   otherwise criminal or objectionable.  The matter communicated

21   may be entirely innocent so long as it is in furtherance of

22   the scheme to defraud.  The use of any instrumentality of

23   interstate commerce also need not be central to the execution

24   of the scheme.  All that is required is that use of any

25   instrumentality of interstate commerce bears some relation to

1    the object of the scheme or fraudulent conduct.

2         Some of the transactions that you heard about

3    involve trades of securities in the over-the-counter markets

4    rather than on a securities exchange.  For these types of

5    securities to be the subject of securities fraud, the

6    government must prove that the purchase or sale of such

7    securities occurred in the United States.  A purchase or sale

8    of securities occurs in the United States if, one, the seller

9    incurs irrevocable liability to deliver a security within the

10   United States, or the buyer incurs irrevocable liability to

11   pay for a security within the United States; or, two, if

12   title to the security passes within the United States.

13   Securities transactions conducted by a U.S.-based agent on

14   behalf of a foreign buyer or seller can still occur in the

15   United States even if title originates from abroad or is

16   ultimately transferred abroad at the end of a transaction.

17        Accordingly, you cannot convict Mr. McLellan on

18   Count Two unless you find the government has established all

19   three elements of securities fraud that I've just described.

20   Question 2 of the verdict form asks you to decide whether the

21   government has proved beyond a reasonable doubt that

22   Mr. McLellan committed securities fraud with respect to the

23   NTMA transition by rendering a verdict of guilty or not

24   guilty.

25        Count Three of the indictment alleges that

1    Mr. McLellan committed securities fraud in relation to the

2    fixed-income securities traded on behalf of Royal Mail as

3    part of a transition managed by State Street in or about

4    March of 2011.  You should apply the explanation of the

5    elements of securities fraud that I previously gave you with

6    respect to Count Two.  Question 3 of the verdict form, here,

7    asks you to decide whether the government proved beyond a

8    reasonable doubt that Mr. McLellan committed securities fraud

9    with respect to the Royal Mail transition by rendering a

10   verdict of guilty or not guilty.

11          Counts Four and Five:  Wire Fraud.

12          Mr. McLellan is charged in Count Four and Count

13   Five with wire fraud.  Chapter 1343 of Title 18 of the United

14   States Code prohibits "having devised or intending to devise

15   any scheme or artifice to defraud, or for obtaining money or

16   property by means of false or fraudulent pretenses,

17   representations, or promises, transmits or causes to be

18   transmitted by means of wire, radio, or television

19   communication in interstate or foreign commerce, any

20   writings, signs, signals, pictures, or sounds for the purpose

21   of executing such scheme or artifice."

22          Count Four charges Mr. McLellan with wire fraud

23   relating to an April 5, 2011 e-mail from Edward Pennings to

24   Mr. McLellan allegedly noting plans to, quote, increase the

25   spreads, quote, on trades conducted for NTMA.

1          For you to find Mr. McLellan guilty of wire fraud,

2     you must be satisfied the government has proven each of the

3     following things beyond a reasonable doubt:

4          First, that there was a scheme to defraud or obtain

5     money or property by means of false or fraudulent pretenses;

6     second, that the scheme to defraud involved a

7     misrepresentation or concealment of a material fact, or the

8     scheme to obtain money by means of false or fraudulent

9     pretenses involved a false statement, half-truth, or knowing

10    concealment concerning a material fact or matter; third, that

11    Mr. McLellan knowingly and willfully participated in this

12    scheme with the intent to defraud; and fourth, that the

13    purpose of executing the scheme or in furtherance of the

14    scheme, Mr. McLellan caused an interstate or foreign wire

15    communication to be used, or it was reasonably foreseeable

16    that for the purpose of executing the scheme or in

17    furtherance of the scheme, an interstate wire communication

18    would be used, on or about April 5, 2011 in the form of the

19    alleged e-mail from Mr. Pennings.

20         I will now explain these elements of wire fraud for

21    you in greater detail.  Please note the definitions of

22    certain terms you have already heard with respect to

23    securities fraud in Counts Two and Three may differ in

24    meaning with respect to wire fraud.

25         A "scheme" includes any plan, pattern, or course of

action.  It's not necessary the government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme or that the alleged scheme actually succeeded in defrauding anyone.  But the government must prove beyond a reasonable doubt that the scheme was substantially as charged in the indictment.

The term "defraud" means to deceive another in order to obtain money or property.  Misrepresentations amounting only to deceit are insufficient to maintain a wire fraud charge.  A scheme to defraud ordinarily is accompanied by a desire or purpose to bring about some gain or benefit to oneself or some other person or entity or by desire or purpose to cause some loss to some purpose or entity.

A scheme to defraud may be carried out by making false or fraudulent statements and representations.  You should analyze whether a statement or misrepresentation is false or fraudulent according to the instructions that I gave you with respect to Counts Two and Three for securities fraud.

The term "false and fraudulent pretenses" means any false statements or assertions that were either known to be untrue when made or made with reckless indifference to the truth or intent to defraud.  The term includes actual, direct false statements as well as half-truths and the knowing concealment of facts.

1          A fact is "material" if it has a natural tendency

2     to influence or be capable of influencing the decision of the

3     person to whom it was addressed under the circumstances.  In

4     this case, you should consider whether the fact would have a

5     natural tendency to influence or be capable of influencing

6     the decision of a reasonable investor engaging a transition

7     manager.

8          For purposes of wire fraud, a person acts

9     "knowingly" if he is conscious and aware of his actions,

10    realizes what he is doing or what is happening around him,

11    and does not act because of ignorance, mistake, or accident.

12         For the purposes of wire fraud, an act is "willful"

13    if it is done voluntarily and intentionally and with the

14    specific intent to do something the law forbids or with the

15    specific intent to fail to do something the law requires to

16    be done, that is to say, with bad purpose either to disobey

17    or disregard the law.

18         To act "with intent to defraud" means to act

19    willfully and with a specific intent to deceive or cheat for

20    the purpose of either causing some financial loss to another

21    or to bring about some financial gain to oneself.  Thus, if

22    Mr. McLellan acted in good faith, he cannot be guilty of wire

23    fraud.  Misunderstanding legal requirements or simply being

24    wrong do not preclude a finding that one's actions were

25    undertaken in good faith.  Mr. McLellan has no burden to

1    establish he acted in good faith.  Rather, the burden is

2    always on the government to prove fraudulent intent and lack

3    of good faith as well as all the other elements of the crime

4    beyond a reasonable doubt.

5         Again, intent or knowledge may not ordinarily be

6    proven directly because there is no way of directly

7    scrutinizing the workings of a human mind.  In determining

8    what Mr. McLellan knew or intended at any particular time,

9    you may consider any statements made or acts done or omitted

10   by Mr. McLellan and all other facts and circumstances

11   received in evidence that may aid in your determination of

12   Mr. McLellan's knowledge or intent.

13        Wire communications in interstate or foreign

14   commerce include a telephone communication or e-mail from one

15   state to another or between the United States and another

16   country.  The wire communication does not itself have to be

17   essential to the scheme, but it must have been made for the

18   purpose of carrying out the scheme.  There is no requirement

19   that Mr. McLellan himself was responsible for the wire

20   communication, that the wire communication itself was

21   fraudulent, or that the use of wire communication facilities

22   in interstate commerce was intended as the specific or

23   exclusive means of accomplishing the alleged fraud.  But the

24   government must prove beyond a reasonable doubt that

25   Mr. McLellan knew or could reasonably have foreseen the use

1    of a wire communication would follow in the course of the

2    scheme.  To "cause" an interstate wire communication to be

3    made is to do an act with knowledge that an interstate wire

4    communication will follow in the ordinary course of business

5    or where such communication can reasonably be foreseen.  Here

6    the government alleges an April 5, 2011 e-mail as the wire

7    communication.

8            Question 4 of the verdict form here asks you to

9    decide whether the government proved beyond a reasonable

10   doubt that Mr. McLellan committed wire fraud with respect to

11   NTMA, the April 5, 2011 e-mail, by rendering a verdict of

12   guilty or not guilty.

13           Count Five charges Mr. McLellan with wire fraud

14   relating to a June 22, 2011 e-mail from Mr. McLellan to

15   Edward Pennings allegedly directing Pennings to inform Royal

16   Mail that "inadvertent commissions" had been applied to

17   trades in the United States.  You should apply the

18   explanation of the elements of wire fraud I previously gave

19   you with respect to Count Four.  You can see we're almost

20   done.  Question 5 of the verdict form asks you to decide

21   whether the government proved beyond a reasonable doubt that

22   Mr. McLellan committed wire fraud with respect to Royal Mail,

23   June 22, 2011 e-mail, by rendering a verdict of guilty or not

24   guilty.

25           Count Six:  Wire Fraud Affecting a Financial

1    Institution.

2         Count Six charges Mr. McLellan with wire fraud

3    affecting a financial institution.  Section 1343 of Title 18

4    of the United States Code prohibits wire fraud which, quote,

5    affects a financial institution, quote.

6         Specifically, Mr. McLellan is alleged to have

7    committed wire fraud affecting both State Street Corporation

8    and AXA Equitable Life Insurance Company in connection with

9    an alleged e-mail sent from Boston, Massachusetts to New

10   York, New York, attaching a proposal to AXA to manage a

11   fixed-income transition for a fee of approximately $592,000,

12   on or about February 24, 2011.

13        For you to find Mr. McLellan guilty of wire fraud

14   affecting a financial institution, you must be satisfied the

15   government has proven each of the following things beyond a

16   reasonable doubt:

17        First, that there was a scheme to defraud or to

18   obtain money or property by means of false pretenses; second,

19   that the scheme to defraud involved the misrepresentation or

20   concealment of a material fact, or the scheme to obtain money

21   by means of false or fraudulent pretenses involved a false

22   statement, half-truth, or knowing concealment concerning a

23   material fact or matter; third, that Mr. McLellan knowingly

24   and willfully participated in this scheme with intent to

25   defraud; and fourth, that for the purpose of executing the

scheme or in furtherance of the scheme, Mr. McLellan caused

an interstate or foreign wire communication to be used, or it

was reasonably foreseeable that for the purpose of executing

the scheme or in furtherance of the scheme, an interstate

wire communication would be used, on or about the dates

alleged.  Here, the alleged wire communication is the

February 24, 2011 e-mail to AXA.

I've already explained to you the first four

elements of this count with respect to Counts Four and Five.

In order to convict Mr. McLellan, you must find the

government has proven each of these four elements beyond a

reasonable doubt.

A fifth element of Count Six requires the

government to prove beyond a reasonable doubt that the wire

fraud scheme charged in this count affected a financial

institution.  The parties agree that the government has met

its burden of proof that the conduct charged, quote, affected

a financial institution, quote.  You are instructed to find

this element satisfied.

Question 6, the last question on the verdict form,

asks you to decide whether the government proved beyond a

reasonable doubt that Mr. McLellan committed wire fraud with

respect to AXA, February 24, 2011 e-mail, affecting a

financial institution by rendering a verdict of guilty or not

guilty.

1    I've just explained to you what the government must

2    prove to establish that Mr. McLellan personally committed or

3    participated in Counts Two through Six.  There is a second

4    way the government can prove Mr. McLellan guilty of these

5    counts.

6    The second way is for the government to prove

7    beyond a reasonable doubt that Mr. McLellan aided and abetted

8    the commission of the offense.

9    To "aid and abet" means intentionally to help

10   someone else commit the charged crime.  To establish aiding

11   and abetting, the government must prove beyond a reasonable

12   doubt:

13   First, that someone else committed the charged

14   securities fraud or wire fraud; and second, that Mr. McLellan

15   conscientiously shared the other person's knowledge of the

16   securities fraud or wire fraud, intended to help the other

17   person commit the securities fraud or wire fraud, and took

18   part in the criminal endeavor seeking to make it succeed by

19   taking an affirmative act.

20   To be found guilty as an aider and abettor,

21   Mr. McLellan need not have committed the securities fraud or

22   wire fraud, been present when it was performed, or been aware

23   of the details of its execution.  But a general suspicion

24   that an unlawful act may occur or that something criminal is

25   happening is not enough.  Mere presence at the scene of the

securities fraud or wire fraud, even with knowledge that securities fraud or wire fraud is being committed, also is not sufficient to establish aiding and abetting.  But you may consider these among other factors.

I've come now to the last part of my instructions, which are much briefer -- the rules for your deliberations.

When you retire to the jury room, you will discuss the case with your fellow jurors to reach agreement, if you can do so.  The first thing you must do is select a foreperson.  This will be the first decision you make together as a jury.  The foreperson will have the same voice and the same vote as the other deliberating jurors.  The foreperson will act as the moderator of the discussion and will serve as the jury's spokesperson.  The foreperson's most important obligation is to ensure that any juror who wishes to be heard on any material issue has a full and fair opportunity to be heard by his or her fellow jurors.  Your foreperson will preside over your deliberations and will speak for you here in court.  Your foreperson's vote or opinion as to what the verdict should be is not entitled to any greater weight than that of any other member of the jury.

Your verdict must be unanimous.  All of you must agree on the verdict.

Reaching agreement.

Each of you must decide the case for yourself, but

1    you should do so only after considering all of the evidence,

2    discussing it fully with your fellow jurors, and listening to

3    the views of the other jurors.  Do not be afraid to change

4    your opinion if you think you are wrong, but do not come to a

5    decision simply because other jurors think it is right.

6            It is important you reach a verdict if you can do

7    so conscientiously.  There is no reason for you to think that

8    another jury would be better qualified than you to decide the

9    case.  If it looks at some point as if you may have

10    difficulty in reaching a unanimous verdict, and if a greater

11    number of you are agreed on a verdict, the jurors in both the

12    majority and the minority should reexamine their positions to

13    see whether they have given careful consideration and

14    sufficient weight to the evidence that has favorably

15    impressed the jurors who disagree with them.  You should not

16    hesitate to reconsider your views from time to time and to

17    change them if you are persuaded that doing so is

18    appropriate.

19            It is important that you attempt to return a

20    verdict but only if each of you can do so after having made

21    your own conscientious determination.  Do not surrender an

22    honest conviction as to the weight and effect of the evidence

23    simply to reach a verdict.

24            Communication with the Court.

25            If it becomes necessary during your deliberations

1    to communicate with me, you may send a note through the jury

2    officer outside your door.  The note must be signed by your

3    foreperson or by one or more members of the jury.  None of

4    you should ever attempt to communicate with me on anything

5    concerning the case except by a signed writing.  I will

6    communicate with any member of the jury on matters concerning

7    the case only in writing or orally here in open court.  If

8    you send out a question, I will consult with the parties

9    before answering it, and I will do so as promptly as

10   possible.  You may continue with your deliberations while

11   waiting for the answer to any question.

12           Remember that you are not to tell anyone, including

13   me, how the jury stands numerically or otherwise until after

14   you have reached a unanimous verdict or have been discharged.

15           Verdict form.

16           After you have reached a unanimous verdict, your

17   foreperson will fill in the verdict form that has been given

18   to you, sign it and date it, and advise the jury officer

19   outside your door that you are ready to return to the

20   courtroom.

21           After you return to the courtroom, your foreperson

22   will deliver the completed verdict form as directed in open

23   court.

24           Final points.

25           Members of the jury, it's now time for the case to

1   be submitted to you.  The exhibits that were admitted into

2   evidence will be sent back with you to consider in your

3   deliberations.  You will also take your written copy of this

4   charge.  I want to caution you, however, not to dwell on any

5   one particular portion of it, if you decide it review it at

6   all, because you must consider these instructions as a whole.

7   Each of you are equally entitled to read and consider the

8   written charge as you see fit.

9          When you have commenced your deliberations, all of

10  you must be together at all times when you are deliberating.

11  Whenever you need a recess for any purpose, your foreperson

12  may declare one.  Do not discuss the case during the recess

13  in your deliberations.  All discussion of the case should

14  occur only when you are all together and your foreperson has

15  indicated that deliberations may proceed.  This ensures that

16  everyone on the jury has an equal opportunity to participate

17  and to hear all of what other members of the jury have to

18  say.

19          I thank you for your attention.

20          And now before we conclude, I just need to talk to

21  the lawyers for a moment.

22          (Discussion at the sidebar.)

23          MR. WEINBERG:  I have a series of objections that

24  were largely made at the instruction conference, so I have no

25  objection if your Honor wants to excuse the jury and let me

1    list them for you.

2            THE COURT:  That's fine with me.  It's quicker.  Is

3    that all right with you?

4            MR. FRANK:  Yes, your Honor.

5            THE COURT:  Do you have anything you want me to

6    address?

7            MR. FRANK:  No.

8            THE COURT:  I'm going to explain to them about the

9    three alternates now, and then I'm going to have them go back

10   and get their stuff and then come back into the courtroom.

11           (End of discussion at sidebar.)

12           THE COURT:  So, ladies and gentlemen, you're about

13   to return to the jury room.  I now actually have my most

14   difficult task, which is to explain to you that three of your

15   number are alternates.  Juries in the United States are

16   juries of 12.  There are 15 of you.  Let me explain why we

17   have more than 12, because I think it happened at the

18   beginning of this case, one person who was one of the 16 had

19   to be excused.  And sometimes, especially in the course of a

20   trial that lasts a couple of weeks, as this one, somebody

21   gets sick, something happens, an emergency, for whatever

22   reason somebody needs to be excused from the jury.  So that's

23   why we have alternates.  But only 12 deliberate.  So all 15

24   of you can go to the jury room.  Three of you -- I won't

25   refer to you by name.  On the front row, sir, you in the last

1    seat there, and in the back row, the two of you in the last

2    two seats to my -- the far end closest to the gallery, the

3    three of you are the alternates.  So you can return to the

4    jury room to say your goodbyes and to get your whatever items

5    you had there, and then I'd ask you to return to the

6    courtroom because I have one or two instructions for you

7    before you go on your way.

8            For the remainder of you, you are the jury who will

9    in a moment will all rise, we'll send you back to the jury

10   room.  You need to wait a moment or two to commence your

11   deliberations because it will take us just five minutes or so

12   just to assemble the exhibits, send them in, and turn on the

13   TV system so you'll have everything on there.

14           All right?

15           All rise for the jury.

16           (Jury left the courtroom.)

17           THE COURT:  You can be seated.  Maybe before you

18   put those matters on the record, Mr. Weinberg, you and

19   Mr. Frank can assemble the exhibits, to the extent they're

20   not already done, maybe we can put that on the record.

21           Is everything right there?

22           MR. FRANK:  I think that's done, your Honor.

23           THE COURT:  So I guess it's ready to go.

24           MR. WEINBERG:  I would respectfully object to

25   exhibits that define the party proposing them, this is

1    Department of Justice emblem and sign, I think that can come

2    out.

3                MR. JOHNSTON:  We can remove them.

4                THE COURT:  Fine.

5                (Discussion off the record.)

6                THE COURT:  So you're both content that the

7    notebooks on top of the desk in front of Ms. Simeone can go

8    to the jury with the instructions that I read and the verdict

9    form?

10               MR. WEINBERG:  Yes, your Honor.

11               THE COURT:  All right.  Same, Mr. Frank?

12               MR. FRANK:  Yes, your Honor.

13               THE COURT:  And Ms. Simeone can turn on the JERS

14   system, and you're both agreeable to the list that's the

15   index for the JERS system, you've all seen and reviewed that?

16               MR. WEINBERG:  Yes, your Honor.

17               MR. FRANK:  Yes, your Honor.

18               THE COURT:  All right, fine.

19               I'm having -- since lunch is there, it doesn't seem

20   fair to send the alternates home without lunch, I have a

21   conference room behind the courtroom that's separate that has

22   no papers relating to any case in there, the alternates are

23   going to take their lunch, put their lunch in there, then

24   come out here.  I'll give them instructions, then I'll have

25   Ms. Simeone take them up there, they can eat their lunch if

1    they wish, and then they'll go on their way.

2              Let's just wait for them to come back in.

3              If you want to put on the record what you want to

4    put on the record now, you can, Mr. Weinberg.

5              MR. WEINBERG:  Thank you, your Honor.

6              Number one is we object to the Court's not giving

7    supplemental request and document 451 and request 1, and

8    supplemental request 437 which seek that the statements that

9    are being alleged to be the fraud have to be an affirmative

10   misrepresentation, an affirmative lie.

11             Two, we object to the absence of an adverse

12   inference instruction.

13             Three, we object to the absence of request number

14   22 and the original request --

15             (Alternate jurors entered the courtroom.)

16             THE COURT:  Hi, you can have a seat right there for

17   a minute, in the first three seats are fine.  Please be

18   seated.

19             Okay.  So, first, just matters of convenience, I

20   think you arranged, Ms. Simeone, they can --

21             THE CLERK:  They didn't want to get any lunches.

22             THE COURT:  You're all set.  If you wanted to take

23   lunch, that's fine.

24             So I want to -- two things.  First of all, I thank

25   you very much for your service because we really do need

1    alternates.  It is one of the worst parts of my job is to

2    discharge you.  You sat through the whole proceedings and

3    then we send you home to not participate in what the whole

4    proceeding has aimed at.  And I would say this.  You're

5    actually not done with your service as jurors.  I'm not

6    actually discharging you right now from your jury service.

7    And the reason is this:  It's possible still, as happens

8    sometimes, that something happens to a juror and then we

9    would need one of you.  So the instructions that I've given

10   you each day, don't discuss the case among yourselves, don't

11   discuss it with anyone else, don't do any independent

12   research, continue to apply to you.  Because it's possible

13   that -- you remain when you walk out of the courtroom

14   alternates, and it's possible that we would need your

15   service.  If we do, you will hear from us.  We'll call you

16   and ask you to come in, and then I would explain to you

17   whatever you need to know to join the deliberations.

18          Alternatively, if we don't need your service, when

19   I know we don't need your service, you will hear from us and

20   we will tell you at that point that you are discharged from

21   your jury service.

22          I really do thank you very much for your service on

23   the jury.  It is really important that citizens like yourself

24   are willing to serve, and it is really important that

25   citizens be willing to serve not only as jurors but also as

 1   alternates.  Because as occurs in the regular course of life,

 2   things happen, people can't always continue in their jury

 3   service, so your presence has helped ensure that we could

 4   reach the end, if we need your service, that we will be able

 5   to reach the end.  So I thank you very much to have your

 6   service and you're not discharged, but you're free to go on

 7   your way, and we will let you know when you are discharged.

 8           Ms. Simeone will take you out and can show you how

 9   to get to the elevator.

10           All right.  So all rise for the alternates.

11           (Alternate jurors left the courtroom.)

12           THE COURT:  You can be seated.

13           Mr. Weinberg, you can go ahead and continue.

14           MR. WEINBERG:  Thank you, your Honor.

15           So we object to the absence of instruction request

16   22, which we call the Grunewald instruction.

17           For the not giving request 2, which is that the

18   jury cannot convict based on an omission.

19           The denial of request 3 and 5, an objection to the

20   Court's instruction on the connection element of securities

21   fraud.

22           We object on page 27 to the language that coincided

23   or touched is sufficient.

24           On page 28, that the alleged false statement relate

25   to an investment decision as being too broad.

1       We object to the denial of instruction request 4

2   and 6 which deal with materiality and again tie it to the

3   buying and selling of security, and our definition of a

4   reasonable investor.

5       We object to the denial of instruction 6 and 13

6   where we ask for a definition of sophisticated investor.

7       We object on page 29 of the instructions to the

8   willfulness definition which instead of tying it to unlawful

9   acts ties it to acting -- knowingly acting wrongly.

10      We object to request -- the denial of request 10

11  which fully sets out what we consider to be the

12  extraterritoriality law regarding securities fraud counts and

13  believe that the Court's instruction did not provide the jury

14  with the guidance that's required by Morrison and other cases

15  on securities fraud, and the domestic element requirement.

16      We object to the denial of request 18 in the

17  failure to instruct on extraterritoriality regarding wire

18  fraud.

19      We object to instructions on pages 26 to 30

20  regarding securities fraud and on page 33 regarding wire

21  fraud in that the Court provided the jury with a number of

22  different options, including reckless indifference,

23  half-truth, concealment of facts, omitted statements that

24  were needed to make other statements not misleading, and

25  omissions themselves believing that they're inconsistent with

1      the government's theory of prosecution and estoppel basis

2      given that the government has stated that this is an

3      affirmative misrepresentation case.

4              We object to the Court's instruction on page 28

5      regarding consideration of victim testimony.

6              We object to the denial of supplemental request 8

7      which is the contracts replaced prior representations.

8              Object on page 22 to the Court's on or about

9      instruction which in terms of Counts Four to Six has the

10     capacity to invite conviction on the basis of conduct other

11     than the specific wires alleged.

12             And finally, on page 34, we object to the Court's

13     not instructing the sharp dealing and reliance on contract

14     can be considered as evidence of good faith.  Those matters

15     that we have requested at Docket 437, instruction 4 and

16     request 12 in our overall request for instructions.

17             Thank you very much, your Honor.

18             THE COURT:  You're welcome.

19             Anything you want to add, Mr. Frank?

20             MR. FRANK:  No, your Honor.

21             THE COURT:  All right.  So the jury has the

22     exhibits, Ms. Simeone will be back, and she'll release the

23     JERS system to them.

24             You can release the JERS.

25             THE CLERK:  They're watching the tutorial on how to

1    use it.

2              THE COURT:  Perfect.

3              If we don't hear from the jury before, then at --

4    why don't you come back at five of five.  At 5:00, I'll send

5    them home unless they then tell me they want to stay.

6              Ms. Simeone will know where to get you, Mr. Frank,

7    Mr. Johnson.

8              Are you going to stay in the building,

9    Mr. Weinberg?

10             MR. WEINBERG:  We're going to go out for a while,

11   but we'll all be within ten minutes of the building.

12             THE COURT:  Fine.  Put down your cell phones.

13             Ms. Simeone knows how to reach you in the office,

14   Mr. Frank.  Give Ms. Simeone your cell phones, too.

15             I will say that's the fastest preparation of

16   exhibits to send back to the jury in any case over which I've

17   presided, so very impressive that you had it all done.

18             (Discussion off the record.)

19             THE COURT:  The JERS has been released.

20             Anything else before we adjourn?  Okay.

21             MR. WEINBERG:  Thank you, your Honor.

22             THE COURT:  Thank you.  We're adjourned.

23             (Court in recess at 1:46 p.m.

24             and reconvened at 4:23 p.m.)

25             (The jury enters the courtroom.)

1          THE COURT:  So I understand, ladies and gentlemen,

2    you want to go home for the day, which is fine.  As I told

3    you, you're in charge of your schedule.

4          So don't discuss the case when you're outside the

5    jury room.  So don't discuss the case among yourselves

6    anymore, don't discuss the case with anyone else.  Don't do

7    any independent research.

8          I'll see you tomorrow morning.  I'll bring you in

9    at 9:00, just to confirm that you complied with those

10   instructions and send you on your way, and you'll resume your

11   deliberations.

12         THE JUROR:  We discussed, potentially, coming in a

13   little early for us.

14         THE COURT:  Yes.  You tell me that time, and I'll

15   bring you in here then.  You're in charge.

16         THE JUROR:  We thought about 8:30.

17         THE COURT:  You want me to meet you at 8:30?  I'll

18   bring you in at 8:30.  Or when you're all here --

19         THE JUROR:  We'll still do 9:00.  I don't know if

20   everyone will be here by 8:30.

21         THE COURT:  Fine.  So I'll bring you in the

22   courtroom at 9:00.  I have no objection to you commencing

23   deliberations before you come out into the courtroom,

24   provided no deliberations until all of you are there.  And I

25   will bring you out at 9:00 to confirm that everybody followed

1    my instructions.

2              Is that all right?

3              MR. WEINBERG:  Of course, Your Honor.

4              MR. FRANK:  No objection, Your Honor.

5              THE COURT:  Okay.  Fine.  Good.

6              Then, have a nice evening, all rise for the jury.

7              (The jury exits the courtroom.)

8              THE COURT:  Well, they're hard working, they want

9    to come in early.

10             MR. WEINBERG:  That's a first, right?

11             THE COURT:  So 9 o'clock, I'll bring them in just

12   to confirm that, and send them on their way.  I'll see you

13   then.

14             MR. FRANK:  So we should be here at 9 o'clock?

15             THE COURT:  I think so.  I think I'd rather not be

16   in the courtroom with the jury, without all of you.

17             MR. WEINBERG:  We'll be here?

18             THE COURT:  Okay.  Thank you.

19             (Court in recess at 4:25 p.m.)

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4        We, Rachel M. Lopez and Debra M. Joyce, Certified

5    Realtime Reporters, in and for the United States District

6    Court for the District of Massachusetts, do hereby certify

7    that pursuant to Section 753, Title 28, United States Code,

8    the foregoing pages are a true and correct transcript of the

9    stenographically reported proceedings held in the

10   above-entitled matter and that the transcript page format is

11   in conformance with the regulations of the Judicial

12   Conference of the United States.

13

14                         Dated this 25th day of June, 2018.

15

16

17

18                         /s/ RACHEL M. LOPEZ

19                         /s/ DEBRA M. JOYCE

20

21

22        _____
          Rachel M. Lopez, CRR
23        Debra M. Joyce, RMR, CRR
          Official Court Reporter
24

25