UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA )
                                )
        v.                 )          Criminal No. 16-10094-LTS
                                )
ROSS MCLELLAN,          )          **Leave to File Granted**
                                )          **On July 24, 2018**
         Defendant.      )
_____

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION FOR JUDGMENT OF ACQUITTAL
AND IN THE ALTERNATIVE FOR NEW TRIAL**

The government respectfully submits this response in opposition to the defendant's renewed motion, pursuant to Fed. R. Crim. P. 29(c) and 33, for a judgment of acquittal or, alternatively, a new trial.  Dkt. 495.  The defendant's motion, which relies largely on previously rejected legal and factual arguments, should be denied.

His renewed motion for a judgment of acquittal fails because (1) he fails to meet his burden of demonstrating that the evidence, taken in the light most favorable to the government, was insufficient to prove that the fraud was "in connection with" or "material" to the purchase and sale of securities; (2) his contention that the Court erred in instructing the jury concerning the "in connection with" requirement, allowing the jury to convict him based on conduct "untethered to the decision to purchase or sell securities," is likewise unavailing; and (3) he fails to meet his burden of demonstrating that the evidence was insufficient to prove that the bond transactions for Royal Mail were domestic securities transactions.

His motion for a new trial should be rejected because he fails to meet his burden of proving that this is an "exceptional circumstance" warranting a new trial.  His contention that the government presented an "omissions" case after disavowing that theory is untrue, as is his

suggestion that the jury instructions allowed the jury to convict him on that purportedly disavowed theory.  His extraterritoriality arguments contravene black letter law.  His contention that his conviction was infected by spillover prejudice from evidence concerning Count Six—on which he was acquitted—and that the Court erred in failing to sever that count is without merit. And his renewed contention that his due process rights were violated by his inability to obtain evidence from overseas falls far short of demonstrating that the evidence he sought was material or favorable, that it was within the power of the government to obtain, or that the government acted in bad faith, much less that this could have reasonably affected the outcome of the proceedings.

## Background

After a three-week trial, the defendant was convicted of four counts of wire fraud and securities fraud (Counts Two through Five), and one count of conspiracy to commit the same (Count One), in connection with a scheme to defraud at least six clients of State Street's transition management business in Europe, the Middle East and Africa ("EMEA").

The evidence presented at trial was overwhelming.  Two cooperating witnesses, Richard Boomgaardt and Edward Pennings—both of whom pled guilty to conspiring with the defendant to commit wire and securities fraud—testified over the course of more than a week about the fact that, with the defendant's authorization and at his direction, they had deliberately applied hidden commissions to billions of dollars' worth of securities trades while falsely representing to clients that they would act as the clients' agent and fiduciary, and would charge flat fees, or commissions lower than those actually applied.  The cooperator testimony was corroborated by, among other things: (1) emails demonstrating the defendant's involvement in, and direction of the scheme; (2) extensive documentation of the written representations State Street made to its

clients; (3) testimony by two Boston-based traders—Stephen Finocchi, a trader of U.S. fixed income securities, and Joe Dionisio, a trader of U.S. equities—that the defendant personally ordered them to apply commissions to trades and to hide those charges, in Finocchi's case by deleting the commissions from a spreadsheet sent to a State Street colleague and in Dionisio's case by falsely making the trades look as though they were executed at the volume weighted average price ("VWAP"), when in fact they were executed at a far better price; and (4) recordings of the defendant personally instructing Finocchi and Dionisio and discussing the scheme with Boomgaardt and Pennings.  Among those recordings was a pair of calls on August 26, 2011, as the conspiracy was unraveling, in which the defendant noted, among other things, the need to "come clean" and discussed possible cover stories.

The evidence also demonstrated other ways in which the defendant sought to conceal his actions from clients and from others within State Street, including (a) emails in which he directed Pennings to falsely inform one client, Royal Mail, that "inadvertent commissions" had been applied to its U.S. fixed income trades (even though McLellan had personally ordered Finocchi to apply those very commissions, and even though the conspirators had also applied even larger commissions to bonds traded in Europe), and (b) a letter from Mark Hansen, State Street's head of compliance—which McLellan had directed Pennings to draft for Hansen, and which McLellan had personally reviewed and approved—falsely representing to Royal Mail's consultant, Graham Dixon of Inalytics, that the overcharges had been applied in error and were limited to charges on U.S. securities.

The jury convicted McLellan of Counts One through Five in less than six hours, but acquitted him of Count Six, charging wire fraud affecting a financial institution, in connection

with an alleged contemporaneous scheme to defraud a New York-based insurer, Axa Equitable

Life Insurance Co., via similar commission overcharges on billions of dollars' worth of bonds.

<u>Argument</u>

I.   <u>McLellan's Motion for a Judgment of Acquittal Should be Denied</u>

In his motion for acquittal on Counts One through Three, McLellan reprises arguments

from his motions to dismiss and requests for jury instructions:  <u>first</u>, that the misrepresentations

were not "in connection with" or "material" to the purchase and sale of securities; and <u>second</u>,

that the bond transactions in Count Three were not domestic transactions.   These contentions,

which the Court has previously rejected, continue to lack merit.  McLellan also argued, as part of

his original motion for a judgment of acquittal, that the wires charged in Counts Four and Five

were not sufficiently in furtherance of the charged scheme to defraud.  This contention, too,

should be rejected.

a.   <u>Standard of Review</u>

"Defendants challenging convictions for insufficiency of evidence face an uphill battle."

<u>United States v. Knaggs</u>, 91 F. Supp. 3d 78, 81 (D. Mass. 2015) (internal alterations

incorporated).  The Court must determine "whether any rational factfinder could have found that

the evidence presented at trial, together with all reasonable inferences, viewed in the light most

favorable to the government, established each element of the particular offense beyond a

reasonable doubt."  <u>United States v. Richard</u>, 234 F.3d 763, 767 (1st Cir. 2000) (citation

omitted).

b.   There Was Sufficient Evidence that the Charged Misstatements Were
   <u>Material and "In Connection With" the Purchase and Sale of Securities</u>

McLellan argues that the securities fraud convictions cannot stand because the alleged

misstatements were not "in connection with" the purchase or sale of a security or material to an

investment decision, but were instead directed to the decision to hire State Street as a transition manager.  Dkt. 495 at 2.  That is not true.

There is no heavy burden imposed by the phrase "in connection with" in Rule 10b-5. The Supreme Court has repeatedly held that the phrase "in connection with the purchase or sale of any security," like the securities fraud statute as a whole, should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes."  SEC v. Zanford, 535 U.S. 813, 819 (2002), which is why the courts addressing the issue have held that it is at most a "modest requirement," Segal v. Fifth Third Bank, N.A., 581 F.3d 305, 310 (6th Cir. 2009), and have elucidated its meaning with synonymous phrases like "coincide[ing] with" and "touching" the purchase or sale of securities.  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006) ("Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction . . . ."); Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13 (1971) (question was whether victim "suffered an injury as a result of deceptive practices touching its sale of securities").

This Court properly instructed the jury that the element "is satisfied if you find that Mr. McLellan's alleged conduct in some way 'touched upon' or 'coincided'—that is, that the alleged fraud or deceit had some relationship to these individual sales or purchases."  Dkt. 466 at 27. And the government easily satisfied the element as instructed.  Indeed, the very machinery of the fraud was hidden commissions added to the prices of the securities.  This deceit was inextricable from the purchase and sale of those securities, insofar as the victims were misled about the price they paid for every security they bought and the price they received for every security they sold, and the fraud grew with every single purchase and sale.

The materiality element was also met.  The Court correctly instructed the jury that, to find the element satisfied, there had to be a "substantial likelihood that a reasonable investor would consider the fact important when making an investment decision.  In other words, a statement contains a material fact if there is a substantial likelihood that a reasonable investor engaging a transition manager would view the statement as significantly altering the total mix of information available."  Dkt. 466 at 2.  That instruction incorporated the longstanding materiality test for Rule 10b-5 articulated by the Supreme Court.  See Basic v. Levinson, 485 U.S. 224, 231 (1988) ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

The instruction also correctly defined the relevant investment decision as "engaging a transition manger" because hiring a transition manager necessarily involved the decision to buy and sell a particular set of securities at agreed-upon prices through a single agent.  See Lim v. Charles Schwab & Co., No. 15-CV-02074-RS, 2015 WL 7996475, at *7 (N.D. Cal. Dec. 7, 2015) ("the false promise that customers will receive the best price for their trades is material to every decision to purchase or sell a security through Schwab"); Lewis v. Scottrade, Inc., 204 F. Supp. 3d 1064, 1068 (E.D. Mo. 2016) (alleged fraud concerning order-rerouting practices was material to plaintiffs' decision "to buy or sell securities through Scottrade"); cf. SEC v. Crowe, 216 F. Supp. 3d 852, 867 (S.D. Ohio 2016) (finding "in connection with" element of 10b-5 met based on "false promise that State Street was the best venue for the pension funds' trades").  Indeed, contrary to the defendant's argument, every statement made to induce clients to choose State Street as a transition manager was simultaneously made to induce them to buy and sell securities at a specific price—because choosing State Street as a transition manager necessarily

included the decision to transact a list of securities at what the clients believed would be the

market price, or the market price plus an agreed-upon commission.

At trial, the victims testified that, based on the representations made to them, they

believed they were receiving market prices.  See Trial Tr. (June 12, 2018) at 170: (Dean

Johnson: representations of "riskless principal agency counterparty" and "flat fee" meant

"[t]here's no difference between the buy cost and the sell cost" of the securities); id. at 250:8-13

(Roul Haerden:  "best execution" means that agent will "find the cheapest bonds available that

can be bought and sold in the market" and "you pay a fee for that service"); Trial Tr. (June 13,

2018) at 35:13-17 (Ian McKnight: testifying that no commissions "means no charges being

added" when State Street "executing these trades on your behalf"); Trial Tr. (June 19, 2018) at

36:12-20 (Eugene O'Callaghan: "So I understood that there would be no commissions charged

on any of the trades . . . . And in place of the commission, in order for State Street to earn

revenue, that there would be a management fee . . . . And that that would be the only cost that we

would incur and the only revenue that State Street would earn from the transaction.").  Because it

was undisputed that State Street's role was buying and selling specified quantities of certain

securities at the clients' direction, it was perfectly acceptable for the Court to define the relevant

investment decision as a "reasonable investor engaging a transition manager."  Dkt. 466 at 28;

see United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009) ("[T]he district court has

considerable discretion in how it formulates, structures, and words its jury instructions.")

(citation omitted).

Moreover, the victims testified that the secret commissions were significant and would

have affected their decision to hire State Street in the first place.  See Trial Tr. (June 12, 2018) at

175:2-6 (Dean Johnson: "Q. To what extent would knowing that you would have been charged

1.1 million have affected your decision to hire State Street?  A. We wouldn't have hired them.");
id. at 258 (Roul Haerden: "Q. Had you know known that you would be paying this fee, would
that have affected your decision . . . whether to hire State Street as a transition manager?  A.
Yes."); Trial Tr. (June 13, 2018) at 60:19-20 (Ian McKnight: "[State Street] wouldn't have been
appointed if that was the fee."); Trial Tr. (June 19, 2018) at 52:16-21 (Eugene O'Callaghan: "If
we had known about [the secret commission], it would most certainly have changed the outcome,
because the score that would have been awarded for fees in our assessment criteria . . . for State
Street would have been materially less.").   This testimony that the victims would not have hired
State Street as their transition manager was more than sufficient for a jury to find that the
misstatements were material to their investment decisions.

    c.   There Was Sufficient Evidence that the Purchase and Sale of U.S.
         Corporate Bonds in Count 3 Were Domestic Securities Transactions

     McLellan also contends that there was insufficient evidence that the bond transactions in
the Royal Mail transition, the basis of Count Three, were domestic securities transactions.  This
contention is without merit.

     First, the jury heard multiple witnesses testify that U.S. corporate bonds, such as those
traded for Royal Mail, traded in the United States.[1]

---

[1] See, e.g., Trial Tr. (June 7, 2018) at 15:4-14 (Rick Boomgaardt: Royal Mail assets included
bonds being sold "[b]oth in the U.S. and in Europe"); Trial Tr. (June 13, 2018) at 53:10-19: (Ian
McKnight: TRACE trades at issue in Royal Mail transition are those "pertaining to US corporate credit,"
and TRACE system does not "show[] bonds that trade outside of the US"); id. at 132:4-17 (Stephen
Finocchi: testifying that Exhibit 130 was an execution report pertaining to Royal Mail of U.S. corporate
bonds that "trade in the United States").

Second, the jury heard testimony that State Street's U.S. broker-dealer entered into corporate bond trades on behalf of Royal Mail within the United States.[2]  This was because the trades at issue were riskless principal trades, which meant "for settlement purposes [the bank] sit[s] in between the market and the client."  See Trial Tr. (June 8, 2018) at 185:18-20 (Pennings).  For every riskless principal purchase or sale, there were two offsetting trades: one between the client and State Street, and one between State Street and the counterparty in the market.[3]  And, when the U.S. corporate bonds were traded on behalf of a client, State Street's Boston-based broker-dealer, State Street Global Markets, LLC, was the intermediate entity.[4]

_____

[2] Trial Tr. (June 6, 2018) at 25:2-6: (Rick Boomgaardt: trading of "U.S. stocks and bonds . . . . would still be done by our Boston trading team," even if a client is based in Europe); id. at 141:22-25 & 141:1-9 (Finocchi: testifying that he worked "in the broker-dealer unit" and would go to marketplace "to trade on behalf of State Street Global Markets LLC").

[3] Trial Tr. (June 15, 2018) at 103:17-25 (Tom Clemmenson: riskless principal trades are when they "essentially book one side of the trade and sort of flip the ticket and book the other");  Trial Tr. (June 8, 2018) at 185:20-22 (Pennings: in riskless principal trades "we face off with the market and the client faces off with us"); Trial Tr. (June 11, 2018) at 55:22-56:1 (Pennings: riskless principal means that "from a client's perspective . . . State Street was acting as the counterparty for settlement purposes and sitting in between the market and the client.  So doing back-to-back trades.").

[4] Trial Tr. (June 15, 2018) at 130:17-25 (Tom Clemmenson: "Q. . . . State Street Bank Europe is one of the transition management desks that would send orders to the broker-dealer SSGM, LLC, meaning to you, correct?  A. Yes, it was a global transition, yes, if they held U.S. dollar bonds. Q. Exactly. And they would do that on behalf of a client of State Street Bank Europe, Limited, right?  A. Yes.") Trial Tr. (June 18, 2018) at 76-77 (Scott Shaw: "Q. . . . You just testified a few moments ago that you understand that State Street Global Markets is a broker-dealer for the bank, right? A. Yes.  Q. And it performs execution services for other corporate subsidiaries of the bank, like State Street Bank Europe Limited, correct? A. Yes.  Q. And when a broker-dealer executed a trade, meaning when SSGM, LLC, executes a trade, they go to the marketplace --.  A. That's right.  Q. -- to find a counterpart for that particular trade?  A. Correct.  . . . .  Q. So in a fixed income execution, the broker-dealer goes to the marketplace, and eventually the fixed income instrument, if they're buying it, would go from a counterparty to the broker-dealer, meaning SSGM, LLC, correct?  A. There would be a trade report, yes.").

These undisputed facts, viewed in the light most favorable to the government and drawing all reasonable inferences in its favor, were sufficient for the jury to find that the purchase and sale of the bonds underlying Count Three "occurred in the United States," Dkt. 466 at 31, per the requirements of <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247, 269 (2010) (off-exchange securities transactions must have been "made in the United States"). Indeed, the fact that State Street Global Markets, a U.S. broker-dealer, was buying and selling bonds as a riskless principal is itself proof that a buyer or seller (*i.e.*, State Street Global Markets itself) incurred irrevocable liability for the transactions in question within the United States—in line with the Court's instruction. Dkt. 466 at 31.

But Royal Mail itself also incurred irrevocable liability to pay for and deliver bonds within the United States. As the Court's instruction correctly noted, "Securities transactions conducted by a U.S.-based agent on behalf of a foreign buyer or seller can still occur in the United States even in title originates from abroad, or is ultimately transferred abroad at the end of the transaction." Dkt. 466 at 31; <u>see</u> <u>Butler v. United States</u>, 992 F. Supp. 2d 165, 178 (E.D.N.Y. 2014) (securities transactions conducted by U.S-based agent were domestic); <u>Atlantic Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC</u>, 2 F. Supp. 3d 550, 560 (S.D.N.Y. 2014) (domestic transactions when plaintiffs placed orders with an agent in U.S. who transmitted orders to U.S. broker-dealer); <u>Absolute Activist Value Master Fund Ltd. v. Ficeto</u>, 677 F.3d 60, 68 (2d Cir. 2012). ("[T]he location of the broker could be relevant to the extent that the broker carries out tasks that irrevocably bind the parties to buy or sell securities."). The fact that State Street entered into bond transactions in the United States on behalf of, and at the direction of, Royal Mail was sufficient for jury to conclude that Royal Mail *committed* in the United States to deliver and pay for those bonds.

Moreover, the government went still further and elicited testimony that when a U.S. broker-dealer purchases or sells U.S. corporate bonds, those trades also settle and clear in the United States.  See Trial Tr. (June 18, 2018) at 68:15-19 (Scott Shaw: settlement "is when the actual money moves from the buyer, through to the seller, and the securities go from the seller to the buyer").  The government specifically elicited testimony that the U.S. corporate bonds in the Royal Mail transition cleared and settled in the United States.  See id. at 71:14-25 (Shaw: testifying that corporate bonds listed on the Royal Mail post-trade report settled and cleared through the National Securities Clearing Corporation in New York).  Because this exchange of money for securities occurred in the United States, the jury could reasonably find that the transfer of ownership likewise occurred in the United States, and that the bond transactions were therefore domestic transactions.

The defendant contends that because Shaw used the term "beneficial ownership," as opposed to "title," the evidence was insufficient.  This is nonsense.  Beneficial owners are "those investors who paid for, and have the right to vote and dispose of, the shares."  Perrin v. Sw. Water Co., No. CV-08-7844-DMG, 2014 WL 10979865, at *2 n.3 (C.D. Cal. July 2, 2014).[5]

---

[5] Shaw did *not* testify, as the defendant contends, that "title does not" pass to the broker-dealer. Dkt. 495 at 5.  Instead, he testified, in response to a cross-examination question about the transfer of title at settlement, that "[i]t's a little more complicated with regard to title under the way the market is structured," but that "transfer of ownership or beneficial ownership" occurs at settlement and "goes to the end customer who bought the bonds," rather than the broker-dealer, "unless [the broker-dealer is] buying for themselves." Trial Tr. (June 18, 2018) at 77-78.  Shaw thus distinguished between "beneficial" ownership and title because "record" ownership of bonds is typically in "street name."  See, e.g., Balkema v. Wachovia Sec., LLC, No. 11-412 SC, 2011 WL 2633617, at *1 (N.D. Cal. July 5, 2011) (describing "custom in the industry that when a client buys securities through a brokerage firm, the firm holds the securities in its own name (referred to as 'street name'), rather than in the client's name.  Under this arrangement, the client is the beneficial owner of the securities and the broker is the record owner of the securities. . . .  in order to allow securities to be easily transferred between parties.  By holding the securities in street name, the brokerage firm can avoid delays associated with the transfer of ownership

There is no magic to the word "title," and the case law refers interchangeably to the transfer of property *or* title.  See Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 68 (2d Cir. 2012) ("After all, a 'sale' is ordinarily defined as '[t]he transfer of *property or title* for a price.'") (citing, *inter alia*, Black's Law Dictionary  (9th ed. 2009)) (emphasis added).  In any event, "title" simply refers to "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property."  Black's Law Dictionary (10th ed. 2014).  As noted, Shaw testified that this transfer—the exchange of money for securities—occurred in the United States at the time of settlement.  He likewise testified, on cross-examination, that at settlement, "transfer of ownership or beneficial ownership" goes "to the end customer who bought the bonds."  Trial Tr. (June 18, 2018) 77:12-13, 22-24.  This was sufficient, along with all the other evidence, for the jury to conclude that the transactions occurred in the United States.

    d.  The Wires in Counts Four and Five Were In Furtherance of the Charged Fraud

In his initial motion for a judgment of acquittal, McLellan argued that there was insufficient evidence he "caused" the wires charged in Counts Four and Five to be sent, or that they were "incident to an essential part of the scheme."  Dkt. 449 at 15-17.  This argument should be rejected.  Cf. United States v. Soto, 799 F.3d 68, 92 (1st Cir. 2015) ("It is not

---

and quickly settle trades."); United Dominion Indus. Ltd. v. Commercial Intertech Corp., 943 F. Supp. 857, 866–67 (S.D. Ohio 1996) ("[T]oday, shareholders, with rare exception, no longer receive or hold stock certificates.  Titles to these certificates are held instead in nominee or 'street name' accounts. Nominee accounts involve the designation of a nominee . . .  to hold legal title to the shares.  Under a nominee arrangement, the beneficial owner retains ownership of and control over the shares but does not appear as the record owner. . . .  Shares are held by brokers or banks on behalf of customers, with legal title in the name of the broker or bank, or its nominee.").

necessary to prove that the defendant personally executed the mailings, but merely that the

defendant caused the mailing by doing some act from which it is reasonably foreseeable that the

mails will be used.  This includes knowing (or at least reasonably foreseeing) that the mail is

often used in the ordinary course of business.") (citation and internal quotation marks omitted).

"So long as there is a connection or relationship between the mailing and the fraudulent scheme

and the mailing was part of the execution of the scheme as conceived by the perpetrator at the

time, the 'in furtherance' prong is satisfied."  Id. (citation and internal quotation marks omitted).[6]

The evidence, taken in the light most favorable to the government, easily satisfied this

burden.  McLellan and his co-conspirators regularly communicated about their conspiracy via

email, with Pennings keeping McLellan informed of the progress of the conspiracy, and

McLellan directing and approving Pennings' and Boomgaardt's actions.  Pennings' April 5, 2011

email to McLellan was no different, updating McLellan that NTMA would not use State Street

for futures and that "this will increase the 'spread'" that State Street would secretly apply to this

next phase of the transition.  Pennings' email was both an update on the progress of the

conspiracy, and a request for permission from McLellan to increase the hidden charges on

NTMA.  Cf. United States v. Paone, 782 F.2d 386, 391 (2d Cir. 1986) ("in furtherance"

requirement satisfied for purposes of admitting co-conspirator statement "when a co-conspirator

is apprised of the progress of the conspiracy").

---

[6] See also Carpenter v. United States, 484 U.S. 19, 25, 108 S. Ct. 316, 320, 98 L. Ed. 2d 275
(1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we
apply the same analysis to both sets of offenses here.").

McLellan's June 22, 2011 email, in turn, in which he instructed Pennings to falsely inform Royal Mail that "inadvertent commissions" had been applied, did not occur after "the main objectives of the alleged fraud conspiracy had been achieved," as McLellan contends, but—taken in the light most favorable to the government—was intended to prevent the fraud from being discovered, and thereby to allow the co-conspirators to keep the $2 million in European commissions they had secretly charged Royal Mail, and to continue defrauding other clients.  See United States v. Pimental, 380 F.3d 575, 588 (1st Cir. 2004) ("[L]ulling the victim into a false sense of security contributes to the prevention of the scheme's detection by making detection of the scheme less likely. This is sufficient to satisfy the 'in furtherance of' requirement of the mail fraud statute.").

II.     The Defendant's Motion for a New Trial
        Should Be Denied

A.  Applicable Law

Federal Rule of Criminal Procedure 33(a) provides that a court may grant a defendant's motion for new trial "if the interest of justice so requires."  Id.  Such a remedy is to be used "only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict."  United States v. Merlino, 592 F.3d at 32 (further citation omitted).  The court is permitted to weigh evidence and credibility; however, absent exceptional circumstances, the court should defer to the jury's findings.  United States v. Thrower, 746 F. Supp. 2d 303, 307 (D. Mass. 2010).

B.  <u>The Jury Instructions Did Not Permit Conviction on Improper Bases</u>

a.  <u>Omissions</u>

The defendant's contention that the jury instructions "expressly allow[ed] the jury to convict" him based on "half-truth and misleading statement theories" that the government previously disclaimed, Dkt. 495 at 11, is without merit.

<u>First</u>, the government never disavowed a theory of guilt based on half-truths and misleading statements, as the defendant suggests.  Rather, in responding to the *defendant's* repeated attempts to turn this into a case about a failure to disclose commissions in the face of a legal duty, the government made clear that it was instead a case about a deliberate effort to mislead State Street's clients about what they would be charged for securities trades.  In support of his argument, the defendant quotes the government's brief in opposition to his motion to sever Count Six, Dkt. 495 at 7, but his use of ellipses and sentence fragments is telling.  The full quote from the government's response is as follows:

> McLellan's contention that a "meaningfully distinct legal and regulatory regime" governed his interactions with [AXA] and the interactions he directed with State Street's EMEA clients is a red herring. Despite McLellan's best efforts to turn this into an omissions case, this is a case about *affirmative* misrepresentations that McLellan personally made or directed. *Accordingly, McLellan's defense "based on differences between the relevant laws, procedures, practices, and the reasonable expectations of sophisticated clients and their consultants and attorneys in EMEA and the U.S.," Dkt. 292 at 6, is a non-starter under both the original indictment and the superseding indictment. Regardless of what disclosures are required under the laws in Europe and those in the United States,* no legal or regulatory regime permits bankers to affirmatively lie. That is what McLellan is charged with doing.

Dkt. 298 at 6 (second emphasis added).  The context makes clear that the government was simply rejecting the defendant's effort to frame the case as about omissions in the face of a legal duty to disclose, and arguing instead that the case was about misstatements intended to mislead

State Street's clients into thinking the bank would charge them one price even as the defendant

and his co-conspirators intended to charge them another.[7]

The government's theory of the case was not "newfound" in the face of some unexpected

defense argument "as trial unfolded," as McLellan absurdly contends.  Dkt. 495 at 8.  And the

Court should likewise reject the defendant's contention that he "spent the three months prior to

trial" under a mistaken belief, "based on the government's own representations to the Court, that

he would be able to" argue that "State Street's statements about flat fees were true and therefore

could not support conviction."  Id. at 12.  The government's theory was clear from the outset of

the case, and the defendant can hardly claim to have been confused.  Indeed, in June 2017—a

full *year* before trial—the government, in its response to the defendant's pretrial motions, noted

that, "notwithstanding McLellan's repeated attempts to turn it into one—this is not an omissions

case, in which State Street promised customers an implementation shortfall, *while remaining*

*silent as to how much it would charge for its services. Instead, McLellan is charged with*

*defrauding clients by agreeing to specific fees for transitions and then adding hidden*

*commissions into the price of securities trades conducted as part of those transitions that were*

---

[7] The government's prediction was borne out when the defendant called, as one of two witnesses in his case-in-chief, an expert who testified that there is no legal requirement in the United States for broker-dealers to disclose markups on riskless principal trades.  See Trial Tr. (June 19, 2018) at 150:21-151:4.  The defendant also successfully argued for the inclusion in the jury instructions of a reference to the absence of such a legal duty.  See, e.g., Trial Tr. (June 25, 2018) at 139:1-4 ("[T]here is no general legal duty to disclose fixed income commissions, spreads or markups or markdowns. You may not convict Mr. McLellan solely based on the taking of undisclosed revenues.").  And McLellan's counsel repeatedly argued in closing that the contracts between State Street and its clients imposed no such duty either.  See e.g., id. at 71:5-7 ("There's a specific clause in the contact between Royal Mail and State Street, no duty to disclose."); id. at 76:23-25 ("What also stays in is the clause of the contract saying there's no duty on the broker-dealer to disclose the markups to the clients.").

*over and above the agreed-upon fees.*"  Dkt. 170 at 44 (emphasis added).  Later, in a filing

several weeks prior to trial, the government again noted—this time in response to a defense

motion to exclude evidence of concealment:

> The omissions theory the government has disclaimed is silence in
> light a duty to disclose: "[T]his is not an omissions case, in which
> State Street promised customers an implementation shortfall, while
> remaining silent as to how much it would charge for its services."
> Dkt. 170. Omitting a material fact designed to make an uttered
> statement misleading is an affirmative misrepresentation within the
> heartland of the government's theory.  See United States v.
> Weimert, 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he concept of
> misrepresentation is [] broad, reaching not only false statements of
> fact but also misleading half-truths and knowingly false
> promises."); United States v. Kone, 303 F. App'x 38, 40 (2d Cir.
> 2008) (noting that an affirmative misrepresentation theory
> encompasses "half truths" and the omission of "facts necessary to
> make the statements made, in light of the circumstances under
> which they were made, not misleading").

Dkt. 354 at 9 n. 4.

   The government's distinction between an omissions case and an affirmative

misstatements case did not rely on some obscure terminology.  Rather, the government explained

exactly what it meant at the time it used those terms, and it used them in an utterly standard way,

with the former limited to silence in the face of a legal duty to disclose, and the latter

encompassing half-truths and statements that are deliberately false or misleading by virtue of

what they do not say.  As the case law makes clear, "[a]n omissions case is where the defendant

does not speak about the fraud at all (he omits everything).  In an omissions case a defendant

may commit fraud by mere silence, but only if an independent duty to speak exists."  United

States v. Spanier, No. 16-CR-1545-BEN, 2017 WL 1336998, at *2 (S.D. Cal. Apr. 7, 2017).  "*In

contrast to an omissions case*, in a half-truths case the duty to disclose arises from the truth

already half-spoken."  Id. (emphasis added); see also id. (noting that "common law fraud has

long encompassed certain misrepresentations by omission.  It can also include half-truths.")

(further citation omitted); United State v. Sumeru, 449 F. App'x 617, 622 (9th Cir. 2011) (half-

truths, where materials facts were concealed or omitted alongside other statements, are

affirmative misrepresentations); United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000)

(affirmative misrepresentations include failures to disclose alongside other statements).[8]

    Second, the defendant's contention that the government argued a "straightforward

omissions theory of fraud" at trial, Dkt. 495 at 8, is untrue.  The government repeatedly argued

that the representations State Street made to its clients, at the defendant's direction, were

affirmatively false.  For example, the government noted in opening that the evidence would show

that "[t]hey promised one price and they secretly charged another."  Trial Tr. (June 5, 2018) at

---

[8] McLellan attempts to distinguish Spanier on the basis that it arose "in the context of countering the defendant's argument that he was under no duty to disclose the information at issue," noting:  "The court rejected this contention, reasoning that 'the duty to disclose arises from the truth already half-spoken.'"  Dkt. 495 at 11 (quoting Spanier, 2017 WL 1336998 at 2).  That, of course, is precisely the point.  As the Spanier Court noted, quoting Benjamin Franklin:  "Half the Truth is often a great Lie." 2017 WL 1336998 at 1 (citation omitted).  The Court went on to distinguish between "spoken half-truths"—affirmative statements designed to mislead even in the absence of "a formal or informal special relationship giving rise to a duty to speak"—and omissions, defined as "complete silence" in the face of an "independent duty to speak."  See generally id.  The cases the defendant cites are not to the contrary. In Capri Optics Profit Sharing v. Digital Equip. Corp., for example, the court did not purport to distinguish between an "omissions" case and an "affirmative misstatements" case.  Rather, it simply acknowledged that the plaintiff had narrowed its misstatements theory to an argument that the "statements were false in themselves," and not that the defendant "had a duty to supply omitted matter in order to prevent possible misleading."  950 F.2d 5, 7-8 (1st Cir. 1991).  Likewise, the mere fact that McLellan can find other cases in which the words "omit" or "omission" are used in the context of a half-truth theory does not transform those cases into "omissions" cases.  McLellan's sophisticated counsel plainly understood what the government meant when it distinguished between an omissions case and an affirmative misstatements case, and McLellan's effort to play word games should be rejected.  Cf., e.g., Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 479 (4th Cir. 2011) (Wynn, J., concurring) ("I agree with the majority that affirmative (mis)statements or half-truths can serve as the basis for 10b–5 liability.  But so can omissions—that is, the failure to disclose material facts that the plaintiffs have the right to know.") (alteration and internal quotation marks omitted).

26:3-4.  It noted that "once they succeeded in luring clients in with a low price and a promise to put the client's interest first, they did exactly the opposite. They tacked on secret commissions that the clients couldn't see. . . ."  Id. at 31:8-11.  And it argued that the affirmative misrepresentations were not limited to fees alone, but also extended to false representations that State Street would act as its clients' agent and fiduciary.  See, e.g., id. at 30:21-24 ("they also promised to act in their client's best interest, to act as their agent, and to represent them in getting the best price for their stocks and their bonds").

Third, while McLellan argues that the Court should have given a different instruction— avoiding any reference to "omissions," and "prohibit[ing] the jury from conviction Mr. McLellan based on a mere 'failure to disclose relevant facts,'" Dkt. 495 at 9, he does not—because he cannot—argue that the instruction the Court actually gave was erroneous.  That instruction, which quoted the language of Rule 10b-5, was essentially a standard securities fraud instruction. And to the extent the Court deviated from a standard instruction, it did so at the defendant's request by specifically advising the jury of the absence of a "general legal duty to disclose fixed income commissions, spreads or markups or markdowns" and admonishing them that they could "not convict Mr. McLellan solely based on the taking of undisclosed revenues."  Trial Tr. (June 25, 2018) at 139:1-4.  Accordingly, the Court did advise the jury that it could not convict the defendant on an omissions theory—based on silence in the face of a duty to disclose—the only theory that the government had actually "disclaimed."[9]

_____

[9] Likewise, McLellan's argument that, with a different instruction, the defense "would have had a strong counter-argument that State Street's representations regarding the flat fees to be charged were, in fact, true," Dkt. 495 at 12, is frivolous.  For example, McLellan contends, by way of example, that "the RFP responses and transition notices quoting flat fees were not false in themselves."  Id. at 13.  Yet as the government pointed out in closing (contrary to the defendant's contention that "the government has not

19

b.  Extraterritoriality — Wire Fraud

The defendant next argues the court erred in its wire fraud instruction by declining to instruct the jury that the wire fraud conduct had to be domestic in nature.  The defendant's requested instruction sought to add requirements that are unnecessary under controlling First Circuit and Supreme Court law.  Moreover, the very suggestion that the defendant's conduct was not domestic is frivolous:  the defendant directed the scheme from Boston; employed State Street's Boston-based broker-dealer in the execution of the scheme; directed the actions of Boston-based traders and other State Street employees as part of the scheme; and communicated with his co-conspirators from Boston over wires to and from the United States.

The touchstone for the scope of the wire fraud statute is the use of U.S. wires that affect interstate or foreign commerce.[10]  So long as U.S. wires are used to execute a scheme to defraud,

_____

argued otherwise," id.), McLellan *himself* was recorded on August 26, 2011 telling his co-conspirators that their response to the Royal Mail RFP did not give them "a leg to stand on."  The government argued:

> "We don't have a leg to stand on."  Those are Ross McLellan's words, not based on Ed Pennings' e-mails with Ian McKnight, not based on any missile in the night, as Mr. Weinberg put it in opening, based on the RFP. The proposal State Street had submitted, where they had promised a flat management fee and no commissions, where they promised to be Royal Mail's agent and fiduciary, where they promised to put its interest ahead of their own. The same promises as the defendant knew they always made, and that they had made to each and every one of the clients they had defrauded.

Trial Tr. (June 25, 2018) at 41:25-42:9.

[10] See, e.g., United States v. Garlick, 240 F. 3d 789, 792–93 (9th Cir. 2001) (focus of the mail and wire fraud statutes is the misuse of the instrumentality of communication); United States v. Trapilo, 130 F.3d 547, 552 (2d Cir. 1997) ("What is proscribed is the use of telecommunications systems of the United States in furtherance of a scheme whereby one intends to defraud another of property."); United States v. Monostra, 125 F.3d 183, 187 (3d Cir. 1997) (mail and wire fraud statutes are "directed at the instrumentalities of fraud").

the conduct falls within the statute's reach.   See, e.g., United States v. Hayes, 99 F. Supp. 3d 409, 420 (S.D.N.Y. 2015) (presumption against extraterritoriality "irrelevant" to wire fraud and conspiracy charges where "co-conspirators purportedly caused the manipulated LIBOR to be published to servers in the United States and used United States wires to memorialize trades affected by that rate"); United States v. Allen, 160 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (no extraterritorial application of wire fraud statute where "indictment charged that the wires used to settle payments under interest rate swap contracts, and wires that Thomson used to publish LIBOR to subscribers in New York, originated or terminated in New York").   And the Court correctly instructed the jury on this point.   See Dkt. 466 at 36 ("Wire communications in interstate or foreign commerce include a telephone communication or email from one state to another, or between the United States and another country.").

The Court's instruction was in line with First Circuit precedent.   In United States v. Lyons, the court considered the phrase "in interstate or foreign commerce" in the Wire Act, 18 U.S.C. § 1084—language identical to that used in Section 1343—and held that "transmissions between the United States and a foreign country" are sufficient to bring conduct within the statute's scope.   740 F.3d 702, 718 (1st Cir. 2014); see also United States v. Georgiou, 777 F.3d 125, 138 (3rd Cir. 2015) (affirming wire fraud conviction when there were foreign victims and wires between the United States and other countries).   The charged conduct in Lyons was offshore gambling, but because "[t]he communications giving rise to these convictions had at least one participant inside the United States . . . [they] fall within the statute's scope."   740 F.3d at 718.   The same analysis applies to the wire fraud in this case: because the emails underlying

Counts Four and Five involved one participant in the United States, and were in furtherance of a

scheme to defraud, they fell within the scope of the wire fraud statute.[11]

Controlling Supreme Court authority dictates the same outcome.  In <u>Pasquantino v.</u>

<u>United States</u>, 544 U.S. 349 (2005), the Supreme Court affirmed a conviction under the wire

fraud statute where the defendants smuggled alcohol into Canada from the U.S. to avoid paying

taxes to the Canadian government.  <u>See</u> <u>id.</u> at 371 ("T[he] domestic element of petitioner's

conduct is what the government is punishing . . . when it prosecutes a scheme to defraud a

foreign individual or corporation, or a foreign government acting as a market participant.").

Even though the misrepresentations underlying the scheme to defraud—failing to list on customs

forms that the defendants had goods to declare—occurred in Canada, and the relevant property

right turned on Canadian law, the defendants' conduct was chargeable in the United States

because they had used telephones in New York to place orders with a discount liquor store in

Maryland, thus employing domestic wires in furtherance of the scheme.  <u>Id.</u> at 353.

Accordingly, neither the location of the misrepresentations nor the location of the victim

mattered because wires integral to the scheme passed through the United States.

The defendant correctly points out that the Supreme Court clarified that the scheme in

<u>Pasquantino</u> was executed in the United States and that its "interpretation of the wire fraud

statute does not give it extraterritorial effect."  Dkt. 495 at 15 (citing <u>Pasquantino</u>, 544 U.S. at

371).  But neither did this Court's jury instruction.  It stated that the wire in furtherance of the

---

[11] The defendant suggests that the Court "should not follow" <u>Lyons</u>.  Dkt. 495 at 14.  But it is not
for a district court to reject circuit precedent it may disagree with.  <u>See</u> <u>Eulitt v. Me. Dep't of Educ.</u>, 386
F.3d 344, 349 (1st Cir. 2004) ("Until a court of appeals revokes a binding precedent, a district court
within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute
by supervening authority.").

fraud had to be sent between two states or between the United States and foreign country—the essence of what it means to execute a fraudulent scheme domestically.

In his bid to fault the Court's jury instructions, the defendant tries to cobble together a requirement from inapposite cases.  For example, he cites <u>RJR Nabisco, Inc. v. European Community</u>, 136 S. Ct. 2090 (2016), for the uncontroversial proposition that "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if the conduct occurred abroad."  <u>Id</u>. at 2101.  But that simply begs the question of the statute's focus.  In <u>RJR Nabsico</u>, the Supreme Court accepted without comment the Second Circuit's conclusion that the mail and wire fraud offenses alleged as predicates for a private racketeering complaint *were* "committed within the United States."  <u>Id</u>. at 2099.  The Second Circuit, in turn, concluded that it "need not now decide precisely how to draw the line between domestic and extraterritorial applications of the wire fraud statute . . . because wherever that line should be drawn, the conduct alleged here clearly states a domestic cause of action."  <u>European Cmty. v. RJR Nabisco, Inc.</u>, 764 F.3d 129, 142 (2d Cir. 2014), <u>rev'd and remanded</u>, 136 S. Ct. 2090 (2016).

The defendant likewise plucks language from <u>United States v. Brien</u>—a nearly four-decade-old opinion—in support of the proposition that the wire fraud statutes focuses "on the scheme, not on the implementation of it."  617 F.2d 299, 307 (1st Cir. 1980).  In <u>Brien</u>, however, the court was not assessing the territorial reach of the wire fraud statute, but rather whether the "it" was the alleged "scheme," or specific mailings or wires, that determined the scope of a

search warrant.  Lyons, by contrast, demonstrates that when assessing extraterritoriality, the First

Circuit focuses on the wires themselves.  740 F.3d at 718.[12]

In any event, even if the Court erred in instructing the jury—which it did *not*—any error

was harmless.  See United States v. DiMasi, 817 F. Supp. 2d 9, 14 (D. Mass. 2011); United

States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012) ("Even an incorrect instruction to which an

objection has been preserved will not require us to set aside a verdict if the error is harmless.").

Had the Court given the defendant's requested instruction—adding requirements that the

"fraudulent scheme involved a substantial amount of conduct in the United States" and that "the

conduct in the United States was integral to the commission of the fraud"—the outcome would

have been the same.  The jury heard abundant evidence that the defendant gave orders

concerning the execution and concealment of the scheme from Boston, consulted with and

---

[12]   The remaining out-of-circuit district court cases the defendant cites acknowledge the lack of
binding authority supporting the more stringent test those courts applied.  See United States v. Gasperini,
No. 16-CR-441 (NGG), 2017 WL 2399693, at *7 (E.D.N.Y. June 1, 2017) ("The limited number of
opinions attempting to discern the 'focus' of the wire fraud statute generally break into two camps: those
emphasizing the 'wires' and those looking to the 'fraud.'"); United States v. All Assets Held at Bank
Julius, 251 F. Supp. 3d 82, 102 (D.D.C. 2017) ("The Court has found little precedent regarding how much
of the scheme must occur in the United States to constitute a domestic application of the wire fraud
statute."); Elsevier, Inc. v. Grossman, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016) ("It is not entirely clear
what sort of domestic conduct is "relevant" to this statutory focus.").  And the defendant simply ignores
decisions declining to adopt a more stringent test, including decisions in the very districts he references.
See e.g., United States v. Hussain, No. 16-cr-00462-CRB-1, 2017 WL 4865562, at *5 (N.D. Cal. Oct. 27,
2017) (concluding that "the Ninth Circuit would hold that the use of the wires is the conduct relevant to
the focus of that statute for the purpose of determining whether a particular application is extraterritorial,"
and that "[s]o long as the government identifies a domestic wire transmission, the statute is not
improperly extraterritorial in its application"); United States v. Hawit, No. 15-CR-252 (PKC), 2017 WL
663542, at *5 (E.D.N.Y. Feb. 17, 2017) ("at this stage the Court need not, and declines to, articulate a
general test for whether a given application of the wire fraud statute is extraterritorial or domestic");
United States v. Hayes, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) ("Darin's argument that the location of
the wires is 'ancillary' to the location of the scheme to defraud must, therefore, be rejected because the
location of the wires is the Court's primary concern.").

approved the actions of his co-conspirators via emails from Boston, directed traders in the United

States to add secret commissions to U.S. stocks and bonds, and utilized State Street's U.S.-based

broker-dealer to execute the scheme.

> c. <u>Extraterritoriality – Securities Fraud</u>

The defendant similarly contends that the <u>Morrison</u> instruction provided insufficient

guidance for the jury to decide where the securities transactions occurred.  Yet, as already noted,

the instruction accurately told the jury that in order to find a domestic transaction, it had to

conclude either that "the seller incurs irrevocable liability to deliver a security within the United

States, or the buyer incurs irrevocable liability to pay for a security within the United States or

. . . title to the security passes within the United States."  Dkt. 466 at 21.

A multi-factor test was unnecessary where, as here, U.S. corporate bonds were traded

through a U.S. broker-dealer and the trades cleared and settled in the United States.  As the

government has previously noted, the cases that have relied on multi-factor tests concerned

bespoke or non-standard securities and private placement offerings that were not traded through

U.S.-based broker-dealers or market makers. <u>See, e.g.</u>, <u>United States v. Vilar</u>, 729 F.3d 62, 76-77

(2d Cir. 2013) (involving "Guaranteed Fixed Rate Deposit Accounts" that were exclusively

offered by defendants' investment advisor); <u>Absolute Activist Value Master Fund Ltd. v. Ficeto</u>,

677 F.3d 60, 63 (2d Cir. 2012) (involving "private investment in public equity ('PIPE')

transactions"); <u>Sec. & Exch. Comm'n v. Yin Nan Michael Wang</u>, 2015 WL 12656906, at *2

(C.D. Cal. Aug. 18, 2015) (involving investment vehicles that "solicited investors through

Private Placement Memoranda ('PPMs')").  And none of those cases addressed the relevant jury

instruction.  Indeed, the defendant has not identified *a single court* that has given the instruction

he sought.

This Court "adequately illuminate[d] the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury," United States v. DeStefano, 59 F.3d 1, 3 (1st Cir. 1995), by instructing them that the transaction had to occur in the United States, either by passing title or incurring irremovable liability.  More was not required.  See United States v. De La Cruz, 835 F.3d 1, 12 (1st Cir. 2016) ("A trial court is obliged to inform the jury about the applicable law, but, within wide limits, the method and manner in which the judge carries out this obligation is left to his or her discretion.") (citation omitted).

Moreover, as with the wire fraud instruction, any instructional error was harmless.  The multi-factor test the defendant proposed—"facts relating to the formation of the purchase or sale agreement, where the purchase or sale orders are placed, where title to the security is passed, and where the monies involved in the purchase or sale changed hands," Dkt. 362 at 16—cut overwhelmingly in the government's favor.  With respect to the U.S. bonds underlying Count Three, the evidence made established that the purchase and sale orders were placed by State Street Global Markets in Boston, change of ownership occurred in New York, and the money changed hands at settlement, also in New York.  Indeed, the defendant did not even attempt to persuade the jury in closing that the government had not satisfied the Morrison standard as set forth in the Court's instruction.  The inclusion of additional instructions would not have changed anything.[13]

---

[13] To the extent the defendant repeats arguments made in his related motion for acquittal concerning the "in connection with" and materiality instructions, those arguments should be rejected for the reasons discussed above.

C.  There Was No Spillover Prejudice and the Denial of the
Defendant's Severance Motion Was Not Error

McLellan next argues that he suffered spillover prejudice from the fact that the Court

declined to sever Count Six—the alleged fraud against AXA—notwithstanding the fact that the

jury acquitted him on that count.  McLellan's argument is frivolous and, in any event, falls far

short of meeting his burden of demonstrating a miscarriage of justice sufficient to warrant a new

trial.

First, McLellan's contention that there was little evidentiary overlap between Count Six

and the remaining counts, Dkt. 495 at 21, is incorrect.  As McLellan himself acknowledges,

Pennings—one of the government's two cooperating witnesses—testified that the defendant

made a contemporaneous admission to him about the intentional overcharging of AXA.  Id. at

22.[14]  And the evidentiary overlap was not limited to this testimony.  For example, prior to trial,

the government noted as follows:

> [T]he government intends to call as witnesses two fixed-income
> traders who were involved in the trading of bonds for both [AXA]
> and other alleged victims. Their testimony will provide important
> evidence about the domestic and foreign frauds, and will establish
> the common nature of the schemes, including, *inter alia*, the fact
> that McLellan personally directed them to charge hidden
> commissions in contravention of the written trading instructions
> they received for the transitions conducted for the U.S. Insurance
> Company and the EMEA victims; that the receipt of such
> instructions from McLellan was highly unusual; and that the
> charging of hidden commissions was unprecedented in their
> experience at State Street and contrary to their understanding of
> how the bank charged its customers.

---

[14] The fact that McLellan's counsel, by his own account, did not "deem" this testimony
"sufficiently prejudicial to address during the defense summation," id., simply underscores the lack of
merit in his contention that he suffered spillover prejudice from the AXA evidence.

Dkt. 392 at 2.  At trial, the government did exactly that, calling two U.S. fixed-income traders,

Stephen Finocchi and Tom Clemmenson, both of whom were involved in the transitions for

AXA and for the other victims, and both of whom testified (1) that McLellan personally directed

them to charge hidden commissions in contravention of the written trading instructions they

received; (2) that the receipt of such instructions from McLellan was highly unusual; and (3) that

the charging of hidden commissions was unprecedented in their experience at State Street and

contrary to their understanding of how the bank charged its customers, thus establishing the

common nature of the schemes.  See, e.g., Trial Tr. (June 13, 2018) at 116:17-19; 129:12-17;

130:7-131:6; Trial Tr. (June 15, 2018) at 93:21-25; 99:6-11; 105:16-19; 110:5-7.  Likewise, the

government called an FBI agent, Michael McGillicuddy, to testify about admissions McLellan

made in a 2012 interview about State Street's charging practices, and it called another agent,

Garett Trombly, to introduce additional emails relevant to both the AXA fraud and the European

victims.  More broadly, the government introduced general background testimony concerning

"the nature and operation of the transition management business, the business context in which

the defendant committed the alleged frauds, and his motives," all of which was "relevant and

overlapping," with respect to Count Six and the remaining counts.  Dkt. 392 at 2.  Boomgaardt,

for example, testified at length concerning the operation of the transition management industry,

the definition of key terms, and State Street's practices in that business, as well as about the

bank's practices with respect to the awarding of discretionary bonuses.  Pennings testified that

State Street's description of itself as "agent" and "fiduciary" in responses to requests for proposal

and other documents provided to clients was common throughout the different regions the

defendant oversaw, and that the defendant was familiar with these materials.  See, e.g., Trial Tr.

(June 8, 2018) at 91:14-92:3.  Accordingly, contrary to the defendant's contention, the

government's pretrial prediction that there would be witnesses in common between Count Six and the remaining counts was borne out at trial, as was its prediction that "few, if any, additional witnesses [would] be required to prove" Count Six.  Dkt. 298 at 6.  Indeed, the three "additional" witnesses the government called—transition manager Kristen Morris, trader Tom Clemmenson, and a victim-witness, James Kelly—all testified in the course of a single day.  See Trial Tr. (June 15, 2018).

Second, even had the evidentiary overlap not been as extensive as it was, and even were Count Six not formally joined to the remaining counts, the Court correctly noted that much of the evidence concerning Count Six would likely have been admissible at a trial of the remaining counts (and vice versa) pursuant to Federal Rules of Evidence 404(b) and 403.  Dkt. 306 at 3.  In this regard, McLellan specifically challenges the government's rebuttal argument that the jury should reject his contention "that any fraud had been committed by Pennings without his knowledge . . . in light of Mr. McLellan's alleged involvement in the AXA fraud."  Dkt. 495 at 22.  But the government's rebuttal was *precisely* the kind of argument about knowledge, the absence of mistake, and a common scheme or *modus operandi* that is permitted by Rule 404(b).  Cf. United States v. Grey, 891 F.3d 1054, 1060 (D.C. Cir. 2018) ("the fact that [defendant] engaged in similar conduct around the same time as the charged conduct was probative of his state of mind"); United States v. Rutkoske, 506 F.3d 170, 178 (2d Cir. 2007) (affirming district court's conclusion that "if [defendant] argued a lack of knowledge at trial, which he did, the probative value of the other acts evidence would greatly increase, such that the balance under Rule 403 would shift considerably in favor of admissibility") (further quotation marks and internal alterations omitted); United States v. Hollis, 971 F.2d 1441, 1457 (10th Cir. 1992), cert.

denied, 507 U.S. 985 (1993) ("evidence of similar conduct would likely have been admissible anyway under Fed. R. Evid. 404(b), as showing intent or lack of mistake, etc.").[15]

Third, McLellan's contention that his convictions were tainted by spillover prejudice from Count Six is, in any event, speculative and implausible. Indeed, merely to recite his argument—that he was convicted of Counts One through Five based on evidence that, by his own account, was insufficient to convict him of Count Six—is to refute it. The evidence concerning the counts of conviction was, as noted, overwhelming, and to the extent there is any conclusion to be drawn from his acquittal on the remaining count, it is that he was *not* prejudiced by that evidence. See United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991) ("Since Natanel was acquitted on all counts save count 18, it is hard to envision how the joinder of counts might have prejudiced him. The appellant speculates that he was hurt by evidentiary spillover—but the jury's demonstrated selectivity affords a reasonably good assurance that no injurious spillover effect occurred."); United States v. Drougas, 748 F.2d 8, 19 (1st Cir. 1984) ("DeFeo's claim of spillover prejudice is more difficult to comprehend since he was acquitted of the substantive charges relating to the second smuggle. . . . The evidence amply supports DeFeo's conviction for his part in the first smuggle, and we find no error in the trial court's denial of severance."). Cf. United States v. Edgar, 82 F.3d 499, 505 (1st Cir. 1996) (noting that

---

[15] The defendant's reliance on United States v. Robles-Alvarez, 874 F.3d 46 (1st Cir. 2017), is misplaced. In that case, the court *admitted* evidence of the defendant's drug smuggling trip to Antigua as "intrinsic" to the charged crime because it was "part of the necessary description of the events leading up to the crime" and helped to establish "the background, formation, and development of the illegal relationship, and . . . the basis for the co-conspirators' relationship of mutual trust," id. at 51 (internal quotation marks omitted). But the court also noted that the evidence would have been admissible under Rule 404(b) to prove intent and "demonstrate the unlikeliness that the defendant was merely an innocent and unknowing bystander." Id.

"the spillover from [defendant's] acquittal on the bankruptcy count and certain of the workers' compensation counts could just as easily be posited to have worked to his benefit").

    D.  The Defendant's Due Process and Compulsory Process Rights Were Not Infringed

McLellan's final argument, that his "inability to access material evidence" from overseas infringed his Fifth Amendment due process and Sixth Amendment compulsory process rights to present a complete defense, is without merit.

    a.  Applicable Law

"The Constitution does not automatically entitle a criminal defendant to unobtainable testimony," United States v. Resurreccion, 978 F.2d 759, 762 (1st Cir. 1992), and neither due process nor compulsory process rights are implicated by a defendant's mere inability to obtain evidence from abroad.  Indeed, "[i]t is well settled that a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution," United States v. Sensi, 879 F.2d 888, 899 (D.C. Cir. 1989), and that "the Sixth Amendment can give the right to compulsory process *only where it is within the power of the federal government to provide it*."  United States v. Greco, 298 F.2d 247, 251 (2d Cir. 1962) (emphasis added).  "Otherwise any defendant could forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as a witness in his favor." Id.; see also United States v. Clarke, 767 F. Supp. 2d 12, 71 (D.D.C. 2011), aff'd sub nom. United States v. Straker, 800 F.3d 570 (D.C. Cir. 2015) ("a defendant's inability to obtain foreign documents is not grounds for a new trial").  The same principles apply under the Fifth Amendment.  See, e.g., United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982) (applying similar analysis to due process and compulsory process claims and finding that government did not violate defendant's rights under either clause by deporting witnesses to alleged crime); United States v. Boyajian, No. CR 09-933(A)-CAS,

2014 WL 6750230 (C.D. Cal. Nov. 26, 2014) (rejecting defendant's contention that due process and compulsory process rights were violated where he was convicted for "acts that occurred in Cambodia" but was unable to compel foreign witnesses to appear or to authenticate foreign public records absent stipulation, which government declined to provide); United States v. Zabaneh, 837 F.2d 1249, 1259-60 (5th Cir. 1988) (affirming conviction for possession and distribution of marijuana shipped from Belize to Texas where defendant "was not afforded extra-territorial service of compulsory process" and only three of 12 subpoenaed witnesses from abroad appeared at trial); see also Revels v. Diguglielmo, No. CIV.A. 03-5412, 2005 WL 1677951, at *6 (E.D. Pa. July 18, 2005) (same analysis applies to due process and compulsory process claims).

"Before the absence of defense witnesses can be said to violate either the right to compulsory process or due process, the defendant must show that the testimony from the missing witnesses would have been relevant, material, *and favorable*." United States v. Mount, 896 F.2d 612, 621 (1st Cir. 1990) (no denial of due process or compulsory process rights where court declined to order government to pay plane fare of defense witnesses from Ireland) (emphasis added); see also United States v. Tennessee Morales-Morales, 181 F.3d 81 (1st Cir. 1998) (unpublished) ("the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining witnesses *in his favor*'") (emphasis added).  There is "nothing fundamentally unfair about convicting [a defendant] without unobtainable testimony, the potential value of which is . . . highly speculative." Resurreccion, 978 F.2d at 762.  Accordingly, "[t]here can be no violation of the defense's right to present evidence . . . unless some contested act or omission (1) can be attributed to the sovereign and (2) *causes* the loss or erosion of

testimony which is both (3) material to the case and (4) favorable to the accused." United States v. Hoffman, 832 F.2d 1299, 1303 (1st Cir. 1987) (emphasis added). The defendant bears the burden of proving that the government's failure to secure evidence within its reach was in bad faith, see United States v. Dring, 930 F.2d 687, 693 (9th Cir. 1991) ("In cases of constitutionally guaranteed access to evidence, wherein the Government loses potentially exculpatory evidence, the Supreme Court applies a two-pronged test of bad faith and prejudice."); California v. Trombetta, 467 U.S. 479, 488 (1984) (noting, in rejecting claim of due process violation, that the authorities acted "in good faith and in accord with their normal practice"), and that "there is a reasonable likelihood that the [evidence] could have affected the judgment of the trier of fact." Valenzuela-Bernal, 458 U.S. at 874.

> **b.** McLellan Cannot Demonstrate that Material, Favorable Evidence Was Unobtainable, that the Government Could Have Obtained It and Declined To Do So in Bad Faith, or that the Outcome of the Trial Was Affected

Mclellan cannot meet his burden of demonstrating that the foreign evidence he cites was material or favorable, that it was within the power of the government to obtain, that the government caused its unavailability or acted in bad faith, much less that it could have affected the verdict in the facing of overwhelming evidence of guilt. See Valenzuela-Bernal, 458 U.S. at 874 n.10 ("If there is no reasonable doubt about guilt whether or not additional evidence is considered, there is no justification for a new trial.") (further citation and internal quotation marks omitted).

First, with respect to much of the evidence referenced in his motion, McLellan cannot meet his burden of demonstrating that the evidence was beyond his reach. To the contrary, he concedes, as he must, that he *received* evidence from overseas pursuant to letters rogatory, including "partial productions" from the Kuwait Investment Authority ("KIA"), Sainsbury and

Royal Mail, "a limited set of materials produced by [the National Treasury Management Agency ("NTMA")] to the City of London police," and material produced by AON Hewitt, a consultant to Sainsbury.  Dkt. 495 at 26.  He omits to note that he also received documents from Inalytics, which consulted to KIA, Royal Mail and Sainsbury, and which responded fully to his document requests served via letters rogatory.  As trial began, McLellan also acknowledged that he had received some materials from Nomura, an investment bank that bid on transitions for NTMA, Royal Mail and KIA.  See Trial Tr. (June 19, 2018) at 24:6-8 (counsel noting that "Nomura is producing documents in a serial way starting about two or three days ago").[16]

McLellan's inability to obtain *all* the documents he sought before trial from entities subject to the letters rogatory he obtained is explicitly *not* a due process violation.  See, e.g., United States v. Al Fawwaz, 116 F. Supp. 3d 194, 214 (S.D.N.Y. 2015) ("The cases make clear that trials need not be stayed indefinitely to await the unpredictable developments of foreign proceedings."); United States v. Bastanipour, 697 F.2d 170, 178 (7th Cir. 1982) ("The record

---

[16] McLellan's reference to the government's failure to call a representative of KIA as a witness, Dkt. 495 at 26, is puzzling.  The government, of course, is under no obligation to call a particular witness, and McLellan has never previously raised this issue.  More importantly, while McLellan sought documents from KIA via letters rogatory, he at no time sought testimony from any KIA witness via Rule 15 or otherwise, as far as the government is aware.  Similarly, McLellan complains that his "ability to present a complete defense was further hindered by the government's opposition to his attempts to depose former European lawyers for State Street," but he omits to note that (1) the government did *not* oppose his request to take a Rule 15 deposition of one of those lawyers, Sarah Lewis, see Dkt. 265 at 7; (2) he *did* depose the remaining two lawyers, Simone Paul and Krystyna Beck, in the parallel SEC proceedings but *withdrew* his request to introduce their videotaped testimony at trial; (3) his motion to obtain their deposition testimony a second time via Rule 15 was filed less than four months before trial, far too late to compel their testimony via renewed letters rogatory, see Dkt. 296; and (4) the government's opposition impeded nothing, insofar as the Court sought to encourage the witnesses to testify voluntarily, the witnesses "carefully considered" the request before declining it, see Dkt. 427, and the Court ultimately denied the Rule 15 motion as moot in light of "the unwillingness of each witness to appear, and the imminency of trial," see Dkt. 405.

indicates the district court delayed commencement of the trial for several months to allow time for the letters rogatory to be transmitted and returned. . . . We do not think the trial court was obliged to postpone commencement of trial indefinitely.").  Indeed, this Court recognized as much when it adjourned the trial in July 2017 at the McLellan's request so that he could pursue his then-pending letters rogatory, while suggesting that the letters may not have been sought "as soon as reasonably possible," and noting that it would be reluctant to adjourn the trial again.  See Dkt. 195 (noting that continuance "accommodates the timeline for the letters rogatory" and that "the Court does not anticipate any further continuances in the scheduling of the trial").

Second, to the extent McLellan complains of his inability to obtain *additional* documents from NTMA (beyond those produced by NTMA itself to the City of London Police, and those McLellan sought from Nomura in connection with its work for NTMA), he fails to meet his burden of demonstrating that those materials were either material or favorable to him, or could have affected the outcome of the trial.  Indeed, McLellan does not even cite any specific documents he sought from NTMA, save for "bids submitted by State Street's competitors for the transitions at issue," Dkt. 495 at 26, which, of course, were equally available to him from the banks themselves.[17]  Instead, he simply refers generically to "contemporaneous internal communications," which he speculates would have "demonstrate[d] that competing bidders offered total costs greater than or equal to those offered by State Street," and "would, in turn, provide fodder for cross-examination."  Dkt. 495 at 26.  That, of course, is not enough,

---

[17] As noted, McLellan *did* receive a production of documents from one of those banks, Nomura, in response to his letter rogatory requests.  The government is unaware whether McLellan even sought documents from Citibank—the other bank that bid on the NTMA transition at issue in this case, see Trial Tr. (June 19, 2018) at 30:13-17—though it was presumably also subject to legal process.

particularly where such speculation is not only unsupported, but contrary to the testimony at trial. See Trial Tr. (June 19, 2018) at 52:91-21, 106:1-9; see also, e.g., Resurreccion, 978 F.2d at 762 ("we can find nothing fundamentally unfair about convicting [a defendant] without unobtainable testimony, the potential value of which is . . . highly speculative"); Valenzuela-Bernal, 458 U.S. at 874 (defendant who "made no effort to explain what material, favorable evidence the deported passengers would have provided for his defense . . . failed to establish a violation of the Fifth or Sixth Amendment").

Third, McLellan fails to meet his burden of proving that there was some "act or omission" by the government that rendered the additional evidence unavailable to him, much less that the government acted in bad faith.[18]  Instead, he simply asserts, without more, that the government would have been able to obtain those documents pursuant to an MLAT request.  But that is far from obvious.  See United States v. Mejia, 448 F.3d 436, 444 (D.C. Cir. 2006) (rejecting contention that court erred by failing to require government to seek recordings from Costa Rica under MLAT and noting that "[h]aving the authority 'to seek' tapes or transcripts through a treaty is not the same thing as having 'the power to secure' them").  Notably, as the government has previously argued, the MLAT between the United States and Ireland explicitly provides that the treaty's provisions "shall *not* give rise to a right on the part of any private

---

[18] As the government has previously noted, McLellan's reliance on United States v. Theresius Filippi, 918 F.2d 244 (1st Cir. 1990), is misplaced. In that case, the question was whether the government would exercise its discretion to grant parole admission into the country of a witness who was willing to testify on the defendant's behalf, *not* whether it would exercise a treaty right *vis-à-vis* another country in an impermissible manner.

person to obtain, suppress, or exclude any evidence."[19]   The First Circuit, interpreting identical

language in the MLAT between the United States and the United Kingdom, concluded that "[t]he

language of the treaty is clear" and means what it says:  that private persons do not have the right

to invoke its terms.   In re Request from U.K. Pursuant to Treaty Between the Government of the

U.S. and Government of U.K., 685 F.3d 1, 11-12 (1st Cir. 2012).  By extension, private persons

do not have the right to compel the government to invoke the treaty's terms on their behalf, and

thereby to do for them that which they cannot do directly.[20]   Accordingly, the defendant cannot

meet his burden of proving that the materials he sought from NTMA were "obtainable" by the

government on his behalf pursuant to the U.S.-Ireland MLAT.  He likewise cannot meet his

burden of proving that the government's failure to pursue an MLAT request for him—an action

which the case law suggests and the Department of Justice's Office of International Affairs

---

[19] See Art. 1, Treaty Between the Government of the United States of America and the
Government of Ireland on Mutual Legal Assistance in Criminal Matters, January 18, 2001, *available at*
https://www.state.gov/documents/organization/129536.pdf.

[20] This makes sense.  As the government has previously noted, an MLAT is a mechanism
designed to facilitate the efforts of U.S. prosecutors in gathering evidence in a foreign jurisdiction. As
such, an MLAT is neutral with regard to a defendant's constitutional rights; it neither guarantees nor
subverts them.  While this may place the government in a privileged position relative to a criminal
defendant when it comes to gathering evidence abroad, the mere existence of such inequities—no
different than the government's unequal power to use search warrants and wiretaps—does not amount to
a due process violation. See Valenzuela-Bernal, 458 U.S. at 872 ("Due process guarantees that a criminal
defendant will be treated with 'that fundamental fairness essential to the very concept of justice.  In order
to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts
complained of must be of such quality as necessarily prevents a fair trial.'") (quoting Lisenba v.
California, 314 U.S. 219, 236 (1941)).

concurs is not permitted by the Treaty—was in bad faith, particularly in light of the informal efforts the government made to obtain those same materials, and other materials, on his behalf.[21]

 Fourth, McLellan does not even attempt to argue that the evidence he sought would have affected the outcome of the trial.  Indeed, even accepting, for the sake of argument, his unsupported contention that the NTMA documents would have allowed him to establish, on cross-examination, "that any misrepresentation by State Street was not material to NTMA's investment decision," Dkt. 495 at 26-27, that evidence would *at most* have had relevance to Counts Two and Four—the substantive counts concerning NTMA.[22]  It would have had minimal, if any relevance, to the conspiracy charged in Count One, or the substantive counts of wire fraud and securities fraud relating to Royal Mail charged in Counts Three and Five, and no impact on the jury's verdict in light of the overwhelming evidence of the defendant's guilt.

---

[21] As the government previously advised McLellan and the Court, it reached out repeatedly to NTMA (as well as Sainsbury and the City of London Police) to determine whether they would produce the documents he sought, resulting in an accelerated production by the City of London Police.

[22] As noted, this claim is contrary to the testimony that the misrepresentation concerning fees *was* material to NTMA and was, in fact, an explicit factor in NTMA's standard protocol for evaluating transition proposals, with an assigned weighting—a fact about which the defendant did, in fact, cross-examine Eugene O'Callaghan, the witness from NTMA.  See Trial Tr. (June 19, 2018) at 52:4-21; 54:18-57:2.  Tellingly, the defendant also omits to note that he *did* have documents setting forth the terms of competing bids for the Royal Mail transition and chose *not* to use them during his cross-examination, and that he did receive internal emails from Dutch Doctors, but used only one such document in cross-examination, to little effect—thus confirming the lack of any impact such theoretical evidence would have had on the jury's verdict.  See Trial Tr. (June 12, 2018) at 268:19-271:20.

<u>Conclusion</u>

For the foregoing reasons, the government respectfully submits that the defendant's motion for a judgment of acquittal or, alternatively, a new trial, should be denied.

Respectfully submitted,

SANDRA MOSER                                    ANDREW E. LELLING
Acting Chief, Fraud Section                     United States Attorney
Criminal Division

By: _/s/ William E. Johnston_                   By: _/s/ Stephen E. Frank_
    WILLIAM E. JOHNSTON                              STEPHEN E. FRANK
    Trial Attorney                                   Assistant U.S. Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 24, 2018, this document was filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

_/s/ Stephen E. Frank_
STEPHEN E. FRANK