UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

                         )
                         )
UNITED STATES OF AMERICA    )
                         )
v.                              )        No. 16-10094-LTS
                         )        Leave to File Granted
ROSS MCLELLAN,          )        July 24, 2018
Defendant                 )
                         )
_____ )

**DEFENDANT ROSS MCLELLAN'S REPLY TO GOVERNMENT'S OPPOSITION TO
HIS MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL**

      For the reasons set forth herein and in defendant McLellan's opening motions, Dkt. 449

and 495, Mr. McLellan respectfully requests that this Honorable Court enter a judgment of

acquittal or, alternatively, vacate his convictions and order a new trial.[1]

**MEMORANDUM OF LAW**

**A.     Judgment of Acquittal**

      As the First Circuit has recently recognized, federal criminal law "does not purport to

reach all frauds." *United States v. Berroa*, 856 F.3d 141, 152 (1st Cir. 2017) (quoting *Schmuck*

*v. United States*, 489 U.S. 705, 710 (1989)).  The statutes at issue may "encompass a broad range

of behavior," but "there are limits nonetheless, and they must be defined by more than just

prosecutorial discretion." *United States v. Weimert*, 819 F.3d 351, 370 (7th Cir. 2016).  The

_____

[1] Mr. McLellan continues to assert, and does not waive, all arguments raised in his opening
motions, even if not specifically referenced herein.

government's prosecution of Mr. McLellan sought to disregard these limits.  The government's interpretation of the securities fraud statute, for example, reads the "in connection with" language broadly enough to encompass any fraud that eventually leads to some securities transaction.  It similarly proffers an understanding of the requirement that the defendant "cause" a wire transmission so expansive as to have essentially no meaning.   The Court should resist the government's attempts to stretch the charging statues beyond what their language will bear.

   1.   *The government proceeded on a legally defective theory of securities fraud and, therefore, introduced insufficient evidence to satisfy the "in connection with" or materiality requirements.*

There was simply no trial evidence that State Street's alleged misrepresentations impacted any client's decision about (a) whether or not to buy or sell securities, or (b) what specific securities to buy or sell.  Rather, "the purportedly false statements . . . were all made either in the context of seeking to obtain transition management contracts or well after the securities transactions at issue had taken place."  Dkt. 449 at 2.[2]  The selection of a transition manager was temporally removed from the purchase and sale decisions.  In fact, it could be weeks or months after the hiring of a transition manager before the client finalized a list of desired assets.  And the evidence was undisputed that the transition manager did not assume any responsibility for deciding what assets to buy or sell, but simply implemented the clients' decisions.  The government does not dispute these points, but instead suggests that alleged

---

[2] The government does not respond to Mr. McLellan's argument that the latter category of statements, those occurring after the relevant transactions, cannot support a securities fraud conviction.  *See* Dkt. 449 at 6-7 (citing cases).  The government's silence on this point constitutes a clear waiver, and this Court should disregard any such statements in assessing the sufficiency of the evidence on these counts.

misstatements affecting the clients' selection of State Street as their transition manager were sufficient to satisfy Rule 10b-5. *See* Dkt. 501 at 8. Whether Rule 10b-5 is broad enough to encompass such conduct is a pure legal issue ripe for decision by this Court.

As the Supreme Court has clearly stated, "[a] fraudulent misrepresentation or omission is not made 'in connection with' . . . a 'purchase or sale of a . . . security' unless it is material to a decision by one or more individuals . . . . ***to buy or to sell*** a" security. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) (emphasis added). This limitation is not a mere formalism, but rather serves important federalism purposes. Indeed, "to interpret the necessary statutory 'connection' more broadly . . . would interfere with state efforts to provide remedies for victims of ordinary state-law frauds." *Id.* at 391; *see also SEC v. Zandford*, 535 U.S. 813, 818 (2002) (noting Court's refusal "to stretch the language of the securities fraud provisions to encompass every conversion or theft that happens to involve securities" (citation omitted)).

In light of this precedent, the government's tacit admission that the clients' decisions to engage in the securities transactions at issue were independent of any fraud by State Street essentially gives away the game. The government does not so much as mention *Troice* in its opposition, instead relying heavily on prior decisions. *See* Dkt. 501 at 5 (citing *Zandford*, 535 U.S. at 819 and *Merrill Lynch. v. Dabit*, 547 U.S. 71, 85 (2006)).[3] But, as this very Court has recognized, "[a]fter *Troice*, a mere coincidence of fraud with a transaction in covered securities will no longer suffice" to satisfy the "in connection with" requirement. *Henderson v. Bank of N.Y. Mellon Corp.*, 146 F. Supp. 3d 438, 443 (D. Mass. 2015). The *Troice* Court expressly

---

[3] Mr. McLellan has already distinguished the three out-of-circuit district court decisions cited by the government on this issue. *See* Dkt. 187 at 4-6.

distinguished *Zandford* and *Dabit* on the ground that both cases "involved . . . 'purchases' or 'sales' induced by the fraud."  571 U.S. at 389.  Here, by contrast, there is no evidence that the alleged misrepresentations by State Street "induced" any securities transaction.

The government, in an attempt to salvage the infirm securities fraud convictions, argues that the "deceit was inextricable from the purchase and sale of [the relevant] securities, insofar as the victims were misled about the price they paid for every security they bought and the price they received for every security they sold."  Dkt. 501 at 5.  This vague standard of inextricability appears nowhere in the statute or binding precedents interpreting it.  Courts have, in other contexts, characterized similarly worded standards as "elusive and unhelpful."  *United States v. Green*, 617 F.3d 233, 246 (3d Cir. 2010).  Aside from being legally irrelevant, the government's characterization of the evidence is also inaccurate.  Far from being "misled about the price they paid for every security," there is no evidence that the relevant clients even discussed the prices of the underlying securities prior to the transitions.  Indeed, the prices were not known until State Street, acting as the client's agent, went to the marketplace to solicit bids.  The term "market price" was never part of any alleged false statement to a client, nor was there any evidence that representations on this issue played any part in a client's decision to buy or sell a particular security.  And, as the former General Counsel of FINRA testified, there was no general prohibition on State Street adding a mark-up to the market prices.  *See* June 19, 2018 Tr. at 147.

On the related issue of materiality, the government's argument is entirely predicated upon its assumption that the selection of a transition manager constitutes an "investment decision."  *See* Dkt. 501 at 6.  The government does not acknowledge, much less address, the contrary decisions cited in Mr. McLellan's opening motion.  *See SEC v. Goble*, 682 F.3d 934, 944 (11th

4

Cir. 2012) ("[A] misrepresentation that would only influence an individual's choice of broker-dealers cannot form the basis for § 10(b) securities fraud liability."); *Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1148–49 (11th Cir. 2018) ("[T]he choice of a type of investment account, much like the choice of a broker-dealer, is not intrinsic to the investment decision itself. Although RJA's alleged misrepresentation regarding the Processing Fee might have influenced a reasonable investor's decision to pick the Passport Account over another type of account, that does not make the alleged representation 'material.'"); *see also* Dkt. 449 at 6 n.3 (citing cases). Moreover, the only evidence cited by the government in support of its materiality argument is subjective testimony from the alleged victims.  Dkt. 501 at 7-8.  Such evidence does not constitute proof beyond a reasonable doubt that the applicable objective standard was satisfied. *See* Dkt. 360 at 3 (citing cases).

Because the government relies exclusively on evidence of alleged false statements made in connection with the selection of a transition manager, as opposed to the decision to buy or sell securities, it has introduced insufficient evidence to permit a reasonable jury to find that the alleged fraud was "in connection with" or material to such a purchase or sale.  A judgment of acquittal should, therefore, be entered on Counts 2 and 3 and so much of Count 1 as charges conspiracy to commit securities fraud.  By delinking the fraud from the buying and selling of securities, the government also triggered the need for an extraterritoriality instruction that looked beyond the unique factors that are solely relevant when a securities transaction is the subject of the fraud – here, where the selection of a transition manager is at the core of the alleged fraud, an

instruction that focuses on the locus of that fraud, not the locus of the securities transaction, was required. *See infra* at 12.  Mr. McLellan alternatively requests a new trial on this basis.[4]

2.   <u>*The government introduced insufficient evidence to prove beyond a reasonable doubt that irrevocable liability was incurred or title was passed in the U.S.*</u>

In order to convict Mr. McLellan of securities fraud, the government was also required to prove that "irrevocable liability [wa]s incurred or title passe[d] within the United States."  Dkt. 449 at 8 (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012)).[5]  None of the evidence cited by the government was sufficient to sustain its burden.

The mere fact that some of the securities at issue were "U.S. corporate bonds" is plainly not enough.  *See Absolute*, 677 F.3d at 70 ("[W]hile the complaint alleges that the U.S. Penny Stocks were issued by United States companies . . . , th[is] fact[] do[es] not demonstrate that the purchases and sales were 'made in the United States.'" (citation omitted)).  For this same reason, the fact that some of the bond transactions were reported in TRACE cannot warrant a finding that the transitions were domestic.  Vague assertions, by witnesses lacking personal knowledge, that some of the bonds were sold "in the U.S." similarly do not constitute proof beyond a reasonable doubt.  *Cf. id.* ("[T]he mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions.").

---

[4] The government does not contest the relevance of the factors listed in the proposed defense instruction, but rather asserts that these facts "cut overwhelmingly in the government's favor." Dkt. 501 at 26.  This should have been a question for the jury, not the government, to answer.

[5] The government points to no evidence "that the underlying securities involved in the transitions . . . were listed on an American stock exchange." Dkt. 449 at 8.  Thus, the government's sole means of establishing domestic transactions was to prove "the purchase or sale of [a] security in the United States."  *Id.* (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010)).

When stripped of these irrelevant and conclusory assertions, the government's evidence essentially amounts to high-level testimony that some of the trading was carried out by State Street's Boston traders.  While this fact may be relevant, it is far from dispositive.[6]  The "location of the broker could be relevant to the extent that the broker carries out tasks that irrevocably bind the parties to buy or sell securities," but "the location of the broker alone does not necessarily demonstrate where a contract was executed."  *Id.* at 68.[7]  Here, the transition management agreements between State Street and the relevant clients were indisputably executed outside the U.S.  The government failed to introduce evidence about any additional agreements that may have been entered into between State Street's Boston-based broker-dealer and its counterparties in the market.  Indeed, the government did not introduce transaction-specific evidence regarding ***any*** of the factors identified as relevant to this inquiry by the Second Circuit.  *See id.* at 70 (listing "the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money").

In an attempt to fill this gaping evidentiary hole, the government called Scott Shaw as a witness.  Shaw, who did not even work at State Street during the relevant timeframe, "could not

---

[6] The Court's instruction that "[s]ecurities transactions conducted by a U.S.-based agent on behalf of a foreign buyer or seller ***can*** still occur in the United States," is not necessarily to the contrary.  Dkt. 466 at 31 (emphasis added).  However, the jury could have misread this instruction "to allow a third means of finding a United States transaction, even if neither irrevocable liability nor the passing of title occurred in the United States."  Dkt. 495 at 19-20 n.7.

[7] The cases cited by the government are not to the contrary.  *See Butler v. United States*, 992 F. Supp. 2d 165, 178 (E.D.N.Y. 2014) (noting that defendant acted as an "American based agent" but also observing that defendant, "from his office in New York, . . . followed-up with potential clients"); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 560 (S.D.N.Y. 2014) (denying motion to dismiss but cautioning, "[i]t may well be that discovery will reveal that Plaintiffs did not incur irrevocable liability" in the U.S.).

definitively testify whether trades conducted by State Street on behalf of the relevant clients . . .
cleared or settled in the United States.  Shaw's speculation that they may or probably would have
done so does not constitute proof beyond a reasonable doubt."  Dkt. 449 at 8.  Moreover, despite
the government's protestations to the contrary, Shaw testified that title does not pass between the
broker-dealer and the counterparty.  *See* June 18, 2018 Tr. at 77 ("Q. And does title and
ownership . . . go from the counterparty to SSGM, LLC?  A. Change of beneficial ownership, not
title."); *id.* at 78 ("The broker-dealer never owns the bonds, unless they're buying for
themselves.").  This dispute is, however, beside the point.  Even crediting the government's
questionable reading of Shaw's testimony, the mere fact that he did not arrive at State Street until
several years after the transactions in question, and therefore lacks any personal knowledge of
those transactions, forecloses the government's heavy reliance on him.

 For this independent reason, the Court should enter a judgment of acquittal on Count 3.

 3. *The government cannot prove wire fraud based on entirely unsolicited or after-*
*the-fact wire transmissions.*

 The entirely unsolicited email from Pennings regarding the NTMA transition cannot
support a wire fraud conviction for Mr. McLellan.  "Not only did McLellan not send this email,
but there is no evidence whatsoever that he caused it to be sent."  Dkt. 449 at 15.  If the wire
fraud or aiding and abetting statute's requirement that a defendant "cause" the charged
transmission means anything at all, it is not satisfied in these circumstances.  *See Chattanooga-*
*Hamilton Cty. Hosp. Auth. v. Hosp. Auth. of Walker*, No. 14-CV-40, 2015 WL 11622950, at *10
(N.D. Ga. May 11, 2015) ("[T]he Court cannot conclude that an entity that simply received

unsolicited e-mails engaged in wire fraud").[8]  Under the government's contrary reading, it is

seemingly impossible to imagine any wire transmission that would be in furtherance of the

alleged scheme that would not also be somehow caused by a charged defendant.  Causation and

in furtherance are separate requirements, and one should not be read so broadly as to be rendered

entirely meaningless.  For this reason, the Court should enter a judgment of acquittal on Count 4.

Along similar lines, the government does nothing to controvert Mr. McLellan's position

that an "'after-the-fact' transmission cannot support a wire fraud conviction." Dkt. 449 at 16;

*see also United States v. Lazarenko*, 564 F.3d 1026, 1036 (9th Cir. 2009) ("To support a wire

fraud charge, the wire must be incident to the execution of the scheme and not part of an after-

the-fact transaction . . . ." (citation omitted)).  The government's response that, in some

circumstances, transmissions that "prevent the fraud from being discovered" may be in

furtherance of the alleged scheme is true so far as it goes, but if it is construed as the government

wishes this would make the temporal duration of conspiracies virtually limitless.  Dkt. 501 at 14.

The government fails to even mention, much less respond to, Mr. McLellan's contention that the

scope of the scheme must be informed by what the alleged perpetrators "conceived . . . at the

time." Dkt. 449 at 17 (quoting *Schmuck*, 489 U.S. at 715).[9]  Here, "there is no evidence that . . .

McLellan and his purported co-conspirators envisioned telling inquiring clients that the charges

---

[8] The government's reading of this email is, to say the least, charitable.  The message reads, in its
entirety: "Ntma just informed us they did not want to use futures on the trade scheduled for later
this week.  I think this will increase the 'spread.'"  It self-evidently contains no "request for
permission from McLellan to increase the hidden charges." Dkt. 501 at 13.

[9] The government has similarly failed to respond to Mr. McLellan's argument that judgment of
acquittal should be entered on the conspiracy count (Count 1) under *Grunewald v. United States*,
353 U.S. 391 (1957).  This utter lack of developed argument constitutes a waiver, precluding any

were inadvertent or accidental.  Rather, to the contrary, Pennings . . .  testified unequivocally that the group ***intended*** to use contract language appearing to permit mark-ups as 'cover' if issues ever arose." *Id.* (emphasis added).  Accordingly, the after-the-fact June 22, 2011 email cannot support a wire fraud conviction, and the Court should enter a judgment of acquittal on Count 5.

**B.     New Trial**

At the outset, the government misstates the standard applicable to Mr. McLellan's new trial claims.  It suggests that Mr. McLellan was required to establish an "exceptional circumstance" in order to obtain relief.  Dkt. 501 at 1.  But, as the very case cited by the government makes clear, this heightened standard only applies "where the award of a new trial is predicated on the district court's evaluation of the weight of the evidence rather than its concern about the effect of prejudicial acts that may have resulted in an unfair trial."  *United States v. Merlino*, 592 F.3d 22, 32 (1st Cir. 2010) (citation omitted).  Here, none of Mr. McLellan's arguments are predicated upon the weight of the evidence.  In these circumstances, "a trial court may grant a new trial based on reconsideration of its disposition of any discretionary matter."  Dkt. 495 at 6 (citation omitted); *see also United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994) (stating that court need not conclude that it committed "legal error" to grant a new trial).

1.     *Jury instructions failed to require any finding that the alleged wire frauds were domestic in nature.*

Mr. McLellan requested a jury instruction on this issue to ensure compliance with the presumption against extraterritoriality mandated by the Supreme Court.  *See Morrison*, 561 U.S. at 255.  The Court not only declined to give Mr. McLellan's proposed instruction, but failed "to

_____

reliance on post-transition communications in support of the conspiracy conviction.

provide . . . any instruction at all requiring the jury to find that the wire fraud charges were domestic in nature." Dkt. 495 at 13.

The mere fact that the Court informed the jury that one element of the offense was the use of "an interstate or foreign wire communication" is no substitute. Dkt. 466 at 33. The government's argument to the contrary is heavily predicated on the perceived binding force of *United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014). *Lyons*, however, dealt with an entirely different statute, and therefore does not bind the Court on the issue presented here.[10] The government's argument to reflexively transpose *Lyons* into the context of the wire fraud statute is directly contrary to the Supreme Court's admonition that a "general reference to foreign commerce . . . does not defeat the presumption against extraterritoriality." *Morrison*, 561 U.S. at 263. The government makes no attempt to reconcile its argument with *Morrison*. And its other primary authority, *Pasquantino v. United States*, 544 U.S. 349 (2005), is similarly inapplicable. As one court has explained, *Pasquantino* "did not speak to the . . . case of a scheme devised and otherwise executed abroad that involves some use of U.S. wires." *United States v. Gasperini*, No. 16-CR-441, 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017) (citation omitted).[11]

---

[10] And the distinction between the two statutes is meaningful. The Wire Act proscribes "the transmission in interstate or foreign commerce of bets or wagers." 18 U.S.C. § 1084(a). Thus, the perceived harmful conduct targeted by the statute and the use of the wires are one and the same. The wire fraud statute, by contrast, "focus[es] on the scheme, not on the implementation of it." *United States v. Brien*, 617 F.2d 299, 307 (1st Cir. 1980).

[11] The out-of-circuit district court decisions cited by the government are unpersuasive. The New York cases are inconsistent with Second Circuit precedent. *See Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (finding alleged fraud extraterritorial notwithstanding use of U.S. wires). Two of these New York cases involved charges that the defendants used U.S. wires to manipulate LIBOR rates. In these circumstances, there was a much closer connection between the wire transmissions, which were used to disclose the

The government also attempts to dismiss an intervening Supreme Court decision directing courts to look to the location of "the conduct relevant to the statute's focus" in assessing the issue of extraterritoriality. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). The First Circuit has clearly indicated that the focus of the wire fraud statute is on the underlying scheme to defraud, not the wire transmissions in furtherance of that scheme. *See Brien*, 617 F.2d at 307. And this result is hardly surprising. While a wire transmission is, to be sure, a required element of the offense, such transmissions only implicate the Congressional concern that led to the passage of the statute when they advance some fraudulent purpose. Indeed, many Americans send hundreds of entirely innocent wire transmissions on a daily basis. In this case, the alleged scheme to defraud involved a European bank's interactions, through a European salesman, with European clients, some of whom were represented by European consultants. At the very least, these circumstances permitted a reasonable jury to conclude that the locus of the alleged scheme was foreign rather than domestic. Because the Court's instructions did not allow such a finding, Mr. McLellan should be granted a new trial.

2. *Jury instructions permitted conviction on an omission theory that had been expressly and repeatedly disclaimed by the government.*

The government takes the position that the Court's instructions on this issue were correct and "standard." Dkt. 501 at 19. This, quite frankly, is beside the point. The problem is that the

---

manipulated rate, and the scheme to defraud than in the present case. *See, e.g.*, *United States v. Hayes*, 99 F. Supp. 3d 409, 421 (S.D.N.Y. 2015). The remaining case cited by the government is equivocal on the relevant issue. *See United States v. Hussain*, No. 16-CR-462, 2017 WL 4865562, at *4 (N.D. Cal. Oct. 27, 2017) ("The drafters of § 1343 did not envision the statute applying to internationals bouncing wires into and out of the United States, with no participation from any U.S. resident, in order to defraud international entities. The government's bright-line rule thus appears to be problematically broad in application . . . ." (citation omitted)).

government explicitly (and emphatically) disclaimed any reliance on alleged "omissions," only to turn around months later and successfully request an instruction permitting the jury to convict on this very basis. The government's belated attempts to introduce nuance into its prior statements should be rejected. Its waiver was clear and unequivocal: "Despite McLellan's best efforts to turn this into an omissions case, this is a case about *affirmative* misrepresentations that McLellan personally made or directed." Dkt. 298 at 6 (emphasis in original).[12]

The government never seriously disputes the notion that federal courts routinely categorize half-truths and misleading non-disclosures as types of omissions. *See, e.g.*, *Capri Optics Profit Sharing v. Digital Equip. Corp.*, 950 F.2d 5, 8 (1st Cir. 1991) (including within waiver of reliance on "omissions" any argument that "defendant had a duty to supply omitted matter in order to prevent possible misleading");[13] *see also* Dkt. 495 at 10-11 (citing and

---

[12] The block quote in the government's brief is five full sentences long, and, for the sake of brevity, Mr. McLellan's opening motion included only selections of the passage. Nowhere in the full quotation, however, does the government in any way cabin or qualify its waiver of an "omissions" theory or express an intent to rely on any theory other than "affirmative[] lie[s]." Dkt. 501 at 15. Mr. McLellan's argument for severance based on differences between the applicable legal regimes was just as relevant to a half-truth theory as it was to a theory of silence in the face of some pre-existing legal duty. Whether a particular statement is misleading in the circumstances based on some related omission necessarily implicates the background legal and regulatory norms that inform industry participants' expectations regarding disclosure.

[13] The government's characterization of this First Circuit opinion is inaccurate. *Capri Optics* did not involve the mere narrowing of a "misstatements theory," Dkt. 501 at 18 n.8, but rather an express waiver of any reliance upon "nondisclosure" or "omission" of pertinent information. 950 F.2d at 7. Included within the latter category were precisely the types of half-truths upon which the government relied in the present case. This binding precedent directly contradicts the government's insistence that half-truths are anything other than a type of omission.

discussing cases).  The government's reliance at trial upon alleged half-truths and misleading

non-disclosures therefore fell squarely within the category of omissions under binding caselaw.[14]

  In light of the foregoing precedents, the government is essentially left arguing that, when

it said it was waiving reliance on "omissions," it did not really mean omissions, or at least not all

omissions.  *See* Dkt. 501 at 18 n.8 ("[T]he mere fact that McLellan can find . . . cases in which

the words 'omit' or 'omission' are used in the context of a half-truth theory does not transform

those cases into 'omissions' cases.  McLellan's sophisticated counsel plainly understood what

the government meant when it distinguished between an omissions case and an affirmative

misstatements case.").  But defense counsel cannot read the government's mind and, therefore,

had little choice but to take the government at its word that it would not rely on alleged

"omissions," as that term is used in relevant caselaw.  As the government acknowledges, it did

not clarify the scope of its waiver until almost three months later and about two weeks prior to

trial.  *See* Dkt. 501 at 17.

  The government's abrupt reversal of course was far from harmless.  While the

government continues to insist that the alleged misstatements relied upon at trial were

"affirmatively false," Dkt. 501 at 18, this is only true under the government's broad

understanding of that phrase to include half-truths and misleading non-disclosures.  The

government has never suggested, for example, that the flat fees quoted in the marketing materials

---

[14] The "clear" caselaw cited by the government for the contrary proposition essentially amounts
to dicta from a single out-of-circuit district court decision.  *See* Dkt. 501 at 17 (citing *United
States v. Spanier*, No. 16-CR-1545, 2017 WL 1336998, at *2 (S.D. Cal. Apr. 7, 2017)).  But
*Spanier* stands only for the unremarkable (and undisputed) proposition that a defendant may, in
the abstract, be convicted for securities fraud based on half-truths.  It says nothing of the
situation at hand, where the government has expressly waived reliance on such a theory.

were not the same as the flat fees ultimately charged.  Nor has it meaningfully contended that State Street failed to act as the relevant clients' "agent" when soliciting competing bids in the marketplace.  If these representations were affirmatively false, it is only because of State Street's silence regarding mark-ups.  Once the circularity of the government's argument is exposed, it becomes clear that the statements upon which Mr. McLellan's convictions are predicated fall squarely within the scope of the government's waiver.  Had the Court held the government to its word, Mr. McLellan would have had a powerful argument that the statements at issue were true and thus could not support conviction.  *Cf. Weimert*, 819 F.3d at 357 ("*[W]e do not imply that all or even most instances of non-disclosure of information that someone might find relevant come within the purview of the . . . wire fraud statute[]*." (citation omitted) (emphasis added)).

        3.      *The government's invitation to convict Mr. McLellan on the EMEA charges based on evidence regarding the unrelated AXA scheme warrants a new trial.*

In opposing Mr. McLellan's request for a new trial on this basis, the government relies heavily on the fact that the jury acquitted Mr. McLellan of the separate charge relating to AXA. This reasoning overlooks the government's express invitation for the jury to consider the AXA evidence in deciding Mr. McLellan's guilt with respect to the other counts.  *See* June 25, 2018 Tr. at 112 (arguing that Mr. McLellan "must be the unluckiest man in the world . . . to be mixed up in these frauds in two different continents where he is the single common denominator."). The jury's conclusion that the AXA evidence did not establish Mr. McLellan's guilt on that charge beyond a reasonable doubt self-evidently does not mean that it declined the government's explicit prompting to consider that same evidence in connection with the alleged European fraud.

The government's sarcastic suggestion that Mr. McLellan would have to be "the unluckiest man in the world" to be implicated in both the EMEA and AXA frauds is a naked appeal to propensity reasoning. The government essentially told the jury that Mr. McLellan's involvement in one fraud made it more likely that he perpetrated another. Tellingly, the government did not even attempt to establish any "common non-propensity thread connecting" the two alleged schemes, as required by Fed. R. Evid. 404(b). *United States v. Lynn*, 856 F.2d 430, 435 (1st Cir. 1988). It did not, for example, suggest "that any aspect of the supposed plan was 'so unusual and distinctive as to be like a signature,' thereby tending to prove that the perpetrator of one offense must also have committed the other." Dkt. 301 at 7 (quoting *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979)). In fact, the EMEA scheme and the alleged AXA fraud were fundamentally different in a number of crucial respects. *See* Dkt. 292 at 5-7. Accordingly, the government relied upon the mere alleged "repeated performance of the same class of crimes." Dkt. 301 at 7 (quoting *Phillips*, 599 F.2d at 136). In doing so, it asked the jury to draw precisely the type of inference based on criminal propensity that Rule 404(b) forbids.

The government's contention that it has somehow fulfilled its promise of significant evidentiary overlap should be rejected out-of-hand. There was no substantive evidentiary overlap, other than Pennings' fleeting testimony that Mr. McLellan mentioned the alleged AXA fraud during the course of the EMEA conspiracy. Neither the government nor Mr. McLellan deemed this testimony sufficiently important to mention in final argument to the jury. While the government maintains that Stephen Finocchi and Tom Clemmenson were involved in both alleged schemes, *the fact remains that neither witness testified about both of them*. Agent Michael McGillicuddy testified about neither of these specific offenses, but instead about his

interview of Mr. McLellan in connection with an entirely different investigation. Nor can

purported "background testimony" about State Street's transition management business provide

the missing evidentiary link, especially when the sources of that testimony, Pennings and

Boomgaardt, lacked any personal knowledge of State Street's practices in the U.S. Finally, the

government's choice to use the same agent, Garett Trombly, to introduce documents relevant to

both EMEA clients and AXA falls well-short of meaningful evidentiary overlap.

       4.    *Mr. McLellan's lack of access to material evidence that was readily available to the government violated his Constitutional rights.*

The government's leading argument on this issue is that criminal defendants are not

Constitutionally entitled to access "unobtainable" evidence. Dkt. 501 at 31. In making this

contention, the government assumes that the evidence in question was not within its reach. The

government, however, fails to marshal any authority in support of this crucial assumption. In

fact, the government's view is wrong. The MLATs plainly establish the government's

entitlement to "assistance," including the production of relevant documents, in connection with

criminal prosecutions. This language is clearly broad enough to include requests made by the

government on behalf of criminal defendants. *See* L. Song Richardson, *Due Process for the

Global Crime Age: A Proposal*, 41 Cornell Int'l L.J. 347, 381 (2008) ("None of the treaties

differentiate between evidence that the prosecution requires and that which the defendant

requires."); *United States v. Des Marteau*, 162 F.R.D. 364, 372 (M.D. Fla. 1995) (noting

government's offer to submit an MLAT request for evidence sought by defendant). The Court

has expressly declined to decide this question. *See* Dkt. 350 at 1 n.1.[15]

---

[15] The mere fact that the MLATs do not create private rights of action says nothing about

As the First Circuit has made abundantly clear, the mere fact that certain evidence lies outside the Court's subpoena power does not preclude a finding that it is accessible to the government by other means. *See United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990). In *Theresius Filippi*, the court found a Sixth Amendment violation where the government declined to request a "Special Interest Parole" that would have allowed a defense witness residing abroad to come to the U.S. and testify at trial. The First Circuit unequivocally concluded that this "deliberate omission to act, where action was required, by the United States Attorney constitutes a violation of the Sixth Amendment right to compulsory process and, derivatively, the right to due process protected by the Fifth Amendment." *Id.*

*Theresius Filippi* stands for the proposition that, in appropriate circumstances, the Constitution compels the government to take an affirmative, otherwise discretionary action to assist a criminal defendant in obtaining material evidence located abroad. In many rounds of briefing on this subject, the government has yet to put forward any principled distinction between *Theresius Filippi* and the present case. Instead, it persists in an unconvincing effort to narrow *Theresius Filippi* to its facts. *See* Dkt. 501 at 36 n.18. Of course, this is not how our common-law system of jurisprudence works. Indeed, if any factual distinction were sufficient to render a prior precedent inapplicable, each Constitutional claim would be *sui generis*. The gaping hole in the government's attempt to maneuver around *Theresius Filippi* is any explanation as to why the factual distinctions proffered are Constitutionally relevant. In fact,

---

whether the government, having chosen to bring a criminal prosecution alleging frauds on six foreign entities, may be compelled to choose between (a) exercising its right to assist the defendant in obtaining relevant evidence from those entities; or (b) forgoing its own reliance on related evidence. *See In re Request from U.K.*, 685 F.3d 1, 13 (1st Cir. 2012).

there are no such relevant distinctions to be found.  *Theresius Filippi* clearly demonstrates that the government is Constitutionally required to use available means to assist a criminal defendant in obtaining relevant evidence located in a foreign country not otherwise available to the defendant.  That is precisely the question raised in the present case.[16]

The government's suggestion that Mr. McLellan has failed to make a sufficient showing of materiality is foreclosed both by Supreme Court precedent and this Court's prior rulings. Where, as here, the defendant currently lacks access to the evidence at issue, he "cannot be expected to render a detailed description" of it.  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982).  Accordingly, he need only make a "plausible showing" that the evidence is "material and favorable to his defense."  *Id.*  The "events to which" the evidence relates, "and the relevance of those events to the crime charged, may well demonstrate" materiality.  *Id.* at 871. Mr. McLellan has provided multiple detailed explanations regarding the relevance of the evidence sought.  *See, e.g.*, Dkt. 181 at 4-6; Dkt. 276 at 6-7.  Indeed, this Court has already stated that it "considers . . . the evidence" to be "directly relevant to the issues in dispute" in this case. *See, e.g.*, Dkt. 168-1.  It even went so far as to say "that justice cannot completely be done amongst the parties without the production of the documents requested."  *See, e.g.*, *id.*  In these circumstances, the government's position that Mr. McLellan has failed to satisfy the relaxed standard of materiality set forth in *Valenzuela-Bernal* is simply not credible.

---

[16] Contrary to the government's argument, *Theresius Filippi* did not require any showing of bad faith.  *See also, e.g.*, Dkt. 328 at 4 n.3.  To the extent bad faith is required, it should be "inferred solely from the absence of any known countervailing reason for the Government's refusal to invoke the MLAT and level the 'playing field' between the parties."  *Id.* (citation omitted).

Mr. McLellan's receipt of partial productions from some entities did not provide the "meaningful opportunity to present a ***complete*** defense" guaranteed by the Constitution. *California v. Trombetta*, 467 U.S. 479, 485 (1984) (emphasis added). Mr. McLellan has received no assurance that documents provided were complete responses to his requests. In fact, to the contrary, some of the productions were obviously incomplete. KIA and Sainsbury, for example, provided a mere handful of documents to the prosecution which were thereafter provided to the defense. While the government notes that Mr. McLellan received "some materials from Nomura," Dkt. 501 at 34, one of the competing bidders for the NTMA transition, none of the documents received from that entity related to NTMA. The government neglects to mention that Mr. McLellan has yet to receive a single document from the other competing bidder, Goldman Sachs. It also overlooks the key fact that NTMA itself entirely rebuffed his Letters Rogatory requests, notwithstanding the fact that Mr. McLellan received some related documents from other sources.

Given the lack of complete productions, it is quite possible that the foreign entities simply withheld anything harmful or controversial. It would hardly be surprising, for example, for a transition management client to decline to voluntarily produce an internal email chain reflecting prior knowledge that State Street would likely charge a mark-up and/or the lack of importance of any such mark-up. As the situation currently stands, Mr. McLellan can have no assurance that he received any such obviously relevant communications that may exist.[17]

---

[17] The mere fact that Mr. McLellan received some internal communications from Dutch Doctors and only used one such communication in cross-examination does not foreclose the relevance of internal communications that may have been in the possession of the other clients. Given Mr. McLellan's lack of personal connection to the Dutch Doctors transition, defense counsel made a

## C.    Conclusion

For the foregoing reasons, Mr. McLellan respectfully requests that this Honorable Court grant his Motion for Judgment of Acquittal, Dkt. 449, or alternatively vacate his convictions and order a new trial, Dkt. 495.

Respectfully submitted,

Ross McLellan
By his Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

**/s/ Michael Pabian**
Michael Pabian
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Maksim Nemtsev**
Maksim Nemtsev
20 Park Plaza, Suite 1000

---

strategic decision not to conduct an extensive cross regarding these communications.  Obviously, this calculus would likely have been different for other clients.

Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

Dated: July 31, 2018

## <u>CERTIFICATE OF SERVICE</u>

I, Martin G. Weinberg, hereby certify that on this date, July 31, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**<u>/s/ Martin G. Weinberg</u>**
Martin G. Weinberg