UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————
                                          )
UNITED STATES OF AMERICA   )
                                          )
            v.                            )          Criminal No. 16-cr-10094-LTS
                                          )
ROSS MCLELLAN,                   )
                                          )
            Defendant.              )
———————————————————  )

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with the

sentencing of defendant Ross McLellan, scheduled to occur on October 16, 2018.  The

government concurs with the Probation Department that the applicable Sentencing Guidelines

level in this case is 35, as set forth in the Presentence Report ("PSR").  Based on the defendant's

criminal history category of I, the guidelines sentencing range is 168 to 210 months.  For the

reasons set forth below, the government respectfully submits that the Court should impose a

sentence of 60 months.

As the Court is aware, McLellan was convicted after trial on June 26, 2018, of two counts

of wire fraud, in violation of Title 18, United States Code, Section 1343; two counts of securities

fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); and one count of

conspiracy to commit wire fraud and securities fraud, in violation of Title 18, United States

Code, Section 371.[1]  The charges arose out of McLellan's involvement in a scheme to

overcharge clients of State Street Corp., one of the world's largest banks, through the application

---

[1] McLellan was acquitted of one count of wire fraud affecting a financial institution, in violation
of Title 18, United States Code, Section 1343.

1

of hidden commissions on billions of dollars' worth of securities trades conducted as part of its transition management business in Europe, the Middle East and Africa ("EMEA").  The victims were large institutional investors, including the pension fund of the British postal service, the Royal Mail; the pension fund of a large British supermarket chain, Sainsbury's; the National Treasury Management Agency ("NTMA"), a government fund in Ireland used to support the pensions of Irish government workers and to make social service payments to Irish citizens; the pension fund of Eircom, the Irish phone company; the "Dutch Ductors" pension fund for physicians in the Netherlands; and the Kuwait Investment Authority ("KIA"), the sovereign wealth fund of the government of Kuwait.  Losses exceeded $20 million.

Until the scheme's discovery, McLellan was employed by State Street in Boston as an executive vice president, head of the global Portfolio Solutions Group, and president of the bank's U.S. broker-dealer subsidiary.  As such, he was one of the top few dozen executives at a bank of roughly 30,000 employees.  His compensation, including bonus, exceeded $1 million annually.  His co-conspirators included two other senior executives:  Edward Pennings, a London-based senior managing director and head of the bank's Portfolio Solutions Group for the EMEA region, who reported to McLellan; and Richard Boomgaardt, a managing director and the London-based head of State Street's EMEA transition management desk, who reported to Pennings.  Pennings and Boomgaardt both waived extradition to the United States, pled guilty to conspiring with McLellan, and provided substantial assistance in the government's investigation and prosecution of the case—Boomgaardt, during the early stages of the government's investigation, and Pennings approximately one year after being indicted alongside McLellan.[2]  In

---

[2] Boomgaardt was recently sentenced by Judge Casper to a term of probation, while Pennings is scheduled to be sentenced after McLellan.

2017, the government also entered into a deferred prosecution agreement with State Street itself, pursuant to which the bank paid a criminal money penalty of $32.3 million and agreed to appoint an independent corporate compliance monitor for a term of three years.[3]

As set forth below, the government submits that a term of incarceration of 60 months is sufficient, but not greater than necessary to achieve the goals of sentencing.  The government's recommendation takes account of the fact that the sentencing guidelines in this case are driven by multiple enhancements that, while applicable, may tend to overstate the severity of the crimes for which McLellan stands convicted relative to other financial crimes with similar guidelines ranges.  The government also recognizes the existence of several mitigating factors, including the fact that McLellan previously led a law-abiding life and did not, in the short term, directly profit from his actions, insofar as he did not personally pocket the stolen money; that the victims have been reimbursed by State Street; and that McLellan has suffered collateral consequences from his actions, including the termination of his employment and the loss of his livelihood.  At the same time, the government believes that the requested term of imprisonment is necessary to recognize the seriousness of the crime, and to achieve two additional purposes of sentencing: just punishment and general deterrence.

---

[3] State Street subsequently also settled parallel civil charges brought by the Securities and Exchange Commission.  Pursuant to that settlement, it paid a civil money penalty of $32.3 million.  In addition, State Street paid a fine of £22.9 million to resolve civil charges brought by the Financial Conduct Authority, in England.

<u>Background</u>

The Court is by now familiar with transition management—the business of helping large institutional investors efficiently move their investments between and among asset managers or liquidate large investment portfolios, with the goal of reducing risk and costs. The instant charges centered on a scheme, spanning February 2010 through September 2011, and overseen by McLellan, to increase State Street's revenues by secretly overcharging transition management clients through the use of hidden commissions on securities traded in the course of transitions. Specifically, State Street, at the direction of McLellan, Pennings, and Boomgaardt, agreed to manage transitions for six clients pursuant to agreed-upon fees—in several cases, for a flat fee (meaning that the clients would pay State Street a management fee but would receive market prices on all the securities trades conducted in connection with the transitions, without any additional per-trade charges), and in the case of KIA, for no fee (meaning that the client would simply receive the market prices, with no additional per-trade charge). Then, notwithstanding those agreements, and representations made to the affected clients in the course of attempting to win their business—including that State Street would act as the client's "agent" and "fiduciary" and would "put [the] client's interest ahead of [its] own"— McLellan, Pennings, and Boomgaardt directed other State Street employees to apply secret commissions to securities trades conducted in connection with the transitions, thereby diminishing the net value the clients obtained from those trades and enriching State Street beyond its bargained-for compensation. In short, McLellan, Pennings, and Boomgaardt sought to defraud the affected clients by misleading them as to what State Street would charge for each transition and at what price it would buy and sell securities on their behalf.

The evidence showed that McLellan approved and oversaw the scheme and closely monitored its progress.  For example, the evidence showed that Pennings repeatedly consulted with McLellan about how much to bid for deals in order to win them and how much to overcharge clients once the deals were won, and that McLellan personally approved those overcharges.  Thus, it was McLellan who directed Pennings to bid "thin to win" the Royal Mail contract, and who—as soon as the assignment was secured with a flat-fee bid—personally approved charging hidden commissions of between one and two basis points on the resulting trades.  Indeed, McLellan personally directed a U.S.-based fixed income trader, Stephen Finocchi, to apply those commissions, and later called Finocchi to ensure that he was doing it.

McLellan also oversaw and directed efforts to hide the commissions from the affected clients, and from others within the bank.  For example, the evidence at trial showed that McLellan, while visiting London, personally requested that U.S. traders working in Boston provide him with the intraday highs and lows of certain securities traded on behalf of the KIA, to make sure that the undisclosed commissions, when added to the actual prices at which the trades were executed, did not substantially exceed the range of reported market prices for the day, thus rendering the overcharges less likely to be discovered.  Likewise, McLellan personally directed an equities trader in Boston, Joe Dionisio, to charge a price for certain securities traded on behalf of the NTMA that would resemble the volume-weighted average price ("VWAP") at which those securities traded during the day, even though the NTMA had not requested VWAP pricing, in an effort to disguise the fact that State Street had actually secured a much better price and was improperly pocketing the difference—a difference McLellan personally specified.  And McLellan personally directed Finocchi to "zero out" the commissions he had applied to the

Royal Mail trades when sending over the trading file to a colleague in London, Samina Vernon, who was charged with reporting the results to the client.

Ultimately, when Royal Mail independently discovered that charges had been applied to certain U.S. securities trades in contravention of its agreement with State Street, McLellan directed Pennings to falsely tell the client that "inadvertent commissions" had been applied to U.S. trades, and *not* to disclose that commissions had also been applied to European trades, for which market trading results were not publicly available to contradict the false market prices State Street had reported.  In a last-ditch effort to avoid exposure of the fraudulent scheme, McLellan likewise told the same lie to State Street's compliance staff—that the bank had erroneously charged Royal Mail commissions on its U.S. securities trades—and directed Pennings to incorporate that lie in a letter to the client's consultant from the bank's head of compliance, which McLellan then directed Boomgaardt to send.

Boomgaardt, however, ignored that directive, prompting an internal investigation that ultimately led to the bank's decision to refund Royal Mail and the other affected clients, to terminate McLellan, Pennings, and later Boomgaardt, and to report their conduct to British securities regulators.  The government's investigation followed.

Critically, the evidence at trial showed that McLellan was fully aware from the scheme's inception that what he was doing was wrong.  Indeed, by early 2010, McLellan was not only aware that a competing a transition manager, Convergex, was similarly misleading clients about what it was charging for securities trades, but he sent Pennings an email referring to Convergex's practice as "client abuse."  The two men then sought to use what they had learned to dissuade clients from doing business with Convergex.  When those efforts failed, they adopted a similar

6

strategy of fraud and deception.  And when, in early 2012—after his termination from State Street—McLellan was interviewed by FBI agents about Convergex's scheme, he both acknowledged the wrongfulness of Convergex's actions, and denied that State Street had engaged in comparable charging practices.

A.  Section 3553(a) Factors

1.  The Nature and Circumstances of the Offense

The nature and circumstances of the offense are serious.  The defendant was the youngest-ever executive vice president of one of the world's largest banks, who in that position directed a scheme to defraud clients of more than $20 million over a period of approximately 18 months.  The scheme was brazen and manifestly criminal.  The defendant and his co-conspirators knowingly and intentionally deceived their clients about what State Street would charge for its services, while representing to those clients that the bank would act as their agent and fiduciary and in so doing would safeguard their best interests, and place those interests ahead of its own. In so doing, they took advantage of the peculiarities and lack of transparency of the bond markets, of their own superior knowledge of those markets, and ultimately, of the trust their clients placed in them.  Indeed, they explicitly represented themselves as more trustworthy than their competitors, even as they secretly helped themselves to their clients' money, and glibly lied about it.

The victims of the scheme were for the most part pension funds with fiduciary duties of their own to safeguard the assets of their participants.  The people running those funds—several of whom testified at trial—were not highly paid Wall Street bankers, but rather career administrators who took their fiduciary responsibilities seriously, and who plainly relied, to their

detriment, on the representations their bankers made to them.  In this regard, while the charged

crime is not the same as an investment fraud in which an investment adviser plunders the last

dollar of an elderly retiree, neither is it victimless.  As the manager of the Royal Mail pension

fund testified, the scheme resulted in the loss of $10 from the pension of every postal worker in

the United Kingdom.  See Trial Tr. (June 13, 2018) at 60:4-6.

    While McLellan did not profit immediately from his involvement in financial terms—

insofar as he and his co-conspirators did not pocket the money they stole—the evidence showed

that his compensation and career advancement were tied to the revenues and revenue growth of

the units he oversaw.  Indeed, McLellan sent emails to his staff during the charged period

bemoaning the lack of revenue growth, and directly linking that stagnancy to their prospects for

bonuses and promotions.  He knew that driving revenue higher was critical to his year-end

bonus, his stature within the bank, and his career advancement.  And the evidence showed that

he was right.  Indeed, McLellan was promoted to from senior managing director to executive

vice president in early 2011—during the scheme's progress—and the email announcing his

promotion specifically attributed it, in part, to his success in increasing revenues in 2010, the

year in which the scheme commenced and both KIA and Dutch Doctors were overcharged.  In

this sense, at least, the crime in which McLellan engaged is no different from any other financial

fraud, albeit on a larger and more complex scale: he and his co-conspirators stole money because

they thought they could get away with it, and because they thought that doing so would benefit

them over time.

2.   <u>The Defendant's History and Characteristics</u>

McLellan has no prior criminal record.  He is a highly educated and intelligent individual who is plainly devoted to his family and his community.  He was well-liked at work, and had an unblemished prior career.  He had a bright professional future.

In some ways, the defendant's background underscores the dangers cases like this one lay bare: someone with a criminal record would not have been in the position of trust he occupied, and would therefore not have been able to perpetrate the fraud as he did.  It was precisely because of how much clients trusted him and his colleagues that the scheme could occur—and that some colleagues within the bank had difficulty believing, even afterwards, that McLellan was involved.

At the same time, the fact that someone in the defendant's position would engage in such brazen criminality is particularly troubling.  McLellan was at the pinnacle of his career.  Yet arrogance, greed, and raw ambition drove him to take advantage of clients he thought would never know better.  Those same qualities drove him to enlist in his scheme others who were initially reluctant to go along, but who reported to him and were dependent on his approval for their own career advancement.  Boomgaardt is one example.  At trial, he testified with remarkable candor about knowing—on his drive home from work after sitting beside McLellan and adding secret commissions to KIA's trades—that what they had done was wrong, and about the moral conflict he felt about his complicity.  Finocchi is another example.  A junior bond trader multiple levels below McLellan in the bank's hierarchy, Finocchi testified about boasting to McLellan that he had charged a client a higher price for certain trades than he had achieved in

the market—despite the fact that the client trusted State Street to achieve the best possible execution on its trades.  Finocchi believed, correctly, that his actions would impress McLellan.

Finocchi's belief speaks to the corrosive effect that the actions of someone in McLellan's position can have.  Senior executives lead not just by direction but by example, and their corruption is contagious.  It infects those around them, and below them, and degrades and threatens the entire system.

McLellan's actions bespeak his indifference not just to these downstream effects, but also to the impact his actions could have on the lives and careers of others.  With the scheme threatening to unravel, he directed Boomgaardt to send a letter, signed by the head of compliance, that he knew contained a blatant lie.  In so doing, he was unconcerned about the impact his actions could have not just on Boomgaardt, but also on that unknowing executive's career.

Likewise, after the scheme was uncovered, McLellan sought to pin the blame on Pennings—a strategy he continued to embrace at trial.  To this day, McLellan has declined to accept responsibility for his actions, or to express any remorse.

      3.   The Need for Just Punishment, Adequate Deterrence
           And the Avoidance of Unwarranted Sentencing Disparities

This case presents a sad example of a defendant who lost his moral compass—who participated in a scheme to defraud not because he was struggling financially, and not because he lacked the ability to appreciate the wrongfulness of his actions, but simply because he thought it would benefit him and that he could get away with it.  Countless individuals are situated similarly to this defendant—in senior positions of trust, leading companies and divisions where they could, if they wanted, bilk their clients with impunity.  They do not do so for two reasons:

first, because it is a basic tenet of society that theft—even from investment funds with billions of dollars under management—is wrong; and second, because they know that if they are caught, the consequences will be severe.  They will lose their jobs, their good name, and very likely, their liberty.

The sentence the government seeks takes all this into account.  Just punishment requires that someone who oversaw and personally participated in a scheme to bilk clients of tens of millions of dollars, and to cover it up afterwards, serve a meaningful term of incarceration.  Prison is also necessary here for its deterrent effect—not so much specific deterrence, because McLellan is unlikely to work in financial services again—but general deterrence across the securities and financial services industry.   Senior bank executives must know that fraud schemes like this one will, if discovered send them to jail—a result all the more critical insofar as the difficulty in detecting such schemes means that many doubtless go undiscovered, and thus unpunished.  Absent such consequences, there is little save good intentions that will deter criminal conduct like that committed by this defendant and his co-conspirators.

The sentence the government seeks is also appropriate to avoid disparities with other defendants who have committed similar crimes.  In particular, it distinguishes between the defendant and his co-conspirators:  Boomgaardt, who approached the government of his own volition in the early stages of its investigation, accepted responsibility for his actions, demonstrated genuine remorse, pled guilty to his crime, and assisted the government in its investigation—and who received a probationary sentence; and Pennings, who pled guilty after he was indicted, expressed remorse for his actions, and for whom the government anticipates seeking a term of incarceration that recognizes his substantial assistance with its investigation.

11

The government's recommendation appropriately distinguishes between this crime and other financial crimes insofar as it accounts for the fact that the defendant did not simply take money from clients and put it in his own pocket. It further recognizes that the sentencing guidelines here—driven as they are not just by the loss amount, but also by other enhancements reflecting the defendant's seniority and the scheme's complex and international nature—may not be the best measure of appropriate punishment on the particular facts of this case. And it recognizes the defendant's other qualities, including his lack of a prior criminal record and the collateral consequences of his conviction. Ultimately, the sentence the government seeks is just three months in prison for every million dollars the defendant and his co-conspirators stole. It is, the government submits, appropriate, but not greater than necessary, to recognize the seriousness of the defendant's offense and to afford just punishment and adequate deterrence, while avoiding disparities with other defendants who are similarly situated.

Conclusion

The crimes for which McLellan was convicted are serious and his lack of remorse clear. His sentence must send a clear message to bankers and securities industry professionals in the United States and around the world: that no matter how senior they are or how far and fast they have risen, no matter how distant the markets in which they operate or the victims they defraud, and no matter how complex or difficult to discover their crimes may be, they cannot defraud clients with impunity.

For the reasons set forth above, the government respectfully recommends that the defendant be sentenced to a term of imprisonment of five years.

12

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   */s/ Stephen E. Frank*
STEPHEN E. FRANK
Assistant U.S. Attorney

SANDRA MOSER
Acting Chief, Fraud Section
Criminal Division

By:   */s/ William E. Johnston*
William E. Johnston
Trial Attorney

Date:   October 9, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document file through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: October 9, 2018

*/s/ Stephen E. Frank*
Stephen E. Frank