UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)
UNITED STATES OF AMERICA            )
)
v.                                  )            No. 16-10094-LTS
)
ROSS MCLELLAN,                      )
Defendant                           )
)
_____ )

## DEFENDANT ROSS MCLELLAN'S SENTENCING MEMORANDUM

Mr. McLellan does not, in any respect, seek to depreciate or minimize the gravity of his offenses of conviction. He does, however, seek via this sentencing memorandum to place his conduct in the proper context, as well as to provide the Court with a full, three-dimensional understanding of the human being whose fate now rests in its hands.

I.    *Personal Background*

For his entire lifetime, Mr. McLellan has been a good person. Attached to this memorandum are 78 letters of support from family and friends which together bring into sharp focus the person now facing sentencing before the Court: a devoted son, a caring and supportive sibling, a loving husband, a deeply involved father of four young children, and an empathetic and dependable friend to many. As detailed in these letters, Mr. McLellan has made a habit of quietly helping those in need (asking for and expecting nothing in return), steadfastly offered the kind of friendship any person would cherish, and provided an unwavering foundation of support

1

and care to his family, his parents, his friends, and many more.  Even while facing federal

indictment, Mr. McLellan has remained an irreplaceable pillar of support to his wife Lisa, his

four young children, and many in his community.  He is the friend willing to go to extraordinary

lengths where necessary (*e.g.*, by organizing assistance for multiple neighbors battling cancer),

or to simply lend a compassionate ear and provide advice when smaller, day-to-day problems

begin to feel overwhelming.  He is the coach who goes out of his way to support children who

are shy or struggling, even those who are otherwise complete strangers to him.  He is the

community member willing to take charge of all aspects of a charity event to support a

neighborhood child diagnosed with a rare disease.  He is, simply put, independent of his

participation in the events that led to his conviction which are addressed below, an exceptional

human being.

 Mr. McLellan is 46 years old.  He was born in Warwick, Rhode Island to John and

Daune McLellan.  Mr. McLellan's family situation during his early years was difficult at times.

His father was an alcoholic, who was often intoxicated in front of his children and frequently

unemployed.  *See* PSR ¶ 54.[1]  The family also lacked financial resources, and was dependent on

public assistance, as well as help from extended family members, to meet their basic needs.  *See*

*id.*

 It is from these humble beginnings that Mr. McLellan developed his strong work ethic.

As his sister Patricia describes, "[a]t a very young age Ross had a paper route and that is when he

---

[1] Mr. McLellan himself has struggled with alcohol, a problem that has been understandably
exacerbated by the stress of the long investigation, prosecution, and trial of this case.  *See*
PSR ¶ 76.

first became conscientious.  Every day he would have to come home from school and deliver the

papers and once a week he would have to collect the money from his customers."  Exhibit 2.  As

a teenager, Mr. McLellan also worked in a supermarket meat and produce department.  *See*

Exhibit 3, Letter from Rose Angela McLellan.  In addition to helping support his family

financially, Mr. McLellan was a diligent student.  *See* Exhibit 2, Letter from Patricia LePage.

This work ethic, though rooted in childhood, has proved enduring for Mr. McLellan.  As his wife

Lisa describes, "Ross is the hardest-working person I know.  His parents did not go to college,

nor did they have the financial resources to fund his education. . . .  He put himself through

college and graduate school on scholarship and loans."  Exhibit 1.  Mr. McLellan's hard work

paid dividends.  He graduated from Stonehill College and earned an MBA from Boston College

by attending night classes.  After being hired by State Street, he quickly rose up the ranks

through hard work not privilege to become the youngest Executive Vice President in the history

of the bank.

More remarkable than Mr. McLellan's success was the fact that his humble, easygoing

nature remained entirely unchanged.  According to Mr. McLellan's sister, his "humility is almost

comical."  Exhibit 2.  As an example, she points to an interview Mr. McLellan gave to a local

newspaper after his son Matthew was the first baby born on the South Shore on January 1, 2007.

When reporters asked Mr. McLellan "what he did for a living his answer was very general and

basic when at the time he was a Vice President.  Ross's friends and colleagues had a good laugh

at his reluctance to share his accomplishments in the corporate world."  *Id.*  Mr. McLellan's

brother Andrew tells a similar story: "I read recently that Ross was the youngest executive vice

president in State Street's history and was a lecturer at M.I.T.  I knew Ross was successful but was un[a]ware of how successful.  This is because his career was only a small part of his life, which he rarely spoke about and never bragged about."  Exhibit 4.

For Mr. McLellan, his family always came first.  *See, e.g.*, Exhibit 4 (explaining that Mr. McLellan "was much more interested in coaching his children's sports teams, their education, and well-being").  Family is everything to Mr. McLellan.  He is a loving husband and father of four young children whom he adores.  Mr. McLellan has a thirteen-year-old son Luke, an eleven-year-old son Matthew, and seven-year-old twins Julia and Thomas.  As one friend puts it, "I have witnessed [Mr. McLellan's] eyes light up when his son Luke saves a goal or when his son Matt scores that goal.  I have witnessed his pride when his twins get up on stage at their elementary school to perform a song or recite a poem at [an] all school meeting.  I have seen that smile on his face when his daughter Julia runs into his arms after her dance recitals or gymnastic meets eager to receive flowers from her Dad. . . .  I have also seen the love that his family has for him."  Exhibit 5, Letter from Jeff Chisholm.  And Mr. McLellan's dedication to family is not limited to his own children.  To the contrary, he has also taken extraordinary steps to support extended family, including starting "a college fund for all his nieces and nephews."  Exhibit 2, Letter from Patricia LePage.  In the words of Mr. McLellan's nephew, "Ross is someone who would do anything for me and would truly do whatever he could to help anyone."  Exhibit 6, Letter from Alexander LePage.

In 2016, in addition to being under federal indictment, Mr. McLellan experienced a great deal of difficulty and loss in his family life.  Both of his parents passed away in a matter of

months, and his in-laws also fought serious illness.  Consistent with his longstanding character,

Mr. McLellan did not shrink from these trying circumstances, but instead rose to meet them.  As

his sister explains, "[t]oward the end of our parents' lives they were struggling financially.  Our

mother wanted nothing more than to spend her final days in her beloved home of 42 years.  Ross

discretely gave my father fifty thousand dollars so he could pay his bills.  As the executrix of my

parents' estate I did not know of this transaction until after their passing."  Exhibit 2.  Even more

important than this significant financial support was the crucial day-to-day assistance that Mr.

McLellan constantly provided to his ailing parents.  In the words of Mr. McLellan's brother,

"there were a number of trips to the emergency room or long hospital stays.  Many times, my

sister and I were unaware of the smaller events because Ross took care of everything.  Living

over an hour and half away, with a taxing career and large family, he would be by their side

making sure they had the necessary medicines, proper care, and that their financials were in

order and bills paid.  It is not unusual for a child to take care of elderly parents.  The important

facts are that Ross never wanted or took credit.  His only concern was doing the right thing for

my parents."  Exhibit 4.  Along similar lines, Mr. McLellan's mother-in-law writes, "in the last

three years my husband was partially paralyzed after spinal surgery due to cancer . . . .  Ross has

been wonderful throughout our ordeal, coming to us as often as he can and always offering to

help.  Ross is a true blessing to us!"  Exhibit 7, Letter from Theresa and Vincent Ziccardi.

Mr. McLellan's family leans on him now more than ever.  As his wife Lisa explains,

"[s]ince my return to full-time employment in 2016, Ross has assumed many of the primary

daily parenting responsibilities for our large family: he packs lunches, drives the children to

school and religious education classes, takes them to medical appointments, attends parent-teacher conferences, and coaches their youth hockey teams.  Further, our oldest son [Luke] has special needs, diagnosed at age 7 by a neurologist at Boston Children's Hospital with severe attentional deficits that impact his academic and social development."  Exhibit 1.  Both Luke's pediatrician and his neurologist wrote letters speaking to the crucial role that Mr. McLellan plays in his ongoing treatment, and the negative effect that a lengthy prison term would have on the McLellan children.  *See* Exhibits 8 and 9.

Mr. McLellan is not only a pillar of his own immediate and extended family, but also of the larger community.  As one friend puts it, "[o]ur community and by proxy our society are so much the better for Ross's presence and involvement directly on so many fronts for so many years."  Exhibit 10, Letter from William Toland.  Another refers to Mr. McLellan as "truly a beacon of our community," who "does everything for others, never thinking of himself."  Exhibit 11, Letter from Stephen Murray.  A third friend (of almost thirty years) concludes, "[e]verything Ross does is about making sure the people around him have more than he does.  This epitomizes who Ross is as a person.  Someone who puts everyone else above himself."  Exhibit 12, Letter from Brendan Burke.

This high praise for Mr. McLellan's character is borne out by countless examples (too many to summarize here) described in the attached letters of support.  Time and time again, Mr. McLellan has gone to extraordinary lengths to lend a hand to friends, neighbors, co-workers, and, perhaps most tellingly, complete strangers.  The examples copied below illustrate who Mr. McLellan is as a person far better than any summary ever could:

- "I will start with the hero part.  Starting in January 2011, Jenn has endured two separate cancer diagnoses that at times looked bleak.  Both battles landed her in hospitals for days, and sometimes, weeks on end.  With three young children, there is no way Jenn and I could have successfully focused on beating cancer while making our kids feel remotely normal and safe without amazing efforts from our friends and family.  ***Despite all of this happening at the same time Ross knew he would be dealing with this case, Ross was constantly there for us***.  Lots of people did amazing things – rides for the kids, dinners for the family – and the McLellans were no exception.  They pitched in on all of it.  But Ross went even further.  Without asking or even telling me, Ross began taking the trash out of my garage and taking it to the dump every Friday for months on end.  He did not do it for the credit but simply because we needed the help.  ***It was only looking back on it did I realize how selfless Ross was since, at the same time, he and his family were facing their own set of challenges but he did not hesitate to sacrifice his own time to help us***."  Exhibit 13, Letter from Bob Gilman (emphasis added).

- "In 2014, my wife Mary was stricken with brain cancer.  This, as you can imagine, was an enormous shock to our family (my wife and three children).  During the initial diagnosis and surgery, followed by the surgery to attempt to remove the tumor, and the subsequent months of radiation and chemotherapy, we were in need of significant assistance and support.  Lisa and Ross spearheaded an effort to organize our meals, childcare, transportation, and other crucial necessities during this time.  We got through this trying period because of their kindness, hard work and generosity."  Exhibit 14, Letter from Bill Farrington.

- "There is someone in our town who has battled cancer.  I will refer to her as 'Jane'. . . .  As Jane was recovering from surgery and dealing with chemotherapy and its side effects, Ross and Lisa were welcoming [her son] to their home and activities without reservation.  Many times, the boy would be in their house before the McLellan's would wake up and he simply joined them for breakfast as Jane was home recuperating.  I don't know this from Ross or Lisa, rather having observed this when carpooling with Ross to sports activities.  There was the boy, welcomed, with Ross & Lisa giving him a sense of comfort when he needed a level of support & compassion."  Exhibit 15, Letter from Joseph Guerrero.

- "Some years ago my husband was at the hospital with my father-in-law who was, at the time, quite ill.  Alex had called to tell me that his mother was going to come stay the night with us to be closer to the hospital in case of an emergency involving his father.  Our guest room bed was at the time 'on loan' at a neighbor's house, and I could not collect it and set it up for her on my own.  After speaking with a next-door neighbor, ***it was Ross who showed up a short***

7

***time later, having heard through the 'grapevine' that I needed help.  Ross has never met my in-laws.  Alex wasn't even home.  Yet there he was***."  Exhibit 16, Letter from Alex and Sarah Mills (emphasis added).

- "First and foremost, you can always count on Ross.  They often say it takes a village to raise kids these days and if this is the case then we are certainly blessed to have Ross McLellan part of our village.  I can't even begin to count the number of times he has driven our kids to practices and games.  ***If asked, he would probably tell you that we've done the same, but in all honesty we haven't even come close to returning all the times he has helped out our family***.  Ross truly is that friend who is always willing to help others.  He is that friend that shows up at your door to take you to dinner knowing your family is not around to help you celebrate your birthday.  He is that friend that would drop his plans or rearrange his schedule to help you out again and again never expecting anything in return."  Exhibit 5, Letter from Jeff Chisholm (emphasis added).

- "As it pertains to my middle child, he is shy socially and does not have a lot of confidence.  Getting him to games and practices was a chore, one that gave me great stress, as it was a constant battle.  I noticed after a few weeks that he was no longer fighting me on going to practice and games.  He became much more comfortable socially, I noticed him talking to the other kids around Ross as he was telling stories or congratulating the kids.  ***Ross could sense that my child was shy and nervous, and even though he did not know me or my child at the time, he would call out my son's number and tell him in front of the others that he had made a great play***.  It made all the difference in the world for my son as the other kids would repeat it to him, and the praise was something that coming from someone who is not his parent, meant the world to him.  For Ross to do this for my son, who now plays with much more confidence, and is more at ease socially, without knowing either of us, told me everything I needed to know about him. . . .  ***He had nothing to gain from going out of his way to help my son and put him at ease.  He did it because that is the type of person he is***. . . .  Shortly thereafter I introduced myself to Ross and thanked him for his overwhelming kindness.  It didn't even register with him that he had done anything as it just happens naturally for him."  Exhibit 11, Letter from Stephen Murray (emphasis added).

- "I owe so much of what my life is to Ross.  Below I have shared several stories involving Ross and me (there are many, many more).  None of them on their own are a big deal, but it is such small actions that occur frequently over an extended period-of-time that show true character . . . .  When I needed a place to live or a roommate – he found one for me.  When I needed encouragement, it was Ross who provided it.  When I had nowhere to go for a holiday, he would take me with

him to his parents.  When I had nothing going on or he found out I was alone, he would have me over for dinner.  When I was upset or needed a friend, it was his house I would go.  When I needed advice, it was his counsel I sought. . . .  Ross is an amazing friend.  I am so lucky to have had him in my life the past 23 years. I love him like a brother, love his family as my own and ***based on . . . what he has done for me and how he has been there for me over the years – I know he loves me back***.”  Exhibit 17, Letter from Craig Svendsen (emphasis added).

- “My son is a perfect example of his paternalistic nature.  [My son’s] enthusiasm for hockey has always outweighed his abilities.  Hockey is a game where natural talents are necessary to truly excel in this sport, and sadly [my son] wasn’t gifted with those skills.  He’s always struggled to keep up, and has worked very hard over the years to improve his game.  Ross has coached [my son] on a number of teams, and has been his constant advocate during countless sessions.  Hockey team placements in Hingham have been given an unhealthy importance, and are often driven by non-performance issues.  Over the years Ross had always been [my son’s] biggest cheerleader, speaking up for him and highlighting his hard work.  This has helped [my son] make appropriate teams he wouldn’t have otherwise.  [My son] wasn’t the only player Ross advocated for, though, as there were a number of others he went to bat for, ensuring their hard work and efforts were recognized and rewarded. . . .  ***We didn’t ask Ross to do that, he took it upon himself to speak up for these kids who didn’t have a voice themselves.  He wasn’t looking for anything in return, just doing what he felt was right***.”  Exhibit 18, Letter from Jim Taylor (emphasis added).

- “Our boys instantly loved Ross as he would always talk sports with them which they loved.  ***Ross always made himself available when the boys would go over and ask him to play catch with them.  They would wait for Ross to come home from work and would go running over with glove and ball in hand.  Ross never turned them away and never made them feel he was too busy***.  For my oldest son’s 8th birthday, Ross went out and bought him a Paul Pierce Celtics Jersey. My son wore it every day for months and months and at times he would sleep in that jersey.  It was the best birthday gift an 8-year-old boy received that year.” Exhibit 19, Letter from Karen Morris (emphasis added).

- “Every winter Ross comes out and plows our elderly neighbor’s driveway and our driveway as well.  When I tell him I will be out to shovel he tells me he enjoys doing the plowing and to stay inside.”  Exhibit 19, Letter from Karen Morris.

- “I remember my senior year leaving my town house on a Thursday evening on my way to enjoy one of the last nights.  On my way out of the townhouse that

evening, Ross was departing the opposite direction with a backpack.  I asked, 'where are you going?'  His response, 'to the Computer Center to put together everyone's resume.'  Ross took the hand-written resumes for all of my housemates and put them into a document to help them find jobs.  Again, Ross always put others above himself.  He did this back then and still does to this day."  Exhibit 12, Letter from Brendan Burke.

- "With our son having special needs, his interests have not fallen in the traditional sport activities that many kids play and often are the topic of adult discussions.  Ross always asks about what our kids are doing and his supportive attitude towards our activities (mountain biking, skiing, etc) have always been appreciated.  I have run into many parents that avoid that discussion with me.  Ross always sums up that spending time with our kids is always the most important thing and he has a very realistic view of the kid's sports activities that we don't participate in."  Exhibit 20, Letter from Brian Koyce.

- "As indicated, I feel I know Ross as a person and his moral fiber as well as anyone.  But I was caught off guard by something he did a few years back.  ***During the holiday season he had a number of gifts for his family stolen from his car.  Most people would be angry and upset.  His response was something to the effect that he hoped the lives of those responsible got better so they wouldn't need to do something like that in the future.  This is the Ross McLellan I know***."  Exhibit 4, Letter from Andrew McLellan (emphasis added).

- "Early in my trading career at State Street, I made a large trading error that cost our firm a significant amount of money.  I went home that night worried about a meeting I would have early the next morning with my direct manager and Ross.  It was a humbling and embarrassing mistake and I thought I was going to get fired, or at the very least, harshly reprimanded.  The next morning none of those things happened.  Ross sat me down and calmly asked me to explain what happened the day before and then told me to forget about it.  After that, we discussed ways to avoid such an occurrence in the future.  With some input from some other traders we came up with some new protocols that would eliminate such errors in the future.  I still fondly remember the way Ross handled the situation."  Exhibit 21, Letter from Sean Canavan.

Ross and his wife Lisa have also been generous with their time when it comes to

volunteer work and charitable causes:

- "While at State Street, Ross led volunteer teams in service of the Cradles to Crayons organization, donated a percentage of his salary to the United Way, and

was a sponsor for the Jimmy Fund.  More recently, he and I are on the planning committee for an annual summer fundraiser in our town to benefit Children's Hospital.  ***Ross spends countless hours helping to organize this charity Wiffle ball tournament – from ordering t-shirts to recruiting teams, to working the event itself***."  Exhibit 1, Letter from Lisa McLellan (emphasis added).

- "He has coached several teams for Hingham Youth Hockey and doesn't hesitate to offer his help with other sports.  Coaching with him, to have witnessed first-hand the positive influence he has had on the kids in our community.  He is able to coach in a manner that promotes both growth, sportsmanship, and respect for their team.  ***I would actually describe him as the driving force behind Hingham Youth Hockey*** serving as both equipment manager and league representative.  He has done such an outstanding job managing the equipment that he has rightfully earned the nickname 'USA Equipment Manager of the Year'."  Exhibit 5, Letter from Jeff Chisholm (emphasis added).

- "Most recently, Ross has been an integral part of a charity fundraiser that our teenage son started to raise awareness of his rare disease and to benefit the children's hospital where he is currently a patient.  When we sent out requests for help with this endeavor, it was no surprise to us that Ross was one of the first to respond to say that he would help in whatever way we needed assistance.  Many people will offer help in a situation like ours but then life gets busy and it is hard to help out which is certainly understandable.  However ***over the past two years during what we know has been the most difficult time in his life, he has helped out in so many ways to support our charity event and support his friends***.  He is always there to help with whatever we need.  He often works quietly behind the scenes to get things done.  For example, last year at the height of frenetic last minute event planning he arrived at our door with all the event t-shirts in hand.  Without being asked, he had driven into the city to pick up the shirts for us and deliver them because he knew everyone was overcommitted with other tasks.  He is a friend who cares deeply about others and is always there to help a friend in need."  Exhibit 22, Letter from Tom and Susanne Malloy (emphasis added).

- "Recently, I had the opportunity to experience Ross' generosity in a community setting.  Ross and his wife Lisa managed the second annual Wiffle Ball Tournament to raise money for the Children's Hospital.  Ross's neighbor's son is currently battling a rare bone disease along with another child in his town and they are seeking treatment at Boston Children's Hospital. . . .  ***Ross lined the fields, organized the teams, instructed the volunteers, posted the tournament board, hugged and high-fived every child that participated*** and even managed to hit a couple of home runs for our team.  The day was an absolute success and although Ross and Lisa would not take credit for it, it would not have been a

success without their direct involvement." Exhibit 23, Letter from Brian Doyle (emphasis added).

- "At Plymouth River School there is constantly a need for volunteers and my wife and I do our best to make certain that we contribute. We have been part of the PRS community for close to 7 years and there has never been a time when we have volunteered that the McLellan's were not there pitching in as well. *The McLellan Family exemplifies what it means to give back*." Exhibit 24, Letter from Geoffrey Hart (emphasis added).

Perhaps most impressive, and indicative of Mr. McLellan's character, is the fact that he has continued to be unfailingly selfless and empathetic even after being indicted and losing both of his parents all in the space of a single year:

- "[T]hroughout it all, Ross has been a model of resiliency and grace for our children, always answering their questions honestly, teaching them to be kind to others, and encouraging them to stand up for what they believe in. During his trial, Ross was adamant that this was his burden to shoulder alone, and actively discouraged his many family members and friends from coming to court to support him. . . . And yet *even in these bleakest and most uncertain times, Ross exhibits a profound sense of gratitude for his family and his blessings. I could not be more proud of the example he has set for our children*." Exhibit 1, Letter from Lisa McLellan (emphasis added).

- "Perhaps nothing has impressed us more about Ross since we have known him th[a]n the way he has conducted himself while having this case hanging over every aspect of his life for seven years. Ross has never failed to put others, and most importantly his family, first. Even at the lowest points in the case, Ross did everything possible to be there for his family. This includes attending a baseball game for his son the day of the verdict despite knowing that the other parents would know what happened and that the world had just dealt him a terrible blow. . . . Given what we know of him in all kinds of contexts, it is not surprising but also no less inspiring." Exhibit 13, Letter from Bob Gilman.

- "Ross loves hockey and was a goalie in his younger days. He is a coach and board member of the local youth hockey program. . . . When invariably there is an issue, like I had with my younger son, Ross was there to lend an ear and look to ensure my son was treated fairly. In fact, with all of Ross's professional challenges *2 days prior to his arrest, unbeknownst to me, he made time for me to understand my son's situation*. He intervened on my son's behalf as he wanted

to ensure my son's best interests were being served.  ***In hindsight, he had many more pressing matters bearing down on him, though he made the time for me given his concern for a friend and the values he lives daily***."  Exhibit 15, Letter from Joseph Guerrero (emphasis added).

- "[O]ne of our fondest recollections of Ross was when we were first invited to attend the McLellans' annual 4th of July pool party in 2011. . . .  I must share with you that although Ross was simultaneously dealing with immense stress and sadness, you would never know it this year.  All the kids including his own looked up to him as they always do . . . .  I will never forget the moment my wife and I looked out . . . and watched Ross and their 4 kids in the pool as if it was a normal July 4th.  It took incredible courage for Ross knowing his life as he knows it could be forever changed but there he was playing in the pool with his kids and making sure all the kids had a great time the entire day.  This is Ross.  He is always the one watching out for everyone – his wife, his children, his parents, family, friends and community."  Exhibit 25, Letter from David and Cherie Le Penske.

II.  *A sentence of one year and one day would be fair, just, and sufficient to meet the sentencing goals set forth in 18 U.S.C. § 3553(a)*

As in all sentencing proceedings, this Court is tasked with imposing a punishment that is "sufficient, but ***not greater than necessary***" to serve the enumerated statutory goals.  18 U.S.C. § 3553(a) (emphasis added).  Among other things, the Court should consider the nature and extent of the defendant's particular role in the offense; what, if any, punishment has already been inflicted upon him; his individual circumstances; sentences imposed and to be imposed on his co-conspirators, and, in the discretion of the court, on other defendants in other similar or related cases outside the district; and the likelihood of recidivist behavior.  In the circumstances of the present case, the defense respectfully submits that a sentence of one year and one day is "sufficient, but not greater than necessary" to serve § 3553(a)'s sentencing goals.

a.  *Specific and general deterrence*

First, Mr. McLellan is a first-time offender, having never previously been in contact with

13

the criminal justice system, much less convicted of a crime.  From a sentencing perspective, this fact is of the utmost importance.  As Judge Gertner noted in *United States v. Germosen*, there is "a demonstrable difference in the recidivism rates of real first time offenders as compared to other defendants in Criminal History Category I."  473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citation omitted).[2]   There is no need to subject Mr. McLellan to years of incarceration in order to specifically deter him.

The goal of general deterrence similarly does not require a lengthy period of incarceration.  In short, no rational human being aware of what has occurred to Mr. McLellan would ever knowingly and intentionally choose to endure what he has experienced over the course of the past seven years.  Having spent decades of his life building a successful career and an unimpeachable reputation in his community, Mr. McLellan has now lost all he has worked for.  The countless hours spent working to put himself through night school and earn a master's degree have been wasted, his job at State Street terminated, his initially successful consulting business now essentially worthless and without clients given the reputational impact of the current charges and then conviction.  Moreover, in the six years since his termination, Mr. McLellan and his family have been forced to live under the burden first of U.K. regulatory allegations and then U.S. criminal investigation followed by felony charges.[3]  Anyone paying

---

[2] The Sentencing Commission, recognizing this fact, recently promulgated an amendment, effective November 1, 2018, directing courts to "consider imposing a sentence other than a sentence of imprisonment" for certain first-time offenders.  Amendments to the Sentencing Guidelines at 29 (Nov. 1, 2018).

[3] The Court plainly has the ability to consider these collateral consequences in fashioning an appropriate sentence.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is

even an iota of attention to Mr. McLellan's case has already been adequately deterred.

Additionally, banks cannot help but understand the serious nature of the conduct at issue in light

of State Street's widely publicized deferred prosecution agreement with the government.  In

order to resolve the charges, State Street was required to pay more than $64 million to U.S.

government agencies.  *See* Department of Justice Release (Jan. 18, 2017).[4]

      b.    *Circumstances of offenses*

     While Mr. McLellan, for sentencing purposes, is not contesting the evidence in this

proceeding, a careful examination of the circumstances of his offenses reflects certain factors

that the Court can consider in mitigating his individual culpability.  He was neither the initial

architect of the overcharging scheme nor heavily involved in its day-to-day operation.  *See*

Defendant's Memorandum in Support of Objections to Government's Version of Offense

Conduct and Sentencing Guidelines Calculations at 2-5.  Mr. Pennings, not Mr. McLellan, was

charged with running State Street's transition management business in Europe.  Mr. Pennings

was supervised by Steve Smit, the SSgM head of the U.K. Office, as well as by Mr. McLellan.

After losing a number of bids to competitors that he believed to be charging more money than

---

difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (varying from guidelines to impose non-incarcerative sentence "in part because of a number of statutory and regulatory collateral consequences [the defendant] will face as a convicted felon").

[4] The U.K. regulatory authority assessed a separate penalty of almost $38 million.  *See* Financial Conduct Authority Release (Jan. 31, 2014).  These fines were in addition to State Street's full reimbursement of the mark-ups charged to all six affected clients, even KIA which was arguably not defrauded at all.

State Street, Mr. Pennings began to move State Street's business model closer to that of its competitors.[5]

Crucially, none of the co-conspirators were even conscious of the possibility that they were committing crimes. *See* June 12 Tr. at 59 (Pennings) ("I never, in my wildest dream, dreamed that I could be indicted by US court . . . [o]r by any court."); June 7 Tr. at 144-45 (Boomgaardt) (Q: "You didn't believe that you were committing a criminal act, did you?" A: "Again, I didn't think about in that way, but you know, I'm thinking about it now in that way, but no, I didn't at the time."). State Street not McLellan received the non-disclosed markups. Mr. McLellan acknowledges that he made errors in judgment. He could have acted differently. While certain internal disclosures were made, for instance in Pennings' April 2011 conference with State Street attorneys and their outside counsel at the London law firm of Herbert Smith and in Mr. McLellan's disclosures in November 2010 prior to KIA 121 to persons including Mark Hansen, the global head of Compliance, *see* Defendant's Memorandum in Support of Objections to Government's Version of Offense Conduct and Sentencing Guidelines Calculations at 19-21, Mr. McLellan could have sought clearer and more express approval from his superiors at State Street, as well as the bank's legal and compliance personnel. He similarly could have required Pennings, Boomgaardt, and the EMEA transition management team to be more explicit with

---

[5] An additional fact relevant to sentencing is that Mr. Pennings repeatedly told Mr. McLellan that State Street's competitors in the transition management field, particularly investment banks, were profiting from undisclosed spreads. *See, e.g.*, June 8 Tr. at 134; *id.* at 108. The government sought to differentiate State Street by pointing to language in its RFP responses indicating that it would act as the client's "agent" or "fiduciary," however the catalyst for the offense was not personal greed but a desire to have the bank succeed in this uniquely competitive European environment.

clients about how State Street and more particularly its affiliate broker-dealer would be

compensated for its services.  Mr. McLellan has already paid an excruciating price for these

mistakes.

   c. *Disparity as compared to co-defendants and similar cases nationally*

  Section 3553(a) specifically directs sentencing judges to consider "the need to avoid

unwarranted sentence disparities among defendants . . . who have been found guilty of similar

conduct."  Boomgaardt pled guilty to participating in the exact same conspiracy for which Mr.

McLellan was convicted.  Judge Casper, ***consistent with the government's recommendation***, did

not impose any incarcerative sentence, instead requiring only that Boomgaardt complete a one-

year term of probation.  Pennings, the other principal co-conspirator, has not yet been sentenced,

but the government agreed to accept his guilty plea to a single count of conspiracy.  The statutory

maximum for that offense is five years' imprisonment.  *See* 18 U.S.C. § 371.  This was prior to

and independent of a subsequent cooperation agreement that makes Pennings eligible for even

greater consideration at his future sentencing.

  While it is true that Mr. McLellan was Pennings' superior with regard to their

employment at State Street, Pennings' involvement in the charged scheme was significantly

greater than Mr. McLellan's.  It was Pennings, not Mr. McLellan, who actually made the false or

misleading representations at issue.  It was Pennings who told Dutch Doctors State Street would

charge 1 bp, when he actually planned to charge 1.5.  It was Pennings who told Royal Mail that

the quoted flat fee included "all trading required."  While Mr. McLellan respects the jury's

verdict and does not dispute that he failed to direct Mr. Pennings to not charge non-disclosed

broker-dealer mark-ups to NTMA and Royal Mail as well as helping to charge mark-ups for certain trades involving Royal Mail, NTMA, and KIA, any suggestion that his culpability is equal to or greater than Pennings' is inconsistent with the trial evidence.

Although Mr. McLellan, in contrast to Mr. Pennings and Mr. Boomgaardt neither entered a plea of guilty nor exchanged his cooperation and then testimony for the benefits that have already been conferred on Mr. Boomgaardt, Mr. McLellan asserted his unquestioned right to a jury trial where he required the government to meet its burden.  Not only is this a permissible response to a criminal charge, but it advances the very societal interests that the Sixth Amendment was originally intended to serve.  *See* Nat'l Ass'n of Criminal Defense Lawyers [hereinafter "NACDL"], *NACDL's Effort to Expose and Limit the Trial Penalty Garners Broad Support with the Launch of a National Reform Effort* (July 2018) (quoting John Gleeson, former U.S. District Judge) ("We have a system in which you do not get punished unless the government can prove you guilty beyond a reasonable doubt and to the extent that prosecutors are empowered to create a world in which only the extreme risk assumers will exercise that right, we are getting close to extinguishing it."); NACDL, *The Trial Penalty* at 14 (2018) (quoting Thomas Jefferson) ("I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." (alteration in original)). Mr. McLellan did not testify, nor did he elicit any witness testimony that could fairly be characterized as incredible.  Although he is not entitled to a decreased guideline for acceptance of responsibility, his decision to contest the government's proof should not otherwise enhance the sentence he would have received had he pled guilty.

Section 3553(a)(6) also encompasses consideration of sentences imposed on defendants in other similar cases.  *See United States v. Robles-Alvarez*, 874 F.3d 46, 52 (1st Cir. 2017) (explaining that this subsection is "primarily aimed at national disparities," but "also permits consideration of disparities among co-defendants" (citation omitted)).  One comparator comes to mind immediately because it has been repeatedly proffered by the government as a close analogue to this case, namely the alleged fraud involving undisclosed mark-ups at ConvergEx.  *See* June 25 Tr. 109 (referring to State Street's conduct in this case as "exactly the same as the ConvergEx lie").  The government recently entered into a plea agreement to resolve allegations against Anthony Blumberg regarding the ConvergEx fraud.  The agreement reflects a term of imprisonment of zero to eighteen months.  *See United States v. Blumberg*, No. 14-CR-458 (D.N.J.), Dkt. 269.  Sentencing is scheduled for December.  ConvergEx's global head of transition management, who allegedly played a role in the fraud very similar to that alleged as to Mr. McLellan, was not charged criminally at all.  The allegations against him were instead pursued in civil enforcement proceedings.  *See SEC v. Bassily*, No. 16-CV-2733 (S.D.N.Y.), Dkt. 1.  This civil case was resolved via a settlement agreement which enjoined the defendant from violating securities laws and required him to disgorge his profits from the fraud.  *See* Dkt. 84. Mr. McLellan has already lost his securities licenses and did not personally profit at all from the overcharging scheme.

The ConvergEx case is not an outlier.  Indeed, courts have routinely imposed non-custodial or relatively short incarceratory sentences in fraud cases where the conduct was ***more*** serious than the offense conduct here, based on factors equally applicable in this case, including

the aberrant or isolated nature of the conduct, lack of personal profit to the defendant, and the

fact that the victim(s) received value:

| CASE | GSR | SENTENCE | SUMMARY |
|---|---|---|---|
| *United States v. Mordach,* 14-CR-10218 (D. Mass) (Saris, J.) | 151-181 | 1 year, 1 day | Defendant pled guilty (without an agreement) and was sentenced to 1 year and 1 day despite the fact that the scheme caused a $4.3 million loss to the Federal Perkins Loan program and affected 1,103 students.  Defendant did not personally profit from the scheme and defendant's conduct was aberrant. |
| *United States v. Prosperi,* 06-CR-10116 (D. Mass) (Stearns, J.) | 87-108 | 6 months home confinement, 3 years probation | Defendant and his co-conspirators engaged in a years-long fraud scheme in which they provided concrete for the federally funded "Big Dig" construction project that did not meet required specifications, and created false documentation certifying compliance, causing a loss in excess of $5 million. Defendant was sentenced to 3 years probation and 6-month home confinement. The First Circuit affirmed the sentence. *United States v. Prosperi*, 686 F.3d 32, 50 (1st Cir. 2012).  The sentencing court relied, in part, on its perception that the offense was motivated by the "corporate culture" of the company, rather than a desire for "personal enrichment." *Id.* at 45. |
| *United States v. Harkonen,* 08-CR-164 (N.D. Cal.) (Seeborg, J.) | 188-235 | 6 months home confinement, 4 years probation | Defendant, the president and CEO of a pharmaceutical company, was convicted of misrepresenting the effectiveness of a drug as part of a scheme to defraud doctors into prescribing, dying patients into taking, and insurers into paying for the drug, which caused a loss of $32.1 million. |
| *United States v. Greebel,* 15-CR-637 (E.D.N.Y.) (Matsumoto, J.) | 108-135 | 18 months | Attorney convicted by jury of securities fraud resulting in losses of over $10 million involving Martin Shkreli.  Defendant betrayed his client's trust in committing the offense. |

| *United States v. Litvak*, 13-CR-19 (D. Conn.) (Hall, J.) | 108-135 | 24 months | Defendant, a senior trader and managing director at Jefferies & Co, Inc. (a global securities and investment banking firm), was convicted of defrauding multiple victims in 55 securities transactions over the course of three years. As part of the scheme, defendant misrepresented the prices of bonds purchased by Jefferies and then sold to victims.  After a second successful appeal, the United States Attorney's Office agreed to dismiss the case. |
|---|---|---|---|
| *United States v. Lumiere*, 16-CR-483 (S.D.N.Y) (Rakoff, J.) | 87-108 | 18 months | Defendant was convicted of securities and wire fraud for his participation in a scheme to mismark securities in a hedge fund in order to overstate the value of the fund. The scheme resulted in millions of dollars in unlawful gain. |
| *United States v. Block*, 16-CR-595 (S.D.N.Y) (Oetken, J.) | Over 100 years | 18 months | Defendant, the former CFO of a publicly traded real estate investment trust, was convicted of manipulating the company's financial results by fraudulently inflating a key metric used by investors to evaluate Real Estates Investment Trusts.  The fraud caused a loss in excess of $300 million to shareholders.  Defendant had otherwise led a law-abiding life and had been punished by the loss of his profession. |
| *United States v. Collins*, 07-CR-1170 (S.D.N.Y) (Preska, J.) | Life | 1 year, 1 day | Defendant was a lawyer who played an indispensable role in the accounting fraud at Refco, a publicly traded company. Defendant prepared legal documents over several years for transactions planned by company insiders to effect the fraud.  There were thousands of victims and billions of dollars in losses. The fact that the defendant did not personally profit from the fraud took the case "outside the heartland" of fraud cases.  *See* Dkt. 244 at 30. |
| *United States v. Graham*, 06-CR-137 (D. Conn.) | Life | 1 year, 1 day | Defendant, in-house counsel at General Reinsurance Corporation ("GRC"), played a substantial role in creating and concealing |

| | | | |
|---|---|---|---|
| (Droney, J.) | | | sham agreements in fraudulent reinsurance transactions between GRC and AIG causing a loss in excess of $500 million to shareholders.  Defendant did not personally profit from the fraud. |
| *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) | 57-71 | 1 day | Sixth Circuit affirmed variance from the guideline range of 51 to 71 months to 1 day imprisonment where defendant was convicted of defrauding a bank and the Small Business Administration, causing the SBA to lose approximately $1.7 million. |
| *United States v. Roth*, 05-CR-792, 2008 WL 686783, at *1-3 (N.D. Ill. Mar. 11, 2008) (Darrah, J.) | 63-78 | 4 years probation | Defendant was in-house counsel who pled guilty to making false statements to the FBI and admitted to engaging in a scheme to defraud a hospital that caused a loss of $14.7 million. |

The defendants in the above cases were convicted of fraud that caused substantially more loss, *e.g., Harkonen*, *Block*, *Collins*, *Graham*, to many more victims, *e.g., Mordach*.  A term of imprisonment of one year and one day would be fully consistent with these exemplars.

For all the reasons articulated herein, and those to be advanced at the hearing, the defense respectfully submits that a sentence of imprisonment for one year and one day is fair, just, proportionate, and sufficient to meet the § 3553(a) sentencing objectives.  This sentence would certainly be "significant . . . to an offender," like Mr. McLellan, "who has never been incarcerated at all."  *United States v. Herink*, No. 10-CR-169, 2012 WL 3112002, at *8 (D. Neb. July 30, 2012).  And there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J.

485, 492 (1998)); *see also, e.g.*, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects."). These findings reflect the commonsense conclusion that no jail sentence is "short" to the human being who has to actually spend his time confined to a correctional facility, separated from friends and loved ones.

III.    *Conclusion*

For the greater part of four decades, Mr. McLellan did everything right. He worked his way through night school and rose through the ranks at State Street to become the youngest Executive Vice President in the history of the bank. He started a family, becoming a dedicated husband and a loving father to four young children. He was a consistently caring, helpful, and empathetic co-worker, neighbor, and friend. Here, at worst, for a relative fraction of his life (2010-11), Mr. McLellan failed to lead when leadership was needed – he did not proactively direct Pennings to provide fuller disclosure in view of the State Street marketing and RFP materials. That mistake, though, should not outweigh a lifetime of good deeds, earnest decision-making, hard work, kindness, and overall decency and humanity. For all of the reasons set forth above, the defense respectfully requests a sentence of one year and one day in prison.

Respectfully submitted,

Ross McLellan
By his Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480

20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: October 10, 2018

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, October 10, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg