UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 16-10094-LTS |
| | ) | |
| ROSS MCLELLAN, | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANT ROSS MCLELLAN'S MEMORANDUM IN SUPPORT OF HIS
OBJECTIONS TO THE GOVERNMENT'S VERSION OF OFFENSE CONDUCT AND
SENTENCING GUIDELINES CALCULATIONS**

Now comes the defendant Ross McLellan and respectfully submits this memorandum in

support of his objections to the government's version of offense conduct and its Sentencing

Guidelines calculations.

**MEMORANDUM OF LAW**

As this Court is fully aware, Supreme Court and First Circuit precedents confer broad

discretion to determine the appropriate sentence in individual cases. *See, e.g.*, *Gall v. United

States*, 552 U.S. 38 (2007); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008)

(affirming "dramatic" downward variance under *Gall*).  No longer are district courts bound by

the strictures of the guidelines or even permitted to presume that the applicable guidelines range

is reasonable.  *See Gall*, 552 U.S. at 49-50.  Rather, "once the [guidelines sentencing range

("GSR")] is properly calculated, sentencing becomes a judgment call for the court, and the court

may construct a sentence varying from the GSR based on a complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (citation omitted).  Moreover, under *Kimbrough v. United States*, 552 U.S. 85 (2007), courts are free to deviate from the guidelines even where doing so "contravenes a broad policy pronouncement of the Sentencing Commission." *United States v. Politano*, 522 F.3d 69, 74 (1st Cir. 2008) (citation omitted); *see also, e.g.*, *United States v. Vanvliet*, 542 F.3d 259, 271 (1st Cir. 2008) (relying on *Kimbrough* for proposition "that district courts legitimately may cite their own disagreements with Guidelines policy as justification for imposing a below-Guidelines sentence").

"It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence." *United States v. Lacouture*, 835 F.3d 187, 189-90 (1st Cir. 2016) (citation omitted).  Accordingly, such an enhancement "cannot be applied unless the government . . . prove[s] the predicate fact or facts" to be more likely true than untrue. *Id.* at 191 n.6.

I.      *Circumstances of Offenses*

For sentencing purposes, Mr. McLellan will not dispute much of the government's recitation of the relevant facts.  Mr. McLellan does not, for example, dispute the evidence that he did not direct Ed Pennings to explicitly disclose to NTMA and Royal Mail State Street's intention to charge both an explicit transition management fee and a further mark-up on bond and equity trades by the broker-dealer, nor that he furthered both the Royal Mail and NTMA transitions by participating in the implementation of the trading which included the imposition of

2

the mark-ups.  There are, however, a few discrete points of contention that are potentially material to the Court's threshold determination of the correct sentencing guideline and then to the imposition of a fair and just sentence.

      a.    *Mr. McLellan did not introduce the idea of hidden commissions*

According to the government, the conspiracy to charge "hidden commissions" from State Street's EMEA clients "started with KIA."  June 25 Tr. at 27; *see also* June 5 Tr. at 25 ("At [Mr. McLellan's] direction, State Street **began** secretly overcharging its clients." (emphasis added)). The government argued to the jury that Mr. Pennings "wasn't going to go ahead on this scheme without the boss's [Mr. McLellan's] okay."  June 25 Tr. at 28.  Mr. Pennings, who was competing with other large financial institutions that charged low or no explicit commissions/fees and made their profits from trading (*e.g.*, Goldman Sachs, Nomura, Citibank), felt that to compete he had to also offer KIA, NTMA, and Royal Mail a very low explicit fee – either zero (KIA) or below two bps (NTMA and Royal Mail) – that would generate little or no profits for the bank.  *See* June 6 Tr. at 72; June 8 Tr. at 47.  Then, despite the marketing material and RFP responses that averred that State Street was different than their market-making competitors, non-disclosed broker-dealer mark-ups were charged.  That Mr. Pennings initiated this charging structure to compete in the European market after losing many RFPs to competitors like Nomura (*e.g.*, many of the NTMA proposals prior to NTMA transition 14 and many KIA bids) is amply proven by the evidence.  That Mr. McLellan did not prohibit this practice is also not contested; that he invented or "directed" this competitive practice that is at the core of this case is respectfully denied.

In fact, the practice of charging mark-ups without specific disclosure pre-dated Mr. McLellan's involvement in the charged scheme.  Indeed, Pennings charged a mark-up embedded in the bid/ask spread on multiple occasions months prior to KIA 115 and without any prompting or involvement from Mr. McLellan.  On February 24, 2010, Pennings placed a call to Anna Tanfield, another London-based State Street employee, regarding an upcoming "broker deal" for a transition management client.  Pennings said to Tanfield, "I don't want them [the client] to see how much commission we put in there."  Exhibit 1 at 3.  He later added, "it is built into the spread anyway."  *Id.*  Along similar lines, on March 22, 2010, Pennings received an email regarding an upcoming trade for Swiss client AHV, a broker rather than transition management client.  Benjamin Mooney, one of State Street's London transition managers, wrote that the benchmark prices "are what we showed the client, with 2 bps comm built in.  So . . . your street-side benchmarks are these plus 2 bps."  Exhibit 2.  Pennings forwarded the message to another State Street employee in London adding, "Or more if we can get away with it!"  *Id.*  Ultimately, Pennings expressly instructed that the added commissions be withheld from the client.  In fact, he specifically directed a subordinate to "remove the headline 'including Comm'" from an Excel file reflecting the "best bid" State Street had received for various securities.  Exhibit 3.  There is no evidence that Mr. McLellan had any detailed knowledge or involvement in these transactions.

      b.    *Mr. McLellan did not "direct" the criminal conduct*

The government has maintained throughout this litigation that State Street's EMEA transition management personnel made the charged misrepresentations "at the direction of McLellan."  *See, e.g.*, PSR ¶ 16.  But the trial evidence made clear that Mr. McLellan had no

personal interactions whatsoever with any of the six affected clients.  *See* June 7 Tr. at 138

(Boomgaardt); June 12 Tr. at 167 (Johnson); *id.* at 246 (Haerden); June 13 Tr. at 24 (Mcknight);

June 19 Tr. at 53 (O'Callaghan).  Mr. McLellan therefore did not directly make a single

representation, false or otherwise, to any client representative nor did he direct Mr. Pennings in

terms of determining when he would add a non-disclosed broker mark-up to a disclosed

transition fee nor in a selection of the amount of any mark-up.  Pennings, by contrast, had years-

long relationships with clients such as KIA and NTMA before Mr. McLellan even became the

global head of State Street's Portfolio Solutions Group.

Even conceding for sentencing purposes that Mr. McLellan was aware of the mark-ups

charged to Royal Mail as well as NTMA often by the receipt of "FYI" emails from Mr.

Pennings, as well as the evidence that those mark-ups were not specifically disclosed to the

client, Mr. McLellan did not direct Pennings to lie to Royal Mail by assuring it that the quoted

flat fee included "all trading required."  Trial Ex. 93.  Indeed, to the contrary, Pennings did not

copy Mr. McLellan on that email, or even subsequently forward the communication to him.[1]

While these facts may not be viewed by the Court as justifying Mr. McLellan's conduct, the

defense submits that they provide necessary context for evaluating Mr. McLellan's failure to

direct Pennings to disclose to Royal Mail that the overall State Street "fees" would include not

only the explicit fee for transition management services (approximately 242,000 GBP) but also

an additional "fee" of one or two bps for the affiliate broker-dealer's executing of the trades.

---

[1] In fact, the evidence demonstrates that Pennings told Mr. McLellan as late as August 2011 that
he had told Royal Mail that he "could not say that we didn't make any money elsewhere."  Trial
Ex. 548.

Mr. McLellan's involvement in post-transition communications with Royal Mail must similarly be viewed in the appropriate context.  It is true that, in response to an after-the-fact client inquiry, Mr. McLellan recommended that Pennings describe the mark-ups as "inadvertent commissions."  But Pennings had already committed to this lie before involving Mr. McLellan. First, he answered Ian Mcknight's request for information about the overall fees paid by Royal Mail to State Street by saying that the quoted fee plus any futures commissions was "the sole revenue for SSGM and/or any of its affiliates on this event."  Trial Ex. 160.  Then, upon being confronted by the client about the mark-ups, Pennings responded, "[t]hat doesn't seem right so let me investigate . . . and get back to you."  *Id.*  Pennings testified that he discussed this reply "with Rick [Boomgaardt] and possibly Paul McGee and Ian Holden, but that's it."  June 11 Tr. at 127.  By the time Mr. McLellan was finally brought into the loop, he faced the difficult decision of (a) telling the client that Pennings had lied; or (b) continuing to characterize the issue as a mistake.  The former option would almost certainly entail a loss of potential future business from Royal Mail, a pension fund holding between 20 and 30 billion GBP in assets.  Mr. McLellan chose to go along with Pennings' suggestion that the charges had been the result of mistake in order to protect his employee and the bank's relationship with an important client.  This was the wrong choice.  For sentencing purposes, however, the Court should not adopt the inaccurate suggestion that Mr. McLellan initiated the after-the-fact lie.

Mr. McLellan and Mr. Pennings did make disclosures of the fact that the broker-dealer was charging certain European clients a mark-up, Mr. Pennings during an April 2011 telephone meeting with both State Street and outside counsel (Herbert Smith) and Mr. McLellan during the

6

November 2, 2010 meetings in Boston with the head of State Street Compliance Mark Hansen and others.  *See infra* at 19-21.  Clearly more could have been done within the bank to make absolutely clear that the mark-ups were explicitly approved by Mr. McLellan's superior David Puth and others.[2]

II.   <u>*Loss Amount*</u>

     a.   *Policy disagreement with fraud guideline*

Few guideline provisions have been subject to more consistent criticism than that applicable to fraud offenses.  Courts have been particularly skeptical of that guideline's loss table, which provides for very large sentencing enhancements based solely on aggregate loss amount.  The Sentencing Commission chose not to "start[] the Guidelines calculation . . . by selecting a base level that realistically reflected the seriousness of a typical fraud offense." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).  Instead, it set a base offense level so low as to translate to a sentence of probation depending on criminal history, and then created sixteen categories of loss amount that serve as "the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *Id.*  "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be

---

[2] This failure resulted in the bank's decision to rebate the charged mark-ups and terminate Mr. McLellan from his position at the bank.  But neither Mr. Pennings, *see* June 12 Tr. at 59, Mr. Boomgaardt, *see* June 7 Tr. at 144-45, nor Mr. McLellan believed they were committing a crime or even an FCA or SEC violation, as contrasted to the ordinary "fraud" defendant whose criminal intent at the time of the offense is far more clear-cut.

irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).  As

Judge Rakoff has poignantly explained:

> The notion that this complicated analysis, and moral responsibility,
> can be reduced to the mechanical adding-up of a small set of
> numbers artificially assigned to a few arbitrarily-selected variables
> ***wars with common sense***.  Whereas apples and oranges may have
> but a few salient qualities, human beings in their interactions with
> society are too complicated to be treated like commodities, and the
> attempt to do so can only lead to ***bizarre results***.

*Id.* at 350 (emphasis added).  To generalize criminal culpability largely from the mathematics of

a loss or intended loss without distinguishing the nature of the conduct that led to the loss, the

extent to which the defendant monetarily gained from the offense, whether the victim was

vulnerable rather than an institution able to transcend the loss or able to rely on civil processes

and its overall wealth to recover from the loss, and countless other factors that distinguish one

fraud offense from another – *e.g.*, distinguishing a Ponzi scheme, an investor ripping off

vulnerable victims, a securities fraud that compromised the integrity of financial markets with

the current offense – illustrates the unreliability of predicating a sentence almost exclusively on

"loss."[3]

Beyond this general concern about the fraud guideline's "sentencing by numbers"

approach, several jurists have criticized the loss table on the grounds that the astronomical

sentencing increases it calls for are utterly lacking in empirical support.  Indeed:

> the numbers assigned by the Sentencing Commission to various
> sentencing factors appear to be more the product of ***speculation,
> whim, or abstract number-crunching*** than of any rigorous
> methodology—thus maximizing the risk of injustice. . . .  The
> Guidelines' calculations for this offense are no longer tied to the

---

[3] That the losses were fully repaid by State Street is also not irrelevant.

> mean of what federal judges had previously imposed for such
> crimes, but instead reflect an ever more draconian approach to
> white collar crime, unsupported by any empirical data.

*Id.* at 351 (emphasis added); *see also United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *United States v. Corsey*, 723 F.3d 366, 380 (2d. Cir. 2013) (Underhill, J., concurring) ("The three sets of amendments to the loss table of the fraud guideline . . . have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences.  Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission.").

As the Second Circuit has recently recognized, disagreement with the Sentencing Commission's "unusual[]" approach to fraud "is a circumstance that a sentencing court is entitled to consider" in imposing a variant sentence.  *Algahaim*, 842 F.3d at 800 (citing *Kimbrough*, 552 U.S. at 101).  And district courts have, in practice, repeatedly varied downward from large guideline sentencing ranges driven by loss amount.  In doing so, several courts have been harshly critical of the fraud guideline.  *See United States v. Johnson*, No. 16-CR-457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) (imposing 24-month sentence despite GSR of 87-108 months, and observing, "[a]s far as this court can tell, the Sentencing Commission's loss-enhancement numbers ***do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of***

*the crime*." (emphasis added)); *Gupta*, 904 F. Supp. 2d at 355 (varying downward from GSR of 78-97 months to impose 24-month sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting "***the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense***" (emphasis added)); *United States v. Herink*, No. 10-CR-169, 2012 WL 3112002, at *7 (D. Neb. July 30, 2012) (imposing sentence of 18 months despite GSR of 51-63 months and explaining that "because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court afford[ed] them less deference than it would to empirically-grounded Guidelines"); *see also* Mark H. Allenbaugh, *Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 23 (2013) ("It appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range.").  In short:

> where . . . the calculations under the guidelines have ***so run amok that they are patently absurd on their face***, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.

*Adelson*, 441 F. Supp. 2d at 515 (emphasis added).  The defense submits that, for these reasons, the Court can and should disregard the loss-driven GSR and impose an individualized sentence based on the particular facts and circumstances of this case.  *See* Defendant's Sentencing Memorandum at 13-23.

      b.     *Fraud guideline overstates the gravity of the offense*

Even if, contrary to the authorities cited above, the Court agrees with the policy underlying the fraud guideline and its loss table, the government's calculation of loss in this case, which would increase Mr. McLellan's offense level nearly four-fold (from seven to twenty-seven) based on conduct from which he made no tangible profit or gain, strays beyond the bounds of that provision in a number of respects.[4]

Assuming that the Court agrees in full with the government's guidelines calculation, a downward departure or variance is appropriate on the grounds that the ***twenty-level enhancement*** dictated by the loss table "substantially overstates the seriousness of the offense." U.S.S.G. §2B1.1, cmt. n.20(C) (stating that downward departure may be warranted on this basis); PSR ¶ 108 (noting this as "potential grounds for departure"); *United States v. Pol-Flores*, 644 F.3d 1, 5 (1st Cir. 2011) ("[O]ne ground supporting a below-guideline sentence could be that the intended loss attributed to [the defendant] overvalued the seriousness of the offense." (citation omitted) (second alteration in original)). The fraud guideline's principal reliance on loss amount is a particularly poor fit to the facts of this case. There is no suggestion, much less evidence, that even a single penny of the purported loss went into Mr. McLellan's pocket. *See*

---

[4] It is important to note at the outset that the jury's verdict does not establish that Mr. McLellan committed any fraud other than in connection with the NTMA and Royal Mail transitions, which served as the predicates for the four substantive EMEA counts. While he was also convicted of conspiring to defraud certain EMEA clients, it is impossible to tell which, if any, other clients the jury's verdict was based upon. Because the government did not request a special verdict, there is no indication that the jury found Mr. McLellan to have committed, conspired to commit, or aided and abetted any fraud on KIA, Sainsbury's, Eircom, or Dutch Doctors. Purported losses arising from transitions conducted on behalf of these four clients should, therefore, be excluded from the guidelines calculation, as explained in more detail below. *See infra* at 18-21, 24-7.

*United States v. Watt*, 707 F. Supp. 2d 149, 155 (D. Mass. 2010) (noting that loss is not an "appropriate proxy" for culpability where the defendant "made nothing from the scheme"); *Herink*, 2012 WL 3112002, at *7 ("[T]here is no evidence that [the defendant] profited from his fraudulent acts, and that fact tempers his culpability to some degree."). Rather, the trial evidence was undisputed that the entire amount of the mark-ups went to State Street. *See* PSR ¶ 26 ("[N]o monies were earned by the conspirators as a result of the overcharges.").[5] Mr. McLellan is the antithesis of the Ponzi schemer or the preyor on vulnerable defenseless that the "loss" guideline encompasses.

The case of Mark Johnson provides a helpful analogue. Johnson, HSBC's global head of foreign exchange ("FX") trading, was alleged to have exploited confidential client information for his own benefit in connection with a large FX trade. Johnson engaged in "front-running" by directing subordinates to buy large amounts of the currency the client would soon be purchasing, thereby driving up the price and increasing HSBC's profits. Not only did the offense adversely affect the client, but it also "caused a disruption in the rate at which the British Pound traded against the U.S. Dollar, thereby having a financial impact on countless businesses and consumers and undermining the public's confidence in the integrity of" FX markets. *United States v. Johnson*, 16-CR-457 (E.D.N.Y.), Dkt. 217 at 3. After the jury rendered a guilty verdict, Johnson, like Mr. McLellan, faced a large (sixteen-level) sentencing enhancement for loss

---

[5] The government may suggest that Mr. McLellan benefited indirectly through career advancement or performance-based compensation, but the incremental impact of these seven specific transitions was almost certainly negligible. Mr. McLellan was in charge of State Street's global Portfolio Solutions Group. Transition management was just one of several sub-groups under that umbrella. And State Street conducted as many as 1,000 transitions per year during the relevant time period across its EMEA, U.S., and APAC regions.

12

amount.  Unlike Mr. McLellan, Johnson was also subject to an enhancement for obstruction of justice for his "false testimony" at trial.  *Johnson*, 2018 WL 1997975, at *1.  Despite the resulting GSR of 87-108 months, the court sentenced Johnson to 24 months imprisonment.  In doing so, it focused on the fact that the GSR was driven by the loss amount, to the almost complete exclusion of other "significantly more important" sentencing considerations.  *Id.* at *3.  Accordingly, the court "refuse[d] to mechanistically impose such an illogical sentence," and instead relied heavily on its analysis of the 3553(a) factors.  *Id.*  This Court should follow suit here.  Indeed, an even lower sentence is called for in Mr. McLellan's case, which did not involve any disruption of global financial markets or any attempt to obstruct justice.

       c.     *Value of trade execution services as to NTMA and Royal Mail*[6]

      The transitions conducted for NTMA and Royal Mail were both deals in which State Street quoted a flat transition management fee but also charged a mark-up on trades without specific disclosure to the client.[7]  Boomgaardt testified as to the flat fees that, if they were the only source of revenue for State Street, there would be little if any profit from the bank's participating in either transition.  *See* June 6 Tr. at 72; June 8 Tr. at 47.  In calculating the loss for these transitions, as well as all the others, the government simply includes the entire amount of

---

[6] This argument is equally applicable to the five other transitions addressed below.

[7] As explained by Cassie Waller, one of State Street's primary contact persons for NTMA, after losing many consecutive bids, Pennings held a series of lunch meetings with this client.  While Pennings never "put two and two together" for NTMA, he "was pretty explicit about how Nomura made their money when they were quoting one or zero.  And the one time we then quote for . . . one or zero close to as low as we can go, we win the deal."  Exhibit 4 at 9.  In light of these interactions, NTMA at least had reason to inquire as to whether State Street was charging a mark-up.  It did not ask this question, and State Street did not volunteer the information.

the mark-ups charged.  But the commentary to the applicable guideline provision expressly states that any such loss "***shall be reduced by . . . the fair market value of . . . the services rendered[] by the defendant or other persons acting jointly with the defendant***."  U.S.S.G. §2B1.1, cmt. n.3(E) (emphasis added).  The government's analysis, in direct contradiction of this authoritative guidance, fails to account for the value of broker-dealer services indisputably rendered by State Street to the relevant clients.

The First Circuit has long recognized two distinct types of frauds.  The first type involves "the 'true con artist,' . . . who intends only to pocket the money without rendering [anything] in return."  *United States v. Prange*, 771 F.3d 17, 36 (1st Cir. 2014) (citation omitted) (alteration in original).  The second, and less culpable, category "involves a person who would not have attained the contract or loan but for the fraud, but who fully intends to perform."  *Id.* (citation omitted); *see also United States v. Barnes*, 125 F.3d 1287, 1291 (9th Cir. 1997) (referencing "extensive precedent acknowledging that value may be rendered even amid fraudulent conduct").  In the latter circumstance, courts have consistently held that a sentencing judge must reduce the amount of any loss to reflect the value of services rendered by the defendant.  *See United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) ("If the defendant . . . rendered any legitimate services to the victim before the fraud was detected, the loss amount must be reduced by the fair market value of . . . the services rendered."); *United States v. Anders*, 333 F. App'x 950, 955 (6th Cir. 2009) (finding it "apparent that the district court, by failing to apply the required credit against loss, miscalculated the applicable advisory Guidelines range, rendering defendant's sentence procedurally unreasonable"); *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008)

("A straightforward application of the guidelines requires discounting the actual loss by the value of the drugs dispensed."); *Barnes*, 125 F.3d at 1291 ("[T]he district court erred in failing to award Appellant credit for the value of the services he provided satisfactorily.").  The reason for this "net loss" approach is simple: it "reflects the Sentencing Commission's position that an offender who transfers something of value to the victim is generally committing a less serious offense than one who does not."  *United States v. Worley*, 729 F. App'x 850, 851 (11th Cir. 2018).

In the present case, the trial record clearly establishes that State Street's affiliated broker-dealer provided a valuable, highly complex trade-execution service to the bank's transition management clients.  *See, e.g.*, June 13 Tr. at 158 (Finocchi).  What's more, the government's own witnesses unanimously agreed that broker-dealers deserve to be, and routinely are, compensated for executing trades.  *See id.* at 119 (Dionisio); *id.* at 158 (Finocchi); June 15 Tr. at 114 (Clemmenson).  The evidence was also clear that the execution services provided by the broker-dealer were separate and distinct from the transition management services rendered by State Street Bank Europe Limited.  *See* June 19 Tr. 156 (Menchel); June 13 Tr. at 119-20 (Dionisio); *id.* at 159 (Finocchi).  Indeed, the clients would have had to pay to execute trades, even if State Street routed orders through external, non-affiliated broker-dealers.  *See* June 19 Tr. at 163 (Menchel).

The only compensation to State Street for these execution services were the very same mark-ups that comprise the entirety of the government's loss calculation.  Accordingly, the loss amount must be reduced by the fair market value of those services.  And here, the best evidence

15

of fair market value is the fact that the clients were unequivocally satisfied with what they paid immediately after the transactions. *See id.* at 47 (O'Callaghan); *id.* at 110; June 13 Tr. at 48 (Mcknight).[8]  This satisfaction is hardly surprising.  Indeed, in both the NTMA and Royal Mail transitions, State Street outperformed its initial implementation shortfall estimate, transitioning the assets in question at a lower cost than the amount expected and agreed upon with the client. With respect to NTMA, combining all three tranches of the transition, State Street beat the implementation shortfall estimates reflected in the applicable pre-trade reports by a total of more than 800,000 Euros.  *Compare* Trial Ex. 560 at 2 (estimating 8,865,661 Euros in costs for tranche 1 equity trades), *with* Trial Ex. 138-1 at 7 (reflecting 468,196 Euros in actual costs for tranche 1 equity trades); *compare* Trial Ex. 561 at 1 (estimating 244,966 Euros in costs for tranche 1 fixed income trades), *with* Trial Ex. 138-1 at 14 (reflecting 242,202 Euros in actual costs for tranche 1 fixed income trades).[9]  For Royal Mail, State Street traded 1.3 billion GBP in assets for a total cost of only 6,178,958 GBP, slightly less than the estimated implementation shortfall.  *See* Trial Ex. 148-1 at 4.  In short, in terms of total transition costs, both NTMA and Royal Mail received precisely what they bargained for, and actually even more.  Perhaps for this reason, after each and every one of the relevant transitions, either the client or the consultant

---

[8] At this time, the clients had received post-trade reports which included the mark-ups in the total implementation shortfall calculation, although they did not separately itemize the mark-ups.

[9] State Street also beat its implementation shortfall estimate in tranche 2.  While the actual costs of tranche 3 exceeded State Street's estimate, Eugene O'Callaghan testified at trial that this discrepancy was due to circumstances outside of the transition manager's control.  *See* June 19 Tr. at 110.  In any event, even accounting for this tranche, State Street still significantly outperformed expectations overall.

pursued a continuing relationship with State Street.[10]

As to the size of the mark-ups, the former General Counsel of FINRA Marc Menchel testified that mark-ups up to 25 bps were "common," and that enforcement in the fixed income context would "tend[] to happen only after 4 percent [or 400 bps]."  June 19 Tr. at 152.  Perhaps unsurprisingly in light of the foregoing, the government has never argued that the mark-ups charged were excessive or unreasonable, instead basing its case entirely upon the failure to make the needed disclosures to the clients who testified to believing that only the explicit transition management fee was being charged.  There was no evidence that the relevant clients could have obtained comparable broker-dealer services for less money than that charged by State Street.[11] As a result of this lack of proof, "it is hard to see how the government can measure [the] loss on the theory that, but for the fraud, it would have enjoyed that initial low price."  *United States v. Stern*, 13 F.3d 489, 497 (1st Cir. 1994); *see also Johnson*, 2018 WL 1997975, at *2 ("The Government has not proven by a preponderance of the evidence that no profit would have resulted from the [] transaction but for [the defendant's] fraudulent behavior, nor has it rebutted the argument that HSBC likely would have made that profit on the [] transaction even without

---

[10] KIA, for example, solicited bids from State Street in connection with its next four transitions (and awarded one of those four to State Street).  Dutch Doctors similarly awarded a transition to State Street in June 2011.  NTMA solicited a bid from State Street in June 2011.  The consultants involved in both the Sainsbury's and Eircom transitions also solicited future business from State Street.

[11] Mr. McLellan does not have access to proposals submitted to NTMA and Royal Mail by competing bidders because of the government's refusal to invoke its right under applicable Mutual Legal Assistance Treaties to compel production of those documents.  While Royal Mail did produce a summary chart with some information about competing bids, that is no substitute for access to the underlying submissions themselves.

engaging in deceptive conduct.").  At best, the clients were deprived of the opportunity to have

their assets transitioned at cost, which no other competing provider would likely have offered

them.[12]

     d.     *State Street committed no fraud in connection with the KIA transitions*

Nearly half of the government's total loss calculation stems from two transitions

conducted for KIA.  But neither Mr. McLellan nor anyone else at State Street committed a fraud

in connection with those transactions.  The government's heavy reliance on the KIA transitions

therefore runs afoul of the rule that "[o]nly conduct that is criminal may be used as 'relevant

conduct' to determine a defendant's offense level."  *United States v. Benns*, 740 F.3d 370, 374

(5th Cir. 2014); *see also, e.g.*, *United States v. Gambaryan*, 654 F. App'x 888, 890 (9th Cir.

2016) (vacating sentence reflecting loss calculation based on Medicare claims where court was

unable to "quantify how many of the total claims submitted were fraudulent").  In analyzing this

issue, it is important to note that not every instance of "sharp dealing" or "unethical conduct"

amounts to a criminal fraud.  *United States v. Weimert*, 819 F.3d 351, 357 (7th Cir. 2016).

The government's theory of fraud for KIA is unique as compared to the other transactions

at issue.  That is because, contrary to the allegation of "hidden" or "secret" commissions, both

Boomgaardt and Pennings testified that State Street expressly informed KIA of its intent to

charge a mark-up, notwithstanding the fact that it was quoting zero commissions.  *See, e.g.*, June

---

[12] Mr. McLellan notes that, while the government's proffered loss amount for five of the six
relevant clients matches those set out in the Deloitte report, the alleged loss to NTMA exceeds
Deloitte's calculation by about $700,000.  While Mr. McLellan notes this discrepancy and
objects to the government's figure, he does not believe that the issue will be material in
determining the applicable guideline offense level.

5 Tr. at 137 (Boomgaardt testifying that, before KIA 115, he heard Pennings tell KIA over the phone, "if we charge zero for this, ***we're going to have to take a spread***" (emphasis added)); *see also* June 6 Tr. at 31; June 8 Tr. at 117.  KIA's response was simple:  it instructed Pennings "to go with the flow," June 12 Tr. at 148, and never asked State Street how much money it made off the transition, *see id.* at 73.

The only conceivable basis for the government's inclusion of the KIA mark-ups in its loss calculation is Pennings' testimony that, before KIA 115, he told the client that State Street's remuneration would come from "the other side of the transaction."  June 8 Tr. at 118.  But, as Pennings himself openly acknowledged, this statement was "nonsense" because "it's just not practically possible" to charge the "other side."  *Id.*  Such "nonsensical" statements are "incapable of influencing the intended victim" and therefore cannot support a fraud conviction. *Dickey v. Kennedy*, 738 F. Supp. 2d 222, 226 (D. Mass. 2010).  This is especially so where the purported victim is one of the world's largest sovereign wealth funds with full access to the most sophisticated advisers.

The absence of any fraud is even clearer with respect to KIA 121.  As an initial matter, this transition involved no communication comparable to Pennings' email suggesting that the KIA 115 mark-ups would come from the "other side."  Just as it had with the prior KIA transition, State Street bid zero commissions.  But, on the eve of trading, a unique "complication" arose: State Street's new "Rates business," which engaged in principal trading of fixed income securities, wanted to be involved.  June 11 Tr. at 29.  Among other concerns raised by this development was the fact that State Street would "be making money twice," as both the

19

internal broker-dealer (*i.e.*, SSgM or SSgMI) and the Rates desk would charge a mark-up.  *Id.* at

30.  Pennings viewed this as especially problematic given the fact that "the periodic notice would

say zero commissions" and "everyone knew we were going to make a lot of money out of" the

deal.  *Id.*

The involvement of the Rates desk led to a full review of the transition by State Street's

global heads of legal and compliance.  In connection with that review, Mr. McLellan, over

Pennings' objection, sent the periodic notice to State Street's global head of legal, Bryan

Woodard.  Exhibit 5.  He subsequently forwarded the same correspondence to the bank's global

head of compliance, Mark Hansen, and the head of Global Markets, David Puth.  Trial Ex. 311;

Exhibit 6.  Over the course of the ensuing meetings and email correspondence, Mr. McLellan

received repeated assurances from legal and compliance personnel that the broker-dealer could

charge KIA mark-ups/fees for executing its trades.  *See, e.g.*, Trial Ex. 53 (Tom Bryant, State

Street's head of U.S. trading, indicating that a State Street lawyer told him "she didn't see it as

an issue that we both [the Rates desk and transition management] make money on this trade . . .

so if we are forced to do it we should both be able to charge.  (us as the BD and them as an MM

on behalf of STT).").  Indeed, despite the relevant documentation reflecting no commissions, the

permissibility of charging a mark-up to KIA was taken as a given, with the only question being

whether the Rates desk could take a second mark-up.  Thus, when Hansen raised the prospect of

"potential fiduciary issues" regarding the charging of two mark-ups, Mr. McLellan responded ***to

the bank's global head of compliance*** and five other recipients, including two State Street

compliance officers and one attorney, "Are you saying only one of us can charge a mark up?"

Exhibit 7.  Hansen responded that he would review the relevant documentation the following day, but he certainly never prohibited State Street's internal broker-dealer from charging a mark-up on trading which, following these discussions, the broker-dealer added to the price of the bond trades while acting as riskless principal.[13]  Ultimately, State Street's legal department expressly allowed trading to proceed, including the use of the Rates desk.[14]

III.   *Organizer/Leader*

The government also seeks a two-level enhancement on the grounds that Mr. McLellan "was an organizer, leader, manager, or supervisor in any criminal activity."  U.S.S.G. §3B1.1(c).  For purposes of this enhancement, it is not enough that Mr. McLellan was technically Pennings' superior based on their employment positions at State Street.  Instead, the relevant inquiry is whether Mr. McLellan acted as an organizer or leader in the charged "criminal activity."  *Id.*; *see also United States v. Flores-De-Jesus*, 569 F.3d 8, 34 (1st Cir. 2009) (explaining that the defendant must "control, organize, or manage criminal *actors*" (citation omitted)).

---

[13] Perhaps for these reasons, the Superseding Indictment contains no explicit reference whatsoever to KIA 121.

[14] Based on the foregoing, it is unsurprising that, in January 2012, months after Mr. McLellan had been dismissed from State Street, Stephen Smit, the bank's Executive Vice President for the EMEA region, wrote a letter to KIA declining to refund the very mark-ups now at issue.  After a review of relevant documentation and email correspondence, State Street concluded that KIA's "staff understood that [State Street] would earn some level of compensation for the transition services provided."  Exhibit 8.  More specifically, "State Street would arrange to receive a portion of the bid-ask spread."  *Id.*  Smit maintained that both KIA transitions were "successful" and "that the compensation earned" was "fair in light of the high quality project management, risk management and trading that State Street carried out."  *Id.*  Months later, Deloitte, an accounting firm hired by State Street to review and analyze the relevant transactions, reached a similar conclusion.  In contrast to the five other clients at issue, Deloitte found no "deliberate overcharging" of KIA.

With this perspective, it becomes clear that Mr. McLellan was a leader in name only.  Mr. McLellan's lack of supervisory power over Pennings is perhaps best exemplified by the Royal Mail transition.  Pennings chose not to copy Mr. McLellan on his crucial assurance that the fee quoted included "all trading required."  Trial Ex. 93.  This example of Pennings acting "as a free agent" undermines any suggestion that Mr. McLellan exercised control over his criminal activity. *United States v. Al-Rikabi*, 606 F.3d 11, 14 (1st Cir. 2010).  Boomgaardt testified that he took his direction from Pennings and had little, if any, personal interaction with Mr. McLellan regarding most of the relevant transitions.  *See* June 6 Tr. at 51; *id.* at 65; *id.* at 147; *id.* at 158.

IV.    *Violation of Securities Law*

For the reasons articulated in his Motion for Judgment of Acquittal, Mr. McLellan maintains that the conduct proven at trial does not amount to a violation of U.S. securities laws. *See* Dkt. 449 at 2-8; Dkt. 495 at 2-6; Dkt. 504 at 2-8.  While Mr. McLellan understands that the Court has rejected this argument in the context of his Rule 29 motion, he nonetheless contends that, because the evidence was insufficient to satisfy Rule 10b-5's "in connection with" requirement or to prove domestic securities transactions, the U.S.S.G. §2B1.1(b)(19) enhancement should not apply.

V.    *Offense Committed Outside U.S./Sophisticated Means*

Mr. McLellan agrees that, as a technical matter, the guidelines call for a two-level enhancement because a substantial part of the fraud occurred outside the U.S.  The guideline provision at issue, U.S.S.G. §2B1.1(b)(10)(B), was, however, intended primarily to address cases involving extraterritorial "conduct, such as sophisticated concealment, that makes it difficult for

law enforcement authorities to discover the offense or apprehend the offender." U.S.S.G. App.
C, amend. 577 (Reason for Amendment). Here, the operation of the charged scheme from the
U.K. was entirely divorced from any motive to evade detection or apprehension by U.S.
authorities. To the contrary, the conduct was based in London simply because that is where
Pennings and Boomgaardt worked. The defense respectfully submits that a variance is
appropriate to reflect the fact that the pertinent language of §2B1.1(b)(10), while technically
applicable to these facts, was adopted principally to address a different fact pattern.
Additionally, the defense contends that increasing Mr. McLellan's sentence based on the
extraterritorial nature of the fraud violates *Morrison v. National Australia Bank, Ltd.*, 561 U.S.
247 (2010).

The government's alternative suggestion that a §2B1.1(b)(10) enhancement is warranted
because the scheme "involved sophisticated means" is belied by its own theory of prosecution.
This enhancement requires "more than the concealment or complexities inherent in fraud."
*United States v. Balde*, 616 F. App'x 578, 584 (4th Cir. 2015) (citation omitted); *see also United
States v. George*, 841 F.3d 55, 66 (1st Cir. 2016) (citing a scheme utilizing "corporate shells" as
the "prototypical example"). But, as characterized by the government in its closing argument,
the charged scheme at issue in this case was "at its heart . . . one of the oldest and most basic
frauds out there, bait and switch . . . ." June 25 Tr. at 21-22; *see also id.* at 33 ("It was a bait and
switch, plain and simple."). The government's concession that the defendant's fraud, far from
being particularly complex, was instead "basic" and "simple" precludes a guidelines
enhancement for sophisticated means.

VI.    _Transitions to be Excluded from Guideline Calculation_

Much like KIA, the Court should decline to consider loss amounts attributed to the Sainsbury's, Eircom, or Dutch Doctors transitions in calculating the applicable GSR.

a.    *Sainsbury's and Eircom*

Amounts ascribed to the Sainsbury's and Eircom transitions, $1,003,375 and $1,109,722, respectively, should be excluded from the loss calculation in light of the paucity of evidence connecting Mr. McLellan to the transitions in any way, much less to any intentional overcharging.   For sentencing purposes, a defendant is "not automatically . . . responsible for all the losses caused by the jointly undertaken criminal activity." *United States v. Pizarro-Berrios*, 448 F.3d 1, 6 (1st Cir. 2006).  Rather, the Court "must make an individualized determination regarding the amount of loss attributable to, or reasonably foreseeable by, a [particular] defendant." *Id.* at 7.

In the present case, the result of this individualized determination is clear.  The record is bereft of any witness testimony or documentary exhibits connecting Mr. McLellan to the Sainsbury's transition in any manner.  The evidence was similarly scant with respect to Eircom. The only relevant witness testimony was Pennings' one-word affirmative answer when asked whether he had discussed with Mr. McLellan his intent to charge a hidden spread for this transition.  But this fleeting accusation, entirely devoid of detail, is difficult to square with the lack of corroborative documentary evidence.  The only trial exhibit linking Mr. McLellan to the Eircom transition was an email chain between he and Boomgaardt discussing upcoming deals. Boomgaardt volunteered, "Eircom is kicking off in anger tomorrow."  Trial Ex. 155.  Mr.

24

McLellan responded asking whether revenues are "still about 1 mill." *Id.* Of course, Mr.

McLellan's mere awareness of the approximate revenues expected from the upcoming transition

says nothing of his knowledge regarding the terms of any fee agreement crafted by Pennings

and/or Boomgaardt. Absent evidence that Mr. McLellan knew these projected revenues

exceeded any agreed fee, there is simply no indication that Mr. McLellan was complicit in a

fraud.[15]

       b.    *Dutch Doctors*

     The evidence connecting Mr. McLellan to the Dutch Doctors transition was also thin.[16]

The Dutch Doctors transition occurred in June of 2010, and the client consisted of two related

Netherlands pension funds. Pennings, who was from the Netherlands himself, built a

relationship with the client. *See* June 8 Tr. at 163. He informed the client that State Street would

take a spread of 1 bp as compensation, but ultimately ended up charging 1.5 bps. Boomgaardt

testified at trial that he did not recall having a single conversation with Mr. McLellan about the

Dutch Doctors transition. *See* June 6 Tr. at 52. The relevant emails on which Mr. McLellan was

included were largely informational in nature and contained no detailed discussion of fee

structure or mark-ups. Crucially, Mr. McLellan was not copied on the key email in which

Pennings inaccurately told the client that State Street would charge a spread of only 1 bp. Trial

Ex. 38. Of course, without knowledge of what had been represented to the client, Mr.

---

[15] Tellingly, Deloitte designated Pennings and Boomgaardt as "key individuals" for both the
Sainsbury's and Eircom transitions, but did not include Mr. McLellan in either list.

[16] Again, Deloitte's list of "key individuals" included both Pennings and Boomgaardt, but not
Mr. McLellan.

McLellan's mere awareness that State Street expected to earn significant revenues from the Dutch Doctors transition cannot establish his complicity in any fraud.[17]

The government's inclusion of Dutch Doctors in its loss calculation fails for a second, independent reason.  There were no securities traded on U.S. exchanges as to the Dutch Doctors transition.   Several courts have held that Congress did not intend for "foreign crimes" to be considered in calculating a defendant's offense level.  *United States v. Azeem*, 946 F.2d 13, 17-18 (2d Cir. 1991); *see also United States v. Chao Fan Xu*, 706 F.3d 965, 992 (9th Cir. 2013) ("[T]he connection between Defendants' bank fraud and the United States is too attenuated to be considered when calculating a base offense level."), *abrogated on other grounds by RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016); *United States v. Chunza-Plazas*, 45 F.3d 51, 57 (2d Cir. 1995) (holding that "illegal activities" in foreign country that "were not crimes against the United States . . . should not be included in the guideline calculation"); *United States v. Turner*, 624 F. Supp. 2d 206, 214 (E.D.N.Y. 2009) (holding that, in order to qualify as "relevant conduct," foreign acts must constitute "a crime against the United States").  Here, as Mr. McLellan has already explained and the trial evidence has not controverted, the alleged fraud on Dutch Doctors lacked sufficient U.S. connections to constitute a domestic securities or wire fraud.  *See generally* Dkt. 343.

If the contentions in this section, and those made with respect to KIA, are adopted, the

---

[17] Neither is it sufficient that Pennings informed Mr. McLellan that State Street would "have to charge a bit more" once he learned that the bank would not be able to earn any futures clearing revenue.  Trial Ex. 42.  As an initial matter, it is not inherently nefarious or illegal to charge more on some trades to compensate for a loss of revenue with respect to others.  Nothing about Pennings' email to Mr. McLellan reflects an intent to add ***undisclosed*** charges.

overall loss is reduced from $20,793,490 to $7,451,357 leading to a 2-level reduction of the guideline, *see* U.S.S.G. §2B1.1(b)(1)(J).

VII.    *Conclusion*

For the foregoing reasons, Mr. McLellan respectfully objects to the government's version of offense conduct and its sentencing guidelines calculation.

Respectfully submitted,

Ross McLellan
By his Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Robert M. Goldstein**
Robert M. Goldstein
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 742-9015
rmg@goldstein-lawfirm.com

Dated: October 10, 2018

27

<u>**CERTIFICATE OF SERVICE**</u>

I, Martin G. Weinberg, hereby certify that on this date, October 10, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

<u>**/s/ Martin G. Weinberg**</u>
Martin G. Weinberg