UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
                                        )
UNITED STATES OF AMERICA                )
                                        )
        v.                              )        No. 16-10094-LTS
                                        )
ROSS MCLELLAN,                          )
        Defendant                       )
                                        )
_____        )

**DEFENDANT ROSS MCLELLAN'S MOTION FOR RELEASE PENDING APPEAL
AND INCORPORATED MEMORANDUM OF LAW**

Defendant Ross McLellan respectfully moves, pursuant to 18 U.S.C. §3143(b) and Fed.

R. Crim. P. 46(c), that this Honorable Court continue his release on bond pending his appeal to

the United States Court of Appeals for the First Circuit. Mr. McLellan presents no flight or safety

risk, and his appeal will raise substantial questions of law that, if decided in his favor, will likely

result in reversal or a new trial:

1.  The evidence was insufficient to support McLellan's convictions for securities fraud

and conspiracy to commit securities fraud.

2.  The Court's instructions regarding the "in connection with" and materiality elements

of securities fraud were erroneous.

3. The Court erred in failing to instruct the jury that the wire fraud statute does not apply

extraterritorially.

4. The Court erred in failing to order the government to exercise its MLAT rights to

obtain material evidence.

**Local Rule 7.1(a)(2) Certification**

The government opposes this request for release pending appeal.

## I.    THE STANDARD FOR GRATING RELEASE PENDING APPEAL.

Under 18 U.S.C. §3143(b)(1)(B), a court considering a defendant's request for release pending appeal must make two determinations: (1) whether "the appeal raise[s] a substantial question of law or fact" and (2) whether, "if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985). A "substantial question" is "a 'close' question or one that very well could be decided the other way." *Id.* at 523. Whether or not the defendant's appeal presents a "close" question is to be decided on a case-by-case basis. *Id.* "[L]ikely to result in reversal or an order for a new trial" requires "that the claimed error not be harmless or unprejudicial." *Id.* The "likely to result" standard is to be applied "flexibly." *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002). *See United States v. Zimny*, 857 F.3d 97, 101 (1st Cir. 2017) ("[W]e must ask whether a reversal or new trial is likely if the substantial question of fact Zimny has raised . . .is determined favorably to [Zimny]."); *United States v. Powell*, 761 F.2d 1227, 1233 (8th Cir.1985) (in deciding the second part of the standard, the court "must assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction").

The First Circuit has stressed that bail pending appeal is *not* "contingent on a finding by the district court that it is likely to be reversed." *Bayko*, 774 F.2d at 523. *See, e.g., United States v. Greenberg*, 772 F.2d 340, 341 (7th Cir. 1985) (district court does not have to find that it is

more likely to be reversed than affirmed); *Powell*, 761 F.2d at 1232 ("a judge considering the question of bail pending appeal need not hold . . . that he or she has probably made a mistake"); *United States v. Miller*, 753 F.2d 19, 23 (3d Cir.1985) ("The federal courts are not to be put in the position of 'bookmakers' who trade on the probability of ultimate outcome").

> Thus, in determining whether there is a substantial question, a court must keep in mind that it is not being asked to reverse its position on issues decided at trial, nor is it being asked to grant a new trial. It must decide only that a significant issue exists that merits appellate review and that the issue is critical enough to the defendant's conviction that a contrary appellate ruling would warrant a reversal.

*United States v. Hicks*, 611 F.Supp. 497, 499 (S.D. Fla. 1985). The issues to be raised in Mr. McLellan's appeal amply satisfy this standard.

## II.     MR. MCLELLAN DOES NOT POSE ANY FLIGHT OR SAFETY RISK.

Mr. McLellan does not anticipate that the government will contend that he poses any risk of flight or dangerousness. Mr. McLellan has been free pending trial and sentencing since April 2016, and has fully complied with all the terms and conditions of his release. Prior to the events giving rise to his convictions, Mr. McLellan had led a law-abiding, and indeed exemplary, life for more than four decades. There is no indication that he would deviate from this long track-record of lawfulness during the pendency of an appeal.

After the jury verdict, this Court sentenced Mr. McLellan to an incarcerative term of 18 months. Given the fact that the median processing time for First Circuit appeals is approximately 11 months, *see* First Circuit 2016 Annual Report at 18, it is likely that, if the Court denies release pending appeal, Mr. McLellan will, given the complexity of this case, serve most of his term of imprisonment before his appeal is even decided. Release pending appeal would, therefore, have the added advantage of ensuring that Mr. McLellan's appeal rights are not rendered illusory.

III.   **THIS APPEAL WILL RAISE SUBSTANTIAL ISSUES WHICH, IF DECIDED IN MR. MCLELLAN'S FAVOR, WILL LIKELY RESULT IN THE REVERSAL OF MR. MCLELLAN'S CONVICTIONS OR AN ORDER FOR A NEW TRIAL ON ALL COUNTS OF CONVICTION.**

A.   **The Securities Fraud Convictions (Counts Two and Three and So Much of Count One as Charges Conspiracy to Commit Securities Fraud).**

1.   **The applicable law.**

15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5 contain a critical limiting principle: the fraud must have been "in connection with the purchase or sale of any security." In *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014), the Supreme Court considered the question whether the phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" in 15 U.S.C. §78bb(f)(1)(A) was broader than misrepresentations that are material to the purchase or sale of a covered security. Answering that question with a resounding no, the Court held that "[a] fraudulent misrepresentation . . . is not made 'in connection with' . . . a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Id.* at 387. After *Troice*, as the First Circuit has recognized, "the 'in connection with' requirement is satisfied only 'where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security.'" *Hidalgo-Velez v. San Juan Asset Mgmt., Inc.*, 758 F.3d 98, 106 (1st Cir. 2014). *See Henderson v. Bank of New York Mellon Corp.*, 146 F. Supp. 3d 438, 443-44 (D.Mass. 2015) ("After *Troice*, a mere coincidence of fraud with a transaction in covered securities will no longer suffice" to satisfy the "in connection with" requirement). The same is true under 15 U.S.C. §78j(b) and the parallel language of Rule 10b-5: A misrepresentation is material only "when there is a substantial likelihood that a reasonable

investor would find [the misrepresentation] important in making an investment decision." *United States v. Vilar*, 729 F.3d 62, 92 (2d Cir. 2013), *quoting United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012).

Misstatements that "do[] not affect the decision to make the investment in which the loss complained of occurred [are] not actionable under Rule 10b-5." *Trustees of Hotel Employees & Rest. Employees Int'l Union Pension Fund v. Amivest Corp.*, 733 F.Supp. 1180, 1186 (N.D. Ill. 1990), *quoting Latigo Ventures v. Laventhal & Horwath*, 876 F.2d 1322, 1325 (7th Cir. 1989). *See, e.g., SEC v. Pirate Investor LLC,* 580 F.3d 233, 240 (4th Cir. 2009) ("[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security . . . would consider the fact important in deciding whether to buy or sell the security"); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("Material information is information that would be important to a reasonable investor in making his or her investment decision"); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ("A statement . . . is only material if a reasonable investor would consider it important in determining whether to buy or sell stock").

In addition, the deception must be in connection with the purchase or sale of a security, "*not deception of an identifiable purchaser or seller.*" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (emphasis added). Misstatements made "in connection with" the purchase or sale of a security must be "of a sort that would cause reasonable investors to rely thereon, and, in connection therewith . . . cause them to purchase or sell a corporation's securities." *SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391, 397 (S.D.N.Y. 2016), *quoting SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968).

While the Supreme Court had said that the statute should be construed "flexibly to effectuate its remedial purposes," *SEC v. Zanford*, 535 U.S. 813, 819 (2002), it has at the same time cautioned that "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of §10b." *Id.* at 820. *See Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 938 (2d Cir. 1984) (federal securities laws are not intended "to provide a broad federal remedy for all fraud").[1]

Two Eleventh Circuit cases provide material guidance in this context. In *SEC v. Goble*, 682 F.3d 934, 943-44 (11th Cir. 2012), the Court rejected the SEC's theory that under Rule 10b-5 the misrepresentation at issue was material because it would have impacted an investor's choice of broker-dealers. The test for materiality in the securities fraud context, the Court stated, is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Id.* at 943. The operative "course of action," the Court continued, is "an *investment* decision—*not an individual's choice of broker-dealers*." *Id.* (emphasis added). The Court held that "a misrepresentation that would only influence an

---

[1] Nor does the statute encompass actions that are more properly treated as breaches of contract. *See, e.g., Hunt v. Robinson*, 852 F.2d 786, 787-88 (4th Cir. 1988) (goal of the statute "is not furthered by bringing within the ambit of § 10(b) claims amounting to breach of contract or common law fraud which have long been the staples of state law"); *Korff v. Bank Julius Baer & Co.*, 1990 WL 67771 at *3 (S.D.N.Y. May 14, 1990) (dismissing complaint where "[a]lthough plaintiffs' allegations may provide the basis for a claim of breach of fiduciary duty or breach of contract, they fall far short of providing the basis for a federal claim under §10(b) or Rule 10b-5"); *Bischoff v. G.K. Scott & Co.*, 687 F. Supp. 746, 749 (E.D.N.Y. 1986) ("It is well settled that allegations of a mere breach of contract or breach of fiduciary duty, without more, do not state a claim under Section 10(b) or Rule 10b–5," *citing Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 445 (2d Cir. 1971); *see also Gigliotti v. Mathys*, 129 F. Supp. 2d 817, 823-24 (D.V.I. 2001) ("key factor in weeding out cases involving mere breaches of contract is whether the alleged misrepresentations were intended to induce a sale or purchase of a security at the time of sale or purchase").

individual's choice of broker-dealers cannot form the basis for §10b securities fraud liability." *Id.* at 944.[2]

More recently, in *Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142 (11th Cir. 2018), the issue before the Court was "whether the conduct alleged in Brink's complaint—that RJA built a profit into the Processing Fee while representing to its Passport Account customers that the Processing Fee covered only the actual costs of transaction execution and clearing—constitutes a 'misrepresentation or omission of a material fact in connection with the purchase or sale' of those securities." *Id.* at 1147. The Court noted that "[m]ateriality has special meaning in the context of federal securities fraud," *i.e.*, "materiality in federal securities law requires a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Id.* at 1148, *quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Relying on its prior decision in *Goble*, the Court concluded that "the choice of a type of investment account, much like the choice of a broker-dealer, is not intrinsic to the investment decision itself. Although RJA's alleged misrepresentation regarding the Processing Fee might have influenced a reasonable investor's decision to pick the Passport Account over another type of account, that

---

[2] Similarly, the First Circuit recently stated that "a fact is material where there is 'a substantial likelihood that' its disclosure 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 750 (1st Cir. 2016), *quoting Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). That "total mix of information" must pertain to an *investment* decision. Here, the misstatements pertained to the clients' choice of transition manager, *not* to any investment decision.

does not make the alleged representation 'material.'" *Id.* at 1148-49.[3]

> ### 2. The evidence was insufficient to support McLellan's convictions for securities fraud (Counts Two and Three) and conspiracy to commit securities fraud (Count One).

When the reach of the securities fraud statutes is properly cabined, as discussed in the preceding section, McLellan's securities fraud convictions cannot stand, nor can his conviction on so much of Count One as charges conspiracy to commit securities fraud.[4] The record is

---

[3] Other courts have also stressed the critical distinction between fraud pertaining to the securities themselves, which may constitute securities laws violations, and fraud aimed at obtaining the clients' business, which does not. *See, e.g., Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 403 (S.D.N.Y. 2013) (complaint failed to state claim under Rule 10b-5 where the alleged fraud "pertains not to the sale of the securities or the value of the securities themselves, but to the terms of the relationship between the broker and the customer"); *Trustees of Hotel Employees & Rest. Employees Int'l Union Pension Fund v. Amivest Corp.*, 733 F. Supp. 1180, 1185-86 (N.D.Ill. 1990) (complaint dismissed where fraud alleged related only to Trustees' relationship with defendant and "was not related to a decision whether or not to invest in a particular security;" trustees alleged "only that they should have received the commissions that were retained by Amivest" but failed to allege "any facts that would indicate that they would not have purchased the mutual funds absent the alleged fraud"); *Bischoff v. G.K. Scott & Co.*, 687 F. Supp. 746, 749 (E.D.N.Y. 1986) ("In general, misrepresentations made by brokers inducing the opening of an account are not actionable under the federal securities laws. Because such broker misrepresentations are connected to the broker's efforts to attract the investor's business, and are not tied to a particular trade, they do not meet the Rule 10b-5 requirement that an actionable misrepresentation be in connection with the purchase or sale of securities"); *Williamsport Firemen Pension Boards I & II v. E. F. Hutton & Co.*, 567 F.Supp. 140, 144 (M.D. Pa. 1983) (dismissing count of complaint because allegations of misrepresentations with respect to commissions to be earned by defendants "have no causal connection to the purchase by the Pension Boards of any particular securities. The alleged fraud involves only the general relationship between the Defendants and the Pension Boards").

[4] To prove a defendant's guilt of conspiracy, "the government must show two kinds of intent: intent to agree and intent to commit the substantive offense." *United States v. Bristol-Martir*, 570 F.3d 29, 39 (1st Cir. 2009). To prove McLellan guilty of conspiracy to commit securities fraud, therefore, the government must have proven that McLellan intended to agree to commit securities fraud and that he intended to commit securities fraud, *i.e.*, that he agreed to, and intended, that misleading statements be made "in connection with" the purchase or sale of securities that were material to the clients' decisions to purchase or sell particular securities.

wholly devoid of evidence that the decisions of *any* of the six clients at issue regarding the particular securities they would buy and sell in accomplishing their transitions were affected in any way by anything said or done by McLellan, Pennings, Boomgaardt or anyone else whom the government contended were coconspirators.  Here, as in *Goble* and *Brink*, the misrepresentations influenced only the choice of State Street as transition manager, not the clients' decisions regarding their investment strategy or what securities to buy or sell. These latter were decisions made by the client independent of the selection of the entity that would carry out the transition and cannot support a conviction for securities fraud.

The evidence adduced by the government focused solely on demonstrating that the misrepresentations affected the clients' decisions to select State Street as their transition manager. *See* Tr. 6/12/18 at 175 (Dean Johnson testifies that Sainsbury's would not have hired State Street to conduct the transition had it known of the additional charges but would have hired JP Morgan instead); *id.* at 258 (Roul Haerden testifies that knowing of the additional charges would have affected Dutch Doctors' decision to hire State Street); Tr. 6/13/18 at 60 (Ian McKnight testifies that Royal Mail would not have chosen State Street had it known of the total cost); Tr. 6/19/19 at 52 (Eugene O'Callaghan testifies that NTMA would not have selected State

---

As for aiding-and-abetting liability, a likely basis for the jury's conviction on Counts Two and Three, "an aiding and abetting conviction requires not just an act facilitating one or another element [of the offense], but also a state of mind extending to the entire crime." *Rosemond v. United States*, 572 U.S. 65, 76 (2014). "Under *Rosemond*, to establish the mens rea required to aid and abet a crime, the government must prove that the defendant participated with advance knowledge of the elements that constitute the charged offense." *United States v. Encarnacion-Ruiz*, 787 F.3d 581, 588 (1st Cir. 2015). Thus, to be liable for the charged securities fraud violations as an aider and abettor, McLellan must have been proven beyond a reasonable doubt to have known, and intended, that misleading statements would be made "in connection

Street had it known of the additional charges). In its closing argument, the government argued only that the clients would not have chosen State Street as their transition manager but for the misrepresentations, *see* Tr. 6/25/18 at 50, and made no mention whatsoever of any effect that the misrepresentations may have had on any clients' decision to buy or sell any particular security. Indeed, it could not, as there was no such evidence. For the reasons addressed in the previous section, the evidence was insufficient to prove either the "in connection with" or the materiality elements of securities fraud, as such conduct falls outside the scope of the securities laws which Mr. McLellan was charged with violating.

### 3.    The Court's instructions regarding the "in connection with" and materiality elements of securities fraud were erroneous.

As the discussion of the applicable law in Section III(A)(1), *supra*, demonstrates, the Court's interrelated instructions regarding the "in connection with" and materiality elements of securities fraud impermissibly broadened the permissible bases for conviction and invited the jury to convict Mr. McLellan based on conduct falling outside the bounds of the securities fraud statutes. Mr. McLellan's contention that the Court's securities fraud instructions were erroneous is a substantial one, one which, if decided in his favor on appeal, will result in the vacatur of his convictions on Counts Two and Three and so much of Count One as charges conspiracy to commit securities fraud.

As to the "in connection with" element, the Court told the jury only that "[t]his requirement is satisfied if you find that Mr. McLellan's alleged conduct in some way 'touched upon' or 'coincided' with a securities transaction—that is, that the alleged fraud or deceit had

---

with" the purchase or sale of securities that were material to the clients' decisions to purchase or

some relationship to these individual sales or purchases." Final Jury Charge (Doc. 466) at 27; Tr. 6/25/18 at 137-38.[5]  As for materiality, the Court instructed the jury that

> [a] fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the fact important when making an investment decision. In other words, a statement contains a material fact if there is a substantial likelihood that a reasonable investor *engaging a transition manager* would view the statement as significantly altering the total mix of information available. . . . You may consider the testimony of a victim as evidence in determining what would be material to a hypothetical reasonable investor under the circumstances.

---

sell particular securities.

[5] McLellan requested that the Court provide additional explanation of the "in connection with" element, including the following:

> A misrepresentation is not made in connection with the purchase or sale of a security unless it is material to a decision by one or more individuals to buy or to sell a covered security. Deception of the purchaser or seller alone does not suffice; the deceptive conduct must be in connection with the purchase or sale of a security. False statements made to induce a transition management client to choose State Street as its transition manager are not statements made in connection with the purchase or sale of a security.

Defendant Ross McLellan's Requests for Instructions to the Jury (Doc. 362) ("Instruction Requests") at 3. McLellan objected to the Court's "in connection with" instruction and to the Court's failure to give the instruction requested by McLellan. Tr. 6/25/18 at 163.

Final Jury Charge at 28; Tr. 6/25/18 at 139-40 (emphasis added).[6]

The Court's broad-brush "in connection with" instruction, which permitted the jury to find the element proven if the alleged fraud had "some relationship," regardless of how tangential or attenuated to the purchase or sale of particular securities, along with its over-expansive materiality  instruction, permitted the jury to convict Mr. McLellan based on false statements (and, under the Court's instructions, omissions) that were material only to the clients' selection of State Street as their transition manager and not to any decisions to buy or sell particular securities.  And it is likely that the jury did just that, given the government's focus on false and misleading statements made to potential transition management clients in the course of seeking their business for State Street.[7] Because the Court's instructions permitted the jury to

---

[6] McLellan objected to this portion of the Court's instructions. Tr. 6/25/18 at 163-64. He further objected to the Court's failure to give his requested instructions regarding materiality. Those requested instructions sought to have the jury told that "[t]o 'significantly alter the total mix of information available' means to meaningfully affect a reasonable investor's consideration about whether to buy or sell a security, and at what price." Instruction Requests at 5. In addition, they asked that the jury be instructed that

> [m]isstatements that do not affect the decision whether to buy or sell a particular security are not material within the meaning of the securities fraud statutes. Even if a misstatement was material to another decision by the transition management or potential transition management client, such as the decision regarding whether to select State Street's transition management services, it is not material as that term is used in the context of the securities fraud statutes under which Mr. McLellan is charged.  Statements that affected only the relationship between State Street and the transition management client are not material under the securities laws. If you find that false statements were made but that they affected only the decision to use State Street as the transition manager or other aspects of the contract between State Street and the client but did not affect the decision of the transition management client to buy or sell a particular security, you must find Mr. McLellan not guilty.

*Id.* at 7.

[7] The Court's instruction that the jury could consider the testimony of the alleged victims in determining materiality only served to enhance the likelihood that the jury convicted on this

convict McLellan based on conduct that does not violate the securities fraud statutes—misleading statements that were neither "in connection with" the purchase or sale of securities nor material to the decision to purchase or sell particular securities—his convictions on Counts Two and Three and so much of Count One as charges conspiracy to commit securities fraud are likely to be vacated on appeal.

While it is true that the case was submitted to the jury on three alternative bases of securities fraud, *see* Final Jury Charge at 26; Tr. 6/25/18 at 136-37,[8]  when, as here, "a jury has been presented with several bases for conviction, one of which is legally erroneous, and it is impossible to tell which ground the jury convicted upon, the conviction cannot stand." *United States v. Sawyer*, 85 F.3d 713, 730-31 (1st Cir. 1996). *See, e.g., Yates v. United States*, 354 U.S. 298, 312 (1957) ("In . . . circumstances [where a legally invalid theory has been submitted to the jury] we think the proper rule to be applied is that which requires a verdict to be set aside where

---

impermissible basis, as they uniformly testified only that the misstatements were material to their choice of State Street as their transition manager.

[8] It remains an open question in this circuit whether McLellan could properly be convicted on a scheme liability theory.  "A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir.2011); *see, e.g., Public Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b–5(b)"); *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c)"); *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."); *see also  Lorenzo v. SEC*,  872 F.3d 578, 600-01 (D.C. Cir. 2017) (Kavanaugh, J., dissenting). The Supreme Court may shed further light on this question this term, as it granted certiorari in *Lorenzo*. 2018 WL 646998 (U.S. June 18, 2018).

the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"); *United States v. Mubayyid*, 658 F.3d 35, 71 (1st Cir. 2011) ("*Yates* stands for the principle that a conviction must be vacated where the charged crime was submitted to the jury on two independent theories of guilt, one of which [is legally invalid], and where 'it is impossible to tell which ground the jury selected'" (emphasis omitted)).

The government's theory of prosecution was all times predicated on affirmative misrepresentations. *See* Government's Response in Opposition to Defendant's Motion to Sever Count 6 (Doc. 298) at 6 ("this is a case about *affirmative* misrepresentations that McLellan personally made or directed" (emphasis in original)); Tr. 6/12/18 at 107 (government emphatically states that "lies are the subject of this case."). This is the theory on which its presentation of evidence and its arguments to the jury focused, *see* Tr. 6/5/18 at 25-26, 31, 33-37; Tr. 6/25/18 at 20-25, 33, 53, and this is the theory on which the jury most likely convicted McLellan. Under *Yates*, reversal is likely to result because it cannot be conclusively found that the jury's verdicts on Counts Two and Three and so much of Count One as charges a conspiracy to commit securities fraud in fact rested upon a legally and factually adequate ground.

Under the circumstances of this case, it cannot be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Fernandez*, 722 F.3d 1, 27 (1st Cir. 2013), *quoting Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Accordingly, Mr. McLellan's securities fraud convictions (including conspiracy to commit securities fraud) are likely to be vacated on appeal.

**B.   The Court's Failure to Instruct the Jury that the Wire Fraud Statute Does not Apply Extraterritorially.**

This issue will present the First Circuit with an important question of first impression in this circuit: whether the wire fraud statute, 18 U.S.C. §1343, applies extraterritorially and, if it does, whether this Court erred in declining to submit the issue to the jury. There can be little doubt that the question whether the wire fraud statute applies extraterritorially is a substantial one. Indeed, as addressed further herein, it is one that has already split the circuits. This substantial issue, if decided in Mr. McLellan's favor, would likely result in the vacatur of his convictions on Counts Four and Five and so much of Count One as charges conspiracy to commit wire fraud.

To assist the jury in determining whether the wire fraud charged was properly punishable as a domestic fraud, as opposed to being an extraterritorial fraud beyond the reach of the wire fraud statute, Mr. McLellan requested that the jury be instructed that

> . . . . the wire fraud statute also does not apply extraterritorially. The focus of the wire fraud statute is on the fraudulent scheme. Even if you find that Mr. McLellan participated in a scheme to defraud, as I have defined it for you, he may be punished for that conduct under the United States wire fraud statute only if (i) the fraudulent scheme involved a substantial amount of conduct in the United States, and (ii) the conduct in the United States was integral to the commission of the fraud, and (iii) at least some of the conduct involved the use of the U.S. wires. If you do not find all three of these factors satisfied, you must find Mr. McLellan not guilty.

Instruction Requests at 26.[9] Under the circumstances of this case, in which the alleged scheme to defraud predominantly involved actions taken by, and statements made by, a London-based

---

[9] The requested instruction was derived from *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103 (D.D.C. 2017); *United States v. Gasperini*, 2017 WL 2399693 at *8 (E.D.N.Y. June 1, 2017); and *Elsevier, Inc. v. Grossman*, 199 F.Supp.3d 768, 784 (S.D.N.Y. 2016).

salesman to obtain the transition management business of European and Middle Eastern clients for a European bank (State Street Bank Europe Ltd.) through proposals submitted and negotiations conducted entirely extraterritorially, the failure to instruct the jury about the substantive domestic limitations of the wire fraud statute is likely to be found to have been reversible error if the First Circuit agrees that the wire fraud statute does not apply extraterritorially.

In *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010), and *RJR Nabisco, Inc. v. European Community*, ___ U.S.___, 136 S.Ct. 2090 (2016), the Court, relying on the "longstanding principle of American law" that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States," *id.* at 255, prescribed a hard-and-fast rule, applicable to all cases under the statute at issue: "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.* As the Second Circuit has explained:

> The presumption against extraterritoriality is not a rule to be applied to the specific facts of each case. . . . A statute either applies extraterritorially or it does not, and once it is determined that a statute does not apply extraterritorially, the only question we must answer in the individual case is whether the relevant conduct occurred in the territory of a foreign sovereign.

*United States v. Vilar*, 729 F.3d 62, 74 (2d Cir. 2013).   *Morrison* makes clear that the presumption against extraterritoriality is not rebutted by the presence of statutory language referring to foreign commerce. *See* 561 U.S. at 262-63 ("we have repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to foreign commerce do not apply abroad," *quoting EEOC v. American Arabian Oil Co.*, 499 U.S. 244, 251 (1991). The *Morrison* Court also cautioned that "*possible* interpretations of statutory

language do not override the presumption against extraterritoriality." *Id.* at 264 (emphasis added). Later, in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), the Court added another caution regarding statutory language which is not indicative of extraterritorial application, noting that "it is well established that generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality." *Id.* at 118.

*Morrison* and *Kiobel* establish a two-step framework for analyzing extraterritoriality issues:

> At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." *If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.*

*RJR Nabisco*, 136 S.Ct. at 2101, *quoted in United States v. Valenzuela*, 849 F.3d 477, 485 n.3 (1st Cir. 2017) (emphasis added). *See WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136-37 (2018) (discussing applicable standard).  An application is not domestic, however, simply because the offense has *some* contact with United States territory.  "[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266 (emphasis in original).

### 1.   Step one of the *Morrison* framework: determining whether §1343 applies extraterritorially.

Analyzing the wire fraud statute under the first step of the *Morrison* framework, the Second Circuit held in *European Community v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), *reversed and remanded on other grounds, RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090 (2016),[10] that the wire fraud statute does not apply extraterritorially:

> The argument in favor of extraterritoriality depends on [the statute's] references to foreign commerce. The wire fraud statute applies to the transmission of communications by "wire, radio, or television . . . in interstate or foreign commerce" in the execution of a scheme to defraud. *Id.* § 1343. . . . In *Morrison,* the Supreme Court observed that a "general reference to foreign commerce . . . does not defeat the presumption against extraterritoriality." . . . This admonition appears to bar reading [the wire fraud statute] literally to cover wholly foreign . . . communication. We conclude that the references to foreign commerce in [the wire fraud] statute[], deriving from the Commerce Clause's specification of Congress's authority to regulate, do not indicate a congressional intent that the statute[] apply extraterritorially.

---

[10]   The Supreme Court did not consider whether the wire fraud statute applied extraterritorially in *RJR Nabisco* but instead focused its opinion on the extraterritoriality of the RICO statute.

*Id.* at 140-41. It is likely that the First Circuit will follow the Second Circuit's well-reasoned opinion in *RJR Nabisco*, given that decision's close adherence to the teaching of *Morrison*.[11]

There is no controlling First Circuit precedent that would dictate a contrary result. *United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014), addressed the extraterritoriality of 18 U.S.C. §1084, not §1343. Section 1084 prohibits the "knowing[] use[] [of] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers." In a cursory analysis, the Court concluded that §1084 applies extraterritorially because it explicitly references transmissions between the United States and a foreign country. *Id.* at 718. Because "[t]he communications giving rise to these convictions had at least one participant inside the United States, the Court stated, the communications "fall within the statute's scope." *Id.*[12]

---

[11] The Third Circuit reached the opposite conclusion in *United States v. Georgiou*, 777 F.3d 125, 137-38 (3d Cir. 2015), in which the Court held that §1343 applies extraterritorially based on the foreign commerce reference in the statute. *Georgiou* ignores *Morrison*'s warning that, just because a statute contains a routine jurisdictional reference to foreign commerce, does not mean that Congress intended that the statute apply extraterritorially. Under *Morrison*, the inclusion of "foreign commerce" language in §1343 does not automatically mean that the statute was intended to apply extraterritorially, and *Georgiou* was wrongly decided.

[12] To the extent that *Lyons* held that §1084 applies extraterritorially based solely on the statute's "foreign commerce" language, it would be inconsistent with the teaching of *Morrison*, which *Lyons* does not even cite, that a statute's inclusion of a reference to foreign commerce does not by itself mean that Congress intended that the statute apply extraterritorially. **Lyons was also decided before the Supreme Court "clarified its test for deciding whether a statute applies extraterritorially" in *RJR Nabisco*. *Valenzuela*, 849 F.3d at 485**. *Lyons* is perhaps better understood as applying the second, rather than the first, part of the *Morrison* inquiry, and concluding that the case before the Court was a domestic, rather than an extraterritorial, application of the statute, as, although the offshore betting operation was located in Antigua, the

*Lyons* relied predominantly on *Pasquantino v. United States*, 544 U.S. 349 (2005), a case decided well before *Morrison* and *RJR Nabisco*. In *Pasquantino*, the defendants, over a four-year period, used the telephones while in the United States to order liquor from discount liquor stores in Maryland and then paid others to smuggle the liquor into Canada, thereby depriving Canada of substantial tax revenues. This was not, the Supreme Court said, an extraterritorial application of the wire fraud statute because the offense "was complete the moment [defendants] executed the scheme inside the United States." *Id.* at 371.  It was, therefore, the Court concluded, domestic conduct that was being punished.[13] *See United States v. Gasperini*, 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017) ("*Pasquantino* considered only whether the fact that the ultimate victim of a fraudulent scheme rendered the application of the wire fraud statute impermissible extraterritorial, even though the underlying scheme was otherwise entirely carried out in the United States."). Neither *Lyons* nor *Pasquantino* support the proposition that §1343 applies extraterritorially whenever United States wires are used in the execution of the fraud. As the Second Circuit explained in *RJR Nabisco*:

---

defendants conducted extensive activities in Florida and Massachusetts, recruiting American customers and paying them their winnings and collecting their losses. *See id.* at 711-12. Section 1084 differs from §1343 in that its focus is on the use of the wires to transmit gambling information. If the *Morrison/RJR Nabisco* focus standard were applied in *Lyons*, the result would likely have been the same. Here, however, as addressed further *infra*, the focus of the wire fraud statute is on the scheme to defraud, not on the use of the wires.

[13] In *Pasquantino*, virtually all of the offense conduct took place in the United States. That being the case, the result in *Pasquantino* would likely have been the same under the *Morrison/RJR Nabisco* standard. *Morrison* distinguished *Pasquantino* by noting that the wire fraud at issue in Pasquantino "was complete the moment [defendants] executed the scheme inside the United States," and further noting that it was "[t]his domestic element of petitioners' conduct [that] the Government is punishing." *Morrison*, 561 U.S. at 272, *quoting Pasquantino*, 544 U.S. at 371. The scheme to defraud in *Pasquantino* was conceived and carried out almost entirely in the United States, and *Pasquantino* was thus a domestic application of §1343.

> In *Pasquantino* . . . , the Supreme Court suggested, in dictum, that, because the wire fraud statute punishes frauds executed in interstate or foreign commerce it is surely not a statute in which Congress had only domestic concerns in mind. . . . . Because that statement is dictum, and because *Morrison* explicitly rejects the reasoning on which it relies, we do not read *Pasquantino* to require us to construe the "foreign commerce" language of the wire fraud statute as rebutting the presumption against extraterritoriality.

764 F.3d at 141 n.11 (internal quotation marks and citations omitted). *See Gasperini*, 2017 WL 2399693, at *8 (*Pasquantino* "did not speak to the . . . case of a scheme devised and otherwise executed abroad that involves some use of U.S. wires"). Given the dispositive differences between this case and *Lyons* and *Pasquantino*, the evolution of extraterritoriality jurisprudence since those cases were decided, and the Second Circuit's persuasive ruling in *RJR Nabisco*, it is likely that the First Circuit will hold that the wire fraud statute does not apply extraterritorially.[14]

### 2.     Step two of the *Morrison* inquiry: determining the focus of §1343.

The essential elements of wire fraud are: "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme." *United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013). The scheme to defraud must cause, or have been intended to cause, a deprivation of money or property. *See United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998). Thus, §1343 "forbids a particular class of frauds (*i.e.*, frauds that are designed to take money or property and that involve the U.S. [wires]."

---

[14] Such a conclusion would apply not only to the two substantive wire fraud counts but also to so much of Count One as charges conspiracy to commit wire fraud. "[T]he extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute." *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013). *See Gasperini*, 2017 WL 2399693, at *8 ("The court agrees that there is no reason to differentiate the extraterritoriality analysis as between 'ancillary' offenses and the underlying substantive offense,

*Elsevier, Inc. v. Grossman*, 199 F.Supp.3d 768, 783 (S.D.N.Y. 2016).  Such frauds are, therefore

"properly considered the 'focus' of" §1343.  *Id. See, e.g., United States v. Bradley*, 644 F.3d

1213, 1249 n.77 (11th Cir. 2011) ("The mail and wire fraud statutes . . . focus their attention on

the use of a misrepresentation to obtain money that is not owed"); *United States v. Brien*, 617

F.2d 299, 307 (1st Cir. 1980) ("the mail and wire fraud statutes focus on the scheme, not on the

implementation of it"); *Bascunan v. Elsaca*, 2018 WL 4360780, at *8 (S.D.N.Y. Sept. 6, 2018)

("the focus of the wire and mail fraud statutes is the 'scheme to defraud'"); *Gasperini*, 2017 WL

2399693, at *8 (concluding that "the wire fraud statute's 'focus' is the fraudulent scheme.");

*United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 102 (D.D.C. 2017) ("the

focus of the wire fraud statute is the scheme to defraud—or more precisely, a scheme to defraud

that involves the use of U.S. wires.").[15]  Thus, the focus of the statute is the prohibited fraudulent

conduct, not the use of domestic wires.[16]  Accordingly, McLellan could only be convicted on

---

and so the court's examination of the wire fraud violation applies equally to the related wire
fraud conspiracy count.").

   [15] The Second Circuit did not further define the line between domestic and extraterritorial
applications of the wire fraud statute in its *RJR Nabisco* opinion but did provide the following
general guidance: "If domestic conduct satisfies every essential element to prove a violation of a
United States statute that does not apply extraterritorially, that statute is violated even if some
further conduct contributing to the violation occurred outside the United States." 764 F.3d at
142.

   In a later summary order, the Second Circuit found the domestic contacts of the alleged
scheme to defraud insufficient to render the wire fraud statute applicable to the conduct at issue,
noting that "simply alleging that some domestic conduct occurred cannot support a claim of
domestic application." *Petroleos Mexicanos v. SK Engineering & Const. Co.*, 572 Fed. App'x
60, 61 (2d Cir. 2014), *quoting Norex Petroleum Ltd. v. Access Indus., Inc.,* 631 F.3d 29, 32–33
(2d Cir. 2010). The domestic contacts alleged were, in the *Petroleos* Court's view, insufficient
to sustain jurisdiction, even though financing was obtained in this country, invoices were sent to a
bank in this country for payment, and the domestic bank issued payment. *Id.* at 61.

   [16] Some courts have found that use of domestic wires, even minimally, will suffice to
render the offense a domestic one, *see, e.g., United States v. Allen*, 160 F.Supp.3d 698, 707

Counts Two and Three and so much of Count One as charges conspiracy to commit wire fraud if the punishable conduct constituted a domestic application of the wire fraud statute.

### 3.     The issue should have been submitted to the jury.

The substantive reach of §1343 is a merits question. *Morrison*, 561 U.S. at 254.  The question whether the conduct at issue in this case fell within the substantive scope of §1343 was a question for the jury. Given proper instructions, the jury could well have found that the scheme to defraud was an extraterritorial one, beyond the reach of §1343. This is particularly true in light of the Court's instructions, which focused the jury on false statements and omissions relating to the clients' selection of State Street as their transition manager. After instructing the jury that, in order to find McLellan guilty of wire fraud, it had to find that the scheme to defraud "involved the misrepresentation or concealment of a material fact" or that the scheme to obtain money by means of false or fraudulent pretenses "involved a false statement, half-truth, or knowing concealment concerning a material fact or matter," Final Jury Charge at 33, the Court told the

---

(S.D.N.Y. Feb. 16, 2016); *United States v. Hayes*, 99 F.Supp.3d 409 (S.D.N.Y. 2015), *aff'd on other grounds*, 118 F. Supp. 3d 620 (S.D.N.Y 2015). The better view, however, is found in *United States v. Hawit*, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2016), in which the court rejected the government's  contention that even a single use of domestic wires sufficed to make the offense subject to prosecution under §1343, concluding that that "extreme position" was foreclosed by the Second Circuit's *Petroleos Mexicanos* decision, which held that "'three minimal contacts' with the United States—including the use of U.S. wires to transfer of illicit funds—were insufficient to establish a domestic application of the wire fraud statute." *Id.* at *5. "The natural implication of *Petroleos Mexicanos*," the court continued, "is that, in determining whether the wire fraud statute is being applied 'domestically' or 'extraterritorially' in a given case, a court must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires." *Id. See United States v. Prevezon Holdings LTD.*, 122 F. Supp. 3d 57, 71-72 (S.D.N.Y. 2015) (court, in part relying on *Petroleos Mexicanos*, refused to apply §1343 to a foreign fraud that involved single use of U.S. wires).

jury that, in determining whether the fact at issue was material, it "should consider whether the fact would have a natural tendency to influence or be capable of influencing the decision of a reasonable investor engaging a transition manager." *Id.* at 35.

The false statements, half-truths, and omissions presented by the government were uniformly directed at obtaining the clients' transition management business for State Street. Indeed, the clients' representatives who testified all said that, had they known what State Street's fees actually would have been, they would not have selected State Street as their transition manager, *i.e.*, that the representations were material to the choice of transition manager. Those choices were, however, made entirely extraterritorially, as were the representations that produced them. The statements to the clients which induced them to select State Street were all made in Europe by Pennings and/or Boomgaardt to clients and/or their consultants located in Europe and the Middle East, using exclusively foreign wires. The pretrade estimates and the periodic notices were all prepared in Europe. The contracts were negotiated by and between individuals located in Europe and the Middle East and the contracting parties were all foreign—State Street Bank Europe Ltd. and the foreign clients.[17] A jury instructed as to the lack of extraterritorial reach of

---

[17] As for NTMA, the subject of Count Four, NTMA was headquartered in Ireland, Tr. 6/18/18:57, and the all negotiations that led to State Street's being awarded the transition were conducted between Boomgaardt and Pennings in London and NTMA in Ireland. Tr. 6/6/18:66-80, 91. The flat fee/no commission proposal sent to NTMA was drafted in London by Pennings and Boomgaardt, as was the periodic notice, and all the representations regarding the fees that State Street would charge for the transition and the capacity in which it would act, based on which NTMA chose to award State Street part of the transition, were made by Pennings and Boomgaardt in London. Tr. 6/6/18:67-73, 98-101; Tr. 6/11/18:63-64, 74; 6/19/18:33-42. The contract was between State Street Bank Europe, Ltd. ("SSBEL"), located in London, Tr. 6/19/18:60, and NTMA, was signed by SSBEL personnel, and was governed by Irish law. Tr. 6/7/18:18; 6/18/18:58-59; Tr. 6/19/18:58. NTMA had no contact with McLellan.

the wire fraud statute could well have found that the scheme to defraud by obtaining the clients' transition management business through misrepresentations/omissions regarding what State Street would charge for its services—the conduct relevant to the wire fraud statute's focus—was so predominantly foreign as to be beyond the reach of the wire fraud statute.

### C. The Court's Failure to Order the Government to Exercise its MLAT Rights to Obtain Material Evidence.

As Mr. McLellan has already explained on a number of occasions, his Fifth and Sixth Amendment rights were violated by the government's failure to provide him necessary assistance by exercising its indisputable right to access material evidence under applicable Mutual Legal Assistance Treaties ("MLATs").  *See* Dkt. 276; Dkt. 281; Dkt. 328; Dkt. 495 at 24-27; Dkt. 504 at 17-20; *see also California v. Trombetta*, 467 U.S. 479, 485 (1984) (holding that Due Process requires "that criminal defendants be afforded a meaningful opportunity to present a complete defense," including "constitutionally guaranteed access to evidence" (citation omitted)); *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990) (stating that "a deliberate omission to act, where action was required, by the United States Attorney" to assist the defendant in procuring material evidence located abroad "constitutes a violation of the Sixth Amendment right to compulsory process and, derivatively, the right to due process protected by the Fifth Amendment").

---

The same was true with respect to Royal Mail (Count Five). The flat-fee proposal was made by Pennings, Tr. 6/7/18:13; 6/11/18:89-97, and it was Pennings who represented to Royal Mail that the flat fee would be State Street's sole compensation. Tr. 6/11/18:99; 6/13/18:25-43, 65, 68. Royal Mail worked directly with Pennings and Boomgaardt and had no contact with McLellan. Tr. 6/13/18:24, 61-62. As with NTMA, the periodic notice setting forth State Street's compensation was generated in London. Tr. 6/13/18:45-47.

This Court, in a pre-trial ruling, rejected Mr. McLellan's request that the government be required to exercise its MLAT rights to obtain the evidence in question, or, alternatively, that the government's evidence regarding the relevant clients be suppressed.  In doing so, the Court did not question any of the underpinnings of Mr. McLellan's constitutional arguments.  It did not, for example, find that the evidence sought was not material, that it was not available to the government via MLAT procedures, or that it was available to Mr. McLellan by other reasonable means.  The Court nonetheless denied Mr. McLellan's motion without prejudice solely based on its perceived "lack[]" of "authority to compel the government to exercise its rights under any of the relevant MLATs on behalf of, or for the benefit of, a private person."  Dkt. 350 at 1.[18]

There is a substantial question as to the correctness of the Court's ruling on this point.  The issue at hand, whether the government may be constitutionally required to exercise its MLAT rights to obtain material defense evidence, is a novel one in this circuit.  The most closely analogous First Circuit precedent, *Theresius Filippi*, suggests that the court could well answer this question in the affirmative.

The Court did not reach this substantive issue, but instead based its ruling on a perceived lack of judicial power.  This holding is in tension with the bedrock principle that "[i]t is emphatically the province and duty of the judicial department to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  Of course, this duty to interpret and expound the law, applies to the U.S. Constitution, which is the "supreme Law of the Land."  *Cooper v. Aaron*, 358

---

[18] The Court's ruling permitted Mr. McLellan to renew his Due Process argument "after trial in the event of a conviction."  Dkt. 350 at 2.  Mr. McLellan, accordingly, re-raised the argument in his Motion for New Trial, *see* Dkt. 495 at 25-27, which was subsequently denied, *see* Dkt. 508.

U.S. 1, 18 (1958).  In the words of the Supreme Court, it is a "basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system."  *Id.*  The courts' duty "to say what the law is" would be entirely ineffectual without the corresponding power to compel other government actors to comply with the law.  Indeed, courts routinely order state and federal executive officials to act when doing so is required by the Constitution.  *See, e.g.*, *id.* at 4-5 (requiring state officials to comply with desegregation decisions); *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957) ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.  In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action." (footnotes omitted)).  Crucially, the government's exercise of its treaty power is, like all other government action, subject to constitutional constraints.  *See, e.g.*, *Reid v. Covert*, 354 U.S. 1, 16 (1957) ("[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution."); *Plaster v. United States*, 720 F.2d 340, 348 (4th Cir. 1983) ("[T]he United States government must, in carrying out its treaty obligations, conform its conduct to the requirements of the Constitution, and . . . treaty obligations cannot justify otherwise unconstitutional governmental conduct.").

The sole binding precedent[19] relied upon by this Court in concluding that it lacked the power to grant the relief sought is not directly on point.  *In re Request from United Kingdom* involved a suit by two private persons to prevent compliance with an MLAT request.  *See* 685 F.3d 1, 3 (1st Cir. 2012).  The plaintiffs purported to sue directly under the applicable MLAT itself, contending "that the Attorney General failed to fulfill his obligations under the US–UK MLAT and that they have a private right of action to seek a writ of mandamus compelling him to comply with the treaty."  *Id.* at 9.  The First Circuit sensibly rejected this argument, relying in part on express treaty language indicating that the MLAT was not intended to create private rights.  Here, by contrast, the source of Mr. McLellan's asserted right is not any of the relevant MLATs.  Rather, he contends that the requested relief is mandated under the Fifth and Sixth Amendments to the U.S. Constitution.  It is one thing to hold that a private party may not state a claim under a treaty that expressly disclaims the existence of private rights, but quite another to conclude that federal courts lack the power to compel the government to exercise its treaty rights when doing so is required by the Constitution.

Even assuming, contrary to the above analysis, that the Court did lack authority to compel the government to utilize the MLATs, it plainly had the ability to order suppression of the government's evidence relating to the relevant foreign clients.  Indeed, the *Trombetta* Court expressly referred to suppression as a possible remedy for a similar Due Process violation.  *See* 467 U.S. at 486-87.  And "foreclosing the ability of the Government to rely on" testimony and documents from the foreign clients was the only way to effectively "neutralize the constitutional

---

[19] The Court also cited an out-of-circuit district court decision, but, as Mr. McLellan has already explained, that case was wrongly decided and based on a misreading of *Theresius*

infringement" from Mr. McLellan's lack of reciprocal access to such evidence. *United States v. Elliott*, 83 F. Supp. 2d 637, 649 (E.D. Va. 1999). The Court's failure to grant this alternative request resulted in the government's being able to present evidence from NTMA, Sainsbury's, and Royal Mail witnesses all without the defense having access to the contemporaneous emails and business documents that would prevent what at essence was an imbalanced evidentiary presentation that the Constitution forbids. *See Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) ("[B]y evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt."); *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) ("In the absence of any valid . . . justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." (citation omitted)). Federal courts have the "inherent power to exclude evidence . . . where necessary to prevent the non-offending side from suffering" this type of "unfair prejudice." *Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 446 (1st Cir. 1997).

## CONCLUSION

For all the foregoing reasons, Mr. McLellan's Motion for Release Pending Appeal should be granted.

Respectfully submitted,
By his attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116

---

*Filippi.* *See* Dkt. 276 at 10-11.

(617) 227-3700 (telephone)
(617) 338-9538 (fax)
owlmgw@att.net


## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this 17th day of October 2018, I caused the within Motion to be served on all registered participants through its filing with this Court's CM/ECF system.

**/s/ Martin G. Weinberg**
Martin G. Weinberg