<pre>
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3      - - - - - - - - - - - - - - - - - - x

 4      UNITED STATES OF AMERICA,            :

 5            Plaintiff,                      :    Criminal Action No.
                                                  1:16-cr-10094-LTS
 6         v.                                 :

 7      ROSS MCLELLAN,                        :

 8            Defendant.                      :

 9      - - - - - - - - - - - - - - - - - - x

10

11        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

13                              SENTENCING

14

15
                        Tuesday, October 16, 2018
16                            9:31 a.m.

17

18

19

20      John J. Moakley United States Courthouse
        Courtroom No. 13
21      One Courthouse Way
        Boston, Massachusetts
22

23      Rachel M. Lopez, CRR
        Official Court Reporter
24      raeufp@gmail.com

25
</pre>

1                        **A P P E A R A N C E S**

2    On behalf of the Plaintiff:

3         UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
          BY:   STEPHEN E. FRANK
4         John Joseph Moakley Courthouse
          One Courthouse Way, Suite 9200
5         Boston, Massachusetts  02210
          (617) 748-3244
6         stephen.frank@usdoj.gov

7
     On behalf of the Defendant:
8
          MARTIN G. WEINBERG, P.C.
9         BY:  MARTIN G. WEINBERG
          20 Park Plaza
10        Suite 1000
          Boston, Massachusetts  02116
11        (617) 227-3700
          owlmcb@att.net
12

13        LAW OFFICES OF ROBERT M. GOLDSTEIN
          BY:  ROBERT M. GOLDSTEIN
14        20 Park Plaza
          Suite 1000
15        Boston, Massachusetts  02116
          (617) 742-9015
16        rmg@goldstein-lawfirm.com

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1   (In open court.)

2   THE DEPUTY CLERK:  The United States District Court

3   for the District of Massachusetts is now in session, the

4   Honorable Leo T. Sorokin presiding.

5   Today is October 16th, the case of United States v.

6   Ross McLellan, criminal action 16-10094 will now be heard

7   before this Court.

8   Counsel, please identify themselves for the record.

9   MR. FRANK:  Stephen Frank for the United States.

10  Good morning, Your Honor.

11  THE COURT:  Good morning, Mr. Frank.

12  MR. WEINBERG:  And good morning, Your Honor.

13  Martin Weinberg with Rob Goldstein, here on behalf of

14  Mr. McLellan, who sits to my left.

15  MR. GOLDSTEIN:  Good morning, Your Honor.

16  THE COURT:  Good morning.

17  Good morning, Mr. McLellan.

18  MR. MCLELLAN:  Good morning.

19  THE COURT:  All right.  So I have -- we're here for

20  sentencing of Mr. McLellan.  I have before me the

21  Government's sentencing -- the revised presentence report,

22  the Government's sentencing memo, the defendant's objections

23  to the probation sentencing calculation, and a separate

24  defendant sentencing memo with the 67 letters in support.

1    I've read --

2         That's everything, right?

3         MR. FRANK:  I believe that's correct, Your Honor.

4         MR. WEINBERG:  Yes, Your Honor.

5         THE COURT:  All right.  I've read all of those

6    materials, and, Mr. Frank, there are victims, they have a

7    right to be heard.  I assume they've been given notice.  And

8    I haven't heard anything, so I assume they don't want to be

9    heard today.

10        MR. FRANK:  They've been notified, Your Honor, and

11   they haven't contacted us about being present today.  They're

12   all overseas, obviously, and so --

13        THE COURT:  And some of them testified, in any

14   event, at the trial, so I'm familiar with that.

15        So that takes care of that.

16        So my thought, as a way to proceed, would be I

17   would hear -- I would just hear from the Government with

18   respect both to the sentencing calculation and to the

19   recommendation; hear from the defendant, as to counsel, both

20   as to the objections to the presentence report calculation

21   and as to the recommendation; give Mr. McLellan his

22   opportunity, if he wishes to exercise it, to allocute; and

23   then I'll explain -- at that point I'll resolve the

24   objections to the presentence report, which really are just

25   with respect to the calculation.

1             There are no other objections, right?

2             MR. WEINBERG:  That's correct, Your Honor.

3             THE COURT:  And then explain -- at that point, I'll

4    determine what sentence to impose and explain it.

5             Sound all right?

6             MR. FRANK:  Yes, Your Honor.

7             THE COURT:  All right.  I'll hear from the

8    Government first.

9             MR. FRANK:  Your Honor, as an initial matter, the

10   Government agrees with the probation department that the

11   applicable sentencing guidelines level here is 35.  I'm happy

12   to address the defendant's specific objections to each of the

13   enhancements, but I think unless the Court has specific

14   questions, I'm happy just to rely on the record.  But we

15   agree that the level is 35, and that results in a guidelines

16   range of 168 to 210 months.  As set forth in our papers,

17   we're requesting that the Court impose a sentence here of

18   below the guidelines range, a sentence of 60 months.

19            Today is a sad day, Your Honor.  The Government

20   recognizes that the defendant has no criminal -- prior

21   criminal record.  We recognize that he overcame a difficult

22   background to achieve tremendous professional success at

23   State Street.  And we, like the Court, have read each and

24   every one of the letters that he submitted on his behalf to

25   the Court.  There is no doubt that the defendant is a

1    generous and highly regarded member of his community.  There

2    is, likewise, no doubt that he is a good father who loves and

3    is loved by his children and his spouse.

4           And we recognize, in asking for a 60-month

5    sentence, that it is the defendant's family that will suffer

6    from whatever sentence the Court imposes today.  So it is

7    difficult to stand here and ask for a term of imprisonment

8    under those circumstances.

9           But the fact is, Your Honor, that the defendant

10   ultimately, as the jury found, crossed a line, not once, but

11   repeatedly, over an extended period of some 18 months, until

12   he was caught and the scheme in which he participated

13   unravelled.  He deceived his clients and even his co-workers.

14   He defrauded his victims of more than $20 million, and he

15   lied to cover it up.

16          To this day, he has failed to fully accept

17   responsibility for his actions, or even to acknowledge that

18   they are criminal, or to express any remorse.

19          I would note, Your Honor, that the sentencing memo

20   submitted by the defense talks about State Street moving its

21   business model closer to that of its competitors.  It talks

22   about competitors profiting from undisclosed spreads.  It

23   suggests that one of the victims, KIA, was not defrauded at

24   all.  It cites a sentencing letter submitted in connection

25   with the brief, talking about the defendant's conviction as

1    "the world dealing him a terrible blow."  And it points the

2    finger for any wrongdoing at his co-conspirators, notably

3    Mr. Pennings, who testified as a cooperating witness for the

4    defendant, and says that to the extent that there were any

5    false or misleading statements made, they were Mr. Pennings'

6    responsibility.

7              There is no doubt that Mr. Pennings and

8    Mr. Boomgaardt, and the others who participated in this

9    scheme, bear responsibility for their involvement.  The

10   Government doesn't argue otherwise.  But at the end of the

11   day, there was equally no doubt that it was the defendant who

12   was in charge, who was the senior-most executive, who

13   approved and directed each and every one of the steps that

14   were taken in furtherance of this scheme.  It was because of

15   him that this scheme happened.  The others turned to him for

16   approval, and he provided it.  He did that deliberately, he

17   did it knowingly, he did it intentionally, he knew that his

18   clients were being duped, and that's a crime.  And when that

19   crime is committed by an executive vice presidents at one of

20   the world's largest banks, it demands a serious consequence.

21             Your Honor, as we've set forth in our papers, we

22   recognize that the sentencing guidelines in this case are

23   very high.  They are driven by the size of the loss and by

24   numerous enhancements.  As a legal matter, we believe that

25   each of those enhancements are applicable.

1          But we also believe that the guidelines are not

2     particularly helpful as applied to the facts of this case.

3     Among other things, they don't distinguish between theft, for

4     example, from the savings of an elderly retiree, who has no

5     hope of recovering that loss, and theft from institutional

6     investors, such as those affected here, albeit investors in

7     this case whose mission was to safeguard the savings of

8     retirees.  The guidelines don't distinguish between a crime

9     that's designed directly to line a defendant's own pockets,

10    and a crime with a more indirect profit motive, such as the

11    one here.

12          For those reasons, among others, and

13    notwithstanding the fact that this defendant exercised his

14    right to put the Government to its burden of proof at trial,

15    we have taken a very unusual step of recommending a sentence

16    substantially below the applicable guidelines.

17          In considering the applicable factors under

18    Section 3553(a), we do not believe that specific deterrence

19    or the need to protect the public from further crimes of this

20    defendant are key factors applicable to this sentencing.  And

21    we recognize that the defendant's financial services career

22    is effectively over.

23          That said, we do believe that a meaningful sentence

24    is necessary to reflect the seriousness of this crime, and to

25    provide for general deterrence; to send a message to

1   similarly situated executives that high titles, large

2   paychecks, and the trappings of the executive suite do not

3   provide a license to rip off your customers.

4        At the end of the day, bankers who steal from their

5   clients need to know that they will be called to account,

6   just like everyone else.  And the public needs to know that,

7   too, to maintain and, perhaps, to restore faith not just in

8   our financial system, but equally in our system of justice.

9        The sentence recommendation we've made takes into

10  account, as well, the need to avoid unwarranted sentencing

11  disparities between similarly situated defendants.  The

12  defense, in its brief, cited numerous cases.  I would point

13  Your Honor to a case that I argued before Your Honor a number

14  of years ago, involving a defendant by the name of Daniel

15  Thibeault, a graduate of Harvard Business School, who built a

16  legitimate and highly successful mutual fund company, but

17  ended up taking a detour into fraud.  The loss amount in that

18  case was approximately $15 million, somewhat below the loss

19  amount here.  It did involve individual investors, some, but

20  not most of the money in that case, went into the defendant's

21  own pocket, but most of the money went back into his firm.

22  And in that case, the Court imposed a sentence of nine years.

23       Here we are asking for a sentence of five years.

24  We believe that that sentence will appropriately situate the

25  defendant, not just relative to others more broadly similarly

1    situated, but more particularly relative to his two

2    co-conspirators, both of whom testified at trial,

3    Mr. Boomgaardt and Mr. Pennings.  Mr. Boomgaardt has been

4    sentenced to a probationary term.  Mr. Pennings is yet to be

5    sentenced.

6            I would note that Mr. Boomgaardt came to the

7    Government early in our investigation, before he knew that he

8    was the subject of an investigation, voluntarily came to this

9    country, proffered extensively, admitted responsibility for

10   his crimes, assisted the Government in its investigation,

11   waived extradition, pled guilty, and testified at trial.

12           Mr. Pennings, after he was indicted, ultimately

13   waived extradition, came to this country, pled guilty, later

14   entered into a cooperation agreement, and testified at trial.

15           Notwithstanding that fact, we expect to ask for a

16   meaningful term of incarceration for Mr. Pennings, and the

17   sentence that we have asked for in this case takes that into

18   account, and we believe is appropriate in a relative --

19   relative to that sentence.

20           Your Honor, five years is definitely a long time in

21   prison, notwithstanding any time off that the defendant gets

22   not just for good behavior, but for any participation in the

23   RDAP program, for which he appears likely to qualify.

24           THE COURT:  I'm not sure he's -- the presentence

25   report -- our probation office, as I'm sure you know, is the

1    only probation office in the country that actually screens

2    people for RDAP, in our ever-ending quest in the judiciary to

3    assist the executive branch in its performance of its duties.

4    So our presentence reports, because it's the most efficient

5    time to do it, when we know the most about the person, would

6    say if the person qualifies.

7              Does it indicate that he qualifies?  I thought I

8    didn't see that.

9              THE PROBATION OFFICER:  Your Honor, in the

10   presentence report, it does not particularly include that

11   language, because it did not meet the level of the probation

12   officer's screening tool.  However, there is sufficient

13   information in the presentence report --

14             THE COURT:  That he might qualify.

15             THE PROBATION OFFICER:  Correct.

16             THE COURT:  I see.  Okay.

17             THE PROBATION OFFICER:  And the Bureau of Prisons

18   will do an independent assessment of that, and very likely he

19   will qualify.

20             THE COURT:  Okay.  Fine.  Thank you.  So there it

21   stands.

22             MR. FRANK:  Thank you, Your Honor.  And in the

23   event he were to participate in that program, to qualify and

24   participate in their program, as the Court knows, that could

25   ultimately reduce his sentence by up to a year.

1          Notwithstanding that fact, we're asking for five

2     years, which is a long time, even taking all of that into

3     account.  But at the end of the day, we submit that is an

4     appropriate sentence, sufficient, but not greater than

5     necessary, to achieve the goals of sentencing on the facts of

6     this case.  Thank you.

7          THE COURT:  Just one question, Mr. Frank.  Is the

8     Government making a recommendation with respect to fine and

9     supervised released or not?

10          MR. FRANK:  We are not making a specific

11     recommendation.  We would defer to the Court on that.

12          THE COURT:  All right.  Mr. Weinberg.

13          MR. WEINBERG:  Thank you, Your Honor.  I don't want

14     to spend a lot of time on the guidelines, but I do want to

15     just touch --

16          THE COURT:  First of all, you don't waive anything.

17     Everything that's in the presentence report I consider and

18     everything in your sentencing memo.  So you're welcome to say

19     whatever you want to say on all of those, but just so the

20     record is clear, the absence of mentioning anything doesn't

21     waive anything of those.  They are all there, and I'm going

22     to rule and consider all of them.

23          MR. WEINBERG:  Thank you, Your Honor.  And I'll be

24     very brief, because we have briefed them both in terms of the

25     objections and the addendum to probation, and in terms of a

1    separate sentencing brief.

2              I do think, in contrast to a Ponzi scheme or to a

3    scheme where money is just taken from people without services

4    reciprocating, that in this case there were services that had

5    a fair market value, that being the services of the

6    broker-dealer.  And to the extent that the evidence in this

7    case demonstrated no excessive markups -- in other words, you

8    could have a crime, deceit, and yet have fair market value.

9    The cases we provided talk about a disbarred lawyer providing

10   services, and the court saying those services had value.

11   They talk about doctors and labs providing medical services

12   that were not authorized, but had value.  The First Circuit

13   talks about having to value the stock that resulted from a

14   kickback scheme, in the case of *Prange*.

15             So this is -- if Your Honor was trying to apply the

16   loss guideline, you know, there are significant issues that

17   have been raised, including KIA, which I think Your Honor has

18   a principled basis to not count as part of an alleged fraud.

19   KIA, Mr. Boomgaardt talks about walking into Mr. Pennings'

20   office, and hear Mr. Pennings on the phone with the KIA

21   representative, Mr. Das, saying, you know, "If you don't want

22   to pay commissions, there's going to be a spread."

23   Mr. Boomgaardt later is on an audio, in the fall of 2010, on

24   the second KIA transition, telling people there's going to be

25   a markup, that they don't want fee, they don't want explicit

1    fees.  State Street is not doing for free a $4 billion

2    transition, where they're going to cover the costs of the

3    custody costs, without being clear to everybody in the

4    financial world that there's going to be a markup, there's

5    going to be a spread.  And that's just the way KIA asked for

6    the transaction to occur.

7           So I don't want to belabor the guidelines.  I

8    appreciate the Government's agreement that these guidelines

9    overstate the loss, whether it's a disagreement with the loss

10   guideline or a statement that they don't lead to a fair and

11   just result in this case.

12          What I'd rather do is emphasize the agreements and

13   disagreements.  I don't -- I've not asked for probation, even

14   though we litigated this case, you know, on the premise that

15   Mr. McLellan didn't have criminal intent.  And when you look

16   at intent, it's not easy.  There's some gray here.  This is

17   not a Ponzi scheme, an investment relationship off, a

18   dump-and-dump swindle.  Mr. Pennings himself said, "In my

19   wildest dreams I didn't imagine that I would be committing a

20   US crime," and then he added, "or any crime."

21          Mr. Boomgaardt talked about wrongfulness being on

22   his -- weighing on him while he was engaged in these

23   practices, but again, not believing at the time that he was

24   committing a crime.

25          And Mr. McLellan, too, you know, made disclosures.

1   This wasn't a crystal clear criminal intent.

2          The wrongful -- the willfulness instruction talks

3   about wrongfulness.  It talks about disregarding, rather than

4   just disobeying, the law.  So I think there's a way to

5   reconcile a jury verdict, which I'm certainly not disputing.

6   This is not the time to be disputing the Government's proof

7   or the jury verdict.  But there's something different about

8   criminal intent of someone who decides:  I'm going to take

9   this investor money and use it to buy a Rolex, or use it to

10  buy a car or yacht, as some people.

11          Take Mr. Thibeault.  I mean, he took investor money

12  and used it for personal enrichment.  He went to the SEC, if

13  I called the case correctly, and lied.  He went to the court

14  and lied.

15          THE COURT:  Thibeault -- wait, who are you talking

16  about?

17          MR. WEINBERG:  Mr. Thibeault.

18          THE COURT:  Yes.

19          MR. WEINBERG:  That this is a crime of not only

20  quantitative, but qualitative differences, and a person who's

21  very different than Mr. McLellan.

22          So we come out that punishment and deterrence do

23  matter.  And of course, I agree there's no need to further

24  deter Mr. McLellan.  He's -- you know, in the world of

25  financial services, when you've been accused, and you can

1  show this from the drainage of his clientele at Harbor

2  Analytics, widely respected for his intelligence, and yet he

3  lost his business because there was a public accusation, now

4  a public conviction.

5        His life that he struggled for, that he went to

6  night school for, that he worked tirelessly -- we have

7  letters from people who worked with him at the beginning of

8  State Street, saying he was the last man at the office, even

9  when he was a manager.  He was busy printing and collating

10  presentations that he was going to make to United States

11  clients the next week.  He was there at the end of the day,

12  and he was there at the beginning of the day.

13        He didn't get his position by privilege or by going

14  to the same country club as some CEO at State Street.  He

15  earned it.  He earned it by going to school, by getting

16  educated, by working harder than others.  He earned it by

17  skill and by hard work, and it's over.  And it's over at what

18  could have been the prime of his professional life.

19        The collateral consequences are catastrophic to

20  him, not only the consequences that he will never again be

21  able to pursue his life dream in terms of employment, but the

22  obvious consequences to a man that cares about his children,

23  cares about his community, that he's going to jail, absent

24  bail pending appeal or absent a successful appeal.  He

25  understands that.

1            He authorized me to ask for a sentence of a year

2     and a day, which is very hard for me to do, given my respect

3     for Mr. McLellan.  But that's a sentence that reconciles the

4     appropriate principles of the criminal justice system

5     sentencing, with that other principle, which is to impose a

6     sentence that's the least sentence that's necessary to meet

7     the purposes of sentencing.

8            The purpose is punishment.  Your Honor can consider

9     collateral consequences, can consider the punishment of a

10    person who was fired from the bank or terminated.  They

11    reached a resolution.  But he lost his job, and it wasn't by

12    his choice, in 2011, October.  That's seven years he's lived

13    with the termination, followed by the internal investigation,

14    followed by the UK investigation, followed by the SEC and DOJ

15    investigation that started in about 2014, followed by a

16    federal criminal accusation, followed by a trial.

17            And you know, I appreciate that Mr. Frank's

18    recommendation doesn't seek an inflation for his exercising

19    the right to trial.  We didn't put on defenses that were

20    implausible, much less improper.  He asked -- put the

21    Government to its test, which has a certain value in a system

22    where 97 percent of the people plead guilty.  And I know he's

23    not eligible for the --

24            THE COURT:  It's a Constitutional right.

25            MR. WEINBERG:  So he has, in many ways, Your Honor,

1    been punished.  His life has been irrevocably changed.  A

2    year and a day is a significant punishment.  You miss --

3           We were listening to a tape of Webster Hubbell,

4    Bill Clinton's deputy attorney general, went to jail over

5    something that he did in Arkansas.  And he gave a speech, and

6    he said, "After a year, when you miss your birthday, your

7    wife's birthday," -- in this case, Mr. McLellan will miss

8    four children's birthdays, ages 13, 11, and 7, twins.  He

9    will miss Christmas and Easter.  He will miss his

10   anniversary.  Once you've missed all those occasions once,

11   you know, it's all -- it's punishment enough to a man that

12   cares about his family and cares about his commitments to his

13   family and others.

14          When you talk about general deterrence, which is a

15   legitimate and principled basis to impose a sentence -- and I

16   understand Mr. Frank's concern about disincentivizing others

17   in bank and financial industries from being tempted to commit

18   crimes.  Could anybody that knows of this case -- which is a

19   predicate for deterrence, you have to know about the case at

20   some level.  Could anybody know what's become of him, his

21   job, his loss of job?  Could anybody know that he's going to

22   go to jail for a year and a day and not be deterred?  And I

23   suggest that if there is that person who would not be

24   deterred, he's not going to be deterred because Your Honor

25   imposes a sentence that exceeds one year and one day.

1          All of the studies, or at least the general

2     prevailing view, is it's the certitude of apprehension and

3     punishment, not the duration of punishment, that matters.

4          In the case of *United States vs. Gupta*, who was a

5     well respected -- he was a board member at Goldman Sachs.  He

6     walked out of the Goldman Sachs board meeting, where it was

7     learned that Warren Buffett was going to invest $5 billion in

8     Goldman Sachs, and within seconds, called a hedge fund

9     trader, gave him that information, lead to a huge insider

10    trading case in New York.  Judge Rakoff imposed a sentence of

11    two years on a crime that I suggest strikes at the heart of

12    the securities markets more than Mr. McLellan's, imposed the

13    two-year sentence, and said during that case that

14    white-collar businessmen get deterred by lower sentences than

15    a professional criminal.

16          And again, I don't know.  I can't image anyone who

17    knows of what's occurred with Mr. McLellan, you know, not

18    being deterred if they're open to being deterred.

19          In terms of banks, they're deterred by State

20    Street's being required not just to pay an SEC fine, but to

21    enter a deferred prosecution agreement.  They lost a lot of

22    money, and they lost a lot of reputation.

23          So I think the deterrence factor has already been

24    accomplished.  I think the punishment of one year, one day,

25    would more than meet the requirements of punishment.

1          Again, this is -- and I want to go back to 3553 and

2     look for a second at the offense.  This is not a straight-out

3     rip off.  And I understand that Mr. Frank recognizes that and

4     has made distinctions between those people and Mr. McLellan.

5          This was not a case of complete concealment.  If

6     Your Honor remembers, in the midst of KIA 121, where the bank

7     wanted to buy the bonds that were being sold by KIA,

8     Mr. McLellan sends the periodic notice to the head of global

9     legal, Bryan Woodard.  And then they all knew that on a zero

10    commission transition with KIA, the pipeline said "We're

11    expecting to make $4 million from this transition."  And that

12    got everyone in the bank interested.

13         But what was unique here is that Mr. McLellan is

14    talking to the head of legal, global, Bryan Woodard, and the

15    head of compliance, Mark Hansen.  He's saying to Mark Hansen,

16    who's looking at whether there's a conflict of interest to

17    have State Street buy the bonds that they're brokering from a

18    client, and there's a lot of attention.  Ultimately, it's

19    approved by lawyers in the UK.  But Mr. McLellan, on

20    November 2, is saying to Mr. Hansen, "Are you saying only one

21    of us can take a markup?"  That's not the language of someone

22    who believes that nobody knows that State Street is taking a

23    markup on a zero commission transition with the bank's

24    biggest client, or one of its two biggest clients.

25         And Mr. McLellan -- this is Exhibit 53 -- gets an

e-mail from a man named Tom Bryant, who is one of the key US
traders who are in a telephone call with Mr. Woodard and
another US lawyer for State Street named Melissa McKay.  And
he's saying to Mr. McLellan, "Melissa has no problem with us
both taking a markup, you as a broker-dealer" -- meaning
State Street Global Market -- "and rates as a principal."

This is not a complete defense.  I'm not
relitigating the case.  Mr. Pennings himself made disclosures
at an April 2011 meeting with State Street lawyers and with
the outside counsel in London, in UK, Herbert Smith, and
said, "Let's look at the template.  I want to make sure it
allows us to both charge a transition management fee and a
nondisclosed broker-dealer markup."

And again, these weren't crystal clear.  And no one
regrets not having written an e-mail to the bank more than
Mr. McLellan that got explicit, express approval of the
business model that was being used in Europe.

I mean, he wasn't the principal beneficiary of
this, he didn't make any money himself.  At some incremental
level, yes, making these dollars increased the performance of
EMEA transition management.  But the bonuses in State Street,
where 50 percent was the overall bank, another 25 percent was
State Street Global Markets, which spread across all kinds of
activities.  His division, Portfolio Solutions Group, was
25 percent; but there's four different units within it,

1    transition management, one of four.  So you're breaking it

2    down from 25 percent to one of four.  And EMEA is only

3    20 percent of transition management, meaning it's a small,

4    single digit amount that was affected by the success of these

5    transitions.

6            Again, I'm not arguing that there's not a need for

7    bankers to get the message that you need to walk away from a

8    line.  Don't get close to the line, don't cross the line.

9    But I believe a sentence of one year and one day would fully

10   accomplish those sentencing purposes.

11           I want to look for a minute at Mr. McLellan

12   himself.  And I thank Your Honor for going through the

13   letters.  But to me they were extraordinary.  They, quite

14   frankly, you know, made me want to do more, and not ask for

15   people to ask me to do things, and to go out and be proactive

16   and give more time.  But it's --

17           You know, it was just an eloquent demonstration.

18   You can't make this stuff up.  You can't make up that you

19   have Christmas presents in your car that get stolen before

20   you put them under the tree.  Mr. McLellan's reaction is, "I

21   hope the thieves have a better year next year, so they don't

22   have to engage in this kind of behavior."

23           Or that one of the neighbors has cancer, and he

24   goes, without being asked, and takes their garbage to the

25   dump every week.

1          Another family in the neighborhood has another

2     medical issue, and Ross McLellan is there organizing child

3     care and food, so that they can attend to these medical

4     crises.

5          Another person has a family member that came to

6     town because of the hospital.  They've got nowhere to put

7     them.  Without being asked, Mr. McLellan hears in the

8     pipeline, he shows up and says, "What can I do?"

9          Charity events, he's the one driving to town

10    because someone couldn't go to pick up the T-shirts.  He's

11    the one organizing the events.

12         Coaching.  The neighbors that talk about how it

13    wasn't a coach for his kids, it was to coach that everyone

14    had a positive experience; that he -- you know, three

15    different neighbors, and there's probably more, talk about

16    how he took the least talented players under his wing and

17    made them feel as essential parts of those teams, and gave

18    8-year-olds and 9-year-olds the best of that kind of group

19    experience.  And that when people -- parents thanked him, it

20    was -- didn't even recognize that he had done something that

21    wasn't just the natural thing to do.

22         You know, his siblings talk about, you know, his

23    goodness.  When his parents were sick, his in-laws, when they

24    were sick, he would drive to New Jersey.  When people had

25    funerals, he would drive two-and-a-half hours.

1    And mostly his parenting and the preciousness.  On

2    the day of this verdict, which had to be the darkest day of

3    his life, he left this courtroom, took a boat to Hingham, and

4    was at his kid's baseball game; how pained he is to know

5    about the meanness in social media, with kids talking about

6    what's happened to his children's father.

7    It's just an extraordinary set of letters.  You

8    know, one of the letters quoted John Wooden, the coach, which

9    is, "A man's character is determined by what he does when no

10   one is looking."  Ross McLellan never thought that he'd be in

11   a courtroom, you know, asking a judge to balance the act with

12   the person.  That's what's here.  And Ross McLellan didn't

13   expect and didn't ask -- in fact, he asked people not to

14   come.  And yet this courtroom is virtually filled with people

15   that ignored that request, that felt that Ross McLellan, you

16   know, deserved their presence, just like he warranted their

17   letters, their testimonials to his basic goodness.

18   Judge, a year and a day is an enormous amount of

19   time to a father of four.  There are tender times in their

20   life.  It's an enormous amount of time for him to be away

21   from his family.  You know, his wife works to make the

22   economics work.  He's been the principal parent that packs

23   the lunches and drives the kids to schools and attends every

24   game.  I don't know what purpose there is in a sentence that

25   exceeds that.

1          I truly, really believe that Mr. Frank's

2     prosecution has chilled the banking world from being tempted

3     to engage in conduct similar to that which occurred in this

4     case, and that a sentence of one year and one day will be the

5     end of a series of incremental punishments that has

6     irrevocably changed this man's life.  I ask you please to

7     impose a one year, one day sentence on Mr. McLellan.

8          Thank you, sir.

9          THE COURT:  Thank you, Mr. Weinberg.

10         Mr. McLellan, you have the right, if you wish to

11    exercise it, to what we call "allocate" or speak on your own

12    behalf before I impose sentence.  You obviously do not have

13    to speak, and if you elect not to speak, then I will not hold

14    it against you.  But if you wish to speak, this is the moment

15    to do so.

16         MR. MCLELLAN:  Thank you, Your Honor.

17         It pains me to be here.  This has obviously been an

18    extremely difficult time for my family, dating back to the

19    time that Mr. Weinberg told me that I was the target of a

20    criminal investigation.  Given the press that this case has

21    generated, I feel like I've been in prison since April of

22    '16.  It's been very difficult.

23         I worked my entire life to build my career.  I took

24    all the money I ever made, I took loans, I used credit cards

25    to get through Stoneham College and Boston College.  I

1    studied as hard as I could to get my securities license, my

2    CFA charter.  All of this is gone.  My financial career is

3    over.  But I can live with that.  What pains me more is the

4    effect that it has had on my family.

5            My wife and four children have done nothing wrong,

6    yet they've been severely affected by these events.  When I

7    realized my older children were being mocked at school, it

8    was the lowest point of my life.

9            That said, I also understand that life sometimes,

10   you need to sleep in the bed you made.  I'm no way -- I'm not

11   infallible.  I could have made different decisions.  I should

12   have made different decisions.  I can't undo that.

13           Mr. Frank said I've showed no remorse.  There's no

14   more remorseful person on this planet than me.  I don't think

15   I've had a night's sleep in the last three years, where I

16   haven't stared at the ceiling and thought about what I should

17   have done differently and how it has affected my wife, my

18   friends, my family.

19           I hope you show mercy, as I try and rebuild my life

20   and be a positive impact on society, which I think I can do.

21   Thank you.

22           THE COURT:  Thank you, Mr. McLellan.

23           So let me first start with the guidelines and

24   address the objections that you advance, Mr. Weinberg.

25           So the base offense level is seven under the

1    sentencing guidelines, based on the offenses of conviction.

2    I don't think there's any objection to that.

3            The next enhancement, probation applied a 20-point

4    enhancement, based on the loss amount of $20 million.  So you

5    have two types of objections to that, Mr. Weinberg.  First

6    you have a -- what I'll call a general, overarching objection

7    that there is no loss; and second, individual objections to

8    certain deals.  And I'll address them both.

9            With respect to the individual objections, you had

10   an objection to Judge -- to the Dutch Doctors deal,

11   Sainsbury's, and Eircom, separate objections to each one.  I

12   overruled each of those specific objections, basically for

13   the reasons articulated in the presentence report, which I

14   adopt.

15           The KIA objection, I sustain that objection.  I

16   think it's close, but the evidence -- given that

17   Mr. Boomgaardt, who I found to be a truthful and credible

18   witness, in every respect, and what he said about what

19   Mr. Pennings disclosed to KIA, I'm not persuaded that -- I'm

20   not persuaded by preponderance that it is -- that there was

21   an intent to defraud there.

22           I will explain that, for reasons I'll explain

23   later, that first of all, that $9.6 million loss doesn't

24   change anything in the guideline calculation.  I address it

25   just because this is a case where I think I should address

1    everything.  And so if I were -- if I'm wrong, for reasons

2    I'll explain later, I don't -- at least for me, what I'm

3    doing, it won't affect things.  And I'll explain that.

4            So that takes care of the specific, individual

5    objections.

6            With respect to the loss amount, I have spent a lot

7    of time thinking about this, both because of the significance

8    of the case to Mr. McLellan and the significance of the case

9    to the Government, and the excellent advocacy that you both

10   have provided throughout the case.  And I will say that I'm

11   not sure the guidelines are very clear on this particular

12   point.

13           But there are, essentially, under 2B1.1 for the

14   loss amount, there's -- if you give me one moment.  There's

15   actual loss, intended loss, or gain, which in cascading

16   levels I apply first actual loss, and if there weren't, to be

17   determined; and intended loss; and if not, gain.  I don't

18   think I need to decide between those three, because the

19   number is the same on all three.  It's the approximately

20   $10 million, without the KIA or -- whichever one of those

21   applies.  And clearly, at a minimum, the gain applies.  The

22   intended gain of the scheme was the $10 million.

23           The real issue here that's being argued is that

24   Mr. McLellan, under the guidelines, is entitled to a

25   reduction in the loss amount for the fair market value of the

1      services.  At the time the services were delivered, not so --

2      so that's without counting the fact that State Street paid

3      the people back later.  That wouldn't count under that

4      credit.

5              And so I have thought about that, and my

6      resolution -- I have a resolution of that, and then I'll

7      further explain the significance of that.  My resolution is I

8      find that the loss amount is the $10 million.  The reason

9      is -- well, I think the question is close.  The question --

10     the 10 million, I resolve it this way.  The stated deal

11     was -- the deal, as stated between the clients and State

12     Street, means that the extra charges, which is the

13     $10 million, that wasn't part of the deal.  And there's an

14     inference, which I draw, that it was bid low or bid in that

15     way, and that that's some -- that's a measure of the fair

16     market value of the services.  I will come back to that when

17     we talk about sentencing, but that's how I resolve that.

18              I recognize it's close, because they did deliver --

19     this is, they delivered services, they were good services.

20     And I don't believe there's any evidence as to what anybody

21     else bid or any evidence that anyone else would have done it

22     for the stated price or what price, other than there were

23     other people willing to do it.  But on balance, given the

24     evidence and what's in the PSR, for those reasons I find that

25     the loss amount is the $10 million.

1          Next -- so leaves us with a base offense level of
2     7, the enhancement of 20.
3          There's a two-point enhancement for the offense
4     involved sophisticated means, and a substantial part of the
5     scheme was committed from outside the US.  So I'll just say,
6     with respect to that, certainly it's beyond doubt that a
7     substantial part of the scheme was committed outside of the
8     US, and that's enough to apply the enhancement.  And for that
9     reason, I apply the enhancement.
10          I don't think I need to resolve the question of
11     sophisticated means.  In many respects, this wasn't
12     sophisticated.  This was just -- they just lied to customers
13     as to whether they were going to embed a charge and sort of a
14     straightforward kind of fraud.  But the two-point enhancement
15     applies for the substantial part.
16          I will tell you both, I'm likely to -- I don't
17     think the intent of the guideline is -- well, it literally
18     qualifies, I just don't think this guideline, with respect to
19     substantial part from outside the United States, is meant to
20     apply to this circumstance.  There's -- I don't -- I
21     understand from the commentary of the guidelines that the
22     purpose is when there's something about the international
23     aspect that makes it more difficult to detect or make it is
24     more sophisticated in some way.  Here it's just the business
25     was global.  This was primarily committed -- this was only

1    committed out of the clients of the London office, and some

2    of it involved in the United States.

3          I recognize that's a disputed issue for appeal.

4    But based on the record as it stands, what I found, it's a US

5    crime and so it applies.  But I think that a variance with

6    respect to that is appropriate.  And I don't think it's

7    counterbalanced by the sophisticated means, because

8    fundamentally, it doesn't seem sophisticated to me.  It is --

9    there's nothing particularly complex, it's just not telling

10   them what they're doing or lying to them about what they're

11   doing.

12         So that is -- I recognize Judge Casper, in

13   Mr. Boomgaardt's case, applied the sophisticated means

14   enhancement.  I don't really know -- I can't comment on that,

15   other than to say I wholeheartedly agree with the result that

16   Judge Casper imposed upon Mr. Boomgaardt.  I didn't even

17   realize until I had read the PSR recently that he had been

18   sentenced.  But based on his testimony, I certainly -- I

19   think -- there's nothing about that that causes me concern

20   with respect to Mr. McLellan's sentence here.

21         The plus-four for securities law violation and that

22   the defendant himself was licensed applies.  I overrule the

23   objection for the reasons stated in the presentence report.

24         The two-point enhancement for being a manager or a

25   supervisor, I also overrule the objection and apply that.  I

1   think that both -- for two reasons, one, the reasons

2   articulated in the presentence report, and also because what

3   the evidence showed me here is that not only was Mr. McLellan

4   actually the supervisor of Mr. Pennings, but he -- there was

5   a quality of supervision and authorization to what

6   transpired, sufficient to invoke the two-point enhancement,

7   and so I apply that.

8           So that brings me to an actual offense level of

9   what's set forth in the presentence report of 35, which is a

10   guideline sentencing range in criminal history category I,

11   because Mr. McLellan has no prior record of anything, a

12   guideline sentencing range of 168 to 210 months.

13           I commend the parties for recognizing that that

14   guideline sentencing range bears no particular meaningful

15   reference to what kind of sentence ought to be imposed in

16   this case.  I just don't think that -- so I considered the

17   guideline, as I'm required to do.  I don't think the

18   guideline captures the issues that are at stake, at least

19   with respect to the -- because of the loss amount, primarily.

20           I recognize that your sentencing recommendation,

21   Mr. Weinberg, is essentially a sentencing recommendation as

22   if the loss were zero.  Because if the loss were zero, by my

23   calculation under the guidelines, then Mr. McLellan would be

24   facing a 12- to 18-month sentence under the guidelines.  And

25   you recommend a year and a day, which would be the lowest

possible sentence under that.  I don't know if that's how you located it, but that would be, I think -- if I did my math right, I think that's around where you'd be.

In any event, so I make the following further findings and observations.  I consider the 3553(a) factors, as I'm required to do, which I'm not going to recite here but I'm familiar with them.  You're all familiar with them, and you've referred to them.  I make the following findings and then will explain them also back in reference to the guidelines and then as to what I'm going to do.

This to me is a truth case.  That's what this is.  This is a case about truth.  The executives in any industry, but especially the securities industry, may not lie in their marketing to customers or the bank, even when, as here, the customer, at the end of the day, as they did in this case at the end of the day, know the total cost of the deal, though not the price charged at State Street.

So as I understand the evidence in this case, the customers were lied to as to what they were going to be charged.  They were promised one charge, and then there were additional hidden charges that the customers were explicitly promised weren't going to be imposed.  At the end of the day, when they got the total result, they knew they had, for example, a billion to start with, and they got 900 -- I'm using these numbers hypothetically -- they got $992 back.

1      They knew the whole thing cost them $8 million.  They didn't

2      know, and it wasn't disclosed to them, that part of that

3      8 million was, say, for example, 2 million and charges that

4      State Street imposed that were promised that wouldn't be

5      imposed, and those were buried within other charges.

6              The customers were satisfied with the performance,

7      there's no doubt about it.  They were satisfied at the time.

8      The victims that testified at trial thought that State Street

9      did a good job, but they were understandably and rightfully

10     mad for being lied to.  And they were lied to.

11             But that makes this -- this is a lie and deception,

12     which is the essence of fraud, and it's a salient

13     consideration in this sentencing and my judgment.

14             The loss amount -- well, so, Mr. McLellan, the jury

15     of your peers has spoken.  And you participated in this

16     criminal conduct, and that's why you're here for sentencing.

17     But there are several important factors that I consider.

18     This was not a Ponzi scheme.

19             I don't view -- I appreciate the reference to

20     Mr. Thibeault, who I did sentence to nine-and-a-half years.

21     Mr. Thibeault's case, in my judgment, is wholly different

22     than this case for a number of reasons.  The first is,

23     Mr. Thibeault stole money.  He ran --

24             He was no doubt a successful businessman before he

25     committed the crime, very successful in his own right, which

1    he had earned, and which you and Mr. Mr. Frank rightfully

2    recognized.  You didn't dispute any of that properly.

3            But his mutual fund business, he stole from what

4    was the mutual fund for purposes of his own lifestyle or for

5    his other business.  But he put his hand in the till of the

6    mutual fund and he took the money, and that is different.

7    The people who he -- the purpose of the mutual fund was

8    investment; it wasn't for him to take the money to run it in

9    his own business.  So it was a different kind of case.

10            And Mr. Thibeault, throughout the proceedings,

11   until he pled guilty, demonstrated a disregard for the

12   intervention of the law.  Mr. McLellan didn't resist, if you

13   will, when State Street fired him and attempted to separate.

14   It separated, and they negotiated whatever they negotiated.

15   Mr. Thibeault's response was very different.

16            But to me, that was a different case.  This isn't a

17   Ponzi scheme.  There's no doubt in this case that State

18   Street was qualified to do the work that they did.  This

19   isn't a case of a bidder who was a lawyer practicing law

20   without a license.  These people were qualified to do the

21   work they did, and they performed the work well.  The total

22   cost was disclosed at the end.

23            They didn't disclose the fact that they were

24   charging people differently than they'd promised.  That's

25   what makes this a lie case.

1          Mr. McLellan didn't divert the overcharges into his

2     own pocket directly.  This was overcharges that went to State

3     Street, and then in the -- however -- I mean, he got benefit

4     from it, because he benefitted when his unit and his people

5     did well, but this isn't the case of him overcharging the

6     customers and then taking the overcharges and putting it in

7     his pocket, as opposed to passing it on to State Street.

8          So for those reasons, the loss amount is not a

9     useful measure, in my mind, of culpability or of the 3553(a)

10    factors.  So for those reasons, I'm not starting at 100 and

11    whatever the guideline sentencing range is.  And if I'm wrong

12    about the loss amount, and if the loss amount -- if the

13    loss amount is -- if I'm wrong and it's 20 million, rather

14    than 10 million, that doesn't change what I'm going to do

15    here today.  It wouldn't change what I do.  For all the

16    reasons that I'm expressing, I would reach the same result.

17         Likewise, if I'm wrong, and the loss amount were

18    zero and there were no loss, in my judgment, I've thought

19    about the case that way, too, because the loss amount, for

20    the reasons that I've articulated here and earlier, is close.

21    How to determine it?  I still would reach the same result

22    that I'm reaching.  I think it's right on the facts and

23    circumstances of the case.  So I say that to make the record

24    clear.

25         So in particular, I find the loss amount overstates

1    states the culpability, and I depart under the guidelines
2    commentary, which provides for departure when the loss amount
3    overstates the culpability.

4           I think it's noteworthy, to some degree of less
5    significance, but it is of significance, that in this case I
6    don't think Mr. McLellan committed this crime out of personal
7    greed in order to go buy a boat or a lifestyle.  He was
8    living very well, he made a lot of money.  I have no doubt
9    that he went into that industry in part to make a lot of
10   money, and that's fine.  That's not -- that's legal, and
11   people do that all the time.  There's nothing wrong with
12   that.

13          But this was driven, I think, by the drive to win,
14   to succeed, which in part is to make money.  Whether that
15   drive was self-imposed, whether it was culture imposed at
16   State Street, or whether it's the larger industry, is not an
17   issue that is sufficiently litigated for me to resolve.  But
18   it doesn't matter.  The issue here is that you can't lie.
19   Truth matters, and you cannot tell people that you're going
20   to charge one thing, and charge something else.  And that
21   while -- so that's what this is.

22          There's an additional -- several additional factors
23   that I consider, some aggravating and some mitigating.

24          Mr. McLellan, you were a senior executive.  Your
25   blessance and assistance was necessary and important in this

proceedings.  You were a role model -- you were obviously a
role model in your community to many people.  I've read each
and every one of those letters at least once, some of them
more than once.  And there's no doubt that you were a role
model to young boys and girls, not only your own children,
but to many other people.  You were a role model to your
neighbors and to many people in your community.

        But I'm not talking about that kind of role model.
I'm talking about the role model as a senior executive in
State Street, both at the final level you reach, but before
that, at the different levels.  You were a role model, and
you knew this kind of charging was wrong at the time.  You
referred to other people doing this and that it was wrong.
And so by blessing it, by allowing it, by participating in
it, you did wrong.  And that is an aggravating factor in my
mind, in all of these considerations.

        On the other hand, there are individual
considerations that I weigh.  Your career is decimated.  Your
years of -- you have been under years of stress and
humiliation.  You climbed out of the first hole, which was
that you were -- went from high flying executive at State
Street in September of 2011, to fired and unemployed pretty
quickly, and that's a -- that's a big hit.  And then you
started to climb out of it by creating your own consulting
firm, I understand.  And then you got what amounts to -- I

don't know what this was intended to do, it's not, but you
were then wiped out again.  Because when the indictment came
down, that was the end of your consulting business, I don't
have any doubt.  And so I recognize that that is a difficult
thing.

You have no doubt lived, other than this, a good
life.  You are an example of a good man, who has lived a good
life, who committed a crime, for which you must be punished.
And I weigh all of that.

I particularly have weighed, as highlighted by both
of you, that just punishment and general deterrence, since
any punishment in this situation is probably sufficient for
Mr. McLellan.

So Mr. McLellan, for the reasons that I have
articulated, and in consideration of Title 18, United States
Code, Section 3553, and the admonition that I impose a
sentence that is sufficient, but not greater than necessary
to comply with all the purposes of sentencing, I am imposing
the following:  A period of incarceration of 18 months, two
years of supervised release, a $500 mandatory special
assessment, a $5,000 fine to be paid in installments, as I
don't think you're indigent.  I peg the fine to the guideline
ranges that my sentence would be applicable to, to be paid in
installments, pursuant to a schedule provided by the
probation office.

1          I assume you don't object to self-surrender, do
2     you?
3          MR. FRANK:  No, Your Honor.
4          THE COURT:  I permit you to self-surrender to the
5     Bureau of Prisons.  Unless you have a different suggestion,
6     Mr. Weinberg, I would suggest January 5, 2019, to -- it seems
7     reasonable, under the circumstances, to permit Mr. McLellan,
8     if he wishes, to be home for the holidays and with his
9     family.
10          If you wish, I'm prepared to make a judicial
11     recommendation to the prison camp at Fort Devens, which would
12     facilitate visits by his family.
13          So Maria, the judgment should reflect a -- first, a
14     judicial recommendation to the prison camp at Fort Devens, so
15     as to facilitate continued contact with his wife, children,
16     and the many people in the court with whom I've taken notice;
17     and second, if for some reason the Bureau of Prisons finds
18     that he doesn't qualify, or whatever reason doesn't place him
19     there, to the nearest -- the nearest Bureau of Prisons
20     facility -- the Bureau of Prisons facility nearest to his
21     home, so as to facilitate the contact with his family.
22          During the period of supervised release,
23     Mr. McLellan, I impose the following conditions.  There's
24     mandatory conditions of supervision, you may not commit
25     another federal, state, or local crime.  You must not

1    unlawfully possess a controlled substance.

2              I'll impose the drug testing requirement.  You must

3    refrain from any unlawful use of a controlled substance, and

4    you must cooperate in the collection of DNA.  It doesn't seem

5    like controlled substances are any issue, so I'm not really

6    sure why testing would be necessary in that regard.

7              You'll comply with the standard conditions of

8    supervision that have been adopted by the court, which are

9    described at US sentencing guidelines, Section 5D1.3,

10   subsection (c).

11             I should have asked you, Mr. Weinberg, and I

12   forgot.  Did you review the revised presentence report with

13   your client?

14             MR. WEINBERG:  Mr. McLellan and I did review it,

15   Your Honor, and --

16             THE COURT:  All right.  Fine.  Thank you.  Prior to

17   the sentencing, obviously?

18             MR. WEINBERG:  We thank probation for all of its

19   hard work in this case.

20             THE COURT:  So the following special conditions

21   during the two years of supervision:  One, you're prohibited

22   from engaging in an occupation, business, or profession that

23   would require you to engage in conduct as a financial broker

24   or trader or would otherwise place an employer or client at

25   risk based on the incident offense.  Second, you're

1     prohibited from consuming any alcoholic beverages.

2          That may be, Mr. McLellan, for you, the most

3     important provision, both so that you can comply with the

4     terms of your supervised release, but really, for the five

5     most important things you have in your life, with your wife

6     and your children.  And I will tell you what I tell many of

7     the people who come before me, that if you are wondering

8     about whether to do something or not, the best criteria to

9     which you should apply as to whether it's something to do or

10     not, is, (a), is it something that you would want your

11     youngest child to do, and (b), is this something that you

12     would want your youngest child to know you were doing.  And I

13     think, with respect to the drinking, the answer to both of

14     those questions would be no.

15          So you're clearly a very strong person.  You

16     have -- you pulled yourself up from -- from not -- you came

17     from a family of no privilege, of no money and no privilege

18     and some difficulties.  And you, by dint of tremendous

19     determination and hard work, you succeeded in many respects.

20     You succeeded professionally, until this; you succeeded

21     personally, as witnessed by all the people in this courtroom.

22     There are many people I sentence, Mr. McLellan, and the

23     entire courtroom is empty.  There is nobody there for them.

24          And so it says something about all these people.

25     They all know that you've been convicted of these crimes,

```
 1    they all know what the nature of these crimes are, and they
 2    came here, nonetheless.  And so -- but you need to, like, not
 3    be drinking anymore.
 4              And you must participate in a program for substance
 5    abuse counseling, as directed by the probation office, which
 6    may include testing --
 7              I'm not reciting these in their entirety,
 8    Mr. Weinberg.  You don't object to that, do you?
 9              MR. WEINBERG:  No, Your Honor.
10              THE COURT:  You must pay the balance of any fine
11    according to a court ordered repayment schedule.
12              You're prohibited from incurring new credit charges
13    or opening additional lines of credit, without the approval
14    of the probation office while any financial obligations
15    remain outstanding.
16              You must provide probation access to any requested
17    financial information, which may be shared with the financial
18    litigation unit and the United States Attorney's Office.
19              You shall be required to contribute to the cost of
20    evaluation, treatment, programming, and monitoring, based on
21    the ability to pay or the availability of third-party
22    payment.
23              You have the right to appeal from this sentence, as
24    well as the conviction.  Any notice of appeal has to be filed
25    within 14 days.  Mr. Weinberg can do that for you, and you
```

1    can speak to him about that.

2              You have the right, if you're --

3              Does he have the right only if he's indigent, or

4    does he always have the right to have the clerk file the

5    notice of appeal on his behalf?  Well, I'll give him the

6    notice in any event.

7              MR. WEINBERG:  I will file the notice of appeal,

8    Your Honor.

9              THE COURT:  You have the right if you're indigent,

10   and perhaps in any event.  Certainly, if you wish the clerk

11   to file the notice of appeal on your behalf, even though

12   you're not indigent, I will be prepared to direct the clerk

13   to do so.  But Mr. Weinberg is going to do it.

14             So Mr. McLellan, this is not a -- this is not a

15   light sentence.  This is a serious thing.  18 months in

16   federal prison is a long time.  It's more than one -- it's

17   potentially more than one Christmas.  It's maybe not more

18   than one Christmas, but it's a long time.  It's a serious

19   sentence, for serious misconduct.  And so what I -- if I were

20   to leave you personally with anything, I leave you that you

21   need to go forward from this, as you described in your

22   allocution.

23             Is there anything else from probation.

24             THE PROBATION OFFICER:  No, Your Honor.

25             THE COURT:  Anything else from the Government?

1          MR. FRANK:  No, Your Honor.  Thank you.

2          THE COURT:  Anything else, Mr. Weinberg?

3          MR. WEINBERG:  Just I would ask the Court to

4    consider bail, pending appeal.

5          THE COURT:  You know, Mr. Weinberg, here's the

6    thing about that.  I confess that this issue has arisen so

7    rarely that I'm not that familiar -- I guess if you're asking

8    me to consider it, then of course.  I'll consider anything

9    either one of you ask me to do.  I'm not saying I'll do it.

10   But I think, if you want that, what you need to do is file a

11   motion to articulate, briefly, what the legal standard and

12   why, and why I should do that.  And it's my recollection, but

13   I think you'd have to remind me, is that you need to be able

14   to show that you're likely -- I think is it likely to prevail

15   on appeal?

16         MR. WEINBERG:  It's no risk of flight and no danger

17   to the community.  I don't think there would be disputes

18   about meeting those two or three criteria.  The third

19   criteria is substantial issues that, if the defense view is

20   allowed, would result in a vacating of the prison portion of

21   the sentence.  The standard does not require the Court, in

22   any way, to believe that the Court made a mistake in its

23   judgments on the various legal issues raised, but simply to

24   determine that other judges might, in good faith, disagree.

25         I will file a motion tomorrow, if Your Honor

1    pleases, that will give us time to consider it.

2              THE COURT:  You can file a motion.

3              And you can respond in the ordinary course, the

4    14 days.  That will be sufficient, Mr. Frank?  I mean, you

5    can certainly -- it's quicker if you want to, but if you want

6    the 14 days --

7              MR. FRANK:  I definitely want the 14 days, Judge.

8    I was wondering if I wanted more than 14 days.

9              THE COURT:  Do you know if you want 14?  It's easy

10   to resolve that now.

11             MR. FRANK:  14 should be fine.

12             THE COURT:  Okay.  All right.

13             Fine.  So you'll file the motion, I'll get the

14   response.  And then we'll -- I don't -- I hadn't thought

15   about that.

16             MR. WEINBERG:  Thank you very much, Judge.

17             THE COURT:  Well, thank you.  We're adjourned.

18             THE DEPUTY CLERK:  All rise, this matter is

19   adjourned.

20             (Court in recess at 10:36 a.m.)

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5   and for the United States District Court for the District of

6   Massachusetts, do hereby certify that pursuant to Section

7   753, Title 28, United States Code, the foregoing pages

8   are a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13                          Dated this 25th day of October, 2018.

14

15

16

17                  /s/ RACHEL M. LOPEZ

18

19

20          _____

21          Rachel M. Lopez, CRR
            Official Court Reporter

22

23

24

25