UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                            )<br>)<br>ROSS MCLELLAN,                         )<br>)<br>Defendant.                     )<br> | Criminal No. 16-10094-LTS |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL**

The government respectfully submits this response in opposition to the defendant's motion, pursuant to 18 U.S.C. § 3143(b) and Fed. R. Crim. P. 46(c), for release pending appeal. Dkt. 521 ("Def. Br."). The defendant's motion relies on legal and factual arguments that this Court has repeatedly rejected—including most recently in its denial of the defendant's motion for a judgment of acquittal, Dkt. 508—and does not raise substantial questions of law or fact that, if decided in his favor, will likely result in the reversal of his conviction or a new trial. For that reason, and the reasons set forth below and in the government's prior briefing on these topics—including its opposition to the defendant's pretrial motions, Dkt. 204, its opposition to his motion to compel the government to exercise its MLAT treaty rights, Dkt. 279, and its opposition to the defendant's Rule 29 motion Dkt. 501—the instant motion should be denied.

Background

After a three-week trial, the defendant was convicted of four counts of wire fraud and securities fraud (Counts Two through Five), and one count of conspiracy to commit the same (Count One), in connection with a scheme to defraud at least six clients of State Street's transition management business in Europe, the Middle East and Africa ("EMEA").

Following his conviction, the defendant moved, pursuant to Fed. R. Crim. P. 29(c) and 33, for a judgment of acquittal or, alternatively, a new trial. Dkt. 495. As part of that motion, the defendant argued, *inter alia*, (1) that the evidence was insufficient to prove that the fraud was "in connection with" or "material" to the purchase and sale of securities, and that the Court erred in instructing the jury concerning the "in connection with" requirement, allowing the jury to convict him based on conduct "untethered to the decision to purchase or sell securities"; (2) that the court erred in its wire fraud instruction by declining to instruct the jury that the wire fraud conduct had to be domestic in nature; and (3) that his "inability to access material evidence" from overseas infringed his Fifth Amendment due process and Sixth Amendment compulsory process rights to present a complete defense. *See id*.

The Court denied the defendant's motion. Dkt. 508. In its denial, the Court noted that the defendant's arguments "were raised and addressed on numerous occasions," and that "[n]othing in McLellan's motion papers raises any novel point of fact or law beyond those the Court considered in initially rejecting the challenges McLellan reiterates now." *Id*. at 1-2.

The defendant now renews the same arguments in support of his motion for release pending appeal.

Argument

I.     <u>Applicable Law</u>

McLellan seeks bail pending appeal pursuant to 18 U.S.C. §3143(b). That statute provides that a person convicted of an offense and sentenced to a term of imprisonment shall be detained pending appeal "unless the judicial officer finds":

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

>> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
>> (i) reversal,
>
>> (ii) an order for a new trial,
>
>> (iii) a sentence that does not include a term of imprisonment, or
>
>> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. §3143(b)(1). "If the judicial officer makes such findings, such judicial officer shall order the release of the person * * *." *Id.*

With respect to the showing required under 18 U.S.C. §3143(b)(1)(B), the First Circuit has stated that it has two distinct parts: "(1) that the appeal raise a substantial question of law or fact and (2) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985); *see also United States v. Zimny*, 857 F.3d 97, 99 (1st Cir. 2017) (referring to the former as the "the substantiality prong" and the latter as the "likelihood prong"). In determining whether an appeal raises a substantial question of law or fact, it is not enough for a defendant to show that a disputed point of law or fact was "fairly debatable" or that a "possibility of reversal" exists. *Bayko*, 774 F.2d at 523 (vacating district court's order and revoking bail upon finding that the district court erroneously ordered bail when it concluded that there was a "possibility of reversal" on appeal). Rather, an appeal must present a "'close question or one that very well could be decided the other way.'" *Zimny*. 857 F.3d at 100 (quoting *Bayko*, 774 F.2d at 523). In determining whether such a

3

question, if decided in the defendant's favor, is likely to result in reversal or an order for a new trial, "the claimed error [must] not be harmless or unprejudicial." *Bayko*, 774 F.2d at 523.[1]

> II. The Court's Securities Fraud Instruction Was Correct and Does Not Raise a Substantial Question of Law, and There Was Sufficient Evidence To Support the Defendant's Convictions for Securities Fraud

McLellan argues that the Court erred in instructing the jury concerning the "in connection with" and materiality elements of securities fraud, and that his securities fraud convictions cannot stand because, he contends, "[t]he record is wholly devoid of evidence" that the alleged misstatements were "in connection with" the purchase or sale of a security or material to an investment decision. Def. Br. at 4-13. Instead, he contends, the misrepresentations "influenced only the choice of State Street as a transition manager." *Id*. at 9. McLellan's arguments are without merit and do not raise a substantial question of law or fact, much less one that is likely to result in reversal or a new trial.

As the government noted in its response to McLellan's Rule 29 motion, the Supreme Court has repeatedly held that the phrase "in connection with the purchase or sale of any security," like the securities fraud statute as a whole, should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes," *SEC v. Zanford*, 535 U.S. 813, 819 (2002), which is why the courts addressing the issue have held that it is at most a "modest requirement," *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir. 2009), and have elucidated its meaning with synonymous phrases like "coincid[ing] with" and "touching" the purchase or sale of securities. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71,

---

[1] The government does not argue that McLellan is likely to flee or that he poses a danger to the safety of any other person or the community.

85 (2006) ("Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction"); *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971) (question was whether victim "suffered an injury as a result of deceptive practices touching its sale of securities").

In instructing the jury here, the Court properly employed language taken directly from Supreme Court precedent that the "in connection with" element "is satisfied if you find that Mr. McLellan's alleged conduct in some way 'touched upon' or 'coincided'—that is, that the alleged fraud or deceit had some relationship to these individual sales or purchases." Dkt. 466 at 27.

Likewise, the Court correctly instructed the jury that, to find the materiality element satisfied, there had to be a "substantial likelihood that a reasonable investor would consider the fact important when making an investment decision. In other words, a statement contains a material fact if there is a substantial likelihood that a reasonable investor engaging a transition manager would view the statement as significantly altering the total mix of information available." Dkt. 466 at 2. That instruction, too, incorporated the well-established materiality test for Rule 10b-5 articulated by the Supreme Court. *See Basic v. Levinson*, 485 U.S. 224, 231 (1988) ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."). It also correctly defined the relevant investment decision as "engaging a transition manger" because hiring a transition manager necessarily involved the decision to buy and sell a particular set of securities at agreed-upon prices through a single agent. *See Lim v. Charles Schwab & Co.*, No. 15-CV-02074-RS, 2015 WL 7996475, at *7 (N.D. Cal. Dec. 7, 2015) ("the false promise that customers will receive the best price for their trades is material to every decision to purchase or sell a security through Schwab"); *Lewis v. Scottrade*,

*Inc.*, 204 F. Supp. 3d 1064, 1068 (E.D. Mo. 2016) (alleged fraud concerning order-rerouting practices was material to plaintiffs' decision "to buy or sell securities through Scottrade"); *cf. SEC v. Crowe*, 216 F. Supp. 3d 852, 867 (S.D. Ohio 2016) (finding "in connection with" element of 10b-5 met based on "false promise that State Street was the best venue for the pension funds' trades"). The Court's instructions on these points thus raise no "substantial" or "close" legal questions. They were, instead, standard instructions that quoted from longstanding Supreme Court and other precedent. *Cf. United States v. Dimasi*, 817 F. Supp. 2d 9, 17 (D. Mass. 2011) (not a close question whether jury instructions were correct where instructions were based on Supreme Court and other precedent).

And the government easily satisfied those elements as instructed. Indeed, the very machinery of the fraud in this case was the adding of hidden commissions to the prices of securities. This deceit was inextricable from the purchase and sale of those securities, insofar as the victims were misled about the price they paid for every security they bought and the value they received for every security they sold, and the fraud grew with every single purchase and sale. Put differently, *every* statement made to induce clients to choose State Street as a transition manager was *simultaneously* made to induce them to buy and sell securities at a specific price— because choosing State Street as a transition manager necessarily included the decision to transact a list of securities at what the clients believed would be the market price, or the market price plus an agreed-upon commission.

Contrary to McLellan's contention that the trial record is "devoid" of evidence that the fraud was "in connection with" the purchase and sale of securities, the government introduced extensive evidence that McLellan and his co-conspirators falsely told clients that State Street would obtain the best possible prices for their securities trades, and would pass those prices

through to them with no commission, or with a specified commission—and the victims testified that, based on these misrepresentations, they believed they were receiving market prices for the individual securities they bought and sold. *See* Trial Tr. (June 12, 2018) at 170: (Dean Johnson: representations of "riskless principal agency counterparty" and "flat fee" meant "[t]here's no difference between the buy cost and the sell cost" of the securities); *id*. at 250:8-13 (Roul Haerden: "best execution" means that agent will "find the cheapest bonds available that can be bought and sold in the market" and "you pay a fee for that service"); Trial Tr. (June 13, 2018) at 35:13-17 (Ian McKnight: testifying that no commissions "means no charges being added" when State Street "executing these trades on your behalf"); Trial Tr. (June 19, 2018) at 36:12-20 (Eugene O'Callaghan: "So I understood that there would be no commissions charged on any of the trades . . . . And in place of the commission, in order for State Street to earn revenue, that there would be a management fee . . . . And that that would be the only cost that we would incur and the only revenue that State Street would earn from the transaction.").

      Likewise, the government introduced extensive evidence that McLellan and his co-conspirators manipulated the trading results State Street reported so as to actively hide the hidden commissions from clients and others within the bank. Thus, for example, the government introduced audio recordings and testimony from two Boston-based traders—Stephen Finocchi, a trader of U.S. fixed income securities, and Joe Dionisio, a trader of U.S. equities—demonstrating that McLellan personally ordered them both to apply commissions to trades and then to hide those charges, in Finocchi's case by deleting the commissions from a spreadsheet sent to a State Street colleague and in Dionisio's case by falsely making the trades look as though they were executed at the volume weighted average price ("VWAP"), when in fact they were executed at a far better price. The government also introduced recordings and testimony demonstrating that

McLellan requested information from Finocchi and another Boston-based trader about the prices at which they had executed bond trades for the Kuwait Investment Authority ("KIA"), and that McLellan and Boomgaardt then added commissions to individualized trades in such a way as to keep the reported trading prices close enough to the intraday high prices that they would not attract scrutiny. The government thus introduced evidence that McLellan and his co-conspirators promised to pass through market prices to the clients (or market prices plus a specific markup), and then secretly manipulated trading reports in order to mislead clients (and co-workers) about the prices at which the bank actually bought and sold securities, thereby diminishing the net value the clients obtained from those individual trades, and pocketing the difference.

Accordingly, the fraud was not limited to influencing the victims' choice of State Street as a transition manager, as McLellan contends, nor did it end when those contracts were secured. Rather, that is where the fraud began, with false promises about the fees State Street would, and would not, charge. And it continued, coinciding with every aspect of the bank's purchase and sale of securities on behalf of its clients. For that reason, as the government has previously noted, it is difficult to conceive of a fraud more quintessentially connected with the purchase and sale of securities than this one, where the very essence of the scheme was to make clients believe that they were paying one price for securities (the market price, or the market price plus a disclosed commission), when they were actually paying another (the market price plus an undisclosed commission), where trading results were actively manipulated in such a way that clients (and others within State Street) were deceived as to the value of each individual trade, and where each trade, in turn, furthered the fraud and increased the victims' loss. *Cf. Zandford*, 535 U.S. at 820–21 (noting that "each sale was made to further respondent's fraudulent scheme [and]

each was deceptive because it was neither authorized by, nor disclosed to" the victim, and concluding: "It is enough that the scheme to defraud and the sale of securities coincide.").[2]

Moreover, the victims testified that the secret commissions were significant and would have affected their decision to hire State Street to conduct those individual transactions on their behalf, because they would not have agreed to pay those additional per-trade charges. *See* Trial Tr. (June 12, 2018) at 175:2-6 (Dean Johnson: "Q. To what extent would knowing that you would have been charged 1.1 million have affected your decision to hire State Street? A. We wouldn't have hired them."); *id.* at 258 (Roul Haerden: "Q. Had you know known that you would be paying this fee, would that have affected your decision . . . whether to hire State Street as a transition manager? A. Yes."); Trial Tr. June 13, 2018 at 60:19-20 (Ian McKnight: "[State

---

[2] In this respect, McLellan's fraud was not meaningfully different from those in the long line of cases in which courts concluded that undisclosed markups constituted fraud in connection with the purchase and sale of securities. *See, e.g., Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 193 (2d Cir. 1998) ("we must also seek, under § 10(b) and Rule 10b-5, to protect customers from paying excessive markups that, because they remained undisclosed, are fraudulent"); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1469 (2d Cir. 1996) ("a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws"); *Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606, 613 (6th Cir. 1992) (broker's "failure to disclose exorbitant mark-ups violates section 78j(b) and Rule 10b–5"); *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031, 1033 (3d Cir. 1987) (expressing "no doubt" that broker's charging of undisclosed, excessive commissions was "actionable under section 10(b) and Rule 10b-5"); *see also Brink v. Raymond James & Assocs.*, No. 15-CV-60334-WPD, 2016 WL 3950030, at *4 (S.D. Fla. June 6, 2016) ("Because Plaintiff was allegedly charged a Processing Fee hiding an undisclosed commission with each transaction, the fees coincided with the purchase or sale of securities" and satisfied "in connection with" requirement); *Marini v. Adamo*, 995 F. Supp. 2d 155, 189 (E.D.N.Y. 2014) (rare coin dealer's representation that he would only charge "a minimal markup on each coin" actionable under Section 10(b) where he "charged a markup that often exceeded 100%").

Street] wouldn't have been appointed if that was the fee."); Trial Tr. (June 19, 2018) at 52:16-21 (Eugene O'Callaghan: "If we had known about [the secret commission], it would most certainly have changed the outcome, because the score that would have been awarded for fees in our assessment criteria . . . for State Street would have been materially less."). This testimony that the victims would not have hired State Street as their transition manager based on the charges it was secretly adding to each individual securities transaction was more than sufficient for a jury to find that the misstatements were material to their investment decisions.[3]

---

[3] McLellan's reliance on two civil cases from the Eleventh Circuit—*SEC v. Goble*, 682 F.3d 934, (11th Cir. 2012), and *Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142 (11th Cir. 2018)— in support of his materiality argument is misplaced. Those cases conflict with the holdings of district courts in at least three other circuits, which have found that misrepresentations that influence the choice of a broker-dealer *can*, in fact, be material for purposes of Section 10(b). *See, e.g., Crowe*, 216 F. Supp. 3d at 867 (distinguishing *Goble* on its facts and finding that "the false promise that State Street was the best venue for the pension funds' trades . . . [was] "material to the pension funds' decision to purchase or sell securities through State Street"); *Lewis v. Scottrade, Inc.*, 204 F. Supp. 3d 1064, 1068 (E.D. Mo. 2016) (alleged fraud concerning order-routing practices was material to plaintiffs' decisions "to buy or sell securities through Scottrade"); *Lim*, 2015 WL 7996475 at *7 ("the false promise that customers will receive the best price for their trades is material to every decision to purchase or sell a security through Schwab"). In any event, *Goble* is inapposite here because, as noted, McLellan's fraud was *not* limited to influencing the victims' choice of broker-dealers, but instead simply *began* there—and continued with marking up securities prices, in many instances trade by trade, in order to mislead clients about the price at which their securities transactions were executed and to deprive them of the full value of those trades. Likewise, both cases are distinguishable on their facts. For example, in *Brink*, the plaintiff "knew how much she was being charged for costs associated with each transaction and was never charged more than she agreed to pay." 892 F.3d at 1149. And in *Goble*, fraudulent accounting entries in a clearing firm's internal books and records were not communicated to investors, did not result in the mispricing of any securities, and did not, apparently, even cause investors to suffer a loss. *See* 682 F.3d at 943, 946.

### III. The Court's Wire Fraud Instruction Was Correct and Does Not Raise a Substantial Question of Law or Fact

McLellan next argues the court erred in its wire fraud instruction by declining to instruct the jury that the wire fraud statute does not apply extraterritorially. Here, too, however, the Court's instruction was utterly standard, followed binding First Circuit precedent, and does not implicate any "close" or "fairly debatable" questions of law or fact. And, even had the jury been instructed as McLellan requested—contrary to that precedent—the outcome would not have been different.

As an initial matter—and as the Court previously noted in rejecting McLellan's extraterritoriality argument in the context of his motion to dismiss—the First Circuit, in "[a]ddressing the extraterritorial application of a criminal statute with language similar to 18 U.S.C. § 1343 . . . concluded that Congress had indicated an intent to reach conduct beyond the United States by 'explicitly appl[ying]' the statute 'to transmissions between the United States and a foreign country.'" Dkt. 302 at 3 (quoting *United States v. Lyons*, 740 F.3d 702, 718) (1st Cir. 2014)). This, the Court properly concluded, is binding precedent. *Id.* As the Court noted: "The wire fraud statute explicitly references transmissions 'in interstate *or foreign* commerce,' § 1343 (emphasis added), and the two transmissions at issue here were either made or received by McLellan in the United States." *Id.*; *see also United States v. Georgiou*, 777 F.3d 125, 138 (3rd Cir. 2015) (affirming wire fraud conviction when there were foreign victims and wires between the United States and other countries); *Pasquantino v. United States*, 544 U.S. 349, 371 (2005) (affirming conviction under the wire fraud statute where the defendants smuggled alcohol into Canada from the U.S. to avoid paying taxes to the Canadian government, and noting: "T[he] domestic element of petitioner's conduct is what the government is punishing . . . when it

prosecutes a scheme to defraud a foreign individual or corporation, or a foreign government acting as a market participant.").

McLellan's entire argument is thus based on a single Second Circuit case, *European Cmty. v. RJR Nabisco*, 764 F.3d 129 (2d Cir. 2014), *rev'd and remanded on other grounds, RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016), which concluded, based on *Morrison*, that "the references to foreign commerce in [the wire fraud statute and the Travel Act], deriving from the Commerce Clause's specification of Congress's authority to regulate, do not indicate a congressional intent that the statutes apply extraterritorially," and that, accordingly, the statutes do not cover "wholly foreign travel or communication." *Id*. at 141. Yet, as the Second Circuit itself acknowledged, its reading is at odds with *Pasquatino*'s conclusion that, "because 'the wire fraud statute punishes frauds executed in interstate or foreign commerce' it 'is surely not a statute in which Congress had only domestic concerns in mind.'" *Id*. (quoting *Pasquatino*, 544 U.S. at 371-72. And even in *RJR Nabisco*, the Second Circuit declined to "decide precisely how to draw the line between domestic and extraterritorial applications of the wire fraud statute . . . because wherever that line should be drawn, the conduct alleged here clearly states a domestic cause of action." *Id*. at 142. The Court noted that "[t]he complaint alleges that defendants hatched schemes to defraud in the United States, and that they used the U.S. mails and wires in furtherance of those schemes and with the intent to do so." It concluded:

> In other words, plaintiffs have alleged conduct in the United States that satisfies every essential element of the mail fraud, wire fraud, and Travel Act claims. If domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States.

*Id.*

Likewise, other courts within the Second Circuit have concluded, post-*RJR Nabisco*, that the wire fraud statute is *not* applied extraterritorially where, as here, "a defendant who is charged with violation of the fraud statute used domestic wires to carry out the fraudulent scheme." *United States v. Hayes*, 99 F. Supp. 3d 409, 420 (S.D.N.Y. 2015) (presumption against extraterritoriality "irrelevant" to wire fraud and conspiracy charges where "co-conspirators purportedly caused the manipulated LIBOR to be published to servers in the United States and used United States wires to memorialize trades affected by that rate"); *United States v. Allen*, 160 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (no extraterritorial application of wire fraud statute where "indictment charged that the wires used to settle payments under interest rate swap contracts, and wires that Thomson used to publish LIBOR to subscribers in New York, originated or terminated in New York"). And the Court correctly instructed the jury on this point. *See* Dkt. 466 at 36 ("Wire communications in interstate or foreign commerce include a telephone communication or email from one state to another, or between the United States and another country.").

Accordingly, even if McLellan were correct that the wire fraud statute does not apply extraterritorially—which he is not—his argument would fail because he raises is no substantial question of fact, in light of the evidence adduced at trial, that the charged conduct was anything other than domestic in nature.[4] *See, e.g., United States v. All Assets Held at Bank Julius, Baer &*

---

[4] Contrary to McLellan's argument, the touchstone for the scope of the wire fraud statute is the use of U.S. wires that affect interstate or foreign commerce. *See, e.g., United States v. Garlick*, 240 F. 3d 789, 792 –93 (9th Cir. 2001) (focus of the mail and wire fraud statutes is the misuse of the instrumentality of communication); *United States v. Trapilo,* 130 F.3d 547, 552 (2d Cir. 1997) ("What is proscribed is the use of telecommunications systems of the United States in furtherance of a scheme whereby one *intends* to defraud another of property."); *United States v. Monostra,* 125 F.3d 183, 187 (3d Cir. 1997) (mail and wire fraud statutes are "directed at the instrumentalities of fraud").

*Co.*, CV 04-0798 (PLF), 2017 WL 1508608, at *15 (D.D.C. Apr. 27, 2017) ("a complaint alleges a domestic application of wire fraud when (1) a defendant or coconspirator commits a substantial amount of conduct in the United States, (2) the conduct is integral to the commission of the scheme to defraud, and (3) at least some of the conduct involves the use of U.S. wires in furtherance of defraud."). Indeed, while McLellan points to the fact that the actual misrepresentations were made in Europe and the Middle East to clients based there, he omits to note the evidence that McLellan himself approved and directed those misrepresentations from the United States, and committed almost all of the charged conduct in Boston, as a Boston-based

---

Even the out-of-Circuit district court cases on which McLellan relies acknowledge the lack of binding authority supporting the more stringent test those courts applied. *See United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693, at *7 (E.D.N.Y. June 1, 2017) ("The limited number of opinions attempting to discern the 'focus' of the wire fraud statute generally break into two camps: those emphasizing the 'wires' and those looking to the 'fraud.'"); *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 102 (D.D.C. 2017) ("The Court has found little precedent regarding how much of the scheme must occur in the United States to constitute a domestic application of the wire fraud statute."); *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016) ("It is not entirely clear what sort of domestic conduct is "relevant" to this statutory focus."). And McLellan simply dismisses decisions declining to adopt a more stringent test—including decisions in the very districts he references—with the conclusory contention that the "better view" is the position he favors. Def. Br. at 23 n.16. *See e.g., United States v. Hussain*, No. 16-cr-00462-CRB-1, 2017 WL 4865562, at *5 (N.D. Cal. Oct. 27, 2017) (concluding that "the Ninth Circuit would hold that the use of the wires is the conduct relevant to the focus of that statute for the purpose of determining whether a particular application is extraterritorial," and that "[s]o long as the government identifies a domestic wire transmission, the statute is not improperly extraterritorial in its application"); *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *5 (E.D.N.Y. Feb. 17, 2017) ("at this stage the Court need not, and declines to, articulate a general test for whether a given application of the wire fraud statute is extraterritorial or domestic"); *United States v. Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) ("Darin's argument that the location of the wires is 'ancillary' to the location of the scheme to defraud must, therefore, be rejected because the location of the wires is the Court's primary concern.").

executive of a Boston-based bank who agreed, while in Boston, to engage in an illegal fraud scheme, and who directed the progress of that scheme from Boston, where he sent and received the wires underlying Counts Four and Five, and where he personally directed Boston-based traders to secretly mark up millions of dollars of U.S. securities trades while hiding what they were doing.  Notably, courts have found a domestic application of the wire fraud statute based on substantially less domestic conduct.  *See, e.g., United States v. Kazzaz,* 592 F. Appx. 553, 554–55 (9th Cir. 2014) (defendant mailed checks to U.S. and used electronic communications to transmit payment to U.S. bank); *United States v. Allen*, 160 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (indictment "charged that the wires used to settle payments under interest rate swap contracts, and the wires that Thomson Reuters used to publish LIBOR to subscribers in New York, originated or terminated in New York"); *United States v. Coffman*, 771 F. Supp. 2d 735, 738–39 (E.D. Ky. 2011) (defendant used U.S. mail and interstate wires to execute fraud scheme).  At the same time, courts have consistently held that the mere presence of foreign conduct does not render a wire fraud scheme extraterritorial.  *See United States v. Hawit*, 15-CR-252 (PKC), 2017 WL 663542 at *6 (E.D.N.Y. Feb. 17, 2017) ("To be sure, the alleged fraud schemes extended beyond the United States – and may very well have had their centers of gravity outside the United States—but the schemes' contacts with the United States were substantial, and the U.S. wires were an integral part of the overall schemes."); *Reich v. Lopez*, 38 F. Supp. 3d 436, 448 (S.D.N.Y. 2014) ("As long as enough domestic conduct exists to fulfill the requirements of both the Travel Act and wire fraud, it is irrelevant that those statutes are further violated by conduct that is extraterritorial in nature"), *aff'd*, 2017 WL 2293546, at *1 (2d Cir. 2017).

    Moreover, even if the Court erred in instructing the jury—which it did *not*—any error is unlikely to result in reversal or an order for a new trial.  For all the reasons set forth above, even

had the Court given McLellan's requested instruction—adding requirements that the "fraudulent scheme involved a substantial amount of conduct in the United States" and that "the conduct in the United States was integral to the commission of the fraud"—the outcome would have been the same. In light of that overwhelming evidence, the very suggestion that McLellan's conduct was not domestic borders on frivolous.

IV. The Court's Failure to Order the Government to Exercise its MLAT Rights or To Suppress the Government's Evidence Does Not Raise a Substantial Question of Law

McLellan's final argument—that the Court erred in not ordering the government to exercise its MLAT rights to obtain evidence he sought from abroad or, alternatively, in declining to suppress the government's evidence from overseas—also does not raise a substantial question of law likely to result in the reversal of his conviction or an order for a new trial.

As this Court correctly noted, it "lack[ed] authority to compel the government to exercise its rights under any of the relevant MLATs on behalf of, or for the benefit of, a private person." Dkt. 350 at 1. In reaching that conclusion, the Court cited binding First Circuit precedent for the proposition that "treaties do not generally create rights that are privately enforceable in the federal courts." *Id.* (citing *In re Request from U.K. Pursuant to Treaty Between the Government of the U.S. and Government of U.K.*, 685 F.3d 1, 11 (1st Cir. 2012) (citation omitted)). Likewise, the Court relied on *United States v. Rosen*, 240 F.R.D. 204 (E.D. Va. 2007), which flatly rejected the proposition that McLellan raises here: "that a defendant's right to compulsory process is violated when the government (i.e., the Executive Branch) declines to exercise a treaty power to compel the testimony of a non-American in another country." *Id.* at 214-15. Indeed, *Rosen* noted: "No court has so held. This is so because the right to compulsory process extends only as far as a court's own process powers, and cannot be stretched to include compelling the invocation of treaty process powers available only to the Executive Branch." *Id.* at 215; *see also*

*United Kingdom v. United States*, 238 F.3d 1312, 1317 (11th Cir. 2001) ("There is no provision for private parties, such as individual criminal defendants in the English (or American) courts, to request the production of information."); *United States v. Sedaghaty*, 728 F.3d 885, 917 (9th Cir. 2013) ([T]he district court had no authority [by which it could] order the Executive Branch to invoke the [MLAT] process to obtain evidence abroad for a private citizen."); *United States v. Mejia*, 448 F.3d 436, 444 (D.C. Cir. 2006) (rejecting contention that court erred by failing to require government to seek recordings from Costa Rica under MLAT and noting that "[h]aving the authority 'to seek' tapes or transcripts through a treaty is not the same thing as having 'the power to secure' them"); *United States v. Jefferson*, 594 F. Supp. 2d 655 (E.D.V.A.. 2009) ("It is thus clear that the defendant, as a private party, is not entitled to use the MLA Treaty process himself or force the government to use the treaty on his behalf.").

These conclusions, in turn, are consistent with black-letter law that: (1) a defendant generally has no due process right to secure evidence extraterritorially by way of a U.S. subpoena for testimony or production of physical evidence, *see, e.g., United States v. Zabaneh*, 837 F.2d 1249, 1259-60 (5th Cir. 1978); and (2) "a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution," *United States v. Sensi*, 879 F.2d 888, 899 (D.C. Cir. 1989).[5]

In the face of this extensive contrary precedent, McLellan invokes no less an authority than *Marbury v. Madison* for the proposition that it is "the province and duty of the judicial

---

[5] In addition, as the government has previously noted, the MLAT between the United States and Ireland explicitly provides that the treaty's provisions "shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence."

department to say what the law is." 5 U.S. 137, 177 (1803). That, of course, is beside the point. As the foregoing makes clear, courts have decided, unambiguously, that treaties do <u>not</u> create private rights of action, and a defendant's right to compulsory process is <u>not</u> violated when the government declines to exercise a treaty power to secure evidence from abroad.

McLellan also continues to invoke *United States v. Theresius Filippi*, 918 F.2d 244 (1st Cir. 1990). Yet in that case, as the government has previously noted, the sole question was whether the U.S. government would grant parole admission into the country of a witness who was willing to testify on the defendant's behalf—whether, in other words, it would act "where action was *required*," *id*. at 247 (emphasis added)—and <u>not</u> whether it would exercise a <u>nonexistent</u> treaty right vis-à-vis another country. Indeed, in concluding, in dicta, that the government should have admitted the defendant's witness, the First Circuit also reaffirmed the proposition that "[t]he government has no power to compel the presence of a foreign national residing outside the United States," and that, accordingly, "a Sixth Amendment violation in this case cannot rest on the failure to issue a subpoena." *Id.* at 247-48.

Likewise, this Court correctly noted that McLellan offered no valid basis to exclude the government's evidence simply because of his own inability to procure other evidence. *See* Dkt. 350 at 2. McLellan does not specifically challenge this conclusion—asserting only that the Court should have suppressed the government's evidence to prevent an "imbalanced evidentiary presentation." Def. Br. at 29. That is not enough. *Cf. Sensi*, 879 F.2d at 899 ("a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution"). Tellingly, McLellan does not, because he cannot, contend that any of the evidence he sought from abroad would actually have affected the outcome of the proceedings. Without more, he fails to raise a substantial question of law or fact likely to result in a reversal or a new trial.

Conclusion

For the foregoing reasons, McLellan has failed to show that his appeal will present a substantial question of law or fact likely to result in reversal of his conviction or a new trial, and his motion for bail pending appeal should therefore be denied.

Respectfully submitted,

| | |
|---|---|
| SANDRA MOSER | ANDREW E. LELLING |
| Acting Chief, Fraud Section | United States Attorney |
| Criminal Division | |
| | |
| By:  /s/ William E. Johnston | By: /s/ Stephen E. Frank |
| WILLIAM E. JOHNSTON | STEPHEN E. FRANK |
| Trial Attorney | Assistant U.S. Attorney |

**CERTIFICATE OF SERVICE**

I certify that on November 7, 2018, this document was filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

/s/ *Stephen E. Frank*
STEPHEN E. FRANK