UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)
UNITED STATES OF AMERICA            )
)
    v.                                )                    No. 16-10094-LTS
)
ROSS MCLELLAN,                      )
    Defendant                       )
)
)
_____ )

**DEFENDANT ROSS MCLELLAN'S REPLY TO GOVERNMENT'S OPPOSITION TO HIS MOTION FOR RELEASE PENDING APPEAL**

      The government, while citing the correct standard for the granting of bail pending appeal, proceeds to argue in opposition to McLellan's motion for release pending appeal as if what McLellan must show is that he *will* prevail on appeal. That, however, is not the proper lens through which to evaluate a bail pending appeal motion. Instead, the question is whether McLellan has demonstrated that there exists a "substantial question"—"a 'close' question or one that very well could be decided the other way"—and whether, if those substantial questions are decided in his favor, the result is likely to be reversal or an order for a new trial.   *United States v. Bayko*, 774 F.2d 516, 522-23 (1st Cir. 1985). As the First Circuit has stressed, this standard does not require this Court to find that it is likely to be reversed. *Id.* at 523. McLellan has satisfied the standard for granting bail pending appeal. In addition, the 18-month sentence imposed on McLellan provides a further reason to extend McLellan's release pending the resolution of his appeal in the First Circuit. The *median* time between the filing of the notice of appeal to final disposition of criminal cases in the First Circuit is 17 months. Administrative Office of the United States Courts, *Judicial Business of the United States Courts*, tbl. B-4A, at 2

1

(2017), http://www.uscourts.gov/sites/default/files/data_tables/jb_b4a_0930.2017.pdf.[1] With a sentence of 18 months, McLellan will serve slightly more than 15 months. If McLellan were to be incarcerated pending appeal and were ultimately to prevail, he would be deprived of much of the benefit of his appeal.

I.   **THIS APPEAL WILL RAISE SUBSTANTIAL ISSUES WHICH, IF DECIDED IN MCLELLAN'S FAVOR, WILL LIKELY RESULT IN THE REVERSAL OF MCLELLAN'S CONVICTIONS OR AN ORDER FOR A NEW TRIAL ON ALL COUNTS OF CONVICTION.**

   A.   **The Securities Fraud Convictions (Counts Two and Three and So Much of Count One as Charges Conspiracy to Commit Securities Fraud).**

The government effectively concedes that there is a split among various courts on the issues to be raised by McLellan in his appeal— the Eleventh Circuit versus three district courts—regarding whether fraud related to the selection of a transition manager (or broker/dealer) violates the securities fraud statutes. *See* Opposition at 10 n.3. This alone suffices to demonstrate that the question presented here is a substantial one. For all the reasons addressed in McLellan's opening motion, the Eleventh Circuit's analysis is the more consonant with securities law precedent. There is simply no justification for the over-expansion of the securities laws on which the government's theory of prosecution rested.[2] If McLellan is right, and the First

---

[1] McLellan's opening motion cited a 2016 source for a median processing time of 11 months. Motion at 3. The data cited above is both more recent and focused on elapsed time for criminal cases.

[2] It bears repeating that, although the Supreme Court has said that the statute should be construed "flexibly to effectuate its remedial purposes," *SEC v. Zanford*, 535 U.S. 813, 819 (2002), quoted in Opposition at 4, it has at the same time cautioned that "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of §10b." *Id.* at 820.

Circuit agrees with the Eleventh Circuit,[3] then McLellan's securities fraud convictions will be reversed or, at minimum, a new trial will be ordered.

Contrary to the government's argument, the selection of a transition manager is not an "investment decision," Opposition at 5, nor are representations that influence the choice of transition manager "material to a decision . . . to buy or to sell a 'covered security.'" *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014)*. See Hidalgo-Velez v. San Juan Asset Mgmt., Inc.*, 758 F.3d 98, 106 (1st Cir. 2014) ("the 'in connection with' requirement is satisfied only 'where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security.'"). The selection of a transition manager, like the selection of a broker/dealer, is not "intrinsic to the investment decision itself." *Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1148-49 (11th Cir. 2018).

The government makes much of evidence relating to the clients' expectation of "best execution," but the Court's instructions permitted the jury to convict McLellan solely because the representations at issue were material to the selection of State Street as transition manager, an instruction which did not tell the jury that it needed to look further to determine whether the representations actually influenced a decision to buy or sell particular securities and instead affirmatively approved a conviction based solely on the selection of a transition manager.[4]  The Court's instructions, in injecting the choice of transition manager as a basis for conviction of

---

[3] The government points out that the two Eleventh Circuit cases on which McLellan relies are civil cases, but then, so too are the cases on which the government relies. With respect to the particular issues raised here, the law does not differ depending upon whether the case is a civil or a criminal one.

[4] There were no "agreed-upon prices" for the buying or selling of securities, Opposition at 5, but instead only a prediction of the costs of the entire transition in the pretrade estimate.

securities fraud, were hardly "standard instructions." Opposition at 6.  Instead, they permitted the jury to convict McLellan based on conduct outside the scope of the securities fraud statutes, and it is likely that it did so, given the government's focus on the relationship between the representations and the selection of State Street as transition manager, *see* Motion for Release Pending Appeal (Doc. 521) at 9-10, and the Court's instruction that a representation that was material solely to the choice of transition manager sufficed to prove securities fraud. It does not matter, therefore, for present purposes, that the government's theory of securities fraud may have been broader than the influencing of the clients to select State Street as transition manager. *See* Opposition at 8.[5] What matters here is that the Court's instructions told the jury that representations that influence only the choice of transition manager suffice to prove the materiality/ "in connection with" elements of securities fraud.[6]

The government's efforts to distinguish *Brink* and *Goble* are unavailing. The reasoning of these cases is directly relevant to the issues presented here. The Court's holding in *Goble* did not

---

[5]  The government now says that it advanced two theories of fraud, although at trial it appeared more as a unitary theory focused on the choice of transition manager, and it is likely that that was that theory on which the jury relied in convicting McLellan. In any event, as discussed in McLellan's Motion at 13-14, where it is not possible to tell with any assurance which theory jury adopted, and one theory is legally impermissible, the conviction must be vacated.

[6]  The fraud alleged in this case was, contrary to the government's argument, very different from the cases cited by the government page 9 n.2 of its Opposition. All except one of those cases dealt with the taking of *excessive* markups, which was not at issue in this case. The markups taken here, while amounting in total to large sums of money, were, as to each trade, far from anything that has ever been deemed excessive, amounting to only hundredths of a percent. Markups are not "excessive" as that term is used in the securities context simply because they are undisclosed; instead, a markup is excessive only "when it bears no reasonable relation to the prevailing market price." *Bank of Lexington & Tr. Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606, 613 (6th Cir. 1992) (upholding district court finding that markups, only one of which exceeded 5%, were not excessive). The remaining case cited by the government, *Brink*, has been reversed by the Eleventh Circuit.

turn on whether the investors suffered losses or whether the information was communicated to investors. *See* Opposition at 10 n.3. Instead, the Court rejected the SEC's expansive interpretation of materiality, akin to that proposed by the government here:

> This court has said that the test for materiality in the securities fraud context is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action. *We understand this "course of action" to mean an investment decision—not an individual's choice of broker-dealers. . . . We hold that a misrepresentation that would only influence an individual's choice of broker-dealers cannot form the basis for § 10(b) securities fraud liability.*

*SEC v. Goble*, 682 F.3d 934, 943-44 (11th Cir. 2012) (emphasis added). The holding in *Brink* followed directly from the reasoning of *Goble*:

> *Following this reasoning, the choice of a type of investment account, much like the choice of a broker-dealer, is not intrinsic to the investment decision itself.* Although RJA's alleged misrepresentation regarding the Processing Fee might have influenced a reasonable investor's decision to pick the Passport Account over another type of account, that does not make the alleged representation "material."

*Brink v. Raymond James & Assocs., Inc.*, 892 F.3d 1142, 1148-49 (11th Cir. 2018) (emphasis added). *Brink* and *Goble* establish that McLellan's appeal will raise a very substantial question indeed regarding the scope of the securities fraud statutes.

**B.     The Court's Failure to Instruct the Jury that the Wire Fraud Statute Does not Apply Extraterritorially.**

Whether the wire fraud statute applies extraterritorially and, if it does not, whether the focus of the wire fraud statute is the use of the wires or, as McLellan contends, the fraud itself, is a question that has produced many differing interpretations—the Second Circuit saying that the wire fraud statute does not apply extraterritorially and the Third Circuit saying that it does, and some courts saying that the focus of the statute is on the use of the wires and others saying that

5

the focus is the locus of the fraudulent scheme. That being the case, it can hardly be said, as the government does, that McLellan's appeal will not present a substantial question.[7]

In saying that McLellan's argument rests on "a single Second Circuit case," Opposition at 12, the government treats the well-reasoned decision of a sister circuit as of no moment to the question whether this appeal presents a substantial question. The fact remains that the Second Circuit held in *RJR Nabisco* that the wire fraud statute does not apply extraterritorially, and the fact that it did so underscores the substantiality of the issue. Moreover, the government is wrong that *RJR Nabisco* provides the only support for McLellan's argument. The conclusion that §1343 does not apply extraterritorially flows inexorably from *Morrison* and the Supreme Court's *RJR Nabisco* decision.

The Second Circuit did not "acknowledge that its reading was inconsistent with *Pasquantino*[]." Opposition at 12. On the contrary, it said that it was not:

> In *Pasquantino*, . . . the Supreme Court suggested, in dictum, that, because "the wire fraud statute punishes frauds executed in interstate or foreign commerce" it "is surely not a statute in which Congress had only domestic concerns in mind." . . . . Because that statement is dictum, *and because Morrison explicitly rejects the reasoning on which it relies, we do not read* Pasquantino *to require us to construe the "foreign commerce" language of the wire fraud statute as rebutting the presumption against extraterritoriality.*

*RJR Nabisco*, 764 F.3d at 141 (emphasis added). Nor does it matter for present purposes that the Second Circuit did not define where the line falls between domestic and extraterritorial conduct.

---

[7] McLellan has already explained a length why *Lyons*, which dealt with a different statute, is not binding precedent, particularly as it did not conduct the analysis required under *Morrison* and *RJR Nabisco*, which categorically rejects the proposition that a statute has extraterritorial application simply because it references foreign commerce and requires an examination of the statute's focus. *See* Motion at 19-20 & n.12. McLellan has also explained why *Pasquantino* is no obstacle to the adoption of his position. *Id.* at 21-22 & n.12.

What matters here is its holding that the wire fraud statute does not have extraterritorial application. In any event, a properly instructed jury could have found that domestic conduct did *not* satisfy every essential element of the wire fraud offense. *See* Opposition at 12.

The second step of the *Morrison/RJR Nabisco* analysis "requires distinguishing between conduct underlying the [indictment] from conduct relevant to the statute's focus. *Only conduct relevant to the statute's focus determines domestic application of the statute.*" *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 194 (5th Cir. 2017) (emphasis added). The focus of a statute is "'the objec[t] of [its] solicitude,' which can include the conduct it 'seeks to 'regulate,' as well as the parties and interests it 'seeks to 'protec[t]' or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018), *quoting Morrison*, 561 U.S. at 267. *See In re Search Warrant Issued to Google, Inc.*, 264 F. Supp. 3d 1268, 1277 (N.D. Ala. 2017) ("*Morrison* and related cases portray that Courts should discern a statute's focus textually, whereas a statute's purpose establishes a broader lens of perspective. A statute's purpose represents the aim, end, or goal a legislative body endeavors to address. . . . A statute's focus represents the conduct, events, relationships, or 'objects of solicitude' Congress centers upon to effect the purpose of the statute."). The problem with the cases cited by the government for the proposition that the use of the wires is the focus of the statute, *see* Opposition at 13, is that they confuse purpose with focus. Preventing misuse of the wires may have been a purpose of the wire fraud statute, but the use of the wires is not the statute's *focus*. Instead, as the cases on which McLellan relies have concluded, the focus of the statute is the prohibited fraudulent conduct, not the use of domestic wires.

Here, the conduct relevant to the statute's focus was extraterritorial rather than domestic. The false statements, half-truths, and omissions on which the government relied—the conduct relevant to the statute's focus—were uniformly made by Pennings and Boomgaardt in London to clients and/or their consultants located in Europe and the Middle East, using exclusively foreign wires and were uniformly directed at obtaining the clients' transition management business for SSBEL, also located in London. McLellan had no contact with the clients, made no misrepresentations (or omissions or half-truths), did not instruct Pennings or Boomgaardt to lie to clients, and certainly did not instruct Pennings to tell Royal Mail that the flat fee would include all trading (or even know that he did). Like the representations that produced them, the clients' choices were made entirely extraterritorially. The pretrade estimates, the periodic notices, and the post-trade reports were all prepared in London. The contracts were negotiated by and between individuals located in Europe and the Middle East and the contracting parties were all foreign—SSBEL and the foreign clients. Yes, undisclosed commissions were taken on trades conducted in the United States, but the government repeatedly stressed that the taking of undisclosed commissions was not the fraud but instead the affirmative misrepresentations to clients, *see* Tr. 6/11/18 at 12; Tr. 6/12/18 at 107-08; Tr. 6/22 at 11, all of which took place extraterritorially. That McLellan, located in Boston, did not call foreign clients to whom he had never spoken, or direct Pennings to do so, to correct misleading omissions made by Pennings in Europe to foreign clients does not transform the locus of the fraud from Europe to the United States.

A jury instructed as to the lack of extraterritorial reach of the wire fraud statute could well have found that the scheme to defraud by obtaining the clients' transition management

business through misrepresentations/omissions regarding what State Street would charge for its services—the conduct relevant to the wire fraud statute's focus—was so predominantly foreign as to be beyond the reach of the wire fraud statute. This issue, too, presents a substantial question that, if decided in McLellan's favor, is likely to result in an order for a new trial.

### C.     The Court's Failure to Order the Government to Invoke Its MLAT Rights or Alternatively to Suppress Related Government Evidence.

The government's argument on this issue rests largely on the Court's finding that, despite McLellan's arguments to the contrary, it lacked authority to require the government to invoke its treaty rights.   For reasons outlined in his opening motion, McLellan believes this presents a substantial question for appeal.   But the government's opposition is perhaps even more notable for what it does not dispute.   The government importantly does not question (1) that the evidence at issue was material to McLellan's trial defense; (2) that the evidence was available to the government via MLAT procedures; or (3) that the evidence was not accessible to McLellan by any other reasonable means.   As McLellan has repeatedly laid out in his pleadings on this issue, these are the three required elements of his Sixth Amendment claim.   *See, e.g.*, Doc. 495 at 24-25 (citing *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990)).

The government has yet to provide any principled way to distinguish *Theresius Filippi*, the most closely analogous binding precedent.[8]   The government asserts that here, unlike in *Theresius Filippi*, no action by the government was "required."   Opposition at 18.   But that is precisely the question that McLellan is asking the Court to decide.   The Court has yet to rule on whether McLellan had a Constitutional right to access the evidence in question.   Of course, if the

---

[8] The authorities relied upon by the government are either inapposite or wrongly decided

Court answers that question in the affirmative, then government action was no less "required" here than in *Theresius Filippi*.  In light of this First Circuit precedent clearly supporting McLellan's position, he has, at the very least, raised a substantial question on this issue.

Contrary to the government's suggestion, McLellan has clearly contended that his inability to access the evidence in question was not harmless.  *See, e.g.*, Doc. 495 at 26-27. While McLellan cannot possibly predict the exact contents of the very documents he has not yet been able to access, he has more than satisfied the requirement that he make a "plausible showing" that the evidence is "material and favorable to his defense."  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982).  Indeed, this Court has already acknowledged "that justice cannot completely be done amongst the parties without the production of the documents requested."  *See, e.g.*, Dkt. 168-1.  Among other things, McLellan lacked access to bids submitted by State Street's competitors for the European transitions at issue.  Notably, McLellan was acquitted of the sole substantive charge for which he had access to this information.  *See* Doc. 495 at 26.

## II.    CONCLUSION

For the foregoing reasons, as well as those set forth in his initial motion, McLellan respectfully requests that his Motion for Release Pending Appeal be granted.

---

for reasons that McLellan has already explained in detail.  *See, e.g.*, Doc. 521 at 28-29 & n.19.

Respectfully submitted,
Ross McLellan
By his Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: November 8, 2018

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, November 8, 2018, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg