```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

 3      - - - - - - - - - - - - - - - - - - x

 4      UNITED STATES OF AMERICA,           :

 5              Plaintiff,                   :    Criminal Action No.
                                                 1:16-cr-10094-LTS
 6          v.                              :

 7      ROSS MCLELLAN,                       :

 8              Defendant.                   :

 9      - - - - - - - - - - - - - - - - - - x

10

11        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                           MOTION HEARING
13

14

                       Monday, March 26, 2018
15                          1:59 p.m.

16

17

18

19

20      John J. Moakley United States Courthouse
        Courtroom No. 13
21      One Courthouse Way
        Boston, Massachusetts
22

23      Rachel M. Lopez, CRR
        Official Court Reporter
24      raeufp@gmail.com

25
```

1                    **A P P E A R A N C E S**

2     On behalf of the Plaintiff:

3          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:  STEPHEN E. FRANK
4          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
5          Boston, Massachusetts  02210
           (617) 748-3244
6          stephen.frank@usdoj.gov

7
           UNITED STATES DEPARTMENT OF JUSTICE
8          BY:  WILLIAM JOHNSTON
           1400 New York Avenue, Northwest
9          Washington, D.C.  20005
           (202) 514-0687
10         william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
           BY:  MARTIN G. WEINBERG
14         20 Park Plaza
           Suite 1000
15         Boston, Massachusetts  02116
           (617) 227-3700
16         owlmcb@att.net

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1                                           

2        (In open court.)

3        THE DEPUTY CLERK:  The United States District Court

4  for the District of Massachusetts is now in session, the

5  Honorable Leo T. Sorokin presiding.

6        Today is March 26th, the case of United States vs.

7  Ross McLellan, criminal action 16-10094, will now appear

8  before this Court.

9        Counsel, please identify themselves for the record.

10       MR. FRANK:  Stephen Frank and William Johnston for

11  the United States.  Good afternoon, Your Honor.

12       THE COURT:  Good afternoon.

13       MR. WEINBERG:  Good afternoon, Your Honor, Martin

14  Weinberg on behalf of Ross McLellan, who sits to my left.

15       THE COURT:  All right.  Good afternoon.

16       Good afternoon, Mr. McLellan.

17       So I think there's three motions, but essentially,

18  it seems like there's -- well, I guess there's two or three

19  issues.  One is the defendant's request that I order the

20  Government to invoke the MLAT procedures.  Right?  One is the

21  request for Rule 15 depositions for two witnesses.  And the

22  third is the witness, who I previously issued a Rule 15 order

23  for, who doesn't wish to testify, and who's outside the scope

24  of the Court's subpoena power, you want me to invoke the MLAT

25  for that person, too.

1          MR. WEINBERG:  I do, Your Honor.

2          THE COURT:  All right.  So just before we get to

3     all of those, just thinking about this practically, what if

4     the -- would these people be -- would these people be willing

5     to testify by video conference, live at the trial?  And would

6     you want that, if they would?

7          MR. WEINBERG:  The answer is, yes, I would want

8     that.  I would want them to testify, whether it's

9     contemporaneous with the jury or before the trial.  But

10    unfortunately, the three people that I'm trying to acquire

11    testimony from, all of whom were former State Street lawyers,

12    two of whom remain represented by the State Street legal

13    team, have all -- none of them have indicated any willingness

14    to volunteer.

15         THE COURT:  How did you get two of them to sit for

16    the civil deposition?

17         MR. WEINBERG:  Through a letters rogatory process

18    that took some time and navigated its way through the courts,

19    and eventually they required that the two lawyers sit through

20    a civil deposition.

21         THE COURT:  And where was the deposition held?

22         MR. WEINBERG:  It was held in the Freshfields

23    offices.  Freshfields is a UK solicitor's firm --

24         THE COURT:  In London.

25         MR. WEINBERG:  -- that works with Wilmer, all of

1    whom represent State Street.

2              THE COURT:  But the depositions were in London.

3              MR. WEINBERG:  The depositions were in London.  I

4    was in Boston with the SEC, in the SEC offices.

5              THE COURT:  So you did it by video conference.

6              MR. WEINBERG:  We did.

7              THE COURT:  I see.  So I'm happy to hear you about

8    all the issues, but I'll just tell you a couple of practical

9    things that I'm thinking about in light of looking at the

10   papers.

11             To the extent the issue -- the argument is made by

12   the Government that, well, these people with the documents,

13   or the witnesses, don't have anything that's really

14   admissible or relevant to offer, and the like, I feel like

15   it's premature for me to make such a ruling.  In other words,

16   if these witnesses -- by analogy, if these three witnesses or

17   these were subpoenaed for trial testimony, they had just

18   issued a subpoena to show up on June, whatever date we're

19   starting in June, for trial testimony, and you moved to

20   quash, making the same arguments that you're making, I'd say

21   you're too early.  I'm not prepared right now, from what I

22   hear.  It's not so plain that I would just say now, quash,

23   they can't bring them in.  Later, hard to say.  Once we --

24             You know, these are witnesses you're going to call

25   in your case, if you call them, right?

1          MR. WEINBERG:  Yes.

2          THE COURT:  So we've heard all the Government's

3     case, and I would say to you, essentially, that motion is

4     denied without prejudice.  You're renewing it, like, when we

5     get there.  And then once I've heard your case and I've seen

6     and I've heard his opening and we see where it's going and I

7     have a better feel for the evidence, then maybe.  I don't

8     know.  It would just depend.

9          So the second consideration is that the question --

10    the relief sought of ordering the Government to invoke a

11    treaty process is a unusual, to say the least, form of

12    relief, that raises lots of questions that would need to be

13    resolved before I would issue such an order.

14         The down the road -- and many of those -- the

15    issues that it raises are laid out very clearly by the

16    Government in its papers and the problems that it presents.

17    The down the road concern, if you will, I think, the problem

18    or issue that I see lurking out there is, if -- if I -- if

19    there is no right, which may well be correct, that that is no

20    right to force the Government to invoke the MLAT, and then if

21    this evidence is not obtained, that then what we face down

22    the road, I think, since this seems to be a no stone

23    unturned, by and large, defense -- no disrespect, but it's

24    very vigorous, as it should be -- is the argument that's sort

25    of alluded to in the papers, I think, which is that there is

1       a due process issue with the trial because some set of

2       evidence that was -- existed, wasn't made available.

3               And this is a complicated, somewhat lengthy, case,

4       and I'm thinking that it would be -- if, to the extent that

5       we can resolve issues and make them go away and solve

6       problems and have this trial decided on the relevant,

7       admissible evidence, wherever the evidence is located, it

8       would be better, putting aside there are complicated legal

9       procedural international issues that bear on -- and

10      separation of powers that bear on lots of these things.

11              So that's why I started at the outset, and with

12      respect to the witnesses, I'm wondering, I understand why a

13      witness wouldn't want to -- a person who is not a citizen of

14      the United States, who is not employed in the United States,

15      hasn't, at least for these purposes, for this work, hasn't

16      been to the United States, I don't know whether they've come

17      here otherwise, but they're outside my subpoena power, why

18      they might not want to come to a trial and testify, pursuant

19      to a day-to-day, essentially nonbinding subpoena.

20              On the other hand, maybe they would like -- if

21      they've been in their office, and two of the three of them

22      have already testified, anyway, you know, maybe they'd be

23      willing to testify by video conference.  It seems to me, it's

24      not that hard.

25              You're willing to agree that they could testify by

1    video conference.  They don't have to be here in person.  And

2    to the extent you have a right to that, I don't know if the

3    Government has a parallel right or not, but I take it I

4    assume you would likely -- it would seem to me likely you

5    would be satisfied if they were by video conference.  You

6    could tell me if you weren't.  But these aren't -- it doesn't

7    seem like the kind of witnesses that -- who are -- whose

8    personal presence would be required, as distinct from video

9    conference testimony.

10            We could arrange that in the course of the trial,

11   during the defense case, that we would take them first thing,

12   9 o'clock our time, it's roughly 3 o'clock their time, it's

13   business hours.  I don't know how long the testimony is, but

14   it doesn't seem like these are two-day witnesses.

15            So that makes me wonder whether, rather than a deep

16   dive into all the legal issues, what's the potential for sort

17   of -- it mostly falls upon either you, Mr. Frank, or you,

18   Mr. Johnston.

19            Right?

20            MR. JOHNSTON:   (Nods head.)

21            THE COURT:  Mr. Johnston.  Whether like you could

22   prevail upon either the targets of the subpoenas or the

23   individual witnesses.  I recognize there's two different

24   categories, documents and witnesses, but at least as to

25   witnesses, whether they're willing to accommodate on a non,

1    you know -- not on a coercive basis, but by a willingness.

2    In other words, something like that, whether we could work it

3    out.  And the same question, really, with respect to the

4    documents.  That's really what I'm wondering.

5           MR. FRANK:  Can I just address -- this is actually

6    Mr. Johnston's motion, but I'm going to assert the power of

7    local -- my local authority.

8           But with respect --

9           THE COURT:  Well, is this assertion -- does this

10   have precedential effect that the local -- does this mean

11   that by Mr. Johnston sitting there, he's in the criminal

12   division, at main justice, as they say?

13          MR. FRANK:  He is.

14          THE COURT:  Does this mean by him sitting silently

15   by, while one of the provinces has asserted in open court on

16   the record it's for the provinces to take control in

17   supremacy, that the main justice is subservient in litigation

18   decisions to local?

19          MR. FRANK:  I think that's exactly what he's

20   saying.

21          MR. JOHNSTON:  We're one big DOJ family.

22          MR. FRANK:  With respect to the documents, Your

23   Honor, I think it's slightly different.  I did speak with

24   Mr. Weinberg about the documents last week.  We didn't oppose

25   the document requests initially, when he -- when he asked for

1   the letters rogatory, notwithstanding the fact that we I

2   think would have had a legitimate basis for doing so.  They

3   are sweeping requests.  They are asking for troves and troves

4   of e-mail.

5          What I said to him last week is, I don't know if

6   these companies are going to listen to me anymore than they

7   listen to you or respond to me anymore than they respond to

8   you.  But if you think they would, I'm happy to go to them

9   with a specific request for a specific document.

10          THE COURT:  More tailored than the broad.

11          MR. FRANK:  You know, if what you really want is,

12   you know, the responses to the RFPs submitted by Goldman

13   Sachs, or whoever else, I'm willing to ask them for those

14   specific documents.  What I'm not going to do is ask them for

15   60 days of e-mails from a variety of people dealing with any

16   aspect of the transition.

17          THE COURT:  Right.

18          MR. FRANK:  So that's what I would say with respect

19   to the documents.

20          With respect to the individual witnesses, we

21   haven't spoken with those witnesses.  They don't -- while

22   they are represented by State Street, two of them are

23   apparently for convenience sake and for financial reasons,

24   they don't work for State Street anymore.

25          THE COURT:  I saw that.

1        MR. FRANK:  I don't think I have any greater

2   likelihood of prevailing upon them than anyone else does.

3   We're certainly not opposed to doing their depositions -- to

4   doing their testimony remotely by video, if that's doable.

5   But I don't know of any reason why they would be more

6   responsive to my request than to Mr. Weinberg's request.

7   Except that if we're willing to do it by video, maybe they

8   would just say, you know, "It's not that big of an

9   inconvenience, I'll do it."

10        THE COURT:  I don't -- you know better than I

11   whether they would be responsive to -- or whether they might

12   be responsive or whether you have -- but I would assume that,

13   (a), the video might be more appealing to them than a

14   deposition; that (b), that whenever that big, happy

15   Department of Justice family makes a request to someone in a

16   different family, that people usually listen.  They don't

17   always do it, as I'm sure you well know, but they do listen.

18   And while they don't work for State Street anymore, they're

19   former employees of State Street.  State Street maybe was

20   obligated, maybe accommodated them to represent them.  State

21   Street listens to you, I suspect, and State Street might be

22   willing to weigh in on it, and that might appeal to them.  So

23   I don't know what all their considerations are, but

24   oftentimes people are willing to be reasonable.

25        And there's also, actually, the other pitch

1    available to both of you, which is that these people aren't

2    complete and utter strangers to this case; that is, this

3    isn't like the in-house counsel at State Street in the Hong

4    Kong office, who never dealt with Mr. McLellan, never dealt

5    with any of the transitions, never dealt with any of the

6    alleged victims of this case, was in a completely different

7    department and had nothing to do with it, and somebody says,

8    "Hey, we want you to testify in this case."  They have at

9    least some -- they touched at least something related to this

10   case.

11          And I would assume, since they're lawyers, even

12   though they're not US lawyers, that they appreciate the

13   significance of cases in which people's liberty is at stake,

14   and that it's, you know, reasonable to think that why

15   wouldn't they be willing to make available their -- whatever

16   information they have.  It may -- it's not -- and especially

17   when they can do it from the comfort of their law office.  It

18   doesn't seem to be a substantial inconvenience.

19          This isn't a case that raises privilege, because

20   State Street has waived.  So it seems like it's a question

21   of, you know, how hard is it for them.  Right?  That's one

22   reason that I thought of a video conference.  I just wanted

23   to make sure there wasn't some reason that someone cared

24   about that, which it sounds like everyone's fine with it.

25          And I thought, to the extent that they do testify

1   in some form, live testimony would be better than deposition

2   testimony, both because the jury will hear the person live

3   and will be able to size them up, in a different way than

4   watching a TV video of their deposition.  And the objections,

5   from my experience, will be vastly easier to resolve

6   realtime, than you all reserving, like the civil practice of

7   reserving objections and filing memos and me reviewing them.

8   But I can't really review it until we get close to the time

9   that the person is going to testify, because it might relate

10  to the Government's case, and then line by line.

11          And I've done that, but my experience is that

12  neither plaintiff's -- Government counsel, defense counsel,

13  nor the Court find it a very satisfying or helpful process.

14  It's better than nothing but --

15          What do you have to say about all that,

16  Mr. Weinberg?

17          MR. WEINBERG:  One, of course, it's the evidence

18  that I want to acquire both documentary and testimonially.

19  If the Government can do it without a court order or without

20  us navigating amongst these difficult Constitutional issues,

21  I'm happy.

22          I also think the Government's got a working

23  relationship with the City of London, which has been tasked

24  by the home office of the UK to implement the seven different

25  letters rogatory in England.  And I'm hopeful that Mr. Frank

1    can weigh on them to expedite their efforts to enforce the

2    letters rogatory.  I can't -- I don't know where that process

3    is at, because there's been no communication back from the

4    home office to our UK solicitors.  But it's at least another

5    Avenue of an attempt by the Government to do what, up to now,

6    they haven't done, which is to acquire material, and I

7    believe potentially exculpatory evidence, very likely

8    exculpatory evidence, from the entities, many of whom they

9    will call as witnesses in this case.  And so again --

10            THE COURT:  So just so -- I'm not making a ruling

11   now about exculpatory evidence or Constitutional obligation

12   to acquire, even if it is exculpatory, whether you have an

13   obligation to acquire things that you have not read, not

14   seen, don't have, because it raises a whole host of different

15   questions.  And I am, in the first instance, trying to think

16   about this in a completely nonlawyerly, if you will, but

17   completely practical, recognizing that often practicality and

18   lawyers don't always mesh up, because we all get caught up in

19   the law, which is fine and appropriate.  But it's just a

20   question of will these three witnesses be willing to come by

21   video conference, and if they do, it resolves a lot of

22   issues.  And will this move if it's sitting in the City of

23   London's desk somewhere, somebody, and they're busy?  Can

24   they focus on it and get it done?

25            Now, to get the Government to do what Mr. Frank has

1        described, it might involve narrowing, to some degree, your

2        requests.  And I have the sense from your papers, to some

3        extent, that at least there's been some back and forth with

4        some of the targets of the letters rogatory, and that at

5        least they complained, to some degree is what it sounds like,

6        and you responded in some way as to some of them.  And I

7        don't really know whether that led to a narrowing of your

8        view or not.

9                MR. WEINBERG:  And we don't know.  Predictably, it

10       was the two other banks with their armies of lawyers at

11       Nomura and Goldman Sachs that were the two parties that we

12       learned objected to the scope of letters rogatory.  We have

13       not learned that there's been any objection from two of --

14               THE COURT:  But did you see what their -- did you

15       see what their objections were?

16               MR. WEINBERG:  Yes.  And we --

17               THE COURT:  And you responded.  So did your

18       response say, "In light of that, we narrow what we're asking

19       for," or did you say the objections were wrong?

20               MR. WEINBERG:  I believe there was some narrowing.

21               Is that correct?

22               MR. NEMTSEV:  Yes, that's correct.

23               MR. WEINBERG:  This is Mr. Nemtsev, who is working

24       with me --

25               THE COURT:  Oh.

1          MR. WEINBERG:  -- who was responsible for this part
2     of it.
3          MR. NEMTSEV:  Your Honor, we substantially narrowed
4     the request.  We eliminated the requirement that they do a
5     privilege log.  We also eliminated the request that they
6     identify where the documents came from.  Primarily, the
7     objecting party was Goldman Sachs, not the other party of
8     Nomura.  So there, the attorneys just said they couldn't
9     locate the documents requested, because the transition team
10    of Nomura was actually terminated awhile back.  But we did
11    narrow the Goldman request substantially.
12         THE COURT:  So as to Nomura, basically, there's
13    nothing to get.
14         MR. NEMTSEV:  They're doing a search again.  We
15    identified some search terms they could use and limit what
16    they're finding, and hopefully limit as to relevant
17    materials.  But they haven't responded or at least we haven't
18    seen a response from them.
19         And the other parties did not file objections.  One
20    party filed a clarification request.  We clarified the
21    request.  But they never objected to it.
22         MR. WEINBERG:  The two client parties, who I
23    believe Mr. Frank is going to rely on as part of his
24    prosecution, did not object to the scope of requests, at
25    least according to what our UK solicitors reported as coming

1   from the home office, which was communicating the level of

2   objection and the limits of the objections.

3           MR. FRANK:  Your Honor, there's a practicality

4   issue and a slippery slope issue here that I just want to

5   identify.  I, frankly, have difficulty keeping track.  There

6   have been so many letters rogatory.  There have been so many

7   document requests to so many different parties.  I think it's

8   a little bit unfair.  I'm willing to do some to make this

9   easier for Mr. Weinberg, but I think it's a little bit unfair

10  to ask us to go to Eircom and Royal Mail and Goldman Sachs

11  and Nomura and all of these different entities, and the City

12  of London police, with whom I have not spoken in two years,

13  and ask them for documents that the defense wants.  I just

14  think there are limits to what we should be asked to do.

15          I'm willing to do some.  If there are specific

16  witnesses he wants, if there's a handful of documents he

17  wants from a couple of entities, that's one thing.  But if

18  we're talking about going to six or seven entities for all

19  sorts of different things, you know, I've just come off a

20  trial, I've got two months to prepare for this big trial, I

21  shouldn't be required to spend my time on a search for

22  defense evidence.

23          MR. WEINBERG:  And part of the issue, Your Honor,

24  is that, you know, Mr. Frank and I, I think in good faith,

25  both of us coming at this from different perspective.

1           THE COURT:  Uh-huh.

2           MR. WEINBERG:  My position is the Government should

3    have done this a year ago or two years ago, understanding

4    that what I was seeking was material evidence that would

5    assist the defense on issues that had been raised in the

6    court.  And Mr. Frank's position is to -- you know, he could

7    certainly speak to it -- is that:  I've got no obligation

8    under MLAT or any other legal obligation to help the defense

9    access evidence, even exculpatory evidence or potentially

10   exculpatory evidence, that's not in my possession.  And this

11   evidence, I would not contend, is in Mr. Frank's possession.

12           We're kind of between all of the principles that

13   mandate the Constitutional imperatives.  And I recognize that

14   I'm taking from the *Trombetta* case, which talks about access,

15   and under the proper circumstances we will deal with, you

16   know, exculpatory evidence not in the Government's

17   possession.  But that was *California v. Trombetta*, and it was

18   three decades ago.  And *Valenzuela-Bernal* talked about it,

19   and the dissenting/concurring opinions talked about it.  But

20   there it was a deportation that was proper under immigration

21   law, and the defense didn't come up and make a good faith

22   representation as to why the witness would have material

23   evidence.  Had they done it, we would be, perhaps, at a

24   different place.

25           And there are supervisory cases that do not speak

1    to this issue, but talk about the court's powers to have a

2    fair trial.  I mean, during the readings in the last few

3    days, I'm going to quote from *US v. Nixon*, and then 174 years

4    before *Nixon*, the *Aaron Burr* case, where Justice Marshall

5    wrestled with Aaron Burr's subpoena on President Jefferson to

6    provide a document that he wanted to use in his defense.

7                THE COURT:  What was the resolution?

8                MR. WEINBERG:  The resolution was that Justice

9    Marshall ordered the President to provide the document, in

10   one of those seminal decisions that became a precursor to

11   Rule 17, which --

12               THE COURT:  Did President Jefferson produce it?

13               MR. WEINBERG:  Yes.  Yes.  It was mentioned often

14   in the *Nixon* case, that presidents are not outside the law.

15   I haven't read the *Paula Jones* case lately, but they might

16   have referenced Aaron Burr there, as well.

17               But the problem is that Rule 17, of course, has its

18   limits.  But it has its purposes.  And the Government,

19   preindictment, has all of these asymmetric powers that we

20   know so well.  And I've lived with them since the 1980s,

21   whether it's 5K or all of the rest.  I don't need to repeat

22   them to this Court.  But the asymmetry of rights and powers

23   is supposed to be levelled once you're indicted.  And Rule 17

24   in the *Nixon* case speaks to it as we want to get all the

25   material evidence, so that each party has a full and complete

1    right to present its case, the defense, as well as the
2    Government.
3             And some of these cases say:  But there's no power
4    to subpoena a foreign national.  There is a US national who
5    is oversees, but there's no power to subpoena a foreign
6    national from a foreign country.  But that's pre-MLAT.
7    That's the *Filippi* First Circuit case from 1990.  And there's
8    been like 60 MLATs since then.
9             I grant you, only one judge, in an unreported
10   decision that we have some disagreement about, you know,
11   whether exactly what happened because it wasn't reported,
12   which is the *Sindona* case.  And I'm old enough to have
13   actually participated in the representation of Mr. Sindona on
14   his subsequent bail jumping case.  Judge Marvin Frankel had
15   the Franklin National Bank bankruptcy, and the judge
16   presiding over that, apparently at the defense request, had
17   the Government -- and we don't know just how and when, it was
18   an order or request, used its Swiss MLAT powers, which are
19   written differently than the UK, but not differently than the
20   Netherlands, to go and get a witness to depose; whether in
21   Switzerland or Italy it's not 100 percent clear, but probably
22   Switzerland, from my memory of the fading memory of the
23   *Sindona* case.
24            But yes, I'm asking the Court to -- I found one of
25   the other case of interest that I gave to Mr. Frank about ten

1    minutes to 2:00, which is the supervisory ruling from the

2    Ninth Circuit, which upheld a district judge in Montana in

3    the *W.R. Grace* case.  The judge ordered the Government to

4    provide a witness list a year before trial, or those

5    witnesses would be excluded.  The Government argued on the

6    interlocutory appeal, you have no power to do that, and the

7    court upheld that discretionary decision by the district

8    court under its inherent powers to manager its own court

9    schedule and, essentially, supervisory powers.  And that's

10   the *W.R. Grace* case.

11            THE COURT:  And therefore, from that, as applied to

12   this case, that's --

13            MR. WEINBERG:  We have a trial date on June 4th.

14            THE COURT:  Yeah.

15            MR. WEINBERG:  And Your Honor has already received

16   my best efforts to encourage Your Honor to continue it

17   because of the adding of the count that I argued what I

18   argued, and I'm not going to reargue.

19            THE COURT:  Sure.

20            MR. WEINBERG:  But I have a trial date in nine

21   weeks or ten weeks, and I have court issued letters rogatory,

22   and they are mired in the bureaucracies or the different kind

23   of functioning of the different countries.  I don't have a

24   single page from any document that I've asked for letters

25   rogatory from four different sovereign nations:  The Mideast,

1    the Netherlands, Ireland, and the UK.

2            I'm expecting the Netherlands to produce documents,

3    I should tell Your Honor that.  Ireland has said they will

4    not produce documents unless they're requested by the

5    Government.  That's the way that they read their MLAT,

6    central authority to central authority.

7            And the UK, we're in kind of a legal quicksand,

8    because everything is where it should be.  The home office is

9    relying on the City of London, but we don't know where --

10   what the City of London has done, whether they have

11   expedited, whether they have delayed, whether they've

12   collected from the parties that don't object.  We've asked

13   the home office, "Give us what the entities don't object to.

14   If there are objections, we understand that takes more time."

15   And despite the efforts of very reputable solicitors, who

16   made multiple phone calls, and I've seen their e-mails to

17   Paul Chrome, we don't have any answers.  So I can't tell the

18   Court whether these pivotally important evidence from the UK

19   will be produced before June 4.

20           But the Court has the option to continue the case.

21   And yes, there are cases that discourage it.  And I can't

22   even tell you to put it on to September 4, although I like

23   that date, after Labor Day, and I'll have the evidence,

24   because I don't know that I'll have the evidence.  But in the

25   implementation of the Court's powers to have a fair trial,

1    that I argue are required by due process and are argued --

2    and are required by compulsory clause rights, and I can argue

3    this at length and we argue to some extent in our pleadings,

4    that my biggest position is I've got a Constitutional right

5    to material evidence; that this is not like breath samples in

6    *Trombetta* that have almost no chance of being exculpatory,

7    it's not like the deported alien where there was no proffer

8    of materiality.  This is important.

9         And I thank Mr. Frank for his current willingness

10   to -- a very limited basis, and I'll accept whatever the

11   Government gets to me, because it brings me closer to a fair

12   trial, but it doesn't get me a fair trial.  What gets me a

13   fair trial is that the bulk of what we've sought by letters

14   rogatory -- and I can walk the Court through its materiality

15   and why it's more than just a few documents.

16        The *Litvak* case, which the Second Circuit reversed

17   because of an exclusion of an expert, and they went to a

18   retrial in Connecticut and convicted of one of nine counts

19   they dealt with materiality.  There, there was a broker,

20   arm's length brokers, one lied to another.  They indicted

21   securities fraud.  And the principal evidence, even though

22   materiality is an objective test, what does a reasonable

23   person believe is important or material, they allowed the --

24   the brokers, the bond brokers to go and testify to their

25   subjective affects of the false statements.

1          And I have every reason to believe it would be

2     Mr. Frank or Johnston's intention to call the British client,

3     I won't name them, because they are still under pseudonyms,

4     but the British pension client, that was a client of State

5     Street, and to call the Irish client, that was a client of

6     State Street, and several others, and ask for their

7     testimony:  Was -- did you understand State Street's fees to

8     be X?  What was the effect when you learned they were Y?

9     Would you have dealt with State Street, had you known they

10    would be Y instead of X?  Did you understand that the fees

11    that were charged included the broker-dealer, where there was

12    a management fee for transition management advice, and then

13    separate transaction fees that were charged by the

14    broker-dealer, and it's the transaction fees from the

15    broker-dealer, the markups that were modest by comparison,

16    that are the subject matter of the Government's indictment?

17         And this is -- and I've asked for e-mails with

18    search terms.  I've asked, with them, for date limits.  But

19    they're pivotal to my ability to cross-examine what are going

20    to be very sympathetic witnesses, one of whom has already

21    testified, at a national hearing, he considered the conduct

22    akin to robbery.

23         So I know these are going to be adversarial

24    witnesses, whether or not the fees were material to experts,

25    third parties, you know, impartial people.  And what I need

1    is to be able to cross-examine them about how they received

2    State Street's proposal, and how they received the

3    alternative proposals that I will contend required much

4    higher charges; and whether what was important to them is to

5    take a billion dollars of assets that were in the Vanguard

6    Fund and sell them.  And the assets were so great it moved

7    the market prices, so the transition managers were required

8    to try to minimize the market impact and get them to

9    Fidelity.

10           And one of my arguments will be what they really

11   cared about is getting them from A to B, with the overall

12   less costs.  It didn't matter very much if they got them at

13   50 basis points from A to B, and State Street charged five

14   basis points, that was better than someone charging three

15   basis points of a fee, but it cost them 55 basis points to

16   move the billion from A to B.  And this is the kind of stuff

17   that they would be talking to each other about and talking to

18   their consultants about and assessing all of the different

19   transition proposals and assessing whether they were happy

20   with State Street's performance.

21           The Court should know that almost all of the

22   clients, despite their current grievances, rehired State

23   Street for subsequent transitions because the performance was

24   that good and was better than the competitors.

25           So it goes to materiality.  It goes to the

1    credibility of the current testimony from these aggrieved

2    clients.  It goes to what professionals assess was the likely

3    cost of the transition.  I mean, one of the Government

4    clients was charged 200,000 pounds for a

5    multiple-billion-dollar transition, and there will be

6    evidence that nobody in that marketplace, no professional

7    would believe 200,000 pounds -- I think it was

8    242,000 pounds.  It's a lot of money to me, but I'm not

9    trading billions of dollars.

10            So this is going to be very complicated,

11   challenging issues to represent Mr. McLellan.  Bankers are

12   not the most popular people on the planet, and there are

13   challenges to have a jury understand the marketplace and what

14   sophisticated investors and their consultants really

15   understand when they're weighing Goldman Sachs, JP Morgan,

16   State Street, and to get that so they're not free to just

17   testify as victims.

18            And what happened is State Street, there was

19   publicity, and State Street rolled back one of the

20   transitions, and then told the other clients that they felt

21   there was charging that the State Street institution didn't

22   approve.  And that will be heavily contested whether or not

23   Mr. McLellan did anything that at almost all levels State

24   Street didn't understand.  They got all the money, and there

25   was plenty of evidence that they were charging what they

1    charged.  It went through all the hierarchy in State Street.

2          But State Street essentially invited these people

3    to make a grievance claim, and they would get back the money.

4    So of course they all, representing trust funds and sovereign

5    wealth funds, couldn't resist the request:  Send us a bill,

6    and we'll send a check.

7          But they're going to be coming into court, they

8    will be adversarial witnesses, and I desperately need what I

9    would get from a domestic entity, Rule 17, which is what the

10   letters rogatory are intended to produce.  I wish I had a

11   date, because if that was promised by the UK they'd be here

12   Labor Day.

13         THE COURT:  I understand.  Let's see what Mr.

14   Johnston or Mr. Frank wants to say.

15         MR. WEINBERG:  Thank you, Your Honor.

16         MR. FRANK:  Your Honor, the Court has already

17   addressed the timing issue.  This case was indicted in 2016.

18   When the Court pushed back the trial date initially, it was

19   because of these letters rogatory.  And what I recall Your

20   Honor saying at that point was, the date might come when you

21   still don't have this stuff, and we're not moving the trial

22   date again.  And that is supported by abundant precedent.  We

23   cited in our brief, Mr. Johnston's brief, a number of cases

24   making clear that trials need not be stayed indefinitely to

25   await the unpredictable development --

1          THE COURT:  Mr. Johnston, does Mr. Lelling have the

2    same authority vis-à-vis Mr. Sessions, as Mr. Frank does to

3    you?  Is the principle transferable?

4          MR. JOHNSTON:  I don't have any insights into that

5    level of authority but my pay grade.

6          MR. WEINBERG:  This precedent might empower

7    marijuana retailers to feel a little more emboldened as they

8    go forward.

9          MR. FRANK:  In any event, the Court said it

10   wouldn't wait for the unpredictable developments of foreign

11   proceedings, and that's supported by the case law.  We've

12   waited a very long time.

13         THE COURT:  So I'm not moving the trial date today.

14         MR. FRANK:  My point is, it was predictable, it was

15   foreseeable that we might not have -- that Mr. Weinberg might

16   not have these documents.  And that's the situation that

17   we're in.  And for Mr. Weinberg to argue that it was our

18   obligation at some point to go and get these materials for

19   him, is a little bit arguing both sides of the coin.  On the

20   one hand, he has argued that he didn't move for Rule 15

21   depositions of Beck and Paul, the people that he'd like to

22   depose again, because it wasn't foreseeable to him --

23   notwithstanding his arguments in front of Judge Woodlock, it

24   wasn't foreseeable to him that those depositions would be

25   material, relevant, and exculpatory.  And on the other hand,

1    he needed to wait for the depositions to know that.  And on

2    the other hand, he's arguing that we should have foreseen

3    that he would take the deposition that there's material,

4    relevant, and exculpatory evidence in all of these different

5    places.

6              So the fact is, this evidence is neither material,

7    relevant, nor exculpatory.  It's changing the subject.  State

8    Street went and pitched these clients on a fee for its

9    services and then charged a different fee.  That's what this

10   case is about.  It's not about what other banks would have

11   charged or promised to charge and how well the clients would

12   have done by selecting those banks.  They selected this bank,

13   based on a promise to charge X, and it secretly charged Y.

14   That's what this case is about.  And that's why all of that

15   other stuff is completely irrelevant to the facts of this

16   case.

17             And so while, again, we're willing to ask one or

18   two folks to get one or two things that are really important

19   to the defense, what we're not willing to do is now, on the

20   eve of trial, turn this into a fishing expedition for all

21   sorts of documents that we don't even think the defense is

22   entitled to ask for, even if it were a Rule 17 subpoena even

23   domestically.  This is a fishing expedition for documents.

24             Mr. Weinberg stood here and said these are the

25   kinds of things that these consultants and their clients

1     would be talking about and might be expected to be talking

2     about.  And the reason that he's using that terminology is

3     because he doesn't know.  He doesn't know that they talked

4     about it or what they talked about or what they said.  And

5     that doesn't satisfy the *Nixon* requirements for a Rule 17

6     subpoena, much less warrant all of the sort of tortuous

7     proceedings that we're talking about putting ourselves

8     through to get this kind of stuff from foreign companies.

9              MR. WEINBERG:  If I can just respond very briefly,

10    Your Honor.

11             THE COURT:  Very briefly.

12             MR. WEINBERG:  Before you loose patience with me.

13             There's a big difference between Ms. Paul and Beck

14    on one hand, and the Government's obligations, which I

15    continue to propose are mandated by due process.  The

16    Government knew, back in July, when the letters rogatory

17    issued, that a letter rogatory process could be slow, and yes

18    might not be here by June 4, 2018, and yet did nothing,

19    despite their asymmetric powers to assist in getting what is

20    material and what I believe is exculpatory.

21             The *Trombetta* case and the *Bernal* case talk about a

22    diluted obligation to particularize which e-mail is

23    exculpatory or exactly what the witness would say, when they

24    don't have access to the e-mail or the witness.  But

25    certainly it is highly likely that the letters rogatory would

1    generate documents that would be of enormous help in

2    cross-examining the witnesses, and more, not just for

3    impeachment, but in understanding what they understood, what

4    was important to them when they were assessing these multiple

5    bids.

6           So I don't agree with Mr. Frank that he can sit

7    there, you know, and say because I couldn't know that Paul

8    and Beck would give exculpatory evidence in their testimony

9    until they did, and then four days later we asked for a

10   criminal Rule 15, that that's -- that excuses or extinguishes

11   the foreseeability to the Government that amongst these

12   letters rogatory are documents that would be important in

13   terms of compulsory process, important in terms of

14   substantive evidence, important in terms of

15   cross-examination.

16          It's been -- we've been litigating.  We've put out

17   on the table the letters rogatory, why we need them, Judge

18   Bowler issued them.  Yes, there was no opposition.  But this

19   doesn't come as a surprise to Mr. Frank, that today is the

20   first day that the Government understands that the defense

21   wants and believes that the evidence they sought is material

22   and exculpatory.

23          I grant you, it's not like a *Brady* obligation.

24   It's not cemented since the Earl Warren era that the

25   Government has to go and comb through their files.  But it

1    is, I contend, a Constitutional right that is teed up on the

2    unique facts of this case.

3         And I want to say one more thing in terms of why

4    this is unique, which is that we didn't pick this case, with

5    all its global witnesses.  Six out of seven of the alleged

6    victims come from overseas and are not within Rule 17.  I

7    didn't pick for State Street to decide, in its strategic

8    interest, to essentially join with the Government and provide

9    the Government with pathways and roadmaps and selected audios

10   and selected e-mails.  They flew witnesses over from London.

11   That's preindictment.

12        So I get the fact that the world is supposed to be

13   asymmetric, because the Government has the power to

14   investigate.  But the *Nixon* case talks about an even playing

15   field under Rule 17.  And this is one step away.  Because in

16   an MLAT world, the Government has the power to get these

17   documents.  The foreign countries are compelled.

18        This country, in the First Circuit case that Judge

19   Lynch wrote about BC said:  Yes, we have a Constitution.

20   We're the courts.  If an MLAT from some other country is

21   asking us to unconstitutionally require evidence, we're going

22   to assert our judicial powers.

23        But other than that, these MLATs are not

24   discretionary.  There's -- they have limits, but they don't

25   affect -- they limit the Government from going out and

1   getting evidence that's important to a trial, it's

2   potentially exculpatory, it's material, whether the

3   Government -- the Court orders it.  And there's nothing about

4   prohibiting private causes of action that prevent the United

5   States Attorney from using an MLAT to get material and

6   exculpatory evidence, and there's nothing about --

7         THE COURT:  What reason do you have to believe that

8   if, today, they went back to their office, either because I

9   issued a court order or because they decided on their own

10  just to do it, to make an MLAT request, that that MLAT

11  request would actually -- if it were done with reasonable

12  dispatch, but not superordinary speed, reasonable dispatch,

13  that it would be done, responded to, and the documents

14  produced in a meaningful time before the trial?

15        MR. WEINBERG:  Well, the UK MLAT has an option,

16  when things have a time sensitivity, to making the request

17  even telephonic before it's all written.

18        MR. FRANK:  That's just not going to happen, Judge.

19        MR. WEINBERG:  Let me finish.

20        MR. FRANK:  First of all, the fact that

21  Mr. Weinberg keeps using the words "material" and

22  "exculpatory" over and over again, doesn't make it so.  He's

23  just throwing those words in here.  He has no idea what's in

24  those documents.

25        Number two, I've never heard of a telephonic MLAT.

1     What I do know is I need to go through OIA.  What I know is

2     that to issue MLATs to one country, much less three

3     countries, even to get through OIA is going to take us

4     basically until trial, much less whatever is going to happen.

5     We're talking about at least a year, if not longer, of a

6     delay in this trial, which this case is already two years

7     old.

8              I would also add, Your Honor, that while we don't

9     think that the Court has authority to order us to get an

10    MLAT, even if we were to go get an MLAT, and even if we were

11    to say that we were doing it, as we would have to say, on the

12    basis of a defense request for these documents, in all

13    likelihood, even if OIA were to authorize the request, which

14    they wouldn't, we would be faced with other countries

15    responding to us in exactly the way that we would respond if

16    those countries came to us and said, "We're trying to get

17    these documents on behalf of the defense in this case," which

18    would be to say, "We're not going to provide you those

19    documents, because the treaty doesn't obligate us to do that

20    and the treaty doesn't contemplate that."

21             So the MLAT is essentially a nonstarter here.

22    Unless the Court is willing to create new law by ordering us

23    to get it and to delay this trial by a year or more, there's

24    just no -- the MLAT is just -- it's just an impossibility on

25    the facts of this case at this point in the proceedings.

1          THE COURT:  So here's what -- I'm ending sort of

2   where I began.  It seems, in the first instance, that there's

3   some practical issues here.  One is the three witnesses and

4   whether one or all of them might be willing to testify by

5   videoconference.  I mean, if they prefer depositions, and you

6   all agree, that's fine.  But I would think they would prefer

7   live testimony.  And it certainly would be, it seems to me,

8   preferable for the jury to have live testimony.

9          Second, there's a variety of documents that are in

10  England that have been subject to the -- form to some degree

11  to the letters rogatory process that is somewhere, and

12  whether that is -- what is the status of that and whether

13  that process that has commenced and has gotten however far

14  its gotten, whether, either through the City of London police

15  or otherwise, it can be prodded, and as a result, the

16  documents produced.

17         And third, I suppose there's the documents in

18  Ireland, which really, there's a letter rogatory process that

19  ended, as best we can tell; that is, it was begun, and

20  Ireland took the position, "If you want them, go through the

21  MLAT."  So I suppose there's the question is whether the

22  target would be willing to -- I suppose there's no law that

23  prohibits the person with the documents from just producing

24  them on their own, separate from MLAT, separate from letters

25  rogatory.

1          So the way I think about this, in the first
2    instance, is those are the three subject area of evidence.
3    In a perfect world, which we do not live in, but we could,
4    nonetheless, aspire to, we would have that, at least, before
5    the Court, so that we could then argue about whether it's
6    relevant and admissible, or not, and whether it's material,
7    or not, and what utility it has and the like.
8          So it -- it also, I think, has the virtue of -- to
9    the extent it's available, of avoiding either the
10   potential -- the issue that seems clear to be raised.  I make
11   no view as to whether it's -- how much strength it has.  But
12   the issue that Mr. Weinberg is raising, which is that, "Well,
13   then, you know, the trial is infected," I am -- my intent, at
14   the present time, is right now trial is scheduled on
15   June 4th.  I haven't heard anything to change my
16   mind about -- I'm certainly not *sua sponte* changing the trial
17   date.  And to the extent of what Mr. Weinberg raised was sort
18   of an implicit invitation, then I stand where I stand.
19          But I think that to the extent that we can -- it
20   may not be resolved fully.  It may not be that all the
21   witnesses are here, with all -- video here.  It may not be
22   that all the documents that Mr. Weinberg seeks are required.
23   But the degree of potential unfairness -- I'm not saying
24   there is an unfairness if none of it arrives.  But the degree
25   of potential unfairness certainly is reduced, the more that

1    appears.

2            It may be beyond even the power of a -- a lawyer

3    who can override representatives from Washington.  But

4    perhaps not.  So it would be, I think, prudent, in the first

5    instance, at least whereas here the Government is not opposed

6    to making some efforts.

7            I recognize, and I think you make a fair point,

8    Mr. Frank.  You have -- is it ten weeks, did you say?  Nine

9    weeks?  Whatever it is.

10            MR. FRANK:  Something like that.

11            THE COURT:  Something like that to prepare for

12    trial.  I certainly don't expect you to spend the whole ten

13    weeks doing the bidding of Mr. Weinberg on this or other

14    issues.

15            On the other hand, the nature of the litigation

16    process is -- especially the criminal litigation process, is

17    often -- and this isn't going to be the end of things that

18    you're going to have to respond to from Mr. Weinberg, and you

19    know that.  And that would be true even if this were a purely

20    case that arose out of a car stop and a much simpler case.

21    You would be making *Jencks* disclosures, and then there would

22    be a request, "Well, what about this?" or there might be an

23    issue about one of the officers, and that might require you

24    to look into it.  It might not be anything.  So to some

25    extent that comes up frequently.

1          That said, I think the consideration that you raise

2     is reasonable.  And you know, I'm not -- but it's also an

3     issue that you potentially have to face later, as do I.  And

4     it would be best for the Government, the Court, and for

5     Mr. McLellan if the trial is fair, or as fair as we can

6     reasonably make it.  And so in the first instance, before I

7     resolve all of these issues on the motions, I would be

8     interested to see, what, if anything, could be done to

9     practically resolve it.

10          I suppose that leads me to one question, which is,

11     I would think the best course is maybe a status report, and

12     the question is should that be in a week?  Two week?  I don't

13     want to make it too soon to be, like, unreasonable.  On the

14     other hand, I don't want to make it too long, because at some

15     point I have to resolve the issues.  And I don't know if the

16     two of you want to talk to each other about that, and you can

17     just call Maria and tell me when you would think it would be

18     or whether you want to tell me now.  And whatever you think

19     makes the most sense about that.

20          MR. WEINBERG:  I also have a request for a status

21     conference for other issues, which is that given the enormity

22     of the discovery in this case, over 1,400,000 pages,

23     Mr. Frank and I are talking and trying to work out a schedule

24     for things like witness lists, exhibit lists, tape lists.

25     But in the event we can't accommodate each other, we would

1    want to see the Court --

2            THE COURT:  I'm happy to -- I should say, and I

3    meant to say this at the outset, and I didn't, but it was on

4    my mind, which is, I'm sorry, I think this is the third date

5    for this hearing.  And I don't like setting dates and then

6    pulling the rug out from you.  I recognize you have other

7    cases and you have obligations in this case, and I don't

8    ordinarily do that.  And I apologize for that.  I've been

9    busy, and I wanted to be able to give this the attention it

10   deserves.

11           But I'm happy to see you at any point, as a general

12   matter, when you need to see me on a status conference.  I'm

13   happy to schedule that now.  I'm happy to wait.  And if you

14   talk to each other on these other issues and you think

15   there's utility to having a status conference, you can call

16   Maria.  I'll usually be able to see you pretty quickly,

17   within a couple days to a week -- within a day to a week.

18           I also think it's a sensible idea, in a case like

19   this, that has a lot of documents and a lot of evidence, to

20   think about -- I think I issued a pretrial schedule, in terms

21   of like motions in limine and jury instructions.  But if you

22   think a more -- a more detailed schedule is -- to address

23   issues is useful, then I would -- the first question that I

24   have is, well, what days would you want to set.  And I would

25   look to all of you.  I'm open to that.  It's a longer case.

1          How long do you think it will --

2          MR. FRANK:  I actually don't think it will be that

3    long, Judge.  I think we're talking, from our perspective,

4    two to three weeks.

5          THE COURT:  Oh.  For some reason, I had the

6    impression that it was four to five.

7          MR. FRANK:  I know that Mr. Weinberg's

8    cross-examines are to the point and concise.  And similarly

9    our direct will be to the point and concise.  And I don't

10   anticipate an overwhelming number of witnesses.

11         THE COURT:  Two to three weeks for the presentation

12   of your case, including reasonable cross.

13         MR. FRANK:  I believe that's right.

14         THE COURT:  Does that seem right to you as to their

15   case?  From what you know so far?

16         MR. WEINBERG:  Two to three, with a likelihood of

17   three, is what I think the Government case, with cross, will

18   take.  And then if we put on a defense, depending on the

19   strength of the Government's three weeks, it would not take

20   more than a week.

21         THE COURT:  Okay.  So at the point moment, what I

22   should think about would be four weeks, in terms of like, if

23   I were thinking of my own trial calendar, I should block out

24   for sure four weeks, just in case yours went to -- the

25   Government's case went to three; and if you did present a

1   case and if it went all the way, that would be another week

2   and that would be four.

3           So my usual -- I think we discussed this before.  I

4   usually sit 9:00 to 1:00, but meet with the lawyers at 8:30

5   to resolve issues so that we can limit the number of

6   sidebars.  And I'm also happy to meet with you in the

7   afternoon.  It's been my -- I know, Mr. Johnston, since you

8   probably practice elsewhere in the country, that they don't

9   do it that way elsewhere.

10          MR. JOHNSTON:  No.  Most full trial days, usually.

11          THE COURT:  Right.  I know.  They call them "full."

12  But I will tell you, I talked to a juror from one of those

13  other places once, and that juror told me he was deeply

14  unhappy with the court -- not our court, but another court.

15  And one of the things that she was unhappy with was, "I never

16  knew when the day was going to end."  And they spent

17  interminable amount of time over at sidebar talking about

18  legal issues, and we sat there, twiddling our thumbs and they

19  were wasting my time.

20          And so I hear that.  And I understand everybody

21  else in the country thinks that like 9:00 to 1:00 is like

22  half time.  But I'm not so persuaded that actually going all

23  day ends up being more productive.  Because, at least in my

24  experience, when I say 9:00 to 1:00, that means we start at

25  9:00, and at five of 1:00, whoever is putting on witnesses,

1     when the witness steps down, call the next witness.  And on

2     the other hand, we'll stop at 1:00.  But I will -- but you've

3     thought about that in terms of --

4             MR. FRANK:  I have, Your Honor.  And having just

5     done a trial that was very strictly 9:00 to 1:00, with a

6     25-minute break and no sidebars, it -- you know, it moved

7     slower than I would have liked or anticipated.  I think in

8     that case, there were multiple defense counsel, and

9     cross-examinations took unusually long.

10            So the only thing that I would say is I have

11    practiced in one of those other districts, and I've seen

12    jurors sleeping in the afternoon.  But I also would ask that

13    the Court not maybe promise the jury that it's always going

14    to be 9:00 to 1:00, in case --

15            THE COURT:  So here's what I'll do about that.  I

16    will talk to both of you before -- when we get closer about

17    whether there's either a witness who's coming in, you know,

18    that would be reasonable to accommodate, or whether you

19    foresee some reasonable risk that it would be useful.  I have

20    sat in the afternoon.  I will do it sometimes.

21            And I understand that one of the virtues, from the

22    Court's perspective, honestly, if you sit all day, is you

23    wear the lawyers out.  So you can't do as much.  If we go

24    9:00 to 5:00, at least you have less time to prepare, and

25    people drop more things is my sense.

1        But sometimes there are -- I'm not inflexible.  And
2   there are times when it makes sense to sit in the afternoon.
3   I have done that.  I'm open to that.  I simply want -- I want
4   to be able to tell the jurors that at the beginning.  So that
5   if we're going -- if the plan is -- if you, either because of
6   the an individual witness or several or just because of
7   timing, given when we're starting, you know, it would be nice
8   to get it to them not -- I forget exactly when the Fourth of
9   July falls, but not to impinge on that week, then maybe sit
10  in the afternoon.  Then I would tell them that at the
11  beginning, "We're going to go 9:00 to 1:00, but we could,
12  potentially, and we'll give you notice in advance."  But then
13  I wouldn't say to them at 12:00, "You're going until 2:00
14  today."  I'll tell them today for tomorrow.  It's only fair,
15  in terms of their lives.  And they will pay back in their
16  attention in spades what we give them in terms of just due
17  consideration and courtesy.
18        So I'm open to that, if that seems -- and we can
19  talk about that a week before or something like that.
20        MR. WEINBERG:  Judge, does it make sense to
21  schedule for some date perhaps late next week or middle of
22  next week, where we could both have the report on whatever
23  efforts Mr. Frank has succeeded in.  And also, we could at
24  least --
25        THE COURT:  You think that's a reasonable time on

1    the other issues?

2         MR. FRANK:  Well, I think the first question is

3    whether Mr. Weinberg intends to narrow some of these

4    requests.  And then assuming he's willing to do that, then,

5    you know, I do need to be calling people overseas, multiple

6    different parties, apparently, so I'm going to need some time

7    for that.  But I don't think late next week would be a

8    problem.  But I think the antecedent question is whether

9    there's going to be any narrowing or whether we're just --

10        THE COURT:  Well, I think as to the three witness,

11   I'm not sure what --

12        MR. FRANK:  That I understand.

13        THE COURT:  Right.  But as to the documents, so

14   we're clear, I'm not ordering you to make any phone calls, at

15   all.  I'm simply observing the various issues.  And it seems

16   practical to do that.

17        In terms of like narrowing or not, I'm not ordering

18   anyone to do anything, so I'm taking a view of that.  I'm not

19   ordering Mr. Weinberg to narrow it, but I'm not saying -- you

20   know, is it prudent to be narrow?  Of course.  Because to the

21   extent you narrow, you make it easier for the target of the

22   subpoena to comply and it's simpler.  I think you appreciate

23   that general proposition.

24        As to whether, you know, what you want to do about

25   it or not, that's, in the first instance, up to you.  You

1    could decide:  You know what?  I'm not making the phone

2    calls, unless you narrow it, Mr. Weinberg.  That's a free

3    choice for you to make.  And I'm not -- since I'm not

4    ordering anything at the moment, I'm not ruling on whether --

5    narrowing or not.  But you know, that's up to --

6              MR. WEINBERG:  I can say what I'm going to do.  I'm

7    going to prioritize a list of things that I think that

8    Mr. Frank could easily get.  I'm not going to narrow it, if

9    narrowing it means waiving my other requests through the

10   letters rogatory process or my primary request, which is the

11   Government ought to use MLAT.  And if they don't, I am

12   reserving my request that this Court exclude or limit the

13   testimony of the witnesses --

14             THE COURT:  I'm not -- I haven't ruled on any of

15   the motions, so you don't -- so that's --

16             MR. WEINBERG:  And I also want to reserve any right

17   to seek a continuance if I find out, through any course, that

18   these letters rogatory will be answered, but answered

19   promptly, but not by June 4.  But I can't particularize that

20   at this point.

21             THE COURT:  Nobody is waiving anything by --

22             MR. WEINBERG:  Thank you, Judge.

23             THE COURT:  -- whatever they're doing or not doing.

24   And you're all free to -- everybody knows how to file motions

25   for reconsideration, and so you're all free to seek

1    reconsideration of anything that I've already ruled upon, and
2    you're all free to seek the same relief -- no relief that
3    I've given or not given in this case or any other case is
4    ever without prejudice to changing that based upon new facts,
5    new evidence, new circumstances.  And so you all can do
6    whatever you do about all that, as I'm sure you would do,
7    anyway.
8              All right.  So do you want to come in the end of
9    next week or file something?
10             There are two different questions.  So on the
11   second topic, the other issues, is the end of next week a
12   sensible time, both of you think?  Or is that too early?
13             MR. FRANK:  The other issues being the timing of --
14             THE COURT:  Like he was talking about witness
15   lists.
16             MR. FRANK:  I think we've had one preliminary
17   conversation.  I'm optimistic.
18             THE COURT:  You should talk a little bit more about
19   it.
20             MR. WEINBERG:  I think we'll be able to work it
21   out.
22             THE COURT:  So if you need something on that, when
23   and if you do, call Maria and just say, "We would like to
24   have a status," on whatever it's about.  And if you think
25   it's useful to file something, fine.  But if not, you think

1    it's fine, just you want to talk about it, that's fine, too.

2    And whenever you want to do that, I'll do that.

3             As to these issues, you want to file a status

4    report in writing, or do you want to come in?  And when as to

5    either?

6             MR. FRANK:  I would say we need at least a week,

7    maybe a little bit longer.  So --

8             THE COURT:  I would think that -- like end of next

9    week, the beginning of the following week, either for a

10   status report or coming in.  I'm fine either way.

11            MR. WEINBERG:  The only reason that I would ask the

12   end of next week, other than, I think, as the case gets

13   closer, having the information gets more important, is that

14   I've got to be in the District of Puerto Rico on a public

15   corruption case on the 11th, afternoon of the 11th, coming

16   back the 13th.

17            THE COURT:  All right.

18            MR. WEINBERG:  So I didn't want those dates to

19   interfere with the Court's schedule.

20            THE COURT:  So how about, are you both here on the

21   6th?

22            MR. WEINBERG:  Yes, your Honor.

23            MR. FRANK:  Yes.

24            MR. WEINBERG:  That good?

25            THE COURT:  Okay.  6th at 2 o'clock.

```
 1                    MR. WEINBERG:  Great.

 2                    THE COURT:  Mr. Johnston, you're always welcome to

 3          come in person, but you're also welcome to come by telephone

 4          to something like that, if you prefer.

 5                    MR. FRANK:  I fear that after what I did today,

 6          Mr. Johnston is never coming back.

 7                    MR. JOHNSTON:  Thank you, Your Honor.

 8                    THE COURT:  Well, the relationships --

 9                    MR. FRANK:  Actually, Your Honor, I'm sorry, I'm

10          not here on the 6th.

11                    THE COURT:  Okay.  How about the 5th?

12                    MR. FRANK:  Yeah, I --

13                    THE COURT:  You're away all week?

14                    MR. FRANK:  It's a last minute family vacation that

15          I forgot about.

16                    THE COURT:  That's fine.  I think, for fear of

17          after what you've done today, I don't think Mr. Johnston is

18          going to stand up and say, "Judge, don't worry, I'll cover

19          for him."

20                    MR. FRANK:  Why don't we file something on the 4th.

21                    And then when are you going?  You're gone the 11th

22          to the 13th?

23                    MR. WEINBERG:  Yes.

24                    MR. FRANK:  And if we feel we need to come in, we

25          could come in like the 10th.
```

1          THE COURT:  Let me just see one thing about the

2     10th.

3          Yes, I could fit you in if I had to.

4          So file something on the 4th, and tell me on the

5     4th if you want to come in on the 10th in the filing.  If

6     either one of you wants to come in, I'll see you.

7          (Discussion off the record.)

8          MR. WEINBERG:  Could we have a time, perhaps, at

9     the end of the day on the 4th, just to see the Court?

10    Hopefully, we don't need to see the Court because we've

11    worked out the scheduling.  But I hate to have it go to

12    within --

13         THE COURT:  It's hard to see you the end of the

14    4th.

15         MR. FRANK:  Your Honor, I'm happy to come in on the

16    4th at any time.  I just want to make sure that we have time

17    to --

18         THE COURT:  The problem with the 4th is there's a

19    BBA bench bar here at the courthouse that I'm on a panel, and

20    I don't know -- I think it might be 3:00 to 5:00.  I could

21    see you in the -- you know, any time between the beginning of

22    the day and 2 o'clock.

23         MR. WEINBERG:  I think 12 o'clock is good.

24         MR. FRANK:  Sure.

25         MR. WEINBERG:  12 o'clock, Your Honor?

1              THE COURT:  Sure.

2              MR. FRANK:  That's to revisit these issues?

3              MR. WEINBERG:  To really, if we need, on the

4     scheduling.  Because that's actually 60 days before trial.

5              THE COURT:  Scheduling of what?

6              MR. WEINBERG:  If Mr. Frank and I cannot resolve

7     the exhibit lists, witness lists, tapes, transcripts, all of

8     the different issues connected with preparing for the trial

9     and need it to --

10             THE COURT:  I think the two of you need to talk

11    about that with each other.

12             So wait.  On the issues that we're here today,

13    you're going to file something some time on the 4th.  And if

14    you want to see me, you'll see me on the 10th.  Is that what

15    you're saying about that?

16             MR. WEINBERG:  That would be fine.

17             THE COURT:  All right.

18             MR. FRANK:  I would suggest we save everything

19    until the 10th.

20             THE COURT:  So if you want to see me on the 10th,

21    on the things related to this case, you will say on the

22    filing on the 4th, "Can we see you on the 10th?"

23             MR. FRANK:  Yes.

24             THE COURT:  And then I'll schedule it.  Otherwise,

25    we won't have it on the 10th.

1          As to the other issues, all the other issues, why

2     don't you -- is it really going to impact you if we didn't

3     resolve those until the 10th?

4          MR. WEINBERG:  It's -- quite frankly, my problem

5     is -- and again, Mr. Frank and I have worked on other issues,

6     and I have some degree of optimism we can reach a consensus.

7     But with this many documents, this many tapes, this many

8     transcripts, you know, I'm looking for some production

9     60 days before trial, and the 10th is within that 60 days.

10          MR. FRANK:  He's not going to be getting any

11     production 60 days before trial.  So you know, we're a week

12     away from that or ten days away from that time.

13          THE COURT:  And you're not planning to do it.  You

14     don't have it presently underway.

15          Why don't you talk to each other.  Why don't you

16     make a request to him, tell him what you're thinking about,

17     what you want to talk to each other.  And if you -- and I

18     just like whatever the issue is, to be joined with each

19     other.  In other words, he knows what you want for the

20     schedule.

21          MR. WEINBERG:  I think he knows.  And it's a

22     witness list and evidence regarding foreign witnesses, so if

23     I need to go and hire someone in Britain to go investigate

24     somebody.

25          THE COURT:  Why can't we do it on the 10th?  What's

1     the difference between the 10th and the 4th?

2          MR. WEINBERG:  Just six days, where I don't know

3     whether the Court is going to order something.  I'm sitting

4     there with 1,400,000 documents, many are e-mails.  I know

5     some of the Government witnesses.  Clearly the two

6     co-conspirators are high on Mr. Frank's scorecard.  But there

7     may be other witnesses that I have 8,000 e-mails for, and I

8     don't want to be spending my time reading those 8,000, if

9     Mr. Frank is going to be calling several other witnesses.

10    It's just an enormous challenge for both sides to properly

11    prepare the case.  I don't think it's unfair for me to

12    seek --

13          THE COURT:  Fine.  I'll see you on the 4th at noon.

14          As to the -- the issues for today will -- you can

15    just file something, if you want.  And if I need to see you,

16    I'll see you on the 10th about that.

17          As to these scheduling issues, I'll see you on the

18    4th to talk about them, if they're not resolved.  And it

19    would be helpful to me, if they're not resolved, but some

20    time Tuesday, the end of the day, or whenever, Tuesday, so I

21    could read it Wednesday morning, you just tell me these

22    are -- like this is what -- just without briefing, but you

23    want this.

24          MR. WEINBERG:  Got it.

25          THE COURT:  And the Government says a different

1    schedule, whatever.

2              MR. WEINBERG:  Thank you, Judge.

3              THE COURT:  Okay.  We're adjourned.  Thank you very

4    much.

5              THE DEPUTY CLERK:  All rise.  This matter is

6    adjourned.

7              (Court in recess at 3:08 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4        I, Rachel M. Lopez, Certified Realtime Reporter, in

5   and for the United States District Court for the District of

6   Massachusetts, do hereby certify that pursuant to Section

7   753, Title 28, United States Code, the foregoing pages

8   are a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13                    Dated this 7th day of January, 2019.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20  _____

21                    Rachel M. Lopez, CRR
                      Official Court Reporter

22

23

24

25