```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3   - - - - - - - - - - - - - - - - - - x

 4   UNITED STATES OF AMERICA,              :

 5          Plaintiff,                      :    Criminal Action No.
                                                 1:16-cr-10094-LTS
 6       v.                                 :

 7   ROSS MCLELLAN,                         :

 8          Defendant.                      :

 9   - - - - - - - - - - - - - - - - - - x

10

11        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                          STATUS CONFERENCE
13

14
                       Tuesday, April 24, 2018
15                            2:10 p.m.

16

17

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom No. 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25
```

1                          **A P P E A R A N C E S**

2       On behalf of the Plaintiff:

3            UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
             BY:   STEPHEN E. FRANK
4            John Joseph Moakley Courthouse
             One Courthouse Way, Suite 9200
5            Boston, Massachusetts  02210
             (617) 748-3244
6            stephen.frank@usdoj.gov

7
             UNITED STATES DEPARTMENT OF JUSTICE
8            BY:   WILLIAM JOHNSTON
             1400 New York Avenue, Northwest
9            Washington, D.C.  20005
             (202) 514-0687
10           william.johnston4@usdoj.gov

11

12      On behalf of the Defendant:

13           MARTIN G. WEINBERG, P.C.
             BY:   MARTIN G. WEINBERG
14           20 Park Plaza
             Suite 1000
15           Boston, Massachusetts  02116
             (617) 227-3700
16           owlmcb@att.net

17
             LAW OFFICES OF ROBERT M. GOLDSTEIN
18           BY:   ROBERT M. GOLDSTEIN
             20 Park Plaza
19           Suite 1000
             Boston, Massachusetts  02116
20           (617) 742-9015
             rmg@goldstein-lawfirm.com

21

22

23

24

25

**P R O C E E D I N G S**

1

2        (In open court.)

3        THE DEPUTY CLERK:  The United States District Court

4   for the District of Massachusetts is now in session, the

5   Honorable Leo T. Sorokin presiding.

6        Today is April 24th, the case of United States v.

7   Ross McLellan, criminal action 16-10094, will now appear

8   before this Court.

9        Counsel, please I've themselves for the record.

10       MR. FRANK:  Stephen Frank and William Johnston for

11   the United States.  Good afternoon, Your Honor.

12       THE COURT:  Good afternoon.

13       MR. WEINBERG:  Good afternoon.  Martin Weinberg

14   with Rob Goldstein, on behalf of Ross McLellan.

15       MR. GOLDSTEIN:  Good afternoon.

16       THE COURT:  Good afternoon.

17       All right.  So I saw you filed two motions

18   yesterday.  Any -- before we get to those, any updates on

19   anything that either of you want to report or --

20       MR. FRANK:  Not much by way of updates from us,

21   Your Honor.  We have been in further contact -- I think the

22   last time we were here, there was one of the Irish victims

23   that we had not been able to make contact with.  I did make

24   contact with that victim.  I forwarded a list of documents

25   that Mr. Weinberg had provided and that he was seeking in

1    priority order, the document requests in priority order, and

2    I have not heard back.  We've been playing a little bit of

3    phone tag.  So I expect that I will hear back at some point.

4    But they were considering that request.

5            The other Irish victim has not responded to

6    multiple inquiries on our part.

7            THE COURT:  One question that I had for context is,

8    in the course of all the documents that you've produced or

9    made available, in some form or another, to the defense, do

10   those include documents from each of the victims?  Or are

11   they documents -- they are certainly documents from State

12   Street, right?

13           MR. FRANK:  Correct.

14           THE COURT:  And some of those may have derived

15   originally -- you got them from State Street, but they came

16   from the victims.  Maybe.

17           MR. FRANK:  Well, they're -- the overwhelming

18   majority of the documents that we obtained in the course of

19   our investigation and produced to the defense, were documents

20   that we obtained, directly or indirectly, from State Street.

21   Necessarily, those include communications between State

22   Street and the victims.

23           THE COURT:  Yes.  Okay.

24           MR. FRANK:  With respect to the -- we never

25   subpoenaed or issued letters rogatory to -- or pursued MLATs

1    to the foreign victims.  There are a couple of stray

2    documents that we received on a voluntary basis that were

3    turned over, but not in the -- not in the way of a large

4    production from any of those.

5              With respect to the more recently charged domestic

6    victim, there was a production of about 58,000 documents that

7    we received, 58,000 pages that we received from that victim,

8    that we turned over to the defense.

9              THE COURT:  And at the trial, do you anticipate

10   witnesses from each of the victims?

11             MR. FRANK:  Not from each of the victims, but from

12   several of the victims.

13             THE COURT:  From several victims.

14             MR. FRANK:  Now, what I will say, Your Honor, is

15   that since the first time we had this conversation, a couple

16   of months ago or six weeks ago, the defense has received a

17   fair number of documents.  And in fact, two weeks ago, the

18   defense received a production from the City of London police,

19   which is itself comprised of productions from a number of the

20   entities in the UK from which they sought documents.

21             They have been reviewing those documents for the

22   past two weeks.  They've notified the Court that some of

23   those documents are of interest to them.  We just, today,

24   received from the defense a thumb drive containing those

25   documents.  We don't know what's in there.  They've also

1   received a production of documents from the victim in the

2   Netherlands.

3            THE COURT:  The ones they referred to in their

4   motion.

5            MR. FRANK:  Correct.

6            So relative to where we are were when we started

7   having these discussions, there are tens of thousands of

8   pages of materials that the defense is now in possession of,

9   that they were not in possession of.

10           With respect to the three witnesses, who's

11  testimony they want to take, we are essentially in the same

12  place we were, except that there's the additional fact, which

13  I think I mentioned to the Court last time, that the

14  Government is in a similar position.  There's at least one

15  witness that we wanted to call, who has not agreed to come

16  over here and testify, nor has that witness agreed to a

17  voluntary taking of her testimony in London, nor has she

18  agreed to appear by video.  So both --

19           THE COURT:  Can you MLAT a witness?  In other

20  words, can you invoke the MLAT to take testimony either by

21  deposition or videoconference?

22           MR. FRANK:  I think we could invoke the MLAT to

23  take testimony, at least in the same way that, if we received

24  a Rule 15 deposition order from this Court, I think we could

25  probably invoke the MLAT process.

1          THE COURT:  And then take the deposition over

2     there.

3          MR. JOHNSTON:  Correct.  I don't think we can force

4     the defendant -- a witness to come here.

5          THE COURT:  Okay.  So that would be your remedy, so

6     to speak, for the person that you point out, if you decided

7     that there was a basis for a Rule 15 order and a basis for an

8     MLAT request, and if you thought that there was enough time

9     and it was important enough in terms of the work involved,

10    and what have you, all of those very different --

11         MR. FRANK:  It's a theoretical remedy, Your Honor,

12    but it's not a practical remedy.  Because we have a trial

13    date.

14         THE COURT:  Right.

15         MR. FRANK:  And we believe we should stick to that

16    trial date.

17         THE COURT:  Right.

18         MR. FRANK:  And so my point is only that we are

19    similarly situated.  We have a trial date, and we can't get

20    the victim -- the witness to come here to testify.  We can't

21    get the witness to testify there.  So we're without that

22    witness.

23         THE COURT:  Okay.  Anything you want to add,

24    Mr. Weinberg?

25         MR. WEINBERG:  Just several things.  I'll be short.

1    One, we're really not similarly situated, since the

2    Government, at any time in the past -- since 2015, when they

3    started the investigation, had the unilateral ability to rely

4    on MLATs to get testimony, certainly squarely within the MLAT

5    procedure.  They chose not to.  They could have gotten

6    documents.  They could have gotten testimony.  They chose to

7    rely on State Street as an almost exclusive source of the

8    evidence that's been provided.

9              MR. FRANK:  I don't want to interrupt, Your Honor,

10   but I'm going to, just briefly, to correct one thing.

11             We are similarly situated.  In fact, Mr. Weinberg

12   did seek letters rogatory, did obtain letters rogatory, to

13   obtain testimony from two of the very same witnesses he now

14   wants us to go get an MLAT to take testimony from, again.

15   Had he sought to take their testimony one time, in a Rule 15

16   deposition, for purposes of both proceedings, he would have

17   that testimony now.  But he made a tactical decision not to

18   do that.  And now our position is he needs to live with the

19   consequences of that tactical decision.

20             MR. WEINBERG:  To equate letters rogatory and MLATs

21   is farfetched, given our joint --

22             THE COURT:  So just to clarify one thing, (a), I

23   think it's irrelevant -- I'm going to decide the motions that

24   are presented to me.  And as a general proposition, the

25   Government and the defendant in criminal cases aren't

similarly situated.  The Government has certain positions.
It's not like a civil case over money damages.  And the
Government has certain rights and obligations that the
defense doesn't have, and the defense has certain rights that
it can advance that don't really apply to the Government.  So
you're different.

Second, though, with respect to the more narrow
question to which Mr. Frank is referring to, which is
acquiring evidence, the question isn't -- I'm not going to
determine whether you're similarly situated or not, because
I'm not sure what -- I understand why you make the point, in
atmospheric or sense, Mr. Frank, but I don't know that it
bears on the legal question.

The legal question is you've asked for certain
things, and are you entitled to those.  And to the extent
they are discretionary, should I exercise the discretion,
given all the factors, to award that relief or not.  And if
the Government is not handicapped or is handicapped, I don't
know that it advantages or disadvantages.  But as to these
two particular witnesses -- so I don't know where -- I
understand your point, but I don't know that it makes a
difference.

MR. FRANK:  If I can just make one narrow addendum
to the point.  I understand what the Court is saying.  But we
are similarly situated in one sense, which is that I could

1    have, some time ago, sought an MLAT to take the testimony, to

2    compel the testimony of this witness.  I didn't do that, and

3    now I'm living with the consequences of that decision, which

4    is that I have a June trial date, and I'm not going to have

5    her testimony.

6              Similarly, Mr. Weinberg, a year ago, more than a

7    year ago, made a decision to seek letters rogatory to compel

8    the testimony in the civil proceeding of two former State

9    Street lawyers in the United Kingdom.  He made a tactical

10   decision not to seek their testimony in this case.  But now,

11   having taken their testimony in the civil proceedings, on the

12   eve of trial, he wants to compel us to go get it for him or

13   delay the proceedings so he can go get it again.  And that is

14   a way in which we are similarly situated.  He made a decision

15   not to take an earlier --

16             THE COURT:  Perhaps.  But it isn't -- it isn't the

17   similarly situated that I understood you to be referring to

18   before.

19             MR. FRANK:  Well, we both have witnesses overseas,

20   whose testimony we'd like to take.  We didn't seek to get it

21   compelled earlier, and now we need to live with the

22   consequences.

23             MR. WEINBERG:  Well, there's three differences.

24             One is, Mr. Frank knew I was taking the

25   depositions, could have moved to join them.

1          Second of all, I didn't know anything about this

2     witness that Mr. Frank wants to call.

3          Three, we do know there's going to be witnesses

4     from the Irish client.  Only the Government has the right to

5     ask the prosecutors in Ireland to honor a request for letters

6     rogatory.  Or the Irish government has told us through our

7     Irish counsel, if Mr. Frank, if the US Attorney, Department

8     of Justice asks for this information, then your letters

9     rogatory will be implemented through our process.

10          THE COURT:  You mean asks for it in the form of an

11     MLAT request?

12          MR. WEINBERG:  Yes.

13          THE COURT:  Or just asks for it generally?

14          MR. WEINBERG:  Via an MLAT.

15          MR. FRANK:  I don't have that right to do that on

16     behalf of the defense.  I have the right to do that on behalf

17     of the Government in a prosecution.

18          THE COURT:  He's saying what they're saying, which

19     is it may be that -- I'm not saying that this is the case,

20     but what I understand him to be saying is that the Irish

21     government takes the position that they won't honor a letters

22     rogatory request, unless there is an MLAT request coming by

23     bay of the prosecuting authorities.  It may be that you

24     don't -- maybe, maybe not, I haven't decided, but that you

25     don't have the authority to ask for that.

1          But even if you don't have the authority to ask for

2     that, it doesn't mean that the Irish government, operating

3     under Irish law, doesn't take the position that that is a

4     necessary precondition to the enforcement in Ireland of a

5     letters rogatory.  I'm not saying it is.  But what I

6     understand him to be making here is not an argument about

7     your authority to ask for it, as much as what their position

8     is as to whether they can act on the --

9          MR. WEINBERG:  But it's also about the Government's

10    authority.

11         MR. FRANK:  Our position is that the Irish

12    government would not respond to an MLAT request, were they to

13    understand that we were simply a mouthpiece of the defense

14    making that MLAT request.

15         MR. WEINBERG:  But the Government is a mouthpiece

16    for the interest of justice.  I understand asymmetry when

17    they're investigating, but to ask for this Irish treasury, a

18    critical client, one of the substantive counts, two witnesses

19    on the Government witness list, to ask for them to produce

20    documents that will assist the trier of fact to understand

21    whether a client is guilty or innocent is not being a

22    mouthpiece for the defense.  It's discharging the

23    Government's obligations, that only they can discharge, to

24    provide evidence that gives us a fair trial.

25         MR. FRANK:  That's not true, Your Honor.

1     Mr. Weinberg doesn't know what's in those documents.  He

2     can't represent to this Court that there's anything in those

3     documents that would be of assistance to the defense or

4     assistance to the Government.  He simply wants to go on a

5     fishing expedition and see what's out there.  And the

6     Government is never under an obligation to assist the defense

7     to go on a fishing expedition.

8             MR. WEINBERG:  You're assisting the Court in

9     providing documents that, in the ordinary case, when the

10    Government is calling witnesses from a company and claiming

11    they're a victim, they would have the company's documents.

12             This is an unusual case, where the Government

13    allowed State Street, in essence, to be the source of the

14    investigation.  And we should not be denied those documents

15    from that client.

16             What I can say to the Court is, having gotten

17    documents from one of the UK clients through the letters

18    rogatory process, they're enormously helpful and important.

19    We've set out some of the general reasons in our motion for

20    continuance.  I have every reason to believe that the Irish

21    documents would be just as material and just as exculpatory

22    on the various issues, such as with whether or not the

23    revenues that the Government says are the undisclosed fees,

24    were really material to the client in terms of what their

25    alternatives were, what the other companies were proposing.

1    And that's a critical issue.

2        MR. FRANK:  As a matter of law, Your Honor, that

3    has nothing to do with materiality.  So we can do away with

4    that argument right now.  Whether they could have gotten the

5    services from somebody else for a different price has no

6    bearing on whether the decision to engage in this

7    transaction, at this price, with this bank, was materially

8    influenced by the representations before made.

9        MR. WEINBERG:  Of course it is.  If three other

10   banks were charging $100, and State Street is charging 20,

11   and when you add $10 for extra, unknown fees, they would have

12   gotten the deal for $30, they would have chosen State Street.

13   And the proof is almost every one of their six clients went

14   back to State Street, after the deals that the Government has

15   criminalized, for further transitions, knowing how much the

16   prior deals cost them.  They didn't know the breakout, how

17   much State Street got.  Rather --

18        THE COURT:  Maybe it shows that they thought that

19   now that State Street had been prosecuted by the United

20   States Government and that two high-level employees had

21   been --

22        I assume, upon the indictment, that was the end of

23   Mr. McLellan's work.

24        MR. WEINBERG:  This was before, Your Honor.  This

25   was during the 2011 period.  Many of the Government victim

1    clients went back to State Street, asked State Street for

2    further proposals.  Some hired State Street to do further

3    transitions before the press blew this up.

4              Now, Mr. Frank may say --

5              THE COURT:  But I guess there's two different

6    questions.  One question is whether the jury decides, in the

7    end, that these alleged misrepresentations charged in the

8    indictment were material or not.  Right?

9              MR. WEINBERG:  Yes.

10             THE COURT:  That's going to be a question that the

11   jury is going to have to decide.  And the second question --

12   and that's not one -- neither of you are asking me to take

13   materiality from the jury, right?  Isn't that an element of

14   the offense?

15             MR. FRANK:  That is an absolute element of the

16   offense, Your Honor.

17             MR. WEINBERG:  Yes.

18             THE COURT:  So the question of whether a piece of

19   information is relevant, that the jury can consider in making

20   its materiality determination, is a different question.  And

21   I think the question we have here, I would think that price

22   seems like the kind of thing that, in most transactions, is a

23   relevant and material consideration.  But that would be for

24   the jury to decide.  But whether they were -- cared about the

25   price or whether they were more focused on quality or service

1    or the amount of money at the end, or other things in these

2    transactions, will be what the evidence is for the jury.

3    Whether there's enough -- what you're really saying --

4         Are we arguing the motion to continue now?  I'm not

5    quite clear what, at this point, we're arguing.

6         MR. WEINBERG:  It's a combination.  I've asked Your

7    Honor to issue the orders for the MLATs in Ireland, which

8    I've asked for.  It's also relevant to the continuance

9    motion, because we are seeking and expect to get further

10   information.

11        THE COURT:  So let me just frame a couple things,

12   so we can keep this more little focused.

13        With respect to the MLAT motions, I understand

14   what, as a general matter, you are seeking and what the legal

15   positions are.  And I think I heard argument from you

16   previously on those motions.  I'm of the view that I need to

17   decide those motions, and for whatever the decision is.  But

18   I need to decide those.  I think that, at this point, that

19   makes the most sense.

20        And the last time I saw you I think I said I was

21   going to proceed to probably decide them.  I certainly wasn't

22   going to hold them in abeyance, and I haven't held them in

23   abeyance.  But I -- well, anyway, the fact of the matter is,

24   I haven't done it yet.  But I do think I need to do it soon.

25   So I need to resolve those motions, and I will do that.

1        If there's a particular point that either of you

2   want to make with respect to those motions, beyond simply

3   that either it's -- the stuff underlying that you're seeking

4   is really important and matters to you, and therefore, you --

5   that -- to the extent that it's relevant to the legal

6   analysis to consider, I have that point.

7        And to the extent the point is that, really, this

8   isn't -- even though materiality is an element of the

9   offense, it's a materiality of the transaction, and this

10  information from the victims isn't really that material.  So

11  in a sense, I can cut it off at the pass, putting aside the

12  question of MLAT authority and the like because none of this

13  really matters, I got that.

14       I understand your points.  And you've articulated

15  them in the papers, too, and so you don't really need to

16  reiterate to those.

17       So one, I'll do that.  If there's something else to

18  add that hasn't been said before, that you just feel like you

19  need to emphasize or update in light of what's transpired

20  since I heard from you before on the MLAT, I'll hear that

21  now.  Otherwise, I'd say I'll take the MLAT motion under

22  advisement, and I will issue something promptly.

23       MR. WEINBERG:  And we jointly agree to submit it on

24  the papers.

25       MR. FRANK:  Yeah.  We have nothing further to add

1    to what we've said and what we say in our papers on that

2    particular motion, Your Honor.  I would say that, and I know

3    the Court understands this, we've already made disclosures to

4    the defense last week.  Three days later, the defense filed a

5    motion for a continuance.

6          THE COURT:  This is the continuance issue.  Let me

7    pause.  Okay.

8          The next issue is -- it seems to me there's two

9    other issues.  There's two motions that you just filed.

10   Those are the three things, if you will --

11         MR. FRANK:  Correct.

12         THE COURT:  -- on my docket, to speak of in this

13   case.

14         MR. FRANK:  Correct.

15         THE COURT:  So let's circle back.  As to the

16   questionnaire, which is, in a sense, independent of his

17   motion for a new trial, I understand from the conferral

18   certificate that you oppose.  And my question is, do you just

19   wish to be heard on it, or do you wish to issue a written

20   opposition?  Or do you briefly want to tell you what your

21   view is and then --

22         MR. FRANK:  I can briefly tell you what our view

23   is.  And if it would be helpful to the Court, we are

24   certainly happy to issue a written opposition first.

25         THE COURT:  Why don't you do that.

1          MR. FRANK:  We reviewed the proposed questionnaire

2     before it was submitted to the Court or pursuant to the

3     defense potion.  We believe there are a number of questions

4     on there that are simply standard background questions that

5     the Court always asks.  We don't believe those need to be

6     submitted to the jury by way of a questionnaire.

7          We believe there are a number of other questions on

8     there that are not particularly relevant, that are sort of

9     prejudicial in the very nature of the question.  But for

10    example, there's a question on there about whether the

11    members of the jury have -- have ever had an account at a

12    credit union.  It's hard for me to conceive of the relevance

13    of whether the witness -- the jurors have ever had a credit

14    union account, to the trial of an executive at a --

15          THE COURT:  Let me ask you this question.  I will

16    say that the relevance of the credit union question eluded

17    me.

18          But rather than -- before you get to the particular

19    individual questions, just as to whether, whatever the scope

20    is, there should be a questionnaire or not.

21          MR. FRANK:  We don't think there needs to be a

22    questionnaire.  What I was going to say, Your Honor, is to

23    the extent that there are three or four questions on there

24    that we don't have a particular objection to, there's no

25    reason that those require a questionnaire.  Those are

1    questions that a Court could easily ask in an ordinary voir

2    dire.

3            THE COURT:  So my question to you, Mr. Weinberg --

4    I would group your questions into three categories.  Some are

5    like -- they would ordinarily be asked.  Some are -- like I

6    would be happy to from you, not at the moment, but I would be

7    happy to hear from you on whether to ask them or not -- like

8    credit union, I don't really see what that has to do with

9    this case, but I'm sure you have a reason.

10           MR. WEINBERG:  I do.

11           THE COURT:  And so third are some that are not

12   standard questions, but seem like the kind of questions, or

13   touch upon topics, even that might not ask it the way you

14   posed, framed it there, they are the kind of topics that

15   likely would come up or reasonably would be discussed to be

16   asked in a case like this.

17           But the fundamental question is, why would I not do

18   this in the ordinary way of asking, as we typically do,

19   questions of the venire, and then individual voir dire, where

20   they come up and I'll ask them individual questions --

21           Let me step back, since neither of you --

22           What I would ordinarily do in most cases, what I've

23   done in every case, save one, is ask the venire general

24   questions, where people raise their hand to respond.  It's a

25   format with which I'm sure you're familiar.  And then I would

1    bring up to sidebar any person who answered yes.  And maybe

2    if you wanted any person -- I would tell people, "If you

3    didn't raise your hand but you want to come up, you cam come

4    up."

5              At sidebar, I would ask follow-up questions about

6    the things that they had raised their hand about, and then I

7    would permit both of you to ask reasonable follow-up

8    questions about the topics that were put in play about what

9    they spoke about at sidebar.

10             And then I would send them back, and then

11   eventually seek, depending on whether it's one or two rounds,

12   alternates and jurors, separate or not; but say if we're

13   doing them separately, as the rule suggests, 12 jurors, I

14   would ask them all what they do for work, what their spouse

15   does, to the extent you don't know and haven't heard from

16   them.  And then you would do your peremptories, and we would

17   do round by round, no back-strikes, and then do the second.

18             I'm sure you have done something like that.

19             MR. WEINBERG:  Yes, I have.

20             THE COURT:  Since I've copied it from others.

21             MR. WEINBERG:  Regularly.

22             THE COURT:  So given that, why not do it that way?

23   Why do I need to do a questionnaire?

24             MR. WEINBERG:  (A), I think that when jurors get a

25   questionnaire and have some time to reflect and to write out

1    an answer, to the extent it's not a yes or no, you're going

2    to get a more accurate and affirmative statement.  Whereas

3    jurors sometimes don't want to raise their hand, they don't

4    want to speak, they may be hesitant to speak.  Some of these

5    topics are personal:  Have you suffered financial losses?

6    Feelings about the industries.  And this is a case that

7    carries with it a significant amount of potential prejudice.

8    People have suffered through the 2008 and '09 recession.

9         THE COURT:  Right.  But this case, it's not a

10   mortgage case.  This isn't like a bank that -- I don't recall

11   any cases -- I've had a lot of mortgage cases, but I don't

12   recall any with State Street.  Maybe they have been in cases,

13   and I don't recall.  But they're not a company whose staple

14   business was mortgages and lending mortgages or mortgage

15   servicing.  They're not an investment banking house whose

16   name is tied to the 2008 meltdown.  And so this case itself

17   is not about retail transactions or investment banking

18   transactions.  The transactions at issue in this case are --

19   so people might have some initial financial industry bubble

20   or, you know, quick response to that, but as they hear about

21   the case, it is not about that.

22        MR. WEINBERG:  I think it's about whether power is

23   open and transparent with clients and customers.  And there's

24   a -- people walk in, and they have an inherent bias that

25   banks can't be trusted, bankers can't be trusted, people

1    dealing in Wall Street can't be trusted, and it's hard to get

2    to the bottom of it.  And yet that drives people's

3    predispositions about receiving the evidence.

4              And it's a lot of inherent issues to the criminal

5    justice system, prosecutors, you know, defense lawyers,

6    people charged with crime.  I have not asked any of that.

7    I've really stripped this from questionnaires that I've asked

8    judges and judges have given.

9              But this is -- I've tried to narrow it down to

10   areas where people will come in, not biased against

11   Mr. McLellan because of publicity, but having serious

12   feelings about banks, bankers, brokers, Wall Street, that

13   will be focused on whether or not they give Mr. McLellan his

14   presumption of innocence to start a criminal trial.

15             I also say that there's no prejudice to the

16   Government or to the justice system.  Questionnaires like

17   this may actually provide the Court and provide the parties

18   with a better predicate to exercise peremptory challenges and

19   a better predicate to know when there's the potential for

20   cause challenges that should have a court ask further

21   questions.  This is not a great burden.  This is not like

22   other questionnaires.

23             THE COURT:  Right.  But partly I'm wondering --

24   it's not clear to me that, to the extent there's the kind of

25   prejudice that you suggest, or potential prejudice that you

1    suggest, it's not clear to me that a questionnaire, these

2    questions, necessarily, ferret that out.  It might be more

3    successfully --

4         Well, first, my experience is, as to certain

5    things, especially about topics that are not as loaded as,

6    say, discrimination charges, people are fairly open in what

7    they're unhappy about and not shy about expressing it.  And

8    this isn't like a case where someone would -- in order to be,

9    quote, biased, would be admitting to some sort of

10   discriminatory prejudice that is viewed often as socially

11   unacceptable.  So it seems to me, to the extent it needs to

12   be addressed, it's addressed just in the ordinary voir dire.

13   I mean, that's the way I would be thinking about it.

14        MR. WEINBERG:  I just think the questionnaire

15   process, Judge, helps jury selection, helps fair and

16   intelligent cause and peremptory challenges.  I don't see it

17   as a great burden.  I can't represent that this case is

18   unique.

19        THE COURT:  I understand.

20        MR. WEINBERG:  It's not unique.  There's no

21   publicity, there's no civil rights issues.  But there's not a

22   great burden on using a tool that other judges have used on

23   white collar cases that help each party identify people that

24   ought not to be here for a three- or four-week trial.

25        THE COURT:  All right.  Anything about that?

1          MR. FRANK:  To the extent that there are questions

2    that we can agree on, we have no objection to, obviously,

3    those questions being asked the jury.  But I think the only

4    thing that the Court has heard about the reason that we

5    should have a questionnaire in this case is Mr. Weinberg's

6    anecdotal suggestion that maybe jurors give more thought in

7    writing down their responses.  And I would suggest that

8    there's at least as much reason to believe that jurors are

9    more careful when they're answering a question directly to a

10   federal judge, as they are when they are writing down on

11   paper in the anonymity of the jury room.

12          THE COURT:  All right.  I'll about it.  I think

13   what I'll do is take it under advisement.  If I think it's

14   helpful to have you file something in writing, I'll ask you

15   to do that.

16          MR. FRANK:  Thank you, Your Honor.

17          THE COURT:  But at the moment, I think I understand

18   the issues.

19          That brings us to a motion for the continuance of

20   the trial.  So I know you oppose it.  I read it last night.

21   I'm happy to hear you about it.  But I'm also happy to -- I

22   don't want to foreclose anything.  And I'm not telegraphing

23   anything by saying that.  In the ordinary course, people get

24   to file written responses to written motions.  And I'm not

25   requiring you to file a response.  I didn't know how you

1    wanted to do this.

2         MR. FRANK:  Again, similarly, we're happy to do

3    whatever would be most helpful to the Court.

4         We do oppose it.  We think, depending on what the

5    Court does with the MLAT motion, obviously that will have an

6    impact on the continuance motion.  In other words, if you

7    grant the MLAT motion, you're necessarily granting a

8    continuance.

9         But assuming you don't grant the MLAT motion, we

10   oppose a continuance for a number of reasons, one of which is

11   the amount of time that has already elapsed since the

12   indictment of this case.  Witness memories fade over time.

13        Also witness availability becomes more

14   questionable.  We know that our witnesses are available now

15   at the beginning of June.  I can't say whether they will be

16   available at whatever date the Court sets.

17        One thing that I do know is that Mr. Johnston is

18   not available in mid September, which is the date that

19   counsel has suggested.  So we would necessarily either be

20   looking at a date prior to then, when Mr. Weinberg has said

21   he was not available and when a continuance wouldn't really

22   be of help to him, or we would be looking at a longer

23   continuance than that.  And that's a pretty long continuance,

24   given a case that's already this old.

25        So we're happy to reduce that to writing.  And I

1    don't know if there's any other arguments that we'll come up

2    with.  But we'll do whatever is most helpful to the Court.

3              THE COURT:  Okay.  What do you want to add?

4              MR. WEINBERG:  Not much, because we set out the

5    grounds yesterday.  I think Your Honor --

6              THE COURT:  One question that I have is, suppose

7    you persuade me, then how do I know -- there's nothing about

8    the motion for continuance that makes me think that all the

9    reasons that you're advancing now won't apply anew in

10   August or -- in August?

11             MR. WEINBERG:  For this reason, Your Honor.  The

12   second of the two principal grounds for the continuance is

13   our receipt, since the adding of the new charge, which I

14   believe was added on February 7th.  I'm not going to reargue

15   severance, but it did add a series of challenges, new

16   witnesses.  Three of the 14 are directed towards that.

17             THE COURT:  That's why you have Mr. Goldstein right

18   here, right?  You got six.  It's about right.  You got six

19   charges, right?  And Mr. Goldstein can handle one.  I mean,

20   it's not that much heavy lifting for him to do one charge and

21   one count of an indictment.

22             MR. WEINBERG:  We were actually laughing downstairs

23   that we, in a million-and-a-half page, 12,000 audio case,

24   getting 100,000 pages of new documents, about 60,000 from the

25   Government and about 50,000 from State Street, on prior

1   17(c)'s, and we're expecting 20 to 30,000 more on the

2   domestic insurer new 17(c)'s, we're almost anesthetized to

3   what it means to integrate over 100,000 pages in the final

4   month or final two months or final three months of pretrial

5   preparation.  It's a challenge, even to a man of

6   Mr. Goldstein's relentless resources and energies.

7           THE COURT:  So you're withdrawing the motion?

8           MR. WEINBERG:  It's difficult.  I can't say --

9   whenever Your Honor tells us to start trial, we're going to

10  start trial.  But the combination of awaiting new letters

11  rogatory, translating the one we received, I think, last week

12  for one of the clients; getting from the UK the final three

13  or four entities.  And it looks like they're ready to

14  finalize our efforts, which have gone on for over a year, to

15  convince the UK authorities that our requests are focused

16  enough on Goldman and Nomura to get their documents.

17          We're awaiting a UK client that Mr. Frank is trying

18  to get us information on.  We're awaiting the Irish client,

19  that is a pivotal client.  It's one of the three major

20  clients that the Government is relying upon in this case.

21  It's important.

22          When you add what we're expecting over the next

23  month or two, to what we know we're receiving on the domestic

24  insurer, from the domestic insurer and from State Street, to

25  everything else that we've received since the Government

1    added the count and since Your Honor ruled on the 17(c), and

2    since we got the letters rogatory information, it's beginning

3    to filter in and we have to integrate it.

4         We gave the Government an expert disclosure with

5    four experts.  I know the Government gave us their

6    non-witness 3500 and a list of audios.  We're going to give

7    the Government this Friday, whether or not Your Honor grants

8    the continuance, a list of our audios.  We're working

9    collaboratively to have this case fine tuned.

10        But I think that we would be better prepared and be

11   better lawyers, with all of the new information, new charges,

12   and new foreign information, if Your Honor gave us a

13   continuance to August 11, which would permit us to try the

14   case in August before Labor Day.  After Labor Day, if

15   Mr. Johnston is unavailable the last couple of months in

16   September, to start it the first week in October.

17        Mr. McLellan has not caused society any problems.

18        Mr. Frank, in the abstract, fears unavailability.

19   But he's had weeks knowing that we're moving for a

20   continuance, I've told him, to see whether there, in fact, is

21   unavailability.

22        I think the parties really would both be better

23   prepared to try a case in a few months --

24        THE COURT:  So you said that's the second reason.

25   Essentially, what I understand it to be is there's a lot of

1    material received since February, digesting it.

2              MR. WEINBERG:  Yeah.

3              THE COURT:  You prefer to have more time to digest

4    it, and that's why -- but what's the --

5              MR. WEINBERG:  The first reason is we're seeking

6    and expect to receive, whether through the Government's

7    efforts with the Irish client, whether through our own

8    translating the Netherlands materials, whether it's through

9    the UK efforts, which are finally seemingly --

10             And again, we've had foreign lawyers working for

11   over a year, to work on these letters rogatory.  We're

12   finally getting the fruits.  They're important to us.  I

13   expect we'll have more over the next month or two from the

14   UK, hopefully from Ireland, definitely from the Netherlands

15   translations.  I expect the Goldman and Nomura information,

16   now that we've gone back and narrowed again our requests.

17             And you know, I don't know whether we're going to

18   have it on June 3rd, June 5th.  The end of May?  There's a

19   little bit of imprecision.  I'm not in control of the foreign

20   processes.  But we've done our absolute best.

21             And given its importance, I don't know what

22   countervailing consideration outweighs the combination of

23   this huge volume of new materials, the new charge that the

24   Government brought on February 7th, and our continuing

25   receipt and reasonable expectation of receiving even

1    additional materials from the foreign countries.

2              I'd say one more thing, which is the Government has

3    told me, and I have no reason to doubt their sincerity, that

4    they don't expect, currently, to have another alleged

5    co-conspirator as a witness, which might be a witness on the

6    domestic insurer charge.  They've named three witnesses, but

7    none of them are -- they're all, you know, workers.

8              THE COURT:  I don't know what you mean by that.

9              MR. WEINBERG:  Well, I'm concerned that we're going

10   to be a week before trial, two weeks, three weeks before

11   trial, and added to all of these other concerns, the volume

12   of materials --

13             THE COURT:  That there would be someone who is not

14   now named as a co-conspirator, unindicted co-conspirator,

15   would be so named.

16             MR. WEINBERG:  Yeah.

17             THE COURT:  And you don't -- based on your

18   conversations with the Government, don't expect that to

19   happen.

20             MR. WEINBERG:  No.  I --

21             MR. FRANK:  Well, it's not a question of named

22   co-conspirator.  Mr. Weinberg knows who the alleged,

23   unindicted co-conspirators are, I believe.  It's a question

24   of whether there would be another witness.

25             THE COURT:  Whether you would call someone --

1          MR. FRANK:  Correct.

2          THE COURT:  -- who is one of those people who you

3     haven't, so far, indicated that you're going to call.

4          MR. FRANK:  That's correct.

5          THE COURT:  I see.

6          So what you, Mr. Weinberg, don't expect is one of

7     the unindicted co-conspirators, whom you're aware, and is not

8     presently on the Government's witness list, you don't expect

9     that somebody will move from unindicted non-witness to

10    unindicted witness.

11         MR. WEINBERG:  No.  I was inartful, because I don't

12    know where Mr. Frank is at.  He's been candid with me in

13    saying that he doesn't currently expect -- doesn't currently

14    have a co-conspirator witness, other than the two defendants

15    that have pled, probably at least one of them before Your

16    Honor.  But that could almost be the tipping point.  In other

17    words, we're trying to deal with 100,000 documents, and

18    Mr. Frank has reserved the right, over the next four or five

19    weeks, to add another co-conspirator witness, which makes it

20    more difficult, because these witnesses come with dozens of

21    thousands of e-mails.

22         And so it's another concern that I have, as we work

23    through the schedule, in all cases.  But this case is

24    weighty.  Motions in limine, we filed one today with a

25    *Grunewald*, and there will be other motions in limine.  Your

1    Honor wanted the ones we can identify filed not necessarily

2    the last seven days.

3            THE COURT:  What's the --

4            MR. WEINBERG:  Whether or not the Government

5    evidence that came after the end of the six transitions, it

6    was more in the nature of whether or not there was

7    concealment from State Street, you know, could be --

8            THE COURT:  Whether that's admissible.

9            MR. WEINBERG:  Whether it's admissible and under

10   what circumstances, et cetera.

11           THE COURT:  Anything that you wanted to say on the

12   continuance issue?

13           MR. FRANK:  Just some practical points, Your Honor.

14   All of us could be better lawyers with more time.  Right?

15   It's a little scary to think that Mr. Weinberg could be an

16   even better lawyer.  But all of us could be more prepared

17   with more time.

18           But a year ago, when the Court addressed this

19   issue, which was already a year into the case, Your Honor

20   said you were inclined to make this the last continuance, in

21   part because of the fact that the defense had waited a year

22   into the case before even filing those letters rogatory, for

23   which we are now awaiting responses.  And what the Court I

24   believe said was that regardless of where we were in

25   responses to those letters rogatory, we were going to proceed

1    with the date of June 4th.

2            You know, Mr. Weinberg mentioned there are two

3    cooperating witnesses.  Those cooperating witnesses have

4    waited a very long time to be sentenced.  If we get another

5    adjournment, they're going to -- there's going to be -- one

6    of two things is going to happen.  One of those witnesses is

7    not before this Court.  That witness will either be sentenced

8    without the benefit of having had the opportunity to complete

9    his cooperation, or his life is going to be in limbo for that

10   much longer.

11           If Your Honor adjourns this again, we're looking

12   at, given Mr. Johnston's schedule -- and I just want to be

13   clear about that.  His trial starts at the end of October, so

14   he can't do something in mid September, because that would

15   put it basically up until the beginning of his next complex

16   fraud trial.

17           MR. WEINBERG:  His trial is in October?  You said

18   October.

19           MR. FRANK:  His trial is in October.  You're asking

20   for mid September.  He can't do a trial in mid September

21   that's going to lead up to the eve of his trial in October,

22   and then turn around and do another complex fraud trial in

23   Arizona.

24           MR. JOHNSTON:  Las Vegas.

25           MR. FRANK:  Las Vegas.  Same difference.

1           THE COURT:  Roll the dice.

2           MR. FRANK:  He can't turn around and do another

3  complex fraud trial within a couple of weeks after this

4  trial.  That trial is going to go through November.  So what

5  we're really looking at is sort of early 2019 for a case that

6  was indicted in March of 2016.  That doesn't seem reasonable.

7  But that's essentially what the defense is asking for here.

8           I've mentioned the issue with our cooperating

9  witnesses.  But our other witnesses, it's not fair to them,

10  as well.  It's not fair to the victims in this case, either,

11  Your Honor.

12           MR. WEINBERG:  Judge, I'm ready.  I've got a

13  personal family wedding on August 4th that, you know, I'm

14  ready to start the trial several days thereafter.  So we can

15  try this case in August, we can try this case the first day

16  of September and be ready weeks before Mr. Johnston's next

17  responsibility.

18           MR. FRANK:  I'm not available then, Your Honor.

19           MR. WEINBERG:  Start it the day after Labor Day,

20  we'll be finished in September.  That will give Mr. Johnston

21  a break before his October trial.  That will give us added

22  months to get ready.

23           THE COURT:  Okay.  Thank you.  I'll think about it.

24  I'll resolve it soon.  I know that, obviously, one way or the

25  other, you both want the answer.

1            MR. FRANK:  Well, the only other small point that I

2     would mention on that point, Your Honor, is we have other

3     disclosures that are due to be made in less than two weeks.

4            THE COURT:  It's not going to take me two weeks.

5            MR. FRANK:  Thank you.

6            THE COURT:  All right.  Should I -- at the moment,

7     I'm not sure I have anything else on the calendar in this

8     case before the final pretrial a couple days before.  So if

9     you -- why don't the two of you do this.  I'm not going to

10    schedule something right now.  I'm running a little behind

11    schedule today, anyway.  The two of you can talk to each

12    other.  I'm happy to see you whenever you think it's helpful.

13            In the meantime, assume you're going to be seeing

14    me, if I haven't put it on the docket, we'll put it on the

15    docket the Thursday before the trial for a final pretrial

16    conference.  I think I set dates for motions in limine and

17    jury instructions and voir dire and suggested to you to do

18    earlier things that you thought would be helpful to resolve

19    earlier.  If either of you think there are other dates that I

20    should schedule or you want to see me at other times, just

21    ask Maria, or file just like a one-sentence request and I'll

22    do it.

23            And go back -- if I haven't -- I think I did set

24    those dates, but if I didn't, then you could confer with each

25    other and propose a set of dates that makes sense for both of

1    you, given the complexity of the case, that tees up those

2    issues in time for me to read them before the final pretrial.

3            Anything else?  Okay.  Thank you very much.  We're

4    adjourned.

5            THE DEPUTY CLERK:  This matter is adjourned.

6            THE COURT:  Oh.  One thing that I wanted to tell

7    you about, if we go forward in June, if I deny the motion to

8    continue, Thursday, June 14th, we won't sit, because the

9    court is having an all day sentencing symposium that day that

10   I need to participate in.  So we'll go the day before, we'll

11   go the day after, but there's that one Thursday.  So just in

12   terms of planning purposes, that day we won't have court.

13           MR. FRANK:  Thank you, Your Honor.

14           MR. WEINBERG:  Thank you, Judge.

15           (Court in recess at 2:52 p.m.)

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of January, 2019.

/s/ RACHEL M. LOPEZ

_____
Rachel M. Lopez, CRR
Official Court Reporter