<table>
<tr><td>1</td><td></td></tr>
</table>

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3     - - - - - - - - - - - - - - - - - - x

 4     UNITED STATES OF AMERICA,              :

 5            Plaintiff,                       :    Criminal Action No.
                                                    1:16-cr-10094-LTS
 6         v.                                  :

 7     ROSS MCLELLAN,                          :

 8            Defendant.                        :

 9     - - - - - - - - - - - - - - - - - - x

10

11         BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

                           FINAL PRETRIAL CONFERENCE
13

14

                          Wednesday, May 30, 2018
15                              2:01 p.m.

16

17

18

19

20
       John J. Moakley United States Courthouse
21     Courtroom No. 13
       One Courthouse Way
22     Boston, Massachusetts

23
       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com
25
```

1                         **A P P E A R A N C E S**

2     On behalf of the Plaintiff:

3          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
           BY:  STEPHEN E. FRANK
4          John Joseph Moakley Courthouse
           One Courthouse Way, Suite 9200
5          Boston, Massachusetts  02210
           (617) 748-3244
6          stephen.frank@usdoj.gov

7
           UNITED STATES DEPARTMENT OF JUSTICE
8          BY:  WILLIAM JOHNSTON
           1400 New York Avenue, Northwest
9          Washington, D.C.  20005
           (202) 514-0687
10         william.johnston4@usdoj.gov

11

12    On behalf of the Defendant:

13         MARTIN G. WEINBERG, P.C.
           BY:  MARTIN G. WEINBERG
14         20 Park Plaza
           Suite 1000
15         Boston, Massachusetts  02116
           (617) 227-3700
16         owlmcb@att.net

17
           LAW OFFICES OF ROBERT M. GOLDSTEIN
18         BY:  ROBERT M. GOLDSTEIN
           20 Park Plaza
19         Suite 1000
           Boston, Massachusetts  02116
20         (617) 742-9015
           rmg@goldstein-lawfirm.com

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (In open court.)

3          THE DEPUTY CLERK:  The United States District Court

4     for the District of Massachusetts is now in session, the

5     Honorable Leo T. Sorokin presiding.

6          Today is May 30th, the case of United States v.

7     McLellan, criminal action 16-10094, will now appear before

8     this Court.

9          Counsel, please identify themselves for the record.

10         MR. FRANK:  Stephen Frank and William Johnston for

11    the United States.  And with us at counsel table is Martina

12    Kneifel, who is a paralegal for the Department of Justice.

13         THE COURT:  Great.  Welcome.

14         MR. WEINBERG:  Martin Weinberg and Rob Goldstein on

15    behalf of Ross McLellan, Your Honor.

16         MR. GOLDSTEIN:  Good afternoon, Your Honor.

17         THE COURT:  So first, to run through a couple of

18    things, just to make sure we're on track for Monday.  One --

19    we'll know better later in the week, but right now I

20    anticipate we'll get jurors -- if it doesn't change, I

21    anticipate we'll get jurors at 9:30.  There's a reasonable

22    chance of that.

23         I think, at the suggestion of Jim McAlear from the

24    jury office, I'm going to change just the way I ask the

25    questions, the order a little bit, not -- it doesn't affect

1       the way we went over the strikes, no effect on that.  But I'm

2       going to -- the first question that I'm going to ask the

3       venire is the scheduling question.  And I'll go through that.

4              So I'll ask everybody in the venire -- I'll do the

5       preliminary explanation of the case, but then instead of

6       first going through who the lawyers, and one by one, each

7       voir dire question that I'll go over with you in a minute,

8       I'm going to ask first the scheduling question, because it's

9       a three- to four-week case and because there are likely other

10      cases impaneling on Monday.  I'll do that first, bring up to

11      sidebar anyone who has a scheduling issue that I need to

12      explore, and we'll talk about it.

13             I'll excuse whoever needs to be excused for

14      scheduling.  Everybody left has the time to serve.  And then

15      I can send those people down, and they can participate in

16      other shorter trials that might be impaneling after us on

17      Monday.  So I'll do that.  When I'm done with that, then I'll

18      ask all the other questions, and I'll bring them up to

19      sidebar.

20             So that may give you more contact with the jurors,

21      but -- and it should maybe speed the process a little bit.

22             MR. WEINBERG:  Could I ask a few -- several

23      questions, just focused on the jury, Your Honor?

24             THE COURT:  Yes.

25             MR. WEINBERG:  One is, I would ask the Court to

1    consider not advising the jurors who have issues with the

2    schedule that there are other cases that they --

3            THE COURT:  Oh.  That I'm not going to say.  I'm

4    telling you that as to why I'm doing it.

5            MR. WEINBERG:  Because our challenge, of course, is

6    to get a cross-section on a case of three to four weeks.

7            THE COURT:  Right.  I'm just going to ask the

8    scheduling question about -- and then I'll talk to them about

9    scheduling.  And then I will -- when I'm done, we'll release

10   those people who have scheduling -- who I've excused for

11   scheduling purposes, to go downstairs to the jury office.

12           MR. WEINBERG:  Second, I'm wondering --

13           THE COURT:  What I ordinarily would say to them is,

14   "Well, you know, we'll send you down there, there might be

15   another case for you to work on."

16           MR. WEINBERG:  No objection to that.

17           Second, the jury list, is that going to be

18   available to both parties Friday?  Or is that only made

19   available on Monday?

20           THE COURT:  As far as I know, you only get it

21   Monday morning at 9:00.  I've never really seen it before

22   then.

23           MR. WEINBERG:  Okay.  That is usually what happens.

24           THE COURT:  Right.

25           MR. WEINBERG:  And that's been the regular course.

1              And last, I would ask the Government, since they
2      have the capacity to check jurors, sometimes they do,
3      sometimes they don't, regarding whether any of them are on an
4      FBI database, I would only ask that if it's the intention of
5      the Government to do any kind of background check through
6      databases that are unavailable to the defense, that they be
7      required to share the information with us.
8              MR. FRANK:  It's not our intention, Your Honor.
9      We're going to be in the courtroom with the Court, with
10     counsel.  We're not going to be running data checks.
11             MR. WEINBERG:  I accept that.  Thank you.
12             THE COURT:  Fine.  Okay.
13             How long do you think you're each going to be with
14     your openings?
15             MR. FRANK:  About 30 minutes with us, Your Honor.
16             MR. WEINBERG:  Longer than that, 45 to 50 minutes,
17     Your Honor.
18             THE COURT:  Okay.  And ordinarily, after we pick
19     the jury, I would send them out to get settled in the jury
20     room, bring them back in -- either before they go out or when
21     they come back in, swear them in, and give them some
22     preliminary instructions.
23             Most of the preliminary instructions are -- you
24     will struggle not to sleep through.  It is essentially what
25     is evidence, you know, the course of the trial.  It's the

1    same -- it would be no different in this case than in any

2    other criminal case.

3           And then there's one part that I usually explain

4    the case a little bit.  It's sometimes a bit more detailed

5    explanation than I would have given the venire, and it kind

6    of depends.  So sometimes it might just be the same.

7           And I don't typically charge the elements of the --

8    I don't typically give them any more explanation than charged

9    with the -- I would say:  The defendant is charged in Count 1

10   with conspiracy to violate laws of the United States, Count 2

11   with this, Count 3 with this, Count 4 with this, Count 5 with

12   this, Count 6 with this.  The defendant denies the charges."

13          I might, depending on -- you know, give a little

14   bit -- like another sentence or two factual detail about the

15   nature of the -- you know, what's alleged in the indictment.

16   But I -- but I think about whether, especially in a longer

17   case, whether it's helpful to explain --

18          There are a lot of issues, by way of parenthetical,

19   that you've raised objections to the Government's --

20   disagreements to the jury instructions.  I'm not planning on

21   resolving those before the preliminary instructions on

22   Monday.  And anything I charge them on wouldn't resolve

23   those -- I'm not prepared to resolve some of those questions

24   now.  I want to hear the evidence, and I would like to look

25   more carefully at your proposals and the law, and I might

1    want to hear from one or another of you or more.  So it would

2    be at a pretty high plain.

3              But still I guess I'm asking you whether you want

4    me to do that and what you want me to say, or whether you

5    don't want me to do it.

6              MR. FRANK:  Your Honor, we actually prepared a

7    proposal in light of Your Honor's comments yesterday asking

8    us for that, and I forgot to print it out.  So it's being

9    printed right now, and we can hand it up to the Court.

10             THE COURT:  Fine.

11             MR. FRANK:  It's a very, very short, high-level

12   overview of the indictment.

13             THE COURT:  So you think that can be useful, both

14   to the venire, so they can answer the questions, and then I

15   can repeat it.  Sometimes I use the same explanation, once to

16   the venire and once to the sworn jury.

17             MR. FRANK:  I don't think it will hurt.

18             THE COURT:  I think usually sometimes hearing

19   things twice is helpful.  But you think --

20             And beyond that, you're not particularly looking

21   for me to precharge them, so to speak?

22             MR. FRANK:  No, Your Honor.

23             MR. WEINBERG:  We're not looking for a precharge,

24   but I would reserve a right to add a paragraph to Mr. Frank's

25   explanation of the case.

1          THE COURT:  Sure.

2          MR. WEINBERG:  We may have some disagreements.

3          THE COURT:  Okay.

4          MR. FRANK:  Here it is, actually, Judge.

5          THE COURT:  All right.

6          MR. FRANK:  Thank you.

7          THE COURT:  (The Court reviews the document.)

8          MR. WEINBERG:  Several observations here.

9          First, we would ask -- we would prepare, overnight,

10    Your Honor, and have for the Court tomorrow, whether we'd

11    have session or whether we'd submit it, an additional

12    paragraph that would include both Mr. McLellan's denial and

13    his assertion that he acted in good faith, and we would spell

14    that out in several sentences.

15          Two, I don't think that the Government needs to

16    both have an allegation of misleading clients, in

17    paragraph 2, and then a further allegation of misleading

18    clients in paragraph 3.  And I think that can be combined

19    into a single sentence, since this is an overview that the

20    Court will be giving the jurors.

21          And lastly, I don't think there's any need at this

22    level for the Court to take this version on the

23    count-by-count analysis, unless this would be what the Court

24    would ordinarily say to the jury about the different charges.

25    I don't think it needs to be reiterated.

1         THE COURT:  So I guess I would say, I have two

2    different statements in mind.  They could be the same, they

3    could be different.  One is to the jury -- I'm sorry, to the

4    venire.  And I don't know that the venire needs a

5    count-by-count recitation, because what they need to know is

6    the gist of what's going on.

7         I think what I'm going to do is this.  You should

8    draft --

9         What I would ordinarily do is have some version of

10   some -- for the venire, some version or subset of this of

11   what the Government's view was, subject to your comments, and

12   then some summary of what the defendant's is.  And if you

13   want to say more than "denies the charges," that's fine.  I'm

14   open to that.  That's not limited.

15        What I'm -- my goal with the venire is something

16   that neither of you object to, the things that are said in

17   there, that it's fairly vanilla and that it gives them some

18   understanding of what the case is; so when I ask them

19   questions about, like, there's a cooperating witness, or you

20   have to follow the rules of law, or this and that, or do you

21   know about the securities industry, they have some context in

22   which to answer and it's not in a vacuum.

23        The second statement for the preliminary

24   instructions for the jury I think is a little bit helpful

25   just for me to -- like there I might give a little bit more

1    count by count, just because it's their first introduction to

2    the case.  You'll be giving your opening statements and

3    perhaps referring to the individual counts, but it's a

4    beginning introduction to them of -- that there are several

5    counts.  It's starting to focus them on the idea that there

6    are counts.  They might not hear again after the first day

7    about counts until the last day.  But it does introduce them

8    to that, so a little bit more detail is sometimes helpful

9    there.

10           And this level of detail, I mean, might be in that

11    zone.  I probably wouldn't want to say more than this.

12           MR. FRANK:  Your Honor, most of what Mr. Weinberg

13    says, subject to reading it, sounds reasonable to me.  I

14    think where we might have an issue is detailing the defensive

15    or even getting into the issue of good faith, which is a

16    legal concept.  It is -- it is -- you know, what we were

17    trying to do is simply pair it in plain English, the charges:

18    What is this case about.

19           I think it would be a good idea for the Court to

20    remind the jury that these are merely allegations; it's our

21    obligation to prove them beyond a reasonable doubt.  The

22    defendant denies the allegations.  But to then get into the

23    substance of what the defense is, is beyond what we had

24    considered sort of the purpose of doing this in the first

25    place.

1          THE COURT:  So I guess it would depend as to what
2     you would want to say.  I'm thinking that --
3          MR. WEINBERG:  I'm going to say less than Mr. Frank
4     fears, but more than nothing.
5          THE COURT:  I have no view until you submit it.
6          MR. WEINBERG:  And I do think -- you know, I
7     understand the point that the Government's got the burden and
8     these are allegations, but I also think it's very important
9     that a jury hear, both in the opening from the Court and in
10    the openings, which is why mine might be a little longer than
11    Mr. Frank's, that there is a defense; that these allegations
12    are just allegations, and Mr. McLellan intends to represent
13    to this jury through the evidence of that.  And it will be
14    short, it will be concise.
15         THE COURT:  We'll look at it, and then we'll see.
16         MR. WEINBERG:  Thank you.
17         THE COURT:  That sounds good.  If you can -- well,
18    okay.  Submit it in writing for sure when it's done, and
19    maybe we're meeting tomorrow and maybe we're not.
20         All right.  I think, as a practical matter, you can
21    anticipate doing openings on Tuesday.  I was thinking about
22    that.  But I think you probably all would prefer that.  And
23    the scheduling -- I think realistically the earliest we'll be
24    done picking the jury is 11:30 or 12:00.  The preliminary
25    instructions take a little bit of time.  I hate to -- I don't

1    want to split the openings between lunch and coming back.

2    We'll go however long it takes Monday to pick the jury, and I

3    might do the preliminary instructions that I'm going to give

4    them, so then they can come in Tuesday morning at 9:00 a.m.,

5    opening for the Government.  So we'll do that.

6            All right.  That takes us to the -- what I'm -- in

7    jury selection, I have a general statement that I say to

8    jurors, just about the importance of jury service and the

9    Constitution.  And then I'll explain to them briefly the

10   process that we're going to go through in terms of asking

11   them the questions and coming up to sidebar.  And then I'll

12   read to them a description of the case, which I'll look at

13   what the Government has, what you have, and I'll -- what you

14   give me, and I'll put something together and read it to you

15   or issue it on ECF so you can read it, so you know

16   beforehand, if you have any great objection.

17           All right.  So the first question that I'll ask is

18   the scheduling question.  And we'll do that.  And then I'll

19   come back with whoever is left, and I'll ask them the

20   following.  Some of these questions, I'll -- if you want to

21   know the exact wording of the question, ask me.  Otherwise,

22   I'm just telling you generally.  Some I think you know what

23   they are.

24           Do you know the prosecutors in the case, and the

25   case agent?  I'll have you stand, and I might have you

1    introduce yourselves or I might say your names.  But probably

2    I would have you introduce yourselves.  Same with -- I'll ask

3    them if they have ever worked for the US Attorney's Office or

4    the FBI.  Same with defense counsel and Mr. McLellan.

5         I'd like a list -- maybe if you've given it to me

6    you have to remind me where it is in the docket, a list of

7    witnesses or other -- if there's somebody who's not a

8    witness, who you think -- or could be a witness, but might

9    not be a witness, who you think we should run the name by the

10   venire.  And what I typically say is these are the witnesses

11   or other people you might hear a lot about.  And then I'm

12   separately asking a question about the list of companies I

13   think you gave me, Mr. Frank.  So I'll read that list to

14   them, and ask them if they know anybody.

15        And then I'll ask them about the following

16   entities:  Aon Hewitt, AXA Equitable Life Insurance,

17   Inalytics, I-n-a-l-y-t-i-c-s, Kuwait Investment Authority,

18   Mercer, National Treasury Management Agency, Royal Mail,

19   Sainsbury's PLC, State Street Corp., Dutch Doctors Pension

20   Fund.  I'll ask them if they or anyone in their families have

21   worked for them or for State Street or any of State Street's

22   related entities.

23        Have you ever been involved in a lawsuit, sort of

24   lawyers, US attorneys, those -- FBI, SEC, or the US Postal

25   Inspection Service.

1           Have they read or heard anything about

2   Mr. McLellan.  Do you know anything about this case or him?

3   Have you heard or read anything about other securities fraud

4   cases or trials involving State Street?  Do you know anything

5   about other securities fraud cases or trials involving State

6   Street?  Do any of you have an interest in the case.  Do any

7   of you know each other?  I once had jurors who knew each

8   other.

9           Have you formed an opinion about the case from what

10  you've already heard?  Have you expressed an opinion?  Would

11  you tend to believe testimony of a law enforcement agent over

12  that of a civilian witness?  Would you tend to give the

13  testimony of a witness for the Government, or evidence given

14  by the Government, more weight than defendant's evidence,

15  just because it's presented by the Government?  So are you

16  aware of any bias or prejudice that might make it hard for

17  you to serve, or anything about the facts that might make it

18  difficult?

19          Have you, a family member, or a close friend ever

20  been the victim of a fraud?  Same as to worked at a bank or

21  financial institution that has experienced or investigated

22  fraud committed against them.

23          You might hear testimony from a cooperator.  The

24  law says you have to give greater scrutiny.  Could you follow

25  that instruction?

1    He was an executive, Mr. McLellan, of a company

2    that manages transitions for large institutional investors.

3    Anything about this fact that would make it difficult for you

4    to serve as a fair and impartial juror?

5    Have you had any experience with securities or

6    banking industry professionals, or similar professionals,

7    that would make it difficult for you to serve as a fair and

8    impartial juror in this case?

9    Have you had any experience as an investor that

10   might make it difficult for you to serve as a fair and

11   impartial juror?  Any.

12   Of you have any views about State Street, large

13   banks, large bank executives, Wall Street, or other

14   securities industry, generally, that might make it difficult

15   for you to serve as a fair and impartial juror in this case?

16   Have you, a family member, or a close friend ever

17   worked in the securities or banking industry, for example, as

18   a stockbroker at an investment bank?  Same universe of people

19   have any associations or employment with the SEC, the CFTC,

20   FINRA, NASD, or New York Stock Exchange?  Have you or any

21   member of your family or a close friend worked for any other

22   securities or regulatory agency, whether federal, state or

23   local?

24   Do you have any views about the regulation or

25   securities or banking industries that would make it difficult

1    for you to serve as fair and impartial?

2          Are you a members of a victim's right group, or has

3    anyone in your family ever been incarcerated?

4          I explain some legal principles and ask if they can

5    follow them.  These are all the presumption of innocence,

6    only evidence that's presented in the courtroom, follow my

7    instruction whether or not you agree with them, can't discuss

8    the case among yourselves or with anyone else.  The burden --

9    the presumption of innocence and the burden of proof

10   questions.  Any philosophical or moral beliefs about sitting

11   in judgment?  Don't think about punishment.  Some law

12   enforcement questions.

13         Have you ever been employed by the FBI, marshals,

14   local/state police, and the like?

15         You'll hear testimony in this case from law

16   enforcement officers.  The law requires you to weigh the

17   testimony the same as the testimony of any other witness.

18   Would you have any difficulty following that?

19         Have you ever had dealings with law enforcement,

20   whether favorable or unfavorable, which might influence your

21   consideration of this case?

22         Lawsuit of any kind against a law enforcement

23   officer or agency.

24         Have you ever been involved in a criminal case, a

25   victim, witness, lawyer and the like, serve as a juror?

1          Any other reason you can't serve?  Hearing?

2     Disability?

3          Anything about that?

4          MR. WEINBERG:  Just one area.  I think Your Honor

5     covered it, but I wanted to be sure, which is whether or not

6     either they, family members, close friends work for or in the

7     past worked for State Street.

8          THE COURT:  I have that.  I've asked that.  I will

9     be asking them:  Have any of you, anybody in your family --

10    or do you want me to say close friend? -- ever worked for any

11    of the entities I just listed -- those are all those other

12    companies -- or for State Street or any of its related

13    evidence?

14         Do I need to include close friends?

15         MR. WEINBERG:  I think so, because from two

16    perspectives.  One is State Street is now being alleged by

17    the Government in Count 6 to be a victim, and I think they

18    intend to call a witness.

19         And second, even though they may not be witnesses

20    in specific, other than those that are named, you know,

21    through the testimony, there's going to be testimony about

22    certain executives, lawyers, compliance people that work for

23    State Street back in '10 and '11.

24         THE COURT:  Fine.

25         MR. FRANK:  Yeah.  Just to clarify, we're not

1  alleging that State Street is a victim.  We're alleging it's

2  an unindicted co-conspirator.  But it is affected in the

3  sense of the statute.

4          Your Honor, just a very trivial point, it's AXA

5  Equitable and Aon Hewitt.

6          THE COURT:  Aon Hewitt as in A-o-n.  How do you --

7  what is the other one?

8          MR. FRANK:  AXA Equitable.

9          THE COURT:  AXA.

10         MR. FRANK:  And I didn't hear -- I wasn't quite

11 sure I heard correctly, but the supermarket chain is

12 Sainsbury's.

13         THE COURT:  Sainsbury's?

14         MR. FRANK:  Yes.

15         THE COURT:  I have that.  I probably pronounced it

16 wrong.

17         Okay.  That takes care of that.  Okay.

18         So let me run through, first, a number of motions

19 that I don't think I really need to hear from you on.  And

20 I'll likely memorialize this in writing -- not in a lengthy

21 writing, but in writing.  And then there's some more

22 evidentiary motions that we can talk about.  I'm happy to

23 talk about these if you really, really want to, but I've read

24 all the papers.

25         And so the Rule 15 depositions, the motion to Rule

1    15 depositions, I don't really think we need to talk about.

2          The jury questionnaire motion.

3          I think the motion to exclude, relating to alleged

4    concealment, is pretty clear.  The -- which I'm likely to

5    deny the motion to exclude.

6          I'm likely to deny the motion to exclude the Dutch

7    pension fund transition.

8          I'm likely to deny the motion to sever.  The --

9          I'm likely to deny the motion to preclude

10   individual investors from testifying.

11         I'm likely to deny the motion to exclude his

12   statements to the agents.  Though I pause there.  A concern I

13   have is -- and all I know about it is what's in the four

14   corners of those motions, is that I don't think it's fair for

15   there to be an expressed or implied inference that either,

16   (a), that he was interviewed because he was implicated in

17   whatever ConvergEx did or didn't do, or was -- and I don't

18   think you're going there, but I could see just that the FBI

19   interviews somebody, creates a specter for some people; or

20   second, that somehow, because he got interviewed, even if he

21   didn't do it, he's mixed up in it in some way.  And so I

22   know, in a sense, you're not looking for those inferences,

23   you know --

24         MR. FRANK:  They wouldn't even be true, Your Honor.

25   He was viewed as a potential victim.

 1          THE COURT:  Right.  Okay.  So to the extent that --

 2    I'm likely to admit it.  That said, when it comes along, if

 3    you are -- would like a limited -- some sort of instruction

 4    to explain that, like, he was -- you know, the FBI went to

 5    talk to him because they thought he might be a victim or a

 6    witness -- essentially an employee of a victim, right?  And

 7    they just went to him for informational purposes, that would

 8    seem to dispel these other potential inferences.  If you want

 9    that, you could bring that up or we could talk about that.  I

10    don't know if you want that or not.

11          MR. WEINBERG:  Thank you, Your Honor.

12          And to the extent that Your Honor intends to deny

13    the motion to exclude, I might ask the Court to allow a brief

14    voir dire so that Your Honor can reassess whether or not the

15    ConvergEx business model is so dissimilar from what the

16    Government charges State Street, that this really is

17    wandering in, you know, to a different offense.  I think a

18    20- or 25-minute voir dire, we can make the points.  Your

19    Honor would then have a record to determine whether or not

20    this is or is not admissible.

21          THE COURT:  That seems more like weight than

22    admissibility.  I mean, just from reading the papers, it

23    strikes me as -- it may be not that helpful.  It may be

24    really different.  But it didn't -- nothing about it struck

25    me as so, like -- this isn't like they were interviewing him

1    about, I don't know, somebody who's adding a dollar to every

2    commission, you know, in every retail trade, you know, for

3    individual retail customers.  It's like, okay, it's a

4    securities industry.  But it seems -- so that -- so you can

5    ask.

6              MR. WEINBERG:  Okay.

7              THE COURT:  You can ask for anything and -- but

8    that's my general thought on that.

9              MR. WEINBERG:  I understand.

10             THE COURT:  And if you want the limiting

11   instruction, I think maybe the day before it's coming, or

12   something, propose something, and we'll look at it then.  But

13   I would be thinking about something like that, because that

14   did cross my mind.

15             The motion to admit foreign deposition testimony,

16   I'm likely to wait on until I hear back.  Maybe I was

17   successful yesterday in my -- as to paper.

18             Well, so that leaves a couple motions to talk

19   about.  And maybe to keep it moving and guide it a little

20   bit, I'll give you a couple thoughts I had or just things I

21   was thinking about, and I'm happy to hear you.

22             One is that, as to a lot of the things that the

23   defendant, that the Government is seeking to strike that's in

24   the defense case, a lot of it just strikes me as I just have

25   to wait and see.  In other words, I haven't heard the

1   evidence.  I don't -- I know, in some ways, a fair bit about

2   this case.  But this is a complicated case, and I don't know

3   every -- I don't know what all the theories are of the

4   Government or the defense.  I'm going to know a lot more

5   about this case Tuesday at noon than I do now, and I'll know

6   more about it as I hear the witnesses.

7         So I can imagine ways in which some things might be

8   admissible, but I don't think it really will be admissible on

9   those grounds or not.  I don't know what the issues will be.

10  And sometimes I just don't know really what this thing is

11  about, and I won't know until I hear the evidence and it's

12  offered.  So in a big picture way, I'm not likely to rule on

13  all these things.  That said, trying to be helpful, I'll give

14  you some thoughts.

15        With respect to the regulations -- I understand the

16  case to be an affirmative misrepresentation case by the

17  Government, that the Government is alleging Mr. McLellan

18  made -- that he or co-conspirators made statements that the

19  Government alleges were untrue, half true, or deceptive for

20  the -- with the intent and purpose of misleading the victims;

21  that to the extent that he should have said more, the

22  Government says the duty to say more arose out of what was

23  said, not out of any independent legal obligation to

24  disclose.  So in that sense, it's not an omissions case and,

25  therefore, the Government is not saying some regulation said:

1    You had to say this.

2              That said, it may be that some regulation that says

3    you don't have to disclose certain kinds of things, if

4    there's sufficient similarity to the kinds of things that

5    weren't disclosed here, and if there's some connection to --

6    there's some evidentiary basis to infer that Mr. McLellan

7    knew about that regulation at the time -- at the time the

8    failure to disclose occurred -- not today, say -- it seems to

9    me the regulation, that regulation could be potentially

10   relevant and admissible, even though it's not an omissions

11   case.  Because I could potentially see it bearing on good

12   faith and -- which I understand is sort of how it's being

13   advanced.

14             That said, I'm much more dubious that either --

15   that unpassed regulations in legislation has any particular

16   significance, as a general proposition.  I think the reasons

17   why things are proposed and then don't get passed is purely

18   speculative as to sort of what it means, so I'm not sure you

19   can draw any inference out of it.  I don't think you can even

20   necessarily draw the inference that it necessarily reverses

21   course.  So I am much more skeptical.

22             I'm not ruling those things out right now, but I'm

23   much more skeptical of the admissibility of those.  So that

24   sort of touches upon, I think, the motion that relates to the

25   Senate bill and the regulation.

1          MR. FRANK:  May I inquire?

2          THE COURT:  Yeah.

3          MR. FRANK:  So Your Honor suggested that there

4    would need to be some evidentiary basis that the defendant

5    knew about the regulation.  So that would be a burden on the

6    defense to enter that evidence before --

7          THE COURT:  Burden on Mr. Weinberg to at least

8    point to me to some evidence before I'm likely to admit that.

9    And whether he has to produce the evidence or it comes out of

10   your evidence, I'm agnostic.  But I think there has to be --

11   I don't think the regulation is just admissible on its own.

12   The only way I understand it might be argued about or -- so

13   far, unless somebody gives me another reason in the course of

14   the trial, I would think that if it's bearing on his state of

15   mind and his potential good faith or absence of intent, or

16   what have you, he'd need to know about it.

17          There are a myriad of ways one could make that

18   connection to him knowing about it, possibly -- I have no

19   idea.

20          MR. FRANK:  The only additional concern I would

21   cite about showing the jury the actual document, Your Honor,

22   as opposed to having witnesses, for example, expert witnesses

23   testify as to the existence of the regulation, is that this

24   will then be the only statute that is physically put in front

25   of the jury.  Not even the statutes with which he's charged

1    are physically put in front of the jury.  So this single

2    statute --

3            First of all, the Court is the interpreter of the

4    law.  But second of all, this single statute will all of a

5    sudden be there for the jury to view in absence of any other

6    statutes and takes on sort of inordinate importance and

7    suddenly turns them into interpreters of the law.  If the

8    point is only that there is a statute that says commissions

9    need not be disclosed by riskless principals trading bonds,

10   assuming there's a reason to believe the defendant knew about

11   that statute, the existence of that statute can be discussed

12   through witness testimony, without actually putting the

13   physical document in front of the jury.

14           THE COURT:  So I -- fair point.  I'm not prepared

15   to resolve that now.  I'm not so much -- I wasn't so much

16   speaking to the actual document, as to the content.

17           MR. FRANK:  I understand.

18           THE COURT:  And how the content might come in and

19   what it might be seems, itself, a question that we would

20   resolve at the trial when it came up.

21           You could think about that.  It's a consideration.

22           MR. WEINBERG:  The real test, Judge, and I think

23   you've put your finger on it -- and I understand Mr. Frank's

24   objection.  It's not irrational.  And perhaps we can work out

25   a stipulation that's simpler for the jury.

```
1            THE COURT:  You might find it more effective for
2    you not to have them reading the statute, because it may be
3    fairly opaque to them.
4            MR. WEINBERG:  Understood.
5            THE COURT:  And so you may be better off with like,
6    if there's a basis that's coming in, some sort of stipulation
7    as to what that regulation might say or testimony about it,
8    right?
9            MR. WEINBERG:  So if we can work a stipulation
10   out -- and I'm confident that we probably can -- then the
11   issue is how precise is the evidence -- is the evidentiary
12   predicate for the admission of the stipulation, as opposed to
13   the regulation?  I know that there will be evidence in the
14   record that Mr. McLellan said to people there is no duty to
15   disclose outside of ERISA, which is a special statute that
16   protected many of the United States clients of State Street,
17   but not all.
18           For instance, AXA was not ERISA protected.  The
19   European clients were not ERISA protected.  And then that
20   statement of Mr. McLellan's state of mind is clearly
21   admissible on his understanding, his knowledge, his good
22   faith, whether he was right or wrong.
23           You know, I don't know that we can't get farther,
24   if we focus on just what is the evidentiary basis for
25   Mr. McLellan's awareness of the framework that he was working
```

1    in, in nonERISA clients.  But I do think a reliable,

2    contemporaneous statement that that was his state of mind is

3    sufficient.

4              THE COURT:  So --

5              MR. WEINBERG:  And that really goes to the case

6    that we gave Your Honor, the citation to -- which was the

7    court essentially saying --

8              THE COURT:  I haven't -- I don't recall seeing that

9    statement in the briefing.  So if -- you know, one end is

10   that he testifies and says, "I read it," right?

11             MR. WEINBERG:  Yeah.

12             THE COURT:  Plainly, at the relevant time.  That's

13   good enough.

14             You could have an e-mail that sent it out.  There's

15   one case one of you cited that someone took a training class.

16   I think the Government admitted evidence that the defendant

17   had taken a training class.  And that might give rise to an

18   inference that they would have talked about this kind of

19   regulation and -- maybe.  It depends on what I knew about

20   what the class was.  But something --

21             So that one is -- you know, that's not as far

22   afield as what I'd say don't think would be persuasive, which

23   is the mere fact that he works in the industry and that it

24   might be a regulation that's relevant to his area of work in

25   the industry.  It's a little bit more specific than that, but

1    it's still pretty --

2            MR. WEINBERG:  Understood.  And we'll provide --

3    before we reference any of the regulations that we've sought

4    to admit, we will certainly provide the Court with the

5    predicate and seek its admission based on that.

6            MR. FRANK:  Okay.  Is there more than one?

7            MR. WEINBERG:  There's three or four -- there's

8    several regulations.  And if you and I reach a stipulation, I

9    understand it's conditioned on the foundation that

10   Mr. McLellan had some, at least, general awareness.  And I

11   would be prepared to make that proffer before I reference any

12   regulation or stipulation.

13           MR. FRANK:  Okay.  I just only remember one being

14   included in the exhibit, so that's why I'm asking.

15           THE COURT:  You had a motion, Mr. Weinberg, to

16   admit one regulation and a Senate document.  That's what I've

17   been speaking about.  There was some reference in the

18   experts, it was unclear, to sort of changing rules and

19   regulations.

20           MR. WEINBERG:  Yeah.  I was thinking of the second

21   regulation, in fact, that was passed, as opposed to rejected,

22   just recently, which, for the first time, conferred

23   obligations on brokers to disclose riskless principal markups

24   to retail customers as contrasted to professional customers.

25   I think it's all the same framework, which there is no

1    prohibition, per se, absent ERISA or a fiduciary

2    relationship.  There is no compulsion to disclose a markup,

3    other than --

4              THE COURT:  So in the expert -- that makes me think

5    about the expert motion.

6              By the way, one question that I did want to ask

7    you, duration of trial.

8              MR. WEINBERG:  Yes.

9              THE COURT:  What's your estimate now?

10             MR. FRANK:  We are still optimistic that we will be

11   done well under three weeks.  That depends --

12             THE COURT:  Both sides or just your side?

13             MR. FRANK:  Our side.  That completely depends

14   on -- I mean, certainly based on the length of our

15   anticipated direct examinations, it's easy.  But it entirely

16   depends on the length of the --

17             THE COURT:  Within three weeks is not only based on

18   your presentation, but what you reasonably might anticipate,

19   based on your experience as to what the cross would be.

20             MR. FRANK:  It factors in cross, yes.  I just --

21   you know, with two of the witnesses in particular, I have no

22   idea whether we're talking two hours or eight hours.

23             THE COURT:  I'm guessing as to, if those two are

24   Mr. Pennings and Boomgaardt, not two hours.  But I don't

25   know.

1          MR. WEINBERG:  Yeah.  I think more than two and

2     less than eight.

3          THE COURT:  All right.  And then how long do you

4     think you'll be?

5          MR. WEINBERG:  If I -- if the defense goes to the

6     maximum, it will be less than a week.  Five days, five days

7     maximum.

8          THE COURT:  So I ask for two reasons.  One is, I

9     want to tell -- in asking the jurors the schedule, I need to

10     tell them how long it will be.  And so if we're starting on

11     June 4th and we're saying one, two -- you're saying you'll be

12     done before -- no later than and probably before June 22nd.

13          MR. FRANK:  Yes, Your Honor.  Is that the end of

14     the third week?

15          THE COURT:  Yes.

16          MR. FRANK:  Yes, Your Honor.

17          THE COURT:  So the 4th, the 11th, and the 18th.

18          MR. FRANK:  That's my hope.

19          THE COURT:  All right.  You say you'll be done

20     within a week.

21          MR. WEINBERG:  Yes.  We've scheduled some of the

22     non-US experts for the very end of the third week that

23     Mr. Frank just identified and the very beginning of the --

24          THE COURT:  The reason that I asked this is, (a),

25     can I tell the jurors that they will get the case no later

1    than -- can I say no later than Thursday, June 28th?  The

2    reason I -- here's the practical considerations.

3              One, I want to be able to tell the jurors when

4    they'll get the case, so that they can answer whether it's a

5    scheduling issue or not.

6              Two, my practice is to tell them you'll get it by a

7    certain date, and then I intend to give it to them by that

8    certain date.  That's why I'm talking to you and looking to

9    you to give me that.  But once I say that, I'm going to do my

10   best to -- I'm not saying I've never gone back on that to the

11   jurors, but I work really hard not to go back on that.  I

12   want to say -- give them something that's realistic that we

13   can meet and -- so then promise them that they would get it

14   by that time, and I'll be --

15             I don't impose, on civil or criminal cases, time

16   limits, but I would be asking you a lot about the time,

17   keeping it moving.  Do we need this?  Can we keep it going,

18   and be -- where are we in terms of your estimate?

19             And so that's the reason I asked.  It's like not a

20   fake number.  It's for real.

21             And then the other consideration, the practical

22   matter you have is that, if you really go all of this time --

23   and the reason that I brought up Thursday, the 28th, is if

24   they got it on -- if you figure it's going to take the whole

25   morning to do closing arguments and charge -- or most of it,

1    right?

2              You're going to want at least 45 minutes for close?

3              MR. WEINBERG:  Yes.

4              MR. FRANK:  Absolutely.

5              THE COURT:  Right.  Plus, there's a number of

6    charges, and it's somewhat complicated.  So let's just say 45

7    minutes for the charge, so an hour and a half, so by the

8    time -- it's 12:00 to 1 o'clock when you're done with all of

9    that in the morning.  And assuming we're -- that means you're

10   done with the evidence on Wednesday the 27th.  That gives

11   them one afternoon and the next day for deliberations.

12             The following week is 4th of July week.  I'm happy

13   to be here.  I think I'm going to be here, anyway.  But a lot

14   of people take vacation then.  And I think if -- I think

15   we'll -- one of the things that will come up in the

16   scheduling question is, what about Fourth of July week?

17             I'm open -- I guess what I would probably say to

18   the jurors, if they're not done by then, is that we're not

19   sitting -- they're not deliberating that week, or we're not

20   sitting that week, unless -- either, period, I would just

21   decide it.  That's probably what I would do.  Because I'd

22   worry that if there's one juror who doesn't want to, that it

23   will create division in the jury, if I give the decision to

24   them.  If they're deliberating, I probably would leave it to

25   them to decide.

1          MR. WEINBERG:  I can say to the Court that my

2     prediction of the defense is somewhere between three days

3     minimum and five days maximum.  And I do think that in terms

4     of the Government's case, it will take less than three weeks.

5     There's going to be two extensive cross-examinations,

6     Pennings and Boomgaardt.  I don't think that the rest of the

7     Government's case is going to generate very long crosses,

8     maybe one or two witnesses longer than others.  But I tend to

9     try to be focused and precise and not wander and --

10          THE COURT:  So you think, actually, even though

11     we're picking a jury Monday, open on Tuesday, and miss

12     one day with no trial, that they will be done before the

13     29th?

14          MR. WEINBERG:  And I guess --

15          THE COURT:  How long would it take you if you just

16     did direct, you didn't have any cross?

17          MR. FRANK:  I haven't done the math, Your Honor,

18     but I will say that the Boomgaardt and Pennings direct are --

19          Mr. Johnston is saying five hours each.  I think

20     they're shorter than that.

21          THE COURT:  I like your thinking better than

22     Washington.

23          MR. FRANK:  Bureaucrats.

24          And you know, there are recordings that take a fair

25     amount of time, but -- so that would be the outside number.

1    So that's eight to ten hours, call it, on direct.

2          THE COURT:  So are you both comfortable, given what

3    you know about the case, if I tell the jurors on Monday that

4    they'll get the case by the end of the day, no later than

5    Thursday, June 28th?

6          MR. WEINBERG:  I would say with the caveat, Judge,

7    that an unexpected -- and I wonder whether or not the jurors

8    could be asked, if there's unforeseen things, whether they

9    would be prepared to sit for an afternoon or two, in order to

10    get them the case, before the week that includes July 4th?

11          MR. FRANK:  So that's an area where we have some

12    agreement, given the difficulties that we have in scheduling

13    witnesses who are coming from Europe.  And there's a fair

14    number of them.  We've made travel plans for them.  But these

15    are voluntary witnesses, and they need to go back.  They're

16    all pretty short witnesses.

17          THE COURT:  So here's -- so what -- there's --

18    those are two different things.  Yours is there comes up an

19    afternoon, like we're looking like we could get it on the

20    28th, but we need one or two afternoons in the last week, in

21    the last five or six days.

22          MR. WEINBERG:  Yes.

23          THE COURT:  My inclination of that is, later, if

24    that's what it is, is tell the jurors.  They'll all be happy

25    with us that -- like this is the situation, it's taking

1       longer, the choice is the afternoon or not.  We'll know

2       something about their afternoon schedules from the -- and at

3       that point, they'll be invested in the case.  If it's just an

4       afternoon or two in the last three to seven trial days, I

5       think it's not a problem.  I would prefer to avoid it, but

6       I've done that before, in one or two cases.  And my

7       experience is the jurors get invested, and it's a better time

8       to ask them.  Because we're only going to ask them if we

9       really need it for that.

10              I'm open to what you're suggesting, Mr. Frank,

11      because I hear you.  You hate to have somebody who flew in

12      from Europe, and they're an hour on the witness stand and

13      they did 15 minutes, and now we're saying, "Well, let's sit

14      around for the afternoon, miss your plane."  It costs

15      everybody a lot of money and dislocation, and come back

16      tomorrow for 20 minutes.

17              But I guess the question is, how often do you want

18      to do it, and do you know when you'd want to do it?  Because

19      what happens, in my experience in picking the juries, is

20      there are some people who are able to serve if they know

21      they're going to leave at 1 o'clock every day.  There are

22      some people who it doesn't matter.  And there are some people

23      who, you know, maybe could accommodate.  You might -- it

24      matters to them, sort of in picking, what that is.  So I

25      guess the question is how often would I be telling them?  I'm

1  open to it.  I would hear why.

2  MR. FRANK:  Well, my goal would be to avoid it.

3  But my only hope would be that, rather than telling them that

4  1 o'clock is a hard and fast --

5  THE COURT:  Would I be able to tell them the day

6  before, or I wouldn't really know until the day of?

7  MR. FRANK:  I think we probably have a good sense

8  the day before, because we would know who's here and how --

9  how far behind we are.

10  THE COURT:  So what I might do -- and you could

11  remind me about this on Monday, if I forget -- is say to them

12  that the schedule is 9:00 to 1:00.  It's really 9:00 to 1:00.

13  You'll really be done every day at 1 o'clock.  Except there's

14  some witnesses from Europe in this case, and that we're -- we

15  hope to be able to do the whole thing 9:00 to 1:00, and

16  manage the schedules and the like.  But it's possible that,

17  given the scheduling issues, we have somebody from Europe,

18  and we need to get them back.  And so there could be -- on a

19  regular basis, there could be an occasional afternoon where

20  you might be asked to sit.  But if you do, you'll know at

21  least the day before.

22  MR. FRANK:  I think that would be fair, Your Honor.

23  THE COURT:  Okay.  Fine.  All right.  That takes

24  care of that.

25  So coming back to the experts.  So I thought --

1     again, I'm not really prepared to rule on this definitively.

2     All I have is what you excerpted, Mr. Frank.  I haven't read

3     the reports.  I don't know how much of the reports you

4     actually intend to elicit in the form of testimony or whether

5     the report is more expansive and protected.

6             I'll say a couple of things that I think might be

7     helpful to guide you.  One is, to the extent that they're

8     talking about -- I assume both of the -- the following

9     assumes that they're experts in the field.  Assuming they're

10    experts in the field and they want to say that -- reading,

11    say the contracts at issue, this is how -- if they're trying

12    to say this is what the contracts mean?  No.  That's law.

13    They don't get to say that.

14            But if they want to say this is how people in the

15    industry understand these terms, without regard to whether

16    that's right or wrong, just this is how -- this is either

17    what this term generally means to people in this industry and

18    based on my experience and expertise, I think that's fair.

19            And to the extent there's a legal interpretation

20    about the term, I will either then give a limiting

21    instruction:  Look, there's a legal meaning to the contract.

22    That comes from me.  He's not telling you the legal meaning,

23    he's telling you his view of the way people in the industry

24    just think about.

25            So that -- I'm open to hearing you, if you think

1    that's not a proper line to draw.  But I'm inclined to be

2    open to that.

3            MR. JOHNSTON:  Your Honor, as we stated in our

4    motion to limit the testimony, we think it's fine to have an

5    expert testify about a particular term.  But I think going

6    beyond that and starting to interpret phrases and sentences

7    and paragraphs, which is what I think the defense experts do

8    intend to do, which is to look at an entire subsection and

9    say, "Here is where the State Street entity is saying they

10   don't have to disclose their commissions and that their

11   broker-dealer will actually take an undisclosed markup," we

12   think that would be straying too far.

13           But if it went purely to when they use the term

14   "fiduciary," this is what people believe -- people in the

15   industry believe fiduciary to mean.

16           THE COURT:  So some of that might depend on what

17   the term -- what the phrase or paragraph is and why -- the

18   more it looks like a lawyer reading a contract, giving his

19   legal interpretation, the more it's excludable.

20           The more it's -- seems like a person in the

21   industry saying, "This is a common phrase that we see all the

22   time in contracts, and this is how we understand -- people in

23   this industry understand that phrase," then it seems more in

24   the genre of like talking about a particular term.  Some of

25   that is context.  That's how -- so I don't necessarily

1    disagree with you, but some of it depends on what it is.

2                MR. JOHNSTON:  Right.  And maybe that's just, in

3    trial, we will object as we see needed as -- if the testimony

4    starts to stray in that direction, we believe that defense

5    does --

6                THE COURT:  I think -- so helpful that you made the

7    motion, because it got me thinking about the issue.  I don't

8    know that I can rule on the issue until I know more.  I have

9    this general thought, in terms of the evidence, how I would

10   view -- I'm thinking about things maybe being admissible or

11   not.

12               MR. GOLDSTEIN:  I'm just upset that Mr. Johnston

13   got to speak before I did in the case.  But I think we

14   understand the Court's --

15               THE COURT:  That's only because you're such a

16   shrinking violet.  You're not supposed to be a potted plant.

17               MR. GOLDSTEIN:  We understand the Court's ground

18   rules.  I think the testimony is going to fall within the

19   proper context that the Court set out, but -- so we

20   understand.

21               THE COURT:  So let me give you two other, sort of,

22   thoughts.  One was that I don't know that he can say

23   sophisticated clients seem to accept the banks are making

24   money beyond the explicit fee.  That seems like he's just

25   testifying what people think about.  It's one thing to say --

1    maybe it's relevant, maybe it isn't relevant that --

2           There's a couple of different kinds of providers of

3    these services, and they make money in a couple different

4    ways, in different ways.  This provider makes -- this kind of

5    provider makes -- typically works this way, this kind of

6    provider typically works that way, this kind of provider

7    typically works this way.  State Street is one of those three

8    kinds of providers.  That might be relevant to provide

9    context, or it might bear on materiality.

10          But it seems like, at least put that way, they just

11   seem to accept -- I mean, how does he know what people seem

12   to accept, that there's an -- that might --

13          MR. GOLDSTEIN:  No.  I think the testimony is going

14   to be more in the line in terms of his experience in the

15   industry and how the industry, as a whole, works in this

16   particular sector.

17          And so to that extent, I think, if he does testify

18   to that -- in that context, Your Honor, it's going to be

19   couched in the sense that here's his expertise, he's his

20   experience in the particular industry, and here's how

21   participants within that particular industry understand how

22   these different sectors of the industry work, where

23   particular people might make money in that particular sector

24   of the industry.

25          THE COURT:  I'm also dubious about this whole

1    aborted attempt to require full disclosures in the regulatory

2    context, which is in -- of a piece with, but maybe different

3    than, the Senate bill.  It wasn't quite clear why that -- I

4    am not so persuaded of that.

5              MR. GOLDSTEIN:  And again, we'll broach the topic

6    with the Court before we try to elicit any testimony in terms

7    of that field attempt.

8              THE COURT:  On the other hand, just on the RFPs, I

9    could see it being more of a piece that, you know, that

10   people in the industry, typically there's an RFP, people

11   respond, in my experience, typically view that as the

12   starting point, but not the binding agreement; that these

13   other things are the agreement.  He could -- he -- especially

14   if it's more couched, "And this is how -- this is typically

15   how it works, this is the custom and practice in the

16   industry," seems more -- that seems more acceptable.

17             Any questions about that one?

18             MR. FRANK:  No, Your Honor.

19             THE COURT:  The Government's motion to preclude

20   introduction of self-serving hearsay in the undesignated

21   audio recordings.  So I thought about that a lot.  Well,

22   there are two parts to that.  First, the designation part

23   that you're asking for.  I'm inclined to agree with

24   Mr. Weinberg, given the representations he's making about

25   what he's disclosing and when, that you put in your response,

1    if you do that, that seems to resolve it.  I recognize there

2    could --

3            MR. FRANK:  I'm sorry, what is Your Honor referring

4    to?

5            THE COURT:  This is you wanted him to designate in

6    advance all the audio portions he's going to use in

7    impeachment and produce transcripts.  That was my

8    understanding of what you were asking for and -- or one of

9    the two things you were asking for in that motion, in a big

10   picture way.  And he has said, no, I don't think I have to do

11   that in advance, but I will notify you --

12           Essentially, I understood when you get up to do

13   your cross?  Is that what you're talking about?

14           MR. WEINBERG:  My thought is we have prepared

15   either transcripts or we have prepared verbatim summaries, I

16   don't know until after hearing direct, you know, which ones I

17   will preliminarily intend to use.  And I may not know until I

18   determine whether or not the witness --

19           THE COURT:  What they're saying --

20           MR. WEINBERG:  -- is or is not going to agree with

21   my leading questions regarding certain subjects.

22           But to the extent that I intend to play an audio

23   that I believe satisfies Rule 16, I will provide Mr. Frank,

24   at that time, a transcript.

25           THE COURT:  So my question is, why can't you give

```
 1    to him when you stand up?  The reason I ask is -- the reason

 2    that I wonder about that -- or one of the things, as a

 3    practical matter --

 4            As a general matter, I think you don't have to

 5    disclose those things until you start to ask the question,

 6    the way you proposed.  But there are a lot of audio

 7    recordings here.  And to the extent that he wants to look at

 8    and consider an audio recording, if you're doing it at that

 9    moment, to key it up, to look at it, put it on headphones and

10    listen to it, or if they have a transcript or whatever, is

11    somewhat cumbersome.  It doesn't seem to impair your ability

12    to do the cross, if you give it to him at the beginning of

13    the --

14            Why would it impair your ability if you give it to

15    him at the beginning of the cross?

16            MR. WEINBERG:  (A), I think that the -- giving him

17    a transcript would be --

18            THE COURT:  I'm not ordering you to prepare a

19    transcript you don't have.

20            MR. WEINBERG:  They are.  So in other words, to the

21    extent they're not -- that we have substantially verbatim

22    summaries of a whole thing of things that I have --

23            THE COURT:  So all the things you want to cross on,

24    like this, what you view is a substantially verbatim

25    transcript.
```

1          MR. WEINBERG:  Yes.  And to the extent I elect to

2    use it.  And maybe it's five, six, eight, rather than the 50

3    that are in the kind of options.  I would give Mr. Frank, at

4    that time, as I would give him if he asked for a transcript

5    of a prior inconsistent statement, or an e-mail that I

6    contend constitutes a contradiction, I would have a Post-it

7    where, in the transcript, I intend to go.

8          He could certainly, just as he would with a

9    document, look at the transcript.  I represent the

10   transcripts were prepared by a third party.  They're as

11   accurate as the transcripts the Government has prepared to

12   use on direct exam.  And that more than satisfies the

13   requirements on 613.

14         MR. FRANK:  Your Honor, a couple of points.  The

15   transcripts that the Government is using on direct exam are

16   being each individually reviewed by the witnesses who are

17   introducing those transcripts, corrected by those witnesses,

18   and will be vouched for by those witnesses.  That cannot be

19   the case for transcripts that are used on cross-examination.

20   And I will tell you that these transcripts prepared by third

21   parties are littered with errors.  These are complicated

22   terms that -- financial terms that just -- and proper names

23   that can be confusing to somebody preparing a transcript.

24         The second point is, audio is inherently different

25   than a document.  A document can be scanned in its entirety,

1    can be looked at.  We can see the entire thing.  With audio,

2    we actually have to listen to it.  Some of these recordings

3    are a minute or two minutes.  Some of them are 15-minutes

4    long.  So I cannot be -- to the --

5            Well, there's two issues.  One is the use of that

6    as impeachment and my ability to actually redirect the

7    witness.  The second issue is what the jury hears.  And

8    there's -- there should -- that should be no different from a

9    document, where -- it can't just be put in front of the jury.

10   It -- and what I understand counsel to be proposing is that

11   it is put in front of the jury.  Because once it's been

12   played, it can't be unplayed.  Once it's been played in open

13   court.  There's no document that he would be able to just put

14   in front of the jury --

15           THE COURT:  No.  But he could pull up, couldn't he,

16   and say, "Didn't you" -- holding the piece of paper, "Didn't

17   you write an e-mail on such and such a date, to so and so

18   person and say this"?

19           MR. FRANK:  For sure.  Yes.

20           THE COURT:  And he's essentially put the document

21   in front of the jury.

22           MR. FRANK:  It's very different from actually

23   playing -- putting the document in front of the jury and

24   playing audio in front of the jury.  He can say, "Didn't you

25   say this to this person in a phone call?"  Sure.  He can then

play a phone call for the witness on headphones.  But to
actually play the audio in front of the jury --

THE COURT:  So I guess there's a couple of
different issues.  One, I don't see why playing it -- you
know, I guess I'd say this.  In the first instance, if
there's questions about audio, then we can play headphones.
We can do it with headphones.  What I would -- I'm assuming,
based on my experience in this case and the presumption that
I would generally indulge in, but -- for both those reasons,
that the things that were being played were, in fact,
impeachment, were admissible, and that there was a good-faith
basis to believe they contained the statements that would
render them appropriate to play, if I heard them in advance
and if you heard them in advance.

Now, that presumption could shift, if it didn't
play out that way, after -- you know, in the course of the
trial, right, one by one.  Right?  But we could also -- the
question of putting on -- I know you want to put it on
headphones.  We can do that, potentially.  And that mitigates
or resolves the issue of the jury hearing it before we've all
heard it and resolves whatever issues are presented by it.

MR. FRANK:  But if there's a 30-second excerpt from
a ten-minute recording, Your Honor, we can't know whether
that's misleading, whether that's out of context, unless
we've heard the recording.  And while I respect

1    Mr. Weinberg's point that I'm obligated to know my evidence,

2    there are 14,000 recordings here.  There's a practical issue,

3    and it's a little bit unfair.  And I think it's particularly

4    unfair where the reality is defendants put in their case on

5    cross-examination.

6              So the line between what is impeachment and what is

7    their case in chief is a very thin line.  And he's obviously

8    got these transcripts and summaries prepared.  He knows what

9    he intends to use, so I think it's a little bit unfair to

10   say, "I don't know what's going to come up in trial, and I

11   can't give you a heads-up the day before I examine this

12   witness."

13             What I might use -- there could be a requirement

14   that we not discuss it with the witness, but at least --

15   which we would be prepared to abide by.  But at least the

16   opportunity to hear the recording in its entirety, so that we

17   don't have to stop the trial in the middle every time he does

18   this to --

19             THE COURT:  That's the practical reason.

20             MR. WEINBERG:  But he doesn't have to, Judge.  The

21   rule does not require that Mr. Frank listen to ten minutes,

22   if the contradiction is 30 or 60 seconds, because he has

23   redirect.  He will get the tapes that I use.

24             THE COURT:  But how is this a practical matter?

25   You cross them, he learns right before you ask on -- you

1    impeach the witness with a 30-second contradiction on your

2    cross.  He gets it right then, he looks at the verbatim

3    transcript.  Maybe it's not apparent to him, completely, from

4    the --

5           This is a verbatim transcript of the whole ten

6    minutes?

7           MR. WEINBERG:  Most of them are verbatim

8    transcripts of the full ten minutes.  Some, as I say, are in

9    reserve, in case, and they are substantially verbatim

10   summaries.

11          Mr. Frank, if he looks at it and says, "Wow, this

12   doesn't seem like a contradiction," we can deal with it.  But

13   I think these are fairly blatant contradictions.  I have got

14   a lot of tapes to select amongst.  I have got some

15   credibility that I hope is as great with the Court after the

16   trial as before and as great with Mr. Frank as before.  I

17   don't intend to try to take a witness ten degrees and play a

18   ten-minute tape.  I've told Mr. Frank, I'm not playing tapes

19   where these -- where Mr. Pennings is making statements that,

20   you know, are not relevant to the case but --

21          THE COURT:  Are all the tapes you want to play

22   contradictions?  That's the purpose of them?

23          MR. WEINBERG:  I would best be able to answer that

24   question after I see what Mr. Frank elicits from Mr. Pennings

25   on direct.  There are tapes wherein I expect the Government

1      to elicit parts of the KIA transitions.  But if they do it in

2      a way that I consider distorted, they may be tapes that both

3      impeach and augment the Government's presentation on a

4      specific, you know, transition.

5              MR. FRANK:  Well, augmenting -- you know, it sounds

6      like a lot like a case in chief, Your Honor.

7              MR. WEINBERG:  What I don't think I'm required to

8      do, Judge, is to give Mr. Frank every tape that I have that I

9      might use.  I don't think that I'm required to preview my

10     defense.

11             THE COURT:  No.  The -- here's the thing that I am

12     concerned about.  To the extent that -- I don't want to spend

13     a lot of time putting on headphones at the trial to listen to

14     things, and I don't want to spend a lot of time recalling

15     witnesses because after you did your redirect, you come back

16     to me and the Government comes back and says, "Now we had a

17     chance this -- yesterday afternoon to listen to the whole ten

18     minutes of this, and now we want to recall the witness to

19     explain a little more about that, which we didn't have the

20     chance to do, because we didn't know about it."  But that's

21     the sort of -- and the --

22             And in an ordinary case, I wouldn't be so

23     interested to this request.  But there are, you know,

24     thousands of things, so it makes it more difficult to know

25     about them all, check them out.  It may be that your ten or

1    80, or whatever tapes that are your likely tapes, are all

2    ones that he's heard 20 times, anyway.  I don't know that.

3    But those are the practical concerns that I'm thinking about.

4              MR. WEINBERG:  I don't think that this is, from a

5    cross-examination perspective, going to be loaded with tapes.

6    I do think that either because Mr. Pennings will agree to

7    certain propositions that will eliminate the requirement of a

8    tape --

9              THE COURT:  This is primarily a Pennings and

10   Boomgaardt issue?

11             MR. WEINBERG:  Yes.  Exclusively -- well, not

12   exclusively.  There's a third witness.

13             MR. GOLDSTEIN:  There is a third witness, too.

14             THE COURT:  Who is the third witness?

15             MR. WEINBERG:  Mr. Dixon.

16             THE COURT:  Who is that?

17             MR. WEINBERG:  He is a consultant to the Royal Mail

18   and will be testifying regarding his --

19             THE COURT:  He's the one who's referred to in the

20   e-mails as the consultant who was -- who didn't like State

21   Street?

22             MR. WEINBERG:  Yes.

23             MR. FRANK:  Yes.

24             THE COURT:  And he's on tape, just when he called

25   State Street?

1          MR. WEINBERG:  He and Mr. Boomgaardt have extensive

2     conversations on tape.

3          THE COURT:  I see.  When are the three of them

4     likely to testify?  Or are there -- are they likely to

5     testify -- I mean, who's your first witness?  Is it one of

6     them?

7          MR. FRANK:  Well, now Your Honor is giving

8     Mr. Weinberg exactly what he's been asking me for, for

9     three days.  Our first witness is going to be Mr. Boomgaardt.

10         THE COURT:  Okay.  So the issue is -- it won't be

11    joined on Tuesday, exactly, because you won't be doing your

12    cross on Tuesday.  But even if you're faster -- even if it

13    goes at the speed -- it's funny that the rocket docket, which

14    is so close to D.C., is not influencing the pace of the

15    Department of Justice in its examinations.  But --

16         MR. FRANK:  By the way, Your Honor, just for the

17    record, we endorse all the abuse that you want to heap on

18    Mr. Johnston throughout these proceedings.

19         THE COURT:  I see that.

20         You should think about that invitation,

21    Mr. Johnston, and what that means.  And you know, there's a

22    central dynamic in American history that has been the battle

23    between local and central authority and back and forth.  And

24    you should think about whether you should inveigh greater

25    authority in Washington to weigh down, to stamp out this kind

1    of -- this could rise up to be a potential insurrection in

2    the provinces.

3            MR. JOHNSTON:  Having tried my first case in the

4    rocket docket, what is fast about that Court is getting the

5    case to trial.  But once you're at trial, the attorneys are

6    given full length of time for their examinations.

7            THE COURT:  Ah.  All right.

8            As to Boomgaardt, so we're not going -- his cross

9    isn't going to happen until Wednesday.  There is --

10           MR. FRANK:  That's right, Your Honor.  And what I

11   would propose is on Tuesday night, the defense disclose the,

12   you know, likely tapes that may come up on cross.  We will

13   agree not to talk to Mr. Boomgaardt about them.  But at least

14   then we could listen to them, and so we don't have to stop

15   the proceedings to be able to redirect him or to lodge proper

16   objections, frankly.

17           MR. WEINBERG:  Here's one problem.  If they

18   finished the exam of Mr. Boomgaardt, that -- I wouldn't

19   accept the proposition.  It's not ideal.  I think it's more

20   than what 613 requires, but at least I'd understand the

21   logic.  But even Mr. Frank doesn't have two silos in his

22   head.  One of the silos that is prepared ----

23           THE COURT:  I understand.  You don't want him to

24   then shift his direct examination to go through those.

25           MR. WEINBERG:  Even unconsciously, even if he's

1    trying his best to ignore what he just heard.

2            THE COURT:  All right.  I'm going to think about

3    that issue.  At the moment, I'm not ordering anything.

4            With respect to the individual -- so the Government

5    identified a lot of individual hearsay statements.  So I

6    think for -- firstly, all of them, it's sort of a

7    case-by-case determination, based upon how the evidence is

8    coming in.  I'm not ruling on them now.  I don't know what

9    all the evidence is.  I need to hear the evidence and then

10   hear, looking at that evidence, what is being offered, what

11   is the purpose of it, how does it fit into the case and the

12   defense and the like.

13           I will say this.  I don't think every single

14   document that's created by a company is automatically a

15   business record, because it's written down by somebody at the

16   company.  That -- the business record exception doesn't, in

17   this day and age, where essentially most everything happens

18   in writing, didn't transform every previously inadmissible

19   oral conversation into an admissible business record.

20           But I don't intend to resolve this on some broad,

21   plain rule about the business records exception.  It's more

22   on an individual, look at the document, does this particular

23   document seem to meet the exception or not.  Or was it

24   offered for a non-truth purpose, and what is that.  I -- so

25   that's one thought that came to mind in looking at these

1    particular issues.

2              Let me just -- on some, I'm just not clear what the

3    purpose is.  I will say, with respect to people saying "great

4    job."  There's a couple, "Great job.  That's really good,"

5    the two or -- those struck me -- I'm wondering about the

6    relevance of those.  Those struck me as comments, "You made a

7    lot of money."  I don't know what the significance is to that

8    to his defense.  He made a lot of money, and so they're happy

9    about that.

10             And I think the jury, you wouldn't even need any

11   evidence.  The jury can probably come to that conclusion in

12   the absence of evidence, that he made a lot of money for

13   them.  But it doesn't necessarily speak at all to what the

14   issues are in the case.

15             There's one that's later, it's overblown, in an

16   unexecuted contract.  I'm not prepared to rule on either of

17   those now.  I don't know what -- how they fit into the case

18   and what the evidence is and what the arguments are.  But I'm

19   certainly going to look carefully at those kinds of things to

20   see whether -- for what purpose are they being offered, and

21   is there really a basis to offer it for that purpose.

22             MR. WEINBERG:  And I would say, without belaboring

23   it because I do think it's a document-by-document analysis,

24   just so Your Honor has further context, one of the arguments

25   that we'll be making is transparency within the bank; that

1    the revenues generated by transitions, including revenues

2    generated by transitions for which there were fees, where the

3    people in the hierarchy could see there was a fee, could see

4    there's significantly higher revenues, that the exposure of

5    the revenues to the hierarchy of the bank above Mr. McLellan

6    will be contended to be circumstantial evidence that

7    Mr. McLellan, in good faith, believed that the business model

8    that was generating these revenues was not being concealed

9    from State Street.  And part of the Government's allegation

10   is that this was a concealment from clients and a concealment

11   from State Street.

12          THE COURT:  So my understanding -- and correct me

13   if I'm wrong -- is that there were two different

14   concealments; that it's alleged that the defendant was

15   concealing from the customers these so-called secret

16   commissions or markups, or what have you, and that -- I don't

17   understand there to be -- I didn't understand there to be an

18   allegation that he was concealing from State Street the

19   revenues.

20          MR. FRANK:  That's correct, Your Honor.  He's --

21          THE COURT:  What he's concealing from State Street

22   is the fact that the customer doesn't know that he's charging

23   the so-called secret commissions.

24          MR. FRANK:  That's exactly right.  And just to be

25   clear, the defense has marked an entire binder full of

1    monthly and daily revenue updates that were distributed

2    around the bank.  We haven't objected to any of those.

3            THE COURT:  Have not.

4            MR. FRANK:  We have not.  Those set forth the

5    generation of revenues.  But it's the question of how the

6    revenues were generated and what the customers knew about

7    that, that's the issue.

8            MR. WEINBERG:  I agree.  It's not a home run that

9    there is the $3 million they made from --

10           THE COURT:  So the admissibility of those documents

11   is not at issue, because everyone agrees that, "Whoo-hoo,

12   yeah" --

13           MR. WEINBERG:  That gets me like halfway from third

14   base to home plate.  And the home plate part would be that

15   Mr. McLellan sees the people who are above him, as he was

16   allegedly above Mr. Pennings, saying, "Great job."  These are

17   professional bankers.  You know, they know how monies are

18   generated by fixed income transactions.  And I think I could

19   use that as, again, a building block towards good faith.

20           THE COURT:  Maybe.  Maybe not.  I mean, I think it

21   just depends whether there's -- what the evidence is and

22   whether you can draw the inference that a higher-up who says

23   "great job" is -- you know, could reasonably be inferred to

24   have -- be endorsing what was not just the charging of the

25   commission, because there's, really, here --

1          The Government is not contending that State Street

2     couldn't, as a matter of law, charge these commissions,

3     right?  They could have done this.

4          MR. FRANK:  That's right.

5          THE COURT:  It's just saying it was no good,

6     because they said they weren't.

7          MR. WEINBERG:  I think Your Honor has put your

8     finger on one of the essential battlegrounds in this case.

9          THE COURT:  Okay.  So some of these things I could

10    see -- I don't think that they turn completely on whether

11    they're admissible for the truth of the matter asserted.

12    Some of them, I will tell you, I understand the defense

13    arguments to be not for the truth of the matter asserted, and

14    then it just depends.  I'm not really -- I don't know enough

15    about the case, yet, and the particulars of each thing, each

16    document or statement and where it fits in, to know whether

17    it comes in for or not for the truth of the -- for one of

18    these other purposes.  And it might vary from -- I think it

19    likely would vary document to document, at least require an

20    independent, individual examination.

21          One theory that you advance, Mr. Weinberg, is very

22    interesting.  I'm not -- I haven't -- I'm just not sure about

23    it.  I have -- it raises a number of considerations and that

24    is the idea that a defendant who has pled guilty and admitted

25    that, therefore, he has a guilty mind, could be impeached

1    with -- if you will, there could be evidence that, if he were

2    on trial, might be admissible to show good faith.  It might

3    not be a home run, but it might be a fact that tends to show

4    he knew it, he knew it at the relevant time, before he -- at

5    a relevant time of the criminal activity, and it might bear

6    on his good faith.

7            But the idea, when he's -- but you want to admit

8    that, even though he's pled guilty.  And so that --

9            MR. WEINBERG:  I -- exactly.  I don't think -- I

10   don't think a 2018 or 2017 decision that it's in my

11   self-interest to plead guilty and I pled guilty in an

12   American courtroom, necessarily means that, in 2010,

13   Mr. Pennings didn't, at least in part, do things he thought

14   at that time were legal.  Maybe he thinks they're not legal

15   now.  There are -- it raises a host of important, interesting

16   issues.

17           THE COURT:  Well, no.  He's admitting not only that

18   he thinks now they're not legal, he's -- he admitted that he

19   then had a guilty mind; that he couldn't have pled guilty now

20   if he doesn't now think that he then had a guilty mind.  This

21   isn't, I don't think, the situation where everyone agreed as

22   to what happened, and he said, "Oh, when I did it, I thought

23   I didn't commit a crime."  But there's -- it's a strict

24   liability criminal offense, and now I appreciate that it is

25   illegal.  I didn't know that, but I also now know that

1    doesn't matter.

2            MR. WEINBERG:  I think Your Honor will see that

3    this is not a black and white circumstance.  This is -- you

4    know, part of my defense, just so Your Honor has that

5    framework, is not limited to good faith, not limited to

6    Mr. McLellan's lack of criminal intent.

7            I think there's a strong argument here that many,

8    if not all, of the transactions charged by the Government,

9    are not a crime.  I can say, when I went over all the

10   ConvergEx stuff and read how the Southern District of New

11   York treated ConvergEx, they actually got a criminal plea

12   from the company.  But the chief of the company, the man that

13   was in Mr. Pennings or Mr. McLellan's position, resolved this

14   case through an SEC settlement.

15           This is not like a bank robbery, it's not like

16   everybody knows it's a crime.  There are delicate and nuanced

17   issues about just what did and did not violate American fraud

18   laws, or much of the conduct -- the contracts were between

19   British clients and a British entity of State Street.

20           MR. FRANK:  Just to be clear, there was an

21   individual charged in the ConvergEx case.  That comes up in

22   the --

23           THE COURT:  That's not coming up in this trial.

24           MR. FRANK:  It's not, but --

25           THE COURT:  Right.

1          MR. FRANK:  I don't want the Court to be under the

2     illusion that individuals were not charged with committing

3     crimes in that case.

4          MR. WEINBERG:  Well --

5          THE COURT:  You know what?  It's too far afield.  I

6     don't -- to understand the significance of all of that, I'd

7     have to understand the case to come to my own independent

8     judgment, in other words, why people -- why something might

9     have happened in a particular case or it didn't happen and

10    what it all meant.

11         MR. WEINBERG:  I guess all I wanted to do was

12    communicate that I don't think Mr. Pennings' plea preempts an

13    argument that -- if I make it, that not only did Mr. McLellan

14    lack criminal intent, but he also did not commit a crime.

15         THE COURT:  So I'm not -- I don't think the

16    Government has moved to preempt an argument that you might

17    make in close about that.  The -- more the question is

18    whether a particular document that was given to Mr. Pennings

19    that, let's just say for sake of discussion, would be

20    admissible on a trial on these charges of Mr. Pennings, that

21    would be admissible to potentially -- because it might be

22    admissible to show his good faith, even if it isn't

23    admissible for the truth of the matter asserted.

24         Whether it's -- where there's no evidence your

25    client understood it, or it's not coming in for you to

1    impeach Mr. Pennings, it's not coming in where he admits that

2    he told Mr. McLellan about it, those are different avenues.

3    But where it's just coming in to say, well, it goes to his

4    good faith, he's a co-conspirator, and there's no conspiracy

5    unless the two of them had guilty minds together and, so I

6    could consider -- that argument is interesting.

7              MR. WEINBERG:  I would say that Mr. Pennings' plea

8    does not stop Mr. McLellan from arguing that there was no

9    meeting of the minds, because both Mr. Pennings and

10   Mr. McLellan lacked a criminal intent to enter --

11             THE COURT:  I don't think it stops you from making

12   the argument.

13             MR. WEINBERG:  And these are the building blocks of

14   that argument, which are their e-mails.  Many of them are

15   e-mails right in the -- not only during the conspiracy, but

16   e-mails during the very transitions that the Government

17   claims are a crime.  And this really could go -- I mean, we

18   were talking about it.  If you had a -- like a video with an

19   audio and a robbery, you certainly would be able to admit it

20   because that's the act.  Well, these e-mails between the

21   clients and State Street, between Pennings and the

22   representatives of the clients, between Pennings and

23   Boomgaardt, are the transition, and we ought to be able to

24   admit it.

25             THE COURT:  Those are considerations that you need

1    to think about, because I'll be thinking about those --

2         MR. FRANK:  And just to be clear, we're not

3    objecting to their uses as impeachment evidence.

4         THE COURT:  Right.

5         MR. FRANK:  We're objecting to their admission as

6    part of the defendant's case in chief.

7         THE COURT:  Right.

8         MR. FRANK:  He can ask the witness about it.

9         THE COURT:  Yes.  No, no.  Right.  I understand the

10   motion is not directed at that, but it might -- he wants to

11   admit it, not necessarily for the truth, but he wants to

12   admit it not just to -- well, it may be that sort of this is

13   a fine academic point that's not really relevant, because

14   Mr. Pennings is going to say, "Yes, that was told to me, and

15   I was aware of these things at the time," and that may

16   resolve some of these issues, depending on what the testimony

17   is.

18        MR. FRANK:  Just a procedural matter, Your Honor.

19   So what I understand Your Honor to be saying, with respect to

20   our motions on these documents, is that we're going to do it

21   on a case-by-case basis.  And we get that.  The Government's

22   intention for our case in chief had been to introduce our

23   exhibits in bulk, and that would obviously not be possible on

24   a defense case where we're going document by document.  But

25   we think it should be possible for our case to expedite

1    things.  And since there haven't really been objections to

2    any of our exhibits --

3          THE COURT:  I don't --

4          Do you object to that process?

5          MR. WEINBERG:  I object to it, unless I know what

6    documents Mr. Frank wants in.  Some of them, you know, we

7    will not have objections to.  Others --

8          THE COURT:  So let me say this.  As a general

9    proposition, to the extent there are documents that you have

10    that are not objected to, for both -- for you, in the

11    presentation of your case, I am generally happy to have you

12    just say, "These are all admitted," either en masse --

13    because they're unobjected to.  And I'll explain to the jury

14    that sometimes there will be objections, sometimes there

15    won't.  You need to --

16          I'm sure you're sharing the list, already, but

17    clarify as to what the scope of that is.  I'm -- and I'm

18    amenable when you -- you're --

19          You anticipate presenting a case, right?

20          MR. WEINBERG:  Yes.

21          THE COURT:  So I'm amenable, when you get to your

22    case, to doing the same thing.  I'm also amenable, to the

23    extent you come in in the morning, you tell me, "Judge,

24    there's nine more exhibits one or both of us are going to be

25    doing today and there's no objections to them."  Like when

1    you first go to use that exhibit, just say, "Judge, this is

2    Exhibit 10 I'm about to ask the witness about.  I move it

3    without objection into evidence."

4            "Is that correct?"

5            "Yes."

6            In evidence, done.

7            And -- along the way.  And I would do that for both

8    of you.

9            In other words, to the extent that it's agreed to,

10   I don't want to spend time on it.

11           MR. WEINBERG:  And it may be, Your Honor, that we

12   would ask the Court, at the time the Government offers

13   exhibits, to also admit defense exhibits to which there is no

14   objection, which are relevant.

15           For instance, I don't mean every one of their 20

16   witnesses, but Mr. Boomgaardt, the Government is going to

17   plan to put in five hours worth of testimony, which is going

18   to probably include 30, 40 different exhibits.  We may want

19   15 or 20 exhibits that are Boomgaardt-related that we may

20   want to ask him about.

21           THE COURT:  So I will tell you both that I tell the

22   jurors at the end, like, it doesn't matter who offered the

23   exhibits.  It's the evidence that matters.  I'm happy, if

24   there's no objection to those exhibits, as to whatever they

25   are, that, you know -- if they're agreed to, if they're

exhibits that will be in evidence and to which there is no

objection, then to -- you know, I'm open to hear from all of

you, to admit them all at once.  I'm happy to just say

there's a whole bunch of exhibits that are coming in evidence

and not particularly spend any time identifying whose they

are.  It doesn't really, to me, matter whose exhibit it is,

like what -- although they're probably labeled "Government"

and "defense," that that doesn't really matter.  But so I

don't have any -- I'm not adverse to doing that, but I'd want

to hear from Mr. Frank and how he feels about it.

        MR. WEINBERG:  Okay.  Maybe we can start with

Mr. Boomgaardt, and we can get our hands around the groupings

of the exhibits that we want to use.  And we probably don't

have many objections to much of what the Government wants to

put in through Boomgaardt and that --

        MR. FRANK:  I'm not sure I've ever seen defendants

introduce their own case in chief through the Government's

witnesses.  I'm not sure what Mr. Weinberg is proposing.

        THE COURT:  So I don't -- I guess all I'm saying is

this.  I would ordinarily think you would do your exhibits

for your case when you start.  But to the extent there are

exhibits you are going to introduce along the way in the --

either with the first witness or the Government's witnesses,

that you're going to seek to introduce into evidence at that

point, if they're not objected to and we're just going to, en

1    masse, move a bunch in, I don't mind moving in -- I'm okay to

2    move in more, rather than doing them one by one when they

3    come up.

4         None of that precludes doing things either one by

5    one, or in groups in the morning, or just as you go, if

6    they're not objected to.  If they're objected to, then we do

7    it in the ordinary course, and we lay the foundation and the

8    like.  But that seems like something maybe you should talk to

9    each other about in the first instance.

10        I want to touch briefly about a couple other

11   points, to give you some things I was thinking about.  One

12   is, there was another motion the Government made about

13   inadmissible and irrelevant third-party hearsay.  I'll tell

14   you a couple tentative thoughts I had, because this might be

15   helpful.

16        I read this memo that's a comparative -- it's by

17   the consultant -- it's a comparative assessment of the bids.

18   I might be -- I'm not ruling that out automatically.  I could

19   see that as potentially relevant to materiality.  And I'm

20   going to allow the victims to testify not only to what they

21   heard, but why they thought it was important, essentially

22   what you want to do.

23        MR. FRANK:  And the issue with that one, Your

24   Honor, is -- one of the issues with that one is there's

25   actually no witness for that document.  There's no witness

1    that we're calling from that victim or from that consultant.

2    So I'm not sure how that comes in.

3            THE COURT:  You mean from an authenticity

4    perspective?

5            MR. FRANK:  Not just from an authenticity

6    perspective, but who's to interpret that document.  It's just

7    being --

8            THE COURT:  Well, I think there needs to be some

9    foundation.  Somebody needs to say it was received.  To me

10   it's relevant that it was received by the victim.  That's how

11   I was thinking about its potential relevance.  I'm not ruling

12   it in, but to the extent the victim got it, it potentially

13   bears on it's information that the victim considered in

14   thinking about whether it was important or not and these

15   different types of considerations.  What you're raising is

16   sort of a procedural issue, like how do we know the victim

17   got it.  How do we know they sent it, right?

18           MR. FRANK:  And even if they got it, how do we know

19   they read it, how do we know they understood it, how do we

20   know that they thought about it.  All of these, without a

21   witness, we're just going to be putting in hearsay documents

22   and then arguing what they meant to people.

23           THE COURT:  Those are -- those are considerations

24   about --

25           MR. WEINBERG:  Maybe we should just strike this

 1    transition from being an object of the conspiracy, if the

 2    Government has chosen not to call a witness that we can

 3    introduce material and relevant evidence through.

 4            THE COURT:  This is the Royal -- this is the

 5    British banking, right?

 6            MR. FRANK:  No, Your Honor.  This is Eircom, which

 7    is an Irish phone company and its pension fund.

 8            THE COURT:  It's within the conspiracy, but not

 9    otherwise part of the case.

10            MR. FRANK:  And you know, once again --

11            THE COURT:  Are you presenting any evidence about

12    them?

13            MR. FRANK:  There will be reference to Eircom.

14    It's not going to be an extensive part of our case.  They

15    were another victim of the fraud.  There's not -- it's not a

16    substantive count; it's wrapped up in the conspiracy.

17            THE COURT:  What comes in related to them?

18            MR. FRANK:  There will be testimony about the

19    fact -- I'm not sure --

20            MR. JOHNSTON:  Mr. Boomgaardt will testify about it

21    and representations that he made and assisted and --

22            THE COURT:  So he'll -- will he testify in short

23    form to this:  I talked to them, I got them as a client, I

24    told them this.  That was untrue, we charged commissions that

25    I didn't -- that I represented to them I wasn't charging?

1      MR. JOHNSTON:  Yes.

2      THE COURT:  Okay.

3      MR. FRANK:  But then to have an internal e-mail

4 between an Eircom consultant, who's not here, and an Eircom

5 witness who's not here -- there's been no effort by the

6 defense to get any Eircom witnesses.  They never tried to

7 depose any Eircom witnesses.  They just want to put in

8 hearsay documents.

9      MR. WEINBERG:  This is Ireland.  Ireland told us

10 that you can have as many letters rogatory as you want, we

11 don't honor them, unless the United States Department of

12 Justice, through MLAT, asks the central authorities in

13 Ireland to produce records.

14      MR. FRANK:  The consultant is in London, Your

15 Honor.

16      MR. WEINBERG:  Yes.  But the client is in Ireland.

17      MR. FRANK:  But the document from the consultant is

18 in -- that document that's in question was produced by a --

19      MR. WEINBERG:  No question.  Because we couldn't

20 get the documents, because Mr. Frank wouldn't move under

21 MLAT.

22      THE COURT:  Right.  But what the -- that somebody

23 read it would come from Ireland.

24      MR. FRANK:  The person who received the -- the

25 people who received it are in Ireland.  The people who sent

1   it and who could testify about it --

2           THE COURT:  But they could only testify, at most,

3   that they wrote it, and they could maybe say --

4           MR. FRANK:  They discussed it with the client.

5   There's a whole range of things.  My point is only that, to

6   just simply introduce this hearsay document --

7           THE COURT:  It's a consideration.  I'll think about

8   that.  I was not aware of that or hadn't perceived that.

9           Are the requests -- the responses to the RFP also

10  to the same victim?  There was some discussion in the motion

11  about responses to requests for proposal from which State

12  Street emerged as the successful bidder.  Was it that same

13  victim?

14          MR. FRANK:  I believe that refers to the responses

15  to AXA, Your Honor.

16          THE COURT:  Oh.  To the US one.

17          MR. FRANK:  I'm trying to find what we were -- at

18  the bottom of page 2, that was -- of our motion, that was

19  responses by other companies to AXA.

20          THE COURT:  Okay.  All right.  That's -- I could --

21  that's within the realm of the information the victim was

22  considering at the time that they were evaluating --

23          MR. FRANK:  And we would have no objection to it

24  being used for impeachment purposes.  The question is whether

25  it comes in as an exhibit, Your Honor.

1          THE COURT:  I guess the content of it, which is as
2     far as I had gotten in thinking about it, was that I could
3     see it bearing on this is the choice they were making at the
4     time, and the choice between what was said to them by
5     Boomgaardt or by Pennings or by McLellan or whomever.  And
6     this is among the range of choices that they were facing, and
7     that might be something that might bear on the jury's
8     evaluation of the materiality.
9          MR. FRANK:  Again, we're not questioning the
10    relevance, Your Honor, but we're questioning the
11    admissibility of the particular document.  The witness may
12    certainly be impeached about it, but I'm not sure what the
13    evidentiary basis is to actually admit the document.
14         THE COURT:  Impeached, no.  You didn't care about
15    this, because here are all the other things.
16         MR. FRANK:  Did you receive a proposal from X, Y, Z
17    bank?  Did the proposal --
18         THE COURT:  You mean impeaching the materiality.
19    That's what you mean when you say --
20         MR. FRANK:  To the extent that it's relevant.
21    Because it's -- on the issue of materiality, the witness from
22    AXA can be asked about whether they received and reviewed a
23    proposal, what consideration they gave to proposal, et
24    cetera.  The question is whether the proposal itself is
25    admissible under the rules of evidence, and our position is

1   that it's not.

2          THE COURT:  All right.  Well, that presents two

3   parts.  The content -- subject matter is --

4          You don't object to the --

5          MR. FRANK:  We don't object to the relevance of the

6   document.  We object to its admissibility.  We don't think

7   it's a business record.  We don't think it should be

8   admitted, you know, under that rule.  But we certainly think

9   the witness can be asked about the fact that they received

10  other proposals, and this is what those proposals offered.

11         MR. WEINBERG:  Well, I'm not 100 percent sure I

12  know which document we're referring to but --

13         THE COURT:  I think we're referring to the one --

14  if it's the -- the responses to the requests for proposal to

15  the victim in Count 6.

16         MR. WEINBERG:  I thought those were mostly Eircom.

17  But if it is AXA and it was received from AXA, that may

18  qualify under the business record exception.

19         MR. FRANK:  These were documents prepared by

20  BlackRock and ConvergEx, actually, when they were bidding on

21  the AXA transition.  They were submitted by those entities to

22  AXA.  I don't think they become AXA business records.

23         MR. WEINBERG:  Well, they were either received from

24  AXA or received from State Street, so somebody kept them in

25  the ordinary course of business, you know, based on an

1    evaluation of which of multiple banks was selected.  It

2    certainly would qualify under 807, if not 8036, and it's

3    certainly highly relevant.

4          MR. FRANK:  Not for its truth, Your Honor.  And the

5    fact that it was received and maintained doesn't make it a

6    business record of the company.  There's still not going to

7    be testimony about whose practice it was to produce the

8    document, what information they produced it from, all of the

9    other requirements of the business records rule.

10          THE COURT:  I'll have to think about that one.

11          One last point I want to raise with you, which is

12    the deferred prosecution agreement.  Am I correct, Mr. Frank,

13    that you want it on the following theory, that State Street

14    entered into this DPA after the -- it learned about -- at

15    some point after it learned about the conduct that gave rise

16    to Counts 1 to 5, that they entered into this deferred

17    prosecution agreement.  It cost them lawyer money, it cost

18    them fines, or something, and it cost them money to pay for a

19    monitor.  And from that, the jury could infer that the

20    conduct giving rise to Count 6, which occurred at the same

21    general time period as the conduct giving rise to Counts 1 to

22    5, either caused them -- cost them that amount -- those kinds

23    of money, or would similarly cost them money.

24          MR. FRANK:  Certainly that last point, Your Honor.

25    There is an additional point, which is that under the DPA --

1    so yes, the conduct --

2          THE COURT:  The fact that other similar conduct at

3    the same time cost them money is a basis to infer that this

4    conduct would also cost them money.

5          MR. FRANK:  Would -- yes, Your Honor.  In addition,

6    it actually did cost them money as a result of the DPA,

7    because the DPA requires State Street to disclose evidence of

8    fraud to the Government, which State Street did when it

9    learned about AXA, which resulted in additional expenses to

10   State Street, namely the need to reimburse AXA, likely the

11   need to reimburse AXA additional costs; the need to conduct

12   an investigation of what happened with AXA, for which they

13   hired outside lawyers; the need to hire auditors to go over

14   the transaction.  So the DPA itself led to costs related to

15   AXA, but also the conduct.

16         THE COURT:  So why do you need the DPA?  Why isn't

17   it enough to say -- to put in the following two things in

18   evidence?  One, that State Street learned about this conduct

19   that gives rise to Count 6, and then it cost them -- they did

20   the following things which cost them money?  They reimbursed,

21   they paid for investigation to the company, they did

22   auditors, they did the things that they did, and that that

23   cost them.

24         And then -- and then there were similar conduct

25   that you heard about in Counts 1 to 5, that the defendant

1    engaged in, and that, too, cost them money, because they

2    hired a monitor, they reached a settlement with the

3    Government that cost them money -- or something like that.

4            MR. FRANK:  So let me just be clear.  In the reply

5    brief, Mr. Weinberg suggested that we not put in the

6    statement of the facts that's appended to the DPA.  That

7    seemed to be the main part of his objection, that admitted

8    statement of fact --

9            THE COURT:  Is that the main part of the objection?

10           MR. WEINBERG:  It's one of the many main parts of

11   the objection.

12           MR. FRANK:  We would have no objection to leaving

13   out the statement of facts.  The fact that State Street paid

14   a 60-plus million-dollar criminal money penalty in connection

15   with this conduct is highly relevant to the fact that the --

16   that it was affected as a financial institution.  And so it's

17   not just -- it's not just the fact that they paid money to

18   the Government, it's the fact that it was a large amount of

19   money, that it was a criminal money penalty, that it affected

20   their business.

21           There will be testimony that, as a result of that

22   criminal penalty, they shut down their transition management

23   business in London.  There have been serious repercussions to

24   the financial institution all around this.  And if the

25   defense is not prepared to stipulate that the financial --

1    that the company was affected, which is the other way around

2    this, we feel we should be able to put in this document.

3              MR. WEINBERG:  But it's being affected as to counts

4    that are not charged as bank fraud, that don't have the

5    elements.

6              THE COURT:  The affected person -- who has to be

7    affected?

8              MR. FRANK:  State Street Corporation.

9              MR. WEINBERG:  As to AXA.  As to the AXA

10   transaction.

11             THE COURT:  But the AXA fraud -- if proved as

12   fraud, the AXA fraud has to have affected State Street.

13             MR. FRANK:  Has to have created a reasonable

14   likelihood, an increased likelihood, of harm.

15             THE COURT:  But it's State Street who would be

16   affected.

17             MR. FRANK:  Correct.

18             MR. WEINBERG:  And State Street affected by the

19   alleged AXA fraud, if proven, which means that it's not --

20   it's irrelevant that State Street was affected by the

21   Counts 1 through 5 alleged frauds that generated a decision

22   by State Street to pay 60 million.  It had nothing to do with

23   AXA.

24             Instead, the Government can elicit through the

25   State Street witness, consistent with Your Honor's questions,

1    you know, "What happens when State Street discovers something

2    wrong?"

3           "We conduct an investigation."

4           "Are you at risk of an SEC penalty?"

5           "Yes, we are."

6           Four or five general questions that meet the

7    requirements of the -- of that element of Count 6.

8           The last thing they should be able to do is to

9    prove they've paid damages as a result of Counts 1 to 5,

10   which don't --

11          MR. FRANK:  Your Honor --

12          MR. WEINBERG:  Let me finish, Steve.

13          -- which don't have the same elements as Count 6.

14   That's the kind of spillover prejudice that really warrants a

15   reconsideration of the severance, that the Government is

16   going to push to get in State Street's admissions to Counts 1

17   to 5.

18          MR. FRANK:  He has the right to put me to my burden

19   of proof.  But if he's going to put me to my burden of proof,

20   I have the right to introduce what actually happened.  And

21   what actually happened is that, as a result of identical

22   conduct by the identical person, at the exact same time,

23   State Street paid a criminal money penalty of

24   $60-plus million, that resulted in the shutdown of its London

25   transition management business.

1          So the jury is entitled to conclude from that, that

2     the identical conduct would have made that result even worse

3     had it been -- had it come to light at the time.  And in

4     fact, even when it came to light later, it did have

5     additional repercussions, in addition to the $62 million that

6     they paid.

7          MR. WEINBERG:  The London office was not shut down

8     because of the discovery of --

9          THE COURT:  So let me stop you here.  I want to

10    think about this a little bit more.  I think it would be

11    maybe useful, after I thought about it a little more, to talk

12    to you again about it.

13         I -- one concern that I have is that there's an

14    inference that, because State Street pled guilty, he did it.

15    That's not admissible, you're not offering on that on Count 1

16    to 5.  And so absolutely, if he doesn't stipulate, you're

17    entitled to prove your case, including that element of

18    Count 6; but in doing so, I think about whether there is

19    something that would cause a problem in some way.  Right?

20    Just like you can only prove it in the rules of evidence.  So

21    that's a concern I have about that, and so you should all

22    think about that.  I'll think about that.

23         I have one last question for you.  I've been

24    talking this whole time, going back and forth with you on

25    different issues that I wanted to address.  I don't really

1    have any more time today, but I do have more time either

2    tomorrow, or probably more likely Friday afternoon.  And so

3    I'm wondering, if there are -- beyond this DPA issue, which I

4    might want to talk to you more about before Monday, is there

5    any issues that you all wanted to raise with me?  Not so much

6    that we go over them now, but that would --

7            MR. FRANK:  Just a housekeeping matter.  We'd like

8    to use a PowerPoint during the opening.

9            THE COURT:  I don't have a problem with that.  You

10   can do that.  I'll give you the advice that it's a good idea

11   to run it by the other side.  I had one of your colleagues

12   once, who used a PowerPoint in closing argument, and the

13   other side objected that it had a slide referring to facts

14   not in evidence.  And it became clear, based on my judgment,

15   that it wasn't -- it was, in fact, a fact not in evidence,

16   and I struck it in the middle of his close.

17           To his credit, he did a fine job of, like, managing

18   to have the PowerPoint pulled out from under the rug.  And

19   the technical person did a really good job.  And further into

20   the closing he was able to use it without the one or two

21   slides that had the facts not in evidence.

22           So I'm not saying you have to do that, at all.  You

23   don't have to show it to the other side.  I just -- you can

24   think about that, because it mitigates issues.  But there's

25   no rule that you have to.  It just means that if you don't,

1    and then there's an issue, then there's an issue.

2          I'm not saying -- it's unusual.  I prefer not to

3    have to do that.  I don't say that as that that's what's in

4    my mind.  My happiest moments in openings and closings are

5    when it all goes smoothly and there's no objections.  Or if

6    there are, they are the kind of things that I can resolve

7    after.  So but there's no general reason that you can't use a

8    PowerPoint.

9          Do you all want to use JERS?

10         MR. FRANK:  I mean, we'll prepare a JERS disc.

11   We -- I frankly don't have much experience with how it

12   actually functions back there.  But we have no objection to

13   preparing a disc.

14         THE COURT:  Nor do I.  But I -- so we might --

15   maybe we'll do that.  But -- I'm not sure if the testimony --

16   we're having a problem with it.  I'll look into it.

17         Any other housekeeping -- any matters that you all

18   want to address with me, that we can take up probably not

19   now, but tomorrow or Friday?

20         MR. WEINBERG:  Not right now, Your Honor.

21         THE COURT:  So if I wanted to talk to you more

22   about the DPA thing, should we do that Friday at 2 o'clock or

23   just do that Monday after we're done picking the jury?

24         MR. WEINBERG:  Whichever Your Honor prefers.

25         THE COURT:  Why don't we just do it Monday after we

1    pick the jury.  We can do it Monday afternoon.

2            MR. FRANK:  That's fine, Your Honor.  There's a

3    whole other reason why we think the DPA may need to come in,

4    and that's related to our motion to preclude the evidence of

5    State Street executives' reactions in September after parts

6    of the fraud began to emerge.

7            THE COURT:  All right.  Maybe we can talk about

8    that then, too.

9            Okay.  All right.  Then that's it, unless you have

10   anything else?  No.

11           MR. FRANK:  No, Your Honor.  Thank you.

12           MR. WEINBERG:  Thank you, Your Honor.

13           THE COURT:  Thank you very much.

14           THE DEPUTY CLERK:  All rise.  This matter is

15   adjourned.

16           THE COURT:  One last thing, just for you, Mr. Frank

17   and Mr. Johnston, not necessarily right now, not necessarily

18   before Monday.  Mr. Weinberg filed some objections to your

19   jury instructions, not quite as to all those things, but to

20   some of those things.  They raised issues as to -- they're

21   the mirror of how his proposal differed from yours, and his

22   added or had different takes on certain issues than yours.

23   I'm sure you have seen that or will see that.  Some of those

24   issues are issues that I'd be interested in hearing the

25   Government's response to.

1          Whether I should issue a willful blindness
2     instruction or not, I don't need briefing from you now.
3     That's an issue that, if you want to brief, would be at the
4     very end.  Or I would just hear from you why you think the
5     evidence shows that it's warranted in this particular case.
6          On the other hand, some of them about in
7     connection, and the like, are more complicated legal
8     questions.  And this is a case where I'm thinking about
9     writing the jury instruction -- well, notwithstanding the
10    fact that some of your colleagues weren't happy that I tried
11    to be prepared in another case by writing the jury
12    instructions in a tentative fashion before the trial began
13    and then sharing with them, so they would know what I was
14    thinking about.  I'm, nonetheless, not deterred in
15    preparation and think that preparation is a valuable thing.
16         So in this case, I'm not that prepared, but I am
17    thinking about the jury instructions.  And so there's no
18    particular time at the moment.  I'm not dealing with that in
19    any meaningful way before Monday or Tuesday.  But it would be
20    helpful on some of those, because they are more nuanced
21    issues that are not so straightforward.  And I'd be
22    interested in that, because I am going to try to think about
23    that as we go along; so that when we get to the end, I've
24    thought that through, and then I can hear from you and I have
25    really looked at that and resolved it.

1          MR. FRANK:  We will do that, Your Honor.

2          THE COURT:  Okay.  Thanks.

3          THE DEPUTY CLERK:  This matter is adjourned.

4          (Court in recess at 3:48 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4        I, Rachel M. Lopez, Certified Realtime Reporter, in

5   and for the United States District Court for the District of

6   Massachusetts, do hereby certify that pursuant to Section

7   753, Title 28, United States Code, the foregoing pages

8   are a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13                         Dated this 7th day of January, 2019.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20       _____

21       Rachel M. Lopez, CRR
         Official Court Reporter

22

23

24

25