# United States Court of Appeals
## For the First Circuit

No. 18-2032

UNITED STATES OF AMERICA,

Appellee,

v.

ROSS MCLELLAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, <u>U.S. District Judge</u>]

Before

Howard, <u>Chief Judge</u>,
Torruella, and Thompson, <u>Circuit Judges</u>.

<u>Martin Weinberg</u>, with whom <u>Kimberly Homan</u> were on brief, for appellant.
<u>Stephen E. Frank</u>, Assistant United States Attorney, with whom <u>Andrew E. Lelling</u>, United States Attorney, was on brief, for appellee.

May 20, 2020

      **TORRUELLA**, **Circuit Judge**.  Ross McLellan ("McLellan") appeals his convictions of securities and wire fraud as well as conspiracy to commit securities and wire fraud for his leadership role in a scheme to defraud overseas institutional investors by applying hidden commissions on the buying and selling of U.S. securities.  First, McLellan disputes that there was sufficient evidence to sustain his securities fraud convictions under 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. § 240.10b-5 (hereinafter "Rule 10b-5") and objects to the district court's jury instruction on the elements of said offense.  Second, he protests that his wire fraud conviction under 18 U.S.C. § 1343 was the product of an improper extraterritorial application of the wire fraud statute, and relatedly, he submits that it was error for the district court not to instruct the jury that it had to find a domestic application of the statute to convict.  Third, he contends that the district court erred by not compelling the U.S. government to exercise its powers under Mutual Legal Assistance Treaties ("MLATs") with the United Kingdom and the Republic of Ireland to seek evidence that could have been favorable to his defense.  See Mutual Legal Assistance Treaty, U.S.-U.K. and N. Ir., Jan. 6, 1994 (hereinafter "U.S.-U.K. MLAT"); Mutual Legal Assistance Treaty, U.S.-Ir., Jan. 18, 2001 (hereinafter "U.S.-Ireland MLAT").

      Because we hold that the relevant securities law covers misrepresentations of the commissions to be applied to securities

trades by transition managers under the agency model, we find that the evidence was sufficient to sustain McLellan's convictions and that to the extent that the jury instructions may have been overbroad, any error was harmless. Moreover, we need not address whether § 1343 applies extraterritorially because McLellan was convicted under a proper domestic application of the statute, and to that end, the district court's jury instructions on wire fraud nevertheless required the jury to find a domestic application. Finally, because the district court correctly determined that it lacked the authority to order the government to lodge MLAT requests on behalf of a private party, we find no reversible error. Accordingly, we affirm McLellan's convictions on all counts.

## I. **Factual Background**

### A. **State Street's Transition Management Services**

Because McLellan challenges the sufficiency of the evidence, we summarize the evidence in the light most favorable to the verdict. See United States v. Kanodia, 943 F.3d 499, 501 (1st Cir. 2019).

McLellan, a former executive vice president of State Street Bank ("State Street"), a Boston-based corporation, was charged with committing securities and wire fraud for his part in a scheme intended to defraud six institutional investors.

In his position, McLellan was the global head of State Street's Portfolio Solutions Group ("PSG"), which included its

-3-

transition management services, until October 2011. During McLellan's tenure, State Street was one of numerous firms that competed to provide transition management services to institutional clientele. When large institutional investors, such as pension funds, transition from one asset manager to another, they typically hire a transition manager to restructure their portfolios so as to minimize the "implementation shortfall." Transition management firms specialize in buying and selling securities on the open market on behalf of their clientele so as to reduce as much as possible the monetary losses that the supply and demand pressures of securities markets can cause during transitions.

Two models dominate the transition services market: the "principal" model and the "agency" model. Under the principal model, the firm directly buys securities from and sells securities to its client. While a transition manager in the principal model assumes the risk that it will have to make unprofitable trades to complete the transition for the client, it is also able to keep any profit made on those trades for itself. Under the agency model, the firm acts as an intermediary that facilitates the buying or selling of securities for its clients through a third-party broker-dealer. Firms utilizing the agency model profit from transition services through two means: an upfront flat fee for the entire transition or a disclosed fee per trade. The client -- not

-4-

the transition management firm -- selects the securities to be sold and bought on the open market. During the relevant time period, State Street followed the "agency model." State Street promoted this model to its clients through its advertising materials and assured them that it would function as a fiduciary while trading on their behalf.

As overseer of State Street's transition management services, McLellan engaged Boston-based traders to buy and sell U.S. securities for State Street clients. State Street's clients in Europe, the Middle East, and Africa contracted with State Street through the London-based State Street Bank Europe Ltd. ("SSBEL"). Edward Pennings ("Pennings"), a critical government witness at trial, headed SSBEL's transition management group first as vice president and then as senior managing director; he reported directly to McLellan. Pennings spoke with McLellan daily about State Street's clients and trades as the transactions at issue progressed. Rick Boomgaardt ("Boomgaardt") headed SSBEL's transition management desk in London. Although he reported directly to Pennings, Boomgaardt periodically communicated with McLellan about ongoing negotiations and transitions.

In the aftermath of the 2008 economic recession in the United States, McLellan, Pennings, and Boomgaardt devised a scheme to promise low commissions, or a flat fee, to potential clients with the intention of embedding large hidden commissions in the

-5-

price of the securities as reported to the clients during the transition. McLellan directed Pennings and Boomgaardt to pursue this scheme for large bond-based deals because those securities were reported to clients on a "net" basis, which incorporated the commissions into the price of the security as it was represented to the client at the end of the transaction. This reporting practice would make it difficult for clients to notice the hiked-up charge. Conversely, commissions on stocks are typically reported separately from the price of the stock, allowing the client to see the precise purchase or sale price and the commission that the firm took from the transaction. On occasion, Pennings, while in his position at SSBEL, would represent to other State Street employees that the commissions were approved by the European management and were legal. At times, Pennings also relayed to other members of the team that the contracts were sufficiently vague to allow the taking of undisclosed markups despite having made affirmative representations to the contrary.

**B.   The Relevant Transitions**

The government's case against McLellan hinged on seven discrete transitions that State Street handled for six clients. Those clients were: Kuwait-based Kuwait Investment Authority ("KIA"); Netherlands-based Dutch Doctors; Ireland-based National Treasury Management Agency ("NTMA"); U.K.-based Sainsbury's; Ireland-based Eircom; and U.K.-based Royal Mail. Each of those

-6-

six clients had a master transition management agreement ("TMA") with State Street that governed the terms of all subsequent transactions.

Institutional investors, such as these six clients, solicit bids from transition management firms through a request for proposals ("RFP"). Transition managers then submit estimates of the implementation shortfall to the prospective client in the hopes of winning its business. For each of these clients, Pennings and Boomgaardt prepared all of the responses to RFPs, directly negotiated the contracts for transitions, and prepared periodic notices and pre-trade estimates. McLellan did not directly communicate or negotiate with any of the six defrauded investors. However, McLellan directed the scheme from the United States, contacted traders in the United States to oversee and implement the application of hidden commissions, and shaped the team's response to the discovery of the scheme by attempting to cover it up.

### 1.  **First KIA Transition**

In March 2010, KIA, a Kuwaiti sovereign wealth fund, selected State Street to manage a transition involving $2 billion in bonds. Pennings negotiated the deal with a KIA representative named Das. During the negotiations, Pennings represented to Das that State Street would conduct the transition without taking any commissions whatsoever even though Pennings always intended

-7-

otherwise.  Boomgaardt testified that he and McLellan decided to make a zero-commission quote in order to compete with other banks bidding on the KIA transition.  After submitting the bid, Pennings represented to KIA that State Street would make money on "the other side of the transaction."  At trial, Pennings testified that this explanation to KIA was "nonsense" and meaningless because there was no way to make money on "the other side of the transactions." Pennings did tell Das that, absent a commission, State Street would take a "spread," but he never explained how it would be applied or how the spread would impact KIA.  Pennings and Boomgaardt both testified that they were not sure if Das understood how State Street was going to make money on the deal.  After the negotiations were completed, Pennings sent a periodic notice to Das with the terms of the transition agreement.  This document represented in a footnote that all bonds would be priced "net" per market convention.  The periodic notice, however, did not disclose that a commission would be charged on each trade.  Ultimately, KIA commissioned State Street to handle half the transition and commissioned a competitor, Nomura, to handle the other half of the transition.

McLellan played an active behind-the-scenes role throughout the KIA transition.  Pennings and Boomgaardt testified that the decision to submit the "zero commission" bid to KIA was not only "discussed" with McLellan but also "came from" him.

-8-

Pennings told McLellan through email that McLellan was "[g]onna have to be creative," which Pennings testified meant that McLellan, as the lead State Street executive in Boston, was going to have to apply hidden commissions on the securities transactions in the United States.    After KIA accepted the bid, McLellan -- who happened to be in London at the time -- contacted Stephen Finocchi, a Boston-based trader, and asked for a report of the highest daily prices at which the bonds in question were traded.   According to Boomgaardt, McLellan sought this information to ensure that the price charged with the added commissions was below the daily high to avoid tipping KIA off to the hidden commissions.   Boomgaardt further testified that he and McLellan looked at the data together and decided how much commission to add to each of the bonds in the KIA transition.   Despite McLellan's precautions, State Street still charged KIA above the reported daily high on some of the bonds, which KIA did not question.   In total, State Street skimmed off $2.6 million in undisclosed commissions across the entire transition.   The final cost of the transition for KIA came in approximately 0.07 percent below the original pre-trade estimate. If State Street had not applied hidden commissions, KIA would have made a net profit of roughly half a million dollars from the transition.

-9-

## 2. <u>Dutch Doctors Transition</u>

In June 2010, Dutch Doctors, a Netherlands-based pension fund for doctors, hired State Street to transition $1.6 billion in European bonds.  Pennings told Dutch Doctors that State Street would conduct the transition for a commission of 1 basis point, or 0.01 percent of the aggregate value of the assets traded.  After securing the contract, McLellan and Pennings learned that Dutch Doctors was contractually obligated to reserve all rights to futures trading to its asset manager, JP Morgan, which meant that the deal would yield less profit for State Street in the long run.  To cover the expected losses, Pennings secretly raised the charge to 1.5 basis points, which ultimately translated to a total profit to State Street of several million dollars, including $1 million in hidden commissions.

Again, although McLellan did not communicate directly with Dutch Doctors, he was intimately involved in the scheme and the transition.  On June 10, 2010, Pennings informed McLellan via email that he was going to bid on a Dutch Doctors contract, which Pennings claimed was necessary to enlist McLellan in a "push in the U.S. . . . to make sure that [State Street Global Advisors, an asset management affiliate of State Street,] would help us win this deal."  In response, McLellan encouraged Pennings to "[j]ust win, baby," implying that Pennings should secure the contract and a good deal for State Street by any means necessary.  To that end,

-10-

McLellan was in the loop about and encouraged Pennings's plan to secretly raise the basis point for commissions to compensate State Street for the loss that it would incur in futures trading.

### 3.  Second KIA Transition

In October 2010, KIA opened bidding for a second transition involving $4 billion in assets.  State Street, through Pennings, again submitted a zero-commission bid to KIA and won the transition contract.  Once again, Pennings intended to take undisclosed commissions on the transactions involved in the trading.  Pennings testified that he believed that Das knew how State Street would make money on the deal.

For his part, McLellan approved Pennings's zero-commission bid before it was submitted to KIA.  After landing the deal, McLellan requested that Pennings forward him a copy of the TMA and the periodic notice.  McLellan communicated with various players throughout the transition about the commissions to be taken in the United States.  He personally approved a London-based trader's instruction to take 18 basis points on the buy side and 2 basis points on the sell side of each of the transactions for KIA in the United States.

During the second KIA transition, State Street's newly established "rates desk," an office within State Street that would directly buy and sell bonds for clients, sought permission to participate in the transition.  McLellan and Pennings opposed their

-11-

inclusion because of the risk that their scheme would be uncovered by others within State Street. McLellan asked Pennings if "legal" had looked at the TMA with KIA, to which Pennings responded: "[A]bsolutely not. Nor did they look at the periodic notice. This can of worms stays closed." McLellan agreed with Pennings that they could not disclose the spread to others within State Street. Ultimately, however, McLellan did share the agreement with State Street's legal department. Pennings testified that the legal department did in fact sign off on the rates desk's involvement and that he did not know if anyone noticed the zero-commission language. According to Pennings, State Street earned "$2.6 million or thereabouts" from the second KIA transition but disclosed "[z]ero, nothing" to KIA. Since the implementation shortfall of $2,047,000 was well below the initial estimate, KIA would have actually made a profit on the transition had State Street not pocketed the hidden commissions.

### 4.  <u>NTMA Transition</u>

In December 2010, NTMA, an Irish government employee pension fund, sought to transition $4 billion in assets through the sale of a combination of stocks and bonds because Irish banks needed a cash injection at the time. Pennings submitted a bid for the transition with a management fee of 1.25 basis points and no commissions despite his intention to apply hidden commissions. According to Boomgaardt, he did so to beat competitors for the

-12-

bid.  NTMA ultimately selected State Street to handle half of the
transition.  With the negotiations for the contract completed,
Pennings instructed Boomgaardt not to inform NTMA transition
managers of the hidden commissions.

Pennings eventually renegotiated the fee to 1.65 basis
points based on complications associated with the trades that NTMA
sought to make.  An NTMA official testified that the pension fund
believed that 1.65 basis points would be the only cost of the
transition and that additional commissions would not be applied.
In later communications, Pennings informed McLellan of his
intention to secretly increase the markup.  At the conclusion of
trading, the transition came in below the estimated shortfall that
Pennings provided to NTMA.  However, NTMA's representative
testified that it would not have selected State Street if it had
known that additional hidden commissions were going to be applied
because a competitor, Citibank, would have been less expensive.

Once again, McLellan oversaw the transition from the
United States.  While McLellan never communicated directly with
NTMA, he did approve the bid with no commission and told Pennings
that the price charged to the client would have to include a hidden
commission in order for State Street to make a profit, and he spoke
directly with Pennings about the implementation of the scheme.
McLellan reviewed the TMA and periodic notice and determined that
nothing in the documents affirmatively prevented a broker-dealer

-13-

from taking commissions on the trades. He then agreed to Pennings's proposed commissions on the transition -- 10 to 12 basis points on fixed income trades and 3 basis points on U.S. equities -- and directed traders to use a rarely-consulted stock trading account to evade State Street's automated systems for reporting equities trades, which would have broken down the trade by market price and commission charge in the documents given to the client. He further oversaw the trading in Boston and told traders what markdowns and markups to take on each of the transactions. At the end of the transition, State Street had taken millions in undisclosed commissions on trades for NTMA.

### 5. **Sainsbury's Transition**

In January 2011, Boomgaardt received an RFP from Sainsbury's, a pension-fund for a large supermarket chain in the United Kingdom, which he forwarded to Pennings. Boomgaardt sent Sainsbury's a proposal that offered to conduct the multimillion-dollar transition for a flat fee of £350,000. Boomgaardt submitted this bid under the assumption that competitors were also submitting low bids. Boomgaardt, however, believed that his superiors -- i.e., Pennings and McLellan -- intended to take undisclosed commissions on transactions during the transition. Pennings reaffirmed Boomgaardt's belief that McLellan had approved their proposal for the transition. The TMA with Sainsbury's provided that any commissions taken on the

-14-

transition had to be detailed in the periodic notice, and the relevant periodic notice provided that State Street would take no commissions on the transition. A Sainsbury's representative testified that he understood State Street's proposal to mean that there would be no difference between the buy or sell cost and the cost as represented in the final documents submitted to them. At the conclusion of trading, the transition came in roughly 19.2 basis points below the original shortfall estimate. Nevertheless, the Sainsbury's representative testified that the company would not have hired State Street had it known that $1.1 million of additional commissions would be applied, and it would have given its business to a competitor, JP Morgan, instead. Once again, State Street collected millions of dollars in hidden commissions.

### 6. Eircom Transition

In March 2011, Eircom, a telecommunications company in Ireland, sought bids for transitioning approximately $1 billion in assets. Boomgaardt proposed to conduct a transition for a flat fee of €400,000, and Eircom awarded State Street the contract. Pennings indicated to Boomgaardt that the contract did not prohibit commissions and directed him to apply additional hidden commissions on trades. Pennings testified that McLellan personally approved the scheme to apply hidden commissions, which Boomgaardt understood as well. In an email to Boomgaardt in May 2011, McLellan mentioned the prospect of $1 million in revenue, which

-15-

could only be achieved through the application of hidden commissions.

### 7. __Royal Mail Transition__

In March 2011, Boomgaardt and Pennings proposed a flat fee of 1.75 basis points to Royal Mail, a pension fund for postal workers in the United Kingdom, for its transition of $3.2 billion in assets. Again, Pennings intended to take undisclosed commissions of roughly 1 basis point on U.S. trades and 2 basis points on European trades. Pennings, however, forwarded a periodic notice to Royal Mail that only outlined a flat management fee for the entire transition and did not inform Royal Mail of his intention to take commissions. In an email to Royal Mail representatives, Pennings confirmed that the flat fee was the total cost for the transition. Royal Mail testified that it would not have hired State Street if it had known that hidden commissions were going to be charged.

McLellan, once again, was operating behind the scenes on the transition. Before bidding on the contract, Pennings told McLellan of the opportunity, to which McLellan emailed in response: "thin to win." Pennings understood this email to be an endorsement of a low bid with hidden commissions to beat competitors in the market and earn substantial profits. Pennings, however, never communicated to McLellan that he had made a representation regarding the flat fee as equating the total costs. Pennings

-16-

nevertheless did notify McLellan of his intent to take commissions of 1.5 to 2 basis points beyond the flat fee that he proposed. McLellan coordinated trades in the United States and instructed U.S. traders to place hidden commissions on the trades. A Boston-based trader understood that the instruction was a directive to mislead Royal Mail as to the price of the securities. State Street collected over $1 million in revenue through undisclosed commissions throughout the Royal Mail transition.

After receiving the final financial report on the transition in June 2011, Royal Mail contacted Pennings and inquired into State Street's charges because it appeared that additional commissions had been applied to the transition. Pennings initially denied that commissions had been applied but agreed to investigate the matter and then discussed the issue with McLellan. McLellan and Pennings decided to disclose only the commissions taken on trades in the United States and not those in the European market to Royal Mail. Pennings then carried out this plan and disclosed to Royal Mail that the commissions were only an issue in the United States. Boomgaardt testified that McLellan independently told him to use the term "fat-finger trading error" when discussing the commissions issue with Royal Mail. In an email, McLellan stated that those in State Street should describe the commissions as an "inadvertent commissions applied" error. Subsequently, McLellan

-17-

authorized Pennings and Boomgaardt to refund the commissions on U.S. trades, totaling $1 million.

After receiving these disclosures, Royal Mail hired an independent auditor, Inalytics, to investigate the transition. McLellan and Pennings instructed Boomgaardt not to forward information to Inalytics that would disclose the European markups. Absent this information, Inalytics requested that State Street sign off on the propriety of the transition, and McLellan asked Pennings to draft a compliance letter that omitted the commissions on European securities. McLellan reviewed the letter, which provided that only $1 million had been taken in commissions and directed Boomgaardt to send it to Royal Mail. Boomgaardt, however, refused and told a London-based State Street executive about the commissions and the scheme.

In August, McLellan sought all information from Boomgaardt pertaining to Royal Mail including the RFP, the TMA, and the periodic notice. On a subsequent phone call between McLellan, Boomgaardt, and Pennings, McLellan discussed how to "message" a Royal Mail consultant "that we may have the same booking issue in the U.K. as we do in the States." At that time, Pennings and McLellan suggested taking the position that the agreements permitted them to take hidden commissions on trades. After this phone call, McLellan, however, decided that all commissions would be refunded to Royal Mail. McLellan then

-18-

directed Pennings to inform Inalytics of the European commissions and that Pennings should "come clean for everything."

## II. **Procedural Background**

McLellan was indicted on one count of federal conspiracy under 18 U.S.C. § 371 based on predicates of securities and wire fraud (Count 1), two counts of securities fraud under 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. 240.10b-5 (Counts 2-3), two counts of wire fraud under 18 U.S.C. § 1343 (Counts 4-5), and one count of wire fraud affecting a financial institution under 18 U.S.C. § 1343 (Count 6).

During the pre-trial phase, McLellan requested that the district court issue letters rogatory to the United Kingdom and Ireland to obtain documents from NTMA and Eircom. He sought internal communications from those firms pertaining to: (1) TMA compensation terms with State Street and the victims' understanding of those terms; (2) the victims' perception of the fees; (3) all competing bids; and (4) the victims' perception of State Street's overcharges. The district court granted the request and issued nine letters rogatory, see 28 U.S.C. § 1781, each of which noted in part that McLellan demonstrated "that justice cannot completely be done amongst the parties without the production of the documents requested." Those letters were sent to NTMA, Royal Mail, Sainsbury's, Eircom, Inalytics, Mercer (a U.K. entity that acted as a consultant to Eircom), Aon (another U.K. entity that

-19-

acted as a consultant to Sainsbury's), Nomura, and Goldman Sachs. Additionally, the court granted a seven-month continuance of the trial to provide McLellan with ample time to obtain the documents requested via letters rogatory. While McLellan concedes that he did "receive partial compliance with the letters rogatory from some of the subpoenaed parties," he maintains that he was unable to access "contemporaneous internal communications that would have reflected the considerations that went into the selection of State Street," and he did not receive any material directly from NTMA.

In January 2018, the Judicial Authority of Ireland notified the district court that it declined to enforce the letters and determined that an MLAT request was the only means of producing the materials. McLellan then moved for the district court to order the Executive Branch to make a request pursuant to the U.S.-Ireland MLAT. McLellan further requested that the district court order the government to exercise its MLAT powers to request documents from U.K. entities when the production of evidence was stalled within the U.K. police department.[1] If the district court declined, McLellan requested that the court exclude all evidence

_____

[1] We note that, prior to trial, McLellan also moved to order the Attorney General to submit a request to depose a witness located in the Netherlands who did not respond to the court's Rule 15 deposition order pursuant to the U.S.-Netherlands MLAT, which the district court denied. However, he does not challenge this decision on appeal.

-20-

on NTMA and Eircom.  The government opposed McLellan's request to compel it to exercise its treaty powers.

The district court denied McLellan's motion to compel on the ground that it lacked authority to do so.  Additionally, it found no valid basis to grant McLellan's request to exclude the government's evidence solely because of his inability to procure additional evidence.  However, the district court did note that "the more limited power available to McLellan to compel production of witnesses or documents from outside the United States as compared to within the United States potentially raise[d] fairness or due process considerations."

At trial, McLellan objected to the district court's jury instructions regarding the "in connection with" and "materiality" elements of the securities fraud charge on the ground that they were overly broad.  Specifically, he argued that the jury should have been instructed that the "in connection with" element was only met if the fraud was "material to a decision by one or more individuals to buy or to sell a covered security."  On the wire fraud counts, the district court held that 18 U.S.C. § 1343, or the wire fraud statute, applies extraterritorially and denied McLellan's proposed instruction that would have limited the wire fraud statute to domestic conduct.  Ultimately, the jury convicted McLellan of securities fraud, wire fraud, and conspiracy (Counts 1-5) and acquitted him of wire fraud affecting a financial

-21-

institution (Count 6).  The district court then denied McLellan's motion for a judgment of acquittal or a new trial.

At sentencing, the district court was "not persuaded" that "there was an intent to defraud" on the first KIA transition and thus did not include it in the loss calculation.  The district court then sentenced McLellan to eighteen months of imprisonment to be followed by two years of supervised release and assessed a $5,000 fine.  McLellan filed a timely notice of appeal the very same day.

On appeal, McLellan challenges each of his convictions on the same grounds that he raised below.  He asserts that the district court erred in its interpretation of both the securities fraud and wire fraud statutes as well as when it refused to compel the government to exercise its powers under the U.S.-U.K. and U.S.-Ireland MLATs.  We take each of these challenges in turn.

### III.  Securities Fraud

**A.  Sufficiency of the Evidence**

On appeal, McLellan challenges the sufficiency of the evidence supporting his securities fraud convictions. Specifically, he argues that Security Exchange Commission ("SEC") Rule 10b-5 does not prohibit the misrepresentations for which he is responsible, which, in his view, were not made "in connection with" the purchase or sale of any covered securities but rather

-22-

were merely intended to induce prospective clients to retain State Street's transition management services.

We review challenges to the sufficiency of evidence de novo.  See United States v. Mehanna, 735 F.3d 32, 42 (1st Cir. 2013).  "This review eschews credibility judgments and requires us to take the facts and all reasonable inferences therefrom in the light most favorable to the jury's verdict."  Id.  After reviewing the record, "a guilty verdict need not be an inevitable outcome; rather, 'it is enough that the finding of guilt draws its essence from a plausible reading of the record.'"  Id. (quoting United States v. Sepúlveda, 15 F.3d 1161, 1173 (1st Cir. 1993)).  Importantly, McLellan's sufficiency challenge does not take aim at the factual record itself.  Instead, he challenges whether the facts in the record are sufficient to sustain a conviction for securities fraud premised on a Rule 10b-5 theory as a matter of law.

### 1.

The Securities Exchange Act of 1934 ("Exchange Act") "forbids the use of any manipulative or deceptive devices or contrivances 'in connection with the purchase or sale of any security.'"  Hidalgo-Vélez v. San Juan Asset Mgmt., Inc., 758 F.3d 98, 104 (1st Cir. 2014) (quoting 15 U.S.C. § 78j(b)).  As part of its enforcement mechanisms, the Exchange Act grants the SEC the authority to promulgate regulations, such as Rule 10b-5, "which

-23-

likewise prohibits fraud in connection with the purchase or sale of securities." Id. (citing 17 C.F.R. § 240.10b-5).[2] The purpose of the Exchange Act and complementary SEC regulations is "to insure honest securities markets and thereby promote investor confidence." Chadbourne & Parke LLP v. Troice, 571 U.S. 377, 390 (2014) (quoting United States v. O'Hagan, 521 U.S. 642, 658 (1997)). Congress's view was that the statutory scheme would "protect investors against manipulation of stock prices," Basic Inc. v. Levinson, 485 U.S. 224, 230 (1988) (citing S. Rep. No. 73-792, at 1-5 (1934)), and rein in "dishonest practices of the market place [that] thrive upon mystery and secrecy." Id. (quoting H.R. Rep. No. 73-1383, at 11 (1934)).

To make out a criminal case of securities fraud under Rule 10b-5, the government must prove that the defendant, acting willfully, knowingly, and with intent to defraud, made a material

---

[2] Specifically, Rule 10b-5 declares it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

misstatement or omission in connection with the purchase or sale of any security. See United States v. Vilar, 729 F.3d 62, 88 (2d Cir. 2013); see also SEC v. Tambone, 597 F.3d 436, 447 n.9 (1st Cir. 2010) (noting that in public enforcement actions under Rule 10b-5, as opposed to private civil enforcement actions, the government need not prove reliance). Because McLellan lays siege to his securities fraud conviction on the ground that his fraud was not in connection with the purchase or sale of a security, we train our analysis on that element of the offense.

The "in connection with" element requires the government to prove that the alleged misrepresentation was "material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" Hidalgo-Vélez, 758 F.3d at 106 (quoting Troice, 571 U.S. at 387). This is "satisfied only 'where the misrepresentation [would make] a significant difference to someone's decision to purchase or to sell a covered security.'" Id. (quoting Troice, 571 U.S. at 387).[3] We have at times referred to the "in connection with" element as the "transactional nexus" inquiry, and under this framework, we determine whether the alleged

---

[3] Because Hidalgo-Vélez was a civil case in which the plaintiff had to prove reliance, it made sense there (as in Troice) to say that the plaintiff had to prove that the fraud actually made a difference to a statutorily relevant investment decision; by contrast, in a criminal case (as we have explained), the government need only prove that the misrepresentation would have been material to a reasonable investor.

-25-

scheme to defraud and the security transaction are sufficiently close to warrant application of Rule 10b-5.  Calderón Serra v. Banco Santander P.R., 747 F.3d 1, 5 (1st Cir. 2014) (noting that the "in connection with" element should not be read "so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)" (quoting SEC v. Zandford, 535 U.S. 813, 820 (2002))).

In Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, the Supreme Court interpreted parallel "in connection with" language in the Securities Litigation Uniform Standards Act ("SLUSA"), which gave it occasion to explain that Rule 10b-5's transactional nexus required merely that "the fraud alleged 'coincide' with a securities transaction." 547 U.S. 71, 85 (2006) (quoting United States v. O'Hagan, 521 U.S. 642, 656 (1997)); see also Hidalgo-Vélez, 758 F.3d at 105-06.  Subsequently, in Troice, the Supreme Court reaffirmed Dabit and clarified that a "fraudulent misrepresentation or omission is not made 'in connection with'" the purchase or sale of covered securities "unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"  Troice, 571 U.S. at 387 (emphasis added); see also Calderón Serra, 747 F.3d at 5 (treating the question as whether the fraud was "in connection with" inducing customers to take out loans or to purchase securities).  Notably, Troice reasoned that it did not modify the Dabit standard because

-26-

"[e]very one of [the Supreme Court's prior cases] concerned a false statement (or the like) that was 'material' to another individual's decision to 'purchase or s[ell]' a statutorily defined 'security' or 'covered security.'" Troice, 571 U.S. at 393 (alteration in original) (quoting Dabit, 547 U.S. at 75-77). We have since interpreted Troice to infuse the transactional nexus analysis with a determinative inquiry into materiality. See Calderón Serra, 747 F.3d at 6. Although Troice did not modify Dabit, we have understood the case to mean that the alleged fraud must reach a certain threshold of materiality to be deemed made "in connection with" a transaction in securities. See Troice, 571 U.S. at 387-88.

In an attempt to dissolve the nexus between his fraud and the discrete purchases and sales of securities, McLellan urges us to find that his up-front misrepresentations to clients that State Street would not be charging commissions were only material to those clients' decisions to select State Street as a transition manager and not to their decisions to buy or sell particular securities. At its core, this argument is twofold. On the law, McLellan argues that under Troice, a misrepresentation which goes only to the selection of a transition manager is insufficient to establish securities fraud. On the facts, McLellan maintains that there is no evidence that State Street's zero-commissions misrepresentations would have affected a reasonable investor's decision about whether to buy or sell a statutorily covered

-27-

security.  Neither assertion persuades us.  After careful review, we hold that a broker-agent who misrepresents to his prospective clients how much they will pay, or what value they will receive, for each securities trade that he makes on their behalf, commits securities fraud within the meaning of Rule 10b-5.

### 2.

On a global level, McLellan mistakenly treats this case as if there is only one investment decision at issue for each transition: the client's macro-level decision that, over some period of time, it would like to transition its investment in Asset X to an investment in Asset Y.  While McLellan's misrepresentations may not have influenced that one macro-level decision for any of the transitions, we do not understand an investor's choice between transition managers to be the legal equivalent of choosing between brokers to execute a purchase of a single share of stock at the prevailing price at any given time.  To the contrary, as the record demonstrates, the idiosyncrasies of transition management services (as compared to run-of-the-mill brokerage services) belie McLellan's attempt to escape liability for his fraudulent misrepresentations.

Investors that hire transition managers are preparing to transition sizeable investment portfolios (often valued in the hundreds of millions if not billions of dollars) from one set of assets to another.  Under the agency model, when the investor hires

-28-

a transition manager to handle a transition, the investor turns over its portfolio to the transition manager, who enters an extended series of individual securities transactions on behalf of the investor. That the clients did not actually make those micro-level decisions themselves, instead entrusting them to State Street, does not relieve McLellan of securities fraud liability. In our view, even if a client had already made a macro-level decision about the securities it wished to buy or sell before hiring State Street, the micro-level trading decisions that the client delegates to State Street as the transition manager under the agency model -- i.e., the choices of when, at what price, and in what quantities to trade -- are "decision[s] to purchase or to sell a covered security" within the meaning of Troice, 571 U.S. at 387.

It follows that McLellan's up-front misrepresentations that he would not charge commissions were "material" to those when-and-how decisions because they reasonably induced the clients to delegate those decisions to State Street as their transition manager. See Hidalgo-Vélez, 758 F.3d at 106. Moreover, while McLellan's after-the-fact price reports themselves may not be material to (i.e., not reasonably capable of influencing) any of the micro-level decisions that State Street made on its clients' behalf, McLellan's up-front no-commission lies understated the total price that clients would ultimately pay or receive for the

-29-

securities that State Street bought and sold on their behalf.   In
other words, those lies also translated into back-end price
inflation, which was necessary to conceal and complete the fraud.
And it is well-settled that the price of a security is material to
a reasonable investor's buy-sell decision.   See Rayner v. E*Trade
Fin. Corp., 899 F.3d 117, 122 (2d Cir. 2018) ("It is frivolous to
suggest that negatively influencing the price and quantity at which
clients may buy and sell securities would not 'make[] a significant
difference to someone's decision to purchase or to sell a covered
security." (alteration in original) (quoting Troice, 571 U.S. at
387)).

Together, this is enough to satisfy Rule 10b-5's
transactional nexus requirement.

**3.**

We find clear support for this position in several lines
of precedent.   First, we look to SEC v. Zandford, where the client
gave the defendant-broker control over his investment account, and
the broker then "sold the [client's] securities while secretly
intending from the very beginning to keep the proceeds."   535 U.S.
813, 824 (2002).   There, the Supreme Court held that the fraud
satisfied the "in connection with" requirement because a broker
"who sells customer securities with intent to misappropriate the
proceeds, violates [Section] 10(b) and Rule 10b-5," even though
the fraudster did not misrepresent the value of any security or

-30-

fraudulently induce the customer to enter a securities transaction. Id. at 819-20. The Court explained that the "connection between the deception and the sale" was identical to a case in which the defendant "sold [the victim] a security ([an] option) while secretly intending from the very beginning not to honor the option." Id. at 823-24 (quoting Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 597 (2001)). In both cases, the fraud "deprived the [victim] of the benefit of the sale" that the fraudster had expressly or impliedly promised to deliver. Id. at 824. Those promises were "material to a transaction in the relevant securities by or on behalf of someone other than the fraudster" and met the "in connection with" requirement. Troice, 571 U.S. at 393 (citing Zandford, 535 U.S. at 822 and Wharf, 532 U.S. at 590-92); see also Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 9 (1971) (controlling shareholders committed securities fraud when they duped company into authorizing sale of treasury bonds with the misrepresentation that "it, the seller, would receive the proceeds").

        And that is just what happened here; McLellan induced clients to delegate to him a whole set of investment decisions -- i.e., the micro-level decisions about when and how to execute the trades -- by promising them the full proceeds from each trade while planning all along to pocket the undisclosed commissions. Indeed, McLellan (unlike Zandford, who just sold his clients' securities

-31-

and pocketed the proceeds), made an affirmative, up-front misrepresentation that overstated the benefit that State Street's clients would derive from each trade. On that score, his case is even more straightforward than the one the Supreme Court considered in <u>Zandford</u>. McLellan tries to distinguish <u>Zandford</u> because there, he says, each sale breached the broker's fiduciary duty and "in and of itself was a fraud upon the client," so the fraud "perfectly coincided" with Zandford's sales of securities; whereas here, the government did not pursue the same theory; instead, it focused on McLellan's no-commission lies, which were made to clients after they had already decided which securities to trade as part of the transition, before they decided to hire State Street, and before State Street executed any trade on their behalf. However, in truth, McLellan's lies were about the trades themselves. He misrepresented to the clients how much State Street would charge for each trade it made on their behalf, and the alleged fraud was not complete until he followed through on the scheme by taking an unauthorized cut of the proceeds from each trade. Because the lies overstated the benefit that clients would get from every purchase and sale, and the complete fraud coincided with each trade, it had the close nexus to those transactions that we have required for securities fraud under Rule 10b-5. <u>Hidalgo-Vélez</u>, 758 F.3d at 105; <u>Calderón Serra</u>, 747 F.3d at 6.

-32-

The Second Circuit's decision in <u>United States</u> v. <u>Litvak</u> is also consistent with our conclusion. 808 F.3d 160, 167-68 (2d Cir. 2015) (<u>Litvak I</u>). To lay out the facts, Litvak was a residential mortgage-backed securities ("RMBS") broker-dealer who acted as a principal, buying and reselling RMBS to investor-buyers (the victims). In one of his schemes, he bought RMBS from third-party sellers for one price, then lied to the investor-buyers by saying that he had paid a higher price, effectively hiding an undisclosed markup. <u>See</u> <u>Litvak I</u>, 808 F.3d at 167-68. The Second Circuit held that there was enough evidence for a securities fraud conviction because, in the opaque market for RMBS (where investors have to rely on brokers to tell them what prices the securities are selling for), a broker-dealer's misrepresentations to investor-buyers about the price he paid for the RMBS can inflate the price at which the investor-buyer ultimately agrees to pay for it. <u>See id.</u> at 167-68 nn.5-7, 175-76. Therefore, although the buyer-victims in <u>Litvak</u> did not pay Litvak any more than the price they negotiated to pay him, they would have negotiated a lower price if they had known Litvak had bought cheaper than he let on (or so a jury could find). <u>Id.</u>; <u>see also</u> <u>United States</u> v. <u>Litvak</u>, 889 F.3d 56, 67 (2d Cir. 2018) (<u>Litvak II</u>). As here, the broker fraudulently induced the victims to pay more per trade (in the amount of a hidden markup) than they would have paid otherwise.

-33-

Along those lines, McLellan cites a pair of Eleventh Circuit decisions to support his contention that, legally, a misrepresentation which goes only to the selection of a transition manager is insufficient to establish securities fraud: Brink v. Raymond James & Assocs., Inc., 892 F.3d 1142 (11th Cir. 2018); and SEC v. Goble, 682 F.3d 934 (11th Cir. 2012). However, a closer inspection leads to the conclusion that McLellan's case is actually even clearer than Litvak, and distinct from Goble and Brink, because State Street's clients, unlike the victims in the Eleventh Circuit cases, did not know "how much [they were] being charged for costs associated with each [securities] transaction" and were "charged more than [they] agreed to pay." Brink, 892 F.3d at 1149.

In Goble, the owner of a brokerage firm directed an employee to record a fake transaction in the company's books in order to avoid SEC regulations requiring businesses to set aside a certain amount of funds. 682 F.3d at 939-40. The Eleventh Circuit determined that this activity was a "misrepresentation that would only influence an individual's choice of broker-dealers," and it was therefore not material to an investment decision to purchase or sell securities. Id. at 944. In Brink, a broker misrepresented to clients the purpose of a "processing fee" by indicating that the fee was used to facilitate securities trades but then also built a commission into the fee. 892 F.3d at 1144-45. The Eleventh Circuit held that a misrepresentation that

-34-

only goes to "the choice of a type of investment account . . . is not intrinsic to the investment decision itself." Id. at 1148-49. However, the Eleventh Circuit emphasized in Brink that the defendant "did not 'mislead [its] customers as to what portion of the total transaction cost was going toward purchasing securities versus the cost of the broker's involvement.'" Id. at 1149 (quoting Litvak I, 808 F.3d at 176) (alteration in original). Thus, because the fee was fully disclosed prior to the transaction, the Eleventh Circuit could conclude that "a reasonable investor would [not] have made different investment decisions." Id.

These factual distinctions between McLellan's fraud (i.e., that of a transition manager under the agency model) and the misrepresentations at issue in Brink and Goble are critical. While the fraud in Brink and Goble may have been relevant to an investor when deciding whether to do business with the broker generally, the Eleventh Circuit determined that it did not influence the narrower decision to purchase or sell the securities through that transaction, and thus it lacked the close nexus required to prove Rule 10b-5 securities fraud. In those cases, however, the investors were not misled as to the value or price of a security, nor did the broker apply undisclosed markups. Cf. Litvak I, 808 F.3d at 175-76. Instead, the brokers misrepresented ancillary facts about their businesses, such as the nature of a processing fee and the financial state of the firm.

-35-

These types of misrepresentations could be fairly regulated by competition in the marketplace (as opposed to the Exchange Act) because, knowing the full cost up front, the customer could always seek the services of another firm to help purchase or sell the desired securities.  See id.

By contrast, McLellan's misrepresentations concerned the costs of the trades themselves and required McLellan to distort the prices of the securities that his firm traded on the back end to conceal (and complete) the fraud.  That is precisely why, under the agency model of transition management services, McLellan's no-commission lies have a tight-enough nexus to the relevant securities transactions to fit "comfortably within the confines of the 'in connection with' requirement."  Hidalgo-Vélez, 758 F.3d at 107.  For the foregoing reasons, misrepresentations that influence the choice of a transition manager under the agency model, unlike the choice of a run-of-the-mill broker-dealer, necessarily affect who makes the micro-level trading decisions, and therefore, the statutorily relevant investment decisions themselves.

Circling back to Litvak, McLellan also tries to distinguish the case on its facts because there, he suggests, the fraud influenced the victims' decisions about whether to buy or sell the covered securities at all, not just what price to pay or when to trade.  But from Zandford, we know that there need not "be a misrepresentation about the value of a particular security in

-36-

order to run afoul of the [Exchange] Act"; inducing the victim to let you sell its securities, then pocketing the proceeds you promised to pass on, is enough.  See 535 U.S. at 820.  And the victims in Litvak did not testify they would have foregone the trades if Litvak had not lied -- only that they would have paid less, just as the State Street clients would have here.  See Litvak I, 808 F.3d at 167-68 nn.5-7.

Moreover, from Dabit, we know that the choice of when to buy or sell a security, which itself often affects how much you pay or receive from the sale, is itself a significant investment decision that the Exchange Act and Rule 10b-5 protect.  Dabit involved a holder action, in which the plaintiffs alleged that Merrill Lynch's analysts intentionally overvalued stocks held by its investment banking clients and caused its brokers and their clients to "continue[] to hold their stocks long beyond the point when, had the truth been known, they would have sold." Dabit, 547 U.S. at 75.  When the truth was revealed, the stock prices tanked. Id.  The brokers and their clients sued alleging that they were "fraudulently induced, not to sell or purchase, but to retain or delay selling their securities" and thereby suffered losses.  Id. at 77.  The Supreme Court held that this fraud met the "in connection with" requirement even though the plaintiffs were not "defrauded into purchasing or selling particular securities." Id. at 85, 85 n.10.  And as we have explained, the Court in Troice,

-37-

right after establishing that the "fraudulent misrepresentation or omission [must be] . . . material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security,'" the Court qualified that "[w]e do not here modify Dabit." Troice, 571 U.S. at 387.

**4.**

Our conclusion that McLellan's up-front misrepresentations satisfy the "in connection with" requirement is also bolstered by the long line of cases finding that the taking of undisclosed markups constitutes securities fraud. See Grandon v. Merrill Lynch & Co., 147 F.3d 184, 193 (2d Cir. 1998) (finding that undisclosed excessive markups violated Rule 10b-5); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1469 (2d Cir. 1996) ("[A] broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates . . . § 10(b) of the securities laws."); Bank of Lexington & Tr. Co. v. Vining-Sparks Sec., Inc., 959 F.2d 606, 613 (6th Cir. 1992) ("[T]he failure to disclose exorbitant mark-ups violates section 78j(b) and Rule 10b-5."); Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 835 F.2d 1031, 1033-36 (3d Cir. 1987) (reversing a grant of summary judgment because it had "no doubt" that taking undisclosed excessive markups violated Rule 10b-5). McLellan argues that these cases are inapplicable for two reasons. First, he contends that they all deal with "excessive" markups, but there is no showing

-38-

that State Street's markups were "excessive." Second, he submits that Troice changed the legal landscape so as to foreclose his conviction.

First, to be sure, McLellan is right that there is no finding that the commissions were "excessive" in some abstract sense. There is no allegation here that State Street's markups were not "reasonably related to prices charged in an open and competitive market." Grandon, 147 F.3d at 189. However, the rationale underlying the undisclosed markup cases is that broker-dealers make an "implied representation that [they] charge their customers securities prices that are reasonably related to the prices charged in an open and competitive market." Id. Here, McLellan expressly misrepresented the markups he planned to charge, charging the clients a higher markup than he represented. If a broker's failure to disclose an abnormally high markup is a material omission, McLellan's affirmative promise that he would charge a lower markup than he planned to charge must be a material misstatement.

Second, there are reasons to be skeptical that Troice had such a major impact on what conduct is prosecutable as securities fraud. For instance, in Troice, the Supreme Court "specif[ies] at the outset that [the] holding does not limit the Federal Government's authority to prosecute frauds like the one here," or otherwise "limit[] the Federal Government's prosecution

-39-

power in any significant way." 571 U.S. at 381 (internal quotation marks omitted). McLellan essentially asks that we ignore that language and apply Troice to limit the Federal Government's ability to prosecute anyway. We decline the invitation.

**5.**

Finally, we note that McLellan's behavior is the type of fraudulent behavior which was meant to be forbidden by the Exchange Act and Rule 10b-5. Unlike the defendant in Troice, State Street defrauded "victims who took, who tried to take, who divested themselves of, who tried to divest themselves of," and "who maintained an ownership interest" in covered securities. Troice, 571 U.S. at 378; see also id. at 388-89 ("The regulatory statutes refer to persons engaged in securities transactions that lead to the taking or dissolving of ownership positions. And they make it illegal to deceive a person when he or she is doing so."). The clients sought to "reap the benefit of trading in [those] covered securities," Hidalgo-Vélez, 758 F.3d at 108, and McLellan deprived them of part of that benefit, as in Zandford. His fraud therefore implicates "[t]he purpose of § 10(b) and Rule 10b-5," which is "to protect persons who are deceived in securities transactions -- to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate," or in the case of State Street, for a deal that is "not to be what

-40-

it purports to be." Chem. Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984). And in Troice, the Supreme Court was clear that brokers, accountants, investment advisors, and others who "give advice, counsel, and assistance in investing in the securities markets" remain subject to the federal securities laws unless they "do not sell or participate in selling securities traded on U.S. national exchanges." Troice, 571 U.S. at 390. Transition management services are important to institutional investors restructuring huge portfolios, and if those investors cannot trust transition managers to tell them how much the transition will cost, their services lose much of their value to the national securities markets and their participants, potentially influencing investors' decisions about whether to move at all. See Zandford, 535 U.S. at 823 (noting that if investors "cannot rely on a broker to exercise [its] discretion for their benefit, then the [brokerage] account loses its added value").

So by our lights, a broker-agent's misrepresentation is material to statutorily relevant investment decisions if it would reasonably influence an investor's choice to entrust the agent with the decisions of when, at what price, and in what quantities to trade the securities. And a lie that clients will receive more of the benefit of each purchase and sale, when in fact, the broker-agent intends to (and does) charge hidden commissions on each trade, is "material" to that choice and, therefore, to the

myriad investment decisions that it influences. That McLellan's fraud misled clients about the costs of each trade, and therefore "depended heavily on misrepresentations about [the] transactions in covered securities," confirms a tight-enough nexus to those transactions to satisfy the "in connection with" requirement. Hidalgo-Vélez, 758 F.3d at 107 (citation omitted).

We therefore conclude that the Troice standard is satisfied, and we decline to find that misrepresentations that only affect the selection of a transition manager necessarily lack a tight-enough nexus to qualify as securities fraud within the meaning of Rule 10b-5. Accordingly, the evidence was sufficient to support McLellan's securities fraud convictions.

## B. Instructional Error

Relatedly, McLellan takes issue with the district court's instruction to the jury regarding the "in connection with" element of Rule 10b-5. Our approach to claims of instructional error is "two-tiered": we review questions about whether jury instructions "conveyed the essence of the applicable law" de novo and questions about whether the district court's "choice of language was unfairly prejudicial" for abuse of discretion. United States v. Tkhilaishvili, 926 F.3d 1, 14 (1st Cir. 2019) (quoting United States v. Sabean, 885 F.3d 27, 44 (1st Cir. 2018)). An incorrect instruction, however, "will not require us to set aside

-42-

a verdict if the error is harmless."  <u>United States</u> v. <u>Sasso</u>, 695

F.3d 25, 29 (1st Cir. 2012).

> As to Rule 10b-5's "in connection with" requirement, the

district court instructed the jury:

> This requirement is satisfied if you find that Mr.
> McLellan's alleged conduct in some way touched upon
> or coincided with a securities transaction; that is,
> that the alleged fraud or deceit <u>had some relationship</u>
> <u>to the individual sales or purchases</u>.

(emphasis added).  The court further instructed the jury that it

could find the materiality component of the "in connection with"

element satisfied if there was a "substantial likelihood that a

reasonable investor engaging a transition manager would view the

statement as significantly altering the total mix of information

available."  McLellan objected to both instructions as overbroad

because they could have enabled the jury to convict him based on

a theory of misrepresentations that do not satisfy the updated and

narrower "in connection with" requirement.  Instead, McLellan

requested to have the jury instructed that the "in connection with"

element was only met if the fraud was "material to a decision by

one or more individuals to buy or to sell a covered security."  He

further requested that "material" be defined as "meaningfully

affect[ing] a reasonable investor's consideration about whether to

buy or sell a security, and at what price."

> On its face, the framing used by the district court in

its "in connection with" jury instructions displays some degree of

-43-

overbreadth. We have indeed interpreted Troice to cabin the "in connection with" requirement, such that the fraud (as we have explained above) must be one that would make a significant difference to a reasonable investor's decision to purchase or sell securities rather than merely touch upon or coincide with a discrete securities transaction. See Hidalgo-Vélez, 758 F.3d at 106. In other words, the government must establish that the misrepresentation would make "a significant difference to someone's decision to purchase or to sell a covered security," not merely that it was, in some sense, related to that decision. Id. (quoting Troice, 571 U.S. at 386-87). Nevertheless, it is not clear either that Troice should be read to require a narrower jury instruction. For one, the instructional language here is drawn in part from Dabit, which Troice explicitly indicated that it did not modify. Plus, Dabit rejected the proposition that the "in connection with" element is satisfied "only when the plaintiff himself was defrauded into purchasing or selling particular securities" and holds that to find securities fraud, "it is enough that the fraud alleged 'coincide' with a securities transaction." Dabit, 547 U.S. at 85.

However, even assuming the instructions were overbroad, such a finding would not warrant overturning the conviction if the potential error in the jury instruction were harmless. Where a potentially erroneous instruction deals with an "essential element

of the crime," United States v. Doherty, 867 F.2d 47, 58 (1st Cir. 1989), it is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." United States v. Wright, 937 F.3d 8, 30 (1st Cir. 2019) (internal quotation marks omitted).  "An erroneous instruction on an element of the offense can be harmless beyond a reasonable doubt, if, given the factual circumstances of the case, the jury could not have found the defendant guilty without making the proper factual finding as to that element." Doherty, 867 F.2d at 58; see also Pope v. Illinois, 481 U.S. 497, 503 (1987).  The government bears the burden of proving "that an instruction that is constitutionally flawed is harmless." Wright, 937 F.3d at 30.  In order to engage in this inquiry, we must "review[] the entire record" and "consider[] the likely impact of the error on the minds of the jurors." Doherty, 867 F.2d at 58; see also Neder v. United States, 527 U.S. 1, 19 (1999).

After doing so, we having little difficulty concluding that, even assuming the "in connection with" jury instructions were overboard, any potential error was harmless beyond a reasonable doubt.  The government's case was premised on McLellan's up-front misrepresentations that State Street would not take commissions from the securities trades it made on behalf of its clients as part of their transition, which as a matter of law, satisfy the transactional nexus requirement under Rule 10b-5.  The

-45-

jury was free to believe Pennings, Boomgaardt, and other witnesses when they testified about the structure and intent of the scheme to hide commissions, or the jury could have determined that these witnesses were not credible, in which case they would have acquitted McLellan. The jury was not free, however, to extrapolate from Pennings and Boomgaardt's testimony that some other scheme, not advanced by the government and not supported by the evidence, was the fraud alleged to have occurred.[4] From the confines of the evidence produced at trial, we find no evidence from which the jury could rationally have reached a conclusion to convict under these instructions on a ground other than that McLellan directed misrepresentations as to commissions, which where material to the statutorily relevant trading decisions of State Street's clients. As noted in the previous section, the government's case thus fell firmly within the scope of Rule 10b-5, and the jury's conclusion would have remained the same even with a tailored jury instruction.

Therefore, to the extent that the jury instruction as to the "in connection with" element of Rule 10b-5 might have been

---

[4] This case is thus distinguishable from cases such as Wright, where the government advanced the theory on which the defendant was potentially erroneously convicted. See Wright, 937 F.3d at 30. While the government need not advance the erroneous theory for an instructional error to be harmful, there must be something in the record from which a jury could have reached a legally erroneous, but rational, decision to convict. We find nothing in the record that would support such a rational decision based on the potentially overbroad instruction.

-46-

overbroad, any potential error was ultimately harmless. Accordingly, we affirm McLellan's securities fraud convictions.

## IV.  **Wire Fraud**

Next, McLellan challenges his conviction for wire fraud. He argues that the federal wire fraud statute, 18 U.S.C. § 1343,[5] does not apply extraterritorially, and that the district court erred by failing to provide an instruction that would have required the jury to find a domestic application of the statute. We need not decide whether § 1343 applies extraterritorially because the facts underlying McLellan's conviction suffice to establish a domestic application of § 1343 inasmuch as he committed each required element of wire fraud from the United States through domestic wires. As the instructions required the jury to find that McLellan utilized a wire in the United States, we find that the district court did not err in refusing to supply a domestic application instruction.

---

[5]  The wire fraud statute, 18 U.S.C. § 1343, provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

"A district court's refusal to give a requested instruction is reviewed de novo." United States v. Figueroa-Lugo, 793 F.3d 179, 191 (1st Cir. 2015) (emphasis added). The defendant must present evidence sufficient to show "that he was entitled to the instruction." Id. "The initial threshold determination we must make is whether the evidence, viewed in the light most favorable to the defense, 'can plausibly support the theory of the defense.'" Id. (quoting United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998)). If the evidence is sufficient, we then move onto a three-part test where the district court is reversed only if the proffered instruction was "(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense." United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013).

McLellan's argument that he is entitled to the domestic application instruction he seeks is only plausible if the wire fraud statute does not apply extraterritorially. Otherwise he may properly be convicted based on foreign conduct, "barring some other limitation." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101 (2016) (quoting Morrison v. Nat'l Aus. Bank Ltd., 561 U.S. 247, 267 n.9 (2010)).

-48-

## A.    Extraterritorial Reach of § 1343

We review the extraterritorial application of a statute in two steps.  First, "we ask whether the presumption against extraterritoriality has been rebutted."  RJR Nabisco, 136 S. Ct. at 2101.  "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  Id. at 2100.  The threshold question is "whether Congress has affirmatively and unmistakably instructed that the statute" will apply extraterritorially.  Id.  In the clearest case, this intent is evinced when the statute affirmatively proscribes activities that "tak[e] place outside the United States."  Id. at 2101 (alteration in original) (quoting 18 U.S.C. § 1957(d)(2)).  While such "an express statement . . . is not essential," id. at 2102, we nevertheless "assume that Congress legislates with an awareness of the presumption against extraterritorial application."  Carnero v. Bos. Sci. Corp., 433 F.3d 1, 7 (1st Cir. 2006).[6]  "If the statute is not extraterritorial, then at the

---

[6]  "The presumption serves at least two purposes."  Carnero, 433 F.3d at 7.  First, it prevents "unintended clashes between our laws and those of other nations."  Id. (quoting Equal Emp't Opp. Comm'n v. Arabian Am. Oil Co. ("Aramco"), 499 U.S. 244, 248 (1991)).  Second, it is premised on the notion that Congress is primarily concerned with domestic conditions.  Id.  In analyzing a statute, we consult a statute's "text, context, structure, and legislative history."  Id.; see also RJR Nabisco, 136 S. Ct. at 2101 (employing same approach).

second step we determine whether the case involves a domestic application of the statute." RJR Nabisco, 136 S. Ct. at 2101.

While it is "usually . . . preferable for courts to proceed in [this] sequence," we may "start[] at step two in appropriate cases." Id. at 2101 n.5. We do so when it is "plain" that a domestic application is present but the statute itself gives rise to complex questions of congressional intent. Cf. Pearson v. Callahan, 555 U.S. 223, 236-37 (2009) (noting efficiency benefits of skipping to second step of qualified immunity analysis). "One reason to exercise that discretion is if addressing step one would require resolving 'difficult questions' that do not change 'the outcome of the case,' but could have far-reaching effects in future cases." WesternGeco LLC v. Ion Geophysical Corp., 138 S. Ct. 2129, 2136 (2018) (quoting Pearson, 555 U.S. at 236-37).

Because § 1343 contains difficult questions about whether Congress intended the statute to apply extraterritorially, we skip to the second step and determine that the present case is a domestic application of the statute. Compare European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129, 141 n.11 (2d Cir. 2014), rev'd on other grounds, 136 S. Ct. 2090 (2016) (finding § 1343 does not apply extraterritorially), with United States v. Lyons, 740 F.3d 702, 718 (1st Cir. 2014) (finding Wire Act applies extraterritorially); and United States v. Georgiou, 777 F.3d 125, 137-38 (3d Cir. 2015) (holding § 1343 applies extraterritorially).

-50-

**B.   Domestic Application of § 1343**

We determine whether the wire fraud statute applies domestically based on the facts at hand "by identifying the statute's focus and asking whether the conduct relevant to that focus occurred in United States territory." WesternGeco LLC, 138 S. Ct. at 2136 (internal quotation marks omitted).  A statute's "focus" is the "object of its solicitude." Id. at 2137 (noting that the "focus" includes the "conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate" (alternations and internal quotation marks omitted)).

In McLellan's view, the "focus" of § 1343 is the fraud simpliciter that the transmission of communications through wires seeks to advance and not the use of the wires themselves.  Under that theory, he maintains that there is no possible domestic application of the wire fraud statute, since the alleged fraud transpired in a foreign country through Pennings and Boomgaardt's use of foreign wires.  For the following reasons, we disagree.

To be convicted of wire fraud, the government must establish (1) "a scheme to defraud"; (2) "knowing and willful participation in the scheme with the intent to defraud"; and (3) "the use of interstate or foreign wire communications to further that scheme." United States v. Valdés-Ayala, 900 F.3d 20, 33 (1st Cir. 2018) (internal quotation marks omitted).  As we have previously found, the structure, elements, and purpose of the

-51-

wire fraud statute indicate that its focus is not the fraud itself but the abuse of the instrumentality in furtherance of a fraud. See United States v. Gordon, 875 F.3d 26, 37 (1st Cir. 2017) ("[I]n enacting the mail and wire fraud statutes, Congress took aim at the means of conducting a substantive offense, not at the substantive offense itself."); see also Pasquantino v. United States, 544 U.S. 349, 358 (2005) ("[T]he wire fraud statute punishes fraudulent use of domestic wires."); Bascuñán v. Elsaca, 927 F.3d 108, 122 (2d Cir. 2019) (analyzing the elements of § 1343 and finding that "the regulated conduct is not merely a 'scheme to defraud,' but more precisely the use of the mail or wires in furtherance of a scheme to defraud" (emphasis omitted)); United States v. Driver, 692 F. App'x 448, 449 (9th Cir. 2017) (rejecting argument that the scheme to defraud is the focus of the wire fraud statute because "[t]he focus of [the mail and wire fraud statutes] is upon the misuse of the instrumentality of communication" (quoting United States v. Garlick, 240 F.3d 789, 792 (9th Cir. 2001))).

A statute is applied domestically "[i]f domestic conduct satisfies every essential element to prove a violation . . . even if some further conduct contributing to the violation occurred outside the United States." European Cmty., 764 F.3d at 142; see also RJR Nabisco, 136 S. Ct. at 2101 ("If the conduct relevant to the statute's focus occurred in the United States, then the case

-52-

involves a permissible domestic application even if other conduct occurred abroad.").

This framework is easily met in this case. The district court instructed the jury that it could only convict McLellan if a "wire communication" was sent by him or was caused to have been sent by him. The district court defined "wire communication" to include only "a telephone communication or email from one state to another or between the United States and another country." It finally instructed the jury that the wire communication need not be "essential to the scheme" but "must have been made for the purpose of carrying out the scheme."

While McLellan argues that he could have been convicted for one stray domestic wire, this glosses over the indictment and the district court's instructions. The § 1343 counts pinpointed two specific email communications between McLellan and Pennings. The first was an April 5, 2011 email from Pennings to McLellan that noted plans to "increase the spread" on NTMA trades. The second was a June 22, 2011 email, which told Pennings to inform Royal Mail that "inadvertent commissions" were applied in the United States.

Given the instructions, the jury was required to find (1) that the emails were sent or caused to be sent to, from, or within the United States, (2) with the intent to defraud, and (3) that the emails were for the purpose of carrying out the scheme to

-53-

defraud.    A   jury,   then,   could   only   convict   McLellan   if   it

determined McLellan sent or caused another to send a domestic wire

that   met   each   of   these   requirements.    In   doing   so,   the   jury   in

effect   would   be   concluding   that   McLellan   abused   a   domestic

instrumentality   while   in   the   United   States.    Therefore,   the

instructions   as   presented   sufficiently   ensured   a   domestic

application   of   the   wire   fraud   statute.    See   Baird,   712   F.3d   at

628. This conclusion disposes of McLellan's claim that the district

court   erred   in   refusing   to   apply   a   domestic   application

instruction.    To   prevail   on   this   claim,   he   needed   to   present

evidence sufficient to show that the proffered instruction was

"not   substantially   covered   by   the   charge   as   rendered."    Id.    He

falters   on   this   prong   because   the   instruction   he   desired   was

substantially covered by the one given by the court.

        As we deal with an instance where a domestic defendant

sent or received communications on behalf of a domestic corporation

through domestic wires in a scheme that was in part implemented

domestically, we need not at this stage determine where the precise

line   is   between   domestic   and   foreign   activity   "because   wherever

that line should be drawn, the conduct alleged here clearly states

a domestic cause of action."    European Cmty., 764 F.3d at 142.[7]

_____

[7]   In a case where a foreign defendant is alleged to have committed
wire fraud against a foreign victim, and the use of domestic wires
was merely "incidental" to the overall scheme, additional inquiry
may be necessary to ensure a domestic application of the statute.

-54-

However, we make clear what is implied in the Second Circuit decisions.  Where a defendant is charged with wire fraud based on having sent or received wire communications while in the United States for the purpose of carrying out a scheme to defraud, the wire fraud statute has been applied domestically even if the victim is located outside of the United States.  See European Cmty., 764 F.3d at 139 (rejecting conclusion that the presumption against extraterritoriality "insulat[es] purely domestic conduct from liability simply because the defendant has acted in concert with a foreign enterprise"); see also Elbaz, 332 F. Supp. 3d at 974 ("[I]t does not matter if the bulk of the scheme to defraud involves foreign activity[] [b]ecause the focus of the wire fraud statute is misuse of U.S. wires to further a fraudulent scheme.").  That the fraud is ultimately conducted through foreign wires does not mitigate this finding; the jury was required to find that McLellan's use of domestic wires was in furtherance of the fraud against the foreign victim.  See Pasquantino, 544 U.S. at 371

---

Bascuñán, 927 F.3d at 122 (establishing two part framework that finds "wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of mail or wires was a core component of the scheme to defraud"); see also United States v. Elbaz, 332 F. Supp. 3d 960, 974 (D. Md. 2018) (noting difference in a "scenario in which a fraud scheme [is] perpetrated by foreigners against other foreigners, with no U.S. nexus other than the incidental use of U.S. wires, is nevertheless charged as a domestic offense").  This, however, is not the case presented to us today.

(finding domestic application where domestic wires were used to organize a scheme to defraud a foreign sovereign in that foreign sovereign's territory).  It is McLellan's domestic conduct through domestic wires that spurred his prosecution.  See id.

Not only was the instruction in effect tailored to require a domestic application, the evidence was more than sufficient to find a domestic application.  On the large scale, the jury heard substantial evidence that McLellan directed the scheme from the United States, dictated the commissions to be applied to U.S.-based trades through email and phone calls, and used email and phone calls to shape the response to Royal Mail's discovery of the scheme.  On the smaller scale, the April 5th email was an approval of a scheme to increase, without NTMA's consent, commissions applied on security trades in the United States.  The June 22nd email was sent by McLellan to direct the coverup of the scheme.  As the given instructions required the jury to find all the elements for a domestic application and the evidence was sufficient to support that conclusion, we find that the district court did not err in declining to provide McLellan's proposed instruction.

## V.  Mutual Legal Assistance Treaties

Finally, McLellan asserts that the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment demand that courts have the authority to order the

government to exercise its MLAT powers to request evidence from foreign countries. He therefore argues that the district court erred by declining to compel the government to pursue the evidence and testimony he sought through the MLAT process when its letters rogatory proved ineffectual. Because the district court does not possess the power to order the government to lodge requests under MLATs, we disagree and find no reversible error.[8]

We review the district court's determination that it lacked the power to order the government to make an MLAT request de novo because it "turn[s] on an interpretation of law." Obiora, 910 F.3d at 560. The district court determined that it lacked the authority "to compel the government to exercise its rights under any of the relevant MLATs on behalf of, or for the benefit of, a private person." First, to support its ruling, it quoted our decision in United States v. McIntyre (In re Price), 685 F.3d 1, 11 (1st Cir. 2012) (internal quotation marks omitted) (hereinafter "Price I") for the proposition that "treaties do not generally

---

[8] Alternatively, McLellan argues that the district court erred in not excluding the government's evidence obtained from foreign clients. As his claim is reviewed for an abuse of discretion, United States v. Obiora, 910 F.3d 555, 560 (1st Cir. 2018), and the evidence the government sought to introduce was probative and equally available to McLellan, we see no grounds to find that the district court abused its discretion in not excluding this evidence. See United States v. Sensi, 879 F.2d 888, 899 (D.C. Cir. 1989) ("[A] defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution.").

-57-

create rights that are privately enforceable in the federal courts." Second, it referenced United States v. Rosen, 240 F.R.D. 204, 214-15 (E.D. Va. 2007), which "not[ed] that no court has held that a defendant's compulsory process rights are violated when the executive branch declines to exercise a treaty power to compel testimony of a non-American in another country." McLellan challenges both rationales.

Our opinion in Price I is the lodestar for the MLAT origin story and the appropriate law to apply when private individuals seek MLAT relief. As the district court noted, "treaties do not generally create rights that are privately enforceable in the federal courts." United States v. Li, 206 F.3d 56, 60 (1st Cir. 2000) (en banc).[9] The U.S.-U.K. MLAT is no exception because it "expressly disclaims the existence of any private rights." Price I, 685 F.3d at 13. Article 1, paragraph 3 of the U.S.-U.K. MLAT provides the textual hook for this conclusion. Id. at 12-13. It states, in full: "This treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on

---

[9] This comports with the "background presumption" that "[i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." Medellín v. Texas, 552 U.S. 491, 506 n.3 (2008) (alteration in original) (quoting Restatement (Third) of Foreign Relations Law of the United States § 907 cmt. a, at 395 (1986)).

the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request." U.S.-U.K. MLAT, art. 1, ¶ 3. In relevant part, the U.S.-Ireland MLAT is a carbon copy. See U.S.-Ireland MLAT, art. 1, ¶ 4.

However, we recognize that McLellan seeks relief under the Constitution and only indirectly invokes the MLATs. By asking the district court for an order to compel the government to exercise its treaty powers to request potentially favorable evidence to his case from foreign countries, McLellan seeks to protect his due process rights rather than "to vindicate a private treaty right."[10] It is well-settled law that "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." Boos v. Barry, 485 U.S. 312, 324 (1988) (quoting Reid v. Covert, 354 U.S. 1, 16 (1957) (plurality opinion)). As the Ninth Circuit has noted, those restraints certainly include "the separation of powers and the guarantee of due process." In re Premises Located at 840 140th Ave. NE, Bellevue, Wash., 634 F.3d 557, 571-72 (9th Cir. 2011) (citing Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 416 n.9 (2003) (holding that treaties are

---

[10] Along those lines, McLellan contends that even if the MLATs preclude private rights of action, "they do not preclude the ability of courts to order the government to seek evidence in the interests of ensuring defendants a fair trial." By his reading, the language of the MLATs is "broad enough to encompass requests made by the government on behalf of criminal defendants."

-59-

"[s]ubject . . . to the Constitution's guarantees of individual rights")). McLellan submits that because MLATs create an "evidence-gathering imbalance" in criminal cases where the charges include conduct occurring abroad, the related guarantees of the Due Process Clause of the Fifth Amendment and the Compulsory Process Clause of the Sixth Amendment empower the courts to safeguard these rights to restore the evidentiary balance, notwithstanding the absence of private rights of action in the MLATs.

As McLellan notes, we have held that district courts possess the authority to quash a subpoena issued by the government pursuant to a U.S.-U.K. MLAT request. United States v. Trs. of Bos. Coll. (In re Price), 718 F.3d 13, 23 (1st Cir. 2013) (hereinafter "Price II"). Our reasoning was based on the observation that "[n]othing in the text of the U.S.-U.K. MLAT, or its legislative history . . . lead[s] us to conclude that the courts of the United States have been divested of an inherent judicial role that is basic to our function as judges." Id.[11] Relying on Price II, McLellan contends that if separation of powers

---

[11] Additionally, he cites to the Ninth Circuit case quoted in Price II rejecting the government's assertion of sole discretion in MLAT affairs because it "suggests that by ratifying an MLAT, the legislative branch could compel the judicial branch to reach a particular result . . . in particular cases, notwithstanding any concerns, such as violations of individual rights, that a federal court may have." In re 840 140th Ave. NE, 634 F.3d at 572.

justifies a trial court's retention of power to quash MLAT
subpoenas issued by the U.S. government that potentially infringe
on First Amendment protections, then it must also dictate that
courts have the power to "ensure the defendant's right to a
fundamentally fair trial" by "ordering the government to exercise
its undoubted right to obtain the evidence." For the following
reasons, we disagree.

First, our line of cases involving MLAT subpoenas is
readily distinguishable from the predicament that McLellan faces.
In Price I and Price II, the Executive Branch exercised its
diplomatic discretion to comply with the United Kingdom's MLAT
request for information related to an ongoing investigation into
a casualty from the conflict in Northern Ireland. See Price II,
718 F.3d at 16-17. Accordingly, the U.S. government issued two
subpoenas through an appointed commissioner, see 18 U.S.C. § 3512,
to compel Boston College ("BC") to produce interviews from formerly
active participants in the conflict that were compiled by one of
BC's research projects. Price II, 718 F.3d at 16. The central
holding of Price II was that the district court had abused its
discretion by compelling BC to produce interviews that exceeded
the scope of the original subpoena, thus implicating First
Amendment concerns. Id. at 17. In Price I, we determined that
the treaties precluded private rights of action, and we therefore
denied foreign citizens' motions to intervene in BC's motion to

-61-

quash. 685 F.3d at 3, 13. Additionally, we held that § 701(a)(1) of the Administrative Procedure Act ("APA") barred jurisdiction over the prospective plaintiff's APA claim because the U.S.-U.K. MLAT "by its express language precludes judicial review." Id. at 13. These cases constitute the inverse of McLellan's situation.

Since the U.S. government has not exercised its discretion to pursue evidence through the relevant MLATs, McLellan effectively urges the Court to find that the MLATs have expanded the role of the judiciary to include the ability to compel the government to seek the type of evidence he requests. Separation of powers surely cannot be stretched so far in this direction as to provide an avenue for a district court to compel a co-equal branch to take certain action on behalf of a private individual without textual or statutory direction.[12] Quite the opposite of Price II, here, it would offend separation of powers principles to permit the Judiciary to "impair" the Executive "in the performance

---

[12] This is consistent with the view taken by the Department of Justice at a hearing before the Senate Foreign Relations Committee: "While a U.S. court would be able to ask the prosecution to make a request under the treaty (i.e., to adopt a request as its own), the court would lack the power or authority to compel the Government to make a request for the benefit of the defense over the objection of the prosecution." Consular Conventions, Extradition Treaties, and Treaties Relating to Mutual Legal Assistance in Criminal Matters (MLATs): Hearing Before the S. Comm. on Foreign Relations, 102d Cong. 40 (1992) (statement of Robert Mueller III, Assistant Att'y Gen., Criminal Div., Dep't of Justice).

of its constitutional duties." Price II, 718 F.3d at 22 (quoting Clinton v. Jones, 520 U.S. 681, 701 (1997)).  The Constitution may protect individuals in the United States from subpoenas to comply with foreign MLAT requests, but it generally does not vest criminal defendants with the power to compel the government to lodge diplomatic requests on their behalf.   See United States v. Sedaghaty, 728 F.3d 885, 917 (9th Cir. 2013) ("[T]he district court had no authority to order the Executive Branch to invoke the treaty process to obtain evidence abroad for a private citizen.").[13] A contrary finding could potentially open U.S. foreign affairs to the far-flung theories of criminal defendants and risk delay of

---

[13]  Despite our search, we could find no decision contrary to this proposition.  United States v. Schneider, No. 17-935, 2019 WL 4242637, at *17 (E.D. Pa. Sept. 6, 2019) (rejecting the defendant's argument that the government's use of an MLAT with Russia deprived him of his "rights to a fair trial, due process and compulsory process"); Escalante v. Lizarraga, No. ED CV 17-850-R (SHK), 2018 WL 2938520, at *7-9 (C.D. Cal. Apr. 16, 2018) ("[A] criminal defendant has no rights under the [MLAT between the U.S. and Mexico] to obtain evidence."); United States v. León, No. 09 CR 383-16, 2018 WL 1832878, at *4 (N.D. Ill. Apr. 16, 2018) ("[T]his Court has 'no authority to order the Executive Branch to invoke the treaty process to obtain evidence abroad for a private citizen.'" (quoting Sedaghaty, 728 F.3d at 911-917)); United States v. Márquez, No. 10CR3044 WQH, 2012 WL 349580, at *4 (S.D. Cal. Feb. 2, 2012) ("[T]he Sixth Amendment right to compulsory process . . . does not require an order compelling the Government to use the MLAT to obtain evidence on behalf of the Defendant."); United States v. Jefferson, 594 F. Supp. 2d 655, 674-75 (E.D. Va. 2009) ("It is . . . 'quite clear that the right to compulsory process extends only to forms of process a court can issue of its own power, not to forms of process that require the cooperation of the Executive Branch or foreign courts.'" (quoting Rosen, 240 F.R.D. at 214)).

trial as other countries respond to those requests.  Id. (noting distinctions between immunity context and international treaties).[14]

        Second, despite McLellan's protestations, our holding in United States v. Theresius Filippi, 918 F.2d 244 (1st Cir. 1990), does not dictate otherwise.  The Sixth Amendment encompasses a criminal defendant's right "to have compulsory process for obtaining witnesses in his favor."  U.S. Const. amend. VI.  This includes "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary."  United States v. Acevedo-Hernández, 898 F.3d 150, 169 (1st Cir. 2018) (quoting Washington v. Texas, 388 U.S. 14, 18-19 (1967)).  This right, however, is not absolute.  See United States v. Resurrección, 978 F.2d 759, 762 (1st Cir. 1992) ("The Constitution does not automatically entitle a criminal defendant to unobtainable testimony.").  "There can be no violation of the defense's right to present evidence . . . unless some contested act or omission (1) can be attributed to the sovereign and (2) causes the loss or erosion of testimony which is both (3) material to the

_____

[14]  This is certainly not a case where there was a "stacked deck" against McLellan.  See Sedaghaty, 728 F.3d at 916.  McLellan concedes that he was able to receive some measure of documents from the relevant clients.  This is, therefore, not a case where the government possesses evidence, or has easy access to evidence, that a criminal defendant lacks.  Instead, "both sides faced obstacles in obtaining evidence from abroad."  See id.

case and (4) favorable to the accused." United States v. Hoffman,
832 F.2d 1299, 1303 (1st Cir. 1987); see also Theresius Filippi,
918 F.2d at 247.

Theresius Filippi featured a criminal defendant facing
drug trafficking charges who was unable to secure the presence of
a key corroborating witness located in Ecuador due to government
inaction.  918 F.2d at 245-46.  Since the district court judge
determined that the witness was material and that his testimony
would have been favorable to the defense, our analysis concerned
the attributability and causation prongs of the Hoffman test.  Id.
at 247.  We recognized that "the right of compulsory process does
not ordinarily extend beyond the boundaries of the United States."
Id.  However, we determined that the government's subpoena power
abroad was not at issue because the witness was willing -- and
indeed intended -- to testify at trial but for his inability to
"overcome the immigration hurdles blocking his entry into the
United States."  Id.  In our view, the "onus" was therefore on the
government "merely to make it possible" for the witness to attend
trial "by requesting a Special Interest Parole from the
[Immigration and Naturalization Service]."  Id.  Although we
ultimately affirmed the conviction because the defendant waived
his compulsory process rights by "proceed[ing] at trial without
his witness," id. at 246, we also found that the U.S. Attorney's
"deliberate omission to act, where action was required" directly

caused the defense to lose its only material witness, which rose to the level of impermissible interference with his Fifth and Sixth Amendment rights. Id. at 247.

McLellan's case is readily distinguishable on the causation and favorability prongs of the Hoffman test. First, McLellan has not established that the U.S. government actually or proximately caused the absence of the evidence he seeks. The omission in this case is the government's discretionary decision not to initiate MLAT requests for evidence on McLellan's behalf when the letters rogatory failed to achieve the desired result. However, while the government may request evidence through the MLAT process, it cannot guarantee compliance. See United States v. Mejía, 448 F.3d 436, 444 (D.C. Cir. 2006) ("Having the authority 'to seek' tapes or transcripts through a treaty is not the same thing as having 'the power to secure' them."); United Kingdom v. United States, 238 F.3d 1312, 1317 n.5 (11th Cir. 2001) ("[C]ompliance with an MLAT request is not mandatory with respect to records held by governmental agencies."). The Judicial Authority of Ireland's reply to the district court's letters rogatory statement that it understands the U.S.-Ireland MLAT to be the appropriate avenue for requesting evidence refers to a protocol, but it does not promise results.

McLellan's claim also stumbles on the favorability element. Although the district court acknowledged that the

-66-

evidence McLellan sought was material to his case (specifically to the materiality component of securities fraud), McLellan failed to provide a plausible showing that the evidence would be favorable to his defense. See Hoffman, 832 F.2d at 1303 ("There must be a plausible showing that the testimony was both material and favorable to the defense."). McLellan sought information from Ireland-based Eircom and NTMA pertaining to (1) internal communications related to the firms understanding of the offer from State Street, (2) communications regarding the fees, (3) competing bids, and (4) communications related to overcharges. While McLellan argues strenuously that the evidence was necessary to cross-examine witnesses on the securities fraud counts, he presented no plausible basis for the district court to determine that the evidence in the possession of those firms contained information that could have led to an acquittal, and he concedes that he does not know the contents of the documents that he seeks. See id.[15] His arguments only demonstrate that the evidence was

---

[15] In an analogous case, the Supreme Court held that the government was not required to halt a deportation of a potentially material and possibly favorable witness, where the criminal defendant made no showing that the testimony the witness would have given would have been favorable. United States v. Valenzuela-Bernal, 458 U.S. 858, 870-71 (1982). While the Court recognized that it would be difficult for an accused defendant to determine if testimony from the witness would be material and favorable at trial, and relaxing the requirements might be justified in those instances, it determined that such difficulty does not "afford[] the basis for wholly dispensing with such a showing." Id. at 870.

-67-

material, but he has not demonstrated that the evidence would have been favorable.  A showing of materiality, alone, is insufficient to show favorability.  Id.; see also United States v. Combs, 555 F.3d 60, 63-64 (1st Cir. 2009) (rejecting criminal defendant's claim that "it [was] impossible to know how [the witness] might have testified absent [the government's] conduct" as insufficient to establish favorability).

We conclude, therefore, that the district court does not have the authority to compel the government to issue MLAT requests. Nor is the "onus" on the government in this case to "make it possible" for the defendant to obtain, via an MLAT request, evidence that he cannot establish is favorable to his case. Theresius Filippi, 918 F.2d at 247.  Thus, we find no reversible error.  However, we believe it important to note that we do not disagree that the text of the MLATs at issue do not explicitly preclude the government from using its discretion to lodge requests on behalf of criminal defendants.  Prosecutors have a duty to "act in accordance with the obligations imposed on [them] as . . . agent[s] of justice," id. at 246, and where practicable, deploying the government's MLAT capabilities in such a manner would be a just way of fulfilling those obligations.[16]  However, where,

---

[16]   In the rare event that a court does make a request for information under an MLAT, the Department of Justice takes the position that "[a] decision would be made on a case-by-case basis," and even if "the prosecutor is not persuaded that evidence abroad

as here, a criminal defendant makes no plausible showing that the government could have secured evidence that is both material and favorable to his defense, we have little difficulty concluding that the prosecutors did not violate this duty.

## VI.  **Conclusion**

Accordingly, we affirm McLellan's convictions on all counts.

**Affirmed**.

_____

really exists or is needed, he or she may well ask the Department to make the request anyway, in order to alleviate any questions or concern the court may have on the matter."  102d Cong. 41 (1992).